**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN BRENT, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CARVANA CO., ERNEST GARCIA III, and MARK JENKINS,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff John Brent ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Carvana Co. ("Carvana" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Carvana securities between May 6, 2020 and June 24, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. The Company also maintains an inspection and reconditioning center, a hub, a used dealer license, and a sales finance license in New Jersey.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Carvana securities during the Class Period and was economically damaged thereby.

7.     Defendant Carvana, purports to be, along with its subsidiaries, an e-commerce platform for buying and selling used cars in the United States.

8.     The Company is incorporated in Delaware and its head office is located at 1930 W. Rio Salado Parkway, Tempe, Arizona 85281. Carvana's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CVNA".

9.     Defendant Ernest Garcia III ("Garcia") is the founder of the Company and has served as the Chief Executive Officer, President, and Chairman of the Company since 2012.

10.     Defendant Mark Jenkins ("Jenkins") has served as the Company's Chief Financial Officer since 2014.

11.     Defendants Garcia and Jenkins are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)  was directly involved in the day-to-day operations of the Company at the highest levels;

(c)  was privy to confidential proprietary information concerning the Company and its business and operations;

(d)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)  approved or ratified these statements in violation of the federal securities laws.

13.  The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

16.    On May 6, 2020, the Company filed with the SEC its quarterly report for the period ended March 31, 2020 (the "1Q20 Report") signed by Defendant Jenkins. Attached to the 1Q20 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

17.    The 1Q20 Report stated the following, in pertinent part, regarding Carvana further penetrating existing markets without even noting Carvana's current and ongoing issues with documentation, registration, title, and with governmental authorities:

> **Markets and Population Coverage**
> ***Our growth in retail units sold is driven by increased penetration in our existing markets*** and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana

employee in a branded delivery truck.

*    *    *

**We expect to launch many small markets near our existing infrastructure soon.**

*    *    *

**Revenue and Gross Profit**
**Our increased penetration in existing markets** and expansion into new markets has led to growth in retail units sold. …

Our largest source of revenue, used vehicle sales, totaled $964.3 million and $683.8 million during the three months ended March 31, 2020 and 2019, respectively. **As we increase penetration in existing markets** and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

*    *    *

**During our growth phase, our highest priority will continue to be providing exceptional customer experiences**, increasing our brand awareness and building **an infrastructure to support growth in retail units sold**. …

(Emphasis added.)

18.    On February 25, 2021, the Company filed with the SEC its annual report for the year ended December 31, 2020 (the "2020 Annual Report") signed by Defendant Garcia. Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.    The 2020 Annual Report stated the following, in pertinent part, regarding registration and title as well as Carvana further penetrating existing

7

markets without even noting Carvana's current and ongoing issues with documentation, registration, title, and with governmental authorities:

### Our Growth Strategies

The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and GAP waiver coverage, as well as trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

***Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service.*** Since launching Carvana eight years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2020. ***We plan to continue growing our vehicle unit sales, market penetration***, number of markets, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

***Increase Sales Through Further Penetration of Our Existing Markets***

We believe that our markets are at an early stage of growth when measured by market penetration. ***Our growth continues to be driven by further market penetration in our existing markets.*** For the year ended December 31, 2020, our markets opened in 2013 through 2019 grew by 35%, despite the impacts of COVID-19. We plan to continue marketing and actively building our brand image and awareness in existing markets by improving our operations, opening additional vending machines, and increasing our inventory size.

*     *     *

**Markets and Population Coverage**

***Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets.*** We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising.

*     *     *

**Revenue and Gross Profit**

***Our increased penetration in existing markets and expansion into new markets has led to growth in retail unit sales.***

*     *     *

Our largest source of revenue, used vehicle sales, totaled $4.7 billion, $3.4 billion, and $1.8 billion during the years ended December 31, 2020, 2019, and 2018, respectively. ***As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold.***

*     *     *

We sell used vehicles directly to our customers through our website. The price of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. We satisfy our performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. We recognize revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Our return policy allows customers to initiate a return during the first seven days after delivery. … Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

*     *     *

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. The prices of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at

9

the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. … Prior to the delivery of the vehicle, the payment is received or financing has been arranged. … Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

(Emphasis added.)

