ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (CA 200643) (*Pro Hac Vice* pending)
RACHEL A. COCALIS (CA 312376) (*Pro Hac Vice* pending)
SARAH A. FALLON (CA 345821) (*Pro Hac Vice* pending)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | No. CV-22-2126-PHX-MTL |
| This Document Relates To: | LEAD PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| All Actions. | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

                                                                                    **Page**

I.      INTRODUCTION ...................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................... 5

III.    PARTIES ................................................................................................. 5

        A.     Plaintiffs ....................................................................................... 5

        B.     Exchange Act Defendants ............................................................ 6

IV.     BACKGROUND ..................................................................................... 8

        A.     Title and Registration .................................................................. 8

        B.     Used Car Industry ........................................................................ 9

        C.     Carvana's Origins ...................................................................... 10

        D.     Garcia Senior's Control of Carvana ........................................... 13

        E.     Carvana's Key Financial Metrics ............................................... 15

        F.     Carvana's Analyst Day ............................................................... 17

V.      CONFIDENTIAL WITNESS ACCOUNTS ............................................ 19

VI.     DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF
        BUSINESS ............................................................................................ 41

        A.     Leading Up to the Class Period, Investors Questioned Carvana's
               Growth Story ............................................................................. 41

        B.     Defendants Engaged in a Fraudulent Scheme to Inflate Carvana's
               Retail Units Sold and Stock Price .............................................. 42

        C.     Defendants Concealed the Devastating Effects of Their Scheme ....... 51

               1.     Defendants Hid the Logistical Nightmare Created by Their
                      Scheme ............................................................................ 51

               2.     Defendants Hid that Carvana's Retail Growth Was Supported
                      by Unprofitable and Unsustainable Sales ......................... 55

               3.     Defendants Hid that Carvana's Title and Registration
                      "Practices" Created Additional Expenses and Would Lead to
                      Legal and Regulatory Backlash ......................................... 57

        D.     Defendants Dumped Their Holdings After Pumping Up Carvana's
               Stock Price................................................................................. 58

        E.     The Truth Is Revealed ................................................................ 59

Page

VII.   FINANCIAL, REGULATORY, AND LEGAL ACTIONS AGAINST
CARVANA SUPPORT PLAINTIFFS' CLAIMS.................................................. 61

VIII.  DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING
STATEMENTS AND OMISSIONS........................................................................ 66

A.   Defendants' False and Misleading Statements and Omissions for
Fiscal Year 2020............................................................................................. 66

B.   Defendants' False and Misleading Statements and Omissions for
Fiscal Year 2021............................................................................................. 91

C.   Defendants' False and Misleading Statements and Omissions for Q1
2022 and Q2 2022 ......................................................................................... 116

IX.    ADDITIONAL ALLEGATIONS OF SCIENTER .............................................. 136

A.   Insider Stock Sales Support a Motive to Commit Fraud ......................... 136

1.   Garcia Senior's Class Period Sales and Insider Trading .............. 136

2.   Jenkins's Class Period Sales and Insider Trading........................... 141

3.   Huston's Class Period Sales and Insider Trading .......................... 143

4.   Keeton's Class Period Sales and Insider Trading .......................... 145

B.   Defendants' 10b5-1 Plans Do Not Rebut a Strong Inference of
Scienter........................................................................................................... 147

C.   Multiple Confidential Witnesses Raised Quality, Indiscriminate
Growth, and Title Problems with Managers, Including Defendants
Garcia Junior, Jenkins, and Huston........................................................... 149

D.   Defendants Managed the Company's Operations and Had Access to
Confidential Information About the Alleged Fraud................................. 152

E.   Defendants Knew or Recklessly Disregarded that Carvana's Focus
on Growth Resulted in Unsustainable Costs............................................ 154

F.   Defendants Closely Monitored Markets, Pricing Trends, and
Customer Sentiment to Guide Inventory Decisions................................. 154

G.   Issues with Inventory, Title, and Registration Were Widely Known
and Discussed Throughout the Company During the Class Period.......... 156

H.   Defendants' Denials Throughout the Class Period Support an
Inference of Scienter .................................................................................... 158

I.   Defendants Stop Reporting Critical Metrics on May 6, 2021.................. 159

Page

1. Average Days to Sale ............................................................... 159
2. Buying Cars from Customers ................................................... 160

J. Defendants Garcia Junior's and Jenkins's SOX Certifications and Signing of SEC Filings Support Scienter .................................... 161

K. Corporate Scienter ........................................................................ 162

X. LOSS CAUSATION ............................................................................... 162

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD ON THE MARKET DOCTRINE .......................................... 167

XII. NO SAFE HARBOR ............................................................................. 168

XIII. CLASS ACTION ALLEGATIONS ....................................................... 168

XIV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............... 170

XV. SECURITIES ACT ALLEGATIONS ................................................... 206

A. Plaintiffs' Purchases in the 2022 Public Offering ...................... 206

B. Securities Act Defendants ........................................................... 206

C. Background of the 2022 Public Offering ..................................... 207

D. Materially False and Misleading Statements and Omissions in the Registration Statement ............................................................ 209

E. The Registration Statement Contained Deficient and Inaccurate Risk Disclosures ............................................................................ 217

F. The Role of the Underwriter Defendants in Connection with the 2022 Public Offering .................................................................... 218

XVI. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............... 219

PRAYER FOR RELIEF .................................................................................. 223

DEMAND FOR TRIAL BY JURY .............................................................. 224

Lead Plaintiffs United Association National Pension Fund ("UANPF") and Saskatchewan Healthcare Employees' Pension Plan ("SHEPP," and collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon investigation as to all other matters conducted by and through their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Carvana Co. ("Carvana" or the "Company"), transcripts of Carvana's public conference calls, press releases issued by the Company, media reports about the Company, and interviews with third parties conducted by attorneys and/or investigators retained by attorneys.  Plaintiffs' investigation of the facts underlying this action continues, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.    INTRODUCTION

1.    This action concerning a classic pump-and-dump scheme asserts violations of the federal securities laws against Carvana, its controlling shareholder, founders, and certain officers on behalf of Plaintiffs and all other persons and entities that purchased or otherwise acquired Carvana Class A common stock between May 6, 2020 and November 3, 2022, inclusive (the "Class Period").[1]

2.    Carvana is a self-described e-commerce company dealing in used cars. Throughout the Class Period, Defendants (defined herein) billed Carvana to investors as the Amazon of the used car industry.  Unlike traditional dealerships, Carvana would be a seemingly limitless growth machine because the Company's disruptive model was full of competitive advantages, such as a "capital-light" expansion model, a scalable business model, and a groundbreaking logistics network that could readily deliver or pick-up cars

---

[1]    This action also asserts additional violations of the federal securities laws against certain executives, directors, and underwriters on behalf of a class of purchasers of Class A common stock directly in a public offering on or about April 20, 2022 (the "2022 Public Offering"). *See* §§XV.-XVI.

1   nationwide.  As Defendants promised investors, Carvana's "business gets better as it gets

2   bigger."

3       3.      But, unbeknownst to investors, Carvana's growth machine was a lemon, built

4   on a fraudulent scheme and a series of misrepresentations and omissions designed to boost

5   Carvana's share prices for long enough to allow the Company's founders and executives to

6   sell more than $3.87 billion of their personally held stock at artificially inflated prices.

7       4.      Carvana was founded by Ernest Garcia II ("Garcia Senior") and his son Ernest

8   Garcia III ("Garcia Junior") as a wholly-owned subsidiary of Garcia Senior's other used car

9   business, DriveTime Automotive ("DriveTime").  As DriveTime was facing millions of

10  dollars in fines for violating federal laws and increased oversight, Garcia Senior spun off

11  Carvana.

12      5.      Then, the father-and-son team took Carvana public, celebrating the culmination

13  of their efforts by ringing the bell at the New York Stock Exchange ("NYSE") side by side.

14  But Garcia Senior had a problem.  His prior federal felony conviction for fraud barred him

15  from employment at any NYSE listed company.  Thus, Garcia Senior – Carvana's unofficial

16  chairman – installed his son as the Company's Chief Executive Officer ("CEO") and

17  Chairman, designed Carvana's voting structure so that he maintained more than 80% of the

18  voting power, became Carvana's largest shareholder, and appointed his loyal friends (and

19  partner in crime) as board members.

20      6.      After going public, Defendants continued to tout their "bigger is better" growth

21  story.  Immediately before the Class Period, however, Defendants faced a dilemma as

22  investors were concerned that Carvana's retail sales growth was slowing.  As a Morgan

23  Stanley analyst noted on February 27, 2020, if Carvana's "growth starts to slow significantly,

24  and the company is still not profitable, there will be a transition away from growth investors,

25  and . . . how investors think about the valuation of the stock will change."

26      7.      Defendants could not let this happen; they needed the Company to have a high

27  valuation so they could cash out their personal holdings in Carvana stock at a top dollar.

28  Thus, Defendants planned and executed a scheme to inflate the Company's retail vehicle

1   sales while concealing the unsustainability of Carvana's model and the many devastating

2   consequences of their scheme.

3          8.     Weeks before the start of the Class Period, Defendant Garcia Senior partnered

4   with his son to orchestrate a direct offering that allowed Garcia Senior to purchase stock pre-

5   Class Period at a depressed price that he would later sell at inflated prices during the Class

6   Period.  Indeed, "Garcia Senior 'participated behind the scenes in the planning and execution

7   of the very abbreviated process that led up to [Carvana's] Direct Offering.'"  And, "on

8   Saturday, March 28, 2020, Garcia Junior forwarded the stock issuance allocations list to

9   Garcia Senior . . . stating that they had to 'figure out plan on your money.'"  *In re Carvana*

10  *Co. S'holders Litig.*, 2022 WL 2352457, at *4 (Del. Ch. June 30, 2022).

11         9.     As the Class Period began, Defendants embarked on their scheme to inflate

12  Carvana's retail sales, and thus, Carvana's stock price.  While Defendants disclosed the

13  Company's focus on retail sales growth, Defendants concealed that it required a series of

14  unsustainable machinations to accelerate this growth, including: (i) "frequently aquir[ing]

15  sales that were less profitable"; (ii) abruptly escalating the number of cars purchased from

16  customers to induce trade-ins by lowering the Company's purchasing and verification

17  standards, and buying "as much as was humanly possible"; (iii) launching a rapid and

18  unsustainable nationwide expansion plan to enter over 150 new markets even though the

19  Company lacked the necessary infrastructure to serve many of these markets; (iv) violating

20  state title and registration laws to quickly push through sales; and (v) entering into a pass-

21  through sales arrangement with the Garcias' DriveTime to sell thousands of cars with no

22  benefit to Carvana except for the boost to its reported unit sales.

23        10.    At the same time that Defendants inflated Carvana's retail unit growth,

24  Defendants made materially false and misleading statements regarding its business.

25  Specifically, Defendants exalted Carvana's increases in retail sales and masked its actual

26  gross profits per retail unit, while touting the efficiencies and capabilities of its

27  groundbreaking logistics network and "capital-light" expansion model.  Defendants'

28  assurances were aimed at convincing investors that Carvana's growth was sustainable.  After

1  all, if Carvana could pair its explosive unit growth with purported profitability, and a

2  scalable logistics model that could expand across the country efficiently and cost effectively,

3  the sky was the limit.

4         11.    Defendants' limitless growth story produced its desired results.  Carvana's

5  retail sales growth skyrocketed, propelling Carvana to be named as one of the fastest

6  companies to ever make the Fortune 500 list based on organic growth alone, along with

7  Google and Amazon.  Naturally, Carvana's stock price soared, rising as high as $376 per

8  share during the Class Period.  And Defendants took full advantage of the artificially inflated

9  stock price by dumping more than $3.87 billion of their personally held shares on

10  unsuspecting investors.

11         12.    Garcia Senior alone reaped more than ***$3.6 billion*** in insider sales proceeds.

12  Daniel Taylor, an accounting professor at the Wharton School of Business and director of the

13  Wharton Forensic Analytics Lab, explained to *Forbes* and *The Wall Street Journal* that

14  Garcia Senior's insider trades were nefarious, concluding: "***What I'm saying is the Garcias***

15  ***knew it was short-lived[.] . . .  The Garcias knew the music would eventually end***."[2]

16         13.    And the music did end – with a thud.  Through a series of partial disclosures,

17  investors began to learn that Carvana was a very different company from the one they were

18  sold.  Defendants' "bigger is better" Amazon-comparison story was a fiction.  Ultimately,

19  Defendants admitted that Carvana's retail sales growth was unsustainable – indeed, by the

20  end of the Class Period, retail sales were significantly declining.  Defendants acknowledged

21  that Carvana's "capital-light" market expansion model was a farce, and Carvana was forced

22  to issue billions of dollars of high-interest junk bonds to acquire a nationwide auction house,

23  ADESA, to backfill its deficient infrastructure.

24  

---

25  [2]    Ben Foldy, *CEO's Father Gets a $3.6 Billion Stock Windfall at Carvana*, Wall Street
26  Journal (Sept. 17, 2021), https://www.wsj.com/articles/ceos-dad-gets-a-3-6-billion-stock-windfall-at-carvana-11631791801 ("*$3.6 Billion Stock Windfall* Article"); Carvana CEO's Net Worth Skids But His Dad, Who Controls Company, Is Worth Nearly $3 Billion, Forbes
27  (Dec. 8, 2022), https://www.forbes.com/sites/johnhyatt/2022/12/08/carvana-ceos-net-worth-skids-but-his-dad-who-controls-company-is-worth-nearly-3-billion/?sh=3baa11e163cf.
28  ("*Dad, Who Controls Company, Is Worth Nearly $3 Billion* Article").

14. By the time the truth about Carvana's growth, profitability, and business model was revealed, the price of Carvana's Class A common stock had plummeted from a Class Period high of $376 per share to $7.39 per share, representing a decline of more than 97%, leaving the Company on the verge of bankruptcy. While investors suffered billions of dollars in damages, Defendants' fraudulent conduct permitted them to walk away with billions of dollars. Plaintiffs seek to recover those damages on behalf of the putative Class through this action.

## II. JURISDICTION AND VENUE

15. Jurisdiction is conferred by 28 U.S.C. §1331, §22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §77v), and §27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa). The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77o) and §§10(b), 20(a), and 20(A) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

16. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act, and §22 of the Securities Act. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

18. Lead Plaintiff United Association National Pension Fund is an Alexandria, Virginia-based multi-employer defined benefit pension plan. UANPF is one of the nation's

largest Taft-Hartley funds with approximately $6.5 billion in assets held for the benefit of approximately 150,000 participants.  As detailed in UANPF's previously-filed certification (*see* ECF 9-4; ECF 9-5, ¶¶2; ECF 9-6 at 7), UANPF purchased a significant number of shares of Carvana Class A common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.  As discussed *infra* §XV.A., on April 22, 2022, UANPF also purchased 1,455 shares of Class A common stock in the 2022 Public Offering from Citigroup Global Markets Inc. ("Citigroup") for $80.00 per share.

19.   Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan, the largest defined benefit plan in the Saskatchewan providence of Canada, is a multi-employer defined benefit pension plan serving the healthcare sector with over 60,000 members and more than $10 billion in assets under management.   As detailed in SHEPP's previously-filed certification (*see* ECF 9-3; ECF 9-5, ¶¶3; ECF 9-6 at 7), SHEPP purchased a significant number of shares of Carvana Class A common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.   As discussed *infra* §XV.A., on April 22, 2022, SHEPP also purchased 3,838 shares of Class A common stock in the 2022 Public Offering from Citigroup for $80.00 per share.

**B.   Exchange Act Defendants**

20.   Defendant Carvana is a Delaware corporation with its principal executive offices located in Tempe, Arizona.  Carvana's Class A common stock trades on the NYSE under the symbol "CVNA."

21.   Defendant Ernest Garcia III is a co-founder of the Company and has served as its CEO, President, and Chairman since 2012.

22.   Defendant Mark Jenkins ("Jenkins") was, at all relevant times, and continues to be, Carvana's Chief Financial Officer ("CFO").  During the Class Period, Defendant Jenkins sold 336,929 shares, nearly 34% of his holdings, at artificially inflated prices for proceeds of $79,246,195.

23.     Defendant Ernest Garcia II is a founder of the Company and was, at all relevant times, and continues to be, the Company's controlling shareholder.  He is also the largest single seller of Carvana stock throughout the Class Period, having sold over $3.6 billion in Class A common stock at artificially inflated prices.  Garcia Senior is Garcia Junior's father and maintains a close relationship with his son, whom he lived next door to during the Class Period.  Garcia Senior is the largest owner of the Company's former parent company, DriveTime.  Leading up to and throughout the Class Period, Carvana engaged in many related-party transactions with Garcia Senior and his companies that were admittedly not negotiated at arm's length.  *See* ¶¶44, 153-155.  In addition, two of Carvana's board members – Securities Act Defendants (defined herein) Ira Platt and Gregory Sullivan – are former directors and officers of Garcia Senior's companies.  Since Carvana went public, Garcia Senior has actively supported Carvana's business.  As *The Wall Street Journal* reported in its article "Family Business Deals Help Fuel Carvana's Explosive Growth":

> To add buildings for another 1,000 employees at its Phoenix-area corporate campus, Mr. Garcia II bought the land.  To help pay for inspection centers getting cars to customers faster, Carvana purchased a building from Mr. Garcia II and sold it for more.[3]

24.     Defendant Ryan Keeton ("Keeton") is a co-founder of the Company and was, at all relevant times, and continues to be Carvana's Chief Brand Officer.  During the Class Period, Keeton sold 180,007 shares of Carvana stock, or nearly 63% of his stock, at artificially inflated prices for proceeds of more than $42.3 million.

25.     Defendant Benjamin Huston ("Huston") is a co-founder of the Company and was, at all relevant times, and continues to be Carvana's Chief Operating Officer ("COO").  During the Class Period, Huston sold 336,937 shares of Carvana stock, or more than 34% of his stock, at artificially inflated prices, for proceeds of nearly $79.3 million.  Prior to joining Carvana, Huston was an associate at Latham & Watkins LLP, where he focused on

---

[3]   Margot Patrick, Kristin Broughton & Ben Foldy, *Family Business Deals Help Fuel Carvana's Explosive Growth*, Wall St. J. (Dec. 17, 2021), https://www.wsj.com/articles/family-business-deals-help-fuel-carvanas-explosive-growth-11639737181 ("*Family Business Deals* Article").

regulatory affairs.  In addition, Huston attended Stanford University and graduated the same year as Defendant Garcia Junior.  In his role as COO at Carvana, Huston was responsible for Carvana operations, including inventory management and wholesale, inspection and reconditioning, logistics and fulfillment, customer service operations, real estate, and market expansion.

26.     The defendants referenced in ¶¶20-25, above, are collectively referred to as the "Exchange Act Defendants" or "Defendants."

27.     Defendants Garcia Senior, Garcia Junior, Jenkins, Keeton, and Huston (collectively, the "Individual Defendants"), because of their voting power and/or positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

28.     The Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.  The Defendants are liable for the scheme and false and misleading statements and omissions pleaded herein.

29.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Carvana Class A common stock by engaging in the violative conduct alleged herein, which caused Carvana Class A common stock to trade at artificially inflated prices during the Class Period.

## IV.     BACKGROUND

### A.     Title and Registration

30.     A vehicle's title is a legal document issued by the state that demonstrates the vehicle's ownership.  Generally, absent title, a driver cannot register a vehicle, lawfully

operate a vehicle, or purchase insurance for the vehicle.  In many states, such as Texas, Pennsylvania, Michigan, and Illinois, it is illegal to sell a car without holding title.  States generally set out the legal requirements for transferring title when a new owner purchases a vehicle, often including a time limit within which title must be transferred to the new owner.

31.    A vehicle registration reflects a state's certification that a car can be driven on public roads.  Each state requires vehicles to be registered with a designated state government agency.  It is illegal in every state to drive an unregistered car or one with a lapsed registration.  License plates and tags are a part of the registration process as they indicate that a car is properly registered.  Driving without a valid license plate is illegal in all 50 states.  The only exception for driving without a permanent license plate is the brief window after one has purchased a new car and is waiting for permanent plates.  During this period, states require drivers to display a temporary plate provided by the dealer.  Further, many states, like Illinois and North Carolina, require the temporary license and/or tag to be issued from the state in which the car is to be registered.

**B.    Used Car Industry**

32.    The market for used cars in the United States is highly fragmented.  At the time of Carvana's IPO in 2017, "[t]he largest dealer brand command[ed] approximately 1.6% of the U.S. market and the top 100 used car retailers collectively held approximately 7.0% market share."[4]  As explained in Carvana's 2021 10-K, this fragmentation has remained: In "2020, the largest dealer brand [CarMax] commands approximately 2.2% of the U.S. market and the top 100 used car retailers collectively hold approximately 10.2% market share."[5]

33.    In addition, the used car market has traditionally been dominated by brick-and-mortar retail dealerships.  For example, at the time of Carvana's IPO and the start of the Class Period, online retailers held less than 1% of the market share.

---

[4]  *See* Carvana's Form 424B4 (Apr. 28, 2017) ("IPO Prospectus") at 2.

[5]  2021 10-K at 2.

34. Used car dealers either sell vehicles at retail or at wholesale. A retail sale is the sale of a vehicle to a customer. By contrast, wholesale sales are sales of vehicles at auction, between dealers, or to third-party wholesalers.

### C. Carvana's Origins

35. Garcia Senior was a real estate developer until federal investigators began investigating his real estate and stock deals in connection with the Lincoln Savings & Loan scandal. In 1990, Garcia Senior pled guilty to "fraudulently obtain[ing] a $30-million line of credit in a series of transactions that also helped Lincoln [Savings & Loan] hide its ownership . . . from regulators."[6] At the time of his plea, U.S. Attorney General Dick Thornburgh stated: Garcia Senior's "'white-collar scheme – using "straw borrowers" – is of particular concern because it is designed to conceal the true nature of the financial transactions involved . . . . In the process, federal regulators are deceived, the institution is defrauded and the taxpayers are left to foot the bill.'"[7]

36. As a result of his conviction, Garcia Senior was banned for life from serving as an employer, officer, or director with a company on the NYSE. In the wake of his conviction, Garcia Senior filed for personal and corporate bankruptcy. Just one year later, however, he bought a rental car franchise called Ugly Duckling and merged it with his finance company to become the largest subprime lender and seller of used cars.

37. Garcia Senior took Ugly Duckling public in 1996 on the NASDAQ (as he was banned from the NYSE). Garcia Senior, who maintained 56% ownership of the company even after it went public, touted the company's growth and innovation, claiming "while the

---

[6] James S. Granelli, *Lincoln S&L; Figure Pleads Guilty to Fraud: Crime: Ernest C. Garcia II admits acting to help the thrift hide its ownership of some risky desert land in Arizona,* L.A. Times (Oct. 31, 1990), https://www.latimes.com/archives/la-xpm-1990-10-31-fi-3371-story.html.

[7] *Id.*

1   goal of CarMax and AutoNation is to restructure the retail auto business, Ugly Duckling is

2   breaking new ground on the financing side."[8]  Not surprisingly, the stock price skyrocketed.

3       38.     But just a few years later, Ugly Duckling was drowning.  The price of Ugly

4   Duckling sunk from $25.00 per share to just $2.50 per share, and Garcia Senior bought all

5   the publicly owned shares for a pittance.  Further, during Ugly Duckling's ugly dive, Garcia

6   Senior lined his pockets; as *Forbes* reported at the time, "Garcia has been especially adept at

7   feathering his own nest with Ugly Duckling's assets" with many investors calling "foul."[9]

8   Upon taking Ugly Duckling private, Garcia Senior swiftly settled a number of shareholder

9   actions and renamed the company DriveTime.

10      39.     Shortly thereafter, Garcia Junior graduated from college and joined his father's

11  company.  In 2012, Garcia Senior and his son, along with Defendants Keeton and Huston,

12  founded Carvana Group LLC as a wholly owned subsidiary of DriveTime.  According to

13  Garcia Junior, Carvana's reliance on DriveTime cannot be understated as "'[w]e were able to

14  build Carvana into a stronger company much quicker than we likely would have been able to

15  do without the benefits we had early in our company's history from being able to use the

16  backbone of [DriveTime].'"[10]

17      40.     But shortly thereafter – as with Garcia Senior's prior ventures – DriveTime

18  found itself in hot water.   In November 2014, pursuant to the Dodd-Frank Wall Street

19  Reform and Consumer Protection Act, the Consumer Financial Protection Bureau ("CFPB")

20  brought an enforcement action against DriveTime and its finance company for violating

21  federal financial laws by "harass[ing] and harm[ing] countless consumers, many of whom

---

[8]   Jerry Knight, *To Wall Street, It's a Swan*, Wash. Post (Sept. 6, 1997), https://www.washingtonpost.com/archive/business/1997/09/26/to-wall-street-its-a-swan/7aa7026d-489c-44e2-8b3e-e6394d67ff90/; *see also* Nathan Vardi, *Feathered Nest,* Forbes, https://www.forbes.com/forbes/2001/1126/082.html?sh=56d6df22e88e ("*Feathered Nest* Article").

[9]   *Feathered Nest* Article.

[10]   Bill Alpert, *Used-Car Prices Are Plunging.  So Why Is Carvana's Stock Soaring?  Time for a Rethink*, Barron's (May 1, 2020), https://www.barrons.com/articles/used-car-prices-plunging-why-carvana-stock-soaring-51588342112.

1   were economically vulnerable."  DriveTime was fined $8 million, subjected to increased

2   oversight, and forced to reform its business practices.

3       41.     At the same time, the father-and-son team decided to spin Carvana Group off

4   of DriveTime.  Less than three years later, in 2017, the Garcias took the Company public on

5   the NYSE.  As Garcia Senior had done with its predecessor, the Garcias pitched Carvana as a

6   disrupter and innovator in the used car market.  Carvana, like Ugly Duckling, was drastically

7   different from CarMax.

8       42.     The father-and-son duo, who live next door to one another, maintained 97% of

9   the voting power upon going public and celebrated their accomplishment by ringing the

10  NYSE bell side by side.[11]



---

[11]  As reflected in the picture, Garcia Senior (right) and Garcia Junior (left) watched their Company go public on the NYSE together on the trading floor.

**D.     Garcia Senior's Control of Carvana**

43.     Because of his conviction and ban from the NYSE, Garcia Senior is not identified in Carvana's SEC filings as a Carvana employee, officer, or director.  But there can be no doubt that Garcia Senior controls Carvana.  Indeed, Garcia Senior is Carvana's largest shareholder and holds approximately 84% of the voting power at the Company.  Moreover, Garcia Senior installed his son as CEO of the Company and his former DriveTime employees and Lincoln Savings & Loan cronies to Carvana's Board of Directors.  Indeed, as a court recently acknowledged, Garcia Senior was thick as thieves with Ira Platt ("Platt") and Greg Sullivan ("Sullivan"), whom he had installed on Carvana's Board of Directors.  They were, in fact, independent neither from him nor, consequently, from his son.[12]

44.     Moreover, Carvana utilizes a capital structure that enables the Garcias to maintain supermajority voting control largely untethered from their economic interest in the Company.  For example, Carvana's dual-class ownership structure provides that any share owned by one of the Garcia Parties[13] is entitled to ten votes per share, compared to the single vote per share on each share held by the public.  According to Daniel Taylor, an accounting professor at the Wharton School of Business and director of the Wharton Forensic Analytics Lab, Carvana's unique ownership "'structure has allowed [the Garcias] to run this $60 billion public company as if it's a family firm and for the family's benefit.'"[14]  Indeed, leading up to

---

[12]  *In re Carvana Co. S'holders Litig.*, 2022 WL 2352457, at *9-*16 (Del. Ch. June 30, 2022).  For example, director Gregory Sullivan "was censured by the NYSE due to actions he took on behalf of Garcia Senior" in connection with Garcia Senior's fraud. *Id.* at *9.  But, as the court noted, while "[t]he NYSE censure could have been career-ending for Sullivan, . . . it was not" as Garcia Senior hired him at DriveTime and eventually installed him as DriveTime's CEO. *Id.* at *9-*13.  This led to the court's "inference that Sullivan and Platt are beholden to the Garcias." *Id.* at *18.

[13]  "Garcia Parties" refers to Garcia Senior, Garcia Junior, and entities controlled by one or both of them.

[14]  *$3.6 Billion Stock Windfall* Article.

and throughout the Class Period, Carvana made numerous deals with Garcia Senior's companies that were admittedly "not negotiated at arm's length."[15]

- In 2018, SilverRock, one of Garcia Senior's companies that "provides extended warranties that Carvana sells to customers, hit snags renewing an Arizona license in 2018 because it was in negative equity."[16] It was able to recover, however, by advising the "department that its financial position was improving from contracts with Carvana and DriveTime, and that it would soon be profitable."[17]

- During the Class Period, Garcia Senior's companies received approximately $406.5 million from Carvana through their various related party agreements.  In 2020, his companies generated $85 million in revenue from providing extended warranties to Carvana's customers, collecting on customer loans, and selling or leasing real estate to Carvana.  And in 2021 and the first three fiscal quarters of 2022, Garcia Senior's companies brought in at least $321.5 million from its deals with Carvana:[18]

|  | 2021 | 2022 (through Q3) |
|---|---|---|
| Lease Agreements | $7 million | $3 million |
| Corporate Office Leases: |  |  |
|     Headquarters | $1 million | $1 million |
|     Office Building | $1 million | $1 million |
| Retail Vehicle Acquisitions | $168 million | $19 million |
| Master Dealer Agreement | $15.3 million | $14 million |
| Servicing and administrative fees | $81.7 million | $7 million |
| Shared services agreement | $1 million | $1 million |
| Private Plane Sharing Agreement | $0.5 million | N/A |
| **Total** | **$275.5 million** | **$46 million** |

- Another company owned by Garcia Senior, Bridgecrest – formerly DT Credit Co. before it changed its name following the CFPB $8 million penalty – saw its loan servicing portfolio more than double to over $10 billion due to its Carvana business.  And through Bridgecrest, Carvana finances the majority of the cars they sell.

---

[15]  Carvana's 2020 Annual Report on SEC Form 10-K (Feb. 25, 2021) ("2020 10-K").

[16]  *Family Business Deals* Article.

[17]  *Id.*

[18]  Carvana's Related Party disclosures in its 2021 10-K, 2021 Proxy Statement, and Quarterly Report on SEC Form 10-Q (Nov. 30, 2022) ("Q3 2022 10-Q").

45.     Garcia Senior is also Carvana's largest beneficiary of the Company's tax receivable agreement.  Typically, tax assets generated by companies are used to reduce future tax bills, providing savings for the company to invest in its operations.  Carvana, however, has agreed to pay Carvana Group LLC Unitholders, the largest of which is Garcia Senior, 85% of the benefit of these tax assets in cash.  During the Class Period, the portion of the Company's tax receivable agreement owed was $1.1 billion.

46.     Simply put, not only does Garcia Senior control Carvana, but he designed it to benefit himself.

### E.     Carvana's Key Financial Metrics

47.     Defendants told investors that Carvana's business should be measured by its primary objectives and corresponding metrics, including "Objective #1: Grow Retail Units and Revenue," and "Objective #2: Increase Total Gross Profit Per [Retail] Unit."[19]   In addition, Carvana provided the number of markets and population coverage as a key operating metric.  Defendants identified these metrics as indicative of Carvana's financial performance, both current and future.

48.     ***Retail Unit Growth***.  In Carvana's SEC Form S-1/A, filed April 27, 2017 ("Amended Registration Statement") and first-ever shareholder letter, Defendants were unequivocal that the Company's number one objective – and metric to watch – was growth in retail units sold.  Indeed, Defendants advised that "[w]e view retail units sold as the single most important metric in our business."[20]  In the quarters that followed, Defendants would repeatedly advise investors that its number one objective was to grow retail units sold because it is "the most important measure of our growth."[21]

49.     Critically, Defendants repeatedly told investors that Carvana's retail sales were essential to the Company's profitability because they "drive[] the majority of our revenue

---

[19]   Q1 2017 Shareholder Letter (June 6, 2017).

[20]   *Id.*; *see also* Amended Registration Statement.

[21]   2020 10-K at 51; *see also* 2021 10-K at 53.

and allow[] us to capture additional revenue streams associated with financing, vehicle service contracts ('VSCs') and trade-in vehicles."[22]  Moreover, these sales "allow [Carvana] to benefit from economies of scale due to our centralized online sales model, [which] provides meaningful operating leverage in acquisition, reconditioning, transport, customer service and delivery."[23]

50.    Like Amazon, Carvana's retail sales were the key to unlocking Carvana's success because they drove growth and, in turn, profits.  As such, in order to secure and maintain a high valuation in the market, Carvana needed to demonstrate to investors that the Company's hyper-growth was sustainable.  Accordingly, throughout the Class Period, Defendants highlighted Carvana's exponential growth in retail units sold in all of Carvana's investor presentations, earnings calls, SEC filings, and shareholder letters.

51.    ***Total Gross Profit Per Retail Unit* ("Total GPU")**.  Defendants explained that increasing Total GPU was the Company's secondary objective and the second most important metric by which to evaluate Carvana.  Defendants advised investors that "gross profit per unit is a key measure of our growth ***and long-term profitability***."[24]  Accordingly, throughout the Class Period, Defendants reported on Total GPU in all of Carvana's investor presentations, earnings calls, SEC filings, and shareholder letters, as a key metric for measuring long-term profitability.   Carvana excluded certain selling costs from its calculation of Total GPU, including outbound logistics expenses and title and registration expenses.  As discussed *infra*, excluding title and registration expenses was inconsistent with the manner in which Carvana's closest competitor, CarMax, calculated gross profit per unit. In addition, excluding outbound logistics expenses was inconsistent with the way Defendants viewed total profitability per retail unit internally.  *See* ¶172.

---

[22]  Amended Registration Statement at 5; *see also* 2020 10-K; 2021 10-K.

[23]  Amended Registration Statement at 71; *see also* 2020 10-K; 2021 10-K.

[24]  Amended Registration Statement at 77.

52.   ***Market Expansion***.  Carvana also reported the number of markets in which it sold vehicles as a key metric.  Carvana defined a market "as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers . . . typically conducted by a Carvana employee in a branded delivery truck."  Defendants explained that market expansion drove retail sales growth because as the number of markets grow, "the population of consumers who have access to our fully integrated customer experience increases."  Thus, Carvana also reported the percentage of the U.S. population it served through these markets along with the number of inspection and reconditioning centers ("IRCs") as key metrics.

**F.    Carvana's Analyst Day**

53.   At Carvana's first and only Analyst Day on November 29, 2018, Defendants set forth their long-term goals for the Company.  Principally, Defendant Garcia Junior announced that the Company's long-term goal was to sell two million-plus units a year to become the largest automotive retailer.  Moreover, because Defendants had told investors that, under Carvana's Amazon model, growth would purportedly drive profits, Defendants posed the question: "***[D]oes Carvana want to be the largest automotive retailer or the most profitable***?"[25]   They provided the answer that analysts and investors wanted to hear: "***[B]oth***."[26]  Defendant Jenkins further elaborated that this goal was achievable because the "scalability of the online sales model, we believe, will lead to [being a] larger industry player[] than we've historically seen in automotive retail and more profitable player[] [than] we've historically seen due to a long-term lower cost structure."[27]

54.   Throughout the Analyst Day, Defendants sought to convince investors that Carvana could achieve its lofty goals by touting the benefits of Carvana's business model.  According to Defendants, unlike traditional dealerships, Carvana's e-commerce model

---

[25]   Carvana Co. Corporate Analyst Meeting, dated November 29, 2018 ("Analyst Day"), at 10.

[26]   *Id.*

[27]   *Id.*

offered structural cost advantages that enabled the Company to become more profitable as it grew in scale:

> [W]e . . . see a significant opportunity **to reduce [logistics] expenses as a percent of [sales] over time. . . .  [T]he big takeaway here is there are significant benefits over time from adding more inspection and reconditioning centers. . . .  As we add more inspection and reconditioning centers over time, we expect the average distance that we are driving to come down and average logistics expense as a percentage of Revenue to come down as well**.

*     *     *

> [T]here's some scale benefits in the logistics and market occupancy network that just comes from higher utilization in logistics and leverage or more throughput through a somewhat slightly fixed infrastructure and market occupancy.[28]

55.    In addition, Carvana's Chief Product Officer explained that the Company's nationally pooled inventory was one of its most invaluable "structural differentiators" as the "centralization of our inventory all connected through nationwide logistics, [means] we can get a much broader selection available to our customer base."[29]  Similarly, prior to Analyst Day, Garcia Junior touted: "***[A] unique attribute of our business model relative to automotive retail and then not unique relative to e-commerce is that all of our cars are available to customers everywhere***. . . .  [Thus,] you're increasing conversion across all of your markets . . . we feel really, really good about that model."[30]

56.    Not surprisingly, analysts reporting on the event highlighted that the Company's model supported its path to becoming the largest (and, eventually, a profitable) company:

> •    Carvana highlighted the health and momentum of its business at its first-ever analyst day . . . .  ***With its centralized inventory, nationwide logistics, and proprietary vertically integrated technology,***

---

[28]  *Id.* at 13-14.

[29]  *Id.* at 4.

[30]  Carvana Co. at Goldman Sachs Global Retailing Conference, dated September 7, 2017, at 3.

*management sees the opportunity to ultimately sell 2 million cars annually . . . .*[31]

- With analyst day now in the books, we continue to view CVNA among the most compelling LT [long term] *growth stories* in our coverage universe today. . . .   In a highly fragmented market with little differentiation among players, *we view CVNA as an industry disruptor, with a winning ecommerce model . . . .   CVNA makes a strong case that its real estate-light model, centralized inventory, national logistics (with free delivery) and integrated lending are structural advantages*.[32]

- *Carvana's goal is to be the largest and most profitable automotive retailer, and given its centralized inventory model, market expansion plans, and multiple levers to increase overall gross profit per unit, we believe Carvana is well positioned to achieve this goal.*[33]

## V.   CONFIDENTIAL WITNESS ACCOUNTS

57.   Several former Company employees have provided information demonstrating that Defendants' Class Period statements were false and misleading, that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements, and that Defendants engaged in a scheme to defraud investors.  The confidential witnesses ("CWs") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Carvana.  The CWs provided information to Plaintiffs' counsel and Plaintiffs' counsel's investigators on a confidential basis and are particularly described by job description and/or responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.  As set forth below, the information provided by the CWs supports a strong inference that the Exchange Act Defendants acted with scienter.

58.   **Confidential Witness No. 1 ("CW-1")** was employed by Carvana in a supervisory role on the Wholesale Team at a large Carvana facility in the Northeast U.S. for

[31]   William Blair analyst report, "Raises Long-Term Profit Goals at Analyst Day" (Nov. 29, 2018).

[32]   Wells Fargo analyst report, "CVNA: Analyst Day Thoughts; Raising (LT Targets In) Arizona" (Nov. 30, 2018).

[33]   JMP analyst report, "Thoughts From Carvana's Analyst Day: Executing Well With Multiple Long-Term Opportunities" (Nov. 30, 2018).

1    more than six months during the Class Period.  CW-1's role involved managing the

2    "lifecycle" of vehicles that were going to be sold wholesale.  This included overseeing a

3    team of inspectors who inspected vehicles before they were put up for auction and ensuring

4    that vehicles were picked up by wholesale buyers' haulers after they were purchased at

5    auction.

6        59.    CW-1 explained that the wholesale facility where he/she worked was

7    essentially an overflow for the IRCs because the IRCs did not have the capacity to store and

8    process all the vehicles that were going to be sold wholesale.  CW-1's facility was basically

9    a giant parking lot and thousands of vehicles could be stored there.

10       60.    CW-1 explained that vehicles that had been purchased with the intent to be

11   sold wholesale were shipped directly to CW-1's facility, but CW-1's facility also received

12   many vehicles from IRCs after they were "flipped" to wholesale.  CW-1 explained that

13   inspectors at the IRCs inspected vehicles that were supposed to be sold retail.  Sometimes the

14   inspectors at the IRCs decided to flip vehicles to wholesale, typically because it was going to

15   cost too much money or require too much labor to repair the vehicles well enough to sell

16   them as retail.  When this occurred, CW-1 would do an evaluation and approve the transfer

17   of the vehicles to wholesale, and they would be shipped to CW-1's facility.  CW-1 said that a

18   lot of the vehicles that CW-1's facility received were trade-ins.  CW-1 said that so many

19   vehicles had to be sold wholesale because Carvana had been trying to purchase "everything,"

20   regardless of the quality of their vehicles.

21       61.    CW-1 said that when an individual seller submitted information about a

22   vehicle, Carvana did very little or nothing to verify the accuracy of the information.  This

23   meant that Carvana would buy vehicles even if the condition had been misrepresented by the

24   seller.

25       62.    CW-1 also explained that sometimes Carvana used third-party contractors to

26   pick up vehicles from sellers when the market operations team was too busy.  CW-1 believed

27   that the third-party contractors just picked up the vehicles without looking at the quality at

28   all.  CW-1 provided the example of a vehicle that Carvana purchased that had bullet holes in

it, but the seller had rated it in fair condition.  CW-1 said that this vehicle should never have been purchased.  CW-1 also recalled an instance when a vehicle that was supposedly in good condition had missing seats.  CW-1 knew that sellers were rating poor quality vehicles in fair or good condition because CW-1 saw what the sellers had reported about vehicles when he/she approved them to be flipped from retail to wholesale based on data CW-1 pulled from Carvana's Saleforce.com application.  CW-1 wondered how these poor-quality vehicles had been purchased at retail price and why Carvana did not seem to do anything to prevent sellers from misrepresenting the quality of their vehicles.

63.     CW-1 participated in Carvana all-hands meetings that were held by Zoom in which senior executives like Defendant Garcia Junior addressed employees.  In these calls, Garcia Junior would discuss the Company's performance.  The tenor of the calls was always "upbeat."  CW-1 is pretty sure that his/her bosses, and "probably Garcia" had "talked about high growth" including how the Company had grown and how the Company was expected to do.

64.     CW-1 said that it was pretty much the case that Carvana lowered its standards when it came to trade-ins as long as the customer was also buying a car from Carvana.  CW-1 explained that Carvana "wouldn't care" about the poor quality.  CW-1 said that as long as someone was also "buying from us," then Carvana would take the trade-ins.  But this practice resulted in, for instance, a car that had been missing its backseat being accepted, which CW-1 is pretty sure had been a trade-in.  CW-1 was also pretty sure the car with bullet holes had been a trade-in because with trade-ins, Carvana was not doing any verifications of what the customer was representing (whereas with wholesale, usually what the seller was representing about the vehicle's condition was in fact what was being sold).

65.     CW-1 confirmed that the parties picking up a customer's trade-in were supposed to assess the vehicle and not accept the vehicle if it was inoperable or did not meet the description provided by the customer.  CW-1 said that at the time he/she began working at Carvana, his/her "partner" at the wholesale facility had previously been a Customer Advocate and then transferred to wholesale.  CW-1 believed that a lot of the cars that were

1   flipped to wholesale had been trade-ins because he/she heard this from CW-1's "counterpart"

2   who had been with Carvana "for years."  According to CW-1, vehicles that ended up being

3   flipped to wholesale included vehicles that had also been procured with the intention of

4   being sold retail, but the quality of those vehicles ended up being too poor.  CW-1 said this

5   reflected that Carvana "wanted to purchase as much as was humanly possible."

6         66.   CW-1 also said that Carvana did not make any efforts to stop purchasing

7   vehicles from sellers who had misrepresented the condition of vehicles to Carvana in

8   previous sales.  CW-1 recalled an instance where he/she recognized a particular seller's

9   name when he/she was reviewing vehicles that were supposed to have been sold retail but

10  had to be flipped to wholesale.  CW-1 determined that this seller had sold five vehicles to

11  Carvana at retail, or "full value" price, and all five of them had to be sold wholesale because

12  the seller had misrepresented the quality of the vehicles.

13        67.   CW-1 stated that the issues he/she observed at Carvana were "obvious to

14  anyone with eyes."

15        68.   **Confidential Witness No. 2 ("CW-2")** was employed by Carvana as a Sell to

16  Carvana ("STC") Advisor for more than six months during the Class Period at the

17  Company's facility in a Southeastern state.  CW-2's duties entailed physically acquiring cars

18  from individuals who had sold their vehicles to Carvana.  To that end, CW-2 travelled to

19  wherever the selling individual was located throughout a large portion of that Southeastern

20  state.  CW-2 appraised the vehicle to validate that it was in the condition represented by the

21  customer at the time of the online sale to Carvana, obtain the title and registration

22  documentation, and arrange for a towing company to transport the vehicle to the Carvana

23  facility in which he/she worked, and sometimes to other Carvana facilities.

24        69.   CW-2's appraisal included a "functionality test" of the vehicle's interior and

25  exterior.  CW-2 said that in the event his/her appraisal identified issues and concerns that the

26  seller had not identified at the time of the online sale, then he/she entered those matters into a

27  laptop computer he/she carried with him/her.  There were times CW-2 was overruled by

28

1   his/her superiors and was directed to procure a car regardless of his/her concerns.   And

2   CW-2 said it was definitely the case that Carvana had been overpaying for vehicles.

3          70.     CW-2 knew how much Carvana had agreed to pay for the vehicles because the

4   amount was included in the appraisal.  CW-2 reiterated that he/she had been surprised at how

5   much Carvana spent for some vehicles.

6          71.     Transporting the vehicles from the place of purchase to the Carvana

7   distribution center ("DC") initially entailed coordinating with towing companies.  CW-2 said

8   there were rumors that Carvana was incurring thousands of dollars of costs by engaging with

9   a "wrecker" company.  CW-2 went on to say that he/she and the other STC Advisors used to

10  drive to the seller's location using a Carvana-issued car.  However, in the last three months

11  of CW-2's employment, a change was made whereby the STC Advisors instead took Uber

12  rides to the seller's location and then drove the purchased vehicle back to the DC.  CW-2

13  was not completely comfortable with this change, in part because the vehicles that had been

14  purchased were not always safe to drive.  To that point, two vehicles he/she had to drive died

15  while CW-2 was driving them and he/she had to be picked up by an Uber.  While CW-2 had

16  not thought it was efficient when he/she was driving a company vehicle to, say, drive two

17  hours one way, handle a vehicle purchase and pick-up, only to then drive three hours to the

18  next vehicle, he/she also did not think switching to Uber was much better.  Overall, CW-2

19  believed that Carvana had been "overscheduling" the STC Advisors because Carvana was

20  focused more on the quantity of used vehicles it was procuring, as opposed to the quality of

21  those vehicles and the efficiency of its operations.

22         72.     CW-2 was aware of "numerous instances" of Carvana buying vehicles very

23  inexpensively (he/she used the amount of $400) that were "not safe to drive" and on which

24  the "check engine light" came on right after they were purchased.  If it had been up to

25  him/her, CW-2 would never have purchased these vehicles, but CW-2 was often overruled.

26  As CW-2 put it: "I was more cautious about quality."   At least a couple of times CW-2

27  reported his/her concerns and that he/she did not think a given vehicle should be purchased

28  but "leadership would say take it" anyway.

73.   **Confidential Witness No. 3 ("CW-3")** was employed by Carvana in Phoenix, Arizona before the Class Period began until the middle of the Class Period. During the Class Period, CW-3 was employed as a Dealer Success Advocate on Carvana's Wholesale Team, where CW-3 assisted dealers that had purchased vehicles from Carvana through auction and had issues that made the vehicles unsellable to retail customers.

74.   CW-3 said that the vehicles Carvana sold at auction had been purchased from auctions and from individuals. CW-3 believes that most of them were purchased from individuals. CW-3 explained that these were vehicles that did not meet certain standards set by Carvana to sell retail. CW-3 used Salesforce to document his/her communications with dealers. CW-3 believes that more vehicles (both those that had been procured wholesale as well as from STC) were being sold wholesale because Carvana had lowered its standards for buying vehicles in 2019.

75.   CW-3 explained that whenever vehicles were sold through auction, there was an arbitration process where Carvana had to buy back vehicles when buyers wanted to return them because there were issues that had not been noted by Carvana at the time of the sale. CW-3 said that buybacks were common and missing titles were the main reason vehicles were bought back. However, some of the buybacks also occurred because of quality issues. CW-3 commented that it was well known internally that the vehicles Carvana was buying from both wholesale and STC were "not the best."

76.   Regarding the missing titles, CW-3 said that Carvana had around 60 days to provide buyers with the titles for the vehicles they had purchased from Carvana and the buyers could request buybacks because of that issue during this period of time. CW-3 estimated that Carvana generally had around half of the titles for the vehicles they sold wholesale at the time of sale. One of the reasons why CW-3 quit was because so many vehicles were missing titles and he/she frequently was not able to get adequate answers from the Titles Team as to why. CW-3 would reach out to the Titles Team and they would tell him/her to check back in a week, so CW-3 would, but sometimes a month would pass and it turned out that nothing had been done. CW-3 said that one of the supposed reasons that it

1   was difficult for the Titles Team to get the titles was because Departments of Motor Vehicles
2   ("DMVs") were falling behind in their workload during the pandemic.  However, sometimes
3   CW-3 called the DMVs to try to get the titles himself/herself and sometimes CW-3 was
4   provided with different information than what he/she had been told by the Titles Team.  CW-
5   3 recalled that there was one dealer who had purchased over 100 vehicles from Carvana that
6   were missing titles and around half of them were past the arbitration deadline.  Prior to CW-
7   3's departure, CW-3 said there were other dealers who were so angry they told him/her they
8   would never work with Carvana again.

9        77.    In early 2020, CW-3 only received around 10 to 15 calls a week from dealers
10   regarding title issues.  CW-3 described early 2020 through May 2020 as a "slow time."  As
11   CW-3 recounted, after May 2020, it was as if a "fire started," with around 100 calls per week
12   from angry dealers regarding title issues.  In fact, additional employees had to be hired on
13   CW-3's team to deal with the increased call volume.

14        78.    CW-3 discussed the title issues with his/her manager, but nothing was done
15   and he/she was just given excuses like the DMVs were backed up, or the Titles Team had
16   been restructured.  The title issues also were discussed during weekly meetings with the
17   Wholesale Team that were led by the Director of Wholesale.

18        79.    CW-3 said that the process to sell vehicles to Carvana became "way too easy."
19   CW-3 explained that when he/she first started working at Carvana more than a year before
20   the beginning of the Class Period, Carvana refused to complete purchases when it was
21   discovered that sellers misrepresented information they provided to Carvana regarding
22   vehicle history and condition.  In those instances, CW-3 said customers may have been
23   required to re-submit the questionnaires with accurate information prior to purchase.
24   However, sometime in 2019, when CW-3 was a member of the Trades Team which is part of
25   the STC Team, Carvana started accepting "all vehicles" and did not inspect them before
26   purchasing them anymore.  CW-3 said that Carvana purchased a lot of "trash vehicles" after
27   this change, which had to be sold at auction.

28

80.     CW-3 said that these relaxed standards also led to Carvana accepting more stolen vehicles and vehicles with fraudulent paperwork, which CW-3 observed when he/she was a part of the Trades Team near the end of 2019. CW-3 said that one of the most common problems he/she saw were sellers who did not disclose that they had a loan on their vehicles. CW-3 said that sometimes the team was able to catch the person, but if they could not then Carvana would just pay off the loan after they had purchased the vehicles, which could mean that they were out upwards of $10,000 on that sale.

81.     **Confidential Witness No. 4 ("CW-4")** was employed by Carvana as an Operations Specialist in the Wholesale Department at an IRC in the Midwest from before the Class Period began until early 2022. CW-4 worked in a supervisory role from the middle of 2021 until he/she left Carvana. The IRC at which CW-4 worked had over 500 employees and housed over 10,000 vehicles when CW-4 left Carvana. CW-4's duties and responsibilities at Carvana included (but were not limited to) tracking inventory using spreadsheets and various software programs, working with the Reconditioning Managers and Department Leads to transition vehicles to wholesale, working with the Logistics and Inventory Teams to transport wholesale inventory to other locations, and working with hubs and auctions to manage inventory and arbitration claims.

82.     The team CW-4 oversaw at the IRC processed vehicles that were going to be sold to the wholesale market, which meant that they would be sold through an auction, usually to used car lots. CW-4 explained that if a car met any of the following criteria that car would automatically be transferred to the wholesale team: (i) vehicles that had over a certain mileage; (ii) were over a certain year; or (iii) had been in a reported accident. CW-4 also said that there was a separate retail team at the IRC. Accordingly, if the retail team's inspections of a vehicle discovered certain types of damage to the vehicles, those vehicles would be sent to the wholesale team since they did not meet Carvana's criteria to sell to the retail market. CW-4 said that rust damage, including rusted out frames, was a common reason why vehicles in the IRC were sent to the wholesale team. CW-4 also said that any inoperable vehicles were sent to the wholesale team.

83.     CW-4 explained that, beginning in the first quarter of 2021, he/she was told in a meeting that there would be a "a huge increase" in the volume of cars to be sold wholesale and was asked how much room he/she had at the IRC to store cars.  The meeting, which took place over Zoom, included CW-4, an Area Manager, various Wholesale Managers, Directors, and Associate Directors.  As CW-4 put it, Carvana was "looking to buy what cars they could."  The Company's initiative resulted in Carvana buying "any car" that may have resulted in an increase in trade-ins.  CW-4 said that the volume of cars at the IRC increased from just over 100 in the beginning of 2021 to almost 1,000 over the course of the year, a 10-fold increase that CW-4 called "pretty epic," causing the IRC to run "out of room."

84.     CW-4 said that Carvana was "picking up anything" regardless of the condition, including cars that literally had "no rear ends," even though the cars that were picked up were supposed to be operable and drivable.  CW-4 reiterated that Carvana was not supposed to be receiving these kinds of vehicles but that "we were getting them on a regular basis."

85.     CW-4 characterized Carvana as having a huge mess when it came to titles. CW-4 recalled that when he/she left, there were over 70 wholesale vehicles at his/her IRC alone for which Carvana lacked the title and were just sitting around.  CW-4 also recalled that there was a Google spreadsheet that tracked vehicles that needed titles for the entire IRC (retail and wholesale), which CW-4 believes existed since CW-4 first started working at Carvana.  CW-4 emphasized that there were "a ridiculous amount of cars on the list."

86.     CW-4 said that it was well known internally that title issues were a very common problem at Carvana, and everyone complained about it.  CW-4 recalled that the Title Department was revamped three times, but they still had not gotten the title process right, and CW-4's understanding was that the title team had "tons" of titles they needed to process and sometimes titles were lost.  CW-4 recalled that the team was working on acquiring some titles from years earlier.  CW-4 also recalled that retail titles were "Priority 1" and wholesale titles were "Priority 2."  CW-4 also said that sometimes there were arbitrations after vehicles were sold by Carvana.  According to CW-4, title issues were the most common reason for arbitrations.

87.     CW-4 said that the titles were supposed to be obtained at the time the vehicles were being picked up (unless the vehicles were still being financed.)   CW-4 said that Carvana had four levels regarding title status: A, B, C, and D.   The D category meant Carvana did not have the title.   The C category meant that Carvana did not have the title, but was working on getting it.   The B category meant that the necessary steps to get the title had been done, but Carvana was still waiting to receive the title.   And the A category meant Carvana had the title actually in-hand.   According to CW-4, there were "tons of D" category cars.   As CW-4 explained, "everyone knew we have title issues."

88.     In February 2022, one week before the ADESA acquisition was announced publicly, CW-4 attended a meeting with the wholesale team, including director-level employees.   Defendant Huston also attended this meeting.   During this meeting, Huston mentioned that ADESA's title department was good and Carvana would adopt their processes and improve the title process.   These comments made CW-4 believe that Huston must have known about the title issues.

89.     CW-4 said that Carvana's acquisition of ADESA was part of Carvana's efforts to expand into new markets that might have been far from existing Carvana IRCs.   According to CW-4, when he/she was hired, "they were saying" that Carvana was not operating in certain areas like the Pacific Northwest because of logistics.   Carvana's range for picking up and delivering vehicles was only five hours out and five hours back (although third-party haulers could go further).   As such, for example, a customer in Ohio purchasing a car from Carvana that was in Oregon would exceed this range.   Although Carvana had operations in some of the western states like California and Nevada, there was essentially not a hub or IRC between Indiana and Oregon that would fall within the five-hour transportation limit.   The sheer amount of money it would cost to pay third-party haulers to cover such distances was cost prohibitive.   To that point, the "biggest reason" for acquiring ADESA had been its locations which reflected that ADESA operated nationwide and had something like 51 or 52 locations.   This had been discussed at the meeting.

90.     CW-4 said Carvana had a logistics team that was "dysfunctional."  CW-4 also said there were vehicles sitting "everywhere," and sometimes it seemed as though no one was planning routes to pick them up.  CW-4 also recalled an incident where he/she found a vehicle at the IRC that had been missing in the system for two years.  CW-4 found it just by doing simple inventory tasks.  CW-4 thought the logistics and inventory problems were "out of this world," and did not understand why there were so many problems at Carvana, especially since it was not a new company.  CW-4 said that it was difficult to describe how disorganized the logistics team was.  CW-4 tried to give them advice, but they were "all over the place," and logistics and inventory issues remained a constant problem throughout CW-4's employment at Carvana.

91.     According to CW-4, cars delivered to retail were not being added to the retail inventory on the day they were received.  Instead the retail group might wait a week before adding the cars to inventory.  The reason for this was that as soon as a car was added to the retail inventory it began the aging process.  Therefore the aging report would "look bad" if there were cars sitting there for 20 days.  As CW-4 put it, Carvana's business was "all about get-in/get-out" when it came to inventory, so the retail business would wait a week before scanning vehicles into inventory, even if the vehicles were actually there.  CW-4 said his/her cars would "get caught in that mess."  The General Managers and Logistics Managers made the decision not to enter these vehicles into the retail inventory.  The General Managers did "not want anything aging," so they worked with the Logistics Managers to delay scanning in vehicles.

92.     **Confidential Witness No. 5 ("CW-5")** was employed by Carvana as a Market Operations Manager in a West Coast hub from shortly before the Class Period began until the middle of 2022.  Employees at the hub at which CW-5 worked delivered vehicles to customers that they had purchased from Carvana via the Company's website and picked up vehicles that customers had sold to Carvana.  CW-5 was a high-level employee at the hub and managed the hub's day-to-day operations, including ensuring that vehicles were properly delivered to customers.  CW-5 also managed the employees at the hub. Additionally, CW-5

1   oversaw key performance indicators, budgets, profit and loss, and inventory management for

2   the hub.  The inventory management function included reviewing which vehicles were in the

3   lot at the hub and the vending machine, and being aware of how many vehicles were

4   "coming and leaving."

5         93.    CW-5 explained that the hub received vehicles from a Carvana IRC and many

6   of the vehicles had issues even though they supposedly had been thoroughly inspected at the

7   IRC.  Sometimes the vehicles were damaged during transit.  However, other times, the

8   vehicles clearly had damage prior to being sent from the IRC to the hub (and therefore must

9   have had this damage when they were at the IRC) but had not been noted on Carvana's

10   website when the vehicle was sold, so the depiction of the vehicle on the website was not

11   "100% honest."

12         94.    CW-5 said that because "so many cars" that came to the hub were damaged, it

13   became, and continued to be, "way too much."  CW-5 heard from his/her predecessor at the

14   hub that the issues with the quality of the vehicles had gotten worse "all of the sudden"

15   (apparently prior to when CW-5 joined Carvana), and the quality problems persisted

16   throughout CW-5's own employment at Carvana.  CW-5 explained that Carvana "overspent"

17   on repairs for vehicles because there were so many quality issues and the third-party

18   mechanics he/she hired for the repairs were very expensive.  Overall, CW-5 felt that he/she

19   just "threw money" at vehicles that should have already been fixed at the IRC.  CW-5

20   mentioned there were a lot of returns since Carvana had a seven-day money back guarantee

21   and there were so many issues with the vehicles.  CW-5 said that returns were not too

22   common when he/she first started working at the hub, but got worse after spring 2022.

23         95.    CW-5 explained that when an individual wanted to sell their vehicle to

24   Carvana, that person had to fill out a survey regarding the quality of the vehicle and Carvana

25   essentially "took their word" for it when an offer was made.  When an Advocate from the

26   hub went to pick up the vehicle, the Advocate would try to confirm if the quality of the

27   vehicle matched what the seller had represented.  If it did not match, the Advocate was

28   supposed to call an "inside team" to get a reappraisal.  However, there was only about a

1    50/50 chance that the inside team would do their job and reappraise the vehicle.  Sometimes

2    Carvana's inside team would tell the Advocate to do the reappraisal, or Carvana's inside

3    team would just agree to pay thousands of dollars for "super crappy" vehicles.

4          96.    CW-5 said that the employees at the hub had to check the paperwork for the

5    vehicles they were picking up from the sellers or that were dropped off at the purchaser's

6    premises.  They also had to check IDs to make sure they were not fake.  CW-5 said that there

7    were a lot of fake, or at least "sketchy," buyers and sellers, including some accounts that

8    were obviously fraudulent.  CW-5 also said that sometimes customers did not have insurance

9    or did not show up for their appointments.  CW-5 said that money was wasted when the hub

10   employees hauled a vehicle out to a customer that had intended to purchase the vehicle, but

11   the customer did not show up for the appointment.

12         97.    CW-5 said that inventory for his/her hub was low when CW-5 first started

13   working at the hub so it arguably made sense to overpay for poor quality vehicles, but

14   Carvana continued to pay "crazy amounts" of money for vehicles after the inventory level at

15   the hub was no longer low.  CW-5 recalled that demand really slowed down around June or

16   July 2022 because of increasing interest rates, but Carvana did not reduce the number of

17   vehicles Carvana bought, so Carvana ended up with too much inventory.  CW-5 said that

18   demand started to slow down before June 2022, but it became a bigger problem around

19   summer 2022.  CW-5 heard this was a trend at other hubs from other Operations Managers.

20   CW-5 said that there were weekly meetings for the Operations Managers, and CW-5

21   occasionally spoke with them outside of these meetings.  CW-5 also saw communications

22   from other managers on Slack messaging software.

23         98.    The cost of the third-party mechanics was the main key performance indicator

24   CW-5 was concerned about for his/her hub, and CW-5 discussed it with his/her manager

25   during meetings.

26         99.    CW-5 attended a leadership summit with all Market Operations Managers and

27   senior leadership in April 2022 at Carvana's headquarters in Phoenix, Arizona.  This summit

28   included a Q&A session with Defendants Garcia Junior and Huston.  During this session, the

executives answered questions that had been submitted ahead of time and they also took additional questions afterward.  CW-5 recalled that someone asked about what was going to be done regarding the quality issues with the vehicles that the hubs were receiving from the IRCs.  CW-5 believes this individual may have asked something along the lines of whether the 150-point inspections were actually being performed since there were so many issues with the vehicles the hubs were receiving.

100.   **Confidential Witness No. 6 ("CW-6")** was employed by Carvana as a Centralized Planning Analyst for more than six months during the Class Period and was also employed as a Finance Analyst for more than six months during the Class Period.  CW-6's role in Centralized Planning involved managing vehicle pick-ups and deliveries to customers.

101.   In the Finance Analyst role, CW-6 heard from other employees (possibly during a staff meeting) that there were inefficiencies with logistics.  For instance, it was the practice of the Logistics Group to initiate delivery of a vehicle as soon as a customer placed an order for a vehicle, but before any payment had been made.  If a customer subsequently canceled the order, which customers did, then the delivery that was en route had to be canceled, and Carvana incurred the cost unnecessarily.  CW-6 pointed to other logistical inefficiencies.  For instance, there might be two hubs fairly close to each other and a vehicle was scheduled to be delivered to one of the hubs, only for the delivery to be shifted to the other hub for one reason or another.  Carvana's processes were such that sometimes, instead of simply routing the delivery en route to the nearby hub, the delivery would go back to the point of origin and then be shipped to the intended hub.

102.   CW-6 said he/she "absolutely" learned that Carvana was incurring excessive costs in regards to transporting vehicles from the hubs and IRCs to customers, especially with the geographic expansion of Carvana.  CW-6 said that picking up a customer's trade-in and delivering another car to the same customer who had provided the trade-in required two separate trips.  CW-6 said "they were talking about consolidating" the trips into a single one, but he/she does not know if this was ever implemented.

103.   **Confidential Witness No. 7 ("CW-7")** was employed by Carvana as an Associate Buyer in Tempe, Arizona for more than a year during the Class Period.  As an Associate Buyer, CW-7 reviewed more than 15,000 digital vehicle condition reports and purchased more than 2,000 vehicles valued at $65 million from various vehicle auction platforms.  In addition, CW-7 appraised vehicles using standard vehicle appraisal tools and audited more than 2,000 listings for errors and features that fell below inventory quality standards.

104.   CW-7 said that Carvana used a Tableau server which distilled various financial details, including "the total costs" Carvana incurred to acquire, recondition, and otherwise make the cars available for sale, as well as what the vehicles had actually sold for, from which was derived the Gross Profit Per Unit ("GPU"), *i.e.*, profit for each vehicle sold.  CW-7 said that as of spring 2022, the Tableau server had shown the average GPU for the vehicles to which CW-7 had access had been about $100, but in fall 2022, the GPU for the vehicles CW-7 could see in Tableau had declined to $23, meaning a near 80% decline in less than a year.

105.   CW-7 said he/she believed the Tableau server data was updated daily.  While the majority of vehicles in the Tableau system to which CW-7 had access had been procured by way of online wholesale auctions, some of the cars that had been procured by way of the STC program may have been included.

106.   CW-7 said that another important metric available in the Tableau server was the average number of days on-site, which was the number of days from when Carvana had purchased a vehicle to when the vehicle had been sold.  In the same timeframe as when the GPU was declining, the average number of days on-site for the same vehicles had been increasing.

107.   CW-7 confirmed that Carvana definitely overpaid for vehicles.  In CW-7's opinion, the reason Carvana ended up overpaying for vehicles reflected the Company's "mission statement" to become the biggest online car company.  CW-7 noted that Carvana "loved to compare" itself to CarMax and Amazon.  CW-7 believed Garcia Junior wanted to

1   make Carvana as big as possible regardless of the cost or internal differences in opinion in

2   regards to strategy.  CW-7 said that during the COVID-19 pandemic, Carvana had been

3   bidding and paying on average 6% "higher than everyone else" on online wholesale auctions.

4       108.   CW-7 said that he/she and other employees were told that Carvana acquired

5   ADESA so that Carvana could get within 100 miles of the most populated areas of the

6   country and thereby extend its reach.

7       109.   **Confidential Witness No. 8 ("CW-8")** was employed by Carvana as a Buyer

8   and Category Analyst in Carvana's Tempe, Arizona, Corporate Headquarters for more than

9   18 months during Class Period.  As a Category Analyst, CW-8 oversaw all aspects of

10  inventory management, pricing, inventory levels, margins, and analytics for certain vehicle

11  segments.  CW-8 also managed pricing operations, including executing initial price targets

12  and markdowns in order to move inventory.  As a Buyer, CW-8 worked to acquire vehicles

13  for Carvana from auctions using a system called vAuto, which was owned by Manheim.

14      110.   CW-8 and his/her team used Tableau software, from which numerous reports

15  could be derived, and Microsoft SQL, which connected to a computer server where data was

16  stored.  Using this software enabled CW-8's team to see inventory data and various metrics,

17  including how many vehicles Carvana had in inventory, how long these vehicles had been

18  sitting around without being sold, Carvana's website traffic, and supply/demand ratios.

19      111.   Category Analysts like CW-8 set the final prices based upon the ranges from

20  the algorithm and other factors, such as the current inventory Carvana had on hand.  CW-8

21  also worked with the data scientists on "markdowns" (*i.e.*, lowering prices on previously

22  priced vehicles) for vehicles that were not selling.  This process involved lowering the price

23  of a vehicle by $500 to $1,000 and then potentially lowering it again if the vehicle still did

24  not sell after 7 days.

25      112.   According to CW-8, sometimes Carvana's Buyers paid "outrageous" prices for

26  vehicles, which lowered margins because the vehicles could not support higher selling

27  prices.  CW-8 explained that vehicles were rated Tier 1 to Tier 5, and sometimes the Buyers

28  paid up to $5,000 over the market price to acquire vehicles in certain Tiers.  CW-8 also said

1   that around the summer/fall 2021 timeframe there was a lot of pressure on CW-8's team, the

2   Buyers, and the STC team to get every vehicle possible, no matter the price. As a reflection

3   of the efforts to procure as many vehicles as possible, CW-8 added that the expectation was

4   that the titles for the vehicles could be acquired later if they were not available at the time of

5   purchase.

6       113.   CW-8 said that as a result of this pressure, Carvana essentially "overbought"

7   vehicles during 2021, and CW-8's team started to become concerned as they saw the

8   inventory levels rising. Around fall and winter of 2021, CW-8's team began to raise

9   concerns about the high level of inventory to director-level employees because it was

10  becoming difficult to sell certain types of vehicles, CW-8's team had to lower prices, and

11  margins were decreasing. CW-8's team had weekly meetings every Thursday with an

12  Associate Director where they would go over each segment and provide inventory updates.

13  CW-8's teammates raised concerns about the excess inventory in a couple of these meetings

14  and one of his/her coworkers, who was a Financial Analyst, made a report about this topic.

15  However, his/her team's concerns were ignored and the Buyers were told to continue buying

16  vehicles. By March 2022, "everything was on fire" because Carvana was "totally

17  overstocked" and the forecast had to be lowered.

18      114.   **Confidential Witness No. 9 ("CW-9")** was employed by Carvana as a Lead

19  for Customer Experience in Carvana's Tempe, Arizona headquarters for more than six

20  months during the Class Period. As a Team Lead, CW-9 supervised more than a dozen

21  Customer Experience Advocates. Prior to Q1 2022, CW-9's team had handled only post-

22  sales calls from customers, primarily pertaining to issues with vehicle delivery delays,

23  registration and title delays, and vehicle quality and condition complaints. Beginning around

24  Q1 2022, Carvana merged the pre-sales and post-sales Customer Experience teams, so that

25  CW-9's team began handling both types of calls. Pre-sales calls primarily pertained to

26  questions about the purchasing process, including the STC program.

27      115.   There was a lot with which CW-9 disagreed, including the lack of action taken

28  by other Carvana departments in regard to issues such as vehicle quality, including

1   delivering vehicles without the vehicle inspections being completed, vehicle delivery delays,

2   registration delays, the expiration of temporary plates, and Carvana encouraging these

3   customers to continue driving the cars while reassuring them that Carvana would reimburse

4   them if they were to be cited.

5       116.   CW-9 said the Customer Advocates on his/her team handled anywhere from 10

6   to 30 calls a day (the number varied depending on call duration).   The calls were from all

7   over the country.   Registration delays, which primarily meant that a title had not been

8   provided to the customer, amounted to roughly half of the calls the team had handled before

9   the team began handling both pre- and post-sale calls.   CW-9 said that he/she noticed an

10  increase in the number of calls from customers experiencing title delays beginning in Q1

11  2022.

12      117.   CW-9 attended Carvana all-hands calls in which Defendant Garcia Junior

13  spoke to employees.   According to CW-9, the title and registration issues Carvana was

14  experiencing were raised by employees on these calls.   CW-9 said that the questions to

15  Garcia Junior from employees were along the lines that they were getting inundated with

16  calls regarding registration problems and they asked Garcia Junior to elaborate on steps the

17  Company was taking to mitigate the problems and provide better solutions.   Garcia Junior's

18  response was always along the lines that Carvana was working on a solution.   CW-9

19  particularly remembered a call in January 2022 in which questions about registration were

20  posed to Garcia Junior.

21      118.   Vehicle quality issues also represented a large portion of the calls that CW-9's

22  team handled.   CW-9 said those issues ranged from check engine lights coming on, to

23  mismatched tires, faulty emissions, damage to the vehicle (including at the time of delivery),

24  accidents the vehicle had been in that had not been reported to CarFax, and vehicle recalls

25  that had not been processed correctly – "or at all."

26      119.   When the pre-sales and post-sales teams were merged in Q1 2022, CW-9

27  estimated that probably 30% of calls pertained to pre-sales, 35% to 40% pertained to

28  registration and title issues, and 25% to 30% pertained to quality.   Prior to the merger, the

1  calls had been fairly evenly split between quality issues and registration and title issues.

2  CW-9 dealt with customers in other states who were experiencing quality problems.

3  According to CW-9, the quality shortcomings and problems seemed to CW-9 to be pervasive

4  everywhere Carvana operated, not just in specific areas.

5        120.   CW-9 said that, as Carvana grew, it began accepting substandard cars and that

6  the STC program took vehicles that were often converted for sale through wholesale

7  channels.

8        121.   **Confidential Witness No. 10 ("CW-10")** was employed by Carvana as a

9  Registration Specialist in Carvana's Tempe, Arizona headquarters for more than six months

10 during the Class Period.  As a Registration Specialist, CW-10 reviewed documentation from

11 customers registering vehicles in multiple states, made sure that certain documents (*i.e.*,

12 proof of insurance, driver's license) were valid, completed vehicle title work with dealer and

13 customer information, worked with multiple vendors to ensure that all deal and customer

14 information had been entered correctly and that all necessary documentation had been

15 received before submitting to the DMV, and created temporary operating plates for

16 customers.  In mid-2022, CW-10 became a Specialist Point of Contact ("SPOC"), where

17 CW-10 helped Customer Advocates answer customer questions regarding registration.  As a

18 SPOC, CW-10 also worked with his/her team and others in the Company to make sure that a

19 customer's registration was completed correctly.

20       122.   When CW-10 was on the SPOC team, he/she recalled one instance where a

21 vehicle had been purchased from a seller in Texas, but the seller never provided a copy of the

22 title.  Carvana then sold that car to a buyer in Illinois.  However, Carvana was unable to get a

23 duplicate copy of the title, CW-10 believes, because there was an issue with the vehicle's

24 Carfax report.  CW-10 also said that there were other issues with getting copies of the titles

25 for new customers, including when sellers had not signed the paperwork that allowed

26 Carvana to get a duplicate title, or when sellers had not signed a power of attorney form that

27 allowed Carvana to transfer the title.  CW-10 said that sometimes getting the title could be a

28 "big mess."

123.    CW-10 recounted that there had been two vehicle sales when he/she had been on the SPOC team for which the Customer Advocates had been trying to get the titles for over a year, which meant the buyers had been unable to drive their vehicles.  CW-10 said there had been a lot of research notes and in regards to one of them, there had been a major discrepancy between the mileage in the Carfax report and the vehicle's odometer.  CW-10 reported this, and it was apparently found to have happened a "multitude" of other times.

124.    CW-10 recounted another incident in which the buyer had been unable to drive the vehicle he/she had purchased from Carvana because Carvana was waiting to obtain the title, but all CW-10 could say to that customer was "we're working on it."  CW-10 learned about the other incidents when he/she had made a report to his/her Team Captain (who was not CW-10's direct supervisor, but someone from whom he/she sought answers to questions he/she had), and CW-10 brought it up to the Supervisor, and then to a manager.   In this discussion, the Team Captain apparently referenced another team that was involved with issues and discrepancies between the Carfax reports and the actual condition of the vehicles Carvana had sold to customers, including the odometer readings not matching the Carfax reports.  CW-10 said there was "a huge hiccup" with the Carfax report for another vehicle that had a salvage title, which apparently set forth who had repaired the vehicle and when, but the mileage on the title ended up being off by 100,000 miles.  This discrepancy had not been picked up by Carvana before the erroneous mileage was entered into Carvana's system and Carvana sold the vehicle.

125.    In CW-10's opinion, these kinds of problems transpired because Carvana primarily just wanted to "get money."  Specifically, CW-10 thinks it is the case that mistakes like these occurred because Carvana was so anxious to get and sell cars they did not adequately check everything.  CW-10 confirmed and said it was a common opinion amongst personnel that Carvana was buying cars at a breakneck speed and that it was not adequately checking them.  This common sentiment was also shared by CW-10's former supervisor.  On the basis of customer questions and complaints, it had seemed to him/her that these kinds of problems with poor vehicle quality had been happening a lot.

126.   **Confidential Witness No. 11 ("CW-11")** was employed by Carvana as a Market Operations Team Lead at a hub in the Southeastern U.S. for over a year during the Class Period.  CW-11's role involved running the team that delivered vehicles to customers that customers had purchased online from Carvana.  CW-11's team also brought vehicles to the Company's local vending machine, and they also picked up vehicles that customers had sold to Carvana online.  CW-11 oversaw multiple Managers, Customer Advocates, and Lot Attendants.

127.   CW-11 said that Carvana was essentially purchasing vehicles "sight unseen," and initially his/her team was not expected to do much to verify the condition of the vehicles. However, he/she recalled attending a conference call with the buying department from the corporate office, and was told that CW-11's team should call the buying department when they went to pick up a vehicle if the vehicle was not in the condition that had been represented by the seller.  CW-11 recalled an incident where a seller dropped off a Jeep Wrangler that was in "awful" condition, including missing an entire panel, but the seller had been offered "a ton of money" for the vehicle by Carvana's website because he/she had listed the vehicle in perfect condition.  CW-11 called the buying department and sent them pictures of the vehicle, but was told "it's fine" and that Carvana would purchase the vehicle for the quote that had been provided by the website.

128.   CW-11 recounted that the same day as the Jeep Wrangler was picked up, three other vehicles with similar problems were dropped off at the hub.  Two of these were handled by CW-11's subordinates and one of them – a Ford Explorer – CW-11 had handled himself/herself.  The Ford Explorer was completely lacking two A-frame pillars, even though the seller had not identified any such deficiencies and had rated the car as in good condition.  As with the Jeep Wrangler incident, when CW-11 contacted the buying department, he/she was told to "do the deal."  The same thing happened to members of CW-11's team, so they stopped calling the buying department when vehicles were in bad condition since doing so did not seem to accomplish anything.  CW-11 said it was definitely the case that Carvana's practices in such situations meant Carvana was purchasing vehicles

1    at inflated prices.  According to CW-11, the buying department did not actually care about

2    the condition of the vehicles and just wanted to "get as many cars as it could."

3         129.    CW-11 said the majority of reconditioned vehicles were stored at the IRCs.

4    However, as Carvana's accumulation of vehicles increased, this also necessitated his/her hub

5    to begin storing vehicles at an adjacent lot and then also at another lot located perhaps half-a-

6    mile away.  Altogether, there ended up being 300 vehicles stored at the 3 lots.  As CW-11

7    put it, Carvana was "always looking for places" to store vehicles.

8         130.    Employees at CW-11's level and market team leaders attended Zoom calls

9    with the Company's C-level executives (including Defendants Garcia Junior, Jenkins, and

10   Huston) probably every quarter.  On one of these Zoom calls in early 2021 attended by

11   Defendant Garcia Junior, a meeting attendee expressed concern about the poor quality of the

12   cars Carvana was purchasing.   According to CW-11, one of the C-level executives

13   responded: Carvana was "just worried about growth and not procedural" operations.  CW-11

14   recalled that this same C-level executive spoke about the importance of growth on that call

15   and suggested that employees read a certain book (he/she could not remember which one)

16   because it would help them understand that growth is all that matters.  CW-11 remembers

17   he/she recalled thinking: "Wow, they don't care about operations, just growth."  There was

18   time for questions and answers at the end of these calls, and during every call someone in a

19   market operations role complained about the poor quality of the vehicles they received from

20   the reconditioning centers.  CW-11 said that this was the number one complaint from the

21   operations side of the business because they felt guilty delivering poor quality vehicles to

22   customers.  CW-11 was pretty sure that these C-level Zoom calls were recorded because he

23   recalled listening to a recording of one of the Zoom calls that he had missed.

24        131.    CW-11 eventually learned that selling vehicles without the title and issuing

25   temporary plates from other states was a common practice at Carvana.  CW-11 started to

26   learn the truth because he/she spoke with employees at the hub who worked on registering

27   vehicles.  They told CW-11 that there was a drawer of documentation for vehicles that had

28   been sold by Carvana but which they could not get registered since the titles were missing.

132.    CW-11 recalled reviewing a Google document spreadsheet of the vehicles for which registration could not be completed since the titles were missing and there were notes made by Carvana personnel in Arizona along the lines that they were working on obtaining the title.

## VI.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS

133.    Leading up to and throughout the Class Period, Defendants engaged in a fraudulent scheme that operated as a deception on the investing public concerning the Company's growth, profitability, and business model.  The purpose of the scheme was to artificially pump up the price of Carvana's stock so as to allow the Individual Defendants to dump billions of dollars of their personal holdings.  Defendants' pump-and-dump scheme worked as planned; Defendants divested themselves of more than $3.87 billion during the Class Period.

### A.    Leading Up to the Class Period, Investors Questioned Carvana's Growth Story

134.    Immediately preceding the Class Period, two events combined to drive down Carvana's stock price.  First, analysts expressed alarm that Carvana's growth was slowing.  On February 27, 2020, Morgan Stanley stated in its report that "[i]f the growth starts to slow significantly, and the company is still not profitable, ***there will be a transition away from growth investors, and we believe that how investors think about the valuation of the stock will change***."[34]  Similarly, CFRA told its readers that "[w]hile we remain positive on e-commerce growth in the auto retail space, we think investors will be less willing to look past CVNA's slowing top line growth and persistent lack of profitability than they were in 2019."[35]  Second, the novel coronavirus created a global pandemic, driving down global stock markets.  In response, Carvana's stock price fell to a multi-year low.

---

[34]   Morgan Stanley analyst report, "4Q19 Review: Growth Slowing & Not Yet Profitable" (Feb. 27, 2020).

[35]   CFRA analyst report (Feb. 27, 2020).

135.    Defendants knew that the depressed stock price created an opportunity for Garcia Senior to buy low and enrich himself once Defendants implemented their scheme to pump up Carvana's stock price so that they could dump their personal holdings at artificially inflated prices. Accordingly, on March 30, 2020, Defendants orchestrated a direct offering so that Garcia Senior, the Company's controlling shareholder, could purchase $25 million of Class A common stock at unreasonably low price to make billions once Carvana's stock price increased.

136.    Notably, as stated in a derivative court's order denying the Garcias' motion to dismiss for failure to state a claim: "***Garcia Senior 'participated behind the scenes in the planning and execution of the very abbreviated process that led up to the Direct Offering*.'**" For example, "[o]n Saturday, March 28, 2020, Garcia Junior forwarded the stock issuance allocations list to Garcia Senior, referring to the list as '[p]retty solid' and stating that they had to '***figure out plan on your money*.'**" *Carvana Co. S'holders*, 2022 WL 2352457, at *4.[36]

**B.    Defendants Engaged in a Fraudulent Scheme to Inflate Carvana's Retail Units Sold and Stock Price**

137.    Critical to the success of Defendants' scheme to pump the stock was a story of continued hyper-growth where, under Carvana's scalable model: "***[O]ur business gets better as it gets bigger*.**" To secure a high valuation so Defendants could cash out at top dollar, Defendants needed to demonstrate to investors that Carvana could accelerate and sustain its hyper-growth while leveraging its purported "capital-light" expansion model, groundbreaking logistics network, and competitive advantages over traditional car dealerships. Thus, Defendants planned and executed a scheme to grow the Company's retail vehicle sales by "frequently aquir[ing] sales that were less profitable," including sales in

---

[36]    The court's order also confirms that Carvana's board members are beholden to, and thus not independent of, Defendant Garcia Senior. *See Carvana Co. S'holders,* 2022 WL 2352457, at *1 ("Plaintiffs' allegations 'support a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection' between Sullivan [a Carvana director] and Garcia Senior."); *see id.* at *16 (finding "plaintiffs have pled particularized facts raising a reasonable doubt as to Platt's independence").

"markets with lower profitability due to long distance from inventory."[37]   Defendants abruptly ramped up buying cars from customers by lowering the Company's purchasing and verification standards.  Defendants further boosted retail vehicle sales by violating state laws regarding title and registration.  In addition, Defendants inflated sales by expanding into more than 100 disparate markets knowing they lacked the necessary infrastructure to serve those markets, leading to outsized costs and logistic constraints.  Defendants also obscured that the Company had entered into an arrangement with the Garcias' DriveTime to sell thousands of cars with no benefit to Carvana except for the boost to its reported unit sales.  While Defendants' scheme achieved a temporary bump in unit sales – and in Carvana's stock price – Defendants concealed the devastating consequences to the Company.  *See* §VI.C.  When the truth came out that Carvana was not the high-growth, capital-light, Amazon of used cars that Defendants made it out to be, Carvana's Class A common stock plummeted more than 97%, leaving Carvana on the verge of bankruptcy.

138.   As detailed below, Defendants engaged in the following course of conduct to perpetuate their scheme.

139.   ***First***, at the beginning of the Class Period, Defendants drastically increased the number of cars Carvana purchased from customers, "buying more than 100% as many cars from customers as [it was] selling to customers."   To carry out this abrupt change, unbeknownst to investors, Defendants lowered the Company's purchasing and verification standards for the cars it purchased, buying "as much as was humanly possible."   This allowed Carvana to induce trade-ins and display a wider inventory pool on its website, which increased sales.

140.   For example, according to CW-3, before the beginning of the Class Period, Carvana was strict about not completing purchases when it discovered that sellers had not accurately described the condition of their vehicle, even making them re-submit questionnaires with accurate information.  Immediately before and during the Class Period,

---

[37]   Q3 2022 Shareholder Letter.

however, CW-3 stated that Carvana relaxed its standards to accept "all vehicles" and did not genuinely inspect vehicles before purchasing them anymore.  CW-3 observed that Carvana purchased a lot of "trash vehicles" after lowering its standards.  Corroborating CW-3's experience, CW-5 heard from his/her predecessor at the hub that the issues with the quality of the vehicles had gotten worse "all of the sudden."  Likewise, CW-1 stated that Carvana lowered its standards when it came to accepting trade-ins as long as the customer was also buying a car from Carvana.  In fact, CW-4 was told at a meeting of Carvana's initiative to buy "any car" to secure an increase in trade-ins.

141.   Indeed, CWs-1, 3, 4, 5, 8, 10, and 11 all report that during the Class Period it was Carvana's general practice to purchase cars sight unseen and do little to nothing to verify the accuracy of sellers' representations of their vehicles.  CW-11 reported that he/she and his/her team members stopped calling the buying department when vehicles were in worse condition than the seller had described since doing so did not seem to accomplish anything, and it appeared that the buying department did not actually care about the condition of the vehicles and just wanted to "get as many cars as they could."  Corroborating CW-11's account, CW-5 stated that there was only a 50/50 chance that a vehicle would be reappraised if it did not match the seller's description.  Likewise, CW-2 confirmed that he/she was overruled when voicing concerns about the quality of vehicles as "leadership would say take it."

142.   Compounding matters, according to CWs-1, 3, 4, 5, 7, 8, and 11, Carvana routinely paid customers "outrageous" prices, sometimes thousands of dollars over asking price, for vehicles in terrible condition.  As CW-7 reported, he/she understood that the reason Carvana did this was the Company's "mission statement" to become the biggest online car company.

143.   As discussed *infra*, unbeknownst to investors, this course of conduct had adverse consequences for the Company, including significant costs and logistical constraints.  §V.I.C.

144.   **Second**, to boost sales, Defendants embarked on a rapid and unsustainable nationwide expansion plan to enter over 150 new markets, more than doubling the Company's footprint in just six quarters.  Unbeknownst to investors, Defendants did so even though they knew or recklessly disregarded that many of these markets were less profitable due to their distance from Carvana's existing IRCs and that they strained Carvana's underbuilt logistics network.

145.   Carvana's network required the buildout of IRCs as IRCs bridged the distance between markets and handled the intake, storage, processing, and reconditioning of vehicle inventory.  Without sufficient IRC coverage, Carvana was, in certain instances, buying a vehicle from a customer in one state, transporting the vehicle to another state for inspection and reconditioning, and then selling and delivering the vehicle to a customer in a third state.  But, in an effort to appear "capital-light" as promised, Defendants failed to keep Carvana's buildout of costly IRCs on pace with its market expansion.  For example, in Q2 2020, Defendants added 100 new markets without adding a **single** IRC.  As shown in the chart below, Carvana's expansion plan was predicated on opening markets that were significant distances from existing IRCs.

| | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | CLASS PERIOD TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New markets added | 15 | 100 | 0 | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 169 |
| New markets 100 miles or more from an existing IRC when opened | 15 | 83 | - | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 152 |
| as a % of new markets added | 100% | 83% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| New markets 200 miles or more from an existing IRC when opened | 14 | 46 | - | 3 | 6 | 27 | 9 | 3 | 1 | 1 | 110 |
| as a % of new markets added | 93% | 46% | - | 60% | 100% | 100% | 100% | 100% | 50% | 50% | 65% |

146.   Carvana's network required the buildout of IRCs as IRCs bridged the distance between markets.  Further, Defendants knew or recklessly disregarded that Carvana incurred at least $750 more in costs per retail car sold in markets 200 miles or more from a Carvana IRC.  In fact, Garcia Junior disclosed this fact when offering a "**perspective on how powerful**

1   *proximity can be*."[38]  Carvana also referenced the significance of markets being 100 miles

2   from an existing IRC when it bought ADESA "to put 78% of U.S. population within 100

3   miles of a Carvana inspection and reconditioning center."   Defendants emphasized

4   "SHORTER DISTANCE = SAVINGS . . .  Increased customer conversion; Faster inventory

5   turn times; Lower inbound transport & logistics costs; Lower shipping costs to customers."

6   Despite this, and because Carvana had already achieved market coverage near its existing

7   IRCs but still sought to report an increase in retail sales growth as part of its scheme, the vast

8   majority of new markets added were necessarily a significant distance from an existing IRC,

9   as demonstrated by the map below.



147.   As discussed *infra*, unbeknownst to investors, Defendants' expansion into new

markets far from existing IRCs had adverse consequences for the Company.  The resulting

---

[38]  Q4 2021 Conference Call.

logistical constraints and increased expenses eventually required Defendants to spend $4 billion to purchase and integrate ADESA in order to fix the problem.  §§VI.C.1.-2.

148.  ***Third***, because complying with state title and registration laws would slow sales growth, Defendants decided to flout those requirements and push through sales in violation of the law.  Indeed, as the *Barron's* exposé, *Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars*, later revealed, in Carvana's "haste to seize market share from competitors" and report additional units sold, Carvana sold cars to customers before it held title to those cars and before it could get them registered to their new owners.[39]

149.  This practice was systematic and nationwide.  For example, CW-3 (Phoenix, Arizona) estimated that Carvana only had around ***half*** of the titles for the vehicles it sold wholesale at the time of sale.  Further, CW-3 noted that, prior to the Class Period, he/she received only around 10 to 15 calls a week from dealers regarding title issues.  But after Defendants enacted their scheme, a "fire started" and he/she started receiving around 100 calls per week regarding title issues.  CW-9 (Tempe, Arizona) said the Customer Advocates on his/her team handled calls from all over the country.  Registration delays, which primarily meant that a title had not been provided to the customer, amounted to roughly half of the calls the team had handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from customers experiencing title delays beginning in Q1 2022.  CW-10 (Tempe, Arizona) described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-11 (Southeastern U.S.) reported that there was a drawer of documentation for vehicles that had been sold by Carvana but which they could not get registered since the titles were missing.  CW-11 also described reviewing a Google spreadsheet of the vehicles for which registration could not be completed since the titles were missing.  That spreadsheet contained notes made by Carvana personnel in Arizona

---

[39]  Jacob Adelman, *Carvana Sought to Disrupt Auto Sales.  It Delivered Undriveable Cars*, Barron's (June 24, 2022), https://www.barrons.com/articles/carvana-used-cars-registration-problems-51656111441 ("*Undriveable Cars* exposé").

along the lines that they were working on obtaining the title.  CW-8 (Tempe, Arizona, Corporate Headquarters) said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 (Midwestern U.S.) said there was a Google spreadsheet that tracked vehicles without titles for the entire IRC, and "there were a ridiculous amount of cars on the list."  According to CW-4, it was well known internally that title issues were a common problem – CW-4 described it as a huge mess.  Ultimately, Defendants admitted that they systematically violated the law.  ¶¶190-191.

150.    Worse still, because Carvana could not register the cars it sold absent title, the Company issued countless temporary plates, sometimes as many as ten times to a single customer.  And these temporary plates were often issued by states with more liberal registration requirements than the state in which the car was purchased, in violation of state laws and regulations.  CW-11 explained that the issuance of these temporary plates was a common practice at Carvana.  In addition, CW-9 expressed frustration with Carvana's issuance of temporary plates and explained that Carvana encouraged customers to continue driving despite lapsed paperwork.

151.    Corroborating the confidential witness accounts, the *Carvana Faces Government Scrutiny and Fines* Article, revealed that Carvana "provided [a Michigan buyer] with temporary registrations from Georgia, Tennessee and Arizona in lieu of registering his car in Michigan."[40]  Similarly, in the *Undriveable Task Force* exposé, *Barron's* revealed that "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is *wide[]-reaching*" and described instances where Carvana had sent at least ten different license plates from different states to a customer.  Similarly, state and law enforcement agency investigations, findings, and suspensions further confirm Defendants'

---

[40]    Ben Foldy and Mike Colias, *Carvana Faces Government Scrutiny and Fines Following Consumer Complaints*, Wall St. J. (Oct. 22, 2021), https://www.wsj.com/articles/carvana-faces-government-scrutiny-and-fines-following-consumer-complaints-11634902676 ("*Carvana Faces Government Scrutiny and Fines* Article").

1   systematic and illegal practices.  §VII.  Even Defendants would later admit to this course of

2   conduct.  *Id.*

3        152.   As discussed *infra*, unbeknownst to investors, this course of conduct had

4   adverse consequences for the Company, including exposing the Company to legal and

5   regulatory backlash.  §VI.C.3.

6        153.   ***Fourth***, to further inflate its reported retail unit sales, Carvana entered into a

7   series of revenue pass-through arrangements with Garcia Senior's closely affiliated company

8   DriveTime (of which Garcia Junior and his children own nearly a quarter through a trust).

9   These arrangements involved Carvana purchasing thousands of fully reconditioned vehicles

10  from DriveTime, which were then resold on the Carvana website.  However, in certain

11  instances, the transactions lacked any economic substance for Carvana, and served only to

12  inflate Carvana's reported retail sales volume.  For example, on certain sales of cars acquired

13  from DriveTime, Carvana would pass the entire proceeds from the sale back to DriveTime.

14  Carvana admitted that "we purchase reconditioned vehicles from DriveTime . . . in other

15  instances our purchase price [paid to DriveTime] is the list price on Carvana.com after a

16  customer has placed an order on the vehicle" (*i.e.*, Carvana's sales price).[41]   In these

17  transactions, Carvana acted as DriveTime's middle man or agent, but still recorded the

18  revenue and retail unit sales on ***its*** books.[42]

19       154.   Carvana concealed the full extent of these arrangements from investors,

20  offering only piecemeal and inconsistent disclosures concerning the pass-through revenue

21  arrangements.  For example, Carvana did not report actual retail unit sales sold pursuant to

22  these arrangements but disclosed only information regarding the expense incurred to

---

[41]   Description of Wholesale Vehicle Purchase Agreements included in Carvana's March 23, 2022 DEF 14-A.

[42]   As a law professor at Washburn University stated, the Garcias "'have a convoluted tangle of interrelated companies and related party transactions, and it's very difficult to understand or pull apart.'"   Moreover, "[t]he problem with related-party transactions with large shareholders . . . is 'they don't need to make money from this entity because they own the other entities.'"   Simply put, Carvana "'doesn't have to make money for them to make money.'"  *Family Business Deals* Article.

1  purchase vehicles from DriveTime.  Carvana also disclosed inconsistent facts about these

2  arrangements across its SEC filings.

3      155.   The DriveTime pass-through sales arrangements had a material impact on

4  Carvana's reported retail sales volume and reported growth.  Although the full details

5  regarding these agreements were concealed in Carvana's quarterly SEC filings, certain

6  expense figures can be used to estimate the vehicles Carvana sold pursuant to these

7  arrangements.  For example, Carvana acknowledged in its 2022 Form DEF 14-A Proxy

8  statement that it incurred $168 million of expenses purchasing reconditioned vehicles from

9  DriveTime in a single quarter, Q4 2021.  Carvana also acknowledged additional expenses

10  pursuant to DriveTime "Retail Vehicle Acquisition" arrangements in its Forms 10-Q starting

11  in Q2 2020.  The chart below depicts: (i) the estimated retail units sold pursuant to the

12  Wholesale Vehicle Purchase Agreements that Carvana and DriveTime entered into on

13  September 29, 2022; and (ii) the estimated retail units sold pursuant to other "Retail Vehicle

14  Acquisition" agreements that Carvana and DriveTime entered into during Q2 2020.[43]  As

15  shown below, Carvana's estimated unit sales from these arrangements were material,

16  including over 7,000 vehicles in Q4 2021, making up over 600% of Carvana's reported

17  sequential growth that quarter and 17% of its reported annual growth.

18

|  | Q3 2021 | Q4 2021 |
|---|---|---|
| Total disclosed expenses on "Wholesale Vehicle Purchase Agreements" | - | $ 168,000,000 |
| Total disclosed cost of sales on "Retail Vehicle Acquisition" agreements | $ 17,000,000 | - |
| Avg. cost of sale per retail unit | $ 21,902 | $ 23,869 |
| Estimated unit sales sold pursuant to Drivetime agreements | 776 | 7,038 |
| as a % of reported retail volume y/y GROWTH | 2% | 17% |
| as a % of reported retail volume sequential GROWTH | 19% | 660% |

23      156.   ***Defendants' plan worked***.  From the outside, it appeared that Carvana was

24  getting better as it got bigger.  Defendants touted its rapid retail sales growth while pitching

25  that this growth was sustainable because of Carvana's e-commerce model.  For example,

26  Defendants exalted the numerous advantages it had over traditional car dealerships, such as

27  [43]  *See* Description of "Retail Vehicle Acquisition" agreement with DriveTime, included in
28  Carvana's Form 10-Q for the period ended September 30, 2021.

its nationally pooled inventory supported by its groundbreaking logistics network that could sell a car to any customer anywhere, and its "capital-light" market expansion model. §VIII.A.-C.

157. The market was duped and rewarded Defendants. For example, four days after the Company announced that it was "named to the Fortune 500 list for the first time, becoming one of the four fastest companies to ever make the list with organic growth, along with Amazon," which purportedly demonstrated that Carvana's business "model has uniquely powerful unit economics and scalability," Carvana's Class A common stock reached its record high price of $376 per share. During this time, Defendants dumped more than $3.87 billion of their Carvana holdings.

## C. Defendants Concealed the Devastating Effects of Their Scheme

158. Unbeknownst to investors, Defendants' "bigger is better" story was a fiction. Indeed, Defendants knew or recklessly disregarded that Carvana's growth-at-any-cost scheme was unsustainable. Defendants' fraudulent course of conduct to fuel hyper-growth without regard to profitability or critical infrastructure left the Company facing an existential crisis, with runaway expenses, billions of dollars of debt, a crippled logistics network, and legal and regulatory backlash.

### 1. Defendants Hid the Logistical Nightmare Created by Their Scheme

159. ***Defendants' unsupported, rapid market expansion caused substantial logistics constraints and costs***. Defendants' decision to expand rapidly into new markets across the country ravaged Carvana's purportedly efficient nationwide logistics network, revealed the absurdity of its "capital-light" expansion model, and significantly increased Carvana's expenses.

160. As discussed *supra*, unbeknownst to investors, Defendants rapidly expanded into markets across the country despite needing critical infrastructure to support Carvana's nationwide expansion. *See* ¶¶144-147, 232(d). Unsurprisingly, Defendants later admitted near the end of the Class Period that Carvana's rapid "location growth" created "more

1   vehicle moves, more miles traveled," "higher number of constrained routes," and a "higher

2   degree of backlog on constrained routes."[44]

3       161.   Carvana's logistic constraints were costly as the Company was forced to rely

4   on expensive third-party providers for vital logistics and reconditioning functions.  As CW-4

5   stated, Carvana's range for picking up and delivering vehicles was only five hours out and

6   five hours back (although third-party haulers could go further).  As such, a customer in Ohio

7   purchasing a car that was in Oregon would exceed this range.  Essentially, there was not a

8   hub or IRC between Indiana and Oregon that would fall within the five-hour transportation

9   limit.  According to CW-4, the sheer amount of money it would cost to pay third-party

10  haulers to cover such distances was prohibitive.  Thus, by the end of the Class Period,

11  Carvana would need to "[r]educe third-party inbound transport share," "[i]n-sourc[e] third-

12  party pickups" for Carvana's "[l]ast-mile delivery," and "[r]educe third-party shipping" to

13  severely curtail logistics expenses.

14      162.   Further, although Garcia Junior understood "how powerful [the] proximity"

15  between an IRC and a market was to Carvana's expenses, the vast majority of new markets

16  added were necessarily a significant distance from an IRC because Carvana had already

17  achieved market coverage near its existing IRCs but still sought to report growth in unit sales

18  as part of its scheme.  *See* ¶¶144-147, 232(e).  Thus, during the Class Period, Carvana's

19  logistics expenses spiked by 300% and its market occupancy costs (*i.e.*, facilities expenses)

20  increased by nearly 250% between the start of the Class Period and Q1 2022.  In Q1 2022,

21  Carvana admitted that logistical constraints caused a "more than $600 per retail unit YoY

22  increase in reconditioning and inbound transport costs."

23      163.   To survive, by the end of the Class Period, Defendants would "reduce

24  advertising" aimed at acquiring sales in these new markets and "take other actions to

25

26

27

28  ────────────

[44]  May 2022 Updated Operating Plan.

- 52 -

1    improve profitability, such as increasing long-distance shipping fees."[45]    Tellingly, one

2    media outlet noted:

3        According to management, a key piece of the advertising pullback was, "less
         advertising in distant markets with less profitable sales." Step back and think

4        about that for a moment. *It means that the company had historically grown
         in these markets even though they weren't all that attractive. It was growth*

5        *for growth's sake and not necessarily growth to improve profitability*.[46]

6        164.    As discussed *infra*, Carvana would be forced to acquire ADESA for billions of

7    dollars to remedy the unmanageable logistical constraints and control ballooning costs.  As

8    CW-4 stated, the "biggest reason" for acquiring ADESA had been its locations which

9    reflected that ADESA operated nationwide and had something like 51 or 52 locations.  Thus,

10   according to CW-4, Carvana's acquisition of ADESA was a consequence of Carvana's

11   efforts to expand into new markets that might have been far from existing Carvana IRCs.

12   Indeed, CW-7 said that he/she and other employees were in fact told that Carvana acquired

13   ADESA so that Carvana could get within 100 miles of the most populated areas of the

14   country and thereby extend its reach.

15       165.    *Buying cars from customers also created substantial logistical constraints*

16   *and costs*.  For example, Defendants' decision to abruptly and drastically alter its plan to buy

17   more cars from customers to inflate retail units sold caused sudden and overwhelming

18   inventory growth.   Carvana's inventory growth created "parking constraints," "load

19   imbalances," and "increased the number of vehicles moved and total vehicle miles traveled,

20   adding to costs and logistics network complexity."[47] As Garcia Junior noted, "[y]ou need to

21   warehouse and recon those cars to get them retail ready . . . You need a place to stage the

22   logistics."  But Carvana's "capital-light" model lacked such a place.

23       166.    In addition, because Defendants lowered Carvana's purchasing and verification

24   standards when implementing their scheme, Carvana was flooded with "trash cars" that were

25   ---
     [45]  Q3 2022 Shareholder Letter.

26   [46]  Reuben Gregg Brewer, *3 Signs Carvana Has Hit the Wall*, The Motley Fool (Feb. 2,
27   2023), https://www.fool.com/investing/2023/02/02/3-signs-carvana-has-hit-the-wall/.

28   [47]  May 2022 Updated Operating Plan.

- 53 -

unfit to be sold retail and had to be sold wholesale.  Unbeknownst to investors, this sudden and overwhelming increase in wholesale volume created a costly, logistical nightmare as "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicle moves and increased complexity in our multi-car logistics network."[48]  The increased wholesale volume also led to "more vehicle moves," "more miles traveled," "constrained routes," "a higher backlog on constrained routes," "lower performance on operational metrics," and "the inefficient use of nationwide logistics network."[49]  These logistics problems Defendants created to maintain their growth story came at a steep price.  As demonstrated in the chart below, the growth in wholesale volume from buying cars from customers spiked Carvana's logistical expenses.



167.    As discussed *infra* §§VI.C.1.-2., Defendants would later acknowledge that Carvana's logistical constraints were not only unmanageable, but also spiked the Company's wholesale transportation costs, eventually leading the Company to forego retail growth and seek a multi-billion dollar fix to purchase ADESA.

---

[48]  *Id.*

[49]  *Id.*

### 2. Defendants Hid that Carvana's Retail Growth Was Supported by Unprofitable and Unsustainable Sales

168.    Unbeknownst to investors, the Company's retail growth was not sustainable as it was supported by unprofitable and "less profitable" sales.  As Defendants admitted at the end of the Class Period, Carvana's retail growth was composed of "less profitable sales . . . in markets with lower profitability due to long distance from inventory."[50]  Worse still, Carvana "frequently acquired sales that were less profitable in the immediate period" due to its singular focus on growth during the Class Period.[51]  At the end of the Class Period, after Carvana admitted it would stop acquiring "less profitable sales," an analyst at Needham & Company contrasted this disclosure with the Company's strategy during the Class Period, "the path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, ***versus prior it was more about selling as many cars as possible***."  Defendants knew or recklessly disregarded that these sales "in the immediate period" – that is, during the Class Period – were less profitable and this approach to growth was unsustainable.  And yet, Defendants concealed this fact from investors.

169.    In addition to the temporary profit boost from used car prices across the industry, Defendants further masked these unprofitable and "less profitable" sales during the Class Period by citing Carvana's Total GPU metric as a reliable measure of the purported profitability of each retail unit it sold.  Defendants knew or recklessly disregarded, however, that Carvana excluded certain selling costs from its calculation of Total GPU, including outbound logistics expenses and title and registration expenses.

170.    Defendants accounted for "inbound" logistics expenses incurred to ship a newly acquired car to one of Carvana's IRCs in cost of sales.  Thus, these costs were included in the Company's publicly reported Total GPU metric.  But Carvana arbitrarily excluded the "outbound" logistics expenses incurred to ship the same car to a customer from "cost of sales," and instead recorded the expense as a general corporate overhead expense so

---

[50] Q3 2022 Shareholder Letter.

[51] *Id.*

that it did not impact the reported GPU metric.  This effort to manipulate Total GPU, and show improving profitability, was misleading in light of the fact that Defendants internally, including Defendant Garcia Junior, viewed outbound expenses as costs of sales.  Indeed, as Defendant Garcia Junior later acknowledged, outbound logistics expenses, just like inbound expenses, were an important component of measuring the profitability of each car sold:

> ***When we think about trying to aim for more profitable sales, what does that mean***?  There's certainly variability in the kind of gross profit associated with different types of sales.  Obviously, sales where customers finance with us are more profitable than those where they don't.  And those where they choose to buy a warranty are more profitable than those where they don't.
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  There's also kind of variation in ***the underlying costs of completing a sale***.  ***If it's a car that's nearby to an inspection center, it can be much, much lower***.  If it's a car that's maybe further away but where we're charging a shipping fee, ***it can be higher*** . . . , And so I think there can be variation in ***underlying cost of sales***.

171.    Because Defendants did not specifically breakout outbound shipping costs, and instead buried them among SG&A expenses, investors could not calculate the actual profitability for each car sold, like Garcia Junior did internally.  Outbound logistics costs were material.  For example, on sales to customers in markets greater than 200 miles from an IRC, outbound logistics contributed an additional $750 per unit of expenses incurred by Carvana.

172.    To further mask actual profitability, Defendants also omitted title and registration expenses from cost of sales and, thus, the Total GPU metric frequently cited Defendants.  Instead, Carvana buried these expenses in Carvana's "Other" SG&A category, and provided no breakout of costs.  The cost of obtaining title and registration for each retail vehicle is necessary to evaluate the profitability of each retail car sold.  Tellingly, Carvana's closest competitor, CarMax, includes title and registration expenses in cost of sales and its publicly reported GPU metric.  Carvana's title and registration costs were material.  For example, Defendants broke out "Other" SG&A in their 2022 updated operating plan for their first time, revealing that transaction expenses, which primarily consisted of title, registration, and related expenses, totaled $410 dollars per unit in FY 2021.

173.   Further, as discussed *supra*, Defendants' scheme was unsustainable because it resulted in a significant increase in "less profitable" wholesale sales.   *See* §VI.C.1. Defendants knew or recklessly disregarded that this drastic increase was unsustainable because wholesale sales do not facilitate additional high-margin revenue by way of vehicle financing, vehicle service contracts, and insurance coverage that are sold only as part of retail sales.   *See, e.g.*, ¶¶49, 262(d).   In fact, on average Carvana lost money on each wholesale vehicle sold when accounting for SG&A expenses, such as logistics and title and registration expenses (both of which Carvana's biggest competitor, CarMax, considered). *See, e.g.*, ¶¶172, 230(b), 261.   For example, in Q1 2022, Carvana reported a purported average gross profit of $457 per wholesale vehicle sold.   After adding back the estimated logistics expense per vehicle sold (~$360) and the estimated title and registration expense per vehicle (~$390), however, Carvana lost, on average, almost $300 per wholesale vehicle sold.

174.   At bottom, unbeknownst to investors, to inflate Carvana's retail unit growth, Carvana relied on acquiring unprofitable and less profitable sales, shattering the Company's finances and leaving it on the precipice of bankruptcy.

### 3.   Defendants Hid that Carvana's Title and Registration "Practices" Created Additional Expenses and Would Lead to Legal and Regulatory Backlash

175.   As if crippling logistics costs coupled with unprofitable sales were not enough, Defendants' scheme to sell more cars by circumventing title and registration laws and regulations drastically increased Carvana's SG&A expenses.   For example, Carvana relied on costly third parties for "a significant portion of [its] title and registration processing."[52]   In addition to these costly third-party expenses, internally Carvana had to: (i) create a new department to deal with the title and registration problems in early 2021; (ii) hire even more new staffers, or "paperwork specialists," by fall 2021; and (iii) create the "undriveable-car task-force" in 2022.[53]   Further, Carvana not only paid its customers' citations for driving

---

[52]   Q3 2022 Shareholder Letter.

[53]   *Undriveable Cars* exposé.

1    with expired plates or tags, but it also paid them to use rideshare services such as Uber for

2    each day that their car was undriveable because it could not be registered.  And, in many

3    instances, Carvana had to purchase vehicles back from its customers when it could not

4    deliver title to those vehicles.

5         176.  Defendants' undisclosed decision to boost sales by sidestepping title and

6    registration laws and regulations exposed Carvana to devastating financial, regulatory, legal,

7    and reputational loss.  *See infra* §VII.  For example, unbeknownst to investors, on May 7,

8    2021, Michigan fined Carvana thousands of dollars and placed the Company on an 18-month

9    probation.  ¶187.  Indeed, not only would Carvana be left facing an SEC investigation and a

10   consumer class action at the end of the Class Period, but it would also have its dealer license

11   revoked or suspended in multiple states, the damage from which Defendants called

12   "incalculable and irreparable." [54]  *See infra* §VII.  Moreover, as the latest revocation and

13   suspensions were disclosed mere weeks ago (¶¶190-191), it seems highly probable that even

14   more financial and legal issues will be disclosed after the filing of this complaint.

15        **D.    Defendants Dumped Their Holdings After Pumping Up
                   Carvana's Stock Price**

16

17        177.  Before the full extent of the effects described *supra* were known, Defendants

18   dumped their shares of Carvana stock.  Based on Defendants' misleading and unsustainable

19   Amazon growth story, Carvana's stock price soared more than 318% during the Class

20   Period.  Defendants – in possession of material inside information and "kn[o]w[ing] it was

21   short-lived . . . [and] the music would eventually end"[55] – ***sold nearly 15 million shares of***

22   ***their personal holdings of Carvana stock for proceeds of more than $3.87 billion*** before

23   the bottom fell out.

24   _____

     [54]   A series of FOIA requests revealed that the SEC has an open investigation into Carvana.
25   John Gavin, *CVNA – Watch List: 77 US Companies with Undisclosed SEC Probes*,  Probes
     Reporter (Feb. 2, 2023).

26   [55]   John Hyatt, *Carvana's Chaotic Zoom Firing Caps Company's Struggles Amid Market
27   Downturn*, Forbes (May 21, 2022),
     https://www.forbes.com/sites/johnhyatt/2022/05/21/carvanas-chaotic-zoom-firing-ernie-
28   garciacaps-companys-struggles-amid-market-downturn/?sh=6ba1db414c1a.

178.    Defendants' conspicuously timed sales are summarized in the following chart, and the detailed sales information is attached as Appendix A.



179.    As Dan Taylor, an accounting professor at the Wharton Business School and head of the Wharton Forensic Analytics Lab, noted: "'Carvana's actions and the actions of the executives signal to me that ***the executives knew what was coming, and consequently took advantage of the lofty valuations to [] sell their own equity*** . . . .'"[56]

E.    **The Truth Is Revealed**

180.    After Defendants sold their stock, they acknowledged that, for Carvana, bigger was not better.  In truth, Carvana's growth model was not "scalable."  Its market expansion model was not "capital-light."  It failed to comply with state title and registration laws.  The Company had not seen "economies of scale" as it grew.  And, its logistics model was neither efficient nor groundbreaking.  Simply put, Carvana was not the Amazon of used cars.  In the

---

[56]   John Hyatt, *Carvana Insiders Including The CEO's Billionaire Father Are Buying Up Shares As Stock Hits Lows*, Forbes (June 22, 2022), https://www.forbes.com/sites/johnhyatt/2022/06/17/carvana-insiders-including-the-ceos-billionaire-father-are-buying-up-shares-as-stock-hits-lows/?sh=58b34c537e20.

end, Carvana needed to stop growing altogether and spend billions of dollars to fix the Company.

181.    Indeed, as Carvana fell apart, the Company would be forced to do an about-face and change its entire ethos of being the largest auto retailer.  Now, for the first time, growth in retail units sold was not the Company's priority.  To survive, Carvana's singular focus would be on slashing expenses, eliminating "less profitable sales," and attempting to patch its nationwide logistics network.  As an analyst at Needham & Company noted, "[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible."  Unsurprisingly, once Carvana began to consider profitability, its once explosive retail growth evaporated.  In fact, after Carvana reported its first year-over-year retail sales decline in Q3 2022, the sales declined further as the Class Period ended.  *See* Wedbush (Dec. 28, 2022) (publishing an analysis of industry data indicating that Carvana sales are down 25% year over year); *see also* William Blair (Jan. 19, 2023) (estimating that Carvana will report a sales decline of 28% year over year for the month of December 2022).

182.    Worse yet, because Defendants' capital-light market expansion model was unsustainable and cost prohibitive, Carvana needed critical infrastructure to support its new disparate markets spanning the country.  As Defendants knew all along, and as CWs-4 and 7 confirmed, Carvana also needed this infrastructure to stem the increased costs and network complexity from the "wholesale [vehicles] acquired from customers," which were being "transported to the nearest Carvana IRC" often hundreds of miles away.  And because Carvana's own title and registration practices skirted the law to boost sales, Carvana needed a new way to do things.  Thus, Carvana would be forced to take on more than $3.4 billion in high interest rate debt to purchase ADESA and acquire its 56 nationwide locations and title and registration departments.  As Garcia Junior knew from the outset, "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"[57]

---

[57]  Martin Romjue, *Carvana Founder and CEO Shares Business Approach, ADESA Details*, Vehicle Remarketing (Sept. 13, 2022),

In fact, he admitted that "[a] major factor motivating the deal is the fact that an e-commerce used car retailer needs a physical footprint like Amazon, which is undergirded by a network of massive distribution centers and transport depots."[58]

183.    The purchase of ADESA as a last minute fix, while necessary to save the Company, was an "albatross around [Carvana's] neck"[59] – that would leave the Company on the verge of bankruptcy.

184.    At bottom, while Defendants' scheme pumped up Carvana's Class A common stock price so that Defendants could line their pockets with billions of dollars while concealing the truth about Carvana's business model, investors were left holding the bag.

## VII.    FINANCIAL, REGULATORY, AND LEGAL ACTIONS AGAINST CARVANA SUPPORT PLAINTIFFS' CLAIMS

185.    As discussed in more detail below, Defendants' pump-and-dump scheme has exposed Carvana to devastating financial, regulatory and legal repercussions.  In fact, Carvana recently argued in a court filing that the "'***damage to Carvana's reputation and goodwill***'" from just one of the state suspensions "'***is incalculable and irreparable***.'"[60] Moreover, the suspensions continue to mount as mere weeks ago Carvana signed a plea deal in Michigan and also forfeited its dealership license in Illinois.

186.    ***North Carolina***.  Following an investigation and hearing on July 21, 2021, Carvana entered into a settlement agreement with the North Carolina Division of Motor Vehicles.  Pursuant to the settlement, Carvana's dealer license was suspended for six months because Carvana failed to deliver titles, sold motor vehicles without a state inspection, and

---

https://www.vehicleremarket.com/10181084/carvana-founder-and-ceo-shares-business-approach-adesa-details.

[58]  *Id.*

[59]  Seth Basham, Nathan Friedman and Matthew McCartney, *Company Report: Carvana Co., No Signs of Stabilization Yet; Liquidity Remains in Focus*, Wedbush (Nov. 16, 2022).

[60]  Jamie L. Lareau, *Carvana sues Michigan after officials suspended its license to sell cars*, Detroit Free Press, at 3 (Oct. 14, 2022),  ("*Carvana sues Michigan* Article").

1    illegally issued out-of-state temporary tags and plates for vehicles sold to customers in North

2    Carolina.

3        187.   **Michigan**.   Unbeknownst to investors, by February 2021, the Michigan

4    Department of State ("MDOS") was investigating Carvana and met with Company

5    executives on March 23, 2021.  On May 7, 2021, unbeknownst to investors, Carvana was

6    fined thousands of dollars and placed on an 18-month probation.  Carvana repeatedly

7    violated the terms of its probation agreement.

8        188.   On February 7, 2022, following additional meetings between Carvana and

9    MDOS, Carvana "admi[tted] . . . several more violations of the Code," paid thousands of

10   dollars in additional fines, and agreed to extend its probation.[61]  Nevertheless, Carvana's title

11   violations continued.  Accordingly, on October 7, 2022, Michigan suspended Carvana's

12   license for: (1) "failing to make application for title and registration within 15 days of

13   delivery for 112 customers since agreeing to an earlier probation extension"; (2) "committing

14   fraudulent acts in connection with selling or otherwise dealing in vehicles where Carvana

15   employees admitted to destroying title applications and all applicable documents pertaining

16   to the sale of [certain vehicles]" that it later took back from customers; (3) "improperly

17   issuing temporary registrations"; and (4) "violating [the] terms of a probation agreement 127

18   times."[62]

19       189.   In response, Carvana sued Michigan's Secretary of State, arguing that it was

20   not given a hearing on the license matter, and that "***the damage to Carvana's reputation***

21   ***and goodwill posed by the suspension order is incalculable and irreparable***."[63]

22       190.   Following the Class Period, on January 11, 2023, Carvana paid thousands of

23   additional dollars in fines and signed a plea deal with Michigan's Secretary of State, in

24   [61]   Angela Benander, *Department of State Suspends Novi Dealership*, Michigan
       Department of State (Oct. 7, 2022),
25   https://www.michigan.gov/sos/resources/news/2022/10/07/department-of-state-suspends-
       novi-dealership.
26

27   [62]   *Id.*

28   [63]   *See Carvana sues Michigan* Article at 3.

1    which Carvana "'agreed it had violated the law and to have its dealer license revoked and be

2    barred from reapplying for a new license for three years.'"[64]    Carvana's spokesperson

3    justified the settlement to a media outlet stating, "'There was a hearing that was supposed to

4    happen saying Carvana was late on some of these titles and we'd [have to] say, "Yes we're

5    late" . . . so there could be permanent revocation. . . . We don't want to be at war with our

6    regulators.'"[65]

7         191.    *Illinois*.    On May 12, 2022, Illinois suspended Carvana's dealer license.

8    According to the Illinois Secretary of State Office, Carvana was failing to timely transfer

9    title and improperly supplying customers with out-of-state temporary plates, causing some

10   consumers to receive police citations.  Illinois officials initially lifted the suspension.  Mere

11   months later, however, the suspension would be reinstated because "'***Carvana continued to***

12   ***conduct business in a manner that violates Illinois state law*** . . . by again issuing out-of-

13   state temporary plates to Illinois customers, which is illegal in Illinois, and by missing

14   required deadlines to process title and registration paperwork.'"[66]  Defendants, nevertheless,

15   continued to fight the suspension in court and were granted a restrictive temporary

16   restraining order.  Garcia Junior downplayed the issue in response to an analyst's questions

17   during the Class Period, referring to the suspensions as a "miscommunication."[67]  After the

18   Class Period, however, in January 2023, Illinois's Secretary of State announced a settlement

19   agreement with Carvana, in which Carvana admitted to violating Illinois law, agreed to abide

20   by new restrictions and increased oversight, and surrendered its $250,000 bond.  Moreover,

21   the settlement agreement allows the Illinois Secretary of State to summarily suspend and

---

[64]  Jamie L. LaReau, *Carvana, Michigan Reach Deal That Leaves Used Car Megastore Without License in State*, Detroit Free Press (Jan. 11, 2023), https://www.freep.com/story/money/cars/2023/01/11/carvana-michigan-dealer-license-settlement/69797797007/.

[65]  *Id.*

[66]  Jacob Adleman, *Illinois Officials Have Suspended Carvana's License. Again*, Barron's (July 18, 2022), https://www.barrons.com/articles/carvana-license-suspended-illinois-51658181664.

[67]  Q2 2022 Carvana Co. Earnings Call, dated Aug. 4, 2022 ("Q2 2022 Earnings Call").

1  revoke Carvana's dealership license once again if it fails to comply with either the agreement

2  or the law.

3  192.  ***Arizona***.  As first reported by *Barron's* on June 24, 2022, Arizona's

4  Department of Transportation ("ADOT") canceled a program that allowed Carvana to issue

5  temporary plates for sales that occurred in other states after receiving more than 80

6  complaints around "such issues as missing, delayed, and altered title and registration

7  documents, contract discrepancies, [and] significant odometer discrepancies . . . ."  Further,

8  while ADOT's spokesperson declined to provide further details due to open investigations

9  into Carvana's registration practices, he confirmed that while "'ADOT tries to accommodate

10  businesses like Carvana with their unique online business model as best we can' . . . 'for

11  consumer protection, we need to make sure that all car dealers operating in Arizona are

12  following state laws.'"[68]

13  193.  ***Pennsylvania***.  As was revealed by a local Pennsylvania media outlet mere

14  days before the end of the Class Period, Pennsylvania had suspended the dealer license of

15  one of Carvana's dealership locations in Pennsylvania.  Initially, Carvana denied the reports

16  until Pennsylvania officials provided the suspension letters to the media.  It was later

17  revealed that Pennsylvania had suspended both of Carvana's locations in Philadelphia for

18  title and registration issues.

19  194.  ***Florida***.  As first reported by *The Wall Street Journal*, unbeknownst to

20  investors, by October 22, 2021, Carvana had already settled a complaint with the Florida

21  DMV as it found that Carvana had failed to provide title paperwork for a number of

22  customers for up to eight months.  Further, in November 2021, the WFLA news outlet hosted

23  a half-hour news segment, in which it revealed that Florida issued an administrative

24  complaint against Carvana concerning title delays.  In December 2021, Florida's Department

25  of Highway Safety and Motor Vehicles threatened the Company with a statewide license

26  suspension over its failure to timely register cars, identifying hundreds of vehicles with

27  
28  [68]  Jason Adelman, *Carvana Sought to Disrupt Auto Sales.  It Delivered Undriveable Cars.*, Barron's Online (June 24, 2022), at 7.

issues.  While Florida withdrew that threat in February after the Company had demonstrated progress in registering the hundreds of delinquent vehicles, by August 2022, media outlets reported that Florida had filed two additional complaints identifying numerous cases in which consumers waited more than 100 days and, in one case, 253 days, to get the titles for their cars.

195.  ***Texas***.  As first reported by *The Wall Street Journal*, by October 22, 2021, Texas had fined Carvana at least $10,500 for violations related to title and registration.

196.  ***Maryland***.  On October 11, 2022, media outlets reported that Maryland had joined the mounting number of states fining Carvana.  Further, according to the Maryland Department of Transportation Motor Vehicle Administration, Carvana failed to timely register approximately 10% of its sales from June 2021 to July 2022.

197.  ***Ohio***.  On November 22, 2022, Fox28 reported that Ohio had suspended Carvana's privileges to issue temporary tags nearly two years earlier.  Specifically, the Ohio Bureau of Motor Vehicles ("BMV") told the outlet:

> "In December of 2020, the Ohio BMV became aware of an inordinately high number of recent temporary tag issuances by Carvana.  After investigating the matter, it was determined that the issuances did not comply with Ohio law.  The Ohio BMV subsequently suspended temporary tag issuance privileges for all applicable Carvana locations in Ohio."[69]

198.  Although the Ohio BMV reinstated Carvana's privileges "'[a]fter a number of meetings with Carvana representatives and written assurance that prior practices have been halted . . . [t]he Ohio BMV continues to monitor Carvana . . . .'"[70]

199.  ***Consumer Class Action***.  On January 13, 2022, more than two dozen plaintiffs filed an amended class consumer complaint, in which they allege Carvana violated common law and the Pennsylvania Unfair and Deceptive Trade Practices Act by failing to timely

---

[69]  Lisa Rantala, *No Titles, No Registration: Car Owners in Ohio File Complaints Against Carvana*, Fox 28, (Nov. 22, 2022),https://myfox28columbus.com/no-titles-no-registration-car-owners-in-ohio-file-complaints-against-carvana-vehicles-bureau-of-motor-vehicles-bmv-attorney-general-david-yost#:~:text=After%20investigating%20the%20matter%2C%20it,applicable%20Carvana%20locations%20in%20Ohio.

[70]  *Id.*

transfer title.  The plaintiffs allege that as a result of Carvana's fraudulent conduct, customers were often unable to drive the vehicles they purchased because they could not register the cars or obtain insurance without the cars' titles.  Moreover, the plaintiffs allege that Carvana's conduct caused customers to be questioned and even arrested by law enforcement while driving with the temporarily registered cars.  Defendants vehemently opposed the allegations, but on September 30, 2022, U.S. District Judge Edward G. Smith denied defendants' motion to dismiss.

## VIII.  DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.  Defendants' False and Misleading Statements and Omissions for Fiscal Year 2020

200.  On May 6, 2020, after the market closed, Carvana announced its financial results for the fiscal quarter ended March 31, 2020 by issuing a Form 8-K that included an earnings press release (the "Q1 2020 Earnings Release").  Carvana also held a conference call for analysts and investors to discuss the Q1 results (the "Q1 2020 Earnings Call") and issued a letter to shareholders (the "Q1 2020 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.  During the Q1 2020 Earnings Call, Defendant Jenkins stated: "***Retail units sold in Q1 totaled 52,427, an increase of 43%.***"  Defendant Jenkins also stated: "***we plan to open many smaller markets that can be served by our existing logistics and delivery infrastructure with limited incremental investment***."

201.  The Q1 2020 Shareholder Letter signed by Defendants Garcia Junior and Jenkins contained similar language regarding retail units sold: "Retail units sold totaled 52,427, an increase of 43%."

202.  Also on May 6, 2020, Carvana filed its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "Q1 2020 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q1 2020 10-Q described Carvana's numerous purported competitive advantages of its sourcing of cars from customers.  Specifically, the 10-Q stated:

- ***Vehicle sourcing and acquisition***.  For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer.  ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***.  We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

203.   The Q1 2020 10-Q represented "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in our most recent Annual Report on Form 10-K."  The Form 10-K risk factors included:

We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers.

*        *        *

The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations.  Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.

204.   In the Q1 2020 10-Q, Defendants also made statements regarding the Company's expansion:

Over time, we have continually improved our market expansion playbook, which we believe provides us with ***the capability to efficiently execute our growth plan***. . . .   We plan to continually evaluate consumer demand and our operational capacity to determine our market opening strategy.  ***We expect to launch many small markets near our existing infrastructure soon***.

- 67 -

1   205. On August 5, 2020, after the market closed, Carvana announced its financial

2 results for the fiscal quarter ended June 30, 2020 by issuing a Form 8-K that included an

3 earnings press release (the "Q2 2020 Earnings Release").

4   206. On the same day, Carvana held a conference call for analysts and investors to

5 discuss the Q2 results (the "Q2 2020 Earnings Call").  On the earnings call, Defendant

6 Jenkins stated: "***Q2 was a strong quarter for Carvana.  Retail units sold in Q2 totaled***

7 ***55,098 units, an increase of 25%***."  Defendant Jenkins also responded to an analyst question

8 regarding an increase in Carvana's reported profit margins, stating:

> 9 Sure.  ***So there are definitely some exciting trends in retail GPU.  I***
> 10 ***think the most exciting is that, as I mentioned earlier, in July, we bought***
> ***more than 100% as many cars from customers as we sold to customers***.  We
> 11 think that that was basically – I could probably, call it, 10% to 15% in April
> when we paused purchasing for customers.  And it's just been on a basically
> 12 straight line upward since then.
>
> 13 ***I think that's obviously a positive, that drives wholesale GPU, that***
> ***drives incremental retail GPU, because cars that you acquire from***
> 14 ***customers are typically more profitable than cars that you acquire at***
> ***auction***.  We're actually acquiring fewer cars from auction now currently than
> 15 at any point since early 2018.  So I think that generally points to a pretty
> strong dynamic in retail GPU.

16   207. On the same day, Carvana also issued a letter to its shareholders ("Q2 2020

17 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.  In the

18 letter, Defendants stated, "[f]or the quarter, retail units sold increased to 55,098, up 25%

19 from 44,000 in Q2 2019."

20   208. In addition, the Q2 2020 Shareholder Letter stated: "We opened a record 100

21 new markets in Q2 2020, increasing the total percentage of the U.S. population we serve in

22 our 261 markets to 73.2%, up from 68.7% at the end of Q1 2020."

23   209. Also on August 5, 2020, Carvana filed its quarterly report on Form 10-Q for

24 the period ended June 30, 2020 (the "Q2 2020 10-Q"), which was signed by Defendant

25 Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and

26 Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q2 2020 10-Q

27 contained similarly misleading disclosures as the Q1 2020 10-Q with respect to buying cars

28 from customers and title and registration risks, as described at ¶¶202-204 above.

210.    In addition, the Q2 2020 10-Q also contained misleading disclosures with respect to Carvana's market expansion:

> *During our growth phase, our highest priority, outside of safety, will continue to be* providing exceptional customer experiences, increasing our brand awareness and *building an infrastructure to support growth in retail units sold*.

211.    On October 29, 2020, after the market closed, Carvana announced its financial results for the fiscal quarter ended September 30, 2020, by issuing a Form 8-K that included an earnings press release (the "Q3 2020 Earnings Release") and a letter to shareholders (the "Q3 2020 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins. The Q3 2020 Shareholder Letter stated:

> Growth has been and will continue to be our first financial objective due to the enormous size of our opportunity and the significant positive feedback in our model. *As we grow – by expanding geographically, building accumulated awareness, improving our customer experience, and broadening our customer offering – our business becomes stronger*. Growth in customers allows us to hold more inventory, increasing selection and conversion. Growth allows us to add more IRCs, increasing the density of our logistics network and lowering average delivery times, which further increases conversion. *Growth also enables economies of scale*, creating value to further invest in the customer experience. All these dynamics create a flywheel that drives even more growth.

212.    The Q3 2020 Shareholder Letter also exalted the Company's expansion efforts, stating:

> We believe, now more than ever, in our approach of developing infrastructure well ahead of demand, and we remain committed to building out our IRC pipeline and logistics network capacity to meet future demand.
>
> *        *        *
>
> We now operate 26 vending machines and serve 261 markets covering 73.2% of the population. We will continue to open smaller markets to fill out our footprint in the immediate term. From there, our path to 95% population coverage will primarily involve balancing the benefits of serving a broader population with our goal to alleviate constraints in our supply chain.

213.    On the same day, Carvana held a conference call for analysts and investors to discuss the Q3 results (the "Q3 2020 Earnings Call"). On the Q3 2020 Earnings Call, Defendant Jenkins stated: "*Retail units sold in Q3 totaled 64,414, an increase of 39%* . . . .

Total vehicles acquired from customers grew by 128% in Q3, leading us to buy 114% as many cars from customers as we sold to customers, up from 69% a year ago."

214.    During the Q3 2020 Earnings Call, when an analyst expressed skepticism regarding the operating expenses associated with buying cars from customers as opposed to at auction, Defendant Jenkins assured investors that the strategy was profitable:

Nathaniel Holmes Schindler BofA Merrill Lynch, Research Division – Director

So obviously, you've talked a lot about the GPU value. If you purchase a car from consumers, you get it for a much lower price than from auctions. It's less efficient market, totally makes sense. But how much incremental operating expenses are there? When you purchase a car from auction, it's not a lot of – it's a lot of cars in a single place. They're often right near your IRCs. So if you – but if you buy cars from consumers, they're all over the place. You then – and they also – it takes people to negotiate in that and talk. *Is there a lot of extra operating expense in that relative to buying at the auction*?

Mark Jenkins Carvana Co. – CFO

Sure. So I think the big expenses associated with buying cars from customers is an inventory source is exactly what you laid out. It's basically the labor and delivery/pickup costs of going out to a customer's driveway to pick up the car and then bringing it into our logistics network and then transporting it into one of our IRCs. *All of those expenses are actually – those are reflected in our wholesale gross profit number as well as in our retail gross profit number*.

*And when we say that buying cars from customers is more profitable than buying cars from auctions, that's – what we mean by that is it's more profitable net of those expenses of going to get the car from the customer and bring it into the IRCs*. So I think that's the most important point is the most significant expenses. *There are some other little expenses in call center and the like*. But the most significant expenses are in picking up the car from the customer and transporting it to our IRCs, which are all reflected in our GPU numbers and are also reflected when we say that those cars are more profitable than the cars sourced from auction.

215.    Also on October 29, 2020, Carvana filed its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "Q3 2020 10-Q"), which was signed by Defendant Jenkins. Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q. The Q3 2020 10-Q contained similarly false and misleading disclosures as the Q2 2020 10-Q with respect to

1  buying cars from customers, market expansion, and title and registration risks, as described

2  at ¶210 above.

3      216.    On January 27, 2021, Defendant Keeton appeared on the ModernRetail

4  Podcast.  In response to a question regarding whether it was "difficult to scale" Carvana's

5  practice of buying cars from customers, Defendant Keeton responded by choosing to

6  highlight all the benefits of Carvana's "strategy:"

> [W]e're buying more cars than we're actually selling from customers. . . . those are huge numbers and I think the way we were able to do both the buying cars from customers or even just selling cars online is just reducing friction from the process.  Right.  We talked a little bit about it earlier where there's all these things put in front of you when you're at the traditional dealership going to that transaction.  And when we built a self-service platform, we removed a lot of that and put customers in control.  So I think the offering itself is very, very easy and intuitive.  We have customers come to our website, they kind of fill out a form that has something maybe six to eight questions.  It takes a couple of minutes, *and then we literally return a firm real offer back in, like, sub-second speed.  And the reason we're doing that is because we built really great technology that enables us to have a view into what are kind of like values for cars that we're selling.  What types of cars are we selling?  What cars do we need?  How are we looking at wholesale auctions, everything across the board, taking in information on the car itself the customer is selling*. . . .  And the ability that we've kind of created to build and kind of execute that at the scale that we are has been the challenge. . . .  *So I think it's very, very seamless.  There's not a lot of friction there. . . . It's a very seamless frictionless experience. . . . So I think that's been kind of like the fuel that's been driving the engine there as well as for our retail business*.

18      217.    On February 25, 2021, after the market closed, Carvana announced its financial

19  results for the fiscal quarter and year ended December 31, 2020, by issuing a Form 8-K that

20  included an earnings press release (the "Q4 2020 Earnings Release") and a letter to

21  shareholders (the "Q4 2020 Shareholder Letter"), which was signed by Defendants Garcia

22  Junior and Jenkins.  The Q4 2020 Shareholder Letter stated:

> As we approach *nationwide geographic coverage*, utilize even more national marketing channels, and develop a national brand, we are increasingly *viewing our business as an integrated national one, similar to other leading eCommerce players*.

218.    The Q4 2020 Shareholder Letter stated: "2020 was a defining year for Carvana.

We became the second largest seller of used cars in the country in just our eighth year in

1   operation. . . .   Retail units sold totaled 72,172, an increase of 43%. . . .   [And we are the]

2   [f]astest growing automotive retailer . . . ."

3       219.   In addition, the Q4 2020 Shareholder Letter advised that the Company

4   "[a]dded five new markets, bringing our end-of-year total to 266 covering 73.7% of the

5   population[.]"   Later the Shareholder Letter added, "[t]he breadth of our gains in market

6   penetration and the consistency of our growth trends despite [supply-chain] constraints

7   demonstrate the quality of our customer offering."

8       220.   On the same day, Carvana held a conference call for analysts and investors to

9   discuss the Q4 results (the "Q4 2020 Earnings Call").   During the Q4 2020 Earnings Call,

10  Defendant Garcia Junior stated: "Today, we are the second largest seller of used cars in the

11  country, marking the final milestone on our path to becoming the largest.   And we have

12  levered EBITDA margin for 7 consecutive years, **demonstrating significant and consistent**

13  **progress on our path to becoming the most profitable**."   Also during the call, Defendant

14  Jenkins stated that retail units increased "37%."

15      221.   Defendant Jenkins also responded to an analyst question regarding Carvana's

16  ability to leverage SG&A expenses:

17          Sure.  So as you sort of alluded to, **as we've grown the business, we've**
            **been able to show leverage in SG&A.  I think that will continue to be the**
18          **case going forward as we march through our long-term model**.  As we take a
            narrower view into 2021, I think one way that we think about this question of
19          leverage is through our cohorts, where we've definitely seen leverage over
            time as cohorts age.  I think that, that happens in several of the line items.
20          One, I think that we've historically seen advertising leverage in our cohorts as
            they age, as word-of-mouth grows, as awareness grows and the cohorts, we
21          provided some data on that in the shareholder letter.

22          As it relates to some of the other expense line items, we've also seen
            leverage in the cohorts there.  **I think that takes the form of benefits from**
23          **scale.  I think it takes the form of benefits of utilization in the logistics**
            **network**.  And then there's also benefits as we scale of spreading some of our
24          fixed cost base out over more and more units and more and more markets.
            And **so I think we've seen lots of great trends and leverage in the business**.
25          We provided some guidance on EBITDA margin, where we expect another
            year of improvement.  We think that will be coupled with improvement in
26          SG&A as we march toward our long-term model.  And I think we feel pretty
            good about the path that we're on.

27

28

222.   Also during the Q4 2020 Earnings Call, Defendant Garcia Junior responded to an analyst question regarding buying cars from customers:

> *[W]e've got a model where we can sell cars across geographies and across makes and models and across the price spectrum.  And we've got very efficient ways to sell even wholesale cars.  It puts us in a position where we can be a very high-quality buyer*.  And so we've seen a lot of success in that business.
>
> So I think that we're excited by where we are.  I think going forward, it's – there's no – until we get extremely large, there isn't necessarily a fundamental ratio that we would shoot for with respect to cars bought relative to cars sold.  I think we will just seek to grow both businesses as quickly as we possibly can because we've set up the business to do so.  *If we're buying significantly more cars than we're selling, then we have the capacity to sell the excess wholesale*.  If we're not, then we have the capacity to buy cars from other channels.  And so we're just going to look to grow both businesses as quickly as we can independently.

223.   On February 25, 2021, Carvana filed its 2020 10-K, which was signed by Defendants Garcia Junior and Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 2020 10-K.   The 2020 10-K described Carvana's numerous purported competitive advantages including its e-commerce platform, logistics network, and nationwide inventory and delivery capabilities.  Specifically, Carvana sought to differentiate its business model and cost structure from "traditional" used car retailers, which it negatively described in the 2020 10-K as follows:

> **Traditional used car retailers** may lack the scale and expertise to consistently purchase high-quality vehicles and uniformly recondition them, increasing the incidence of selling a "lemon."
>
> *      *      *
>
> The **traditional used car retailing model** is costly, operationally challenging and difficult to scale.  Providing an end-to-end solution requires inspection, repair, reconditioning and showroom facilities, as well as inventory sourcing and financing capabilities, substantially all of which is traditionally done at each dealership location. . . .
>
> Customer acquisition is expensive and inefficient for **traditional automotive retailers** as they are typically confined to local advertising channels and must drive foot traffic to their physical locations, where they offer an often undifferentiated service and limited inventory.
>
> *      *      *

*Traditional used car retailers* are limited by staging capacity and anticipated local demand at each dealership; they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively.  Additionally, even as traditional used car retailers add new store locations, it remains difficult to create broad diversity of inventory among stores because each lot requires the highest demand units, creating redundancies.

\*     \*     \*

*Traditional used car retailers* have high overhead costs and must pass these costs on to their customers.

\*     \*     \*

*[T]raditional* dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

224.    In contrast to traditional dealerships, the 2020 10-K described Carvana's ability to readily offer its national pooled inventory in all markets:

As of December 31, 2020, *we offer all customers a nationally pooled inventory* of over 31,000 high-quality used vehicles on our website.

\*     \*     \*

While *our entire inventory of vehicles is available for sale across the United States* through our own network and third party delivery services, our focus is on serving our markets and providing the best possible car buying and selling experience to our customers at a low, transparent cost.  *Our established logistics network and ability to deliver or pick up any car in our inventory* on Carvana-branded haulers to customers within our markets allow us to provide a low-cost, simple car buying and selling experience.

\*     \*     \*

Our business benefits from powerful network effects.  *Our logistics* capabilities *allow us to offer every car in our inventory to customers across all of our markets*.

225.    The 2020 10-K also stated that Carvana's model had a "lower variable cost structure" as compared to traditional dealerships:

Our proprietary technology and vertically integrated business model will allow us to enjoy *a significantly lower variable cost structure at scale versus traditional dealerships* and provide substantial value to our customers. We do not require a network of brick-and-mortar dealerships, staffed with sales personnel; instead, we utilize both an in-house logistics network and patented vending machines to facilitate vehicle delivery and pick-ups.

- 74 -

226.   Moreover, the 2020 10-K exalted the strengths and advantages of Carvana's logistics capabilities and "capital-light expansion model."   Specifically, the 2020 10-K stated:

**Efficient Logistics Network and Attractive Fulfillment Experience**

We have developed proprietary logistics software and an in-house delivery network that differentiates us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience.

\*        \*        \*

Our business benefits from powerful network effects.  **Our logistics** capabilities **allow us to offer every car in our inventory to customers across all of our markets**.

\*        \*        \*

**Continue to Enter Key Geographic Markets**.

We believe there is a substantial opportunity to utilize **our capital-light expansion model** and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. We believe we can enter more markets than many of the larger dealership groups because of **our lower cost structure, which allows us to efficiently operate in smaller markets**.  Furthermore, **our nationally pooled inventory creates an even larger competitive advantage** in these smaller markets, where customers typically have access to less inventory selection at local dealerships.

\*        \*        \*

**Transportation and Fulfillment**.  Third-party vehicle transportation is often slow, expensive, and unreliable.  To address these challenges, **we built an in-house auto logistics network backed by a proprietary TMS to transport our vehicles nationwide**.  The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers.  Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost.

227.   The 2020 10-K also described the strengths and advantages of Carvana's vehicle acquisition:

**Vehicle Acquisition. . . .  We assess vehicles on the basis of quality, inventory fit,** consumer **desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory**.  We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

228.   The 2020 10-K also purported to warn of the following risk regarding regulatory compliance:

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.
>
> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers.
>
> *          *          *
>
> The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations.  Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.  We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

229.   The statements detailed in ¶¶200-201, 206-207, 213, 218, 220, *supra*, regarding retail unit sales were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)   Retail unit growth was unsustainable and fueled by Defendants' scheme. §VI.  Indeed, after the Class Period, Chris Pierce, a research analyst at Needham & Company, noted "The path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible."

(b)   Carvana's retail sales growth included "less profitable sales . . . in markets with lower profitability due to long distance from inventory."

(c)     To achieve the stated sales growth, Defendants embarked on an unsustainable, nationwide expansion plan designed to boost unit sales without regard to profitability.  The vast majority of new markets that Carvana opened were a significant distance from existing IRCs, and thus, retail unit sales were, on average, less profitable.  In fact, in Q1 2020, 100% of Carvana's new markets were more than 100 miles from an existing an IRC, including 93% that were over 200 miles from an IRC.  ¶¶144-147.  In Q2 2020, 83% of Carvana's new markets were more than 100 miles from an existing an IRC, including 46% that were over 200 miles from an IRC.  *Id.*  In Q4 2020, 100% of Carvana's new markets were more than 100 miles from an existing an IRC, including 60% that were over 200 miles from an IRC.  *Id.*

(d)     To achieve the stated sales growth, Carvana "frequently acquired sales that were less profitable in the immediate period," which was not sustainable.  §§VI.B.-C.2, VI.E.  For example, Defendants pricing decisions "incorporated the value of future sales" because they were singularly focused on retail sales growth without regard to profitability. CW-11 described taking part in a Zoom call in early 2021 attended by Defendant Garcia Junior where another C-level executive explained that Carvana was "just worried about growth and not procedural" operations.  CW-11 recalled that this same C-level executive spoke about the importance of growth on that call and suggested that employees read a certain book because it would help them understand that growth is all that matters.  CW-11 remembers he/she recalled thinking, "Wow, they don't care about operations, just growth." Indeed, after the Class Period, Chris Pierce, a research analyst at Needham & Company, noted "The path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible."

(e)     Defendants lowered the Company's purchasing and verification standards when buying cars from customers to induce trade-ins and increase inventory, which boosted retail vehicle sales.  ¶¶139-143.  In fact, according to CWs-1 and 4, Carvana increased buying cars from customers, including those that did not meet its purchasing and verification standards, to induce trade-ins to boost retail sales.  *Id.*, ¶¶64-65, 83.

1          (f)     In Carvana's "haste to seize market share from competitors" and boost

2   retail sales, Carvana sold cars to customers before it held title to those cars and faster than it

3   could get them registered to their new owners.  ¶¶148-152, 185-199.  For example, CW-3

4   estimated that Carvana only had around *half* of the titles for the vehicles it sold wholesale at

5   the time of sale.  Further, CW-3 noted that prior to the Class Period, he/she only received

6   around 10 to 15 calls a week from dealers regarding title issues.  But after Defendants

7   enacted their scheme, a "fire started" because he/she started receiving around 100 calls per

8   week regarding title issues.  CW-9 said the Customer Advocates on his/her team handled

9   calls from all over the country.  Registration delays, which primarily meant that a title had

10  not been provided to the customer, amounted to roughly half of the calls the team had

11  handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she

12  noticed an increase in the number of calls from customers experiencing title delays

13  beginning in Q1 2022.  CW-10 described instances where titles on vehicles Carvana sold

14  could not be obtained for over a year, which meant the buyers were unable to drive their cars.

15  CW-11 reported that there was a drawer of documentation for vehicles that had been sold by

16  Carvana but which they could not get registered since the titles were missing.  In fact, near

17  the end of the Class Period, Defendants would be forced to enact "buffer" periods to allow

18  the title and registration team sufficient time to secure title, which Defendants admitted

19  would slow growth.  In addition, Defendants' statements regarding retail sales growth as

20  detailed in ¶¶200-201, 206-207, 213, 218, 220, *supra*, are misleading for the additional

21  reason that Defendants chose to speak about the drivers of retail unit growth, but did not

22  disclose that the growth was unsustainable.

23          (g)     Indeed, by disclosing inaccurate and incomplete information regarding

24  Carvana's retail sales growth, Defendants misled analysts and investors as to the

25  sustainability of Carvana's growth during the Class Period.

26      230.   The statements detailed in ¶206, *supra*, regarding Carvana's purported

27  improving profitability, as demonstrated by its Total GPU metric, were materially false

28

and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)     To measure the profitability of a particular vehicle sale, Defendants accounted for "inbound" logistics expense incurred to ship a newly acquired car to one of Carvana's IRCs in cost of sales. Thus, these costs were included in the Company's publicly reported Total GPU metric. But Carvana arbitrarily excluded the "outbound" logistics expenses incurred to ship the same car to a customer from "cost of sales," and instead recorded the expense as a general corporate overhead expense so that it did not impact the reported GPU metric. This effort to manipulate Total GPU, and show improving profitability, was misleading in light of the fact that Defendants, including Defendant Garcia Junior, internally viewed outbound expenses as costs of sales. Indeed, as Defendant Garcia Junior later acknowledged, outbound logistics expenses, just like inbound expenses, were an important component of measuring the profitability of each car sold:

> ***When we think about trying to aim for more profitable sales, what does that mean***? There's certainly variability in the kind of gross profit associated with different types of sales. Obviously, sales where customers finance with us are more profitable than those where they don't. And those where they choose to buy a warranty are more profitable than those where they don't.
>
> And then I think there's a number of other dynamics kind of across car type, et cetera. There's also kind of variation in ***the underlying costs of completing a sale***. ***If it's a car that's nearby to an inspection center, it can be much, much lower***. If it's a car that's maybe further away but where we're charging a shipping fee, ***it can be higher*** . . . , And so I think there can be variation in ***underlying cost of sales***.

Defendants buried outbound expenses as one of its many logistics expenses, which is a component of SG&A, not costs of sales. Defendants did not specifically breakout outbound shipping costs. This prevented investors from calculating the actual profit Carvana made on each car sold, like Garcia Junior did internally. Outbound logistics costs were material. For example, on sales to customers in markets greater than 200 miles from an IRC, outbound logistics contributed an additional $750 per unit to logistics costs. ¶¶144-147, 157, 171. Indeed, when Defendants changed their business model to consider profitability, one of their "key initiatives" in Carvana's updated operating plan was to reduce outbound logistics.

(b)     Defendants also omitted title and registration expenses from costs of sales, and, thus, Total GPU, and instead accounted for them as one component of Carvana's "Other" SG&A.  The cost of obtaining title and registration for each retail vehicle is necessary to evaluate the profitability of each retail car sold.  Tellingly, Carvana's closest competitor, CarMax, includes title and registration expenses in costs of sales and GPU.  These costs concealed from investors were material.  For example, Defendants broke out "Other" SG&A in their 2022 updated operating plan for their first time, revealing that transaction expenses, which primarily consisted of title, registration, and related expenses, which totaled $410 dollars per unit in FY2021.

231.   Defendants' misstatements and omissions regarding the benefits of purchasing cars from customers, as set forth in ¶¶202, 206, 209, 214, 215, 219, 222, 227, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)     Contrary to Defendants' statement that they were "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory" (¶¶202, 227), as CWs-1, 2, 3, 4, 5, 6, 10, and 11 reported, Carvana purchased vehicles regardless of their quality.  In fact, according to CWs-1 and 4, as long as a customer was buying a car from Carvana, Defendants did not care about the condition of the trade-in vehicle.  CW-10 corroborated this account, explaining that Carvana was buying cars at breakneck speed and not adequately inspecting them.  CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do much to verify the condition of the vehicles.  Based on CW-11's interactions with the buying department, CW-11 observed that Carvana did not actually care about the condition of the vehicles and just wanted to "get as many cars as it could."

(b)     Contrary to Defendants' statement about the cost advantages of buying cars from customers, Garcia Junior admitted at the end of the Class Period: Carvana had

1  "*been fighting back the expense associated with . . . buying cars from customers over the*
2  *last several years*."[71]

3         (c)     The increase in buying cars from customers caused significant logistic
4  constraints and costs.  For example, buying cars from customers caused parking constraints,
5  load imbalancing, more vehicle moves, more miles traveled, constrained routes, a higher
6  backlog on constrained routes, and poor performance on operational metrics.  ¶¶139-143,
7  165-167.  CW-4 described a policy change at Carvana that resulted in Carvana buying "any
8  car" it could.  CW-4 said that the volume of cars at the IRC increased ten-fold over the
9  course of a year, causing the IRC to run "out of room."  CW-6 said he/she "absolutely"
10  learned that Carvana was incurring excessive costs when transporting vehicles from the hubs
11  and IRCs to customers, especially with the geographic expansion of Carvana.  For instance,
12  rather than combining the pick up of a customer's trade-in and the delivery of a vehicle
13  purchased by the same customer from Carvana into a single trip, CW-6 said that Carvana
14  made two separate trips for this transaction.  CW-8 described pressure on his/her team to
15  purchase every vehicle possible, regardless of the price.  As a result of this pressure, CW-8
16  said that Carvana "overbought" vehicles in 2021 and, by March 2022, "everything was on
17  fire" because Carvana was "totally overstocked."  Defendants would later acknowledge that
18  these operational issues substantially increased transportation costs.

19         (d)     The rapid increase in buying cars from customers caused a spike in the
20  number of cars that Carvana was forced to sell wholesale.  For example, CW-1 said that
21  there was a huge influx of vehicles that had to be sold wholesale because Carvana had been
22  trying to purchase "everything" from customers, regardless of the quality of the vehicles.
23  CW-3 corroborated this account, explaining that Carvana sold more vehicles wholesale,
24  including those that had been purchased from customers, because Carvana had lowered its
25  standards for buying vehicles.  Likewise, CW-9 said that, as Carvana grew, it began
26  accepting substandard cars and that the STC program took vehicles that were often converted

27  _____
28  [71]  William Blair Growth Stock Conference (June 7, 2022).

for sale through wholesale channels.  The additional wholesale volume had numerous devastating impacts, as described below.

(i)      Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  For example, in fiscal year 2020, the average selling price for a wholesale vehicle was $8,065 whereas the average selling price of a retail vehicle was more than twice that: $19,420.  And because wholesale sales do not facilitate additional high-margin revenue opportunities such as vehicle financing, VSCs, and insurance coverage that are only sold as part of retail sales, wholesale volume was unprofitable or significantly less profitable, even before factoring in the constraints these sales added to Carvana's logistics network, as described below.  In fact, after factoring in all SG&A expenses, on average Carvana lost money on each wholesale vehicle sold as depicted in the chart below.  Even when adding back only certain SG&A expenses, such as logistics and title and registration expenses (both of which Carvana's biggest competitor, CarMax, considered as cost of sale), Carvana lost money on many of its wholesale vehicle sales.  For example, in Q1 2002, Carvana reported a purported average gross profit of $457 per wholesale vehicle sold.  However, after adding back the estimated logistics expense per vehicle sold (~$360) and the estimated title and registration expense per vehicle (~$390), however, Carvana lost, on average, almost $300 per wholesale vehicle sold.



(ii)     As demonstrated in the chart below, the increase in wholesale car growth coincided with a rapid rise in logistics expenses.



(iii)     As Defendants later revealed, "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicle moves and increased complexity in our multi-car logistics network."

(iv)     Carvana's logistics network lacked adequate facilities for storing and processing the wholesale volume, compelling Defendants to purchase ADESA in part to have physical locations to "transport most wholesale units acquired from customers." ¶¶139-143, 165-167.  Because Defendants embarked on a rapid increase in buying cars from customers without a corresponding increase in infrastructure expenditures, Defendants had to take on billions of dollars in debt so as to purchase ADESA to "lower[] costs and logistics network complexity." *Id.*

(e)     In addition, Defendants' statements regarding the benefits of buying cars from customers are misleading for the additional reason that Defendants chose to speak about the benefits of buying cars from customers, but did not disclose the devastating consequences of lowering their purchase and verification standards to "get as many cars as it could." Indeed, by disclosing inaccurate and incomplete information regarding buying cars from customers, Defendants misled analysts and investors as to the sustainability and profitability of Carvana's vehicle acquisitions and growth.

232.    Defendants' misstatements and omissions regarding Carvana's nationwide market expansion, as set forth in ¶¶204, 208, 210-212, 215, 217, 219, 221, 223-224, 226, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)    In connection with Carvana's stated goal of reaching 95% of the U.S. population, Carvana added new markets without any regard to profitability.  Defendants knew that the distance from existing IRCs was directly correlated to logistics and related expenses.  In fact, Defendants acknowledged that sales in markets more than 200 miles from a Carvana IRC incurred at least $750 more per car in logistics and related expenses.  Carvana also referenced the significance of markets being 100 miles from an existing IRC when it bought ADESA "to put 78% of U.S. population within 100 miles of a Carvana inspection and reconditioning center."  In spite of this, and because Carvana had already achieved market coverage near its existing IRCs, the vast majority of the new markets opened by Carvana were a significant distance from existing IRCs.  The following charts illustrate the percentage of new markets that were a significant distance from existing IRCs at the time they were opened:

| | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | CLASS PERIOD TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New markets added | 15 | 100 | 0 | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 169 |
| New markets 100 miles or more from an existing IRC when opened | 15 | 83 | - | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 152 |
| as a % of new markets added | 100% | 83% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| New markets 200 miles or more from an existing IRC when opened | 14 | 46 | - | 3 | 6 | 27 | 9 | 3 | 1 | 1 | 110 |
| as a % of new markets added | 93% | 46% | - | 60% | 100% | 100% | 100% | 100% | 50% | 50% | 65% |



Legend:
- Market opened prior to the Class Period
- New market added during the Class Period, less than 100 miles from an existing IRC when opened
- New market added during the Class Period, 200 miles or more from an existing IRC when opened
- New market added during the Class Period, between 100 and 200 miles from an existing IRC when opened
- IRC's during the Class Period (including IRC's opened on the following dates: Columbus, OH Q3'20, Orlando, FL & Memphis, TN Q4'20; Birmingham, AL Q1'21, Salt Lake City, UT Q4'21; Cincinnati, OH, San Antonio, TX, & Oklahoma City, OK Q1'22; Richmond, VA Q3'22)

(b)     Contrary to Defendants' representations, Carvana's expansion model was not "capital-light."  In fact, Carvana's expansion required the buildout of costly IRCs to support the new markets, including the intake, storage, processing, and reconditioning of vehicle inventory.  However, in an effort to appear "capital-light," Carvana delayed the buildout of new IRCs.  New IRC growth significantly lagged behind Carvana's expansion into new markets.  For example, while Carvana added 100 new markets in Q2 2020 alone, it added no new IRCs during the quarter.  Overall, during the Class Period, Carvana added over 150 new markets spanning the country while adding just eight new IRCs.  CW-7 said that he/she and other employees were told that Carvana acquired ADESA so that Carvana could get within 100 miles of the most populated areas of the country and thereby extend its reach.  Eventually the lack of critical infrastructure crippled the Company's operations, and Defendants were forced to spend $3 billion to acquire ADESA and its 56 locations across the country to bridge the gap.

(c)     As the distance between new markets and Carvana's regional IRCs increased, Carvana was forced to increasingly rely on costly third-party providers for vital logistics and reconditioning functions that were necessary to serve the distant markets. CW-4 said that Carvana's acquisition of ADESA was part of Carvana's efforts to expand into new markets that might have been far from existing Carvana IRCs. Carvana's range for picking up and delivering vehicles was only five hours out and five hours back (although third-party haulers could go further). As such, for example, a customer in Ohio purchasing a car from Carvana that was in Oregon would exceed this range. Although Carvana had operations in some of the western states like California and Nevada, there was essentially not a hub or IRC between Indiana and Oregon that would fall within the five-hour transportation limit. The sheer amount of money it would cost to pay third-party haulers to cover such distances was prohibitive. Therefore, according to CW-4, the "biggest reason" for acquiring ADESA had been its locations which reflected that ADESA operated nationwide and had something like 51 or 52 locations. These costs were largely concealed from investors until the end of the Class Period when Defendants admitted the need to "[r]educe third-party inbound transport share," "[i]n-sourc[e] third-party pickups" for Carvana's "[l]ast-mile delivery," and to "[r]educe third-party shipping" to curtail logistics expenses. Carvana also acknowledged that "location growth" had led to "the addition of many third-party reconditioning locations."

(d)     As part of Defendants' nationwide expansion plan, Carvana touted its "nationally pooled inventory" and "[o]ur established logistics network and ability to deliver or pick up any car in our inventory." Contrary to these representations, Defendants understood that it was unprofitable to pick-up and deliver cars over significant distances. At the end of the Class Period, Defendants acknowledged the need to "meter" (*i.e.*, stop) selling retail cars to reduce "less profitable sales . . . in markets with lower profitability due to long distance from inventory."

(e)     Contrary to Defendants' assertions that Carvana could easily expand, and achieve significant "economies of scale," as its "capital-light" and "vertically integrated

business model" had significant cost advantages versus traditional because it did not require cost-intensive "brick-and-mortar dealerships, staffed with sales personnel," Defendants understood that Carvana's expansion model did not achieve "economies of scale."  In fact, Carvana's rapid expansion model produced the opposite results with costs ***increasing*** as its geographic footprint expanded.   For example, as depicted below, the total "market occupancy cost" per market increased significantly as Carvana added new markets:



Occupancy Costs per Market

Similarly, Carvana's IRCs, which could not keep up with the rapid market growth, did not "speed[] delivery times and increas[e] logistics network efficiency," as Defendants claimed. In reality, the costs per IRC ballooned as Carvana "frequently moved vehicles between IRCs in different markets due to parking constraints" causing "total vehicle miles traveled" to increase and "adding to costs and logistics network complexity."  As depicted below, this caused the total logistics expense per IRC to increase by almost $2 million during the Class Period.



(f)      In addition to the reasons noted above, Defendants' statement regarding their intent to "launch many small markets near our existing infrastructure" (¶204) is false for the additional reason that at the time the statement was made on May 6, 2020, Defendants were aware that Carvana was about to launch 100 new markets, the majority of which were 100 miles or more from existing IRC (*i.e.*, "our existing infrastructure").  In fact, just one day after that making the statement, on May 7, 2020, Carvana announced that it was opening 100 new markets including 83 new markets that were over 100 miles away from existing IRCs and 46 that were more than 200 miles from an IRC.  ¶145.

233.   Defendants' misstatements and omissions regarding Carvana's title and registration practices, as set forth in ¶¶203, 209, 215, 228, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)      Defendants' scheme to artificially inflate the price of Carvana Class A common stock included violating state title and registration laws to push through sales and boost Carvana's retail sales growth.  §§VI.B.-C, VI.E, VII.

(b)      Defendants, and their representatives, violated numerous state laws and regulations concerning title and registration in furtherance of the scheme.  For example, as was later revealed by the media, states' investigations, findings, and suspensions, and Defendants' belated admissions, Defendants, and their representatives, routinely and

1    repeatedly sold cars before holding title to the vehicle; failed to register cars within the

2    legally required timeframe; and illegally issued out-of-state temporary tags and/or license

3    plates.  §VII.

4            (c)      In addition, Defendants omitted that they undertook an undisclosed

5    course of illegal conduct with regard to Carvana's title and registration practices to increase

6    conversion of Carvana's retail sales.  §§V., VI.B.-C.  For example, CWs-8 and 10 reported

7    that internally the expectation was that Carvana could acquire title after purchasing a car

8    from a customer, but CWs-3, 4, 8, 9, 10 and 11 universally report that Carvana would sell

9    these vehicles before they received title.  In fact, CW-3 estimated that Carvana only had

10   around *half* of the titles for the vehicles it sold wholesale at the time of sale.  Further, CW-3

11   noted that, after Defendants enacted their scheme, a "fire started" because he/she started

12   receiving around 100 calls per week regarding title issues.  CW-9 said the Customer

13   Advocates on his/her team handled calls from all over the country.  Registration delays,

14   which primarily meant that a title had not been provided to the customer, amounted to

15   roughly half of the calls the team had handled before the team began handling both pre- and

16   post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from

17   customers experiencing title delays beginning in Q1 2022. CW-9 also described attending an

18   all-hands call in January 2022 in which Defendant Garcia Junior spoke to employees.

19   During the call, employees told Garcia Junior that they were being inundated with calls

20   regarding registration problems.  CW-10 described instances where titles on vehicles

21   Carvana sold could not be obtained for over a year, which meant the buyers were unable to

22   drive their cars. CW-11 reported that there was a drawer of documentation for vehicles that

23   had been sold by Carvana but which they could not get registered since the titles were

24   missing.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles

25   could be acquired later if they were not available at the time of purchase.  CW-4 said there

26   was a Google spreadsheet that tracked vehicles without titles for the entire IRC, and "there

27   were a ridiculous amount of cars on the list."  According to CW-4, it was well known

28   internally that title issues were a common problem – CW-4 described it as a huge mess.

(d)    Further, the CWs' accounts are corroborated by the multiple states' investigations, findings, and suspensions of Carvana's dealership licenses for (i) selling cars without holding title to the vehicle, (ii) failing to register vehicles within the required timeframe, and (iii) issuing out-of-state temporary tags and/or license plates.  §VII.  Even Carvana "agreed it had violated the law and to have its dealer license revoked and be barred from reapplying for a new license for three years."[72]  Near the end of the Class Period, Defendants would be forced to enact "buffer" periods to allow the title and registration team sufficient time to secure title, which Defendants admitted would slow growth.  ¶277.

(e)    As a result of (a)-(d) above, Carvana was subject to a substantial risk of reputational, legal and financial harm.

234.    Defendants' statements set forth in ¶¶223-226, *supra*, regarding its cost advantages over traditional used car retailers, including that Carvana's "business model will allow [the Company] to enjoy a significantly lower variable cost structure at scale [as] [w]e do not require a network of brick-and-mortar dealerships" were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)    As detailed *supra*, Defendants did not incur less capital costs than "brick-and-mortar" dealerships.  Although Carvana did not need dealership locations, it needed significant brick and mortar infrastructure in the form of IRCs and hubs to intake, process, recondition and sell its vehicles.  Without sufficient location coverage, Carvana was, in certain instances, buying  a vehicle from a customer in one state, transporting the vehicle to another state for inspection and reconditioning, and then selling and delivering the vehicle to a customer in a third state.  Local car dealerships do not have these same overhead and logistics costs.  Eventually, Defendants were forced to spend $3 billion to acquire ADESA and its 56 locations across the country to bridge the gap.  As Garcia Junior said, "[A] major

---

[72]  Jamie LaReau, *Carvana, Michigan Reach Deal That Leaves Used Car Megastore Without License in State*, Detroit Free Press (Jan. 11, 2023), available at https://www.freep.com/story/money/cars/2023/01/11/carvana-michigan-dealer-license-settlement/69797797007/.

factor motivating the deal is the fact that an e-commerce used car retailer needs a physical footprint like Amazon, which is undergirded by a network[] of massive distribution centers and transport depos."

(b)      Contrary to Defendants' assertion that traditional used car dealerships have high overhead costs in comparison to Carvana (¶¶223, 225), Carvana's SG&A costs (*i.e.*, overhead) costs were the same or more than traditional dealers.  For example, in 2021, Carvana spent $1,126 per retail unit on advertising whereas AutoNation spent $300.  According to National Automobile Dealers Association data, the average franchise car dealer spent $275 per unit during the same period.  In addition, as demonstrated by the chart below, Carvana's closest competitor CarMax, had significantly lower overhead expenses than Carvana:

| Cost area | Carvana | CarMax |
|---|---|---|
| Retail units sold | 425,237 | 924,338 |
| Wholesale units sold | 170,056 | 706,212 |
| Total units sold | 595,293 | 1,630,550 |
| | | |
| Compensation & Benefits | 667,000,000 | 1,326,400,000 |
| *Per unit sold* | $1120 | $813 |
| Advertising | 479,000,000 | 325,900,000 |
| *Per retail unit sold* | $1,126 | $353 |
| Logistics expenses | 148,000,000 | Included in cost of sales |
| *Per unit sold* | $249 | N/A |
| Total SG&A | 2,033,000,000 | 2,325,200,000 |
| *Per unit sold* | $3,415 | $1,426 |

**B.      Defendants' False and Misleading Statements and Omissions for Fiscal Year 2021**

235.   On March 1, 2021, Carvana presented at the JMP Securities Technology Conference.  During the Company's presentation, Defendant Garcia Junior responded to an analyst question regarding Carvana's expansion into new markets, including the Company's goal to reach 95% of the U.S. population:

> So I think the goal is to get to 95% plus, which is largely like you can think of as kind of like coverage of contiguous U.S. is kind of like the simplest way to think about that.

And then I think like the next question is, how much do you expand in any given year?  And from like a long-term perspective and from a brand building perspective, we want to expand as much as we possibly can. . . .

So I think that's kind of the next question, which is like how much market do you want to open up?  Because *I do think we're largely in a place now where if we wanted to just like open it all up, we probably could.  It's not operationally difficult enough at this point where we couldn't open up all of it very quickly*.  So the second question is just amount that we want to unlock.  And then the third question is where do you unlock the amount that you're going to unlock.

And in general, we're going to pick the easiest like amount that we want to unlock that we can.  And so going up to like the Pacific Northwest, like that's kind of the last remaining big population cluster that we haven't yet addressed, but it's also pretty far removed from the nearest population cluster.  And so it's kind of always been lower priority as a result of that.  And then we haven't given specific expectations of what we're going to open.  But obviously, *we're marching to the place where you're starting to get close to opening everything, so it's not far away*.

236.    On May 6, 2021, after the market closed, Carvana announced its financial results for the fiscal quarter ended March 31, 2021 by issuing a Form 8-K that included an earnings press release (the "Q1 2021 Earnings Release") and a letter to shareholders (the "Q1 2021 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.

237.    The Q1 2021 Shareholder Letter stated:

[W]e added 16 new markets including our first 5 markets in the Pacific Northwest.  This adds the last major region in our nationwide footprint and brings our total U.S. population coverage to 77.4% . . . we continue to expect to increase our population coverage to 78%-80% while serving more than 300 markets by year-end.

238.    On the same day, Carvana held a conference call for analysts and investors to discuss the fiscal results for the first quarter of 2021 (the "Q1 2021 Earnings Call").  On the Q1 2021 Earnings Call, Defendant Garcia Junior stated:

In 2013, our first year, we had $4 million of revenue.  Today, we're over 1,000x larger.  Looking forward, we're just as excited as we were then.  We're delivering to customers the best experiences available in buying or selling a car.  The quality of the unit economics that emerge from the investments we have made over time are showing up in our results.  *The scalability of our model is apparent, and our business gets better as it gets bigger*.

239.    On the Q1 2021 Earnings Call, Defendant Jenkins responded to an analyst question regarding buying cars from customers:

Sure.  So I can take that one.  So I mean, ***I think our #1 channel for sourcing inventory has now become sourcing cars directly from customers, which has several advantages that we've talked about historically***.  I think we're certainly going to continue to focus on that.  That's a business that we want to build and continue to grow over the long term.  And so I think that's our #1 area of focus and would be the – sort of the first answer to that question.

I think in terms of the wholesale market dynamics, we're still certainly buying cars out on the wholesale market.  I think we're buying cars.  ***We're making money on those cars when we retail them***.  I think we feel very comfortable in the current environment.  And our – from a sourcing perspective, our main area of focus is going to be continue to grow the business of buying cars from customers.

240.   Also on May 6, 2021, Carvana filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "Q1 2021 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q1 2021 10-Q contained similar disclosures as the 2020 10-K with respect to Carvana's purported competitive advantages, including its logistics network, and nationwide inventory and delivery capabilities, cost structure, vehicle acquisitioning, and risk disclosures as described at ¶¶224-227 above.

241.   On August 5, 2021, after the market closed, Carvana announced its financial results for the fiscal quarter ended June 30, 2021, by issuing a Form 8-K that included an earnings press release (the "Q2 2021 Earnings Release") and a letter to shareholders (the "Q2 2021 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.

242.   The Q2 2021 Shareholder Letter exalted that the Company "[e]xpanded our population coverage to 79.4% through the addition of 27 new markets."  The Q2 2021 Shareholder Letter also noted Carvana's improvements in profitability as it set a "company record in Total GPU of $5,120, our first quarter over $5,000, driven by company records in every underlying GPU category."

243.   On the same day, Carvana held a conference call for analysts and investors to discuss the Q2 results (the "Q2 2021 Earnings Call").  On the Q2 2021 Earnings Call, Defendant Jenkins stated:

We set company records across many key financial metrics and made significant progress toward our long-term goals.  Retail units sold in Q2 totaled 107,815, our first quarter over 100,000 units and an increase of 96%.

244.    Also during the Q2 2021 Earnings Call, Defendant Garcia Junior stated:

*[W]e've built this channel of buying cars from customers that has performed very well for us over a long period of time.  We've made continual high-quality progress in both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on cars that we buy from customers*. . . .

. . . And so what that was is because vehicle prices were appreciating so quickly, there were more customers that were willing to sell their car, interested in selling their car in this environment than in any other environments.

And that led to record increases in the number of cars that we were buying from customers, faded anyway in absolute terms or relative to cars that we are selling to customers.  *So we saw a lot of volume there, that did drive some expense.  That expense was more than offset by the margins that we were able to realize on those cars*.

245.    Defendant Garcia Junior also responded to an analyst question regarding Carvana's profitability:

I think the thing that we would point to is that is the biggest by a long, long way, is just buying cars from customers.

*We just saw a massive, massive increase in the number of cars we're buying from customers and in the profitability of buying cars from customers*.  And I think that flowed through.

246.    In addition, on August 5, 2021, Carvana filed its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q2 2021 10-Q contained similar disclosures as the 2020 10-K with respect to Carvana's purported competitive advantages, including its cost structure, vehicle acquisitioning, logistics network, and nationwide inventory and delivery capabilities, as described at ¶¶224-227 above.

247.    The Q2 2021 10-Q also stated, "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in" the 2020 10-K.

248. On August 11, 2021, Carvana presented at the J.P. Morgan 2021 Auto Conference. During the Company's presentation, Carvana was asked about the title and licensing issue in North Carolina. Carvana's VP of IR, Mike Levin, stated, "*[T]his was a relatively unusual action but is also pretty small in scope, relatively speaking*." Defendant Jenkins and Carvana's VP of IR further responded:

Rajat Gupta – JPMorgan Chase & Co, Research Division – Research Analyst

Great. Thanks. So maybe let's just get right into it. I wasn't expecting to ask this question, but since the news hit the headlines around the North Carolina DMV in the suspension – in the Raleigh region.

Just curious to know, any update you could provide in up front, like what exactly happened. What's going on? Like is it just restricted to certain ZIP codes? Is it the whole state? Can you buy cars from consumers? Just if you could give us a quick rundown, just start would be helpful.

Mark Jenkins – Carvana Co. – CFO

Yes, sure. So the brief summary there is following COVID, I think there are a number of things that led to title and registration getting backed up. And I think since some of the delays associated with COVID, we've continued to be somewhat backed up in title and registration, and that's impacted the customer experience on title and registration in certain instances.

In this particular case, *I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina*. And so I think the DMV there thought that with having a set of customers experienced title and registration delays that they wanted to do something to reflect the fact that they didn't like customers in that state experiencing these delays.

So what they did was they asked us to stop delivering cars from the vending machine in Raleigh. We can still deliver cars in the metro area of Raleigh, just not from the specific vending machine location. And we can also still do work in the vending team, but we just can't deliver cars from that particular location. And so that's what they elected to do. Based on our research, that's a relatively sort of unusual approach for something like this and having a set of customers have title and registration delays, but that's where we are today. And yes, we announced it, and that's the background.

Rajat Gupta – JPMorgan Chase & Co, Research Division – Research Analyst

Got it. *And are you comfortable that this is a very North Carolina specific issue and not something you might need to investigate in like other states, just to make sure it's covered*? Or just curious like has this led you to like maybe like just check what's happening and make sure that this is not more of a widespread issue?

Mark Jenkins – Carvana Co. – CFO

Sure.  Well, I would make 2 points on that.  One, our understanding is that this is quite unprecedented.  But having said that, our goal is to provide the best customer experiences possible and make sure that we're – our processes are dialed and we're doing . . .

\*        \*        \*

Michael Louis Levin – Carvana Co. – VP of IR

Yes.  Just I think that there is always a lot of room for us to improve, and the #1 focus here is on customer experience, and we work with DMVs in every single state around the country to achieve that goal.  And I think this, based on the pandemic, what was an area where we saw delays.  ***And this was a relatively unusual action, but is also pretty small in scope, relatively speaking***.

249.    On September 14, 2021, Carvana presented at the Citi Global Technology Conference.   During the Company's presentation, Defendant Jenkins responded to an analyst's question regarding buying cars from customers:

Sure.  Yes.  So I think this has been a really sort of explosive growth area for the business is buying more cars from customers.  I think we much more quickly than we even expected exceeded our long-term targets for the number of cars we're buying from customers relative to retail units sold.  We set a record on that metric in Q2.  We also exceeded our long-term targets on a fraction of cars that we retail that we originally sourced from customers as opposed to from other wholesale channels.  And so ***that's been a fantastic success for the business***.

I think that fantastic success is driven by the customer experience we provide, where it truly is a unique and incredibly convenient customer experience where you can go on your phone and with a few clicks get an official value for your car, schedule a pickup and we'll come take a look at your car and take it away and hands you a check.  It's really truly an amazing experience.  And so we (technical difficulty) still see opportunities to improve that business over time, but we're very pleased with the progress we've made so far.  In terms of the matching between the number of cars we buy from customers and the number of cars we retail, we actually – we don't think there's necessarily – there has to be a one-to-one link there because ***you can always wholesale cars that you may not have capacity to recondition or retail at any point in time***.

250.    On November 4, 2021, Carvana held a conference call for analysts and investors to discuss the Q3 results (the "Q3 2021 Earnings Call").  On the Q3 2021 Earnings Call, Defendant Jenkins stated: "Q3 was another strong quarter for Carvana.  Retail units sold totaled 111,949, an increase of 74%."  In addition, during the call, Defendant Garcia Junior stated:

The third quarter was another great quarter for Carvana as **we continued our march toward becoming the largest and most profitable automotive retailer**. We sold over 110,000 cars to customers . . . .

251.   Defendant Garcia Junior also responded to an analyst question regarding Carvana purchasing cars from customers:

So I think first and foremost, on buying cars from customers, I think that's – necessity would not be the way that I would describe it. **I think the way that I would describe it is it's better**. It allows us to provide a high-quality experience to a customer that we're buying a car from, and then **it gets us access to a higher-quality pool of inventory that is, on average, more profitable. And so we want to do as much of that as we possibly can. We want to build the business capacity to be able to handle as much of that as we possibly can**.

\*      \*      \*

[T]he margins that are available in the auction market are very small. And **so that means that kind of the channel of buying cars from customers is even better today than normal**.

252.   Also on November 4, 2021, Carvana filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "Q3 2021 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q3 2021 10-Q contained similar disclosures as the 2020 10-K with respect to Carvana's purported competitive advantages, including cost structure, vehicle acquisitioning, risk disclosures, logistics network, and nationwide inventory and delivery capabilities, as described at ¶¶224-227 above.

253.   In addition, on the same day Defendants issued a shareholder letter, which was signed by Defendants Garcia Junior and Jenkins ("Q3 2021 Shareholder Letter").  The Q3 2021 Shareholder Letter stated: "We delivered 111,949 retail units and grew revenue to $3.5 billion, an increase of 74% and 125% YoY respectively."

254.   The Q3 2021 Shareholder Letter stated the Company "[e]xpanded our population coverage to 80.6% through the addition of 9 new markets[.]"

255.   On February 24, 2022, after the market closed, Carvana announced its financial results for the fiscal quarter and year ended December 31, 2021, by issuing a Form 8-K that

included an earnings press release (the "Q4 2021 Earnings Release") and a letter to shareholders (the "Q4 2021 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.  The Q4 2021 Shareholder Letter stated:

> We expect the first quarter to be a tougher quarter *as a result of the supply chain challenges brought on by the Omicron variant and severe winter storms and the recent rapid increase in short-term interest rates.  We expect these effects to have a significant impact on total GPU and SG&A per retail unit sold*, leading to an expected EBITDA margin loss in the mid-single digit range.

256.    The Q4 2021 Shareholder Letter exalted that the Company "opened 45 new markets in 2021, increasing our total market count to 311 and the total percentage of the U.S. population we serve to 81.0%, up from 73.7% at the end of 2020. . . .  In 2022, we expect to continue marching toward our goal of 95% population coverage in the U.S."

257.    On the same day, Carvana held a conference call for analysts and investors to discuss the Q4 results (the "Q4 2021 Earnings Call").  On the Q4 2021 Earnings Call, Defendant Jenkins stated: "[R]etail units sold totaled 425,237, an increase of 74%, making us the fastest used automotive retailer to sell over 400,000 vehicles in 1 year."  The Q4 2021 Shareholder Letter also contained similar language regarding the growth in retail units sold.

258.    Also on the Q4 2021 Earnings Call, Defendant Garcia Junior responded to an analyst question regarding Carvana's title and registration problems:

> Now because you brought it up, *I do think the registration team and title team inside Carvana definitely deserves a shout-out.  They've done an unbelievable job over the last probably 6 months or so, making a lot of progress*.  We're now kind of approaching similar levels of success in title and registration to what we were experiencing pre-pandemic.  So I think that that's really exciting, and that's hard to do in this environment.  *So there's a lot of great things going on there*.

259.    On February 24, 2022, Carvana filed 2021 10-K, which was signed by Defendants Garcia Junior and Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-K.  The 2021 10-K contained similar disclosures as the 2020 10-K with regard to Carvana's numerous purported competitive advantages, including its vehicle acquisitioning, logistics network, cost-structure, and national footprint, as described at ¶¶224-227 above.  In

addition, the 2021 10-K contained similar disclosures as the 2020 10-K regarding the disadvantages of traditional used car retailers as compared to Carvana's disruptive business model, as described at ¶223 above.

260.    Further, the 2021 10-K contained similar disclosures as the 2020 10-K with respect to Carvana's purported risk warnings regarding regulatory compliance, as described at ¶227 above.

261.    The statements detailed in ¶¶238, 243, 250, 253, 257, *supra*, regarding retail sales growth were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)    Retail unit growth was unsustainable and fueled by Defendants' scheme. §VI. Indeed, after the Class Period, Chris Pierce, a research analyst at Needham & Company, noted "[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible."

(b)    Carvana retail sales growth included "less profitable sales . . . in markets with lower profitability due to long distance from inventory."

(c)    To achieve the stated sales growth, Defendants embarked on an unsustainable, nationwide expansion plan designed to boost unit sales without regard to profitability.  The vast majority of new markets that Carvana opened were a significant distance from existing IRCs, and thus, retail unit sales were, on average, less profitable.  In fact, in Q1 2021, Q2 2021, Q3 2021, and Q4 2021, 100% of the new markets that Defendants entered were over 200 miles from an existing IRC.  ¶¶144-147.

(d)    To achieve the stated sales growth, Carvana "frequently acquired sales that were less profitable in the immediate period," which was not sustainable.  §§VI.B.-C.2, VI.E.  For example, Defendants pricing decisions "incorporated the value of future sales" because they were singularly focused on retail sales growth without regard to profitability.

(e)    CW-11 described taking part in a Zoom call in early 2021 attended by Defendant Garcia Junior where another C-level executive explained that Carvana was "just

1    worried about growth and not procedural" operations.  CW-11 recalled that this same C-level

2    executive spoke about the importance of growth on that call and suggested that employees

3    read a certain book because it would help them understand that growth is all that matters.

4    CW-11 remembers he/she recalled thinking: "Wow, they don't care about operations, just

5    growth."  ¶277.

6             (f)     Defendants lowered the Company's purchasing and verification

7    standards when buying cars from customers to induce trade-ins and increase inventory,

8    which boosted retail vehicle sales.  ¶¶139-143.  According to CWs-1 and 4, Carvana

9    increased buying cars from customers, including those that did not meet its purchasing and

10   verification standards, to induce trade-ins to boost retail sales.  *Id.*, ¶¶64-65, 83.

11            (g)     In Carvana's "haste to seize market share from competitors" and boost

12   retail sales, Carvana sold cars to customers before it held title to those cars and faster than it

13   could get them registered to their new owners.  ¶¶148-152, 185-199.  For example, CW-3

14   estimated that Carvana only had around ***half*** of the titles for the vehicles it sold wholesale at

15   the time of sale.  Further, CW-3 noted that prior to the Class Period, he/she only received

16   around 10 to 15 calls a week from dealers regarding title issues.  But after Defendants

17   enacted their scheme, a "fire started" because he/she started receiving around 100 calls per

18   week regarding title issues.  CW-9 said the Customer Advocates on his/her team handled

19   calls from all over the country.  Registration delays, which primarily meant that a title had

20   not been provided to the customer, amounted to roughly half of the calls the team had

21   handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she

22   noticed an increase in the number of calls from customers experiencing title delays

23   beginning in Q1 2022.  CW-10 described instances where titles on vehicles Carvana sold

24   could not be obtained for over a year, which meant the buyers were unable to drive their cars.

25   CW-11 reported that there was a drawer of documentation for vehicles that had been sold by

26   Carvana but which they could not get registered since the titles were missing.  In fact, near

27   the end of the Class Period, Defendants would be forced to enact "buffer" periods to allow

28   the title and registration team sufficient time to secure title, which Defendants admitted

1    would slow growth.  In addition, Defendants' statements regarding retail sales growth are

2    misleading for the additional reason that Defendants chose to speak about the drivers of retail

3    unit growth, but did not disclose that the growth was unsustainable because it was driven by

4    the Defendants' scheme.

5           (h)     Indeed, by disclosing inaccurate and incomplete information regarding

6    Carvana's retail sales growth, Defendants misled analysts and investors as to the

7    sustainability of Carvana's growth during the Class Period.

8           262.   The statements detailed in ¶242, *supra*, regarding Carvana's purported

9    improving profitability, as demonstrated by its Total GPU metric, were materially false

10   and/or misleading or omitted material information necessary to make them not misleading

11   based on the following facts, which were known to or recklessly disregarded by Defendants:

12          (a)     To measure the profitability of a particular vehicle sale, Defendants

13   accounted for "inbound" logistics expense incurred to ship a newly acquired car to one of

14   Carvana's IRCs in cost of sales.  Thus, these costs were included in the Company's publicly

15   reported Total GPU metric.  But Carvana arbitrarily excluded the "outbound" logistics

16   expenses incurred to ship the same car to a customer from "cost of sales," and instead

17   recorded the expense as a general corporate overhead expense so that it did not impact the

18   reported GPU metric.  This effort to manipulate Total GPU, and show improving

19   profitability, was misleading in light of the fact that Defendants, including Defendant Garcia

20   Junior, internally viewed outbound expenses as costs of sales.  Indeed, as Defendant Garcia

21   Junior later acknowledged, outbound logistics expenses, just like inbound expenses, were an

22   important component of measuring the profitability of each car sold:

23          ***When we think about trying to aim for more profitable sales, what does that***
       ***mean***?  There's certainly variability in the kind of gross profit associated with
24     different types of sales.  Obviously, sales where customers finance with us are
       more profitable than those where they don't.  And those where they choose to
25     buy a warranty are more profitable than those where they don't.

26          And then I think there's a number of other dynamics kind of across car
       type, et cetera.  There's also kind of variation in ***the underlying costs of***
27     ***completing a sale***.  ***If it's a car that's nearby to an inspection center, it can***
       ***be much, much lower***.  If it's a car that's maybe further away but where we're

28

charging a shipping fee, ***it can be higher*** . . . , And so I think there can be variation in ***underlying cost of sales***.

Defendants buried outbound expenses as one of its many logistics expenses, which is a component of SG&A, not costs of sales.  Defendants did not specifically breakout outbound shipping costs.  This prevented investors from calculating the actual profit Carvana made on each car sold, like Garcia Junior did internally.  Outbound logistics costs were material.  For example, on sales to customers in markets greater than 200 miles from an IRC, outbound logistics contributed an additional $750 per unit to logistics costs.  ¶¶144-147, 157, 171.  Carvana also referenced the significance of markets being 100 miles from an existing IRC when it bought ADESA "to put 78% of U.S. population within 100 miles of a Carvana inspection and reconditioning center."  Indeed, when Defendants changed their business model to consider profitability, one of Carvana's "key initiatives" in its updated operating plan was to reduce outbound logistics.

(b)     Defendants also omitted title and registration expenses from costs of sales, and, thus, Total GPU, and instead accounted for them as one component of Carvana's "Other" SG&A.  The cost of obtaining title and registration for each retail vehicle is necessary to evaluate the profitability of each retail car sold.  Tellingly, Carvana's closest competitor, CarMax, includes title and registration expenses in costs of sales and GPU.  These costs concealed from investors were material.  For example, Defendants broke out "Other" SG&A in their 2022 updated operating plan for their first time, revealing that transaction expenses, which primarily consisted of title, registration, and related expenses, which totaled $410 dollars per unit in FY 2021.

263.    Defendants' misstatements and omissions regarding the benefits of purchasing cars from customers, as set forth in ¶¶238, 239, 240, 244, 245, 246, 249, 250, 252, 259, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)      Contrary to Defendants' statement that they were "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory" as CWs-1, 2, 3, 4, 5, 6, 10, and 11 reported, Carvana purchased vehicles regardless of their quality.  In fact, according to CWs-1 and 4, as long as a customer was buying a car from Carvana, Defendants did not care about the condition of the trade-in vehicle.  CW-10 corroborated this account, explaining that Carvana was buying cars at breakneck speed and not adequately inspecting them.  CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do much to verify the condition of the vehicles.  Based on CW-11's interactions with the buying department, CW-11 observed that Carvana did not actually care about the condition of the vehicles and just wanted to "get as many cars as it could."

(b)      Contrary to Defendants' statements about the cost advantages of buying cars from customers, ¶¶239, 244, 249, 250, Defendants omitted what Garcia Junior told investors at the end of the Class Period: Carvana had "***been fighting back the expense associated with . . . buying cars from customers over the last several years***."[73]

(c)      The increase in buying cars from customers caused significant logistic constraints and costs.  For example, buying cars from customers caused parking constraints, load imbalancing, more vehicle moves, more miles traveled, constrained routes, a higher backlog on constrained routes, poor performance on operational metrics, and the inefficient use of nationwide logistics network.  ¶¶139-143, 165-167.  CW-4 described a policy change at Carvana that resulted in Carvana buying "any car" it could.  CW-4 said that the volume of cars at the IRC increased ten-fold over the course of a year, causing the IRC to run "out of room."  CW-6 said he/she "absolutely" learned that Carvana was incurring excessive costs when transporting vehicles from the hubs and IRCs to customers, especially with the geographic expansion of Carvana.  For instance, rather than combining the pick up of a

---

[73]   William Blair Growth Stock Conference (June 7, 2022).

customer's trade-in and the delivery of a vehicle purchased by the same customer from Carvana into a single trip, CW-6 said that Carvana made two separate trips for this transaction.  CW-8 described pressure on his/her team to purchase every vehicle possible, regardless of the price.  As a result of this pressure, CW-8 said that Carvana "overbought" vehicles in 2021 and, by March 2022, "everything was on fire" because Carvana was "totally overstocked."  Defendants would later acknowledge that these operational issues substantially increased transportation costs.  *Id.*

(d)     The rapid increase in buying cars from customers caused a spike in the number of cars that Carvana was forced to sell wholesale.  For example, CW-1 said that there was a huge influx of vehicles that had to be sold wholesale because Carvana had been trying to purchase "everything" from customers, regardless of the quality of the vehicles.  CW-3 corroborated this account, explaining that Carvana sold more vehicles wholesale, including those that had been purchased from customers, because Carvana had lowered its standards for buying vehicles.  Likewise, CW-9 said that, as Carvana grew, it began accepting substandard cars and that the STC program took vehicles that were often converted for sale through wholesale channels.  The additional wholesale volume had numerous devastating impacts, as described below.

(i)     Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  For example, in fiscal year 2020, the average selling price for a wholesale vehicle was $8,065 whereas the average selling price of a retail vehicle was more than twice that: $19,420.  And because wholesale sales do not facilitate additional high-margin revenue opportunities such as vehicle financing, VSCs, and insurance coverage that are only sold as part of retail sales, wholesale volume was unprofitable or significantly less profitable, even before factoring in the constraints these sales added to Carvana's logistics network, as described below.  In fact, after factoring in all SG&A expenses, on average Carvana lost money on each wholesale vehicle sold, as depicted in the chart below.  *See* ¶¶172-173, 230(b). Even when adding back only certain SG&A expenses, such as logistics and title and registration expenses (both of which Carvana's biggest competitor, CarMax,

1   considered as cost of sale), Carvana lost money on many of its wholesale vehicle sales.  For

2   example, in Q1 2002, Carvana reported a purported average gross profit of $457 per

3   wholesale vehicle sold.  However, after adding back the estimated logistics expense per

4   vehicle sold (~$360) and the estimated title and registration expense per vehicle (~$390),

5   Carvana lost, on average, almost $300 per wholesale vehicle sold.



16          (ii)     As demonstrated in the chart below, the increase in wholesale car

growth coincided with a rapid rise in logistics expenses.



26          (iii)    As Defendants later revealed, "wholesale units acquired from

27  customers have typically been transported to the nearest Carvana IRC, generating additional

28  vehicle moves and increased complexity in our multi-car logistics network."

1         (iv)     Carvana's logistics network lacked adequate facilities for storing
2  and processing the wholesale volume, compelling Defendants to purchase ADESA in part to
3  have physical locations to "transport most wholesale units acquired from customers." ¶¶139-
4  143, 165-167.  Because Defendants embarked on a rapid increase in buying cars from
5  customers without a corresponding increase in infrastructure expenditures, Defendants had to
6  take on billions of dollars in debt so as to purchase ADESA to "lower[] costs and logistics
7  network complexity." *Id.*  As Garcia Junior later admitted at an August 17 keynote interview
8  during the International Automotive Remarketers Alliance Summer Roundtable, "You need
9  to warehouse and recon those cars to get them retail ready . . . .  You need a place to stage
10  the logistics . . . ." Garcia Junior further acknowledged that "[a] major factor motivating the
11  deal is the fact that an e-commerce used car retailer needs a physical footprint like Amazon,
12  which is undergirded by a network[] of massive distribution centers and transport depos."
13  *Id.*

14         (e)     In addition, Defendants' statements regarding the benefits of buying
15  cars from customers are misleading for the additional reason that Defendants chose to speak
16  about the benefits, but did not disclose the devastating consequences of lowering their
17  purchase and verification standards to "get as many cars as it could."  Indeed, by failing to
18  disclose that the facts identified in (a)-(d), Defendants provided a misleading picture of
19  buying cars from customers.  By disclosing inaccurate and incomplete information regarding
20  buying cars from customers, Defendants misled analysts and investors as to the true nature of
21  Carvana's growth during the Class Period.

22     264.    Defendants' misstatements and omissions regarding Carvana's nationwide
23  market expansion, as set forth in ¶¶235, 237, 238, 240, 242, 246, 252, 254, 256, 259, *supra*,
24  were materially false and/or misleading or omitted material information necessary to make
25  them not misleading based on the following facts, which were known to or recklessly
26  disregarded by Defendants:

27         (a)     In connection with Carvana's stated goal of reaching 95% of the U.S.
28  population, Carvana added new markets without any regard to profitability.  Defendants

knew that the distance from existing IRCs was directly correlated to logistics and related expenses.  In fact, Defendants acknowledged that sales in markets more than 200 miles from a Carvana IRC incurred at least $750 more in logistics and related expenses.  Carvana also referenced the significance of markets being 100 miles from an existing IRC when it bought ADESA "to put 78% of U.S. population within 100 miles of a Carvana inspection and reconditioning center."  In spite of this, and because Carvana had already achieved market coverage near its existing IRCs, the vast majority of the new markets opened by Carvana were a significant distance from existing IRCs.  The charts below illustrate the percentage of new markets that were a significant distance from existing IRCs at the time they were opened.

| | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | CLASS PERIOD TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New markets added | 15 | 100 | 0 | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 169 |
| New markets 100 miles or more from an existing IRC when opened | 15 | 83 | - | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 152 |
| as a % of new markets added | 100% | 83% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| New markets 200 miles or more from an existing IRC when opened | 14 | 46 | - | 3 | 6 | 27 | 9 | 3 | 1 | 1 | 110 |
| as a % of new markets added | 93% | 46% | - | 60% | 100% | 100% | 100% | 100% | 50% | 50% | 65% |



(b)      Contrary to Defendants' representations, Carvana's expansion model was not "capital-light."  In fact, Carvana's expansion required the buildout of costly IRCs to support the new markets, including the intake, storage, processing, and reconditioning of vehicle inventory.  However, in an effort to appear "capital-light," Carvana delayed the buildout of new IRCs.  New IRC growth significantly lagged behind Carvana's expansion into new markets.  For example, while Carvana added 100 new markets in Q2 2020 alone, it added no new IRCs during the quarter.  Overall, during the Class Period, Carvana added over 150 new markets spanning the country at significant distances from existing IRCs.  CW-7 said that he/she and other employees were told that Carvana acquired ADESA so that Carvana could get within 100 miles of the most populated areas of the country and thereby extend its reach.  Eventually the lack of critical infrastructure crippled the Company's operations, and Defendants were force to spend $3 billion to acquire ADESA and its 56 locations across the country to bridge the gap.

1          (c)      As the distance between new markets and Carvana's regional IRCs
2  increased, Carvana was forced to increasingly rely on costly third-party providers for vital
3  logistics and reconditioning functions that were necessary to serve the distant markets.  CW-
4  4 said that Carvana's acquisition of ADESA was part of Carvana's efforts to expand into
5  new markets that might have been far from existing Carvana IRCs.  Carvana's range for
6  picking up and delivering vehicles was only five hours out and five hours back (although
7  third-party haulers could go further).  As such, for example, a customer in Ohio purchasing a
8  car from Carvana that was in Oregon would exceed this range.  Although Carvana had
9  operations in some of the western states like California and Nevada, there was essentially not
10  a hub or IRC between Indiana and Oregon that would fall within the five-hour transportation
11  limit.  The sheer amount of money it would cost to pay third-party haulers to cover such
12  distances was prohibitive.  Therefore, according to CW-4, the "biggest reason" for acquiring
13  ADESA had been its locations which reflected that ADESA operated nationwide and had
14  something like 51 or 52 locations.  These costs were largely concealed from investors until
15  the end of the Class Period when Defendants admitted the need to "[r]educe third-party
16  inbound transport share," "[i]n-sourc[e] third-party pickups" for Carvana's "[l]ast-mile
17  delivery," and to "[r]educe third-party shipping" to curtail logistics expenses.  Carvana also
18  acknowledged that "location growth" had led to "the addition of many third-party
19  reconditioning locations."

20          (d)      As part of Defendants' nationwide expansion plan, Carvana touted its
21  "nationally pooled inventory" and claimed "[o]ur established logistics network and ability to
22  deliver or pick up any car in our inventory."  Contrary to these representations, Defendants
23  understood that it was unprofitable to pick-up and deliver cars over significant distances.  At
24  the end of the Class Period, Defendants acknowledged the need to "meter" (*i.e.*, stop) selling
25  retail cars to reduce "less profitable sales . . . in markets with lower profitability due to long
26  distance from inventory."

27          (e)      Contrary to Defendants' assertions that Carvana could easily expand,
28  and achieve significant "economies of scale," because its  "capital-light" and "vertically

integrated business model" had significant cost advantages versus traditional because it did not require cost-intensive "brick-and-mortar dealerships, staffed with sales personnel," Defendants understood that Carvana's expansion model did not achieve "economies of scale." In fact, Carvana's rapid expansion model produced the opposite results with costs *increasing* as its geographic footprint expanded. For example, as depicted below, the total "market occupancy cost" per market increased significantly as Carvana added new markets.



Similarly, Carvana's IRCs, which could not keep up with the rapid market growth, did not "speed[] delivery times and increas[e] logistics network efficiency," as Defendants claimed. In reality, the costs per IRC ballooned as Carvana "frequently moved vehicles between IRCs in different markets due to parking constraints" causing "total vehicle miles traveled" to increase and "adding to costs and logistics network complexity." As depicted below, this caused the total annual logistics expense per IRC to increase by almost $2 million during the Class Period.



265.    Defendants' misstatements and omissions regarding Carvana's title and registration practices, as set forth in ¶¶240, 247, 248, 252, 258, 260, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)    Defendants' scheme to artificially inflate the price of Carvana Class A common stock included violating state title and registration laws to push through sales and boost Carvana's retail sales growth.  §§VI.B.-C, VI.E, VII.

(b)    Defendants, and their representatives, violated numerous state laws and regulations concerning title and registration in furtherance of the scheme.  For example, as was later revealed by the media, states' investigations, findings, and suspensions, and Defendants' belated admissions, Defendants, and their representatives, routinely and repeatedly sold cars before holding title to the vehicle; failed to register cars within the legally required timeframe; and illegally issued out-of-state temporary tags and/or license plates.  §VII.

(c)    In addition, Defendants omitted that they undertook an undisclosed course of illegal conduct with regard to Carvana's title and registration practices to increase conversion of Carvana's retail sales.  ¶¶148-152, 185-199.  For example, as detailed above, CWs-8 and 10 reported that internally the expectation was that Carvana could acquire title

after purchasing a car from a customer, but CWs-3, 4, 8, 9, 10 and 11 universally reported that Carvana would sell these vehicles before they received title. In fact, CW-3 estimated that Carvana only had around **half** of the titles for the vehicles they sold wholesale at the time of sale. Further, CW-3 noted that, after Defendants enacted their scheme, a "fire started" because he/she started receiving around 100 calls per week regarding title issues. CW-9 said that during the Class Period, the Customer Advocates on his/her team handled anywhere from ten to 30 calls a day concerning registration delays, which primarily meant that a title had not been provided to the customer, which roughly amounted to half of the calls the team had handled before the scheme. CW-9 also described attending an all-hands call in January 2022 in which Defendant Garcia Junior spoke to employees. During the call, employees told Garcia Junior that they were being inundated with calls regarding registration problems. CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars. CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana but which they could not get registered since the titles were missing. CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase. CW-4 said there was a Google spreadsheet that tracked vehicles without titles for the entire IRC, and "there were a ridiculous amount of cars on the list." According to CW-4, it was well known internally that title issues were a common problem – CW-4 described it as a huge mess.

       (d)    Further, the CWs' accounts are corroborated by the multiple states' investigations, findings, and suspensions of Carvana's dealership licenses for (i) selling cars without holding title to the vehicle, (ii) failing to register vehicles within the required timeframe, and (iii) issuing out-of-state temporary tags and/or license plates. §VII. Even Carvana "agreed it had violated the law and to have its dealer license revoked and be barred from reapplying for a new license for three years."[74] Near the end of the Class Period,

---

[74] Jamie LaReau, *Carvana, Michigan Reach Deal That Leaves Used Car Megastore Without License in State*, Detroit Free Press (Jan. 11, 2023), available at

1    Defendants would be forced to enact "buffer" periods to allow the title and registration team

2    sufficient time to secure title, which Defendants admitted would slow growth.  ¶277.

3         (e)    Defendants' statements minimizing the extent of the title and

4    registration violations were materially false and misleading.  In fact, as described *supra*, far

5    from being a North Carolina-specific issue, CWs-3, 4, 8, 9, 10, and 11 report that title issues

6    were pervasive at the Company.  ¶¶148-152, §V.  Moreover, following an investigation and

7    subsequent meetings with Carvana executives, Michigan Department of State placed

8    Carvana on an 18-month probation for violating its states' title and registration laws on May

9    7, 2021.   ¶187.   Further, subsequent government investigations, plea agreements,

10   suspensions, and media reports confirm that during the Class Period Defendants violated

11   numerous laws and regulations in Texas, Florida, Michigan, Maryland, North Carolina,

12   Oklahoma, and Ohio.  §VII.  For example, in December 2021, Florida's Department of

13   Highway Safety and Motor Vehicles threatened the company with a statewide license

14   suspension over its failure to timely register cars, identifying hundreds of vehicles with

15   issues.  Further, near the end of the Class Period, Maryland Department of Transportation

16   Motor Vehicle Administration found that from June 2021 to July 2022, Carvana failed to

17   timely register approximately 10% of its sales.  ¶196.  And following the Class Period,

18   Carvana admitted to additional violations of Michigan's and Illinois's laws regarding title

19   and registration.

20        (f)    As a result of (a)-(c) and (e) above, Carvana was subject to a substantial

21   risk of reputational, legal and financial harm.

22        (g)    In addition to the reasons noted above in (a)-(f), Defendant Garcia

23   Junior's statement that the "registration team and title team insider Carvana definitely

24   deserve[] a shout out" because "there's a lot of great things going on in there," (¶258), is

25   false for the additional reason that contrary to his statement, it was well known internally that

26   Carvana's title and registration team was a mess.  For example, CW-4 recalled that the Title

27   https://www.freep.com/story/money/cars/2023/01/11/carvana-michigan-dealer-license-
28   settlement/69797797007/.

- 113 -

1   Department was revamped three times, but they still had not gotten the title process right,

2   and CW-4's understanding was that the title team had "tons" of titles they needed to process

3   and sometimes titles were lost.  Indeed, as reported by Barron's in its *Undriveable Task*

4   *Force* exposé, Carvana had to create the "undriveable task-force" in 2022.

5       266.   Defendants' statements set forth in ¶¶240, 246, 252, 259, *supra*, regarding its

6   cost advantages over traditional used car retailers, including that Carvana's "business model

7   will allow [the Company] to enjoy a significantly lower variable cost structure at scale [as]

8   [w]e do not require a network of brick-and-mortar dealerships" were materially false and/or

9   misleading or omitted material information necessary to make them not misleading based on

10  the following facts, which were known to or recklessly disregarded by Defendants:

11      (a)   As detailed *supra*, Defendants did not incur less capital costs than

12  "brick-and-mortar" dealerships.  Although Carvana did not need dealership locations, it

13  needed significant brick and mortar infrastructure in the form of IRCs and hubs to intake,

14  process, recondition and sell its vehicles.  Without sufficient location coverage, Carvana was,

15  in certain instances, buying  a vehicle from a customer in one state, transporting the vehicle

16  to another state for inspection and reconditioning, and then selling and delivering the vehicle

17  to a customer in a third state.  Local car dealerships simply do not have these overhead and

18  logistics costs.  Eventually, Defendants were forced to spend $3 billion to acquire ADESA

19  and its 56 locations across the country to bridge the gap.  As Garcia Junior said, "[A] major

20  factor motivating the deal is the fact that an e-commerce used car retailer needs a physical

21  footprint like Amazon, which is undergirded by a network[] of massive distribution centers

22  and transport depos."

23      (b)   Contrary to Defendants' assertion that traditional used car dealerships

24  have high overhead costs in comparison to Carvana (*see, e.g.*, ¶107), Carvana's SG&A costs

25  (*i.e.*, overhead) costs were the same or more than traditional dealers.  For example, in 2021,

26  Carvana spent $1,126 per retail unit on advertising whereas AutoNation spent $300.

27  According to National Automobile Dealers Association data, the average franchise car dealer

28  spent $275 per unit during the same period.  In addition, as demonstrated by the chart below,

Carvana's closest competitor CarMax, had significantly lower overhead expenses than Carvana:

| Cost area | Carvana | CarMax |
|---|---|---|
| Retail units sold | 425,237 | 924,338 |
| Wholesale units sold | 170,056 | 706,212 |
| Total units sold | 595,293 | 1,630,550 |
|  |  |  |
| Compensation & Benefits | 667,000,000 | 1,326,400,000 |
| Per unit sold | $1120 | $813 |
| Advertising | 479,000,000 | 325,900,000 |
| Per retail unit sold | $1,126 | $353 |
| Logistics expenses | 148,000,000 | Included in cost of sales |
| Per unit sold | $249 | N/A |
| Total SG&A | 2,033,000,000 | 2,325,200,000 |
| Per unit sold | $3,415 | $1,426 |

267. The statements detailed in ¶255, *supra*, regarding purported external, transitory factors, such as omicron, impacting Carvana's SG&A expenses and logistics network were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a) Carvana's logistical constraints and increased SG&A expenses were substantially due to Defendants' undisclosed scheme to pump Carvana's retail sales growth and stock price. Indeed, as part of Defendants' scheme, Defendants engaged in unsustainable machinations to achieve this growth, the result of which was increased SG&A expenses, such as title registration costs, and logistical costs and constraints. §§VI.B.-C., VI.E.

(b) As described *supra*, Carvana's substantial SG&A expenses per retail unit sold and logistical constraints directly coincided with Defendants' scheme. For example, the exponential growth in wholesale volume directly coincided with a spike in logistics expenses. In fact, in their new operating plan, Defendants admitted that increased inventory, increased wholesale volume, and location growth were three primary drivers of the Company's logistics costs and constraints. Contrary to Defendants' representation that

its poor results were due to "transitory" external factors, Carvana would be forced to admit at the end of the Class Period that its own actions, such as acquiring less profitable sales and expanding into unprofitable markets, drove Carvana's poor results.  Further, these results were in fact not transitory as Carvana would have to take extreme measures to slash its SG&A expenses and repair its broken logistics network, which would hamper Carvana's retail sales growth and Total GPU.  For example, Defendants announced at the end of the Class Period that the Company had been, and would continue, reducing advertising, reducing its website inventory, incentivizing pickups and drop-offs at vending machines, and continuing inventory visibility metering on long-distance inventory.

(c)     By disclosing inaccurate and incomplete information regarding the factors impacting Carvana's logistics network and SG&A expenses, Defendants misled analysts and investors as to the true condition of Carvana's current and future growth during the Class Period.

**C.    Defendants' False and Misleading Statements and Omissions for Q1 2022 and Q2 2022**

268.    On April 20, 2022, after the market closed, Carvana announced its financial results for the fiscal quarter ended March 31, 2022, by issuing a Form 8-K that included an earnings press release (the "Q1 2022 Earnings Release") and a letter to shareholders (the "Q1 2022 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.  In the Q1 2022 Shareholder Letter, Defendants Garcia Junior and Jenkins stated: "Retail units sold totaled 105,185 an increase of 14%."

269.    In the Q1 2022 Earnings Release, Defendant Garcia Junior stated: "Q1 was a unique environment.  ***Omicron, high used vehicle prices, rapid changes in interest rates and other macro factors impacted Carvana*** and the used vehicle industry as a whole . . . ***We view these macro factors as transitory*** and remain focused on delivering the best possible experiences to our customers."

270.    The Q1 2022 Shareholder Letter described Carvana's disappointing Q1 results but largely blamed external factors such as "Omicron, used vehicle prices, interest rates,

other macro factors."  Carvana also described the conditions as "transitory."  Specifically, the Q1 2022 Shareholder Letter stated:

- **High used vehicle prices** had a significant impact on industry-wide used vehicle sales, since higher prices reduce affordability, leading some buyers to forgo or delay their purchases.

- **Rapid increases in benchmark interest rates** continued throughout the quarter, placing further pressure on affordability for customers.

- **Increases in gasoline prices**, continued higher economy-wide inflation, and dampening of consumer sentiment further impacted used vehicle buyers.

- **Omicron and severe weather events caused significant and persistent disruptions** in our logistics network.  These disruptions created a backlog of network constraints that lasted longer than expected and had more significant impacts than expected.

*       *       *

**The same factors that impacted retail units sold (e.g., Omicron, severe weather events, logistics network constraints, high used vehicle prices, rising interest rates, other macro factors) had a significant impact on SG&A per retail unit sold in Q1**.

*       *       *

**We believe the factors currently impacting used vehicle industry sales are transitory**, and we are well positioned to take advantage when the industry rebounds.

*       *       *

We remain firmly on the path to changing the way people buy and sell cars and to becoming the largest and **most profitable automotive retailer**.

271.   On the same day, Carvana held a conference call for analysts and investors to discuss the Q1 results (the "Q1 2022 Earnings Call").  On the Q1 2022 Earnings Call, Defendant Jenkins stated: "In Q1, retail units sold totaled 105,185, an increase of 14%. . . . Total gross profit per unit in Q1 was $2,833, a decrease of $823 year-over-year. . . . **While we faced a uniquely difficult environment in the first quarter, we are already seeing positive trends across our key metrics**."  In addition, the Q1 2022 Shareholder Letter contained similar language regarding the retail units sold.

272.   Further, during the Q1 2022 Earnings Call, Defendant Garcia Junior stated:

The first quarter was a challenging quarter for Carvana.  There were a number of impacts on the business, some internal and some external, that combined to **negatively** impact our financial results.  **We view these impacts as transitory setbacks**, and I will hit them first. . . .

First, let's discuss the impacts to our results.  There were 3 primary drivers of our results in the first quarter.  The first is our operational constraints that most severely impacted our inspection centers and logistics network.  **These began with Omicron, were exacerbated by winter storms**, and then the path to recovery has been slowed by our inspection center and logistics network and inventory growth causing us to produce and move more inventory to newly opened IRCs that are further away from our average customers, leading to additional network complexity.  These effects had negative impacts on both sales volumes and retail GPU.

\*       \*       \*

I think going forward, the most important thing that we can do is we just need to align our cost levels with sales.

\*       \*       \*

And then we also have some operational levers that we have that are in our control.  We talked about – **we definitely took a hit from Omicron and logistics network.  And then that was extended by winter storms**.

273.    Also during the Q1 2022 Earnings Call, Defendant Jenkins stated:

Retail cost increases in Q1 were primarily due to inefficiencies in the inspection and reconditioning centers and logistics network, **which in turn were driven by Omicron, severe weather events and the extended time lines required to recover from these events**. . . . .

274.    On May 10, 2022, Carvana filed its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "Q1 2022 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q1 2022 10-Q contained similar disclosures as the 2021 Form 10-K with respect to Carvana's purported competitive advantages, including its vehicle acquisitioning, logistics network and nationwide inventory and delivery capabilities, as described at ¶¶224-227 above.

275.    On June 24, 2022, in response to questions for the *Undriveable Cars* exposé, a Carvana spokesman told *Barron's* "very few of its customers experienced registration delays." The Carvana's spokesman further minimized the title and registration problems and the nature of its disagreements with regulators, telling *Barron's*:

"Carvana, like many dealers over the past two years, has in limited instances encountered **challenges** processing title and registration paperwork for its customers after the sale,' the company says. 'In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states."

\*      \*      \*

Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and **2021**. "We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward," it says.

276.   On August 4, 2022, after the market closed, Carvana announced its financial results for the fiscal quarter ended June 30, 2022, by issuing a Form 8-K that included an earnings press release (the "Q2 2022 Earnings Release") and a letter to shareholders (the "Q2 2022 Shareholder Letter"), which was signed by Defendants Garcia Junior and Jenkins.  The Q2 2022 Shareholder Letter stated:

The second quarter was a quarter of adjustment and progress for Carvana.  As a result of changes in the economy, the market, and the industry, we shifted our priorities to **focus on driving profitability through operating efficiency and reducing expenses**.

. . . We have implemented new internal processes to accelerate our **progress**, and **we are now operating more effectively across the business than at any other time in our history**.

\*      \*      \*

**The used vehicle industry continues to face high used vehicle prices, rising interest rates, and other macroeconomic pressures.  We believe the factors currently impacting used vehicle industry sales are transitory**, and at some point, the headwinds we have seen this year will turn into tailwinds.  We are adapting to the current environment quickly and using it as an opportunity to become more efficient.  As a result, we will be well positioned for the turnaround when it arrives.

\*      \*      \*

We remain **firmly** on the path to changing the way people buy and sell cars and to becoming **the largest and most profitable automotive retailer**.

277.   On the same day, Carvana held a conference call for analysts and investors to discuss the Q2 results.  On the Q2 2022 Earnings Call, Defendant Jenkins stated, "[i]n Q2, retail units sold totaled 117,564, an increase of 9%."  The Q2 2022 Shareholder Letter contained similar language regarding retail units sold.

278.    Also on the Q2 2022 Earnings Call, Defendant Garcia Junior responded to analyst questions regarding Carvana's title and registration issues:

Nicholas Freeman Jones JMP Securities LLC, Research Division – Director & Equity Research Analyst

I guess 2, if I could.  On the time buffers in certain states related to title and registration, is that a structural hurdle that's going to persist?  Can you drive more efficiency there and kind of get rid of that over time?  And how do you expect that to impact, I guess, conversion in the States?  And then the second question, there was a bullet about not passing through the cost of fund increases.  How should we think about, I guess, when you might start passing this through?

Ernest C. Garcia Carvana Co. - Co-Founder, President, CEO & Chairman

. . . So first, on the time buffers, I do think that's been associated with just ensuring that we're delivering the cleanest and fastest experience to our customers on the registration front that we possibly can. . . .  We definitely unfortunately gotten a lot of attention for registration over the last maybe 3 to 6 months.

**And I think, unfortunately, that narrative is probably both pretty exaggerated and then also lagging – kind of lagging where reality is**.  So I think I want to talk a little bit about kind of the progress we've made there.  **So today, we probably have about kind of 1/3 the rate of customers that are getting the delayed plates that we had even a year ago**.

*          *          *

**We think we're especially proud of that in light of the fact that in order to give our customers a 7-day return policy and a nationwide inventory, we often to take on more complicated underlying registration tasks**.  And when you control for the complexity of that, we're sort of better again than most dealers out there.

So I think, again, the team has done a great job.  I think the way that we're executing today is better than we've ever executed in the past, and it's a level that we're proud of, but certainly not satisfied with.  We're going to continue to push, and we've got a lot of improvements in process, a lot of additional improvements in product that we're rolling out to make sure that we're getting all the paperwork that we need to from customers, that is clear to customers what to upload and what to have ready at the time of delivery, et cetera.

. . . We're also working to improve the system.  We're working with several states as partners.  We view the states as partners, and many states view us as partners as well.  Many of these states have registration modernization initiatives underway. . . .

. . . And I do think it's something where we do expect those buffers to go away over time.  So we think it's hard to predict exactly when we'll be pulling those back, but the expectation is absolutely that we will pull those back over time.  **And then certainly, that does impact sales conversion.**

***There's no question that faster delivery times impact sales conversion.  And when we add these time buffers, the form it takes to a customer is just they see a longer delivery time.  And so that does impact conversion***.  And we expect to continue to make progress there over time.

\*     \*     \*

Seth Mckain Basham Wedbush Securities Inc., Research Division – MD of Equity Research

Thanks for all the information.  I have a follow-up question after the last ***question*** that was asked.  First, as it relates to the titling registration challenges, are there any states where you are not able to currently sell vehicles because of those challenges?  And then secondly, are there any issues currently with selling vehicles that don't have clean titles?

Ernest C. Garcia Carvana Co. – Co-Founder, President, CEO & Chairman

Sure.  ***So there are no states where we're not able to sell vehicles today and no issues with the clean title issue as well***.  I do think over time, these things can periodically pop up.  We recently had Illinois pop up.  We were excited to have a judge kind of give us time to make sure that we were able to work with the state and make sure we could resolve some of the maybe miscommunication disagreements that we've had.

\*     \*     \*

And so I think periodically, over time, there is certainly risk that we'll run into these – with the state here or there.  ***But in general, we've got a great relationship across states***, and we view the states as partners.

279.    Also on August 4, 2022, Carvana filed its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "Q2 2022 10-Q"), which was signed by Defendant Jenkins.  Attached thereto were SOX certifications signed by Defendants Garcia Junior and Jenkins attesting to the accuracy of financial reporting in the 10-Q.  The Q2 2022 10-Q contained similar disclosures as the 2021 Form 10-K with respect to Carvana's purported competitive advantages, including its vehicle acquisitioning, logistics network, and nationwide inventory and delivery capabilities, as described at ¶¶224-227 above.

280.    On October 10, 2022, the Michigan Department of State announced that it had suspended the license of the Carvana dealership in Novi, Michigan for "imminent harm to the public."  The suspension resulted from Carvana's recent title and licensing violations in Michigan.  In response to the suspension, Carvana spokesperson Kristin Thwaites stated:

"We reject the Michigan Secretary of State's allegations as baseless and reckless and ***we*** strongly disagree with the state's heavy-handed and abrupt

effort to shut down a growing Michigan business with tens of thousands of customers ***over what amounts to technical, paperwork violations involving title and transfer issues***."

\*      \*      \*

"[I]n most instances, arcane and outdated regulations have struggled to keep pace with our innovative business model, technology and surging customer demand for a new, convenient and accessible way to shop, buy and trade-in used vehicles. We urge the Secretary of State to begin dialogue to resolve this matter as expeditiously as possible. Meanwhile we will continue serving our customers, creating jobs and investing in Michigan while this matter is being resolved."

281.    The statement detailed in ¶¶268, 271, 277, *supra*, regarding purported retail unit sales growth was materially false and/or misleading or omitted material information necessary to make it not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)    Retail unit growth was unsustainable and fueled by Defendants' scheme. §VI. Indeed, after the Class Period, Chris Pierce, a research analyst at Needham & Company, noted "[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible."

(b)    To achieve the stated sales growth, Carvana "frequently acquired sales that were less profitable in the immediate period," which was not sustainable. §§VI.B.-C.2, VI.E. For example, Defendants pricing decisions "incorporated the value of future sales" because they were singularly focused on retail sales growth without regard to profitability. CW-11 described taking part in a Zoom call in early 2021 attended by Defendant Garcia Junior where another C-level executive explained that Carvana was "just worried about growth and not procedural" operations. CW-11 recalled that this same C-level executive spoke about the importance of growth on that call and suggested that employees read a certain book because it would help them understand that growth is all that matters. CW-11 remembers he/she recalled thinking, "Wow, they don't care about operations, just growth."

(c)    To achieve the stated sales growth, Defendants embarked on an unsustainable, nationwide expansion plan designed to boost unit sales without regard to profitability. The new markets that Carvana opened were a significant distance from existing

IRCs, and thus, retail unit sales were, on average, less profitable.  In fact, in Q1 2022, 100% of Carvana's new markets were more than 100 miles from an existing an IRC, including 50% that were over 200 miles from an IRC.  ¶¶144-147.  In Q2 2022, 100% of Carvana's new markets were more than 100 miles from an existing an IRC, including 50% that were over 200 miles from an IRC.  ¶¶144-147.

(d)     To achieve the stated sales growth, Carvana "frequently acquired sales that were less profitable in the immediate period."

(e)     Defendants "incorporated the value of future sales" into their "pricing decisions[,]" because they were singularly focused on retail sales growth without regard to near-term profitability.  CW-11 described taking part in a Zoom call in early 2021 attended by Defendant Garcia Junior where another C-level executive explained that Carvana was "just worried about growth and not procedural" operations.  CW-11 recalled that this same C-level executive spoke about the importance of growth on that call and suggested that employees read a certain book because it would help them understand that growth is all that matters.  CW-11 remembers he/she recalled thinking, "Wow, they don't care about operations, just growth."

(f)     Defendants lowered the Company's purchasing and verification standards when buying cars from customers to induce trade-ins and increase inventory, which boosted retail vehicle sales.  ¶¶139-143.  According to CWs-1 and 4, Carvana increased buying cars from customers, including those that did not meet its purchasing and verification standards, to induce trade-ins to boost retail sales.  *Id.*, ¶¶64-65, 83.

(g)     In Carvana's "haste to seize market share from competitors" and boost retail sales, Carvana sold cars to customers before it held title to those cars and faster than it could get them registered to their new owners.  ¶¶148-152, 185-199.  For example, CW-3 estimated that Carvana only had around *half* of the titles for the vehicles it sold wholesale at the time of sale.  Further, CW-3 noted that prior to the Class Period, he/she only received around 10 to 15 calls a week from dealers regarding title issues.  But after Defendants enacted their scheme, a "fire started" because he/she started receiving around 100 calls per

week regarding title issues.  CW-9 said the Customer Advocates on his/her team handled calls from all over the country.  Registration delays, which primarily meant that a title had not been provided to the customer, amounted to roughly half of the calls the team had handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from customers experiencing title delays beginning in Q1 2022.  CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars. CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana but which they could not get registered since the titles were missing.  In fact, near the end of the Class Period, Defendants would be forced to enact "buffer" periods to allow the title and registration team sufficient time to secure title, which Defendants admitted would slow growth.

(h)     In addition, Defendants' statements regarding retail sales growth are misleading for the additional reason that Defendants chose to speak about the drivers of retail unit growth, but did not disclose that the growth was unsustainable.  Indeed, by disclosing inaccurate and incomplete information regarding Carvana's retail sales growth, Defendants misled analysts and investors as to the sustainability of Carvana's growth during the Class Period.

282.   Defendants' misstatements and omissions regarding the benefits of purchasing cars from customers, as set forth in ¶279, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)     Contrary to Defendants' statement that they were "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory" as CWs-1, 2, 3, 4, 5, 6, 10, and 11 reported, Carvana purchased vehicles regardless of their quality.  In fact, according to CWs-1 and 4, as long as a customer was buying a car from Carvana, Defendants did not care about

1    the condition of the trade-in vehicle.  CW-10 corroborated this account, explaining that

2    Carvana was buying cars at breakneck speed and not adequately inspecting them.  CW-11

3    said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to

4    do much to verify the condition of the vehicles.  Based on CW-11's interactions with the

5    buying department, CW-11 observed that Carvana did not actually care about the condition

6    of the vehicles and just wanted to "get as many cars as it could."

7            (b)    The increase in buying cars from customers caused significant logistic

8    constraints and costs.  For example, buying cars from customers caused parking constraints,

9    load imbalancing, more vehicle moves, more miles traveled, constrained routes, a higher

10   backlog on constrained routes, poor performance on operational metrics, and the inefficient

11   use of Carvana's purported nationwide logistics network.  ¶¶139-143, 165-167.  CW-4

12   described a policy change at Carvana that resulted in Carvana buying "any car" it could.

13   CW-4 said that the volume of cars at the IRC increased ten-fold over the course of a year,

14   causing the IRC to run "out of room."  CW-6 said he/she "absolutely" learned that Carvana

15   was incurring excessive costs when transporting vehicles from the hubs and IRCs to

16   customers, especially with the geographic expansion of Carvana.  For instance, rather than

17   combining the pick up of a customer's trade-in and the delivery of a vehicle purchased by the

18   same customer from Carvana into a single trip, CW-6 said that Carvana made two separate

19   trips for this transaction.  CW-8 described pressure on his/her team to purchase every vehicle

20   possible, regardless of the price.  As a result of this pressure, CW-8 said that Carvana

21   "overbought" vehicles in 2021 and, by March 2022, "everything was on fire" because

22   Carvana was "totally overstocked."  Defendants would later acknowledge that these

23   operational issues substantially increased transportation costs.  *Id.*

24           (c)    The rapid increase in buying cars from customers caused a spike in the

25   number of cars that Carvana was forced to sell wholesale.  For example, CW-1 said that

26   there was a huge influx of vehicles that had to be sold wholesale because Carvana had been

27   trying to purchase "everything" from customers, regardless of the quality of the vehicles.

28   CW-3 corroborated this account, explaining that Carvana sold more vehicles wholesale,

including those that had been purchased from customers, because Carvana had lowered its standards for buying vehicles.  Likewise, CW-9 said that, as Carvana grew, it began accepting substandard cars and that the STC program took vehicles that were often converted for sale through wholesale channels.  The additional wholesale volume had numerous devastating impacts, as described below.

(i)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  For example, in fiscal year 2020, the average selling price for a wholesale vehicle was $8,065 whereas the average selling price of a retail vehicle was more than twice that: $19,420.  In fact, after factoring in all expenses, on average the Company lost money on each wholesale vehicle sold as depicted in the chart below.



(ii)    As demonstrated in the chart below, the increase in wholesale car growth coincided with a rapid rise in logistics expenses.



(iii)    As Defendants later revealed, "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicle moves and increased complexity in our multi-car logistics network."

(iv)    Carvana's logistics network lacked adequate facilities for storing and processing the wholesale volume, compelling Defendants to purchase ADESA in part to have physical locations to "transport most wholesale units acquired from customers." ¶¶139-143, 165-167.  Because Defendants embarked on a rapid increase in buying cars from customers without a corresponding increase in infrastructure expenditures, Defendants had to take on billions of dollars in debt so as to purchase ADESA to "lower[] costs and logistics network complexity." *Id.*

(d)    In addition, Defendants' statements regarding the benefits of buying cars from customers as detailed in ¶279, *supra*, are misleading for the additional reason that Defendants chose to speak about the benefits of buying cars from customers, but did not disclose the devastating consequences of lowering their purchase and verification standards to "get as many cars as it could."   Indeed, by disclosing inaccurate and incomplete information regarding buying cars from customers, Defendants misled analysts and investors as to the sustainability and profitability of Carvana's vehicle acquisitions and growth.

283.    Defendants' misstatements and omissions regarding Carvana's nationwide market expansion, as set forth in ¶¶274, 279, *supra*, were materially false and/or misleading

or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a) In connection with Carvana's stated goal of reaching 95% of the U.S. population, Carvana added new markets without any regard to profitability. Defendants knew that the distance from existing IRCs was directly correlated to logistics and related expenses. In fact, Defendants acknowledged that sales in markets more than 200 miles from a Carvana IRC incurred at least $750 more in logistics and related expenses. Carvana also referenced the significance of markets being 100 miles from an existing IRC when it bought ADESA "to put 78% of U.S. population within 100 miles of a Carvana inspection and reconditioning center." In spite of this, and because Carvana had already achieved market coverage near its existing IRCs, the vast majority of the new markets opened by Carvana were a significant distance from existing IRCs. The charts below illustrate the percentage of new markets that were a significant distance from existing IRCs at the time they were opened.

| | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | CLASS PERIOD TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New markets added | 15 | 100 | 0 | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 169 |
| New markets 100 miles or more from an existing IRC when opened | 15 | 83 | - | 5 | 6 | 27 | 9 | 3 | 2 | 2 | 152 |
| as a % of new markets added | 100% | 83% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 90% |
| New markets 200 miles or more from an existing IRC when opened | 14 | 46 | - | 3 | 6 | 27 | 9 | 3 | 1 | 1 | 110 |
| as a % of new markets added | 93% | 46% | - | 60% | 100% | 100% | 100% | 100% | 50% | 50% | 65% |



(b)     Contrary to Defendants' representations, Carvana's expansion model was not "capital-light." In fact, Carvana's expansion required the buildout of costly IRCs to support the new markets, including the intake, storage, processing, and reconditioning of vehicle inventory. However, in an effort to appear "capital-light," Carvana delayed the buildout of new IRCs. New IRC growth significantly lagged behind Carvana's expansion into new markets. For example, while Carvana added 100 new markets in Q2 2020 alone, it added no new IRCs during the quarter. Overall, during the Class Period, Carvana added over 150 new markets spanning the country, with 90% of the new markets over 100 miles from an existing IRC, including 65% that were more than 200 miles from an IRC. CW-7 said that he/she and other employees were told that Carvana acquired ADESA so that Carvana could get within 100 miles of the most populated areas of the country and thereby extend its reach. Eventually the lack of critical infrastructure crippled the Company's operations, and Defendants were force to spend $3 billion to acquire ADESA and its 56 locations across the country to bridge the gap.

1          (c)      As the distance between new markets and Carvana's regional IRCs

2    increased, Carvana was forced to increasingly rely on costly third-party providers for vital

3    logistics and reconditioning functions that were necessary to serve the distant markets.  CW-

4    4 said that Carvana's acquisition of ADESA was part of Carvana's efforts to expand into

5    new markets that might have been far from existing Carvana IRCs.  Carvana's range for

6    picking up and delivering vehicles was only five hours out and five hours back (although

7    third-party haulers could go further).  As such, for example, a customer in Ohio purchasing a

8    car from Carvana that was in Oregon would exceed this range.  Although Carvana had

9    operations in some of the western states like California and Nevada, there was essentially not

10   a hub or IRC between Indiana and Oregon that would fall within the five-hour transportation

11   limit.  The sheer amount of money it would cost to pay third-party haulers to cover such

12   distances was prohibitive.  Therefore, according to CW-4, the "biggest reason" for acquiring

13   ADESA had been its locations which reflected that ADESA operated nationwide and had

14   something like 51 or 52 locations.  These costs were largely concealed from investors until

15   the end of the Class Period when Defendants admitted the need to "[r]educe third-party

16   inbound transport share," "[i]n-sourc[e] third-party pickups" for Carvana's "[l]ast-mile

17   delivery," and to "[r]educe third-party shipping" to curtail logistics expenses.  Carvana also

18   acknowledged that "location growth" had led to "the addition of many third-party

19   reconditioning locations."

20          (d)      As part of Defendants' nationwide expansion plan, Carvana touted its

21   "nationally pooled inventory" and claimed "[o]ur established logistics network and ability to

22   deliver or pick up any car in our inventory."  Contrary to these representations, Defendants

23   understood that it was unprofitable to pick-up and deliver cars over significant distances.  At

24   the end of the Class Period, Defendants acknowledged the need to "meter" (*i.e.*, stop) selling

25   retail cars to reduce "less profitable sales . . . in markets with lower profitability due to long

26   distance from inventory."

27          (e)      Contrary to Defendants' assertions that Carvana could easily expand,

28   and achieve significant "economies of scale," because its  "capital-light" and "vertically

integrated business model" had significant cost advantages versus traditional because it did not require cost-intensive "brick-and-mortar dealerships, staffed with sales personnel," Defendants understood that Carvana's expansion model did not achieve "economies of scale."  In fact, Carvana's rapid expansion model produced the opposite results with costs *increasing* as its geographic footprint expanded.  For example, as depicted below, the total "market occupancy cost" per market increased significantly as Carvana added new markets.



Similarly, Carvana's IRCs, which could not keep up with the rapid market growth, did not "speed[] delivery times and increas[e] logistics network efficiency," as Defendants claimed. In reality, the costs per IRC ballooned as Carvana "frequently moved vehicles between IRCs in different markets due to parking constraints" causing "total vehicle miles traveled" to increase and  "adding to costs and logistics network complexity."  As depicted below, this caused the total logistics expense per IRC to increase by almost $2 million during the Class Period.



284. Defendants' misstatements and omissions regarding Carvana's title and registration practices, as set forth in ¶¶275, 278, 280, *supra*, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)     Defendants' scheme to artificially inflate the price of Carvana Class A common stock included violating state title and registration laws to push through sales and boost Carvana's retail sales growth.  §§VI.B.-C., VI.E., VII.

(b)     Defendants, and their representatives, violated numerous state laws and regulations concerning title and registration in furtherance of the scheme.  *See, e.g.*, §§V., VI.B, VI.C.3.  For example, as was later revealed by the media, states' investigations, findings, and suspensions, and Defendants' belated admissions, Defendants, and their representatives, routinely and repeatedly sold cars before holding title to the vehicle; failed to register cars within the legally required timeframe; and illegally issued out-of-state temporary tags and/or license plates.  §VII.

(c)     In addition, Defendants omitted that they undertook an undisclosed course of illegal conduct with regard to Carvana's title and registration practices to increase conversion of Carvana's retail sales.  §§V., VI.B., VI.C.3.  For example, as detailed above, CWs-8 and 10 reported that internally the expectation was that Carvana could acquire title after purchasing a car from a customer, but CWs-3, 4, 8, 9, 10 and 11 universally reported

that Carvana would sell these vehicles before they received title.  In fact, CW-3 estimated that Carvana only had around *half* of the titles for the vehicles they sold wholesale at the time of sale.  Further, CW-3 noted that, after Defendants enacted their scheme, a "fire started" because he/she started receiving around 100 calls per week regarding title issues. CW-9 said that during the Class Period, the Customer Advocates on his/her team handled anywhere from ten to 30 calls a day concerning registration delays, which primarily meant that a title had not been provided to the customer, which roughly amounted to half of the calls the team had handled before the scheme.  CW-9 also described attending an all-hands call in January 2022 in which Defendant Garcia Junior spoke to employees.  During the call, employees told Garcia Junior that they were being inundated with calls regarding registration problems.  CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana but which they could not get registered since the titles were missing.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 said there was a Google spreadsheet that tracked vehicles without titles for the entire IRC, and "there were a ridiculous amount of cars on the list."  According to CW-4, it was well known internally that title issues were a common problem – CW-4 described it as a huge mess.

(d)     Further, the CWs' accounts are corroborated by the multiple states' investigations, findings, and suspensions of Carvana's dealership licenses for (i) selling cars without holding title to the vehicle, (ii) failing to register vehicles within the required timeframe, and (iii) issuing out-of-state temporary tags and/or license plates.  §VII.  Even Carvana "agreed it had violated the law and to have its dealer license revoked and be barred from reapplying for a new license for three years."[75]  ¶190.  Near the end of the Class Period,

---

[75]  Jamie LaReau, *Carvana, Michigan Reach Deal That Leaves Used Car Megastore Without License in State*, Detroit Free Press (Jan. 11, 2023), available at https://www.freep.com/story/money/cars/2023/01/11/carvana-michigan-dealer-license-settlement/69797797007/.

1   Defendants would be forced to enact "buffer" periods to allow the title and registration team

2   sufficient time to secure title, which Defendants admitted would slow growth.  ¶277.

3           (e)       In addition to the reasons above, Defendants' statements minimizing the

4   extent of the title and registration violations were materially false and misleading for the

5   following additional reasons.  In fact, as described *supra*, far from being a "limited" issue,

6   CWs-3, 4, 8, 9, 10, and 11 report that title issues were pervasive at the Company.  ¶¶158-

7   152, §V.  Moreover, following an investigation and subsequent meetings with Carvana

8   executives, Michigan Department of State placed Carvana on an 18-month probation for

9   violating its states' title and registration laws on May 7, 2021.  ¶187.  Further, subsequent

10  government investigations, plea agreements, suspensions, and media reports confirm that,

11  during the Class Period, Defendants violated numerous laws and regulations in Texas,

12  Florida, Michigan, Maryland, North Carolina, Oklahoma, Georgia, Pennsylvania, Arizona,

13  Michigan and Illinois.  ¶¶185-199.  For example, in December 2021, Florida's Department

14  of Highway Safety and Motor Vehicles threatened the Company with a statewide license

15  suspension over its failure to timely register cars, identifying hundreds of vehicles with

16  issues.  Further, near the end of the Class Period, Maryland Department of Transportation

17  Motor Vehicle Administration found that from June 2021 to July 2022, Carvana failed to

18  timely register approximately 10% of its sales.  ¶196.  And following the Class Period,

19  Carvana admitted to additional violations of Michigan's and Illinois's laws regarding title

20  and registration.

21          (f)       In addition, contrary to Defendants' statement that it was having

22  "productive conversations with regulators" and "fel[t] very confident moving forward,"

23  ¶275, mere weeks later, Michigan suspended Carvana's license for: (1) "failing to make

24  application for title and registration within 15 days of delivery for 112 customers since

25  agreeing to an earlier probation extension"; (2) "committing fraudulent acts in connection

26  with selling or otherwise dealing in vehicles where Carvana employees admitted to

27  destroying title applications and all applicable documents pertaining to the sale of [certain

28  vehicles]" that it later took back from customers; (3) "improperly issuing temporary

registrations"; and (4) "violating [the] terms of a probation agreement 127 times." ¶188. Further, shortly after Carvana's statement, the Company would see its licenses suspended or revoked in Pennsylvania and Illinois. ¶¶191, 193.

(g)     As a result of (a)-(e) above, Carvana was subject to a substantial risk of reputational, legal and financial harm.

285.    The statements detailed in ¶¶269, 270, 272, 273, 276, *supra*, regarding purported external, transitory factors, such as omicron, impacting Carvana's SG&A expenses and logistics network were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants:

(a)     Carvana's logistical constraints and increased SG&A expenses were substantially due to Defendants' undisclosed scheme to pump Carvana's retail sales growth and stock price.   Indeed, as part of Defendants' scheme, Defendants engaged in unsustainable machinations to achieve this growth the result of which was increased SG&A expenses, such as title registration costs, and logistical costs and constraints. §§VI.B.-C., VI.E.

(b)     As described *supra*, Carvana's substantial SG&A expenses per retail unit sold and logistical constraints directly coincided with Defendants' scheme. *See, e.g.,* §VI.C. For example, the exponential growth in wholesale volume directly coincided with a spike in logistics expenses. ¶166. In fact, in their new operating plan, Defendants admitted that increased inventory, increased wholesale volume, and location growth were three primary drivers of the Company's logistics costs and constraints.

(c)     Contrary to Defendants' representation that its poor results were due to "transitory" external factors, Carvana would be forced to admit at the end of the Class Period that its own actions, such as acquiring less profitable sales and expanding into unprofitable markets, drove Carvana's poor results.  Further, these results were in fact not transitory as Carvana would have to take extreme measures to slash its SG&A expenses and repair its broken logistics network, which would hamper Carvana's retail sales growth and Total GPU.

1   For example, Defendants announced at the end of the Class Period that the Company had
2   been, and would continue, reducing advertising, reducing its website inventory, incentivizing
3   pickups and drop-offs at vending machines, and continuing inventory visibility metering on
4   long-distance inventory.

5          (d)     By disclosing inaccurate and incomplete information regarding the
6   factors impacting Carvana's logistics network and SG&A expenses, Defendants misled
7   analysts and investors as to the true condition of Carvana's current and future growth during
8   the Class Period.

9   IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

10         A.     Insider Stock Sales Support a Motive to Commit Fraud

11         286.   Defendants were motivated to engage in their fraudulent scheme in order to
12  collectively sell more than 14.8 million shares of Carvana Class A common stock for
13  proceeds of more than $3.87 billion.  Notably, Defendants collectively unloaded more than
14  14.2 million shares – worth nearly $3.7 billion – before the public got wind of Defendants'
15  scheme to defraud or Defendants' misrepresentations and omissions.

16                1.     Garcia Senior's Class Period Sales and Insider Trading

17         287.   Even though Garcia Senior's felony conviction prevented him from publicly
18  participating in the management of Carvana, Garcia Senior worked hand-in-glove with his
19  son, Defendant Garcia Junior, to manipulate Carvana's stock price, buying Carvana's stock
20  pre-Class Period at a depressed price so he could sell his Carvana stock at inflated prices
21  during the Class Period.  Less than two months before the beginning of the Class Period,
22  "Garcia Senior 'participated behind the scenes in the planning and execution of the very
23  abbreviated process that led up to [Carvana's] Direct Offering.'"  *Carvana Co. S'holders*,
24  2022 WL 2352457, at *4.  For example, "[o]n Saturday, March 28, 2020, Garcia Junior
25  forwarded the stock issuance allocations list to Garcia Senior, referring to the list as 'Pretty
26  solid' and stating that they had to 'figure out plan on your money.'"  *Id.*

27         288.   From October 30, 2020 through August 23, 2021, a less than 10-month period,
28  Garcia Senior exploited the artificial inflation in Carvana's stock caused by Defendants'

pump-and-dump scheme by selling off approximately 19% of his shareholdings. ***Garcia Senior sold every single trading day for nearly a year, even accelerating his plan to dump shares at even higher per-day share amounts and conducting off-plan sales***. In total, Garcia Senior sold 13,950,000 shares of his Carvana stock at prices as high as $376.52 per share – 43 times Carvana's stock prices at the close of the Class Period – for nearly ***$3.7 billion in total proceeds***.

289.    These trades were unusual when compared to those sales in the two-and-a-half year period leading up to the start of the Class Period. Indeed, in stark contrast to Garcia Senior's Class Period Sales, during the equivalent pre-Class Period interval, Garcia Senior did not sell a single share of his personal holdings. Instead, he sold less than 10.9 million shares of Carvana stock he owned indirectly through DriveTime or his company Verde for proceeds of $456.3 million.

290.    Moreover, Garcia Senior's Class Period sales were also suspicious in nature as he modified his 10b5-1 plan, adopted on June 15, 2020, ***twice*** within a year of its adoption date to ***accelerate*** the number of shares he could sell at artificially inflated prices. Professor Taylor of the Wharton School of Business explained that Garcia Senior's frequent modification of his plan raises serious red-flags: "I've studied 20,000 10b5-1 plans, [and] I can't recall another of this size where there are modifications every six months."[76] Unsurprisingly, Professor Taylor concluded: "***What I'm saying is the Garcias knew it was short-lived[.] . . . The Garcias knew the music would eventually end***."[77]

291.    Garcia Senior sold the vast majority of his Carvana stock during the Class Period pursuant to these modified plans. Worse still, as discussed in more detail below, Garcia Senior sold more than $478.4 million ***outside of*** his questionable 10b5-1 plan. ***His sales and their timing can be seen in the following graph***:

---

[76]    *$3.6 Billion Stock Windfall* Article; *Dad, Who Controls Company, Is Worth Nearly $3 Billion* Article.

[77]    *Chaotic Zoom Firing Caps Company's Struggles* Article.



Defendant Garcia Senior's Insider Sales I 5.6.20 – 11.3.22

The trend of Close as an attribute for Date Day

292.    Garcia Senior's sales of his Carvana stock during the Class Period began on October 30, 2020 with a sale of over two million shares at average share prices of $195.36 for total proceeds of over $388 million, as Carvana's stock price had increased more than 114% since the start of the Class Period.

293.    On November 4, 2020 – just four days into his new 10b5-1 trading plan – **Garcia Senior modified his trading plan** to "adjust certain minimum trading price conditions,"[78] which accelerated the rate at which he could sell his shares to unsuspecting investors per day.  Notably, by November 4, 2020, Carvana's stock price had more than doubled since the start of the Class Period from $91.15 per share to $201.20.

294.    Moreover, on December 2, 2020, as Carvana's stock price soared even higher, Garcia Senior sold an additional two million shares of his Carvana stock at $239.20 per share

---

[78]    Schedule 13D/A (October 30, 2020), https://www.sec.gov/Archives/edgar/data/1690820/000119312520288024/d715970dsc13da.htm.

through a block trade made *outside of his trading plan, enabling him to pocket $478.4 million*.

295.    Over the following two months, Garcia Senior sold 3.6 million shares of his Carvana stock for total proceeds of more than $877 million.  Specifically, from October 31, 2020 to December 6, 2020, Garcia Senior sold over 2.7 million shares of his Carvana stock for gross proceeds of nearly $638.8 million.  And from December 7, 2020 to January 6, 2021, Garcia Senior sold 917,976 shares of his Carvana stock for total proceeds of $238.3 million.

296.    From January 7, 2021 to February 28, 2021, Garcia Senior sold 1.8 million shares of his Carvana stock for proceeds of more than $507.9 million.  Consistent with his modified trading plan, Garcia Senior generally sold shares of his Carvana stock at a rate of 50,000 shares per day.  On six days during this period, however, Garcia Senior increased his daily sale of his Carvana stock to 60,000 when Carvana share prices neared or exceeded $300 per share.  Further, on February 10, 2021, Garcia Senior sold 52,528 shares of his Carvana stock, and on February 18, 2021 he sold 50,301 shares.  Tellingly, during this increased period of trading, the Michigan Department of State had begun investigating Carvana's Novi dealership for registration and titling violations.  This would only be revealed to the public much later, however, allowing Garcia Senior to profit from sales of inflated shares in the meantime.

297.    Over the following three months, Garcia Senior sold 2.8 million shares of his Carvana stock for total proceeds of $758.4 million.  Then, on May 20, 2021 – less than six months after his first modification of his trading plan, as Carvana's shares continued to climb to record highs, and weeks after Carvana was placed on probation in Michigan after admitting to violating state title and register laws (unbeknownst to investors) – *Garcia Senior modified his trading plan for a second time to accelerate the number of shares he could sell per day*.

298.    These modifications were justifiably criticized.  As David F. Larcker, a professor of accounting at Stanford Graduate School of Business, told *Forbes*, "The active

modification of a 10b5-1 plan raises the question of whether someone is trying to rebalance their portfolio, time the market, or is in possession of non-material public information."[79]  In fact, as *The Wall Street Journal* reported, "Securities and Exchange Commission Chairman Gary Gensler has said the agency is drafting revisions to the rules governing the plans, including limiting the number of possible cancellations or modifications" because of the controversy surrounding manipulations like Garcia Senior's.[80]

299.    Following this second modification, over a period of less than 90 days, Garcia Senior sold over 3.6 million shares of his Carvana stock for proceeds of more than $1.1 billion until his final sale on August 23, 2021.  Garcia Senior chose to sell for only nine trading days following the first partial disclosure to the public; as noted by the media, in the following fourteen months *as Carvana's stock price collapsed, Garcia Senior never sold again during the Class Period*.  As one reporter noted, Garcia Senior is "far wealthier than he'd be if he'd never dumped shares."[81]

300.    In addition to Garcia Senior's $3.7 billion in Class Period insider stock sales, the Garcias also executed certain purchases of Carvana stock during the Class Period.  On April 26, 2022 Garcia Junior purchased 2 million shares, spending $160 million, and Garcia Senior purchased 5.1 million shares, spending $408 million.  These purchases of Carvana stock from the Company's 2022 Offering were necessary in order to ensure the successful execution of that offering.  Garcia Senior also purchased again on June 10, 2022 (793,790 shares for $17.4 million) and again on June 13, 2022 (less than 1.2 million shares for $24.6 million).  In total, the Garcias purchased 9 million shares for a total of $610 million, a minimal sum relative to Garcia Senior's multi-billion dollar insider sales.  Further, the Garcias executed these purchases in an effort to artificially inflate Carvana stock price and once again dump their over-valued shares on an under-informed market.

---

[79]  *Dad, Who Controls Company, Is Worth Nearly $3 Billion* Article.

[80]  *$3.6 Billion Stock Windfall* Article.

[81]  *Dad, Who Controls Company, Is Worth Nearly $3 Billion* Article.

1

## 2.      Jenkins's Class Period Sales and Insider Trading

2       301.    Between August 7, 2020 and November 8, 2021, as Carvana's stock peaked,

3    Jenkins took advantage of the artificial inflation in Carvana's stock price caused by

4    Defendants' pump-and-dump scheme and sold 336,922 shares of his Carvana stock, 34% of

5    his holdings, for proceeds of over $79 million.[82]  Jenkins's Class Period sales were unusual

6    compared to the two-and-a-half year period preceding the Class Period, when Jenkins sold

7    10,000 fewer shares of his Carvana stock for proceeds of only $18.5 million.  Moreover,

8    Jenkins's annual salary for the fiscal year ended December 31, 2020 was $384,395.  Thus,

9    the proceeds from his insider sales during the Class Period were ***over 206 times the amount***

10   ***he received in salary***.  ***His sales and their timing can be seen in the following graph***:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [82]   Following November 8, 2021, Jenkins made one additional sale during the Class Period

28   on February 1, 2022.  On this day, Jenkins sold a mere 7 shares for $1,153.46.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



The trend of Close as an attribute for Date Day.

20   302.   From August 7, 2020 to December 22, 2020, Jenkins sold 260,000 shares of his

21   Carvana stock for $56.7 million.

22   303.   Between January 14, 2021 and August 2, 2021, as Carvana's stock peaked,

23   Jenkins sold 60,000 shares of his Carvana stock for proceeds of $17.3 million, selling $14.3

24   million of these shares after the start of the Michigan Secretary of State's investigation, ***but***

25   before the partial disclosure involving North Carolina's suspension of Carvana's license.

26   During this period, on March 15, 2021, Jenkins adopted a new 10b5-1 plan, which means

27   that Jenkins does not qualify for the affirmative defense under a 10b5-1 plan because he was

28   aware of material, non-public, inside information before he entered into his new plan.

304.    In fact, Jenkins's modification of his 10b5-1 plan in March 2021 demonstrates the existence of strategic trading under the plan in which Jenkins effected sales pursuant to his 10b5-1 plan before adverse news disclosures.  From September 1, 2021 to November 8, 2021, for example, Jenkins sold 16,929 shares of his Carvana stock for total proceeds of $5.3 million, suspiciously timing his sales to take as much advantage of inflated prices as he could before *The Wall Street Journal*'s exposé.

### 3.    Huston's Class Period Sales and Insider Trading

305.    Between August 7, 2020 and November 8, 2021, as Carvana's stock peaked, Huston took advantage of the artificial inflation in Carvana's stock caused by Defendants' pump-and-dump scheme and sold 336,930 shares of his Carvana stock, 34% of his holdings, for proceeds of nearly $79.3 million.[83]  His Class Period sales were unusual compared to the two-and-a-half year period preceding the Class Period, when Huston sold more than 10,000 fewer shares of his Carvana stock for proceeds of only $18.5 million.  Huston's Class Period sales were also suspicious in timing, as 97% of his sales were accomplished prior to *The Wall Street Journal*'s exposé was published on October 22, 2021.  Huston's annual salary for the fiscal year ended December 31, 2020 was $376,010.  Accordingly, his insider sales during the Class Period were ***over 210 times the amount he received in salary***.  ***His sales and their timing can be seen in the following graph***:

---

[83]   Following November 8, 2021, Huston made one additional sale during the Class Period on February 1, 2022.  On this day, he sold a mere 7 shares for $1,153.46.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



The trend of Close as an attribute for Date Day.

20
21
22
23
24
25
26
27
28

306.    From August 7, 2020 to December 22, 2020, Huston sold 260,000 shares of his Carvana stock, collecting proceeds of over $56.7 million.

307.    Between January 14, 2021 and August 2, 2021, he sold 60,000 shares of his Carvana stock for nearly $17.3 million, offloading shares at peak share prices.  Huston sold $11.3 million of these shares and adopted a new 10b5-1 plan (on March 16, 2021) **after** the start of the Michigan Secretary of State's investigation **and before** the partial disclosure involving North Carolina's suspension of Carvana's license.  Huston's adoption of a new 10b5-1 plan on March 16, 2021 means that he does not qualify for the affirmative defense

1 under a 10b5-1 plan because he was aware of material, non-public, inside information before

2 he entered into his new plan.

3      308. In fact, Huston's modification of his 10b5-1 plan in March 2021 demonstrates

4 the existence of strategic trading under the plan in which Huston effected sales pursuant to

5 his 10b5-1 plan before adverse news disclosures.

6      309. From September 1, 2021 to November 8, 2021, Huston sold 16,930 shares of

7 his Carvana stock for total proceeds of nearly $5.3 million, suspiciously timing his sales to

8 take as much advantage of inflated prices as he could.

9      **4.** **Keeton's Class Period Sales and Insider Trading**

10      310. Between August 7, 2020 and July 15, 2021, as Carvana's stock prices peaked,

11 Keeton took advantage of the artificial inflation in Carvana's stock caused by Defendants'

12 pump-and-dump scheme and offloaded 180,000 shares of his Carvana stock, 63% of his

13 ownership, to pocket more than $42.3 million.[84]  In the two-and-a-half years leading up to

14 the Class Period, Keeton sold a total of 207,000 shares of his Carvana stock for proceeds of

15 less than $10.8 million.  Keeton's annual salary for the fiscal year ended December 31, 2018

16 was $330,000.[85]  His proceeds from insider stock sales during the Class Period totaled over

17 $42.3 million – *more than 128 times the amount he received in salary*.  *His sales and their*

18 *timing can be seen in the following graph*:

19

20

21

22

23

24

25

---

26 [84]  After July 15, 2021, Keeton conducted one final sale during the Class Period on February 1, 2022 – a miniscule 7 shares for $1,153.46.

27 [85]  Keeton's share ownership and salary during the Class Period was not provided in

28 Carvana's SEC filings.



The trend of Close as an attribute for Date Day.

311.    In just the four-month period between August 7, 2020 and December 15, 2020, Keeton sold 110,000 shares of his Carvana stock, pocketing more than $22.6 million, pursuant to a 10b5-1 plan he adopted less than two months earlier, on June 9, 2020.  Because Keeton was aware of material, non-public, inside information before he entered into his new plan, he does not qualify for the affirmative defense under a 10b5-1 plan.  In fact, Keeton's modification of his 10b5-1 plan in June 2020 demonstrates the existence of strategic trading under the plan in which Keeton effected sales pursuant to his 10b5-1 plan before adverse news disclosures.

312.    Between January 14, 2021 and July 15, 2021, Keeton sold 70,000 shares of his Carvana stock for total proceeds of over $19.7 million, suspiciously timing all of his sales, with the exception of a miniscule 7-share sale, to be completed prior to *The Wall Street Journal*'s exposé published on October 22, 2021.  Further, all but one of these sales were accomplished after the start of the Michigan Secretary of State's investigation, but before the partial disclosure involving North Carolina's suspension of Carvana's license.  By timing his sales to predate the disclosure of this adverse information, Keeton exploited Carvana's artificially inflated stock prices.

**B.    Defendants' 10b5-1 Plans Do Not Rebut a Strong Inference of Scienter**

313.    Defendants Garcia Senior, Jenkins, Huston, and Keeton each had a 10b5-1 trading plan in place during the Class Period.  Each Defendant modified his plan or adopted a new plan during the Class Period.  Thus, at every point that Defendants made the decision to trade, they were aware of and participating in the Company's unsustainable growth scheme which inflated Carvana stock.

314.    All that a Rule 10b5-1 plan does is move the relevant date at which the insider possessed material information from the date of the trade to the date when the trade was planned.  The SEC attempted, through Rule 10b5-1 to provide a mechanism for insiders to sell their options while not in possession of material inside information.  However, this mechanism, as mentioned above, has frequently been manipulated to conceal intentionally timed trades which earn abnormal returns for privileged insiders.  Insiders accomplish these sales through bulk transactions to the disadvantage of stockholders.

315.    Indeed, a December 2006 academic study suggests that returns on stock sales made pursuant to pre-arranged trading plans intending to comply with SEC Rule 10b5-1 significantly exceed market returns.  The academic study found that trades under 10b5-1 plans beat the market by over 6% during a period of six months, while executives at the same companies who traded without 10b5-1 plans beat the market by only 1.9%.  The study concluded that the evidence demonstrates the existence of strategic trading under 10b5-1

1  plans in which executives effect sales pursuant to such plans before adverse news
2  disclosures.   This manipulation occurs with such frequency that the SEC is currently
3  considering repealing the Rule and has already made amendments to the Rule to increase the
4  requirements to adopt these plans.  The amendments will become effective on February 26,
5  2023.[86]   In addition, the SEC recently adopted a new rule to "target corporate insider
6  trading," which will "remove many of the loopholes that allowed corporate insiders to hide
7  behind these trading plans."[87]  One notable change requires that "[o]fficers and directors will
8  have to wait at least 90 days after starting or modifying a 10b5-1 plan before they can trade
9  under the arrangement."[88]  These requirements will apply to most US-listed companies on
10  April 1, 2023.[89]  Had they applied to Carvana during the Class Period, Defendants' trades
11  under their 10b5-1 plans would have been delayed by three months following each new
12  adoption or modification.

13      316.   The trading plans that Defendants put in place to dump their Carvana shares
14  trigger precisely the concerns that the SEC has and further demonstrate Defendants' scienter.
15  Defendants adopted their plans during the Class Period and began selling within months.
16  Each Defendant had an initial trade which was outsized in comparison to the rest of their
17  trades.[90]  Collectively, Defendants only once sold shares for a price lower than $180 per

---

[86]  17 C.F.R. §240.10b5-1.

[87]  Jonathon Weil, *New SEC Rules Target Corporate Insider Trading: Loopholes will close for executives selling company stock*, Wall St. J. (Feb. 13, 2023), https://www.wsj.com/articles/new-sec-rules-target-corporate-insider-trading-4f1c64e8.

[88]  *Id.*

[89]  *Id.*

[90]  There are seven hallmarks of a Rule 10b5-1 plan that is consistent with the intent of the SEC, that is, to offer executives an opportunity to engage in uninformed trades for diversification purposes: (1) significant time lag between adoption and first trade; (2) regularly scheduled trades; (3) sales over long periods of time; (4) sales of relatively consistent size and relatively small amounts compared with overall shareholdings; (5) sales at a range of stock prices; (6) no changes or cancellations of plans; and (7) a high level of board and general counsel involvement in adoption, alteration, and termination decisions. Though many of these factors cannot be assessed because Defendants' plans are not publicly available, based on the publicly available information about these plans, the 10b5-1 plans fail each of these factors.

share, and each of them sold a significant portion of their total holdings during the Class Period.

317. Additionally, Defendants' plans are uniquely suspicious for the following reasons:

- **Garcia Senior**: Entered into his 10b5-1 plan on June 15, 2020, more than a month after the start of the Class Period; made his first sale three months later, selling two million shares more than most of his other trades, which varied based on trading prices; modified his plan four days later and again six months after that (all still during the Class Period as Carvana stock was inflated); sold **two million shares outside of his plan** on December 2, 2020; sold every single day until just over a year after he adopted his plan.

- **Jenkins**: Entered into his 10b5-1 plan on June 15, 2020, made his first sale less than two months later on August 7, 2020, adopted a new plan on March 15, 2021, and traded under his plan for only 15 months, selling more than a third of his shares.

- **Huston**: Entered into his 10b5-1 plan on June 15, 2020, began trading on August 7, 2020, adopted a new plan on March 16, 2021, sold additional shares exercised in December pursuant to an exchange agreement, and traded for only 15 months under his plan, selling more than a third of his shares.

- **Keeton**: Entered into his 10b5-1 plan on June 9, 2020, began trading on August 7, 2020, traded for less than a year under his plan, and sold nearly two-thirds of his ownership.

318. Thus, rather than using the Rule to diversify their holdings, the Defendants manipulatively used the Rule in an attempt to shield their stock sales. In reality, these were informed trades which earned the insiders systematic returns and provided their personal motive to engage in their scheme and fraudulent course of conduct.

C. **Multiple Confidential Witnesses Raised Quality, Indiscriminate Growth, and Title Problems with Managers, Including Defendants Garcia Junior, Jenkins, and Huston**

319. As the confidential witness accounts demonstrate, Defendants knew or recklessly disregarded that Carvana had lowered its purchasing and verification standards when buying cars from customers to induce trade-ins and in turn additional retail vehicle sales. Defendants also knew or recklessly disregarded that the rapid increase in buying cars from customers caused a spike in the number of cars that Carvana was forced to sell wholesale because Carvana purchased low quality vehicles from customers at inflated prices.

1   Indeed, the Individual Defendants participated in calls and attended meetings at which the

2   low quality of vehicles being purchased from customers was frequently raised and discussed.

3       320.    For example, CW-5 attended a leadership summit with all Market Operations

4   Managers and senior leadership in April 2022 at Carvana's headquarters in Phoenix.  This

5   summit included a Q&A session with Defendants Garcia Junior and Huston.  During this

6   session, the executives answered questions that had been submitted ahead of time and they

7   also took additional questions afterward.  CW-5 recalled that someone asked about what was

8   going to be done regarding the quality issues infecting the vehicles that the hubs were

9   receiving from the IRCs.  CW-5 believes this individual may have asked something along

10  the lines of whether the 150-point inspections were actually being performed since there

11  were so many issues with the vehicles the hubs were receiving.

12      321.    CW-11, too, attended a meeting where the poor quality of vehicles purchased

13  from customers was discussed with Defendants Garcia, Jenkins, and Huston.  CW-11

14  recounted Defendants' singular focus on growth, which resulted in Carvana lowering its

15  purchasing and verification standards.  Employees at CW-11's level and market team leaders

16  attended Zoom calls with the Company's C-level executives (including Defendants Garcia

17  Junior, Jenkins and Huston) probably every quarter.  On one of these Zoom calls in early

18  2021 attended by Defendants Garcia Junior, Jenkins, and Huston, a meeting attendee

19  expressed concern about the poor quality of the cars Carvana was purchasing.  According to

20  CW-11, one of the C-level executives responded: Carvana was "just worried about growth

21  and not procedural" operations.  CW-11 recalled that this same C-level executive spoke

22  about the paramount importance of growth on that call and suggested that employees read a

23  certain book because it would help them understand that growth is all that matters.  CW-11

24  remembers he/she recalled thinking: "Wow, they don't care about operations, just growth."

25  There was time for questions and answers at the end of these calls, and during every call

26  someone in a market operations role complained about the poor quality of the vehicles they

27  received from the IRCs.  CW-11 said that this was the number one complaint from the

28

1   operations side of the business because they felt guilty delivering poor quality vehicles to

2   customers.

3        322.   Other confidential witnesses raised concerns about the eroding purchasing

4   standards and the mounting costs of excess inventory to Carvana with director-level

5   employees at Carvana.   Around the fall and winter of 2021, CW-8's team began to raise

6   concerns about the high level of inventory to director-level employees because it was

7   becoming difficult to sell certain types of vehicles and CW-8's team had to lower prices and

8   margins were decreasing.   CW-8's team had weekly meetings every Thursday with an

9   Associate Director where they would go over each segment and provide inventory updates.

10  CW-8's teammates raised concerns about the excess inventory in a couple of these meetings

11  and one of his/her coworkers, who was a Financial Analyst, made a report about this topic.

12  However, CW-8's team's concerns were ignored, and the Buyers were told to continue

13  buying vehicles.  Likewise, CW-1 said that, after operating under the directive "to purchase

14  as much as was humanly possible," which resulted in Carvana purchasing "everything"

15  regardless of the quality, Carvana's subpar and bloated inventory issues were "obvious to

16  anyone with eyes."  Finally, CW-2 reported that he/she would never have purchased vehicles

17  that were "not safe to drive," but when CW-2 reported his/her concerns that Carvana should

18  not purchase a vehicle, "leadership would say take it" anyway.

19       323.   The confidential witness accounts also show that Defendants knew or

20  recklessly disregarded that, in order to boost sales, Carvana purchased cars without title and

21  sold cars before it held title to those cars.  For example, CW-9 described attending an all-

22  hands call in January 2022 in which Defendant Garcia Junior spoke to employees.  During

23  the call, employees told Garcia Junior that they were being inundated with calls regarding

24  registration problems.   In addition, in February 2022, CW-4 attended a meeting with

25  Defendant Huston and the wholesale team, including director-level employees.  During this

26  meeting, Huston said that ADESA's title department was good and Carvana would adopt

27  their processes to improve the title process.  CW-4 inferred from these comments that

28  Huston knew about the title issues.  After all, "everyone [at Carvana] knew we ha[d] title

issues," said CW-4, and everyone complained about it.  In addition, CW-3 discussed the title problems with his/her manager and at weekly meetings with the Director of Wholesale, but the Company brushed off CW-3's concerns, doing nothing other than offering excuses.  CW-10 raised the title problems with a supervisor and then with a manager.

**D.    Defendants Managed the Company's Operations and Had Access to Confidential Information About the Alleged Fraud**

324.    Defendants Garcia Junior, Jenkins, Huston, and Keeton were each Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Brand Officer, respectively, throughout the Class Period, and by virtue of their management of the Company's operations and their access to confidential proprietary information concerning the Company's operations and financial results, either knew about or recklessly disregarded the alleged scheme to defraud investors.  Specifically, Defendants were hands-on executives who designed Carvana's operations and paid close attention to the interplay between promoting growth and related increases in operational costs and constraints.

325.    For example, Defendant Huston's Linkedin profile explains that, in his role as COO at Carvana, he was "[r]esponsible for Carvana operations, including inventory management and wholesale, inspection and reconditioning, logistics and fulfillment, customer service operations, real estate, and market expansion."  Defendant Huston's responsibility for the precise operational areas at the heart of Defendants' alleged fraud supports an inference that Huston knew of or recklessly disregarded Defendants' scheme to defraud.

326.    Further, media reports reveal that business at Carvana was run in a top-down fashion, with the Garcias maintaining an "iron grip" over the Company's operations.  For instance, the *Dad, Who Controls Company, Is Worth Nearly $3 Billion* Article, published on December 8, 2022, explained, in pertinent part:

> The Garcias' ***iron grip*** on Carvana's is reflected in the younger Garcia's management style, according to one former Carvana executive who spoke with *Forbes* on the condition of anonymity.  "You will often hear people talk about the good old boys club and it absolutely exists there," says the former employee.  Higher ups who went against the CEO were quickly shown the door, according to the former employee.  "The culture is ***you either are on***

***board with us and everything we do and say and drink the Kool Aid, or you are not and get out*."**

327.    Finally, as described in more detail in §V., *supra*, confidential witness accounts make clear that Defendants had access to information rendering their statements false and misleading and revealing the crippling costs infecting Carvana's operations.

328.    Specifically, the Defendants had access to data setting forth the total costs that Carvana incurred to acquire, transport, and otherwise make cars available for sale, as well as what the vehicles had actually sold for, from which GPU was derived.  CW-7 explained Carvana used a Tableau data server which was updated daily and which revealed declining GPU as the Company increased its reliance on purchasing vehicles from customers to boost retail units sold.  The server also contained data showing an increase in the average number of days on-site, which measures the number of days between procuring and selling a vehicle.

329.    In addition, CW-8 and his/her team used Tableau, from which numerous reports could be derived, and Microsoft SQL, which connected to a computer server where data was stored.  Using this software enabled CW-8's team to see inventory data and various metrics, including how many vehicles Carvana had in inventory, how long these vehicles had been sitting around without being sold, Carvana's website traffic, and supply/demand ratios.

330.    The Defendants also had access to information showing titling issues throughout the Company.  CW-4 recounted that the Company kept a Google spreadsheet tracking vehicles which needed title across the entire IRC at which he/she worked.  CW-11 also described reviewing a Google spreadsheet of the vehicles for which registration could not be completed since the titles were missing.  That spreadsheet contained notes made by Carvana personnel in Arizona along the lines that they were working on obtaining the title.

331.    Given that the Company closely tracked and monitored the movement of its key operating metrics, including costs incurred to make vehicles available for sale, and that the Company kept detailed records of vehicles that needed title, Defendants' access to this information gives rise to an inference that Defendants either knew or recklessly disregarded that their Class Period statements were false and misleading.

332.    Moreover, the Defendants' statements regarding the low expense of purchasing cars from customers (*supra*, ¶¶206, 214, 216, 222, 239, 244, 245, 249, 251), and their statements dismissing titling issues as limited and small in scope (*supra*, ¶¶248, 258, 275, 278), led to the inference that Defendants were reasonably knowledgeable about these issues and had made an effort to review relevant information available to them to inform themselves of material issues impacting the Company before publicly speaking about them.

### E.    Defendants Knew or Recklessly Disregarded that Carvana's Focus on Growth Resulted in Unsustainable Costs

333.    During the Class Period, the Company was focused exclusively on maximizing the growth of retail units sold despite incurring unsustainable operational costs and logistical constraints, which Defendants concealed from investors.  For example, during an early 2021 meeting with Defendants Garcia Junior, Jenkins, and Huston, CW-11 witnessed Defendants' singular focus on growth, which resulted in Carvana lowering its purchasing and verification standards.  During that meeting, one of the C-level executives explained that Carvana was "just worried about growth and not procedural" operations.  CW-11 recalled that this same C-level executive spoke about the paramount importance of growth on that call and suggested that employees read a certain book because it would help them understand that growth is all that matters.  CW-11 remembers he/she recalled thinking: "Wow, they don't care about operations, just growth."

### F.    Defendants Closely Monitored Markets, Pricing Trends, and Customer Sentiment to Guide Inventory Decisions

334.    The Defendants repeatedly stated that they closely monitored used retail and wholesale market pricing and consumer demand to guide inventory decisions throughout the Class Period:

- Defendant Garcia Junior (May 6, 2020): "Given the dramatic moves in the market, buying cars from customers is effectively happening in a much less liquid market where you have a single seller, selling a single car once every many years, whereas the wholesale markets are much more liquid.  And so if you have rapid price disruptions, those wholesale markets tend to virtually instantaneously adapt to that new environment, whereas the consumer market tends to be a little stickier in both directions.  And so *we will be monitoring both of those*

*markets and getting a sense of where the better market is to acquire inventory in the near term*."

- Defendant Garcia Junior (May 6, 2020): "Prices have stabilized and started to recover.  But there are still reasons to believe that prices could drop again.  There are many sellers that – sellers or shadow sellers that are out there that have not moved inventory yet.  And so *we want to be mindful of watching that carefully and getting a sense of what that's going to do to the market*.  And so *that's something we're keeping a careful eye on, and that's part of why we've made the decision to manage our inventory levels down and reduce our exposure there*."

- Defendant Garcia Junior (October 29, 2020): "*[I]nternally, what we're always focused on is what's happening to underlying demand*.  And we can kind of massage out what's happening to underlying demand by *looking at what's happening to sales and looking at the drivers of conversion that impacts sales, which include where inventory is, how much inventory is close to different markets, what delivery times are in different markets, what our inventory distribution looks like* relative to the distribution that is traditionally sold in different markets, what our credit policies are relative to the distribution of credits in different markets."

335.   And, during his interview on the *ModernRetail Podcast*, Defendant Keeton emphasized that the Company's logistical network allowed *visibility* into its "diversified" inventory acquired from customers:

I think, when we first started because we didn't really have a brand name yet and we didn't have the ability to acquire cars from customers.  A lot of our inventory was going from the very similar channels that dealerships do.  Let's go to wholesale auctions, but *let's use kind of like data and quantify and site traffic because we're fully transactional to better understand what is the right kind of depth and breadth of our inventory*.  But as we've grown and scaled and got more sophisticated over time, this last quarter that again we reported Q3 was the first time that we actually bought more cars from consumers that we sold. . . .  But when you start getting from consumers, you can really kind of diversify that and find different vehicles that customers are looking for.  And for us, as a business model, that's beneficial because we can find those cars, we can retail them because we have these inspection centers . . . that we acquire, we inspect them, we perfect them and then we hold them just like Amazon.  And then we have a logistical network that connects those cars to customers throughout the country.  So I think all of that kind of *combines together that we're able to have really kind of good views into a continually diversified set of inventory*.

336.   Given the Defendants' constant monitoring of market prices and consumer demand, the Defendants either knew or recklessly disregarded that, as a result of the increase in cars sourced from customers, the Company had amassed a substantial inventory of poor-quality vehicles that could be sold only at wholesale.

**G. Issues with Inventory, Title, and Registration Were Widely Known and Discussed Throughout the Company During the Class Period**

337.    Further, issues regarding Carvana's excess inventory, its overpaying for low-quality vehicle purchases, and wide-spread issues with title and registration – which stemmed from the Company's growth-at-any-costs strategy – were widely known and discussed throughout the Company.

338.    As set forth in ¶117, the title and registration problems were discussed with Defendants in early 2022.  Likewise, Defendants directed employees to focus on growth regardless of operational costs and logistics constraints.  *See* ¶130.  In addition, numerous accounts from confidential witnesses reveal that title and registration issue and quality issues with customer-sourced vehicles were wide-spread, widely known, and often discussed throughout the Company.  Thus, the Defendants either knew or recklessly disregarded that their growth-at-all-costs strategy eroded the quality of Carvana's vehicle inventory such that large swath of customer-purchased vehicles could be sold only at wholesale, and the title and registration problems were mounting as Defendants cut corners to boost sales.

339.    Specifically, CW-3 explained that buybacks – *i.e.*, when Carvana had to re-purchase vehicles from unsatisfied customers – were common at Carvana, and were largely driven by issues with missing title and other quality issues.  CW-3 commented that it was well known internally that vehicles Carvana was purchasing were lower quality vehicles, and that the issues were discussed during weekly meetings with the Wholesale Team led by the Director of Wholesale.  CW-3 ultimately quit because of widespread title issues and the inability to obtain adequate answers from Carvana's titling team as to why the problems persisted.

340.    CW-4 explained that titling issues were a widely-known, common problem at Carvana about which numerous employees had complained.  CW-4 recounted that the Company kept a Google spreadsheet tracking vehicles which needed title across the entire IRC at which he/she worked.  CW-4 recounted that titling issues had gotten so bad that the Titling Team was revamped three separate times, to no avail.

341.     CW-5 explained that there were weekly meetings among Operations Managers, as well as informal conversations outside of weekly meetings, and communications from managers on the Company's Slack.  As a result of these conversations, CW-5 learned that the excess inventory problem experienced at his/her hub was a widespread trend occurring at other hubs as well.

342.     CW-8 also explained that his/her team began raising concerns about high inventory levels to director-level employees around Fall and Winter of 2021.  CW-8 explained that his/her team had weekly Thursday meetings with an Associate Director where they would provide inventory updates, and CW-8's team raised concerns about excess inventory.

343.     CW-9 said the Customer Advocates on his/her team handled calls from all over the country.  Registration delays, which primarily meant that a title had not been provided to the customer, amounted to roughly half of the calls the team had handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from customers experiencing title delays beginning in Q1 2022.  Vehicle quality issues also made up a large portion of customer calls.  CW-9 explained that quality shortcomings were pervasive throughout Carvana.

344.     CW-10 recounted numerous quality issues and discrepancies between vehicle odometers and Carfax representations, one of which he/she reported to his/her Team Captain, and brought up to the Supervisor and a Manager.  The Team Captain informed CW-10 that another team was involved with similar issues and discrepancies in Carfax reports.  CW-10 believed, on the basis of common sentiment, customer questions, and customer complaints, that these issues with vehicle quality were common.

345.     CW-11 said that selling vehicles without the title and issuing temporary plates from other states was a common practice at Carvana.  CW-1 described a drawer of documentation for vehicles that had been sold by Carvana but could not be registered because the titles were missing.  CW-11 also described reviewing a Google spreadsheet of the vehicles for which registration could not be completed since the titles were missing.  That

spreadsheet contained notes made by Carvana personnel in Arizona along the lines that they were working on obtaining the title.  Thus, the Defendants either knew of or recklessly disregarded issues with overpaying for poor-quality vehicles, excess inventory, and titling and registration problems, in light of the fact that these issues were widely known, commonly discussed and often reported at the Company.

## H.   Defendants' Denials Throughout the Class Period Support an Inference of Scienter

346.   Furthermore, to conceal from investors Defendants' wrongdoing, Defendants hid from investors the operating costs associated with acquiring cars from customers and the title and registration issues that increased as Defendants cut corners to grow retail sales.

347.   As discussed in more detail above in ¶214, during the Q3 2020 Earnings Call, Defendant Jenkins was asked about the "extra operating expense" associated with buying cars from customers compared to buying at auction.  In response, Defendant Jenkins explained: "when we say that buying cars from customers is more profitable than buying cars from auctions, that's – what we mean by that is it's more profitable net of those expenses of going to get the car from the customer and bring it into the IRCs."  He added that "[t]here are some other little expenses in [the] call center and the like."

348.   In reality, Carvana's practice of purchasing cars from customers caused crippling costs, was logistically inefficient, caused a spike in the number of cars that Carvana had to sell wholesale at much lower prices, and created a glut of cars for which Carvana lacked adequate facilities to store.  Defendant Jenkins's denial of the increased operational expenses associated with the Company's practice of purchasing vehicles from customers supports an inference that he was attempting to conceal the truth regarding Carvana's operations and Defendants' scheme.  In fact, Defendant Jenkins's denial of the massive costs created by purchasing cars from customers supports an inference that he was reasonably knowledgeable about these issues and had made an effort to review relevant information available to him to inform him of material issues impacting the Company before publicly speaking about them.

349.     Similarly, at the JPMorgan 2021 Auto Conference, on August 11, 2021, in response to a question about the title problems in North Carolina, Defendant Jenkins stated: "I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina."  Later, he explained, "our understanding is that this is quite unprecedented."

350.     In reality, massive swaths of Carvana's inventory were experiencing titling and registration issues across multiple states as a result of Carvana's efforts to increase conversion of retail sales.  Defendant Jenkins's denial of widespread titling and registration issues supports an inference that he intended to conceal the truth regarding Carvana's title and registration problems.  In fact, Defendant Jenkins's denial of the extent of Carvana's title and registration problem gives rise to the inference that he was reasonably knowledgeable about these issues and had made an effort to review relevant information available to him to inform him of material issues impacting the Company before publicly speaking about them.

**I.     Defendants Stop Reporting Critical Metrics on May 6, 2021**

351.     Defendants' scienter is further supported by Defendants' decision to cease reporting key metrics that might have tipped investors off to their scheme.

**1.     Average Days to Sale**

352.     On May 6, 2021, as Carvana became overrun by logistics costs, which they later admitted stalled delivery times, Defendants stopped reporting  "average days to sale," which was one of Carvana's "Key Operating Metrics" consistently identified in the Company's registration statement and SEC filings.  Instead, Defendants replaced this "Key Operating Metric" with the number of IRCs purportedly because "our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale over the past three years." Defendants' abrupt decision to pull a key operating metric supports an inference that Defendants chose to conceal the metric because it was trending in the wrong direction. Indeed, according to CW-4, cars delivered to retail were not being added to the retail inventory on the day they were received.  Instead the retail group might wait a week before

1   adding the cars to inventory.  The reason for this was that a car began the aging process as

2   soon as it was added to the retail inventory.  Therefore, the aging report would "look bad" if

3   there were cars sitting there for 20 days.  As CW-4 put it, Carvana's business was "all about

4   get-in/get-out" when it came to inventory, so the retail business would wait a week before

5   scanning vehicles into inventory, even if the vehicles were actually there.  The General

6   Managers, who did "not want anything aging," worked with Logistics Managers to delay

7   scanning vehicles into retail inventory.

8              **2.       Buying Cars from Customers**

9       353.     At Carvana's Analyst Day, Defendants Jenkins and Garcia Junior announced

10  Carvana's ***long-term*** goal to purchase 38%-52% of its vehicles from customers (as compared

11  to Carvana's current level of 16% purchased from customers).  In the quarters following, the

12  Company devoted an entire section of its Shareholder Letters to providing detailed metrics

13  on buying cars from customers to demonstrate the Company's progress towards Defendants'

14  purported goal of growth and long-term profitability.  These detailed metrics included

15  graphics regarding the number of customer vehicles acquired, ***the customer-sourced ratio,***

16  ***and the percentage of customer vehicles acquired as a percent of retail units sold***.

17      354.     Defendants' scheme, however, depended on drastically increasing the volume

18  of cars purchased from customers far above the 38%-52% source ratio that Defendants had

19  publicly reported as their goal.  Indeed, by Q4 2020, Carvana's customer-source ratio had

20  already jumped to 65%, and had grown by 110% between 2019 and 2020.  As the adverse

21  consequences of Defendants' scheme mounted, Defendants abruptly stopped reporting these

22  metrics.

23      355.     On May 6, 2021, Defendants announced that they would no longer "provide

24  detailed statistics on buying cars from customers each quarter" as "[the Company's] success

25  over the last 2 years has made the strength of our offering of buying cars from customers

26  clear."  Accordingly, while Carvana's stock fell on this news, investors continued to believe

27  that Defendants' strategy would contribute to the Company's growth and profitability.  *See,*

28  *e.g.*, Cowen Equity Research Analyst Report (May 7, 2021) (upon maintaining its

outperform rating, an analyst at Cohen noted: "Cars Purchased from Customers Continues to Pace at ~100% of Retail Units Sold, Mgmt to Stop Providing Detailed Metrics: Mgmt. noted they had purchased approximately as many cars from customers as they had sold them . . . . ***Mgmt. indicated that they believe their strategy of buying cars from customers had been fully validated***, and that they would stop providing detailed metrics on these ratios in the future."); *see also* Truist Securities Analyst Report (May 7, 2021) (upon revising its price target upward, an analyst explained: "We believe the company has honed its efforts to efficiently acquire vehicles from the consumer and believe this represents a GPU growth opportunity over time.  Mgt noted that the strength continued into April, as the company set a new record for cars bought from customers . . . .").

### J.  Defendants Garcia Junior's and Jenkins's SOX Certifications and Signing of SEC Filings Support Scienter

356.  The Sarbanes-Oxley certifications signed by Defendants Garcia Junior and Jenkins throughout the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Carvana was being made known to them and that the Company's disclosure controls were operating effectively, further underscore scienter.

357.  During the Class Period, Defendants Garcia Junior and Jenkins repeatedly certified that they had undertaken an assessment and evaluation of Carvana's disclosure controls to ensure that Carvana's SEC filings did not contain any false information, including controls designed to ensure that material information about Carvana is made known to Defendants Garcia Junior and Jenkins during the period in which financial reports are being prepared.  This supports an inference that Defendants Garcia Junior and Jenkins knowingly or recklessly misled the market by making such representations and executing such certifications because they were at the time aware of or recklessly disregarded the truth regarding Defendants' scheme to: (i) purchase low quality vehicles from customers to induce trade-ins and boost retail sales; (ii) embark on a nationwide market expansion without the

1  necessary infrastructure; and (iii) increase retail sales by purchasing and selling cars that

2  lacked title.

3        **K.**     **Corporate Scienter**

4        358.   The allegations above also establish a strong inference that Carvana as an

5  entity acted with corporate scienter throughout the Class Period, as Defendants, its officers,

6  management, and agents, had actual knowledge of the misrepresentations and omissions of

7  material facts set forth herein (for which they had a duty to disclose), or acted with reckless

8  disregard for the truth because they failed to ascertain and to disclose such facts, even though

9  such facts were available to them. Such material misrepresentations and/or omissions were

10 done knowingly or recklessly, and without a reasonable basis, for the purpose and effect of

11 concealing the fraudulent scheme from the investing public. By concealing these material

12 facts from investors, Carvana maintained and/or increased its artificially inflated common

13 stock prices throughout the Class Period.

14 **X.**    **LOSS CAUSATION**

15       359.   Defendants' wrongful conduct, as alleged herein, directly and proximately

16 caused Plaintiffs' and Class members' economic loss. Plaintiffs' claims for securities fraud

17 are asserted under the fraud-on-the-market and *Affiliated Ute Citizens of Utah v. United*

18 *States*, 406 U.S. 128 (1972) theories of reliance. The markets for Carvana's Class A

19 common stock were open, well-developed, and efficient at all relevant times. During the

20 Class Period, as detailed herein, Defendants engaged in a scheme and made materially

21 misleading statements and omissions regarding Carvana's growth, profitability, key financial

22 metrics, business model and title and registration practices. Defendants' conduct artificially

23 inflated the price of Carvana Class A common stock and operated as a fraud or deceit on the

24 Class.

25       360.   The Class Period inflation in Carvana's Class A common stock price was

26 removed when information concealed by Defendants' scheme and misleading statements and

27 omissions was revealed to the market. The information was disseminated through partial

28 disclosures that revealed the nature and effect of Defendants' alleged misconduct. These

1    disclosures, as more particularly described below, removed artificial inflation from Carvana

2    Class A common stock price, causing economic injury to Plaintiffs and other members of the

3    Class.

4         361.   The corrective impact of the partial disclosures during the Class Period alleged

5    herein, however, was tempered by Defendants' continued scheme and misleading statements

6    and omissions that continued to conceal the true nature of Defendants' fraud.  Each partial

7    disclosure did not on its own fully remove the inflation from Carvana's stock price, because

8    it only partially revealed the nature and ramification of Defendants' previously

9    misrepresented and concealed conduct.  Defendants' continued scheme and

10   misrepresentations and omissions maintained the price of Carvana common stock at a level

11   that was inflated by fraud and induced members of the Class to continue purchasing shares in

12   Carvana even after Defendants' partial disclosures.

13        362.   The disclosures that corrected the market price to reduce the inflation

14   maintained by Defendants' fraud are detailed below.  These stock price declines were due to

15   firm-specific, fraud-related disclosures and were not the result of market, industry, or firm-

16   specific, non-fraud factors.  The following stock price declines and descriptions thereof are

17   not necessarily comprehensive because fact and expert discovery are not complete.

18        363.   A partial disclosure entered the market on August 10, 2021, after the market

19   closed, when local media in North Carolina reported that Carvana's dealer license in Raleigh,

20   North Carolina was suspended for six months for violating the state's title and registration

21   laws.  An article by ABC detailing the "suspen[sion]," noted "[d]ocuments show the hearing

22   determined that Carvana failed to deliver titles to the DMV, sold motor vehicles without a

23   state inspection, and issued out-of-state temporary tags and plates for vehicles sold to

24   customers in North Carolina."[91]  As a result of this partial disclosure, the price of Carvana

25   stock declined by $9.40 per share, or 2.5%, to close at $360.70 per share on August 11, 2021.

26

27   [91] *NC Suspends Carvana vehicle Sales at Wake County location for 6 months*, ABC 11, (Aug. 10, 2021), available at https://abc11.com/carvana-wake-county-suspended-car-

28   vending-machine/10943046/.

In contrast to the decline in Carvana stock, the Standard & Poor's Composite Stock Index ("S&P 500") increased by 0.2% during this period.[92]

364.    Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's Class A common stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.   In addition, Defendants falsely reassured investors on August 11, 2021 at the J.P. Morgan 2021 Auto Conference that the title and registration problems were a North Carolina specific issue that "was a relatively unusual action, but is also pretty small in scope."   Thus, the price of Carvana's Class A common stock remained artificially inflated.

365.    On October 22, 2021, *The Wall Street Journal* published an article entitled "Carvana Faces Government Scrutiny and Fines."   The article exposed the Company's recent problems with various state title and registration laws, revealing that "[a]t least four states have disciplined Carvana or are investigating the company for violating vehicle-sales rules . . . .   These actions haven't been previously reported."   Following this news, the price of Carvana stock declined 1.4% on Friday, October 22, 2021, and declined an additional 1.8% on Monday, October 25, 2021.   In contrast to the total two-trading-day decline of 3.2% in Carvana common stock, the S&P 500 increased by 0.4% during this period.

366.    On April 20, 2022, after the market closed, Carvana issued disappointing Q1 2022 financial results and a Class A common stock offering to support its purchase of ADESA.   On this news, the price of Carvana's Class A common stock declined 10.1% on volume of more than 17 million shares to close at $83.14 per share on April 21, 2022.   On April 22, 2022, Carvana announced the upsize of the Class A common stock offering.   Then, on April 25, 2022, after the market closed, Defendants announced a $2.275 billion notes offering to finance the ADESA notes offering.   On April 28, 2022, Carvana increased the offering to $3.275 billion.   During the period from April 21, 2022 through April 29, 2022,

---

[92]   For purposes of comparing its stock price performance vis-à-vis its peers and relevant market, Carvana referred investors to the S&P 500 Index.

1    Carvana's Class A common stock price declined 44.2% to close at $57.96 on April 29, 2022.

2    In contrast, the S&P 500 declined by 7.4% during this period.

3        367.    Analysts commented on this disappointing news.  For example, a JP Morgan

4    analyst labeled the earnings call and follow-ups "'confidence shattering'" and added "'we do

5    not believe Carvana (CVNA) is likely to get a free pass on SG&A any longer.'"

6        368.    Defendants' partial disclosure did not on its own fully remove the inflation

7    from Carvana's Class A common stock price because it only partially revealed the nature and

8    extent of Defendants' previously misrepresented and concealed conduct.  In addition,

9    Defendants falsely reassured investors that the issues were "transitory."  *See, e.g.*, BofA

10   Securities (April 21, 2022) ("GPU misses on macro headwind . . . Omicron remained a

11   headwind in 1Q, pressuring production and logistics capacity").  Thus, the price of Carvana's

12   Class A common stock remained artificially inflated.

13       369.    On May 10, 2022, Carvana issued an 8-K announcing that it was: (i) laying off

14   approximately 2,500 employees "primarily in operational groups in connection with its

15   previously announced plans to better align staffing and expense levels with sales volumes";

16   (ii) transitioning operations away from some logistical hubs and an IRC "in connection with

17   these right-sizing initiatives"; and (iii) that it would release "materials on Carvana's

18   [updated] operating plan" later that week.  As a result of this partial disclosure, the price of

19   Carvana's Class A common stock declined 5.4% on volume of more than 15.7 million shares

20   on May 10, 2022, and declined an additional 18.2% on volume of nearly 23 million shares

21   on May 11 2022.  In contrast to the total two-day decline of 22.6% in Carvana common

22   stock, the S&P 500 declined a modest 1.4% during this period.

23       370.    Analysts took notice.  For example, a Wedbush analyst stated, "[w]e were

24   surprised by the workforce reduction, as CVNA had previously (as of late April) planned to

25   slowly reduce headcount."  Wedbush (May 11, 2022).  Similarly, Morgan Stanley reported

26   on the 8-K, noting, "[b]eyond the actions disclosed in today's 8-K, we believe transparency

27   around future actions and management's disclosure and messaging around the path forward

28   will be critical to re-establishing investor confidence which has been lost over the past few

months."  Morgan Stanley (May 10, 2022).  Further, *Forbes* reported "Carvana's mass firing was a sign of much bigger problems at the company, according to 10 former employees . . . and several industry analysts.  They describe a spendthrift business, whose growth-at-all-costs mentality undermined business operations and sowed the seeds of its recent layoffs."[93]

371.  Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's Class A common stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.  In addition, Defendants falsely reassured investors that the changes were made in connection with the Company's "previously announced plans to better align staffing and expense levels with sales volumes" and "macroeconomic environment."  8-K (May 10, 2022).  Thus, the price of Carvana's Class A common stock remained inflated.

372.  On June 24, 2022, after the market closed, *Barron's* published its *Undriveable Cars* exposé.  The article, which included interviews with Carvana customers and former employees, further revealed the Company's problems regarding title and registration and its violations of various state laws and regulations.  On the following two trading days, the price of Carvana stock declined 21% to close at $24.74 per share on June 28, 2022.

373.  Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's Class A common stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.  In addition, Defendants falsely reassured investors by downplaying the Company's practices and problems with title and registration.  Indeed, in the *Undriveable Cars* exposé, Defendants claimed only that: "'[i]n a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states.'"  Further, Defendants falsely assured investors that "'[w]e've had productive conversations with regulators in all of those states and feel very

---

[93]  *Chaotic Zoom Firing Caps Company's Struggles* Article.

1    confident about our operations going forward.'"[94]   Thus, the price of Carvana's Class A

2    common stock remained inflated.

3         374.   On October 7, 2022, the Michigan Department of State announced that it had

4    suspended the license of the Carvana dealership in Novi, Michigan for "imminent harm to

5    the public."  The suspension resulted from Carvana's recent title and licensing violations in

6    Michigan.  Following this news, the price of Carvana stock declined 5.5% on volume of 9.6

7    million shares to close at $18.21 per share on October 10, 2022.  In contrast to the decline of

8    5.5% in Carvana common stock, the S&P 500 declined a modest 0.8% during this period.

9    Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's

10   Class A common stock price because it only partially revealed the nature and extent of

11   Defendants' previously misrepresented and concealed conduct.

12        375.   On November 3, 2022, after the market closed, Carvana issued disappointing

13   Q3 2022 financial results.  Carvana disclosed that retail car sales declined 8% from the prior

14   year.  As a result of this disclosure, the price of Carvana stock declined 39.0% on volume of

15   more than 71 million shares on November 4, 2022, and declined an additional 15.6% on

16   volume of more than 52 million shares on November 7, 2022.  In contrast to the total two

17   day decline of 54.6% in Carvana common stock, the S&P 500 increased by 2.4% during this

18   period.  The closing price of $7.39 per share on November 7, 2022 represented a total decline

19   of more than 97% from the Class Period high of $370.10 per share in August 2021.

20   **XI.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND
             THE FRAUD ON THE MARKET DOCTRINE**

21
22        376.   Plaintiffs will rely, in part, upon the presumption of reliance established by the

     fraud-on-the-market doctrine in that:

23
24        •    Defendants made public misrepresentations or failed to disclose material facts
               during the Class Period;

25        •    the omissions and misrepresentations were material;

26        •    Carvana Class A common stock is traded in an efficient market;

27   _____

28   [94]  *Undriveable Cars* exposé.

- the Company's Class A common stock is liquid and was heavily traded during the Class Period;

- the Company's Class A common stock was traded on the NYSE and was covered by multiple analysts; and

- Plaintiffs and members of the Class purchased, acquired, and/or sold Carvana Class A common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

377.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

378.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.   NO SAFE HARBOR

379.    Many (if not all) of Defendants' false and misleading statements and omissions during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

380.    Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

381.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Carvana who knew that the FLS was false or misleading.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XIII.   CLASS ACTION ALLEGATIONS

382.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or

otherwise acquired Carvana Class A common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

383.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Carvana Class A common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Carvana or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

384.   Common questions of law and fact predominate and include: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants engaged in a scheme to defraud; (iii) whether Defendants omitted and/or misrepresented material facts; (iv) whether Defendants acted knowingly or with recklessly disregarded for the truth; and (v) whether the prices of Carvana Class A common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

385.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

386.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

387.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against the Exchange Act Defendants)

388.    Plaintiffs repeat and allege each and every allegation set forth above as if fully set forth herein.

389.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

390.    During the Class Period, Defendants engaged in a scheme and wrongful course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed a scheme to defraud in connection with the purchase and sale of Carvana Class A common stock. Defendants' scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Carvana Class A common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Carvana Class A common stock at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, Defendants, and each of them, took the actions set forth herein.

391.    Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in: (a) Defendants' scheme; and (b) the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements

and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Carvana Class A common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Carvana's finances and business prospects.

392.   By virtue of their ownership and/or positions at Carvana, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth.

393.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the controlling shareholder, senior managers and/or directors of Carvana, Defendants had knowledge of the details of Carvana's internal affairs.

394.   The Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Carvana. As controlling shareholders, officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Carvana's businesses, operations, future financial condition, and future prospects. As a result of Defendants' misconduct, the market price of Carvana's Class A common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Carvana's business and financial condition which were concealed by the Individual Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Carvana Class A common stock at artificially inflated prices and in doing so relied upon the price of the

1   securities, the integrity of the market for the securities, and/or upon statements disseminated

2   by the Individual Defendants, and were damaged thereby.

3       395.   During the Class Period, Carvana Class A common stock was traded on an

4   active and efficient market.  Plaintiffs and the other members of the Class, relying on the

5   materially false and misleading statements described herein, which Defendants made, issued,

6   or caused to be disseminated, or relying upon the integrity of the market, purchased or

7   otherwise acquired Carvana Class A common stock at prices artificially inflated by

8   Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the

9   truth, they would not have purchased or otherwise acquired said Class A common stock, or

10  would not have purchased or otherwise acquired it at the inflated prices paid.  At the time of

11  the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Carvana Class

12  A common stock was substantially lower than the prices paid by members of the Class.  The

13  market price of Carvana Class A common stock declined upon public disclosure of the facts

14  alleged herein to the injury of Plaintiffs and Class members.

15      396.   By reason of the conduct alleged herein, Defendants knowingly or recklessly,

16  directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated

17  thereunder.

18      397.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

19  and the other members of the Class suffered damages in connection with their respective

20  purchases, acquisitions and/or sales of Carvana Class A common stock during the Class

21  Period, as the truth about Carvana's operations and prospects began to be disclosed to the

22  investing public.

23                **COUNT II**
       **Violations of §20(a) of the Exchange Act**

24        **(Against the Exchange Act Defendants)**

25      398.   Plaintiffs repeat and reallege each and every allegation set forth above as if

26  fully set forth herein.

27

28

399.   During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Carvana, and conducted and participated, directly and indirectly, in the conduct of Carvana's business affairs.

400.   During all relevant times during the Class Period, Garcia Senior owned a majority of the voting power of all outstanding shares of the Company's common stock, effectively giving him full control over the Company's most important decisions, such that Carvana was a "controlled company" within the meaning of the corporate governance standards of the New York Stock Exchange.

401.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Carvana's financial condition and results of operations, and to correct promptly any public statements issued by Carvana which had become materially false or misleading.

402.   Each of the Individual Defendants, therefore, acted as a controlling person of Carvana.  By reason of their senior management positions and/or being directors and/or the controlling shareholder of Carvana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Carvana to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over Carvana's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.  In addition, the Garcias owned a majority of Carvana's Class B shares, which shares guarantee the Garcias ten votes per share for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Carvana to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Carvana within the meaning of §20(a) of the Exchange Act.

403.   Carvana had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control

1  the actions of its employees and their salaries, bonuses, incentive compensation, and other

2  employment considerations.  By virtue of the foregoing, Carvana had the power to influence

3  and control, and did influence and control, directly or indirectly, the decision-making of the

4  Individual Defendants, including the content of their public statements.

5      404.   By reason of the above conduct, the Individual Defendants are liable pursuant

6  to §20(a) of the Exchange Act for the violations committed by Carvana.

7                              **COUNT III**
                    **Violations of §20(A) of the Exchange Act**
8        **(Against Defendants Garcia Senior, Jenkins, Keeton, and Huston)**

9      405.   Plaintiffs repeat and reallege each and every allegation set forth above as if

10  fully set forth herein.

11      406.   Count III is brought pursuant to §20(A) of the Exchange Act against

12  Defendants Garcia Senior, Jenkins, Keeton, and Huston on behalf of Plaintiffs and members

13  of the Class who were damaged by each of these Defendant's insider trading.

14      407.   As detailed herein, Defendants Garcia Senior, Jenkins, Keeton, and Huston

15  were in possession of material nonpublic information concerning Carvana.  They took

16  advantage of their possession of material nonpublic information regarding Carvana to obtain

17  millions of dollars in insider trading profits during the Class Period.

18      408.   Defendants' sales of Carvana Class A common stock during the Class Period

19  (set forth below and in Appendix A hereto) were made contemporaneously with Plaintiffs'

20  purchases of Carvana Class A common stock (set forth below and in Plaintiffs' certifications

21  (ECF 9) during the Class Period as follows:

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Garcia Senior | 10/30/2020 | 300 | $212.68 | UANPF | 10/30/2020 | 800 | $184.01 |
|  |  | 400 | $211.31 |  |  |  |  |
|  |  | 200 | $210.09 |  |  |  |  |
|  |  | 200 | $207.05 |  |  |  |  |
|  |  | 100 | $205.00 |  |  |  |  |
|  |  | 300 | $203.75 |  |  |  |  |
|  |  | 400 | $202.86 |  |  |  |  |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 355 | $202.09 | | | | |
| | | 1,060 | $200.66 | | | | |
| | | 400 | $199.65 | | | | |
| | | 500 | $197.94 | | | | |
| | | 500 | $196.85 | | | | |
| | | 300 | $195.41 | | | | |
| | | 100 | $194.15 | | | | |
| | | 300 | $193.41 | | | | |
| | | 2,000,000 | $191.19 | | | | |
| | | 700 | $190.78 | | | | |
| | | 300 | $189.43 | | | | |
| | | 380 | $188.04 | | | | |
| | | 800 | $186.96 | | | | |
| | | 1,660 | $185.86 | | | | |
| | | 5,532 | $184.89 | | | | |
| | | 5,300 | $183.94 | | | | |
| | | 7,040 | $183.04 | | | | |
| | | 2,623 | $182.02 | | | | |
| | | 250 | $180.37 | | | | |
| Garcia Senior | 11/2/2020 | 2,100 | $189.21 | UANPF | 11/4/2020 | 466 | $200.58 |
| | | 3,517 | $188.10 | | | | |
| | | 4,970 | $187.22 | | | | |
| | | 3,489 | $186.25 | | | | |
| | | 2,500 | $185.11 | | | | |
| | | 3,092 | $183.98 | | | | |
| | | 3,832 | $183.09 | | | | |
| | | 5,900 | $182.06 | | | | |
| | | 600 | $180.96 | | | | |
| | 11/3/2020 | 500 | $194.27 | | | | |
| | | 1,122 | $193.62 | | | | |
| | | 3,100 | $192.36 | | | | |
| | | 7,369 | $191.55 | | | | |
| | | 8,235 | $190.51 | | | | |
| | | 6,574 | $189.69 | | | | |
| | | 1,900 | $188.50 | | | | |
| | | 1,200 | $186.92 | | | | |
| | 11/4/2020 | 352 | $201.43 | | | | |
| | | 1,400 | $200.45 | | | | |
| | | 2,702 | $199.51 | | | | |
| | | 7,700 | $198.38 | | | | |
| | | 9,700 | $197.52 | | | | |
| | | 4,243 | $196.44 | | | | |
| | | 2,503 | $195.52 | | | | |
| | | 1,400 | $194.16 | | | | |
| Garcia | 11/5/2020 | 400 | $209.66 | UANPF | 11/5/2020 | 234 | $206.89 |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Senior | | 1,400 | $208.46 | | | | |
| | | 2,600 | $207.24 | | | | |
| | | 3,500 | $206.30 | | | | |
| | | 5,156 | $205.39 | | | | |
| | | 12,392 | $204.20 | | | | |
| | | 4,552 | $203.27 | | | | |
| Garcia Senior | 11/6/2020 | 107 | $211.52 | UANPF | 11/6/2020 | 31 188 | $209.86 $209.35 |
| | | 1,693 | $210.74 | | | | |
| | | 2,525 | $209.46 | | | | |
| | | 4,400 | $208.61 | | | | |
| | | 3,707 | $207.72 | | | | |
| | | 800 | $206.44 | | | | |
| | | 2,000 | $205.77 | | | | |
| | | 1,000 | $204.46 | | | | |
| | | 2,303 | $203.31 | | | | |
| | | 1,303 | $202.33 | | | | |
| | | 1,300 | $201.39 | | | | |
| | | 1,500 | $200.28 | | | | |
| | | 4,262 | $199.18 | | | | |
| | | 2,100 | $198.30 | | | | |
| | | 1,000 | $196.98 | | | | |
| Garcia Senior | 11/9/2020 | 100 | $206.93 | UANPF | 11/9/2020 | 112 169 | $201.41 $200.39 |
| | | 793 | $206.38 | | | | |
| | | 495 | $205.24 | | | | |
| | | 1,800 | $203.80 | | | | |
| | | 1,800 | $202.97 | | | | |
| | | 3,012 | $201.72 | | | | |
| | | 7,753 | $200.89 | | | | |
| | | 6,570 | $200.06 | | | | |
| | | 800 | $198.78 | | | | |
| | | 1,500 | $197.45 | | | | |
| | | 2,520 | $196.73 | | | | |
| | | 2,857 | $195.90 | | | | |
| Garcia Senior | 11/10/2020 | 1,000 | $194.27 | UANPF | 11/12/2020 | 400 | $214.52 |
| | | 3,000 | $193.57 | | | | |
| | | 7,799 | $192.55 | | | | |
| | | 4,876 | $191.74 | | | | |
| | | 800 | $190.51 | | | | |
| | | 300 | $188.49 | | | | |
| | | 2,700 | $186.91 | | | | |
| | | 3,200 | $186.12 | | | | |
| | | 1,495 | $185.00 | | | | |
| | | 2,430 | $183.98 | | | | |
| | | 2,400 | $183.04 | | | | |
| | 11/11/2020 | 1,923 | $207.09 | | | | |
| | | 1,000 | $206.54 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 3,095 | $205.34 | | | | |
| | | 1,804 | $204.35 | | | | |
| | | 2,607 | $203.34 | | | | |
| | | 3,671 | $202.24 | | | | |
| | | 3,473 | $201.19 | | | | |
| | | 1,927 | $200.10 | | | | |
| | | 3,700 | $199.08 | | | | |
| | | 1,300 | $197.99 | | | | |
| | | 1,200 | $197.07 | | | | |
| | | 3,600 | $195.99 | | | | |
| | | 700 | $194.64 | | | | |
| | | 117 | $217.02 | | | | |
| | | 3,309 | $216.38 | | | | |
| | | 4,339 | $215.38 | | | | |
| | | 12,535 | $214.46 | | | | |
| | | 3,200 | $213.47 | | | | |
| | 11/12/2020 | 900 | $211.46 | | | | |
| | | 2,200 | $210.65 | | | | |
| | | 1,000 | $209.50 | | | | |
| | | 800 | $208.18 | | | | |
| | | 1,100 | $207.49 | | | | |
| | | 500 | $205.77 | | | | |
| | | 1,200 | $219.07 | | | | |
| | | 900 | $218.52 | | | | |
| | | 1,500 | $217.23 | | | | |
| | | 3,617 | $216.24 | | | | |
| | | 1,798 | $214.83 | | | | |
| | 11/13/2020 | 4,600 | $213.93 | | | | |
| | | 2,620 | $212.91 | | | | |
| | | 4,224 | $212.00 | | | | |
| | | 3,815 | $210.95 | | | | |
| | | 4,826 | $209.85 | | | | |
| | | 900 | $208.91 | | | | |
| Garcia Senior | | 200 | $212.97 | UANPF | 11/18/2020 | 217 | $224.12 |
| | | 1,924 | $212.18 | | | | |
| | | 4,782 | $211.30 | | | | |
| | 11/16/2020 | 7,123 | $210.20 | | | | |
| | | 11,552 | $209.34 | | | | |
| | | 3,219 | $208.36 | | | | |
| | | 400 | $207.24 | | | | |
| | | 800 | $206.17 | | | | |
| | | 597 | $222.67 | | | | |
| | | 1,898 | $221.98 | | | | |
| | 11/17/2020 | 5,122 | $220.89 | | | | |
| | | 4,900 | $220.02 | | | | |
| | | 1,401 | $219.02 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 700 | $217.81 | | | | |
| | | 700 | $216.22 | | | | |
| | | 1,705 | $215.13 | | | | |
| | | 3,055 | $214.26 | | | | |
| | | 2,100 | $213.56 | | | | |
| | | 1,899 | $212.12 | | | | |
| | | 2,526 | $211.29 | | | | |
| | | 1,395 | $210.30 | | | | |
| | | 2,002 | $209.39 | | | | |
| | 11/18/2020 | 100 | $230.71 | | | | |
| | | 300 | $229.72 | | | | |
| | | 1,006 | $228.78 | | | | |
| | | 2,610 | $227.88 | | | | |
| | | 5,894 | $226.76 | | | | |
| | | 7,836 | $225.91 | | | | |
| | | 4,597 | $224.81 | | | | |
| | | 6,057 | $223.90 | | | | |
| | | 1,200 | $223.08 | | | | |
| | | 400 | $221.20 | | | | |
| Garcia Senior | 11/19/2020 | 2,287 | $229.90 | UANPF | 11/19/2020 | 583 | $227.72 |
| | | 7,017 | $229.23 | | | | |
| | | 4,007 | $228.09 | | | | |
| | | 4,208 | $227.15 | | | | |
| | | 5,245 | $226.02 | | | | |
| | | 4,400 | $225.12 | | | | |
| | | 2,036 | $223.91 | | | | |
| | | 800 | $222.93 | | | | |
| Garcia Senior | 11/20/2020 | 100 | $236.07 | UANPF | 11/23/2020 | 731 | $242.08 |
| | | 3,665 | $235.31 | | | | |
| | | 6,016 | $234.53 | | | | |
| | | 2,005 | $233.62 | | | | |
| | | 1,950 | $232.57 | | | | |
| | | 2,077 | $231.50 | | | | |
| | | 4,972 | $230.29 | | | | |
| | | 4,415 | $229.48 | | | | |
| | | 4,800 | $228.14 | | | | |
| | 11/23/2020 | 200 | $243.96 | | | | |
| | | 1,149 | $242.91 | | | | |
| | | 3,500 | $242.16 | | | | |
| | | 5,303 | $241.13 | | | | |
| | | 5,979 | $239.99 | | | | |
| | | 6,834 | $238.94 | | | | |
| | | 5,835 | $238.13 | | | | |
| | | 1,200 | $237.06 | | | | |
| Garcia Senior | 11/24/2020 | 200 | $245.78 | SHEPP | 11/25/2020 | 516 | $241.12 |
| | | 900 | $245.20 | | | | |

- 178 -

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 2,600 | $243.95 | | | | |
| | | 2,200 | $243.02 | | | | |
| | | 2,061 | $241.93 | | | | |
| | | 700 | $240.59 | | | | |
| | | 1,400 | $239.62 | | | | |
| | | 2,000 | $238.38 | | | | |
| | | 2,700 | $237.46 | | | | |
| | | 4,199 | $236.52 | | | | |
| | | 3,785 | $235.62 | | | | |
| | | 3,057 | $234.58 | | | | |
| | | 2,698 | $233.50 | | | | |
| | | 1,500 | $232.60 | | | | |
| | 11/25/2020 | 100 | $242.87 | | | | |
| | | 800 | $242.00 | | | | |
| | | 400 | $241.03 | | | | |
| | | 1,470 | $239.79 | | | | |
| | | 2,613 | $238.86 | | | | |
| | | 6,030 | $237.86 | | | | |
| | | 6,669 | $236.95 | | | | |
| | | 9,203 | $235.98 | | | | |
| | | 2,215 | $234.96 | | | | |
| | | 500 | $233.59 | | | | |
| Garcia Senior | 12/2/2020 | 2,000,000 | $239.20 | UANPF | 12/8/2020 | 300 | $262.09 |
| | | 400 | $238.29 | | | | |
| | | 1,100 | $237.41 | | | | |
| | | 2,648 | $236.69 | | | | |
| | | 2,740 | $235.50 | | | | |
| | | 4,079 | $234.60 | | | | |
| | | 3,200 | $233.37 | | | | |
| | | 2,473 | $232.57 | | | | |
| | | 800 | $231.28 | | | | |
| | | 700 | $229.17 | | | | |
| | | 3,355 | $227.95 | | | | |
| | | 4,165 | $227.15 | | | | |
| | | 1,200 | $226.11 | | | | |
| | | 2,040 | $224.80 | | | | |
| | | 1,100 | $224.03 | | | | |
| | 12/3/2020 | 1,521 | $231.87 | | | | |
| | | 5,589 | $231.13 | | | | |
| | | 8,720 | $230.18 | | | | |
| | | 4,668 | $229.24 | | | | |
| | | 5,502 | $228.19 | | | | |
| | | 1,600 | $227.14 | | | | |
| | | 1,400 | $225.91 | | | | |
| | | 1,000 | $224.40 | | | | |
| | 12/4/2020 | 1,334 | $242.53 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 2,300 | $241.51 | | | | |
| | | 2,899 | $240.08 | | | | |
| | | 3,300 | $239.39 | | | | |
| | | 5,697 | $238.17 | | | | |
| | | 3,417 | $237.23 | | | | |
| | | 1,452 | $236.20 | | | | |
| | | 5,800 | $235.25 | | | | |
| | | 2,101 | $234.35 | | | | |
| | | 1,171 | $233.05 | | | | |
| | | 3,998 | $231.80 | | | | |
| | | 4,179 | $230.44 | | | | |
| | | 2,352 | $229.43 | | | | |
| | | 3,335 | $259.18 | | | | |
| | | 9,352 | $258.36 | | | | |
| | | 5,715 | $257.46 | | | | |
| | | 1,714 | $256.39 | | | | |
| | | 199 | $255.34 | | | | |
| | | 1,300 | $253.89 | | | | |
| | | 1,100 | $253.00 | | | | |
| | 12/7/2020 | 4,581 | $250.05 | | | | |
| | | 7,240 | $249.58 | | | | |
| | | 1,000 | $248.38 | | | | |
| | | 1,800 | $247.18 | | | | |
| | | 1,764 | $246.35 | | | | |
| | | 300 | $244.36 | | | | |
| | | 300 | $242.44 | | | | |
| | | 300 | $241.34 | | | | |
| | | 1,800 | $262.50 | | | | |
| | | 8,233 | $261.85 | | | | |
| | | 13,130 | $260.13 | | | | |
| | 12/8/2020 | 8,895 | $259.29 | | | | |
| | | 9,516 | $258.49 | | | | |
| | | 5,028 | $257.43 | | | | |
| | | 1,826 | $256.28 | | | | |
| | | 1,572 | $255.26 | | | | |
| | | 200 | $243.62 | | | | |
| | | 400 | $241.61 | | | | |
| | | 600 | $240.04 | | | | |
| | | 6,073 | $238.81 | | | | |
| Garcia Senior | 1/4/2021 | 3,968 | $238.05 | UANPF | 1/6/2021 | 1,175 6,285 | $253.43 $252.00 |
| | | 843 | $236.50 | | | | |
| | | 2,501 | $235.45 | | | | |
| | | 4,763 | $234.46 | | | | |
| | | 6,751 | $233.42 | | | | |
| | | 2,955 | $232.54 | | | | |
| | | 5,450 | $231.44 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 5,496 | $230.49 | | | | |
| | 1/5/2021 | 200 | $255.07 | | | | |
| | | 450 | $254.07 | | | | |
| | | 1,400 | $252.90 | | | | |
| | | 700 | $251.88 | | | | |
| | | 1,300 | $250.44 | | | | |
| | | 400 | $249.16 | | | | |
| | | 2,410 | $247.97 | | | | |
| | | 8,360 | $247.14 | | | | |
| | | 8,476 | $246.15 | | | | |
| | | 8,597 | $245.32 | | | | |
| | | 2,207 | $244.05 | | | | |
| | | 2,600 | $243.12 | | | | |
| | | 1,100 | $242.18 | | | | |
| | | 700 | $240.77 | | | | |
| | | 600 | $239.80 | | | | |
| | | 500 | $238.64 | | | | |
| | 1/6/2021 | 100 | $257.00 | | | | |
| | | 3,100 | $256.37 | | | | |
| | | 6,236 | $255.19 | | | | |
| | | 4,931 | $254.36 | | | | |
| | | 2,100 | $253.36 | | | | |
| | | 3,501 | $252.26 | | | | |
| | | 4,815 | $251.34 | | | | |
| | | 3,100 | $250.17 | | | | |
| | | 3,811 | $249.21 | | | | |
| | | 1,400 | $248.24 | | | | |
| | | 804 | $247.07 | | | | |
| | | 3,602 | $246.13 | | | | |
| | | 1,700 | $245.18 | | | | |
| | | 800 | $243.86 | | | | |
| Garcia Senior | 1/7/2021 | 739 | $275.39 | UANPF | 1/7/2021 | 17 | $265.48 |
| | | 4,100 | $274.76 | | | | |
| | | 914 | $273.58 | | | | |
| | | 2,524 | $272.55 | | | | |
| | | 1,562 | $271.67 | | | | |
| | | 760 | $270.29 | | | | |
| | | 2,524 | $269.36 | | | | |
| | | 7,824 | $268.35 | | | | |
| | | 11,427 | $267.42 | | | | |
| | | 2,762 | $266.50 | | | | |
| | | 300 | $265.11 | | | | |
| | | 1,164 | $263.78 | | | | |
| | | 2,992 | $262.24 | | | | |
| | | 3,522 | $261.37 | | | | |
| | | 5,786 | $260.49 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 500 | $258.14 | | | | |
| | | 600 | $256.34 | | | | |
| Garcia Senior | 1/8/2021 | 4,038 | $278.92 | UANPF | 1/8/2021 | 400 | $278.64 |
| | | 7,931 | $278.07 | | | | |
| | | 5,861 | $277.00 | | | | |
| | | 8,576 | $276.01 | | | | |
| | | 7,516 | $275.00 | | | | |
| | | 3,700 | $274.05 | | | | |
| | | 2,925 | $272.89 | | | | |
| | | 1,153 | $271.70 | | | | |
| | | 3,700 | $270.20 | | | | |
| | | 2,600 | $269.58 | | | | |
| | | 1,000 | $268.17 | | | | |
| | | 1,000 | $267.20 | | | | |
| Garcia Senior | 1/11/2021 | 3,900 | $278.60 | UANPF | 1/12/2021 | 292 | $288.68 |
| | | 3,437 | $277.52 | | | 447 | $287.20 |
| | | 3,614 | $276.68 | | | 544 | $285.94 |
| | | 8,740 | $275.26 | | | 1,968 | $287.76 |
| | | 15,185 | $274.62 | | | | |
| | | 6,561 | $273.47 | | | | |
| | | 5,963 | $272.54 | | | | |
| | | 300 | $270.78 | | | | |
| | | 1,200 | $269.56 | | | | |
| | | 700 | $268.15 | | | | |
| | | 400 | $266.86 | | | | |
| | 1/12/2021 | 100 | $292.43 | | | | |
| | | 1,000 | $291.26 | | | | |
| | | 6,493 | $290.51 | | | | |
| | | 8,080 | $289.46 | | | | |
| | | 8,468 | $288.44 | | | | |
| | | 4,030 | $287.52 | | | | |
| | | 5,932 | $286.43 | | | | |
| | | 3,754 | $285.57 | | | | |
| | | 5,443 | $284.44 | | | | |
| | | 1,500 | $283.29 | | | | |
| | | 3,200 | $282.28 | | | | |
| | | 600 | $281.07 | | | | |
| | | 400 | $279.77 | | | | |
| | | 600 | $278.43 | | | | |
| | | 400 | $277.29 | | | | |
| Garcia Senior | 1/13/2021 | 2,096 | $294.32 | UANPF | 1/13/2021 | 445 | $292.57 |
| | | 2,300 | $293.55 | | | 607 | $287.68 |
| | | 6,127 | $292.56 | | | 633 | $289.26 |
| | | 3,087 | $291.47 | | | 1,772 | $289.52 |
| | | 6,883 | $290.39 | | | | |
| | | 11,199 | $289.44 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 15,108 | $288.49 | | | | |
| | | 3,200 | $287.61 | | | | |
| Garcia Senior | 1/14/2021 | 1,877 | $302.25 | UANPF | 1/14/2021 | 104 200 3,591 | $297.93 $297.39 $297.36 |
| | | 4,965 | $301.59 | | | | |
| | | 4,261 | $300.64 | | | | |
| | | 5,499 | $299.33 | | | | |
| | | 10,794 | $298.43 | | | | |
| | | 17,114 | $297.45 | | | | |
| | | 6,855 | $296.49 | | | | |
| | | 4,200 | $295.52 | | | | |
| | | 2,300 | $294.55 | | | | |
| | | 900 | $293.33 | | | | |
| | | 700 | $291.30 | | | | |
| | | 535 | $290.30 | | | | |
| Garcia Senior | 1/15/2021 | 500 | $294.61 | UANPF | 1/21/2021 | 1,618 | $273.56 |
| | | 3,900 | $293.64 | | | | |
| | | 600 | $292.70 | | | | |
| | | 1,200 | $291.58 | | | | |
| | | 2,601 | $289.95 | | | | |
| | | 6,562 | $289.26 | | | | |
| | | 11,035 | $288.21 | | | | |
| | | 9,853 | $287.30 | | | | |
| | | 5,544 | $286.26 | | | | |
| | | 5,905 | $285.26 | | | | |
| | | 900 | $283.91 | | | | |
| | | 1,400 | $283.06 | | | | |
| | 1/19/2021 | 300 | $290.00 | | | | |
| | | 400 | $288.85 | | | | |
| | | 1,558 | $287.90 | | | | |
| | | 500 | $286.80 | | | | |
| | | 700 | $285.71 | | | | |
| | | 300 | $284.37 | | | | |
| | | 1,200 | $282.74 | | | | |
| | | 1,910 | $281.16 | | | | |
| | | 3,039 | $280.29 | | | | |
| | | 3,539 | $279.38 | | | | |
| | | 3,403 | $278.34 | | | | |
| | | 8,570 | $277.16 | | | | |
| | | 17,318 | $276.26 | | | | |
| | | 6,563 | $275.24 | | | | |
| | | 700 | $274.42 | | | | |
| | 1/20/2021 | 400 | $277.72 | | | | |
| | | 1,100 | $276.34 | | | | |
| | | 2,320 | $275.31 | | | | |
| | | 1,300 | $273.97 | | | | |
| | | 1,500 | $273.21 | | | | |

- 183 -

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 5,276 | $272.11 | | | | |
| | | 5,084 | $271.08 | | | | |
| | | 19,485 | $270.09 | | | | |
| | | 12,444 | $269.26 | | | | |
| | | 1,091 | $268.29 | | | | |
| | 1/21/2021 | 200 | $276.23 | | | | |
| | | 1,200 | $275.41 | | | | |
| | | 13,646 | $274.51 | | | | |
| | | 11,083 | $273.78 | | | | |
| | | 11,264 | $272.67 | | | | |
| | | 4,204 | $271.69 | | | | |
| | | 4,150 | $270.56 | | | | |
| | | 2,308 | $269.67 | | | | |
| | | 982 | $268.60 | | | | |
| | | 963 | $267.58 | | | | |
| Garcia Senior | 1/25/2021 | 212 | $284.62 | UANPF | 1/29/2021 | 400 | $262.34 |
| | | 2,070 | $283.93 | | | | |
| | | 1,480 | $282.77 | | | | |
| | | 3,993 | $281.66 | | | | |
| | | 3,921 | $280.80 | | | | |
| | | 1,778 | $279.52 | | | | |
| | | 1,020 | $278.56 | | | | |
| | | 1,512 | $277.11 | | | | |
| | | 299 | $275.72 | | | | |
| | | 165 | $274.97 | | | | |
| | | 4,227 | $273.56 | | | | |
| | | 9,879 | $272.82 | | | | |
| | | 5,252 | $271.75 | | | | |
| | | 5,200 | $270.74 | | | | |
| | | 3,385 | $269.56 | | | | |
| | | 3,471 | $268.70 | | | | |
| | | 858 | $267.19 | | | | |
| | | 682 | $266.17 | | | | |
| | | 110 | $264.64 | | | | |
| | | 486 | $263.94 | | | | |
| | 1/26/2021 | 700 | $277.55 | | | | |
| | | 500 | $276.67 | | | | |
| | | 2,100 | $275.21 | | | | |
| | | 2,255 | $274.36 | | | | |
| | | 4,142 | $273.35 | | | | |
| | | 6,304 | $272.40 | | | | |
| | | 3,798 | $271.39 | | | | |
| | | 900 | $269.78 | | | | |
| | | 500 | $268.35 | | | | |
| | | 2,174 | $267.16 | | | | |
| | | 3,304 | $266.47 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 7,454 | $265.31 | | | | |
| | | 9,676 | $264.44 | | | | |
| | | 2,362 | $263.38 | | | | |
| | | 2,500 | $262.21 | | | | |
| | | 1,331 | $261.33 | | | | |
| | | 100 | $250.84 | | | | |
| | | 1,000 | $249.68 | | | | |
| | | 2,200 | $248.31 | | | | |
| | | 2,399 | $247.34 | | | | |
| | | 1,295 | $246.50 | | | | |
| | | 1,500 | $245.17 | | | | |
| | 1/27/2021 | 3,802 | $244.25 | | | | |
| | | 3,672 | $243.18 | | | | |
| | | 6,576 | $242.26 | | | | |
| | | 9,205 | $241.25 | | | | |
| | | 3,783 | $240.27 | | | | |
| | | 2,168 | $239.16 | | | | |
| | | 1,100 | $237.88 | | | | |
| | | 1,200 | $236.78 | | | | |
| | | 320 | $267.38 | | | | |
| | | 500 | $266.45 | | | | |
| | | 1,495 | $265.56 | | | | |
| | | 1,700 | $264.46 | | | | |
| | | 3,192 | $263.54 | | | | |
| | | 3,303 | $262.56 | | | | |
| | | 1,804 | $261.01 | | | | |
| | | 12,085 | $260.02 | | | | |
| | | 4,304 | $259.03 | | | | |
| | | 5,131 | $258.12 | | | | |
| | 1/28/2021 | 3,392 | $257.05 | | | | |
| | | 3,784 | $256.09 | | | | |
| | | 2,495 | $254.79 | | | | |
| | | 2,100 | $254.08 | | | | |
| | | 700 | $252.86 | | | | |
| | | 1,442 | $251.93 | | | | |
| | | 503 | $250.98 | | | | |
| | | 100 | $249.00 | | | | |
| | | 300 | $248.10 | | | | |
| | | 300 | $247.18 | | | | |
| | | 1,050 | $246.24 | | | | |
| | | 1,565 | $264.47 | | | | |
| | | 807 | $263.29 | | | | |
| | 1/29/2021 | 712 | $261.95 | | | | |
| | | 9,320 | $261.30 | | | | |
| | | 1,865 | $260.16 | | | | |
| | | 1,000 | $258.76 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 1,800 | $257.72 | | | | |
| | | 4,452 | $256.71 | | | | |
| | | 1,700 | $255.73 | | | | |
| | | 4,950 | $254.40 | | | | |
| | | 4,700 | $253.50 | | | | |
| | | 4,121 | $252.55 | | | | |
| | | 4,402 | $251.47 | | | | |
| | | 2,898 | $250.41 | | | | |
| | | 2,808 | $249.45 | | | | |
| | | 1,600 | $248.59 | | | | |
| | | 1,300 | $247.48 | | | | |
| Garcia Senior | 2/4/2021 | 100 | $290.83 | UANPF | 2/10/2021 | 300 | $297.30 |
| | | 2,202 | $290.20 | | | | |
| | | 2,497 | $289.16 | | | | |
| | | 4,100 | $288.21 | | | | |
| | | 2,801 | $287.29 | | | | |
| | | 2,344 | $286.10 | | | | |
| | | 5,397 | $285.01 | | | | |
| | | 13,141 | $284.15 | | | | |
| | | 4,967 | $283.18 | | | | |
| | | 3,451 | $282.09 | | | | |
| | | 4,500 | $280.96 | | | | |
| | | 2,900 | $280.21 | | | | |
| | | 1,600 | $278.89 | | | | |
| | 2/5/2021 | 504 | $291.98 | | | | |
| | | 3,329 | $291.05 | | | | |
| | | 3,558 | $290.44 | | | | |
| | | 6,778 | $289.04 | | | | |
| | | 12,962 | $288.07 | | | | |
| | | 5,455 | $287.16 | | | | |
| | | 4,505 | $286.08 | | | | |
| | | 5,423 | $285.12 | | | | |
| | | 900 | $284.14 | | | | |
| | | 900 | $282.54 | | | | |
| | | 3,086 | $281.54 | | | | |
| | | 2,600 | $280.73 | | | | |
| | 2/8/2021 | 979 | $293.87 | | | | |
| | | 5,639 | $293.11 | | | | |
| | | 1,899 | $291.79 | | | | |
| | | 1,600 | $291.04 | | | | |
| | | 5,253 | $289.63 | | | | |
| | | 8,700 | $288.68 | | | | |
| | | 9,287 | $287.76 | | | | |
| | | 6,955 | $286.63 | | | | |
| | | 3,920 | $285.85 | | | | |
| | | 3,474 | $284.49 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 2,294 | $283.63 | | | | |
| | 2/9/2021 | 474 | $299.36 | | | | |
| | | 1,325 | $298.46 | | | | |
| | | 2,800 | $297.45 | | | | |
| | | 2,720 | $296.43 | | | | |
| | | 3,735 | $295.56 | | | | |
| | | 2,630 | $294.46 | | | | |
| | | 5,710 | $293.48 | | | | |
| | | 1,900 | $292.31 | | | | |
| | | 5,224 | $291.25 | | | | |
| | | 5,788 | $290.17 | | | | |
| | | 4,109 | $289.34 | | | | |
| | | 1,700 | $288.10 | | | | |
| | | 1,759 | $286.97 | | | | |
| | | 1,908 | $285.78 | | | | |
| | | 3,200 | $284.86 | | | | |
| | | 5,018 | $283.95 | | | | |
| | 2/10/2021 | 121 | $300.34 | | | | |
| | | 6,348 | $299.78 | | | | |
| | | 4,750 | $298.69 | | | | |
| | | 4,963 | $297.98 | | | | |
| | | 3,275 | $296.59 | | | | |
| | | 12,934 | $295.65 | | | | |
| | | 7,604 | $294.75 | | | | |
| | | 4,493 | $293.88 | | | | |
| | | 1,940 | $292.67 | | | | |
| | | 3,651 | $291.33 | | | | |
| | | 1,080 | $290.55 | | | | |
| | | 290 | $289.57 | | | | |
| | | 182 | $288.43 | | | | |
| | | 897 | $287.04 | | | | |
| Garcia Senior | 2/22/2021 | 300 | $304.99 | UANPF | 2/26/2021 | 167 | $288.01 |
| | | 4,400 | $304.19 | | | 332 | $278.31 |
| | | 4,652 | $302.99 | | | 3,220 | $281.61 |
| | | 3,111 | $302.03 | | | | |
| | | 3,834 | $300.81 | | | | |
| | | 3,200 | $299.99 | | | | |
| | | 700 | $298.88 | | | | |
| | | 1,400 | $297.89 | | | | |
| | | 1,100 | $296.35 | | | | |
| | | 600 | $295.34 | | | | |
| | | 1,000 | $294.06 | | | | |
| | | 1,600 | $293.03 | | | | |
| | | 2,303 | $291.88 | | | | |
| | | 6,122 | $290.78 | | | | |
| | | 8,304 | $289.95 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 3,535 | $288.91 | | | | |
| | | 2,000 | $287.96 | | | | |
| | | 2,900 | $287.09 | | | | |
| | | 834 | $285.62 | | | | |
| | | 1,900 | $284.64 | | | | |
| | | 500 | $282.20 | | | | |
| | | 3,905 | $281.41 | | | | |
| | | 1,800 | $280.45 | | | | |
| | 2/23/2021 | 300 | $283.23 | | | | |
| | | 1,179 | $282.23 | | | | |
| | | 3,301 | $281.44 | | | | |
| | | 1,363 | $280.38 | | | | |
| | | 500 | $279.03 | | | | |
| | | 1,100 | $277.39 | | | | |
| | | 1,686 | $276.62 | | | | |
| | | 995 | $275.17 | | | | |
| | | 3,329 | $274.30 | | | | |
| | | 2,254 | $273.43 | | | | |
| | | 480 | $272.50 | | | | |
| | | 2,373 | $271.19 | | | | |
| | | 2,918 | $270.23 | | | | |
| | | 2,038 | $269.17 | | | | |
| | | 3,361 | $268.07 | | | | |
| | | 5,598 | $267.19 | | | | |
| | | 2,100 | $266.17 | | | | |
| | | 3,000 | $265.09 | | | | |
| | | 1,900 | $263.88 | | | | |
| | | 900 | $262.49 | | | | |
| | | 2,275 | $261.45 | | | | |
| | | 4,547 | $260.57 | | | | |
| | | 2,503 | $259.94 | | | | |
| | 2/24/2021 | 1,500 | $285.67 | | | | |
| | | 4,816 | $284.80 | | | | |
| | | 3,648 | $283.75 | | | | |
| | | 10,980 | $282.72 | | | | |
| | | 6,149 | $281.80 | | | | |
| | | 3,600 | $280.75 | | | | |
| | | 3,200 | $279.61 | | | | |
| | | 1,000 | $278.59 | | | | |
| | | 549 | $277.50 | | | | |
| | | 1,000 | $276.35 | | | | |
| | | 200 | $275.03 | | | | |
| | | 1,900 | $274.31 | | | | |
| | | 3,146 | $273.44 | | | | |
| | | 2,317 | $272.29 | | | | |
| | | 2,095 | $271.65 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 2,362 | $270.24 | | | | |
| | | 1,538 | $269.32 | | | | |
| | | 500 | $289.47 | | | | |
| | | 701 | $287.82 | | | | |
| | | 1,130 | $286.92 | | | | |
| | | 1,100 | $285.50 | | | | |
| | | 1,103 | $284.42 | | | | |
| | | 700 | $283.16 | | | | |
| | | 800 | $282.00 | | | | |
| | | 600 | $281.26 | | | | |
| | | 1,350 | $279.78 | | | | |
| | | 2,050 | $278.88 | | | | |
| | | 2,429 | $277.94 | | | | |
| | | 2,700 | $276.80 | | | | |
| | | 4,549 | $275.95 | | | | |
| | 2/25/2021 | 2,100 | $274.62 | | | | |
| | | 1,446 | $273.76 | | | | |
| | | 1,100 | $271.77 | | | | |
| | | 1,683 | $270.97 | | | | |
| | | 3,524 | $269.88 | | | | |
| | | 2,455 | $268.91 | | | | |
| | | 1,703 | $267.76 | | | | |
| | | 2,677 | $266.76 | | | | |
| | | 4,077 | $265.95 | | | | |
| | | 2,131 | $264.85 | | | | |
| | | 2,900 | $263.69 | | | | |
| | | 2,585 | $262.50 | | | | |
| | | 1,307 | $261.72 | | | | |
| | | 600 | $260.53 | | | | |
| | | 100 | $294.88 | | | | |
| | | 530 | $293.77 | | | | |
| | | 1,254 | $292.91 | | | | |
| | | 2,358 | $292.11 | | | | |
| | | 1,900 | $290.98 | | | | |
| | | 3,334 | $289.96 | | | | |
| | | 3,126 | $288.95 | | | | |
| | | 3,017 | $287.96 | | | | |
| | 2/26/2021 | 2,201 | $286.93 | | | | |
| | | 8,384 | $285.83 | | | | |
| | | 4,482 | $284.96 | | | | |
| | | 1,736 | $284.00 | | | | |
| | | 2,340 | $282.67 | | | | |
| | | 1,400 | $281.38 | | | | |
| | | 1,825 | $279.99 | | | | |
| | | 700 | $278.69 | | | | |
| | | 7,403 | $277.95 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 700 | $276.31 | | | | |
| | | 5 | $275.50 | | | | |
| | | 975 | $274.99 | | | | |
| | | 805 | $273.98 | | | | |
| | | 625 | $272.80 | | | | |
| | | 100 | $271.16 | | | | |
| | | 500 | $270.27 | | | | |
| | | 200 | $267.83 | | | | |
| Garcia Senior | 3/8/2021 | 2,300 | $262.01 | UANPF | 3/12/2021 | 200 | $287.43 |
| | | 773 | $261.25 | | | | |
| | | 8,640 | $260.33 | | | | |
| | | 3,700 | $259.39 | | | | |
| | | 2,194 | $258.26 | | | | |
| | | 3,875 | $257.29 | | | | |
| | | 3,443 | $256.28 | | | | |
| | | 2,000 | $255.30 | | | | |
| | | 900 | $253.96 | | | | |
| | | 1,100 | $252.75 | | | | |
| | | 1,547 | $251.71 | | | | |
| | | 2,586 | $250.51 | | | | |
| | | 1,800 | $249.38 | | | | |
| | | 1,250 | $248.50 | | | | |
| | | 3,979 | $247.51 | | | | |
| | | 1,591 | $246.46 | | | | |
| | | 1,752 | $245.25 | | | | |
| | | 1,009 | $243.73 | | | | |
| | | 4,027 | $242.44 | | | | |
| | | 1,534 | $241.53 | | | | |
| | 3/9/2021 | 736 | $261.59 | | | | |
| | | 6,668 | $260.76 | | | | |
| | | 20,524 | $259.94 | | | | |
| | | 6,760 | $258.91 | | | | |
| | | 3,944 | $257.91 | | | | |
| | | 3,932 | $256.89 | | | | |
| | | 3,280 | $255.72 | | | | |
| | | 3,156 | $254.89 | | | | |
| | | 1,000 | $253.73 | | | | |
| | 3/10/2021 | 400 | $273.63 | | | | |
| | | 800 | $272.66 | | | | |
| | | 1,603 | $271.68 | | | | |
| | | 953 | $270.66 | | | | |
| | | 2,100 | $269.49 | | | | |
| | | 1,891 | $268.50 | | | | |
| | | 3,229 | $267.61 | | | | |
| | | 4,600 | $266.50 | | | | |
| | | 3,945 | $265.47 | | | | |

- 190 -

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 5,634 | $264.39 | | | | |
| | | 2,427 | $263.46 | | | | |
| | | 5,452 | $262.34 | | | | |
| | | 4,113 | $261.23 | | | | |
| | | 9,547 | $260.23 | | | | |
| | | 2,106 | $259.31 | | | | |
| | | 1,200 | $258.17 | | | | |
| | 3/11/2021 | 400 | $278.93 | | | | |
| | | 1,879 | $277.82 | | | | |
| | | 11,937 | $276.99 | | | | |
| | | 9,123 | $276.12 | | | | |
| | | 4,824 | $274.98 | | | | |
| | | 889 | $273.88 | | | | |
| | | 4,030 | $272.68 | | | | |
| | | 2,774 | $271.62 | | | | |
| | | 1,600 | $270.77 | | | | |
| | | 2,901 | $269.54 | | | | |
| | | 3,622 | $268.50 | | | | |
| | | 1,921 | $267.26 | | | | |
| | | 2,500 | $266.17 | | | | |
| | | 1,600 | $265.30 | | | | |
| | 3/12/2021 | 2,063 | $287.93 | | | | |
| | | 2,718 | $287.19 | | | | |
| | | 1,200 | $285.94 | | | | |
| | | 1,724 | $284.79 | | | | |
| | | 1,700 | $283.46 | | | | |
| | | 2,000 | $282.60 | | | | |
| | | 3,545 | $281.55 | | | | |
| | | 1,600 | $280.42 | | | | |
| | | 800 | $279.39 | | | | |
| | | 200 | $278.11 | | | | |
| | | 300 | $276.14 | | | | |
| | | 1,802 | $274.43 | | | | |
| | | 2,200 | $273.72 | | | | |
| | | 600 | $272.21 | | | | |
| | | 1,500 | $271.34 | | | | |
| | | 3,700 | $270.18 | | | | |
| | | 2,012 | $269.19 | | | | |
| | | 1,400 | $268.13 | | | | |
| | | 4,500 | $267.03 | | | | |
| | | 5,137 | $266.09 | | | | |
| | | 6,379 | $265.15 | | | | |
| | | 2,920 | $264.13 | | | | |
| Garcia Senior | 4/1/2021 | 500 | $275.20 | UANPF | 4/6/2021 | 360 | $280.73 |
| | | 1,400 | $274.12 | | | | |
| | | 1,000 | $272.69 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 1,610 | $271.83 | | | | |
| | | 7,242 | $270.71 | | | | |
| | | 3,382 | $269.78 | | | | |
| | | 3,086 | $268.86 | | | | |
| | | 5,824 | $267.41 | | | | |
| | | 9,874 | $266.42 | | | | |
| | | 13,193 | $265.51 | | | | |
| | | 2,889 | $264.71 | | | | |
| | | 900 | $270.86 | | | | |
| | | 401 | $269.21 | | | | |
| | | 4,912 | $268.36 | | | | |
| | | 8,082 | $267.56 | | | | |
| | | 4,200 | $266.60 | | | | |
| | 4/5/2021 | 4,000 | $265.43 | | | | |
| | | 2,993 | $264.50 | | | | |
| | | 7,453 | $263.40 | | | | |
| | | 8,461 | $262.36 | | | | |
| | | 7,298 | $261.53 | | | | |
| | | 1,300 | $260.48 | | | | |
| | | 780 | $281.10 | | | | |
| | | 1,200 | $280.17 | | | | |
| | | 2,794 | $278.96 | | | | |
| | | 8,333 | $277.95 | | | | |
| | | 11,416 | $277.13 | | | | |
| | | 5,949 | $276.20 | | | | |
| | | 3,088 | $275.02 | | | | |
| | 4/6/2021 | 1,200 | $273.72 | | | | |
| | | 1,900 | $272.99 | | | | |
| | | 3,971 | $271.76 | | | | |
| | | 3,058 | $270.70 | | | | |
| | | 2,300 | $269.92 | | | | |
| | | 886 | $268.47 | | | | |
| | | 1,826 | $267.64 | | | | |
| | | 699 | $266.74 | | | | |
| | | 600 | $265.01 | | | | |
| | | 600 | $273.41 | | | | |
| | | 785 | $271.89 | | | | |
| | | 3,518 | $271.13 | | | | |
| | 4/9/2021 | 5,220 | $270.10 | | | | |
| Garcia Senior | | 14,833 | $269.16 | | | | |
| | | 16,166 | $268.30 | UANPF | 4/15/2021 | 300 | $283.15 |
| | | 5,772 | $267.34 | | | | |
| | | 3,106 | $266.23 | | | | |
| | | 3,155 | $270.17 | | | | |
| | 4/12/2021 | 4,232 | $269.25 | | | | |
| | | 6,417 | $268.34 | | | | |

| | Defendants' Open Market Sales | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| **Defendant** | **Sale Date** | **Shares Sold** | **Price** | **Lead Plaintiffs** | **Purchase Date** | **Shares Purchased** | **Price** |
| | | 8,092 | $267.53 | | | | |
| | | 4,068 | $266.40 | | | | |
| | | 3,100 | $265.23 | | | | |
| | | 3,336 | $264.31 | | | | |
| | | 6,792 | $263.26 | | | | |
| | | 4,768 | $262.25 | | | | |
| | | 2,640 | $261.32 | | | | |
| | | 3,400 | $260.19 | | | | |
| | | 800 | $277.61 | | | | |
| | | 6,381 | $276.88 | | | | |
| | | 2,800 | $275.79 | | | | |
| | | 4,448 | $274.92 | | | | |
| | 4/13/2021 | 2,988 | $273.70 | | | | |
| | | 9,285 | $272.73 | | | | |
| | | 11,416 | $271.90 | | | | |
| | | 2,789 | $270.80 | | | | |
| | | 4,005 | $269.69 | | | | |
| | | 5,088 | $268.84 | | | | |
| | | 400 | $281.70 | | | | |
| | | 500 | $280.60 | | | | |
| | | 5,164 | $279.47 | | | | |
| | | 11,708 | $278.79 | | | | |
| | | 11,050 | $277.73 | | | | |
| | | 5,911 | $276.72 | | | | |
| | 4/14/2021 | 2,511 | $275.60 | | | | |
| | | 900 | $274.58 | | | | |
| | | 2,299 | $273.33 | | | | |
| | | 2,600 | $272.36 | | | | |
| | | 3,143 | $271.56 | | | | |
| | | 1,600 | $270.26 | | | | |
| | | 2,214 | $269.19 | | | | |
| | | 400 | $285.23 | | | | |
| | | 2,891 | $284.62 | | | | |
| | | 3,437 | $283.46 | | | | |
| | | 3,583 | $282.52 | | | | |
| | | 1,453 | $281.56 | | | | |
| | | 200 | $280.28 | | | | |
| | | 500 | $279.27 | | | | |
| | 4/15/2021 | 2,136 | $278.10 | | | | |
| | | 4,870 | $277.10 | | | | |
| | | 5,615 | $276.04 | | | | |
| | | 11,722 | $275.14 | | | | |
| | | 7,293 | $274.24 | | | | |
| | | 4,500 | $273.19 | | | | |
| | | 400 | $271.38 | | | | |
| | | 700 | $270.51 | | | | |

| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
|---|---|---|---|---|---|---|---|
| | | 300 | $269.37 | | | | |
| Garcia Senior | 5/18/2021 | 300 | $230.07 | | | | |
| | | 1,511 | $229.32 | | | | |
| | | 8,992 | $228.35 | | | | |
| | | 13,476 | $227.54 | | | | |
| | | 11,451 | $226.35 | | | | |
| | | 4,270 | $225.58 | | | | |
| | 5/19/2021 | 400 | $231.92 | | | | |
| | | 300 | $231.07 | | | | |
| | | 4,768 | $229.85 | | | | |
| | | 4,800 | $229.05 | | | | |
| | | 5,978 | $227.93 | | | | |
| | | 6,754 | $227.03 | | | | |
| | | 9,886 | $225.85 | | | | |
| | | 2,214 | $225.04 | | | | |
| | | 1,200 | $223.62 | | | | |
| | | 1,500 | $222.79 | | | | |
| | | 1,200 | $221.64 | | | | |
| | | 1,000 | $220.30 | | | | |
| | 5/20/2021 | 2,189 | $242.32 | | | | |
| | | 2,692 | $241.58 | | | | |
| | | 3,066 | $240.43 | | | | |
| | | 4,050 | $239.52 | | | | |
| | | 3,054 | $238.35 | | | | |
| | | 5,246 | $237.51 | | | | |
| | | 2,400 | $236.37 | | | | |
| | | 3,003 | $235.10 | | | | |
| | | 4,833 | $233.97 | | | | |
| | | 2,467 | $233.35 | UANPF | 5/24/2021 | 400 | $253.93 |
| | | 600 | $232.08 | | | | |
| | | 1,600 | $230.92 | | | | |
| | | 2,600 | $229.90 | | | | |
| | | 2,200 | $229.22 | | | | |
| | 5/21/2021 | 3,901 | $246.74 | | | | |
| | | 8,513 | $246.22 | | | | |
| | | 6,686 | $245.03 | | | | |
| | | 6,101 | $244.01 | | | | |
| | | 3,949 | $243.23 | | | | |
| | | 7,650 | $242.04 | | | | |
| | | 3,200 | $241.01 | | | | |
| | 5/24/2021 | 300 | $258.17 | | | | |
| | | 2,500 | $257.24 | | | | |
| | | 2,500 | $256.28 | | | | |
| | | 2,600 | $255.06 | | | | |
| | | 12,845 | $254.04 | | | | |
| | | 15,055 | $253.32 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 3,200 | $252.23 | | | | |
| | | 500 | $251.11 | | | | |
| | | 500 | $248.62 | | | | |
| Garcia Senior | 6/4/2021 | 2,900 | $278.07 | UANPF | 6/11/2021 | 200 | $274.28 |
| | | 15,596 | $277.46 | | | | |
| | | 3,014 | $276.62 | | | | |
| | | 9,759 | $275.31 | | | | |
| | | 13,358 | $274.25 | | | | |
| | | 5,373 | $273.45 | | | | |
| | 6/7/2021 | 3,951 | $280.67 | | | | |
| | | 7,458 | $280.06 | | | | |
| | | 2,900 | $278.76 | | | | |
| | | 6,400 | $277.64 | | | | |
| | | 16,151 | $276.73 | | | | |
| | | 10,540 | $275.79 | | | | |
| | | 2,600 | $274.82 | | | | |
| | 6/8/2021 | 200 | $280.50 | | | | |
| | | 3,400 | $279.85 | | | | |
| | | 1,700 | $278.62 | | | | |
| | | 11,909 | $277.48 | | | | |
| | | 17,891 | $276.75 | | | | |
| | | 5,900 | $275.70 | | | | |
| | | 6,100 | $274.75 | | | | |
| | | 2,900 | $273.86 | | | | |
| | 6/9/2021 | 1,100 | $276.04 | | | | |
| | | 1,225 | $275.35 | | | | |
| | | 1,075 | $273.97 | | | | |
| | | 4,401 | $272.87 | | | | |
| | | 5,031 | $271.96 | | | | |
| | | 3,270 | $270.92 | | | | |
| | | 2,710 | $269.87 | | | | |
| | | 7,254 | $268.94 | | | | |
| | | 11,289 | $267.75 | | | | |
| | | 7,163 | $267.11 | | | | |
| | | 1,000 | $266.08 | | | | |
| | | 4,482 | $264.94 | | | | |
| | 6/10/2021 | 2,200 | $268.03 | | | | |
| | | 13,262 | $267.19 | | | | |
| | | 22,392 | $266.49 | | | | |
| | | 8,546 | $265.32 | | | | |
| | | 3,600 | $264.61 | | | | |
| | 6/11/2021 | 2,357 | $274.35 | | | | |
| | | 11,496 | $273.67 | | | | |
| | | 15,864 | $272.54 | | | | |
| | | 11,036 | $271.85 | | | | |
| | | 2,100 | $270.59 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 1,700 | $269.62 | | | | |
| | | 2,000 | $268.41 | | | | |
| | | 3,447 | $267.54 | | | | |
| Garcia Senior | 6/25/2021 | 2,100 | $306.33 | UANPF | 7/1/2021 | 106 | $305.42 |
| | | 400 | $305.27 | | | | |
| | | 2,620 | $304.71 | | | | |
| | | 10,701 | $303.53 | | | | |
| | | 7,590 | $302.67 | | | | |
| | | 8,021 | $301.55 | | | | |
| | | 9,327 | $300.52 | | | | |
| | | 10,196 | $299.51 | | | | |
| | | 9,045 | $298.64 | | | | |
| | 6/28/2021 | 3,484 | $309.45 | | | | |
| | | 10,506 | $308.75 | | | | |
| | | 6,290 | $307.71 | | | | |
| | | 10,700 | $306.60 | | | | |
| | | 3,100 | $305.72 | | | | |
| | | 6,925 | $304.80 | | | | |
| | | 8,909 | $303.74 | | | | |
| | | 5,220 | $302.64 | | | | |
| | | 4,266 | $301.60 | | | | |
| | | 600 | $300.39 | | | | |
| | 6/29/2021 | 2,602 | $303.04 | | | | |
| | | 5,585 | $302.37 | | | | |
| | | 8,056 | $301.22 | | | | |
| | | 19,119 | $300.24 | | | | |
| | | 11,798 | $299.25 | | | | |
| | | 5,340 | $298.24 | | | | |
| | | 7,500 | $297.37 | | | | |
| | 6/30/2021 | 2,000 | $306.95 | | | | |
| | | 12,140 | $306.27 | | | | |
| | | 15,850 | $305.39 | | | | |
| | | 5,697 | $304.20 | | | | |
| | | 3,301 | $303.41 | | | | |
| | | 6,854 | $302.18 | | | | |
| | | 10,471 | $301.23 | | | | |
| | | 3,687 | $300.24 | | | | |
| | 7/1/2021 | 1,265 | $308.18 | | | | |
| | | 12,970 | $307.45 | | | | |
| | | 13,965 | $306.47 | | | | |
| | | 9,520 | $305.59 | | | | |
| | | 2,580 | $304.59 | | | | |
| | | 1,200 | $303.66 | | | | |
| | | 3,648 | $302.21 | | | | |
| | | 4,149 | $301.43 | | | | |
| | | 9,603 | $300.37 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 1,100 | $299.51 | | | | |
| Garcia Senior | 7/2/2021 | 874 | $313.18 | UANPF | 7/2/2021 | 106<br>395 | $311.95<br>$309.73 |
| | | 1,600 | $312.42 | | | | |
| | | 13,866 | $311.71 | | | | |
| | | 12,196 | $310.56 | | | | |
| | | 16,204 | $309.65 | | | | |
| | | 13,660 | $308.63 | | | | |
| | | 1,600 | $307.80 | | | | |
| Garcia Senior | 7/6/2021 | 300 | $321.58 | UANPF | 7/6/2021 | 314<br>319 | $316.17<br>$317.89 |
| | | 400 | $320.82 | | | | |
| | | 1,300 | $319.76 | | | | |
| | | 2,450 | $318.37 | | | | |
| | | 3,374 | $317.43 | | | | |
| | | 14,997 | $316.34 | | | | |
| | | 8,908 | $315.40 | | | | |
| | | 10,200 | $314.28 | | | | |
| | | 9,000 | $313.19 | | | | |
| | | 7,771 | $312.44 | | | | |
| | | 1,300 | $311.38 | | | | |
| Garcia Senior | 7/7/2021 | 300 | $319.93 | UANPF | 7/7/2021 | 302 | $316.17 |
| | | 1,100 | $318.97 | | | | |
| | | 4,840 | $317.88 | | | | |
| | | 16,740 | $316.92 | | | | |
| | | 25,372 | $316.04 | | | | |
| | | 9,448 | $315.28 | | | | |
| | | 1,770 | $313.71 | | | | |
| | | 430 | $312.67 | | | | |
| Garcia Senior | 7/8/2021 | 400 | $322.12 | UANPF | 7/8/2021 | 131<br>228<br>368 | $320.62<br>$312.87<br>$322.51 |
| | | 2,636 | $321.29 | | | | |
| | | 11,142 | $320.45 | | | | |
| | | 9,099 | $319.53 | | | | |
| | | 3,500 | $318.50 | | | | |
| | | 2,300 | $317.45 | | | | |
| | | 3,700 | $316.36 | | | | |
| | | 7,527 | $315.37 | | | | |
| | | 1,500 | $314.41 | | | | |
| | | 400 | $313.03 | | | | |
| | | 1,800 | $311.86 | | | | |
| | | 8,709 | $310.97 | | | | |
| | | 7,287 | $310.15 | | | | |
| Garcia Senior | 7/9/2021 | 800 | $327.08 | UANPF | 7/9/2021 | 74<br>249 | $325.17<br>$322.53 |
| | | 5,680 | $326.11 | | | | |
| | | 11,987 | $325.17 | | | | |
| | | 22,154 | $324.35 | | | | |
| | | 7,297 | $323.31 | | | | |
| | | 7,298 | $322.27 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 3,484 | $321.47 | | | | |
| | | 1,300 | $320.16 | | | | |
| Garcia Senior | 7/12/2021 | 2,600 | $326.24 | UANPF | 7/12/2021 | 105 | $323.00 |
| | | 8,609 | $325.43 | | | | |
| | | 20,638 | $324.25 | | | | |
| | | 21,615 | $323.40 | | | | |
| | | 6,538 | $322.51 | | | | |
| Garcia Senior | 7/13/2021 | 800 | $328.63 | UANPF | 7/13/2021 | 97 | $326.12 |
| | | 2,123 | $327.57 | | | 99 | $324.44 |
| | | 3,177 | $326.68 | | | 438 | $323.61 |
| | | 6,300 | $325.61 | | | | |
| | | 10,136 | $324.48 | | | | |
| | | 25,664 | $323.80 | | | | |
| | | 10,371 | $322.85 | | | | |
| | | 1,429 | $321.73 | | | | |
| Garcia Senior | 7/14/2021 | 500 | $323.61 | UANPF | 7/14/2021 | 222 | $316.61 |
| | | 1,500 | $322.12 | | | 661 | $318.54 |
| | | 7,700 | $321.34 | | | | |
| | | 2,300 | $320.23 | | | | |
| | | 14,966 | $319.15 | | | | |
| | | 3,537 | $317.85 | | | | |
| | | 15,783 | $317.12 | | | | |
| | | 7,533 | $316.02 | | | | |
| | | 2,181 | $315.09 | | | | |
| | | 2,300 | $314.02 | | | | |
| | | 1,700 | $312.88 | | | | |
| Garcia Senior | 7/15/2021 | 600 | $319.18 | UANPF | 7/15/2021 | 33 | $310.83 |
| | | 1,800 | $318.28 | | | 529 | $311.42 |
| | | 1,706 | $316.99 | | | | |
| | | 1,894 | $316.05 | | | | |
| | | 1,696 | $314.99 | | | | |
| | | 7,121 | $313.99 | | | | |
| | | 13,254 | $313.13 | | | | |
| | | 11,475 | $311.14 | | | | |
| | | 12,532 | $310.55 | | | | |
| | | 3,551 | $309.54 | | | | |
| | | 3,271 | $308.29 | | | | |
| | | 1,100 | $307.31 | | | | |
| Garcia Senior | 7/16/2021 | 100 | $318.25 | UANPF | 7/16/2021 | 166 | $313.61 |
| | | 2,500 | $317.67 | | | 666 | $314.16 |
| | | 8,941 | $316.54 | | | | |
| | | 15,605 | $315.62 | | | | |
| | | 10,911 | $314.90 | | | | |
| | | 10,511 | $313.37 | | | | |
| | | 11,432 | $312.82 | | | | |
| Garcia | 7/19/2021 | 6,694 | $310.64 | UANPF | 7/19/2021 | 23 | $305.67 |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Senior | | 3,594 | $309.68 | | | 209 | $306.80 |
| | | 5,600 | $308.75 | | | | |
| | | 5,630 | $307.73 | | | | |
| | | 16,481 | $306.71 | | | | |
| | | 12,911 | $305.76 | | | | |
| | | 6,890 | $304.86 | | | | |
| | | 2,200 | $303.82 | | | | |
| Garcia Senior | 7/20/2021 | 2,100 | $327.34 | UANPF | 7/20/2021 | 66 | $325.34 |
| | | 6,503 | $326.61 | | | 312 | $320.69 |
| | | 4,300 | $325.42 | | | | |
| | | 8,738 | $324.58 | | | | |
| | | 3,900 | $323.41 | | | | |
| | | 3,400 | $322.57 | | | | |
| | | 1,200 | $321.03 | | | | |
| | | 2,500 | $320.39 | | | | |
| | | 2,000 | $319.03 | | | | |
| | | 3,883 | $318.00 | | | | |
| | | 3,100 | $317.20 | | | | |
| | | 2,977 | $316.02 | | | | |
| | | 5,199 | $314.98 | | | | |
| | | 8,000 | $314.08 | | | | |
| | | 2,200 | $313.09 | | | | |
| Garcia Senior | 7/21/2021 | 1,792 | $331.83 | UANPF | 7/21/2021 | 19 | $330.32 |
| | | 7,638 | $331.24 | | | 30 | $332.05 |
| | | 16,164 | $330.38 | | | 54 | $330.40 |
| | | 4,898 | $329.31 | | | 63 | $330.38 |
| | | 8,600 | $328.18 | | | 76 | $325.14 |
| | | 9,206 | $327.23 | | | | |
| | | 4,502 | $326.33 | | | | |
| | | 3,334 | $324.99 | | | | |
| | | 2,466 | $324.12 | | | | |
| | | 1,200 | $322.97 | | | | |
| | | 200 | $321.56 | | | | |
| Garcia Senior | 7/22/2021 | 100 | $338.51 | UANPF | 7/22/2021 | 22 | $334.62 |
| | | 1,400 | $336.89 | | | 202 | $335.28 |
| | | 15,549 | $336.09 | | | | |
| | | 18,042 | $335.14 | | | | |
| | | 17,243 | $334.27 | | | | |
| | | 5,766 | $333.10 | | | | |
| | | 1,900 | $332.28 | | | | |
| Garcia Senior | 7/23/2021 | 1,390 | $340.65 | UANPF | 7/23/2021 | 49 | $338.92 |
| | | 8,653 | $339.89 | | | 218 | $334.39 |
| | | 5,114 | $339.04 | | | | |
| | | 4,472 | $338.19 | | | | |
| | | 5,672 | $336.96 | | | | |
| | | 8,278 | $336.01 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 7,580 | $334.92 | | | | |
| | | 4,015 | $334.05 | | | | |
| | | 3,300 | $332.85 | | | | |
| | | 3,105 | $331.86 | | | | |
| | | 3,396 | $330.96 | | | | |
| | | 3,925 | $329.82 | | | | |
| | | 1,100 | $328.81 | | | | |
| Garcia Senior | 7/26/2021 | 400 | $338.82 | UANPF | 7/26/2021 | 323 | $337.23 |
| | | 11,121 | $338.04 | | | | |
| | | 35,282 | $337.23 | | | | |
| | | 7,989 | $336.20 | | | | |
| | | 5,208 | $335.29 | | | | |
| Garcia Senior | 7/27/2021 | 1,600 | $338.25 | UANPF | 7/27/2021 | 69 | $330.14 |
| | | 13,664 | $337.09 | | | 72 | $330.27 |
| | | 4,318 | $336.31 | | | 788 | $331.51 |
| | | 4,540 | $335.23 | | | | |
| | | 4,085 | $334.33 | | | | |
| | | 2,700 | $333.04 | | | | |
| | | 2,000 | $331.98 | | | | |
| | | 9,687 | $331.18 | | | | |
| | | 10,360 | $330.20 | | | | |
| | | 5,946 | $329.32 | | | | |
| | | 1,100 | $328.16 | | | | |
| Garcia Senior | 7/28/2021 | 900 | $343.87 | UANPF | 7/28/2021 | 163 | $337.62 |
| | | 5,488 | $343.12 | | | 263 | $340.62 |
| | | 4,292 | $342.04 | | | | |
| | | 8,584 | $341.05 | | | | |
| | | 19,434 | $339.98 | | | | |
| | | 11,303 | $339.27 | | | | |
| | | 3,210 | $338.12 | | | | |
| | | 3,289 | $337.10 | | | | |
| | | 900 | $335.81 | | | | |
| | | 1,333 | $334.98 | | | | |
| | | 1,267 | $333.91 | | | | |
| Garcia Senior | 7/29/2021 | 10,999 | $339.74 | UANPF | 7/29/2021 | 416 | $338.40 |
| | | 26,563 | $338.93 | | | 875 | $338.70 |
| | | 16,458 | $337.94 | | | | |
| | | 3,880 | $337.06 | | | | |
| | | 2,100 | $335.90 | | | | |
| Garcia Senior | 7/30/2021 | 500 | $340.77 | UANPF | 7/30/2021 | 36 | $336.17 |
| | | 1,500 | $339.65 | | | 58 | $337.56 |
| | | 2,044 | $338.37 | | | 115 | $336.77 |
| | | 22,157 | $337.27 | | | 206 | $340.07 |
| | | 28,601 | $336.54 | | | | |
| | | 5,198 | $335.59 | | | | |
| Garcia | 8/2/2021 | 3,328 | $337.37 | UANPF | 8/2/2021 | 14 | $335.97 |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Senior | | 14,939 | $336.41 | | | | |
| | | 17,379 | $335.56 | | | | |
| | | 20,948 | $334.59 | | | | |
| | | 3,406 | $333.75 | | | | |
| Garcia Senior | 8/3/2021 | 700 | $334.58 | UANPF | 8/9/2021 | 120 | $352.05 |
| | | 11,429 | $333.79 | | | | |
| | | 24,525 | $332.72 | | | | |
| | | 11,016 | $331.80 | | | | |
| | | 6,230 | $330.80 | | | | |
| | | 4,600 | $329.82 | | | | |
| | | 1,500 | $328.80 | | | | |
| | 8/4/2021 | 1,000 | $333.86 | | | | |
| | | 3,100 | $333.09 | | | | |
| | | 20,641 | $332.18 | | | | |
| | | 22,124 | $331.42 | | | | |
| | | 5,795 | $330.25 | | | | |
| | | 3,664 | $329.21 | | | | |
| | | 1,901 | $328.27 | | | | |
| | | 1,775 | $327.28 | | | | |
| | 8/5/2021 | 2,200 | $337.32 | | | | |
| | | 8,375 | $336.51 | | | | |
| | | 14,876 | $335.76 | | | | |
| | | 16,509 | $334.69 | | | | |
| | | 8,584 | $333.76 | | | | |
| | | 2,900 | $332.70 | | | | |
| | | 3,925 | $331.51 | | | | |
| | | 2,231 | $330.59 | | | | |
| | | 400 | $328.47 | | | | |
| | 8/6/2021 | 400 | $371.67 | | | | |
| | | 200 | $369.50 | | | | |
| | | 400 | $368.36 | | | | |
| | | 471 | $365.91 | | | | |
| | | 1,129 | $365.08 | | | | |
| | | 300 | $363.50 | | | | |
| | | 100 | $361.12 | | | | |
| | | 100 | $359.53 | | | | |
| | | 600 | $358.68 | | | | |
| | | 1,500 | $357.49 | | | | |
| | | 1,800 | $356.59 | | | | |
| | | 2,300 | $355.47 | | | | |
| | | 3,240 | $354.47 | | | | |
| | | 1,460 | $353.50 | | | | |
| | | 1,100 | $352.53 | | | | |
| | | 1,000 | $351.38 | | | | |
| | | 1,400 | $350.33 | | | | |
| | | 1,900 | $349.16 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 4,514 | $348.25 | | | | |
| | | 6,890 | $347.25 | | | | |
| | | 4,810 | $346.26 | | | | |
| | | 11,231 | $345.25 | | | | |
| | | 4,500 | $344.40 | | | | |
| | | 2,400 | $343.20 | | | | |
| | | 1,200 | $342.18 | | | | |
| | | 1,100 | $341.08 | | | | |
| | | 3,255 | $340.20 | | | | |
| | | 700 | $339.04 | | | | |
| | | 298 | $357.33 | | | | |
| | | 5,370 | $356.64 | | | | |
| | | 7,610 | $355.43 | | | | |
| | | 10,318 | $354.56 | | | | |
| | | 6,155 | $353.71 | | | | |
| | | 3,050 | $352.60 | | | | |
| | | 3,599 | $351.51 | | | | |
| | | 3,863 | $350.47 | | | | |
| | 8/9/2021 | 5,947 | $349.58 | | | | |
| | | 4,590 | $348.74 | | | | |
| | | 2,000 | $347.57 | | | | |
| | | 300 | $346.02 | | | | |
| | | 600 | $345.06 | | | | |
| | | 1,400 | $343.82 | | | | |
| | | 1,900 | $342.89 | | | | |
| | | 1,300 | $341.79 | | | | |
| | | 1,700 | $340.44 | | | | |
| | | 200 | $376.52 | | | | |
| | | 1,200 | $375.86 | | | | |
| | | 5,300 | $374.87 | | | | |
| | | 521 | $373.53 | | | | |
| | | 1,033 | $372.45 | | | | |
| | | 7,374 | $371.71 | | | | |
| | 8/10/2021 | 14,463 | $370.59 | | | | |
| | | 12,289 | $369.67 | | | | |
| Garcia Senior | | 9,911 | $368.65 | UANPF | 8/11/2021 | 3 | $356.97 |
| | | 4,109 | $367.81 | | | | |
| | | 1,600 | $366.34 | | | | |
| | | 1,600 | $365.45 | | | | |
| | | 100 | $360.56 | | | | |
| | | 300 | $359.54 | | | | |
| | | 1,200 | $374.61 | | | | |
| | | 1,900 | $372.96 | | | | |
| | 8/11/2021 | 1,200 | $372.29 | | | | |
| | | 600 | $370.82 | | | | |
| | | 1,907 | $369.90 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| | | 2,794 | $368.75 | | | | |
| | | 2,701 | $367.68 | | | | |
| | | 3,722 | $366.79 | | | | |
| | | 2,298 | $365.81 | | | | |
| | | 3,802 | $364.77 | | | | |
| | | 900 | $363.54 | | | | |
| | | 3,265 | $362.58 | | | | |
| | | 3,335 | $361.35 | | | | |
| | | 10,896 | $360.45 | | | | |
| | | 7,080 | $359.60 | | | | |
| | | 8,420 | $358.41 | | | | |
| | | 3,980 | $357.58 | | | | |
| Garcia Senior | 8/12/2021 | 2,100 | $364.31 | UANPF | 8/12/2021 | 3 | $356.99 |
| | | 3,300 | $363.35 | | | | |
| | | 4,650 | $362.53 | | | | |
| | | 12,501 | $361.38 | | | | |
| | | 6,899 | $360.49 | | | | |
| | | 9,393 | $359.42 | | | | |
| | | 13,678 | $358.45 | | | | |
| | | 7,479 | $357.51 | | | | |
| Garcia Senior | 8/13/2021 | 8,080 | $361.15 | UANPF | 8/16/2021 | 13 64 90 | $356.91 $356.22 $356.93 |
| | | 29,597 | $360.39 | | | | |
| | | 17,200 | $359.33 | | | | |
| | | 5,123 | $358.39 | | | | |
| | 8/16/2021 | 1,000 | $363.68 | | | | |
| | | 7,698 | $362.77 | | | | |
| | | 8,901 | $361.51 | | | | |
| | | 4,950 | $360.89 | | | | |
| | | 4,100 | $359.66 | | | | |
| | | 9,036 | $358.63 | | | | |
| | | 10,515 | $357.60 | | | | |
| | | 6,900 | $356.63 | | | | |
| | | 5,800 | $355.70 | | | | |
| | | 1,100 | $354.79 | | | | |
| Garcia Senior | 8/17/2021 | 2,000 | $355.60 | UANPF | 8/17/2021 | 74 233 | $352.22 $352.22 |
| | | 3,500 | $354.69 | | | | |
| | | 5,917 | $353.70 | | | | |
| | | 17,236 | $352.56 | | | | |
| | | 13,859 | $351.74 | | | | |
| | | 10,888 | $350.73 | | | | |
| | | 4,954 | $349.70 | | | | |
| | | 1,646 | $348.77 | | | | |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Jenkins | 8/7/2020 | 190,000 | $202.60 | SHEPP | 8/7/2020 | 648 | $203.91 |
| | | | | | 8/7/2020 | 3,677 | $203.27 |
| | | | | | 8/10/2020 | 972 | $189.18 |
| | | | | | 8/11/2020 | 810 | $188.84 |
| | | | | | 8/12/2020 | 147 | $191.97 |
| | | | | | 8/13/2020 | 250 | $193.84 |
| Jenkins | 10/1/2020 | 10,000 | $240.25 | UANPF | 10/1/2020 | 600 | $237.67 |
| Jenkins | 12/7/2020 | 9,888 | $259.35 | UANPF | 12/8/2020 | 300 | $262.09 |
| | 12/8/2020 | 112 | $259.73 | | | | |
| Jenkins | 1/14/2021 | 10,000 | $298.31 | UANPF | 1/14/2021 | 104 | $297.93 |
| | | | | | 1/14/2021 | 200 | $297.39 |
| | | | | | 1/14/2021 | 3,591 | $297.36 |
| Jenkins | 7/1/2021 | 10,000 | $302.97 | UANPF | 7/1/2021 | 106 | $305.42 |
| | | | | | 7/2/2021 | 106 | $311.95 |
| | | | | | 7/2/2021 | 395 | $309.73 |
| | | | | | 7/6/2021 | 314 | $316.17 |
| | | | | | 7/6/2021 | 319 | $317.89 |
| | | | | | 7/7/2021 | 302 | $316.17 |
| Jenkins | 8/2/2021 | 10,000 | $336.02 | UANPF | 8/2/2021 | 14 | $335.97 |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Keeton | 8/7/2020 | 70,000 | $200.10 | SHEPP | 8/7/2020 | 648 | $203.91 |
| | | | | | 8/7/2020 | 3,677 | $203.27 |
| | | | | | 8/10/2020 | 972 | $189.18 |
| | | | | | 8/11/2020 | 810 | $188.84 |
| | | | | | 8/12/2020 | 147 | $191.97 |
| | | | | | 8/13/2020 | 250 | $193.84 |
| Keeton | 10/15/2020 | 10,000 | $217.55 | UANPF | 10/15/2020 | 700 | $224.04 |
| | | | | | 10/16/2020 | 300 | $221.71 |
| Keeton | 11/16/2020 | 10,000 | $209.78 | UANPF | 11/18/2020 | 217 | $224.12 |
| | | | | | 11/19/2020 | 583 | $227.72 |
| | | | | | 11/23/2020 | 731 | $242.08 |
| Keeton | 1/14/2021 | 10,000 | $297.18 | UANPF | 1/14/2021 | 104 | $297.93 |
| | | | | | 1/14/2021 | 200 | $297.39 |
| | | | | | 1/14/2021 | 3,591 | $297.36 |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Keeton | 7/15/2021 | 10,000 | $312.13 | UANPF | 7/15/2021 | 33 | $310.83 |
| | | | | | 7/15/2021 | 529 | $311.42 |
| | | | | | 7/16/2021 | 166 | $313.61 |
| | | | | | 7/16/2021 | 666 | $314.16 |
| | | | | | 7/19/2021 | 23 | $305.67 |
| | | | | | 7/19/2021 | 209 | $306.80 |
| | | | | | 7/20/2021 | 66 | $325.34 |
| | | | | | 7/20/2021 | 312 | $320.69 |
| | | | | | 7/21/2021 | 19 | $330.32 |
| | | | | | 7/21/2021 | 30 | $332.05 |
| | | | | | 7/21/2021 | 54 | $330.40 |
| | | | | | 7/21/2021 | 63 | $330.38 |
| | | | | | 7/21/2021 | 76 | $325.14 |

| Defendants' Open Market Sales | | | | Contemporaneous Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiffs | Purchase Date | Shares Purchased | Price |
| Huston | 8/7/2020 | 190,000 | $202.65 | SHEPP | 8/7/2020 | 648 | $203.91 |
| | | | | | 8/7/2020 | 3,677 | $203.27 |
| | | | | | 8/10/2020 | 972 | $189.18 |
| | | | | | 8/11/2020 | 810 | $188.84 |
| | | | | | 8/12/2020 | 147 | $191.97 |
| | | | | | 8/13/2020 | 250 | $193.84 |
| Huston | 10/1/2020 | 10,000 | $240.00 | UANPF | 10/1/2020 | 600 | $237.67 |
| Huston | 12/7/2020 | 10,000 | $259.12 | UANPF | 12/8/2020 | 300 | $262.09 |
| Huston | 1/14/2021 | 10,000 | $298.28 | UANPF | 1/14/2021 | 104 | $297.93 |
| | | | | | 1/14/2021 | 200 | $297.39 |
| | | | | | 1/14/2021 | 3,591 | $297.36 |
| Huston | 7/1/2021 | 10,000 | $302.96 | UANPF | 7/1/2021 | 106 | $305.42 |
| | | | | | 7/2/2021 | 106 | $311.95 |
| | | | | | 7/2/2021 | 395 | $309.73 |
| | | | | | 7/6/2021 | 314 | $316.17 |
| | | | | | 7/6/2021 | 319 | $317.89 |
| | | | | | 7/7/2021 | 302 | $316.17 |
| Huston | 8/2/2021 | 10,000 | $335.95 | UANPF | 8/2/2021 | 14 | $335.97 |

409.   Plaintiffs and members of the Class who purchased shares of Carvana Class A common stock contemporaneously with sales by Defendants suffered damages because: (i)

in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased Carvana Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## XV.   SECURITIES ACT ALLEGATIONS

410.    In this section of the complaint, Plaintiffs assert a series of strict liability and negligence claims on behalf of purchasers in the 2022 Public Offering for violations of the Securities Act.   Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct.

### A.    Plaintiffs' Purchases in the 2022 Public Offering

411.    On April 22, 2022, Plaintiffs purchased shares of Class A common stock directly in the 2022 Public Offering from underwriter defendant Citigroup Global Markets Inc. for $80.00 per share.

### B.    Securities Act Defendants

412.    Defendant Carvana was the issuer of the 2022 Public Offering.

413.    Defendants Garcia Junior and Jenkins signed the Registration Statement issued in connection with the 2022 Public Offering.

414.    Defendant Stephen Palmer ("Palmer") served as Carvana's Vice President of Accounting and Finance and signed the Registration Statement issued in connection with the 2022 Public Offering.

415.    Defendants Michael Maroone ("Maroone"), Neha Parikh ("Parikh"), Ira Platt ("Platt"), and Greg Sullivan ("Sullivan") each served as members of Carvana's Board of Directors and signed the Registration Statement issued in connection with the 2022 Public Offering.  Defendants Maroone, Parikh, Platt, and Sullivan are collectively referred to herein as the "Director Defendants" and, together with Defendants Garcia Junior, Jenkins, and Palmer, as the "Individual Securities Act Defendants."

416.   Defendants Citigroup Global Markets Inc. ("Citigroup") and J.P. Morgan Securities LLC ("J.P. Morgan") acted as underwriters of, and as sellers in, Carvana's 2022 Public Offering (collectively, the "Underwriter Defendants").   Each of the Underwriter Defendants served as underwriters and/or underwriter representatives for the Offering.

417.   In connection with the 2022 Public Offering, the Underwriter Defendants marketed Carvana common stock to potential investors using materially false or misleading information about the Company, and/or omitted material information required to be disclosed in the Registration Statement.   The Underwriter Defendants also caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the 2022 Public Offering.   The Underwriter Defendants are liable to Plaintiffs and those similarly situated under the Securities Act.

418.   Defendants Carvana, the Individual Securities Act Defendants and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

**C.    Background of the 2022 Public Offering**

419.   On April 20, 2022, Carvana filed with the SEC on a Form S-3 an automatically effective shelf registration statement pursuant to which Carvana could offer to sell shares of Class A common stock on terms to be determined at the time of each offering, pursuant to a prospectus supplement to be filed with the SEC in connection with each offering (the "Registration Statement").   Five days later, on April 25, 2022, Carvana filed a prospectus supplement (the "Prospectus Supplement"), offering to sell 15,625,000 shares of Class A common stock at a price of $80 per share.   The Registration Statement, Prospectus Supplement, and all documents incorporated therein are collectively referred to as the "Registration Statement" or the "Offering Documents."

420.   The Offering Documents incorporated a number of previously filed documents by reference, including the 2021 10-K.

421.   On April 26, 2022, Carvana announced the completion of the 2022 Public Offering, which raised proceeds of $1,225,460,000.

422.     Prior to the 2022 Public Offering, and unbeknownst to investors, Carvana was facing numerous issues that rendered the Company's growth unsustainable, including worsening logistical constraints in acquiring cars, an increasing supply of low-quality vehicles, and widespread title and registration issues.   Despite these problems, the Registration Statement made a number of false and misleading statements about the Company's competitive advantages over traditional dealers, the scalability and cost-effectiveness of its business model, the efficiency of its national logistics infrastructure, the quality of its vehicle inventory, and the purported risks surrounding regulatory compliance, all while negligently failing to disclose Carvana's mounting problems.

423.     Carvana's rapid market expansion created logistical constraints and additional costs to support new markets at greater distances, which created mounting expenses.   As Defendants later disclosed following the 2022 Public Offering, Carvana's rapid "location growth" created "more vehicle moves, more miles traveled," "higher number of constrained routes," and a "higher degree of backlog on constrained routes."   Carvana's logistic constraints were increasingly costly as the Company was forced to rely on expensive third-party providers for vital logistics and reconditioning functions as the Company's own critical infrastructure lagged behind its nationwide expansion.

424.     Carvana also had amassed a substantial inventory of vehicles purchased from consumers, without regard to the vehicle's quality.   The impact of this was two-fold.   First, the increasing inventory of vehicles from consumers worsened Carvana's logistical constraints as cars had to be obtained from these individuals and then transported and stored at Carvana IRCs – creating more vehicle moves, more miles traveled, constrained routes, a higher backlog on constrained routes, poor performance on operational metrics, and the inefficient use of Carvana's nationwide logistics network.   Second, the low-quality vehicles could only be sold at wholesale, which was often unprofitable when taking into account the various expenses involved in obtaining and processing the vehicles.   This was especially true in light of the fact that Carvana frequently overpaid for low-quality vehicles, as consumers

selling their vehicles as trade-ins would misrepresent the vehicle quality, with no consequence from Carvana.

425.  Finally, the massive influx of vehicles purchased from consumers exacerbated widespread vehicle titling issues at Carvana, and ultimately resulted in countless vehicles being sold to customers before title could be procured and transferred, often in violation of state law.  Following the 2022 Public Offering, on May 12, 2022, Carvana's license was suspended in Illinois for continued violation of title and registration requirements.

**D.  Materially False and Misleading Statements and Omissions in the Registration Statement**

426.  The Registration Statement was negligently prepared and, as a result: (i) contained untrue statements of material fact; (ii) omitted to disclose material information necessary to make statements made therein not misleading; and (iii) was not prepared in accordance with SEC rules and regulations governing its preparation.

427.  The 2021 10-K described Carvana's numerous purported competitive advantages including its e-commerce platform, logistics network, and nationwide inventory and delivery capabilities.  Specifically, Carvana sought to differentiate its business model and cost structure from "traditional" used car retailers, which it negatively described at various points in the 2021 10-K as follows:

> ***Traditional used car retailers*** may lack the scale and expertise to consistently purchase high-quality vehicles and uniformly recondition them, increasing the incidence of selling a "lemon."

> *          *          *

> The ***traditional used car retailing model*** is costly, operationally challenging and difficult to scale.  Providing an end-to-end solution requires inspection, repair, reconditioning and showroom facilities, as well as inventory sourcing and financing capabilities, substantially all of which is traditionally done at each dealership location. . . .

> Customer acquisition is expensive and inefficient for ***traditional automotive retailers*** as they are typically confined to local advertising channels and must drive foot traffic to their physical locations, where they offer an often undifferentiated service and limited inventory.

> *          *          *

> ***Traditional used car retailers*** are limited by staging capacity and anticipated local demand at each dealership; they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively.  Additionally, even as traditional used car retailers add new store locations, it remains difficult to create broad diversity of inventory among stores because each lot requires the highest demand units, creating redundancies.

*     *     *

> ***Traditional used car retailers*** have high overhead costs and must pass these costs on to their customers.

*     *     *

> ***[T]raditional*** dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

428.    In contrast to traditional dealerships, the 2021 10-K highlighted the strengths and advantages of Carvana's business model, which was intended to "disrupt[] the traditional used vehicle sales model."  For example, the 2021 10-K stated:

**Purpose-Built Vertically Integrated E-commerce Platform**

> We built our used car e-commerce platform because we believe a lower and differentiated cost structure is critical to providing a seamless, best-in-class car buying and selling experience.  We believe that traditional dealerships and other technology-enabled auto platforms do not provide this type of experience, and that ***our end-to-end model allows us to offer a superior solution while reducing our cost of operations*** and enhancing our ability to offer complementary products and services. . . .  Additionally, we control ***the logistics infrastructure*** that enables us to offer customers fast, specific, and reliable delivery and pick-up times.

429.    In addition, the 2021 10-K described the advantages of its nationally pooled inventory:

> Our technology and infrastructure allow us to ***seamlessly and cost efficiently deliver this experience to our customers.***  We use proprietary algorithms to optimize ***our nationally pooled inventory*** of over 71,000 total website units, inspect and recondition our vehicles based on our 150-point inspection process, and operate our own logistics network to deliver cars directly to customers as soon as the next day.

*     *     *

**The Best Selection**

> As of December 31, 2021, we offer all customers a nationally pooled inventory of over 71,000 high-quality used vehicles on our website.

- 210 -

\*     \*     \*

While our inventory of vehicles is available for sale across the United States through our own network and third-party delivery services, our focus is on serving our markets and providing the best possible car buying and selling experience to our customers at a low, transparent cost.  Our established logistics network and ability to deliver or pick up any car in our inventory on Carvana-branded haulers to customers within our markets allow us to provide a low-cost, simple car buying and selling experience.

430.    Similarly, the 2021 10-K stated that Carvana's model had a "lower variable cost structure" as compared to traditional dealerships:

**The Best Value**

Our proprietary technology and vertically integrated business model will allow us to enjoy *a significantly lower variable cost structure at scale versus traditional dealerships* and provide *substantial* value to our customers. We do not require a network of brick-and-mortar dealerships, staffed with sales personnel; instead, we utilize both an in-house *logistics* network and patented vending machines to facilitate vehicle delivery and pickups.  These savings are passed on to the consumer through sales prices that are below industry averages.  Additionally, *we believe our pooled inventory approach will at scale result in lower average days to sale than industry averages, which we expect will help improve margins due to decreased vehicle depreciation resulting in higher unit selling price*.

431.    Moreover, the 2021 10-K exalted the strengths and advantages of Carvana's logistic capabilities.  Specifically, the 2021 10-K stated:

*Efficient Logistics Network and Attractive Fulfillment Experience*

We have developed proprietary logistics software and an in-house delivery network that differentiates us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience.

\*     \*     \*

*Scale Driving Powerful Network Effects*

Our business benefits from powerful network effects.  Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets.

\*     \*     \*

*Continue to Enter Key Geographic Markets*

We believe there is a substantial opportunity to utilize *our capital-light expansion model* and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. We believe we can enter more markets than many of the larger dealership

groups because of ***our lower cost structure, which allows us to efficiently operate in smaller markets.*** Furthermore, ***our nationally pooled inventory creates an even larger competitive advantage*** in these smaller markets, where customers typically have access to less inventory selection at local dealerships.

### Optimize Our Inventory Selection

We will continue to optimize and broaden the selection of vehicles we make available to our customers. Expanding our inventory selection increases the likelihood that each visitor to our site finds a vehicle that matches his or her preferences and ***benefits all existing markets simultaneously due to our nationally pooled inventory model.*** Expanding our inventory selection depends on our ability to source and acquire a sufficient number of appropriate used vehicles, including acquiring more vehicles from customers, to develop processes for effectively utilizing capacity in our IRCs, and to hire and train employees to staff these centers. As we build out additional IRCs we will shorten the distance from our inventory pools to our customers, reducing delivery times, which, all else equal, should increase conversions.

* * *

***Transportation and Fulfillment***. Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, ***we built an in-house auto logistics network backed by a proprietary TMS to transport our vehicles nationwide***. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or hub for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays, and ensuring a seamless and reliable customer experience.

432.    The 2021 10-K described the strengths and advantages of Carvana's vehicle acquisition:

***Vehicle Acquisition.*** We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***.

433.    The 2021 10-K explained that Carvana "generate[s] revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of

ancillary products such as VSCs and GAP waiver coverage." Specifically discussing wholesale sales as a source of revenue, the 2021 10-K explained:

> We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

434. With regard to retail units sold, the 2021 10-K stated that: "[w]e view retail units sold as a key measure of our growth for several reasons," including that "growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations."

435. And, further explaining the Company's priorities with respect to retail units sold, the 2021 10-K explained:

> During our growth phase, **our highest priority**, outside of safety, will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure **to support growth in retail units sold.** **Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit.** These strategies include the following:
>
> •**Increase the purchase of vehicles from customers. We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection**.

436. The 2021 10-K purported to warn of the following risk regarding potential problems with the Company's title and registration practices:

> Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying and selling that will save them time and money. Accordingly, our ability to consistently deliver a high quality experience and our reputation as a company of integrity are critical to our success. If we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs that damages this reputation, it could adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations. Even the perception of a decrease in the quality of our customer service or brand could impact results. Our high rate of growth, the operationally intensive aspect of our offering, and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, **submitting title and registration paperwork to state entities) makes**

- 213 -

*maintaining the quality of our customer experience a particularly difficult challenge*.

437.    The 2021 10-K also purported to warn of the following risk regarding regulatory compliance:

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.

> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers.

> \*        \*        \*

> The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations.  Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.  We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

438.    The statements detailed in ¶¶433-435, *supra*, regarding purported retail unit sales growth were inaccurate statements of material fact because they omitted material information and failed to disclose the following material undisclosed facts which existed at the time of the 2022 Public Offering:

(a)    that Carvana's retail sales growth included "less profitable sales . . . in markets with lower profitability due to long distance from inventory."

(b)    that Carvana's unsustainable, nationwide expansion through retail unit sales came at the expense of profitability.

(c)    that to achieve sales growth, Carvana "frequently acquired sales that were less profitable in the immediate period."

(d)     that one byproduct of increased retail sales was the accumulation of lower-quality vehicles from customers selling their cars via trade-ins.

(e)     that Carvana sold cars to customers before it held title to those cars and faster than it could get them registered to their new owners; and

(f)     that by speaking about the drivers of retail unit growth, Defendants created a duty to disclose that the undisclosed facts identified in (a)-(e) were what was driving increased retail unit sales.

439.    Defendants' misstatements and omissions regarding the benefits of purchasing cars from customers, as set forth in ¶¶432, 435, *supra*, were inaccurate statements of material fact because they omitted material information and failed to disclose the following material undisclosed facts which existed at the time of the 2022 Public Offering:

(a)     that Carvana purchased vehicles regardless of their quality.

(b)     that buying cars from customers led to crippling costs.

(c)     that the increase in buying cars from customers caused inventory growth, parking constraints and load imbalancing, which in turn led to more vehicle moves, more miles traveled, constrained routes, a higher backlog on constrained routes, poor performance on operational metrics, and the inefficient use of nationwide logistics network.

(d)     that the rapid increase in buying cars from customers caused a spike in the number of cars that Carvana was forced to sell wholesale, which had numerous devastating impacts.

(i)     that Carvana sold cars at wholesale at significantly lower prices than those sold at retail and, on average it lost money on each wholesale vehicle as the increase in wholesale car growth coincided with a rapid rise in logistics expenses; and

(ii)    that Carvana's logistics network lacked adequate facilities for storing and processing the wholesale volume, which led Defendants to purchase ADESA.

440.    Defendants' misstatements and omissions regarding Carvana's nationwide market expansion, as set forth in ¶¶427-431, *supra*, were inaccurate statements of material

1    fact because they omitted material information and failed to disclose the following material

2    undisclosed facts which existed at the time of the 2022 Public Offering:

3            (a)     that Carvana's expansion model was not "capital-light."   In fact,

4    Carvana's expansion required the buildout of costly IRCs to support the new markets,

5    including the intake, storage, processing, and reconditioning of vehicle inventory.

6            (b)     that as the distance between new markets and Carvana's regional IRCs

7    increased, Carvana was forced to increasingly rely on costly third-party providers for vital

8    logistics and reconditioning functions that were necessary to serve the distant markets.

9            (c)     that it was unprofitable for Carvana to pick-up and deliver cars over

10   significant distances.

11           (d)     that Carvana's expansion model did not achieve "economies of scale."

12   In fact, Carvana's rapid expansion model produced the opposite results with costs *increasing*

13   as its geographic footprint expanded.   Over time, the costs per IRC ballooned as Carvana

14   "frequently moved vehicles between IRCs in different markets due to parking constraints"

15   causing "total vehicle miles traveled" to increase and "adding to costs and logistics network

16   complexity."

17       441.   Defendants' misstatements and omissions regarding Carvana's title and

18   registration practices, as set forth in ¶¶436-437, *supra*, were inaccurate statements of

19   material fact because they omitted material information and failed to disclose that, at the time

20   of the 2022 Public Offering, Defendants and their representatives violated numerous state

21   laws and regulations concerning title and registration.   Defendants and their representatives

22   routinely and repeatedly sold cars before holding title to the vehicle; failed to register cars

23   within the legally required timeframe; and illegally issued out-of-state temporary tags and/or

24   license plates.   As a result, Carvana was subject to an increased risk of reputational, legal and

25   financial harm.

26

27

28

### E.     The Registration Statement Contained Deficient and Inaccurate Risk Disclosures

442.    Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 105 of Regulation S-K [17 C.F.R. §229.105], namely, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."   None of the risk disclosures in the Registration Statement meaningfully disclosed the risks associated with Carvana's mounting titling issues and its practice of issuing temporary out-of-state licenses to customers for whom it was unable to procure vehicle title.

443.    The 2021 10-K  warned that the Company is "subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration," and that "violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have material adverse effect on our business, sales, and results of operations."

444.    The Registration Statement did not warn, however, that, at the time of the 2022 Public Offering, Carvana was already experiencing widespread issues complying with state and local title and registration requirements, which the Company often addressed by issuing illegal, out-of-state temporary license plates to customers while they attempted to procure proper title.

445.    As a result of these practices, Carvana faced a mounting risk of regulatory action across the country, not merely as a result of being "subject to" state and local licensing requirements, but as a result of the Company's active violations of those requirements.  Moreover, the Company was already experiencing damage to its reputation as a result of the title and licensing issues as customers lodged numerous complaints, reported Carvana to local authorities, and increasingly sold their purchased vehicles back to Carvana after they were unable to obtain proper title.

446.    Accordingly, the Registration Statement negligently failed to disclose the material factors that made an investment in the offering risky or speculative, as required by Item 3 of Form S-1.

**F.      The Role of the Underwriter Defendants in Connection with the 2022 Public Offering**

447.    The 2022 Public Offering was a firm commitment offering conducted by and through the Underwriter Defendants.

448.    The Underwriter Defendants participated in the violations complained of herein as detailed below.

449.    The Underwriter Defendants are investment banking houses that, among other things, specialize in underwriting public offerings of securities.   They served as the underwriters of the 2022 Public Offering and shared nearly $25,000,000 in fees collectively for doing so.

450.    The Underwriter Defendants also obtained an agreement from Carvana to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act of 1933.

451.    Upon information and belief, representatives of the Underwriter Defendants also assisted Carvana in planning the 2022 Public Offering, and had access to confidential corporate information concerning Carvana's operations and financial prospects.

452.    In addition to availing themselves of virtually unlimited access to internal corporate documents, on information and belief, agents of the Underwriter Defendants met with Carvana's lawyers, management, and top executives prior to the 2022 Public Offering.

453.    Upon information and belief, during these meetings, agreements were reached as to: (i) the strategy to best accomplish the 2022 Public Offering; (ii) the terms of the 2022 Public Offering, including the price at which Carvana common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

454.    As a result of those frequent contacts and communications between the Underwriter Defendants, Carvana and the Individual Securities Act Defendants (as well as the Underwriter Defendants' direct involvement in material issues requiring disclosure, including Carvana's business performance and financials), the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the existing yet undisclosed conditions and material risks detailed herein, which were either misrepresented in or omitted from the Registration Statement.

455.    At a minimum, the Underwriter Defendants were negligent in not knowing, and failing to disclose in connection with the 2022 Public Offering, the adverse information alleged herein that was contrary to the disclosures in the Registration Statement, the omission of which rendered the Registration Statement false and misleading at the time it was made effective.

456.    The Underwriter Defendants helped cause the Registration Statement to be filed with the SEC and declared effective in connection with the offer and sale of the shares of Carvana common stock registered thereby, including those shares purchased by Plaintiffs and other members of the Class.

## XVI.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV
### Violations of §11 of the Securities Act
### (Against the Securities Act Defendants)

457.    Plaintiffs incorporate ¶¶15-19, 30-34, 47-49, 51, 410-456 by reference.

458.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

459.    The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act.  Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with this Count.

460.    The Registration Statement used to complete the 2022 Public Offering contained untrue statements of material fact, omitted to state material facts required to be

stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

461.    By reason of the conduct herein alleged, each Securities Act Defendant named herein violated §11 of the Securities Act.

462.    Plaintiffs purchased Carvana common stock in the 2022 Public Offering. Specifically: (a) UANPF and SHEPP purchased Carvana Class A common stock directly in the April 2022 Public Offering; (b) UANPF and SHEPP purchased Carvana Class A common stock on April 22, 2022 at $80.00 per share; and (c) UANPF and SHEPP purchased Carvana Class A common stock directly from defendant underwriter Citigroup.

463.    Plaintiffs and the Class have sustained damages as the value of the stock issued in the 2022 Public Offering has declined due to the Securities Act Defendants' violations.

464.    At the time of their purchases of Carvana Class A common stock issued in the 2022 Public Offering, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action.  Less than three years have elapsed between the time that the stock upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

**COUNT V**
**Violations of §12(a)(2) of the Securities Act**
**(Against the Securities Act Defendants)**

465.    Plaintiffs repeat and re-allege the above allegations in ¶¶15-19, 30-34, 47-49, 51, 410-464 as if fully set forth herein.

466.    This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against the Securities Act Defendants.  This Cause of Action does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

467.   Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2).  Liability for a violation of §12(a)(2) extends to those, at a minimum, who passed title to the security to the purchaser, as well as those who solicited the purchase.

468.   By means of the defective Prospectus Supplement, which was incorporated in and formed part of the Registration Statement for the 2022 Public Offering, these defendants promoted and sold, for the benefit of themselves and their associates, Carvana common stock to the Plaintiffs and other members of the Class.  In the absence of their efforts to publicize the 2022 Public Offering and solicit Carvana common stock purchasers, the 2022 Public Offering could not have occurred.

469.   The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Offering Documents for their own financial benefit.  But for their participation in the 2022 Public Offering, including their solicitation, the 2022 Public Offering could not, and would not, have been accomplished.

470.   The Offering Documents contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above.  The Securities Act Defendants owed Plaintiffs and the other members of the Class who purchased Carvana common stock pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

471.   By reason of the conduct alleged herein, the Securities Act Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Carvana common stock pursuant to the Prospectus Supplement sustained damages in connection with their purchases.  Accordingly,

1    Plaintiffs and the other members of the Class who hold the common stock issued pursuant to

2    the Prospectus Supplement have the right to rescind and recover the consideration paid for

3    their shares, and hereby tender their common stock to the defendants sued herein.  Class

4    members who have sold their common stock seek damages to the extent permitted by law.

5                                     **COUNT VI**
                          **Violations of §15 of the Securities Act**
6                    **(Against the Individual Securities Act Defendants)**

7         472.    Plaintiffs repeat and re-allege the above allegations in ¶¶15-19, 30-34, 47-49,

8    51, 410-471 as if fully set forth herein.

9         473.    This Cause of Action is brought pursuant to §15 of the Securities Act against

10   the Individual Securities Act Defendants.  This cause of action does not allege, and does not

11   intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any

12   implication of fraudulent intent is hereby expressly disclaimed.

13        474.    Where a violation of §11 or §12(a)(2) occurs, §15 gives rise to liability as to

14   "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant

15   to or in connection with an agreement or understanding with one or more other persons by or

16   through stock ownership, agency, or otherwise, controls any person liable under §§77k or 77l

17   [§11 or §12(a)(2)]."  15 U.S.C. §77o(a).  Control persons under §15 are "liable jointly and

18   severally with and to the same extent as such controlled person to any person to whom such

19   controlled person is liable."  *Id.*

20        475.    As detailed herein, each of the Individual Securities Act Defendants committed

21   primary violations of the Securities Act and is directly responsible and primarily liable for

22   any such violations.   In addition, the Individual Securities Act Defendants acted as

23   controlling persons of Carvana within the meaning of §15 of the Securities Act by virtue of

24   their position as a director and/or senior officer of Carvana.  By reason of their senior

25   management positions and/or directorships at the Company, as alleged above, these

26   Defendants, individually and acting pursuant to a common plan, had the power to influence

27   and exercised the same to cause Carvana to engage in the conduct complained of herein.  By

28

reason of such conduct, the Individual Securities Act Defendants are liable pursuant to §15 of the Securities Act.

476.    Each of the Individual Securities Act Defendants was a culpable participant in the violations of §11 alleged in Count IV above.   Because of their senior executive management and/or director positions with Carvana, they each had access to the undisclosed adverse information about the Company's business, operations, market trends, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof.   Based on this knowledge and (i) having signed and/or authorized the signing of the Registration Statement, (ii) being named in the Registration Statement and identified as a director and/or executive officer, and/or (iii) playing a material role or otherwise participating in the process which allowed the 2022 Public Offering to be successfully completed, each of the Individual Securities Act Defendants was a culpable participant in the violations of §11 alleged in Count IV above.

477.    By reason of the conduct alleged herein, the Individual Securities Act Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class rescission or a rescissory measure of damages;

1    D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

2  in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and

3  other costs and disbursements; and

4    E.    Awarding Plaintiffs and other members of the Class such other injunctive or

5  equitable relief, including disgorgement and/or the imposition of a constructive trust, that

6  may be deemed just and proper by the Court.

7                      **DEMAND FOR TRIAL BY JURY**

8    Plaintiffs demand a trial by jury.

9  DATED:  February 14, 2023              ROBBINS GELLER RUDMAN
                                              & DOWD LLP
10                                          DANIEL S. DROSMAN
                                            RACHEL A. COCALIS
11                                          SARAH A. FALLON

12

13                                            s/ DANIEL S. DROSMAN
                                            DANIEL S. DROSMAN
14
                                            655 West Broadway, Suite 1900
15                                          San Diego, CA  92101
                                            Telephone:  619/231-1058
16                                          619/231-7423 (fax)
                                            dand@rgrdlaw.com
17                                          rcocalis@rgrdlaw.com
                                            sfallon@rgrdlaw.com
18
                                            ROBBINS GELLER RUDMAN
19                                            & DOWD LLP
                                            SAMUEL H. RUDMAN
20                                          ROBERT M. ROTHMAN
                                            DAVID A. ROSENFELD
21                                          BRENT E. MITCHELL
                                            58 South Service Road, Suite 200
22                                          Melville, NY  11747
                                            Telephone:  631/367-7100
23                                          631/367-1173 (fax)
                                            srudman@rgrdlaw.com
24                                          rrothman@rgrdlaw.com
                                            drosenfeld@rgrdlaw.com
25                                          bmitchell@rgrdlaw.com

26                                          Lead Counsel for Lead Plaintiffs

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'DONOGHUE & O'DONOGHUE LLP
DINAH S. LEVENTHAL
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
dleventhal@odonoghuelaw.com

Additional Counsel for Lead Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT PC
ANDREW FRIEDMAN
7301 N. 16th Street, Suite 102
Phoenix, AZ  85020
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com

Local Counsel