**Exhibit 1**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended March 31, 2020**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

---

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | | | | |
|---|---|---|---|---|
| **1930 W. Rio Salado Parkway** | **Tempe** | **Arizona** | | **85281** |
| (Address of principal executive offices) | | | | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of May 1, 2020, the registrant had 64,063,049 shares of Class A common stock outstanding and 101,200,276 shares of Class B common stock outstanding.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

|  |  |  | **Page** |
|---|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | | |
| | Unaudited Condensed Consolidated Balance Sheets as of March 31, 2020 and December 31, 2019 | | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2020 and 2019 | | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2020 and 2019 | | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2020 and 2019 | | 5 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 31 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | | 50 |
| Item 4. | Controls and Procedures | | 50 |
| **PART II.** | **OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | | 51 |
| Item 1A. | Risk Factors | | 51 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 51 |
| Item 3. | Defaults Upon Senior Securities | | 52 |
| Item 4. | Mine Safety Disclosures | | 52 |
| Item 5. | Other Information | | 52 |
| Item 6. | Exhibits | | 53 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 72,435 | $ 76,016 |
| Restricted cash | 72,600 | 42,443 |
| Accounts receivable, net | 26,591 | 39,864 |
| Finance receivables held for sale, net | 199,045 | 286,969 |
| Vehicle inventory | 844,681 | 762,696 |
| Beneficial interests in securitizations | 118,923 | 98,780 |
| Other current assets | 59,309 | 52,654 |
| Total current assets | 1,393,584 | 1,359,422 |
| Property and equipment, net | 645,485 | 543,471 |
| Operating lease right-of-use assets, including $43,677 and $44,583, respectively, from leases with related parties | 169,741 | 123,420 |
| Intangible assets, net | 6,685 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $8,372 and $6,138, respectively, due from related parties | 14,370 | 14,850 |
| Total assets | $ 2,239,218 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $10,173 and $9,549, respectively, due to related parties | $ 246,783 | $ 234,443 |
| Short-term revolving facilities | 812,214 | 568,840 |
| Current portion of long-term debt | 53,286 | 48,731 |

| | | |
|---|---:|---:|
| Other current liabilities, including $4,456 and $4,518, respectively, from leases with related parties | 16,141 | 12,856 |
| Total current liabilities | 1,128,424 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 936,121 | 883,060 |
| Operating lease liabilities, excluding current portion, including $40,732 and $41,829, respectively, from leases with related parties | 159,751 | 116,071 |
| Other liabilities | 1,696 | 1,808 |
| Total liabilities | 2,225,992 | 1,865,809 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 50,660 and 50,507 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 51 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 285,874 | 280,994 |
| Accumulated deficit | (242,921) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 43,105 | 98,112 |
| Non-controlling interests | (29,879) | 93,827 |
| Total stockholders' equity | 13,226 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,239,218 | $ 2,057,748 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| **Sales and operating revenues:** | | |
| Used vehicle sales, net | $ 964,279 | $ 683,829 |
| Wholesale vehicle sales | 79,606 | 33,030 |
| Other sales and revenues, including $20,562 and $10,573, respectively, from related parties | 54,331 | 38,375 |
| **Net sales and operating revenues** | 1,098,216 | 755,234 |
| Cost of sales, including $842 and $1,273, respectively, to related parties | 959,794 | 666,702 |
| **Gross profit** | 138,422 | 88,532 |
| Selling, general and administrative expenses, including $4,426 and $2,735, respectively, to related parties | 275,711 | 155,241 |
| Interest expense, including $333 to related parties | 28,862 | 15,648 |
| Other expense, net | 17,406 | 239 |
| **Net loss before income taxes** | (183,557) | (82,596) |
| Income tax provision | — | — |
| **Net loss** | (183,557) | (82,596) |
| Net loss attributable to non-controlling interests | (123,670) | (59,481) |
| **Net loss attributable to Carvana Co.** | $ (59,887) | $ (23,115) |
| Net loss per share of Class A common stock, basic and diluted | $ (1.19) | $ (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | 50,399 | 41,352 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 41,208 | $ 41 | 104,336 | $ 104 | $ 147,916 | $ (68,375) | $ 147,742 | $ 227,428 |
| Net loss | — | — | — | — | — | (23,115) | (59,481) | (82,596) |
| Exchanges of LLC Units | 2,020 | 2 | (1,984) | (2) | 1,899 | — | (1,899) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 25,582 | — | — | 25,582 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (25,582) | — | — | (25,582) |
| Contribution of Class A common stock from related party | (72) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 74 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (14) | — | — | — | (433) | — | — | (433) |
| Options exercised | 27 | — | — | — | 426 | — | — | 426 |
| Equity-based compensation | — | — | — | — | 8,022 | — | — | 8,022 |
| **Balance, March 31, 2019** | 43,243 | $ 43 | 102,352 | $ 102 | $ 157,830 | $ (91,490) | $ 86,362 | $ 152,847 |

3

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 50,507 | $ 51 | 101,219 | $ 101 | $ 280,994 | $ (183,034) | $ 93,827 | $ 191,939 |
| Net loss | — | — | — | — | — | (59,887) | (123,670) | (183,557) |
| Exchanges of LLC Units | 116 | — | (19) | — | 36 | — | (36) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1,949 | — | — | 1,949 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1,949) | — | — | (1,949) |
| Issuance of Class A common stock to settle vested restricted stock units | 38 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (8) | — | — | — | (2,356) | — | — | (2,356) |
| Options exercised | 7 | — | — | — | 145 | — | — | 145 |
| Equity-based compensation | — | — | — | — | 7,055 | — | — | 7,055 |
| **Balance, March 31, 2020** | 50,660 | $ 51 | 101,200 | $ 101 | $ 285,874 | $ (242,921) | $ (29,879) | $ 13,226 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (183,557) | $ (82,596) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 15,811 | 7,943 |
| Loss on disposal of property and equipment | 145 | 49 |
| Provision for bad debt and valuation allowance | 5,213 | 1,385 |
| Gain on loan sales | (12,976) | (19,200) |
| Equity-based compensation expense | 5,940 | 7,711 |
| Amortization and write-off of debt issuance costs and bond premium | 1,932 | 979 |
| Originations of finance receivables | (782,240) | (532,066) |
| Proceeds from sale of finance receivables, net | 812,868 | 601,557 |
| Purchase of finance receivables | — | (127,710) |
| Principal payments received on finance receivables held for sale | 25,653 | 11,227 |
| Unrealized loss on beneficial interests in securitization | 11,405 | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | 12,995 | (5,435) |
| Vehicle inventory | (80,014) | (112,536) |
| Other assets | (3,985) | (12,873) |
| Accounts payable and accrued liabilities | 1,820 | 48,632 |
| Operating lease right-of-use assets | (46,321) | (1,262) |
| Operating lease liabilities | 46,965 | 68 |
| Other liabilities | (112) | (382) |
| Net cash used in operating activities | (168,458) | (214,509) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $0 and $4,257, respectively, from related parties | (89,433) | (43,199) |
| Principal payments received on beneficial interests in securitizations | 725 | — |
| Net cash used in investing activities | (88,708) | (43,199) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 1,964,496 | 807,890 |
| Payments on short-term revolving facilities | (1,721,122) | (570,076) |
| Proceeds from issuance of long-term debt | 51,963 | 41,817 |
| Payments on long-term debt | (5,912) | (3,003) |
| Payments of debt issuance costs | (3,472) | (567) |
| Proceeds from exercise of stock options | 145 | 426 |
| Tax withholdings related to restricted stock awards | (2,356) | (433) |
| Net cash provided by financing activities | 283,742 | 276,054 |
| **Net increase in cash, cash equivalents and restricted cash** | 26,576 | 18,346 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 145,035 | $ 107,055 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

### Description of Business

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is a leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

### Organization

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Senior Notes (as defined in Note 9 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 10 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of March 31, 2020, Carvana Co. owned approximately 32.5% of Carvana Group and the LLC Unitholders (as defined in Note 10 — Stockholders' Equity) owned the remaining 67.5%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of March 31, 2020, results of operations and changes in stockholder's equity for the three months ended March 31, 2020 and 2019. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

### Liquidity

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in conformity with GAAP, which contemplate continuation of the Company as a going concern. The Company has incurred losses from inception through March 31, 2020, and expects to incur additional losses in the future. As the Company continues to grow

6

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

into new markets, build vending machines and inspection and reconditioning centers ("IRCs"), and enhance technology and software development efforts, it may need access to additional capital. Historically, the Company has raised additional capital through equity issuances or debt instruments to fund its expansion (refer to Note 10 — Stockholders' Equity and Note 9 — Debt Instruments). The Company has also funded some of its capital expenditures through long-term financing with lenders and other investors, as described further in Note 9 — Debt Instruments. At March 31, 2020, the Company had $87.1 million of committed funds for future construction costs at four IRCs currently under construction. The Company funds vehicle inventory purchases through its Floor Plan Facility, as described further in Note 9 — Debt Instruments. As of March 31, 2020, the Company had approximately $211.8 million available under its $950.0 million Floor Plan Facility and may draw upon this facility through October 2020 to fund future vehicle inventory purchases, as described further in Note 9 — Debt Instruments. Further, the Company plans to increase the amount and maturity date of financing available to purchase vehicle inventory within the next year by amending its existing Floor Plan Facility or by entering into a new agreement. The Company has historically sold the finance receivables it generates through forward flow agreements and fixed pool loan sales, including securitization transactions. In March 2020, the Company amended its Master Purchase and Sale Agreement with Ally to provide for the sale of up to $2.0 billion of principal balance of finance receivables through March 2021. Prior to selling the finance receivables as part of a securitization transaction, the Company funds the finance receivables through Finance Receivable Facilities (as defined and further discussed in Note 9 — Debt Instruments). At March 31, 2020, the Company had $851.0 million available under its Finance Receivable Facilities, which have a current total capacity of $925.0 million. The Company may draw upon these facilities through July 2021 and February 2022 to fund future finance receivable originations. The aggregate capacity of these facilities may be increased to $1.0 billion with the consent of certain lenders. On April 1, 2020, the Company completed a registered direct offering of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Due to the impact of COVID-19 on the economy, the Company has temporarily paused certain new market openings and vending machine launches and significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and information technology investments. The Company has also rebalanced its marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust in the future. Management believes that the actions taken in respect of the COVID-19 pandemic, current working capital, results of operations, and expected continued inventory and capital expenditure financing are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. The COVID-19 pandemic has adversely impacted the global economy, as well as the Company's operations, and the extent and duration of the impacts remain unclear. The Company's future estimates, including, but not limited to, the Company's allowance for loan losses, inventory valuations, fair value measurements, cancellation reserves, asset impairment charges, and discount rate assumptions, may be impacted and continue to evolve as conditions change as a result of the COVID-19 pandemic. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. The Company adopted ASU 2016-13 on January 1, 2020. Financial assets measured at fair value through net income are excluded from the scope of ASU 2016-13. The Company's beneficial interests in securitizations are carried at fair value and are thus excluded from ASU 2016-13. Finance receivables originated in connection with the Company's vehicle sales are held for sale and presented at the lower of amortized cost or fair value. The Company intends to sell the finance receivables prior to their contractual maturity, therefore the recovery of the asset is from its sale rather than maturity and the Company is not required to measure the expected lifetime credit losses. The adoption of ASU 2016-13 did not have a material effect on the Company's consolidated financial statements.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") related to updated requirements over the disclosures of fair value measurements. Under ASU 2018-13, certain disclosure requirements for fair value measurements will be eliminated, modified or added to facilitate better communication around recurring and nonrecurring fair value measurements. ASU 2018-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with some amendments applied prospectively, some applied retrospectively and early adoption permitted. The Company adopted ASU 2018-13 for its fiscal year beginning January 1, 2020 and it did not have a material effect on the Company's fair value disclosures within its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The intent of this pronouncement is to align the requirements for capitalizing implementation costs incurred in a cloud computing arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software as defined in ASC 350-40. Under ASU 2018-15, the capitalized implementation costs related to a cloud computing arrangement will be amortized over the term of the arrangement and all capitalized implementation amounts will be required to be presented in the same line items of the financial statements as the related hosting fees. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have a material effect on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"). ASU 2018-17 requires reporting entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety for determining whether a decision-making fee is a variable interest. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. Entities are required to apply the amendments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have an effect on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). ASU 2020-04 provides optional guidance for a limited period of time related to contract modifications and hedge accounting to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The standard is effective from March 12, 2020 through December 31, 2022, except for hedging relationships existing as of December 31, 2022 that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The Company may elect to take advantage of this optional guidance in its transition away from LIBOR within certain debt contracts but does not expect a material impact on its consolidated financial statements. As of March 31, 2020, the Company had not modified any contracts or had any hedge accounting activity that fell under ASU 2020-04.

**Accounting Standards Issued But Not Yet Adopted**

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. ASU 2019-12 will be effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. The Company plans to adopt ASU 2019-12 for its fiscal year beginning January 1, 2021 and is currently assessing the impact, if any, the guidance will have on its consolidated financial statements.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 3 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net as of March 31, 2020 and December 31, 2019 (in thousands):

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Land and site improvements | $ 103,536 | $ 98,530 |
| Buildings and improvements | 275,707 | 229,640 |
| Transportation fleet | 128,740 | 110,302 |
| Software | 78,707 | 66,875 |
| Furniture, fixtures and equipment | 45,955 | 38,123 |
| Total property and equipment excluding construction in progress | 632,645 | 543,470 |
| Less: accumulated depreciation and amortization on property and equipment | (105,922) | (88,795) |
| Property and equipment excluding construction in progress, net | 526,723 | 454,675 |
| Construction in progress | 118,762 | 88,796 |
| Property and equipment, net | $ 645,485 | $ 543,471 |

Depreciation and amortization expense on property and equipment was approximately $15.3 million and $7.6 million for the three months ended March 31, 2020 and 2019, respectively. These amounts primarily relate to selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 4 — GOODWILL AND INTANGIBLE ASSETS, NET**

On April 12, 2018, the Company acquired Car360, Inc. ("Car360"), a provider of app-based photo capture technology, for approximately $16.7 million, net of cash acquired of approximately $0.4 million. The purchase price was comprised of approximately $6.7 million cash, net of cash acquired, and approximately 0.5 million Class A Units of Carvana Group, with a fair value of approximately $10.0 million.

The purchase price was allocated to net tangible assets of approximately $0.2 million and intangible assets of approximately $9.9 million based on their fair values on the acquisition date and a related deferred tax liability of approximately $2.5 million. The deferred tax liability will amortize over 2 years to 7 years, and approximately $0.1 million and $0.4 million was amortized during the three months ended March 31, 2020 and 2019, respectively. The excess of the purchase price over the amounts allocated to assets acquired, liabilities assumed and the deferred tax liability was approximately $9.4 million, which has been recorded as goodwill. The historical results of operations for Car360 were not significant to the Company's consolidated results of operations for the periods presented.

The following table summarizes intangible assets and goodwill related to the Car360 acquisition as of March 31, 2020 and December 31, 2019 (in thousands):

| | Useful Life | March 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Intangible assets: | | | |
| Developed technology | 7 years | $ 8,642 | $ 8,642 |
| Customer relationships | 2 years | 523 | 523 |
| Non-compete agreements | 5 years | 774 | 774 |
| Intangible assets, acquired cost | | 9,939 | 9,939 |
| Less: accumulated amortization | | (3,254) | (2,707) |
| Intangible assets, net | | $ 6,685 | $ 7,232 |
| | | | |
| Goodwill | N/A | $ 9,353 | $ 9,353 |

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Amortization expense was approximately $0.5 million and $0.4 million during the three months ended March 31, 2020 and 2019, respectively. As of March 31, 2020, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 4.9 years. The anticipated annual amortization expense to be recognized in future years as of March 31, 2020 is as follows (in thousands):

|  | Expected Future Amortization |
|---|---|
| Remainder of 2020 | $ 1,042 |
| 2021 | 1,389 |
| 2022 | 1,389 |
| 2023 | 1,279 |
| 2024 | 1,235 |
| 2025 | 351 |
| Thereafter | — |
| Total | $ 6,685 |

## NOTE 5 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of March 31, 2020 and December 31, 2019 (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Accounts payable, including $10,173 and $9,549, respectively, due to related parties | $ 56,008 | $ 63,576 |
| Sales taxes and vehicle licenses and fees | 50,364 | 45,812 |
| Accrued interest expense | 31,210 | 15,650 |
| Accrued property and equipment | 27,270 | 23,433 |
| Reserve for returns and cancellations | 20,024 | 19,721 |
| Accrued compensation and benefits | 14,096 | 21,726 |
| Accrued advertising costs | 12,687 | 11,403 |
| Customer deposits | 6,249 | 6,379 |
| Other accrued liabilities | 28,875 | 26,743 |
| Total accounts payable and accrued liabilities | $ 246,783 | $ 234,443 |

## NOTE 6 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group ("DriveTime") entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2021 and 2024. Most of the facilities allow the Company to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in December 2018. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring in 2021 and the Company having the right to

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco inspection and reconditioning centers ("IRCs"). At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations and its share of estimated costs incurred by DriveTime related to preparing these sites for use. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In December 2016, the Company entered into a lease agreement related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In August 2018, the Company entered into an additional lease agreement with a coterminous initial term with Verde for contiguous space to that IRC. The lease agreements require monthly rental payments and can each be extended for four additional five-year periods.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a lease agreement with DriveTime for access to and utilization of a fully operational IRC near Cleveland, Ohio. DriveTime vacated the facility in February 2019, at which point the Company became the sole occupant and began leasing the full facility from DriveTime. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. Before DriveTime vacated the facility, the Company paid a monthly rental fee for facility and shared reconditioning costs, calculated based on the Company's pro rata utilization of space at the IRC in a given month, along with a pro rata share of the facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the three months ended March 31, 2020, total costs related to these operating lease agreements, including those noted above, were approximately $1.8 million with approximately $0.8 million and $1.0 million allocated to inventory and selling, general and administrative expenses, respectively. During the three months ended March 31, 2019, total costs related to these lease agreements were approximately $1.0 million with approximately $0.8 million and $1.2 million allocated to inventory and selling, general and administrative expenses, respectively.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company became the sole occupant in April 2019. The lease expires in four years, subject to the ability to exercise three renewal options of five years each. DriveTime remained an occupant of the facility through April 1, 2019 but is not fully released from the lease obligations by the landlord.

During the three months ended March 31, 2019, in connection with the Company becoming the sole occupant of the IRC near Cleveland, Ohio, the Company purchased certain leasehold improvements and equipment from DriveTime for DriveTime's net book value of approximately $4.3 million.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was approximately $0.2 million during each of the three months ended March 31, 2020 and March 31, 2019, respectively.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was approximately $0.2 million during the three months ended March 31, 2020.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended March 31, 2020 and March 31, 2019, the Company recognized approximately $18.3 million and $10.1 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. During the three months ended March 31, 2020 and March 31, 2019, the Company recognized approximately $2.3 million and $0.5 million, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers a portion of the Company's GAP waiver coverage and the limited warranty provided to all customers under the Master Dealer Agreement. The Company pays a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers and a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase. The Company incurred approximately $1.3 million and $0.8 million during the three months ended March 31, 2020 and March 31, 2019, respectively, related to the administration of GAP waiver coverage and limited warranty. As of March 31, 2020, the majority of the Company's GAP waiver coverage sales were administered by an unrelated party.

**GAP Waiver Insurance Policy**

During the three months ended March 31, 2020 and 2019, the Company purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $0.0 million and $1.0 million, respectively, that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that the Company sold in its securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, the Company entered into a retrospective profit sharing agreement with BlueShore under which the Company will share in the profits generated from the insurance policies by receiving a portion of the excess of the premium it paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. As of March 31, 2020 and December 31, 2019, the Company held a receivable of approximately $0.1 million and $0.2 million, respectively, which is included in other assets on the accompanying unaudited condensed consolidated balance sheets, related to this retrospective profit sharing agreement.

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $1.6 million and $0.5 million during the three months ended March 31, 2020 and 2019, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime approximately $0.1 million under this agreement during both the three months ended March 31, 2020 and 2019, respectively.

**Senior Notes Held by Verde**

As of both March 31, 2020 and December 31, 2019, Verde held $15.0 million of principal of the Company's outstanding Senior Notes, as defined and further discussed in Note 9 — Debt Instruments.

**Accounts Payable Due to Related Party**

As of March 31, 2020 and December 31, 2019, approximately $10.2 million and $9.5 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contribution Agreements**

On September 10, 2018, the Company announced a commitment by its Chief Executive Officer, Ernest Garcia III, to contribute shares of the Company's Class A common stock, for each then-current employee from his personal shareholdings to the Company at no charge (the "Share Contributions"). His contributions funded equity awards of 165 restricted stock units to each of the Company's then-current employees upon their satisfying certain employment tenure requirements (the "100k Milestone Gift"). The Company entered into certain contribution agreements related to his commitment in order to effect the transfer of shares from Mr. Garcia to the Company. The Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, but pursuant to a series of contribution agreements, it has indemnified Mr. Garcia from any such obligations that may arise. See Note 10 — Stockholders' Equity and Note 12 — Equity-Based Compensation for further discussion. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**IP License Agreement**

In February 2017, the Company entered into a license agreement that governs the rights of certain intellectual property owned by the Company and the rights of certain intellectual property owned by DriveTime. The license agreement, which was amended and restated in April 2017, generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property, and each party agrees to certain covenants not to sue the other party, its affiliates and certain of its service providers in connection with various patent claims. The exclusive license to DriveTime is limited to the business that is primarily of subprime used car sales to retail customers. However, upon a change of control of either party, both parties' license rights as to certain future improvements to licensed intellectual property and all limited exclusivity rights are terminated. The agreement does not provide a license to any of the Company's patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to the Company's vending machines, automated vehicle photography or certain other elements of the Company's brand.

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 7 — FINANCE RECEIVABLE SALE AGREEMENTS

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of agreements: forward flow agreements, including a Master Purchase and Sale Agreement and Master Transfer Agreement, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with certain financing partners, including Ally Bank and Ally Financial (the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. In March and April 2020, the Company and the Ally Parties amended the MPSA to, among other things and subject to the terms of the agreement, commit the purchaser to purchase up to a maximum of $2.0 billion of principal balances of finance receivables from the amendment date through March 23, 2021 and broaden the set of finance receivables covered by the MPSA.

During the three months ended March 31, 2020 and 2019, the Company sold approximately $351.1 million and $65.3 million, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.9 billion of unused capacity as of March 31, 2020.

**Master Transfer Agreement**

Through May 7, 2019, the Company was party to a master transfer agreement (the "Master Transfer Agreement") with a purchaser trust (the "Purchaser Trust") under which the Purchaser Trust committed to purchase finance receivables meeting certain underwriting criteria. During the three months ended March 31, 2019, the Company sold approximately $58.3 million in principal balances of finance receivables under the Master Transfer Agreement.

During the three months ended March 31, 2019, the Company entered into a separate agreement to purchase finance receivables that it previously sold to the Purchaser Trust under the Master Transfer Agreement for a total price of approximately $127.7 million and immediately resold such finance receivables into a securitization transaction, which is described further in Note 8 — Securitizations and Variable Interest Entities.

On May 7, 2019, the Company purchased the certificate of the Purchaser Trust for $34.0 million, net of cash acquired. At the time of acquisition the trust assets included $139.7 million of finance receivables that the Company had previously sold to the Purchaser Trust under the Master Transfer Agreement, and its liabilities included $105.7 million in associated debt and other liabilities. In February 2020, the Master Transfer Agreement terminated in connection with the termination of a past finance receivable facility discussed in Note 9 — Debt Instruments.

**Securitization Transactions**

Beginning in 2019, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 8 — Securitizations and Variable Interest Entities.

During the three months ended March 31, 2020 and 2019, the Company sold approximately $494.8 million and $350.0 million, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners under the MPSA, the Master Transfer Agreement, and to investors in securitization transactions was approximately $13.0 million and $19.2 million during the three months ended

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

March 31, 2020 and 2019, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

## NOTE 8 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES

As noted in Note 7 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include but are not limited to rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of March 31, 2020, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. The Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets at fair value, which as of March 31, 2020 and December 31, 2019 were approximately $118.9 million and $98.8 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of March 31, 2020.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at March 31, 2020 and December 31, 2019. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

|  | March 31, 2020 | | December 31, 2019 | |
|  | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| --- | --- | --- | --- | --- |
|  | (in thousands) | | | |
| Rated notes | $ 94,158 | $ 94,158 | $ 85,234 | $ 85,234 |
| Certificates and other assets | 24,765 | 24,765 | 13,546 | 13,546 |
| Total unconsolidated VIEs | $ 118,923 | $ 118,923 | $ 98,780 | $ 98,780 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. These securities are interests in securitization

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of March 31, 2020 and December 31, 2019 were as follows (in thousands):

|  | March 31, 2020 | | December 31, 2019 | |
|  | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|
| Rated notes | $ 101,678 | $ 94,158 | $ 84,983 | $ 85,234 |
| Certificates and other assets | 27,750 | 24,765 | 13,456 | 13,546 |
| Total securities available for sale | $ 129,428 | $ 118,923 | $ 98,439 | $ 98,780 |

### NOTE 9 — DEBT INSTRUMENTS

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by substantially all of its assets, other than the Company's interests in real property and finance receivables pledged under its Finance Receivable Facilities (as defined below). The facility has a maturity date of October 31, 2020 and requires monthly interest payments on borrowings under the Floor Plan Facility. The Company most recently amended the Floor Plan Facility in November 2019 to, among other things, increase the available capacity to $950.0 million from $650.0 million, adding flexibility to acquire more vehicles from customers. The annual interest rate was reduced to one-month LIBOR plus 3.15% if the average outstanding balance on the Floor Plan Facility in the previous calendar month is greater than $500.0 million and otherwise remains unchanged from one-month LIBOR plus 3.40%. The amendment also requires that at least 7.5% of the total principal amount owed to the lender is held as restricted cash, a change from 5%.

Repayment in an amount equal to the amount of the advance or loan must be made within five business days of selling or otherwise disposing of the underlying vehicle inventory, unless customers financed the purchase by originating an automotive finance receivable. For used vehicle sales involving financing originated by the Company and sold or pledged under either the MPSA or the Finance Receivable Facilities, repayment is due upon the earlier of fifteen business days after the sale of the used vehicle or one business day following the sale or pledge of the related finance receivable. With respect to such used vehicle sales involving financing that are not sold under either the MPSA or the Finance Receivable Facilities, repayment of the advance or the loan for such vehicles is due upon the earlier of fifteen business days after the sale of the vehicle or two business days following the funding of the related finance receivable. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts.

As of March 31, 2020, the interest rate on the Floor Plan Facility was approximately 4.14%, the Company had an outstanding balance under this facility of approximately $738.2 million, unused capacity of approximately $211.8 million, and held approximately $55.4 million in restricted cash related to this facility. As of December 31, 2019, the interest rate on the Floor Plan Facility was approximately 4.91%, the Company had an outstanding balance of approximately $515.5 million, unused capacity of approximately $434.5 million, and held approximately $38.7 million in restricted cash related to this facility.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain automotive finance receivables originated by the Company. As of March 31, 2020, the lender has

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

committed $425.0 million under this facility. The Company can increase this commitment in $25.0 million increments up to $500.0 million with the lender's consent, and draw upon this facility until July 23, 2021.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until February 20, 2022.

Both facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. Both facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of March 31, 2020, the Company had an outstanding balance under these facilities of approximately $74.0 million, and unused capacity of approximately $851.0 million. During the three months ended March 31, 2020, the Company's effective interest rate on these facilities was 3.57%.

*Past Finance Receivable Facilities*

In April 2019, the Company entered in a Loan and Security Agreement pursuant to which Ally Bank agreed to provide a $300.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus a spread ranging from 1.00% to 1.80%.

In May 2019, in connection with the acquisition of the Purchaser Trust described in Note 7 — Finance Receivable Sale Agreements, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement to provide an additional $350.0 million revolving credit facility to fund certain other automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus 1.95%.

Both credit facilities required that at least 2% of the outstanding pledged finance receivables principal balances, plus any undistributed amounts collected on the pledged finance receivables amount, be held as restricted cash.

Interest payments on these credit facilities were payable monthly on each draw date. Principal repayments occurred on the fifteenth day of each calendar month in an amount equal to the undistributed receivables collected.

The Company voluntarily terminated these facilities in February 2020 after entering into the active finance receivable facilities described above.

**Long-Term Debt**

*Senior Unsecured Notes*

On September 21, 2018, the Company issued an aggregate of $350.0 million in senior unsecured notes due 2023 (the "Existing Notes") under an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). On May 24, 2019, the Company issued $250.0 million in aggregate principal amount of additional notes (the "New Notes") under the Indenture, at a 100.5% premium. The Existing Notes and New Notes (together the "Senior Notes") are treated as a single class for all purposes and have the same terms. The Senior Notes accrue interest at a rate of 8.875% per annum, which is payable semi-annually in arrears on April 1 and October 1 of each year. The Senior Notes mature on October 1, 2023, unless earlier repurchased or redeemed, and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales or funding of its finance receivables, if any). The Company may redeem some or all of the Senior Notes on or after October 1, 2020 at redemption prices set forth in the Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2020, the Company may redeem up to 35.0% of the aggregate principal amount of the Senior Notes at a redemption price equal to 108.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to October 1, 2020, by paying a make-whole premium plus any accrued and unpaid interest, to, but not

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indenture governing the Senior Notes contains restrictive covenants that, subject to certain conditions, limit the ability of the Company to, among other things, incur additional debt or issue preferred stock, create liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default. As of March 31, 2020, the Company was in compliance with all covenants.

In connection with the issuance of these Senior Notes, Carvana Group amended its LLC agreement to create a class of non-convertible preferred units, which Carvana Co. purchased with its net proceeds from the issuance of these Senior Notes, as further discussed in Note 10 — Stockholders' Equity.

The outstanding principal of the Senior Notes, net of debt issuance costs and including the premium, was approximately $591.7 million and $591.1 million as of March 31, 2020 and December 31, 2019, respectively, of which $15.0 million of principal was held by Verde as of both periods, and is included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two to five-year term and requires monthly payments. As of March 31, 2020, the outstanding principal of these notes had a weighted-average interest rate of 6.7% and totaled approximately $29.7 million, of which approximately $12.6 million is due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheet.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of March 31, 2020, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of March 31, 2020 and December 31, 2019, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $226.7 million and $174.7 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheet.

In November 2017, the Company entered into a master sale-leaseback agreement (the "Master Sale-Leaseback Agreement" or "MSLA"), which was amended in November 2018, pursuant to which it may sell and lease back certain of its owned or leased properties and construction improvements. Under the MSLA, at any time the Company may elect to, and beginning in November 2020 or until a property owner of a leased site consents to the sale-leaseback, the purchaser has the right to demand that the Company repurchase one or more of the properties sold and leased back pursuant to the MSLA for an amount equal to the repurchase price. Repurchase prices are defined in each of the applicable leases and are generally the original purchase prices plus any accrued and unpaid rent. Under the MSLA, the total sales price of properties the Company has sold and is leasing back at any point in time is limited to $75.0 million. As of March 31, 2020 and December 31, 2019, the Company may sell and lease back approximately $75.0 million of its property and equipment under the MSLA.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

*Financing of Beneficial Interests in Securitizations*

In June 2019, the Company entered into a secured borrowing facility through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase. As discussed in Note 8 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules.

As of March 31, 2020 and December 31, 2019, the Company has pledged approximately $77.7 million and $85.0 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreement with expected repurchases ranging from January 2026 to October 2026. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lender, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transaction. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of this facility, net of debt issuance costs, was approximately $75.5 million and $82.7 million as of March 31, 2020 and December 31, 2019, respectively, of which approximately $25.4 million and $26.4 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

**NOTE 10 — STOCKHOLDERS' EQUITY**

Immediately prior to the IPO, Carvana Co. amended and restated its certificate of incorporation to, among other things authorize (i) 50.0 million shares of Preferred Stock, par value $0.01 per share, (ii) 500.0 million shares of Class A common stock, par value $0.001 per share, and (iii) 125.0 million shares of Class B common stock, par value $0.001 per share. On December 5, 2017, Carvana Co. amended and restated its certificate of incorporation to authorize 100,000 shares of Convertible Preferred Stock, with an initial stated value of $1,000 per share and a par value of $0.01 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of March 31, 2020, there were approximately 189.9 million and 4.6 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on March 31, 2020), respectively, issued and outstanding. As discussed in Note 12 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold and are earned over the requisite service period.

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC units issued subsequent to the IPO (the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain Class A Units and Class B Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they will be required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended March 31, 2020, certain LLC Unitholders exchanged 0.1 million LLC Units and 0.0 million shares of Class B common stock for 0.1 million newly-issued shares of Class A common stock. Simultaneously, and in connection with these exchanges, Carvana Co. received approximately 0.1 million LLC Units, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of the Senior Notes in September 2018 and May 2019, as discussed further in Note 9 — Debt Instruments. Carvana Co. used its net proceeds from the Senior Notes to purchase 600,000 Class A Non-Convertible Preferred Units. In the event Carvana Co. makes payments on the Senior Notes, Carvana Group will make an equal cash distribution to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit shall be canceled and retired.

**Contribution of Class A Common Shares From Ernest Garcia III**

During the three months ended March 31, 2019, the Company and its Chief Executive Officer, Ernest Garcia III, entered into a contribution agreement (the "Contribution Agreement") in connection with the 100k Milestone Gift, as defined in Note 6 — Related Party Transactions. Pursuant to the Contribution Agreement, Mr. Garcia contributed approximately 0.1 million shares of the Company's Class A common stock to the Company during the three months ended March 31, 2019 at no charge. The Company subsequently granted approximately 0.1 million restricted stock units during the three months ended March 31, 2019 to employees. Refer to Note 12 — Equity-Based Compensation for further discussion. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contribution, it has indemnified Mr. Garcia from any such obligations that may arise. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**NOTE 11 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the three months ended March 31, 2020 and 2019, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $0.0 million and $1.9 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of March 31, 2020, Carvana Co. owned approximately 32.5% of Carvana Group with the LLC Unitholders owning the remaining 67.5%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

## NOTE 12 — EQUITY-BASED COMPENSATION

Equity-based compensation expense is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation expense recognized during the three months ended March 31, 2020 and 2019 is as follows (in thousands):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Class B Units | $ | 458 | $ | 578 |
| Restricted Stock Units and Awards excluding those granted in relation to the 100k Milestone Gift | | 4,495 | | 2,467 |
| Restricted Stock Units granted in relation to the 100k Milestone Gift | | — | | 3,124 |
| Options | | 1,607 | | 1,207 |
| Class A Units | | 495 | | 646 |
| Total equity-based compensation | | 7,055 | | 8,022 |
| Equity-based compensation capitalized to property and equipment | | (1,115) | | (311) |
| Equity-based compensation capitalized to inventory | | (91) | | (877) |
| Equity-based compensation, net of capitalized amounts | $ | 5,849 | $ | 6,834 |

As of March 31, 2020, the total unrecognized compensation expense related to outstanding equity awards was approximately $75.8 million, which the Company expects to recognize over a weighted-average period of approximately 3.1 years. Total unrecognized equity-based compensation expense will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14.0 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units ("RSUs") and other stock-based awards to employees, directors, officers and consultants. The majority of the Company's equity awards, other than those granted in relation to the 100k Milestone Gift, vest over four year periods based on continued employment with the Company. As of March 31, 2020, approximately 10.4 million shares remain available for future equity award grants under this plan.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four- year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five- years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three months ended March 31, 2020 or March 31, 2019. As of March 31, 2020, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 13 — LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented.

The following table presents the calculation of basic and diluted net loss per share during the three months ended March 31, 2020 and 2019 (in thousands, except per share data):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | | 2019 | |
| Numerator: | | | | |
| Net loss | $ | (183,557) | $ | (82,596) |
| Net loss attributable to non-controlling interests | | 123,670 | | 59,481 |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ | (59,887) | $ | (23,115) |
| Denominator: | | | | |
| Weighted-average shares of Class A common stock outstanding | | 50,555 | | 41,632 |
| Nonvested weighted-average restricted stock awards | | (156) | | (280) |
| Weighted-average shares of Class A common stock to compute basic and diluted net loss per Class A common share | | 50,399 | | 41,352 |
| Net loss per share of Class A common stock, basic and diluted | $ | (1.19) | $ | (0.56) |

On April 1, 2020, the Company completed a registered direct offering of approximately 13.3 million shares of its Class A common stock and received net proceeds from the offering of approximately $599.5 million.

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented. LLC Units (adjusted for the Exchange Ratio and participation thresholds) are considered potentially dilutive

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash.

Weighted-average as-converted Class A Units of approximately 101.4 million and 104.4 million together with the related Class B common stock for the three months ended March 31, 2020 and 2019, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Outstanding Class B Units of approximately 5.0 million and 6.3 million at March 31, 2020 and 2019, respectively, were evaluated for potentially dilutive effects and were determined to be anti-dilutive. Weighted-average potentially dilutive restricted stock awards and units of approximately 0.8 million and 0.7 million for the three months ended March 31, 2020 and 2019, respectively, were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive. As of both March 31, 2020 and 2019, 1.3 million options were outstanding and evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

## NOTE 14 — INCOME TAXES

As described in Note 1 — Business Organization, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 10 — Stockholders' Equity, the Company acquired approximately 0.1 million LLC Units during the three months ended March 31, 2020 in connection with exchanges with LLC Unitholders. During the three months ended March 31, 2020, the Company recorded a gross deferred tax asset of approximately $1.9 million associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statement of stockholders' equity.

As described in Note 4 — Goodwill and Intangible Assets, Net, Carvana Group acquired Car360 on April 12, 2018. The acquisition included various intangible assets, and as a result the Company recognized a deferred tax liability of approximately $2.5 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheet. The deferred tax liability will be amortized over two to seven years and approximately $0.1 million and $0.4 million was amortized during the three months ended March 31, 2020 and 2019, respectively.

During the three months ended March 31, 2020, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of March 31, 2020 and December 31, 2019, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The Company does not expect the provisions of the legislation to have a significant impact on the effective tax rate or income tax payable and deferred income tax positions of the Company.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 10 — Stockholders' Equity, each

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of March 31, 2020, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of March 31, 2020, the total unrecorded TRA liability is approximately $180.1 million. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

## NOTE 15 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of March 31, 2020, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2020 and 2032. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 6 — Related Party Transactions for further discussion of operating leases with related parties.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

**Lease Costs and Activity**

The Company's lease costs and activity during the three months ended March 31, 2020 and 2019 were as follows (in thousands):

| | | Three Months Ended March 31, | | |
| --- | --- | --- | --- | --- |
| | | 2020 | | 2019 |
| **Lease costs:** | | | | |
| Finance leases: | | | | |
| Amortization of finance lease assets | $ | 3,470 | $ | 1,267 |
| Interest obligations under finance leases | | 805 | | 331 |
| Total finance lease costs | $ | 4,275 | $ | 1,598 |
| | | | | |
| Operating leases: | | | | |
| Fixed lease costs | $ | 5,638 | $ | 2,328 |
| Fixed lease costs to related parties | | 2,118 | | 1,806 |
| Variable short-term lease costs to related parties | | 178 | | 454 |
| Total operating lease costs | $ | 7,934 | $ | 4,588 |
| | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | |
| Operating lease liabilities to third parties | $ | 3,905 | $ | 1,817 |
| Operating lease liabilities to related parties | $ | 2,153 | $ | 2,137 |
| Interest payments on finance lease liabilities | $ | 805 | $ | 331 |
| | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | |
| Principal payments on finance lease liabilities | $ | 4,064 | $ | 1,208 |

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of March 31, 2020 (in thousands):

| | Finance Leases | Operating Leases [1] Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| Remainder of 2020 | $ 14,033 | $ 6,110 | $ 12,384 | $ 18,494 | $ 32,527 |
| 2021 | 17,058 | 7,737 | 18,739 | 26,476 | 43,534 |
| 2022 | 16,471 | 7,775 | 17,249 | 25,024 | 41,495 |
| 2023 | 15,360 | 7,834 | 15,166 | 23,000 | 38,360 |
| 2024 | 8,238 | 6,621 | 13,680 | 20,301 | 28,539 |
| Thereafter | 2,308 | 28,622 | 147,118 | 175,740 | 178,048 |
| Total minimum lease payments | 73,468 | 64,699 | 224,336 | 289,035 | 362,503 |
| Less: amount representing interest | (7,738) | (19,531) | (93,612) | (113,143) | (120,881) |
| Total lease liabilities | $ 65,730 | $ 45,168 | $ 130,724 | $ 175,892 | $ 241,622 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of March 31, 2020 and December 31, 2019, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of March 31, 2020 and 2019 were as follows, excluding short-term operating leases:

| | Three Months Ended March 31, | |
|---|---|---|
| | **2020** | **2019** |
| Weighted-average remaining lease terms (years) | | |
| Operating leases | 10.9 | 10.9 |
| Finance leases | 4.5 | 4.9 |
| Weighted-average discount rate | | |
| Operating leases | 8.3 % | 9.0 % |
| Finance leases | 5.4 % | 5.6 % |

**NOTE 16 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $5.4 million and $3.7 million as of March 31, 2020 and December 31, 2019, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, as of March 31, 2020 the Company does not believe that the ultimate resolution of any legal actions, either individually or in the aggregate, will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its own proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

**NOTE 17 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

As of March 31, 2020 and December 31, 2019, the Company held certain assets that were required to be measured at fair value on a recurring basis and beneficial interests in securitizations for which it elected the fair value option.

The following tables are a summary of fair value measurements and hierarchy level at March 31, 2020 and December 31, 2019 (in thousands):

**As of March 31, 2020:**

|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** |  |  |  |  |
| Money market funds [1] | $ 2,720 | $ 2,720 | $ — | $ — |
| Beneficial interests in securitizations | 118,923 | — | — | 118,923 |

**As of December 31, 2019:**

|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** |  |  |  |  |
| Money market funds [1] | $ 56,435 | $ 56,435 | $ — | $ — |
| Beneficial interests in securitizations | 98,780 | — | 29,222 | 69,558 |

_____

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of March 31, 2020 and December 31, 2019, the Company has a purchase price adjustment receivable of approximately $1.9 million and $6.9 million, respectively, which is carried at fair value and classified as other assets in the accompanying unaudited condensed consolidated balance sheets. Under the Master Purchase and Sale Agreement, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivable is determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the Master Purchase and Sale Agreement. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data this receivable is classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivable during the three months ended March 31, 2020 and 2019 were approximately $5.1 million and $0.0 million, respectively, and are reflected in other expense, net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 8 — Securitizations and Variable Interest Entities. Level 2 assets typically include

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

beneficial interests in the most recent securitization due to the proximity to the end of the period and lack of observable changes in economic inputs. Given the changes in the market and overall economic inputs between pricing and closing of the most recent securitization transaction completed in March 2020, it was classified as Level 3 as of March 31, 2020.

The Company's beneficial interests in securitizations, which are classified as Level 3, are classified as such due to the lack of observable market data to corroborate either the non-binding market consensus prices or the non-binding broker quotes. The significant unobservable market data includes market yields. Significant increases or decreases in market yields would result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense, net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. During the three months ended March 31, 2020, the Company transferred beneficial interests acquired as part of the securitization transaction in December 2019 from Level 2 to Level 3. The assets are typically initially classified as Level 2 due to the transactions' proximity to the end of each respective reporting period and the lack of observable changes in economic inputs. As noted above, the Company uses significant unobservable inputs to measure the fair value of these assets on a recurring basis, thus they will be classified as Level 3 in future periods. There were no transfers out of Level 3 during the three months ended March 31, 2020. There were no transfers into or out of Level 3 during the three months ended March 31, 2019.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three months ended March 31, 2020 (in thousands):

|  | March 31, 2020 |
|---|---|
| **Opening Balance, December 31, 2019** | $ 69,558 |
| Transfers into Level 3 | 29,222 |
| Received in securitization transactions | 39,578 |
| Cash receipts | (8,030) |
| Change in fair value | (11,405) |
| **Ending Balance, March 31, 2020** | $ 118,923 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended March 31, 2020 and December 31, 2019. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of March 31, 2020 and December 31, 2019 was as follows (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value, net of unamortized debt issuance costs | $ 591,731 | $ 591,124 |
| Fair value | 562,144 | 625,114 |

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of March 31, 2020 and December 31, 2019 were as follows (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value | $ 199,045 | $ 286,969 |
| Fair value | 199,045 | 304,532 |

**Derivative Instruments**

As of March 31, 2020 and December 31, 2019, the Company had no outstanding derivative instruments.

**NOTE 18 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the three months ended March 31, 2020 and 2019 (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2020 | 2019 |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 13,272 | $ 3,917 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 35,886 | $ 11,246 |
| Property and equipment acquired under finance leases | $ 18,326 | $ 11,395 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 50,253 | $ 4,940 |
| Equity-based compensation expense capitalized to property and equipment | $ 1,115 | $ 311 |
| Fair value of beneficial interests received in securitization transactions | $ 39,578 | $ 19,531 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 7,305 | $ — |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented (in thousands):

|  | March 31, 2020 | December 31, 2019 | March 31, 2019 | December 31, 2018 |
|---|---|---|---|---|
| Cash and cash equivalents | $ 72,435 | $ 76,016 | $ 85,321 | $ 78,861 |
| Restricted cash [1] | 72,600 | 42,443 | 21,734 | 9,848 |
| Total cash, cash equivalents and restricted cash | $ 145,035 | $ 118,459 | $ 107,055 | $ 88,709 |

(1) Amounts included in restricted cash represent the deposits required under the Company's short-term revolving facilities. Refer to Note 9 — Debt Instruments for additional information.

**NOTE 19 — SUBSEQUENT EVENTS**

**Registered Direct Offering**

On April 1, 2020, the Company completed a registered direct offering to investors of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Ernest Garcia II, through Verde, and Ernest Garcia III each invested approximately $25.0 million, or

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

approximately 0.6 million shares of the Class A common stock, in the offering. Following the completion of the offering, Carvana Co. owns approximately 37.8% of Carvana Group and the LLC Unitholders own the remaining 62.2%.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Item 1 of this Form 10-Q.*

<div align="center">

**Overview**

</div>

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a used vehicle.*** As of March 31, 2020, we listed approximately 33,500 vehicles for sale on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- ***Finance their purchase.*** Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we earn a premium upon sale.

- ***Protect their purchase.*** Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- ***Sell us their car.*** We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle sourcing and acquisition.*** We primarily acquire our used vehicle inventory through the large and liquid national used-car auction market and directly from customers when they trade in or sell us their vehicles. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary

<div align="center">

31

</div>

algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- *Inspection and reconditioning.*   Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to one of our IRCs, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- *Photography and merchandising.*   To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

- *Transportation and fulfillment.*   Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays, and ensuring a seamless and reliable customer experience.

## COVID-19 Update

COVID-19 is having an impact on retail and consumer lending businesses nationwide, with local governments, businesses, and consumers increasingly limiting commercial activity and capital markets experiencing instability. The worldwide spread of the COVID-19 outbreak is expected to result in a global slowdown of economic activity which is likely to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the outbreak is contained. This is impacting our business and the automotive industry as a whole. We are positioning the business today to be lean and flexible in this period of lower demand and higher uncertainty. To this end, we have temporarily paused certain new market openings and vending machine launches and significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and information technology investments. We have also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up to meet expected customer demand when the current COVID-19 pandemic subsides.

Our most important priority is the well-being of our employees and customers. We have taken several steps to provide a healthy working environment, including implementing work from home policies for employees who are able to work remotely, pausing all non-essential travel and group meetings, performing deep cleaning and sanitization in all of our facilities, and implementing social distancing policies. For many customers, buying or selling a car is an important component of their transportation and financial planning needs. We believe our online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. Our touchless delivery process allows customers to shop for a car from the comfort of their home, complete their transaction on their phone or laptop, and take

32

delivery of their new car without coming into physical contact with our delivery personnel. At delivery, we sanitize the car and communicate with the customer over the phone as they feel out the car and complete paperwork. Our employees and customers have given us positive feedback on this approach, and we believe it represents a significant step forward in the safety of retail auto sales in the current environment. In April 2020, we introduced a promotion that provides qualifying customers that finance their used vehicle purchase with us additional financial flexibility by offering the option to delay their first payment until 90 days after their purchase.

Our financial statements reflect estimates and assumptions made by management that affect the carrying values of the Company's assets and liabilities, disclosures of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, including as a result of the COVID-19 pandemic, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations. We will continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

Our operational and financial performance will depend on future developments related to the continuously evolving COVID-19 pandemic. Future developments include the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the development of treatments or vaccines, the resumption of widespread economic activity, and changes in consumer sentiment. Due to the inherent uncertainty of the unprecedented and rapidly evolving situation, we are unable to predict the impact of the COVID-19 pandemic will have on our future operations.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the three months ended March 31, 2020, the number of vehicles we sold to retail customers grew by 42.6% to 52,427 compared to 36,766 in the three months ended March 31, 2019. We expect our used vehicle sales to be negatively impacted by COVID-19.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer

33

advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings in each of the past seven years. After opening Atlanta, Georgia in 2013, we opened two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 15 in the first three months of 2020, bringing our total number of markets to 161 as of March 31, 2020. Our 15 market openings since December 31, 2019 increased the total percentage of the U.S. population serviced in our markets to 68.7% as of March 31, 2020 from 66.9% as of December 31, 2019. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. In light of the COVID-19 pandemic, we temporarily paused certain new market openings and vending machine launches. We plan to continually evaluate consumer demand and our operational capacity to determine our market opening strategy. We expect to launch many small markets near our existing infrastructure soon.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness. With our growth into new markets, national television advertising has become more economically efficient compared to purchasing several local television advertising campaigns.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has led to growth in retail units sold. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $964.3 million and $683.8 million during the three months ended March 31, 2020 and 2019, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $79.6 million and $33.0 million during the three months ended March 31, 2020 and 2019, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $54.3 million and $38.4 million during the three months ended March 31, 2020 and 2019, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

We expect the COVID-19 pandemic to impact all three sources of revenue and gross profit. First, we expect the pandemic to negatively impact retail units sold, which directly impacts retail, wholesale, and other revenue and gross profit. Second, we expect the pandemic to negatively impact retail and wholesale gross profit per unit due to the impact of lower demand on average days to sale and industry-wide used vehicle pricing. Specifically, we expect our average days to sale to increase and average retail and wholesale selling prices to fall in the near-term as dealers and wholesale suppliers work through inventory across the industry. Finally, we expect the pandemic to negatively impact gain on loan sale revenue due to higher required yields from loan investors during this period of uncertainty. While significant in the near-term, we believe all of these impacts are transitory, and we plan to stay lean during this period and maintain strength and flexibility for a return to normal conditions.

34

During our growth phase, our highest priority will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In light of the COVID-19 pandemic, we temporarily paused purchasing vehicles from customers independent of a retail sale, and subsequently resumed these purchases in limited circumstances.

- *Reduce average days to sale.* Our goal is to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our eight existing IRCs, which collectively have capacity to inspect and recondition over 400,000 vehicles per year at full utilization**.**

- *Increase utilization on logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from wholesale auctions or customers.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

## Seasonality

Absent the impact of COVID-19, used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business. The impact of COVID-19 on seasonality is uncertain.

## Investment in Growth

Absent the impact of COVID-19, we have aggressively invested in the growth of our business and we expect this investment to continue following a return to normal conditions. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending. There is no guarantee that we will be able to realize the return on our investments.

The worldwide spread of COVID-19 is expected to result in a global slowdown of economic activity which is likely to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the pandemic is contained. Due to the COVID-19

pandemic, we have temporarily paused new market openings and vending machine launches and significantly reduced discretionary growth expenditures on hiring, travel, IRC and vending machine construction, and information technology investments. We have also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up to meet customer demand when the current COVID-19 pandemic subsides.

### Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 6 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

### Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, opening new markets, and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Retail units sold | 52,427 | 36,766 |
| Number of markets | 161 | 109 |
| Average monthly unique visitors | 6,807,631 | 3,790,052 |
| Inventory units available on website | 33,570 | 18,221 |
| Average days to sale | 68 | 63 |
| Total gross profit per unit [1] | $ 2,640 | $ 2,408 |

(1) Includes $10 and $21, respectively, related to the 100k Milestone Gift discussed below.

#### *Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

#### *Number of Markets*

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers by a Carvana employee in a branded delivery truck. We view the number of markets we serve as a key driver of our growth. As we increase our number of markets, the population of consumers who have access to our fully integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

#### *Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Inventory Units Available*

We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. We view inventory units available as a key measure of our growth. Growth in inventory units available increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in inventory units available indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand inventory units available while continuing to grow sales, thereby improving other key operating metrics of the business.

*Average Days to Sale*

We define average days to sale as the average number of days between when we acquire the vehicle and when we deliver it to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

In the second half of 2018, we announced a commitment by our Chief Executive Officer, Ernest Garcia III ("Mr. Garcia"), to contribute 165 shares of Class A common stock to us from his personal shareholdings for every one of our then-existing employees upon their satisfying certain employment tenure requirements. In connection with such contributions, we made corresponding grants of 165 restricted stock units under our 2017 Omnibus Incentive Plan to each employee who satisfied the requirements (the "100k Milestone Gift" or "Gift"). Under GAAP, the 100k Milestone Gift was treated as compensation expense, a portion of which related to the production of our used vehicle inventory and was therefore capitalized to inventory and subsequently recognized within costs of sales when the related inventory was sold. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift has been fulfilled and as of March 31, 2020, all of the compensation expense related to the 100k Milestone Gift has been recognized. For the three months ended March 31, 2020 and 2019, total gross profit per unit includes $10 and $21, respectively, related to the 100k Milestone Gift.

## Components of Results of Operations

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our number of markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our average days to sale and our pricing strategy. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenues we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish. The securitization trusts issue asset-backed securities, which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under a committed forward-flow arrangement with financing partners who acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

*Cost of Sales*

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

*Used Vehicle Gross Profit*

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

*Wholesale Vehicle Gross Profit*

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes (including amounts due to Verde), our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 9 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other Expense*

Other expense, net includes changes in fair value on our beneficial interests in securitizations and purchase price adjustment receivable, as discussed in Note 17 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general operating expenses such as gains or losses from disposals of long-lived assets.

**Results of Operations**

| | Three Months Ended March 31, | | | | Change |
|---|---|---|---|---|---|
| | | 2020 | | 2019 | |
| | (dollars in thousands, except per unit amounts) | | | | |
| **Net sales and operating revenues:** | | | | | |
| Used vehicle sales, net | $ | 964,279 | $ | 683,829 | 41.0 % |
| Wholesale vehicle sales | | 79,606 | | 33,030 | 141.0 % |
| Other sales and revenues [(1)] | | 54,331 | | 38,375 | 41.6 % |
| Total net sales and operating revenues | $ | 1,098,216 | $ | 755,234 | 45.4 % |
| **Gross profit:** | | | | | |
| Used vehicle gross profit[(3)] | $ | 82,862 | $ | 47,122 | 75.8 % |
| Wholesale vehicle gross profit[(4)] | | 1,229 | | 3,035 | (59.5)% |
| Other gross profit [(1)] | | 54,331 | | 38,375 | 41.6 % |
| Total gross profit | $ | 138,422 | $ | 88,532 | 56.4 % |
| **Market information:** | | | | | |
| Markets, beginning of period | | 146 | | 85 | 71.8 % |
| Market launches | | 15 | | 24 | (37.5)% |
| Markets, end of period | | 161 | | 109 | 47.7 % |
| **Unit sales information:** | | | | | |
| Used vehicle unit sales | | 52,427 | | 36,766 | 42.6 % |
| Wholesale vehicle unit sales | | 10,754 | | 6,701 | 60.5 % |
| **Per unit selling prices:** | | | | | |
| Used vehicles | $ | 18,393 | $ | 18,599 | (1.1)% |
| Wholesale vehicles | $ | 7,402 | $ | 4,929 | 50.2 % |
| **Per unit gross profit:[(2)]** | | | | | |
| Used vehicle gross profit[(3)] | $ | 1,581 | $ | 1,282 | 23.3 % |
| Wholesale vehicle gross profit[(4)] | $ | 114 | $ | 453 | (74.8)% |
| Other gross profit | $ | 1,036 | $ | 1,044 | (0.8)% |
| Total gross profit | $ | 2,640 | $ | 2,408 | 9.6 % |

(1) Includes $20,562 and $10,573 for the three months ended March 31, 2020 and 2019, respectively, of other sales and revenues from related parties.
(2) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.
(3) Includes $510 and $764, or $10 and $20 per unit, related to the 100k Milestone Gift.
(4) Includes $17 and $22, or $2 and $3 per wholesale unit, related to the 100k Milestone Gift.

*Used Vehicle Sales*

   *Three months ended March 31, 2020 Versus* 2019. Used vehicle sales increased by $280.5 million to $964.3 million during the three months ended March 31, 2020, compared to $683.8 million during the three months ended March 31, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 52,427 from 36,766 during the three months ended March 31, 2020 and 2019, respectively. The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness and customer referrals. The increase in unit sales was also driven by growth to 161 markets as of March 31, 2020 from 109 markets as of March 31, 2019. Retail units sold in March was negatively impacted by COVID-19 as consumers increasingly sheltered-in-place and reduced commercial activity and we reduced advertising expenditures. Following COVID-19, we anticipate that unit sales will continue to grow as we increase penetration in existing markets and launch new markets. The average selling price of our retail units sold decreased

to $18,393 during the three months ended March 31, 2020 from $18,599 during the three months ended March 31, 2019, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

### Wholesale Vehicle Sales

*Three months ended March 31, 2020 Versus* 2019. Wholesale vehicle sales increased by $46.6 million to $79.6 million during the three months ended March 31, 2020, compared to $33.0 million during the three months ended March 31, 2019. We primarily obtain our wholesale inventory by acquiring vehicles from customers. The increase in revenue was partially driven by an increase in wholesale units sold to 10,754 from 6,701 during the three months ended March 31, 2020 and 2019. As our retail unit sales have increased, so have the trade-ins we receive. Moreover, during the three months ended March 31, 2020, we also acquired more vehicles from customers who did not purchase a retail unit from us. Therefore, we have had more units available for sale to wholesalers over time and our revenues attributed to wholesale vehicle sales have increased. In addition, the average selling price of our wholesale units sold increased to $7,402 during the three months ended March 31, 2020 from $4,929 during the three months ended March 31, 2019.

### Other Sales and Revenues

*Three months ended March 31, 2020 Versus* 2019. Other sales and revenues primarily consist of gains on the sales of loans we originate, commissions we receive on sales of VSCs and GAP waiver coverage. Other sales and revenues increased by $16.0 million to $54.3 million during the three months ended March 31, 2020, compared to $38.4 million during the three months ended March 31, 2019. This increase was primarily driven by the increase in retail units sold which led to an increase in loans originated, as well as an increase in VSC sales and GAP waiver coverage sales. The increase in loan originations resulted in an increase in interest income from interest earned on finance receivables held on balance sheet prior to our securitization transactions. Although the number of loans sold increased year-over-year, the gain on loan sale decreased as a result of the disruption in the overall securitization market experienced near the end of the three months ended March 31, 2020 as a result of the COVID-19 pandemic.

### Used Vehicle Gross Profit

*Three months ended March 31, 2020 Versus* 2019. Used vehicle gross profit increased by $35.7 million to $82.9 million during the three months ended March 31, 2020, compared to $47.1 million during the three months ended March 31, 2019. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,581 for the three months ended March 31, 2020 compared to $1,282 for the three months ended March 31, 2019. The per unit increase was primarily driven by acquiring more vehicles from customers. Due to COVID-19, the increase in used vehicle gross profit was partially offset by an adjustment to the value of our unsold used vehicle inventory of approximately $6.5 million to reflect its net realizable value as of March 31, 2020.

### Wholesale Vehicle Gross Profit

*Three months ended March 31, 2020 Versus* 2019. Wholesale vehicle gross profit decreased by $1.8 million to $1.2 million, during the three months ended March 31, 2020, compared to $3.0 million during the three months ended March 31, 2019. Although there was an increase in wholesale units sold to 10,754 during the three months ended from 6,701 during the three months ended March 31, 2019, there was a decrease in wholesale vehicle gross profit per wholesale unit, to $114 in the three months ended March 31, 2020 compared to $453 in the three months ended March 31, 2019. The decrease in wholesale vehicle gross profit per unit was primarily a result of the decline in the overall wholesale market conditions caused by the COVID-19 pandemic toward the end of the quarter, leading to an adjustment to the value of our unsold wholesale inventory of approximately $2.8 million to reflect its net realizable value as of March 31, 2020.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

41

*Components of SG&A*

|  | Three Months Ended March 31, | |
|  | 2020 | 2019 |
|  | (in thousands) | |
| Compensation and benefits [1] | $ 84,250 | $ 48,804 |
| 100k Milestone Gift | — | 2,188 |
| Advertising | 74,788 | 39,522 |
| Market occupancy [2] | 8,103 | 4,370 |
| Logistics [3] | 18,914 | 12,249 |
| Other [4] | 89,656 | 48,108 |
| Total | $ 275,711 | $ 155,241 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.
(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $120.5 million to $275.7 million during the three months ended March 31, 2020, compared to $155.2 million during the three months ended March 31, 2019. The increase was partially due to an increase in compensation and benefits by $35.4 million during the three months ended March 31, 2020, compared to the three months ended March 31, 2019, which was primarily driven by expansion of our logistics and delivery network, as well as growth in our corporate and technology teams. The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $35.3 million during the three months ended March 31, 2020, compared to the three months ended March 31, 2019. Market occupancy, logistics, and other overhead costs also increased during the three months ended March 31, 2020 compared to the prior period primarily due to an increase in number of markets and units sold.

*Interest Expense*

Interest expense increased by $13.2 million to $28.9 million during the three months ended March 31, 2020, compared to $15.6 million during the three months ended March 31, 2019. The increase is primarily due to the increase in the outstanding balance of the Senior Notes as a result of the issuance in May 2019 which incurred interest expense of $13.3 million during the three months ended March 31, 2020, compared to $7.8 million during the three months ended March 31, 2019. The remaining increase is due to increased interest expense incurred on our short-term revolving facilities, capital and finance leases, and long-term debt due to larger outstanding balances in the three months ended March 31, 2020 compared to the three months ended March 31, 2019.

*Other Expense, Net*

Other expense, net increased by $17.2 million to $17.4 million during the three months ended March 31, 2020, compared to $0.2 million during the three months ended March 31, 2019. The increase is primarily due to the uncertainty in the capital markets caused by the COVID-19 pandemic, driving a $16.5 million decline in certain assets carried at fair value, including our beneficial interests in securitizations and purchase price adjustment receivable, as of March 31, 2020.

### Non-GAAP Financial Measures

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA, EBITDA margin, adjusted net loss and adjusted net loss per share. We

42

believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three months ended March 31, 2020, there was approximately $0.5 million of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three months ended March 31, 2019, there was approximately $3.0 million of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $0.8 million within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### EBITDA and EBITDA Margin

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows (dollars in thousands):

|  | Three Months Ended March 31, | | | |
|  | 2020 | | 2019 | |
|---|---|---|---|---|
| Net loss[1] | $ | (183,557) | $ | (82,596) |
| Depreciation and amortization expense | | 15,811 | | 7,943 |
| Interest expense | | 28,862 | | 15,648 |
| EBITDA | $ | (138,884) | $ | (59,005) |
| | | | | |
| Total revenues | $ | 1,098,216 | $ | 755,234 |
| EBITDA Margin[2] | | (12.6)% | | (7.8)% |

(1) Includes $0.5 million and $3.0 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0% and 0.4%, respectively, related to the 100k Milestone Gift.

### Adjusted Net Loss and Adjusted Net Loss per Share

Adjusted net loss represents net loss attributable to Carvana Co. assuming the full exchange of all outstanding LLC Units for shares of Class A common stock. Adjusted net loss per share is calculated by dividing adjusted net loss by the weighted-average shares of Class A common stock outstanding assuming the full exchange of all outstanding LLC Units.

Adjusted net loss and adjusted net loss per share are supplemental measures of operating performance that do not represent and should not be considered alternatives to net loss and net loss per share, as determined under GAAP. We believe that by assuming the full exchange of all outstanding LLC Units, adjusted net loss and adjusted net loss per share supplement GAAP measures and enable us and our investors to more effectively evaluate our performance period-over-period and relative to our competitors that have different organizational and tax structures because the assumption eliminates the effect of any changes in net loss attributable to Carvana Co. driven by increases in our ownership of Carvana Group, LLC, which are unrelated to our operating performance.

A reconciliation of adjusted net loss to net loss attributable to Carvana Co., the most directly comparable GAAP measure, and the computation of adjusted net loss per share are as follows (in thousands, except per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Numerator: | | |
| Net loss attributable to Carvana Co. | $ (59,887) | $ (23,115) |
| Net loss attributable to non-controlling interests | (123,670) | (59,481) |
| Adjusted net loss attributable to Carvana Co. Class A common stock[2] | $ (183,557) | $ (82,596) |
| | | |
| Denominator: | | |
| Weighted-average shares of Class A common stock outstanding[1] | 50,399 | 41,352 |
| Adjustments: | | |
| Weighted-average assumed exchange of LLC Units for shares of Class A common stock | 105,241 | 108,974 |
| Adjusted shares of Class A common stock outstanding | 155,640 | 150,326 |
| Adjusted net loss per share[3] | $ (1.18) | $ (0.55) |

(1) Excludes approximately 1.1 million and 0.7 million nonvested service-based restricted stock awards and units outstanding at March 31, 2020 and March 31, 2019, respectively, and 1.3 million vested and nonvested stock options outstanding at both March 31, 2020 and March 31, 2019 because they were determined to be anti-dilutive.
(2) Includes $0.5 million and $3.0 million, respectively, related to the 100k Milestone Gift.
(3) Includes $0.00 and $0.02 per share, respectively, related to the 100k Milestone Gift.

## Liquidity and Capital Resources

### General

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

On March 24, 2020, we amended our Master Purchase and Sale Agreement with Ally to provide for the sale of up to $2.0 billion of principal balance of finance receivables to Ally. The amended agreement upsizes Ally's purchase commitment by approximately $1.6 billion, extends it to March 23, 2021, and broadens the set of customers covered by the agreement. This agreement gives us significant flexibility to serve customers during this period of heightened uncertainty.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including the impact of COVID-19, our rate of revenue growth, our expansion into new markets, construction of vending machines and IRCs, and the timing and extent of our spending to support our technology and software development efforts.

We had the following liquidity resources available as of March 31, 2020 and December 31, 2019 (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Cash and cash equivalents | $ 72,435 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 163,775 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 103,317 | 104,680 |
| Committed liquidity resources available | $ 339,527 | $ 459,776 |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $28.3 million and $29.7 million as of March 31, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.
(3) We have $174.8 million and $158.7 million of total unfunded gross real estate assets as of March 31, 2020 and December 31, 2019, respectively.

As of March 31, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1,875.0 million and $1,600.0 million, an outstanding balance of $812.2 million and $568.8 million, and unused capacity of $1,062.8 million and $1,031.2 million, respectively.

We also had $87.1 million and $137.7 million of committed funds for future construction costs of four IRCs with unfinished construction as of March 31, 2020 and December 31, 2019, respectively. In addition, we had $49.0 million and $13.5 million of total unpledged beneficial interests in securitizations as of March 31, 2020 and December 31, 2019, respectively.

Additionally, on April 1, 2020, we completed a registered direct offering of approximately 13.3 million shares of our Class A common stock and received net proceeds from the offering of approximately $599.5 million.

As of March 31, 2020 and December 31, 2019, our outstanding principal amount of indebtedness, including finance leases, was $1.8 billion and $1.5 billion, respectively, summarized in the table below (in thousands). See Note 9 — Debt Instruments and Note 15 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **Asset-Based Financing:** |  |  |
| Inventory | $ 738,214 | $ 515,487 |
| Finance receivables and beneficial interests | 151,677 | 138,335 |
| Transportation fleet [1] | 85,561 | 73,369 |
| Real estate [2] | 239,045 | 187,082 |
| Total asset-based financing | 1,214,497 | 914,273 |
| Senior unsecured notes [3] | 600,000 | 600,000 |
| Total debt | 1,814,497 | 1,514,273 |
| Less: unamortized premium and debt issuance costs [4] | (12,876) | (13,642) |
| **Total debt, net** | $ 1,801,621 | $ 1,500,631 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) As of both March 31, 2020 and December 31, 2019, Verde held $15.0 million of the Senior Notes.
(4) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other current assets and other assets on our consolidated balance sheets. The unamortized premium is presented as an increase to the carrying amount of the senior unsecured notes on our consolidated balance sheets.

45

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the three months ended March 31, 2020 and 2019 (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Net cash used in operating activities | $ (168,458) | $ (214,509) |
| Net cash used in investing activities | (88,708) | (43,199) |
| Net cash provided by financing activities | 283,742 | 276,054 |
| Net increase in cash, cash equivalents and restricted cash | 26,576 | 18,346 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 145,035 | $ 107,055 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. For the three months ended March 31, 2020, net cash used in operating activities was $168.5 million, a decrease of $46.1 million compared to net cash used in operating activities of $214.5 million for the three months ended March 31, 2019. The decrease in our net cash used in operating activities was primarily due to decreased cash used to purchase finance receivables, as well as changes in working capital during each period, primarily vehicle inventory and accounts receivable. These decreases in use of cash were partially offset by increased net loss as a result of increased selling, general and administrative expenses and a decrease in net cash inflows associated with the change in accounts payable and accrued liabilities.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $88.7 million and $43.2 million during the three months ended March 31, 2020 and 2019, respectively, an increase of $45.5 million. The increase primarily relates to the increase in purchases of property and equipment, specifically related to the construction of new IRCs and vending machines. Constructing new IRCs and vending machines allows us to recondition more vehicles and reach additional customers. To finance these investments we have entered into various financing transactions, such as sale-leasebacks.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $283.7 million and $276.1 million during the three months ended March 31, 2020 and 2019, respectively, an increase of $7.7 million. The change primarily relates to increased proceeds from long-term debt net of payments driven by increased proceeds on sale-leaseback arrangements on four IRCs currently under construction during the three months ended March 31, 2020.

**Contractual Obligations and Commitments**

We have not entered into any material contractual obligations or commitments outside of the ordinary course of business since the most recently ended fiscal year as disclosed in the header "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our most recent Annual Report on Form 10-K.

**Fair Value Measurements**

We report money market securities, certain receivables, and beneficial interests in securitizations at fair value. See Note 17 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Off-Balance Sheet Arrangements**

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivables by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 8 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

Except as discussed above, we did not have any off-balance sheet arrangements as of March 31, 2020.

**Critical Accounting Policies**

Refer to Note 2 — Summary of Significant Accounting Policies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for accounting pronouncements and material changes to our critical accounting policies since December 31, 2019. There have been no other material changes to our critical accounting policies and use of estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

47

## FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the effect and consequences of the COVID-19 public health crisis on matters including U.S. and local economies; our business operations and continuity; the availability of corporate and consumer financing; the health and productivity of our employees; the ability of third-party providers to continue uninterrupted service; and the regulatory environment in which we operate;

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime and its affiliates;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our ability to sell and generate gains on the sale of automotive finance receivables;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the Internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance vending machines and IRCs;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

49

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indenture governing our senior unsecured notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Controls Over Financial Reporting

There were no changes to our internal control over financial reporting that occurred during the three months ended March 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, except as follows:

*The COVID-19 pandemic is adversely affecting, and could continue to adversely affect, our business, operating results, financial condition and prospects.*

COVID-19 was identified in China in late 2019 and has spread globally. The rapid spread has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders and shutdowns. These measures have impacted and may further impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. While the federal and state governments have taken measures to try to contain the COVID-19 pandemic, there is considerable uncertainty regarding such measures and potential future measures. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business and have a material adverse effect on our business, operating results, financial condition and prospects. There is no certainty that measures taken by governmental authorities will be sufficient to mitigate the risks posed by the COVID-19 pandemic, and our ability to perform critical functions could be harmed.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty, and has led to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. It is likely that the COVID-19 pandemic will cause an economic slowdown, and it is possible that it could cause a global recession. Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further risks related to negative economic conditions are described in our risk factor titled "Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues." under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019.

The ultimate magnitude of COVID-19, including the extent of its impact on our financial and operational results, which could be material, will be determined by the length of time that the pandemic continues, its effect on the demand for our vehicles, our inventory supply chain and distribution, and the capital markets, as well as the effect of governmental regulations imposed in response to the pandemic. We cannot at this time predict the impact of the COVID-19 pandemic, but it could continue to have a material adverse effect on our business, operating results, financial condition and prospects.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

**Recent Sales of Unregistered Securities**

There were no unregistered sales of equity during the three months ended March 31, 2020, except as otherwise previously reported.

During the three months ended March 31, 2020, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged approximately 0.1 million LLC Units and approximately 0.0 million shares of Class B common stock for approximately 0.1 million newly-issued shares of Class A common stock.

These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Seventh Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.2* | Eighth Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.3* | Ninth Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.4 | Transfer Agreement, dated March 30, 2020, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

* Certain portions of the exhibit (indicated by "[***]") have been omitted as the Registrant has determined (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:    May 6, 2020

<div style="text-align:right">

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins

Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

</div>

54

**SEVENTH AMENDMENT**

SEVENTH AMENDMENT, dated as of March 19, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, and by the Sixth Amendment, dated as of April 19, 2019 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

(a) inserting each of the following terms which are double underlined in the place where such term appears below to the "Cutoff Date" definition:

""Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to

any First Tier Receivables Pool and Receivables Pool sold (i) from and including March 7, 2019 to and including April 4, 2019, respectively, and (ii) on March 20, 2020, the "Cutoff Date" shall be the date consented to by the Purchasers."

(b) inserting the following terms to the end of clause (xxxiv) to the "Eligible Receivable" definition:

"provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply."

(c) inserting each of the following terms which are double underlined in the place where such term appears below and deleting the stricken text to the "Origination Period" definition:

""Origination Period" means, each calendar week during the period beginning with the week of December 12, 2016 and ending with the week containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, and (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, and (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, "Origination Period" shall be the period consented to by the Purchasers."

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 <u>Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of a signed counterpart to this Amendment that has been duly executed and delivered by each of the parties hereto.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.04 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the

subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.05 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

*[remainder of the page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**CARVANA AUTO RECEIVABLES 2016-1 LLC**, as Transferor

By:     /s/ Paul Breaux

Name:    Paul Breaux

Title:    Vice President

**ALLY BANK**, as Purchaser

By:     /s/ William R. Thompson

Name:    William R. Thompson

Title:    Authorized Representative

**ALLY FINANCIAL INC**, as Purchaser

By:     /s/ Thomas Elkins

Name:    Thomas Elkins

Title:    Authorized Representative

Agreed to and Accepted by:

**CARVANA, LLC**, as Seller

By:     /s/ Paul Breaux

Name:    Paul Breaux

Title:    Vice President

**EIGHTH AMENDMENT**

EIGHTH AMENDMENT, dated as of March 24, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, and by the Seventh Amendment, effective as of March 19, 2020, (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

(a) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Commitment Amount" definition:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

""Commitment Amount" means the sum of (i) $2,000,000,000~~1,000,000,000~~ plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool."

(b) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Commitment Period" definition:

""Commitment Period" means the period from the Fourth~~Third~~ Extension Amendment Effective Date to the earliest of (i) the Scheduled Commitment Termination Date, (ii) the occurrence of a Commitment Termination Event and (iii) the purchase by the Purchasers of Receivables Pools with a total Cutoff Date Aggregate Outstanding Principal Balance in an amount equal to the Commitment Amount."

(c) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Cutoff Date" definition:

""Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to any First Tier Receivables Pool and Receivables Pool sold (i) from and including March 7, 2019 to and including April 4, 2019, respectively, ~~and~~ (ii) on March 20, 2020, and (iii) on any other date consented to by the Purchasers in their sole discretion, the "Cutoff Date" shall be the date consented to by the Purchasers."

(d) deleting clauses (xlii) and (xliii) to the "Eligible Receivable" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Eligible Receivable" definition:

"(xxxiii) (A) for Receivables with a related Cutoff Date on or after February 24, 2019 and on or prior to March 19, 2020, the LTV at origination did not exceed [***] and (B) for Receivables with a related Cutoff Date after March 19, 2020, where the Obligor has a FICO score (a) greater than or equal to 640, then the LTV at origination is less than or equal to [***]%; (b) greater than or equal to 600 and less than 640, then the LTV at origination is less than or equal to [***]%, (c) greater than or equal to 580 and less than 600, then the LTV at origination is less than or equal to 140%; and (d) less than 580, then the LTV at origination is less than or equal to [***]%;"

[***] Redacted for confidentiality purposes.

"(xxxiv) The Obligor has a FICO score of not less than 520~~590~~ and, not more than the Upper Bound FICO Score, which, except for a Receivable included in the initial Receivables Pool on the initial Closing Date, shall have been obtained by Carvana within the [***] days prior to the origination of the related Receivable, unless otherwise consented to by the Purchasers; <u>provided</u> that, if the Seller exercises a Limited Sale Option on any Closing Date occurring on or after March 7, 2019 through and including April 4, 2019, the maximum FICO score limit described in this clause (xxxiv) shall not apply; provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply;"

(e) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Origination Period" definition:

""<u>Origination Period</u>" means, each calendar week during the period beginning with the week of December 12, 2016 and ending with the week containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, ~~and~~ (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, <u>and (iv) any other date consented to by the Purchasers in their sole discretion,</u> "Origination Period" shall be the period consented to by the Purchasers."

(f) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Purchase Percentage" definition:

""<u>Purchase Percentage</u>" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" <u>and such other documented administrative criteria as the Purchasers may agree to from time to time</u> during such Origination Period (which, for purposes of <u>clause (ii)</u> shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than <u>100%</u>~~50%~~ and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply."

---

[***] Redacted for confidentiality purposes.

(g) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Scheduled Commitment Termination Date" definition:

""Scheduled Commitment Termination Date" means March 23, 2021~~April 17, 2020~~."

(h) adding a new definition of "Fourth Extension Amendment Effective Date" in proper alphabetical order to read as follows:

""Fourth Extension Amendment Effective Date" means March 24, 2020."

(i) deleting the "Third Extension Amendment Effective Date" definition.

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100%~~50%~~ (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%~~50%~~) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination

Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage."

Section 2.02 <u>Amendments to Section 2.1(d) (Selection of Receivables Pools)</u>. <u>Section 2.1(d)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(d) <u>Selection of Receivables Pools.</u> The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures <u>and such other documented administrative criteria as the Purchasers may agree to from time to time</u>, as selected by the Seller in accordance with the Selection Procedures and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) upon consultation with the Purchasers, each such Receivables Pool (after giving effect to such sale) meets the Eligible Receivables Pool criteria. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis <u>after applying such documented administrative criteria as the Purchasers may agree to from time to time</u> (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this <u>Section 2.1(d)</u> and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection."

Section 2.03 <u>Amendments to Section 6.2(b) (Minimum Sales Amount)</u>. <u>Section 6.2(b)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than <u>100%</u>50% (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of <u>100%</u>50%) of the aggregate principal balance of weekly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" <u>and such other documented administrative criteria as the</u>

<u>Purchasers may agree to from time to time</u> originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers.

Section 2.04 <u>Amendments to Section 7.20(h) (Credit Policy)</u>. <u>Section 7.20(h)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

(h) <u>Credit Policy</u>. During the Commitment Period, the Transferor will not, and it will not permit the Seller to, amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to <u>Exhibit E</u> attached hereto, without written notification to the Purchasers; <u>provided</u> that the prior written consent of the Purchasers shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Purchasers under this Agreement or any other Basic Document. The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's policies concerning generation of financing terms as well as (i) a comparison showing all changes to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month, noting that the Purchasers may also request a current version of the Seller's policies concerning generation of financing terms at any point in time. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms. <u>The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's Credit Policy as well as (i) a comparison showing all changes to the Seller's Credit Policy as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's Credit Policy as provided to the Purchasers during the previous calendar month, noting that the Purchasers may also request a current version of the Seller's Credit Policy at any point in time.</u>

Section 2.05 <u>Amendments to Exhibit A</u>. <u>Schedule 6</u> (Accounts and Receivables Analysis for the subject Receivables Pool) to <u>Exhibit A</u> to the Master Purchase and Sale Agreement is hereby deleted in its entirety and replaced with "[Reserved]".

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto;

(b) a signed counterpart to the Twelfth Amended and Restated Letter Agreement re Master Purchase and Sale Agreement, dated as of the date hereof, shall have been duly

executed and delivered by Carvana, LLC, Bridgecrest Credit Company, LLC, the Transferor, Ally Financial, and Ally Bank; and

(c) a signed copy of the Sixth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Representations and Warranties</u>. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 Effect of Headings. The section headings herein are for convenience only and shall not affect the construction hereof.

*[remainder of the page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By:    /s/ Paul Breaux
      Name: Paul Breaux
      Title: Vice President

ALLY BANK,
as Purchaser

By:    /s/ William R. Thompson
      Name: William R. Thompson
      Title: Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser

By:    /s/ Thomas Elkins
      Name: Thomas Elkins
      Title: Authorized Representative

      Agreed to and Accepted by:

      CARVANA, LLC,
      as Seller
      By:     /s/ Paul Breaux
      Name:   Paul Breaux
      Title:    Vice President

**NINTH AMENDMENT**

NINTH AMENDMENT, dated as of April 29, 2020 (this "<u>Amendment</u>") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, and by the Eighth Amendment, effective as of March 24, 2020 (the "<u>Master Purchase and Sale Agreement</u>"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "<u>Transferor</u>"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "<u>Purchaser</u>"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "<u>Purchaser</u>" and, together with Ally Bank, the "<u>Purchasers</u>").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 <u>Amendments to Appendix A (Definitions)</u>. Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

(a) adding a definition of "Flex Receivable" in the proper alphabetical order to read as follows:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

""Flex Receivable" means a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including [***] (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller. For the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable."

(b) adding a definition of "Flex Amount" in the proper alphabetical order to read as follows:

""Flex Amount" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement."

(c) revising the "Administrative Purchase Payment" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Administrative Purchase Payment" definition

""Administrative Purchase Payment" means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360."

(d) revising clause (xii) to the "Eligible Receivable" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Eligible Receivable" definition:

""(xii) (A) For a Receivable that is not a Flex Receivable, the The first scheduled payment in respect of such Receivable is no more than forty-five (45) days from the related contract date or (B) is a Flex Receivable;""

(e) revising the "Warranty Payment" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Warranty Payment" definition:

""Warranty Payment" means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days

[***] Redacted for confidentiality purposes.

from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360."

(f) revising the "Purchase Price" definition and inserting each of the following terms which are double underlined in the place where such term appears below to the "Purchase Price" definition:

""Purchase Price" means the price applicable to the Purchased Receivables purchased in any Receivables Pool, which shall be equal to (x) the sum of (i) the price for such Receivables Pool designated by the Pricing Model (for the avoidance of doubt, the Pricing Model will, for each Purchased Receivable in such Receivables Pool, (A) increase the related purchase price for any interest scheduled to accrue (ignoring any non-scheduled payment that may be received by the Seller) for the period from the date of origination (or, if such Purchased Receivable has at least one scheduled monthly payment occurring prior to the related Cutoff Date, from such most recent scheduled monthly payment date) through the related Closing Date and (B) decrease the related purchase price for the portion of any non-scheduled payment received by the Seller prior to the related Cutoff Date allocated to accrued interest) plus (ii) the Pre-closing Interest Carry Amount for such Receivables Pool as of the Closing Date, minus (y) the Flex Amount (if any) for such Receivables Pool."

(g) revising the "First Step Receivables Purchase Price" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "First Step Receivables Purchase Price" definition:

""First Step Receivables Purchase Price" means, with respect to a First Tier Receivables Pool, an amount equal to the related ~~Closing Date~~ Second Step Receivables Purchase Price."

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100% (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale

[***] Redacted for confidentiality purposes.

Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including [\*\*\*], taken together, shall not exceed $[\*\*\*] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)."

Section 2.03 Amendments to Section 2.1(b) (Purchaser Obligation). Section 2.1(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including [\*\*\*], taken together, shall not exceed $[\*\*\*], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation")."

Section 2.04 Amendments to Section 2.1(d) (Selection of Receivables Pools). Section 2.1(d) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each of the following terms which are double underlined in the place where such term appears below and deleting the stricken text:

"(d) Selection of Receivables Pools. The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures and such other documented administrative criteria as the Purchasers may agree to from time to time, as selected by the Seller in accordance with the Selection Procedures and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) (a) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria and (b) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, such Receivables Pool together with all Receivable Pools previously purchased,

[\*\*\*] Redacted for confidentiality purposes.

meet the applicable Eligible Receivables Pool criteria~~each such Receivables Pool (after giving effect to such sale) meets the Eligible Receivables Pool criteria~~. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the <u>applicable</u> criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis after applying such documented administrative criteria as the Purchasers may agree to from time to time (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this Section 2.1(d) and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection."

> Section 2.05 <u>Amendments to Section 3.1(e) (Purchase Cadence and Settlement Report)</u>. <u>Section 3.1(e)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(e) <u>Purchase Cadence and Settlement Report</u>. Not later than the third (3rd) Business Day following an Origination Period, the Transferor shall provide the Purchasers with the Purchase Percentage and supply the Purchasers with an initial data tape in form and substance acceptable to the Purchasers containing the information as called for in <u>Exhibit D</u> <u>and indicating which Receivables listed in such initial data tape are Flex Receivables</u> with respect to all Receivables originated or acquired by the Seller in the preceding Origination Period (and any Previously Originated Receivables to be included in the Related Receivables Pool) that the Seller and the Transferor intend in good faith to sell to the Purchasers under this Agreement meeting the selection criteria for sale to the Transferor and those Receivables meeting the eligibility criteria for sale by the Transferor to the Purchasers, a Receivables Pool. Not later than the first (1st) Business Day of the second week following an Origination Period (but at least two (2) Business Days prior to the related Closing Date), the Transferor shall supply the Purchasers with a final data tape in form and substance acceptable to the Purchasers containing the final information as called for in <u>Exhibit D</u> <u>and indicating which Receivables listed in such initial data tape are Flex Receivables</u> with respect to all Receivables in the related Receivables Pool and identifying any receivable in the initial data tape that was determined not to be an Eligible Receivable, including any receivable with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable. Not less than two (2) Business Days prior to each proposed Closing Date, the Transferor will deliver to the Purchasers a settlement report substantially in the form of <u>Schedule 2</u> attached to the Pool Supplement (the "<u>Settlement Report</u>"), in form and substance reasonably acceptable to the Purchaser setting forth amounts due the Transferor with respect to the applicable Receivables Pool and containing at least the calculation of the related Cutoff Date Aggregate Outstanding Principal Balance, the Pre-closing Interest Carry Amount, the purchase price designated by the Pricing Model, the re-liening expenses described in <u>Section 2.7</u> and the Second Step Receivables Purchase Price."

[***] Redacted for confidentiality purposes.

Section 2.06 <u>Amendments to Section 4.1(a) (General Procedures)</u>. <u>Section 4.1(a)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(iii) Not later than the second (2nd) Business Day of the second week following an Origination Period (but at least one (1) Business Day prior to the related Closing Date), the Purchasers shall notify the Seller of the final Purchase Price <u>(including any Flex Amount)</u> for the Receivables Pool and the final allocation of purchase between Ally Bank and Ally Financial."

Section 2.07 <u>Amendments to Section 5.2(cc)(i) (Characteristics of the Receivables)</u>. Section 5.2(cc)(i) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(i) <u>Characteristics of Receivables</u>. As of each Cutoff Date (except to the extent otherwise provided in the definition of "Eligible Receivable") with respect to the related Receivables to be purchased, (A) each Receivable is an Eligible Receivable, (B) ~~all of the Receivables, together, constitute an Eligible Receivables Pool~~<u>(i) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (ii) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable)</u> and (C) the Receivables Pool was selected as described in Section 2.1(d)."

Section 2.08 <u>Amendments to Section 6.2(a) (Aggregate Purchase Commitment)</u>. <u>Section 6.2(a)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) <u>Aggregate Purchase Commitment</u>. After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date <u>and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including [\*\*\*], taken together, shall not exceed $[\*\*\*] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)</u>."

Section 2.09 <u>Amendments to Section 8.2 (Repurchase of Receivables Upon Breach by the Transferor)</u>. <u>Section 8.2</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"Upon (i) the discovery of any breach of any representation or warranty as set forth in <u>Section 5.2(cc)</u> of this Agreement (and with respect to <u>paragraphs (i)(B)(ii) and (x)</u> therein, without

[\*\*\*] Redacted for confidentiality purposes.

giving effect to any knowledge requirements) or (ii) the Purchasers incurring any cost, expense, loss, claim, damage or liability resulting from any conduct or omission of the Seller or the Transferor that results in the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Such notice shall specify the reason for such ineligibility or breach and shall identify all Receivables that the party preparing such notice knows is so ineligible or in breach as of such date. Unless the breach described in clause (i) above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in clause (ii) above, in each such circumstance, the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit, or cause to be remitted the Warranty Payment to the applicable Collection Account for distribution pursuant to Section 4.2 of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in Section 7.14 of this Agreement) against the Transferor for such breach available to the Purchasers."

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 Conditions to Effectiveness. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto;

(b) a signed copy of the Thirteenth Amended and Restated Letter Agreement re Master Purchase and Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC, Bridgecrest Credit Company, LLC, the Transferor, Ally Financial, and Ally Bank; and

(c) a signed copy of the Seventh Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 Continuing Effect of the Master Purchase and Sale Agreement. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 Representations and Warranties. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

[***] Redacted for confidentiality purposes.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

[***] Redacted for confidentiality purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By: /s/ Paul Breaux

Name:   Paul Breaux
Title:   Vice President

ALLY BANK,
as Purchaser

By: /s/ William R. Thompson

Name:   William R. Thompson
Title:   Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser

By: /s/ Thomas Elkins

Name:   Thomas Elkins
Title:   Authorized Representative

Agreed to and Accepted by:

CARVANA, LLC,
as Seller

By:   /s/ Paul Breaux
Name:   Paul Breaux
Title:   Vice President

**RECEIVABLES TRANSFER AGREEMENT**

This RECEIVABLES TRANSFER AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of March 30, 2020, is by and between Carvana Receivables Depositor LLC, a Delaware limited liability company (the "Depositor"), and Carvana Auto Receivables Trust 2020-NP1, a Delaware statutory trust (the "Issuing Entity").

**AGREEMENTS**

WHEREAS, on the Closing Date, Carvana, LLC (the "Seller") has sold automobile retail installment contracts and related rights to the Depositor;

WHEREAS, the Depositor is willing to sell such contracts and related rights to the Issuing Entity pursuant to this Agreement;

WHEREAS, the Issuing Entity intends to contribute or otherwise transfer such contracts and related rights, or interests therein, to Carvana Auto Receivables Grantor Trust 2020-NP1, a Delaware statutory trust (the "Grantor Trust"), pursuant to the Receivables Contribution Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Receivables Contribution Agreement"), between the Issuing Entity and the Grantor Trust, in exchange for the Grantor Trust Certificate;

WHEREAS, the Grantor Trust intends to pledge such contracts and related rights to Wells Fargo Bank, National Association ("Wells Fargo"), as indenture trustee (the "Indenture Trustee"), and the Issuing Entity will issue notes backed by the Grantor Trust Certificate pursuant to the Indenture, dated as of the date hereof (as amended, modified or supplemented from time to time, the "Indenture"), among the Issuing Entity, Carvana Auto Receivables Grantor Trust 2020-NP1 (the "Grantor Trust"), and the Indenture Trustee; and

WHEREAS, Bridgecrest Credit Company, LLC, an Arizona limited liability company (the "Servicer"), is willing to service such contracts in accordance with the terms of the Servicing Agreement, dated as of the date hereof, among the Issuing Entity, the Grantor Trust, the Backup Servicer and the Servicer.

NOW, THEREFORE, in consideration of the mutual agreements and subject to the terms and conditions herein contained, each party agrees as follows for the benefit of the other party:

ARTICLE I
DEFINITIONS

Section 1.1 Definitions; Rules of Construction. Certain capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings assigned to them in Part I of Appendix A of the Indenture. All references herein to "the Agreement" or "this Agreement" are to this Receivables Transfer Agreement as it may be amended, supplemented or modified from time to time, and all references herein to Articles and Sections are to Articles or Sections of this Agreement unless otherwise specified (and for such purposes only, references in

those sections to the Agreement (including references to "this Agreement", "hereof", "hereunder" and words of like effect) shall be deemed to refer this Agreement). The rules of construction set forth in Part II of Appendix A of the Indenture shall be applicable to this Agreement.

ARTICLE II
CONVEYANCE OF RECEIVABLES

Section 2.1 Conveyance of Receivables.

(a) On the Closing Date, the Depositor hereby agrees to sell, transfer, assign, set over and otherwise convey to the Issuing Entity and the Issuing Entity hereby agrees to purchase from the Depositor, without recourse, all right, title and interest of the Depositor in, to and under the following property, whether now existing or hereafter created or acquired (all of the property described in this Section 2.1(a) being collectively referred to herein as the "Second Step Transferred Property"):

(i) the Receivables and all instruments and all monies due or to become due or received by any Person in payment of any of the foregoing on or after the Cutoff Date;

(ii) the Financed Vehicles securing such Receivables (including any such Financed Vehicles that have been repossessed), any document or writing evidencing any security interest in any such Financed Vehicle and each security interest in each Financed Vehicle;

(iii) the Receivable Files and the Servicer Files related to such Receivables;

(iv) all rights to payment under all Insurance Policies with respect to the Financed Vehicles or the Obligors, including any monies collected from whatever source in connection with any default of an Obligor or with respect to any such Financed Vehicle and any proceeds from claims or refunds of premiums on any Insurance Policy;

(v) all guaranties, indemnities, warranties, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of the Receivables, whether pursuant to the related Contracts or otherwise;

(vi) all rights to payment under all service contracts and other contracts and agreements associated with such Receivables;

(vii) all Liquidation Proceeds related to any such Receivable received on or after the Cutoff Date;

(viii) subject to the Transaction Documents and the Master Agency Agreement, all deposit accounts, monies, deposits, funds, accounts and instruments relating to the foregoing (excluding payments or recoveries in respect of the Receivables received prior to the Cutoff Date);

(ix) the Receivables Purchase Agreement, including the right of the Depositor to cause the Seller to repurchase Receivables under certain circumstances;

(x) the proceeds of any and all of the foregoing; and

(xi) all present and future claims, demands, causes of action and choses in action in respect of any of all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property; all accounts, general intangibles, chattel paper, instruments, documents, money, investment property, deposit accounts, letters of credit, letter-of-credit rights, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations; and all other property which at any time constitutes all or part of or is included in the proceeds of any of the foregoing.

(b) In connection with the purchase and sale of the Second Step Transferred Property hereunder, the Depositor agrees, at its own expense, (i) to annotate and indicate on its books and records (including any computer files) that the Receivables were sold and transferred to the Issuing Entity pursuant to this Agreement, (ii) to deliver to the Issuing Entity (or its designee) all Collections on the Receivables, if any, received on or after the Cutoff Date, and (iii) to deliver to the Issuing Entity an assignment in the form attached hereto as Exhibit A (the "Second Step Receivables Assignment").

(c) In consideration of the sale of the Receivables from the Depositor to the Issuing Entity as provided herein, the Issuing Entity shall deliver to, or upon the order of, the Depositor the Notes and Certificates (the "Purchase Price"). The Issuing Entity hereby directs the Depositor to transfer all Electronic Contracts included in the Second Step Transferred Property directly to the Grantor Trust, as assignee under the Receivables Contribution Agreement of the Issuing Entity.

Section 2.2 Intent of the Parties.

It is the intention of the parties that each conveyance hereunder of the Receivables and the other Second Step Transferred Property from the Depositor to the Issuing Entity as provided in Section 2.1 be, and be construed as, an absolute sale, without recourse, of the Receivables and other Second Step Transferred Property by the Depositor to the Issuing Entity. Furthermore, no such conveyance is intended to be a pledge of the Second Step Transferred Property by the Depositor to the Issuing Entity to secure a debt or other obligation of the Issuing Entity. If,

however, notwithstanding the intention of the parties, the conveyance provided for in Section 2.1 is determined, for any reason, not to be an absolute sale, then the parties intend that this Agreement shall be deemed to be a "security agreement" within the meaning of Article 9 of the UCC and the Depositor hereby grants to the Issuing Entity a "security interest" within the meaning of Article 9 of the UCC in all of the Depositor's right, title and interest in and to the Second Step Transferred Property, now existing and hereafter created or acquired, to secure a loan in an amount equal to Purchase Price and each of the Depositor's other payment obligations under this Agreement.

<div align="center">

ARTICLE III
REPRESENTATIONS, WARRANTIES AND COVENANTS

</div>

Section 3.1 Representations and Warranties of the Depositor.

(a) General Representations and Warranties. The Depositor makes the following representations and warranties to the Issuing Entity as of the date of this Agreement, which shall survive the delivery of the Second Step Transferred Property and on which representations and warranties the Issuing Entity shall rely in acquiring the Second Step Transferred Property.

(i) Organization and Good Standing. The Depositor has been duly organized, and is validly existing as a limited liability company, in good standing under the laws of the state of its formation, with all requisite limited liability company power and authority to own or lease its properties and conduct its business as such business is presently conducted, and the Depositor had at all relevant times, and now has the power, authority and legal right to acquire, own and sell the Receivables and other Second Step Transferred Property.

(ii) Due Qualification. The Depositor is duly qualified to do business and is in good standing under the laws of each jurisdiction, and has obtained all necessary licenses and approvals in all jurisdictions, in which the ownership or lease of its property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination, purchase, sale, pledge and servicing of the Receivables) except where the failure to so qualify or obtain such license or approval could not reasonably be expected to result in a Material Adverse Effect.

(iii) Power and Authority; Due Authorization. The Depositor (i) has the power and authority to (A) execute and deliver this Agreement and the other Transaction Documents to which it is a party, (B) carry out the terms of the Transaction Documents to which it is a party and (C) sell the Second Step Transferred Property on the terms and conditions herein provided and (ii) has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and the sale of the Second Step

Transferred Property on the terms and conditions herein and therein provided.

(iv) <u>Valid Sale, Binding Obligation</u>. This Agreement, when duly executed and delivered by the Depositor, and the Second Step Receivables Assignment constitute a valid sale, transfer and assignment of the applicable Receivables and other Second Step Transferred Property to the Issuing Entity, enforceable against creditors of and purchasers from the Depositor; and this Agreement, when duly executed and delivered by the Depositor, and the Second Step Receivables Assignment constitute a legal, valid and binding obligation of the Depositor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(v) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which the Depositor is a party and the fulfillment of the terms hereof and thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Depositor's certificate of formation, limited liability company agreement or other constituent documents or any Contractual Obligation of the Depositor, (ii) result in the creation or imposition of any Lien upon any of the Depositor's properties, other than Liens permitted or created pursuant to the Transaction Documents, or (iii) violate any Applicable Law; in each case, except where such failure to comply could not reasonably be expected to have a Material Adverse Effect with respect to the Depositor.

(vi) <u>No Proceedings</u>. There are no proceedings or investigations pending or, to the knowledge of the Depositor, threatened against the Depositor, before any Governmental Authority (i) asserting the invalidity of this Agreement or any other Transaction Document to which the Depositor is a party, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document to which the Depositor is a party or (iii) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to the Depositor.

(vii) <u>No Consents</u>. All approvals, authorizations, consents, orders, or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Depositor of this Agreement and any other Transaction Document to which the Depositor is a party have been obtained.

(b) <u>Representations and Warranties Regarding the Receivables</u>. The Depositor makes the following representations and warranties to the Issuing Entity regarding each Receivable as of the Closing Date, which shall survive the sale, transfer and assignment of the Receivables and on which representations and warranties the Issuing Entity shall rely in acquiring the Receivables.

(i) <u>Receivables</u>. Pursuant to <u>Section 2.1(a)(ix)</u>, the Depositor assigns to the Issuing Entity all of its right, title and interest in, to and under the Receivables Purchase Agreement. Such assigned right, title and interest includes the benefit of the representations and warranties of the Seller made to the Depositor pursuant to Section 3.1(b) of the Receivables Purchase Agreement. The Depositor hereby represents and warrants to the Issuing Entity that the Depositor has taken no action which would cause such representations and warranties of the Seller to be false in any material respect as of the Closing Date.

(ii) <u>Good Title</u>.

(A) Immediately prior to the conveyance of each Receivable and the related Second Step Transferred Property to the Issuing Entity pursuant to this Agreement and the Second Step Receivables Assignment, the Depositor had good and marketable title thereto, free and clear of all Liens except for Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Second Step Transferred Property shall, on or after the Closing Date, be on file in any recording office except such as may be filed in favor of (i) the Issuing Entity in accordance with this Agreement, (ii) the Grantor Trust in connection with the Receivables Contribution Agreement or (iii) the Indenture Trustee in connection with the Indenture.

(B) Upon the conveyance of such Receivable and the other related Second Step Transferred Property to the Issuing Entity pursuant to this Agreement and the Second Step Receivables Assignment, the Issuing Entity will be the sole owner of, and have good, indefeasible and marketable title to such Receivable and other related Second Step Transferred Property, free and clear of any Lien (other than Liens created hereunder and Permitted Liens); and, to the extent the related Obligor has a contractual right to return the Financed Vehicle to the Seller for repurchase, the applicable repurchase period has expired. As of the Closing Date, each Receivable and the related Financed Vehicle is free and clear of any Lien of any Person (other than Liens created hereunder and Permitted Liens or those Liens that will be released simultaneously with the conveyance hereunder) and is in compliance with all Applicable Laws.

(iii) <u>All Filings Made</u>. With respect to the sale and assignment of the Second Step Transferred Property to the Issuing Entity, the Depositor has taken all steps reasonably necessary to ensure that such sale and assignment has been perfected under the relevant UCC. With respect to the Second Step Transferred Property, the Depositor has taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Indenture Trustee a first priority perfected security interest in the Second Step Transferred Property have been made.

(iv) <u>Value Given</u>. The Issuing Entity shall have given reasonably equivalent value to the Depositor in consideration for the transfer by the Depositor to the Issuing Entity of each of the Receivables and the related Second Step Transferred Property under this Agreement.

(c) <u>Repurchase of Receivables</u>.

(i) In the event of

(A) a breach of any representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement or <u>Section 3.1(b)</u> hereof with respect to any Receivables that materially and adversely affects the interests of the Noteholders or the Certificateholders taken as a whole, unless the breach by the Depositor shall have been cured within thirty (30) days following (i) discovery of the breach or receipt of notice of such breach by the Depositor from the Issuing Entity or the Grantor Trust (which notice shall provide sufficient detail so as to allow the Seller to reasonable investigate the alleged breach), or (ii) in the case of the Owner Trustee, the Grantor Trust Trustee or the Indenture Trustee, a Responsible Officer of such trustee has actual knowledge or receives written notice of a breach of such representation or warranty, then

(B) the Depositor shall (1) repurchase from the Issuing Entity each Receivable related to such breach by remitting to the Collection Account an amount equal to the Purchase Amount of each such Receivable or (2) in the event of a breach of any representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement that results in a Repurchase Event, use reasonable efforts to enforce, at the direction of the Issuing Entity or any of it assigns, including the Indenture Trustee, the obligations of the Seller under Section 3.1(c) of the Receivables Purchase Agreement to repurchase each Receivable related to such breach by remitting to the Collection Account an amount equal to the Purchase Amount of each such Receivable. Any such breach of a representation or warranty set forth in <u>Section 3.1(b)</u> hereof shall be deemed not to materially and adversely affect the interests of the Noteholders or the Certificateholders taken as a whole, if such Repurchase Event does not affect the ability of the Issuing Entity (or its assignee) to receive and retain timely payment in full on such Receivable. The Depositor shall not interfere with or act to hinder the Issuing Entity's or any assignee's exercise of rights and remedies under this <u>Section 3.1(c)</u> or under Section 3.1(c) or Section 4.13 of the Receivables Purchase Agreement.

(ii) It is understood and agreed that the obligation of the Depositor to repurchase any Receivable as to which a breach of a representation or

warranty set forth in <u>Section 3.1(b)</u>, which materially and adversely affects the interests of the Noteholders or the Certificateholders taken as a whole, has occurred and is continuing, and the obligation of the Depositor to enforce the Seller's obligation to repurchase such Receivables pursuant to the Receivables Purchase Agreement in connection with a breach of a representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement shall, if such obligations are fulfilled, constitute the sole and exclusive remedy (other than any indemnities available pursuant to <u>Section 4.13</u> or Section 4.13 of the Receivables Purchase Agreement) against the Depositor or the Seller for such breach available to the Issuing Entity, the Grantor Trust, the Financial Parties, the Owner Trustee, the Grantor Trust Trustee or the Indenture Trustee.

(iii) Upon the receipt of the applicable Purchase Amount, the applicable Receivable and any and all related Second Step Transferred Property shall be automatically and immediately assigned and re-conveyed by the Issuing Entity (or its applicable assign, as the case may be) to the Depositor.

(d) Upon discovery by the Depositor or by the Issuing Entity of a breach of any of the representations and warranties set forth in <u>Section 3.1(a)</u> or <u>Section 3.1(b)</u> or Section 3.1(a) or Section 3.1(b) of the Receivables Purchase Agreement, the party discovering such breach shall give prompt written notice to the other party.

Section 3.2 <u>Representations and Warranties of the Issuing Entity.</u>

(a) The Issuing Entity makes the following representations and warranties to the Depositor as of the date of this Agreement, and on which representations and warranties the Depositor shall rely in selling the Receivables.

(i) <u>Organization and Good Standing</u>. The Issuing Entity has been duly organized, and is validly existing as a statutory trust and in good standing under the laws of the state of its formation, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to this Agreement.

(ii) <u>Power and Authority; Due Authorization</u>. The Issuing Entity (i) has the power and authority to (A) execute and deliver this Agreement and the other Transaction Documents to which it is a party and (B) carry out the terms of this Agreement and the other Transaction Documents to which it is a party and (ii) has duly authorized by all necessary action on its part the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party.

(iii) <u>Binding Obligation</u>. This Agreement constitutes a legal, valid and binding obligation of the Issuing Entity enforceable against the Issuing Entity in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(iv) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Issuing Entity's Formation Documents or any Contractual Obligation of the Issuing Entity, (ii) result in the creation or imposition of any Lien upon any of the Issuing Entity's properties, other than Liens permitted or created pursuant to the Transaction Documents, or (iii) violate any Applicable Law, in each case, except where such failure to comply could not reasonably be expected to have a Material Adverse Effect with respect to the Issuing Entity.

(v) <u>No Proceedings</u>. There are no proceedings or investigations pending or, to the knowledge of the Issuing Entity, threatened against the Issuing Entity, before any Governmental Authority (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to the Issuing Entity.

(vi) <u>No Consents</u>. All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority (if any) required for the due execution, delivery and performance by the Issuing Entity of this Agreement have been obtained.

(b) Upon discovery by the Depositor or by the Issuing Entity of a breach of any of the representations and warranties set forth in <u>Section 3.2(a)</u>, the party discovering such breach shall give prompt written notice to the other party.

Section 3.3 <u>Covenants of the Depositor.</u> The Depositor hereby covenants as to the Receivables the Depositor has sold to the Issuing Entity hereby that:

(a) <u>Delivery of Payments</u>. The Depositor shall within two (2) Business Days after the Closing Date, transfer all Collections received by it on or after the Cutoff Date with respect to any Receivable or related Second Step Transferred Property to, or at the direction of, the Issuing Entity (or the Grantor Trust).

(b) <u>Keeping of Records and Books of Account</u>. The Depositor will maintain and implement administrative and operating procedures and keep and maintain all documents, books, records and other information, reasonably necessary or advisable for the collection of all Receivables and other Second Step Transferred Property.

(c) <u>Security Interests</u>. The Depositor will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than Permitted Liens) on any portion of the Receivables or other Second Step Transferred Property, whether now existing or hereafter transferred hereunder, or any interest therein, and the Depositor will not sell, pledge, assign or suffer to exist any Lien on its interest, if any, hereunder. The Depositor will promptly notify the Issuing Entity of the existence of any Lien (other than Permitted Liens) on any portion of the Receivables or other Second Step Transferred Property and the Depositor shall defend the right, title and interest of the Issuing Entity (and the permitted assignees) in, to and under such Receivables and other Second Step Transferred Property, against all claims of third parties; provided, however, that nothing in this subsection shall prevent or be deemed to prohibit the Depositor from suffering to exist Permitted Liens upon any portion of the Second Step Transferred Property.

ARTICLE IV
MISCELLANEOUS PROVISIONS

Section 4.1 <u>Amendment.</u>

(a) This Agreement may be amended, waived, supplemented or modified only with 10 Business Days' prior written notice to the Rating Agencies of the substance of such proposed amendment and by a written amendment duly executed and delivered by the Depositor and the Issuing Entity, without the consent of the Indenture Trustee, the Owner Trustee, the Grantor Trust Trustee, any of the Noteholders, any of the Certificateholders or any other Person to (i) cure any ambiguity, (ii) correct or supplement any provision in this Agreement that may be defective or inconsistent with any other provision in this Agreement or any other Transaction Document or with any description thereof in the Offering Memorandum, (iii) add to the covenants, restrictions or obligations of the Seller, (iv) add, change or eliminate any other provision of this Agreement in any manner that shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of the Noteholders or Unaffiliated Certificateholders, or (v) to add or supplement any credit enhancement for the benefit of the Noteholders of any class or the Certificateholders (provided that if any such addition shall affect any class of Noteholders differently from any other class of Noteholders, then such addition shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any class of Noteholders), <u>provided</u> that in the case of this <u>clause (v)</u>, the consent of the Certificateholders shall be required. Notwithstanding anything to the contrary herein, an Opinion of Counsel shall be delivered to the Depositor, the Grantor Trust Trustee and the

Owner Trustee to the effect that such amendment would not cause the Issuing Entity or the Grantor Trust to fail to qualify as a grantor trust for United States federal income tax purposes.

(b) This Agreement may be amended, waived, supplemented or modified only with 10 Business Days' prior written notice to the Rating Agencies of the substance of such proposed amendment and by a written amendment duly executed and delivered by the Depositor, the Issuing Entity, and the Indenture Trustee with the consent of Noteholders whose Notes evidence not less than a majority of the Outstanding Amount of the Controlling Class as of the close of business on the preceding Distribution Date, or if no Notes (other than the Class XS Notes) are Outstanding, Certificateholders holding a majority of the Voting Interests of the Certificates (which consent, whether given pursuant to this Section 4.1 or pursuant to any other provision of this Agreement, shall be conclusive and binding on such Person and on all future holders of such Notes or Certificates and of any Notes or Certificates issued upon the transfer thereof or in exchange thereof or in lieu thereof whether or not notation of such consent is made upon any Notes or Certificates) for the purpose of adding any provisions to, or changing in any manner, or eliminating any of the provisions of this Agreement, or of modifying in any manner the rights of the Noteholders or the Certificateholders; provided, however, that no such amendment shall (a) adversely affect the then-current credit rating assigned to any Class of Notes by any of the Rating Agencies without the consent of the holders of two-thirds of the Outstanding Amount of each affected Class of Notes as of the close of the preceding Distribution Date or (b) reduce the aforesaid percentage of Noteholders or Certificateholders required to consent to any such amendment, without the consent of the holders of all Notes or Certificates then outstanding, as the case may be. Notwithstanding anything to the contrary herein, an Opinion of Counsel shall be delivered to the Depositor, the Grantor Trust Trustee and the Owner Trustee to the effect that such amendment would not cause the Grantor Trust or the Issuing Entity to fail to qualify as a grantor trust for United States federal income tax purposes.

(c) No amendment, waiver or other modification which adversely affects the rights, duties, indemnities or immunities of the Owner Trustee or the Grantor Trust Trustee under this Agreement shall be effective without such entity's prior written consent.

Section 4.2 Protection of Right, Title and Interest in and to Receivables.

(a) The Depositor, at its expense, shall cause all financing statements and continuation statements, amendments, assignments and any other necessary documents and notices, covering or evidencing the Issuing Entity's right, title and interest in and to the Receivables and other Second Step Transferred Property to be promptly recorded, registered and filed, and at all times to be kept recorded, registered and filed, and take such other action, all in such manner and in such places as may be required by law, fully to preserve and protect the right, title and

interest of the Issuing Entity hereunder in and to all of the Receivables and such other Second Step Transferred Property. The Depositor shall deliver to the Issuing Entity file-stamped copies of, or filing receipts for, any document recorded, registered or filed as provided above, as soon as available following such recording, registration or filing. The Issuing Entity shall cooperate fully with the Depositor in connection with the obligations set forth above and will execute any and all documents reasonably required to fulfill the intent of this subsection.

(b) <u>Name Change</u>. The Depositor shall not change its State of organization or its name, identity or entity structure in any manner that would, could or might make any financing statement or continuation statement filed by the Depositor or the Issuing Entity or the Issuing Entity's assigns seriously misleading within the meaning of the UCC, unless it shall give the Issuing Entity written notice thereof at least five (5) Business Days prior to such change.

(c) <u>Executive Office; Maintenance of Offices</u>. The Depositor shall give the Issuing Entity written notice at least ten (10) Business Days prior to any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement. The Depositor shall at all times maintain its principal executive office within the United States of America.

(d) <u>New Debtor</u>. In the event that the Depositor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Depositor hereunder, the Depositor shall comply fully with the obligations of <u>Section 4.2(a)</u>.

(e) The Depositor shall maintain its computer systems relating to contract record keeping so that, from and after the time of sale of any Receivable under this Agreement, the Depositor's master computer records (including any backup archives) that refer to a Receivable shall indicate clearly the interest of the Issuing Entity (or assignees).

Section 4.3 <u>Governing Law; Consent to Jurisdiction; Waiver of Objection to Venue.</u>
THIS AGREEMENT AND THE SECOND STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS (OTHER THAN §§5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW)). EACH OF THE PARTIES HERETO HEREBY AGREES TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, LOCATED IN THE BOROUGH OF MANHATTAN AND THE FEDERAL COURTS LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER OR UNDER THE SECOND STEP RECEIVABLES ASSIGNMENT IN ANY OF THE

AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

Section 4.4 <u>Waiver of Jury Trial.</u> TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 4.5 <u>Notices.</u> All demands, notices and communications upon or to the Depositor or the Issuing Entity under this Agreement shall be delivered as specified in Part III of Appendix A to the Indenture.

Section 4.6 <u>Severability of Provisions.</u> If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions and terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement.

Section 4.7 <u>Closing; Assignment; Conveyance of Receivables and Second Step Transferred Property to the Issuing Entity.</u> The transfer of the Receivables contemplated by this Agreement shall take place at 1930 W. Rio Salado Parkway, Tempe, Arizona 85281, on the date hereof. This Agreement may not be assigned by the Issuing Entity or the Depositor except as contemplated by this Section 4.7. The Depositor acknowledges that the Issuing Entity (or any permitted assign) may make further assignments, conveyances and pledges of the Receivables and the other Second Step Transferred Property, together with its rights under this Agreement to other Persons pursuant to the Indenture and the Receivables Contribution Agreement and that the Grantor Trust may make further assignments, conveyances and pledges pursuant to the Receivables Contribution Agreement and the Indenture. The Depositor acknowledges and consents to such assignments and pledges and waives any further notice thereof.

Section 4.8 <u>No Waiver; Cumulative Remedies.</u> No failure to exercise and no delay in exercising, on the part of the Depositor or the Issuing Entity, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 4.9 <u>Counterparts.</u> This Agreement may be executed in two (2) or more counterparts (and by different parties on separate counterparts), each of which shall be an

original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by email or facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 4.10 Third-Party Beneficiaries. This Agreement will inure to the benefit of and be binding upon the parties hereto, the Grantor Trust and the Indenture Trustee and, to the extent expressly referenced herein, shall inure to the benefit of the Noteholders and the Certificateholders, who shall be considered to be a third party beneficiary hereof. Except as otherwise provided in this Agreement, no other Person will have any right or obligation hereunder.

Section 4.11 Merger and Integration. Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

Section 4.12 Headings. The headings herein are for purposes of references only and shall not otherwise affect the meaning or interpretation of any provision hereof.

Section 4.13 Indemnification. The Depositor shall indemnify and hold harmless the Issuing Entity and its assignees (each, an "Indemnified Person") from and against any loss, liability, expense (including reasonable and documented out of pocket external attorneys' fees and costs) or damage suffered or sustained by reason of third party claims which may be asserted against or incurred by the Issuing Entity or any of the permitted assignees (collectively, "Losses") as a result of the breach of the Depositor's representations and warranties contained herein and any failure by the Depositor to comply with its obligations under Section 4.2 or Section 3.3(c); provided that the Depositor's repurchase obligation for a breach of representations and warranties set forth in Section 3.1(b) hereof is the sole remedy therefor. Notwithstanding the foregoing, such indemnity shall not be available to an Indemnified Person to the extent that such Losses (A) have resulted from the gross negligence, bad faith, fraud or willful misconduct of such Indemnified Person or (B) arise primarily due to the deterioration in the credit quality or market value of the Receivables, Financed Vehicles or other Second Step Transferred Property (or the underlying Obligors thereunder) or otherwise constituting credit recourse for the failure of an Obligor to pay any amount owing with respect to any Second Step Transferred Property.

Section 4.14 Survival.

All representations, warranties, covenants, indemnities and other provisions made by the Depositor herein or in connection herewith shall be considered to have been relied upon by the Issuing Entity, and shall survive the execution and delivery of this Agreement. The terms of Section 4.13 shall survive the termination of this Agreement.

Section 4.15 No Petition Covenant.

Notwithstanding any prior termination of this Agreement, the Depositor shall not, prior to the date which is one year and one day after the final distribution with respect to the Notes (other than the Class XS Notes) to the Note Distribution Account or, with respect to the Certificates, to the Certificateholders or the Certificate Distribution Account, acquiesce, petition or otherwise invoke or cause the Issuing Entity or the Grantor Trust to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuing Entity or the Grantor Trust under any federal or State bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuing Entity or the Grantor Trust or any substantial part of the property of either of them, or ordering the winding up or liquidation of the affairs of the Issuing Entity or the Grantor Trust under any federal or State bankruptcy or insolvency proceeding.

Section 4.16 Limitation on Liability.

It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust, National Association ("WTNA"), not individually or personally but solely as Owner Trustee of the Issuing Entity in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Issuing Entity is made and intended not as personal representations, undertakings and agreements by WTNA but is made and intended for the purpose of binding only Issuing Entity, (c) nothing herein contained shall be construed as creating any liability on WTNA, individually or personally, to perform any covenant either expressed or implied contained herein of the Issuing Entity, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, (d) WTNA has made no investigation as to the accuracy or completeness of any representations and warranties made by Issuing Entity in this Agreement and (e) under no circumstances shall WTNA be personally liable for the payment of any indebtedness or expenses of Issuing Entity or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Issuing Entity or Grantor Trust, as applicable, under this Agreement.

**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

CARVANA RECEIVABLES DEPOSITOR LLC

By:  /s/ Paul Breaux
Name:  Paul Breaux
Title:  Vice President

CARVANA AUTO RECEIVABLES TRUST 2020-NP1
By:  WILMINGTON TRUST,
     NATIONAL ASSOCIATION,
     not in its individual capacity but solely as
     Owner Trustee

By:  /s/ Nancy Hagner
Name:  Nancy Hagner
Title:  Vice President

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e1)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:      May 6, 2020                                                       /s/ Ernest C. Garcia, III
                                                                            Ernest C. Garcia, III
                                                                            *Chairman and Chief Executive Officer*

<u>Exhibit 31.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 6, 2020

/s/ Mark Jenkins

Mark Jenkins
*Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:     May 6, 2020                                        /s/ Ernest C. Garcia, III

                                                             Ernest C. Garcia, III
                                                             *Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    May 6, 2020                                                        /s/ Mark Jenkins

                                                                            Mark Jenkins
                                                                            *Chief Financial Officer*

# Exhibit 2

**S&P Global**
Market Intelligence

# Carvana Co. NYSE:CVNA
# FQ1 2020 Earnings Call Transcripts

## Wednesday, May 06, 2020 9:30 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ1 2020- | | | -FQ2 2020- | -FY 2020- | -FY 2021- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.64) | (1.18) | NM | (0.63) | (2.45) | (1.58) |
| **Revenue  (mm)** | 1099.20 | 1098.22 | ▼(0.09 %) | 801.94 | 4384.62 | 6770.38 |

Currency: USD
Consensus as of  May-05-2020 12:28 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ2 2019** | (0.43) | (0.40) | NM |
| **FQ3 2019** | (0.39) | (0.56) | NM |
| **FQ4 2019** | (0.63) | (0.79) | NM |
| **FQ1 2020** | (0.64) | (1.18) | NM |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ................................................................... | **3** |
| **Presentation** | ................................................................... | **4** |
| **Question and Answer** | ................................................................... | **8** |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

**Mark Jenkins**
*Chief Financial Officer*

**Michael Louis Levin**
*Vice President of Investor Relations*

**ANALYSTS**

**Andrew M. Boone**
*JMP Securities LLC, Research Division*

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

**Bradley D. Erickson**
*Needham & Company, LLC, Research Division*

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

**Colin Alan Sebastian**
*Robert W. Baird & Co. Incorporated, Research Division*

**Lee T. Krowl**
*B. Riley FBR, Inc., Research Division*

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

**Nels Richard Nelson**
*Stephens Inc., Research Division*

**Nicholas Freeman Jones**
*Citigroup Inc, Research Division*

**Rajat Gupta**
*JP Morgan Chase & Co, Research Division*

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, and welcome to the Carvana First Quarter 2020 Earnings Call. [Operator Instructions] Please note, today's event is being recorded.

I would now like to turn the conference over to Mike Levin, Vice President of Investor Relations. Please proceed.

**Michael Louis Levin**
*Vice President of Investor Relations*

Thank you, Eric. Good afternoon, ladies and gentlemen, and thank you for joining us on Carvana's first quarter earnings conference call. Please note that this call will simultaneously be webcast on the Investor Relations section of the company's corporate website at investors.carvana.com. The first quarter shareholder letter is also posted on the IR website.

Joining me on the call today are: Ernie Garcia, Chief Executive Officer; and Mark Jenkins, Chief Financial Officer.

Before we start, I would like to remind you that the following discussion contains forward-looking statements within the meaning of the federal securities laws, including, but not limited to, Carvana's market opportunities and future financial results that involve risks and uncertainties that may cause actual results to differ materially from those discussed here. A detailed discussion of the material factors that could cause actual results to differ from forward-looking statements can be found in the Risk Factors section of Carvana's most recent Form 10-K and Form 10-Q. The forward-looking statements and risks in this conference call are based on current expectations as of today, and Carvana assumes no obligation to update or revise them, whether as a result of new developments or otherwise.

Unless otherwise noted on today's call, our comparisons are on a year-over-year basis. Our commentary today will include non-GAAP financial measures. Historically, we've used the non-GAAP measure ex-Gift, which excludes the impact of 100,000 milestone Gift to our employees. But beginning this quarter, that program has concluded and is no longer material to our results. And so any metrics for this quarter referenced on the call today will be inclusive of the 100,000 milestone Gift. You can find the 100,000 milestone Gift impacts called out in our reported financials. Reconciliations between GAAP and non-GAAP metrics for our reported results can be found in our shareholder letter issued today, a copy of which can be found on our Investor Relations website.

And now with that said, I'd like to turn the call over to Ernie Garcia. Ernie?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Thank you, Mike, and thanks, everyone, for joining the call. This has been a quarter unlike any we've faced as a company. The onset of the pandemic has led unprecedented changes in our health and behavior, which in turn, have significant and currently unquantifiable impact to the economy. Accordingly, we will spend less time than we normally would discussing the specifics of the quarter. I will briefly hit on where we sit today and then spend more time discussing the ways we've reacted so far and the ways we are thinking about and planning for the future.

We began to see significant reductions in demand in the back half of March with a sales trough in early April at approximately 30% reduction in sales year-over-year. From there, we have consistently improved week after week, with sales in the most recent weeks being up about 20% to 30% year-over-year. It is difficult to get clear visibility into exactly how the industry performed over the last several weeks but every indication is that Carvana has outperformed the industry quite significantly and grown our market share accordingly over this period. We believe part of this outperformance has been driven by transitory factors and that part of it has been driven by customer preference changes due to the pandemic. We don't yet

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

know how precipitous these customer preference changes will be, but we are optimistic. Viewed through a medium-term lens, we believe customer behavior shifts are likely to accelerate our progress.

Now let's turn to how we've reacted so far. In early March, it became clear that we were dealing with a very significant event. At that time, we determined that we were fighting a battle with 2 fronts: health and financial health. Our first priority is the health front, keeping our team and our customers safe. Along those lines, we have enacted work-from-home for corporate and customer care teams, have reconfigured our inspection centers and field locations to support social distancing, adopted CDC guidance and implemented a touchless delivery experience for our customers.

The second front is the financial health front. Here, we've had 3 primary goals: to align expenses with this new environment, to manage our risks and uncertainties thoughtfully, and to ensure we preserve and continue to progress in those areas that are most important to our long-term success. We came into the pandemic expecting our biggest absolute unit growth year yet and with the business positioned to deliver on those goals. Demand shock, we started to see in mid-March has obviously necessitated some significant and difficult changes. In order to align expenses with the new environment, we eliminated overtime and travel budgets, reduced hours and paused hiring. Another important component of our strategy for managing through this has been to carefully manage our risks and uncertainties. We view the most important areas of uncertainty during this period to be industry demand levels, the credit and capital market environment and inventory values. In an effort to manage demand uncertainty, we moved quickly on expense management, rolled out new commercials tailored to this environment, implemented a 90-day payment deferment promotion for our customers and designed our expense reduction initiatives to be impactful while also being easily reversible to enable us to adopt -- or adapt to different demand scenarios.

We've also been active in managing our credit and capital markets risk. In late March, we tightened credit significantly on the loans generated on our platform. In addition, we upsized our forward flow purchase agreement with Ally to $2 billion, and broadened the set of customers covered under the agreement, and we completed a $600 million common stock offering to fortify our balance sheet. We view inventory values as another area that we want to be purposeful about managing. We ceased all purchases, except for customer trade-ins in late March, which in combination with our outperformance in sales relative to the industry, have reduced our total inventory by about 30% in just 5 weeks since the quarter ended. This significantly reduces our exposure to inventory purchased prior to the pandemic. As we bring down expenses and manage our risks, we are also continuing to extend our leadership in the areas that are most important to our long-term success. The single most important is the quality of our customer experiences. Our customer experiences have 3 primary drivers: our culture, our technology and our supply chain. We are continuing to invest in our technology to make buying a car even easier, more fun and safe for our customers. This, in turn, enables a different, more efficient supply chain than has traditionally existed in automotive retail. We're also continuing to fill our real estate pipeline while holding off on growth CapEx, so we are prepared to return to rapid growth when the time is right.

Culture is at the top of the list of drivers of our long-term success. It is at the top for a reason. Everything we do, all the things that come together to deliver incredible customer experiences are done by our people. People and the relationships and processes that connect them are the great fundamental in any business. An environment like this is a test for any culture. You learn more about people and more about a culture during these moments of intense direct pressure.

But before I tell you what we've learned so far, I want to tell you what we hope. In mid-March, we set a goal that we would come out of this stronger, that we, our entire team across the country, would look back on this time as a period that we came together. To achieve this, we decided to use our values, most extensively our value we're-all-in-this-together as the lens for making tough decisions. We came into the pandemic poised for tremendous growth. This obviously made aligning expenses with this environment difficult. The only way we could achieve it was to significantly reduce hours for thousands of people across the company. This was undoubtedly the hardest and most painful decision any members of our management team have ever had to make. It's an unfortunate reality that the right decision for Carvana, given all of our goals, was to reduce the hours of the operators that work so hard every day to deliver the customer experiences that define us. That reality did not align with our value all-in-this-together. So

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

we set up a fund where people across the company could volunteer a portion of their salaries that would go into this fund and offset lost wages for those that lost hours. We had hundreds and hundreds and hundreds of people across the company voluntarily contribute their wages into the fund, including the Board of Directors and the executive team that all contributed 100% of their salaries during this time.

I think there is no clearer expression of our culture than this. In fact, many of the contributions came from people who lost hours themselves, but who knew others needed a hand more than they did. Really think about that for a minute. In a time of fear and uncertainty, these people, who are dealing themselves with reduced income, decided to give more. They did it because they are incredible people. They did it because they're part of something, and they did it because we're all in this together. And the fact that they did it, that so many did it, is something that I think the entire team at Carvana should be tremendously proud of. This is the strongest and fondest memory I'll take from all this. Difficulty rarely leaves things as they were. It tears groups apart or it brings them together. We've been brought together. There are undoubtedly more challenges lying in front of us, but we head into those challenges confidently because of the people standing beside us. Mark?

**Mark Jenkins**
*Chief Financial Officer*

Thank you, Ernie, and thank you all for joining us today. Q1 was a strong quarter for Carvana in light of the extreme disruption to our nation, industry and company brought on by COVID-19. Retail units sold in Q1 totaled 52,427, an increase of 43%. Total revenue was $1.1 billion, an increase of 45%. Both of these numbers reflect significant gains in market share, which are continuing through April and the first week of May.

Total gross profit per unit was $2,640 in Q1, an increase of $232. Our growth in GPU was driven by strong retail GPU, which increased $299 to $1,581, our highest ever, driven primarily by buying cars from customers. Wholesale GPU was $23, a reduction of $60, primarily impacted by declines in industry-wide wholesale prices in late Q1. Other GPU was $1,036, a decrease of $8. This included a $97 reduction in finance GPU to $528, offset by an $89 increase in ancillary products to $508.

In March, we completed our first non-prime securitization and sold our prime loans that were originally intended to be part of our 2-shelf securitization program under our existing forward flow agreement. While lower than recent quarters, we believe our Q1 finance GPU demonstrates the resilience of our finance platform during an extremely volatile period.

EBITDA margin was negative 12.6% in Q1, a decrease from negative 7.8%. EBITDA margin was significantly impacted by the reduction in demand brought on by COVID-19 during a key selling period in March. In addition, EBITDA margin in Q1 was impacted by 2.4 percentage points or $26 million due to COVID-19-related noncash adjustments to asset carrying values that we do not expect to recur in future periods.

In late Q1, we took several measures to better align our expenses with customer demand. Following the spread of COVID-19, we immediately paused discretionary growth investments, including new hiring, travel and new facilities and IT investments. We also made the prudent but difficult decisions to rebalance staffing and marketing to better match demand. Although we made these decisions early and quickly, lower volume outweighed the expense reductions and led to a 4.6% increase in SG&A as a percent of revenue.

In light of the uncertainty generated by COVID-19, our expansion strategy has shifted to one that prioritizes risk reduction, while also ensuring that we are prepared for growth when a normalized environment returns. We have paused acquiring new inspection and reconditioning centers and vending machines. However, we are continuing construction on IRCs that were already in process and that have existing sale-leaseback agreements in place.

Additionally, due to the positive customer response to our touchless delivery offering, we plan to open many smaller markets that can be served by our existing logistics and delivery infrastructure with limited incremental investment.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Following quarter end, we completed a registered direct offering of 13.3 million shares, raising $600 million and bringing our total liquidity resources on April 1 to over $1 billion. These liquidity resources provide us with significant flexibility to operate our business under a wide range of operating and macroeconomic scenarios. In addition, we upsized and extended our existing forward flow agreement with Ally, providing additional flexibility to serve our customers. We expect $169 million on a fully exchanged basis, shares in Q2. As we look forward, we are focused on positioning the business to be lean and flexible as we march toward our long-term goals.

Thank you for your attention. We will now take questions.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question today will come from Zach Fadem of Wells Fargo.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

I'm curious if you could talk us through the inventory management in a little more detail and how you went about the $500 per unit inventory charge. And then curious if you could talk us through whether the environment has evolved into Q2. And if you see any reasons to believe the GPU environment can improve from here.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think in general, the way that we assess our inventory and determine its carrying value is a function of basically looking at what our pricing is and then what that means for what we're likely to receive in proceeds relative to the value that we acquired inventory at. And that's kind of a standard accounting framework for determining that. So that's how we go about assessing our inventory charges at reserve level.

In terms of how the situation has evolved, I think it's been a very dynamic situation in terms of what's going on with inventory pricing. We saw right when the pandemic hit, basically, volume kind of dried up in the wholesale markets pretty significantly. It dropped down to probably 20% of normal levels. It stayed down at those levels for a while. We've seen it more recently climb up to closer to 50% of its, probably, pre-pandemic expected levels over the last couple of weeks, and that's been kind of a linear march up. We've also seen wholesale pricing kind of move up a little bit over the last couple of weeks as well. We've seen sell-through rates, which is the likelihood that any given car that's going through auction is actually sold to a buyer, also go up a little bit. So I think there's been some signs of stability there, but I think we still remain in a highly uncertain environment as it relates to vehicle values. And so that's something that we're assessing very carefully and watching.

On the retail side, there's definitely been much more stability in pricing for probably a number of technical reasons, but we've seen much more stability there. I think what we've attempted to do by stopping our purchases and kind of trying to push our inventory values -- or excuse me, inventory levels down as quickly as we could, is just make sure that we minimize our exposure to all that inventory that was purchased in the pre-pandemic world as we view that as a potentially large exposure. I do think we've had incredible progress there, marching that down 30% since the end of March. And so I think that's something that we're really excited about. But I do think that's something that we're paying very close attention to.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Got it. And then I wanted to talk about the 90-day, no-payment offer. Curious if all customers qualify for that. And maybe you could walk through the impact there in terms of top line. And I was also curious how that works in terms of financing those receivables and if there's a delayed impact there on those transactions?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So on the 90-day promo, that is something that there are qualifying requirements for that. So for many of the customers that are then being sold through our forward flow purchase agreement, most of them are qualifying, and then they have an option to elect into that or not. In the loans that are not being sold through our forward flow purchase agreement, which is approximately 1/3 of the loans we're

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

originating today, a significant minority of the customers are qualifying for that. We do believe that's probably had a positive impact. I think quantifying it precisely is difficult in light of the many, many different things that we've done over the last several weeks to ensure that we're putting our best support in front of our customers. So I think that's been one of many steps that we've taken.

The impact to GPU flows through finance GPU. And so in the case of anything sold to Ally, that's something that is predetermined, then we worked with them, given their experience with these kinds of offerings to customers in the past, to size that appropriately. And so that's how that's all been working.

**Operator**

Our next question will come from Colin Sebastian with Baird.

**Colin Alan Sebastian**
*Robert W. Baird & Co. Incorporated, Research Division*

Great. And I hope everyone there is safe and healthy. I guess one follow-up on the April trends. How much have you been able to take advantage of some of the ad pricing deflation? How much has that been a catalyst for your ability to connect with potential buyers? And then looking beyond the current environment, curious on what you think might be liquidity needs incrementally for the balance of the year in different scenarios around the economy. And in general, is the environment changing any of your strategic priorities, whether that's related to market expansions and vending machines, things like that?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So there's clearly been a reduction in advertising costs. I think there's also clearly been an increase in impressions. More consumers are consuming more media than they historically have. And so I think that cost per impressions have fallen pretty dramatically. I think that impact is at least directionally offset by the fact that consumers are also purchasing less in this environment across the economy, I mean up until several weeks ago, especially in automotive. But we've clearly seen price reductions. Those price reductions have continued over the last month or so. And so I don't think we know exactly where that's going to go, but there's clearly been reductions in the cost to get your message in front of consumers, and that's something we'll continue to monitor very carefully going forward.

**Mark Jenkins**
*Chief Financial Officer*

Sure. And then on the liquidity question, I would start with the fact that we had about $1 billion -- actually a little bit more than $1 billion in total liquidity resources as of April 1, following flows of our $600 million offering. That gives us ample resources to operate in even deep stress scenarios. I think -- we think those deep stress scenarios are looking less likely than perhaps they were 3 or 4 weeks ago. But we have a lot of flexibility, even in deep stress scenarios to operate flexibly. And then, of course, in upside scenarios, have a lot of flexibility there as well. I think some of the drivers of that flexibility have been the operational changes that we have made to respond to the COVID-19 environment. Those include limiting capital expenditures, as I mentioned in my prepared remarks, to focus primarily on inspection and reconditioning centers where we already have sale-leaseback agreements in place.

And then from an operating expense perspective, obviously, taking a number of steps to match our operating expenses to the current demand environment. And so the combination of those things which really started to be put into action in the second half of March, and then we were sort of playing out those plans through the second half of March and then through April, leave us feeling really good about our liquidity position, even in deep stress scenarios because of those levers that we have in the business.

**Operator**

Our next question will come from Lee Krowl of B. Riley FBR.

**Lee T. Krowl**
*B. Riley FBR, Inc., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Great. One, I kind of wanted a just kind of at a high level demand [ pick your ] thoughts as we have arguably lower air travel coming over the holiday season of summer. Thoughts on implied demand from more vehicles on the road, more miles driven. And then also just the kind of thoughts around the shift in the tax date from April to July.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

On your first point, I think there's a lot of uncertainty and a lot of questions about what this new world means, both in the immediate term and in the longer term. I think what we'd say is there's a lot of different data sources out there. You can read about the expectations that personal ownership actually accelerates as a result of all this and increases because more people don't want to take public transportation or choose not to partake in ridesharing. There are probably other effects like those outlined, where people are traveling less in the air and taking road trips instead. I think all of those things are possible. They're very, very hard to size, and they're very hard to rely on. I think what we are most excited about is, first and foremost, the market share that we've kind of always been planning to go after and take over time. We'd been growing our business very quickly prior to this as a result of our extremely differentiated offering, and all the customer preferences that, that serves. And I think that in this new world, we now know the direction of a new customer preference, which is a preference for safety and minimizing unnecessary impact with other people that customers don't know as well. We know that, that's likely to push demand in our direction and aid our goals of increasing our market share. We don't know how strong that impact will be. We don't know how persistent it will be, but it's pretty clear that's a directional impact. And we think that overall, when assessing Carvana, what matters most is our market share gains. The market around us is extraordinarily large. And we're still very, very small compared to that market. And then your second question, would you mind clarifying? I'm not sure I totally understood.

**Lee T. Krowl**
*B. Riley FBR, Inc., Research Division*

The tax date.

**Mark Jenkins**
*Chief Financial Officer*

Yes.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Okay. Perfect. So we -- the tax date -- do you mean tax refunds that showed up a week or so later this year? Is that what you're referencing?

**Lee T. Krowl**
*B. Riley FBR, Inc., Research Division*

Correct.

**Mark Jenkins**
*Chief Financial Officer*

So I -- or is it -- perhaps you're referencing the change in the filing deadline from April 15 to July 15? I think that could have some impact on customer behavior. We did see some tax refunds certainly come through before COVID-19 really came into force in the U.S. in Q1. But I think that any impacts from the shift in the deadline from April to July, I would think would just be very much melded in with the probably much bigger impacts that come from shelter-in-place orders being lifted, consumers starting to get out there and spend again. I think it'll be hard to disentangle those impacts. And I actually think the COVID impacts will win out over any impacts related to the tax deadline shift.

**Operator**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question will come from Brian Nagel of Oppenheimer.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

So the first question I wanted, I guess it's more geared towards Mark, just on the financials. Clearly, as you talked about a lot of significant disruption here in the first quarter. But as we look at that quarter and some of the maybe areas of cost, are there larger call-outs that we should be thinking about as we try to get to what would have been a more normalized earnings trajectory for Carvana, either positives or negatives, call it, as the business had to flex in the second half of the month of March?

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. So the largest expense call-out is the adjustment to asset carrying values totaled about $26 million that I alluded to in my prepared remarks. That was really split between 2 things. The larger portion was related to adjustments in the valuation of finance receivable-related assets that we hold on our balance sheet. Obviously, the end of March, which is when we do that evaluation, was a very turbulent time in financial markets. And so we took an adjustment to some finance-receivable-related assets that we hold on the balance sheet. The second largest category was, we did observe toward the end of March, significant changes in the wholesale trading prices of used vehicles, and then we also saw a significant reduction in demand, which changed some of our expectations about the number of days to sale that we expected to experience in our Retail business. And so when taking both of those things into consideration, we made some adjustments to our inventory value. And the sum of those totaled $26 million. So that was a very large impact on the expense side.

In terms of SG&A, I think the 2 biggest places where we saw an impact were really in advertising per car sold and compensation and benefits per car sold. The way to think about both of those is -- Q4 and then early Q1 -- or the first couple of months of Q1, is a big investment period for us as we invest in staffing and invest in marketing in preparation for one of the busiest times of the year, which is tax season. And so this year, we made those significant investments, but then demand in March was nothing like what we anticipated for obvious reasons related to COVID-19. And so we certainly saw elevated levels of compensation and benefits and advertising expense per unit relative to what we otherwise would have expected. We also saw elevated levels on a per unit basis in the other expense line items, but those were the biggest 2.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

No. That's very helpful. I appreciate it. And then my follow-up question. As we look at the rebound in sales you called out here in Q2. So congrats on that. The question I have is -- and again, I can understand it's fluid right now, but is this -- are you seeing just -- is this more of a return to normal, your normal customers coming back? Or is there some type of shift within that -- the demand is returning? And then the second is, is it ramping? Or is it continuing to ramp here? Or is it basically just reset back a bit?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think there are many different data sources that you can look at to try to get a sense of what sales looked like across the industry in April and in the last several weeks. And I think many of those data sets circle around the same answers, but don't precisely agree. For used car sales, I think they range from estimates of the entire month of April being down 55%, give or take, to as little as 45%. And in more recent weeks, depending on what data set you're looking at, maybe down 35% to maybe only down 20% to 25%. So I think those would be the estimates of what's happening in the industry over the last several weeks. In the month of April, we -- as we said, we troughed at approximately down 30% year-over-year early in the month. We then came back very strongly to end the month barely down year-over-year at all. And in those recent weeks, they've been up 20% to 30% and have seen pretty healthy, steady consistent growth over the last several weeks. So it's clear that we are outperforming the industry based on all the data that we look at. When we look at the demographics of our customers and kind of try to get a sense

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

of where that share may be coming from, our demographics were pretty broad-based before. And so there may be some very subtle differences that we're able to observe. But I don't think any of those differences are strong enough to where we have certainty that there's real information in them or certainly that they would be worth calling out on this call.

So I think in general, it feels like it's been a broad based improvement. There have been surveys out, and there's a million of these surveys out, so you can look at many different ones. But one that came out several weeks ago, that was put out by CarGurus, prior to the pandemic, one of the questions they asked customers was something along the lines of, would you consider buying a car online? And at that time, something like 32% of customers raised their hand and said, "I would consider doing that." Several weeks ago, which was still relatively early in all this. But several weeks ago, that number had jumped up to about 61% of customers that said they would consider buying a car online. So we do think that in this new environment, we have a very, very desirable offering. And so we think that bodes well for the medium term. But undoubtedly, the market -- the entire industry took a big surprising unexpected hit in late March and April. And I think now we're marching back pretty steadily. And I think if you take these lines and extend them out, I think they'd suggest a pretty exciting next couple of quarters in several respects. But we think that there's still a fair amount of risk left. We still don't have a permanent solution for the virus. We still don't really know the degree of the economic impacts. I think there's a number of micro impacts in automotive that we're watching very carefully that we called out in our prepared remarks. So I think we are enthusiastic about the response that we've seen. And most importantly, honestly, the way that the company has responded to all of this. But I think we're still trying to make sure that we're looking at the future through the lens of different scenarios and making sure the business is flexible and able to adapt quickly to different scenarios as we're not sure exactly what to expect out of the next several months.

### Operator

Our next question will come from Sharon Zackfia of William Blair.

### Sharon Zackfia
*William Blair & Company L.L.C., Research Division*

Could you give us any perspective on what retail GPU might have looked like for you in April as you were kind of unwinding the inventory? And then secondarily, on the Finance business, I mean, obviously, the end of March was really rough. How do we think about finance revenue per car kind of going into the second quarter and the rest of the year? Should that normalize back towards levels that look more similar to last year? Or is there something else that we should consider as kind of hampering that?

### Ernest C. Garcia
*Founder, President, CEO & Chairman*

Sure. Let's start with retail GPU. So I think, first and foremost, I think we are very pleased with retail GPU and I think absent the coronavirus, it would have been higher still. But we view that as a very healthy number. It was marginally impacted by our choice to stop purchasing inventory in late March. This is something that's kind of always happening in our retail GPU and flowing through our financial statements is that you're constantly buying cars. Then if you buy those cars, those cars get reconditioned at the inspection and reconditioning centers. They get put on the site, and then they have some probability of being sold in any given day. The cars that you put up that are sold quickly tend to have higher margins and the cars that take longer to sell tend to have lower margins. And so when you stop buying cars, you're kind of freezing your inventory in time and that inventory starts to age out. And so all else constant, the average margin that you observe flowing through the income statement is going to drop because time is moving and cars depreciate with respect to time. And so I do think that probably had a marginal impact. That will likely be a larger impact in the second quarter than it was in the first. If you just kind of run a very simple mental model of saying you don't buy any cars in the quarter, then on average your days to sale would go up by approximately 45 days if you're selling those cars throughout a 90-day quarter. And so you can kind of do the math on what would happen there. We are starting to now turn purchases back on, given both the stability that we're observing in the wholesale markets or at least the relative stability that we're observing in the wholesale markets, and the strong demand that we're seeing as well as the fact that we've now brought our inventory down and reduced our exposure there considerably. So that will

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

provide an offset to just that depreciation, but that is an impact in Q1, and it's likely to be a larger impact in Q2.

As we think about finance revenue per car, I think I'll start with, we're extremely pleased with how our finance platform held up in this environment. We went and did our first non-prime securitization in the quarter. We did that in an extremely turbulent market, but we did get that done before markets shut for a short period of time. And so we did not get the premium that we were expecting or likely would have gotten in previous periods, but we still got a very solid premium, and we're pleased with that. And then we pivoted as securitization markets closed for a short period of time. And instead of doing a prime securitization, we sold those loans to our forward flow purchase agreement. As would be expected in this new environment when kind of yields are moving up and spreads are moving up and loss expectations are moving up, the premium we received was less than we might have otherwise received, but it was, again, a premium that we were pleased with.

So to me, I would view that as actually an excellent test and a sign of resiliency of the finance platform. We certainly wish it would have been as high a number as it was in Q4 and always do and believe that it will continue to go up even from the Q4 levels. But I also think that, that number represents a very strong number compared to what the traditional dealership model gets. And it also represents a relatively small decrease relative to what many finance models that would take charges to credit being held on balance sheet would take. And so I think to us, that's a very resilient number that we think is a great moment for the finance platform to demonstrate its strength, not only in a positive scenario, but also in a downside case.

**Operator**

Our Next question will come from Armintas Sinkevicius of Morgan Stanley.

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

Great. I'm just looking at SG&A, and "other" is defined as IT expenses, corporate occupancy, professional services, insurance, limited warranty, title registration. And I'm assuming that on their own, none of these items is really greater than $8 million for market occupancy. But this line has been a bit of a black box here. And I was hoping that you could shed some color on what goes into "other," why it's doubled over the past year? Is it capitalized software? Or is there something else driving that growth higher?

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. We hit this a little bit on the last call as well. So I think there's basically 3 big buckets that you can think of as being in "other." The first is technology. The second is corporate. And then there's also some transactional expenses in there.

I think in terms of the way that, that's grown over the last year or so, we definitely have been investing in all of those areas. And so one of the big sources of investment in 2019 was essentially building almost from scratch, this business of buying cars from customers. That definitely impacted all 3 of those big buckets that I just walked through. That was a major innovation and a major add to the business in 2019. And so it was a big driver of all the line items, but certainly the other SG&A line item as well. That's also true in Q1. All of those things that I just walked through, would certainly be expenses that we'd be bearing in Q1. And other SG&A per car sold actually was up a little bit in Q1 despite a pretty significant drop-off in demand in March. But those are the major buckets. That's certainly a bucket that we expect to lever significantly over time as we march toward our long-term model.

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

Okay. And just for the first quarter, every single line item in SG&A was higher than the prior quarter. You mentioned some of the costs related to advertising and comp and benefits. But looking ahead to the second quarter, what levers are you pulling here to manage to what you see as an appropriate burn rate

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

for the company? Any of these line items that we should be thinking of trending lower sequentially into the second quarter?

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. So we certainly expect declines on a per-car-sold basis in those SG&A line items. I think -- where does that come from? I think a big part of the expected decline on a per-unit basis is the response that we've taken to COVID-19. And so in Q1, we were in a period where we were significantly investing. March is often one of our best, if not our best month of the year, which is common in the used car industry. And so we were investing really significantly in advance of expected busy season. And when that busy season didn't materialize, obviously, that had a significant impact on our expenses per car sold that were ultimately realized in the quarter. Of course, we do expect, as I alluded to, through the actions that we've taken for per-car-sold expenses to decline in Q2.

**Operator**

Our next question will come from Ron Josey of JMP Securities.

**Andrew M. Boone**
*JMP Securities LLC, Research Division*

This is Andrew Boone on for Ron. With April sales rebounding to that plus 20% to 30% level that you guys talked about and understood things are yet to kind of normalize. But with significant share gains that you guys are seeing, can you talk about kind of with the recapitalized balance sheet, why you guys aren't leaning into advertising more? Is there a change in ROI? Or is there something else there? And then secondly, just kind of a big picture question. So Ernie, the way that you've built this business is really a fixed cost model. As you go through something like this, does this make you want to push more cost to a variable model? Or do you think about that any differently?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So what I would say is that I think I would start with we're extraordinarily happy with the way the last several weeks have gone from a demand perspective. We're -- being up 20% to 30% year-over-year after being down 30% year-over-year, just several weeks before is a pretty dramatic reversal and has us back to pretty significant levels of sales. I think as we look forward, what we're trying to do is we're trying to balance the uncertainty that remains in the industry and the economy and with the virus, with the upside potential that we clearly see. And I think that has us monitoring many different things very closely. We've talked a little bit about how we're monitoring the inventory prices in markets. We're definitely monitoring the credit markets. We're clearly very closely following demand that we're seeing on our website. We're paying close attention to marketing costs. We're trying to get a good handle on all of those things. We're trying to make sure that we move forward in ways that we believe allow us to take advantage of the situation when it's positive, but also ensure that we cut off the worst downside cases if things do turn a little bit negative. And I think that's an equation that we're trying to balance really carefully because we do feel like while trends are very positive, it is still entirely possible that we're in the somewhat early stages of this, and we want to make sure that we get a good look at it before we make sweeping moves. But we will be monitoring all that, and we have been making changes very rapidly and I would anticipate that we will continue to make changes very rapidly as information becomes available.

I think this business is designed to swap variable costs for fixed costs relative to the traditional model. And we think that is absolutely the right move. And in no way, shape or form, would we want to change that at all. I think the degree to which that ends up being the right choice is a function of the size of the business that you believe you can ultimately build. And prior to this, we believed that we could build a business that would sell 2 million-plus cars per year and that, that would lead to us being the largest, most profitable automotive retailer, and I don't think we have any information that would cause us to question that in any way, shape or form. I think if anything, that the information that's changed would potentially make us more optimistic about the speed to getting there or even the possible ultimate upside. So I think we feel very good about the way we've designed the business and think it positions us incredibly well to continue

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

growth. I think we've also demonstrated a lot of flexibility in the model. This point is right that we've built a business that is set up to have higher fixed costs and lower variable costs. That's an incredible setup when you're growing very quickly and when you're looking at the long-term with these large market shares. That's a really tough setup when you're looking at a discontinuous demand shock, like the one that we just saw over the last 5 or 6 weeks. But I think the business also demonstrated its flexibility and our ability to pull levers and kind of size it down and pull in our wings and adjust quickly to a lower demand environment. And then it's shown its ability to spring back up over the last couple of weeks. So we feel great about the business that we designed and think, if anything, the future is brighter.

**Operator**

Our next question will come from Rajat Gupta of JPMorgan.

**Rajat Gupta**
*JP Morgan Chase & Co, Research Division*

I just had a couple of follow ups on the finance GPU questions. Could you help break out what the difference in finance GPU was in 1Q between the forward flow and the non-prime ABS deal? And related to that, moving into the second quarter and beyond, is the plan still to monetize a majority of the loans through Ally in the near term? Or have you seen any change in the environment in the ABS markets that you might want to tap into in the second quarter as well. And then like what kind of impact -- do we expect a similar kind of premium in the second quarter as well, overall, as you saw in the first quarter? And I have a follow-up.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So at a high level, what I would say is on both pools, we received a premium. On both pools, it was less than we would have anticipated prior. We historically haven't kind of dove in at greater detail than that. And so I don't think we'll start now. But generally speaking, those pools, we tend to monetize it at somewhat similar levels. Looking forward -- first, I want to start with Ally. I think Ally has been an absolutely tremendous partner for us and reacted very quickly with us when we saw the difficulty that was emerging in the economy generally as a result of the pandemic, and also in credit markets and worked with us to upsize that forward flow purchase agreement to a $2 billion agreement. As you'd expect in this environment, they are going to do better financially on those loans they originate as they should, a, because of the environment and, b, because they were there for us to make sure that we could massage out that risk, which we're extraordinarily grateful for. So they will do better and that will, all else constant, impact finance GPU over the coming quarters -- quarter or 2. That said, the market also tends to react when interest rates move and the interest rates that we were able to charge in the market may offset that. It's hard to know exactly what's going to happen there.

Looking into Q2 and trying to figure out exactly where finance GPU is going to be is definitely difficult. I don't think we have perfect clarity there in any way, shape or form. We wouldn't anticipate it. Our best guess with fairly wide uncertainty bars around, it would be for it to be somewhat similar to what it was in Q1. The securitization markets have begun to open up again. There have been several deals done over the last couple of weeks, and there's anticipated to be many more deals done over the next several weeks. And so I do think those markets are opening up and the ability to monetize receivables seems to be improving. So I think there are reasons to be optimistic there. But I also think that, that remains an area where it's wise to kind of expect the unexpected there and plan for a little bit of uncertainty. So I don't think we want to give you precise expectations for what that will look like in Q2.

**Rajat Gupta**
*JP Morgan Chase & Co, Research Division*

That's some great color. And then just more of a housekeeping question. The other expense line item that was up materially. I believe some of that was due to the loss -- some of the beneficial interest in securitization. Was there anything else that went into that, that was material to call out? And also, is that part of the $26 million noncash that you talked about as well? Just trying to clarify that.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Jenkins**
*Chief Financial Officer*

Yes. That was -- that $17 million is part of the $26 million. That's the larger portion that I was referencing earlier. And then that $17 million is related to these finance-receivable-related assets. The biggest part of that is retained beneficial interest in securitizations. And then there's a portion that's another finance-receivable-asset bonus payment, essentially.

**Rajat Gupta**
*JP Morgan Chase & Co, Research Division*

Got it. Got it. So basically, $9 million was the impact on like just the retail and wholesale GPU. The rest is mainly finance-driven?

**Mark Jenkins**
*Chief Financial Officer*

That's correct.

**Operator**

Our next question comes from Rick Nelson of Stephens.

**Nels Richard Nelson**
*Stephens Inc., Research Division*

I'd like to follow up this traumatic shift from sales declines early in April to the increases that you're seeing later in the month. Seems much more traumatic than what's happening in the overall Used Car business. And curious about GPU? Were there changes there as stimulus checks? Could that impact the 90-day promotion? How do you think that impacted?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think those are among the things that are difficult to disentangle. I think we saw a rapid demand shock that pushed sales down. And then I think from there, we implemented the 90-day promotion. We've put out different marketing materials that are tailored to this moment to reach out to customers through these less expensive marketing channels. The stimulus checks were received by customers. There seems to be general recovery happening in the market. And so I believe there are a number of forces that are flowing through there that are difficult to separate. I think what we're excited about is it does seem clear that we are outperforming the market generally in terms of the severity of the decrease in sales and in terms of the speed with which sales are climbing back. And so I think we're excited by that. And we think that, that speaks to these shifts in customer preferences in our direction. But trying to disentangle the other impacts, I think, is too difficult for us to want to take a swing at that.

**Nels Richard Nelson**
*Stephens Inc., Research Division*

Okay. Got you. And I'm also curious do you reduce retail inventory exclusively through the website or do you use the wholesale channel to liquidate auctions or other wholesalers?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Through the website.

**Nels Richard Nelson**
*Stephens Inc., Research Division*

All through the website. Great.

**Operator**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our next question comes from Nick Jones of Citi.

**Nicholas Freeman Jones**
*Citigroup Inc, Research Division*

I guess one on the competition. You pointed to the CarGurus survey. So undoubtedly, that's a marketing tool for them to try to get other dealers to start delivering. Have you changed your views on what competition's going to do to kind of -- the new way to sell cars? It seems like you might have more entrants now after this. Do you have any updated thoughts there?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

What I was getting at -- I think across the economy, across different retail verticals and certainly in automotive, I think there seems to be a broadly held expectation that e-commerce will be a relative outperformer during this time and coming out of this time. And so I don't think that, that's a secret. I think the survey that came from CarGurus is one of many surveys like it as this is clearly a very topical point at the moment.

So I think what we would start with is we think that, that's really, really good news. I think the first order impact of consumers wanting to transact in the way that we've specialized for the last 7 years is a big positive. And then I do think that, to some degree, you do need to then think through the second order effect, which is others being more inclined to try to build similar offerings to the offering that we've built. And so I think our expectation would be that, that will likely happen. I think that was already happening to some degree and our view would be that will likely happen debatably more now.

I think it's important to look at the market generally. This is a market with tens of thousands of dealers where the top 100 players have on the order of a 7% or 8% market share. So it's an enormously fragmented market. It's a very large market, depending on your definition on the order of $1 trillion market. So it's really, really large. And so we think that, that also points in the direction of not becoming overly competition focused because there are just so many small competitors as opposed to 1 or 2 large competitors as there generally are in many of these other industries. We've spent the last 7 years investing in the technology that gives customers a great experience online and investing in the supply chain that, that great online experience unlocks, that delivers selection to customers. And building a brand for doing exactly that and building e-commerce business is an expensive undertaking. It takes a lot of time. It takes a lot of money. This is clearly visible across industries, and it's hard. It's a hard thing to do. So I think would we expect more competition as a result of all this? I think the answer directionally would be yes. Would we view the underlying driver of that competition that consumers are more excited about buying cars online that, that transition has been accelerated as a much bigger positive than the increase in competition is potentially negative? Absolutely.

So I think overall, we're feeling very optimistic about the long-term impacts of this or at least the medium-term impacts of this. From a long-term perspective, it's hard to know exactly how this will play out.

**Operator**

Our next question comes from Mike Montani of Evercore.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

The questions I had are along the lines of 2 different areas. One would be with the Ally deal in place now, just trying to get a handle on the magnitude of profit pressure that we might anticipate on kind of like-for-like loans. And is that something that would remain in place over the course of the next year? And then there's a follow-up.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. So I don't think we want to quantify that right now because I think what happens in an environment like this is several-fold. Loss expectations tend to go up, which, all else constant, would reduce premiums. The yields that risk takers expect to earn tend to go up, which, all else constant, would reduce premiums. And then consumer interest rates tend to go up as well, which, all else constant, tends to increase premiums and the balance of those things is a little bit hard to predict. Historically, the value of loans originated through automotive retailers and finance companies through that kind of combined stack, has been fairly stable. And so our expectation would be for that to converge back to where it was prior to this and then continue its upward journey from there. I think the exact timing of all that is unclear. I think whether the next step is a positive one or a negative one is unclear. But we've definitely taken steps to try to make sure that the loans we're originating are very desirable loans. We've tightened credit pretty significantly going into this in an effort to make sure that we were positioning ourselves conservatively. We modeled the way that we were tightening credit off of the way that credit was ultimately tightened and performed in the 2008 and 2009 financial crisis. And so we made the assumption that losses will deteriorate a similar degree. That's a more severe assumption than most rating agencies are making and securitizations that are getting done today. We made the assumption that investor yields would go up to where they were in the 2008, 2009 crisis. That seems to be similar to or more severe than the implied yields that seem to be clearing in the securitization market today, although that is a volatile market. So I think, in terms of what we're originating, and we feel very good about it. We feel like we've thought carefully about what we wanted to do to credit. We believe that tight credit in those ways has likely reduced our overall volume by something on the order of 25%, which is very, very significant. And I think also speaks to how strong the demand is that we're seeing because we -- from all indications, it seems that we have likely tightened credit more than the rest of the industry has. And so absent that tightening, we may be performing even better. But we've made those moves to ensure that we're positioned defensively as we continue to monitor what's going on, and then we'll figure out what the right move -- what the right next move is from here.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

Okay. Great. And if I could, just some additional color on the wholesale front. Just curious to see what you all are finding in terms of pricing over the past couple of weeks on the wholesale pricing? And then what's the read-through for that in terms of 2 areas: one would be GPUs. So should we anticipate any further kind of mark-to-market adjustments on GPUs in 2Q? Or if you assume kind of current trends persist that 1Q markdown was enough? And then the second question would be on the consumer side and the trade-in side, is the 70% and 40% ratios kind of good to go again now given that you guys are once again in the market and purchasing cars for consumers? Or are you trying to be more deliberate and not scale that up as quickly as it was?

**Mark Jenkins**
*Chief Financial Officer*

Sure. I'll take the question on wholesale GPU. So we don't expect any of the adjustments that we talked about earlier to recur in future periods. However, I do think it's reasonable to assume that wholesale GPU will be lower than a normalized level in Q2. I think there's still an awful lot of uncertainty around how exactly the wholesale market is going to evolve from here. I think we've started to see some volume come back, but certainly not at normalized levels yet. And so I think we'll see what happens in the market, but there's certainly a lot of uncertainty right now. And I think a reasonable expectation is that Q2 will be lower than normalized levels.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

And then as it relates to the customer sourced vehicles, I think neither the 70%, which was the percentage of cars we were buying relative to the number of cars that we were selling, nor the 40%, which is the percentage of cars that we were selling to customers that were previously bought from customers, neither of those numbers were our long-term goals and both of those numbers were on steep positive trajectories heading into this. We did pause purchasing through all channels, except for customer trade-ins early in this cycle. And so that will clearly push down that 70% number just directly

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

because we're not buying cars. We are selling cars. So that just kind of mechanically drops, at least in a transitory way. And then the 40% number is a function of when we turn purchasing back on, what ratio of purchasing is coming from customers versus what is coming from other sources. And I think that there is uncertainty in what that ratio will be in the near term. In the medium term and long term, we would expect it to go back to where it was before and to continue to climb because buying cars from customers is the most fundamental and most economic source of cars that there is. And so that's where you want to be buying cars. Given the dramatic moves in the market, buying cars from customers is effectively happening in a much less liquid market where you have a single seller, selling a single car once every many years, whereas the wholesale markets are much more liquid. And so if you have rapid price disruptions, those wholesale markets tend to virtually instantaneously adapt to that new environment, whereas the consumer market tends to be a little stickier in both directions. And so we will be monitoring both of those markets and getting a sense of where the better market is to acquire inventory in the near term. But in the medium and long term, our expectations would be to march back to where we were and continue from there.

**Operator**

Your last question today will come from Brad Erickson of Needham & Company.

**Bradley D. Erickson**
*Needham & Company, LLC, Research Division*

I have a couple of follow-ups. Ernie, you were just kind of talking about a little bit on the auction, the wholesale area, but I just wanted to go a little further. What needs to happen really before those physical auctions can function normally again? And just kind of how vital that is for you to have enough inventory to keep driving growth? And then I have a follow-up.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think the auctions are functioning fairly normally, again, in the sense that you can buy and sell cars. And the volume is on the order of 1/2 what it would have likely otherwise been if it weren't for all of this. Prior to this, the majority of buyers through many of the larger auction houses were already buying cars online. And so many, many more buyers have moved to buying cars online. But the auctions are functioning. And so I don't think that, that is a fundamental limiter to moving back to whatever levels we would like to in terms of acquisitions. I think the thing that we want to be careful about is our expectations for what's going to happen to prices. Prices have stabilized and started to recover. But there are still reasons to believe that prices could drop again. There are many sellers that -- sellers or shadow sellers that are out there that have not moved inventory yet. And so we want to be mindful of watching that carefully and getting a sense of what that's going to do to the market. And so that's something we're keeping a careful eye on, and that's part of why we've made the decision to manage our inventory levels down and reduce our exposure there. Now the opportunity is also extraordinarily large because the wholesale market has dropped pretty significantly in most recent weeks down, probably on the order of about 12%. And the retail markets have only dropped a couple of percent. And so the implied wholesale retail spread is much, much wider on the order of 9% wider than it normally is. And that does generate a lot of opportunity because it suggests that there are much larger margins than are normally available for the taking there. And so we're trying to balance the risk with the upside opportunity. And I think all that's coming together into our strategy that we've been discussing on the call.

**Bradley D. Erickson**
*Needham & Company, LLC, Research Division*

Got it. And then just one last one, and I apologize if you touched on this earlier, I jumped on late. But can you just give any sort of -- this is a question really for Mark, can you give any sort of EBITDA loss expectation for the year under some plausible scenario if the business were to stay where it's at today with the April growth rates. Just any guardrails as to how to think about that. Or even like on a basis where what level of the business would have to be at from here to be, say, EBITDA breakeven might be another way to get at it. Any help on that Mark would be great.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. I think I'll start with Q2. And I think maybe a way to summarize some of the directional things that you should be keeping in mind as it relates to that question. But a lot of these we've hit on, on this call so far. So we do expect GPU to drop somewhat meaningfully from Q1 to Q2 as a result of some of the dynamics that were talking about earlier on this call, particularly in retail GPU. I think we also expect expenses per unit to meaningfully drop going from Q1 to Q2. And there, I think just to give a rough ballpark of order of magnitude, dropping down to sort of second half 2019 levels on SG&A per car sold. And then we think the combination of those 2 things will certainly lead to reduced EBITDA dollar losses in Q2, and then we would expect things getting better from there as well.

**Operator**

This concludes our question-and-answer session. I would now like to turn the conference back over to management for any closing remarks.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I'd just like to thank everybody for joining the call. We really appreciate it. And then I also want to turn to Team Carvana out there in telephone land. Thank you to all of you for the job you've done over the last 6 weeks. We have crammed so much into that very short period. Everyone's been working unbelievably hard. The results speak for themselves. We've made tremendous, tremendous strides in the business, and that's 100% because of how hard you guys are all working. So I truly can't thank you enough. It's admirable, and we really, really appreciate it. Let's keep fighting through the rest of this. We're in a great spot. Thank you, everyone.

**Operator**
The conference has now concluded Thank you very much for attending today's presentation. You may now disconnect.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended June 30, 2020**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

---

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **81-4549921** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **1930 W. Rio Salado Parkway        Tempe      Arizona** | **85281** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

|  |  | Accelerated filer |  |
|---|---|---|---|
| Large accelerated filer | ☒ | | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of July 31, 2020, the registrant had 69,434,579 shares of Class A common stock outstanding and 101,200,276 shares of Class B common stock outstanding.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

|  |  | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** |  |
| Item 1. | Financial Statements |  |
|  | Unaudited Condensed Consolidated Balance Sheets as of June 30, 2020 and December 31, 2019 | 1 |
|  | Unaudited Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2020 and 2019 | 2 |
|  | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three and Six Months Ended June 30, 2020 and 2019 | 3 |
|  | Unaudited Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2020 and 2019 | 5 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 52 |
| Item 4. | Controls and Procedures | 52 |
| **PART II.** | **OTHER INFORMATION** |  |
| Item 1. | Legal Proceedings | 53 |
| Item 1A. | Risk Factors | 53 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 53 |
| Item 3. | Defaults Upon Senior Securities | 54 |
| Item 4. | Mine Safety Disclosures | 54 |
| Item 5. | Other Information | 54 |
| Item 6. | Exhibits | 55 |

PART I. FINANCIAL INFORMATION

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

|  | June 30, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 246,299 | $ 76,016 |
| Restricted cash | 119,987 | 42,443 |
| Accounts receivable, net | 45,543 | 39,864 |
| Finance receivables held for sale, net | 358,124 | 286,969 |
| Vehicle inventory | 629,401 | 762,696 |
| Beneficial interests in securitizations | 116,563 | 98,780 |
| Other current assets, including $1,248 and $0, respectively, due from related parties | 55,569 | 52,654 |
| Total current assets | 1,571,486 | 1,359,422 |
| Property and equipment, net | 704,748 | 543,471 |
| Operating lease right-of-use assets, including $42,691 and $44,583, respectively, from leases with related parties | 166,337 | 123,420 |
| Intangible assets, net | 6,337 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $10,502 and $6,138, respectively, due from related parties | 18,545 | 14,850 |
| Total assets | $ 2,476,806 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $10,912 and $9,549, respectively, due to related parties | $ 278,081 | $ 234,443 |
| Short-term revolving facilities | 31,000 | 568,840 |
| Current portion of long-term debt | 52,470 | 48,731 |
| Other current liabilities, including $4,329 and $4,518, respectively, from leases with related parties | 11,712 | 12,856 |
| Total current liabilities | 373,263 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 965,668 | 883,060 |
| Operating lease liabilities, excluding current portion, including $39,664 and $41,829, respectively, from leases with related parties | 163,210 | 116,071 |
| Other liabilities | 1,584 | 1,808 |
| Total liabilities | 1,503,725 | 1,865,809 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of June 30, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 69,414 and 50,507 shares issued and outstanding as of June 30, 2020 and December 31, 2019, respectively | 69 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of June 30, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 709,536 | 280,994 |
| Accumulated deficit | (283,751) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 425,955 | 98,112 |
| Non-controlling interests | 547,126 | 93,827 |
| Total stockholders' equity | 973,081 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,476,806 | $ 2,057,748 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 991,802 | $ 855,785 | $ 1,956,081 | $ 1,539,614 |
| Wholesale vehicle sales | 49,434 | 63,014 | 129,040 | 96,044 |
| Other sales and revenues, including $22,720, $13,989, $43,282, and $24,562, respectively, from related parties | 77,098 | 67,422 | 131,429 | 105,797 |
| **Net sales and operating revenues** | 1,118,334 | 986,221 | 2,216,550 | 1,741,455 |
| Cost of sales, including $891, $1,217, $1,733, and $2,490, respectively, to related parties | 968,128 | 848,428 | 1,927,922 | 1,515,130 |
| **Gross profit** | 150,206 | 137,793 | 288,628 | 226,325 |
| Selling, general and administrative expenses, including $4,491, $2,885, $8,917, and $5,620, respectively, to related parties | 239,934 | 181,843 | 515,645 | 337,084 |
| Interest expense, including $333, $333, $666, and $666, respectively, to related parties | 19,915 | 19,315 | 48,777 | 34,963 |
| Other (income) expense, net | (3,079) | 694 | 14,327 | 933 |
| **Net loss before income taxes** | (106,564) | (64,059) | (290,121) | (146,655) |
| Income tax provision | (238) | — | (238) | — |
| **Net loss** | (106,326) | (64,059) | (289,883) | (146,655) |
| Net loss attributable to non-controlling interests | (65,496) | (43,736) | (189,166) | (103,217) |
| **Net loss attributable to Carvana Co.** | $ (40,830) | $ (20,323) | $ (100,717) | $ (43,438) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.62) | $ (0.44) | $ (1.73) | $ (0.99) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | 66,327 | 46,038 | 58,363 | 43,695 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 41,208 | $ 41 | 104,336 | $ 104 | $ 147,916 | $ (68,375) | $ 147,742 | $ 227,428 |
| Net loss | — | — | — | — | — | (23,115) | (59,481) | (82,596) |
| Exchanges of LLC Units | 2,020 | 2 | (1,984) | (2) | 1,899 | — | (1,899) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 25,582 | — | — | 25,582 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (25,582) | — | — | (25,582) |
| Contribution of Class A common stock from related party | (72) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 74 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (14) | — | — | — | (433) | — | — | (433) |
| Options exercised | 27 | — | — | — | 426 | — | — | 426 |
| Equity-based compensation | — | — | — | — | 8,022 | — | — | 8,022 |
| **Balance, March 31, 2019** | 43,243 | $ 43 | 102,352 | $ 102 | $ 157,830 | $ (91,490) | $ 86,362 | $ 152,847 |
| Net loss | — | — | — | — | — | (20,323) | (43,736) | (64,059) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 4,830 | 5 | — | — | 297,606 | — | — | 297,611 |
| Adjustments to the non-controlling interests related to equity offering | — | — | — | — | (201,015) | — | 201,015 | — |
| Exchanges of LLC Units | 1,612 | 2 | (971) | (1) | 1,571 | — | (1,571) | 1 |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 33,573 | — | — | 33,573 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (33,573) | — | — | (33,573) |
| Contribution of Class A common stock from related party | (43) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 78 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (13) | — | — | — | (1,557) | — | — | (1,557) |
| Options exercised | 25 | — | — | — | 372 | — | — | 372 |
| Equity-based compensation | — | — | — | — | 8,602 | — | — | 8,602 |
| **Balance, June 30, 2019** | 49,732 | $ 50 | 101,381 | $ 101 | $ 263,409 | $ (111,813) | $ 242,070 | $ 393,817 |

3

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 50,507 | $ 51 | 101,219 | $ 101 | $ 280,994 | $ (183,034) | $ 93,827 | $ 191,939 |
| Net loss | — | — | — | — | — | (59,887) | (123,670) | (183,557) |
| Exchanges of LLC Units | 116 | — | (19) | — | 36 | — | (36) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1,949 | — | — | 1,949 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1,949) | — | — | (1,949) |
| Issuance of Class A common stock to settle vested restricted stock units | 38 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (8) | — | — | — | (2,356) | — | — | (2,356) |
| Options exercised | 7 | — | — | — | 145 | — | — | 145 |
| Equity-based compensation | — | — | — | — | 7,055 | — | — | 7,055 |
| **Balance, March 31, 2020** | 50,660 | $ 51 | 101,200 | $ 101 | $ 285,874 | $ (242,921) | $ (29,879) | $ 13,226 |
| Net loss | — | — | — | — | — | (40,830) | (65,496) | (106,326) |
| Issuances of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 18,333 | 18 | — | — | 1,058,922 | — | — | 1,058,940 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (643,886) | — | 643,886 | — |
| Exchanges of LLC Units | 285 | — | — | — | 1,385 | — | (1,385) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21,159 | — | — | 21,159 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21,159) | — | — | (21,159) |
| Issuance of Class A common stock to settle vested restricted stock units | 61 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (26) | — | — | — | (3,135) | — | — | (3,135) |
| Options exercised | 101 | — | — | — | 2,676 | — | — | 2,676 |
| Equity-based compensation | — | — | — | — | 7,700 | — | — | 7,700 |
| **Balance, June 30, 2020** | 69,414 | $ 69 | 101,200 | $ 101 | $ 709,536 | $ (283,751) | $ 547,126 | $ 973,081 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Six Months Ended June 30, | |
| --- | ---: | ---: |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (289,883) | $ (146,655) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 33,440 | 16,830 |
| Loss on disposal of property and equipment | 4,643 | 653 |
| Provision for bad debt and valuation allowance | 7,618 | 3,291 |
| Gain on loan sales | (52,272) | (59,573) |
| Equity-based compensation expense | 12,160 | 15,745 |
| Amortization and write-off of debt issuance costs and bond premium | 3,838 | 2,172 |
| Originations of finance receivables | (1,565,009) | (1,181,807) |
| Proceeds from sale of finance receivables, net | 1,459,344 | 1,356,345 |
| Purchase of finance receivables | — | (161,781) |
| Principal payments received on finance receivables held for sale | 38,370 | 30,846 |
| Unrealized loss (gain) on beneficial interests in securitization | 3,388 | (177) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (7,041) | (9,747) |
| Vehicle inventory | 137,224 | (191,991) |
| Other assets | (3,371) | (24,074) |
| Accounts payable and accrued liabilities | 39,275 | 57,152 |
| Operating lease right-of-use assets | (42,917) | (15,115) |
| Operating lease liabilities | 45,995 | 13,434 |
| Other liabilities | (224) | (382) |
| Net cash used in operating activities | (175,422) | (294,834) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $0 and $6,282, respectively, from related parties | (171,057) | (88,137) |
| Principal payments received on beneficial interests in securitizations | 3,869 | 1,108 |
| Net cash used in investing activities | (167,188) | (87,029) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 2,616,660 | 1,901,607 |
| Payments on short-term revolving facilities | (3,154,500) | (2,164,248) |
| Proceeds from issuance of long-term debt | 87,391 | 315,674 |
| Payments on long-term debt | (11,912) | (6,868) |
| Payments of debt issuance costs | (3,472) | (7,034) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 |
| Proceeds from exercise of stock options | 2,821 | 798 |
| Tax withholdings related to restricted stock awards | (5,491) | (1,990) |
| Net cash provided by financing activities | 590,437 | 335,550 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 247,827 | (46,313) |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 366,286 | $ 42,396 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

### Description of Business

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is a leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

### Organization

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Senior Notes (as defined in Note 9 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 10 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of June 30, 2020, Carvana Co. owned approximately 39.8% of Carvana Group and the LLC Unitholders (as defined in Note 10 — Stockholders' Equity) owned the remaining 60.2%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of June 30, 2020, results of operations and changes in stockholder's equity for the three and six months ended June 30, 2020 and 2019, and cash flows for the six months ended June 30, 2020 and 2019. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

### Liquidity

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in conformity with GAAP, which contemplate continuation of the Company as a going concern. The Company has incurred losses

6

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

from inception through June 30, 2020, and expects to incur additional losses in the future. As the Company continues to grow into new markets, build vending machines and inspection and reconditioning centers ("IRCs"), and enhance technology and software development efforts, it may need access to additional capital. Historically, the Company has raised additional capital through equity issuances or debt instruments to fund its expansion (refer to Note 10 — Stockholders' Equity and Note 9 — Debt Instruments). The Company has also funded some of its capital expenditures through long-term financing with lenders and other investors, as described further in Note 9 — Debt Instruments. At June 30, 2020, the Company had $52.6 million of committed funds for future construction costs at four IRCs with unfinished construction. The Company funds vehicle inventory purchases through its Floor Plan Facility, as described further in Note 9 — Debt Instruments. As of June 30, 2020, the Company had approximately $919.0 million available under its $950.0 million Floor Plan Facility and may draw upon this facility through October 2020 to fund future vehicle inventory purchases, as described further in Note 9 — Debt Instruments. Further, the Company plans to increase the amount and maturity date of financing available to purchase vehicle inventory within the next year by amending its existing Floor Plan Facility or by entering into a new agreement. The Company has historically sold the finance receivables it generates through forward flow agreements and fixed pool loan sales, including securitization transactions. At June 30, 2020, the Company's Master Purchase and Sale Agreement with Ally has a remaining capacity for the sale of up to $1.3 billion of principal balance of finance receivables through March 2021. Prior to selling the finance receivables, the Company may fund them through Finance Receivable Facilities (as defined and further discussed in Note 9 — Debt Instruments). At June 30, 2020, the Company had $925.0 million available under its Finance Receivable Facilities, which have a current total capacity of $925.0 million. The Company may draw upon these facilities through July 2021 and February 2022 to fund future finance receivable originations. The aggregate capacity of these facilities may be increased to $1.0 billion with the consent of certain lenders. During the three months ended June 30, 2020, the Company completed equity offerings of approximately 18.3 million shares of its Class A common stock for net proceeds of approximately $1.1 billion.

Due to the impact of the novel coronavirus ("COVID-19") on the economy, the Company significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and information technology investments. The Company also rebalanced its marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to quickly adjust as conditions evolve. Management believes that the actions taken in respect of the COVID-19 pandemic, current working capital, results of operations, and expected continued inventory and capital expenditure financing are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. The COVID-19 pandemic has adversely impacted the global economy, as well as the Company's operations, and the extent and duration of the impacts remain unclear. The Company's future estimates, including, but not limited to, the Company's allowance for loan losses, inventory valuations, fair value measurements, cancellation reserves, asset impairment charges, and discount rate assumptions, may be impacted and continue to evolve as conditions change as a result of the COVID-19 pandemic. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. The Company adopted ASU 2016-13 on January 1, 2020. Financial assets measured at fair value through net income are excluded from the scope of ASU 2016-13. The Company's beneficial interests in securitizations are carried at fair value and are thus excluded from ASU 2016-13. Finance receivables originated in connection with the Company's vehicle sales are held for sale and presented at the lower of amortized cost or fair value. The Company intends to sell the finance receivables prior to their contractual maturity, therefore the recovery of the asset is from its sale rather than maturity and the Company is not required to

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

measure the expected lifetime credit losses. The adoption of ASU 2016-13 did not have a material effect on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") related to updated requirements over the disclosures of fair value measurements. Under ASU 2018-13, certain disclosure requirements for fair value measurements will be eliminated, modified or added to facilitate better communication around recurring and nonrecurring fair value measurements. ASU 2018-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with some amendments applied prospectively, some applied retrospectively and early adoption permitted. The Company adopted ASU 2018-13 for its fiscal year beginning January 1, 2020 and it did not have a material effect on the Company's fair value disclosures within its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The intent of this pronouncement is to align the requirements for capitalizing implementation costs incurred in a cloud computing arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software as defined in ASC 350-40. Under ASU 2018-15, the capitalized implementation costs related to a cloud computing arrangement will be amortized over the term of the arrangement and all capitalized implementation amounts will be required to be presented in the same line items of the financial statements as the related hosting fees. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have a material effect on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"). ASU 2018-17 requires reporting entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety for determining whether a decision-making fee is a variable interest. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. Entities are required to apply the amendments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have an effect on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). ASU 2020-04 provides optional guidance for a limited period of time related to contract modifications and hedge accounting to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The standard is effective from March 12, 2020 through December 31, 2022, except for hedging relationships existing as of December 31, 2022 that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The Company may elect to take advantage of this optional guidance in its transition away from LIBOR within certain debt contracts but does not expect a material impact on its consolidated financial statements. As of June 30, 2020, the Company had not modified any contracts or had any hedge accounting activity that fell under ASU 2020-04.

**Accounting Standards Issued But Not Yet Adopted**

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. ASU 2019-12 will be effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. The Company plans to adopt ASU 2019-12 for its fiscal year beginning January 1, 2021 and is currently assessing the impact, if any, the guidance will have on its consolidated financial statements.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 3 — PROPERTY AND EQUIPMENT, NET

The following table summarizes property and equipment, net as of June 30, 2020 and December 31, 2019 (in thousands):

| | June 30, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Land and site improvements | $ | 103,939 | $ | 98,530 |
| Buildings and improvements | | 290,025 | | 229,640 |
| Transportation fleet | | 133,976 | | 110,302 |
| Software | | 89,409 | | 66,875 |
| Furniture, fixtures and equipment | | 52,508 | | 38,123 |
| Total property and equipment excluding construction in progress | | 669,857 | | 543,470 |
| Less: accumulated depreciation and amortization on property and equipment | | (125,064) | | (88,795) |
| Property and equipment excluding construction in progress, net | | 544,793 | | 454,675 |
| Construction in progress | | 159,955 | | 88,796 |
| Property and equipment, net | $ | 704,748 | $ | 543,471 |

Depreciation and amortization expense on property and equipment was approximately $17.2 million and $8.4 million for the three months ended June 30, 2020 and 2019, respectively, and approximately $32.5 million and $16.1 million for the six months ended June 30, 2020 and 2019, respectively. These amounts primarily relate to selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying unaudited condensed consolidated statements of operations.

## NOTE 4 — GOODWILL AND INTANGIBLE ASSETS, NET

On April 12, 2018, the Company acquired Car360, Inc. ("Car360"), a provider of app-based photo capture technology, for approximately $16.7 million, net of cash acquired of approximately $0.4 million. The purchase price was comprised of approximately $6.7 million cash, net of cash acquired, and approximately 0.5 million Class A Units of Carvana Group, with a fair value of approximately $10.0 million.

The purchase price was allocated to net tangible assets of approximately $0.2 million and intangible assets of approximately $9.9 million based on their fair values on the acquisition date and a related deferred tax liability of approximately $2.5 million. The deferred tax liability will amortize over 2 years to 7 years, and approximately $0.1 million and $0.0 million was amortized during the three months ended June 30, 2020 and 2019, respectively, and $0.2 million and $0.4 million during the six months ended June 30, 2020 and 2019, respectively. The excess of the purchase price over the amounts allocated to assets acquired, liabilities assumed and the deferred tax liability was approximately $9.4 million, which has been recorded as goodwill. The historical results of operations for Car360 were not significant to the Company's consolidated results of operations for the periods presented.

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes intangible assets and goodwill related to the Car360 acquisition as of June 30, 2020 and December 31, 2019 (in thousands):

|  | Useful Life | June 30, 2020 | | December 31, 2019 |
| --- | --- | --- | --- | --- |
| Intangible assets: |  |  |  |  |
| Developed technology | 7 years | $ | 8,642 | $ 8,642 |
| Customer relationships | 2 years |  | — | 523 |
| Non-compete agreements | 5 years |  | 774 | 774 |
| Intangible assets, acquired cost |  |  | 9,416 | 9,939 |
| Less: accumulated amortization |  |  | (3,079) | (2,707) |
| Intangible assets, net |  | $ | 6,337 | $ 7,232 |
|  |  |  |  |  |
| Goodwill | N/A | $ | 9,353 | $ 9,353 |

Amortization expense was approximately $0.3 million and $0.4 million during the three months ended June 30, 2020 and 2019, respectively, and $0.9 million and $0.8 million during the six months ended June 30, 2020 and 2019, respectively. As of June 30, 2020, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 4.6 years. The anticipated annual amortization expense to be recognized in future years as of June 30, 2020 is as follows (in thousands):

|  | Expected Future Amortization |
| --- | --- |
| Remainder of 2020 | $ 694 |
| 2021 | 1,389 |
| 2022 | 1,389 |
| 2023 | 1,279 |
| 2024 | 1,235 |
| 2025 | 351 |
| Thereafter | — |
| Total | $ 6,337 |

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 5 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of June 30, 2020 and December 31, 2019 (in thousands):

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Accounts payable, including $10,912 and $9,549, respectively, due to related parties | $ 69,996 | $ 63,576 |
| Sales taxes and vehicle licenses and fees | 57,654 | 45,812 |
| Accrued compensation and benefits | 28,914 | 21,726 |
| Accrued property and equipment | 27,625 | 23,433 |
| Reserve for returns and cancellations | 23,125 | 19,721 |
| Accrued interest expense | 17,121 | 15,650 |
| Accrued advertising costs | 13,986 | 11,403 |
| Customer deposits | 8,928 | 6,379 |
| Other accrued liabilities | 30,732 | 26,743 |
| Total accounts payable and accrued liabilities | $ 278,081 | $ 234,443 |

## NOTE 6 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group ("DriveTime") entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2021 and 2024. The Company has the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in December 2018. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring in 2021 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco inspection and reconditioning centers ("IRCs"). At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations and its share of estimated costs incurred by DriveTime related to preparing these sites for use. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In December 2016, the Company entered into a lease agreement related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In August 2018, the Company entered into an additional lease agreement with a coterminous initial term with Verde for contiguous space to that IRC. The lease agreements require monthly rental payments and can each be extended for four additional five-year periods.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a lease agreement with DriveTime for access to and utilization of a fully operational IRC near Cleveland, Ohio. DriveTime vacated the facility in February 2019, at which point the Company became the sole occupant and began leasing the full facility from DriveTime. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. Before DriveTime vacated the facility, the Company paid a monthly rental fee for facility and shared reconditioning costs, calculated based on the Company's pro rata utilization of space at the IRC in a given month, along with a pro rata share of the facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the three months ended June 30, 2020, total costs related to these operating lease agreements, including those noted above, were approximately $1.8 million with approximately $0.8 million and $1.0 million allocated to inventory and selling, general and administrative expenses, respectively. During the six months ended June 30, 2020, total costs related to these lease agreements were approximately $3.6 million with approximately $1.6 million and $2.0 million allocated to inventory and selling, general and administrative expenses, respectively. During the three months ended June 30, 2019, total costs related to these lease agreements were approximately $2.0 million with approximately $0.9 million and $1.1 million allocated to inventory and selling, general and administrative expenses, respectively. During the six months ended June 30, 2019, total costs related to these lease agreements were approximately $4.0 million with approximately $1.7 million and $2.3 million allocated to inventory and selling, general and administrative expenses, respectively.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company became the sole occupant in April 2019. The lease expires in four years, subject to the ability to exercise three renewal options of five years each. DriveTime remained an occupant of the facility through April 1, 2019 but is not fully released from the lease obligations by the landlord.

During the three and six months ended June 30, 2019, the Company purchased certain leasehold improvements and equipment from DriveTime at facilities the Company previously shared with them for DriveTime's net book value of approximately $2.0 million and $6.3 million, respectively.

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was approximately $0.3 million and $0.5 million during the three and six months ended June 30, 2020, respectively, and approximately $0.3 million and $0.5 million during the three and six months ended June 30, 2019, respectively.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was approximately $0.2 million and $0.4 million during the three and six months ended June 30, 2020, respectively.

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three and six months ended June 30, 2020, the Company recognized approximately $19.3 million and $37.6 million, respectively, and during the three and six months ended June 30, 2019, the Company recognized approximately $13.1 million and $23.2 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. The Company recognized approximately $3.4 million and $5.7 million during the three and six months ended June 30, 2020, respectively, and approximately $0.9 million and $1.4 million during the three and six ended June 30, 2019, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers a portion of the Company's GAP waiver coverage and the limited warranty provided to all customers under the Master Dealer Agreement. The Company pays a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers and a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase. The Company incurred approximately $1.2 million and $2.5 million during the three and six months ended June 30, 2020, respectively, and $1.1 million and $1.9 million during the three and six months ended June 30, 2019, respectively, related to the administration of GAP waiver coverage and limited warranty. As of June 30, 2020, the majority of the Company's GAP waiver coverage sales were administered by an unrelated party.

**GAP Waiver Insurance Policy**

The Company purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $0.0 million during both the three and six months ended June 30, 2020, and approximately $0.6 million and $1.6 million during the three and six months ended June 30, 2019, respectively, that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that the Company sold in its securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, the Company entered into a retrospective profit sharing agreement with BlueShore under which the Company shares in the profits generated from the insurance policies by receiving a portion of the excess of the premium it paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. As of June 30, 2020 and December 31, 2019, the Company held a receivable of approximately $0.1 million and $0.2 million, respectively, which is included in other assets on the accompanying unaudited condensed consolidated balance sheets, related to this retrospective profit sharing agreement.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $1.0 million and $2.6 million during the three and six months ended June 30, 2020, respectively, and $0.5 million and $1.0 million during the three and six months ended June 30, 2019, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime approximately $0.0 million and $0.1 million under this agreement during the three and six months ended June 30, 2020, respectively, and approximately $0.2 million and $0.3 million under this agreement during the three and six months ended June 30, 2019, respectively.

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Senior Notes Held by Verde**

As of both June 30, 2020 and December 31, 2019, Verde held $15.0 million of principal of the Company's outstanding Senior Notes, as defined and further discussed in Note 9 — Debt Instruments.

**Accounts Payable Due to Related Party**

As of June 30, 2020 and December 31, 2019, approximately $10.9 million and $9.5 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contribution Agreements**

On September 10, 2018, the Company announced a commitment by its Chief Executive Officer, Ernest Garcia III, to contribute shares of the Company's Class A common stock, for each then-current employee from his personal shareholdings to the Company at no charge (the "Share Contributions"). His contributions funded equity awards of 165 restricted stock units to each of the Company's then-current employees upon their satisfying certain employment tenure requirements (the "100k Milestone Gift"). The Company entered into certain contribution agreements related to his commitment in order to effect the transfer of shares from Mr. Garcia to the Company. The Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, but pursuant to a series of contribution agreements, it has indemnified Mr. Garcia from any such obligations that may arise. See Note 10 — Stockholders' Equity and Note 12 — Equity-Based Compensation for further discussion. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**IP License Agreement**

In February 2017, the Company entered into a license agreement that governs the rights of certain intellectual property owned by the Company and the rights of certain intellectual property owned by DriveTime. The license agreement, which was amended and restated in April 2017, generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property, and each party agrees to certain covenants not to sue the other party, its affiliates and certain of its service providers in connection with various patent claims. The exclusive license to DriveTime is limited to the business that is primarily of subprime used car sales to retail customers. However, upon a change of control of either party, both parties' license rights as to certain future improvements to licensed intellectual property and all limited exclusivity rights are terminated. The agreement does not provide a license to any of the Company's patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to the Company's vending machines, automated vehicle photography or certain other elements of the Company's brand.

**NOTE 7 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with certain financing partners, including Ally Bank and Ally Financial (the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2020, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, commit the purchaser to purchase up to a maximum of $2.0 billion of principal balances of finance receivables from March 24, 2020 through March 23, 2021 and broaden the set of finance receivables covered by the MPSA.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

During the six months ended June 30, 2020 and 2019, the Company sold approximately $960.0 million and $257.0 million, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.3 billion of unused capacity as of June 30, 2020.

**Master Transfer Agreement**

In November 2017, the Company entered into a master transfer agreement (the "2017 Master Transfer Agreement") with a purchaser trust (the "2017 Purchaser Trust") under which the 2017 Purchaser Trust committed to purchase an aggregate amount of principal balances of finance receivables.

On May 7, 2019, the Company purchased the certificate of the 2017 Purchaser Trust for $34.0 million, net of cash acquired. At the time of acquisition the trust assets included $139.7 million of finance receivables that the Company had previously sold to the trust under the 2017 Master Transfer Agreement, and its liabilities included $105.7 million in associated debt and other liabilities. In connection with the certificate purchase, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement (the "A&R Loan and Security Agreement") pursuant to which Ally Bank agreed to provide a $350.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company, as further described in Note 9 — Debt Instruments. In February 2020, the 2017 Master Transfer Agreement terminated in connection with the termination of a past finance receivable facility discussed in Note 9 — Debt Instruments.

During the six months ended June 30, 2019, prior to the acquisition of the certificate in the trust, the Company sold approximately $139.3 million in principal balances of finance receivables under the Master Transfer Agreement.

During the six months ended June 30, 2019, prior to the certificate purchase, the Company also purchased finance receivables that it previously sold to the purchaser trust under the 2017 Master Transfer Agreement for a total price of approximately $127.7 million and immediately resold such finance receivables into a securitization transaction, which is described further in Note 8 — Securitizations and Variable Interest Entities. This transaction was entered into in connection with the securitization transaction and was entered into independently from the terms of the 2017 Master Transfer Agreement.

**Securitization Transactions**

Beginning in 2019, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 8 — Securitizations and Variable Interest Entities.

During the six months ended June 30, 2020 and 2019, the Company sold approximately $494.8 million and $820.0 million, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners under the MPSA, the Master Transfer Agreement, and to investors in securitization transactions was approximately $39.3 million and $40.4 million during the three months ended June 30, 2020 and 2019, respectively, and $52.3 million and $59.6 million during the six months ended June 30, 2020 and 2019, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 8 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 7 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include but

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

are not limited to rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of June 30, 2020, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. The Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets at fair value, which as of June 30, 2020 and December 31, 2019 were approximately $116.6 million and $98.8 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of June 30, 2020.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at June 30, 2020 and December 31, 2019. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

|  | June 30, 2020 | | December 31, 2019 | |
|  | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
|---|---|---|---|---|
|  | (in thousands) | | | |
| Rated notes | $ 92,133 | $ 92,133 | $ 85,234 | $ 85,234 |
| Certificates and other assets | 24,430 | 24,430 | 13,546 | 13,546 |
| Total unconsolidated VIEs | $ 116,563 | $ 116,563 | $ 98,780 | $ 98,780 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of June 30, 2020 and December 31, 2019 were as follows (in thousands):

|  | June 30, 2020 | | December 31, 2019 | |
|  | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|
| Rated notes | $ 93,019 | $ 92,133 | $ 84,983 | $ 85,234 |
| Certificates and other assets | 25,804 | 24,430 | 13,456 | 13,546 |
| Total securities available for sale | $ 118,823 | $ 116,563 | $ 98,439 | $ 98,780 |

## NOTE 9 — DEBT INSTRUMENTS

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by substantially all of its assets, other than the Company's interests in real property and finance receivables pledged

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

under its Finance Receivable Facilities (as defined below). The facility has a maturity date of October 31, 2020 and requires monthly interest payments on borrowings under the Floor Plan Facility. The available capacity of the Floor Plan Facility is $950.0 million, the annual interest rate is one-month LIBOR plus 3.15% if the average outstanding balance on the Floor Plan Facility in the previous calendar month is greater than $500.0 million and otherwise it is one-month LIBOR plus 3.40%. The Floor Plan Facility requires that at least 7.5% of the total principal amount owed to the lender is held as restricted cash, a change from 5.0%.

Repayment in an amount equal to the amount of the advance or loan must generally be made within several days after selling or otherwise disposing of the underlying vehicle inventory. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts.

As of June 30, 2020, the interest rate on the Floor Plan Facility was approximately 3.56%, the Company had an outstanding balance under this facility of approximately $31.0 million, unused capacity of approximately $919.0 million, and held approximately $2.3 million in restricted cash related to this facility. As of December 31, 2019, the interest rate on the Floor Plan Facility was approximately 4.91%, the Company had an outstanding balance of approximately $515.5 million, unused capacity of approximately $434.5 million, and held approximately $38.7 million in restricted cash related to this facility.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain automotive finance receivables originated by the Company. As of June 30, 2020, the lender has committed $425.0 million under this facility. The Company can increase this commitment in $25.0 million increments up to $500.0 million with the lender's consent, and draw upon this facility until July 23, 2021.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until February 20, 2022.

Both facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. Both facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of June 30, 2020, the Company had $0.0 million outstanding under these facilities, and unused capacity of approximately $925.0 million. As of June 30, 2020, the undistributed cash collections held in restricted cash related to these facilities was approximately $117.7 million. During the three months ended June 30, 2020, the Company's effective interest rate on these facilities was approximately 2.64%.

*Past Finance Receivable Facilities*

In April 2019, the Company entered in a Loan and Security Agreement pursuant to which Ally Bank agreed to provide a $300.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus a spread ranging from 1.00% to 1.80%.

In May 2019, in connection with the acquisition of the Purchaser Trust described in Note 7 — Finance Receivable Sale Agreements, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement to provide an additional $350.0 million revolving credit facility to fund certain other automotive finance receivables originated by the

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus 1.95%.

Both credit facilities required that at least 2% of the outstanding pledged finance receivables principal balances, plus any undistributed amounts collected on the pledged finance receivables amount, be held as restricted cash.

Interest payments on these credit facilities were payable monthly on each draw date. Principal repayments occurred on the fifteenth day of each calendar month in an amount equal to the undistributed receivables collected.

As of December 31, 2019, these credit facilities had an interest rate ranging between approximately 2.76% and 3.71%, and the Company had an outstanding balance under these facilities of approximately $53.4 million, unused capacity of approximately $596.6 million, and held approximately $3.7 million in restricted cash related to these facilities.

The Company voluntarily terminated these facilities in February 2020 after entering into the active finance receivable facilities described above.

**Long-Term Debt**

*Senior Unsecured Notes*

On September 21, 2018, the Company issued an aggregate of $350.0 million in senior unsecured notes due 2023 (the "Existing Notes") under an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). On May 24, 2019, the Company issued $250.0 million in aggregate principal amount of additional notes (the "New Notes") under the Indenture, at a 100.5% premium. The Existing Notes and New Notes (together the "Senior Notes") are treated as a single class for all purposes and have the same terms. The Senior Notes accrue interest at a rate of 8.875% per annum, which is payable semi-annually in arrears on April 1 and October 1 of each year. The Senior Notes mature on October 1, 2023, unless earlier repurchased or redeemed, and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales or funding of its finance receivables, if any). The Company may redeem some or all of the Senior Notes on or after October 1, 2020 at redemption prices set forth in the Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2020, the Company may redeem up to 35.0% of the aggregate principal amount of the Senior Notes at a redemption price equal to 108.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to October 1, 2020, by paying a make-whole premium plus any accrued and unpaid interest, to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indenture governing the Senior Notes contains restrictive covenants that, subject to certain conditions, limit the ability of the Company to, among other things, incur additional debt or issue preferred stock, create liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default. As of June 30, 2020, the Company was in compliance with all covenants.

In connection with the issuance of these Senior Notes, Carvana Group amended its LLC agreement to create a class of non-convertible preferred units, which Carvana Co. purchased with its net proceeds from the issuance of these Senior Notes, as further discussed in Note 10 — Stockholders' Equity.

The outstanding principal of the Senior Notes, net of debt issuance costs and including the premium, was approximately $592.3 million and $591.1 million as of June 30, 2020 and December 31, 2019, respectively, of which $15.0 million of principal was held by Verde as of both periods, and is included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of June 30, 2020, the outstanding principal of these notes had a weighted-average interest rate of 6.8% and totaled approximately $27.6 million, of which approximately $12.6 million is due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheet.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of June 30, 2020, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of June 30, 2020 and December 31, 2019, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $263.7 million and $174.7 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

In November 2017, the Company entered into a master sale-leaseback agreement (the "Master Sale-Leaseback Agreement" or "MSLA"), which was amended in November 2018, pursuant to which it may sell and lease back certain of its owned or leased properties and construction improvements. Under the MSLA, at any time the Company may elect to, and beginning in November 2020 or until a property owner of a leased site consents to the sale-leaseback, the purchaser has the right to demand that the Company repurchase one or more of the properties sold and leased back pursuant to the MSLA for an amount equal to the repurchase price. Repurchase prices are defined in each of the applicable leases and are generally the original purchase prices plus any accrued and unpaid rent. Under the MSLA, the total sales price of properties the Company has sold and is leasing back at any point in time is limited to $75.0 million. As of June 30, 2020 and December 31, 2019, the Company may sell and lease back approximately $75.0 million of its property and equipment under the MSLA.

*Financing of Beneficial Interests in Securitizations*

In June 2019, the Company entered into a secured borrowing facility through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase. As discussed in Note 8 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules.

As of June 30, 2020 and December 31, 2019, the Company has pledged approximately $70.4 million and $85.0 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreement with expected repurchases ranging from January 2026 to October 2026. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lender, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transaction. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of this facility, net of debt issuance costs, was approximately $68.4 million and $82.7 million as of June 30, 2020 and December 31, 2019, respectively, of which approximately $24.0 million and $26.4 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

**NOTE 10 — STOCKHOLDERS' EQUITY**

Carvana Co.'s amended and restated certificate of incorporation, among other things authorizes (i) 50.0 million shares of Preferred Stock, par value $0.01 per share, (ii) 500.0 million shares of Class A common stock, par value $0.001 per share, and (iii) 125.0 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of June 30, 2020, there were approximately 213.2 million and 4.6 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on June 30, 2020), respectively, issued and outstanding. As discussed in Note 12 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold and are earned over the requisite service period.

**Equity Offerings**

On May 24, 2019, the Company completed a public equity offering of 4.2 million shares of its Class A common stock at a public offering price of $65.00 per share and received net proceeds from the offering of approximately $258.8 million after underwriting discounts and commissions and offering expenses. As part of the offering, the Company granted the underwriters a 30-day option to purchase all or part of approximately 0.6 million additional shares of Class A common stock. On June 20, 2019, the underwriters exercised their option in full for an additional $38.9 million in proceeds after offering expenses. The Company used the net proceeds to purchase approximately 6.0 million newly-issued LLC Units in Carvana Group.

On April 1, 2020, the Company completed a registered direct offering to investors of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Ernest Garcia II, through Verde, and Ernest Garcia III each invested approximately $25.0 million or approximately 0.6 million shares of the Class A common stock, in the offering. The Company used the net proceeds to purchase approximately 16.7 million newly-issued LLC Units in Carvana Group.

On May 21, 2020, the Company completed a public equity offering of 5.0 million shares of its Class A common stock at an offering price of $92.00 per share and received net proceeds from the offering of approximately $459.5 million. The Company used the net proceeds to purchase approximately 6.3 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the six months ended June 30, 2020, certain LLC Unitholders exchanged 0.5 million LLC Units and 0.0 million shares of Class B common stock for 0.4 million newly-issued shares of Class A common stock. Simultaneously, and in connection with these exchanges, Carvana Co. received approximately 0.5 million LLC Units, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of the Senior Notes in September 2018 and May 2019, as discussed further in Note 9 — Debt Instruments. Carvana Co. used its net proceeds from the Senior Notes to purchase 600,000 Class A Non-Convertible Preferred Units. In the event Carvana Co. makes payments on the Senior Notes, Carvana Group will make an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit shall be canceled and retired.

**Contribution of Class A Common Shares From Ernest Garcia III**

During the three and six months ended June 30, 2019, the Company and its Chief Executive Officer, Ernest Garcia III, entered into contribution agreements (the "Contribution Agreements") in connection with the 100k Milestone Gift, as defined in Note 6 — Related Party Transactions. Pursuant to the Contribution Agreements, Mr. Garcia contributed approximately 0.0 million and 0.1 million shares of the Company's Class A common stock to the Company during the three and six months ended June 30, 2019, respectively, at no charge. The Company subsequently granted approximately 0.0 million and 0.1 million restricted stock units during the three and six months ended June 30, 2019, respectively, to employees. Refer to Note 12 — Equity-Based Compensation for further discussion. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contribution, it has indemnified Mr. Garcia from any such obligations that may arise. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**NOTE 11 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans, such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the six months ended June 30, 2020 and 2019, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $1.4 million and $3.5 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity. During the six months ended June 30, 2020 and 2019, Carvana Co. utilized its

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

net proceeds from its equity offerings to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by approximately $643.9 million and $201.0 million, respectively, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of June 30, 2020, Carvana Co. owned approximately 39.8% of Carvana Group with the LLC Unitholders owning the remaining 60.2%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

| | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Transfers (to) from non-controlling interests: | | | | |
| Decrease as a result of issuances of Class A common stock | $ | (643,886) | $ | (201,015) |
| Increase as a result of exchanges of LLC Units | | 1,421 | | 3,470 |
| Total transfers to non-controlling interests | $ | (642,465) | $ | (197,545) |

## NOTE 12 — EQUITY-BASED COMPENSATION

Equity-based compensation expense is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation expense recognized during the three and six months ended June 30, 2020 and 2019 is as follows (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2020** | | **2019** | | **2020** | | **2019** | |
| Class B Units | $ | 259 | $ | 578 | $ | 717 | $ | 1,156 |
| Restricted Stock Units and Awards excluding those granted in relation to the 100k Milestone Gift | | 5,274 | | 3,214 | | 9,769 | | 5,681 |
| Restricted Stock Units granted in relation to the 100k Milestone Gift | | — | | 2,809 | | — | | 5,933 |
| Options | | 1,809 | | 1,457 | | 3,416 | | 2,664 |
| Class A Units | | 358 | | 544 | | 853 | | 1,190 |
| Total equity-based compensation | | 7,700 | | 8,602 | | 14,755 | | 16,624 |
| Equity-based compensation capitalized to property and equipment | | (1,480) | | (577) | | (2,595) | | (879) |
| Equity-based compensation capitalized to inventory | | (7) | | (958) | | (98) | | (1,835) |
| Equity-based compensation, net of capitalized amounts | $ | 6,213 | $ | 7,067 | $ | 12,062 | $ | 13,910 |

As of June 30, 2020, the total unrecognized compensation expense related to outstanding equity awards was approximately $70.9 million, which the Company expects to recognize over a weighted-average period of approximately 3.0 years. Total unrecognized equity-based compensation expense will be adjusted for actual forfeitures.

### 2017 Omnibus Incentive Plan

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14.0 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units ("RSUs") and other stock-based awards to employees, directors, officers and consultants. The majority of the Company's equity awards, other than those granted in

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

relation to the 100k Milestone Gift, vest over four year periods based on continued employment with the Company. As of June 30, 2020, approximately 9.9 million shares remain available for future equity award grants under this plan.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and six months ended June 30, 2020 or 2019. As of June 30, 2020, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 13 — LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented.

The following table presents the calculation of basic and diluted net loss per share during the three and six months ended June 30, 2020 and 2019 (in thousands, except per share data):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| Numerator: | | | | |
| Net loss | $ (106,326) | $ (64,059) | $ (289,883) | $ (146,655) |
| Net loss attributable to non-controlling interests | 65,496 | 43,736 | 189,166 | 103,217 |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (40,830) | $ (20,323) | $ (100,717) | $ (43,438) |
| Denominator: | | | | |
| Weighted-average shares of Class A common stock outstanding | 66,430 | 46,284 | 58,493 | 43,958 |
| Nonvested weighted-average restricted stock awards | (103) | (246) | (130) | (263) |
| Weighted-average shares of Class A common stock to compute basic and diluted net loss per Class A common share | 66,327 | 46,038 | 58,363 | 43,695 |
| Net loss per share of Class A common stock, basic and diluted | $ (0.62) | $ (0.44) | $ (1.73) | $ (0.99) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

not been presented. LLC Units (adjusted for the Exchange Ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash.

Weighted-average as-converted LLC Units of approximately 105.1 million and 106.4 million, comprised of approximately 101.4 million and 101.9 million Class A Units together with the related Class B common stock and approximately 3.7 million and 4.5 million Class B Units, for the three months ended June 30, 2020 and 2019, respectively, and of approximately 105.2 million and 107.7 million, comprised of approximately 101.4 million and 103.1 million Class A Units together with the related Class B common stock and approximately 3.8 million and 4.6 million Class B Units, during the six months ended June 30, 2020 and 2019, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Outstanding Class B Units were approximately 4.7 million and 5.7 million at June 30, 2020 and 2019, respectively. Weighted-average potentially dilutive restricted stock awards and units of approximately 0.8 million and 0.6 million for the three months ended June 30, 2020 and 2019, respectively, and approximately 0.8 million and 0.7 million for the six months ended June 30, 2020 and 2019, respectively, were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive. As of both June 30, 2020 and 2019, 1.2 million options were outstanding and evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 14 — INCOME TAXES**

As described in Note 1 — Business Organization, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 10 — Stockholders' Equity, the Company acquired approximately 0.4 million and 0.5 million LLC Units, respectively, during the three and six months ended June 30, 2020 in connection with exchanges with LLC Unitholders. During the three and six months ended June 30, 2020, the Company recorded a gross deferred tax asset of approximately $7.1 million and $9.0 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statement of stockholders' equity.

As described in Note 10 — Stockholders' Equity, Carvana Co. purchased a total of approximately 22.9 million newly-issued LLC Units of Carvana Group in connection with a direct offering and a public equity offering during the three and six months ended June 30, 2020. During the three and six months ended June 30, 2020, the Company recognized a gross deferred tax asset of approximately $14.1 million associated with a portion of the basis difference resulting from this purchase of LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 4 — Goodwill and Intangible Assets, Net, Carvana Group acquired Car360 on April 12, 2018. The acquisition included various intangible assets, and as a result the Company recognized a deferred tax liability of approximately $2.5 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheet. The deferred tax liability will be amortized over two to seven years and approximately $0.2 million and $0.4 million was amortized during the six months ended June 30, 2020 and 2019, respectively.

During the six months ended June 30, 2020, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of June 30, 2020 and December 31, 2019, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The Company does not expect the provisions of the legislation to have a significant impact on the effective tax rate or income tax payable and deferred income tax positions of the Company.

The Company's effective tax rate for the three and six months ended June 30, 2020 was 0.2% and 0.1%, respectively, and for the three and six months ended June 30, 2019 was 0.0%, related to Car360, a wholly-owned subsidiary acquired in April 2018.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 10 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of June 30, 2020, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of June 30, 2020, the total unrecorded TRA liability is approximately $187.1 million. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 15 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of June 30, 2020, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2020 and 2032. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 6 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and six months ended June 30, 2020 and 2019 were as follows (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | | 2020 | | 2019 |
| **Lease costs:** | | | | | | | | |
| Finance leases: | | | | | | | | |
| Amortization of finance lease assets | $ | 3,976 | $ | 1,988 | $ | 7,446 | $ | 3,255 |
| Interest obligations under finance leases | | 888 | | 514 | | 1,693 | | 845 |
| Total finance lease costs | $ | 4,864 | $ | 2,502 | $ | 9,139 | $ | 4,100 |
| | | | | | | | | |
| Operating leases: | | | | | | | | |
| Fixed lease costs to non-related parties | $ | 7,367 | $ | 2,943 | $ | 13,005 | $ | 5,271 |
| Fixed lease costs to related parties | | 2,009 | | 1,922 | | 4,127 | | 3,728 |
| Variable short-term lease costs to related parties | | 217 | | 333 | | 395 | | 787 |
| Total operating lease costs | $ | 9,593 | $ | 5,198 | $ | 17,527 | $ | 9,786 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | | | | | |
| Operating lease liabilities to non-related parties | | | | | $ | 8,067 | $ | 3,270 |
| Operating lease liabilities to related parties | | | | | $ | 4,069 | $ | 4,309 |
| Interest payments on finance lease liabilities | | | | | $ | 1,693 | $ | 845 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | | | | | |
| Principal payments on finance lease liabilities | | | | | $ | 8,229 | $ | 3,275 |

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of June 30, 2020 (in thousands):

|  | Finance Leases | Operating Leases [1] | | | Total |
|---|---|---|---|---|---|
|  |  | Related Party [2] | Non-Related Party | Total Operating |  |
| Remainder of 2020 | $ 9,842 | $ 3,986 | $ 8,319 | $ 12,305 | $ 22,147 |
| 2021 | 18,085 | 7,737 | 19,136 | 26,873 | 44,958 |
| 2022 | 17,412 | 7,775 | 17,657 | 25,432 | 42,844 |
| 2023 | 16,269 | 7,834 | 15,582 | 23,416 | 39,685 |
| 2024 | 9,120 | 6,621 | 13,697 | 20,318 | 29,438 |
| Thereafter | 2,823 | 28,622 | 147,118 | 175,740 | 178,563 |
| Total minimum lease payments | 73,551 | 62,575 | 221,509 | 284,084 | 357,635 |
| Less: amount representing interest | (7,454) | (18,582) | (90,580) | (109,162) | (116,616) |
| Total lease liabilities | $ 66,097 | $ 43,993 | $ 130,929 | $ 174,922 | $ 241,019 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of June 30, 2020 and December 31, 2019, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of June 30, 2020 and 2019 were as follows, excluding short-term operating leases:

|  | As of June 30, | |
|---|---|---|
|  | 2020 | 2019 |
| Weighted-average remaining lease terms (years) |  |  |
| Operating leases | 10.7 | 10.9 |
| Finance leases | 4.3 | 4.7 |
| Weighted-average discount rate |  |  |
| Operating leases | 8.3 % | 8.8 % |
| Finance leases | 5.4 % | 5.6 % |

**NOTE 16 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $6.5 million and $3.7 million as of June 30, 2020 and December 31, 2019, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, as of June 30, 2020 the Company does not believe that the ultimate resolution of any legal actions, either individually or in the aggregate, will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its own proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

**NOTE 17 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

As of June 30, 2020 and December 31, 2019, the Company held certain assets that were required to be measured at fair value on a recurring basis and beneficial interests in securitizations for which it elected the fair value option.

The following tables are a summary of fair value measurements and hierarchy level at June 30, 2020 and December 31, 2019 (in thousands):

**As of June 30, 2020:**

|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** |  |  |  |  |
| Money market funds [1] | $ 226,312 | $ 226,312 | $ — | $ — |
| Beneficial interests in securitizations | 116,563 | — | — | 116,563 |

**As of December 31, 2019:**

|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** |  |  |  |  |
| Money market funds [1] | $ 56,435 | $ 56,435 | $ — | $ — |
| Beneficial interests in securitizations | 98,780 | — | 29,222 | 69,558 |

_____

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of June 30, 2020 and December 31, 2019, the Company has purchase price adjustment receivables of approximately $4.5 million and $6.9 million, respectively, which are carried at fair value and classified as other assets in the accompanying unaudited condensed consolidated balance sheets. Under the Master Purchase and Sale Agreement, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the Master Purchase and Sale Agreement. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of approximately $0.1 million and a loss of approximately $5.0 million during the three and six months ended June 30, 2020, respectively, and $0.0 million during both the three and six months ended June 30, 2019, and are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations.

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 8 — Securitizations and Variable Interest Entities. Level 2 assets typically include beneficial interests in securitization transactions that closed near the end of the period due to the proximity to the end of the period and lack of observable changes in economic inputs. Given the changes in the market and overall economic inputs between pricing and closing, the March 2020 securitization transaction was classified as Level 3 as of March 31, 2020. No securitization transactions were completed during the three months ended June 30, 2020.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of June 30, 2020 and December 31, 2019, the discount rates were 3.8% to 10.0% and 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. During the six months ended June 30, 2020, the Company transferred beneficial interests acquired as part of the December 2019 securitization transaction initially classified as Level 2 from Level 2 to Level 3. During the three months ended June 30, 2019, the Company transferred beneficial interests acquired as part of the March 2019 securitization transaction initially classified as Level 2 from Level 2 to Level 3. The assets are typically initially classified as Level 2 due to the transactions' proximity to the end of each respective reporting period and the lack of observable changes in economic inputs. As noted above, the Company uses significant unobservable inputs to measure the fair value of these assets on a recurring basis, thus they will be classified as Level 3 in future periods. There were no transfers out of Level 3 during the three and six months ended June 30, 2020 or June 30, 2019.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and six months ended June 30, 2020 and June 30, 2019 (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | | 2020 | | 2019 |
| **Opening Balance** | $ | 118,923 | $ | — | $ | 69,558 | $ | — |
| Transfers into Level 3 | | — | | 19,531 | | 29,222 | | 19,531 |
| Received in securitization transactions | | — | | — | | 39,578 | | — |
| Cash receipts | | (10,377) | | (1,108) | | (18,407) | | (1,108) |
| Change in fair value | | 8,017 | | 177 | | (3,388) | | 177 |
| **Ending Balance** | $ | 116,563 | $ | 18,600 | $ | 116,563 | $ | 18,600 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended June 30,

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

2020 and December 31, 2019. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of June 30, 2020 and December 31, 2019 was as follows (in thousands):

|  | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value, net of unamortized debt issuance costs | $ 592,338 | $ 591,124 |
| Fair value | 597,699 | 625,114 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of June 30, 2020 and December 31, 2019 were as follows (in thousands):

|  | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value | $ 358,124 | $ 286,969 |
| Fair value | 381,366 | 304,532 |

**Derivative Instruments**

As of June 30, 2020 and December 31, 2019, the Company had no outstanding derivative instruments.

**NOTE 18 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the six months ended June 30, 2020 and 2019 (in thousands):

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2020 | 2019 |
| **Supplemental cash flow information:** | | |
| Cash payments for interest, including $666 and $703, respectively, to related parties | $ 46,175 | $ 31,610 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 31,226 | $ 9,717 |
| Property and equipment acquired under finance leases | $ 22,883 | $ 16,552 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 51,674 | $ 20,767 |
| Equity-based compensation expense capitalized to property and equipment | $ 2,595 | $ 879 |
| Fair value of beneficial interests received in securitization transactions | $ 39,578 | $ 46,123 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 14,538 | $ — |

31

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented (in thousands):

| | June 30, 2020 | | December 31, 2019 | | June 30, 2019 | | December 31, 2018 |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 246,299 | $ | 76,016 | $ | 40,200 | $ | 78,861 |
| Restricted cash [1] | | 119,987 | | 42,443 | | 2,196 | | 9,848 |
| Total cash, cash equivalents and restricted cash | $ | 366,286 | $ | 118,459 | $ | 42,396 | $ | 88,709 |

(1) Amounts included in restricted cash represent the deposits required under the Company's short-term revolving facilities. Refer to Note 9 — Debt Instruments for additional information.

32

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Item 1 of this Form 10-Q.*

<div align="center">

**Overview**

</div>

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a used vehicle.***  As of June 30, 2020, we listed approximately 16,400 vehicles for sale on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- ***Finance their purchase.***  Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we earn a premium upon sale.

- ***Protect their purchase.***  Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- ***Sell us their car.***  We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle sourcing and acquisition.***  We primarily acquire our used vehicle inventory through the large and liquid national used-car auction market and directly from customers when they trade in or sell us their vehicles. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000

<div align="center">

33

</div>

vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

• *Inspection and reconditioning.*    Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to one of our IRCs, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

• *Photography and merchandising.*    To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

• *Transportation and fulfillment.*    Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays, and ensuring a seamless and reliable customer experience.

### COVID-19 Update

In March 2020, the World Health Organization declared the novel coronavirus ("COVID-19") outbreak to be a global pandemic. In mid-March, a number of state and local government authorities issued shelter in place and stay at home orders which negatively impacted demand for used vehicles. Near the end of April 2020, the industry began to see a recovery in general market conditions, and demand for used vehicles picked up as the quarter progressed resulting in a 25% increase in our used vehicle unit sales during the second quarter of 2020 compared to 2019.

For many customers, buying or selling a car is an important component of their transportation and financial planning needs. Based on the CarGurus U.S. COVID-19 Sentiment Study in June 2020 of potential car buyers, 37% of respondents agreed COVID-19 will impact how they shop long-term. Prior to the COVID-19 pandemic, 32% of car shoppers were open to buying a vehicle online, now 60% are open to it. In addition, there was a shift in June 2020 with a decrease in respondents planning to purchase a new vehicle and an increase in those planning to purchase a used vehicle. We believe our online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. Our touchless delivery process allows customers to shop for a car from the comfort of their home, complete their transaction on their phone or laptop, and take delivery of their new car without coming into physical contact with our delivery personnel. At delivery, we sanitize the car and communicate with the customer over the phone as they feel out the car and complete paperwork. Our employees and customers have given us positive feedback on this approach, and we believe it represents a significant step forward in the safety of retail auto sales in the current environment.

During the second quarter of 2020, we continued to take steps to position the business to be lean and flexible in this period of higher uncertainty. To this end, we reduced discretionary expenditures on new hiring, travel, facilities, and information

34

technology investments. We also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up and down to meet expected customer demand during and after the current COVID-19 pandemic. We demonstrated our flexibility throughout the second quarter of 2020, which began with low demand that increased over the course of the quarter, allowing us to increase our operations and launch new markets to meet the increasing customer demands.

Our most important priority is the well-being of our employees and customers. We have taken several steps to provide a safe and healthy working environment, including implementing work from home policies for employees who are able to work remotely, pausing all non-essential travel and group meetings, performing deep cleaning and sanitization in all of our facilities, and implementing social distancing and mask policies.

Our financial statements reflect estimates and assumptions made by management that affect the carrying values of the Company's assets and liabilities, disclosures of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, including as a result of the COVID-19 pandemic, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations. We will continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

Our operational and financial performance will depend on future developments related to the continuously evolving COVID-19 pandemic. Future developments include the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the development of treatments or vaccines, the resumption of widespread economic activity, and changes in consumer sentiment. Due to the inherent uncertainty of the unprecedented and rapidly evolving situation, we are unable to predict the impact of the COVID-19 pandemic on our future operations.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the six months ended June 30, 2020, the number of vehicles we sold to retail customers grew by 33.1% to 107,525 compared to 80,766 in the six months ended June 30, 2019. Our used vehicle sales were negatively impacted at the onset of COVID-19 in the United States but have rebounded since then. We expect our used vehicle sales could be negatively impacted in future periods as a result of the continued economic impacts of the COVID-19 pandemic.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

35

**Markets and Population Coverage**

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings in each of the past seven years. After opening Atlanta, Georgia in 2013, we opened two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 115 in the first six months of 2020, bringing our total number of markets to 261 as of June 30, 2020. Our 115 market openings since December 31, 2019 increased the total percentage of the U.S. population serviced in our markets to 73.2% as of June 30, 2020 from 66.9% as of December 31, 2019. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. In light of the ongoing COVID-19 pandemic, we plan to continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness. With our growth into new markets, national television advertising has become more economically efficient compared to purchasing several local television advertising campaigns.

**Revenue and Gross Profit**

Our increased penetration in existing markets and expansion into new markets has led to growth in retail units sold. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $991.8 million and $2.0 billion during the three and six months ended June 30, 2020, respectively, and $855.8 million and $1.5 billion during the three and six months ended June 30, 2019, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $49.4 million and $129.0 million during the three and six months ended June 30, 2020, respectively, and $63.0 million and $96.0 million during the three and six months ended June 30, 2019, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $77.1 million and $131.4 million during the three and six months ended June 30, 2020, respectively, and $67.4 million and $105.8 million during the three and six months ended June 30, 2019, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

The COVID-19 pandemic impacted all three sources of revenue and gross profit during the three and six months ended June 30, 2020. Given the uncertainty and continuously evolving aspects of COVID-19, it may continue to impact our revenue and gross profit in future periods. First, the pandemic negatively impacted retail units sold, which directly impacted retail, wholesale, and other revenue and gross profit. However, since the drastic drop in demand in mid-March through mid-April, demand for retail units has rebounded, and we ended the second quarter with 25% year-over-year growth. Second, the

36

pandemic negatively impacted wholesale units sold and purchased for sale due to the unstable condition of the wholesale market, which directly impacted wholesale and retail revenue. However, the wholesale market is stabilizing as of June 30, 2020. We expected the pandemic to negatively impact retail and wholesale gross profit per unit due to the impact of lower demand on average days to sale and industry-wide used vehicle pricing in the three months ended June 30, 2020. Specifically, our average days to sale increased and average retail and wholesale selling prices fell as dealers and wholesale suppliers worked through inventory across the industry. Finally, the pandemic had a slight negative impact to gain on loan sale revenue due to higher required yields from loan investors during this period of uncertainty, which resulted in not completing a securitization transaction during the three months ended June 30, 2020. While these impacts could potentially reoccur or continue in the future and could be significant, we believe they are transitory, and we plan to stay lean during this period and maintain strength and flexibility for a return to normal conditions.

During our growth phase, our highest priority, outside of safety, will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- ***Increase the purchase of vehicles from customers.*** We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In light of the COVID-19 pandemic, we temporarily paused purchasing vehicles from customers independent of a retail sale, but have subsequently resumed these purchases.

- ***Reduce average days to sale.*** Our goal is generally to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- ***Leverage existing IRC infrastructure.*** As we scale, we intend to more fully utilize the capacity in our nine existing IRCs, which collectively have capacity to inspect and recondition over 475,000 vehicles per year at full utilization**.**

- ***Increase utilization on logistics network.*** As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from wholesale auctions or customers.

- ***Increase conversion on existing products.*** We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- ***Add new products and services.*** We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- ***Increase monetization of our finance receivables.*** We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- ***Optimize purchasing and pricing.*** We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

**Seasonality**

Absent the impact of COVID-19, used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly

37

operating results, which may not fully reflect the underlying performance of our business. The impact of COVID-19 on seasonality is uncertain.

## Investment in Growth

Absent the impact of COVID-19, we have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending. There is no guarantee that we will be able to realize the return on our investments.

The worldwide spread of COVID-19 is expected to result in a continued global slowdown of economic activity which is likely to continue to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the pandemic is contained. Due to the COVID-19 pandemic, we significantly reduced discretionary growth expenditures on hiring, travel, IRC and vending machine construction, and information technology investments. We also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up or down to meet customer demand during and after the current COVID-19 pandemic.

## Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 6 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

## Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, opening new markets, and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2020 | 2019 | 2020 | 2019 |
| Retail units sold | 55,098 | 44,000 | 107,525 | 80,766 |
| Number of markets | 261 | 137 | 261 | 137 |
| Average monthly unique visitors | 8,022,507 | 4,763,911 | 7,415,069 | 4,276,981 |
| Inventory units available on website | 16,479 | 18,835 | 16,479 | 18,835 |
| Average days to sale | 89 | 61 | 79 | 62 |
| Total gross profit per unit (1) | $ 2,726 | $ 3,132 | $ 2,684 | $ 2,802 |

(1) Includes $0, $43, $5, and $34, respectively, related to the 100k Milestone Gift discussed below.

### Retail Units Sold

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

### Number of Markets

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers by a Carvana employee in a branded delivery truck. We view the number of markets we serve as a key driver of our

38

growth. As we increase our number of markets, the population of consumers who have access to our fully integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Inventory Units Available*

We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. We view inventory units available as a key measure of our growth. Growth in inventory units available increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in inventory units available indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand inventory units available while continuing to grow sales, thereby improving other key operating metrics of the business.

*Average Days to Sale*

We define average days to sale as the average number of days between when we acquire the vehicle and when we deliver it to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

In the second half of 2018, we announced a commitment by our Chief Executive Officer, Ernest Garcia III ("Mr. Garcia"), to contribute 165 shares of Class A common stock to us from his personal shareholdings for every one of our then-existing employees upon their satisfying certain employment tenure requirements. In connection with such contributions, we made corresponding grants of 165 restricted stock units under our 2017 Omnibus Incentive Plan to each employee who satisfied the requirements (the "100k Milestone Gift" or "Gift"). Under GAAP, the 100k Milestone Gift was treated as compensation expense, a portion of which related to the production of our used vehicle inventory and was therefore capitalized to inventory and subsequently recognized within costs of sales when the related inventory was sold. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift has been fulfilled and as of March 31, 2020, all of the compensation expense related to the 100k Milestone Gift had been recognized. Total gross profit per unit includes $0 and $5 per unit during the three and six months ended June 30, 2020, respectively, and $43 and $34 per unit during the three and six months ended June 30, 2019, respectively, related to the 100k Milestone Gift.

<div align="center">

**Components of Results of Operations**

</div>

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our number of markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also

<div align="center">39</div>

affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our average days to sale and our pricing strategy. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

### Wholesale Vehicle Sales

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by COVID-19.

### Other Sales and Revenues

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenues we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under a committed forward-flow arrangement with financing partners who acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

### Cost of Sales

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

*Used Vehicle Gross Profit*

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

*Wholesale Vehicle Gross Profit*

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes (including amounts due to Verde), our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 9 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other (Income) Expense*

Other (income) expense, net includes changes in fair value on our beneficial interests in securitizations and purchase price adjustment receivables, as discussed in Note 17 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

*Income Tax Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. As of June 30, 2020, the Company's income tax benefit is generated at Car360, a wholly-owned subsidiary, acquired in April 2018.

**Results of Operations**

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|
| | | 2020 | 2019 | Change | 2020 | 2019 | Change |
| | | (dollars in thousands, except per unit amounts) | | | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | | |
| Used vehicle sales, net | $ | 991,802 $ | 855,785 | 15.9 % | $ 1,956,081 | $ 1,539,614 | 27.1 % |
| Wholesale vehicle sales | | 49,434 | 63,014 | (21.6)% | 129,040 | 96,044 | 34.4 % |
| Other sales and revenues [1] | | 77,098 | 67,422 | 14.4 % | 131,429 | 105,797 | 24.2 % |
| Total net sales and operating revenues | $ | 1,118,334 $ | 986,221 | 13.4 % | $ 2,216,550 | $ 1,741,455 | 27.3 % |
| **Gross profit:** | | | | | | | |
| Used vehicle gross profit[3] | $ | 65,566 $ | 63,378 | 3.5 % | $ 148,428 | $ 110,500 | 34.3 % |
| Wholesale vehicle gross profit[4] | | 7,542 | 6,993 | 7.9 % | 8,771 | 10,028 | (12.5)% |
| Other gross profit [1] | | 77,098 | 67,422 | 14.4 % | 131,429 | 105,797 | 24.2 % |
| Total gross profit | $ | 150,206 $ | 137,793 | 9.0 % | $ 288,628 | $ 226,325 | 27.5 % |
| **Market information:** | | | | | | | |
| Markets, beginning of period | | 161 | 109 | 47.7 % | 146 | 85 | 71.8 % |
| Market launches | | 100 | 28 | 257.1 % | 115 | 52 | 121.2 % |
| Markets, end of period | | 261 | 137 | 90.5 % | 261 | 137 | 90.5 % |
| **Unit sales information:** | | | | | | | |
| Used vehicle unit sales | | 55,098 | 44,000 | 25.2 % | 107,525 | 80,766 | 33.1 % |
| Wholesale vehicle unit sales | | 7,277 | 10,756 | (32.3)% | 18,031 | 17,457 | 3.3 % |
| **Per unit selling prices:** | | | | | | | |
| Used vehicles | $ | 18,001 $ | 19,450 | (7.4)% | $ 18,192 | $ 19,063 | (4.6)% |
| Wholesale vehicles | $ | 6,793 $ | 5,858 | 16.0 % | $ 7,157 | $ 5,502 | 30.1 % |
| **Per unit gross profit:[2]** | | | | | | | |
| Used vehicle gross profit[3] | $ | 1,190 $ | 1,440 | (17.4)% | $ 1,380 | $ 1,368 | 0.9 % |
| Wholesale vehicle gross profit[4] | $ | 1,036 $ | 650 | 59.4 % | $ 486 | $ 574 | (15.3)% |
| Other gross profit | $ | 1,399 $ | 1,532 | (8.7)% | $ 1,222 | $ 1,310 | (6.7)% |
| Total gross profit | $ | 2,726 $ | 3,132 | (13.0)% | $ 2,684 | $ 2,802 | (4.2)% |

(1) Includes $22,720 and $13,989 for the three months ended June 30, 2020 and 2019, respectively, and $43,282 and $24,562 for the six months ended June 30, 2020 and 2019, respectively, of other sales and revenues from related parties.
(2) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.
(3) Includes $0, $1,808, $510, and $2,572, or $0, $42, $5, and $32 per unit, related to the 100k Milestone Gift.
(4) Includes $0, $103, $17, and $125, or $0, $10, $0, and $8 per wholesale unit, related to the 100k Milestone Gift.

*Used Vehicle Sales*

*Three months ended June 30, 2020 Versus* 2019. Used vehicle sales increased by $136.0 million to $991.8 million during the three months ended June 30, 2020, compared to $855.8 million during the three months ended June 30, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 55,098 from 44,000 during the three months ended June 30, 2020 and 2019, respectively. The increase in unit sales was also driven by growth to 261 markets as of June 30, 2020 from 137 markets as of June 30, 2019. Retail units sold was negatively impacted by COVID-19 particularly at the beginning of the period as consumers sheltered-in-place and reduced commercial activity and as we reduced advertising expenditures. However, as some shelter-in-place orders were lifted and some commercial activity increased later in the period, we experienced growth in retail unit sales, increased penetration in existing markets, and also launched new markets. The average selling price of our retail units sold decreased to $18,001 from $19,450 due primarily to vehicle mix and to a lesser

extent to an increase in our average days to sale to 89 days from 61 days during the three months ended June 30, 2020 and 2019, respectively, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

*Six months ended June 30, 2020 Versus 2019.* Used vehicle sales increased by $416.5 million to $2.0 billion during the six months ended June 30, 2020 compared to $1.5 billion during the six months ended June 30, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 107,525 from 80,766 during the six months ended June 30, 2020 and 2019, respectively. The increase in units sold was driven in part by enhanced marketing efforts and customer referrals. The increase in unit sales was also driven by growth to 261 markets as of June 30, 2020 from 137 markets as of June 30, 2019. Although we experienced a negative impact on retail units sold due to the COVID-19 pandemic primarily in March and April, we started to see a rebound in sales later in the period with the reopening of the economy. The average selling price of our retail units sold decreased to $18,192 from $19,063 due primarily to vehicle mix and to a lesser extent to an increase in average days to sale to 79 days from 62 days during the six months ended June 30, 2020 and 2019, respectively, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

### Wholesale Vehicle Sales

*Three months ended June 30, 2020 Versus* 2019. Wholesale vehicle sales decreased by $13.6 million to $49.4 million during the three months ended June 30, 2020, compared to $63.0 million during the three months ended June 30, 2019. The decrease in revenue was primarily driven by a decrease in wholesale units sold to 7,277 from 10,756 during the three months ended June 30, 2020 and 2019, respectively. Wholesale units sold was negatively affected by COVID-19 as wholesale markets shut down and we temporarily halted our program of buying vehicles from customers at the beginning of the quarter. Despite the decline in wholesale vehicle units sold, the average selling price of our wholesale units sold increased to $6,793 during the three months ended June 30, 2020 from $5,858 during the three months ended June 30, 2019, partially offsetting the decrease in wholesale revenue resulting from the decrease in unit sales.

*Six months ended June 30, 2020 Versus 2019.* Wholesale vehicle sales increased by $33.0 million to $129.0 million during the six months ended June 30, 2020, compared to $96.0 million during the six months ended June 30, 2019. As our retail unit sales increased over the six-month period despite the effect of COVID-19, so did the trade-ins we received, providing more vehicles available for wholesale. Moreover, during the six months ended June 30, 2020, we also acquired more vehicles from customers who did not purchase a retail unit from us despite the effect of COVID-19. Therefore, we had more units available for sale to wholesalers, primarily during the first half of the six-month period, driving an increase in our revenues attributed to wholesale vehicle sales. In addition, the average selling price of our wholesale units sold increased to $7,157 during the six months ended June 30, 2020 from $5,502 during the six months ended June 30, 2019.

### Other Sales and Revenues

*Three months ended June 30, 2020 Versus* 2019. Other sales and revenues increased by $9.7 million to $77.1 million during the three months ended June 30, 2020, compared to $67.4 million during the three months ended June 30, 2019. This increase was primarily driven by the increase in retail units sold, which led to an increase in VSC sales and GAP waiver coverage sales. This was partially offset by a decrease in the gain on loan sale due to the COVID-19 environment, in part because we did not complete a securitization transaction during the three months ended June 30, 2020.

*Six months ended June 30, 2020 Versus 2019.* Other sales and revenues increased by $25.6 million to $131.4 million during the six months ended June 30, 2020, compared to $105.8 million during the six months ended June 30, 2019. The increase is primarily driven by retail units sold which led to an increase in VSC sales and GAP waiver coverage sales. The increase in retail units sold also led to an increase in loan originations, partially offset by a decrease in gain on loan sale as a result of the disruption in the overall securitization market driven by the COVID-19 pandemic.

### Used Vehicle Gross Profit

*Three months ended June 30, 2020 Versus* 2019. Used vehicle gross profit increased by $2.2 million to $65.6 million during the three months ended June 30, 2020, compared to $63.4 million during the three months ended June 30, 2019. This increase was driven primarily by an increase in retail units sold, despite a decrease in used vehicle gross profit per unit to $1,190 for the three months ended June 30, 2020 compared to $1,440 for the three months ended June 30, 2019. The per unit

43

decrease was negatively affected by COVID-19 as we temporarily halted buying cars from customers and average days to sale increased.

*Six months ended June 30, 2020 Versus 2019.* Used vehicle gross profit increased by $37.9 million to $148.4 million during the six months ended June 30, 2020, compared to $110.5 million during the six months ended June 30, 2019. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,380 for the six months ended June 30, 2020 compared to $1,368 for the six months ended June 30, 2019. The per unit increase was primarily driven by acquiring more vehicles from customers primarily during the first half of the six-month period.

### Wholesale Vehicle Gross Profit

*Three months ended June 30, 2020 Versus* 2019. Wholesale vehicle gross profit increased slightly by $0.5 million to $7.5 million during the three months ended June 30, 2020, compared to $7.0 million during the three months ended June 30, 2019. Although there was a decrease in wholesale units sold to 7,277 during the three months ended June 30, 2020 from 10,756 during the three months ended June 30, 2019, there was an increase in wholesale vehicle gross profit per wholesale unit to $1,036 in the three months ended June 30, 2020 compared to $650 in the three months ended June 30, 2019.

*Six months ended June 30, 2020 Versus 2019.* Wholesale vehicle gross profit decreased by $1.3 million to $8.8 million during the six months ended June 30, 2020, compared to $10.0 million during the six months ended June 30, 2019. This decrease was driven primarily by a decrease in wholesale vehicle gross profit per wholesale unit to $486 from $574, despite an increase in wholesale units sold to 18,031 from 17,457 in the six months ended June 30, 2020, and 2019, respectively. The increase in number of wholesale vehicles sold was primarily due to the expansion of our program of acquiring vehicles from customers, primarily during the first half of the six-month period.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

### Components of SG&A

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2020** | | **2019** | |
| | (in thousands) | | | | | | | |
| Compensation and benefits [1] | $ | 74,202 | $ | 54,184 | $ | 158,452 | $ | 102,988 |
| 100k Milestone Gift | | — | | 1,415 | | — | | 3,603 |
| Advertising | | 62,330 | | 50,367 | | 137,118 | | 89,889 |
| Market occupancy [2] | | 8,019 | | 4,720 | | 16,122 | | 9,090 |
| Logistics [3] | | 16,699 | | 13,643 | | 35,613 | | 25,892 |
| Other [4] | | 78,684 | | 57,514 | | 168,340 | | 105,622 |
| Total | $ | 239,934 | $ | 181,843 | $ | 515,645 | $ | 337,084 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.
(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

44

Selling, general and administrative expenses increased by $58.1 million and $178.6 million to $239.9 million and $515.6 million during the three and six months ended June 30, 2020, respectively, compared to $181.8 million and $337.1 million during the three and six months ended June 30, 2019, respectively. The increase was partially due to an increase in compensation and benefits by $20.0 million and $55.5 million during the three and six months ended June 30, 2020, respectively, compared to the three and six months ended June 30, 2019, which was primarily driven by expansion of our logistics and delivery network and customer care teams. The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $12.0 million and $47.2 million during the three and six months ended June 30, 2020, respectively, compared to the three and six months ended June 30, 2019 primarily due to an increase in number of markets. Market occupancy, logistics, and other overhead costs also increased during the three and six months ended June 30, 2020 compared to the respective prior periods primarily due to an increase in number of markets and units sold. These increases were offset by efforts to decrease and balance discretionary spend as a result of the uncertain economic environment surrounding the COVID-19 pandemic.

### Interest Expense

Interest expense increased by $0.6 million and $13.8 million to $19.9 million and $48.8 million during the three and six months ended June 30, 2020, respectively, compared to $19.3 million and $35.0 million during the three and six months ended June 30, 2019, respectively. The increase is primarily due to the increase in the outstanding balance of the Senior Notes as a result of the issuance in May 2019 which incurred interest expense of $13.3 million and $26.6 million during the three and six months ended June 30, 2020, respectively, compared to $10.0 million and $17.8 million during the three and six months ended June 30, 2019, respectively. The remaining increase is due to increased interest expense incurred on additional sale leaseback financing.

### Other (Income) Expense, Net

Other (income) expense, net changed by $3.8 million to income of $3.1 million compared to expense of $0.7 million during the three months ended June 30, 2020 and 2019, respectively. Other expense, net increased by $13.4 million to $14.3 million compared to $0.9 million during the six months ended June 30, 2020 and 2019, respectively. The changes in the three and six months ended June 30, 2020 compared to June 30, 2019 are primarily due to fair value adjustments on our retained beneficial interests in securitizations and on our purchase price adjustment receivables as a result of the COVID-19 pandemic. During the first half of the six-month period ended June 30, 2020, the fair value of these assets carried at fair value declined as a result of the uncertainty in the capital markets. During the second half of the period, the fair value on our beneficial interests in securitizations increased as the economy appeared to rebound. This increase was partially offset by a $4.5 million loss on disposal of fixed assets during the three months ended June 30, 2020 as a result of terminated construction projects due to the uncertain future economic environment surrounding COVID-19.

### Income Tax Provision

We recognized an income tax benefit of approximately $0.2 million during the three months ended June 30, 2020 related to our wholly owned subsidiary, Car360. The benefit was recognized as a result of decreased subscription revenue from third parties, resulting in a net loss for the period.

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA and EBITDA margin. We believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three and six months ended June 30, 2020, there was approximately $0.0 million and $0.5 million, respectively, of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three and six months ended June 30, 2019, there was approximately $3.3 million and $6.3 million, respectively, of stock based compensation related to the 100k Milestone Gift program impacting the

45

calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $1.9 million and $2.7 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows (dollars in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2020 | 2019 | 2020 | 2019 |
|---|---|---|---|---|
| Net loss[1] | $ (106,326) | $ (64,059) | $ (289,883) | $ (146,655) |
| Depreciation and amortization expense | 17,629 | 8,887 | 33,440 | 16,830 |
| Interest expense | 19,915 | 19,315 | 48,777 | 34,963 |
| Income tax provision | (238) | — | (238) | — |
| EBITDA | $ (69,020) | $ (35,857) | $ (207,904) | $ (94,862) |
| | | | | |
| Total revenues | $ 1,118,334 | $ 986,221 | $ 2,216,550 | $ 1,741,455 |
| EBITDA Margin[2] | (6.2)% | (3.6)% | (9.4)% | (5.4)% |

(1) Includes $0.0 million, $3.3 million, $0.5 million, and $6.3 million respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.3%, 0.0%, and 0.4% respectively, related to the 100k Milestone Gift.

### Liquidity and Capital Resources

### *General*

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

On March 24, 2020, we amended our Master Purchase and Sale Agreement with Ally to provide for the sale of up to $2.0 billion of principal balance of finance receivables to Ally. The amended agreement upsizes Ally's purchase commitment by approximately $1.6 billion, extends it to March 23, 2021, and broadens the set of customers covered by the agreement. This agreement gives us significant flexibility to serve customers during this period of heightened uncertainty.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including the impact of COVID-19, our rate of revenue growth, our expansion into new markets, construction of vending machines and IRCs, and the timing and extent of our spending to support our technology and software development efforts.

46

We had the following liquidity resources available as of June 30, 2020 and December 31, 2019 (in thousands):

|  | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Cash and cash equivalents | $ 246,299 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 806,697 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 106,104 | 104,680 |
| **Committed liquidity resources available** | **$ 1,159,100** | **$ 459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $31.1 million and $29.7 million as of June 30, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.
(3) We have $213.5 million and $158.7 million of total unfunded gross real estate assets as of June 30, 2020 and December 31, 2019, respectively.

As of June 30, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1.9 billion and $1.6 billion, an outstanding balance of $31.0 million and $568.8 million, and unused capacity of $1.8 billion and $1.0 billion, respectively.

We also had $52.6 million and $137.7 million of committed funds for future construction costs of four IRCs with unfinished construction as of June 30, 2020 and December 31, 2019, respectively.

In addition, we had $47.0 million and $13.5 million of total unpledged beneficial interests in securitizations as of June 30, 2020 and December 31, 2019, respectively.

As of June 30, 2020, the Company's restricted cash included approximately $117.7 million in collections accounts for finance receivables pledged to the Finance Receivables Facilities, the majority of which became unrestricted on July 15, 2020.

As of June 30, 2020 and December 31, 2019, our outstanding principal amount of indebtedness, including finance leases, was $1.1 billion and $1.5 billion, respectively, summarized in the table below (in thousands). See Note 9 — Debt Instruments and Note 15 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

|  | June 30, 2020 | December 31, 2019 |
|---|---|---|
| **Asset-Based Financing:** |  |  |
| Inventory | $ 31,000 | $ 515,487 |
| Finance receivables and beneficial interests | 70,443 | 138,335 |
| Transportation fleet[1] | 83,837 | 73,369 |
| Real estate[2] | 275,969 | 187,082 |
| Total asset-based financing | 461,249 | 914,273 |
| Senior unsecured notes[3] | 600,000 | 600,000 |
| Total debt | 1,061,249 | 1,514,273 |
| Less: unamortized premium and debt issuance costs[4] | (12,111) | (13,642) |
| **Total debt, net** | **$ 1,049,138** | **$ 1,500,631** |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) As of both June 30, 2020 and December 31, 2019, Verde held $15.0 million of the Senior Notes.
(4) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other current assets and other assets on our consolidated balance sheets and not included

47

here. The unamortized premium is presented as an increase to the carrying amount of the senior unsecured notes on our consolidated balance sheets.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the six months ended June 30, 2020 and 2019 (in thousands):

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net cash used in operating activities | $ (175,422) | $ (294,834) |
| Net cash used in investing activities | (167,188) | (87,029) |
| Net cash provided by financing activities | 590,437 | 335,550 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 247,827 | (46,313) |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 366,286 | $ 42,396 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. For the six months ended June 30, 2020, net cash used in operating activities was $175.4 million, a decrease of $119.4 million compared to net cash used in operating activities of $294.8 million for the six months ended June 30, 2019. The decrease in our net cash used in operating activities was primarily due to decreased cash used to purchase vehicle inventory. This was partially offset by increased net loss as a result of increased selling, general and administrative expenses.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $167.2 million and $87.0 million during the six months ended June 30, 2020 and 2019, respectively, an increase of $80.2 million. The increase primarily relates to the increase in purchases of property and equipment, specifically related to the construction of new IRCs and vending machines. Constructing new IRCs and vending machines allows us to recondition more vehicles and reach additional customers. To finance these investments we have entered into various financing transactions, such as sale-leasebacks.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $590.4 million and $335.6 million during the six months ended June 30, 2020 and 2019, respectively, an increase of $254.9 million. The change primarily relates to increased proceeds from the issuances of Class A common stock, partially offset by decreased proceeds from short-term revolving facilities and long-term debt.

## Contractual Obligations and Commitments

We have not entered into any material contractual obligations or commitments outside of the ordinary course of business since the most recently ended fiscal year as disclosed in the header "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our most recent Annual Report on Form 10-K.

**Fair Value Measurements**

We report money market securities, certain receivables, and beneficial interests in securitizations at fair value. See Note 17 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Off-Balance Sheet Arrangements**

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivables by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 8 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

Except as discussed above, we did not have any off-balance sheet arrangements as of June 30, 2020.

**Critical Accounting Policies**

Refer to Note 2 — Summary of Significant Accounting Policies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for accounting pronouncements and material changes to our critical accounting policies since December 31, 2019. There have been no other material changes to our critical accounting policies and use of estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the effect and consequences of the COVID-19 public health crisis on matters including U.S. and local economies; our business operations and continuity; the availability of corporate and consumer financing; the health and productivity of our employees; the ability of third-party providers to continue uninterrupted service; and the regulatory environment in which we operate;

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime and its affiliates;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our ability to sell and generate gains on the sale of automotive finance receivables;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the Internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance vending machines and IRCs;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

51

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indenture governing our senior unsecured notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Controls Over Financial Reporting

There were no changes to our internal control over financial reporting that occurred during the three months ended June 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

52

## PART II. OTHER INFORMATION

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K and in our Quarterly Report on Form 10-Q filed May 6, 2020. As we disclosed in our Form 10-Q filed May 6, 2020:

*The COVID-19 pandemic is adversely affecting, and could continue to adversely affect, our business, operating results, financial condition and prospects.*

COVID-19 was identified in China in late 2019 and has spread globally. The rapid spread has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders and shutdowns. These measures have impacted and may further impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. While the federal and state governments have taken measures to try to contain the COVID-19 pandemic, there is considerable uncertainty regarding such measures and potential future measures. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business and have a material adverse effect on our business, operating results, financial condition and prospects. There is no certainty that measures taken by governmental authorities will be sufficient to mitigate the risks posed by the COVID-19 pandemic, and our ability to perform critical functions could be harmed.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty, and has led to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. It is likely that the COVID-19 pandemic will cause an economic slowdown, and it is possible that it could cause a global recession. Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further risks related to negative economic conditions are described in our risk factor titled "Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues." under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019.

The ultimate magnitude of COVID-19, including the extent of its impact on our financial and operational results, which could be material, will be determined by the length of time that the pandemic continues, its effect on the demand for our vehicles, our inventory supply chain and distribution, and the capital markets, as well as the effect of governmental regulations imposed in response to the pandemic. We cannot at this time predict the impact of the COVID-19 pandemic, but it could continue to have a material adverse effect on our business, operating results, financial condition and prospects.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

**Recent Sales of Unregistered Securities**

There were no unregistered sales of equity during the six months ended June 30, 2020, except as otherwise previously reported.

During the six months ended June 30, 2020, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged approximately 0.5 million LLC Units and approximately 0.0 million shares of Class B common stock for approximately 0.4 million newly-issued shares of Class A common stock. These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 10.1* | Tenth Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.2 | Eleventh Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

* Certain portions of the exhibit (indicated by "[***]") have been omitted as the Registrant has determined (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:    August 5, 2020

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins

Mark Jenkins

Chief Financial Officer

(On behalf of the Registrant and as Principal Financial Officer)

56

**Exhibit 10.1**

**TENTH AMENDMENT**

TENTH AMENDMENT, dated as of May 19, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, by the Eighth Amendment, effective as of March 24, 2020, and by the Ninth Amendment, effective as of April 29, 2020 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section  1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

"(a) <u>Transferor Obligation</u>. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100% (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "<u>Transferor Obligation</u>"); <u>provided</u>, <u>further</u>, notwithstanding the maximum FICO score described in <u>clause (xxxiv)</u> in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in <u>clause (xxxiv)</u> thereof) originated during the related Origination Period; <u>provided further</u> that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)."

Section 2.02 <u>Amendments to Section 2.1(b) (Purchaser Obligation)</u>. <u>Section 2.1(b)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

---

[***] Redacted for confidentiality purposes.

"(b) Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation")."

Section 2.03 Amendments to Section 6.2(a) (Aggregate Purchase Commitment). Section 6.2(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Aggregate Purchase Commitment. After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)."

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 Conditions to Effectiveness. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto; and

(b) a signed copy of the Eighth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 Continuing Effect of the Master Purchase and Sale Agreement. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

[***] Redacted for confidentiality purposes.

Section 3.03 <u>Representations and Warranties</u>. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
    as Transferor

By:   /s/ Paul Breaux
        Name:    Paul Breaux
        Title:     Vice President

ALLY BANK,
    as Purchaser

By:   /s/ William R. Thompson
        Name:    William R. Thompson
        Title:     Authorized Representative

ALLY FINANCIAL INC.,
    as Purchaser

By:   /s/ Thomas Elkins
        Name:    Thomas Elkins
        Title:     Authorized Representative

Agreed to and Accepted by:

CARVANA, LLC,
    as Seller

By:       /s/ Paul Breaux
Name:     Paul Breaux
Title:      Vice President

**Exhibit 10.2**

**ELEVENTH AMENDMENT**

ELEVENTH AMENDMENT, dated as of June 30, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, by the Eighth Amendment, effective as of March 24, 2020, by the Ninth Amendment, effective as of April 29, 2020, and by the Tenth Amendment, effective as of May 19, 2020 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

(a) revising the "Flex Receivable" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Flex Receivable" definition:

""Flex Receivable" means either (x) a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including May 31, 2020 (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller. F, noting that for the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable, or (y) a Receivable sold on June 30, 2020 and listed on Schedule 10 to the Second Step Pool Supplement dated as of June 30, 2020."

Section 2.02 <u>Amendments to Section 2.1(a) (Transferor Obligation)</u>. <u>Section 2.1(a)</u> of the Master Purchase and Sale Agreement is hereby amended by inserting the following to the end of such section:

"Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020 shall not be deemed to be a Flex Receivable."

Section 2.03 <u>Amendments to Section 2.1(b) (Purchaser Obligation)</u>. <u>Section 2.1(b)</u> of the Master Purchase and Sale Agreement is hereby amended by inserting the following to end of such section:

"Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020 shall not be deemed to be a Flex Receivable."

Section 2.04 <u>Amendments to Section 6.2(a) (Aggregate Purchase Commitment)</u>. <u>Section 6.2(a)</u> of the Master Purchase and Sale Agreement is hereby amended by inserting the following to end of such section:

"Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 6.2(a), any Receivable sold on June 30, 2020 shall not be deemed to be a Flex Receivable."

SECTION III
MISCELLANEOUS

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto;

(b) a signed copy of the Fourteenth Amended and Restated Letter Agreement re Master Purchase and Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC, Bridgecrest Credit Company, LLC, the Transferor, Ally Financial, and Ally Bank; and

(c) a signed copy of the Ninth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 Continuing Effect of the Master Purchase and Sale Agreement. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 Representations and Warranties. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 Binding Effect. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 Counterparts. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES

UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 Effect of Headings. The section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By:     /s/ Paul Breaux
       Name: Paul Breaux
       Title: Vice President

ALLY BANK,
as Purchaser

By:     /s/ William R. Thompson
       Name: William R. Thompson
       Title: Authorized Representative

ALLY FINANCIAL INC.,
as
Purchaser   as Purchaser

By:     /s/ Thomas Elkins
       Name: Thomas Elkins
       Title: Authorized Representative

Agreed to and Accepted by:

CARVANA, LLC,
as Seller   as Seller
By:     /s/ Paul Breaux
Name:    Paul Breaux
Title:     Vice President

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e1)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 5, 2020

/s/ Ernest C. Garcia, III

Ernest C. Garcia, III
*Chairman and Chief Executive Officer*

<u>Exhibit 31.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 5, 2020                                                    /s/ Mark Jenkins
                                                                          Mark Jenkins
                                                                          *Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended June 30, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:     August 5, 2020

/s/ Ernest C. Garcia, III

Ernest C. Garcia, III
*Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended June 30, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    August 5, 2020                                        /s/ Mark Jenkins

                                                               Mark Jenkins
                                                               *Chief Financial Officer*

**Exhibit 4**

**S&P Global**
Market Intelligence

# Carvana Co. NYSE:CVNA
# FQ2 2020 Earnings Call Transcripts

## Wednesday, August 05, 2020 9:30 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ2 2020- | | | -FQ3 2020- | -FY 2020- | -FY 2021- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.79) | (0.62) | NM | (0.65) | (3.30) | (1.96) |
| **Revenue (mm)** | 1159.68 | 1118.33 | ▼ (3.57 %) | 1441.06 | 5243.17 | 7614.39 |

Currency: USD
Consensus as of  Aug-05-2020 12:09 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

**- EPS NORMALIZED -**

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ3 2019** | (0.39) | (0.56) | NM |
| **FQ4 2019** | (0.63) | (0.79) | NM |
| **FQ1 2020** | (0.64) | (1.18) | NM |
| **FQ2 2020** | (0.79) | (0.62) | NM |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ...................................................................................... | **3** |
| **Presentation** | ...................................................................................... | **4** |
| **Question and Answer** | ...................................................................................... | **7** |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Ernest C. Garcia**
*Founder, President, CEO &
Chairman*

**Mark Jenkins**
*Chief Financial Officer*

**Michael Louis Levin**
*Vice President of Investor
Relations*

**ANALYSTS**

**Alexander Eugene Potter**
*Piper Sandler & Co., Research
Division*

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

**Bradley D. Erickson**
*Needham & Company, LLC,
Research Division*

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research
Division*

**Colin Alan Sebastian**
*Robert W. Baird & Co.
Incorporated, Research Division*

**Daniel B. Powell**
*Goldman Sachs Group, Inc.,
Research Division*

**Michael David Montani**
*Evercore ISI Institutional Equities,
Research Division*

**Nicholas Freeman Jones**
*Citigroup Inc., Research Division*

**Rajat Gupta**
*JPMorgan Chase & Co, Research
Division*

**Ronald Victor Josey**
*JMP Securities LLC, Research
Division*

**Seth Mckain Basham**
*Wedbush Securities Inc., Research
Division*

**Sharon Zackfia**
*William Blair & Company L.L.C.,
Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good afternoon, and welcome to the Carvana Second Quarter 2020 Earnings Call. [Operator Instructions] Please note, this event is being recorded. I would now like to turn the conference over to Mike Levin, Vice President of Investor Relations. Please go ahead.

**Michael Louis Levin**
*Vice President of Investor Relations*

Thank you, Andrea. Good afternoon, ladies and gentlemen, and thank you for joining us on Carvana's second quarter earnings conference call. Please note that this call will be simultaneously webcast on the Investor Relations section of the company's corporate website at investors.carvana.com. The second quarter shareholder letter is also posted on the IR website.

Joining me on the call today are Ernie Garcia, Chief Executive Officer; and Mark Jenkins, Chief Financial Officer. Before we start, I would like to remind you that the following discussion contains forward-looking statements within the meaning of the federal securities laws, including, but not limited to, Carvana's market opportunities and future financial results that involve risks and uncertainties that may cause actual results to differ materially from those discussed here. A detailed discussion of the material factors that cause actual results to differ from forward-looking statements can be found in the Risk Factors section of Carvana's most recent Form 10-K and Form 10-Q.

The forward-looking statements and risks in this conference call are based on current expectations as of today, and Carvana assumes no obligation to update or revise them, whether as a result of new developments or otherwise.

Unless otherwise noted on today's call, all comparisons are on a year-over-year basis. Our commentary today will include non-GAAP financial measures. Reconciliations between GAAP and non-GAAP metrics for our reported results can be found in our shareholder letter issued today, a copy of which can be found on our Investor Relations website.

And now with that said, I'd like to turn the call over to Ernie Garcia. Ernie?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Thanks, Mike, and thanks, everyone, for joining our call. The first half of 2020 has been an unprecedented and trying time for so many as the world grapples with COVID-19. It has impacted all of our personal lives, impacted the way we interact, the way we live and the way we work. As we've managed through this dynamic period, we've put people first. Our operations and people ops team have done an unbelievable job taking care of our team and of our customers. Thank you to them for everything you've done and everything you continue to do.

In addition to the changes in the ways people interact, live and work, the pandemic has also led to changes in the way people shop. It's created a disruption that has forced people out of their habits, that has caused people to try new things. And new experiences they're having are resulting in change.

Suddenly, buying cars online is becoming normalized. This is a big deal. We came into 2020 the market leader with a bright future. We are the market leader because from the very beginning, our guiding light has been delivering the best customer experiences available anywhere. To do that, we've recruited the best people to take up our mission alongside us. We built a culture of tireless energy and ambition, and we've invested in technology and infrastructure that are necessary to deliver on the constantly changing preferences and expectations of our customers. And we've done it all with the genuine discipline of a long-term focus.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

These things are easy to say and hard to do. They are the things that matter in the long run. They are an enduring differentiator and the reason our future was bright before. And now we have added the tailwinds of rapidly changing customer behaviors. Our future is even brighter now.

In the immediate term, we are working to alleviate the operational constraints that have emerged as a result of our choice to defensively position the business at the onset of the pandemic, as well as the complications of ramping up at record speeds at the same time COVID-19 continues to impact many of our markets. The same production team that delivered over 10x increase in production capacity over the last 4 years is up to the task.

Now I'd like to turn to our results in the second quarter. We grew units by 25% in the quarter, including decreases in sales year-over-year in early April and growth of approximately 40% later in the quarter. This growth was achieved despite managing through the most difficult period of the pandemic and facing severe inventory constraints.

In the second quarter, we also saw a rapid rebound in GPU, which demonstrates the resilience in our model across each of our gross profit contributors, as well as the speed of our reaction at the onset of pandemic. Managing through this unique environment has also led to efficiency on the expense side and demonstrated the long-term strength of our cost model.

We continue to see exciting progress across our key metrics heading into the quarter. The most notable is that we hit our long-term milestone of buying 100% as many cars from our customers as we sold to them in July. This is an unbelievable achievement that has come much more quickly than we had anticipated. Congratulations and thank you to the sales at Carvana team, you're doing a truly amazing job.

Moving forward, there's a lot to get excited about. As we always have, we're focused on building enduring value. We are positioning ourselves for the shifts we are seeing in customer preferences, investing in our offering of buying cars from our customers, focusing on simplifying the automotive value chain, building out significant capacity in our supply chain, investing in initiatives that make us even more efficient and scalable, and most importantly, continually improving our customer experiences through better technology, infrastructure and process.

The customer experiences we deliver on our execution are the forces that matter most over time and they have our complete attention. That focus and our long-term lens are what brought us to this point. They put us on the path to selling 2 million-plus units per year and to becoming the largest and most profitable automotive retailer.

They've made us the fastest-growing retailer in the country. They've driven incredible customer experiences over many years. They've generated a constant unwillingness to be satisfied with our own product that has pushed ceaseless improvement, and the accumulation of all that has made us the market leader.

We are not content with being a market leader. We're on a mission: To change the way people buy cars. Our ambition and excitement is driven by the opportunity we see in front of us. And today, we are more excited and we are more ambitious than we have ever been before. Mark?

**Mark Jenkins**
*Chief Financial Officer*

Thank you, Ernie, and thank you all for joining us today. Q2 was a strong quarter for Carvana. Retail units sold in Q2 totaled 55,098 units, an increase of 25%. The sales growth started to rebound in April and continued to improve to approximately 40% later in the quarter, despite significant inventory constraints brought on by COVID.

Total revenue was $1.1 billion, an increase of 13%. Growth in units was higher than growth in revenue, primarily due to lower retail average selling prices driven by vehicle acquisition mix and lower wholesale volume, driven by our pause in purchasing vehicles from customers earlier in the quarter.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Record demand for our offering, combined with production capacity constraints, has led us to sell the available vehicles on our website faster than at any point in our history. This demonstrates our ability to turn cars extremely quickly, a noticeable positive for the long-term model. But we believe our current inventory is meaningfully limiting sales, making growing inventory our top company priority.

Total gross profit per unit was $2,726 in Q2, a decrease of $406 year-over-year and an increase of $86 sequentially. Due to the dynamic nature of the current environment, we will focus our more detailed commentary on sequential changes.

Retail GPU was $1,190, a decrease of $391 sequentially. Early in the pandemic, we made the decision to reduce risk by pausing purchasing and lowering prices to reduce our inventory size. This led to higher average days of sale in the quarter and lower retail GPU due to the lack of new, higher-margin inventory coming to the website. Within the quarter, we observed a V-shaped pattern of retail GPU, with margins reaching their low point in May and seeing a sharp rebound in June as new vehicles were added to the site. We expect retail GPU to climb further in Q3.

Wholesale GPU was $137, an increase of $114 sequentially. This was driven by record gross profit for wholesale units sold of $1,036 or $695, excluding the impact of our wholesale valuation adjustment in Q1. Gross profit for wholesale units sold was primarily driven by strong, industry-wide wholesale pricing in the latter part of the quarter, combined with strong execution by our team.

Other GPU was $1,399, an increase of $363 sequentially. The sequential gain was primarily due to a $337 increase in finance GPU, driven by improved market conditions since the end of Q1 and credit tightening earlier in the pandemic.

EBITDA margin was negative 6.2% in Q2, an improvement from negative 12.6% in Q1. Following the spread of COVID-19, we paused corporate hiring and adjusted our hours in our operating groups to more closely match expenses with current demand as opposed to bearing additional expenses for future demand as we have historically had.

In total, we sold 2,671 more retail units in Q2 than Q1, while reducing SG&A spend by approximately $36 million sequentially. This led to a 3.7% improvement in SG&A as a percent of revenue compared to Q1 2020 and a significant improvement in EBITDA margin. We expect further improvement in EBITDA margin in Q3.

To meet accelerating demand for our online offering, we are actively taking steps to expand our production capacity. Following quarter end, we opened our ninth IRC near Columbus, Ohio, bringing our annual production capacity to nearly 500,000 units at full utilization. In addition, we are on track to open 2 additional IRCs by year-end, adding more than 100,000 additional units of capacity at full utilization, and we have a pipeline of future facilities beyond those.

During the quarter, we completed 2 equity offerings, bringing our total liquidity resources to over $1.3 billion at quarter end. There were 171.4 million weighted average shares outstanding in Q2 on a fully exchanged basis, and we expect approximately 174.4 million shares on a fully exchanged basis in Q3. As we look forward, we are focusing on scaling our operations to meet demand on our way toward our long-term goals. Thank you for your attention. We will now take questions.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And our first question will come from Colin Sebastian of Baird.

**Colin Alan Sebastian**
*Robert W. Baird & Co. Incorporated, Research Division*

Great. And I hope everyone there is healthy and well. My question is since you're not yet at full utilization levels within the existing IRCs, I wonder if there are any process improvements or other changes that you can make to improve throughput near term?

And then secondly, related to advertising costs. Despite the inventory constraints, you're still spending a fair bit per unit. And I'm wondering if we'll see more efficiency on advertising as we move into the third quarter.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So on the throughput front, I would say I do think we're finding actually quite a few efficiencies now. We talked about when we came to the pandemic, we reduced hours. And then we ramped those up as we saw volume coming in, we started to get in front of that and tried to produce cars again. I think any time you go through an exercise like that, you undoubtedly just find process improvements. And then I think the tension that we've recently felt where we're clearly inventory-constrained has also forced us to find efficiencies that we maybe weren't looking at hard for in the past, but there's been efficiencies there.

We've also continued to roll out a number of different technology innovations, including an entirely new system that runs our inspection centers that we expect to help us find additional efficiencies from there. So I think across the board, we've always been finding efficiencies in that process and all others. But I think in this stressed time, we've probably been able to find efficiencies even faster.

Right now, what's holding us back is just managing through these coronavirus waves, which have been impacting, especially the Sun Belt, pretty dramatically recently, and that's where we have a lot of our different inspection centers. And as we said in our prepared remarks, we're choosing to put people first, and we're missing on the conservative side there. We're being very careful in contact tracing and sending anyone home who could have been exposed to anyone who comes in with a case and giving them paid time off. And so we're missing conservative there. I think and we think that's the right way to miss.

And so as that starts to calm down, we think that's going to be very helpful. And then we're also working now to hire people as quickly as we can. The facilities have a certain capacity, as we said, the 9 that we have open now have nearly 500,000 units of facility capacity, but we have to staff those up to get access to that capacity. We'll open 2 more by the end of the year. That will add roughly an additional 100,000 units of facility capacity. But again, we have to staff those up, so this unique environment to be hiring as well. And we're working as quickly as we possibly can.

We're also innovating on the hiring front. So I think we've got a lot of things there that we're excited about. This is -- as a public company, this is the first time that we've managed through in inventory and reconditioning supply constraint. But as a private company, it's not. We dealt with similar situations in '15 and '16. And the team that we've got that grew our reproduction capacity by approximately 10x the last 3.5 or 4 years is definitely up to the challenge. And so we think it's going to take a minute to grow through, but we absolutely have all the confidence in the world that we'll get through it.

On the advertising front, I think you bring up an interesting point, and I think there is tension there as well. We are clearly constrained in inventory, and that means that for any given customer that comes to the site, the odds of them seeing the car they're looking for is lower, and therefore, your conversion rates will be lower. And so it makes a little bit less sense to advertise as much. And especially when you have as

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

much excess demand as we do, there's even a very good chance that significantly less advertising would still lead to very similar levels of sales.

I think we're trying to balance that against kind of the long-term value of building brands. And so I think that's an equation that's not a simple one to optimize. We clearly should be dramatically reducing our marketing expense if we're optimizing [ the line ]. And it's much less clear what to do if you're optimizing the long term. In the business of buying cars from customers, we have pulled back more on marketing there. We're facing constraints in that business as well. And the reason we pulled back there is because there we have excess demand, it starts to impact customer experience in a way that is more costly. If a customer comes on site and doesn't see the car that they want, that's not a perfect experience, but it's not a bad experience. Whereas if they would like to sell you their car and it takes longer for you to hold the people and longer to get their title cleared, et cetera, that's not a great experience on the FTC side. And so we have elected to pull back a bit there. And we definitely expect to see leverage over time as we continue to grow into this demand and get the benefits of increased inventory that will increase conversion.

**Operator**

Our next question comes from Brian Nagel of Oppenheimer.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

First question I want to ask, I mean, we talk a lot about the limitations within the business model right now. Is there a way to estimate to what extent that has actually held sales back as the business is -- as the trends have been rebounding here in the last several weeks or so?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think there are lots of ways to estimate that. And I think we probably want to stay away from trying to quantify too directly just because the different ways of estimating, I think, can cause you to arrive at fairly different answers. So what I would say is I would point to the graph that we put in our shareholder letter under Objective 1 that shows inventory efficiency. You can kind of think of the shape of that graph is effectively just beating the odds that any given car is sold at any given day. And that's clearly at levels that are much, much higher than we've ever seen before. That gives a sense of kind of the underlying demand that we are not able to access right now.

I think another stat that is probably very useful is at the end of the quarter, near the end of June, we probably had somewhere between 1/4 and 1/5 as many cars that were available for customers that wanted to buy cars as we had prior to the pandemic. I think a lot of times we can -- from a financial perspective, we can look at balance sheet inventory. But what matters to the customer is what are the cars on the site that are not currently in the purchase process with another customer. And the number of cars that we had at the end of the quarter, as I said, was between 1/4 and 1/5. So that's a dramatic reduction in the amount of selection that customers were able to have. And so we feel like there's probably a lot of excess demand sitting in there, and we're working very hard to try to unlock it.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

That's very helpful. Then my second -- my follow-up unrelated. Just with regard to SG&A, and you have in your letter on Page 9, the table that shows the components of SG&A by month. You can see the SG&A ex advertising G&A from -- in the month of April was $3,760 and then moved down to about $2,600. That was clearly reflects cutting costs as the COVID crisis was hitting. How much -- how should we think about that going forward? You mentioned in the limited guidance you gave that we expect to see a better margin. But how much of that SGA decline is actually going to stick here?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. So I think there's actually something that's really valuable reveal there. And so I think when we use the terminology cutting cost, what's imagined is a reduction in workforce that is probably not sustainable. And so you wouldn't expect that in the future. And I think that we should probably think about that kind of experiment that was running our data there a little bit differently.

So normally, when we're growing as quickly as we have been over the last several years, and you're looking at growth in SG&A from quarter-to-quarter and then you're trying to look at it on a per unit basis to understand what that means, there's a lot going on there, right? Normally, we -- we're growing our fixed functions, so we're growing corporate. We're adding to our development teams. We're adding to our analytics teams. We can keep our analytics teams, our development team the same size and continue to basically invest at the speed we have in the past. But we continue to believe that there is a lot of opportunity. And so we are accelerating those investments, and we are growing those teams. And so when you look at that in the past, you're seeing growth in fixed operations as well in our growth in SG&A.

The other thing you're seeing there is our actual variable costs, right? We have variable costs associated with selling cars, and that flows through to SG&A, obviously, as well.

And then a third element of what drives our SG&A growth over time is, generally speaking, we're carrying more headcount than we need at any point in time to service the demand that we see, because we're preparing for what we anticipate to be growth. And that's been kind of the stance we've been in for the entirety of our company's life.

I think going into the pandemic, we had to make some choices about how do we want to position ourselves. And I think the only thing that you really know going into a pandemic like this is that you don't know what's going to happen. And so you have to decide what kind of errors you want to make and we decided with the long-term lens that the better error for us to make was to miss conservatively. And if things came back, then we would kind of deal with it. But at least we wouldn't put ourselves in a bad spot if they didn't.

And so what we did is we paused corporate hiring. And so what that means when you're looking at SG&A growth going from March to April to May to June, you're no longer seeing the growth in our fixed operations or in development or in analytics that you would normally see flowing through SG&A.

We also reduced hours to match the demand that we were seeing and to have the capacity, the operational capacity to handle the sales that were actually flowing through the system. And then as we ramped up, we increased those hours. So you started to see something that look a lot more like variable costs, and you didn't necessarily see the same overhead that we're carrying for future sales.

And so I think in that moment, we saw something that looked probably not precisely like variable costs, but it looks a lot more like variable costs. And I think the story there is very good. And I think it strongly budgeted our long-term model.

Now going forward, we're going to go back to a growth stance. We're going to be carrying people for growth that we expect in the future. Because if anything, we now expect to be growing even faster than we were expecting in the past. We're going to continue to make investments because we believe that we've got the best customer experience out there, and we believe that experience can be improved upon a lot. So I think we will, in the future, look to continue to make very significant investments to continue to grow into this incredible opportunity, and we'll expect to continue to lever as we have for the last 7 years. But I don't think it's going to be exactly what you saw over the last several months. Mark, do you have anything to add to that?

**Mark Jenkins**
*Chief Financial Officer*

No, I think it covers it pretty well. I think we're obviously very excited about the leverage that we showed year-over-year in SG&A in light of, I think, a really significant development in the business, which we called out earlier. But we're now at the point in July where we're buying more than 100% as many cars from customers as we're selling to customers, which is a metric and a milestone that we laid out in our long-term model in late '18, and it's almost unbelievable that we've achieved it this quickly.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

But to show leverage year-over-year, while also building that really substantial and long-term valuable business, I think it's something that we're feeling pretty good about.

**Operator**

Our next question comes from Sharon Zackfia with William Blair.

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

I guess to dive into the inventory issue a bit more, I'm not really clear if the issue at this point is the speed at which you're turning the cars or if it's just the outsized demand or a combination of the 2.

And I was hoping you could maybe quantify what throughput is now versus pre-pandemic and whether or not there's any additional levers you could pull via outsourcing. Or how long do you think at this point, it would get -- it would take to get inventory into a situation where you think you're actually able to meet that demand you were talking about?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So let me, first of all, just isolate where the constraint is. So the constraint is in our ability to take a car that we purchase and certify it and make it retail-ready for a customer and get it up on the website. So it's kind of purchasing, I would not say that word constraint today, especially with all the gains that we've seen in buying cars from customers. We've got ready access to lots of cars there. The constraint is definitely focused on our ability to produce those cars and get them up on the website.

I would point to, in general, a good estimate of how fast we're producing cars is basically the same speed for some cars. So if you're selling 55,000 cars in a quarter, that means that you're probably doing on the order of 4,600 cars a week, give or take. And if inventory is flat, then you're producing kind of that same amount. So if you look back over time, that's where you kind of see all of the growth that we've seen in retail sales has been accompanied by growth in production capacity.

If we look forward at our facility capacity, we have facility capacity of 500,000 units today. So that's on the order of 10,000 units a week. And then by the end of the year, we're going to add capacity for an additional 100,000, so roughly 2,000 per week. So we have a lot of facility capacity, the speed at which we can kind of get into that as a function of how quickly we can hire and train inside of those facilities. And so we're going to work to do that as quickly as we can, but I don't think we're yet prepared to provide specific time lines or goalpost because we're obviously in a unique environment with coronavirus.

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

Can I ask a follow-up? Is this manifesting in any way that the consumer sees other than a lack of inventory? So for example, are they seeing extended delivery times? Are there any ramifications for customer satisfaction?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think -- I would say we also have some constraints in the business in inside advocates' ability to answer calls when customers call in, and then in outside advocates and last mile delivery and, to a lesser extent, in the logistics network. Those constraints are more of the flavor that we've seen different points in the past, and they're not nearly as pronounced today as the production constraint. So those are out there, and those are driving our decision-making as well. But we're alleviating those much more quickly. And those are the type of constraints that I think are much easier to alleviate and not something that we're really concerned about over more than, say, a month or so period of time.

**Operator**

Our next question comes from Rajat Gupta of JPMorgan.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

I just wanted to clarify -- one clarification. The end of quarter 40% number, that was a unit growth number, not a revenue number, right? Just to be clear.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Correct.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

And then how -- would you be able to quantify what July looked like? And you said it was -- it sustained into the quarter, but just curious if there's a number you could put in July.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So we haven't quantified that. I think what we said, the strength that we saw in demand continued to push into July. We actually continue to see inventory constraints elevate early in the month. And we're working very hard, as we said, to alleviate those. So I think right now, it's pretty clear demand is significantly higher than the sales that we're seeing flow through the system. And we think that in the immediate term, at least, our ability to produce cars is going to directly drive the number of cars that we're able to sell. And it feels like we've got this amount of room there. So we're focused on production right now. If we can get that figured out, we think that demand will continue to grow pretty rapidly.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Got it. And on the 3Q -- on the third quarter GPU, you mentioned that it would increase sequentially and driven by retail GPU. But on the finance side, I mean, it was pretty strong number here in the second quarter despite some uncertainty earlier in the quarter. And it looks like you monetized a significantly lower amount than what you actually originated. And despite that, you had a strong number.

So -- and you noted in the release that the third quarter increase is likely to be driven by retail GPU only. But it looks like you should be able to sustain at least this level of finance GPU into the third quarter as well. So just curious as to what you're seeing there. And how should we think about the finance GPU through the remainder of the year?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think the biggest sort of finance GPU, the really -- hope you'll take away is we think that demonstrated the resiliency in our program. This was obviously an unbelievable event going through the pandemic that rocked capital markets and dramatically impacted things. And we were very pleased with the number that we had in Q1 in light of everything going on. And then we think the rebound that we saw into Q2 is very exciting as well and speaks to the strength of the program and the diversity of our different ways to monetize our receivables.

I think there were probably 2 drivers of the growth from Q1 to Q2. The first is, I think, the speed with which we acted and the credit tightening that we implemented in Q1. When you tighten credit, all else constant, any given receivable is generally more valuable. And so that was one of the drivers of the increase in the value of our loans. And then the second, I think, was just the general macro environment. Capital markets did improve, and so that was helpful as well.

Going forward on the finance line item, I think you can kind of think of -- I think constant improvement would be how we would look at what's going on in the core business. I think we're constantly getting better at underwriting customers and at structuring credit and assessing credit and attracting great

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

customers. So I think there's kind of constant improvement there. And then I think you kind of overlay that with the capital markets. And I think you should expect that to impact us in whatever direction the capital markets move. So if they continue to improve, that would be a positive for us. If they move in the wrong direction, that would likely be a negative. But we expect to march back to the levels that we were at in 2019 and then to continue from there to the long-term model that we outlined in late 2018.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Got it. Sorry, just one follow-up, if I may. Just on the competitive landscape. I mean clearly, like, for the last few years, you were the only major online player out there. But it looks like the pandemic has accelerated plans for a lot of the brick-and-mortar retailers to enter into this space aggressively. Have you seen any impact on your business because of that yet? Or I mean, do you expect to see anything in the near term, particularly with respect to leveraging your advertising expense, longer term? Just curious as to what your thoughts are there, and that will be all.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure, of course. So I mean, I would start with this, and I apologize for constantly beating the same drum here, but I do think this is a unique market. And it's unlike many other retail markets where, on the use side, there's 40 million transactions and depending on what numbers you're looking at, there's on the order of 40,000 dealers. This is a tremendously, tremendously fragmented market. And it's a market that historically has had all of those players and has always been very competitive with offerings that are fairly undifferentiated, at least from a macro view.

I think as a result, I think it's very hard for any given competitor to materially impact anyone else. Until market shares get much more concentrated, I think that would be our expectation, that it would -- that would continue to be the case. I can't think of a time in our history when we've looked inside of a market or across time and determined that we think the major driver of some line item that's moving is competition. And I do think that that would be expected just given the structure of the market.

Now I do think as more and more people move online, what we've historically seen is e-commerce is an expensive business to build, and it requires a lot of time and a lot of effort and a lot of tinkering and significant infrastructure and technology. And that kind of investment, it generally is not investment that can be made by lots and lots of players. And so there does tend to be more market concentration over time. I think that would be the first order effect.

I also think these sorts of business models where there are real economies of scale, where as you get bigger, you have more selection for your customers and you have more of a brand, you -- maybe it feeds back into price, it feeds back into faster delivery time. Those sorts of things also drive more concentration.

And so I think we would look at more concentration as the first order impact. And to the extent that happens, I think we're going to be very happy. And then I think the second order impact could potentially be additional competition on things like marketing dollars. But we would expect that to be a follower not a leader, and we've seen no evidence of the contrary so far.

**Operator**

Our next question comes from Michael Montani of Evercore.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

I just wanted to ask about on the retail GPU side, you all had mentioned that you expected to see improvement, I think, quarter-over-quarter there. Is that basically tied to the increased production capacity as you hire individuals back to increase throughput? Or is there more that goes into that with pricing dynamics and acquisition? And then I have a follow-up.

**Mark Jenkins**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Chief Financial Officer*

Sure. So there are definitely some exciting trends in retail GPU. I think the most exciting is that, as I mentioned earlier, in July, we bought more than 100% as many cars from customers as we sold to customers. We think that that was basically -- I could probably, call it, 10% to 15% in April when we paused purchasing for customers. And it's just been on a basically straight line upward since then.

I think that's obviously a positive, that drives wholesale GPU, that drives incremental retail GPU, because cars that you acquire from customers are typically more profitable than cars that you acquire at auction. We're actually acquiring fewer cars from auction now currently than at any point since early 2018. So I think that generally points to a pretty strong dynamic in retail GPU.

In addition to that, just technically, we do expect average days of sale to come down in Q3 relative to a high in Q2. And that's just basically a technical dynamic with -- when we stopped purchasing cars, that led average day sales to increase in Q2. And now that we're actively purchasing cars, particularly from customers, but in general, we expect it to come down in Q3, which will also be a tailwind.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

Okay. Then you had mentioned that the anticipation was meaningful EBITDA margin improvement quarter-over-quarter. So just wondering if you could dive into the SG&A side a little bit further there, because it sounds like there could be advertising opportunity, but then perhaps there's the headcount side going the other direction.

So I'm just wondering, is there opportunity in the other line item of SG&A? Or where do you really see the benefits there, if there is SG&A opportunities as well?

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. So I think the way we think about SG&A in the remainder of the year -- so we do expect meaningful year-over-year leverage. I think that comes from some of the process efficiencies that we picked up during the COVID period, some of the technology gains that we've made as our teams have focused in on scalability and efficiency.

I think that we also do plan to invest. So we expect meaningful leverage year-over-year while also investing for growth into 2021, which is -- our lens have started to look toward 2021, and also while investing in our technology pipeline, so we expect meaningful leverage year-over-year in SG&A in the back half and then meaningful improvement sequentially in EBITDA margin versus what we saw in Q2.

**Operator**

Our next question comes from Armintas Sinkevicius of Morgan Stanley.

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

I wanted to touch on the inventory briefly. And Ernie, I know you said that there's a variety of different outcomes here. So that's probably where I'm shaking out. But if I look at the 40% growth that you have going on, if we were to assume that that carries through the rest of the quarter, you're looking at something like 65,000 units for the third quarter.

But then if I look at the chart that you have there with regards to inventory efficiency, it looks like it's about 3.5x for the month of June. It's about 11,000, 12,000 units online right now. So if I were to assume that 11,000 to 12,000 at 3.5x, I guess, mean to the low 40,000 range. And so how should we be thinking about the impact of the inventory constraint to your third quarter?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I think I would just go back to what we said previously. I think we're clearly constrained, and that is clearly driving sales volume right now. You can kind of infer what we were selling per week over the last quarter and how that was ramping up. And so we're producing at roughly that rate as inventory has kind of bottomed and just started to tick back up.

And so I think it's going to be driven, I think, more than anything, by just our ability to produce cars. And so we really think that's the driver. And I think given the uncertainty with coronavirus and everything else, I think we're not prepared to precisely predict that for you right now.

**Armintas Sinkevicius**
*Morgan Stanley, Research Division*

Okay. And then just market expansion, you opened up 100 markets last quarter. How are you thinking about market expansion? I know we're still in a bit of an uncertain environment here. But any markets this year? Or would you sort of look to resume next year depending on how the coronavirus is trending?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So yes, I think the -- our approach to market openings, looking forward, will definitely depend on how things are going with a containment of coronavirus. And to a certain extent, our pacing on scaling up inventory. I think we were able to open 100 markets in Q2 fairly quickly with limited investment, limited travel, even really limited incremental hiring, basically because those markets were supported from our existing logistics and last-mile delivery network. And so that was a great thing for the customers in those markets to be able to bring our offering to additional markets in the COVID period, I think it was really valuable. But looking forward, I think it will largely depend on nationwide dynamics with COVID as well as our own inventory.

**Operator**

Our next question comes from Ron Josey of JMP Securities.

**Ronald Victor Josey**
*JMP Securities LLC, Research Division*

I've got 2, please. So Ernie, understood as you ramp up operations, inventory should improve and the growth in trade is clear, and we talked about 100%.

But now that you're acquiring fewer cars from auction, really, at any point, I think you said since 2018, can you just talk about the potential of CarvanaACCESS, which launched in the quarter and how you view that?

And then, Mark, we just talked about improving EBITDA margins and improving retail GPU. I wanted to ask maybe some of the drivers in a different way from a product perspective. And we're seeing more delivery fees on the network than ever before. We're seeing more inventory from dealer partners, even older cars. And so wondering how you can -- if you can talk about how these sort of changes to the consumer experience are contributing to overall profitability.

And maybe a better way of asking that is how do you balance, call it, these benefits with the investments needed now that the balance sheet is significantly stronger, benefits of greater margins?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. Let me start with CarvanaACCESS. So let me put CarvanaACCESS maybe in the context of buying cars from customers. So as Mark said, we bought as many cars from customers as we sold in July. That's really, really exciting, and that generates a lot of inventory for us.

Now some of those cars are going to fit our retail standards and some are not. For those that fit our retail standards, that's pretty incredible because that's a very significant collapse of the entire automotive value chain, where we are now buying a car from a customer and then producing it and preparing it for

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

the customer and delivering it right to the next customer. There's a lot of friction that has existed in the historical system that is being cut out of that transaction. And that's really, really exciting.

And the retail side feeds back on the purchasing side and vice versa. Because we have such a broad retail network that we can sell across brands and across geographies, we can bid a little more aggressively on cars that we're buying. And then because we're buying cars from customers directly, and we've got that proprietary source of inventory, we've got higher quality inventory with larger margins on the retail side of the business. So that's really, really exciting.

But there's this kind of fork in the inventory that you buy from customers that doesn't fit on the website. And so -- and that's -- they're great cars, they just don't fit our retail standards. And so at CarvanaACCESS, it's a way for us to take those cars and get them to dealers or other partners that buy wholesale inventory and deliver those cars to them in a way that's also very efficient. And that efficiency feeds back in the same ways as the efficiencies of the retail business.

So that's what's going on there. We think that's another exciting development and another step toward our long-term goals in both retail and wholesale margin.

**Mark Jenkins**
*Chief Financial Officer*

Sure. And then on the EBITDA margin improvements. So I called out earlier, we expect meaningful leverage on a per retail unit sold basis in SG&A comparing year-over-year. We also are expecting a step-up in retail GPU and we talked about some of the dynamics there. Some of the smaller items in terms of merchandising or testing that we're doing on the website, I wouldn't see any of those as being particularly a large contributor to the EBITDA margin improvement that we called out. Again, I think that will be mainly focused on growth in GPU, driven by retail. And then EBITDA leverage on a per retail unit sold basis -- or sorry, SG&A leverage on a per retail unit sold basis.

**Operator**

Our next question comes from Nick Jones of Citi.

**Nicholas Freeman Jones**
*Citigroup Inc., Research Division*

Just 2 questions. First, I guess, you're back to being positioned for growth. COVID-19, we kind of see a second wave over the winter or something like that, do you think you need to take this similar actions you took back in April? Or do you have kind of a different liquidity position where you can kind of be a little bit more aggressive, if that were to happen?

And then the second question is just more on consumer behavior. Are you seeing any shift in consumer behavior? Is there some deurbanization or people opting for cars for safety reasons instead of taking public transit? Are they maybe being a little more patient in finding their cars online versus not -- they're not really going to dealerships and dealing with that experience? Do you kind of have more lead time? And are you able to kind of acquire cars more efficiently now than maybe pre-COVID?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So on the second wave point, I mean, I think I think we'll have to wait and see there. I think what is certain is exactly what you pointed to, we would enter in a very different position than we entered last time just because we've got well over $1 billion of liquidity. And I think we've been kind of hardened and we know what processes we need to roll out to handle these situations. We've dealt with the various state openings and closings, and we know how to manage through all of that.

So I think we would be positioned significantly better for other situation like this. But obviously, the details would matter a lot there. And so I don't think we can give you more than just that we'd be positioned really well.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

On the consumer behavior side, I think there's so much going on inside of that question. What I would say is I think people are asking questions about are people going to drive more now because they don't want public transportation, they don't want to do ride share as much? The answer to that is probably. Are people going to drive less because there's going to be more work from home? The answer to that is probably. What are some of those things? I don't really feel like we necessarily know. And there's probably 100 other impacts as well.

I think over the last 7 years, we've grown this company by growing market share because we have a dedicated offering that's appealed to customers in a different way from what the traditional offering has been able to offer customers. And I think the biggest and most pronounced change in customer behavior is that if there was this massive disruption that put people in a position where they had to try different things. When they try different things, they like some of those different things that they try, and that's accelerated e-commerce adoption across the board. And so to us, I think that preference shift is the most powerful customer behavior change that we're seeing.

And then in the immediate term, as we're dealing with these waves in these different markets, there's undoubtedly different behaviors that we observe and different preferences that customers have. But I think we're trying to stay most focused on the enduring forces. And we're trying to build to support those enduring forces because these always bring a long-term term to everything that we do. And so that's what's in our focus today.

**Operator**

Our next question comes from Seth Basham of Wedbush Securities.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

My question first is around pricing. Given the tight inventory dynamics, what is your thought around retail pricing? Do you have the ability to move pricing up with the market at least or above market given these constraints?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think pricing is a very interesting area right now. Just across the board, there's been dramatic swings in wholesale and retail prices across the entire industry. Our position has been to maintain significant discounts for our customers and continue with, kind of, the long-term view that we've always brought.

I do think we're in an environment now that is unlike an environment that we've seen at least in a very long time where retail prices are going up. And so that's fairly unique. So we're trying to take that into account and be thoughtful about it. But in terms of our customer-facing stance, we're trying to continue to deliver to customers the significant value that we've delivered to them in the past.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

Fair enough. And secondly, as it relates to your financing options, what are your thoughts about revisiting the ABS market?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I think our thoughts are the same as they've always been. I mean I think the view that we had prior to the crisis was the ABS markets, in a good environment, always provide the most efficient monetization of the finance receivables. And so we would likely show the highest finance GPU if we hit the ABS markets in good times. But in not as good times, the ABS markets do tend to be disrupted more and kind of close faster. And there's less ready access and access can be expensive. And so doing both purchases with a great partner like Ally, while it's not quite as efficient in good times, it's very reliable.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And I think that that position that we had, that it was important to have access to both channels, I think that was supported by what we saw going through the pandemic. Ally was an unbelievable partner for us, and they were there when we needed them, and we couldn't be more appreciative of that. And I think we'll seek to be a good partner for them as they've been for us going forward. But we also will still access the ABS markets when the timing is right, and we'll just try to find balance between those different considerations.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

Got it. One last question, if I may, on financing. Last quarter, you wrote down [ eventual ] interest and securitizations on the balance sheet. Did you change the valuation of those with this second quarter report?

**Mark Jenkins**
*Chief Financial Officer*

Yes. We had an adjustment that increased the valuation of those by about $8 million in the second quarter, that will show up in other income and expense.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

And did you make any changes to the potential bonus payouts that you changed last quarter as well?

**Mark Jenkins**
*Chief Financial Officer*

I don't believe we made any material changes to those.

**Operator**

Our next question comes from Daniel Powell of Goldman Sachs.

**Daniel B. Powell**
*Goldman Sachs Group, Inc., Research Division*

Two, if I may. On the first, I just wanted to get a sense if you could sort of tell us quarter-to-date how the inventory is trending, specifically relative to the comment you'd made about sort of being at 1/4 to 1/5 of sort of available for sale units relative to demand earlier in the quarter versus pre-COVID.

And then second question is just around advertising, maybe a similar question just asked kind of a different way. As you sort of look at your production capacity, recovering and getting back to a level that you'd like to see, how aggressive or not might you consider being, just given all of the secular tailwinds you're seeing in your market right now?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think first order, we've -- as we've seen additional demand, it has kind of immediately consumed our gains in production so far. And so our inventory has been flattish. It could be, I think, a good starting point. Maybe you've seen a tiny tick up recently, and we hope to be able to get in front of that and continue to grow it. But I think it's also a good story that when we kind of put additional inventory on the site, it pretty instantly gets grabbed by somebody.

So we're going to try to go out as quickly as we can. And I do think that the speed at which our inventory grows can be a function first of production, second of sales. If sales are instantly consuming all the production, then inventory is not going to grow. But if we're able to grow production even faster than sales, then we'll grow it. So I think we're really focused on hoping that we get as much demand as we possibly can to the site and then hoping that we get as much production as we possibly can at the site. And then I think inventory is kind of the output of that equation more so than the input of that equation.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

On the advertising side, yes, I would say, I think, there potentially could be some interesting opportunities that could take many forms. I think we've already moved pretty quickly at the onset of the pandemic, within about, I don't know, a matter of weeks, I think 2 weeks. We put out a pandemic-specific commercial that talked about our touchless delivery and kind of spoke to the moment. And I think we're really proud of our marketing team's ability to get that out that quickly.

More recently, we launched another commercial called the Pioneers of Online, that kind of speaks to the fact that we kind of started this trend and that we've been working with this for 7 years, and we've built a lot of infrastructure that makes it very easy for a customer to go on our website, see a great selection and get an incredible experience. And we're trying to make sure that that message is heard.

And so I think that there's opportunities like that from a messaging perspective. From a distribution perspective or an advertising spend perspective, we've also seen cost per impression have definitely gone down more recently. And kind of conversion rates at the top of the marketing funnel, meaning on to website, have likely gone up. And so I think those are exciting developments. But we're in such a unique environment that I don't know that we are smart to extrapolate that out to the future and expect that to stay forever.

I think some of our kind of bigger, longer-term mental models that we've used in the past, where there's 40 million cars, there's 40,000 dealers, they all have the same economics. The way that they spend from a marketing perspective and the way they price cars, it has to support their cost structures that are effectively shared and their profit goals that are effectively shared. And so there is just a lot of ballast in this market that I think should always make us skeptical of short-term swings and whether or not they'll persist. But so far, the swings that we've seen have, if anything, been positive.

**Operator**

Our next question comes from Alex Potter of Piper Sandler.

**Alexander Eugene Potter**
*Piper Sandler & Co., Research Division*

I wanted to touch on hiring. You mentioned this, it's kind of interesting. Obviously, if you're ramping up your IRC capacity, you have to put bodies in those facilities. And this is a unique environment to be hiring in, I think, is how you put it. Presumably, it should be easy to find people, given all the talk of unemployment. But I'd be interested in hearing the extent to which staffing is a potential constraint.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think there are a lot of people that are unemployed. I think there are also dynamics going on with unemployment payouts and different things that can be an offset to the ease of which you might be able to hire right now. And then I think, obviously, it's a unique environment with people wondering if they want to go into work at all right now when there are coronavirus waves in different parts of the country.

And so I think it's just -- it's a different environment. And I don't think it's an environment that we should expect to persist. But it's a different environment than we face. The way that you go out and reach out to candidates and find people is different. The way those people are feeling and thinking about what they want from their job is different. And so your messaging needs to be different. And so I think it's just a different time. And I think the team is doing an unbelievable job. I think we've made a ton of progress already. So I don't mean to give you all of that as a set of excuses because it's really not. But I do just think it's a unique environment. It's a unique time. It makes it a little harder than it normally would be to forecast exactly how quickly we'll be able to make the progress that we anticipate making.

We are very optimistic, and we are making progress right now, and we have been making progress over the last 1.5 months as we've been really focused on this. But I think it's a little hard for us to be making precise promises in this moment in time.

**Alexander Eugene Potter**
*Piper Sandler & Co., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. Okay. Fair enough. And then I guess maybe a related question. Of the IRCs that you currently have, is it possible to quantify the number of those or maybe a percentage that are being impacted from a workforce standpoint because of COVID outbreaks in those specific areas, maybe the number of people who you would normally have showing up as a percentage of what you could have showing up? Something like that.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I'll give you something a little more general than you're probably looking for. But I would just say, first order, it's just when there's a COVID outbreak in some cities, we are likely going to be impacted by that if we have operations in that city. And so the Sun Belt has recently been impacted. Most recently, maybe the Midwest. We have inspection centers in the Midwest as well. So I think we can be impacted -- we are impacted when that happens in any given market.

I think the great news is, as I said in my prepared remarks, I do think our ops teams and our people ops teams have done a really, really good job with that. We've had next to no transmission at any Carvana locations. But people in these markets do get coronavirus. And then when they come into the facility and we check their temperature, we do contract -- or contact tracing and have to figure all that out. And that does disrupt things a bit and slow things down.

So I don't want to give you a ton more than that, but I would say if there's a market where there's a significant outbreak of coronavirus happening and we have operations there, we're probably dealing with it.

**Operator**

Our final question will come from Brad Erickson of Needham & Company.

**Bradley D. Erickson**
*Needham & Company, LLC, Research Division*

First, just when you think about the traffic levels on the site lately, what's your sense on some of the demand that's getting turned away, I would imagine, because of the inventory constraints? Are those customers coming back to the site persistently? Or do you think some of those sales are just being lost? What's your sense there? And then I have a follow-up.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I think probably a little bit of both. I mean this is going to be something of a speculative answer, but -- because I think just tracking customers online is an imperfect science, but certainly a little bit of both. When customers come to the site and they don't see the car they're looking for, they likely will keep shopping, and that means checking other places and checking with us. And if they find the car they're looking for somewhere else, I think the odds that they go somewhere else are probably pretty good. And if they don't, the odds that they come back are also probably pretty good.

So I don't know that I can give you something more satisfying than that. I think it's probably the best we can do.

**Bradley D. Erickson**
*Needham & Company, LLC, Research Division*

Yes. No, that works. And then just related to the underwriting standards. You talked about ratcheting up early on through the pandemic. Is it safe to say you fully relaxed those now back to, say, pre-pandemic levels? Or are they still somewhat elevated there with more to relax? Just any color on the pace of change around the underwriting standards.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Sure. So I don't think we want to quantify that, but we definitely are continuing to maintain significantly tighter credit than we had heading into the pandemic. It is not as tight as it was at the peak. Tightness kind of in, I suppose, early April and maybe through April. But it remains pretty tight. I think we feel like that's the right [ err ] to make right now as well. We already have a lot of excess demand on the site, and I think -- we don't know exactly where the economy is going to go over the next 3, 6, 9, 18 months. And so we're going to be a little bit careful there. So I think that is another potential release valve over time for even more demand.

**Operator**

This concludes our question-and-answer session. I would like to turn the conference back over to Ernie Garcia for any closing remarks.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Thanks, everyone, for joining the call. We really appreciate it. To the entire Carvana team. Thank you, you're doing an absolutely incredible job.

A couple specific call out to the STC team, you're on fire, great work, [ keep lots of ] ramping. It's an inside joke that they'll understand. So I hope there's a tiered room somewhere.

And then to the inspection center teams, I know you're listening to this call and you probably heard a lot of discussions that stress you out. We know that you're doing an unbelievable job. You're working incredibly hard. And we're making a ton of progress, and you're in this position because of choices we made. So we could not be more appreciative. We thank you for everything you're doing, and please keep it up. Thanks, everyone.

**Operator**
The conference has now concluded. Thank you for attending today's presentation, and you may now disconnect.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

**Exhibit 5**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended September 30, 2020**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **81-4549921** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **1930 W. Rio Salado Parkway      Tempe      Arizona** | **85281** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒   Yes ☐   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | Accelerated filer | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of October 26, 2020, the registrant had 70,578,738 shares of Class A common stock outstanding and 101,200,276 shares of Class B common stock outstanding.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | | **Page** |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
| | Unaudited Condensed Consolidated Balance Sheets as of September 30, 2020 and December 31, 2019 | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2020 and 2019 | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three and Nine Months Ended September 30, 2020 and 2019 | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2020 and 2019 | 7 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 56 |
| Item 4. | Controls and Procedures | 56 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 57 |
| Item 1A. | Risk Factors | 57 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 57 |
| Item 3. | Defaults Upon Senior Securities | 58 |
| Item 4. | Mine Safety Disclosures | 58 |
| Item 5. | Other Information | 58 |
| Item 6. | Exhibits | 59 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | September 30, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Restricted cash | 22,619 | 42,443 |
| Accounts receivable, net | 82,932 | 39,864 |
| Finance receivables held for sale, net | 316,972 | 286,969 |
| Vehicle inventory | 967,547 | 762,696 |
| Beneficial interests in securitizations | 112,134 | 98,780 |
| Other current assets, including $5,437 and $0, respectively, due from related parties | 71,196 | 52,654 |
| Total current assets | 1,747,104 | 1,359,422 |
| Property and equipment, net | 800,181 | 543,471 |
| Operating lease right-of-use assets, including $22,483 and $44,583, respectively, from leases with related parties | 141,657 | 123,420 |
| Intangible assets, net | 5,990 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $4,908 and $6,138, respectively, due from related parties | 28,513 | 14,850 |
| Total assets | $ 2,732,798 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $12,845 and $9,549, respectively, due to related parties | $ 355,876 | $ 234,443 |
| Short-term revolving facilities | 126,981 | 568,840 |
| Current portion of long-term debt | 54,313 | 48,731 |
| Other current liabilities, including $3,442 and $4,518, respectively, from leases with related parties | 11,616 | 12,856 |
| Total current liabilities | 548,786 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 1,080,929 | 883,060 |
| Operating lease liabilities, excluding current portion, including $19,482 and $41,829, respectively, from leases with related parties | 140,010 | 116,071 |
| Other liabilities | 1,497 | 1,808 |
| Total liabilities | 1,771,222 | 1,865,809 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 70,538 and 50,507 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 71 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 721,174 | 280,994 |
| Accumulated deficit | (290,836) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 430,510 | 98,112 |
| Non-controlling interests | 531,066 | 93,827 |
| Total stockholders' equity | 961,576 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,732,798 | $ 2,057,748 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | $ 3,245,209 | $ 2,470,630 |
| Wholesale vehicle sales, including $1,323, $0, $1,365, and $0, respectively, from related parties | 129,925 | 92,430 | 258,965 | 188,474 |
| Other sales and revenues, including $26,141, $15,824, $69,423, and $40,386, respectively, from related parties | 124,556 | 71,408 | 255,985 | 177,205 |
| **Net sales and operating revenues** | 1,543,609 | 1,094,854 | 3,760,159 | 2,836,309 |
| Cost of sales, including $931, $997, $2,664, and $3,487, respectively, to related parties | 1,282,336 | 957,311 | 3,210,258 | 2,472,441 |
| **Gross profit** | 261,273 | 137,543 | 549,901 | 363,868 |
| Selling, general and administrative expenses, including $4,712, $4,264, $13,630, and $9,884, respectively, to related parties | 267,842 | 207,970 | 783,487 | 545,054 |
| Interest expense, including $332, $332, $998, and $998, respectively, to related parties | 20,276 | 20,990 | 69,053 | 55,953 |
| Other (income) expense, net | (9,201) | 827 | 5,126 | 1,760 |
| **Net loss before income taxes** | (17,644) | (92,244) | (307,765) | (238,899) |
| Income tax provision | 76 | — | (162) | — |
| **Net loss** | (17,720) | (92,244) | (307,603) | (238,899) |
| Net loss attributable to non-controlling interests | (10,635) | (62,156) | (199,801) | (165,373) |
| **Net loss attributable to Carvana Co.** | $ (7,085) | $ (30,088) | $ (107,802) | $ (73,526) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.10) | $ (0.60) | $ (1.73) | $ (1.61) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | 70,005 | 49,787 | 62,244 | 45,726 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 41,208 | $ 41 | 104,336 | $ 104 | $ 147,916 | $ (68,375) | $ 147,742 | $ 227,428 |
| Net loss | — | — | — | — | — | (23,115) | (59,481) | (82,596) |
| Exchanges of LLC Units | 2,020 | 2 | (1,984) | (2) | 1,899 | — | (1,899) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 25,582 | — | — | 25,582 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (25,582) | — | — | (25,582) |
| Contribution of Class A common stock from related party | (72) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 74 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (14) | — | — | — | (433) | — | — | (433) |
| Options exercised | 27 | — | — | — | 426 | — | — | 426 |
| Equity-based compensation | — | — | — | — | 8,022 | — | — | 8,022 |
| **Balance, March 31, 2019** | 43,243 | $ 43 | 102,352 | $ 102 | $ 157,830 | $ (91,490) | $ 86,362 | $ 152,847 |
| Net loss | — | — | — | — | — | (20,323) | (43,736) | (64,059) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 4,830 | 5 | — | — | 297,606 | — | — | 297,611 |
| Adjustments to the non-controlling interests related to equity offering | — | — | — | — | (201,015) | — | 201,015 | — |
| Exchanges of LLC Units | 1,612 | 2 | (971) | (1) | 1,571 | — | (1,571) | 1 |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 33,573 | — | — | 33,573 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (33,573) | — | — | (33,573) |
| Contribution of Class A common stock from related party | (43) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 78 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (13) | — | — | — | (1,557) | — | — | (1,557) |
| Options exercised | 25 | — | — | — | 372 | — | — | 372 |

3

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Equity-based compensation | — | | — | — | | — | — | 8,602 | — | — | 8,602 |
| **Balance, June 30, 2019** | 49,732 | $ | 50 | 101,381 | $ | 101 | $ 263,409 | $ (111,813) | $ 242,070 | $ 393,817 |
| Net loss | — | | — | — | | — | — | (30,088) | (62,156) | (92,244) |
| Exchanges of LLC Units | 511 | | — | (131) | | — | 1,196 | — | (1,196) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | | — | — | | — | 8,891 | — | — | 8,891 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | | — | — | | — | (8,891) | — | — | (8,891) |
| Contribution of Class A common stock from related party | (59) | | — | — | | — | — | — | — | |
| Issuance of Class A common stock to settle vested restricted stock units | 83 | | — | — | | — | — | — | — | |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (11) | | — | — | | — | (1,562) | — | — | (1,562) |
| Options exercised | 40 | | — | — | | — | 694 | — | — | 694 |
| Equity-based compensation | — | | — | — | | — | 10,473 | — | — | 10,473 |
| **Balance, September 30, 2019** | 50,296 | $ | 50 | 101,250 | $ | 101 | $ 274,210 | $ (141,901) | $ 178,718 | $ 311,178 |

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 50,507 | $ 51 | 101,219 | $ 101 | $ 280,994 | $ (183,034) | $ 93,827 | $ 191,939 |
| Net loss | — | — | — | — | — | (59,887) | (123,670) | (183,557) |
| Exchanges of LLC Units | 116 | — | (19) | — | 36 | — | (36) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1,949 | — | — | 1,949 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1,949) | — | — | (1,949) |
| Issuance of Class A common stock to settle vested restricted stock units | 38 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (8) | — | — | — | (2,356) | — | — | (2,356) |
| Options exercised | 7 | — | — | — | 145 | — | — | 145 |
| Equity-based compensation | — | — | — | — | 7,055 | — | — | 7,055 |
| **Balance, March 31, 2020** | 50,660 | $ 51 | 101,200 | $ 101 | $ 285,874 | $ (242,921) | $ (29,879) | $ 13,226 |
| Net loss | — | — | — | — | — | (40,830) | (65,496) | (106,326) |
| Issuances of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 18,333 | 18 | — | — | 1,058,922 | — | — | 1,058,940 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (643,886) | — | 643,886 | — |
| Exchanges of LLC Units | 285 | — | — | — | 1,385 | — | (1,385) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21,159 | — | — | 21,159 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21,159) | — | — | (21,159) |
| Issuance of Class A common stock to settle vested restricted stock units | 61 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (26) | — | — | — | (3,135) | — | — | (3,135) |
| Options exercised | 101 | — | — | — | 2,676 | — | — | 2,676 |
| Equity-based compensation | — | — | — | — | 7,700 | — | — | 7,700 |
| **Balance, June 30, 2020** | 69,414 | $ 69 | 101,200 | $ 101 | $ 709,536 | $ (283,751) | $ 547,126 | $ 973,081 |
| Net loss | — | — | — | — | — | (7,085) | (10,635) | (17,720) |
| Exchanges of LLC Units | 1,039 | 1 | — | — | 5,424 | — | (5,425) | — |

5

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 47,441 | — | — | 47,441 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (47,441) | — | — | (47,441) |
| Issuance of Class A common stock to settle vested restricted stock units | 30 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (3,129) | — | — | (3,129) |
| Options exercised | 57 | 1 | — | — | 2,086 | — | — | 2,087 |
| Equity-based compensation | — | — | — | — | 7,257 | — | — | 7,257 |
| **Balance, September 30, 2020** | 70,538 | $ 71 | 101,200 | $ 101 | $ 721,174 | $ (290,836) | $ 531,066 | $ 961,576 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (307,603) | $ (238,899) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 52,076 | 27,505 |
| Loss on disposal of property and equipment | 5,708 | 1,046 |
| Provision for bad debt and valuation allowance | 10,752 | 7,030 |
| Gain on loan sales | (129,041) | (99,408) |
| Equity-based compensation expense | 18,011 | 25,366 |
| Amortization and write-off of debt issuance costs and bond premium | 5,745 | 3,569 |
| Originations of finance receivables | (2,492,741) | (1,877,336) |
| Proceeds from sale of finance receivables, net | 2,478,931 | 2,027,689 |
| Purchase of finance receivables | — | (161,781) |
| Principal payments received on finance receivables held for sale | 60,113 | 54,623 |
| Unrealized (gain) loss on beneficial interests in securitization | (4,021) | 219 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (45,575) | (27,907) |
| Vehicle inventory | (197,962) | (213,762) |
| Other assets | (17,743) | (25,755) |
| Accounts payable and accrued liabilities | 112,495 | 65,452 |
| Operating lease right-of-use assets | (18,237) | (18,896) |
| Operating lease liabilities | 22,699 | 16,952 |
| Other liabilities | (311) | (382) |
| Net cash used in operating activities | (446,704) | (434,675) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $21,657 and $6,282, respectively, from related parties | (270,486) | (151,380) |
| Principal payments received on beneficial interests in securitizations | 8,782 | 2,577 |
| Net cash used in investing activities | (261,704) | (148,803) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 3,425,755 | 3,093,039 |
| Payments on short-term revolving facilities | (3,867,614) | (3,133,186) |
| Proceeds from issuance of long-term debt | 203,047 | 367,349 |
| Payments on long-term debt | (18,414) | (11,087) |
| Payments of debt issuance costs | (11,730) | (8,423) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 |
| Proceeds from exercise of stock options | 4,907 | 1,492 |
| Tax withholdings related to restricted stock awards | (8,619) | (3,552) |
| Net cash provided by financing activities | 786,272 | 603,243 |
| **Net increase in cash, cash equivalents and restricted cash** | 77,864 | 19,765 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 196,323 | $ 108,474 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

### Description of Business

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is a leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

### Organization

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Senior Notes (as defined in Note 9 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 10 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of September 30, 2020, Carvana Co. owned approximately 40.4% of Carvana Group and the LLC Unitholders (as defined in Note 10 — Stockholders' Equity) owned the remaining 59.6%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of September 30, 2020, results of operations and changes in stockholder's equity for the three and nine months ended September 30, 2020 and 2019, and cash flows for the nine months ended September 30, 2020 and 2019. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

### Liquidity

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in conformity with GAAP, which contemplate continuation of the Company as a going concern. The Company has incurred losses

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

from inception through September 30, 2020, and expects to incur additional losses in the future as the Company continues to grow into new markets, build inspection and reconditioning centers ("IRCs") and vending machines, and enhance technology and software. During the nine months ended September 30, 2020, the Company has completed equity offerings of 18.3 million shares of Class A common stock for net proceeds of $1.1 billion. Since March 2020, the Company's forward flow partner has committed to purchase a total of $3.0 billion of the Company's finance receivables. In addition, subsequent to September 30, 2020, the Company increased its floor plan facility to $1.25 billion and extended the maturity to March 31, 2023. Also subsequent to September 30, 2020, the Company issued $1.1 billion in senior unsecured notes, $626.8 million of the proceeds from which were used to repay its senior notes due in 2023 and the remainder of which will be used for general corporate purposes. Management believes that the actions taken in respect of the COVID-19 pandemic, current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. The COVID-19 pandemic has adversely impacted the global economy, as well as the Company's operations, and the extent and duration of the impacts remain unclear. Certain of the Company's estimates, including, but not limited to, the Company's allowance for loan losses, inventory valuations, fair value measurements, cancellation reserves, asset impairment charges, and discount rate assumptions, have been and may continue to be impacted and evolve as conditions change as a result of the COVID-19 pandemic. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. The Company adopted ASU 2016-13 on January 1, 2020. Financial assets measured at fair value through net income are excluded from the scope of ASU 2016-13. The Company's beneficial interests in securitizations are carried at fair value and are thus excluded from ASU 2016-13. Finance receivables originated in connection with the Company's vehicle sales are held for sale and presented at the lower of amortized cost or fair value. The Company intends to sell the finance receivables prior to their contractual maturity, therefore the recovery of the asset is from its sale rather than maturity and the Company is not required to measure the expected lifetime credit losses. The adoption of ASU 2016-13 did not have a material effect on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") related to updated requirements over the disclosures of fair value measurements. Under ASU 2018-13, certain disclosure requirements for fair value measurements will be eliminated, modified or added to facilitate better communication around recurring and nonrecurring fair value measurements. ASU 2018-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with some amendments applied prospectively, some applied retrospectively and early adoption permitted. The Company adopted ASU 2018-13 for its fiscal year beginning January 1, 2020 and it did not have a material effect on the Company's fair value disclosures within its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The intent of this pronouncement is to align the requirements for capitalizing implementation costs incurred in a cloud computing arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software as defined in ASC 350-40. Under ASU 2018-15, the capitalized implementation costs related to a cloud computing arrangement will be amortized over the term of the arrangement and all

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

capitalized implementation amounts will be required to be presented in the same line items of the financial statements as the related hosting fees. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have a material effect on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"). ASU 2018-17 requires reporting entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety for determining whether a decision-making fee is a variable interest. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. Entities are required to apply the amendments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have an effect on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). ASU 2020-04 provides optional guidance for a limited period of time related to contract modifications and hedge accounting to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The standard is effective from March 12, 2020 through December 31, 2022, except for hedging relationships existing as of December 31, 2022 that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The Company may elect to take advantage of this optional guidance in its transition away from LIBOR within certain debt contracts but does not expect a material impact on its consolidated financial statements. As of September 30, 2020, the Company had not modified any contracts or had any hedge accounting activity in which it utilized the optional guidance under ASU 2020-04.

**Accounting Standards Issued But Not Yet Adopted**

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. ASU 2019-12 will be effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. The Company plans to adopt ASU 2019-12 for its fiscal year beginning January 1, 2021 and is currently assessing the impact, if any, the guidance will have on its consolidated financial statements.

**NOTE 3 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net as of September 30, 2020 and December 31, 2019:

|  | September 30, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Land and site improvements | $ 130,890 | $ 98,530 |
| Buildings and improvements | 346,651 | 229,640 |
| Transportation fleet | 148,270 | 110,302 |
| Software | 99,151 | 66,875 |
| Furniture, fixtures and equipment | 56,819 | 38,123 |
| Total property and equipment excluding construction in progress | 781,781 | 543,470 |
| Less: accumulated depreciation and amortization on property and equipment | (146,241) | (88,795) |
| Property and equipment excluding construction in progress, net | 635,540 | 454,675 |
| Construction in progress | 164,641 | 88,796 |
| Property and equipment, net | $ 800,181 | $ 543,471 |

Depreciation and amortization expense on property and equipment was approximately $18.4 million and $10.3 million for the three months ended September 30, 2020 and 2019, respectively, and approximately $50.9 million and $26.3 million for the

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

nine months ended September 30, 2020 and 2019, respectively. These amounts primarily relate to selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying unaudited condensed consolidated statements of operations.

### NOTE 4 — GOODWILL AND INTANGIBLE ASSETS, NET

On April 12, 2018, the Company acquired Car360, Inc. ("Car360"), a provider of app-based photo capture technology, for approximately $16.7 million, net of cash acquired of approximately $0.4 million. The purchase price was comprised of approximately $6.7 million cash, net of cash acquired, and approximately 0.5 million Class A Units of Carvana Group, with a fair value of approximately $10.0 million.

The purchase price was allocated to net tangible assets of approximately $0.2 million and intangible assets of approximately $9.9 million based on their fair values on the acquisition date and a related deferred tax liability of approximately $2.5 million. The deferred tax liability will amortize over 2 years to 7 years, and approximately $0.1 million and $0.0 million was amortized during the three months ended September 30, 2020 and 2019, respectively, and $0.3 million and $0.4 million during the nine months ended September 30, 2020 and 2019, respectively. The excess of the purchase price over the amounts allocated to assets acquired, liabilities assumed and the deferred tax liability was approximately $9.4 million, which has been recorded as goodwill. The historical results of operations for Car360 were not significant to the Company's consolidated results of operations for the periods presented.

The following table summarizes intangible assets and goodwill related to the Car360 acquisition as of September 30, 2020 and December 31, 2019:

| | Useful Life | September 30, 2020 | December 31, 2019 |
|---|---|---|---|
| | | (in thousands) | |
| Intangible assets: | | | |
| Developed technology | 7 years | $ 8,642 | $ 8,642 |
| Customer relationships | 2 years | — | 523 |
| Non-compete agreements | 5 years | 774 | 774 |
| Intangible assets, acquired cost | | 9,416 | 9,939 |
| Less: accumulated amortization | | (3,426) | (2,707) |
| Intangible assets, net | | $ 5,990 | $ 7,232 |
| | | | |
| Goodwill | N/A | $ 9,353 | $ 9,353 |

Amortization expense was approximately $0.3 million and $0.4 million during the three months ended September 30, 2020 and 2019, respectively, and $1.2 million during both the nine months ended September 30, 2020 and 2019, respectively. As of

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

September 30, 2020, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 4.4 years. The anticipated annual amortization expense to be recognized in future years as of September 30, 2020 is as follows:

|  | Expected Future Amortization |
| --- | --- |
|  | (in thousands) |
| Remainder of 2020 | $ 347 |
| 2021 | 1,389 |
| 2022 | 1,389 |
| 2023 | 1,279 |
| 2024 | 1,235 |
| 2025 | 351 |
| Thereafter | — |
| Total | $ 5,990 |

**NOTE 5 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES**

The following table summarizes accounts payable and other accrued liabilities as of September 30, 2020 and December 31, 2019:

|  | September 30, 2020 | December 31, 2019 |
| --- | --- | --- |
|  | (in thousands) | |
| Accounts payable, including $12,845 and $9,549, respectively, due to related parties | $ 96,477 | $ 63,576 |
| Sales taxes and vehicle licenses and fees | 65,671 | 45,812 |
| Accrued compensation and benefits | 31,268 | 21,726 |
| Accrued property and equipment | 30,439 | 23,433 |
| Accrued interest expense | 30,167 | 15,650 |
| Reserve for returns and cancellations | 27,197 | 19,721 |
| Customer deposits | 17,541 | 6,379 |
| Accrued advertising costs | 15,426 | 11,403 |
| Other accrued liabilities | 41,690 | 26,743 |
| Total accounts payable and accrued liabilities | $ 355,876 | $ 234,443 |

**NOTE 6 — RELATED PARTY TRANSACTIONS**

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group ("DriveTime") entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2021 and 2024. The Company has the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in December 2018. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring in 2021 and the Company having the right to

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco inspection and reconditioning centers ("IRCs"). At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In December 2016, the Company entered into a lease agreement related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In August 2018, the Company entered into an additional lease agreement with a coterminous initial term with Verde for contiguous space to that IRC. The lease agreements required monthly rental payments and could have been extended for four additional five-year periods. In September 2020, to consummate a sale leaseback transaction with an unrelated third party, the Company exercised a pre-existing option to purchase the leased land and related assets from Verde for its net book value of approximately $21.7 million thus terminating the lease agreement. The Company immediately sold such land and related assets along with the Company's leasehold improvements at the IRC to a third party who simultaneously leased back the IRC to the Company.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a lease agreement with DriveTime of a fully operational IRC near Cleveland, Ohio. DriveTime vacated the facility in February 2019, at which point the Company became the sole occupant and began leasing the full facility from DriveTime. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. Before DriveTime vacated the facility, the Company paid a monthly rental fee for facility and shared reconditioning costs, calculated based on the Company's pro rata utilization of space at the IRC in a given month, along with a pro rata share of the facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the three months ended September 30, 2020, total costs related to these operating lease agreements, including those noted above, were approximately $2.4 million with approximately $0.8 million and $1.6 million allocated to inventory and selling, general and administrative expenses, respectively. During the nine months ended September 30, 2020, total costs related to these lease agreements were approximately $6.0 million with approximately $2.4 million and $3.6 million allocated to inventory and selling, general and administrative expenses, respectively. During the three months ended September 30, 2019, total costs related to these lease agreements were approximately $2.0 million with approximately $0.8 million and $1.2 million allocated to inventory and selling, general and administrative expenses, respectively. During the nine months ended September 30, 2019, total costs related to these lease agreements were approximately $6.0 million with approximately $2.5 million and $3.5 million allocated to inventory and selling, general and administrative expenses, respectively.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company became the sole occupant in April 2019. The lease expires in four

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

years, subject to the ability to exercise three renewal options of five years each. DriveTime remained an occupant of the facility through April 1, 2019 but is not fully released from the lease obligations by the landlord.

During the three and nine months ended September 30, 2019, the Company purchased certain leasehold improvements and equipment from DriveTime at facilities the Company previously shared with them for DriveTime's net book value of approximately $2.0 million and $6.3 million, respectively.

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was approximately $0.2 million during both the three months ended September 30, 2020 and 2019 and approximately $0.7 million during both the nine months ended September 30, 2020 and 2019.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was approximately $0.2 million and $0.6 million during the three and nine months ended September 30, 2020, respectively.

**Wholesale Revenue**

In 2020, DriveTime began purchasing wholesale vehicles from the Company through competitive online auctions that are managed by an independent third party. As a result, the Company recognized approximately $1.3 million and $1.4 million of wholesale revenue from DriveTime during the three and nine months ended September 30, 2020, respectively.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended September 30, 2020 and 2019, the Company recognized approximately $22.3 million and $15.0 million, respectively, and during the nine months ended September 30, 2020 and 2019, the Company recognized approximately $59.9 million and $38.2 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing. The Company recognized approximately $3.8 million and $0.8 million during the three months ended September 30, 2020 and 2019, respectively, and approximately $9.5 million and $2.2 million during the nine ended September 30, 2020 and 2019, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. As of September 30, 2020, the Company's ongoing GAP waiver coverage sales were administered by an unrelated party. The Company incurred approximately $1.6 million and $1.2 million during the three months ended September 30, 2020 and 2019, respectively, and $4.1 million and $3.1 million during the nine months ended September 30, 2020 and 2019, respectively, related to the administration of limited warranty and GAP waiver coverage.

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**GAP Waiver Insurance Policy**

The Company purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $0.1 million and $1.7 million during the three and nine months ended September 2019, respectively, and for a nominal amount during the three and nine months ended September 30, 2020, that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that the Company sold in its securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, the Company entered into a retrospective profit sharing agreement with BlueShore under which the Company shares in the profits generated from the insurance policies by receiving a portion of the excess of the premium it paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. As of September 30, 2020 and December 31, 2019, the Company held a receivable of approximately $0.1 million and $0.2 million, respectively, which is included in other assets on the accompanying unaudited condensed consolidated balance sheets, related to this retrospective profit sharing agreement.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $1.7 million during both the three months ended September 30, 2020 and 2019 and $4.3 million and $2.7 million during the nine months ended September 30, 2020 and 2019, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime approximately $0.1 million under this agreement during both the three months ended September 30, 2020 and 2019 and approximately $0.2 million and $0.4 million under this agreement during the nine months ended September 30, 2020 and 2019, respectively.

**Senior Notes Held by Verde**

As of both September 30, 2020 and December 31, 2019, Verde held $15.0 million of principal of the Company's outstanding Senior Notes, as defined and further discussed in Note 9 — Debt Instruments. On October 2, 2020, the Company redeemed all of the Senior Notes, including the amount held by Verde, as discussed in Note 19 — Subsequent Events.

**Accounts Payable Due to Related Party**

As of September 30, 2020 and December 31, 2019, approximately $12.8 million and $9.5 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contribution Agreements**

On September 10, 2018, the Company announced a commitment by its Chief Executive Officer, Ernest Garcia III, to contribute shares of the Company's Class A common stock, for each then-current employee from his personal shareholdings to the Company at no charge (the "Share Contributions"). His contributions funded equity awards of 165 restricted stock units to each of the Company's then-current employees upon their satisfying certain employment tenure requirements (the "100k Milestone Gift"). The Company entered into certain contribution agreements related to his commitment in order to effect the transfer of shares from Mr. Garcia to the Company. The Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, but pursuant to a series of contribution agreements, it has indemnified Mr. Garcia from any

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

such obligations that may arise. See Note 10 — Stockholders' Equity and Note 12 — Equity-Based Compensation for further discussion. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**IP License Agreement**

In February 2017, the Company entered into a license agreement that governs the rights of certain intellectual property owned by the Company and the rights of certain intellectual property owned by DriveTime. The license agreement, which was amended and restated in April 2017, generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property, and each party agrees to certain covenants not to sue the other party, its affiliates and certain of its service providers in connection with various patent claims. The exclusive license to DriveTime is limited to the business that is primarily of subprime used car sales to retail customers. However, upon a change of control of either party, both parties' license rights as to certain future improvements to licensed intellectual property and all limited exclusivity rights are terminated. The agreement does not provide a license to any of the Company's patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to the Company's vending machines, automated vehicle photography or certain other elements of the Company's brand.

**NOTE 7 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with certain financing partners, including Ally Bank and Ally Financial (the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2020, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, commit the purchaser to purchase up to a maximum of $3.0 billion of principal balances of finance receivables from March 24, 2020 through March 23, 2021, broaden the set of finance receivables covered by the MPSA, and provide additional flexibility in the timing of sales of finance receivables.

During the nine months ended September 30, 2020 and 2019, the Company sold approximately $1.8 billion and $0.3 billion, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.5 billion of unused capacity as of September 30, 2020.

**Master Transfer Agreement**

In November 2017, the Company entered into a master transfer agreement (the "2017 Master Transfer Agreement") with a purchaser trust (the "2017 Purchaser Trust") under which the 2017 Purchaser Trust committed to purchase an aggregate amount of principal balances of finance receivables.

On May 7, 2019, the Company purchased the certificate of the 2017 Purchaser Trust for $34.0 million, net of cash acquired. At the time of acquisition the trust assets included $139.7 million of finance receivables that the Company had previously sold to the trust under the 2017 Master Transfer Agreement, and its liabilities included $105.7 million in associated debt and other liabilities. In connection with the certificate purchase, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement (the "A&R Loan and Security Agreement") pursuant to which Ally Bank agreed to provide a $350.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company, as further described in Note 9 — Debt Instruments. In February 2020, the 2017 Master Transfer Agreement terminated in connection with the termination of the A&R Loan and Security Agreement, as referenced in Note 9 — Debt Instruments.

During the nine months ended September 30, 2019, prior to the acquisition of the certificate in the trust, the Company sold approximately $139.3 million in principal balances of finance receivables under the Master Transfer Agreement.

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

During the nine months ended September 30, 2019, prior to the certificate purchase, the Company also purchased finance receivables that it previously sold to the purchaser trust under the 2017 Master Transfer Agreement for a total price of approximately $127.7 million and immediately resold such finance receivables into a securitization transaction, which is described further in Note 8 — Securitizations and Variable Interest Entities. This transaction was entered into in connection with the securitization transaction and was entered into independently from the terms of the 2017 Master Transfer Agreement.

**Securitization Transactions**

Beginning in 2019, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 8 — Securitizations and Variable Interest Entities.

During the nine months ended September 30, 2020 and 2019, the Company sold approximately $494.8 million and $1.4 billion, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was approximately $76.8 million and $39.8 million during the three months ended September 30, 2020 and 2019, respectively, and $129.0 million and $99.4 million during the nine months ended September 30, 2020 and 2019, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 8 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 7 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include but are not limited to rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of September 30, 2020, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. The Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets at fair value, which as of September 30, 2020 and December 31, 2019 were approximately $112.1 million and $98.8 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of September 30, 2020.

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at September 30, 2020 and December 31, 2019. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | September 30, 2020 | | December 31, 2019 | |
| | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
|---|---|---|---|---|
| | (in thousands) | | | |
| Rated notes | $ 83,089 | $ 83,089 | $ 85,234 | $ 85,234 |
| Certificates and other assets | 29,045 | 29,045 | 13,546 | 13,546 |
| Total unconsolidated VIEs | $ 112,134 | $ 112,134 | $ 98,780 | $ 98,780 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. As described in Note 9 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of September 30, 2020 and December 31, 2019 were as follows:

| | September 30, 2020 | | December 31, 2019 | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|
| | (in thousands) | | | |
| Rated notes | $ 83,868 | $ 83,089 | $ 84,983 | $ 85,234 |
| Certificates and other assets | 25,276 | 29,045 | 13,456 | 13,546 |
| Total securities available for sale | $ 109,144 | $ 112,134 | $ 98,439 | $ 98,780 |

## NOTE 9 — DEBT INSTRUMENTS

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by the Company's vehicle inventory, general intangibles, accounts, and finance receivables. Under the Floor Plan Facility, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts. The Floor Plan Facility also requires monthly interest payments and that at least 7.5% of the total principal amount owed to the lender is held as restricted cash.

As of September 30, 2020, the interest rate on the Floor Plan Facility was approximately 3.55%, the Company had an outstanding balance under this facility of approximately $110.0 million, unused capacity of approximately $840.0 million, and held approximately $8.2 million in restricted cash related to this facility. As of December 31, 2019, the interest rate on the Floor Plan Facility was approximately 4.91%, the Company had an outstanding balance of approximately $515.5 million, unused capacity of approximately $434.5 million, and held approximately $38.7 million in restricted cash related to this facility.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Effective October 1, 2020, the Company amended the Floor Plan Facility to increase the line of credit to $1.25 billion, reduce the interest rate to one-month LIBOR plus 3.15% irrespective of the outstanding balance, and extend the maturity date to March 31, 2023. The Company will also be required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain automotive finance receivables originated by the Company. As of September 30, 2020, the lender had committed $425.0 million under this facility. The Company could increase this commitment in $25.0 million increments up to $500.0 million with the lender's consent, and can draw upon this facility until July 23, 2021. On October 28, 2020, the Company increased its commitment under this facility to $500.0 million.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until February 20, 2022.

Both facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. Both facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of September 30, 2020, the Company had $17.0 million outstanding under these facilities, unused capacity of approximately $908.0 million, and held approximately $14.2 million in restricted cash related to these facilities. During the three months ended September 30, 2020, the Company's effective interest rate on these facilities was approximately 1.94%.

*Past Finance Receivable Facilities*

In April 2019, the Company entered in a Loan and Security Agreement pursuant to which Ally Bank agreed to provide a $300.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus a spread ranging from 1.00% to 1.80%.

In May 2019, in connection with the acquisition of the Purchaser Trust described in Note 7 — Finance Receivable Sale Agreements, the Company and Ally Bank entered into the A&R Loan and Security Agreement to provide an additional $350.0 million revolving credit facility to fund certain other automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus 1.95%.

Both credit facilities required that at least 2% of the outstanding pledged finance receivables principal balances, plus any undistributed amounts collected on the pledged finance receivables amount, be held as restricted cash.

Interest payments on these credit facilities were payable monthly on each draw date. Principal repayments occurred on the fifteenth day of each calendar month in an amount equal to the undistributed receivables collected.

As of December 31, 2019, these credit facilities had an interest rate ranging between approximately 2.76% and 3.71%, and the Company had an outstanding balance under these facilities of approximately $53.4 million, unused capacity of approximately $596.6 million, and held approximately $3.7 million in restricted cash related to these facilities.

The Company voluntarily terminated these facilities in February 2020 after entering into the active finance receivable facilities described above.

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Long-Term Debt**

*Senior Unsecured Notes*

On September 21, 2018, the Company issued an aggregate of $350.0 million in senior unsecured notes due 2023 (the "Existing Notes") under an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). On May 24, 2019, the Company issued $250.0 million in aggregate principal amount of additional notes (the "New Notes") under the Indenture, at a 100.5% premium. The Existing Notes and New Notes (together the "Senior Notes") are treated as a single class for all purposes and have the same terms. The Senior Notes accrue interest at a rate of 8.875% per annum, which is payable semi-annually in arrears on April 1 and October 1 of each year. The Senior Notes mature on October 1, 2023, unless earlier repurchased or redeemed, and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales or funding of its finance receivables, if any). The Company may redeem some or all of the Senior Notes on or after October 1, 2020 at redemption prices set forth in the Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2020, the Company may redeem up to 35.0% of the aggregate principal amount of the Senior Notes at a redemption price equal to 108.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to October 1, 2020, by paying a make-whole premium plus any accrued and unpaid interest, to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indenture governing the Senior Notes contains restrictive covenants that, subject to certain conditions, limit the ability of the Company to, among other things, incur additional debt or issue preferred stock, create liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default. As of September 30, 2020, the Company was in compliance with all covenants.

In connection with the issuance of these Senior Notes, Carvana Group amended its LLC agreement to create a class of non-convertible preferred units, which Carvana Co. purchased with its net proceeds from the issuance of these Senior Notes, as further discussed in Note 10 — Stockholders' Equity.

The outstanding principal of the Senior Notes, net of unamortized debt issuance costs and including the premium, was approximately $592.9 million and $591.1 million as of September 30, 2020 and December 31, 2019, respectively, of which $15.0 million of principal was held by Verde as of both periods, and is included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

On October 2, 2020, the Company exercised its option to redeem all of the Senior Notes at the redemption price set forth in the Indenture, plus accrued interest, in connection with the issuance of the 2025 Notes and 2028 Notes as defined in Note 19 — Subsequent Events.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of September 30, 2020 and December 31, 2019, the outstanding principal of these notes had a weighted-average interest rate of 7.0% and 6.6%, respectively, and totaled approximately $27.2 million and $31.8 million, respectively, net of unamortized debt issuance costs, of which approximately $13.2 million and $10.9 million, respectively, was due within the next twelve

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of September 30, 2020, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of September 30, 2020 and December 31, 2019, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $365.3 million and $174.7 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

In November 2017, the Company entered into a master sale-leaseback agreement (the "Master Sale-Leaseback Agreement" or "MSLA"), which was amended in November 2018, pursuant to which it may sell and lease back certain of its owned or leased properties and construction improvements. Under the MSLA, at any time the Company may elect to, and beginning in November 2020 or until a property owner of a leased site consents to the sale-leaseback, the purchaser has the right to demand that the Company repurchase one or more of the properties sold and leased back pursuant to the MSLA for an amount equal to the repurchase price. Repurchase prices are defined in each of the applicable leases and are generally the original purchase prices plus any accrued and unpaid rent. Under the MSLA, the total sales price of properties the Company has sold and is leasing back at any point in time is limited to $75.0 million. As of September 30, 2020 and December 31, 2019, the Company may sell and lease back approximately $75.0 million of its property and equipment under the MSLA.

*Financing of Beneficial Interests in Securitizations*

Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase. As discussed in Note 8 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules.

As of September 30, 2020 and December 31, 2019, the Company has pledged approximately $76.3 million and $85.0 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from January 2026 to July 2027. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was approximately $74.4 million and $82.7 million as of September 30, 2020 and December 31, 2019, respectively, of which approximately $22.8 million and $26.4 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

**NOTE 10 — STOCKHOLDERS' EQUITY**

Carvana Co.'s amended and restated certificate of incorporation, among other things authorizes (i) 50.0 million shares of Preferred Stock, par value $0.01 per share, (ii) 500.0 million shares of Class A common stock, par value $0.001 per share, and (iii) 125.0 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of September 30, 2020, there were approximately 214.6 million and 3.4 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on September 30, 2020), respectively, issued and outstanding. As discussed in Note 12 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold and are earned over the requisite service period.

**Equity Offerings**

On May 24, 2019, the Company completed a public equity offering of 4.2 million shares of its Class A common stock at a public offering price of $65.00 per share and received net proceeds from the offering of approximately $258.8 million after underwriting discounts and commissions and offering expenses. As part of the offering, the Company granted the underwriters a 30-day option to purchase all or part of approximately 0.6 million additional shares of Class A common stock. On June 20, 2019, the underwriters exercised their option in full for an additional $38.9 million in proceeds after offering expenses. The Company used the net proceeds to purchase approximately 6.0 million newly-issued LLC Units in Carvana Group.

On April 1, 2020, the Company completed a registered direct offering to investors of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Ernest Garcia II, through Verde, and Ernest Garcia III each invested approximately $25.0 million or approximately 0.6 million shares of the Class A common stock, in the offering. The Company used the net proceeds to purchase approximately 16.7 million newly-issued LLC Units in Carvana Group.

On May 21, 2020, the Company completed a public equity offering of 5.0 million shares of its Class A common stock at an offering price of $92.00 per share and received net proceeds from the offering of approximately $459.5 million. The Company used the net proceeds to purchase approximately 6.3 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for.

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the nine months ended September 30, 2020, certain LLC Unitholders exchanged 1.8 million LLC Units and 0.0 million shares of Class B common stock for 1.4 million newly-issued shares of Class A common stock. Simultaneously, and in connection with these exchanges, Carvana Co. received approximately 1.8 million LLC Units, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of the Senior Notes in September 2018 and May 2019, as discussed further in Note 9 — Debt Instruments. Carvana Co. used its net proceeds from the Senior Notes to purchase 600,000 Class A Non-Convertible Preferred Units. In the event Carvana Co. makes payments on the Senior Notes, Carvana Group will make an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit shall be canceled and retired.

As discussed further in Note 9 — Debt Instruments and Note 19 — Subsequent Events, the Company redeemed its Senior Notes on October 2, 2020 using a portion of its net proceeds from the issuance of its 2025 Notes and 2028 Notes, at which point the 600,000 Class A Non-Convertible Preferred Units were canceled and retired. Also, on October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of preferred units to be sold to Carvana Co. in connection with the issuance of the 2025 Notes and 2028 Notes.

**Contribution of Class A Common Shares From Ernest Garcia III**

During the three and nine months ended September 30, 2019, the Company and its Chief Executive Officer, Ernest Garcia III, entered into contribution agreements (the "Contribution Agreements") in connection with the 100k Milestone Gift, as defined in Note 6 — Related Party Transactions. Pursuant to the Contribution Agreements, Mr. Garcia contributed approximately 0.1 million and 0.2 million shares of the Company's Class A common stock to the Company during the three and nine months ended September 30, 2019, respectively, at no charge. The Company subsequently granted approximately 0.1 million and 0.2 million restricted stock units during the three and nine months ended September 30, 2019, respectively, to employees. Refer to Note 12 — Equity-Based Compensation for further discussion. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contribution, it has indemnified Mr. Garcia from any such obligations that may arise. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**NOTE 11 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans, such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

During the nine months ended September 30, 2020 and 2019, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $6.8 million and $4.7 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity. During the nine months ended September 30, 2020 and 2019, Carvana Co. utilized its net proceeds from its equity offerings to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by approximately $643.9 million and $201.0 million, respectively, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of September 30, 2020, Carvana Co. owned approximately 40.4% of Carvana Group with the LLC Unitholders owning the remaining 59.6%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (in thousands) | |
| Transfers (to) from non-controlling interests: | | |
| Decrease as a result of issuances of Class A common stock | $ (643,886) | $ (201,015) |
| Increase as a result of exchanges of LLC Units | 6,845 | 4,666 |
| Total transfers to non-controlling interests | $ (637,041) | $ (196,349) |

## NOTE 12 — EQUITY-BASED COMPENSATION

Equity-based compensation expense is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation expense recognized during the three and nine months ended September 30, 2020 and 2019 is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | (in thousands) | | | |
| Class B Units | $ 256 | $ 648 | $ 973 | $ 1,804 |
| Restricted Stock Units and Awards excluding those granted in relation to the 100k Milestone Gift | 4,887 | 3,513 | 14,656 | 9,194 |
| Restricted Stock Units granted in relation to the 100k Milestone Gift | — | 4,446 | — | 10,379 |
| Options | 1,777 | 1,369 | 5,193 | 4,033 |
| Class A Units | 337 | 497 | 1,190 | 1,687 |
| Total equity-based compensation | 7,257 | 10,473 | 22,012 | 27,097 |
| Equity-based compensation capitalized to property and equipment | (1,406) | (852) | (4,001) | (1,731) |
| Equity-based compensation capitalized to inventory | (90) | (1,824) | (188) | (3,659) |
| Equity-based compensation, net of capitalized amounts | $ 5,761 | $ 7,797 | $ 17,823 | $ 21,707 |

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

As of September 30, 2020, the total unrecognized compensation expense related to outstanding equity awards was approximately $66.4 million, which the Company expects to recognize over a weighted-average period of approximately 2.8 years. Total unrecognized equity-based compensation expense will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14.0 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units ("RSUs") and other stock-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company vests over four year periods based on continued employment with the Company. The RSUs granted in relation to the 100k Milestone Gift vested within one week of the grant date. As of September 30, 2020, approximately 9.8 million shares remain available for future equity award grants under this plan.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and nine months ended September 30, 2020 or 2019. As of September 30, 2020, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 13 — LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented.

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net loss per share during the three and nine months ended September 30, 2020 and 2019:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | (in thousands, except per share data) | | | |
| Numerator: | | | | |
| Net loss | $ (17,720) | $ (92,244) | $ (307,603) | $ (238,899) |
| Net loss attributable to non-controlling interests | 10,635 | 62,156 | 199,801 | 165,373 |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (7,085) | $ (30,088) | $ (107,802) | $ (73,526) |
| Denominator: | | | | |
| Weighted-average shares of Class A common stock outstanding | 70,064 | 50,003 | 62,350 | 45,973 |
| Nonvested weighted-average restricted stock awards | (59) | (216) | (106) | (247) |
| Weighted-average shares of Class A common stock to compute basic and diluted net loss per Class A common share | 70,005 | 49,787 | 62,244 | 45,726 |
| Net loss per share of Class A common stock, basic and diluted | $ (0.10) | $ (0.60) | $ (1.73) | $ (1.61) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented. LLC Units (adjusted for the Exchange Ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash.

Weighted-average as-converted LLC Units of approximately 104.4 million and 105.7 million, comprised of approximately 101.3 million and 101.6 million Class A Units together with the related Class B common stock and approximately 3.1 million and 4.1 million Class B Units, for the three months ended September 30, 2020 and 2019, respectively, and of approximately 104.9 million and 107.0 million, comprised of approximately 101.3 million and 102.6 million Class A Units together with the related Class B common stock and approximately 3.6 million and 4.4 million Class B Units, during the nine months ended September 30, 2020 and 2019, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Outstanding Class B Units were approximately 3.4 million and 5.3 million at September 30, 2020 and 2019, respectively. Weighted-average potentially dilutive restricted stock awards and units of approximately 0.7 million and 0.6 million for the three months ended September 30, 2020 and 2019, respectively, and approximately 0.8 million for both the nine months ended September 30, 2020 and 2019, respectively, were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive. As of September 30, 2020 and 2019, 1.1 million and 1.2 million options were outstanding and evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 14 — INCOME TAXES**

As described in Note 1 — Business Organization, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

As described in Note 10 — Stockholders' Equity, the Company acquired approximately 1.3 million and 1.8 million LLC Units, respectively, during the three and nine months ended September 30, 2020 in connection with exchanges with LLC Unitholders. During the three and nine months ended September 30, 2020, the Company recorded a gross deferred tax asset of approximately $47.4 million and $56.5 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statement of stockholders' equity.

As described in Note 10 — Stockholders' Equity, the Company purchased a total of approximately 22.9 million newly-issued LLC Units of Carvana Group in connection with a direct offering and a public equity offering during the three and nine months ended September 30, 2020. During the nine months ended September 30, 2020, the Company recognized a gross deferred tax asset of approximately $14.1 million associated with a portion of the basis difference resulting from this purchase of LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 4 — Goodwill and Intangible Assets, Net, Carvana Group acquired Car360 on April 12, 2018. The acquisition included various intangible assets, and as a result the Company recognized a deferred tax liability of approximately $2.5 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheet. The deferred tax liability will be amortized over two to seven years and approximately $0.3 million and $0.4 million was amortized during the nine months ended September 30, 2020 and 2019, respectively.

During the nine months ended September 30, 2020, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of September 30, 2020 and December 31, 2019, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The Company does not expect the provisions of the legislation to have a significant impact on the effective tax rate or income tax payable and deferred income tax positions of the Company.

The Company's effective tax rate for the three months ended September 30, 2020 and 2019 was an expense of 0.4% and 0.0%, respectively, and for the nine months ended September 30, 2020 and 2019 was a benefit of 0.1% and 0.0%, respectively, related to Car360, a wholly-owned subsidiary acquired in April 2018.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 10 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of September 30, 2020, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of September 30, 2020, the total unrecorded TRA liability is approximately $238.5 million. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

## NOTE 15 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

### Operating Leases

As of September 30, 2020, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2020 and 2032. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 6 — Related Party Transactions for further discussion of operating leases with related parties.

### Finance Leases

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and nine months ended September 30, 2020 and 2019 were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| | (in thousands) | | | |
| **Lease costs:** | | | | |
| Finance leases: | | | | |
| Amortization of finance lease assets | $ 4,239 | $ 2,222 | $ 11,685 | $ 5,477 |
| Interest obligations under finance leases | 911 | 547 | 2,604 | 1,392 |
| Total finance lease costs | $ 5,150 | $ 2,769 | $ 14,289 | $ 6,869 |
| | | | | |
| Operating leases: | | | | |
| Fixed lease costs to non-related parties | $ 7,325 | $ 3,487 | $ 20,330 | $ 8,759 |
| Fixed lease costs to related parties | 1,959 | 1,849 | 6,086 | 5,577 |
| Variable short-term lease costs to related parties | 1,002 | 390 | 1,397 | 1,177 |
| Total operating lease costs | $ 10,286 | $ 5,726 | $ 27,813 | $ 15,513 |
| | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | |
| Operating lease liabilities to non-related parties | | | $ 12,264 | $ 6,147 |
| Operating lease liabilities to related parties | | | $ 5,876 | $ 6,333 |
| Interest payments on finance lease liabilities | | | $ 2,604 | $ 1,392 |
| | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | |
| Principal payments on finance lease liabilities | | | $ 12,860 | $ 5,581 |

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of September 30, 2020:

| | Finance Leases | Operating Leases [1] | | | Total |
| | | Related Party [2] | Non-Related Party | Total Operating | |
|---|---|---|---|---|---|
| | | (in thousands) | | | |
| Remainder of 2020 | $ 5,799 | $ 1,361 | $ 4,115 | $ 5,476 | $ 11,275 |
| 2021 | 21,395 | 5,236 | 19,115 | 24,351 | 45,746 |
| 2022 | 20,320 | 5,225 | 17,583 | 22,808 | 43,128 |
| 2023 | 19,119 | 5,233 | 15,402 | 20,635 | 39,754 |
| 2024 | 11,801 | 3,968 | 13,517 | 17,485 | 29,286 |
| Thereafter | 5,416 | 8,501 | 146,368 | 154,869 | 160,285 |
| Total minimum lease payments | 83,850 | 29,524 | 216,100 | 245,624 | 329,474 |
| Less: amount representing interest | (8,409) | (6,599) | (87,399) | (93,998) | (102,407) |
| Total lease liabilities | $ 75,441 | $ 22,925 | $ 128,701 | $ 151,626 | $ 227,067 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of September 30, 2020 and December 31, 2019, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of September 30, 2020 and 2019 were as follows, excluding short-term operating leases:

| | September 30, | |
|---|---|---|
| | 2020 | 2019 |
| Weighted-average remaining lease terms (years) | | |
| Operating leases | 10.6 | 10.4 |
| Finance leases | 4.3 | 4.5 |
| Weighted-average discount rate | | |
| Operating leases | 8.3 % | 8.7 % |
| Finance leases | 5.3 % | 5.5 % |

**NOTE 16 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $8.2 million and $3.7 million as of September 30, 2020 and December 31, 2019, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, the Company does not believe that the ultimate resolution of these actions will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**NOTE 17 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

As of September 30, 2020 and December 31, 2019, the Company held certain assets that were required to be measured at fair value on a recurring basis and beneficial interests in securitizations for which it elected the fair value option.

The following tables are a summary of fair value measurements and hierarchy level at September 30, 2020 and December 31, 2019:

**As of September 30, 2020:**

| | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| | (in thousands) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 148,406 | $ 148,406 | $ — | $ — |
| Beneficial interests in securitizations | 112,134 | — | — | 112,134 |

**As of December 31, 2019:**

| | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| | (in thousands) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 56,435 | $ 56,435 | $ — | $ — |
| Beneficial interests in securitizations | 98,780 | — | 29,222 | 69,558 |

_____

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2020 and December 31, 2019, the Company has purchase price adjustment receivables of approximately $10.2 million and $6.9 million, respectively, which are carried at fair value and classified as other assets in the accompanying unaudited condensed consolidated balance sheets. Under the Master Purchase and Sale Agreement, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the Master Purchase and Sale Agreement. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of approximately $3.4 million and a loss of approximately $1.6 million during the three and nine months ended September 30, 2020, respectively, and are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

statements of operations. There were no adjustments to the fair value of the purchase price adjustment receivables during the three and nine months ended September 30, 2019.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 8 — Securitizations and Variable Interest Entities. Level 2 assets typically include beneficial interests in securitization transactions that closed near the end of the period due to the proximity to the end of the period and lack of observable changes in economic inputs. Given the changes in the market and overall economic inputs between pricing and closing, the March 2020 securitization transaction was classified as Level 3 as of March 31, 2020. The March 2020 transaction was the only securitization completed during nine months ended September 30, 2020.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of September 30, 2020 and December 31, 2019, the discount rates were 2.1% to 10.0% and 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. During the nine months ended September 30, 2020, the Company transferred beneficial interests acquired as part of the December 2019 securitization transaction initially classified as Level 2 from Level 2 to Level 3. During the nine months ended September 30, 2019, the Company transferred beneficial interests acquired as part of the March 2019 and June 2019 securitization transactions initially classified as Level 2 from Level 2 to Level 3. The assets are typically initially classified as Level 2 due to the transactions' proximity to the end of each respective reporting period and the lack of observable changes in economic inputs. As noted above, the Company uses significant unobservable inputs to measure the fair value of these assets on a recurring basis, thus they will be classified as Level 3 in future periods. There were no transfers out of Level 3 during the three and nine months ended September 30, 2020 or 2019.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and nine months ended September 30, 2020 and 2019:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2020 | 2019 | 2020 | 2019 |
|  | (in thousands) | | | |
| **Opening Balance** | $ 116,563 | $ 18,600 | $ 69,558 | $ — |
| Transfers into Level 3 | — | 26,592 | 29,222 | 46,123 |
| Received in securitization transactions | — | — | 39,578 | — |
| Cash receipts | (11,838) | (2,913) | (30,245) | (4,021) |
| Change in fair value | 7,409 | (396) | 4,021 | (219) |
| **Ending Balance** | $ 112,134 | $ 41,883 | $ 112,134 | $ 41,883 |

32

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended September 30, 2020 and December 31, 2019. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of September 30, 2020 and December 31, 2019 was as follows:

|  | September 30, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Carrying value, net of unamortized debt issuance costs | $ 592,944 | $ 591,124 |
| Fair value | 619,389 | 625,114 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of September 30, 2020 and December 31, 2019 were as follows:

|  | September 30, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Carrying value | $ 316,972 | $ 286,969 |
| Fair value | 342,973 | 304,532 |

**Derivative Instruments**

As of September 30, 2020 and December 31, 2019, the Company had no outstanding derivative instruments.

33

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 18 — SUPPLEMENTAL CASH FLOW INFORMATION

The following table summarizes supplemental cash flow information for the nine months ended September 30, 2020 and 2019:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (in thousands) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest, including $666 and $703, respectively, to related parties | $ 55,300 | $ 36,930 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 34,161 | $ 14,983 |
| Property and equipment acquired under finance leases | $ 36,860 | $ 24,253 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 51,934 | $ 27,059 |
| Equity-based compensation expense capitalized to property and equipment | $ 4,001 | $ 1,731 |
| Fair value of beneficial interests received in securitization transactions | $ 39,578 | $ 80,072 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 21,463 | $ 1,444 |
| Debt issuance costs included in accounts payable and accrued liabilities | $ 2,188 | $ — |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

| | September 30, 2020 | December 31, 2019 | September 30, 2019 | December 31, 2018 |
| --- | --- | --- | --- | --- |
| | (in thousands) | | | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 | $ 94,943 | $ 78,861 |
| Restricted cash [1] | 22,619 | 42,443 | 13,531 | 9,848 |
| Total cash, cash equivalents and restricted cash | $ 196,323 | $ 118,459 | $ 108,474 | $ 88,709 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities. Refer to Note 9 — Debt Instruments for additional information.

## NOTE 19 — SUBSEQUENT EVENTS

**Issuance and Redemption of Senior Unsecured Notes**

On October 2, 2020, the Company issued $500.0 million in aggregate principal amount of 5.625% senior unsecured notes due October 1, 2025 (the "2025 Notes") and $600.0 million aggregate principal amount of 5.875% senior unsecured notes due October 1, 2028 (the "2028 Notes" and, collectively, the "Notes"). The interest on the Notes is payable semi-annually on April 1 and October 1 of each year, beginning on April 1, 2021. The Company used approximately $626.8 million of the proceeds from issuance to redeem in full the $600.0 million aggregate principal amount of its Senior Notes due 2023.

**Floor Plan Facility Amendment**

Effective October 1, 2020, the Company amended its Floor Plan Facility to increase the line of credit to $1.25 billion, reduce the interest rate to one-month LIBOR plus 3.15% irrespective of the outstanding balance, and extend the maturity date to March 31, 2023. Upon entering into the agreement on September 29, 2020, the Company paid a commitment fee. The Company will be required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Item 1 of this Form 10-Q.*

<div align="center">

**Overview**

</div>

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a used vehicle.*** As of September 30, 2020, we listed approximately 26,800 vehicles for sale on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- ***Finance their purchase.*** Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we earn a premium upon sale.

- ***Protect their purchase.*** Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- ***Sell us their car.*** We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle sourcing and acquisition.*** We primarily acquire our used vehicle inventory through the large and liquid national used-car auction market and directly from customers when they trade in or sell us their vehicles. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000

<div align="center">

35

</div>

vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- *Inspection and reconditioning.*    Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to an IRC, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- *Photography and merchandising.*    To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

- *Transportation and fulfillment.*    Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory at the IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

## COVID-19 Update

In March 2020, the World Health Organization declared the novel coronavirus ("COVID-19") outbreak to be a global pandemic. In mid-March, a number of state and local government authorities issued shelter in place and stay at home orders which negatively impacted demand for used vehicles. Near the end of April 2020, the industry began to see a recovery in general market conditions, and demand for used vehicles picked up as the second quarter progressed resulting in a 25% increase in our used vehicle unit sales during the second quarter of 2020 compared to 2019 and a 39% increase in our used vehicle unit sales in the third quarter of 2020 compared to 2019.

For many customers, buying or selling a car is an important component of their transportation and financial planning needs. Based on the CarGurus U.S. COVID-19 Sentiment Study in June 2020 of potential car buyers, 37% of respondents agreed COVID-19 will impact how they shop long-term. Prior to the COVID-19 pandemic, 32% of car shoppers were open to buying a vehicle online, now 60% are open to it. In addition, there was a shift in June 2020 with a decrease in respondents planning to purchase a new vehicle and an increase in those planning to purchase a used vehicle. We believe our online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. Our touchless delivery process allows customers to shop for a car from the comfort of their home, complete their transaction on their phone or laptop, and take delivery of their new car without coming into physical contact with our delivery personnel. At delivery, we sanitize the car and communicate with the customer over the phone as they feel out the car and complete

36

paperwork. Our employees and customers have given us positive feedback on this approach, and we believe it represents a significant step forward in the safety of retail auto sales in the current environment.

We continue to take steps to position the business to be lean and flexible with a focus on our discretionary expenditures including new hiring, travel, facilities, and information technology investments. We also closely monitor key metrics to determine when and how quickly to adjust our marketing, staffing, and purchasing levels to align with demand. We believe our business model makes us well-positioned to scale up and down to meet expected customer demand during and after the current COVID-19 pandemic. We demonstrated our flexibility throughout the second and third quarters of 2020, which began with low demand that increased over the course of the second quarter and overall high demand throughout the third quarter, allowing us to increase our operations, launch new markets, and resume hiring to meet the increasing customer demands.

Our most important priority is the well-being of our employees and customers. We have taken several steps to provide a safe and healthy working environment, including implementing work from home policies for employees who are able to work remotely, pausing most non-essential travel and in-person group meetings, performing deep cleaning and sanitization in all of our facilities, and implementing social distancing and mask policies.

Our financial statements reflect estimates and assumptions made by management that affect the carrying values of the Company's assets and liabilities, disclosures of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, including as a result of the COVID-19 pandemic, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations. We will continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

Our operational and financial performance will depend on future developments related to the continuously evolving COVID-19 pandemic. Future developments include the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the development of treatments or vaccines, the resumption and continuation of widespread economic activity, and changes in consumer sentiment. Due to the inherent uncertainty of the unprecedented and rapidly evolving situation, we are unable to predict the impact of the COVID-19 pandemic on our future operations.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the nine months ended September 30, 2020, the number of vehicles we sold to retail customers grew by 35.2% to 171,939 compared to 127,179 in the nine months ended September 30, 2019. Our used vehicle sales were negatively impacted at the onset of COVID-19 in the United States but have rebounded since then. We expect our used vehicle sales could be negatively impacted in future periods as a result of the continued economic impacts of the COVID-19 pandemic.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

37

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

<div align="center">

**Markets and Population Coverage**

</div>

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings in each of the past seven years. After opening Atlanta, Georgia in 2013, we opened two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 115 in the first nine months of 2020, bringing our total number of markets to 261 as of September 30, 2020. Our 115 market openings since December 31, 2019 increased the total percentage of the U.S. population serviced in our markets to 73.2% as of September 30, 2020 from 66.9% as of December 31, 2019. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. In light of the ongoing COVID-19 pandemic, we plan to continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness. With our growth into new markets, national television advertising has become more economically efficient compared to purchasing several local television advertising campaigns.

<div align="center">

**Revenue and Gross Profit**

</div>

Our increased penetration in existing markets and expansion into new markets has led to growth in retail units sold. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $1.3 billion and $0.9 billion during the three months ended September 30, 2020 and 2019, respectively, and $3.2 billion and $2.5 billion during the nine months ended September 30, 2020 and 2019, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $129.9 million and $92.4 million during the three months ended September 30, 2020 and 2019, respectively, and $259.0 million and $188.5 million during the nine months ended September 30, 2020 and 2019, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $124.6 million and $71.4 million during the three months ended September 30, 2020 and 2019, respectively, and $256.0 million and $177.2 million during the nine months ended September 30, 2020 and 2019, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

<div align="center">

38

</div>

The COVID-19 pandemic impacted all three sources of revenue and gross profit during the nine months ended September 30, 2020. Given the uncertainty and continuously evolving aspects of COVID-19, it may continue to impact our revenue and gross profit in future periods. First, the pandemic negatively impacted retail units sold, which directly impacted retail, wholesale, and other revenue and gross profit. However, since the drastic drop in demand in mid-March through mid-April, demand for retail units has rebounded, including 39% year-over-year growth in the third quarter. Second, the pandemic initially negatively impacted wholesale units sold and purchased for sale due to the unstable condition of the wholesale market, which directly impacted wholesale and retail revenue. However, the wholesale market has since stabilized as of September 30, 2020. We believe the pandemic negatively impacted retail and wholesale gross profit per unit due to the impact of lower demand on average days to sale and industry-wide used vehicle pricing through June 30, 2020. However, during the three months ended September 30, 2020, our average days to sale decreased and average retail and wholesale selling prices increased as dealers and wholesale suppliers saw high industry-wide market prices. Finally, the pandemic had a slight negative impact to gain on loan sale revenue due to higher required yields from loan investors during this period of uncertainty, which resulted in not completing a securitization transaction during either the three months ended June 30, 2020 or September 30, 2020. While these impacts could potentially reoccur or continue in the future and could be significant, we believe they are transitory, and we plan to stay lean during this period and maintain strength and flexibility.

During our growth phase, our highest priority, outside of safety, will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In light of the COVID-19 pandemic, we temporarily paused purchasing vehicles from customers independent of a retail sale, but have subsequently resumed these purchases.

- *Reduce average days to sale.* Our goal is generally to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our ten existing IRCs, which collectively have capacity to inspect and recondition approximately 550,000 vehicles per year at full utilization**.**

- *Increase utilization on logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from wholesale auctions or customers.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

## Seasonality

Absent the impact of COVID-19, used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Absent the impact of COVID-19, used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business. The impact of COVID-19 on seasonality is uncertain.

## Investment in Growth

Absent the impact of COVID-19, we have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending. There is no guarantee that we will be able to realize the return on our investments.

The worldwide spread of COVID-19 is expected to result in a continued global slowdown of economic activity which is likely to continue to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the pandemic is contained. Due to the COVID-19 pandemic, we have continued to monitor discretionary growth expenditures on hiring, travel, IRC and vending machine construction, and information technology investments. We also continue to closely monitor key metrics to determine when and how quickly to adjust our marketing, staffing, and purchasing levels to align with demand. We believe our business model makes us well-positioned to scale up or down to meet customer demand during and after the current COVID-19 pandemic.

## Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 6 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

## Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, opening new markets, and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| Retail units sold | 64,414 | 46,413 | 171,939 | 127,179 |
| Number of markets | 261 | 146 | 261 | 146 |
| Average monthly unique visitors | 9,183,469 | 6,271,686 | 8,004,536 | 4,941,883 |
| Inventory units available on website | 26,897 | 21,376 | 26,897 | 21,376 |
| Average days to sale | 58 | 63 | 71 | 63 |
| Total gross profit per unit [1] | $ 4,056 | $ 2,963 | $ 3,198 | $ 2,861 |

(1) Includes $0, $33, $3, and $33, respectively, related to the 100k Milestone Gift discussed below.

### *Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary

40

driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

### Number of Markets

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers by a Carvana employee in a branded delivery truck. We view the number of markets we serve as a key driver of our growth. As we increase our number of markets, the population of consumers who have access to our fully integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

### Average Monthly Unique Visitors

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

### Inventory Units Available

We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. We view inventory units available as a key measure of our growth. Growth in inventory units available increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in inventory units available indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand inventory units available while continuing to grow sales, thereby improving other key operating metrics of the business.

### Average Days to Sale

We define average days to sale as the average number of days between when we acquire the vehicle and when we deliver it to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price.

### Total Gross Profit per Unit

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

In the second half of 2018, we announced a commitment by our Chief Executive Officer, Ernest Garcia III ("Mr. Garcia"), to contribute 165 shares of Class A common stock to us from his personal shareholdings for every one of our then-existing employees upon their satisfying certain employment tenure requirements. In connection with such contributions, we made corresponding grants of 165 restricted stock units under our 2017 Omnibus Incentive Plan to each employee who satisfied the requirements (the "100k Milestone Gift" or "Gift"). Under GAAP, the 100k Milestone Gift was treated as compensation expense, a portion of which related to the production of our used vehicle inventory and was therefore capitalized to inventory and subsequently recognized within costs of sales when the related inventory was sold. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift has been fulfilled and as of March 31, 2020, all of the compensation expense related to the 100k Milestone Gift had been recognized. Total gross profit per unit includes $0 and $33 per unit during the three months ended September 30, 2020 and 2019, respectively, and $3 and $33 per unit during the nine months ended September 30, 2020 and 2019, respectively, related to the 100k Milestone Gift.

41

**Components of Results of Operations**

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our number of markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our average days to sale and our pricing strategy. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. Beginning in 2020, wholesale vehicle sales includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an independent third party. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by COVID-19.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under a committed forward-flow arrangement with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization

42

transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

### Cost of Sales

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

### Used Vehicle Gross Profit

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

### Wholesale Vehicle Gross Profit

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

### Selling, General and Administrative Expenses

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

### Interest Expense

Interest expense includes interest incurred on our Senior Notes (including amounts due to Verde), our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 9 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

### Other (Income) Expense

Other (income) expense, net includes changes in fair value on our beneficial interests in securitizations and purchase price adjustment receivables, as discussed in Note 17 — Fair Value of Financial Instruments of our financial statements included in

43

Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

### Income Tax Provision

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. As of September 30, 2020, the Company's income tax benefit is generated at Car360, a wholly-owned subsidiary, acquired in April 2018.

44

**Results of Operations**

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | Change | 2020 | 2019 | Change |
| | (dollars in thousands, except per unit amounts) | | | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | 38.5 % | $ 3,245,209 | $ 2,470,630 | 31.4 % |
| Wholesale vehicle sales [1] | 129,925 | 92,430 | 40.6 % | 258,965 | 188,474 | 37.4 % |
| Other sales and revenues [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total net sales and operating revenues | $ 1,543,609 | $ 1,094,854 | 41.0 % | $ 3,760,159 | $ 2,836,309 | 32.6 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 119,607 | $ 60,563 | 97.5 % | $ 268,035 | $ 171,063 | 56.7 % |
| Wholesale vehicle gross profit [1][4] | 17,110 | 5,572 | 207.1 % | 25,881 | 15,600 | 65.9 % |
| Other gross profit [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total gross profit | $ 261,273 | $ 137,543 | 90.0 % | $ 549,901 | $ 363,868 | 51.1 % |
| **Market information:** | | | | | | |
| Markets, beginning of period | 261 | 137 | 90.5 % | 146 | 85 | 71.8 % |
| Market launches | — | 9 | (100.0)% | 115 | 61 | 88.5 % |
| Markets, end of period | 261 | 146 | 78.8 % | 261 | 146 | 78.8 % |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 64,414 | 46,413 | 38.8 % | 171,939 | 127,179 | 35.2 % |
| Wholesale vehicle unit sales | 15,375 | 11,698 | 31.4 % | 33,406 | 29,155 | 14.6 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 20,013 | $ 20,059 | (0.2)% | $ 18,874 | $ 19,426 | (2.8)% |
| Wholesale vehicles | $ 8,450 | $ 7,901 | 6.9 % | $ 7,752 | $ 6,465 | 19.9 % |
| **Per unit gross profit: [5]** | | | | | | |
| Used vehicle gross profit [3] | $ 1,857 | $ 1,305 | 42.3 % | $ 1,559 | $ 1,345 | 15.9 % |
| Wholesale vehicle gross profit [4] | $ 1,113 | $ 476 | 133.8 % | $ 775 | $ 535 | 44.9 % |
| Other gross profit | $ 1,934 | $ 1,539 | 25.7 % | $ 1,489 | $ 1,393 | 6.9 % |
| Total gross profit | $ 4,056 | $ 2,963 | 36.9 % | $ 3,198 | $ 2,861 | 11.8 % |

(1) Includes $1,323 and $0 for the three months ended September 30, 2020 and 2019, respectively, and $1,365 and $0 for the nine months ended September 30, 2020 and 2019, respectively, of wholesale revenue from related parties.
(2) Includes $26,141 and $15,824 for the three months ended September 30, 2020 and 2019, respectively, and $69,423 and $40,386 for the nine months ended September 30, 2020 and 2019, respectively, of other sales and revenues from related parties.
(3) Includes $0, $1,381, $510, and $3,953, or $0, $30, $3, and $31 per unit, related to the 100k Milestone Gift.
(4) Includes $0, $142, $17, and $267, or $0, $12, $0, and $9 per wholesale unit, related to the 100k Milestone Gift.
(5) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

*Used Vehicle Sales*

   *Three months ended September 30, 2020 Versus* 2019. Used vehicle sales increased by $358.1 million to $1.3 billion during the three months ended September 30, 2020, compared to $931.0 million during the three months ended September 30, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 64,414 from 46,413 during the three months ended September 30, 2020 and 2019, respectively. The increase in unit sales was driven by growth in existing markets due to enhanced marketing efforts, expanded inventory selection, and increased brand awareness. The increase in unit sales was also driven by growth to 261 markets as of September 30, 2020 from 146 markets as of September 30, 2019. The average selling price of our retail units sold decreased slightly to $20,013 from $20,059 due primarily to vehicle mix

45

despite a decrease in our average days to sale to 58 days from 63 days during the three months ended September 30, 2020 and 2019, respectively, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

*Nine months ended September 30, 2020 Versus 2019.* Used vehicle sales increased by $774.6 million to $3.2 billion during the nine months ended September 30, 2020 compared to $2.5 billion during the nine months ended September 30, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 171,939 from 127,179 during the nine months ended September 30, 2020 and 2019, respectively. The increase in units sold was driven in part by enhanced marketing efforts, expanded inventory selection, and increased brand awareness. The increase in unit sales was also driven by growth to 261 markets as of September 30, 2020 from 146 markets as of September 30, 2019. Although we experienced a negative impact on retail units sold due to the COVID-19 pandemic primarily in March and April, we started to see a rebound in sales later in the period with the reopening of the markets. The average selling price of our retail units sold decreased to $18,874 from $19,426 due primarily to vehicle mix and to a lesser extent to an increase in average days to sale to 71 days from 63 days during the nine months ended September 30, 2020 and 2019, respectively, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

**Wholesale Vehicle Sales**

*Three months ended September 30, 2020 Versus* 2019. Wholesale vehicle sales increased by $37.5 million to $129.9 million during the three months ended September 30, 2020, compared to $92.4 million during the three months ended September 30, 2019. The increase in revenue was primarily driven by an increase in wholesale units sold to 15,375 from 11,698 during the three months ended September 30, 2020 and 2019, respectively. In addition to the increase in wholesale vehicle units sold, the average selling price of our wholesale units sold increased to $8,450 during the three months ended September 30, 2020 from $7,901 during the three months ended September 30, 2019 due to the mix of units acquired from customers and strong wholesale market prices.

*Nine months ended September 30, 2020 Versus 2019.* Wholesale vehicle sales increased by $70.5 million to $259.0 million during the nine months ended September 30, 2020, compared to $188.5 million during the nine months ended September 30, 2019. As our retail unit sales increased over the nine-month period despite the effect of COVID-19, so did the trade-ins we received, providing more vehicles available for wholesale. Moreover, during the nine months ended September 30, 2020, we also acquired more vehicles from customers who did not purchase a retail unit from us. Therefore, we had more units available for sale to wholesalers, driving an increase in our revenues attributed to wholesale vehicle sales. In addition, the average selling price of our wholesale units sold increased to $7,752 during the nine months ended September 30, 2020 from $6,465 during the nine months ended September 30, 2019 due to the mix of units acquired from customers and strong wholesale market prices toward the end of the 2020 period.

**Other Sales and Revenues**

*Three months ended September 30, 2020 Versus* 2019. Other sales and revenues increased by $53.1 million to $124.6 million during the three months ended September 30, 2020, compared to $71.4 million during the three months ended September 30, 2019. This increase was primarily driven by originating and selling more finance receivables, resulting in an increase in gain on loan sale. Additionally, the increase was due to an increase in retail units sold, which led to an increase in VSC sales and GAP waiver coverage sales.

*Nine months ended September 30, 2020 Versus 2019.* Other sales and revenues increased by $78.8 million to $256.0 million during the nine months ended September 30, 2020, compared to $177.2 million during the nine months ended September 30, 2019. The increase is primarily driven by originating and selling more finance receivables, resulting in an increase in gain on loan sale. In addition, the increase in retail units sold led to an increase in VSC sales and GAP waiver coverage sales.

**Used Vehicle Gross Profit**

*Three months ended September 30, 2020 Versus* 2019. Used vehicle gross profit increased by $59.0 million to $119.6 million during the three months ended September 30, 2020, compared to $60.6 million during the three months ended September 30, 2019. This increase was driven primarily by an increase in retail units sold, along with an increase in used

46

vehicle gross profit per unit to $1,857 for the three months ended September 30, 2020 compared to $1,305 for the three months ended September 30, 2019. The per unit increase was primarily due to acquiring more vehicles from customers.

*Nine months ended September 30, 2020 Versus 2019.* Used vehicle gross profit increased by $97.0 million to $268.0 million during the nine months ended September 30, 2020, compared to $171.1 million during the nine months ended September 30, 2019. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,559 for the nine months ended September 30, 2020 compared to $1,345 for the nine months ended September 30, 2019. The per unit increase was primarily driven by acquiring more vehicles from customers.

### Wholesale Vehicle Gross Profit

*Three months ended September 30, 2020 Versus* 2019. Wholesale vehicle gross profit increased by $11.5 million to $17.1 million during the three months ended September 30, 2020, compared to $5.6 million during the three months ended September 30, 2019. This was primarily due to an increase in wholesale units sold to 15,375 during the three months ended September 30, 2020 from 11,698 during the three months ended September 30, 2019 and an increase in wholesale vehicle gross profit per wholesale unit to $1,113 in the three months ended September 30, 2020 compared to $476 in the three months ended September 30, 2019 primarily driven by acquiring more vehicles from customers and strong wholesale market prices.

*Nine months ended September 30, 2020 Versus 2019.* Wholesale vehicle gross profit increased by $10.3 million to $25.9 million during the nine months ended September 30, 2020, compared to $15.6 million during the nine months ended September 30, 2019. This increase was driven primarily by an increase in wholesale vehicle gross profit per wholesale unit to $775 from $535, along with an increase in wholesale units sold to 33,406 from 29,155 in the nine months ended September 30, 2020, and 2019, respectively. The increase in number of wholesale vehicles sold and the improved gross profit per wholesale unit were primarily due to acquiring more vehicles from customers and strong wholesale market prices in the latter part of the 2020 period.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

47

*Components of SG&A*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| | | (in thousands) | | |
| Compensation and benefits [1] | $ 80,248 | $ 60,655 | $ 238,700 | $ 163,643 |
| 100k Milestone Gift | — | 2,903 | — | 6,506 |
| Advertising | 65,148 | 55,264 | 202,266 | 145,153 |
| Market occupancy [2] | 9,733 | 5,517 | 25,855 | 14,607 |
| Logistics [3] | 18,073 | 14,068 | 53,686 | 39,960 |
| Other [4] | 94,640 | 69,563 | 262,980 | 175,185 |
| Total | $ 267,842 | $ 207,970 | $ 783,487 | $ 545,054 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.
(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $59.9 million to $267.8 million, compared to $208.0 million during the three months ended September 30, 2020 and 2019, respectively. Selling, general, and administrative expenses increased by $238.4 million to $783.5 million, compared to $545.1 million during the nine months ended September 30, 2020 and 2019, respectively. The increase was partially due to an increase in compensation and benefits by $19.6 million and $75.1 million during the three and nine months ended September 30, 2020, respectively, which was primarily driven by expansion of our teams to support our growth. The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $9.9 million and $57.1 million during the three and nine months ended September 30, 2020, respectively, primarily due to an increase in number of markets. Market occupancy, logistics, and other expenses also increased during the three and nine months ended September 30, 2020 compared to the respective prior periods primarily due to an increase in number of markets and units sold. These increases were partially offset by efforts to decrease and balance discretionary spend as a result of the uncertain economic environment surrounding the COVID-19 pandemic.

*Interest Expense*

Interest expense decreased slightly by $0.7 million to $20.3 million, compared to $21.0 million during the three months ended September 30, 2020 and 2019, respectively, but increased $13.1 million to $69.1 million, compared to $56.0 million during the nine months ended September 30, 2020 and 2019, respectively. The increase over the nine month period is primarily due to the increase in the outstanding balance of the Senior Notes as a result of the issuance in May 2019 which incurred interest expense of $39.9 million and $31.0 million during the nine months ended September 30, 2020 and 2019, respectively. Both the three and nine month periods increased due to increased interest expense incurred on additional sale leaseback financing, which was offset by decreased interest expense on the Floor Plan Facility as a result of a lower outstanding balance.

*Other (Income) Expense, Net*

Other (income) expense, net changed by $10.0 million to income of $9.2 million compared to expense of $0.8 million during the three months ended September 30, 2020 and 2019, respectively. Other expense, net increased by $3.4 million to $5.1 million compared to $1.8 million during the nine months ended September 30, 2020 and 2019, respectively. The changes in the three and nine months ended September 30, 2020 compared to September 30, 2019 are primarily due to fair value adjustments on our retained beneficial interests in securitizations. During the first half of the nine-month period ended September 30, 2020, the fair value of these assets carried at fair value declined as a result of the uncertainty in the capital markets. During the second

48

half of the period, the fair value on our beneficial interests in securitizations increased as the economy appeared to rebound. This increase was partially offset by a $5.7 million loss on disposal of fixed assets during the nine months ended September 30, 2020 as a result of terminated construction projects due to the uncertain future economic environment surrounding COVID-19.

### *Income Tax Provision*

We recognized an income tax benefit of approximately $0.2 million during the nine months ended September 30, 2020 related to our wholly owned subsidiary, Car360. The benefit was recognized as a result of decreased subscription revenue from third parties, resulting in a net loss for the period.

### Non-GAAP Financial Measures

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA and EBITDA margin. We believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three and nine months ended September 30, 2020, there was approximately $0.0 million and $0.5 million, respectively, of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three and nine months ended September 30, 2019, there was approximately $4.4 million and $10.7 million, respectively, of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $1.5 million and $4.2 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences

49

in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2020 | | 2019 | | 2020 | | 2019 | |
| | (dollars in thousands) | | | | | | | |
| Net loss[1] | $ | (17,720) | $ | (92,244) | $ | (307,603) | $ | (238,899) |
| Depreciation and amortization expense | | 18,636 | | 10,675 | | 52,176 | | 27,505 |
| Interest expense | | 20,276 | | 20,990 | | 69,053 | | 55,953 |
| Income tax provision | | 76 | | — | | (162) | | — |
| EBITDA | $ | 21,268 | $ | (60,579) | $ | (186,536) | $ | (155,441) |
| | | | | | | | | |
| Total revenues | $ | 1,543,609 | $ | 1,094,854 | $ | 3,760,159 | $ | 2,836,309 |
| EBITDA Margin[2] | | 1.4 % | | (5.5)% | | (5.0)% | | (5.5)% |

(1) Includes $0.0 million, $4.4 million, $0.5 million, and $10.7 million respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.4%, 0.0%, and 0.4% respectively, related to the 100k Milestone Gift.

**Liquidity and Capital Resources**

*General*

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including the impact of COVID-19, our rate of revenue growth, our expansion into new markets, construction of IRCs and vending machines, and the timing and extent of our spending to support our technology and software development efforts.

We had the following liquidity resources available as of September 30, 2020 and December 31, 2019:

| | September 30, 2020 | December 31, 2019 |
|---|---|---|
| | (in thousands) | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 975,264 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 101,233 | 104,680 |
| **Committed liquidity resources available** | **$ 1,250,201** | **$ 459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $26.2 million and $29.7 million as of September 30, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.
(3) We have $197.7 million and $158.7 million of total unfunded gross real estate assets as of September 30, 2020 and December 31, 2019, respectively.

As of September 30, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1.9 billion and $1.6 billion, an outstanding balance of $127.0 million and $568.8 million, and unused capacity of $1.7 billion and $1.0 billion, respectively.

We also had $19.9 million and $137.7 million of committed funds for future construction costs of IRCs with unfinished construction as of September 30, 2020 and December 31, 2019, respectively.

In addition, we had $36.6 million and $13.5 million of total unpledged beneficial interests in securitizations as of September 30, 2020 and December 31, 2019, respectively.

On October 2, 2020, we issued $500.0 million principal amount of 5.625% Senior Notes due 2025 and $600.0 million principal amount of 5.875% Senior Notes due 2028 and used approximately $626.8 million of the proceeds to redeem in full the outstanding $600.0 million principal amount of our 8.875% Senior Notes due 2023 resulting in net proceeds of approximately $455.9 million.

As of September 30, 2020 and December 31, 2019, our outstanding principal amount of indebtedness, including finance leases, was $1.3 billion and $1.5 billion, respectively, summarized in the table below. See Note 9 — Debt Instruments and Note

51

15 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

| | September 30, 2020 | December 31, 2019 |
|---|---|---|
| | (in thousands) | |
| **Asset-Based Financing:** | | |
| Inventory | $ 109,981 | $ 515,487 |
| Finance receivables and beneficial interests | 93,349 | 138,335 |
| Transportation fleet[1] | 91,309 | 73,369 |
| Real estate[2] | 379,374 | 187,082 |
| Total asset-based financing | 674,013 | 914,273 |
| Senior unsecured notes[3] | 600,000 | 600,000 |
| Total debt | 1,274,013 | 1,514,273 |
| Less: unamortized premium and debt issuance costs[4] | (11,790) | (13,642) |
| **Total debt, net** | $ 1,262,223 | $ 1,500,631 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) As of both September 30, 2020 and December 31, 2019, Verde held $15.0 million of the Senior Notes.
(4) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other current assets and other assets on our consolidated balance sheets and not included here. The unamortized premium is presented as an increase to the carrying amount of the senior unsecured notes on our consolidated balance sheets.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the nine months ended September 30, 2020 and 2019:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2020 | 2019 |
| | (in thousands) | |
| Net cash used in operating activities | $ (446,704) | $ (434,675) |
| Net cash used in investing activities | (261,704) | (148,803) |
| Net cash provided by financing activities | 786,272 | 603,243 |
| Net increase in cash, cash equivalents and restricted cash | 77,864 | 19,765 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 196,323 | $ 108,474 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. For the nine months ended September 30, 2020, net cash used in operating activities was $446.7 million, an increase of $12.0 million compared to net cash used in operating activities of $434.7 million for the nine months ended September 30, 2019. The increase in our net cash used in operating activities was primarily due to increased net loss partially offset by changes in working capital.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $261.7 million and $148.8 million during the nine months ended September 30, 2020 and 2019,

respectively, an increase of $112.9 million. The increase primarily relates to the increase in purchases of property and equipment, specifically related to the construction of new IRCs and vending machines. Constructing new IRCs and vending machines allows us to recondition more vehicles and reach additional customers. To finance these investments we have entered into various financing transactions, such as sale-leasebacks.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $786.3 million and $603.2 million during the nine months ended September 30, 2020 and 2019, respectively, an increase of $183.0 million. The change primarily relates to increased proceeds from the issuances of Class A common stock, offset by decreased net proceeds from short-term revolving facilities and long-term debt.

### Contractual Obligations and Commitments

On October 2, 2020, we issued $500.0 million in aggregate principal amount of 5.625% senior unsecured notes due October 1, 2025 (the "2025 Notes") and $600.0 million aggregate principal amount of 5.875% senior unsecured notes due October 1, 2028 (the "2028 Notes" and, collectively, the "Notes"). The interest on the Notes is payable semi-annually on April 1 and October 1 of each year, beginning on April 1, 2021. We used approximately $626.8 million of the proceeds from issuance to redeem in full the $600.0 million aggregate principal amount of our Senior Notes due 2023.

Other than as noted above, we have not entered into any material contractual obligations or commitments outside of the ordinary course of business since the most recently ended fiscal year as disclosed in the header "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our most recent Annual Report on Form 10-K.

### Fair Value Measurements

We report money market securities, certain receivables, and beneficial interests in securitizations at fair value. See Note 17 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

### Off-Balance Sheet Arrangements

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivables by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 8 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

Except as discussed above, we did not have any off-balance sheet arrangements as of September 30, 2020.

### Critical Accounting Policies

Refer to Note 2 — Summary of Significant Accounting Policies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for accounting pronouncements and material changes to our critical accounting policies since December 31, 2019. There have been no other material changes to our critical accounting policies and use of estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

## FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the effect and consequences of the COVID-19 public health crisis on matters including U.S. and local economies; our business operations and continuity; the availability of corporate and consumer financing; the health and productivity of our employees; the ability of third-party providers to continue uninterrupted service; and the regulatory environment in which we operate;

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime and its affiliates;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our ability to sell and generate gains on the sale of automotive finance receivables;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the Internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

55

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indenture governing our senior unsecured notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Controls Over Financial Reporting

There were no changes to our internal control over financial reporting that occurred during the three months ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

### ITEM 1A. RISK FACTORS

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K and in our Quarterly Reports on Form 10-Q filed May 6, 2020 and August 5, 2020. As we disclosed in our Form 10-Q filed May 6, 2020 and August 5, 2020:

*The COVID-19 pandemic is adversely affecting, and could continue to adversely affect, our business, operating results, financial condition and prospects.*

COVID-19 was identified in China in late 2019 and has spread globally. The rapid spread has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders and shutdowns. These measures have impacted and may further impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. While the federal and state governments have taken measures to try to contain the COVID-19 pandemic, there is considerable uncertainty regarding such measures and potential future measures. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business and have a material adverse effect on our business, operating results, financial condition and prospects. There is no certainty that measures taken by governmental authorities will be sufficient to mitigate the risks posed by the COVID-19 pandemic, and our ability to perform critical functions could be harmed.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty, and has led to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. The COVID-19 pandemic has caused an economic slowdown, and it is possible that it could cause a global recession. Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further risks related to negative economic conditions are described in our risk factor titled "Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues." under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019.

The ultimate magnitude of COVID-19, including the extent of its impact on our financial and operational results, which could be material, will be determined by the length of time that the pandemic continues, its effect on the demand for our vehicles, our inventory supply chain and distribution, and the capital markets, as well as the effect of governmental regulations imposed in response to the pandemic. We cannot at this time predict the impact of the COVID-19 pandemic, but it could continue to have a material adverse effect on our business, operating results, financial condition and prospects.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Recent Sales of Unregistered Securities

There were no unregistered sales of equity during the nine months ended September 30, 2020, except as otherwise previously reported.

57

During the nine months ended September 30, 2020, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged approximately 1.8 million LLC Units and approximately 0.0 million shares of Class B common stock for approximately 1.4 million newly-issued shares of Class A common stock. These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

58

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 4.1 | Indenture, dated October 2, 2020 (incorporated by reference to Exhibit 4.1 to Carvana's Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.2 | Indenture, dated October 2, 2020 (incorporated by reference to Exhibit 4.2 to Carvana's Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 10.1* | Second Addendum to the Master Dealer Agreement, effective August 31, 2020 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC, filed herewith. |
| 10.2* | Twelfth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated September 29, 2020, filed herewith. |
| 10.3* | Second Amendment to the Amended and Restated Inventory Financing and Security Agreement, dated September 29, 2020, filed herewith. |
| 10.4 | Fifth Amended and Restated Limited Liability Company Agreement, dated October 2, 2020 (incorporated by reference to Exhibit 10.1 to Carvana's Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

* Certain portions of the exhibit (indicated by "[***]") have been omitted as the Registrant has determined (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

59

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:     October 29, 2020

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins

Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

60



**Dealer Agreement Second Addendum
Dealer Profit Sharing Program**

SilverRock

**Exhibit 10.1**

**Effective 8/31/2020 this Dealer Agreement Second Addendum ("Second Addendum") attaches to, supersedes, and replaces the Dealer Agreement Addendum Dealer Profit Sharing Program and becomes a part of the Dealer Agreement ("Agreement") previously entered into between SilverRock Automotive, Inc. and SilverRock Automotive of Florida, Inc. (Collectively "SilverRock Automotive" or "Company") and Carvana, LLC ("Dealer").**

Whereas the parties wish to amend the Agreement for the Dealer's participation in the Dealer Profit Sharing Program ("Program").

Now therefore, in consideration of the agreements contained herein to be mutually kept and performed, the parties agree to the following:

**Definitions**: The capitalized terms used herein shall have the following meanings:

a. **Calculation Date:** The last day *of the month for February, May, August, and November*, on which Underwriting Profit calculations will be performed each year this Addendum is in effect.
b. **Calendar Year Pool:** Qualifying Contracts sold between January 1 and December 31 of each year, including any contracts in such period that the Dealer issued and which the Company is the obligor either directly or through risk transfer.
c. **Claims**: The total cost of vehicle repairs, benefits, and loss adjustment expenses which have been paid or approved under the terms of Qualifying Contracts.
d. **Cumulative Profit Share Distributions:** The sum of all Profit Share Distributions prior to the applicable Calculation Date.
e. Gross Reserve Written: The sum of Reserve written at time of contract origination for Qualifying Contracts.
f. **Net Earned Reserve**: The amount of the Reserve, less any Qualifying Contract cancellation refunds, related to the portion of Claims expected to occur during a specific period of time during the term of a Qualifying Contract.
g. **Inception-to-Date**: Is the period of time between the effective date of a Qualifying Contract and the Calculation Date.
h. **Loss Ratio**: Claims divided by Net Earned Reserves, expressed as a percentage, as of the Calculation Date.
i. **Profit Share Distribution:** The amount of Underwriting Profit that Dealer is returned on each Payment Date, calculated per the formula below as of the applicable Calculation Date:
   a. **("Underwriting Profit")** less ("**Cumulative Profit Share Distributions")** less [("**Reserve Factor**") multiplied by ("**Reserve**")]
j. **Reserve Factor:** Factor applied to Reserve at each respective calculation date.
k. **Payment Date**: The last day of the month immediately following the Calculation Date on which any amounts due under this Second Addendum will be paid.
l. **Qualifying Contracts**: Company service contracts with terms of twelve (12) months or longer which were sold by Dealer pursuant to the Dealer Agreement and which have not been cancelled and fully (100%) refunded, in addition to those service contracts sold prior to the Dealer Agreement which have subsequently been transferred to the Company as obligor and which have not been cancelled and fully (100%) refunded.

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.



**Dealer Agreement Second Addendum**
**Dealer Profit Sharing Program**

m. **Reserve**: Dollar amounts, calculated as of each applicable Calculation Date, determined by Company using relevant historical loss experience, which have been set aside for the payment of Claims.

n. **Underwriting Profit:** Amount by which Net Earned Reserve exceeds Claims and taxes or fees for Qualifying Contracts calculated on an inception to date basis.

o. **Underwriting Loss**: Amount by which Claims, taxes and fees exceed Net Earned Reserve for Qualifying Contracts.

**Program Terms and Qualification:**

a. **Profit Share Distribution:** The Parties agree to calculate and process the Profit Share Distribution, **("Underwriting Profit")** less ("**Cumulative Profit Share Distributions")** less [("**Reserve Factor**") multiplied by ("**Reserve**")],in accordance with the applicable Calculation Dates and Payment Dates.

   The "Reserve Factor" and "Reserve" applied to the above Profit Share Distribution may be allocated into Calendar Year Pools as follows:
   - If any Calendar Year Pool maintains a Loss Ratio below [***] as of the Calculation Date, the Reserve Factor for such Calendar Year Pool will be [***] and applied to all outstanding Reserve. For each Calendar Year Pool that maintains a Loss Ratio of greater than [***] as of the Calculation Date, each 1% increase in loss ratio, rounded to the nearest one, above [***] will increase the [***] Reserve Factor applied to such Calendar Year Pool by 1%.
   - If Gross Reserve Written in the most recent Calendar Year Pool decreases by more than 40% from the trailing calendar year, the base reserve factor will increase from [***] to [***].

b. A negative Profit Share Distribution Calculation does not require a payment from Dealer to Company. Profit Share Distributions shall only flow from Company to Dealer.

c. The First remittance of Profit Share Distribution, if applicable, shall be made to Dealer on the Payment Date following the first Calculation Date.

d. This Second Addendum terminates automatically upon termination of the Dealer Agreement.

e. This Second Addendum can be terminated by either party with ninety (90) days' prior written notice.

f. This Second Addendum terminates automatically upon any of the following acts by Dealer: fraud or intentional misconduct against Company, filing for bankruptcy, insolvency, assignment for benefit of creditors or any act of similar or like nature.

g. Upon termination, all Profit Share Distribution payments on existing Calendar Year Pools will continue to be paid to the Dealer according to the terms and qualifications above until the total Underwriting Profit or Underwriting Loss is fully realized.

h. Nothing in this Second Addendum changes the Parties' existing obligations under the Agreement.

i. Company has the right to offset Profit Share payments under this Addendum by any amounts Dealer owes to Company under the Agreement.

[***] Redacted for confidentiality purposes.

 **Dealer Agreement Second Addendum**
**Dealer Profit Sharing Program**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

| SilverRock: | Dealer: |
|---|---|
| **SilverRock Automotive, Inc.** | **Carvana, LLC** |
| **SilverRock Automotive of Florida, Inc.** | 1930 W Rio Salado Pkwy |
| 1720 W Rio Salado Pkwy | Tempe, AZ 85281 |
| Tempe, AZ 85281 | |
| Signature: /s/ Erik Rasmussen | Signature: /s/ Matt Dundas |
| *Authorized Representative of SilverRock* | *Authorized Representative of Dealer* |
| Name: Erik Rasmussen | Name: Matt Dundas |
| Title: Sr. Managing Director | Title: Director, Finance |
| Date: 9/28/2020 | Date: 9/28/2020 |

**Exhibit 10.2**

**TWELFTH AMENDMENT**

TWELFTH AMENDMENT, dated as of September 29, 2020 (this "<u>Amendment</u>") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, by the Eighth Amendment, effective as of March 24, 2020, by the Ninth Amendment, effective as of April 29, 2020, by the Tenth Amendment, effective as of May 19, 2020 and by the Eleventh Amendment, effective as of June 30, 2020 (the "<u>Master Purchase and Sale Agreement</u>"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "<u>Transferor</u>"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "<u>Purchaser</u>"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "<u>Purchaser</u>" and, together with Ally Bank, the "<u>Purchasers</u>").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 <u>Amendments to Appendix A (Definitions)</u>. <u>Appendix A</u> to the Master Purchase and Sale Agreement is hereby amended by:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

(a) revising the "Commitment Amount", "Flex Receivable", and "Purchase Percentage" definitions and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Commitment Amount", "Flex Receivable", and "Purchase Percentage" definitions:

""Commitment Amount" means the sum of (i) $3,000,000,000 $2,000,000,000 plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool.

"Flex Receivable" means either (x) a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including May 31, 2020 (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller, noting that for the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable, or (y) a Receivable sold on either June 30, 2020 or September 29, 2020 and listed on Schedule 10 to the Second Step Pool Supplement dated as of June 30, 2020 or Schedule 10 to the Second Step Pool Supplement dated as of September 29, 2020, respectively.

"Purchase Percentage" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than 100%, other than during the period from October 1, 2020 through November 14, 2020 when the Purchase Percentage will be 0%, and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase

Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply."

Section 2.02 <u>Amendments to Section 2.1(a) (Transferor Obligation)</u>. <u>Section 2.1(a)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) <u>Transferor Obligation</u>. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the periods from January 4, 2019 to February 9, 2019 <u>and October 1, 2020 through November 14, 2020 (provided, however, that the Transferor may elect to sell a Receivables Pool during any calendar week from October 1, 2020 through November 14, 2020)</u>, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100%<u>, other than during the period from October 1, 2020 through November 14, 2020 when the Purchase Percentage will be 0%,</u> (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%<u>, other than during the period from October 1, 2020 through November 14, 2020 when the Purchase Percentage will be 0%,</u>) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "<u>Transferor Obligation</u>"); provided, further, notwithstanding the maximum FICO score described in <u>clause (xxxiv)</u> in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in <u>clause (xxxiv)</u> thereof) originated during the related Origination Period; <u>provided further</u> that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not

3

more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020 or September 29, 2020 shall not be deemed to be a Flex Receivable."

Section 2.03 <u>Amendments to Section 2.1(b) (Purchaser Obligation)</u>. <u>Section 2.1(b)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Purchaser Obligation</u>. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019 <u>and October 1, 2020 through November 14, 2020 (provided, however, that the Purchasers may elect, in their sole discretion to purchase a Receivables Pool during any calendar week from October 1, 2020 through November 14, 2020)</u>, on each Closing Date designated by the Transferor pursuant to Section 4.1(a); <u>provided</u> that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "<u>Purchaser Obligation</u>"). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020 <u>or September 29, 2020</u> shall not be deemed to be a Flex Receivable."

Section 2.04 <u>Amendments to Section 6.2(a) (Aggregate Purchase Commitment)</u>. The last sentence of <u>Section 6.2(a)</u> of the Master Purchase and Sale Agreement is hereby amended by inserting each of the following terms which are double underlined in the place where such term appears below:

Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 6.2(a), any Receivable sold on June 30, 2020 <u>or September 29, 2020</u> shall not be deemed to be a Flex Receivable.

[***] Redacted for confidentiality purposes.

4

Section 2.05 <u>Amendments to Section 6.2(b) (Minimum Sales Amount)</u>. <u>Section 6.2(b)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than 100%, <u>other than during the period from October 1, 2020 through November 14, 2020 when the Purchase Percentage will be 0%,</u> (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of 100%, <u>other than during the period from October 1, 2020 through November 14, 2020 when the Purchase Percentage will be 0%,</u>) of the aggregate principal balance of weekly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers."

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto; and

(b) a signed copy of the Tenth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Representations and Warranties</u>. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the

<div align="center">5</div>

same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

6

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

<div style="margin-left:45%;">

CARVANA AUTO RECEIVABLES 2016-1 LLC,
    as Transferor

By:    /s/ Paul Breaux
    Name: Paul Breaux
    Title: Vice President & Secretary


ALLY BANK,
    as Purchaser

By:    /s/ William R. Thompson
    Name: William R. Thompson
    Title: Authorized Representative


ALLY FINANCIAL INC.,
    as Purchaser

By:    /s/ Thomas Elkins
    Name: Thomas Elkins
    Title: Authorized Representative

</div>

Agreed to and Accepted by:

CARVANA, LLC,
    as Seller

By:    /s/ Paul Breaux
Name:    Paul Breaux
Title:    Vice President & Secretary

**Exhibit 10.3**

**SECOND AMENDED AND RESTATED INVENTORY FINANCING AND SECURITY AGREEMENT**

### I. THE PARTIES TO THIS AGREEMENT

This Second Amended and Restated Inventory Financing and Security Agreement ("Agreement") is effective as of October 1, 2020, and is made by and among the following parties:

A. **Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey)**, a Utah state-chartered bank (together with its successors and assigns, "Bank"), with a local business office located at 5851 Legacy Circle, Suite 200, Plano, Texas 75024; and

B. **Ally Financial Inc.**, a Delaware entity ("Ally") with a local business office located at 5851 Legacy Circle, Suite 200, Plano, Texas 75024 (together with Bank, the "Ally Parties" and Bank and Ally each being, an "Ally Party"); and

C. **Carvana, LLC**, an Arizona limited liability company, with its principal executive office currently located at 1930 W Rio Salado Parkway, Tempe, Arizona 85281 ("Dealership").

### II. THE RECITALS

The essential facts relied on by Bank, Ally and Dealership as true and complete, and giving rise to this Agreement, are as follows:

A. From time to time, Dealership has and/or intends to acquire one or more Vehicles (defined below) from one or more manufacturer, distributor, dealers, auctioneer, merchant, customer, broker, seller, or other supplier ("Vehicle Seller(s)"), for the principal purpose of selling or leasing them to retail customers in the ordinary course of business.

B. To enable Dealership to acquire Vehicles and hold them in inventory, Dealership wants the Ally Parties to provide Dealership with wholesale inventory floorplan finance accommodations by i) advancing the purchase price of the Vehicles directly to the Vehicle Sellers; ii) advancing funds to other third parties who are not Vehicle Sellers; or iii) by loaning money directly to Dealership for Vehicles that were previously purchased from Vehicle Sellers by Dealership ("Inventory Financing"). (Vehicles acquired with or held as a result of Inventory Financing may be referred to as "Inventory Financed Vehicles.")

C. Bank is willing to provide Dealership with Inventory Financing in accordance with all of the provisions of this Agreement.

D. Ally is willing to provide Dealership with Inventory Financing in accordance with all of the provisions of this Agreement.

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

E.  The Inventory Financing will be governed by the terms of this Agreement. Accordingly, this Agreement sets forth the rights and duties between Bank and Dealership and between Ally and Dealership concerning Inventory Financing, including establishment of a credit line by which inventory financing advances will be made by either or both of the Ally Parties, payment of principal, interest, and other charges, the grant of security interests in collateral, and other terms and conditions. Before execution, each party has carefully read this Agreement and each related document and has consulted with or had an opportunity to consult with an attorney.

III. <u>THE AGREEMENT</u>

In consideration of the premises and the mutual promises in this Agreement, which are acknowledged to be sufficient, Bank, Ally and Dealership agree to the following:

A. <u>Inventory Finance Accommodations</u>.

1.  <u>Definition of "Vehicle"</u>. As used in this Agreement, "Vehicle" means an automobile, van, or light duty truck that is not manufactured for a particular commercial purpose. Notwithstanding anything to the contrary in this Agreement or otherwise, Inventory Financing is available only for a Vehicle that can be registered for use on public highways, and is not a vehicle that is titled outside the United States or has been previously titled outside the United States, in each case:

    (a) of the then-current model year, or eleven previous model years,

    (b) having fewer than 150,000 miles,

    (c) that Dealership has purchased for at least $1,500,

    (d) for which such Dealership has received the title and purchase documentation,

    (e) that has not been purchased by Dealership for the use of its employees,

    (f) that is not subject to a current arbitration proceeding between the purchaser and the Dealership with respect to the sale of such vehicle, and

    (g) that is not subject to an existing consumer lease from Dealership or an affiliate of Dealership.

2. <u>Establishment of a Committed Inventory Financing Credit Line</u>. Subject to the terms and conditions of this Agreement,

    (a) Each of the Ally Parties commits to provide Inventory Financing to Dealership until the Maturity Date (as defined below). Before the Maturity Date, Dealership may request the Ally Parties to extend this commitment, and the Ally Parties, in their sole discretion, may extend this commitment.

2

(b) The sum of all Inventory Financing by each Ally Party, plus any obligation of each Ally Party to make specific advances to a Vehicle Seller or other party, constitutes a single obligation of Dealership to such Ally Party. The sum of all Inventory Financing plus the sum of all obligations of both of the Ally Parties to make specific advances to Vehicle Sellers or other parties constitutes the Dealership's "Wholesale Outstandings."

(c) The "Maturity Date" shall be <u>March 31, 2023</u>.

3. <u>Amount of the Credit Line</u>. The aggregate amount of credit available pursuant to this Agreement (the "Credit Line") is <u>$1,250,000,000.00</u>.

4. <u>Advance</u>. The advance rate for Inventory Financing, is as follows:

(a) Auction and rental Vehicles: initially funded within 30 calendar days of purchase, [***]% of:
(i.) the purchase price of such Vehicle, plus
(ii.) fees charged by an auction in connection with the purchase of such Vehicle, plus
(iii.) post-sale inspection fees in connection with the purchase of such Vehicle.

The Ally Parties have no obligation to advance any amount for costs related to transportation or labor with respect to a Vehicle.

(b) Trade-in Vehicles and Vehicles purchased directly from customers and any amounts initially funded for an Auction or rental Vehicle after 30 calendar days from the purchase date: [***]% of acquisition cost of such Vehicles.

(c) Any amounts re-borrowed under the Credit Line against a Vehicle after repayment of the initial advance: [***]% of the principal balance amount that was repaid on the immediately prior pay-off of such Vehicle.

5. <u>Method of Providing Inventory Financing</u>. The Credit Line must be used exclusively for Inventory Financing in any of the following ways:

(a) <u>Advances Directly to Vehicle Sellers</u>. From time to time, upon notice from Dealership or Vehicle Sellers, either or both of the Ally Parties may advance money directly to Vehicle Sellers for Vehicles acquired or proposed to be acquired by Dealership as Inventory Financed Vehicles. The Ally Parties will make payment in accordance with and in reliance on any invoice, draft, debit, contract, advice or other communication received by the Ally Parties from the Vehicle Seller. The Ally Parties are not required to verify the order or shipment of any Vehicle for which it pays a Vehicle Seller and are not responsible for any nonconformity of the Vehicle, delivery, or transaction between Dealership and a Vehicle Seller. If requested, Dealership will promptly provide invoices, bills of sale, title other transaction documents pertaining to such Vehicles.

[***] Redacted for confidentiality purposes

3

(b) <u>Advances Directly to or on behalf of Dealership</u>. From time to time, either or both of the Ally Parties may advance money directly to Dealership or to other third parties who are not Vehicle Sellers on behalf of Dealership to finance Vehicles then owned or proposed to be acquired by Dealership. The amount that will be advanced to or on behalf of Dealership for the Vehicles will be determined in accordance with Subsection III.A.4 above. Upon request by either or both of the Ally Parties, Dealership must provide the Ally Parties with satisfactory evidence of the value, ownership, and title status of the Vehicle(s), including the manufacturer's certificate of origin or title certificate (original or valid copy), invoice or bill of sale, and the shipping receipt, bill of lading, and the like.

6. <u>Evidence of Inventory Financing</u>. The Ally Parties will maintain on their books and records in accordance with their usual practices, one or more accounts detailing the Inventory Financing, Wholesale Outstandings, and all Interest, Principal Reductions, net settlements (as described in Section III.C.4 below), Other Charges and any other related fees, costs, expenses, and payments owed by Dealership. From time to time, ordinarily monthly, the Ally Parties will furnish Dealership with statements of its account information ("Wholesale Billing Statement"). If only one Wholesale Billing Statement is provided by the Ally Parties, the Wholesale Billing Statement will indicate (by account number or otherwise) the Inventory Financing provided by each of the Ally Parties. Unless Dealership advises the Ally Parties in writing of any discrepancy on the Wholesale Billing Statement within ten (10) calendar days of receipt, and absent manifest error, the Wholesale Billing Statement will be deemed acknowledged and agreed to by Dealership and conclusive proof of Dealership's actual obligation to each of the Ally Parties as of the date of the Wholesale Billing Statement last received by Dealership.

7. <u>Other Financing Accommodations</u>. Upon Dealership's request, either or both of the Ally Parties may provide other forms of finance and / or credit accommodations which arise out of or relate to the business operations of Dealership and / or any of its owners, officers, or affiliates, including, without limitation, the discount purchase of retail installment sale and lease agreements, working capital, revolving credit, equipment, and realty loans (such accommodations from either of the Ally Parties being, the "Other Financing Accommodations"). The availability, amount, terms, conditions, provisions, continuation, documentation, and administration of Other Financing Accommodations are separate and distinct from the Inventory Financing under this Agreement and may be provided, if at all, only according to the terms and conditions of the written agreement between such Ally Party and Dealership. If Dealership requests additional Inventory Financing beyond the aggregate amount of the Credit Line stated in Subsection III.A.3 above, and the Ally Parties decline the request, then Dealership and the Ally Parties will negotiate in good faith to restructure the credit and collateral arrangements this Agreement to facilitate Dealership's efforts to obtain the additional financing from another financial institution.

B. <u>Interest, Principal Reductions, Late Charges, Costs, Expenses and Other Charges and Fees</u>.

4

1. <u>Interest Accrual, Rate, and Method of Calculation</u>. Wholesale Outstandings owed to the Ally Parties will bear interest on and from the day after each advance or loan through the date of repayment in full. Interest will be at a per annum rate and will be determined using a 365/360 simple interest method of calculation, unless expressly prohibited by law ("Interest"). The Interest rate is 1-M LIBOR Index Rate* plus an "Increment" of 315 basis points.

   The 1-M LIBOR Index Rate in effect for a monthly billing period is defined as the arithmetic mean of the 1-Month LIBOR Rate for the calendar days from and including the 26th of the calendar month which is two months prior to the applicable monthly billing period and ending with the 25th of the month immediately preceding the applicable monthly billing period ("Measurement Period"). The 1-Month LIBOR Rate applicable to any day on which no rate is published will be the rate last quoted prior to such day. The "1-Month LIBOR Rate" is defined as: The per annum rate of interest for one month deposits in U.S. Dollars for each day of the Measurement Period that appears on the Bloomberg screen US0001M Index (London Interbank Offered Rate administered by the British Bankers' Association, New York Stock Exchange Euronext or other successor administrator for LIBOR) at approximately 11:00 a.m. London time, or if such source becomes unavailable or there is no such successor, the per annum rate of interest for one month deposits in U.S. Dollars for each day of the Measurement Period obtained from such other commercially available source providing quotations of LIBOR as Ally Bank may designate.

   *The parties acknowledge that London Interbank Offered Rate ("LIBOR") may be phased out in the future. In the event that the Ally Parties will no longer utilize a LIBOR-based rate for this Credit Line, the "1-M LIBOR Index Rate" will be re-defined as the successor base or reference rate applicable to this Credit Line designated by the Ally Parties in their reasonable discretion. In such event, the Increment may also be adjusted by the Ally Parties so that the total interest rate paid by the Dealership immediately after the conversion from the LIBOR-based rate will approximate the total interest rate paid by the Dealership immediately prior to the conversion. The Dealership will be notified of these changes, which will be made without requiring the necessity of an amendment to this Agreement.*

2. <u>Maximum Interest</u>. In no event will Interest owed to either or both of the Ally Parties under this Agreement exceed the maximum rate of interest allowed by law in effect at the time it is assessed. Each of the Ally Parties and Dealership intend to faithfully comply with applicable usury laws, and this Agreement is to be construed in accordance with this intent. If circumstances cause the actual or imputed interest contracted for, charged, or received by either or both of the Ally Parties to be in excess of the maximum rate of interest allowed by law, Dealership must promptly notify the affected Ally Party(ies) of the circumstance, and such Ally Party(ies) will either, at their sole discretion, refund to Dealership, or credit the Wholesale Outstandings owed by Dealership to such Ally Party(ies), with so much of the imputed interest as will reduce the effective rate of interest to an amount one-tenth of one per cent (0.10%) per annum less than the maximum rate of interest allowed by law for the applicable period.

3. <u>Principal Reductions</u>. Dealership must pay a monthly principal reduction of 10% of the original principal amount (each a "Principal Reduction") for each Vehicle on Dealership's floorplan for more than 180 days (regardless of repayment and re-borrowing) until the outstanding principal amount for that Vehicle is reduced to lesser of 50% of the original principal amount or 50% of the clean wholesale value. Principal Reductions may be billed to Dealership and will reduce the amount of the Wholesale Outstandings when paid by Dealership. Any change in the Principal Reductions required by either or both of the Ally Parties will not constitute an amendment to this Agreement.

4. <u>Late Charge</u>. Unless prohibited by law, each of the Ally Parties may assess a late charge of up to five percent (5%) of any amount owed to such Ally Party(ies) that is not paid when due and payable after giving effect to applicable grace periods ("Late Charge"). The Late Charge is in addition to Interest.

5. <u>Costs, Expenses, Fees</u>. Unless prohibited by law, Dealership must pay all expenses and reimburse each of the Ally Parties for any cost, expense, or other expenditures, including reasonable attorney fees and legal expenses; amounts expended by the Ally Parties on behalf of Dealership; collection and bankruptcy costs, fees and expenses; and all other amounts incurred by each of the Ally Parties in the enforcement of any right or remedy, collection of any Obligation (as defined in Subsection III.D.2, below), or defense of any claim or action in respect of this Agreement.

6. <u>Other Charges and Fees</u>. The Ally Parties may assess and Dealership will pay charges in connection with Inventory Financing in the areas of audit, collateral monitoring, non-compliance, and returned item ("Other Charges"). Provided no Default has occurred, the Ally Parties will provide advance notice of at least 30 calendar days of new charges or changes to existing charges.

7. <u>Commitment Fee</u>. Simultaneously with the signing of this Agreement, Dealership will pay to the Ally Parties a "Commitment Fee" in the amount of $[***].

8. <u>Availability Fee</u>. For each calendar quarter beginning with the fourth quarter of 2020 (i.e., October through December, 2020), Dealership will pay an "Availability Fee" equal to [***] times the difference between the average outstanding floorplan balance for such quarter and the Credit Line amount. The Availability Fee will be calculated by the Ally Parties promptly after the end of each quarter and will be due and payable no later than the end of the month immediately following the end of such quarter.

C. <u>Payments by Dealership</u>.

1. <u>Permissive Principal Payments</u>. Except as otherwise expressly stated in this Agreement, Dealership may pay to the Ally Parties some or all of the Wholesale Outstandings and any other payment obligations at any time before they are due and payable without premium or penalty.

[***] Redacted for confidentiality purposes

6

2. <u>Required Payments</u>. Dealership must fully, promptly, and faithfully pay to the Ally Parties the Wholesale Outstandings, Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees and any other payment obligations due under this Agreement, as follows:

    (a) the principal amount of the advance or loan by the Ally Parties for each Inventory Financed Vehicle as and when such Vehicle is sold, leased, consigned, gifted, exchanged, transferred, otherwise disposed of, registered, placed into service, or no longer in the possession of the Dealership, or if it is otherwise lost, stolen, confiscated, missing, or otherwise not received, or if it is damaged or destroyed; and

    (b) the total amount specified in the Wholesale Billing Statement or other billing statements for Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees and any other payment obligations, immediately upon receipt from the Ally Parties.

3. <u>Method of Payment</u>. All payments must be made by Dealership to the Ally Parties by one or more of the following methods: (i) in good funds by draft, check, or other negotiable instrument, (ii) in good funds by wire transfer, electronic fund transfer, automated clearing house transfer, or other electronic means, or (iii) chattel paper assigned to one of the Ally Parties that is acceptable to such Ally Party in its sole discretion. Upon request by either or both of the Ally Parties, Dealership must make all payments to such Ally Party(ies) in immediately available funds, certified check, bank check, and the like. Dealership must remit all payments owed to Ally and Bank under this Agreement to Ally at the local business office set forth in Section I.A above, or any other place as each of the Ally Parties designates from time to time.

4. <u>"Full" Payment Defined</u>. The requirement for making payments "fully" as set forth in this Agreement means that the required payment amount must be either actually remitted to and received by the Ally Parties in whole, without setoff or recoupment, or credited by either of the Ally Parties or any affiliate of either of the Ally Parties in accordance with the SmartCash Agreement among the Ally Parties and Dealership. This does not include funds actually received by the Ally Parties from or on behalf of Dealership for specific application to a required payment by way of:

    (a) subvention, discount, subsidy, support, or supplementation from a Vehicle Seller; or

    (b) credit, rebate, bonus, debit, disbursement, or other payment from either of the Ally Parties or any other person for the purchase of chattel paper, distribution from finance reserve accounts, application of account balances, and the like.

    Absent payment actually being remitted by Dealership to the Ally Parties or actually credited by either of the Ally Parties or any of their affiliates, payment is not "fully" made because either or both of the Ally Parties have:

(a) a right of setoff, recoupment, and the like;

(b) a Security Interest in or an assignment of Collateral (each as defined in Section III. D. below), or the proceeds thereof; or

(c) a direct or indirect claim against a Vehicle Seller, surety, guarantor, or any other person.

Dealership's obligation to pay each of the Ally Parties as set forth in this Agreement is independent of any other rights that Dealership or either of the Ally Parties may have to effect payment from other sources and persons, and neither of the Ally Parties has any duty to undertake the enforcement of any other rights.

5. "Prompt" Payment Defined. Except as otherwise provided herein, the requirement for making payments "promptly" as set forth in this Agreement means that the required payment amount must be tendered to the Ally Parties within five (5) business days.

(a) Release Period. In their sole discretion, either or both of the Ally Parties may permit more time between the event and payment due date to take into account factors such as delays in the administration, processing, and delivery of the payments ("Release Period"). The Release Period is available only for payments required under Subsection III.C.2.(a) above. The existence, duration, terms, and continuation of the Release Period are subject to change from time to time by each of the Ally Parties. Changes in the Release Period by the Ally Parties do not constitute amendments of this Agreement.

Consistent with the foregoing, the following provisions will apply to the Release Period as of the effective date of this Agreement:

i. With respect to vehicles sold by Carvana pursuant to a retail installment contract that becomes subject to the so-called "Flow Purchase" or "Warehouse Financing" credit facilities between the Ally Parties and Carvana and/or its affiliates, Carvana may make payment to the Ally Parties under Section III.C.2(a) on or before the earlier of one business day after the Ally Parties fund Carvana (or its affiliate) under the so-called "Part A" or "Part B" facility, or 15 business days after the date of sale;

ii. With respect to vehicles sold by Carvana pursuant to a retail installment contract, other than as described above in Section III.C.5(a)(i), Carvana may make payment to the Ally Parties under Section III.C.2(a) on or before the earlier of: two business days after Carvana (or its affiliate) is funded, or 15 business days after the date of sale;

8

      iii.    In all other circumstances, Carvana may make payment to the Ally Parties under IFSA Section III.C.2(a) on or before five business days after the date of sale; and

      iv.    The Ally Parties reserve the right to adjust, increase or decrease these periods in the future, in their discretion with notice to Dealership of at least five business days prior to the effect of such adjustment, increase or decrease.

6. <u>"Sold" Defined</u>. "Sold" as set forth in this Agreement means the delivery or transfer of ownership, title or interest in the property by Dealership to a third party (whether an affiliate or non-affiliate of Dealership).

7. <u>Source and Application of Payment</u>. The source of all payments due under this Agreement is presumptively deemed to be Collateral (as defined in III.D.1, below). Absent Default (as defined in Section III.H. below), the Ally Parties will apply payments pursuant to Dealership's instructions. Absent instruction from Dealership or in the event of Default, the Ally Parties will apply payments against any obligation due and owing by Dealership under this Agreement or other Financing Accommodations. A payment is not final to the extent of any defeasance of it by application of law. Payment made by check, draft, or other instrument will be deemed made by Dealership not later than one (1) business day after the instrument is accepted by the payor bank. Except as otherwise provided in any SmartCash Agreement between Dealership and either or both of the Ally Parties, payments made by wire transfer, electronic fund transfer, automated clearing house transfer, and other electronic means will be deemed made by Dealership upon posting of such payment by the Ally Parties.

D. <u>The Ally Parties' Security Interests</u>.

1. <u>Grant of Security Interest</u>. Dealership hereby grants to each of Bank and Ally a continuing security interest in and a collateral assignment of ("Security Interest") all of the following described property in which Dealership has or may have any rights, wherever located, whether now existing or hereafter arising or acquired and any and all accessions, additions, attachments, replacements, substitutions, returns, profits, and proceeds in whatever form or type, of any of the property ("Collateral"):

      all Vehicles, including but not limited to those for which either of the Ally Parties provides Inventory Financing; accounts; general intangibles; and chattel paper.

2. <u>The Obligations Secured</u>. The Collateral secures payment and performance of all debts, obligations, and duties of Dealership to Bank and Ally of every kind and description, now existing or hereafter arising under this Agreement, whether primary or secondary, absolute or contingent, due or to become due, direct or indirect, presently contemplated or not contemplated by Bank, Ally or Dealership, or otherwise designated by the parties as secured or unsecured ("Obligations").

9

3. <u>Status of Collateral</u>. The Collateral is held by Dealership in trust for each of the Ally Parties. The Collateral must be and remain free from all confiscations, assessments, forfeitures, loss, destruction, impairment, tax liens and other liens, security interests, pledges, claims, and encumbrances except for:

    (a) the Security Interest arising under this Agreement, or as otherwise contemplated by this Agreement;

    (b) non-consensual statutory liens resulting from deposits made in the ordinary course of business in connection with workers compensation, unemployment insurance, social security, and other similar laws;

    (c) other security interests to which each of the Ally Parties specifically consents in writing.

    The grant of the Security Interest and the execution of any document, instrument, promissory note, or the like, in connection with it or the Obligations do not constitute payment or performance of any of the Obligations, except to the extent of actual, indefeasible payment of the Obligations from the realization by Dealership or the Ally Parties of the Collateral or otherwise. Except as otherwise agreed to by the parties, the Security Interest continues to the full extent provided in this Agreement until all Obligations are fully and indefeasibly paid and performed, even if the Credit Line is from time to time modified, suspended, or terminated and reestablished.

4. <u>Perfection of Security Interest</u>. The Ally Parties may each file financing statements, note their liens on titles, and take any other steps in order to establish, confirm, and maintain a perfected Security Interest in the Collateral. Dealership will execute and deliver any documents necessary and appropriate for these purposes and otherwise irrevocably appoints each of the Ally Parties to do so. Each of the Ally Parties may require Dealership to pay any fee, cost, tax, or assessment required by any government entity to perfect and / or maintain each of the Ally Parties' Security Interest in the Collateral. All financing statements previously filed by either or both of the Ally Parties are hereby ratified and authorized by Dealership as of the date of filing.

5. <u>Protection of Security Interest</u>. Unless expressly prohibited by law, in the event of Default and unless and until the Default is cured to the satisfaction of the Ally Parties or in the event of material jeopardy to 10% or more of the Collateral pledged hereunder (based on clean wholesale value), upon either of the Ally Parties' request, Dealership must immediately:

    (a) turn over to Ally or some other party designated by the Ally Parties custody or control of all manufacturer's certificates of origin, certificates of title, documents of title, bills of sale, invoices, and other records or instruments of ownership by Dealership pertaining to the Vehicles;

    (b)   establish and maintain an account, separate from other Dealership accounts, at a federally insured financial institution with which Dealership and/or its

affiliates have had no business or lending relationship for a minimum of six (6) months before setting up the account, into which cash, instruments, and other proceeds of Collateral are to be deposited and segregated from other funds of Dealership;

(c) protect and defend the Collateral against the claims and demands of all other persons, including, but not limited to obtaining waivers from landlords, depository institutions and other parties which have access to or control over the Ally Parties' Collateral or proceeds of the Ally Parties' Collateral; and

(d) permit representative(s) of each of the Ally Parties to monitor Collateral by taking one or more of the following actions:

(i.) to enter any locations where Dealership conducts business or maintains Collateral, and to remain on the premises for such time as such Ally Party(ies) may deem desirable;

(ii.) to take possession and control over certificates of origin, title, and keys with respect to each Vehicle comprising Dealership's inventory or equipment;

(iii.) to take constructive or actual possession and control over all documents, books, records, papers, accounts, chattel paper, electronic chattel paper, instruments, promissory notes, general intangibles, payment intangibles, supporting obligations, contract rights, software, or any similar types of tangible or intangible property relating to or comprising the Collateral;

(iv.) to receive payment of all Collateral proceeds; and

(v.) to take whatever additional actions as either or both of the Ally Parties may deem necessary or desirable to protect and preserve the Collateral, and to carry out, and to protect and preserve each of the Ally Parties' security rights and remedies.

6. Offset. In addition to the Security Interest, each of the Ally Parties retains any and all rights of offset, recoupment, netting-out, and any other legal or equitable rights, in each case provided to it under applicable law, to credit those assets of Dealership in the possession or control of Ally Bank or Ally Financial, as applicable, against any Obligations of Dealership to Ally Bank or Ally Financial under this Agreement or any other auto finance related agreement (e.g., inventory financing; SmartAuction; purchase of retail installment sale contracts and leases), whether then matured, liquidated, or due. For clarity, the term "Obligations of Dealership" in the preceding sentence does not include the obligations of any affiliate of Dealership.

7. Authorization Regarding Proceeds of Collateral. Dealership hereby authorizes and empowers each of Bank and Ally to demand, collect and receive from auctions and

11

others, and give such parties binding receipts for, all proceeds of Collateral and, in Dealership's name or otherwise, to prosecute suits therefor. With or without a default, each of the Ally Parties may, at any time notify auctions and others to make payment directly to the Ally Parties of proceeds of Collateral. Dealership unconditionally and irrevocably authorizes and instructs auctions and others to make payment of proceeds of Collateral directly to the Ally Parties as instructed, and authorizes auctions and others to rely on a copy of this Agreement as evidence of the authorization and instruction. The Ally Parties will account to Dealership for all sums received pursuant to this Section III.D.7 and applied in the manner described in Subsection III.C.7 above. This authorization is irrevocable without the prior written consent of each of the Ally Parties and is provided as additional security for and not as payment of obligations now or hereafter arising to the Ally Parties. Dealership hereby appoints each Bank and Ally as its agent and attorney-in-fact for the sole purpose of executing or endorsing, on Dealership's behalf, any document, check or other instrument necessary to cause payment of proceeds of Collateral, or to perfect Bank's and/or Ally's security interest in the proceeds of Collateral.

E. Dealership's Handling of Vehicles.

1.  Ownership and Taxes. Dealership will have and maintain absolute title to and ownership of each Vehicle, subject to each Ally Party's respective Security Interest in the Vehicle. Dealership will pay all taxes and assessments at any time levied on any Vehicle as and when they become due and payable.

2.  Location. Dealership will keep Vehicles at Dealership's locations (including without limitation retail business locations, temporary holding locations, inspection and repair center locations) and will not remove them from those locations (other than transportation and relocation among such locations or to customers after sale), except:

    (a)  for temporary relocation for repair, restoration, reconditioning, governmental inspection, and the like;

    (b)  as consistent with the usage of the Vehicle as a Demonstrator or Shop Rental (each as defined in Subsection III.E.4. below);

    (c)  upon advance or concurrent notice to the Ally Parties, for bailment to another person for upfitting, completion, upgrading, modification, and the like; or

    (d)  upon advance or concurrent notice to the Ally Parties, for storage and display at a temporary location.

3.  Condition. Dealership will keep Vehicles in good operating condition and repair, in good and marketable condition and will not alter or substantially modify any of them, except as otherwise contemplated in Subsection III.E.2(c) above.

4.  Usage. Dealership may permit a potential customer to use and examine any Vehicle for the purpose of inspecting, test-driving, and considering the purchase or lease of a

12

Vehicle. Dealership will not use Vehicles illegally or improperly and will hold and consider them as inventory held in the ordinary course of business (including without limitation for repair, restoration, reconditioning, storage, exhibition, sale or lease to retail customers), except as follows:

(a)  <u>Demonstrators</u>. From time to time, Dealership may use one or more Vehicles for demonstration and promotional purposes ("Demonstrator"), pursuant to the following additional terms and conditions:

    (i.)  [Reserved.]

    (ii.)  Dealership may provide a Vehicle to a person whose use of it will directly or indirectly promote the Dealership's business including:

        • owners or employees of the Dealership, provided the Vehicle is for local use, for short duration, and no fee is assessed;
        • service customers, provided the Vehicle is for local use, short duration, and no fee is assessed.

    (iii.)  [Reserved.]

    (iv.)  Upon either or both of the Ally Parties' request, Demonstrators are subject to:

        • a term of no more than twelve months;
        • inspection by each of the Ally Parties (including all related documents);
        • reductions in principal balance in an amount determined by such Ally Party(ies);
        • removal from service as a Demonstrator; and
        • any other limitation imposed by either or both of the Ally Parties from time to time.

    (v.)  Dealership must obtain and maintain liability insurance coverage insuring Dealership and the Demonstrator user in an amount that is at least the greater of the minimum required by law or $100,000/$300,000 bodily injury and $25,000 property damage for vehicles used as Demonstrators.

(b)  <u>Shop Rentals</u>. From time to time, Dealership may use one or more Vehicles for short term rental to customers ("Shop Rental"), pursuant to the following additional terms and conditions:

    (i.)  Dealership must request permission from each of the Ally Parties to make the designation and use of the Vehicle as a Shop Rental. The request must be made in advance on a form provided by the Ally

13

Parties for this purpose and include a detailed description of the Vehicle proposed for designation as a Shop Rental, including:

- Vehicle information: vehicle identification number; stock number;
- Shop Rental service information: term of service; effective date of service period;
- Vehicle financing information: amount financed; monthly amortization; first payment due date; balloon payment; and
- any additional information or document that either or both of the Ally Parties may request from time to time.

(ii.)   The Ally Parties may approve or deny the request for a Shop Rental and may rescind any approval previously granted. Any approval must be in writing.

(iii.)   The Shop Rental must be confined to a customer of Dealership who is in need of a temporary replacement motor vehicle:

- while the customer's vehicle is being repaired by Dealership;
- for a thirty (30) day period following theft of the customer's motor vehicle; or
- pending delivery of a motor vehicle to customer pursuant to a bona fide order with Dealership.

(iv.)   Unless changed by either or both of the Ally Parties in their sole discretion, Dealership must make monthly principal reduction payments in the amount designated from time to time by the such Ally Party(ies) for the Shop Rental plus monthly interest or other service charges established by each of the Ally Parties from time to time.

(v.)   A Vehicle may not be used as a Shop Rental for a term longer than the term specified in the written approval provided by the Ally Parties, unless each of the Ally Parties consents in writing to a longer period.

(vi.)   Dealership must maintain insurance coverage on the Shop Rental as follows:

- comprehensive and collision coverage insuring each of the Ally Parties and Dealership (as their interests may appear); and
- liability insurance coverage insuring Dealership and the Shop Rental user in an amount that is at least the greater of the minimum required by law or $100,000/$300,000 bodily injury and $25,000 property damage.

(vii.)   Dealership must immediately notify each of the Ally Parties whenever a Shop Rental ceases to be used in this way by reason of its sale, lease,

14

re-designation by either or both of the Ally Parties or Dealership, or otherwise.

(viii.)   All other terms and conditions of this Agreement will apply to a Shop Rental.

5. <u>Inspection</u>. Without any advance notice to Dealership, each of the Ally Parties may at all times have access to, examine, audit, appraise, verify, protect, or otherwise inspect the Vehicles (to the extent not in transit to a customer after sale) wherever located as frequently as each of the Ally Parties elects. The inspection may include examination and copying of all documents, titles, certificates of origin, invoices, instruments, chattel paper, computer records, bank statements, and all other books and records of the Dealership of or pertaining to the Vehicles or to determine compliance with this Agreement. Bank and Ally each have Dealership's continuing consent to enter the Dealership's premises to carry out inspections. In connection with the inspection, the Ally Parties may be assisted by, cooperate with, or discuss the financial and business affairs of Dealership with any of the officers, owners, employees, sureties, creditors, or agents of Dealership. Notwithstanding anything in this Agreement to the contrary and, the Ally Parties will not conduct such inspection and/or audit more than one (1) time in any calendar month unless a Default occurred and has not been cured to the Ally Parties' satisfaction.

6. [Reserved.]

7. <u>Report of Damage, Loss</u>. Concurrent with discovery that a Vehicle has been destroyed, lost, stolen, or missing, Dealership will notify each of the Ally Parties of the discovery by reporting the Vehicle in the reports delivered pursuant to Section III.G.1.(a). In addition, Dealership will notify each of the Ally Parties if more than 10% (based on clean wholesale value) of the Vehicles at, or attributable to, any Dealership retail location are damaged. Dealership must use reasonable means to diligently repair and restore such Vehicle to its original condition, replace, or locate any of these Vehicles, and keep the Ally Parties apprised of these efforts.

8. <u>Risks</u>. Neither of the Ally Parties has any risk or responsibility concerning the ownership, location, condition, usage, inspection, or disposition of any Vehicle or other Collateral whether or not permitted by this Agreement, including fire, theft, vandalism, mischief, collision, acts of terrorism, acts of God, property damage, personal injury, public liability, and the like ("Risks"). Dealership bears and assumes the Risks, unless imposed by law on another person and except to the extent of any insurance proceeds actually received by the Ally Parties. Dealership will indemnify and hold harmless Bank and Ally against all Risks, including injury and damage to persons, property, or Collateral caused by any of these Risks.

9. <u>Insurance</u>. Except to the extent that both of the Ally Parties obtain insurance for themselves on one or more of the Risks, Dealership must acquire and maintain one or more policies of insurance on losses which may arise as a consequence of the Risks on any of the Vehicles or, as requested by either or both of the Ally Parties, on other

15

Collateral, in such amounts and with such terms as Dealership and the Ally Parties deem reasonably adequate for the conduct of Dealership's business and the value of the Vehicles. Each of the Ally Parties must be named as a loss payee, as each of their interests may appear. Dealership must provide each of the Ally Parties with one or more certificates of insurance evidencing compliance with this Subsection III.E.9.

F. <u>Representations and Warranties of Dealership</u>. Dealership represents and warrants to each of the Ally Parties the accuracy and completeness of each of the following statements as of the effective date of this Agreement. Dealership will immediately notify each of the Ally Parties of any known or expected material change to any of these statements. Otherwise, they are deemed as continuing and reaffirmed each time either of the Ally Parties provides Inventory Financing to Dealership.

1. <u>Dealership Existence</u>. Dealership is duly formed, constituted, and is in good standing in the jurisdiction in which it is located, as "location" is determined under Article 9 of the Uniform Commercial Code, as amended from time to time. Dealership has all government and other permits, licenses, authorizations, and approvals necessary to do business lawfully in the jurisdiction in which any of its business operations are located.

2. <u>Dealership Authorization</u>. Dealership is authorized and empowered to execute and deliver this Agreement and to do all things necessary and appropriate to fulfill and implement the terms and conditions of it.

3. <u>Legal Compliance</u>. Dealership is in material compliance with all federal, state, and local laws, regulations, and ordinances.

4. <u>Financial Condition</u>. Information on the financial condition of Dealership which has or may be submitted to either or both of the Ally Parties, either directly or indirectly (e.g., through a Vehicle Seller), by Dealership or an agent of Dealership (e.g., accountant), fairly presents the financial condition of Dealership in accordance with generally accepted accounting principles applied on a consistent basis.

5. <u>Relationship of Ally Parties and Dealership</u>. The relationship between each of the Ally Parties and Dealership is one of creditor and debtor, respectively, based upon this Agreement and/or Other Financing Accommodations. There is no fiduciary, trust, representative, confidential, partnership, or other special relationship between either of the Ally Parties and Dealership. The Ally Parties do not have and will not have any investment in Dealership, whether equity or otherwise. Dealership is not a counselor, advisor, agent or legal or other representative of Bank or Ally. Neither Bank nor Ally is a counselor, advisor, agent, or legal or other representative of the Dealership, except for the limited power of attorney expressly described in Subsections III.D.4. and 7. above and Subsections III.J.10. and III.K.18. below, and each of them recognizes the ability, importance, and freedom to consult with any accountants, attorneys, agents, advisors, and business consultants of their choice in connection with the review, execution, and administration of this Agreement. Neither of the Ally Parties controls, supervises, or manages Dealership.

16

6. <u>Relationship with Vehicle Sellers</u>. The Ally Parties do not represent the interests of any Vehicle Seller. The relationships of each of the Ally Parties and Dealership to any Vehicle Seller are separate and distinct from one another. Neither of the Ally Parties is under the control of any Vehicle Seller, despite any business, consultative, investment, ownership, legal, or other relationship either of the Ally Parties may have with one or more Vehicle Seller. Nothing in this Agreement obligates Dealership to obtain Inventory Financing from the Ally Parties based on any relationship that either of the Ally Parties may have with one or more Vehicle Sellers.

G. <u>Additional Promises of Dealership</u>. Dealership will:

1. Provide (directly or by posting to a secure site accessible by the Ally Parties) each of the Ally Parties with accurate and complete information, data, books, records, documentation, and the like, concerning:

    (a)   all financial and business matters of Dealership, upon request by either or both of the Ally Parties; and

    (b)   any of the following proposed or actual changes, immediately:

        (i.) the Dealership's name, address, tax status, entity, structure;

        (ii.) the Dealership's solvency; and

        (iii.) any change in ownership of the Dealership; and

    (c)   all financial and other reports made and information provided to any Vehicle Sellers and will allow each of the Ally Parties direct access to all such reports and information, and upon request by either or both of the Ally Parties, provide copies of such reports and information.

2. To the extent not publicly available, provide audited financial statements within 120 days after the end of each of its fiscal years, and unaudited financial statements within 60 days after the end of the first three fiscal quarters of each fiscal year.

3. At all times, remain in good standing under, and have not received or sent notice of termination of, any contracts, franchise agreements, dealer sales and service agreements, and the like, provided by Vehicles Sellers which manufacture or distribute new Vehicles to Dealership.

4. Maintain, at all times, a Credit Balance (as defined in Dealership's Second Amended and Restated Credit Balance Agreement, dated as of November 1, 2019, as such agreement may be further amended, modified or replaced) of at least 7.5% of the total principal amount owed to the Bank from time to time for used vehicle inventory financed by the Bank under this Agreement so long as Dealership owes any debt to Bank or until Bank otherwise agrees in writing.

17

5. Maintain unrestricted cash, cash equivalents and availability in operating lines of credit, excluding amounts restricted pursuant to the terms of a Credit Balance Agreement between Dealership and Bank, in an amount not less than 10.0% of the amount of the Credit Line.

6. [Reserved.]

7. Maintain, at all times, at least 5% equity in its inventory, calculated as the amount expressed as a percentage equal to

    (a)   1 minus

    (b)   the amount of

        (i) total Wholesale Outstandings divided by

        (ii) with respect to Eligible Vehicles, 100% of the sum of:
- the purchase price of such Vehicle,
- fees charged by an auction in connection with the purchase of such Vehicle,
- post-sale inspection fees in connection with the purchase of such Vehicle, and
- the reconditioning parts, repair parts, and related labor cost with respect to such Vehicle.

        "Eligible Vehicles" means Vehicles that Dealership acquired by any means, excluding each Exception Vehicle.

        "Exception Vehicle" means a Vehicle for which any part of the purchase price remains unpaid; a Vehicle that is or has been subject to a consumer lease from Dealership or an affiliate of Dealership; and/or a Vehicle provided to a Dealership employee or other representative for long-term use (i.e., a company vehicle).

    (the foregoing calculation will not include any costs related to transportation with respect to a Vehicle).

8. Promptly notify the Ally Parties of any material reduction in availability of loans, financing, credit lines, or other credit accommodations provided or made available by any bank, finance company, or other source.

9. [Reserved.]

   H. <u>Default by Dealership</u>. An occurrence of any one or more of the following events constitutes a default under this Agreement ("Default"):

18

1. Failure of Dealership to pay when due the full amount owing to either of the Ally Parties under Sections III.B or C above;

2. Material jeopardy to 10% or more of the Collateral (based on clean wholesale value) and such jeopardy has not abated for a period of two (2) calendar days after notice thereof by either of the Ally Parties;

3. The breach of, or the failure of Dealership to fully comply with or duly perform, any term, condition, or promise of this Agreement or any other Obligation and such failure continues unremedied for a period of five (5) business days after notice thereof by either of the Ally Parties;

4. Any representation, statement, or warranty made by Dealership to either of the Ally Parties in this Agreement or otherwise, which was false or materially misleading when made;

5. The inability of Dealership to pay debts as they mature, or any proceeding in bankruptcy, insolvency, or receivership, instituted by or against Dealership or Dealership's property;

6. This Agreement is unenforceable or the security interest in the collateral created by this Agreement ceases to be in full force and effect; and/or

7. An event or circumstance occurs that has a material adverse effect on the business, condition (financial or otherwise), operations, performance or properties of Dealership, or the ability of Dealership to perform its respective obligations under this Agreement.

I.  <u>Waiver and Modification of Certain Important Rights</u>. Unless and only to the extent not expressly prohibited by law, Dealership, Bank and Ally expressly and affirmatively waive and modify certain very important rights, as follows:

1. <u>Claims</u>. Any and all claims, causes of action, suits, rights, remedies, disputes, complaints, defenses, and counterclaims between either or both of the Ally Parties on the one hand and Dealership on the other hand, or any of their officers, agents, employees, subsidiaries, affiliates, members, owners, or shareholders directly or indirectly arising out of or relating to the terms or subject matter of this Agreement, whether in contract, tort, equity, statute, or regulation, or pertaining to conversion, fraud, defamation, negligence, franchise, licensing, or distribution or the defect, non-conformity, price, or allocation of Vehicles by any Vehicle Seller, or otherwise, but not including actions for and enforcement of provisional remedies otherwise provided by law, equity, or agreement between the parties, suits for debt, enforcement of security interests, or claims pursuant to Section III.J. below, ("Claim") are subject to each of the following:

   (a)  <u>Claim Resolution</u>. The resolution of any Claim ("Claim Resolution") will occur, if at all, only in accordance with the following provisions and sequence:

(i.)   Informal discussion and negotiation between executive level managers of the Dealership and the Ally Party(ies) asserting a Claim or against which a Claim is asserted;

(ii.)   Mediation in accordance with the rules of commercial mediation as published from time to time by the American Arbitration Association, JAMS, or any other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted; and

(iii.)   Binding arbitration in accordance with the rules of commercial arbitration as published from time to time by the American Arbitration Association, JAMS, or other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted ("Arbitration"), except that the Arbitration must be decided based upon the terms and conditions of this Agreement.

(b)   <u>Jurisdiction and Venue</u>.

(i.)   All mediation and arbitration hearings and proceedings brought pursuant to Subsections III.I.1(a)(ii) and (iii) above shall occur at a location within fifty (50) miles of Ally's local business office set forth in Section I.B above, or the current replacement for it.

(ii.)   The enforcement of any Claim or Claim Resolution provision and the enforcement of any Arbitration award must be brought, if at all, solely and exclusively in the state or federal court of original jurisdiction for the location of the Ally local business office set forth in Section I. B. above, or the current replacement for it.

**(c)   <u>JURY WAIVER</u>. BANK, ALLY AND DEALERSHIP WAIVE AND RENOUNCE THE RIGHT UNDER FEDERAL AND STATE LAW TO A TRIAL BY JURY FOR ANY CLAIM.**

2.   <u>Choice of Law</u>. This Agreement must be construed, interpreted, and enforced in accordance with the laws of the state of Arizona without regard to its conflict of laws rules.

3.   <u>Limitation of type and nature of damage Claims for violation</u>. With respect to any Claim:

(a)   Dealership's damages under this Agreement are expressly limited to the following:

(i.)   the actual dollar amount of Dealership's economic or financial loss; and
(ii.)   reasonable dollar amount of lost future profits for not more than two (2) years from the accrual date of the Claim.

(b)  Neither party may assert a claim for any of the following:

(i.)  punitive or exemplary damages, unless the Claim would constitute a felony under the law of the state indicated in Subsection III.I.2, above; or

(ii.)  consequential and incidental damages.

(c)  Any liability of either Ally Party to Dealership related to any Claim is limited to and will not exceed the amount of total Interest assessed by the Ally Party(ies) against whom the Claim is brought and actually paid by Dealership in the twenty-four (24) calendar months immediately preceding accrual of the Claim.

4.  <u>Notification of information to Others</u>. Bank and Ally each have the right, but not the obligation, to notify guarantors, sureties, Vehicle Sellers, Account Debtors and other third parties (e.g., owners, officers, etc.) of the terms, administration, or performance of this Agreement.

5.  <u>Information From and To Third Persons</u>. Dealership irrevocably and continuously consents to the disclosure of all types and kinds of information in any format concerning the Dealership by third persons to each of the Ally Parties and the obtaining of information by each of the Ally Parties from third persons, including, by way of example, credit, financial, and business information, whether of direct actual experience or obtained from other sources.

6.  <u>Confidentiality</u>.

(a)  Unless prior written approval is obtained from Dealership, the Ally Parties will not disclose Dealership's Confidential Financial Information to any third person or entity, other than state or federal regulators that have authority over the Ally Parties, or third persons or entities who provide services to the Ally Parties and who are under an obligation of confidentiality to the Ally Parties. In this Section III.I.6, "Confidential Financial Information" means any financial information about Dealership or its subsidiaries, including, but not limited to, number of units sold, received by either or both Ally Parties from Dealership that: (i) is marked "Confidential"; and (ii) was not publicly available or previously known to the Ally Parties. The Ally Parties shall use Dealership's Confidential Financial Information only for legitimate business purposes in connection with existing or proposed transactions between Dealership and either or both Ally Parties.

(b)  The Ally Parties acknowledge the Confidential Financial Information protected by the terms of this Section III.I.6 is of a special character, such that money damages would not be sufficient to compensate Dealership for any unauthorized use or disclosure. The Ally Parties agree that injunctive and other equitable relief may be pursued to prevent any actual or threatened

21

unauthorized use or disclosure of Confidential Financial Information. The remedy stated above may be pursued in addition to any other remedies available at law or in equity.

(c)    The Ally Parties acknowledge that United States securities laws prohibit any person who has material, non-public information from purchasing or selling Dealership's publicly-traded securities or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

J. <u>Default</u>. Notwithstanding and without regard to the provisions of Section III.I. above, in the event of Default by Dealership, then either or both of the Ally Parties may exercise any one or more of the following provisional rights and remedies in addition to those otherwise provided by law. These provisional rights and remedies are cumulative and not alternative, are non-exclusive, and may be enforced successively or concurrently. The single or partial exercise of any right or remedy does not waive or exhaust any other rights or remedies or waive any present or future Default of any kind. Unless and until a Default is completely remedied to the Ally Parties' satisfaction:

1.    <u>Demand</u>. Either or both of the Ally Parties may demand immediate payment in full of all Obligations owed by Dealership to such Ally Party(ies).

2.    <u>Repossession of Collateral</u>. Either or both of the Ally Parties may take immediate possession of the Collateral, without demand, further notice to or consent of Dealership, and with or without legal process. Upon request by either or both of the Ally Parties, Dealership must assemble the Collateral and make it available to such Ally Party(ies) at a reasonably convenient place designated by such Ally Party(ies), including the Dealership premises. Dealership irrevocably authorizes and empowers each of the Ally Parties and their agents to enter upon the premises where the Collateral is located and remove it or render portions of it unusable ("Collateral Recovery"). Dealership irrevocably waives any bonds, surety, or security which may be required by any rule, law, or procedure in connection with Collateral Recovery.

3.    <u>Suit at Law or in Equity</u>. Either or both of the Ally Parties may institute proceedings in a proper court of law or equity to enforce any and all provisional remedies such Ally Party(ies) have at law or equity, including injunctive relief and action for possession of Collateral, an order for accounting, appointment of a receiver or examiner, or the like. Either or both of the Ally Parties may apply for and have granted any equitable or other legal relief appropriate to enforce any right or remedy including specific performance and the issuance of any <u>ex</u> <u>parte</u> preliminary injunction to protect the Collateral.

4.    <u>Refrain from Disposition</u>. Upon request by either or both of the Ally Parties, Dealership will not sell, lease, or otherwise dispose of any Vehicles or other Collateral without the prior written consent of each of the Ally Parties.

5.    <u>Turnover of All Proceeds</u>. All amounts received by Dealership upon the sale, lease, or other disposition of any Vehicle must be paid to the Ally Parties even if it exceeds the specific amount for which the Ally Parties provided Inventory Financing for that Vehicle.

22

Payments may be applied by the Ally Parties to the Obligations, as determined by the Ally Parties, unless otherwise required by law.

6. <u>Direct Collection of Collateral</u>. Either or both of the Ally Parties may make direct collection of any Collateral in the possession or control of any third party, including, but not limited to, chattel paper, accounts, accounts with Vehicle Sellers, instruments, and proceeds.

7. <u>Disposition of Collateral</u>. Following total or partial Collateral Recovery, either or both of the Ally Parties may sell, lease, or otherwise dispose of all or any portion of the Collateral not less than ten (10) calendar days after giving Dealership written notice of the public or private sale or as permitted by law which it proposes for the account of Dealership. The sale of Vehicles at an auction at which only other dealers or Vehicle Sellers are generally invited to attend is deemed to be a "private sale."

8. <u>"Commercially Reasonable" Defined</u>. Any of the following, nonexclusive, methods of Collateral disposition is deemed "commercially reasonable" in accordance with Article 9 of the Uniform Commercial Code:

    (a)   repurchase of any Vehicle, parts, or accessories manufactured by the original Vehicle Seller pursuant to the terms of a repurchase agreement between such Ally Party and Vehicle Seller;

    (b)   sale of any parts or accessories to the highest bidder in an auction sale, in lieu of a sale to a Vehicle Seller pursuant to a repurchase agreement, where the proceeds to either or both of the Ally Parties are reasonably believed to be higher than they would be under the repurchase agreement;

    (c)   sale to the highest cash bid from dealers in the type of property repossessed, whether in bulk or parcels; and

    (d)   sale at any physical or virtual auction, including SmartAuction, at which only dealers of multiple or single Vehicle manufacturer are generally invited to attend.

9. <u>Deficiency</u>. Dealership must fully and promptly pay to each of the Ally Parties any deficiency remaining after disposition of the Collateral, except to the extent expressly modified by each of the Ally Parties in writing.

10. <u>Limited Power of Attorney</u>. Dealership hereby irrevocably appoints each Bank and Ally, acting through any of their respective officers and employees, its true and lawful attorney for and in its name, stead, and behalf as if fully done by Dealership, to sign, endorse, execute, negotiate, compromise, settle, complete, and deliver:

    (a)   any invoice, bill of sale, certificate of title, manufacturer's certificate of origin, application, and any other instrument or document pertaining to title or ownership or the transference thereof of any Collateral;

(b) any financing statement, notice, filing, or document pertaining to the enforcement of the Security Interest in Collateral; and

(c) any check, draft, certificate of deposit, credit voucher, or any other medium of payment, insurance claims, proof of loss, instrument, or document pertaining to or proceeds of any Collateral;

This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

11. <u>Default Rate of Interest</u>. To the extent permitted by law, each of the Ally Parties may immediately assess a default rate of Interest up to the current rate of Interest plus five percent (5%).

12. <u>Duty of Care</u>. Neither of the Ally Parties has any duty as to the collection or protection of Collateral, nor as to the preservation of any rights pertaining to it, except for the use of reasonable care in the custody and preservation of the Collateral when in the possession of such Ally Party.

K. <u>Additional Provisions</u>.

1. <u>Authenticity and Authority</u>. Each of the Ally Parties may rely and act upon any form of communication purportedly sent by Dealership as the authentic and duly authorized act of Dealership, in the implementation or furtherance of the purposes of this Agreement, whether by electronic, computer, telegraphic, facsimile, telephonic, personal or paper delivery, transmission, or otherwise; provided such Ally Party:

(a) acts in good faith;

(b) has no actual knowledge of information to the contrary; and

(c) the practice is customary with dealers generally or Dealership specifically.

The Ally Parties have no obligation to scrutinize, inquire, or confirm any communication.

2. <u>Written Waivers Only</u>. A waiver, release, estoppel, or defense of any provision of this Agreement is effective only if it is in writing signed by the party sought to be bound by it.

(a) No course of dealing nor the delay or failure of either or both of the Ally Parties to enforce any right or remedy, in whole or in part, to demand payment or to declare an event of Default under this Agreement will:

> (i.)    alter or affect any of Dealership's obligations or such Ally Party's(ies') rights and remedies; or
>
> (ii.)    operate as a waiver, release, estoppel, or defense thereof.

(b)    Any notice to or demand on Dealership by either or both of the Ally Parties in any event not specifically required under this Agreement does not entitle Dealership to any other or further notice or demand in the same, similar, or other circumstances unless specifically required by this Agreement.

(c)    There can be no waiver of this Subsection III.K.2, except in writing signed by the party against whom the alleged waiver is asserted. Reliance by any party on an oral representation will be deemed unreasonable.

3.    <u>Assignment</u>. Dealership must not assign or cause the transfer of any duties or obligations under this Agreement without the express prior written consent of each of the Ally Parties. Each of the Ally Parties may freely assign its rights, duties and obligations under this Agreement, so long as the assignee(s) assumes all obligations under this Agreement.

4.    <u>Amendments</u>. No amendment of any provision of this Agreement is effective without the written, signed agreement of Dealership and the Ally Parties.

5.    <u>Use of Tracking Devices</u>. If Dealership decides, in its sole discretion, to acquire internet accessible reporting with respect to any tracking device in or on any Vehicle used in order to locate the Vehicle, subject to applicable law, Dealership will provide Bank with access to such reporting.

6.    <u>Definitions and Word Meanings</u>. The word "may" or any other term in this Agreement signifying a permissive, elective, or optional right of a party to act or decide, or to refuse to act or decide, will mean and be construed as providing the complete and absolute prerogative of that party to do so in its sole, unfettered discretion. The word "will" is a mandatory word denoting an obligation to pay or perform. Otherwise, unless the context otherwise clearly requires, the terms used in this Agreement must be given the meaning ascribed to them in accordance with the capitalized definitions established throughout this Agreement; the Uniform Commercial Code, as amended from time to time; and common and ordinary usage in law and commercial practice, respectively.

7.    <u>Section Captions</u>. The captions inserted at the beginning of each article, section, and subsection are for convenience only and do not limit, enlarge, modify, explain, or define the text thereof nor affect the construction or interpretation of this Agreement.

8.    <u>Effective</u>. This Agreement substitutes and supersedes any previously executed agreement between Dealership and either or both of the Ally Parties concerning wholesale inventory floor plan finance accommodations and will govern Dealership's inventory floor plan finance indebtedness to each of the Ally Parties now outstanding under any prior agreement (e.g., Wholesale Security Agreement, Bank or Ally Form 178 and all amendments to it) or incurred under this Agreement. This Agreement is not a novation or

25

transformation of any prior obligation but merely restates and substitutes for any prior agreement related to inventory floor plan finance accommodations.

9. <u>Termination</u>. This Agreement is effective until terminated upon the earlier of: the Maturity date (as such date may be extended by agreement of the parties hereto); an event of Default, at the non-defaulting party's option exercised by sending written notice of termination to the defaulting party; or the parties mutually agree in writing to terminate the Agreement. Termination will not relieve any party from any duty or obligation incurred, or right, waiver, modification, or benefit bestowed, prior to the effective date of the termination.

10. <u>Binding</u>. This Agreement is binding on Bank, Ally and Dealership and their respective successors, administrators, and assigns.

11. <u>No Third Party Beneficiary</u>. Except as outlined in Section III.D, no Vehicle Seller or any person (other than Bank, Ally and Dealership) may rely on this Agreement or any term or provision contained in this Agreement.

12. <u>Severability</u>. Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.

13. <u>Notice</u>. Any notice required to be given by this Agreement or by law is deemed reasonably and properly given if sent to the other party within the time frame set forth in this Agreement, but in any event no less than ten (10) calendar days, at the address set forth in Section I. above by any one of the following nonexclusive methods:

    (a) United States certified, registered, or first class mail, postage prepaid;

    (b) Use of a commercially recognized express delivery service;

    (c) Electronic mail or facsimile transmission; or

    (d) Personal delivery.

14. <u>Separate Credit Accommodations</u>. Despite the fact that Ally may be acting as a servicer or agent on behalf of Bank, Dealership recognizes that Ally and Bank are providing separate credit accommodations to Dealership with the terms consolidated in a single document and credit line for the convenience of the parties. Bank is not responsible for the performance or conduct of Ally and Ally is not responsible for the performance or conduct of Bank. Dealership shall not assert against Bank any claim, defense or set-off relating to Ally and Dealership will not assert against Ally any claim, defense or set-off relating to Bank. This Agreement does not create any rights and obligations between Ally and Bank.

15. <u>Time of the Essence</u>. Time is of the essence as to this Agreement. There is no grace period, right to cure, or other indulgence provided in the terms and conditions of this

26

Agreement unless expressly provided for in this Agreement or in a separate writing signed by the party against whom it is asserted.

16. <u>Entire Agreement</u>. This document amends and restates the Amended and Restated Inventory Financing and Security Agreement, dated as of July 27, 2015, and, as amended and restated, contains the entire agreement of Bank, Ally and Dealership concerning the subject matter set forth herein. There are no other oral or implied agreements, understandings, or representations between them. Dealership has not relied on any statement, promise, or representation made by anyone connected with Bank or Ally, except as provided in this Agreement or any related document.

17. <u>No Interpretive Presumptions</u>. The language in this Agreement will be construed according to the fair and usual meaning of the language and will not be strictly construed for or against either party.

18. <u>Continued Cooperation</u>. Dealership will execute and deliver to each of the Ally Parties any and all documents, notices, instruments, and other writings and perform all acts necessary and appropriate to fully implement the terms and conditions of this Agreement. Dealership hereby irrevocably appoints each Bank and Ally, acting through any of their officers and employees, its true and lawful attorney for and in its name, stead and behalf as if fully done by Dealership to execute, complete and deliver any other document, instrument, or agreement in connection with this Agreement to supply any omitted information and correct any patent errors in any of them. This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

19. <u>Use of Pronouns</u>. All personal pronouns, whether used in the masculine, feminine or neuter gender, will include all other genders; the singular will include plural, and the plural will include the singular.

20. <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which is deemed an original and all of which taken together constitute one and the same agreement. Any electronically placed or delivered (e.g., via fax or email) signatures of the parties constitute and are deemed original signatures for all purposes.

27

**Ally Bank**

By:      /s/ Stephen B. Gambrel

Name:    Stephen B. Gambrel

Title:   Authorized Representative

Date:    September 29, 2020

**Ally Financial Inc.**

By:      /s/ Stephen B. Gambrel

Name:    Stephen B. Gambrel

Title:   Authorized Representative

Date:    September 29, 2020

**Carvana, LLC**

By:      /s/ Paul Breaux

Name:    Paul Breaux

Title:   Vice President

Date:    September 29, 2020

28

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e1)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        October 29, 2020

/s/ Ernest C. Garcia, III
Ernest C. Garcia, III
*Chairman and Chief Executive Officer*

<u>Exhibit 31.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        October 29, 2020                                    /s/ Mark Jenkins
                                                                 Mark Jenkins
                                                                 *Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    October 29, 2020                                    /s/ Ernest C. Garcia, III
                                                              Ernest C. Garcia, III
                                                              *Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    October 29, 2020                                    /s/ Mark Jenkins
                                                             Mark Jenkins
                                                             *Chief Financial Officer*

**Exhibit 6**





## LETTER TO SHAREHOLDERS

## Q3 | 2020







# CARVANA

## OCTOBER 29, 2020





Dear Shareholders,

The third quarter was an exceptional quarter for Carvana. We hit several significant operational and financial milestones including buying more cars from our customers than we sold, crossing $4,000 in GPU, and achieving our first EBITDA positive quarter.

These are important milestones, and they carry important meaning.

Buying more cars from our customers than we sold to them just 2 years after focusing on the opportunity demonstrates the appeal of our customer experience, the scrappiness of our team, the quality of our brand, and the scalability of our infrastructure. It also feeds back into our retail offering by supplying us with a highly scalable channel of extremely diverse and desirable inventory.

Crossing $4,000 GPU and achieving our first EBITDA positive quarter demonstrate the power of our financial model as we march toward our long-term goals.

Customer preference shifts and our team's continued execution in 2020 bode very well for our long-term opportunity. Looking forward, our focus will remain exactly where it has been: on our customers, on our team, and on our execution. We are firmly on the path to changing the way people buy cars, to delivering 2 million+ cars per year, and to becoming the largest and most profitable automotive retailer.

## Summary of Q3 2020 Results

All financial comparisons stated below are versus Q3 2019, unless otherwise noted. Complete financial tables appear at the end of this letter.

Q3 2020 Financial Results:
- Retail units sold totaled 64,414, an increase of 39%
- Revenue totaled $1.544 billion, an increase of 41%
- Total gross profit was $261 million, an increase of 90%
- Total gross profit per unit (GPU) was $4,056, an increase of $1,093 [1]
- Net loss was $18 million, an improvement from $92 million
- EBITDA margin was 1.4%, an improvement from (5.5%) [2]
- Basic and diluted net loss, per Class A share was $0.10 based on 70.0 million shares of Class A common stock outstanding

Q3 2020 Other Results:
- Opened our 9th inspection and reconditioning center (IRC) near Columbus, Ohio
- Opened one vending machine in Louisville, Kentucky, bringing our end-of-quarter total to 25
- Increased our March 2020 forward flow agreement with Ally to a total purchase commitment of $3 billion

## Recent Events

We would also like highlight the following recent accomplishments:

- Opened our 10th IRC near Orlando, Florida
- Opened our 26th vending machine near Detroit, Michigan
- Increased our floor plan facility with Ally to $1.25 billion from $950 million and extended its maturity through March 2023
- Closed a $1.1 billion senior notes offering ($500 million 5.625% Senior Notes due 2025 and $600 million 5.875% Senior Notes due 2028) and redeemed $600 million 8.875% Senior Notes due 2023

---

[1] Includes a $0 and $33 impact for the current and prior year period, respectively from the 100k Milestone Gift.

[2] Includes a 0.0% and 0.4% impact for the current and prior year period, respectively from the 100k Milestone Gift.

## Outlook

In light of the uncertainty surrounding COVID-19 and its economic repercussions we are not providing guidance at this time. Instead, we are providing directional color.

Following our significant progress on production capacity, GPU, and EBITDA margin this quarter, we are positioning the business for strong growth in 2021.

In the fourth quarter, we expect seasonal patterns across major line items to be similar to past years, with a few adjustments noted below.

First, we have elected not to run our usual Cyber Monday promotion this year as we continue to focus on building inventory. As a result, we expect retail unit growth to face a headwind around the time of Cyber Monday and a tailwind as we continue building selection on the website. Over the course of the third quarter we significantly grew the number of vehicles available for immediate purchase, but ended the quarter at just half the level we had prior to the pandemic. During the fourth quarter we expect to make significant additional progress in growing our inventory.

Second, we expect the market to transition to a more normalized depreciation environment in Q4 accentuating normal seasonal trends in wholesale GPU.

Lastly, we expect Retail GPU to have a seasonal change that more closely resembles 2018, as Q4 2019 was impacted by early iterations in our customer-sourced bidding and pricing that offset a normal seasonal shape.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

## Clear Progress Toward Our Long-Term Goals

Our management team has always focused on delivering an exceptional and unparalleled customer experience while simultaneously growing the business rapidly and achieving our financial objectives. To realize our long-term vision, our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and, (3) Demonstrate Operating Leverage.

At our Analyst Day in November 2018, we laid out our long-term goals of selling 2 million+ units per year and achieving 15% to 19% gross margin, 6% to 8% SG&A as a percent of revenue, and 8% to 13.5% EBITDA margin.

In only two years, we have made tremendous progress toward these goals.

That progress starts with growth, which is rooted in our industry leading customer experiences. Since Q3 2018, we have increased the number of cars we sold to customers 2.5x and increased the number of cars we bought from customers an incredible 8x.

Growth has been and will continue to be our first financial objective due to the enormous size of our opportunity and the significant positive feedback in our model. As we grow—by expanding geographically, building accumulated awareness, improving our customer experience, and broadening our customer offering—our business becomes stronger. Growth in customers allows us to hold more inventory, increasing selection and conversion. Growth allows us to add more IRCs, increasing the density of our logistics network and lowering average delivery times, which further increases conversion. Growth also enables economies of scale, creating value to further invest in the customer experience. All these dynamics create a flywheel that drives even more growth.



**QUARTERLY RETAIL UNIT SALES**

88% CAGR
1Q16 – 3Q20

We have paired our rapid growth over the past several years with significant increases in gross margin, reaching the middle of our long-term target range in Q3. Our gains in gross margin have been broad-based, including buying more cars from customers, lowering average days to sale, and enhancing monetization of our finance platform and ancillary products. Despite all this progress, we still see significant opportunities for further gains, giving us the flexibility to either drive additional margin expansion or further enhance our customer offering.



# GROSS MARGIN

*2018, 2019, and Q3 2020 include a 0.2%, 0.1%, and 0.0% impact from the 100k Milestone Gift, respectively.

We have also paired our rapid growth with meaningful SG&A leverage. Our progress on SG&A has come while making significant investments to support our continued growth, building an industry-leading supply chain, and continually improving the customer experience.

In 2019, for example, we made the decision to invest meaningfully in building our offering of buying cars from customers, and those investments are paying significant dividends today. In Q3, we sourced 56% of the cars we retailed from customers which exceeded the top end of our long-term target range of sourcing 38% to 52%.

We expect to make similar investments in the future when we believe they serve our long-term goals, while demonstrating SG&A leverage as we continue to scale.





*2018, 2019, and Q3 2020 include a 0.4%, 0.2%, and 0.0% impact from the 100k Milestone Gift, respectively.

Our progress on our three key financial objectives led to our first EBITDA positive quarter in Q3, a significant milestone on the path toward building the largest and most profitable auto retailer. We are excited about this achievement, what it means for our trajectory, and what it says about the quality of our business model and team.



*2018, 2019, and Q3 2020 include a 0.6%, 0.4%, and 0.0% impact from the 100k Milestone Gift, respectively.

Our cohorts also demonstrate our progress toward profitability. In Q3, our five oldest cohorts were solidly EBITDA positive, with our two oldest cohorts approaching our long-term target EBITDA margin range. While our cohorts generally have similar gross margins, older cohorts have much lower SG&A as a percent of revenue due to lower advertising expenses as a percent of revenue, lower logistics expenses as a percent of revenue due to closer geographic proximity to existing IRCs, and greater scale.

Our progress over the past two years leaves us more excited than ever about our opportunity to change the way people buy cars.

We believe that our focus on growth should reflect the size of the opportunity in front of us as well as our operational and financial capacity to make the investments necessary to achieve that growth. Over the last nine months, customer preference migration, our team's successful execution, and our financial strength bolster the argument for growth as our top priority. Looking forward, we expect to continue investing in growth while maintaining strong gross margins and demonstrating SG&A leverage.

## Buying Cars from Customers

In Q3, for the first time in our history we bought more cars from our customers than we sold to them.

We acquired 73.4k vehicles from our customers, an increase of 128% year-over-year, which resulted in buying 114% as many cars as we sold, up from 69% a year ago. Two primary drivers powered this exceptional growth. The first was the unprecedented demand we saw after resuming purchasing vehicles from our customers in May. The second was our operating teams' incredible response to this increase in demand. For perspective on the scale of the operational challenges our team overcame, we more than tripled the number of cars we bought from our customers quarter-over-quarter, reaching a level nearly double our previous high all while delivering to customers the best experience available when selling a car.

Our rapid acceleration in buying cars from customers fueled our inventory growth lifting our customer sourced retail units. In Q3, we sourced 56% of our retail units sold from customers, up from 31% a year ago. This number eclipsed the top end of the long-term target range of 38%-52% that we outlined at our analyst day just two years ago.





7

## Expansion

The unprecedented demand that we've seen for buying and selling cars online has underscored the importance of our expansion strategy. We believe, now more than ever, in our approach of developing infrastructure well ahead of demand, and we remain committed to building out our IRC pipeline and logistics network capacity to meet future demand.

In Q3, we further demonstrated progress in this regard, opening our 9th inspection and reconditioning center (IRC) near Columbus, Ohio. Since quarter-end, we've opened our 10th IRC, also a four-line facility, near Orlando, Florida. Additionally, we expect to open our 11th IRC by year-end, increasing our annual production capacity to approximately 600k vehicles at full utilization.

We now operate 26 vending machines and serve 261 markets covering 73.2% of the population.  We will continue to open smaller markets to fill out our footprint in the immediate term. From there, our path to 95% population coverage will primarily involve balancing the benefits of serving a broader population with our goal to alleviate constraints in our supply chain.



CARVANA MARKETS AND POPULATION COVERAGE

*Represents facilities and markets as of October 29, 2020

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: investors.carvana.com/resources/investor-materials.

## Management Objectives

Our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and, (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

Below we present our long-term financial model that we introduced at our Analyst Day on November 29, 2018. We believe this is the appropriate frame through which to evaluate our results and progress towards each of our financial objectives.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | Q3 2020 | Long Term Target |
|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 41% | – |
| Gross Margin [1] | 5.3% | 7.9% | 10.1% | 12.9% | 16.9% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 4.2% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A [2] | 21.1% | 18.2% | 14.9% | 13.7% | 11.9% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.2% | 0.5 – 1.0% |
| SG&A Total as % of Revenue [2] | 29.8% | 26.0% | 21.7% | 20.0% | 17.4% | 6 – 8% |
| Net Loss Margin [3] | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (1.1)% | – |
| EBITDA Margin [3] | (23.2%) | (16.9%) | (10.5%) | (6.2%) | 1.4% | 8 – 13.5% |

[1] Gift impact of 0.2%, 0.1%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
[2] Gift impact of 0.4%, 0.2%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
[3] Gift impact of 0.6%, 0.4%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
Note: Numbers may not foot due to rounding.

## Objective #1: Grow Retail Units and Revenue

Q3 2020 marked another quarter of strong year-over-year growth across retail units sold and revenue.  For the quarter, retail units sold increased to 64,414, up 39% from 46,413 in Q3 2019. Q3 revenue grew to $1.544 billion, up 41% from $1.095 billion.

As in Q2, inventory constraints impacted growth in retail units sold, and we are continuing to focus on growing inventory to meet demand. We ended the quarter with 26,897 website units and 11,900 available for immediate purchase, up from 5,914 at the end of Q2 but still only half as many as pre-pandemic levels.



QUARTERLY RETAIL UNIT SALES

## Objective #2: Increase Total Gross Profit Per Unit

Total GPU reached a record in Q3 at over $4,000, driving our gross margin to the midpoint of our long-term model. The year-over-year and sequential GPU growth was driven primarily by strength in Retail and Finance GPU.

For Q3 2020:

- Total
  - Total GPU was $4,056 vs. $2,963 in Q3 2019 and $2,726 in Q2 2020 [3]
- Retail
  - Retail GPU was $1,857 vs. $1,305 in Q3 2019 and $1,190 in Q2 2020 [3]
  - Year-over-year changes in retail vehicle GPU were primarily driven by more customer-sourced vehicles, which generally have higher margins. Sequential changes were primarily driven by more customer-sourced vehicles, a reduction in average days to sale to 58 from 89, and lower reconditioning costs per unit as production utilization normalized.
- Wholesale
  - Wholesale GPU was $266 vs. $120 in Q3 2019 and $137 in Q2 2020 [3]
  - Year-over-year changes in wholesale GPU were driven by record wholesale volume (units +31% YoY to 15,375) and record gross profit per wholesale unit sold of $1,113, an increase from $476 in Q3 2019. Increased wholesale volume came from the growth in vehicles purchased from customers, while gross profit per wholesale unit benefited from the strength in wholesale market values.
- Other
  - Other GPU was $1,934 vs. $1,539 in Q3 2019 and $1,399 in Q2 2020
  - Year-over-year changes in Other GPU were driven by higher finance GPU and increased attachment of VSC. Finance GPU was $1,415 in Q3 compared to $1,078 in Q3 2019 and $865 in Q2 2020. The YoY increase was primarily due to tightened credit standards and lower benchmark interest rates, while the sequential gain was also due to improved market conditions.



**TOTAL GROSS PROFIT PER UNIT**

*2018, 2019, Q1 2020, Q2 2020, and Q3 2020 include a $43, $31, $10, $0, and $0 impact from the 100k Milestone Gift, respectively.

---

[3] Total GPU includes a $0, $33, and $0 impact in Q3 2020, Q3 2019, and Q2 2020, respectively, from the 100k Milestone Gift. This includes a $0, $30, and $0 impact, respectively, in retail GPU, and a $0, $3, and $0 impact, respectively, in wholesale GPU.

## Objective #3: Demonstrate Operating Leverage

We achieved positive EBITDA for the first time in Q3 driven by strong GPU performance along with continued SG&A leverage while resuming incremental investments required to prepare for another year of significant growth. Net loss margin levered by 7.3% to (1.1%) versus the prior year and EBITDA margin levered by 6.9% in Q3 to reach positive 1.4%.

For Q3 2020, as a percentage of revenue:

- Total SG&A levered by 1.6%, primarily reflecting benefits from scale and sustained cost efficiencies through the pandemic, moderated by investments to support the growth in the business into 2021. [4]
- Compensation and benefits levered by 0.6%, Advertising levered by 0.8%, Logistics and market occupancy were approximately flat, and Other SG&A levered by 0.2%



*2018, 2019, Q1 2020, Q2 2020, and Q3 2020 include a 0.6%, 0.4%, 0.0%, 0.0% and 0.0% impact from the 100k Milestone Gift, respectively.

---

[4] Prior year period includes a 0.3% impact from the 100k Milestone Gift, contained within Compensation and Benefits.

## Summary

In the third quarter we hit several significant milestones on the path to fulfilling our mission of changing the way people buy cars.

We achieved these milestones because of the quality of the team we get to work with every day, because of their obsession with our customer experience, and because of the foundation we have laid over the last 7 years as a result of our long-term focus.

We are in the best position we have ever been as a company.

Our offering has never been more appealing to car buyers and sellers. The path to our long-term financial model has never been more clearly visible. Our financial position has never been stronger. Our team has never been closer or more battle tested. And our ambition and focus on our customers have never wavered.

The march continues.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

# Appendix

*Conference Call Details*

Carvana will host a conference call today, October 29, 2020, at 5:30 p.m. EDT (2:30 p.m. PDT) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until November 5, 2020, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10148378#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2019 and our Quarterly Report on Form 10-Q for Q1 2020, Q2 2020, and Q3 2020.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ( "GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | September 30, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Restricted cash | 22,619 | 42,443 |
| Accounts receivable, net | 82,932 | 39,864 |
| Finance receivables held for sale, net | 316,972 | 286,969 |
| Vehicle inventory | 967,547 | 762,696 |
| Beneficial interests in securitizations | 112,134 | 98,780 |
| Other current assets, including $5,437 and $0, respectively, due from related parties | 71,196 | 52,654 |
| Total current assets | 1,747,104 | 1,359,422 |
| Property and equipment, net | 800,181 | 543,471 |
| Operating lease right-of-use assets, including $22,483 and $44,583, respectively, from leases with related parties | 141,657 | 123,420 |
| Intangible assets, net | 5,990 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $4,908 and $6,138, respectively, due from related parties | 28,513 | 14,850 |
| Total assets | $ 2,732,798 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $12,845 and $9,549, respectively, due to related parties | $ 355,876 | $ 234,443 |
| Short-term revolving facilities | 126,981 | 568,840 |
| Current portion of long-term debt | 54,313 | 48,731 |
| Other current liabilities, including $3,442 and $4,518, respectively, from leases with related parties | 11,616 | 12,856 |
| Total current liabilities | 548,786 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 1,080,929 | 883,060 |
| Operating lease liabilities, excluding current portion, including $19,482 and $41,829, respectively, from leases with related parties | 140,010 | 116,071 |
| Other liabilities | 1,497 | 1,808 |
| Total liabilities | 1,771,222 | 1,865,809 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 70,538 and 50,507 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 71 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 721,174 | 280,994 |
| Accumulated deficit | (290,836) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 430,510 | 98,112 |
| Non-controlling interests | 531,066 | 93,827 |
| Total stockholders' equity | 961,576 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,732,798 | $ 2,057,748 |

16

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | $ 3,245,209 | $ 2,470,630 |
| Wholesale vehicle sales, including $1,323, $0, $1,365, and $0, respectively, from related parties | 129,925 | 92,430 | 258,965 | 188,474 |
| Other sales and revenues, including $26,141, $15,824, $69,423, and $40,386, respectively, from related parties | 124,556 | 71,408 | 255,985 | 177,205 |
| **Net sales and operating revenues** | 1,543,609 | 1,094,854 | 3,760,159 | 2,836,309 |
| Cost of sales, including $931, $997, $2,664, and $3,487, respectively, to related parties | 1,282,336 | 957,311 | 3,210,258 | 2,472,441 |
| **Gross profit** | 261,273 | 137,543 | 549,901 | 363,868 |
| Selling, general and administrative expenses, including $4,712, $4,264, $13,630, and $9,884, respectively, to related parties | 267,842 | 207,970 | 783,487 | 545,054 |
| Interest expense, including $332, $332, $998, and $998 to related parties | 20,276 | 20,990 | 69,053 | 55,953 |
| Other (income) expense, net | (9,201) | 827 | 5,126 | 1,760 |
| **Net loss before income taxes** | (17,644) | (92,244) | (307,765) | (238,899) |
| Income tax provision | 76 | — | (162) | — |
| **Net loss** | (17,720) | (92,244) | (307,603) | (238,899) |
| Net loss attributable to non-controlling interests | (10,635) | (62,156) | (199,801) | (165,373) |
| **Net loss attributable to Carvana Co.** | $ (7,085) | $ (30,088) | $ (107,802) | $ (73,526) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.10) | $ (0.60) | $ (1.73) | $ (1.61) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 70,005 | 49,787 | 62,244 | 45,726 |

(1)   Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

17

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (307,603) | $ (238,899) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 52,076 | 27,505 |
| Loss on disposal of property and equipment | 5,708 | 1,046 |
| Provision for bad debt and valuation allowance | 10,752 | 7,030 |
| Gain on loan sales | (129,041) | (99,408) |
| Equity-based compensation expense | 18,011 | 25,366 |
| Amortization and write-off of debt issuance costs and bond premium | 5,745 | 3,569 |
| Originations of finance receivables | (2,492,741) | (1,877,336) |
| Proceeds from sale of finance receivables, net | 2,478,931 | 2,027,689 |
| Purchase of finance receivables | — | (161,781) |
| Principal payments received on finance receivables held for sale | 60,113 | 54,623 |
| Unrealized (gain) loss on beneficial interests in securitization | (4,021) | 219 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (45,575) | (27,907) |
| Vehicle inventory | (197,962) | (213,762) |
| Other assets | (17,743) | (25,755) |
| Accounts payable and accrued liabilities | 112,495 | 65,452 |
| Operating lease right-of-use assets | (18,237) | (18,896) |
| Operating lease liabilities | 22,699 | 16,952 |
| Other liabilities | (311) | (382) |
| Net cash used in operating activities | (446,704) | (434,675) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $21,657 and $6,282, respectively, from related parties | (270,486) | (151,380) |
| Principal payments received on beneficial interests in securitizations | 8,782 | 2,577 |
| Net cash used in investing activities | (261,704) | (148,803) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 3,425,755 | 3,093,039 |
| Payments on short-term revolving facilities | (3,867,614) | (3,133,186) |
| Proceeds from issuance of long-term debt | 203,047 | 367,349 |
| Payments on long-term debt | (18,414) | (11,087) |
| Payments of debt issuance costs | (11,730) | (8,423) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 |
| Proceeds from exercise of stock options | 4,907 | 1,492 |
| Tax withholdings related to restricted stock awards | (8,619) | (3,552) |
| Net cash provided by financing activities | 786,272 | 603,243 |
| **Net increase in cash, cash equivalents and restricted cash** | 77,864 | 19,765 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 196,323 | $ 108,474 |

18

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2020** | **2019** | **2020** | **2019** |
| | (in thousands) | | | |
| Weighted-average shares of Class A common stock outstanding | 70,005 | 49,787 | 62,244 | 45,726 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 104,406 | 105,733 | 104,907 | 107,016 |
| | 174,411 | 155,520 | 167,151 | 152,742 |

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three and nine months ended September 30, 2020, there was approximately $0.0 million and $0.5 million, respectively, of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three and nine months ended September 30, 2019, there was approximately $4.4 million and $10.7 million, respectively, of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $1.5 million and $4.2 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 |
| | (dollars in thousands) | | | | |
| Net loss [1] | $ (92,244) | $ (125,740) | $ (183,557) | $ (106,326) | $ (17,720) |
| Depreciation and amortization expense | 10,675 | 13,760 | 15,811 | 17,629 | 18,636 |
| Interest expense | 20,990 | 24,653 | 28,862 | 19,915 | 20,276 |
| Income tax provision | — | — | — | (238) | 76 |
| EBITDA | $ (60,579) | $ (87,327) | $ (138,884) | $ (69,020) | $ 21,268 |
| | | | | | |
| Total revenues | $1,094,854 | $1,103,587 | $ 1,098,216 | $ 1,118,334 | $ 1,543,609 |
| Net loss margin | (8.4)% | (11.4)% | (16.7)% | (9.5)% | (1.1)% |
| EBITDA Margin [2] | (5.5)% | (7.9)% | (12.6)% | (6.2)% | 1.4 % |

(1) Includes $4.4 million, $2.5 million, $0.5 million, $0.0 million, and $0.0 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.4%, 0.2%, 0.0%, 0.0%, and 0.0%, respectively, related to the 100k Milestone Gift.

| | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| | (dollars in thousands) | | | | | |
| Net loss [1] | $ (15,238) | $ (36,780) | $ (93,112) | $ (164,316) | $ (254,745) | $ (364,639) |
| Depreciation and amortization expense | 1,705 | 2,800 | 4,658 | 11,568 | 23,539 | 41,265 |
| Interest expense | 108 | 1,412 | 3,587 | 7,659 | 25,018 | 80,606 |
| EBITDA | $ (13,425) | $ (32,568) | $ (84,867) | $ (145,089) | $ (206,188) | $ (242,768) |
| | | | | | | |
| Total revenues | $ 41,679 | $ 130,392 | $ 365,148 | $ 858,870 | $1,955,467 | $3,939,896 |
| Net loss margin | (36.6)% | (28.2)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% |
| EBITDA Margin [2] | (32.2)% | (25.0)% | (23.2)% | (16.9)% | (10.5)% | (6.2)% |

(1) Includes $0.0 million, $0.0 million, $0.0 million, $0.0 million, $11.8 million, and $13.2 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.0%, 0.0%, 0.0%, 0.6%, and 0.4%, respectively, related to the 100k Milestone Gift.

20

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | 2020 | 2019 | Change |
| | (dollars in thousands, except per unit amounts) | | | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | 38.5 % | $ 3,245,209 | $ 2,470,630 | 31.4 % |
| Wholesale vehicle sales [1] | 129,925 | 92,430 | 40.6 % | 258,965 | 188,474 | 37.4 % |
| Other sales and revenues [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total net sales and operating revenues | $ 1,543,609 | $ 1,094,854 | 41.0 % | $ 3,760,159 | $ 2,836,309 | 32.6 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 119,607 | $ 60,563 | 97.5 % | $ 268,035 | $ 171,063 | 56.7 % |
| Wholesale vehicle gross profit [1][4] | 17,110 | 5,572 | 207.1 % | 25,881 | 15,600 | 65.9 % |
| Other gross profit [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total gross profit | $ 261,273 | $ 137,543 | 90.0 % | $ 549,901 | $ 363,868 | 51.1 % |
| **Market information:** | | | | | | |
| Markets, beginning of period | 261 | 137 | 90.5 % | 146 | 85 | 71.8 % |
| Market launches | — | 9 | (100.0)% | 115 | 61 | 88.5 % |
| Markets, end of period | 261 | 146 | 78.8 % | 261 | 146 | 78.8 % |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 64,414 | 46,413 | 38.8 % | 171,939 | 127,179 | 35.2 % |
| Wholesale vehicle unit sales | 15,375 | 11,698 | 31.4 % | 33,406 | 29,155 | 14.6 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 20,013 | $ 20,059 | (0.2)% | $ 18,874 | $ 19,426 | (2.8)% |
| Wholesale vehicles | $ 8,450 | $ 7,901 | 6.9 % | $ 7,752 | $ 6,465 | 19.9 % |
| **Per unit gross profit: [5]** | | | | | | |
| Used vehicle gross profit [3] | $ 1,857 | $ 1,305 | 42.3 % | $ 1,559 | $ 1,345 | 15.9 % |
| Wholesale vehicle gross profit [4] | $ 1,113 | $ 476 | 133.8 % | $ 775 | $ 535 | 44.9 % |
| Other gross profit | $ 1,934 | $ 1,539 | 25.7 % | $ 1,489 | $ 1,393 | 6.9 % |
| Total gross profit | $ 4,056 | $ 2,963 | 36.9 % | $ 3,198 | $ 2,861 | 11.8 % |

(1)  Includes $1,323 and $0 for the three months ended September 30, 2020 and 2019, respectively, and $1,365 and $0 for the nine months ended September 30, 2020 and 2019, respectively, of wholesale revenue from related parties.

(2)  Includes $26,141 and $15,824 for the three months ended September 30, 2020 and 2019, respectively, and $69,423 and $40,386 for the nine months ended September 30, 2020 and 2019, respectively, of other sales and revenues from related parties.

(3)  Includes $0, $1,381, $510, and $3,953, or $0, $30, $3, and $31 per unit, related to the 100k Milestone Gift.

(4)  Includes $0, $142, $17, and $267, or $0, $12, $0, and $9 per wholesale unit, related to the 100k Milestone Gift.

(5)  All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 |
| | (in thousands) | | | | |
| Compensation and benefits [1] | $ 60,655 | $ 72,939 | $ 84,250 | $ 74,202 | $ 80,248 |
| 100k Milestone Gift | 2,903 | 1,263 | — | — | — |
| Advertising | 55,264 | 58,867 | 74,788 | 62,330 | 65,148 |
| Market occupancy [2] | 5,517 | 6,644 | 8,103 | 8,019 | 9,733 |
| Logistics [3] | 14,068 | 18,090 | 18,914 | 16,699 | 18,073 |
| Other [4] | 69,563 | 83,860 | 89,656 | 78,684 | 94,640 |
| Total | $ 207,970 | $ 241,663 | $ 275,711 | $ 239,934 | $ 267,842 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.

(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

|  | September 30, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 975,264 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 101,233 | 104,680 |
| **Committed liquidity resources available** | $ **1,250,201** | $ **459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.

(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $26.2 million and $29.7 million as of September 30, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.

(3) We have $197.7 million and $158.7 million of total unfunded gross real estate assets as of September 30, 2020 and December 31, 2019, respectively.

As of September 30, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1.9 billion and $1.6 billion, an outstanding balance of $127.0 million and $568.8 million, and unused capacity of $1.7 billion and $1.0 billion, respectively.

We also had $19.9 million and $137.7 million of committed funds for future construction costs of IRCs with unfinished construction as of September 30, 2020 and December 31, 2019, respectively.

In addition, we had $36.6 million and $13.5 million of total unpledged beneficial interests in securitizations as of September 30, 2020 and December 31, 2019, respectively.

On October 2, 2020, we issued $500.0 million principal amount of 5.625% Senior Notes due 2025 and $600.0 million principal amount of 5.875% Senior Notes due 2028 and used approximately $626.8 million of the proceeds to redeem in full the outstanding $600.0 million principal amount of our 8.875% Senior Notes due 2023 resulting in net proceeds of approximately $455.9 million.











# CARVANA
## CULTURE

# Q3 | 2020





**Exhibit 7**

SC 13G/A 1 schedule13g123120.htm SC 13G/A GARCIA III

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

# Schedule 13G

**Under the Securities Exchange Act of 1934**
(Amendment No. 4 )*

**Carvana Co.**

(Name of Issuer)

**Class A Common Stock, par value $0.001 per share**

(Title of Class of Securities)

**146869102**

(CUSIP Number)

**December 31, 2020**

(Date of Event which Requires Filing of this Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule is filed:

☐ Rule 13d-1(b)

☐ Rule 13d-1(c)

☒ Rule 13d-1(d)

---

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter the disclosures provided in a prior cover page.

The information required in the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

| CUSIP No. 146869102 | 13G | Page 2 of 6 Pages |

| 1 | NAMES OF REPORTING PERSON<br>I.R.S. IDENTIFICATION NO. OF ABOVE PERSON (ENTITIES ONLY):<br>Ernest C. Garcia, III | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br><br>(a) ☐<br>(b) ☐ | | |
| 3 | SEC USE ONLY | | |
| 4 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>United States of America | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 5 | SOLE VOTING POWER<br>4,282,636 shares(a) | |
| | 6 | SHARED VOTING POWER<br>11,834,021 shares(b) | |
| | 7 | SOLE DISPOSITIVE POWER<br>4,282,636 shares(a) | |
| | 8 | SHARED DISPOSITIVE POWER<br>11,834,021 shares(b) | |
| 9 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>16,116,657 shares (See Item 4) | | |
| 10 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (9) EXCLUDES CERTAIN SHARES (See Instructions) ☐ | | |
| 11 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (9)<br>18.71% (c) (See Item 4) | | |
| 12 | TYPE OF REPORTING PERSON (See Instructions)<br>IN | | |

(a) Includes 3,664,526 shares of Class A common stock that are issuable in exchange for Class A common units in Carvana Group, LLC ("Class A Units"), 42,529 shares of Class A common stock issuable upon the exercise of options, including those that will have vested within 60 days of December 31, 2020, and 1,723 shares of Class A common stock issuable upon vesting and settlement of restricted stock units that will have vested within 60 days of December 31, 2020, inclusive of shares to be withheld for tax purposes.
(b) Includes 11,834,021 shares of Class A common stock issuable in exchange for Class A Units held directly by the Ernest Irrevocable 2004 Trust III (the "Trust"). The Reporting Person is the Co-Administrative Trustee and Co-Investment Trustee of the Trust and therefore shares voting and dispositive power over the shares of Class A common stock issuable upon exchange of the Class A Units held directly by the Trust.
(c) The percentage is calculated using 70,578,738 shares of the Issuer's Class A common stock outstanding as of October 26, 2020, as reported in the Issuer's Quarterly Report on Form 10-Q filed with the United States Securities and Exchange Commission (the "SEC") on October 29, 2020.

CUSIP No. 146869102                                   **13G**

**Item 1(a)   Name of Issuer:**

Carvana Co. (the "Issuer").

**Item 1(b)   Address of Issuer's Principal Executive Offices:**

1930 W. Rio Salado Parkway, Tempe, Arizona 85281.

**Item 2(a)   Name of Person Filing:**

This Schedule 13G is filed by Ernest C. Garcia, III (the "Reporting Person").

The Reporting Person is a citizen of the United States of America.

**Item 2(b)   Address of Principal Business Office or, if none, Residence:**

The principal business address of the Reporting Person is as follows:

c/o Carvana Co.
1930 W. Rio Salado Parkway
Tempe, Arizona 85281

**Item 2(c)   Citizenship:**

See response to Item 4 of the cover page and Item 2(a) above.

**Item 2(d)   Title of Class of Securities:**

Class A common stock, par value $0.001 per share ("Class A Common Stock").

**Item 2(e)   CUSIP Number:**

146869102.

**Item 3   If this statement is filed pursuant to §§ 240.13d-1(b) or 240.13d-2(b) or (c), check whether the person filing is a:**

(a) ☐   Broker or dealer registered under section 15 of the Act (15 U.S.C. 78o).

(b) ☐   Bank as defined in section 3(a)(6) of the Act (15 U.S.C. 78c).

(c) ☐   Insurance company as defined in section 3(a)(19) of the Act (15 U.S.C. 78c).

(d) ☐    Investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8).

(e) ☐    An investment adviser in accordance with §240.13d-1(b)(1)(ii)(E).

(f) ☐    An employee benefit plan or endowment fund in accordance with §240.13d-1(b)(1)(ii)(F).

(g) ☐    A parent holding company or control person in accordance with § 240.13d-1(b)(1)(ii)(G).

| CUSIP No. 146869102 | **13G** | Page 4 of 6 Pages |

(h) ☐   A savings associations as defined in Section 3(b) of the Federal Deposit Insurance Act (12 U.S.C. 1813).

(i) ☐   A church plan that is excluded from the definition of an investment company under section 3(c)(14) of the Investment Company Act of 1940 (15 U.S.C. 80a-3).

(j) ☐   Non-U.S. institution in accordance with Rule 13d-1(b)(1)(ii)(J).

(k) ☐   Group, in accordance with §240.13d-1(b)(1)(ii)(K).

Not applicable.

**Item 4      Ownership:**

(a)   *Amount beneficially owned as of the date hereof:*

See response to Item 9 on the cover page.

Pursuant to the Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC and an Exchange Agreement that the holders of Class A Units entered into with the Issuer, the Reporting Person is entitled from time to time at his option to exchange Class A Units (together with shares of his Class B common stock), for shares of Class A common stock on a five-to-four basis (or, at the Issuer's discretion, for cash).

The Reporting Person beneficially owns (i) 573,858 shares of Class A common stock (ii) 15,498,547 shares of Class A common stock issuable upon exchange of Class A Units, 11,834,021 of which are issuable upon exchange of Class A Units held directly by the Trust, (iii) 42,529 shares of Class A common stock issuable upon the exercise of options, including those that will have vested within 60 days of December 31, 2020, and (iv) 1,723 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of December 31, 2020, inclusive of shares to be withheld for tax purposes. The Reporting Person is the Co-Administrative Trustee and Co-Investment Trustee of the Trust and therefore shares voting and dispositive power with respect to the securities held directly by the Trust.

(b)   *Percent of class:* See response to Item 11 on the cover page.

(c)   *Number of shares as to which such person has:*

(i) sole power to vote or to direct the vote: See responses to Item 5 on the cover page and Item 4(a) above.

(ii) shared power to vote or to direct the vote: See responses to Item 6 on the cover page and Item 4(a) above.

(iii) sole power to dispose or to direct the disposition of: See responses to Item 7 on the cover page and Item 4(a) above.

**13G**

(iv) shared power to dispose or to direct the disposition of: See responses to Item 8 on the cover page and Item 4(a) above.

**Item 5**  **Ownership of Five Percent or Less of a Class:**

Not Applicable.

**Item 6**  **Ownership of More Than Five Percent on Behalf of Another Person:**

Not Applicable.

**Item 7**  **Identification and Classification of the Subsidiary Which Acquired the Security Being Reported on By the Parent Holding Company:**

Not Applicable.

**Item 8**  **Identification and Classification of Members of the Group:**

Not Applicable.

**Item 9**  **Notice of Dissolution of Group:**

Not Applicable.

**Item 10**  **Certification:**

Not Applicable.

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated:  February 12, 2021

By:       /s/ Ernest C. Garcia, III
Name:     Ernest C. Garcia, III

**Exhibit 8**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2020**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1930 W. Rio Salado Parkway    Tempe    Arizona** | **85281** |
| (Address of principal executive offices) | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒   Yes ☐   No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐   Yes ☒   No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  ☒   Yes ☐   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal   ☒
control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report.

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐    Yes  ☒    No

As of June 30, 2020, the aggregate market value of the common stock of the registrant held by non-affiliates was $8.2 billion based on the closing price of the common stock on the New York Stock Exchange on such date.

As of February 19, 2021, the registrant had 78,331,472 shares of Class A common stock outstanding and 93,929,471 shares of Class B common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2021 Annual Meeting of Shareholders are incorporated by reference into Part III of this Form 10-K.

**CARVANA CO.**
**FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2020**
**INDEX**

| | | **Page** |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 45 |
| Item 2. | Properties | 45 |
| Item 3. | Legal Proceedings | 46 |
| Item 4. | Mine Safety Disclosure | 46 |
| | **PART II** | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 47 |
| Item 6. | Selected Financial Data | 49 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 71 |
| Item 8. | Financial Statements and Supplementary Data | 72 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 126 |
| Item 9A. | Controls and Procedures | 126 |
| Item 9B. | Other Information | 126 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 127 |
| Item 11. | Executive Compensation | 127 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 127 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 127 |
| Item 14. | Principal Accountant Fees and Services | 127 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 128 |
| | Signatures | 130 |

**PART I**

In this Annual Report on Form 10-K, "we," "our," "us," "Carvana," and "the Company" refer to Carvana Co. and its consolidated subsidiaries, unless the context requires otherwise.

**Forward-Looking and Cautionary Statements**

This Annual Report on Form 10-K, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions, and expectations disclosed in the forward-looking statements we make. Important factors that could cause or contribute to such differences include, but are not limited to, those discussed under Item 1A —"Risk Factors" in this Annual Report on Form 10-K. The forward-looking statements in this Annual Report on Form 10-K represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

**Market and Industry Data**

Some of the market and industry data contained in this Annual Report on Form 10-K are based on independent industry publications or other publicly available information. Although we believe that these independent sources are reliable, we have not independently verified and cannot assure you as to the accuracy or completeness of this information. As a result, you should be aware that the market and industry data contained herein, and our beliefs and estimates based on such data, may not be reliable.

**ITEM 1. BUSINESS.**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 to complete an initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Carvana Co. Class A common stock trades on the New York Stock Exchange under the symbol "CVNA." Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to both Carvana Group and its consolidated subsidiaries prior to the IPO described in this report and to Carvana Co. and its consolidated subsidiaries following the IPO and organizational transactions completed in connection with our IPO.

<div align="center">

**Our Company**

</div>

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want—a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

We provide refreshingly different and convenient experiences for used car buying and selling that can save customers time and money. On our platform, consumers can research and identify a vehicle, inspect it using our patented 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle, and schedule delivery or pick-up, all from their desktop or mobile devices. Alternatively, a customer can obtain a firm offer online for their vehicle by answering a few questions without needing to provide photos or service records. Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase or sale, and schedule delivery or pick-up online in as little as 10 minutes.

Our technology and infrastructure allow us to seamlessly and cost efficiently deliver this experience to our customers. We use proprietary algorithms to optimize our nationally pooled inventory of over 31,000 total website units, inspect and recondition our vehicles based on our 150-point inspection process, and operate our own logistics network to deliver cars directly to customers as soon as the next day. Customers in certain markets also have the option to pick up their vehicle at one of our patented vending machines, which provides an exciting pick-up experience for the customer while decreasing our variable costs, increasing scalability and building brand awareness.

The automotive retail industry's large size, fragmentation, and lack of differentiated offerings present an opportunity for disruption. We have demonstrated that our custom-built business model can capitalize on this opportunity. From the launch of our first market in January 2013 through December 31, 2020, we purchased, reconditioned, sold, and delivered approximately 587,600 vehicles to customers through our website, generating approximately $12.9 billion in revenue. Our sales have grown as we have increased our market penetration in our current markets and added new markets. As of December 31, 2020, our in-house distribution network services 266 metropolitan markets, and we plan to continue to expand our network into additional markets.

<div align="center">

**Industry Background & Market Opportunity**

</div>

*Exceptionally Large and Fragmented Market*

The U.S. automotive industry generated approximately $1.0 trillion in sales in 2019, according to the NADA Data 2019 report. This comprised roughly 20% of the U.S. retail economy and made it the largest consumer retail market in the United States according to the U.S. Census Bureau. Based on Cox Automotive data, there were an estimated 37.2 million used vehicle transactions in 2020, down 7% from the 40 million in 2019.

The used car retail industry is highly fragmented. There were approximately 43,000 used car dealerships in the U.S. according to Borrell Associates' 2017 Outlook. As of 2019, the largest dealer brand commands approximately 1.9% of the U.S. market and the top 100 used car retailers collectively hold approximately 9.3% market share, according to Automotive News. Additionally, consumers are often dissatisfied with the car buying process. According to the 2019 Cox Automotive Car Buyer Journey Study, 61% of car buyers do not feel the shopping experience has improved, with paperwork and negotiations being the most frustrating parts of the purchase process.

The traditional used car retailing model is costly, operationally challenging and difficult to scale. Providing an end-to-end solution requires inspection, repair, reconditioning and showroom facilities, as well as inventory sourcing and financing capabilities, substantially all of which is traditionally done at each dealership location. According to publicly listed dealership

<div align="center">2</div>

filings, some full-service dealerships providing all of these services can require an initial investment of up to $22 million per dealership. Additional variable costs include the salaries of on-site employees, inventory financing fees, and vehicle transportation costs.

Customer acquisition is expensive and inefficient for traditional automotive retailers as they are typically confined to local advertising channels and must drive foot traffic to their physical locations, where they offer an often undifferentiated service and limited inventory.

Additional challenges in automotive retailing, both online and offline, stem from the following unique characteristics of selling cars:

- big ticket item, often representing the second most expensive purchase many consumers make and finance, and one of the customer's largest and longest life cycle purchases;

- range of taste in make, model, body style, price, year, mileage, color, drivetrain, and features;

- complex transaction often involving a vehicle trade-in, financing, and the purchase of add-on service products to protect the customer's investment;

- reliance on third parties for critical business functions; and

- state and local regulatory variability.

### The Way Consumers Buy Cars Is Changing

Historically, consumers discovered vehicles for sale through local print and broadcast media, as well as word of mouth, and would go to dealerships to educate themselves on potential purchases. However, consumers no longer rely solely on traditional media and dealerships to discover and research vehicles. According to a MediaPost article from April 2018, 91% of vehicle shoppers utilize the internet. In fact, the 2020 Car Buyer Journey report from Cox Automotive indicates that a typical used car buyer spends approximately ten hours researching his or her prospective car purchase online.

As e-commerce has become more established, reaching 14.3% of total retail sales in the U.S. during the third quarter of 2020 according to the U.S. Census Bureau, consumers have become more comfortable buying taste-driven, higher-priced products such as consumer electronics and home furnishings online. Similarly, auto consumers are interested in e-commerce solutions for their car purchasing needs—83% of U.S. car buyers want to do one or more steps of the car purchasing process online, according to the 2019 Cox Automotive Future of Digital Retail Study.

### What Auto Consumers Want

As a result of the unique aspects of purchasing a vehicle, consumers have a distinct set of expectations that are challenging for traditional used car retailers to address.

- *Wide selection*. Automobiles vary widely in model, style, color, age and price, and consumers exhibit differing tastes, style, and purchasing goals and budgets. This requires dealers to maintain a broad inventory and offer multiple financing, warranty and service plan choices.

  - Traditional used car retailers are limited by staging capacity and anticipated local demand at each dealership; they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively. Additionally, even as traditional used car retailers add new store locations, it remains difficult to create broad diversity of inventory among stores because each lot requires the highest demand units, creating redundancies.

- *Value*. Auto consumers want consistent, fair value.

  - Traditional used car retailers have high overhead costs and must pass these costs on to their customers.

3

• *Confidence in quality*. Auto consumers want to have comfort that the vehicle they purchase is mechanically sound and will not require costly repairs or replacement in the near term.

- Traditional used car retailers may lack the scale and expertise to consistently purchase high-quality vehicles and uniformly recondition them, increasing the incidence of selling a "lemon."

• *Control and no pressure*. Auto consumers want to feel in control of the buying process, without being pressured.

- According to a 2020 Gallup Poll, only 48% of American consumers view the automotive industry positively. In addition, only 58% of people trust that used car dealerships can provide the best deal, according to the 2018 Cox Automotive Car Buyer Journey.

• *Fast, simple purchasing process*. Auto consumers want their transaction to be convenient, fair and on their own desired timeline.

- Buying a car at a traditional auto dealership is often a multi-part transaction including vehicle purchase, trade-in, financing and complementary products, and requires over two hours on average, according to the 2020 Car Buyer Journey report from Cox Automotive, and nearly half of that is spent doing paperwork and negotiating.

<div align="center">

**Carvana's Solution**

</div>

In response to these evolving consumer needs, we built Carvana to provide a no-pressure, no-haggle experience with flexible and fast transactions. Consumers can research and identify a vehicle, inspect it using interactive high definition photography, obtain financing and warranty coverage, value their current vehicle, complete their purchase, and schedule delivery or pick up, all from our online platform. Our uniformed employees deliver cars to customers in branded haulers as soon as the next day, and we offer a seven-day return policy on all of our cars sold. The sales process we have built enables our customers to execute their purchases, once a car has been selected, in as little as 10 minutes and obtain a value for their current vehicle in as little as two minutes.

We aim to deliver the best selection, best value, and best experience for used car buyers and sellers.

*The Best Selection*

As of December 31, 2020, we offer all customers a nationally pooled inventory of over 31,000 high-quality used vehicles on our website. We evaluate all of the vehicles that we own and offer for sale using our 150-point "Carvana Certified" inspection process, which we are able to perform at scale across our network of inspection and reconditioning centers ("IRCs"). Our customer research indicates that size and range of selection are primary determinants of where customers will transact. We use proprietary algorithms to optimize our inventory acquisition based on extensive used vehicle market and customer behavior data. Furthermore, our nationally pooled inventory system maximizes the breadth of vehicle selection for our customers in any given location. This results in a higher likelihood that customers are able to find the make, model, year, and color combination that they desire. In contrast, traditional dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

*The Best Value*

Our proprietary technology and vertically integrated business model will allow us to enjoy a significantly lower variable cost structure at scale versus traditional dealerships and provide substantial value to our customers. We do not require a network of brick-and-mortar dealerships, staffed with sales personnel; instead, we utilize both an in-house logistics network and patented vending machines to facilitate vehicle delivery and pick-ups. These savings are passed on to the consumer through sales prices that are below industry averages. Additionally, we believe our pooled inventory approach will at scale result in lower average days to sale than industry averages, which we expect will help improve margins due to decreased vehicle depreciation resulting in higher unit selling price. Furthermore, we are able to provide personalized and highly transparent financing terms based on basic customer information that results in faster transaction times, clear lending terms, and competitive interest rates.

<div align="center">

4

</div>

*The Best Experience*

We aim to provide the best car buying and selling experience available for our customers through a fully integrated, convenient online experience. Our patented 360-degree vehicle imaging technology provides transparency by allowing customers to view vehicle features and imperfections. We also provide automated vehicle valuations for buying vehicles from customers with or without a retail purchase, automated financing, vehicle service contracts ("VSC"), GAP waiver coverage, and limited warranty. Customers can easily select among thousands of preapproved financing terms and receive approval in seconds.

We offer a premium fulfillment experience with pick-up and delivery options available, including pick-up at our vending machines in some markets. Our in-house customer advocates are available to answer customer questions that arise throughout the process. At every customer touch point, we strive to provide the level of customer service that makes purchasing a car from us an enjoyable, memorable experience. Finally, we offer seven-day return and 100-day warranty policies with every car we sell. We believe that our customers value the ease of use and transparency of our platform. They have responded favorably to our solution, as illustrated by the ratings we receive. Our customers rated us an average of 4.7 out of 5.0 as of December 31, 2020 based on over 80,000 satisfaction surveys we solicited from our inception through December 31, 2020. These positive reactions create opportunities for repeat customers and a strong referral network.

## Strengths & Competitive Advantages

Our business model is disrupting the traditional used vehicle sales model. Our primary goal is to rapidly scale vehicle unit sales by focusing on delivering an unparalleled customer experience. Since our inception in 2012, we have been developing and leveraging the following key strengths of our robust platform, which we believe provide significant competitive advantages.

*Purpose-Built Vertically Integrated E-commerce Platform*

We built our used car e-commerce platform because we believe a lower and differentiated cost structure is critical to providing a seamless, best-in-class car buying and selling experience. We believe that traditional dealerships and other technology-enabled auto platforms do not provide this type of experience, and that our end-to-end model allows us to offer a superior solution while reducing our cost of operations and enhancing our ability to offer complementary products and services. Our vertically integrated platform gives us control of all critical operations and transaction elements, which facilitates a fast, simple, and consistent user experience. We control the algorithms that help determine the vehicles we make available to our customers, the prices of those vehicles, the financing terms, and VSC and GAP waiver coverage options available to our customers and the trade-in values we offer. Additionally, we control the logistics infrastructure that enables us to offer customers fast, specific, and reliable delivery and pick-up times. We have invested heavily in our custom designed website to provide a cutting-edge user interface, and have built a team of in-house customer advocates that is dedicated to providing first-rate customer service.

*Differentiated Shopping Experience*

We have developed technology that makes the online vehicle purchasing process intuitive, transparent and fun. Our patented photo booth, paired with custom photo processing and display technology, provides an interactive way for consumers to search for vehicles and take a virtual tour of the interior and exterior of a vehicle using annotated, high definition photography. We believe this technology, coupled with our certification process and seven-day return policy, generates the confidence and trust in our platform needed to buy a car online.

*Proprietary Financing Technology*

Our differentiated financing solutions provide customers with nearly instantaneous credit decisions as well as flexibility and transparency in financing their vehicle purchase. We preapprove thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. We preapprove these terms utilizing "soft credit checks" which do not impact a customer's credit unless they complete a purchase and financing transaction. Due to our relatively low car prices, our customers generally have lower PTI (Payment to Income) ratios, lower LTV (Loan to Value) ratios, or higher quality vehicles underlying their financing transactions than they would have at higher prices. This significantly enhances the quality of the loans that we generate and the premium we can capture when we sell them through securitization transactions or to our financing partners.

5

*Efficient Logistics Network and Attractive Fulfillment Experience*

We have developed proprietary logistics software and an in-house delivery network that differentiates us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience. Our home delivery is typically conducted by a Carvana employee on a branded delivery truck. Customers in certain markets can also pick up their vehicles at one of our patented car vending machines, which are multi-story glass towers that store purchased vehicles. These vending machines provide an attractive and unique experience for our customers and develop brand awareness while lowering our variable fulfillment expenses. Following the opening of a vending machine in one of our markets, our market penetration has seen a meaningful increase while our variable operating costs per car sold have decreased. We intend to grow our logistics network and build vending machines in many of the metropolitan markets that we serve.

*Scaled Used Vehicle Infrastructure*

As of December 31, 2020, we leverage a network of eleven IRCs and supporting software for our vehicle reconditioning and logistics activities that required significant investment in time and capital to develop. We believe these facilities at full utilization give us capacity to inspect and recondition approximately 600,000 cars per year. Our proprietary inventory management system and Transportation Management System ("TMS"), combined with our expertise and experience gained from operating these facilities, position us well to continue to build out additional reconditioning and distribution centers as needed. To increase the available selection of vehicles on our website, we have also tested using third party inspection and reconditioning centers to recondition a limited portion of vehicles for our inventory.

*Scale Driving Powerful Network Effects*

Our business benefits from powerful network effects. Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets. As we add markets, we expect to increase overall demand, which would enable us to carry a larger inventory. A broader vehicle inventory would further improve our offering across our markets, enabling us to increase market share. Furthermore, we anticipate that increased brand awareness, driven by national advertising, will allow us to expand our national inventory and further these network effects.

### Our Growth Strategies

The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and GAP waiver coverage, as well as trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service. Since launching Carvana eight years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2020. We plan to continue growing our vehicle unit sales, market penetration, number of markets, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

*Increase Sales Through Further Penetration of Our Existing Markets*

We believe that our markets are at an early stage of growth when measured by market penetration. Our growth continues to be driven by further market penetration in our existing markets. For the year ended December 31, 2020, our markets opened in 2013 through 2019 grew by 35%, despite the impacts of COVID-19. We plan to continue marketing and actively building our brand image and awareness in existing markets by improving our operations, opening additional vending machines, and increasing our inventory size.

*Continue to Enter Key Geographic Markets*

We believe there is a substantial opportunity to utilize our capital-light expansion model and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. We believe we can enter more markets than many of the larger dealership groups because of our lower cost structure, which allows us to efficiently

6

operate in smaller markets. Furthermore, our nationally pooled inventory creates an even larger competitive advantage in these smaller markets, where customers typically have access to less inventory selection at local dealerships.

### Optimize Our Inventory Selection

We will continue to optimize and broaden the selection of vehicles we make available to our customers. Expanding our inventory selection increases the likelihood that each visitor to our site finds a vehicle that matches his or her preferences and benefits all existing markets simultaneously due to our nationally pooled inventory model. Expanding our inventory selection depends on our ability to source and acquire a sufficient number of appropriate used vehicles, including acquiring more vehicles from customers, to develop processes for effectively utilizing capacity in our IRCs, and to hire and train employees to staff these centers. As we build out additional IRCs we will shorten the distance from our inventory pools to our customers, reducing delivery times, which, all else equal, should increase conversions.

### Continue to Innovate and Extend Our Technology Leadership

We will continue to make significant investments in improving and adding to our customer offering. We believe that the complexity of the automotive retail transaction provides substantial opportunity for technology investment and that our leadership and continued growth will enable us to responsibly invest in further separating ourselves from our competitors' offerings. In addition to our own internal developments, we have acquired purpose-built technology from Carlypso, Car360, and Propel AI and hired employees from those companies. We believe each of these acquisitions and purchases not only extends our technology leadership but adds talented entrepreneurs to our team.

### Continue to Enhance Our Mobile Sales Platform

We will continue investing in our mobile platform to enhance our customers' ability to search for, research, finance, sell, and purchase vehicles entirely on mobile devices, including smartphones and tablets. According to J.D. Power 2017 New Autoshopper Study, 56% of auto research occurred on a mobile device. According to Statista, goods and services purchased via mobile devices by U.S. consumers totaled $338 billion in 2020, which accounted for 31% of total e-commerce. Growth in mobile-only sales depends on our ability to deliver an innovative, appealing mobile experience, as well as customers' tastes for buying exclusively on mobile devices.

### Develop Broad Consumer Awareness of Our Brand

We believe our brand development efforts will meaningfully impact our ability to acquire new customers. We intend to continue attracting new customers through advertising, public relations, customer referrals and customers selling us their vehicles. We also plan to build vending machines in additional markets to capitalize on word-of-mouth publicity in building awareness of our brand.

### Generate Referrals and Repeat Customers

Our growth is enhanced by providing a superior customer experience, which drives our ability to generate customer referrals and repeat sales.

### Develop New Products

We plan to continue leveraging our existing e-commerce and logistics infrastructure to increase monetization opportunities by introducing new complementary products and services. The car purchasing and ownership cycle provides many opportunities to add value for our customers and our technology expertise and process automation position us well to provide these services in unique and differentiated ways.

**Customer Lifecycle**

*Search and Discovery.* We have developed a mobile-optimized website, where prospective car buyers can immediately begin browsing, researching, filtering and identifying their choice from an inventory of over 31,000 total website units that we offer for sale. We have also developed a series of innovative features to enhance the customer experience on our website and enable better product discovery, such as highly engaging visual imagery and merchandising, as well as easy-to-use site

7

navigation tools and personalization features. We also integrate with various vehicle data providers for vehicle feature and option information as a research tool to assist our customers with their purchase decisions.

*Virtual Tour.* Once customers select a vehicle, they have the ability to take an annotated virtual vehicle tour on our website, which includes a 360-degree view of the interior and exterior of the actual vehicle. This interactive tour allows customers to review vehicle imperfections through high definition photography and provides them with an extensive list of vehicle details, accessories and safety features presented in an intuitive and easy to review manner.

*Seamless Transaction Technology.* Once customers have chosen a vehicle, our platform allows them to complete the purchase in as little as 10 minutes, saving them both time and money.

• *Financing.* We preapprove thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. Our website includes unique, highly engaging, and intuitive financing tools that are transparent and demonstrate the relationship between preapproved down payment, monthly payment, and term combinations. Our innovative financing tool allows borrowers to select an exact dollar payment plan based on thousands of permutations of APR, down payment, monthly payment, and term. Our customers can obtain a financing decision in seconds generated by our proprietary credit scoring and deal structuring algorithms for every car in our inventory. This involves a short process that only requires 11 fields to be completed and will not impact customers' credit unless they pursue a purchase and finance transaction.

• *Complementary products.* Our customers can further supplement their online vehicle purchase by electing to purchase a fully integrated VSC, or extended warranty. In order to help improve the transaction experience, we evaluate numerous options to ultimately provide each customer with personalized options for VSC and extended warranty plans that we believe will best meet their needs. Customers in most states financing their purchase with us are also offered GAP waiver coverage, customized by term length, during checkout.

• *Sell a vehicle.* For customers interested in trading-in or selling us their vehicle without the purchase of a retail vehicle, our online tool provides customers with an automated valuation of their existing vehicle that can be applied to any vehicle purchase or paid directly without an associated vehicle purchase. In either case, a customer can receive a firm offer for their vehicle from our site simply by answering a few questions about the vehicle condition and features. The customer can then schedule a time to have the vehicle picked up at their home and receive payment. This process eliminates the need to visit a dealership or negotiate a private sale.

• *Documentation and payment.* To further improve the ease of financing, complementary products, and trade-ins, we have developed a seamless, fully integrated online documentation process. We have established partnerships with several technology providers that allow for automated down payment, income verification, and payment processing through simple, easy to use tools, such as the ability to take pictures of required documents with a smartphone.

*Fulfillment.* Customers can choose to have their vehicle delivered or pick up their vehicle at one of our patented vehicle vending machines. In certain markets, we can deliver cars as soon as the next day with a Carvana-uniformed employee in a branded, custom single-car hauler. Our vending machines provide an attractive and unique customer pick-up experience that many customers choose. At our vending machines, the customer deposits a Carvana-branded token into a coin slot and an automated platform selects the customer's car from the multi-story tower and delivers it to a garage bay where the customer is waiting with a Carvana delivery advocate.

*Post-sale customer support.* Once customers have their car, our customer advocates manage the post-sale coordination and service call process including any claims from our standard 100-day / 4,189-mile "Worry Free Guarantee" and the seven-day return policy. Given the return rates we have seen and the cost to us of honoring the return policy, we believe the peace of mind our customers gain from our seven-day return policy supports the cost of this offering. Our customers rated us an average of 4.7 out of 5.0 as of December 31, 2020, based on over 80,000 satisfaction surveys we solicited from our inception through December 31, 2020. These positive reactions create opportunities for repeat customers and a strong referral network.

### Vehicle Lifecycle

*Vehicle Acquisition*. We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at

8

auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

*Inspection and Reconditioning*. Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to one of our IRCs, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing to be made available for sale on our website.

*Photography and Merchandising*. To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

*Transportation and Fulfillment*. Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary TMS to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or hub for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays, and ensuring a seamless and reliable customer experience.

## Markets and Population Coverage

As of December 31, 2020, we have an established logistics network and a local marketing presence in 266 major metropolitan cities and have purchased, reconditioned, sold, and delivered approximately 587,600 vehicles since the launch of our first market in January 2013. We initially launched in Atlanta, Georgia in 2013 and have since grown our network across the United States, adding two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 120 in 2020. As of December 31, 2020, our 266 markets serviced 73.7% of the U.S. population compared to our 146 markets as of December 31, 2019, which serviced 66.9% of the U.S. population. We calculate our population coverage as the population in our open markets at the end of the period as a percentage of the total metropolitan statistical area ("MSA") population in the U.S., based on 2015 data from the U.S. Census Bureau. We are committed to providing an honest, transparent, and customer-centric used car buying and selling experience online, which is achieved through our hub and spoke market approach. While our entire inventory of vehicles is available for sale across the United States through our own network and third party delivery services, our focus is on serving our markets and providing the best possible car buying and selling experience to our customers at a low, transparent cost. Our established logistics network and ability to deliver or pick up any car in our inventory on Carvana-branded haulers to customers within our markets allow us to provide a low-cost, simple car buying and selling experience.

## Marketing

We believe our customer base is relatively similar to the overall market for used cars at average price points of our vehicles, with a slight shift toward younger customers. Our sales and marketing efforts utilize a multi-channel approach, built on a seasonality-adjusted, market-based model budget. We utilize a combination of brand building as well as direct response channels to efficiently seed and scale our local markets. Our paid advertising efforts include, but are not limited to, advertisements through national and local television, search engine marketing, inventory site listing, retargeting, organic

9

referral, display, out-of-home, digital video, digital radio, direct mail, and branded pay-per-click channels. We believe our strong customer focus ensures customer loyalty which will drive both repeat purchases and referrals. In addition to our paid channels, we intend to attract new customers through enhancing our earned media and public relations efforts and further investing in our patented vending machines.

## Customer Advocates

We have a team of in-house customer support specialists who provide assistance 13 hours per day, seven days per week to our customers located nationwide. Operating as advocates, our specialists are available to assist customers with questions that arise throughout the car buying process. These advocates are available via web chat or telephone and help customers navigate the website, answer specific questions and assist in loan verification by working with our customers to establish proof of identity, income, and insurance. We take a consultative approach with our customers, offering live support, if needed, and acting as a trusted partner to guide them through each phase of the purchase lifecycle. We are committed to providing our customers with the highest quality transaction experience and believe our advocates, who receive no commission income, are a meaningful reason why customers prefer transacting with us. The effectiveness of our model is reflected in the high ratings we receive from our customers and strong customer referrals. We focus on developing our advocates and providing them with the information and resources they need to offer exceptional customer service.

## Competition

The U.S. used car marketplace is highly fragmented. There are approximately 43,000 used car dealerships in the United States according to Borrell Associates' 2017 Outlook, including approximately 27,000 independent dealerships. The largest dealer brand commands approximately 1.9% of the U.S. market and the top 100 used car retailers collectively hold approximately 9.3% market share, according to Automotive News. We believe the primary competitive factors in this market include transparency, convenience, price, selection, and vehicle quality. Our current competitors can be largely classified into the following segments:

- franchised dealerships – 37% of establishments;

- independent dealerships – 63% of establishments; and

- online dealerships/marketplaces.

A number of used vehicles are also bought and sold through privately negotiated transactions.

We believe that our vertically integrated business model provides a meaningful and sustainable competitive advantage.

## Technology

Our business is driven by data and technology at all stages of the process, from inventory purchasing, reconditioning, photography, and annotation through online merchandising, sales, financing, trade-ins, logistics, and delivery. Carvana's proprietary and exclusive-use technology portfolio includes:

- a decision model for consolidating internal and external data to provide profitability estimates for inventory available for purchase;

- a limited-exclusivity license to an inventory management system that handles vehicles from acquisition through photography;

- a custom-built automated photography technology system that combines high-quality photos to produce an interactive, 360-degree virtual tour of both the exterior and interior of the vehicle, and creates a 3D model of the car allowing for future innovations;

- a website that includes advanced filtering and search technology that helps customers find a car that suits their tastes;

- a logistical model to optimize the transport of purchased inventory to and from the customer; and

10

• a custom automated delivery tower, or vending machine, including customer experience enhancements such as automatically generated video (suitable for posting to social media) that captures the customer's pick-up experience.

We also rely on third party technology, including the following:

• customer identity verification for financing;

• transportation fleet telemetry;

• network infrastructure for hosting the website and inventory data;

• software libraries, development environments, and tools;

• services to allow customers to digitally sign contracts;

• customer service call center management software; and

• automation controls and software for the vending machine.

11

**Organizational Structure**

The following chart summarizes our organizational structure as of December 31, 2020. This chart is provided for illustrative purposes only and does not purport to represent all legal entities owned or controlled by us:



(1) Shares of Class A common stock and Class B common stock vote as a single class. Each outstanding share of Class A common stock is entitled to one vote on all matters to be voted on by stockholders generally. The shares of Class B common stock have no economic rights. Each share of our Class B common stock held by Ernest Garcia II, Ernest Garcia III and entities controlled by one or both of them (collectively, the "Garcia Parties") entitles its holder to ten votes on all matters to be voted on by

12

stockholders generally for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A common units of Carvana Group ("Class A Units") and Class B common units of Carvana Group ("Class B Units") were exchanged for Class A common stock). All other shares of our Class B common stock entitle their holder to one vote per share on all matters to be voted on by stockholders generally. In accordance with the exchange agreement (the "Exchange Agreement") entered into in connection with the organizational transactions, LLC Unitholders (as defined in Note 10 — Stockholders' Equity*) are entitled to exchange LLC Units (as defined in Note 1 — Business Organization), together with shares of Class B common stock in the case of certain Class A Units, for shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash.

(2) We have short-term revolving facilities with an aggregate borrowing capacity of $2.25 billion. One of the facilities is a floor plan facility used to finance our used vehicle inventory, which is secured by our vehicles, general intangibles, accounts receivable, and finance receivables. The other facilities finance our finance receivables held by wholly-owned bankruptcy remote subsidiaries by Carvana, LLC and are secured by those receivables. As of December 31, 2020, the outstanding balance under these facilities was approximately $39.8 million. See Note 9 — Debt Instruments.

(3) In October 2020, we issued an aggregate of $1.1 billion in senior unsecured notes due 2025 and 2028. The outstanding principal balance, net of unamortized debt issuance costs, was approximately $1.1 billion as of December 31, 2020. See Note 9 — Debt Instruments.

*All internal cross-references to Notes 1- 20 herein are to the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K.

13

## Human Capital

Carvana's mission is to change the way people buy cars, and achieving that mission will not be possible without attracting, engaging, and retaining high quality teammates who view their work as more than just a job. We believe in the importance of our employees' satisfaction and development and we continually invest in them by further developing internal recruiting, talent development, human resources, and other teams, committees, and programs that may from time to time be supplemented by external resources, including surveys each quarter to gauge employee satisfaction.

We have developed discrete programs focused on these investments that include career paths, mentorship opportunities, promotions, training, and diversity and inclusion. These internal programs are designed to, among other things, grow our employees into leadership and management positions and foster a culture of inclusion. For example, our Carvana Communities program supports employees in creating and leading company affinity groups that are sponsored by a senior leader and designed to connect groups with a mission of support, inclusion, and connection throughout all of Carvana. Additionally, our Learning Management System provides broader access to training and development information and resources across Carvana.

We consider our relationship with our employees to be strong, and it is because of their passion and hard work that Carvana is now the second largest used automotive retailer in the U.S. As of December 31, 2020, we had over 10,400 full-time and part-time employees.

## Intellectual Property

We protect our intellectual property through a combination of trademarks, domain names, copyrights, trade secrets, patents, and contractual provisions and restrictions on access and use of our proprietary information and technology.

We hold twelve patents, which cover our vending machine technology, photo booth, website user interface technology, and imaging technology.

We have seventeen trademark registrations, including registrations for "Carvana," the Carvana logo, and various slogans.

We are the registered holder of a variety of domestic and international domain names, including "carvana.com."

In addition to the protection provided by our intellectual property rights, we generally enter into confidentiality and proprietary rights agreements with our employees, consultants, contractors, and business partners. In addition, employees and contractors with inventive functions are subject to invention assignment agreements. We further control the use of our proprietary technology and intellectual property through provisions in both our general and product-specific terms of use on our website.

In addition, we have a cross-license agreement with DriveTime Automotive Group, Inc. (we will refer to DriveTime Automotive Group, Inc. together with its subsidiaries and affiliates, other than us, as "DriveTime") pursuant to which DriveTime has obtained limited licenses to some of our intellectual property.

## Seasonality

Used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business. The novel coronavirus ("COVID-19") impacted used vehicle sales in the first and second quarters of 2020. The continuing impact of COVID-19 and related stimulus payments on seasonality is uncertain. See COVID-19 Update in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations." See Item 1A "Risk Factors—Risks Related to Our Business—We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business."

## Government Regulation

*Industry and Vehicle Dealer Laws and Regulations*

Various aspects of our business are or may be subject to U.S. federal, state, and municipal regulation. In particular, the advertising, sale, purchase, financing, and transport of used motor vehicles are highly regulated by states in which we do business and by the U.S. federal government. The regulatory bodies that regulate our business include at the federal level: the Consumer Financial Protection Bureau, the Federal Trade Commission, the United States Department of Transportation, the Occupational Health and Safety Administration, the Department of Justice, and the Federal Communications Commission; at the state level: various state dealer licensing authorities, state consumer protection agencies including state attorney general offices, and state financial regulatory agencies; and at the municipal level our business is regulated by various municipal authorities covering licensing, zoning, occupancy, and tax obligations. We are subject to compliance audits of our operations by many of these authorities.

Certain states have concluded that our activities are subject to vehicle dealer licensing laws, requiring us to maintain a used vehicle dealer license in order to conduct business in that state. In certain other states, we have elected to obtain a used vehicle dealer license to maximize operational flexibility and efficiency and invest in relationships with state regulators. We have at least one licensed facility in Alabama, Arkansas, Arizona, California, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, and Wisconsin.

Most states regulate retail installment sales, including setting a maximum interest rate, caps on certain fees, or maximum amounts financed. In addition, certain states require that finance companies in general and Carvana in particular file a notice of intent or have a sales finance license or an installment sellers license in order to solicit or originate installment sales in that state. In certain other states, we have chosen to obtain such a license to invest in relationships with state regulators. We have obtained a sales finance license in Arizona, Delaware, Louisiana, Minnesota, New Mexico, New York, Pennsylvania, and Texas, an installment seller license in Florida, Maryland, Michigan, and New Jersey, and have filed consumer credit notices in Colorado, Indiana, Iowa, Kansas, Maine, Mississippi, Oklahoma, South Carolina, Utah, West Virginia, Wisconsin, and Wyoming.

*Environmental Laws and Regulations*

We are subject to a variety of federal, state, and local environmental laws and regulations that pertain to our operations. The regulations concern material storage, air quality, waste handling, and water pollution control. The regulations also regulate our use and operation of gasoline storage tanks, gasoline dispensing equipment, oil tanks, and paint booths among other things. Our business involves the use, handling, and disposal of hazardous materials and wastes, including motor oil, gasoline, solvents, lubricants, paints, and other substances. We manage our compliance through permitting and operational control.

For a discussion of the various risks we face from regulation and compliance matters, see Item 1A "Risk Factors—Risks Related to Our Business—We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply with these laws and regulations could have a material adverse effect on our business, results of operations, and financial condition."

## Other Information

General information about us can be found at investors.carvana.com. The information contained on or connected to our website is not incorporated by reference into this Annual Report on Form 10-K and should not be considered part of this or any other report filed with the SEC. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as any amendments to those reports, are available free of charge through our website as soon as reasonably practicable after we file them with, or furnish them to, the SEC. The SEC maintains a website at www.sec.gov that contains reports, proxy statements, and other information regarding SEC registrants, including Carvana Co.

## ITEM 1A. RISK FACTORS.

*Described below are certain risks to our business and the industry in which we operate. You should carefully consider the risks described below, together with the financial and other information contained in this Annual Report on Form 10-K and in our other public disclosures. If any of the following risks actually occurs, our business, financial condition, results of operations,*

15

*cash flows and prospects could be materially and adversely affected. As a result, our future results could differ materially from historical results and from guidance we may provide regarding our expectations of our future financial performance, and the trading price of our Class A common stock could decline.*

**Risk Factors Summary**

The following is a summary of the principal factors that make an investment in our securities speculative or risky, all of which are more fully described below in this section. This summary should be read in conjunction with the full description of "Risk Factors" in this section and should not be relied upon as an exhaustive summary of the material risks facing our business. In addition to the following summary and the information in this section, you should consider the other information contained in this Annual Report on Form 10-K before investing in our securities.

*Risks Related to Our Business*
- COVID-19 and other future epidemics and public health crises;
- our history of losses and ability to maintain profitability in the future;
- our ability to effectively manage our rapid growth;
- our ability to maintain customer service quality and reputational integrity and enhance our brand;
- our limited operating history;
- the seasonal and other fluctuations in our quarterly operating results;
- our relationship with DriveTime and its affiliates;
- our ability to compete in the highly competitive industry in which we participate;
- the changes in prices of new and used vehicles;
- our ability to acquire desirable inventory;
- our ability to sell our inventory expeditiously;
- our ability to sell and generate gains on the sale of automotive finance receivables;
- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;
- our reliance on credit data for the automotive finance receivables we sell;
- our ability to successfully market and brand our business;
- our reliance on internet searches to drive traffic to our website;
- our ability to comply with the laws and regulations to which we are subject;
- the changes in the laws and regulations to which we are subject;
- our ability to comply with the Telephone Consumer Protection Act of 1991;
- the evolution of regulation of the internet and e-commerce;
- our ability to grow complementary product and service offerings;
- our ability to address the shift to mobile device technology by our customers;
- risks related to the larger automotive ecosystem;
- the geographic concentration where we provide services and recondition and store vehicle inventory;
- our ability to obtain affordable inventory insurance;
- our ability to raise additional capital;
- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;
- our reliance on our proprietary credit scoring model in the forecasting of loss rates;
- our reliance on internal and external logistics to transport our vehicle inventory;
- the risks associated with the construction and operation of our inspection and reconditioning centers, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;
- our ability to finance inspection and reconditioning centers and vending machines;
- our ability to protect the personal information and other data that we collect, process and store;
- disruptions in availability and functionality of our website;
- our ability to protect our intellectual property, technology, and confidential information;
- our ability to defend against claims that our employees, consultants, or advisors have wrongfully used or disclosed trade secrets or intellectual property;
- our ability to defend against intellectual property disputes;
- our ability to comply with the terms of open source licenses;
- conditions affecting vehicle manufacturers, including manufacturer recalls;
- our reliance on third party technology to complete critical business functions;
- our dependence on key personnel to operate our business;
- the diversion of management's attention and other disruptions associated with potential future acquisitions and strategic initiatives; and
- the legal proceedings to which we may be subject in the ordinary course of business.

16

*Risks Related to Our Organizational Structure*
- our corporate structure and the Tax Receivable Agreement; and
- status as a "controlled company".

*Risks Related to Our Liquidity*
- our substantial indebtedness;
- our inability to generate sufficient cash flow;
- changes in capital markets;
- the risks due to our securitizations; and
- risk retention rules.

*Risks Related to Ownership of our Class A Common Stock*
- the Garcia Parties control us and their interests may conflict with our or our stockholders' interests in the future;
- dilution due to issuance of additional Class A common stock or LLC Units in the future;
- we could sell substantial blocks of our Class A common stock in the future;
- we have no intention to pay dividends on our Class A common stock;
- Delaware law and our charter may prevent stockholders from changing decisions made by management;
- we may issue shares of preferred stock in the future; and
- our internal controls over financial reporting.

*General Risk Factors*
- the resources required to comply with public company obligations;
- our management's accounting judgments and estimates, as well as changes to accounting policies;
- changes in effective tax rates or review of our tax returns;
- our Class A common stock is volatile;
- negative research about our business; and
- risks related to the actions of short sellers of our Class A common stock.

## Risks Related to Our Business

***The COVID-19 pandemic is adversely affecting, and could continue to adversely affect, our business, operating results, financial condition and prospects.***

The rapid spread of COVID-19 since late 2019 has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders and shutdowns. These measures have impacted and may further impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. While the federal and state governments have taken measures to try to contain the COVID-19 pandemic, there is considerable uncertainty regarding such measures and potential future measures. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business and have a material adverse effect on our business, operating results, financial condition and prospects. There is no certainty that measures taken by governmental authorities will be sufficient to mitigate the risks posed by the COVID-19 pandemic, and our ability to perform critical functions could be harmed.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty, and has led to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. It is likely that the COVID-19 pandemic will continue to cause economic distress in certain sectors of the economy, and it is possible that it could cause a global recession. Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further risks related to negative economic conditions are described in our risk factor below titled "Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues."

The ultimate magnitude of COVID-19, including the extent of its impact on our financial and operational results, which could be material, will be determined by the length of time that the pandemic continues, its effect on the demand for our vehicles, our inventory supply chain and distribution, and the capital markets, as well as the effect of governmental regulations imposed in response to the pandemic. We cannot at this time predict the ultimate impact of the COVID-19 pandemic, but it could have a material adverse effect on our business, operating results, financial condition and prospects.

17

*We have a history of losses and we may not achieve or maintain profitability in the future.*

We have not been profitable since our inception in 2012 and had an accumulated loss of approximately $1.4 billion as of December 31, 2020. We incurred net losses of $254.7 million, $364.6 million, and $462.2 million in the years ended December 31, 2018, 2019, and 2020, respectively. We expect to make significant investments to further develop and expand our business and these investments may not result in increased revenue or growth on a timely basis or at all. In addition, as a public company, we have and will continue to incur significant legal, accounting, and other expenses. As a result of these expenditures, we will have to generate and sustain increased revenue to achieve and maintain profitability.

We expect to continue to incur losses as we invest in and strive to grow our business. We may incur significant losses in the future for a number of reasons, including investing in growth, slowing demand for used vehicles and our related products and services, increasing competition, weakness in the automotive retail industry generally, a decline in global financial conditions that negatively impacts economic activity and employment, as well as other risks described in this Annual Report on Form 10-K, and we may encounter unforeseen expenses, difficulties, complications, and delays in generating revenue or profitability. If our rate of generating revenue slows, we may not be able to reduce costs in a timely manner because many of our costs are fixed. In addition, if we reduce variable costs to respond to losses, this may limit our ability to acquire customers and grow our revenues. Accordingly, we may not achieve or maintain profitability and we may continue to incur significant losses in the future.

*Our recent, rapid growth may not be indicative of our future growth and, if we continue to grow rapidly, we may not be able to manage our growth effectively.*

In the calendar years 2018, 2019, and 2020, our revenue grew from $2.0 billion, to $3.9 billion, to $5.6 billion, respectively. For our revenues to continue to increase, we need to successfully increase our penetration in existing markets, enter new markets, acquire more customers, gain repeat customers, and expand our brand awareness. The foregoing may not happen at all or may not happen as quickly as we expect. Our failure to successfully accomplish the foregoing could harm our business, financial condition, and results of operation.

We expect that, in the future, even if our revenue increases, our rate of growth may decline. In any event, we will not be able to grow as fast or at all if we do not:

- increase the number of unique visitors to our website and the number of customers;

- further improve the quality of our product offering, features, and complementary products and services;

- introduce high quality new products, services, and features; or

- make sellable sufficient appropriate inventory with high enough quality and low enough cost to meet the increasing demand for our vehicles.

There can be no assurance that we will meet these objectives. We expect to continue to expend substantial financial and other resources on:

- marketing and advertising, including an increase to our television and streaming video advertising expenditures;

- expansion of our inventory; and

- general administration, including legal, accounting, internal audit, and other compliance expenses related to being a public company.

Our historical rapid growth has placed and may continue to place significant demands on our management and our operational and financial resources. We have experienced significant growth in the number of users of our platform as well as the amount of data that we analyze. We have hired and expect to continue hiring additional personnel to support our rapid growth. Our organizational structure is becoming more complex as we add staff, and we will need to improve our operational, financial, and management controls as well as our reporting systems and procedures. We will require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas without undermining our corporate culture of rapid innovation, teamwork, and attention to the car-buying and car-selling experience for the consumer. If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' car-buying and car-selling experience and the quality of the vehicles we sell, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

18

Our business has grown rapidly as additional customers have sold us their vehicles and purchased used vehicles and complementary products and services through our platform. However, our business is relatively new and has operated at substantial scale for only a limited period of time. Given this limited history, it is difficult to predict whether we will be able to maintain or grow our business. We also expect that our business will evolve in ways that may be difficult to predict. For example, over time our investments that are intended to drive new customer traffic to our website may be less productive than expected. In the event of this or any other adverse developments, our continued success will depend on our ability to successfully adjust our strategy to meet changing market dynamics. If we are unable to do so, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

***Our failure to maintain a reputation of integrity and to otherwise maintain and enhance our customer service quality and brand could adversely affect our business, sales, and results of operations.***

Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying and selling that will save them time and money. Accordingly, our ability to consistently deliver a high quality experience and our reputation as a company of integrity are critical to our success. If we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs that damages this reputation, it could adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations. Even the perception of a decrease in the quality of our customer service or brand could impact results. Our high rate of growth, the operationally intensive aspect of our offering, and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, submitting title and registration paperwork to state entities) makes maintaining the quality of our customer experience a particularly difficult challenge.

Irrespective of their validity, complaints or negative publicity—about our business practices, our marketing, and advertising campaigns, our compliance with applicable laws and regulations, the integrity of the data that we provide to users, our cybersecurity measures and privacy practices and other aspects of our business—could diminish customer confidence in our platform and adversely affect our brand. The growing use of social media increases the speed with which information, misinformation, and opinions can be shared and thus the speed with which our reputation can be affected. If we fail to correct or mitigate misinformation or negative information about us, the vehicles we offer to sell or purchase, our customer experience, or any aspect of our brand, including information spread through social media or traditional media channels, it could have a material adverse effect on our business, sales, and results of operations.

***Our operating history and historical reliance on DriveTime systems and services make it difficult to evaluate our current business and future prospects.***

We launched our first market in 2013 and do not have a long history operating as a commercial company. In addition, we have only operated independently of DriveTime since November 1, 2014, and, following our spinoff from DriveTime, we remained dependent on DriveTime for a number of important operations, including locations for certain of our inspection and reconditioning centers ("IRCs"), vehicle inventory purchasing, and a number of administrative services. While many services historically provided by DriveTime are now provided by other vendors or have been brought in house we continue to utilize DriveTime for certain services. Due to this and other factors, our operating results are not predictable and our historical results may not be indicative of our future results.

***We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business.***

We expect our quarterly results of operations, including our revenue, gross profit, and profitability, if any, and cash flow to vary significantly in the future based in part on, among other things, consumers' car-buying patterns. Used vehicle sales exhibit seasonality with sales typically peaking late in the first calendar quarter (coinciding with the time when the federal government issues tax refunds) and diminishing through the rest of the year, with the lowest relative level of sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our sales patterns to date have been different from the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used-vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year. Historically, this has led our gross profit per unit to be higher on average in the first half of the year than in the second half of the year. Other factors that may cause our quarterly results to fluctuate include, without limitation:

- potential COVID-19 related stimulus payments;
- the timing of our sales of our finance receivables;

19

- our ability to attract new customers;

- changes in the competitive dynamics of our industry;

- the regulatory environment;

- expenses associated with unforeseen quality issues and manufacturer recalls; and

- litigation or other claims against us.

In addition, a significant portion of our expenses are fixed and do not vary proportionately with fluctuations in revenues. Accordingly, our results in any quarter may not indicate the results we may achieve in any subsequent quarter or for the full year, and period-to-period comparisons of our operating results may not be meaningful.

***Through shared service and other agreements not negotiated at arm's length, there were and are benefits to us from DriveTime's expertise and economies of scale, and we continue to and may in the future utilize DriveTime and its affiliates for certain services and processes.***

We were incubated by and may benefit from our relationship and a series of arrangements with DriveTime not negotiated at arm's length, as DriveTime is controlled by our controlling shareholder who is also the father of our chief executive officer. Currently, many services that DriveTime historically provided to us (including certain accounting, finance, legal, human resources, payroll and benefits, tax, information technology, real estate, and inventory purchasing) are now provided by alternative vendors or have been brought in-house. Consequently, certain of our historical costs may not accurately reflect our future costs to the extent that DriveTime no longer provides us with such services or refuses to continue doing so at currently contracted-for prices.

For example, DriveTime built certain of our IRCs in Georgia, Texas, Ohio, Tennessee, and New Jersey and is now our landlord at many such sites. Verde Investments, Inc. ("Verde"), an affiliate of DriveTime, formerly leased to us our Arizona IRC and sold it to us in 2020. If we are unable to time-efficiently and cost-effectively construct or acquire additional IRCs in the future, our production capacity may not be sufficient to satisfy customer demand. In addition, we lease certain of our hubs from DriveTime. If we cannot similarly lease space for new hubs or IRCs from DriveTime at prices consistent with their historical prices, or at all, we may not be able to expand production or penetration into markets as quickly as we have historically and we may incur additional costs in such expansion.

We continue to periodically engage DriveTime, its affiliates, and other entities controlled by our controlling shareholder to provide us with certain services, including the administration of certain VSCs, GAP waiver coverage, and other related products sold to our customers. We also continue to utilize DriveTime for certain information technology systems and services. For example, we rely on DriveTime's inventory management system to support our revenue recognition process. Should DriveTime fail to adequately perform any of these services or maintain these systems on terms or at prices consistent with their historical prices, or at all, our financial condition and results of operations may be adversely affected.

Additionally, DriveTime has in the past and may in the future purchase or sell certain vehicles or automotive finance receivables from or to us. However, there can be no assurance that they will do so on the same or similar terms, or at all. As a result, our historical results may not be reflected in our future results.

Before and after we sell automotive receivables originated by us, DriveTime performs ongoing servicing and collections. If DriveTime is unwilling to enter into servicing arrangements for our future auto receivable facilities on terms or at prices consistent with their historical prices or at all, our revenues derived from the sale of those receivables may decline as a result. If DriveTime refuses to continue servicing and collecting on automotive finance receivables originated by us before we sell them, our ability to adequately prepare such receivables for sale may be adversely affected.

***We participate in a highly competitive industry; pressure from existing and new companies may adversely affect our business and operating results.***

We face significant competition from companies that provide listings, information, lead generation, and car-buying and selling services designed to reach businesses and consumers and enable dealers to reach these consumers and inventory sources.

Our current and future competitors may include:

- traditional used vehicle dealerships that could increase investment in technology and infrastructure to compete directly with our online model;

20

- internet and online automotive sites that could change their models to directly compete with us, such as Amazon, Autobytel.com, AutoTrader.com, Cars.com, CarGurus.com, eBay Motors, Edmunds.com, Google, KBB.com, and TrueCar.com;

- providers of offline, membership-based car-buying services such as the Costco Auto Program;

- used vehicle dealers or marketplaces with e-commerce business or online platforms such as Shift, Fair, and Vroom; and

- automobile manufacturers such as Ford, General Motors, Hyundai, and Volkswagen that could change their sales models through technology and infrastructure investments.

We also expect that competitors, both new and existing, will continue to enter the online and traditional automotive retail industry with competing brands, business models, products, and services, which could make it difficult to acquire inventory, attract customers, and sell vehicles at a profitable price. For example, traditional vehicle dealerships could transition their selling efforts to the internet, allowing them to more efficiently sell vehicles across state lines and compete directly with our online offering and no-negotiating pricing model. There can be no assurance we will not experience competition from DriveTime, the company from which we were spun off and with which we currently have a number of business relationships. Furthermore, we have a cross-license agreement with DriveTime pursuant to which DriveTime has obtained limited licenses to some of our intellectual property. Additionally, existing e-commerce businesses, such as Amazon, could directly enter the online used vehicle market. Some of these companies have significantly greater resources than we do and may be able to provide customers access to a greater inventory of vehicles at lower prices or purchase vehicles from consumers at higher prices while delivering a competitive online experience.

Our competitors may also develop and market new technologies that render our existing or future business model, products and services less competitive, unmarketable or obsolete. For example, rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used vehicles we sell, particularly if urbanization increases. Technology is currently being developed to produce automated, driverless vehicles that could reduce the demand for, or replace, traditional vehicles including the used vehicles that we sell. In addition, if our competitors develop business models, products or services with similar or superior functionality to our solutions, it may adversely impact our business.

Our competitors may also impede our ability to reach consumers or commence operations in certain jurisdictions. For example, our competitors may increase their search engine optimization efforts and outbid us for search terms on various search engines. Additionally, our competitors could use their political influence and increase lobbying efforts to hinder our real estate entitlements processes, push for new regulations, or encourage interpretations of existing regulations that would prevent us from operating in certain jurisdictions.

Our current and potential competitors may have significantly greater financial, technical, marketing, and other resources than we have, and the ability to devote greater resources to the development, promotion and support of their products and services. Additionally, they may have more extensive automotive industry relationships, longer operating histories, and greater name recognition than we have. As a result, these competitors may be able to respond more quickly with new technologies and to undertake more extensive marketing or promotional campaigns. If we are unable to compete with these companies, the demand for our used vehicles, products, and services could substantially decline.

Private plaintiffs and federal, state, and local regulatory and law enforcement authorities continue to scrutinize advertising, sales, financing, and insurance activities in the purchase, sale, and leasing of used vehicles. If, as a result, other automotive retailers adopt more transparent, consumer-oriented business practices, our differentiation versus those retailers could be reduced.

In addition, if one or more of our competitors, or DriveTime, were to merge or partner with another of our competitors, the change in the competitive landscape could adversely affect our ability to compete effectively. Our competitors may also establish or strengthen cooperative relationships with our current or future data providers, technology partners, or other parties with whom we have relationships, thereby limiting our ability to develop, improve, and promote our solutions. We may not be able to compete successfully against current or future competitors, and competitive pressures may harm our revenue, business, and financial results.

21

*Our business is sensitive to changes in the prices of new and used vehicles.*

Any significant changes in prices for new or used vehicles could have a material adverse effect on our revenues and results of operations. For example, if prices for used vehicles rise relative to prices for new vehicles, it could make buying a new vehicle more attractive to our customers than buying a used vehicle, which could have a material adverse effect on our results of operations and could result in reduced used vehicle sales and lower revenue. Additionally, manufacturer incentives could contribute to narrowing the price gap between new and used vehicles. Used vehicle prices may also decline due to an increased number of new vehicle lease returns over the next several years. While lower used vehicle prices reduce our cost of acquiring new inventory, lower prices could also lead to reductions in the prices at which we can sell such inventory, which could have a negative impact on gross profit. Furthermore, any significant changes in wholesale prices for used vehicles could have a material adverse effect on our results of operations by reducing wholesale margins.

*Our business is dependent upon access to desirable vehicle inventory. Obstacles to acquiring attractive inventory, whether because of supply, competition, or other factors, could have a material adverse effect on our business, sales, and results of operations.*

We acquire vehicles for sale through numerous sources, including directly from consumers, from wholesale auctions, and from other retailers. There can be no assurance that the supply of desirable used vehicles will be sufficient to meet our needs. A reduction in the availability of or access to sources of desirable inventory could have a material adverse effect on our business, sales and results of operations.

Additionally, we evaluate hundreds of thousands of potential vehicles daily using a proprietary algorithm to predict mechanical soundness, consumer desirability and relative value as prospective inventory. If we fail to adjust appraisal offers to stay in line with broader market trade-in offer trends, to recognize those trends, or to properly assess vehicles before we purchase them, it could adversely affect our ability to acquire desirable inventory. Our ability to source vehicles through our appraisal process could also be affected by competition, both from new and used vehicle dealers directly and through other websites driving appraisal traffic to those dealers. In addition, we remain dependent on others to sell us used vehicles, and there can be no assurance of an adequate supply of such vehicles on terms that are attractive to us.

*Our business is dependent upon our ability to expeditiously sell inventory. Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales, and results of operations.*

Our purchases of used vehicles are based in large part on projected demand. If actual sales are materially less than our forecasts, we would experience an over-supply of used vehicle inventory. An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and increase our average days to sale.

Used-vehicle inventory has typically represented a significant portion of our total assets. Having such a large portion of our total assets in the form of used vehicle inventory for an extended period of time subjects us to depreciation and other risks. Accordingly, if we have excess inventory or our average days to sale increases, we may be unable to liquidate such inventory at prices that allow us to meet margin targets or to recover our costs, which could have a material adverse effect on our results of operations.

*Our ability to sell automotive finance receivables and generate gains on sales of these finance receivables may decline in the future; any material reduction could harm our business, results of operations, and financial condition.*

We provide financing to customers and typically sell the receivables related to the financing contract. For example, we have entered into various arrangements to sell automotive finance receivables that we originate, including through securitizations and fixed pool loan sales to financing partners, and plan to enter into new arrangements in the future. If we are no longer able to sell receivables to our financing partners for a variety of reasons, including because we reached our capacity under these or future arrangements, our financing partners exercised constructive or other termination rights before we reached capacity or we reached the scheduled expiration date of the commitment, and we are not able to enter into new arrangements on similar terms, we may not have adequate liquidity and our business, financial condition, and results of operations may be adversely affected. Furthermore, if our financing partners cease to purchase these receivables, we could be subject to the risk that some of these receivables are not paid when due and we are forced to incur unexpected asset write-offs and bad-debt expense.

22

*We depend on the sale of automotive finance receivables for a substantial portion of our gross profit.*

In connection with the sale of used vehicles, many of our customers use our financing services to finance a portion of the purchase price of their vehicle. The prices we are able to charge for finance receivables that we sell are based on a variety of factors, including the terms and credit risk associated with the automotive finance receivables, the relationship between the interest rates we quoted the customer at the time they priced their financing and market and projected interest rates at the time we sell the finance receivables, the historical credit performance of the finance receivables we sell, the financing partner and securitization purchaser demand and other factors. If these variables or others were to change, we might be required to reduce our sale prices on finance receivables, sell fewer of them, or both, which could reduce our gains on sales of finance receivables. Any material reduction in our interest rate spread or gains on sale of finance receivables could have a material adverse effect on our business, results, of operations, and financial condition. Furthermore, customers may elect to finance their vehicle purchases through other parties who may be able to offer more attractive terms, in which case we would lose a source of what has historically been a significant portion of our gross profit.

*Our ability to resell automotive finance receivables is dependent on our ability to originate desirable finance receivables. If customers or other parties provide us incorrect or fraudulent data, we may offer credit terms that do not align with customers' credit profiles, and our operating results may be harmed.*

We offer financing to our customers to facilitate their purchases of used vehicles. The terms of the financing we offer are dependent in part on our assessment of such customers' credit-worthiness, which is based on data gathered from customers and other parties. If the information we rely on is inaccurate or fraudulent, we may offer inappropriate terms to our customers, resulting in originating receivables that we are unable to collect or sell because they are based on inaccurate credit profiles. Originating a material amount of receivables with inaccurate or fraudulent credit profiles could have a material adverse effect on our business, results of operations, and financial condition.

*The success of our business relies heavily on our marketing and branding efforts, and these efforts may not be successful.*

We believe that an important component of our growth will be the growth of visitors to our website. Because we are a consumer brand, we rely heavily on marketing and advertising to increase brand visibility with potential customers. We currently advertise through a blend of brand and direct advertising channels with the goal of increasing the strength, recognition, and trust in the Carvana brand and driving more unique visitors to our website. We recorded expenses of approximately $111.2 million, $204.0 million, and $286.4 million on advertising in the years ended December 31, 2018, December 31, 2019, and December 31, 2020, respectively.

Our business model relies on our ability to scale rapidly and to decrease incremental customer acquisition costs over time as we grow. If we are unable to recover our marketing costs through increases in customer traffic and in the number of transactions by users of our platform, if our advertising partners refuse to customize their products and services to accommodate our business model, if our advertising partners refuse to work with us at competitive rates or at all, or if our broad marketing campaigns are not successful or are terminated, it could have a material adverse effect on our growth, results of operations, and financial condition.

*We rely on internet search engines, vehicle listing sites, lead generators, automotive finance providers, and social networking sites to help drive traffic to our website, and if we fail to appear prominently in the search results or fail to drive traffic through paid advertising, our traffic would decline and our business would be adversely affected.*

We depend in part on internet search engines (such as Google and Bing), vehicle listing sites (such as AutoTrader.com, CarGurus.com and TrueCar.com), lead generators, automotive finance partners, and social networking sites (such as Facebook) to drive traffic to our website. Our ability to maintain and increase the number of visitors directed to our website is not entirely within our control. Our competitors may increase their search engine optimization efforts and outbid us for placement on various vehicle listing sites or search terms on various search engines, resulting in their websites receiving a higher search result page ranking than ours. Additionally, internet search engines could revise their methodologies in a way that would adversely affect our search result rankings. If internet search engines modify their search algorithms in ways that are detrimental to us, if vehicle listing sites refuse to display any or all of our inventory in certain geographic markets, or if our competitors' efforts are more successful than ours, overall growth in our customer base could slow or our customer base could decline. Internet search engine providers could provide automotive dealer and pricing information directly in search results, align with our competitors or choose to develop competing services. Our website has experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of users directed to our website through internet search engines, vehicle listing sites, lead generators, automotive finance providers, or social networking sites could harm our business and operating results.

23

***We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.***

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers. Our facilities and business operations are subject to laws and regulations relating to environmental protection and health and safety. The financing we offer to customers is subject to state licensing laws and to federal and state laws regulating the advertising and provision of consumer finance options, the collection of consumer credit and financial information, along with requirements related to online payments and electronic funds transfers. Regulators in jurisdictions where our customers reside but in which we do not have a dealer or financing license could require that we obtain a license or otherwise comply with various state regulations, and may seek to impose punitive fines for operating without a license or demand we seek a license in those jurisdictions, any of which may inhibit our ability to do business in those jurisdictions, increase our operating expenses and adversely affect our financial condition and results of operations. In the future, we may engage in different business activities or make changes to our business model that subject us to further state and federal regulation.

Our logistics operations, which we depend on to transport vehicles to and from auctions, our IRCs, our vending machines, our hubs and our customers, are subject to regulation by the DOT and by the states through which our vehicles travel. Transport vehicle dimensions, transport vehicle conditions, driver motor vehicle record history, driver alcohol and drug testing, and driver hours of service are also subject to both federal and state regulation. More restrictive limitations on vehicle weight and size, condition, trailer length and configuration, methods of measurement, driver qualifications, or driver hours of service would increase our operating expenses and may adversely affect our financial condition, operating results, and cash flows. If we fail to comply with the DOT regulations or if those regulations become more stringent, we could be subject to increased inspections, audits, or compliance burdens. Regulatory authorities could take remedial action including imposing fines, suspending, or shutting down our in-house transportation operations. If any of these events occur, our financial condition, operating results, and cash flows would be adversely affected.

In addition to these laws and regulations that apply to our business operations, we are also subject to laws and regulations affecting public companies, including securities laws and NYSE listing rules. The applicability of these regulatory and legal compliance obligations is dependent on the evolving interpretations of these laws and regulations.

The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results. We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

This description of laws and regulations to which we are or may be subject is not exhaustive, and the regulatory framework governing our operations is subject to evolving interpretations and continuous change. For additional information regarding government regulations and compliance matters we are subject to, see Item 1 "Business—Government Regulation".

Federal legislative and regulatory initiatives and reforms may result in an increase in the cost of regulatory compliance, a decrease in revenues, or result in changes to business practices that could have a material adverse effect on our results of operations. For example, changes in federal labor policy could lead to increased unionization efforts, which could increase labor costs, disrupt facility operations, and have a material adverse effect on our business, sales, and results of operations. The enactment of new laws and regulations or the interpretation of existing laws and regulations in an unfavorable way may affect the operation of our business, directly or indirectly, which could result in substantial regulatory compliance costs, civil or criminal penalties, including fines, adverse publicity, decreased revenues, and increased expenses.

***If we fail to comply with the Telephone Consumer Protection Act, we may face significant damages, which could harm our business, financial condition, results of operations, and cash flows.***

We utilize telephone calls and text messaging as a means of responding to and marketing to consumers interested in purchasing, trading in, selling or financing vehicles and related products and services. We generate leads from our website by prompting potential customers to provide their phone numbers so that we can contact them in response to their interest in

24

financing terms, trading in or selling a vehicles, or purchasing a specific vehicle. We also pay others for leads. A portion of our revenue comes from purchases, sales, and financing that involves a call or text made by our internal call centers, automated communications systems, or vendors we engage to reach out to these potential customers.

The Telephone Consumer Protection Act (the "TCPA"), as interpreted and implemented by the FCC and U.S. courts currently imposes significant restrictions on the use of autodialed telephone calls, pre-recorded messages, and text messages to residential and mobile telephone numbers as a means of communication when prior consent of the person being contacted has not been obtained. Violations of the TCPA may be enforced by the FCC or by individuals through litigation, including class actions. Statutory penalties for TCPA violations range from $500 to $1,500 per violation, which has been interpreted to mean per phone call or text.

While we have implemented processes and procedures to comply with the TCPA, if we or those services we rely on for data fail to adhere to or successfully implement appropriate processes and procedures in response to existing or future regulations, it could result in legal and monetary liability, fines, penalties, or damage to our reputation in the marketplace. Additionally, any changes to the TCPA, its interpretation, or enforcement of it by the government, the courts, or private parties that further restrict the way we contact and communicate with our potential customers or generate leads could adversely affect our ability to attract customers.

*Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.*

We are subject to general business regulations and laws as well as regulations and laws specifically governing the internet and e-commerce. Existing and future regulations and laws could impede the growth of the internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, online payments and funds transfers, privacy, cybersecurity, anti-spam, pricing, content protection, electronic contracts and communications, mobile communications, consumer protection, information reporting requirements, unencumbered internet access to our services and the design and operation of websites. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the internet as the vast majority of these laws were adopted prior to the advent of the internet and do not contemplate or address the unique issues raised by the internet or e-commerce. Unfavorable interpretation or enforcement of regulations and laws, or newly promulgated unfavorable regulations and laws, could diminish the demand for used vehicles and complementary products and services and increase our cost of doing business.

*Our ability to grow our complementary product and service offerings may be limited, which could negatively impact our growth rate, revenues and financial performance.*

If we introduce new or expand existing offerings for our platform, such as services or products involving other inventory sources, new vehicles, trade-ins, financing, various forms of insurance related to vehicle condition, property and casualty, or other insurance products customarily sold by traditional insurance companies, subscription services, shipping services, deficiency waivers, customized accessories, leasing or maintenance, we may incur losses or otherwise fail to enter these markets successfully. Our expansion into these markets will place us in competitive and regulatory environments with which we are unfamiliar and involve various risks, including the need to invest significant resources and the possibility that returns on such investments will not be achieved for several years, if at all. In attempting to establish new service or product offerings, we expect to incur significant expenses and face various other challenges, such as expanding our customer advocate and management personnel to cover these markets and complying with complicated regulations that apply to these markets. In addition, we may not successfully demonstrate the value of these complementary products and services to consumers, and failure to do so would compromise our ability to successfully expand into these additional revenue streams. Any of these risks, if realized, could adversely affect our business and results of operations.

*If we do not adequately address our customers' shift to mobile device technology, operating results could be harmed and our growth could be negatively affected.*

Our future success depends in part on our ability to provide adequate functionality for visitors who use mobile devices to shop for used vehicles and the number of transactions with us that are completed by those users. In recent years the proportion of U.S. consumers who use mobile devices to access websites has generally increased. A shift to mobile technology by our users may harm our business in the following ways:

- customers visiting our website from a mobile device may not accept mobile technology as a viable long-term platform to buy or sell a vehicle. This may occur for a number of reasons, including our ability to provide the same level of

25

website functionality to a mobile device that we provide on a desktop computer, the actual or perceived lack of security of information on a mobile device and possible disruptions of service or connectivity;

- we may not continue to innovate and introduce enhanced products that can be suitably conveyed on mobile platforms;

- consumers using mobile devices may believe that our competitors offer superior products and features based in part on our inability to provide sufficient website functionality to convince a mobile device user to transact with us; or

- regulations related to consumer finance disclosures, including the Truth in Lending Act and the Fair Credit Reporting Act, may be interpreted, in the context of mobile devices, in a manner which could expose us to legal liability in the event we are found to have violated applicable laws.

If we do not develop suitable functionality for users who visit our website using a mobile device, our business and operating results could be harmed.

*Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues.*

Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. For example, the number of used vehicle sales in the United States decreased from approximately 41.4 million in 2007 to approximately 35.5 million in 2009, according to CNW Research Retail Automotive Summary. Purchases of new and used vehicles are typically discretionary for consumers and have been, and may continue to be, affected by negative trends in the economy and other factors, including the COVID-19 pandemic, rising interest rates, the cost of energy and gasoline, the availability and cost of credit, reductions in business and consumer confidence, stock market volatility, increased regulation and increased unemployment. Increased environmental regulation has made, and may in the future make, used vehicles more expensive and less desirable for consumers. In addition, our business may be negatively affected by challenges to the larger automotive ecosystem, including urbanization, global supply chain challenges and other macroeconomic issues. For example, rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used vehicles we sell, particularly if urbanization increases. Additionally, new technologies such as autonomous driving software have the potential to change the dynamics of vehicle ownership in the future. Any of the foregoing could have a material adverse effect on our business, results of operations and financial condition.

*The current geographic concentration where we provide services creates an exposure to severe weather, local economies, regional downturns, or catastrophic occurrences that may materially adversely affect our financial condition and results of operations.*

As of December 31, 2020, we conduct business through eleven IRCs located in Arizona, Arkansas, Florida, Georgia, Indiana, New Jersey, North Carolina, Ohio, Tennessee, and Texas, managing fulfillment to 266 metropolitan areas across most of the United States. We hold the majority of our inventory at these eleven locations. Our business is currently more susceptible to regional conditions than the operations of more geographically diversified competitors, and we are vulnerable to economic downturns and other unforeseen events or circumstances in those regions. Changes in demographics and population or severe weather conditions and other catastrophic occurrences in areas in which we operate or from which we obtain inventory may materially adversely affect our results of operations. Such conditions may result in physical damage to our properties, loss of inventory and delays in the delivery of vehicles to our IRCs, hubs, vending machines, or customers.

Any of these factors may disrupt our businesses and materially adversely affect our financial condition and result of operations. Furthermore, there can be no assurance that we will be able to successfully replicate our business model and achieve levels of success as we enter new markets.

*An inability to obtain affordable insurance on our inventory may materially adversely affect our financial condition and results of operations.*

We rely on inventory insurance to protect against catastrophic losses of our inventory. There is no guarantee that we will continue to be able to insure our inventory at affordable rates, or at all, through outside insurers. If we are unable to purchase affordable insurance, we may have to self-insure, reducing our ability to make other investments in our business and exposing us to financial risk. In addition, our inability to insure our inventory through an outside insurer, or to adequately self-insure, may adversely impact our ability to finance our inventory purchases.

*Our insurance coverage may not be enough to protect us from all claims.*

26

Our business exposes us to an inherent risk of potential liability claims. Although we maintain liability insurance for our directors and officers, auto and general liability, loss due to cybersecurity incidents, damage to property, and various other policies, the coverage limits of these policies may not be adequate to cover all future claims. We may be unable to maintain sufficient liability or other commercial insurance on acceptable terms or at reasonable costs, and this insurance may not provide us with adequate coverage against potential liabilities. A successful claim brought against us in excess of, or outside of, our insurance coverage could have a material adverse effect on our financial condition and results of operations. A liability claim, regardless of its merit or eventual outcome, could result in substantial costs to us, a substantial diversion of management attention and adverse publicity. A liability claim could also harm our reputation and result in a decline in revenues and an increase in expenses.

***We may require additional debt and equity capital to pursue our business objectives and respond to business opportunities, challenges, or unforeseen circumstances. If such capital is not available to us, our business, operating results, and financial condition may be harmed.***

We may require additional capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances, including to increase our marketing expenditures to improve our brand awareness, build and maintain our inventory of quality used vehicles, develop new products or services (including vehicle-financing services) or further improve existing products and services, enhance our operating infrastructure, and acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. However, additional funds may not be available when we need them, on terms that are acceptable to us, or at all. In addition, any debt financing that we secure in the future could involve restrictive covenants which may make it more difficult for us to obtain additional capital and to pursue business opportunities. For example, the indentures governing our 2025 and 2028 Notes limit our ability and certain of our subsidiaries' ability to, among other things, incur additional debt or issue preferred stock, create liens, pay dividends and make other distributions, redeem or repurchase stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. See Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity—Senior Unsecured Notes."

Volatility in the credit markets may also have an adverse effect on our ability to obtain debt financing. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our Class A common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to pursue our business objectives and to respond to business opportunities, challenges or unforeseen circumstances could be significantly limited, and our business, operating results, financial condition and prospects could be adversely affected.

***We rely on agreements with lenders to finance our vehicle inventory purchases. If we fail to maintain adequate relationships with such lenders, we may be unable to maintain sufficient inventory, which would adversely affect our business and results of operations.***

We rely on agreements with lenders to finance our vehicle inventory purchases. If we are unable to extend the agreements on favorable terms or at all, or if the agreements expire and are not renewed, our inventory supply may decline, resulting in fewer vehicles available for sale on our website. For example, our agreement with Ally matures in March 2023 and may be extended for an additional period at Ally's sole discretion. If we are unable to renew the facility with Ally or find a satisfactory replacement, whether because of our financial and operating performance or for other reasons, our ability to acquire inventory would be adversely affected. New funding arrangements may be at higher interest rates or other less favorable terms. These financing risks, in addition to rising interest rates and changes in market conditions, if realized, could negatively impact our results of operations and financial condition.

***Errors in our contracts with our customers could render them unenforceable or ineligible for sale. If we have already sold contracts with errors in them, we could be required to repurchase them.***

We enter into purchase agreements, buyer's orders, retail installment contracts and other contracts with our customers that are generated automatically based upon information the customer enters into our website. The contracts are intended to comply with the applicable consumer lending and other commercial and legal requirements of the relevant jurisdictions. We face the risk, however, that the auto-generated forms may inadvertently contain errors or omissions or otherwise fail to comply with applicable regulations in a manner that would render such contracts unenforceable. For example, most jurisdictions impose a maximum interest rate cap that we can charge our customers. If we exceed the relevant cap, our retail installment contracts in

27

such jurisdiction may be unenforceable, and in some instances, we may be required to pay damages or repay any financing charges previously collected. If a significant number of our retail installment contracts are rendered unenforceable, our financial condition and results of operations may be adversely affected.

We generally seek to sell automotive finance receivables to financing partners or in securitization transactions. The financing partners who agree to buy or fund our loans, and the documents governing our securitizations, require that we make certain representations about the enforceability or validity of those contracts. If these receivables do not meet the specified representations, we have in the past been, and may in the future be, forced to repurchase these receivables. If we sell a significant amount of receivables that do not meet the predetermined representations, we may be required to use cash on hand or to obtain alternative financing in order to repurchase them. Any significant repurchases could have a material adverse effect on our business, results of operations, and financial condition, and may jeopardize our ability to sell contracts to those or other financing partners or purchasers in the future.

***We rely on our proprietary credit scoring model to forecast automotive finance receivable loss rates. If we are unable to effectively forecast loss rates, it may negatively impact our operating results.***

We rely on our internally developed models to forecast loss rates of the automotive finance receivables we originate. If we rely on a model that fails to effectively forecast loss rates on receivables we originate, those receivables may suffer higher losses than expected. We generally seek to sell these receivables to financing partners or in securitization transactions. If the receivables we sell experience higher loss rates than forecasted, we may obtain less favorable pricing on the receivables we sell to those parties in the future and suffer reputational harm in the marketplace for the receivables we sell and our business, results of operations, and financial condition may be adversely affected. We hold receivables we originate on our balance sheet until we sell them to financing partners or in securitization transactions, and to the extent those receivables fail to perform during our holding period, they may become ineligible for sale. As a result, our business, results of operations, and financial condition may be adversely affected.

***Because we rely on internal and external logistics to transport our inventory throughout the United States, we are subject to business risks and costs associated with the transportation industry. Many of these risks and costs are out of our control, and any of them could have a material adverse effect on our business, financial condition, and results of operations.***

We rely on a combination of internal and external logistics to transport vehicles to and from wholesale auctions, IRCs, hubs, vending machines and our customers. As a result, we are exposed to risks associated with the transportation industry such as weather, traffic patterns, gasoline prices, recalls affecting our vehicle fleet, local and federal regulations, vehicular crashes, insufficient internal capacity, rising prices of transportation vendors, fuel prices, taxes, license and registration fees, insurance premiums, self-insurance levels, difficulty in recruiting and retaining qualified drivers, disruption of our technology systems, equipment supply, equipment quality, and increasing equipment and operational costs. Our failure to successfully manage our logistics and fulfillment process could cause a disruption in our inventory supply chain and distribution, which may adversely affect our operating results and financial condition.

***We face a variety of risks associated with the construction, financing, and operation of our inspection and reconditioning centers and vending machines, any of which could adversely affect our financial condition and results of operations.***

We are required to obtain approvals, permits, and licenses from state regulators and local municipalities to construct and operate our IRCs and vending machines. We may face delays in obtaining the requisite approvals, permits, financing, and licenses to construct and operate our IRCs and vending machines, or we may not be able to obtain them at all. If we encounter delays in obtaining or cannot obtain the requisite approvals, permits, financing, and licenses to construct and operate our IRCs and vending machines in desirable locations, our financial condition and results of operations may be adversely affected.

We lease or finance certain real estate on which we construct and operate some of our IRCs and vending machines. Because of potential difficulties finding a replacement tenant, some landlords will have concerns leasing and some lenders will have concerns financing to a tenant like us. Consequently, some landlords or lenders may offer unfavorable leasing or financing terms or may not be willing to lease or finance the sites we pursue. Similarly, sites we wish to purchase for the construction or operation of our IRCs and vending machines may have similar constraints. If we are required to enter into inflexible or expensive leases, financing, or purchase agreements to construct and operate our IRCs and vending machines, our financial condition and results of operations may be adversely affected.

We depend on one supplier to construct portions of our vending machines and to provide technical support and maintenance on them. If we are unable to maintain our relationship with our supplier, or our supplier ceases to produce the parts or perform the services we need, or our supplier is unable to effectively deliver services and equipment on timelines and at the

28

price we have negotiated, and we are unable to contract with an alternative supplier, we may not be able to construct new vending machines or continue to operate existing vending machines, and our financial condition and operating results may be adversely affected. Additionally, the durability of our vending machines is unknown and we may be required to incur significant maintenance and other expenses to keep them operating properly. If we are required to incur significant expenses to maintain our vending machines our financial condition and operating results may be adversely affected.

We also rely on vendors and suppliers to construct and operate portions of our IRCs. If we are unable to maintain our relationship with our vendors and suppliers, or such vendors and suppliers cease to provide the services we need, or such vendors and suppliers are unable to effectively deliver our services on timelines and at the price we have negotiated, and we are unable to contract with alternative vendors and suppliers, our ability to construct new IRCs or continue to operate existing IRCs and our financial condition and operating results may be adversely affected.

***We may rely on agreements with lenders or institutional real estate investors to finance certain vending machines and inspection and reconditioning centers. If we fail to create or maintain adequate relationships with lenders or investors to finance such assets, we may be unable to construct and operate additional vending machines and inspection and reconditioning centers in the future, which would adversely affect our business and results of operations.***

We currently rely on agreements with lenders or institutional real estate investors to finance certain vending machines and IRCs, and may in the future rely on agreements with lenders or investors to finance real estate capital expenditures, including additional inspection and reconditioning centers and vending machines. If we are unable to enter into new financing agreements for such assets on favorable terms or at all, whether because of our financial and operating performance or for other reasons, our ability to construct and operate additional IRCs and vending machines would be adversely affected. New funding arrangements may be at higher interest rates than historical real estate financing or contain other less favorable terms. If realized, these financing risks, in addition to rising interest rates and changes in market conditions, could negatively impact our results of operations and financial condition.

***We collect, process, store, share, disclose, and use personal information and other data. Our actual or perceived failure to protect such information and data, mitigate data loss, and prevent a cybersecurity or other incident could damage our reputation and harm our business and operating results.***

We collect, process, store, share, disclose, and use sensitive information and other data provided by consumers and employees, including personally identifying information. We rely on encryption and authentication technology licensed from third parties to securely transmit and store such information. We also may share information with third-party service providers as part of business operations. We expend significant resources to protect against both internal and external security breaches and may need to expend more resources in the event we need to address problems caused by breaches. Any failure or perceived failure to maintain the security of personal and other data that is provided to us by consumers, employees, and vendors could harm our reputation and expose us to a risk of loss or litigation and possible liability, any of which could adversely affect our business and operating results.

Additionally, concerns about how we collect, protect, store, use, or disclose personal information, or other privacy related matters, even if unfounded, could harm our business and operating results.

We are subject to numerous and rapidly evolving federal, state, and local laws regarding privacy, cybersecurity and the collection, use, and disclosure of personal information and other data. The laws are subject to differing interpretations, and both the laws and their interpretations are often inconsistent across jurisdictions. We are also subject to contractual requirements and others' privacy policies that govern how we use and protect personal information and other data. They may be costly to comply with, and may conflict with other rules. These obligations may be interpreted and applied in new ways or in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. New regulations could be enacted. Any failure or perceived failure by us to comply with our privacy policies, our privacy- or cybersecurity-related obligations to consumers, employees, or other third parties, or our privacy- or cybersecurity-related legal obligations, or any compromise generally of security that results in the unauthorized release or transfer of sensitive information, which may include personally identifiable information or other customer or employee data, may result in governmental enforcement actions, litigation, provision of required notifications to consumers or public statements against us by consumer advocacy groups or others and could cause consumers, employees, vendors, securitization or real estate investors, and receivable or real estate financing partners to lose trust in us, which could have an adverse effect on our business. If third-party service providers, developers, or other parties that we work with violate applicable laws, contractual assurances with us, or our policies, such violations may also put consumers', employees', third-party service providers', or receivable financing partners' information at risk and could in turn harm our reputation, business, and operating results.

29

*A significant disruption in service on our website could damage our reputation and result in a loss of consumers, which could harm our business, brand, operating results, and financial condition.*

Our brand, reputation, and ability to attract consumers depend on the reliable performance of our website and the supporting systems, technology, and infrastructure. We may experience significant interruptions to our systems in the future. Interruptions in these systems, whether due to system failures, programming or configuration errors, computer viruses, or physical or electronic break-ins, including from ransomware or distributed denial of service attacks could limit the availability of our inventory on our website and prevent or inhibit consumers from accessing our website. Problems with the reliability or security of our systems could harm our reputation, result in a loss of customers and result in additional costs.

Substantially all of the communications, network, and computer hardware used to operate our website are located at co-location facilities. Although we have multiple locations, our systems are not fully redundant. In addition, we do not own or control the operation of these facilities. Our systems and operations are vulnerable to damage or interruption from fire, flood, power loss, telecommunications failure, terrorist attacks, acts of war, electronic and physical break-ins, computer viruses, earthquakes, and similar events. The occurrence of any of these events could damage our systems and hardware or could cause them to fail.

Problems faced by our web-hosting providers could adversely affect the experience of our customers. For example, our web-hosting providers could close their facilities without adequate notice or suffer interruptions in service caused by cyber-attacks, natural disasters or other phenomena. Any financial difficulties, including bankruptcy, faced by our web-hosting providers or any of the service providers with whom they contract may have negative effects on our business, the nature and extent of which are difficult to predict. If our web-hosting providers are unable to keep up with our growing capacity needs, our business could be harmed.

Any errors, defects, disruptions, or other performance or reliability problems with our network operations could interrupt our customers' physical or electronic access to our inventory and our access to data that drives our inventory purchase operations as well as cause delays and additional expense in arranging access to new facilities and services, any of which could harm our reputation, business, operating results, and financial condition.

*Failure to adequately protect our intellectual property, technology, and confidential information could reduce our competitiveness and harm our business and operating results.*

Our business depends on our intellectual property, technology, and confidential information, the protection of which is crucial to the success of our business. For example, we have developed proprietary algorithms to price the vehicles we purchase and sell, to determine the financing terms we offer customers, and to power our in-house logistics network. Our intellectual property also includes, but is not limited to: inventions (whether or not patentable), the content of our website, mobile applications, registered domain names, our photography technology, and our vending machine design and technology. We rely on a combination of patents, trademarks, trade secrets, copyrights, and contractual restrictions to protect these algorithms and our other intellectual property, technology, and confidential information. In addition, we attempt to protect our intellectual property, technology, and confidential information by requiring certain of our employees and consultants to enter into confidentiality and invention assignment agreements and certain third parties to enter into nondisclosure agreements. These agreements may not effectively grant all necessary rights to any inventions that may have been developed by the employees and consultants. In addition, these agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property, or technology, and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information, intellectual property, or technology. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our website features, software, and functionality, or to obtain and use information that we consider proprietary. Changes in the law or adverse court rulings may also limit the scope of our rights and inhibit us from preventing others from using our technology.

We currently hold rights to the "carvana.com" internet domain name and various other related domain names. The regulation of domain names in the United States is subject to change. Regulatory bodies could establish additional top-level domains, appoint additional domain name registrars, or modify the requirements for holding domain names. As a result, we may not be able to acquire or maintain all domain names that use the name Carvana or are otherwise important for our business.

30

***We may be subject to claims that our employees, consultants, or advisors have wrongfully used or disclosed trade secrets or other intellectual property or proprietary information of their current or former employers, or claims asserting ownership of what we regard as our own intellectual property.***

Although we try to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or those who work for us have used or disclosed trade secrets or other intellectual property or proprietary information of their current or former employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, we may have to pay monetary damages and lose valuable intellectual property rights or personnel. Even if we are successful in defending against such claims, litigation could result in substantial costs, harm our reputation, and be a distraction to management.

In addition, while it is our policy to require our employees and contractors who may be involved in the conception or development of intellectual property to execute agreements assigning such intellectual property to us, we may be unsuccessful in executing such an agreement with each party who conceives or develops intellectual property that we regard as our own. The assignment of intellectual property may not be self-executing, may not be enforceable in certain jurisdictions or may be breached, and we may be forced to bring claims against third parties or defend claims that they may bring against us to determine the ownership of what we regard as our intellectual property. This could be costly, and if we are unsuccessful, we may not be able to prevent others from using our technology, and may not be able to use it ourselves.

***We may become involved in lawsuits to defend ourselves against intellectual property disputes, which could be expensive and time consuming, and ultimately unsuccessful, and could result in the diversion of significant resources, and hinder our ability to commercialize our existing or future products.***

Our success depends in part on not infringing the patents or violating the other proprietary rights of others. Intellectual property disputes can be costly to settle or defend and may cause our business, operating results and financial condition to suffer. Significant litigation regarding patent rights occurs in the e-commerce industry. Whether merited or not, it is possible that U.S. patents and pending patent applications controlled by third parties may be alleged to cover our products and activities. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios and competing technologies, may have applied for or obtained or may in the future apply for and obtain patents that prevent, limit, or otherwise interfere with our ability to use our technology or processes that are necessary to operate our business. Our competitors may have one or more patents for which they can threaten or initiate patent infringement actions against us or any of our suppliers. Our ability to defend ourselves or our suppliers may be limited by our financial and human resources, the availability of reasonable defenses, and the ultimate acceptance of our defenses by the courts or juries. Furthermore, if such patents are successfully asserted against us, this may result in an adverse impact on our business, including injunctions, damages, and attorneys' fees. From time to time and in the ordinary course of business, we may develop non-infringement or invalidity positions with respect to the patents of others, which may not be accepted by a judge or jury if such patents were asserted against us.

We may receive communications from patent holders alleging infringement of patents or other intellectual property rights or misappropriation of trade secrets, or offering licenses to such intellectual property. Any claims that we assert against perceived infringers could also provoke these parties to assert counterclaims against us alleging that we infringe their intellectual property rights. At any given time, we may be involved as either a plaintiff or a defendant in a number of patent infringement actions, the outcomes of which may not be known for prolonged periods of time.

The large number of patents, the rapid rate of new patent applications and issuances, the complexities of the technologies involved, our potential expansion into new business lines and technologies, and the uncertainty of litigation significantly increase the risks related to any patent litigation. Furthermore, as the number of participants in our industry grows, the possibility of intellectual property infringement claims against us increases. Any litigation or claim against us, even those without merit, may cause us to incur substantial costs, and could place a significant strain on our financial resources, divert the attention of management and other resources from our core business and harm our reputation. Any potential intellectual property litigation also could force us to do one or more of the following:

- stop using the technology, content, branding or processes that use the disputed intellectual property necessary to operate our business and sell our products;

- obtain a license from the intellectual property owner to continue using technology or processes necessary to operate our business or sell our products, which license may require substantial royalty payments and may not be available on commercially reasonable terms, or at all;

- incur significant expenses and legal fees;

- pay substantial damages or royalties to the party whose intellectual property rights we are alleged to be infringing, potentially including treble damages if the court finds that the infringement was willful;

- pay substantial royalties, upfront fees, or grant cross-licenses to intellectual property rights for our products and services;

- find a non-infringing substitute product or technology, which could be costly and create significant delay in our operations; or

- redesign those products, technologies or processes that infringe any intellectual property, which could be costly, disruptive, or infeasible.

***Our platform utilizes open source software, and any failure to comply with the terms of these open source licenses could negatively affect our business.***

We use open source software in our platform and expect to use open source software in the future. The terms of various open source licenses have not been interpreted by United States courts, and there is a risk that such licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to market our platform. By the terms of certain open source licenses, we could be required to release the source code of our proprietary software and to make our proprietary software available under open source licenses if we combine our proprietary software with open source software in a certain manner. In the event that portions of our proprietary software are determined to be subject to an open source license, we could be required to publicly release the affected portions of our source code, to re-engineer all or a portion of our technologies, or otherwise to be limited in the use or licensing of our technologies, each of which could reduce or eliminate the value of our technologies and services. In addition to risks related to license requirements, usage of open source software can lead to greater risks than use of commercial software, as open source licensors generally do not provide warranties or controls on the origin of the software. Many of the risks associated with usage of open source software cannot be eliminated and could negatively affect our business and operating results.

***Our business is sensitive to conditions affecting automotive manufacturers, including manufacturer recalls.***

Adverse conditions affecting one or more automotive manufacturers could have a material adverse effect on our sales and results of operations and could impact the supply of vehicles. Manufacturer recalls are a common occurrence that have accelerated in frequency and scope in recent years. Recalls and the increased regulatory scrutiny surrounding selling used vehicles with open safety recalls could adversely affect used vehicle sales or valuations, could cause us to temporarily remove vehicles from inventory, could cause us to sell affected vehicles at a loss, could force us to incur increased costs, and could expose us to litigation and adverse publicity related to the sale of recalled vehicles, which could have a material adverse effect on our business, financial condition, and results of operations.

***We rely on third-party technology to complete critical business functions. If that technology fails to adequately serve our needs and we cannot find alternatives, it may negatively impact our operating results.***

We rely on third-party technology for certain of our critical business functions, including supply chain and inventory management, customer identity verification for financing, transportation fleet telemetry, network infrastructure for hosting the website and inventory data, software libraries, development environments and tools, services to allow customers to digitally sign contracts, customer service call center management software, automation controls and software for our vending machines, hosted telephony, human resource management, and security. If these technologies fail or we cannot maintain our relationships with the technology providers and we cannot find suitable alternatives, our financial condition and operation results may be adversely affected.

***We depend on key personnel to operate our business. If we are unable to retain, attract and integrate qualified personnel, our ability to develop and successfully grow our business could be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our executives and employees. Our future success depends on our ability to attract, develop, motivate, and retain highly qualified and skilled employees. Qualified individuals are in high demand, and we may incur significant costs to attract and retain them. In addition, the loss of any of our key employees or senior management, including our Chief Executive Officer, Ernest Garcia III, our Chief Financial Officer, Mark Jenkins, and our Chief Operating Officer, Benjamin Huston, could materially adversely affect our ability to execute our business plan and strategy, and we may not be able to find adequate replacements on a timely basis, or at all. Our executive officers and other employees are at-will employees, which means they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. We may not be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting

32

well-qualified employees or retaining and motivating existing employees, our business could be materially and adversely affected.

***We have and may continue to acquire other companies or technologies, which could divert our management's attention, result in additional dilution to our stockholders and otherwise disrupt our operations and harm our operating results.***

Our success will depend, in part, on our ability to grow our business in response to the demands of consumers, other constituents within the automotive industry, and competitive pressures. In the past, we have done so by acquiring complementary businesses and technologies rather than through internal development, and we may do so again in the future. The identification of suitable acquisition candidates can be difficult, time-consuming, and costly, and we may not be able to successfully complete identified acquisitions. The risks we face in connection with acquisitions include:

- diversion of management time and focus from operating our business to addressing acquisition integration challenges;

- coordination of technology, research and development, and sales and marketing functions;

- transition of the acquired company's users to our website and mobile applications;

- retention of employees from the acquired company;

- cultural challenges associated with integrating employees from the acquired company into our organization;

- integration of the acquired company's accounting, management information, human resources, and other administrative systems;

- the need to implement or improve controls, policies, and procedures at a business that, prior to the acquisition, may have lacked effective controls, policies, and procedures;

- potential write-offs of intangibles or other assets acquired in such transactions that may have an adverse effect on our operating results;

- liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, violations of laws, commercial disputes, tax liabilities, and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired company, including claims from terminated employees, consumers, former investors, or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and investments could cause us to fail to realize the anticipated benefits of these acquisitions or investments, cause us to incur unanticipated liabilities, and otherwise harm our business. Future acquisitions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, amortization expenses, or the write-off of goodwill, any of which could harm our financial condition. Any of these risks, if realized, could materially and adversely affect our business, financial condition, and results of operations.

***We are, and may in the future be, subject to legal proceedings in the ordinary course of our business. If the outcomes of these proceedings are unfavorable to us, it could have a material adverse effect on our business, results of operations, and financial condition.***

We are subject to various litigation matters from time to time, which could have a material adverse effect on our business, results of operations and financial condition. Legal claims could be asserted against us by individuals, either individually or through class actions, by governmental entities in civil or criminal investigations and proceedings or by other entities. These claims could be asserted under a variety of laws, including but not limited to consumer finance laws, consumer protection laws, laws governing motor vehicle dealers, intellectual property laws, privacy laws, labor and employment laws, securities laws, employee benefit laws, tax laws, and tort laws. These actions could expose us to adverse publicity and to substantial monetary damages and legal defense costs, injunctive relief and criminal and civil fines and penalties, including but not limited to suspension or revocation of licenses to conduct business.

**Risks Related to Our Organizational Structure**

***Our principal asset is our indirect interest in Carvana Group, and, accordingly, we depend on distributions from Carvana Group to pay our taxes and expenses, including payments under the 2025 and 2028 Notes and Tax Receivable Agreement. Carvana Group's ability to make such distributions may be subject to various limitations and restrictions.***

We are a holding company and have no material assets other than our indirect ownership of LLC Units of Carvana Group. As such, we have no independent means of generating revenue or cash flow, and our ability to pay our taxes, debt obligations, and operating expenses depends on the financial results and cash flows of Carvana Group and its subsidiaries and distributions we receive from Carvana Group. These taxes, obligations, and expenses include the following:

*Taxes*. Carvana Group is treated as a partnership for U.S. federal income tax purposes and, as such, is not subject to any entity-level U.S. federal income tax. Instead, taxable income of Carvana Group is allocated to the LLC Unitholders, including Carvana Sub, our wholly owned subsidiary. Accordingly, we incur income taxes on our allocable share of any net taxable income of Carvana Group. Under the terms of the LLC Agreement (as defined in Note 1— Business Organization), Carvana Group is obligated to make tax distributions to LLC Unitholders, including us.

*Debt obligations*. We have payment obligations under our 2025 and 2028 Notes (detailed in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" and Note 9—Debt Instruments—Long Term Debt). Under the terms of the LLC Agreement, Carvana Group is obligated to make distributions to us for the payment of obligations under these notes.

*Operating expenses and other expenses*. We also incur expenses related to our operations, including payments under the Tax Receivable Agreement (as defined in Note 14—Income Taxes). Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we may realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Under the terms of the LLC Agreement, Carvana Group is obligated to make distributions to us for our payment obligations under the Tax Receivable Agreement.

While we intend to cause Carvana Group to make distributions to us in an amount sufficient to fund these taxes, obligations, and expenses, Carvana Group's ability to make such distributions may be subject to various limitations and restrictions, such as restrictions on distributions that would either violate any contract or agreement to which Carvana Group is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering Carvana Group insolvent. If we do not have sufficient funds to pay taxes, obligations or expenses, we may have to borrow funds, which could materially adversely affect our liquidity and financial condition and subject us to various restrictions imposed by any such lenders. If we are unable to make payments under the Tax Receivable Agreement, those payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds.

***Conflicts of interest could arise between our stockholders and the LLC Unitholders, which may impede business decisions that could benefit our stockholders.***

Holders of LLC Units have the right to consent to certain amendments to the operating agreement of the LLC, as well as to certain other matters, including the revaluation of partnership interests in Carvana Group. Holders of these voting rights may exercise them in a manner that conflicts with the interests of our stockholders. Circumstances may arise in the future when the interests of the LLC Unitholders conflict with the interests of our stockholders. As we control the LLC, we have certain obligations to the LLC Unitholders that may conflict with fiduciary duties our officers and directors owe to our stockholders. These conflicts may result in decisions that are not in the best interests of stockholders.

***We are a "controlled company" within the meaning of the rules of the NYSE and, as a result, we qualify for exemptions from certain corporate governance requirements. Our stockholders do not have the same protections afforded to stockholders of companies that are subject to such requirements.***

The Garcia Parties continue to control a majority of the combined voting power of Carvana Co. As a result, we continue to be a controlled company within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and need not comply with certain requirements, including the requirement that a majority of the Board consist of independent directors and the requirements that our compensation and nominating and governance committees be composed entirely of

34

independent directors. We do not intend to utilize these exemptions; however, for so long as we qualify as a controlled company, we will maintain the option to utilize some or all of these exemptions. If we utilize these exemptions, we may not have a majority of independent directors and our compensation and nominating and governance committees may not consist entirely of independent directors, and such committees will not be subject to annual performance evaluations. Accordingly, in the event we rely on these exemptions in the future, our stockholders would not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE.

***The Tax Receivable Agreement with the LLC Unitholders requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that the payments we will be required to make will be substantial.***

In connection with the consummation of our IPO, we entered into a Tax Receivable Agreement with the LLC Unitholders. Pursuant to the Tax Receivable Agreement, we will be required to make cash payments to such LLC Unitholders equal to 85% of the tax benefits, if any, that we actually realize, or, in some circumstances, are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of the LLC and an adjustment in the tax basis of the assets of the LLC reflected in that proportionate share as a result of any future exchanges of LLC Units held by the LLC Unitholders for shares of our Class A common stock or cash, and (2) certain other tax benefits related to payments we make under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, which tax reporting positions will be based on the advice of our tax advisors. Any payments made by us to the LLC Unitholders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make payments under the Tax Receivable Agreement, such payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that may be deemed realized under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are also not conditioned upon the LLC Unitholders maintaining a continued ownership interest in the LLC.

The actual amount and timing of any payments under the Tax Receivable Agreement will vary depending upon a number of factors, including the timing of exchanges by the LLC Unitholders, the amount of gain recognized by such LLC Unitholders, the amount and timing of the taxable income we generate in the future and the federal tax rates then applicable.

***The amounts that we may be required to pay to the LLC Unitholders under the Tax Receivable Agreement may be accelerated in certain circumstances and may also significantly exceed the actual tax benefits that we ultimately realize.***

The Tax Receivable Agreement provides that if (1) certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, (2) we breach any of our material obligations under the Tax Receivable Agreement or (3) we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, to make payments under the Tax Receivable Agreement would accelerate and become immediately due and payable. The amount due and payable in that circumstance is based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

As a result of a change in control or our election to terminate the Tax Receivable Agreement early, (1) we could be required to make cash payments to the LLC Unitholders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement and (2) we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring, or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

***Certain benefits from our organizational structure, including the Tax Receivable Agreement, will not benefit Class A common stockholders to the same extent as they will benefit the LLC Unitholders.***

Certain benefits from our organizational structure, including the Tax Receivable Agreement, will not benefit the holders of our Class A common stock to the same extent as LLC Unitholders. We entered into a Tax Receivable Agreement with the LLC Unitholders, which will provide for the payment by us to the LLC Unitholders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of the LLC and an adjustment in the tax basis of the assets of the LLC reflected in that proportionate share as a result of any future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash and (2) certain other tax benefits related to our making payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Although we will retain 15% of the amount of such tax benefits, this and other aspects of our organizational structure may adversely impact the trading market for the Class A common stock.

***We will not be reimbursed for any payments made to the LLC Unitholders under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

We will not be reimbursed for any cash payments previously made to the LLC Unitholders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to an LLC Unitholder will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we are required to make under the terms of the Tax Receivable Agreement and, as a result, there may not be future cash payments to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will agree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings.

***We may not be able to realize all or a portion of the tax benefits that are currently expected to result from future exchanges of LLC Units for our Class A common stock and from payments made under the Tax Receivable Agreement.***

Our ability to realize the tax benefits that we currently expect to be available as a result of the increases in tax basis created by any future exchanges of LLC Units (together with shares of our Class B common stock in the case of certain Class A Units) for our Class A common stock, the payments made pursuant to the Tax Receivable Agreement, and the interest deductions imputed under the Tax Receivable Agreement all depend on a number of assumptions, including that we earn sufficient taxable income each year during the period over which such deductions are available and that there are no changes in applicable law or regulations. For example, the reduction in corporate tax rates pursuant to the 2017 changes in U.S. federal income tax law has the effect of reducing the expected value of the tax benefits we realize as a result of the increase in our proportionate share of the existing tax basis of the assets of Carvana Group arising from future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash. The reduction in the value of such tax benefits is expected to have two primary consequences—it reduces the cash payments we expect to be required to make pursuant to the Tax Receivable Agreement and it reduces the expected value to us of the 15% of the amount of such tax benefits that we will retain pursuant to the Tax Receivable Agreement. Additionally, if our actual taxable income were insufficient or there were additional adverse changes in applicable laws or regulations, we may be further unable to realize all or a portion of the expected tax benefits and our cash flows and stockholders' equity could be negatively affected.

***In certain circumstances, Carvana Group will be required to make distributions to us and the LLC Unitholders and the distributions may be substantial.***

Carvana Group is treated as a partnership for U.S. federal income tax purposes and, as such, is not subject to U.S. federal income tax. Instead, taxable income is allocated to its members, including us. We intend to cause Carvana Group to make tax distributions quarterly to the holders of Class A Units (including us) on a pro rata basis based on Carvana Group's net taxable income and to the holders of Class B Units based on such holder's allocable share of Carvana Group's net taxable income (rather than on a pro rata basis). Funds used by Carvana Group to satisfy its tax distribution obligations will not be available for reinvestment in our business. Moreover, these tax distributions may be substantial, and will likely exceed (as a percentage of Carvana Group's income) the overall effective tax rate applicable to a similarly situated corporate taxpayer. As a result of the potential differences in the amount of net taxable income allocable to us and the LLC Unitholders, particularly in light of the

36

reduction in corporate tax rates passed in 2017, it is possible that we will receive distributions significantly in excess of our tax liabilities and obligations to make payments under the Tax Receivable Agreement. To the extent we do not distribute such cash balances as dividends on our Class A common stock and instead, for example, hold such cash balances or lend them to Carvana Group, the LLC Unitholders would benefit from any value attributable to such accumulated cash balances as a result of its ownership of Class A common stock following an exchange of its LLC Units (including any exchange upon an acquisition of us).

***If we were deemed to be an investment company under the Investment Company Act of 1940, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations.***

Under Sections 3(a)(1)(A) and (C) of the 1940 Act, a company generally will be deemed to be an "investment company" for purposes of the 1940 Act if it (1) is, or holds itself out as being, engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities or (2) is engaged, or proposes to engage, in the business of investing, reinvesting, owning, holding, or trading in securities and it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We do not believe that we are an investment company, as such term is defined in either of those sections of the 1940 Act.

As the sole managing-member of Carvana Sub, we control and manage Carvana Sub, which, by virtue of being the sole managing-member of Carvana Group, in turn, controls and manages Carvana Group. On that basis, we believe that neither our interest in Carvana Sub nor Carvana Sub's interest in Carvana Group are "investment securities" under the 1940 Act. Therefore, we have less than 40% of the value of our total assets (exclusive of U.S. government securities and cash items) in "investment securities." However, if we were to lose the right to manage and control Carvana Sub or if Carvana Sub were to lose the right to manage and control Carvana Group, interests in Carvana Group or Carvana Sub could be deemed to be "investment securities" under the 1940 Act.

We intend to conduct our operations so that we will not be deemed to be an investment company. However, if we were deemed to be an investment company, restrictions imposed by the 1940 Act, including limitations on our capital structure and our ability to transact with affiliates, could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition, and results of operations.

## Risks Related to Our Liquidity

***Our substantial indebtedness could adversely affect our financial flexibility and our competitive position and prevent us from fulfilling our obligations under our credit agreement.***

As of December 31, 2020, we had outstanding, on a consolidated basis (1) $1.1 billion aggregate principal amount of our 2025 and 2028 Notes, (2) $39.8 million aggregate principal amount of borrowings under our amended and restated vehicle inventory financing and security agreement with Ally Financial, dated as of September 29, 2020 (the "Floor Plan Facility") and the Finance Receivable Facilities (as defined below), (3) $110.0 million aggregate principal amount of indebtedness represented by our finance lease agreements between us and providers of equipment financing, (4) $25.2 million aggregate principal amount of indebtedness represented by our promissory note agreements between us and providers of equipment financing, and (5) an outstanding balance of $81.3 million relating to secured borrowing facility through which we finance certain retained beneficial interests in our securitizations. Also, as of December 31, 2020, we had, on a consolidated basis, $387.4 million of other long-term debt related to our sale leaseback transactions. Our substantial indebtedness could have significant effects on our business. For example, it could:

- make it more difficult for us to satisfy our obligations with respect to our current and future indebtedness, including our 2025 and 2028 Notes and Floor Plan Facility;

- increase our vulnerability to adverse changes in prevailing economic, industry, and competitive conditions;

- require us to dedicate a substantial portion of our cash flow from operations to make payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions, the execution of our business strategy, and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- increase our cost of borrowing;

- restrict us from exploiting business opportunities;

37

- place us at a disadvantage compared to our competitors that have fewer debt obligations; and

- limit our ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy, and other general corporate purposes.

We expect to use cash flow from operations to meet current and future financial obligations, including funding our operations, debt service requirements, and capital expenditures. The ability to make these payments depends on our financial and operating performance, which is subject to prevailing economic, industry, and competitive conditions and to certain financial, business, economic, and other factors beyond our control.

*Despite current indebtedness levels, we may incur substantially more indebtedness, which could further exacerbate the risks associated with our substantial indebtedness.*

We may incur significant additional indebtedness in the future. We may also consider investments in joint ventures or acquisitions, which may increase our indebtedness. If new debt is added to our currently anticipated indebtedness levels, the related risks that we face could intensify.

*We may not be able to generate sufficient cash flow to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under such indebtedness, which may not be successful, or may harm our business.*

Our ability to make scheduled payments or to refinance outstanding debt obligations depends on our financial and operating performance, which will be affected by prevailing economic, industry, and competitive conditions and by financial, business, and other factors beyond our control. Additionally, some of our debt accrues interest at a variable rate that is based on LIBOR or other market rates; if those market rates rise, so too will the amount we need to pay to satisfy our debt obligations. We may not be able to maintain a sufficient level of cash flow from operating activities to permit us to pay the principal, premium, if any, and interest on our indebtedness. Any failure to make payments of interest and principal on our outstanding indebtedness on a timely basis would likely result in a reduction of our credit rating, which would also adversely affect our ability to incur additional indebtedness.

We may not be able to refinance any of our indebtedness on commercially reasonable terms or at all. If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or seek to restructure or refinance our indebtedness. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants. These alternative measures may not be successful, and we may be unable to meet our scheduled debt service obligations.

In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to sell material assets or operations to attempt to meet our debt service obligations. We may not be able to consummate these asset sales to raise capital or sell assets at prices and on terms that we believe are fair, and any proceeds that we do receive may not be adequate to meet any debt service obligations then due. If we cannot meet our debt service obligations, the holders of our indebtedness may accelerate such indebtedness and, to the extent such indebtedness is secured, foreclose on our assets. In such an event, we may not have sufficient assets to repay our indebtedness. If any of these risks are realized, our business and financial condition would be adversely affected.

*The phase-out of the London Interbank Offered Rate (LIBOR), or the replacement of LIBOR with a different reference rate, may adversely affect interest rates.*

On November 30, 2020, the ICE Benchmark Administration Limited, with the support of the United States Federal Reserve and the United Kingdom's Financial Conduct Authority, announced plans to consult on ceasing publication of LIBOR on December 31, 2021 for only the one week and two month LIBOR tenors, and on June 30, 2023 for all other LIBOR tenors. While this announcement extends the transition period for the phaseout of LIBOR to June 2023, the United States Federal Reserve concurrently issued a statement advising banks to stop new LIBOR issuances by the end of 2021. In light of these recent announcements, the future of LIBOR at this time is uncertain and any changes in the methods by which LIBOR is determined or regulatory activity related to LIBOR's phaseout could cause LIBOR to perform differently than in the past or cease to exist. Changes in the method of calculating LIBOR, or the replacement of LIBOR with an alternative rate or benchmark, may adversely affect interest rates and result in higher borrowing costs. This could materially and adversely affect our results of operations, cash flows, and liquidity. We cannot predict the effect of the potential changes to LIBOR or the establishment and use of alternative rates or benchmarks. If changes are made to the method of calculating LIBOR or LIBOR ceases to exist, we may need to amend certain contracts or enter into new ones and cannot predict what alternative rate or benchmark would be negotiated. This may result in an increase to our interest expense.

38

*Changes in capital markets could adversely affect our business, sales, results of operations, and financial condition.*

Changes in the availability or cost of the financing to support the origination and sale of automotive finance receivables could adversely affect sales and results of operations. Among other programs, we may use securitization programs to fund many automotive finance receivables we originate. Changes in the condition of the securitization market could lead us to incur higher costs to access funds in this market or require us to seek alternative means to finance those originations that could be more expensive, which could have a material adverse effect on our business, sales, and results of operations.

*We may experience greater credit losses or prepayments in any interests we hold in automotive finance receivables than we anticipate.*

Until we sell automotive finance receivables, and to the extent we retain interests in automotive finance receivables after we sell them, whether pursuant to securitization transactions or otherwise, we are exposed to the risk that applicable customers will be unable or unwilling to repay their loans according to their terms and that the vehicle collateral securing the payment of their loans may not be sufficient to ensure full repayment. Credit losses are inherent in the automotive finance receivables business and could have a material adverse effect on our results of operations.

We make various assumptions and judgments about the automotive finance receivables we originate and may provide an allowance for loan losses, value beneficial ownership interests, and estimate prepayment rates based on a number of factors. Although management may establish an allowance for loan losses, value beneficial ownership interests, and estimate prepayment rates based on analysis it believes is appropriate, this may not be adequate. For example, if economic conditions were to deteriorate unexpectedly, additional loan losses not incorporated in the existing allowance or valuation may occur. Losses or prepayments in excess of expectations could have a material adverse effect on our business, results of operations, and financial condition.

*Our securitizations may expose us to financing and other risks, and there can be no assurance that we will be able to access the securitization market in the future, which may require us to seek more costly financing.*

We have securitized, and may in the future securitize, certain of our automotive finance receivables to generate cash. In such transactions, we convey a pool of automotive finance receivables to a special purpose vehicle, typically a trust that, in turn, issues certain securities. The securities issued by the special purpose vehicle are collateralized by the pool of automotive finance receivables. In exchange for the transfer of finance receivables to the special purpose vehicle, we typically receive the cash proceeds from the sale of the securities.

Although we successfully completed four securitizations in 2019 and two securitizations in 2020, we can give no assurances that we will be able to complete additional securitizations if the securitization markets become constrained. In addition, the value of any securities that we may retain in our securitizations, including securities retained to comply with the Risk Retention Rules (defined below), might be reduced or, in some cases, eliminated as a result of an adverse change in economic conditions or the financial markets. If it is not possible or economical for us to securitize our automobile finance receivables in the future, we would need to seek alternative financing to support our operations and to meet our existing debt obligations, which may be less efficient and more expensive than raising capital via securitizations and may have a material adverse effect on our results of operations, financial condition, and liquidity.

*Risk retention rules may increase our compliance costs, limit our liquidity and otherwise adversely affect our operating results.*

Effective as of December 24, 2016, "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Act (the "Risk Retention Rules") require a "securitizer" or "sponsor" of a securitization transaction to retain, directly or through a "majority-owned affiliate" (each defined in the Risk Retention Rules), in one or more prescribed forms, at least 5% of the credit risk of the securitized assets. For the securitization transactions for which we have acted as "sponsor," we have sought and will likely continue to seek to satisfy the Risk Retention Rules by retaining a "vertical interest" (as defined in the Risk Retention Rules) through either a majority-owned affiliate (MOA) or directly on our balance sheet. In addition, we have and will likely continue to enter into arrangements to finance or monetize a portion of the retained credit risk in one or more prescribed forms under the Risk Retention Rules. In addition to the discussion in this section, see Note 2 — Summary of Significant Accounting Policies and Note 8 — Securitizations and Variable Interest Entities.

We have also participated in other structured program transactions that we have determined are not securitizations that require risk retention, and accordingly, we have not sought to comply with any Risk Retention Rules that would be applicable to securitization transactions. The Risk Retention Rules are subject to varying interpretations, and one or more regulatory or

39

governmental authorities could take positions with respect to the Risk Retention Rules that conflict with, or are inconsistent with, the Risk Retention Rules as understood by or interpreted by us, the securitization industry generally, or past or current regulatory or governmental authorities. There can be no assurance that applicable regulatory or governmental authorities will agree with any of our determinations described above, and if such authorities disagree with such determinations, we may be exposed to additional costs and expenses, in addition to potential liability. Furthermore, we expect that compliance with the Risk Retention Rules (and other related laws and regulations), as currently understood by us, may entail the implementation of new forms, processes, procedures, controls, and infrastructure. Such implementation may be costly and may adversely affect our operating results.

In addition to the increased costs we expect to be generated by our efforts to comply with applicable Risk Retention Rules, which may be significant, we expect compliance with any applicable Risk Retention Rules will require capital, which could potentially have been deployed in other ways that could have generated better value. Holding risk retention interests or loans in contemplation of structured financing increases our exposure to the performance of the loans that underlie or are expected to underlie those transactions. Accordingly, although compliance with applicable Risk Retention Rules would be expected to more closely align our incentives with those of the investors in our loans, it is also expected that poor loan performance may have a heightened adverse effect on the value of our shares. This may exacerbate the negative effects of poor loan performance on the value of our shares.

### Risks Related to Ownership of our Class A Common Stock

***The Garcia Parties control us and their interests may conflict with our or our stockholders' interests in the future.***

The Garcia Parties together hold approximately 90% of the voting power of our outstanding capital stock through their beneficial ownership of our Class A and Class B common stock as of December 31, 2020. The Garcia Parties are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Our Class A common stock has one vote per share. So long as the Garcia Parties continue to beneficially own a sufficient number of shares of Class B common stock, even if they beneficially own significantly less than 50% of the shares of our outstanding capital stock, the Garcia Parties will continue to be able to effectively control our decisions. For example, if the Garcia Parties hold Class B common stock amounting to 25% of our outstanding capital stock, they would collectively control 77% of the voting power of our capital stock.

As a result, the Garcia Parties have the ability to elect all of the members of our Board and thereby effectively control our policies and operations, including the appointment of management, future issuances of our Class A common stock or other securities, the payment of dividends, if any, on our Class A common stock, the incurrence of debt by us, amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions. The interests of the Garcia Parties may not in all cases be aligned with our stockholders' interests.

In addition, the Garcia Parties can determine the outcome of all matters requiring stockholder approval, cause or prevent a change of control of our company or a change in the composition of our Board, and preclude any acquisition of our company. This concentration of voting control could deprive our stockholders of an opportunity to receive a premium for their shares of Class A common stock as part of a sale of our company and ultimately might affect the market price of our Class A common stock.

In addition, the Garcia Parties may have an interest in pursuing acquisitions, divestitures, and other transactions that, in their judgment, could enhance their investment, even though such transactions might involve risks. For example, the Garcia Parties could cause us to make acquisitions that increase our indebtedness or cause us to sell revenue-generating assets. The Garcia Parties may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. One of the Garcia Parties, Ernest Garcia II, is the chairman of the board of directors and controlling shareholder of DriveTime, which could compete more directly with us in the future. Our amended and restated certificate of incorporation provides that none of the Garcia Parties or any director who is not employed by us (including any non-employee director who serves as one of our officers in both his or her director and officer capacities) or his or her affiliates has any duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. The Garcia Parties also may pursue acquisition opportunities that may otherwise be complementary to our business, and, as a result, those acquisition opportunities may not be available to us.

40

***Our stock may be diluted by future issuances of additional Class A common stock or LLC Units in connection with our incentive plans, acquisitions or otherwise; future sales of such shares in the public market or the expectations that such sales may occur could lower our stock price.***

We may issue additional shares of Class A common stock in several ways:

*By the Board*. Our amended and restated certificate of incorporation authorizes us to issue shares of our Class A common stock and options, rights, warrants and appreciation rights relating to our Class A common stock or the consideration of and on the terms and conditions established by our Board in its sole discretion, whether in connection with acquisitions or otherwise.

*Under the Exchange Agreement*. LLC Unitholders may require Carvana Group to redeem all or a portion of their LLC Units in exchange for, at our election, (1) a cash payment by Carvana Group or (2) newly issued shares of Class A common stock, in each case in accordance with the terms and conditions of the Exchange Agreement. The LLC Agreement authorizes Carvana Group to issue additional LLC Units whether in connection with an acquisition or otherwise. We have entered into a Registration Rights Agreement with certain LLC Unitholders that would require us to register shares issued to them, and we may enter into similar agreements in the future.

*Under the 2017 Omnibus Incentive Plan*. We have reserved 14.0 million shares of Class A common stock for issuance under our 2017 Incentive Plan (as defined in Note 12 — Equity-Based Compensation). As of December 31, 2020 we have granted 2.4 million restricted stock awards and units and options to purchase 1.6 million shares of Class A common stock to certain consultants, directors, and employees. After considering the granted and forfeited awards as well as the 555,556 shares purchased by Ernest Garcia III in the equity offering completed in April 2020, we have 9.8 million shares of Class A common stock available for future issuance under our 2017 Incentive Plan as of December 31, 2020.

Any stock that we issue or exchange would dilute the percentage ownership held by the investors who purchase Class A common stock. The market price of shares of our Class A common stock could decline as a result of newly issued or exchanged stock, or the perception that we might issue or exchange stock. A decline in the price of our Class A common stock might impede our ability to raise capital through the issuance of additional shares of Class A common stock or other equity securities.

***Substantial blocks of our total outstanding shares may be sold into the market. If there are substantial sales of shares of our Class A common stock, the price of our Class A common stock could decline.***

The price of our Class A common stock could decline if there are substantial sales of our Class A common stock (including sales of Class A common stock issuable upon exchange of LLC Units), particularly sales by our directors, executive officers, and significant stockholders, or if there is a large number of shares of our Class A common stock available for sale. As of December 31, 2020, we have 76.5 million shares of our Class A common stock outstanding. All of the shares of Class A common stock sold in our IPO and the follow-on offerings in April 2018, May 2019, April 2020, and May 2020 are available for sale in the public market. Shares held by directors, executive officers and other affiliates are subject to volume limitations under Rule 144 under the Securities Act of 1933, as amended, or the Securities Act, and various vesting agreements.

Certain of our LLC Unitholders have rights, subject to conditions, to require us to file registration statements covering Class A common stock issuable to them upon exchange of their LLC Units. We would be required to include certain Class A common shares in registration statements that we may file for ourselves or our stockholders, subject to market standoff and lockup agreements. These registration rights would facilitate the resale of such securities into the public market, and any such resale would increase the number of shares of our Class A common stock available for public trading. We also intend to register shares of common stock that we have issued and may issue under our employee equity incentive plans. Once we register these shares, they will be able to be sold freely in the public market upon issuance, subject to existing market standoff or lock-up agreements.

The market price of the shares of our Class A common stock could decline as a result of the sale of a substantial number of our shares of Class A common stock in the public market or the perception in the market that the holders of a large number of such shares intend to sell their shares.

***We do not intend to pay dividends on our Class A common stock for the foreseeable future.***

We currently have no intention to pay dividends on our Class A common stock at any time in the foreseeable future. Any decision to declare and pay dividends in the future will be made at the discretion of our Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions, and other factors that our Board may deem relevant. Certain of our debt instruments contain covenants that restrict our ability and the ability of our subsidiaries

to pay dividends and in the future we may enter into new instruments with similar covenants. In addition, despite our current indebtedness, we may still be able to incur additional debt in the future, and such indebtedness may restrict or prevent us from paying dividends on our Class A common stock.

***Delaware law and certain provisions in our certificate of incorporation may prevent efforts by our stockholders to change the direction or management of our company.***

We are a Delaware corporation, and the anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change of control would be beneficial to our existing stockholders. In addition, our certificate of incorporation and our amended and restated by-laws contain provisions that may make the acquisition of our company more difficult without the approval of our Board, including, but not limited to, the following:

• the Garcia Parties are entitled to ten votes for each share of our Class B common stock they hold of record on all matters submitted to a vote of stockholders for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock);

• at such time as there are no outstanding shares of Class B common stock, only our Board may call special meetings of our stockholders;

• we have authorized undesignated preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval; and

• we require advance notice and duration of ownership requirements for stockholder proposals.

Our amended and restated certificate of incorporation also contains a provision that provides us with protections similar to Section 203 of the Delaware General Corporation Law (the "DGCL"), and prevents us from engaging in a business combination with a person (excluding the Garcia Parties and their transferees) who acquires at least 15% of our common stock for a period of three years from the date such person acquired such common stock, unless board or stockholder approval is obtained prior to the acquisition. These provisions could discourage, delay, or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for our stockholders to elect directors of their choosing and cause us to take other corporate actions our stockholders desire, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our Class A common stock. In addition, because our Board is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace current members of our management team.

These and other provisions in our certificate of incorporation, bylaws and Delaware law could make it more difficult for stockholders or potential acquirers to obtain control of our Board or to initiate actions that are opposed by our then-current Board, a merger, tender offer or proxy contest involving our company. The existence of these provisions could negatively affect the price of our common stock and limit opportunities for our stockholders to realize value in a corporate transaction.

***With limited exceptions, the Court of Chancery of the State of Delaware is the sole and exclusive forum for certain stockholder litigation matters, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees, or stockholders.***

Pursuant to our certificate of incorporation, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware is the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers, or other employees to us or our stockholders, (3) any action asserting a claim against us arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against us that is governed by the internal affairs doctrine. The forum selection clause in our certificate may have the effect of discouraging lawsuits against us or our directors and officers and may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees, or stockholders.

***We may issue shares of preferred stock in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our Class A common stock, which could depress the price of our Class A common stock.***

Our certificate of incorporation authorizes us to issue one or more series of preferred stock. Our Board has the authority to determine the preferences, limitations and relative rights of the shares of preferred stock and to fix the number of shares constituting any series and the designation of such series, without any further vote or action by our stockholders. Our preferred

42

stock could be issued with voting, liquidation, dividend and other rights superior to the rights of our Class A common stock. The potential issuance of preferred stock may delay or prevent a change in control of us, discouraging bids for our Class A common stock at a premium to the market price, and materially adversely affect the market price and the voting and other rights of the holders of our Class A common stock.

## General Risk Factors

*The obligations associated with being a public company require significant resources and management attention, and we have and will continue to incur increased costs as a result of being a public company.*

As a public company, we face increased legal, accounting, administrative, and other costs and expenses. We have incurred and expect to continue to incur significant costs related to operating as a public company. We are subject to the Securities Exchange Act of 1934, the rules and regulations implemented by the SEC, the Sarbanes-Oxley Act, the Dodd-Frank Act, the Public Company Accounting Oversight Board, and the listing requirements of the NYSE, each of which imposes additional reporting and other obligations on public companies.

These rules and regulations and changes in laws, regulations and standards relating to corporate governance and public disclosure, which have created uncertainty for public companies, have and will continue to increase our legal and financial compliance costs and make some activities more time consuming and costly. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. Our investment in compliance with existing and evolving regulatory requirements has and will continue to result in increased administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities, which could have a material adverse effect on our business, financial condition, and results of operations.

*Our results of operations and financial condition are subject to management's accounting judgments, estimates, and changes in accounting policies.*

The preparation of our financial statements requires us to make estimates and assumptions affecting the reported amounts of our assets, liabilities, revenues, and expenses. If these estimates or assumptions are incorrect, it could have a material adverse effect on our results of operations or financial condition. We have identified several accounting policies as being "critical" to the fair presentation of our financial condition and results of operations because they involve major aspects of our business and require us to make judgments about matters that are inherently uncertain. These policies are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes to consolidated financial statements included in this Annual Report on Form 10-K.

The implementation of new accounting requirements or other changes to U.S. generally accepted accounting principles could have a material adverse effect on our reported results of operations and financial condition.

*Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our operating results and financial condition.*

We are subject to income taxes in the United States, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;
- expected timing and amount of the release of any tax valuation allowances;
- expiration of or detrimental changes in research and development tax credit laws; or
- changes in tax laws, regulations, or interpretations thereof.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our operating results and financial condition.

43

***Our Class A common stock price may be volatile or may decline regardless of our operating performance.***

Volatility in the market price of our Class A common stock may prevent our stockholders from being able to sell their shares at or above the price they paid for them. Many factors may cause the market price of our Class A common stock to fluctuate significantly, including those described elsewhere in this "Risk Factors" section and this Annual Report on Form 10-K, as well as the following:

- pandemics, including COVID-19, and other crises or disasters;

- our operating and financial performance and prospects;

- our quarterly or annual earnings or those of other companies in our industry compared to market;

- future announcements or press coverage concerning our business or our competitors' businesses;

- the public's reaction to our press releases, other public announcements, and filings with the SEC;

- the size of our public float;

- coverage by or changes in financial estimates by securities analysts or failure to meet their expectations;

- market and industry perception of our success, or lack thereof, in pursuing our growth strategy;

- strategic actions by us or our competitors, such as acquisitions or restructurings;

- changes in laws or regulations which adversely affect our industry or us;

- changes in accounting standards, policies, guidance, interpretations, or principles;

- changes in senior management or key personnel;

- issuances, exchanges or sales, or expected issuances, exchanges, or sales of our capital stock;

- adverse resolution of new or pending litigation against us; and

- changes in general market, economic, and political conditions in the United States and global economies or financial markets, including those resulting from natural disasters, terrorist attacks, acts of war, and responses to such events.

As a result, volatility in the market price of our Class A common stock may prevent investors from being able to sell their Class A common stock at or above their purchase price or at all. These broad market and industry factors may materially reduce the market price of our Class A common stock, regardless of our operating performance. In addition, price volatility may be greater if the public float and trading volume of our Class A common stock is low.

***We are subject to SEC rules and regulations regarding our internal control over financial reporting. If we fail to remediate material weaknesses in our internal control over financial reporting or otherwise establish and maintain effective internal control over financial reporting and disclosure controls and procedures, we may not be able to accurately report our financial results, or report them in a timely manner.***

As a public reporting company, we are subject to the rules and regulations established from time to time by the SEC and the NYSE. These rules and regulations require that, among other things, we establish and periodically evaluate procedures with respect to our internal control over financial reporting. Reporting obligations as a public company place a considerable strain on our financial and management systems, processes and controls, as well as on our personnel. Our management team, including our chief executive officer and chief financial officer, has limited experience managing a publicly traded company, and limited experience complying with the increasingly complex and changing laws pertaining to public companies.

In addition, as a public company we are required to document and test our internal control over financial reporting pursuant to Section 404 of the Sarbanes–Oxley Act so that our independent registered public accounting firm can attest in this Annual Report on Form 10-K as to the effectiveness of our internal control over financial reporting, and in future annual reports. Under this law, we have been required and will continue to be required to document and make significant changes to our internal control over financial reporting.

If our senior management is unable to conclude that we have effective internal control over financial reporting or to certify the effectiveness of such controls; if our independent registered public accounting firm cannot render an unqualified opinion on management's assessment and the effectiveness of our internal control over financial reporting; or if material weaknesses in our internal control over financial reporting is identified, we could be subject to regulatory scrutiny, a loss of public and investor confidence, and to litigation from investors and stockholders, which could have a material adverse effect on our business and our stock price. In addition, if we do not maintain adequate financial and management personnel, processes and controls, we

44

may not be able to manage our business effectively or accurately report our financial performance on a timely basis, which could cause a decline in our common stock price and adversely affect our results of operations and financial condition.

***Negative research about our business published by analysts or journalists could cause our stock price to decline. A lack of regularly published research about our business could cause trading volume or our stock price to decline.***

The trading market for our Class A common stock depends in part on the research and reports that analysts and journalists publish about us or our business. If analysts or journalists publish inaccurate or unfavorable research about our business, our stock price would likely decline. If we fail to meet the expectations of analysts for our operating results, or if the analysts who covers us downgrade our stock, our stock price would likely decline. If one or more of these analysts ceases coverage of us or fails to publish reports on us regularly, demand for our stock could decrease, which could cause our stock price and trading volume to decline.

***Short sellers of our stock may be manipulative and may drive down the market price of our common stock.***

Short selling is the practice of selling securities that the seller does not own but rather has borrowed or intends to borrow from a third party with the intention of buying identical securities at a later date to return to the lender. A short seller hopes to profit from a decline in the value of the securities, as the short seller expects to pay less in the covering purchase than it received in the sale. It is therefore in the short seller's interest for the price of the stock to decline, and some short sellers publish, or arrange for the publication of, opinions or characterizations regarding the relevant issuer, often involving deliberate misrepresentations of the issuer's business prospects and similar matters calculated to create negative market momentum.

As a public entity in a highly digital world, we have been and in the future may be the subject of concerted efforts by profiteering short sellers to spread misinformation and misrepresentations in order to gain an illegal market advantage. In the past, the publication of intentional misinformation concerning Carvana by a disclosed short seller could be associated with the selling of shares of our common stock in the market on a large scale, resulting in a precipitous decline in the market price per share of our common stock. In addition, the publication of intentional misinformation may also result in lawsuits, the uncertainty and expense of which could adversely impact our business, financial condition, and reputation.

While utilizing all available tools to defend ourselves and our assets against these short seller efforts, there is limited regulatory control, making such efforts an ongoing concern for any public company. While we move forward in our business development strategies in good faith, there are no assurances that we will not face more of these short sellers' efforts or similar tactics by bad actors in the future, and the market price of our common stock may decline as a result of their actions or the action of other short sellers.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

None.

## ITEM 2. PROPERTIES.

***Corporate Headquarters***. We lease approximately 610,000 square feet of office space for our corporate headquarters at various locations in Tempe and Scottsdale, Arizona.

***Other Facilities***. We recondition, photograph, and store inventory at our IRCs, each of which is leased under either an operating lease or sale and leaseback transaction. Excluding unopened properties, we have IRCs in Winder, GA; Delanco, NJ;

45

Blue Mound, TX; Tolleson, AZ; Greenfield, IN: Euclid, OH; Nashville, TN; Concord, NC: Heath, OH: Haines City, FL; and West Memphis, AR.

We use vending machines and hubs to deliver cars to customers. With the exception of a hub in Alabama, vending machines in Pittsburgh and Atlanta, and assorted properties under construction, all of these locations are leased through an operating lease or a sale leaseback agreement accounted for as a finance transaction.

**List of states with at least one hub or vending machine (excludes properties under construction)**

| | | | |
|---|---|---|---|
| Alabama | Illinois | Minnesota | Oklahoma |
| Arizona | Indiana | Missouri | Pennsylvania |
| Arkansas | Kansas | Nevada | South Carolina |
| California | Kentucky | New Jersey | Tennessee |
| Colorado | Louisiana | New Mexico | Texas |
| Connecticut | Maryland | New York | Utah |
| Florida | Massachusetts | North Carolina | Virginia |
| Georgia | Michigan | Ohio | Wisconsin |

## ITEM 3. LEGAL PROCEEDINGS.

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity, or capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability, and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

## ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

On April 28, 2017, our Class A common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "CVNA." Prior to that time, there was no public market for our Class A common stock.

Our Class B common stock is not listed nor traded on any stock exchange.

**Holders of Record**

We are authorized to issue up to 500,000,000 shares of Class A common stock, up to 125,000,000 shares of Class B common stock and up to 50,000,000 shares of preferred stock. As of February 19, 2021, there were 61 shareholders of record of our Class A common stock. The number of record holders does not include persons who held shares of our Class A common stock in "street name" accounts through brokers, banks, and other financial institutions. As of February 19, 2021, there were 8 shareholders of record of our Class B common stock.

**Dividend Policy**

We have not declared or paid any cash dividends on our Class A common stock during the fiscal year and do not currently anticipate paying cash dividends in the foreseeable future. Holders of our Class B common stock are not entitled to receive dividends.

**Stock Performance Graph**

The following graph compares the total shareholder return from April 28, 2017, the date on which our Class A common shares commenced trading on the NYSE, through December 31, 2020 of (i) our Class A common stock, (ii) the Standard and Poor's 500 Stock Index ("S&P 500") and (iii) the Standard and Poor's 500 Retailing Index ("S&P 500

47

Retailing Index"), assuming an initial investment of $100 on April 28, 2017 including reinvestment of dividends where applicable. The results presented below are not necessarily indicative of future performance.



**Comparison of CVNA Cumulative Total Return Since IPO**

**Recent Sales of Unregistered Securities**

On November 6, 2018, as part of the consideration for the purchase of technology assets from Propel AI, Inc. ("Propel"), we issued 9,524 shares of Class A common stock pursuant to the asset purchase agreement by and between us and Propel. These shares were issued in reliance upon an exemption from the registration requirements of the Securities Act, pursuant to Section 4(a)(2) thereof and Rule 506(b) of Regulation D. We registered these shares on December 3, 2018. On November 13, 2019, we issued the remaining 2,381 shares of Class A common stock pursuant to the asset purchase agreement. Such shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

There were no unregistered sales of equity during the year ended December 31, 2020, except as otherwise previously reported.

During the year ended December 31, 2020, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged 9.1 million LLC Units and 5.6 million shares of Class B common stock for 7.3 million shares of Class A common stock. Such shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

48

## ITEM 6. SELECTED FINANCIAL DATA.

You should read the following selected financial data in conjunction with Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," our audited consolidated financial statements included in Item 8, "Financial Statements and Supplementary Data," and other financial information included elsewhere in this Form 10-K.

| | As of and for the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** |
| | (in thousands, except per share and selected other data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Net sales and operating revenues | $ 5,586,565 | $ 3,939,896 | $ 1,955,467 | $ 858,870 | $ 365,148 |
| Gross profit | $ 793,765 | $ 506,414 | $ 196,709 | $ 68,091 | $ 19,197 |
| Net loss | $ (462,222) | $ (364,639) | $ (254,745) | $ (164,316) | $ (93,112) |
| | | | | | |
| Net loss per share of Class A common stock, basic and diluted [1] | $ (2.63) | $ (2.45) | $ (2.03) | $ (1.31) | $ (0.68) |
| | | | | | |
| **Selected Other Data:** | | | | | |
| Number of markets at period end | 266 | 146 | 85 | 44 | 21 |
| Retail units sold | 244,111 | 177,549 | 94,108 | 44,252 | 18,761 |
| Total gross profit per unit | $ 3,252 | $ 2,852 | $ 2,090 | $ 1,539 | $ 1,023 |
| | | | | | |
| **Consolidated Balance Sheets Data (at period end):** | | | | | |
| Total assets | $ 3,034,531 | $ 2,057,748 | $ 991,013 | $ 641,137 | $ 335,833 |
| Short-term revolving facilities | $ 39,820 | $ 568,840 | $ 196,963 | $ 248,792 | $ 165,313 |
| Long-term debt | $ 1,682,499 | $ 931,791 | $ 436,482 | $ 53,600 | $ 5,461 |
| Class A Convertible Preferred Stock | $ — | $ — | $ — | $ 97,127 | $ — |

(1) Amounts for periods prior to the initial public offering have been retrospectively adjusted to give effect to 15.0 million shares of Class A common stock issued in the initial public offering and the associated organizational transactions.

49

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion should be read in conjunction with Part I, including matters set forth in the "Risk Factors" section of this Annual Report on Form 10-K, and our financial statements and notes thereto included in Part II, Item 8 of this Form 10-K. Except when stated otherwise, we present the discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations on a consolidated basis.

### Overview

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

See Part I, Item 1 - "Business" for a detailed description and discussion of the Company's business.

### COVID-19 Update

In March 2020, the World Health Organization declared the COVID-19 outbreak to be a global pandemic, and a number of state and local government authorities issued shelter in place and stay at home orders which negatively impacted our operations and the demand for used vehicles during the first half of 2020. During the second quarter of 2020 we began to see a recovery in general market conditions, and demand for used vehicles increased across our network, resulting in a 25%, 39% and 43% increase in our used vehicle sales during the second, third and fourth quarters of 2020 compared to 2019, respectively. We believe we have been relatively successful in navigating the impact of COVID-19 on our business to date and believe our business model makes us well-positioned to scale up and down to meet expected customer demand during and after the current COVID-19 pandemic.

Our most important priority continues to be the well-being of our employees and customers. We have taken several steps to provide a safe and healthy working environment. In addition, we believe our online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car.

There are ongoing related risks to our business that depend on future developments related to the continuously evolving COVID-19 pandemic. Please see the "Results of Operations" section of this Item below and certain risk factors described in Part I, Item 1A, Risk Factors in this Annual Report on Form 10-K, particularly the first risk factor included there, for more detailed descriptions of the impacts and risks to our business.

We will continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the year ended December 31, 2020, the number of vehicles we sold to retail customers grew by 37.5% to 244,111, compared to 177,549 in the year ended December 31, 2019. During the year ended December 31, 2019, our retail units sold grew by 88.7% to 177,549, compared to 94,108 in the year ended December 31, 2018. Our used vehicle sales were negatively impacted at the onset of COVID-19 in the United States but have rebounded since then. We expect our used vehicle sales could be negatively impacted in future periods as a result of the continued economic impacts of the COVID-19 pandemic.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings in each of the past eight years. After opening Atlanta, Georgia in 2013, we opened two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 120 in 2020, bringing our total number of markets to 266 as of December 31, 2020. Our 120 market openings during 2020 increased the total percentage of the U.S. population serviced in our markets to 73.7% as of December 31, 2020 from 66.9% as of December 31, 2019. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. In light of the ongoing COVID-19 pandemic, we plan to continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Market Cohorts

Many of our markets are in a nascent stage, making company-wide measures potentially less informative than measurements of more seasoned markets. The majority of our markets opened in 2019 and 2020. The graphs below provide alternative metrics related to unit sales performance and customer acquisition costs, examining our progress based on when we commenced operations in the market.

We measure penetration in each cohort based on our retail unit sales to customers in that cohort and an estimate of used vehicle market size in that cohort based on U.S. used vehicle sales per capita. Cohorts differ based on the number and average population of markets in the cohort, the timing of market openings in the first fiscal year of the cohort and other demographic or economic differences across cohorts. However, taken as a whole, they illustrate how our penetration over time evolves as markets age.

51

While COVID-19 and its related effects significantly impacted our company and industry this year, we have seen rapid growth in our cohorts following the initial wave of the pandemic. In the fourth quarter of 2020, our 2013-2019 cohorts grew retail units sold by 40%, and our oldest cohort of Atlanta grew by 12%, despite a year-over-year reduction in industry-wide used vehicles sales and the absence of a Cyber Monday promotion. In the month of December, our 2013-2019 cohorts grew by nearly 50%, and our oldest cohort of Atlanta grew by 24%.

The growth in our cohorts came despite significant supply chain constraints. Strong retail unit growth and increased COVID-19 cases around the country led to continued constraints in the fourth quarter of 2020. While production was our largest constraint, our accelerated growth in December also exacerbated constraints in our logistics network, leading to increased average delivery times year-over-year. We believe returning to normalized available inventory and delivery time levels would have had a significant positive impact on growth in the fourth quarter of 2020.

As of the fourth quarter of 2020, more than 90% of our 266 markets are ramping faster than Atlanta at the same age, and 101, 28, and 7 markets have now crossed the milestones of 1.0%, 1.5%, and 2.0% market penetration, respectively, an increase from 23, 7, and 2, respectively last year. As in past years, we generally continue to see similar trends across markets, including newer markets, smaller markets, and more proximate markets ramping even faster than average.

The following graphs present market penetration and customer acquisition costs by cohort as a time series by quarters in operation. Markets are first grouped into cohorts based on the year in which they began local delivery operations, and then data is aligned by first-quarter-in-operation results; however we only display data for periods in which all markets were active. For example, the 2020 cohort presented below is a single quarterly data point as of December 31, 2020 because markets that opened in the fourth quarter of 2020 have only been open for a single quarter. We chose this approach because it avoids a number of base-effect distortions that can occur by including periods in which not all markets were open.

Our market penetration chart provides a way to measure our retail unit sold growth in market cohorts controlling for differences in population across cohorts, but it does not adjust for changes in total used vehicle industry sales in a period. Industry-wide used vehicle sales data is known to be imperfect, with impacts from variable registration requirements and timing, incomplete geographic coverage, and lack of uniform data on independent dealers and peer-to-peer transactions among the challenges. Changes in industry sales were particularly impactful in 2020 given the significant variability in industry sales throughout the year.



**Market Penetration by Cohort**

During 2020, we sold 11,936 retail units in our 2013 cohort, 6,635 in our 2014 cohort, 22,822 in our 2015 cohort, 28,993 in our 2016 cohort, 62,103 in our 2017 cohort, 42,679 in our 2018 cohort, 22,344 in our 2019 cohort, and 11,313 in our 2020 cohort. We sold 35,286 retail units out-of-market, which primarily consist of retail units sold in smaller cities and towns around our core markets. Production costs of television campaigns and advertising costs outside of our markets, including pre-opening advertising costs and the portion of national television advertising representative of the population not served by an open market, totaled $58.5 million, $48.4 million, and $35.7 million during the years ended December 31, 2020, 2019, and 2018, respectively. We expect out-of-market sales and advertising to decline as a percent of total unit sales and advertising costs as we open more markets.

Our advertising expense per retail unit chart provides a way to measure advertising leverage in our market cohorts over time. The data in the chart shows total cohort advertising expense, including advertising focused on buying cars from customers, divided by retail units sold in each cohort. All of our cohorts levered advertising expense per retail unit meaningfully year over year in the fourth quarter of 2020, despite the headwinds described earlier in this section. In addition, a significant portion of our advertising budget and operational capacity was utilized to drive growth in buying cars from customers, which grew 110% year over year in the fourth quarter and which is not included in the denominator of our advertising expense per retail unit calculation.

**Advertising Expense per Unit Sold by Cohort**



As we approach nationwide geographic coverage, utilize even more national marketing channels, and develop a national brand, we are increasingly viewing our business as an integrated national one, similar to other leading e-commerce players. As a result, we expect this to be the last time we present detailed cohort data as our rapid growth will continue to be evident at the company level.

The patterns in our markets and cohorts are a testament to our customer offering and the positive feedback inherent in our model. The rapid, consistent, and improving growth trends in our cohorts are driven over time by continually improving products, growing national brand awareness, increased selection, and an expanding delivery network.

**Revenue and Gross Profit**

Our increased penetration in existing markets and expansion into new markets has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

53

Our largest source of revenue, used vehicle sales, totaled $4.7 billion, $3.4 billion, and $1.8 billion during the years ended December 31, 2020, 2019, and 2018, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $445.2 million, $267.6 million, and $73.6 million during the years ended December 31, 2020, 2019, and 2018, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $400.7 million, $251.7 million, and $96.8 million during the years ended December 31, 2020, 2019, and 2018, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

The COVID-19 pandemic impacted our revenue and gross profit during the year ended December 31, 2020. Given the uncertainty and continuously evolving aspects of COVID-19, it may continue to impact our revenue and gross profit in future periods. First, the pandemic negatively impacted retail units sold, which directly impacted retail, wholesale, and other revenue and gross profit. However, since the drastic drop in demand in March and April, demand for retail units has rebounded, including 43% year-over-year growth in the fourth quarter. Second, the pandemic initially negatively impacted wholesale units sold and purchased for sale due to the unstable condition of the wholesale market, which directly impacted wholesale and retail revenue. However, the wholesale market has since stabilized through the second half of 2020. We believe the pandemic negatively impacted retail and wholesale gross profit per unit due to the impact of lower demand on average days to sale and industry-wide used vehicle pricing through June 30, 2020. However, during the last six months of 2020, our average days to sale decreased and average retail and wholesale selling prices increased as dealers and wholesale suppliers saw high industry-wide market prices. Finally, the pandemic impacted gain on loan sale revenue through June 30, 2020 due to higher required yields from loan investors during this period of uncertainty; however, these impacts abated during the last six months of the year. While these impacts could potentially reoccur or continue in the future and could be significant, we believe they are transitory, and we plan to stay lean during this period and maintain strength and flexibility.

During our growth phase, our highest priority, outside of safety, will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- ***Increase the purchase of vehicles from customers.*** We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

- ***Reduce average days to sale.*** Our goal is generally to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

54

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our eleven existing IRCs, which collectively have capacity to inspect and recondition approximately 600,000 vehicles per year at full utilization.

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from customers or wholesale auctions.

- *Increase conversion of existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

### Seasonality

Absent the impact of COVID-19, used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Absent the impact of COVID-19, used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business. COVID-19 impacted used vehicle sales in the first and second quarters of 2020. The continuing impact of COVID-19 and related stimulus payments on seasonality is uncertain.

### Investment in Growth

Absent the impact of COVID-19, we have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending. There is no guarantee that we will be able to realize the return on our investments.

The worldwide spread of COVID-19 is expected to result in a continued global slowdown of economic activity which is likely to continue to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the pandemic is contained. Due to the COVID-19 pandemic, we have continued to monitor discretionary growth expenditures on hiring, travel, IRC and vending machine construction, and information technology investments. We also continue to closely monitor key metrics to determine when and how quickly to adjust our marketing, staffing, and purchasing levels to align with demand. We believe our business model makes us well-positioned to scale up or down to meet customer demand during and after the current COVID-19 pandemic.

### Relationship with Related Parties

For discussion about our relationships with related parties, refer to Note 6 — Related Party Transactions of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K and our Proxy Statement for our 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

**Key Operating Metrics**

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, opening new markets, and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Retail units sold | 244,111 | 177,549 | 94,108 |
| Number of markets | 266 | 146 | 85 |
| Average monthly unique visitors | 8,534,731 | 5,132,492 | 2,280,376 |
| Total website units | 31,234 | 25,977 | 14,657 |
| Average days to sale | 67 | 62 | 64 |
| Total gross profit per unit [1] | $ 3,252 | $ 2,852 | $ 2,090 |

(1) Includes $2, $31, and $43, respectively, related to the 100k Milestone Gift discussed below.

*Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

*Number of Markets*

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers, which is typically conducted by a Carvana employee in a branded delivery truck. We view the number of markets we serve as a key driver of our growth. As we increase our number of markets, the population of consumers who have access to our fully integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including available inventory for sale, vehicles currently engaged in a purchase or reserved by a customer, and units that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business. In prior periods, this key operating metric was called "inventory units available on website".

*Average Days to Sale*

We define average days to sale as the average number of days between when we acquire the vehicle and when we deliver it to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

In the second half of 2018, we announced a commitment by our Chief Executive Officer, Ernest Garcia III ("Mr. Garcia"), to contribute 165 shares of Class A common stock to us from his personal shareholdings for every one of our then-existing employees upon their satisfying certain employment tenure requirements. In connection with such contributions, we made corresponding grants of 165 restricted stock units under our 2017 Incentive Plan to each employee who satisfied the requirements (the "100k Milestone Gift" or "Gift"). Under GAAP, the 100k Milestone Gift was treated as compensation expense, a portion of which related to the production of our used vehicle inventory and was therefore capitalized to inventory and subsequently recognized within costs of sales when the related inventory was sold. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled and as of March 31, 2020, all of the compensation expense related to the 100k Milestone Gift had been recognized. Total gross profit per unit includes $2, $31, and $43 per unit during the years ended December 31, 2020, 2019 and 2018, respectively, related to the 100k Milestone Gift.

## Components of Results of Operations

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our number of markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 and related stimulus payments on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our average days to sale and our pricing strategy. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by COVID-19. Beginning in 2020,

57

wholesale vehicle sales includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party.

### Other Sales and Revenues

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenues we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing platforms. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement and master transfer agreements, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

### Cost of Sales

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

### Used Vehicle Gross Profit

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

### Wholesale Vehicle Gross Profit

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

### *Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

### *Interest Expense*

Interest expense includes interest incurred on our Senior Notes, including amounts previously due to Verde, our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 9 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes interest incurred during various construction projects to build, upgrade, or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated lives of the related assets.

### *Other (Income) Expense*

Other (income) expense, net includes changes in fair value on our beneficial interests in securitizations and purchase price adjustment receivables, as discussed in Note 17 — Fair Value of Financial Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K, along with other general expenses such as gains or losses from disposals of long-lived assets.

### *Income Tax Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. As of December 31, 2020, the Company's income tax benefit is generated at Car360, a wholly-owned subsidiary, acquired in April 2018.

**Results of Operations**

| | 2020 | 2019 | Change | 2018 | Change |
|---|---|---|---|---|---|
| | | | **Years Ended December 31,** | | |
| | | | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | |
| Used vehicle sales, net | $ 4,740,595 | $ 3,420,601 | 38.6 % | $ 1,785,045 | 91.6 % |
| Wholesale vehicle sales [1] | 445,236 | 267,586 | 66.4 % | 73,584 | 263.6 % |
| Other sales and revenues [2] | 400,734 | 251,709 | 59.2 % | 96,838 | 159.9 % |
| Total net sales and operating revenues | $ 5,586,565 | $ 3,939,896 | 41.8 % | $ 1,955,467 | 101.5 % |
| **Gross profit:** | | | | | |
| Used vehicle gross profit [3] | $ 359,341 | $ 237,855 | 51.1 % | $ 94,319 | 152.2 % |
| Wholesale vehicle gross profit [1][4] | 33,690 | 16,850 | 99.9 % | 5,552 | 203.5 % |
| Other gross profit [2] | 400,734 | 251,709 | 59.2 % | 96,838 | 159.9 % |
| Total gross profit | $ 793,765 | $ 506,414 | 56.7 % | $ 196,709 | 157.4 % |
| **Market information:** | | | | | |
| Markets, beginning of period | 146 | 85 | 71.8 % | 44 | 93.2 % |
| Market launches | 120 | 61 | 96.7 % | 41 | 48.8 % |
| Markets, end of period | 266 | 146 | 82.2 % | 85 | 71.8 % |
| **Unit sales information:** | | | | | |
| Used vehicle unit sales | 244,111 | 177,549 | 37.5 % | 94,108 | 88.7 % |
| Wholesale vehicle unit sales | 55,204 | 39,895 | 38.4 % | 15,125 | 163.8 % |
| **Per unit selling prices:** | | | | | |
| Used vehicles | $ 19,420 | $ 19,266 | 0.8 % | $ 18,968 | 1.6 % |
| Wholesale vehicles | $ 8,065 | $ 6,707 | 20.2 % | $ 4,865 | 37.9 % |
| **Per unit gross profit: [5]** | | | | | |
| Used vehicle gross profit [3] | $ 1,472 | $ 1,340 | 9.9 % | $ 1,002 | 33.7 % |
| Wholesale vehicle gross profit [4] | $ 610 | $ 422 | 44.5 % | $ 367 | 15.0 % |
| Other gross profit | $ 1,642 | $ 1,418 | 15.8 % | $ 1,029 | 37.8 % |
| Total gross profit | $ 3,252 | $ 2,852 | 14.0 % | $ 2,090 | 36.5 % |

(1) Includes $4,145, $0, and $0, respectively, of wholesale revenue from related parties.
(2) Includes $104,738, $59,677, and $25,572, respectively, from related parties.
(3) Includes $510, $5,092, and $3,870, or $2, $28, and $41 per unit, respectively, related to the 100k Milestone Gift.
(4) Includes $17, $358, and $133 or $0, $9, and $9 per wholesale unit, respectively, related to the 100k Milestone Gift.
(5) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

### *Used Vehicle Sales*

*Fiscal 2020 Versus 2019.* Used vehicle sales increased by $1.3 billion to $4.7 billion during the year ended December 31, 2020 compared to $3.4 billion during the year ended December 31, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 244,111 from 177,549 during the years ended December 31, 2020 and 2019, respectively. The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, and customer referrals. The increase in unit sales was also driven by growth to 266 markets as of December 31, 2020 from 146 markets as of December 31, 2019. Although we experienced a negative impact on retail units sold at the onset of the COVID-19 pandemic, we started to see a rebound in sales later in the period with the reopening of the markets. We anticipate that unit sales will continue to grow as we increase penetration in existing markets and continue to launch new markets. In addition, the average selling price of our retail units sold increased to $19,420 in the year ended December 31, 2020 from $19,266 in the prior year, due primarily to vehicle mix.

*Fiscal 2019 Versus 2018.* Used vehicle sales increased by $1.6 billion to $3.4 billion during the year ended December 31, 2019 compared to $1.8 billion during the year ended December 31, 2018. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 177,549 from 94,108 during the years ended December 31, 2019 and 2018, respectively. The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, and customer referrals. The increase in unit sales was also driven by growth to 146 markets as of December 31, 2019 from 85 markets as of December 31, 2018. In addition, the average selling price of our retail units sold increased to $19,266 in the year ended December 31, 2019 from $18,968 in the prior year, due primarily to more vehicles acquired from customers, resulting in a broader inventory mix.

### Wholesale Vehicle Sales

*Fiscal 2020 Versus 2019.* Wholesale vehicle sales increased by $177.7 million to $445.2 million during the year ended December 31, 2020, compared to $267.6 million during the year ended December 31, 2019. We primarily obtain our wholesale inventory by acquiring vehicles from customers. As our retail unit sales have increased, so have the trade-ins we receive. Moreover, during the year ended December 31, 2020, we also acquired more vehicles from customers who did not purchase a retail unit from us. In addition, the average selling price of our wholesale units sold increased to $8,065 during the year ended December 31, 2020 from $6,707 during the year ended December 31, 2019, due to the mix of vehicles acquired from customers and strong wholesale market prices.

*Fiscal 2019 Versus 2018.* Wholesale vehicle sales increased by $194.0 million to $267.6 million during the year ended December 31, 2019, compared to $73.6 million during the year ended December 31, 2018. We primarily obtain our wholesale inventory by acquiring vehicles from customers. As our retail unit sales increased, so did the trade-ins we received. Moreover, during the year ended December 31, 2019, we also acquired more vehicles from customers who did not purchase a retail unit from us. In addition, the average selling price of our wholesale units sold increased to $6,707 during the year ended December 31, 2019 from $4,865 during the year ended December 31, 2018, due primarily to the mix of vehicles acquired from customers.

### Other Sales and Revenues

*Fiscal 2020 Versus 2019.* Other sales and revenues primarily consist of gains on the sales of loans we originate, commissions we receive on sales of VSCs and sales of GAP waiver coverage. Other sales and revenues increased by $149.0 million to $400.7 million during the year ended December 31, 2020, compared to $251.7 million during the year ended December 31, 2019. This increase was primarily driven by originating and selling more finance receivables, resulting in an

increase in gain on loan sale. Additionally, the increase was due to an increase in retail units sold, which led to an increase in VSC sales and GAP waiver coverage sales, along with an increase in interest income during the year ended December 31, 2020 from interest earned on finance receivables held on balance sheet prior to selling them.

*Fiscal 2019 Versus 2018.* Other sales and revenues increased by $154.9 million to $251.7 million during the year ended December 31, 2019, compared to $96.8 million during the year ended December 31, 2018. This increase was primarily driven by the increase in retail units sold, which led to an increase in loans originated and sold, as well as an increase in VSC sales and GAP waiver coverage sales. The increase also includes an increase in interest income during the year ended December 31, 2019 from interest earned on finance receivables held on balance sheet prior to our securitization transactions throughout the year.

### Used Vehicle Gross Profit

*Fiscal 2020 Versus 2019.* Used vehicle gross profit increased by $121.5 million to $359.3 million during the year ended December 31, 2020, compared to $237.9 million during the year ended December 31, 2019. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,472 for the year ended December 31, 2020 compared to $1,340 for the year ended December 31, 2019. The per unit increase was primarily driven by acquiring more vehicles from customers.

*Fiscal 2019 Versus 2018.* Used vehicle gross profit increased by $143.5 million to $237.9 million during the year ended December 31, 2019, compared to $94.3 million during the year ended December 31, 2018. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,340 for the year ended December 31, 2019 compared to $1,002 for the year ended December 31, 2018. The per unit increase was primarily driven by acquiring more vehicles from customers and incremental shipping revenue.

*Wholesale Vehicle Gross Profit*

*Fiscal 2020 Versus 2019.* Wholesale vehicle gross profit increased by $16.8 million to $33.7 million during the year ended December 31, 2020, compared to $16.9 million during the year ended December 31, 2019. This increase was driven primarily by an increase in wholesale units sold to 55,204 during the year ended December 31, 2020 from 39,895 in the prior year, along with an increase in wholesale vehicle gross profit per wholesale unit to $610 for the year ended December 31, 2020 compared to $422 for the year ended December 31, 2019. The increase in number of wholesale vehicles sold and the improved gross profit per wholesale unit were primarily due to acquiring more vehicles from customers and strong wholesale market prices in the latter part of 2020.

*Fiscal 2019 Versus 2018.* Wholesale vehicle gross profit increased by $11.3 million to $16.9 million during the year ended December 31, 2019, compared to $5.6 million during the year ended December 31, 2018. This increase was driven primarily by an increase in wholesale units sold to 39,895 during the year ended December 31, 2019 from 15,125 in the prior year, along with an increase in wholesale vehicle gross profit per wholesale unit to $422 for the year ended December 31, 2019 compared to $367 for the year ended December 31, 2018. The number of wholesale units sold and the per-unit increase was primarily due to acquiring more vehicles from customers, resulting in more and higher quality vehicles sold at auction.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

*Components of SG&A*

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| | | (in thousands) | | | | |
| Compensation and benefits [1] | $ | 338,321 | $ | 236,582 | $ | 131,714 |
| 100k Milestone Gift | | — | | 7,769 | | 7,818 |
| Advertising | | 286,433 | | 204,020 | | 111,229 |
| Market occupancy [2] | | 36,448 | | 21,251 | | 12,097 |
| Logistics [3] | | 76,822 | | 58,050 | | 35,197 |
| Other [4] | | 388,137 | | 259,045 | | 127,203 |
| Total | $ | 1,126,161 | $ | 786,717 | $ | 425,258 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.
(2) Market occupancy costs includes occupancy costs of our vending machines and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(3) Logistics includes fuel, maintenance, and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(4) Other costs include all other selling, general, and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

*Fiscal 2020 Versus 2019.* Selling, general and administrative expenses increased by $339.4 million to $1.1 billion during the year ended December 31, 2020 compared to $786.7 million during the year ended December 31, 2019. The increase was partially due to an increase in compensation and benefits of $101.7 million during the year ended December 31, 2020, which was primarily driven by expansion of our teams to support our growth. The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $82.4 million to $286.4 million during the year ended December 31, 2020 compared to $204.0 million during the year ended December 31, 2019, primarily due to an increase in advertising to drive growth in units sold and acquired from customers. Market occupancy, logistics, and other expenses also increased during the year ended December 31, 2020 compared to the prior year primarily due to an increase in the number of

units sold, markets served, and in preparation for future growth. These increases were partially offset by efforts to decrease and balance discretionary spend as a result of the uncertain economic environment surrounding the COVID-19 pandemic.

*Fiscal 2019 Versus 2018.* Selling, general and administrative expenses increased by $361.5 million to $786.7 million during the year ended December 31, 2019 compared to $425.3 million during the year ended December 31, 2018. The increase was partially due to an increase in compensation and benefits of $104.9 million during the year ended December 31, 2019, which was primarily driven by expansion of our logistics, customer care, and market operations teams. The increase in selling, general, and administrative expenses was also partially due to an increase in advertising expense of $92.8 million to $204.0 million during the year ended December 31, 2019 compared to $111.2 million during the year ended December 31, 2018, primarily due to an increase in number of markets and related to increased advertising for buying cars from customers through national television and internet advertising. Market occupancy, logistics and other overhead costs also increased during the year ended December 31, 2019 compared to the prior year primarily due to an increase in number of markets and units sold.

### Interest Expense

*Fiscal 2020 Versus 2019.* Interest expense increased by $50.9 million to $131.5 million during the year ended December 31, 2020 compared to $80.6 million during the year ended December 31, 2019. The increase is primarily due to refinancing our Senior Notes, which resulted in approximately $33.7 million of debt extinguishment costs upon redemption of the 2023 Notes in the fourth quarter of 2020 (as defined and further discussed in Note 9 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K). Despite lowering the interest rates on the Senior Notes, the higher outstanding balances throughout the year ended December 31, 2020 compared to the year ended December 31, 2019 led to an increase in interest expense of approximately $11.9 million. Interest expense also increased due to a $12.7 million increase in interest incurred on additional sale leaseback financing during the year. These increases in interest expense were partially offset by a decrease in interest incurred on our short-term revolving facilities during the year ended December 31, 2020 compared to 2019 primarily due to a decrease in the outstanding balance of our Floor Plan Facility. See Note 9 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K for additional information about our outstanding debt.

*Fiscal 2019 Versus 2018.* Interest expense increased by $55.6 million to $80.6 million during the year ended December 31, 2019 compared to $25.0 million during the year ended December 31, 2018. The increase is primarily due to the outstanding balance of the Senior Notes we issued in September 2018 and May 2019, which incurred interest expense of $44.3 million and $8.6 million during the years ended December 31, 2019 and December 31, 2018, respectively. These amounts include related party expense of $1.3 million and $0.4 million for the years ended December 31, 2019 and December 31, 2018, respectively. Additionally, interest expense incurred on our short-term revolving facilities increased by $15.5 million to $25.2 million during the year ended December 31, 2019 compared to $9.7 million during the year ended December 31, 2018 due to an increase in the available capacity and resulting balance outstanding on our Floor Plan Facility, and due to the addition of our Finance Receivable Facilities, which we entered into in 2019.

### Other (Income) Expense, Net

Other (income) expense, net changed by $5.2 million to income of $1.4 million compared to expense of $3.7 million during the years ended December 31, 2020 and 2019, respectively. The changes are primarily due to fair value adjustments on our retained beneficial interests in securitizations. During the first quarter of the year ended December 31, 2020, the fair value of these assets carried at fair value declined as a result of the uncertainty in the capital markets. During the remainder of the year, the fair value on our beneficial interests in securitizations increased as capital markets and the economy rebounded.

### Income Tax Provision

We recognized an income tax benefit of approximately $0.3 million during the year ended December 31, 2020 related to our wholly-owned subsidiary, Car360. The benefit was recognized as a result of decreased subscription revenue from third parties, resulting in a net loss for the period. We did not recognize an income tax expense or benefit during the years ended December 31, 2019 and 2018.

63

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA and EBITDA margin. We believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

In prior periods, we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded, it is not material to current or future years and the adjustment is no longer included within similar calculations. For the year ended December 31, 2020, there was approximately $0.5 million of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the years ended December 31, 2019 and December 31, 2018, there was approximately $13.2 million and $11.8 million, respectively, of stock based compensation related to the 100k Milestone Gift impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including $5.4 million and $4.0 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

*EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss, which is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | 2018 | |
| | (dollars in thousands) | | | | | |
| Net loss[1] | $ | (462,222) | $ | (364,639) | $ | (254,745) |
| Depreciation and amortization expense | | 73,791 | | 41,265 | | 23,539 |
| Interest expense | | 131,528 | | 80,606 | | 25,018 |
| Income tax provision | | (255) | | — | | — |
| EBITDA | $ | (257,158) | $ | (242,768) | $ | (206,188) |
| | | | | | | |
| Total revenues | $ | 5,586,565 | $ | 3,939,896 | $ | 1,955,467 |
| EBITDA Margin[2] | | (4.6)% | | (6.2)% | | (10.5)% |

(1) Includes $0.5 million, $13.2 million, and $11.8 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.4%, and 0.6%, respectively, related to the 100k Milestone Gift.

**Liquidity and Capital Resources**

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the

issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including the impact of COVID-19, our rate of revenue growth, our expansion into new markets, construction of IRCs and vending machines, and the timing and extent of our spending to support our technology and software development efforts.

We had the following liquidity resources available as of December 31, 2020 and 2019:

| | December 31, | | |
| --- | --- | --- | --- |
| | **2020** | | **2019** |
| | **(in thousands)** | | |
| Cash and cash equivalents | $ | 300,810 | $ 76,016 |
| Availability under short-term revolving facilities[1] | | 1,088,259 | 279,080 |
| Availability under sale-leaseback agreements[2][3] | | 18,549 | 104,680 |
| **Committed liquidity resources available** | $ | **1,407,618** | $ **459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements
(2) We had $75.0 million available for sale and leaseback transactions under a master sale-leaseback agreement as of December 31, 2019 and an additional $18.5 million and $29.7 million as of December 31, 2020 and December 31, 2019, respectively, available under sale-leaseback arrangements with other parties.
(3) We have $249.7 million and $158.7 million of total unfunded gross real estate assets as of December 31, 2020 and 2019, respectively.

As of December 31, 2020 and 2019, the short-term revolving facilities had total capacity of approximately $2.3 billion and $1.6 billion, an outstanding balance of $39.8 million and $568.8 million, and unused capacity of $2.2 billion and $1.0 billion, respectively.

We also had $6.3 million and $137.7 million of committed funds for future construction costs of IRCs with unfinished construction as of December 31, 2020 and 2019, respectively.

In addition, we had $47.7 million and $13.5 million of total unpledged beneficial interests in securitizations as of December 31, 2020 and 2019, respectively.

As of December 31, 2020 and 2019, our outstanding principal amount of indebtedness, including finance leases, was $1.7 billion and $1.5 billion, respectively, summarized in the table below. See Note 9 — Debt Instruments and Note 15 — Leases of

65

our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K for definitions and further information on our debt and finance leases.

| | December 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| **Asset-Based Financing:** | (in thousands) | | | |
| Inventory | $ | 39,820 | $ | 515,487 |
| Finance receivables and beneficial interests | | 81,259 | | 138,335 |
| Transportation fleet [1] | | 123,950 | | 73,369 |
| Real estate [2] | | 398,612 | | 187,082 |
| Total asset-based financing | | 643,641 | | 914,273 |
| Senior Notes [3] | | 1,100,000 | | 600,000 |
| Total debt | | 1,743,641 | | 1,514,273 |
| Less: unamortized premium and debt issuance costs [4] | | (21,322) | | (13,642) |
| **Total debt, net** | $ | 1,722,319 | $ | 1,500,631 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) As of December 31, 2020 and 2019, Verde held $0.0 million and $15.0 million of the Senior Notes, respectively.
(4) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other current assets and other assets on our consolidated balance sheets. The unamortized premium is presented as an increase to the carrying amount of the Senior Notes at December 31, 2019 on our consolidated balance sheet.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing, and financing activities for the years ended December 31, 2020, 2019, and 2018:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (in thousands) | | | | | |
| Net cash used in operating activities | $ | (608,412) | $ | (757,134) | $ | (414,340) |
| Net cash used in investing activities | | (345,926) | | (227,739) | | (150,338) |
| Net cash provided by financing activities | | 1,164,990 | | 1,014,623 | | 466,264 |
| Net increase (decrease) in cash and cash equivalents | | 210,652 | | 29,750 | | (98,414) |
| Cash, cash equivalents, and restricted cash at beginning of period | | 118,459 | | 88,709 | | 187,123 |
| Cash, cash equivalents, and restricted cash at end of period | $ | 329,111 | $ | 118,459 | $ | 88,709 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. For the year ended December 31, 2020, net cash used in operating activities was $608.4 million, a decrease of $148.7 million compared to net cash used in operating activities of $757.1 million for the year ended December 31, 2019, which was an increase of $342.8 million compared to net cash used in operating activities of $414.3 million for the year ended December 31, 2018. The changes in our net cash used in operating activities were primarily due to our increased net losses and changes in working capital, which is primarily related to the increase in our vehicle inventory.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $345.9 million, $227.7 million, and $150.3 million during the years ended December 31, 2020, 2019, and 2018, respectively, resulting in increases of $118.2 million and $77.4 million. The increases were primarily related to increases in purchases of property and equipment, specifically related to the construction of new IRCs and vending machines. Constructing new IRCs and vending machines allows us to recondition more vehicles and reach additional customers. To finance these investments we have entered into various financing transactions, such as sale-leasebacks.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity and unsecured senior note issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $1.2 billion and $1.0 billion during the years ended December 31, 2020 and 2019, respectively, an increase of $150.4 million. The change primarily relates to increased proceeds from the issuance of Class A common stock by $761.3 million, along with an increase in net cash from long-term debt proceeds and payments of approximately $216.1 million partially due to refinancing our senior unsecured notes, which were partially offset by a net decrease of $795.5 million from changes in our short-term revolving facilities activity. Cash provided by financing activities was $1.0 billion and $466.3 million during the years ended December 31, 2019 and 2018, respectively, an increase of $548.4 million. The net increase primarily related to increased proceeds from the issuance of Class A common stock by $125.3 million, along with a net increase of $318.3 million from changes in our short-term revolving facilities activity.

**Contractual Obligations and Commitments**

The following table sets forth the amounts of our significant contractual obligations and commitments with definitive payment terms as of December 31, 2020:

| | Payments due by Period | | | | |
|---|---|---|---|---|---|
| | (in thousands) | | | | |
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| Floor Plan Facility[1][2] | $ 39,820 | $ 39,820 | $ — | $ — | $ — |
| Finance Receivable Facilities[1][3] | — | — | — | — | — |
| Senior Notes[1] | 1,100,000 | — | — | 500,000 | 600,000 |
| Notes payable | 25,168 | 17,356 | 7,812 | — | — |
| Financing of beneficial interests in securitizations[4] | 81,260 | 22,408 | 44,541 | 14,311 | — |
| Finance leases | 110,015 | 26,405 | 50,866 | 30,742 | 2,002 |
| Interest payments[5] | 436,934 | 69,793 | 133,067 | 128,283 | 105,791 |
| Real estate financing | 895,850 | 31,562 | 65,010 | 67,746 | 731,532 |
| Operating leases, non-related party | 231,488 | 27,211 | 42,829 | 30,027 | 131,421 |
| Operating leases, related party[6] | 28,236 | 5,250 | 10,502 | 6,843 | 5,641 |
| Real estate commitments[7] | 99,785 | 99,785 | — | — | — |
| Total | $ 3,048,556 | $ 339,590 | $ 354,627 | $ 777,952 | $ 1,576,387 |

(1) All debt arrangements above are discussed and defined in Note 9 — Debt Instruments, included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K.

(2) Represents the principal amounts outstanding as of December 31, 2020. Due to the uncertainty of forecasting the timing of expected variable interest rate payments, interest payment amounts are not included in the table. Borrowings under the Floor Plan Facility are generally payable within five business days of the sale of the underlying vehicle or fifteen business days of the

67

sale of the finance receivable originated in connection with the sale of the vehicle. In either case, the payment is expected to be within one year of December 31, 2020.

(3) Represents the principal amounts outstanding as of December 31, 2020. Due to the uncertainty of forecasting the timing of expected variable interest rate payments, interest payment amounts are not included in the table. Interest payments on borrowings under the Finance Receivable Facilities are expected to be paid in the first fifteen days of each calendar month.

(4) The securitization trusts distribute payments directly to the lender related to our pledged beneficial interests in securitizations. These amounts represent anticipated principal amount reductions based on the expected timing of these payments. Due to the uncertainty of forecasting the expected interest payments, interest payment amounts are not included in the table.

(5) Represents fixed interest payments on our outstanding Senior Notes, notes payable, and finance leases.

(6) Related party operating lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where we share space with DriveTime, as those are contingent upon the Company's utilization of the leased assets, and thus can vary, as further discussed in Note 6 — Related Party Transactions, included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K.

(7) Includes minimum remaining fixed payments related to IRC and vending machine construction contracts, excluding variable installation costs, which fluctuate based on actual completion time.

## Fair Value Measurements

We report money market securities, certain receivables, and beneficial interests in securitizations at fair value. See Note 17 — Fair Value of Financial Instruments, included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K, which is incorporated into this item by reference.

## Off-Balance Sheet Arrangements

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivables by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 8 — Securitizations and Variable Interest Entities, included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K, for further discussion regarding our transactions with unconsolidated variable interest entities.

Except as discussed above, we did not have any off-balance sheet arrangements as of December 31, 2020.

## Critical Accounting Policies and Estimates

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with United States generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses and related disclosures of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions, impacting our reported results of operations and financial condition.

Certain accounting policies involve significant judgments and assumptions by management, which have a material impact on the carrying value of assets and liabilities and the recognition of income and expenses. Management considers these accounting policies to be critical accounting policies. The estimates and assumptions used by management are based on historical experience and other factors, which are believed to be reasonable under the circumstances. The significant accounting policies and estimates which we believe are the most critical to aid in fully understanding and evaluating our reported financial results are described below. Refer to Note 2 — Summary of Significant Accounting Policies of the consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K, for more detailed information regarding our critical accounting policies.

68

***Revenue Recognition***

We recognize revenue in accordance with the five-step model prescribed by ASC 606 that includes: (1) identify the contract; (2) identify the performance obligations; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations; and (5) recognize revenue when (or as) performance obligations are satisfied.

We sell used vehicles directly to our customers through our website. The price of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. We satisfy our performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. We recognize revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Our return policy allows customers to initiate a return during the first seven days after delivery. Estimates for returns are based on an analysis of historical experience, trends and sales data. Changes in these estimates are reflected as an adjustment to revenue in the period identified. The amount of consideration received for used vehicle sales includes noncash consideration representing the value of trade-in vehicles, if applicable, as stated in the contract. Prior to the delivery of the vehicle, the payment is received or financing has been arranged. Payments from customers that finance their purchases with third parties are typically due and collected within 30 days of delivery of the used vehicle. In future periods additional provisions may be necessary due to a variety of factors, including changing customer return patterns due to the maturation of the online vehicle buying market, macro- and micro-economic factors that could influence customer return behavior and future pricing environments. If these factors result in adjustments to sales returns, they could significantly impact our future operating results. Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

We also sell vehicles to wholesalers. These vehicles sold to wholesalers are primarily acquired from customers that do not meet our quality standards to list and sell through our website. We satisfy our performance obligation for wholesale vehicles sales when the wholesale purchaser obtains control of the underlying vehicle, which is upon delivery when the transfer of title, risks and rewards of ownership and control pass to the wholesale purchaser. We recognize revenue at the amount we expect to receive for the used vehicle, which is the fixed price determined at the auction. The purchase price of the wholesale vehicle is typically due and collected within 30 days of delivery of the wholesale vehicle.

Customers purchasing used vehicles from us may enter into contracts for VSCs and, if they finance with us, GAP waiver coverage. The prices of VSCs and GAP waiver coverage are set forth in each contract. We sell and receive a commission on VSCs under a master dealer agreement with DriveTime, pursuant to which we sell VSCs that DriveTime administers and is the obligor. We receive a commission on GAP waiver coverage contracts where the administrator of the contract is obligated to reimburse the holder of the underlying finance receivable for a balance that is in excess of the value of the financed vehicle in the event of a total loss. We recognize commission revenue at the time of sale, net of a reserve for estimated contract cancellations. Our risk related to contract cancellations is limited to the commissions that we receive. Cancellations fluctuate depending on the customer-financing default or prepayment rates, and shifts in customer behavior, including those related to changes in the coverage or term of the product. To the extent that actual experience differs from historical trends, there could be significant adjustments to our contract cancellation reserves. DriveTime administers a portion of the GAP waiver coverage contracts we sell to our customers. GAP waiver coverage contracts administered by DriveTime obligate whoever holds the underlying finance receivable to not attempt collection of a balance that is in excess of the value of the financed vehicle in the event of a total loss. DriveTime GAP waiver coverage is recognized as the performance obligation is satisfied over the period of coverage, generally on a straight-line basis over the expected period the outstanding balance of the related finance receivable will exceed the value of the financed vehicle, less a reserve for cancellations. Upon selling the corresponding finance receivable, we recognize any remaining deferred revenue. The reserve for cancellations of VSCs and GAP waiver coverage is estimated based upon historical experience and recent trends and is reflected as a reduction of other sales and revenues. Changes in these estimates are reflected as an adjustment to revenue in the period identified.

Under the master dealer agreement with DriveTime, we are also contractually entitled to receive profit-sharing revenues based on the performance of the VSCs once a required claims period has passed. This is a form of variable consideration we recognize as revenue to the extent that it is probable that it will not result in a significant revenue reversal. We apply the expected value method, utilizing expected VSC performance based on historical claims and cancellation data from our customers, as well as other qualitative assumptions to estimate the amount we expect to receive. We reassess the estimate each reporting period with any changes reflected as an adjustment to other sales and revenues in the period identified. Profit-sharing payments will begin when the underlying VSCs reach a specified level of claims history.

Sales of finance receivables are recognized in accordance with ASC Topic 860, *Transfers and Servicing of Financial Assets*. ASC 860 states that a transfer of an entire financial asset, a group of entire financial assets, or a participating interest in

69

an entire financial asset in which the transferor surrenders control over those financial assets is accounted for as a sale only if all of the following conditions are met:

- The transferred financial assets have been isolated from the transferor - put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

- Each transferee has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or third-party holder of its beneficial interests) from taking advantage of its right to pledge or exchange the asset and provides more than a trivial benefit to the transferor.

- The transferor, its consolidated affiliates included in the financial statements being presented or its agents do not maintain effective control over the transferred financial assets or third-party beneficial interests related to those transferred assets.

For transfers of financial assets that meet the above conditions for sale treatment, including in our securitization transactions, we record the gain on the sale of a finance receivable upon receipt of proceeds in an amount equal to the fair value of the net proceeds received less the carrying amount of the finance receivable. Sales of automotive finance receivables are contingent on customers meeting certain underwriting standards established by the investors purchasing the related automotive finance receivable. To the extent that automotive finance receivables sold do not meet these underwriting standards we could potentially be required to repurchase the receivable which could have a significant impact on the amount of gain or loss on finance receivable sales previously recognized. Any significant estimated post-sale obligations or contingent obligations to the purchaser of the receivables would be accrued if probable and estimable in accordance with ASC 450, *Contingencies* at the time of sale. Any such obligations are considered in our determination of the accounting for the transfers of the finance receivables under ASC Topic 860, *Transfers and Servicing of Financial Assets.*

### Finance Receivables

Finance receivables include installment contracts we originate to facilitate vehicle sales. We classify these receivables as held for sale, as we do not intend to hold the finance receivables we originate to maturity. We typically sell the finance receivables we originate. We record a valuation allowance to report finance receivables at the lower of unpaid principal balance or fair value. To determine the fair value of finance receivables we utilize industry-standard modeling, such as discounted cash flow analysis, factoring in our historical experience, the credit quality of the underlying receivables, loss trends and recovery rates, as well as the overall economic environment. For purposes of determining the valuation allowance, finance receivables are evaluated collectively to determine the allowance as they represent a large group of smaller-balance homogeneous loans. To the extent that actual experience differs from historical trends, there could be significant adjustments to our valuation allowance. Principal balances of finance receivables are charged-off when we are unable to sell the finance receivable and the related vehicle has been repossessed and liquidated or the receivable has otherwise been deemed uncollectible. The estimates and trends used have historically been effective in our determination of our valuation allowance.

### Valuation of Inventory

Vehicle inventory consists of used vehicles, primarily acquired at auction and directly from customers. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental costs are capitalized as a component of inventory. Inventory is stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is the estimated selling price less costs to complete, dispose and transport the vehicles. Selling prices are derived from historical data and trends, such as sales price and inventory turn times of similar vehicles, as well as independent market resources. Each reporting period we recognize any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value through cost of sales. To the extent that there are significant changes to estimated vehicle selling prices or decreases in demand for used vehicles, there could be significant adjustments to reflect our inventory at net realizable value.

### Income Taxes

We account for income taxes pursuant to the asset and liability method, which requires the recognition of deferred income tax assets and liabilities related to the expected future tax consequences arising from temporary differences between the carrying amounts and tax bases of assets and liabilities based on enacted statutory tax rates applicable to the periods in which the temporary differences are expected to reverse. Any effects of changes in income tax rates or laws are included in income tax expense in the period of enactment. We reduce the carrying amounts of deferred tax assets by a valuation allowance if, based on the evidence available, it is more likely than not that such assets will not be realized. In making the assessment under the more

likely than not standard, appropriate consideration must be given to all positive and negative evidence related to the realization of the deferred tax assets. The assessment considers, among other matters, the nature, frequency, and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carry forward periods by jurisdiction, our experience with loss carryforwards not expiring unutilized, and all tax-planning alternatives that may be available. A valuation allowance is recognized if under applicable accounting standards we determine it is more likely than not that our deferred tax assets would not be realized.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of exposure due to potential changes in inflation or interest rates. We do not hold financial instruments for trading purposes.

**Interest Rate Risk**

Our primary market risk exposure related to our debt is changing LIBOR-based interest rates. We had total outstanding debt of $39.8 million under our short-term revolving facilities at December 31, 2020. Amounts outstanding under our short-term revolving facilities are generally due within one year and bear a variable interest rate of a fixed spread to the one-month LIBOR rate. At December 31, 2020, the applicable one-month LIBOR rate was 0.14%. Based on the amounts outstanding, a 100-basis point increase or decrease in market interest rates would result in a change to annual interest expense of $0.4 million at December 31, 2020.

Our long-term debt, consisting of our Senior Notes (as defined in Note 9 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K), notes payable, and finance leases have fixed interest rates and terms, and as such, we consider the associated risk to our results of operations from changes in market rates of interest to be minimal.

We are also exposed to interest rate risk arising from market rate adjustments as they pertain to our securitization transactions. Future sales of our finance receivables may be affected by changes in market rates. We have previously managed this interest rate exposure through the use of derivative instruments such as interest rate swap contracts, and may continue to do so in the future.

**Inflation Risk**

Based on our analysis of the periods presented, we believe that inflation has not had a material effect on our operating results. There can be no assurance that future inflation will not have an adverse impact on our operating results and financial condition.

71

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

<div align="center"><b>INDEX TO CONSOLIDATED FINANCIAL STATEMENTS</b></div>

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 73 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 | 76 |
| Consolidated Statements of Operations for the Years Ended December 31, 2020, 2019, and 2018 | 77 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2020, 2019, and 2018 | 78 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2020, 2019, and 2018 | 81 |
| Notes to Consolidated Financial Statements | 82 |

<div align="center">72</div>

<div align="center">

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

</div>

Board of Directors and Shareholders
Carvana Co.

**Opinion on the financial statements**
We have audited the accompanying consolidated balance sheets of Carvana Co. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020 and 2019, the related consolidated statements of operations, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2020, and the related notes and financial statement schedule included under Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 25, 2021, expressed an unqualified opinion.

**Basis for opinion**
These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matters**
The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Transfers of financial assets*
As described further in Notes 2, 7, and 8 to the financial statements, the Company recognized gains on loan sales of approximately $217.6 million during the year ended December 31, 2020. The Company is party to various transfer agreements pursuant to which it sells finance receivables meeting specified underwriting criteria to certain financing partners. The Company also transfers its finance receivables in connection with asset backed securitization transactions. The Company determines the accounting for the transfers of its finance receivables under ASC 860, Transfers and Servicing of Financial Assets ("ASC 860").

We determined transfers of financial assets is a critical audit matter primarily because the related accounting guidance for transfers of finance receivables involves material transactions, complex judgments in determining the appropriateness of derecognition of the assets and obtaining legal opinions regarding isolation of the transferred finance receivables from the transferor.

<div align="center">

73

</div>

Our audit procedures related to the transfers of finance receivables and related gain on loan sales included the following, among others:

• We tested the appropriateness of management's accounting conclusions on the transfers of finance receivables by reading the various transfer or sale agreements and legal opinions, provided by the Company's external legal counsel, and compared the terms and conclusions to the criteria set forth in ASC 860;

• We tested the design and operating effectiveness of key controls relating to the transfers of finance receivables and related gains on loan sales, and the accounting conclusions reached thereon.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2015.

Southfield, Michigan
February 25, 2021

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Carvana Co.

**Opinion on internal control over financial reporting**
We have audited the internal control over financial reporting of Carvana Co. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2020, and our report dated February 25, 2021, expressed an unqualified opinion on those financial statements.

**Basis for opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Controls over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**
A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Southfield, Michigan
February 25, 2021

75

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands)**

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 300,810 | $ 76,016 |
| Restricted cash | 28,301 | 42,443 |
| Accounts receivable, net | 78,563 | 39,864 |
| Finance receivables held for sale, net | 274,941 | 286,969 |
| Vehicle inventory | 1,036,235 | 762,696 |
| Beneficial interests in securitizations | 131,274 | 98,780 |
| Other current assets, including $6,434 and $0, respectively, due from related parties | 73,023 | 52,654 |
| Total current assets | 1,923,147 | 1,359,422 |
| Property and equipment, net | 909,166 | 543,471 |
| Operating lease right-of-use assets, including $21,809 and $44,583, respectively, from leases with related parties | 155,464 | 123,420 |
| Intangible assets, net | 5,643 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $3,753 and $6,138, respectively, due from related parties | 31,758 | 14,850 |
| Total assets | $ 3,034,531 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $15,509 and $9,549, respectively, due to related parties | $ 342,314 | $ 234,443 |
| Short-term revolving facilities | 39,820 | 568,840 |
| Current portion of long-term debt | 65,497 | 48,731 |
| Other current liabilities, including $3,471 and $4,518, respectively, from leases with related parties | 19,506 | 12,856 |
| Total current liabilities | 467,137 | 864,870 |
| Long-term debt, excluding current portion, including $0 and $15,000, respectively, held by a related party | 1,617,002 | 883,060 |
| Operating lease liabilities, excluding current portion, including $18,645 and $41,829, respectively, from leases with related parties | 147,478 | 116,071 |
| Other liabilities | 1,411 | 1,808 |
| Total liabilities | 2,233,028 | 1,865,809 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of December 31, 2020 and 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized, 76,512 and 50,507 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 77 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized, 95,592 and 101,219 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 96 | 101 |
| Additional paid in capital | 741,601 | 280,994 |
| Accumulated deficit | (354,174) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 387,600 | 98,112 |
| Non-controlling interests | 413,903 | 93,827 |
| Total stockholders' equity | 801,503 | 191,939 |
| Total liabilities & stockholders' equity | $ 3,034,531 | $ 2,057,748 |

See accompanying notes to consolidated financial statements.

76

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share amounts)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **Sales and operating revenues:** | | | |
| Used vehicle sales, net | $ 4,740,595 | $ 3,420,601 | $ 1,785,045 |
| Wholesale vehicle sales, including $4,145, $0, and $0 respectively, from related parties | 445,236 | 267,586 | 73,584 |
| Other sales and revenues, including $104,738, $59,677, and $25,572, respectively, from related parties | 400,734 | 251,709 | 96,838 |
| **Net sales and operating revenues** | 5,586,565 | 3,939,896 | 1,955,467 |
| Cost of sales, including $3,522, $4,357, and $4,772, respectively, to related parties | 4,792,800 | 3,433,482 | 1,758,758 |
| **Gross profit** | 793,765 | 506,414 | 196,709 |
| Selling, general and administrative expenses, including $18,597, $13,869, and $8,217, respectively, to related parties | 1,126,161 | 786,717 | 425,258 |
| Interest expense, including $998, $1,331, and $370, respectively, to related parties | 131,528 | 80,606 | 25,018 |
| Other (income) expense, net | (1,447) | 3,730 | 1,178 |
| **Net loss before income taxes** | (462,477) | (364,639) | (254,745) |
| Income tax provision | (255) | — | — |
| **Net loss** | (462,222) | (364,639) | (254,745) |
| Net loss attributable to non-controlling interests | (291,082) | (249,980) | (199,269) |
| **Net loss attributable to Carvana Co.** | (171,140) | (114,659) | (55,476) |
| Dividends on Class A convertible preferred stock | — | — | (4,206) |
| Accretion of beneficial conversion feature on Class A convertible preferred stock | — | — | (1,380) |
| **Net loss attributable to Class A common stockholders** | $ (171,140) | $ (114,659) | $ (61,062) |
| Net loss per share of Class A common stock, basic and diluted | $ (2.63) | $ (2.45) | $ (2.03) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 64,981 | 46,847 | 30,043 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

See accompanying notes to consolidated financial statements.

77

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(In thousands)**

| | Class A Convertible Preferred Stock | | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2017** | 100 | $ 97,127 | 18,096 | $ 18 | 114,664 | $ 115 | $ 41,375 | $ (12,899) | $ 153,808 | $ 279,544 |
| Net Loss | — | — | — | — | — | — | — | (55,476) | (199,269) | (254,745) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | — | — | 6,600 | 7 | — | — | 172,280 | — | — | 172,287 |
| Adjustments to non-controlling interests related to equity offering | — | — | — | — | — | — | (132,375) | — | 132,375 | — |
| Issuance of LLC Units related to business acquisitions | — | — | — | — | — | — | — | — | 9,981 | 9,981 |
| Adjustments to non-controlling interests related to business acquisitions | — | — | — | — | — | — | 1,297 | — | (1,297) | — |
| Issuance of Class A common stock related to purchase of assets | — | — | 10 | — | — | — | 536 | — | — | 536 |
| Conversions of Class A Convertible Preferred Stock | (100) | (98,507) | 5,077 | 5 | — | — | 98,502 | — | — | — |
| Adjustment to non-controlling interests related to conversion of Class A Convertible Preferred Stock | — | — | — | — | — | — | (67,972) | — | 67,972 | — |
| Accretion of beneficial conversion feature on Class A convertible Preferred Stock | — | 1,380 | — | — | — | — | (1,380) | — | — | — |
| Dividends on Class A Convertible Preferred Stock | — | — | — | — | — | — | (4,206) | — | — | (4,206) |
| Exchanges of LLC Units | — | — | 11,331 | 11 | (10,328) | (11) | 15,828 | — | (15,828) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | — | — | 95,179 | — | — | 95,179 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis of Carvana Group | — | — | — | — | — | — | (95,179) | — | — | (95,179) |
| Contribution of Class A common stock from related party | — | — | (198) | — | — | — | — | — | — | — |
| Issuance of Class A common stock as restricted stock awards and to settle vested restricted stock units | — | — | 327 | — | — | — | — | — | — | — |

78

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | (95) | — | — | — | (2,509) | — | — | (2,509) |
| Options exercised | — | — | 60 | — | — | — | 795 | — | — | 795 |
| Equity-based compensation | — | — | — | — | — | — | 25,745 | — | — | 25,745 |
| **Balance, December 31, 2018** | — | $ — | 41,208 | $ 41 | 104,336 | $ 104 | $ 147,916 | $ (68,375) | $ 147,742 | $ 227,428 |
| Net loss | — | — | — | — | — | — | — | (114,659) | (249,980) | (364,639) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | — | — | 4,830 | 5 | — | — | 297,606 | — | — | 297,611 |
| Adjustments to non-controlling interests related to equity offering | — | — | — | — | — | — | (201,015) | — | 201,015 | — |
| Exchanges of LLC Units | — | — | 4,321 | 5 | (3,117) | (3) | 4,948 | — | (4,950) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | — | — | 70,252 | — | — | 70,252 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | — | — | (70,252) | — | — | (70,252) |
| Contribution of Class A common stock from related party | — | — | (203) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | — | — | 300 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | (53) | — | — | — | (5,830) | — | — | (5,830) |
| Options exercised | — | — | 104 | — | — | — | 1,696 | — | — | 1,696 |
| Equity-based compensation | — | — | — | — | — | — | 35,673 | — | — | 35,673 |
| **Balance, December 31, 2019** | — | $ — | 50,507 | $ 51 | 101,219 | $ 101 | $ 280,994 | $ (183,034) | $ 93,827 | $ 191,939 |
| Net loss | — | — | — | — | — | — | — | (171,140) | (291,082) | (462,222) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | — | — | 18,333 | 18 | — | — | 1,058,922 | — | — | 1,058,940 |
| Adjustments to non-controlling interests related to equity offering | — | — | — | — | — | — | (643,886) | — | 643,886 | — |
| Exchanges of LLC Units | — | — | 7,281 | 7 | (5,627) | (5) | 32,726 | — | (32,728) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | — | — | 406,870 | — | — | 406,870 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | — | — | (406,870) | — | — | (406,870) |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of Class A common stock to settle vested restricted stock units | — | | — | 234 | — | | — | — | | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | | — | (38) | — | | — | — | (23,145) | | — | — | (23,145) |
| Options exercised | — | | — | 195 | 1 | | — | — | 5,418 | | — | — | 5,419 |
| Equity-based compensation | — | | — | — | — | | — | — | 30,572 | | — | — | 30,572 |
| **Balance, December 31, 2020** | — | $ | — | 76,512 | $ | 77 | 95,592 | $ 96 | $ 741,601 | $ (354,174) | $ 413,903 | $ | 801,503 |

See accompanying notes to consolidated financial statements.

80

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ (462,222) | $ (364,639) | $ (254,745) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 73,791 | 41,265 | 23,539 |
| Loss on disposal of property and equipment | 6,130 | 1,714 | 575 |
| Provision for bad debt and valuation allowance | 20,962 | 11,922 | 1,917 |
| Gain on loan sales | (217,643) | (137,301) | (51,729) |
| Equity-based compensation expense | 25,088 | 33,063 | 24,095 |
| Amortization and write-off of debt issuance costs and bond premium | 7,959 | 5,541 | 2,305 |
| Loss on early extinguishment of debt | 33,683 | — | — |
| Originations of finance receivables | (3,579,156) | (2,625,351) | (1,259,539) |
| Proceeds from sale of finance receivables, net | 3,634,520 | 2,643,912 | 1,633,519 |
| Purchase of finance receivables | — | (161,781) | (387,445) |
| Principal payments received on finance receivables held for sale | 90,235 | 85,017 | — |
| Unrealized (gain) loss on beneficial interest in securitization | (8,823) | 964 | — |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (42,995) | (9,741) | (19,212) |
| Vehicle inventory | (263,321) | (344,861) | (183,068) |
| Other assets | (26,415) | (32,619) | (12,249) |
| Accounts payable and accrued liabilities | 94,179 | 97,912 | 68,550 |
| Operating lease right-of-use assets | (32,044) | (46,928) | — |
| Operating lease liabilities | 38,057 | 45,195 | — |
| Other liabilities | (397) | (418) | (853) |
| Net cash used in operating activities | (608,412) | (757,134) | (414,340) |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment, including $21,657 and $6,282 in 2020 and 2019, respectively, from related parties | (359,801) | (230,538) | (143,668) |
| Principal payments received on beneficial interests in securitizations | 13,875 | 2,799 | — |
| Business acquisitions, net of cash acquired | — | — | (6,670) |
| Net cash used in investing activities | (345,926) | (227,739) | (150,338) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from short-term revolving facilities | 4,429,185 | 4,485,917 | 1,848,051 |
| Payments on short-term revolving facilities | (4,958,205) | (4,219,415) | (1,899,880) |
| Proceeds from issuance of long-term debt, including $25,000[1] in 2018 from related parties | 1,335,779 | 481,772 | 399,063 |
| Payments on long-term debt | (653,589) | (15,683) | (35,522) |
| Payments of debt issuance costs | (29,394) | (11,445) | (11,390) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 | 172,287 |
| Net proceeds from issuance of Class A Convertible Preferred Stock | — | — | (12) |
| Proceeds from exercise of stock options | 5,419 | 1,696 | 795 |
| Tax withholdings related to restricted stock units and awards | (23,145) | (5,830) | (2,509) |
| Dividends paid on Class A Convertible Preferred Stock | — | — | (4,619) |
| Net cash provided by financing activities | 1,164,990 | 1,014,623 | 466,264 |
| **Net increase (decrease) in cash and cash equivalents** | 210,652 | 29,750 | (98,414) |
| Cash, cash equivalents, and restricted cash at beginning of period | 118,459 | 88,709 | 187,123 |
| Cash, cash equivalents, and restricted cash at end of period | $ 329,111 | $ 118,459 | $ 88,709 |

(1) A related party initially acquired $25.0 million of the senior unsecured notes during the year ended December 31, 2018, of which it subsequently disposed of $10.0 million, and held $15.0 million as of December 31, 2019 and $0.0 million as of December 31, 2020.

See accompanying notes to consolidated financial statements.

81

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1 — BUSINESS ORGANIZATION

### Description of Business

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub (collectively, "Carvana Co.") together with its consolidated subsidiaries (the "Company") is a leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

### Organization

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016, for the purpose of completing an initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 9 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units
(the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 10 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of December 31, 2020, Carvana Co. owned approximately 43.8% of Carvana Group and the LLC Unitholders (as defined in Note 10 — Stockholders' Equity) owned the remaining 56.2%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The accompanying consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary. All intercompany balances and transactions have been eliminated.

### Liquidity

The accompanying consolidated financial statements of the Company have been prepared in conformity with U.S. GAAP, which contemplate continuation of the Company as a going concern. The Company has incurred losses from inception through December 31, 2020, and expects to incur additional losses in the future as the Company continues to grow into new markets, build inspection and reconditioning centers and vending machines, and enhance technology and software. During the year ended December 31, 2020, the Company completed equity offerings of 18.3 million shares of Class A common stock for net proceeds of $1.1 billion and issued $500.0 million and $600.0 million in senior unsecured notes due in 2025 and 2028, respectively, from which $626.8 million of the proceeds were used to repay its senior unsecured notes due in 2023. In addition, the Company has a $1.25 billion floor plan facility through March 31, 2023. Management believes that current working capital,

82

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. The COVID-19 pandemic has adversely impacted the global economy, as well as the Company's operations, and the extent and duration of the impacts remain unclear. Certain of the Company's estimates, including, but not limited to, the Company's allowance for loan losses, inventory valuations, fair value measurements, cancellation reserves, asset impairment charges, and discount rate assumptions, have been and may continue to be impacted and evolve as conditions change as a result of the COVID-19 pandemic. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Comprehensive Loss**

During the years ended December 31, 2020, 2019, and 2018, the Company did not have any other comprehensive income and, therefore, the net loss and comprehensive loss were the same for all periods presented.

**Cash and Cash Equivalents**

The Company has cash deposits and cash equivalents deposited in or managed by major financial institutions. Cash equivalents include highly liquid investment instruments with original maturities of three months or less, and consist primarily of money market funds. At times the related amounts are in excess of the amounts insured by the Federal Deposit Insurance Corporation. The Company has not experienced any losses with these financial institutions and does not believe it represents significant credit risk.

**Restricted Cash**

Amounts included in restricted cash represent the deposits required under the Company's short-term revolving facilities and any undistributed amounts collected on the finance receivables pledged under the Company's finance receivable facilities as explained in Note 9 — Debt Instruments.

**Accounts Receivable, Net**

Accounts receivable, net of an allowance for doubtful accounts, includes certain amounts due from customers and their finance providers. The allowance for doubtful accounts is estimated based upon historical experience, current economic conditions, and other factors and is evaluated periodically. The allowance for doubtful accounts was approximately $4.7 million and $3.2 million as of December 31, 2020 and 2019, respectively.

**Finance Receivables Held for Sale, Net**

Finance receivables include installment contracts the Company originates to its customers to facilitate vehicle sales. The Company classifies these receivables as held for sale, as it does not intend to hold the finance receivables it originates to maturity. The Company typically sells the finance receivables it originates, as explained in Note 7 — Finance Receivable Sale Agreements and Note 8 — Securitizations and Variable Interest Entities. The Company records a valuation allowance to report finance receivables at the lower of unpaid principal balance or fair value. To determine the fair value of finance receivables the Company utilizes industry-standard modeling, such as discounted cash flow analysis, factoring in the Company's historical experience, the credit quality of the underlying receivables, loss trends and recovery rates, as well as the overall economic environment. For purposes of determining the valuation allowance, finance receivables are evaluated collectively to determine the allowance as they represent a large group of smaller-balance homogeneous loans. The allowance was approximately $16.3 million and $7.3 million as of December 31, 2020 and 2019, respectively. Principal balances of finance receivables are charged-

83

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

off when the Company is unable to sell the finance receivable and the related vehicle has been repossessed and liquidated or the receivable has otherwise been deemed uncollectible. Interest income on finance receivables held for sale is recognized when earned based on contractual loan terms and is included in other sales and revenues. Loan origination costs are capitalized and recognized as a reduction to the gain on loan sale when the loans are sold.

**Vehicle Inventory**

Vehicle inventory consists of used vehicles, primarily acquired at auction and directly from customers. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental overhead costs are capitalized as a component of inventory. Inventory is stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is the estimated selling price less costs to complete, dispose and transport the vehicles. Selling prices are derived from historical data and trends, such as sales price and inventory turn times of similar vehicles, as well as independent market resources. Each reporting period the Company recognizes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value through cost of sales in the accompanying consolidated statements of operations.

**Property and Equipment**

Property and equipment consists of land, buildings and improvements, transportation fleet equipment, software, and furniture, fixtures and equipment and is stated at cost less accumulated depreciation and amortization. Repairs and maintenance costs that extend the life or utility of an asset are also capitalized. Ordinary repairs and maintenance are charged to expense as incurred. Costs incurred during construction are capitalized as construction in progress and reclassified to the appropriate fixed asset categories when the project is completed. In addition, interest on borrowings during the active construction period of construction projects is capitalized and depreciated over the estimated useful lives of the related assets. Costs incurred during the preliminary project planning phase are charged to expense as incurred.

The Company capitalizes direct costs of materials and services consumed in developing or obtaining internal-use software. The Company also capitalizes payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use, to the extent of the time spent directly on the project. Capitalization of costs begins during the application development stage and ends when the software is available for general use. Costs incurred during the preliminary project and post-implementation stages are charged to expense as incurred.

Depreciation and amortization are computed using the straight-line method over the lesser of the remaining lease term or the following estimated useful lives:

| | |
|---|---|
| Buildings and improvements | 5-30 years |
| Transportation fleet equipment | 3-8 years |
| Software | 3 years |
| Furniture, fixtures and equipment | 3-5 years |

Management reviews long-lived assets for impairment when events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. The Company compares the sum of estimated undiscounted future cash flows expected to result from the use of the asset to the carrying value of the asset. When the carrying value of the asset exceeds its estimated undiscounted future cash flows, the Company recognizes an impairment charge for the amount by the which the carrying value of the asset exceeds the fair value of the asset. The Company recorded no impairment charges during the years ended December 31, 2020, 2019, and 2018. See Note 3 — Property and Equipment, Net for additional information on property and equipment.

**Goodwill and Intangible Assets**

Intangible assets are recognized and recorded at their acquisition date fair values. Definite-lived intangible assets consist of developed technology, customer relationships, and non-compete agreements and are amortized on a straight-line basis over their estimated useful lives. The Company determined the useful lives of its definite-lived intangible assets based on multiple factors including technological obsolescence, the make-up of the acquired customer base and expected attrition, and the period over which expected cash flows are used to measure the fair value of the intangible asset at acquisition. The Company periodically reassesses the useful lives of its definite-lived intangible assets when events or circumstances indicate that useful lives have

84

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

significantly changed from the previous estimate. No impairment charges related to intangible assets were recognized during the years ended December 31, 2020, 2019, or 2018.

Goodwill represents the excess purchase price over the fair value of the net assets acquired. Goodwill is not amortized but is tested at least annually or more frequently when events or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The Company has one operating segment, which is its reporting unit; therefore, management analyzes goodwill associated with all of its operations when analyzing for potential impairment. The Company first assesses qualitative factors to determine if it is not more likely than not that the fair value of its reporting unit is less than its carrying amount. No impairment charges related to goodwill were recognized during the years ended December 31, 2020, 2019, or 2018.

**Leases**

The Company determines if an arrangement is a lease at inception by evaluating if the asset is explicitly or implicitly identified or distinct, if the Company will receive substantially all of the economic benefit or if the lessor has an economic benefit and the ability to substitute the asset. Right-of-use ("ROU") assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The Company assesses whether the lease is an operating or finance lease at its inception. Operating lease liabilities are recognized at commencement date based on the present value of the lease payments over the lease term. To calculate the present value, the Company uses the implicit rate in the lease when readily determinable. However, most of the Company's leases do not provide an implicit rate and it uses its incremental borrowing rate. The incremental borrowing rate is based on collateralized borrowings of similar assets with terms that approximate the lease term when available and when collateralized rates are not available, it uses uncollateralized rates with similar terms adjusted for the fact that it is an unsecured rate. The operating lease ROU asset is the initial lease liability adjusted for any prepayments, initial indirect costs incurred by the Company, and lease incentives. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying consolidated balance sheets. The Company's finance leases are included in property and equipment and long-term debt on the accompanying consolidated balance sheets.

**Securitizations and Variable Interest Entities**

The Company reviews subsidiaries and affiliates, as well as other entities, to determine if they should be considered VIEs, and whether it should change the consolidation determinations based on changes in their characteristics. The Company considers an entity a VIE if its equity investors own an interest therein that lacks the characteristics of a controlling financial interest or if such investors do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support or if the entity is structured with non-substantive voting interests. A VIE is consolidated by its primary beneficiary, the party that has both the power to direct the activities that most significantly impact the VIE's economic performance and the obligation to absorb losses or the right to receive benefits of the VIE that could potentially be significant to the VIE. The Company evaluates whether it has variable interests in the VIE and if so, if it is the primary beneficiary of the VIE on an ongoing basis. The Company consolidates VIEs when it is deemed to be the primary beneficiary.

The Company sponsors asset-backed securitization transactions. These transactions often result in the creation of securitization trusts, which are VIEs. To comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules") the Company retains at least a 5% interest in the credit risk of the underlying finance receivables, which it accomplishes by retaining at least a 5% interest in each security issued by the securitization trusts. Typically, this includes notes and certificates, which are presented as beneficial interests in securitizations on the accompanying consolidated balance sheets.

**Other Assets**

Other current assets consist of various items, including, among other items, software licenses and subscriptions, prepaid expenses, the estimated reserve for vehicle inventory returns, debt issuance costs on revolving debt instruments, the current portion of the receivable related to the excess cash reserves over realized claims of VSCs, and deposits. Other assets consist of various items, including, among other items, the purchase price adjustment receivables based on the performance of the Company's finance receivables, the receivable related to the excess cash reserves over realized claims of VSCs, deposits and debt issuance costs on revolving debt instruments.

85

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Accrued Liabilities**

Accrued liabilities consist of various items payable within one year, including, among other items, accruals for capital expenditures, sales tax, compensation and benefits, vehicle licenses and fees, interest expense, reserves for returns and cancellations,and advertising expenses.

**Other Liabilities**

As of December 31, 2020 and 2019, other current liabilities primarily consist of the current portion of operating lease liabilities. Other liabilities consist of various items to be recognized beyond one year, including the deferred tax liability associated with acquisitions of intangible assets.

**Revenue Recognition**

The Company recognizes revenue in accordance with the five-step model prescribed by ASC 606 that includes: (1) identify the contract; (2) identify the performance obligations; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations; and (5) recognize revenue when (or as) performance obligations are satisfied.

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. The prices of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. Changes in these estimates are reflected as an adjustment to revenue in the period identified. The amount of consideration received for used vehicle sales includes noncash consideration representing the value of trade-in vehicles, if applicable, as stated in the contract. Prior to the delivery of the vehicle, the payment is received or financing has been arranged. Payments from customers that finance their purchases with third parties are typically due and collected within 30 days of delivery of the used vehicle. Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

*Wholesale Vehicle Sales*

The Company sells vehicles to wholesalers. These vehicles sold to wholesalers are primarily acquired from customers that do not meet the Company's quality standards to list and sell through its website. The Company satisfies its performance obligation for wholesale vehicle sales when the wholesale purchaser obtains control of the underlying vehicle, which is upon delivery when the transfer of title, risks and rewards of ownership, and control pass to the wholesale purchaser. The Company recognizes revenue at the amount it expects to receive for the used vehicle, which is the fixed price determined at the auction. The purchase price of the wholesale vehicle is typically due and collected within 30 days of delivery of the wholesale vehicle.

*Other Sales and Revenues*

Other sales and revenues include gains on the sales of finance receivables, commissions on vehicle service contracts ("VSCs"), GAP waiver coverage, commissions on GAP waiver coverage, and interest income received on finance receivables prior to selling them to investors.

Customers purchasing used vehicles from the Company may enter into contracts for VSCs and, if they finance with the Company, GAP waiver coverage. The prices of VSCs and GAP waiver coverage are set forth in each contract. The Company sells and receives a commission on VSCs under a master dealer agreement with DriveTime, pursuant to which the Company sells VSCs that DriveTime administers and is the obligor. The Company receives a commission on GAP waiver coverage contracts where the administrator of the contract is obligated to reimburse the holder of the underlying finance receivable for a balance that is in excess of the value of the financed vehicle in the event of a total loss. The Company recognizes commission revenue at the time of sale, net of a reserve for estimated contract cancellations. GAP waiver coverage contracts administered by DriveTime obligate whoever holds the underlying finance receivable to not attempt collection of a balance that is in excess of the value of the financed vehicle in the event of a total loss. DriveTime GAP waiver coverage is recognized as the performance obligation is satisfied over the period of coverage, generally on a straight-line basis over the expected period the outstanding balance of the related finance receivable will exceed the value of the financed vehicle, less a reserve for

86

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

cancellations. Upon selling the corresponding finance receivable, the Company recognizes any remaining deferred revenue. The reserve for cancellations of VSCs and GAP waiver coverage contracts is estimated based upon historical experience and recent trends and is reflected as a reduction of other sales and revenues. Changes in these estimates are reflected as an adjustment to other sales and revenues in the period identified.

Under the master dealer agreement with DriveTime, the Company is also contractually entitled to receive profit-sharing revenues based on the performance of the VSCs once a required claims period has passed. This is a form of variable consideration the Company recognizes as revenue to the extent that it is probable that it will not result in a significant revenue reversal. The Company applies the expected value method, utilizing expected VSC performance based on historical claims and cancellation data from its customers, as well as other qualitative assumptions to estimate the amount it expects to receive. The Company reassesses the estimate each reporting period with any changes reflected as an adjustment to other sales and revenues in the period identified. Profit-sharing payments will begin when the underlying VSCs reach a specified level of claims history. As of December 31, 2020 and 2019, the Company had ending receivables of approximately $10.2 million and $6.0 million, respectively, related to cumulative profit-sharing payments recognized as revenue to which it expects to be entitled. The receivables are included in other current assets and other assets on the accompanying consolidated balance sheets.

The Company accounts for sales of finance receivables in accordance with ASC Topic 860, *Transfers and Servicing of Financial Assets* ("ASC 860"). ASC 860 states that a transfer of an entire financial asset, a group of entire financial assets, or a participating interest in an entire financial asset in which the transferor surrenders control over those financial assets is accounted for as a sale only if all of the following conditions are met:

- The transferred financial assets have been isolated from the transferor - put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

- Each transferee has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or third-party holder of its beneficial interests) from taking advantage of its right to pledge or exchange the asset and provides more than a trivial benefit to the transferor.

- The transferor, its consolidated affiliates included in the financial statements being presented or its agents do not maintain effective control over the transferred financial assets or third-party beneficial interests related to those transferred assets.

For the years ended December 31, 2020, 2019, and 2018, all transfers of finance receivables met the requirements for sale treatment. The Company records the gain on the sale of a finance receivable upon receipt of proceeds, in an amount equal to the fair value of the net proceeds received less the carrying amount of the finance receivable. The Company has made customary representations related to the sales of finance receivables. Any significant estimated post-sale obligations or contingent obligations to the purchaser of the receivables would be accrued if probable and estimable in accordance with ASC 450, *Contingencies*. Any such obligations are considered in the Company's determination of the accounting for the transfers of the finance receivables under ASC Topic 860, *Transfers and Servicing of Financial Assets.*

**Cost of Sales**

Cost of sales includes the cost to acquire used vehicles and direct and indirect vehicle reconditioning costs associated with preparing the vehicles for resale. Vehicle reconditioning costs include parts, labor, inbound transportation costs, and other incremental overhead costs, which are allocated to inventory via specific identification and standard costing. Occupancy and labor costs not related to vehicle acquisition or reconditioning, including those incurred in connection with expanding production capacity, are expensed as incurred as a component of selling, general and administrative expense. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

**Selling, General, and Administrative Expenses**

Selling, general, and administrative ("SG&A") expenses primarily include compensation and benefits, advertising, depreciation expense, facilities costs, technology expenses, logistics and fulfillment expenses, and other administrative expenses. SG&A expenses exclude the costs related to reconditioning vehicles and inbound transportation, which are included in cost of sales, and payroll costs of employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Advertising Costs**

Advertising production costs are expensed the first time the advertising takes place. All other advertising costs are expensed as incurred. Advertising expenses are included in SG&A expenses on the accompanying consolidated statements of operations. Advertising expense was approximately $286.4 million, $204.0 million, and $111.2 million during the years ended December 31, 2020, 2019, and 2018, respectively.

**Equity-Based Compensation**

The Company classifies equity-based awards granted in exchange for services as either equity awards or liability awards. The classification of an award as either an equity award or a liability award is generally based upon cash settlement options. Equity awards are measured based on the fair value of the award at the grant date. Liability awards are re-measured to fair value each reporting period. Prior to the adoption of ASU 2018-07, *Compensation - Stock Compensation (Topic 718)* ("ASU 2018-07"), on January 1, 2019, each reporting period, the Company recognized the change in fair value of awards issued to non-employees as expense. Following adoption of ASU 2018-07, accounting requirements for equity-based awards to nonemployees are aligned with those to employees, including measuring the equity instruments at the grant-date fair value. The Company recognizes equity-based compensation on a straight-line basis over the award's requisite service period, which is generally the vesting period of the award, less actual forfeitures. No compensation expense is recognized for awards for which participants do not render the requisite services. For equity and liability awards earned based on performance or upon occurrence of a contingent event, when and if the awards will be earned is estimated. If an award is not considered probable of being earned, no amount of equity-based compensation is recognized. If the award is deemed probable of being earned, related compensation expense is recorded over the estimated service period. To the extent the estimate of awards considered probable of being earned changes, the amount of equity-based compensation recognized will also change. See Note 12 — Equity-Based Compensation for additional information on equity-based compensation.

**Shipping and Handling**

The Company's logistics costs related to transporting its used vehicle inventory include fuel, maintenance, depreciation related to operating its own transportation fleet, and third party transportation fees. The portion of these costs related to inbound transportation from the point of acquisition to the inspection and reconditioning center are capitalized to inventory and then included in cost of sales when the related used vehicle is sold. Logistics costs not included in cost of sales are included in selling, general and administrative expenses in the accompanying consolidated statements of operations and were approximately $76.8 million, $58.1 million, and $35.2 million during the years ended December 31, 2020, 2019, and 2018, respectively, excluding compensation and benefits.

**Defined Contribution Plan**

The Company sponsors a qualified 401(k) retirement plan (defined contribution plan) for its employees. The plan covers substantially all employees who have attained the age of 18. Participants may voluntarily contribute to the plan up to the maximum limits established by Internal Revenue Service regulations. The Company provides matching contributions of 40% up to the first 6% of an employee's compensation, which vests evenly over the employee's initial five-year service period. Employer contributions to the plan, net of forfeitures, were approximately $3.2 million, $2.0 million, and $1.1 million for the years ended December 31, 2020, 2019, and 2018, respectively. Employer contributions are included in selling, general, and administrative expenses in the accompanying consolidated statements of operations.

**Derivative Instruments and Hedging Activities**

The Company from time to time enters into short-term derivative instruments to manage risks arising from its business operations and economic conditions, primarily cash flow variability that may arise from interest rate changes between the time the Company originates finance receivables and the time it sells them through securitizations. The Company does not designate these derivative instruments as hedges under ASC 815, *Derivatives and Hedging* for hedge accounting treatment and as a result they are accounted for as economic hedges. Gains and losses related to the derivative instruments are included within other sales and revenues to follow the presentation of the hedged item within the accompanying consolidated statements of operations and any derivative instruments outstanding as of the end of the period are reported at fair value on the accompanying consolidated balance sheets.

88

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Fair Value Measurements**

The fair value of financial instruments is based on estimates using quoted market prices, discounted cash flows, or other valuation techniques. Those techniques are significantly affected by the assumptions used, including the discount rate and the estimated timing and amount of future cash flows. Therefore, the estimates of fair value may differ substantially from amounts that ultimately may be realized or paid at settlement or maturity of the financial instruments, and those differences may be material. Accordingly, the aggregate fair value amounts presented may not represent the Company's underlying institutional value.

The Company uses the three-tier hierarchy established by U.S. GAAP, which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value to determine the fair value of its financial instruments. This hierarchy indicates to what extent the inputs used in the Company's calculations are observable in the market. The different levels of the hierarchy are defined as follows:

| | |
|---|---|
| **Level 1:** | Unadjusted quoted prices in active markets for identical assets or liabilities. |
| **Level 2:** | Other than quoted prices that are observable in the market for the asset or liability, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or model-derived valuations or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. |
| **Level 3:** | Inputs are unobservable and reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. |

The Company has elected the fair value option for its beneficial interests in securitizations, which primarily include notes and certificates of the securitization trusts. Electing the fair value option allows the Company to recognize changes in the fair value of these assets in the period the fair value changes. The changes in fair value are recorded within other expense, net and amounts attributable to interest income are reported in interest expense, net as earned on the accompanying consolidated statements of operations. See Note 17 — Fair Value of Financial Instruments for additional information.

**Segments**

Business segments are defined as components of an enterprise about which discrete financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing operating performance. Based on the way the Company manages its business, the Company has determined that it currently operates with one reportable segment. The chief operating decision maker focuses on consolidated results in assessing operating performance and allocating resources. Furthermore, the Company offers similar products and services and uses similar processes to sell those products and services to similar classes of customers throughout the United States ("U.S."). Substantially all revenue is generated and all assets are held in the U.S. for all periods presented.

**Income Taxes**

The Company accounts for income taxes pursuant to the asset and liability method, which requires the recognition of deferred income tax assets and liabilities related to the expected future tax consequences arising from temporary differences between the carrying amounts and tax bases of assets and liabilities based on enacted statutory tax rates applicable to the periods in which the temporary differences are expected to reverse. Any effects of changes in income tax rates or laws are included in income tax expense in the period of enactment. The Company reduces the carrying amounts of deferred tax assets by a valuation allowance if, based on the evidence available, it is more likely than not that such assets will not be realized. In making the assessment under the more likely than not standard, appropriate consideration must be given to all positive and negative evidence related to the realization of the deferred tax assets. The assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carry forward periods by jurisdiction, the Company's experience with loss carryforwards not expiring unutilized, and all tax planning alternatives that may be available. A valuation allowance is recognized if under applicable accounting standards the Company

89

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

determines it is more likely than not that its deferred tax assets would not be realized. See Note 14 — Income Taxes for additional information.

**Adoption of New Accounting Standards**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. The Company adopted ASU 2016-13 on January 1, 2020. Financial assets measured at fair value through net income are excluded from the scope of ASU 2016-13. The Company's beneficial interests in securitizations are carried at fair value and are thus excluded from ASU 2016-13. Finance receivables originated in connection with the Company's vehicle sales are held for sale and presented at the lower of amortized cost or fair value. The Company intends to sell the finance receivables prior to their contractual maturity, therefore the recovery of the asset is from its sale rather than maturity and the Company is not required to measure the expected lifetime credit losses. The adoption of ASU 2016-13 did not have a material effect on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") related to updated requirements over the disclosures of fair value measurements. Under ASU 2018-13, certain disclosure requirements for fair value measurements will be eliminated, modified or added to facilitate better communication around recurring and nonrecurring fair value measurements. ASU 2018-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with some amendments applied prospectively, some applied retrospectively and early adoption permitted. The Company adopted ASU 2018-13 for its fiscal year beginning January 1, 2020 and it did not have a material effect on the Company's fair value disclosures within its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The intent of this pronouncement is to align the requirements for capitalizing implementation costs incurred in a cloud computing arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software as defined in ASC 350-40. Under ASU 2018-15, the capitalized implementation costs related to a cloud computing arrangement will be amortized over the term of the arrangement and all capitalized implementation amounts will be required to be presented in the same line items of the financial statements as the related hosting fees. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have a material effect on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"). ASU 2018-17 requires reporting entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety for determining whether a decision-making fee is a variable interest. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. Entities are required to apply the amendments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have an effect on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). ASU 2020-04 provides optional guidance for a limited period of time related to contract modifications and hedge accounting to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The standard is effective from March 12, 2020 through December 31, 2022, except for hedging relationships existing as of December 31, 2022 that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The Company may elect to take advantage of this optional guidance in its transition away from LIBOR within certain debt contracts but does not expect a material impact on its consolidated financial statements. As of December 31, 2020, the Company had not modified any contracts or had any hedge accounting activity in which it utilized the optional guidance under ASU 2020-04.

90

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Accounting Standards Issued But Not Yet Adopted**

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. ASU 2019-12 will be effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. The Company will adopt ASU 2019-12 for its fiscal year beginning January 1, 2021 and does not anticipate the adoption to have a material impact on its consolidated financial statements.

**NOTE 3 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net, as of December 31, 2020 and 2019:

|  | December 31, | |
|---|---|---|
|  | **2020** | **2019** |
|  | **(in thousands)** | |
| Land and site improvements | $ 132,378 | $ 98,530 |
| Buildings and improvements | 476,494 | 229,640 |
| Transportation fleet | 189,870 | 110,302 |
| Software | 112,542 | 66,875 |
| Furniture, fixtures, and equipment | 60,245 | 38,123 |
| Total property and equipment excluding construction in progress | 971,529 | 543,470 |
| Less: accumulated depreciation and amortization on property and equipment | (170,788) | (88,795) |
| Property and equipment excluding construction in progress, net | 800,741 | 454,675 |
| Construction in progress | 108,425 | 88,796 |
| Property and equipment, net | $ 909,166 | $ 543,471 |

Depreciation and amortization expense on property and equipment was approximately $72.2 million, $39.6 million, and $22.5 million for the years ended December 31, 2020, 2019, and 2018, respectively. These amounts primarily relate to selling, general, and administrative activities and are included as a component of selling, general, and administrative expenses in the accompanying consolidated statements of operations.

The Company capitalized internal use software costs totaling approximately $48.9 million, $31.7 million, and $17.4 million during the years ended December 31, 2020, 2019, and 2018, respectively, which is included in software and construction in progress in the table above. The Company capitalized approximately $36.1 million, $24.7 million, and $13.6 million during the years ended December 31, 2020, 2019, and 2018, respectively, of payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use.

The Company capitalizes interest in connection with various construction projects to build, upgrade, or remodel certain of its facilities. During the years ended December 31, 2020, 2019, and 2018, the Company incurred total interest costs, net of interest income, of approximately $139.6 million, $84.2 million, and $26.6 million, respectively, of which approximately $8.1 million, $3.6 million, and $1.6 million, respectively, were capitalized.

**NOTE 4 — GOODWILL AND INTANGIBLE ASSETS**

On April 12, 2018, the Company acquired Car360, Inc. ("Car360"), a provider of app-based photo capture technology, for approximately $16.7 million, net of cash acquired of approximately $0.4 million. The purchase price was comprised of approximately $6.7 million cash, net of cash acquired, and approximately 0.5 million Class A Units of Carvana Group, with a fair value of approximately $10.0 million.

The purchase price was allocated to net tangible assets of approximately $0.2 million and intangible assets of approximately $9.9 million based on their fair values on the acquisition date and a related deferred tax liability of approximately $2.5 million. The deferred tax liability will amortize over two to seven years, and approximately $0.4 million was amortized during both of the years ended December 31, 2020 and 2019. The excess of the purchase price over the amounts

91

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

allocated to assets acquired, liabilities assumed and the deferred tax liability was approximately $9.4 million, which has been recorded as goodwill. The historical results of operations for Car360 were not significant to the Company's consolidated results of operations for the periods presented.

The following table summarizes intangible assets and goodwill related to the Car360 acquisition as of December 31, 2020 and 2019:

|  | | December 31, | |
|  | Useful Life | 2020 | 2019 |
|  | | (in thousands) | |
| Intangible assets: | | | |
| Developed technology | 7 years | $ 8,642 | $ 8,642 |
| Customer relationships | 2 years | — | 523 |
| Non-compete agreements | 5 years | 774 | 774 |
| Intangible assets, acquired cost | | 9,416 | 9,939 |
| Less: accumulated amortization | | (3,773) | (2,707) |
| Intangible assets, net | | $ 5,643 | $ 7,232 |
| | | | |
| Goodwill | N/A | $ 9,353 | $ 9,353 |

Amortization expense was $1.6 million during both of the years ended December 31, 2020 and 2019 and $1.1 million during the year ended December 31, 2018. As of December 31, 2020, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 4.1 years. The anticipated annual amortization expense to be recognized in future years as of December 31, 2020 is as follows:

|  | Expected Future Amortization |
|  | (in thousands) |
| 2021 | $ 1,389 |
| 2022 | 1,389 |
| 2023 | 1,279 |
| 2024 | 1,235 |
| 2025 | 351 |
| Thereafter | — |
| Total | $ 5,643 |

92

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

## NOTE 5 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of December 31, 2020 and 2019:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| | **(in thousands)** | |
| Accounts payable, including $15,509 and $9,549, respectively, due to related parties | $ 66,504 | $ 63,576 |
| Sales taxes and vehicle licenses and fees | 71,504 | 45,812 |
| Accrued compensation and benefits | 34,531 | 21,726 |
| Accrued property and equipment | 33,604 | 23,433 |
| Reserve for returns and cancellations | 25,053 | 19,721 |
| Accrued advertising costs | 20,790 | 11,403 |
| Accrued interest expense | 19,689 | 15,650 |
| Customer deposits | 16,881 | 6,379 |
| Other accrued liabilities | 53,758 | 26,743 |
| Total accounts payable and other accrued liabilities | $ 342,314 | $ 234,443 |

## NOTE 6 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2021 and 2024. The Company has the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the numbers of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in September 2020. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring in 2021 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco inspection and reconditioning centers ("IRCs"). At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

In December 2016, the Company entered into a lease agreement related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In August 2018, the Company entered into an additional lease agreement with a coterminous initial term with Verde for contiguous space to that IRC. The lease agreements required monthly rental payments and could have been extended for four additional five-year periods. In September 2020, to consummate a sale leaseback transaction with an unrelated third party, the Company exercised a pre-existing option to purchase the leased land and related assets from Verde for its net book value of approximately $21.7 million thus terminating the lease agreement. The Company immediately sold such land and related assets along with the Company's leasehold improvements at the IRC to a third party who simultaneously leased back the land and the IRC to the Company.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a lease agreement with DriveTime of a fully operational IRC near Cleveland, Ohio. DriveTime vacated the facility in February 2019, at which point the Company became the sole occupant and began leasing the full facility from DriveTime. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. Before DriveTime vacated the facility, the Company paid a monthly rental fee for facility and shared reconditioning costs, calculated based on the Company's pro rate utilization of space at the IRC in a given month, along with a pro rata share of the facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the year ended December 31, 2020, total costs related to these operating lease agreements, including those noted above, were approximately $7.5 million with approximately $3.0 million and $4.5 million allocated to inventory and selling, general, and administrative expenses, respectively. During the year ended December 31, 2019, total costs related to these operating lease agreements were approximately $7.9 million with approximately $3.3 million and $4.6 million allocated to inventory and selling, general, and administrative expenses, respectively. During the year ended December 31, 2018, total costs related to these operating lease agreements were approximately $8.8 million with approximately $4.4 million allocated to each of inventory and selling, general, and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company became the sole occupant in April 2019. The lease expires in four years, subject to the ability to exercise three renewal options of five years each. DriveTime remained an occupant of the facility through April 1, 2019 but is not fully released from lease obligations by the landlord.

During the year ended December 31, 2019, the Company purchased certain leasehold improvements and equipment from DriveTime at facilities the Company previously shared with them for DriveTime's net book value of approximately $6.3 million.

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was approximately $1.0 million during the year ended December 31, 2020, and approximately $0.9 million during both of the years ended December 31, 2019 and 2018.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. During the years ended December 31, 2020 and 2019, the rent expense incurred under the lease with Verde was approximately $0.8 million and $0.0 million, respectively.

94

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Wholesale Revenue**

In 2020, DriveTime began purchasing wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party. As a result, the Company recognized approximately $4.1 million of wholesale revenue from DriveTime during the year ended December 31, 2020.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the years ended December 31, 2020, 2019, and 2018, the Company recognized approximately $93.6 million, $55.6 million, and $23.7 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing. During the years ended December 31, 2020, 2019, and 2018, the Company recognized approximately $11.1 million, $4.1 million, and $1.9 million, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-contract fee to DriveTime to administer the limited warranty included with every purchase and a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. As of February 2020, all of the Company's on-going GAP waiver coverage sales began to be administered by an unrelated party. The Company incurred approximately $6.1 million, $4.3 million, and $2.2 million during the years ended December 31, 2020, 2019, and 2018, respectively, related to the administration of limited warranty and GAP waiver coverage.

**GAP Waiver Insurance Policy**

The Company purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $1.8 million during the year ended December 31, 2019 and for a nominal amount during the year ended December 31, 2020, that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that the Company sold in its securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, the Company entered into a retrospective profit sharing agreement with BlueShore under which the Company shares in the profits generated from the insurance policies by receiving a portion of the excess of the premium it paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. As of December 31, 2020 and 2019, the Company held a receivable of approximately $0.1 million and $0.2 million, respectively, which is included in other assets on the accompanying consolidated balance sheets, related to this retrospective profit sharing agreement.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $6.1 million, $4.2 million, and $0.9 million for the years ended December 31, 2020, 2019, and 2018, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime in 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The

95

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Company reimbursed DriveTime approximately $0.2 million during the year ended December 31, 2020, and approximately $0.5 million during both of the years ended December 31, 2019 and 2018 under this agreement.

**Accounts Payable Due to Related Party**

As of December 31, 2020 and 2019, approximately $15.5 million and $9.5 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying consolidated balance sheets.

**Senior Unsecured Notes Held by Verde**

As of December 31, 2019, Verde held $15.0 million of principal of the Company's outstanding 2023 Notes. In October 2020, the Company redeemed all of the 2023 Notes, including the amount held by Verde, as defined and further discussed in Note 9 — Debt Instruments.

**Contribution Agreements**

On September 10, 2018, the Company announced a commitment by its Chief Executive Officer, Ernest Garcia III, to contribute shares of the Company's Class A common stock, for each then-current employee from his personal shareholdings to the Company at no charge (the "Share Contributions"). His contributions funded equity awards of 165 restricted stock units to each of the Company's then-current employees upon their satisfying certain employment tenure requirements (the "100k Milestone Gift"). The Company entered into certain contribution agreements related to his commitment in order to effect the transfer of shares from Mr. Garcia to the Company. The Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, but pursuant to a series of Contribution Agreements, it has indemnified Mr. Garcia from any such obligations that may arise. See Note 10 — Stockholders' Equity and Note 12 — Equity-Based Compensation for further discussion. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis after February 2019, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred nominal expenses related to the Shared Services Agreement during all the years ended December 31, 2020, 2019, and 2018.

**NOTE 7 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial (the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2020, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, commit the purchaser to purchase up to a maximum of

96

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

$3.0 billion of principal balances of finance receivables from March 24, 2020 through March 23, 2021, broaden the set of finance receivables covered by the MPSA, and provide additional flexibility in the timing of sales of finance receivables.

During the years ended December 31, 2020, 2019, and 2018, the Company sold approximately $2.2 billion, $418.8 million, and $733.4 million, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.1 billion of unused capacity as of December 31, 2020.

**Transfer Agreements**

*2017 Master Transfer Agreement*

In November 2017, the Company entered into a master transfer agreement (the "2017 Master Transfer Agreement") with a purchaser trust (the "2017 Purchaser Trust") under which the 2017 Purchaser Trust committed to purchase an aggregate amount of principal balances of finance receivables.

On May 7, 2019, the Company purchased the certificate of the 2017 Purchaser Trust for $34.0 million, net of cash acquired. At the time of acquisition the trust assets included $139.7 million of finance receivables that the Company had previously sold to the trust under the 2017 Master Transfer Agreement, and its liabilities included $105.7 million in associated debt and other liabilities. In connection with the certificate purchase, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement (the "A&R Loan and Security Agreement") pursuant to which Ally Bank agreed to provide a $350.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company, as further described in Note 9 — Debt Instruments. In February 2020, the 2017 Master Transfer Agreement terminated in connection with the termination of the A&R Loan and Security Agreement, as referenced in Note 9 — Debt Instruments.

During the years ended December 31, 2019, prior to the acquisition of the certificate in the trust, and December 31, 2018, the Company sold approximately $139.3 million and $348.8 million, respectively, in principal balances of finance receivables under the 2017 Master Transfer Agreement.

During the year ended December 31, 2019, prior to the acquisition of the certificate in the trust, the Company also purchased finance receivables that it previously sold to the 2017 Purchaser Trust under the 2017 Master Transfer Agreement for a total price of approximately $127.7 million and immediately resold such finance receivables into a securitization transaction, which is described further in Note 8 — Securitizations and Variable Interest Entities. This transaction was entered into in connection with the securitization transaction and was entered into independently from the terms of the 2017 Master Transfer Agreement.

*2018 Transfer Agreement*

On December 21, 2018, the Company entered into a transfer agreement (the "2018 Transfer Agreement") with a purchaser trust under which the trust purchased principal balances of finance receivables from the Company, a portion of which were related to a refinancing transaction, discussed further below. During the year ended December 31, 2018, the Company sold approximately $115.0 million in principal balances of finance receivables under the 2018 Transfer Agreement, excluding those that were part of the refinancing transactions described below.

*Refinancing Transactions*

During the year ended December 31, 2018, the Company purchased finance receivables that it previously sold to the 2017 Purchaser Trust under the 2017 Master Transfer Agreement for a total price of approximately $387.4 million and immediately resold such finance receivables to other trusts with the same certificate holder for the same price under separate transfer agreements, one of which was the 2018 Transfer Agreement. Other than customary repurchase obligations, the Company is not obligated to, nor does it have a right to, purchase or sell finance receivables it has previously sold under the 2017 Master Transfer Agreement. These transactions completed in 2018 were entered into in connection with a refinancing by the trusts' certificate holder and were entered into independently from the terms of the 2017 Master Transfer Agreement. The Company received fees totaling approximately $6.3 million for structuring and participating in these transactions, which are included in other sales and revenues in the accompanying consolidated statements of operations.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Securitization Transactions**

Beginning in 2019, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 8 — Securitizations and Variable Interest Entities.

During the years ended December 31, 2020 and 2019, the Company sold approximately $899.8 million and $1.9 billion, respectively, in principal balances of finance receivables through securitization transactions.

**Fixed Pool Loan Sales**

In 2020, the Company further expanded its finance platform by completing fixed pool loan sales to a new financing partner on terms substantially similar to the Company's securitization transactions and MPSA sales, including a sale of approximately $320.0 million in principal balances of finance receivables in December 2020.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was approximately $217.6 million, $137.3 million, and $51.7 million during the years ended December 31, 2020, 2019, and 2018, respectively, which is included in other sales and revenues in the accompanying consolidated statements of operations.

**NOTE 8 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 7 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include but are not limited to rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of December 31, 2020, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. The Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying consolidated balance sheets, which as of December 31, 2020 and 2019 were approximately $131.3 million and $98.8 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of December 31, 2020.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at December 31, 2020 and 2019. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value

98

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | December 31, 2020 | | December 31, 2019 | |
| | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| --- | --- | --- | --- | --- |
| | (in thousands) | | | |
| Rated notes | $ 97,794 | $ 97,794 | $ 85,234 | $ 85,234 |
| Certificates and other assets | 33,480 | 33,480 | 13,546 | 13,546 |
| Total unconsolidated VIEs | $ 131,274 | $ 131,274 | $ 98,780 | $ 98,780 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. As described in Note 9 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of December 31, 2020 and 2019 were as follows:

| | December 31, 2020 | | December 31, 2019 | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| --- | --- | --- | --- | --- |
| | (in thousands) | | | |
| Rated notes | $ 96,141 | $ 97,794 | $ 84,983 | $ 85,234 |
| Certificates and other assets | 28,015 | 33,480 | 13,456 | 13,546 |
| Total securities available for sale | $ 124,156 | $ 131,274 | $ 98,439 | $ 98,780 |

## NOTE 9 — DEBT INSTRUMENTS

Debt instruments, excluding finance leases, which are discussed in Note 15 — Leases, as of December 31, 2020 and 2019 consisted of the following:

| | December 31, | |
| | 2020 | 2019 |
| --- | --- | --- |
| | (in thousands) | |
| Asset-Based Financing: | | |
| Floor Plan Facility | $ 39,820 | $ 515,487 |
| Finance Receivable Facilities | — | 53,353 |
| Financing of beneficial interests in securitizations | 81,259 | 84,982 |
| Notes payable | 25,167 | 31,757 |
| Real estate financing | 387,380 | 177,221 |
| Total asset-based financing | 533,626 | 862,800 |
| Senior Notes [1] | 1,100,000 | 600,000 |
| Total debt | 1,633,626 | 1,462,800 |
| Less: current portion | (78,912) | (606,644) |
| Less: unamortized premium and debt issuance costs [2] | (21,322) | (13,642) |
| Total long-term debt, net | $ 1,533,392 | $ 842,514 |

(1) As of December 31, 2020 and 2019, Verde held $0.0 million and $15.0 million, respectively, of the Senior Notes, as hereafter defined.

(2) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying consolidated balance sheets. Unamortized debt issuance costs related to

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

revolving debt arrangements are presented within other current assets and other assets on the accompanying consolidated balance sheets. The unamortized premium is presented as an increase to the carrying amount of the Senior Notes at December 31, 2019 on the accompanying consolidated balance sheet.

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by the Company's vehicles, general intangibles, accounts receivable, and finance receivables. Under the Floor Plan Facility, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts. The Floor Plan Facility also requires monthly interest payments and that at least 7.5% of the total principal amount owed to the lender is held as restricted cash.

Effective October 1, 2020, the Company amended the Floor Plan Facility to increase the line of credit to $1.25 billion, reduce the interest rate to one-month LIBOR plus 3.15% irrespective of the outstanding balance, and extend the maturity date to March 31, 2023. The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter.

For the year ended December 31, 2020, the Company's effective interest rate on the Floor Plan Facility was approximately 3.87%, the Company had an outstanding balance under this facility of approximately $39.8 million, unused capacity of approximately $1.21 billion, and held approximately $3.1 million in restricted cash related to this facility. As of December 31, 2019, the interest rate on the Floor Plan Facility was 4.91%, the Company had an outstanding balance of approximately $515.5 million, unused capacity of approximately $434.5 million, and held approximately $38.7 million in restricted cash related to this facility.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could increase this commitment in $25.0 million increments up to $500.0 million with the lender's consent, and can draw upon this facility until July 23, 2021. On October 28, 2020, the Company increased its commitment under this facility to $500.0 million.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until February 20, 2022.

Both facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. Both facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of December 31, 2020, the Company had no amounts outstanding under these facilities, unused capacity of $1.0 billion, and held approximately $25.2 million in restricted cash related to these facilities. For the year ended December 31, 2020, the Company's effective interest rate on these facilities was approximately 2.77%.

100

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

*Past Finance Receivable Facilities*

In April 2019, the Company and Ally Bank entered in a Loan and Security Agreement pursuant to which Ally Bank agreed to provide a $300.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus a spread ranging from 1.00% to 1.80%.

In May 2019, in connection with the acquisition of the Purchaser Trust described in Note 7 — Finance Receivable Sale Agreements, the Company and Ally Bank entered into the A&R Loan and Security Agreement to provide an additional $350.0 million revolving credit facility to fund certain other automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus 1.95%.

Both credit facilities required that at least 2% of the outstanding pledged finance receivables principal balances, plus any undistributed amounts collected on the pledged finance receivables amount, be held as restricted cash. Interest payments on these credit facilities were payable monthly on each draw date. Principal repayments occurred on the fifteenth day of each calendar month in an amount equal to the undistributed receivables collected.

As of December 31, 2019, these credit facilities had an interest rate ranging between approximately 2.76% and 3.71%, and the Company had an outstanding balance under these facilities of approximately $53.4 million, unused capacity of $596.6 million, and held approximately $3.7 million in restricted cash related to these facilities.

The Company voluntarily terminated these facilities in February 2020 after entering into the active finance receivable facilities described above.

**Long-Term Debt**

*Senior Unsecured Notes*

Since 2018, the Company has issued various senior unsecured notes, each as further described below (collectively, the "Senior Notes").

*2025 and 2028 Senior Unsecured Notes*

On October 2, 2020, the Company issued $500.0 million in aggregate principal amount of 5.625% senior unsecured notes due October 1, 2025 (the "2025 Notes") and $600.0 million aggregate principal amount for 5.875% senior unsecured notes due October 1, 2028 (the "2028 Notes" and, collectively, the "2025 and 2028 Notes"). The 2025 and 2028 Notes were newly issued under separate indentures (the "2025 Indenture", the "2028 Indenture", and, collectively, the "Indentures"), each dated as of October 2, 2020, entered into by and among the Issuer, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The interest on the 2025 and 2028 Notes is payable semi-annually on April 1 and October 1 of each year, beginning on April 1, 2021. The 2025 Notes and 2028 Notes mature on October 1, 2025 and October 1, 2028, respectively, unless earlier repurchased or redeemed, and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales of its finance receivables, if any).

The Company may redeem some or all of the 2025 Notes on or after October 1, 2022 at redemption prices set forth in the 2025 Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2022, the Company may redeem up to 35.0% of the aggregate principal amount of the 2025 Notes at a redemption price equal to 105.625%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the 2025 Notes prior to October 1, 2022, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the 2025 Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Company may redeem some or all of the 2028 Notes on or after October 1, 2023 at redemption prices set forth in the 2028 Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2023, the Company may redeem up to 35.0% of the aggregate principal amount of the 2028 Notes at a redemption price equal to 105.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity

101

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

offerings. In addition, the Company may, at its option, redeem some or all of the 2028 Notes prior to October 1, 2023, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the 2028 Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures governing the 2025 and 2028 Notes contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain important exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if the 2025 and 2028 Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default. As of December 31, 2020, the Company was in compliance with all covenants.

In connection with the issuance of the 2025 and 2028 Notes, Carvana Group amended and restated its LLC agreement to, among other things, authorize the issuance of preferred units, which Carvana Co. purchased with its net proceeds from the issuance of the 2025 and 2028 Notes, as further discussed in Note 10 — Stockholders' Equity.

The outstanding principal of the 2025 and 2028 Notes, net of unamortized debt issuance costs, was approximately $1.1 billion as of December 31, 2020 and is included in long-term debt in the accompanying consolidated balance sheet.

*2023 Senior Unsecured Notes*

On September 21, 2018, the Company issued an aggregate of $350.0 million in senior unsecured notes due 2023 (the "2023 Existing Notes") under an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee (the "2023 Indenture"). On May 24, 2019, the Company issued $250.0 million in aggregate principal amount of additional notes (the "2023 Additional Notes") under the Indenture, at a 100.5% premium. The 2023 Existing Notes and 2023 Additional Notes (together the "2023 Notes") were treated as a single class for all purposes and had the same terms. The 2023 Notes accrued interest at a rate of 8.875% per annum, which was payable semi-annually in arrears on April 1 and October 1 of each year beginning April 1, 2019. The 2023 Notes were set to mature on October 1, 2023, unless earlier repurchased or redeemed, and were guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales of its finance receivables, if any). The Company could redeem some or all of the 2023 Notes on or after October 1, 2020 at redemption prices set forth in the 2023 Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2020, the Company could redeem up to 35.0% of the aggregate principal amount of the 2023 Notes at a redemption price equal to 108.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company could, at its option, redeem some or all of the 2023 Notes prior to October 1, 2020, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experienced certain change of control events, it had to make an offer to purchase all of the 2023 Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The 2023 Indenture governing the 2023 Notes contained restrictive covenants that limited the ability of the Company to, among other things, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants would have been suspended if the 2023 Notes were assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default.

In connection with the issuance of the 2023 Notes, Carvana Group amended its LLC agreement to create a class of non-convertible preferred units, which Carvana Co. purchased with its net proceeds from the issuance of the 2023 Notes, as further discussed in Note 10 — Stockholders' Equity.

On October 2, 2020, the Company used approximately $626.8 million of the proceeds from the issuance of its 2025 and 2028 Notes, described above, to redeem in full the $600.0 million aggregate principal amount of its 2023 Notes by exercising

102

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

its option to redeem all of the 2023 Notes at the redemption price set forth in the 2023 Indenture, plus accrued interest. The Company incurred $33.7 million of debt extinguishment costs, including $26.6 million of redemption premium and $7.1 million related to derecognizing unamortized debt issuance costs and premium, which is included in interest expense on the accompanying consolidated statement of operations. The payment of the redemption premium is included within payments on long-term debt within financing activities on the accompanying consolidated statement of cash flows.

The outstanding principal of the 2023 Notes, net of unamortized debt issuance costs and including the premium, was approximately $591.1 million as of December 31, 2019, of which $15.0 million of principal was held by Verde, and is included in long-term debt in the accompanying consolidated balance sheet.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of December 31, 2020 and 2019, the outstanding principal of these notes had a weighted-average interest rate of 7.1% and 6.6%, respectively, and totaled approximately $25.2 million and $31.8 million, respectively, of which approximately $17.4 million and $10.9 million, respectively, was due within the next twelve months and included as current portion of long-term debt in the accompanying consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of December 31, 2020, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of December 31, 2020 and 2019, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $384.6 million and $174.7 million, respectively, and was included in long-term debt in the accompanying consolidated balance sheets.

In November 2017, the Company entered into a master sale-leaseback agreement (the "Master Sale-Leaseback Agreement" or "MSLA"), which was amended in November 2018, pursuant to which it could sell and lease back certain of its owned or leased properties and construction improvements. This agreement expired in November 2020. Under the MSLA, at any time the Company could elect to, and beginning in November 2020 or until a property owner of a leased site consented to the sale-leaseback, the purchaser had the right to demand that the Company repurchase one or more properties sold and leased back pursuant to the MSLA for an amount equal to the repurchase price. Repurchase prices were defined in each of the applicable leases and are generally the original purchase prices plus any accrued and unpaid rent. Under the MSLA, the total sales price of properties the Company could sell and lease back at any point in time was limited to $75.0 million. As of December 31, 2019, the Company could sell and lease back approximately $75.0 million of its property and equipment under the MSLA.

*Financing of Beneficial Interests in Securitizations*

Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase. As discussed in Note 8 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules.

As of December 31, 2020 and 2019, the Company has pledged approximately $81.3 million and $85.0 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreement with expected repurchases ranging from January 2026 to September 2027. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of

103

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was approximately $79.4 million and $82.7 million, respectively, as of December 31, 2020 and 2019, of which approximately $21.9 million and $26.4 million, respectively, is included in current portion of long-term debt in the accompanying consolidated balance sheets.

The following table summarizes the aggregate maturities due in each period for notes payable, Senior Notes, and financing of beneficial interests in securitizations as of December 31, 2020. Maturities related to financing of beneficial interests in securitizations are estimated based on expected timing of payments from the securitization trusts to the lender.

|  | As of December 31, 2020 |
| --- | ---: |
|  | (in thousands) |
| 2021 | $ 39,764 |
| 2022 | 31,340 |
| 2023 | 21,012 |
| 2024 | 11,561 |
| 2025 | 502,750 |
| Thereafter | 600,000 |
| Total | $ 1,206,427 |

**NOTE 10 — STOCKHOLDERS' EQUITY**

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50.0 million shares of Preferred Stock, par value $0.01 per share, (ii) 500.0 million shares of Class A common stock, par value $0.001 per share, and (iii) 125.0 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC Units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of December 31, 2020, there were approximately 215.1 million and 3.1 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on December 31, 2020), respectively,

104

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

issued and outstanding. As of December 31, 2019, there were approximately 189.7 million and 4.9 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on December 31, 2019), respectively, issued and outstanding. As discussed in Note 12 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan"), are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 30, 2018, the Company completed a public equity offering of 6.6 million shares of its Class A common stock at a public offering price of $27.50 per share and received net proceeds from the offering of approximately $172.3 million after underwriting discounts and commissions and offering expenses. The Company used the net proceeds to purchase approximately 8.3 million newly-issued LLC Units in Carvana Group. A holder of Class A common stock (the "Selling Stockholder") and certain LLC Unitholders (the "Selling LLC Unitholders") sold a total of approximately 6.1 million shares of Class A common stock as part of the offering. The Selling LLC Unitholders exchanged approximately 6.9 million LLC Units for approximately 5.6 million shares of Class A common stock to be sold in the offering, and to the extent such Selling LLC Unitholder held Class B common stock, the corresponding shares of Class B common stock were immediately retired by the Company. The Company did not receive any proceeds from the sale of the approximately 6.1 million shares of Class A common stock by the Selling Stockholder and the Selling LLC Unitholders.

On May 24, 2019, the Company completed a public equity offering of 4.2 million shares of its Class A common stock at a public offering price of $65.00 per share and received net proceeds from the offering of approximately $258.8 million after underwriting discounts and commissions and offering expenses. As part of the offering, the Company granted the underwriters a 30-day option to purchase all or part of approximately 0.6 million additional shares of Class A common stock. On June 20, 2019, the underwriters exercised their option in full for an additional $38.9 million in proceeds after offering expenses. The Company used the net proceeds to purchase approximately 6.0 million newly-issued LLC Units in Carvana Group.

On April 1, 2020, the Company completed a registered direct offering to investors of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Ernest Garcia II, through Verde, and Ernest Garcia III each invested approximately $25.0 million, or approximately 0.6 million shares of the Class A common stock, in the offering. The Company used the net proceeds to purchase approximately 16.7 million newly-issued LLC Units in Carvana Group.

On May 21, 2020, the Company completed a public equity offering of 5.0 million shares of its Class A common stock at an offering price of $92.00 per share and received net proceeds from the offering of approximately $459.5 million. The Company used the net proceeds to purchase approximately 6.3 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the years ended December 31, 2020 and 2019, certain LLC Unitholders exchanged 9.1 million and 5.4 million LLC Units and 5.6 million and 3.1 million shares of Class B common stock for 7.3 million and 4.3 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received 9.1 million and 5.4 million LLC Units during the years ended December 31, 2020 and 2019, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units

105

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

were created in connection with Carvana Co.'s issuance of the 2023 Notes in September 2018 and May 2019, as discussed further and defined in Note 9 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1,100,000 Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. Carvana Co. used its net proceeds from the 2023 Notes and the 2025 and 2028 Notes to purchase 600,000 and 1,100,000 Class A Non-Convertible Preferred Units, respectively. In the event Carvana Co. makes payments on the Senior Notes, Carvana Group will make an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit shall be canceled and retired.

As discussed further in Note 9 — Debt Instruments, the Company redeemed its 2023 Notes on October 2, 2020 using a portion of its net proceeds from the issuance of its 2025 and 2028 Notes, at which point 600,000 Class A Non-Convertible Preferred Units were canceled and retired.

**Convertible Preferred Stock**

On December 5, 2017, Carvana Co. sold 100,000 shares of Convertible Preferred Stock for a purchase price of $100.0 million and net proceeds of approximately $98.5 million, which it used to purchase 100,000 Convertible Preferred Units of Carvana Group at a price per unit equal to the initial stated value of the Convertible Preferred Stock less issuance costs. The Convertible Preferred Stock has a par value of $0.01 per share and a liquidation value of $1,000 per share.

At the holder's request beginning on January 29, 2018, any or all shares of the Convertible Preferred Stock were convertible into shares of Class A common stock at an initial conversion rate of 50.78 shares of Class A common stock per share of Convertible Preferred Stock. On or after December 5, 2018, the Company had the option to cause all shares of Convertible Preferred Shares to be converted into shares of Class A common stock or cash, at the Company's election, if the 10-day volume-weighted average price equaled or exceeded 150% of the conversion price as set forth in the agreement. In the event Carvana Co. issued any shares of Class A common stock upon conversion of any shares of Convertible Preferred Stock or in connection with any change of control repurchase of shares of Convertible Preferred Stock, a corresponding number of Convertible Preferred Units would be canceled and cease to be outstanding, and Carvana Group would issue Class A Units to Carvana Co. on a four-to-five ratio between the number of shares of Class A common stock issued by Carvana Co. to the holders of the Convertible Preferred Stock and the number of Class A Units issued.

During the year ended December 31, 2018, at the holder's request 75,000 shares of Convertible Preferred Stock, and at the Company's election 25,000 shares of Convertible Preferred Stock, were converted into a total of approximately 5.1 million shares of Class A common stock. Simultaneously, and in connection with these conversions, 100,000 Convertible Preferred Units were canceled and Carvana Group issued approximately 6.3 million Class A Units to Carvana Co.

The initial conversion price was $19.6945, which was calculated based on a 20.0% premium to the volume weighted average price for Class A common stock during the 5 trading days immediately preceding December 4, 2017. Following announcement of the transaction, the share price of Class A common stock increased and exceeded the conversion price on the commitment date and resulted in a beneficial conversion feature ("BCF") of approximately $2.6 million. The BCF was originally recorded as a reduction of the Convertible Preferred Stock with an offset to additional paid-in capital. The BCF accreted as a deemed dividend through January 29, 2018, the first available conversion date, increasing the carrying value of the Convertible Preferred Stock with an offsetting charge to additional paid-in capital. During the year ended December 31, 2018, the Company recorded approximately $1.4 million in accretion related to the BCF.

Upon a change of control, as defined in the agreement, any holder of Convertible Preferred Stock had the option to require the Company (or its successor) to purchase, any or all of its Convertible Preferred Stock at a purchase price per share, payable at the Company's option in any combination of cash or shares of Class A common stock, of 101% of the liquidation preference, plus all accumulated dividends.

Holders of the Convertible Preferred Stock had no voting rights. The Convertible Preferred Stock ranked senior, as to payment of dividends and distributions of assets upon the liquidation, dissolution or winding up of Company, to the Company's common stock and any shares of capital stock of the Company not expressly ranking senior to or pari passu with the Convertible Preferred Stock, and junior to all shares of capital stock of the Company issued after the issuance of the

106

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Convertible Preferred Stock, if the terms of which expressly provided that such shares would rank senior to the Convertible Preferred Stock.

The Convertible Preferred Stock accrued dividends at 5.5% per annum of the liquidation preference of $1,000 per share. The dividends were payable in cash quarterly commencing March 15, 2018 so long as the Company had funds legally available and the Board declared a cash dividend payable. The Company could not declare dividends on shares of its common stock or purchase or redeem shares of its common stock, unless all accumulated and unpaid dividends on the Convertible Preferred Stock had been paid in full or a sum for such amounts had been set aside for payment. As the Company declared and paid dividends on the Convertible Preferred Stock, Carvana Group made distributions to Carvana Co. with respect to the Convertible Preferred Units in an amount equal to the related Convertible Preferred Stock dividend amount and any corresponding tax payments.

During the year ended December 31, 2018, the Company paid approximately $4.6 million of dividends to the holders of the Convertible Preferred Stock and Carvana Group distributed approximately $4.6 million to Carvana Co. with respect to the Convertible Preferred Units.

As of December 31, 2018, there were no outstanding shares of Convertible Preferred Stock and no related accrued dividends.

**Contributions of Class A Common Shares From Ernest Garcia III**

During the years ended December 31, 2019 and 2018, the Company and its Chief Executive Officer, Ernest Garcia III, entered into contribution agreements (the "Contribution Agreements") in connection with the 100k Milestone Gift, as defined in Note 6 — Related Party Transactions. Pursuant to the Contribution Agreements, Mr. Garcia contributed approximately 0.2 million shares of the Company's Class A common stock to the Company during both the years ended December 31, 2019 and 2018, at no charge. The Company subsequently granted approximately 0.2 million restricted stock units during both the years ended December 31, 2019 and 2018 to employees. Refer to Note 12 — Equity-Based Compensation for further discussion. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, it has indemnified Mr. Garcia from any such obligations that may arise. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**NOTE 11 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the issuance of restricted or non-restricted stock, exercise of options, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications, and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the years ended December 31, 2020, 2019, and 2018, the total adjustments related to exchanges of LLC Units was a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $32.7 million, $4.9 million, and $15.8 million, respectively, which has been included in exchanges of LLC Units in the accompanying consolidated statement of stockholders' equity. During the years ended December 31, 2020, 2019, and 2018, Carvana Co. utilized its net proceeds from its equity offerings to purchase LLC Units, which resulted in an adjustment to increase non-

107

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

controlling interests and to decrease additional paid-in capital by approximately $643.9 million, $201.0 million, and $132.4 million, respectively, which has been included in adjustment to non-controlling interests related to equity offering in the accompanying consolidated statement of stockholders' equity.

During the year ended December 31, 2018, Carvana Group issued approximately 0.5 million Class A Units with a fair value of approximately $10.0 million as part of the purchase price consideration for Car360, which is reflected as an increase in non-controlling interests in the accompanying consolidated statement of stockholders' equity. The adjustment related to the issuance of Class A Units to acquire Car360 was a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $1.3 million, which has been included in adjustment to non-controlling interests related to business acquisitions in the accompanying consolidated statement of stockholders' equity. During the year ended December 31, 2018, the 100,000 shares of Convertible Preferred Stock converted into approximately 5.1 million shares of Class A common stock, Carvana Co. canceled and retired 100,000 Convertible Preferred Units, and Carvana Group issued approximately 6.3 million Class A Units to Carvana Co. The adjustment related to the conversion of Convertible Preferred Stock was an increase in non-controlling interests and a corresponding decrease in additional paid-in capital of approximately $68.0 million, which has been included in adjustment to non-controlling interests related to conversion of Class A Convertible Preferred Stock in the accompanying consolidated statement of stockholders' equity.

As of December 31, 2020, Carvana Co. owned approximately 43.8% of Carvana Group with the LLC Unitholders owning the remaining 56.2%. The net loss attributable to the non-controlling interests on the accompanying consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

The following table summarizes the effects of changes in ownership in Carvana Group on the Company's equity during the years ended December 31, 2020, 2019, and 2018:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| | (in thousands) | | |
| Transfers (to) from non-controlling interests: | | | |
| Decrease as a result of issuance of Class A common stock | $ (643,886) | $ (201,015) | $ (132,375) |
| Increase as a result of Carvana Group's issuance of Class A Units in connection with business acquisitions | — | — | 1,297 |
| Increase as a result of exchanges of LLC Units | 32,728 | 4,948 | 15,828 |
| Decrease as a result of conversion of Class A Convertible Preferred Stock | — | — | (67,972) |
| Total transfers to non-controlling interests | $ (611,158) | $ (196,067) | $ (183,222) |

108

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

## NOTE 12 — EQUITY-BASED COMPENSATION

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity based compensation recognized during the years ended December 31, 2020, 2019, and 2018 is as follows:

| | For the Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2020 | | 2019 | | 2018 | |
| | (in thousands) | | | | | |
| Class B Units | $ | 1,225 | $ | 2,361 | $ | 2,474 |
| Restricted Stock Units and Awards excluding those granted in relation to the 100k Milestone Gift | | 20,853 | | 13,057 | | 6,897 |
| Restricted Stock Units granted in relation to the 100k Milestone Gift | | — | | 12,694 | | 12,120 |
| Options | | 6,967 | | 5,377 | | 2,357 |
| Class A Units | | 1,527 | | 2,184 | | 1,897 |
| Total equity-based compensation | | 30,572 | | 35,673 | | 25,745 |
| Equity-based compensation capitalized to property and equipment | | (5,484) | | (2,610) | | (1,650) |
| Equity-based compensation capitalized to inventory | | (309) | | (4,505) | | (3,776) |
| Equity-based compensation, net of capitalized amounts | $ | 24,779 | $ | 28,558 | $ | 20,319 |

During the years ended December 31, 2020, 2019, and 2018, the Company capitalized approximately $5.5 million, $2.6 million, and $1.7 million, respectively, of equity-based compensation to property and equipment related to software development and real estate projects and approximately $0.3 million, $4.5 million, and $3.8 million, respectively, to inventory related to reconditioning and inbound transportation of vehicles. All other equity-based compensation is included in selling, general, and administrative expenses in the accompanying consolidated statements of operations.

As of December 31, 2020, unrecognized equity-based compensation related to outstanding awards and the related weighted-average period over which it is expected to be recognized subsequent to December 31, 2020 is presented in the table below. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

| | Unrecognized Equity-Based Compensation Related to Outstanding Awards (in thousands) | | Remaining Weighted-Average Amortization Period (in years) |
| --- | --- | --- | --- |
| Class B Units | $ | 1,020 | 1.1 |
| Restricted Stock Units and Awards | | 48,813 | 2.7 |
| Options | | 16,013 | 2.6 |
| Class A Units | | 1,689 | 1.3 |
| Total unrecognized equity-based compensation | $ | 67,535 | |

### 2017 Omnibus Incentive Plan

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan 14.0 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other stock-based awards to employees, directors, officers, and consultants. The majority of equity granted by the Company vests over four-year periods based on continued employment with the Company. As of December 31, 2020, approximately 9.8 million shares remain available for future equity-based award grants under this plan.

*Restricted Stock Awards and Restricted Stock Units*

Restricted stock awards ("RSAs") entitle recipients to vote and to receive all dividends declared with respect to such shares, payable upon vesting. RSAs vest over a period of two to five years, subject to the recipient's continued employment or

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

service. The Company did not grant any RSAs during the years ended December 31, 2020 and 2019. During the year ended December 31, 2018, the Company issued certain employees and consultants an aggregate of approximately 0.1 million RSAs pursuant to the terms of the 2017 Incentive Plan with a weighted-average grant-date fair value of $45.05. The Company determined the grant-date fair value of the RSAs based on the closing price of the Company's Class A common stock on the grant date.

Restricted stock units ("RSUs") do not entitle recipients to vote or receive dividends. RSUs generally vest over a period of four years, subject to the recipient's continued employment. During the years ended December 31, 2020, 2019, and 2018, the Company issued certain employees an aggregate of approximately 0.3 million, 0.7 million, and 0.7 million RSUs, respectively, pursuant to the terms of the 2017 Incentive Plan with a weighted-average grant-date fair value of $110.00, $60.91, and $46.41, respectively. The Company determined the grant-date fair value of the RSUs based on the closing price of the Company's Class A common stock on the grant date. RSUs are settled in shares of Class A common stock on a one-to-one basis within thirty days of vesting. As discussed in Note 10 — Stockholders' Equity, included in these RSUs, in connection with the 100k Milestone Gift, during both the years ended December 31, 2019 and 2018 the Company granted approximately 0.2 million RSUs with a vesting period of one week or less following receipt of Class A common stock from its Chief Executive Officer, Ernest Garcia III. The Company recognized approximately $12.7 million and $12.1 million during the years ended December 31, 2019 and 2018, respectively, of equity-based compensation, a portion of which related to the production of the Company's used vehicle inventory and was therefore capitalized to inventory.

RSA and RSU activity during the years ended December 31, 2020, 2019, and 2018 was as follows:

| | Number of RSAs/RSUs (in thousands) | | Weighted-Average Grant-Date Fair Value |
|---|---|---|---|
| Outstanding at January 1, 2018 | 420 | $ | 17.63 |
| Granted | 791 | $ | 46.19 |
| Settled | (391) | $ | 42.35 |
| Forfeited | (56) | $ | 21.64 |
| Outstanding at December 31, 2018[1] | 764 | $ | 34.25 |
| | | | |
| Granted | 672 | $ | 60.91 |
| Settled | (461) | $ | 45.05 |
| Forfeited | (47) | $ | 37.15 |
| Outstanding at December 31, 2019[1] | 928 | $ | 48.04 |
| | | | |
| Granted | 342 | $ | 110.00 |
| Settled | (475) | $ | 45.80 |
| Forfeited | (57) | $ | 70.89 |
| Outstanding at December 31, 2020[1] | 738 | $ | 76.43 |

(1) All outstanding RSAs and RSUs at December 31, 2020, 2019, and 2018 are nonvested.

*Non-Qualified Stock Options*

Non-qualified stock options allow recipients to purchase shares of Class A common stock at a fixed exercise price. The fixed exercise price is equal to the price of a share of Class A common stock at the time of grant. The options typically vest 20% or 25% on the anniversary of the grant date and in equal monthly installments thereafter for a total vesting period of four or five years and expire ten years after the grant date.

110

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Stock option activity during the years ended December 31, 2020, 2019, and 2018 was as follows:

| | Number of Options (in thousands) | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2018 | 755 | $ | 15.60 | 9.5 | $ | 3,000 |
| Options granted | 294 | $ | 44.81 | | | n/a |
| Options exercised | (60) | $ | 13.26 | | $ | 1,224 |
| Options forfeited or expired | (58) | $ | 16.15 | | | n/a |
| Outstanding at December 31, 2018 | 931 | $ | 24.95 | 8.9 | $ | 11,306 |
| | | | | | | |
| Options granted | 364 | $ | 37.70 | | | n/a |
| Options exercised | (104) | $ | 16.28 | | $ | 5,388 |
| Options forfeited or expired | (44) | $ | 17.53 | | | n/a |
| Outstanding at December 31, 2019 | 1,147 | $ | 30.07 | 8.3 | $ | 71,101 |
| | | | | | | |
| Options granted | 179 | $ | 88.56 | | | n/a |
| Options exercised | (195) | $ | 27.82 | | $ | 24,479 |
| Options forfeited or expired | (59) | $ | 16.52 | | | n/a |
| Outstanding at December 31, 2020 | 1,072 | $ | 41.01 | 7.7 | $ | 212,844 |
| | | | | | | |
| Vested and exercisable as of December 31, 2020 | 481 | $ | 28.29 | 7.2 | $ | 101,689 |
| Expected to vest as of December 31, 2020 | 591 | $ | 51.37 | 8.1 | $ | 111,155 |

The Company determined the grant-date fair value of the options granted during the years ended December 31, 2020, 2019, and 2018 using the Black-Scholes valuation model with the following weighted-average assumptions:

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Expected volatility[1] | 70.1 % | 66.7 % | 65.5 % |
| Expected dividend yield | — % | — % | — % |
| Expected term (in years)[2] | 6.14 | 6.11 | 6.00 |
| Risk-free interest rate | 1.4 % | 2.5 % | 3.0 % |
| Weighted-average grant-date fair value per option | $53.62 | $23.87 | $26.93 |

(1) Measured using the Company's historical data and selected high-growth guideline companies and considering the risk factors that would influence the range of expected volatility because the Company does not have sufficient historical data to provide a reasonable basis upon which to estimate the expected volatility for the entirety of the term.

(2) Expected term represents the estimated period of time until an option is exercised and was determined using the simplified method because the Company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term.

**Class A Units**

During the year ended December 31, 2018, the Company granted certain employees approximately 0.4 million Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

A summary of the Class A Unit activity for the years ended December 31, 2020, 2019, and 2018 is as follows:

| | Class A Units | |
|---|---|---|
| | Number of Class A Units (in thousands) | Weighted-Average Grant Date Fair Value |
| Outstanding at January 1, 2018 | — | n/a |
| Granted | 393 | $ 18.58 |
| Exchanged | — | n/a |
| Forfeited | — | n/a |
| Outstanding at December 31, 2018 | 393 | |
| | | |
| Granted | — | n/a |
| Exchanged | (172) | $ 18.58 |
| Forfeited | — | n/a |
| Outstanding at December 31, 2019 | 221 | |
| | | |
| Granted | — | n/a |
| Exchanged | (100) | $ 18.58 |
| Forfeited | — | n/a |
| Outstanding at December 31, 2020 | 121 | |
| | | |
| Vested as of December 31, 2020 | 24 | $ 18.58 |
| Expected to vest as of December 31, 2020 | 97 | $ 18.58 |

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four to five years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Vested Class B Units participate in any distributions of Carvana Group in excess of those required for the Class A Units subject to the participation threshold. As discussed in Note 10 — Stockholders' Equity, grantees may receive shares of the Company's Class A common stock in exchange for Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units granted during the years ended December 31, 2020, 2019, or 2018. As of December 31, 2020, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

112

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

A summary of the Class B Unit activity for the years ended December 31, 2020, 2019, and 2018 is as follows:

| | Class B Units | | |
| --- | --- | --- | --- |
| | Number of Class B Units (in thousands) | Weighted-Average Participation Threshold per Class B Unit | |
| Outstanding at January 1, 2018 | 7,421 | $ | 2.95 |
| Granted | — | | n/a |
| Exchanged | (901) | $ | 0.96 |
| Forfeited | (127) | $ | 10.49 |
| Outstanding at December 31, 2018 | 6,393 | $ | 3.08 |
| | | | |
| Granted | — | | n/a |
| Exchanged | (1,202) | $ | 1.17 |
| Forfeited | (23) | $ | 5.23 |
| Outstanding at December 31, 2019 | 5,168 | $ | 3.51 |
| | | | |
| Granted | — | | n/a |
| Exchanged | (1,991) | $ | 1.22 |
| Forfeited | (14) | $ | 5.81 |
| Outstanding at December 31, 2020 | 3,163 | $ | 4.94 |
| | | | |
| Vested as of December 31, 2020 | 2,962 | $ | 4.56 |
| Expected to vest as of December 31, 2020 | 201 | $ | 10.52 |

## NOTE 13 — LOSS PER SHARE

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented.

113

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

The following table presents the calculation of basic and diluted net loss per share during the years ended December 31, 2020, 2019, and 2018:

|  | For the years ended December 31, | | |
|  | 2020 | 2019 | 2018 |
|  | (in thousands) | | |
| **Numerator:** | | | |
| Net loss | $ (462,222) | $ (364,639) | $ (254,745) |
| Net loss attributable to non-controlling interests | 291,082 | 249,980 | 199,269 |
| Dividends on Class A convertible preferred stock | — | — | (4,206) |
| Accretion of beneficial conversion feature on Class A convertible preferred stock | — | — | (1,380) |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (171,140) | $ (114,659) | $ (61,062) |
| **Denominator:** | | | |
| Weighted-average shares of Class A common stock outstanding | 65,074 | 47,079 | 30,362 |
| Nonvested weighted-average restricted stock awards | (93) | (232) | (319) |
| Weighted-average shares of Class A common stock to compute basic and diluted net loss per Class A common share | 64,981 | 46,847 | 30,043 |
| Net loss per share of Class A common stock, basic and diluted | $ (2.63) | $ (2.45) | $ (2.03) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented. LLC Units (adjusted for the Exchange Ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash.

Weighted-average as-converted shares of Convertible Preferred Stock of approximately 0.0 million for both of the years ended December 31, 2020 and 2019, and 3.9 million for the year ended December 31, 2018 were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Weighted-average as-converted LLC Units of approximately 104.0 million, 106.6 million, and 113.7 million, comprised of approximately 100.7 million, 102.3 million, and 108.9 million Class A Units together with the related Class B common stock and approximately 3.3 million, 4.3 million, and 4.8 million Class B Units, during the years ended December 31, 2020, 2019, and 2018, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Outstanding Class B Units were approximately 3.2 million, 5.2 million, and 6.4 million at December 31, 2020, 2019, and 2018, respectively. Weighted-average potentially dilutive restricted stock awards and units of approximately 0.8 million outstanding for both of the years ended December 31, 2020 and 2019, and 0.5 million outstanding during the year ended December 31, 2018 were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive. As of both the years ended December 31, 2020 and 2019, approximately 1.1 million options were outstanding and 0.9 million options as of December 31, 2018 were outstanding and evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 14 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 10 — Stockholders' Equity, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

114

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Net loss before income taxes was $462.5 million, $364.6 million, and $254.7 million for the years ended December 31, 2020, 2019, and 2018, respectively. The Company had an income tax benefit of $0.3 million for the year ended December 31, 2020 and no income tax expense or benefit for the years ended December 31, 2019 and 2018.

The components of income tax expense (benefits) are as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2020 | 2019 | 2018 |
|  | (in thousands) | | |
| Federal - Current | $ 119 | $ — | $ — |
| Federal - Deferred | (333) | — | — |
|  | (214) | — | — |
| State - Current | 23 | — | — |
| State - Deferred | (64) | — | — |
|  | (41) | — | — |
| Total Benefit | $ (255) | $ — | $ — |

A reconciliation of the U.S. federal rate to the Company's effective income tax rate is as follows:

|  | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2020 | | 2019 | | 2018 | |
|  | Amount | Percent | Amount | Percent | Amount | Percent |
|  | (dollars in thousands) | | | | | |
| Expected U.S. federal income taxes at statutory rate | $ (97,120) | 21.0 % | $ (76,574) | 21.0 % | $ (53,496) | 21.0 % |
| Loss attributable to non-controlling interests | 62,446 | (13.5)% | 52,496 | (14.4)% | 41,024 | (16.1)% |
| State taxes | (9,412) | 2.0 % | (2,945) | 0.8 % | (2,363) | 0.9 % |
| Stock based compensation | (5,112) | 1.1 % | (593) | 0.2 % | (10) | 0.0 % |
| Valuation allowance | 55,554 | (12.0)% | 18,039 | (4.9)% | 14,771 | (5.8)% |
| Effect due to LLC flow-through structure | (6,785) | 1.5 % | 10,004 | (2.7)% | — | — % |
| Other | 174 | 0.0 % | (427) | 0.0 % | 74 | 0.0 % |
| Income tax benefit | $ (255) | 0.1 % | $ — | — % | $ — | — % |

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Deferred income taxes reflect the net tax effects of temporary differences between the tax basis in an asset or liability and its reported amount under U.S. GAAP. These temporary differences result in taxable or deductible amounts in future years. The components of the Company's deferred tax assets are as follows:

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| | (in thousands) | | | |
| Deferred tax assets: | | | | |
| Investment in Carvana Group | $ | 555,574 | $ | 155,775 |
| Net operating loss carryforward | | 98,731 | | 44,771 |
| Interest expense carryforward | | 21,028 | | 13,721 |
| Tax credit carryforward | | 1,944 | | 586 |
| Total gross deferred tax assets | | 677,277 | | 214,853 |
| Valuation allowance | | (677,277) | | (214,853) |
| Total deferred tax assets, net of valuation allowance | $ | — | $ | — |
| | | | | |
| Deferred tax liabilities: | | | | |
| Intangibles | $ | (1,411) | $ | (1,808) |
| Total gross deferred tax liabilities | | (1,411) | | (1,808) |
| Net deferred tax liabilities | $ | (1,411) | $ | (1,808) |

As of December 31, 2020 and 2019, the Company had federal and state net operating loss carry forwards of $414.9 million and $188.2 million, respectively. Federal losses that arose prior to 2018 will begin to expire in 2037. Federal losses generated after 2017 will be carried forward indefinitely.

As described in Note 10 — Stockholders' Equity, the Company acquired 9.1 million LLC Units during the year ended December 31, 2020 in connection with exchanges with Existing LLC Unitholders. During the year ended December 31, 2020, the Company recorded a gross deferred tax asset of $406.9 million associated with the basis difference in its investment in Carvana Group related to the acquisition of the LLC Units which is reflected as an increase to additional paid-in capital in the accompanying statements of stockholders' equity.

As described in Note 10 — Stockholders' Equity, on April 30, 2018, the Company completed a public equity offering of 6.6 million shares of its Class A common stock. The Company recognized a gross deferred tax asset of $2.5 million associated with the portion of the basis difference resulting from the purchase of LLC Units which is reflected as an increase to additional paid-in capital in the accompanying statements of stockholders' equity. The Company has not recorded a deferred tax asset of $30.6 million related to the remaining basis difference associated with the purchase of LLC Units as the difference will only reverse upon the sale of its interest in Carvana Group.

As described in Note 10 — Stockholders' Equity, on May 24, 2019, the Company completed a public equity offering of 4.2 million shares of the Class A common stock. As part of the offering, the underwriters were given an option to purchase all or part of approximately 0.6 million additional shares of Class A common stock which the underwriters exercised in full. The Company recognized a gross deferred asset of approximately $7.5 million associated with a portion of the basis difference resulting from this purchase of LLC Units which is reflected as an increase to additional paid-in capital in the accompanying consolidated statements of stockholders' equity. The Company has not recorded a deferred tax asset of $42.7 million related to the remaining basis difference associated with the purchase of LLC Units as the difference will only reverse upon the sale of its interest in Carvana Group.

As described in Note 10 — Stockholders' Equity, the Company purchased a total of approximately 22.9 million newly-issued LLC Units of Carvana Group in connection with a direct offering and a public equity offering during the year ended December 31, 2020. During the year ended December 31, 2020, the Company recognized a gross deferred tax asset of approximately $14.1 million associated with a portion of the basis difference resulting from this purchase of LLC Units which is reflected as an increase to additional paid-in capital in the accompanying consolidated statements of stockholders' equity. The

116

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Company has not recorded a deferred tax asset of $146.9 million related to the remaining basis difference associated with the purchase of LLC Units as the difference will only reverse upon the sale of its interest in Carvana Group.

As described in Note 4 — Goodwill and Intangible Assets, Carvana Group acquired Car360 on April 12, 2018. The acquisition included various intangible assets, and as a result the Company recognized a deferred tax liability of approximately $2.5 million which is reflected within other liabilities in the accompanying consolidated balance sheets. The deferred tax liability will be amortized over two to seven years, and approximately $0.4 million was amortized during both of the years ended December 31, 2020 and 2019.

During the year ended December 31, 2020, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance of $677.3 million against its deferred tax assets. The Company has $1.4 million of deferred tax liabilities not available to offset deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of the year ended December 31, 2020 and 2019, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The Company does not expect the provisions of the legislation to have a significant impact on the effective tax rate or income tax payable and deferred income tax positions of the Company.

The Company's effective tax rate for the years ended December 31, 2020 and 2019 was a benefit of 0.1% and 0.0%, respectively, related to Car360, a wholly-owned subsidiary acquired in April 2018.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the Existing LLC Unitholders and other qualifying transactions. As described in Note 10 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement (the "TRA"). Under the TRA, the Company generally will be required to pay to the Existing LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

117

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of December 31, 2020, the Company has concluded, based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of December 31, 2020, the total unrecorded TRA liability is approximately $607.3 million. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

**Uncertain Tax Positions**

Based on the Company's analysis of tax positions taken on income tax returns filed, no uncertain tax positions existed as of December 31, 2020, 2019, and 2018. Carvana Co. was formed in November 2016 and did not engage in any operations prior to the IPO and associated organizational transactions. Carvana Co. was not required to file 2016 tax returns and filed its first tax returns for the tax year 2017, the first year it became subject to examination by taxing authorities for U.S. federal and state income tax purposes. Carvana Group is treated as a partnership for U.S. federal and state income tax purposes and its tax returns are subject to examination by taxing authorities. Carvana Group has filed income tax returns for years through 2017. These returns are subject to examination by the taxing authorities in the respective jurisdictions, generally for three or four years after they were filed.

**NOTE 15 — LEASES**

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of December 31, 2020, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking, and corporate offices. The initial terms expire at various dates between 2021 and 2032. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying consolidated balance sheets.

Refer to Note 6 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying consolidated balance sheets.

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

**Lease Costs and Activity**

The Company's lease costs and activity during the years ended December 31, 2020 and 2019 were as follows:

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| | (in thousands) | |
| **Lease Costs:** | | |
| Finance Leases: | | |
| Amortization of finance lease assets | $ 17,602 | $ 8,116 |
| Interest obligations under finance leases | 3,893 | 2,014 |
| Total finance lease expense | $ 21,495 | $ 10,130 |
| | | |
| Operating Leases: | | |
| Fixed lease costs | $ 28,915 | $ 13,333 |
| Fixed lease costs to related parties | 7,462 | 7,469 |
| Variable short-term lease costs to related parties | 1,791 | 1,396 |
| Total operating lease costs | $ 38,168 | $ 22,198 |
| | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | |
| Operating lease liabilities to third party | $ 17,901 | $ 9,600 |
| Operating lease liabilities to related party | $ 7,246 | $ 8,398 |
| Interest payments on finance lease liabilities | $ 3,893 | $ 2,014 |
| | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | |
| Principal payments on finance lease liabilities | $ 19,516 | $ 8,425 |

119

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Maturity of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of December 31, 2020:

| | Finance Leases | Operating Leases [1] Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| | | (in thousands) | | | |
| 2021 | $ 31,426 | $ 5,250 | $ 27,211 | $ 32,461 | $ 63,887 |
| 2022 | 29,037 | 5,243 | 23,521 | 28,764 | 57,801 |
| 2023 | 27,810 | 5,259 | 19,308 | 24,567 | 52,377 |
| 2024 | 20,044 | 3,983 | 14,698 | 18,681 | 38,725 |
| 2025 | 12,231 | 2,860 | 15,329 | 18,189 | 30,420 |
| Thereafter | 2,043 | 5,641 | 131,421 | 137,062 | 139,105 |
| Total minimum lease payments | 122,591 | 28,236 | 231,488 | 259,724 | 382,315 |
| Less: amount representing interest | (12,576) | (6,120) | (86,620) | (92,740) | (105,316) |
| Total lease liabilities | $ 110,015 | $ 22,116 | $ 144,868 | $ 166,984 | $ 276,999 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.

(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of December 31, 2020 and 2019, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of December 31, 2020 and 2019 were as follows, excluding short-term operating leases:

| | December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **Weighted average remaining term (years)** | | |
| Operating leases | 9.8 | 10.6 |
| Finance leases | 4.4 | 4.5 |
| **Weighted-average discount rate** | | |
| Operating leases | 8.3 % | 8.4 % |
| Finance leases | 5.3 % | 5.4 % |

**NOTE 16 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $11.0 million and $3.7 million, as of December 31, 2020 and 2019, respectively, and is included in accounts payable and other accrued liabilities in the accompanying consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, as of December 31, 2020 and 2019, the Company does not believe that the ultimate resolution of any legal actions, either individually or in the aggregate, will have a material adverse effect on its financial position, results of operations, liquidity, and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its own proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

**NOTE 17 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

**Items Measured at Fair Value on a Recurring Basis**

A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies. The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option.

The following tables are a summary of fair value measurements and hierarchy level at December 31, 2020 and 2019:

|  | December 31, 2020 | | | |
|  | Carrying Value | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
|  | (in thousands) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 308,425 | $ 308,425 | $ — | $ — |
| Beneficial interests in securitizations | 131,274 | — | — | 131,274 |

|  | December 31, 2019 | | | |
|  | Carrying Value | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
|  | (in thousands) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 56,435 | $ 56,435 | $ — | $ — |
| Beneficial interests in securitizations | 98,780 | — | 29,222 | 69,558 |

(1) Consist of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying consolidated balance sheets.

As of December 31, 2020 and 2019, the Company has purchase price adjustment receivables of approximately $13.9 million and $6.9 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the Master Purchase and Sale Agreement, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the Master Purchase and Sale Agreement. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables was a gain of approximately $2.1 million during the year ended December 31, 2020, and is reflected in other income, net in the accompanying consolidated statement of operations. There were no adjustments to the fair value of the purchase price adjustment receivables during the year ended December 31, 2019.

121

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Continued)

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 8 — Securitizations and Variable Interest Entities. Level 2 assets typically include beneficial interests in securitization transactions that closed near the end of the period due to the proximity to the end of the period and lack of observable changes in economic inputs. Given the changes in the market and overall economic inputs between pricing and closing of the March 2020 securitization transaction, it was initially classified as Level 3. As the December 2020 securitization transaction occurred in the middle of the month, allowing observable changes in economic inputs to occur before period end, the December 2020 transaction was classified as Level 3 as of December 31, 2020. The March 2020 and December 2020 were the only securitization transactions completed during the year ended December 31, 2020.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of December 31, 2020 and 2019, the discount rates were 1.4% to 10.0% and 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other (income) expense, net in the accompanying consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis.
During the year ended December 31, 2020, the Company transferred beneficial interests acquired as part of the December 2019 securitization transaction initially classified as Level 2 from Level 2 to Level 3. During the year ended December 31, 2019, the Company transferred beneficial interests acquired as part of the securitization transactions in March, June, and September from Level 2 to Level 3. The assets were initially classified as Level 2 due to the transactions' proximity to the end of each respective reporting period and the lack of observable changes in economic inputs. As noted above, the Company uses significant unobservable inputs to measure the fair value of these assets on a recurring basis, thus they will be classified as Level 3 in future periods. There were no transfers out of Level 3 during the years ended December 31, 2020 and 2019.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the years ended December 31, 2020 and 2019:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2019 |
| | (in thousands) | | |
| **Opening Balance** | $ | 69,558 | $ | — |
| Transfers into Level 3 | | 29,222 | | 80,081 |
| Received in securitization transactions | | 65,548 | | — |
| Cash receipts | | (41,877) | | (9,559) |
| Change in fair value | | 8,823 | | (964) |
| **Ending Balance** | $ | 131,274 | $ | 69,558 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing

122

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

interest rates during each respective period and they have not materially changed as of or during the years ended December 31, 2020 and 2019. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of December 31, 2020 and 2019 was as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2020 | | 2019 | |
|  | (in thousands) | | | |
| Carrying value, net of unamortized debt issuance costs | $ | 1,083,375 | $ | 591,124 |
| Fair value | | 1,121,305 | | 625,114 |

The fair value of finance receivables, which are carried at the lower of unpaid principal balance or fair value on the accompanying consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of December 31, 2020 and 2019 were as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2020 | | 2019 | |
|  | (in thousands) | | | |
| Carrying value | $ | 274,941 | $ | 286,969 |
| Fair value | | 299,823 | | 304,532 |

**Derivative Instruments**

As of December 31, 2020 and 2019, the Company had no outstanding derivative instruments.

123

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

## NOTE 18 — SUPPLEMENTAL CASH FLOW INFORMATION

The following table summarizes supplemental cash flow information for the years ended December 31, 2020, 2019, and 2018:

| | For the Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2020 | | 2019 | | 2018 | |
| | (in thousands) | | | | | |
| **Supplemental cash flow information:** | | | | | | |
| Cash payments for interest, including $1,331, $1,368, and $0, respectively, to related parties | $ | 94,815 | $ | 74,080 | $ | 16,322 |
| **Non-cash investing and financing activities:** | | | | | | |
| Capital expenditures financed through long-term debt | $ | — | $ | — | $ | 10,139 |
| Capital expenditures included in accounts payable and accrued liabilities | $ | 36,005 | $ | 25,367 | $ | 9,384 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ | 70,917 | $ | 58,186 | $ | — |
| Property and equipment acquired under finance leases | $ | 78,322 | $ | 35,924 | $ | 16,543 |
| Equity-based compensation expense capitalized to property and equipment | $ | 5,484 | $ | 2,610 | $ | 1,650 |
| Property and equipment acquired through issuance of Class A common stock | $ | — | $ | — | $ | 536 |
| Fair value of beneficial interests received in securitization transactions | $ | 65,548 | $ | 109,303 | $ | — |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ | 28,002 | $ | 6,760 | $ | — |
| Issuance of LLC Units related to business acquisitions | $ | — | $ | — | $ | 9,981 |
| Conversion of Class A Convertible Preferred Stock to common stock | $ | — | $ | — | $ | 98,507 |

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the accompanying consolidated balance sheets that sum to the total of the same amounts shown in the accompanying consolidated statements of cash flows for all periods presented:

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2020 | | 2019 | | 2018 | |
| | (in thousands) | | | | | |
| Cash and cash equivalents | $ | 300,810 | $ | 76,016 | $ | 78,861 |
| Restricted cash [1] | | 28,301 | | 42,443 | | 9,848 |
| Total cash, cash equivalents, and restricted cash | $ | 329,111 | $ | 118,459 | $ | 88,709 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities and any undistributed amounts collected on the finance receivables pledged under the Company's finance receivable facilities. Refer to Note 9 — Debt Instruments for additional information.

124

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**NOTE 19 — SELECTED QUARTERLY FINANCIAL DATA (UNAUDITED)**

The following table sets forth certain unaudited quarterly results of operations for the years ended December 31, 2020 and 2019:

| | | Three Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2019 | Jun 30, 2019 | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 |
| | | | | (in thousands, except per share data) | | | | |
| Net sales and operating revenues | $ 755,234 | $ 986,221 | $ 1,094,854 | $ 1,103,587 | $ 1,098,216 | $ 1,118,334 | $ 1,543,609 | $ 1,826,406 |
| Gross profit | $ 88,532 | $ 137,793 | $ 137,543 | $ 142,546 | $ 138,422 | $ 150,206 | $ 261,273 | $ 243,864 |
| Net loss | $ (82,596) | $ (64,059) | $ (92,244) | $ (125,740) | $ (183,557) | $ (106,326) | $ (17,720) | $ (154,619) |
| Net loss attributable to Carvana Co. | $ (23,115) | $ (20,323) | $ (30,088) | $ (41,133) | $ (59,887) | $ (40,830) | $ (7,085) | $ (63,338) |
| Net loss per share of Class A common stock, basic and diluted [1] | $ (0.56) | $ (0.44) | $ (0.60) | $ (0.82) | $ (1.19) | $ (0.62) | $ (0.10) | $ (0.87) |

(1) The sum of the four quarters may differ from the annual amount due to rounding and timing of changes in weighted-average outstanding shares relative to net losses incurred each period.

125

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

None.

## ITEM 9A. CONTROLS AND PROCEDURES.

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Management's Report on Internal Controls over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2020 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Grant Thornton LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

### Changes in Internal Controls Over Financial Reporting

There was no change in our internal control over financial reporting identified in management's evaluation during the fourth quarter of 2020 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### Limitations of Effectiveness of Controls and Procedures and Internal Control over Financial Reporting

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

## ITEM 9B. OTHER INFORMATION.

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

**ITEM 11. EXECUTIVE COMPENSATION.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Incentive Plans**

The following table provides information about our equity compensation plans under which our Class A common stock is authorized for issuance as of December 31, 2020:

| Plan Category | Number of securities to be issued upon exercise of outstanding options | Weighted-average exercise price of outstanding options | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders [1] | 1,072,102 | $ 41.01 | 9,810,192 |

(1) Includes awards granted and available for future issuance under our 2017 Omnibus Incentive Plan.

The information required by Item 403 of Regulation S-K is incorporated by reference to Carvana's Proxy Statement for its 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2021 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2020.

127

**PART IV**

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

1    Financial Statements: The Consolidated Financial Statements of Carvana are set forth in Part II, Item 8 of this Form 10-K.

2    Financial Statement Schedules: Schedule II - Valuation and Qualifying Accounts.

**Schedule II - Valuation and Qualifying Accounts**

| | Balance at beginning of period | Additions | | Reductions | Balance at end of period |
|---|---|---|---|---|---|
| | | Charged to costs and expenses | Charged to other accounts | | |
| | | | (in thousands) | | |
| Deferred tax asset valuation allowance: | | | | | |
| Year ended December 31, 2020 | $    214,853 | $    55,554 | $    406,870  (1) | $    — | $    677,277 |
| Year ended December 31, 2019 | $    126,562 | $    18,039 | $    70,252  (1) | $    — | $    214,853 |
| Year ended December 31, 2018 | $    16,612 | $    14,771 | $    95,179  (1) | $    — | $    126,562 |
| (1) Amount relates to a valuation allowance established on deferred taxes related to our investment in Carvana Group. | | | | | |

All other financial statement schedules are not required or are not applicable, or the required information is shown in the consolidated financial statements or notes to the consolidated financial statements.

3    Exhibits: The exhibits listed in the accompanying Exhibit Index are filed, furnished or incorporated by reference as part of this Form 10-K.

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 3.2 | Amended and Restated Bylaws of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 4.1 | Indenture, dated as of October 2, 2020, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.2 | Form of 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.3 | Indenture, dated as of October 2, 2020, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.4 | Form of 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.5 | Description of Registrant's Securities, filed herewith. |
| 10.1 | Tax Receivable Agreement, dated April 27, 2017, by and among the Carvana Co., Carvana Group, LLC, a Delaware limited liability company and the TRA Holders (as defined therein) (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.2 | Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated October 2, 2020, by and among Carvana Group, LLC and its Members (as defined therein) (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 10.3 | Exchange Agreement, dated April 27, 2017, by and among the Company, Carvana Group, Carvana Co. Sub LLC and the holders of the Company's Common Units (as defined therein) (incorporated by reference to Exhibit 10.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.4 | Second Amended and Restated Registration Rights Agreement, dated April 27, 2017, by and among the Company, Carvana Group and the other signatories party thereto (incorporated by reference to Exhibit 10.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.5† | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.10 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.6† | Carvana Group, LLC Equity Incentive Plan (incorporated by reference to Exhibit 10.15 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.7† | Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.8† | First Amendment to 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on June 6, 2017). |
| 10.9† | Second Amendment to 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2017). |
| 10.10† | Form of Incentive Stock Option Agreement (incorporated by reference to Exhibit 10.5 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.11† | Form of Restricted Stock Agreement (incorporated by reference to Exhibit 10.6 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.12† | Form of Nonqualified Stock Option Agreement (incorporated by reference to Exhibit 10.7 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.13† | Form of Stock Appreciation Rights Agreement (incorporated by reference to Exhibit 10.8 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.14† | Form of Restricted Stock Unit Agreement (incorporated by reference to Exhibit 10.9 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.15† | Form of Cash-Based Award Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 7, 2018). |
| 10.17† | Form of Performance Restricted Stock Unit Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.2 to Carvana Co.'s Current Report 8-K filed with the SEC on May 7, 2018). |
| 10.18† | Form of Restricted Stock Unit Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 31, 2018). |
| 10.19† | Form of Nonqualified Stock Option Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 31, 2018). |
| 10.20* | Second Amended and Restated Inventory Financing and Security Agreement, dated as of October 1, 2020 among Ally Bank, Ally Financial and Carvana, LLC (incorporated by reference to Exhibit 10.3 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on October 29, 2020). |
| 10.21* | Amended and Restated Master Purchase and Sale Agreement, among Ally Bank, Ally Financial, Inc. and Carvana Auto Receivables 2016-1 LLC, dated as of March 6, 2017 (incorporated by reference to Exhibit 10.22 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.22 | First Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated September 14, 2017, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, Ally Financial Inc. (incorporated by reference to Exhibit 10.43 to Carvana Co.'s Annual Report on Form 10-K filed with the SEC on March 6, 2018). |
| 10.23 | Second Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated November 3, 2017, among Carvana Auto Receivables 2016-1 LLC, Ally Bank and Ally Financial Inc. (incorporated by reference to Exhibit |

10.3 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2017).

| | |
|---|---|
| 10.24 | Omnibus Amendment No. 2 to the Ally Flow transaction, dated as of January 4, 2018 (incorporated by reference to Exhibit 10.44 to Carvana Co.'s Annual Report on Form 10-K filed with the SEC on March 6, 2018). |
| 10.25 | Third Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated November 2, 2018, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2018). |
| 10.26 | Fourth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated January 4, 2019, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.61 to Carvana Co.'s Annual Report on Form 10-K filed with the SEC on February 27, 2019). |
| 10.27* | Fifth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated March 6, 2019 among Carvana Auto Receivables 2016-1 LLC, Ally Bank, Ally Financial Inc. (incorporated by reference to Exhibit 99.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on April 25, 2019). |
| 10.28* | Sixth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated April 19, 2019 among Carvana Auto Receivables 2016-1 LLC, Ally Bank, Ally Financial Inc. (incorporated by reference to Exhibit 99.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on April 25, 2019). |
| 10.29 | Seventh Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated March 19, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on May 6, 2020). |
| 10.30* | Eighth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated March 24, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on May 6, 2020). |
| 10.31* | Ninth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated April 29, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.3 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on May 6, 2020). |
| 10.32* | Tenth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated May 19, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc.(incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on August 5, 2020). |
| 10.33 | Eleventh Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated June 30, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc.(incorporated by reference to Exhibit 10.2 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on August 5, 2020). |
| 10.34* | Twelfth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated September 29, 2020,among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on October 29, 2020). |
| 10.35* | Thirteenth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated December 30, 2020, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc., filed herewith. |
| 10.36* | Fourteenth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated January 29, 2021, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc., filed herewith. |
| 10.37 | Time Sharing Agreement, dated October 22, 2015, by and among Bridgecrest Credit Company, LLC, f/k/a DT Credit Company, LLC, as lessor, and Carvana Group, LLC, Verde Investments, Inc., GO Capital Holdings, LLC and Oreno Holdings, LLC, as lessees (incorporated by reference to Exhibit 10.21 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.38 | First Amendment to Time Sharing Agreement, dated May 15, 2017 among DT Credit Company , LLC and the Lessees listed therein (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on August 8, 2017). |
| 10.39* | Loan and Security Agreement, dated April 19, 2019 (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on April 25, 2019). |
| 10.40* | Amended and Restated Loan and Security Agreement, dated May 7, 2019 (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on May 8, 2019). |
| 10.41 | SilverRock Automotive Master Dealer Agreement, dated December 8, 2016 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc. and Carvana, LLC (incorporated by reference to Exhibit 10.24 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.42 | Amendment to the Master Dealer Agreement, effective October 1, 2018 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.5 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2018). |
| 10.43* | Second Addendum to the Master Dealer Agreement, effective August 31, 2020 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on October 29, 2020). |
| 10.44 | Transfer Agreement, dated March 29, 2019 among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2019-1 (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on April 2, 2019). |
| 10.45 | Transfer Agreement, dated June 27, 2019 among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2019-2 (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 3, 2019). |
| 10.46 | Transfer Agreement, dated September 27, 2019 among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2019-3 (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 1, 2019). |
| 10.47 | Transfer Agreement, dated December 27, 2019 among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2019-4 (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on December 30, 2019). |
| 10.48 | Transfer Agreement, dated March 30, 2020, among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2020-NP1 (incorporated by reference to Exhibit 10.4 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on May 6, 2020). |
| 10.49 | Transfer Agreement, dated December 10, 2020 among Carvana Receivables Depositor LLC and Carvana Auto Receivables Trust 2020-P1 (incorporated by reference to Exhibit 10.2 to Carvana Receivables Depositor LLC's Current Report on Form 8-K filed with the SEC on December 15, 2020). |

| 10.50† | Non-Compete Agreement between Carvana, LLC and Ernest C. Garcia III (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on November 1, 2018). |
| 21.1 | Carvana Co. Subsidiaries, filed herewith. |
| 23.1 | Consent of Grant Thornton, LLP, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

* Certain portions of the exhibit (indicated by "[***]") have been omitted as the Registrant has determined (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

† Indicates a management contract or compensatory plan or arrangement.

129

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:    February 25, 2021

**Carvana Co.**
(Registrant)

By: /s/ Ernest Garcia III
Ernest Garcia III
President, Chief Executive Officer and Chairman
February 25, 2021

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Ernest Garcia III <br> Ernest Garcia III | President, Chief Executive Officer, and Chairman | February 25, 2021 |
| /s/ Mark Jenkins <br> Mark Jenkins | Chief Financial Officer | February 25, 2021 |
| /s/ Stephen Palmer <br> Stephen Palmer | Vice President of Accounting and Finance | February 25, 2021 |
| /s/ Michael Maroone <br> Michael Maroone | Director | February 25, 2021 |
| /s/ Ira Platt <br> Ira Platt | Director | February 25, 2021 |
| /s/ Dan Quayle <br> Dan Quayle | Director | February 25, 2021 |
| /s/ Greg Sullivan <br> Greg Sullivan | Director | February 25, 2021 |
| /s/ Neha Parikh <br> Neha Parikh | Director | February 25, 2021 |

130

<div align="right">**Exhibit 4.5**</div>

## Description of Registrant's Securities

The following is a description of each class of securities of Carvana Co. ("we," "our," the "Company") that is registered under Section 12 of the Securities and Exchange Act of 1034, as amended, and does not purport to be complete. For a complete description of the terms and provisions of such securities, refer to the Company's amended and restated certificate of incorporation (our "certificate") and amended and restated by-laws (our "bylaws"), copies of which have been filed as Exhibit 3.1 and 3.2 to our Annual Report on Form 10-K, of which this Exhibit 4.5 is a part.

### General

Our certificate authorizes capital stock consisting of:

- 500,000,000 shares of Class A common stock, par value $0.001 per share;
- 125,000,000 shares of Class B common stock, par value $0.001 per share; and
- 50,000,000 shares of undesignated preferred stock, with a par value per share that may be established by our Board of Directors (our "Board") in the applicable certificate of designations.

As of February 19, 2021, we had 78,331,472 and 93,929,471 shares of our Class A common stock and Class B common stock issued and outstanding, respectively.

### Class A Common Stock

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. The holders of our Class A common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class A common stock will vote together with holders of our Class B common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate described below or as otherwise required by applicable law or the certificate.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our Board out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation or the sale of all or substantially all of our assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock will be entitled to receive pro rata our remaining assets available for distribution.

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class A common stock.

### Class B Common Stock

Each holder of Class B common stock is entitled to one vote for each share of Class B Common Stock held of record by such holder; provided that each holder that, together with its affiliates (which, in the case of the Garcia Parties, includes each other Garcia Party), (1) beneficially owns 50% or more of the LLC Units of Carvana Group, LLC ("LLC Units") and (2) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least 25% of the outstanding shares of Class A common stock (determined assuming that each Class A Unit held by holders other than the Carvana Co. Sub LLC ("Carvana Sub") were exchanged for Class A common stock), is entitled to ten votes for each share of Class B common stock held of record by such holder. Each other share of our Class B common stock entitles its holder to one vote on all matters to

be voted on by stockholders generally. The Garcia Parties holding shares of our Class B common stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders when the Garcia Parties' direct or indirect beneficial ownership of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is less than 25%. The holders of our Class B common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class B common stock will vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate described below or as otherwise required by applicable law or the certificate.

Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation or the sale of all or substantially all of our assets. Additionally, holders of shares of our Class B common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class B common stock. Any amendment of our certificate that gives holders of our Class B common stock (1) any rights to receive dividends or any other kind of distribution, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Holders of Class A Units own 100% of our outstanding Class B common stock.

**Preferred Stock**

Under the terms of our certificate, our Board is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our Board has the discretion to determine the rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our Board to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

**Forum Selection**

Our certificate provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the United States District Court for the District of Delaware) will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action asserting a claim against the company or any director or officer of the company arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against the company or any director or officer of the company that is governed by the internal affairs doctrine. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Anti-Takeover Provisions**

Our certificate, bylaws and the DGCL contain provisions, which are summarized in the following paragraphs, that are intended to enhance the likelihood of continuity and stability in the composition of our Board. These

provisions are intended to avoid costly takeover battles, reduce our vulnerability to a hostile change of control and enhance the ability of our Board to maximize stockholder value in connection with any unsolicited offer to acquire us. However, these provisions may have an anti-takeover effect and may delay, deter or prevent a merger or acquisition of us by means of a tender offer, a proxy contest or other takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the prevailing market price for the shares of Class A common stock held by stockholders.

***These provisions include:***

    ***Dual Class of Common Stock***. As described above in "— Class A Common Stock " and "— Class B Common Stock," our certificate provides for a dual class common stock structure pursuant to which the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock), thereby giving the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.

    ***Classified Board.*** Our certificate provides that our Board will be divided into three classes of directors, with the classes as nearly equal in number as possible, and with the directors serving three-year terms. As a result, approximately one-third of our Board will be elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our Board. Our certificate will also provide that, subject to any rights of holders of preferred stock to elect additional directors under specified circumstances, the number of directors will be fixed exclusively pursuant to a resolution adopted by our Board. Our Board currently has five members.

    ***Stockholder Action by Written Consent.*** Our certificate precludes stockholder action by written consent at any time the Garcia Parties are no longer entitled to ten votes for each share of Class B common stock held of record on all matters submitted to a vote.

    ***Special Meetings of Stockholders.*** Except as required by law, special meetings of our stockholders shall be called at any time only by or at the direction of our Board or the chairman of our Board; provided, however, (1) at any time when the Garcia Parties beneficially owns any of our Class B common stock, special meetings of our stockholders shall also be called by our Board or the chairman of our Board at the request of the Garcia Parties and (2) at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, special meetings of our stockholders shall also be called by holders of a majority in voting power of the outstanding shares of our capital stock entitled to vote on all matters to be voted on by stockholders generally, voting together as a single class. Our bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of us.

    ***Advance Notice Procedures.*** Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our Board; provided, however, such advance notice procedure will not apply to the Garcia Parties. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our Board or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the bylaws will not give our Board the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of us.

***Removal of Directors; Vacancies.*** Directors may be removed with or without cause upon the affirmative vote of a majority in voting power of all outstanding shares of stock entitled to vote thereon, voting together as a single class; provided, however, at any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, directors may only be removed for cause, and only by the affirmative vote of holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class. In addition, our certificate will also provide that, subject to the rights granted to one or more series of preferred stock then outstanding, any newly created directorship on our Board that results from an increase in the number of directors and any vacancies on our Board will be filled at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, either (1) upon the affirmative vote of a majority in voting power of all outstanding shares of capital stock entitled to vote thereon, voting together as a single class or (2) if no such appointment has been made by the tenth day following the occurrence of the vacancy, or if such shareholders holding a majority in voting power of all outstanding shares of capital stock notify our Board that no appointment shall be made, by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director. At any time the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any newly created directorship on our Board that results from an increase in the number of directors and any vacancy occurring on our Board will be filled by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director.

***Supermajority Approval Requirements.*** Our Board is expressly authorized to make, alter, amend, change, add to, rescind or repeal, in whole or in part, our bylaws without a stockholder vote in any matter not inconsistent with the laws of the State of Delaware and our certificate. For as long as the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of a majority in voting power of the outstanding shares of our stock entitled to vote on such amendment, alteration, change, addition, rescission or repeal. When the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of the holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class.

The DGCL provides generally that the affirmative vote of a majority of the outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's certificate of incorporation, unless the certificate requires a greater percentage.

At any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, the following provisions in our certificate may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 2/3% (as opposed to a majority threshold that would apply when holders of our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote) in voting power of all the then-outstanding shares of stock entitled to vote thereon, voting together as a single class:

- the provision requiring a 66 2/3% supermajority vote for stockholders to amend our bylaws;
- the provisions providing for a classified Board (the election and term of our directors);
- the provisions regarding resignation and removal of directors;
- the provisions regarding entering into business combinations with interested stockholders;
- the provisions regarding stockholder action by written consent;
- the provisions regarding calling special meetings of stockholders;
- the provisions regarding filling vacancies on our Board and newly created directorships;
- the provisions eliminating monetary damages for breaches of fiduciary duty by a director; and
- the amendment provision requiring that the above provisions be amended only with a 66 2/3% supermajority vote.

The combination of the classification of our Board, the lack of cumulative voting and the supermajority voting requirements will make it more difficult for our existing stockholders to replace our Board as well as for another

party to obtain control of us by replacing our Board. Because our Board has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management.

*Authorized but Unissued Shares.* Our authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval, subject to stock exchange rules. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. One of the effects of the existence of authorized but unissued common stock or preferred stock may be to enable our Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive our stockholders of opportunities to sell their shares of common stock at prices higher than prevailing market prices.

*Business Combinations.* We are not subject to the provisions of Section 203 of the DGCL. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the time that the person becomes an interested stockholder, unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns, or did own within three years prior to the determination of interested stockholder status, 15% or more of the corporation's voting stock.

Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions: (1) before the stockholder became an interested stockholder, the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder; (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans, in some instances; or (3) at or after the time the stockholder became an interested stockholder, the business combination was approved by the Board and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares.

We have opted out of Section 203; however, our certificate contains similar provisions providing that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the stockholder became an interested stockholder, unless:

- prior to such time, our Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;
- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, excluding certain shares; or
- at or subsequent to that time, the business combination is approved by our Board and by the affirmative vote of holders of at least 66 2/3% of our outstanding voting stock that is not owned by the interested stockholder.

Under certain circumstances, this provision will make it more difficult for a person who would be an "interested stockholder" to effect various business combinations with the company for a three-year period. This provision may encourage companies interested in acquiring the company to negotiate in advance with our Board because the stockholder approval requirement would be avoided if our Board approves either the business combination or the transaction which results in the stockholder becoming an interested stockholder. These

provisions also may have the effect of preventing changes in our Board and may make it more difficult to accomplish transactions which stockholders may otherwise deem to be in their best interests.

Our certificate provides that the Garcia Parties, and any of their direct or indirect transferees and any group as to which such persons are a party, do not constitute "interested stockholders" for purposes of this provision.

## Limitations on Liability and Indemnification of Officers and Directors

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties, subject to certain exceptions. Our certificate of incorporation will include a provision that eliminates the personal liability of directors for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL. The effect of these provisions will be to eliminate the rights of us and our stockholders, through stockholders' derivative suits on our behalf, to recover monetary damages from a director for breach of fiduciary duty as a director, including breaches resulting from grossly negligent behavior. However, exculpation will not apply to any director if the director has acted in bad faith, knowingly or intentionally violated the law, authorized illegal dividends or redemptions or derived an improper benefit from his or her actions as a director.

Our bylaws provide that we must indemnify and advance expenses to our directors and officers to the fullest extent authorized by the DGCL. We also are expressly authorized to carry directors' and officers' liability insurance providing indemnification for our directors, officers and certain employees for some liabilities. We believe that these indemnification and advancement provisions and insurance will be useful to attract and retain qualified directors and officers.

The limitation of liability, indemnification and advancement provisions that will be included in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breaches of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

## Corporate Opportunity Doctrine

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our certificate, to the maximum extent permitted from time to time by Delaware law, renounces any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to certain of our officers, directors or stockholders or their respective affiliates, other than those officers, directors, stockholders or affiliates acting in their capacity as our employee or director. Our certificate provides that, to the fullest extent permitted by law, any director or stockholder who is not employed by us or our affiliates will not have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (2) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or stockholder, other than directors or stockholders acting in their capacity as our director or as a stockholder, acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. Our certificate will not renounce our interest in any business opportunity that is expressly offered to an employee director or employee in his or her capacity as a director or employee of Carvana Co. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our certificate, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

**Dissenters' Rights of Appraisal and Payment**

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of Carvana Co. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

**Stockholders' Derivative Actions**

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is American Stock Transfer & Trust Company, LLC. Its address is 6201 15th Avenue, Brooklyn, NY 11219.

**Listing**

Our Class A common stock is listed on the NYSE under the trading symbol "CVNA."

**Exhibit 10.35**

**THIRTEENTH AMENDMENT**

THIRTEENTH AMENDMENT, dated as of December 30, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, by the Eighth Amendment, effective as of March 24, 2020, by the Ninth Amendment, effective as of April 29, 2020, by the Tenth Amendment, effective as of May 19, 2020, by the Eleventh Amendment, effective as of June 30, 2020 and by the Twelfth Amendment, dated as of September 29, 2020 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

(a) revising the "Flex Receivable" and "Purchase Percentage" definitions and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Flex Receivable" and "Purchase Percentage" definitions:

""Flex Receivable" means either (x) a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including May 31, 2020 (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller, noting that for the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable, or (y) a Receivable sold on either June 30, 2020, or September 29, 2020, or December 30, 2020 and listed on Schedule 10 to the Second Step Pool Supplement dated as of June 30, 2020, or Schedule 10 to the Second Step Pool Supplement dated as of September 29, 2020 or Schedule 10 to the Second Step Pool Supplement dated as of December 30, 2020, respectively.

"Purchase Percentage" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than 100%, other than during the period from October 1, 2020 through November 14, 2020 January 28, 2021 when the Purchase Percentage will be 0%, and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply."

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and

agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the periods from January 4, 2019 to February 9, 2019 and October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 (provided, however, that the Transferor may elect to sell a Receivables Pool during any calendar week from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021), with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100%, other than during the period from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 when the Purchase Percentage will be 0%,

(adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%, other than during the period from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 when the Purchase Percentage will be 0%,) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020, ~~or~~ September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable."

Section 2.03 Amendments to Section 2.1(b) (Purchaser Obligation). Section 2.1(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

---

[***] Redacted for confidentiality purposes.

"(b) Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019 and October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 (provided, however, that the Purchasers may elect, in their sole discretion to purchase a Receivables Pool during any calendar week from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021), on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation"). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020, ~~or~~ September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable."

Section 2.04 Amendments to Section 6.2(a) (Aggregate Purchase Commitment)
Amendments to Section 6.2(a) (Aggregate Purchase Commitment). The last sentence of Section 6.2(a) of the Master Purchase and Sale Agreement is hereby amended by inserting each of the following terms which are double underlined in the place where such term appears below:

"Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 6.2(a), any Receivable sold on June 30, 2020, ~~or~~ September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable. "

Section 2.05 Amendments to Section 6.2(b) (Minimum Sales Amount). Section 6.2(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) Minimum Sales Amount. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than 100%, other than during the period from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of 100%, other than during the period from October 1, 2020 through ~~November 14, 2020~~ January 28, 2021 when the Purchase Percentage will be 0%,) of the aggregate principal balance of weekly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers."

---

[***] Redacted for confidentiality purposes.

SECTION III
MISCELLANEOUS

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto; and

(b) a signed copy of the Eleventh Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Representations and Warranties</u>. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401

AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

*[remainder of the page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC
    as Transferor

By:    /s/ Paul Breaux
       Name:    Paul Breaux
       Title:    Vice President

ALLY BANK,
    as Purchaser

By:    /s/ Thomas Elkins
       Name:    Thomas Elkins
       Title:    Authorized Representative

ALLY FINANCIAL INC.,
    as Purchaser

By:    /s/ Thomas Elkins
       Name:    Thomas Elkins
       Title:    Authorized Representative

Agreed to and Accepted by:

CARVANA, LLC,
        as Seller

By:    /s/ Paul Breaux
Name:    Paul Breaux
Title:    Vice President

**Exhibit 10.36**

**FOURTEENTH AMENDMENT**

FOURTEENTH AMENDMENT, dated as of January 29, 2021 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, by the Eighth Amendment, effective as of March 24, 2020, by the Ninth Amendment, effective as of April 29, 2020, by the Tenth Amendment, effective as of May 19, 2020, by the Eleventh Amendment, effective as of June 30, 2020, by the Twelfth Amendment, dated as of September 29, 2020 and by the Thirteenth Amendment, dated as of December 30, 2020 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

(a) revising clause (viii) of the "Eligible Receivable" definition and the "Purchase Percentage" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, clause (viii) of the "Eligible Receivable" definition and the "Purchase Percentage" definition:

"Eligible Receivable" means, with respect to each Receivable in a First Tier Receivables Pool or a Receivables Pool, as applicable that such Receivable:

(viii) (a) a Title Lien Nominee is named as the first lien holder on the Certificate of Title for the related Financed Vehicle, or if a new or replacement Certificate of Title is being or will be applied for with respect to such Financed Vehicle, documentation has been or will be submitted to obtain title thereto noting such Person as lien holder and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns and (i) if the Certificate of Title has not been received, the Collateral Custodian will have received a copy of the title application within 45 days of inclusion as part of the Purchased Property and (ii) such Certificate of Title will be received within (x) 180 days, or (y) solely with respect to any Receivable included in a Receivables Pool that was purchased by the Purchasers during the time period from June 30, 2020 through December 31, 2020, 300 days, of inclusion as part of the Purchased Property or (b) in those states that permit electronic recordation of Liens, such Person is named as the first lien holder on the Certificate of Title for the related Financed Vehicle on the electronic Lien and title system of the applicable state, or the Servicer or the Originator has submitted for electronic recordation, by either a third-party service provider or the relevant state registrar of titles, for such Person to be named as the lien holder on the Certificate of Title on the electronic Lien and title system of the applicable state and (i) if a confirmation has not been received, the Collateral Custodian will have received a copy of the electronic submission within 45 days of inclusion as part of the Purchased Property and (ii) a confirmation document is received within (x) 180 days, or (y) solely with respect to any Receivable included in a Receivables Pool that was purchased by the Purchasers during the time period from June 30, 2020 through December 31, 2020, 300 days, of inclusion as part of the Purchased Property and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns;.

"Purchase Percentage" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than 100%, other than during the period from October 1, 2020 through January 28, 2021 March 22, 2021 when the Purchase Percentage will be 0%, and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply."

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each

term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the periods from January 4, 2019 to February 9, 2019 and October 1, 2020 through ~~January 28, 2021~~ March 22, 2021 (provided, however, that the Transferor may elect to sell a Receivables Pool during any calendar week from October 1, 2020 through ~~January 28, 2021~~ March 22, 2021), with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100%, other than during the period from October 1, 2020 through ~~January 28, 2021~~ March 22, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%, other than during the period from October 1, 2020 through ~~January 28, 2021~~ March 22, 2021 when the Purchase Percentage will be 0%,) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020, ~~or~~ September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable."

[***] Redacted for confidentiality purposes.

Section 2.03 <u>Amendments to Section 2.1(b) (Purchaser Obligation)</u>. Section 2.1(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Purchaser Obligation</u>. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019 and October 1, 2020 through ~~January 28, 2021~~ <u>March 22, 2021</u> (provided, however, that the Purchasers may elect, in their sole discretion to purchase a Receivables Pool during any calendar week from October 1, 2020 through ~~January 28, 2021~~ <u>March 22, 2021</u>), on each Closing Date designated by the Transferor pursuant to Section 4.1(a); <u>provided</u> that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively,_ the "<u>Purchaser Obligation</u>"). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable."

Section 2.04 <u>Amendments to Section 6.2(b) (Minimum Sales Amount)</u>. Section 6.2(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than 100%, other than during the period from October 1, 2020 through ~~January 28, 2021~~ <u>March 22, 2021</u> when the Purchase Percentage will be 0%,_ (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of 100%, other than during the period from October 1, 2020 through ~~January 28, 2021~~ <u>March 22, 2021</u> when the Purchase Percentage will be 0%,) of the aggregate principal balance of weekly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers."

<div align="center">

SECTION III
MISCELLANEOUS

</div>

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

---

[***] Redacted for confidentiality purposes.

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto; and

(b) a signed copy of the Twelfth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 Continuing Effect of the Master Purchase and Sale Agreement. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 Representations and Warranties. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 Binding Effect. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 Counterparts. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED

STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC
as Transferor

By: /s/ Paul Breaux
Name:    Paul Breaux
Title:    Vice President

ALLY BANK,
as Purchaser

By: /s/ Aaron Dawkins
Name:    Aaron Dawkins
Title:    Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser

By: /s/ Thomas Elkins
Name:    Thomas Elkins
Title:    Authorized Representative

Agreed to and Accepted by:

CARVANA, LLC,
as Seller

By:    /s/ Paul Breaux
Name:    Paul Breaux
Title:    Vice President

**Exhibit 21.1**

**SUBSIDIARIES OF THE COMPANY**

The following are the direct and indirect subsidiaries of Carvana Co. as of December 31, 2020:

| Subsidiary | Jurisdiction of Organization |
| --- | --- |
| Carvana Co. Sub LLC | Delaware |
| Carvana Group, LLC | Delaware |
| Carvana, LLC | Arizona |
| Car360, Inc. | Delaware |
| Carvana Receivables Depositor LLC | Delaware |
| Carvana RR I, LLC | Delaware |
| Carvana RR II, LLC | Delaware |
| SPVANA I, LLC | Delaware |
| SPVANA II, LLC | Delaware |

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We have issued our reports dated February 25, 2021, with respect to the consolidated financial statements and internal control over financial reporting included in the Annual Report of Carvana Co. on Form 10-K for the year ended December 31, 2020. We consent to the incorporation by reference of said reports in the Registration Statements of Carvana Co. on Form S-3 (File No. 333-231606) and on Form S-8 (File No. 333-217520).

/s/ GRANT THORNTON LLP

Southfield, Michigan
February 25, 2021

**Exhibit 31.1**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Ernest Garcia III, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Carvana Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:      February 25, 2021                                             /s/ Ernest C. Garcia III
                                                                        _____
                                                                        Ernest C. Garcia III
                                                                        *Chairman and Chief Executive Officer*

**Exhibit 31.2**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Mark Jenkins, certify that:

1. I have reviewed this Annual Report on Form 10-K of Carvana Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:      February 25, 2021                                              /s/ Mark Jenkins
                                                                         Mark Jenkins
                                                                         *Chief Financial Officer*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Carvana Co. (the "Company") for the fiscal year ended December 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:       February 25, 2021                                    /s/ Ernest C. Garcia III

                                                                                     Ernest C. Garcia III
                                                                                     *Chairman and Chief Executive Officer*

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Carvana Co. (the "Company") for the fiscal year ended December 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    February 25, 2021                                    /s/ Mark Jenkins
                                                             Mark Jenkins
                                                             *Chief Financial Officer*

# Exhibit 9

**S&P Global**
Market Intelligence

# Carvana Co. NYSE:CVNA
# FQ4 2020 Earnings Call Transcripts
## Thursday, February 25, 2021 10:30 PM GMT
### S&P Global Market Intelligence Estimates

| | -FQ3 2020- | | | -FQ4 2020- | -FY 2020- | -FY 2021- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (0.28) | (0.10) | NM | (0.49) | (2.25) | (1.27) |
| **Revenue (mm)** | 1533.24 | 1543.61 | ▲0.68 | 1608.57 | 5371.79 | 7987.79 |

Currency: USD
Consensus as of Feb-24-2021 5:02 AM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ4 2019** | (0.63) | (0.79) | NM |
| **FQ1 2020** | (0.64) | (1.18) | NM |
| **FQ2 2020** | (0.79) | (0.62) | NM |
| **FQ3 2020** | (0.28) | (0.10) | NM |

COPYRIGHT © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ..................................................................... | 3 |
| Presentation | ..................................................................... | 4 |
| Question and Answer | ..................................................................... | 7 |

COPYRIGHT © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

**Mark Jenkins**
*Chief Financial Officer*

**Michael Louis Levin**
*Vice President of Investor Relations*

## ANALYSTS

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

**Christopher James Bottiglieri**
*Exane BNP Paribas, Research Division*

**Edward James Yruma**
*KeyBanc Capital Markets Inc., Research Division*

**John Robert Colantuoni**
*Jefferies LLC, Research Division*

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

**Nicholas Freeman Jones**
*Citigroup Inc. Exchange Research*

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

**Robert Charles Zeller**
*Truist Securities, Inc., Research Division*

**Ronald Victor Josey**
*JMP Securities LLC, Research Division*

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good afternoon, and welcome to the Carvana Fourth Quarter 2020 Earnings Call. [Operator Instructions] Please note this event is being recorded. I would now like to turn the conference over to Mike Levin, Vice President of Investor Relations. Please go ahead.

**Michael Louis Levin**
*Vice President of Investor Relations*

Thank you, Andrea. Good noon, ladies and gentlemen, and thank you for joining us on Carvana's Fourth Quarter and Full Year 2020 Earnings Conference Call. Please note that this call will be simultaneously webcast on the Investor Relations section of the company's corporate website at investors.carvana.com. The fourth quarter shareholder letter is also posted on the IR website.

Joining me on the call today are Ernie Garcia, Chief Executive Officer; and Mark Jenkins, Chief Financial Officer. Before we start, I would like to remind you that the following discussion contains forward-looking statements within the meaning of the federal securities laws, including, but not limited to, Carvana's market opportunities and future financial results that involve risks and uncertainties that may cause actual results to differ materially from those discussed here. A detailed discussion of the material factors that cause actual results to differ from forward-looking statements can be found in the Risk Factors section of Carvana's most recent Form 10-K. The forward-looking statements and risks in this conference call are based on current expectations as of today, and Carvana assumes no obligation to update or revise them, whether as a result of new developments or otherwise. Unless otherwise noted on today's call, all comparisons are on a year-over-year basis.

Our commentary today will include non-GAAP financial measures. Reconciliations between GAAP and non-GAAP metrics for our reported results can be found in our shareholder letter issued today, a copy of which can be found on our Investor Relations website.

And now with that said, I'd like to turn the call over to Ernie Garcia. Ernie?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Thanks, Mike. Thanks, everyone, for joining our call. 2020 was a defining year for Carvana and one that we will likely look back on as a significant milestone in our journey. When we launched the company 8 years ago, we set out to be the first online seller of cars by building modern technology, a new optimized supply chain and integrating vertically to serve modern customer preferences and deliver the best customer experiences available. When we went public 4 years ago, we spoke of our most mature market, Atlanta, as a proof point that we could build a sizable business, given its 1% market penetration, and we set a mid-term goal for the company to reach $3,000 GPU. And 2 years ago, at our Analyst Day, we outlined the audacious goal of becoming the largest and most profitable automotive retailer of buying as many cars from our customers we were selling and of selling more than 2 million cars per year.

Today, we are the leading online seller of cars by a wide margin. And for 8 years, we've been the leading -- the leader in providing the best customer experience available in buying a car. Today, we have over 100 markets above 1% market penetration. For 7 consecutive years, we've grown GPU by $400 or more. And in 2020, we exceeded our $3,000 GPU goal for a full year and hit $4,000 in our best quarter. Today, we are the second largest seller of used cars in the country, marking the final milestone on our path to becoming the largest. And we have levered EBITDA margin for 7 consecutive years, demonstrating significant and consistent progress on our path to becoming the most profitable.

In the second half of 2020, we bought more cars from our customers than we sold to them, and we are celebrating our third consecutive year of being the fastest-growing automotive retailer in the country, lighting our path to selling more than 2 million cars per year. Overall life is a company, we have set goals,

and we have hit them. And we have many more goals in front of us. But before diving into more detail about where we are now and how we plan to continue hitting our goals in the years ahead, I want to talk for a moment about what got us here. Our engine of growth has been incredible people with high ambition, boundless energy and discipline, who have chosen to care a little more than most, who learn and get a little better every day, who feel like they're part of something and who have fun along the way. This has always been a close group that we are proud to be a part of. But 2020 drew us even closer and made us even prouder.

We came into the year positioned for another year of hypergrowth before rapidly transitioning to a defensive posture in the pandemic hit and rapidly reverting back to growth posture as demand shifted in our direction. Our team made those adjustments, managed through 3 waves of COVID and delivered another year of being the fastest-growing automotive retailer in the country while simultaneously growing GPU and levering EBITDA margin. When we move to a defensive posture, our team stuck together. We managed through the pandemic without a single layoff and without furloughs. And when we reduced hours for our operations teams, our team came together. We created the We're All In This Together Fund with contributions from hundreds and hundreds of people throughout the company that generated sufficient funds to ensure that the Carvana team members that were impacted by reduced hours, were still able to maintain over 80% of their take-home pay over the entire effective period.

To every member of our team, thank you. You have an unbelievable mount to be proud of. So where are we now? And where do we go from here? In the short-term as a result of the accelerating adoption of our model and the strength of our customer experiences in our brand, we have far more demand than we are able to satisfy with our current supply chain. As evidenced of this demand, in January, we grew sales by 80% year-over-year, and did so with just half the immediately available inventory that we had a year ago. This demand paired with the operational stresses of 3 successive waves of COVID, have led to constraints across our operational chain. But given that they are most pronounced and hardest resolved in our IRCs, we will focus our comments on our progress there.

We opened 4 IRCs in 2020 and plan to open 2 more by the end of 2021, and the team is working at max speed to ramp hiring and training to catch up to demand as quickly as possible. Since December, we have increased production by 40%. In the medium term, we are working even faster than before to prepare the business to handle the demand. In 2022, we plan to open 8 additional IRCs, bringing our total IRCs between now and the end of 2022 to 10 and bring our total facility capacity to 1.25 million per year at that time. We're also scaling our logistics network capacity and capabilities further and making additional investments in technology that make our customer experiences even better to make us more efficient and enable us to scale more quickly.

In the long term, the plan remains the same. We built a platform that delivers the best customer experiences, the best unit economics and is the most scalable. This is a powerful combination. We got here with execution, innovation and ambition. Execution allows us to cover ground along our path. Innovation allows us to uncover additional opportunities. And ambition keeps us charging forward, and we are charging forward. The opportunities in front of us are broadening and are even bigger than they were in the past, fully achieving our potential will demand that we continue to improve, that we move even faster. Our ambition is only growing, but we must also maintain focus to move fast. We'll continue to prioritize growth, and we must also stay disciplined to continue demonstrating operating leverage. We will do all of that while always keeping our customers at the center of every decision we make and while delivering to them the best customer experiences around. And we'll get a little bit better every day and have fun along the way. It will be hard. All important things are. Our team is up for the challenge, the march continues. Mark?

**Mark Jenkins**
*Chief Financial Officer*

Thank you, Ernie, and thank you all for joining us today. We are pleased to report another year of strong growth in both retail units and revenue. Revenue totaled $5.6 billion, an increase of 42%, and retail units sold totaled 244,111, an increase of 37%, making us the second largest used automotive retailer in the

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

U.S. For the fourth quarter, retail units sold totaled 72,172, an increase of 43%. The total revenue was $1.8 billion, an increase of 65%.

Our exceptional growth in 2020 was driven by rapid growth within our market cohorts. This strong growth overpowered COVID-19-related headwinds and our significant supply chain constraints. In Q4, our 2013 to 2019 cohorts grew retail units sold by 40% and our oldest cohort of Atlanta grew by 12% despite an industry-wide decline in used vehicle sales and our election not to run our Cyber Monday promotion this year. Our growth accelerated as we exited the year. With our 2013 to 2019 cohorts growing by 75% in January and our oldest cohort of Atlanta growing by 45%. In 2020, we completed our seventh consecutive year of $400 or more in GPU improvement and our seventh consecutive year of EBITDA margin leverage. Total gross profit per unit for the year was $32.52. Our growth in GPU was broad-based, including increases of $132 in retail, $43 in wholesale, $134 in finance and $90 in ancillary products. Our GPU performance was bolstered by buying cars from customers. In 2020, we acquired 204,000 vehicles from customers, an increase of 95%.

Total GPU in Q4 was 33 79, an increase of $549 year-over-year. Sequential changes in GPU were primarily driven by retail GPU, which saw approximately $300 of normal seasonal depreciation, $100 of higher than normal seasonal depreciation and $200 of transitory costs, primarily driven by rapidly ramping our reentering capacity in the midst of the third wave of COVID-19. We expect these transitory costs to flow into Q1, but to moderate beginning in Q2 as we ramp our new IRCs and move further away from the third wave.

In 2020, we took another meaningful step forward in our finance platform. In Q4, we successfully completed our first SEC registered securitization, selling $405 million in principal balance and contributing to a $421 increase in finance GPU year-over-year. EBITDA margin was negative 3.9% in Q4, an improvement of 4% versus the prior year, reflecting gains in both GPU and SG&A leverage. We ended the year with $1.7 billion in total liquidity resources, giving us significant flexibility to execute our plan. In 2020, we opened 120 new markets, bringing our year-end total to 266. With these new market openings, we now serve 74% of the U.S. population, up from 67% at the end of 2019. We will continue to expand in 2021 and expect to serve 78% to 80% of the U.S. population in more than 300 markets by year-end.

In 2020, we also made significant progress scaling our vehicle production capacity, and this continues to be an area of focus for the business. We added 4 inspection and reconditioning centers in 2020, bringing our annual production capacity at full utilization to over 600,000 units at year-end. We expect to open 2 IRCs in 2021 and 8 in 2022, ending 2022 with more than 1.25 million units of annual production capacity at full utilization. Our eyes are squarely focused on achieving our goal of selling more than 2 million units per year. And we will continue to maintain a healthy pipeline of future IRCs to support our growth.

As we look forward to 2021, we expect another strong year on retail units sold, revenue, GPU and EBITDA margin. We expect an acceleration of growth in retail units sold in '21 and expect the level of that growth to be governed primarily by the speed at which we scale our production capacity. We expect revenue growth in 2021 to be in line with retail units sold growth. Finally, we expect total GPU in the mid 3,000 and a small EBITDA margin loss in 2021, improving both metrics year-over-year while continuing to invest for the long term.

Since becoming a public company nearly 4 years ago, we have made tremendous progress across all aspects of the business and achieved many major milestones, such as achieving our first EBITDA positive quarter this year. Since 2017, we have consistently rapidly grown retail units sold, increased GPU and demonstrated operating leverage. We've made significant progress and are excited about what comes next. Thank you for your attention. We'll now take questions.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And the first question will come from Sharon Zackfia of William Blair.

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

Thanks for all of the commentary on the logistics and the reconditioning and kind of what you're facing there. I guess I'm curious as well, there's been a lot of talk about stimulus checks and what that may or may not have meant to January this year. I know you talked about January. Have you seen trends continue strongly end of February? And then as you think about delivery times, and I think this was commented on in the shareholder letter, what is the kind of optimal delivery timing? I mean, where is that line in the sand where the customer starts to bulk and looks elsewhere? And could you give us an idea of what delivery times are now versus maybe pre pandemic?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. Okay. So I believe so January 1, with respect to stimulus. I think it's hard to disentangle probably all the different things that have been going on. Stimulus did not result in a large discontinuous super noticeable bump in demand. So I don't think that we would have saw too much of what we saw in January to stimulus. I think instead, what we would have signed the majority of the January strength too is just ramping up our production capacity. As I said in my remarks, we ramped up our production capacity -- or excuse me, production level by approximately 40% from December to January, and that unlocks additional inventory, which then very rapidly sold. So I think that would probably be the driver.

Heading into February, I think from a demand perspective, we've largely seen the same. February can be a bit of a tricky month because there's really nothing about February that you would expect to be different from January with the exception of the arrival of tax season, which this year has reportedly been pushed back a couple of weeks, although I think we're starting to see some evidence that it's showing up at least moderately over the last couple of days. So prior to kind of tax season hitting, I would say, February looked a lot like January and the same trends continued. Those trends are just that we've got a lot more demand than we're able to satisfy given our limited inventory. And so our focus is definitely on trying to ramp that up and produce inventories, by far and away, the biggest impact, but you also brought up delivery times. The rest of the supply chain is also impacted. That obviously includes logistics. Roughly speaking, year-over-year, more recently over the last couple of weeks, logistics has probably been on the order of kind of -- delivery has probably been on the order of 40%, give or take longer than they were a year ago.

I don't think that there's a magical moment where delivery times get too long, and that starts to materially crimp sales. I think it's much more of a continuous effect. And I think that part of that increase in delivery times is just due to the underlying strain of ramping the business as quickly as we are. Although I think a very meaningful portion of that strain has also just been the very large storms that we saw in the middle of the country over the last week or 2, which we would expect to be transitory, and we'd expect to work out over the next week or so.

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

I guess a follow-up. I mean, knowing what you know now. I mean, at what point do you think you've got reconditioning where it needs to be? You've got logistics where they need to be, and we're not talking about the pinch points related to demand.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. So I mean, I think -- I do think it's a high quality problem. I think we've dealt with supply constraints many times throughout the company's life. Generally speaking, the form that takes is we'll see some supply side constraints, and then we will resolve those over maybe a 3-month period or so. I think 2020 was pretty unique in the sense that we came into the year positioned for our largest growth year ever. And then we were hit by the pandemic. We rapidly pulled in. And then kind of customer preference has shifted in our direction. We saw more demand than we had ever seen before, and we tried to rapidly catch up. And then that was kind of overlaid with 3 successive waves of COVID, which obviously have kind of impacts across our entire supply chain. So I think this has been a difficult year, and I think we can almost think about it as being kind of 3 separate events that led to some supply side constraints.

I think the team has done an incredible job working out of all 3 of those different events. And I think that's evidenced by the growth that we saw in the year despite the pandemic. And then obviously, the growth that we saw in January is tremendous. And I think at different points in the year, we kind of worked out of some of the supply side constraints started to build inventory again, and then we got hit with the next wave, and we had to kind of go back and start again. So I think as long as we head into a more normalized world, I think we'll work out of this pretty quickly. We put some materials together in the shareholder letter that are hopefully helpful about the IRC capacity that we are building.

That's facility capacity, which is different than active production capacity is producing cars, but we're clearly building for a very large future, and we're trying to make sure that we get in front of ourselves because when we look at our supply chain, the longest lead time components of that supply chain is building the physical facilities to do the reconditioning. The second longest lead time is training and hiring all the people to turn that capacity into active capacity. But we're working very hard to get in front of it. And I think we feel incredible at the plan, and then I would just reiterate the statistic again, increasing total production by 40% from December to today is a pretty incredible move. And I think, as I said, the team has done an unbelievable job in light of the circumstances to rapidly catch us up.

**Operator**

The next question comes from Zach Fadem of Wells Fargo.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

So the quarter-to-date commentary for January would suggest that you're tracking at about 6,400 units per week. And if we look back since you've been a public company, you've been able to step-up that weekly run rate every single quarter. So when I think about the commentary around capacity and production and inventory constraints, is there anything out there besides those things that would preclude you from continuing to ramp up that weekly unit run rate? That's the first question. Could you talk me through that?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So we put some commentary in our outlook about the expected differences in shape this year. And I think that kind of cuts directly to the point that you're making. The demand that we're seeing, I want to reiterate is very, very strong. We're clearly seeing materially more demand than we're going to be able to satisfy this quarter and probably for the remainder of the entire year, and we're going to work very hard to try to catch back up. And I don't think we want to dive into weekly sales rates, but kind of the numbers that you're pointing to aren't unreasonable. I think it's important to look at those numbers in light of the graph that we provided around immediately available inventory on the website in our shareholder letter, where as of the end of January, we had 9,500 cars that were immediately available for customers. That means cars that a customer can purchase and are ready to be loaded on a truck right when the customer purchase them. So selling that number of cars against an inventory of 9,500 cars is an extremely rapid turn.

And there is just something to kind of a natural limit of how quickly customers can get on the site, find the car they want and start to go through the purchase process. So I think our expectation is that probably

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

relative to previous years, sales volumes will be pushed a little bit into the future. Partially, that's going to be because of tax season being pushed back a couple of weeks. But I think the bigger impact is probably just us catching up to demand and catching up our production capacity. And so I think you've seen these big discontinuous moves in the past. Those really big discontinuous moves have been supported by a much larger ready inventory than we have today. And so in order to take as big of a discontinuous step, we would have to be turning inventory extremely, extremely quickly. So it's likely that in the immediate term, the step-up will not be as severe. But then because we have excess demand as we move through the year and catch up production, we may see kind of a more beneficial shape later in the year.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Got it. Okay. That one makes sense. And then, Mark, as I look at your business today, you sold about 244,000 cars last year. And it took you an operating expense base of about $1.1 billion to support that. So as I look to 2021, can you talk about incremental SG&A per unit, and walk me through how to think about the SG&A step up? And what is expected to be a fixed cost, which I guess we can call it investment? And then how much would be a variable cost?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So as you sort of alluded to, as we've grown the business, we've been able to show leverage in SG&A. I think that will continue to be the case going forward as we march through our long-term model. As we take a narrower view into 2021, I think one way that we think about this question of leverage is through our cohorts, where we've definitely seen leverage over time as cohorts age. I think that, that happens in several of the line items. One, I think that we've historically seen advertising leverage in our cohorts as they age, as word-of-mouth grows, as awareness grows and the cohorts, we provided some data on that in the shareholder letter.

As it relates to some of the other expense line items, we've also seen leverage in the cohorts there. I think that takes the form of benefits from scale. I think it takes the form of benefits of utilization in the logistics network. And then there's also benefits as we scale of spreading some of our fixed cost base out over more and more units and more and more markets. And so I think we've seen lots of great trends and leverage in the business. We provided some guidance on EBITDA margin, where we expect another year of improvement. We think that will be coupled with improvement in SG&A as we march toward our long-term model. And I think we feel pretty good about the path that we're on.

**Operator**

Your next question comes from Michael Montani of Evercore ISI.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

The first one I had was just to clarify a little bit in the guidance, you had mentioned a small EBITDA margin loss. Does that basically mean like a down low single-digit EBITDA margin? Or were you talking about the actual dollar amount itself?

**Mark Jenkins**
*Chief Financial Officer*

So I think what we were guiding to is mid-3,000 GPU and a small EBITDA margin loss. I think that again will be driven by some of the sources that I was just describing in response to Zach's question. I mean I think that will be our eighth consecutive year of EBITDA margin improvement.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

Okay. And then the other question I had was on total revenue growing roughly in line with retail units sold. I was thinking it might be up faster given the success that you've seen in wholesale, ancillary and then

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

just the ASPs being up year-over-year. So I'm just wondering if there's something there that I'm missing that we need to consider as well on some of these other lines of business?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think you're hitting on a couple of good points there. I think the major drivers of revenue are vehicle ASP and then wholesale and other revenues. And we've obviously made progress in all of those, really the latter 2. I think one point that I would make is we've seen ASPs drift up here a little bit in the back half of the year. Part of that is just supply and demand and our purchasing algorithms responding to what we're seeing in supply and demand. Part of that is also an intentional to a degree. As we're constrained in the reconditioning centers, we've tended to shade a little bit more toward some cars that maybe require less reconditioning on occasion. So that's been a driver. I think the gains that we saw in ASP in the back half of the year, we expect to moderate a little bit in 2021, so the balance of all of those things is what led to our guidance.

**Operator**

The next question comes from Naved Khan of Truist Securities.

**Robert Charles Zeller**
*Truist Securities, Inc., Research Division*

This is Robert Zeller on for Naved. Congrats on the good -- on the great performance of a quarter. A couple of questions. So can you just reiterate -- just discuss about what made Atlanta, which is one of your first markets, what made that market very attractive to enter? And then stepping back, as we speak broadly about the rule of 40 with -- in the Internet space. We've seen that become the rule of 50, the rule of 60, the rule of 70. And Carvana has shown really great top line growth and improving EBITDA margin. So curious how you're thinking about that general phenomenon moving forward?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. Well, first of all, thank you. I can tell you were internally debate and good quarter and great quarter. We appreciate you going with a great quarter there. So thank you for that. What makes Atlanta an attractive market to enter? That's going way back in our history. The short story is basically, we had some kind of operational benefits to scaling out of a pre-existing reconditioning center in that area. And so that's what kind of led to us choosing that market. There was nothing unique about the market that we thought would uniquely fit our model. It was more about just operational ease that caused us to choose to go there. And then obviously, that market has responded really well ever since. And I think we put some commentary in the letter that 90% of the markets that we've launched are continuing to ramp even faster than Atlanta did at the same point in its life. So I think there's nothing special about the choice of that market. It's been a great market for us. It's continued to grow. It had a great January, growing at 45%. And I think the other markets are performing very similarly.

Mark, do you want to hit the rule of 40, 50, 60? I'm not sure I'm familiar enough for that rule.

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes, yes. I mean I think we're very happy with the comp to fast-growing Internet companies. Thank you for that. I think historically, we fared extremely well on any rule that you could put together. I think our growth has been historically strong compared to other e-commerce companies. I think we've continued that strong growth while also showing significantly narrowing EBITDA loss margins. So I think we continue to fair well on those metrics. We're going to look to obviously continue to make progress on both top line growth and simultaneously on EBITDA margin leverage, which is something we've been able to do for 7 consecutive years now. So we're going to keep trying to keep that number as high as we possibly can.

**Ernest C. Garcia**

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*Founder, President, CEO & Chairman*

The other thing that I would just say is, as I try to infer what the underlying drivers of that rule are. I also think our business has the unique benefit of having visibility into the underlying cohorts as well. We shared data in the third quarter that our oldest cohorts were already approaching our long-term EBITDA target range. And that several of our cohorts were positive from EBITDA perspective. So I think that really does help to clarify that kind of the -- while we're making all this progress and constantly narrowing our EBITDA margin losses, we have shown negative EBITDA over time, but that kind of investment is clearly going into the growth of the business.

**Operator**

Your next question comes from Rajat Gupta of JPMorgan.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

I just had a couple on like the GPU. The $200 transitionary impact on retail GPU in the fourth quarter, what is assumed for the 2021 mid 3,000 guide with respect to that? Does that all come back? Do you still have a of that flowing through into the guidance? And just relatedly, could you give us a sense of like how that mid-3,000 breaks up narrow across the 3 different businesses? That would be helpful. And then I have a quick follow-up.

**Mark Jenkins**
*Chief Financial Officer*

Sure. Yes. So as it relates to the transitory costs, we do expect them to flow into Q1, but then to moderate beginning in Q2. And the moderation comes from -- as we ramp our new IRCs and as we move further away from COVID, the third wave of COVID, we expect those impacts to moderate. So that was -- on your first question. On your second question, consistent with our sort of past outlooks that we've given for the year, we don't plan to break down the mid-3,000 GPU into various components. But I think we've given a pretty good sense there of the progress that we expect to make next year. And I think we're feeling really good about that total GPU progress. Not unlike EBITDA margin. Next year, we'll make our eighth consecutive year of improvements in total GPU, and we're feeling really good about that.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Got it. That's helpful. And just on the February comment, you talked about trends continuing like January. I'm not sure if I missed it, but was there any impact from the adverse weather that hurt February? Or despite that, you continue to see the same level of growth that you saw in January? Just wanted to clarify that point.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. Yes. I think there are several concepts in there. So in terms of underlying demand, we've seen underlying demand be very consistent throughout the early part of this year so far. In terms of sales, we've seen kind of the demand for sale to be very consistent, but there have been some delays related to the storms in the middle of the country. We expect to resolve those over the next week or so. As it relates to year-over-year growth, that will be impacted by the storms that we saw, which impacts the timing of sales, but then also by the timing of tax season, which is the major catalyst for growth that happens sometime between kind of mid-February and mid-March. And we expect to be later this year than last. But as it relates to kind of modeling underlying demand and getting that signal for what that implies for the strength of the business and what we expect the year going forward, it's been very consistent so far this year.

**Operator**

The next question comes from Edward Yruma of KeyBanc Capital Markets.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Edward James Yruma**
*KeyBanc Capital Markets Inc., Research Division*

I guess 2 for me. First, on the consumer sourced vehicles. It looks like you guys continue to push penetration higher. Just wondering if you're starting to get to the point where the consumer is potentially pricing against some of your competitors, are you having to pay more for vehicles at your consumer sourcing? And then maybe just as a second question, now that we're in a rising rate environment, how should we expect that to flow through the P&L, particularly out of the fact that you're doing more of your securitization yourself and trying to net those 2 out?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So first of all, on buying cars from customers. That business obviously continues to do incredibly well and grew at 96% for 2020. I do think the most impressive statistic there is that in the fourth quarter of the cars that we sold to customers, 65% had been bought from customers. To put that in context, when we had our Analyst Day 2 years ago. We set out a long-term goal of 38% to 52%. So for roughly 2/3 of our cars that we sold to customers we bought from other customers, that's a pretty remarkable number and something that we're extremely excited about. As it relates to the implications for the future and the remaining opportunity, please keep in mind that on the retail side of the business, we're still about 0.7% of the entire market. We remain very, very small compared to the business. And on the purchasing side of the business, we're probably a little bit bigger than that, but not materially bigger than that. And those 2 businesses are largely independent. They kind of intersect and move together as it relates to trade-ins when a customer simultaneously buys and sells a car.

But the majority of each business runs independently. So I think looking forward, we expect those businesses to grow independently to some degree. We expect them to basically race against each other in moments of strain when we are constrained in our logistics network, we will tend to favor retail transactions to vehicle purchasing transactions in our delivery schedule. So that can have some impacts in the near-term and kind of makes the businesses interact together. But over the medium and long term, we don't expect that to be a big driver, and we're just going to work to grow both those businesses as fast as we possibly can as we think that they are mutually reinforcing and enormous opportunities independently. As far as selling loans goes, there's a lot that goes into that. I would say, generally speaking, over any kind of medium-range period of time kind of consumer spreads or kind of interest rates that we would fund at and consumer-facing rates have spreads that are fairly consistent.

And so I think, generally speaking, the expected finance margin is very similar across time. I do think in a lowering rate environment, sometimes those margins get a little bit bigger for a quarter or 2, and in a raising rate environment, they can get compressed a little bit for a quarter or 2. But those impacts are generally relatively small compared to the entire finance margin. So I think kind of the directional impact you're pointing to is a reasonable factor, although there are many factors, including just the underlying improvement we've seen in that business over the last year or so. So I think you could model that in, but I don't think it's a big contributor.

**Operator**

The next question comes from Chris Bottiglieri of Exane Paribas.

**Christopher James Bottiglieri**
*Exane BNP Paribas, Research Division*

So I want to ask you about inventory selection on our website. Clearly, there's very prolific levels of demand that's outpacing your ability to scale production. From my observations, you've been testing third-party part inventory on your website for at least a year or 2 now. Can you talk about any initial results that you've seen? What are the benefits and trade-offs with Carvana and the third-party dealer from this arrangement? And then from an investor standpoint, how do we evaluate the economic implications of allowing more third parties on your website?

**Ernest C. Garcia**

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Founder, President, CEO & Chairman*

Sure. So there's a lot in there. Let me start with this. In any given quarter, we probably have 100 to 200 tests that we're running across the business. There's a much smaller set of potentially very large tests. But we have many, many tests that we're running. We have -- depending on how you break it down, probably 60 to 75 different independent product groups that are made up of engineers and product designers and visual designers and analysts and infrastructure developers and database developers that are all running kind of in their own area and building their own technology. So there's always a lot going on. And in general, our policy is going to be to just discuss things that we believe will have early to have the potential to have a material impact on our P&L in the near term. And prior to that, we will probably just choose to not discuss these underlying tests too much. That said, the particular test that you are talking about, we are going to be moving into a second phase of that test to test it at slightly higher scales. We still expect it to be small. It does not have a material impact on the business to the extent that changes, and we will start to discuss it with you more. But we will be doing a little bit more of that. So you may see some more partners and more inventory showing up there.

You then ask a question about how we collectively can evaluate all the opportunities that Carvana faces. And generally speaking, there are many lens, in many ways that we think about these different opportunities, but the lens that we use the most often is we're always trying to pick the opportunities that we think offer the best customer experience, the most compelling unit economics and the most scalability, and we're trying to make good choices in the trade-offs of those 3 dimensions. And that's how we will determine where we put our energies. And ofttimes, there will be many tests going on in the background that are helping us to understand what some of those trade-offs may be with some of the things that we could invest more energy into.

**Christopher James Bottiglieri**
*Exane BNP Paribas, Research Division*

Yes. That's really helpful. And then just a follow-up is I want to follow-up on the Atlanta performance is really eye-popping the 24% to 45% growth in January. What would you attribute the acceleration? When I look at the 2 IRCs you opened in West Memphis and Orlando, they seem to flank Atlanta from a geographical perspective. Is it reasonable to think that Atlanta, some of your earlier markets disproportionately benefited from these IRCs? And are there any other markets where you feel like when you open an IRC this year it coul sustain a similar benefit?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So I think there's a lot going on there. Let me start with what I think is most important, and then we can talk about some of the other impacts as well. The most important impact, I think, by a long way, we talked a lot about the constraints that we face as we kind of dealt with COVID and then try to catch up with these 3 successive waves. I think the right way to look at kind of the back 3 quarters of 2020 is that we really aren't seeing demand signals when we look at the markets. What we're really looking at is we're looking at the way that we're allocating the very constrained supply that we had. So if you see one market growing faster than other market, all that's really telling us is just that we were constrained in total sales and the market that grew faster had even more aggressive underlying demand, then the markets that grew a little bit slower. And so therefore, more of the cars were shifted in that direction.

And so I think when you're trying to assess demand growth over the last 9 months, I just it's difficult looking at sales data because we have been so severely constrained. So that, I think, is the biggest thing. And then I think that, that -- while we still are constrained, I think what we saw in January is we saw the benefit of this 40% increase in production that happened from December to now that has been very helpful. So I think that, that's probably the biggest underlying driver. I do think that in general, as we've opened inspection centers near markets, those markets have benefited from that because those cars are closer by. And therefore, oftentimes, those customers will buy them because the delivery times are faster. So they may have more demand for those cars than customers in other markets. So I think that's an impact. And then we also launched a vending machine in Atlanta recently. So I think that, that is probably an impact as well. So I think there's a number of things going on, but I do think the most important is just

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

kind of the -- while we remain very, very supply constrained, I think slightly loosening those constraints was helpful in January.

**Operator**

The next question comes from Nick Jones of Citi.

**Nicholas Freeman Jones**
*Citigroup Inc. Exchange Research*

As the demand for consumers to sell cars directly to you exceeds your original goals. I guess, what have you learned? And can you revise those goals potentially? Or where do you think, I guess both ratios can go over time, customer source ratio and then also the ratio as a percent of retail sold?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So I think -- let me start with how we arrived at our original goals. Our original goals were arrived at by looking at market leaders over time and what they had been able to achieve. And kind of using the heuristic that, that was a good target for us to aim for. And I think the results that we've seen over the last year are really, really exciting, and we think just speak to the extreme simplicity of our offering from a customer experience perspective, but also to the underlying strength of the model. When we've got a model where we can sell cars across geographies and across makes and models and across the price spectrum. And we've got very efficient ways to sell even wholesale cars. It puts us in a position where we can be a very high-quality buyer. And so we've seen a lot of success in that business.

So I think that we're excited by where we are. I think going forward, it's -- there's no -- until we get extremely large, there isn't necessarily a fundamental ratio that we would shoot for with respect to cars bought relative to cars sold. I think we will just seek to grow both businesses as quickly as we possibly can because we've set up the business to do so. If we're buying significantly more cars than we're selling, then we have the capacity to sell the excess wholesale. If we're not, then we have the capacity to buy cars from other channels. And so we're just going to look to grow both businesses as quickly as we can independently.

**Nicholas Freeman Jones**
*Citigroup Inc. Exchange Research*

Great. Great. And 1 follow-up on, I guess, on -- as you expand, they cover more population. How should we think about that? Is that -- are there going to be some maybe large new markets? Are these mostly adjacent, or maybe there's already kind of high Carvana brand awareness?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So I mean, I think like always, it will likely be a mix of both. I think the way we've historically expanded our network after launching in Atlanta in 2013 is sort of a continuous expansion out from Atlanta and now crossing most of the U.S., there's still some room for us to expand. There's still some fill in markets available to us within the existing footprint of our network. And so we're just going to keep marching forward here toward our goal of near nationwide coverage.

**Operator**

The next question comes from Ron Josey of JMP Securities.

**Ronald Victor Josey**
*JMP Securities LLC, Research Division*

Maybe 1 bigger picture one and then more specific -- some of that...

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Ron, I apologize, can you hear me? We lost you at more specific, if you could start there.

**Ronald Victor Josey**
*JMP Securities LLC, Research Division*

All right. Well, high-level question and 1 more specific question. So -- and it gets to do -- it has to do with just more demand than supply, but then alleviating that in January. So just bigger picture, why is 10 the right number in the next 2 years for IRCs? If the goal is 2 million, why not just go after that, build more in '21, more in '22, et cetera. Because you're clearly seeing the benefits here in January when more supply came on? And then the second question is, it looks like advertising rose 40% in the quarter. And so Mark, as basically demand outstrip supply, can you just talk a little bit more about your advertising plans and -- just making sure that as awareness grows that you've got the supply to sort of back it up?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. So at a high level, I think we -- I think the right way to think about how we're growing IRC capacity is basically as fast as we can. And so that is a relatively long lead time undertaking. You have to find different sites around the country in the areas where you want to be, you have to negotiate transactions, you have to work with the city to get your zoning approvals, you have to then build the physical sites and then you have to hire and train all the people in those sites. So I think the simple way to think about that is we're going as fast as we possibly can. And I think that we recently have added more capacity than ever in our history, and our plan over the next 24 months is to add significantly more capacity than we've ever had in our history, and we're working hard behind the scenes to fill in a robust pipeline behind that. So in general, I think we don't intend to miss on the not ambitious side. We're going to be working really hard to try to build as much capacity as we possibly can.

**Mark Jenkins**
*Chief Financial Officer*

Yes. And then on the advertising point, it's an interesting question that we always face whenever we get constrained in operations. That question is, hey, do you start to pull back in certain areas of the business while you are constrained. And I think when we're balancing those questions, we always, first and foremost, take a long-term view. I think we want to continue to build our brand. We want to continue to provide a great experience to the customer, great value to the customer. And we're going to take -- you're going to look at those things through a long-term lens. In addition, as Ernie has alluded to, we're also -- we have many teams that are working as hard as they can, doing an amazing job, working to scale our production capacity, scale us up in the logistics network and the other parts of our supply chain to help us meet all the demand that we're seeing. And so that's where we're really focused. We know we have a tremendous amount of demand, and we're working as hard as we can to make sure that we can fulfill it all.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

And maybe just a little additional color there, Ron, in case is helpful. I do think that we try to think a little bit differently about brand advertising and direct advertising. And I think when we are severely constrained, we will pull back a bit on some of the kind of direct response advertising, but we still got a really long way to go in brand advertising. Based on our internal surveys that we've done, we still would only have approximately 10% unaided awareness nationally. So there's still a lot of room to go there. And just as part of the long-term view, we do try to balance those things, even though we recognize it can look like a bit of a conflict in the near-term when we're clearly constrained on the supply side and already have an excess of demand.

**Operator**

[Operator Instructions] And our next question comes from John Colantuoni of Jefferies.

**John Robert Colantuoni**

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

*Jefferies LLC, Research Division*

On capacity constraints, should we think of the 80% growth in January as a decent proxy for what unit sales could have grown in Q4 had capacity not been a constraining factor? And I have a follow-up.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I want to be a little careful about diving into too much hypothetical, but let's just talk about January because I think we've at least provided the underlying data for that. We grew at 80% in January, and we had half of the available inventory that we had a year before. We also have longer delivery times than we had the year before. So I think the underlying demand in January, we believe, was sufficient for sales to have grown materially more than they did in January. And I think kind of on either side of that, that is likely true. So I think that's the right way to think about it. As we look forward, we feel like this is really a question of how quickly can we ramp up production capacity, and that's going to be what drives our sales growth. There seems to be significantly more demand than we're able to handle today.

**John Robert Colantuoni**
*Jefferies LLC, Research Division*

Great. And can you help disaggregate the mid 3,000 GPU expected in 2021 between retail, wholesale and finance and other?

**Mark Jenkins**
*Chief Financial Officer*

Yes. So consistent with our past outlooks that we've given over the last several years, we don't break the total GPU components out in our guidance, but we hope that the mid 3,000s total GPU guidance for the year will be helpful.

**Operator**

The next question comes from Brian Nagel of Oppenheimer.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

Nice quarter, congratulations. So I apologize if it's a bit repetitive. But just on -- with regard to supply constraints, you talked about in your letter, in your comments here that those were alleviated somewhat in January, and you saw sales improve significantly. When you refer to supply constraints, is there a delineation between what's in your control and what you're in the process of building out versus external factors that may be persistent for a while longer?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Sure. I would say, in our control would be the characterization of our supply side constraints. And so just to be very clear, what we mean by that, our supply chain means buying cars. It means transferring cars to reconditioning centers, putting roughly $1,000 of parts and labor into those cars, photographing them, preparing them for sale, listing them on the website. A customer calling into an advocate and asks some questions about the car and then going through the purchase process. And then that car being delivered to the customer. That is the sum of the chains. And so I think the places where we historically have seen constraints are in customer care, the advocates in logistics and in the reconditioning center. Today, they are clearly most pronounced in the reconditioning centers. And so that's where the constraints are. And we collectively refer to that supply chain as supply side constraints. The constraints are not in just acquiring vehicles. In general, we have ready access to vehicles.

**Operator**

Our final question will come from Adam Jonas of Morgan Stanley.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

So Ernie, once upon a time, people used to describe Amazon as an online book retailer. Today, Carvana is described as an online used car dealer. Now, look, I think one of the themes from this call is you guys are really constrained to meet demand. And so this question, obviously, is quite long term. And I'm not asking you to break major new information on this call, right. But could the Carvana vertically integrated software and logistics platform that you've built and are growing, could that have a use in addressing auto or fleet management-related markets beyond just used cars, specifically new or mega fleet management, stroke, rideshare, et cetera?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

So that's a big question. So let me start with this. I think we are clearly constrained today, and we clearly have an unbelievable opportunity in front of us, just kind of blocking and tackling and doing exactly what we know how to do. We have 0.7% market share. It's a $40 million year per year unit. There's a ton of room to buy more cars from customers. I think there's theoretical room to accelerate the rate at which customers turn over cars between each other, making the market larger. But then I do think that there's also no doubt that we have a lot of really compelling assets. And I think there's probably lots of ways to think about our assets. But I think one way that's maybe useful is to kind of think about kind of any transaction requires a customer. It requires the transaction itself, and then it requires a vehicle.

And I think when you think about the Carvana business through that lens, kind of the customer is our brand, which I think we've built a pretty exceptional customer brand that's known for delivering great customer experiences. And while there's still a ton of room to grow that, we're investing in it. It's one of the better known brands now in automotive. And so I think that's exciting. I think when you look at the transaction, I think we've built a lot of technology that takes a very complicated vehicle purchase and makes it simple for a customer by kind of taking all the things that go into purchasing a car and the surrounding transactions and just making that easy.

And so that's a tool set that we've built. And then when you think about the supply side, we've got a supply chain that enables us to deliver a car to a customer's door with a branded hauler and a uniformed Carvana team member to what we hope to be 80% of the U.S. population by the end of this year. So I do think that those are very, very interesting assets. And I think that as we think about the way that automotive -- the automotive industry at large evolves over the next decade or so. I think as you think about many of those opportunities, there are many places where those assets or some combination of those assets may be an extremely important and highly differentiated part of various customer value chains. And so I do think that it doesn't take a ton of creativity to see that.

Again, I want to reiterate, the opportunity in front of us is really, really large. And I think that one of the great problems that we face. And I think this is a very high-quality problem as well is trying to find the balance between being extremely focused on the things that we know really well, but making sure that we're ambitious enough to take full advantage of the position in which we find ourselves. And I think that our ability to manage that equation and to continue to move fast, we continue to put space between us and others that are looking at the same problem set, I think is going to end being the story of Carvana over the next decade. So we're aware of all that, and we're trying to make smart decisions as we move forward.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

Okay. Ernie, if I could just have a follow-up and then I'll bust out here. As you're no doubt aware, there are a lot of new EV manufacturers entering the U.S. market. And they all have one thing in common, they don't want to use franchise dealers, right? Not at all. They all want to go direct-to-consumer. I mean, I count 8 to 10 significant new OEMs in the next 3 to 5 years. And I'm counting 15 to 20 by the end of the decade, and that's a very open-ended number. So I'm just kind of -- and these guys as they're coming to market, they're teaming up with partners. I think sister is using Cox or Manheim. Lucid is using Glovis.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Lordstown, I think, Camping World. I mean, give me a break. So again, could you confirm -- you're super capacity constrained, but is your team even at a high level entertaining discussions with this flood of new players that will need logistics and support and customer care support when they have products, but no way to kind of serve the customer? Are there even advanced discussions -- not advanced, preliminary, highly preliminary discussions at this time? Or would you care to avoid that question?

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

I think we're probably smarter to stick with the answer that we gave you to the previous question, and then I would just reiterate that our supply constraints are generally in the reconditioning center. That's generally where they are. So anyway, I appreciate the question. Recognize that there are many opportunities out there. And as I said, I think something we got to do a really good job of over the next 10 years is finding the balance between focus and ambition.

**Operator**

This concludes our question-and-answer session. I would like to turn the conference back over to management for any closing remarks.

**Ernest C. Garcia**
*Founder, President, CEO & Chairman*

Great. Well, thank you, everyone, for joining the call. We really appreciate it. And to the entire Carvana team, unbelievable year. Thank you so much for everything you did. This year threw more at us than we could have possibly imagined. And I don't think there will ever be a year that I'll walk out of prouder, and I hope you feel the same way because you did an incredible job. We stuck together as a team. We're in a great spot as a result. So thank you so much. Talk to you next quarter.

**Operator**
The conference has now concluded. Thank you for attending today's presentation, and you may now disconnect.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2021 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2021 S&P Global Market Intelligence.

# Exhibit 10





# LETTER TO **SHAREHOLDERS**

## Q4 | 2020





# CARVANA

## FEBRUARY 25, 2021







# Annual Key Metrics













*GPU in 2018, 2019, and 2020 include a $43, $31, and $2 impact from the 100k Milestone Gift, respectively. EBITDA margin in 2018, 2019, and 2020 include a 0.6%, 0.4%, and 0.0% impact from the 100k Milestone Gift, respectively.

## 2020 Highlights

### GROWTH

- Fastest growing automotive retailer (+66,562 retail units)

- Became the second largest used automotive retailer in the U.S. in just our 8th year in operation, while still only having ~0.7% market penetration

- Grew revenue to $5.6 billion, up 42% YoY

- Atlanta, our first market, achieved market penetration of 2.34% in Q4

- More than 90% of markets are ramping faster than Atlanta at the same age

- 101 markets with greater than 1% market penetration in Q4, up from 23 last year

- Bought 204k cars from our customers, up 95% from 104k last year

### PROFITABILITY

- First positive EBITDA quarter in Q3

- 7th consecutive year of $400+ of GPU improvement

- 7th consecutive year of EBITDA margin leverage

- Sourced 65% of our retail units sold in Q4 from customers, 13% above the high end of our long-term target range just two years after setting that target

### CUSTOMER EXPERIENCE & CULTURE

- 8th consecutive year of industry-leading Net Promoter Score (NPS)

- Managed through the COVID-19 pandemic with no layoffs or furloughs

- Created the 'We're All In This Together Fund' to benefit employees with temporarily reduced hours, with contributions from over 500 employees, enabling those with reduced hours to maintain over 80% of take-home pay

- Named in the Top 10 of America's best mid-sized employers to work for by Forbes

2

Dear Shareholders,

2020 was a defining year for Carvana. We became the second largest seller of used cars in the country in just our eighth year in operation. We increased GPU by $400 and levered EBITDA margin for the seventh consecutive year.

These achievements mark significant milestones on our march toward becoming the largest and most profitable automotive retailer.

They also came despite the significant challenges brought on by COVID-19. 2020 was a test unlike anything we have faced before. It tested us as people and tested our business. In both tests, we fared very well.

As people, our team embraced our value "We're All In This Together." We shared the financial burden through the 'We're All In This Together Fund' and kept our team intact without any layoffs or furloughs.

As a business, we adapted. We moved from an aggressive growth footing to a defensive posture and back again in a matter of months. The results of those rapid transitions paired with the increases we have seen in demand led to constraints throughout our supply chain, which our team has already made impressive progress toward alleviating.

In our view, our team's resilience and adaptability is the highlight of the year.

We are emerging from 2020 as an even stronger company with even greater ambition.

## Summary of Q4 2020 and 2020 Results

Q4 2020 Financial Results: All financial comparisons stated below are versus Q4 2019, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 72,172, an increase of 43%
- Revenue totaled $1.826 billion, an increase of 65%
- Total gross profit was $244 million, an increase of 71%
- Total gross profit per unit was $3,379, an increase of $549 [1]
- Net loss was $155 million, an increase from $126 million
    - Net loss includes $34 million of debt extinguishment costs associated with the refinancing of our senior unsecured notes in Q4
- EBITDA margin was (3.9%), an improvement from (7.9%) [2]
- Basic and diluted net loss, per Class A share was $0.87 based on 73.2 million shares of Class A common stock outstanding

Q4 2020 Other Results:
- Launched two new inspection and reconditioning centers (IRCs) in a quarter for the first time, opening our 10th near Orlando, FL and 11th near Memphis, TN
- Opened two vending machines near Detroit, MI and in Atlanta, GA, bringing our end-of-year total to 27
- Added five new markets, bringing our end-of-year total to 266 covering 73.7% of the population
- Completed our first SEC registered prime securitization deal selling $405 million in principal balances
- Closed a $1.1 billion senior notes offering ($500 million 5.625% Senior Notes due 2025 and $600 million 5.875% Senior Notes due 2028) and redeemed $600 million 8.875% Senior Notes due 2023

---

[1] Includes a $0 and $24 impact for the current and prior year period, respectively from the 100k Milestone Gift

[2] Includes a 0.0% and 0.2% impact for the current and prior year period, respectively from the 100k Milestone Gift

FY 2020 Financial Results: All financial comparisons stated below are versus 2019, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 244,111, an increase of 37%
- Revenue totaled $5.587 billion, an increase of 42%
- Total gross profit was $794 million, an increase of 57%
- Total gross profit per unit was $3,252, an increase of $400 [3]
- Net loss was $462 million, an increase from $365 million
    - Net loss includes $34 million of debt extinguishment costs associated with the refinancing of our senior unsecured notes in Q4
- EBITDA margin was (4.6)%, an improvement from (6.2%) [4]
- Basic and diluted net loss, per Class A share was $2.63 based on 65.0 million shares of Class A common stock outstanding

## Outlook

Our financial goal is to become the largest and most profitable automotive retailer. Over the past few years, we have made tremendous progress toward this goal, rapidly growing retail units and revenue, increasing GPU, and improving EBITDA margin. We expect to continue our progress toward this goal next year.

In FY 2021, we expect to accelerate growth in retail units sold, and with demand for our offering currently outpacing our supply chain capacity, we expect the level of growth and timing of sales to be governed primarily by the speed at which we scale our production.

We expect revenue growth in FY 2021 to be in line with retail units sold growth. We expect Total GPU, which includes retail, wholesale, and other gross profit, in the mid-$3,000's in FY 2021, continuing our progress on increasing GPU. Finally, in light of the size of our opportunity and our strong financial position, we expect to invest in building our business for the long-term, leading to a small EBITDA margin loss in FY 2021 while continuing our progress on demonstrating leverage.

We are excited about 2021 which we expect to be another significant step toward our long-term goals.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

---

[3] Includes a $2 and $31 impact for the current and prior year period, respectively from the 100k Milestone Gift

[4] Includes a 0.0% and 0.4% impact for the current and prior year period, respectively from the 100k Milestone Gift

4

## Markets & Cohorts

2020 was another year of strong growth across our cohorts, with penetration increasing in our existing markets and our newly launched markets again off to the best start in our history. This strong growth overpowered several headwinds, the most significant of which was supply chain constraints, which constrained growth this year as we sold more cars than we produced. The breadth of our gains in market penetration and the consistency of our growth trends despite these constraints demonstrate the quality of our customer offering. Several key trends in our cohorts excite us:

1. **Our cohorts are growing rapidly.** While COVID-19 and its related effects significantly impacted our company and industry this year, we have seen rapid growth in our cohorts following the initial wave of the pandemic. In Q4 2020, our 2013-2019 cohorts grew retail units sold by 40%, and our oldest cohort of Atlanta grew by 12%, despite a year-over-year reduction in industry-wide used vehicles sales and the absence of a Cyber Monday promotion (see Figure 1). We exited the year growing even faster. In the month of December, our 2013-2019 cohorts grew by nearly 50%, and our oldest cohort of Atlanta grew by 24%. This trend further accelerated in January, with the 2013-2019 cohorts growing by 75% and Atlanta by 45%.

2. **Our growth comes despite significant supply chain constraints.** Since the onset of the pandemic, sales outpacing production has driven our immediately available inventory down from ~25k to ~10k units, reflecting significant COVID-19-related constraints in our inspection and reconditioning centers (see Figure 2). Strong retail unit growth and increased COVID-19 cases around the country have led to continued constraints in Q4 and so far in Q1. Total company retail units sold grew ~80% in January year-over-year, despite immediately available inventory on our website being ~50% lower than a year prior. While production has been our largest constraint, our accelerated growth in December and January also exacerbated constraints in our logistics network, leading to increased average delivery times YoY. We believe returning to normalized available inventory and delivery time levels would have had a significant positive impact on growth in Q4.

3. **Our growth continues to be consistent and broad-based.** As of Q4 2020, more than 90% of our 266 markets are ramping faster than Atlanta at the same age, and 101, 28, and 7 markets have now crossed the milestones of 1.0%, 1.5%, and 2.0% market penetration, respectively, an increase from 23, 7, and 2 respectively last year (see Figure 3). As in past years, we generally continue to see similar trends across markets, including newer markets, smaller markets, and more proximate markets ramping even faster than average.

4. **We are driving advertising leverage over time.** All of our cohorts levered advertising expense per retail unit meaningfully year-over-year in Q4 2020 (see Figure 4), despite the headwinds described in points 1 and 2. In addition, a significant portion of our advertising budget and operational capacity was applied to drive growth in buying cars from customers, which grew 110% year-over-year in Q4 and which is not included in the denominator of our advertising expense per retail unit calculation. We are excited by the advertising leverage in our cohorts and expect them to continue to lever over time as we march toward our long-term financial model.

**Figure 1: Market Penetration by Cohort***

Our market penetration chart provides a way to measure our retail units sold growth in market cohorts controlling for differences in population across cohorts, but it does not adjust for changes in total used vehicle industry sales in a period due to the lack of timely and high-quality used vehicle industry sales data. Changes in industry sales were particularly impactful in 2020 given the significant variability in industry sales throughout the year.



*The line charts in Figures 1 and 4 show the market penetration and advertising expense per unit of our eight annual market cohorts (2013 through 2020) by quarters since launch. The charts align performance of all markets in a cohort with their first quarter in operation and include data in quarters where all markets in a cohort were active (e.g. there is one data point for the 2020 cohort, six for the 2019 cohort, nine for the 2018 cohort, etc.). Additional details on methodology are provided in our Annual Report on Form 10-K.

**Figure 2**



*Immediately available inventory are vehicles listed on our website that have been reconditioned and photographed and are available for immediate purchase by a customer. They are a subset of total website units, which is reported in key operating metrics and represents all vehicles listed on our website including immediately available inventory, vehicles currently engaged in a purchase or reserved by a customer, and units that can be reserved that generally have not yet completed the inspection and reconditioning process.

**Figure 3**



**Figure 4: Advertising Expense per Retail Unit Sold by Cohort**

Our advertising expense per retail unit chart provides a way to measure advertising leverage in our cohorts over time. The data in the chart shows total cohort advertising expense, including advertising focused on buying cars from customers, divided by retail units sold in each cohort.



This shareholder letter marks the fifth year of market and cohort data we have presented as a public company. From our S-1 in early 2017 to today, this data has presented clear and consistent trends in our growth at the market and cohort level. As we approach nationwide geographic coverage, utilize even more national marketing channels, and develop a national brand, we are increasingly viewing our business as an integrated national one, similar to other leading eCommerce players. As a result, we expect this letter to be the last time we present detailed cohort data. Our rapid growth will continue to be evident at the company level.

The patterns in our markets and cohorts are a testament to our customer offering and the positive feedback inherent in our model. The rapid, consistent, and improving growth trends in our cohorts are driven over time by constantly improving products, growing national brand awareness, increased selection, and an expanding delivery network.

8

## Expansion

We opened 120 new markets in 2020, increasing our total market count to 266 and the total percentage of the U.S. population we serve to 73.7%, up from 66.9% at the end of 2019. We also opened 2 new vending machines in the fourth quarter and 4 in the full year, bringing our total to 27. In 2021, we expect to increase our population coverage to 78%-80% while serving more than 300 markets by year-end.

We made significant progress in scaling our production capacity in 2020, and this continues to be a key area of focus for the business. We opened 4 inspection and reconditioning centers (IRCs) in 2020, bringing our annual production capacity at full utilization to more than 600k units at the end of the year.

We expect to open 10 new IRCs by the end of 2022, including 2 in 2021 and 8 in 2022, bringing our total capacity at full utilization to over 1.25M units by the end of 2022. We also expect to significantly grow our logistics fleet, add thousands of customer care and last-mile delivery advocates who have a passion for delivering unparalleled customer experiences, and make significant investments in technology and process optimization to make our entire platform even more efficient and even more scalable. Our expansion plans put us squarely on the path to achieving our goal of selling more than 2 million units per year.



*Projected IRC capacity at full utilization reflects target annual production capacity when each IRC is fully staffed. As in past years, we expect actual production throughput in each year to be lower than fully-utilized capacity due primarily to the time lag in fully staffing IRCs after their launch.



**CARVANA MARKETS, VENDING MACHINES, AND IRCs**

*As of February 25, 2021

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: investors.carvana.com/resources/investor-materials

## Management Objectives

Our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

Below we present our long-term financial model that we introduced at our Analyst Day on November 29, 2018. We believe this is the appropriate frame through which to evaluate our results and progress towards each of our financial objectives.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Long Term Target |
|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 42% | – |
| Gross Margin [1] | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A [2] | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 0.5 – 1.0% |
| SG&A Total as % of Revenue [2] | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 6 – 8% |
| Net Loss Margin [3] | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | – |
| EBITDA Margin [3] | (23.2%) | (16.9%) | (10.5%) | (6.2%) | (4.6%) | 8 – 13.5% |

[1] 100k Milestone Gift impact of 0.2%, 0.1%, and 0.0% in 2018, 2019, and 2020, respectively.
[2] 100k Milestone Gift impact of 0.4%, 0.2%, and 0.0% in 2018, 2019, and 2020, respectively.
[3] 100k Milestone Gift impact of 0.6%, 0.4%, and 0.0% in 2018, 2019, and 2020, respectively.
Note: Numbers may not foot due to rounding.

## Objective #1: Grow Retail Units and Revenue

Q4 2020 marked another quarter of strong growth in retail units sold and revenue.  For the quarter, retail units sold increased to 72,172, up 43% from 50,370 in Q4 2019. Q4 revenue grew to $1.826 billion, up 65% from $1.104 billion. Full year retail units sold was 244,111, up 37%, making us the second largest seller of used vehicles in the country, and total revenue reached $5.587 billion, up 42%. Growth this year was driven by robust demand across our markets and cohorts, despite significant supply chain constraints. Demand continues to outpace our ability to fulfill it, and we are quickly ramping up capacity throughout our supply chain to support accelerated growth in 2021.



**Buying Cars from Customers**

We bought 204k cars from customers in 2020, up 95% for the year, despite temporarily pausing vehicle purchasing at the onset of the pandemic. This growth accelerated in the second half of the year, when we bought more vehicles from customers than we sold to them, underscoring our differentiated customer offering and flexible supply chain.

In Q4 total vehicles acquired from customers grew by 110% YoY. Growth in vehicles acquired from customers also fed our retail inventory, diversifying our selection and improving acquisition prices. In Q4, we sourced 65% of retail units sold from customers, up from 43% in Q4 2019 and 56% last quarter. Combining retail sales with standalone vehicle purchases, we had more than 408k total transactions in 2020, up 59% from over 256k in 2019.





13

## Objective #2: Increase Total Gross Profit Per Unit

Total GPU increased by $549 YoY in Q4 and by $400 for the full year, reflecting broad-based gains.

For Q4 2020:

- Total
  - Total GPU was $3,379 vs. $2,830 in Q4 2019 [5]
- Retail
  - Retail GPU was $1,265 vs. $1,326 in Q4 2019 [5]
  - Sequential changes in retail vehicle GPU vs. $1,857 in Q3 2020 were driven by three primary factors:
    1. ~$300 of the sequential change was due to normal seasonal depreciation in Q4
    2. ~$100 of the sequential change was due to higher-than-normal Q4 seasonal depreciation
    3. ~$200 of the sequential change was due to transitory factors primarily driven by higher costs associated with rapidly ramping our reconditioning capacity in the midst of the third wave of COVID-19
  - Year-over-year changes in retail vehicle GPU were primarily driven by the second and third factors above, partially offset by the absence of a Cyber Monday promotion this year and an increase in the percentage of retail units sourced from customers
- Wholesale
  - Wholesale GPU was $108 vs. $25 in Q4 2019 [5]
  - Year-over-year changes in wholesale GPU were driven by record wholesale volume (units +103% YoY to 21,798) and an increase in gross profit per wholesale unit sold to $358 from $116 in Q4 2019, primarily driven by gains in buying vehicles from customers. Sequential changes were primarily due to a more normalized wholesale depreciation environment in Q4 vs. an atypical environment in Q3.
- Other
  - Other GPU was $2,006 vs. $1,479 in Q4 2019
  - Year-over-year changes in Other GPU were driven by both higher finance and ancillary GPU. Total finance GPU was $1,400 in Q4 compared to $979 in Q4 2019. This YoY increase was primarily driven by our first public securitization, lower benchmark rates, tightened credit standards, and continued credit scoring and pricing optimizations. Ancillary product GPU increased to $606 in Q4 compared to $500 in Q4 2019. Approximately $96 of this change was driven by a reduction in our reserve for vehicle service contract cancellations that we do not expect to recur in future quarters.

For FY 2020:

- Total
  - Total GPU was $3,252 vs. $2,852 in 2019 [6]
  - Total GPU increased $400 year-over-year despite significant impacts from COVID-19 in the first half of the year. Our GPU gains were broad-based, including gains in retail, wholesale, finance, and ancillary products.

---

[5] Total GPU includes a $0 and $24 impact in Q4 2020 and Q4 2019, respectively, from the 100k Milestone Gift. This includes a $0 and $23 impact, respectively, in retail GPU, and a $0 and $2 impact, respectively, in wholesale GPU.

[6] Total GPU includes a $2 and $31 impact in 2020 and 2019, respectively, from the 100k Milestone Gift.

## TOTAL GROSS PROFIT PER UNIT



*2018, 2019, and 2020 include a $43, $31, and $2 impact from the 100k Milestone Gift, respectively. This includes a $42, $28, and $2 impact, respectively, in retail GPU, and a $1, $3, and $0 impact, respectively, in wholesale GPU.

### RETAIL GPU

### WHOLESALE GPU

### FINANCE GPU

### ANCILLARY GPU

15

## Objective #3: Demonstrate Operating Leverage

We levered EBITDA margin for the seventh consecutive year in 2020, despite significant impacts from COVID-19. In Q4, net loss margin levered by 2.9% (including $34 million of Q4 2020 debt extinguishment costs associated with refinancing our senior unsecured notes), and EBITDA margin levered by 4.0% driven by year-over-year improvements in GPU and SG&A leverage.

The fourth quarter is typically an investment quarter for us due to significant seasonal investments in team and infrastructure to prepare for growth in the first half of the next year. Q4 SG&A as a percent of revenue increased by 1.4% vs. Q3 2020, compared to a sequential increase of 3.1% in Q4 2019 and 1.8% in Q4 2018 excluding the 100k Milestone Gift.

In addition, these results were achieved despite transitory expenses equaling approximately 1% of revenue in Q4 2020, including COVID-19-related expenses and several employee-recognition expenses at the end of the year to thank our employees for their outsized efforts in 2020.

For Q4 2020, as a percentage of revenue:

- Total SG&A levered by 3.1%, primarily reflecting benefits from scale and sustained cost efficiencies through the pandemic, moderated by investments to support our growth plan in 2021 and beyond [7]
- Compensation and benefits levered by 1.3%, primarily reflecting benefits from scale and process efficiencies, partially offset by investments to support our growth plan in 2021 and beyond
- Advertising levered by 0.7%, reflecting growing brand awareness while supporting advertising focused on buying cars from customers
- Logistics and market occupancy levered by 0.4%, reflecting improving efficiency and volumes through our fulfillment network
- Other SG&A levered by 0.8%, primarily reflecting benefits from scale partially offset by investments to support our growth plan in 2021 and beyond

For FY 2020, as a percentage of revenue:

- Total SG&A increased by 0.2%, primarily reflecting inefficiencies around the onset of the pandemic in the first half of the year, partially offset by the scale and leverage achieved in the second half [8]
- Compensation and benefits levered by 0.1%, advertising levered by 0.1%, logistics and market occupancy was approximately flat, and other SG&A increased by 0.4%



*2018, 2019, and 2020 include a 0.6%, 0.4%, and 0.0% impact from the 100k Milestone Gift, respectively.
**2020 Net loss includes $34 million (0.6%) of debt extinguishment costs associated with refinancing our senior unsecured notes in Q4.

---

[7] Prior year period includes a 0.1% impact from the 100k Milestone Gift, contained within Compensation and Benefits
[8] Prior year period includes a 0.1% impact from the 100k Milestone Gift, contained within Compensation and Benefits

## Summary

A year ago, our shareholder letter didn't include a single mention of COVID-19. It's amazing to see the sweeping changes to the world, to consumers, and within Carvana that COVID-19 has driven.

We are extremely proud of how our team came together in 2020 to adapt to the seemingly endless change. To every member of the team, thank you.

We have always been a team of extreme ambition on a mission to change the way people buy cars. Today we are a stronger team with even greater ambition.

We have built a platform that enables the best customer experiences, the best unit economics, and is the most scalable in automotive retail. This is a powerful combination.

The path forward is clear.

The march continues.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

# Appendix

*Conference Call Details*

Carvana will host a conference call today, February 25, 2021, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until March 4, 2021, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10151970#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2020.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except per share amounts)**

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 300,810 | $ 76,016 |
| Restricted cash | 28,301 | 42,443 |
| Accounts receivable, net | 78,563 | 39,864 |
| Finance receivables held for sale, net | 274,941 | 286,969 |
| Vehicle inventory | 1,036,235 | 762,696 |
| Beneficial interests in securitizations | 131,274 | 98,780 |
| Other current assets, including $6,434 and $0, respectively, due from related parties | 73,023 | 52,654 |
| Total current assets | 1,923,147 | 1,359,422 |
| Property and equipment, net | 909,166 | 543,471 |
| Operating lease right-of-use assets, including $21,809 and $44,583, respectively, from leases with related parties | 155,464 | 123,420 |
| Intangible assets, net | 5,643 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $3,753 and $6,138, respectively, due from related parties | 31,758 | 14,850 |
| Total assets | $ 3,034,531 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $15,509 and $9,549, respectively, due to related parties | $ 342,314 | $ 234,443 |
| Short-term revolving facilities | 39,820 | 568,840 |
| Current portion of long-term debt | 65,497 | 48,731 |
| Other current liabilities, including $3,471 and $4,518, respectively, from leases with related parties | 19,506 | 12,856 |
| Total current liabilities | 467,137 | 864,870 |
| Long-term debt, excluding current portion, including $0 and $15,000, respectively, held by a related party | 1,617,002 | 883,060 |
| Operating lease liabilities, excluding current portion, including $18,645 and $41,829, respectively, from leases with related parties | 147,478 | 116,071 |
| Other liabilities | 1,411 | 1,808 |
| Total liabilities | 2,233,028 | 1,865,809 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized, and none issued and outstanding as of December 31, 2020 and 2019, respectively | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized, 76,512 and 50,507 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 77 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized, 95,592 and 101,219 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 96 | 101 |
| Additional paid in capital | 741,601 | 280,994 |
| Accumulated deficit | (354,174) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 387,600 | 98,112 |
| Non-controlling interests | 413,903 | 93,827 |
| Total stockholders' equity | 801,503 | 191,939 |
| Total liabilities & stockholders' equity | $ 3,034,531 | $ 2,057,748 |

19

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share amounts)**

| | Three Months Ended December 31, | | Years Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | (unaudited) | | | |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 1,495,386 | $ 949,971 | $ 4,740,595 | $ 3,420,601 |
| Wholesale vehicle sales, including $2,780, $0, $4,145, and $0, respectively, from related parties | 186,271 | 79,112 | 445,236 | 267,586 |
| Other sales and revenues, including $35,315, $19,291, $104,738, and $59,677, respectively, from related parties | 144,749 | 74,505 | 400,734 | 251,709 |
| **Net sales and operating revenues** | 1,826,406 | 1,103,588 | 5,586,565 | 3,939,896 |
| Cost of sales, including $858, $870, $3,522, and $4,357, respectively, to related parties | 1,582,542 | 961,041 | 4,792,800 | 3,433,482 |
| **Gross profit** | 243,864 | 142,547 | 793,765 | 506,414 |
| Selling, general and administrative expenses, including $4,967, $3,985, $18,597, and $13,869, respectively, to related parties | 342,674 | 241,663 | 1,126,161 | 786,717 |
| Interest expense, including $0, $333, $998, and $1,331, respectively, to related parties | 62,475 | 24,653 | 131,528 | 80,606 |
| Other (income) expense, net | (6,573) | 1,971 | (1,447) | 3,730 |
| **Net loss before income taxes** | (154,712) | (125,740) | (462,477) | (364,639) |
| Income tax provision | (93) | — | (255) | — |
| **Net loss** | (154,619) | (125,740) | (462,222) | (364,639) |
| Net loss attributable to non-controlling interests | (91,281) | (84,607) | (291,082) | (249,980) |
| **Net loss attributable to Carvana Co.** | (63,338) | (41,133) | (171,140) | (114,659) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.87) | $ (0.82) | $ (2.63) | $ (2.45) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | 73,193 | 50,211 | 64,981 | 46,847 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | For the Years Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | **2020** | **2019** | **2018** |
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ (462,222) | $ (364,639) | $ (254,745) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 73,791 | 41,265 | 23,539 |
| Loss on disposal of property and equipment | 6,130 | 1,714 | 575 |
| Provision for bad debt and valuation allowance | 20,962 | 11,922 | 1,917 |
| Gain on loan sales | (217,643) | (137,301) | (51,729) |
| Equity-based compensation expense | 25,088 | 33,063 | 24,095 |
| Amortization and write-off of debt issuance costs and bond premium | 7,959 | 5,541 | 2,305 |
| Loss on early extinguishment of debt | 33,683 | — | — |
| Originations of finance receivables | (3,579,156) | (2,625,351) | (1,259,539) |
| Proceeds from sale of finance receivables, net | 3,634,520 | 2,643,912 | 1,633,519 |
| Purchase of finance receivables | — | (161,781) | (387,445) |
| Principal payments received on finance receivables held for sale | 90,235 | 85,017 | — |
| Unrealized (gain) loss on beneficial interest in securitization | (8,823) | 964 | — |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (42,995) | (9,741) | (19,212) |
| Vehicle inventory | (263,321) | (344,861) | (183,068) |
| Other assets | (26,415) | (32,619) | (12,249) |
| Accounts payable and accrued liabilities | 94,179 | 97,912 | 68,550 |
| Operating lease right-of-use assets | (32,044) | (46,928) | — |
| Operating lease liabilities | 38,057 | 45,195 | — |
| Other liabilities | (397) | (418) | (853) |
| Net cash used in operating activities | (608,412) | (757,134) | (414,340) |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment, including $21,657 and $6,282 in 2020 and 2019, respectively, from related parties | (359,801) | (230,538) | (143,668) |
| Principal payments received on beneficial interests in securitizations | 13,875 | 2,799 | — |
| Business acquisitions, net of cash acquired | — | — | (6,670) |
| Net cash used in investing activities | (345,926) | (227,739) | (150,338) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from short-term revolving facilities | 4,429,185 | 4,485,917 | 1,848,051 |
| Payments on short-term revolving facilities | (4,958,205) | (4,219,415) | (1,899,880) |
| Proceeds from issuance of long-term debt, including $25,000[(1)] in 2018 from related parties | 1,335,779 | 481,772 | 399,063 |
| Payments on long-term debt | (653,589) | (15,683) | (35,522) |
| Payments of debt issuance costs | (29,394) | (11,445) | (11,390) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 | 172,287 |
| Net proceeds from issuance of Class A Convertible Preferred Stock | — | — | (12) |
| Proceeds from exercise of stock options | 5,419 | 1,696 | 795 |
| Tax withholdings related to restricted stock units and awards | (23,145) | (5,830) | (2,509) |
| Dividends paid on Class A Convertible Preferred Stock | — | — | (4,619) |
| Net cash provided by financing activities | 1,164,990 | 1,014,623 | 466,264 |
| **Net increase (decrease) in cash and cash equivalents** | 210,652 | 29,750 | (98,414) |
| Cash, cash equivalents, and restricted cash at beginning of period | 118,459 | 88,709 | 187,123 |
| Cash, cash equivalents, and restricted cash at end of period | $ 329,111 | $ 118,459 | $ 88,709 |

(1) A related party initially acquired $25.0 million of the senior unsecured notes during the year ended December 31, 2018, of which it subsequently disposed of $10.0 million, and held $15.0 million as of December 31, 2019 and $0.0 million as of December 31, 2020.

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

| | Three Months Ended December 31, | | Years Ended December 31, | |
|---|---|---|---|---|
| | **2020** | **2019** | **2020** | **2019** |
| | **(in thousands)** | | | |
| Weighted-average shares of Class A common stock outstanding | 73,193 | 50,211 | 64,981 | 46,847 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 101,360 | 105,407 | 104,021 | 106,623 |
| | 174,553 | 155,618 | 169,002 | 153,470 |

22

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

In prior periods, we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded, it is not material to current or future years and the adjustment is no longer included within similar calculations. For the year ended December 31, 2020, there was approximately $0.5 million of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the years ended December 31, 2019 and December 31, 2018, there was approximately $13.2 million and $11.8 million, respectively, of stock based compensation related to the 100k Milestone Gift impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including $5.4 million and $4.0 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss, which is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2019 | Jun 30, 2019 | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 |
| | (dollars in thousands) | | | | | | | |
| Net loss[1] | $(82,596) | $(64,059) | $(92,244) | $(125,740) | $(183,557) | $(106,326) | $(17,720) | $(154,619) |
| Depreciation and amortization expense | 7,943 | 8,887 | 10,675 | 13,760 | 15,811 | 17,629 | 18,636 | 21,715 |
| Interest expense | 15,648 | 19,315 | 20,990 | 24,653 | 28,862 | 19,915 | 20,276 | 62,475 |
| Income tax provision | — | — | — | — | — | (238) | 76 | (93) |
| EBITDA | $(59,005) | $(35,857) | $(60,579) | $(87,327) | $(138,884) | $(69,020) | $ 21,268 | $(70,522) |
| | | | | | | | | |
| Total revenues | $755,234 | $986,221 | $1,094,854 | $1,103,587 | $1,098,216 | $1,118,334 | $1,543,609 | $1,826,406 |
| Net Loss Margin | (10.9)% | (6.5)% | (8.4)% | (11.4)% | (16.7)% | (9.5)% | (1.1)% | (8.5)% |
| EBITDA Margin[2] | (7.8)% | (3.6)% | (5.5)% | (7.9)% | (12.6)% | (6.2)% | 1.4 % | (3.9)% |

(1) Includes $3.0 million, $3.3 million, $4.4 million, $2.5 million, $0.5 million, $0.0 million, $0.0 million, and $0.0 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.4%, 0.3%, 0.4%, 0.2%, 0.0%, 0.0%, 0.0%, and 0.0%, respectively, related to the 100k Milestone Gift.

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

| | For the Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** | **2015** | **2014** |
| | (dollars in thousands) | | | | | | |
| Net loss[1] | $(462,222) | $(364,639) | $(254,745) | $(164,316) | $(93,112) | $(36,780) | $(15,238) |
| Depreciation and amortization expense | 73,791 | 41,265 | 23,539 | 11,568 | 4,658 | 2,800 | 1,705 |
| Interest expense | 131,528 | 80,606 | 25,018 | 7,659 | 3,587 | 1,412 | 108 |
| Income tax provision | (255) | — | — | — | — | — | — |
| EBITDA | $(257,158) | $(242,768) | $(206,188) | $(145,089) | $(84,867) | $(32,568) | $(13,425) |
| | | | | | | | |
| Total revenues | $5,586,565 | $3,939,896 | $1,955,467 | $858,870 | $365,148 | $130,392 | $41,679 |
| Net Loss Margin | (8.3)% | (9.3)% | (13.0)% | (19.1)% | (25.5)% | (28.2)% | (36.6)% |
| EBITDA Margin[2] | (4.6)% | (6.2)% | (10.5)% | (16.9)% | (23.2)% | (25.0)% | (32.2)% |

(1) Includes $0.5 million, $13.2 million, $11.8 million, $0.0 million, $0.0 million, $0.0 million, and $0.0 million, respectively, related to the 100k Milestone Gift.

(2) Includes 0.0%, 0.4%, 0.6%, 0.0%, 0.0%, 0.0% and 0.0%, respectively, related to the 100k Milestone Gift.

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended December 31, | | | Years Ended December 31, | | |
|---|---|---|---|---|---|---|
| | **2020** | **2019** | **Change** | **2020** | **2019** | **Change** |
| | (dollars in thousands, except per unit amounts) | | | | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $1,495,386 | $ 949,971 | 57.4 % | $ 4,740,595 | $ 3,420,601 | 38.6 % |
| Wholesale vehicle sales [1] | 186,271 | 79,112 | 135.5 % | 445,236 | 267,586 | 66.4 % |
| Other sales and revenues [2] | 144,749 | 74,504 | 94.3 % | 400,734 | 251,709 | 59.2 % |
| Total net sales and operating revenues | $1,826,406 | $1,103,587 | 65.5 % | $ 5,586,565 | $ 3,939,896 | 41.8 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 91,306 | $ 66,792 | 36.7 % | $ 359,341 | $ 237,855 | 51.1 % |
| Wholesale vehicle gross profit [1][4] | 7,809 | 1,250 | 524.7 % | 33,690 | 16,850 | 99.9 % |
| Other gross profit [2] | 144,749 | 74,504 | 94.3 % | 400,734 | 251,709 | 59.2 % |
| Total gross profit | $ 243,864 | $ 142,546 | 71.1 % | $ 793,765 | $ 506,414 | 56.7 % |
| **Market information:** | | | | | | |
| Markets, beginning of period | 261 | 146 | 78.8 % | 146 | 85 | 71.8 % |
| Market launches | 5 | — | n/a | 120 | 61 | 96.7 % |
| Markets, end of period | 266 | 146 | 82.2 % | 266 | 146 | 82.2 % |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 72,172 | 50,370 | 43.3 % | 244,111 | 177,549 | 37.5 % |
| Wholesale vehicle unit sales | 21,798 | 10,740 | 103.0 % | 55,204 | 39,895 | 38.4 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 20,720 | $ 18,860 | 9.9 % | $ 19,420 | $ 19,266 | 0.8 % |
| Wholesale vehicles | $ 8,545 | $ 7,366 | 16.0 % | $ 8,065 | $ 6,707 | 20.2 % |
| **Per unit gross profit: [5]** | | | | | | |
| Used vehicle gross profit [3] | $ 1,265 | $ 1,326 | (4.6)% | $ 1,472 | $ 1,340 | 9.9 % |
| Wholesale vehicle gross profit [4] | $ 358 | $ 116 | 208.6 % | $ 610 | $ 422 | 44.5 % |
| Other gross profit | $ 2,006 | $ 1,479 | 35.6 % | $ 1,642 | $ 1,418 | 15.8 % |
| Total gross profit | $ 3,379 | $ 2,830 | 19.4 % | $ 3,252 | $ 2,852 | 14.0 % |

(1) Includes $2,780, $0, $4,145, and $0, respectively, of wholesale revenue from related parties.
(2) Includes $35,315, $19,291, $104,738, and $59,677, respectively, from related parties.
(3) Includes $0, $1,139, $510, and $5,092 or $0, $23, $2, and $28 per unit, respectively, related to the 100k Milestone Gift.
(4) Includes $0, $91, $17, and $358 or $0, $9, $0, and $9 per wholesale unit, respectively, related to the 100k Milestone Gift.
(5) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2019 | Jun 30, 2019 | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 |
| | (in thousands) | | | | | | | |
| Compensation and benefits [1] | $ 48,804 | $ 54,184 | $ 60,655 | $ 72,939 | $ 84,250 | $ 74,202 | $ 80,248 | $ 99,621 |
| 100k Milestone Gift | 2,188 | 1,415 | 2,903 | 1,263 | — | — | — | — |
| Advertising | 39,522 | 50,367 | 55,264 | 58,867 | 74,788 | 62,330 | 65,148 | 84,167 |
| Market occupancy [2] | 4,370 | 4,720 | 5,517 | 6,644 | 8,103 | 8,019 | 9,733 | 10,593 |
| Logistics [3] | 12,249 | 13,643 | 14,068 | 18,090 | 18,914 | 16,699 | 18,073 | 23,136 |
| Other [4] | 48,108 | 57,514 | 69,563 | 83,860 | 89,656 | 78,684 | 94,640 | 125,157 |
| Total | $ 155,241 | $ 181,843 | $ 207,970 | $ 241,663 | $ 275,711 | $ 239,934 | $ 267,842 | $ 342,674 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.

(2) Market occupancy costs includes occupancy costs of our vending machines and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3) Logistics includes fuel, maintenance, and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4) Other costs include all other selling, general, and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

| | | December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2020** | | **2019** |
| | | **(in thousands)** | | |
| Cash and cash equivalents | $ | 300,810 | $ | 76,016 |
| Availability under short-term revolving facilities[1] | | 1,088,259 | | 279,080 |
| Availability under sale-leaseback agreements[2][3] | | 18,549 | | 104,680 |
| **Committed liquidity resources available** | $ | **1,407,618** | $ | **459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) We had $75.0 million available for sale and leaseback transactions under a master sale-leaseback agreement as of December 31, 2019 and an additional $18.5 million and $29.7 million as of December 31, 2020 and December 31, 2019, respectively, available under sale-leaseback arrangements with other parties.
(3) We have $249.7 million and $158.7 million of total unfunded gross real estate assets as of December 31, 2020 and 2019, respectively.

As of  December 31, 2020 and 2019, the short-term revolving facilities had total capacity of approximately $2.3 billion and $1.6 billion, an outstanding balance of $39.8 million and $568.8 million, and unused capacity of $2.2 billion and $1.0 billion, respectively.

We also had $6.3 million and $137.7 million of committed funds for future construction costs of IRCs with unfinished construction as of December 31, 2020 and 2019, respectively.

In addition, we had $47.7 million and $13.5 million of total unpledged beneficial interests in securitizations as of December 31, 2020 and 2019, respectively.

27













