# Exhibit 21





# LETTER TO **SHAREHOLDERS**

# Q4 | 2021







CARVANA

FEBRUARY 24, 2022




# Annual Key Metrics



**RETAIL UNITS SOLD**

2014: 2,105 · 2015: 6,523 · 2016: 18,761 · 2017: 44,252 · 2018: 94,108 · 2019: 177,549 · 2020: 244,111 · 2021: 425,237



**TOTAL REVENUE ($M)**

2014: $42 · 2015: $130 · 2016: $365 · 2017: $859 · 2018: $1,955 · 2019: $3,940 · 2020: $5,587 · 2021: $12,814



**TOTAL MARKETS AT YEAR END**

2014: 3 · 2015: 9 · 2016: 21 · 2017: 44 · 2018: 85 · 2019: 146 · 2020: 266 · 2021: 311



**CAR VENDING MACHINES**

2015: 1 · 2016: 2 · 2017: 7 · 2018: 15 · 2019: 23 · 2020: 27 · 2021: 30



**GROSS PROFIT PER UNIT**

2014: $(201) · 2015: $206 · 2016: $1,023 · 2017: $1,539 · 2018: $2,090 · 2019: $2,852 · 2020: $3,252 · 2021: $4,537



**NET INCOME (LOSS) AND EBITDA MARGIN**

EBITDA: 2014: -32.2% · 2015: -25.0% · 2016: -23.2% · 2017: -16.9% · 2018: -10.5% · 2019: -6.2% · 2020: -4.6% · 2021: -0.0%

NET INCOME (LOSS): 2014: -36.6% · 2015: -28.2% · 2016: -25.5% · 2017: -19.1% · 2018: -13.0% · 2019: -9.3% · 2020: -8.3% · 2021: -2.2%

EBITDA    NET INCOME (LOSS)

# 2021 Highlights

## GROWTH

- Fastest growing e-commerce company in US history

- Fastest automotive retailer to sell one million vehicles online

- Fastest automotive retailer to organically grow to selling more than 400,000 vehicles in one year

- Grew revenue to $12.8 billion, up 129% YoY

- Atlanta, our first market, achieved market penetration of 3.5% in Q4, an increase of 51% YoY

- 95% of markets are ramping faster than Atlanta at the same age

- 214 markets with greater than 1% market penetration in Q4, up from 101 last year

- 113 markets with greater than 1.5% market penetration in Q4, up from 28 last year

- 47 markets with greater than 2% market penetration in Q4, up from 7 last year

- Triple digit growth in total customer transactions (cars sold + standalone cars bought) for the 7th year

## PROFITABILITY

- First full year of positive EBITDA margin, excluding one-time items[1]

- First profitable quarter in Q2 2021

- 8th consecutive year of $400+ of gross profit per unit (GPU) improvement

- 8th consecutive year of EBITDA margin leverage

## CUSTOMER EXPERIENCE & CULTURE

- 9th consecutive year of 80+ Net Promoter Score

- Highest ranking retail or technology company on Forbes Best Employer in the U.S. and #8 overall

- Granted equity to all Carvana team members as we have done for each of the five years that we have been a public company

- Added to the Fortune 500 list in only 8 years, becoming one of the four fastest companies to ever make the list with organic growth, along with Amazon, Google, and Facebook

---

[1] In our commercial agreement with Root, we received 42 million warrants to acquire common stock in Root that vest upon the earlier of product integration or 18 months. We recorded these assets and related deferred revenue in Q4 2021, and we also recorded a fair value adjustment to the warrants of -$24 million.

Dear Shareholders,

2021 was an extraordinary year for Carvana full of landmark accomplishments on our mission of changing the way people buy and sell cars.

We were named to the Fortune 500; tied for the third fastest company to ever do so. We sold our 1 millionth car; growing to achieve this milestone faster than any automotive retailer in history. We had our first positive earnings quarter. And we had our first EBITDA positive year, excluding one-time items[1]. We became the fastest growing e-commerce company in US history, hitting over $12 billion in revenue in just 9 years. And we were named to the top 10 of Forbes Best Large Employers list, ranked ahead of all other retail and technology companies.

This list of accomplishments can only be achieved with a clear, customer focused mission, paired with an enormous opportunity, viewed through a long-term lens, and powered by a lot of work from a lot of great people. We have a lot of great people and they are putting in the work.

The end of 2021 and the start of 2022 have come with more challenges for our team to face. The Omicron wave has impacted our supply chain deeply. We have seen the fastest increase in interest rates in recent memory, and we have seen historic vehicle price increases. These impacts will make for a challenging first quarter.

But the foundation of our mission and of the hard work put in over many years by our great people clearly lights the path to a very strong remainder of the year and to the achievement of many more landmark accomplishments beyond.

We remain firmly on the path to changing the way people buy cars, to delivering millions of cars per year, and to becoming the largest and most profitable automotive retailer.

## Summary of Q4 2021 and 2021 Results

Q4 2021 Financial Results: All financial comparisons stated below are versus Q4 2020, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 113,016 an increase of 57%
- Revenue totaled $3.753 billion, an increase of 105%
- Total gross profit was $516 million, an increase of 111%
- Total gross profit per unit was $4,566, an increase of $1,187
- Net loss was $182 million, an increase from $154 million
- EBITDA margin was (2.5%) an improvement from (3.9%)
  - Includes (0.6%) impact from one-time items[1]
- Basic and diluted net loss, per Class A share was $1.02 based on 86.9 million shares of Class A common stock outstanding

FY 2021 Financial Results: All financial comparisons stated below are versus 2020, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 425,237, an increase of 74%
- Revenue totaled $12.814 billion, an increase of 129%
- Total gross profit was $1.929 billion, an increase of 143%
- Total gross profit per unit was $4,537, an increase of $1,285
- Net loss was $287 million, an improvement from $462 million
- EBITDA margin was (0.0%), an improvement from (4.6%)
  - Includes (0.2%) impact from one-time items[1]

---

[1] In our commercial agreement with Root, we received 42 million warrants to acquire common stock in Root that vest upon the earlier of product integration or 18 months. We recorded these assets and related deferred revenue in Q4 2021, and we also recorded a fair value adjustment to the warrants of -$24 million.

- Basic and diluted net loss, per Class A share was $1.63 based on 82.8 million shares of Class A common stock outstanding

<u>Other Results and Recent Events</u>:

- In FY 2021, we opened 45 markets, expanding our population coverage by 7.3% to 81.0%
- In Q4 2021, we opened our 14th inspection and reconditioning center (IRC) near Salt Lake City
- Following year end, we opened our 15th IRC near Cincinnati, OH

## Ernie's 1 Million Unit Milestone Gift to Carvana Employees

In January 2022, in recognition of Carvana selling its 1 millionth vehicle in Q4, CEO Ernie Garcia III committed to giving current employees 23 shares of his personal stock once they reach their two-year employment anniversary, a gift worth over $100 million at the announcement's stock price. Similar to the 2018 100k Milestone Gift, Ernie Garcia wanted to recognize and reward all Carvana team members who have contributed time, dedication, and effort to helping Carvana reach these monumental achievements.

Because this gift is Ernie's personal stock, it does not have a dilutive effect on existing shareholders. However, in accordance with U.S. GAAP the gift will be recorded as share-based compensation expense in our consolidated statement of operations. As a result, we expect the gift to have a ~$60 million impact on FY 2022 EBITDA, including a ~$30 million impact in Q1 2022.[2]

## Outlook

We expect another year of significant growth and strong financial performance in 2022 on our path toward achieving our mission of changing the way people buy and sell cars and becoming the largest and most profitable automotive retailer.

In FY 2022, we expect to grow retail units sold to over 550k. Following the first quarter, in Q2 through Q4 taken in aggregate, we expect total GPU over $4,000 and approximately breakeven EBITDA margin.

We expect the first quarter to be a tougher quarter as a result of the supply chain challenges brought on by the Omicron variant and severe winter storms and the recent rapid increase in short-term interest rates. We expect these effects to have a significant impact on total GPU and SG&A per retail unit sold, leading to an expected EBITDA margin loss in the mid-single digit range. For more granular information on the impacts of the environment on the first quarter, please see the Appendix.

This outlook excludes any impacts from our acquisition of ADESA's U.S. physical auction business. We will provide more information at a later time.

We are excited about 2022 and expect to take another significant step toward reaching our long-term goals.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

---

[2] Our FY 2022 outlook excludes the impact of Ernie's gift. We will call out the impact of gift amounts in future letters. For additional information, please see the 1 Million Milestone Gift materials posted on our investor relations website

## Acquisition of ADESA U.S.

We have always framed our opportunity simply. Customers desire the experience we provide for them. Providing it is hard. It requires a difficult combination of culture, technology, operations and infrastructure.

That simple frame is clarifying. To achieve our goals, we must continue to deliver great customer experiences. We must continue to differentiate our unit economics. And we must scale. That is our path.

In alignment with that path, today we are extremely excited to announce that we have signed a definitive agreement to acquire ADESA's U.S. physical auction business ("ADESA U.S."), a wholly owned subsidiary of KAR Auction Services, Inc. ("KAR"), subject to customary closing conditions.

ADESA U.S. is the nation's 2nd largest network of physical auctions servicing a broad set of commercial and dealer customers with a range of wholesale used vehicle auction solutions. The ADESA U.S. business facilitated ~1 million transactions in 2021 through 56 sites totaling approximately 6.5 million square feet of buildings on more than 4,000 acres.

We plan to continue operating ADESA U.S.'s physical auctions while simultaneously developing the sites to include Carvana's standard retail inspection, reconditioning, and logistics capabilities. Over time we expect approximately 2M units of annual production capacity from the ADESA U.S. sites once fully built out, the equivalent of 30 greenfield Carvana IRCs, bringing total future IRC capacity to over 3M units at full utilization.

The acquisition is expected to close in the second quarter of 2022 and will be financed with $3.275 billion in committed debt financing to fund the $2.2 billion purchase price and an additional $1 billion in improvements across the 56 sites.



Our rationale for the acquisition is fourfold:

1. Further solidify our path to becoming the largest and most profitable automotive retailer.

2. These locations instantly provide us with a nationwide IRC network that we estimate will increase our production capacity by approximately 2M units per year once fully built out over time.

3. These locations will substantially improve our logistics network as we move from currently having IRCs within 100 miles of 32% of the US population to 78% of the US population as the ADESA U.S. sites are fully built out and join the IRC network.  This will reduce shipping times and unlocks the opportunity for same day and next day delivery to more customers than ever before.

4. This significantly increases our auction capabilities and kickstarts or deepens our relationships with many large and important players in the automotive industry. We look forward to working with our new customers, to creatively finding new and interesting ways to work together, and to valuing them in the same ways we have always valued our customers.

In addition to clearly lighting the path to increasing ambitions and solidifying confidence in that path, we also expect this acquisition to accelerate our progress toward our long-term financial model.

We offer more detail and data on this rationale in our ADESA U.S. Acquisition Deck which is available on our investor relations website.

2 million + car sales per year is no longer the goal. We are aiming higher.

## Progress Toward our Long-Term Goals

Carvana's long-term vision is clear. Our goal is to become the largest and most profitable auto retailer by building a business that delivers exceptional customer experiences, superior unit economics, and rapid scalability. Our results in 2021 speak to our continued progress toward this vision. In 2021, we grew revenue by triple digits for the seventh year out of our 8 years as a company, achieved gross margin within our long-term model range, and earned positive EBITDA margin for the first time, excluding one-time items[1]. In addition, we continue to see exciting trends throughout the business on our way toward our long-term model.

## LONG TERM FINANCIAL GOALS

|  | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | Long Term Target |
|---|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 42% | 129% | – |
| Gross Margin | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15.1% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 3.7% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 11.3% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 0.8% | 0.5 – 1.0% |
| SG&A Total as % of Revenue | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 15.9% | 6 – 8% |
| Net Income (loss) Margin | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% | – |
| EBITDA Margin | (23.2%) | (16.9%) | (10.5%) | (6.2%) | (4.6%) | (0.0)%* | 8 – 13.5% |

*Includes (0.2%) impact from one-time items

---

[1] In our commercial agreement with Root, we received 42 million warrants to acquire common stock in Root that vest upon the earlier of product integration or 18 months. We recorded these assets and related deferred revenue in Q4 2021, and we also recorded a fair value adjustment to the warrants of -$24 million.

**Market Penetration**

We continue to see rapid growth in our cohorts. In Q4 2021, our 2013-2020 cohorts grew retail units sold by 52%, and our oldest cohort of Atlanta grew by 51% to 3.53% market penetration, a new company record. We also continue to see broad based gains across cohorts. As of Q4 2021, 95% of our 311 markets are ramping faster than Atlanta at the same age, and record numbers of markets are crossing key market penetration thresholds.

## NUMBER OF MARKETS ABOVE MARKET PENETRATION MILESTONES



**Cohort Economics**

In FY 2021, five of our nine cohorts had positive EBITDA margin, and our two oldest cohorts achieved EBITDA margin greater than 4% for the full year. Profitable unit economics in older cohorts highlight a clear path toward our long-term model and have several drivers. First, older cohorts have lower advertising expense as a percent of revenue than the company as a whole, since they have had more time for awareness to accumulate and for word of mouth and repeat customers to grow. Second, older cohorts have lower outbound logistics expense as a percent of revenue, since they tend to be closer to scaled inspection and reconditioning centers. Third, older cohorts have higher sales volume than newer ones, allowing market and fixed expenses to be spread across a greater number of retail units sold.

## Expansion

We made significant progress in scaling our production capacity in 2021. We opened three new inspection and reconditioning center (IRCs) during the year, including one near Salt Lake City, Utah in Q4 that we initially scheduled for 2022. These new IRCs increased our total IRC count to 14 at the end of 2021. Our 2021 progress in scaling IRCs enabled us to increase our average immediately available inventory from 9k in Q1 to 25k in Q4.

Following year end, we also opened our 15th IRC near Cincinnati, Ohio, increasing total capacity at full utilization to ~880k units as of February 24, 2022. In addition to Salt Lake City and Cincinnati, we have 6 additional IRCs that are on track to open by the end of 2022. We plan to open 5 of these on schedule, leading to 1.2M+ units of annual capacity at full utilization by year end, and with our acquisition of ADESA U.S., we are currently evaluating our preferred timeline on opening the sixth.

Looking beyond 2022, we expect to focus our expansion efforts on developing ADESA U.S. sites on the path toward unlocking approximately 2M units of incremental annual production capacity at full utilization.

We opened 45 new markets in 2021, increasing our total market count to 311 and the total percentage of the U.S. population we serve to 81.0%, up from 73.7% at the end of 2020. We also opened three new vending machines in 2021, raising our total to 30. In 2022, we expect to continue marching toward our goal of 95% population coverage in the U.S.

## CARVANA MARKETS, VENDING MACHINES, AND IRCs



*As of February 24, 2022

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: https://investors.carvana.com/investor-resources/investor-materials

9

## Management Objectives

Our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

## Objective #1: Grow Retail Units and Revenue

It took us roughly 6 months to sell our 100th vehicle, 3 years to sell our 10,000th vehicle, 5 years to sell our 100,00th vehicle, and now, in Q4 we sold our 1 millionth vehicle, making us the fastest used auto retailer to reach this milestone in just 9 years.

For the quarter, retail units sold increased to 113,016, up 57% from 72,172 in Q4 2020. Q4 revenue grew to $3.753 billion, up 105% from $1.827 billion. Full year retail units sold was 425,237, up 74%, and total revenue reached $12.814 billion, up 129%. Revenue grew faster than retail units in 2021 due to higher used vehicle prices, higher wholesale volume from buying more cars from customers, and higher other revenue per retail unit compared to the prior year.

2021 was another year of historically rapid growth, despite a unique environment and significant supply chain constraints.

## QUARTERLY RETAIL UNIT SALES



## Objective #2: Increase Total Gross Profit Per Unit

Total GPU increased by $1,187 YoY in Q4 and by $1,285 for the full year, reflecting gains across all components.

For Q4 2021:

- Total
  - Total GPU was $4,566 vs. $3,379 in Q4 2020
- Retail
  - Retail GPU was $1,495 vs. $1,265 in Q4 2020
  - Year-over-year changes in retail vehicle GPU were primarily driven by an increase in the percentage of retail units sourced from customers, partially offset by higher reconditioning costs due to COVID-19 and higher wholesale acquisition prices.
- Wholesale
  - Wholesale GPU was $549 vs. $108 in Q4 2020
  - Year-over-year changes in wholesale GPU were due to wholesale volume growth (units +115% YoY to 46,760) and an increase in gross profit per wholesale unit sold to $1,326 from $358 in Q4 2020, driven by gains in buying vehicles from customers and wholesale market appreciation.
- Other
  - Other GPU was $2,522 vs. $2,006 in Q4 2020
  - Year-over-year changes in Other GPU were primarily driven by strong finance execution and the impact of higher industry-wide vehicle prices on average loan size.

For FY 2021:

- Total
  - Total GPU was $4,537 vs. $3,252 in 2020. Total GPU increased $1,285 year-over-year. Our GPU gains were broad-based, including gains in retail, wholesale, finance, and ancillary products.



## Objective #3: Demonstrate Operating Leverage

We levered EBITDA margin for the eighth consecutive year in 2021 and achieved our first full year of positive EBITDA margin, excluding one-time items[1]. In Q4, net loss margin levered by 3.7%, and EBITDA margin levered by 1.4% driven by year-over-year improvements in GPU and SG&A leverage.

These strong results were achieved despite significant impacts from COVID-19 and investments made to support our growth plan in 2022 and beyond.

For Q4 2021, as a percentage of revenue:

- Total SG&A levered by 2.2%, primarily driven by the impact of higher used vehicle prices on revenue. Compensation and benefits increased by 0.2%. Advertising levered by 1.0%. Logistics and market occupancy were approximately flat as a percent of revenue. Other SG&A levered by 1.4%. All SG&A components were impacted by our increase in cars bought from customers relative to cars sold to customers, COVID-19, and our significant investments to support growth in 2022 and beyond.

For FY 2021, as a percentage of revenue:

- Total SG&A levered by 4.3% year-over-year. Compensation and benefits levered by 0.9%, advertising levered by 1.4%, logistics and market occupancy levered by 0.3%, and other SG&A levered by 1.7%. All SG&A components for the full year were impacted by the same factors noted above.



*Includes (0.2%) impact from one-time items

---

[1]  In our commercial agreement with Root, we received 42 million warrants to acquire common stock in Root that vest upon the earlier of product integration or 18 months. We recorded these assets and related deferred revenue in Q4 2021, and we also recorded a fair value adjustment to the warrants of -$24 million.

## Summary

2021 was our most highlight filled year yet. From becoming the fastest growing Ecommerce company in U.S. history to being named the top retailer on Forbes Best Large Employers list, it was a year of incredible achievements.

The foundations for more incredible achievements are clearly laid.

We have built a customer focused culture and are a company filled with people who care.

We have built the technology necessary to make buying or selling a car simple and fun – and we are making it simpler and even more fun all the time.

In just nine years, we built the operational capacity that allowed us to efficiently deliver our 1 millionth car sale. And even faster than that, we added to that operational capacity allowing us to buy our 1 millionth car from our customers just yesterday.

We have built the infrastructure that all that technology and operational capacity sit on top of with 311 markets, 30 vending machines, and 14 IRCs connected through our logistics network.

And now, with our agreement to purchase ADESA U.S., we plan to add an additional 56 auction locations that will also serve as IRCs and logistics hubs adding new capabilities to Carvana and giving us a path to production capacity of over 3 million units per year when fully built out.

In 2021, we sold almost 10x as many cars to our customers as we did in 2017, the year we went public. That's a lot of growth in a short period of time.

The path to significantly more growth over a long period of time is illuminated as our individual markets continue to rapidly grow with our average market growing by over 50% last year.

We find ourselves in a unique market today that demands our attention to manage through. We have been in unique markets before and, as we have in the past, we will give this our attention.

The march continues.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

13

## Appendix: Notes on the Current Environment

We have received several questions from investors on the impact of the current macroeconomic and automotive retail environment on Carvana's business. In an effort to be helpful, we include some additional commentary on these impacts below.

The current automotive retail environment is characterized by very high used vehicle prices compared to historical norms. The average market price, controlling for mix, for our typical car has increased by more than 30% since January 2021, an effect that is having an impact on affordability for the average used car buyer.

This inflationary effect combined with Omicron appears to be broadly impacting independent used vehicle dealers. According to Cox Automotive, dealership used vehicle sales are down approximately 15-20% vs. 2021 through the first seven weeks of the year. Our continued growth in Q4 2021 and early Q1 2022 suggest we are continuing to significantly outperform the industry and gain market share.

|  | Short-Term Impact of<br>Current Environment |
|---|---|
| **Retail unit sold volume** | Since January 2021, the average used vehicle in our inventory, controlling for mix, has increased in price by more than 30%. This industry-wide inflation has been particularly strong in affordable cars, with cars with a market price below $15k in January 2021 appreciating by ~40% YoY compared to cars with a market price above $35k appreciating by ~15% YoY.<br><br>**High used vehicle prices** have a significant impact on industry-wide used vehicle sales, since higher prices reduce affordability, leading some buyers to forgo or delay their purchases.<br><br>To illustrate this point, in January 2022, Carvana sales to customers with annual incomes below $50k grew 30 points slower YoY than the company as a whole, while sales to customers with >$100k annual incomes grew 30 points faster than the company as a whole. Many used vehicle buyers are priced out of the market, creating pent up demand for a time when prices eventually normalize.<br><br>In addition to high used vehicle prices, **the spread of Omicron and several severe weather events** also significantly impacted retail units sold volume early in Q1 2022. So far in Q1, we have seen hourly employee callout rates up to 30%, leading to significantly higher than normalized delivery delays and cancellations that are continuing to impact the efficiency of our logistics and last mile delivery network. We currently expect these effects to normalize in Q2. |
| **Buying cars from customers volume** | **High used vehicle prices** increase consumers' propensity to sell their cars, other things being equal. We set new company records for cars bought from customers in 2021, both in absolute terms and relative to retail units sold. These metrics benefited from a high price tailwind, but much of our success was driven by fundamental improvements in awareness and the quality of our product offering. |
| **Retail GPU** | **High used vehicle prices** have several offsetting effects on retail GPU. First, buying more cars from customers improves retail GPU. Second, periods of retail price appreciation can benefit retail GPU, other things being equal, since vehicles increase in value between acquisition and sale. However, this is offset by the fact that **wholesale market price appreciation** generally leads to lower retail GPU, other things being equal, due to higher input costs.<br><br>**The spread of Omicron** and earlier waves of COVID-19, have a negative impact on retail GPU, other things being equal, by increasing reconditioning payroll cost and inbound logistics cost per unit due to higher callouts, lower efficiency, and lower throughput. The Omicron wave has had a significantly larger effect than prior COVID-19 waves on these costs. We expect this to lead to a |

14

| | |
|---|---|
| | sequential reduction in retail GPU in Q1, followed by a sequential increase in Q2.<br><br>In 2021, we believe the aforementioned environmental tailwinds and headwinds approximately offset, creating a neutral impact on retail GPU for the full year. |
| **Wholesale GPU** | **Wholesale market price appreciation** benefits wholesale GPU due to the lag time between acquiring a wholesale car from a customer and disposing of it at auction. If the price of the car increases during this period, this leads to a higher spread between acquisition and sale prices, improving profitability.<br><br>In 2021, we achieved record gross profit per wholesale unit sold of $1,116. This metric benefited from wholesale market appreciation, but we also made fundamental improvements to our wholesale sales platform, including improving awareness and the quality of our customer offering, optimizing our bidding algorithms, and expanding our base of wholesale buyers in our Carvana Access sales channel. We estimate that the net impact of wholesale market price appreciation was ~$150 of Wholesale GPU in FY 2021.<br><br>In Q1 2022, we expect to see higher wholesale depreciation rates than in prior quarters, leading to an expected reduction in wholesale GPU. |
| **Other GPU** | **High used vehicle prices** typically lead to higher average loan sizes, with higher retail sale prices partially offset by higher down payments. Higher average loan sizes increase financing revenue other things being equal. We estimate that the net impact of higher-than-normal used vehicle prices was ~$150 of Other GPU in FY 2021.<br><br>**Rapidly rising interest rates** have a transitory impact on Other GPU due to the lag time between when we offer a rate to a customer and when we sell that customer's loan. If benchmark rates rise quickly after we make our offer, we earn a lower premium and lower financing revenue, other things being equal. As a result, we expect the rapid rise in interest rates between November 2021 and February 2022 to have an impact on Other GPU in Q1. We typically pass on benchmark rate changes to customers and have already updated rates to reflect most of these recent changes. We have also recently increased our hedging of interest rate changes to lessen the impact of future changes. |
| **SG&A per retail unit sold** | We expect **the spread of Omicron, weather events, and high used vehicle prices** to have an impact on SG&A per retail unit in Q1 2022. As noted above, so far in Q1, we have seen hourly employee callout rates up to 30%, leading to significantly higher than normalized delivery delays and cancellations that are continuing to impact the efficiency of our logistics and last mile delivery network as well as completed sale volume. We currently expect these effects to normalize in Q2. |

15

# Appendix

*Conference Call Details*

Carvana will host a conference call today, February 24, 2022, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until March 3, 2022, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 1572552#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2021.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 403 | $ 301 |
| Restricted cash | 233 | 28 |
| Accounts receivable, net | 206 | 79 |
| Finance receivables held for sale, net | 356 | 275 |
| Vehicle inventory | 3,149 | 1,036 |
| Beneficial interests in securitizations | 382 | 131 |
| Other current assets, including $12 and $6, respectively, due from related parties | 163 | 73 |
| Total current assets | 4,892 | 1,923 |
| Property and equipment, net | 1,560 | 909 |
| Operating lease right-of-use assets, including $17 and $22, respectively, from leases with related parties | 369 | 156 |
| Intangible assets, net | 4 | 6 |
| Goodwill | 9 | 9 |
| Other assets, including $7 and $4, respectively, due from related parties | 181 | 32 |
| Total assets | $ 7,015 | $ 3,035 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $27 and $16, respectively, due to related parties | $ 656 | $ 342 |
| Short-term revolving facilities | 2,053 | 40 |
| Current portion of long-term debt | 152 | 65 |
| Other current liabilities, including $3 and $3, respectively, from leases with related parties | 29 | 20 |
| Total current liabilities | 2,890 | 467 |
| Long-term debt, excluding current portion | 3,208 | 1,617 |
| Operating lease liabilities, excluding current portion, including $13 and $19, respectively, from leases with related parties | 361 | 148 |
| Other liabilities | 31 | 1 |
| Total liabilities | 6,490 | 2,233 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized, and none issued and outstanding as of December 31, 2021 and 2020, respectively | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized, 89,930 and 76,512 shares issued and outstanding as of December 31, 2021 and 2020, respectively | — | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized, 82,900 and 95,592 shares issued and outstanding as of December 31, 2021 and 2020, respectively | — | — |
| Additional paid in capital | 795 | 742 |
| Accumulated deficit | (489) | (354) |
| Total stockholders' equity attributable to Carvana Co. | 306 | 388 |
| Non-controlling interests | 219 | 414 |
| Total stockholders' equity | 525 | 802 |
| Total liabilities & stockholders' equity | $ 7,015 | $ 3,035 |

17

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended December 31, | | Years Ended December 31, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| | (unaudited) | | | |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 2,897 | $ 1,496 | $ 9,851 | $ 4,741 |
| Wholesale vehicle sales, including $17, $3, $54, and $4, respectively, from related parties | 571 | 186 | 1,920 | 445 |
| Other sales and revenues, including $65, $36, $208, and $105, respectively, from related parties | 285 | 145 | 1,043 | 401 |
| **Net sales and operating revenues** | 3,753 | 1,827 | 12,814 | 5,587 |
| Cost of sales, including $44, $1, $65, and $4, respectively, to related parties | 3,237 | 1,583 | 10,885 | 4,793 |
| **Gross profit** | 516 | 244 | 1,929 | 794 |
| Selling, general and administrative expenses, including $8, $5, $27, and $19, respectively, to related parties | 620 | 342 | 2,033 | 1,126 |
| Interest expense, including $0, $0, $0, and $1, respectively, to related parties | 55 | 62 | 176 | 131 |
| Other expense (income), net | 22 | (6) | 6 | (1) |
| **Net loss before income taxes** | (181) | (154) | (286) | (462) |
| Income tax provision | 1 | — | 1 | — |
| **Net loss** | (182) | (154) | (287) | (462) |
| Net loss attributable to non-controlling interests | (93) | (91) | (152) | (291) |
| **Net loss attributable to Carvana Co.** | (89) | (63) | (135) | (171) |
| Net loss per share of Class A common stock, basic and diluted | $ (1.02) | $ (0.87) | $ (1.63) | $ (2.63) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | 86,939 | 73,193 | 82,805 | 64,981 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ (287) | $ (462) | $ (365) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 105 | 74 | 41 |
| Equity-based compensation expense | 39 | 25 | 33 |
| Loss on disposal of property and equipment | 1 | 6 | 2 |
| Provision for bad debt and valuation allowance | 28 | 21 | 12 |
| Amortization and write-off of debt issuance costs and bond premium | 11 | 8 | 6 |
| Loss on early extinguishment of debt | — | 34 | — |
| Unrealized loss on warrants to acquire Root Class A common stock | 24 | — | — |
| Unrealized (gain) loss on beneficial interests in securitizations | (7) | (9) | 1 |
| Changes in finance receivable related assets: | | | |
| Originations of finance receivables | (7,306) | (3,579) | (2,625) |
| Proceeds from sale of finance receivables, net | 7,391 | 3,634 | 2,644 |
| Gain on loan sales | (717) | (218) | (137) |
| Principal payments received on finance receivables held for sale | 206 | 90 | 85 |
| Purchase of finance receivables | — | — | (162) |
| Other changes in assets and liabilities: | | | |
| Vehicle inventory | (2,086) | (263) | (345) |
| Accounts receivable | (148) | (43) | (10) |
| Other assets | (105) | (26) | (33) |
| Accounts payable and accrued liabilities | 247 | 94 | 98 |
| Operating lease right-of-use assets | (213) | (32) | (47) |
| Operating lease liabilities | 223 | 38 | 45 |
| Net cash used in operating activities | (2,594) | (608) | (757) |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment, including $0, $22, and $6, respectively, from related parties | (557) | (360) | (231) |
| Purchases of investments | (126) | — | — |
| Principal payments received on and proceeds from sale of beneficial interests | 56 | 14 | 3 |
| Net cash used in investing activities | (627) | (346) | (228) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from short-term revolving facilities | 14,600 | 4,429 | 4,486 |
| Payments on short-term revolving facilities | (12,587) | (4,958) | (4,219) |
| Proceeds from issuance of long-term debt | 1,650 | 1,336 | 482 |
| Payments on long-term debt | (73) | (654) | (16) |
| Payments of debt issuance costs | (24) | (29) | (11) |
| Net proceeds from issuance of Class A common stock | — | 1,059 | 297 |
| Proceeds from equity-based compensation plans | 2 | 5 | 2 |
| Tax withholdings related to restricted stock units and awards | (40) | (23) | (6) |
| Net cash provided by financing activities | 3,528 | 1,165 | 1,015 |
| **Net increase in cash and cash equivalents** | 307 | 211 | 30 |
| Cash, cash equivalents, and restricted cash at beginning of period | 329 | 118 | 88 |
| Cash, cash equivalents, and restricted cash at end of period | $ 636 | $ 329 | $ 118 |

19

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

|  | Three Months Ended December 31, | | Years Ended December 31, | |
|  | 2021 | 2020 | 2021 | 2020 |
| --- | --- | --- | --- | --- |
|  | (in thousands) | | | |
| Weighted-average shares of Class A common stock outstanding | 86,939 | 73,193 | 82,805 | 64,981 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 87,968 | 101,360 | 91,990 | 104,021 |
|  | 174,907 | 174,553 | 174,795 | 169,002 |

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

*EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss, which is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 |
| | (dollars in millions) | | | | | | | |
| Net loss | $ (184) | $ (106) | $ (18) | $ (154) | $ (82) | $ 45 | $ (68) | $ (182) |
| Depreciation and amortization expense | 16 | 17 | 19 | 22 | 22 | 24 | 26 | 33 |
| Interest expense | 29 | 20 | 20 | 62 | 30 | 43 | 48 | 55 |
| Income tax provision | — | — | — | — | — | — | — | 1 |
| EBITDA | $ (139) | $ (69) | $ 21 | $ (70) | $ (30) | $ 112 | $ 6 | $ (93) |
| | | | | | | | | |
| Total revenues | $ 1,098 | $ 1,118 | $ 1,544 | $ 1,827 | $ 2,245 | $ 3,336 | $ 3,480 | $ 3,753 |
| Net Loss Margin | (16.7)% | (9.5)% | (1.1)% | (8.5)% | (3.7)% | 1.3 % | (2.0)% | (4.8)% |
| EBITDA Margin | (12.6)% | (6.2)% | 1.4 % | (3.9)% | (1.3)% | 3.4 % | 0.2 % | (2.5)% |

| | For the Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| | (dollars in millions) | | | | | | |
| Net loss | $ (37) | $ (93) | $ (164) | $ (255) | $ (365) | $ (462) | $ (287) |
| Depreciation and amortization expense | 3 | 5 | 12 | 24 | 41 | 74 | 105 |
| Interest expense | 1 | 3 | 7 | 25 | 81 | 131 | 176 |
| Income tax provision | — | — | — | — | — | — | 1 |
| EBITDA | $ (33) | $ (85) | $ (145) | $ (206) | $ (243) | $ (257) | $ (5) |
| | | | | | | | |
| Total revenues | $ 130 | $ 365 | $ 859 | $ 1,955 | $ 3,940 | $ 5,587 | $12,814 |
| Net Loss Margin | (28.2)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% |
| EBITDA Margin | (25.0)% | (23.2)% | (16.9)% | (10.5)% | (6.2)% | (4.6)% | (0.0)% |

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended December 31, | | | Years Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | Change | 2021 | 2020 | Change |
| | (dollars in millions, except per unit amounts) | | | | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 2,897 | $ 1,496 | 93.6 % | $ 9,851 | $ 4,741 | 107.8 % |
| Wholesale vehicle sales [1] | 571 | 186 | 207.0 % | 1,920 | 445 | 331.5 % |
| Other sales and revenues [2] | 285 | 145 | 96.6 % | 1,043 | 401 | 160.1 % |
| Total net sales and operating revenues | $ 3,753 | $ 1,827 | 105.4 % | $ 12,814 | $ 5,587 | 129.4 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit | $ 169 | $ 91 | 85.7 % | $ 697 | $ 359 | 94.2 % |
| Wholesale vehicle gross profit [1] | 62 | 8 | 675.0 % | 189 | 34 | 455.9 % |
| Other gross profit [2] | 285 | 145 | 96.6 % | 1,043 | 401 | 160.1 % |
| Total gross profit | $ 516 | $ 244 | 111.5 % | $ 1,929 | $ 794 | 142.9 % |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 113,016 | 72,172 | 56.6 % | 425,237 | 244,111 | 74.2 % |
| Wholesale vehicle unit sales | 46,760 | 21,798 | 114.5 % | 170,056 | 55,204 | 208.1 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 25,634 | $ 20,720 | 23.7 % | $ 23,167 | $ 19,420 | 19.3 % |
| Wholesale vehicles | $ 12,211 | $ 8,545 | 42.9 % | $ 11,287 | $ 8,065 | 40.0 % |
| **Per unit gross profit:** | | | | | | |
| Used vehicle gross profit | $ 1,495 | $ 1,265 | 18.2 % | $ 1,638 | $ 1,472 | 11.3 % |
| Wholesale vehicle gross profit | 549 | 108 | 408.3 % | 446 | 138 | 223.2 % |
| Other gross profit | 2522 | 2006 | 25.7 % | 2453 | 1642 | 49.4 % |
| Total gross profit | $ 4,566 | $ 3,379 | 35.1 % | $ 4,537 | $ 3,252 | 39.5 % |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale gross profit | $ 1,326 | $ 358 | 270.4 % | $ 1,116 | $ 610 | 83.0 % |

(1) Includes $17, $3, $54, and $4, respectively, of wholesale revenue from related parties.
(2) Includes $65, $36, $208, and $105, respectively, of other sales and revenues from related parties.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 |
|---|---|---|---|---|---|---|---|---|
| Compensation and benefits [1] | $ 84 | $ 74 | $ 80 | $ 100 | $ 126 | $ 148 | $ 181 | $ 212 |
| Advertising | 75 | 62 | 65 | 84 | 100 | 119 | 126 | 134 |
| Market occupancy [2] | 8 | 8 | 10 | 11 | 13 | 15 | 18 | 24 |
| Logistics [3] | 19 | 17 | 18 | 23 | 30 | 34 | 40 | 44 |
| Other [4] | 90 | 78 | 96 | 124 | 128 | 154 | 181 | 206 |
| Total | $ 276 | $ 239 | $ 269 | $ 342 | $ 397 | $ 470 | $ 546 | $ 620 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

(2) Market occupancy costs includes occupancy costs of our vending machines and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3) Logistics includes fuel, maintenance, and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4) Other costs include all other selling, general, and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

We had the following liquidity resources available as of December 31, 2021 and 2020:

| | December 31, | |
|---|---|---|
| | **2021** | **2020** |
| | **(in millions)** | |
| Cash and cash equivalents | $ 403 | $ 301 |
| Availability under short-term revolving facilities[1] | 438 | 1,088 |
| Availability under sale-leaseback agreements[2] | — | 19 |
| Committed liquidity resources available | 841 | 1,408 |
| Unpledged vehicle inventory not included above[3] | 665 | — |
| Unpledged real estate not included above[4] | 677 | 250 |
| Unpledged beneficial interests in securitizations[5] | 100 | 48 |
| Total liquidity resources[6] | $ 2,283 | $ 1,706 |

1.  Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date, excluding the impact to restricted cash requirements. This is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

2.  Availability under real estate agreements is the available amount we can borrow under our existing real estate financing agreements based on the value of existing real estate on our balance sheet. From time to time, we may enter committed real estate financing agreements that allow for future pledging of real estate assets on a flexible timeline. We began using committed real estate financing agreements in 2017 and may do so in the future.

3.  Unpledged vehicle inventory is the value of vehicle inventory on our balance sheet on the period end date beyond that covered by committed financing agreements. On February 1, 2022, we upsized our vehicle inventory floor plan commitment to $3.0 billion. The additional commitment would increase our availability under short-term revolving facilities and committed liquidity sources available by $665 million, with a corresponding reduction in unpledged vehicle inventory and finance receivables.

4.  Unpledged real estate assets include IRC and vending machine real estate assets that have not been previously pledged or sold. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

5.  Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

6.  Total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities on our balance sheet that can be financed using traditional asset-based financing sources. To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.






# CARVANA
## CULTURE
# Q4 | 2021



**Exhibit 22**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a)**
**of the Securities Exchange Act of 1934**

Filed by the
Registrant ☒

Filed by a party other
than the registrant ☐

Check the appropriate box:

☐  Preliminary Proxy Statement
☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

# CARVANA CO.
### (Name of registrant as specified in its charter)

**(Name of Person(s) Filing Proxy Statement, if other than Registrant)**

Payment of Filing Fee (Check all boxes that apply):

☒  No fee required.
☐  Fee paid previously with preliminary materials.
☐  Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.



Dear Fellow Stockholders,

We are pleased to invite you to attend the 2022 Annual Meeting of Stockholders of Carvana Co. on Monday, May 2, 2022, beginning at 2:00 p.m., PDT. The annual meeting will be conducted virtually via live webcast. To participate in this year's annual meeting of stockholders, you must register beforehand by visiting www.proxydocs.com/CVNA by 5:00 p.m. EST on April 28, 2022 or the Registration Deadline. After completion of your registration by the Registration Deadline, further instructions, including a unique link to access the annual meeting, will be emailed to you. You will not be able to attend the annual meeting physically. Once registered you will be able to listen to the annual meeting live and vote online.

Details regarding how to attend the meeting online and the business to be conducted at the annual meeting are more fully described in the accompanying Notice of 2022 Virtual Annual Meeting of Stockholders and Proxy Statement. We will mail a notice containing instructions on how to access this proxy statement and our annual report on or about Wednesday, March 23, 2022, to all stockholders entitled to vote at the annual meeting. Stockholders who prefer a paper copy of the proxy materials may request one on or before April 22,

2022, by following the instructions provided in the notice we will send.

   Your vote is important. Whether or not you plan to attend the annual meeting, we urge you to vote. You may vote by proxy over the Internet, by telephone, or by mail following instructions on the proxy card. Voting by proxy will ensure your representation at the annual meeting regardless of whether you attend.

   Sincerely,



**Ernest Garcia III**
President, Chief Executive Officer and Chairman

# NOTICE OF 2022 VIRTUAL ANNUAL MEETING OF STOCKHOLDERS

The 2022 virtual Annual Meeting of Stockholders of CARVANA CO. ("Carvana" or the "Company") will be held on Monday, May 2, 2022 at 2:00 PM (PDT) and will be conducted virtually via live webcast (the "Annual Meeting"). To participate at this year's Annual Meeting, you must register beforehand by visiting http://www.proxydocs.com/CVNA by 5:00 p.m. EST on April 28, 2022 (the "Registration Deadline"). You will be asked to provide the control number located inside the shaded gray box on your notice or the proxy card, or the Control Number, as described in the notice or proxy card. After completion of your registration by the Registration Deadline, further instructions, including a unique link to access the Annual Meeting, will be emailed to you. Once registered you will be able to listen to the Annual Meeting live and vote online. We are holding the Annual Meeting for the following purposes, as more fully described in the accompanying proxy statement:

1. to elect two nominees identified in the accompanying proxy statement to serve as directors, as recommended by the Compensation and Nominating Committee of the Board of Directors of Carvana;
2. to ratify the appointment of Grant Thornton LLP as Carvana's independent registered public accounting firm for the year ending December 31, 2022;
3. to consider the approval, by an advisory vote, of Carvana's executive compensation (i.e., "say-on-pay" proposal); and
4. to transact other business as may properly come before the meeting or any adjournment of the meeting.

Our board of directors has set March 3, 2022, as our record date for this year's meeting. Only stockholders that owned Carvana Co.'s Class A common stock or Class B common stock at the close of business on that day are entitled to notice of our Annual Meeting and may vote at it or any adjournment of the meeting. On or about March 23, 2022, we expect to mail to our stockholders a Notice of Internet Availability of Proxy Materials, or the Notice, containing instructions on how to access our proxy statement and our 2021 annual report. This Notice provides instructions on how to vote via the Internet or by telephone and includes instructions on how to receive a paper copy of our proxy materials by mail. The proxy statement and our 2021 annual report can be accessed directly at the following Internet address: http://www.proxydocs.com/CVNA.

By Order of the Board of Directors

**Paul Breaux**
General Counsel and Secretary

## TABLE OF CONTENTS

| | |
|---|---|
| Commonly Asked Questions and Answers About the Annual Meeting | 1 |
| Board of Directors and Corporate Governance | 5 |
| ITEM 1 - ELECTION OF DIRECTORS | 8 |
| Director Nominees | 8 |
| Continuing Directors | 8 |
| Independence Status | 10 |
| Controlled Company Status | 10 |
| Board Meetings and Committees | 11 |
| Board Leadership Structure | 13 |
| Risk Oversight | 14 |
| Compensation Committee Interlocks and Insider Participation | 14 |
| Communications by Stockholders and Other Interested Parties with the Board of Directors | 15 |
| Director Compensation | 15 |
| Executive Officers | 18 |
| Compensation Discussion and Analysis | 20 |
| Executive Summary | 20 |
| Compensation Objectives and Principles | 23 |
| Compensation Setting Process | 24 |
| Competitiveness of Our Compensation Program | 25 |
| Compensation Components | 27 |
| Compensation-Related Policies | 32 |
| Compensation and Risk | 32 |
| Tax and Accounting Implications | 33 |
| Compensation and Nominating Committee Report | 34 |
| Compensation Tables | 35 |
| Summary Compensation Table | 35 |
| Grants of Plan-Based Awards | 37 |
| Outstanding Equity Awards at 2021 Fiscal Year End | 38 |
| Option Exercises and Stock Vested | 40 |
| Potential Payments upon a Change in Control | 40 |
| CEO Pay Ratio | 42 |
| Certain Relationships and Related Party Transactions | 42 |
| Policies for Approval of Related Party Transactions | 42 |
| Amended and Restated Operating Agreement | 42 |
| Exchange Agreement | 43 |
| Registration Rights Agreement | 44 |
| Tax Receivable Agreement | 44 |
| Indemnification of Officers and Directors | 45 |
| Related Party Employment Relationships | 45 |

| | |
|---|---|
| Contribution Agreement | 45 |
| Relationship with DriveTime | 45 |
| Security Ownership of Certain Beneficial Owners and Management | 51 |
| ITEM 2 - RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 58 |
| Fees and Services | 58 |
| Audit Committee Report | 60 |
| ITEM 3 - SAY ON PAY | 61 |
| Other Matters | 61 |
| Incorporation by Reference | 61 |
| Availability of SEC Filings, Code of Conduct, and Committee Charters | 62 |
| Where to Find Additional Information | 62 |
| Cost of Proxy Solicitation | 62 |
| Annex | 63 |
| Non-GAAP Financial Measures | 63 |

**Commonly Asked Questions and Answers About the Annual Meeting**

**Q: Why did I receive these materials?**

The Board of Directors of Carvana Co. (the "Board") is soliciting your proxy to vote at our 2022 Annual Meeting of Stockholders (or at any postponement or adjournment of the meeting). Stockholders who own shares of our common stock (Class A or Class B) as of the record date, March 3, 2022, are entitled to vote at the annual meeting. You should review these proxy materials carefully as they give important information about the items that will be voted on at the annual meeting, as well as other important information about Carvana.

**Q: Who will be entitled to vote?**

Stockholders who own shares of our common stock as of the record date, March 3, 2022, are entitled to vote at the annual meeting. As of the record date, Carvana had approximately 90,100,981 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding. Holders of shares of Class A common stock are entitled to one vote per share of Class A common stock. Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively, the "Garcia Parties") are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock, determined on an as-exchanged basis assuming that all of the Class A common units ("Class A Units") and Class B common units ("Class B Units," and together with Class A Units, "LLC Units") of Carvana Group, LLC ("Carvana Group") were exchanged for Class A common stock. The Garcia Parties are currently entitled to ten votes per share of Class B common stock they beneficially own. All other holders of Class B common stock are entitled to one vote per share. All holders of Class A common stock and Class B common stock will vote together as a single class except as otherwise required by applicable law. Cumulative voting is not permitted with respect to the election of directors or any other matter to be considered at the annual meeting.

**Q: What will I be voting on?**

You will be voting on the following matters:

1. to elect two Class II directors to serve on the Board until the 2025 Annual Meeting and until their successors are duly elected and qualified;
2. to ratify the appointment of Grant Thornton LLP as Carvana's independent registered public accounting firm for the year ending December 31, 2022;
3. to consider the approval, by an advisory vote, of Carvana's executive compensation (i.e., "say-on-pay"); and
4. to transact other business as may properly come before the meeting or any adjournment of the meeting.

**Q: How does the Board recommend I vote on these matters?**

The Board recommends you vote for the following:

1. FOR the election of Dan Quayle and Gregory Sullivan as Class II directors;
2. FOR the ratification of the appointment of Grant Thornton LLP as our independent registered public accounting firm for the year ending December 31, 2022; and
3. FOR the approval, by an advisory vote, of Carvana's executive compensation.

**Q: How do I cast my vote?**

*Registered Stockholders*. If you hold shares in your own name, you are a registered stockholder and there are four ways to vote:

1. by Internet at http://www.proxypush.com/CVNA, 24 hours a day, seven days a week (have your proxy card in hand when you visit the website);
2. by toll-free telephone at 1-866-509-2149 (have your proxy card in hand when you call);
3. by completing and mailing your proxy card (if you received printed proxy materials); or
4. by voting during the virtual Annual Meeting through www.proxydocs.com/CVNA. To be admitted to the Annual Meeting and vote your shares, you must register by the Registration Deadline and provide the Control Number as described in the Notice or proxy card. After completion of your registration by the Registration Deadline, further instructions, including a unique link to access the Annual Meeting, will be emailed to you.

Even if you plan to attend the virtual Annual Meeting, we recommend that you also vote by proxy so that your vote will be counted if you decide not to attend the Annual Meeting.

*Beneficial Stockholders*. If you hold your shares through a broker, trustee, or other nominee, you are a beneficial stockholder. If you are a beneficial stockholder, you will receive voting instructions from your broker, bank, or other nominee. You must follow the voting instructions provided by your broker, bank, or other nominee in order to instruct your broker, bank, or other nominee on how to vote your shares. Beneficial stockholders should generally be able to vote by returning the voting instruction card to their broker, bank, or other nominee, or by telephone or via Internet. However, the availability of telephone or Internet voting will depend on the voting process of your broker, bank, or other nominee. As discussed above, if you are a beneficial stockholder, you are invited to attend and vote your shares at the Annual Meeting live via webcast so long as you register to attend the Annual Meeting at www.proxydocs.com/CVNA by the Registration Deadline. To vote online at the Annual Meeting, you must obtain a legal proxy from your broker, bank, or other nominee.

**Q: Can I access the proxy materials electronically?**

Yes. Your notice, proxy card, or voting instruction card will contain instructions on how to view our proxy materials for the annual meeting online and how to instruct us to send our future proxy materials to you electronically by email. Our proxy materials are also available at

2

www.proxydocs.com/CVNA and will be available during the voting period starting on March 23, 2022.

Instead of receiving future copies of our proxy statement and annual reports by mail, stockholders of record and most beneficial owners can elect to receive an email that will provide an electronic link to these documents. Your election to receive future proxy materials by email will remain in effect until you revoke it.

Please note that only one notice will be sent to stockholders who are listed at the same address unless such stockholders have notified Carvana of their desire to receive multiple copies of such documents. If a single copy of the notice was delivered to an address that you share with another stockholder, and you prefer to receive additional copies, or if multiple copies were delivered to an address that you share with another stockholder, and you prefer to receive one copy, Carvana will promptly make such changes upon request. You may make such requests over the internet at www.investorelections.com/CVNA, via telephone at (866) 648-8133, or via e-mail at paper@investorelections.com.

**Q: How may I change or revoke my proxy?**

*Registered Stockholders*. If you are a stockholder of record, you can change your vote or revoke your proxy any time before or at the Annual Meeting by:

1.  entering a new vote by Internet or by telephone (until the applicable deadline for each method as set forth above);
2.  returning a later-dated proxy card (which automatically revokes the earlier proxy card);
3.  notifying our Secretary, in writing, at Carvana Co., Attn: Corporate Secretary, 1930 W. Rio Salado Pkwy, Tempe, AZ 85281; or
4.  attending and voting at the virtual Annual Meeting (although attendance at the Annual Meeting will not, by itself, revoke a proxy) at www.proxydocs.com/CVNA.

*Beneficial Stockholders*. If you are a beneficial stockholder, your broker, bank or other nominee can provide you with instructions on how to change your vote.

**Q: Who can attend the annual meeting?**

All common stockholders as of the record date, or their duly appointed proxies, may pre-register and virtually attend the Annual Meeting.

**Q: What is the voting requirement to approve each of the items, and how are the votes counted?**

*ITEM 1 – ELECTION OF DIRECTORS*. A plurality of the votes cast by the shares of common stock present in person or represented by proxy at the virtual meeting and entitled to vote thereon is required to elect each nominee. This means that the two nominees receiving the highest number of votes at the annual meeting will be elected, even if those votes do not

3

constitute a majority of the votes cast. Abstentions and broker non-votes will not impact the election of the nominees.

*ALL OTHER ITEMS.* The affirmative vote of a majority of the votes cast by the shares of common stock present in person or represented by proxy at the virtual meeting and entitled to vote thereon is required to approve all other items. Abstentions will be counted as present and entitled to vote on the proposal and will therefore have the effect of a negative vote. We do not expect there to be any broker non-votes with respect to any of the proposals.

**Q: When will the results of the vote be announced?**

The preliminary voting results will be announced at the annual meeting. The final voting results will be published in a current report on Form 8-K filed with the SEC within four business days of the annual meeting.

**Q: What is the deadline for submitting a stockholder proposal or director nomination for the 2023 Annual Meeting?**

Stockholder proposals pursuant to SEC Rule 14a-8 for inclusion in Carvana's proxy statement and form of proxy for Carvana's 2023 Annual Meeting of Stockholders must be received by Carvana at our principal executive offices at 1930 W. Rio Salado Pkwy, Tempe, AZ, 85281, no later than the close of business on November 23, 2022. Stockholders wishing to make a director nomination or bring a proposal, but not include it in Carvana's proxy materials, must provide written notice of their nomination or proposal to the general counsel and secretary at Carvana's principal executive offices no later than the close of business on February 1, 2023, and not earlier than the close of business on January 2, 2023, assuming Carvana does not change the date of the 2023 Annual Meeting of Stockholders by more than 30 days before or after the anniversary of the 2022 Annual Meeting. If so, Carvana will release an updated time frame for stockholder proposals. Any stockholder proposal or director nomination must comply with the other provisions of Carvana's amended and restated bylaws and be submitted in writing to the general counsel and secretary at Carvana's principal executive offices.

To comply with the universal proxy rules (once effective), stockholders who intend to solicit proxies in support of director nominees, other than the Company's nominees, must provide notice that sets forth the information required by Rule 14a-19 under the Exchange Act no later than Friday, March 3, 2023.

4

# BOARD OF DIRECTORS AND CORPORATE GOVERNANCE

Our business and affairs are managed under the direction of our Board, which is composed of six directors. Our certificate of incorporation provides that the authorized number of directors may be changed only by resolution of our Board. Our certificate also provides that our Board will be divided into three classes of directors, with the classes as nearly equal in number as possible. At each annual meeting of stockholders, a class of directors will be elected for a three-year term to succeed the class whose term is then expiring.

The following table sets forth the director class, name, age as of May 2, 2022, and other information for each member of our Board:

| Name | Class | Age | Position | Director Since | Current Term Expires | Expiration of Term For Which Nominated |
|---|---|---|---|---|---|---|
| Ernest Garcia III | I | 39 | President, CEO, and Chairman | 2017 | 2024 | |
| Ira Platt | I | 58 | Director | 2017 | 2024 | |
| Dan Quayle | II | 75 | Director | 2017 | 2022 | 2025 |
| Gregory Sullivan | II | 63 | Director | 2017 | 2022 | 2025 |
| Michael Maroone | III | 68 | Lead Director | 2017 | 2023 | |
| Neha Parikh | III | 43 | Director | 2019 | 2023 | |

We believe that in order for our Board to effectively guide us to long-term sustainable, dependable performance, it should be composed of individuals with sophistication and experience in the many disciplines that impact our business. To best serve our stockholders, we seek to have a board of directors that, as a whole, is competent in key corporate disciplines, including accounting and financial acumen, business judgment, crisis management, governance, leadership, people management, risk management, social responsibility and reputational issues, and strategy and strategic planning. Additionally, the Board desires to have specific knowledge related to our industry, such as expertise in automotive retail, consumer finance, and eCommerce.

The Compensation and Nominating Committee believes that all directors must, at a minimum, meet the criteria set forth in the Board's code of conduct and the corporate governance guidelines, which specify, among other things, that the Compensation and Nominating Committee will consider criteria such as independence, diversity, age, skills, and experience in the context of the needs of the Board. In addressing issues of diversity in particular, the Compensation and Nominating Committee considers a nominee's differences in viewpoint, professional experience, background, education, skill, age, race, gender, and national origin. The Compensation and Nominating Committee believes that diversity of backgrounds and viewpoints is a key attribute for a director nominee. Accordingly, to improve director diversity and best serve our stockholders, the Compensation and Nominating Committee formally adopted a policy in 2019 to request that any search firm that it engages include women and minority candidates in the initial list from which the Compensation and Nominating

5

Committee selects director candidates. The Compensation and Nominating Committee also will consider a combination of factors for each director, including whether the nominee possesses:

a. the ability to represent all stockholders without a conflict of interest;
b. the ability to work in and promote a productive environment;
c. sufficient time and willingness to fulfill the substantial duties and responsibilities of a director;
d. the high level of character and integrity that we expect;
e. broad professional and leadership experience and skills necessary to effectively respond to the complex issues encountered by a national, publicly traded company; and
f. the ability to apply sound and independent business judgment.

The Compensation and Nominating Committee has determined that all of our directors meet the criteria and qualifications set forth in the code of conduct for the Board, the corporate governance guidelines and the criteria set forth above for director nominees. Moreover, each director possesses the following critical personal qualities and attributes that we believe are essential for the proper functioning of the Board to allow it to fulfill its duties for our stockholders: accountability, ethical leadership, governance, integrity, risk management, and sound business judgment. In addition, our directors have the mature confidence to assess and challenge the way things are done and recommend alternative solutions, a keen awareness of our business and the social realities of the environment in which we operate, the independence and high-performance standards necessary to fulfill the Board's oversight function, and the humility, professional maturity, and style to interface openly and constructively with other directors. Finally, the director biographies below include a non-exclusive list of other key experiences and qualifications that further qualify the individual to serve on the Board. These collective qualities, skills, experiences, and attributes are essential to our Board's ability to exercise its oversight function for Carvana and its stockholders and to guide the long-term sustainable, dependable performance of our business.

Subject to any earlier resignation or removal in accordance with the terms of our certificate and bylaws, our Class I directors will serve until our 2024 annual meeting of stockholders, our Class II directors will serve until our 2022 annual meeting of stockholders, and our Class III directors will serve until our 2023 annual meeting of stockholders. In addition, our certificate provides that our directors may be removed with or without cause by the affirmative vote of at least a majority of the voting power of our outstanding shares of stock entitled to vote thereon, voting together as a single class, for so long as the Garcia Parties are entitled to ten votes for each share of Class B common stock they hold. If the Garcia Parties are no longer entitled to ten votes for each share of Class B common stock they hold, then our directors may be removed only for cause upon the affirmative vote of at least 66⅔% of the voting power of our outstanding shares of stock entitled to vote thereon.

The Compensation and Nominating Committee will consider stockholder nominations for membership on the Board. For the 2023 Annual Meeting, nominations may be submitted to Carvana Co., 1930 W. Rio Salado Pkwy, Tempe, AZ 85281, Attn: Secretary, who will forward them to the Chairman of the Compensation and Nominating Committee. Recommendations must be in writing and we must receive the recommendation no later than the close of business on February 1, 2023, and not earlier than the close of business on January 2, 2023.

6

Recommendations must also include certain other requirements specified in our bylaws. The Compensation and Nominating Committee will apply the same criteria to the evaluation of those candidates as it applies to other director candidates.

When filling a vacancy on the Board, the Compensation and Nominating Committee identifies the desired skills and experience of a new director and nominates individuals who it believes can strengthen the Board's capabilities and further diversify the collective experience represented by the then-current directors. The Compensation and Nominating Committee may engage third parties to assist in the search and provide recommendations. As discussed above, any search firm that the Compensation and Nominating Committee engages is requested to include women and minority candidates in the initial list from which the Compensation and Nominating Committee selects director candidates. Also, directors are generally asked to recommend candidates for the position. The candidates would be evaluated based on the process outlined in the corporate governance guidelines and the Compensation and Nominating Committee charter, and the same process would be used for all candidates, including candidates recommended by stockholders.

7

# ITEM 1—ELECTION OF DIRECTORS

Our Board recommends that the nominees below be elected as members of the Board at the annual meeting to serve for a three-year term expiring at the 2025 Annual Meeting.

| NAME | AGE | DIRECTOR SINCE | POSITION |
|------|-----|----------------|----------|
| Dan Quayle | 75 | 2017 | Director |
| Gregory Sullivan | 63 | 2017 | Director |

Each nominee was recommended for election by the Compensation and Nominating Committee for consideration by the Board and proposal to our stockholders. If, before the annual meeting, any nominee becomes unable to serve, or chooses not to serve, the Board may (i) nominate a substitute (ii) allow the vacancy to remain until the Board identifies an appropriate candidate or (iii) reduce the size of the board to eliminate the vacancy. If the Board chooses to nominate a substitute nominee, the persons named as proxies on the proxy card will vote for that substitute nominee.

**The Board recommends that you vote "FOR" each of the director nominees.**

## DIRECTOR NOMINEES

**Dan Quayle** has served on our Board since our Initial Public Offering ("IPO") in 2017. Mr. Quayle has served the United States Federal Government in various capacities as a Congressman, Senator, and as the 44th Vice President of the United States of America from 1989 to 1993. Since 1999, Mr. Quayle has been with Cerberus Capital, a New York private investment firm. He has served as Chairman of Cerberus Global Investments since 2001. Mr. Quayle earned a B.A. degree in political science from DePauw University and a J.D. from the Indiana University Robert H. McKinney School of Law. We believe Mr. Quayle will continue to be a valuable member of our Board because of his experience as the chairman of Cerberus Global Investments, LLC, as well as his extensive experience in the areas of government, foreign relations, and private investment..

**Gregory Sullivan** has served on our Board since our IPO. Mr. Sullivan is the Chief Executive Officer ("CEO") of AFAR Media, a travel media company he co-founded in 2007. From 1995 to 2007, Mr. Sullivan served DriveTime in various capacities, including as president from 1995 to 2004, CEO from 1999 to 2004, and Vice Chairman from 2004 to 2007. Mr. Sullivan earned a B.B.A. degree in finance from the University of Notre Dame and a J.D. from the University of Virginia School of Law. We believe that Mr. Sullivan will continue to be a valuable member of our Board because of his senior management experience in the automotive and media industries.

## CONTINUING DIRECTORS

**Ernest Garcia III** co-founded Carvana and has served as our President and CEO since our inception in 2012. Mr. Garcia is also Chairman of the Carvana Co. Board. Prior to founding

8

Carvana, Mr. Garcia held various roles at DriveTime Automotive Group, Inc. ("DriveTime") from January 2007 to January 2013. From January 2007 to December 2008, he served as a financial strategist. He was a managing director of corporate finance from December 2008 to November 2009. From November 2009 until January 2013, he served as a Vice President and Treasurer and Director of Quantitative Analytics. As Director of Quantitative Analytics, Mr. Garcia was responsible for the firm's ongoing development of consumer credit scoring models, and its utilization of those tools in retail-vehicle-sales deal structuring and vehicle-price optimization. Prior to DriveTime, Mr. Garcia was an associate in the Principal Transactions Group at RBS Greenwich Capital from 2005 to 2006, where he focused on consumer-credit-based investments. Mr. Garcia holds a B.S. in management science and engineering from Stanford University. We believe that Mr. Garcia will continue to be a valuable member of our Board because of his extensive knowledge of our business and strategy, as well as his experience in the automotive retail industry and leadership role with us.

**Ira Platt** has served on our Board since our IPO. Since its inception in 2009, Mr. Platt has been the president of Georgiana Ventures, LLC, a firm that provides equity and debt capital to specialty finance companies, acquires portfolios of consumer finance receivables and offers consulting services to the specialty finance industry. From May 2009 to December 2013, Mr. Platt served as the President of 221 Capital Partners, LLC, a firm that provides advisory services. From 2009 to 2011, Mr. Platt was the Portfolio Manager for the Rosemont TALF Opportunity Fund, a partnership investing in asset-backed securities. In addition, Mr. Platt was a managing director and Head of the Principal & Distressed Capital Business for RBS Greenwich Capital, the domestic fixed income banking unit of the Royal Bank of Scotland Group, from 1997 to 2009. Mr. Platt was an Executive Vice President of the Aegis Consumer Funding Group, a publicly traded non-prime automotive finance company, from 1991 to 1997. Mr. Platt earned a B.A. degree in 1985 from Emory University and an M.B.A. from The Fuqua School of Business at Duke University. Mr. Platt served on DriveTime's board of directors from February 2014 until April 2017. We believe that Mr. Platt will continue to be a valuable member of our Board because of his service on DriveTime's board and his extensive experience in consumer finance and the automotive retail industry.

**Michael Maroone** has served on our Board since our IPO. Mr. Maroone is currently the CEO of Maroone U.S.A. LLC, a position he has held since May 2017. From July 2005 to April 2015, Mr. Maroone served on the board of AutoNation, Inc., an automotive retailer and provider of new and used vehicles and related services. From August 1999 until his retirement in February 2015, Mr. Maroone also served as President and Chief Operating Officer of AutoNation, Inc. Prior to joining AutoNation, Inc., Mr. Maroone was President and CEO of the Maroone Automotive Group, a privately-held automotive retail group, from 1977 to 1997. Mr. Maroone currently serves on three other boards: as chairman of the board of Cleveland Clinic Florida, a non-profit, multi-specialty academic hospital; as a member of the board of the Cleveland Clinic Enterprise Board; and as a member of the board and audit committee of MDH Acquisition Corp, a New York Stock Exchange ("NYSE") listed special purpose acquisition corporation. Mr. Maroone previously served as a member of the board of Cox Automotive, Inc., a privately held combination of global automotive wholesale and services businesses including automotive auctions, financial services, media, and software; as a member of the board of Salty Dot, Inc., on the Cleveland Clinic Board of Trustees; and was co-chairman of the Florida Leadership Board of the Cleveland Clinic. He holds a B.S. degree in Small Business Management from the University

9

of Colorado Boulder. Mr. Maroone was selected to serve on our Board because of his advisory experience and his extensive experience in the automotive retail industry, and we believe that Mr. Maroone will continue to be a valuable member of our Board because of such experience.

**Neha Parikh** has served on our Board since April 2019. Ms. Parikh is the Chief Executive Officer of Waze, where people and technology meet to solve transportation challenges, a position she has held since June 2021. Waze is a platform that empowers communities to contribute road data, edit Waze maps and carpool to improve the way we move about the world. From August 2017 to November 2019, Ms. Parikh served as the President of Hotwire, a leading innovator in value creation and discount travel and a member of the Expedia Group. She started with Expedia Group in 2008 with Hotels.com, where she amassed experience in roles across the business, including product development, marketing, pricing, and strategy. Prior to her role with Hotwire, she was the Senior Vice President of Global Brands and Retail for Hotels.com, driving marketing activities, overseeing the global P&L and operations, and leading merchandising, business development, and partner marketing globally. Before joining Hotels.com, Ms. Parikh worked in consumer insight and demand strategy consulting with The Cambridge Group where she led projects across a variety of retailers, and at Dade Behring, Inc. (a Siemens healthcare company), where she held progressive levels of responsibility in marketing and product development. She also worked as a management consultant at Pricewaterhouse Coopers, LLP and gained multi-faceted expertise at an internet start-up in Chicago. Ms. Parikh also served on the board of directors of Tailwind Acquisition Corp, a NYSE listed special purpose acquisition corporation, from 2020 to 2021. Ms. Parikh holds a bachelors of business degree from The University of Texas at Austin and an MBA from the Kellogg School of Management at Northwestern University. We believe that Ms. Parikh will continue to be a valuable member of our Board because of her extensive senior management experience in the online retail vertical.

## INDEPENDENCE STATUS

The listing standards of the NYSE require that, subject to specified exceptions, each member of a listed company's audit committee, compensation committee, and nominating committee be independent and that audit committee members also satisfy independence criteria set forth in Rule 10A-3 under the Exchange Act.

Our Board has determined that each of our non-employee directors, including our director nominees Dan Quayle and Gregory Sullivan, meets the requirements to be an independent director. In making this determination, our Board considered the relationships that each non-employee director has with Carvana and all other facts and circumstances that our Board deemed relevant in determining their independence, including beneficial ownership of our Class A common stock.

## CONTROLLED COMPANY STATUS

For purposes of the corporate governance rules of the NYSE, we are a "controlled company." Controlled companies under those rules are companies of which more than 50% of the voting power for the election of directors is held by an individual, a group, or another company. The Garcia Parties beneficially own more than 50% of the combined voting power of

10

Carvana Co. Accordingly, we expect to be eligible for, but do not currently intend to take advantage of, certain exemptions from the corporate governance requirements of the NYSE. Specifically, as a "controlled company," we would not be required to have:

a. a majority of independent directors,
b. a nominating and corporate governance committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities,
c. a compensation committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, or
d. an annual performance evaluation of the nominating and governance and compensation committees.

In the event we choose to rely on some or all of these exemptions in the future, you would not have the same protections afforded to stockholders of companies that are subject to all of the applicable corporate governance rules of the NYSE.

**BOARD MEETINGS AND COMMITTEES**

During the year ended December 31, 2021, our Board held seventeen meetings, our Audit Committee held seven meetings, and our Compensation and Nominating Committee held four meetings. Directors are expected to attend the annual meeting of stockholders and all or substantially all of the Board meetings and meetings of committees on which they serve, and to spend the time needed and meet as frequently as necessary to properly discharge their responsibilities. Each director attended last year's annual meeting. Eleven of the seventeen meetings of the Board in 2021 were attended by 100% of the directors, and of the remaining six meetings of the Board with less than 100% attendance, five were attended by five of the six directors. Each director attended 100% of the meetings held by the committees of the Board on which the director served.

Our Board has an Audit Committee and a Compensation and Nominating Committee. The composition, duties and responsibilities of these committees are as set forth below. In the future, our board may establish other committees, as it deems appropriate, to assist it with its responsibilities.

| Board Member | Audit Committee | Compensation and Nominating Committee |
|---|---|---|
| Ira Platt | (Chairman) | • |
| Gregory Sullivan | • | (Chairman) |
| Dan Quayle | | • |
| Michael Maroone | • | |
| Neha Parikh | • | • |

*AUDIT COMMITTEE*

The Audit Committee is responsible for, among other matters,

11

1. appointing, compensating, retaining, evaluating, terminating, and overseeing our independent registered public accounting firm;
2. discussing with our independent registered public accounting firm their independence from management;
3. reviewing with our independent registered public accounting firm the scope and results of their audit;
4. approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;
5. overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;
6. reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls, and compliance with legal and regulatory requirements;
7. establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls, or auditing matters; and
8. overseeing our enterprise risk management program.

Our Board has affirmatively determined that Mr. Platt, Mr. Maroone, Ms. Parikh, and Mr. Sullivan meet the definition of "independent director" for purposes of serving on an Audit Committee under Rule 10A-3 of the Exchange Act and the NYSE rules. In addition, our Board has determined that Mr. Platt and Mr. Sullivan each qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. The written charter for our Audit Committee is available at our corporate website at investors.carvana.com/corporate-governance/governance-documents.

*COMPENSATION AND NOMINATING COMMITTEE*

The Compensation and Nominating Committee is responsible for, among other matters,

1. reviewing key employee compensation goals, policies, plans, and programs;
2. reviewing and providing recommendations to the Board regarding the compensation of our directors, CEO, and other executive officers;
3. reviewing and approving employment agreements and other similar arrangements between us and our executive officers;
4. administering stock plans and other incentive compensation plans;
5. identifying individuals qualified to become members of our Board, consistent with criteria approved by our Board;
6. overseeing the organization of our Board to discharge the Board's duties and responsibilities properly and efficiently;
7. assisting the Board in its oversight of human capital management, including corporate culture, diversity and inclusion, recruiting, retention, attrition, talent management, career development and progression, succession, and employee relations;
8. identifying best practices and recommending corporate governance principles; and
9. developing and recommending to our Board a set of corporate governance guidelines and principles applicable to us.

The Board has adopted a written charter for the Compensation and Nominating Committee, which is available on our corporate website at investors.carvana.com/corporate-governance/governance-documents. Each member of our Compensation and Nominating Committee is an independent director as defined by NYSE rules.

## BOARD LEADERSHIP STRUCTURE

The following section describes our board leadership structure, the reasons why the structure is in place at this time, the roles of various positions, and related key governance practices. The mix of experienced independent and management directors that make up our Board, along with the independent role of our lead director and our independent board-committee composition, benefits Carvana and its stockholders.

### INDEPENDENCE; BOARD MIX

Our Board has an effective mix of independent and management directors. It is composed of five independent directors and our current chairman and CEO, Ernest Garcia III.

### LEAD DIRECTOR

The Board believes that it is beneficial to Carvana and its stockholders to designate one of the directors as a lead director who is elected by a majority of the Board. The lead director serves a variety of roles, including reviewing and approving Board schedules to confirm the appropriate board and committee topics are reviewed and sufficient time is allocated to each; liaising between our chairman and CEO and non-management directors when necessary and appropriate (that said, each director has direct and regular access to the chairman and CEO) and calling an executive session of independent directors at any time consistent with the bylaws and certificate of incorporation. Michael Maroone, an independent director and member of our Audit Committee, is currently our lead director. Mr. Maroone is an effective lead director for Carvana due to, among other things, his independence, his board leadership experience with AutoNation, Inc., his strong strategic and financial acumen, his commitment to ethics, his extensive knowledge of the automotive retail environment, and his deep understanding of Carvana and its business.

### CHAIRMAN / CEO

With respect to the roles of chairman and CEO, the corporate governance guidelines provide that the roles may be separated or combined, and the Board will exercise its discretion in combining or separating these positions as it deems appropriate in light of prevailing circumstances. Mr. Garcia has been our chairman and CEO since our IPO. The Board believes that combining the roles of chairman and CEO, together with the separate, independent role of our lead director, is currently the most effective leadership structure because Mr. Garcia has extensive knowledge and experience in a variety of relevant areas acquired through his professional and other experiences, including automotive retail, e-commerce, consumer finance and strategic planning. This knowledge and experience gives Mr. Garcia the insight necessary to

13

combine the responsibilities of strategic development and execution along with management of day-to-day operations.

*SELF EVALUATION*

Our Compensation and Nominating Committee conducts an annual performance evaluation to determine whether the Board, its committees, and the directors are functioning effectively. This includes survey materials as well as conversations between each director and the lead director. The evaluation focuses on the Board's and the committees' contributions to Carvana and has an enhanced focus on areas in which the Board or management believes that the Board could improve.

As part of the annual Board self-evaluation, the Board evaluates whether the current leadership structure continues to be appropriate for Carvana and its stockholders. Our corporate governance guidelines provide the flexibility for our Board to modify our leadership structure in the future as appropriate.

## RISK OVERSIGHT

The Board, as a whole and through the Audit Committee, oversees our risk management program, which is designed to identify, evaluate, and respond to our high priority risks and opportunities. The risk management program facilitates constructive dialog at the senior management and board level to proactively realize opportunities and manage risks. Our Audit Committee is primarily responsible for overseeing our risk management processes on behalf of the full board. Our management, including our executive officers, is primarily responsible for managing the risks associated with the operation and business of our Company and provides regular updates to the Audit Committee and the full Board on identified high priority risks and opportunities within the risk management program, and regularly provides a more in depth report on select topics, such as cybersecurity, including response planning and the program's major initiatives.

*CODE OF ETHICS AND CONDUCT*

We have adopted a code of business conduct and ethics that applies to all of our employees, officers, and directors, including those officers responsible for financial reporting. Our code of business conduct and ethics is available on our website at investors.carvana.com/corporate-governance/governance-documents. We intend to disclose any amendments to the code or waivers of its requirements on our website.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

No interlocking relationships exist between the members of our Board and the board or compensation committee of any other company.

14

**COMMUNICATIONS BY STOCKHOLDERS AND OTHER INTERESTED PARTIES WITH THE BOARD OF DIRECTORS**

Stockholders and other interested parties may contact an individual director, the lead director, the Board as a group, or a specified board committee or group, including the non-management directors as a group, by sending regular mail to

Carvana Co.
1930 W. Rio Salado Pkwy
Tempe, AZ 85281
ATTN: Board of Directors

or by email at leaddirector@carvana.com.

Each communication should specify which director or directors the communication is addressed to, as well as the general topic of the communication. Carvana will receive the communications and process them before forwarding them to the addressee. Carvana may also refer communications to other departments within Carvana. Carvana generally will not forward to the directors a communication that is primarily commercial in nature, relates to an improper or irrelevant topic, or requests general information regarding Carvana.

**DIRECTOR COMPENSATION**

Prior to our IPO, none of our directors received compensation as a director from us. We have designed our non-employee director compensation program to achieve the following objectives:

a.  align directors' interests with the long-term interests of our shareholders;
b.  attract and retain outstanding director candidates with diverse backgrounds and experiences; and
c.  recognize the substantial time commitment required to serve as a Carvana director.

The Compensation and Nominating Committee reviews the Company's director compensation program periodically. Independent directors may not receive, directly or indirectly, any consulting, advisory or other compensatory fees from us. Members of the Board who are employees of Carvana do not receive compensation for their service on the Board. The following

15

table presents summary information regarding the total compensation awarded to, earned by, and paid to our non-employee directors for the year ended December 31, 2021:

| Name | Fees earned or paid in cash ($) | Stock awards ($) [1] | Total ($) |
|---|---|---|---|
| Ira Platt | $ 150,000 | $ 181,883 | $ 331,883 |
| Gregory Sullivan | $ 150,000 | $ 181,883 | $ 331,883 |
| Dan Quayle | $ 125,000 | $ 181,883 | $ 306,883 |
| Michael Maroone | $ 150,000 | $ 181,883 | $ 331,883 |
| Neha Parikh | $ 140,000 | $ 181,883 | $ 321,883 |

(1) The amounts reported in the Stock Awards column represent the grant date fair value on March 22, 2021, of the restricted stock units ("RSUs") granted to the non-employee directors during the year ended December 31, 2021 presented as computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. As disclosed in the table below, the annual grant of RSUs for each non-employee director, similar to 2020, was calculated at a fair market value of $180,000 based on the 10-day trailing average closing stock price on March 19, 2021. In 2021, this amount came to 664 RSUs.

*NON-EMPLOYEE DIRECTOR COMPENSATION STRUCTURE*

As of December 31, 2021, we compensated our non-employee directors according to the following structure:

| Description | Amount |
|---|---|
| Annual retainer | $110,000 |
| Annual grant | Grant of 664 restricted stock units having a fair market value of $180,000, based on the 10-day trailing average closing stock price on March 19, 2021, that vests 100% after approximately one (1) year. |
| Additional retainer for chair of committee | $25,000 for Audit Committee; $25,000 for Compensation and Nominating Committee |
| Additional retainer for lead director | $25,000 |
| Additional retainer for non-chair committee members | $15,000 for Audit Committee; $15,000 for Compensation and Nominating Committee |

Additionally, when Ms. Parikh was appointed to the Board in April 2019, she received a one-time award of RSUs having a fair market value of $150,000 based on the stock closing price as of April 18, 2019 that vests one-third annually over three (3) years. All non-employee directors are also reimbursed for their reasonable expenses to attend meetings of our Board and related committees and otherwise attend to our business.

*DIRECTOR STOCK OWNERSHIP GUIDELINES*

The minimum Company stock ownership guidelines for non-employee directors is five (5) times the amount of the annual retainer paid by the Company, not including retainers paid for serving as the lead director or chair of a committee, within five (5) years of being named a

16

director. For the CEO, the minimum Company stock ownership guideline is six (6) times base salary within five (5) years of being named in the role. The guidelines serve to align the interests of our directors to those of our stockholders.

Under this formula, the current ownership requirement is $550,000 (5 x $110,000) of Company stock for non-employee directors, and $4,545,000 (6 x $757,500) of Company stock for our CEO. Under these guidelines, directors elected at our IPO would have until April 2022 to comply with this requirement and Ms. Parikh, who joined the Board in April 2019, would have until April 2024 to meet this requirement. Each director is expected to continue to meet the ownership requirement for as long as he or she serves as a director of the Board. All non-employee directors and our CEO are in compliance with these guidelines as of the date of this proxy statement.

17

## EXECUTIVE OFFICERS

Below is a list of the names, ages, positions, and a brief account of the business experience of the individuals who serve as executive officers of Carvana Co. as of May 3, 2022:

| Name | Age | Position |
| --- | --- | --- |
| Ernest Garcia III | 39 | President, Chief Executive Officer and Chairman |
| Mark Jenkins | 43 | Chief Financial Officer |
| Benjamin Huston | 39 | Chief Operating Officer |
| Ryan Keeton | 44 | Chief Brand Officer |
| Daniel Gill | 39 | Chief Product Officer |
| Paul Breaux | 38 | Vice President, General Counsel, and Secretary |
| Tom Taira | 51 | President, Special Projects |

**Ernest Garcia III** is the president and CEO of Carvana and the chairman of our Board. His biography can be found above under "Board of Directors and Corporate Governance – Continuing Directors."

**Mark Jenkins** has served as our Chief Financial Officer since July 2014. Prior to joining Carvana, Mr. Jenkins was a professor in the finance department at the Wharton School of the University of Pennsylvania from 2009 to 2014, where his teaching and research focused on consumer and corporate credit markets. While at Wharton, Mr. Jenkins was responsible for teaching courses in the undergraduate, MBA, and executive education programs on corporate restructuring, corporate credit, and leveraged finance. Prior to his time at Wharton, Mr. Jenkins worked at the Brattle Group from 2001 to 2004, an economic consulting firm, where he focused on corporate valuation and demand forecasting in technology markets. Mr. Jenkins received a Ph.D. in economics from Stanford University and a B.S.E. from Duke University in mathematics and civil engineering.

**Benjamin Huston** co-founded Carvana and has served as our Chief Operating Officer since our inception in 2012. Prior to joining Carvana, Mr. Huston co-founded Looterang, a card-linking platform that enabled personalized deals to be automatically administered through consumer credit or debit cards, in 2011. Mr. Huston was CEO of Looterang from 2011-2012. From 2008 to 2011, Mr. Huston served as an associate at Latham and Watkins, a full-service global law firm, where he focused on regulatory affairs. Mr. Huston holds a J.D. from Harvard Law School and a B.A. in American studies from Stanford University.

**Ryan Keeton** co-founded Carvana and has served as our Chief Brand Officer since our inception in 2012. Prior to joining Carvana, Mr. Keeton was a principal at the Montero Group, a strategic consultancy firm, from 2010 to 2012, where he advised global public and private companies on strategic and business initiatives. From 2008 to 2010, Mr. Keeton served as Director of Strategic Marketing for George P. Johnson, a global marketing agency. Mr. Keeton holds a B.A. in English and American literature and language from Harvard University.

18

**Daniel Gill** has served as our Chief Product Officer since March 2015, overseeing all technology functions, as well as strategic partnerships for the business. Prior to joining Carvana, Mr. Gill spent his career in both enterprise software and consumer internet businesses. Mr. Gill served as Head of Strategy and Business Development for Inflection from May 2014 to March 2015. He co-founded and served as CEO of Huddler from 2007 until the company's acquisition by Wikia in May of 2014. Mr. Gill holds a degree in biology from Stanford University.

**Paul Breaux** has served as our General Counsel since August 2015. Prior to joining Carvana, Mr. Breaux practiced law at the Houston, Texas office of the firm Andrews Kurth LLP (now Hunton Andrews Kurth LLP) from 2008 to 2015. While at Andrews Kurth, Mr. Breaux's representative experience encompassed a broad range of general business transactions matters. Mr. Breaux holds a J.D. from Harvard Law School, a B.A. in Plan II Honors from The University of Texas at Austin, and a B.B.A. in finance from The University of Texas at Austin.

**Tom Taira** has served as President, Special Projects since October 2018. Prior to joining Carvana, Mr. Taira was the co-founder and CEO of Propel AI, which was acquired by Carvana in 2018. In 2005, Mr. Taira co-founded TrueCar, Inc. and from 2005 until 2018 he served in various roles at TrueCar, Inc. including Chief Product Officer, Chief Strategy Officer, and President. Between 2009 to 2010, Mr. Taira co-founded and served as CEO of Honk LLC, an automotive social media website, which was acquired by TrueCar. He has also been a Director and founding team member at various automotive startups, including Model E, a vehicle subscription service, and Build-to-Order, a new American automotive manufacturer. Mr. Taira began his automotive career at Toyota Motor Sales, U.S.A. where he served as eBusiness Strategy Manager. Mr. Taira holds a B.A. in Social Sciences from the University of California, Irvine and an M.B.A. from Georgetown University.

19

## COMPENSATION DISCUSSION AND ANALYSIS

This Compensation Discussion and Analysis ("CD&A") describes our executive compensation objectives and design, our compensation-setting process, our executive compensation program components, and the decisions made in 2021 with respect to our CEO, chief financial officer, and our three other most highly compensated executive officers for the year ended December 31, 2021, who have been designated as our "named executive officers" under Item 402 of Regulation S-K (each, an "NEO" and collectively, the "NEOs"):

| Named Executive Officer | Position |
| --- | --- |
| Ernest Garcia III | Chief Executive Officer |
| Mark Jenkins | Chief Financial Officer |
| Benjamin Huston | Chief Operating Officer |
| Daniel Gill | Chief Product Officer |
| Tom Taira | President, Special Projects |

This CD&A may contain statements regarding future individual and Company performance targets and goals. These targets and goals should not be understood to be statements of management's expectations or estimates of results or other guidance. We specifically caution investors not to apply these statements to other contexts.

## EXECUTIVE SUMMARY

*COMPANY PERFORMANCE HIGHLIGHTS*

2021 was a successful year for Carvana. We had another year of impressive growth in revenue, retail units sold, and total customers served. We again achieved a record in our gross profit per unit, and for the first time, we reached positive EBITDA for the fiscal year, excluding one-time items, as further described in the Company's Annual Report on Form 10-K for the year ended December 31, 2021. Our growth has few historical precedents and continues to make us one of the fastest-growing technology, consumer, or retail companies at our scale.

The highlights of our 2021 performance include:

- Positive EBITDA for the full year, excluding one-time items;
- 74% increase in retail units sold, from 244,111 to 425,237;
- 129% revenue growth, from $5.6 billion to $12.8 billion;





- 81.0% population coverage, up from 73.7%;
- 3 additional car vending machines, bringing our total from 27 to 30;





- a $1,285 increase in gross profit per unit from $3,252 to $4,537;
- improvement in net loss margin from (8.3%) to (2.2%);
- improvement in EBITDA margin from (4.6%) to (0.0%); and

*Note that EBITDA and EBITDA margin are non-GAAP measures. A description of these measures and a reconciliation of these measures to the nearest comparable GAAP measure can be found in the annex of this proxy statement.*

21



- three year shareholder return of 608.6%, significantly outperforming our peer group companies (see "Competitiveness of our Compensation Program" below) as an index as well as the S&P 500 and S&P 500 Retailing Indices.



## CORPORATE GOVERNANCE HIGHLIGHTS REGARDING EXECUTIVE COMPENSATION

We endeavor to maintain sound executive compensation policies and practices, including compensation-related corporate governance standards, consistent with our executive

22

compensation philosophy. The following summarizes our executive compensation and related governance policies and practices:

| WHAT WE DO | WHAT WE DO NOT DO |
| --- | --- |
| A significant portion of compensation is "at risk" and tied to long-term Company performance | No discretionary or guaranteed incentive payments |
| Market-based executive compensation levels are reviewed by Compensation and Nominating Committee annually | No new or legacy excise-tax gross-up provisions |
| An independent compensation consultant is retained to evaluate our executive compensation and make recommendations | No option repricing without stockholder consent |
| | Short term incentives |
| | Executives are prohibited from hedging |

We believe that we have designed executive compensation plans that effectively support our strategic and financial goals, create a culture of teamwork, and are directly tied to the performance of the Company and shareholder outcomes. We will continue to utilize rigorous governance processes to monitor and evaluate the compensation programs as well as implement best practices in compensation governance. We welcome shareholder feedback on our programs.

## COMPENSATION OBJECTIVES AND PRINCIPLES

Carvana seeks to create and maintain a culture of teamwork and high performance. Our executive compensation programs are one of the tools we utilize to accomplish this objective. Philosophically, we aim to treat our executives fairly when considering:

a. the complexity of their jobs,
b. the market for their executive talent,
c. their individual performance,
d. the financial and strategic performance of the Company, and
e. the need to retain the executives.

Within that framework, it is critical that we meet our objectives to:

a. attract and retain the best executive talent to support our growth,
b. align the interests of our executives with those of our shareholders, and
c. provide incentives that are linked directly to our long-term strategies.

We expect that our executives will in aggregate be paid fairly compared to the compensation peer group approved by the Compensation and Nominating Committee considering Company performance, individual performance, tenure, and experience.

**COMPENSATION SETTING PROCESS**

*ROLE OF COMPENSATION AND NOMINATING COMMITTEE AND CHIEF EXECUTIVE OFFICER IN SETTING EXECUTIVE COMPENSATION*

The Compensation and Nominating Committee has responsibility for overseeing the design, development, and implementation of the compensation program for our CEO and other NEOs. The committee evaluates the performance of our CEO and the performance of the other executive officers. Our CEO assists the Compensation and Nominating Committee in evaluating the performance of our other executive officers, including the NEOs other than the CEO. Our CEO does not participate in certain portions of committee meetings or meetings of the Board when his compensation is discussed and determined, and has requested that his total compensation be set significantly below the market median due to his significant ownership interest in our Company.

Based on these assessments, the members of the Compensation and Nominating Committee, each of whom is an independent director, make the final compensation decisions for the NEOs other than the CEO, and make recommendations to the Board for the CEO's compensation. The Board makes the final decision for the CEO's compensation.

*INDEPENDENT COMPENSATION ADVISOR*

Our Compensation and Nominating Committee believes that independent advice is important in developing Carvana's executive compensation programs. Since September 2017, the Compensation and Nominating Committee has engaged Korn Ferry as its independent compensation consultant to advise on executive compensation matters. All work performed by the independent compensation consultant regarding our executive compensation program is tasked and overseen directly by the Compensation and Nominating Committee. Our management provides information and analyses to the Compensation and Nominating Committee at the Compensation and Nominating Committee's direction.

In addition to advising on our executive compensation program, Korn Ferry, at the request of and in service to the Compensation and Nominating Committee, provided certain other compensation advisory services for 2021 compensation, including assistance with establishing a compensation peer group, benchmarking executive compensation, aggregate broad based equity usage (including run rate and total dilution), outlining peer group short- and long-term incentive practices, and reviewing the narrative disclosure in this Compensation Discussion and Analysis.

Korn Ferry does not provide any other material services to Carvana Co. The Compensation and Nominating Committee has assessed the independence of Korn Ferry pursuant to the NYSE rules and concluded that Korn Ferry's work for the Compensation and Nominating Committee did not raise any conflicts of interest.

24

*CONSIDERATION OF THE SAY-ON-PAY VOTE*

We last held a non-binding, advisory vote to approve the compensation of our NEOs, commonly referred to as the "say-on-pay" vote, at our 2021 Annual Meeting of Shareholders, as required by Section 14A of the Securities Exchange Act of 1934. Our advisory resolution to approve the compensation of our NEOs received substantial majority support from shareholders with over 99.8% "For" votes of votes cast. We take this result as support that our executive compensation program and practices are reasonable and well-aligned with shareholder expectations. Nevertheless, we review our overall approach to executive compensation periodically and we expect that the specific direction, emphasis, and components of our executive compensation program will continue to evolve, as will our process for establishing executive compensation.

**COMPETITIVENESS OF OUR COMPENSATION PROGRAM**

Our executive compensation program is designed so that the sum of base pay plus total long-term compensation is competitive with market practices. Market practices—or benchmarks—are based on peer-group data and compensation survey data.

The Compensation and Nominating Committee, with the assistance of its compensation consultant, Korn Ferry, reviewed and selected potential peer companies based on revenue size, industry focus, growth rates, complexity of operations, customer base, and market for talent. Many of our direct industry competitors are either privately held companies or are larger than us in revenue size, although very few have our growth trajectory. With the assistance of its compensation consultant, the Compensation and Nominating Committee approved the following compensation peer group in order to determine market pay levels and pay practices for fiscal year 2021:

- Wayfair Inc.
- Advance Auto Parts, Inc.
- Tractor Supply Company
- Asbury Automotive Group, Inc.
- Ulta Beauty, Inc.
- Williams-Sonoma, Inc.
- Chewy, Inc.
- Knight-Swift Transportation Holdings Inc.
- The Aaron's Company, Inc.
- Lululemon Athletica Inc.
- Zillow Group, Inc.
- Lyft, Inc.
- GoDaddy Inc.
- IAC/InterActiveCorp
- RH
- Floor & Decor Holdings, Inc.

The Compensation and Nominating Committee expects to continue to review our compensation peer group on an annual basis, considering changes in our size and business and the businesses of the companies in the peer group.

The Compensation and Nominating Committee also uses compensation survey data in its evaluation of executive pay for the NEOs. Survey data provides insight into positions that may not generally be reported in proxy statements and information about the compensation of executives of non-public companies. To assist the Compensation and Nominating Committee in evaluating fiscal year 2021 compensation levels, the Compensation and Nominating Committee

reviewed both peer-group proxy data and information from survey databases, utilizing appropriate subsets based on the size of the company.

26

**COMPENSATION COMPONENTS**

In accordance with our overall compensation philosophy and program, executives are provided with a mix of base salary, long-term incentives, and employee benefits. Our compensation philosophy places a significant portion of the potential total compensation for each NEO "at risk" such that compensation will vary based on the performance of Carvana. Variable compensation is a component of compensation for most of our employees, but a higher proportion of our NEOs' compensation is at risk than that of our general employee population. As shown in the pay mix chart below, our compensation program is designed to be highly performance-based. An average of approximately 82.7% of our NEO's approved compensation is tied to our stock price performance.

CEO and Other NEO Average Compensation by Type



- ◼ Base Salary
- ◼ Stock Options
- ◼ Time Based RSUs

27

The following table describes the material elements of compensation and the objectives of each element:

| PROGRAM | DESCRIPTION | OBJECTIVES |
|---|---|---|
| **ANNUAL COMPENSATION:** | | |
| *Base Salary* | • Ongoing cash compensation based on executive officer's role, responsibilities, competitive market positioning, and individual performance. | • Attract and retain qualified key managerial talent. <br><br> • Recognize sustained individual performance. |
| **LONG-TERM COMPENSATION:** | | |
| *Long Term Incentive Program* | • A long-term incentive program using time-based awards. | • Focus executives on long-term Company performance and long-term financial and strategic success. <br><br> • Retention. <br> • Align employee and stockholder interests via stock ownership. |

*BASE SALARY*

The base salaries for the NEOs are reviewed annually by the Compensation and Nominating Committee. Individual salaries are determined based upon a combination of factors, including the scope of responsibilities, individual preferences, performance, and experience, our Company's performance, an individual's potential for making contributions to future company performance, and competitive pay practices. The committee considers all these factors in determining base salary increases and does not assign a specific weighting to any individual factor.

In February 2021, the Compensation and Nominating Committee reviewed the base salaries of our executive officers, including our NEOs, taking into consideration the factors described above. Following this review, the Compensation and Nominating Committee determined to alter the mix between base salary and equity compensation to put more of the NEO's pay at-risk. The committee also determined to slightly increase the base salary of the chief product officer to maintain the competitiveness of this compensation element.

Ernest Garcia III, our CEO, had a 2019, 2020, and 2021 base salary of $885,000, $767,000, and 757,500, respectively. Mark Jenkins, our chief financial officer, had a 2019, 2020, and 2021 base salary of $735,000, $745,000, and $742,500, respectively. Benjamin Huston, our chief operating officer, had a 2019, 2020, and 2021 base salary of $735,000, $745,000, and $742,500, respectively. Daniel Gill, our chief product officer, had a 2019, 2020, and 2021 base salary of $645,000, $654,000, and $667,500, respectively. Tom Taira, our president of special projects, had a 2021 base salary of $877,500.

As disclosed in our Shareholder Letter dated May 6, 2020, in response to the COVID-19 pandemic, management and the Board recommended and the Compensation and Nominating Committee agreed, to contribute a portion of executive officers' 2020 annual base salaries and each Board member's 2020 annual retainer to our disaster relief program, the "We're All in This Together Fund" (the "Fund"). Approximately 49% of each NEO's annual base salary went to the Fund, and as a result the actual base salary received by each NEO decreased overall in 2020 from the amounts stated above and is reflected in the Summary Compensation Table below.

*LONG-TERM INCENTIVE PROGRAM*

The Compensation and Nominating Committee believes that stock-based performance compensation is essential to align the interests of Carvana's management and its shareholders in enhancing the long-term value of our equity and to encourage executives to remain with the Company. Due to the Compensation and Nominating Committee's focus on long-term growth, we do not have short-term incentives in the executive pay mix. This structure is reviewed by the Compensation and Nominating Committee annually and may change in the future. Among the varied types of equity awards the Compensation and Nominating Committee is authorized to use under the equity plan, stock options are the ones that the Compensation and Nominating Committee has determined are preferable for use with NEOs, because their value is more leveraged to future value appreciation and depends upon a future increase in the value of our common stock. The committee also has determined that time-based restricted stock unit grants to NEOs may be used for the purposes of retention or recognition of outstanding performance in part because restricted stock units are less volatile than stock options. During 2021 the Company granted stock options and RSUs under the Company's 2017 Omnibus Incentive Plan (the "Plan").

### 2021 Stock Option Grant

For fiscal year 2021, the Compensation and Nominating Committee determined to award time-based stock options to provide an award that has a value dependent upon a future increase in the value of our Class A common stock.

For the 2021 annual grant of stock options, the Compensation and Nominating Committee targeted a grant value equal to approximately 62.0% of each executive's total direct compensation, or 75% of each executive's long-term incentive compensation. The options were granted on February 14, 2021. Mr. Garcia was granted 18,044 options ($3,219,213 grant date value), Messrs. Jenkins and Huston were each granted 17,687 options ($3,155,521 grant date value), Mr. Gill was granted 15,900 options ($2,836,704 grant date value), and Mr. Taira was granted 9,973 options ($1,779,273 grant date value). All of these grants vest 25% on April 1, 2022 and in 36 equal monthly installments thereafter, subject to each grantee's continued employment.

### 2021 Time-Based Grant

For fiscal year 2021, the Compensation and Nominating Committee also granted a time-based RSU award. For the award, the Compensation and Nominating Committee targeted a grant value equal to approximately 20.7% of each NEO's total direct compensation, or 25% of

29

each NEO's long-term incentive compensation. The RSUs were granted on February 14, 2021. Mr. Garcia was granted 3,625 RSUs ($1,073,181 grant date value), Messrs. Jenkins and Huston were each granted 3,554 RSUs ($1,052,162 grant date value), Mr. Gill was granted 3,195 RSUs ($945,880 grant date value), and Mr. Taira was granted 2,004 RSUs ($593,284 grant date value). All of these grants vest 25% on April 1, 2022 and in 36 equal monthly installments thereafter.

### *2019 and 2020 Performance and Time Contingent Grant*

As previously disclosed, for fiscal years 2019 and 2020, the Compensation and Nominating Committee granted blended performance and time contingent RSU awards (the "2019 Award" and the "2020 Award"). Both the 2019 Award and the 2020 Award were subject to continued employment and the Company's achievement of positive EBITDA for a calendar quarter (the "Performance Trigger"). On October 29, 2020, the Company filed its Form 10-Q for the third quarter of 2020 reporting positive EBITDA. Accordingly, the Compensation and Nominating Committee determined that the Performance Trigger for the 2019 Award and the 2020 Award had been achieved. The 2019 Award vested 39.6% on November 1, 2020 and the remaining amount vests in 29 equal installments on the first of the month thereafter. The 2020 Award vested 25% on April 1, 2021 and the remaining amount vests in 36 equal monthly installments on the first of the month thereafter.

## *PERQUISITES AND BENEFITS*

Currently, we do not view perquisites or other personal benefits as a significant component of our executive compensation program. Accordingly, we did not provide perquisites to our executive officers in 2021, including our NEOs, except that each of the NEOs, along with certain other employees, can use one of the Company inventory vehicles (which generally will be replaced every three years); each, along with many of our employees, may use a company-provided cellular phone; and each, along with all of our employees, may participate in our 401(k) match benefit which is based on salary.

We do not expect that any future perquisites or other personal benefits will be a significant aspect of our executive compensation program. All future practices with respect to perquisites or other personal benefits will be approved and subject to periodic review by the Compensation and Nominating Committee.

## *TERMINATION, SEVERANCE, AND CHANGE IN CONTROL BENEFITS*

We do not have employment or severance agreements with our executives. In the event of a change in control for either Carvana Co. or Carvana Group, any payment due to the NEOs would be governed by the NEOs' individual equity award agreements made under the Carvana Co. 2017 Omnibus Incentive Plan (the "Plan") and the Carvana Group, LLC Equity Incentive Plan (the "Carvana Group Plan"). The Compensation and Nominating Committee believes that payments to NEOs in the event of a change in control as governed by these agreements benefit stockholders by providing an important incentive to NEOs to remain focused on running the business in the case of a pending or actual change in control event.

30

In the event of a Change in Control of Carvana Co. (as the term is defined in the Plan) and if an NEO is terminated involuntarily without Cause (as the term is defined in the Plan) within twenty-four months following the Change in Control, then all outstanding unvested stock options and time contingent RSUs of the NEO granted by our 2018, 2019, 2020, and 2021 equity award agreements will become fully exercisable and vested. An NEO whose employment is terminated because of death or disability will have one year from the time of termination to exercise any then-vested options, instead of the usual 90 days, provided that such exercise must occur prior to the expiration date of the options. If an NEO's employment is terminated due to the NEO's disability, and that NEO later dies within a year of such termination, the legal representative of the NEO's estate may exercise the options within the earlier period of the one year anniversary of the date of death and the expiration date of the options.

Each NEO is also required to comply with the restrictive covenants set forth in each individual equity award agreement. All NEOs are subject to confidentiality obligations pursuant to their award agreements. In addition, Messrs. Garcia, Jenkins, and Huston are subject to non-competition provisions during the NEO's employment and for a period of 18 months after termination. Messrs. Garcia, Jenkins, and Huston are also required to comply with non-solicitation and non-interference obligations during the NEO's employment and for a period of 12 months after termination.

In the event of a Change in Control of Carvana Group (as the term is defined in the Carvana Group Plan) all outstanding unvested Class B Unit awards held by participants in the Carvana Group Plan, whose employment has not previously been terminated, will accelerate in full, subject to certain escrow demand rights held by a purchaser of control of Carvana Group.

Except for these arrangements described above, none of our NEOs have entered into any plans, arrangements or agreements with Carvana providing for payments upon termination of employment or change in control of Carvana, other than payments generally available to all salaried employees that do not discriminate in scope, terms, or operation in favor of the executive officers of Carvana.

31

## COMPENSATION-RELATED POLICIES

*COMPENSATION RECOVERY ("CLAWBACK") POLICY*

In 2018, the Compensation and Nominating Committee approved the adoption of a "clawback" policy, which would provide for the clawback or recoupment of any compensation granted, earned, or vested that is tied to performance metrics, in the event of an accounting restatement resulting from material noncompliance with certain financial reporting requirements that reveals that such performance (or level of performance) was not achieved.

*POLICY REGARDING HEDGING AND PLEDGING OF COMPANY STOCK*

Carvana's insider trading policy prohibits all employees from buying or selling Carvana securities while aware of material nonpublic information and prohibits the disclosure of material nonpublic information to others who then trade in our securities. As part of this policy, certain other Carvana-securities-related transactions by directors, officers and other employees are also prohibited or subject to specific notice and pre-approval requirements. The policy is premised on the belief that even in those circumstances where the proposed transaction may not constitute a violation of law or applicable regulations, it is nonetheless inappropriate for any director, officer, or other employee to engage in short-term or speculative transactions in our securities which may be viewed as reducing their incentive to improve our performance or inconsistent with the objectives of our stockholders in general. Therefore, it is our policy that directors, officers, and other employees may not engage in any transactions involving our securities which constitute short sales, puts, calls, or other similar derivative securities. The policy also prohibits certain other transactions, including hedging or monetization transactions—e.g., zero-cost collars, forward sale contracts, and arrangements pledging company securities as collateral for a loan (without adequate assurance of other available assets to satisfy the loan).

## COMPENSATION AND RISK

We believe that our compensation programs create appropriate incentives to drive sustained, long-term increases in shareholder value. These programs have been designed and administered in a manner that discourages undue risk-taking by employees. Relevant features of these programs include:

- Focus on weighting compensation toward four-year and greater vesting schedules of equity awards;
- individual NEO pay generally set at market competitive levels against comparable executive roles at an appropriate set of peer companies, except the CEO, who has compensation significantly below market levels due to his significant ownership interest in us;
- no employment agreements with executive officers; and
- restrictions on trading in Carvana Class A common stock to reduce insider trading compliance risk, as well as prohibitions on pledging and hedging Carvana capital stock.

In light of these features, we conclude that the risks arising from our executive and employee compensation policies and practices are not reasonably likely to have a material adverse effect on the Company.

**TAX AND ACCOUNTING IMPLICATIONS**

Carvana considers the tax and accounting aspects of the elements of compensation we offer in determining the most effective method for compensating our executives. This includes, but is not limited to, Section 162(m) of the Internal Revenue Code and the regulations thereunder. Section 162(m) generally limits the tax deduction available to public companies for annual compensation paid to the CEO and certain other NEOs in excess of $1 million.

Prior to 2017 tax legislation, this $1 million deduction limit did not apply to compensation that qualified as "performance-based." However, as of result of 2017 tax legislation, this "performance-based" exemption was eliminated, unless such compensation qualifies for transition relief (relating to written binding contracts in effect on November 2, 2017, which were not subsequently materially modified). Therefore, certain compensation paid under our existing equity plans and certain of our long-term equity awards originally designed with the intent that such amounts qualify as "performance-based" compensation may not be deductible in the future. Although the Compensation and Nominating Committee may consider the effect that Section 162(m) and the potential lack of deduction for amounts paid in excess of the deduction limit may have on Carvana, the Compensation and Nominating Committee continues to retain flexibility to make compensation decisions, in the exercise of its business judgment, that are based on factors that it determines to be appropriate (as determined by the Compensation and Nominating Committee in its sole discretion) to enable Carvana to continue to attract, retain, reward, and motivate its highly-qualified executives. This flexibility may include amending or modifying the design elements of our historical compensation programs.

## COMPENSATION AND NOMINATING COMMITTEE REPORT

The Compensation and Nominating Committee has reviewed and discussed the foregoing Compensation Discussion and Analysis with management. Based on this review and discussion, the Committee recommended to the Carvana, Co. Board of Directors that the Compensation Discussion and Analysis be included in this proxy statement and incorporated by reference into Carvana Co.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2021.

Respectfully submitted by:

Gregory Sullivan
Ira Platt
Dan Quayle
Neha Parikh

34

# COMPENSATION TABLES

## SUMMARY COMPENSATION TABLE

The following table presents summary information regarding the total compensation awarded to, earned by, and paid to our NEOs for the past three fiscal years.

| Name and Principal Position | Year | Salary ($)[3] | Stock awards ($)[1] | Option awards ($)[1] | All other compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|---|
| **Ernest Garcia III** | 2021 $ | 757,500 $ | 1,073,181 $ | 3,219,213 $ | 451 $ | 5,050,345 |
| *Chief Executive Officer* | 2020 $ | 411,752 $ | 545,811 $ | 1,636,881 $ | — $ | 2,594,444 |
| | 2019 $ | 885,000 $ | 522,925 $ | 1,549,203 $ | — $ | 2,957,128 |
| **Mark Jenkins** | 2021 $ | 742,500 $ | 1,052,162 $ | 3,155,521 $ | 22,469 $ | 4,972,652 |
| *Chief Financial Officer* | 2020 $ | 384,395 $ | 530,302 $ | 1,590,544 $ | 24,541 $ | 2,529,782 |
| | 2019 $ | 735,000 $ | 434,283 $ | 1,286,618 $ | 23,657 $ | 2,479,558 |
| **Benjamin Huston** | 2021 $ | 742,500 $ | 1,052,162 $ | 3,155,521 $ | 18,886 $ | 4,969,069 |
| *Chief Operating Officer* | 2020 $ | 376,010 $ | 530,302 $ | 1,590,544 $ | 18,294 $ | 2,515,150 |
| | 2019 $ | 735,000 $ | 434,283 $ | 1,286,618 $ | 22,921 $ | 2,478,822 |
| **Daniel Gill** | 2021 $ | 667,500 $ | 945,880 $ | 2,836,704 $ | 18,871 $ | 4,468,955 |
| *Chief Product Officer* | 2020 $ | 332,850 $ | 465,432 $ | 1,395,797 $ | 20,819 $ | 2,214,898 |
| | 2019 $ | 645,000 $ | 381,128 $ | 1,129,067 $ | 13,819 $ | 2,169,014 |
| **Tom Taira** | 2021 $ | 877,500 $ | 593,284 $ | 1,779,273 $ | 45,883 $ | 3,295,940 |
| *President, Special Projects* | | | | | | |

(1) The amounts reported in the Stock Awards and Option Awards columns represent the grant date fair value of the RSUs and stock options granted to the NEOs during the years presented as computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. A discussion of the assumptions used in computing the grant date fair values may be found in Note 12, "Equity-Based Compensation" included in the audited financial statements contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2021.

35

(2) The following items were included in "All Other Compensation" for 2019, 2020, and 2021:

| Name | Year | 401(k) Plan Company Match[i] | Incremental Cost of Company Car[ii] | Cellphone Expense[iii] | Vacation Payout[iv] | Total |
|---|---|---|---|---|---|---|
| Ernest Garcia III | 2021 $ | — $ | — $ | 451 $ | — $ | 451 |
| | 2020 $ | — $ | — $ | — $ | — $ | — |
| | 2019 $ | — $ | — $ | — $ | — $ | — |
| Mark Jenkins | 2021 $ | 3,480 $ | 18,500 $ | 489 $ | — $ | 22,469 |
| | 2020 $ | 5,510 $ | 18,500 $ | 531 $ | — $ | 24,541 |
| | 2019 $ | 4,655 $ | 18,500 $ | 502 $ | — $ | 23,657 |
| Benjamin Huston | 2021 $ | 3,480 $ | 14,750 $ | 656 $ | — $ | 18,886 |
| | 2020 $ | 2,865 $ | 14,750 $ | 679 $ | — $ | 18,294 |
| | 2019 $ | 7,280 $ | 14,750 $ | 891 $ | — $ | 22,921 |
| Daniel Gill | 2021 $ | 6,960 $ | 11,250 $ | 661 $ | — $ | 18,871 |
| | 2020 $ | 8,893 $ | 11,250 $ | 676 $ | — $ | 20,819 |
| | 2019 $ | 1,828 $ | 11,250 $ | 741 $ | — $ | 13,819 |
| Tom Taira | 2021 $ | 6,960 $ | — $ | — $ | 38,923 $ | 45,883 |

(i) Represents discretionary matching contributions under our 401(k) Plan.

(ii) The incremental cost of the company car to us has been calculated based on the depreciation value of the vehicle.

(iii) Represents the cost of company-paid cell phone service.

(iv) Represents vacation payout of time accrued and unused at year end, paid out as required by California law.

(3) The amount reported as salaries for the NEOs for 2020 show the base salary for each NEO approved by the Board and the Compensation and Nominating Committee in February 2020 (for Mr. Garcia $767,000; for Messrs. Jenkins and Huston $745,000; and for Mr. Gill $645,000) adjusted for the amount each NEO contributed to the Fund as discussed above under "Compensation Components - Base Salary". These amounts represent the actual salary each NEO received for 2020 and the actual compensation received by each NEO for 2020.

36

**GRANTS OF PLAN-BASED AWARDS**

| Name | Grant Date | All other stock awards: Number of shares of stock or units (#)[1] | All other option awards: Number of securities underlying options (#)[2] | Exercise or base price of option awards ($/sh) | Grant date fair value of stock and option awards[3] |
|---|---|---|---|---|---|
| **Ernest Garcia III** | 2/14/2021 | 3,625 | — | $ — | $ 1,073,181 |
| | 2/14/2021 | — | 18,044 | $ 296.05 | $ 3,219,213 |
| **Mark Jenkins** | 2/14/2021 | 3,554 | — | $ — | $ 1,052,162 |
| | 2/14/2021 | — | 17,687 | $ 296.05 | $ 3,155,521 |
| **Benjamin Huston** | 2/14/2021 | 3,554 | | $ — | $ 1,052,162 |
| | 2/14/2021 | — | 17,687 | $ 296.05 | $ 3,155,521 |
| **Daniel Gill** | 2/14/2021 | 3,195 | — | $ — | $ 945,880 |
| | 2/14/2021 | — | 15,900 | $ 296.05 | $ 2,836,704 |
| **Tom Taira** | 2/14/2021 | 2,004 | — | $ — | $ 593,284 |
| | 2/14/2021 | — | 9,973 | $ 296.05 | $ 1,779,273 |

(1) The amounts in these columns represent the number of shares that would be issued for awards of RSUs which are scheduled to vest 25% on April 1, 2022 and in 36 monthly installments thereafter, subject to the grantee's continued employment, as more fully described above under "Compensation Discussion and Analysis—Long Term Incentive Program."

(2) Represents awards of stock options which are scheduled to vest 25% on April 1, 2022 and in 36 month installments thereafter, subject to the grantee's continued employment, as more fully described above under "Compensation Discussion and Analysis—Long Term Incentive Program."

(3) The amounts reported in this column represent the grant date fair value of the options and RSUs granted to the NEOs as computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718.

**OUTSTANDING EQUITY AWARDS AT 2021 FISCAL YEAR END**

| Name | Option Awards | | | | Equity Awards | |
|---|---|---|---|---|---|---|
| | Number of securities underlying unexercised options (#) exercisable | Number of securities underlying unexercised options (#) unexercisable | Option exercise price ($) | Option expiration date | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested ($)[1] |
| **Ernest Garcia III:** | | | | | | |
| Non-qualified stock options [2] | | 18,044 $ | 296.05 | 2/14/2031 | | |
| Non-qualified stock options [3] | 12,188 | 17,062 $ | 88.62 | 2/14/2030 | — $ | — |
| Non-qualified stock options [4] | 42,951 | 21,475 $ | 38.00 | 2/25/2029 | — $ | — |
| Non-qualified stock options [5] | 14,656 | 1,332 $ | 44.21 | 7/28/2028 | — $ | — |
| Restricted stock units [6] | | | | | 3,625 $ | 840,239 |
| Restricted stock units [7] | — | — $ | — | | 1,166 $ | 270,267 |
| Restricted stock units [9] | — | — $ | — | | 3,593 $ | 832,821 |
| Restricted stock units [8] | — | — $ | — | | 4,529 $ | 1,049,777 |
| **Mark Jenkins:** | | | | | | |
| Non-qualified stock options [2] | | 17,687 $ | 296.05 | 2/14/2031 | | |
| Non-qualified stock options [3] | 11,843 | 16,579 $ | 88.62 | 2/14/2030 | — $ | — |
| Non-qualified stock options [4] | 35,671 | 17,835 $ | 38.00 | 2/25/2029 | — $ | — |
| Non-qualified stock options [5] | 13,740 | 1,249 $ | 44.21 | 7/28/2028 | — $ | — |
| Restricted stock units [6] | | | | | 3,554 $ | 823,782 |
| Restricted stock units [7] | — | — $ | — | | 1,093 $ | 253,346 |
| Restricted stock units [9] | — | — $ | — | | 3,491 $ | 809,179 |
| Restricted stock units [8] | — | — $ | — | | 3,761 $ | 871,762 |
| Class B Units [11] | — | — $ | — | | 6,667 $ | 1,156,271 |
| **Benjamin Huston:** | | | | | | |
| Non-qualified stock options [2] | | 17,687 $ | 296.05 | 2/14/2031 | | |
| Non-qualified stock options [3] | 11,843 | 16,579 $ | 88.62 | 2/14/2030 | — $ | — |
| Non-qualified stock options [4] | 35,671 | 17,835 $ | 38.00 | 2/25/2029 | — $ | — |
| Non-qualified stock options [5] | 13,740 | 1,249 $ | 44.21 | 7/28/2028 | — $ | — |
| Restricted stock units [6] | | | | | 3,554 $ | 823,782 |
| Restricted stock units [7] | — | — $ | — | | 1,093 $ | 253,346 |
| Restricted stock units [9] | — | — $ | — | | 3,491 $ | 809,179 |
| Restricted stock units [8] | — | — $ | — | | 3,761 $ | 871,762 |
| Class B Units [11] | — | — $ | — | | 6,667 $ | 1,156,271 |
| **Daniel Gill** | | | | | | |
| Non-qualified stock options [2] | | 15,900 $ | 296.05 | 2/14/2031 | | |
| Non-qualified stock options [3] | 10,393 | 14,549 $ | 88.62 | 2/14/2030 | — $ | — |
| Non-qualified stock options [4] | 31,303 | 15,651 $ | 38.00 | 2/25/2029 | — $ | — |
| Non-qualified stock options [5] | 12,091 | 1,099 $ | 44.21 | 7/28/2028 | — $ | — |
| Restricted stock units [6] | | | | | 3,195 $ | 740,569 |

| | Exercisable | Unexercisable | Exercise Price | Expiration Date | Number | Market Value |
|---|---|---|---|---|---|---|
| Restricted stock units [7] | | — | — $ | — | 962 $ | 222,982 |
| Restricted stock units [9] | | — | — $ | — | 3,064 $ | 710,205 |
| Restricted stock units [8] | | — | — $ | — | 3,301 $ | 765,139 |
| Class B Units [11] | | — | — $ | — | 2,500 $ | 433,580 |
| **Tom Taira** | | | | | | |
| Non-qualified stock options [2] | | 9,973 $ | 296.05 | 2/14/2031 | | |
| Non-qualified stock options [3] | 6,616 | 9,262 $ | 88.62 | 2/14/2030 | | |
| Non-qualified stock options [4] | 17,111 | 10,556 $ | 38.00 | 2/25/2029 | | |
| Non-qualified stock options [5] | 9,212 | 5,714 $ | 52.66 | 10/9/2028 | | |
| Restricted stock units [6] | | | | | 2,004 $ | 464,507 |
| Restricted stock units [10] | | | | | 3,081 $ | 714,145 |
| Restricted stock units [9] | | | | | 1,950 $ | 451,991 |
| Restricted stock units [8] | | | | | 2,226 $ | 515,965 |

(1) Amounts were determined based on the closing price of Carvana Co.'s Class A common stock on December 31, 2021, of $231.79 and the applicable participation thresholds of our B4 Units (as defined below). These values may not reflect the value actually realized by the NEOs upon vesting.

(2) These stock options vest 25% on April 1, 2022, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(3) These stock options vest 25% on April 1, 2021, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(4) These stock options vested 25% on April 1, 2020, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(5) These stock options vested 25% on April 1, 2019, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(6) These RSUs vest 25% on April 1, 2022, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(7) These RSUs vested 25% on April 1, 2019, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(8) These RSUs met the Performance Trigger on October 29, 2020 when Carvana filed its Form 10-Q for the third quarter of 2020 reflecting positive EBITDA. As a result, these RSUs vested

39.6% on November 1, 2020, and the remaining amount vests in 29 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(9) These RSUs met the Performance Trigger on October 29, 2020 when Carvana filed its Form 10-Q for the third quarter of 2020 reflecting positive EBITDA. As a result, these RSUs vested 25% on April 1, 2021 and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(10) These RSUs vested 25% on October 1, 2019, and the remaining amount vests in 36 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

(11) These Class B Units (the "B4 Units") were granted on April 27, 2017, with a participation threshold of $12.00; 20% vested on February 1, 2018, and the remaining amount vests in 48 equal monthly installments on the first of each month thereafter, subject to the grantee's continued employment.

## OPTION EXERCISES AND STOCK VESTED

| Name | Option awards | | Stock Awards[1] | |
|---|---|---|---|---|
| | Number of shares acquired on exercise (#) | Value realized on exercise ($) | Number of shares acquired on vesting (#) | Value realized on vesting ($) |
| Ernest Garcia III | — | — | 9,458 $ | 2,719,776 |
| Mark Jenkins | — | — | 41,913 $ | 11,593,806 |
| Benjamin Huston | — | — | 41,913 $ | 10,810,475 |
| Daniel Gill | — | — | 19,869 $ | 5,850,301 |
| Tom Taira | 12,500 | 2,359,184 | 18,786 $ | 5,531,121 |

(1) Amounts include RSUs and Class B Units. The number of shares and values were determined based on the closing price of Carvana Co.'s Class A common stock on each vesting date and, in the case of Class B Units, the applicable participation thresholds of our B4 Units (as defined above in the "Outstanding Equity Awards at 2021 Fiscal Year End" table) and of our Class B Units with a participation threshold equal to $0.00 (the "B1 Units"), $4.878 (the "B2 Units"), and $5.8114 (the "B3 Units").

## POTENTIAL PAYMENTS UPON A TERMINATION OR CHANGE IN CONTROL

As described in "Compensation Discussion and Analysis – Termination, Severance, and Change in Control Benefits" above, we do not have an employment or severance plan or agreement with any of our NEOs; however, our NEOs would be entitled to accelerated vesting of certain equity awards upon the occurrence of the following scenarios, with values calculated based on the Company's closing stock price on December 31, 2021:

40

| Name | Change in Control (Without Termination) ($)[1] | Involuntary Termination without Cause Within 24 Months of a Change in Control ($)[2] |
|---|---|---|
| **Ernest Garcia III:** | $ — | $ 8,687,860 |
| **Mark Jenkins:** | $ 1,156,271 | $ 7,685,650 |
| **Benjamin Huston:** | $ 1,156,271 | $ 7,685,650 |
| **Daniel Gill:** | $ 433,580 | $ 6,739,298 |
| **Tom Taira:** | $ — | $ 5,900,979 |

(1) Amounts in this column represent the value based on the Company's closing stock price as of December 31, 2021, and include the following:

- On a fully exchanged basis, the Class B Units (as described above under "Outstanding Equity Awards at 2021 Fiscal Year End"), that would vest upon a Change In Control of Carvana Group, as long as the executive's employment had not been previously terminated and subject to certain escrow demand rights held by a purchaser of control of Carvana Group.

(2) Amounts in this column represent the value based on the Company's closing stock price as of December 31, 2021, and include the following:

- All outstanding unvested time-based RSUs granted in 2018, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All unvested stock options granted in 2018, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All unvested stock options granted in 2019, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All outstanding unvested RSUs granted in 2019, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All unvested stock options granted in 2020, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All outstanding unvested RSUs granted in 2020, which would become fully vested if the executive is involuntarily terminated without cause within 24 months of a change of control of Carvana Co.
- All unvested stock options granted in 2021, which would become fully vested if the NEO is involuntarily terminated without cause within 24 months of a change in control of Carvana Co.
- All outstanding unvested RSUs granted in 2021, which would become fully vested if the executive is involuntarily terminated without cause within 24 months of a change of control of Carvana Co.

Each NEO is required to comply with the restrictive covenants set forth in each NEO's individual equity award agreement, which includes confidentiality obligations for all NEOs, and non-solicitation, non-competition, and non-interference obligations for Messrs. Garcia, Jenkins, and Huston. Please see "Compensation Discussion and Analysis – Termination, Severance, and

41

Change in Control Benefits" for a more detailed discussion regarding the acceleration and treatment of such equity awards.

## CEO PAY RATIO

The 2021 annual total compensation of our median-compensated employee other than Mr. Garcia was $36,975. We identified our median-compensated employee by calculating the annual salary of all our employees as of December 31, 2021, annualized for those who joined Carvana during the year. Mr. Garcia's 2021 annual total compensation was $5,050,345, as disclosed in the "Summary Compensation Table" above. The ratio of our median-compensated employee to Mr. Garcia is 1-to-137.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

### POLICIES FOR APPROVAL OF RELATED PARTY TRANSACTION

We have adopted a written policy with respect to the review, approval, and ratification of related party transactions. Under the policy, our Board is responsible for reviewing and approving related party transactions. In the course of its review and approval of related party transactions, our Board will consider the relevant facts and circumstances to decide whether to approve such transactions. In particular, our policy requires our Board to consider, among other factors it deems appropriate:

    a.  the related person's relationship to us and interest in the transaction;
    b.  the material facts of the proposed transaction, including the proposed aggregate value of the transaction;
    c.  the impact on a director's independence in the event the related person is a director or an immediate family member of the director;
    d.  the benefits to us of the proposed transaction;
    e.  if applicable, the availability of other sources of comparable products or services; and
    f.  an assessment of whether the proposed transaction is on terms that are comparable to the terms available to an unrelated third party or to employees generally.

The Board may only approve those transactions that are in or are not inconsistent with our best interests and those of our stockholders, as the Board determines in good faith.

### AMENDED AND RESTATED OPERATING AGREEMENT

In connection with the organizational transactions we effected in connection with our IPO, we amended and restated Carvana Group's existing operating agreement, which we refer to as the "LLC Operating Agreement." On October 2, 2018, Carvana Group amended the LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of the 2023 Notes in September 2018 and May 2019 (see Carvana's Annual Report on Form 10-K for 2021, Item 8 Note 9 — Debt Instruments). On October 2, 2020, Carvana Group amended and restated the LLC Agreement to,

42

among other things, authorize the issuance of 1,100,000 Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 Notes and 2028 Notes (see Carvana's Annual Report on Form 10-K for 2021, Item 8 Note 10 — Stockholders' Equity) and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes, and on August 16, 2021, Carvana Group LLC issued approximately 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes (see Carvana's Annual Report on Form 10-K for 2021, Item 8 Note 10 — Stockholders' Equity). Carvana Co. used its net proceeds from the 2023 Notes, the 2025 Notes and 2028 Notes, the 2027 Notes, and the 2029 Notes to purchase 600,000, 1,100,000, 600,000, and 800,000 Class A Non-Convertible Preferred Units, respectively. In the event Carvana Co. makes payments on the 2025 Notes, 2028 Notes, 2027 Notes, and 2029 Notes, Carvana Group will make an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of 2025 Notes, 2028 Notes, 2027 Notes, and 2029 Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired.

As discussed further in Carvana's Annual Report on Form 10-K for 2021, Item 8, Note 9 — Debt Instruments, the Company redeemed its 2023 Notes on October 2, 2020 using a portion of its net proceeds from the issuance of its 2025 Notes and 2028 Notes, at which point 600,000 Class A Non-Convertible Preferred Units were canceled and retired.

The operations of Carvana Group, and the rights and obligations of the LLC Unitholders, are set forth in the LLC Operating Agreement.

**EXCHANGE AGREEMENT**

On April 27, 2017, we entered into an exchange agreement with Carvana Co. Sub LLC (our wholly owned subsidiary) and the LLC Unitholders. Under the exchange agreement, LLC Unitholders (and certain permitted transferees thereof) may exchange at any time their LLC Units for either shares of our Class A common stock or for cash, whichever we decide. To the extent LLC Unitholders also hold Class B common stock, they will be required to deliver to us the same number of shares of Class B common stock as Class A common stock being exchanged for. We will then cancel those shares of Class B common stock. As LLC Unitholders exchange their interest in Carvana Group, our indirect interest in Carvana Group will increase correspondingly.

When an LLC Unitholder makes an exchange, they will receive four shares of Class A common stock for every five Class A Units or, at our option, cash equal to the value of a share of Class A common stock multiplied by 0.8 times the number of Class A Units being exchanged. The value of the Class A common stock is determined by the average of the volume-weighted average prices for a share of Class A common stock for each of the three consecutive full trading days ending on and including the last full trading day immediately prior to the related date of exchange. Class B Units are subject to vesting and a participation threshold, and, as a result, LLC Unitholders exchanging Class B Units will receive a number of shares of Class A common stock

equal to the Class A common stock value (determined the same way as above) less the applicable participation threshold multiplied by 0.8 times the number of Class B Units being exchanged, divided by the same Class A common stock value, subject to adjustment as set forth in the Exchange Agreement.

## REGISTRATION RIGHTS AGREEMENT

In connection with the IPO, we entered into a registration rights agreement with certain LLC unitholders. These LLC unitholders are entitled to request that we register their shares on a long-form or short-form registration statement on one or more occasions in the future, which registrations may be "shelf registrations." All of these LLC unitholders will be entitled to participate in certain of our registered offerings, subject to the restrictions in the registration rights agreement. We will pay expenses in connection with the exercise of these rights. The registration rights described in this paragraph apply to (1) shares of our Class A common stock held by certain LLC unitholders, and (2) any of our capital stock (or that of our subsidiaries) issued or issuable with respect to the Class A common stock described in clause (1) with respect to any dividend, stock split, recapitalization, reorganization, or certain other corporate transactions ("Registrable Securities"). These registration rights are also for the benefit of any subsequent holder of Registrable Securities, provided that any particular securities will cease to be Registrable Securities when they have been sold in a registered public offering, sold in compliance with Rule 144 of the Securities Act or repurchased by us or our subsidiaries. In addition, any Registrable Securities held by a person other than an LLC Unitholder and their affiliates will cease to be Registrable Securities if they can be sold without limitation under Rule 144 of the Securities Act.

## TAX RECEIVABLE AGREEMENT

We have entered into a Tax Receivable Agreement with LLC Unitholders that will provide for the payment from time to time by us to such persons of 85% of the amount of the benefits, if any, that we realize or, under certain circumstances, are deemed to realize as a result of

1. the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of any future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash; and
2. certain other tax benefits related to our making payments under the Tax Receivable Agreement.

We expect to benefit from the remaining 15% of any tax benefits that we actually realize and, except in connection with a change of control, we will not make any payments under the Tax Receivable Agreement until after we have directly or indirectly realized (or have been deemed to have realized) benefits in excess of such payments. These payment obligations are obligations of

44

Carvana Co. and not of Carvana Group. No payments were made during the year ended December 31, 2021.

## INDEMNIFICATION OF OFFICERS AND DIRECTORS

We have entered into indemnification agreements with each of our executive officers and directors. The indemnification agreements provide the officers and directors with contractual rights to indemnification, expense advancement, and reimbursement, to the fullest extent permitted under Delaware law. Additionally, we may enter into indemnification agreements with any new directors or officers that may be broader in scope than the specific indemnification provisions contained in Delaware law.

## RELATED PARTY EMPLOYMENT RELATIONSHIPS

We employ Laura White, who is the sister-in-law of our Chief Operating Officer Benjamin Huston, as corporate counsel. Ms. White's compensation is based on her education, experience, and the responsibilities of her position. For the year ended December 31, 2021, Ms. White received a salary of $180,000 and equity awards totaling approximately $76,000 over four years.

## CONTRIBUTION AGREEMENT

On January 5, 2022, our CEO Ernie Garcia III announced to the Company that he will contribute 23 shares (or roughly $5,000 at the time of the announcement) of Class A common stock from his personal shareholdings for every one of the Company's then-existing employees upon their satisfying certain employment tenure requirements (the "1 Million Unit Milestone Gift"). In connection with this ongoing commitment from Mr. Garcia, the Company and Mr. Garcia entered into a contribution agreement on February 22, 2022, under which Mr. Garcia will contribute to us at the end of each fiscal quarter the number of shares of our Class A common stock, granted pursuant to the 1 Million Unit Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that he individually owns, at no charge. The contribution is intended to fund restricted stock unit awards to certain employees of the Company upon their satisfying applicable employment tenure requirements. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has indemnified Mr. Garcia from any such obligations that may arise.

## RELATIONSHIP WITH DRIVETIME

Prior to November 1, 2014, Carvana, LLC was a wholly owned subsidiary of DriveTime. On November 1, 2014, DriveTime distributed the units of Carvana, LLC to the unit holders of DriveTime on a pro rata basis, which we refer to as the "Spinoff." DriveTime is controlled by our controlling stockholder, Ernest Garcia II, who is also the father of our CEO, Ernest Garcia III. Following the Spinoff, the unit holders of DriveTime contributed the Carvana, LLC units to Carvana Group.

Subsequent to the Spinoff, we entered into several agreements with DriveTime and affiliated companies that were intended to facilitate our transition to a standalone company, which are described below, along with subsequent agreements. We will refer to DriveTime and its subsidiaries and affiliates, other than us, as "DriveTime." In addition to the discussion below, our relationship with DriveTime is further discussed in Note 6 to our Notes to Consolidated Financial Statements of Carvana's Annual Report on Form 10-K for 2021. There can be no assurances that DriveTime or its affiliated companies will enter into any new agreements or arrangements with us, or extend or renew existing agreements or arrangements, on the same terms, similar terms, or at all.

*ATLANTA, GA HUB LOCATION LEASE GUARANTEE*

In May 2013, DriveTime guaranteed our obligations under the lease governing our occupancy of the property on which an Atlanta hub is located. We did not compensate DriveTime for the guarantee. The initial lease term and rent payments commenced December 1, 2013, and the lease expired on November 30, 2021 and was not renewed. Base rent during the initial term was $9.5 thousand per month, subject to increase by 3% of the then-current base rent during each extension term. Monthly rent payments were $11.0 thousand per month through November 30, 2020 and $11.3 thousand per month through November 30, 2021. In addition to base rent, we were responsible for our proportionate share of common area maintenance charges. Total expenses related to this lease agreement were approximately $0.2 million for the year ended December 31, 2021.

*LEASE AGREEMENT*

In connection with the Spinoff, we entered into a lease agreement dated November 1, 2014, with DriveTime that governs our access to and utilization of space at inspection and reconditioning centers ("IRCs") in Blue Mound, Texas, and Delanco, New Jersey, and previously in Winder, Georgia, which previously were DriveTime IRCs. The lease agreement was most recently amended in December 2018. The agreement also governs utilization of office space and parking spaces at various DriveTime IRCs and retail facilities that we use as hubs.

Under the amended lease agreement, hubs generally have cancellable two-year terms subject to certain two consecutive one-year renewal options and subject to the terms of any master lease under which we are subleasing. At both of these locations, we make monthly lease payments based on DriveTime's actual rent expense. In addition, we are responsible for the actual insurance costs and real estate taxes. Total expenses related to this lease agreement were approximately $2.2 million for the year ended December 31, 2021.

*HOUSTON, TX VENDING MACHINE LEASE GUARANTEE*

On July 14, 2015, DriveTime guaranteed our obligations under the lease governing our occupancy of the property on which our Houston vending machine is located. We do not compensate DriveTime for the guarantee. The initial lease term commenced January 8, 2016, and we began paying base rent on May 7, 2016. Base rent during the initial term is $23.0 thousand per month, and the initial term expires on April 6, 2026. We have the option to extend the initial

term for four additional consecutive five-year periods. Base rent during each extension term will increase 10% of the then-current base rent for each subsequent extension. Total expenses related to this lease agreement were approximately $0.3 million for the year ended December 31, 2021.

*TEMPE, AZ OFFICE SPACE*

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. Total expenses related to this lease agreement were approximately $1.2 million for the year ended December 31, 2021.

In addition to the Company's corporate headquarters, in December 2019 an affiliate of DriveTime ("Verde RE") purchased an office building in Tempe, Arizona that we leased from an unrelated party. In connection with the purchase, Verde RE assumed that lease. The lease has an initial term of 10 years, subject to the right to exercise two five-year extension options. During the year ended December 31, 2021, the rent paid to Verde RE was approximately $0.8 million.

*WINDER, GA INSPECTION AND RECONDITIONING CENTER LEASE*

In February 2017, we entered into a lease with DriveTime for an IRC in Winder, Georgia where we previously maintained partial occupancy under the DriveTime lease agreement described above and we are now the sole occupant. The lease has an 8-year term, subject to our ability to exercise three renewal option terms of five years each. We began paying base rent of $83.3 thousand per month as of March 1, 2017. The monthly rent is subject to adjustment each year beginning January 1, 2018, increasing in an amount equal to the percentage increase in the Consumer Price Index, with a maximum of 5% and a minimum of 2%. The monthly rent increased on January 1, 2021, to $90.5 thousand. Our total expenses related to this lease agreement were approximately $1.1 million for the year ended December 31, 2021.

*HUB LEASE AGREEMENT*

In March 2017, we entered into a lease with DriveTime that governs our utilization of office space and parking spaces at DriveTime facilities that we use as hubs. The lease was most recently amended in July 2021. Under the lease agreement, we pay a monthly rental fee related to our pro rata utilization of space at such facilities plus a pro rata share of each facility's actual insurance costs and real estate taxes. Each hub has an initial cancellable term of two years, subject to certain two consecutive one-year renewal options. Our total expenses related to this lease agreement were approximately $1.2 million for the year ended December 31, 2021.

47

*CLEVELAND, OH AREA INSPECTION AND RECONDITIONING CENTER SUBLEASE*

In November 2018, Carvana entered into a sublease agreement with DriveTime for an inspection and reconditioning center near Cleveland, Ohio. We pay a base rent of $35.0 thousand per month which increases in each extension term. The sublease has an initial term of three years. We have the ability to exercise three renewal options of five years each. In July 2021, we exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime, effective October 1, 2021. Our total expenses related to this lease agreement were approximately $0.5 million for the year ended December 31, 2021.

*NASHVILLE, TN AREA INSPECTION AND RECONDITIONING CENTER LEASE*

On February 28, 2019, Carvana assumed a lease from DriveTime of an IRC near Nashville, Tennessee, though DriveTime was not fully released from lease obligations by the landlord. The term expires on October 31, 2023, subject to our ability to exercise three renewal options of five years each. Monthly base rent in 2021 was $31 thousand. The rent will further increase during each extension term over the then-current base rent by an amount equal to the percentage increase in the Consumer Price Index, with a maximum of 15% and a minimum of 10%. During the year ended December 31, 2021, the total rent expense to the landlord was approximately $0.7 million.

*SERVICING AGREEMENTS WITH DRIVETIME*

In December 2015, we entered into a servicing agreement with DriveTime, wherein DriveTime agreed to perform certain servicing and administrative functions with respect to automotive finance receivables we own after origination and before sale. In the year ended December 31, 2021, DriveTime had aggregate earnings of approximately $2.3 million for performing servicing functions for such receivables.

In addition, DriveTime services loans that we have sold to third parties. For the year ended December 31, 2021, DriveTime had aggregate earnings of approximately $9.7 million related to the servicing of such loans.

Further, DriveTime performs certain servicing and administrative functions with respect to automotive finance receivables we sell or pledge under the following agreements:

*Master Purchase and Sale Agreement*

In December 2016, we entered into a master purchase and sale agreement pursuant to which we sell finance receivables meeting certain underwriting criteria to certain financing partners, including Ally Bank and Ally Financial. Throughout 2020 and 2021, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. During the year ended December 31, 2021, we sold approximately $2.1 billion in principal balances of finance receivables under the purchase and

48

sale agreement. DriveTime had aggregate earnings of approximately $26.7 million pursuant to the agreement for performing servicing functions for the year ended December 31, 2021.

### *Transfer Agreements*

In March, June, September, and December 2019 and March and December 2020, we entered into transfer agreements pursuant to which we sold finance receivables meeting certain underwriting criteria to certain purchaser trusts in connection with the securitization of those finance receivables. Under these agreements, the purchaser trusts purchased an aggregate of approximately $2.8 billion in principal balances of finance receivables. In March, June, September, and December 2021, we entered into additional transfer agreements in connection with the securitization of finance receivables. Under these 2021 agreements, the purchaser trusts purchased an aggregate of approximately $5.0 billion in principal balances of finance receivables.

The purchaser trusts of these securitizations engaged Carvana as the administrator of such trusts and DriveTime as servicer of the receivables. In the year ended December 31, 2021, DriveTime had aggregate earnings of approximately $38.9 million for performing servicing functions under these agreements.

### *2020 and 2021 Credit Facilities*

In January and February 2020, we entered into two revolving credit facilities (the "2020 Credit Facilities") and in April and October 2021, we entered into two additional credit facilities (the "2021 Credit Facilities") with certain lenders to fund automotive finance receivables originated by the Company. The 2020 Credit Facilities may be drawn upon through January 24, 2023 and December 8, 2023, respectively, and the 2021 Credit Facilities may be drawn upon through October 30, 2022 and April 15, 2023, respectively. As of the date hereof, the lenders have committed an aggregate amount of $2.1 billion under these facilities. The lenders and the Company engaged DriveTime as servicer of the receivables. In the year ended December 31, 2021, DriveTime had aggregate earnings of approximately $4.1 million for performing these servicing functions.

*GAP WAIVER INSURANCE POLICY*

In 2020, we purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $27,000 that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that we sold in our securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, we entered into a retrospective profit sharing agreement with BlueShore under which we share in the profits generated from the insurance policies by receiving a portion of the excess of the premium we paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. In the future we may partner with BlueShore on additional ancillary products, which could include products customarily sold by automotive retailers or other insurance products customarily sold by traditional insurance companies. As of December 31, 2021, we held a receivable of approximately $0.1 million.

*MASTER DEALER AGREEMENT*

In December 2016, we entered into a master dealer agreement with DriveTime. Pursuant to this agreement, we may sell vehicle service contracts ("VSCs") to customers purchasing a vehicle from us. We earn a commission on each VSC sold to our customers and DriveTime is obligated by and subsequently administers the VSCs. We collect the retail purchase price of the VSCs from our customers and remit the purchase price net of commission to DriveTime. During the year ended December 31, 2021, we recognized approximately $186.0 million of commissions earned on VSCs sold to our customers and administered by DriveTime, net of a reserve for estimated contract cancellations. In November 2018, we amended the master dealer agreement to allow Carvana to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the agreement was further amended to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. During the year ended December 31, 2021, Carvana recognized approximately $20.5 million related to payments for excess reserves to which it expects to be entitled.

Beginning in 2017, DriveTime also administers the limited warranty provided to all customers. We pay a per-contract fee to DriveTime to administer the limited warranty included with every purchase. We incurred costs of approximately $15.3 million during the year ended December 31, 2021, related to the administration of the limited warranty.

*AIRCRAFT TIME SHARING AGREEMENT*

On October 22, 2015, we entered into an agreement to share usage of two aircraft operated by DriveTime. Pursuant to the agreement, as amended, we agreed to reimburse DriveTime for actual expenses for each of our flights. The original term of the agreement was for 12 months, with perpetual 12-month automatic renewals. Either the lessors or the lessees can terminate the lease with 30 days' prior written notice. We reimbursed DriveTime approximately $0.5 million under this agreement during the year ended December 31, 2021.

*WHOLESALE REVENUE*

In 2020, DriveTime began purchasing wholesale vehicles from us through competitive online auctions that are managed by an unrelated third party. As a result, we recognized approximately $54 million of wholesale revenue from DriveTime during the year ended December 31, 2021.

*RETAIL VEHICLE ACQUISITION AGREEMENTS*

Effective September 29, 2021, we entered into Wholesale Vehicle Purchase Agreements with DriveTime, pursuant to which we purchase reconditioned vehicles from DriveTime. In certain instances our purchase price is the wholesale price of the vehicle plus a fee, which encompasses, among other things, transportation and reconditioning costs, and in other instances our purchase price is the list price on Carvana.com after a customer has placed an order on the

50

vehicle. Our total expenses related to the Wholesale Vehicle Purchase Agreement were approximately $168 million for the year ended December 31, 2021.

*SHARED SERVICES AGREEMENT*

Prior to the Spinoff, we relied on DriveTime for its administrative functions. In connection with the Spinoff, we entered into a shared services agreement under which DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services to primarily facilitate our transition of these functions to us on a standalone basis. The shared services agreement operates on a year-to-year basis, with Carvana having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate certain services with 90 days' prior written notice. In February 2021 the Shared Services Agreement was amended to add additional administrative services including but not limited to certain account remediation services. Our total expenses related to the Share Services Agreement were approximately $30 thousand for the year ended December 31, 2021.

# SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information regarding beneficial ownership of our common stock as of March 3, 2022, by:

- each person or group of affiliated persons known by us to be the beneficial owner of more than 5% of our common stock;
- each of our named executive officers;
- each of our directors; and
- all of our current executive officers and directors as a group.

We have determined beneficial ownership in accordance with the rules of the SEC, and the information is not necessarily indicative of beneficial ownership for any other purpose. Unless otherwise indicated below, it is our understanding that the persons and entities named in the table have sole voting and sole investment power with respect to all shares that they beneficially own, subject to community property laws where applicable. In computing the number of shares of our common stock beneficially owned by a person and the percentage ownership of that person, we deemed outstanding shares of our common stock subject to options, Class B Units, or restricted stock units held by that person that are currently exercisable or exercisable within 60 days of March 3, 2022. We did not deem these shares outstanding, however, for the purpose of computing the percentage ownership of any other person. We have based the percentage ownership of our Class A common stock on 90,128,686 shares of our common stock outstanding as of March 3, 2022, and have based the percentage ownership of our Class B common stock on 82,900,275 shares as of the same date. Unless otherwise indicated, the address of each beneficial owner listed on the table below is c/o Carvana Co., 1930 W Rio Salado Pkwy, Tempe, AZ 85281.

51

| | Shares Beneficially Owned | | | | |
| | Class A Common Stock[1] | | Class B Common Stock[1] | | |
| Name of Beneficial Owner | Shares | % | Shares | % | Voting % |
|---|---|---|---|---|---|
| Ernest C. Garcia II | 655,556 (2) | * | 70,723,479 (3) | 85 % | 84 % |
| CVAN Holdings, LLC | 9,345,376 (4) | 10 % | 8,495,376 (4) | 10 % | 2 % |
| T. Rowe Price Associates, Inc. | 13,439,264 (5) | 15 % | — | — % | * |
| FMR LLC | 9,290,614 (6) | 10 % | — | — % | * |
| Morgan Stanley ; Morgan Stanley Investment Management Inc. | 5,303,437 (7) | 6 % | — | — % | * |
| Tiger Global Investments, L.P.; Tiger Global Performance, LLC; Tiger Global Management, LLC; Charles P. Coleman III; Scott Shleifer | 7,262,905 (8) | 8 % | — | — % | * |
| The Vanguard Group | 4,971,881 (9) | 6 % | — | — % | * |
| Baillie Gifford & Co (Scottish Partnership) | 9,655,855 (10) | 11 % | — | — % | * |
| Spruce House Investment Management LLC; Spruce House Capital LLC; Spruce House Partnership LP; Zachary Sternberg; Benjamin Stein | 4,592,100 (11) | 5 % | — | — % | * |
| *Management and Directors* | | | | | |
| Ernest C. Garcia, III | 768,394 (12) | * | 27,450,547 (13) | 33 % | 17 % |
| Mark Jenkins | 654,395 (14) | * | — | — % | * |
| Benjamin Huston | 654,396 (15) | * | — | — % | * |
| Daniel Gill | 246,922 (16) | * | — | — % | * |
| Tom Taira | 83,188 (17) | * | — | — % | * |
| Ira Platt | 114,165 (18) | * | — | — % | * |
| Gregory Sullivan | 34,316 (19) | * | — | — % | * |
| Dan Quayle | 36,816 (19) | * | — | — % | * |
| Michael Maroone | 77,816 (20) | * | — | — % | * |
| Neha Parikh | 9,864 (21) | * | — | — % | * |
| All management and directors (12 individuals) | 3,124,195 (22) | 3 % | 27,450,547 (22) | 33 % | 17 % |

(1) Each share of Class A common stock entitles the registered holder thereof to one vote on all matters presented to stockholders for a vote generally, including the election of directors. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally, including the election of directors, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock). Each other share of our Class B common stock entitles its holder to one vote on all matters to be voted on by stockholders generally, including the election of directors. The Class A common stock and Class B common stock vote as a single class on all matters except as required by law or the certificate of incorporation. A "*" indicates percentages of less than 1%.

(2) This number includes 555,556 shares of our Class A common stock owned by Verde Investments, Inc., which Mr. Garcia II wholly owns and controls. This number also includes 100,000 shares of our Class A common stock owned by the Ernest C. Garcia III Multi-Generational Trust III. While Ernest Garcia II and Ernest Garcia III are joint investment trustees over the Ernest C. Garcia III Multi-Generational Trust III, the trust is irrevocable and Mr. Garcia II is not a beneficiary. Mr. Garcia III and his children are the beneficiaries of the Ernest C.

Garcia III Multi-Generational Trust III. This information is based on the Form 4 filed with the SEC by Mr. Garcia II on August 25, 2021. Mr. Garcia II's address is 100 Crescent Court, Suite 1100, Dallas, TX 75201.

(3) This number includes 38,937,458 shares of Class B common stock owned directly by Mr. Garcia II; and 8,000,000 shares of Class B common stock owned by ECG II SPE, of which Mr. Garcia II is the 100% owner. This number also includes 11,834,021 shares of Class B common stock owned by the Ernest Irrevocable 2004 Trust III, of which Mr. Garcia III is the sole beneficiary, and 11,952,000 shares of Class B common stock owned by the Ernest C. Garcia III Multi-Generational Trust III, of which Mr. Garcia III is a beneficiary together with his children. While Ernest Garcia II and Ernest Garcia III are joint investment trustees over the Ernest Irrevocable 2004 Trust III and the Ernest C. Garcia III Multi-Generational Trust III, the trusts are irrevocable and Mr. Garcia II is not a beneficiary. These shares of Class B common stock together with the corresponding LLC Units may be exchanged for 70,723,479 shares of Class A common stock. These shares of Class A common stock represent approximately 40% of the shares of Class A common stock that would be outstanding if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time. This information is based on the Form 4 filed with the SEC by Mr. Garcia II on August 25, 2021. The address for each of these reporting persons is 100 Crescent Court, Suite 1100, Dallas, TX 75201.

(4) CVAN Holdings, LLC; CVAN Holding Company, LLC, Delaware Life Holdings Parent, LLC; Delaware Life Holdings Parent II, LLC; Delaware Life Holdings Manager, LLC; and Mark Walter report shared voting and dispositive power of 9,345,376 shares of Class A common stock and 8,495,376 shares of Class B common stock. CVAN Holdings, LLC directly holds the Class A common stock and Class B common stock. CVAN Holdings, LLC is a wholly-owned subsidiary of CVAN Holding Company, LLC ("CVAN HC"). CVAN HC is a wholly-owned subsidiary of Delaware Life Holdings Parent, LLC ("Parent I"). Parent I is a wholly-owned subsidiary of Delaware Life Holdings Parent II, LLC ("Parent II"). Each of Parent I and Parent II is managed by Delaware Life Holdings Manager, LLC ("Manager") and each of Parent II and Manager is controlled by Mr. Mark Walter ("Mr. Walter"). Each of CVAN HC, Parent I, Parent II, Manager, and Mr. Walter may be deemed to indirectly share voting and dispositive power over the securities held directly by CVAN Holdings, LLC, and as a result, may be deemed to have or share beneficial ownership of the securities held directly by CVAN Holdings, LLC. These shares of Class B common stock together with the corresponding LLC Units may be exchanged for 8,495,376 shares of Class A common stock. These shares of Class A common stock represent approximately 5% of the shares of Class A common stock that would be outstanding if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time. CVAN Holdings, LLC has pledged an aggregate of 6,875,000 of the LLC Units and 5,500,000 shares of Class B common stock to secure its obligations under a prepaid variable forward sale contract with an unaffiliated third party, including its obligation to deliver to such third party up to 5,500,000 shares of Class A common stock on the maturity date of the contract. The pledged securities are exchangeable for 5,500,000 shares of Class A common stock pursuant to the Exchange Agreement. This information is based on the Schedule 13G/A filed with the SEC on February 14, 2022. The address for each of these reporting persons is 227 W. Monroe Suite 5000, Chicago, IL 60606.

(5) T. Rowe Price Associates, Inc. reports sole dispositive power of 13,439,264 shares of Class A common stock and sole voting power of 5,181,082 shares of Class A common stock. This information is based on the Schedule 13G/A filed with the SEC on February 14, 2022. The address for T. Rowe Price Associates, Inc. is 100 E. Pratt Street, Baltimore, MD 21202.

(6) FMR LLC reports sole power to dispose or direct the disposition of 9,290,614 shares of Class A common stock and sole power to vote or direct the vote of 1,436,955 shares of Class A common stock. This information is based on the Schedule 13G/A filed with the SEC on January 10, 2022. FMR LLC's address is 245 Summer Street, Boston, MA 02210.

(7) Morgan Stanley reports shared voting power of 4,917,348 and shared dispositive power of 5,303,437 shares of Class A common stock. Morgan Stanley Investment Management Inc. reports shared voting power of 4,793,949 and shared dispositive power of 5,179,912. This information is based on the Schedule 13G/A filed with the SEC on February 10, 2022. The address for Morgan Stanley is 1585 Broadway New York, NY 10036 and the address for Morgan Stanley Investment Management Inc. is 522 5th Avenue 6th Floor New York, NY 10036.

(8) Tiger Global Performance, LLC, Tiger Global Management, LLC, Charles P. Coleman III, and Scott Shleifer each report shared voting and dispositive power of 7,262,905 shares of Class A common stock. Tiger Global Investments, L.P. reports shared voting and dispositive power of 5,102,888 shares of Class A common stock. This information is based on the Schedule 13G/A filed with the SEC on February 14, 2022. The address for Tiger Global Investments, L.P. is P.O. Box 31106, 89 Nexus Way, Camana Bay, Grand Cayman KY1-1205, Cayman Islands. The address for each of the other reporting persons herein is 9 West 57th Street, 35th Floor, New York, NY 10019.

(9) The Vanguard Group reports sole dispositive power of 4,798,963 shares of Class A common stock. The Vanguard Group reports shared power to dispose or direct the disposition of 172,918 of these shares of Class A common stock and shared power to vote or direct the vote of 75,936 of these shares of Class A common stock. This information is based on the Schedule 13G/A filed with the SEC on February 9, 2022. The Vanguard Group's address is 100 Vanguard Blvd., Malvern, PA 19355.

(10) Baillie Gifford & Co. (Scottish partnership) reports sole dispositive power of 9,655,855 shares of Class A common stock and sole voting power of 6,677,200 shares of Class A common stock. This information is based on the Schedule 13G filed with the SEC on January 12, 2022. The address for Baillie Gifford & Co. is Calton Square, 1 Greenside Row, Edinburgh EH1 3AN, Scotland, UK.

(11) Spruce House Investment Management LLC; Spruce House Capital LLC; The Spruce House Partnership LLC; The Spruce House Partnership (AI) LP; The Spruce House Partnership (GP) LP; Zachary Sternberg and Benjamin Stein report shared voting and dispositive power of 4,500,000 shares of Class A common stock. Zachary Sternberg reports sole voting and dispositive power of 50,000 shares of Class A common stock. Benjamin Stein reports sole voting and dispositive power of 42,100 shares of Class A common stock. The Spruce House Partnership LLC holds the 4,500,000 shares with shared voting and dispositive power and its sole members are The Spruce House Partnership (AI) LP and The Spruce House Partnership (QP) LP, each a

54

private investment fund managed by Spruce House Investment Management LLC. Spruce House Capital LLC serves as the general partner and Spruce House Investment Management LLC serves as the investment manager. Zachary Sternberg and Benjamin Stein each serve as managing members of Spruce House Capital LLC and Spruce House Investment Management LLC. This information is based on the Schedule 13G/A filed with the SEC on February 4, 2022. The address for each of these reporting persons is 435 Hudson Street, 8th Floor New York, NY 10014.

(12) This number includes 681,350 shares of Class A common stock owned directly by Ernest Garcia III and 100,000 shares of Class A common stock owned by the Ernest C. Garcia III Multi-Generational Trust III. While Ernest Garcia II and Ernest Garcia III are joint investment trustees over the Ernest C. Garcia III Multi-Generational Trust III, the trust is irrevocable and Mr. Garcia II is not a beneficiary. Mr. Garcia III and his children are the beneficiaries of the Ernest C. Garcia III Multi-Generational Trust III. This number also includes 85,771 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022, and 1,273 shares of Class A common stock issuable upon vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(13) This number includes 3,664,526 shares of Class B common stock owned directly by Mr. Garcia III, 11,834,021 shares of Class B common stock owned by the Ernest Irrevocable 2004 Trust III, of which Mr. Garcia III is the sole beneficiary, and 11,952,000 shares of Class B common stock owned by the Ernest C. Garcia III Multi-Generational Trust III., of which Mr. Garcia III is a beneficiary together with his children. While Ernest Garcia II and Ernest Garcia III are joint investment trustees over the Ernest Irrevocable 2004 Trust III and the Ernest C. Garcia III Multi-Generational Trust III, the trusts are irrevocable and Mr. Garcia II is not a beneficiary. These shares of Class B common stock together with the corresponding LLC Units may be exchanged for 27,450,547 shares of Class A common stock. These shares of Class A common stock represent approximately 16% of the shares of Class A common stock that would be outstanding if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(14) This number includes 8,792 shares of Class A common stock owned directly by Mr. Jenkins; 568,541 shares of Class A common stock issuable in exchange for vested Class B Units including those that will be vested within 60 days of March 3, 2022, based on an assumed price of $123.33 share (the closing price of our Class A common stock on the NYSE on March 3, 2022); 75,826 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022; and 1,236 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(15) This number includes 8,792 shares of Class A common stock owned directly by Mr. Huston; 568,542 shares of Class A common stock issuable in exchange for vested Class B Units including those that will be vested within 60 days of March 3, 2022, based on an assumed price of $123.33 per share (the closing price of our Class A common stock on the NYSE on March 3, 2022); 75,826 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022; and 1,236 shares of Class A common stock

issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(16) This number includes 19,694 shares of Class A common stock owned directly by Mr. Gill; 159,442 shares of Class A common stock issuable in exchange for vested Class B Units including those that will be vested within 60 days of March 3, 2022, based on an assumed price of $123.33 per share (the closing price of our Class A common stock on the NYSE on March 3, 2022); 66,681 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022; and 1,105 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(17) This number includes 22,079 shares of Class A common stock owned directly by Mr. Taira; 59,950 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022; and 1,159 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(18) This number includes 5,224 shares of Class A common stock owned directly by Mr. Platt, 850 shares of Class A common stock held directly and jointly by Mr. Platt's parents, and 14,999 shares of Class A common stock owned by the Ira J. Platt Revocable Trust. Mr. Platt is co-trustee, and Mr. Platt's spouse is the primary beneficiary of the Ira J. Platt Revocable Trust. This number also includes 61,500 shares of Class A common stock issuable in exchange for vested Class B Units including those that will be vested within 60 days of March 3, 2022, based on an assumed price of $123.33 per share (the closing price of our Class A common stock on the NYSE on March 3, 2022) and 664 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(19) This number includes 664 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes.

(20) This number includes 25,224 shares of Class A common stock owned directly by Mr. Maroone, 1,000 shares of Class A common stock held directly by the Maroone Family Partnership, LP, an entity controlled by Mr. Maroone that Mr. Maroone disclaims beneficial ownership of except to the extent of his pecuniary interest therein, and 20,000 shares of Class A common stock held directly by the Michael Maroone Family Partnership, LP, an entity controlled by Mr. Maroone. This number also includes 664 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022.

(21) This number includes 8,406 shares of Class A common stock owned directly by Ms. Parikh. This number also includes 1,458 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022.

(22) This number includes 1,646,487 shares of Class A common stock issuable in exchange for vested Class B Units including those that will be vested within 60 days of March 3, 2022, based on an assumed price of $123.33 per share (the closing price of our Class A common stock on the NYSE on March 3, 2022); 472,056 shares of Class A common stock issuable upon the exercise of options that will have vested within 60 days of March 3, 2022; 11,589 shares of Class A common stock issuable upon the vesting and settlement of restricted stock units that will have vested within 60 days of March 3, 2022, inclusive of shares to be withheld for tax purposes. This number excludes 27,450,547 shares of Class A common stock issuable in exchange for LLC Units held by our executive officers and directors, based on an assumed price of $123.33 per share (the closing price of our Class A common stock on the NYSE on March 3, 2022). These shares of Class A common stock issuable in exchange for vested Class B Units and other LLC Units represent approximately 17% of the shares of Class A common stock that would be outstanding if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

57

# ITEM 2 - RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee has appointed Grant Thornton LLP as our independent registered public accounting firm for the year ending December 31, 2022. Services provided to Carvana and its subsidiaries by Grant Thornton LLP for the year ended December 31, 2021 are described below and under "Audit Committee Report."

## FEES AND SERVICES

The following table summarizes the aggregate fees for professional audit services and other services rendered by Grant Thornton LLP for the years ended December 31, 2021 and 2020:

| Services | 2021 | | 2020 | |
|---|---|---|---|---|
| Audit Fees | $ | 2,065,280[1] | $ | 1,653,994[1] |
| Audit-Related Fees | $ | 77,730[2] | $ | 21,200[2] |
| Tax Fees | $ | 646,402[3] | $ | 443,200[3] |
| All Other Fees | $ | — | $ | — |

(1) Includes the aggregate fees for the audit of our annual consolidated financial statements and internal controls, and the reviews of each of our quarterly consolidated financial statements. These fees also include procedures performed related to our follow on offerings completed in April 2020 and May 2020, and the issuance of our senior notes in October 2020, March 2021, and August 2021.

(2) Includes the aggregate fees for the audit of the annual financial statements of the Carvana, LLC 401k plan and examination of management's assertion of compliance with certain servicing criteria in accordance with Regulation AB.

(3) Includes the aggregate fees for tax return preparation and other tax compliance services.

In considering the nature of the services provided by the independent auditor, the Audit Committee determined that such services are compatible with the provision of independent audit services. The Audit Committee discussed these services with the independent auditor and Carvana management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the SEC to implement the Sarbanes–Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

The Audit Committee has adopted a policy that requires advance approval of all audit services as well as non-audit services to the extent required by the Exchange Act and the Sarbanes–Oxley Act of 2002. Unless the specific service has been previously pre-approved with respect to that year, the Audit Committee must approve the permitted service before the independent auditor is engaged to perform it.

The Audit Committee approved all services provided by Grant Thornton LLP. Representatives of Grant Thornton LLP are expected to be present at the annual meeting. They will have the opportunity to make a statement if they desire to do so, and we expect that they will be available to respond to questions.

Ratification of the appointment of Grant Thornton LLP requires affirmative votes from the holders of a majority of the shares present in person or represented by proxy at the virtual annual meeting and entitled to vote. If Carvana's stockholders do not ratify the appointment of Grant Thornton LLP, the Audit Committee will reconsider the appointment and may affirm the appointment or retain another independent accounting firm. Even if the appointment is ratified, the Audit Committee may in the future replace Grant Thornton LLP as our independent registered public accounting firm if it is determined that it is in Carvana's best interests to do so.

**The Audit Committee and the Board recommend that you vote "FOR" the ratification of the appointment of Grant Thornton LLP as the independent registered public accounting firm of Carvana for the year ending December 31, 2022.**

59

**AUDIT COMMITTEE REPORT**

The Audit Committee oversees our financial reporting process on behalf of the Board. The Audit Committee is composed of four independent directors (as defined by the New York Stock Exchange Listing Standards), met seven times in 2021, and operates under a written charter, which is posted on our website at investors.carvana.com/corporate-governance/governance-documents. As provided in the charter, the Audit Committee's oversight responsibilities include monitoring the integrity of our financial statements (including reviewing financial information, the systems of internal controls, the audit process, and the independence and performance of our internal audit function and independent registered public accounting firm) and our compliance with legal and regulatory requirements. However, management has the primary responsibility for the financial statements and the reporting process, including our systems of internal controls. In fulfilling its oversight responsibilities, the Audit Committee:

- reviewed and discussed the audited financial statements for the year ended December 31, 2021, with our management;

- discussed with our independent auditors, Grant Thornton LLP, the matters required to be discussed by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301 (Communications with Audit Committees); and

- received the written disclosures and the letter from Grant Thornton LLP required by applicable requirements of the PCAOB regarding Grant Thornton LLP's communications with the audit committee concerning independence, and has discussed with Grant Thornton LLP the independence of Grant Thornton LLP.

Based on the Audit Committee's review and discussions noted above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in our Annual Report on Form 10-K for the year ended December 31, 2021.

Respectfully submitted by:

Ira Platt
Gregory Sullivan
Michael Maroone
Neha Parikh

60

## ITEM 3 - SAY ON PAY

We are asking stockholders to approve, on an advisory basis, the compensation of our named executive officers as disclosed in the "Compensation Discussion and Analysis," the "Summary Compensation Table," and the related compensation tables and narrative. This item is being presented pursuant to Section 14A of the Securities Exchange Act of 1934. Although this advisory vote is not binding, the Compensation and Nominating Committee will consider the voting results when evaluating our executive compensation program.

Our executive compensation programs are designed to support our long-term success and reflect our pay-for-performance culture. Our Company has grown dramatically over the years. Our growth has few historical precedents and makes us one of the fastest-growing technology, consumer, or retail companies at our scale, and in 2021 we continued to grow rapidly, with another year of impressive revenue growth while simultaneously making significant progress in gross profit per unit and improving our operating leverage. We have a strong belief in promoting a pay-for-performance culture, and, accordingly, as described in the "Compensation Discussion and Analysis" of this proxy statement, the Compensation and Nominating Committee has structured our executive compensation program to tie total compensation to long-term stockholder value, as reflected primarily in our stock price. We believe that our executive compensation plans effectively support our strategic and financial goals, create a culture of teamwork, and are directly tied to the performance of the Company and shareholder outcomes.

**The Board recommends a vote "FOR" approval, on an advisory basis, of our executive compensation as described in this proxy statement.**

## OTHER MATTERS

We are not aware of any matters other than those discussed in the foregoing materials contemplated for action at the annual meeting. The persons named in the proxy card will vote in accordance with the recommendation of the Board on any other matters incidental to the conduct of, or otherwise properly brought before, the annual meeting. The proxy card contains discretionary authority for them to do so.

## INCORPORATION BY REFERENCE

The "Audit Committee Report" included in this proxy statement shall not be deemed soliciting material or filed with the SEC and shall not be deemed incorporated by reference into any prior or future filings made by us under the Securities Act or the Exchange Act, except to the extent that we specifically incorporate such information by reference. In addition, this document includes website addresses, which are intended to provide inactive, textual references only. The information on these websites is not part of this document.

## AVAILABILITY OF SEC FILINGS, CODE OF CONDUCT, AND COMMITTEE CHARTERS

Copies of our reports on Forms 10-K, 10-Q, 8-K, all amendments to those reports filed with the SEC, our code of business conduct, corporate governance guidelines, the charters of the Audit Committee and Compensation and Nominating Committee, and any reports of beneficial ownership of our common stock filed by executive officers, directors and beneficial owners of more than 10% of our outstanding common stock are posted on and may be obtained through our website, investors.carvana.com, or may be requested in print, at no cost, by email at investors@carvana.com or by mail to Carvana Co., 1930 W. Rio Salado Pkwy, Tempe, AZ 85281, Attention: Investor Relations.

## WHERE TO FIND ADDITIONAL INFORMATION

We are subject to the informational requirements of the Exchange Act and in accordance therewith, we file annual, quarterly, and current reports and other information with the SEC. This information can be inspected and copied at the Public Reference Room at the SEC's office at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Such information may also be accessed electronically by means of the SEC's home page on the internet at www.sec.gov. We are an electronic filer, and the SEC maintains an internet site at www.sec.gov that contains the reports and other information we file electronically. Our website address is investors.carvana.com. Please note that our website address is provided as an inactive textual reference only. We make available free of charge, through our website, our annual report on Form 10-K, as amended, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC. The information provided on or accessible through our website is not part of this proxy statement.

## COST OF PROXY SOLICITATION

Carvana is paying the expenses of this solicitation. Carvana will also make arrangements with brokerage houses and other custodians, nominees and fiduciaries to forward proxy materials to beneficial owners of stock held as of the record date by such persons, and Carvana will reimburse such persons for their reasonable out-of-pocket expenses in forwarding such proxy materials. In addition to solicitation by mail, directors, officers, and other employees of Carvana may solicit proxies in person or by telephone, facsimile, email, or other similar means.

## ANNEX

**NON-GAAP FINANCIAL MEASURES**

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA and EBITDA margin. We believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

*EBITDA AND EBITDA MARGIN*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss, which is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | **Years Ended December 31,** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | | **2018** | | **2017** | |
| | **(dollars in millions)** | | | | | | | | | |
| Net loss | $ | (287) | $ | (462) | $ | (365) | $ | (255) | $ | (164) |
| Depreciation and amortization expense | | 105 | | 74 | | 41 | | 24 | | 12 |
| Interest expense | | 176 | | 131 | | 81 | | 25 | | 7 |
| Income Tax Provision | $ | 1 | $ | — | $ | — | $ | — | $ | — |
| EBITDA | $ | (5) | $ | (257) | $ | (243) | $ | (206) | $ | (145) |
| | | | | | | | | | | |
| Total revenues | $ | 12,814 | $ | 5,587 | $ | 3,940 | $ | 1,955 | $ | 859 |
| Net Loss Margin | | (2.2)% | | (8.3)% | | (9.3)% | | (13.0)% | | (19.1)% |
| EBITDA Margin | | — % | | (4.6)% | | (6.2)% | | (10.5)% | | (16.9)% |



P.O. BOX 8016, CARY, NC 27512-9903

**YOUR VOTE IS IMPORTANT! PLEASE VOTE BY:**

**INTERNET**
Go To: **www.proxypush.com/CVNA**
• Cast your vote online
• **Have your Proxy Card ready**
• Follow the simple instructions to record your vote

**PHONE**  Call **1-866-509-2149**
• Use any touch-tone telephone
• **Have your Proxy Card ready**
• Follow the simple recorded instructions

**MAIL**
• Mark, sign and date your Proxy Card
• Fold and return your Proxy Card in the postage-paid envelope provided

**"ALEXA, VOTE MY PROXY"**
• Open Alexa app and browse skills
• Search "Vote my Proxy"
• Enable skill

# Carvana Co.

### Annual Meeting of Stockholders

For Stockholders of record as of March 03, 2022

**TIME:**     Monday, May 2, 2022 2:00 PM, Pacific Time
**PLACE:**   Annual Meeting to be held live via the Internet - please visit
www.proxydocs.com/CVNA for virtual meeting registration details.

### This proxy is being solicited on behalf of the Board of Directors

The undersigned hereby appoints Paul Breaux and Kevin Hogan (the "Named Proxies"), and each or either of them, as the true and lawful attorneys of the undersigned, with full power of substitution and revocation, and authorizes them, and each of them, to vote all the shares of capital stock of Carvana Co. which the undersigned is entitled to vote at said meeting and any adjournment thereof upon the matters specified and upon such other matters as may be properly brought before the meeting or any adjournment thereof, conferring authority upon such true and lawful attorneys to vote in their discretion on such other matters as may properly come before the meeting and revoking any proxy heretofore given.

THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, SHARES WILL BE VOTED IDENTICAL TO THE BOARD OF DIRECTORS RECOMMENDATION. This proxy, when properly executed, will be voted in the manner directed herein. In their discretion, the Named Proxies are authorized to vote upon such other matters that may properly come before the meeting or any adjournment or postponement thereof.

You are encouraged to specify your choice by marking the appropriate box (SEE REVERSE SIDE) but you need not mark any box if you wish to vote in accordance with the Board of Directors' recommendation. The Named Proxies cannot vote your shares unless you sign (on the reverse side) and return this card.

PLEASE BE SURE TO SIGN AND DATE THIS PROXY CARD AND MARK ON THE REVERSE SIDE

# Carvana Co.

## Annual Meeting of Stockholders

**Please make your marks like this:** ☒

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE DIRECTORS IN PROPOSAL 1, AND "FOR" PROPOSALS 2 AND 3.**

| PROPOSAL | YOUR VOTE | | | BOARD OF DIRECTORS RECOMMENDS |
|---|---|---|---|---|
| 1.  Election of Directors: | | | | |
| | FOR | | WITHHOLD | |
| 1.01 Dan Quayle | ☐ | | ☐ | FOR |
| 1.02 Gregory Sullivan | ☐ | | ☐ | FOR |
| | FOR | AGAINST | ABSTAIN | |
| 2.  Ratification of the appointment of Grant Thornton LLP as our independent registered public accounting firm for the year ending December 31, 2022. | ☐ | ☐ | ☐ | FOR |
| 3.  Approval, by an advisory vote, of Carvana's executive compensation. | ☐ | ☐ | ☐ | FOR |
| 4.  Other business as may properly come before the meeting or any adjournment of the meeting. | | | | |

**You must pre-register to attend the meeting online.**
Authorized Signatures - Must be completed for your instructions to be executed.
Please sign exactly as your name(s) appears on your account. If held in joint tenancy, all persons should sign. Trustees, administrators, etc., should include title and authority. Corporations should provide full name of corporation and title of authorized officer signing the Proxy/Vote Form.

_____  _____
Signature (and Title if applicable)　　　　　Date　　Signature (if held jointly)　　　　　Date

65

**Exhibit 23**

**S&P Global**
Market Intelligence

# Carvana Co. NYSE:CVNA
# FQ1 2022 Earnings Call Transcripts
## Wednesday, April 20, 2022 9:30 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ1 2022- | | | -FQ2 2022- | -FY 2022- | -FY 2023- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (1.58) | (2.89) | NM | (0.76) | (3.65) | (1.57) |
| **Revenue  (mm)** | 3371.35 | 3497.00 | ▲3.73 | 4123.52 | 16638.06 | 21358.87 |

Currency: USD
Consensus as of  Apr-19-2022 12:59 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

**- EPS NORMALIZED -**

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ2 2021** | (0.39) | 0.26 | NM |
| **FQ3 2021** | (0.30) | (0.38) | NM |
| **FQ4 2021** | (0.82) | (1.02) | NM |
| **FQ1 2022** | (1.58) | (2.89) | NM |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ............................................................................................................ | **3** |
| **Presentation** | ............................................................................................................ | **4** |
| **Question and Answer** | ............................................................................................................ | **8** |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Ernest C. Garcia**
*Co-Founder, President, CEO &*
*Chairman*

**Mark Jenkins**
*Chief Financial Officer*

**Michael Louis Levin**
*Vice President of Investor*
*Relations*

**ANALYSTS**

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research*
*Division*

**Christopher Alan Pierce**
*Needham & Company, LLC,*
*Research Division*

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research*
*Division*

**John Christopher Parke**
*Wells Fargo Securities, LLC,*
*Research Division*

**John Robert Colantuoni**
*Jefferies LLC, Research Division*

**Michael Allen Baker**
*D.A. Davidson & Co., Research*
*Division*

**Michael David Montani**
*Evercore ISI Institutional Equities,*
*Research Division*

**Rajat Gupta**
*JPMorgan Chase & Co, Research*
*Division*

**Robert Charles Zeller**
*Truist Securities, Inc., Research*
*Division*

**Seth Mckain Basham**
*Wedbush Securities Inc., Research*
*Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, and welcome to the Carvana First Quarter 2022 Earnings Conference Call. [Operator Instructions] Please note, this event is being recorded.

I would now like to turn the conference over to Mike Levin, VP of Investor Relations. Please go ahead.

**Michael Louis Levin**
*Vice President of Investor Relations*

Thank you, Betsy. Good afternoon, ladies and gentlemen. Thank you for joining us on Carvana's First Quarter 2022 Earnings Conference Call. Please note that this call will be simultaneously webcast on the Investor Relations section of the company's corporate website at investors.carvana.com. The first quarter shareholder letter is also posted on the IR website. Also, we posted additional information on the ADESA U.S. acquisition transactions, which can be found in the Events & Presentations page of the IR website. Joining me on the call today are Ernie Garcia, Chief Executive Officer; and Mark Jenkins, Chief Financial Officer.

Before we start, I would like to remind you that the following discussion contains forward-looking statements within the meaning of the federal securities laws, including, but not limited to, Carvana's market opportunities and future financial results that involve risks and uncertainties that may cause actual results to differ materially from those discussed here. A detailed discussion of the material factors that cause actual results to differ from forward-looking statements can be found in the Risk Factors section of Carvana's most recent Form 10-K. The forward-looking statements and risks in this conference call are based on current expectations as of today, and Carvana assumes no obligation to update or revise them whether as a result of new developments or otherwise.

Unless otherwise noted on today's call, all comparisons are on a year-over-year basis. Our commentary today will include non-GAAP financial measures. Reconciliations between GAAP and non-GAAP metrics for our reported results can be found in our shareholder letter issued today, a copy of which can be found on our Investor Relations website.

And now with that said, I'd like to turn it over to Ernie Garcia. Ernie?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Thanks, Mike, and thanks, everyone, for joining our call. The first quarter was a challenging quarter for Carvana. There were a number of impacts on the business, some internal and some external, that combined to negatively impact our financial results. We view these impacts as transitory setbacks, and I will hit them first. Secondly, I will discuss what we are working on internally to address each of these impacts. Next, I'll touch on the underlying demand for our offering. And finally, I'll close on our thoughts on the long term.

First, let's discuss the impacts to our results. There were 3 primary drivers of our results in the first quarter. The first is our operational constraints that most severely impacted our inspection centers and logistics network. These began with Omicron, were exacerbated by winter storms, and then the path to recovery has been slowed by our inspection center and logistics network and inventory growth causing us to produce and move more inventory to newly opened IRCs that are further away from our average customers, leading to additional network complexity. These effects had negative impacts on both sales volumes and retail GPU.

The second was industry-wide impacts. Affordability and general consumer sentiment combined to drive fewer industry-wide sales than prior periods. While we continue to rapidly grow market share throughout the quarter, the combination of these economic factors and our operational constraints caused our growth to come in lower than we were anticipating. Because of the operational requirements of our business, we

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

generally plan and build for growth 6 to 12 months in advance, depending on the lead times necessary to ramp each operational team. On average, across our history, this has served us well as it has enabled us to maintain much higher levels of growth in businesses with our operational complexity historically have been able to achieve. But given the internal and external factors described above, this quarter, it caused us to carry more expenses than we had sales to offset them with. This led to total SG&A levels that were largely on plan in total dollars being much higher per unit than prior periods and, to a lesser degree, also flowed through COGS driving down total GPU.

Thirdly, interest rates moved up rapidly in the quarter. As we originate the loans our customers use to buy parts from us and then sell them later, interest rate increases between initially showing our customers their financing terms and ultimately selling those loans lead to a reduction in the value of the loans we sell, which had the impact of reducing Other GPU. These factors combined to lead to a clear step back in our financial results. While this isn't what we are shooting for, it is straightforward to understand, and it suggests straightforward solutions.

Returning to positive EBITDA and resuming our march to our long-term financial model from there requires that we resolve our operational constraints, that we get our expenses and sales back into balance through a combination of sales increases and cost efficiencies and that we adjust our process in our finance group to reduce the impact of rapidly rising rates on GPU until we return to an environment with more stable rates. We have detailed plans that are already in motion in each of these areas. Our logistics team has clear plans in several key areas to catch up with the level our metrics were a year ago and then to move significantly beyond them. The addition of ADESA to our network will help to accelerate these plans further.

Logistics progress will also unlock the ability to make more of our inventory visible to more of our customers, which is a straightforward way to drive sales up faster -- as faster delivery time and larger selections increase customer conversion. Beyond that, the team is working on several near- and medium-term plans to improve the selection of more affordable cars we have for our customers. These plans start as simply as buying a greater quantity of less expensive cars and extend the changes to our inspection center processes to produce more of those cars and other product enhancements that make it easier for our customers to find and purchase less expensive cars.

In addition, we are using our temporary excess capacity as an opportunity to gain additional cost efficiencies. While we are always aiming for cost improvement, the constant pressure of growth often dominates our priorities and slows our progress. Across the company, we have each of our operational teams focused on process and product improvements to increase efficiency in an effort to reduce cost and improve our scalability as part of Project Catapult. We are determined to make the most of this opportunity.

Next, I want to touch on the underlying demand for our offering. Here, the signs continue to look great. We continue to rapidly gain market share in this difficult environment as we grew by 14% while the market around us was shrinking. Further, we can look at subpopulations of our customers that are less impacted by affordability and interest rates to get a deeper view into demand. Our customers with FICO scores over 700 grew approximately 50% despite our logistics constraints and our ongoing suppression of inventory visibility.

Lastly, I want to close with a couple of thoughts on the long term. At any point in time, the company's success is driven by the sum of the structural forces that define an industry, by the macroeconomic backdrop and by company-specific factors. In the long run, the macroeconomic backdrop disappears from that equation as it just becomes its average. Structurally, nothing has changed. We're a fragmented 40 million unit per year market with significant margins and customers who are open to and excited about something new.

From a company-specific perspective, we continue to make constant progress. During this period, we have excess capacity. We have a transitory reduction in the amount of energy necessary to keep up with growth. While we will not allow that to reduce our energy output -- but we will not allow that to reduce our energy output in the least. We will simply point more of our energy towards system and process improvements to maintain the same aggregate level of relentless improvement.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

In 9 years, we've gone from an idea to a company with over $12 billion in revenue, and we are still just 1% of our market. In 9 years, we went from the company with negative gross profit to a company with over $4,500 gross profit per unit. In 9 years, we went from a company that lost $0.30 of EBITDA for every dollar of revenue to a company with approximately EBITDA breakeven just last year. That constant progress has been the result of the opportunity our market has presented us, the power of the business model we have built, the quality of the team we have assembled and the endless effort, creativity and passion the team has poured in.

Some quarters are bumpier than others. Unfortunately, in the real world, there are rarely perfectly straight lines anywhere. While it might be a little harder to see this quarter than most, we remain squarely on the path to building the largest and most profitable automotive retailer and to changing the way people buy and sell cars. The march continues. Mark?

**Mark Jenkins**
*Chief Financial Officer*

Thank you, Ernie, and thank you all for joining us today. Carvana continued to gain market share in Q1, but several external and internal factors impacted our financial results. Some of these impacted the used vehicle industry as a whole, such as Omicron, used vehicle prices, interest rates and other macroeconomic factors. And others were more specific to Carvana, such as reconditioning and logistics network disruptions.

The impact of these factors on retail units sold volume was the primary driver of our results in Q1. We generally prepare for sales volume 6 to 12 months in advance, meaning we built capacity in most of our business functions for significantly more volume than we fulfilled in Q1. With our costs relatively fixed in the short term, the lower retail unit volume led to higher cost of goods sold per unit and higher SG&A per unit. These effects combined with rapidly rising interest rates and widening credit spreads to lead to lower EBITDA margin.

In Q1, retail units sold totaled 105,185, an increase of 14%. Total revenue was $3.497 billion, an increase of 56%. Total gross profit per unit in Q1 was $2,833, a decrease of $823 year-over-year. This total gross profit included a $76 per unit impact from Ernie's 1 million unit milestone gift to Carvana employees. Retail GPU was $808 in Q1, a decrease of $403. Retail GPU was impacted by a more than $600 per unit increase in reconditioning and inbound transport costs relative to the prior year and a more than $100 per unit decrease in shipping revenue driven by refunds to customers following extended delivery times.

Retail cost increases in Q1 were primarily due to inefficiencies in the inspection and reconditioning centers and logistics network, which in turn were driven by Omicron, severe weather events and the extended time lines required to recover from these events, and due to lower retail units sold volume which increased per unit cost. We believe the factors impacting Q1 were transitory, and we expect to see retail costs move toward more normalized levels over the coming quarters as our logistics network normalizes and our expense levels are better balanced with sales volumes.

Wholesale GPU was $219 in Q1, a decrease of $8, driven by higher volume, offset by lower profit per unit. Other GPU was $1,806 in Q1, a decrease of $412. Year-over-year changes in Other GPU were primarily driven by higher benchmark interest rates at the time of loan sale relative to origination interest rates and widening of credit spreads following the onset of the conflict between Russia and Ukraine, partially offset by the impact of higher industry-wide used vehicle prices on average loan size.

Looking sequentially, the rapid rise in benchmark interest rates and widening credit spreads had a significant impact on the spread between funding costs and origination interest rates in Q1 versus Q4. This increase in spread had a more than $600 impact on Other GPU in Q1. We expect this spread to move toward more normalized levels over the coming quarters.

The same factors that impacted retail units sold and total GPU also impacted EBITDA margin in Q1. EBITDA margin was minus 11.6%, a decrease from minus 1.3%. EBITDA margin included a 0.8% negative impact from Ernie's 1 million unit milestone gift to Carvana employees.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

While we faced a uniquely difficult environment in the first quarter, we are already seeing positive trends across our key metrics. And we expect meaningful sequential improvement in Q2 versus Q1 in retail units sold, revenue, total GPU, SG&A per retail unit sold and EBITDA margin.

In our last shareholder letter, we provided an expectation that we would achieve over $4,000 GPU and approximately EBITDA breakeven in the last 3 quarters of 2022 taken in aggregate. We now expect the return to over $4,000 GPU and positive EBITDA to be pushed back a few quarters and then to resume our march toward our long-term financial model.

We are on track to close our acquisition of ADESA U.S. in May and are excited about the role that ADESA U.S. will play in our path toward our long-term goals. The ADESA U.S. footprint includes 56 sites with approximately 6.5 million square feet of buildings on more than 4,000 acres. We expect to be able to build approximately 2 million units of annual reconditioning capacity in these locations while still operating ADESA U.S.'s wholesale auction business. This is the equivalent of approximately 30 greenfield Carvana IRC locations in terms of the production volume that we expect to unlock over time.

Adding the ADESA U.S. footprint will dramatically improve our logistics network over time. With the addition of these locations, we will eventually have reconditioned inventory within 50 miles of 58% of the U.S. population and within 200 miles of 94%. This will have the benefit of reducing shipping distances, times and costs, accelerating us to our long-term financial model.

We expect the ADESA U.S. purchase price to be financed primarily with $2.275 billion in unsecured notes. In addition, we expect to raise an additional $1 billion in preferred equity and $1 billion in common equity for future real estate improvements on the ADESA U.S. sites and for general corporate purposes. These financing transactions will place us in our strongest total liquidity resources and production capacity position ever, giving us a strong foundation for profitable growth and significant flexibility to execute our plan.

On March 31, we had approximately $1.7 billion in total liquidity resources, including cash, revolving availability and financeable real estate and securities. In total, we expect the transaction to generate approximately $1.9 billion of net cash proceeds after payment of the ADESA U.S. purchase price and more than $900 million of financeable real estate, bringing our total liquidity resources to approximately $4.5 billion pro forma for the transactions.

In addition, we estimate that the ADESA U.S. locations have approximately 200,000 units of facility capacity that is available for use with limited incremental site improvements. Combining our own IRCs with these ADESA U.S. locations, we expect total annual capacity at full utilization to be approximately 1.4 million units by the end of 2022. We are excited to join forces with the ADESA U.S. team on the path toward our long-term goals of buying and selling millions of cars per year and becoming the largest and most profitable auto retailer.

Thank you for your attention. We'll now take questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] The first question today comes from Zach Fadem with Wells Fargo.

**John Christopher Parke**
*Wells Fargo Securities, LLC, Research Division*

This is John Parke on for Zach. I guess with the 2 offerings you just announced, it doesn't sound like you guys are really changing the way you plan on financing the acquisition. But can you guys kind of share how you're thinking about the debt terms, I guess, the incremental interest expense as well as any associated CapEx plan with this acquisition in '22?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So yes, I think we have announced our plans for financing the ADESA purchase as well as future real estate improvements on the ADESA site and additional funds for general corporate purposes. We expect that to take the form of $2.275 billion in unsecured notes, $1 billion of preferred equity and $1 billion of common equity. I think the specific terms on that, we'll discuss in the coming days. But I think that's the basic transaction structure.

I think we feel really great about that transaction structure. I think it gives us a lot of flexibility to execute our plan. I think we feel really great about the trajectory that we're on. We feel really great about joining forces with ADESA U.S. and all the benefits that, that brings to our core business. And so yes, I think we feel grateful about the acquisition and the financing structure. And then in terms of some of your questions on specifics on the securities, I think we'll talk more about that in the coming days.

In terms of CapEx, one of the nice benefits of the ADESA acquisition is we do expect it to meaningfully reduce our quarterly CapEx outflows from the levels that we've been at over the past several quarters. And the reason for that is we have been spending a significant amount through 2021 and early 2022 on building out our own Carvana greenfield IRCs. That's been a meaningful use of capital expenditures for us. Now with the ADESA locations online, we do expect to be outlaying meaningfully less CapEx on certainly Carvana greenfield IRCs and then in general. So I think that's the directional guidance that I would give there.

**John Christopher Parke**
*Wells Fargo Securities, LLC, Research Division*

Great. And then just kind of switching gears a little bit on like, I guess, financing GPU. You guys talked about the $600 sequential impact from the compressing ABS spreads normalizing. I guess -- I mean is there any way to kind of help us think about like what a normal level of Other GPU should be?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So I mean I think we have talked a little bit about Other GPU. I think we had a strong year on Other GPU in 2021. We do think there was tailwinds to our Other GPU in 2021 that came from elevated industry-wide used vehicle prices because basically, the way that, that works is the higher used vehicle prices lead to higher average loan sizes, which leads to higher Other GPU, other things being equal. We sized that about $150 per unit.

And then I think the other point that I would make on Other GPU is we see significant opportunities in front of us to expand Other GPU from a fundamental perspective off of what we've seen historically. I think that takes the form of fundamental improvements in the finance platform, other fundamental improvements in ancillary products, including existing and new ancillary products. So I think overall, we feel like we built a business to generate very significant other revenues and very significant Other GPU

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

over time. I think Q1 was certainly an outlier, not representative at all of what we would expect to see on a normalized basis.

**Operator**

The next question comes from Chris Bottiglieri with BNP.

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research Division*

Yes. I guess the first question is one of your peers today highlighted that there's been some chatter that ADESA is losing a bunch of its OEM relationships because of the acquisition. So I just want to get a sense for like as you think about the EBITDA you've acquired, what type of attrition standards that you've -- attrition estimates you've assumed. And then two, I guess, just like bigger picture, is there any opportunity to restructure the deal to incorporate some of this? Do you have to pay a breakage fee if you walk away from a deal? It'd just be helpful to think through that before you approach the capital markets.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So let me just start with the reiteration of how excited we are about this transaction. We do think it's -- has the potential to be a truly transformative transaction, giving us a nationwide footprint, the capacity to produce a lot more cars, the ability to put those cars closer to customers, to shrink delivery times, to reduce delivery costs, to enhance the customer experience and to do it at greater volume and to do it all faster and also to accelerate our path to our long-term financial model because of the benefits of those locations. So we're extremely excited about that. And then we're also excited about the auction business itself and the way that, that kind of works when paired with the Carvana business.

So I want to start there, and that dominates anything that happens kind of quarter-to-quarter, day-to-day or any other results. I do think that there has been -- across the auction business in general, across all different auction groups, there has been something of a reduction in volume over the last quarter, much like we've seen in retail. And I think ADESA has not been immune to that. I think there have been a small handful of both buyers and sellers who have elected, at least in the short term, to not do business with ADESA as part of the transaction. That's actually probably even maybe a little less than we would have anticipated so far.

We've heard some really positive news as well. We don't think that that's actually flowing through and impacting the results in a way that is noticeable as of yet. So I think most importantly, we are extremely excited about the transaction. It's very much a long-term foundational view that is generating that excitement. And that extends across reconditioning, logistics and the exciting things that we can do together with the auction. So we're excited. I think there will probably be some of that noise. Maybe there's a little bit more of that in the future. But it's been -- it has not been at a level that is concerning, at least to us.

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research Division*

Got you. That's helpful. Then just a related follow-up. It looks like there's an extra $1 billion of capital being raised now. Can you maybe just talk about that? Is it just because of, frankly, how scary the macro backdrop is, you're just being a little bit conservative with the balance sheet? Or would you look to kind of repay some debt outstanding with some of the proceeds? Trying to understand where the extra $1 billion comes from. And I apologize if you already addressed this.

**Mark Jenkins**
*Chief Financial Officer*

No, you're good. So what I would say is I think the way that we've chosen to structure this purchase and the capital that we're raising is aimed at giving us maximum flexibility. It dramatically enhances our liquidity position. I think it does give us a lot of flexibility in the future to do interesting things. Undoubtedly, this quarter is not what we were planning for. We both hit in our prepared remarks. It's in

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the shareholder letter. We do plan for growth 6 to 12 months in advance. The world looks very different 6, 12 months ago.

And so we built for a different environment than we find ourselves in today. That had costs. Those show up in the results that we're reporting. And now we're starting from a worse place than we would have liked to start. And so I think for the remainder of this year, we have to kind of dig out of that hole a little bit.

So that also generates a rationale for a little bit of additional cushion. And then obviously, the macro backdrop is uncertain. And I think that extends to the broader macro economy and also to the way the auto industry is going to evolve from here. There are some pretty unique things happening in the auto industry these days that I at least haven't seen in my career.

And so we think that given the opportunity that we've got, the size of that opportunity, the strength of which our customers have responded to our offering over the last 9 years, the market share that we've seen continually growing across our markets, the continued market share growth that we've seen, the addition of ADESA and the ability for us to build into that opportunity, we just want to make sure that we position ourselves very well to ride out whatever storm may or may not come. And so I think that this structure gives us the ability to do that. It gives us the ability to continue to run our play. And that's what we're going to do because we think the opportunity is absolutely massive.

### Operator

The next question comes from John Colantuoni with Jefferies.

### John Robert Colantuoni
*Jefferies LLC, Research Division*

So the shareholder letter mentioned aligning revenue and costs over the coming quarters while also mentioning that profitability suffered somewhat in Q1 from having a high level of fixed costs. Maybe you could just help square those 2 comments and also help detail some of the levers you have to become more efficient over the coming quarters.

### Ernest C. Garcia
*Co-Founder, President, CEO & Chairman*

Sure. So I mean, first of all, let's walk through how I think the numbers work in the simplest way we can. So as we said, we aim for growth 6 to 12 months in advance. And that's because we've grown at a very fast rate. We do have real ops. Our growth is not continuous and smooth. It tends to be discontinuous around tax season, which is the end of February, early March. So that requires planning, and we have to build up our operational capacity ahead of time.

If we go back in time to Q4, we grew at 57%. In Q3, we're growing at 74%. So we clearly were growing at higher rates, and we were anticipating higher rates of sales in Q1 because we didn't appreciate what would happen industry-wide with affordability and interest rates and consumer sentiment, everything pushing overall volumes down. And so we built more capacity. And so one way to look at that is if you look at our SG&A per unit, it's at levels that we haven't been at in a really long time. And we've been at much, much lower levels. We've been on the order of $2,500 less many times in our history.

And so even if we just kind of do a simple math there and say we would have aimed for this level of growth and not kind of built for a higher level of growth across 100,000 sales, that's $250 million, that's a really big difference. And so we built for more than showed up. And I think that's where we find ourselves today. The other impact that kind of drove the results was some of that kind of extra capacity we built also does flow through COGS, and it impacted various GPU line items, and then we saw interest rates move back.

And so some of those things kind of led us to where we are. I think going forward, the most important thing that we can do is we just need to align our cost levels with sales. And the good news is we've been growing market share very consistently even through this environment. So the underlying business continues to grow relative to the market. We grew at 14% in the quarter, which isn't as fast as we would

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

have liked, but it's very solid in light of a shrinking environment. We continue to see more evidence of the underlying demand growth if we look a bit deeper. We pointed to the statistic of customers over 700 FICO grew at 50% in the quarter. Across all of our cohorts, we saw growth year-over-year in the quarter despite the shrinking market.

So I think what we have to do now is we just have to continue to position the business to benefit from that growth. We have to try to do our best to understand what's going to happen in the macro environment because as we're continuing to take market share, there's a question about what's going on with the aggregate level of sales across the industry. As long as that's still shrinking, that will be a headwind to growth. When that abates and even stabilizes somewhere, that should be less of a headwind, which will be beneficial. And then at some point, that will reverse and will turn into a tailwind.

And then we also have some operational levers that we have that are in our control. We talked about -- we definitely took a hit from Omicron and logistics network. And then that was extended by winter storms. And then as we've opened 3 inspection centers in the last quarter and one in the quarter before it and we've got kind of inventory in different places that grew a little faster than we anticipated, that put a little bit of extra strain on the network. Unfortunately, that extra strain has put us in a position where we have not yet increased visibility of inventory across our network to customers everywhere.

So those are operational undertakings that we're very focused on. We want to try to get our logistics network back to where it was a year ago and then continue to proceed positively from there. That would lead to faster delivery times and greater sales, all else constant. And then that puts us in a spot to be able to make inventory visible, which should also lead to greater sales, all else constant. And so that's the kind of easiest and most important way to get back to balances to drive up sales.

And then I think something that we're trying to do internally and something that I'm incredibly proud of the team for is every moment, whether it's the moment you plan for or it's a little bit different than the moment you anticipated, it is some sort of an opportunity. And as a company for the last 9 years, we've been characterized by sprinting as fast as we possibly can to keep up with the demand that we've seen. And I think the company has done a great job. The team has done a great job keeping up with that growth and growing GPU and levering EBITDA. But undoubtedly, when you're growing that fast, there are just trade-offs that get made, and there are priorities that you have to kind of surrender to.

And so growth usually wins. And that means that kind of cost reductions oftentimes do take a back seat. And we haven't had a lot of opportunities where there's less immediate pressure on us to grow. And I think the advantage that we have today and the opportunity we have today is we do have excess capacity. And so we've got the team pointing their energy at let's find ways to get more efficient and faster than we otherwise would have because we still got all this effort, and now we have this new opportunity where we're not pointing a lot of that effort in the direction of just keeping our head above water with growth.

And so that's the other big opportunity that we've got. And somewhere in the mix there between growing sales as a result of our market share growth, growing sales as a result of continuing to improve our operations with the overlay of whatever happens in the market and then getting more efficient on expenses because of this opportunity that we've got, we expect to get back in balance, and then we'll continue to build from there. So that's our plan, and we feel really good about it.

**John Robert Colantuoni**
*Jefferies LLC, Research Division*

Just wanted to quickly ask about the proposed offering from this morning -- from this afternoon, sorry. It sounds like last quarter, the $1 billion of additional financing was being mostly invested into the ADESA assets. But the proposed offering mentioned that you'll also be now investing that $1 billion into working capital and general corporate purposes in addition to that, the investments in the ADESA assets. So 2 questions -- and that's also in addition to raising an additional $1 billion in equity.

So 2 questions here. Can you just quantify how much of that $1 billion you'll be investing into each of the buckets that you outlined in the proposed offering? And then second, what changed since last quarter that's necessitating an additional $2 billion in cash?

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Mark Jenkins**
*Chief Financial Officer*

Sure. So on the construction improvements to the ADESA locations, there's -- nothing's changed there. So we still expect to invest approximately $1 billion over a period of multiple years in the ADESA locations in order to move them from what we estimate is about 200,000 infrastructure capacity today, if fully staffed, from an annual retail reconditioning perspective up to 2 million annual units of production capacity at full utilization when fully staffed, which is our goal for the ADESA locations. So that is exactly the same as we've always thought about it. I think we do plan to, yes, fill out the locations. We expect that to cost about $1 billion over a period of multiple years.

In terms of the additional capital, I mean, I think the way we're thinking about that is we have a very big opportunity as a company. I think we're extremely excited about the opportunity in front of us to take meaningful market share, to drive strong unit economics, to take advantage of the ADESA acquisition, to get additional reconditioning capacity closer to more customers, to improve customer experience and speed delivery times, take advantage of the logistics network benefits that come from having a more broadly distributed footprint.

And so I think we decided to raise that additional capital just to allow us to completely focus on that goal, building toward our long-term model and to stop having conversations about liquidity and what happens in a deep recession and a prolonged recession and all those sorts of things. So I think we feel really good about the transaction structure that we've put together. I think we feel great about the ADESA acquisition and the overall trajectory that, that places us on.

**Operator**

The next question comes from Michael Montani with Evercore ISI.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

I had 2 questions. The first one was around the demand side. So last quarter, you had given some color around how units grew for households with $100,000 plus of income versus those with $50,000. So I was wondering if you could discuss that and/or the impact of stimulus, which we think could have been 500 bps to 1,000 bps. And then I had a separate question.

**Mark Jenkins**
*Chief Financial Officer*

Sure. So what I would say is, at a high level, those kinds of metrics remain the same or kind of even more severe, where those with higher incomes have outgrown those with lower incomes by even more recently. So I think this kind of theme of affordability has continued to get stronger over the last several months. So whether you're looking at that in income, in credit, we provided the statistic with customers over 700 FICO or in age, I think that basically shows up anywhere. So that is clearly something that is very active in terms of what's going on in the auto industry today. Those with higher incomes and better credit are still buying cars at much higher levels than those with lower incomes and lower credit in this environment.

I think it's hard to disentangle the stimulus. That -- there were several different ways of stimulus last year and the year before, and it's hard for us to precisely disentangle that. Clearly, that is something we're comping over. Last year, it was tax season, and there as a little bit of stimulus story thereafter. And this year, tax season, in general, I would say, was much softer in terms of impact than tax seasons historically have been. I think it's hard to disentangle the kind of comping stimulus effect from the affordability issues and the general consumer confidence and just kind of socioeconomic issues and everything going on in the world. But clearly, it all played something of a role.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

Okay. That's helpful. And then just on the headcount front, we had seen a pretty significant kind of quarter-on-quarter reduction in job openings. And I'm just wondering if you could talk to kind of if you

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

assume volumes are relatively similar or improved kind of only modestly. How long do you think it would take to kind of rightsize the cost structure for that kind of environment? Is it kind of a 1-quarter thing? Or is it more 2 to 3 quarters?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So I don't think we're going to give precise time lines on that. What I'll say is we're going to be working hard in every direction. We've been growing market share quickly. We clearly have operational opportunities that we expect will drive additional growth, all else constant. We're clearly focused from a product perspective on driving additional affordability, which I think will be helpful for customers. And then we're also very focused on gaining cost efficiencies as quickly as we can.

I would say our plan right now is sprint in all those different directions. And then we'll see where that all comes. I think it's -- historically, it's been easier for us to provide specific guidance and forecast when we're trying to predict what's going on with our demand and what's going on with our execution. I think today, we have a significant overlay of dynamism in the economy broadly. And I think we want to be careful about being too specific in any of our projections as a result of that.

**Operator**

[Operator Instructions] The next question today comes from Brian Nagel with Oppenheimer.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

So I apologize, I want to focus a bit shorter term. But just there was a lot of comment -- you made a lot of comments, a lot of detail with regard to the effects in the quarter being transitory. Could you help us -- could you talk more about the trend through the quarter than you're hearing even into Q2, both with unit sales as well as GPU, and maybe some of the early improvements you're already starting to see as some of these factors begin to abate?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. Well, I think we'll definitely have to talk about Q1. I mean in Q1, I would say it was, for the most part, just kind of continually -- it looked like the industry environment was deteriorating throughout is, I think, probably the simplest way to characterize that. And again, disentangling how much of that was affordability, how much of that was just general consumer confidence or interest rates is very, very hard. But I think just looking at auto sales across the industry and looking at auto sales of peers, it looked like it was deteriorating throughout the quarter. And I think it's very, very early in Q2, so I don't think we're going to provide too specific of a view there.

But I do think that from the time that we last spoke and had our last earnings call, things clearly continued to deteriorate from an industry perspective. Now we do think that's transitory. There's a question of duration. But this industry is a $40 million transaction industry. It's been that way for a very long time. If you kind of zoom out over any reasonable period of time, that's what it averages. And kind of of that -- those transactions come from the fact that there's 270 million cars on the road and consumers trade with each other once every 6.75 years, and that's kind of the math that works out.

In a moment like this, it gets very easy for many people to kind of put off the decision to purchase a car for many possible underlying reasons. And so historically, you can see car sales slow for a period. And generally, that generates pent-up demand, and it alleviates relatively quickly. I think we do have extra dynamics going on right now. We have inflation. We have reduced new car production. We have car prices that are massively outpacing inflation in terms of price increases.

So I think it's hard to know exactly how those forces will all play out in the near term. I think from our perspective, we made this comment in prepared remarks, the most important thing we can do is continue to build towards the structural opportunity that sits in front of us, which is this 40 million opportunity, and continue to make gains as a company and then just position ourselves to be resilient to whatever

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the macro economy brings us. And we think capital is a big part of that, and we think we've positioned ourselves well for whatever that does bring.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

That's helpful. And then so just to follow up on that. I mean you're talking primarily about the unit sales. But with regard to -- on the GPU side in particular, the reconditioning costs, have you started to see that dynamic improve yet?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sorry. So yes, so on the retail cost side. So I mean I do think that Omicron had very acute effects, for example, on the reconditioning centers, and we are moving further away from that. So I think that's beneficial, other things being equal. We definitely have been seeing improvements in the logistics network versus the most disrupted points. So I think that's beneficial, other things being equal. So I would say we are seeing some positive data there.

**Operator**

The next question comes from Rajat Gupta from JPMorgan.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Just first one on just the consumer environment in the near term. In the shareholder letter, you mentioned that you're seeing a pretty substantial sequential improvement already in the order metrics, including sales. Is that primarily a function of just alleviating some of the capacity constraints or bottlenecks? Or is there something in the demand environment that's helping that? Just wanted to clarify that, and I have a follow-up.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So I think -- again, those things are a bit difficult to disentangle. But from a logistics perspective, for example, we have made some gains. We're -- if we kind of look at where we were a year ago and then compare ourselves to the peak, depending on what metric you're looking at, we've maybe made kind of half the gains back to where we would like to be if we were in the same spot as we were a year ago. And then we've got room to go from there. So I think there have been some benefits that are specific to Carvana that we believe are driving some benefit. And then we also do believe that we are growing market share.

And so as long as even kind of the rate of industry-wide sales shrinking reduces, all else constant, that should be positive for us as long as we continue to execute on our side. So I think -- like I said, it's very early in the quarter. We don't want to talk too much about it, but I think there have been some at least operational gains that we are making, and they are likely having a positive impact.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Got it. And the other thing you mentioned in the Other GPU that you are able to successfully pass on the benchmark increases through APRs in the month of April. Have you seen any impact on demand because of that? Or has that been very consistent versus what you would have expected? I mean some of your competitors had some different perspectives on that. So I was just curious like what you're seeing and like how is that influencing demand, if at all? Or is it all pretty much sticking pretty nicely?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. I would say all else constant, there's no question that increasing interest rates negatively impacts demand, and that's something that we try to make sure that we're measuring carefully all the time inside the company. I think the other thing that's true is that benchmark rates go up, and as risk spreads go up, the rest of the market also raises interest rates. And so from a kind of competitive option perspective, consumer options just in general kind of go up.

And so I think that there is kind of this term that's often used that we've used in the past as well that interest rates are somewhat sticky where when they're going up, it's sometimes difficult to pass all of the increases on to customers instantly in a way that is economically optimal. It just tends to take a little bit longer because different groups do take different views and it takes a little bit of time to adjust. But generally, that adjustment period is not super long, and then the same is true on the other side as well.

So I think undoubtedly, we would expect to see more demand if we were not raising interest rates with the environment. But I think that, that would be -- the rest of the market is also raising interest with the environment. And so I think that we are not seeing the same impacts that we would see if we were raising interest rates by ourselves and the market raising interest rates alongside us.

**Operator**

The next question comes from Adam Jonas with Morgan Stanley.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

Ernie, what can you tell us about Project Catapult, please? You're referring to a lot of the cost actions. And based on the e-mails I'm getting tonight, your quarterly cash burn and how -- and what you can control to manage that even if it wasn't part of the plan is having a big impact on how long the capital that you're in process of raising can last you depending on outcome. So it sounds super important, but you mentioned logistics teams and some stuff, but I don't know if you could be a little more specific with those efficiency levers in terms of dollar terms or how we can dynamic that.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. Well, first of all, Project Catapult is the internal term that we use for the project that's running across all of our different operational groups right now. So that was a little bit of an internal call-out to our teams. There's a lot going on. Across every single operational team, there are very clear goals and very clear metrics and a cadence of kind of catching up and accountability to make sure that we can gain as quickly as we possibly can. And we really are excited internally about using this as an opportunity to make gains that are hard to make in moments where you have as much pressure as we've had on average from growth.

So I think there are many, many different subcomponents to that plan, and it does cross every operational team and several product teams as well. So I don't even really know where to begin, but I would say that the overall theme is coiled the Catapult and put ourselves in a spot where we're really ready to efficiently grow when the market supports us and where we get gains in the near term in all these areas where we know we can be better and we finally have an opportunity to focus on it. So that's the general theme.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

So Ernie, I'm interpreting that as it's not purely a cost-cutting program. It's an efficiency program that can yield savings in a prolonged period of half the growth that you would have anticipated if 14% of that -- if that was prolonged and not what you're capacitized for that you could lower the burn rate in the next couple of quarters? Is that relevant?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. I think efficiency is kind of lower cost and simpler to scale up. And so I think it's the pursuit of efficiencies across all of our different operational teams.

**Operator**

The next question comes from Seth Basham with Wedbush Securities.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

My first question is just a clarifying one on the last one. So you are in the process of cutting costs in certain areas of the business to reduce the cash burn.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sorry, that was your question. Yes. So we are working on these projects that I discussed to find efficiencies across the business. That extends to every operating team, and all else constant, we do expect that to reduce variable costs.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

Okay. And then my follow-up question is just understanding when you announced the ADESA deal, you were thinking of financing at that point in time, from my understanding, solely with debt. And now you're financing it partly with preferred equity and now there's an additional equity cushion. So what changed relative to that financing component for the ADESA acquisition and the improvements from the debt component and the preferred equity component between then and now.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So I think we can maybe separate that into 2. So one is the addition of equity. And I think that, that was driven by giving us more flexibility, as discussed earlier. We do think our opportunity is enormous. We think the market around us has moved a little bit. We think that suggests that we should put ourselves into a position where we can operate as flexibly as possible to take full advantage of the opportunity that we've got.

And so I think that's an addition. And then I think in the capital structure, we evaluated a lot of different possible solutions and evaluated those through a lot of different lenses, cost efficiency, flexibility, prepayability, and came down with this being the right capital structure. So I think there are a bunch of considerations there.

**Operator**

The next question comes from Michael Baker with D.A. Davidson.

**Michael Allen Baker**
*D.A. Davidson & Co., Research Division*

Okay. A couple real quick ones here, one, and then a follow up. Just on used car pricing in the industry, what's your view on where it's going? Some of the indexes seem to be coming down on a sequential basis, and then the year-over-year growth has been a little bit less than it has been. Yet you're seeing the opposite. Your used car -- your ASPs are up and up at an accelerating rate. One of your competitors that reported this morning, same thing, year-over-year increases were higher than last quarter, and sequentially, the prices are getting higher. So why the discrepancy, do you think? And where do you see used car prices going?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Well, that's a very hard question. So let's start with maybe the discrepancy. I think the discrepancy could be partially in timing, and then it could also be the gap between wholesale markets and retail markets. So we definitely saw car prices.

Let's start with wholesale pricing. We definitely saw wholesale prices kind of move up in the end of last year and into early this year. And then more recently, we've seen wholesale prices start to fall back a bit. But I think when you're comparing quarter-over-quarter, year-over-year, it just kind of depends on the blend of where car prices were across the sum of that period. And so I think maybe some of those discrepancies could just be a function of what different periods you're looking at and what different companies you're looking at.

I think generally speaking, retail prices have been lagging wholesale prices. And generally speaking, they moved down a little bit more smoothly or up a little bit more smoothly. The way that a large portion of the market operates is that cars are kind of purchased at a point in time, and then they're financed on a floor plan, and they're kind of sold cost-plus for lack of a kind of more complicated description. There's a lot more that goes into it. I think that's a good first order way to think about it.

And so oftentimes, if wholesale prices drop, it's not necessarily clear that retail prices will immediately follow because many of the cars that are sitting on dealer lots were bought in the previous period, and there's debt against those cars at a price that was the prevailing price to that previous period. And oftentimes, dealers are not in a position to take loss on those cars or choose not to take a loss on those cars and say they'll just prices longer and then sell them at a higher price. So you tend to see a little bit more stability in retail prices.

Those -- I started with kind of the historical prices and then moved on to the dynamics and what can sometimes create a gap between wholesale and retail. As far as where it goes from here, I think the simple answer is I certainly don't know. I think today, depending on what kind of bucket of used car prices you're looking at, many cars are 40% more expensive than a year ago, whereas economy-wide, inflation is closer to 8%. So relative to other goods, cars are more expensive today than they have historically been. You would -- or I guess I would at least expect that over a medium period of time, cars will likely kind of have the same relationship to other goods that they've historically had. And so that would mean either more inflation or car prices will come down at some point.

And then I think probably the single biggest input to car prices today and the single biggest input to a lot of the unique dynamics that are happening across the new car market and the used car market is just new car production levels, which are obviously much lower than they've historically been. And so I think that it's hard to figure out how all that's going to balance out. And I think we'll be paying very close attention and trying to do the best job we can to predict it and trying to manage the business in a way that's resilient to whatever direction those things could move. But I don't think we're confident in precisely how it will work out.

I will say our hope is that car prices come down. I think all else constant, you would -- we would certainly prefer car prices to come down. I think in transition, there's a chance that, that would provide something of a headwind to retail GPU. I also think because of the dynamics discussed with kind of the gap between the wholesale market and the retail market, it's not obvious that headwind would be as strong as it might look if you saw wholesale prices move down. And then it also would clearly be a benefit to our customers if car prices were lower, and that would probably play a big part in returning the industry to normal, which would cause kind of the industry dynamics to reverse from what's been a headwind recently to a tailwind, which we think would be great for the business. So I think our hope is the car prices to go down. I think we would like to stay away from trying to precisely call it.

**Michael Allen Baker**
*D.A. Davidson & Co., Research Division*

Yes. That makes sense. And just a follow-up on that. You said in the past, Ernie, that the ideal environment is lower used car prices, as you just reiterated, but also lower interest rates. I think what we might get here is one of those lower car prices, but I think we're seeing higher interest rates. How would

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

you sort of characterize that environment honestly, 1 to 10, let's say, as being -- 10 being the most ideal environment?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

I mean I think if we're going with 1 to 10, I think 10 would have to be everything is low and competition gives up and consumers are excited. I think that would be 10. I think moving off of that ideal, I think the most important thing is cars that people can afford because of the sum of vehicle prices and interest rates, which the vast majority of consumers are financing their purchases. And so affordability for them is kind of the intersection of -- or the combination of both car prices and interest rates.

And then I just think stability. We feel like we've got an enormous opportunity, and we want to build into that opportunity. But building into that opportunity as efficiently as possible is made easier if we have clear visibility into what the future holds. And so if we had more stability in the market, I think that would be easier for us to just kind of stably grow and to be able to rely on what the market's going to do around us. And I think we care more about that probably than levels of either rates or prices but certainly would love for affordability to get better for our customers as well.

**Operator**

The next question comes from Chris Pierce with Needham.

**Christopher Alan Pierce**
*Needham & Company, LLC, Research Division*

Just 2. On the first one, we talked a lot about efficiency, but you guys spent $21 million more dollars to sell 8,000 less cars as far as advertising. So I just want to think about advertising. Is that something that was preplanned and that kind of -- the demand environment snuck on you guys? Or is that something that's kind of a bigger picture sacred cow? And the second question will be around credit spreads.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So what I would say on that is, I think, as I said, across the board, we build our plans out in advance. And then something that we've learned to do over time is be careful about yanking the wheel too much too quickly because generally, you regret it when you do. And I think when we talk about marketing in particular, we still remain a relatively young brand that's building a lot of awareness. And we think that there's a lot of value in continuing to build awareness and understanding of what we do and trust in what we do.

And we also think that oftentimes, marketing is something that has a potentially long payoff. I think a lot of times, marketing dollars are thought of as kind of a direct investment where dollar goes in and a sale comes out. But the truth is a lot of what you're doing with marketing is getting impressions on people and communicating what you do and how you do it. And those impressions add up, and you build a brand with that. And the payoff of marketing can be long. And so we will look to make moves that we think are intelligent across the board across time as we're managing the business, but we also try to be careful to not yank the wheel too much. So that's part of what you're seeing.

**Christopher Alan Pierce**
*Needham & Company, LLC, Research Division*

Understood. And then if I look at Q1 APR or some securitization versus Q4, if you're going to -- and we're talking about higher FICO score customers being a larger part of the growth. I guess can APR move higher because as interest rates move higher, even these customers, your best customers, will face higher rates? I'm just trying to figure out how the spread can widen because you've only got 2 levers and your yield levers are lower and you don't really have much control over it.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. So I think the simplest way to probably think about that is just customers with higher FICOs are different customers than customers with lower FICOs. And so the interest rate spread that matters there is the spread between their rates and their funding costs. And on other customers, it's their rate and their funding costs. And so I think what matters is keeping the spread between those 2 things in a place that you can monetize in a consistent way.

I think what happened in the quarter that is unique, the mix shift effects don't matter all that much because the spreads are kind of priced in, in a way that is thoughtful, and the mix shifts don't matter too much. What happened in the quarter is when we originate a loan, we have an interest rate that we show to a customer, and there's an expectation of the underlying funding cost. And then if the actual funding cost ends up being different than that expectation because either benchmarks or risk premiums or expected losses move between the moment of origination and the moment of sale, then that ends up being a headwind.

And so what we saw, obviously, was pretty dramatic and straight moves. I believe it's the most dramatic benchmarks have moved since the great financial crisis, and that had an impact. But I think that we're -- if you look at the actual rates that were charged to customers at any point in time and the expected funding costs throughout the quarter, we were getting loans in a very similar spot to where we were previously.

### Operator

Our last question today will come from Naved Khan with SunTrust.

### Robert Charles Zeller
*Truist Securities, Inc., Research Division*

This is Robert Zeller on for Naved. So just -- I'm just curious on the -- so you guys are planning 6 to 12 months ahead. What short-term measures you guys have, what operational measures you have in place to react to near-term market swings or exogenous macro conditions? And then secondly, have you said publicly or can you give us some sort of understanding of where the ADESA locations -- what they're operating at today? So appreciate the projections and forecasts on what they can do at full capacity, but maybe what their -- what levels they're operating at today for not full capacity.

### Ernest C. Garcia
*Co-Founder, President, CEO & Chairman*

Sure. So I think in the near term, our goal is kind of as outlined earlier on the call. We want to do everything we can to improve the operational constraints that we think are constricting sales that we can show customers more cars and drive sales up. And then we're working hard to drive as much cost efficiency as we possibly can, and we'll see how that all kind of plays out.

On the ADESA side, ADESA currently has facility capacity for approximately 200,000 cars per year, a little over 200,000 cars per year. And so that kind of already exists in these sites. And then over time, we'll be making the investments to be able to ramp up that facility capacity to the 2 million that we outlined earlier and in our deck. The actual utilization is far below the capacity they have. And so there's an ability for us to hire and train and unlock more of that capacity, but there are steps between where we are in doing that. But the facilities exist and are ready to go, but there's still a need for hiring and training to unlock the 200,000 plus.

And then just would reiterate again, I think we put in our shareholder letter kind of our footprint and the ADESA footprint. And I really think that that's a powerful page to take a look at because it's -- if you look at our footprint today and you look at where our reconditioning centers are and you think about this through the lens of the logistics constraints that we've seen over the last 4 or 5 months, you can really see how that works, right? We're buying cars nationwide, and we're shipping a lot of those cars to middle of the country to get reconditioned, and we ship them all the way back out to customers.

And when you kind of look at that as the footprint and you overlay it on the map, you can see how all of those kind of inbound and outbound transport legs really reduced. And to kind of maximally get

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

advantage of our business model, our logistics network, it does require a coordination between where cars are produced and logistics network and where cars are purchased. And we think that this gives us an incredible opportunity to coordinate that much better, much more tightly and with lower distances and times sitting between cars and customers. So we're obviously really excited about that, and we'll look to gain the benefits from that as quickly as we can.

**Operator**

This concludes our question-and-answer session. I would like to turn the conference back over to management for any closing remarks.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Great. Well, thank you, everyone, and thanks for joining the call. To everyone on team Carvana, let's really take advantage of the opportunity. We've talked about it a lot internally, but this is an opportunity that we have. And if we take advantage of it, we're going to look back on it very fondly. And I think there's a huge chance that we can make this into a big positive. So let's do that. I appreciate everything you guys do. Appreciate you taking the time to listen to the call, and we'll talk to you again next quarter. Thanks.

**Operator**
The conference has now concluded. Thank you for attending today's presentation. You may now disconnect.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

**Exhibit 24**





# LETTER TO **SHAREHOLDERS**

## Q1 | 2022







CARVANA

APRIL 20, 2022





Dear Shareholders,

The first quarter was a challenging quarter for Carvana. While we continued to increase market share rapidly and continued laying the operational, technical, and cultural foundations to buy and sell millions of cars, several external and internal factors impacted our financial results.

Some of these impacted the used vehicle industry as a whole (e.g., Omicron, used vehicle prices, interest rates, other macro factors), and others were more specific to Carvana (e.g., reconditioning and logistics network disruptions).

The impact of these factors on retail unit sold volume was the primary driver of our results in Q1.

We generally prepare for sales volume 6-12 months in advance, meaning we built capacity in most of our business functions for significantly more volume than we fulfilled in Q1. With our costs relatively fixed in the short-term, the lower retail unit volume led to higher cost of goods sold per unit (e.g., reconditioning and inbound transport costs), leading to lower GPU, and higher SG&A per unit. These effects combined with rapidly rising interest rates and widening credit spreads led to lower EBITDA margin.

The sales results of other used vehicle dealers suggest Carvana is gaining meaningful market share in a difficult industry environment, despite operational constraints. In general, we believe the used vehicle market is a stable market that will average 40 million or more annual unit sales over time. We believe the factors currently impacting used vehicle industry sales are transitory, and we are well positioned to take advantage when the industry rebounds.

Our confidence in our growth trajectory is bolstered by the strong growth trends we are seeing in parts of the business that are less impacted by used vehicle affordability. Retail units sold to Carvana finance platform customers with a FICO score greater than 700 increased by ~50% YoY in Q1, despite the aforementioned industry headwinds and operational constraints.

In the long-term, our expectations are unchanged, and our enthusiasm is as high as ever. All the fundamentals that powered us forward over the last 9 years remain the same. Our customers love our offering, and we love building and relentlessly improving it for them.

We remain firmly on the path to changing the way people buy and sell cars and to becoming the largest and most profitable automotive retailer.

## Summary of Q1 2022 Results

Q1 2022 Financial Results: All financial comparisons stated below are versus Q1 2021, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 105,185 an increase of 14%
- Revenue totaled $3.497 billion, an increase of 56%
- Total gross profit was $298 million, a decrease of 12%
- Total gross profit per unit was $2,833 (incl. $76 gift impact), a decrease of $823
- Net loss was $506 million, an increase from $82 million
- EBITDA margin was (11.6%), a decrease from (1.3%)
  - EBITDA margin includes a (0.8%) impact from Ernie's 1MM Unit Milestone Gift to employees
- Basic and diluted net loss, per Class A share was $2.89 based on 90.1 million shares of Class A common stock outstanding

<u>Other Results and Recent Events</u>:

- On February 24th, 2022, we announced an agreement to acquire the ADESA U.S. Physical Auction business from KAR Global for $2.2 billion. The transaction is expected to close in May 2022.
- In Q1 2022, we opened our 15th, 16th, and 17th inspection and reconditioning centers (IRCs) near Cincinnati, OH, Oklahoma City, OK, and San Antonio, TX.

## Ernie's 1 Million Unit Milestone Gift to Carvana Employees

In January 2022, in recognition of Carvana selling its 1 millionth vehicle in Q4, CEO Ernie Garcia committed to giving current employees 23 shares of his personal stock once they reach their two-year employment anniversary, a gift worth over $100 million at the announcement's stock price. Similar to the 2018 100k Milestone Gift, Ernie wanted to recognize and reward all Carvana team members who have contributed time, dedication, and effort to helping Carvana reach these monumental achievements.

Because this gift is Ernie's personal stock, it does not have a dilutive effect on existing shareholders. However, in accordance with U.S. GAAP the gift will be recorded as share-based compensation expense in our consolidated statement of operations. As a result, the gift had a ~$28 million impact on EBITDA in Q1 2022, and we expect it to have a ~$30 million impact on EBITDA in aggregate in the remaining three quarters of FY 2022.[1]

---

[1] For additional information, please see the 1 Million Milestone Gift materials posted on our investor relations website.

## Outlook

While we faced a uniquely difficult environment in the first quarter, we are already seeing positive trends across our key metrics.

In light of the current industry trends impacting customer affordability, high used vehicle prices, rapid movements in interest rates, rapid increases in fuel prices, and other macroeconomic uncertainty impacting the used vehicle market, at this time we are no longer providing specific numeric near-term guidance for the remainder of the year.

As we look forward, we expect to see the following trends:

- We expect to continue to gain significant market share in 2022 through continued growth in retail units and revenue.

- As discussed above, we generally prepare for sales volume 6-12 months in advance, meaning we built capacity in most of our business functions for significantly more volume than we fulfilled in Q1. Over the next several quarters, we expect to better align sales with expense levels through a combination of higher sales and expense efficiencies.

- We expect to continue to improve the efficiency of our logistics network over the next several quarters, speeding delivery times, reducing rescheduling and cancellation rates, and enabling broader inventory selection through increased inventory visibility.

- On GPU, we expect retail cost of goods sold per unit to return to more normalized levels over the next several quarters as we move further away from Omicron and logistics network disruptions.

- We also expect the spreads between loan origination interest rates and benchmark interest rates to return to more normalized levels as we move further away from the rapid increases in Q4 and Q1 and due to changes to our pricing cadence and hedging policy.

- As a result of all of the above, we expect meaningful sequential improvement in Q2 vs. Q1 in retail units sold, revenue, total GPU, SG&A per retail unit sold, and EBITDA margin.

In our last shareholder letter, we provided an expectation that we would achieve over $4,000 GPU and approximately EBITDA breakeven in the last three quarters of 2022 taken in aggregate. We now expect a return to over $4,000 GPU and positive EBITDA to be pushed back a few quarters and then to resume our march to our long-term financial model.

This outlook excludes any impacts from our acquisition of ADESA's U.S. physical auction business.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

## Update on Acquisition of ADESA U.S.

We are on track to close our acquisition of ADESA U.S. in May 2022 and excited about the role that ADESA U.S. will play in our path toward our long-term goals. Our rationale for the acquisition is threefold: (1) increase production capacity, (2) improve our logistics network, and (3) deepen our vertical integration.

### #1 Increase production capacity

The ADESA U.S. footprint includes 56 sites with approximately 6.5 million square feet of buildings on more than 4,000 acres. We expect to be able to build out approximately 2 million units of annual reconditioning capacity in these locations while still operating the wholesale auction business. This is the equivalent of approximately 30 greenfield Carvana IRC locations in terms of production volume that we expect to unlock over time.

In addition, the ADESA U.S. locations currently have facilities capable of producing more than 200k cars per year, which will enable us to get meaningful production volume out of these locations more quickly without the need for additional real estate improvements.

### #2 Improve our logistics network

Adding the ADESA U.S. footprint will dramatically improve our logistics network over time. With the addition of these locations, we will eventually have reconditioned, front-line inventory within 50 miles of 58% of the US population and will be within 200 miles of 94%.

This will have the benefit of reducing shipping distances, times, and costs, accelerating us to our long-term financial model. In fact, we estimate that sales that we complete today to customers within 200 miles of the IRC where their car is stored cost us $750 less in COGS and SG&A than our average sale. In addition, adding the ADESA U.S. locations will make our network more resilient and more robust to weather disruptions by having more routes connecting origin and destination points.

In addition, it unlocks the opportunity for same day and next day delivery to more customers than ever before.

### #3 Deepen our vertical integration

As we have discussed in the past, the entire used car market and all the institutions that comprise it exist to help customers switch cars with one another. The more of this market that we can participate in and the more we can integrate those various functions, the more cost we can remove from the system and the simpler we can make experiences for all of our customers, both consumers and other buyers and sellers.

The most immediate and simplest of these benefits is the ability for us to more efficiently purchase cars directly from customers nationwide whether we plan to sell them ourselves or not. Today we frequently have our last mile delivery advocates pick these cars up from customer's homes and transport them to a market hub and then transport these cars long distances from their origin to our nearest IRC where they are either reconditioned or held until they are wholesaled. With this acquisition, we can now position advocates at the auction locations and transport cars from our customer's driveways directly to an ADESA U.S. location without any additional moves.

We expect there to be additional opportunities to reduce costs and improve the economics and experience of buying and selling cars for all of our customers over time.

Overall, we expect the acquisition of ADESA U.S. to accelerate the positive feedback that exists in our business. Demand enables us to invest in more inspection center capacity to drive more selection, and more inspection center locations reduce delivery times and costs. Finally, more selection, faster delivery times, and lower costs drive more demand starting the cycle over again.

For additional details on ADESA U.S., please see: https://investors.carvana.com/investor-resources/investor-materials



## Expansion

We continued making significant progress scaling our production capacity in Q1 2022. We opened our 15th, 16th and 17th IRCs in Cincinnati, OH, Oklahoma City, OK and San Antonio, TX, respectively, increasing total annual capacity at full utilization to approximately 1 million units at quarter-end.

Prior to the ADESA U.S. acquisition, we planned to open 8 new Carvana IRCs in 2021. We opened 1 in Q4 2021 and 3 in Q1 2022. We also plan to open 3 more in 2022, bringing our total to 7 out of 8. Following the acquisition of ADESA U.S., we have paused the construction of the remaining planned IRC to allow us to focus on integrating ADESA U.S. locations into our reconditioning and logistics network.

ADESA U.S.'s 56 locations currently have the physical capacity to produce more than 200k units per year when fully staffed with limited real estate improvements. Combining our own IRCs with ADESA U.S. locations, we expect total annual capacity at full utilization to be approximately 1.4 million units by the end of 2022.

Looking beyond 2022, we expect to focus our expansion efforts on developing ADESA U.S. sites on the path toward fully unlocking approximately 2M units of incremental annual production capacity at full utilization, as well as improving our logistics network and reducing delivery times and costs.



## ANNUAL PRODUCTION CAPACITY AT FULL UTILIZATION (000s)

## CARVANA MARKETS, VENDING MACHINES, AND IRCs



## ADESA SITES

*As of April 20, 2022

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: https://investors.carvana.com/investor-resources/investor-materials

## Management Objectives

Our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

## LONG TERM FINANCIAL GOALS

|  | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | Q1 2022 | Long Term Target |
|---|---|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 42% | 129% | 56% | – |
| Gross Margin | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15.1% | 8.5% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 3.7% | 4.4% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 11.3% | 15.3% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 0.8% | 1.1% | 0.5 – 1.0% |
| SG&A Total as % of Revenue | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 15.9% | 20.8% | 6 – 8% |
| Net Income (loss) Margin | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% | (14.5)% | – |
| EBITDA Margin | (23.2%) | (16.9%) | (10.5%) | (6.2%) | (4.6%) | (0.0)% | (11.6)% | 8 – 13.5% |

8

## Objective #1: Grow Retail Units and Revenue

Retail units sold in Q1 increased to 105,185, up 14% from 92,457 in Q1 2021. Q1 revenue grew to $3.497 billion, up 56% from $2.245 billion. Revenue grew faster than retail units due to higher used vehicle prices and higher wholesale volume from buying more cars from customers.

Our growth rate in Q1 was negatively impacted by several external and internal factors.

- High used vehicle prices had a significant impact on industry-wide used vehicle sales, since higher prices reduce affordability, leading some buyers to forgo or delay their purchases.

- Rapid increases in benchmark interest rates continued throughout the quarter, placing further pressure on affordability for customers.

- Increases in gasoline prices, continued higher economy-wide inflation, and dampening of consumer sentiment further impacted used vehicle buyers.

- Omicron and severe weather events caused significant and persistent disruptions in our logistics network. These disruptions created a backlog of network constraints that lasted longer than expected and had more significant impacts than expected. Logistics network constraints impacted volume through several channels:

  o Extended delivery times, which negatively impacts conversion to sale.

  o Elevated delivery rescheduling and cancellation rates, which led to many cases in which we lost and were unable to recover customers who had their delivery times pushed to a later date.

  o The need to meter inventory visibility in search results due to constraints along shipping routes, which negatively impacts conversion due to lower available selection.

In Q1 we grew retail units sold by 14%, despite negative impacts from both external and internal factors. Precisely quantifying the impact of the external factors (e.g., high used vehicle prices, rising interest rates, rising gas prices and inflation) is difficult, but we can approximate them by looking at populations of customers that are less impacted by affordability. For our customers with FICO scores over 700, growth was approximately 50% in Q1. These customers were also impacted by our operational constraints. Quantifying the impact of internal constraints is also difficult, but we believe they further significantly reduced sales in the first quarter. We continue to work on relieving these constraints.



**QUARTERLY RETAIL UNIT SALES**

## Objective #2: Increase Total Gross Profit Per Unit

Q1 2022 was impacted by a variety of factors that joined together to create an outlier quarter on Total GPU.

- Total
  - Total GPU was $2,833 (incl. $76 gift impact; $2,909 excl. gift impact) vs. $3,656 in Q1 2021
- Retail
  - Retail GPU was $808 (incl. $76 gift impact; $884 excl. gift impact) vs. $1,211 in Q1 2021
  - The spread of Omicron, severe weather events, and related inefficiencies had a significant impact on Retail GPU in Q1. In particular, in Q1 2022 we saw:
    - A more than $600 per retail unit YoY increase in reconditioning and inbound transport costs primarily due to inefficiencies in the inspection and reconditioning centers and logistics network driven by Omicron, severe weather events, and the extended timelines required to recover from these events and to lower retail unit sold volume, which increased per unit costs.
    - A more than $100 per retail unit YoY decrease in shipping revenue driven by refunds to customers following extended delivery times.
    - These impacts were partially offset by gains in buying cars from customers.
  - We believe the factors impacting Q1 were transitory, and we expect to see costs move toward more normalized levels over the coming quarters as our logistics network normalizes and our expense levels are better balanced with sales volumes.
- Wholesale
  - Wholesale GPU was $219 vs. $227 in Q1 2021
  - Year-over-year changes in wholesale GPU were due to wholesale volume growth (units +93% YoY to 50,280), offset by a decrease in gross profit per wholesale unit sold to $457 from $806 in Q1 2021 due to higher wholesale market depreciation and higher inbound transport costs on wholesale units sold due to the factors described above.
- Other
  - Other GPU was $1,806 vs. $2,218 in Q1 2021
  - Year-over-year changes in Other GPU were primarily driven by higher benchmark interest rates at time of loan sale relative to origination interest rates and widening of credit spreads following the onset of the conflict between Russia and Ukraine, partially offset by the impact of higher industry-wide vehicle prices on average loan size.
    - Looking sequentially, the rapid rise in benchmark interest rates and widening credit spreads had a significant impact on the spread between funding costs and origination interest rates in Q1 vs. Q4. This increase in spread had a more than $600 impact on Other GPU in Q1. We expect this spread to move toward more normalized levels over the coming quarters.
    - Importantly, we believe Other GPU is impacted more by rapid changes in rates than the level of rates. The rise in benchmark interest rates in Q4 through Q1 was the largest and fastest we have seen in nearly 15 years, since mid-2008. We have made several changes that we expect to dampen the impact of future movements in benchmark interest rates. First, we have passed through a large portion of recent funding cost increases into origination APRs. Second, we have updated our pricing cadence to update APRs more quickly in response to rapid changes in benchmark interest rates. Third, we have increased our hedging of benchmark interest rate risk on originated loans. We are already seeing these changes impact loans originated in April, with the spread between originated APRs and benchmark interest rates meaningfully higher in April than in Q1.

## FIRST QUARTER TOTAL GROSS PROFIT PER UNIT



## Objective #3: Demonstrate Operating Leverage

The same factors that impacted retail units sold and total GPU in Q1 2022 also impacted SG&A as a percent of revenue, net loss margin, and EBITDA margin. Net loss margin increased by 10.8%, and EBITDA margin loss increased by 10.2% each driven by lower retail unit growth relative to expense growth and lower total GPU.

The same factors that impacted retail units sold (e.g., Omicron, severe weather events, logistics network constraints, high used vehicle prices, rising interest rates, other macro factors) had a significant impact on SG&A per retail unit sold in Q1. We generally prepare for sales volume 6-12 months in advance, meaning we built capacity in each of our business functions for significantly more volume than we fulfilled in Q1. With our costs relatively fixed in the short-term, the lower retail unit volume led to higher SG&A per unit.

Total SG&A as a percentage of revenue in Q1 increased by 3.1%, compensation and benefits increased by 1.7%, advertising was flat, logistics and market occupancy increased by 0.3%, and other SG&A increased by 1.1%.

Over the next several quarters, we expect to better align sales with expense levels through a combination of higher sales and expense efficiencies. We expect this to lead to a meaningful sequential decrease in SG&A per retail unit sold and improvement in EBITDA margin in Q2.



## Summary

The first quarter was challenging.

As we have before, we will adjust to the new environment while also keeping our eyes on our long-term goals.

Difficult environments sharpen us. They reveal our weaknesses and force new perspectives. In that way, they present new opportunities. This environment is no different. It is an opportunity.

While the quarter was undoubtedly a step backwards in our financial results, we will work hard to make it the marker of an even larger step forward in achieving our goal of becoming the largest and most profitable automotive retailer.

The march continues.


Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

13

## Appendix

*Conference Call Details*

Carvana will host a conference call today, April 20, 2022, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until April 27, 2022, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 8325992#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2021.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 247 | $ 403 |
| Restricted cash | 295 | 233 |
| Accounts receivable, net | 208 | 206 |
| Finance receivables held for sale, net | 393 | 356 |
| Vehicle inventory | 3,304 | 3,149 |
| Beneficial interests in securitizations | 416 | 382 |
| Other current assets, including $8 and $12, respectively, due from related parties | 207 | 163 |
| Total current assets | 5,070 | 4,892 |
| Property and equipment, net | 1,856 | 1,560 |
| Operating lease right-of-use assets, including $16 and $17, respectively, from leases with related parties | 475 | 369 |
| Intangible assets, net | 4 | 4 |
| Goodwill | 9 | 9 |
| Other assets, including $4 and $7, respectively, due from related parties | 171 | 181 |
| Total assets | $ 7,585 | $ 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $28 and $27, respectively, due to related parties | $ 748 | $ 656 |
| Short-term revolving facilities | 2,786 | 2,053 |
| Current portion of long-term debt | 178 | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | 29 | 29 |
| Total current liabilities | 3,741 | 2,890 |
| Long-term debt, excluding current portion | 3,286 | 3,208 |
| Operating lease liabilities, excluding current portion, including $12 and $13, respectively, from leases with related parties | 474 | 361 |
| Other liabilities | 32 | 31 |
| Total liabilities | 7,533 | 6,490 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2022 and December 31, 2021 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 90,062 and 89,930 shares issued and outstanding as of March 31, 2022 and December 31, 2021, respectively | — | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of March 31, 2022 and December 31, 2021 | — | — |
| Additional paid-in capital | 829 | 795 |
| Accumulated deficit | (749) | (489) |
| Total stockholders' equity attributable to Carvana Co. | 80 | 306 |
| Non-controlling interests | (28) | 219 |
| Total stockholders' equity | 52 | 525 |
| Total liabilities & stockholders' equity | $ 7,585 | $ 7,015 |

15

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Sales and operating revenues:** | | |
| Used vehicle sales, net | $    2,732 | $    1,800 |
| Wholesale vehicle sales, including $14 and $6, respectively, from related parties | 575 | 240 |
| Other sales and revenues, including $48 and $42, respectively, from related parties | 190 | 205 |
| **Net sales and operating revenues** | 3,497 | 2,245 |
| Cost of sales, including $9 and $1, respectively, to related parties | 3,199 | 1,907 |
| **Gross profit** | 298 | 338 |
| Selling, general and administrative expenses, including $6 and $6, respectively, to related parties | 727 | 397 |
| Interest expense | 64 | 30 |
| Other expense (income), net | 13 | (7) |
| **Net loss before income taxes** | (506) | (82) |
| Income tax provision | — | — |
| **Net loss** | (506) | (82) |
| Net loss attributable to non-controlling interests | (246) | (46) |
| **Net loss attributable to Carvana Co.** | $    (260) | $    (36) |
| Net loss per share of Class A common stock, basic and diluted | $    (2.89) | $    (0.46) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 90,095 | 78,103 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

16

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (506) | $ (82) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 37 | 22 |
| Equity-based compensation expense | 28 | 8 |
| Loss on disposal of property and equipment | 1 | — |
| Provision for bad debt and valuation allowance | 5 | 1 |
| Amortization and write-off of debt issuance costs and bond premium | 6 | 2 |
| Unrealized loss on warrants to acquire Root Class A common stock | 5 | — |
| Unrealized (gain) loss on beneficial interests in securitization | 10 | (2) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (1,985) | (1,427) |
| Proceeds from sale of finance receivables, net | 1,906 | 1,368 |
| Gain on loan sales | (105) | (138) |
| Principal payments received on finance receivables held for sale | 61 | 32 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | (133) | (397) |
| Accounts receivable | (5) | (41) |
| Other assets | (43) | (29) |
| Accounts payable and accrued liabilities | 117 | 151 |
| Operating lease right-of-use assets | (106) | — |
| Operating lease liabilities | 113 | — |
| Other liabilities | 1 | — |
| Net cash used in operating activities | (593) | (532) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (220) | (82) |
| Principal payments received on and proceeds from sale of  beneficial interests | 12 | 7 |
| Net cash used in investing activities | (208) | (75) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 5,231 | 2,064 |
| Payments on short-term revolving facilities | (4,498) | (1,981) |
| Proceeds from issuance of long-term debt | 20 | 640 |
| Payments on long-term debt | (36) | (14) |
| Payments of debt issuance costs | — | (7) |
| Proceeds from equity-based compensation plans | 2 | — |
| Tax withholdings related to restricted stock units and awards | (12) | (9) |
| Net cash provided by financing activities | 707 | 693 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | (94) | 86 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 542 | $ 415 |

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in thousands) | |
| Weighted-average shares of Class A common stock outstanding | 90,095 | 78,103 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 84,952 | 96,569 |
| | 175,047 | 174,672 |

18

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

*EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA Margin*

EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by U.S. GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. Adjusted EBITDA is defined as EBITDA plus other expense (income), net and other unusual items, as provided in the following table. EBITDA Margin is EBITDA as a percentage of total revenues. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. We use EBITDA and Adjusted EBITDA to measure the operating performance of our business and EBITDA Margin and Adjusted EBITDA Margin to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA and Adjusted EBITDA to net loss, which is the most directly comparable U.S. GAAP measure, and calculation of EBITDA Margin and Adjusted EBITDA Margin is as follows:

| (dollars in millions) | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 |
| Net (loss) income | $ (82) | $ 45 | $ (68) | $ (182) | $ (506) |
| Depreciation and amortization expense | 22 | 24 | 26 | 33 | 37 |
| Interest expense | 30 | 43 | 48 | 55 | 64 |
| Income tax provision | — | — | — | 1 | — |
| EBITDA | $ (30) | $ 112 | $ 6 | $ (93) | $ (405) |
| | | | | | |
| Total revenues | $ 2,245 | $ 3,336 | $ 3,480 | $ 3,753 | $ 3,497 |
| Net (loss) income margin | (3.7)% | 1.3 % | (2.0)% | (4.8)% | (14.5)% |
| EBITDA Margin | (1.3)% | 3.4 % | 0.2 % | (2.5)% | (11.6)% |
| | | | | | |
| EBITDA | $ (30) | $ 112 | $ 6 | $ (93) | $ (405) |
| Other expense (income), net | (7) | (6) | (3) | 22 | 13 |
| CEO Milestone Gift in cost of sales | — | — | — | — | 8 |
| CEO Milestone Gift in SG&A | — | — | — | — | 20 |
| Adjusted EBITDA | $ (37) | $ 106 | $ 3 | $ (71) | $ (364) |
| | | | | | |
| Total revenues | $ 2,245 | $ 3,336 | $ 3,480 | $ 3,753 | $ 3,497 |
| Adjusted EBITDA Margin | (1.6)% | 3.2 % | 0.1 % | (1.9)% | (10.4)% |

19

| (dollars in millions) | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Net loss | $ (37) | $ (93) | $ (164) | $ (255) | $ (365) | $ (462) | $ (287) |
| Depreciation and amortization expense | 3 | 5 | 12 | 24 | 41 | 74 | 105 |
| Interest expense | 1 | 3 | 7 | 25 | 81 | 131 | 176 |
| Income tax provision | — | — | — | — | — | — | 1 |
| EBITDA | $ (33) | $ (85) | $ (145) | $ (206) | $ (243) | $ (257) | $ (5) |
| | | | | | | | |
| Total revenues | $ 130 | $ 365 | $ 859 | $ 1,955 | $ 3,940 | $ 5,587 | $ 12,814 |
| Net loss margin | (28.2)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% |
| EBITDA Margin | (25.0)% | (23.2)% | (16.9)% | (10.5)% | (6.2)% | (4.6)% | (0.0)% |
| | | | | | | | |
| EBITDA | $ (33) | $ (85) | $ (145) | $ (206) | $ (243) | $ (257) | $ (5) |
| Other expense (income), net | — | — | 1 | 1 | 4 | (1) | 6 |
| CEO Milestone Gift in cost of sales | — | — | — | 4 | 5 | 1 | — |
| CEO Milestone Gift in SG&A | — | — | — | 8 | 8 | — | — |
| Adjusted EBITDA | (33) | (85) | (144) | (193) | (226) | (257) | 1 |
| | | | | | | | |
| Total revenues | $ 130 | $ 365 | $ 859 | $ 1,955 | $ 3,940 | $ 5,587 | $ 12,814 |
| Adjusted EBITDA Margin | (25.0)% | (23.2)% | (16.8)% | (9.9)% | (5.7)% | (4.6)% | 0.0 % |

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | **2021** | **Change** |
| | **(in millions, except unit and per unit amounts)** | | | |
| **Net sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ | 2,732 | $ | 1,800 | 51.8 % |
| Wholesale vehicle sales [1] | | 575 | | 240 | 139.6 % |
| Other sales and revenues [2] | | 190 | | 205 | (7.3)% |
| Total net sales and operating revenues | $ | 3,497 | $ | 2,245 | 55.8 % |
| **Gross profit:** | | | | |
| Used vehicle gross profit | $ | 85 | $ | 112 | (24.1)% |
| Wholesale vehicle gross profit [1] | | 23 | | 21 | 9.5 % |
| Other gross profit [2] | | 190 | | 205 | (7.3)% |
| Total gross profit [3] | $ | 298 | $ | 338 | (11.8)% |
| **Unit sales information:** | | | | |
| Used vehicle unit sales | | 105,185 | | 92,457 | 13.8 % |
| Wholesale vehicle unit sales | | 50,280 | | 26,040 | 93.1 % |
| **Per unit selling prices:** | | | | |
| Used vehicles | $ | 25,973 | $ | 19,469 | 33.4 % |
| Wholesale vehicles | $ | 11,436 | $ | 9,217 | 24.1 % |
| **Per retail unit gross profit:** | | | | |
| Used vehicle gross profit | $ | 808 | $ | 1,211 | (33.3)% |
| Wholesale vehicle gross profit | | 219 | | 227 | (3.7)% |
| Other gross profit | | 1,806 | | 2,218 | (18.6)% |
| Total gross profit [3] | $ | 2,833 | $ | 3,656 | (22.5)% |
| **Per wholesale unit gross profit:** | | | | |
| Wholesale vehicle gross profit | $ | 457 | $ | 806 | (43.2)% |

_____

(1) Includes $14 and $6, respectively, of wholesale revenue from related parties.

(2) Includes $48 and $42, respectively, of other sales and revenues from related parties.

(3) For the three months ended March 31, 2022, we recognized $8 million of share-based compensation expense within used vehicle gross profit related to the CEO Milestone Gift. The corresponding impact to used vehicle per unit gross profit was $76 for the three months ended March 31, 2022.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 |
| | (in millions) | | | | |
| Compensation and benefits [1] | $ 126 | $ 148 | $ 181 | $ 212 | $ 236 |
| CEO Milestone Gift [2] | — | — | — | — | 20 |
| Advertising | 100 | 119 | 126 | 134 | 155 |
| Market occupancy [3] | 13 | 15 | 18 | 24 | 23 |
| Logistics [4] | 30 | 34 | 40 | 44 | 56 |
| Other [5] | 128 | 154 | 181 | 206 | 237 |
| Total | $ 397 | $ 470 | $ 546 | $ 620 | $ 727 |

_____

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the CEO's gift of personal stock to employees upon the company's one millionth vehicle sold, except those costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

We had the following liquidity resources available as of March 31, 2022 and 2021:

| | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|
| | (in millions) | | |
| Cash and cash equivalents | $ 247 | $ | 403 |
| Availability under short-term revolving facilities [1] | 483 | | 438 |
| **Committed liquidity resources available** | **$ 730** | **$** | **841** |
| Unpledged vehicle inventory not included above[2] | 1 | | 665 |
| Unpledged real estate not included above[3] | 824 | | 677 |
| Unpledged beneficial interests in securitizations[4] | 152 | | 100 |
| **Total liquidity resources[5]** | **$ 1,707** | **$** | **2,283** |

---

1. Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date, excluding the impact to restricted cash requirements. This is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

2. Unpledged vehicle inventory is the value of vehicle inventory on our balance sheet on the period end date beyond that covered by committed financing agreements. On February 1, 2022, we upsized our vehicle inventory floor plan commitment to $3.0 billion.

3. Unpledged real estate assets include IRC and vending machine real estate assets that have not been previously pledged or sold. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

4. Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

5. Total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities on our balance sheet that can be financed using traditional asset-based financing sources. To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

23







# CARVANA
## CULTURE

# Q1 | 2022

**Exhibit 25**

**S&P Global**
Market Intelligence

# Carvana Co. NYSE:CVNA
# FQ2 2022 Earnings Call Transcripts

## Thursday, August 04, 2022 9:30 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ1 2022- | -FQ2 2022- | -FY 2022- | -FY 2023- |
|---|---|---|---|---|
|  | CONSENSUS | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | (1.58) | (1.98) | (7.76) | (4.34) |
| **Revenue  (mm)** | 3371.35 | 3993.82 | 16003.38 | 19961.21 |

Currency: USD
Consensus as of  Aug-02-2022 10:48 PM GMT



| - EPS NORMALIZED - | | | |
|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE |
| **FQ2 2021** | (0.39) | 0.26 | NM |
| **FQ3 2021** | (0.30) | (0.38) | NM |
| **FQ4 2021** | (0.82) | (1.02) | NM |
| **FQ1 2022** | (1.58) | (2.89) | NM |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ............................................................................... | **3** |
| **Presentation** | ............................................................................... | **4** |
| **Question and Answer** | ............................................................................... | **8** |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

**Mark Jenkins**
*Chief Financial Officer*

**Michael Louis Levin**
*Vice President of Investor Relations*

**ANALYSTS**

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research Division*

**Colin Alan Sebastian**
*Robert W. Baird & Co. Incorporated, Research Division*

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

**Nicholas Freeman Jones**
*JMP Securities LLC, Research Division*

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Hello, and welcome to the Carvana Second Quarter 2022 Earnings Conference Call. [Operator Instructions]

Please note, this event is being recorded. I would now like to turn the conference over to Mike Levin, Vice President of Investor Relations. Please go ahead.

**Michael Louis Levin**
*Vice President of Investor Relations*

Thank you, MJ. Good afternoon, ladies and gentlemen, and thank you for joining us on Carvana's Second Quarter 2022 Earnings Conference Call. Please note that this call will be simultaneously webcast on the Investor Relations section of the company's corporate website at investors.carvana.com. The second quarter shareholder letter is also posted on the IR website. Also, we posted a set of supplemental financial tables for Q2 to assist investors in understanding the moving pieces this quarter with the consolidation of ADESA, and we've updated our operating plan deck to reflect the addition of ADESA. Both can be found on the Events & Presentations page of our IR website.

Joining me on the call today are Ernie Garcia, Chief Executive Officer; and Mark Jenkins, Chief Financial Officer.

Before we start, I would like to remind you that the following discussion contains forward-looking statements within the meaning of the federal securities laws, including, but not limited to, Carvana's market opportunities and future financial results that involve risks and uncertainties that may cause actual results to differ materially from those discussed here. A detailed discussion of the material factors that cause actual results to differ from forward-looking statements can be found in the Risk Factors section of Carvana's most recent Form 10-K and Form 10-Q for the first quarter of 2022. The forward-looking statements and risks in this conference call are based on current expectations as of today, and Carvana assumes no obligation to update or revise them whether as a result of new developments or otherwise. Unless otherwise noted on call, all comparisons are on a year-over-year basis.

Our commentary today will include non-GAAP financial measures. Reconciliations between GAAP and non-GAAP metrics for our reported results can be found in our shareholder letter issued today, a copy of which can be found on our Investor Relations website.

And now with that said, I'd like to turn the call over to Ernie Garcia. Ernie?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Thanks, Mike, and thanks all for joining the call. The second quarter was probably the most dynamic quarter we've had at Carvana. We shifted our priorities for the first time in company history to favor efficiency and cash flow in recognition of the changes to the market and the economic landscape as well as to enable us to quickly adjust to changes in our industry that had caused our expenses to be out of balance with sales volumes. We also completed our acquisition of ADESA in a transaction that we believe will be transformative over time.

First, I want to hit our change in priorities to favor efficiency in cash flow. We began to make the biggest changes inside the company in May. These changes have been significant. They've resulted in prioritization shifts across every group in the business. They've resulted in the creation of new processes to increase focus and drive progress on these priorities. While it is early in the execution of our plan, this is going very well so far.

At Carvana, we've always said high standards for ourselves. And I think it's one of the reasons we've been pretty successful so far. In the long run, the ability to keep pressure on ourselves is probably one of

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the greatest differentiators in how groups of people perform, but there's no substitute for the focus and motivation provided by market and economic disruption.

Everyone feels it and difficulty reveals people. What is revealing about the people of Carvana is something I already knew and something I can't thank them all enough for. The people of Carvana Care and they don't shy away from a challenge. They are fighters. The people of Carvana are focused in making faster progress than we have made at any point in our history. They're working hard, but they're finding the fun in it, and they're making change they're proud of. And as a result, we are rolling out new capabilities, products and processes at an incredible rate. Our plan is to continue until we reach our goals.

This drove a lot of progress in the quarter in a short period of time. We grew units sequentially by over 10% and reduced total SG&A by 5% at the same time, causing us to drive cash SG&A down per unit by $850 in the quarter to $5,400. We've set a stretch goal to hit $4,000 cash SG&A per unit in the fourth quarter, excluding impacts from ADESA. This is going to be a hard mark to hit, but so far, we're on the path. From there, we will continue to our midterm goal of $3,000 per unit. We will keep pushing.

We also drove up GPU by $500 in the quarter to $3,400. We provided some bridges back to $4,500 and beyond in our shareholder letter. The biggest thing separating us from climbing back to that level is execution. We'll be pushing here as well.

Now turning to the ADESA acquisition. We are excited about joining forces with ADESA when we completed the deal. Now that we've begun working with the team, we are more excited. First, I want to give credit to the ADESA team. They've embraced us in a way that we couldn't have reasonably expected. They're a fun group of warm people who are enthusiastic about doing right by their customers and about finding ways to do even better. On a personal level, it has been fun to meet so many people inside the company to learn from them and to see how interested they are in learning from us.

Our alignment is leading to extremely fast progress on our integration. We already have over half the cars we buy from our customers that we plan to sell through the wholesale channel landing at 46 ADESA locations nationwide. We've already embedded market operations hubs at 18 ADESA sites. ADESA is already reconditioning over 500 cars a week in locations that complement our existing IRC footprint, primarily on the coast.

In addition, we have also already deepened our relationship with Hertz in ways we couldn't have without ADESA. Over time, we expect ADESA to dramatically increase the scale and customer proximity of our inspection center network. We expect it to strengthen and simplify our logistics capabilities and we expect to find cost savings and revenue opportunities that wouldn't be possible without our combined capabilities. We still have a long way to go to complete our integration, and this is another area where we will continue to push.

Now I'd like to turn to what we're thinking about the near term. We are going to maintain our current priorities for the foreseeable future to drive efficiencies that we believe serve our short- and long-term goals best in this environment. While we continue to expect to rapidly gain market share, our shift in focus means growth in units and revenue will be slower than it otherwise would be in the short term. We also don't know exactly what to expect from industry level sales in the near term in light of everything going on in the economy.

In July, for example, there was another industry-wide reduction in demand levels, which has impacted us as well. We have meaningful latent demand and several levers to drive growth, which we will begin to pull over time, but the speed that we pull those levers will be driven by the progress we are making in our higher priorities. In more difficult times, people tend to get more nearsighted. There are good reasons for this. There's value in dialing into important cost fundamentals to get less attention at easier times. And as you can see from our priorities, we are focusing more on fundamentals in this environment as well. That said, it's still important to maintain awareness of the mountain we are climbing.

Through a long-term lens, Q2 has the potential to be one of our greatest quarters. It serves as a catalyst to put more focus on driving efficiency. This was something we were going to do at some point anyway and the environment has provided pressure that we will use to make progress faster than we likely would

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

have otherwise. Our visibility to much higher volumes in high. On the demand side of the equation, we continue to take market share in this environment, and the market shares we have in our most mature cohorts provide a clear map to growing volume dramatically. In addition, previous periods of economic strain have accelerated consolidation in our industry.

On the supply side, the acquisition of ADESA is a game changer. Simply put, execution is all that separates us from millions of sales per year. From a GPU perspective, our bridge back to 2021 level is straightforward, and from there, opportunity remains. SG&A has been and remains our biggest opportunity. We have a clear plan. That plan is being aggressively executed against with concrete goals in every group of the company. And we have the historical performance we have seen in our more mature cohorts as proof points. We remain firmly on the path to achieving our mission of changing the way people buy cars and are becoming the largest and most profitable automotive retailer. The march continues. Mark?

**Mark Jenkins**
*Chief Financial Officer*

Thank you, Ernie, and thank you all for joining us today. We made significant progress in Q2 on many fronts. We closed our acquisition of ADESA. We set clear operating priorities focused on reducing SG&A expense and driving toward positive free cash flow. And we made significant sequential progress on our key metrics despite facing continued macro-related pressures and working through internal constraints.

In Q2, retail units sold totaled 117,564, an increase of 9%. We gained significant market share in Q2 despite the impact of high used vehicle prices, rising interest rates, and other economy-wide factors on our industry. Total revenue in Q2 was $3.884 billion, an increase of 16%. Total revenue included $108 million from our acquisition of ADESA's wholesale marketplace, which closed on May 9. Total gross profit per unit in Q2 was $3,368, a decrease of $1,752 a year and an increase of $535 sequentially.

Due to the dynamic nature of the current environment, we will focus our more detailed commentary on sequential changes. Retail GPU was $1,131 in Q2 compared to $808 in Q1, a sequential increase of $323. Retail gross profit included a $51 per unit impact from Ernie's 1 million unit milestone gift to Carvana employees and a $34 per unit impact from our May reduction in force. Excluding these impacts, retail GPU in Q2 was $1,216 compared to $884 in Q1. Sequential changes in retail GPU were primarily driven by higher spreads between retail sales prices and acquisition prices. Retail reconditioning and inbound transport costs were similar in Q2 and Q1 as we primarily sold vehicles in Q2 that were reconditioned prior to our cost efficiency initiatives.

Wholesale GPU was $383 in Q2 compared to $219 in Q1, a sequential increase of $164. Sequential changes in wholesale GPU were primarily driven by a $43 impact from the ADESA wholesale marketplace, net of $128 of depreciation and amortization expense, as well as increased spreads between wholesale sales prices and acquisition prices.

Other GPU was $1,854 in Q2 compared to $1,806 in Q1. Sequential changes in other GPU were primarily driven by higher customer rates relative to benchmark interest rates, partially offset by wider credit spreads and a change in loan sales channel mix. Looking toward Q3, we expect to sell loans in the whole loan sales format, but will maintain flexibility to optimize our channel mix as the quarter progresses.

We made significant progress reducing SG&A per retail units sold in Q2 with SG&A per unit, excluding depreciation and amortization, share-based compensation and ADESA, declining by $942 compared to Q1. We expect to make continued progress on reducing SG&A expense in the coming quarters as we continue to focus on operating efficiency across all areas of the business.

Adjusted EBITDA margin in Q2 was minus 6.2% compared to minus 10.2% in Q1, an improvement of 4 percentage points. Adjusted EBITDA excludes impacts from Ernie's gift to personal stock to Carvana employees as well as other income and expense, which primarily includes changes in the fair value of securities, but it includes non-gift share-based compensation and expenses related to our May reduction in force.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Adjusted EBITDA also included a minus $2 million impact from the acquisition of ADESA, inclusive of $3 million of onetime expenses and the reallocation of $2 million of gross profit generated from Carvana business that was internalized following the acquisition. Following quarter end, we began implementing changes that we expect to positively impact EBITDA contribution from ADESA by approximately $7 million per quarter by later this year.

As a result of the way the teams have come together, all we have continued to learn about the ADESA business, the rapid progress we are making in integration and the long-term opportunity that exists between our 2 companies, we are as excited as ever about our acquisition of ADESA. On June 30, we had approximately $4.7 billion in total liquidity resources, including $2.7 billion in cash and revolving availability and $2.1 billion of unpledged real estate and other assets, including approximately $1 billion of real estate acquired with ADESA.

We also ended the quarter with approximately 1.2 million annual units of inspection and reconditioning center capacity at full utilization, giving us substantial infrastructure for future growth. This strong liquidity position, our significant production capacity runway and our clear and focused operating plan positions us well on our path to achieve our goals of driving positive cash flow and becoming the largest and most profitable auto retailer.

Thank you for your attention. We'll now take questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from Zack Fadem of Wells Fargo.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Ernie, at the current level of 8,000 to 9,000 cars per week, should we view this as a fair characterization of demand for your business today or more so a level that you're intentionally managing to as you shift the focus to profitability? And assuming it's the latter, can you talk about the level that units need to restep up to in order to achieve the stretch SG&A per unit goal in Q4?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So let's start with where units are. I think in the second quarter, we grew units by 9% at a time when the market was probably shrinking by around 15%, give or take. So when you look at that, I think we did continue to take market share. It's certainly at a slower rate than we historically have, but still at a pretty fast rate when you kind of really stop and take in. So I think that something to be happy with in light of the circumstances.

We have obviously changed our focus quite a bit, and that has real impacts. When you think about year-over-year growth rates a year ago, everyone across every group inside Carvana had their #1 priority just driving growth. Today, the #1 priority is driving efficiency. And that has all kinds of impacts. We talked about the logistics network, for example, in the shareholder letter that gives some examples, but there are examples like that everywhere else.

And so I think there's certainly some impacts that are happening when you think about it from a year-over-year basis. I think when you look at it sequentially, I think there's some impact there as well that take the same form in terms of the shift to focus. We decreased our marketing budget by about 15% quarter-over-quarter. That was certainly from elevated levels in Q1 that we're not interested in sustaining. But nonetheless, it's a 15% reduction in marketing spend quarter-over-quarter. That's going to have something impact all else constant.

We've also been purpose about managing our inventory down. So from peaks and more recent, we probably have around 20% fewer cars that are visible for our customers today than we had recently. Again, all else constant, that would put a bit of a headwind on growth.

So I think we're making the choice today that we think enable us to drive efficiency as quickly as we possibly can, and we think that's the right thing to do with the business, and we're making a lot of progress as a result. And that's the way that we're prioritizing things.

I think when we think about kind of what the opportunity is long term, I think, honestly, it's the exact same way we would have thought about it 6 months ago or 12 months ago. I don't think there's really anything different. We have years and years of history across hundreds of markets of continually gaining market penetration. I think extrapolating off, that's not super hard. And then even in this environment with a focus change, we continue to take market share.

So I think from a long-term perspective, we don't really look at it differently. And I think we're certainly reducing the speed at which we're growing today, given the shift in focus, but our hope and belief is that by getting more efficient, it makes it easier to grow faster in the future because you have kind of less work to do per sale. And so we'll hope to get that back over time at some point.

I think when we look to our goals, we -- there's kind of 2 ways that we can make progress toward $4,000 cash SG&A ex ADESA. I think one is just general progress in the business and driving more efficiency and one is certainly getting more units so we can kind of have more units to have our fixed cost flow over. And

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

I think both are very powerful. The first is probably sufficient to get to that goal. It's probably insufficient to get to that goal in the fourth quarter. So without growth, you'd probably expect that to push out further in time.

We don't want to, I think, specifically give thoughts on exactly what we expect the growth to be as we head through the next couple of quarters. But I think our expectation of stretching to get that $4,000 goal, it does have gains in both areas, but the primary focus is efficiency throughout the business.

**Zachary Robert Fadem**
*Wells Fargo Securities, LLC, Research Division*

Got it. That all makes sense. And in terms of your SG&A run rate in dollars, it looks like the primary step-down sequentially was pretty much all advertising. And as you look to Q3 and Q4, can you walk through how the reduction in force impacts the comp and benefits line and maybe pinpoint specifically how the SG&A dollar decline should trend from here, and then what the synergies from ADESA for the logistics or market occupancy lines, how those flow in as well?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So I'll hit that one. So I think our -- just as a starting point, we did see pretty meaningful SG&A dollar savings in Q2 relative to Q1. I do think those came across multiple buckets, including I think total payroll declined by -- on the order of $20 million. Advertising came down by on the order of $25 million, slightly less. Other SG&A also declined. So we did see declines across multiple buckets looking from Q1 to Q2. And I think that's due to all the things that we've talked about around looking to drive efficiencies. Certainly, the reduction in force impacted the payroll number.

And so -- but I do think we're seeing gains across multiple areas of the business. One number that stepped up from an SG&A spend perspective was logistics in Q2 relative to Q1. I think a big portion of that step-up was related to third-party transport services that we used in Q2 to work to clear certain backlogs out of the logistics network in areas that were particularly constrained. And so that's something -- that's an expense that we bore in Q2, but don't expect to bear to nearly the same degree in Q3. So that's one particular example.

As we're looking out over the rest of the year, we really do see opportunities across all areas of the business. They continue to drive SG&A efficiency. And so we will be looking to do that across the business. Some of the bigger buckets, I do think, continuing to match staffing levels to volume, I think would be one of the bigger ones there, but we do see many opportunities.

Overall, I would say, obviously, we're very pleased with our progress on SG&A per unit in Q2, bringing it down by on the order of $1,000 quarter-over-quarter. We're excited about the progress that we hope to be prepared.

**Operator**

The next question comes from Sharon Zackfia of William Blair.

**Sharon Zackfia**
*William Blair & Company L.L.C., Research Division*

A question on reconditioning and inbound transport. I know it was kind of similar in the second quarter to the first quarter. And there's obviously a timing lag here. But given the work you've done, where is that running now in terms of improvement? I'm assuming on cars reconditioned today and transported today is no longer a $600 delta. And then secondarily, I just wanted to, as you shifted focus as a company to cost, how have you changed like the incentive structure within the organization?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. I'll try to take those and then feel free to jump in if you'd like, Mark. So I think, first, with kind of COGS expenses, we really started to make a lot of these changes in the middle of May. And so that's obviously going to take some time to then flow all the way through to sales, which is when we'll see that in retail GPU. We're making a lot of progress in those underlying expenses just like we are in SG&A. And so those will show up over time. We expect to continue to make progress there.

And then the SG&A immediately as you get the progress, whereas the COGS benefit you make the progress and then you have kind of the time lag until you sell the car and then it flows through. So there's kind of is a delay there. And again, those kind of cost reductions really just started over the last 1.5 months.

In terms of focus inside the organization and kind of incentive structure, I would say, in many ways, it's similar. It's just the projects that we're kind of pulling off the wall are different, and they're cost-focused instead of being growth-focused. I think we have implemented a number of different processes that we're finding really efficient inside the company. not to dive into too much detail, but across every group in the company, we've got very clear projects. We're doing I think a better job than we have in the past narrowing our focus on those that are most likely to make the biggest impact the fastest. We've got every group meeting together on Monday and reporting the progress against expectations every single week. On Tuesday, we're getting all of our operational groups together and we go through how each group is performing relative to other groups internally. So we make sure that we can take full advantage of internal benchmarking. And then obviously, a lot of work is happening in the rest of the week as well.

And so I think really, it's more about the projects that we're pulling off the board. We've always had a lot of areas that we wanted to work on. It was just a question of what we prioritized. And so I think our priorities have changed. But I think we've also implemented some processes that have driven additional focus and attention and accountability and speed. And I really do think the results of that so far has been pretty great.

Yes, I think just -- it's hard to put this in a model, but we have a project that we rolled out, for example, in the last couple of days. And just kind of sitting in the room with the team is that was rolled out and there were people across many different offices on a Zoom call with 50 people going back and forth, talking about the statistics in real time of how this new product was working. It was really cool to see. And you could see on everyone's faces, there was just a lot of pride in what they had built that they had built it fast and rolled it out quickly.

And like I said, that's a hard thing to put in a model, but it's probably the most valuable thing over time because that just compounds over and over again. And I do think that, as we've gone through this change of focus, the people inside Carvana have done an unbelievable job embracing that, getting excited about it and then pushing very hard. And I think that the enthusiasm and speed of which we're getting things done is something that I'm extremely excited about and grateful to the team for.

**Operator**

The next question comes from Michael Montani of Evercore ISI.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

So first, I was just hoping if you could give some incremental color around the consumer in terms of maybe what you're seeing in demand trends for high income versus lower income. And then also if there's any impact in terms of credit availability and/or ASPs of the vehicles that you're selling, if there's kind of a noteworthy divergence in trend there for high versus low price tag units.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. I don't know if we have anything too interesting to share here versus what we've shared in the past or what you might expect. But I think in general, the trends are as you'd expect, that I think we're seeing higher incomes in general kind of fare a little bit better in this environment, higher FICOs in general fare a

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

little bit better in this environment. All else constant, that's leading to higher purchase prices. It's leading to differences in mix and attach rates for finance and products like that.

So I mean I think the impacts that we're seeing are probably those that you'd expect. I think from a credit perspective across automotive, I think in general, most finance companies continue to see pretty strong performance. I think there's been a slow drift back to more normalized 2019 levels off of kind of what was absolutely exceptional performance in 2020 and 2021. So I don't think there's anything too notable happening there just yet.

And so yes, I think the only other notable thing is this is a large ticket purchase. It's a purchase that is financed, it's discretionary. I think historically, it has oftentimes been a purchase that leads the economy. And then it also kind of uniquely, in this environment, it's driven by kind of the complexity of OEMs, global supply chains. This is probably one of the products that has inflated the most in terms of price relative to all other products in the economy.

And so it's probably an area that is felt relatively more stressed so far broadly. That's not great when you're looking at it in hindsight. But I think when you look at it from a forward lens, it's debatably good news because it's hard to say exactly what's going to come from the economy here. But if we start from a place to believing that the kind of auto industry has already taken a deeper stress than the rest of the economy, I think it means kind of any additional stresses from here and expectations should probably be less than any recovery from here and expectations should probably be more.

So I think we'll see how that all unfolds over time. We're certainly in a unique time where it's obviously impacting customers in lots of ways. But as I said, I don't think that it's anything unexpected for our customer versus other customers out there.

**Michael David Montani**
*Evercore ISI Institutional Equities, Research Division*

And then just in terms of pricing, just curious if you all have a view that we may see a flat or even decreasing retail pricing from here. And if we do see retail prices decrease into the back half of the year, does that make it harder to reach the GPU goals that you've set out? Or have you already kind of planned for that?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

So I think that's hard to say, but I do think -- let me give you first just a fact. I think we have seen depreciation kind of return to the market so far this year. So that is something that is occurring. Next is something of a mental model. It's not totally dissimilar to what we just discussed. But I think given that car prices have inflated more than other goods and services, it is probably likely that on average, they will depreciate faster in the future to kind of get back into alignment with their relationship with other goods and services. So I think that's a reasonable expectation.

I think whether or not that has an impact on retail GPU is a little bit less clear than you might because it's largely a function of what are dealer expectations. Historically, when there's more depreciation, you see a bigger spread between wholesale prices and retail prices because dealers are, in effect, kind of building in the expected depreciation into the price they pay for a car at the wholesale market. To the extent that occurs, you could see decreasing prices without noticeably decreasing retail GPUs.

To the extent the depreciation is unexpected, I think you could see decrease in GPUs as you go through that period. On average, you have seen kind of the former. You've seen basically flattish retail GPUs as car prices have decreased. And I do think that in the early depreciation we've seen so far, there's evidence that, that relationship remains. Even in our results from this quarter, you can see that we began to see higher spreads between the price that we paid for cars and the price we were able to receive for cars. And so I do think there's some evidence of that spread widening again. Obviously, that's -- we don't know exactly how that will play out, but that's how it's historically played out, and there is some evidence that's playing out that way now as well.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

The next question is from Chris Bottiglieri of Exane BNP Paribas.

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research Division*

I think you got to beat me to my first question a little bit there. But can you give us a sense like, obviously, the $600 didn't flow the room from the logistics and reconditioning. But you did see like, frankly, pretty good improvement sequentially in a retail GPU. And you seem to highlight market improvements there. Is that all just kind of would you cited a second ago on kind of move in to wholesale pricing? Or are there other factors that led you to kind of expand that retail GPU $400 sequentially?

**Mark Jenkins**
*Chief Financial Officer*

Sure. I'll take that one. I think we were very pleased with our retail GPU progress in the quarter, frankly, I think it was a nice step-up once adjusting for our reduction in force in Ernie's gift, $1,216 in the quarter, a meaningful step-up from Q1. And so I think we feel really good about that number in light of the fact that we still have -- I think that number includes very elevated reconditioning and inbound transport costs. And so I think we view that as a real positive.

I think what were some of the sequential drivers. So one simple one is about $100 of the sequential gain. We had lost about $100 of shipping revenue per unit in Q1 due to refunds driven by significant logistics network delays. We basically got that back in the second quarter. So that was part of the sequential bridge.

A second part of the sequential bridge is Q4 2021 was a really high time to be purchasing cars. And so as we moved away from Q4 '21, I think that had a positive impact on retail GPU, where in Q1, we were just selling more cars that were purchased in Q4 than we sold in Q2. And Q4 was a very high price time to be purchasing. So that was a favorable impact going from Q1 to Q2 as well.

And so I think those are the big impacts. I think -- yes, I think those were the primary impacts, yes, in Q2, and I think leaves us feeling in a pretty strong position in light of the opportunities that we still see on the cost side of GPU.

**Christopher James Bottiglieri**
*BNP Paribas Exane, Research Division*

Got you. That's really helpful. And then just an unrelated question. If I look at the ADESA financials, like the best I can tell, it looks like I take kind of like the $7 million improvement and kind of like double the quarter-to-date ADESA financials. It seems like you're probably running $13 million a quarter on ADESA profitability, which may be a tad below the $100 million you were targeting. And I know volumes declined sequentially. But -- so I guess my question is, with that long preamble is like, is this a good run rate for profitability until volumes improve? Or is there other reasons to be more positive on kind of profitability ramping ADESA near term?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So I think we try to provide some guidance in our deck, our operating plan deck of kind of around $100 million as being a good kind of ballpark estimate for where ADESA would be. I think we're clearly at a trough for kind of the auction business today. It's -- or I don't want to say necessarily precisely the trough. We're at a low point relative to recent history for the auction business.

For ADESA in 2019, they were at approximately 1.8 million units per year, which is obviously a very large number. They're on the order of 1 million shy of that today. I think there's plenty of room for the business to continue to improve from here. I think a reasonable way to think about how it might improve from here is to kind of look back to 2008 and what occurred back then.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

In 2008, the units dropped by actually a lesser amount because it wasn't really kind of a perfect storm for auctions like the last couple of years has been. And then it took about 5 years for all the volume to come back as the OEMs got their production back up after bankruptcy and everything else.

I think the fundamentals were not as severe. The technicals were more severe in the auction business kind of this time around. And so I think there's potential that the recovery could be faster, but I think it's hard to know exactly how quickly that will occur.

I think a good touristic for thinking about what flow-through looks like in that business is probably something on the order of $250 of kind of incremental EBITDA per unit is probably a reasonable way to think about it. And so I think when we look forward, we don't quite know if we're exactly at the trough for auctions, but I think there's lots of reasons to be somewhat optimistic. There are some indications that OEMs are starting to increase their production. Car prices are starting to dip a little bit, which makes it a little bit less likely that any given franchise dealer is going to keep every kind of off-lease car like they have been. OEMs are starting to sell more cars to rental car companies, which ran our companies are normally big sellers. I think there's room for finance companies to start selling more cars as well.

So I don't think we know exactly how that will play out, but I think over time, there's certainly room for volume to continue to come back and ADESA's built a great business with a lot of great customers. So they're well positioned when it does. And so I think there's room for it to certainly move materially beyond kind of what our kind of medium-term average expectation of $100 million that we put in that deck is.

So we still think that kind of on average, that's probably a reasonable way to think about what the earnings power of the business is. And then obviously, there's a ton of things that we're extremely excited about in terms of the way that we're working together. Our integration really is going very well. I know I said it in my prepared remarks, but we closed that transaction 2.5 months ago, and we have cars on the ground in 46 locations. We have people that are actively working, dropping off retail cars, picking up cars we're buying from customers out of 18 locations. Those numbers are growing quickly. We've already started to ramp up production in coastal locations. There's a lot of cost savings there as well.

When we buy a car from a customer and we're able to drop it off at a nearby ADESA instead of running through our logistics network, we can save pretty material dollars per transaction there. And it also dramatically simplifies our logistics network. There's a ton of gains there. I talked about some benefits that we've had with some partners where we've been able to do things that we couldn't have otherwise done.

So I do think that just the deeper we get into the ADESA transaction, the more excited we get, not just about the extremely exciting long-term opportunities around reconditioning and logistics, but also around the near-term opportunities just ways that we can be more efficient together. And again, I do want to give the team credit there. You never know exactly how integration is going to go. I think when you do an acquisition, then you kind of walk over to other side of the deal closes and you get to go meet all the people and have your first couple of conversations. You don't quite know what the reception is going to be, and I really will say the ADESA team has just greeted us with completely open arms, and it has been really great.

And I think the integration has gone a lot better than it might have otherwise because of how open-minded they've been and how much they've already been able to teach us. So we remain extremely excited about it. We think it's a huge deal in the long term. And we also think that there's very big gains that we can make in the near term as well, but it's going to require work and we're hard at it.

**Operator**

The next question comes from Adam Jonas of Morgan Stanley.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

I just had a question about working capital, specifically inventory, which, of course, just declined very substantially, about $466 million. I believe that number includes ADESA in there. So correct me if I'm

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

wrong. So is that a level that you feel is kind of normal to finish the year with? Was it -- do you see it as kind of more correcting from what was the last couple of quarters of just your -- the issues between COVID and IRC bottlenecks and now you're at a normal level? Or is that -- or is there some kind of making up to do and you need to have like a flow out again in order to achieve the volume that you want? My first question.

**Mark Jenkins**
*Chief Financial Officer*

Sure. So I'll take that one. So we did reduce inventory meaningfully quarter-over-quarter. As a note, that doesn't include any impacts from ADESA who doesn't have material inventory. So that's just related to Carvana. I think the main way to think about that is we talked a bit about this on the Q1 call, but we did meaningfully overbuild in various areas of the business, kind of moving into Q1 of this year. That included infrastructure, that included staffing. That also included inventory. So we definitely have been at an above normalized level of inventory.

And so we've been sort of steadily marching it down like over the course of Q2 and also so far in Q3. I think we do expect to continue to lower inventory balance here in the third quarter just as we sort of normalize the size of inventory to get to our target level. I sort of think of our target level as somewhere in the $2 billion to $2.5 billion range. And I think we'll continue -- we were above that at the end of Q2. And so I do think we'll continue to lower that just to get inventory size in line with our targets, aligned with the rest of the business.

So I think that's one point. I do think we've got lots of opportunities to get more out of our inventory as we move away from third-party reconditioning. The third-party reconditioning typically has much longer cycle times than first-party reconditioning. And so as we move away from third-party reconditioning, that will have a positive impact on recon cycle time.

Many of our cost initiatives are also speed initiatives that have the goals of speeding up the number of days between when we acquire a car and get it the RC, speeding up the number of days between when we start -- inspect the car and get it fully reconditioned. And so we do think we've got a number of levels to get more out of our inventory as it normalizes.

**Adam Michael Jonas**
*Morgan Stanley, Research Division*

That's very clear. Just a follow-up then, housekeeping. How many cars did you have in inventory at the end of 2Q in terms of units and how that compared to 1Q?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So the -- so we don't report that number specifically, but we did see a unit decline in inventory as well that was -- think of it as approximately in line with the balance decline.

**Operator**

The next question comes from Nick Jones with JMP Securities.

**Nicholas Freeman Jones**
*JMP Securities LLC, Research Division*

I guess 2, if I could. On the time buffers in certain states related to title and registration, is that a structural hurdle that's going to persist? Can you drive more efficiency there and kind of get rid of that over time? And how do you expect that to impact, I guess, conversion in the States? And then the second question, there was a bullet about not passing through the cost of fund increases. How should we think about, I guess, when you might start passing this through?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Sure. Those are 2 big questions they'll lend themselves to long answer. So we'll try to be as concise as we can. So first, on the time buffers, I do think that's been associated with just ensuring that we're delivering the cleanest and fastest experience to our customers on the registration front that we possibly can. I'm going to kind of jump into just an explanation on that as well for moms I can imagine that's a question people on the call may have. We definitely unfortunately gotten a lot of attention for registration over the last maybe 3 to 6 months.

And I think, unfortunately, that narrative is probably both pretty exaggerated and then also lagging -- kind of lagging where reality is. So I think I want to talk a little bit about kind of the progress we've made there. So today, we probably have about kind of 1/3 the rate of customers that are getting the delayed plates that we had even a year ago. That puts us at kind of the best levels we've ever been in our company history.

And while it's unfortunately kind of hard to get really clear data around how other dealers perform in registration, that is an imperfect process across the entire industry. Unfortunately, I think over time, it's something that things want to improve, but it is a complicated process. And so we do our best to try to pull down what data we can to look at various parts of the flow, whether it's title processes or registration processes. And it is the case that in the majority of states, we're performing better than the majority of dealers.

And so I think that's something that we're generally pretty proud of. We think we're especially proud of that in light of the fact that in order to give our customers a 7-day return policy and a nationwide inventory, we often to take on more complicated underlying registration tasks. And when you control for the complexity of that, we're sort of better again than most dealers out there.

So I think, again, the team has done a great job. I think the way that we're executing today is better than we've ever executed in the past, and it's a level that we're proud of, but certainly not satisfied with. We're going to continue to push, and we've got a lot of improvements in process, a lot of additional improvements in product that we're rolling out to make sure that we're getting all the paperwork that we need to from customers, that is clear to customers what to upload and what to have ready at the time of delivery, et cetera.

And so we're working on all those process and I think continually getting better all the time. We're also working to improve the system. We're working with several states as partners. We view the states as partners, and many states view us as partners as well. Many of these states have registration modernization initiatives underway. And so we proactively work with them on those. We've been part of legislative change in a number of states. We've seen policy changes in a number of other states as a result of our involvement.

And so I do think this is something that's actually continually improving. And I do think it's something where we do expect those buffers to go away over time. So we think it's hard to predict exactly when we'll be pulling those back, but the expectation is absolutely that we will pull those back over time. And then certainly, that does impact sales conversion. There's no question that faster delivery times impact sales conversion. And when we add these time buffers, the form it takes to a customer is just they see a longer delivery time. And so that does impact conversion. And we expect to continue to make progress there over time.

On the interest rate changes, what I would say, we have passed through some interest rate changes over the last many months if we go back to when interest rates started to increase in the back half of last year. But in general, when interest rates start to increase, we tend to see finance companies, ourselves included, pass through those increases in benchmarks or risk spreads a little more slowly than they show up. And I think that's where kind of the term interest rates are sticky comes from.

And so the sum of interest rates -- interest rate increases, both benchmarks and risk spreads has not yet been passed all the way to consumers. I think it's hard to say exactly what will be the smart rate for that to be passed through over time. In many ways, it's a function of what other finance companies are doing. We obviously don't have perfect data on what the finance companies are doing, but we do have good data there. And so when we kind of monitor many different kind of larger banks and financial institutions, we've

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

seen a lot of those institutions start to raise interest rates really starting in March and April, kind of a couple of months after we did. And we tend to see them over the last several months raising interest rates by something between 25 and 50 basis points, give or take, a month, which actually can make a pretty big difference pretty fast.

So we don't know exactly how other finance companies are going to react. We'll continue to monitor elasticities and try to make smart decisions about how we're handling interest rates on our side. But certainly, we've seen an increase in benchmarks and spreads that has not been passed all the way through. And then we try to provide some math to make it straightforward for investors to understand what the impact of that is holding all else constant. And we're obviously hopeful that over time, that comes back.

**Operator**

The next question is from Seth Basham of Wedbush Securities.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

Thanks for all the information. I have a follow-up question after the last question that was asked. First, as it relates to the titling registration challenges, are there any states where you are not able to currently sell vehicles because of those challenges? And then secondly, are there any issues currently with selling vehicles that don't have clean titles?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So there are no states where we're not able to sell vehicles today and no issues with the clean title issue as well. I do think over time, these things can periodically pop up. We recently had Illinois pop up. We were excited to have a judge kind of give us time to make sure that we were able to work with the state and make sure we could resolve some of the maybe miscommunication disagreements that we've had. So we look forward to working with them. We kind of share the same goals that they've got. The regulators in all these states just want to make sure the customers get the best registration process they possibly can, and that's the goal that we share. So we look forward to working with them. And our hope is that we can partner with them in the same way that we've partnered with many other regulators in many other states.

I also say that as part of that, something -- sometimes good things can come out of a more difficult situation, but something that's great that came out of Illinois is when we were shut down for a period of time there, as we were kind of working to resolve some of these misunderstandings with the state, we did reach out to customers and asked for support. In 48 hours, we had 6,000 customers sign a petition of support. We have thousands of comments that came in supporting Carvana. Since then, we've had thousands more come in as well.

And so I think that was a powerful kind of message from our customers that certainly, customers across the country and in the state of Illinois all other states as well are really loving the Carvana experience. And those are people that are intimately familiar with our process that kind of instantly came to our aid there, which I think was a great sign.

And so I think periodically, over time, there is certainly risk that we'll run into these -- with the state here or there. But in general, we've got a great relationship across states, and we view the states as partners. And our goal is to make sure that we continue to evolve all those relationships so that we can view all the safest partners, and they can view us the same way.

**Seth Mckain Basham**
*Wedbush Securities Inc., Research Division*

Great. And as a follow-up on the financing business, can you talk about the channel mix shift for some your finance receivables in the second quarter? How much would you sell to Ally? What's the remaining

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

availability with that agreement? And then your decision to potentially sell whole loans in the third quarter, what's driving that?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So what I would say is, I think whatever we thought about where we're going to sell our receivables, we're trying to balance maximizing proceeds and minimizing kind of cross time volatility. I think that's always been our goal. That's been the reason we've set up kind of a platform that enabled us to move in both directions. And obviously, there's been a lot more noise, I think, across financial markets over the last many months than there has been in quite some time.

And so I think -- and a form that basically takes is that increases volatility in a process like a securitization. And so what we elected to do is kind of in this environment, I think we're kind of leaning more in the direction of reduced volatility than we are in the direction of maximized proceeds. And we elected to work with Ally to purchase more of our loans, which is something that we did in COVID as well with very similar motivations. And I think that, that's a relationship that we feel has worked out great for us and that we hope and believe that they believe it worked out great for them as well.

So I think that's the way that we generally think about it. We make sure that we always have access to all the different channels. And we're monitoring what our expectations would be in each channel, again, in both of those dimensions, both the expectation and kind of volatility around that expectation.

I think as we head through the rest of the year, it's hard to know exactly where things are going to go. It is a pretty dynamic kind of macroeconomic backdrop and these markets can be sensitive to the way the data flows in across that backdrop. I think several weeks ago, the ABS markets were in rougher shape. I think the last couple of weeks have actually been very good in the ABS market. So we'll continue to monitor those markets and try to make the best decision that we possibly can. But our baseline expectation today is to continue to lean more in the direction of pooled loan sales. But again, we want to ensure that we have flexibility to exercise whatever freedom we think is the right choice to make as we move through the rest of the year.

**Mark Jenkins**
*Chief Financial Officer*

And then on the question about capacity. So our agreement with Ally was most recently upsized in March and has $3.2 billion of capacity remaining.

**Operator**

The next question comes from Rajat Gupta with JPMorgan.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Great. Thanks for taking the questions and for all the color provided on the call so far. I just had a follow-up on one of the earlier questions on SG&A. So what happens when you get to the $4,000 target? One of the questions we get a lot is trying to address is once you get to the $4,000 and you continue to reduce that even further, how should we think about growth, particularly in the context of some reduced ad spending recently, some of the other growth initiatives that you had that you're tempering recently? What kind of like -- what's the growth algorithm for the company will get to that lower SG&A level? And I have a follow-up.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. So I think the short answer on what do we do when we get to $4,000 as we keep going, I think, is kind of the plan. So first, let's talk about the walk from where we are to $4,000. That's a level that we've hit many times before in the company's history. And so I don't think in our minds at least, there's a big question about whether or not we can get to $4,000. I think the question is, how quickly can we

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

responsibly get to $4,000? We do have hundreds of locations and many functions across those locations. So there's many hundreds of groups that we have to manage across the business. And we have to make sure that we're managing our expenses down at a rate that is both fast because we want to get it down as quickly as we can, but also that doesn't derail these different groups in different locations in different functional areas because that's costly as well.

And so I think the goal -- the stretch goal of $4,000 at the end of this year is basically more a function of the pace at which we think we can responsibly get there. But then a question about whether or not we believe that we can get there. I think as we look from $4,000 down to kind of the midterm goal of $3,000 and beyond that to our long-term model, I think it's just about driving additional efficiencies. We have many ways to look at where those efficiencies are. I think probably the easiest is to just look at our cohorts.

We provided some data in the past about what our SG&A expenses are in some of our more mature cohorts. And so I think that provides visibility into what we've been able to do. And we were able to do that before we really put focus on prioritizing processes and products that make us more efficient. So as we kind of move through this period where we've prioritized those process improvements and product enhancements, we think that we're positioning ourselves better to outperform that than ever before.

We think across every group inside the company, we now have concrete goals that build up to our midterm goal of $3,000 per unit. I think we've always had bottoms-up models to inform our long-term financial model. But now that's converting into actual kind of products and projects that we have across all these different teams to get us there.

And then in terms of what it means for growth, I think the biggest impact to growth are probably based on the kind of shift in focus and just a question of which projects we prioritize, and where we put our effort across the business. And so I think as we get to lower and lower SG&A levels, I think the impact there to growth in our expectation at least are probably positive. And again, I think the simplest way to think about that or at least the way that we think about that is that the amount of work it takes to increase sales by any given amount is, in many ways, kind of proportionate to your expenses per unit because they kind of represent the work that's being done inside the company to sell a unit. And as we drive those expenses down, it means there's less work to do per unit. It means with the same amount of work, we can grow units by more.

So I think we're excited about what kind of these efficiency goals are going to mean for our growth in kind of the medium term. But I think, as I said, we're really focused on gaining efficiency today. And I think we're making a lot of progress. We undoubtedly have a lot more progress to make, and the team recognizes that and is extremely focused. But we're on a very good path, and we're excited about it.

**Rajat Gupta**
*JPMorgan Chase & Co, Research Division*

Got it. And maybe just a follow-up on the SG&A. Within the comp and benefits line, is there a way that you can help dissect for us what the corporate employee costs are versus some of the more personnel-related expenses in terms of employees who are involved in the actual buy-sell financing part of the transaction? Any metrics you can share around efficiency there, transaction time for sale or employee hours per sale or something of that sort? And so where are we today? And where do you expect to get to as you get to your $4,000 or the $3,500 target next year?

**Mark Jenkins**
*Chief Financial Officer*

Sure. I can hit that one in a couple of different ways. So I do think we've -- I think on comp, for example, you can see what we've achieved in the past is on sort of compensation and benefits for retail units sold. I think that's a useful benchmark for where it can go. I think we've laid out midterm goals that are available on the Investor Relations website that also give a sense of where it can go sort of beyond what we've already achieved in the past. I think -- and so I think those are hopefully helpful resources for you on that question.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I think in terms of what we're seeing from an efficiency perspective, we're absolutely seeing efficiency gains throughout the business. I think our teams are working every day on those efficiency gains. And I think we're seeing things like hours per delivery is coming down and sort of the customer care phone time per sale is coming down. Those are a few examples. Utilization in the logistics network is going up. There's -- there are many, many more. That's just a few. But I do think we're seeing very positive trends in some of these efficiency metrics that we've been focused on over the last several weeks or slightly longer. And so I think some of those internal metrics that all of the teams are focused on, we're feeling really good about the way they're -- those are trending.

**Operator**

The next question comes from Colin Sebastian of Baird.

**Colin Alan Sebastian**
*Robert W. Baird & Co. Incorporated, Research Division*

I guess I was going to ask about sort of the whole process of managing the process improvements, but I think that maybe takes a little too long to answer here. So instead, as follow-ups, I guess, first off, what -- in terms of not using the ABS market, is that factored into the GPU? Or what's the impact on other GPU if you do not access the ABS market?

And then secondly, in terms of widening the scope of inventory to capture more value-priced cars, if that -- if you are doing that, are you seeing more demand through the mass market part of the funnel? Is that something that you're marketing against? Or does that sort of -- that traffic sort of naturally come to the website and the app? How does that work?

**Mark Jenkins**
*Chief Financial Officer*

Sure. So I think on the first question, so the way we've always thought about this is we have a 2-channel strategy for monetizing our loans. We use the securitization market. And then we sell loans through whole loan sales or for flow agreement. And I think the way we think about that 2-channel strategy is that it balances economics and stability. And what I mean by that is, typically, in the securitization market, you see better monetization, but the securitization market involves more variability. And so the forward flow and whole loan sales typically have lower monetization but add a degree of stability. So that's basically the way we thought about it.

In terms of our forward-looking expectations, I think we plan around expectations for ABS or for whole loan sales. As we laid out in Q3, our current expectation is we'll be selling loans in a whole loan sale format, but we'll continue to evaluate as the quarter progresses.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

And then I think there's certainly demand for lower-priced cars. I think that's definitely something that's true. There's basically just a dearth of lower-priced cars out there industry-wide today. It is also true that those that are seeking higher-priced cars are probably less impacted by the economy, at least so far in kind of the form that this thing has taken so far.

So in terms of like demand across cars, I would say it shifted to cheaper cars less than you might expect in light of kind of the desirability of those inexpensive cars, but then also kind of the relative strength of the higher income consumer, which offsets that to a degree. But I think we're continuing to push in that direction. We've got a number of initiatives to make sure that we're able to provide our customers with a diverse set of cars that fit their needs across all different dimensions that matter, including price and working on different product enhancements to make it easier for customers to afford cars in this difficult environment when prices are high. So I think that's an area that will continue to get focused from us, and it's an area where we've made progress so far and plan to make more progress going forward.

**Operator**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The last question will come from Brian Nagel of Oppenheimer.

**Brian William Nagel**
*Oppenheimer & Co. Inc., Research Division*

So I know we're trying to rein down here. So I'll ask one -- I guess one question with 2 parts. But with regard to ADESA, well, there's a lot of -- there's been chatter out there about now that Carvana owns ADESA, maybe some historic customers or partners with ADESA would no longer want to do business with ADESA because they're now competitors to Carvana. So the question I have, are you seeing that dynamic? If so, is that factored into kind of the parameters you've given us for the ADESA business?

And then secondly, just as we think about ADESA and its enhancement to the overall Carvana model, at what point or at what point would there kind of be that breakout moment where we really start to see the true benefits that ADESA is bringing to Carvana?

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Sure. I try to go on site as you said, we are tight on time. Let me start with I think, for sure, we saw some customers of ADESA initially react negatively to the news. And we do feel like we lost some volume as a result of that immediately as the transaction was announced. I do think since then, the news is actually pretty good. Obviously, we don't know how this will play out over time, but we've seen a number of those customers already come back. We've seen some big commercial accounts start to shift more business back to ADESA.

And so I think that so far, at least, it feels like the team at ADESA has done a good job weathering the turbulence of that transaction, which obviously causes everyone to kind of stop and reevaluate for a moment, but it feels like we're in a pretty good spot. And then I do think looking forward, it's hard to know that's going to unfold. Again, ADESA is approximately 1 million units back of where it was in 2019. So there's a lot of room for volume increases from here kind of regardless of the number of customers that come back.

But we'll be fighting and shooting to provide great experiences to all the historical customers of ADESA and trying to explain why we think that ADESA is still a great option for them. And as I said, I think so far, the news there is pretty good.

I think in terms of when to see what you expect to see the benefits of ADESA, I think, hopefully, it's relatively quick. We're already seeing operationally some benefits today that are pretty material. And hopefully, it's kind of continual over time and continually increasing. And hopefully, it's continue increasing for a long time. I think that there are many areas to reduce costs. There are many areas to drive revenue. There are many areas to collaborate on solutions for our shared customers that kind of benefit from our shared capabilities. And then there's obviously a lot of room to recondition more cars closer to our customers and to enhance our logistics network to get cars to customers faster. And I think unlocking all of that is many, many year plan that we're excited about running at as quickly as we can, and we're excited to do it with the team at ADESA.

**Operator**

This concludes our question-and-answer session. I would like to turn the conference back over to management for any closing remarks.

**Ernest C. Garcia**
*Co-Founder, President, CEO & Chairman*

Well, thank you everyone, for joining the call. To everyone inside Carvana and ADESA, thank you so much for everything that you guys have done. The last several months have been dynamic, I believe, it was the word that we used in the prepared remarks. You all have felt that and seen that. And I think that people always have to decide how they respond to any kind of adversity. And I think the way that people inside Carvana have responded has been unbelievable. I think we could not ask for more. We couldn't be prouder to be working side by side with you guys. The progress that we're making is exceptional. I hope you're

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

proud of what you're doing. If we keep our heads down, we're going to continue to make a lot of progress really quickly. And that has been awesome to see and is exciting for the future.

And then for the ADESA team, we've done this a couple of times now, but I really do just feel extremely grateful that you have embraced us in the way that you have. And I think that hopefully, we're both seeing the gains from that. I think it's showing up in the results already, and we're excited about where we can go from here. So we look forward to continuing to work with you.

Thanks, everyone. We'll talk to you next time.

**Operator**
The conference has now concluded. Thank you for attending today's presentation. You may now disconnect.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**CARVANA CO. FQ2 2022 EARNINGS CALL | AUG 04, 2022**

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.

**Exhibit 26**





# LETTER TO **SHAREHOLDERS**

# Q2 | 2022





## CARVANA

AUGUST 4, 2022







Dear Shareholders,

The second quarter was a quarter of adjustment and progress for Carvana. As a result of changes in the economy, the market, and the industry, we shifted our priorities to focus on driving profitability through operating efficiency and reducing expenses.

The people inside Carvana are responding. We have implemented new internal processes to accelerate our progress, and we are now operating more effectively across the business than at any other time in our history.

Our team's efforts are producing many positive trends in our key operating metrics. In the second quarter, we drove meaningful sequential improvement in retail units sold, revenue and total GPU, while simultaneously reducing total SG&A dollars. This resulted in material reductions to SG&A per retail unit sold and a significant improvement in EBITDA margin.

Looking through a medium-term lens, we also made tremendous progress this quarter by acquiring ADESA U.S. ("ADESA"), the second largest used vehicle physical auction business in the U.S., significantly increasing the scope of our logistics network and reconditioning capacity. In the few months since the acquisition, we have already made meaningful progress integrating our two businesses, giving us visibility to significant gains in both the short and long term.

The used vehicle industry continues to face high used vehicle prices, rising interest rates, and other macroeconomic pressures. We believe the factors currently impacting used vehicle industry sales are transitory, and at some point, the headwinds we have seen this year will turn into tailwinds. We are adapting to the current environment quickly and using it as an opportunity to become more efficient. As a result, we will be well positioned for the turnaround when it arrives.

In tougher times, focus generally turns to the short term, but it is useful to maintain awareness of the long term as well. It looks better than ever.

Despite all the headwinds we have faced in the economy, in the industry, and from shifting our priorities, we have continued to deliver incredible customer experiences and to rapidly gain market share.

The strength of our customer offering, our market penetration in our more mature markets, and our dramatically improved infrastructure resulting from the acquisition of ADESA bode very well for our future scale.

We believe we have a clear roadmap to return to $4,500 GPU[1] and beyond. We still have a long way to go to hit our mid-term SG&A target of $3,000 per unit[1], but the path has never been as clearly outlined with concrete internal goals across teams against which we are making rapid, meaningful progress.

We remain firmly on the path to changing the way people buy and sell cars and to becoming the largest and most profitable automotive retailer.

## Summary of Q2 2022 Results

Q2 2022 Financial Results: All financial comparisons stated below are versus Q2 2021, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 117,564 an increase of 9%
- Revenue totaled $3.884 billion, an increase of 16%
- Total gross profit was $396 million, a decrease of 28%
- Total gross profit per unit was $3,368, a decrease of $1,752
  - Total gross profit per unit includes a $51 impact from the CEO's gift[2] and a $34 impact from expenses related to our May reduction in force
  - Total gross profit per unit, excluding these items was $3,453
- Net Income (loss) was $(439) million, a decrease from $45 million

[1] Excluding ADESA. For additional details on our midterm SG&A goal including ADESA please see our updating operating plan presentation posted on our investor relations website.

[2] For additional information, please see the 1 Million Milestone Gift materials posted on our investor relations website.

1

- Adjusted EBITDA margin[3] was (6.2%), a decrease from 3.4%
  - Adjusted EBITDA margin includes a (0.2%) impact from non-Gift share-based compensation and a (0.4%) impact from our May reduction in force
  - Adjusted EBITDA margin excluding these items was (5.6%)
- Basic and diluted net loss, per Class A share was $2.35 based on 101.5 million shares of Class A common stock outstanding

Other Results and Recent Events:

- On April 26, 2022, we issued 15.625 million shares of Carvana Co. Class A common stock, generating total proceeds of $1.2 billion after fees and expenses.
- On May 9, 2022, we closed our acquisition of the ADESA U.S. Physical Auction business from KAR Global for $2.2 billion. The purchase price of the acquisition and funding for future improvements was funded through the issuance of $3.275 billion of new senior notes due 2030.
- In June 2022, we completed a $30 million sale leaseback on the second phase of our Indianapolis inspection and reconditioning center (IRC).
- Following quarter-end, we opened 1 new greenfield IRC near Richmond, VA.
- In July 2022, we launched Carvana Insurance built with Root to enable Coverage in 3 Clicks™.

## Outlook

We made strong progress on our operating plan in Q2 2022, achieving our outlook for meaningful sequential improvement in retail units sold, revenue, total GPU, SG&A per retail unit sold, and EBITDA margin, while also laying the groundwork for additional progress in future quarters.

As discussed in our recent operating plan presentation, given the current industry, economy, and market environment, we have shifted our priorities to lowering expenses and driving positive free cash flow. On the path toward these goals:

- We continue to expect sequential improvements in SG&A per retail unit sold in Q3 vs. Q2 and again in Q4 vs. Q3 on a consolidated basis, inclusive of ADESA SG&A expenses.

- We are maintaining our Q4 stretch goal of $4,000 SG&A per retail unit sold, excluding D&A, SBC, and ADESA. Including the consolidation of ADESA SG&A expenses, this stretch goal maps into a range of $4,350 to $4,450 SG&A per retail unit sold, excluding D&A and SBC. Our ability to achieve our stretch goal will depend primarily on retail unit volume and the total SG&A expense savings that we are able to achieve by Q4.

- Finally, we continue to expect a return to >$4,000 total GPU and significant positive EBITDA in FY 2023, both including and excluding ADESA gross profit and SG&A expenses.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

---

[3] Adjusted EBITDA margin excludes the impacts of the CEO's Gift and Other Income and Expense

## Integrating ADESA

We closed our acquisition of ADESA on May 9, 2022, and since then our teams have been working closely together on integrating Carvana operations into ADESA locations. As of August 4, we have already:

1) Embedded market hubs at 18 ADESA locations.

2) Began landing over half of the cars we buy from customers that we plan to sell wholesale at ADESA sites.

3) Ramped up our overall inspection and reconditioning volume to over 500 units per week at ADESA sites that complement our existing IRC footprint, mostly in coastal locations.

Looking forward, we plan to continue rapidly adding Carvana functions to ADESA locations while preserving and over time improving upon the operations that successfully made ADESA the second largest used vehicle physical auction business in the U.S. For additional details on ADESA's Q2 financial results, please see Appendix 1.

We are extremely happy with our integration progress so far which has only been possible because of the enthusiasm from the teams on both sides to work together.

This progress and the visibility into additional progress has us more excited than ever about the long-term strategic benefits of the Carvana and ADESA combination.

## Expansion

In Q2 2022, we completed our acquisition of ADESA and closed one IRC in Euclid, OH, the smaller of two IRCs in the Cleveland, OH metropolitan area. ADESA's 56 locations currently have the physical capacity to produce more than 200k units per year when fully staffed with limited real estate improvements. This brought our total annual capacity at full utilization to ~1.2 million units at quarter-end, an increase from ~1 million units at the end of Q1.

We opened 1 new IRC near Richmond, VA in July 2022 and remain on track to open 2 more IRCs in 2022, bringing our total annual capacity at full utilization to ~1.4 million units by the end of 2022.

Looking beyond 2022, we expect to focus our expansion efforts on developing ADESA sites for additional production, as well as improving our logistics network and reducing delivery times and costs.



**ANNUAL PRODUCTION CAPACITY AT FULL UTILIZATION (in millions)**

## CARVANA MARKETS, VENDING MACHINES, IRCs, AND ADESA SITES



*As of August 4, 2022

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: https://investors.carvana.com/investor-resources/investor-materials

## Management Objectives

Historically, our three primary financial objectives have been: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

As discussed in our recent operating plan presentation, given the current industry, economy, and market environment, we have shifted our priorities to lowering expenses and driving positive free cash flow. However, this letter maintains our historical format to discuss our key results.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | Q2 2022 | Long Term Target |
|---|---|---|---|---|---|---|---|---|
| *YoY Revenue Growth* | 180% | 135% | 128% | 101% | 42% | 129% | 16% | – |
| **Gross Margin** | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15.1% | 10.2% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 3.7% | 3.4% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 11.3% | 13.9% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 1.0% | 2.0% | 0.5 – 1.0% |
| *SG&A Total as % of Revenue* | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 15.9% | 18.6% | 6 – 8% |
| Net Income (loss) Margin | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% | (11.3)% | – |
| **Adjusted EBITDA Margin\*** | (23.2%) | (16.8%) | (9.9%) | (5.7%) | (4.6%) | 0.2% | (6.2)% | 8 – 13.5% |
| **EBITDA Margin** | | | | | | | | 8 – 13.5% |

\*Adjusted EBITDA Margin excludes the impacts of the CEO's Gift and Other Income and Expense which we expect to be immaterial in the long-term

## Objective #1: Grow Retail Units and Revenue

Retail units sold in Q2 increased to 117,564, up 9% from 107,815 in Q2 2021. Q2 revenue grew to $3.884 billion, up 16% from $3.336 billion. Revenue grew faster than retail units due to higher used vehicle prices and the acquisition of ADESA.

Our growth in the quarter reflected significant market share gains versus the used vehicle industry as a whole, which was down ~15% year-over-year according to industry data sources. These market share gains reflect the desirability of our customer offering and came despite several headwinds related to our changing priorities.

These headwinds included the disruption of our reduction in force that we completed in May and the adjustment to our priorities to elevate expense reduction as our number one financial objective. For example, we reduced our marketing budget by 15% sequentially and reduced the size of our immediately available inventory versus peak levels, which both created sequential volume headwinds with an eye toward future profitability.

We also made progress strengthening our logistics network in Q2, though we do not believe logistics network changes were a material driver of sequential sales volume.

For additional details on our logistics network please see Appendix 2.

### QUARTERLY RETAIL UNIT SALES



## Objective #2: Increase Total Gross Profit Per Unit

We achieved significant sequential improvement in total GPU in Q2 2022, despite the continued impacts of elevated retail and wholesale costs.

- Total
  - Total GPU was $3,368 vs. $5,120 in Q2 2021 and $2,833 in Q1 2022
    - Total GPU includes a -$51 impact from Ernie's 1MM unit milestone gift and a -$34 one-time impact from our May reduction in force.
    - Excluding these impacts, total GPU was $3,453 vs. $2,909 in Q1 2022, a sequential improvement of $544.

- Retail
  - Retail GPU was $1,131 vs. $2,022 in Q2 2021 and $808 in Q1 2022
    - Retail GPU includes a -$51 impact from Ernie's 1MM unit milestone gift and a -$34 one-time impact from our May reduction in force.
    - Excluding these impacts, retail GPU was $1,216 vs. $884 in Q1 2022, a sequential improvement of $332.
  - Year-over-year changes in retail GPU were primarily driven by ~$600 per unit higher reconditioning and inbound transport costs compared to Q2 2021, the aforementioned Gift and reduction in force impacts, and higher retail depreciation rates compared to Q2 2021, partially offset by buying more cars from customers.
  - Sequential changes in retail GPU were primarily driven by higher spreads between retail sales prices and acquisition prices. Retail reconditioning and inbound transport costs were similar in Q2 and Q1, as we primarily sold vehicles in Q2 that were reconditioned prior to our cost efficiency initiatives.

- Wholesale
  - Wholesale GPU was $383 vs. $547 in Q2 2021 and $219 in Q1 2022[4]
  - Year-over-year changes in wholesale GPU were driven by a $43 impact from the acquisition of ADESA, as well as wholesale volume growth (units +18% YoY to 55,299), offset by a decrease in gross profit per wholesale unit sold to $814 from $1,254 in Q2 2022 due to higher wholesale market depreciation and higher inbound transport costs on wholesale units sold.
  - Sequential changes in wholesale GPU were primarily driven by ADESA and increased spreads between sales and acquisition prices.

- Other
  - Other GPU was $1,854 vs. $2,551 in Q2 2021 and $1,806 in Q1 2022
  - Year-over-year changes in Other GPU were driven by several factors, including higher benchmark interest rates at time of loan sale relative to origination interest rates, wider credit spreads, and a change in loan sales channel mix, partially offset by the impact of higher industry-wide vehicle prices on average loan size.
  - Sequential changes in Other GPU were primarily driven by higher origination rates relative to benchmark interest rates, partially offset by wider credit spreads and a change in loan sales channel mix.
  - Looking toward Q3, we expect to sell loans in the whole loan sales format but will maintain flexibility to optimize our channel mix as the quarter progresses.

For additional details on drivers of Total GPU please see Appendix 3.

---

[4] Beginning in Q2 2022, wholesale gross profit and wholesale GPU includes gross profit from the sale of wholesale marketplace vehicles at our acquired ADESA locations. For additional details on the impact of ADESA on wholesale GPU, please see the Q2 2022 Financial Supplement Tables posted on our investor relations website.



**SECOND QUARTER TOTAL GROSS PROFIT PER UNIT**

## Objective #3: Demonstrate Operating Leverage

We made significant sequential improvement in net loss margin and Adjusted EBITDA margin in Q2, levering by 3.2% and 5.0%, respectively, driven by improvements in both GPU gains and SG&A leverage. On a year-over-year basis net loss margin increased by 12.7% and Adjusted EBITDA margin loss increased by 9.9%, each driven by the industry, economic, and internal factors described throughout this letter.

For Q2 2022, as a percentage of revenue:

- Total SG&A levered by 2.2% sequentially, reflecting gains across most components. Compensation and benefits levered by 0.8%, advertising levered by 1.1%, logistics and market occupancy increased by 0.2%, and other SG&A levered by 0.5%. Leverage across these components was driven by adjustments made to better align expense levels with sales volume.

- Total SG&A increased by 4.5% year-over-year, compensation and benefits increased 2.1%, advertising levered by 0.2%, logistics and market occupancy increased by 1.0%, and other SG&A increased by 1.6%.

For additional details on SG&A leverage please see Appendix 4.



## Summary

Andy Grove has a famous quote about companies going through difficult periods:

*"Bad companies are destroyed by crisis, good companies survive them, great companies are improved by them."*

Quotes that get repeated over time are usually repeated because they are supported by history and ring true. This quote is no different. Plans are full of straight lines, but history tends to zig and zag.

On the way to achieving our mission, we will probably be tested many times. As we have in the past, we will Zag Forward and seek to improve with every test.

The march continues.


Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

## Summary

Andy Grove has a famous quote about companies going through difficult periods:

## Appendix #1: Additional Details on Integrating ADESA

One of our priorities at ADESA is to continue providing great customer service to ADESA's auction buyers and sellers and to benefit from ADESA's existing high-quality business through EBITDA contribution today with the potential to increase very significantly as the auction industry rebounds over the next several years.

The current wholesale auction industry environment is a unique and challenging one, with constraints on new car production leading to much lower than historical supply from large commercial sellers, such as new car manufacturers, rental car companies, and finance companies.

Marketplace unit volume was the primary driver of ADESA's results in Q2, with units declining ~10% sequentially vs. Q1. Approximately half of this change was due to the attrition of certain customers following the acquisition. Since the closing, we have already had some buyers and sellers that initially pulled away from ADESA come back, and we have also recently had multiple other large commercial sellers increase the volume they are sending to ADESA. The team at ADESA has done an excellent job managing the turbulence of the acquisition and is back to business as usual.

For the partial quarter following the close of our acquisition on May 9, 2022, the ADESA wholesale marketplace transacted 111,883 units, generating $108 million in revenue, $20 million of gross profit excluding depreciation and amortization, and -$2 million of Adjusted EBITDA. For additional details on ADESA financial results, please see the Q2 2022 Financial Supplement Tables posted on our investor relations website.

This partial quarter Adjusted EBITDA included $3 million of one-time expenses and the reallocation of $2 million of gross profit generated from Carvana business that was internalized following the acquisition. In addition, these results were impacted by a temporary pause on making operating adjustments while our two companies merged. Following quarter end, we began implementing changes that we expect to positively impact EBITDA contribution by approximately $7 million per quarter by later this year.

As a result of the way the teams have come together, all we have continued to learn about the business, the rapid progress we are making in integration, and the long-term opportunity that exists between the two companies, we are more excited than ever about our acquisition of ADESA.

## Appendix #2: Additional Details on Strengthening the Logistics Network

Logistics continues to be an important area where there is significant room for additional improvement in reliability, costs, and delivery speed. It is also an area where we have made a lot of fundamental progress recently.

Starting with speed metrics, delivery times across the network have largely been flat over the last several months. These metrics have remained approximately flat as a result of the fundamental progress that we are making being offset by three temporary headwinds.

- The first headwind has been adding delivery time buffers in many states to provide cushion for our title and registration teams to work with the various states to complete necessary registration paperwork. As it relates to title and registration, it is important to note that we are (a) at the best execution levels we have ever been in our history, (b) based on data we have access to, in many cases likely better than the majority of traditional dealerships, and (c) committed to making additional progress which is what has caused us to add buffers in certain states. We expect to remove these buffers over time as we continue to improve our processes and obtain licenses at additional locations, which simplifies paperwork processing.

- Second, reduced affordability and the tougher economic environment have led to an increase in the rate of customer order cancellation, which leads to additional strain per sale on our network. While we expect this effect to also be transitory and to alleviate over time naturally when affordability and the economy improve, we are also actively working on several product improvements to reduce this unnecessary strain.

- Third, as part of our work to balance the business with sales volume, we have reduced the size of our inventory which, all else constant, causes customers to select cars that are further away from them on average.

Moving to reliability, two important metrics we use internally measure the percentage of scheduled multi-car hauler trips and of individual car loading events that are executed as expected. Both metrics have improved materially over the last couple months and are now at levels that are similar to or better than prior to the Omicron wave. This progress has been the result of product and process enhancements as well as more internal benchmarking leading to operational focus at our sites with the most opportunity for improvement.

Finally, on cost, an important driver for our network is our utilization percentage which measures what percentage of vehicle slots are utilized on a mile weighted basis across our logistics network. Over the last 6 months, we have reduced unutilized slots by approximately one third. This has been accomplished with fundamental product enhancements and by balancing inventory positioning which got out of balance in the first quarter. We added route utilization awareness into our vehicle bidding systems, into our schedulers, and into our customer facing merchandising to nudge transportation demand toward routes where the logistics network is better suited to fulfill it reliably and efficiently.

Historically these systems had awareness of shipping distance, but were unaware of utilization on required routes. In order to improve inventory positioning without building in recurring costs, we spent more on third party transportation in the second quarter to move inventory from our most out of balance locations. Over time, we will explore the appropriate balance of utilization and speed in our logistics network as these are performance criteria that can be traded off with one another.

Overall, we feel that our logistics network is stronger than it has been in recent history. That said, we have significantly more progress to make and we have better visibility than ever into how to make that progress. This will continue to be an area of the business that receives increased attention.

## Appendix #3: Additional Details on Drivers of Total GPU

We achieved $3,410 total GPU ex Gift, RIF, ADESA in Q2, while experiencing several notable impacts on the business.

- First, retail reconditioning and inbound transport costs were up ~$600 per unit YoY. We made progress in Q2 on reducing costs on produced units that were pushed to the website, but this progress will take time to appear in retail cost of sales as the newly produced units are sold and units produced in past periods with higher cost structures become a smaller share of sales.

- Second, the current used vehicle affordability and interest rate environment is having an impact on the share and mix of customers who finance a vehicle with us. As used vehicle prices normalize we expect favorable finance attachment rate and mix effects relative to Q2. We estimate attach rate and mix effects vs. a normalized environment at ~$250 of Other GPU.

- Third, we saw industry-wide cost of funds for large, mature issuers increase relative to benchmark rates in Q2 relative to Q1 2022 and FY 2021. We have not yet passed on these cost of fund increases, which we estimate at less than 1 point of rate, but we are starting to see other lenders increase rates and believe the industry will continue to pass through increased costs. We estimate the impact of passing through cost of funds increases at ~$250 of Other GPU.

- Finally, we experienced an impact from a higher cost of funds on our Q2 securitization relative to large, mature issuers. We estimate this impact at ~$100 of Other GPU, which we view as transitory based on the specific timing of our Q2 securitization.

Beyond these notable impacts, we also see several additional opportunities.

- With our recent acquisition of ADESA, we also see an opportunity to utilize ADESA locations to expand our wholesale volume and GPU.

- In July, we launched our fully embedded insurance offering with Root, providing an opportunity for expanded insurance-related GPU.

- We continue to see multiple opportunities to expand Other GPU by adding new products to our checkout flow when priorities permit and further enhancements to our finance platform.

Putting it all together, we continue to have strong conviction about our vertically integrated business model's ability to generate significant GPU, largely through normalizing large temporary impacts and operating our standard playbook on other opportunities.

## Appendix #4: Additional Details on SG&A per Retail Unit Sold

Our path to our midterm goal on SG&A per retail unit sold has two phases.

Phase 1: Return to previous levels of SG&A per retail unit sold ex D&A and SBC

- The first phase is a return to $4,000 SG&A per retail unit sold excluding D&A, SBC, and ADESA (or equivalently, our consolidated goal of $4,350-4,450 ex D&A and SBC including ADESA). We have achieved this goal in several quarters in the past.

- The most important step in this phase is managing SG&A expenses down in absolute dollar terms to match volume. Our business has several levers to adjust expense levels. The largest of these are staffing levels, scheduling optimization, in-sourcing third-party services, and reducing other discretionary expenses.

Phase 2: Proceed to Midterm Goal

- Our teams are focused on our primary objective of driving efficiency and reducing SG&A per retail unit sold. Across the business, we have numerous initiatives in place to drive toward our midterm goal.

- In logistics, we have several key initiatives underway to lower costs, improve speed, and enhance reliability. These include reducing third-party logistics spend, increasing utilization through better load balancing across the network, improving trip and staging execution, and reducing vehicle miles traveled.

- In our last-mile delivery network, we have several key initiatives underway for improving cost per retail unit sold, while maintaining strong availability for our customers, including (i) internal benchmarking and performance management, (ii) staffing and scheduling optimization, (iii) in-sourcing third-party vehicle pick-ups, (iv) pairing retail and buying cars from customer activities, and (v) increasing vending machine utilization.

- In customer care, we have several key initiatives underway for improving cost per retail unit sold, while maintaining a strong customer experience, including (i) internal benchmarking and performance management, (ii) automation of manual tasks, (iii) simplified advocate workflows, (iv) enhanced customer communication, and (v) reduction of duplicated and low value tasks.

- In advertising, our two primary areas of focus are (i) optimizing spend by mixing toward higher efficiency channels, campaigns, and markets, and (ii) increasing customer conversion to sale. We have several key initiatives underway to improve conversion to sale, including a new co-signer product offering, more affordable inventory, and improvements to the logistics network, as discussed above.

- Finally, in corporate and technology, we continue to see opportunities to reduce inefficient and discretionary spend, which combined with growth in volume, will lower per unit expenses.

We are already seeing gains across these areas and are excited to progress to our near-term, midterm, and long-term SG&A goals.

# Appendix

## *Conference Call Details*

Carvana will host a conference call today, August 4, 2022, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until August 11, 2022, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 6706049#.

## *Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2021 and Quarterly Report on Form 10-Q for the quarter ending March 31, 2022.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

## *Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ( "GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,047 | $ | 403 |
| Restricted cash | | 150 | | 233 |
| Accounts receivable, net | | 428 | | 206 |
| Finance receivables held for sale, net | | 393 | | 356 |
| Vehicle inventory | | 2,865 | | 3,149 |
| Beneficial interests in securitizations | | 401 | | 382 |
| Other current assets, including $8 and $12, respectively, due from related parties | | 207 | | 163 |
| Total current assets | | 5,491 | | 4,892 |
| Property and equipment, net | | 3,261 | | 1,560 |
| Operating lease right-of-use assets, including $15 and $17, respectively, from leases with related parties | | 659 | | 369 |
| Intangible assets, net | | 82 | | 4 |
| Goodwill | | 847 | | 9 |
| Other assets, including $3 and $7, respectively, due from related parties | | 162 | | 181 |
| Total assets | $ | 10,502 | $ | 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities, including $24 and $27, respectively, due to related parties | $ | 981 | $ | 656 |
| Short-term revolving facilities | | 1,118 | | 2,053 |
| Current portion of long-term debt | | 212 | | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | | 57 | | 29 |
| Total current liabilities | | 2,368 | | 2,890 |
| Long-term debt, excluding current portion | | 6,605 | | 3,208 |
| Operating lease liabilities, excluding current portion, including $11 and $13, respectively, from leases with related parties | | 640 | | 361 |
| Other liabilities | | 25 | | 31 |
| Total liabilities | | 9,638 | | 6,490 |
| Commitments and contingencies | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,789 and 89,930 shares issued and outstanding as of June 30, 2022 and December 31, 2021, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Additional paid-in capital | | 1,526 | | 795 |
| Accumulated deficit | | (987) | | (489) |
| Total stockholders' equity attributable to Carvana Co. | | 539 | | 306 |
| Non-controlling interests | | 325 | | 219 |
| Total stockholders' equity | | 864 | | 525 |
| Total liabilities & stockholders' equity | $ | 10,502 | $ | 7,015 |

15

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | $ 5,694 | $ 4,304 |
| Wholesale sales and revenues, including $7, $16, $21 and $22, respectively, from related parties | 704 | 557 | 1,279 | 797 |
| Other sales and revenues, including $50, $49, $98 and $91, respectively, from related parties | 218 | 275 | 408 | 480 |
| **Net sales and operating revenues** | 3,884 | 3,336 | 7,381 | 5,581 |
| Cost of sales, including $9, $3, $18 and $4, respectively, to related parties | 3,488 | 2,784 | 6,687 | 4,691 |
| **Gross profit** | 396 | 552 | 694 | 890 |
| Selling, general and administrative expenses, including $7, $6, $13 and $12, respectively, to related parties | 721 | 470 | 1,448 | 867 |
| Interest expense | 116 | 43 | 180 | 73 |
| Other (income) expense, net | (3) | (6) | 10 | (13) |
| **Net (loss) income before income taxes** | (438) | 45 | (944) | (37) |
| Income tax provision | 1 | — | 1 | — |
| **Net (loss) income** | (439) | 45 | (945) | (37) |
| Net (loss) income attributable to non-controlling interests | (201) | 23 | (447) | (23) |
| **Net (loss) income attributable to Carvana Co.** | $ (238) | $ 22 | $ (498) | $ (14) |
| | | | | |
| Net (loss) earnings per share of Class A common stock - basic | $ (2.35) | $ 0.27 | $ (5.20) | $ (0.18) |
| Net (loss) earnings per share of Class A common stock - diluted | $ (2.35) | $ 0.26 | $ (5.20) | $ (0.18) |
| | | | | |
| Weighted-average shares of Class A common stock - basic [1] | 101,450 | 81,398 | 95,773 | 79,751 |
| Weighted-average shares of Class A common stock - diluted | 101,450 | 176,015 | 95,773 | 79,751 |

(1) Weighted-average shares of Class A common stock - basic - outstanding have been adjusted for unvested restricted stock awards.

16

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (945) | $ (37) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 101 | 46 |
| Equity-based compensation expense | 42 | 18 |
| Loss on disposal of property and equipment | 2 | 1 |
| Provision for bad debt and valuation allowance | 8 | 6 |
| Amortization and write-off of debt issuance costs | 12 | 5 |
| Unrealized loss on warrants to acquire Root Class A common stock | 5 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 10 | (4) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (3,960) | (3,289) |
| Proceeds from sale of finance receivables, net | 3,921 | 3,254 |
| Gain on loan sales | (235) | (338) |
| Principal payments received on finance receivables held for sale | 113 | 78 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 333 | (926) |
| Accounts receivable | (29) | (111) |
| Other assets | (19) | (60) |
| Accounts payable and accrued liabilities | 122 | 216 |
| Operating lease right-of-use assets | (102) | (4) |
| Operating lease liabilities | 140 | 6 |
| Other liabilities | (6) | — |
| Net cash used in operating activities | (487) | (1,139) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (361) | (194) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 25 | 20 |
| Net cash used in investing activities | (2,525) | (174) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 8,159 | 4,664 |
| Payments on short-term revolving facilities | (9,094) | (4,024) |
| Proceeds from issuance of long-term debt | 3,416 | 710 |
| Payments on long-term debt | (66) | (29) |
| Payments of debt issuance costs | (65) | (11) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 3 | 1 |
| Tax withholdings related to restricted stock units and awards | (7) | (17) |
| Net cash provided by financing activities | 3,573 | 1,294 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 561 | (19) |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,197 | $ 310 |

17

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2022** | **2021** | **2022** | **2021** |
| | **(in thousands)** | | | |
| Weighted-average shares of Class A common stock outstanding | 101,450 | 81,398 | 95,773 | 79,751 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock [1] | 84,798 | — | 84,798 | 91,731 |
| | 186,248 | 81,398 | 180,571 | 171,482 |

(1) For the three months ended June 30, 2021, the weighted-average as-exchanged LLC Units for shares of Class A common stock were considered dilutive and included in the weighted-average shares of Class A common stock - diluted amount of 176,015.

18

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

*Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation*

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically only been a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations.

A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net (loss) income, which is the most directly comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| (dollars in millions) | | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30, 2021 | | Sep 30, 2021 | | Dec 31, 2021 | | Mar 31, 2022 | | Jun 30, 2022 |
| Net (loss) income | $ | 45 | $ | (68) | $ | (182) | $ | (506) | $ | (439) |
| Income tax provision | | — | | — | | 1 | | — | | 1 |
| Interest expense | | 43 | | 48 | | 55 | | 64 | | 116 |
| Other (income) expense, net | | (6) | | (3) | | 22 | | 13 | | (3) |
| Depreciation and amortization expense | | 30 | | 32 | | 40 | | 45 | | 76 |
| CEO Milestone Gift in cost of sales | | — | | — | | — | | 8 | | 6 |
| CEO Milestone Gift in SG&A | | — | | — | | — | | 20 | | 4 |
| Adjusted EBITDA [1] | $ | 112 | $ | 9 | $ | (64) | $ | (356) | $ | (239) |
| Share-based compensation, excluding Gift | | 9 | | 11 | | 11 | | 10 | | 9 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [1] | $ | 121 | $ | 20 | $ | (53) | $ | (346) | $ | (230) |
| | | | | | | | | | | |
| Total revenues | $ | 3,336 | $ | 3,480 | $ | 3,753 | $ | 3,497 | $ | 3,884 |
| Adjusted EBITDA Margin [2] | | 3.4 % | | 0.3 % | | (1.7)% | | (10.2)% | | (6.2)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation [2] | | 3.6 % | | 0.6 % | | (1.4)% | | (9.9)% | | (5.9)% |

(1) For the three months ended June 30, 2022, includes $14 of expenses associated with the previously announced workforce reduction.
(2) For the three months ended June 30, 2022, includes 0.4% of expenses associated with the previously announced workforce reduction.

| (dollars in millions) | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Net loss | $(37) | $(93) | $(164) | $(255) | $(365) | $(462) | $(287) |
| Income tax provision | — | — | — | — | — | — | 1 |
| Interest expense | 1 | 3 | 7 | 25 | 81 | 131 | 176 |
| Other (income) expense, net | — | — | 1 | 1 | 4 | (1) | 6 |
| Depreciation and amortization expense | 3 | 5 | 12 | 24 | 41 | 74 | 129 |
| CEO Milestone Gift in cost of sales | — | — | — | 4 | 5 | 1 | — |
| CEO Milestone Gift in SG&A | — | — | — | 8 | 8 | — | — |
| Adjusted EBITDA | $(33) | $(85) | $(144) | $(193) | $(226) | $(257) | $25 |
| Share-based compensation, excluding Gift | — | — | 6 | 14 | 23 | 25 | 39 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(33) | $(85) | $(138) | $(179) | $(203) | $(232) | $64 |
| | | | | | | | |
| Total revenues | $130 | $365 | $859 | $1,955 | $3,940 | $5,587 | $12,814 |
| Adjusted EBITDA Margin | (25.0)% | (23.2)% | (16.8)% | (9.9)% | (5.7)% | (4.6)% | 0.2% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (25.0)% | (23.2)% | (16.1)% | (9.2)% | (5.2)% | (4.2)% | 0.5% |

| (dollars in millions) | Three Months Ended, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Q2 14** | **Q2 15** | **Q2 16** | **Q2 17** | **Q2 18** | **Q2 19** | **Q2 20** | **Q2 21** | **Q2 22** |
| Net (loss) income | $(3) | $(8) | $(18) | $(39) | $(51) | $(64) | $(106) | $ 45 | $ (439) |
| Income tax provision | — | — | — | — | — | — | — | — | 1 |
| Interest expense | — | — | 1 | 3 | 4 | 19 | 20 | 43 | 116 |
| Other (income) expense, net | — | — | — | — | — | 1 | (3) | (6) | (3) |
| Depreciation and amortization | — | 1 | 1 | 3 | 5 | 9 | 18 | 30 | 76 |
| CEO Milestone Gift in cost of sales | — | — | — | — | — | 2 | — | — | 6 |
| CEO Milestone Gift in SG&A | — | — | — | — | — | 1 | — | — | 4 |
| Adjusted EBITDA | $(3) | $(7) | $(16) | $(33) | $(42) | $(32) | $(71) | $112 | $(239) |
| Share-based compensation, excluding Gift | — | — | — | 2 | 3 | 6 | 6 | 9 | 9 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(3) | $(7) | $(16) | $(31) | $(39) | $(26) | $(65) | $121 | $(230) |
| | | | | | | | | | |
| Total revenues | $9 | $29 | $87 | $209 | $475 | $986 | $1,118 | $3,336 | $3,884 |
| Adjusted EBITDA Margin | (25.6)% | (23.0)% | (18.9)% | (15.8)% | (8.8)% | (3.2)% | (6.4)% | 3.4% | (6.2)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (25.6)% | (23.0)% | (18.9)% | (14.8)% | (8.2)% | (2.6)% | (5.8)% | 3.6% | (5.9)% |

20

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2022** | **2021** | **Change** | **2022** | **2021** | **Change** |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | 18.3 % | $ 5,694 | $ 4,304 | 32.3 % |
| Wholesale sales and revenues [1] | 704 | 557 | 26.4 % | 1,279 | 797 | 60.5 % |
| Other sales and revenues [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total net sales and operating revenues | $ 3,884 | $ 3,336 | 16.4 % | $ 7,381 | $ 5,581 | 32.3 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 133 | $ 218 | (39.0)% | $ 218 | $ 330 | (33.9)% |
| Wholesale gross profit [1] | 45 | 59 | (23.7)% | 68 | 80 | (15.0)% |
| Other gross profit [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total gross profit | $ 396 | $ 552 | (28.3)% | $ 694 | $ 890 | (22.0)% |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 117,564 | 107,815 | 9.0 % | 222,749 | 200,272 | 11.2 % |
| Wholesale vehicle unit sales | 55,299 | 47,052 | 17.5 % | 105,579 | 73,092 | 44.4 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | 25,195 | 23,225 | 8.5 % | 25,562 | 21,491 | 18.9 % |
| Wholesale vehicles | 12,731 | 11,838 | 7.5 % | 12,114 | 10,904 | 11.1 % |
| **Per retail unit gross profit:** | | | | | | |
| Used vehicle gross profit [4] | $ 1,131 | $ 2,022 | (44.1)% | $ 979 | $ 1,648 | (40.6)% |
| Wholesale gross profit | 383 | 547 | (30.0)% | 305 | 399 | (23.6)% |
| Other gross profit | 1,854 | 2,551 | (27.3)% | 1,832 | 2,397 | (23.6)% |
| Total gross profit | $ 3,368 | $ 5,120 | (34.2)% | $ 3,116 | $ 4,444 | (29.9)% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit | $ 814 | $ 1,254 | (35.1)% | $ 644 | $ 1,095 | (41.2)% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 111,883 | $ — | NM | 111,883 | $ — | NM |
| Wholesale marketplace revenues [5] | $ 108 | $ — | NM | $ 108 | $ — | NM |
| Wholesale marketplace gross profit [5][6] | $ 5 | $ — | NM | $ 5 | $ — | NM |

(1) Includes $7, $16, $21 and $22, respectively, of wholesale revenue from related parties.

(2) Includes $50, $49, $98 and $91, respectively, of other sales and revenues from related parties.

(3) For the three and six months ended June 30, 2022, used vehicle gross profit includes $6 and $14, respectively, of share-based compensation expense related to the CEO Milestone Gift.

(4) For the three and six months ended June 30, 2022, used vehicle per unit gross profit includes $51 and $63, respectively, of share-based compensation expense related to the CEO Milestone Gift.

(5) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.

(6) Wholesale marketplace gross profit includes $15 of depreciation and amortization expense.

NM = Not meaningful

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 | Jun 30, 2022 |
| | (in millions) | | | | |
| Compensation and benefits (1) | $ 148 | $ 181 | $ 212 | $ 236 | $ 248 |
| CEO Milestone Gift (2) | — | — | — | 20 | 4 |
| Advertising | 119 | 126 | 134 | 155 | 131 |
| Market occupancy (3) | 15 | 18 | 24 | 23 | 24 |
| Logistics (4) | 34 | 40 | 44 | 56 | 71 |
| Other (5) | 154 | 181 | 206 | 237 | 243 |
| Total | $ 470 | $ 546 | $ 620 | $ 727 | $ 721 |
| Depreciation and amortization | 24 | 26 | 33 | 37 | 49 |
| Share-based compensation, excluding Gift | 9 | $ 11 | $ 11 | $ 10 | 9 |
| Total, excluding depreciation and amortization and share-based compensation | $ 437 | $ 509 | $ 576 | $ 660 | $ 659 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the CEO's gift of personal stock to employees upon the company's one millionth vehicle sold, except those costs related to preparing vehicles for sale, which are included in cost of sales.

(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

We had the following liquidity resources available as of June 30, 2022 and 2021:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Cash and cash equivalents | $ 1,047 | $ 403 |
| Availability under short-term revolving facilities [1] | 1,603 | 438 |
| **Committed liquidity resources available** | **$ 2,650** | **$ 841** |
| Unpledged vehicle inventory not included above[2] | — | 665 |
| Unpledged real estate not included above[3] | 1,972 | 677 |
| Unpledged beneficial interests in securitizations[4] | 124 | 100 |
| **Total liquidity resources[5]** | **$ 4,746** | **$ 2,283** |

1. Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date, excluding the impact to restricted cash requirements. This is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

2. Unpledged vehicle inventory is the value of vehicle inventory on our balance sheet on the period end date beyond that covered by committed financing agreements. On February 1, 2022, we upsized our vehicle inventory floor plan commitment to $3.0 billion.

3. Unpledged real estate assets include IRC, ADESA locations and vending machine real estate assets that have not been previously pledged or sold. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

4. Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

5. Total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities on our balance sheet that can be financed using traditional asset-based financing sources. To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.









# CARVANA
## CULTURE

# Q2 | 2022







**Exhibit 27**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended September 30, 2022**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission File Number: 001-38073

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | | | |
|---|---|---|---|
| **300 E. Rio Salado Parkway** | **Tempe** | **Arizona** | **85281** |
| (Address of principal executive offices) | | | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)

| | | | |
|---|---|---|---|
| **1930 W. Rio Salado Parkway** | **Tempe** | **Arizona** | **85281** |

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒  Yes ☐  No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒  Yes ☐  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of October 31, 2022, the registrant had 105,947,745 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding.

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | | Page |
|---|---|---:|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
| | Unaudited Condensed Consolidated Balance Sheets as of September 30, 2022 and December 31, 2021 | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2022 and 2021 | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three and Nine Months Ended September 30, 2022 and 2021 | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2022 and 2021 | 7 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 58 |
| Item 4. | Controls and Procedures | 58 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 60 |
| Item 1A. | Risk Factors | 60 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 60 |
| Item 3. | Defaults Upon Senior Securities | 60 |
| Item 4. | Mine Safety Disclosures | 60 |
| Item 5. | Other Information | 60 |
| Item 6. | Exhibits | 61 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | | September 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 316 | $ | 403 |
| Restricted cash | | 161 | | 233 |
| Accounts receivable, net | | 359 | | 206 |
| Finance receivables held for sale, net | | 485 | | 356 |
| Vehicle inventory | | 2,577 | | 3,149 |
| Beneficial interests in securitizations | | 350 | | 382 |
| Other current assets, including $5 and $12, respectively, due from related parties | | 221 | | 163 |
| Total current assets | | 4,469 | | 4,892 |
| Property and equipment, net | | 3,326 | | 1,560 |
| Operating lease right-of-use assets, including $14 and $17, respectively, from leases with related parties | | 689 | | 369 |
| Intangible assets, net | | 76 | | 4 |
| Goodwill | | 847 | | 9 |
| Other assets, including $1 and $7, respectively, due from related parties | | 214 | | 181 |
| Total assets | $ | 9,621 | $ | 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities, including $19 and $27, respectively, due to related parties | $ | 1,009 | $ | 656 |
| Short-term revolving facilities | | 575 | | 2,053 |
| Current portion of long-term debt | | 213 | | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | | 81 | | 29 |
| Total current liabilities | | 1,878 | | 2,890 |
| Long-term debt, excluding current portion | | 6,616 | | 3,208 |
| Operating lease liabilities, excluding current portion, including $10 and $13, respectively, from leases with related parties | | 669 | | 361 |
| Other liabilities | | 84 | | 31 |
| Total liabilities | | 9,247 | | 6,490 |
| Commitments and contingencies (Note 17) | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2022 and December 31, 2021 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,932 and 89,930 shares issued and outstanding as of September 30, 2022 and December 31, 2021, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of September 30, 2022 and December 31, 2021 | | — | | — |
| Additional paid-in capital | | 1,544 | | 795 |
| Accumulated deficit | | (1,270) | | (489) |
| Total stockholders' equity attributable to Carvana Co. | | 274 | | 306 |
| Non-controlling interests | | 100 | | 219 |
| Total stockholders' equity | | 374 | | 525 |
| Total liabilities & stockholders' equity | $ | 9,621 | $ | 7,015 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Sales and operating revenues:** | | | | |
| Retail vehicle sales, net | $ 2,492 | $ 2,650 | $ 8,186 | $ 6,954 |
| Wholesale sales and revenues, including $6, $15, $27 and $37, respectively, from related parties | 697 | 552 | 1,976 | 1,349 |
| Other sales and revenues, including $39, $52, $137 and $143, respectively, from related parties | 197 | 278 | 605 | 758 |
| **Net sales and operating revenues** | 3,386 | 3,480 | 10,767 | 9,061 |
| Cost of sales, including $2, $17, $20 and $21, respectively, to related parties | 3,027 | 2,957 | 9,714 | 7,648 |
| **Gross profit** | 359 | 523 | 1,053 | 1,413 |
| Selling, general and administrative expenses, including $7, $7, $20 and $19, respectively, to related parties | 656 | 546 | 2,104 | 1,413 |
| Interest expense | 153 | 48 | 333 | 121 |
| Other (income) expense, net | 58 | (3) | 68 | (16) |
| **Net loss before income taxes** | (508) | (68) | (1,452) | (105) |
| Income tax provision | — | — | 1 | — |
| **Net loss** | (508) | (68) | (1,453) | (105) |
| Net loss attributable to non-controlling interests | (225) | (36) | (672) | (59) |
| **Net loss attributable to Carvana Co.** | $ (283) | $ (32) | $ (781) | $ (46) |
| Net loss per share of Class A common stock, basic and diluted | $ (2.67) | $ (0.38) | $ (7.88) | $ (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 105,857 | 84,779 | 99,134 | 81,427 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2020** | 76,512 | $ — | 95,592 | $ — | $ 742 | $ (354) | $ 414 | $ 802 |
| Net loss | — | — | — | — | — | (36) | (46) | (82) |
| Exchanges of LLC Units | 3,247 | — | (3,073) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 225 | — | — | 225 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (225) | — | — | (225) |
| Issuance of Class A common stock to settle vested restricted stock units | 62 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (9) | — | — | (9) |
| Options exercised | 15 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 10 | — | — | 10 |
| **Balance, March 31, 2021** | 79,834 | $ — | 92,519 | $ — | $ 755 | $ (390) | $ 356 | $ 721 |
| Net income | — | — | — | — | — | 22 | 23 | 45 |
| Exchanges of LLC Units | 3,189 | — | (3,118) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 217 | — | — | 217 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (217) | — | — | (217) |
| Issuance of Class A common stock to settle vested restricted stock units | 59 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (8) | — | — | (8) |
| Options exercised | 26 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 11 | — | — | 11 |
| **Balance, June 30, 2021** | 83,106 | $ — | 89,401 | $ — | $ 771 | $ (368) | $ 367 | $ 770 |

3

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net loss | — | — | — | — | — | (32) | (36) | (68) |
| Exchanges of LLC Units | 2,400 | — | (2,201) | — | 8 | — | (8) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 199 | — | — | 199 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (199) | — | — | (199) |
| Issuance of Class A common stock to settle vested restricted stock units | 42 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (1) | — | — | — | (8) | — | — | (8) |
| Options exercised | 22 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 14 | — | — | 14 |
| **Balance, September 30, 2021** | 85,569 | $   — | 87,200 | $   — | $  785 | $ (400) | $  323 | $  708 |

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 89,930 | $ — | 82,900 | $ — | $ 795 | $ (489) | $ 219 | $ 525 |
| Net loss | — | — | — | — | — | (260) | (246) | (506) |
| Exchanges of LLC Units | 27 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1 | — | — | 1 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1) | — | — | (1) |
| Contribution of Class A common stock from related party | (97) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 139 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (12) | — | — | (12) |
| Options exercised | 63 | — | — | — | 2 | — | — | 2 |
| Equity-based compensation | — | — | — | — | 43 | — | — | 43 |
| **Balance, March 31, 2022** | 90,062 | $ — | 82,900 | $ — | $ 829 | $ (749) | $ (28) | $ 52 |
| Net loss | — | — | — | — | — | (238) | (201) | (439) |
| Issuances of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 15,625 | — | — | — | 1,227 | — | — | 1,227 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (554) | — | 554 | — |
| Exchanges of LLC Units | 19 | — | — | — | — | — | — | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21 | — | — | 21 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21) | — | — | (21) |
| Contribution of Class A common stock from related party | (2) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 48 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 27 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | 5 | — | — | 5 |
| Options exercised | 10 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, June 30, 2022** | 105,789 | $ — | 82,900 | $ — | $ 1,526 | $ (987) | $ 325 | $ 864 |
| Net loss | — | — | — | — | — | (283) | (225) | (508) |

5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contribution of Class A common stock from related party | (14) | — | — | — | — | — | — | — |
| Issuance of Class A common stock as restricted stock awards and to settle vested restricted stock units | 142 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (1) | — | — | (1) |
| Options exercised | 15 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, September 30, 2022** | 105,932 $ | — | 82,900 $ | — | $ 1,544 $ | (1,270) $ | 100 $ | 374 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (1,453) | $ (105) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 179 | 72 |
| Equity-based compensation expense | 57 | 28 |
| Loss on disposal of property and equipment | 3 | 1 |
| Provision for bad debt and valuation allowance | 11 | 16 |
| Amortization and write-off of debt issuance costs | 20 | 8 |
| Unrealized loss on warrants to acquire Root's Class A common stock | 77 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 1 | (6) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (5,690) | (5,315) |
| Proceeds from sale of finance receivables, net | 5,628 | 5,375 |
| Gain on loan sales | (361) | (528) |
| Principal payments received on finance receivables held for sale | 146 | 136 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 638 | (1,230) |
| Accounts receivable | 40 | (111) |
| Other assets | (75) | (86) |
| Accounts payable and accrued liabilities | 155 | 319 |
| Operating lease right-of-use assets | (132) | (117) |
| Operating lease liabilities | 178 | 121 |
| Other liabilities | (7) | — |
| Net cash used in operating activities | (585) | (1,422) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (451) | (390) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 72 | 38 |
| Net cash used in investing activities | (2,568) | (352) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 10,596 | 8,733 |
| Payments on short-term revolving facilities | (12,074) | (8,318) |
| Proceeds from issuance of long-term debt | 3,435 | 1,525 |
| Payments on long-term debt | (111) | (46) |
| Payments of debt issuance costs | (75) | (21) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 4 | 1 |
| Tax withholdings related to restricted stock units and awards | (8) | (25) |
| Net cash provided by financing activities | 2,994 | 1,849 |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (159) | 75 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 477 | $ 404 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**NOTE 1 — BUSINESS ORGANIZATION**

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC"), auto insurance, and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of September 30, 2022, Carvana Co. owned approximately 55.7% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity) owned the remaining 44.3%.

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K filed on February 24, 2022.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of September 30, 2022, results of operations and changes in stockholder's equity for the three and nine months ended September 30, 2022 and 2021, and cash flows for the nine months ended September 30, 2022 and 2021. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Liquidity**

Since inception, the Company has incurred losses, and expects to incur additional losses in the future as it continues to build inspection and reconditioning centers ("IRCs") and vending machines, serve more of the U.S. population, and enhance technology and software. In the second quarter of 2022, the Company completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion and issued a total of $3.275 billion in aggregate principal amount of 10.25% senior unsecured notes due 2030 (the "2030 Notes"). The Company used a portion of the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA, Inc. ("ADESA") and other ancillary transactions in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes. In March 2022, the Company's forward flow partner committed to purchase a total of $5.0 billion of the Company's finance receivables through March 2023, and such facility had $1.9 billion of unused capacity as of September 30, 2022. In addition, the Company has a $2.2 billion floor plan facility effective through September 22, 2023, and $2.0 billion thereafter through March 22, 2024. Management believes that current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. ASU 2021-08 requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606 instead of being recorded at fair value. The Company early adopted ASU 2021-08 in the second quarter of 2022 and it did not have a material effect on its condensed consolidated financial statements as there were no business combinations affected by the retrospective application to January 1, 2022.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Business**

On May 9, 2022, the Company completed its previously announced acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA from KAR Auction Services, Inc. for approximately $2.2 billion in cash. Proceeds from the issuance and sale of the 2030 Notes were used to fund the acquisition. The acquisition included 56 auction sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding the Company's infrastructure and enhancing its customer offering by facilitating a broader selection of vehicles and faster delivery times.

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes the preliminary allocation of the purchase price consideration to identifiable assets acquired and liabilities assumed as of September 30, 2022:

|  | Preliminary Purchase Price Allocation |
|---|---|
|  | (in millions) |
| **Assets Acquired** |  |
| Current assets | $ 208 |
| Property and equipment | 1,281 |
| Operating lease right-of-use assets | 188 |
| Intangible assets | 79 |
| Other assets | 1 |
|   Total Assets Acquired | 1,757 |
|  |  |
| **Liabilities Assumed** |  |
| Current liabilities | 233 |
| Operating lease liabilities | 167 |
|   Total Liabilities Assumed | 400 |
|  |  |
| **Net Assets Acquired** | 1,357 |
| Purchase price consideration | 2,195 |
| **Goodwill** | $ 838 |

Identifiable intangible assets acquired consist of the following:

|  | Fair Value | Useful Life |
|---|---|---|
| Customer relationships | $ 50 | 10 years |
| Developed technology | $ 29 | 3 years |

Preliminary measurements of fair value are subject to change during the measurement period based on the Company's continuing review of matters related to the acquisition and could be material. The Company expects to complete the purchase price allocation as soon as practicable, but no later than one year from the acquisition date.

Customer relationships were valued using the multi-period excess earnings method of the income approach. Developed technology was valued using the replacement cost method of the cost approach. Significant assumptions used in the valuations were revenues and attrition rate and are classified as Level 3 due to the lack of observable market data. No residual values were assigned to the customer relationships and developed technology intangible assets and they are amortized on an economic useful life basis commensurate with future anticipated cash flows and straight line, respectively. As of September 30, 2022, the remaining weighted-average amortization period for the intangible assets acquired was approximately 6.8 years.

Real property was valued using market comparable transactions of the market approach, for which the key assumption is the similarity of the acquired property to market comparable transactions. Personal property was valued using the replacement cost method of the cost approach, for which the key assumptions are the costs of similar personal property in new condition and economic obsolescence rates.

The acquisition resulted in the recognition of $838 million of goodwill, which is deductible for tax purposes and represents the future economic benefits expected to arise from anticipated synergies and intangible assets that do not qualify for separate recognition, including an assembled workforce, non-contractual relationships and other agreements.

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

For the three and nine months ended September 30, 2022, the Company recognized $193 million and $301 million, respectively, of wholesale sales and revenues, $180 million and $283 million, respectively, of cost of sales, and a net loss of $36 million and $57 million, respectively, from ADESA operations, which includes $31 million and $51 million, respectively, of depreciation and amortization, including acquired intangible assets amortization expense of $6 million and $10 million, respectively.

The following unaudited pro forma combined results of operations information for the three and nine months ended September 30, 2022 and 2021 have been prepared as if the ADESA acquisition occurred on January 1, 2021:

| | | *Unaudited* | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| Revenues | $ 3,386 | $ 3,685 | $ 11,066 | $ 9,721 |
| Net loss | (508) | (144) | (1,583) | (312) |
| Net loss attributable to non-controlling interests | (225) | (68) | (703) | (153) |
| Net loss attributable to Carvana Co. | $ (283) | $ (76) | $ (880) | $ (159) |
| Net loss per share of Class A common stock - basic and diluted | $ (2.67) | $ (0.76) | $ (8.32) | $ (1.64) |
| Weighted-average shares of Class A common stock - basic and diluted | 105,857 | 100,404 | 105,774 | 97,076 |

The unaudited pro forma combined results of operations information reflect the following pro forma adjustments:

| | | *Unaudited* | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
| --- | --- | --- | --- | --- |
| | | Increase/(Decrease) (in millions) | | |
| Interest expense | $ — | $ 86 | $ 123 | $ 259 |
| Lease expense | — | (3) | 5 | (13) |
| Depreciation and amortization expense | — | — | 13 | (4) |
| Intercompany revenues and cost of sales | — | $ (5) | $ (7) | $ (15) |

The unaudited pro forma combined results of operations information is provided for informational purposes only and is not necessarily intended to represent the results that would have been achieved had the ADESA acquisition been consummated on January 1, 2021 or indicative of the results that may be achieved in the future.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 4 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net as of September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Land and site improvements | $ 1,357 | $ 303 |
| Buildings and improvements | 1,231 | 643 |
| Transportation fleet | 658 | 347 |
| Software | 229 | 169 |
| Furniture, fixtures and equipment | 172 | 97 |
| Total property and equipment excluding construction in progress | 3,647 | 1,559 |
| Less: accumulated depreciation and amortization on property and equipment | (488) | (294) |
| Property and equipment excluding construction in progress, net | 3,159 | 1,265 |
| Construction in progress | 167 | 295 |
| Property and equipment, net | $ 3,326 | $ 1,560 |

Depreciation and amortization expense on property and equipment was $100 million and $33 million for the three months ended September 30, 2022 and 2021, respectively, of which $51 million and $27 million were recorded to selling, general and administrative expense, respectively, $13 million and $6 million were capitalized to vehicle inventory, respectively, and $36 million and $6 million were recorded to cost of sales, respectively, including $13 million and $6 million previously capitalized to vehicle inventory.

Depreciation and amortization expense on property and equipment was $238 million and $91 million for the nine months ended September 30, 2022 and 2021, respectively, of which $132 million and $72 million were recorded to selling, general and administrative expense, respectively, $34 million and $19 million were capitalized to vehicle inventory, respectively, and $72 million and $17 million were recorded to cost of sales, respectively, including $31 million and $17 million previously capitalized to vehicle inventory, respectively.

**NOTE 5 — GOODWILL AND INTANGIBLE ASSETS, NET**

The following table summarizes goodwill and intangible assets, net as of September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Intangible assets: | | |
| Customer relationships | $ 50 | $ — |
| Developed technology | 41 | 9 |
| Non-compete agreements | 1 | 1 |
| Intangible assets, acquired cost | 92 | 10 |
| Less: accumulated amortization | (16) | (6) |
| Intangible assets, net | $ 76 | $ 4 |
| | | |
| Goodwill | $ 847 | $ 9 |

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Amortization expense was $6 million and less than $1 million during the three months ended September 30, 2022 and 2021, respectively, and $10 million and $1 million during the nine months ended September 30, 2022 and 2021, respectively. As of September 30, 2022, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 6.3 years. The anticipated annual amortization expense to be recognized in future years as of September 30, 2022, is as follows:

|  | Expected Future Amortization |
|---|---|
|  | (in millions) |
| Remainder of 2022 | $ 6 |
| 2023 | 18 |
| 2024 | 18 |
| 2025 | 14 |
| 2026 | 7 |
| Thereafter | 13 |
| Total | $ 76 |

**NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES**

The following table summarizes accounts payable and other accrued liabilities as of September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Accounts payable, including $19 and $27, respectively, due to related parties | $ 292 | $ 141 |
| Accrued compensation and benefits | 78 | 45 |
| Sales taxes and vehicle licenses and fees | 85 | 102 |
| Accrued interest expense | 191 | 42 |
| Reserve for returns and cancellations | 58 | 44 |
| Accrued property and equipment | 32 | 85 |
| Customer deposits | 33 | 34 |
| Accrued advertising costs | 18 | 40 |
| Other accrued liabilities | 222 | 123 |
| Total accounts payable and accrued liabilities | $ 1,009 | $ 656 |

**NOTE 7 — RELATED PARTY TRANSACTIONS**

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all of the interests in DriveTime, entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with the hub locations having cancellable terms, provided 60 days' prior written notice is given, expiring between 2023 and 2026. The Company has the right to exercise up to two

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

consecutive one-year renewal options at up to ten of these hub locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2023 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations, the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco IRCs. At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a sublease agreement from DriveTime of a fully operational IRC near Cleveland, Ohio. The lease had an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. In July 2021, the Company exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime effective October 1, 2021.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were $1 million during each of the three months ended September 30, 2022 and 2021, and $3 million and $4 million during the nine months ended September 30, 2022 and 2021, respectively, allocated between inventory and selling, general and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. While the Company solely occupies the IRC, DriveTime is not fully released from the lease obligations by the landlord. The lease expires in October 2023, subject to the ability to exercise three renewal options of five years each.

**Office Leases**

In September 2016, the Company entered into a lease for office space in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of another floor in the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was less than $1 million during each of the three months ended September 30, 2022 and 2021, and $1 million during each of the nine months ended September 30, 2022 and 2021.

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In December 2019, Verde Investments, Inc. ("Verde"), a related party of the Company due to the Garcia Parties controlling and owning substantially all of the interests in Verde, purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was less than $1 million during each of the three months ended September 30, 2022 and 2021, and $1 million during each of the nine months ended September 30, 2022 and 2021.

**Wholesale Sales and Revenues**

DriveTime purchases wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. The Company recognized $6 million and $15 million of wholesale sales and revenues from DriveTime during the three months ended September 30, 2022 and 2021, respectively, and $27 million and $37 million during the nine months ended September 30, 2022 and 2021, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of September 30, 2022, $2 million related to vehicles and reconditioning services were included in vehicle inventory in the accompanying unaudited condensed consolidated balance sheets. The Company also recognized $1 million and $17 million of cost of goods sold during the three months ended September 30, 2022 and 2021, respectively, and $19 million during each of the nine months ended September 30, 2022 and 2021.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended September 30, 2022 and 2021, the Company recognized $42 million and $47 million, respectively, and during the nine months ended September 30, 2022 and 2021, the Company recognized $138 million and $130 million, respectively of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. The Company recognized expense of $3 million and income of $5 million during the three months ended September 30, 2022 and 2021, respectively, and expense of $1 million and income of $13 million during the nine months ended September 30, 2022 and 2021, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated party. The Company incurred $5 million during each of the three months ended September 30, 2022 and 2021, and approximately $14 million and $11 million during the nine months ended September 30, 2022 and 2021, respectively, related to the administration of limited warranty and GAP waiver coverage.

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of $3 million and $2 million during the three months ended September 30, 2022 and 2021, respectively, and approximately $7 million and $5 million during the nine months ended September 30, 2022 and 2021, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million and $1 million during the three and nine months ended and September 30, 2022, respectively, and less than $1 million during each of the three and nine months ended September 30, 2021 under this agreement.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the three and nine months ended September 30, 2022 and 2021.

**Accounts Payable Due to Related Party**

As of September 30, 2022 and December 31, 2021, $19 million and $27 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contributions of Class A Common Shares From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in Q4 2021, the Company's CEO, Ernest Garcia III ("Mr. Garcia"), committed to giving then-current employees 23 shares of Class A common stock from his personal shareholdings once employees reach their two-year employment anniversary ("CEO Milestone Gift" or "Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia will contribute to the Company, at the end of each fiscal quarter, the number of shares of Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund RSU awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the three and nine months ended September 30, 2022, 14,099 and 113,206 RSUs, respectively, vested and were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has agreed to indemnify Mr. Garcia from any such obligations that may arise.

**NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial Inc. (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2021 and 2022, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. On each of March 17, 2022 and March 22, 2022, the Ally Parties amended the MPSA to, in aggregate, extend the scheduled commitment termination date to March 21, 2023 and increase the Ally Parties' commitment to purchase finance receivables to $5.0 billion, an increase of $1.0 billion from the previous commitment. Finally, on November 1, 2022, the Company amended and restated the MPSA to, among other things, consolidate and reflect the several previously executed amendments to the MPSA facility and streamline the funding mechanics associated with the sale of finance receivables to the Ally Parties.

During the three months ended September 30, 2022 and 2021, the Company sold $1.3 billion and $594 million, respectively, in principal balances of finance receivables under the MPSA. During the nine months ended September 30, 2022 and 2021, the Company sold $3.1 billion and $1.7 billion, respectively, in principal balances of finance receivables under the MPSA and had $1.9 billion of unused capacity as of September 30, 2022.

**Securitization Transactions**

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with the Risk Retention Rules, as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the three months ended September 30, 2022 and 2021, the Company sold $364 million and $1.5 billion, respectively, in principal balances of finance receivables through securitization transactions. During the nine months ended September 30, 2022 and 2021, the Company sold approximately $2.4 billion and $3.4 billion, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was $126 million and $191 million during the three months ended September 30, 2022 and 2021, respectively, and $361 million and $529 million during the nine months ended September 30, 2022 and 2021, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of September 30, 2022, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets, which as of September 30, 2022 and December 31, 2021 were $350 million and $382 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of September 30, 2022 and December 31, 2021.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at September 30, 2022 and December 31, 2021. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | September 30, 2022 | | | | December 31, 2021 | | | |
| | Carrying Value | | Total Exposure | | Carrying Value | | Total Exposure | |
| | (in millions) | | | | | | | |
| Rated notes | $ | 283 | $ | 283 | $ | 282 | $ | 282 |
| Certificates and other assets | | 67 | | 67 | | 100 | | 100 |
| Total unconsolidated VIEs | $ | 350 | $ | 350 | $ | 382 | $ | 382 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of September 30, 2022 and December 31, 2021 were as follows:

| | September 30, 2022 | | | | December 31, 2021 | | | |
| | Amortized Cost | | Fair Value | | Amortized Cost | | Fair Value | |
| | (in millions) | | | | | | | |
| Rated notes | $ | 298 | $ | 283 | $ | 282 | $ | 282 |
| Certificates and other assets | | 45 | | 67 | | 93 | | 100 |
| Total securities available for sale | $ | 343 | $ | 350 | $ | 375 | $ | 382 |

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 10 — DEBT INSTRUMENTS**

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of September 30, 2022 and December 31, 2021 consisted of the following:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Asset-based financing: | | |
| Floor plan facilities | $ 575 | $ 1,877 |
| Finance receivable facilities | — | 176 |
| Financing of beneficial interest in securitizations | 298 | 282 |
| Notes payable | 4 | 10 |
| Real estate financing | 486 | 447 |
| Total asset-based financing | 1,363 | 2,792 |
| Senior notes | 5,725 | 2,450 |
| Total debt | 7,088 | 5,242 |
| Less: current portion | (687) | (2,154) |
| Less: unamortized debt issuance costs [1] | (85) | (34) |
| Total included in long-term debt, net | $ 6,316 | $ 3,054 |

(1) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying condensed consolidated balance sheets and not included here.

**Short-Term Revolving Facilities**

*Floor Plan Facilities*

The Company previously entered into a floor plan facility with a lender to finance its vehicle inventory (the "Original Floor Plan Facility"), which was secured by Carvana LLC's vehicle inventory, general intangibles, accounts receivable, and finance receivables. The Original Floor Plan Facility was amended at various times and effective September 22, 2022, the Company amended and restated the facility (the "12-Month Floor Plan Facility") to extend the maturity date to September 22, 2023 with a line of credit of $2.2 billion and tie the interest rate to a prime rate plus 1.00%.

On September 22, 2022, the Company also entered into a separate floor plan facility (the "18-Month Floor Plan Facility", and together with the 12-Month Floor Plan Facility, the "Floor Plan Facilities") with a lender. The line of credit under the 18-Month Floor Plan Facility is $2.0 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and its maturity date is March 22, 2024. The interest rate under the 18-Month Floor Plan Facility is tied to a prime rate plus 1.00%.

Under the Floor Plan Facilities, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 150 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facilities and subsequently reborrow such

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

amounts. The Floor Plan Facilities also require monthly interest payments and that at least 12.5% of the total principal amount owed to the lender is held as restricted cash.

The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter under the Floor Plan Facilities.

As of September 30, 2022, the Company had $575 million outstanding under the 12-Month Floor Plan Facility, unused capacity of $1.6 billion, and held $72 million in restricted cash related to this facility. As of September 30, 2022, the Company had no amount outstanding under the 18-Month Floor Plan Facility, unused capacity of $2 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and held no amount in restricted cash related to this facility. During the three months ended September 30, 2022, the Company's effective interest rate on the 12-Month Floor Plan Facility was approximately 4.53%.

As of December 31, 2021, the Company had $1.9 billion outstanding under the Original Floor Plan Facility, unused capacity of $373 million, and held $141 million in restricted cash related to this facility. For the year ended December 31, 2021, the Company's effective interest rate on the Original Floor Plan Facility was approximately 2.55%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility, which was subsequently increased to $500 million, to fund certain automotive finance receivables originated by the Company. In June 2021, the Company amended its agreement to, among other things, extend the maturity date to January 24, 2023.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million, and extend the maturity date to December 8, 2023.

On April 30, 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase this line of credit to $600 million. In September 2022, the Company amended its agreement to extend the maturity date to March 30, 2024.

On October 15, 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until April 15, 2023.

On March 18, 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until September 18, 2023.

The Finance Receivable Facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The Finance Receivable Facilities require monthly payments of interest and fees based on usage and unused facility amounts. The Finance Receivable Facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these Finance Receivable Facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of September 30, 2022 and December 31, 2021, the Company had zero and $176 million, respectively, outstanding under these Finance Receivable Facilities, unused capacity of $2.6 billion and $1.9 billion, respectively, and held $41 million and $67 million, respectively, in restricted cash related to these Finance Receivable Facilities. During the three months ended September 30, 2022, the Company's effective interest rate on these

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Finance Receivable Facilities was approximately 4.33%. For the year ended December 31, 2021, the Company's effective interest rate on these Finance Receivable Facilities was approximately 1.64%.

**Long-Term Debt**

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (collectively, the "Senior Notes") each under a separate indenture (collectively, the "Indentures"), as further described below.

The following table summarizes components of the Company's senior unsecured notes:

| | September 30, 2022 | | December 31, 2021 | Interest Rate |
|---|---|---|---|---|
| | **(in millions, except percentages)** | | | |
| 2025 Senior Unsecured Notes due October 1, 2025 ("2025 Notes") | $ 500 | $ | 500 | 5.625 % |
| 2027 Senior Unsecured Notes due April 15, 2027 ("2027 Notes") | 600 | | 600 | 5.500 % |
| 2028 Senior Unsecured Notes due October 1, 2028 ("2028 Notes") | 600 | | 600 | 5.875 % |
| 2029 Senior Unsecured Notes due September 1, 2029 ("2029 Notes") | 750 | | 750 | 4.875 % |
| 2030 Senior Unsecured Notes due May 1, 2030 ("2030 Notes") | 3,275 | | — | 10.250 % |
| Total principal amount | 5,725 | | 2,450 | |
| Less: unamortized debt issuance cost | (79) | | (28) | |
| Total debt | $ 5,646 | $ | 2,422 | |

Each of the 2025 Notes, the 2027 Notes, the 2028 Notes and the 2029 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The 2030 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee. The interest on each of the Senior Notes is payable semi-annually, beginning on April 1, 2021 for the 2025 Notes and 2028 Notes, October 15, 2021 for the 2027 Notes, March 1, 2022 for the 2029 Notes, and November 1, 2022 for the 2030 Notes. The Senior Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, or immaterial subsidiaries).

The Company may redeem some or all of each issuance of Senior Notes at redemption prices set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to those redemption dates, the Company may redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. With respect to the 2030 Notes, the Company may, at its option, redeem in the aggregate of up to 10% of the original aggregate principal amount of the 2030 Notes during the period from, and including, May 1, 2025 to, but excluding May 1, 2027, at a redemption price equal to 105.125% of the 2030 Notes to be redeemed, plus accrued and unpaid interest thereon to the relevant redemption rate. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to its redemption date, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if any of the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of September 30, 2022 and December 31, 2021, the outstanding principal of these notes had a weighted-average interest rate of 7.0% and 6.4%, respectively, and totaled $4 million and $10 million, respectively, net of unamortized debt issuance costs, of which $2 million and $7 million as of September 30, 2022 and December 31, 2021, respectively, was due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of September 30, 2022, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of September 30, 2022 and December 31, 2021, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was $483 million and $444 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of September 30, 2022 and December 31, 2021, the Company has pledged $298 million and $282 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from July 2024 to September 2029. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was $295 million and $279 million as of September 30, 2022 and December 31, 2021, respectively, of which $109 million and $93 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2022, the Company was in compliance with all debt covenants.

**NOTE 11 — STOCKHOLDERS' EQUITY**

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock, determined on an as-exchanged basis, assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub, LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of September 30, 2022 and December 31, 2021, there were 236 million and 216 million Class A Units, and 2 million and 3 million Class B Units, respectively, (as adjusted for the participation thresholds and closing price of Class A common stock on September 30, 2022 and December 31, 2021), issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 26, 2022, the Company completed a public offering of 15.625 million shares of its Class A common stock for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5.4 million shares of the Class A common stock offered at the public offering price. The Company used the net proceeds to purchase 19.5 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended September 30, 2022 and 2021, certain LLC Unitholders exchanged zero and 3 million LLC Units and zero and 2 million shares of Class B common stock for zero and 3 million newly-issued shares of Class A common stock, respectively. During the nine months ended September 30, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 11 million LLC Units and zero and 8 million shares of Class B common stock for less than 1 million and 9 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received zero and 3 million LLC Units during the three months ended September 30, 2022 and 2021, respectively, and less than 1 million and 11 million LLC Units during the nine months ended September 30, 2022 and 2021, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes. On August 16, 2021, Carvana Group LLC issued 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes. On May 6, 2022, Carvana Group LLC issued 3.3 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2030 Notes. Carvana Co. used its net proceeds from the 2023 Notes (which have since been repurchased), the 2025 and 2028 Notes, the 2027 Notes, the 2029 Notes and the 2030 Notes, to purchase 0.6 million, 1.1 million, 0.6 million, 0.8 million, and 3.3 million, respectively, of Class A Non-Convertible Preferred Units.

When Carvana Co. makes payments on the Senior Notes, Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired.

**NOTE 12 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the nine months ended September 30, 2022 and 2021, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of $1 million and $32 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity. During the nine months ended September 30, 2022, Carvana Co. utilized its net proceeds from its equity offering to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by $554 million, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of September 30, 2022, Carvana Co. owned approximately 55.7% of Carvana Group with the LLC Unitholders owning the remaining 44.3%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

| | Nine Months Ended September 30, | | |
|---|---|---|---|
| | 2022 | | 2021 |
| | (in millions) | | |
| Transfers from (to) non-controlling interests: | | | |
| Decrease as a result of issuances of Class A common stock | $ (554) | $ | — |
| Increase as a result of exchanges of LLC Units | 1 | | 32 |
| Total transfers from (to) non-controlling interests | $ (553) | $ | 32 |

### NOTE 13 — EQUITY-BASED COMPENSATION

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the three and nine months ended September 30, 2022 and 2021 is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions) | | | |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | $ 12 | $ 11 | $ 29 | $ 26 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | 3 | — | 40 | — |
| Options | 3 | 3 | 10 | 8 |
| Class A Units | — | — | — | 1 |
| Total equity-based compensation | 18 | 14 | 79 | 35 |
| Equity-based compensation capitalized to property and equipment | (3) | (3) | (7) | (6) |
| Equity-based compensation capitalized to inventory | (1) | (1) | (16) | (1) |
| Equity-based compensation, net of capitalized amounts | $ 14 | $ 10 | $ 56 | $ 28 |

As of September 30, 2022, the total unrecognized compensation related to outstanding equity awards was $167 million, which the Company expects to recognize over a weighted-average period of approximately 3.0 years. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14 million shares of Class A common stock were initially available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other stock-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company, other than equity granted in relation to the CEO Milestone Gift, vests over four year periods based on continued employment with the Company. As of September 30, 2022, approximately 7 million shares remain available for future equity-based award grants under this plan.

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to maximums that may vary between

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

$10,000 and $25,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP.

As of September 30, 2022, the Company issued 27,462 shares of Class A common stock and 470,044 shares remained available for future issuance. During the three and nine months ended September 30, 2022, the Company incurred less than $1 million of equity-based compensation expense related to the ESPP.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and nine months ended September 30, 2022 or 2021. As of September 30, 2022, outstanding Class B Units had participation thresholds between $0.00 to $12.00. During the three and nine months ended September 30, 2022 and 2021, the Company incurred less than $1 million of equity-based compensation expense related to the Class B Units.

**NOTE 14 — NET LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented. Net loss for all periods presented is attributable only to Class A common stockholders, due to no activity related to convertible preferred stock during those periods.

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net loss per share during the three and nine months ended September 30, 2022 and 2021:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions, except number of shares, which are reflected in thousands, and per share amounts) | | | |
| **Numerator:** | | | | |
| Net loss | $ (508) | $ (68) | $ (1,453) | $ (105) |
| Net loss attributable to non-controlling interests | (225) | (36) | (672) | (59) |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (283) | $ (32) | $ (781) | $ (46) |
| **Denominator:** | | | | |
| Weighted-average shares of Class A common stock outstanding | 105,878 | 84,815 | 99,141 | 81,468 |
| Nonvested weighted-average restricted stock awards | (21) | (36) | (7) | (41) |
| Weighted-average shares of Class A common stock, basic and diluted | 105,857 | 84,779 | 99,134 | 81,427 |
| Net loss per share of Class A common stock, basic and diluted | $ (2.67) | $ (0.38) | $ (7.88) | $ (0.56) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented.

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net loss per share of Class A common stock for the three and nine months ended September 30, 2022 and 2021.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in thousands) | | | |
| Options [1] | 1,265 | 1,101 | 1,265 | 1,101 |
| Restricted Stock Units and Awards [1] | 826 | 688 | 826 | 710 |
| Class A Units [2] | 82,963 | 87,912 | 82,963 | 91,060 |
| Class B Units [2] | 1,580 | 2,150 | 1,580 | 2,271 |

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.
(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

corporation and is subject to U.S. federal, state, and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 11 — Stockholders' Equity, the Company did not acquire any LLC units during the three months ended September 30, 2022. The Company acquired 3 million LLC Units during the three months ended September 30, 2021. The Company acquired less than 1 million and 11 million LLC Units during the nine months ended September 30, 2022 and 2021, respectively, in connection with exchanges with LLC Unitholders. During the three months ended September 30, 2022, the Company did not record a gross deferred tax asset. During the three months ended September 30, 2021, the Company recorded a gross deferred tax asset of $199 million. During the nine months ended September 30, 2022, and 2021, the Company recorded a gross deferred tax asset of $1 million and $641 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 11 — Stockholders' Equity, during the nine months ended September 30, 2022, the Company issued 15.625 million shares of its Class A common stock and received net proceeds from the offering of $1.2 billion. The Company utilized the proceeds to purchase 19.5 million newly issued Class A units in Carvana Group. The Company recognized a gross deferred tax asset of $20 million from the offering, associated with a portion of the basis difference resulting from this purchase of Carvana Group units, which is reflected as an increase to addition paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 5 — Goodwill and Intangible Assets, Net, the Company acquired various intangible assets in connection with the acquisition of Car360 in 2018. As a result, the Company recognized a deferred tax liability of $2 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheets. The deferred tax liability will be amortized over five to seven years and less than $1 million was amortized during each of the nine months ended September 30, 2022 and 2021.

During the nine months ended September 30, 2022, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of September 30, 2022 and December 31, 2021, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the three months ended September 30, 2022 and 2021 was an expense of 0.1% and 0.3%, respectively, and for the nine months ended September 30, 2022 and 2021 was an expense of 0.1% and 0.2%, respectively, related to its wholly-owned subsidiaries.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of September 30, 2022, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of September 30, 2022, the total unrecorded TRA liability is $1.6 billion. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

**NOTE 16 — LEASES**

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of September 30, 2022, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2022 and 2038. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and nine months ended September 30, 2022 and 2021 were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (in millions) | | | |
| **Lease costs:** | | | | |
| Finance leases: | | | | |
| Amortization of finance lease assets | $ 27 | $ 11 | $ 68 | $ 26 |
| Interest obligations under finance leases | 5 | 2 | 13 | 5 |
| Total finance lease costs | $ 32 | $ 13 | $ 81 | $ 31 |
| | | | | |
| Operating leases: | | | | |
| Fixed lease costs to non-related parties | $ 26 | $ 14 | $ 78 | $ 35 |
| Fixed lease costs to related parties | 1 | 1 | 3 | 4 |
| Variable short-term lease costs to related parties | — | 1 | — | 1 |
| Total operating lease costs | $ 27 | $ 16 | $ 81 | $ 40 |
| | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | |
| Operating lease liabilities to non-related parties | | | $ 56 | $ 23 |
| Operating lease liabilities to related parties | | | $ 4 | $ 4 |
| Interest payments on finance lease liabilities | | | $ 13 | $ 5 |
| | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | |
| Principal payments on finance lease liabilities | | | $ 106 | $ 35 |

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of September 30, 2022:

| | Finance Leases | Operating Leases [1] Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| | | (in millions) | | | |
| Remainder of 2022 | $ 32 | $ 1 | $ 25 | $ 26 | $ 58 |
| 2023 | 117 | 5 | 106 | 111 | 228 |
| 2024 | 105 | 3 | 114 | 117 | 222 |
| 2025 | 91 | 2 | 115 | 117 | 208 |
| 2026 | 71 | 2 | 112 | 114 | 185 |
| Thereafter | 32 | 4 | 510 | 514 | 546 |
| Total minimum lease payments | 448 | 17 | 982 | 999 | 1,447 |
| Less: amount representing interest | (47) | (3) | (266) | (269) | (316) |
| Total lease liabilities | $ 401 | $ 14 | $ 716 | $ 730 | $ 1,131 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of September 30, 2022 and December 31, 2021, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of September 30, 2022 and 2021 were as follows, excluding short-term operating leases:

| | As of September 30, | |
|---|---|---|
| | 2022 | 2021 |
| **Weighted-average remaining lease terms (years)** | | |
| Operating leases | 8.6 | 9.2 |
| Finance leases | 4.3 | 4.4 |
| **Weighted-average discount rate** | | |
| Operating leases | 7.1 % | 7.5 % |
| Finance leases | 5.6 % | 5.4 % |

**NOTE 17 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each retail vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was $21 million and $16 million as of September 30, 2022 and December 31, 2021, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

31

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)
(Unaudited)

**Purchase Obligations**

The Company has purchase obligations for certain customary services related to operating a wholesale auction business of $174 million in aggregate over the next seven years, as of September 30, 2022. These purchase obligations are recorded as liabilities when the services are rendered.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. The Company is currently involved in matters related to, among other topics, its title and registration process, including requests for information from government agencies, class actions and shareholder derivative lawsuits. The Company believes the claims in these matters are not material or are without merit and intends to defend the matters vigorously. The Company also continues to work closely with government agencies to respond to their requests for information. It is not possible to determine the probability of loss or estimate damages, if any, for any of the above matters, and therefore, the Company has not established reserves for any of these proceedings. If the Company determines that a loss is both probable and reasonably estimable, the Company will record a liability, and, if the liability is material, disclose the amount of the liability reserved. If an unfavorable ruling or development were to occur, there exists the possibility of a material adverse impact on the Company's business, results of operations, financial condition or cash flows.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies in its most recent Annual Report on Form 10-K.

32

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following tables are a summary of fair value measurements and hierarchy level at September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | | | |
| --- | --- | --- | --- | --- |
|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|  | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $           139 | $           139 | $           — | $           — |
| Beneficial interests in securitizations | 350 | — | — | 350 |
|  | December 31, 2021 | | | |
|  | Carrying Value | Level 1 | Level 2 | Level 3 |
|  | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $           154 | $           154 | $           — | $           — |
| Beneficial interests in securitizations | 382 | — | — | 382 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2022 and December 31, 2021, the Company has purchase price adjustment receivables of $41 million and $34 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of $5 million and $3 million during the three months ended September 30, 2022 and 2021, respectively, and a gain of $11 million and $17 million during the nine months ended September 30, 2022 and 2021, respectively, and are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of September 30, 2022 and December 31, 2021, the discount rates were 4.7% to 10.0% and 1.1% to 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to

33

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers into or out of Level 3 during the three and nine months ended September 30, 2022 or 2021.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that meet the criteria for sale set forth in the Risk Retention Rules. For the three and nine months ended September 30, 2022, the Company sold beneficial interests in securitizations for a purchase price totaling $40 million and $43 million, respectively.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and nine months ended September 30, 2022 and 2021:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (in millions) | | | |
| **Opening Balance** | $ 401 | $ 239 | $ 382 | $ 131 |
| Received in securitization transactions | 24 | 33 | 148 | 170 |
| Cash receipts | (44) | (27) | (136) | (60) |
| Change in fair value | 9 | 2 | (1) | 6 |
| Sales of beneficial interests | (40) | — | (43) | — |
| **Ending Balance** | $ 350 | $ 247 | $ 350 | $ 247 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended September 30, 2022 and December 31, 2021. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of September 30, 2022 and December 31, 2021 was as follows:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Carrying value, net of unamortized debt issuance costs | $ 5,646 | $ 2,422 |
| Fair value | 3,465 | 2,411 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the

34

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of September 30, 2022 and December 31, 2021 were as follows:

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Carrying value | $ 485 | $ 356 |
| Fair value | 520 | 392 |

**Investment in Equity Securities**

During October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to the accounting standards and recorded the investment at its cost of $126 million which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of its investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of its investment in Root, as there have not been changes in the observable price of its equity interest through September 30, 2022. On August 12, 2022, Root effected a reverse stock split of its Class A common stock and Class B common stock at a ratio of 18:1, whereby each 18 shares of Root's Class A common stock and Class B common stock were automatically combined into one share of Class A common stock or Class B common stock, respectively (the "Reverse Stock Split"). The shares of Root's Class A common stock issuable to the Company on the conversion of the Series A convertible preferred shares were adjusted proportionally.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products were to be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "Warrants"). On September 1, 2022, the integrated auto insurance solution, which embedded into the Company's e-commerce platform (the "Integrated Platform"), was completed. One tranche of the Warrants, consisting of 2.4 million shares, as adjusted pursuant to the Reverse Stock Split, became exercisable upon completion of the Integrated Platform, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Integrated Platform and are considered a derivative instrument. The Company used a Monte Carlo simulation to estimate the fair value of these Warrants, which are classified as Level 3. At contract inception, the Company recognized an asset of $30 million for the Warrants and deferred revenue, classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets. During the three months ended September 30, 2022, the Company determined it was probable that the volume of insurance products required to earn the Warrants would be achieved and recorded an additional $75 million of Warrants and deferred revenue based on the contract inception date fair value as determined by the Monte Carlo simulation. The Warrants and deferred revenue are classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets.

The following table presents changes in the Company's Level 3 Warrants measured at fair value:

|  | 2022 |
|---|---|
|  | (in millions) |
| Balance at December 31, 2021 | $ 6 |
| Warrants to acquire Root's Class A common stock | 75 |
| Total unrealized loss [1] | (77) |
| Balance at September 30, 2022 | $ 4 |

(1) The Company recognized the decrease in fair value in relation to the Warrants to acquire Root's Class A common stock through other expense (income), net in the accompanying consolidated statements of operations. The Company recognized a

35

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

decrease in fair value of $72 million and $77 million during the three and nine months ended September 30, 2022, respectively. No amounts were recorded during the three and nine months ended September 30, 2021.

**Derivative Instruments**

As of September 30, 2022 and December 31, 2021, the Company had no other outstanding derivative instruments.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the nine months ended September 30, 2022 and 2021:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2022 | 2021 |
|  | (in millions) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 178 | $ 82 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 43 | $ 74 |
| Property and equipment acquired under finance leases | $ 300 | $ 81 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 371 | $ 139 |
| Warrants to acquire Root's Class A common stock | $ 75 | $ — |
| Equity-based compensation expense capitalized to property and equipment | $ 6 | $ 6 |
| Fair value of beneficial interests received in securitization transactions | $ 148 | $ 235 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 105 | $ 22 |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

|  | September 30, 2022 | December 31, 2021 | September 30, 2021 |
|---|---|---|---|
|  | (in millions) | | |
| Cash and cash equivalents | $ 316 | $ 403 | $ 297 |
| Restricted cash [(1)] | 161 | 233 | 107 |
| Total cash, cash equivalents and restricted cash | $ 477 | $ 636 | $ 404 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities. Refer to Note 10 — Debt Instruments for additional information. Remaining restricted cash represents certain cash held for corporate insurance purposes.

36

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Part I, Item 1 of this Form 10-Q.*

**Overview**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a retail vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a retail vehicle.*** As of September 30, 2022, we listed approximately 71,300 total retail units on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling vehicles to retail customers is the primary driver of our business. Selling retail vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, other ancillary products, and trade-ins.

- ***Finance their purchase.*** Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we generally earn a premium upon sale.

- ***Protect their purchase.*** Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate. We have also partnered with Root, Inc. ("Root") to offer an integrated auto insurance solution, through which customers in most states may conveniently access auto insurance directly from the Carvana e-commerce platform.

- ***Sell us their car.*** We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home or elsewhere within one of our markets and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle acquisition.*** We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from

37

customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- ***Inspection and reconditioning.*** Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to a greenfield inspection and reconditioning center or auction location with reconditioning capacity ("IRC"), at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- ***Photography and merchandising.*** To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs and certain auction sites to better ensure a consistent customer experience.

- ***Transportation and fulfillment.*** Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles to customers in our markets. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs and other sites, and when a vehicle is sold, it is delivered directly to customers in our markets or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

### Retail Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the nine months ended September 30, 2022, the number of vehicles we sold to retail customers grew by 4.2% to 325,319 compared to 312,221 in the nine months ended September 30, 2021. Over time, we expect our retail vehicle sales to grow in future periods with increased penetration in our current markets and expansion into new markets.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, GAP waiver coverage, other ancillary products, and the sale of vehicles acquired from customers.

38

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our historical growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings, resulting in serving more of the U.S. population, in each of the past nine years. Our market openings increased the total percentage of the U.S. population served to 81.1% in 315 markets as of September 30, 2022 from 80.6% in 308 markets as of September 30, 2021. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. We continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has generally led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, wholesale sales of vehicles we acquire from customers, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, retail vehicle sales, totaled $2.5 billion and $2.7 billion during the three months ended September 30, 2022 and 2021, respectively, and $8.2 billion and $7.0 billion during the nine months ended September 30, 2022 and 2021, respectively. As we increase penetration in existing markets and expand to new ones, we generally expect retail vehicle sales to increase along with retail units sold, absent any material adverse macroeconomic conditions. We generate gross profit on retail vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales and revenues, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $697 million and $552 million during the three months ended September 30, 2022 and 2021, respectively, and $2.0 billion and $1.3 billion during the nine months ended September 30, 2022 and 2021, respectively. We generally expect wholesale sales to trend proportionately with retail units sold through trade-ins and from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

On May 9, 2022, we completed our acquisition of the U.S. physical auction business of ADESA from KAR Auction Services, Inc. We have included revenue earned from the sale of wholesale marketplace units by non-Carvana sellers through our wholesale marketplace platform, including auction fees and related services revenue, in wholesale sales and revenues from the date of acquisition. We generate a gross profit on wholesale marketplace units from the difference between the revenue earned from the sale of wholesale marketplace units through our wholesale marketplace platform less our cost of sales associated with operating the wholesale marketplace platform.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commissions on ancillary products such as VSCs, GAP waiver coverage, and auto insurance, totaled $197 million and $278 million during the three months ended September 30, 2022 and 2021, respectively, and $605 million and $758 million during the nine months ended September 30, 2022 and 2021, respectively. We generally expect other sales and revenues to trend proportionately with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies, absent any material adverse macroeconomic conditions. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During current macroeconomic uncertainty, our highest priority will continue to be providing exceptional customer experiences while improving efficiency, increasing our brand awareness and maximizing our infrastructure to support efficient growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* Over time, we plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which on average are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

- *Reduce average days to sale.* Our goal is generally to increase our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our 17 existing IRCs, which collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization. We also intend to use existing capacity in the facilities acquired as part of the ADESA acquisition.

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs or other sites after acquisition from customers or wholesale auctions.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

**Seasonality**

Used vehicle sales (retail and wholesale) generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns in the past have not always reflected the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of macroeconomic conditions, which may not fully reflect the underlying performance of our business.

**Investment in Growth**

We have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. While we intend to become increasingly efficient over time, we also anticipate that our operating expenses will increase substantially over time as we continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

**Relationship with Related Parties**

For discussion about our relationship with related parties, refer to Note 7 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

**Key Operating Metrics**

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S. population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Retail units sold | 102,570 | 111,949 | 325,319 | 312,221 |
| Population coverage | 81.1 % | 80.6 % | 81.1 % | 80.6 % |
| Average monthly unique visitors (in thousands) | 21,333 | 20,071 | 23,203 | 16,632 |
| Total website units | 71,365 | 56,054 | 71,365 | 56,054 |
| Total gross profit per unit [1] | $ 3,500 | $ 4,672 | $ 3,237 | $ 4,526 |

(1) Includes $19, $0, $49, and $0, respectively, related to the CEO Milestone Gift.

***Retail Units Sold***

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

41

*Population Coverage*

We previously reported number of markets as a key operating metric. As we have continued to grow, the population covered by these markets is increasingly a more important driver of our growth than the number of markets we serve. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. We view the growth in population we serve as a key driver of our growth. As we increase our population coverage, the number of consumers who have access to our fully integrated customer experience increases, which in turn helps increase the number of vehicles we sell.

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell over time. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of retail vehicles, gains on the sales of loans originated to finance the vehicles, commissions on sales of VSCs, GAP waiver coverage and other ancillary products, and gross profit generated from wholesale sales of vehicles. We operate an integrated business with the objective of increasing the number of retail units sold and total gross profit per unit. Gross profits generated from the sale of retail and wholesale units are interrelated. For example, our nationwide reconditioning and inspection centers are designed to produce vehicles for both retail and wholesale sales, our vehicle storage locations have shared parking for both retail and wholesale vehicles, and our integrated multi-vehicle logistics and last mile delivery network is operated in service of both retail and wholesale sales. Such interrelationships require us to share finite operational capacity and optimize joint decisions between retail and wholesale sales, in order to position us to achieve our objective of increasing total gross profit per unit. As a result, the inclusion of gross profit generated from wholesale sales of vehicles in total gross profit per unit reflects our integrated business model and the interrelationship between wholesale and retail vehicle sales. We believe the total gross profit per unit metric provides investors with the greatest opportunity to view our performance through the same lens that our management does, and therefore assists investors to best evaluate our business and measure our progress.

*Number of IRCs*

We previously reported our number of IRCs as a key operating metric. With the acquisition of ADESA's physical auction business, we have added an additional 56 locations and are performing reconditioning work at several of these locations as of September 30, 2022, in addition to the 17 historical Carvana-specific locations. Given the expanded reconditioning capacity associated with the acquisition of ADESA's physical auction business, we no longer consider the number of IRCs a key operating metric. During October 2022, we launched one additional IRC in California, bringing the total Carvana-specific locations to 18.

42

**Components of Results of Operations**

*Retail Vehicle Sales*

Retail vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from retail vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting retail vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of retail vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. On a quarterly basis, the number of retail vehicles we sell is also affected by seasonality, with demand for retail vehicles generally reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of retail vehicle sales generally expected to occur in the fourth calendar quarter. However, in 2022, heightened inflation and rising interest rates have resulted in lower demand for used vehicles.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Sales and Revenues*

Wholesale sales and revenues includes the aggregate proceeds we receive on vehicles we acquire and sell to wholesalers, and beginning in 2022, wholesale marketplace revenues. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale sales and revenues include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by the novel coronavirus ("COVID-19") in 2020, 2021, and to a lesser extent in 2022. Wholesale sales and revenues includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. Wholesale marketplace revenues include revenue earned from the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including auction fees and related services revenue.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs, sales of GAP waiver coverage, and commissions and warrants we receive on sales of auto insurance. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

In September 2022, we partnered with Root to offer an integrated auto insurance solution, through which customers may conveniently access auto insurance directly from the Carvana e-commerce platform. We receive commissions and Warrants to purchase shares of Root's Class A common stock based on the Root insurance policies sold through the Integrated Platform. The commission revenue we recognize depends on the number of retail units we sell, the conversion rate of auto policies on these sales, commission rates we receive, and forecasted attrition. The revenue we recognize from warrants as non-cash

43

consideration depends on the probability of achieving certain auto policy sales thresholds within a specific timeline as well as our performance under the agreement.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of retail vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

*Cost of Sales*

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale, and beginning in 2022, wholesale marketplace cost of sales. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC or other site. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value. Wholesale marketplace cost of sales include costs related to the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including labor, rent, depreciation and amortization.

*Retail Vehicle Gross Profit*

Retail vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Retail vehicle gross profit per unit is our aggregate retail vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

*Wholesale Gross Profit*

Wholesale gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers, and beginning in 2022, wholesale marketplace revenues less wholesale marketplace cost of sales. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, the average acquisition price associated with these vehicles, and the number of wholesale marketplace units sold.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines, hubs, and physical auctions, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

44

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes, our Floor Plan Facilities, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other Expense (Income)*

Other expense (income), net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our Warrants to acquire Root's Class A common stock as discussed in Note 18 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

*Income Tax Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. During the three and nine months ended September 30, 2022, the Company generated income tax expense of less than $1 million and $1 million, respectively, compared to less than $1 million during both the three and nine months ended September 30, 2021.

45

**Results of Operations**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | Change | 2022 | | 2021 | Change |
| | (in millions, except unit and per unit amounts) | | | | (in millions, except unit and per unit amounts) | | | |
| **Net sales and operating revenues:** | | | | | | | | |
| Retail vehicle sales, net | $ | 2,492 | $ 2,650 | (6.0)% | $ | 8,186 | $ 6,954 | 17.7 % |
| Wholesale sales and revenues [1] | | 697 | 552 | 26.3 % | | 1,976 | 1,349 | 46.5 % |
| Other sales and revenues [2] | | 197 | 278 | (29.1)% | | 605 | 758 | (20.2)% |
| Total net sales and operating revenues | $ | 3,386 | $ 3,480 | (2.7)% | $ | 10,767 | $ 9,061 | 18.8 % |
| **Gross profit:** | | | | | | | | |
| Retail vehicle gross profit [3] | $ | 116 | $ 198 | (41.4)% | $ | 334 | $ 528 | (36.7)% |
| Wholesale gross profit [1] | | 46 | 47 | (2.1)% | | 114 | 127 | (10.2)% |
| Other gross profit [2] | | 197 | 278 | (29.1)% | | 605 | 758 | (20.2)% |
| Total gross profit | $ | 359 | $ 523 | (31.4)% | $ | 1,053 | $ 1,413 | (25.5)% |
| **Unit sales information:** | | | | | | | | |
| Retail vehicle unit sales | | 102,570 | 111,949 | (8.4)% | | 325,319 | 312,221 | 4.2 % |
| Wholesale vehicle unit sales | | 47,763 | 50,204 | (4.9)% | | 153,342 | 123,296 | 24.4 % |
| **Per unit selling prices:** | | | | | | | | |
| Retail vehicles | $ | 24,296 | $ 23,671 | 2.6 % | $ | 25,163 | $ 22,273 | 13.0 % |
| Wholesale vehicles | $ | 14,593 | $ 10,995 | 32.7 % | $ | 12,886 | $ 10,941 | 17.8 % |
| **Per retail unit gross profit:** | | | | | | | | |
| Retail vehicle gross profit [4] | $ | 1,131 | $ 1,769 | (36.1)% | $ | 1,027 | $ 1,691 | (39.3)% |
| Wholesale gross profit | | 448 | 420 | 6.7 % | | 350 | 407 | (14.0)% |
| Other gross profit | | 1,921 | 2,483 | (22.6)% | | 1,860 | 2,428 | (23.4)% |
| Total gross profit | $ | 3,500 | $ 4,672 | (25.1)% | $ | 3,237 | $ 4,526 | (28.5)% |
| **Per wholesale unit gross profit:** | | | | | | | | |
| Wholesale vehicle gross profit [5] | $ | 691 | $ 936 | (26.2)% | $ | 626 | $ 1,030 | (39.2)% |
| **Wholesale marketplace:** | | | | | | | | |
| Wholesale marketplace units sold | | 193,061 | $ — | NM | | 304,944 | $ — | NM |
| Wholesale marketplace revenues [6] | $ | 193 | $ — | NM | $ | 301 | $ — | NM |
| Wholesale marketplace gross profit [6][7] | $ | 13 | $ — | NM | $ | 18 | $ — | NM |

(1) Includes $6, $15, $27 and $37, respectively, of wholesale revenue from related parties.
(2) Includes $39, $52, $137 and $143, respectively, of other sales and revenues from related parties.
(3) For the three and nine months ended September 30, 2022, retail vehicle gross profit includes $2 and $16, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) For the three and nine months ended September 30, 2022, retail vehicle per unit gross profit includes $19 and $49, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(5) Wholesale vehicle gross profit per wholesale unit excludes wholesale marketplace units sold and wholesale marketplace gross profit.
(6) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.
(7) For the three and nine months ended September 30, 2022, wholesale marketplace gross profit includes $22 and $37, respectively, of depreciation and amortization expense.
NM = Not meaningful

46

*Retail Vehicle Sales*

*Three months ended September 30, 2022 Versus 2021.* Retail vehicle sales decreased by $158 million to $2.5 billion during the three months ended September 30, 2022, compared to $2.7 billion during the three months ended September 30, 2021. The decrease in revenue was primarily due to a decrease in the number of retail vehicles sold to 102,570 from 111,949 during the three months ended September 30, 2022 and 2021, respectively, which was driven by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability. The average selling price of our retail units sold increased to $24,296 from $23,671 during the three months ended September 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Retail vehicle sales increased by $1.2 billion to $8.2 billion during the nine months ended September 30, 2022 compared to $7.0 billion during the nine months ended September 30, 2021. The increase in revenue was primarily due to an increase in the number of retail vehicles sold to 325,319 from 312,221 during the nine months ended September 30, 2022 and 2021, respectively, which was driven by enhanced marketing efforts, expanded inventory selection, and increased brand awareness, partially offset by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability. The average selling price of our retail units sold also increased to $25,163 from $22,273 during the nine months ended September 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the nine months ended September 30, 2021.

*Wholesale Sales and Revenues*

*Three months ended September 30, 2022 Versus 2021.* Wholesale sales and revenues increased by $145 million to $697 million during the three months ended September 30, 2022, compared to $552 million during the three months ended September 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 193,061 wholesale marketplace units sold and $193 million in wholesale revenue. Wholesale units sold decreased to 47,763 from 50,204 during the three months ended September 30, 2022 and 2021, respectively, while the average selling price of our wholesale units sold increased to $14,593 during the three months ended September 30, 2022 from $10,995 during the three months ended September 30, 2021. The decrease in wholesale units sold was due to acquiring fewer vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Wholesale vehicle sales increased by $0.6 billion to $2.0 billion during the nine months ended September 30, 2022, compared to $1.3 billion during the nine months ended September 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 304,944 wholesale marketplace units sold, for a total of $301 million in wholesale revenue. Additionally, wholesale units sold increased to 153,342 from 123,296 during the nine months ended September 30, 2022 and 2021, respectively, and the average selling price of our wholesale units sold increased to $12,886 during the nine months ended September 30, 2022 from $10,941 during the nine months ended September 30, 2021. The increase in wholesale units sold was due to acquiring more vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the nine months ended September 30, 2021.

*Other Sales and Revenues*

*Three months ended September 30, 2022 Versus 2021.* Other sales and revenues decreased by $81 million to $197 million during the three months ended September 30, 2022, compared to $278 million during the three months ended September 30, 2021. This decrease was primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates and decrease in retail units sold, partially offset by the impact of higher industry-wide vehicle prices on average loan size during the three months ended September 30, 2022.

*Nine months ended September 30, 2022 Versus 2021.* Other sales and revenues decreased by $153 million to $605 million during the nine months ended September 30, 2022, compared to $758 million during the nine months ended September 30, 2021. The decrease is primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates,

47

partially offset by the impact of the increase in retail units sold, and the impact of higher industry-wide vehicle prices on average loan size during the nine months ended September 30, 2022.

### Retail Vehicle Gross Profit

*Three months ended September 30, 2022 Versus 2021.* Retail vehicle gross profit decreased by $82 million to $116 million during the three months ended September 30, 2022, compared to $198 million during the three months ended September 30, 2021. Retail vehicle gross profit per unit decreased to $1,131 for the three months ended September 30, 2022, compared to $1,769 for the three months ended September 30, 2021. The per unit decrease was primarily driven by higher acquisition, reconditioning and inbound transport costs, partially offset by a higher ratio of customer-sourced vehicles sold during the three months ended September 30, 2022.

*Nine months ended September 30, 2022 Versus 2021.* Retail vehicle gross profit decreased by $194 million to $334 million during the nine months ended September 30, 2022, compared to $528 million during the nine months ended September 30, 2021. This decrease was driven primarily by a decrease in retail vehicle gross profit per unit to $1,027 for the nine months ended September 30, 2022 compared to $1,691 for the nine months ended September 30, 2021, partially offset by an increase in retail units sold. The per unit decrease was primarily driven by higher acquisition, reconditioning and inbound transport costs, partially offset by a higher ratio of customer-sourced vehicles sold during the nine months ended September 30, 2022.

### Wholesale Gross Profit

*Three months ended September 30, 2022 Versus 2021.* Wholesale gross profit decreased by $1 million to $46 million during the three months ended September 30, 2022, compared to $47 million during the three months ended September 30, 2021. This was primarily due to a decrease in wholesale units sold to 47,763 during the three months ended September 30, 2022 from 50,204 during the three months ended September 30, 2021 and a decrease in wholesale gross profit per wholesale unit to $691 in the three months ended September 30, 2022 compared to $936 in the three months ended September 30, 2021, partially offset by $13 million from the acquisition of ADESA. The decrease in wholesale gross profit per wholesale unit was primarily driven by the difference between our wholesale acquisition price and sales price and the decrease in wholesale units sold was primarily driven by acquiring less vehicles from customers compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Wholesale gross profit decreased by $13 million to $114 million during the nine months ended September 30, 2022, compared to $127 million during the nine months ended September 30, 2021. This decrease was driven primarily by a decrease in wholesale vehicle gross profit per wholesale unit to $626 from $1,030 in the nine months ended September 30, 2022, and 2021, respectively, partially offset by an increase in wholesale units sold to 153,342 from 123,296, respectively, as well as $18 million from the acquisition of ADESA. The increase in the number of wholesale units sold was primarily due to acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was driven by the difference between our wholesale acquisition price and sales price compared to the nine months ended September 30, 2021.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

48

*Components of SG&A*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2022** | **2021** | **2022** | **2021** |
| | | (in millions) | | |
| Compensation and benefits [1] | $ 221 | $ 181 | $ 705 | $ 455 |
| CEO Milestone Gift [2] | 2 | — | 26 | — |
| Advertising | 117 | 126 | 403 | 345 |
| Market occupancy [3] | 23 | 18 | 70 | 46 |
| Logistics [4] | 57 | 40 | 184 | 104 |
| Other [5] | 236 | 181 | 716 | 463 |
| Total | $ 656 | $ 546 | $ 2,104 | $ 1,413 |
| Depreciation and amortization | 57 | 26 | 143 | 72 |
| Share-based compensation, excluding Gift | 14 | 11 | 33 | 28 |
| Total, excluding depreciation and amortization and share-based compensation | $ 583 | $ 509 | $ 1,902 | $ 1,313 |

_____

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $110 million to $656 million during the three months ended September 30, 2022, compared to $546 million during the three months ended September 30, 2021. The increase was partially due to an increase in compensation and benefits of $40 million which was primarily driven by expansion of our teams to support growth, as well as compensation related to the team acquired in the acquisition of ADESA. Market occupancy, logistics, and other expenses also increased during the three and nine months ended September 30, 2022 compared to the respective prior year period primarily due to building capacity for increases in the number of units sold and in population coverage, and in preparation for future growth. These increases were offset by a $9 million decrease in advertising expenses during the three months ended September 30, 2022.

Selling, general and administrative expenses increased by $691 million to $2,104 million during the nine months ended September 30, 2022, compared to $1,413 million during the nine months ended September 30, 2021. The increase was partially due to an increase in compensation and benefits by $250 million which was primarily driven by expansion of our teams to support our growth, as well as the acquisition of ADESA.

In addition, during the nine months ended September 30, 2022, we incurred $26 million of compensation expense related to the CEO Milestone Gift within selling, general and administrative expense, which is presented separately above, compared to none in the nine months ended September 30, 2021.

The increase in selling, general and administrative expenses during the nine months ended September 30, 2022 was also driven by increased advertising expense of $58 million due to an increase in advertising to drive growth in units sold and vehicles acquired from customers. Market occupancy, logistics, and other expenses also increased during the nine months ended September 30, 2022 compared to the respective prior year period primarily due to building capacity for increases in the number of units sold and in population coverage, and in preparation for future growth.

49

*Interest Expense*

Interest expense increased by $105 million to $153 million during the three months ended September 30, 2022, compared to $48 million during the three months ended September 30, 2021, and increased by $212 million to $333 million during the nine months ended September 30, 2022, compared to $121 million during the nine months ended September 30, 2021. The increase is primarily due to increased interest incurred on additional senior unsecured notes issued by the Company in March 2021, August 2021, and May 2022, along with increased interest expense incurred on sale leaseback financing since September 30, 2021.

*Other Expense (Income), Net*

Other expense (income), net changed by $61 million to expense of $58 million during the three months ended September 30, 2022 compared to income of $3 million during the three months ended September 30, 2021. Other expense (income), net changed by $84 million to expense of $68 million during the nine months ended September 30, 2022 compared to income of $16 million during the nine months ended September 30, 2021. The change is primarily due to fair value adjustments on our Warrants to acquire Root's Class A common stock and fair value adjustments on our retained beneficial interests in securitizations and purchase price adjustment receivables.

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation. We historically presented EBITDA and EBITDA Margin, however we believe the presentation of Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation in conjunction with U.S. GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable U.S. GAAP financial measures.

***Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation***

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically been only a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net loss, which is the most directly

50

comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| Net loss | $ (508) | $ (68) | $ (1,453) | $ (105) |
| Income tax provision | $ — | $ — | $ 1 | $ — |
| Interest expense | 153 | 48 | 333 | 121 |
| Other (income) expense, net | 58 | (3) | 68 | (16) |
| Depreciation and amortization expense in cost of sales | 36 | 6 | 71 | 17 |
| Depreciation and amortization expense in SG&A | 57 | 26 | 143 | 72 |
| CEO Milestone Gift in cost of sales | 2 | — | 16 | — |
| CEO Milestone Gift in SG&A | 2 | — | 26 | — |
| Adjusted EBITDA [(1)] | $ (200) | $ 9 | $ (795) | $ 89 |
| Share-based compensation, excluding Gift | 14 | 11 | 33 | 28 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [(1)] | (186) | 20 | (762) | 117 |
| | | | | |
| Total revenues | 3,386 | 3,480 | 10,767 | 9,061 |
| Net loss margin | (15.0)% | (2.0)% | (13.5)% | (1.2)% |
| Adjusted EBITDA margin [(2)] | (5.9)% | 0.3 % | (7.4)% | 1.0 % |
| Adjusted EBITDA margin, excluding non-Gift share-based compensation [(2)] | (5.5)% | 0.6 % | (7.1)% | 1.3 % |

(1) For the three and nine months ended September 30, 2022, includes $0 and $14, respectively, of expenses associated with the previously announced workforce reduction.
(2) For the three and nine months ended September 30, 2022, includes 0.0% and 0.1%, respectively, of expenses associated with the previously announced workforce reduction.

## Liquidity and Capital Resources

*General*

We generate cash from the sale of retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of retail vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, and increased population coverage.

51

We had the following liquidity resources available as of September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | | December 31, 2021 |
|---|---|---|---|
|  | (in millions) | | |
| Cash and cash equivalents | $ | 316 | $ | 403 |
| Availability under short-term revolving facilities [1] | | 1,956 | | 438 |
| Committed liquidity resources available | $ | 2,272 | $ | 841 |
| Unpledged vehicle inventory not included above | | 52 | | 665 |
| Unpledged real estate not included above [2] | | 1,995 | | 677 |
| Unpledged beneficial interests in securitizations | | 67 | | 100 |
| Total liquidity resources | $ | 4,386 | $ | 2,283 |

_____

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in our floor plan and finance receivable facilities, excluding the impact to restricted cash requirements.

(2) Total unpledged gross real estate assets minus committed sale leasebacks. Includes $1.1 billion of ADESA unpledged real estate assets based on preliminary valuations.

Our total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities, on our balance sheet that can be financed using traditional asset-based financing sources.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

As of September 30, 2022 and December 31, 2021, the short-term revolving facilities had a total commitment of $4.8 billion and $4.3 billion, an outstanding balance of $575 million and $2.1 billion, and unused capacity of $4.2 billion and $2.2 billion, respectively.

Availability under real estate agreements is the available amount we can borrow under our existing real estate financing agreements based on the value of existing real estate on our balance sheet. From time to time, we may enter into committed real estate financing agreements that allow for future pledging of real estate assets on a flexible timeline. We began using committed real estate financing agreements in 2017 and may do so in the future.

Unpledged vehicle inventory and finance receivables is the value of vehicle inventory and finance receivables on our balance sheet on the period end date beyond that covered by committed financing agreements.

Unpledged real estate assets include real estate acquired as part of the acquisition of ADESA's U.S. physical auction business, IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained

beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include Adjusted EBITDA, excluding non-Gift share-based compensation, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition, as a growing automotive retailer, we also invest in and generate several types of automotive retail assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of September 30, 2022 and December 31, 2021, our outstanding principal amount of indebtedness, including finance leases, was $7.5 billion and $5.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments and Note 16 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| **Asset-Based Financing:** | | |
| Inventory | $ 575 | $ 1,877 |
| Finance receivables and beneficial interests | 298 | 458 |
| Transportation fleet[1] | 402 | 212 |
| Real estate[2] | 489 | 450 |
| Total asset-based financing | 1,764 | 2,997 |
| Senior Notes | 5,725 | 2,450 |
| Total debt | 7,489 | 5,447 |
| Less: unamortized debt issuance costs[3] | (85) | (34) |
| Total debt, net | $ 7,404 | $ 5,413 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our consolidated balance sheets and not included here.

On April 26, 2022, we completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion. Also, on May 6, 2022, we issued $3.275 billion in senior unsecured notes due 2030. We are using the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by us in connection with the offering. We used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the

$2.2 billion ADESA acquisition and other ancillary transactions in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes.

***Cash Flows***

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the nine months ended September 30, 2022 and 2021:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in millions) | |
| Net cash used in operating activities | $ (585) | $ (1,422) |
| Net cash used in investing activities | (2,568) | (352) |
| Net cash provided by financing activities | 2,994 | 1,849 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (159) | 75 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 477 | $ 404 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, personnel-related expenses, and cash used to acquire customers. Cash used in operating activities was $585 million and $1.4 billion during the nine months ended September 30, 2022 and 2021, respectively, a decrease of $837 million, primarily due to decreases in cash used to acquire vehicle inventory, partially offset by increased net loss as a result of increased selling, general and administrative expenses and reconditioning costs.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $2.6 billion and $352 million during the nine months ended September 30, 2022 and 2021, respectively, an increase of $2.2 billion, primarily driven by our acquisition of the U.S. physical auction business of ADESA for approximately $2.2 billion.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital, finance the $2.2 billion acquisition of ADESA, and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $3.0 billion and $1.8 billion during the nine months ended September 30, 2022 and 2021, respectively, an increase of $1.1 billion. The change primarily relates to increased net proceeds from long-term debt primarily from the issuance of our $3.275 billion Senior Notes in May 2022 along with proceeds from the issuance of Class A common stock during the nine months ended September 30, 2022, partially offset by decreased net proceeds from short-term revolving facilities.

**Contractual Obligations and Commitments**

As of September 30, 2022, there have been no material changes to the contractual obligations or commitments previously disclosed in our most recent Annual Report on Form 10-K, filed February 24, 2022 other than the issuance of $3.275 billion in Senior Notes in May 2022 and the purchase obligations for services of $174 million over the next seven years.

**Fair Value Measurements**

We report money market securities, certain receivables, Warrants to acquire Root's Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Critical Accounting Estimates**

Except for the following, there have been no material changes to our critical accounting estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

*Business Combination Purchase Price Allocation*

The purchase price of an acquisition is allocated to the identifiable assets acquired and liabilities assumed based on their fair values at the date of acquisition, with the excess purchase price being recorded as goodwill. The purchase price allocation for ADESA is preliminary and will continue to be assessed during the measurement period, which may be up to one year from the acquisition date, with any adjustments being recorded against goodwill. See Note 3 — Business Combinations, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for a description of the preliminary status of the accounting for the ADESA acquisition.

The allocation of purchase price to the tangible and identifiable intangible assets acquired is specifically complex because of the significant estimates and assumptions involved in determining their fair values. Due to this higher degree of complexity, we obtained the assistance of outside valuation experts in the allocation of purchase price to the tangible and identifiable intangible assets acquired. While outside valuation experts were used, management has the ultimate responsibility for the valuation methods, models and inputs used and the resulting purchase price allocation. Critical estimates used in valuing tangible assets associated with the ADESA acquisition include, but are not limited to, the similarity of the acquired real property to market comparable transactions, costs of similar personal property in new condition, and economic obsolescence rates. Critical estimates used in valuing identifiable intangible assets associated with the ADESA acquisition include, but are not limited to, revenues and attrition rate.

55

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the impact on our business from macroeconomic conditions, including heightened inflation and rising interest rates;

- our acquisition of ADESA from KAR Auction Services, Inc., including the ability to successfully integrate the operations of the acquired businesses;

- our history of losses and ability to achieve or maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19 and other future epidemics and public health crises;

- our relationship with DriveTime and its affiliates;

- our minority equity investment in Root, Inc.;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

56

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

57

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indentures governing our Senior Notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022, other than those disclosed below.

**Inflation and Interest Rate Risk**

We are affected by inflationary factors such as decreased vehicle affordability, including as a result of rising interest rates, and increases in supply chain and logistics costs, materials costs, and labor costs. We do not believe that inflation has historically had a material effect on our business, financial condition, or results of operations. However, given the current macroeconomic environment and its effect on our results of operations in the third quarter of 2022, which were primarily fewer units sold, we will continue to look for ways to manage any changes in consumer purchasing behavior and increased costs, both of which may continue to adversely affect our business, financial condition, and results of operations.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to

management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

There were no changes to our internal controls over financial reporting that occurred during the three months ended September 30, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors. For more information, see "Legal Matters" in Note 17 — Commitments and Contingencies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 24, 2022 and in our Quarterly Report on Form 10-Q filed May 10, 2022.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 10.1* | Third Amended and Restated Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.2* | Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.3* | Second Amended and Restated Master Purchase and Sale Agreement, dated November 1, 2022, among Ally Bank, Ally Financial Inc. and Carvana Auto Receivables 2016-1 LLC, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

*Certain portions of this exhibit have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K. The registrant agrees to furnish supplementally an unredacted copy of this exhibit to the Securities and Exchange Commission upon its request.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:      November 3, 2022

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins
Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

62

**Exhibit 10.3**

**SECOND AMENDED AND RESTATED**

**MASTER PURCHASE AND SALE AGREEMENT**

**among**

**Carvana Auto Receivables 2016-1 LLC**

**as Transferor**

**and**

**ALLY BANK and ALLY FINANCIAL INC.**

**each a Purchaser**

**DATED AS OF NOVEMBER 1, 2022**

Certain information has been excluded because it is both (i) not material and (ii) the type that the registrant treats as private or confidential.

TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| ARTICLE I DEFINITIONS AND USAGE |  |  | 1 |
|  | Section 1.1 | Definitions | 1 |
| ARTICLE II COMMITMENT TO SELL RECEIVABLES POOLS |  |  | 2 |
|  | Section 2.1 | Commitments to Sell and Purchase Receivables Pools | 2 |
|  | Section 2.2 | Payment of Second Step Receivables Purchase Price | 4 |
|  | Section 2.3 | Pricing Model | 4 |
|  | Section 2.4 | Termination Options. | 5 |
|  | Section 2.5 | Taxes. | 8 |
|  | Section 2.6 | Loss and Liquidation Data. | 9 |
|  | Section 2.7 | Re-Liening Trigger Events | 9 |
| ARTICLE III PURCHASE AND SALE OF RECEIVABLES |  |  | 10 |
|  | Section 3.1 | Sale of Receivables | 10 |
|  | Section 3.2 | The Closing | 13 |
| ARTICLE IV |  |  | 13 |
| CLOSINGS |  |  | 13 |
|  | Section 4.1 | Effecting Purchases | 13 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES |  |  | 14 |
|  | Section 5.1 | Representations and Warranties of the Purchasers. | 14 |
|  | Section 5.2 | Representations and Warranties of the Transferor | 15 |
| ARTICLE VI CONDITIONS |  |  | 23 |
|  | Section 6.1 | Conditions to Effectiveness | 23 |
|  | Section 6.2 | Conditions to Obligation of the Purchasers | 24 |
|  | Section 6.3 | Conditions to Obligation of the Transferor | 27 |
| ARTICLE VII COVENANTS OF THE TRANSFEROR |  |  | 27 |
|  | Section 7.1 | Protection of Right, Title and Interest | 27 |
|  | Section 7.2 | Other Liens or Interests | 29 |
|  | Section 7.3 | Perfection Costs and Expenses | 29 |
|  | Section 7.4 | Separateness | 29 |
|  | Section 7.5 | Notice of Servicer Termination; Etc. | 29 |
|  | Section 7.6 | Conduct of Business; Ownership | 29 |
|  | Section 7.7 | Collections | 30 |
|  | Section 7.8 | Consolidations, Mergers and Sales of Assets. | 30 |
|  | Section 7.9 | Master Sale Agreement | 30 |
|  | Section 7.10 | Operation of the Transferor | 30 |
|  | Section 7.11 | Selection Standards; Quarterly Meetings. | 30 |
|  | Section 7.12 | Furnishing of Information and Inspection of Records | 31 |

| | | |
|---|---|---|
| Section 7.13 | Compliance with Laws, Etc. | 31 |
| Section 7.14 | Indemnity. | 31 |
| Section 7.15 | Publicity | 32 |
| Section 7.16 | No Solicitation | 33 |
| Section 7.17 | Remediation | 33 |
| Section 7.18 | Quarterly Statements as to Compliance | 33 |
| Section 7.19 | Additional Covenants | 33 |
| Section 7.20 | Negative Covenants | 36 |
| Section 7.21 | Accountant's Letter | 38 |

| | | |
|---|---|---|
| ARTICLE VIII MISCELLANEOUS PROVISIONS | | 39 |
| Section 8.1 | Obligations of the Transferor | 39 |
| Section 8.2 | Repurchase of Receivables Upon Breach by the Transferor | 39 |
| Section 8.3 | Assignment of Warranty Receivables | 39 |
| Section 8.4 | Amendment | 39 |
| Section 8.5 | Waivers | 39 |
| Section 8.6 | Notices | 40 |
| Section 8.7 | Costs and Expenses | 40 |
| Section 8.8 | Survival | 41 |
| Section 8.9 | Headings and Cross-References | 41 |
| Section 8.10 | Governing Law, Submission to Jurisdiction, Etc | 41 |
| Section 8.11 | Counterparts; Facsimile and Electronic Signatures | 41 |
| Section 8.12 | Further Assurances | 42 |
| Section 8.13 | No Reliance | 42 |
| Section 8.14 | Severability of Provisions | 42 |
| Section 8.15 | Assignment | 42 |
| Section 8.16 | No Third Party Beneficiaries | 42 |
| Section 8.17 | No Petition Covenant | 42 |
| Section 8.18 | Special Acknowledgement of Purchasers | 43 |
| Section 8.19 | Effect of Amendment and Restatement | 43 |
| Section 8.20 | Recourse Limited to Collateral; Subordination | 43 |

EXHIBITS

EXHIBIT A FORM OF SECOND STEP POOL SUPPLEMENT
EXHIBIT B [RESERVED]
EXHIBIT C FORM OF NOTICE OF CLOSING DATE
EXHIBIT D PURCHASE-BID FILE TAPE DATA LAYOUT
EXHIBIT E CREDIT POLICY
EXHIBIT F SYSTEM DESCRIPTION
EXHIBIT G SYSTEM DESCRIPTION
EXHIBIT H COLLECTION ACCOUNT WIRING INFORMATION

APPENDIX

APPENDIX A Definitions

**SECOND AMENDED AND RESTATED MASTER PURCHASE AND SALE
AGREEMENT**

THIS SECOND AMENDED AND RESTATED MASTER PURCHASE AND SALE AGREEMENT (as from time to time amended, supplemented or otherwise modified and in effect, this "Agreement") is made as of November 1, 2022, among Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the "Transferor"), Ally Bank., a Utah chartered bank, and Ally Financial Inc., a Delaware corporation (each a "Purchaser" and collectively, the "Purchasers").

RECITALS:

In the regular course of its business, Carvana, LLC (the "Seller") sells used automobiles and light trucks and originates automobile and light truck retail installment sale contracts secured by such automobiles and light trucks.

1.  On the Original Execution Date, the Seller and the Transferor have entered into the Master Sale Agreement (Flow) (the "Master Sale Agreement") pursuant to which the Seller has agreed to sell, from time to time, Receivables and related property to the Transferor pursuant to the terms and conditions set forth therein.

2.  The Transferor wishes to sell, and the Purchasers wish to purchase, from time to time, Receivables and related property (including the security interests in the related Financed Vehicles) pursuant to the terms of this Agreement.

3.  Bridgecrest has agreed to service the Receivables Pools and related Purchased Property for the benefit of the Purchasers pursuant to the Master Servicing Agreement.

4.  The Transferor and the Purchasers wish to provide in this Agreement, among other things, the terms on which the Receivables Pools and related property are to be sold by the Transferor to the Purchasers.

In consideration of the foregoing, other good and valuable consideration, and the mutual terms and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND USAGE

Section 1.1 Definitions. Certain capitalized terms used in the above recitals and in this Agreement are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to this Agreement. All references herein to "the Agreement" or "this Agreement" are to this Master Purchase and Sale Agreement as it may be amended, supplemented or modified from time to time, the exhibits and attachments hereto and the capitalized terms used herein which are defined in such Appendix A, and all references herein to Articles, Sections and subsections are to Articles, Sections or subsections of this Agreement unless otherwise specified. The rules of construction and usage set forth in such Appendix A shall be applicable to this Agreement.

ARTICLE II

COMMITMENT TO SELL RECEIVABLES POOLS

Section 2.1 Commitments to Sell and Purchase Receivables Pools

(a)  Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar quarter during the Commitment Period, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance

equal to at least $300,000,000, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, by the Purchase Percentage, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%), of the aggregate principal balance of quarterly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than [***] and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

(b)  Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar quarter during the Commitment Period on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation"). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

(c)  Basic Documents; Second Step Pool Supplement. The Transferor's right, title and interest in the Receivables and related Purchased Property purchased, from time to time, by the Purchaser pursuant to Section 3.1 shall be transferred and assigned by the execution and delivery of a Second Step Pool Supplement, in form and content substantially similar to Exhibit A attached hereto, and the satisfaction of the terms and conditions and the performance of the transactions contained in this Agreement and such Second Step Pool Supplement, as applicable. The Transferor shall deliver the Second Step Pool Supplement to the Purchaser for any Receivables Pool in accordance with the time periods specified in Section 6.2(i)(i).

---

[***] Redacted for confidentiality purposes.

(d) <u>Selection of Receivables Pools</u>. The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures, as selected by the Seller in accordance with the Selection Procedures and such other documented administrative criteria as the Purchasers may agree to from time to time, and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) (a) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria and (b) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the applicable criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis after applying such documented administrative criteria as the Purchasers may agree to from time to time (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this <u>Section 2.1(d)</u> and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection.

Section 2.2 <u>Payment of Second Step Receivables Purchase Price</u>. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Second Step Receivables Purchase Price due on each Closing Date shall be paid by the Purchasers to the Transferor on such Closing Date by wire transfer of immediately available funds to an account or accounts designated by the Transferor. The Second Step Receivables Purchase Price will be set forth in the Second Step Pool Supplement for each Receivables Pool, in the form set forth in <u>Exhibit A</u>.

Section 2.3 <u>Pricing Model</u>. On the initial Closing Date, the Pricing Model shall be as agreed upon by the Parties and may thereafter be amended in accordance with this Section 2.3. The "Pricing Model" shall be delivered by the Purchaser to the Transferor in a Microsoft excel file format by electronic mail. The Parties shall not modify the Pricing Model other than in accordance with this Section 2.3, or by the Purchasers as necessary to cure any ambiguity, correct any error, or to make it consistent with this Agreement; provided, that, for the avoidance of doubt, the inputs and variables used by the Pricing Model (including, for example, any Specified Variables) shall be freely changeable by the Purchasers based on attributes of the Receivables Pool in order to determine the Purchase Price without regard to this Section 2.3. Otherwise, the Pricing Model may only be changed as follows:

(a) At any time, but no more frequently than weekly, the Purchasers will have the right to send a written notice to the Transferor (a "<u>Pricing Model Change Notice</u>") proposing changes to the Pricing Model, including any assumptions within the Pricing Model (the "<u>Pricing Model Amendments</u>"), applicable to all Receivable Pools to be purchased on or after the effective date of such Pricing Model Amendment (which effective date shall be at least 30 days, but no longer than ninety (90) days, after delivery of a Pricing Model Change Notice as described below, or such earlier date as otherwise agreed to by the Transferor and the Purchasers). A Pricing Model Change Notice shall be provided by the Purchasers to the Transferor at least ninety (90) days prior to the effectiveness of the related Pricing Model Amendment; <u>provided</u> that, such notice need only be provided thirty (30) days prior to effectiveness of the related Pricing Model Amendment if the changes based upon (A) 15% deviation in quarterly vintage loss or liquidation experience for any Receivables as compared against prior assumptions, including experience reflected in Vintage Data reports provided to the Purchasers from the Servicer, (B) changes in any of the Credit Policy or the definitions of Eligible Receivable or Eligible Receivables Pool, (C) changes impacting the

Purchasers or their Affiliates due to or arising out of any Banking Regulatory Change or change in Requirements of Law, (D) changes in the cost of funds (including any internal allocation of costs or cost of funds) to the auto finance division of the Purchasers, (E) at any time during the existence and continuance of any Catalyst Event, (F) changes to the methodology (including underlying loss assumptions for comparably-designated dealers) for calculating the NAALR, or (G) a failure by the Transferor and the Purchasers to agree upon mutually acceptable changes to the defined term Eligible Receivables Pool prior by January 24, 2018.

(b)  If the Purchasers and the Transferor reach mutual written agreement regarding such Pricing Model Amendments, then the Pricing Model shall be amended to include such Pricing Model Amendments for Pools purchased subsequent to the date of such mutual agreement. If the Purchasers and the Transferor are not able to reach mutual agreement regarding such Pricing Model Amendments within thirty (30) days after receipt of the related Pricing Model Change Notice, then, the Purchasers may elect, in their sole discretion, to (A) remove or amend and resubmit such Pricing Model Change Notice upon written notice to the Transferor (and the Transferor shall have the longer of (i) the remainder of such thirty (30) day period and (ii) ten (10) days to consider such amended notice) or (B) terminate their obligation to make any further purchases hereunder effective immediately, upon written notice to the Transferor (the "Pricing Termination Notice"). If there is no agreement to amend the Pricing Model and this Agreement is not so terminated, the Pricing Model will remain in effect without the proposed change.

(c)  If a change to the Pricing Model was previously made based on a Pricing Model Change Notice delivered in connection with the occurrence of a Catalyst Event under Section 2.3(a)(E), within thirty (30) days after the end of such Catalyst Event, the Purchasers shall send a subsequent Pricing Model Change Notice to the Transferor proposing changes to the Pricing Model that reasonably reflect the change of circumstances that caused the cessation of such Catalyst Event. Notwithstanding the forgoing, if (i) the Pricing Model Amendment has not yet taken effect and (ii) the Catalyst Event is not continuing, Purchasers shall immediately withdraw the Pricing Model Change Notice upon the termination of the Catalyst Event.

Section 2.4 Termination Options.

(a)  Transferor Termination Options. The Transferor may terminate the Transferor Obligation and the Purchaser Obligation by providing the Purchaser written notice thereof at any time after the occurrence of any of the following (the "Transferor Termination Option"):

(i)  the commencement of a voluntary case by either Purchaser under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by either Purchaser to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of either Purchaser;

(ii)  If the Purchasers and the Transferor are not able to reach mutual agreement regarding a Pricing Model Amendment; provided, that such termination shall not take effect until the last day of the applicable 90 day or 30 day notice period described in Section 2.3(a), as applicable);

(iii)  the breach of any representation, warranty or covenant in this Agreement or the Master Sale Agreement in any material respect by a Purchaser and, if such breach is capable of being cured and such Purchaser is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such failure is received from the Transferor or after discovery of such failure by the related Purchaser; or

(iv)  for any reason with ninety (90) days' prior written notice to the Purchaser.

(b)  Purchaser Termination Options. The Purchasers may terminate the Transferor Obligation and the Purchaser Obligation by providing the Transferor written notice thereof at any time after the occurrence of any of the following (the "Purchaser Termination Option"):

(i)  the commencement of a voluntary case by the Transferor, the Seller, the Performance Guarantor, or the Servicer under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Transferor, the Seller, the Performance Guarantor, or the Servicer to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Transferor, the Seller, the Performance Guarantor, or the Servicer;

(ii)  the Seller or the Performance Guarantor (x) consolidates or merges with or into another Person and is not the surviving entity, or (y) is a party to a merger, conversion or consolidation and is not the surviving entity, or (z) has a Person succeed to its business and, in each case, in the case of the Performance Guarantor, the Guaranty ceases to be legally enforceable against the successor entity;

(iii)  a Servicer Termination Event shall be continuing pursuant to the terms of the Servicing Agreement;

(iv)  if for any reason, a modification to the servicing of the Purchased Property in respect of any Banking Regulatory Change is not made pursuant to Section 3.17 of the Servicing Agreement;

(v)  if the System of Record, including the components thereof, is updated or otherwise modified, or replaced by a successor computer system utilized by the Seller to select receivables, such that the updated, modified or replaced System of Record, including the components thereof, cannot apply the Selection Procedures, as determined by the Purchasers after consultation with the Seller during the Quarterly Selection Standards Meeting following the update, modification or replacement of the System of Record, including the components thereof;

(vi)  (y) the occurrence of a "Termination Event" or "Commitment Termination Event" under any Other Facility Transaction Document or a termination event, event of default, or servicer default under any other credit or purchase facility by the Purchasers or any of their Affiliates to the Seller or the Transferor or any of their consolidated Affiliates that enables or permits the holder or holders of such indebtedness or any trustee or agent on its or their behalf to cause such indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (z) any indebtedness of the Seller or the Transferor or any of their consolidated Affiliates which exceeds $[***] in aggregate principal or face amount becoming due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(vii) a Material Adverse Effect occurs with respect to the Seller or the Transferor;

(viii)  failure of the Seller or the Transferor to pay any amount owed to the Purchasers or any other transaction party under any Basic Document for at least five (5) Business Days;

(ix)  the failure of the Seller or the Transferor to deliver a report or data file under in any Basic Document for at least five (5) Business Days after written notice of such failure is received from either Purchaser or after discovery of such failure by the Seller or the Transferor;

(x)  the breach of any representation, warranty or covenant in any Basic Document in any material respect by the Seller or Transferor and, if such breach is capable of being cured and the Seller or the Transferor is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such breach is received from either Purchaser or after discovery of such breach by the Seller or the Transferor;

(xi)  the Transferor is required to register as an "investment company" under the Investment Company Act of 1940;

(xii) the entry of (y) one or more judgments against the Transferor of $25,000 or more or (z) a judgment against the Seller of $2,500,000 or more or one or more judgments, in the aggregate, of $5,000,000 or more;

[***] Redacted for confidentiality purposes.

(xiii)    the Purchasers shall cease to have a valid and perfected first-priority security interest in any Purchased Property related to 5.0% or more of the Aggregate Outstanding Principal Balance of any Purchased Receivables, and, upon and following the Seller's breach of its purchase obligations pursuant to Section 7.2 of the Master Sale Agreement or the Transferor's breach of its repurchase obligations pursuant to Section 8.2 of this Agreement, any of the Purchased Property;

(xiv)    a Pension Benefit Guaranty Corporation or tax lien is filed against the Seller or Transferor;

(xv)a Change in Control;

(xvi)    for any reason with ninety (90) days' prior written notice to the Transferor; or

(xvii)    upon delivery of a Pricing Termination Notice pursuant to Section 2.3(b)

Section 2.5 Taxes.

(a)    All payments made by the Transferor, the Servicer, the Seller, the Performance Guarantor or the Purchasers under this Agreement and the other Basic Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes or any other tax based upon net income (including any income or capital gain earned by such Party or subsequent transferee or assignee thereof in respect of any Receivable) imposed on any Party as a result of a present or former connection between such Party and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Party having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to any Party hereunder, the amounts so payable to such Party shall be increased to the extent necessary to yield to such Party (after payment of all Non-Excluded Taxes) the amounts payable hereunder in the amounts specified in or pursuant to this Agreement or the other Basic Documents. Whenever any Non-Excluded Taxes are payable by any Party, as promptly as possible thereafter the Party subject to such Non-Excluded Taxes shall send to the paying Party a certified copy of an original official receipt received by the Party subject to such Non-Excluded Taxes showing payment thereof. If any Party fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or other required documentary evidence, such Party shall indemnify the Party subject to such Non-Excluded Taxes for any incremental taxes, interest or penalties that may become payable by such Party as a result of any such failure. The agreements in this Section 2.5(a) shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

(b)    Notice of Increased Costs; Relocation of Purchasing Office; Mandatory Assignment.

(i)    In the event that a Purchaser becomes aware that any amounts are or will be owed to it pursuant to Section 2.5(a), then it shall promptly notify the Transferor thereof and, as soon as possible thereafter, such Purchaser shall submit to the Transferor a certificate indicating the amount of such Purchaser's increased costs, Non-Excluded Taxes and the calculation thereof. Such certificate shall only be prima facie evidence of such increased costs or Non-Excluded Taxes.

(ii)    If such Purchaser claims any additional amounts payable pursuant to Section 2.5(a), it shall use its reasonable efforts (consistent with legal and regulatory restrictions) to avoid the need for changing the methodology for calculating the Second Step Receivables Purchase Price Purchase Price, including changing the jurisdiction of its applicable purchasing office, provided that the taking of any such action would not, in the reasonable judgment of such Purchaser, be disadvantageous to such Purchaser.

(c)    No Assignee Rights to Increased Costs. The terms and conditions of Section 2.5 hereof are personal to the Purchaser and shall not accrue to the benefit of any other Person, including any assignee or transferee of any direct or indirect interest in the Receivables.

Section 2.6 <u>Loss and Liquidation Data</u>. No later than 60 days after the end of each calendar quarter during the period beginning on the date hereof and ending on the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables), the Transferor shall, or shall cause the Seller, Bridgecrest or any other Affiliate holding or aggregating such information to, deliver to the Purchasers a cumulative net loss ratio as of the end of the related calendar quarter (and a narrative description of the methodology for making such calculation), which may be included in the Monthly Servicer Report delivered within 60 days after the end of each calendar quarter to the extent the information is available at that time, for the Seller's entire originated portfolio of retail installment sales contracts as of the end of the related calendar quarter.

Section 2.7 <u>Re-Liening Trigger Events</u>. Upon the occurrence of a Re-Liening Trigger Event, at the direction of the Purchasers, the Transferor shall, and the Transferor shall direct and cause any Affiliate that is a Title Lien Nominee to and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles (or if such Re-Liening Trigger Event relates to (i) one or more States, the related Financed Vehicles titled in such States or (ii) a Title Lien Nominee, the related Financed Vehicles liened in the name of such Title Lien Nominee) to be revised to name the Purchasers or their designee as lienholder; any Re-Liening Expenses shall be paid by the Servicer, and to the extent such costs are not paid by the Servicer but are paid by the Purchasers, such costs shall be recovered by adjusting the Second Step Receivables Purchase Price for an upcoming Receivables Pool as described in <u>Section 2.2</u> and the related Second Step Pool Supplement. In addition, at the sole expense of the Purchasers, upon the request of the Purchasers, the Transferor shall, and the Transferor shall direct and cause the any Affiliate that is a Title Lien Nominee and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles identified, individually or by characteristic, by the Purchasers to be revised to name the Purchasers or their designee as lienholder. The Purchasers shall not direct the Servicer or the Transferor to take any steps to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicle to be revised to name any other Person. The Transferor shall cause any Affiliate that is a Title Lien Nominee to irrevocably appoint or cause each relevant subservicer to irrevocably appoint, the Purchasers as its attorney-in-fact, such appointment being coupled with an interest, to take any and all steps required to be performed pursuant to this Section 2.7, including execution of Certificates of Title or any other documents in the name of the Transferor or such Title Lien Nominee and, in connection with the appointment of any successor Servicer, to execute a power of attorney with respect to such successor Servicer promptly after its appointment as such, naming such successor Servicer as its attorney-in-fact for the same purposes.

ARTICLE III

PURCHASE AND SALE OF RECEIVABLES

Section 3.1 <u>Sale of Receivables</u>.

(a) On each Closing Date during the Commitment Period, subject to the terms and conditions of this Agreement, the Transferor agrees to sell to the Purchasers, and the Purchasers agree to purchase from the Transferor, a Receivables Pool and the following other property relating thereto (collectively, the "<u>Purchased Property</u>"):

(i) all right, title and interest of the Transferor in, to and under each Receivable included in the applicable Receivables Pool listed on a Schedule of Receivables (the form of which is attached as <u>Schedule 2</u> to the Second Step Pool Supplement) delivered to the Purchaser on such Closing Date and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Seller or the Servicer, as applicable, covering any related Financed Vehicle;

(ii) the interest of the Transferor in the security interests in the related Financed Vehicles granted by Obligors pursuant to the Receivables in the applicable Receivables Pool and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premium or other payment with respect to any of the foregoing;

(iv) all of the Transferor's right, title and interest in, to and under the related Receivable Files;

(v) all right, title and interest of the Transferor in, to and under the Master Sale Agreement and the applicable First Step Pool Supplement and First Step Receivables Assignment, including the right of the Transferor to cause the Seller to repurchase Receivables under certain circumstances and the right of the Transferor to be indemnified under the circumstances specified in the Master Sale Agreement; and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in clauses (i) through (v) above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

(b) Second Step Receivables Purchase Price. On each Closing Date, in consideration for the related Purchased Property, the Purchasers shall pay to the Transferor an amount (the "Second Step Receivables Purchase Price") equal to the Purchase Price for such Purchased Property.

The Cutoff Date Aggregate Outstanding Principal Balance, the purchase price designated by the Pricing Model, the Pre-closing Interest Carry Amount, the re-liening expenses described in Section 2.7 and the Second Step Receivables Purchase Price for each Receivables Pool shall be set forth on the related Second Step Pool Supplement.

(c) Wire Transfer. The Purchasers shall pay each Second Step Receivables Purchase Price by federal wire transfer (same day) funds to the Transferor (or its designee) to the account set forth below:

Account Name: Carvana LLC
Account Number: 4124114661
Bank: Wells Fargo Bank, N.A.
ABA: 121000248

Within two (2) Business Days after each Closing Date, the Transferor shall pay to or as directed by the Purchasers in (same day) funds an amount equal to the aggregate amount of all Collections received by the Transferor after the related Cutoff Date, including from the Seller or the Servicer, with respect to the Receivables Pool sold to the Purchasers on such Closing Date through (but excluding) the applicable Closing Date.

(d) Purchase Price Adjustment Payments. Purchase price adjustment payments may be due to the Transferor by the Purchasers as agreed upon by the Parties, as applicable.

(e) Purchase Cadence and Second Step Pool Supplement. Not later than the third (3rd) Business Day following an Origination Period, the Transferor shall provide the Purchasers with the Purchase Percentage and supply the Purchasers with an initial data tape in form and substance acceptable to the Purchasers containing the information as called for in Exhibit D and indicating which Receivables listed in such initial data tape are Flex Receivables with respect to all Receivables originated or acquired by the Seller in the preceding Origination Period (and any Previously Originated Receivables to be included in the Related Receivables Pool) that the Seller and the Transferor intend in good faith to sell to the Purchasers under this Agreement meeting the selection criteria for sale to the Transferor and those Receivables meeting the eligibility criteria for sale by the Transferor to the Purchasers, a Receivables Pool. Not later than the first (1st) Business Day of the second week following an Origination Period (but at least two (2) Business Days prior to the related

Closing Date), the Transferor shall supply the Purchasers with a final data tape in form and substance acceptable to the Purchasers containing the final information as called for in <u>Exhibit D</u> and indicating which Receivables listed in such initial data tape are Flex Receivables with respect to all Receivables in the related Receivables Pool and identifying any receivable in the initial data tape that was determined not to be an Eligible Receivable, including any receivable with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable. Not less than one (1) Business Day prior to each proposed Closing Date, the Transferor will deliver to the Purchasers the related Second Step Pool Supplement substantially in the form of <u>Exhibit A</u> hereto and in form and substance reasonably acceptable to the Purchasers. Exhibit A will set forth amounts due by the Transferor with respect to the applicable Receivables Pool and will contain at least the following settlement information: calculation of the related Cutoff Date Aggregate Outstanding Principal Balance, the Pre-closing Interest Carry Amount, the purchase price designated by the Pricing Model, the re-liening expenses described in <u>Section 2.7</u> and the Second Step Receivables Purchase Price.

(f) <u>No Recourse</u>. It is understood that each sale of Purchased Property by the Transferor to the Purchaser pursuant to this Agreement, a Second Step Pool Supplement and the related Second Step Receivables Assignment shall be without recourse (except as set forth herein and in the other Basic Documents) and the Transferor does not guarantee collection of any Receivable. However, each such sale shall be made pursuant to and in reliance by the Purchaser on the representations, warranties and covenants of the Transferor as set forth in <u>Section 5.2</u>, the indemnities set forth in <u>Section 7.14</u> and the repurchase obligation set forth in <u>Section 8.2</u>.

(g) <u>Intent of the Parties</u>. This Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment is intended to effect a sale of each Receivables Pool by the Transferor to the Purchasers, and the parties intend to treat each such transaction as an independent sale for federal income tax and financial reporting purposes. It is the intention of the Transferor that each sale, transfer, assignment and other conveyance of each Receivables Pool contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment constitutes an independent sale of the related Purchased Property from the Transferor to the Purchasers and that the beneficial interest in and title to each such Receivables Pool shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment does not constitute and is not intended to result in any assumption by the Purchasers (or any of its assigns) of any obligation of the Seller or the Transferor to the Obligors, Affiliates of the Seller, insurers or any other Person in connection with any Receivables, any insurance policies or any agreement or instrument relating to any of them, in each case related to such transfer and assignment. Although the parties intend that each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment to be an independent sale, in the event any such transfer and assignment is deemed to be other than a sale, the parties intend and agree (i) that all filings described in this Agreement shall give the Purchasers a first priority perfected security interest in, to and under the Receivables Pool and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Agreement, together with the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment, shall be deemed to be the grant of, and the Transferor hereby grants to the Purchasers, a security interest from the Transferor to the Purchasers in such Receivables and the related Purchased Property in order to secure its obligations hereunder with respect to such transfer and assignment; (iii) this Agreement, together with the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment, shall be a security agreement under applicable law for the purpose of each such transfer and assignment; and (iv) the Purchasers shall have all of the rights, powers and privileges of a secured party under the UCC with respect to each such transfer and assignment and the Purchased Property related thereto.

Section 3.2 <u>The Closing</u>. The initial closing during the Commitment Period shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

ARTICLE IV

CLOSINGS

Section 4.1 <u>Effecting Purchases</u>.

(a)  <u>General Procedures</u>. During the Commitment Period, the purchase and sale of a Receivables Pool pursuant to the Transferor Obligation will occur on the Closing Date for the calendar quarter that follows receipt of notification from the Transferor of its intent to complete such a sale at such time (which Closing Date, for the avoidance of doubt, will fall in the last calendar week of the related Origination Period). For the avoidance of doubt, subject to the terms and conditions of this Agreement, the Transferor is obligated to sell a Receivables Pool to the Purchasers hereunder during each calendar quarter during the Commitment Period.

(i)  Notification of each sale must be provided by the Transferor to the Purchasers no later the third (3rd) Business Day following an Origination Period (which date falls in the week prior to the week in which the proposed Closing Date for such sale falls), substantially in the form of <u>Exhibit C</u> attached hereto. Such notification must specify for each such proposed Receivables Pool (i) the approximate Cutoff Date Aggregate Outstanding Principal Balance, (ii) the applicable proposed Closing Date, and (iii) the proposed Cutoff Date.

(ii)  Not later than the third (3rd) Business Day after receipt of the initial data tape received in <u>Section 3.1(e)</u> above (but at least three (3) Business Days prior to the related Closing Date), the Purchasers shall notify the Seller of the Purchase Price for each Eligible Receivable on the initial data tape by the Purchasers and the allocation of purchases between Ally Bank and Ally Financial.

(iii)  Not later than the second (2nd) Business Day of the second week following an Origination Period (but at least one (1) Business Day prior to the related Closing Date), the Purchasers shall notify the Seller of the final Purchase Price (including any Flex Amount) for the Receivables Pool and the final allocation of purchase between Ally Bank and Ally Financial.

(iv)  Not less than two (2) Business Days prior to the proposed Closing Date, the Transferor shall deliver to the Purchaser a receivables pool schedule in the form of Schedule 2 to Exhibit A (the "<u>Receivables Pool Schedule</u>"), which shall identify as of the Cutoff Date the pool of Receivables (the "<u>Receivables Pool</u>") to be sold. The Transferor shall promptly provide to the Purchaser all data related to the Receivables Pool that are necessary to determine the Purchase Price for such Receivables Pool or that are reasonably requested by the Purchaser.

(v)  On the Pricing Date, the Purchase Price shall be calculated in accordance with <u>Section 2.3</u>.

(b)  Upon the satisfaction or written waiver of the conditions specified in <u>Section 6.3</u>, on each Closing Date, the Seller will sell the related Purchased Property to the Transferor and the Transferor will sell the Purchased Property in such Receivables Pool to the Purchaser in accordance with the applicable Basic Documents.

(c)  <u>Due Diligence</u>. With respect to each proposed purchase of a Receivables Pool the Seller and the Transferor agree to cooperate with the Purchasers, with respect to all reasonable requests for documents or other information and due diligence procedures.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.1 <u>Representations and Warranties of the Purchasers</u>. The Purchasers represent and warrant to the Transferor as of the date hereof and as of each Closing Date:

(a)   <u>Organization and Good Standing</u>. Ally Bank has been duly organized and is validly existing as a Utah chartered bank in good standing, with power and authority to own its properties and to conduct its business

as such properties are presently owned and such business is presently conducted; and as of the date hereof, Ally Bank's deposits are insured by the Federal Deposit Insurance Corporation and Ally Bank is subject to the Federal Deposit Insurance Act. Ally Financial has been duly organized and validly exists as an entity in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted, including to acquire and own the Receivables.

(b) <u>Due Qualification</u>. Ally Bank is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America. Ally Financial is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America.

(c) <u>Power and Authority</u>. The Purchasers have full power and authority to execute and deliver this Agreement and the Master Servicing Agreement and to perform the terms and provisions hereof and thereof and the execution, delivery and performance of this Agreement and the Master Servicing Agreement have been duly authorized by the Purchasers by all necessary action.

(d) <u>Due Authorization; Enforceability; No Violation</u>. This Agreement and the Master Servicing Agreement have been duly authorized, executed and delivered by the Purchasers, and each is the legal, valid and binding obligation of the Purchasers, enforceable against the Purchasers in accordance with its terms, except as such enforceability may be limited by applicable insolvency, bankruptcy, reorganization, conservatorship, receivership, liquidation or other laws and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law. The consummation of the transactions contemplated by this Agreement and the Master Servicing Agreement and the fulfillment of the terms of this Agreement and the Master Servicing Agreement shall not conflict with, result in any breach of any of the terms and provisions of or constitute (with or without notice or lapse of time) a default under, the articles of incorporation or bylaws of the Purchasers, or, in any material respect, any indenture, agreement, mortgage, deed of trust or other instrument to which the Purchasers is a party or by which it is bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument, or violate, in any material respect, any law or, to the best of the Purchaser's knowledge, any order, rule or regulation applicable to the Purchasers of any Governmental Authority having jurisdiction over the Purchasers or any of its properties, in each case, that would materially and adversely affect the performance by the Purchasers of its obligations under, or the validity and enforceability of, this Agreement.

(e) <u>No Proceedings</u>. There are no proceedings or investigations pending, or, to the best of the Purchasers' knowledge, threatened, before any Governmental Authority having jurisdiction over either Purchaser or any of their properties (i) asserting the invalidity of this Agreement and the Master Servicing Agreement, or (ii) seeking any determination or ruling that might materially and adversely affect the performance by either Purchaser of its obligations under, or the validity or enforceability of, this Agreement and the Master Servicing Agreement against the Purchasers.

Section 5.2 <u>Representations and Warranties of the Transferor</u>. The Transferor represents and warrants to the Purchasers as of the date hereof and as of each Closing Date (except as provided herein otherwise):

(a) <u>Organization and Good Standing</u>. It has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its formation, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and had at all relevant times, and now has all necessary power, authority and legal right to own or lease its properties and conduct its business as such business is presently conducted, including to acquire, own and sell the Receivables and the other Purchased Property except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) <u>Due Qualification</u>. It is duly qualified to do business and is in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination,

purchase, sale and servicing of the Receivables) except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c) <u>Power and Authority; Due Authorization</u>. It (i) has all necessary power, authority and legal right to (A) execute and deliver the Basic Documents to which it is a party, (B) carry out the terms of the Basic Documents to which it is a party and (C) to assign or grant the security interest in the assets transferred by it on the terms and conditions in this Agreement and (ii) has taken all necessary action to authorize the execution, delivery and performance of the Basic Documents to which it is a party and to assign or grant a security interest in the assets transferred by it on the terms and conditions in this Agreement.

(d) <u>Binding Obligation</u>. The Basic Documents to which it is a party have been duly executed and delivered by it and constitute legal, valid and binding obligations of it enforceable against it in accordance with their terms.

(e) <u>No Violation</u>. The consummation of the transactions contemplated by the Basic Documents to which it is a party and the fulfillment of the terms thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its formation documents or any agreement to which it is bound, (ii) result in the creation or imposition of any Lien upon any of its properties, other than pursuant to the Master Sale Agreement and this Agreement, or (iii) violate any Requirements of Law, except, in each case, for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f) <u>No Proceedings</u>. There is no litigation, proceeding or investigation pending or, to the best of its knowledge, threatened against it, before any governmental authority (i) asserting the invalidity of any Basic Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Basic Documents, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect.

(g) <u>All Consents Required</u>. All approvals, authorizations, consents, orders, licenses or other actions of any person or of any governmental authority required for the due execution, delivery and performance by it of the Basic Documents to which it is a party have been obtained except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h) <u>Compliance.</u> It is not in violation in any material respect of any Basic Document to which it is a party or any laws, ordinances, Governmental Rules or regulations to which it is subject except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(i) <u>Bulk Sales</u>. The execution, delivery and performance of the Basic Documents to which it is a party is in the ordinary course of business and does not require compliance with any bulk sales act or similar law.

(j) <u>Solvency</u>. As of each Closing Date, (i) the Transferor is not and shall not become insolvent as a result of the transfer of the related Purchased Property on such date, (ii) the Transferor did not intend to or believe that it would incur debts that would be beyond its ability to pay as such debts matured, (iii) the Transferor did not transfer the related Purchased Property with the actual intent to hinder, delay or defraud any Person and (iv) the assets of the Transferor did not constitute unreasonably small capital to carry out its business as conducted.

(k) <u>Selection Procedures</u>. No procedures believed by it to be materially adverse to the interests of the Purchasers were utilized by it in identifying or selecting Receivables to be transferred by it. In addition, each Receivable assigned pursuant to this Agreement has been underwritten in accordance with and satisfies the standards of the Credit Policy in all material respects.

(l) <u>Taxes</u>. It has filed, caused to be filed, or received an extension of time for filing that has not yet expired, all federal and material state, local or foreign tax returns that are required to be filed by it. It has paid or made adequate provisions for the payment of all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of

which is currently being contested in good faith by appropriate proceedings and with respect to which reserves have been provided on the books of it), and no tax lien has been filed and, to the its knowledge, no claim is being asserted, with respect to any such tax, fee or other charge.

(m) <u>Exchange Act Compliance; Regulations T, U and X</u>. None of the transactions contemplated in the Basic Documents to which it is a party (including the use of the proceeds from the advances) will violate or result in a violation of Section 7 of the Exchange Act, or any regulations issued pursuant thereto, including Regulations T, U and X of the Federal Reserve Board, 12 C.F.R., Chapter II. It does not own or intend to carry or purchase, and no proceeds from the sale of the Purchased Property will be used to carry or purchase, any "margin stock" within the meaning of Regulation U or to extend "purchase credit" within the meaning of Regulation U.

(n) <u>Quality of Title</u>. Each Receivable, together with the Contract related thereto, transferred by it were, prior to the transfer thereof, owned by it free and clear of any Lien except for Permitted Liens, and the Purchasers upon the providing of value described herein shall acquire a valid ownership interest and a perfected first priority security interest in each Receivable and the related Purchased Property then-existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Purchased Property shall, after the relevant Cutoff Date, be on file in any recording office except such as may be filed in favor of the Transferor or the Purchasers in accordance with the Master Sale Agreement and this Agreement.

(o) <u>Security Interest</u>. It has granted a security interest (as defined in the UCC) to the Purchasers in the Purchased Property, which is enforceable in accordance with applicable law upon execution and delivery of the Basic Documents. Upon the filing of UCC-1 financing statements naming the Purchasers as secured party, or upon the Collateral Custodian obtaining possession, in the case of that portion of the Purchased Property which constitutes tangible chattel paper, or upon the E-Vault Provider granting control to the Purchasers, in the case of that portion of the Purchased Property which constitutes electronic chattel paper, the Purchasers shall have a first priority (except for any Permitted Liens) perfected security interest in the Purchased Property.

(p) <u>Reports Accurate</u>. All Monthly Reports, information, exhibits, financial statements, documents, books, records or reports (including the data file indicating characteristics of the Receivables and including electronic writings) furnished or to be furnished by the Seller or the Transferor directly or indirectly to the Purchasers, the Servicer, the Collateral Custodian or the bank holding the Collection Account under or in connection with the Basic Documents to which it is a party (including the Second Step Pool Supplement delivered in connection with each sale are true, correct and complete in all material respects as of the date specified therein or the date so furnished (as applicable).

(q) <u>Location of Offices.</u> The principal place of business and chief executive office of it and the office where it keeps all the Records related to the tangible Contracts are located at the address set forth in <u>Section 8.6</u>; <u>provided</u>, that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281 (or at such other locations as to which the notice and other specified requirements shall have been satisfied).

(r) <u>Tradenames and Place of Business</u>. (i) Except as specified in this Agreement, it has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and (ii) its principal place of business and chief executive office is located at the address set forth in <u>Section 8.6</u> and has been so for the last four (4) months; <u>provided</u>, that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281.

(s) <u>Transfer Agreements</u>. The Master Sale Agreement and this Agreement are the only agreements pursuant to which it purchases or sells the Receivables and the related Contracts.

(t) <u>Value Given</u>. The Purchasers shall have given reasonably equivalent value to the Transferor in consideration for the transfer by the Transferor to the Purchasers of the Receivables and the related Purchased Property under this Agreement, no such transfer shall have been made for or on account of an

antecedent debt owed by the Transferor to the Purchasers and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code. The Transferor shall have given reasonably equivalent value to the Seller in consideration for the transfer by the Seller to the Transferor of the Receivables and the related 2016-1 Purchased Property under the Master Sale Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by the Seller to the Transferor and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code.

(u) <u>Accounting</u>. The Transferor accounts for the transfers to the Purchasers of Receivables and related Purchased Property under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents. The Seller accounts for the transfers to the Transferor of Receivables and related Purchased Property and by the Transferor to the Purchasers under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents, other than for income tax and consolidated accounting purposes.

(v) <u>Investment Company Act</u>. The Transferor is not (i) an "investment company" and is not controlled by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and (ii) a "covered fund" as defined in the final regulations issued December 10, 2013, implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. In making that determination, the Transferor is entitled to rely upon the exemption provided in Section 3(c)(5)(A) or (B) of the Investment Company Act, although there may be additional exemptions or exclusions available to the Transferor.

(w) <u>ERISA</u>. (i) No prohibited transactions or Reportable Events have occurred with respect to any Pension Plan (if any), (ii) no notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA has been filed, nor has any Pension Plan been terminated under Section 4041(c) of ERISA, nor has the Pension Benefit Guaranty Corporation instituted proceedings to terminate, or appointed a trustee to administer a Pension Plan and no event has occurred or condition exists that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, and (iii) no liability under Title IV (other than accrued premiums to the Pension Benefit Guaranty Corporation) has been incurred (whether or not assessed), which individually or in the aggregate with respect to all or any of (i), (ii) and (iii) above, would reasonably be expected to have a Material Adverse Effect on the Seller or Transferor (including its rights and interests in, to or under any Contracts or related Receivables), with respect to the Seller or Transferor.

(x) <u>Accuracy of Representations and Warranties</u>. Each representation or warranty by the Transferor contained in the Basic Documents to which it is a party or in any certificate or other document furnished by the Seller or Transferor pursuant thereto or in connection therewith is true and correct in all material respects as of the date made.

(y) <u>OFAC</u>. Neither the Transferor nor any Affiliate is a Sanctioned Person. The proceeds of any funding will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

(z) <u>Master Sale Agreement</u>. As of each Closing Date, the Transferor has not taken any action that would cause the representations and warranties of the Seller under the Master Sale Agreement or the applicable First Step Pool Supplement, or Bridgecrest under the Master Servicing Agreement, or the Collateral Custodian under the Collateral Custodian Agreement, to be false.

(aa) <u>Use of Proceeds</u>. No proceeds of a purchase hereunder shall be used by the Transferor for a purpose that violates or would be inconsistent with Regulations T, U or X promulgated by the Board of Governors of the Federal Reserve System from time to time.

(ab) <u>Remediation</u>. In the event that the Seller, the Transferor or the Servicer or any of their Affiliates has been required under any Requirements of Law, or has agreed or made arrangements with any Governmental

Authority, to make any Remediation, such Person shall have taken such action as so agreed or arranged or in compliance with all Requirements of Law, as applicable.

(ac) <u>Receivables</u>. The Transferor makes the following representations and warranties as of each Closing Date (except to the extent otherwise provided) with respect to the Receivables the Transferor sold to the Purchasers on such Closing Date, on which the Purchasers relies in accepting such Receivables. Such representations and warranties speak as of the applicable Closing Date (except as provided herein otherwise), and shall survive the sale, transfer and assignment of such Receivables to the Purchasers and any subsequent sale, assignment or transfer of any such Receivables:

    (i) <u>Characteristics of Receivables.</u> As of each Cutoff Date (except to the extent otherwise provided in the definition of "Eligible Receivable") with respect to the related Receivables to be purchased, (A) each Receivable is an Eligible Receivable, (B) (i) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (ii) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (C) the Receivables Pool was selected as described in <u>Section 2.1(d)</u>.

    (ii) <u>Creation, Perfection and Priority of Security Interests</u>. The following representations and warranties regarding creation, perfection and priority of security interests in the related Purchased Property are true and correct:

        (A) While it is the intention of the Transferor and the Purchasers that the transfer and assignment contemplated by this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment shall constitute sales of the related Purchased Property from the Transferor to the Purchaser, this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment shall create a valid and continuing security interest (as defined in the applicable UCC) in the related Purchased Property in favor of the Purchaser, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Transferor.

        (B) Prior to the sale of such Purchased Property to the Purchaser under this Agreement, the Receivables constituted "tangible chattel paper" or "electronic chattel paper" within the meaning of the applicable UCC.

        (C) All filings (including such UCC filings) as are necessary in any jurisdiction to perfect the security interest of the Purchasers in the Purchased Property have been (or prior to the applicable Closing Date will be) made.

        (D) Other than the sale and backup security interest granted to the Purchasers pursuant to this Agreement, the Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of such Purchased Property. The Transferor has not authorized the filing of, and is not aware of, any financing statements against the Transferor that include a description of collateral covering such Purchased Property other than the financing statements relating to the security interests granted to the Purchasers under this Agreement or any financing statement that has been effectively terminated. The Transferor is not aware of any judgment or tax lien filings against it or such Purchased Property.

        (E) Wells Fargo, as Collateral Custodian, or a permitted subcontractor, has in its possession all original copies of the related Original Contract Documents and other documents that constitute or evidence such Receivables and the related Purchased Property that are tangible chattel paper. The E-Vault Provider has in its "control" (as such term is used in Section 9-105 of the UCC), for the benefit of the Purchasers as the "secured party" (as such term is used in Section 9-105 of the UCC), all electronic records constituting or forming a part of the Receivables that are electronic

chattel paper, such that the Purchasers have had and will at all times have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivables. Such Receivable Files and other documents that constitute or evidence such Purchased Property do not have any marks or notations indicating that any ownership or security interest therein has been pledged, assigned or otherwise conveyed to any Person other than the Purchasers.

(F)   None of the Seller, the Transferor, the Servicer or a custodian or vaulting agent thereof holding any Receivable that is electronic chattel paper has communicated an Authoritative Copy of any loan agreement that constitutes or evidences such Receivable to any Person other than the Purchasers and the Collateral Custodian.

(iii)   Schedule of Receivables. The information set forth in the related Schedule of Receivables and in any computer tape regarding the Receivables is true, accurate and complete, and, other than as may be a result of the application of the criteria included in the definitions of Eligible Receivables Pool set forth in Exhibit A, no selection procedures believed to be adverse to the Purchasers were utilized in selecting such Receivables, with respect to the related Receivables Pool, from those receivables of the Seller or the Transferor that otherwise meet such criteria as well as the definition of Eligible Receivables.

(iv)   Compliance With Law. All Requirements of Law in respect of any aspect of such Receivables and the related Purchased Property (including the origination thereof), in each case, have been complied with in all material respects and each Receivable and the sale of the related Financed Vehicle evidenced thereby complied at the time it was originated or made and now complies in all material respects with all applicable Requirements of Law.

(v)   Binding Obligation. Each such Receivable with respect to the related Receivables Pool represents the genuine, legal, valid and binding payment obligation in writing of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights in general and by equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(vi)   Security Interest in Financed Vehicle. Immediately prior to the sale, transfer and assignment thereof pursuant hereto and the related Second Step Receivables Assignment, each such Receivable with respect to the related Receivables Pool was secured by a valid security interest in the Financed Vehicle in favor of the Transferor as secured party, or all necessary and appropriate actions shall have been commenced that would result in the valid perfection of a first priority security interest in the Financed Vehicle favor of the Transferor as secured party.

(vii)   Receivables In Force. As of the applicable Cutoff Date, no such Receivable has been satisfied, subordinated or rescinded, and the Financed Vehicle securing each such Receivable has not been released from the lien of the related Receivable in whole or in part.

(viii)   No Waiver. Since the applicable Cutoff Date, no provision of a Receivable has been, or shall be, waived, altered or modified in any respect other than with respect to alterations and modifications so that such Receivable is an Eligible Receivable (other than clause (ix) thereof, which must have been satisfied at the time of origination) and such Receivable is enforceable after giving effect thereto.

(ix)   No Defenses. No right of rescission, setoff, counterclaim or defense has been asserted or threatened with respect to any such Receivable.

(x)   No Liens. To the best of the Transferor's knowledge: (1) there are no Lien or claims that have been filed for work, labor or materials affecting any Financed Vehicle securing any such Receivable that are or may be Lien prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by such Receivable; (2) no contribution failure has occurred with respect to any Benefit Plan which is sufficient to give rise to a Lien under Section 303(k) of ERISA with respect to any such Receivable; and (3) no tax lien has been filed and no claim related thereto is being asserted with respect to any such Receivable.

(xi) Insurance. Each Obligor under such Receivables is required to maintain a physical damage insurance policy of the type that the Seller requires in accordance with the Credit Policy.

(xii) Good Title. No such Receivable or the related Purchased Property has been sold, transferred, assigned or pledged by the Transferor to any Person other than the Purchasers; immediately prior to the conveyance of such Receivables and the related Purchased Property pursuant to this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment, the Transferor had good and marketable title thereto, free of any Lien other than Permitted Liens; and, upon execution and delivery of the Second Step Pool Supplement and the related Second Step Receivables Assignment by the Transferor, the Purchasers shall acquire a valid and enforceable perfected ownership interest in each such Receivable and Purchased Property, the unpaid indebtedness evidenced thereby and the collateral security therefor, free of any Lien other than Permitted Liens.

(xiii) Lawful Assignment. No such Receivable or the related Purchased Property was originated in, or is subject to Requirements of Law of, any jurisdiction the Requirements of Law of which would make unlawful, void or voidable the sale, transfer and assignment of such Receivable and the other related Purchased Property under this Agreement and the related Second Step Receivables Assignment. None of the Seller, the Transferor or the Servicer has entered into any agreement with any Obligor that prohibits, restricts or conditions the assignment of such Receivable or any other Purchased Property.

(xiv) All Filings Made. All filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected ownership interest in the Receivables and the related Purchased Property shall have been made.

(xv) One Original. There is only one original executed copy of each tangible record constituting or forming a part of such Receivable that is tangible chattel paper or a single Authoritative Copy of each electronic record constituting or forming a part of each Purchased Receivable that is electronic chattel paper.

(xvi) No Documents or Instruments. No such Receivable, or constituent part thereof, constitutes a "negotiable instrument" or "negotiable document of title" (as such terms are used in the UCC).

ARTICLE VI

CONDITIONS

Section 6.1 Conditions to Effectiveness. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent as of the date hereof:

(a) Basic Documents. Each of the Purchasers, the Transferor, the Seller, Bridgecrest, the Collateral Custodian and the Performance Guarantor, as the case may be, shall have executed and delivered each of the Basic Documents to which it is a party, and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on or about the Original Execution Date or the date hereof, as applicable, prior to the effectiveness hereof or thereof, hereunder or thereunder.

(b) Documents to be Delivered by the Transferor.

(i) Good Standing Certificates. The Purchasers shall have received a certificate from the Secretary of State of the States of Arizona and Delaware as to the formation and good standing of the Seller and the Transferor, respectively.

(ii) Corporate Documents. The Purchasers shall have received duly certified copies of the Seller and the Transferor's certificate of formation and limited liability company agreement, resolutions of its directors approving the execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party and the transactions contemplated hereby and thereby, and such other evidence of the authority and incumbency of officers and other appropriate personnel of the Seller and the Transferor, respectively.

(iii) <u>Opinions</u>. External counsel (which shall be satisfactory to the Purchasers in its reasonable judgment) for the Transferor, the Seller, Bridgecrest, the Collateral Custodian (which may be internal counsel) and the Performance Guarantor shall have furnished to the Purchasers written opinions dated as of the Original Execution Date in the form satisfactory to the Purchasers in its reasonable judgment.

(iv) <u>Evidence of UCC Filing</u>. On or prior to Effective Date of this Agreement, the Transferor shall record and file, at its own expense, a UCC-1 financing statement in each jurisdiction in which it is required by applicable law, authorized by and naming the Transferor as seller or debtor, naming the Purchasers as purchaser or secured party, naming the Receivables and the other Purchased Property as collateral, meeting the requirements of the laws of each such jurisdiction and in such manner as is necessary to perfect each sale, transfer, assignment and conveyance of Receivables to the Purchasers hereunder. Such UCC-1 financing statement shall be provided to the Purchasers on or prior to such Effective Date.

(v) <u>Other Documents</u>. The Transferor, the Servicer, the Collateral Custodian and the Performance Guarantor shall have provided such other documents as the Purchaser may reasonably request.

(c) <u>Representations and Warranties</u>. Each of the representations and warranties of each of the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects as of the date hereof (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to the date hereof.

(d) <u>UCC Search Reports</u>. (A) The Transferor shall deliver to the Purchasers (i) certified copies of requests for information or copies (Form UCC-11) (or a similar search report certified by parties acceptable to the Purchasers) dated a date reasonably near the Original Execution Date listing all effective financing statements which name the Seller and the Transferor (under each of its present names and any previous names) as debtor or seller and which are filed in Arizona and Delaware, respectively, and such other jurisdictions where the Purchasers may reasonably request, together with copies of such financing statements, none of which shall cover any Receivables or other Purchased Property, (ii) search reports, each dated a date reasonably near the Original Execution Date with respect to federal, state and local tax liens, judgment liens and liens of the PBGC, respectively, filed against the Seller and the Transferor from the Secretaries of State of the States of Arizona and Delaware and from Maricopa County, Arizona and New Castle County, Delaware, respectively, or such other jurisdictions as the Purchasers shall reasonably request, in each case, showing no such Lien on any of the Receivables or other Purchased Property.

Section 6.2 <u>Conditions to Obligation of the Purchasers</u>. The obligation of the Purchasers to purchase Receivables and the related Purchased Property with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Aggregate Purchase Commitment</u>. After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this <u>Section 6.2(a)</u>, any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

[***] Redacted for confidentiality purposes.

(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than $[***] other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection by the Purchase Percentage, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%,) of the aggregate principal balance of quarterly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers.

(c) <u>Commitment Termination Event</u>. No Commitment Termination Event shall have occurred and the Sale shall occur during the Commitment Period.

(d) <u>Scheduled Commitment Termination Date</u>. The Scheduled Commitment Termination Date shall not have occurred.

(e) <u>Representations and Warranties</u>. Each of the representations and warranties of each of the Transferor, the Servicer the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects at the time of each Closing Date (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to each Closing Date.

(f) <u>Master Sale Agreement</u>. Each of the conditions to the obligations of the Seller under the Master Sale Agreement shall have been satisfied without any waiver thereof.

(g) <u>Security Interests</u>. The security interest granted by the Transferor in favor of the Purchasers in each Receivables Pool previously sold to the Purchasers is a valid and continuing security interest prior to all other Liens, and is enforceable as against such other creditors of and purchasers from the Transferor.

(h) <u>Computer Files Marked</u>. Each of the Seller and the Servicer shall have, on or prior to each Closing Date, indicated in its Receivables System, that such Purchased Property has been sold to the Purchasers pursuant to this Agreement and the related Second Step Receivables Assignment.

(i) <u>Documents to be Delivered By the Transferor</u>. On or before such Closing Date, the Transferor shall have delivered to the Purchasers the following documents:

(i) <u>The Second Step Pool Supplement</u>. The Transferor will execute and deliver the related Second Step Pool Supplement and each of the other documents, certificates and instruments required to be attached thereto as set forth in <u>Exhibit A</u> (a final completed draft of which shall be delivered to the Purchasers at least one (1) Business Day prior to the Closing Date).

(ii) <u>Master Sale Agreement Documents</u>. The Transferor shall deliver to the Purchasers a set of all documents and other writings delivered in connection with the Master Sale Agreement.

---

[***] Redacted for confidentiality purposes.

(iii) <u>Opinions</u>. On the initial Closing Date, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of the initial Closing Date, with respect to true sale characterization of the sales from the Seller to the Transferor pursuant to the Master Sale Agreement, nonconsolidation of the Transferor with the Seller and security interest matters (including creation, perfection and filing priority and control of electronic chattel paper) along with bring-downs of the opinions referred to in <u>Section 6.1(b)(iii)</u>. For any subsequent Closing Date, such counsel shall deliver such bring-downs of the foregoing opinions or new opinions with respect to such matters or such other matters, in each case, due to material changes in circumstances or Requirements of Law (since previously delivered), in each case that the Purchaser shall reasonably request. For the first Closing Date for which there is, or will be, a concentration with respect to any State of outstanding Receivables in all Eligible Receivables Pools purchased by the Purchasers that exceeds 10% of the aggregate Outstanding Principal Balance of all Receivables in all purchased Eligible Receivables Pools after giving effect to such sale, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of such Closing Date, with respect to state titling statute opinions with respect to the Lien on the related Financed Vehicles.

(iv)  <u>Other Documents</u>. On each Closing Date, the Transferor, the Servicer and the Performance Guarantor shall provide such other documents as the Purchasers may reasonably request.

(j) <u>Collateral Custodian Certificate</u>. With respect to all Receivables included in the related Receivables Pool, the Transferor shall, or shall have caused the Seller to, have Delivered each related Original Contract Document to the Collateral Custodian, and the Purchasers shall have received the related executed Document Receipt in accordance with the requirements of the Collateral Custodian Agreement, and the Seller, the Transferor and the Servicer shall have marked their computer files with respect to such Receivables to indicate the interest of the Purchasers.

(k) <u>Other Transactions</u>. The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder.

Section 6.3 <u>Conditions to Obligation of the Transferor</u>. The obligation of the Transferor to sell the Receivables with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Second Step Receivables Purchase Price</u>. On such Closing Date, the Purchasers shall deliver to the Transferor the Second Step Receivables Purchase Price for such Receivables Pool, in accordance with <u>Section 3.1(b)</u> of this Agreement.

(b) <u>Representations and Warranties True</u>. The representations and warranties of the Purchasers under this Agreement and each of the other Basic Documents to which it is a party shall be true and correct in all material respects as of such Closing Date, and the Purchasers shall have performed in all material respects all covenants and agreements, if any, required to be performed by it hereunder and thereunder on or prior to such Closing Date.

(c) <u>Documents to be Delivered By the Purchaser</u>. On or before such Closing Date, the Purchasers shall have delivered to the Transferor the related Second Step Pool Supplement.

(d) <u>Other Transactions</u>. The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder in connection with such sale and such Closing Date.

(e) <u>Other Documents</u>. On such Closing Date, the Purchasers shall provide such other documents as the Transferor may reasonably request.

ARTICLE VII

COVENANTS OF THE TRANSFEROR

Section 7.1 <u>Protection of Right, Title and Interest</u>. The Transferor covenants and agrees with the Purchasers as follows:

(a) <u>Protection of Title; Filings</u>. The Transferor shall authorize and file such financing statements and amendments to financing statements and cause to be authorized, as applicable, and filed such continuation and other statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interest of the Purchasers under this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment in the Receivables and the other Purchased Property and in the proceeds thereof. The Transferor shall deliver (or cause to be delivered) to the Purchasers file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing.

(b) <u>Name Change</u>. The Transferor shall not change its State of organization or its name, identity or corporate structure in any manner that would, could or might make any financing statement or continuation statement filed by the Transferor in accordance with <u>Section 7.1(a)</u> seriously misleading within the meaning of the UCC, unless it shall have given the Purchasers (i) at least 30 days prior written notice thereof if such change would create a new debtor under the UCC (which for purposes of this <u>Section 7.1(b)</u>, shall not include a name change) or change the jurisdiction that would govern the perfection or effect of perfection against the Transferor and after delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents, or (ii) otherwise, notice thereof within 30 calendar days after effectiveness of such change, together with delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents.

(c) <u>Executive Office; Maintenance of Offices</u>. The Transferor shall (i) give the Purchasers at least 30 days prior written notice of any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement Records; <u>provided</u>, that on or about April 1, 2017, the its principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281 and (ii) deliver to the Purchasers acknowledgment copies of the applicable financing statements necessary to perfect or continue the perfection of their respective security or ownership interests hereunder and under the other Basic Documents (it being understood that amendments to all relevant financing statements will be filed in connection with the change in chief executive office described above). The Transferor shall at all times maintain offices from which it primarily services Receivables and its principal executive office within the United States of America.

(d) <u>New Debtor</u>. In the event that the Transferor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Transferor hereunder, the Transferor shall comply fully with the obligations of <u>Section 7.1(a)</u>.

(e) <u>Receivables Systems</u>. If the Transferor maintains computer systems, the Transferor shall maintain, or cause to be maintained, its computer systems so that, from and after the time of sale of the Receivables under this Agreement, if the computer systems and records (including any backup archives) shall refer to any such Receivable, they shall indicate clearly the interest of the Purchasers in such Receivable and that such Receivable is owned by the Purchasers. Indication of the Purchaser's ownership of a Receivable shall be deleted from or modified on the computer systems and records of the Transferor, if any, when, and only when, the related Receivable shall have been paid in full or repurchased. The Transferor shall cause the Collateral Custodian or the E-Vault Provider on its behalf at all times to maintain "control" (as such term is used in Section 9-105 of the UCC) of all electronic records constituting or forming a part of a Receivable constituting electronic chattel paper on behalf of the Purchasers, as "secured party" (as such term is used in

Section 9-105 of the UCC) such that the Purchasers have had and at all times will have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivable.

(f) <u>Certificates of Title</u>. If the Seller has not received a Certificate of Title related to a Purchased Receivable naming a Title Lien Nominee the first lien holder on such Certificate of Title for the related Financed Vehicle or the title application or other documentation necessary to obtain a Certificate of Title thereto noting such lien holder has not been submitted, then, promptly, but no later than 30 days following the related date of origination, the Transferor shall, or shall cause the Seller, to take all steps necessary to perfect the security interest against each Obligor in the related Financed Vehicle.

Section 7.2 <u>Other Liens or Interests</u>. Except for the sale contemplated by this Agreement and the Second Step Receivables Assignment, the Transferor shall not sell, pledge, assign or transfer any Receivable or the related Purchased Property (or any portion thereof) to any other Person, or grant, create, incur, assume or suffer to exist any Lien thereon or on any interest therein, and the Transferor shall defend the right, title and interest of the Purchasers in, to and under such Receivables and the related Purchased Property against all claims of third parties claiming through or under the Transferor. The Transferor shall not do anything to impair the right, title, ownership or security interest of the Purchasers in the Purchased Property.

Section 7.3 <u>Perfection Costs and Expenses</u>. The Transferor agrees to pay all reasonable costs and disbursements in connection with the perfection, as against all third parties, of the Purchaser's right, title and interest in and to the Purchased Property with respect to each Receivables Pool.

Section 7.4 <u>Separateness</u>. Each of the Seller and the Transferor has taken, and shall continue to take, steps to make it unlikely that a voluntary or involuntary application for relief by the Seller under the Bankruptcy Code or similar applicable Requirements of Law in any state jurisdiction, would result in consolidation of the assets and liabilities of the Transferor with those of the Seller. These steps include the maintenance of the Transferor as a separate, limited-purpose subsidiary pursuant to the limitations in the Transferor's limited liability company agreement and compliance with any assumptions or statements of fact in the non-consolidation opinion delivered to the Purchasers in connection with this Agreement. These limitations include restrictions on the nature of the Transferor's business and a restriction on the Transferor's ability to commence a voluntary case or proceeding under the United States Bankruptcy Code or similar applicable state Requirements of Law without the unanimous affirmative vote of all of the Transferor's directors. Under the circumstances set forth in the Transferor's limited liability company agreement, the Transferor is required to have at least one (1) director who qualifies thereunder as an independent director.

Section 7.5 <u>Notice of Servicer Termination; Etc</u>. The Transferor shall notify the Purchasers (A) as soon as possible and in any event within five (5) Business Days after it obtains knowledge of the occurrence of an Event of Servicing Termination; and (B) promptly after the Transferor obtains knowledge thereof, notice of any litigation, investigation or proceeding that may exist at any time between the Transferor and any Person or any litigation or proceeding relating to this Agreement, any other Basic Document or the Purchased Property.

Section 7.6 <u>Conduct of Business; Ownership</u>. The Transferor shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted and do all things necessary to remain duly organized, validly existing and in good standing as a domestic limited liability company in its jurisdictions of formation and maintain all requisite authority, licenses and permits to conduct its business in each jurisdiction in which its business is conducted, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents. The Transferor shall at all times be a wholly-owned subsidiary of the Seller.

Section 7.7 <u>Collections</u>. In the event the Transferor receives any Collections after the related Cutoff Date with respect to the Purchased Property, it shall turn over any Collections received by it with respect to any Purchased Property to the Servicer within two (2) Business Days after its identification of such Collections.

Section 7.8 <u>Consolidations, Mergers and Sales of Assets</u>.

(a)  The Transferor shall not consolidate or merge with or into any other Person or sell, lease or otherwise transfer all or substantially all of its assets to any other Person.

(b)  The Transferor hereby agrees that, until the last Business Day of the twelfth (12th) month following the latest maturing Receivable, it shall not (i) take any action prohibited by (or inconsistent with) its limited liability company agreement, or (ii) without the prior written consent of the Purchasers, amend its limited liability company agreement.

Section 7.9 <u>Master Sale Agreement</u>. The Transferor, on its own behalf and on behalf of the Purchasers and the other Seller Indemnified Parties, shall promptly enforce all covenants, indemnities and other obligations of the Seller contained in the Master Sale Agreement (including <u>Sections 6.11</u> and <u>7.2</u> thereof). The Transferor shall deliver consents, approvals, directions, notices, waivers and take other actions under the Master Sale Agreement as may be directed by the Purchasers.

Section 7.10 <u>Operation of the Transferor</u>. Without limiting the generality of <u>Sections 7.4</u> and <u>7.8(b)</u>, the Transferor shall be operated and managed in accordance with rating agency requirements for multi-use special purpose entities.

Section 7.11 <u>Selection Standards; Quarterly Meetings</u>.

(a)  Until the Commitment Termination Date, in addition to the Quarterly Operations Review (as defined in the Master Servicing Agreement), the Transferor shall participate in quarterly meetings with the Purchasers ("<u>Quarterly Selection Standards Meeting</u>") on the 60th day (or such other day as soon thereafter as the Transferor and the Purchasers shall mutually agree) of each quarter and if such day is not a Business Day, then on the next Business Day (or as Parties may mutually agree) by telephone or, if agreed to by the parties, in person, to discuss and review, among other things, loss and delinquency performance of the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, any material changes to the Seller's Credit Policy and other origination or underwriting guidelines, processes or policies, including special origination programs, that could influence, modify or impact the Purchased Property or the mix or characteristics of future Receivables Pools, as well as any proposed amendments or modifications to the definitions of Eligible Receivable or Eligible Receivables Pool since the preceding Quarterly Selection Standards Meeting.

(b)  During, or following, any Quarterly Selection Standards Meeting, the Purchasers may propose a change by delivering a written request to the Transferor containing such proposed changes ("<u>Selection Standards Change Notice</u>") to the definitions of Eligible Receivable or Eligible Receivables Pool. If Purchasers and the Transferor reach mutual written agreement regarding such changes ("<u>Selection Standards Modification</u>"), then the definitions of Eligible Receivable or Eligible Receivables Pool shall be amended to include such Selection Standards Modification for any Receivables Pools purchased on or after the date of such mutual agreement, or if Purchasers and the Transferor are not able to reach mutual agreement regarding such Selection Standards Modification within 30 days after receipt of the related Selection Standards Change Notice, then no change will occur to the definitions of Eligible Receivable or Eligible Receivables Pool.

Section 7.12 <u>Furnishing of Information and Inspection of Records</u>. If at any time the Transferor maintains any information regarding the Purchased Property, the Transferor shall furnish to the Purchasers from time to time such information with respect to the Purchased Property as the Purchasers may reasonably request. If the Transferor maintains such information, the Transferor shall, at any time and from time to time during regular business hours, as requested by the Purchasers, permit the requesting party, or its agents, representatives or regulators, (i) to examine and make copies of and take abstracts from all books, records and documents (including computer tapes and disks) relating to the Receivables or other Purchased Property, and (ii) to visit the offices and properties of the Transferor for the purpose of examining such materials described in clause (i), and to discuss matters relating to the Purchased Property or the Transferor's performance hereunder and under the other Basic Documents to which such Person is a party with any of the officers, directors, employees or independent public accountants of the Transferor having knowledge of such matters.

Section 7.13 <u>Compliance with Laws, Etc</u>. The Transferor shall comply with all Requirements of Law applicable to it, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents.

Section 7.14 <u>Indemnity</u>.

(a)    The Transferor shall indemnify, defend and hold harmless the Purchasers and its officers, directors, employees, Affiliates and agents (the "<u>Indemnified Parties</u>") from and against any and all costs, expenses, losses, damages, claims and liabilities arising out of or resulting from the use, ownership or operation by the Transferor or any of its Affiliates of any Financed Vehicle.

(b)    The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all reasonable and documented costs, expenses, losses, claims, damages and liabilities solely to the extent that such cost, expense, loss, claim, damage or liability arose out of or resulted from the action or inaction (including any failure to comply with any applicable Requirements of Law) of any third party to whom the Transferor subcontracted or delegated the performance of its duties under this Agreement or the other Basic Documents and only to the extent such cost, expense, loss, claim, damage or liability is not related to any credit loss.

(c)    The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all costs, expenses, losses, claims, damages and liabilities, including reasonable external legal fees and expenses (i) to the extent that such cost, expense, loss, claim, damage, or liability arose out of, resulted from or was imposed upon any such Indemnified Party through the negligence (except for reasonable errors in judgment), willful misfeasance or bad faith of the Transferor or agent in the performance of its duties under this Agreement or the other Basic Documents to which it is a party or by reason of a breach of its obligations or duties under this Agreement or the other Basic Documents to which it is a party, (ii) arising out of, or resulting from, any breach of any representation, warranty, covenant or obligation of the Transferor in this Agreement, the other Basic Documents to which it is a party or in any Schedule, Exhibit, written statement or certificate furnished by the Transferor pursuant to this Agreement or the other Basic Documents to which it is a party (in each case, as each such representation or warranty would read if all qualifications as to knowledge or materiality, including each reference to the defined term "Material Adverse Effect," were deleted therefrom), (iii) arising out of, or resulting from, any untrue statement of a material fact in any written information provided or delivered by the Transferor, or any Affiliate of the Transferor on its behalf, to the Purchasers pursuant to, for the purposes of, or in connection with, this Agreement or the other Basic Documents to which it is a party, (iv) arising out of, or resulting from, any action, suit, proceeding or claim or other litigation to the extent resulting from the actions or omissions of the Seller, the Transferor or any of their consolidated Affiliates or any of their respective agents, directors, officers, servants or employees, excluding, however, any costs, expenses, losses, claims, damages or liabilities resulting from the gross negligence, bad faith or willful misconduct on the part of any such Indemnified Party, and (v) resulting from the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle, including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable. Indemnification under this <u>Section 7.14</u> shall include reasonable fees and expenses of one external counsel and reasonable costs and expenses of litigation; <u>provided</u>, <u>however</u>, that the Transferor pursuant to this <u>Section 7.14</u>, the Seller pursuant to <u>Section 5.4</u> of the Master Sale Agreement and the Servicer pursuant to <u>Section 5.2</u> of the Master Servicing Agreement shall only be responsible collectively for reasonable fees and expenses of one external counsel. If the Transferor has made any indemnity payments pursuant to this <u>Section 7.14</u> and the recipient thereafter collects any of such amounts from others with respect to such claim, the recipient shall promptly repay such amounts collected to the Servicer, without interest.

(d)    This <u>Section 7.14</u> shall survive any termination of this Agreement.

Section 7.15 <u>Publicity</u>. All media releases, public announcements and public disclosures by any Party or its respective employees or agents, relating to this Agreement or the other Basic Documents or the transactions contemplated hereby or thereby or the name of the Purchasers or the Transferor, including promotional or marketing material, shall be coordinated with and consented to by the other Party in writing prior to the release thereof, which

consent shall not be unreasonably withheld or delayed; provided, however, that any announcement intended solely for internal distribution by the disclosing Party to its directors, employees, officers and agents or any disclosure required by Requirements of Law or by accounting requirements, shall not require such coordination or consent.

Section 7.16 No Solicitation. The Transferor agrees that it will not, directly or indirectly, specifically solicit, and will not permit any of its Affiliates to, directly or indirectly, specifically solicit, any Obligor (in writing or otherwise) to refinance any Purchased Receivable (including solicitations for the purchase of a new vehicle); provided, however, that each of Transferor and its Affiliates may, directly or indirectly, engage in a general solicitation directed generally at the obligors of receivables originated or serviced by the Seller or the Servicer at large, so long as the Obligors under the Purchased Receivables are not the predominant targets of such general solicitation for refinancing.

Section 7.17 Remediation. The Transferor shall (i) provide the Purchasers with written notice, to the extent not prohibited by any applicable Requirements of Law, of any Remediation if such Remediation could reasonably be expected, individually or in the aggregate with any other Remediation, to have a Material Adverse Effect on the Purchasers or any of the Purchased Property and (ii) implement any Remediation in accordance with all terms thereof and all applicable Requirements of Law.

Section 7.18 Quarterly Statements as to Compliance. The Transferor shall deliver to the Purchasers, on or before the forty-fifth (45th) day following each calendar quarter, beginning February 14, 2017 (or, if such day is not a Business Day, the next succeeding Business Day), an Officer's Certificate of the Transferor, dated as of the last Business Day of the immediately preceding calendar quarter, in each instance stating that (i) a review of the activities of the Transferor during the preceding calendar quarter (or, with respect to the first such certificate, such period as shall have elapsed from the Effective Date to the date of such certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Transferor has fulfilled all its obligations under this Agreement in all material respects throughout such period, or, if there has been a default in the fulfillment of any such obligation, in any material respect specifying each such default known to such officer and the nature and status thereof.

Section 7.19 Additional Covenants. From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will:

(a) Preservation of Existence; License. It will preserve and maintain its existence, rights, franchises and privileges in its State of formation, and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or would reasonably be expected to have, a Material Adverse Effect and (without suspension or limitation) will not terminate or let lapse any licenses, consents or approval currently held by it necessary to ensure its performance of any duty contemplated by this Agreement and the other Basic Document to which it is a party.

(b) Performance and Compliance with Contracts. It will, at its expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Contracts and in and all other agreements related to such Contracts. It shall enforce its rights under this Agreement and the other Basic Documents.

(c) Keeping of Records and Books of Account. It will (or will cooperate with the Servicer to) maintain and implement administrative and operating procedures (including an ability to re-create records evidencing Receivables in the event of the destruction of the originals thereof, in the case of tangible Contracts, or loss of access to the vault system of the Contracts maintained therein, in the case of electronic Contracts), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables.

(d) Transferred Assets. With respect to each Receivable transferred or acquired by it, it will: (i) transfer or acquire such Receivable pursuant to and in accordance with the terms of the Master Sale Agreement and this Agreement, (ii) take all action necessary to perfect, protect and more fully evidence the assignee's interest in such Receivable, including (A) filing and maintaining, effective financing statements (Form UCC-1) in all necessary or appropriate filing offices, and filing continuation statements, amendments or

assignments with respect thereto in such filing offices and (B) executing or causing to be executed such other instruments or notices as may be necessary or appropriate and (iii) taking all additional action that the Purchasers may reasonably request, including the filing of financing statements to perfect, protect and more fully evidence the respective interests of the parties to the Master Sale Agreement and this Agreement in the Purchased Property.

(e) <u>Collection Policy</u>. It will (or will cooperate with the Servicer to), to the extent applicable, comply with the Collection Policy with respect to each Receivable.

(f) <u>Taxes</u>. It will file or cause to be filed all federal and material state, local or foreign tax returns that are required to be filed by it. It will shall pay all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of which it plans to contest in good faith by appropriate proceedings and with respect to which it retains reserves on its books).

(g) <u>Use of Proceeds</u>. The Transferor will use the proceeds only to acquire Receivables from the Seller.

(h) <u>Liens</u>. It will not create, or participate in the creation of, or permit to exist, any Lien with respect to the Collection Account or any account into which collections on the Receivables are deposited, except as set forth in the Basic Documents.

(i) <u>Reporting</u>. It will distribute, or cause to be distributed, to the Purchasers:

    (i) <u>Monthly Reports</u>. Not later than the Reporting Date preceding each Payment Date, a Monthly Servicer Report.

    (ii) <u>Additional Data</u>. Additionally, and solely to the extent such data is available, the Transferor shall provide, or reasonably cooperate with the Servicer to provide the Purchasers the Monthly Servicer Report or Monthly Data File, as applicable, in a format reasonably acceptable to the Purchasers, with data regarding the characteristics of the Receivables, in form and substance reasonably acceptable to the Purchasers, including (A) delinquencies (including a list of Delinquent Receivables), and (B) annualized losses or loss information by vintage origination year on the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, presented on a quarterly basis, in each case of <u>clause (A)</u> and <u>(B)</u>, until the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables).

    (iii) <u>Income Tax Liability</u>. Within ten (10) Business Days after the receipt of revenue agent reports or other written proposals, determinations or assessments of the Internal Revenue Service or any other taxing authority which propose, determine or otherwise set forth positive adjustments to the tax liability of any "Affiliated Group" (within the meaning of Section 1504(a)(l) of the Code) which equal or exceed one million dollars ($1,000,000) with respect to the Seller or twenty-five thousand dollars ($25,000) with respect to the Transferor, telephonic or emailed notice (confirmed in writing within five (5) Business Days) specifying the nature of the items giving rise to such adjustments and the amounts thereof.

    (iv) <u>Tax Returns</u>. Upon demand by the Purchasers, copies of all federal, State and local tax returns and reports filed by the Seller or the Transferor (excluding sales, use and like taxes), to the extent the Seller or the Transferor is required to file such tax returns.

    (v) <u>Auditors' Management Letters</u>. Promptly after any auditors' management letters are received by the Seller or the Transferor or by its accountants, which refer in whole or in part to any inadequacy, defect, problem, qualification or other lack of fully satisfactory accounting controls utilized by the Seller or the Transferor.

(vi) <u>ERISA</u>. Promptly after receiving written notice of any "Reportable Event" (as defined in Title IV of ERISA) with respect to the Seller or the Transferor (or any ERISA Affiliate thereof), a copy of such written notice.

(vii) <u>Notice of Material Events</u>. Promptly after obtaining knowledge of an event or circumstance that is likely to result in a Commitment Termination Event, Event of Servicing Termination or have a Material Adverse Effect on the Seller or the Transferor, the Purchased Property, or the Purchasers, notice of such event or circumstance. Promptly upon the entry of a judgment against the Seller of $1,000,000 or more.

(j) <u>Accounting Policy</u>. It will promptly notify the Purchasers of any material change in its accounting policies.

(k) <u>Other</u>. It will furnish to the Purchasers promptly, from time to time, such other information, documents, records or reports respecting the Purchased Property or the condition or operations, financial or otherwise, of it as the Purchasers may from time to time reasonably request in order to protect the interests of the Purchasers under or as contemplated by the Basic Documents.

(l) <u>Compliance with System Description</u>. It will, and will cause the Collateral Custodian, E-Vault Provider and, to the extent applicable to the then-applicable E-Vault System, E-Sign Provider to, at all times comply in all material respects with the System Description with respect to matters related to the perfection in the Receivables and the Purchased Receivables by "control" (as such term is used in Section 9-105 of the UCC).

(m) <u>Financial Statements</u>. To the extent not filed with the Commission and publicly available on EDGAR, within 120 days after the end of each fiscal year and 60 days after each fiscal quarter (or if the Seller is a reporting company under the Securities and Exchange Act of 1934, such period as required thereunder for the filing thereof), the Transferor will cause the Seller to provide to the Purchasers copies of its audited financial statements for the prior fiscal year or unaudited financial statements with respect to each of the first three fiscal quarters.

(n) <u>Access to Systems</u>. During the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, or cause the Seller to, give the Purchasers and their duly authorized representatives, attorneys and auditors, upon reasonable request of Purchaser, on-site access to the Transferor and the Seller's loan originations systems and document repository, which access shall facilitate quality assurance and quality control reviews, to enable the Purchasers to back-up Receivables Files to the Purchasers' systems, enable the Purchasers to review Receivables originations processes, procedures, approvals and boarding and permit the Purchasers with reasonable access to the Seller's quality reporting and backup documentation (e.g., workpapers, sampled transactions and account-level results). Promptly following the end of each calendar month during the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, and shall cause the Seller to, at the reasonable request of Purchasers, provide the Purchasers with screenshots that would enable the Purchasers to complete the foregoing review on a sample of Receivables determined by the Purchasers (limited to one hundred (100) Receivables in any calendar week).

(o) <u>Annual Opinion of Counsel</u>. Counsel for the Transferor shall deliver on or before March 15 of each year (or, if such date is not a Business Day, the next succeeding Business Day), beginning March 15, 2018, an Opinion or Opinions of Counsel addressed to the Purchasers stating that, in the opinion of such counsel, such action has been taken with respect to the authorization, execution and filing of any financing statements and continuation statements as is necessary to maintain the liens and security interests created under this Agreement and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the liens and security interests created under this Agreement.

(p) <u>Delivery of Servicer Files</u>. To the extent that any portion of the Servicer Files related to any Purchased Receivable is not in the possession of the Servicer immediately prior to any related Closing Date, the Transferor shall, and shall cause the Seller to, deliver such portion of the Servicer Files for each Receivable listed on the Schedule of Receivables delivered to the Purchasers on each Closing Date.

Section 7.20 <u>Negative Covenants</u>. From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will not:

(a) <u>Other Business</u>. It will not (i) engage in any business other than the transactions contemplated by the Basic Documents, (ii) incur any indebtedness, obligation, liability or contingent obligation of any kind other than pursuant to or as contemplated by the Basic Documents (excluding any incidental expenses incurred in connection with the performance of its obligations under the Basic Documents) or (iii) form any subsidiary or make any investments in any other person.

(b) <u>Receivables Not to be Evidenced by Instruments</u>. It will take no action to cause any Receivable that is not, as of the Closing Date or the related Settlement Date, as the case may be, evidenced by an "instrument" (as defined in Article 9 of the UCC), other than an instrument that constitutes part of chattel paper, to be so evidenced except in connection with the enforcement or collection of such Receivable.

(c) <u>True Sale</u>. It will not account for or treat (whether in its financial statements or otherwise) the transfers by the Seller to the Transferor or the Transferor to the Purchasers in any manner other than as the sale, or absolute assignment, of the Receivables and related assets.

(d) <u>ERISA Matters</u>. It will not, to the extent it could reasonably result in material liability to or impairment of any assets of or interests of the Purchaser in assets of the Transferor, (i) engage or permit any ERISA affiliate to engage in any prohibited transaction for which an exemption is not available or has not previously been obtained from the United States Department of Labor, (ii) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Code with respect to any Pension Plan, (iii) fail to make any payments to a Multiemployer Plan that it or any ERISA Affiliate is required to make under the agreement relating to such Multiemployer Plan or any law pertaining thereto, (iv) permit the filing of any notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, (v) permit the termination of any Pension Plan under Section 4041(c) of ERISA or the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate or appoint a trustee to administer a Pension Plan, or (vi) permit any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e) <u>Formation Documents; Transfer Agreement</u>. Without the prior consent of the Purchasers, the Transferor will not amend, modify, waive or terminate any provision of its formation documents, and the Seller and the Transferor will not amend, modify, waive or terminate any provision of the Basic Documents.

(f) <u>Changes in Payment Instructions to Obligors</u>. It will not add or make any change, or permit the Servicer to make any change, in its instructions to Obligors regarding payments to be made with respect to the Receivables, unless the Purchasers shall have consented to such change and has received duly executed copies of all documentation related thereto, which documentation shall be satisfactory in form and substance to the Purchasers.

(g) <u>Extension or Amendment of Receivables</u>. It will not, except as otherwise permitted in pursuant to this Agreement or the other Basic Documents, extend, amend or otherwise modify, or permit the Servicer to extend, amend or otherwise modify, the terms of any Receivables.

(h) <u>Credit Policy</u>. During the Commitment Period, the Transferor will not, and it will not permit the Seller to, amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to <u>Exhibit E</u> attached hereto, without written notification to the Purchasers; <u>provided</u> that the prior written consent of the Purchasers shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Purchasers under this Agreement or any other Basic Document. The Transferor will provide, or shall cause to be provided, to the Purchasers on a [***] basis a current version of the Seller's policies concerning generation of financing terms as well as (i) a comparison showing all changes to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous [***], noting that the Purchasers may also request a current version of the Seller's policies concerning generation of financing terms at any point in time. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms. The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's Credit Policy as well as (i) a comparison showing all changes to the Seller's Credit Policy as provided to the Purchasers during the previous [***] or (ii) an affirmation that no changes were made to the Seller's Credit Policy as provided to the Purchasers during the previous [***], noting that the Purchasers may also request a current version of the Seller's Credit Policy at any point in time.

(i) <u>Collection Policy</u>. The Transferor will not amend, modify, restate or replace, in whole or in part, the Collection Policy, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement, and as modified by the Servicing Exceptions, if any, or with respect to any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement.

(j) <u>No Assignments</u>. It will not assign or delegate, grant any interest in or permit any Lien (other than Permitted Liens) to exist upon any of its rights, obligations or duties under this Agreement or any other Basic Document without the prior written consent of the Purchasers.

Section 7.21 <u>Accountant's Letter</u>. Not later than thirty (30) days after the end of each calendar quarter, upon the request of the Purchasers, the Transferor shall cause a firm of independent certified public accountants, to furnish to the Purchasers a letter in form and substance acceptable to the Purchasers, stating as of the Cutoff Date that they have performed specified procedures with respect to each Receivables Pool sold to the Purchasers during the preceding calendar quarter. The Transferor shall be responsible for all expenses associated with obtaining such agreed upon procedures letters up to $[***] annually; <u>provided</u> that in the event an agreed upon procedures letter reveals deviations material in nature or amount, then the Transferor shall be obligated to reimburse up to an additional $[***] of agreed upon procedure letters costs incurred in the following 12-month period.

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.1 <u>Obligations of the Transferor</u>. The obligations of the Transferor under this Agreement shall not be affected by reason of any invalidity, illegality or irregularity of any Receivable with respect to any Receivables Pool.

[***] Redacted for confidentiality purposes.

Section 8.2 <u>Repurchase of Receivables Upon Breach by the Transferor</u>. Upon (i) the discovery of any breach of any representation or warranty as set forth in <u>Section 5.2(cc)</u> of this Agreement (and with respect to <u>paragraphs (i)(B)(ii) and (x)</u> therein, without giving effect to any knowledge requirements) or (ii) the Purchasers incurring any cost, expense, loss, claim, damage or liability resulting from the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Such notice shall specify the reason for such ineligibility or breach and shall identify all Receivables that the party preparing such notice knows is so ineligible or in breach as of such date. Unless the breach described in <u>clause (i)</u> above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in <u>clause (ii)</u> above, in each such circumstance, the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit, or cause to be remitted the Warranty Payment to the applicable Collection Account for distribution pursuant to <u>Section 4.2</u> of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in <u>Section 7.14</u> of this Agreement) against the Transferor for such breach available to the Purchasers.

Section 8.3 <u>Assignment of Warranty Receivables</u>. With respect to all Receivables repurchased pursuant to this Agreement, the Purchasers shall assign to the Transferor, without recourse, representation or warranty to the Transferor, all the Purchaser's right, title and interest in and to such Receivables, and all security and documents relating thereto.

Section 8.4 <u>Amendment</u>. This Agreement may be amended from time to time by a written amendment duly executed and delivered by the Transferor and the Purchasers.

Section 8.5 <u>Waivers</u>. No failure or delay on the part of the Purchasers in exercising any power, right or remedy under this Agreement, any Second Step Pool Supplement or any Second Step Receivables Assignment shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy.

Section 8.6 <u>Notices</u>. All communications and notices pursuant hereto to either Party must be in writing personally delivered, sent by facsimile or email and shall be deemed to have been duly given at the address, fax number or email for each Party set forth below.

To Transferor:   Carvana Auto Receivables 2016-1 LLC
c/o Carvana, LLC, its sole member
1930 W. Rio Salado Pkwy
Tempe, AZ 85281
Attention: General Counsel
Email: DL-CarvanaLegal@carvana.com

<u>With a copy to</u>:   Snell & Wilmer L.L.P.
400 East Van Buren
Phoenix, Arizona 85004-2202
Attention: Brian Burke
602.382.6379
bburke@swlaw.com

To Purchasers:   Ally Bank
500 Woodward Avenue
Detroit, MI 48226
Attn: Scott Brobecker
Email: Scott.Brobecker@ally.com

<u>and</u>:     Ally Financial
            Ally Detroit Center
            500 Woodward Avenue
            MC: MI-01-10-LEGAL
            Detroit, MI 48226
            Attn: Richard V. Kent
            Fax No.: (313) 334-3276

Section 8.7 <u>Costs and Expenses</u>. Except as otherwise provided in this Agreement or the other Basic Documents, the Transferor agrees to pay to the Purchasers all reasonable costs and expenses in connection with the preparation, execution and delivery of this Agreement and the other Basic Documents and the other documents to be delivered hereunder or in connection herewith and any requested amendments, waivers or consents hereof including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Purchasers (which shall not exceed $[***] under the Basic Documents), with respect thereto and all costs and expenses, if any, in connection with the enforcement of this Agreement and the other documents delivered hereunder or in connection herewith.

Section 8.8 <u>Survival</u>. The respective agreements, representations, warranties and other statements by the Transferor and the Purchasers set forth in or made pursuant to this Agreement shall remain in full force and effect and shall survive the closing under <u>Section 3.2</u> and any sale, transfer or other assignment of the Receivables or other Purchased Property by the Purchasers.

Section 8.9 <u>Headings and Cross-References</u>. The various headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 8.10 <u>Governing Law, Submission to Jurisdiction, Etc</u>.

(a)  THIS AGREEMENT AND THE SECOND STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS..

(b)  THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)  THE TRANSFEROR AND PURCHASERS EACH HEREBY WAIVES (TO THE EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. INSTEAD, ANY DISPUTE RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

[***] Redacted for confidentiality purposes.

Section 8.11 <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which will be an original, but which together will constitute one and the same instrument. This Agreement may be executed and delivered electronically or by facsimile. Any electronic or facsimile signatures will have the same legal effect as manual signatures. The words "execution", "signed", "signature", and words of like import in this Agreement or in any such amendment, waiver, certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the UCC.

Section 8.12 <u>Further Assurances</u>. The Transferor and Purchasers shall each, at the request of the other, execute and deliver to the other all other instruments that either may reasonably request in order to more fully effect the sale of the Purchased Property to the Purchasers.

Section 8.13 <u>No Reliance</u>. The Purchasers acknowledges and agrees that it is purchasing the Receivables without recourse to the Transferor (other than as otherwise provided in this Agreement).

Section 8.14 <u>Severability of Provisions</u>. If any provision of this Agreement is invalid or unenforceable, then, to the extent such invalidity or unenforceability shall not deprive either Party of any material benefit intended to be provided by this Agreement, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

Section 8.15 <u>Assignment</u>. Subject to the terms of the Confidentiality and Reconstitution Agreement, neither the Transferor nor the Purchasers may assign or otherwise transfer its rights and obligations under this Agreement without the prior written consent of the other Party.

Section 8.16 <u>No Third Party Beneficiaries</u>. This Agreement does not create, and shall not be deemed to create, a relationship between the Parties or any of them and any third party in the nature of a third party beneficiary or fiduciary relationship; provided, however, that the existence of this Section 8.15 shall not relieve the Transferor of its indemnity obligations set forth in Section 7.14 of this Agreement and the Purchasers may enforce such indemnification claims for the Indemnified Parties set forth in Section 7.14.

Section 8.17 <u>No Petition Covenant</u>. Notwithstanding any prior termination of this Agreement, no party to this Agreement shall, prior to the date which is one year and one day after the later of (i) the final payment or liquidation of all Receivables purchased by Ally Bank and Ally Financial Inc. under the Master Purchase Agreement (Flow) and (ii) the repayment in full of all obligations of each Bankruptcy Remote Party in respect of all amounts owing by any Bankruptcy Remote Party to the Administrative Agent and the Lenders pursuant to the Loan and Security Agreement or any other similar financing arrangement to which Ally Bank or any of its Affiliates is a party other than inchoate obligations for which no claim has been made, acquiesce, petition or otherwise invoke or cause any Bankruptcy Remote Party to invoke the process of any Governmental Authority for the purpose of commencing or sustaining a case against such Bankruptcy Remote Party under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of such Bankruptcy Remote Party or any substantial part of its property, or ordering the winding up or liquidation of the affairs of any Bankruptcy Remote Party under any federal or state bankruptcy or Insolvency Proceeding.

Section 8.18 <u>Special Acknowledgement of Purchasers</u>. Each Purchaser hereby acknowledges that it is a sophisticated purchaser capable of analyzing the risk of purchasing the Receivables and that subsequent to the consummation of the transaction contemplated hereby, the Purchasers shall bear all of the risks of ownership of the Receivables, including the risks of defaults and credit losses with respect thereto, except as otherwise set forth in any of the Basic Documents.

Section 8.19 <u>Effect of Amendment and Restatement</u>. It is the intent of the parties hereto that this Second Amended and Restated Master Purchase and Sale Agreement shall, as of the date hereof, amend and restate and replace in its entirety the Amended and Restated Master Purchase and Sale Agreement (Flow), dated March 6, 2017 (the "<u>Original Amended Master Purchase and Sale Agreement</u>"), among the Transferor and the Purchasers, which amended and restated and replaced in its entirety the Master Purchase and Sale Agreement (the "<u>Original Master Purchase and Sale Agreement</u>"), dated December 22, 2016, among the Transferor and the Purchasers; <u>provided</u> that, with respect to the period of time from December 22, 2016 through Mach 6, 2017, the rights, obligations, representations and warranties of the parties shall be governed by the Original Master Purchase and Sale Agreement and, with respect to the period of time from March 6, 2017, through the date hereof, the rights, obligations, representations and warranties of the parties shall be governed by the Original Amended Master Purchase and Sale Agreement; <u>provided</u> further, that the amendment and restatement of the Original Amended Master Purchase and Sale Agreement shall not affect any of the grants, transfers or conveyances contemplated by the Original Amended Master Purchase and Sale Agreement to have occurred prior to the date hereof. Each of the parties hereto, in each of its respective capacities hereunder and under each of the other Basic Documents, as applicable, hereby consents to the amendment and restatement of the Original Amended Master Purchase and Sale Agreement and each of the other Basic Documents on the date hereof, and does hereby acknowledge receipt of notice of such amendments and restatements and waives any further notice requirement with respect thereto, if and to the extent any such consent or notice was required hereunder or thereunder.

Section 8.20 <u>Recourse Limited to Collateral; Subordination</u>.

(a)  The obligations of the Transferor under this Agreement and the other Transaction Documents are obligations solely of the Transferor and shall not constitute a claim against the Transferor to the extent that the Transferor does not have funds sufficient to make payment of such obligations. In furtherance of and not in derogation of the foregoing, to the extent the Transferor enters into secured transactions, the parties hereto acknowledge and agree that they shall have no right, title or interest in or to Other Assets. To the extent that, notwithstanding the agreements and provisions contained in the preceding sentences of this subsection, any of the parties hereto either (i) asserts an interest or claim to, or benefit from, Other Assets, or (ii) is deemed to have any such interest, claim to, or benefit in or from Other Assets, whether by operation of law, legal process, pursuant to applicable provisions of insolvency laws or otherwise (including by virtue of Section 1111(b) of the Bankruptcy Code or any successor provision having similar effect under the Bankruptcy Code), then the parties hereto further acknowledge and agree that any such interest, claim or benefit in or from Other Assets is and shall be expressly subordinated to the indefeasible payment in full of all obligations and liabilities of the Transferor which, under the terms of the relevant documents relating to such Other Assets, are entitled to be paid from, entitled to the benefits of, or otherwise secured by such Other Assets (whether or not any such entitlement or security interest is legally perfected or otherwise entitled to a priority of distribution or application under applicable law, including insolvency laws, and whether asserted against the Transferor), including the payment of post-petition interest on such other obligations and liabilities. This subordination agreement shall be deemed a subordination agreement within the meaning of Section 510(a) of the Bankruptcy Code. The parties hereto further acknowledge and agree that no adequate remedy at law exists for a breach of this Section 8.20 and the terms of this Section 8.20 may be enforced by an action for specific performance.

(b)  The provisions of this Section 8.20 shall be for the third party benefit of those entitled to rely thereon and shall survive the termination of this Agreement.

(c)  The Transferor covenants and agrees that if it enters into secured transactions with respect to Other Assets, it shall cause the appropriate documentation with respect thereto to include provisions substantially similar to those contained in (i) this Section 8.20 pursuant to which the Person(s) to which Other Assets are conveyed disclaims (and subordinates) any interest it may have in the assets of the Transferor other than the specific Other Assets related to such secured transaction and (ii) Section 8.17.

* * *

The Parties have caused this Second Amended and Restated Master Purchase and Sale Agreement to be executed by their respective duly authorized officers as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By:     /s/ Paul Breaux
        Name: Paul Breaux
        Title: Vice President

ALLY BANK,
as Purchaser

By:     /s/ Scott M. Brobecker
        Name: Scott Brobecker
        Title: Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser

By:     /s/ Thomas E. Elkins
        Name: Tom Elkins
        Title: Authorized Representative

**Agreed to and accepted by:**

CARVANA, LLC,
 as Seller

By:     /s/ Paul Breaux
        Name: Paul Breaux
        Title: Vice President

**APPENDIX A**

**DEFINITIONS AND USAGE**

(a)  <u>Construction and Usage</u>. Unless otherwise provided in the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement or any other Basic Documents, the following rules of construction and usage are applicable to this Appendix and the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement and any other Basic Documents.

(i)  As used in this Appendix or in any Basic Document and in any certificate or other document made or delivered pursuant thereto, accounting terms not defined herein, or in any such Basic Document, or in any such certificate or other document, and accounting terms partly defined herein or in any such certificate or other document, to the extent not defined herein, have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms herein, in any such Basic Document or in any such certificate or other document are inconsistent with the meanings of such terms under such generally accepted accounting principles, the definitions contained herein, in such Basic Document or in any such certificate or other document control.

(ii)  The words "hereof," "herein," "hereunder" and words of similar import when used in any Basic Document refer to such Basic Document as a whole and not to any particular provision or subdivision thereof. References in any Basic Document to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such Basic Document. The term "including" means "including without limitation." The word "or" is not exclusive.

(iii)  The definitions contained in any Basic Document are equally applicable to both the singular and plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(iv)  Any agreement, instrument, statute or regulation defined or referred to below means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

(v)  Any interest calculated over a period under any Basic Document shall be based on the actual number of days in such period and 365-day years.

(b)  <u>Definitions</u>

All terms defined in this Appendix shall have the defined meanings when used in any Basic Document, unless otherwise specified or defined therein.

"<u>2-year Prime ABS Spread</u>" means, as of any day, the "2-year Prime ABS Spread" for the most recent week set forth in the Morgan Markets Auto ABS Index; <u>provided,</u> that, if the Morgan Markets Auto ABS Index ceases or fails to publish the 2-year Prime ABS Spread, the 2-year Prime ABS Spread shall be the 2-year Prime ABS Spread as determined by the Purchasers from time to time in the ordinary course of their business and provided to the Transferor; and <u>provided, further</u>, that if the Purchasers no longer periodically determine the 2-year Prime ABS Spread in the ordinary course of their business, then the Purchasers and the Transferor will otherwise establish a methodology for determining the 2-year Prime ABS Spread in a manner mutually acceptable to the Purchasers and the Transferor.

"<u>Action Plan</u>", with respect to a Receivables Pool, has the meaning set forth in <u>Section 3.16(d)</u> of the Master Servicing Agreement.

"<u>Action Plan Meeting</u>", with respect to a Receivables Pool, has the meaning set forth in <u>Section 3.16(c)</u> of the Master Servicing Agreement.

"Action Plan Meeting Regarding Certificates of Title", with respect to all of the Receivables in all Receivables Pools, has the meaning set forth in Section 3.16(g) of the Master Servicing Agreement.

"Action Plan Regarding Certificates of Title", with respect to all of the Receivables in all Receivables Pools, has the meaning set forth in Section 3.16(h) of the Master Servicing Agreement.

"Administrative Purchase Payment" means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) 30/360.

"Administrative Receivable" means a Receivable which the Servicer has repurchased pursuant to Section 3.8 of the Master Servicing Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Outstanding Principal Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of any date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool, as applicable.

"Ally Bank" means Ally Bank, a Utah chartered bank, and its permitted successors and assigns.

"Ally Bank Controls Effectiveness Review" means the Ally Bank process that assesses a suppliers' risk management controls in compliance with FDIC/FFIEC Third Party Vendor Management guidelines.

"Ally Financial" means Ally Financial Inc., a Delaware corporation, and its permitted successors and assigns.

"Anti-Corruption Laws" has the meaning set forth in Section 3.30 of the Master Servicing Agreement.

"Annual Percentage Rate" or "APR" of a Receivable means the annual rate of finance charges stated in the Receivable.

"Applicable Servicing Modification," with respect to a Banking Regulatory Change, shall be the modification to the Servicer's servicing standards and practices (i) approved by the Banking Regulator, if the Banking Regulator has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, (ii) if clause (i) is inapplicable, then as approved by the Purchaser, if the Purchaser has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, or (iii) otherwise, the modification proposed by the Purchaser in the related Notice of Banking Regulatory Change.

"Approved Financed Ancillary Products" means, the products mutually agreed to by the Purchasers and the Transferor with respect to vehicle service contracts, global positioning systems, gap insurance or waiver, prepaid maintenance, tire & wheel protection, paintless dent repair, and such other products as may be agreed to in writing by the Purchasers and Transferor from time to time.

"Authoritative Copy" means with respect to any Electronic Contract, a copy of such Contract that is unique, identifiable and, except as otherwise provided in Section 9-105 of the UCC, unalterable, and is marked "original" or has no watermark or other marking that would indicate that it is a "copy" or "duplicate" or not an original or not an "authoritative" copy.

"Available Collections" means, with respect to a Receivables Pool for any date or period of determination, the sum of the following amounts with respect to such date or period:

(i)   all monies collected from whatever source on such date or during such period with respect to the Receivables within such Receivables Pool;

(ii)  all Liquidation Proceeds received with respect to a Receivable within such Receivables Pool during such period; and

(iii) the Administrative Purchase Payments or Warranty Payments received with respect to each Receivable within such Receivables Pool that became an Administrative Receivable or Warranty Receivable on such date or during such period pursuant to Section 8.2 of the Master Purchase and Sale Agreement or pursuant to Section 3.8 of the Master Servicing Agreement;

provided, however, that in calculating the Available Collections the following will be excluded:

(i)   all payments and proceeds of any Receivables the Warranty Payment or Administrative Purchase Payment of which has previously been included in Available Collections for such Receivables Pool;

"Banking Regulator" means a United States federal or State regulatory agency or instrumentality having authority over U.S. national banks or state chartered banks, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Financial Institutional Examination Council and the Utah Department of Financial Institutions, or any successor federal or state agency or instrumentality.

"Banking Regulatory Change" will occur if (i) a Banking Regulator adopts or modifies regulations or policies which alter the obligations of U.S. national or state chartered banks in general, or Ally Bank in particular, with respect to the servicing of retail automotive loans and retail automotive installment sales contracts, (ii) such regulations apply to retail automotive installment sale contracts owned or serviced by Ally Bank, (iii) compliance by third parties servicing receivables (as servicer for Ally Bank) owned by Ally Bank is required by law and (iv) such regulations require the Servicer (as servicer for Ally Bank) to implement new servicing standards or practices, or otherwise modify the existing standards or practices, other than those set forth in the Basic Documents.

"Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended from time to time.

"Bankruptcy Remote Party" means each of CAR 2016-1, the Borrower or any trust, limited liability company or corporation wholly-owned by CAR 2016-1.

"Basic Documents" means the Master Sale Agreement (including the First Step Receivables Assignment), the Master Purchase and Sale Agreement (including the Second Step Receivables Assignment), the Master Servicing Agreement, , the First Step Pool Supplements, the Second Step Pool Supplements, the Master Confidentiality and Reconstitution Agreement, the Collateral Custodian Agreement, the Letter Agreement and any other document, certificate, opinion, agreement or writing the execution of which is necessary or incidental to carrying out the transactions contemplated by this Agreement or any of the other foregoing documents.

"Benefit Plan" means any of (i) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (ii) a plan subject to Section 4975 of the Code or (iii) any entity whose underlying assets include plan assets by reason of investment by an employee benefit plan or plan in such entity.

"Bridgecrest" means Bridgecrest Credit Company, LLC, an Arizona limited liability company, and its permitted successors and assigns.

"Business Continuity Plan" means the document in which the Servicer plans to protect its employees, and continue its most critical business functions in situations where the facilities, people or information technology resources are interrupted for an extended period.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which banking institutions or trust companies in New York, New York, Minneapolis, Minnesota or Detroit, Michigan may, or are required to, remain closed.

"CAR 2016-1" means the Transferor.

"CAR 2016-1 Purchased Property" has the meaning set forth in Section 3.1(a) of the Master Sale Agreement.

"Carvana" means Carvana, LLC, an Arizona limited liability company, and its permitted successors and assigns.

"Catalyst Event" means a period of time commencing on the date when the 2-year Prime ABS Spread exceeds 0.75% and continuing until the earliest time as of which the 2-year Prime ABS Spread is equal to or less than 0.75%.

"CER" has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

"Certificate of Title" means with respect to a Financed Vehicle, (i) the original certificate of title relating thereto, or copies of correspondence to the applicable Registrar of Titles, and all enclosures thereto, for issuance of the original Certificate of Title or (ii) if the applicable Registrar of Titles issues a letter or other form of evidence of lien in lieu of a Certificate of Title (including electronic titling), either notification of an electronic recordation, by either a Title Intermediary or the applicable Registrar of Titles, or the original lien entry letter or form or copies of correspondence to such applicable Registrar of Titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, shall name the related Obligor as the owner of such Financed Vehicle and a Title Lien Nominee as secured party.

"Change in Control" means the (i) failure of Carvana to maintain, directly or indirectly, (A) control of the board of directors (or similar governing body) and (B) a beneficial ownership of 100% percent of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of the Transferor or (ii) failure of Persons that, as of the Closing Date, directly or indirectly maintain, (X) control of the board of directors (or similar governing body) and (Y) a beneficial ownership of more than fifty percent (50%) of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana to maintain such control or more than 50% ownership, other than as a result of (1) a registered public offering of securities of Carvana or (2) transfers of equity interests to Affiliates of such Persons or to other Persons that, individually or collectively, as of the Closing Date, owned equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana representing not less than ten percent (10%) of such equity interests or Affiliates thereof.

"Change Order" has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

"Change Request" has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

"Closing" means the initial closing that shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

"Closing Date" means, with respect to a First Tier Receivables Pool and subject to Section 3.1(e) of the Master Sale Agreement or a Receivables Pool and subject to Section 4.1(a) of the Master Purchase and Sale Agreement, the date on which the related First Step Pool Supplement or Second Step Pool Supplement is executed and delivered and the Purchase Price is paid, which generally will be the third (3rd) Business Day of the last calendar week of each calendar quarter.

"CNL" means, with respect to any Receivables Pool and any Distribution Date, the Cumulative Net Losses for such Receivables Pool through the last day of the related Collection Period.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

"Collateral Custodian" means Wells Fargo Bank, National Association.

"Collateral Custodian Agreement" means the Amended and Restated Collateral Custodian Agreement, dated as of November 1, 2022, among the Purchasers, the Collateral Custodian, the Servicer, the Transferor and the Seller, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Collateral Custodian Fee: The fees set forth in the Collateral Custodian Agreement as the Collateral Custodian Fees.

"Collection Account" has the meaning set forth in Section 4.1 of the Master Servicing Agreement.

"Collection Period" means each calendar month during the term of the Master Servicing Agreement or, in the case of the initial Collection Period, the period from and including the Cutoff Date of the related Receivables to and including the last day of the month preceding the month in which the first related Distribution Date occurs. Any amount stated "as of the close of business of the last day of a Collection Period" gives effect to all applications of Collections and all remittances or distributions as of the end of the day on such last day.

"Collection Policy" means, with respect to (i) the initial Servicer, the customary servicing and collection guidelines, policies and procedures of the Servicer, including those as attached as Exhibit D to the Master Servicing Agreement, in effect on the Original Execution Date, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement, and as modified by the Servicing Exceptions and the Process Remediations attached to the Master Servicing Agreement as Exhibit F, if any, or (ii) any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement.

"Collections" means, with respect to a First Tier Receivables Pool or a Receivables Pool, all amounts collected by the Servicer or its agents (from whatever source) or otherwise turned over to the Collection Account on or with respect to the related Receivables or the other CAR 2016-1 Purchased Property or Purchased Property, as applicable.

"Commission" means the Securities and Exchange Commission.

"Commitment Amount" means the sum of (i) $5,000,000,000 plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool.

"Commitment Period" means the period from the Fifth Extension Amendment Effective Date to the earliest of (i) the Scheduled Commitment Termination Date, (ii) the occurrence of a Commitment Termination Event and (iii) the purchase by the Purchasers of Receivables Pools with a total Cutoff Date Aggregate Outstanding Principal Balance in an amount equal to the Commitment Amount.

"Commitment Termination Event" means the occurrence of a termination pursuant to Section 2.4(a) or 2.4(b) of the Master Purchase and Sale Agreement.

"Confidential Information" means all information and material of any type, scope or subject matter whatsoever relating to the Purchasers, the Transferor, the Seller, the Servicer or any of their subsidiaries, whether oral or written, and howsoever evidenced or embodied, which each Party, each Party's representatives or agents (including any officers of any Party or any of their subsidiaries) may furnish to the other, or to which either Party is afforded access by the other Party, either directly or indirectly for purposes of such Party's participation in the transactions contemplated by the Master Purchase and Sale Agreement. However, "Confidential Information" shall not include information or material of a Party which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its agents and other representatives, (ii) was available to the receiving Party on a non-confidential basis prior to its disclosure by the disclosing Party, (iii) becomes available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or the disclosing Party's

representatives or agents, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information to the Purchaser, the Seller, the Servicer or the Transferor by a contractual, legal or fiduciary obligation or (iv) consists of the documents evidencing the consummation of the transactions contemplated by the Basic Documents so long as all references to the other Party and all information specific to the assets sold or price paid pursuant to the transactions are removed.

"Confidentiality Agreement" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Contract" means, a fully-executed retail installment sale contract, direct purchase money loan or conditional sale contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract under which an extension of credit is made in the ordinary course of business of the Seller to such Obligor and which is secured by the related Financed Vehicle.

"Credit Policy" means the credit underwriting guidelines, policies and procedures that Carvana or its Subsidiaries utilize in originating or acquiring retail installment sales contracts, including the credit policies as attached as Exhibit E to the Master Purchase and Sale Agreement, as such guidelines, policies and procedures may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 7.20(h) of the Master Purchase and Sale Agreement and Section 6.22(f) of the Master Sale Agreement.

"Cumulative Net Losses" means, with respect to a Receivables Pool as of any Distribution Date, the sum of (i) the aggregate Net Losses experienced on all Liquidating Receivables with such Receivables Pool from the first day of the related Origination Period through the end of the related Collection Period and (ii) the Outstanding Principal Balance as of the Pool Termination Date of any Receivables within such Receivables Pool outstanding on the related Pool Termination Date.

"Customer Information" has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

"Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to any First Tier Receivables Pool and Receivables Pool sold (i) from and including March 7, 2019 to and including April 4, 2019, respectively, (ii) on March 20, 2020, and (iii) on any other date consented to by the Purchasers in their sole discretion, the "Cutoff Date" shall be the date consented to by the Purchasers.

"Cutoff Date Aggregate Outstanding Principal Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of the applicable Cutoff Date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool as of the applicable Cutoff Date, as applicable.

"Defaulted Receivable" means any Receivable upon the first occurrence of any of the following: (i) all, or any part in excess of 10% of any scheduled payment (the "Default Threshold") is one hundred and twenty (120) (or such shorter period as shall be specified in the Collection Policy, it being understood that such period in the Collection Policy shall not be lengthened without the prior written consent of the Purchasers) or more days delinquent on the last day of a calendar month (taking into account the application by the Servicer of payments received in any Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy), (ii) only for Receivables charged off on or before December 31, 2022, for which the Financed Vehicle has been surrendered or repossessed and the redemption period granted the Obligor or required by applicable law has expired, or is to be repossessed but is unable to be located or is otherwise subject to being repossessed, (iii) which has been settled for less than the Outstanding Principal Balance, (iv) which has been liquidated by the Servicer through the sale of the related Financed Vehicle, (v) for which proceeds have been received which in the Servicer's judgment, constitute the final amounts recoverable in respect of such Receivable, or (vi) which has been charged-off (or should have been charged-off) in accordance with the Collection Policy.

"Delinquent Receivable" means any Receivable (other than a Defaulted Receivable) for which all or any part of a scheduled payment (the "Delinquency Threshold") is thirty-one (31) or more days past due, taking into

account the application by the Servicer of payments received in any Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy. For purposes of determining delinquency, in accordance with the Collection Policy, the Servicer applies payments from Obligors in order of delinquency of outstanding scheduled payments, with payments first applied to the longest overdue and outstanding scheduled payment or portion thereof.

"Deliver" means, (x) With respect to a Tangible Contract or other document in a Receivable File other than an Electronic Contract or an electronic Certificate of Title, to deliver physical possession of such Tangible Contract or other document via reputable overnight delivery service, (y) with respect to an Electronic Contract, to direct Wells Fargo Bank, National Association, to transfer such Electronic Contract to the Forward Flow Vault Partition and (z) with respect to electronic Certificates of Title, to cause the applicable Title Intermediary to provide the Collateral Custodian with full electronic access to view such electronic Certificates of Title on the records of the Title Intermediary. The terms "Delivery" and "Delivered" shall have corollary meanings.

"Disclosure Information" has the meaning set forth in Section 3(a)(iv) of the Master Confidentiality and Reconstitution Agreement.

"Distribution Date" means, with respect to each First Tier Receivables Pool or Receivables Pool, the 15th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day, beginning on the date specified in the applicable First Step Pool Supplement or Second Step Pool Supplement, as applicable.

"Document Receipt" means the Document Receipt substantially in the form attached as an exhibit to the Collateral Custodian Agreement executed by the Collateral Custodian and delivered to the Purchasers and the Servicer.

"DriveTime" means DriveTime Automotive Group, Inc., a Delaware corporation, and its permitted successors and assigns.

"Effective Date" means, the date upon which all of the conditions described in Section 6.1 to the Master Purchase and Sale Agreement are met.

"Electronic Contract" means a Contract that constitutes "electronic chattel paper" under and as defined in Section 9-102(31) of the UCC.

"Eligible Receivable" means, with respect to each Receivable in a First Tier Receivables Pool or a Receivables Pool, as applicable that such Receivable:

(i)   Such Receivable was underwritten by the Seller in its ordinary course of business and in accordance with the Credit Policies of the Seller as approved by the Purchasers;

(ii)  Such Receivable was purchased by the Transferor from the Seller in the ordinary course of business and as soon as is practicable after the file with respect to such Receivable is complete;

(iii) Each such sale and assignment of such Receivable was made without any fraud or misrepresentation;

(iv)  With respect to each such sale and assignment of such Receivable, the Seller and the Transferor have taken all steps reasonably necessary to ensure that such sale and assignment has been perfected under the relevant UCC;

(v)   With respect to such Receivable, the Seller shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Transferor a first priority perfected security interest in the CAR 2016-1 Purchased Property shall have been made and the Transferor shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected security interest in the Purchased Property shall have been made;

(vi) The terms of such Receivable (a) create a valid enforceable security interest in favor of the holder thereof, and (b) contain customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for realization against the Financed Vehicle;

(vii) With respect to such Receivable, the related Original Contract Documents are in the possession of the Custodian and the Custodian has issued a collateral receipt to the Purchasers as required under the Collateral Custodian Agreement and the related Servicer Files are in the possession of the Servicer;

(viii)  (a) a Title Lien Nominee is named as the first lien holder on the Certificate of Title for the related Financed Vehicle, or if a new or replacement Certificate of Title is being or will be applied for with respect to such Financed Vehicle, documentation has been or will be submitted to obtain title thereto noting such Person as lien holder and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns and if the Certificate of Title has not been received, the Collateral Custodian will have received a copy of the title application within 45 days of inclusion as part of the Purchased Property or (b) in those states that permit electronic recordation of Liens, such Person is named as the first lien holder on the Certificate of Title for the related Financed Vehicle on the electronic Lien and title system of the applicable state, or the Servicer or the Originator has submitted for electronic recordation, by either a third-party service provider or the relevant state registrar of titles, for such Person to be named as the lien holder on the Certificate of Title on the electronic Lien and title system of the applicable state and if a confirmation has not been received, the Collateral Custodian will have received a copy of the electronic submission within 45 days of inclusion as part of the Purchased Property and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns;

(ix) Such Receivable (including the related Contract) is currently and was at and all times since origination in compliance with all Requirements of Law;

(x) At the time of origination by the Seller, the related Financed Vehicle was covered by an insurance policy that covers physical loss or damage in at least the minimum amount required by the state in which the related Obligor resides, the related Obligor is required under the terms of the related Contract to maintain such insurance policy, and there are no forced-placed insurance premiums added to the Original Amount Financed;

(xi) Such Receivable arises under a Contract which, together with such Receivable (a) has been executed and delivered (or electronically authenticated) by the related Obligor, (b) is in full force and effect and constitutes the legal, valid and binding obligation of the related Obligor, (c) is evidenced by only one executed original copy (or with respect to electronic chattel paper, one Authoritative Copy) (in each case within the meaning of the UCC), (d) contains customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for the realization against the Purchased Property of the benefits of the security provided thereby, including all the rights of a secured party under the relevant UCC, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (e) does not require the Obligor under such Contract to consent to the transfer of the rights and duties of the Seller under such Contract, and (f) does not contain a confidentiality provision that purports to restrict the ability of the Purchasers, to exercise their rights under the Basic Documents, including its right to review the Contract. With respect to a Contract that is electronic chattel paper, the record or records composing the electronic chattel paper are created, stored and assigned in such a manner that (A) a single Authoritative Copy of the record or records exists which is unique, identifiable and unalterable (other than a revision that is readily identifiable as an authorized or unauthorized revision) other than with the participation of the Collateral Custodian in the case of an addition or amendment of a permitted and identifiable assignee and), (B) each copy of the Authoritative Copy and any copy of a copy is readily identifiable as a copy that is not the Authoritative Copy, and (C) the Authoritative Copy has been communicated to and is maintained by the Collateral Custodian;

(xii) The maturity date of such Receivable has not been deferred or extended, except in accordance with the Credit Policy and the Collection Policy and no other provision of the related Contract has been waived,

amended or rewritten or amounts due and owing thereunder deferred or waived (except waivers, amendments, rewrites, deferrals or waivers in all material respects in accordance with the Credit Policy and the Collection Policy and alterations and modifications so that such Receivable is an Eligible Receivable (other than clause (ix) hereof, which must have been satisfied at the time of origination)) and such Receivable is enforceable after giving effect thereto;

(xiii)    Such Receivable (a) is not subject to any dispute, offset, counterclaim or defense whatsoever (except the discharge in bankruptcy of such Obligor), and (b) with respect thereto (i) there is no material breach, default, violation or event of acceleration existing under the related Contract, and there is no event which, with the passage of time, or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and (ii) to the best of the its knowledge, no right of rescission, setoff, counterclaim or defense shall have been asserted or threatened;

(xiv)    Such Receivable is assignable without notice to or the consent of the related Obligor;

(xv)    The Obligor of such Receivable is not a government or government agency, and such Obligor is not an individual that was included on OFAC's List of Specially Designated Nationals at the time of origination;

(xvi)    Such Receivable is denominated and payable only in Dollars by an Obligor with a billing address in any State or territory of the United States or United States military installation;

(xvii)    Such Receivable is not, (a) as of the Cutoff Date for the related Receivables Pool, a Delinquent Receivable, or (b) as of the Closing Date for the related Receivables Pool, a Defaulted Receivable or a Liquidating Receivable;

(xviii)    Each Receivable constitutes any of "chattel paper," "an account," an "instrument" or a "general intangible" as defined in the UCC;

(xix)    The Transferor has good and marketable title to such Receivable free and clear of all liens (other than Permitted Liens) and such Receivable, together with the Contract related thereto, has not been satisfied, subordinated or rescinded, nor shall any Financed Vehicle or other related security have been released from the security interest granted under the related Contract in whole or in part;

(xx)    The Transferor has acquired a valid and perfected first priority security interest in such Receivable and, upon the sale by the Transferor to the Purchasers pursuant to the Master Purchase and Sale Agreement, the Purchasers have acquired a valid and perfected first priority security interest in such Receivable;

(xxi)    The Contract related to such Receivable is a Simple Interest Receivable, and scheduled payments under each Receivable have been applied in accordance with the method for allocating principal and interest set forth in such Receivable;

(xxii)    (A) For a Receivable that is not a Flex Receivable, the first scheduled payment in respect of such Receivable is no more than forty-five (45) days from the related contract date or (B) is a Flex Receivable;

(xxiii)    If such Receivable is a Receivable newly originated by the Seller, at the time of sale of such Receivable, the first scheduled payment was not past due; provided, that no funds have been advanced by the Transferor or the Seller, or anyone acting on behalf of any of them in order to cause such Receivable to comply with this clause (xxiii);

(xxiv)    The Financed Vehicle related to such Receivable (a) was purchased with the proceeds of such Receivable, (b) has all accessories and optional equipment described in the Contract, (c) is not at the time of origination designated for racing or modified for use as a public livery vehicle or any other commercial use, (d) has a history verified by Carvana through an Autocheck report (which may be an

aggregate report in a data tape format) reflecting no disclosed accidents, no title issues or odometer discrepancies with respect to each Financed Vehicle;

(xxv)    Such Receivable shall have been originated in the United States of America to an Obligor domiciled in the United States for the retail sale of a Financed Vehicle by the Seller who, at the time of origination, had all material licenses, permits and consents necessary to originate Receivables in the jurisdiction in which such Contract was originated;

(xxvi)    Such Receivable shall not have been originated in, or be subject to the laws of, any jurisdiction under which the transfer of such Receivable under the transaction documents shall be unlawful, void or voidable;

(xxvii)    With respect to such Receivable, none of the Seller or the Transferor is required to perform any additional service for, or perform or incur any additional obligation to, the related Obligor in order to enforce the related Contract;

(xxviii)    With respect to such Receivable there exists a Receivable File that contains, without limitation, each of the items described in the definition of "Receivable File", including the applicable Original Contract Documents, and the Servicer File and Original Contract Documents are in the possession of the Servicer and the Custodian, respectively, and, with respect to each document contained therein, each form has been correctly prepared in all material respects;

(xxix)    The information relating to the Receivables set forth in the related Schedule of Receivables is true and correct;

(xxx)    The Financed Vehicle related to such Receivable is not of a model year older than 10 years as of the date of origination;

(xxxi)    The Financed Vehicle related to such Receivable does not, as of the date of origination of the related Contract, have mileage in excess of [***] miles;

(xxxii)    The original term of such Receivable is not more than seventy-five (75) months;

(xxxiii)    (A) for Receivables with a related Cutoff Date on or after February 24, 2019 and on or prior to March 19, 2020, the LTV at origination did not exceed [***]% and (B) for Receivables with a related Cutoff Date after March 19, 2020, where the Obligor has a FICO score (a) greater than or equal to [***], then the LTV at origination is less than or equal to [***]%; (b) greater than or equal to [***] and less than [***], then the LTV at origination is less than or equal to [***]%, (c) greater than or equal to [***] and less than [***], then the LTV at origination is less than or equal to [***]%; and (d) less than [***], then the LTV at origination is less than or equal to [***]%;

(xxxiv)    The Obligor has a FICO score of not less than [***] and, not more than the Upper Bound FICO Score, which, except for a Receivable included in the initial Receivables Pool on the initial Closing Date, shall have been obtained by Carvana within the [***] days prior to the origination of the related Receivable, unless otherwise consented to by the Purchasers; provided that, if the Seller exercises a Limited Sale Option on any Closing Date occurring on or after March 7, 2019 through and including April 4, 2019, the maximum FICO score limit described in this clause (xxxiv) shall not apply; provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply;

(xxxv)    Contract provides for level payments, except for the last payment, which is less than or equal to the amount of the preceding level payments, that fully amortized the financed amount and requires that any prepayment must fully pay the Original Amount Financed plus accrued interest to date;

[***] Redacted for confidentiality purposes.

(xxxvi)  Obligor is a natural person, is not an Affiliate of Carvana, is the end user of the Financed Vehicle and the Financed Vehicle is intended for personal, family or household use;

(xxxvii) The Contract does not permit the Obligor to reduce or delay payment or return the Financed Vehicle in lieu or cancellation of payment or to substitute, exchange or add a vehicle as CAR 2016-1 Purchased Property or Purchased Property, respectively;

(xxxviii)Has a governing law provision approved by the Purchasers for use in the jurisdiction where the Obligor (but not any of the Obligor's agents) took delivery of the vehicle;

(xxxix)  No Receivable with a related Cutoff Date on or after the Second Extension Amendment Effective Date and secured by a Financed Vehicle includes Approved Financed Ancillary Products with parameters in excess of the ancillary product Purchasing Guidelines & Parameters;

(xl) For Receivables with a related Cutoff Date on or after the Second Extension Amendment Effective Date, the Obligor has an ID Analytics Credit Optics 5.1 Auto score of not less than 450; and

(xli)No Receivable arises under a Contract that has been executed and delivered (or electronically authenticated) by, and constitutes the legal, valid and binding obligation of, more than one Obligor.

"Eligible Receivables Pool" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"ERISA" means The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"E-Sign Provider" shall mean DocuSign, Inc.

"E Sign Transition Period" shall mean the period beginning on November 29, 2017 and ending on December 4, 2017 or such other day as the Transferor shall specify in writing to the Purchasers.

"E-Vault Provider" means eOriginal, Inc.

"E-Vault System" shall have the meaning set forth in the Custodial Agreement.

"Event of Servicing Termination" means an event specified in Section 6.1 of the Master Servicing Agreement.

"Exchange Act" means The Securities Exchange Act of 1934.

"Extension Amendment Effective Date" means November 3, 2017.

"FDIC/FFIEC Third Party Vendor Management" means the guidance to address the management by a regulated entity of third and fourth party suppliers issued by the Federal Deposit Insurance Corporation, the Federal Financial Institutions Examination Council or any other regulatory entity that covers a business in which Ally Bank or an Ally Bank Affiliate currently operates or may look to operate in the future.

"FICO Score" means, as of any date of determination, the credit score for the applicable Obligor using the Fair, Isaac & Co. FICO Auto Version 3.0 methodology, as provided to Carvana or the Servicer by Experian or such other version as approved by the Purchasers, which, except for Receivables included in the initial Receivables Pool on the initial Closing Date, shall not, without the consent of the Purchasers, be obtained more than thirty (30) days prior to the applicable origination date.

"Fifth Extension Amendment Effective Date" means March 19, 2021.

"Financed Vehicle" means a used automobile or light truck, together with all accessories thereto, securing an Obligor's indebtedness under a Receivable.

"First Step Pool Supplement" means the First Step Pool Supplement, in the form of Exhibit A to the Master Sale Agreement, executed by CAR 2016-1 and the Seller on each Closing Date.

"First Step Receivables Assignment" means the document of assignment attached as Schedule 1 to the First Step Pool Supplement.

"First Step Receivables Purchase Price" means, with respect to a First Tier Receivables Pool, an amount equal to the related Second Step Receivables Purchase Price.

"First Tier Receivables Pool" has the meaning set forth in the recitals to the Master Sale Agreement.

"Flex Amount" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Flex Receivable" means either (x) a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including May 31, 2020 (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller, noting that for the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable, or (y) a Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020.

"Forward Flow Vault Partition" means the segregated vault partition of the E-Vault System established in the name of the Purchasers.

"Freestyle Selection" means the random order that the Receivables are to be selected in the System of Record, after consideration of the Purchase Percentage, Eligible Receivable criteria and Eligible Receivables Pool criteria. The Receivables to be sold to the Transferor will be based on the contract number of the Receivables. The Seller shall sell to the Transferor all Receivables where the ninth and tenth digits of the contract number (such number, the "randomization code") are a number from 01 through the number equal to the Purchase Percentage (it being understood that a Purchase Percentage of 100 would have a randomization code of 00) or, with respect to any Previously Originated Receivable that later becomes an Eligible Receivable, such Previously Originated Receivable shall be included in such Eligible Receivables Pool if its randomization code falls within the Purchase Percentage for its related Origination Period. For example, if the Purchase Percentage for an Origination Period is 85%, the Seller would sell Receivables with contract numbers ending in 01 through 85, and retain Receivables with contract numbers ending in 86 through 00. The Seller shall ensure that contract numbers are assigned randomly as they are entered into the System of Record and in no way adverse to the Purchasers.

"GAP Letter" has the meaning set forth in Section 3.13 of the Master Servicing Agreement.

"GLBA" means the Gramm-Leach-Bliley Act and its implementing regulations.

"GLBA Privacy Requirements" has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

"General Change" has the meaning set forth in Section 3.18(d) of the Master Servicing Agreement.

"Governmental Authority" means any government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the applicable Person.

"Governmental Rules" means any and all laws, statutes, codes, rules, regulations, ordinances, orders, writs, decrees and injunctions, of any Governmental Authority and any and all legally binding conditions, standards, prohibitions, requirements and judgments of any Governmental Authority.

"Indemnified Parties" has the meaning set forth in Section 7.14 of the Master Purchase and Sale Agreement.

"Individual Pre-closing Interest Carry Amount" means, with respect to a Receivable in a Receivables Pool therein and as of the related Closing Date, an amount equal to (i) the Outstanding Principal Balance of such Receivable as of the Cutoff Date, multiplied by (ii) the Pricing Model all-in cost of funds of the Purchasers, for the related FICO band related to such Receivable, multiplied by (iii) (A) with respect to a Receivable for which the last scheduled payment for such Receivable was on or prior to the Cutoff Date, the number of days from the day following such last scheduled payment date through (and including) the related Closing Date for such Receivable and (B) with respect to a Receivable for which the first scheduled payment date for such Receivable does not occur on or prior to the Cutoff Date, the number of days from the day following the date of origination of such Receivable through (and including) the related Closing Date for such Receivable, divided by (iv) 365.

"Information Security Program" has the meaning set forth in Section 3.17(b) of the Master Servicing Agreement.

"Information Recipient" has the meaning set forth in Section 3.28 of the Master Servicing Agreement.

"Insolvency Event" means with respect to a specified Person, such Person shall (A) file a petition or commence a proceeding (1) to take advantage of any Insolvency Law or (2) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, (B) consent or fail to object to any such petition filed or proceeding commenced against or with respect to it or all or substantially all of its property, or any such involuntary petition or proceeding shall not have been dismissed or stayed within sixty (60) days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or proceeding, (C) admit in writing its inability to pay its debts generally as they become due, (D) make an assignment for the benefit of its creditors, (E) voluntarily suspend payment of its obligations or (F) take any action in furtherance of any of the foregoing

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Insolvency Proceeding" means with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

"Inspection Standard" has the meaning set forth in Section 3.18(a) of the Master Servicing Agreement.

"Letter Agreement" means the eighteenth amended and restated letter agreement, dated as of March 22, 2022, among the Purchasers, the Seller, the Transferor and the Servicer, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Lien" means any security interest, lien, charge, pledge, equity, or encumbrance of any kind.

"Liquidating Receivable" means a Receivable as to which the Servicer (i) has reasonably determined, in accordance with its customary servicing procedures, that eventual payment of amounts owing on such Receivable is unlikely, or (ii) has repossessed and disposed of the Financed Vehicle.

"Liquidation Expenses" means, with respect to a Liquidating Receivable, the actual reasonable out-of-pocket costs of liquidation not to exceed $675 (or such greater amount as the Servicer determines is reasonably necessary in accordance with its customary procedures to refurbish and dispose of a liquidated Financed Vehicle).

"Liquidation Proceeds" means, with respect to a Liquidating Receivable, all amounts realized with respect to such Receivable net of Liquidation Expenses and any amounts that are required to be refunded to the Obligor on such Receivable, but in any event not less than zero.

"Loan-to-Value Ratio" or "LTV" means, with respect to any Receivable, the ratio (expressed as a percentage) of (x) the Original Amount Financed of such Receivable on the date such Receivable was originated by the Seller, to (y) the sum of (a)(i) the KBB Weekly "Good Wholesale" (or "Lending") value of the Financed Vehicle as determined by Kelly Blue Book as of the date of origination of the related Receivable or (ii) if such value is not available, the clean trade-in value as determined by National Appraisal Guides, Inc. in the most recent NADA guide or such other source as shall be approved in writing by the Purchasers, plus (b) an amount determined by the Purchasers in their sole discretion to account for Seller's reconditioning process and other factors that enhance vehicle value.

"Master Confidentiality and Reconstitution Agreement" means the Amended and Restated Master Confidentiality and Reconstitution Agreement, dated as of November 1, 2022, by and among Carvana, Bridgecrest, the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Purchase and Sale Agreement" means the Second Amended and Restated Master Purchase and Sale Agreement, dated as of November 1, 2022, by and among the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Sale Agreement" means the Second Amended and Restated Master Sale Agreement (Flow), dated as of November 1, 2022, by and among the Seller and CAR 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Servicing Agreement" means the Amended and Restated Master Servicing Agreement (Flow), dated as of November 1, 2022, by and among Carvana, Bridgecrest and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means, with respect to any Person and to any event or circumstance, a material adverse effect on (i) the business, financial condition, operations, performance or properties of such Person, (ii) the validity or enforceability of the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document or the validity, enforceability or collectability of (a) a material portion of the Receivables purchased by the Purchasers, or (b) a material portion of the collections of such Receivables or the security interests in the Financed Vehicles, (iii) the rights and remedies of either Purchaser, (iv) the ability of such Person to perform its obligations under the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document to which it is a party or (v) the status, existence, perfection, priority or enforceability of either Purchaser interest in any Purchased Property.

"Monthly Data File" has the meaning set forth in Section 4.3 of the Master Servicing Agreement.

"Monthly Servicer Report" has the meaning set forth in Section 4.3 of the Master Servicing Agreement.

"NAALR" means the net average annualized loss rate for the related FICO band or Eligible Receivables Pool, as applicable, as determined by the Purchasers in accordance with their customary policies and procedures, without specific deviation for the Seller or Transferor other than deviation with respect to performance of the Receivables resulting from the application of such customary policies and procedures applied consistently.

"Net Loss" means, with respect to a Receivables Pool, (i) as of any Distribution Date, for each Liquidating Receivable in such Receivables Pool, the Outstanding Principal Balance of such Liquidating Receivable when it became a Liquidating Receivable minus all Liquidation Proceeds received with respect to such Liquidating Receivable on or before the last day of the related Collection Period and (ii) as of the related Pool Termination Date, and with respect to each Receivable then outstanding within such Receivables Pool, the Outstanding Principal Balance of such Receivable as of the last day of the related Collection Period.

"Nonconforming Receivables Pool" means a Receivables Pool that the Purchasers have agreed to purchase on a Closing Date after waiving (i) one or more of the characteristics contained in the definition of "Eligible Receivables Pool" or (ii) one or more of the characteristics contained in the definition of "Eligible Receivable".

"Non-Excluded Taxes" has the meaning set forth in Section 2.5(c) of the Master Purchase and Sale Agreement.

"Notice of Banking Regulatory Change" has the meaning set forth in Section 3.18(a) of the Master Servicing Agreement.

"Notified Total Costs" has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

"NPPI" means "non-public personal information" as defined in 16 C.F.R. § 314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms are defined by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. § 6801 et seq.), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. NPPI also includes any information Ally Financial or Ally Bank (including any of their Affiliates) may directly or indirectly disclose to the Servicer or any Servicer agent or which the Servicer or any Servicer agent may collect or otherwise have access to due to the Servicer or the Servicer agents' relationship with Ally Financial, Ally Bank or any of their Affiliates that relates to an individual. This includes, but is not limited to, financial information; medical or health related information; credit history; income; financial benefits; application, loan or claim information; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Ally Financial, Ally Bank or any of their Affiliates; and the identification of an individual as an Ally Financial or Ally Bank customer or as an individual Ally Financial or Ally Bank claimant.

"Obligor" means the purchaser or co-purchasers of the Financed Vehicle or any other Person who owes payments under a Receivable.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Officer's Certificate" means with respect to any Person, a certificate signed by a Responsible Officer of such Person.

"OFSS" has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

"Operations Diligence" has the meaning set forth in Section 3.15(b) of the Master Servicing Agreement.

"Opinion of Counsel" means a written opinion of counsel, which counsel may be internal or external counsel to a Party, reasonably acceptable to the Party receiving such opinion.

"Original Amount Financed" means, with respect to a Receivable and as of the date on which such Receivable was originated, the aggregate amount advanced under the Receivable toward the purchase price of the Financed Vehicle, including accessories, vehicle delivery fees, insurance premiums, service and warranty contracts and other items customarily financed as part of automobile and light truck retail installment sale contracts or direct purchase money loans and related costs.

"Original Contract Documents" means, with respect to each Receivable, (i) the original Contract and (ii) the Certificate of Title or evidence that such Certificate of Title has been applied for. For the avoidance of doubt, an Authoritative Copy of an electronic document shall constitute an original.

"Original Execution Date" means December 22, 2016.

"Origination Period" means, each quarter during the period beginning with the first quarter of 2021 and ending with the quarter containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, and (iv) any other date consented to by the Purchasers in their sole discretion, the "Origination Period" shall be the period consented to by the Purchasers.

"Other Assets" means any assets (or interests therein) (other than the Purchased Property) conveyed or purported to be conveyed by CAR 2016-1 to another Person or Persons other than the Purchased Property conveyed to the Purchasers under the Master Purchase and Sale Agreement, whether by way of a sale, capital contribution or by virtue of the granting of a lien.

"Other Facility Transaction Documents" means collectively, the "Transaction Documents" or similar term as such term is defined in any purchase agreement or loan and security agreement among Carvana, a bankruptcy remote, special purpose purchaser or borrower formed by Carvana or its Affiliates, the Transferor and Ally Bank.

"Other Information" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Outstanding Principal Balance" means, with respect to a Receivable and as of any date, the Original Amount Financed, less:

(i)  payments received from or on behalf of the related Obligor prior to such date allocable to principal;

(ii)  any refunded portion of extended warranty protection plan costs, physical damage, credit life or disability, warranties, debt cancellation and other insurance premiums included in the Original Amount Financed and allocable to principal;

(iii) any Administrative Purchase Payment or Warranty Payment to the extent allocable to principal; and

(iv) any Liquidation Proceeds previously received on or prior to the last day of the related Collection Period allocable to principal with respect to such Receivable.

"Outward Facing Supplier Standards" means Ally Bank's "Outward Facing Supplier Standards" as provided by Ally Bank to the Servicer.

"Party" means, with respect to each Basic Document, each Person that is a party to such Basic Document, and its permitted successors and assigns.

"Patriot Act" has the meaning set forth in Section 2(f) of the Master Confidentiality and Reconstitution Agreement.

"Performance Guarantor" means, DriveTime and its successors and permitted assigns under the Master Servicing Agreement.

"Permitted Disclosures" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Permitted Liens" any of (a) Liens created pursuant to any Basic Document or (b) with respect to any Financed Vehicle, the Lien noted on the Certificate of Title related to the Financed Vehicle in favor of a Title Lien Nominee.

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Pool Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool, as applicable, as of the close of business of the last day of a Collection Period, the Aggregate Outstanding Principal Balance of the Receivables in such First Tier Receivables Pool or Receivables Pool (excluding Administrative Receivables and Warranty Receivables and Liquidating Receivables as of such date).

"Pool Termination Date" means, with respect to each Receivables Pool, the date that occurs on the last day of the sixth (6th) month after the maturity date of the Receivable within such Receivables Pool with the longest original term to maturity as of the Cutoff Date for such Receivables Pool.

"Pre-closing Interest Carry Amount" means, with respect to a Receivables Pool and as of the related Closing Date, an amount equal to the sum of the Individual Pre-closing Interest Carry Amounts for each of the Receivables in such Receivables Pool.

"Previously Originated Receivable" means, for any Closing Date and the related Eligible Receivables Pool, an Eligible Receivable originated in a prior Origination Period that met the eligibility criteria to be included in an Eligible Receivables Pool that could have been sold to the Purchasers pursuant to the Master Purchase and Sale Agreement on a prior Closing Date but for (i) the Seller not having completed ministerial administrative procedures for such Receivable (such as validating receipt of the down payment) or (ii) the failure to satisfy the representations and warranties regarding the information provided for such Receivable on the related Schedule of Receivables in Section 5.2(cc)(iii) of the Master Purchase and Sale Agreement and clause (xxiv) of the definition of "Eligible Receivable" and such Receivables was removed or repurchased from a prior First Tier Receivables Pool or Receivables Pool, as applicable, solely as a result of such failure (and not for any other reason).

"Pricing Date" shall mean, with respect to any Receivables Pool, the date on which the Purchase Price is agreed, which date shall be no more than two (2) Business Days prior to such Closing Date.

"Pricing Model" has the meaning set forth in Section 2.3 of the Master Purchase and Sale Agreement.

"Pricing Model Amendments" has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

"Pricing Model Change Notice" has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

"Pricing Termination Notice" has the meaning set forth in Section 2.3(b) of the Master Purchase and Sale Agreement

"Program" has the meaning set forth in Section 3.27 of the Master Servicing Agreement.

"Protective Measures" means the steps specified in Section 2(d) of the Master Confidentiality and Reconstitution Agreement.

"Public Securitization" means a public offering registered with the Commission or a private offering under Rule 144A of the Securities Act of asset backed securities backed by United States automotive retail installment sale contracts originated or acquired by Carvana or its Affiliates and sponsored by Carvana or any U.S. special purpose subsidiary thereof engaged in such offerings.

"Purchase Percentage" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal

balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than the value, expressed as a percentage, equal to the minimum sales amount of $300,000,000 for each Closing Date divided by the amount determined in clause (ii) of the preceding sentence, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply.

"Purchase Price" means the price applicable to the Purchased Receivables purchased in any Receivables Pool, which shall be equal to (x) the sum of (i) the price for such Receivables Pool designated by the Pricing Model (for the avoidance of doubt, the Pricing Model will, for each Purchased Receivable in such Receivables Pool, (A) increase the related purchase price for any interest scheduled to accrue (ignoring any non-scheduled payment that may be received by the Seller) for the period from the date of origination (or, if such Purchased Receivable has at least one scheduled monthly payment occurring prior to the related Cutoff Date, from such most recent scheduled monthly payment date) through the related Closing Date and (B) decrease the related purchase price for the portion of any non-scheduled payment received by the Seller prior to the related Cutoff Date allocated to accrued interest) plus (ii) the Pre-closing Interest Carry Amount for such Receivables Pool as of the Closing Date, minus (y) the Flex Amount (if any) for such Receivables Pool.

"Purchased Property" has the meaning set forth in Section 3.1(a) of the Master Purchase and Sale Agreement.

"Purchased Receivables" means, as applicable, all Receivables purchased by CAR 2016-1 in any First Tier Receivables Pool pursuant to the Master Sale Agreement and all Receivables purchased by the Purchaser in any Receivables Pool pursuant to the Master Purchase and Sale Agreement.

"Purchasers" means either Ally Bank or Ally Financial, and its permitted successors and assigns, if the reference to "Purchaser" relates to Receivables purchased by a specified Purchaser, or both Ally Bank and Ally Financial, and their permitted successors and assigns, if the reference to "Purchaser" or "Purchasers" relates to the Receivables or the Receivables Pools as a whole, as the context may require.

"Purchaser Inspection Parties" has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

"Purchaser Obligation" has the meaning set forth in Section 2.1(b) of the Master Purchase and Sale Agreement.

"Purchaser Termination Option" has the meaning set forth in Section 2.4(b) of the Master Purchase and Sale Agreement.

"Purchasing Guidelines & Parameters" are as agreed upon by the Parties to the Master Purchase and Sale Agreement.

"Quarterly Operations Review" has the meaning set forth in Section 3.15(a) of the Master Servicing Agreement.

"Quarterly Review Event" has the meaning set forth in Section 3.15(c) of the Master Servicing Agreement.

"Quarterly Selection Standards Meeting" has the meaning set forth in Section 7.11(a) of the Master Purchase and Sale Agreement.

"Receivable" means a Contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract that is included in the Schedule of Receivables attached as Schedule 2 to each Second Step Pool Supplement. The term "Receivable" does not include any Repurchased Receivable.

"Receivable Files" means, with respect to each Receivable and the related Contract, collectively, the Original Contract Documents and the Servicer Files.

"Receivable Structure Constraints" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Receivables Pool" shall have the meaning given to such term in Section 4.1 of the Master Purchase and Sale Agreement.

"Receivables Pool CNL Ratio" means, for any Distribution Date, the ratio of (i) net losses with respect to the Receivables included in a Receivables Pool during the related Collection Period to (ii) the difference between the beginning balance of the Outstanding Principal Balance for such Collection Period and the ending balance of the Outstanding Principal Balance for such Collection Period, in each case with respect to the Receivables included in such Receivables Pool.

"Receivables Pool CNL Ratio Comparison" means, with respect to a Receivables Pool on any Distribution Date, (x) the Receivables Pool CNL Ratio for such Receivables Pool reported on any Distribution Date for the related Collection Period, divided by (y) the Carvana entire portfolio cumulative net loss ratio for the same Collection Period.

"Receivables Pool Schedule" has the meaning set forth in Section 4.1(a) of the Master Purchase and Sale Agreement.

"Receivables Purchase Rate" means, with respect to Receivables, the percentage equivalent of a fraction, the numerator of which is the Purchase Price for such Receivable, and the denominator of which is the Cutoff Date Aggregate Outstanding Principal Balance of such Receivables.

"Receivables System" means the principal computer system of the Servicer used in the servicing of retail installment sales contracts and direct purchase money loans, including back-up archives.

"Reconstitution" means a direct or indirect encumbrance, risk transfer or disposition of the Purchased Property, or any part thereof, by the Purchaser in the form of a whole loan sale transaction, a securitization transaction funded by securities sold to the public and/or private capital markets or by an asset backed commercial paper conduit, a synthetic transaction where all or a portion of the risk of loss on a reference pool of Receivables is transferred to an investor or counterparty, or any combination of the foregoing; provided, however, that the Purchaser shall not engage in more than three Reconstitutions with respect to the Receivables included in a Receivables Pool sold to the Purchaser under the Master Purchase and Sale Agreement on any Closing Date.

"Reconstitution Assets" has the meaning set forth in Section 3(a)(iii) of the Master Confidentiality and Reconstitution Agreement.

"Reconstitution Assets Servicing Agreement" has the meaning set forth in Section 3(c) of the Master Confidentiality and Reconstitution Agreement.

"Registrar of Titles" means with respect to any State, the governmental agency or body responsible for the registration of, and the issuance of certificates of title relating to, motor vehicles and liens thereon.

"Regulation AB" Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)), in the adopting release (Asset-Backed Securities Disclosure and Registration, Securities Act Release 33-9638, 79 Fed. Reg. 57,184 (September 24, 2014)) and in any adopting release in respect of any amendment with respect to any of the foregoing or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Regulator Inspection Parties" has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

"Re-Liening Expenses" means, any costs associated with the revision of the Certificates of Title pursuant to Section 2.7 of the Master Sale and Purchase Agreement.

"Re-Liening Trigger Event" has the meaning agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Relationship Manager" has the meaning set forth in Section 3.26 of the Master Servicing Agreement.

"Remediation" has the meaning set forth in Section 5.1(r) of the Master Servicing Agreement.

"Report of Assessment of Compliance with Servicing Criteria" has the meaning set forth in Section 3.12 of the Master Servicing Agreement.

"Reporting Date" means the 10th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day.

"Repurchased Receivable" means any repurchased Administrative Receivable or repurchased Warranty Receivable.

"Requirements of Law" means all (a) requirements of applicable federal, state and local laws, and regulations thereunder and (b) orders, decrees, directives, rules and binding guidelines of, or agreements, with any Governmental Authority that are directed to or binding on such Person or such Person's business, operations, services (including, with respect to the Servicer, the Servicer's obligation to service the Purchased Property on behalf of the Purchasers pursuant to the Master Servicing Agreement) or assets, including, in each case, usury laws, Utah banking laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Consumer Financial Protection Bureau's Regulations "B" and "Z," the Servicemembers Civil Relief Act of 2003, the Texas Consumer Credit Code, the United States Foreign Corrupt Practices Act of 1977, the Patriot Act and state adaptations of the National Consumer Act and the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity and disclosure laws; provided, that, in each case with respect to clauses (a) and (b) above, with respect to the Servicer's obligations described in the Master Servicing Agreement, "Requirements of Law" shall not include any items described in clauses (a) or (b) above that are directed to or binding on Ally Financial or Ally Bank solely as a result of such Peron's status as a bank holding company or Utah charted bank, respectively, unless otherwise specified on Exhibit E to the Master Servicing Agreement. Following the Original Execution Date during the term of the Master Servicing Agreement, should the Servicer offer or enter into any subsequent agreement with another Person to service assets on behalf of such Person in compliance with, or provide indemnity for breach of, Requirements of Law applicable to Ally Financial or Ally Bank that are excluded from this definition as a result of the preceding proviso, then this definition shall be deemed to be modified to include such broader provision without any further action of the Parties.

"Responsible Officer" means, when used with respect to any Person, any officer of such Person, including any president, vice president, assistant vice president, secretary, assistant secretary or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject.

"Rule 193 Receivables" has the meaning set forth in Section 3(a)(iv) of the Master Confidentiality and Reconstitution Agreement.

"Schedule of Receivables" means, the list identifying the Receivables attached as Schedule 2 to each Second Step Pool Supplement (which list may be in the form of electronic file, microfiche, disk or other means acceptable to the Purchaser, or pursuant to the Master Sale Agreement).

"Scheduled Commitment Termination Date" means March 21, 2023.

"SEC Reporting Date" has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

"Second Extension Amendment Effective Date" means November 2, 2018.

"Second Step Pool Supplement" means the Second Step Pool Supplement, in the form of Exhibit A to the Master Purchase and Sale Agreement executed by the Seller and the Purchaser on each Closing Date.

"Second Step Receivables Assignment" means the document of assignment attached as Schedule 2 to each Second Step Pool Supplement.

"Second Step Receivables Purchase Price" has the meaning set forth in Section 3.1(b) of the Master Purchase and Sale Agreement.

"Securities Act" means the Securities Act of 1933.

"Selection Procedures" means, the process for selecting Eligible Receivables for inclusion in any First Tier Receivables Pool and Receivables Pool pursuant to Section 3.1(d) of the Master Sale Agreement and Section 2.1(d) of the Master Purchase and Sale Agreement, respectively, whereby such First Tier Receivables Pool and Receivables Pool is selected by the Seller and Transferor utilizing the System of Record under a Freestyle Selection. Such selection shall be made subject to the Eligible Receivable criteria and Eligible Receivables Pool criteria and the sequential contract number assignment described in Section 2.1(d) of the Master Sale Agreement and Section 3.1(d) of the Master Purchase and Sale Agreement.

"Seller" means Carvana, as the seller of the CAR 2016-1 Purchased Property under the Master Sale Agreement, and its permitted successors and assigns.

"Seller Certificate of Title Review Trigger Event" has the meaning set forth in Section 3.16(g) of the Master Servicing Agreement."

"Seller Indemnified Parties" has the meaning set forth in Section 6.11(a) of the Master Sale Agreement.

"Servicer" means Bridgecrest as the servicer of the Receivables, or any permitted successor or assignee thereto under the Master Servicing Agreement.

"Servicer Coverage" has the meaning set forth in Section 3.22 of the Master Servicing Agreement.

"Servicer Files" means the documents specified in Section 2.1 of the Master Servicing Agreement.

"Servicer Indemnified Parties" has the meaning set forth in Section 5.2(a) of the Master Servicing Agreement.

"Servicer Review Trigger Event" has the meaning set forth in Section 3.15 of the Master Servicing Agreement.

"Servicer Termination Threshold Event" means, with respect to the sold Receivables Pools, on any Distribution Date, the aggregate CNL for such Receivables Pools shall be equal to 150% or greater of the aggregate Purchaser Estimated Cumulative Net Losses for such Receivables Pools on such Distribution Date.

"Servicing Criteria" means "Servicing Criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

"Servicing Exception" means any exceptions or supplements to the Collections Policy specified on Exhibit E to the Servicing Agreement (including any requirement of federal, state or local law, or any regulation or any order, decree, directive, rule and binding guideline of, or agreement, with any Governmental Authority applicable to either Purchaser solely as a result of such Purchaser's status as a bank holding company or Utah charted bank, as applicable, that the Purchasers determine requires revisions to the existing Collections Policy), as may be amended or supplemented from time to time by the Purchasers.

"Servicing Fee" means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Servicer for services rendered during the related Collection Period, which will be equal to one-twelfth of the

Servicing Fee Rate multiplied by the Pool Balance of such Receivables Pool as of the first day of such Collection Period; <u>provided</u> that in connection with any initial Collection Period that includes days falling in more than one calendar month, the Servicing Fee shall be calculated for such initial Collection Period giving effect to the reduction of the Pool Balance of such Receivables Pool as of the first day of each such calendar month following the related Cutoff Date during such initial Collection Period.

"<u>Servicing Fee Rate</u>" is as agreed upon by the Parties to the Master Servicing Agreement.

"<u>Settlement Date</u>" means with respect to each Origination Period, the third (3rd) Business Day of the last calendar week of such Origination Period; provided that on any date consented to by the Purchasers in their sole discretion, the "Settlement Date" will be the date consented to by the Purchasers.

"<u>Settlement Report</u>" has the meaning set forth in <u>Section 3.1(e)</u> of the Master Purchase and Sale Agreement.

"<u>Simple Interest Method</u>" means the method of allocating each monthly payment (including multiple monthly payments) on a Simple Interest Receivable to principal and interest, pursuant to which the portion of such payment that is allocated to interest is equal to the Outstanding Principal Balance thereon <u>multiplied</u> by the fixed rate of interest applicable to such Receivable <u>multiplied</u> by the period of time elapsed (expressed as a fraction of a calendar year) since the preceding payment of interest with respect to such Outstanding Principal Balance was made.

"<u>Simple Interest Receivable</u>" means any Receivable under which the portion of each payment allocable to earned interest and the portion allocable to the principal is determined in accordance with the Simple Interest Method. For purposes hereof, all payments with respect to a Simple Interest Receivable shall be allocated to principal and interest in accordance with the Simple Interest Method.

"<u>SOC 1</u>" has the meaning set forth in <u>Section 3.13</u> of the Master Servicing Agreement.

"<u>Specified Variables</u>" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"<u>State</u>" means any of the 50 states of the United States of America, or the District of Columbia.

"<u>Supplemental Fees</u>" means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Purchaser during the related Collection Period, determined pursuant to and defined in <u>Section 3.10(b)</u> of the Master Servicing Agreement.

"<u>Supplemental Servicing Fees</u>" means, with respect to a Receivables Pool as of any Distribution Date, all late fees, prepayment charges and other administrative fees and expenses or similar charges allowed by applicable law with respect to related Receivables, collected (from whatever source) on the Receivables serviced by the Servicer during the related Collection Period.

"<u>System Description</u>" means (a) prior to the E Sign Transition Period, the written description of the eOriginal e-contract system attached to the Master Sale Agreement as <u>Exhibit C</u> and the Master Purchase and Sale Agreement as <u>Exhibit F</u>, (b) during the E-Sign Transition Period, either (i) the written description of the eOriginal e-contract system attached to the Master Sale Agreement as <u>Exhibit C</u> and the Master Purchase and Sale Agreement as <u>Exhibit F</u> or (ii) the written descriptions of the eOriginal, Inc. Authoritative Copy System Description and the DocuSign System Description Authoritative Copy attached to the Master Sale Agreement as <u>Exhibit D</u> and the Master Purchase and Sale Agreement as <u>Exhibit G</u> , and (c) after the E Sign Transition Period, the written descriptions of the eOriginal, Inc. Authoritative Copy System Description and the DocuSign System Description Authoritative Copy attached to the Master Sale Agreement as <u>Exhibit D</u> and the Master Purchase and Sale Agreement as <u>Exhibit G</u>.

"<u>System of Record</u>" means the computer system and programs in place on the date that the Master Sale Agreement and Master Purchase and Sale Agreement become effective (as such system may be updated or otherwise modified) utilized by the Seller to select Receivables for each First Tier Receivables Pool and Receivables Pool

under the Master Sale Agreement and by the Transferor to select Receivables for each Receivables Pool under the Master Purchase and Sale Agreement, respectively.

"TPSM" means Ally Bank's Third Party Supplier Management team.

"Title Intermediary" means, VINTek or another title administration service provider approved in writing by the Seller and Purchasers.

"Title Lien Nominee" means Carvana or GFC Lending LLC (or any other name approved in writing by the Purchasers).

"Three-Month Average Receivables Pool CNL Ratio Comparison" means, on any Distribution Date, the average of the Receivables Pool CNL Ratio Comparison with respect to a Receivable Pool for such Distribution Date and the two Distribution Dates preceding such Distribution Date.

"Transferor" means Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company, and its permitted successors and assigns.

"Transferor Obligation" has the meaning set forth in Section 2.1(a) of the Master Purchase and Sale Agreement.

"Transferor Termination Option" has the meaning set forth in Section 2.4(a) of the Master Purchase and Sale Agreement.

"Treasury Regulations" means the regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"UCC" means the Uniform Commercial Code as in effect in any relevant jurisdiction, from time to time.

"Upper Bound FICO Score" has the meaning agreed upon by the Parties to the Master Sale Agreement and the Master Purchase and Sale Agreement.

"Vehicle Age" with respect to a Financed Vehicle, means the year of origination of the Contract for such Financed Vehicle minus the model year of such Financed Vehicle.

"Warranty Payment" means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (b) the Receivables Purchase Rate, or solely with respect to any Receivable being repurchased pursuant to Section 7.2(ii) of the Master Sale Agreement or Section 8.2(ii) of the Master Purchase and Sale Agreement, and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360.

"Warranty Receivable" means a Receivable which the Transferor has repurchased pursuant to Section 8.2 of the Master Purchase and Sale Agreement or Seller has repurchased pursuant to Section 7.2 of the Master Sale Agreement.

\* \* \* \* \*

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        November 3, 2022                                              /s/ Ernest C. Garcia, III
                                                                                                        Ernest C. Garcia, III
                                                                                                        *Chairman and Chief Executive Officer*

<u>Exhibit 31.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        November 3, 2022                                                /s/ Mark Jenkins
                                                                            Mark Jenkins
                                                                            *Chief Financial Officer*

Exhibit 32.1

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    November 3, 2022                                  /s/ Ernest C. Garcia, III
                                                          Ernest C. Garcia, III
                                                          *Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:      November 3, 2022                                     /s/ Mark Jenkins

                                                                Mark Jenkins
                                                                *Chief Financial Officer*

# Exhibit 28

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2022

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-38073

# CARVANA CO.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | | | |
|---|---|---|---|
| **300 E. Rio Salado Parkway** | **Tempe** | **Arizona** | **85281** |
| (Address of principal executive offices) | | | (Zip Code) |

**(602) 852-6604**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | Trading symbol(s) | **Name of each exchange on which registered** |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |
| Preferred Stock Purchase Rights | — | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐  Yes  ☒  No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐  Yes  ☒  No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒  Yes  ☐  No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒  Yes  ☐  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐  Yes  ☒  No

As of June 30, 2022, the aggregate market value of the common stock of the registrant held by non-affiliates was $2.2 billion based on the closing price of the common stock on the New York Stock Exchange on such date.

As of February 17, 2023, the registrant had 106,074,230 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2023 Annual Meeting of Shareholders are incorporated by reference into Part III of this Form 10-K.

**CARVANA CO.**
**FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2022**
**INDEX**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 51 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosure | 51 |
| **PART II** | | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | [Reserved] | 54 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 55 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 74 |
| Item 8. | Financial Statements and Supplementary Data | 75 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 128 |
| Item 9A. | Controls and Procedures | 128 |
| Item 9B. | Other Information | 128 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 128 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 129 |
| Item 11. | Executive Compensation | 129 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 129 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 129 |
| Item 14. | Principal Accountant Fees and Services | 129 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 130 |
| Item 16. | Form 10-K Summary | 130 |
|  | Signatures | 132 |

**PART I**

In this Annual Report on Form 10-K, "we," "our," "us," "Carvana," and "the Company" refer to Carvana Co. and its consolidated subsidiaries, unless the context requires otherwise.

**Forward-Looking and Cautionary Statements**

This Annual Report on Form 10-K, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- expectations relating to the used car market and our industry;
- macroeconomic conditions, economic slowdown or recessions;
- future financial position;
- business strategy;
- budgets, projected costs, and plans;
- future industry growth;
- financing sources;
- short-and long-term liquidity;
- the impact of litigation, government inquiries, and investigations; and
- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions, and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, those discussed under Item 1A —"Risk Factors" in this Annual Report on Form 10-K. The forward-looking statements in this Annual Report on Form 10-K represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

**Market and Industry Data**

Some of the market and industry data contained in this Annual Report on Form 10-K is based on independent industry publications or other publicly available information. Although we believe that these independent sources are relevant and reliable, we have not independently verified and cannot assure you as to the accuracy or completeness of this information. As a result, you should be aware that the market and industry data contained herein, and our beliefs and estimates based on such data, may not be reliable.

1

**ITEM 1. BUSINESS.**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 to complete an initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Carvana Co. Class A common stock trades on the New York Stock Exchange under the symbol "CVNA." Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to both Carvana Group and its consolidated subsidiaries.

**Our Company**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

We provide refreshingly different and convenient experiences for used car buying and selling that can save customers time and money. On our platform, consumers can research and identify a vehicle, inspect it using our patented 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle, and schedule delivery or pick-up, all from their desktop or mobile devices. Alternatively, a customer can obtain an offer online for their vehicle by answering a few questions without needing to provide photos or service records. Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase or sale, and schedule delivery or pick-up online in as little as 10 minutes.

Our technology and infrastructure allow us to seamlessly and cost efficiently deliver this experience to our customers. We use proprietary algorithms to optimize our nationally pooled inventory of over 63,000 total website units, inspect and recondition our vehicles based on our inspection process, and operate our own logistics network to deliver cars directly to customers in our markets as soon as the next day. Customers in certain markets also have the option to pick up their vehicle at one of our patented vending machines, which provides an exciting pick-up experience for the customer while decreasing our variable costs, increasing scalability and building brand awareness.

On May 9, 2022, we completed the acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA U.S. Auction, LLC ("ADESA") from KAR Auction Services, Inc. ("KAR") for approximately $2.2 billion in cash (the "ADESA Acquisition"). The acquisition included 56 auction sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding our infrastructure and enhancing our customer offering by facilitating a broader selection of vehicles and faster delivery times.

The automotive retail industry's large size, fragmentation, and lack of differentiated offerings present an opportunity for disruption. We have demonstrated that our custom-built business model can capitalize on this opportunity. From the launch of our first market in January 2013 through December 31, 2022, we purchased, reconditioned, sold, and delivered approximately 1.4 million vehicles to customers through our website, cumulatively generating approximately $39.3 billion in revenue. Our sales have grown since our inception as we have increased our market penetration in our current markets and added new markets. As of December 31, 2022, our in-house distribution network services 81.1% of the U.S. population, and in the long-term we plan to continue to expand our population coverage.

**Industry Background & Market Opportunity**

*Large and Fragmented Market*

The U.S. automotive industry generated approximately $1.2 trillion in sales in 2021, according to a 2022 NADA Auto Retailing market summary. Automotive and auto parts sales represent roughly 23% of the U.S. retail economy and are the largest consumer retail markets in the United States according to the U.S. Census Bureau. Based on Cox Automotive data, there were an estimated 40.6 million used vehicle transactions in 2021.

The used car retail industry is highly fragmented. As of 2021, the largest dealer brand commanded approximately 2.3% of the U.S. market and the top 100 used car retailers collectively held approximately 11.1% market share, according to Automotive News. Additionally, consumers are often dissatisfied with the car buying process. According to the 2022 Cox Automotive Car Buyer Journey Study, only 58% of used car buyers were satisfied with the experience.

The traditional used car retailing model is costly, operationally challenging and difficult to scale. Providing an end-to-end solution requires inspection, repair, reconditioning and showroom facilities, as well as inventory sourcing and financing capabilities, substantially all of which is traditionally done at each dealership location. Additional variable costs include the salaries of on-site employees, inventory financing fees, and vehicle transportation costs.

Customer acquisition is expensive and inefficient for traditional automotive retailers as they are typically confined to local advertising channels and must drive foot traffic to their physical locations, where they offer an often undifferentiated service and limited inventory.

Additional challenges in automotive retailing, both online and offline, stem from the following unique characteristics of selling cars:

• big ticket item, often representing the second most expensive purchase many consumers make and finance, and one of the customer's largest and longest life cycle purchases;

• range of taste in make, model, body style, price, year, mileage, color, drivetrain, and features;

• complex transaction often involving a vehicle trade-in, financing, and the purchase of add-on service products to protect the customer's investment;

• reliance on third parties for critical business functions; and

• state and local regulatory variability.

### The Way Consumers Buy Cars Is Changing

Historically, consumers discovered vehicles for sale through local print and broadcast media, as well as word of mouth, and would go to dealerships to educate themselves on potential purchases. However, consumers no longer rely solely on traditional media and dealerships to discover and research vehicles. In fact, the 2022 Car Buyer Journey report from Cox Automotive indicates that a typical car buyer spends approximately eight hours researching his or her prospective car purchase online.

As e-commerce has become more established, reaching 14% of total retail sales in the U.S. during the first three quarters of 2022 according to the U.S. Census Bureau, consumers have become more comfortable buying taste-driven, higher-priced products such as consumer electronics and home furnishings online. Similarly, auto consumers are interested in e-commerce solutions for their car purchasing needs— 64% of buyers prefer to experience more of the purchase process online, compared to their last vehicle purchase, according to the 2021 Digitization of End to End Retailing report from Cox Automotive.

### What Auto Consumers Want

As a result of the unique aspects of purchasing a vehicle, consumers have a distinct set of expectations that are challenging for traditional used car retailers to address.

• *Wide selection*. Automobiles vary widely in model, style, color, age and price, and consumers exhibit differing tastes, style, and purchasing goals and budgets. This requires dealers to maintain a broad inventory and offer multiple financing, warranty and service plan choices.

• Traditional used car retailers are limited by staging capacity and anticipated local demand at each dealership; they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively. Additionally, even as traditional used car retailers add new store locations, it remains difficult to create broad diversity of inventory among stores because each lot requires the highest demand units, creating redundancies.

• *Value*. Auto consumers want consistent, fair value.

• Traditional used car retailers have high overhead costs and must pass these costs on to their customers.

3

• *Confidence in quality*. Auto consumers want to have comfort that the vehicle they purchase is mechanically sound and will not require costly repairs or replacement in the near term.

• Traditional used car retailers may lack the scale and expertise to consistently purchase high-quality vehicles and uniformly recondition them, increasing the incidence of selling a "lemon."

• *Control and no pressure*. Auto consumers want to feel in control of the buying process, without being pressured.

• According to a 2021 Gallup Poll, only 43% of American consumers view the automotive industry positively. The unfavorable consumer sentiment towards the automotive industry creates an opportunity to provide a pressure-free customer experience, through increased control over the purchase process.

• *Fast, simple purchasing process*. Auto consumers want their transaction to be convenient, fair and on their own desired timeline.

• Buying a car at a traditional auto dealership is often a multi-part transaction including vehicle purchase, trade-in, financing and complementary products, and requires nearly three hours on average, according to the 2022 Car Buyer Journey report from Cox Automotive.

**Carvana's Solution**

In response to these evolving consumer needs, we built Carvana to provide a no-pressure, no-haggle experience with flexible and fast transactions. Consumers can research and identify a vehicle, inspect it using interactive high definition photography, obtain financing and warranty coverage, value their current vehicle, complete their purchase, and schedule delivery or pick up, all from our online platform. Our uniformed employees deliver cars to customers in our markets in branded haulers as soon as the next day, or customers can pick vehicles up at one of our 33 vending machines. We offer a seven-day return policy on all of our cars sold. The sales process we have built enables our customers to execute their purchases, once a car has been selected, in as little as 10 minutes, and obtain an offer for their current vehicle in as little as two minutes.

We aim to deliver the best selection, best value, and best experience for used car buyers and sellers.

*The Best Selection*

As of December 31, 2022, we offer all customers a nationally pooled inventory of over 63,000 high-quality used vehicles on our website. We evaluate and recondition all of the vehicles that we own and offer for sale, which we are able to perform at scale across our network of greenfield inspection and reconditioning centers ("IRCs") or auction locations with reconditioning capacity. Our customer research indicates that size and range of selection are primary determinants of where customers will transact. We use proprietary algorithms to optimize our inventory acquisition based on extensive used vehicle market and customer behavior data. Furthermore, our nationally pooled inventory system maximizes the breadth of vehicle selection for our customers in any given location. This results in a higher likelihood that customers are able to find the make, model, year, and color combination that they desire. In contrast, traditional dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

*The Best Value*

Our proprietary technology and vertically integrated business model allow us to enjoy a significantly lower variable cost structure at scale versus traditional dealerships and provide substantial value to our customers. We do not require a network of brick-and-mortar dealerships, staffed with sales personnel; instead, we utilize both an in-house logistics network and patented vending machines to facilitate vehicle delivery and pick-ups. These savings are passed on to the consumer through sales prices that are below industry averages. Additionally, we believe our pooled inventory approach will at scale result in lower average days to sale than industry averages, which we expect will help improve margins due to decreased vehicle depreciation resulting in higher unit selling price. Furthermore, we are able to provide personalized and highly transparent financing terms based on basic customer information that results in faster transaction times, clear lending terms, and competitive interest rates.

4

*The Best Experience*

We aim to provide the best car buying and selling experience available for our customers through a fully integrated, convenient online experience. Our patented 360-degree vehicle imaging technology provides transparency by allowing customers to view vehicle features and imperfections. We also provide automated vehicle valuations for buying vehicles from customers with or without a retail purchase, automated financing, vehicle service contracts ("VSC"), auto insurance, GAP waiver coverage, limited warranty, and other ancillary products. Customers can easily select among thousands of preapproved financing terms and receive approval in seconds.

We offer a premium fulfillment experience with pick-up and delivery options, including pick-up at our vending machines, depending on the market. Our in-house customer advocates are available to answer customer questions that arise throughout the process. At every customer touch point, we strive to provide the level of customer service that makes purchasing a car from us an enjoyable, memorable experience. Finally, we offer seven-day return and 100-day limited warranty policies with every car we sell, subject to a deductible. We believe that our customers value the ease of use and transparency of our platform. They have responded favorably to our solution, as illustrated by the ratings we receive. Our customers rated us an average of 4.7 out of 5.0 as of December 31, 2022 based on over 176,000 satisfaction surveys we solicited from our inception through December 31, 2022. These positive reactions create opportunities for repeat customers and a strong referral network.

## Strengths & Competitive Advantages

Our business model is disrupting the traditional used vehicle sales model. As discussed below under Our Growth Strategies, during current macroeconomic uncertainty, our highest priority remains to provide exceptional customer experiences while increasing operating efficiency. We expect to use the strengths of our business model to develop our brand awareness, support efficient growth in retail units sold, and increase our gross profit per unit. Since our inception in 2012, we have been developing and leveraging the following key strengths of our robust platform, which we believe provide significant competitive advantages.

*Purpose-Built Vertically Integrated E-commerce Platform*

We built our used car e-commerce platform because we believe a lower and differentiated cost structure is critical to providing a seamless, best-in-class car buying and selling experience. We believe that traditional dealerships and other technology-enabled auto platforms do not provide this type of experience, and that our end-to-end model allows us to offer a superior solution while reducing our cost of operations and enhancing our ability to offer complementary products and services. Our vertically integrated platform gives us control of all critical operations and transaction elements, which facilitates a fast, simple, and consistent user experience. We control the algorithms that help determine the vehicles we make available to our customers, the prices of those vehicles, the financing terms, and VSC and GAP waiver coverage options available to our customers and the trade-in values we offer. Additionally, we control the logistics infrastructure that enables us to offer customers fast, specific, and reliable delivery and pick-up times. We have invested heavily in our custom designed website to provide a cutting-edge user interface, and have built a team of in-house customer advocates that is dedicated to providing first-rate customer service.

*Differentiated Shopping Experience*

We have developed technology that makes the online vehicle purchasing process intuitive, transparent and fun. Our patented photo technology, paired with custom photo processing and display technology, provides an interactive way for consumers to search for vehicles and take a virtual tour of the interior and exterior of a vehicle using annotated, high definition photography. We believe this technology, coupled with our certification process and seven-day return policy, generates the confidence and trust in our platform needed to buy a car online.

*Proprietary Financing Technology*

Our differentiated financing solutions provide customers with nearly instantaneous credit decisions as well as flexibility and transparency in financing their vehicle purchase. We preapprove thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. We preapprove these terms utilizing "soft credit checks" which do not impact a customer's credit unless they complete a purchase and financing transaction. Due to our relatively low car prices, our customers generally have lower PTI (Payment to Income) ratios, lower LTV (Loan to Value) ratios, or higher quality vehicles underlying their financing transactions than they would have at higher prices. This significantly enhances the

5

quality of the loans that we generate and the premium we can capture when we sell them through securitization transactions or to our financing partners.

*Efficient Logistics Network and Attractive Fulfillment Experience*

We have developed proprietary logistics software and an in-house delivery network that differentiates us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience. Our home delivery is typically conducted by a Carvana employee on a branded delivery truck. Customers in certain markets can also pick up their vehicles at one of our patented car vending machines, which are multi-story glass towers that store purchased vehicles. These vending machines provide an attractive and unique experience for our customers and develop brand awareness while lowering our variable fulfillment expenses. Following the opening of a vending machine in one of our markets, our market penetration has typically seen a meaningful increase while our variable operating costs per car sold have typically decreased. In the long-term, we intend to grow our logistics network and build vending machines in many of the metropolitan markets that we serve.

*Scaled Used Vehicle Infrastructure*

As of December 31, 2022, we leverage a network of reconditioning centers throughout the U.S. and supporting software for our vehicle reconditioning and logistics activities that required significant investment in time and capital to develop. We believe these facilities at full utilization give us capacity to inspect and recondition approximately 1.1 million cars per year. Our proprietary inventory management system and Transportation Management System ("TMS"), combined with our expertise and experience gained from operating these facilities, position us well to continue to build out additional reconditioning and distribution centers as needed. To increase the available selection of vehicles on our website, we have also tested using third party inspection and reconditioning centers to recondition a limited portion of vehicles for our inventory.

*Scale Driving Powerful Network Effects*

Our business benefits from powerful network effects. Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets. As we add markets, we expect to increase overall demand, which would enable us to carry a larger inventory. A broader vehicle inventory would further improve our offering across our markets, enabling us to increase market share. Furthermore, we anticipate that increased brand awareness, driven by national advertising, will allow us to expand our national inventory and further these network effects.

**Our Growth Strategies**

The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs, auto insurance and GAP waiver coverage, as well as trade-in vehicles. As we evolve, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service. Since launching Carvana ten years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2022. In 2022, as a result of changes in the economy, the market, and the industry, we shifted our priorities to focus on driving profitability through operating efficiency and reducing expenses. During current macroeconomic uncertainty, our highest priority will continue to be providing exceptional customer experiences while improving efficiency and maximizing our infrastructure to support efficient growth in retail units sold. However, our long-term strategy is to continue growing our vehicle unit sales, market penetration, number of markets, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

*Increase Sales Through Further Penetration of Our Existing Markets*

Our growth has historically been driven by further market penetration in our existing markets. Due to the current macroeconomic environment, we are normalizing our inventory size and focusing on operating efficiencies in the short-term. However, our long-term plan remains to continue marketing and actively building our brand image and awareness in existing markets by improving our operations, opening additional vending machines, and increasing our inventory size.

*Optimize Our Inventory Selection*

6

As discussed above, while we are normalizing our inventory in the short-term, in the long-term, we anticipate continuing to optimize and broaden the selection of vehicles we make available to our customers. Expanding our inventory selection increases the likelihood that each visitor to our site finds a vehicle that matches his or her preferences and benefits all existing markets simultaneously due to our nationally pooled inventory model. Expanding our inventory selection depends on our ability to source and acquire a sufficient number of appropriate used vehicles, including acquiring more vehicles from customers, to develop processes for effectively utilizing capacity in our IRCs, and to hire and train employees to staff these centers. With the addition of ADESA's 56 auction sites, 78% of the U.S. population is now within 100 miles of an IRC or auction site, which shortens the distance from our inventory pools to our customers, reducing delivery times, which, all else equal, should increase conversions.

***Continue to Innovate and Extend Our Technology Leadership***

In the long-term, we will continue to make significant investments in improving and adding to our customer offering. We believe that the complexity of the automotive retail transaction provides substantial opportunity for technology investment and that our leadership and continued growth will enable us to responsibly invest in further separating ourselves from our competitors' offerings. In addition to our own internal developments, we have acquired purpose-built technology from Carlypso, Car360, and Propel AI and hired employees from those companies. We believe each of these acquisitions and purchases not only extends our technology leadership but adds talented entrepreneurs to our team.

***Continue to Enhance Our Mobile Sales Platform***

We will continue investing in our mobile platform to enhance our customers' ability to search for, research, finance, sell, and purchase vehicles entirely on mobile devices, including smartphones and tablets. As discussed above, a typical car buyer spends approximately eight hours conducting online research before purchasing a vehicle, according to the 2022 Car Buyer Journey report from Cox Automotive. In addition, a 2022 Pew Research study indicates that 76% of U.S. adults say they make purchases using a mobile device and one-in-three make mobile purchases weekly. Growth in mobile-only sales depends on our ability to deliver an innovative, appealing mobile experience, as well as customers' tastes for buying exclusively on mobile devices.

***Develop Broad Consumer Awareness of Our Brand***

We believe our brand development efforts meaningfully impact our ability to acquire new customers. We intend to continue attracting new customers through advertising, public relations, customer referrals and customers selling us their vehicles. In the long-term, we also plan to build vending machines in additional markets to capitalize on word-of-mouth publicity in building awareness of our brand.

***Generate Referrals and Repeat Customers***

Our growth is enhanced by providing a superior customer experience, which drives our ability to generate customer referrals and repeat sales.

***Develop New Products***

We plan to continue leveraging our existing e-commerce and logistics infrastructure to increase monetization opportunities by introducing new complementary products and services. The car purchasing and ownership cycle provides many opportunities to add value for our customers and our technology expertise and process automation position us well to provide these services in unique and differentiated ways.

**Customer Lifecycle**

*Search and Discovery.* We have developed a mobile-optimized website, where prospective car buyers can immediately begin browsing, researching, filtering and identifying their choice from an inventory of over 63,000 total website units that we offer for sale. We have also developed a series of innovative features to enhance the customer experience on our website and enable better product discovery, such as highly engaging visual imagery and merchandising, as well as easy-to-use site navigation tools and personalization features. We also integrate with various vehicle data providers for vehicle feature and option information as a research tool to assist our customers with their purchase decisions.

*Virtual Tour.* Once customers select a vehicle, they have the ability to take an annotated virtual vehicle tour on our website, which includes a 360-degree view of the interior and exterior of the actual vehicle. This interactive tour allows

7

customers to review vehicle imperfections through high definition photography and provides them with an extensive list of vehicle details, accessories and safety features presented in an intuitive and easy to review manner.

*Seamless Transaction Technology.* Once customers have chosen a vehicle, our platform allows them to complete the purchase in as little as 10 minutes, saving them both time and money.

• *Financing.* We preapprove thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. Our website includes unique, highly engaging, and intuitive financing tools that are transparent and demonstrate the relationship between preapproved down payment, monthly payment, and term combinations. Our innovative financing tool allows borrowers to adjust permutations of their approved credit terms, including down payment, monthly payment, and loan term to select a personal payment plan. Our customers can obtain a preapproval decision in seconds generated by our proprietary credit scoring and deal structuring algorithms for every car in our inventory. This involves a short process that only requires 11 fields to be completed and will not impact customers' credit unless they pursue a purchase and finance transaction.

• *Complementary products.* Our customers can further supplement their online vehicle purchase by electing to purchase a fully integrated VSC. In order to help improve the transaction experience, we evaluate numerous options to ultimately provide each customer with personalized options for VSCs. Customers in most states financing their purchase with us are also offered GAP waiver coverage, customized by term length, during checkout. We have also partnered with Root, Inc. ("Root") to offer an integrated auto insurance solution, through which customers in most states may conveniently access and purchase auto insurance directly from the Carvana e-commerce platform.

• *Sell a vehicle.* For customers interested in trading-in or selling us their vehicle without the purchase of a retail vehicle, our online tool provides customers with an automated offer for their existing vehicle that can be applied to any vehicle purchase or paid directly without an associated vehicle purchase. In either case, a customer can receive an offer for their vehicle from our site simply by answering a few questions about the vehicle condition and features. The customer can then schedule a time to have the vehicle picked up at their home and receive payment. This process eliminates the need to visit a dealership or negotiate a private sale.

• *Documentation and payment.* To further improve the ease of purchasing and financing vehicles, complementary products, and trade-ins, we have developed a seamless, fully integrated online documentation process. We have established partnerships with several technology providers that allow for automated down payment, income verification, and payment processing through simple, easy to use tools, such as the ability to take pictures of required documents with a smartphone.

*Fulfillment.* Customers can choose to have their vehicle delivered or pick up their vehicle at one of our patented vehicle vending machines, depending on the market. In certain markets, we can deliver cars as soon as the next day with a Carvana-uniformed employee in a branded, custom single-car hauler. Our vending machines provide an attractive and unique customer pick-up experience that many customers choose. At our vending machines, the customer deposits a Carvana-branded token into a coin slot and an automated platform selects the customer's car from the multi-story tower and delivers it to a garage bay where the customer is waiting with a Carvana delivery advocate.

*Post-sale customer support.* Once customers have their car, our customer advocates manage the post-sale coordination and service call process including helping customers with returns or exchanges pursuant to our seven-day return policy. Given the return rates we have seen and the cost to us of honoring the return policy, we believe the peace of mind our customers gain from our seven-day return policy supports the cost of this offering. Our customers rated us an average of 4.7 out of 5.0 as of December 31, 2022, based on over 176,000 satisfaction surveys we solicited from our inception through December 31, 2022. These positive reactions create opportunities for repeat customers and a strong referral network.

**Vehicle Lifecycle**

*Vehicle acquisition.* We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with poor condition ratings or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of

8

inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

*Inspection and reconditioning*. Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to an inspection and reconditioning center or auction location with reconditioning capacity, at which point the vehicle is entered into our inventory management system. We then begin an inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to meet our standards and expected timing for that vehicle to be made available for sale on our website.

*Photography and merchandising*. To provide transparency to our customers, our patented, automated photo technology captures a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo technology photographs the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs and certain auction sites to better ensure a consistent customer experience.

*Transportation and fulfillment*. Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by our proprietary TMS to transport our vehicles to customers in our markets. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs and other sites, including those acquired in the ADESA Acquisition, and when a vehicle is sold, it is delivered directly to customers in our markets or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

### Markets and Population Coverage

As of December 31, 2022, we have established a logistics network and local marketing presence in 316 metropolitan cities and have purchased, reconditioned, sold, and delivered over 1.4 million vehicles since the launch of our first market in January 2013. Our expansion model has enabled us to increase the number of markets we operate in each year, resulting in an increase in the total percentage of the U.S. population that we serve in each of the past ten years. As of December 31, 2022, our 316 markets serviced 81.1% of the U.S. population compared to our 311 markets as of December 31, 2021, which serviced 81.0% of the U.S. population. We calculate our population coverage as the population in our open markets at the end of the period as a percentage of the total metropolitan statistical area ("MSA") population in the U.S., based on 2015 data from the U.S. Census Bureau. We are committed to providing an honest, transparent, and customer-centric used car buying and selling experience online, which is achieved through our hub and spoke market approach. Our focus is on serving our markets and providing the best possible car buying and selling experience to our customers at a low, transparent cost. Our established logistics network and ability to deliver or pick up any car in our inventory on Carvana-branded haulers to customers within our markets allow us to provide a low-cost, simple car buying and selling experience.

### Marketing

We believe our customer base is relatively similar to the overall market for used cars at average price points of our vehicles, with a slight shift toward younger customers. Our sales and marketing efforts utilize a multi-channel approach, built on a seasonality-adjusted, market-based model budget. We utilize a combination of brand building as well as direct response channels to efficiently seed and scale our local markets. Our paid advertising efforts include, but are not limited to, advertisements through national and local television, search engine marketing, inventory site listing, retargeting, organic referral, display, out-of-home, digital video, digital radio, direct mail, and branded pay-per-click channels. We believe our strong customer focus ensures customer loyalty which will drive both repeat purchases and referrals. In addition to our paid channels, we intend to attract new customers through enhancing our earned media and public relations efforts and further investing in our patented vending machines.

**Customer Advocates**

We have a team of in-house customer support specialists who provide assistance 14 hours per day, seven days per week to our customers located nationwide. Operating as advocates, our specialists are available to assist customers with questions that arise throughout the car buying process. These advocates are available via web chat or telephone and help customers navigate the website, answer specific questions and assist in loan verification by working with our customers to establish proof of identity, income, and insurance. We take a consultative approach with our customers, offering live support, if needed, and acting as a trusted partner to guide them through each phase of the purchase lifecycle. We are committed to providing our customers with the highest quality transaction experience and believe our advocates are a meaningful reason why customers prefer transacting with us. The effectiveness of our model is reflected in the high ratings we receive from our customers and strong customer referrals. We focus on developing our advocates and providing them with the information and resources they need to offer exceptional customer service.

**Competition**

The U.S. used car marketplace is highly fragmented. The largest dealer brand commands approximately 2.3% of the U.S. market and the top 100 used car retailers collectively hold approximately 11.1% market share, according to Automotive News. We believe the primary competitive factors in this market include transparency, convenience, price, selection, and vehicle quality. Our current competitors can be largely classified into the following segments:

•  franchised dealerships – 37% of establishments;

•  independent dealerships – 63% of establishments; and

•  online dealerships/marketplaces.

A number of used vehicles are also bought and sold through privately negotiated transactions.

We believe that our vertically integrated business model provides a meaningful and sustainable competitive advantage.

**Technology**

Our business is driven by data and technology at all stages of the process, from inventory purchasing, reconditioning, photography, and annotation through online merchandising, sales, automobile financing, trade-ins, logistics, and delivery. Carvana's proprietary and exclusive-use technology portfolio includes:

•  a decision model for consolidating internal and external data to provide profitability estimates for inventory available for purchase;

•  a custom-built inventory management system that handles vehicles from acquisition through photography;

•  a custom-built automated photography technology system that combines high-quality photos to produce an interactive, 360-degree virtual tour of both the exterior and interior of the vehicle, and creates a 3D model of the car allowing for future innovations;

•  a website that includes advanced filtering and search technology that helps customers find a car that suits their tastes;

•  a logistical model to optimize the transport of purchased inventory to and from the customer;

•  a custom automated delivery tower, or vending machine, including customer experience enhancements such as automatically generated video (suitable for posting to social media) that captures the customer's pick-up experience; and

•  sophisticated predictive models and application programming interfaces developed for our automobile finance services and consumer lending applications, process, and terms.

We also rely on third party technology, including the following:

• customer identity verification;

• transportation fleet telemetry;

• network infrastructure for hosting the website and inventory data;

• software libraries, development environments, and tools;

• services to allow customers to digitally sign contracts;

• customer service call center management software; and

• automation controls and software for the vending machine.

**Organizational Structure**

The following chart summarizes our organizational structure as of December 31, 2022. This chart is provided for illustrative purposes only and does not purport to represent all legal entities owned or controlled by us:



(1) Shares of Class A common stock and Class B common stock vote as a single class. Each outstanding share of Class A common stock is entitled to one vote on all matters to be voted on by stockholders generally. The shares of Class B common stock have no economic rights. Each share of our Class B common stock held by Ernest Garcia II, Ernest Garcia III and entities controlled by one or both of them (collectively, the "Garcia Parties") entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A common units of Carvana Group ("Class A Units") and Class B common units of Carvana Group ("Class B Units") were exchanged for Class A common stock). All other shares of our Class B common stock entitle their holder to one vote per share on all matters to be voted on by stockholders generally. In accordance with the exchange agreement (the "Exchange Agreement") entered into in connection with the organizational transactions, LLC Unitholders (as defined in Note 11 — Stockholders' Equity (Deficit)) are entitled to exchange LLC Units (as defined in Note 1 — Business Organization), together with shares of Class B common stock in the case of certain Class A Units, for shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash. Each outstanding share of Class A common stock has one preferred share purchase right (a "Right") attached, as further discussed in Note 20 — Subsequent Events.

(2) We have short-term revolving facilities with an aggregate borrowing capacity of $4.8 billion. One of the facilities is a floor plan facility used to finance our used vehicle inventory, which is secured by our vehicles, general intangibles, accounts receivable, and finance receivables. The other facilities finance our finance receivables held by wholly-owned bankruptcy remote subsidiaries by Carvana, LLC and are secured by those receivables. As of December 31, 2022, the outstanding balance under these facilities was approximately $1.5 billion. See Note 10 — Debt Instruments.

(3) In October 2020, we issued an aggregate of $1.1 billion in senior unsecured notes due 2025 and 2028. In March and August 2021, we issued an additional $600 million and $750 million in senior unsecured notes, respectively, due 2027 and 2029. In May 2022, we issued an additional $3.275 billion in senior unsecured notes due 2030. The outstanding principal balance, net of unamortized debt issuance costs, was approximately $5.6 billion as of December 31, 2022. See Note 10 — Debt Instruments.

*All internal cross-references to Notes 1- 20 herein are to the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K.

**Human Capital**

Carvana's mission is to change the way people buy cars, and achieving that mission will not be possible without attracting, engaging, and retaining high quality teammates who view their work as more than just a job. We believe in the importance of our employees' satisfaction and development and we continually invest in them by further developing internal recruiting, talent development, human resources, and other teams, committees, and programs that may from time to time be supplemented by external resources, including surveys each quarter to gauge employee satisfaction.

We have developed discrete programs focused on these investments that include career paths, mentorship opportunities, promotions, training, and diversity and inclusion. These internal programs are designed to, among other things, grow our employees into leadership and management positions and foster a culture of inclusion. For example, our Carvana Communities program supports employees in creating and leading company affinity groups that are sponsored by a senior leader and designed to connect groups with a mission of support, inclusion, and connection throughout all of Carvana. Additionally, our Learning Management System provides broader access to training and development information and resources across Carvana.

We consider our relationship with our employees to be positive, and it is because of their passion and hard work that Carvana is now the second largest used automotive retailer in the U.S. As of December 31, 2022, we had over 16,600 full-time and part-time employees.

**Intellectual Property**

We protect our intellectual property through a combination of trademarks, domain names, copyrights, trade secrets, patents, and contractual provisions and restrictions on access and use of our proprietary information and technology.

As of December 31, 2022, we hold 21 issued U.S. patents, which cover our vending machine technology, photo technology, website user interface technology, personalization methods for displaying digital media and imaging technology, and one issued international patent covering the photo technology.

We have 31 trademark registrations and six international trademarks, including registrations for "Carvana," the Carvana design mark, the Carvana logo, and various slogans.

We are the registered holder of a variety of domestic and international domain names, including "carvana.com."

In addition to the protection provided by our intellectual property rights, we enter into confidentiality and proprietary rights agreements with our new employees, consultants, contractors, and business partners. In addition, all new employees and contractors execute intellectual property assignment agreements. We further control the use of our proprietary technology and intellectual property through provisions in both our general and product-specific terms of use on our website.

In addition, we have a cross-license agreement with DriveTime Automotive Group, Inc. (we will refer to DriveTime Automotive Group, Inc. together with its subsidiaries and affiliates, other than us, as "DriveTime") pursuant to which DriveTime has obtained limited licenses to some of our intellectual property.

**Seasonality**

Used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our historical rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of macroeconomic conditions, which may not fully reflect the underlying performance of our business.

**Government Regulation**

*Industry and Vehicle Dealer Laws and Regulations*

Various aspects of our business are or may be subject to U.S. federal, state, and municipal regulation. In particular, the advertising, sale, purchase, financing, and transport of motor vehicles are highly regulated by states in which we do business and by the U.S. federal government. The regulatory bodies that regulate our business include at the federal level: the Consumer Financial Protection Bureau, the Federal Trade Commission, the United States Department of Transportation, the Occupational Health and Safety Administration, the Department of Justice, and the Federal Communications Commission; at the state level: various state dealer licensing authorities, state consumer protection agencies including state attorney general offices, and state financial regulatory agencies; and at the municipal level our business is regulated by various municipal authorities covering licensing, zoning, occupancy, and tax obligations. We are subject to compliance audits of our operations by many of these authorities.

Certain states have concluded that our activities are subject to vehicle dealer licensing laws, requiring us to maintain a used vehicle dealer license in order to conduct business in that state. In certain other states, we have elected to obtain a vehicle dealer license to maximize operational flexibility and efficiency and invest in relationships with state regulators. We have at least one licensed facility in 33 states throughout the U.S.

Most states regulate retail installment sales, including setting a maximum interest rate, caps on certain fees, or maximum amounts financed. In addition, certain states require that finance companies in general and Carvana in particular file a notice of intent or have a sales finance license or an installment sellers license in order to solicit or originate installment sales in that state. In certain other states, we have chosen to obtain such a license to invest in relationships with state regulators. We have obtained a sales finance license, an installment seller license, or have filed consumer credit notices in 26 states throughout the U.S.

*Environmental Laws and Regulations*

We are subject to a variety of federal, state, and local environmental laws and regulations that pertain to our operations. The regulations concern air and water quality, as well as material storage, handling, and disposal. The regulations also regulate our use and operation of gasoline dispensing tanks and equipment, oil tanks, and paint booths among other things. Our business involves the use, handling, and disposal of hazardous materials and wastes, including motor oil, gasoline, solvents, lubricants, paints, and other substances. We manage our compliance through permitting and operational control.

For a discussion of the various risks we face from regulation and compliance matters, see Item 1A "Risk Factors—Risks Related to Our Business—We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply with these laws and regulations could have a material adverse effect on our business, results of operations, and financial condition."

**Other Information**

General information about us can be found at investors.carvana.com. The information contained on or connected to our website is not incorporated by reference into this Annual Report on Form 10-K and should not be considered part of this or any other report filed with the SEC. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as any amendments to those reports, are available free of charge through our website as soon as reasonably practicable after we file them with, or furnish them to, the SEC. The SEC maintains a website at www.sec.gov that contains reports, proxy statements, and other information regarding SEC registrants, including Carvana Co.

**ITEM 1A. RISK FACTORS.**

*Described below are certain risks to our business and the industry in which we operate. You should carefully consider the risks described below, together with the financial and other information contained in this Annual Report on Form 10-K and in our other public disclosures. If any of the following risks actually occurs, our business, financial condition, results of operations, cash flows and prospects could be materially and adversely affected. As a result, our future results could differ materially from*

15

*historical results and from guidance we may provide regarding our expectations of our future financial performance, and the trading price of our Class A common stock could decline.*

**Risk Factors Summary**

The following is a summary of the principal factors that make an investment in our securities speculative or risky, all of which are more fully described below in this section. This summary should be read in conjunction with the full description of "Risk Factors" in this section and should not be relied upon as an exhaustive summary of the material risks facing our business. In addition to the following summary and the information in this section, you should consider the other information contained in this Annual Report on Form 10-K before investing in our securities.

*Risks Related to Our Business*

- risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues;
- COVID-19 and other future epidemics and public health crises;
- our ability to raise additional capital;
- our history of losses and ability to maintain profitability in the future;
- our ability to effectively manage our historical rapid growth;
- our ability to maintain customer service quality and reputational integrity and enhance our brand;
- the seasonal and other fluctuations in our quarterly operating results;
- our relationship with DriveTime and its affiliates;
- our ability to compete in the highly competitive industry in which we participate;
- the changes in prices of new and used vehicles;
- our ability to acquire desirable inventory;
- our ability to sell our inventory expeditiously;
- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;
- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;
- our reliance on credit data for the automotive finance receivables we sell;
- our ability to successfully market and brand our business;
- our reliance on internet searches to drive traffic to our website and mobile application;
- our ability to comply with the laws and regulations to which we are subject;
- the changes in the laws and regulations to which we are subject;
- our ability to comply with the Telephone Consumer Protection Act of 1991;
- the evolution of regulation of the internet and e-commerce;
- our ability to grow complementary product and service offerings;
- the geographic concentration where we provide services and recondition and store vehicle inventory;
- our ability to obtain affordable inventory insurance;
- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;
- our reliance on our proprietary credit scoring model in the forecasting of loss rates;
- our reliance on internal and external logistics to transport our vehicle inventory;
- risks associated with the construction and operation of our inspection and reconditioning centers, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;
- our ability to finance inspection and reconditioning centers and vending machines;
- our ability to protect the personal information and other data that we collect, process and store;
- disruptions in availability and functionality of our website and mobile application;
- our ability to protect our intellectual property, technology, and confidential information;
- our ability to defend against intellectual property disputes;
- our ability to comply with the terms of open source licenses;
- conditions affecting vehicle manufacturers, including manufacturer recalls;
- our reliance on third party technology to complete critical business functions;
- our dependence on key personnel to operate our business;
- our minority equity investment in Root, Inc. which may result in us receiving or retaining less than the amount of benefit we otherwise expect to receive from such investment;
- the diversion of management's attention and other disruptions associated with potential future acquisitions and strategic initiatives; and
- the legal proceedings to which we may be subject in the ordinary course of business.

*Risks Related to Our Organizational Structure*
- our corporate structure;
- the potential for conflicts of interest between our stockholders and LLC Unitholders;
- our status as a "controlled company";
- risks related to payments due to LLC Unitholders under the Tax Receivable Agreement, if we derive benefits from using certain tax attributes;
- substantial restrictions in our ability to use our net operating loss carryforwards in the event of an ownership change, as defined in the Internal Revenue Code; and
- potential restrictions if we were to be deemed an investment company under the Investment Company Act of 1940.

*Risks Related to Our Liquidity*
- our substantial indebtedness;
- our ability to generate sufficient cash flow;
- changes in capital markets;
- the risks related to our securitizations; and
- risk retention rules.

*Risks Related to Ownership of our Class A Common Stock*
- the trading price of our Class A common stock is volatile;
- risks related to the actions of short sellers of our Class A common stock;
- the Garcia Parties control us and their interests may conflict with our or our stockholders' interests in the future;
- dilution due to issuance of additional Class A common stock or LLC Units in the future;
- we could sell substantial blocks of our Class A common stock in the future;
- the Company's Tax Asset Preservation Plan could hinder the market for our Class A common stock;
- we have no intention to pay dividends on our Class A common stock;
- Delaware law and our charter may prevent stockholders from changing decisions made by management;
- the Court of Chancery of the State of Delaware is the sole and exclusive forum for certain stockholder litigation matters; and
- we may issue shares of preferred stock in the future.

*Risks Related to the ADESA Acquisition*
- our ability to successfully integrate the operations of Carvana and the Acquired Business (as defined below) in the ADESA Acquisition and to realize the anticipated synergies and cost savings from our combination;
- the assumption of unknown liabilities in the ADESA Acquisition;
- the continued integration of the Acquired Business presents business uncertainties;
- we have and may continue to incur significant expenses in connection with integration of the Acquired Business; and
- acquisition accounting adjustments could adversely affect our financial results.

*General Risk Factors*
- the resources required to comply with public company obligations;
- our management's accounting judgments and estimates, as well as changes to accounting policies;
- changes in effective tax rates or review of our tax returns;
- our internal controls over financial reporting; and
- negative research about our business.

**Risks Related to Our Business**

***Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues.***

Our business is affected by industry and economic conditions. The current macroeconomic environment is characterized by heightened inflation, rising interest rates, rising vehicle prices, high cost of energy and gasoline, reduced availability and higher cost of credit, reduced business and consumer confidence, stock market volatility, increased regulation, and global and domestic fears of recession. These macroeconomic conditions have and may continue to result in decreased consumer demand adversely affecting the market for used vehicles. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Inflationary cost increases for labor, materials, and services may cause costs to increase, as well as scarcity of certain products, which may also adversely affect the market for used

17

vehicles. Purchases of new and used vehicles are typically discretionary for consumers and have been, and may continue to be, affected by negative trends in the economy.

In fiscal year 2022, industry and economic headwinds increased pressure on our sales volume and gross profit per unit. The number of vehicles we sold to retail customers decreased by 3.0% to 412,296, compared to 425,237 in 2021 and gross profit per unit decreased by 33.4% to $3,022 in 2022, as compared to $4,537 in 2021. To manage the business through this period, we have sought to rapidly decrease expenses while optimizing for volume flexibility to adjust the business to changes in unit sales. In 2023, we expect further impacts to the number of retail units sold as the impacts of reduced used vehicle industry demand, increasing benchmark interest rates, higher used vehicle depreciation rates, and our profitability initiatives flow through. Additionally, as a result of increases in our debt and interest rates in 2022, our interest expense increased by $310 million to $486 million compared to $176 million in 2021, primarily as a result of increased interest incurred on our senior unsecured notes. If economic conditions worsen or a recession occurs, it is highly likely that the used car industry will be further impacted and we may be required to take more strict measures than the ones we are taking to protect our business. Those measures, including restructurings and cost savings, could materially adversely affect our business, operations, and financial results.

Moreover, the conflict in Ukraine has and may continue to result in increased volatility in global oil and gas prices. It may also lead to changes in the availability of certain resources, such as nickel and neon, which may affect the supply of new vehicles, thereby affecting the supply chain and market for used vehicles. This volatility may change consumer car purchasing behaviors, which could materially and adversely affect our business and results of operations. To the extent the conflict in Ukraine adversely affects our business, it may also have the effect of heightening many other risks disclosed in our Annual Report on Form 10-K, any of which could materially and adversely affect our business and results of operations.

Increased environmental regulation has also made, and may in the future make, used vehicles more expensive and less desirable for consumers. Further, the U.S. federal government and some state and local governments provide incentives to purchasers of electric vehicles in the form of rebates, tax credits and other financial incentives, which could contribute to making a used vehicle more expensive and less desirable when compared to a new electric vehicle. Our business may also be negatively affected by challenges to the larger automotive ecosystem, including urbanization, global supply chain challenges, military conflicts, and other macroeconomic issues. For example, rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used vehicles we sell, particularly if urbanization increases. New technologies such as autonomous driving software also have the potential to change the dynamics of vehicle ownership in the future. Any of the foregoing could have a material adverse effect on our business, results of operations and financial condition.

***The COVID-19 pandemic and related regulations have in the past, and a resurgence of Covid-19 or related regulations could again adversely affect, our business, operating results, financial condition and prospects.***

Measures implemented by authorities to control the spread of COVID-19 since late 2019 impacted and may again in the future impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. In addition to governmental measures, we have and may again face increased operational challenges from the need to protect employee health and safety. These challenges have included, and may in the future include, workplace disruptions and restrictions on the movement of people, social distancing guidelines, increased employee absenteeism due to illness and/or quarantine and contact tracing requirements. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business. The COVID-19 pandemic and future pandemics or epidemics may cause increased economic and demand uncertainty, and lead to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. Regulations and challenges arising out of the COVID-19 pandemic or future pandemics could have a material adverse effect on our business, operating results, financial condition and prospects.

***We may require additional debt and equity capital to pursue our business objectives and respond to business opportunities, challenges, or unforeseen circumstances. If such capital is not available to us, our business, operating results, and financial condition may be harmed.***

We may require additional capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances, including to increase our marketing expenditures to improve our brand awareness, build and maintain our inventory of quality used vehicles, develop new products or services (including vehicle-financing services) or further improve existing products and services, enhance our operating infrastructure, and acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. However,

18

additional funds may not be available when we need them, on terms that are acceptable to us, or at all. In addition, any debt financing that we secure in the future could involve restrictive covenants which may make it more difficult for us to obtain additional capital and to pursue business opportunities. For example, the indentures governing our 2025, 2027, 2028, 2029, and 2030 Notes limit our ability and certain of our subsidiaries' ability to, among other things, incur additional debt or issue preferred stock, create liens, pay dividends and make other distributions, redeem or repurchase stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. See Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity—Senior Unsecured Notes."

Volatility in the credit markets may also have an adverse effect on our ability to obtain debt financing. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our Class A common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to pursue our business objectives and to respond to business opportunities, challenges or unforeseen circumstances could be significantly limited, and our business, operating results, financial condition and prospects could be adversely affected.

***We have a history of losses and we may not achieve or maintain profitability in the future.***

We have not been profitable since our inception in 2012 and had an accumulated loss of approximately $3.7 billion as of December 31, 2022. We incurred net losses of $462 million, $287 million, and $2.9 billion in the years ended December 31, 2020, 2021, and 2022, respectively. We expect to make significant investments to further develop and expand our business and these investments may not result in increased revenue or growth on a timely basis or at all. In addition, as a public company, we have and will continue to incur significant legal, accounting, and other expenses. As a result of these expenditures, we will have to generate and sustain increased revenue to achieve and maintain profitability.

We expect to continue to incur losses as we invest in and strive to grow our business. We may incur significant losses in the future for a number of reasons, including investing in growth, slowing demand for used vehicles and our related products and services, increasing competition, higher interest rates, decreased vehicle affordability, weakness in the automotive retail industry generally, a decline in global financial conditions that negatively impacts economic activity and employment, as well as other risks described in this Annual Report on Form 10-K, and we may encounter unforeseen expenses, difficulties, complications, and delays in generating revenue or profitability. If our revenue generation slows, we may not be able to reduce costs in a timely manner because many of our costs are fixed. In addition, if we reduce variable costs to respond to losses, this may limit our ability to acquire customers and grow our revenues. Accordingly, we may not achieve or maintain profitability and we may continue to incur significant losses in the future.

***Our historical rapid growth may not be indicative of our future growth and, if we resume growing rapidly, we may not be able to manage our growth effectively.***

In 2020, 2021, and 2022, our revenue grew from approximately $5.6 billion, to $12.8 billion, to $13.6 billion, respectively. For our revenues to continue to increase, we need to successfully increase our penetration in existing markets, enter new markets, acquire more customers, gain repeat customers, and expand our brand awareness. The foregoing may not happen at all or may not happen as quickly as we expect. Our failure to successfully accomplish the foregoing could harm our business, financial condition, and results of operations.

We expect that, in the future, even if our revenue increases, our historical rate of growth may decline. In any event, we will not be able to grow as fast or at all if we do not:

• increase the number of unique visitors to our website and mobile application and the number of customers utilizing our website and mobile application;

• further improve the quality of our product offering, features, and complementary products and services;

• introduce high quality new products, services, and features; or

• make sellable sufficient appropriate inventory with high enough quality and low enough cost to meet the increasing demand for our vehicles.

There can be no assurance that we will meet these objectives. We have and may again expend substantial financial and other resources on:

19

- marketing and advertising, including an increase to our television and streaming video advertising expenditures;

- expansion of our inventory; and

- general administration, including legal, accounting, internal audit, and other compliance expenses related to being a public company.

Our historical rapid growth has placed and may continue to place significant demands on our management and our operational and financial resources. We have experienced significant growth in the number of users of our website and mobile application as well as the amount of data that we analyze. Our organizational structure continues to become more complex, and we will need to continue improving our operational, financial, and management controls as well as our reporting systems and procedures. We will require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas without undermining our corporate culture of rapid innovation, teamwork, and attention to the car-buying and car-selling experience for the consumer. If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' car-buying and car-selling experience and the quality of the vehicles we sell, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

Our business has grown rapidly since inception as additional customers have sold us their vehicles and purchased used vehicles and complementary products and services through our website and mobile application. However, our business is relatively new and has operated at substantial scale for only a limited period of time. Given this limited history, it is difficult to predict whether we will be able to maintain or grow our business. We also expect that our business will continue to evolve in ways that may be difficult to predict. For example, over time our investments that are intended to drive new customer traffic to our website and mobile application may be less productive than expected. In the event of this or any other adverse developments, our continued success will depend on our ability to successfully adjust our strategy to meet changing market dynamics. If we are unable to do so, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

***Our failure to maintain a reputation of integrity and to otherwise maintain and enhance our customer service quality and brand could adversely affect our business, sales, and results of operations.***

Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying and selling that will save them time and money. Accordingly, our ability to consistently deliver a high quality experience and our reputation as a company of integrity are critical to our success. If we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs that damages this reputation, it could adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations. Even the perception of a decrease in the quality of our customer service or brand could impact results. The operationally intensive aspect of our offering and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, submitting title and registration paperwork to state entities) makes maintaining the quality of our customer experience a particularly difficult challenge. For example, in 2022, we were the subject of various complaints relating to the timely delivery of titles and registration paperwork to certain state entities.

While we do not believe these claims are material, irrespective of their validity, any claims, complaints, or negative publicity—about our business practices, our marketing, and advertising campaigns, our compliance with applicable laws and regulations, the integrity of the data that we provide to users, our cybersecurity measures and privacy practices and other aspects of our business—could diminish customer confidence in our platform and adversely affect our brand. The use of social media increases the speed with which information, misinformation, and opinions can be shared and thus the speed with which our reputation can be affected. If we fail to correct or mitigate misinformation or negative information about us, the vehicles we offer to sell or purchase, our customer experience, or any aspect of our brand, including information spread through social media or traditional media channels, it could have a material adverse effect on our business, sales, and results of operations.

***We experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business.***

Our quarterly results of operations, including our revenue, gross profit, and profitability, if any, and cash flow vary from quarter to quarter based in part on, among other things, consumers' car-buying patterns. Used vehicle sales exhibit seasonality with sales typically peaking late in the first calendar quarter (coinciding with the time when the federal government issues tax refunds) and diminishing through the rest of the year, with the lowest relative level of sales expected to occur in the fourth calendar quarter. Due to our historical rapid growth, our sales patterns to date have been different from the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used-vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster

rate in the last two quarters of each year and a slower rate in the first two quarters of each year. Historically, this has led our gross profit per unit to be higher on average in the first half of the year than in the second half of the year. Other factors that cause our quarterly results to fluctuate include, without limitation:

- fluctuations in consumer demand, vehicle supply, and labor supply due to macroeconomic conditions;
- the timing of our sales of our finance receivables;
- our ability to attract new customers;
- changes in the competitive dynamics of our industry;
- the regulatory environment;
- expenses associated with unforeseen quality issues and manufacturer recalls;
- the speed, persistence, and aggregate level of inflation;
- the pace and level of rising benchmark interest rates; and
- litigation or other claims against us.

In addition, a significant portion of our expenses are fixed and do not vary proportionately with fluctuations in revenues. Accordingly, our results in any quarter may not indicate the results we may achieve in any subsequent quarter or for the full year, and period-to-period comparisons of our operating results may not be meaningful.

***Through shared service and other agreements not negotiated at arm's length, there were and are benefits to us from DriveTime's expertise and economies of scale, and we continue to and may in the future utilize DriveTime and its affiliates for certain services and processes.***

We were incubated by and may benefit from our relationship and a series of arrangements with DriveTime not negotiated at arm's length, as DriveTime is controlled by our controlling shareholder who is also the father of our chief executive officer. Currently, many services that DriveTime historically provided to us (including certain accounting, finance, legal, human resources, payroll and benefits, tax, information technology, real estate, and inventory purchasing) are now provided by alternative vendors or have been brought in-house. In addition, DriveTime built certain of our inspection and reconditioning centers ("IRCs") in Georgia, New Jersey, and Texas and is now our landlord at some such sites. Verde Investments, Inc. ("Verde"), an affiliate of DriveTime, formerly leased to us our Arizona IRC and sold it to us in 2020. We have also historically leased certain of our hubs from DriveTime. However, our more recent expansion, including the ADESA Acquisition, has largely been independent of DriveTime. Consequently, certain of our historical costs and expansion activities may not accurately reflect our future costs and expansion to the extent that DriveTime no longer provides us with such services or refuses to continue doing so at currently contracted-for prices.

We continue to periodically engage DriveTime, its affiliates, and other entities controlled by our controlling shareholder to provide us with certain services, including the administration of certain VSCs and other related products sold to our customers. We also continue to utilize DriveTime for certain information technology systems and services. For example, we still partially use an inventory management system obtained from DriveTime to support our revenue recognition process. Should DriveTime fail to adequately perform any of these services or maintain these systems on terms or at prices consistent with their historical prices, or at all, our financial condition and results of operations may be adversely affected.

Additionally, DriveTime has in the past and may in the future purchase or sell certain vehicles or automotive finance receivables from or to us. However, there can be no assurance that they will do so on the same or similar terms, or at all. As a result, our historical results may not be reflected in our future results.

Before and after we sell automotive finance receivables originated by us, DriveTime performs ongoing servicing and collections. If DriveTime is unwilling to enter into servicing arrangements for our future automotive finance receivable transactions on terms or at prices consistent with their historical prices or at all, our revenues derived from the sale of those receivables may decline as a result. If DriveTime refuses or becomes unable to continue servicing and collecting on automotive finance receivables originated by us before we sell them, our ability to adequately prepare such receivables for sale may be adversely affected.

21

***We participate in a highly competitive industry; pressure from existing and new companies may adversely affect our business and operating results.***

We face significant competition from companies that provide listings, information, lead generation, and car-buying and selling services designed to reach businesses and consumers and enable dealers to reach these consumers and inventory sources.

Our current and future competitors may include:

- traditional used vehicle dealerships such as CarMax that could increase investment in technology and infrastructure to compete directly with our online model;

- internet and online automotive sites that could change their models to directly compete with us, such as Amazon, Autobytel.com, AutoTrader.com, Cars.com, CarGurus.com, eBay Motors, Edmunds.com, Google, KBB.com, and TrueCar.com;

- providers of offline, membership-based car-buying services such as the Costco Auto Program;

- used vehicle dealers or marketplaces with e-commerce business or online platforms such as Shift, Fair, and Vroom;

- automobile manufacturers such as Ford, General Motors, Hyundai, and Volkswagen that could change their sales models through technology and infrastructure investments; and

- automobile manufacturers such as Tesla that market directly to consumers.

We also expect that competitors, both new and existing, will continue to enter the online and traditional automotive retail industry with competing brands, business models, products, and services, which could make it difficult to acquire inventory, attract customers, and sell vehicles at a profitable price. For example, traditional vehicle dealerships could transition their selling efforts to the internet, allowing them to more efficiently sell vehicles across state lines and compete directly with our online offering and no-negotiating pricing model. There can be no assurance we will not experience competition from DriveTime, the company from which we were spun off and with which we currently have a number of business relationships. Furthermore, we have a cross-license agreement with DriveTime pursuant to which DriveTime has obtained limited licenses to some of our intellectual property. Additionally, existing e-commerce businesses, such as Amazon, could directly enter the online used vehicle market. Some of these companies have significantly greater resources than we do and may be able to provide customers access to a greater inventory of vehicles at lower prices or purchase vehicles from consumers at higher prices while delivering a competitive online experience.

Our competitors may also develop and market new technologies that render our existing or future business model, products and services less competitive, unmarketable or obsolete. For example, rideshare services, such as Uber and Lyft, are a popular means of transportation and may decrease consumer demand for the used vehicles we sell, particularly if urbanization increases. Technology is currently being developed to produce automated, driverless vehicles that could reduce the demand for, or replace, traditional vehicles including the used vehicles that we sell. In addition, if our competitors develop business models, products or services with similar or superior functionality to our solutions, it may adversely impact our business.

Our competitors may also impede our ability to reach consumers or commence operations in certain jurisdictions. For example, our competitors may increase their search engine optimization efforts and outbid us for search terms on various search engines. Additionally, our competitors could use their political influence and increase lobbying efforts to hinder our real estate entitlements processes, push for new regulations, or encourage interpretations of existing regulations that would inhibit or prevent us from operating in certain jurisdictions.

Our current and potential competitors may have significantly greater financial, technical, marketing, and other resources than we have, and the ability to devote greater resources to the development, promotion and support of their products and services. Additionally, they may have more extensive automotive industry relationships, longer operating histories, and greater name recognition than we have. As a result, these competitors may be able to respond more quickly with new technologies and to undertake more extensive marketing or promotional campaigns. If we are unable to compete with these companies, the demand for our used vehicles, products, and services could substantially decline.

Private plaintiffs and federal, state, and local regulatory and law enforcement authorities continue to scrutinize advertising, sales, financing, and insurance activities in the purchase, sale, and leasing of used vehicles. If, as a result, other automotive retailers adopt more transparent, consumer-oriented business practices, our differentiation versus those retailers could be reduced.

22

In addition, if one or more of our competitors, or DriveTime, were to merge or partner with another of our competitors, the change in the competitive landscape could adversely affect our ability to compete effectively. Our competitors may also establish or strengthen cooperative relationships with our current or future data providers, technology partners, or other parties with whom we have relationships, thereby limiting our ability to develop, improve, and promote our solutions. We may not be able to compete successfully against current or future competitors, and competitive pressures may harm our revenue, business, and financial results.

*Our business is sensitive to changes in the prices of new and used vehicles.*

Any significant changes in prices for new or used vehicles could have a material adverse effect on our revenues and results of operations. For example, an overall increase in prices or monthly payments for used vehicles, including as a result of increased interest rates customers face when financing a vehicle, may make it difficult for certain customers to afford to purchase a vehicle. Similarly, if prices for used vehicles rise relative to prices for new vehicles, it could make buying a new vehicle more attractive to our customers than buying a used vehicle, which could have a material adverse effect on our results of operations and could result in reduced used vehicle sales and lower revenue. Additionally, manufacturer incentives could contribute to narrowing the price gap between new and used vehicles. Further, the U.S. federal government and some state and local governments provide incentives to purchasers of electric vehicles in the form of rebates, tax credits, and other financial incentives, which could contribute to narrowing the price gap between new electric vehicles and used vehicles. Used vehicle prices may also decline due to an increased number of new vehicle lease returns over the next several years. While lower used vehicle prices reduce our cost of acquiring new inventory, lower prices could also lead to reductions in the prices at which we can sell such inventory, which could have a negative impact on gross profit. Furthermore, any significant changes in wholesale prices for used vehicles could have a material adverse effect on our results of operations by reducing wholesale margins.

*Our business is dependent upon access to desirable vehicle inventory. Obstacles to acquiring attractive inventory, whether because of supply, competition, or other factors, could have a material adverse effect on our business, sales, and results of operations.*

We acquire vehicles for sale through numerous sources, including directly from consumers, from wholesale auctions, and from other retailers. There can be no assurance that the supply or price of desirable used vehicles will be sufficient to meet our needs. A reduction in the availability of or access to sources of desirable inventory, whether due to supply chain constraints, pricing, or otherwise, could have a material adverse effect on our business, sales and results of operations.

Additionally, we evaluate hundreds of thousands of potential vehicles daily using a proprietary algorithm to predict mechanical soundness, consumer desirability and relative value as prospective inventory. If we fail to adjust appraisal offers to stay in line with broader market trade-in offer trends, to recognize those trends, or to properly assess vehicles before we purchase them, it could adversely affect our ability to acquire desirable inventory. Our ability to source vehicles through our appraisal process could also be affected by competition, both from new and used vehicle dealers directly and through other websites driving appraisal traffic to those dealers. In addition, we remain dependent on others to sell us used vehicles, and there can be no assurance of an adequate supply of such vehicles on terms that are attractive to us.

Finally, it is common that commercial suppliers of used vehicles regularly review their relationships with whole car auctions, such as our wholesale marketplace platform, through written requests for proposals. Such suppliers may from time to time require us to make changes to the way we do business as part of the request for proposal process or provide services on less favorable terms. There can be no assurance that our existing agreements will not be canceled or that we will be able to enter into future agreements with these or other suppliers on similar terms, or at all.

*Our business is dependent upon our ability to expeditiously sell inventory. Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales, and results of operations.*

Our purchases of used vehicles are based in large part on projected demand. If actual sales are materially less than our forecasts, we have and may again experience an over-supply of used vehicle inventory. An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and increase our average days to sale. Due to macroeconomic conditions, we normalized our inventory size in 2022, reducing our nationally pooled inventory by 7,070 to 63,992 for the year ended December 31, 2022 from 71,062 for the year ended December 31, 2021 in order to better focus on operating efficiencies in the short-term.

Used-vehicle inventory has typically represented a significant portion of our total assets. Having such a large portion of our total assets in the form of used vehicle inventory for an extended period of time subjects us to depreciation or inflation, and other risks. Accordingly, if we have excess inventory or our average days to sale increases, we may be unable to liquidate such

23

inventory at prices that allow us to meet margin targets or to recover our costs, which could have a material adverse effect on our results of operations.

***Our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts may decline in the future; any material reduction could harm our business, results of operations, and financial condition.***

We provide financing to customers and typically sell the receivables related to the financing contract. For example, we have entered into various arrangements to pledge or sell automotive finance receivables that we originate, including through committed structured finance arrangements, term securitizations and fixed pool loan sales to financing partners, and plan to enter into new arrangements in the future. Our ability to obtain funding through those channels is subject to having sufficient assets eligible for use as collateral for the related programs and our ability to obtain derivatives to manage interest rate risk among other considerations. If we are unable to continue obtaining funding through those channels, including because we reached our capacity under these or future arrangements, our financing partners exercised constructive or other termination rights before we reached capacity or we reached the scheduled expiration date of the commitment, or we are unable to enter into new arrangements on similar terms, we may not have adequate liquidity and our business, financial condition, and results of operations may be adversely affected. Furthermore, if our financing partners cease to purchase these receivables, we could be subject to the risk that some of these receivables are not paid when due and we are forced to incur unexpected asset write-offs and bad-debt expense.

***We depend on the sale of automotive finance receivables for a substantial portion of our gross profit.***

In connection with the sale of used vehicles, many of our customers use our financing services to finance a portion of the purchase price of their vehicle. The prices we are able to charge for finance receivables that we sell are based on a variety of factors, including the terms and credit risk associated with automotive finance receivables, the relationship between the interest rates we quoted the customer at the time they priced their financing and market and projected interest rates at the time we sell the finance receivables, the historical credit performance of the finance receivables we sell, demand for assets and related securities of that type in the financial markets, and other factors. If these variables or others were to change, we might be required to reduce our sale prices on finance receivables, sell fewer of them, or both, which could reduce our gains on sales of finance receivables. Any material reduction in our interest rate spread or gains on sale of finance receivables could have a material adverse effect on our business, results, of operations, and financial condition. Furthermore, customers may elect to finance their vehicle purchases through other parties who may be able to offer more attractive terms, in which case we would lose a source of what has historically been a significant portion of our gross profit.

***Our ability to sell automotive finance receivables is dependent on our ability to originate desirable finance receivables. If customers or other parties provide us incorrect or fraudulent data, we may offer credit terms that do not align with customers' credit profiles, and our operating results may be harmed.***

We offer financing to our customers to facilitate their purchases of used vehicles. The terms of the financing we offer are dependent in part on our assessment of such customers' credit-worthiness, which is based on data gathered from customers and other parties. If the information we rely on is inaccurate or fraudulent, we may offer inappropriate terms to our customers, resulting in originating automotive finance receivables that do not perform as expected or we are unable to sell because they are based on inaccurate credit profiles. Originating a material amount of receivables with inaccurate or fraudulent credit profiles could have a material adverse effect on our business, results of operations, and financial condition.

***Our operating history and historical reliance on DriveTime systems and services make it difficult to evaluate our current business and future prospects.***

We launched our first market in 2013 and do not have a long operating history. In addition, we have only operated independently of DriveTime since November 1, 2014, and, following our spinoff from DriveTime, we remained dependent on DriveTime for a number of important operations, including locations for certain of our IRCs, vehicle inventory purchasing, and a number of administrative services. While many services historically provided by DriveTime are now provided by other vendors or have been brought in house, we continue to utilize DriveTime for certain services. Due to this and other factors, our operating results are not predictable and our historical results may not be indicative of our future results.

***The success of our business relies heavily on our marketing and branding efforts, and these efforts may not be successful.***

An important component of our growth is the growth of visitors to our website and mobile application. Because we are a consumer brand, we rely heavily on marketing and advertising to increase brand visibility with potential customers. We currently advertise through a blend of brand and direct advertising channels with the goal of increasing the strength,

24

recognition, and trust in the Carvana brand and driving more unique visitors to our website and mobile application. We recorded expenses of approximately $286 million, $479 million, and $490 million on advertising in the years ended December 31, 2020, December 31, 2021, and December 31, 2022, respectively.

Our business model relies on our ability to decrease incremental customer acquisition costs over time as we grow. If we are unable to recover our marketing costs through increases in customer traffic and in the number of transactions by users of our website and mobile application, if our advertising partners refuse to customize their products and services to accommodate our business model, if our advertising partners refuse to work with us at competitive rates or at all, or if our broad marketing campaigns are not successful or are terminated, it could have a material adverse effect on our growth, results of operations, and financial condition.

***We rely on internet search engines, lead generators, automotive finance providers, social networks, and vehicle listing sites to help drive traffic to our website and mobile application, and if we fail to appear prominently in the search results or fail to drive traffic through paid advertising, our traffic would decline and our business would be adversely affected.***

We depend in part on internet search engines (such as Google and Bing), lead generators, automotive finance partners, social networking sites (such as Facebook), and vehicle listing sites to drive traffic to our website and mobile application. Our ability to maintain and increase the number of visitors directed to our website and mobile application is not entirely within our control. Our competitors may increase their search engine optimization efforts and outbid us for placement on various vehicle listing sites or search terms on various search engines, resulting in their websites receiving a higher search result page ranking than ours. Additionally, internet search engines could revise their methodologies in a way that would adversely affect our search result rankings. If internet search engines modify their search algorithms in ways that are detrimental to us, if vehicle listing sites refuse to display any or all of our inventory in certain geographic markets, or if our competitors' efforts are more successful than ours, overall growth in our customer base could slow or our customer base could decline. Internet search engine providers could provide automotive dealer and pricing information directly in search results, align with our competitors or choose to develop competing services. Our website and mobile application have experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of users directed to our website and mobile application through internet search engines, lead generators, automotive finance providers, social networking sites, or vehicle listing sites, could harm our business and operating results.

***We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our actual or alleged failure to comply with such laws and regulations, could have a material adverse effect on our business, results of operations, and financial condition.***

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers, customer insurance related regulations, and anti-money laundering regulations. Our facilities and business operations are subject to laws and regulations relating to environmental protection and health and safety. The financing we offer to customers is subject to state licensing laws and to federal and state laws regulating the advertising and provision of consumer finance options, the collection of consumer credit and financial information, along with requirements related to online payments and electronic funds transfers. Regulators in jurisdictions where our customers reside but in which we do not have a dealer or financing license could require that we obtain a license or otherwise comply with various state regulations, and may seek to impose punitive fines for operating without a license or demand we seek a license in those jurisdictions, any of which may inhibit our ability to do business in those jurisdictions, increase our operating expenses and adversely affect our financial condition and results of operations. Regulators in jurisdictions in which we have a dealer license have in the past, and may in the future, impose economic fines, suspend or revoke our license, or otherwise preclude us from buying or selling vehicles using our current business model, any of which could have a material adverse effect on our growth, results of operations, and financial condition. In the future, we may engage in different business activities or make changes to our business model that subject us to further state and federal regulation.

Our logistics operations, which we depend on to transport vehicles to and from auctions, our IRCs, our vending machines, our hubs and our customers, are subject to regulation by the DOT and by the states through which our vehicles travel. Transport vehicle dimensions and weight, transport vehicle conditions, driver motor vehicle record history, driver alcohol and drug testing, and driver hours of service are also subject to both federal and state regulation. More restrictive limitations on vehicle weight and size, condition, trailer length and configuration, methods of measurement, driver qualifications, or driver hours of service would increase our operating expenses and may adversely affect our financial condition, operating results, and cash

25

flows. If we fail to comply with the DOT regulations or if those regulations become more stringent, we could be subject to increased inspections, audits, or compliance burdens. Regulatory authorities could take remedial action including imposing fines, suspending, or shutting down our in-house transportation operations. If any of these events occur, our financial condition, operating results, and cash flows would be adversely affected.

In addition to these laws and regulations that apply to our business operations, we are also subject to laws and regulations affecting public companies, including securities laws and NYSE listing rules. The applicability of these regulatory and legal compliance obligations is dependent on the evolving interpretations of these laws and regulations.

The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results. We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

This description of laws and regulations to which we are or may be subject is not exhaustive, and the regulatory framework governing our operations is subject to evolving interpretations and continuous change. For additional information regarding government regulations and compliance matters we are subject to, see Item 1 "Business—Government Regulation".

Federal legislative and regulatory initiatives and reforms may result in an increase in the cost of regulatory compliance, a decrease in revenues, or result in changes to business practices that could have a material adverse effect on our results of operations. For example, changes in federal labor policy could lead to increased unionization efforts, which could increase labor costs, disrupt facility operations, and have a material adverse effect on our business, sales, and results of operations. The enactment of new laws and regulations or the interpretation of existing laws and regulations in an unfavorable way may affect the operation of our business, directly or indirectly, which could result in substantial regulatory compliance costs, civil or criminal penalties, including fines, adverse publicity, decreased revenues, and increased expenses.

***If we fail to comply with the Telephone Consumer Protection Act, we may face significant damages, which could harm our business, financial condition, results of operations, and cash flows.***

We utilize telephone calls and text messaging as a means of responding to and marketing to consumers interested in purchasing, trading in, selling or financing vehicles and related products and services, including insurance. We generate leads from our website and mobile application by prompting potential customers to provide their phone numbers so that we can contact them in response to their interest in financing terms, trading in or selling vehicles, or purchasing a specific vehicle. We also pay others for leads. A portion of our revenue comes from purchases, sales, and financing that involves a call or text made by our internal call centers, automated communications systems, or vendors we engage to reach out to these potential customers.

The Telephone Consumer Protection Act (the "TCPA"), as interpreted and implemented by the FCC and U.S. courts currently imposes significant restrictions on the use of autodialed telephone calls, pre-recorded messages, and text messages to residential and mobile telephone numbers as a means of communication when prior consent of the person being contacted has not been obtained. Violations of the TCPA may be enforced by the FCC or by individuals through litigation, including class actions. Statutory penalties for TCPA violations range from $500 to $1,500 per violation, which has been interpreted to mean per phone call or text. In addition, several states have enacted their own version of the TCPA.

While we have implemented processes and procedures to comply with the TCPA, if we or those services we rely on for data fail to adhere to or successfully implement appropriate processes and procedures in response to existing or future regulations, it could result in legal and monetary liability, fines, penalties, or damage to our reputation in the marketplace. Additionally, any changes to the TCPA, its interpretation, or enforcement of it by the government, the courts, or private parties that further restrict the way we contact and communicate with our potential customers or generate leads could adversely affect our ability to attract customers.

***Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.***

We are subject to general business regulations and laws as well as regulations and laws specifically governing the internet and e-commerce. Existing and future regulations and laws could impede the growth of the internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, online payments and funds transfers, privacy, cybersecurity, anti-spam, pricing, content protection, electronic contracts and communications, mobile communications, consumer protection, information reporting requirements, advertising, unencumbered internet access to our services and the design and operation of

our website and mobile application. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the internet as the vast majority of these laws were adopted prior to the advent of the internet and do not contemplate or address the unique issues raised by the internet or e-commerce. Unfavorable interpretation or enforcement of regulations and laws, or newly promulgated unfavorable regulations and laws, could diminish the demand, including online demand, for used vehicles and complementary products and services and increase our cost of doing business.

***Our ability to grow our complementary product and service offerings may be limited, which could negatively impact our growth rate, revenues and financial performance.***

If we introduce new or expand existing offerings for our platform, such as services or products involving other inventory sources, new vehicles, trade-ins, financing, various forms of insurance related to vehicle condition, property and casualty, or other insurance products customarily sold by traditional insurance companies, subscription services, shipping services, deficiency waivers, customized accessories, leasing or maintenance, we may incur losses or otherwise fail to enter these markets successfully. Our expansion into these markets will place us in competitive and regulatory environments with which we are unfamiliar and involve various risks, including the need to invest significant resources and the possibility that returns on such investments will not be achieved for several years, if at all. In attempting to establish new service or product offerings, we expect to incur significant expenses and face various other challenges, such as expanding our customer advocate and management personnel to cover these markets and complying with complicated regulations that apply to these markets. In addition, we may not successfully demonstrate the value of these complementary products and services to consumers, and failure to do so would compromise our ability to successfully expand into these additional revenue streams. Any of these risks, if realized, could adversely affect our business and results of operations.

***If we do not adequately address our customers' use of mobile device technology, operating results could be harmed and our growth could be negatively affected.***

Our success depends in part on our ability to provide adequate functionality for visitors who use mobile devices to shop for used vehicles and the number of transactions with us that are completed by those users. The proportion of U.S. consumers who use mobile devices to access websites has generally increased. Continued use of mobile technology by our users may harm our business in the following ways:

- customers visiting our website from a mobile device or accessing our website through a mobile application may not accept mobile technology as a viable long-term platform to buy or sell a vehicle. This may occur for a number of reasons, including our ability to provide the same level of functionality to a mobile device that we provide on a desktop computer, the actual or perceived lack of security of information on a mobile device and possible disruptions of service or connectivity;
- we may not continue to innovate and introduce enhanced products that can be suitably conveyed on mobile platforms;
- consumers using mobile devices may believe that our competitors offer superior products and features based in part on our inability to provide sufficient functionality to convince a mobile device user to transact with us; or
- regulations related to consumer finance disclosures, including the Truth in Lending Act and the Fair Credit Reporting Act, may be interpreted, in the context of mobile devices, in a manner which could expose us to legal liability in the event we are found to have violated applicable laws.

If we do not develop suitable functionality for users who access our website using a mobile device, our business and operating results could be harmed.

***The current geographic concentration where we provide services creates an exposure to severe weather, local economies, regional downturns, or catastrophic occurrences that may materially adversely affect our financial condition and results of operations.***

As of December 31, 2022, we conduct business through seventeen IRCs located in Alabama, Arizona, Arkansas, California, Florida, Georgia, Indiana, New Jersey, North Carolina, Ohio, Oklahoma, Texas, Utah, and Virginia managing fulfillment to over 300 metropolitan areas across most of the United States. Although we also hold inventory at a variety of other sites, including sites acquired through the ADESA Acquisition (as defined below), we hold the majority of our inventory at these seventeen locations. Our business has been and may continue to be more susceptible to regional conditions than the operations of more geographically diversified competitors, and we are vulnerable to economic downturns and other unforeseen events or circumstances in those regions. Changes in demographics and population or severe weather conditions and other catastrophic occurrences in areas in which we operate or from which we obtain inventory may materially adversely affect our

results of operations. Such conditions may result in physical damage to our properties, loss of inventory and delays in the delivery of vehicles to our IRCs, hubs, vending machines, or customers.

Any of these factors may disrupt our businesses and materially adversely affect our financial condition and result of operations. Furthermore, there can be no assurance that we will be able to successfully replicate our business model and achieve levels of success as we enter new markets.

***An inability to obtain affordable insurance on our inventory may materially adversely affect our financial condition and results of operations.***

We rely on inventory insurance to protect against catastrophic losses of our inventory. There is no guarantee that we will continue to be able to insure our inventory at affordable rates, or at all, through outside insurers. If we are unable to purchase affordable insurance, we may have to self-insure, reducing our ability to make other investments in our business and exposing us to financial risk. In addition, our inability to insure our inventory through an outside insurer, or to adequately self-insure, may adversely impact our ability to finance our inventory purchases.

***Our insurance coverage may not be enough to protect us from all claims.***

Our business exposes us to an inherent risk of potential liability claims. Although we maintain liability insurance for our directors and officers, auto and general liability, loss due to cybersecurity incidents, damage to property, and various other policies, the coverage limits of these policies may not be adequate to cover all future claims. We may be unable to maintain sufficient liability or other commercial insurance on acceptable terms or at reasonable costs, and this insurance may not provide us with adequate coverage against potential liabilities. A successful claim brought against us in excess of, or outside of, our insurance coverage could have a material adverse effect on our financial condition and results of operations. A liability claim, regardless of its merit or eventual outcome, could result in substantial costs to us, a substantial diversion of management attention and adverse publicity. A liability claim could also harm our reputation and result in a decline in revenues and an increase in expenses.

***We rely on agreements with lenders to finance our vehicle inventory purchases. If we fail to maintain adequate relationships with such lenders, we may be unable to maintain sufficient inventory, which would adversely affect our business and results of operations.***

We rely on agreements with lenders to finance our vehicle inventory purchases. If we are unable to extend the agreements on favorable terms or at all, or if the agreements expire and are not renewed, our inventory supply may decline, resulting in fewer vehicles available for sale on our website and mobile application. For example, our 12-Month Floor Plan Facility (as defined herein) matures in September 2023, and our 18-Month Floor Plan Facility matures March 2024. If we are unable to renew those facilities or find a satisfactory replacement, whether because of our financial and operating performance or for other reasons, our ability to acquire inventory would be adversely affected. New funding arrangements may be at higher interest rates or other less favorable terms. These financing risks, in addition to rising interest rates and changes in market conditions, if realized, could negatively impact our results of operations and financial condition.

***Errors in our contracts with our customers could render them unenforceable or ineligible for sale. If we have already sold contracts with errors in them, we could be required to repurchase them.***

We enter into purchase agreements, buyer's orders, retail installment contracts, consumer loan contracts, and other contracts with our customers that are generated automatically based upon information the customer enters into our website or mobile application. The contracts are intended to comply with the applicable consumer lending and other commercial and legal requirements of the relevant jurisdictions. We face the risk, however, that the auto-generated forms may inadvertently contain errors or omissions or otherwise fail to comply with applicable regulations in a manner that would render such contracts unenforceable. For example, most jurisdictions impose a maximum interest rate cap that we can charge our customers. If we exceed the relevant cap, our retail installment contracts in such jurisdiction may be unenforceable, and in some instances, we may be required to pay damages or repay any financing charges previously collected. If a significant number of our retail installment contracts are rendered unenforceable, our financial condition and results of operations may be adversely affected.

We generally seek to sell automotive finance receivables to financing partners or in securitization transactions. The financing partners who agree to buy or fund our loans, and the documents governing our securitizations, require that we make certain customary representations about the eligibility of those contracts for sale. If these receivables do not meet the specified representations, we have in the past been, and may in the future be, forced to repurchase these receivables. If we sell a significant amount of receivables that do not meet the predetermined representations, we may be required to use cash on hand

28

or to obtain alternative financing in order to repurchase them. Any significant repurchases could have a material adverse effect on our business, results of operations, and financial condition, and may jeopardize our ability to sell contracts to those or other financing partners or purchasers in the future.

***We rely on our proprietary credit scoring model to forecast automotive finance receivable loss rates. If we are unable to effectively forecast loss rates, it may negatively impact our operating results.***

We rely on our internally developed models to forecast loss rates of the automotive finance receivables we originate. If we rely on a model that fails to effectively forecast loss rates on receivables we originate, those receivables may suffer higher losses than expected. We generally seek to sell these receivables to financing partners or in securitization transactions. If the receivables we sell experience higher loss rates than forecasted, we may obtain less favorable pricing on the receivables we sell to those parties in the future and suffer reputational harm in the marketplace for the receivables we sell and our business, results of operations, and financial condition may be adversely affected. We hold receivables we originate on our balance sheet until we sell them to financing partners or in securitization transactions, and to the extent those receivables fail to perform during our holding period, they may become ineligible for sale. As a result, our business, results of operations, and financial condition may be adversely affected.

***Because we rely on internal and external logistics to transport our inventory throughout the United States, we are subject to business risks and costs associated with the transportation industry. Many of these risks and costs are out of our control, and any of them could have a material adverse effect on our business, financial condition, and results of operations.***

We rely on a combination of internal and external logistics to transport vehicles to and from wholesale auctions, IRCs, hubs, vending machines and our customers. As a result, we are exposed to risks associated with the transportation industry such as weather, traffic patterns, gasoline prices, recalls affecting our vehicle fleet, local and federal regulations, vehicular crashes, insufficient internal capacity, rising prices of transportation vendors, fuel prices, taxes, license and registration fees, insurance premiums, self-insurance levels, difficulty in recruiting and retaining qualified drivers, disruption of our technology systems, equipment supply, equipment quality, and increasing equipment and operational costs. Our failure to successfully manage our logistics and fulfillment process could cause a disruption in our inventory supply chain and distribution, which may adversely affect our operating results and financial condition.

***We face a variety of risks associated with the construction, financing, and operation of our inspection and reconditioning centers and vending machines, any of which could adversely affect our financial condition and results of operations.***

We are required to obtain approvals, permits, and licenses from state regulators and local municipalities to construct and operate our IRCs and vending machines. We may face delays in obtaining the requisite approvals, permits, financing, and licenses to construct and operate our IRCs and vending machines, or we may not be able to obtain them at all. If we encounter delays in obtaining or cannot obtain the requisite approvals, permits, financing, and licenses to construct and operate our IRCs and vending machines in desirable locations, our financial condition and results of operations may be adversely affected.

We lease or finance certain real estate on which we construct and operate some of our IRCs and vending machines. Because of potential difficulties finding a replacement tenant due to the uniqueness of our property use, some landlords will have concerns leasing land and allowing the construction of IRCs or vending machines, and some lenders will have concerns financing to a tenant like us. If we are required to enter into inflexible or expensive leases, financing, or purchase agreements to construct and operate our IRCs and vending machines, our financial condition and results of operations may be adversely affected.

We depend on one supplier to construct portions of our vending machines and to provide technical support and maintenance on them. If we are unable to maintain our relationship with our supplier, or our supplier ceases to produce the parts or perform the services we need, or our supplier is unable to effectively deliver services and equipment on timelines and at the price we have negotiated, and we are unable to contract with an alternative supplier, we may not be able to construct new vending machines or continue to operate existing vending machines, and our financial condition and operating results may be adversely affected. Additionally, the durability of our vending machines is unknown and we may be required to incur significant maintenance and other expenses to keep them operating properly. If we are required to incur significant expenses to maintain our vending machines our financial condition and operating results may be adversely affected.

We also rely on vendors and suppliers to construct and operate portions of our IRCs. If we are unable to maintain our relationship with our vendors and suppliers, or such vendors and suppliers cease to provide the services we need, or such vendors and suppliers are unable to effectively deliver our services on timelines and at the price we have negotiated, and we are

29

unable to contract with alternative vendors and suppliers, our ability to construct new IRCs or continue to operate existing IRCs and our financial condition and operating results may be adversely affected.

***We may rely on agreements with lenders or institutional real estate investors to finance certain vending machines and inspection and reconditioning centers. If we fail to create or maintain adequate relationships with lenders or investors to finance such assets, we may be unable to construct and operate additional vending machines and inspection and reconditioning centers in the future, which would adversely affect our business and results of operations.***

We currently rely on agreements with lenders or institutional real estate investors to finance certain real estate capital expenditures, including vending machines and IRCs, and may continue to do so in the future. If we are unable to enter into new financing agreements for such assets on favorable terms or at all, whether because of our financial and operating performance or for other reasons, our ability to construct and operate additional IRCs and vending machines would be adversely affected. New funding arrangements may be at higher interest rates than historical real estate financing or contain other less favorable terms. If realized, these financing risks, in addition to rising interest rates and changes in market conditions, could negatively impact our results of operations and financial condition.

***We collect, process, store, share, disclose, and use personal information and other data. Our actual or perceived failure to protect such information and data, comply with privacy-related requirements, mitigate data loss, and/or prevent a cybersecurity or other incident could damage our reputation and harm our business and operating results.***

We collect, process, store, share, disclose, and use sensitive information and other data provided by consumers, employees, and business partners, including personally identifying information. We use encryption and authentication technology licensed from third parties to securely transmit and store such information. We also share this information with third parties, including third-party service providers as part of our business operations. We expend significant resources to protect against both internal and external security breaches and may need to expend more resources depending upon, for example, changes in the dynamic cybersecurity climate, expected growth of our company, new or changing business ventures or practices, and/or in the event we need to address problems caused by breaches. Any failure or perceived failure to maintain the security of personal and other data that is provided to us by consumers, employees, and vendors could harm our reputation and expose us to a risk of loss or litigation, regulatory scrutiny, and possible liability, any of which could adversely affect our business and operating results.

Additionally, concerns about how we collect, protect, store, use, or disclose personal information, or other privacy related matters, even if unfounded, could harm our business and operating results.

We are subject to numerous and rapidly evolving federal, state, and local laws regarding privacy, cybersecurity and the collection, use, and disclosure of personal information and other data. The laws are subject to differing interpretations, and both the laws and their interpretations are often inconsistent across jurisdictions. For example, the California Consumer Privacy Act, as amended by the California Privacy Rights Act (the "CCPA") gives California residents expanded rights to manage their personal information, such as rights to: access and delete their personal information, opt out of certain personal information sharing, and receive detailed information regarding the way in which their personal information is used. Regulations such as the CCPA can expose us to investigations and enforcement actions by regulatory authorities and claims from individuals potentially resulting in penalties and significant legal liability, if our data management and information technology security efforts are inadequate or even alleged to be inadequate. In addition, cybersecurity has become a top priority for regulators around the world, and some jurisdictions have enacted laws requiring companies to notify individuals of data security breaches involving certain types of personal data. In the United States, the SEC has proposed rules for mandatory disclosure of cybersecurity incidents suffered by public companies and cybersecurity governance and risk management. If we fail to comply with the relevant laws and regulations, we could suffer financial loss, a disruption of our business, liability to investors, regulatory intervention or reputational damage. We are also subject to contractual requirements and others' privacy policies that govern how we use and protect personal information and other data. They may be costly to comply with, and may conflict with other contractual obligations, laws, regulations, or rules. These obligations may be interpreted and applied in new ways or in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules, obligations, or our practices. New regulations could be enacted. Any failure or perceived failure by us to comply with our privacy policies, our privacy- or cybersecurity-related obligations to consumers, employees, or other third parties, or our privacy- or cybersecurity-related legal obligations, or any compromise generally of security that results in the unauthorized release or transfer of sensitive information, which may include personally identifiable information or other customer or employee data, may result in governmental enforcement actions, litigation, provision of required notifications to consumers, regulators, or other authorities, or public statements against us by consumer advocacy groups or others and could cause consumers, employees, commercial partners, securitization or real estate investors, and receivable or real estate financing partners to lose trust in us, which could have an adverse effect on our business. If commercial partners, developers, or other parties that we work with violate applicable laws, contractual assurances with us, or our policies, such violations may also put consumers', employees', commercial partners', or receivable financing partners' information at risk and could in turn harm our reputation, business, and operating results.

30

***A significant disruption in service on our website or mobile application on any medium could damage our reputation and result in a loss of consumers, which could harm our business, brand, operating results, and financial condition.***

Our brand, reputation, and ability to attract consumers depend on the reliable performance of our website and mobile application and the supporting systems, technology, and infrastructure. We may experience significant interruptions to our systems in the future. Interruptions in these systems, whether due to system failures, programming or configuration errors, computer viruses, or physical or electronic break-ins, including from ransomware or distributed denial of service attacks could limit the availability of our inventory on our website and mobile application and prevent or inhibit consumers from accessing our website or mobile application. Problems with the reliability or security of our systems could harm our reputation, result in a loss of customers and result in additional costs.

Substantially all of the communications, network, and computer hardware used to operate our website and mobile application are located at co-location facilities. Although we have multiple locations, our systems are not fully redundant. In addition, we do not own or control the operation of these facilities. Our systems and operations are vulnerable to damage or interruption from fire, flood, power loss, telecommunications failure, terrorist attacks, acts of war, electronic and physical break-ins, computer viruses, earthquakes, and similar events. The occurrence of any of these events could damage our systems and hardware or could cause them to fail.

Problems faced by our web-hosting providers could adversely affect the experience of our customers. For example, our web-hosting providers could close their facilities without adequate notice or suffer interruptions in service caused by cyber-attacks, natural disasters or other phenomena. Any financial difficulties, including bankruptcy, faced by our web-hosting providers or any of the service providers with whom they contract may have negative effects on our business, the nature and extent of which are difficult to predict. If our web-hosting providers are unable to keep up with our growing capacity needs, our business could be harmed.

Any errors, defects, disruptions, or other performance or reliability problems with our network operations could interrupt our customers' physical or electronic access to our inventory and our access to data that drives our inventory purchase operations as well as cause delays and additional expense in arranging access to new facilities and services, any of which could harm our reputation, business, operating results, and financial condition.

***Failure to adequately protect our intellectual property, technology, and confidential information could reduce our competitiveness and harm our business and operating results.***

Our business depends on our intellectual property, technology, and confidential information, the protection of which is crucial to the success of our business. For example, we have developed proprietary algorithms to price the vehicles we purchase and sell, to determine the financing terms we offer customers, and to power our in-house logistics network. Our intellectual property also includes, but is not limited to: inventions (whether or not patentable), the content of our website, mobile applications, registered and unregistered trademarks and trade dress rights, registered domain names, our photography technology, artificial intelligence technology, and our vending machine design and technology. We rely on a combination of patents, trademarks, trade secrets, copyrights, and contractual restrictions to protect these algorithms and our other intellectual property, technology, and confidential information. In addition, we attempt to protect our intellectual property, technology, and confidential information by requiring most of our employees and consultants to enter into confidentiality and invention assignment agreements and certain third parties to enter into nondisclosure agreements. These agreements may not effectively grant all necessary rights to any inventions that may have been developed by the employees and consultants. In addition, these agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property, or technology, and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information, intellectual property, or technology. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our website or mobile application features, software, and functionality, or to obtain and use information that we consider proprietary. Changes in the law or adverse court rulings may also limit the scope of our rights and inhibit us from preventing others from using our technology.

We currently hold rights to the "carvana.com" internet domain name and various other related domain names. The regulation of domain names in the United States is subject to change. Regulatory bodies could establish additional top-level domains, appoint additional domain name registrars, or modify the requirements for holding domain names. As a result, we may not be able to acquire or maintain all domain names that use the name Carvana or are otherwise important for our business.

31

***We may be subject to claims that our employees, consultants, or advisors have wrongfully used or disclosed trade secrets or other intellectual property or proprietary information of their current or former employers, or claims asserting ownership of what we regard as our own intellectual property.***

Although we try to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or those who work for us have used or disclosed trade secrets or other intellectual property or proprietary information of their current or former employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, we may have to pay monetary damages and lose valuable intellectual property rights or personnel. Even if we are successful in defending against such claims, litigation could result in substantial costs, harm our reputation, and be a distraction to management.

In addition, while it is our policy to require our employees and contractors who may be involved in the conception or development of intellectual property to execute agreements assigning such intellectual property to us, we may be unsuccessful in executing such an agreement with each party who conceives or develops intellectual property that we regard as our own. The assignment of intellectual property may not be self-executing, may not be enforceable in certain jurisdictions or may be breached, and we may be forced to bring claims against third parties or defend claims that they may bring against us to determine the ownership of what we regard as our intellectual property. This could be costly, and if we are unsuccessful, we may not be able to prevent others from using our technology, and may not be able to use it ourselves.

***We may become involved in lawsuits to defend ourselves against intellectual property disputes, which could be expensive and time consuming, and ultimately unsuccessful, and could result in the diversion of significant resources, and hinder our ability to commercialize our existing or future products.***

Our success depends in part on not infringing patents or violating other intellectual property rights of others. Intellectual property disputes can be costly to settle or defend and may cause our business, operating results and financial condition to suffer. Significant litigation regarding patent and trademark rights occurs in the e-commerce industry. Whether merited or not, it is possible that U.S. patents, pending patent applications, and trademarks controlled by third parties may be alleged to cover our products, branding, and other activities. Our competitors, many of which have substantially greater resources and have made substantial investments in patent portfolios and competing technologies, may have applied for or obtained or may in the future apply for and obtain patents that prevent, limit, or otherwise interfere with our ability to use our technology or processes that are necessary to operate our business. Our competitors may have one or more patents for which they can threaten or initiate patent infringement actions against us or any of our suppliers. From time to time and in the ordinary course of business, we may develop non-infringement or invalidity positions with respect to the patents of others, which may not be accepted by a judge or jury if such patents were asserted against us. Our ability to defend ourselves or our suppliers may be limited by our financial and human resources, the availability of reasonable defenses, and the ultimate acceptance of our defenses by the courts or juries. Furthermore, if such patents or trademark rights are successfully enforced against us, this may result in an adverse impact on our business, including injunctions, damages, and attorneys' fees.

We may, and occasionally in the ordinary course do receive communications alleging infringement of patents, trademarks, copyrights, or other intellectual property rights or misappropriation of trade secrets, or offering licenses to such intellectual property. Any claims that we assert against perceived infringers could also provoke these parties to assert counterclaims against us alleging that we infringe their intellectual property rights. At any given time, we may be involved as either a plaintiff or a defendant in a number of intellectual property actions, the outcomes of which may not be known for prolonged periods of time.

The large number of patents, the rapid rate of new patent applications and issuances, the complexities of the technologies involved, our potential expansion into new business lines and technologies, and the uncertainty of litigation significantly increase the risks related to any patent litigation. Furthermore, as the number of participants in our industry grows, the possibility of intellectual property infringement claims against us increases. Any litigation or claim against us, even those without merit, may cause us to incur substantial costs, and could place a significant strain on our financial resources, divert the attention of management and other resources from our core business and harm our reputation. Any potential intellectual property litigation also could force us to do one or more of the following:

- stop using the technology, content, branding or processes that use the disputed intellectual property necessary to operate our business and sell our products;

- obtain a license from the intellectual property owner to continue using technology or processes necessary to operate our business or sell our products, which license may require substantial royalty payments and may not be available on commercially reasonable terms, or at all;

- incur significant expenses and legal fees;

32

- pay substantial damages or royalties to the party whose intellectual property rights we are alleged to be infringing, potentially including treble damages if the court finds that the infringement was willful;
- pay substantial royalties, upfront fees, or grant cross-licenses to intellectual property rights for our products and services;
- find a non-infringing substitute product or technology, which could be costly and create significant delay in our operations; or
- redesign those products, technologies or processes that infringe any intellectual property, which could be costly, disruptive, or infeasible.

***Our platform utilizes open source software, and any failure to comply with the terms of these open source licenses could negatively affect our business.***

We use open source software in our platform and expect to use open source software in the future. The terms of various open source licenses have not been interpreted by United States courts, and there is a risk that such licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to market our platform. By the terms of certain open source licenses, we could be required to release the source code of our proprietary software and to make our proprietary software available under open source licenses if we combine our proprietary software with open source software in a certain manner. In the event that portions of our proprietary software are determined to be subject to an open source license, we could be required to publicly release the affected portions of our source code, to re-engineer all or a portion of our technologies, or otherwise to be limited in the use or licensing of our technologies, each of which could reduce or eliminate the value of our technologies and services. In addition to risks related to license requirements, usage of open source software can lead to greater risks than use of commercial software, as open source licensors generally do not provide warranties or controls on the origin of the software. Many of the risks associated with usage of open source software cannot be eliminated and could negatively affect our business and operating results.

***Our business is sensitive to conditions affecting automotive manufacturers, including manufacturer recalls.***

Adverse conditions affecting one or more automotive manufacturers could have a material adverse effect on our sales and results of operations and could impact the supply of vehicles. Manufacturer recalls are a common occurrence that have accelerated in frequency and scope in recent years. Recalls and the increased regulatory scrutiny surrounding selling used vehicles with open safety recalls could adversely affect used vehicle sales or valuations, could cause us to temporarily remove vehicles from inventory, could cause us to sell affected vehicles at a loss, could force us to incur increased costs, and could expose us to litigation and adverse publicity related to the sale of recalled vehicles, which could have a material adverse effect on our business, financial condition, and results of operations.

***We rely on third-party technology to complete critical business functions. If that technology fails to adequately serve our needs and we cannot find alternatives, it may negatively impact our operating results.***

We rely on third-party technology for certain of our critical business functions, including supply chain and inventory management, customer identity verification, transportation fleet telemetry, network infrastructure for hosting the website and mobile application, inventory data, software libraries, development environments and tools, services to allow customers to digitally sign contracts, customer service call center management software, automation controls and software for our vending machines, hosted telephony, human resource management, and security. If these technologies fail or we cannot maintain our relationships with the technology providers and we cannot find suitable alternatives, our financial condition and operation results may be adversely affected.

***We depend on key personnel to operate our business. If we are unable to retain, attract and integrate qualified personnel, our ability to develop and successfully grow our business could be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our executives and employees. Our future success depends on our ability to attract, develop, motivate, and retain highly qualified and skilled employees. Qualified individuals are in high demand, and we may incur significant costs to attract and retain them. In addition, the loss of any of our key employees or senior management, including our Chief Executive Officer, Ernest Garcia III, our Chief Financial Officer, Mark Jenkins, and our Chief Operating Officer, Benjamin Huston, could materially adversely affect our ability to execute our business plan and strategy, and we may not be able to find adequate replacements on a timely basis, or at all. Our executive officers and other employees are at-will employees, which means they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. We may not be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting

---

33

well-qualified employees or retaining and motivating existing employees, our business could be materially and adversely affected.

***Our minority equity investment in Root, Inc. may result in us receiving or retaining less than the amount of benefit we might otherwise expect to receive from such investment, and adversely impact our results of operations and financial condition.***

We hold a minority equity investment in Root, Inc. (NASDAQ: ROOT, "Root"). As a minority equity investor, our influence over Root is limited. As a result, we may be unable to influence Root's business plan, assure quality control, or set the timing and pace of development. Our inability to control the operations or management of Root may result in us receiving or retaining less than the amount of benefit we might otherwise expect to receive from such investment. We may also be unable to cause Root to effect significant transactions such as large expenditures or contractual commitments, the development of insurance products, or the borrowing of money. We may be limited in our ability to monetize or exit our investment in Root given contractual restrictions on selling our investment and uncertainty in the trading market for Root's equity securities. A downward adjustment to or impairment of this equity investment could adversely impact our results of operations and financial condition.

***We have and may continue to acquire other companies or technologies, which could divert our management's attention, result in additional dilution to our stockholders and otherwise disrupt our operations and harm our operating results.***

Our success will depend, in part, on our ability to grow our business in response to the demands of consumers, other constituents within the automotive industry, and competitive pressures. In the past, we have occasionally done so by acquiring complementary businesses and technologies rather than through internal development, and we may do so again in the future. The identification of suitable acquisition candidates can be difficult, time-consuming, and costly, and we may not be able to successfully complete identified acquisitions. The risks we face in connection with acquisitions include:

- diversion of management time and focus from operating our business to addressing acquisition integration challenges;

- coordination of technology, research and development, and sales and marketing functions;

- transition of the acquired company's users to our website and mobile application;

- retention of employees from the acquired company;

- cultural challenges associated with integrating employees from the acquired company into our organization;

- integration of the acquired company's accounting, management information, human resources, and other administrative systems;

- the need to implement or improve controls, policies, and procedures at a business that, prior to the acquisition, may have lacked effective controls, policies, and procedures;

- potential write-offs of intangibles or other assets acquired in such transactions that may have an adverse effect on our operating results;

- liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, violations of laws, commercial disputes, tax liabilities, and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired company, including claims from terminated employees, consumers, former investors, or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and investments could cause us to fail to realize the anticipated benefits of these acquisitions or investments, cause us to incur unanticipated liabilities, and otherwise harm our business. Future acquisitions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, amortization expenses, or the write-off of goodwill, any of which could harm our financial condition. Any of these risks, if realized, could materially and adversely affect our business, financial condition, and results of operations.

***We are, and may in the future be, subject to legal proceedings in the ordinary course of our business. If the outcomes of these proceedings are unfavorable to us, it could have a material adverse effect on our business, results of operations, and financial condition.***

We are subject to various litigation matters from time to time, which could have a material adverse effect on our business, results of operations and financial condition. Legal claims could be asserted against us by individuals, either individually or through class actions, by governmental entities in civil or criminal investigations and proceedings or by other entities. These

claims could be asserted under a variety of laws, including but not limited to consumer finance laws; consumer protection laws; laws governing motor vehicle dealers; laws, regulations, and systems and process requirements related to title and registration; state laws regulating the sale of motor vehicles and related products and services; intellectual property laws; privacy laws; labor and employment laws; securities laws; employee benefit laws; tax laws; contract laws; and tort laws. These actions have in the past and could in the future expose us to adverse publicity and to substantial monetary damages and legal defense costs, injunctive relief and criminal and civil fines and penalties, including but not limited to suspension or revocation of licenses to conduct business.

**Risks Related to Our Organizational Structure**

***Our principal asset is our indirect interest in Carvana Group, and, accordingly, we depend on distributions from Carvana Group to pay our taxes and expenses, including payments under the 2025, 2027, 2028, 2029, and 2030 Notes and Tax Receivable Agreement. Carvana Group's ability to make such distributions may be subject to various limitations and restrictions.***

We are a holding company and have no material assets other than our indirect ownership of LLC Units of Carvana Group. As such, we have no independent means of generating revenue or cash flow, and our ability to pay our taxes, debt obligations, and operating expenses depends on the financial results and cash flows of Carvana Group and its subsidiaries and distributions we receive from Carvana Group. These taxes, obligations, and expenses include the following:

*Taxes.* Carvana Group is treated as a partnership for U.S. federal income tax purposes and, as such, is not subject to any entity-level U.S. federal income tax. Instead, taxable income of Carvana Group is allocated to the LLC Unitholders, including Carvana Sub, our wholly owned subsidiary. Accordingly, we incur income taxes on our allocable share of any net taxable income of Carvana Group. Under the terms of the LLC Agreement (as defined in Note 1—Business Organization), Carvana Group is obligated to make tax distributions to LLC Unitholders, including us.

*Debt obligations.* We have payment obligations under our 2025, 2027, 2028, 2029, and 2030 Notes (detailed in Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" and Note 10—Debt Instruments—Long Term Debt). Under the terms of the LLC Agreement, Carvana Group is obligated to make distributions to us for the payment of obligations under these notes.

*Operating expenses and other expenses.* We also incur expenses related to our operations, including payments under the Tax Receivable Agreement (as defined in Note 15—Income Taxes). Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we may realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Under the terms of the LLC Agreement, Carvana Group is obligated to make distributions to us for our payment obligations under the Tax Receivable Agreement.

While we intend to cause Carvana Group to make distributions to us in an amount sufficient to fund these taxes, obligations, and expenses, Carvana Group's ability to make such distributions may be subject to various limitations and restrictions, such as restrictions on distributions that would either violate any contract or agreement to which Carvana Group is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering Carvana Group insolvent. If we do not have sufficient funds to pay taxes, obligations or expenses, we may have to borrow funds, which could materially adversely affect our liquidity and financial condition and subject us to various restrictions imposed by any such lenders. If we are unable to make payments under the Tax Receivable Agreement, those payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds.

***Conflicts of interest could arise between our stockholders and the LLC Unitholders, which may impede business decisions that could benefit our stockholders.***

Holders of LLC Units have the right to consent to certain amendments to the LLC Agreement, as well as to certain other matters, including the revaluation of partnership interests in Carvana Group. Holders of these voting rights may exercise them in a manner that conflicts with the interests of our stockholders. Circumstances may arise in the future when the interests of the LLC Unitholders conflict with the interests of our stockholders. As we control Carvana Group, we have certain obligations to the LLC Unitholders that may conflict with fiduciary duties our officers and directors owe to our stockholders. These conflicts may result in decisions that are not in the best interests of stockholders.

*We are a "controlled company" within the meaning of the rules of the NYSE and, as a result, we qualify for exemptions from certain corporate governance requirements. Our stockholders do not have the same protections afforded to stockholders of companies that are subject to such requirements.*

The Garcia Parties continue to control a majority of the combined voting power of Carvana Co. As a result, we continue to be a controlled company within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and need not comply with certain requirements, including the requirement that a majority of the Board consist of independent directors and the requirements that our compensation and nominating and governance committees be composed entirely of independent directors. We do not intend to utilize these exemptions; however, for so long as we qualify as a controlled company, we will maintain the option to utilize some or all of these exemptions. If we utilize these exemptions, we may not have a majority of independent directors and our compensation and nominating and governance committees may not consist entirely of independent directors, and such committees will not be subject to annual performance evaluations. Accordingly, in the event we rely on these exemptions in the future, our stockholders would not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE.

*The Tax Receivable Agreement with the LLC Unitholders requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that the payments we will be required to make will be substantial.*

In connection with the consummation of our IPO, we entered into a Tax Receivable Agreement with the LLC Unitholders. Pursuant to the Tax Receivable Agreement, we will be required to make cash payments to such LLC Unitholders equal to 85% of the tax benefits, if any, that we actually realize, or, in some circumstances, are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of any future exchanges of LLC Units held by the LLC Unitholders for shares of our Class A common stock or cash, and (2) certain other tax benefits related to payments we make under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, which tax reporting positions will be based on the advice of our tax advisors. Any payments made by us to the LLC Unitholders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make payments under the Tax Receivable Agreement, such payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that may be deemed realized under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are also not conditioned upon the LLC Unitholders maintaining a continued ownership interest in Carvana Group.

The actual amount and timing of any payments under the Tax Receivable Agreement will vary depending upon a number of factors, including the timing of exchanges by the LLC Unitholders, the amount of gain recognized by such LLC Unitholders, the amount and timing of the taxable income we generate in the future and the federal tax rates then applicable.

*The amounts that we may be required to pay to the LLC Unitholders under the Tax Receivable Agreement may be accelerated in certain circumstances and may also significantly exceed the actual tax benefits that we ultimately realize.*

The Tax Receivable Agreement provides that if (1) certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, (2) we breach any of our material obligations under the Tax Receivable Agreement or (3) we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, to make payments under the Tax Receivable Agreement would accelerate and become immediately due and payable. The amount due and payable in that circumstance is based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

36

As a result of a change in control or our election to terminate the Tax Receivable Agreement early, (1) we could be required to make cash payments to the LLC Unitholders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement and (2) we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring, or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

***Certain benefits from our organizational structure, including the Tax Receivable Agreement, will not benefit Class A common stockholders to the same extent as they will benefit the LLC Unitholders.***

Certain benefits from our organizational structure, including the Tax Receivable Agreement, will not benefit the holders of our Class A common stock to the same extent as LLC Unitholders. We entered into a Tax Receivable Agreement with the LLC Unitholders, which will provide for the payment by us to the LLC Unitholders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of any future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash and (2) certain other tax benefits related to our making payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Although we will retain 15% of the amount of such tax benefits, this and other aspects of our organizational structure may adversely impact the trading market for the Class A common stock.

***We will not be reimbursed for any payments made to the LLC Unitholders under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

We will not be reimbursed for any cash payments previously made to the LLC Unitholders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to an LLC Unitholder will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we are required to make under the terms of the Tax Receivable Agreement and, as a result, there may not be future cash payments to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will agree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings.

***We may not be able to realize all or a portion of the tax benefits that are currently expected to result from future exchanges of LLC Units for our Class A common stock and from payments made under the Tax Receivable Agreement.***

Our ability to realize the tax benefits that we currently expect to be available as a result of the increases in tax basis created by any future exchanges of LLC Units (together with shares of our Class B common stock in the case of certain Class A Units) for our Class A common stock, the payments made pursuant to the Tax Receivable Agreement, and the interest deductions imputed under the Tax Receivable Agreement all depend on a number of assumptions, including that we earn sufficient taxable income each year during the period over which such deductions are available and that there are no changes in applicable law or regulations. For example, the reduction in corporate tax rates pursuant to the 2017 changes in U.S. federal income tax law has the effect of reducing the expected value of the tax benefits we realize as a result of the increase in our proportionate share of the existing tax basis of the assets of Carvana Group arising from future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash. The reduction in the value of such tax benefits is expected to have two primary consequences—it reduces the cash payments we expect to be required to make pursuant to the Tax Receivable Agreement and it reduces the expected value to us of the 15% of the amount of such tax benefits that we will retain pursuant to the Tax Receivable Agreement. Additionally, if our actual taxable income were insufficient or there were additional adverse changes in applicable laws or regulations, we may be further unable to realize all or a portion of the expected tax benefits and our cash flows and stockholders' equity (deficit) could be negatively affected.

37

*Our net operating loss carryforwards could be substantially limited if we experience an ownership change as defined in the Internal Revenue Code.*

Based on our historical financial performance, we have generated a federal net operating loss ("NOL") carryforward of $1.8 billion through the year ended December 31, 2022, and we may generate NOL carryforwards in future years.

Section 382 of the United States Internal Revenue Code of 1986, as amended (the "Code"), contains rules that limit the ability of a company that undergoes an "ownership change" to utilize its NOL carryforwards and certain built-in losses recognized in years after the ownership change. A company generally experiences an ownership change if the percentage of the value of its stock owned by certain "5-percent shareholders," as such term is defined in Section 382 of the Code, increases by more than 50 percentage points over a rolling three-year period. These rules generally operate by focusing on ownership shifts among stockholders owning directly or indirectly 5% or more of the stock of a company and any change in ownership arising from a new issuance of stock by the company.

If we undergo an ownership change for purposes of Section 382 of the Code as a result of future transactions involving our stock, including purchases or sales of stock by current or future 5% shareholders or new issuance of stock by the Company, our ability to use our NOL carryforwards and to recognize certain built-in losses would be subject to the limitations of Section 382 of the Code. Depending on the resulting limitation, a significant portion of our NOL carryforwards could expire before we would be able to use them or could be significantly delayed in their application to offsetting income. A limitation imposed under Section 382 of the Code on our ability to utilize our NOL carryforwards could have a negative impact on our financial position and results of operations.

We have entered into a Section 382 Rights Agreement (the "Tax Asset Preservation Plan") designed to preserve shareholder value and the value of certain tax assets primarily associated with NOL carryforwards and built-in losses under Section 382 of the Code. See "The Tax Asset Preservation Plan the Company implemented to protect our tax attributes could hinder the market for our Class A common stock."

*In certain circumstances, Carvana Group will be required to make distributions to us and the LLC Unitholders and the distributions may be substantial.*

Carvana Group is treated as a partnership for U.S. federal income tax purposes and, as such, is not subject to U.S. federal income tax. Instead, taxable income is allocated to its members, including us. We intend to cause Carvana Group to make tax distributions quarterly to the holders of Class A Units (including us) on a pro rata basis based on Carvana Group's net taxable income and to the holders of Class B Units based on such holder's allocable share of Carvana Group's net taxable income (rather than on a pro rata basis). Funds used by Carvana Group to satisfy its tax distribution obligations will not be available for reinvestment in our business. Moreover, these tax distributions may be substantial, and will likely exceed (as a percentage of Carvana Group's income) the overall effective tax rate applicable to a similarly situated corporate taxpayer. As a result of the potential differences in the amount of net taxable income allocable to us and the LLC Unitholders, particularly in light of the reduction in corporate tax rates passed in 2017, it is possible that we will receive distributions significantly in excess of our tax liabilities and obligations to make payments under the Tax Receivable Agreement. To the extent we do not distribute such cash balances as dividends on our Class A common stock and instead, for example, hold such cash balances or lend them to Carvana Group, the LLC Unitholders would benefit from any value attributable to such accumulated cash balances as a result of its ownership of Class A common stock following an exchange of its LLC Units (including any exchange upon an acquisition of us).

*If we were deemed to be an investment company under the Investment Company Act of 1940, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations.*

Under Sections 3(a)(1)(A) and (C) of the 1940 Act, a company generally will be deemed to be an "investment company" for purposes of the 1940 Act if it (1) is, or holds itself out as being, engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities or (2) is engaged, or proposes to engage, in the business of investing, reinvesting, owning, holding, or trading in securities and it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We do not believe that we are an investment company, as such term is defined in either of those sections of the 1940 Act.

As the sole managing-member of Carvana Sub, we control and manage Carvana Sub, which, by virtue of being the sole managing-member of Carvana Group, in turn, controls and manages Carvana Group. On that basis, we believe that neither our

interest in Carvana Sub nor Carvana Sub's interest in Carvana Group are "investment securities" under the 1940 Act. Therefore, we have less than 40% of the value of our total assets (exclusive of U.S. government securities and cash items) in "investment securities." However, if we were to lose the right to manage and control Carvana Sub or if Carvana Sub were to lose the right to manage and control Carvana Group, interests in Carvana Group or Carvana Sub could be deemed to be "investment securities" under the 1940 Act.

We intend to conduct our operations so that we will not be deemed to be an investment company. However, if we were deemed to be an investment company, restrictions imposed by the 1940 Act, including limitations on our capital structure and our ability to transact with affiliates, could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition, and results of operations.

**Risks Related to Our Liquidity**

***Our substantial indebtedness could adversely affect our financial flexibility and our competitive position and prevent us from fulfilling our obligations under our credit agreement.***

As of December 31, 2022, we had outstanding, on a consolidated basis (1) $5.7 billion aggregate principal amount of our 2025, 2027, 2028, 2029, and 2030 Notes, (2) $1.5 billion aggregate principal amount of borrowings under our amended and restated vehicle inventory financing and security agreement with Ally Financial, effective September 22, 2022 (the "12-Month Floor Plan Facility") and the Finance Receivable Facilities (as defined below), (3) $374 million aggregate principal amount of indebtedness represented by our finance lease agreements between us and providers of equipment financing, (4) $3 million aggregate principal amount of indebtedness represented by our promissory note agreements between us and providers of equipment financing, and (5) an outstanding balance of $268 million relating to secured borrowing facility through which we finance certain retained beneficial interests in our securitizations. Also, as of December 31, 2022, we had, on a consolidated basis, $486 million of other long-term debt related to our sale leaseback transactions. Our substantial indebtedness could have significant effects on our business. For example, it could:

- make it more difficult for us to satisfy our obligations with respect to our current and future indebtedness, including our 2025, 2027, 2028, 2029, and 2030 Notes and the Floor Plan Facilities;

- increase our vulnerability to adverse changes in prevailing economic, industry, and competitive conditions;

- require us to dedicate a substantial portion of our cash flow from operations to make payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions, the execution of our business strategy, and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- increase our cost of borrowing;

- restrict us from exploiting business opportunities;

- place us at a disadvantage compared to our competitors that have fewer debt obligations; and

- limit our ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy, and other general corporate purposes.

We expect to use cash flow from operations to meet current and future financial obligations, including funding our operations, debt service requirements, and capital expenditures. The ability to make these payments depends on our financial and operating performance, which is subject to prevailing economic, industry, and competitive conditions, including the interest rate environment, and to certain financial, business, economic, and other factors beyond our control.

***Despite current indebtedness levels, we may incur substantially more indebtedness, which could further exacerbate the risks associated with our substantial indebtedness.***

We may incur significant additional indebtedness in the future. We may also consider investments in joint ventures or acquisitions, which may increase our indebtedness. If new debt is added to our currently anticipated indebtedness levels, the related risks that we face could intensify.

*We may not be able to generate sufficient cash flow to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under such indebtedness, which may not be successful, or may harm our business.*

Our ability to make scheduled payments or to refinance outstanding debt obligations depends on our financial and operating performance, which will be affected by prevailing economic, industry, and competitive conditions and by financial, business, and other factors beyond our control. Additionally, some of our debt accrues interest at a variable rate that is based on LIBOR or other market rates; if those market rates rise, so too will the amount we need to pay to satisfy our debt obligations. We may not be able to maintain a sufficient level of cash flow from operating activities to permit us to pay the principal, premium, if any, and interest on our indebtedness. Any failure to make payments of interest and principal on our outstanding indebtedness on a timely basis would likely result in a reduction of our credit rating, which would also adversely affect our ability to incur additional indebtedness.

We may not be able to refinance any of our indebtedness on commercially reasonable terms or at all. Additionally, in the future we may need to obtain additional financing from banks or other lenders, through public offerings or private placements of debt or equity, through strategic relationships or other arrangements, or from a combination of these sources. If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or seek to restructure or refinance our indebtedness. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants. These alternative measures may not be successful, and we may be unable to meet our scheduled debt service obligations.

In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to sell material assets or operations to attempt to meet our debt service obligations. We may not be able to consummate these asset sales to raise capital or sell assets at prices and on terms that we believe are fair, and any proceeds that we do receive may not be adequate to meet any debt service obligations then due. If we cannot meet our debt service obligations, the holders of our indebtedness may accelerate such indebtedness and, to the extent such indebtedness is secured, foreclose on our assets. In such an event, we may not have sufficient assets to repay our indebtedness. If any of these risks are realized, our business and financial condition would be adversely affected.

*The phase-out of the London Interbank Offered Rate (LIBOR), or the replacement of LIBOR with a different reference rate, may adversely affect interest rates.*

On March 5, 2021, the administrator for LIBOR announced that it will permanently cease to publish most LIBOR settings beginning on January 1, 2022 and cease to publish the overnight, one-month, three-month, six-month, and 12-month LIBOR settings on July 1, 2023. On December 16, 2022, the Federal Reserve Board announced the adoption of a final rule that implements the Adjustable Interest Rate (LIBOR) Act by identifying benchmark rates based on SOFR that will replace LIBOR automatically on July 2, 2023 in financial contracts where a specific benchmark replacement has not already been determined. The replacement of LIBOR with SOFR may adversely affect interest rates and result in higher borrowing costs. This could materially and adversely affect our results of operations, cash flows, and liquidity. We cannot predict the effect of the discontinuance of LIBOR or the use of SOFR. We have been amending contracts and may need to amend other contracts or enter into new ones to reflect this change, which may result in an increase to our interest expense.

*Changes in capital markets could adversely affect our business, sales, results of operations, and financial condition.*

Changes in the availability or cost of the financing to support the origination and sale of automotive finance receivables could adversely affect sales and results of operations. Among other programs, we may use securitization programs to fund many automotive finance receivables we originate. Changes in the condition of the securitization market could lead us to incur higher costs to access funds in this market or require us to seek alternative means to finance those originations that could be more expensive, which could have a material adverse effect on our business, sales, and results of operations.

*We may experience greater credit losses or prepayments in any interests we hold in automotive finance receivables than we anticipate.*

Until we sell automotive finance receivables, and to the extent we retain interests in automotive finance receivables, including as a result of economic slowdown or recession, after we sell them, whether pursuant to securitization transactions or otherwise, we are exposed to the risk that applicable customers will be unable or unwilling to repay their loans according to their terms and that the vehicle collateral securing the payment of their loans may not be sufficient to ensure full repayment. Credit losses are inherent in the automotive finance receivables business and could have a material adverse effect on our results of operations.

40

We make various assumptions and judgments about the automotive finance receivables we originate and may provide an allowance for loan losses, value beneficial ownership interests, and estimate prepayment rates based on a number of factors. Although management may establish an allowance for loan losses, value beneficial ownership interests, and estimate prepayment rates based on analysis it believes is appropriate, this may not be adequate. For example, if economic conditions were to deteriorate unexpectedly, additional loan losses not incorporated in the existing allowance or valuation may occur. Losses or prepayments in excess of expectations could have a material adverse effect on our business, results of operations, and financial condition.

***Our securitizations may expose us to financing and other risks, and there can be no assurance that we will be able to access the securitization market in the future, which may require us to seek more costly financing.***

We have securitized, and may in the future securitize, certain of our automotive finance receivables to generate cash. In such transactions, we convey a pool of automotive finance receivables to a special purpose vehicle, typically a trust that, in turn, issues certain securities. The securities issued by the special purpose vehicle are collateralized by the pool of automotive finance receivables. In exchange for the transfer of finance receivables to the special purpose vehicle, we typically receive the cash proceeds from the sale of the securities.

Although we have a demonstrated history of securitizing since 2019, we can give no assurances that we will be able to complete additional securitizations if the securitization markets become constrained. In addition, the value of any securities that we may retain in our securitizations, including securities retained to comply with the Risk Retention Rules (defined below), might be reduced or, in some cases, eliminated as a result of an adverse change in economic conditions or the financial markets. If it is not possible or economical for us to securitize our automobile finance receivables in the future, we would need to seek alternative financing to support our operations and to meet our existing debt obligations, which may be less efficient and more expensive than raising capital via securitizations and may have a material adverse effect on our results of operations, financial condition, and liquidity.

***Risk retention rules may increase our compliance costs, limit our liquidity and otherwise adversely affect our operating results.***

Effective as of December 24, 2016, "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Act (the "Risk Retention Rules") require a "securitizer" or "sponsor" of a securitization transaction to retain, directly or through a "majority-owned affiliate" (each defined in the Risk Retention Rules), in one or more prescribed forms, at least 5% of the credit risk of the securitized assets. For the securitization transactions for which we have acted as "sponsor," we have sought and will likely continue to seek to satisfy the Risk Retention Rules by retaining a "vertical interest" (as defined in the Risk Retention Rules) through either a majority-owned affiliate (MOA) or directly on our balance sheet. In addition, we have and will likely continue to enter into arrangements to finance or monetize a portion of the retained credit risk in one or more prescribed forms under the Risk Retention Rules. In addition to the discussion in this section, see Note 2 — Summary of Significant Accounting Policies and Note 9 — Securitizations and Variable Interest Entities.

We have also participated in other structured finance transactions that we have determined are not securitizations requiring risk retention, and accordingly, we have not sought to comply with any Risk Retention Rules that would be applicable to securitization transactions. The Risk Retention Rules are subject to varying interpretations, and one or more regulatory or governmental authorities could take positions with respect to the Risk Retention Rules that conflict with, or are inconsistent with, the Risk Retention Rules as understood by or interpreted by us, the securitization industry generally, or past or current regulatory or governmental authorities. There can be no assurance that applicable regulatory or governmental authorities will agree with any of our determinations described above, and if such authorities disagree with such determinations, we may be exposed to additional costs and expenses, in addition to potential liability. We have implemented procedures to comply with the Risk Retention Rules (and other related laws and regulations), as currently understood by us. Maintenance and adherence to these procedures may be costly and may adversely affect our operating results.

In addition to the costs generated by our efforts to comply with applicable Risk Retention Rules, which may be significant, compliance with any applicable Risk Retention Rules may require capital, which could potentially have been deployed in other ways that could have generated better value. Holding risk retention interests or loans in contemplation of structured financing increases our exposure to the performance of the loans that underlie or are expected to underlie those transactions. Accordingly, although compliance with applicable Risk Retention Rules would be expected to more closely align our incentives with those of the investors in our loans, it is also expected that poor loan performance may have a heightened adverse effect on the value of our shares. This may exacerbate the negative effects of poor loan performance on the value of our shares.

On October 10, 2022, the Commission to the European Parliament and the Council issued a report on the functioning of the European Union Securitisation Regulation. Among other things, the report clarified that EU institutional investors are required to obtain full and detailed information prescribed by the EU Securitisation Regulation even in relation to third-country securitisations. Although our securitizations are not regulated by the EU, there is a risk that our financing partners who are, or may be, subject to EU oversight may not be able to continue or renew certain financing facilities or purchasing of securitization interests we sponsor until we can provide the required information, which would require time and may come at substantial expense.

**Risks Related to Ownership of our Class A Common Stock**

*Our Class A common stock price has been and may continue to be volatile or may decline regardless of our operating performance.*

Volatility in the market price of our Class A common stock may prevent our stockholders from being able to sell their shares at or above the price they paid for them. The market price of our Class A common stock has fluctuated, and may continue to fluctuate widely due to many factors, some of which may be beyond our control. The closing price of our Class A common stock between January 1, 2022 and January 1, 2023 has ranged from a low of $3.72 to a high of $239.63. Many factors may cause the market price of our Class A common stock to fluctuate significantly, including those described elsewhere in this "Risk Factors" section and this Annual Report on Form 10-K, as well as the following:

- adverse impacts to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues;
- "short squeezes";
- pandemics, including COVID-19, and other crises or disasters;
- our operating and financial performance and prospects;
- our quarterly or annual earnings or those of other companies in our industry compared to market;
- future announcements or press coverage concerning our business or our competitors' businesses;
- the public's reaction to our press releases, other public announcements, and filings with the SEC;
- the size of our public float;
- coverage by or changes in financial estimates by securities analysts or failure to meet their expectations;
- market and industry perception of our success, or lack thereof, in pursuing our growth strategy;
- strategic actions by us or our competitors, such as acquisitions or restructurings;
- changes in laws or regulations which adversely affect our industry or us;
- changes in accounting standards, policies, guidance, interpretations, or principles;
- changes in senior management or key personnel;
- issuances, exchanges or sales, or expected issuances, exchanges, or sales of our capital stock;
- adverse resolution of new or pending litigation against us; and
- changes in general market, economic, and political conditions in the United States and global economies or financial markets, including those resulting from natural disasters, terrorist attacks, acts of war, and responses to such events.

As a result, volatility in the market price of our Class A common stock may prevent investors from being able to sell their Class A common stock at or above their purchase price or at all. These broad market and industry factors may materially reduce the market price of our Class A common stock, regardless of our operating performance. In addition, price volatility may be greater if the public float and trading volume of our Class A common stock is low.

*Short sellers of our stock may be manipulative and may have driven down the market price of our common stock.*

Short selling is the practice of selling securities that the seller does not own but rather has borrowed or intends to borrow from a third party with the intention of buying identical securities at a later date to return to the lender. A short seller hopes to profit from a decline in the value of the securities, as the short seller expects to pay less in the covering purchase than it received in the sale. It is therefore in the short seller's interest for the price of the stock to decline, and some short sellers

publish, or arrange for the publication of, opinions or characterizations regarding the relevant issuer, often involving deliberate misrepresentations of the issuer's business prospects and similar matters calculated to create negative market momentum.

As a public entity in a highly digital world, we have been and in the future may be the subject of concerted efforts by profiteering short sellers to spread misinformation and misrepresentations in order to gain an illegal market advantage. In the past, the publication of intentional misinformation concerning Carvana by a disclosed short seller could be associated with the selling of shares of our common stock in the market on a large scale, resulting in a precipitous decline in the market price per share of our common stock. In addition, the publication of intentional misinformation may also result in lawsuits, the uncertainty and expense of which could adversely impact our business, financial condition, and reputation.

While utilizing all available tools to defend ourselves and our assets against these short seller efforts, there is limited regulatory control, making such efforts an ongoing concern for any public company. While we move forward in our business development strategies in good faith, there are no assurances that we will not face more of these short sellers' efforts or similar tactics by adverse actors in the future, and the market price of our common stock may decline as a result of their actions or the action of other short sellers.

***A "short squeeze" due to a sudden increase in demand for shares of our Class A common stock that largely exceeds supply has led to, and may continue to lead to, extreme price volatility in shares of our Class A common stock.***

Speculation on the price of our Class A common stock may involve long and short exposures. To the extent aggregate short exposure exceeds the number of shares of our Class A common stock available for purchase on the open market, investors with short exposure may have to pay a premium to repurchase shares of our Class A common stock for delivery to lenders of our Class A common stock. Those repurchases may in turn, dramatically increase the price of shares of our Class A common stock until additional shares of our Class A common stock are available for trading or borrowing. This is often referred to as a "short squeeze."

A large proportion of our Class A common stock has been and may continue to be traded by short sellers which may increase the likelihood that our Class A common stock will be the target of a short squeeze. A short squeeze has led and could continue to lead to volatile price movements in shares of our Class A common stock that are unrelated or disproportionate to our operating performance or prospects and, once investors purchase the shares of our Class A common stock necessary to cover their short positions, the price of our Class A common stock may rapidly decline. Investors that purchase shares of our Class A common stock during a short squeeze may lose a significant portion of their investment.

***The Garcia Parties control us and their interests may conflict with our or our stockholders' interests in the future.***

The Garcia Parties together hold approximately 88% of the voting power of our outstanding capital stock through their beneficial ownership of our Class A and Class B common stock as of December 31, 2022. The Garcia Parties are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Our Class A common stock has one vote per share. So long as the Garcia Parties continue to beneficially own a sufficient number of shares of Class B common stock, even if they beneficially own significantly less than 50% of the shares of our outstanding capital stock, the Garcia Parties will continue to be able to effectively control our decisions. For example, if the Garcia Parties hold Class B common stock amounting to 25% of our outstanding capital stock, they would collectively control 72% of the voting power of our capital stock.

As a result, the Garcia Parties have the ability to elect all of the members of our Board and thereby effectively control our policies and operations, including the appointment of management, future issuances of our Class A common stock or other securities, the payment of dividends, if any, on our Class A common stock, the incurrence of debt by us, amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions. The interests of the Garcia Parties may not in all cases be aligned with our stockholders' interests.

In addition, the Garcia Parties can determine the outcome of all matters requiring stockholder approval, cause or prevent a change of control of our company or a change in the composition of our Board, and preclude any acquisition of our company. This concentration of voting control could deprive our stockholders of an opportunity to receive a premium for their shares of Class A common stock as part of a sale of our company and ultimately might affect the market price of our Class A common stock.

In addition, the Garcia Parties may have an interest in pursuing acquisitions, divestitures, and other transactions that, in their judgment, could enhance their investment, even though such transactions might involve risks. For example, the Garcia Parties could cause us to make acquisitions that increase our indebtedness or cause us to sell revenue-generating assets. The Garcia Parties may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. The Garcia Parties control and own substantially all interest in DriveTime, which could compete more directly with us in the future. Our amended and restated certificate of incorporation provides that none of the Garcia Parties or any director who is not employed by us (including any non-employee director who serves as one of our officers in both his or her director and officer capacities) or his or her affiliates has any duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. The Garcia Parties also may pursue acquisition opportunities that may otherwise be complementary to our business, and, as a result, those acquisition opportunities may not be available to us.

***Our stock may be diluted by future issuances of additional Class A common stock or LLC Units in connection with our incentive plans, acquisitions or otherwise; future sales of such shares in the public market or the expectations that such sales may occur could lower our stock price.***

We may issue additional shares of Class A common stock in several ways:

*By the Board*. Our amended and restated certificate of incorporation authorizes us to issue shares of our Class A common stock and options, rights, warrants and appreciation rights relating to our Class A common stock or the consideration of and on the terms and conditions established by our Board in its sole discretion, whether in connection with acquisitions or otherwise.

*Under the Exchange Agreement*. LLC Unitholders may require Carvana Group to redeem all or a portion of their LLC Units in exchange for, at our election, (1) a cash payment by Carvana Group or (2) newly issued shares of Class A common stock, in each case in accordance with the terms and conditions of the Exchange Agreement. The LLC Agreement authorizes Carvana Group to issue additional LLC Units whether in connection with an acquisition or otherwise. We have entered into a Registration Rights Agreement with certain LLC Unitholders that would require us to register shares issued to them, and we may enter into similar agreements in the future.

*Under the 2017 Omnibus Incentive Plan*. As of December 31, 2022, we had reserved 14 million shares of Class A common stock for issuance under our 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"), as adjusted pursuant to the terms of the 2017 Incentive Plan (as defined in Note 13 — Equity-Based Compensation). As of December 31, 2022 we have granted 5 million restricted stock awards and units and options to purchase 2 million shares of Class A common stock to certain consultants, directors, and employees, net of forfeitures, expirations, and exercises. We have 7 million shares of Class A common stock available for future issuance under our 2017 Incentive Plan as of December 31, 2022.

Any stock that we issue or exchange would dilute the percentage ownership held by the investors who purchase Class A common stock. The market price of shares of our Class A common stock could decline as a result of newly issued or exchanged stock, or the perception that we might issue or exchange stock. A decline in the price of our Class A common stock might impede our ability to raise capital through the issuance of additional shares of Class A common stock or other equity securities.

*Under the Carvana Co. 2021 Employee Stock Purchase Plan*. We have reserved 500,000 shares of Class A common stock for issuance under our ESPP (as defined in Note 13 – Equity-Based Compensation). As of December 31, 2022, we have issued 88,846 shares of Class A common stock to certain employees. We have 411,154 shares of Class A common stock available for future issuance under our ESPP as of December 31, 2022.

*Pursuant to the Tax Asset Preservation Plan*. As discussed below, we adopted a Tax Asset Preservation Plan in order to preserve our NOL carryforwards. If the Rights under the Tax Asset Preservation Plan become exercisable, our stock may be diluted, though only the interests of the Acquiring Person (as defined below) would be diluted.

***Substantial blocks of our total outstanding shares may be sold into the market. If there are substantial sales of shares of our Class A common stock, the price of our Class A common stock could decline.***

The price of our Class A common stock could decline if there are substantial sales of our Class A common stock (including sales of Class A common stock issuable upon exchange of LLC Units), particularly sales by our directors, executive officers, and significant stockholders, or if there is a large number of shares of our Class A common stock available for sale. As of December 31, 2022, we have 106 million shares of our Class A common stock outstanding. All the shares of Class A common stock sold in our IPO and various follow-on offerings are available for sale in the public market. Shares held by directors,

44

executive officers and other affiliates are subject to volume limitations under Rule 144 under the Securities Act of 1933, as amended, or the Securities Act, and various vesting agreements.

Certain of our LLC Unitholders have rights, subject to conditions, to require us to file registration statements covering Class A common stock issuable to them upon exchange of their LLC Units. We would be required to include certain Class A common shares in registration statements that we may file for ourselves or our stockholders, subject to market standoff and lockup agreements. These registration rights would facilitate the resale of such securities into the public market, and any such resale would increase the number of shares of our Class A common stock available for public trading. We also intend to register shares of common stock that we have issued and may issue under our employee equity incentive plans. Once we register these shares, they will be able to be sold freely in the public market upon issuance, subject to existing market standoff or lock-up agreements.

The market price of the shares of our Class A common stock could decline as a result of the sale of a substantial number of our shares of Class A common stock in the public market or the perception in the market that the holders of a large number of such shares intend to sell their shares.

***The Tax Asset Preservation Plan the Company implemented to protect our tax attributes could hinder the market for our Class A common stock.***

We have entered into a Tax Asset Preservation Plan designed to preserve shareholder value and the value of certain tax assets primarily associated with NOL carryforwards and built-in losses under Section 382 of the Code. The Tax Asset Preservation Plan is intended to act as a deterrent to any person or group acquiring 4.9% or more of our outstanding Class A common stock (any such person an "Acquiring Person"), without the approval of our Board, until the Board determines that the risks associated with Section 382 of the Code have sufficiently decreased to withdraw the Tax Asset Preservation Plan. In connection therewith, on January 16, 2023, the Board declared a dividend of one preferred share purchase right (a "Right") for each share of Class A common stock of the Company. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Shares") at a price of $50.00 per one one-thousandth of a Preferred Share represented by a Right (the "Purchase Price"), subject to adjustment. The Rights will separate and begin trading separately from the Class A common stock, and right certificates will be caused to evidence the Rights, on the earlier to occur of (i) the close of business on the tenth day following a public announcement, or the public disclosure of facts indicating, that a person or group of affiliated or associated persons has acquired beneficial ownership of 4.9% or more of the outstanding Class A common stock (an "Acquiring Person") (or, in the event that the Board determines to effect an exchange in accordance with Section 24 of the Tax Asset Preservation Plan and the Board determines that a later date is advisable, then such later date) and (ii) the close of business on the tenth business day (or such later date as may be determined by action of the Board prior to such time as any person becomes an Acquiring Person) following the commencement of a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 4.9% or more of the outstanding Class A common stock. If issued, each Right, other than Rights beneficially owned by the Acquiring Person (which will thereupon become void) will become exercisable for Class A common stock having a value equal to two times the exercise price of the Right. However, prior to exercise, a Right does not give its holder any rights as a stockholder of the Company, including without limitation, any dividend, voting or liquidation rights. Although our Tax Asset Preservation Plan is intended to prevent an "ownership change" as defined by Section 382 of the Code, we cannot provide any assurance that we will not experience such an ownership change or that we will otherwise be able to use, in full or in part, our NOLs. Additionally, the Tax Asset Preservation Plan may make our Class A common stock less attractive to large institutional holders, discourage potential acquirers from attempting to take over our company, limit the price that investors might be willing to pay for shares of our Class A common stock and otherwise hinder the market for our Class A common stock.

***We do not intend to pay dividends on our Class A common stock for the foreseeable future.***

We currently have no intention to pay dividends on our Class A common stock at any time in the foreseeable future. Any decision to declare and pay dividends in the future will be made at the discretion of our Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions, and other factors that our Board may deem relevant. Certain of our debt instruments contain covenants that restrict our ability and the ability of our subsidiaries to pay dividends and in the future we may enter into new instruments with similar covenants. In addition, despite our current indebtedness, we may still be able to incur additional debt in the future, and such indebtedness may restrict or prevent us from paying dividends on our Class A common stock.

***Delaware law and certain provisions in our certificate of incorporation may prevent efforts by our stockholders to change the direction or management of our company.***

We are a Delaware corporation, and the anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change of control would be beneficial to our existing stockholders. In addition, our certificate of incorporation and our amended and restated by-laws contain provisions that may make the acquisition of our company more difficult without the approval of our Board, including, but not limited to, the following:

- the Garcia Parties are entitled to ten votes for each share of our Class B common stock they hold of record on all matters submitted to a vote of stockholders for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock);

- at such time as there are no outstanding shares of Class B common stock, only our Board may call special meetings of our stockholders;

- we have authorized undesignated preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval; and

- we require advance notice and duration of ownership requirements for stockholder proposals.

Our amended and restated certificate of incorporation also contains a provision that provides us with protections similar to Section 203 of the Delaware General Corporation Law (the "DGCL"), and prevents us from engaging in a business combination with a person (excluding the Garcia Parties and their transferees) who acquires at least 15% of our common stock for a period of three years from the date such person acquired such common stock, unless board or stockholder approval is obtained prior to the acquisition. These provisions could discourage, delay, or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for our stockholders to elect directors of their choosing and cause us to take other corporate actions our stockholders desire, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our Class A common stock. In addition, because our Board is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace current members of our management team.

These and other provisions in our certificate of incorporation, bylaws and Delaware law could make it more difficult for stockholders or potential acquirers to obtain control of our Board or to initiate actions that are opposed by our then-current Board, a merger, tender offer or proxy contest involving our company. The existence of these provisions could negatively affect the price of our common stock and limit opportunities for our stockholders to realize value in a corporate transaction.

***With limited exceptions, the Court of Chancery of the State of Delaware is the sole and exclusive forum for certain stockholder litigation matters, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees, or stockholders.***

Pursuant to our certificate of incorporation, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware is the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers, or other employees to us or our stockholders, (3) any action asserting a claim against us arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against us that is governed by the internal affairs doctrine. The forum selection clause in our certificate may have the effect of discouraging lawsuits against us or our directors and officers and may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees, or stockholders.

***We may issue shares of preferred stock in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our Class A common stock, which could depress the price of our Class A common stock.***

Our certificate of incorporation authorizes us to issue one or more series of preferred stock. Our Board has the authority to determine the preferences, limitations and relative rights of the shares of preferred stock and to fix the number of shares constituting any series and the designation of such series, without any further vote or action by our stockholders. Our preferred stock could be issued with voting, liquidation, dividend and other rights superior to the rights of our Class A common stock. The potential issuance of preferred stock may delay or prevent a change in control of us, discouraging bids for our Class A common stock at a premium to the market price, and materially adversely affect the market price and the voting and other rights of the holders of our Class A common stock.

**Risks Related to the ADESA Acquisition**

*We may be unable to successfully integrate the operations of Carvana and the Acquired Business and we may not realize the anticipated synergies and cost savings from our combination. If the ADESA Acquisition does not achieve its intended results, our business, financial condition and results of operations could be materially and adversely affected.*

On May 9, 2022, Carvana Group completed the acquisition of the U.S. based physical auction business of ADESA U.S. Auction, LLC (the "Acquired Business") from KAR in a carve-out transaction, for approximately $2.2 billion in cash, subject to customary adjustments (the "ADESA Acquisition").

The acquisition of the Acquired Business by Carvana involved the integration of two businesses that previously operated independently, and there can be no assurance that the unique business cultures of the two businesses will prove to be compatible. The ongoing integration of the Acquired Business into the operations of Carvana is a significant undertaking and requires significant attention from our management team. It is possible that the ongoing integration process could take longer than anticipated and could result in the loss of valuable employees, customer and supplier relationships, the disruption of each party's ongoing businesses, processes, and systems, or inconsistencies in standards, controls, procedures, practices, policies, and compensation arrangements, any of which could adversely affect our ability to realize the anticipated benefits of the ADESA Acquisition. Our results of operations could also be adversely affected by any issues attributable to the Acquired Business's operations that arose or are based on events or actions that occurred prior to the closing of the ADESA Acquisition. We may have difficulty addressing and assimilating possible differences in corporate cultures and management philosophies between the Acquired Business and us. The ongoing integration process is subject to a number of uncertainties, and no assurance can be given that the anticipated benefits will be realized or, if realized, the timing of their realization.

Although we expect the ADESA Acquisition, to result in certain synergy benefits and cost savings, actual acquisition synergies and cost savings could differ materially from our current expectations, and we may need to raise additional capital to fund working capital for the Acquired Business.

These expected synergies and cost savings are based on estimates and assumptions made by us that are inherently uncertain, and are subject to significant business, economic, and competitive uncertainties and contingencies, all of which are difficult to predict and many of which are beyond our control. We cannot assure you that we will achieve the full amount of expected synergies and cost savings on the schedule anticipated, or at all, that the actual expenses required to achieve these synergies and cost savings will not materially exceed our current estimates, or that these synergies and cost savings will not have other adverse effects on our business. Failure to successfully integrate the Acquired Business or achieve the anticipated benefits of the ADESA Acquisition could result in increased costs or decreases in the amount of expected revenue and could materially adversely affect our business, financial condition, and results of operations.

*The assumption of unknown liabilities in the ADESA Acquisition may harm our financial condition and results of operations.*

At the closing of the ADESA Acquisition, we assumed certain of the Acquired Business's liabilities, including known and unknown contingent liabilities. If there are significant unknown obligations, or if we incur significant losses arising from known contingent liabilities assumed by us upon closing of the acquisition, the combined company's business could be materially and adversely affected. We may learn additional information about the Acquired Business that adversely affects the combined company, such as unknown liabilities, or issues that could affect our ability to comply with applicable laws. As a result, we cannot assure you that the ADESA Acquisition will prove to be successful or that it will not, in fact, harm our business. Among other things, if the Acquired Business's liabilities are greater than expected, or if there are material obligations of which we are not aware, our business could be materially and adversely affected. If we become responsible for substantial unindemnified or uninsured liabilities, these liabilities may have a material adverse effect on our financial condition and results of operations.

*We have incurred significant expenses in connection with the ADESA Acquisition and the integration of our businesses.*

We have incurred and expect to continue to incur a number of non-recurring costs associated with combining the operations of the two companies which cannot be fully estimated accurately at this time. We may also incur additional costs to attract, motivate or retain management personnel and other key employees. We have incurred and will continue to incur acquisition fees and costs related to formulating integration plans for the combined business, and the execution of these plans

47

may lead to additional unanticipated costs. Although we expect that the elimination of duplicative costs, as well as the realization of other efficiencies related to the integration of the businesses, may offset incremental transaction and transaction-related costs over time, this net benefit may not be achieved in the near term, or at all.

***Acquisition accounting adjustments could adversely affect our financial results.***

We account for the completion of the ADESA Acquisition using the acquisition method of accounting. We allocate the total purchase price to acquired tangible assets, intangible assets, and indefinite-lived intangible assets and assumed liabilities, based on their fair values as of the date of completion of the ADESA Acquisition and record the excess, if any, of the purchase price over those fair values as goodwill. At December 31, 2022, we recorded a non-cash goodwill impairment charge of $847 million. To the extent the value of intangible assets becomes impaired, we may be required to incur further non-cash charges relating to such impairment. Our operating results have been significantly impacted from both the impairment and the underlying trends in the business that triggered the impairment, and there can be no assurance that there will not be further adjustments for impairment in future periods, which could have a further impact on the consolidated and combined financial statements and the Company's future results of operations and financial position. See Note 5 — Goodwill and Intangible Assets for more information.

**General Risk Factors**

***The obligations associated with being a public company require significant resources and management attention, and we have and will continue to incur increased costs as a result of being a public company.***

As a public company, we face increased legal, accounting, administrative, and other costs and expenses. We have incurred and expect to continue to incur significant costs related to operating as a public company. We are subject to the Securities Act of 1933, the Securities Exchange Act of 1934, the rules and regulations implemented by the SEC, the Sarbanes-Oxley Act, the Dodd-Frank Act, the Public Company Accounting Oversight Board, and the listing requirements of the NYSE, each of which imposes additional reporting and other obligations on public companies.

Additionally, on March 21, 2022, the SEC issued a proposed rule regarding the enhancement and standardization of mandatory climate-related disclosures for investors. The proposed rule would mandate extensive disclosure of climate-related data, risks, and opportunities, including financial impacts, physical and transition risks, related governance and strategy and greenhouse gas emissions, for certain public companies. Although the ultimate date of effectiveness and the final form and substance of the requirements for the proposed rule are not yet known and the ultimate scope and impact on our business is uncertain, compliance with the proposed rule, if finalized, may result in increased legal, accounting and financial compliance costs, make some activities more difficult, time-consuming and costly, and place strain on our personnel, systems and resources. The SEC has also announced that it is working on proposals for mandatory disclosure of certain environmental, social and governance ("ESG")-related matters, including with respect to board diversity and human capital management. New additional government regulations could also result in new or more stringent forms of ESG oversight and expanding mandatory and voluntary reporting, diligence, and disclosure. Any additional mandatory disclosure or regulation related to ESG may adversely affect our business, and increased ESG related compliance costs could result in increases to our overall operational costs. Failure to adapt to or comply with regulatory requirements or investor or stakeholder expectations and standards could negatively impact our reputation, ability to do business with certain partners, and our stock price.

These rules and regulations and changes in laws, regulations and standards relating to corporate governance and public disclosure, which have created uncertainty for public companies, have and will continue to increase our legal and financial compliance costs and make some activities more time consuming and costly. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. Our investment in compliance with existing and evolving regulatory requirements has and will continue to result in increased administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities, which could have a material adverse effect on our business, financial condition, and results of operations.

***Our results of operations and financial condition are subject to management's accounting judgments, estimates, and changes in accounting policies.***

The preparation of our financial statements requires us to make estimates and assumptions affecting the reported amounts of our assets, liabilities, revenues, and expenses. If these estimates or assumptions are incorrect, it could have a material adverse

48

effect on our results of operations or financial condition. We have identified several accounting policies as being "critical" to the fair presentation of our financial condition and results of operations because they involve major aspects of our business and require us to make judgments about matters that are inherently uncertain. These policies are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the notes to consolidated financial statements included in this Annual Report on Form 10-K.

The implementation of new accounting requirements or other changes to U.S. generally accepted accounting principles could have a material adverse effect on our reported results of operations and financial condition.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our operating results and financial condition.***

We are subject to income taxes in the United States, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;
- expected timing and amount of the release of any tax valuation allowances;
- expiration of or detrimental changes in research and development tax credit laws; or
- changes in tax laws, regulations, or interpretations thereof.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our operating results and financial condition.

***We are subject to SEC rules and regulations regarding our internal control over financial reporting. If we fail to remediate material weaknesses in our internal control over financial reporting or otherwise establish and maintain effective internal control over financial reporting and disclosure controls and procedures, we may not be able to accurately report our financial results, or report them in a timely manner.***

As a public reporting company, we are subject to the rules and regulations established from time to time by the SEC and the NYSE. These rules and regulations require that, among other things, we establish and periodically evaluate procedures with respect to our internal control over financial reporting. Reporting obligations as a public company place a considerable strain on our financial and management systems, processes and controls, as well as on our personnel. Our management team, including our chief executive officer and chief financial officer, has limited experience managing a publicly traded company, and limited experience complying with the increasingly complex and changing laws pertaining to public companies.

In addition, as a public company we are required to document and test our internal control over financial reporting pursuant to Section 404 of the Sarbanes–Oxley Act so that our independent registered public accounting firm can attest in this Annual Report on Form 10-K as to the effectiveness of our internal control over financial reporting, and in future annual reports. Under this law, we have been required and will continue to be required to document and make significant changes to our internal control over financial reporting.

If our senior management is unable to conclude that we have effective internal control over financial reporting or to certify the effectiveness of such controls; if our independent registered public accounting firm cannot render an unqualified opinion on management's assessment and the effectiveness of our internal control over financial reporting; or if material weaknesses in our internal control over financial reporting is identified, we could be subject to regulatory scrutiny, a loss of public and investor confidence, and to litigation from investors and stockholders, which could have a material adverse effect on our business and our stock price. In addition, if we do not maintain adequate financial and management personnel, processes and controls, we may not be able to manage our business effectively or accurately report our financial performance on a timely basis, which could cause a decline in our common stock price and adversely affect our results of operations and financial condition.

***Negative research about our business published by analysts or journalists could cause our stock price to decline. A lack of regularly published research about our business could cause trading volume or our stock price to decline.***

The trading market for our Class A common stock depends in part on the research and reports that analysts and journalists publish about us or our business. If analysts or journalists publish inaccurate or unfavorable research about our business, our stock price would likely decline. If we fail to meet the expectations of analysts for our operating results, or if the analysts who covers us downgrade our stock, our stock price would likely decline. If one or more of these analysts ceases coverage of us or

fails to publish reports on us regularly, demand for our stock could decrease, which could cause our stock price and trading volume to decline.

50

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

None.

**ITEM 2. PROPERTIES.**

As of December 31, 2022, we operated the following facilities in the U.S.:

| Description of use | Owned interior square footage | Leased interior square footage | Owned land acreage | Leased land acreage |
|---|---|---|---|---|
| Corporate headquarters | — | 1,385,877 | — | 48 |
| Other facilities [1] | 5,026,496 | 6,527,992 | 4,203 | 3,361 |

(1) Other facilities include IRCs, hubs, vending machines, and properties acquired as part of the ADESA Acquisition.

**ITEM 3. LEGAL PROCEEDINGS.**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity, and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability, and validity of third-party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors. For more information, see "Legal Matters" in Note 17 — Commitments and Contingencies, included in Part II, Item 8, Financial Statements, of this Annual Report on Form 10-K.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

On April 28, 2017, our Class A common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "CVNA." Prior to that time, there was no public market for our Class A common stock.

Our Class B common stock is not listed nor traded on any stock exchange.

**Holders of Record**

We are authorized to issue up to 500 million shares of Class A common stock, up to 125 million shares of Class B common stock and up to 50 million shares of preferred stock. As of February 17, 2023, there were 6 shareholders of record of our Class A common stock. The number of record holders does not include persons who held shares of our Class A common stock in "street name" accounts through brokers, banks, and other financial institutions. As of February 17, 2023, there were 8 shareholders of record of our Class B common stock.

**Dividend Policy**

We have not declared or paid any cash dividends on our Class A common stock during the fiscal year and do not currently anticipate paying cash dividends in the foreseeable future. Holders of our Class B common stock are not entitled to receive dividends.

**Stock Performance Graph**

The following graph compares the total shareholder return from April 28, 2017, the date on which our Class A common shares commenced trading on the NYSE, through December 31, 2022 of (i) our Class A common stock, (ii) the Standard and Poor's 500 Stock Index ("S&P 500") and (iii) the Standard and Poor's 500 Retailing Index ("S&P 500

52

Retailing Index"), assuming an initial investment of $100 on April 28, 2017 including reinvestment of dividends where applicable. The results presented below are not necessarily indicative of future performance.



**Comparison of CVNA Cumulative Total Return Since IPO**

**Recent Sales of Unregistered Securities**

There were no unregistered sales of equity during the year ended December 31, 2022, except as otherwise previously reported.

During the year ended December 31, 2022, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged less than 1 million LLC Units and zero shares of Class B common stock for less than 1 million shares of Class A common stock. Such shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**Issuer Purchases of Equity Securities**

None.

**ITEM 6. [RESERVED]**

54

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

The following discussion should be read in conjunction with Part I, including matters set forth in the "Risk Factors" section of this Annual Report on Form 10-K, and our financial statements and notes thereto included in Part II, Item 8 of this Form 10-K. Except when stated otherwise, we present the discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations on a consolidated basis.

### Overview

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

See Part I, Item 1 - "Business" for a detailed description and discussion of the Company's business.

Refer to "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" in Part II, Item 7 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 filed with the SEC on February 24, 2022 for discussion and analysis of our financial condition and results of operations for the fiscal year ended December 31, 2021 compared to the fiscal year ended December 31, 2020.

### Retail Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have historically experienced rapid growth in sales through our website www.carvana.com. Due to macroeconomic impacts, including rising used car prices and interest rates, during the year ended December 31, 2022, the number of vehicles we sold to retail customers decreased by 3.0% to 412,296, compared to 425,237 in the year ended December 31, 2021.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to efficiently increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, GAP waiver coverage, other ancillary products, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

In the long-term, we plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our historical growth in retail units sold has been driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. Opening a new market involves hiring a team of customer

advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has historically enabled us to increase our number of markets, resulting in servicing more of the U.S. population, in each of the past ten years. Our market openings increased the total percentage of the U.S. population served to 81.1% in 316 markets as of December 31, 2022 from 81.0% in 311 markets as of December 31, 2021. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our long-term growth plan. We continually evaluate consumer demand and our operational capacity and necessary efficiencies to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Revenue and Gross Profit

We generate revenue on retail units sold from four primary sources: the sale of the vehicles, wholesale sales of vehicles we acquire from customers, sales through our wholesale marketplace, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, retail vehicle sales, totaled $10.3 billion and $9.9 billion during the years ended December 31, 2022 and 2021, respectively. We generally expect retail vehicle sales to trend proportionately with retail units sold, absent any material changes in macroeconomic conditions. We generate gross profit on retail vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it sale.

Wholesale sales and revenues includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory. Subsequent to our acquisition of the U.S. physical auction business of ADESA from KAR on May 9, 2022, we also include revenue earned for the sale of wholesale marketplace units by non-Carvana sellers through our wholesale marketplace platform, including auction fees and related service revenues, in wholesale sales and revenues. Wholesale sales and revenues totaled $2.6 billion and $1.9 billion during the years ended December 31, 2022 and 2021, respectively. We generally expect wholesale sales to trend proportionately with retail units sold through trade-ins and from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale. We generate a gross profit on wholesale marketplace units from the difference between the revenue earned from the sale of wholesale marketplace units through our wholesale marketplace platform less our cost of sales associated with operating the wholesale marketplace platform.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commissions on ancillary products such as VSCs, GAP waiver coverage, and auto insurance, totaled $741 million and $1.0 billion during the years ended December 31, 2022 and 2021, respectively. We generally expect other sales and revenues to trend proportionately with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies, absent any material changes in macroeconomic conditions. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During current macroeconomic uncertainty, our highest priority will continue to be providing exceptional customer experiences while improving efficiency, increasing our brand awareness and utilizing our infrastructure to support efficient growth in retail units sold, to help us move along the path to achieve profitability and positive free cash flow. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- **Increase the purchase of vehicles from customers.** Over time, we plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This will provide additional vehicles for our retail business, which on average are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In addition, this in turn will grow our wholesale business.

- **Reduce average days to sale.** Our goal is generally to increase our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- **Leverage existing inspection and reconditioning infrastructure.** As we scale, we intend to more fully utilize the capacity at our existing IRCs, which collectively have capacity to inspect and recondition approximately 1.1 million vehicles per year at full utilization. We also intend to use existing capacity in the facilities acquired in the ADESA Acquisition.

- **Increase utilization of our logistics network.** As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs or other sites after acquisition from customers or wholesale auctions.

- **Increase conversion on existing products.** We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins.

- **Add new products and services.** We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- **Increase monetization of our finance receivables.** We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- **Optimize purchasing and pricing.** We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

### Seasonality

Retail and wholesale used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our historical rapid growth, our overall sales patterns in the past have not always reflected the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of macroeconomic conditions, which may not fully reflect the underlying performance of our business.

### Investment in Growth

We have historically aggressively invested in the growth of our business. Due to the current macroeconomic environment, we are focused on driving profitability through operating efficiency and reducing expenses. While we intend to become increasingly efficient over time, we also anticipate that our operating expenses will increase substantially in the long term as we

57

continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

**Relationship with Related Parties**

For discussion about our relationships with related parties, refer to Note 7 — Related Party Transactions of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K and our Proxy Statement for our 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**Key Operating Metrics**

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S. population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

|  | Years Ended December 31, | |
|  | **2022** | **2021** |
| --- | --- | --- |
| Retail units sold | 412,296 | 425,237 |
| Average monthly unique visitors (in thousands) | 21,763 | 17,854 |
| Total website units | 63,992 | 71,062 |
| Total gross profit per unit | $ 3,022 | $ 4,537 |
| Total gross profit per unit, non-GAAP | $ 3,337 | $ 4,593 |

*Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell over time. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of retail vehicles, gains on the sales of loans originated to finance the vehicles, commissions on sales of VSCs, GAP waiver coverage and other ancillary products, and gross profit generated from wholesale sales of vehicles. We operate an integrated business with the objective of increasing the number of retail units sold and total gross profit per unit. Gross profits generated from the sale of retail and wholesale units are interrelated. For example, our nationwide reconditioning and inspection centers are designed to produce vehicles for both retail and wholesale sales, our vehicle storage locations have shared parking for both retail and wholesale vehicles, and our integrated multi-vehicle logistics and last mile delivery network is operated in service of both retail and wholesale sales. Such interrelationships require us to share finite operational capacity and optimize joint decisions between retail and wholesale sales, in order to position us to achieve our objective of increasing total gross profit per unit. As a result, the inclusion of gross profit generated from wholesale sales of vehicles in total gross profit per unit reflects our integrated business model and the interrelationship between wholesale and retail vehicle sales. We define total gross profit per unit, non-GAAP as the aggregate gross profit, non-GAAP in a given period, divided by retail units sold in that period. Gross profit, non-GAAP is defined as gross profit plus depreciation and amortization in cost of sales, share-based compensation including the CEO Milestone Gift in cost of sales, and restructuring costs, minus revenue related to our Root warrants. Refer to "Non-GAAP Financial Measures" for more information, including the reconciliation of non-GAAP financial measures to the most directly comparable U.S. GAAP financial measures. We believe the total gross profit per unit metrics provide investors with the greatest opportunity to view our performance through the same lens that our management does, and therefore assists investors to best evaluate our business and measure our progress.

*Population Coverage*

We previously reported population coverage as a key operating metric. As a result of our growth in recent years, we now cover in excess of 80% of the U.S. population, and as a result, population coverage is no longer considered a key operating metric. We define our population coverage as the percentage of U.S. population that lives within one of our markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define population coverage as the metropolitan statistical area population in the markets we sever at the end of the period divided by the total population in the U.S., based on 2015 data from the U.S. Census Bureau.

*Number of IRCs*

We previously reported our number of IRCs as a key operating metric. With the ADESA Acquisition, we have added an additional 56 auction locations and are performing reconditioning work at several of these locations as of December 31, 2022, in addition to the 17 historical Carvana-specific locations. Given the expanded reconditioning capacity associated with the ADESA Acquisition, we no longer consider the number of IRCs a key operating metric.

**Components of Results of Operations**

*Retail Vehicle Sales*

Retail vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from retail vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting retail vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of retail vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. On a quarterly basis, the number of retail vehicles we sell is also affected by seasonality, with demand for retail vehicles generally reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of retail vehicle sales generally expected to occur in the fourth calendar quarter. However, in 2022, heightened inflation and rising interest rates have resulted in lower demand for used vehicles.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Sales and Revenues*

Wholesale sales and revenues includes the aggregate proceeds we receive on vehicles we acquire and sell to wholesalers, and beginning in 2022, wholesale marketplace revenues. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale sales and revenues include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market. Wholesale sales and revenues includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. Wholesale marketplace revenues include revenue earned from the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including auction fees and related services revenue.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs, sales of GAP waiver coverage, and commissions and warrants we receive on sales of auto insurance. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

In September 2022, we partnered with Root to offer an integrated auto insurance solution, through which customers may conveniently access auto insurance directly from the Carvana e-commerce platform. We receive commissions and Warrants to purchase shares of Root's Class A common stock based on the Root insurance policies sold through the Integrated Platform. The commission revenue we recognize depends on the number of retail units we sell, the conversion rate of auto policies on those sales, commission rates we receive, and forecasted attrition. The revenue we recognize from warrants as non-cash consideration depends on the probability of achieving certain auto policy sales thresholds within a specific timeline as well as our performance under the agreement.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of retail vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

*Cost of Sales*

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale, and beginning in 2022, wholesale marketplace cost of sales. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC or other site. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value. Wholesale marketplace cost of sales include costs related to the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including labor, rent, depreciation and amortization.

*Retail Vehicle Gross Profit*

Retail vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Retail vehicle gross profit per unit is our aggregate retail vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

*Wholesale Gross Profit*

Wholesale gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers, and beginning in 2022, wholesale marketplace revenues less wholesale marketplace cost of sales. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, the average acquisition price associated with these vehicles, and the number of wholesale marketplace units sold.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines, hubs, physical auctions, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Goodwill Impairment*

During the year ended December 31, 2022, we recorded a non-cash goodwill impairment charge of $847 million. Refer to Note 5 — Goodwill and Intangible Assets of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K, for additional information.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes, our Floor Plan Facilities, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build,

61

upgrade, or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

***Other Expense (Income)***

Other expense (income), net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our Warrants to acquire Root's Class A common stock as discussed in Note 18 — Fair Value of Financial Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K, along with other general expenses such as gains or losses from disposals of long-lived assets.

***Income Tax Provision***

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. During each of the years ended December 31, 2022 and 2021, the Company generated income tax expense of $1 million.

**Results of Operations**

| | | Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2022 | 2021 | Change |
| | | (dollars in millions, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | |
| Retail vehicle sales, net | $ | 10,254 | $ 9,851 | 4.1 % |
| Wholesale sales and revenues [1] | | 2,609 | 1,920 | 35.9 % |
| Other sales and revenues [2] | | 741 | 1,043 | (29.0)% |
| Total net sales and operating revenues | $ | 13,604 | $ 12,814 | 6.2 % |
| **Gross profit:** | | | | |
| Retail vehicle gross profit [3] | $ | 371 | $ 697 | (46.8)% |
| Wholesale gross profit [1] | | 134 | 189 | (29.1)% |
| Other gross profit [2] | | 741 | 1,043 | (29.0)% |
| Total gross profit | $ | 1,246 | $ 1,929 | (35.4)% |
| **Unit sales information:** | | | | |
| Retail vehicle unit sales | | 412,296 | 425,237 | (3.0)% |
| Wholesale vehicle unit sales | | 193,260 | 170,056 | 13.6 % |
| **Per unit selling prices:** | | | | |
| Retail vehicles | $ | 24,870 | $ 23,167 | 7.4 % |
| Wholesale vehicles [4] | $ | 10,965 | $ 11,287 | (2.9)% |
| **Per retail unit gross profit:** | | | | |
| Retail vehicle gross profit [5] | $ | 900 | $ 1,638 | (45.1)% |
| Wholesale gross profit | | 325 | 446 | (27.1)% |
| Other gross profit | | 1,797 | 2,453 | (26.7)% |
| Total gross profit | $ | 3,022 | $ 4,537 | (33.4)% |
| **Per wholesale unit gross profit:** | | | | |
| Wholesale vehicle gross profit [6] | $ | 580 | $ 1,116 | (48.0)% |
| **Wholesale marketplace:** | | | | |
| Wholesale marketplace units sold | | 485,333 | — | NM |
| Wholesale marketplace revenues | $ | 490 | $ — | NM |
| Wholesale marketplace gross profit [7] | $ | 22 | $ — | NM |

(1) Includes $32 and $54, respectively, of wholesale sales and revenues from related parties.
(2) Includes $176 and $208, respectively, of other sales and revenues from related parties.
(3) Includes $16 and $0, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) Excludes wholesale marketplace revenues and wholesale marketplace units sold.
(5) Includes $39 and $0, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(6) Excludes wholesale marketplace gross profit and wholesale marketplace units sold.
(7) Includes $62 and $0, respectively, of depreciation and amortization expense.
NM = Not Meaningful

*Retail Vehicle Sales*

Retail vehicle sales increased by $403 million to $10.3 billion during the year ended December 31, 2022 compared to $9.9 billion during the year ended December 31, 2021. The increase in revenue was primarily due to an increase in the average selling price of our retail units sold to $24,870 in the year ended December 31, 2022 from $23,167 in the prior year, due primarily to overall appreciation in the used vehicle market compared to the year ended December 31, 2021. This increase was partly offset by a decrease in the number of retail vehicles sold to 412,296 from 425,237 during the years ended December 31,

63

2022 and 2021, respectively. The decrease in retail units sold was driven by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability.

### Wholesale Vehicle Sales and Revenues

Wholesale vehicle sales increased by $689 million to $2.6 billion during the year ended December 31, 2022, compared to $1.9 billion during the year ended December 31, 2021. The increase in revenue was primarily driven by the ADESA Acquisition, resulting in 485,333 wholesale marketplace units sold, for a total of $490 million in wholesale marketplace revenue. Additionally, wholesale units sold increased to 193,260 from 170,056 during the year ended December 31, 2022 and 2021, respectively, partially offset by a decrease in the average selling price of our wholesale units sold to $10,965 from $11,287 during the years ended December 31, 2022 and 2021, respectively. The increase in wholesale units sold was due to acquiring more vehicles from customers, while the lower average selling price was primarily due to depreciation in the used vehicle market compared to the year ended December 31, 2021.

### Other Sales and Revenues

Other sales and revenues decreased by $302 million to $741 million during the year ended December 31, 2022, compared to $1.0 billion during the year ended December 31, 2021. The decrease is primarily due to fewer loan sales, a decrease in gain on loan sales driven by rapidly increasing benchmark interest rates, and the impact of the decrease in retail units sold, partially offset by the impact of higher industry-wide vehicle prices on average loan size during the year ended December 31, 2022.

### Retail Vehicle Gross Profit

Retail vehicle gross profit decreased by $326 million to $371 million during the year ended December 31, 2022, compared to $697 million during the year ended December 31, 2021. This decrease was driven primarily by a decrease in retail vehicle gross profit per unit to $900 for the year ended December 31, 2022 compared to $1,638 for the year ended December 31, 2021, which was further driven by a decrease in retail units sold. The per unit decrease was primarily driven by higher retail vehicle depreciation rates and reconditioning and inbound transport costs, partially offset by a higher ratio of customer-sourced vehicles sold during the year ended December 31, 2022.

### Wholesale Vehicle Gross Profit

Wholesale vehicle gross profit decreased by $55 million to $134 million during the year ended December 31, 2022, compared to $189 million during the year ended December 31, 2021. This decrease was primarily driven by a decrease in wholesale vehicle gross profit per wholesale unit to $580 from $1,116 for the years ended December 31, 2022 and 2021, respectively, partially offset by an increase in wholesale units sold to 193,260 from 170,056, respectively, as well as $22 million of wholesale marketplace gross profit due to the ADESA Acquisition. The increase in the number of wholesale units sold was primarily due to acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was driven by depreciation in the used vehicle market.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

64

*Components of SG&A*

| | Years Ended December 31, | |
|---|---|---|
| | **2022** | **2021** |
| | (in millions) | |
| Compensation and benefits [1] | $ 917 | $ 667 |
| CEO Milestone Gift [2] | 26 | — |
| Advertising | 490 | 479 |
| Market occupancy [3] | 93 | 70 |
| Logistics [4] | 235 | 148 |
| Other [5] | 975 | 669 |
| Total | $ 2,736 | $ 2,033 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $703 million to $2.7 billion during the year ended December 31, 2022 compared to $2.0 billion during the year ended December 31, 2021. During the first half of the year ended December 31, 2022, we increased compensation and benefits, advertising, market occupancy, logistics, and other expenses primarily due to building capacity for increases in the number of units sold and in population coverage, in preparation for future growth, and as a result of the ADESA Acquisition. During the second half of the year ended December 31, 2022, we strategically reduced our spending across all areas of SG&A in response to various macroeconomic factors. Additionally, during the year ended December 31, 2022, we incurred $50 million of lease termination fees, expenses associated with the previously announced workforce reductions, and other restructuring-related costs.

During the year ended December 31, 2022, we incurred $26 million of compensation expense related to the CEO Milestone Gift within selling, general and administrative expense, which is presented separately above, compared to none during the year ended December 31, 2021.

**Goodwill Impairment**

During the year ended December 31, 2022, we recorded a non-cash goodwill impairment charge of $847 million. Refer to Note 5 — Goodwill and Intangible Assets of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K, for additional information.

**Interest Expense**

Interest expense increased by $310 million to $486 million during the year ended December 31, 2022 compared to $176 million during the year ended December 31, 2021. The increase is primarily due to increased interest incurred on additional

65

senior unsecured notes issued by the Company in March 2021, August 2021, and May 2022, along with increased interest expense incurred on working capital financing since the year ended December 31, 2021, partially due to rising interest rates.

***Other Expense (Income), Net***

Other expense (income), net increased by $64 million to expense of $70 million compared to expense of $6 million during the years ended December 31, 2022 and 2021, respectively. The change is primarily due to fair value adjustments on our warrants to acquire Root's Class A common stock and fair value adjustments on our retained beneficial interests in securitizations and purchase price adjustment receivables.

***Income Tax Provision***

We recognized an income tax expense of $1 million in each of the years ended December 31, 2022 and December 31, 2021 from certain subsidiaries.

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP. We historically presented EBITDA and EBITDA margin, however we believe the presentation of the aforementioned non-GAAP measures, in conjunction with U.S. GAAP financial measures, provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled to the most directly comparable U.S. GAAP financial measures.

***Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP***

Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss, gross profit, or SG&A, as determined by U.S. GAAP.

Adjusted EBITDA is defined as net loss plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization in cost of sales and SG&A, goodwill impairment, share-based compensation including the CEO Milestone Gift in cost of sales and SG&A, and restructuring costs, minus revenue related to our Root warrants. Following the ADESA Acquisition, we are also excluding depreciation and amortization in cost of sales, which was historically only a small component of cost of sales. Adjusted EBITDA margin is Adjusted EBITDA as a percentage of total revenues.

Gross profit, non-GAAP is defined as GAAP gross profit plus depreciation and amortization in cost of sales, share-based compensation including the CEO Milestone Gift in cost of sales, and restructuring costs, minus revenue related to our Root warrants. Total gross profit per retail unit, non-GAAP is Gross profit, non-GAAP divided by retail vehicle unit sales.

SG&A, non-GAAP is defined as GAAP SG&A minus depreciation and amortization in SG&A, share-based compensation including the CEO Milestone Gift in SG&A, and restructuring costs. Total SG&A per retail unit, non-GAAP is SG&A, non-GAAP divided by retail vehicle unit sales.

We use these non-GAAP measures to measure the operating performance of our business as a whole and relative to our total revenues and retail vehicle unit sales. We believe that these metrics are useful measures to us and to our investors because they exclude certain financial, capital structure, and non-cash items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA to net loss, Gross profit, non-GAAP to gross profit, and SG&A,

66

non-GAAP to SG&A, which are the most directly comparable U.S. GAAP measures, and calculations of Adjusted EBITDA margin, Total gross profit per retail unit, non-GAAP, and Total SG&A per retail unit, non-GAAP is as follows:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| | | (dollars in millions) | | | | |
| Net loss | $ | (2,894) | $ | (287) | $ | (462) |
| Income tax provision | | 1 | | 1 | | — |
| Interest expense | | 486 | | 176 | | 131 |
| Other (income) expense, net | | 70 | | 6 | | (1) |
| Depreciation and amortization expense in cost of sales | | 114 | | 24 | | 10 |
| Depreciation and amortization expense in SG&A | | 200 | | 105 | | 74 |
| Goodwill impairment | | 847 | | — | | — |
| Share-based compensation expense in cost of sales | | 16 | | — | | 1 |
| Share-based compensation expense in SG&A | | 69 | | 39 | | 25 |
| Root warrant revenue | | (7) | | — | | — |
| Restructuring [1] | | 57 | | — | | — |
| **Adjusted EBITDA** | $ | (1,041) | $ | 64 | $ | (222) |
| | | | | | | |
| Total revenues | $ | 13,604 | $ | 12,814 | $ | 5,587 |
| Net loss margin | | (21.3)% | | (2.2)% | | (8.3)% |
| **Adjusted EBITDA margin** | | (7.7)% | | 0.5 % | | (4.0)% |
| | | | | | | |
| Gross profit | $ | 1,246 | $ | 1,929 | $ | 794 |
| Depreciation and amortization expense in cost of sales | | 114 | | 24 | | 10 |
| Share-based compensation expense in cost of sales | | 16 | | — | | 1 |
| Root warrant revenue | | (7) | | — | | — |
| Restructuring [1] | | 7 | | — | | — |
| **Gross profit, non-GAAP** | $ | 1,376 | $ | 1,953 | $ | 805 |
| | | | | | | |
| Retail vehicle unit sales | | 412,296 | | 425,237 | | 244,111 |
| Total gross profit per retail unit | $ | 3,022 | $ | 4,537 | $ | 3,253 |
| **Total gross profit per retail unit, non-GAAP** | $ | 3,337 | $ | 4,593 | $ | 3,298 |
| | | | | | | |
| SG&A | $ | 2,736 | $ | 2,033 | $ | 1,126 |
| Depreciation and amortization expense in SG&A | | 200 | | 105 | | 74 |
| Share-based compensation expense in SG&A | | 69 | | 39 | | 25 |
| Restructuring [1] | | 50 | | — | | — |
| **SG&A, non-GAAP** | $ | 2,417 | $ | 1,889 | $ | 1,027 |
| | | | | | | |
| Retail vehicle unit sales | | 412,296 | | 425,237 | | 244,111 |
| Total SG&A per retail unit | $ | 6,636 | $ | 4,781 | $ | 4,613 |
| **Total SG&A per retail unit, non-GAAP** | $ | 5,862 | $ | 4,442 | $ | 4,207 |

(1) For the year ended December 31, 2022, includes $28 million of lease termination fees, net of amounts written off for the corresponding operating lease right-of-use assets and operating lease liabilities which were terminated, $26 million of expenses

associated with the previously announced workforce reductions, of which $7 million was recorded to cost of sales, and $3 million of other restructuring-related costs.

**Liquidity and Capital Resources**

*General*

We generate cash from the sale of retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of retail vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future. We expect our primary sources of cash to continue to be sufficient to fund our operating activities and cash commitments for investing and financing activities for at least the next 12 months.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts in the long-term will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our ability to refinance indebtedness, our ability to obtain supplemental liquidity through debt, equity, strategic relationships or other arrangements on terms available or acceptable to us, our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, and increased population coverage. If we need to obtain supplemental liquidity, there can be no assurance that financing alternatives will be available in sufficient amounts or on terms acceptable to us in the future.

We had the following liquidity resources available as of December 31, 2022 and 2021:

| | December 31, | | | |
|---|---|---|---|---|
| | **2022** | | **2021** | |
| | **(in millions)** | | | |
| Cash and cash equivalents | $ | 434 | $ | 403 |
| Availability under short-term revolving facilities [1] | | 1,444 | | 438 |
| Committed liquidity resources available | $ | 1,878 | $ | 841 |
| Unpledged vehicle inventory not included above | | — | | 665 |
| Unpledged real estate not included above [2] | | 1,971 | | 677 |
| Unpledged beneficial interests in securitizations | | 69 | | 100 |
| Total liquidity resources | $ | 3,918 | $ | 2,283 |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in our floor plan and finance receivable facilities, excluding the impact to restricted cash requirements.
(2) Total unpledged gross real estate assets minus committed sale leasebacks. Includes $1.1 billion of ADESA unpledged real estate assets.

Our total liquidity resources are composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities, on our balance sheet that can be financed using traditional asset-based financing sources.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total

commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

As of December 31, 2022 and 2021, the short-term revolving facilities had a total commitment of $4.8 billion and $4.3 billion, an outstanding balance of $1.5 billion and $2.1 billion, and unused capacity of $3.2 billion and $2.2 billion, respectively.

Unpledged vehicle inventory and finance receivables is the value of vehicle inventory and finance receivables on our balance sheet on the period end date beyond that covered by committed financing agreements. Effective September 22, 2022, we amended and restated our vehicle inventory floor plan facility (the "12-Month Floor Plan Facility") to extend the maturity date to September 22, 2023 with a line of credit of $2.2 billion. On September 22, 2022, we also entered into a separate vehicle inventory floor plan facility (the "18-Month Floor Plan Facility", and together with the 12-Month Floor Plan Facility, the "Floor Plan Facilities") with a lender. The line of credit under the 18-Month Floor Plan Facility is $2.0 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility.

Unpledged real estate assets include real estate acquired as part of the ADESA Acquisition, IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include Adjusted EBITDA, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition, we also invest in and generate several types of automotive retail assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of December 31, 2022 and 2021, our outstanding principal amount of indebtedness, including finance leases, was $8.4 billion and $5.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments and Note 16 — Leases of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K for further information on our debt and finance leases.

| | December 31, | | |
|---|---|---|---|
| | **2022** | | **2021** |
| | (in millions) | | |
| **Asset-Based Financing:** | | | |
| Inventory | $ 569 | $ | 1,877 |
| Finance receivables and beneficial interests | 1,233 | | 458 |
| Transportation fleet [1] | 375 | | 212 |
| Real estate [2] | 489 | | 450 |
| Total asset-based financing | 2,666 | | 2,997 |
| Senior Notes | 5,725 | | 2,450 |
| Total debt | 8,391 | | 5,447 |
| Less: unamortized debt issuance costs [3] | (82) | | (34) |
| **Total debt, net** | $ 8,309 | $ | 5,413 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our consolidated balance sheets and not included here.

On April 26, 2022, we completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion. Also, on May 6, 2022, we issued $3.275 billion in senior unsecured notes due 2030. We are using the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by us in connection with the offering. We used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion ADESA Acquisition and other ancillary transactions in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing, and financing activities for the years ended December 31, 2022, and 2021:

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2022** | | **2021** |
| | (in millions) | | |
| Net cash used in operating activities | $ (1,324) | $ | (2,594) |
| Net cash used in investing activities | (2,583) | | (627) |
| Net cash provided by financing activities | 3,899 | | 3,528 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (8) | | 307 |
| Cash, cash equivalents, and restricted cash at beginning of period | 636 | | 329 |
| Cash, cash equivalents, and restricted cash at end of period | $ 628 | $ | 636 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, personnel-related expenses, and cash used to acquire customers. Cash used in operating activities was $1.3 billion and $2.6 billion for the years ended December 31, 2022 and 2021, respectively, a decrease of $1.3 billion, primarily due to decreases in cash used to acquire vehicle inventory, partially offset by increased selling, general and administrative expenses and reconditioning costs.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $2.6 billion and $627 million during the years ended December 31, 2022 and 2021, respectively, an increase of $2.0 billion, primarily driven by our acquisition of the U.S. physical auction business of ADESA for approximately $2.2 billion, partially offset by a reduction in other capital expenditures in the second half of 2022.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital, finance the $2.2 billion ADESA Acquisition, and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $3.9 billion and $3.5 billion during the years ended December 31, 2022 and 2021, respectively, an increase of $371 million. The change primarily relates to increased net proceeds from long-term debt primarily from the issuance of our $3.275 billion 2030 Notes in May 2022 along with proceeds from the issuance of Class A common stock during the year ended December 31, 2022, partially offset by decreased net proceeds from short-term revolving facilities.

## Contractual Obligations and Commitments

We are party to contractual obligations involving commitments to third parties for which we believe we have sufficient liquidity to fund our operations and meet our obligations as they come due. These contractual obligations impact our liquidity and future capital requirements and primarily consist of long-term debt and related interest payments, leases, short-term revolving facilities, financing of beneficial interests in securitizations, and other purchase obligations and commitments. See Note 8 — Finance Receivable Sale Agreements, Note 10 — Debt Instruments, Note 16 — Leases, and Note 17 — Commitments and Contingencies of the consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K, for more information related to these contractual obligations and commitments.

## Fair Value Measurements

We report money market securities, certain receivables, Warrants to acquire Root's Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part II, Item 8, Financial Statement and Supplementary Data, of this Annual Report on Form 10-K, which is incorporated into this item by reference.

## Critical Accounting Estimates

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with United States generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses and related disclosures of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions, impacting our reported results of operations and financial condition.

Certain accounting policies involve significant judgments and assumptions by management, which have a material impact on the carrying value of assets and liabilities and the recognition of income and expenses. The estimates and assumptions used by management are based on historical experience and other factors, which are believed to be reasonable under the circumstances. The significant accounting estimates which we believe are the most critical to aid in fully understanding and evaluating our reported financial results are described below. Refer to Note 2 — Summary of Significant Accounting Policies of the consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K, for more detailed information regarding our critical accounting policies.

*Revenue Recognition*

We sell retail vehicles directly to our customers through our website. We recognize revenue upon delivery to the customer or pick up of the vehicle by a customer at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Our return policy allows customers to initiate a return during the first seven days after delivery.

Estimates for returns are based on an analysis of historical experience, trends and sales data. Changes in these estimates are reflected as an adjustment to revenue in the period identified.

Customers purchasing retail vehicles from us may enter into contracts for VSCs and, if they finance with us, GAP waiver coverage. The prices of VSCs and GAP waiver coverage are set forth in each contract. We sell and receive a commission on VSCs under a master dealer agreement with DriveTime, pursuant to which we sell VSCs that DriveTime administers and is the obligor. We receive a commission on GAP waiver coverage contracts where the administrator of the contract is obligated to reimburse the holder of the underlying finance receivable for a balance that is in excess of the value of the financed vehicle in the event of a total loss. We recognize commission revenue at the time of sale, net of a reserve for estimated contract cancellations. Our risk related to contract cancellations is limited to the commissions that we receive. Cancellations fluctuate depending on the customer-financing default or prepayment rates, and shifts in customer behavior, including those related to changes in the coverage or term of the product. To the extent that actual experience differs from historical trends, there could be significant adjustments to our contract cancellation reserves. The reserve for cancellations of VSCs and GAP waiver coverage is estimated based upon historical experience and recent trends and is reflected as a reduction of other sales and revenues. Changes in these estimates are reflected as an adjustment to revenue in the period identified.

Under the master dealer agreement with DriveTime, we are also contractually entitled to receive profit-sharing revenues based on the performance of the VSCs once a required claims period has passed. This is a form of variable consideration we recognize as revenue to the extent that it is probable that it will not result in a significant revenue reversal. We apply the expected value method, utilizing expected VSC performance based on historical claims and cancellation data from our customers, as well as other qualitative assumptions to estimate the amount we expect to receive. We reassess the estimate each reporting period with any changes reflected as an adjustment to other sales and revenues in the period identified. Profit-sharing payments will begin when the underlying VSCs reach a specified level of claims history.

### Finance Receivables

Finance receivables include installment contracts we originate to facilitate vehicle sales. We classify these receivables as held for sale, as we do not intend to hold the finance receivables we originate to maturity. We typically sell the finance receivables we originate. We record a valuation allowance to report finance receivables at the lower of unpaid principal balance or fair value. To determine the fair value of finance receivables we utilize industry-standard modeling, such as discounted cash flow analysis, factoring in our historical experience, the credit quality of the underlying receivables, loss trends and recovery rates, as well as the overall economic environment. For purposes of determining the valuation allowance, finance receivables are evaluated collectively to determine the allowance as they represent a large group of smaller-balance homogeneous loans. To the extent that actual experience differs from historical trends, there could be significant adjustments to our valuation allowance. Principal balances of finance receivables are charged-off when we are unable to sell the finance receivable and the related vehicle has been repossessed and liquidated or the receivable has otherwise been deemed uncollectible. The estimates and trends used have historically been effective in our determination of our valuation allowance.

### Beneficial Interests in Securitizations

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. See Note 18 — Fair Value of Financial Instruments, included in Part II, Item 8, Financial Statements and Supplementary Data, of this Annual Report on Form 10-K for further detail on the discount rates.

Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes resulting in a gain or loss in that period.

### Valuation of Inventory

Vehicle inventory consists of used vehicles, primarily acquired directly from customers and at auction. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental costs are capitalized as a component of inventory. Inventory is stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is the estimated selling price less costs to complete, dispose and

transport the vehicles. Selling prices are derived from historical data and trends, such as sales price and inventory turn times of similar vehicles, as well as independent market resources. Each reporting period we recognize any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value through cost of sales. To the extent that there are significant changes to estimated vehicle selling prices or decreases in demand for used vehicles, there could be significant adjustments to reflect our inventory at net realizable value.

### Income Taxes

We account for income taxes pursuant to the asset and liability method, which requires the recognition of deferred income tax assets and liabilities related to the expected future tax consequences arising from temporary differences between the carrying amounts and tax bases of assets and liabilities based on enacted statutory tax rates applicable to the periods in which the temporary differences are expected to reverse. Any effects of changes in income tax rates or laws are included in income tax expense in the period of enactment. We reduce the carrying amounts of deferred tax assets by a valuation allowance if, based on the evidence available, it is more likely than not that such assets will not be realized. In making the assessment under the more likely than not standard, appropriate consideration must be given to all positive and negative evidence related to the realization of the deferred tax assets. The assessment considers, among other matters, the nature, frequency, and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carry forward periods by jurisdiction, our experience with loss carryforwards not expiring unutilized, and all tax-planning alternatives that may be available. A valuation allowance is recognized if under applicable accounting standards we determine it is more likely than not that our deferred tax assets would not be realized.

### Business Combination Purchase Price Allocation

The purchase price of an acquisition is allocated to the identifiable assets acquired and liabilities assumed based on their fair values at the date of acquisition, with the excess purchase price being recorded as goodwill. The allocation of purchase price to the tangible and identifiable intangible assets acquired is specifically complex because of the significant estimates and assumptions involved in determining their fair values. Due to this higher degree of complexity, we obtained the assistance of outside valuation experts in the allocation of purchase price to the tangible and identifiable intangible assets acquired. While outside valuation experts were used, management has the ultimate responsibility for the valuation methods, models and inputs used and the resulting purchase price allocation. Critical estimates used in valuing tangible assets associated with the ADESA Acquisition include, but are not limited to, the similarity of the acquired real property to market comparable transactions, costs of similar personal property in new condition, and economic obsolescence rates. Critical estimates used in valuing identifiable intangible assets associated with the ADESA Acquisition include, but are not limited to, revenues and attrition rate.

### Goodwill

Goodwill represents the excess purchase price over the fair value of the net assets acquired. Goodwill is not amortized but is tested annually during the second quarter or more frequently when events or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The Company has one operating segment, which is its reporting unit; therefore, management analyzes goodwill associated with all of its operations when analyzing for potential impairment. During the fourth quarter of 2022, our market capitalization declined significantly, with a closing stock price on December 27, 2022 at a historic low of $3.72 per share of Class A Common Stock. We determined that a triggering event had occurred, indicating it was more likely than not that the fair value of our single reporting unit was less than its carrying value as of December 31, 2022. Therefore, we performed a quantitative goodwill impairment test for our reporting unit as of December 31, 2022 and as a result recorded a non-cash goodwill impairment charge of $847 million, which was reflected as Goodwill impairment in our Consolidated Statements of Operations.

The quantitative goodwill impairment test requires a determination of whether the fair value of a reporting unit is less than the carrying value. As of December 31, 2022, and because our single reporting unit had a negative carrying value, we utilized an enterprise value-based income approach to determine the fair value of the reporting unit. The income approach discounts projected free cash flows of the reporting unit at a computed weighted average cost of capital as the discount rate. The income approach requires the use of significant estimates and assumptions, which include revenue growth rates and future operating margins used to calculate projected future cash flows, weighted average cost of capital, and future economic and market conditions. In connection with this process, we also reconcile the estimated fair value of our reporting unit to our market capitalization, including consideration of a reasonable control premium, based upon our average stock price over a reasonable period as of the measurement date. We base our cash flow forecasts on our knowledge of the automotive industry, our recent

73

performance, our expectations of future performance, and other assumptions we believe to be reasonable but that are unpredictable and inherently uncertain. Actual future results may differ from those estimates.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of exposure due to potential changes in inflation or interest rates. We do not hold financial instruments for trading purposes.

**Interest Rate Risk**

Our primary market risk exposure related to our debt is changing interest rates. We had total outstanding debt of $1.5 billion under our short-term revolving facilities at December 31, 2022. Amounts outstanding under our short-term revolving facilities are generally due within one year and bear a variable interest rate of a fixed spread to a prime rate. Refer to Note 10 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K for more detail on this variable interest rate. Based on the amounts outstanding, a 100-basis point increase or decrease in market interest rates would result in a change to annual interest expense of $19 million at December 31, 2022. Our interest expense increased by $310 million to $486 million during the year ended December 31, 2022 compared to $176 million during the year ended December 31, 2021, primarily as a result of increased interest incurred on additional senior unsecured notes issued by the Company in March 2021, August 2021, and May 2022, along with increased interest expense incurred on working capital financing.

Our long-term debt, consisting of our Senior Notes (as defined in Note 10 — Debt Instruments of our consolidated financial statements included in Part II, Item 8, Financial Statements and Supplementary Data of this Annual Report on Form 10-K), notes payable, and finance leases have fixed interest rates and terms, and as such, we consider the associated risk to our results of operations from changes in market rates of interest to be minimal.

We are also exposed to interest rate risk arising from market rate adjustments as they pertain to our securitization transactions. Future sales of our finance receivables may be affected by changes in market rates. We have previously managed this interest rate exposure through the use of derivative instruments such as interest rate swap contracts, and may continue to do so in the future.

**Inflation Risk**

We are affected by inflationary factors such as decreased vehicle affordability, including as a result of rising interest rates, and increases in supply chain and logistics costs, materials costs, and labor costs. We do not believe that inflation has historically had a material effect on our business, financial condition, or results of operations. However, given the current macroeconomic environment and its effect on our results of operations in the year ended December 31, 2022, which were primarily fewer units sold, we will continue to look for ways to manage any changes in consumer purchasing behavior and increased costs, both of which may continue to adversely affect our business, financial condition, and results of operations.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID Number 248) | 76 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 79 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021, and 2020 | 80 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended December 31, 2022, 2021, and 2020 | 81 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021, and 2020 | 83 |
| Notes to Consolidated Financial Statements | 84 |

75

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Carvana Co.

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheets of Carvana Co. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2022 and 2021, the related consolidated statements of operations, changes in stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and financial statement schedules included under Item 15(a) (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 23, 2023, expressed an unqualified opinion.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical audit matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Derecognition of Transferred Finance Receivables*

As described further in Notes 2, 8, and 9 to the financial statements, the Company is party to various transfer agreements pursuant to which it sells finance receivables meeting specified underwriting criteria to financing partners. The Company also transfers its finance receivables to securitization trusts as asset backed securitization transactions. In accordance with Accounting Standards Codification (ASC) 860, *Transfers and Servicing* ("ASC 860"), the Company's transfer of finance receivables to financing partners and asset backed securitizations are considered sales of financial assets, in which the Company derecognizes the finance receivables upon the completion of the transfer, as presented within the statements of cash flows. We identified the determination that transfers of finance receivables meet the derecognition criteria of ASC 860 as a critical audit matter.

The principal considerations for our determination that transfers of finance receivables meet the derecognition criteria of ASC 860 is a critical audit matter is because the transfers of material finance receivables from the Company to both its financing partners and securitization trusts requires complex auditor judgments to determine that these transactions meet the derecognition criteria of ASC 860, specifically regarding the legal isolation of the transferred finance receivables from the Company.

Our audit procedures related to the determination that transfers of finance receivables meet the derecognition criteria of ASC 860 included the following, among others:

- We tested the design and operating effectiveness of management's review control over the accounting determination that the transfers of finance receivables meet the derecognition criteria set forth in ASC 860.
- We read the various transfer and sale agreements between the Company and its financing partners and securitization trusts, assessed the true sale and non-consolidation legal opinions, and evaluated the information with respect to management's analysis of the criteria set forth in ASC 860 to permit the derecognition of the finance receivables.

*Fair value of property and equipment acquired in the ADESA US Auction, LLC acquisition*

As described further in Note 3 to the financial statements, on May 9, 2022, the Company completed the acquisition of 100% of the equity interests in the United States physical auction business of ADESA US Auction, LLC for approximately $2.2 billion. The assets acquired and liabilities assumed were recorded at their respective fair value at the acquisition date. The acquisition included auction sites throughout the United States. The Company utilized a third-party valuation firm to determine the fair value of the acquired property and equipment, which included the land and buildings of the auction sites. The acquisition date fair value of the acquired land and buildings comprised $1.3 billion of the allocation of the fair value of the consideration. We identified the estimation of the acquisition date fair value of the acquired land and buildings included in property and equipment as a critical audit matter.

The principal consideration for our determination that the acquisition date fair value of the acquired land and buildings included in property and equipment is a critical audit matter is that auditing the determination of the acquisition date fair values required the use of those with specialized skill and knowledge to evaluate the inputs and assumptions in order to conclude on the appropriateness of management's acquisition date fair value of the acquired land and buildings.

Our audit procedures related to the acquisition date fair value of the acquired land and buildings included in property and equipment included the following, among others:

- We tested the design and operating effectiveness of management's review control evaluating the assumptions applied by the third-party valuation firm, and the determination of fair value of the acquired land and buildings.
- We utilized a valuation specialist to test the reasonableness of the specialist's conclusions for a selection of properties as of the acquisition date. This included evaluating:
  ◦ the estimated fair values for a selection of acquired land, which were valued based on comparable market data. The valuation specialist performed independent market research to test the reasonableness of the specialist's fair value conclusions of the selected acquired land;
  ◦ the estimated fair values for a selection of acquired buildings and site improvements, which were valued based on the estimated replacement cost less physical depreciation. The valuation specialist performed independent market research to test the base costs used in the appraisal report for the buildings and associated site improvements at the selected acquired buildings.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2015.

Southfield, Michigan
February 23, 2023

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Carvana Co.

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of Carvana Co. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2022, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2022, and our report dated February 23, 2023 expressed an unqualified opinion on those financial statements.

**Basis for opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Controls over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Southfield, Michigan
February 23, 2023

78

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 434 | $ 403 |
| Restricted cash | 194 | 233 |
| Accounts receivable, net | 253 | 206 |
| Finance receivables held for sale, net | 1,334 | 356 |
| Vehicle inventory | 1,876 | 3,149 |
| Beneficial interests in securitizations | 321 | 382 |
| Other current assets, including $6 and $12, respectively, due from related parties | 182 | 163 |
| Total current assets | 4,594 | 4,892 |
| Property and equipment, net | 3,244 | 1,560 |
| Operating lease right-of-use assets, including $14 and $17, respectively, from leases with related parties | 536 | 369 |
| Intangible assets, net | 70 | 4 |
| Goodwill | — | 9 |
| Other assets, including $1 and $7, respectively, due from related parties | 254 | 181 |
| Total assets | $ 8,698 | $ 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $16 and $27, respectively, due to related parties | $ 777 | $ 656 |
| Short-term revolving facilities | 1,534 | 2,053 |
| Current portion of long-term debt | 201 | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | 80 | 29 |
| Total current liabilities | 2,592 | 2,890 |
| Long-term debt, excluding current portion | 6,574 | 3,208 |
| Operating lease liabilities, excluding current portion, including $9 and $13, respectively, from leases with related parties | 507 | 361 |
| Other liabilities | 78 | 31 |
| Total liabilities | 9,751 | 6,490 |
| Commitments and contingencies (Note 17) | | |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of December 31, 2022 and 2021 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized, 106,037 and 89,930 shares issued and outstanding as of December 31, 2022 and 2021, respectively | — | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized, 82,900 and 82,900 shares issued and outstanding as of December 31, 2022 and 2021, respectively | — | — |
| Additional paid in capital | 1,558 | 795 |
| Accumulated deficit | (2,076) | (489) |
| Total stockholders' equity (deficit) attributable to Carvana Co. | (518) | 306 |
| Non-controlling interests | (535) | 219 |
| Total stockholders' equity (deficit) | (1,053) | 525 |
| Total liabilities & stockholders' equity (deficit) | $ 8,698 | $ 7,015 |

See accompanying notes to consolidated financial statements.

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | **2020** |
| **Sales and operating revenues:** | | | | | | |
| Retail vehicle sales, net | $ | 10,254 | $ | 9,851 | $ | 4,741 |
| Wholesale sales and revenues, including $32, $54, and $4 respectively, from related parties | | 2,609 | | 1,920 | | 445 |
| Other sales and revenues, including $176, $208, and $105, respectively, from related parties | | 741 | | 1,043 | | 401 |
| **Net sales and operating revenues** | | 13,604 | | 12,814 | | 5,587 |
| Cost of sales, including $22, $65, and $4, respectively, to related parties | | 12,358 | | 10,885 | | 4,793 |
| **Gross profit** | | 1,246 | | 1,929 | | 794 |
| Selling, general and administrative expenses, including $33, $27, and $19, respectively, to related parties | | 2,736 | | 2,033 | | 1,126 |
| Goodwill impairment | | 847 | | — | | — |
| Interest expense, including $0, $0, and $1, respectively, to related parties | | 486 | | 176 | | 131 |
| Other expense (income), net | | 70 | | 6 | | (1) |
| **Net loss before income taxes** | | (2,893) | | (286) | | (462) |
| Income tax provision | | 1 | | 1 | | — |
| **Net loss** | | (2,894) | | (287) | | (462) |
| Net loss attributable to non-controlling interests | | (1,307) | | (152) | | (291) |
| **Net loss attributable to Carvana Co.** | | (1,587) | | (135) | | (171) |
| **Net loss attributable to Class A common stockholders** | $ | (1,587) | $ | (135) | $ | (171) |
| Net loss per share of Class A common stock, basic and diluted | $ | (15.74) | $ | (1.63) | $ | (2.63) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | | 100,828 | | 82,805 | | 64,981 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

See accompanying notes to consolidated financial statements.

80

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 50,507 $ | — | 101,219 $ | — $ | 281 $ | (183) $ | 94 $ | 192 |
| Net Loss | — | — | — | — | — | (171) | (291) | (462) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 18,333 | — | — | — | 1,059 | — | — | 1,059 |
| Adjustments to non-controlling interests related to equity offering | — | — | — | — | (644) | — | 644 | — |
| Exchanges of LLC Units | 7,281 | — | (5,627) | — | 33 | — | (33) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 407 | — | — | 407 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis of Carvana Group | — | — | — | — | (407) | — | — | (407) |
| Issuance of Class A common stock to settle vested restricted stock units | 234 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (38) | — | — | — | (23) | — | — | (23) |
| Options exercised | 195 | — | — | — | 5 | — | — | 5 |
| Equity-based compensation | — | — | — | — | 31 | — | — | 31 |
| **Balance, December 31, 2020** | 76,512 $ | — | 95,592 $ | — $ | 742 $ | (354) $ | 414 $ | 802 |
| Net loss | — | — | — | — | — | (135) | (152) | (287) |
| Exchanges of LLC Units | 13,145 | — | (12,692) | — | 43 | — | (43) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 908 | — | — | 908 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (908) | — | — | (908) |
| Issuance of Class A common stock to settle vested restricted stock units | 218 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 2 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (22) | — | — | — | (39) | — | — | (39) |
| Options exercised | 75 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 47 | — | — | 47 |
| **Balance, December 31, 2021** | 89,930 $ | — | 82,900 $ | — $ | 795 $ | (489) $ | 219 $ | 525 |

81

| | Shares | $ | Shares | $ | | | |
|---|---|---|---|---|---|---|---|
| Net loss | — | — | — | — | — | (1,587) | (1,307) | (2,894) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 15,625 | — | — | — | 1,227 | — | — | 1,227 |
| Adjustments to non-controlling interests related to equity offering | — | — | — | — | (554) | — | 554 | — |
| Exchanges of LLC Units | 46 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 22 | — | — | 22 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (22) | — | — | (22) |
| Contribution of Class A common stock from related party | (128) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 390 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 86 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (8) | — | — | (8) |
| Options exercised | 88 | — | — | — | 3 | — | — | 3 |
| Equity-based compensation | — | — | — | — | 93 | — | — | 93 |
| **Balance, December 31, 2022** | 106,037 | $ — | 82,900 | $ — | $ 1,558 | (2,076) | (535) | $ (1,053) |

See accompanying notes to consolidated financial statements.

82

**CARVANA CO. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ (2,894) $ | (287) $ | (462) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 261 | 105 | 74 |
| Goodwill impairment | 847 | — | — |
| Equity-based compensation expense | 69 | 39 | 25 |
| Loss on disposal of property and equipment | 14 | 1 | 6 |
| Provision for bad debt and valuation allowance | 23 | 28 | 21 |
| Amortization and write-off of debt issuance costs | 27 | 11 | 8 |
| Loss on early extinguishment of debt | — | — | 34 |
| Unrealized loss on warrants to acquire Root Class A common stock | 80 | 24 | — |
| Unrealized gain on beneficial interests in securitizations | (6) | (7) | (9) |
| Changes in finance receivable related assets: | | | |
| Originations of finance receivables | (7,214) | (7,306) | (3,579) |
| Proceeds from sale of finance receivables, net | 6,297 | 7,391 | 3,634 |
| Gain on loan sales | (411) | (717) | (218) |
| Principal payments received on finance receivables held for sale | 190 | 206 | 90 |
| Other changes in assets and liabilities: | | | |
| Vehicle inventory | 1,354 | (2,086) | (263) |
| Accounts receivable | 145 | (148) | (43) |
| Other assets | (83) | (105) | (26) |
| Accounts payable and accrued liabilities | (46) | 247 | 94 |
| Operating lease right-of-use assets | 21 | (213) | (32) |
| Operating lease liabilities | 15 | 223 | 38 |
| Other liabilities | (13) | — | — |
| Net cash used in operating activities | (1,324) | (2,594) | (608) |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment, including $0, $0, and $22, respectively, from related parties | (512) | (557) | (360) |
| Proceeds from sale of property and equipment | 44 | — | — |
| Payment for acquisitions, net of cash acquired | (2,196) | — | — |
| Purchases of investments | — | (126) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 81 | 56 | 14 |
| Net cash used in investing activities | (2,583) | (627) | (346) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from short-term revolving facilities | 12,982 | 14,600 | 4,429 |
| Payments on short-term revolving facilities | (13,501) | (12,587) | (4,958) |
| Proceeds from issuance of long-term debt | 3,435 | 1,650 | 1,336 |
| Payments on long-term debt | (165) | (73) | (654) |
| Payments of debt issuance costs | (75) | (24) | (29) |
| Net proceeds from issuance of Class A common stock | 1,227 | — | 1,059 |
| Proceeds from equity-based compensation plans | 4 | 2 | 5 |
| Tax withholdings related to restricted stock units and awards | (8) | (40) | (23) |
| Net cash provided by financing activities | 3,899 | 3,528 | 1,165 |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (8) | 307 | 211 |
| Cash, cash equivalents, and restricted cash at beginning of period | 636 | 329 | 118 |
| Cash, cash equivalents, and restricted cash at end of period | $ 628 $ | 636 $ | 329 |

See accompanying notes to consolidated financial statements.

83

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1 — BUSINESS ORGANIZATION**

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC"), auto insurance, and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016, for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group, LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units
(the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity (Deficit), the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of December 31, 2022, Carvana Co. owned approximately 55.9% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity (Deficit)) owned the remaining 44.1%.

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation**

The accompanying consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary. All intercompany balances and transactions have been eliminated.

**Liquidity**

The accompanying consolidated financial statements of the Company have been prepared in conformity with U.S. GAAP, which contemplate continuation of the Company as a going concern. Since inception, the Company has incurred losses, and expects to incur additional losses in the future as it continues to build inspection and reconditioning centers ("IRCs") and vending machines, serve more of the U.S. population, and enhance technology and software. In the second quarter of 2022, the Company completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion and issued a total of $3.275 billion in aggregate principal amount of 10.25% senior unsecured notes due 2030 (the "2030 Notes"). The Company used a portion of the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees, and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA U.S. Auction, LLC ("ADESA") and other ancillary transactions in connection therewith, and to pay related fees and expenses in

84

connection therewith, and (b) for working capital, capital expenditures, and other general corporate purposes. In March 2022, the Company's forward flow partner committed to purchase a total of $5.0 billion of the Company's finance receivables through March 2023, and such facility had approximately $1.2 billion of unused capacity as of December 31, 2022. In January 2023, the Company and its forward flow partner amended the commitment to purchase a total of $4.0 billion of the Company's finance receivables through January 2024. In addition, the Company has a $2.2 billion floor plan facility through September 22, 2023, and $2.0 billion thereafter through March 22, 2024, and such facility had approximately $1.6 billion of unused capacity as of December 31, 2022. Management believes that current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Comprehensive Loss**

During the years ended December 31, 2022, 2021, and 2020, the Company did not have any other comprehensive income and, therefore, the net loss and comprehensive loss were the same for all periods presented.

**Cash and Cash Equivalents**

The Company has cash deposits and cash equivalents deposited in or managed by major financial institutions. Cash equivalents include highly liquid investment instruments with original maturities of three months or less, and consist primarily of money market funds. At times the related amounts are in excess of the amounts insured by the Federal Deposit Insurance Corporation. The Company has not experienced any losses with these financial institutions and does not believe it represents significant credit risk.

**Restricted Cash**

Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities and any undistributed amounts collected on the finance receivables pledged under the Company's finance receivable facilities as explained in Note 10 — Debt Instruments. As of December 31, 2022 and 2021, restricted cash also includes certain cash held for corporate insurance purposes.

**Accounts Receivable, Net**

Accounts receivable, net of an allowance for doubtful accounts, includes certain amounts due from customers and their finance providers. The allowance for doubtful accounts is estimated based upon historical experience, current economic conditions, and other factors and is evaluated periodically. The allowance for doubtful accounts was approximately $12 million and $20 million as of December 31, 2022 and 2021, respectively.

**Finance Receivables Held for Sale, Net**

Finance receivables include installment contracts the Company originates to its customers to facilitate vehicle sales. The Company classifies these receivables as held for sale, as it does not intend to hold the finance receivables it originates to maturity. The Company typically sells the finance receivables it originates, as explained in Note 8 — Finance Receivable Sale Agreements and Note 9 — Securitizations and Variable Interest Entities. The Company records a valuation allowance to report finance receivables at the lower of unpaid principal balance or fair value. To determine the fair value of finance receivables the Company utilizes industry-standard modeling, such as discounted cash flow analysis, factoring in the Company's historical experience, the credit quality of the underlying receivables, loss trends and recovery rates, as well as the overall economic

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

environment. For purposes of determining the valuation allowance, finance receivables are evaluated collectively to determine the allowance as they represent a large group of smaller-balance homogeneous loans. The allowance was approximately $36 million and $21 million as of December 31, 2022 and 2021, respectively. Principal balances of finance receivables are charged-off when the Company is unable to sell the finance receivable and the related vehicle has been repossessed and liquidated or the receivable has otherwise been deemed uncollectible. Interest income on finance receivables held for sale is recognized when earned based on contractual loan terms and is included in other sales and revenues. Loan origination costs are capitalized and recognized as a reduction to the gain on loan sale when the loans are sold.

**Vehicle Inventory**

Vehicle inventory consists of used vehicles, primarily acquired directly from customers and at auction. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental overhead costs are capitalized as a component of inventory. Inventory is stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is the estimated selling price less costs to complete, dispose and transport the vehicles. Selling prices are derived from historical data and trends, such as sales price and inventory turn times of similar vehicles, as well as independent market resources. Each reporting period the Company recognizes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value through cost of sales in the accompanying consolidated statements of operations.

**Property and Equipment**

Property and equipment consists of land, buildings and improvements, transportation fleet equipment, software, and furniture, fixtures and equipment and is stated at cost less accumulated depreciation and amortization. Repairs and maintenance costs that extend the life or utility of an asset are also capitalized. Ordinary repairs and maintenance are charged to expense as incurred. Costs incurred during construction are capitalized as construction in progress and reclassified to the appropriate fixed asset categories when the project is completed. In addition, interest on borrowings during the active construction period of construction projects is capitalized and depreciated over the estimated useful lives of the related assets. Costs incurred during the preliminary project planning phase are charged to expense as incurred.

The Company capitalizes direct costs of materials and services consumed in developing or obtaining internal-use software. The Company also capitalizes payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use, to the extent of the time spent directly on the project. Capitalization of costs begins during the application development stage and ends when the software is available for general use. Costs incurred during the preliminary project and post-implementation stages are charged to expense as incurred.

Depreciation and amortization are computed using the straight-line method over the lesser of the remaining lease term or the following estimated useful lives:

| | |
|---|---|
| Buildings and improvements | 15-30 years |
| Transportation fleet equipment | 5-6 years |
| Software | 3 years |
| Furniture, fixtures and equipment | 3-5 years |

Management reviews long-lived assets for impairment when events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. The Company compares the sum of estimated undiscounted future cash flows expected to result from the use of the asset to the carrying value of the asset. When the carrying value of the asset exceeds its estimated undiscounted future cash flows, the Company recognizes an impairment charge for the amount by the which the carrying value of the asset exceeds the fair value of the asset. The Company periodically reassesses the useful lives of its long-lived assets when events or circumstances indicate that useful lives have significantly changed from the previous estimate. The Company recorded no impairment charges during the years ended December 31, 2022, 2021, and 2020. See Note 4 — Property and Equipment, Net for additional information on property and equipment.

**Goodwill and Intangible Assets**

Intangible assets are recognized and recorded at their acquisition date fair values. Definite-lived intangible assets consist of developed technology, customer relationships, and non-compete agreements and are amortized on a straight-line basis over their

86

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

estimated useful lives. The Company determined the useful lives of its definite-lived intangible assets based on multiple factors including technological obsolescence, the make-up of the acquired customer base and expected attrition, and the period over which expected cash flows are used to measure the fair value of the intangible asset at acquisition. The Company periodically reassesses the useful lives of its definite-lived intangible assets when events or circumstances indicate that useful lives have significantly changed from the previous estimate. No impairment charges related to intangible assets were recognized during the years ended December 31, 2022, 2021, or 2020.

Goodwill represents the excess purchase price over the fair value of the net assets acquired. Goodwill is not amortized but is tested annually during the second quarter or more frequently when events or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The Company has one operating segment, which is its reporting unit; therefore, management analyzes goodwill associated with all of its operations when analyzing for potential impairment. When conducting annual or interim impairment assessments, if applicable, a two-step process is used. First, an optional qualitative evaluation is performed as to whether it is more likely than not that the fair value of the Company's sole reporting unit is less than its carrying value, using an assessment of relevant events and circumstances. In performing this assessment, the Company is required to make assumptions and judgments including, but not limited to, an evaluation of macroeconomic conditions as they relate to the business, industry and market trends, as well as the overall future financial performance of the reporting unit. If it is determined that it is not more likely than not that the fair value of the reporting unit is less than its carrying value, no additional tests are performed. However, if the Company concludes otherwise or elects not to perform the qualitative assessment, the Company performs a second step consisting of a quantitative assessment of goodwill impairment. This assessment requires the Company to compare the fair value of its reporting unit with its carrying value, which was negative as of December 31, 2022. If the carrying amount exceeds the fair value, an impairment charge will be recognized. In performing this assessment, the Company is required to make assumptions and judgments including, but not limited to, financial projections, discount rate, and future market conditions. See Note 5 — Goodwill and Intangible Assets for further information on valuation methodology and impairment of goodwill during the year ended December 31, 2022. No impairment charges related to goodwill were recognized during the years ended December 31, 2021 or 2020.

**Leases**

The Company determines if an arrangement is a lease at inception by evaluating if the asset is explicitly or implicitly identified or distinct, if the Company will receive substantially all of the economic benefit or if the lessor has an economic benefit and the ability to substitute the asset. Right-of-use ("ROU") assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The Company assesses whether the lease is an operating or finance lease at its inception. Operating lease liabilities are recognized at commencement date based on the present value of the lease payments over the lease term. To calculate the present value, the Company uses the implicit rate in the lease when readily determinable. However, the Company's leases generally do not provide an implicit rate and it uses its incremental borrowing rate. The incremental borrowing rate is based on collateralized borrowings of similar assets with terms that approximate the lease term when available and when collateralized rates are not available, it uses uncollateralized rates with similar terms adjusted for the fact that it is an unsecured rate. The operating lease ROU asset is the initial lease liability adjusted for any prepayments, initial indirect costs incurred by the Company, and lease incentives. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying consolidated balance sheets. The Company's finance leases are included in property and equipment and long-term debt on the accompanying consolidated balance sheets.

**Securitizations and Variable Interest Entities**

The Company reviews subsidiaries and affiliates, as well as other entities, to determine if they should be considered VIEs, and whether it should change the consolidation determinations based on changes in their characteristics. The Company considers an entity a VIE if its equity investors own an interest therein that lacks the characteristics of a controlling financial interest or if such investors do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support or if the entity is structured with non-substantive voting interests. A VIE is consolidated by its primary beneficiary, the party that has both the power to direct the activities that most significantly impact the VIE's economic performance and the obligation to absorb losses or the right to receive benefits of the VIE that could potentially be significant to the VIE. The Company evaluates whether it has variable interests in the VIE and if so, if it is the primary beneficiary of the VIE on an ongoing basis. The Company consolidates VIEs when it is deemed to be the primary beneficiary.

The Company sponsors asset-backed securitization transactions. These transactions often result in the creation of securitization trusts, which are VIEs. To comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer

87

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

Protection Act of 2010 (the "Risk Retention Rules") the Company retains at least a 5% interest in the credit risk of the underlying finance receivables, which it accomplishes by retaining at least a 5% interest in each security issued by the securitization trusts. Typically, this includes notes and certificates, which are presented as beneficial interests in securitizations on the accompanying consolidated balance sheets.

**Other Assets**

Other current assets consist of various items, including, among other items, software licenses and subscriptions, prepaid expenses, the estimated reserve for vehicle inventory returns, the current portion of the purchase price adjustment receivables based on the performance of the Company's finance receivables, the current portion of the receivable related to the excess cash reserves over realized claims of vehicle service contracts ("VSCs"), and deposits.

Other assets consist of various items, including, among other items, investment in equity instruments (as further discussed in Note 18 — Fair Value of Financial Instruments), the purchase price adjustment receivables based on the performance of the Company's finance receivables, the receivable related to the excess cash reserves over realized claims of VSCs, deposits, and debt issuance costs on revolving debt instruments.

**Accrued Liabilities**

Accrued liabilities consist of various items payable within one year, including, among other items, accruals for capital expenditures, sales tax, compensation and benefits, vehicle licenses and fees, interest expense, reserves for returns and cancellations, and advertising expenses.

**Other Liabilities**

As of December 31, 2022 and 2021, other current liabilities primarily consist of the current portion of operating lease liabilities. Other liabilities consist of various items to be recognized beyond one year, including the deferred revenue associated with Root Warrants (as further discussed in Note 18 — Fair Value of Financial Instruments).

**Revenue Recognition**

The Company recognizes revenue in accordance with the five-step model prescribed by ASC 606 that includes: (1) identify the contract; (2) identify the performance obligations; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations; and (5) recognize revenue when (or as) performance obligations are satisfied.

*Retail Vehicle Sales*

The Company sells retail vehicles directly to its customers through its website. The prices of retail vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for retail vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. Changes in these estimates are reflected as an adjustment to revenue in the period identified. The amount of consideration received for retail vehicle sales includes noncash consideration representing the value of trade-in vehicles, if applicable, as stated in the contract. Prior to the delivery of the vehicle, the payment is received or financing has been arranged. Payments from customers that finance their purchases with third parties are typically due and collected within 30 days of delivery of the retail vehicle. Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

*Wholesale Sales and Revenues*

The Company sells vehicles to wholesalers. These vehicles sold to wholesalers are primarily acquired from customers and do not meet the Company's quality standards to list and sell through its website. The Company satisfies its performance obligation for wholesale sales and revenues when the wholesale purchaser obtains control of the underlying vehicle, which is upon delivery or pick up at an auction when the transfer of title, risks and rewards of ownership, and control pass to the wholesale purchaser. The Company recognizes revenue at the amount it expects to receive for the used wholesale vehicle, which is the fixed price determined at the auction, or for wholesale marketplace transactions, at the amount it expects to receive

88

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

for auction fees charged in facilitating the transaction. The purchase price of the wholesale vehicle is typically due and collected within 30 days of delivery of the wholesale vehicle and auction fees are typically due within two days of a completed sale.

*Other Sales and Revenues*

Other sales and revenues include gains on the sales of finance receivables, commissions on VSCs, GAP waiver coverage, and customer insurance and interest income received on finance receivables prior to selling them to investors.

Customers purchasing retail vehicles from the Company may enter into contracts for VSCs and, if they finance with the Company, GAP waiver coverage. The prices of VSCs and GAP waiver coverage are set forth in each contract. The Company sells and receives a commission on VSCs under a master dealer agreement with DriveTime, pursuant to which the Company sells VSCs that DriveTime administers and is the obligor. The Company receives a commission on GAP waiver coverage contracts where the administrator of the contract is obligated to reimburse the holder of the underlying finance receivable for a balance that is in excess of the value of the financed vehicle in the event of a total loss. The Company recognizes commission revenue at the time of sale, net of a reserve for estimated contract cancellations. GAP waiver coverage contracts obligate whoever holds the underlying finance receivable to not attempt collection of a balance that is in excess of the value of the financed vehicle in the event of a total loss. GAP waiver coverage is recognized as the performance obligation is satisfied over the period of coverage, generally on a straight-line basis over the expected period the outstanding balance of the related finance receivable will exceed the value of the financed vehicle, less a reserve for cancellations. Upon selling the corresponding finance receivable, the Company recognizes any remaining deferred revenue. The reserve for cancellations of VSCs and GAP waiver coverage contracts is estimated based upon historical experience and recent trends and is reflected as a reduction of other sales and revenues. Changes in these estimates are reflected as an adjustment to other sales and revenues in the period identified.

Under the master dealer agreement with DriveTime, the Company is also contractually entitled to receive profit-sharing revenues based on the performance of the VSCs once a required claims period has passed. This is a form of variable consideration the Company recognizes as revenue to the extent that it is probable that it will not result in a significant revenue reversal. The Company applies the expected value method, utilizing expected VSC performance based on historical claims and cancellation data from its customers, as well as other qualitative assumptions to estimate the amount it expects to receive. The Company reassesses the estimate each reporting period with any changes reflected as an adjustment to other sales and revenues in the period identified. Profit-sharing payments will begin when the underlying VSCs reach a specified level of claims history. As of December 31, 2022 and 2021, the Company had ending receivables of approximately $8 million and $19 million, respectively, related to cumulative profit-sharing payments recognized as revenue to which it expects to be entitled. The receivables are included in other current assets and other assets on the accompanying consolidated balance sheets.

The Company accounts for sales of finance receivables in accordance with ASC Topic 860, *Transfers and Servicing of Financial Assets* ("ASC 860"). ASC 860 states that a transfer of an entire financial asset, a group of entire financial assets, or a participating interest in an entire financial asset in which the transferor surrenders control over those financial assets is accounted for as a sale only if all of the following conditions are met:

•   The transferred financial assets have been isolated from the transferor - put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

•   Each transferee has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or third-party holder of its beneficial interests) from taking advantage of its right to pledge or exchange the asset and provides more than a trivial benefit to the transferor.

•   The transferor, its consolidated affiliates included in the financial statements being presented or its agents do not maintain effective control over the transferred financial assets or third-party beneficial interests related to those transferred assets.

For the years ended December 31, 2022, 2021, and 2020, all transfers of finance receivables met the requirements for sale treatment. The Company records the gain on the sale of a finance receivable upon receipt of proceeds, in an amount equal to the fair value of the net proceeds received less the carrying amount of the finance receivable. The Company has made customary representations related to the sales of finance receivables. Any significant estimated post-sale obligations or contingent obligations to the purchaser of the receivables would be accrued if probable and estimable in accordance with ASC 450, *Contingencies*. Any such obligations are considered in the Company's determination of the accounting for the transfers of the finance receivables under ASC Topic 860, *Transfers and Servicing of Financial Assets*.

89

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**Cost of Sales**

Cost of sales includes the cost to acquire used vehicles and direct and indirect vehicle reconditioning costs associated with preparing the vehicles for resale. Vehicle reconditioning costs include parts, labor, inbound transportation costs, and other incremental overhead costs, which are allocated to inventory via specific identification and standard costing. Occupancy and labor costs not related to vehicle acquisition or reconditioning, including those incurred in connection with expanding production capacity, are expensed as incurred as a component of selling, general and administrative expense. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

**Selling, General, and Administrative Expenses**

Selling, general, and administrative ("SG&A") expenses primarily include compensation and benefits, advertising, depreciation expense, facilities costs, technology expenses, logistics and fulfillment expenses, and other administrative expenses. SG&A expenses exclude the costs related to reconditioning vehicles and inbound transportation, which are included in cost of sales, and payroll costs of employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

**Advertising Costs**

Advertising production costs are expensed the first time the advertising takes place. All other advertising costs are expensed as incurred. Advertising expenses are included in SG&A expenses on the accompanying consolidated statements of operations. Advertising expense was approximately $490 million, $479 million, and $286 million during the years ended December 31, 2022, 2021, and 2020, respectively.

**Equity-Based Compensation**

The Company classifies equity-based awards granted in exchange for services as either equity awards or liability awards. The classification of an award as either an equity award or a liability award is generally based upon cash settlement options. Equity awards are measured based on the fair value of the award at the grant date. Liability awards are re-measured to fair value each reporting period. The Company recognizes equity-based compensation on a straight-line basis over the award's requisite service period, which is generally the vesting period of the award, less actual forfeitures. No compensation expense is recognized for awards for which participants do not render the requisite services. For equity and liability awards earned based on performance or upon occurrence of a contingent event, when and if the awards will be earned is estimated. If an award is not considered probable of being earned, no amount of equity-based compensation is recognized. If the award is deemed probable of being earned, related compensation expense is recorded over the estimated service period. To the extent the estimate of awards considered probable of being earned changes, the amount of equity-based compensation recognized will also change. See Note 13 — Equity-Based Compensation for additional information on equity-based compensation.

**Shipping and Handling**

The Company's logistics costs related to transporting its used vehicle inventory include fuel, maintenance, and depreciation related to operating its own transportation fleet, and third-party transportation fees. The portion of these costs related to inbound transportation from the point of acquisition to the inspection and reconditioning center are capitalized to inventory and then included in cost of sales when the related used vehicle is sold. Logistics costs not included in cost of sales are included in selling, general and administrative expenses in the accompanying consolidated statements of operations and were approximately $235 million, $148 million, and $77 million during the years ended December 31, 2022, 2021, and 2020, respectively, excluding compensation and benefits.

**Defined Contribution Plan**

The Company sponsors a qualified 401(k) retirement plan (defined contribution plan) for its employees. The plan covers substantially all employees who have attained the age of 18. Participants may voluntarily contribute to the plan up to the maximum limits established by Internal Revenue Service regulations. The Company provides matching contributions of 40% up to the first 6% of an employee's compensation, which vests evenly over the employee's initial five-year service period. On January 1, 2022, the plan was amended whereby prospective participants' employer matching contributions vest evenly over the employee's initial four-year service period. Employer contributions to the plan, net of forfeitures, were approximately $8 million, $5 million, and $3 million for the years ended December 31, 2022, 2021, and 2020, respectively. Employer

90

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

contributions are included in selling, general, and administrative expenses in the accompanying consolidated statements of operations.

**Derivative Instruments and Hedging Activities**

The Company from time to time enters into short-term derivative instruments to manage risks arising from its business operations and economic conditions, primarily cash flow variability that may arise from interest rate changes between the time the Company originates finance receivables and the time it sells them through securitizations. The Company does not designate these derivative instruments as hedges under ASC 815, *Derivatives and Hedging* for hedge accounting treatment and as a result they are accounted for as economic hedges. Gains and losses related to the derivative instruments are included within other sales and revenues to follow the presentation of the hedged item within the accompanying consolidated statements of operations and any derivative instruments outstanding as of the end of the period are reported at fair value on the accompanying consolidated balance sheets.

**Fair Value Measurements**

The fair value of financial instruments is based on estimates using quoted market prices, discounted cash flows, or other valuation techniques. Those techniques are significantly affected by the assumptions used, including the discount rate and the estimated timing and amount of future cash flows. Therefore, the estimates of fair value may differ substantially from amounts that ultimately may be realized or paid at settlement or maturity of the financial instruments, and those differences may be material. Accordingly, the aggregate fair value amounts presented may not represent the Company's underlying institutional value.

The Company uses the three-tier hierarchy established by U.S. GAAP, which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value to determine the fair value of its financial instruments. This hierarchy indicates to what extent the inputs used in the Company's calculations are observable in the market. The different levels of the hierarchy are defined as follows:

| | |
|---|---|
| **Level 1:** | Unadjusted quoted prices in active markets for identical assets or liabilities. |
| **Level 2:** | Other than quoted prices that are observable in the market for the asset or liability, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or model-derived valuations or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. |
| **Level 3:** | Inputs are unobservable and reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. |

The Company has elected the fair value option for its beneficial interests in securitizations, which primarily include notes and certificates of the securitization trusts. Electing the fair value option allows the Company to recognize changes in the fair value of these assets in the period the fair value changes. The changes in fair value are recorded within other expense, net and amounts attributable to interest income are reported in interest expense, net as earned on the accompanying consolidated statements of operations. See Note 18 — Fair Value of Financial Instruments for additional information.

**Segments**

Business segments are defined as components of an enterprise about which discrete financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing operating performance. Based on the way the Company manages its business, the Company has determined that it currently operates with one operating segment and therefore one reportable segment. The chief operating decision maker focuses on consolidated results in assessing operating performance and allocating resources. Furthermore, the Company offers similar products and

91

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

services and uses similar processes to sell those products and services to similar classes of customers throughout the United States ("U.S."). Substantially all revenue is generated and all assets are held in the U.S. for all periods presented.

**Income Taxes**

The Company accounts for income taxes pursuant to the asset and liability method, which requires the recognition of deferred income tax assets and liabilities related to the expected future tax consequences arising from temporary differences between the carrying amounts and tax bases of assets and liabilities based on enacted statutory tax rates applicable to the periods in which the temporary differences are expected to reverse. Any effects of changes in income tax rates or laws are included in income tax expense in t he period of enactment. The Company reduces the carrying amounts of deferred tax assets by a valuation allowance if, based on the evidence available, it is more likely than not that such assets will not be realized. In making the assessment under the more likely than not standard, appropriate consideration must be given to all positive and negative evidence related to the realization of the deferred tax assets. The assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carry forward periods by jurisdiction, the Company's experience with loss carryforwards not expiring unutilized, and all tax planning alternatives that may be available. A valuation allowance is recognized if under applicable accounting standards the Company determines it is more likely than not that its deferred tax assets would not be realized. See Note 15 — Income Taxes for additional information.

**Adoption of New Accounting Standards**

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. ASU 2021-08 requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606 instead of being recorded at fair value. The Company early adopted ASU 2021-08 in the second quarter of 2022 and it did not have a material effect on its condensed consolidated financial statements as there were no business combinations affected by the retrospective application to January 1, 2022.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Busines**s

On May 9, 2022, the Company completed its previously announced acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA from KAR Auction Services, Inc. for approximately $2.2 billion in cash. Proceeds from the issuance and sale of the 2030 Notes were used to fund the acquisition. The acquisition included 56 auction sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding the Company's infrastructure and enhancing its customer offering by facilitating a broader selection of vehicles and faster delivery times.

92

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

The following table summarizes the allocation of the purchase price consideration to identifiable assets acquired and liabilities assumed as of December 31, 2022:

|  | Purchase Price Allocation |
| --- | --- |
|  | (in millions) |
| **Assets Acquired** |  |
| Current assets | $ 208 |
| Property and equipment | 1,281 |
| Operating lease right-of-use assets | 188 |
| Intangible assets | 79 |
| Other assets | 1 |
| Total Assets Acquired | 1,757 |
|  |  |
| **Liabilities Assumed** |  |
| Current liabilities | 233 |
| Operating lease liabilities | 167 |
| Total Liabilities Assumed | 400 |
|  |  |
| **Net Assets Acquired** | 1,357 |
| Purchase price consideration | 2,195 |
| **Goodwill** | $ 838 |

Identifiable intangible assets acquired consist of the following:

|  | Fair Value | Useful Life |
| --- | --- | --- |
| Customer relationships | $ 50 | 10 years |
| Developed technology | $ 29 | 3 years |

Customer relationships were valued using the multi-period excess earnings method of the income approach. Developed technology was valued using the replacement cost method of the cost approach. Significant assumptions used in the valuations were revenues and attrition rate and are classified as Level 3 due to the lack of observable market data. No residual values were assigned to the customer relationships and developed technology intangible assets and they are amortized on an economic useful life basis commensurate with future anticipated cash flows and straight line, respectively. As of December 31, 2022, the remaining weighted-average amortization period for the intangible assets acquired was approximately 6.6 years.

Real property was valued using market comparable transactions of the market approach, for which the key assumption is the similarity of the acquired property to market comparable transactions. Personal property was valued using the replacement cost method of the cost approach, for which the key assumptions are the costs of similar personal property in new condition and economic obsolescence rates.

The acquisition resulted in the recognition of $838 million of goodwill, which is deductible for tax purposes and represents the future economic benefits expected to arise from anticipated synergies and intangible assets that do not qualify for separate recognition, including an assembled workforce, non-contractual relationships and other agreements.

For the year ended December 31, 2022, the Company recognized $490 million of wholesale sales and revenues, $472 million of cost of sales, and a net loss of $101 million from ADESA operations, which includes $83 million of depreciation and amortization, including acquired intangible assets amortization expense of $15 million.

The following unaudited pro forma combined results of operations information for the year ended December 31, 2022 and 2021 have been prepared as if the ADESA Acquisition occurred on January 1, 2021:

93

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

|  | *Unaudited* | |
|---|---|---|
|  | **Year ended December 31,** | |
|  | **2022** | **2021** |
|  | **(in millions)** | |
| Revenues | $ 13,903 | $ 13,675 |
| Net loss | $ (3,024) | $ (571) |
| Net loss attributable to non-controlling interests | (1,343) | (276) |
| Net loss attributable to Carvana Co. | $ (1,681) | $ (295) |
| Net loss per share of Class A common stock - basic and diluted | $ (15.89) | $ (3.00) |
| Weighted-average shares of Class A common stock - basic and diluted | 105,808 | 98,459 |

The unaudited pro forma combined results of operations information reflect the following pro forma adjustments:

|  | *Unaudited* | |
|---|---|---|
|  | **Year ended December 31,** | |
|  | **2022** | **2021** |
|  | **(in millions)** | |
| Interest expense | $ 123 | $ 345 |
| Lease expense | $ 5 | $ (16) |
| Depreciation and amortization expense | $ 13 | $ (6) |
| Intercompany revenues and cost of sales | $ (7) | $ (20) |

The unaudited pro forma combined results of operations information is provided for informational purposes only and is not necessarily intended to represent the results that would have been achieved had the ADESA Acquisition been consummated on January 1, 2021 or indicative of the results that may be achieved in the future.

**NOTE 4 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net, as of December 31, 2022 and 2021:

|  | **December 31,** | |
|---|---|---|
|  | **2022** | **2021** |
|  | **(in millions)** | |
| Land and site improvements | $ 1,331 | $ 303 |
| Buildings and improvements | 1,267 | 643 |
| Transportation fleet | 673 | 347 |
| Software | 245 | 169 |
| Furniture, fixtures, and equipment | 158 | 97 |
| Total property and equipment excluding construction in progress | 3,674 | 1,559 |
| Less: accumulated depreciation and amortization on property and equipment | (564) | (294) |
| Property and equipment excluding construction in progress, net | 3,110 | 1,265 |
| Construction in progress | 134 | 295 |
| Property and equipment, net | $ 3,244 | $ 1,560 |

Depreciation and amortization expense on property and equipment was approximately $346 million, $153 million, and $92 million for the years ended December 31, 2022, 2021, and 2020, respectively, of which $183 million, $103 million, and $72 million was recorded to selling, general, and administrative expense, respectively, $49 million, $26 million, and $10 million

94

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

was capitalized to vehicle inventory, respectively, and $114 million, $24 million, and $10 million was recorded to cost of sales, respectively, including $52 million, $24 million, and $10 previously capitalized to vehicle inventory.

The Company capitalized internal use software costs totaling approximately $85 million, $59 million, and $49 million during the years ended December 31, 2022, 2021, and 2020, respectively, which is included in software and construction in progress in the table above. The Company capitalized approximately $68 million, $45 million, and $36 million during the years ended December 31, 2022, 2021, and 2020, respectively, of payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use.

The Company capitalizes interest in connection with various construction projects to build, upgrade, or remodel certain of its facilities. During the years ended December 31, 2022, 2021, and 2020, the Company incurred total interest costs, net of interest income, of approximately $503 million, $185 million, and $139 million, respectively, of which approximately $17 million, $9 million, and $8 million, respectively, were capitalized.

### NOTE 5 — GOODWILL AND INTANGIBLE ASSETS

The following table summarizes goodwill and intangible assets, net as of December 31, 2022 and 2021:

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in millions) | |
| Intangible assets: | | |
| Customer relationships | $ 50 | $ — |
| Developed technology | 41 | 9 |
| Non-compete agreements | 1 | 1 |
| Intangible assets, acquired cost | 92 | 10 |
| Less: accumulated amortization | (22) | (6) |
| Intangible assets, net | $ 70 | $ 4 |
| | | |
| Goodwill, beginning of year | $ 9 | $ 9 |
| ADESA Acquisition | 838 | — |
| Impairment | (847) | — |
| Goodwill, end of year | $ — | $ 9 |

During the fourth quarter of 2022, the Company's market capitalization declined significantly, with a closing stock price on December 27, 2022 at a historic low of $3.72 per share of Class A common stock. Management determined that a triggering event had occurred, indicating it was more likely than not that the fair value of the Company's single reporting unit was less than its carrying value as of December 31, 2022. Therefore, management performed a quantitative goodwill impairment test for the Company's reporting unit as of December 31, 2022 and as a result recorded a non-cash goodwill impairment charge of $847 million, which is reflected as Goodwill impairment in the accompanying consolidated statements of operations.

The quantitative goodwill impairment test requires a determination of whether the fair value of a reporting unit is less than the carrying value. As of December 31, 2022, and because the Company's single reporting unit had a negative carrying value, management utilized an enterprise value-based income approach to determine the fair value of the reporting unit. The income approach discounts projected free cash flows of the reporting unit at a computed weighted average cost of capital as the discount rate. The income approach requires the use of significant estimates and assumptions, which include revenue growth rates and future operating margins used to calculate projected future cash flows, weighted average cost of capital, and future economic and market conditions. In connection with this process, management also reconciled the estimated fair value of the Company's single reporting unit to its market capitalization, including consideration of a reasonable control premium, based upon the average price of the Company's Class A common stock over a reasonable period as of the measurement date. Management bases the cash flow forecasts on its knowledge of the automotive industry, recent performance of the Company, its

95

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

expectations of future performance, and other assumptions management believes to be reasonable but that are unpredictable and inherently uncertain. Actual future results may differ from those estimates.

Amortization expense was approximately $16 million, $2 million and $2 million during the years ended December 31, 2022, 2021, and 2020, respectively. As of December 31, 2022, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 6.0 years. The anticipated annual amortization expense to be recognized in future years as of December 31, 2022 is as follows:

|  | Expected Future Amortization |
| --- | --- |
|  | (in millions) |
| 2023 | $ 18 |
| 2024 | 18 |
| 2025 | 14 |
| 2026 | 7 |
| 2027 | 5 |
| Thereafter | 8 |
| Total | $ 70 |

**NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES**

The following table summarizes accounts payable and other accrued liabilities as of December 31, 2022 and 2021:

|  | December 31, | |
| --- | --- | --- |
|  | 2022 | 2021 |
|  | (in millions) | |
| Accounts payable, including $16 and $27, respectively, due to related parties | $ 232 | $ 141 |
| Accrued interest expense | 99 | 42 |
| Sales taxes and vehicle licenses and fees | 76 | 102 |
| Accrued compensation and benefits | 65 | 45 |
| Reserve for returns and cancellations | 60 | 44 |
| Customer deposits | 23 | 34 |
| Accrued property and equipment | 10 | 85 |
| Accrued advertising costs | 7 | 40 |
| Other accrued liabilities | 205 | 123 |
| Total accounts payable and other accrued liabilities | $ 777 | $ 656 |

**NOTE 7 — RELATED PARTY TRANSACTIONS**

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all of the interests in DriveTime, entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities, including hubs and IRCs (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with the hub locations having cancellable terms, provided 60 days' prior written notice is given, expiring between 2023 and 2026. The Company has the right

96

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

to exercise up to two consecutive one-year renewal options at up to ten of these hub locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. There is one facility remaining under the DriveTime Hub Lease Agreement, which has a cancellable term, provided 60 days' prior written notice is given, and expires in 2023. The Company has the right to exercise up to two consecutive one-year renewal options at up to ten locations, under the DriveTime Hub Lease Agreement and the DriveTime Lease Agreement described above.

The hub locations under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations, the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco IRCs. At both of these locations, the Company expects the lease to continue beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In 2016 and 2018, the Company entered into lease agreements related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In September 2020, to consummate a sale leaseback transaction with an unrelated third party, the Company exercised a pre-existing option to purchase the leased land and related assets from Verde for its net book value of $22 million thus terminating the lease agreement. The Company immediately sold such land and related assets along with the Company's leasehold improvements at the IRC to a third party who simultaneously leased back the land and the IRC to the Company.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a sublease agreement from DriveTime of a fully operational IRC near Cleveland, Ohio. The lease had an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. In July 2021, the Company exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime effective October 1, 2021.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were $4 million, $5 million, and $7 million, for the years ended December 31, 2022, 2021, and 2020, respectively, allocated between inventory and selling, general, and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company and the unrelated landlord mutually agreed to terminate this lease early, effective December 31, 2022, in exchange for an early termination payment.

**Office Leases**

In September 2016, the Company entered into a lease for office space in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of another floor in the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the

97

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was $1 million during each of the years ended December 31, 2022, 2021, and 2020.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was $1 million during each of the years ended December 31, 2022, 2021, and 2020.

**Wholesale Sales and Revenues**

DriveTime purchases and sells wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party, and through the Company's wholesale marketplace platform. The Company recognized $32 million, $54 million, and $4 million of wholesale sales and revenues from DriveTime during the years ended December 31, 2022, 2021, and 2020, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of December 31, 2022, and 2021, $1 million and $19 million, respectively, of these vehicles were included in vehicle inventory in the accompanying consolidated balance sheets. The Company also recognized $22 million and $62 million of cost of goods sold during the years ended December 31, 2022 and 2021, respectively.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the years ended December 31, 2022, 2021, and 2020, the Company recognized $176 million, $186 million, and $94 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. During the years ended December 31, 2022, 2021, and 2020, the Company recognized less than $1 million, $20 million, and $11 million, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated party. The Company incurred $18 million, $15 million, and $6 million during the years ended December 31, 2022, 2021, and 2020, respectively, related to the administration of limited warranty and GAP waiver coverage.

**Profit Sharing Agreement**

In June 2018, the Company entered into an agreement with an unaffiliated third party, pursuant to which the Company would sell certain Road Hazard ("RH") and Pre-Paid Maintenance ("PPM") contracts. Under this agreement, third parties would administer the RH and PPM contracts, including providing customer and administrative services, and pay a profit sharing component to the Company. In 2022, the Company began selling equivalent offerings from DriveTime, pursuant to the Master Dealer Agreement discussed above, and all rights and obligations in connection with existing RH and PPM contracts were

98

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

transferred to DriveTime (the "Transferred Contracts"). Finally, in December 2022, the Company entered into a profit sharing agreement with DriveTime with regard to the Transferred Contracts (the "Profit Sharing Agreement"). During the year ended December 31, 2022, the Company recognized approximately $3 million related to payments under the Profit Sharing Agreement to which it expects to be entitled.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of $10 million, $6 million, and $6 million for the years ended December 31, 2022, 2021, and 2020, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million during each of the years ended December 31, 2022, 2021, and 2020 under this agreement.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the years ended December 31, 2022, 2021, and 2020.

**Accounts Payable Due to Related Party**

As of December 31, 2022 and 2021, $16 million and $27 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying consolidated balance sheets.

**Contributions of Class A Common Stock From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in the fourth quarter of 2021, the Company's CEO, Ernest Garcia III ("Mr. Garcia"), committed to giving then-current employees 23 shares of Class A common stock from his personal shareholdings once employees reach their two-year employment anniversary ("CEO Milestone Gift" or "Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia contributes to the Company, at the end of each fiscal quarter, the number of shares of Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund RSU awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the year ended December 31, 2022, 128,133 RSUs vested and were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has agreed to indemnify Mr. Garcia from any such obligations that may arise.

99

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial Inc. (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2021 and 2022, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. On each of March 17, 2022 and March 22, 2022, the Company and the Ally Parties amended the MPSA to extend the scheduled commitment termination date to March 21, 2023 and increase the Ally Parties' commitment to purchase automotive finance receivables to $5.0 billion. In addition, on November 1, 2022, January 13, 2023, and January 20, 2023, the Company and the Ally Parties further amended the MPSA to, in aggregate, consolidate and reflect the several previously executed amendments to the MPSA facility and streamline the funding mechanics associated with the sale of finance receivables to the Ally Parties, extend the scheduled commitment termination date to January 12, 2024, and establish a commitment on the part of the Ally Parties to purchase up to a maximum of $4.0 billion of principal balances of finance receivables between January 13, 2023 and the scheduled commitment termination date.

During the years ended December 31, 2022, 2021, and 2020, the Company sold approximately $3.8 billion, $2.1 billion, and $2.2 billion, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.2 billion of unused capacity as of December 31, 2022.

**Securitization Transactions**

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with the Risk Retention Rules, as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the years ended December 31, 2022, 2021 and 2020, the Company sold approximately $2.4 billion, $5.0 billion and $900 million, respectively, in principal balances of finance receivables through securitization transactions.

**Fixed Pool Loan Sales**

In 2020, the Company further expanded its finance platform by completing fixed pool loan sales to a new financing partner on terms substantially similar to the Company's securitization transactions and MPSA sales, including a sale of approximately $320 million in principal balances of finance receivables in December 2020. There were no such transactions during 2021 or 2022.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was $411 million, $718 million, and $218 million during the years ended December 31, 2022, 2021, and 2020, respectively, which is included in other sales and revenues in the accompanying consolidated statements of operations.

**NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the

100

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of December 31, 2022, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying consolidated balance sheets, which as of December 31, 2022 and 2021 were $321 million and $382 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of December 31, 2022 and 2021.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at December 31, 2022 and 2021. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | December 31, 2022 | | December 31, 2021 | |
| | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| | (in millions) | | | |
| Rated notes | $ 252 | $ 252 | $ 282 | $ 282 |
| Certificates and other assets | 69 | 69 | 100 | 100 |
| Total unconsolidated VIEs | $ 321 | $ 321 | $ 382 | $ 382 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of December 31, 2022 and 2021 were as follows:

| | December 31, 2022 | | December 31, 2021 | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | (in millions) | | | |
| Rated notes | $ 268 | $ 252 | $ 282 | $ 282 |
| Certificates and other assets | 43 | 69 | 93 | 100 |
| Total securities available for sale | $ 311 | $ 321 | $ 375 | $ 382 |

101

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

**NOTE 10 — DEBT INSTRUMENTS**

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of December 31, 2022 and 2021 consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | (in millions) | |
| Asset-based financing: | | |
| Floor plan facility | $ 569 | $ 1,877 |
| Finance receivable facilities | 965 | 176 |
| Financing of beneficial interest in securitizations | 268 | 282 |
| Notes payable | 3 | 10 |
| Real estate financing | 486 | 447 |
| Total asset-based financing | 2,291 | 2,792 |
| Senior notes | 5,725 | 2,450 |
| Total debt | 8,016 | 5,242 |
| Less: current portion | (1,638) | (2,154) |
| Less: unamortized debt issuance costs [1] | (82) | (34) |
| Total included in long-term debt, net | $ 6,296 | $ 3,054 |

(1) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying consolidated balance sheets and not included here.

**Short-Term Revolving Facilities**

*Floor Plan Facilities*

The Company previously entered into a floor plan facility with a lender to finance its vehicle inventory (the "Original Floor Plan Facility"), which was secured by Carvana LLC's vehicle inventory, general intangibles, accounts receivable, and finance receivables. The Original Floor Plan Facility was amended at various times and effective September 22, 2022, the Company amended and restated the facility (the "12-Month Floor Plan Facility") to extend the maturity date to September 22, 2023 with a line of credit of $2.2 billion and tie the interest rate to a prime rate plus 1.00%.

On September 22, 2022, the Company also entered into a separate floor plan facility (the "18-Month Floor Plan Facility", and together with the 12-Month Floor Plan Facility, the "Floor Plan Facilities") with a lender. The line of credit under the 18-Month Floor Plan Facility is $2.0 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and its maturity date is March 22, 2024. The interest rate under the 18-Month Floor Plan Facility is tied to a prime rate plus 1.00%.

Under the Floor Plan Facilities, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 150 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facilities and subsequently reborrow such amounts. The Floor Plan Facilities also require monthly interest payments and that at least 12.5% of the total principal amount owed to the lender is held as restricted cash.

The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter under the Floor Plan Facilities.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

As of December 31, 2022, the Company had $569 million outstanding under the 12-Month Floor Plan Facility, unused capacity of $1.6 billion, and held $71 million in restricted cash related to this facility. As of December 31, 2022, the Company had no amount outstanding under the 18-Month Floor Plan Facility, unused capacity of $2.0 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and held no amount in restricted cash related to this facility. During the year ended December 31, 2022, the Company's effective interest rate on the 12-Month Floor Plan Facility was approximately 3.57%.

As of December 31, 2021, the Company had $1.9 billion outstanding under the Original Floor Plan Facility, unused capacity of $373 million, and held $141 million in restricted cash related to this facility. For the year ended December 31, 2021, the Company's effective interest rate on the Original Floor Plan Facility was approximately 2.55%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility, which was subsequently increased to $500 million, to fund certain automotive finance receivables originated by the Company. In June 2021, the Company amended its agreement to, among other things, extend the maturity date to January 24, 2023. In January 2023, the Company amended its agreement to, among other things, adjust the line of credit to $300 million, and extend the maturity date to January 24, 2024.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million, and extend the maturity date to December 8, 2023.

On April 30, 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase this line of credit to $600 million. In September 2022, the Company amended its agreement to extend the maturity date to March 30, 2024.

On October 15, 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until April 15, 2023.

On March 18, 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until September 18, 2023.

The Finance Receivables Facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The Finance Receivable Facilities require monthly payments of interest and fees based on usage and unused facility amounts. The Finance Receivable Facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these Finance Receivable Facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of December 31, 2022 and 2021, the Company had $965 million and $176 million, respectively, outstanding under these Finance Receivable Facilities, unused capacity of $1.6 billion and $1.9 billion, respectively, and held $36 million and $67 million, respectively, in restricted cash related to these Finance

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

Receivable Facilities. For the years ended December 31, 2022 and 2021, the Company's effective interest rate on these Finance Receivable Facilities was approximately 2.93% and 1.64%.

**Long-Term Debt**

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (collectively, the "Senior Notes") each under a separate indenture (collectively, the "Indentures"), as further described below.

The following table summarizes components of the Company's senior secured notes:

| | December 31, 2022 | December 31, 2021 | Interest Rate |
|---|---|---|---|
| | (in millions, except percentages) | | |
| 2025 Senior Unsecured Notes due October 1, 2025 ("2025 Notes") | $ 500 | $ 500 | 5.625 % |
| 2027 Senior Unsecured Notes due April 15, 2027 ("2027 Notes") | 600 | 600 | 5.500 % |
| 2028 Senior Unsecured Notes due October 1, 2028 ("2028 Notes") | 600 | 600 | 5.875 % |
| 2029 Senior Unsecured Notes due September 1, 2029 ("2029 Notes") | 750 | 750 | 4.875 % |
| 2030 Senior Unsecured Notes due May 1, 2030 ("2030 Notes") | 3,275 | — | 10.250 % |
| Total principal amount | 5,725 | 2,450 | |
| Less: unamortized debt issuance cost | (76) | (28) | |
| Total debt | $ 5,649 | $ 2,422 | |

Each of the 2025 Notes, the 2027 Notes, the 2028 Notes and the 2029 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The 2030 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee. The interest on each of the Senior Notes is payable semi-annually, beginning on April 1, 2021 for the 2025 Notes and 2028 Notes, October 15, 2021 for the 2027 Notes, March 1, 2022 for the 2029 Notes, and November 1, 2022 for the 2030 Notes. The Senior Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, or immaterial subsidiaries).

The Company may redeem some or all of each issuance of Senior Notes at redemption prices set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to those redemption dates, the Company may redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. With respect to the 2030 Notes, the Company may, at its option, redeem in the aggregate of up to 10% of the original aggregate principal amount of the 2030 Notes during the period from, and including, May 1, 2025 to, but excluding May 1, 2027, at a redemption price equal to 105.125% of the 2030 Notes to be redeemed, plus accrued and unpaid interest thereon to the relevant redemption rate. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to its redemption date, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants may be suspended if any

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

of the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings. As of December 31, 2022, the Company was in compliance with all debt covenants.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of December 31, 2022 and 2021, the outstanding principal of these notes had a weighted-average interest rate of 7.5% and 6.4%, respectively, and totaled $3 million and $10 million, respectively, net of unamortized debt issuance costs, of which $1 million and $7 million, respectively, was due within the next twelve months and is included in current portion of long-term debt in the accompanying consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of December 31, 2022, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of December 31, 2022 and 2021, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was $483 million and $444 million, respectively, and was included in long-term debt in the accompanying consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of December 31, 2022 and 2021, the Company has pledged $268 million and $282 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from April 2023 to September 2029. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was $265 million and $279 million, as of December 31, 2022 and 2021, respectively, of which $102 million and $93 million, respectively was included in current portion of long-term debt in the accompanying consolidated balance sheets.

The following table summarizes the aggregate principal maturities due in each period for notes payable, Senior Notes, real estate financing, and financing of beneficial interests in securitizations as of December 31, 2022. Maturities related to financing

105

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

of beneficial interests in securitizations are estimated based on expected timing of payments from the securitization trusts to the lender.

|  | As of December 31, 2022 |
|---|---|
|  | (in millions) |
| 2023 | $ 105 |
| 2024 | 76 |
| 2025 | 553 |
| 2026 | 29 |
| 2027 | 608 |
| Thereafter | 5,111 |
| Total | $ 6,482 |

**NOTE 11 — STOCKHOLDERS' EQUITY (DEFICIT)**

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of December 31, 2022 and 2021, there were 236 million and 216 million Class A Units, respectively, and 1 million and 3 million Class B Units, respectively (as adjusted for the participation thresholds and closing price of Class A common stock on December 31, 2022 and 2021), issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 1, 2020, the Company completed a registered direct offering to investors of 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of $600 million. Ernest

106

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

Garcia II, through Verde, and Ernest Garcia III each invested $25 million, or 0.6 million shares of the Class A common stock, in the offering. The Company used the net proceeds to purchase 16.7 million newly-issued LLC Units in Carvana Group.

On May 21, 2020, the Company completed a public equity offering of 5 million shares of its Class A common stock at an offering price of $92.00 per share and received net proceeds from the offering of $459 million. The Company used the net proceeds to purchase 6.3 million newly-issued LLC Units in Carvana Group.

On April 26, 2022, the Company completed a public offering of 15.625 million shares of its Class A common stock at an offering price of $80 for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5.4 million shares of the Class A common stock offered at the public offering price. The Company used the net proceeds to purchase 19.5 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the years ended December 31, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 16 million LLC Units and zero and 13 million shares of Class B common stock for less than 1 million and 13 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received less than 1 million and 16 million LLC Units during the years ended December 31, 2022 and 2021, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes. On August 16, 2021, Carvana Group LLC issued 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes. On May 6, 2022, Carvana Group LLC issued 3.3 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2030 Notes. Carvana Co. used its net proceeds from the 2023 Notes, (which have since been repurchased), the 2025 and 2028 Notes, the 2027 Notes, the 2029 Notes, and the 2030 Notes to purchase 0.6 million, 1.1 million, 0.6 million, 0.8 million, and 3.3 million, respectively, of Class A Non-Convertible Preferred Units.

When Carvana Co. makes payments on the Senior Notes, Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired. As discussed further in Note 10 — Debt Instruments, the Company redeemed its 2023 Notes on October 2, 2020 using a portion of its net proceeds from the issuance of its 2025 and 2028 Notes, at which point 0.6 million Class A Non-Convertible Preferred Units were canceled and retired.

107

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

**NOTE 12 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications, and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the years ended December 31, 2022, 2021, and 2020, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $1 million, $43 million, and $33 million, respectively, which have been included in exchanges of LLC Units in the accompanying consolidated statements of stockholders' equity (deficit). During the years ended December 31, 2022, and 2020, Carvana Co. utilized its net proceeds from its equity offerings to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by approximately $554 million, and $644 million, respectively, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying consolidated statements of stockholders' equity (deficit). No LLC Units were purchased during 2021.

As of December 31, 2022, Carvana Co. owned approximately 55.9% of Carvana Group with the LLC Unitholders owning the remaining 44.1%. The net loss attributable to the non-controlling interests on the accompanying consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| | | **(in millions)** | |
| Transfers from (to) non-controlling interests: | | | |
| Decrease as a result of issuance of Class A common stock | $ (554) | $ — | $ (644) |
| Increase as a result of exchanges of LLC Units | 1 | 43 | 33 |
| Total transfers from (to) non-controlling interests | $ (553) | $ 43 | $ (611) |

108

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

**NOTE 13 — EQUITY-BASED COMPENSATION**

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the years ended December 31, 2022, 2021, and 2020 is as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| | (in millions) | | |
| Class B Units | $ — | $ — | $ 1 |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | 41 | 35 | 21 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | 39 | — | — |
| Options | 13 | 11 | 7 |
| Class A Units | — | 1 | 2 |
| Total equity-based compensation | 93 | 47 | 31 |
| Equity-based compensation capitalized to property and equipment | (8) | (7) | (6) |
| Equity-based compensation capitalized to inventory | (16) | (1) | — |
| Equity-based compensation, net of capitalized amounts | $ 69 | $ 39 | $ 25 |

During the years ended December 31, 2022, 2021, and 2020, the Company capitalized $8 million, $7 million, and $6 million, respectively, of equity-based compensation to property and equipment related to software development and real estate projects and $16 million, $1 million, and less than $1 million, respectively, to inventory related to reconditioning and inbound transportation of vehicles. All other equity-based compensation is included in selling, general, and administrative expenses in the accompanying consolidated statements of operations.

As of December 31, 2022, unrecognized equity-based compensation related to outstanding awards and the related weighted-average period over which it is expected to be recognized subsequent to December 31, 2022 is presented in the table below. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

| | Unrecognized Equity-Based Compensation Related to Outstanding Awards (in millions) | Remaining Weighted-Average Amortization Period (in years) |
| --- | --- | --- |
| Restricted Stock Units and Awards | $ 109 | 3.0 |
| Options | 31 | 2.8 |
| Total unrecognized equity-based compensation | $ 140 | |

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan 14 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other equity-based awards to employees, directors, officers, and consultants. The majority of equity granted by the Company vests over four-year periods based on continued employment with the Company. As of December 31, 2022, approximately 7 million shares remain available for future equity-based award grants under this plan. In addition, the number of shares authorized for issuance under the 2017 Incentive Plan is subject to an automatic annual increase of the lesser of two percent of our outstanding common stock or an amount determined by the Compensation and Nominating Committee of our Board. While the Compensation and Nominating Committee determined not to increase the number of shares authorized for issuance in prior years, the automatic annual increase on January 1, 2023 was approved. After taking into account the automatic annual increase on January 1, 2023 there were approximately 9 million shares remaining available for future equity-based award grants under the 2017 Incentive Plan.

109

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

*Restricted Stock Awards and Restricted Stock Units*

Restricted stock awards ("RSAs") entitle recipients to vote and to receive all dividends declared with respect to such shares, payable upon vesting. RSAs vest over a period of two to five years, subject to the recipient's continued employment or service. During the year ended December 31, 2022, the Company issued certain employees an aggregate of approximately 0.1 million RSAs pursuant to the terms of the 2017 Incentive Plan with a weighted-average grant-date fair value of $34.21. The Company determined the grant-date fair value of the RSAs based on the closing price of the Company's Class A common stock on the grant date. The Company did not grant any RSAs during the years ended December 31, 2021 and 2020.

Restricted stock units ("RSUs") do not entitle recipients to vote or receive dividends. RSUs generally vest over a period of four years, subject to the recipient's continued employment. During the years ended December 31, 2022, 2021, and 2020, the Company issued certain employees an aggregate of approximately 3.5 million, 0.3 million, and 0.3 million RSUs, respectively, pursuant to the terms of the 2017 Incentive Plan with a weighted-average grant-date fair value of $65.26, $288.27, and $110.00, respectively. The Company determined the grant-date fair value of the RSUs based on the closing price of the Company's Class A common stock on the grant date. RSUs are settled in shares of Class A common stock on a one-to-one basis within thirty days of vesting. As discussed in Note 7 — Related Party Transactions, the RSUs granted during the year ended December 31, 2022 include approximately 0.5 million RSUs granted in connection with the CEO Milestone Gift for which the Company recognized approximately $39 million of equity-based compensation, a portion of which related to the production of the Company's used vehicle inventory and was therefore capitalized to inventory.

RSA and RSU activity during the years ended December 31, 2022, 2021, and 2020 was as follows:

| | Number of RSAs/RSUs (in thousands) | | Weighted-Average Grant-Date Fair Value |
|---|---|---|---|
| Outstanding at January 1, 2020 | 928 | $ | 48.04 |
| Granted | 342 | $ | 110.00 |
| Settled | (475) | $ | 45.80 |
| Forfeited | (57) | $ | 70.89 |
| Outstanding and nonvested at December 31, 2020 | 738 | $ | 76.43 |
| | | | |
| Granted | 258 | $ | 288.27 |
| Settled | (385) | $ | 86.57 |
| Forfeited | (58) | $ | 132.88 |
| Outstanding and nonvested at December 31, 2021 | 553 | $ | 162.32 |
| | | | |
| Granted | 3,482 | $ | 65.26 |
| Settled | (432) | $ | 113.96 |
| Forfeited | (951) | $ | 134.83 |
| Outstanding and nonvested at December 31, 2022 | 2,652 | $ | 52.62 |

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to maximums that may vary between $10,000 and $25,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP.

During the years ended December 31, 2022 and 2021, the Company issued 86,352 and 2,494 shares of Class A common stock, respectively, and as of December 31, 2022, 411,154 shares of Class A common stock remained available for future

110

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

issuance. During both years ended December 31, 2022 and 2021, the Company incurred less than $1 million of equity-based compensation expense related to the ESPP.

*Non-Qualified Stock Options*

Non-qualified stock options allow recipients to purchase shares of Class A common stock at a fixed exercise price. The fixed exercise price is equal to the price of a share of Class A common stock at the time of grant. The options typically vest 25% on the anniversary of the grant date and in equal monthly installments thereafter for a total vesting period of four years and expire ten years after the grant date.

Stock option activity during the years ended December 31, 2022, 2021, and 2020 was as follows:

| | Number of Options (in thousands) | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in millions) |
|---|---|---|---|---|
| Outstanding at January 1, 2020 | 1,147 | $ 30.07 | 8.3 | $ 71 |
| Options granted | 179 | $ 88.56 | | n/a |
| Options exercised | (195) | $ 27.82 | | $ 24 |
| Options forfeited or expired | (59) | $ 16.52 | | n/a |
| Outstanding at December 31, 2020 | 1,072 | $ 41.01 | 7.7 | $ 213 |
| | | | | |
| Options granted | 97 | $ 178.42 | | n/a |
| Options exercised | (75) | $ 24.32 | | $ 20 |
| Options forfeited or expired | (28) | $ 27.62 | | n/a |
| Outstanding at December 31, 2021 | 1,066 | $ 39.74 | 6.7 | $ 183 |
| | | | | |
| Options granted | 297 | $ 119.53 | | n/a |
| Options exercised | (89) | $ 37.89 | | $ 7 |
| Options forfeited or expired | (9) | $ 30.97 | | n/a |
| Outstanding at December 31, 2022 | 1,265 | $ 80.26 | 6.4 | $ — |
| | | | | |
| Vested and exercisable as of December 31, 2022 | 823 | $ 52.04 | 5.5 | $ — |
| Expected to vest as of December 31, 2022 | 442 | $ 132.91 | 8.1 | $ — |

111

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

The Company determined the grant-date fair value of the options granted during the years ended December 31, 2022, 2021, and 2020 using the Black-Scholes valuation model with the following weighted-average assumptions:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Expected volatility[1] | 69.2 % | 67.1 % | 70.1 % |
| Expected dividend yield | — % | — % | — % |
| Expected term (in years)[2] | 6.28 | 6.14 | 6.14 |
| Risk-free interest rate | 2.0 % | 0.7 % | 1.4 % |
| Weighted-average grant-date fair value per option | $74.85 | $178.41 | $53.62 |

(1) Measured using the Company's historical data, market option volatility and selected high-growth guideline companies and considering the risk factors that would influence the range of expected volatility because the Company does not have sufficient historical data to provide a reasonable basis upon which to estimate the expected volatility for the entirety of the term.

(2) Expected term represents the estimated period of time until an option is exercised and was determined using the simplified method because the Company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

112

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

A summary of the Class A Unit activity for the years ended December 31, 2022, 2021, and 2020 is as follows:

| | Class A Units | |
| --- | --- | --- |
| | Number of Class A Units (in thousands) | Weighted-Average Grant Date Fair Value |
| Outstanding at January 1, 2020 | 221 | |
| Granted | — | n/a |
| Exchanged | (100) | $ 18.58 |
| Forfeited | — | n/a |
| Outstanding at December 31, 2020 | 121 | |
| | | |
| Granted | — | n/a |
| Exchanged | (36) | $ 18.58 |
| Forfeited | — | n/a |
| Outstanding at December 31, 2021 | 85 | |
| | | |
| Granted | — | n/a |
| Exchanged | — | n/a |
| Forfeited | (6) | $ 18.58 |
| Outstanding at December 31, 2022 | 79 | |
| | | |
| Vested as of December 31, 2022 | 79 | $ 18.58 |
| Expected to vest as of December 31, 2022 | — | n/a |

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four to five years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the years ended December 31, 2022, 2021, and 2020. As of December 31, 2022, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

A summary of the Class B Unit activity for the years ended December 31, 2022, 2021, and 2020 is as follows:

| | Class B Units | |
| --- | --- | --- |
| | Number of Class B Units (in thousands) | Weighted-Average Participation Threshold per Class B Unit |
| Outstanding at January 1, 2020 | 5,168 | $ 3.51 |
| Granted | — | n/a |
| Exchanged | (1,991) | $ 1.22 |
| Forfeited | (14) | $ 5.81 |
| Outstanding at December 31, 2020 | 3,163 | $ 4.94 |
| Granted | — | n/a |
| Exchanged | (535) | $ 1.70 |
| Forfeited | (1) | $ 12.00 |
| Outstanding at December 31, 2021 | 2,627 | $ 5.60 |
| Granted | — | n/a |
| Exchanged | (61) | $ 5.75 |
| Forfeited | — | n/a |
| Outstanding at December 31, 2022 | 2,566 | $ 5.60 |
| Vested as of December 31, 2022 | 2,566 | $ 5.60 |
| Expected to vest as of December 31, 2022 | — | n/a |

**NOTE 14 — LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented. Net loss for all periods presented is attributable only to Class A common stockholders, due to no activity related to convertible preferred stock during those periods.

114

CARVANA CO. AND SUBSIDIARIES<br>
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS<br>
<b>(Continued)</b>

The following table presents the calculation of basic and diluted net loss per share during the years ended December 31, 2022, 2021, and 2020:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
|  | (in millions, except number of shares, which are reflected in thousands, and per share amounts) | | |
| **Numerator:** |  |  |  |
| Net loss | $ (2,894) | $ (287) | $ (462) |
| Net loss attributable to non-controlling interests | (1,307) | (152) | (291) |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (1,587) | $ (135) | $ (171) |
| **Denominator:** |  |  |  |
| Weighted-average shares of Class A common stock outstanding | 100,848 | 82,839 | 65,074 |
| Nonvested weighted-average restricted stock awards | (20) | (34) | (93) |
| Weighted-average shares of Class A common stock outstanding, basic and diluted | 100,828 | 82,805 | 64,981 |
| Net loss per share of Class A common stock, basic and diluted | $ (15.74) | $ (1.63) | $ (2.63) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented.

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net loss per share of Class A common stock for the years ended December 31, 2022, 2021, and 2020:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
|  | (in thousands) | | |
| Options [1] | 1,265 | 1,066 | 1,072 |
| Restricted Stock Units and Awards [1] | 64 | 666 | 757 |
| Class A Units [2] | 82,963 | 89,773 | 100,700 |
| Class B Units [2] | 1,559 | 2,217 | 3,321 |

---

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity (Deficit), as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

115

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Net loss before income taxes was $2.9 billion, $286 million, and $462 million for the years ended December 31, 2022, 2021, and 2020, respectively. The Company had an income tax expense of $1 million for the years ended December 31, 2022, and 2021, and an income tax benefit of less than $1 million for the year ended December 31, 2020.

The components of income tax expense (benefit) are as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| | (in millions) | | |
| Federal - Current | $ 2 | $ 2 | $ — |
| Federal - Deferred | (1) | (1) | — |
| | 1 | 1 | — |
| State - Current | — | — | — |
| State - Deferred | — | — | — |
| | — | — | — |
| Total Expense (Benefit) | $ 1 | $ 1 | $ — |

A reconciliation of the U.S. federal rate to the Company's effective income tax rate is as follows:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | |
| | Amount | Percent | Amount | Percent | Amount | Percent |
| | (dollars in millions) | | | | | |
| Expected U.S. federal income taxes at statutory rate | $ (607) | 21.0 % | $ (60) | 21.0 % | $ (97) | 21.0 % |
| Loss attributable to non-controlling interests | 274 | (9.5)% | 32 | (11.2)% | 62 | (13.5)% |
| State taxes | (64) | 2.2 % | (8) | 2.8 % | (9) | 2.0 % |
| Stock based compensation | — | — % | (16) | 5.6 % | (5) | 1.1 % |
| Valuation allowance | 398 | (13.7)% | 53 | (18.5)% | 56 | (12.0)% |
| Effect due to LLC flow-through structure | — | — % | — | — % | (7) | 1.5 % |
| Income tax expense (benefit) | $ 1 | — % | $ 1 | (0.3)% | $ — | 0.1 % |

116

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

Deferred income taxes reflect the net tax effects of temporary differences between the tax basis in an asset or liability and its reported amount under U.S. GAAP. These temporary differences result in taxable or deductible amounts in future years. The components of the Company's deferred tax assets are as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | | 2021 |
| | (in millions) | | |
| **Deferred tax assets:** | | | |
| Investment in Carvana Group | $ | 1,471 | $ | 1,391 |
| Net operating loss carryforward | | 451 | | 193 |
| Interest expense carryforward | | 130 | | 50 |
| Tax credit carryforward | | 6 | | 4 |
| Other | | 2 | | 1 |
| Total gross deferred tax assets | | 2,060 | | 1,639 |
| Valuation allowance | | (2,058) | | (1,638) |
| Total deferred tax assets, net of valuation allowance | $ | 2 | $ | 1 |
| | | | | |
| **Deferred tax liabilities:** | | | |
| Intangibles | $ | (1) | $ | (1) |
| | | | | |
| Total deferred tax assets and liabilities | $ | 1 | $ | — |

As of December 31, 2022 and 2021, the Company had federal and state net operating loss carry forwards of $1.9 billion and $801 million, respectively. Federal losses that arose prior to 2018 will begin to expire in 2037. Federal losses generated after 2017 will be carried forward indefinitely.

As described in Note 11 — Stockholders' Equity (Deficit), the Company acquired less than 1 million and 16 million LLC Units during the year ended December 31, 2022 and 2021, respectively, in connection with exchanges with Existing LLC Unitholders. During the year ended December 31, 2022 and 2021, respectively, the Company recorded a gross deferred tax asset of $22 million and $908 million associated with the basis difference in its investment in Carvana Group related to the acquisition of the LLC Units which is reflected as an increase to additional paid-in capital in the accompanying statements of stockholders' equity (deficit).

As described in Note 11 — Stockholders' Equity (Deficit), the Company issued 15.625 million shares of its Class A common stock and received net proceeds from the offering of $1.2 billion. The Company utilized the proceeds to purchase 19.5 million newly issued Class A units in Carvana Group. The Company recognized a gross deferred tax asset of approximately $20 million from the offering, associated with a portion of the basis difference resulting from this purchase of LLC Units, which is reflected as an increase to additional paid-in capital in the accompanying consolidated statements of stockholders' equity (deficit).

As described in Note 3 — Business Combinations, the Company acquired ADESA on May 9, 2022. The Company made an election under Section 336(e) of the United States Internal Revenue Code of 1986, as amended (the "Code") and Section 338 of the Code to treat the acquisition as a deemed asset acquisition for income tax purposes and as such will receive a step up in asset basis and will be able to amortize the acquired Goodwill under Section 197 of the Code over a 15-year period. The total Goodwill amortization expense for the year ended December 31, 2022, is $37 million.

During the year ended December 31, 2022, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance of $2.1 billion against its deferred tax assets. The Company has $2 million in deferred tax assets and $1 million in deferred tax liabilities from separate tax filing entities that are not available to offset its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

117

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of the year ended December 31, 2022 and 2021, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the years ended December 31, 2022 and 2021 was an expense of 0.0% and 0.3%, respectively, related to its wholly-owned subsidiaries.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the Existing LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity (Deficit), each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement (the "TRA"). Under the TRA, the Company generally will be required to pay to the Existing LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of December 31, 2022, the Company has concluded, based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of December 31, 2022, the total unrecorded TRA liability is approximately $1.6 billion. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

**Uncertain Tax Positions**

Based on the Company's analysis of tax positions taken on income tax returns filed, no uncertain tax positions existed as of December 31, 2022, 2021, and 2020. Carvana Co. was formed in November 2016 and did not engage in any operations prior to the IPO and associated organizational transactions. Carvana Co. was not required to file 2016 tax returns and filed its first tax returns for the tax year 2017, the first year it became subject to examination by taxing authorities for U.S. federal and state

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

income tax purposes. Carvana Group is treated as a partnership for U.S. federal and state income tax purposes and its tax returns are subject to examination by taxing authorities. Carvana Group has filed income tax returns for years through 2021. These returns are subject to examination by the taxing authorities in the respective jurisdictions, generally for three or four years after they were filed.

**NOTE 16 — LEASES**

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of December 31, 2022, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking, and corporate offices. The initial terms expire at various dates between 2023 and 2038. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying consolidated balance sheets.

**Lease Costs and Activity**

The Company's lease costs and activity during the years ended December 31, 2022, 2021, and 2020 were as follows:

119

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

|  | December 31, | | | | |
|---|---|---|---|---|---|
|  | 2022 | | 2021 | | 2020 |
|  | (in millions) | | | | |
| **Lease costs:** | | | | | |
| Finance leases: | | | | | |
| Amortization of finance lease assets | $ 95 | $ | 38 | $ | 17 |
| Interest obligations under finance leases | 19 | | 8 | | 4 |
| Total finance lease costs | $ 114 | $ | 46 | $ | 21 |
| | | | | | |
| Operating leases: | | | | | |
| Fixed lease costs to non-related parties [(1)] | $ 129 | $ | 56 | $ | 29 |
| Fixed lease costs to related parties | 5 | | 6 | | 7 |
| Variable short-term lease costs to related parties | 1 | | 1 | | 2 |
| Total operating lease costs | $ 135 | $ | 63 | $ | 38 |
| | | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | | |
| Operating lease liabilities to non-related parties | $ 83 | $ | 35 | $ | 18 |
| Operating lease liabilities to related parties | $ 5 | $ | 5 | $ | 7 |
| Interest payments on finance lease liabilities | $ 19 | $ | 8 | $ | 4 |
| | | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | | |
| Principal payments on finance lease liabilities | $ 139 | $ | 56 | $ | 20 |

(1) The year ended December 31, 2022 includes $28 million of lease termination fees, net of amounts written off for the corresponding operating lease right-of-use assets and operating lease liabilities which were terminated.

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of December 31, 2022:

|  | Finance Leases | Operating Leases [(1)] | | | Total |
|---|---|---|---|---|---|
|  |  | Related Party [(2)] | Non-Related Party | Total Operating |  |
|  |  | (in millions) | | | |
| 2023 | $ 115 | $ 5 | $ 93 | $ 98 | $ 213 |
| 2024 | 103 | 3 | 96 | 99 | 202 |
| 2025 | 91 | 2 | 92 | 94 | 185 |
| 2026 | 74 | 2 | 88 | 90 | 164 |
| 2027 | 31 | 2 | 81 | 83 | 114 |
| Thereafter | 4 | 2 | 304 | 306 | 310 |
| Total minimum lease payments | 418 | 16 | 754 | 770 | 1,188 |
| Less: amount representing interest | (44) | (3) | (200) | (203) | (247) |
| Total lease liabilities | $ 374 | $ 13 | $ 554 | $ 567 | $ 941 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.

120

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of December 31, 2022 and 2021, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of December 31, 2022, 2021, and 2020 were as follows, excluding short-term operating leases:

| | December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| **Weighted average remaining lease terms (years)** | | | |
| Operating leases | 8.4 | 9.2 | 9.8 |
| Finance leases | 4.2 | 4.4 | 4.4 |
| **Weighted-average discount rate** | | | |
| Operating leases | 7.1 % | 7.2 % | 8.3 % |
| Finance leases | 5.7 % | 5.4 % | 5.3 % |

## NOTE 17 — COMMITMENTS AND CONTINGENCIES

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was $19 million and $16 million, as of December 31, 2022 and 2021, respectively, and is included in accounts payable and other accrued liabilities in the accompanying consolidated balance sheets.

**Purchase Obligations**

The Company has purchase obligations for certain customary services related to operating a wholesale auction business of $168 million in aggregate over the next six years, as of December 31, 2022. These purchase obligations are recorded as liabilities when the services are rendered.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business for a publicly traded auto retail and e-commerce company. For example, the Company is currently a party to legal and regulatory disputes, including putative class action and shareholder derivative lawsuits, alleging, among other things, the violation of federal securities and antitrust laws and state laws regarding stockholders' rights and the titling and registration of vehicles sold to its customers. These disputes include, but are not limited to, *In re Carvana Co. Securities Litigation,* United States District Court for the District of Arizona (Case No. CV-22-2126-PHX-MTL); *City of Warwick Retirement System v. Carvana Co., et al.,* Maricopa County, Arizona Superior Court (Case No. CV2022-013054); *In re Carvana Co. Stockholders Litigation,* Delaware Chancery Court (Case No. 2020-0415-KSJM); *Neal Vestal v. Carvana Co., et al.,* Delaware Chancery Court (Case No. 2022-0609-KSJM); *Taiae Bradley v. Carvana, LLC,* United States District Court for the Eastern District of Pennsylvania (Case No. 2:22-cv-02525-MMB); *Dana Jennings, et al. v. Carvana, LLC,* United States District Court for the Eastern District of Pennsylvania (Case No. 5:21-cv-05400-EGS); and *Mountaineer Motors of Lenoir, LLC v. Carvana, LLC, et al.,* United States District Court for the Western District of North Carolina (Case No. 5:22-cv-00171).

The Company believes the claims in these matters are not material or are without merit and intends to defend the matters vigorously. The Company also continues to work closely with government agencies to respond to their requests. It is not possible to determine the probability of loss or estimate damages, if any, for any of the above matters, and therefore, the

121

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

Company has not established reserves for any of these proceedings. If the Company determines that a loss is both probable and reasonably estimable, the Company will record a liability, and, if the liability is material, disclose the amount of the liability reserved. If an unfavorable ruling or development were to occur, there exists the possibility of a material adverse impact on the Company's business, results of operations, financial condition or cash flows.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

## NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies.

The following tables are a summary of fair value measurements and hierarchy level at December 31, 2022 and 2021:

| | December 31, 2022 | | | |
|---|---|---|---|---|
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $ 272 | $ 272 | $ — | $ — |
| Beneficial interests in securitizations | 321 | — | — | 321 |
| | December 31, 2021 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $ 154 | $ 154 | $ — | $ — |
| Beneficial interests in securitizations | 382 | — | — | 382 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying consolidated balance sheets.

As of December 31, 2022 and 2021, the Company has purchase price adjustment receivables of approximately $37 million and $34 million, respectively, which are carried at fair value and classified in other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of approximately $14 million and $20 million during the years ended December 31, 2022 and 2021, respectively, and are reflected in other expense (income), net in the accompanying consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and

122

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Continued)**

there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of December 31, 2022 and 2021, the discount rates were 7.1% to 11.3% and 1.1% to 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense (income), net in the accompanying consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers out of Level 3 during the years ended December 31, 2022 and 2021.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that meet the criteria for sale set forth in the Risk Retention Rules. For the years ended December 31, 2022 and 2021, the Company sold beneficial interests in securitizations for a purchase price totaling $43 million and $1 million, respectively.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the years ended December 31, 2022 and 2021:

| | Years Ended December 31, | | |
| | 2022 | | 2021 |
| | (in millions) | | |
|---|---|---|---|
| **Opening Balance** | $ | 382 | $ | 131 |
| Received in securitization transactions | | 148 | | 338 |
| Cash receipts | | (172) | | (93) |
| Change in fair value | | 6 | | 7 |
| Sales of beneficial interests | | (43) | | (1) |
| **Ending Balance** | $ | 321 | $ | 382 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the years ended December 31, 2022 and 2021. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

123

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

The fair value of the Senior Notes, which are not carried at fair value on the accompanying consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of December 31, 2022 and 2021 was as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2022 | 2021 |
|  | (in millions) | |
| Carrying value, net of unamortized debt issuance costs | $ 5,649 | $ 2,422 |
| Fair value | 2,533 | 2,411 |

The fair value of finance receivables, which are not carried at fair value on the accompanying consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of December 31, 2022 and 2021 were as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2022 | 2021 |
|  | (in millions) | |
| Carrying value | $ 1,334 | $ 356 |
| Fair value | 1,437 | 392 |

**Investment in Equity Securities**

During October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to by the accounting standards and recorded the investment at its cost of $126 million, which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of its investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of its investment in Root, as there have not been changes in the observable price of its equity interest through December 31, 2022. On August 12, 2022, Root effected a reverse stock split of its Class A common stock and Class B common stock at a ratio of 18:1, whereby each 18 shares of Root's Class A common stock and Class B common stock were automatically combined into one share of Class A common stock or Class A common stock, respectively (the "Reverse Stock Split"). The shares of Root's Class A common stock issuable to the Company on the conversion of the Series A convertible preferred shares were adjusted proportionally.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products were to be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "Warrants"). On September 1, 2022, the integrated auto insurance solution, which embedded into the Company's e-commerce platform (the "Integrated Platform"), was completed. One tranche of the Warrants, consisting of 2.4 million shares, as adjusted pursuant to the Reverse Stock Split, became exercisable upon completion of the Integrated Platform, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Integrated Platform and are considered derivative instruments. The Company used a Monte Carlo simulation to estimate the fair value of these Warrants, which are classified as Level 3. At contract inception the Company recognized an asset of $30 million for the Warrants and deferred revenue, classified in other assets and other liabilities, respectively in the accompanying consolidated balance sheets. During the year ended December 31, 2022, the Company determined it was probable that the volume of insurance products required to earn the Warrants would be achieved and recorded an additional $75 million of Warrants and deferred revenue

124

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

based on the contract inception date fair value as determined by the Monte Carlo simulation. The Warrants and deferred revenue are classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets.

The following table presents changes in the Company's Level 3 Warrants measured at fair value:

|  | 2022 |
|---|---|
|  | (in millions) |
| Balance at December 31, 2021 | $ 6 |
| Warrants to acquire Root's Class A common stock | 75 |
| Total unrealized loss [1] | (79) |
| Balance at December 31, 2022 | $ 2 |

(1) The Company recognized the decrease in fair value in relation to the Warrants to acquire Root's Class A common stock through other expense (income), net in the accompanying consolidated statements of operations. The Company recognized a decrease in fair value of $79 million and $24 million during the years ended December 31, 2022 and 2021, respectively.

**Derivative Instruments**

As of December 31, 2022 and 2021, the Company had no other outstanding derivative instruments.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the years ended December 31, 2022, 2021, and 2020:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
|  | (in millions) | | |
| **Supplemental cash flow information:** |  |  |  |
| Cash payments for interest, including $0, $0, and $1, respectively, to related parties | $ 423 | $ 152 | $ 95 |
| **Non-cash investing and financing activities:** |  |  |  |
| Capital expenditures included in accounts payable and accrued liabilities | $ 18 | $ 102 | $ 36 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 375 | $ 253 | $ 71 |
| Property and equipment acquired under finance leases | $ 326 | $ 152 | 78 |
| Warrants to acquire Root Class A common stock | $ 75 | $ 30 | — |
| Equity-based compensation expense capitalized to property and equipment | $ 8 | $ 7 | 6 |
| Fair value of beneficial interests received in securitization transactions | $ 148 | $ 338 | 65 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 134 | $ 38 | 28 |

125

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the accompanying consolidated balance sheets that sum to the total of the same amounts shown in the accompanying consolidated statements of cash flows for all periods presented:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2020** | |
| | (in millions) | | | | | |
| Cash and cash equivalents | $ | 434 | $ | 403 | $ | 301 |
| Restricted cash | | 194 | | 233 | | 28 |
| Total cash, cash equivalents, and restricted cash | $ | 628 | $ | 636 | $ | 329 |

**NOTE 20 — SUBSEQUENT EVENTS**

**Tax Asset Preservation Plan**

The Company has generated a federal net operating loss ("NOL") carryforward of $1.8 billion through the year ended December 31, 2022, and it may generate NOL carryforwards in future years.

Section 382 of the Code of 1986 contains rules that limit the ability of a company that undergoes an "ownership change" as defined in Section 382 of the Code to utilize its NOL carryforwards and certain built-in losses recognized in years after the ownership change. A company generally experiences an ownership change if the percentage of the value of its stock owned by certain "5-percent shareholders," as such term is defined in Section 382 of the Code, increases by more than 50 percentage points over a rolling three-year period. These rules generally operate by focusing on ownership shifts among stockholders owning directly or indirectly 5% or more of the stock of a company and any change in ownership arising from a new issuance of stock by the company.

If the Company undergoes an ownership change for purposes of Section 382 of the Code as a result of future transactions involving its stock, including purchases or sales of stock by current or future 5% shareholders or new issuance of stock by the Company, its ability to use its NOL carryforwards and to recognize certain built-in losses would be subject to the limitations of Section 382 of the Code. Depending on the resulting limitation, a significant portion of the Company's NOL carryforwards could expire before the Company would be able to use them or could be significantly delayed in their application to offsetting income.

The Company has entered into a Section 382 Rights Agreement (the "Tax Asset Preservation Plan") designed to preserve shareholder value and the value of certain tax assets primarily associated with NOL carryforwards and built-in losses under Section 382 of the Code. The Tax Asset Preservation Plan is intended to act as a deterrent to any person or group acquiring 4.9% or more of our outstanding Class A common stock (any such person an "Acquiring Person"), without the approval of the Company's Board.

In connection therewith, on January 16, 2023, the Board declared a dividend of one preferred share purchase right (a "Right") for each share of Class A common stock, par value $0.001 per share, of the Company. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Shares") at a price of $50.00 per one one-thousandth of a Preferred Share represented by a Right (the "Purchase Price"), subject to adjustment. The Rights will separate and begin trading separately from the Class A common stock, and right certificates will be caused to evidence the Rights, on the earlier to occur of (i) the Close of Business (as such term is defined in the Tax Asset Preservation Plan) on the tenth day following a public announcement, or the public disclosure of facts indicating, that a Person (as such term is defined in the Tax Asset Preservation Plan) or group of affiliated or associated Persons has acquired Beneficial Ownership (as such term is defined in the Tax Asset Preservation Plan) of 4.9% or more of the outstanding Class A common stock (an "Acquiring Person") (or, in the event that the Board determines to effect an exchange in accordance with Section 24 of the Tax Asset Preservation Plan and the Board determines that a later date is advisable, then such later date) and (ii) the Close of Business on the tenth Business Day (or such later date as may be determined by action of the Board prior to such time as any Person becomes an Acquiring Person) following the commencement of a tender offer or exchange offer the consummation of which would result in the Beneficial Ownership by a Person or group of 4.9% or more of the outstanding Class A common stock (the earlier of such dates, the "Distribution Date"). If issued, each Right, other than Rights beneficially owned by the Acquiring Person (which will thereupon become void) will

126

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

become exercisable for Class A common stock having a value equal to two times the exercise price of the Right. However, prior to exercise, a Right does not give its holder any rights as a stockholder of the Company, including without limitation any dividend, voting or liquidation rights.

**Master Purchase and Sale Agreement**

Effective January 13, 2023, the Company amended its Master Purchase and Sale Agreement to increase the commitment of the purchaser to purchase up to a maximum of $4.0 billion of principal balances of finance receivables from the amendment date through January 12, 2024.

**Finance Receivable Facilities**

In January 2023, the Company amended one of its agreements governing one of its short-term revolving credit facilities to, among other things, adjust the line of credit from $500 million to $300 million, and extend the maturity date to January 24, 2024.

127

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Controls over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2022 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP. Our independent registered public accounting firm, Grant Thornton LLP, has issued an audit report with respect to our internal control over financial reporting, which appears in Part II, Item 8 of this Annual Report on Form 10-K.

**Changes in Internal Controls Over Financial Reporting**

There was no change in our internal control over financial reporting identified in management's evaluation during the fourth quarter of 2022 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Limitations of Effectiveness of Controls and Procedures and Internal Control over Financial Reporting**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

**ITEM 9B. OTHER INFORMATION.**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.**

Not applicable.

128

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**ITEM 11. EXECUTIVE COMPENSATION.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Incentive Plans**

The following table provides information about our equity compensation plans under which our Class A common stock is authorized for issuance as of December 31, 2022:

| Plan Category | Number of securities to be issued upon exercise of outstanding options [2] | Weighted-average exercise price of outstanding options [3] | Number of securities remaining available for future issuance under equity compensation plans [2][4][5] |
|---|---|---|---|
| Equity compensation plans approved by security holders [1] | 1,265 $ | 80.26 | 7,162 |
| Equity compensation plans not approved by security holders | — $ | — | — |
| Total | 1,265 $ | 80.26 | 7,162 |

(1) Includes awards granted and available for future issuance under our 2017 Omnibus Incentive Plan and offerings under our Employee Stock Purchase Plan, which was approved in 2021. As of December 31, 2022, there were 7,161,642 shares of Class A common stock outstanding under our equity compensation plans, which includes 6,750,488 shares of Class A common stock outstanding under the 2017 Omnibus Incentive Plan and 411,154 shares of Class A common stock outstanding under the Employee Stock Purchase Plan.

(2) Presented in thousands.

(3) The weighted-average exercise price is calculated based solely on the exercise prices of the outstanding options and does not reflect the shares that will be issued upon the vesting of outstanding awards of RSAs or RSUs, which have no exercise price.

(4) Consists of shares available under the ESPP and shares available under the 2017 Omnibus Plan.

(5) The number of shares authorized for issuance under the 2017 Omnibus Incentive Plan is subject to an automatic annual increase of the lesser of two percent of our outstanding common stock or an amount determined by the Compensation and Nominating Committee of our Board. The number of securities remaining available for future issuances under equity compensation plans does not include 2,120,736 shares added to the 2017 Omnibus Incentive Plan pursuant to the automatic annual increase on January 1, 2023.

The information required by Item 403 of Regulation S-K is incorporated by reference to Carvana's Proxy Statement for its 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

The information required by this item is incorporated by reference to Carvana's Proxy Statement for its 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2022.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

1      Financial Statements: The Consolidated Financial Statements of Carvana are set forth in Part II, Item 8 of this Form 10-K.

2      Financial Statement Schedules: Schedule II - Valuation and Qualifying Accounts.

**Schedule II - Valuation and Qualifying Accounts**

| | Balance at beginning of period | | Additions | | Reductions | | Balance at end of period |
|---|---|---|---|---|---|---|---|
| | | Charged to costs and expenses | Charged to other accounts | | | | |
| | | | (in millions) | | | | |
| Deferred tax asset valuation allowance: | | | | | | | |
| Year ended December 31, 2022 | $ 1,638 | $ 398 | $ 22 (1) | $ | — | $ | 2,058 |
| Year ended December 31, 2021 | $ 677 | $ 53 | $ 908 (1) | $ | — | $ | 1,638 |
| Year ended December 31, 2020 | $ 215 | $ 55 | $ 407 (1) | $ | — | $ | 677 |

(1) Amount relates to a valuation allowance established on deferred taxes related to our investment in Carvana Group.

All other financial statement schedules are not required or are not applicable, or the required information is shown in the consolidated financial statements or notes to the consolidated financial statements.

3      Exhibits: The exhibits listed in the accompanying Exhibit Index are filed, furnished or incorporated by reference as part of this Form 10-K.

**ITEM 16. FORM 10-K SUMMARY.**

None.

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Securities and Asset Purchase Agreement, dated February 24, 2022, by and among KAR Auction Services, Inc., Carvana Group, LLC and Carvana Co. solely for purposes of Section 10.15 thereof as guarantor (incorporated by reference to Exhibit 2.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on February 25, 2022). |
| 3.1 | Amended and Restated Certificate of Incorporation of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 3.2 | Amended and Restated Bylaws of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 3.3 | Certificate of Designations of Series B Preferred Stock of Carvana Co., as filed with the Secretary of State of the State of Delaware on January 17, 2023 (incorporated by reference to Exhibit 3.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on January 17, 2023). |
| 4.1 | Indenture, dated as of October 2, 2020, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.2 | Form of 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.3 | Indenture, dated October 2, 2020, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.4 | Form of 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 4.5 | Indenture, dated March 29, 2021, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 5.500% Senior Notes due 2027 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on March 30, 2021). |
| 4.6 | Form of 5.500% Senior Notes due 2027 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on March 30, 2021). |
| 4.7 | Indenture, dated August 16, 2021, among Carvana Co., each of the guarantors party thereto and U.S. Bank National Association, as trustee, related to the 4.875% Senior Notes due 2029 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K files with the SEC on August 16, 2021). |
| 4.8 | Form of 4.875% Senior Notes due 2029 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on August 16, 2021). |
| 4.9 | Indenture, dated as of May 6, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.10 | Form of 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.11 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.12 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 4.875% Senior Notes due 2029 (incorporated by reference to Exhibit 4.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.13 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.5 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.14 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.500% Senior Notes due 2027 (incorporated by reference to Exhibit 4.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.15 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.7 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.16 | Description of Registrant's Securities, filed herewith. |
| 4.17 | Section 382 Rights Agreement, dated as of January 16, 2023, between Carvana Co. and American Stock Transfer & Trust Company, LLC, as rights agent (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on January 17, 2023). |
| 10.1 | Tax Receivable Agreement, dated April 27, 2017, by and among the Carvana Co., Carvana Group, LLC, a Delaware limited liability company and the TRA Holders (as defined therein) (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.2 | Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated October 2, 2020, by and among Carvana Group, LLC and its Members (as defined therein) (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on October 5, 2020). |
| 10.3 | Amendment to Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated December 9, 2022, by and among Carvana Group, LLC and its Members (as defined therein), filed herewith. |
| 10.4 | Exchange Agreement, dated April 27, 2017, by and among the Company, Carvana Group, Carvana Co. Sub LLC and the holders of the Company's Common Units (as defined therein) (incorporated by reference to Exhibit 10.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.5 | Second Amended and Restated Registration Rights Agreement, dated April 27, 2017, by and among the Company, Carvana Group and the other signatories party thereto (incorporated by reference to Exhibit 10.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.6† | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.10 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.7† | Carvana Group, LLC Equity Incentive Plan (incorporated by reference to Exhibit 10.15 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.8† | Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 10.9† | First Amendment to 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on June 6, 2017). |
| 10.10† | Second Amendment to 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2017). |
| 10.11† | Form of Incentive Stock Option Agreement (incorporated by reference to Exhibit 10.5 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.12† | Form of Restricted Stock Agreement (incorporated by reference to Exhibit 10.6 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.13† | Form of Nonqualified Stock Option Agreement (incorporated by reference to Exhibit 10.7 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.14† | Form of Stock Appreciation Rights Agreement (incorporated by reference to Exhibit 10.8 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.15† | Form of Restricted Stock Unit Agreement (incorporated by reference to Exhibit 10.9 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.16† | Form of Cash-Based Award Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 7, 2018). |
| 10.17† | Form of Performance Restricted Stock Unit Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.2 to Carvana Co.'s Current Report 8-K filed with the SEC on May 7, 2018). |
| 10.18† | Form of Restricted Stock Unit Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 31, 2018). |
| 10.19† | Form of Nonqualified Stock Option Agreement Pursuant to the Carvana Co. 2017 Omnibus Incentive Plan (incorporated by reference to Exhibit 99.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 31, 2018). |
| 10.20 | Carvana Co. Employee Stock Purchase Plan (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Registration Statement on Form S-8 filed with the SEC on May 7, 2021). |
| 10.21* | Third Amended and Restated Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.22* | Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.23* | Second Amended and Restated Master Purchase and Sale Agreement, dated as of November 1, 2022, among Ally Bank, Ally Financial Inc. and Carvana Auto Receivables 2016-1 LLC (incorporated by reference to Exhibit 10.3 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC of November 3, 2022). |
| 10.24 | First Amendment to the Second Amended and Restated Master Purchase and Sale Agreement, dated as of January 13, 2022, among Ally Bank, Ally Financial Inc. and Carvana Auto Receivables 2016-1 LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on January 17, 2023). |
| 10.25 | Second Amendment to the Second Amended and Restated Master Purchase and Sale Agreement, dated January 20, 2023, among Ally Bank, Ally Financial Inc. and Carvana Auto Receivables 2016-1 LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on January 20, 2023). |
| 10.26 | Omnibus Amendment No. 2 to the Ally Flow transaction, dated as of January 4, 2018 (incorporated by reference to Exhibit 10.44 to Carvana Co.'s Annual Report on Form 10-K filed with the SEC on March 6, 2018). |
| 10.27 | SilverRock Automotive Master Dealer Agreement, dated December 8, 2016 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc. and Carvana, LLC (incorporated by reference to Exhibit 10.24 to Carvana Co.'s Registration Statement on Form S-1 filed with the SEC on March 31, 2017). |
| 10.28 | Amendment to the Master Dealer Agreement, effective October 1, 2018 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.5 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on November 7, 2018). |
| 10.29* | Second Addendum to the Master Dealer Agreement, effective August 31, 2020 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC on October 29, 2020). |
| 10.30 | Third Addendum to the Master Dealer Agreement, effective April 19, 2021, among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.4 to Carvana Co.'s Quarterly Report on Form 10-Q, filed with the SEC on May 6, 2021). |
| 10.31† | Non-Compete Agreement between Carvana, LLC and Ernest C. Garcia III (incorporated by reference to Exhibit 99.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on November 1, 2018). |
| 10.32 | Contribution Agreement between Carvana Co. and Ernest C. Garcia III, dated February 22, 2022 (incorporated by reference to Exhibit 10.51 to Carvana Co.'s Annual Report on Form 10-K filed with the SEC on February 24, 2022). |
| 21.1 | Carvana Co. Subsidiaries, filed herewith. |
| 23.1 | Consent of Grant Thornton, LLP, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

\* Certain portions of this exhibit have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K. The registrant agrees to furnish supplementally an unredacted copy of this exhibit to the Securities and Exchange Commission upon its request.

† Indicates a management contract or compensatory plan or arrangement.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:     February 23, 2023              **Carvana Co.**
                                         (Registrant)

                                         By: /s/ Ernest Garcia III
                                         _____
                                         Ernest Garcia III
                                         President, Chief Executive Officer and Chairman
                                         February 23, 2023

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Ernest Garcia III<br>Ernest Garcia III | President, Chief Executive Officer, and Chairman | February 23, 2023 |
| /s/ Mark Jenkins<br>Mark Jenkins | Chief Financial Officer | February 23, 2023 |
| /s/ Stephen Palmer<br>Stephen Palmer | Vice President of Accounting and Finance | February 23, 2023 |
| /s/ Michael Maroone<br>Michael Maroone | Director | February 23, 2023 |
| /s/ Ira Platt<br>Ira Platt | Director | February 23, 2023 |
| /s/ Dan Quayle<br>Dan Quayle | Director | February 23, 2023 |
| /s/ Greg Sullivan<br>Greg Sullivan | Director | February 23, 2023 |
| /s/ Neha Parikh<br>Neha Parikh | Director | February 23, 2023 |

**Exhibit 4.16**

**Description of Registrant's Securities**

The following is a description of each class of securities of Carvana Co. ("we," "our," the "Company") that is registered under Section 12 of the Securities and Exchange Act of 1934, as amended, and does not purport to be complete. For a complete description of the terms and provisions of such securities, refer to the Company's amended and restated certificate of incorporation (our "certificate"), amended and restated by-laws (our "bylaws"), Certificate of Designations of Series B Preferred Stock and Section 382 Rights Agreement, copies of which have been filed as Exhibit 3.1, 3.2, 3.3 and 4.17, respectively, to our Annual Report on Form 10-K, of which this Exhibit 4.16 is a part.

**General**

Our certificate authorizes capital stock consisting of:

- 500,000,000 shares of Class A common stock, par value $0.001 per share;
- 125,000,000 shares of Class B common stock, par value $0.001 per share; and
- 50,000,000 shares of undesignated preferred stock, with a par value per share that may be established by our Board of Directors (our "Board") in the applicable certificate of designations.

As of February 17, 2023, we had 106,074,230 and 82,900,276 shares of our Class A common stock and Class B common stock issued and outstanding, respectively.

**Class A Common Stock**

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. The holders of our Class A common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class A common stock vote together with holders of our Class B common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate described below or as otherwise required by applicable law or the certificate.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our Board out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation or the sale of all or substantially all of our assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock will be entitled to receive pro rata our remaining assets available for distribution.

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption or conversion rights. There are no redemption or sinking fund provisions applicable to the Class A common stock.

**Class B Common Stock**

Each holder of Class B common stock is entitled to one vote for each share of Class B common stock held of record by such holder; provided that each holder that, together with its affiliates (which, in the case of the Garcia Parties, includes each other Garcia Party), (1) beneficially owns 50% or more of the LLC Units of Carvana Group, LLC ("LLC Units") and (2) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least 25% of the outstanding shares of Class A common stock (determined assuming that each Class A Unit held by holders other than the Carvana Co. Sub LLC ("Carvana Sub") were exchanged for Class A common stock), is entitled to ten votes for each share of Class B common stock held of record by such holder. Each other share of our Class B common stock entitles its holder to one vote on all matters to

be voted on by stockholders generally. The Garcia Parties holding shares of our Class B common stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders when the Garcia Parties' direct or indirect beneficial ownership of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is less than 25%. The holders of our Class B common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class B common stock vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate described below or as otherwise required by applicable law or the certificate.

Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation or the sale of all or substantially all of our assets. Additionally, holders of shares of our Class B common stock do not have preemptive, subscription, redemption or conversion rights. There are no redemption or sinking fund provisions applicable to the Class B common stock. Any amendment of our certificate that gives holders of our Class B common stock (1) any rights to receive dividends or any other kind of distribution, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Holders of Class A Units own 100% of our outstanding Class B common stock.

**Preferred Stock**

Under the terms of our certificate, our Board is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our Board has the discretion to determine the rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our Board to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

**Forum Selection**

Our certificate provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the United States District Court for the District of Delaware) will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action asserting a claim against the company or any director or officer of the company arising pursuant to any provision of the Delaware General Corporation Law (the "DGCL"), our certificate or our bylaws or (4) any other action asserting a claim against the company or any director or officer of the company that is governed by the internal affairs doctrine. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Anti-Takeover Provisions**

Our certificate, bylaws and the DGCL contain provisions, which are summarized in the following paragraphs, that are intended to enhance the likelihood of continuity and stability in the composition of our Board. These

provisions are intended to avoid costly takeover battles, reduce our vulnerability to a hostile change of control and enhance the ability of our Board to maximize stockholder value in connection with any unsolicited offer to acquire us. However, these provisions may have an anti-takeover effect and may delay, deter or prevent a merger or acquisition of us by means of a tender offer, a proxy contest or other takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the prevailing market price for the shares of Class A common stock held by stockholders.

*These provisions include:*

*Dual Class of Common Stock*. As described above in "— Class A Common Stock " and "— Class B Common Stock," our certificate provides for a dual class common stock structure pursuant to which the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock), thereby giving the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.

*Classified Board.* Our certificate provides that our Board be divided into three classes of directors, with the classes as nearly equal in number as possible, and with the directors serving three-year terms. As a result, approximately one-third of our Board is elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our Board. Our certificate also provides that, subject to any rights of holders of preferred stock to elect additional directors under specified circumstances, the number of directors be fixed exclusively pursuant to a resolution adopted by our Board. Our Board currently has five members.

*Stockholder Action by Written Consent.* Our certificate precludes stockholder action by written consent at any time the Garcia Parties are no longer entitled to ten votes for each share of Class B common stock held of record on all matters submitted to a vote.

*Special Meetings of Stockholders.* Except as required by law, special meetings of our stockholders shall be called at any time only by or at the direction of our Board or the chairman of our Board; provided, however, (1) at any time when the Garcia Parties beneficially owns any of our Class B common stock, special meetings of our stockholders shall also be called by our Board or the chairman of our Board at the request of the Garcia Parties and (2) at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, special meetings of our stockholders shall also be called by holders of a majority in voting power of the outstanding shares of our capital stock entitled to vote on all matters to be voted on by stockholders generally, voting together as a single class. Our bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of us.

*Advance Notice Procedures.* Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our Board; provided, however, such advance notice procedure does not apply to the Garcia Parties. Stockholders at an annual meeting are only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our Board or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the bylaws do not give our Board the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of us.

***Removal of Directors; Vacancies.*** Directors may be removed with or without cause upon the affirmative vote of a majority in voting power of all outstanding shares of stock entitled to vote thereon, voting together as a single class; provided, however, at any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, directors may only be removed for cause, and only by the affirmative vote of holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class. In addition, our certificate also provides that, subject to the rights granted to one or more series of preferred stock then outstanding, any newly created directorship on our Board that results from an increase in the number of directors and any vacancies on our Board will be filled at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, either (1) upon the affirmative vote of a majority in voting power of all outstanding shares of capital stock entitled to vote thereon, voting together as a single class or (2) if no such appointment has been made by the tenth day following the occurrence of the vacancy, or if such shareholders holding a majority in voting power of all outstanding shares of capital stock notify our Board that no appointment shall be made, by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director. At any time the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any newly created directorship on our Board that results from an increase in the number of directors and any vacancy occurring on our Board will be filled by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director.

***Supermajority Approval Requirements.*** Our Board is expressly authorized to make, alter, amend, change, add to, rescind or repeal, in whole or in part, our bylaws without a stockholder vote in any matter not inconsistent with the laws of the State of Delaware and our certificate. For as long as the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders requires the affirmative vote of a majority in voting power of the outstanding shares of our stock entitled to vote on such amendment, alteration, change, addition, rescission or repeal. When the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of the holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class.

The DGCL provides generally that the affirmative vote of a majority of the outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's certificate of incorporation, unless the certificate requires a greater percentage.

At any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, the following provisions in our certificate may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 2/3% (as opposed to a majority threshold that would apply when holders of our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote) in voting power of all the then-outstanding shares of stock entitled to vote thereon, voting together as a single class:

- the provision requiring a 66 2/3% supermajority vote for stockholders to amend our bylaws;
- the provisions providing for a classified Board (the election and term of our directors);
- the provisions regarding resignation and removal of directors;
- the provisions regarding entering into business combinations with interested stockholders;
- the provisions regarding stockholder action by written consent;
- the provisions regarding calling special meetings of stockholders;
- the provisions regarding filling vacancies on our Board and newly created directorships;
- the provisions eliminating monetary damages for breaches of fiduciary duty by a director; and
- the amendment provision requiring that the above provisions be amended only with a 66 2/3% supermajority vote.

The combination of the classification of our Board, the lack of cumulative voting and the supermajority voting requirements will make it more difficult for our existing stockholders to replace our Board as well as for another

party to obtain control of us by replacing our Board. Because our Board has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management.

**Authorized but Unissued Shares.** Our authorized but unissued shares of common stock and preferred stock are available for future issuance without stockholder approval, subject to stock exchange rules. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. One of the effects of the existence of authorized but unissued common stock or preferred stock may be to enable our Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive our stockholders of opportunities to sell their shares of common stock at prices higher than prevailing market prices.

**Business Combinations.** We are not subject to the provisions of Section 203 of the DGCL. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the time that the person becomes an interested stockholder, unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns, or did own within three years prior to the determination of interested stockholder status, 15% or more of the corporation's voting stock.

Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions: (1) before the stockholder became an interested stockholder, the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder; (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans, in some instances; or (3) at or after the time the stockholder became an interested stockholder, the business combination was approved by the Board and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares.

We have opted out of Section 203; however, our certificate contains similar provisions providing that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the stockholder became an interested stockholder, unless:

- prior to such time, our Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;
- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, excluding certain shares; or
- at or subsequent to that time, the business combination is approved by our Board and by the affirmative vote of holders of at least 66 2/3% of our outstanding voting stock that is not owned by the interested stockholder.

Under certain circumstances, this provision will make it more difficult for a person who would be an "interested stockholder" to effect various business combinations with the company for a three-year period. This provision may encourage companies interested in acquiring the company to negotiate in advance with our Board because the stockholder approval requirement would be avoided if our Board approves either the business combination or the transaction which results in the stockholder becoming an interested stockholder. These

provisions also may have the effect of preventing changes in our Board and may make it more difficult to accomplish transactions which stockholders may otherwise deem to be in their best interests.

Our certificate provides that the Garcia Parties, and any of their direct or indirect transferees and any group as to which such persons are a party, do not constitute "interested stockholders" for purposes of this provision.

**Limitations on Liability and Indemnification of Officers and Directors**

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties, subject to certain exceptions. Our certificate of incorporation includes a provision that eliminates the personal liability of directors for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL. The effect of these provisions is to eliminate our rights and the rights of our stockholders, through stockholders' derivative suits on our behalf, to recover monetary damages from a director for breach of fiduciary duty as a director, including breaches resulting from grossly negligent behavior. However, exculpation does not apply to any director if the director has acted in bad faith, knowingly or intentionally violated the law, authorized illegal dividends or redemptions or derived an improper benefit from his or her actions as a director.

Our bylaws provide that we must indemnify and advance expenses to our directors and officers to the fullest extent authorized by the DGCL. We also are expressly authorized to carry directors' and officers' liability insurance providing indemnification for our directors, officers and certain employees for some liabilities. We believe that these indemnification and advancement provisions and insurance will be useful to attract and retain qualified directors and officers.

The limitation of liability, indemnification and advancement provisions that are included in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breaches of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

**Corporate Opportunity Doctrine**

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our certificate, to the maximum extent permitted from time to time by Delaware law, renounces any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to certain of our officers, directors or stockholders or their respective affiliates, other than those officers, directors, stockholders or affiliates acting in their capacity as our employee or director. Our certificate provides that, to the fullest extent permitted by law, any director or stockholder who is not employed by us or our affiliates does not have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (2) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or stockholder, other than directors or stockholders acting in their capacity as our director or as a stockholder, acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our affiliates, such person has no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. Our certificate does not renounce our interest in any business opportunity that is expressly offered to an employee director or employee in his or her capacity as a director or employee of Carvana Co. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our certificate, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

**Dissenters' Rights of Appraisal and Payment**

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of Carvana Co. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

**Stockholders' Derivative Actions**

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is American Stock Transfer & Trust Company, LLC. Its address is 6201 15th Avenue, Brooklyn, NY 11219.

**Listing**

Our Class A common stock is listed on the NYSE under the trading symbol "CVNA."

**Description of Registrant's Preferred Share Purchase Rights**

On January 16, 2023, our Board declared a dividend of one preferred share purchase right (a "Right") for each share of Class A common stock outstanding on January 27, 2023 (the "Record Date") to the stockholders of record on that date. In connection with the distribution of the Rights, we entered into a Section 382 Rights Agreement (the "Tax Asset Preservation Plan"), dated as of January 16, 2023, between the Company and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company, as rights agent. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Shares") at a price of $50.00 per one one-thousandth of a Preferred Share represented by a Right (the "Purchase Price"), subject to adjustment.

**Distribution Date; Exercisability; Expiration**

Initially, the Rights are attached to all Class A common stock certificates (or other evidence of book-entry or other uncertificated ownership) and no separate certificates evidencing the Rights ("Right Certificates") have been issued. Until the Distribution Date (as defined below), the Rights will be transferred with and only with the Class A common stock. As long as the Rights are attached to the Class A common stock, the Company will issue one Right with each new share of Class A common stock (including any Class A common stock issued upon the exchange of LLC Units (as defined in the Tax Asset Preservation Plan) for Class A common stock) so that all such Class A common stock will have Rights attached (subject to certain limited exceptions).

The Rights will separate and begin trading separately from the Class A common stock, and Right Certificates will be caused to evidence the Rights, on the earlier to occur of (i) the Close of Business (as such term is defined in the Tax Asset Preservation Plan) on the tenth day following a public announcement, or the public disclosure of facts indicating, that a Person or group of affiliated or associated Persons has acquired Beneficial Ownership of 4.9% or more of the outstanding Class A common stock (an "Acquiring Person") (or, in the event that the Board determines to effect an exchange in accordance with Section 24 of the Tax Asset Preservation Plan and the Board determines that a later date is advisable, then such later date) and (ii) the Close of Business on the tenth Business Day (or such later date as may be determined by action of the Board prior to such time as any Person becomes an Acquiring Person) following the commencement of a tender offer or exchange offer the consummation of which would result in the Beneficial Ownership by a Person or group of 4.9% or more of the outstanding Class A common stock (the earlier of such dates, the "Distribution Date"). As soon as practicable after the Distribution Date, unless the Rights

are recorded in book-entry or other uncertificated form, the Company will prepare and cause the Right Certificates to be sent to each record holder of Class A common stock as of the Distribution Date.

An "Acquiring Person" will not include (i) the Company, (ii) any Subsidiary (as such term is defined in the Tax Asset Preservation Plan) of the Company, (iii) any employee benefit plan of the Company or of any Subsidiary of the Company, (iv) any entity holding Class A common stock for or pursuant to the terms of any such employee benefit plan or (v) any Person who or which, together with all Affiliates and Associates (as such terms are defined in the Tax Asset Preservation Plan) of such Person, at the time of the first public announcement of the Tax Asset Preservation Plan, is a Beneficial Owner of 4.9% or more of the Class A common stock then outstanding (a "Grandfathered Stockholder"). However, if a Grandfathered Stockholder becomes, after such time, the Beneficial Owner of any additional Class A common stock (regardless of whether, thereafter or as a result thereof, there is an increase, decrease or no change in the percentage of Class A common stock then outstanding Beneficially Owned (as such term is defined in the Tax Asset Preservation Plan) by such Grandfathered Stockholder) then such Grandfathered Stockholder shall be deemed to be an Acquiring Person unless, upon such acquisition of Beneficial Ownership of additional Class A common stock, such person is not the Beneficial Owner of 4.9% or more of the Class A common stock then outstanding. In addition, upon the first decrease of a Grandfathered Stockholder's Beneficial Ownership below 4.9%, such Grandfathered Stockholder will no longer be deemed to be a Grandfathered Stockholder. In the event that after the time of the first public announcement of the Tax Asset Preservation Plan, any agreement, arrangement or understanding pursuant to which any Grandfathered Stockholder is deemed to be the Beneficial Owner of Class A common stock expires, is settled in whole or in part, terminates or no longer confers any benefit to or imposes any obligation on the Grandfathered Stockholder, any direct or indirect replacement, extension or substitution of such agreement, arrangement or understanding with respect to the same or different Class A common stock that confers Beneficial Ownership of Class A common stock shall be considered the acquisition of Beneficial Ownership of additional Class A common stock by the Grandfathered Stockholder and render such Grandfathered Stockholder an Acquiring Person for purposes of the Tax Asset Preservation Plan unless, upon such acquisition of Beneficial Ownership of additional Class A common stock, such person is not the Beneficial Owner of 4.9% or more of the Class A common stock then outstanding.

For the avoidance of doubt, in the event that after the time of the first public announcement of the Tax Asset Preservation Plan, any Person becomes, through the exchange of LLC Units for Class A common stock, the Beneficial Owner of 4.9% or more of the Class A common stock then outstanding (or, in the case of a Grandfathered Stockholder, the Beneficial Owner of any additional Class A common stock), then such Person shall be deemed to be an Acquiring Person unless, upon such acquisition of Beneficial Ownership of additional Class A common stock, such Person is not the Beneficial Owner of 4.9% or more of the Class A common stock then outstanding.

"Beneficial Ownership" is defined in the Tax Asset Preservation Plan to include any securities (i) which a Person or any of such Person's Affiliates or Associates (a) actually owns (directly or indirectly) or would be deemed to actually or constructively own for purposes of Section 382 of the Code or the Treasury Regulations (as such terms are defined in the Tax Asset Preservation Plan) promulgated thereunder, including any coordinated acquisition of securities by any Persons who have a formal or informal understanding with respect to such acquisition (to the extent ownership of such securities would be attributed to such Persons under Section 382 of the Code and the Treasury Regulations promulgated thereunder), (b) beneficially owns, directly or indirectly, within the meaning of Rules 13d-3 or 13d-5 promulgated under the Exchange Act or (c) has the right or ability to vote, or the right to acquire, pursuant to any agreement, arrangement or understanding (except under limited circumstances), (ii) which are directly or indirectly Beneficially Owned by any other Person with which a Person has any agreement, arrangement or understanding for the purpose of acquiring, holding or voting such securities, or obtaining, changing or influencing control of the Company or (iii) which are the subject of, or reference securities for, or that underlie, certain derivative positions of any Person or any of such Person's Affiliates or Associates; provided, that a Person shall not be deemed to be the Beneficial Owner of, or to Beneficially Own, securities tendered pursuant to a tender or exchange offer made pursuant to, and in accordance with, the applicable rules and regulations promulgated under the Exchange Act until such tendered securities are accepted for purchase or exchange. Notwithstanding anything in the Tax Asset Preservation Plan to the contrary, a Person shall not be deemed the Beneficial Owner of, or to Beneficially Own, or to have Beneficial Ownership of, any Class A common stock by virtue of owning shares of Class B common stock or any LLC Units.

The Rights are not exercisable until the Distribution Date. The Rights will expire on the earliest to occur of (i) the date on which the Board determines in its sole discretion that (x) the Tax Asset Preservation Plan is no longer

necessary for the preservation of material valuable NOLs or Tax Attributes or (y) the NOLs and Tax Attributes have been fully utilized and may no longer be carried forward and (ii) the Close of Business on January 15, 2026 (the "Final Expiration Date").

**Exempt Persons and Transactions**

The Board may, in its sole and absolute discretion, determine that a Person is exempt from the Tax Asset Preservation Plan (an "Exempt Person"), so long as such determination is made prior to such time as such Person becomes an Acquiring Person. Any Person will cease to be an Exempt Person if the Board makes a contrary determination with respect to such Person regardless of the reason therefor. In addition, the Board may, in its sole and absolute discretion, exempt any transaction from triggering the Tax Asset Preservation Plan, so long as the determination in respect of such exemption is made prior to such time as any Person becomes an Acquiring Person. Any Person, together with all Affiliates and Associates of such Person, who proposes to acquire 4.9% or more of the outstanding Class A common stock may apply to the Board in advance for an exemption in accordance with and pursuant to the terms of the Tax Asset Preservation Plan.

**Flip-in Event**

If a Person or group becomes an Acquiring Person at any time after the date of the Tax Asset Preservation Plan (with certain limited exceptions), the Rights will become exercisable for Class A common stock having a value equal to two times the exercise price of the Right. From and after the announcement that any Person has become an Acquiring Person, if the Rights evidenced by a Right Certificate are or were acquired or Beneficially Owned by an Acquiring Person or any Associate or Affiliate of an Acquiring Person, such Rights shall become void, and any holder of such Rights shall thereafter have no right to exercise such Rights. If the Board so elects, the Company may deliver upon payment of the exercise price of a Right an amount of cash, securities or other property equivalent in value to the Class A common stock issuable upon exercise of a Right.

**Exchange**

At any time after any Person becomes an Acquiring Person, the Board may exchange the Rights (other than Rights owned by any Person which have become void), in whole or in part, at an exchange ratio of one Class A common stock per Right (subject to adjustment). The Company may issue, transfer or deposit such Class A common stock (or other property as permitted under the Tax Asset Preservation Plan) to or into a trust or other entity created upon such terms as the Board may determine and may direct that all holders of Rights receive such Class A common stock or other property only from the trust or other entity. In the event that the Board determines, before the Distribution Date, to effect an exchange, the Board may delay the occurrence of the Distribution Date to such time as it deems advisable.

**Flip-over Event**

If, at any time after a Person becomes an Acquiring Person, (i) the Company consolidates with, or merges with, any other Person (or any Person consolidates with, or merges with, the Company) and, in connection with such consolidation or merger, all or part of the Class A common stock are or will be changed into or exchanged for stock or other securities of any other Person or cash or any other property or (ii) 50% or more of the Company's consolidated assets or Earning Power (as defined in the Tax Asset Preservation Plan) is sold, then proper provision will be made so that each holder of a Right will thereafter have the right to receive, upon the exercise thereof at the then current exercise price of the Right, that number of shares of common stock of the acquiring company which at the time of such transaction will have a market value of two times the exercise price of the Right.

**Treatment of LLC Units and Class B Common Stock**

If any Person becomes an Acquiring Person, proper provision shall be made under that Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, as amended, dated December 9, 2022, by and among Carvana Group, LLC and its Members (as amended from time to time, the "LLC Agreement") so that each holder of LLC Units, other than any holder of LLC Units who is an Acquiring Person or an Affiliate or

Associate of an Acquiring Person, will be treated equitably vis-à-vis the holders of Class A common stock under the Tax Asset Preservation Plan. For the avoidance of doubt, if any holder of LLC Units becomes an Acquiring Person (or is an Affiliate or Associate of a Person who becomes an Acquiring Person), then the proper provision under the LLC Agreement for the dilution of such Person, including such Person's LLC Units, will be deemed to be equitable treatment. Holders of the Class B common stock are not entitled to receive dividends and would not be entitled under the Tax Asset Preservation Plan to receive a Right or any other rights to purchase equity securities of the Company.

**Redemption**

At any time prior to the earlier to occur of (i) the Close of Business on the tenth day following the Stock Acquisition Date (as defined in the Tax Asset Preservation Plan) (or, if the tenth day following the Stock Acquisition Date occurs before the Record Date, the Close of Business on the Record Date) and (ii) the Final Expiration Date, the Board may redeem the Rights in whole, but not in part, at a price of $0.001 per Right (the "Redemption Price"). The redemption of the Rights may be made effective at such time, on such basis and with such conditions as the Board in its sole discretion may establish. Immediately upon any redemption of the Rights, the right to exercise the Rights will terminate and the only right of the holders of Rights will be to receive the Redemption Price.

**Amendment**

The terms of the Rights may be amended by the Board without the consent of the holders of the Rights, except that at any time after the Close of Business on the tenth day following the Stock Acquisition Date (or, if the tenth day following the Stock Acquisition Date occurs before the Record Date, the Close of Business on the Record Date), no such amendment may adversely affect the interests of the holders of the Rights (other than the Acquiring Person and its Affiliates and Associates).

**Preferred Stock Rights**

Each one-thousandth of a Preferred Share will entitle the holder thereof to the same dividends and liquidation rights as if the holder held one share of Class A common stock and will be treated the same as a share of Class A common stock in the event of a merger, consolidation or other share exchange.

**Rights of Holders**

Until a Right is exercised, the holder thereof, as such, will have no rights as a stockholder of the Company, including, without limitation, the right to vote or to receive dividends.

**Exhibit 10.3**

**AMENDMENT TO FIFTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

This Amendment (this "Amendment") to FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "LLC Agreement") of Carvana Group, LLC, a Delaware limited liability company (the "Company"), is entered into as of December 9, 2022, by and among the Company, Carvana Co. Sub LLC, a Delaware limited liability company ("Carvana Co. Sub"), its Members and Unitholders, and, solely for purposes of Section 3.1, Section 3.2 and Section 8.6 thereof and not as a Member, Unitholder or manager, Carvana Co., a Delaware corporation ("Carvana Co.").

WHEREAS, pursuant to Section 11.2 of the LLC Agreement, the LLC Agreement may be amended by the Manager.

WHEREAS, the undersigned Manager desires to amend the LLC Agreement pursuant to the terms and provisions of this Amendment.

NOW, THEREFORE, in consideration of the premises and the agreements herein contained, the parties hereto hereby agree as follows:

1.    Definitions. Terms capitalized herein and not otherwise defined herein shall have the meanings ascribed to such terms in the LLC Agreement, as amended hereby.

2.    Amendment to LLC Agreement. Section 5.1 of the LLC Agreement is hereby amended to insert a new Section 5.1(d), which shall read as follows:

"(d) Effective as of December 9, 2022, the position of "Independent Manager" is hereby established and is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Delaware Act, and effective as of such date, the initial Independent Manager shall be Stefan M. Selig. The Independent Manager shall be designated, elected, or removed from time to time upon written notice from Carvana Co. Sub. Notwithstanding any of the provisions herein, (i) the Independent Manager shall, in its capacity as Independent Manager, and not in any other capacity, have the same fiduciary duties to the Company and the Unitholders and Members as a member of the board of directors of a Delaware corporation, (ii) each of the Manager and the Independent Manager shall have the power and authority to delegate to one or more other Persons (including, in the case of Manager, to the Independent Manager) any or all of such Manager's or Independent Manager's, as the case may be, rights, powers and duties, as contemplated by Section 18-407 of the Delaware Act, including any of its authority to sign agreements and other documents and take other actions on behalf of the Company and to enter into and perform any document on behalf of the Company, (iii) references to "Manager" in Sections 6.1 and 6.2 shall be deemed to be references to each of Manager and Independent Manager (including, for the avoidance of doubt, that the Independent Manager shall be deemed to be an "Indemnitee"), and (iv) the Independent Manager is an intended third party beneficiary of this Section 5.1(d) and, for the avoidance of doubt, Section 6.1(b) as an Indemnitee and shall be entitled to enforce such provisions (as it may be in effect from time to time) as if directly a party hereto."

3.    General.

(a)    Representations and Warranties. Each of the Members party hereto hereby represents and warrants to each other, which representations and warranties shall survive the execution and delivery hereof, each such Member has the requisite legal power and authority to execute this Amendment, and that this Amendment constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(b)    Reference to LLC Agreement. Upon the effectiveness of this Amendment, each reference in the LLC Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the LLC Agreement, as amended hereby. Except as expressly provided herein, the LLC Agreement shall remain in full force and effect and is hereby ratified and confirmed.

(c)    Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

(d)    Governing Law. This Amendment shall be construed in accordance with and be enforced and governed by the internal laws of the State of Delaware, without regard to choice of law or conflicts of law principles.

(e)    Counterparts; Electronic Signature. This Amendment may be executed in one or more counterparts, each of which taken together shall constitute one and the same instrument. A fax or electronic signature hereto (including .pdf) shall be as legally binding as a signed original for all purposes.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the undersigned has executed this Amendment to Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, effective as of the date first written above.

**MANAGER:**

CARVANA CO. SUB, LLC

By:         /s/ Paul Breaux
Name:       Paul Breaux
Title:      Vice President and Secretary

[*Signature Page to Amendment to Fifth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC*]

3

**Exhibit 21.1**

**SUBSIDIARIES OF THE COMPANY**

The following are the direct and indirect subsidiaries of Carvana Co. as of December 31, 2022:

| Subsidiary | Jurisdiction of Organization |
|---|---|
| Carvana Co. Sub LLC | Delaware |
| Carvana Group, LLC | Delaware |
| Carvana Operations HC LLC | Delaware |
| Carvana, LLC | Arizona |
| SPVANA II, LLC | Delaware |
| SPVANA V, LLC | Delaware |
| Carvana Logistics, LLC | Delaware |
| Adesa US Auction, LLC | Delaware |

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We have issued our reports dated February 23, 2023, with respect to the consolidated financial statements and internal control over financial reporting included in the Annual Report of Carvana Co. on Form 10-K for the year ended December 31, 2022. We consent to the incorporation by reference of said reports in the Registration Statements of Carvana Co. on Form S-3 (File No. 333-264391) and on Forms S-8 (File No. 333-217520, File No. 333-255914, and File No. 333-269560).

/s/ GRANT THORNTON LLP

Southfield, Michigan
February 23, 2023

**Exhibit 31.1**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Ernest Garcia III, certify that:

1. I have reviewed this Annual Report on Form 10-K of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:         February 23, 2023

/s/ Ernest C. Garcia III
Ernest C. Garcia III
*Chairman and Chief Executive Officer*

**Exhibit 31.2**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Mark Jenkins, certify that:

1. I have reviewed this Annual Report on Form 10-K of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:          February 23, 2023

/s/ Mark Jenkins
Mark Jenkins
*Chief Financial Officer*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Carvana Co. (the "Company") for the fiscal year ended December 31, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    February 23, 2023

/s/ Ernest C. Garcia III

Ernest C. Garcia III

*Chairman and Chief Executive Officer*

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Carvana Co. (the "Company") for the fiscal year ended December 31, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        February 23, 2023                                              /s/ Mark Jenkins
                                                                            Mark Jenkins
                                                                            *Chief Financial Officer*

**Exhibit 29**

Clerk of the Superior Court
*** Electronically Filed ***
03/15/2023 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          03/13/2023


HONORABLE TIMOTHY J. THOMASON              CLERK OF THE COURT
                                            K. Chocoj/N. Johnson
                                                  Deputy



CITY OF WARWICK RETIREMENT SYSTEM      GARY A GOTTO

v.

CARVANA CO, et al.                     ANDREA L MARCONI


                                       GARY F BENDINGER
                                       MARCO A DUENAS
                                       RON KILGARD
                                       ALFRED L FATALE III
                                       MATTHEW J PETERS
                                       DAVID P FRIEDMAN
                                       ALLISON L WHITEHILL
                                       SUSAN E ENGEL
                                       JUDGE THOMASON
                                       BRUCE BRAUN
                                       SIDLEY AUSTIN LLP
                                       ONE SOUTH DEARBORN
                                       CHICAGO IL  60603



MINUTE ENTRY


East Court Building – Courtroom 713

9:00 a.m. This is the time set for Oral Argument regarding the following motions:

- Carvana Defendants' Motion to Dismiss Plaintiff's Class Action Complaint, filed December 15, 2022; and

Docket Code 005                    Form V000A                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023

- Defendant Grant Thornton LLP's Motion to Dismiss, filed December 15, 2022.

Plaintiff City of Warwick Retirement System is represented by counsel Marco Duenas, Gary Gotto, Alfred Fatale III, and Ron Kilgard. Defendants Carvana Co., Ernest Garcia, Mark Jenkins, Stephen Palmer, Michael Maroone, Ira Platt, Neha Parikh, and Greg Sullivan are represented by Susan Engel, Andrea Marconi, and Matthew Peters. Defendants Citigroup Global Markets Inc., and J.P. Morgan Securities LLC are represented by David Friedman. Defendant Grant Thornton LLP is represented by Allison Whitehill, Gary Bendinger, and counsel Bruce Braun. All parties appear in person.

Court reporter, Diane Donoho, is present. A record of the proceeding is also made digitally.

Oral argument is presented.

For the reasons stated on the record,

**IT IS ORDERED** taking this matter under advisement.

9:34 a.m. Matter concludes.

**LATER:**

Defendants Carvana Co. ("Carvana"), Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Ira Platt, Neha Parikh, and Greg Sullivan (collectively referred to as the "Carvana Defendants")[1] have moved to dismiss the Complaint for failing to state a claim upon which relief may be granted. Defendant Grant Thornton LLP ("Grant Thornton") has also moved to dismiss the Complaint. Defendants Citigroup Global Markets Inc. ("Citigroup") and J.P. Morgan Securities LLC ("J.P. Morgan") (collectively referred to as the "Underwriter Defendants") have joined in the Carvana Defendants' and Grant Thornton's Motions and filed their own Memorandum in support of the Motions. The Court has considered the Carvana Defendants' and Grant Thornton's Motions, the Underwriter Defendants' Joinder, the plaintiff's Omnibus Response and the Replies, along with the arguments of counsel.

---

[1] Messrs. Garcia, Jenkins, Palmer, Maroone, Platt, and Sullivan and Ms. Parikh are referred to as the "Individual Defendants"

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    03/13/2023

**BACKGROUND**

Carvana is a publicly traded company. It operates an e-commerce platform for buying and selling cars.

Titles to the cars sold by Carvana are issued by various state agencies, pursuant to state laws. Many states have time limits within which titles must be transferred to purchasers.

Carvana has a seven-day return policy. Plaintiff alleges that this results in a more complicated registration and title transfer process than for traditional dealers.

During the pandemic, demand for cars from Carvana increased dramatically. This resulted in a "bottleneck." Carvana allegedly failed to ensure that titles were delivered to customers in a timely manner; delays of months, and sometimes years, allegedly occurred. Plaintiff claims that the delays violated the laws of various states.

According to plaintiff, without a certificate of title issued by the state, a car owner generally cannot lawfully insure or operate a motor vehicle. Plaintiff alleges that, in 2022, state agencies in six states announced regulatory investigations into customer complaints about delays in receiving titles for used vehicles. Hundreds of customers in about 22 states complained about Carvana's failure to timely deliver title.

In April of 2022, Carvana conducted a secondary public offering ("SPO") where, pursuant to underwriting agreements, Citigroup and J.P. Morgan purchased shares that were then sold to investors at $80 per share. Plaintiff purchased shares from Citigroup.

In connection with the offering, Carvana filed a registration statement ("Registration Statement") and a prospectus ("Prospectus"). These documents incorporated Carvana's 2021 Form 10-K, which contained year-end financial statements for 2020 and 2021.

The Complaint alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). The Complaint names as defendants Carvana, five members of Carvana's Board of Directors, Carvana's Chief Financial Officer and Carvana's Vice President of Accounting and Finance. Carvana's auditor, Grant Thornton, is named as a defendant, as are the Underwriter Defendants.[2]

---

[2] Count 1, for violation of Section 11, is brought against all defendants. Count 2, for violation of Section 12(a)(2), is asserted against the Carvana Defendants and the Underwriter Defendants. Count 3, for violation of Section 15, is against the Individual Defendants.

Docket Code 005                          Form V000A                          Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                        03/13/2023


The crux of the Complaint is that Carvana, and its auditor, prematurely recognized revenue from the sale of vehicles. The Carvana Defendants and Grant Thornton contend that the company appropriately recognized revenue when the customer received the vehicle. Plaintiff contends, however, that the financial statements were misleading because revenue could only be properly recognized when the government issued an updated certificate of title to the buyer.

In the notes of its financial statements reported in the 2021 Form 10-K, Carvana disclosed the criteria it considered for recognizing revenue for used vehicle sales. Specifically, Carvana disclosed:

> The Company satisfies its performance obligation for used vehicle sales *upon delivery* when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. … Prior to delivery of the vehicle, the payment is received, or financing has been arranged.
> (Carvana Ex. 3, 2021 Form 10-K at 84) (emphasis added).[3]

Grant Thornton's Audit Report was titled "Opinion on the Financial Statements." Grant Thornton stated "(i)n our opinion, the financial statements present fairly, in all material respects, the financial position of the Company...in conformity with Generally Accepted Accounting Principles ["GAAP"]." Grant Thornton further opined, "[w]e believe that our audits provide a reasonable basis for our opinion."

Plaintiff makes three major contentions. First, Carvana's 2020 and 2021 reported revenue and profit were materially false and misleading, due to improper, premature, revenue recognition. Second, the balance sheets for these years omitted a liability account for deferred revenue for the value of sold cars delivered to customers without a title. Third, Grant Thornton's Statement in the audit report, included in the 2021 Form 10-K, that the financial statements complied with GAAP, was false.

---

[3] In the notes to Carvana's financial statements, filed with the 2019 Form 10-K, which is outside the pleadings, Carvana disclosed that "[t]he company satisfies its performance obligation for used vehicle sales *upon delivery when the transfer of title*, risks and rewards of ownership, and control pass to the customer." (Plaintiff's Ex. 1 2019 Form 10-K at 90) (emphasis added). Plaintiff argues that this pre-SPO disclosure was an acknowledgment that transfer of title is critical for revenue recognition. Plaintiff also notes that Carvana did not disclose that it had changed its revenue recognition policy. Although the wording of the notes to the financial statements changed slightly after 2019, plaintiff has not specifically alleged that there was a change in Carvana's revenue recognition policy or in its application of ASC 606 after 2019. Indeed, the 2019 10-K refers to the transfer of title and not the issuance of a certificate of title, which are two different things.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                  03/13/2023

**ACCOUNTING STANDARDS**

Plaintiff alleges that Carvana violated Accounting Standards Codification ("ASC") 606, which concerns "Revenue from Contracts with Customers." Plaintiff only challenges the timing of revenue recognition.

The relevant question is when a "customer obtains control of" the car. (Carvana Ex. 9, ASC 606-10-25-23). Control of an asset refers to the ability to obtain the benefits of the asset, including the ability to sell the asset. (*Id*., ASC 606-10-25-25). Determining the amount and timing of revenue from customer contracts involves a "significant judgment." (Carvana Ex. 2, ASC 606-10-50-17, -19).

ASC 606 provides a list of five non-exclusive indicators of the transfer of control: (1) the seller has a present right to payment; (2) the buyer has legal title to the asset; (3) the seller has transferred physical possession; (4) the buyer has the significant risks and rewards of ownership; and (5) the buyer has accepted the asset. (Carvana Ex. 9, ASC 606-10-25-30). ASC 606 explains that the presence of one or more indicators "may" reflect that control of the asset has passed to the buyer. (*Id.).* Grant Thornton's implementation guidance, referred to in the Complaint, says that "[n]one of the indicators discussed above is individually determinative; rather, an entity should consider all of the indicators collectively to make a determination as to when control passes to the customer." (Carvana Ex. 7, Grant Thornton guidance at 202).

ASC 606 also includes disclosure requirements, to "enable users of financial statements to understand the nature, amount, timing and uncertainty of revenue." (Carvana Ex. 2, ASC 606-10-50-1). The disclosure requirements include "[t]he significant judgments…made in applying the guidance in this Topic to" an entity's contracts with customers. *Id.* Specifically, the company is required to provide a description of "when the entity typically satisfies its performance obligations (for example, … upon delivery ….)." (*Id*., ASC 606-10-50-12(a)). The company must also "disclose the significant judgments made in evaluating when a customer obtains control of promised goods." (*Id.*, ASC 606-10-50-19).

The Complaint focuses on Carvana's recognition of revenue before the transfer of title. Plaintiff contends that revenue recognition must be delayed until the registration process was completed and a title was issued by the buyer's State. Until that time, the buyer allegedly did not have "legal title" and the "risks and rewards of ownership."

**LEGAL STANDARDS**

A claim under Section 11 of the Securities Act requires proof that the registration statement (1) "contained an untrue statement of a material fact," (2) "omitted to state a material

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          03/13/2023

fact required [by law] to be stated therein," or (3) "omitted to state a material fact …necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). Section 11 is a strict liability statute that does not require fraudulent intent. *In re Daou Systems, Inc*., 411 F.3d 1006, 1027 (9th Cir. 2005) (Liability attaches to "innocent or negligent material misstatements or omissions.").

Section 12(a)(2) likewise requires proof of a misstatement or omission of a material fact in a prospectus; a claim, however, is limited to a plaintiff who purchased a security from a defendant who "offer[ed] or s[old] the security." 15 U.S.C. § 77l(a); *Pinter v. Dahl*, 486 U.S. 622, 647 (1988) ("[L]iability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."). Section 15 makes a "control person" liable for violations of the Securities Act. 15 U.S.C. § 77o(a); *In re Rigel Pharmaceuticals, Inc*., 697 F.3d 869, 886 (9th Cir. 2012) (A Section 15 claim requires an underlying primary violation of the securities laws.).

The Securities Act requires "full and fair disclosure" of relevant information. *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 178 (2015). Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

In *Omnicare,* the United States Supreme Court addressed what opinions are actionable under Section 11.  The Supreme Court held that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief is wrong." *Omnicare,* 575 U.S. at 186. *Omnicare* established three different standards for pleading falsity of opinions. *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.,* 856 F.3d 605, 615-16 (9th Cir. 2017). Under *Omnicare*, opinions are actionable if it is alleged that: (1) "the speaker did not hold the belief ... professed" and that belief is objectively untrue (subjective falsity); (2) "a statement of fact contained within an opinion is materially misleading" when "the supporting fact [the speaker] supplied [is] untrue" (embedded untrue facts); or (3) "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context" (omissions). *Id.* at 616 (*quoting Omnicare*, 575 U.S. at 194).

The materiality of a false and misleading statement or omission is generally a fact-specific analysis to be assessed by a jury. *In re Violin Memory Securities Litigation,* No. 13-CV-5486 YGR, 2014 WL 5525946, at *9 (N.D. Cal. Oct. 31, 2014). A fact is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Industries, Inc. v. Northway*, 426 U.S. 438, 499 (1976)). Indeed, the "emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings." *Weiner v. Quaker Oats Co*., 129 F.3d

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                           03/13/2023

310, 317 (3d Cir. 1997). A complaint may only be dismissed on materiality grounds "if the alleged misrepresentations and omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Id.* (*quoting Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 281 n.11 (3d Cir, cert. denied, 506 U.S. 934 (1992); *Violin*, 2014 WL 5525946, at \*9.

Securities Act plaintiffs "need not allege scienter, reliance, or loss causation," as do plaintiffs alleging fraud under the Securities and Exchange Act of 1934 ("Exchange Act"). *In re Morgan Stanley Information Fund Securities Litigation,* 592 F.3d 347, 359-60 (2d Cir. 2010). Because of the relatively scant legal requirements and low pleading burden, "[p]leading a Section 11 claim is not difficult." *In re Giant Interactive Group, Inc. Securities Litigation*, 643 F. Supp. 2d 562, 568-69 (S.D. N.Y. 2009). Since fraud is not required, the sufficiency of the Complaint is evaluated under Rule 8(a), not the heightened pleading standard of Rule 9(b). *See Omnicare*, 575 U.S. at 179 (Section 11 claims do not require proof of "intent to deceive or defraud"); *In re SunEdison, Inc. Securities Litigation*, 300 F. Supp. 3d 444, 461 (S.D.N.Y. 2018).

The sufficiency of the Complaint must be evaluated under the notice pleading standard in Rule 8(a), as interpreted by the Arizona Supreme Court in *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417 (2008), The heightened federal plausibility standard (*see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) does not apply.

*Omnicare* set forth the factual allegations that must be pled to state a Section 11 claim in an opinion case. As such, if the case involves an opinion, the Complaint must allege facts "calling into question the issuer's basis for offering the opinion" and "identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did nor did not conduct or the knowledge it did or did not have  -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare,* 575 U.S. at 194. Meeting that pleading standard is "no small task for an investor." *Id.* Conclusory allegations are insufficient under both *Omnicare* and Rule 8(a). *Id.; Cullen*, 218 Ariz. at 419, ¶ 7.

**CARVANA DEFENDANTS' REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE AND OTHER EXHIBITS INCLUDED WITH THE MOTIONS AND OMNIBUS RESPONSE**

Carvana Defendants have requested that the Court take judicial notice of, or incorporate by reference, nine exhibits submitted with its Motion. Grant Thornton submitted nine exhibits with its Motion and six exhibits with its Reply. Plaintiff included three exhibits with its Omnibus Response.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023

Generally, the Court can only consider the allegations in the Complaint itself when ruling on a Rule 12(b)(6) Motion to Dismiss. *See* Rule 12(d); *Cullen,* 218 Ariz. at 419, ¶ 7. The Court, however, can consider documents referenced in the Complaint, and matters of public record that are central to the Complaint, without converting the motion into one for summary judgment. *ELM Retirement Center, LP v. Callaway,* 226 Ariz. 287, 289, ¶¶ 6-8 (App. 2010) (trial court's consideration of purchase contract attached to motion to dismiss did not convert it to a motion for summary judgment); *Strategic Development and Const., Inc. v. 7th & Roosevelt Partners, LLC,* 224 Ariz. 60, 63, ¶ 10 (App. 2010).

Carvana Defendants' Exhibits 2, 8 and 9 are copies of various sections of ASC 606. Exhibits 3, 4 and 5 are copies of Carvana's public filings with the Securities and Exchange Commission ("SEC"). Exhibit 7 is a copy of Grant Thornton's guidance on ASC 606. Carvana Defendants' Exhibit 6 is a copy of ASC 105-10-10. Exhibit 10 is a copy of ASC 250-10-45. Plaintiff's Exhibit 1 is a copy of Carvana's 2019 Form 10-K. Exhibit 2 is a copy of a Carvana Retail Purchase Agreement Nevada dated February 18, 2022.[4] Exhibit 3 is a copy of a class action complaint filed in Pennsylvania federal court, brought by Carvana customers complaining that Carvana "fail[ed] to permanently license and register the vehicles properly" and "improperly issu[ing] temporary registrations." (Plaintiff's Ex. 3 at ¶ 194).

Grant Thornton's Exhibit A is a copy of ASC 606. Exhibit B is a copy of Grant Thornton's guidance on ASC 606. Exhibits C and D are copies and excerpts from Carvana's Form 10-K for 2021 and 2022. Grant Thornton's Exhibits E through H are excerpts from Form 10-K's from other car dealers, including AutoNation, Inc., Sonic Automotives, Inc., America's Car-Mart, Inc. and Vroom, Inc.

Plaintiff's exhibits are outside the Complaint and thus, should not be considered in deciding this Motions to Dismiss. Moreover, plaintiff's exhibits have no impact on the Court's decision. (*See* Discussion of Section 11 claim and fn. 3 and fn. 4).[5]

---

[4] The single 2022 Nevada purchase contract is not relevant to plaintiff's claims concerning the challenged 2020 and 2021 financial statements. Plaintiff has not established that this single contract is representative of the thousands of purchase contracts entered into during the relevant period. Further, the purchase agreement provided that "[w]hen [Carvana] transfer[ed] title and ownership of the Vehicle to [the customer], [the customer] may take delivery of the Vehicle…."). (Plaintiff Ex. 2). The agreement does not demonstrate that the transaction is not complete until a certificate of title is issued. As discussed herein, transferring ownership or title to a vehicle and the issuance of a certificate of title are two different things. The Nevada agreement also shows that the buyer had arranged financing of the purchase price prior to delivery. At that point, the customer took delivery and the sale was complete, subject to the "seven (7) day test own" policy.

[5] Although the Complaint discussed customer complaints, it did not specifically mention the Pennsylvania federal lawsuit.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          03/13/2023

Although plaintiff does not challenge the exhibits submitted outside of the Complaint "per se," it does object to the conclusion asserted by defendants that Carvana's revenue recognition practice was consistent with industry practice. The Form 10-Ks of other cars retailers are clearly outside the Complaint. As such, the Court will not consider Grant Thornton's Exhibits E through H. Nor will the Court consider how other car dealers apply ASC 606. The Court will consider the other exhibits submitted with the defendants' Motions.

Grant Thornton submitted six additional exhibits with its Reply. Exhibits A and B are copies of Grant Thornton's Consent and audit opinion filed with the SEC. The audit opinion is quoted in and central to the Complaint. The Court will consider Exhibits A and B.

Grant Thornton's remaining exhibits are excerpts of various accounting standards, none of which are referenced in the Complaint. These exhibits are discussed in passing in footnote 5 on page 10 of Grant Thornton's Reply. The Court will not consider these exhibits, belatedly submitted with the Reply. *See Dawson v. Withycombe*, 216 Ariz. 84, 111, ¶ 91 (App. 2007).

**SECTION 11 CLAIM**

*Defendants' Position*

Defendants claim that ASC 606 requires the exercise of "significant judgment." In particular, the judgment involves determining whether the customer obtained control of the vehicle. Plaintiff's contention that Carvana was prohibited from recognizing revenue until a certificate of title was issued challenges the judgment of Carvana and Grant Thornton.

Statements labelled "opinions," or that use the words "[w]e believe," are generally matters of opinion. *Omnicare,* 757 U.S. at 184, 187-88. This is because a reasonable person recognizes that such statements "convey some lack of certainty as to the statement's content." *Id.* at 187. The *Omnicare* standard applies to statements of opinion in an independent auditor's report. *Querub v. Hong Kong*, 649 Fed. Appx. 55, 58 (2d Cir. 2016), *aff'd In Re Puda Coal, Inc. Securities Litigation,* 30 F. Supp. 3d 230 (S.D.N.Y. 2014); *Hunt v. Bloom Energy Corp ("Bloom")*, 2021 WL 4461171, at *14-15 (N.D. Cal. Sept. 29, 2021). "Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the Omnicare standard for Section 11 claims." *Querub,* 649 Fed. Appx. at 58.

Various cases have held that accounting judgments are generally considered statements of opinion, not facts, because they are inherently subjective. *Dearborn Heights,* 856 F.3d at 614 (statement related to company's goodwill valuation was an opinion subject to *Omnicare* because it expressed defendants' subjective and qualitative assessment of fair value). When a plaintiff challenges financial metrics "because of the accounting treatment applied to those metrics,"

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023

courts routinely hold that the resulting financial metrics achieved by applying judgments are statements of opinion subject to *Omnicare's* falsity standard. *In re AmTrust Financial Services, Inc. Securities Litigation,* No. 17-CV-1545 (LAK), 2019 WL 4257110, at *12 (S.D.N.Y. Sept. 9, 2019); *see also Bloom,* 2021 WL 4461171, at *5 (holding that statements about contingent liabilities were statements of opinion).

Defendants also submit that the Complaint does not allege that ASC 606 requires that revenue recognition MUST be postponed until issuance of the certificate of title. There is also no suggestion that issuance of the title is dispositive. As noted above, ASC 606 provides various, non-exclusive, indicators of the transfer of control. Only one of those factors is "legal title." Moreover, ownership is not dependent on the existence of a certificate of title. *Cabral v. State Farm Fire & Cas. Co.,* 582 F. Supp. 3d 701, 706 (D. Ariz. 2022) (A certificate of title is evidence of ownership but is "not required or dispositive because 'ownership' exists independent of a certificate of title" and "vehicle ownership in Arizona 'does not depend upon an individual obtaining certificate of title or complying with Arizona's transfer of title statue.'"). In other words, a buyer of a vehicle obtains ownership when the sales transaction is complete.[6] Issuance of a certificate of title, while evidence of ownership, does not determine ownership.

Defendants contend that, since the revenue recognition under ASC 606 involves an accounting judgment, plaintiff's claim is subject to *Omnicare's* requirements for establishing falsity. When a plaintiff challenges an affirmative statement of opinion, the plaintiff must show that the speaker did not subjectively believe the stated opinion and that it was objectively false. *Omnicare,* 575 U.S. at 185-86. The Complaint here, however, does not allege that the defendants' opinions on revenue recognition were not honestly held. Defendants point out that the Complaint expressly stated that this "action does not sound in fraud," that "Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or …. acted with scienter or fraudulent intent." (Complaint at ¶¶ 78, 89).

When a plaintiff relies on an omission, it must "identify particular (and material) facts" that "call into question the issuer's basis for offering the opinion." *Omnicare,* 575 U.S. at 194. Defendants contend that plaintiff does not allege an omission. Regardless, plaintiff identified no particular facts that call into question Carvana's basis for its opinion on revenue recognition.

Carvana disclosed the judgments made in recognizing revenue. *See Dearborn Heights,* 856 F.3d at 618-19. Defendants submit that Carvana's financial results could not have been misleading, because Carvana disclosed the indicators of control it relied on, and specifically noted that its performance was satisfied, and control passed "upon delivery" of the vehicle to the

---

[6] Plaintiff does not dispute that the customers made payment or arranged financing before Carvana delivered the vehicles, as disclosed in the footnotes to the financial statements. (*See* Carvana Ex. 3, 2021 Form 10-K at 84).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              03/13/2023

customer. A plaintiff cannot state a claim where the defendant disclosed the information allegedly omitted. *Oregon Public Employees Retirement Fund v. Apollo Group. Inc*., 774 F.3d 598, 609-10 (9th Cir. 2010) (plaintiffs failed to allege accounting errors where defendants disclosed the bad debt reserves were in part attributable to uncollected tuition).

Defendants contend that, given the information disclosed, no reasonable investor could have believed that Carvana recognized revenue in some different way. *See In re Lyft Inc. Securities Litigation,* 484 F. Supp. 3d 758, 772 (N.D. Cal. 2020) (dismissing claim that market share estimate was overstated where defendant disclosed the source and underlying assumptions of the market share estimate). According to defendants, the financial statements were not materially misleading.

Defendants further contend that there has not been an adequate allegation of materiality. A misstatement is actionable only if it would have misled a reasonable investor about his or her purchase. *Daou Systems,* 411 F.3d at 1027. The Complaint does not discuss the financial impact of recognizing revenue at the time of delivery. Rather, the Complaint states only that the impact was "likely" quantitatively material because state regulatory investigations may have identified "thousands of car sales." (Complaint at ¶¶ 65-66). Defendants contend that this type of vague allegation does not satisfy the materiality requirement. *See, e.g., Labul v. XPO Logistics*, No. 3:18 cv-2062 (SRU), 2021 WL 1056828, at *9 (D. Conn. Mar. 19, 2021).[7] Indeed, defendants argue that plaintiff conflates the importance of used car sales to Carvana's business with the materiality of the alleged misstatement.[8]

Grant Thornton points out that Carvana has never restated its financial statements. Restatement, however, is not dispositive. *Aldridge v. A. T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir. 2002).

*Plaintiff's Position*

Plaintiff cites cases for the proposition that GAAP violations, including overstatement of revenues and profit and omission of deferred revenues, are actionable. *City of Omaha Police & Fire Retirement System v. Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379, 413, 417 (S.D.N.Y. 2020) (improper revenue recognition and overstated revenues actionable as GAAP violations); *In Re DDi Corp. Securities Litigation,* No. CV003-7063 NM, 2005 WL 3090882, at

---

[7] In *Labul,* the court stated that materiality allegations in a Securities Act claim must comply with Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Id*. As discussed above, this Court will evaluate the claim in this case, including the materiality allegations, under Arizona Rule 8(a), as interpreted in *Cullen*.

[8] As was discussed at oral argument, the issue here is the timing of revenue recognition. Defendants argue that the plaintiff has not demonstrated that the delay in revenue recognition, which may or may not "push" revenue into a different year, had any material impact on profitability for any given year.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          03/13/2023

*12 (C.D. Cal. July 21, 2005) (sustaining revenue overstatement due to accounting improprieties that violated GAAP); *In re Majesco Securities Litigation,* No. CIV A 05CV-3557 PGS, 2006 WL 2846281, at *4-5 (D.N.J. Sept. 29, 2006) (sustaining revenue overstatement and gross profit as actionable under GAAP). Plaintiff claims that whether application of applicable accounting standards complies with GAAP is generally an issue of fact. *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1993).

Plaintiff contends that this case is about facts, not opinions. Revenue and profits are facts. *S.E.C. v. MiMedx Group, Inc.*, No. 19 Civ 10927 (NRB), 2022 WL 902784, at *10 (S.D.N.Y. Mar. 28, 2022). The Securities Act requires issuers to make "factual statements about their financial health and imposes strict liability with respect to errors and omissions in such statements to promote 'full and fair disclosure' of material information." *In re Petrobras Securities Litigation,* No. 14-cv-9662 (JSR), 2016 WL 1533553, at *4 (S.D.N.Y. Feb. 19, 2016) ("[F]inancial statements embedded within [auditor's] audit opinion are actionable under § 11 as facts."). "If the numbers underlying that data consist only of figures that were then presently known, fixed or definite…then any resulting data would be a statement of fact." *Amtrust,* 2019 WL 4257110, at *14. Likewise, "if the relevant provision of (sic) GAAP or ASC topic applied to produce the data called only for the application of or evaluation under objective criteria, then the resulting data would be a statement of fact." *Id.*

Plaintiff argues that Carvana's revenues and profit "did not involve any inherently subjective valuations, and application of appropriate GAAP standard…called only for objective criteria." *See MiMedx,* 2022 WL 902784 at*10. Plaintiff claims that under ASC 606-10-05-4 a company shall "recognize revenue when (or as) performance obligations are satisfied." Plaintiff submits that the risks and rewards of ownership cannot be transferred without the issuance of a certificate of title. (Complaint at ¶53). As such, plaintiff disputes that this case involves inherently subjective determinations. Rather, according to plaintiff, revenue simply cannot be recognized until a certificate of title is issued.

Plaintiff further cites cases for the proposition that an "opinion" of a professional, such as Grant Thornton, is inherently different from the kind of opinion referred to in *Omnicare.* "[A]udit opinions are not of the same substance as those discussed in *Omnicare*…These sorts of opinions (such as "our products are the finest in the world") are qualitatively different from an auditor's professional opinion about the soundness of a company's financial statements. Thus, no amount of couching an audit report as an opinion obviates the certification effect of those reports when made part of a registration statement." *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc. "Marrone*"), 243 F. Supp. 3d 1109, 1116 (E.D. Ca. 2017). Further, registration statements are "required by statute to include both a balance sheet and a profit and loss statement…that have been certified by an independent public or certified accountant." *Id.* at 1117. As such, the audit report's certification of the financial statements is a statement of fact. *Id.*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                     03/13/2023

Plaintiff also cites case law holding that an auditor can be liable for erroneous financial statements in offering documents. *Id.* One court stated that it was "unaware of any authority supporting [the auditor's] position. The statute extends liability to 'any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement.'" *In re Global Crossing, Ltd. Securities Litigation,* 322 F. Supp. 2d 319, 348 (S.D.N.Y. 2004) (*quoting* 15 U.S.C. § 77k).

Plaintiff claims that it has adequately alleged a case about false facts against all defendants. Revenues and profits were overstated based on premature recognition of income. Even if, however, the statements were opinions, plaintiff further claims that a viable claim has been pled.

Opinions are actionable if (1) "the speaker did not hold the belief…professed"; (2) "the supporting fact [the speaker] supplied [is] untrue"; or (3) the plaintiff alleges "facts going to the basis for the issuer's opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Dearborn Heights,* 856 F.3d at 615-16 (*citing Omnicare*, 575 U.S. at 194-95). Plaintiff claims that the Complaint is viable, even if the statements in question are considered opinions, for three reasons.

First, the Complaint alleges that there were "misstatements of opinion or belief when made." Although the Complaint disclaims any allegation of scienter or fraudulent intent, the Complaint alleges that "any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made." (Complaint at ¶¶ 78, 89). Plaintiff claims that this is an adequate allegation that the belief was not honestly held.  *In re MF Global Holdings, Ltd. Securities Litigation,* 982 F. Supp. 2d 277, 313-14 (S.D.N.Y. 2013).

Second, plaintiff claims that the supporting, or "embedded" facts are untrue. Specifically, Carvana states that it "recognizes revenue in compliance with the five-step model prescribed by ASC 606" and that it "satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer." (Complaint at ¶ 52); (*see* Carvana Ex. 8, 606-10-05-4). Plaintiff claims that these underlying facts are not true. The truth was that Carvana overstated revenue and profit in violation of GAAP.[9]

---

[9] During oral argument, plaintiff complained that the defendants did not discuss the embedded fact issue in their Motions. The Complaint, however, contains no viable allegation that there was a false embedded fact. Moreover, this issue was discussed in the Reply briefs. In any event, as discussed further below, the embedded facts here are nothing more than a repeat of the allegation that revenue was prematurely recognized.

Docket Code 005                          Form V000A                          Page 13

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    03/13/2023


Third, plaintiff claims that Carvana has omitted information which made the information revealed misleading. Carvana failed to disclose that title had not been transferred and that it had, therefore, not satisfied its performance obligation under GAAP to deliver both title and the vehicle.

Plaintiff claims that materiality has been adequately pled. Plaintiff has alleged that the misstatements were material, given that thousands of title delays impacted customers in numerous states. The premature recognition of revenue had a material impact on the financial statements, resulting in a sharp stock price decline. *See MiMedx*, 2022 WL 902783 at *9.

Plaintiff has also alleged qualitative materiality. *City of Omaha,* 450 F. Supp. 3d at 416. The Complaint pleads qualitative materiality under the four factors in SEC Staff Accounting Bulletin No. 99. First, the misstatements allegedly arose from an item capable of precise measurement. Second, the misstatements concerned a significant role of defendant's business. Third, the misstatements impacted the registrant's compliance with regulatory requirements. Carvana's premature revenue recognition allegedly violated GAAP and SEC Regulation S-X. Fourth, the misstatements dealt with an alleged unlawful transaction, in light of the failure to timely deliver titles in accordance with state law. Plaintiff submits that this is an adequate allegation regarding qualitative materiality. *See Id.*

*Discussion of Section 11 Claim*

Carvana's Reported Revenue and Profits Were Opinion Statements Subject to *Omnicare*.

Plaintiff argues that, in order to properly recognize revenue under ASC 606, Carvana had to deliver both "title" and the vehicle to the customer. Plaintiff asserts that Carvana's revenue and profits are "black and white accounting measurements with no room to apply subjective judgement or discretion." (Complaint at ¶ 67(a)). According to plaintiff, revenue can only be recognized when the state government issues an updated certificate of title reflecting the change in ownership.

Plaintiff's argument, however, is undermined by the plain language of ASC 606, which plaintiff concedes is the applicable GAAP standard. When revenue is recognized is not "straightforward," as plaintiff claims.

Plaintiff focuses on the language in ASC 606-10-05-4 which provides that revenue is recognized when the seller "satisfies a performance obligation." (*See* Complaint at ¶ 51); (Carvana Ex. 8, ASC 606-10-05-4). Plaintiff contends that a performance obligation cannot be satisfied until a certificate of title is issued. Plaintiff misreads ASC 606. ASC 606, by its terms, requires the exercise of judgment. There is no bright line rule for determining when revenue is

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                           03/13/2023

recognized. There is certainly no bright line requiring that revenue recognition be delayed until a certificate of title is issued to the buyer.

ASC 606-10-05-4 provides that an entity satisfies a performance obligation "by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service)." Determining when a customer obtains control of the asset involves a "significant judgment." (Carvana Ex. 2, ASC 606-10-50-17,-19).

ASC 606-10-25-30 plainly states that revenue recognition requires an analysis of five non-exclusive indicators, only one of which is "legal title." Nowhere in ASC 606 does it state that the issuance of a state sponsored certificate of title to the buyer is required for control to be transferred. Indeed, plaintiff cites no authority for the proposition that issuance of a certificate of title is even necessary for title to a vehicle to be transferred.[10]

Contrary to plaintiff's contention, there is hardly a bright line test mandating that revenue simply cannot be recognized until a state sponsored certificate of title is issued. As noted, ASC 606 expressly states that its application requires a great deal of judgment in evaluating when the customer takes control of a vehicle. (*See* Carvana Ex. 2, ASC 606-10-50-19; *see also* Carvana Ex. 7, Grant Thornton guidance at 325) ("ASC 606 requires entities to exercise considerably more judgment and to make numerous estimates, (specifically around the timing of satisfying performance obligations, ….").

Courts have consistently held that, where a financial metric reflects an accounting judgment, the resulting financial result reflects a statement of opinion. *E.g.*, *Bloom*, 2021 WL 4461171, at *7-8. As noted in *Bloom*, "the Supreme Court has acknowledged that '[g]enerally

---

[10] Although plaintiff alleges that issuance of a certificate of title is required to transfer title to the car, and to insure and operate a vehicle, that position is not consistent with Arizona law. *See Reinke v. Alliance Towing,* 207 Ariz. 542, 542 (App. 2004) ("We hold that a person may possess legal title to an automobile even though he has neither applied for nor received a certificate of title issued in his name from the Motor Vehicle Division of the Arizona Department of Transportation."); *Cabral*, 582 F. Supp. 3d at 706. Plaintiff has also provided no authority from any relevant jurisdiction holding that a certificate of title is required to transfer title to a vehicle lawfully purchased from a dealer. The cases plaintiff cites do not support its position. *See Michaels v. Dillon*, 191 So. 2d 80, 82 (Fla. Dist. Ct. App. 1966) ("A certificate of title is not, in all cases, conclusive proof of ownership. The certificate invariably establishes presumptive ownership, but such presumption may be overcome by competent evidence."); *Brackin v. Brackin*, 894 N.E.2d 206, 212 (Ind.  App. 2008) ("Standing alone, a certificate of title raises an inference of legal title in the holder subject to contradiction by other evidence. Still, such certificates do not convey title and they are not conclusive proof of title in the one who is therein designated as the owner."); *Dan Pilson Auto Ctr., Inc. v. DeMarco*, 509 N.E.2d 159, 161 (Ill. App. 1987) ("Under established law in Illinois, it is clear that although the Illinois Vehicle Code requires a transfer of certificate of title to effectuate the sale of a vehicle (Ill.Rev.Stat.1985, ch. 95½, par. 3–112(a)), it is not necessarily determinative of the passage of ownership. It is the intent of the parties involved, and not such statutory prerequisites which determine ownership.").

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    03/13/2023

accepted accounting principles [ ] tolerate a range of reasonable treatments, leaving the choice among alternatives to management." *Id.* at *5 (*quoting Thor Power Tool Co. v. C.L.R.,* 439 U.S. 522, 544 (1979). Thus, the *Bloom* court held that, because the ASC criteria for determining whether to classify a lease as a capital lease involved the exercise of judgment, defendants' conclusion that the transaction could be treated as a sale, rather than a capital lease, was an opinion. *Id.*[11]

When the statement of revenue involves objective facts, it is a statement of fact. When the considerations underlying the figures require the exercise of judgment, however, the statement of revenue is an opinion. *Id.* at *7-8. As the court in *AmTrust* explained:

> If the number underlying that data consist only of figures that were then presently known, fixed, or definite – e.g., the price of widgets and number of widgets sold in a previous month – then any resulting data would be a statement of fact. Likewise, if the relevant provision of GAAP or ASC topic applied to produce the data called only for the application or evaluation under objective criteria, then the resulting data would be a statement of fact, If, however, the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion. And, if determining the relevant provision of GAAP to apply in a certain area of accounting or with respect to a certain transaction, involved a subjective evaluation, then any data resulting from that application of GAAP would be a statement of opinion.

*AmTrust*, 2019 WL 4257110, at *14.[12] In Am Trust, the court held that revenue and income figures were opinions where "the relevant accounting guidelines called for the exercise of judgment" and the plaintiff had not alleged "that an ASC topic or section of a particular topic objectively was the only correct guidance to apply." 2019 WL 4257110, at *13, *16.[13]  Carvana's reported revenue and profits were opinions, because they

---

[11] Contrary to plaintiff's claim, the Section 11 claims in *Bloom* were not decided under a heightened pleading standard. The Court in *Bloom* expressly stated that "the heightened pleading standards of the PSLRA do not apply to Section 11 claims." *Id.* at *3; *SunEdison*, 300 F. Supp. 3d at 461 (Rule 8(a) applies to pleading Securities Act claims, not the particularity standard of Rule 9(b)).

[12] The court in *AmTrust* further explained:

> A financial datum in a company's financial statements – for example, a reported dollar figure with an associated description or characterization – may be a pure statement of an objective historical fact or it may reflect a result achieved by applying judgments to objective historical facts, in which case it is or reflects an opinion. Which is the case can depend upon on a number of different factors.

*AmTrust,* 2019 WL 4257110, at *13.

[13] The Ninth Circuit has also recognized that, when the application of GAAP requires a company to exercise judgment, the company's financial statements may constitute an opinion. *Dearborn Heights*, 856 F.3d at 621.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                    03/13/2023

reflected an accounting judgment about when to recognize revenue from the sale of used vehicles.

The cases cited by plaintiff do not hold that revenue recognition resulting from an accounting judgment is an actionable statement of fact, and not an opinion. For example, in *City of Omaha*, plaintiff alleged that the company inflated revenue by employing "fraudulent revenue recognition practices" through fictitious sales and shipments of product and "channel stuffing with unreported returns." *City of Omaha*, 450 F. Supp. 3d at 413. There are no allegations of fraudulent revenue recognition practices here.

In *In Re DDi Corp.*, defendants allegedly fraudulently overstated revenue by prematurely shipping orders to customers and shipping orders from one company facility to another. *DDi,* 2005 WL 3090882, at *12. In denying a motion to dismiss, the court addressed only contentions that fraud had not been pled with particularity under federal rule 9(b) and that materiality had not been adequately alleged. There was no argument before the court that the accounting issues were maters of judgment.

In *MiMedx*, also cited by plaintiff, the "reported revenue represented 'historical income metrics that [did] not involve any inherently subjective valuation,' and application of the appropriate GAAP standard, and the terms of the side agreement, 'called only for … objective criteria.'" *MiMedx*, 2022 WL 902784, at *10, (*quoting AmTrust*, 2019 WL 4257110, at *14). The present case, in contrast, does involve "inherently subjective" decisions.

The cases cited by plaintiff do not stand for the proposition that application of accounting judgments results in an actionable statement of fact, and not an opinion.[14] Rather, accounting

---

[14] *See also Fresno County Employees' Retirement Association v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) ("This case is not about complex accounting judgments over which reasonable minds can differ. The plaintiffs allege that GAAP was irrelevant to the accounting calculus except to the extent that the 10(b) defendants used the accounting standards as a cover to inflate revenues."). Further, plaintiff's argument that the application of ASC 606 is a fact question is not convincing. The cited cases do not support the argument. For example, in *In re Burlington Coat Factory Securities Litigation*, (3rd Cir. 1997), there was a dispute over whether SFAC No. 6 was part of GAAP. 114 F.3d 1410, 1420-21 & n.10 ("At issue here is SFAC No. 6, which although issued by FASB, is allegedly not GAAP – at least according to defendants."). Plaintiffs alleged that the company violated GAAP by not complying with SFAC No. 6. The company asserted that SFAC No. 6 was not GAAP and applied a different accounting method. *Id*. The *Burlington* court held that there were factual disputes over whether the earnings overstatements were the result of using different accounting methods and whether the company's accounting practices were consistent with GAAP. *Id.* at 1421. Here, there is no dispute that ASC 606 is the applicable GAAP standard. In *Provenz*, there was a factual dispute whether the earnings process was substantially complete to allow for earnings to be reported under GAAP. *Provenz*, 102 F.3d at 1490. Here, plaintiff has not alleged that there is a factual dispute over the application of ASC 606, which is undisputedly the applicable standard for recognizing

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          03/13/2023

determinations can result in actionable statements of fact only when there are allegations of fraud or where there clear objective criteria that were not followed.

Because ASC 606 requires the exercise of judgment, the Court finds that Carvana's revenue and profits for the sale of used vehicles are statements of opinion subject to *Omnicare*. As such, to state a claim, plaintiff must allege particular facts that defendants did not honestly hold that opinion or knew it was false, misstated supporting facts, or omitted material facts about the opinion. *Omnicare*, 575 U.S. at 194. "[C]onclusory assertions" are insufficient. *Id.*

The Complaint does not allege that defendants did not honestly believe that revenue was properly recognized on the sale of used vehicles. Plaintiff does not allege that defendants knew revenue should have been accounted for differently. In fact, the Complaint alleges the opposite, stating that this "action does not sound in fraud," and that "Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or …. acted with scienter or fraudulent intent." (Complaint at ¶¶ 78, 89). Without allegations of particular facts that defendants subjectively disbelieved that revenue could be recognized on delivery, the Complaint does not state a claim under *Omnicare*.

Plaintiff next argues that "embedded" in the in the revenue and profits numbers was the statement in the notes to the financial statement that Carvana "recognizes revenue in compliance with the five-step model prescribed by ASC 606" and that it "satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer." (Complaint at ¶ 52). This "embedded fact", however, is not misleading or untrue. The notes disclose that Carvana applied ASC 606 and recognized revenue "upon delivery." Plaintiff has not alleged anything about that statement that is untrue or misleading. Moreover, the purported "embedded" fact is nothing more than a restatement that Carvana exercised its judgment under ASC 606 and recognized revenue at the time of delivery.

Plaintiff has also not alleged omitted material facts. The allegation that Carvana overstated revenue by not deferring revenue is essentially the same as saying that revenue was overstated. No FACTS were omitted. Indeed, Carvana clearly disclosed precisely when it recognized revenue.

To meet the *Omnicare* omission exception, plaintiff must "identify particular (and material) facts going to the basis for the issuer's opinion;" the facts must concern "the inquiry the issuer did or did not conduct or the knowledge it did or did not have." *Omnicare*, 575 U.S. at 194. Plaintiff alleges that Carvana did not disclose that title to numerous cars had not been

_____

revenue. Indeed, there are no issues of fact here. For purposes of this motion, the Court will assume that there were delays in the issuances of certificates of title for numerous vehicles.

Docket Code 005                          Form V000A                          Page 18

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              03/13/2023

transferred to buyers.  The allegation, however, that "Carvana had not transferred title to thousands of customers" does not address the inquiry defendants did or did not conduct or the knowledge they did or did not have.[15] The inquiry was about application of judgment under ASC 606. The knowledge was whether defendants knew they were improperly applying ASC 606. Moreover, as discussed herein, transfer of title or ownership was simply not dependent on issuance of a certificate of title.

Without allegations that defendants knew that judgments they used in determining when revenue should be recognized were misplaced, the Complaint fails to state a claim. Indeed, the accounting judgment resulted in recognition of revenue upon delivery, even if a certificate of title had not yet been issued. The fact that "title" had allegedly not been transferred on numerous vehicles does not address the validity of the accounting judgment exercised by Carvana and Grant Thornton.

Even if Carvana's financial results were not an opinion, plaintiff has not alleged that a false or misleading statement was made. As noted above, the financial data reflected the result of accounting judgment. The manner in which revenue was recognized was clearly disclosed.

Plaintiff has also not pled that GAAP was in fact violated.  As discussed above, plaintiff cannot establish that issuance of a certificate of title was required for revenue recognition under ASC 606.

Plaintiff alleges that the state agencies in six states announced regulatory investigations into customer complaints about delays in receiving title to used vehicles. (Complaint at ¶¶ 42-47, 65). A class action was filed alleging problems with delays in receiving updated title and registration. (Plaintiff's Ex. 3). Plaintiff, however, has not alleged that the customer complaints about delays in receiving titles and registrations had anything to do with Carvana's revenue recognition. For example, the Pennsylvania class action demonstrates that the customer complaints would have no effect on revenue.

The plaintiffs in the Pennsylvania case complained that Carvana "delay[ed] in permanently transferring car titles for months and months which it had contractually represented to hold and agreed to transfer." The two class representative plaintiffs complained that they had not timely received permanent registrations. (*Id.* at ¶¶ 21, 31). The plaintiffs sought, as a class, "the return of 'fees related to registration, title, and/or licenses' … paid to CARVANA and appropriate injunctive relief to require CARVANA to obtain permanent registration tags for the

---

[15] The Complaint alleges that the various state investigations and actions began after the Registration Statement for the SPO was filed. (See Complaint at ¶¶ 39, 42-45). As such, there is no viable claim that these investigations should have been disclosed.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                      03/13/2023

putative class members within thirty days who have not yet received them." (*Id*. at ¶ 176). Thus, the Pennsylvania plaintiffs are seeking damages for breach of contract. They are not alleging that the purchases were not completed. They are not contending that control of the vehicles did not pass to them. Nor are they seeking to rescind their purchases.[16] Indeed, the complaining customers contend that their purchases were completed.  There is no indication that success for the complaining customers in the class action would have any material impact on Carvana's revenue on the sale of used vehicles.

Plaintiff does not explain how investors could have been misled. The offering documents explained the accounting judgment used. The offering documents made it crystal clear that revenue was recognized at the time of delivery and not when a certificate of title was issued. No reasonable investor could have been misled.

As noted above, plaintiff's Complaint also confuses the concept of the passing of title with the issuance of a certificate of title. Plaintiff claims that revenue should not be recognized until title transfers to the buyer. ASC 606 refers to one of the relevant indicators being that the "customer has legal title to the asset." As explained herein, the issuance of a certificate of title is not necessary for legal title to be transferred to the buyer. *See Reinke,* 207 Ariz. at 542. Rather, a certificate of title is simply an administrative step that memorializes the transfer of title.[17] The buyer, however, is the owner of the vehicle when the sales transaction is completed, the purchase price is paid, and the vehicle is delivered to the customer. Transference of legal title is not dependent on the administrative issuance of a certificate by the State. As such, even if revenue should not be recognized until title is transferred, Carvana complied with ASC 606.

---

[16] A few of the individuals referenced in the Pennsylvania Complaint received a refund of the purchase price. (See Plaintiff's Ex. 2 at ¶ 78 (Terri Burton – Carvana "admit[ed] it didn't have title to the subject vehicle and therefore offered to buy back the vehicle and pay Burton money on top of the buy-back amount conditioned on Burton using the excess funds to purchase another vehicle from CARVANA"); ¶ 134 (Brandon Johnson – After telling Mr. Johnson Carvana could not provide title to the vehicle, Mr. Johnson returned the vehicle to Carvana "in exchange for a refund of the ten (10) $290.00 payments made under the sale/financing agreement for the vehicle."); ¶ 140 (William Walker – Mr. Walker confronted Carvana "after the last temporary tag expired and CARVANA unwound the transaction for the vehicle."). The remaining individuals discussed in the Complaint complained about Carvana's failure to deliver timely permanent registrations and the hurdles they faced as a result. It appears from the allegations in the Pennsylvania Complaint that these other plaintiffs retained the vehicles. These plaintiffs did not allege that the delay in receipt of titles meant that the purchases were not completed.  (*Id.* at ¶ 159).

[17] As defendants noted at oral argument, under ASC 606-10-25-17, the completion of administrative tasks is not a factor in the timing of revenue recognition. (Carvana Ex. 9, ASC 606-10-25-17 ("Promised goods or services do not include activities that an entity must undertake to fulfill a contract unless those activities transfer a good or service to a customer. For example, a services provider may need to perform various administrative tasks to set up a contract. The performance of those tasks does not transfer a service to the customer as the tasks are performed. Therefore, those setup activities are not promised goods or services in the contract with the customer.").

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                           03/13/2023

Grant Thornton's Audit Report Is an Opinion Subject to *Omnicare*.

Grant Thornton's audit report is labelled an "opinion" and uses the words "we believe." Generally, when such words are used, reasonable investors recognize that the statement is an opinion because it "convey[s] some lack of certainty as to the statement's content." *Omnicare*, 575 U.S. at 187.

Plaintiff argues that *Omnicare* does not apply to the audit report because Grant Thornton "certified" Carvana's financial statements. Plaintiff's position is not supported by the majority of cases. In fact, several of the cases cited by plaintiff pre-date *Omnicare*. *See, e.g., Global Crossing*, 322 F. Supp. 2d at 348.

Plaintiff relies mainly on *Marrone,* in which the court held that *Omnicare* did not apply to auditors, reasoning that "audit opinions are not of the same substance as those discussed in *Omnicare*." *Marrone,* 243 F. Supp. 3d 1109, 1116-18. The court in *Marrone* said that the hypothetical opinion of a CEO about the company's product discussed in *Omnicare* was "qualitatively different from an auditor's professional opinion about the soundness of a company's financial statements." *Id.*

*Marrone* is clearly an outlier; it conflicts with the majority of cases decided since *Omnicare*. Several courts have expressly disagreed with *Marrone*, reasoning that *Omnicare* "did not recognize any 'auditor' exception to its holding" setting forth the requirements for establishing opinion liability under Section 11, and that "no basis" exists "for creating such an exception." *Bloom*, 2021 WL 4461171, at *14.; *see also Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services, Inc. ("Orrstown"),* No. 1:12-cv-00993, 2022 WL 3572474, at *53, 55, 57 (M.D. Pa. Aug. 18, 2022) (declining to follow *Marrone* and applying *Omnicare*);[18] *SunEdison,* 300 F. Supp. 3d at 500 (applying *Omnicare* opinion standard to audit opinion); *Special Situations Fund III QP, LP v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 Fed. Appx. 72, 76 (2d Cir. 2016); *Querub,* 649 Fed. Appx. at 58. The court in *Bloom* held there was "no meaningful distinction between the professional knowledge that a CEO has and the opinions he offers about a company's technology and the professional knowledge that an auditor has and the opinion it offers about a company's financial statements."

---

[18] In *Orrstown*, the court denied the auditor's motion to dismiss, finding that the complaint alleged the audit opinion omitted material information regarding its audits; specifically the failure to disclose impaired loans, to calculate an allowance for loan loss and to obtain updated borrower information and appraisals, which may have rendered the opinion misleading. 2022 WL 3572474, *57. No such allegations are alleged here. Rather, the sole allegation here is that revenue was recognized prematurely. The Complaint makes conclusory allegations that Grant Thornton omitted material facts. (Complaint at ¶ 82). These conclusory allegations are inadequate under *Omnicare*. Further, as discussed above, the financial statements disclosed the judgment made under ASC 606 concerning the timing of revenue.

Docket Code 005                        Form V000A                        Page 21

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023

*Bloom*, 2021 WL 4461171, at \*14. The distinction *Marrone* made is contrary to the weight of authority.

The Court finds that Grant Thornton's audit report is a statement of opinion subject to *Omnicare*. The Complaint does not allege particular facts that Grant Thornton did not believe to be true or that Grant Thornton did not believe that its opinions to be true. To the contrary, the Complaint expressly "disclaims" that its claims are based on fraud. The allegation that the "challenged statements of opinion or belief … are alleged to have been materially misstated statements of opinion or belief when made" (Complaint at ¶ 78) is conclusory. The Complaint does not allege particular facts required by *Omnicare*. *See Omnicare,* 575 U.S. at 194.

Plaintiff argues that Grant Thornton's audit report contained the "embedded facts" that Carvana's financial statements "present fairly, in all material respects, the financial position of the Company" and the Carvana's "financial statements … and the results of operations and its cash flows" conform with GAAP. In *Petrobras,* the court held that similar language in an audit report concluded that all the facts contained in the company's financial statements were embedded in the audit opinion. 2016 WL 1533553, at \*3-4.

*Petrobras* has not been widely adopted. In *Johnson v. CBD Energy Ltd. ("CBC")*, No. CV H-15-1668, 2016 WL 3654657, at \*12 (S.D. Tex. July 6, 2016), for example, the court found that *Petrobras* misread the "embedded statement of fact" concept. The court noted that, in the example used in *Omnicare*, the embedded statement of fact was: "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access," which rested on a verifiable fact about the company's patented technology. *Omnicare*, 575 U.S. at 185. In *CBD*, the court noted, in contrast, that the numbers in the company's financial statements, on which the auditor opined, did not appear in the audit report, and thus were not "embedded" in the report in the manner described in *Omnicare*. *CBD*, 2016 WL 3654657, at \*12; *see also Bloom*, 2021 WL 4461171, at \*15 (adopting the reasoning in *CBD*).[19]

_____

[19] *In re QuantumScape Securities Class Action Litigation*, cited by plaintiff and mentioned at oral argument, the opinions were accompanied with an unequivocal statement of fact. 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022). The court found that in Statement 2 ("{W}e are confident about is that the fundamental science risk is behind us.") the supporting fact was "fundamental science risk." *Id*. at 724, 739. The court also found that Statement 15 ("We believe our battery technology may provide significant improvements in energy density compared to today's conventional lithium-ion batteries, as shown in the figure below") contained a supporting assertion that the "figure below" showed the technology "may provide significant improvements in energy density" over conventional lithium-ion batteries. *Id*. at 725, 739. Finally, the court found that Statement 20 ("We believe that safety in our cell will be improved relative to lithium-ion because we have replaced the combustible polymer separator with a nonoxidizable (i.e., non-combustible) separator that is thermally stable to much higher temperatures than polymers, so it will act as a more effective barrier between anode and cathode") included that embedded factual

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    03/13/2023


The Court agrees with the reasoning in *CBD*. Grant Thornton gave an audit opinion on Carvana's financial statements; but the financial statements themselves were not "embedded" in the opinion in the way that the patented technology statement was in the *Omnicare* example. The Complaint does not allege that there were any "embedded" facts in the audit opinion that were materially untrue. Even if Carvana's financial statements were embedded in the audit opinion, however, plaintiff has not stated a claim because, as discussed above, the financial statements were the result of accounting judgment. There simply were no "embedded" facts.

Finally, the Complaint fails to allege any that Grant Thornton omitted material facts. As such, plaintiff has not adequately pled that Grant Thornton's opinion is actionable.

As noted above, even if Grant Thornton's audit opinion can be viewed as a factual statement, there nonetheless has not been any viable claim that Grant Thornton made a material, false, statement. The timing of the recognition of revenue was the result of accounting judgment.

The Underwriter Defendants

The Complaint fails to state a claim against the Underwriter Defendants. As discussed above, plaintiff has not alleged any false or misleading statement or omission in the SPO Registration Statement. All of the challenged statements are opinions. There is no allegation in the Complaint that the Underwriter Defendants subjectively believed that Carvana recognized revenue in violation of GAAP. Rather, the Complaint alleges that the Underwriter Defendants were negligent in "not knowing" that Carvana was allegedly "improperly recognizing revenue." (Complaint at ¶ 28). Because the Complaint fails to plead that the Underwriter Defendants disbelieved opinion statements in Carvana's SPO filings, or omitted material facts, it fails to state a Section 11 claim against them. *See Bloom,* 2021 WL 4461171, at *20 (dismissing Section 11 claims against issuer and underwriter under *Omnicare*); *In re Velti PLC, Securities Litigation*, No. 13 Civ. 03889 (WHO), 2015 WL 5736589, at *18 & n.14, 24 (N.D. Cal. Oct. 1, 2015).

**SECTION 12(a)(2) CLAIM**

*Summary of Arguments*

---

assertion that "the safely in its batteries will be better than that in lithium-ion." *Id*. 726, 739-40. Like the example in *Omnicare*, the embedded statements in *QuantumScape* were specific factual assertions that were capable of being proven true or false. Here, plaintiff has not alleged any embedded false factual assertion in Caravan's financial reports. Rather, the only assertion about imbedded facts is the circular contention that the financial statements prematurely recognized revenue.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023

J.P. Morgan and the Carvana Defendants argue that they are not sellers under Section 12(a)(2), as an additional reason why the claim should be dismissed against them. When an underwriter sells stock to the public in an offering, the issuer is typically not liable. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 369-70 (5th Cir. 2001) (citing Section 12's provision that a seller is only liable "to the person purchasing such security from him."). "[T]he seller must, at a minimum, directly communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 584, 871 (5th Cir. 2003).

The Complaint alleges that plaintiff purchased Carvana stock from Citigroup. Plaintiff does not allege that it purchased Carvana stock from J.P. Morgan or the Carvana Defendants.

Plaintiff points out, however, that statutory sellers include not only persons that pass title, but also persons who "solicit the purchase" of securities that are "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 627. Plaintiff claims that Carvana is a statutory seller under 17 C.F.R. § 230.159A ("seller shall include the issuer of the securities").

Plaintiff argues that the Individual Defendants should not be dismissed. The Individual Defendants signed the registration statement and participated in the preparation of the offering documents. The registration statement is a solicitation document. *In re Charles Schwab Corp. Securities Litigation,* 257 F.R.D. 534, 539 & n.3 (N.D. Cal. 2009). The seller does not have to have "personal" contact with the buyer. *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003). Whether defendants were motivated by their own financial interests is, according to plaintiff, a fact question. *Charles Schwab*, 257 F.R.D. at 550.

Plaintiff argues that J.P. Morgan is a seller because it offered, promoted, and sold the Carvana stock in the SPO to class members. The Complaint also alleges that plaintiff purchased Carvana stock in the offering. Plaintiff claims that this is a sufficient claim against J.P. Morgan. *Flynn v. Sientra, Inc,* 2016 WL 3360676, at *8 (C.D. Cal. June 9, 2016).

*Discussion*

Section 12(a)(2) imposes liability on any person who "offers or sells a security" by means of a materially misleading prospectus. 15 U.S.C. § 77l(a)(2). As discussed above, plaintiff has not alleged that Carvana's financial statements in the SPO were materially false or misleading. As such, the Section 12(a)(2) claim must also be dismissed. The claim must be dismissed against the Carvana Defendants and J.P Morgan for the additional reason that they were not "directly involved" in the sale of securities to plaintiff.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              03/13/2023

To establish liability under Section 12(a)(2), plaintiff must show that the defendant "solicited purchase of the securities for their own financial gain." *Daou Systems*, 411 F.3d at 1029. "[L]iability extends only to the person who successfully solicits the purchase." *Pinter*, 486 U.S. at 647. Under *Pinter*, "a defendant who did not directly sell the security to the purchaser can be liable under section 12 only if 'directly involved in the actual solicitation of a securities purchase.'" *Jensen v. iShares Trust*, 44 Cal. App. 5th 618, 650 n.21 (2020). The company issuing securities is not liable unless it was "sufficiently active in promoting the securities." *Lone Star*, 238 F.3d at 370.[20]

Officers and directors are not liable under Section 12(a)(2) unless they actively solicited sales of the securities. *See Vivendi,* 381 F. Supp. 2d at 186.[21]  Signing the materials filed with the SEC is not sufficient.

Further, a plaintiff who alleges that it purchased from one underwriter has no Section 12 claim against other underwriters. *See, e.g., In re Vocera Communications, Inc. Securities Litigation,* 2015 WL 603208, at* 2 (N.D. Ca. Feb. 11, 2015) (dismissing § 12(a)(2) claims against five underwriters where named plaintiff alleged it purchased stock from sixth underwriter). Because J.P. Morgan did not sell to the putative class plaintiff, the Complaint does not state a Section 12(a)(2) claim against it.

---

[20] Plaintiff argues that 17 C.F.R. § 230.159A, which states that a "seller shall include the issuer of the securities" means that Carvana can be liable as a seller. This argument was rejected in *In re Countrywide Fin. Corp. Mortg.-Backed Securities Litigation,* 932 F. Supp. 2d 1095, 1118–19 (C.D. Cal. 2013). The court in *Countrywide* reasoned that the Supreme Court's decision in *Pinter* was unambiguous: "[t]here is no support in the statutory language or legislative history for expansion of [the "offers or sells" language] beyond persons who pass title and persons who 'offer,' including those who 'solicit' offers." *Id*. *(quoting Pinter*, 486 U.S. at 650). Thus, the *Countrywide* court concluded that "the SEC's rule exceeded the statutory language of Section 12(a)(2) and cannot apply." *Id.  Federal Housing Fin. Agency v. UBS Americas, Inc.,* does not help plaintiff's case because there it was alleged that the company "actively participated in the solicitation of "the purchase of the certificates." 858 F. Supp. 2d 306, 333 n. 13 (S.D.N.Y. 2012), *aff 'd*, 712 F.3d 136 (2d Cir. 2013); *see also Mallen v. Alphatec Holdings, Inc.,* 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty. Employees' Retirement Association v. Alphatec Holdings, Inc.*, 607 Fed. App'x 694 (9th Cir. 2015) (holding that complaint failed to state a Section 12(a)(2) claim against substantial investor who was not alleged to have been an "immediate seller" of securities or involved in the preparation of the prospectus and solicitation of securities).

[21] In *Vivendi,* the court found that the complaint alleged the CEO was a seller where it was alleged that he "actively participated in the preparation of the allegedly misleading or false registration statement" and "regularly appeared before investors and financial news agencies to tout the financial vitality of [the company] and thereby encouraged[d] the investors to purchase [the company's] securities." 381 F. Supp. 2d 158, 187. The CEO also stood to benefit personally from the increased sale and share price*. Id.; see also In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 549–50 (N.D. Cal. 2009) (alleging that officers "'actively solicited the sale of the fund's shares' and that certain defendants were involved in marketing the fund."). Here, there are no allegations that the Individual Defendants were directly or actively involved in the solicitation of Carvana stock or stood to personally gain by the stock sales.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    03/13/2023


Plaintiff has not alleged that the Carvana Defendants or J.P. Morgan were "directly involved" in the solicitation of plaintiff's stock purchases. As such, the Complaint fails to state a claim against J.P. Morgan and the Carvana Defendants. In any event, for the reasons set forth above, there was no misstatement or omission of a material fact.

Finally, because the Complaint does not state a claim against the Individual Defendants under Sections 11 or 12(a)(2), it does not state a claim against them under Section 15. *Rigel Pharmaceuticals*, 697 F.3d at 886.[22] As such, the Individual Defendants are dismissed.

**LEAVE TO AMEND**

In footnote 22 of the Omnibus Response, plaintiff asks for leave to amend if any part of the Motions to Dismiss are granted. Leave to amend is "freely given" before dismissing an action under Rule 12(b)(6). Rule 15(a)(2); *Dube v. Likins*, 216 Ariz. 406, 415, ¶ 24 (App. 2007). Defendants did not object to plaintiff's request for leave to amend in the Reply. During oral argument, however, Carvana's counsel contended that an amendment would be futile That may be so.  It is not, however, perfectly clear that an amendment would be futile. *See Yes on Prop 200 v. Napolitano,* 215 Ariz. 458, 471, ¶ 40 (App. 2007). Perhaps plaintiff will be able to plead additional facts or omissions which may state a claim. The Court, in its discretion, will allow an amendment to the Complaint if plaintiff, in good faith, feels that it can state a viable claim under the analysis used in this ruling. [23]

**DISPOSITION**

The Carvana Defendants' and Grant Thornton's Motions to Dismiss are granted. The Underwriter Defendants' Joinder in the Motions to Dismiss is also granted.

---

[22] In light of the foregoing rulings, it is not necessary for the Court to address materiality. In any event, defendants have a valid point on materiality. Carvana reported revenue of $5.587 billion for 2020 and $12.814 billion for 2021. (Complaint at ¶ 54). The revenue per vehicle averaged $19,420 in 2020 and $23,167 for 2021. (Complaint at ¶¶ 65-66). Plaintiff alleges that the title issue affected "at least thousands of car sales" and concluded that Carvana's misstatement was "likely" material. (Complaint at ¶ 66). Based on the allegations in the Complaint, it is not at all clear that the title issue affected so many vehicles that it would have been material to Carvana's financial results. Indeed, as noted above, the issue is the timing of revenue recognition. Plaintiff has made a scant showing that deferral of revenue would have any material impact on the financial performance of any given year. The allegation that the stock price dropped more than 73% below the SPO price does not say anything about whether alleged errors in reported revenue and profit were material.

[23] Plaintiff is cautioned to not file an Amended Complaint that regurgitates and/or repackages the same material in the Complaint and in the Omnibus Response. Plaintiff must state a viable cause of action under the legal standards set forth in this ruling. If plaintiff cannot do so, it should not file an Amended Complaint.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                03/13/2023


Plaintiff may file an Amended Complaint within 30 days of the date of entry of this Order. If no such amendment is timely filed, defendants are directed to submit a form of judgment.