20.     The 2020 Annual Report vaguely and briefly described the following risks, without revealing the true extent of its issues with documentation, registration, title, and with governmental authorities:

> *Our failure to maintain a reputation of integrity and to otherwise maintain and enhance our customer service quality and brand could adversely affect our business, sales, and results of operations.* **Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying and selling that will save them time and money.** Accordingly, our ability to consistently deliver a high quality experience and our reputation as a company of integrity are critical to our success. **If we fail to maintain the high standards on which our reputation is built**, *or if an actual*, or alleged failure of these standards occurs that damages this reputation, **it could adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations**. **Even the perception of a decrease in the quality of our customer service or brand could impact results.** Our high rate of growth, the operationally intensive aspect of our offering, and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, submitting title and registration paperwork to state entities) makes maintaining the quality of our customer experience a particularly difficult challenge.
>
> Irrespective of their validity, complaints or negative publicity—about our business practices, our marketing, and advertising campaigns, our compliance with applicable laws and regulations, the integrity of the

data that we provide to users, our cybersecurity measures and privacy practices and other aspects of our business—***could*** diminish customer confidence in our platform and adversely affect our brand. …

\*     \*     \*

*We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.*

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers. …

(Emphasis added.)

21.    On February 24, 2022, the Company filed with the SEC its annual report for the year ended December 31, 2021 (the "2021 Annual Report") signed by Defendant Garcia. Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.    The 2021 Annual Report stated the following, in pertinent part, regarding Carvana further penetrating existing markets without even noting

Carvana's current and ongoing issues with documentation, registration, title, and with governmental authorities:

## Our Growth Strategies

***The foundation of our business is retail vehicle unit sales.*** This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and GAP waiver coverage, as well as trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

***Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service.*** Since launching Carvana nine years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2021. ***We plan to continue growing our vehicle unit sales, market penetration, number of markets***, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

*Increase Sales Through Further Penetration of Our Existing Markets*

We believe that our markets are at an early stage of growth when measured by market penetration. ***Our growth continues to be driven by further market penetration in our existing markets.*** For the year ended December 31, 2021, our markets opened in 2013 through 2020 grew by 74%, despite the impacts of COVID-19. …

\*    \*    \*

## Customer Lifecycle

*Search and Discovery.* …
*Virtual Tour.* …
*Seamless Transaction Technology.* …

12

• *Documentation and payment.* To further improve the ease of financing, complementary products, and trade-ins, we have developed a seamless, ***fully integrated online documentation process***. We have established partnerships with several technology providers that allow for automated down payment, income verification, and payment processing through simple, easy to use tools, ***such as the ability to take pictures of required documents with a smartphone***.

*     *     *

### Markets and Population Coverage

***Our growth in retail units sold is driven by increased penetration in our existing markets*** and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck.

*     *     *

### Revenue and Gross Profit

***Our increased penetration in existing markets*** and expansion into new markets has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $9.9 billion, $4.7 billion, and $3.4 billion during the years ended December 31, 2021, 2020, and 2019, respectively. ***As we increase penetration in existing markets*** and expand to new ones, we expect used vehicle sales to increase along with retail units sold.

*     *     *

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. The prices of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. …

13

Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

(Emphasis added.)

23.     The 2021 Annual Report vaguely and briefly described the following risks, without revealing the true extent of its issues with documentation, registration, title, and with governmental authorities:

> *Our failure to maintain a reputation of integrity and to otherwise maintain and enhance our customer service quality and brand could adversely affect our business, sales, and results of operations.*
> ***Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying and selling that will save them time and money.*** Accordingly, our ability to consistently deliver a high quality experience and our reputation as a company of integrity are critical to our success. ***If we fail to maintain the high standards on which our reputation is built, or if an actual***, or alleged ***failure*** of these standards occurs that damages this reputation, it ***could*** adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations. Even the perception of a decrease in the quality of our customer service or brand could impact results. Our high rate of growth, the operationally intensive aspect of our offering, and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, submitting title and registration paperwork to state entities) makes maintaining the quality of our customer experience a particularly difficult challenge.
>
> Irrespective of their validity, complaints or negative publicity—about our business practices, our marketing, and advertising campaigns, our compliance with applicable laws and regulations, the integrity of the data that we provide to users, our cybersecurity measures and privacy practices and other aspects of our business—***could*** diminish customer confidence in our platform and adversely affect our brand. …
>
> \*     \*     \*

14

*We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.*

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers. …

(Emphasis added.)

24.     The statements contained in ¶¶ 16-23 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Carvana faced serious, ongoing issues with documentation, registration, and title with many of its vehicles; (2) as a result, Carvana was issuing unusually frequent temporary plates; (3) as a result of the foregoing, Carvana was violating laws and regulations in many existing markets; (4) as a result of the foregoing, Carvana risked its ability to continue business and/or expand its business in existing markets; (5) as a result

of the foregoing, Carvana was at an increased risk of governmental investigation and action; (6) Carvana was in discussion with state and local authorities regarding the above-stated business tactics and issues; (7) Carvana was facing imminent and ongoing regulatory actions including license suspensions, business cessation, and probation in several states and counties including in Arizona, Illinois, Pennsylvania, Michigan, and North Carolina; and (8) as a result, Defendants' statements about Carvana's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

25.    On June 24, 2022, after market hours, *Barron's* published an article entitled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars[,]" which detailed several issues with Carvana.

26.    The *Barron's* article stated the following regarding Carvana's issues with registration and title:

> But as the economy has reopened, Carvana's efforts to resume its torrid pandemic-era sales pace have been complicated by an inconvenient side effect of the growth: ***In its haste to seize market share from competitors, Carvana was selling cars faster than it could get them registered to their new owners.***
>
> \*        \*        \*
>
> Barron's interviews with Carvana customers and former employees shed light on why registrations were delayed and how state regulators have tried to address the issue. The reporting reveals a company scrambling to address the problem, ***at one point forming an ad hoc unit known as the "undriveable-car task force."***

Carvana says many of the delays involved internal paperwork problems, including errors on title documents, missing documents from buyers, and slow work by third-party registration services and state motor vehicle agencies.

***In other instances, though, including Burton's, Carvana sold cars before it had title to the vehicles, an action that is illegal in many states where the company does business.***

[Image omitted.]

"Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says. "In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states."

Interviews with state officials and former Carvana employees show the issue is wider-reaching than the company suggests.

\*     \*     \*

***And state regulators across the U.S. have been subjecting the company to suspensions or increased oversight over registration delays and its practice of issuing multiple temporary license plates from states where it has dealer's licenses, instead of promptly providing permanent ones.***

\*     \*     \*

Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021. "We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward," it says.

\*     \*     \*

Shortly after Carvana opened its 28th vending machine tower in early 2021 near the Las Vegas Strip—there now are 33—JD Decker, the Nevada Department of Motor Vehicles' chief lawman, was patrolling the desert metropolis when he stopped a car for driving with an expired temporary license plate from North Carolina.

***The driver told Decker he'd been getting one temporary license plate after another from Carvana, and was waiting for the next one. He***

*showed Decker a stack of expired temporary plates from around the country he'd burned through.*

"He probably had about 10 different states represented," Decker says. "He had the car for about a year and there was a problem with the title, so they just kept sending him temp tags from all over."

*Former Carvana employees say this was standard procedure by then: The company had started encountering delays in getting vehicles registered to its buyers, so it would use its dealer licenses across the country to issue temporary plates from multiple states to customers.*

"You might end up with a Tennessee temporary plate for 45 days, then an Ohio temporary plate for another 30 to 45 days," says a former senior member of the department at Carvana's Tempe headquarters that responds to the most serious customer complaints, known as the executive resolution team.

"Customers would end up getting sometimes four to six different temporary plates from multiple states," says the former staffer, who was laid off by the company after almost two years in April following a dispute over workplace accommodations for a disability. He asked not to be identified, citing ongoing litigation with the company over his dismissal.

Some of the sanctions levied by states in recent months cite the improper furnishing of temporary out-of-state plates. Carvana says it has "had a number of productive and helpful conversations with regulators across the country" on the topic of out-of-state plates and is "very confident in our processes going forward."

*By early 2021, Carvana was staffing up to deal with title issues. That's when Thomas Hollingsworth joined what he was told was a newly formed titles department at the Tempe headquarters tasked with solving issues that were keeping cars from getting registered to their new owners.*

Until he left the department for another role at Carvana that August, Hollingsworth—who has also since left the company—spent his days

on the phone with banks, state motor vehicle departments, and former owners working to fix paperwork snags.

"I would come in at 7 a.m. and I would leave around 2:30 p.m., and the whole day was basically running through these titles," he says.

***During a period of heavy hiring that fall, Carvana established a new category of staffers called "paperwork specialists" to better manage the documents that flowed in and out of the company with the cars it bought and sold, says a former member of the auto dealer's recruiting team.***

The paperwork specialists were entry-level workers making $15 an hour who were sent out in the field after two weeks of rudimentary instruction, says the former recruiter, whose job was among those lost in the May layoffs and who asked not to be identified for fear of reprisal.

Carvana says it strongly disagrees with the recruiter's characterizations on pay and training. "As a growing business with a novel model, we constantly create new roles and adjust existing ones," the company says. "We've been fortunate to hire a number of great people in all roles."

***But Carvana's sense of urgency surrounding the title-transfer issues may be most apparent in its formation of the undriveable-car task force in May.***

Samantha Berger, another former member of the executive resolution team, says three of her colleagues were pulled aside for specialized vehicle-registration training early that month and given a "giant spreadsheet" of cars.

***The cars were ones that Carvana had been keeping on the road with temporary plates that were now expiring, leaving them to languish, undriveable and parked outside new owners' homes, says Berger, who wound up leaving the company days later, shortly before the layoffs.***

Asked about the undriveable-car task force, Carvana says that its "internal teams have done an incredible job solving unprecedented business process challenges associated with a global pandemic in real-time."

From his perch in Carvana's titles department, Hollingsworth says he was able to see where the company's process went wrong: Sometimes cars got sold off its lots around the country before document handlers in Tempe had time to finish getting the cars' titles transferred to Carvana.

No states are known to have sanctioned Carvana over *the practice of selling vehicles without holding title, but in multiple states where Carvana does business—including Texas, Pennsylvania, Michigan, and Illinois—regulators say it's illegal in most cases to do so.*

While some traditional used-car dealers concede it isn't unheard of to sell vehicles before holding title, most do so only sparingly, and only if they're sure they'll obtain title quickly enough not to cause registration delays for their buyers, according to Jonathan Chariff, CEO of the South Motors auto group in Miami. Florida requires dealers to possess a vehicle's title, or some other evidence of ownership, before making a sale, a state motor vehicle department spokesman says.

Carvana says that "for a limited time period, Carvana offered a small percentage of cars for sale prior to receiving the paper certificate of title," but that "when viewed in totality, the cars for which the paper certificate of title hadn't arrived at time of sale were a very small percentage of Carvana's sales."

Furthermore, Carvana says it only sold cars without a title "in the states where such practice is permissible." *However, customers in states where it is illegal tell Barron's that they learned from Carvana that it sold them cars without holding the titles.*

Those customers include Burton, the Texas woman who bought the Volkswagen hatchback for her son.

Another Carvana customer, Melody Postoy of Glendale, Ariz., another state where the practice is barred, traded in her Lexus for a later model

in late December. About 2½ months later, the last of the temporary plates Carvana provided her expired, leaving her unable to drive the car, she says.

She spent hours on the phone with customer-service agents who offered constantly shifting excuses for why Carvana had been unable to get her registered as the vehicle's owner.

One agent attributed the problem to difficulties with title transfers across state lines. Postoy says this surprised her, since a vehicle history report she reviewed showed that the car had always been registered in Arizona.

[Image omitted.]

In April, when Carvana agreed to reclaim the vehicle for a refund, the agent Postoy spoke with to arrange pickup offered a different excuse. "They told me they were having issues getting ahold of the title," Postoy says.

When asked about such anecdotes in states where vehicles may not be sold without holding title, Carvana said it didn't want to discuss specifics of its legal analysis.

***Even in states where selling vehicles without title isn't prohibited, registration delays have caused problems for Carvana's customers.***

One potential plaintiff in the proposed class-action suit, a hospital lab assistant in North Carolina named William Stalls, bought a 2012 Hyundai Sonata from Carvana in January 2021. Over the next 12 months, Stalls was issued temporary plates from Georgia, Tennessee, Arkansas, and Arizona, the lawsuit alleges.

While driving with one of those plates, police pulled him over for speeding and found in a database that the car was still registered to a prior owner, according to the complaint.

"Despite Stalls showing the officer his sale paperwork and explaining he was waiting for permanent tags from Carvana, Stalls was arrested

and confined to jail for eight hours before posting bond," according to the suit.

An attempt to reach Stalls was unsuccessful. Attorney Robert Cocco, who filed the lawsuit, declined to comment on the case. Asked about the Stalls case, Carvana reiterated that the lawsuit had no merit.

*    *    *

Carvana was also facing scrutiny from state motor vehicle agencies over the company's failure to meet vehicle registration deadlines and the use of out-of-state permits by its customers.

***Early this year, Pennsylvania officials suspended the company's license to issue temporary permits at its two vending-machine towers in that state, in Philadelphia and near Pittsburgh, citing late document submittals, "improper issuance and verification of temporary Pennsylvania plates in other states," and other violations, Pennsylvania Department of Transportation spokesman Diego Sandino said in an email.***

The suspension at the Philadelphia location is active until August, Sandino says. The location near Pittsburgh is suspended for three months after it comes into compliance, which as of late May it hadn't yet done.

The Pennsylvania actions came in response to "temporary technical operational challenges that have since been corrected," Carvana says. "This does not impact our ability to sell cars in Pennsylvania." The company is still able to issue temporary license plates in the state through a third-party licenser, it says.

***Issues related to late title transfers and the use of out-of-state plates have also resulted in increased oversight in Illinois, where the company was forced to cease business entirely for about two weeks in May. A suspension in a North Carolina county ended in January, though the company remains on probation in another North Carolina county. Carvana's license is also on probation in Michigan over registration issues.***

"Carvana is confident in and proud of our current title and registration operations," the company says. "We have productive conversations

22

with regulators in every state where we operate and are very confident that our current operations are designed to meet state standards."

***Even Carvana's home state of Arizona has clamped down on the company's operations*** after officials there received more than 80 complaints about the company over a four-year period, says Arizona Department of Transportation, or ADOT, spokesman Bill Lamoreaux.

The complaints revolved around "such issues as missing, delayed, and altered title and registration documents, contract discrepancies, significant odometer discrepancies, and incomplete emissions at the time of sale," Lamoreaux says.

Carvana often used temporary license plates from Arizona, according to customers and former employees. The state allowed car dealers to issue temporary plates even for sales that occurred in other states, according to Lamoreaux. Last month, Arizona canceled that program after discussions with Carvana, he says.

Lamoreaux declined to provide further details, ***citing open investigations into Carvana's registration practices***.

"ADOT tries to accommodate businesses like Carvana with their unique online business model as best we can," Lamoreaux says. "But for consumer protection, we need to make sure that all car dealers operating in Arizona are following state laws."

(Emphasis added.)

27.    On this news, the Company's share price fell $6.78 per share, or 21%, over the next two trading days, to close at $24.74 per share on June 28, 2022, damaging investors.

28.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Carvana securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Carvana securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Carvana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Carvana securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

36.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
## For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
## Against All Defendants

38.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- • engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

42. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

facts in the statements made by them or other Carvana personnel to members of the investing public, including Plaintiff and the Class.

44.    As a result of the foregoing, the market price of Carvana securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Carvana securities during the Class Period in purchasing Carvana securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

45.    Had Plaintiff and the other members of the Class been aware that the market price of Carvana securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

46.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Carvana securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

48.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

50.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

51.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful

acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

52.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2022                    **THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*