ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
RACHEL A. COCALIS (CA 312376)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re Carvana Co. Securities Litigation | ) ) ) | No. CV-22-2126-PHX-MTL |
| This Document Relates To: | ) ) ) ) | PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| All Actions. | ) ) ) | |

4895-7085-5006.v1

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS ................................. 2

    A.   Garcia Sr. and Garcia Jr. Founded Carvana and Took It Public ....................... 2

    B.   Leading Up to the Class Period, Carvana's Growth Story Faltered, Causing Carvana's Stock Price to Decline ...................................................... 3

    C.   Defendants Participated in an Intentional Scheme to Artificially Inflate the Price of Carvana Stock ......................................................................... 4

    D.   The 2022 Public Offering ......................................................................... 9

    E.   Defendants Dumped Their Stock After Pumping Up Carvana's Stock Price ...................................................................................................... 9

    F.   The Truth Is Revealed, Causing Carvana's Stock Price to Decline by More than 97% During the Class Period ...................................................... 10

II.  LEGAL STANDARD ....................................................................................... 10

III. THE EXTRINSIC DOCUMENTS SHOULD NOT BE CONSIDERED ................. 11

IV.  THE CC IS NOT A PUZZLE PLEADING ...................................................... 12

V.   THE CC STATES A SCHEME CLAIM UNDER THE 1934 ACT ........................ 13

VI.  THE CC STATES ADDITIONAL 1934 ACT CLAIMS ..................................... 15

    A.   The Material Misrepresentations and Omissions Are Actionable .................... 16

        1.   The Retail Unit Sales Misstatements ....................................................... 16

        2.   The Title and Registration Misstatements ........................................... 19

        3.   The Expansion Misstatements ................................................................ 23

        4.   The Buying Cars from Customers Misstatements ............................... 26

        5.   The Cost Advantage Misstatements ....................................................... 30

        6.   The Profitability Misstatements ............................................................. 31

        7.   The Macro-Economic Misstatements .................................................... 32

    B.   Defendants Failed to Challenge Their Insider Trading Omissions ................... 33

    C.   Plaintiffs Allege a Strong Inference of Scienter ........................................... 34

        1.   Defendants Had a $3.87 Billion Motive to Commit Fraud ................... 34

        2.   Defendants' Statements Support the Inference of Scienter .................. 39

4895-7085-5006.v1

**Page**

3. CW Accounts Further Bolster the Inference of Scienter ...................... 41

4. The "Core Operations" Doctrine Supports Scienter ............................ 43

5. Abundant Other Facts Support Scienter ............................................. 45

D. Plaintiffs Adequately Allege Loss Causation ................................................. 46

1. Defendants' Attacks on the April 20, May 10, and November 3, 2022 Corrective Disclosures Fail ........................................................ 47

2. Defendants' Attacks on the August 10, 2021, October 22, 2021, June 24, 2022 and October 7, 2022 Disclosures Fail .......................... 48

E. The CC States a Claim Under §20(A) ............................................................. 51

F. The CC States a Claim Under §20(a) .............................................................. 52

VII.    THE SECURITIES ACT CLAIMS ARE ADEQUATELY ALLEGED ................... 54

A. Plaintiffs Adequately State a Claim Under §11 and §12(a)(2) ....................... 54

1. Plaintiffs Pled Material Misstatements or Omissions ......................... 55

2. Plaintiffs Pled Actionable Omissions Under Item 105 ....................... 55

3. The Securities Act Claims Do Not "Sound In Fraud" ......................... 56

4. Defendants Have Not Proven Negative Causation .............................. 57

5. The §12(a)(2) Defendants Are Statutory Sellers ................................. 58

B. Plaintiffs Adequately State a Claim Under §15 .............................................. 59

VIII.   CONCLUSION ............................................................................................................ 59

4895-7085-5006.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*60223 Tr. v. Goldman, Sachs & Co.*,
    540 F. Supp. 2d 449 (S.D.N.Y. 2007)................................................................................51

*Abdo v. Fitzsimmons*,
    2018 WL 11220494 (N.D. Cal. May 22, 2018) .................................................................53

*Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*,
    2022 WL 3598246 (D. Ariz. Aug. 23, 2022)................................................................15, 48

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................................11

*Austin v. Loftsgaarden*,
    675 F.2d 168 (8th Cir. 1982)..............................................................................................46

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)........................................................32, 35, 36

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..........................................................................35, 36

*Bajjuri v. Raytheon Techs. Corp.*,
    2023 WL 3650554 (D. Ariz. May 25, 2023)...................................................................43, 50

*Baker v. Seaworld Ent., Inc.*,
    2016 WL 2993481 (S.D. Cal. Mar. 31, 2016).......................................................................22

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) .................................................................................53

*Bao v. SolarCity Corp.*,
    2015 WL 1906105 (N.D. Cal. Apr. 27, 2015).......................................................................53

*Baron v. Hyrecar Inc.*,
    2022 WL 17413562 (C.D. Cal. Dec. 5, 2022).......................................................................39

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...........................................................................................................50

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008)....................................................................35, 53

4895-7085-5006.v1

**Page**

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015) ...................................................................................... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................ 11

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ........................................................................... 56

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008).......................................................................................16, 20, 21

*Borteanu v. Nikola Corp.*,
2023 WL 1472852 (D. Ariz. Feb. 2, 2023)...............................................................14, 15, 45

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...............................................................*passim*

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) .................................................................................. 29

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)................................................................................16, 21, 32, 52

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ............................................................................ 58

*Camp v. Qualcomm Inc.*,
2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ........................................................................ 49

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .............................................................................................. 50

*Cheever v. Huawei Device USA, Inc.*,
2019 WL 8883942 (N.D. Cal. Dec. 4, 2019)......................................................................... 15

*Chiarella v. United States*,
445 U.S. 222 (1980) ................................................................................................................ 33

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .............................................................................................. 50

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)..............................................................36, 38, 39

4895-7085-5006.v1

**Page**

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)..................................................................................................33

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
2023 WL 155861 (D. Ariz. Jan. 11, 2023) ........................................................................36, 37

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014)..........................................................................................37

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017)......................................................................................*passim*

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009).................................................................................................33

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017)............................................................................49

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018).................................................................................................31

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .........................................................................................................46, 47

*Edenbrook Cap., LLC v. RhythmOne Plc*,
2019 WL 1791419 (N.D. Cal. Apr. 24, 2019)........................................................................21

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..............................................................................................59

*Eng v. Edison Int'l*,
2017 WL 1857243 (S.D. Cal. May 5, 2017) ..........................................................................50

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ..............................................................................................34

*Est. of Saunders v. Comm'r of Internal Revenue*,
745 F.3d 953 (9th Cir. 2014)..................................................................................................12

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)................................................................36, 40, 51, 52

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995)..............................................................................................25, 33

4895-7085-5006.v1

**Page**

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001).................................................................................................. 41

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ........................................................12, 54, 57, 58

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ...............................................................................15, 34, 44

*FSP Stallion 1 v. Luce*,
2009 WL 1219683 (D. Nev. May 1, 2009)............................................................................... 31

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).......................................................................... 39

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)...........................................................................................*passim*

*Golubowski v. Robinhood Mkts., Inc.*,
2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ................................................................24, 28

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ................................................................................................ 49

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ....................................................................... 52

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................................................... 57

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013).....................................................................................55, 57, 58

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ............................................................................................... 54

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................................................... 53

*In Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................................... 32

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020) .....................................................................11, 12

4895-7085-5006.v1

**Page**

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021),
    *cert. denied*, ___ U.S. ___, 142 S. Ct. 1227 (2022).............................................................*passim*

*In re Alteryx, Inc. Sec. Litig.*,
    2021 WL 4551201 (C.D. Cal. June 17, 2021).......................................................................40

*In re AnaptysBio, Inc.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)......................................................................37

*In re Apollo Grp. Inc. Sec. Litig.*,
    509 F. Supp. 2d 837 (D. Ariz. 2007).....................................................................................50

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ...............................................................................................38

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020)....................................................................13, 24

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................................54

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................................................................57

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) .........................................................................49

*In re BofI Holding, Inc. Sec. Litig.*,
    2017 WL 5973340 (S.D. Cal. Dec. 1, 2017) .........................................................................51

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020),
    *cert. denied*, ___ U.S. ___, 142 S. Ct. 71 (2021).........................................................47, 48, 49

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ...................................................................................................28

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ................................................................................29

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009) ..........................................................................................59

4895-7085-5006.v1

**Page**

*In re Connetics Corp. Sec. Litig.*,
  2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)..................................................................................51

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008)...........................................................................................35

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)...........................................................................................51

*In re Cypress Semiconductor Sec. Litig.*,
  1992 WL 394927 (N.D. Cal. Sept. 23, 1992)..................................................................................38

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005) ...............................................................................................38, 55

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011)............................................................................................................50

*In re Eargo, Inc. Sec. Litig.*,
  2023 WL 1997918 (N.D. Cal. Feb. 14, 2023)..................................................................................57

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002).............................................................................................46

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019).............................................................................................22

*In re FirstEnergy Corp. Sec. Litig.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..............................................................................13, 48

*In re FVC.COM Sec. Litig.*,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000),
  *aff'd*, 32 F. App'x 338 (9th Cir. 2002) ...........................................................................................38

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015).........................................................................................*passim*

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...............................................................................................11, 46

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 12734014 (C.D. Cal. July 28, 2015).................................................................................37

- viii -

4895-7085-5006.v1

**Page**

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008)...................................................................................... 18

*In re Int'l Rectifier Corp. Sec. Litig.*,
2008 WL 4555794 (C.D. Cal. 2008).......................................................................................... 37

*In re Intuitive Surgical Sec. Litig.*,
2017 WL 4355072 (N.D. Cal. Sept. 29, 2017).....................................................................26, 33

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014).......................................................................................... 13

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...................................................................................... 24

*In re Lyft Inc. Sec. Litig.*,
484 F. Supp. 3d 758 (N.D. Cal. 2020)........................................................................................ 56

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) .......................................................................48, 50

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)........................................................................................ 51

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015)...............................................................................50, 53, 54

*In re Musicmaker.com Sec. Litig.*,
2001 WL 34062431 (C.D. Cal. June 4, 2001)............................................................................. 53

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)........................................................................45, 46

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)...................................................................................................... 47

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013)......................................................................................... 57

*In re Peregrine Sys., Inc. Sec. Litig.*,
2005 WL 8158825 (S.D. Cal. Mar. 30, 2005).............................................................................. 53

*In re Petco Animal Supplies Inc. Sec. Litig.*,
2006 WL 6829623 (S.D. Cal. Aug. 1, 2006)............................................................................... 51

4895-7085-5006.v1

**Page**

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ...................................................................... 40

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ......................................................................................*passim*

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .............................................................36, 38, 39

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................................... 35

*In re Shoretel Inc., Sec. Litig.*,
  2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ......................................................................... 58

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................................................................... 40

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)................................................................................................ 37

*In re Stable Rd. Acquisition Corp.*,
  2022 WL 2762213 (C.D. Cal. July 13, 2022) ...................................................................... 44

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) .................................................................................. 38

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................................. 36

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ............................................................................................. 38

*In re Vaxart, Inc. Sec. Litig.*,
  2023 WL 3637093 (N.D. Cal. May 25, 2023) ...................................................................... 14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .......................................................................................16, 44, 45

*In re Violin Memory, Inc. Sec. Litig.*,
  2015 WL 1968766 (N.D. Cal. Apr. 30, 2015) ..................................................................... 59

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................................................. 48

- x -

**Page**

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
258 F. Supp. 3d 1037 (N.D. Cal. 2017) ................................................................................53

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020)....................................................................48, 50

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994).................................................................................................37

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005).................................................................................................50

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004).................................................................................52

*Johnson v. Aljian*,
490 F.3d 778 (9th Cir. 2007).............................................................................................51, 52

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884 (N.D. Cal. 2022)...................................................................................15

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...................................................................*passim*

*Kennedy v. Tallant*,
710 F.2d 711 (11th Cir. 1983) ...............................................................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)..........................................................................................*passim*

*Lamartina v. VMware, Inc.*,
2021 WL 4133851 (N.D. Cal. Sept. 10, 2021).......................................................................36

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ..................................................................51, 52

*Laventhall v. Gen. Dynamics Corp.*,
704 F.2d 407 (8th Cir. 1983)..................................................................................................33

*Leavitt v. Alnylam Pharms., Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020)....................................................................................38

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)............................................................................................24, 25

4895-7085-5006.v1

**Page**

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................29, 48, 49

*Lomingkit v. Apollo Educ. Grp. Inc.*,
2017 WL 633148 (D. Ariz. Feb. 16, 2017)........................................................................ 13, 29

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)...............................................................................................47, 48

*Lorenzo v. SEC*,
___ U.S. ___, 139 S. Ct. 1094 (2019) ............................................................................ 13, 15

*Lowthorp v. Mesa Air Grp. Inc.*,
2021 WL 3089118 (D. Ariz. July 22, 2021)...................................................................*passim*

*Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................................ 13, 45

*Margaritis v. Vast Mountain Dev. Inc.*,
2022 WL 159187 (D. Ariz. Jan. 18, 2022) ............................................................................ 12

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022) ................................................................................. 34

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................................................ 17

*Mauss v. Nuvavsive, Inc.*,
2014 WL 6980441 (S.D. Cal. Dec. 9, 2014) ....................................................................... 22

*Mendoza v. HF Foods Grp. Inc.*,
2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) .................................................................... 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................................................. 47

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007)................................................................................ 51

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008)........................................................................................... 16, 23

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) ............................................................................................. 50

4895-7085-5006.v1

**Page**

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018).........................................................................................46, 47, 48

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020)........................................................................................ 34

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. June 27, 2017) ............................................................................. 12, 24

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)........................................................................................................ 22

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v.*
*Impax Lab'ys, Inc.*,
843 F. App'x 27 (9th Cir. 2021) ...........................................................................................47, 49

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015).......................................................................................... 50

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)..............................................................................................*passim*

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .........................................................................................37, 41, 42, 47

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .................................................................................................... 47

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019)............................................................................................... 45

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .............................................................................................................17, 25, 54

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014)....................................................................................................... 28

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
2023 WL 1800963 (D. Ariz. Feb. 7, 2023)...............................................................................49, 52

*Petrie v. Elec. Game Card, Inc.*,
2011 WL 13130015 (C.D. Cal. Oct. 19, 2011) ......................................................................... 46

4895-7085-5006.v1

**Page**

*Petrie v. Elec. Game Card, Inc.*,
2015 WL 475958 (C.D. Cal. Feb. 5, 2015) ........................................................................... 54

*Pino v. Cardone Cap., LLC*,
55 F.4th 1253 (9th Cir. 2022) ............................................................................................. 58

*Pinter v. Dahl*,
486 U.S. 622 (1988) ............................................................................................................ 58

*Pirani v. Slack Techs., Inc.*,
445 F. Supp. 3d 367 (N.D. Cal. 2020)................................................................................. 59

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ............................................................................................ 43

*Primo v. Pac. Biosciences of Cal., Inc.*,
940 F. Supp. 2d 1105 (N.D. Cal. 2013) ................................................................... 13, 58, 59

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) .......................................................................................25, 35

*Quality Sys. Maverick Fund, L.D.C. v. First Solar, Inc.*,
2018 WL 6181241 (D. Ariz. Nov. 27, 2018)....................................................................43, 49

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)..........................................................................................*passim*

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ..................................................................... 39

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)..................................................................... 29

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)..........................................................................................22, 38

*Rudolph v. UTStarcom*,
2008 WL 4002855 (N.D. Cal. Aug. 21, 2008).................................................................... 46

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................................... 40

*Scheller v. Nutanix, Inc.*,
450 F. Supp. 3d 1024 (N.D. Cal. 2020) .............................................................................. 43

4895-7085-5006.v1

**Page**

*Schultz v. Tomotherapy Inc.*,
2009 WL 2032372 (W.D. Wis. July 9, 2009)........................................................................ 37

*SEC v. Bardman*,
216 F. Supp. 3d 1041 (N.D. Cal. 2016) .............................................................................. 17

*SEC v. Earle*,
2023 WL 2899529 (S.D. Cal. Apr. 11, 2023) ...................................................................... 15

*Sharenow v. Impac Mortg. Holdings, Inc.*,
385 F. App'x 714 (9th Cir. 2010)......................................................................................... 39

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................................*passim*

*Shurkin v. Golden State Vintners Inc.*,
471 F. Supp. 2d 998 (N.D. Cal. 2006),
*aff'd*, 303 F. App'x 431 (9th Cir. 2008) ............................................................................... 53

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 563 U.S. 27 (2011).................................................................................................... 20

*Smilovits v. First Solar, Inc.*,
2012 WL 6574410 (D. Ariz. Dec. 17, 2012)..................................................................*passim*

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017)............................................................................... 58

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................................................................ 11

*Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*,
2018 WL 6787349 (C.D. Cal. Dec. 13, 2018)..................................................................... 31

*Swanson v. Interface, Inc.*,
2022 WL 2003990 (E.D.N.Y. June 6, 2022)....................................................................... 49

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
690 F. Supp. 2d 959 (D. Ariz. 2010)................................................................................... 52

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .................................................................................................. 10, 34

4895-7085-5006.v1

**Page**

*Terenzini v. GoodRx Holdings, Inc.*,
2022 WL 122944 (C.D. Cal. Jan. 6, 2022) .................................................................................. 30

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................................... 39

*Tsirekidze v. Syntax-Brillian Corp.*,
2009 WL 275405 (D. Ariz. Feb. 4, 2009) .................................................................................. 56

*United States v. O'Hagan*,
521 U.S. 642 (1997) .................................................................................................................... 33

*United States v. Reyes*,
660 F.3d 454 (9th Cir. 2011) ...................................................................................................... 41

*United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006*,
447 F.3d 686 (9th Cir. 2006) ...................................................................................................... 52

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) .................................................................................................................... 17

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) .................................................................................................................. 25

*Vanguard Specialized Funds v. VEREIT Inc.*,
2016 WL 5858735 (D. Ariz. Oct. 3, 2016) ................................................................................ 52

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................................... 22

*Veltex Corp. v. Matin*,
2010 WL 3834045 (C.D. Cal. Sept. 27, 2010) ..................................................................... 15, 45

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ............................................................................ 25

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) ...................................................................................................... 53

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007) .......................................................................................... 29

*Welgus v. TriNet Grp., Inc.*,
2017 WL 167708 (N.D. Cal. Jan. 17, 2017) .............................................................................. 53

4895-7085-5006.v1

**Page**

*Werner v. Werner*,
   267 F.3d 288 (3d Cir. 2001).............................................................................................26, 28

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022)............................................................................................... 33

*Weston v. DocuSign, Inc.*,
   2023 WL 3000583 (N.D. Cal. Apr. 18, 2023)..............................................................*passim*

*Zhu v. Taronis Techs. Inc.*,
   2020 WL 1703680 (D. Ariz. Apr. 8, 2020) .......................................................................... 49

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009).............................................................................28, 29, 43, 45

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77 ...................................................................................................................................... 54
   §77k ....................................................................................................................54, 57, 59
   §77k(e)................................................................................................................................ 57
   §77l(a)(2).............................................................................................54, 55, 58, 59
   §77l(b) ................................................................................................................................ 57
   §77o .................................................................................................................................... 54
   §78j(b) ................................................................................................................................ 57

Federal Rules of Civil Procedure
   Rule 8...................................................................................................52, 54, 56, 58
   Rule 9(b)................................................................................................52, 54, 56
   Rule 12 ............................................................................................................................... 50
   Rule 12(b)(6)...................................................................................................................... 46

17 C.F.R.
   §240.10b-5(a)......................................................................................................13, 14, 15
   §240.10b-5(b)..............................................................................................................*passim*
   §240.10b-5(c)......................................................................................................13, 14, 15

4895-7085-5006.v1

## APPENDIX OF DEFINED TERMS

| | |
|---|---|
| "Carvana" or the "Company" | Carvana Co. |
| "CC" or "Complaint" | Lead Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36) |
| "CFPB" | The Consumer Financial Protection Bureau |
| "Class Period" | May 6, 2020 – November 3, 2022 |
| "CW(s)" | Confidential Witness(es).  The CWs are referred to as he/him to preserve their anonymity. |
| "Decl." | Declaration of Matthew J. Peters in Support of Carvana Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Complaint (ECF 51) |
| "Defendants" | The Exchange Act Defendants unless otherwise stated |
| "DOJ" | The Department of Justice |
| "DriveTime" | DriveTime Automotive |
| "Exchange Act" or "1934 Act" | The Securities Exchange Act of 1934 |
| "Exchange Act Defendants" | Defendants Carvana, Garcia Sr., Garcia Jr., Jenkins, Keeton, and Huston |
| "Garcia Jr." | Defendant Ernest Garcia III, Carvana's Chief Executive Officer ("CEO") and Chairman |
| "Garcia Sr." | Defendant Ernest Garcia II |
| "GS Motion" or "GMtn." | Motion to Dismiss by Ernest Garcia (ECF 54) |
| "Huston" | Defendant Benjamin Huston, Carvana's Chief Operating Officer ("COO") |
| "IRC(s)" | Inspection and Reconditioning Center(s) |
| "Jenkins" | Defendant Mark Jenkins, Carvana's Chief Financial Officer |
| "Keeton" | Defendant Ryan Keeton, Carvana's Chief Brand Officer |
| "Motion" or "Mtn." | Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Complaint and Memorandum of Points and Authorities (ECF 50) |
| "NYSE" | The New York Stock Exchange |
| "Offering" or "2022 Public Offering" | Carvana's 2022 public offering on or about April 20, 2022 |
| "Plaintiffs" or "Lead Plaintiffs" | Lead Plaintiffs United Association National Pension Fund and Saskatchewan Healthcare Employees' Pension Plan |
| "PSLRA" | The Private Securities Litigation Reform Act of 1995 |

4895-7085-5006.v1

## APPENDIX OF DEFINED TERMS

| | |
|---|---|
| "Registration Statement" or "RS" | Carvana's Form S-3 registration statement filed with the SEC on April 20, 2022, in connection with the Offering, including the prospectus supplement filed April 25, 2022, and all documents incorporated by reference |
| "S&P 500" | Standard & Poor's Composite Stock Index |
| "SEC" | The U.S. Securities and Exchange Commission |
| "Securities Act" or "1933 Act" | The Securities Act of 1933 |
| "Securities Act Defendants" | Defendants Carvana, Michael Maroone, Neha Parikh, Ira Platt ("Platt"), Greg Sullivan ("Sullivan"), Garcia Jr., Jenkins, Stephen Palmer, Citigroup Global Markets Inc., and J.P. Morgan Securities LLC |
| "The Garcias" | Defendants Garcia Sr. and Garcia Jr. |
| "*The WSJ* exposé" | *The Wall Street Journal*'s October 22, 2021 article: "Carvana Faces Government Scrutiny and Fines" |
| "Total GPU" | Total Gross Profit Per Retail Unit |
| "Underwriter Defendants" | Citigroup Global Markets Inc. ("Citigroup") and J.P. Morgan Securities LLC ("J.P. Morgan") |
| "UW Motion" or UMtn." | Joinder of Underwriter Defendants in the Carvana Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Complaint (ECF 52) |

- xix -

Lead Plaintiffs respectfully submit this Omnibus Memorandum of Law in Opposition to the Exchange Act Defendants' and Securities Act Defendants' Motions.[1]

At its core, the fraud alleged here is about a pump-and-dump scheme. Carvana is an e-commerce company that Defendants – Carvana's founders – billed to investors as the Amazon of the used car industry. Unlike traditional dealerships, Carvana would be a limitless growth machine because its disruptive model was full of competitive advantages. But by 2020, Carvana's growth was slowing, prompting analysts to warn: "[T]here will be a transition away from growth investors, and . . . how investors think about the valuation of the stock will change." ¶6. So, with the proverbial writing on the wall, Defendants planned and executed a scheme to inflate Carvana's sales, and thus, its stock price, while concealing the unsustainability of its model. As Defendants' scheme **pumped Carvana's stock price 318%**, they **dumped more than $3.87 billion of their own shares**. When the truth about Carvana's growth and model could no longer be concealed, **Carvana's stock price plummeted more than 97%**, leaving Carvana on the verge of bankruptcy.

Defendants' storytelling nonetheless continues with their overwrought Motions that ignore Plaintiffs' allegations and improperly insert their own. Tellingly, they hardly mention the CC's scheme liability claims, moving to dismiss them in a few sentences at the end of their Motion. Nor do they acknowledge the SEC investigation or Defendants' actionable omissions for trading on material nonpublic information. Further, the arguments that Defendants do raise fail as they ignore the facts and well-settled law. Indeed, their challenges to the §10b-5(b) claim on falsity, scienter, and loss causation grounds ignore that: (i) securities fraud complaints must be considered holistically; (ii) literally true statements which give only the good without the bad are actionable misrepresentations; and (iii) loss causation may be established in an infinite variety of ways. And no amount of obfuscation can hide the facts based on percipient witnesses, governments' findings of wrongdoing, and Defendants' own admissions. Next, Defendants' attempt to undermine the insider trading claim by citing their 10b5-1 plans is meritless as they entered into and manipulated

---

[1] Unless otherwise stated, capitalized terms used herein have the same meaning as in the Appendix of Defined Terms or the Complaint, all "¶_" and "¶¶_" references are to the Complaint, and citations are omitted and emphasis is added throughout.

- 1 -

4895-7085-5006.v1

the plans to capitalize on the scheme, "'signal[ing] that *the executives knew what was coming, and consequently took advantage of the lofty valuations to [] sell their own equity*.'"  ¶179. Accordingly, the Motions should be denied in their entirety.[2]

## I.    SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS

### A.    Garcia Sr. and Garcia Jr. Founded Carvana and Took It Public

In 1990, Garcia Sr. pled guilty to fraud for his role as a "key figure" in the Lincoln Savings and Loan scandal where he engaged in a financial scheme that deceived federal regulators. ¶35 & n.6.  As a result of his felony conviction, Garcia Sr. was banned for life from serving as an officer or director with a company listed on the NYSE.  *Id.*; ¶¶5, 36, 43.

In 2012, Garcia Sr. and his son, Garcia Jr. – along with Keeton and Huston – founded Carvana as a wholly owned subsidiary of Garcia Sr.'s used car business, DriveTime.  ¶¶4, 39. Carvana's ability to piggyback on Garcia Sr.'s DriveTime proved mutually beneficial to both father and son.  *See, e.g.*, ¶¶12, 23, 39, 44-46, 153-155, 287-300.  According to Garcia Jr., "'[w]e were able to build Carvana into a stronger company much quicker than we likely would have been able to . . . from being able to use the backbone of [DriveTime].'"  ¶39.  But two years later, they spun Carvana off as the CFPB brought an enforcement action against Garcia Sr.'s DriveTime for "harass[ing] and harm[ing] countless consumers," forcing DriveTime to pay $8 million in fines and agree to increased oversight and reforms.  ¶¶4, 40.

In 2017, the Garcias took Carvana public on the NYSE, ringing the NYSE bell side by side. ¶¶5, 41-42.  The father-and-son duo, who live next door to one another, maintained 97% of its voting power after taking Carvana public.  ¶42.  The Garcias billed Carvana as a disrupter – the Amazon of the used car industry – telling investors that Carvana was drastically different from CarMax, one of the largest used car companies.  ¶¶2, 13, 41, 137.

But Garcia Sr.'s felony rap sheet meant that he was banned from appearing to participate in Carvana's management.  ¶¶5, 43, 287.  So Garcia Sr. controlled Carvana by retaining

---

[2] Apart from the alleged fraud, the Securities Act claims adequately allege that the Securities Act Defendants made materially false and misleading statements concerning retail unit sales, buying cars from customers, nationwide expansion, and titling issues in the RS associated with the 2022 Public Offering, for which they are liable.

- 2 -

supermajority voting control, giving him 84% of the voting power and enabling him to install his friends and Lincoln Savings and Loan accomplices on Carvana's Board of Directors. ¶¶43-44. Garcia Sr. exercised that control throughout the Class Period, inducing Carvana to enter into almost a half-billion dollars of transactions with his other companies that were designed to benefit him. ¶¶44-46. According to Wharton Professor Daniel Taylor, Carvana's ownership "'structure has allowed [the Garcias] to run this $60 billion public company as if it's a family firm and for the family's benefit.'" ¶44.

### B.    Leading Up to the Class Period, Carvana's Growth Story Faltered, Causing Carvana's Stock Price to Decline

In November 2018, Carvana held its first and only analyst day, where Defendants told investors that Carvana was going to be the largest automobile retailer by disrupting the traditional used car market with a "unique" business model enabling Carvana to offer its cars to "customers everywhere." ¶¶53-56. As a result of this "unique" business model, Defendants told investors it would become the largest used car company, selling two million cars while reducing expenses – and increasing profits – as it grew. *Id.*

Leading up to the Class Period, however, Carvana's growth slowed, driving down Carvana's stock price. ¶¶6, 134. Analysts expressed alarm: "If the growth starts to slow significantly, and the company is still not profitable, ***there will be a transition away from growth investors, and we believe that how investors think about the valuation of the stock will change***." *Id.* Coupled with the global pandemic, the slowing growth caused Carvana's stock price to fall to a multi-year low. ¶134. To exploit Carvana's low stock price, Defendants orchestrated a direct stock offering so that Garcia Sr., as the Company's controlling shareholder, could purchase $25 million of Class A common stock at a historically low price and make millions of dollars by offloading that stock once they caused Carvana's stock price to increase. ¶¶8, 135-136, 287-300. After reviewing internal Carvana documents, a court in a derivative action concluded: "***Garcia Senior* '*participated behind the scenes*** in the planning and execution of the very abbreviated process that led up to the Direct Offering.'" ¶¶8, 136 & n.36. For example, "[o]n Saturday, March 28, 2020, Garcia Junior forwarded the stock issuance allocations list to Garcia Senior, referring to

- 3 -

the list as '[p]retty solid' and stating that they had to '*figure out plan on your money*.'" *Id.*[3]  Once Garcia Sr. loaded up on Carvana stock at a depressed price, Defendants implemented their scheme to artificially inflate Carvana's shares so they could make billions.

### C.    Defendants Participated in an Intentional Scheme to Artificially Inflate the Price of Carvana Stock

To manipulate Carvana's stock price, Defendants sought to persuade investors that, far from slowing, Carvana's growth would continue to experience hyper-growth because Carvana's business model meant that "*our business gets better as it gets bigger*." ¶¶2, 137, 211, 238.  Unlike traditional dealerships, Carvana would be a limitless growth machine because its disruptive model was full of competitive advantages, such as a scalable "*capital-light*" expansion model and a groundbreaking logistics network that could readily deliver or pick-up cars nationwide. ¶¶2, 10, 137, 211, 226, 238.  To implement their scheme, Defendants engaged in a series of machinations to boost Carvana's retail sales, all the while making false and misleading statements aimed at convincing investors that this growth was sustainable. ¶¶9, 137, 139-155, 185-198.

*First*, Defendants lowered Carvana's purchasing and verification standards to buy "as much as was humanly possible." ¶¶9, 65, 139, 322.  By lowering these standards, Defendants were able to induce trade-ins and display broader inventory on Carvana's website – all of which increased sales. ¶¶139-142.  For example, according to CW-3, before the start of the Class Period, Carvana was strict about not completing purchases when it discovered that sellers had inaccurately described their vehicles' condition. ¶¶79, 140.  Right before and during the Class Period, however, CW-3 stated that Carvana relaxed its standards to accept "all vehicles" and stopped genuinely inspecting vehicles before purchasing them. *Id.*  CW-3 observed that Carvana purchased a lot of "trash vehicles" after lowering its standards. *Id.*  Corroborating CW-3's observations, CW-5 heard from his predecessor at the hub that the quality issues of the vehicles had gotten worse "all of the sudden." ¶¶94, 140.  Likewise, CW-1 stated that Carvana lowered its

---

[3] The court in the derivative action also upheld allegations that certain Carvana directors were beholden to Garcia Sr., concluding that there was "'a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection'" such that directors Sullivan and Platt were not independent. ¶¶43 & n.12, 136 & n.36.

4895-7085-5006.v1

purchasing standards if the customer was also buying a car from Carvana. ¶¶64, 140. In fact, CW-4 was told at a meeting of Carvana's initiative to buy "any car" to secure an increase in trade-ins. ¶¶83, 140. Indeed, CWs-1, 3, 4, 5, 8, 10, and 11 all reported that it was Carvana's general practice during the Class Period to purchase cars sight unseen and do little to nothing to verify the accuracy of sellers' representations. ¶141. And eight CWs reported that Carvana overpaid for these substandard vehicles during the Class Period. ¶142.

As a result, Carvana was flooded with "trash cars" that were unfit to be sold retail and had to be sold wholesale. ¶166. Unbeknownst to investors, this sudden and overwhelming increase in wholesale volume created a costly, logistical nightmare, leading to "more vehicle moves," "more miles traveled," "constrained routes," and "the inefficient use of [Carvana's] nationwide logistics network." ¶¶166, 231(b), 263(b), 282(b). Further, wholesale sales did not capture additional revenue streams associated only with retail sales. ¶¶49, 231(d), 263(d), 282(c).

***Second***, Defendants embarked on a rapid nationwide expansion plan to enter over 150 new markets, more than doubling Carvana's footprint in just 6 quarters. ¶144. And while Defendants touted these expansion efforts (¶¶144-147), unbeknownst to investors, Defendants concealed that they expanded into these new markets without any regard to profitability as they knew or recklessly disregarded that many of these markets were less profitable due to their distance from Carvana's existing IRCs and that they strained Carvana's underbuilt logistics network. *Id.* For example, in Q2 2020, Defendants added 100 new markets without adding a ***single*** IRC. ¶¶145, 232(b), 232(f). Because Carvana had already achieved market coverage near its existing IRCs but still sought to report an increase in retail sales growth as part of its scheme, Carvana's expansion plan was predicated on opening markets that were significant distances from existing IRCs. ¶¶144-147, 232(a), 264(a), 283(a). Defendants knew, but concealed, that this would dramatically increase costs, admitting: "SHORTER DISTANCE = SAVINGS . . . Lower inbound transport & logistics costs; Lower shipping costs to customers." ¶¶146, 168. Thus, during the Class Period, Carvana's logistics expenses spiked by 300%, and its market occupancy costs (*i.e.*, facilities expenses) increased by nearly 250% between the start of the Class Period and Q1 2022. ¶162. In Q1 2022, Carvana admitted that logistical constraints caused a "more than $600 per retail unit

- 5 -

YoY increase in reconditioning and inbound transport costs." *Id.*

In addition, Defendants concealed that its retail growth was predicated on unprofitable and "less profitable" sales. ¶¶168, 229(b), 261(b), 281(b). As Defendants admitted at the end of the Class Period, Carvana's retail growth was composed of "less profitable sales . . . in markets with lower profitability due to long distance from inventory." ¶168. At the end of the Class Period, after Carvana admitted it would stop acquiring "less profitable sales," an analyst at Needham & Company contrasted this disclosure with the Company's strategy during the Class Period: "The path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible." ¶¶168, 181.

To mask these unprofitable and "less profitable" sales during the Class Period, Defendants manipulated Carvana's Total GPU metric by excluding certain selling costs (including outbound logistics expenses and title and registration expenses). ¶¶51, 169-172, 230, 262. These excluded costs were material. ¶¶170-172. For example, on sales to customers in markets greater than 200 miles from an IRC, outbound logistics contributed an additional $750 per unit of expenses incurred by Carvana. ¶¶146, 171, 230(a), 232(a), 262(a), 264(a), 283(a). Title, registration, and related expenses totaled $410 per unit in FY 2021. ¶¶172, 230(b), 262(b). In fact, on average, Carvana lost money on each wholesale vehicle sold when accounting for SG&A expenses, such as logistics and title and registration expenses (both of which Carvana's biggest competitor, CarMax, included in its Total GPU metric). ¶¶51, 172-173, 230(b), 261.

To survive, by the end of the Class Period, Defendants "reduce[d] advertising" aimed at acquiring sales in these new markets and "t[ook] other actions to improve profitability, such as increasing long-distance shipping fees." ¶163. As one commentator noted:

> According to management, a key piece of the advertising pullback was, "less advertising in distant markets with less profitable sales." Step back and think about that for a moment. It means that the company had historically grown in these markets even though they weren't all that attractive. ***It was growth for growth's sake and not necessarily growth to improve profitability***.

*Id.* The resulting logistical constraints and increased expenses eventually required Defendants to spend $4 billion to purchase and integrate ADESA in order to fix the problem. ¶164. CWs 4 and

- 6 -

4895-7085-5006.v1

7 confirmed that Carvana's acquisition of ADESA was a consequence of Carvana's efforts to expand into new markets far from existing IRCs. *Id.* And Defendants themselves admitted near the end of the Class Period that Carvana's rapid "location growth" created "more vehicle moves," "more miles traveled," a "higher number of constrained routes," and a "higher degree of backlog on constrained routes." ¶¶166, 231(b), 263(b), 282(b).

*Third*, to inflate reported unit sales, Defendants concealed certain revenue pass-through transactions with Garcia Sr.'s DriveTime that lacked economic substance. ¶¶153-155. For example, on certain sales of cars acquired from DriveTime, Carvana would pass the entire proceeds from the sale back to DriveTime. ¶153. Carvana acted as DriveTime's middle man but still recorded the revenue and retail unit sales on its books. *Id.* Carvana concealed the full extent of these arrangements from investors, offering only piecemeal and inconsistent disclosures concerning the pass-through revenue arrangements. ¶154. For example, Carvana did not report actual retail unit sales sold pursuant to these arrangements but disclosed only the expense incurred to purchase vehicles from DriveTime. *Id.* Carvana also disclosed inconsistent facts about these arrangements in its SEC filings. ¶¶154-155.

The DriveTime pass-through sales arrangements had a material impact on Carvana's reported retail sales volume and reported growth. ¶155. For example, Carvana not only incurred $168 million of expenses purchasing reconditioned vehicles from DriveTime in Q4 2021, but also additional expenses pursuant to the "Retail Vehicle Acquisition" arrangements. *Id.* All told, over 7,000 vehicle sales in Q4 2021 – making up over 600% of Carvana's reported sequential growth that quarter and 17% of its reported annual growth – came from these concealed sales. *Id.*

*Fourth*, because compliance with state title and registration laws slowed sales, Defendants systematically violated these laws to accelerate growth. ¶¶185-199, 229(f), 233, 261(g), 265, 284. Indeed, as the *Barron*'s exposé, *Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars* ("*Undriveable Cars* exposé"), later revealed, in Carvana's "haste to seize market share from competitors" and report additional units sold, Carvana sold cars to customers before it held title to those cars and before it could get them registered to their new owners. ¶¶148 & n.39, 150. According to numerous employees and regulators from across the country, this practice was

systematic and nationwide:

- CW-3 (Phoenix, Arizona) witnessed that Carvana had just half of the titles for the vehicles it sold wholesale at the time of sale (¶¶76, 149);

- CW-4 (Midwestern U.S.) recounted that there were "a ridiculous amount of cars on" a Google spreadsheet that tracked vehicles without titles for the entire IRC, and the issue was a huge mess (¶¶85, 149);

- CW-8 (Tempe, Arizona, Corporate Headquarters) observed that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase (¶¶112, 149);

- CW-9 (Tempe, Arizona) noticed an increase in calls from customers experiencing title delays beginning in Q1 2022 and Carvana encouraged customers to continue driving despite lapsed paperwork (¶¶116, 149);

- CW-10 (Tempe, Arizona) revealed that titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars (¶¶123, 149);

- CW-11 (Southeastern U.S.) described a drawer of documentation for vehicles sold by Carvana for which the titles were missing (¶¶131, 149); and

- *The Undriveable Cars* exposé reported that "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is wide[]-reaching" (¶151).

Ultimately, Defendants themselves admitted that they systematically violated the law. ¶¶149, 190-191. Defendants' undisclosed decision to boost sales by sidestepping title and registration laws and regulations exposed Carvana to devastating financial, regulatory, legal, and reputational loss. ¶176. For example, unbeknownst to investors, on May 7, 2021, Michigan fined Carvana thousands of dollars and placed it on an 18-month probation. ¶¶176, 187. Indeed, not only would Carvana be left facing an SEC investigation and a consumer class action at the end of the Class Period, but it would also have its dealer license revoked or suspended in multiple states, damage which Defendants called "incalculable and irreparable." ¶¶176, 185-199.

*Fifth*, Defendants made materially false and misleading statements regarding their business to convince investors that Carvana's growth was sustainable. ¶10. After all, if Carvana could pair its explosive unit growth with purported profitability, and a scalable logistics model that could expand across the country efficiently and cost effectively, the sky was the limit. Specifically, Defendants misled investors by stating that Carvana "assess[ed] vehicles *on the basis of quality*," was a "very high-quality buyer," and would "open many smaller markets that can be *served by our*

- 8 -

4895-7085-5006.v1

*existing logistics and delivery infrastructure*." ¶¶200, 202, 222, 227. Defendants claimed that Carvana's "*logistics capabilities allow us to offer every car in our inventory to customers across all of our markets*." ¶226. Defendants falsely told investors that Carvana experienced "a massive, massive increase" in "profitability of buying cars from customers." ¶245. Defendants dismissed title and registration violations, calling them "pretty small in scope," impacting "quite a small fraction of customers," and "technical, paperwork violations." ¶¶248, 280, 349, 364. Garcia Jr. disingenuously stated: "So there are no states where we're not able to sell vehicles today and no issues with the clean title issue as well." ¶278.

### D.    The 2022 Public Offering

On April 20, 2022, Carvana conducted the 2022 Public Offering, selling 15,625,000 shares of common stock at $80 per share (¶419) via the RS, which incorporated, *inter alia*, the 2021 10-K. With the assistance of the Underwriter Defendants, Carvana completed the Offering on April 26, 2022, raising more than $1.2 billion in proceeds. ¶¶421, 447-456. The RS contained materially false and misleading statements, and failed to disclose material information about the mounting costs and complexities of Carvana's operations. CC, §XV.

### E.    Defendants Dumped Their Stock After Pumping Up Carvana's Stock Price

Defendants' limitless growth story produced its desired results: Carvana was named as one of the fastest companies to ever make the Fortune 500 list based on organic growth alone (along with Amazon), and its stock price soared more than 318% during the Class Period. ¶177. Defendants – in possession of material inside information and "*kn[o]w[ing] it was short-lived . . . [and] the music would eventually end*" – took full advantage by dumping nearly 15 million shares of their personal holdings for proceeds of more than $3.87 billion before the truth regarding Carvana's business was revealed and the bottom fell out. ¶¶12, 177-179, 286-318.

Unsurprisingly, Garcia Sr., who controlled Carvana through supermajority voting power (84%) and worked hand-in-glove with his son to execute the scheme, was the biggest beneficiary. ¶¶12, 23, 43, 287-288. From October 30, 2020 through August 23, 2021, a less than 10-month period, Garcia Sr. exploited the artificial inflation in Carvana's stock caused by Defendants'

- 9 -

4895-7085-5006.v1

pump-and-dump scheme by selling off 19% of his holdings. ¶288. Garcia Sr. sold every single trading day for nearly a year, even accelerating his Rule 10b5-1 plan to dump shares at even higher per-day share amounts and conducting off-plan sales. ¶¶288, 290-291, 293, 297, 317. In total, Garcia Sr. sold 13,950,000 shares of his Carvana stock at prices as high as $376.52 per share – 43 times Carvana's stock prices at the close of the Class Period – for nearly ***$3.7 billion*** in total proceeds. ¶388. As Professor Daniel Taylor concluded: "'***Carvana's actions and the actions of the executives signal to me that the executives knew what was coming, and consequently took advantage of the lofty valuations to [] sell their own equity***.'" ¶179.

### F. The Truth Is Revealed, Causing Carvana's Stock Price to Decline by More than 97% During the Class Period

After Defendants sold their stock, they acknowledged that, for Carvana, bigger was not better. ¶¶180-184. In truth, Carvana's growth model was not "scalable." ¶180. Its market expansion model was not "capital-light." ¶¶13, 180, 232(b), 232(e), 264(b), 264(e), 283(b), 283(e). It failed to comply with state title and registration laws. ¶¶9, 137, 148-152, 180, 185-198. The Company had not seen "economies of scale" as it grew. ¶¶180, 232(e), 264(e), 283(e). And its logistics model was neither efficient nor groundbreaking. ¶¶180, 234, 266. Simply put, Carvana was not the Amazon of used cars. *Id.* In the end, Carvana stopped growing altogether and took on more than $3.4 billion in high-interest debt to purchase ADESA and acquire its 56 nationwide locations and title departments. ¶¶13, 147, 164, 182, 231(d)(iv), 232, 234(a), 264, 266(a), 283. The purchase of ADESA as a last minute fix, while necessary to save Carvana, was an "albatross around [its] neck" that would leave Carvana on the verge of bankruptcy. ¶183.

While Defendants' intentional scheme to artificially inflate Carvana's stock price succeeded – enabling Defendants to line their pockets with $3.87 billion while concealing the truth about Carvana's business model – investors were left holding the bag. ¶¶14, 184.

## II.    LEGAL STANDARD

The Court must "accept all factual allegations in the complaint as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007). A complaint need only contain sufficient factual matter that states a claim for relief that is

- 10 -

4895-7085-5006.v1

"'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding plausibility, the Court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (inferences in plaintiff's favor). A complaint may be dismissed only when defendants' plausible alternative explanation is so convincing that plaintiff's explanation is implausible. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages").

### III.    THE EXTRINSIC DOCUMENTS SHOULD NOT BE CONSIDERED

Recently, the Ninth Circuit identified "a concerning pattern in securities cases like this one: exploiting the[] procedures [of judicial notice and incorporation-by-reference doctrine] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Ignoring this admonition, Defendants attached 31 documents – more than 1,600 pages, including 64 lawyer-generated pages – without meaningfully seeking permission from this Court to do so.

***The Court should strike or decline to consider the Appendices***. Appendix A is a counsel-generated chart identifying the misstatements and the purported "reasons . . . why each statement is inactionable." Mtn. at 11. Because it is an improper "extension of Defendants' argument," it exceeds their **59**-page limit and should be stricken. *See, e.g.*, *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *3 (S.D. Cal. June 1, 2020) (striking analogous appendix as "an extension of Defendants' argument and thus . . . the 25-page limit"); *see also Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *11 (N.D. Cal. Apr. 18, 2023) (declining to consider counsel-generated chart). Defendants claim it is "without argument[]" and provided to assist with Plaintiffs' purported puzzle pleading. Mtn. at 11. But it contains many (wrong) "reasons why inactionable" absent from the brief, and courts consistently reject this disingenuous explanation. *See, e.g.*, *Acadia*, 2020 WL 2838686, at *3; App'x A, Nos. 2, 29-30. Appendix B, which contains a misleading graphic and chart created to rebut loss causation, should also be stricken. Defendants do not even attempt to claim it does not contain argument. Nor could they. Because Appendix B "veers toward an

- 11 -

4895-7085-5006.v1

attempt by D[efendants] to insert its 'own version of events into the complaint,' which is impermissible," Plaintiffs request the Court strike it or not consider it. *Weston*, 2023 WL 3000583, at *11 (citing *Khoja*, 899 F.3d at 1002).[4]

## IV.    THE CC IS NOT A PUZZLE PLEADING

Defendants argue the CC should be dismissed as "textbook puzzle pleading." Mtn. at 10-11. But it is not "'so deficient that [d]efendants are incapable of figuring out what statements are alleged to be false.'" *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5 (N.D. Cal. Aug. 7, 2020); *see also Margaritis v. Vast Mountain Dev. Inc.*, 2022 WL 159187, at *2 (D. Ariz. Jan. 18, 2022) (puzzle pleading only where complaint is "'so unruly'" that defendants cannot "'determine which allegations support which claims'"). Indeed, Plaintiffs have identified alleged misstatements and omissions and set forth the facts that rendered them false or misleading in a dedicated section of the Complaint. *See* CC, §V.III. Further, Plaintiffs bolded and italicized relevant portions of lengthy statements; identified the source, speaker, and date of each statement; organized the misstatements chronologically; and matched statements to specific factual reasons why each was misleading when made. *Id.* This is sufficient. *See, e.g.*, *Acadia*, 2020 WL 2838686, at *4 (not puzzle pleading where "Plaintiff's complaint contains a designated section entitled 'Materially False and Misleading Statements Issued'").[5] Tellingly, Defendants had no problem identifying the alleged misstatements. *See, e.g.*, *Margaritis*, 2022 WL 159187, at *2 (not

---

[4] Appendix B is not subject to judicial notice as it includes far more than stock prices. Tellingly, Defendants did not include these lawyer-generated charts as exhibits. **The Court should not consider the exhibits**. Defendants "justify" their 29 exhibits by noting that a court may take judicial notice of or incorporate SEC filings and stock prices. Mtn. at 1 n.1. Because Defendants relegated this "argument" to a stray footnote, it is waived. *E.g.*, *Est. of Saunders v. Comm'r of Internal Revenue*, 745 F.3d 953, 962 n.8 (9th Cir. 2014). Plaintiffs will not further waste their briefing on Defendants' tactics, but if the Court considers the exhibits – even though they are not all incorporated by reference or subject to judicial notice – it cannot do so for the purported truth of the matters asserted therein. *See Khoja*, 899 F.3d at 999. Typically, defendants file requests setting forth the bases for admission. *E.g.*, *id.* at 988 (addressing independent motion for judicial notice and request for incorporation by reference); *see also Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at *3 (D. Ariz. July 22, 2021) (Liburdi, J.) (same); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *7 (C.D. Cal. Jan. 17, 2020) ("**Pursuant to Khoja . . ., Defendants identified the specific portions of the documents they are requesting the Court to consider**.").

[5] *See also Karinski*, 2020 WL 281716, at *9 (not puzzle pleading where "Complaint quotes specific statements and then explains in the subsequent paragraphs why they are allegedly false"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017) (same); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016) (same).

- 12 -

puzzle pleading even where complaint was "not a model of clarity," as defendants "appear[ed]" to "identify[] the particular representations upon which [plaintiffs'] fraud claims are based"); *Uber*, 2020 WL 4569846, at *5 (not puzzle pleading where complaint was "'long, confusing, and meandering,'" but defendants identified the misstatements).[6]

Defendants' gripe about the CC's length is specious as they omit a critical reason for its length: their novel insider sales. Regardless, length alone "does not create the type of 'puzzle-like' complaint that warrants dismissal." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014); *see also Apple*, 2020 WL 2857397, at *8 n.4. The CC is not a puzzle pleading.

## V.   THE CC STATES A SCHEME CLAIM UNDER THE 1934 ACT

It is unlawful for any person to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[] in connection with the purchase or sale of any security."  17 C.F.R. §240.10b-5(a), (c).  "These provisions capture a wide range of conduct."  *Lorenzo v. SEC,* ___ U.S. ___, 139 S. Ct. 1094, 1101 (2019); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) ("*Lorenzo* [held] 'considerable overlap' exists among the subsections of Rule 10b-5 and . . . disseminating false statements 'ran afoul of subsections (a) and (c).'"), *cert. denied*, ___ U.S. ___, 142 S. Ct. 1227 (2022).  "Because 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent

---

[6] Defendants' authority is inapt. Mtn. at 10-11. *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *11 (D. Ariz. Feb. 16, 2017) (plaintiff "merge[d] a variety of statements . . . into one paragraph and" did not explain why they were misleading); *Mendoza v. HF Foods Grp. Inc.*, 2021 WL 3772850, at *12 (C.D. Cal. Aug. 25, 2021) (plaintiffs did not allege "reasons why statements" were misleading); *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274-75 (N.D. Cal. 2019) (plaintiff did not identify which statements were misleading and conceded half were not "'misstatements'"); *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (plaintiffs "present[ed] [lists] of alleged omissions or misstatements but fail[ed] to connect [them] to any particular statements"). Nitpicking, Defendants identify two clerical errors. Mtn. at 11 n.6 (citing ¶¶260, 265). Plaintiffs did mistakenly cite ¶227, instead of ¶228 in ¶260, and the cite in ¶240 should include ¶228, but Defendants cite no authority that these errors warrant dismissal. Next, absent any authority, Defendants fault Plaintiffs for referring to, rather than repeating, misstatements in the SEC filings, such as the lengthy risk disclosures. Mtn. at 11 n.6. This is routine. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 n.6 (N.D. Cal. June 2, 2020); Consolidated Complaint, *In re Apple Inc. Sec. Litig.*, 2022 WL 549720 (No. 4:19-cv-02033) (N.D. Cal. Jan. 5, 2020) (not puzzle pleading where misstatements referred to "the same risk factors" in prior filings); *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *1 (S.D. Ohio Mar. 7, 2022) (upholding complaint where misstatements referred to prior misstatements).

- 13 -

conduct and the roles of the defendants are sufficient for alleging participation.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015).

The CC details Defendants' scheme to inflate Carvana's stock price for the purpose of selling shares at an artificially inflated price, by multiple means and methods, including: (i) Garcia Jr. and "S[r.] . . . planning and execut[ing] [] the . . . Offering" so Garcia Sr. could load up on stock at a depressed price; (ii) lowering Carvana's purchasing and verification standards to induce trade-ins; (iii) launching a rapid and unsustainable nationwide expansion; (iv) flouting state title and registration laws to secure sales before competitors; (v) entering into a pass-through sales arrangement with Garcia Sr.'s DriveTime to boost reported sales; (vi) making materially misleading statements regarding Carvana's business to convince investors that its growth was sustainable (Garcia Jr., Keeton, and Jenkins); (vii) concealing the scheme from the investing public, including through false denials, manipulation of its Total GPU metric, and modification of reported metrics; (viii) entering into or modifying 10b5-1 trading plans to capitalize on the artificial inflation; and (ix) trading nearly 15 million shares to profit from the scheme. CC, §VI.

These detailed allegations suffice at this stage. *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023), is on point. There, the court held that plaintiffs adequately pled a scheme claim where, like here, they alleged defendants engaged in an "intentional scheme to manipulate the price of [the company's] shares for the purpose of selling them at an artificially inflated price," by "conspir[ing] to appoint" a CEO that would carry out a misleading PR campaign; "chang[ing] [the company's] insider trading blackout period to capitalize" on the scheme; "push[ing]" the company to issue a misstatement; and "s[elling] a substantial number of shares to profit from [the misstatements]." *Id.*

Having no response to these compelling allegations, Defendants each devote just two conclusory paragraphs to moving to dismiss the scheme claim. Mtn. at 32-33; GMtn. at 5-6. While Defendants baldly assert that Plaintiffs' scheme "'consists entirely of (and fails for the same reasons as) the misstatements,'" their own authority holds that this is an insufficient basis to dismiss the claim as it is not a "***meaningful*** argument." Mtn. at 32-33; GMtn. at 5-6 (citing *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22-*23 (D. Ariz. Feb. 2, 2023)); *Borteanu*, 2023

- 14 -

4895-7085-5006.v1

WL 1472852, at *21 n.8 (refusing to dismiss scheme claim where defendant "argue[d] that 'Plaintiffs' failure to plead a Rule [10b-5(b)] claim also necessitates dismissal of their scheme liability claims'").[7] Regardless, Plaintiffs adequately alleged a 10b-5(b) claim. *Infra* §VI.[8]

Next, merely reciting the elements, Defendants state that Plaintiffs failed to allege that each Defendant engaged in deceptive conduct, and the purpose and effect of such conduct. Mtn. at 32-33. But courts must "'disregard "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."'" *Alphabet*, 1 F.4th at 698. Moreover, Defendants' claim is belied by Plaintiffs' detailed allegations summarized above. CC, §VI. Further, because Defendants' deceptive conduct was by its very nature public-facing, it was designed to directly impact the price of Carvana stock. Garcia Sr.'s claim that trading cannot form the basis of a scheme claim (GMtn. at 6) is meritless as a "'pump-and-dump stock scheme is a classic violation' of Rule 10b-5(a) and (c)," and he engaged in multiple deceptive acts, such as the DriveTime deal. *Galena*, 117 F. Supp. 3d at 1196 (collecting cases).[9] Because Plaintiffs' scheme claim is adequately pled and Defendants failed to meaningfully address it, the claim should proceed.

## VI.    THE CC STATES ADDITIONAL 1934 ACT CLAIMS

[7] Defendants' authority (Mtn. at 32) is inapt. *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 901 n.3 (N.D. Cal. 2022) (unlike here, defendant "unload[ed] more stock after the fraud began to be revealed . . . than he did after the fraud occurred but before it was revealed," and plaintiffs failed to allege deceptive conduct); *Borteanu*, 2023 WL 1472852, at *23 (unlike here, claim was based solely on the failure to correct another's misstatements and plaintiffs did not have any allegations "related to the conduct's principal purpose"). Garcia Sr.'s parallel argument that there can be no "scheme liability because [it] consisted entirely of alleged misstatements" (GMtn. at 6 n.4) should also be rejected. *See SEC v. Earle*, 2023 WL 2899529, at *7 (S.D. Cal. Apr. 11, 2023) ("The Ninth Circuit is clear that the 'argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*.'"). And "[b]ecause Defendants relegate the argument to a footnote, the Court [should] decline to consider it." *Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019).

[8] Any additional scheme arguments are "waived." *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

[9] Garcia Sr.'s authority is inapt. GMtn. at 6; *Khoja*, 899 F.3d at 1017 (decided before *Lorenzo* and, unlike here, plaintiffs "d[id] not specify what steps, if any, [defendants] took in furtherance of the alleged scheme"); *Veltex Corp. v. Matin*, 2010 WL 3834045, at *6-*8 & n.5, n.11 (C.D. Cal. Sept. 27, 2010) (concerning the "***issu[ance]***" of stock and plaintiffs did not allege a deceptive act to non-issuing defendant or establish scienter); *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*, 2022 WL 3598246, at *5 (D. Ariz. Aug. 23, 2022) (market manipulation claim where plaintiffs "failed to allege any connection between their transactions and" the fraud as they did allege the prices at which they bought shares).

- 15 -

4895-7085-5006.v1

### A. The Material Misrepresentations and Omissions Are Actionable

A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "'"[L]iterally accurate"'" statements may be misleading due to "'"their context and manner of presentation."'" *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "[A] duty to disclose does arise where an omission is misleading because it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *Khoja*, 899 F.3d at 1008-09 ("'once defendants . . . tout positive information . . . they [are] bound to do so in a manner that wouldn't mislead investors'").

As demonstrated by their mere lip service to Plaintiffs' scheme claim, Defendants attempt to frame this case as one of affirmative false statements. To be sure, as noted above and demonstrated further below, Plaintiffs' Exchange Act claims concern a pump-and-dump scheme in which Defendants engaged in unsustainable machinations to boost sales, exalted increases in retail sales, and masked Carvana's actual gross profits per retail unit and title violations, while touting the competitive advantages, efficiencies, and capabilities of Carvana's "capital-light" model to create a misleading impression by omission that Carvana's growth was sustainable.

### 1. The Retail Unit Sales Misstatements

Throughout the Class Period, Defendants misrepresented Carvana's retail unit sales, "omit[ting] to state . . . material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). Citing percipient witnesses, Plaintiffs alleged that Defendants hid that Carvana's retail unit sales growth depended on unsustainable and fraudulent practices which caused runaway expenses, billions of dollars in debt, a crippled logistics network, and legal and regulatory backlash. ¶¶158-

- 16 -

4895-7085-5006.v1

176.  Defendants' statements about Carvana's retail unit sales growth were materially false and misleading because Defendants failed to disclose that Carvana had actually generated its sales in reliance on the allegedly undisclosed, fraudulent practices set forth *supra* in §I.C.

Defendants are incorrect that Plaintiffs failed to allege falsity with particularity.  The CC states with particularity the circumstances constituting the alleged fraud, including the "'who, what, when, where, and how of the misconduct charged.'"  *SEC v. Bardman*, 216 F. Supp. 3d 1041, 1050 (N.D. Cal. 2016).  Plaintiffs allege that Garcia Jr. and Jenkins (***who***) made misleading representations that retail units sold increased (***what***) on conference calls and in Forms 8-K containing shareholder letters (***where***) in fiscal years 2020 and 2021 and the first two quarters of 2022 (***when***), and that those representations were misleading because Defendants failed to disclose that Carvana: (i) purchased as many cars from customers, regardless of the condition, as "humanly possible"; (ii) rapidly expanded into new markets without regard to profitability; (iii) violated state title and registration laws; and (iv) entered into revenue pass-through arrangements with Garcia Sr.'s DriveTime that lacked economic substance for Carvana (***how***).  *See* ¶¶200-201, 206-207, 213, 218, 220, 229, 238, 243, 250, 253, 257, 261, 268, 271, 277, 281.  These allegations provide Defendants notice of the particular conduct at issue so that they can defend against the fraud claims.  *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023).

Defendants claim they had no obligation to disclose a fraudulent business practice – so long as the contemporaneously disclosed retail sales are literally accurate.  Mtn. at 12.  Defendants are wrong.  The Supreme Court has made clear "the rule that half-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations."  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016) (holding this "rule" applies under the False Claims Act in the same way it applies under "securities law") (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one [true] thing and holding back another.").  Thus, when touting Carvana's retail sales growth, Defendants were required to disclose the fraudulent, unsustainable business practices they

- 17 -

relied on to generate that growth. *Shenwick*, 282 F. Supp. 3d at 1135; *Khoja*, 899 F.3d at 1008-09.

Defendants' other scattershot arguments are equally meritless. Defendants assert that certain statements are puffery. But a statement is puffery only if it is not "capable of objective verification" and "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008). Here, the snippets referenced by the Defendants formed part of longer statements that, when viewed in their entirety and in context, served to mislead investors by "'creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Shenwick*, 282 F. Supp. 3d at 1135. For example, Defendants say that calling 2020 a "defining year" is puffery. In fact, Defendants stated: "2020 was a defining year for Carvana. We became the second largest seller of used cars in the country in just our eighth year in operation . . . ." ¶218. Likewise, Defendants do not merely call a quarter "strong"; their entire statement is far more detailed: "Q2 was a strong quarter for Carvana. Retail units sold in Q2 totaled 55,098 units, an increase of 25%." ¶206; *see also* ¶250. These statements – taken as a whole – are plainly capable of objective verification and are precisely the type of statements that reasonable investors would rely on when making investment decisions.

Nor are Plaintiffs' allegations mere complaints about corporate mismanagement. In reality, Defendants may lawfully run Carvana into the ground ***so long as*** they publicly disclose the practices they used to artificially inflate its retail unit sales – and stock price – such as buying cars from customers without regard to quality so as to induce trade-ins, expanding into far-flung markets for which they lack the necessary infrastructure, and ignoring title and registration laws.

In addition, Defendants take potshots at Plaintiffs' calculation that Carvana's unit sales from arrangements with Garcia Sr.'s DriveTime made up over 600% of Carvana's reported sequential growth for Q4 2021, as set forth in ¶155. Defendants' arguments miss the mark. First, Defendants say that Plaintiffs "invent" the calculation out of thin air. Mtn. at 13 n.8. But in the very next sentence, Defendants concede that the calculation is based on "disclosed data." *Id.* Second, Defendants then pivot, asserting that the Court should ignore this figure as it is based on "disclosed data" in a Proxy Statement and a Form 10-Q. *Id.* But under the "buried facts" doctrine,

- 18 -

4895-7085-5006.v1

a disclosure is deemed inadequate if it obscures the information disclosed where, as here, it is disclosed "through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact." *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983). Third, Defendants accuse Plaintiffs of mixing "apples and oranges" when it is Defendants who have made a fruit salad. While Plaintiffs' calculation references the "Wholesale Vehicle Purchase Agreements with DriveTime," Defendants point to a ***different*** expense figure from a ***different*** DriveTime arrangement on a ***different*** date. *Compare* ¶155 (citing to 2022 Form DEF 14-A referencing "Wholesale Vehicle Purchase Agreements" with DriveTime effective September 29, 2021 for "$168 million"), *with* Mtn. at 13 n.8 (citing to 2021 Form 10-K referencing "Retail Vehicle Acquisitions" "during the second quarter of 2021" for "$62 million"). Fourth, Defendants claim that Plaintiffs misidentified expenses as cost of goods sold, but it is Defendants who attempt a sleight of hand. In fact, the costs of goods sold for retail sales consisted of the purchase price of the vehicle, inbound transport costs, and costs to recondition the vehicle – the exact same costs included in the $168 million of "expenses" associated with the Wholesale Vehicle Purchase Agreements that Carvana entered into with DriveTime on September 29, 2021. ¶155.

Finally, Defendants' assertion that their misleading statements were non-actionable opinions is also unavailing. Defendants cite only a single snippet – "another great quarter" (¶250) – that they contend is an opinion. But this snippet, like the ones they incorrectly claim are puffery, formed part of longer statements that, when viewed in their entirety and in context, served to mislead investors. *See* ¶250 ("The third quarter was another great quarter for Carvana as we continued our march to becoming the largest and most profitable automotive retailer. We sold over 110,000 cars to customers . . . ."). Thus, the statements are misleading and actionable.

### 2.     The Title and Registration Misstatements

***The Risk Disclosures***. Defendants' Forms 10-K and 10-Q purported to warn of risks – "administrative, civil, or criminal penalties" – that "***could*** result" if Carvana failed to comply with state title and registration laws and regulations. ¶¶209, 228, 240, 252, 260; *see also* ¶¶203, 247 (confirming no material changes to disclosures). These disclosures were misleading because these

4895-7085-5006.v1

risks had already come to fruition.[10] *See, e.g.*, ¶¶175-176, 185-199, 233, 265, 284; *see also supra* §I.C. The Ninth Circuit consistently finds where, as here, "[r]isk disclosures that 'speak[] entirely of as-yet unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors.'" *Alphabet*, 1 F.4th at 703; *see also Khoja*, 899 F.3d at 1016 (statements warning new data "'***may*** be inconsistent'" with prior results misleading when defendants knew "that the 'new data' revealed exactly that") (emphasis in original); *Berson*, 527 F.3d at 985-87 ("[L]earning that stop-work orders ***might*** be issued is quite different from knowing they were ***in fact*** issued. One indicates a risk, the other a certainty.") (emphasis in original); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (statements misleading for giving "no indication that the risk 'may already have come to fruition'"), *aff'd*, 563 U.S. 27 (2011).

Ignoring this wealth of binding authority, Defendants argue the disclosures do not "suggest to any reasonable investor that Carvana had not or would not be subject to regulatory investigations or penalties." Mtn. at 20-21. But it is well-settled that "warning[s] in each [SEC filing] of risks that '***could***' . . . ***occur***" – like the disclosures here – are "misleading to a reasonable investor when [the company] knew that those risks had materialized." *Alphabet*, 1 F.4th at 704; *see also Weston*, 2023 WL 3000583, at *17 (disclosures that pandemic "'could'" impact business misleading where "those risks may have already come to fruition"). Further, their claim that no "reasonable investor believed a company" would comply with the law in "every instance" (Mtn. at 20-21) is a strawman. A reasonable investor would expect that if the risks associated with breaking the law had come to fruition, Defendants would not speak of those risks as uncertainties. *Alphabet*, 1 F.4th at 704. Thus, the disclosures are materially misleading.

***Statements on Title and Registration Delays***. Once the truth began to leak out, Defendants chose to characterize the title violations as "limited," "small in scope," "North Carolina specific," and occurring "'in a very small percentage of a very small percentage of

---

[10] For example, although Carvana's August 5, 2021 Form 10-Q stated that there had been no material changes to the disclosures in its 2020 Form 10-K (¶247), Michigan had already fined Carvana and placed it on an 18-month probation, North Carolina had fined and suspended Carvana's license, and Ohio had revoked its privileges to issue temporary tags. ¶¶186-187, 197.

- 20 -

instances,'" while touting their "productive" conversations with state regulators. ¶¶248, 258, 275, 278, 280.  In truth, however, the violations were rampant, impacting customers nationwide. Indeed, CWs-3, 4, 8, 9, 10, and 11 each reported that Carvana routinely sold cars before receiving the title.  *E.g.*, ¶¶233(c), 265(c), 284(c); *see also supra* §I.C.  This was no surprise to Defendants when they first spoke on August 11, 2021, as at least three states had already penalized Carvana. ¶¶186-187, 197, 233, 265, 284.[11]  And these issues only worsened.  *E.g.*, ¶¶186-197.  By omitting these material adverse facts, Defendants created an "impression" of the violations that "differ[ed] in a material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006; *see also Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *6 (D. Ariz. Dec. 17, 2012) (finding statements "downplay[ing]" extent of issue misleading).

Defendants' arguments are meritless.  ***First***, their puffery claims (Mtn. at 21 (citing ¶¶248, 258, 275, 278, 280)) fail.  Whether title and registration violations were "specific to North Carolina" or "limited" is objectively verifiable.  Regardless, "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).  Defendants knew Carvana's violations were widespread, and yet made repeated, specific statements that were intended to, and did, reassure investors to the contrary.  *See, e.g.*, *Uber*, 2020 WL 4569846, at *7 (statements, such as "'[i]t's a new day,'" we're "'committed to enhancing safety'" and "'work[ing] tirelessly,'" were not puffery where Uber was trying to reassure investors that persisting problems were in the past); *see also Karinski*, 2020 WL 281716, at *11 (statement that Stamps had a "'great partnership with USPS'" not puffery where USPS was investigating Stamps).

***Second***, Defendants assert that Plaintiffs failed to plead any facts with particularity

---

[11] Defendants' claim that the August 11 statement does not suggest that title issues were North Carolina specific (Mtn. at 21 n.16) is belied by the plain language of the analyst's question and Defendants' responses thereto (¶248).  It is also improper at this stage as factual inferences are drawn in Plaintiffs' favor.  *Berson*, 527 F.3d at 985-87 (where there were multiple interpretations, the court cannot say that as a matter of law that the statement was not misleading at pleading stage); *see also Edenbrook Cap., LLC v. RhythmOne Plc*, 2019 WL 1791419, at *7 (N.D. Cal. Apr. 24, 2019) (same).

- 21 -

4895-7085-5006.v1

regarding Defendants' title and registration violations, casting them as a few "*de minimis* penalties*" and "limited suspensions." Mtn. at 19-20. Plaintiffs' allegations, however, are supported by: six CWs, including CWs who received nationwide customer calls (CW-9) and were located in the Southeast (CW-11), Midwest (CW-4), West (CW-10), and Carvana's headquarters (CW-8); exposés founded on interviews with state officials and current and former employees; states' investigations and findings oft set forth in press releases and settlements; allegations in a consumer class action that survived a motion to dismiss; and Defendants' own admissions. *Supra* §I.C.[12] Thus, the CWs can establish that the violations were nationwide (Mtn. at 21-22). *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (rejecting claim that CWs' accounts in specific regions should be viewed with suspicion when complaint pled a reasonable basis to establish company-wide practices); *see also Glazer*, 63 F.4th at 771.[13] Further, Defendants' disingenuous portrayal of the nine state actions is belied by their admission that the damage of just one of the suspensions "was incalculable and irreparable." ¶¶176, 185-198. And, tellingly, their Motions are silent as to the SEC's investigation.

**Third**, while there is no duty to accuse oneself of "unadjudicated wrongdoing" (Mtn. at 20), once Defendants chose to speak about the violations, a duty arose to do so truthfully, completely, and in a non-misleading manner. *Khoja*, 899 F.3d at 1010. Further, unlike Defendants' authority, states had already found that Carvana violated their laws. **Fourth**, Defendants' suggestion that the penalties came "***years after***" the statements and that they were

---

[12] Defendants attempt to apply an impossibly high burden of falsity. But the Ninth Circuit just instructed that courts must not "impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference fraud.'" *Glazer*, 63 F.4th at 766. Indeed, *Glazer* held that *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001), upon which Defendants rely (Mtn. at 20), is "'***irreconcilable***'" with "subsequent Supreme Court decisions." *Glazer*, 63 F.4th at 766. Their other cases are inapt. Mtn. at 19-20. *Mauss v. Nuvavsive, Inc.*, 2014 WL 6980441, at *4 (S.D. Cal. Dec. 9, 2014) (unlike here, no findings or admissions of wrongdoing within the class period); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019) (same); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) (same).

[13] *Baker v. Seaworld Ent., Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016), is inapt because the CWs gave accounts of attendance at their California parks. Nor do the CW accounts here "contradict" the scheme. Mtn. at 22. That Carvana had a spreadsheet of a "ridiculous amount" of cars sold without actual title only highlights that Defendants decided to sell cars **before** securing title. Indeed, Carvana later enacted "buffer periods" to allow for time to secure title, which Defendants admitted would slow growth. ¶229(f).

"true" (Mtn. at 20-21) misstates the facts and law. *Khoja*, 899 F.3d at 1008-09 (literally true statements may be misleading); *Miller*, 519 F.3d at 886. In sum, the statements were misleading.

### 3. The Expansion Misstatements

As retail sales exploded, Defendants touted Carvana's rapid nationwide expansion driven by its "capital-light expansion model," "nationally pooled inventory," and "logistics capabilities" to assure investors that "[g]rowth . . . enables economies of scale." ¶¶204, 208, 210-212, 215, 217, 219, 221, 223-224, 226, 235, 237-238, 240, 242, 246, 252, 254, 256, 259, 274, 279. Defendants' statements created the misleading impression that the "scalability of [Carvana's] model is apparent, [and] our business gets better as it gets bigger." ¶238.

In truth, Carvana's expansion required significant infrastructure and capital because, as Garcia Jr. knew from the outset, "an e-commerce used car retailer needs a physical footprint like Amazon, which is undergirded by a network of massive distribution centers and transport depots." ¶¶182, 232, 264, 283. Nevertheless, to boost growth with the appearance of sustainability, Defendants expanded into new markets far from Carvana's few IRCs that they knew or recklessly disregarded were "less profitable" and strained Carvana's underbuilt logistics network. *See, e.g.*, ¶¶144-147, 232(a), 264(a), 283(a); *supra* §I.C.[14] Rather than enabling economies of scale, this expansion caused logistics expenses to spike 300%, facilities expenses to increase by nearly 250%, while logistical constraints saw a "more than $600 per retail unit YoY increase in reconditioning and inbound transport costs" as Carvana was forced to rely on costly third parties. ¶¶162, 232, 264, 283; *supra* §I.C. At the end of the Class Period, Defendants stunned investors by announcing they were "reduc[ing] advertising" in new markets to avoid "less profitable" sales, "increasing long-distance shipping fees," and purchasing ADESA. ¶¶162-164, 181, 232, 264, 283. Indeed, commentators were shocked upon realizing Carvana grew "for growth's sake and not necessarily growth to improve profitability." ¶163; *Shenwick*, 282 F. Supp. 3d at 1136 (analysts'

---

[14] For example, while a car sold more than 200 miles from an IRC cost Carvana $750 more per unit and sales 100 miles away also materially increased costs, Defendants obscured that Carvana opened 150 new markets during the Class Period to boost sales – 90% which were over 100 miles from an existing IRC and 65% which were more than 200 miles from an IRC. ¶¶144-147, 232(b), 264(b), 283(b).

- 23 -

4895-7085-5006.v1

interpretation relevant to falsity).

Defendants' sweeping and conclusory claims, absent any authority, that the statements are all either inactionable historical results, "textbook puffery," or "opinions or forward-looking" (Mtn. at 17-18) should be disregarded. *Alphabet*, 1 F.4th at 698. In any event, the statements are actionable. ***First***, as noted *supra*, historical results are not *per se* inactionable. *Compare* Mtn. at 17 (citing ¶208), *with In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (loan growth misleading because loans were the result of "self-dealing"). Here, because Defendants' adulations of Carvana's expansion "create[d] the impression of sustainable" growth, the statements are misleading. *Murphy*, 2017 WL 3084274, at *9 (historical growth misleading where defendants omitted they were "offering discounts . . . to encourage larger sales"); *see also Shenwick*, 282 F. Supp. 3d at 1137-40 (user engagement trends misleading where defendants omitted unfavorable metric undermining trends).[15]

***Second***, the PSLRA safe harbor does not apply. Mtn. at 17-18. For a statement to be shielded from liability, it must be forward-looking ***and*** either "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,'" or made "without actual knowledge that it is false or misleading." *Quality Sys.*, 865 F.3d at 1141. Further, where defendants "make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement," the safe harbor does not apply. *Quality Sys.*, 865 F.3d at 1142. Here, because the statements concerned current or past facts, they are actionable. *E.g.*, ¶221 ("[A]s we've grown the business, we've been able to show leverage in SG&A."); *Glazer*, 63 F.4th at 774 (statement that pipeline "***continuing to grow*** . . . describe past and current conditions").[16]

Even if they were forward-looking, Defendants' cautionary language does not meet the Ninth Circuit's "stringent" standard. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d

---

[15] Defendants' authority helps Plaintiffs or is inapt. *Apple*, 2020 WL 2857397, at *11 (upgrade rates misleading absent disclosure that new software, which slowed operations, contributed to the rates); *Golubowski v. Robinhood Mkts., Inc.*, 2023 WL 1927616, at *7 (N.D. Cal. Feb. 10, 2023) (unlike here, the historical results ***suggested that growth would be "lower" in the future***).

[16] *See also* ¶211 ("Growth has been and will continue to be our first financial objective . . . . Growth also enables economies of scale."); ¶¶204, 210, 212, 237.

- 24 -

940, 947 (9th Cir. 2005). To warrant dismissal "'reasonable minds could not disagree that the challenged statements were not misleading.'" *Id.* The "'inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading.'" *Lowthorp*, 2021 WL 3089118, at \*12. The language must be "'precise,'" and "'directly address'" the misrepresentation such that "the risk of real deception drops to nil." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Here, Carvana's boilerplate, generalized warnings do not address the misstatements. *See, e.g.*, Mtn. at 17 (citing ¶204, Ex. 1 at 34, 48-50). The inadequacy of the cautionary language is "bolstered by the fact that Defendants did not meaningfully update the risk disclosure" from year to year. *Glazer*, 63 F.4th at 780.[17]

*Third*, Defendants' puffery argument (Mtn. at 18 (citing ¶¶221, 226)) fails because whether a company's expansion model is "capital-light" or "show[n] leverage in SG&A" with "growth" is verifiable and a "factual representation about" the expansion. ¶¶221, 226; *e.g.*, *Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) (statements that business is "'ready to scale,'" capable of "integrat[ing] acquisitions 'quickly,'" and "leverag[e]" not puffery as they "describ[ed] what [business] did and what practical aims it was supposed to achieve"). In addition, Defendants knew their foray into distant markets was "less profitable," unsustainable, and straining Carvana's logistics (§I.C.). *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "'anticipates a continuation of its accelerated expansion schedule'" not puffery when expansion had failed). *Fourth*, they are not inactionable opinions. Mtn. at 18. An opinion is misleading where plaintiffs "plead facts that 'call into question the issuer's basis for offering the opinion.'" *Uber*, 2020 WL 4569846, at \*8 (quoting *Omnicare*, 575 U.S. at 194). Here, Plaintiffs have alleged numerous undisclosed facts demonstrating that the information available to Defendants at the time – *e.g.*, 90% of new markets were 100 miles away from IRCs causing logistics constraints,

---

[17] Even if they did, the "safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at \*4 (N.D. Cal. Sept. 4, 2012). Defendants knew their expansion story was a farce. ¶¶232, 264, 283. ***One day after Defendants stated, "we expect to launch many small markets near our existing infrastructure soon"*** (¶204), ***Carvana launched 100 new markets – 83 of which were over 100 miles from an IRC***. ¶232(f).

4895-7085-5006.v1

sales in the new markets were "less profitable," and "location growth" led to "third-party reconditioning locations" (¶¶232, 264, 283) – did not "'fairly align[],'" with the picture painted by the statements. *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017).[18]  Similarly, the CC is not "hindsight pleading" (Mtn. at 18-19) as "defendants' statements were misleading given the information available to them at the time." *Uber*, 2020 WL 4569846, at *8.  Defendants' statements touting Carvana's expansion and its unique model created a misleading impression of the scalability and sustainability of Carvana's growth.

### 4.    The Buying Cars from Customers Misstatements

During the Class Period, Defendants touted the numerous cost "advantages" and profits from buying cars from customers, claiming to be a "high-quality buyer," "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location."[19]  ¶¶202, 206, 209, 214-215, 219, 222, 227, 238-240, 244-246, 249-250, 252, 259, 279.  Further, Defendants told investors that they could "wholesale" "excess" customer-sourced cars, which "drives wholesale GPU."  ¶¶206, 222, 249.

In truth, Defendants drastically increased the volume of cars purchased from customers by lowering purchasing and verification standards in furtherance of their scheme.  ¶¶231, 263, 282.  The CWs describe a dramatic shift in standards and CWs-1, 3, 4, 5, 8, 10, and 11 stated that it

---

[18] The stark differences between Carvana's map and Plaintiffs' map belies Defendants' claim that the CC "simply copies and slightly modifies the[] maps." Mtn. at 18 n.3.  Carvana's deliberately bare bones map omitted numerous material data points.  For example, the map did not differentiate between new and old markets, obscuring the fact that 90% of the new markets were at least 100 miles away from existing IRCs when, in fact, their statements suggested the exact opposite – that Carvana was "launch[ing] many small markets *near our existing infrastructure*."  ¶¶204, 232, 264, 283.  Defendants note that the shareholder letters directed investors to a webpage with the locations of new markets and IRCs.  Mtn. at 18 n.3.  But the webpage did not list the distances between markets and IRCs.  This is inadequate under the buried facts doctrine as the facts would not have been apparent to investors without a thorough investigation and a lengthy mapping exercise of geographic data buried in multiple locations.  *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) (disclosure inadequate if "the fact in question is hidden in a voluminous document *or is disclosed in a piecemeal fashion*").

[19] *E.g.*, ¶245 ("*We just saw a massive, massive increase . . . in the profitability of buying cars from customers*."); ¶214 (Jenkins assuring analyst concerned that the strategy may increase logistics expenses, "*it's more profitable net of those expenses*"); *see also* ¶244 ("*We've made continual high-quality progress in both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on [those] cars*."  Any "*expense was more than offset by the margins*.").

- 26 -

became Carvana's practice to purchase cars sight unseen without verifying the accuracy of sellers' representations. ¶¶231, 263, 282; *supra* §I.C. In fact, in Q1 2021, CW-4 was told at a meeting with Managers, Directors, and Associate Directors of Carvana's initiative to buy "any car" to increase trade-ins. ¶¶83, 231(c), 263(c), 282(c). This had devastating consequences, including: (i) ballooning inventory that strained Carvana's logistic network; (ii) skyrocketing logistics expenses; and (iii) an overwhelming volume of "trash" cars that had to be sold wholesale. ¶¶79, 166, 231, 263, 282. The overwhelming wholesale volume created a costly, logistical nightmare and, worse yet, Carvana lost money on each wholesale vehicle sold. *Id.*; *supra* §I.C. As Garcia Jr. admitted at the end of the Class Period, Carvana had "***been fighting back the expense associated with . . . buying cars from customers over the last several years***." ¶¶231(b), 263(b), 282(b).

In response, Defendants raise a host of meritless arguments. Mtn. at 15. For example, Defendants claim Plaintiffs failed to particularly allege that any of the omitted facts "contradict[ed] any challenged statement." Mtn. at 15. Not so. Plaintiffs provided specific details demonstrating that Carvana abruptly abandoned its standards to purchase "any car," rendering Defendants' assurances that "[w]e assess vehicles on the basis of quality" outright misleading. ¶¶83, 202, 227, 231, 263, 282. Moreover, Plaintiffs established through percipient witnesses, detailed charts, and Defendants' belated admissions that this practice caused such great logistical constraints and SG&A expenses that Carvana was forced to overhaul its entire business to survive. ¶¶231, 263, 282. By touting the benefits of buying cars from customers, including that "***it's more profitable net of . . . expenses***," Defendants created an incomplete impression of buying cars from customers and misled the market as to the sustainability and profitability of Carvana's growth. ¶¶214, 231, 263, 282. To be sure, Defendants' statements created the impression that "[Carvana] has honed its efforts to efficiently acquire vehicles from the consumer," which was a "GPU growth opportunity over time." ¶355; *Shenwick*, 282 F. Supp. 3d at 1136 (analysts' interpretation relevant to falsity).

Further, that Carvana disclosed its intention to source more cars from customers (Mtn. at 15) is unavailing. Defendants' statements are misleading because, unbeknownst to investors and contrary to statements about assessing quality, they did so by lowering purchasing and verification

- 27 -

standards to induce trade-ins.[20]  ¶¶231, 263, 282.  Further, Defendants disclosed the increase in wholesale volume as an added "drive[r] of profits," while concealing not only that wholesale volume materially increased Carvana's logistics constraints and SG&A expenses, but that Carvana also lost money on every wholesale car sold.[21]  *Khoja*, 899 F.3d at 1008-09 (true statement misleading if defendant fails to "'disclos[e] adverse information that cuts against'" it).  Defendants' claim that they disclosed logistics expenses (Mtn. at 16) is a red-herring.  As explained *infra* (§VI.A.6.), Defendants excluded relevant expenses from its GPU metric, while emphasizing that Carvana generated a gross profit on each car it sold as proof that its sourcing strategy worked.  *E.g.*, ¶239.  In truth, when including the applicable logistics expenses that Defendants used to evaluate the cost of sales internally, Carvana lost money on each wholesale car sold.  ¶¶231(d), 263(d), 282(d).  Defendants may buy as many trash cars from customers as they wish (Mtn. at 15) *so long as* they do not mislead investors about doing so.[22]

Recognizing the strength of the CWs' accounts, Defendants resort to taking potshots.  Mtn. at 17.  Indeed, Defendants' claim of a purported disagreement about "perceived inefficiencies" and the volume of cars purchased (Mtn. at 17) fails as they offer no evidence of a disagreement, the CWs spoke in factual terms, and Defendants admitted that the inventory and wholesale volume caused inefficiencies.  *See Glazer*, 63 F.4th at 77 (rejecting similar claim).[23]  That "portions" of the accounts are purportedly hearsay (Mtn. at 17) is of no moment as "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."  *In re Cabletron Sys., Inc.*,

[20] Defendants set a long-term customer source ratio goal of 38%-52%.  ¶353.  By Q4 2020, the ratio had already jumped to 65%, and grew 110% between 2019 and 2020.  *Id.*  **Tellingly, as Carvana nearly doubled its disclosed goal, Defendants stopped reporting this metric**.  ¶354.

[21] That investors knew Carvana was unprofitable on a company-wide basis (Mtn. at 16 n.10) is irrelevant.  That calculation includes executive salaries, taxes, and many other expenses.  Further, Defendants told investors they should measure Carvana's profitability by Total GPU.  Defendants' case (Mtn. at 16) is inapplicable.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (omitted information "made clear" in every filing).

[22] Defendants' authority (Mtn. at 16) is inapt.  *Robinhood*, 2023 WL 1927616, at *10 (there, unlike here, "Plaintiffs allege not that Robinhood falsely misrepresented any facts but merely that Robinhood failed to live up to its lofty opinions and goals").

[23] *See also Karinski*, 2020 WL 281716, at *18.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009), is inapt as the CWs' accounts did not concern complicated assessments of the "preferred scrap rates" in a clinical trial, as was relevant to that case.

- 28 -

311 F.3d 11, 33 (1st Cir. 2002); *accord Zucco*, 552 F.3d at 997 n.4.[24]  Here, Plaintiffs established the reliability of the CWs' accounts (§VI.C.3; CC, §V.), which corroborated one another and other sources.  Further, that "none of the CWs was employed . . . during the ***entire*** Class Period does not in itself render their statements unreliable."  *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020); *see also Glazer*, 63 F.4th at 771 (crediting low-level CWs who did not work at company during the entire class period, finding "as individuals might not have known about corporate-level trends, their statements combine to tell a plausible story" of alleged fraud).[25]

Defendants' conclusory claim that all are inactionable forward-looking statements, opinions, puffery, or historical results (Mtn. at 15) should be disregarded.  *Alphabet*, 1 F.4th at 698.  Regardless, as noted *supra* §VI.A.1., historical results are actionable.  Here, because Defendants omitted that their results were the product of Defendants' undisclosed and unsustainable practice of purchasing "any car," their statements were misleading.  And the statements detailed in ¶222 and ¶239 are not forward-looking (Mtn. at 15) as they concern present facts.  *See* ¶239 ("***[O]ur #1 channel for sourcing inventory has now become sourcing cars directly from customers, which has several advantages***.").[26]  Thus, the statements are actionable.

---

[24] *See also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208-09 (9th Cir. 2016) (reversing dismissal where witness account was improperly dismissed as hearsay); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1189 (N.D. Cal. 2010) (finding hearsay from confidential witnesses "sufficiently plausible and coherent to support" allegations).  *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007), is inapt because the plaintiffs, unlike here, failed "to allege facts showing how the CWs possess the information attributed to them."

[25] Here, where Defendants fail to identify any temporal mismatch, their authority is inapt.  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009), 630 F. Supp. 2d at 1115 (where CWs were not "employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting ***for the entire class period***"); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *13 (D. Ariz. 2017) (not crediting account about fraud occurring "one year after CW[] was no longer employed").

[26] *See also* ¶222.  And, even if they were, the cautionary language does not meet the Ninth Circuit's "stringent" standard.  Defendants' puffery claims (Mtn. at 15 (citing ¶¶238, 249, 206)) fail as reasonable investors did rely on Defendants' statements (*e.g.*, ¶355), and they "address specific aspects of [Carvana]'s operation that [they] know[] to be performing poorly."  *Quality Sys.*, 865 F.3d at 1143.  As such, Defendants' authority (Mtn. at 15) is inapt.  Even if two of the statements were opinions (Mtn. at 15 (citing ¶¶206, 239)), they are actionable as they "plausibly" provided an incomplete "impression of the state of affairs" by omitting that buying cars from customers was materially spiking Carvana's expenses and logistics constraints, such that Carvana would have to overhaul its business.  *Cutler*, 696 F. App'x at 814 (opinion that product was "working" actionable where defendants omitted product was causing a decline in cash collections).

- 29 -

### 5.    The Cost Advantage Misstatements

To further convince investors of Carvana's limitless growth story, Defendants touted the purported cost advantages of its model over that of traditional dealerships, including that Carvana has a "lower variable cost structure at scale [as] . . . [w]e do not require a network of brick-and-mortar dealerships . . . instead, we utilize an in-house logistics networks." ¶¶223-226, 240, 246, 252, 259.  In truth, Carvana's model did not enjoy a lower cost structure or overhead than traditional dealers as Carvana required a ***network of brick-and-mortar infrastructure*** in the form of IRCs and hubs.  ¶¶234, 266.  As noted *supra* §I.C., Defendants postponed its investment in such infrastructure to sell its growth story long enough for them to make billions.

Defendants' claim that the allegations fail because "***CarMax is not a typical traditional dealer***" is specious.  Mtn. at 23.  Carvana's own Form 10-K expressly referred to "***traditional used vehicle dealerships such as CarMax***."  *See* Decl., Ex. 28 at 22.  Next, Defendants' argument that the misstatements are all inactionable (Mtn. at 22-23) fails.  Whether Carvana had a lower cost structure or less overhead than traditional dealerships is neither vague nor subjective.  *E.g.*, *Cutler*, 696 F. App'x at 814.  Indeed, courts routinely find statements of competitive advantages as not opinions or puffery where, as here, the source of the advantage is put at issue.  *E.g.*, *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1049 (D. Minn. 2015) (statement that "'direct sourcing model remain[ed] a material competitive advantage over the other [industry] players'" not "optimism or opinion, but rather a factual statement" about the source of its success obligating it to disclose a related party's involvement in the relationships).[27]  Because the statements concern "existing capabilities," Defendants' claim that "many" are forward-looking (Mtn. at 23 (citing ¶¶225-226)) fails.  *Compare Cutler*, 696 F. App'x at 815, *with* ¶225 (Carvana's "model will allow us to enjoy a significantly lower variable cost structure" as Carvana "do[es] not require a network of brick-and-mortar dealerships" and "utilize[s]" an "in-house logistics

___

[27] Thus, Defendants' reliance on *Terenzini v. GoodRx Holdings, Inc.*, 2022 WL 122944, at *4 (C.D. Cal. Jan. 6, 2022), is misplaced.  Moreover, in *Terenzini*, the court found the statements were "***true*** based on" facts known at the time.  *Id.*

- 30 -

4895-7085-5006.v1

network"); *see also* ¶226.[28]  In sum, statements of the cost advantages of Carvana's model created an inaccurate impression of Carvana's business and, thus, are misleading.

### 6.    The Profitability Misstatements

While Carvana was not yet profitable on a company-wide basis, Defendants told investors that Total GPU, which purported to measure the profitability of each unit sold, "is a key measure of our growth and long-term profitability."  ¶¶51, 169.  Accordingly, during the Class Period, Defendants touted Total GPU as evidence that Carvana's model was working.  ¶¶206, 242.  The statements detailed in ¶206 and ¶242 regarding Carvana's purported improving profitability, as demonstrated by Total GPU, were misleading because Defendants failed to include costs that they used internally to calculate profitability.  ¶¶230, 262.  For example, while "inbound" logistics costs were included in calculating Total GPU, Carvana arbitrarily excluded the "outbound" logistics expenses incurred to ship a car to a customer from the Total GPU calculation.  *Id.*  Internally, however, Garcia Jr. included outbound logistics expenses in assessing the profitability of each car sold.  *Id.*  This manipulation was critical.  If Total GPU included outbound logistics, investors would have known that the limitless growth story was a farce as outbound logistics expenses skyrocketed with the scheme.  Because Defendants did not segregate these costs from other SG&A expenses, investors could not calculate the actual profit Carvana made on each car sold, like Garcia Jr. did internally.[29]  *See FSP Stallion 1 v. Luce*, 2009 WL 1219683, at *6 (D. Nev. May 1, 2009) (denying motion to dismiss where, internally, defendants had "materially different calculations of net operating income" than they disclosed to investors).

---

[28] Even if forward-looking, they are actionable.  Carvana's boilerplate cautionary language is insufficient and Defendants knew that they did not enjoy a lower cost structure.  Defendants' authority is inapt.  *Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*, 2018 WL 6787349, at *2-*3 (C.D. Cal. Dec. 13, 2018) (finding, unlike here, the statements were not "of past or present fact," were "accompanied by meaningful cautionary language" discussing the risks "in extensive detail," and defendants did not know they were false when made).

[29] *Dougherty v. Esperion Therapeutics, Inc.,* 905 F.3d 971, 979, 981 (6th Cir. 2018) (noting that "'divergence between internal reports and external statements on the same subject'" is a "'key factor'" in finding scienter).  Defendants also omitted title and registration expenses from costs of sales, and, thus, Total GPU.  ¶¶230, 262.  Because the cost of obtaining title and registration for each retail vehicle is necessary to evaluate the profitability of each retail car sold, Defendants obscured Carvana's profitability.  *Id.*  Unsurprisingly, Carvana's closest competitor, CarMax, includes title and registration expenses in costs of sales and GPU.  *Id.*

- 31 -

4895-7085-5006.v1

The Total GPU allegations are neither puffery nor opinion. "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Further, even optimistic statements can lead to liability if they contribute to a misleading impression. *Quality Sys.*, 865 F.3d at 1143. Here, Defendants isolate a snippet – "exciting trends in retail GPU" – and incorrectly assert it is puffery or opinion while ignoring the context of the full statement: "So there are definitely some exciting trends in retail GPU. I think the most exciting is that, as I mentioned earlier, in July, we bought more than 100% as many cars from customers as we sold to customers." ¶206. Plaintiffs established falsity.

### 7.    The Macro-Economic Misstatements

When Defendants' scheme caused logistical constraints and astronomical SG&A expenses that could no longer be completely concealed (§I.C.), Defendants told investors that these poor results were due to "transitory," "macro-economic" factors, such as Omicron and "winter storms." ¶¶255, 269-270, 272-273, 276. By omitting that their own actions primarily drove these results, Defendants' statements created a misleading impression of Carvana's current and future business. *E.g.*, *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *11 (N.D. Cal. Nov. 27, 2018) (statements blaming external factors created misleading "impression that these were one-off aberrations").[30]

Defendants' arguments lack merit. Mtn. at 24. Plaintiffs do not have to prove that the external factors did ***not*** impact Carvana's results. *Glazer*, 63 F.4th at 770 (where a "significant cause of . . . missed revenue guidance was the [alleged fraud], it was misleading to blame the revenue miss entirely on [the region's] conditions (***even if [the region's] conditions were also a factor in the financial performance***)"). Here, because Defendants admitted their own actions caused Carvana's poor results, such that Carvana would have to overhaul its business to focus on reducing SG&A, the statements are misleading. *E.g.*, ¶¶267(c), 285(c). While Defendants do not have to disclose every negative factor impacting its business (Mtn. at 24), once their statements "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," a duty arose to disclose the omitted facts. *Brody*, 280 F.3d at 1006. Oddly,

---

[30] While Defendants moved to dismiss the statement in ¶2*2*5 as a macro-economic statement (Mtn. at 24), Plaintiffs assume they made a clerical error and meant to cite ¶2*5*5.

- 32 -

Defendants claim the statements are opinions (Mtn. at 24), but they are objective statements. *E.g.*, ¶269 ("Omicron, high used vehicle prices, rapid changes in interest rates and other macro factors impacted Carvana").[31]  Regardless, they are actionable as the omitted facts did not "fairly align" with the statements. *Intuitive Surgical*, 2017 WL 4355072, at *3.  Lastly, the statements detailed in ¶¶255, 270, 276 are neither forward-looking nor puffery.  Mtn. at 24.  Read in context, the February 24, 2022 statement, made mid-first quarter, is about ***current*** challenges.  ¶255; *see also* ¶¶270, 276 (noting current macro factors to confirm "we ***remain*** firmly on the path").  Far from being vaguely optimistic, Defendants' specific statements intended to, and did, reassure investors.[32]  *Uber*, 2020 WL 4569846, at *7.  Thus, the statements are actionable and misleading.

### B.    Defendants Failed to Challenge Their Insider Trading Omissions

Defendants Garcia Sr., Jenkins, Huston, and Keeton committed actionable omissions by trading on the basis of nonpublic information.  In the Ninth Circuit:

> Omissions are generally actionable under Rule 10b–5(b). . . .  [T]hey stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it.  ***Insider trading cases are a notorious example: the insider who knows nonpublic information and trades on the basis of it has committed an actionable omission***.

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) (citing *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)); *Chiarella v. United States*, 445 U.S. 222, 226-30 (1980) (confirming insiders' duty to disclose or abstain from trading).  Here, because Defendants participated in the scheme, knew about its consequences, and traded on that knowledge, they have committed omissions.  CC, §VI.; ¶¶286-313; *Desai*, 573 F.3d at 940; *Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407, 410 (8th Cir. 1983) ("insiders must either disclose material inside

---

[31] Defendants' authority is inapt.  Mtn. at 24; *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 623 (9th Cir. 2022) (concerning quintessential forward-looking projections with "very detailed meaningful cautionary language").  In *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605, 613 (9th Cir. 2017), the court did not disagree with the district court's conclusion that "goodwill valuations are opinion statements" as "they 'are inherently subjective and involve management's opinion regarding fair value.'"  Here, whether "winter storms" are "temporary" is not inherently subjective.

[32] Even if they are forward-looking, Defendants' boilerplate language "'is not enough to support a determination as a matter of law that defendants' statements were not misleading.'"  *Lowthorp*, 2021 WL 3089118, at *12.  Particularly here, as cautioning of supposed future problems that already exist is not meaningful.  *Cutler*, 696 F. App'x at 813.  They are not puffery as Defendants knew that their own actions were a substantial cause of the results.  *Fecht*, 70 F.3d at 1081.

- 33 -

information . . . or refrain from trading"). Defendants failed to address these omissions, so any arguments on reply are waived. *See Friends of Yosemite Valley*, 520 F.3d at 1033.[33]

### C.    Plaintiffs Allege a Strong Inference of Scienter

Plaintiffs plead scienter where they allege defendants "'made false or misleading statements either ***intentionally*** or ***with deliberate recklessness***.'" *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (emphasis in original); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) ("'[r]ecklessly turning a "blind eye" to impropriety is equally culpable conduct'"). Courts must "accept all factual allegations . . . as true" and consider "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-24 (emphasis in original). The inference "need not be . . . the 'most plausible of competing inferences.'" *Id.* at 324. "[I]f two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032-33 (9th Cir. 2016).

#### 1.    Defendants Had a $3.87 Billion Motive to Commit Fraud

After Defendants' fraud artificially propped up Carvana's stock price – but before the truth regarding Carvana's business model was fully revealed – Defendants unloaded nearly ***$3.87 billion worth of Carvana stock***. ¶286. "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Stock sales provide evidence of scienter when they are "'"unusual" or "suspicious."'" *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders' prior trading history.'" *Id.*

The prodigious number of shares Defendants sold weighs heavily in favor of a scienter inference, as does "the unusual number of insiders who made significant proportions of stock sales." *Tactile*, 595 F. Supp. 3d at 818. Here, Garcia Sr. offloaded 13,950,000 shares (19% of his ownership) for nearly $3.7 billion; Keeton sold 180,007 shares (63%) for more than $42.3 million;

---

[33] As such, Garcia Sr.'s argument that he is not the maker of any statement (GMtn. at 4-5) is irrelevant as he is liable under §10b-5(b) for his omissions. *Supra* §VI.B.

Jenkins sold 336,929 shares (34%) for over $79 million; and Huston sold 336,937 shares (34%) for nearly $79.3 million. ¶¶288, 301, 305, 310. *E.g.*, *Provenz*, 102 F.3d at 1491 (20%); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-*15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6%); *Azar*, 2018 WL 6182756, at *19 (20%); *Weston*, 2023 WL 3000583, at *22 (24%).

Defendants' insider trades were also suspicious in timing and out of line with prior trading habits. *See, e.g.*, ¶¶297, 303, 307, 312. As Professor Taylor put it: "'***Carvana's actions and the actions of the executives signal to me that the executives knew what was coming, and consequently took advantage of the lofty valuations to [] sell their own equity* . . . .*'" ¶179. Indeed, Garcia Sr. began trading every day once his scheme had artificially inflated share prices by 114% and abruptly stopped nine trading days after the first corrective disclosure. ¶¶288-292. Further, his rate of sale peaked just as Carvana's stock did (¶297). *See Am. W.*, 320 F.3d at 939 ("troubling is the fact that the stocks were sold . . . near the stock's peak . . . and just prior to the stock's decline . . . and subsequent plunge"). Garcia Sr. also modified his 10b5-1 plan twice to accelerate the rate at which he dumped his shares. ¶297. Fortuitously, he did so less than two weeks after Defendants boasted that "unit economics" proved the "***scalability of our model . . . and [that] our business gets better as it gets bigger***" and days before Carvana was named to the Fortune 500 (¶¶11, 157, 238, 290, 297). *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) ("amend[ments] [to] 10b5-1 plans to allow more stock sales . . . coupled with the unusual pattern of sales supports an inference of scienter"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (modifications "defeat the very purpose of 10b5-1 plans"). Further, because Garcia Sr. did not sell *any* personal holdings in the two-and-a-half years before the Class Period (¶289), his "sales weigh heavily in showing scienter." *Galena*, 117 F. Supp. 3d at 1171. Similarly, not only did Keeton, Jenkins, and Huston sell their shares when Carvana's stock price skyrocketed, but they also sold 99.99% (Keeton) and 97% (Jenkins and Huston) of those shares prior to *The WSJ* exposé. ¶¶301, 304-305, 310-312. They also sold in a far more condensed timeframe than before the Class Period. *Id.*

Understanding the strength of Plaintiffs' allegations, Defendants are desperate to

- 35 -

4895-7085-5006.v1

undermine their trades. But, as explained below, while Defendants' critiques are numerous, what they are *not* is meritorious. ***Defendants' 10b5-1 plans do not minimize their trades***. As an initial matter, academic studies confirm that 10b5-1 plans have become a tool for executives to engage in insider trading scot free. ¶315. Thus, the SEC adopted new rules to target "loopholes that allowed corporate insiders to hide behind these trading plans." *Id.* Notably, had the SEC's new rules applied, Defendants' sales would have been foreclosed. *Id.* Tellingly, the Motions are silent as to these allegations.[34]

Further, a 10b5-1 plan is an affirmative defense requiring an additional finding of good faith, which is a question of fact that cannot be resolved at this stage.[35] Regardless, because Keeton, Jenkins, and Huston entered into their plans *after* they embarked on the scheme (¶¶303, 307, 311), their plans do not negate scienter. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. Sept. 27, 2022) (rejecting plans adopted "after the motive and opportunity to mislead investors allegedly arose"); *see also Lamartina*, 2021 WL 4133851, at *12 ("SEC regulations recognize [a 10b5-1 plan] as an affirmative defense . . . ***only if*** the insider adopted the plan '[b]efore becoming aware of [nonpublic] information.'"). And Garcia Sr.'s modifications "support an inference of scienter." *E.g.*, *Backe*, 642 F. Supp. 2d at 1185.

Defendants' reliance on this Court's holding in *City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861 (D. Ariz. Jan. 11, 2023) ("*First Solar III*"), is misplaced. Mtn. at 30. *First Solar III* was decided prior to the SEC's new rules, and there, unlike here, the trading defendants were "***net gain[ers]***," the trades – made at typical times – were worth less than $15.9

---

[34] Since the filing of the CC, the DOJ indicted a CEO for insider trading "exclusively on [his] use of a Rule 10b5-1 trading plan," explaining it "'will not allow corrupt executives to misuse 10b5-1 plans as a shield for insider trading.'" *See* https://www.justice.gov/opa/pr/ceo-publicly-traded-health-care-company-charged-insider-trading-scheme.

[35] *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) (finding that, while evidence of 10b5-1 plan "may ultimately provide the basis of an affirmative defense at a later stage . . . it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales"); *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *12 (N.D. Cal. Sept. 10, 2021) (same); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) (same); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (same); *Azar*, 2018 WL 6182756, at *4 ("'[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith,' which a court cannot make [on] a motion to dismiss.").

- 36 -

4895-7085-5006.v1

million, and plaintiffs failed to provide any trading history. 2023 WL 155861, at *8-*9. Critically, unlike Garcia Sr., no defendant sold $478.4 million in stock outside of his plan (¶294) or modified their plan – twice. *Id.*[36] In sum, Defendants' suspect 10b5-1 plans *heighten* the scienter inference.

Unable to rely on his manipulated 10b5-1 plan, Garcia Sr. raises a host of arguments contrary to the law and facts. For example, he argues his near 14 million sales for $3.7 billion were insubstantial. GMtn. at 9. But, as noted *supra*, selling nearly 20% is sufficient, and the Ninth Circuit has explained that "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sales supported scienter in a "novel situation: few others could sell $900 million worth of stock and only sell *2.1*% of their holdings").[37] That Garcia Sr. purchased "7 million shares" for *$65* per share near the end of the Class Period (GMtn. at 9; ¶300) does not negate scienter. Indeed, purchases do not "bear upon Plaintiffs' scienter allegations" where, as here, they were purchased "'after a marked drop'" in stock price "consistent with 'dollar cost averaging,' when stockholders purchase shares of a company just after its price has fallen to make up losses." *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 74 (D. Mass. 2014); *see also Galena*, 117 F. Supp. 3d at 1165 (defendants made purchases so sales "would be mixed with insider buy[s]").[38]

---

[36] This Court also noted "a Rule 10b5-1 plan initiated during a class period will do less to shield a defendant from suspicion." *First Solar III*, 2023 WL 155861, at *9. Defendants' other authority, *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *19 (C.D. Cal. 2008), supports Plaintiffs because the court noted that, unlike here, "[t]here are no allegations that [defendant] actively amended, modified, or manipulated his 10b-5 trading plans." *Id.* at *19 n.14. And *none* of Garcia Sr.'s inapt authority concern *modifications* to plans. GMtn. at 10.

[37] Garcia Sr.'s authority is inapt. *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9-*10 (S.D. Cal. Sept. 20, 2021) (defendant sold $12 million worth of stock, did not trade outside of his unaltered 10b5-1 plan, and trading was not unusual); *Schultz v. Tomotherapy Inc.*, 2009 WL 2032372, at *21 (W.D. Wis. July 9, 2009) (defendants sold shares for $5.6 million and $889,000); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1428 (9th Cir. 1994) ("'[u]ncontradicted deposition testimony [at summary judgment] provided credible and wholly innocent explanations for the stock sales'"); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (majority of selling officers sold between 2.6% and 7.7% of holdings and in a prior consistent manner).

[38] This is particularly true here, given Garcia Sr.'s history of buying low for his own gain. *Infra* §VI.C.5. Garcia Jr.'s last-minute purchases (Mtn. at 29) are similarly unpersuasive. Particularly here, where they were necessary to ensure the execution of the offering. ¶300. Defendants' authority is inapt. *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12734014, at *4 (C.D. Cal. July 28, 2015) (considering defendants' "*simultaneous* acquisition" of shares where, unlike here, the

- 37 -

Garcia Sr. concedes that he did not sell any of his personal holdings in the prior period. GMtn. at 9. Nonetheless, he claims his prior trading is consistent because he sold shares "'owned indirectly,'" through DriveTime or Verde. *Id.* (quoting ¶289). But this bald contention only underscores his change in trading patterns. Further, the difference is meaningful. Garcia Jr. and his children own nearly a quarter of DriveTime (¶153), and thus, Garcia Sr. could not have pocketed all of the $456.3 million in sale proceeds.[39] And scienter is not negated because he sold "[m]any" of his 14 million shares "before its peak." GMtn. at 10. "[T]he fact that Defendants did not wait until the last possible moment to sell does not negate an inference of scienter." *Questcor*, 2013 WL 5486762, at *17 (sales ten months before first disclosure probative of scienter); *see also In re Daou Sys.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (sales at $22.86 probative of scienter where class period high reached over $34); *Karinski*, 2020 WL 281716, at *15 (sales probative of scienter where they occurred "an entire year" before disclosures).[40]

The other Defendants' potshots fair no better. Indeed, Plaintiffs are not required to precisely tie each sale to a false statement (Mtn. at 28). *See, e.g.*, *Acadia*, 2022 WL 4491093, at

plaintiffs failed to provide any "particularized allegations concerning" the defendant's 10b5-1 plan or timing of the sales, which ***all*** occurred a year and a half before stock price peaked); *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (***not*** discounting for ***any*** purchases); *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020) ($66 million in sales were not suspicious and consistent with prior trading); *In re Cypress Semiconductor Sec. Litig.*, 1992 WL 394927, at *2 (N.D. Cal. Sept. 23, 1992) ($1.4 million in trades not suspicious when, unlike here, half of sales occurred ***after*** truth was revealed).

[39] Not surprisingly, all of the cases he cites (GMtn. at 9) compare defendants' ***personally held*** shares. And courts have excluded indirect sales when plaintiffs have attributed them to defendants' class period sales. *E.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (noting the defendant "did not sell any of his ***directly held*** shares during the pertinent time period" and finding the pre-class period sale of "some 300,000 shares held by [defendant indirectly through] an entity" different in kind).

[40] The other Defendants' claim that because they "***stopped*** selling stock" shortly "before most of the alleged corrective disclosures," they could not have "sought to capitalize on artificially inflated stock" (Mtn. at 30) similarly fails. Indeed, they sold at, or within a month of, Carvana's most inflated prices and just before the stock plummeted. ¶¶301, 305, 310. Defendants' authority is inapplicable. *See Ronconi*, 253 F.3d at 435 (unlike here, the "insiders miss[ed] the boat" by selling "at about what the stock was worth ***after*** the bad news was public, not when they might have gained market advantage from as yet undisclosed bad news"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-97 (9th Cir. 2002) (finding plaintiffs lengthened the class period "to [misleadingly] sweep as many stock sales into their totals as possible," and most of the sales in this period made when no other insiders were selling); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1038, 1040 (N.D. Cal. 2000) (unlike here, defendants did not sell shares shortly before the truth was revealed and retained 86% of their holdings), *aff'd*, 32 F. App'x 338 (9th Cir. 2002).

- 38 -

*13 (sales probative of scienter where complaint "does not allege . . . the timing of the sales within the nineteen-month period relative to any of the allegedly misleading statements or omissions"). And, while not required, the CC details that the sales coincided with the misrepresentations, omissions, and scheme. *See, e.g.*, ¶¶297, 303, 307, 312. Further, Jenkins, Keeton, and Huston argue their prior trading history was similar, but their **condensed** selling-spree during the Class Period was atypical. ¶¶301, 305, 310. Regardless, courts find stock sales support scienter even without "any trading history for [a defendant]." *E.g.*, *Karinski*, 2020 WL 281716, at *15.[41]

Lastly, Plaintiffs' motive allegations are not undermined because Garcia Jr. did not sell stock (Mtn. at 28-29). *E.g.*, *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010) (no "negative inference from the absence of stock sales"); *see also Am. W.*, 320 F.3d at 944. "Indeed, there are several explanations for why an individual defendant would not sell stock . . . such as a desire to avoid drawing the market's attention to the problem." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016). Notably, here, the media widely reported on the suspicious timing of the sales. ¶¶178-179. Further, Garcia Jr. was motivated to enable his father – who has trusts for his kids and his own benefit – to pull off massive insider sales. ¶¶153, 287-288; *e.g.*, *Baron*, 2022 WL 17413562, at *15 (brother's sales probative of defendants' scienter); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *2 (S.D.N.Y. Aug. 8, 2012) (defendant's wife's sales supported scienter). In sum, Defendants' suspicious $3.87 billion stock sales strongly support a strong inference of scienter.

### 2. Defendants' Statements Support the Inference of Scienter

"[S]cienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements." *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015); *see also Shenwick*, 282 F. Supp. 3d at 1147 ("As the Ninth Circuit has explained,

---

[41] *See also Acadia*, 2022 WL 4491093, at *13 (sales probative of scienter solely because "the amount of . . . stock sold by the individual [d]efendants . . . is substantial"); *Questcor*, 2013 WL 5486762, at *16 (trades probative of scienter where only two factors met); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) (same). And Defendants' authority (Mtn. at 28), which does not concern a change in patterns is inapt. Next, Defendants' focus on the speaking defendants (*id.*) ignores that Keeton did make an alleged misstatement (¶216), and Garcia Sr. and Huston made omissions and engaged in the scheme (*supra* §§V., VI.B.). Thus, Defendants' reliance on *Glazer* (549 F.3d at 745) and other non-binding authority is misplaced.

4895-7085-5006.v1

an assertion that Defendants were unaware of an alleged issue can be 'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'").

Here, Defendants Jenkins, Keeton, and Garcia Jr. made and approved numerous specific statements regarding the very information that Plaintiffs alleged was false or misleading, evincing their knowledge of the subject matter and supporting a strong inference of scienter.[42] ¶¶334-335; *Shenwick*, 282 F. Supp. 3d at 1147 (finding scienter on actual access where defendant referenced issue as he "'bridged the scienter gap . . . by referencing the data directly'"); *McKesson*, 411 F. Supp. 3d at 601-02 (scienter where defendants "touted intimate knowledge" of pricing). Critically, Defendants often did so in response to analysts' pointed questions. ¶¶346-350; *see, e.g.*, ¶¶214, 235, 239, 248, 251, 258; *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (statements touching on the issues, including in responses to "***direct questioning***" "sufficient to satisfy the ***actual knowledge*** analysis and allows the Court to infer scienter") (some emphasis in original); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (denials about issues in response to questions from analysts support scienter).[43]

In fact, Defendants could field these questions as they repeatedly assured investors that they were "monitoring," "keeping a careful eye on," "always focused on," and had "visibility" into markets, pricing, demand, and had data showing "where inventory is, how much inventory is close to different markets, what delivery times are in different markets, [and] what inventory distribution looks like" (¶¶334-335), such that "[they] knew what [they were] talking about." *S. Ferry LP #2*, 687 F. Supp. 2d at 1259-60; *see also Quality Sys.*, 865 F.3d at 1145. And to the extent Defendants "did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all." *S. Ferry LP #2*, 687 F. Supp. 2d at 1260.

---

[42] Defendants repeatedly discussed: retail unit sales (*e.g.*, ¶¶200-201, 206-207); buying cars from customers (*e.g.*, ¶¶214, 216, 222); profitability (*e.g.*, ¶206); capital-light, scalable nationwide expansion (*e.g.*, ¶¶215, 219, 221); cost advantages (*e.g.*, ¶¶223-226, 240); logistics and SG&A (*e.g.*, ¶¶255, 269-270); and title issues (*e.g.*, ¶¶247-248, 278).

[43] *See also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) ("attempts to 'placate the market in reaction to the inquiries by . . . analysts . . . provides cogent support for [an] inference of scienter'"). As such, Defendants' case (Mtn. at 30-31) is inapt. *In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201 (C.D. Cal. June 17, 2021) (unlike here, plaintiffs did not identify any statements evincing scienter).

4895-7085-5006.v1

"Defendants' false exculpatory statements are [further] additional indicia of scienter." *Karinski*, 2020 WL 281716, at \*16; *see also United States v. Reyes*, 660 F.3d 454, 466-67 (9th Cir. 2011) (same). Defendants' false denials regarding the title violations and macroeconomic factors support scienter. *Supra* §§VI.A.2., VI.A.7. Lastly, Defendants' belated admissions also support their knowledge. A "classic fact pattern[] giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *Oracle*, 380 F.3d at 1232-33 (reversing dismissal in part on admissions). This case follows that classic pattern. *See, e.g.*, ¶231(b) (Garcia Jr. admitting Carvana had "***been fighting back the expense associated with . . . buying cars from customers over the last several years***").[44] Defendants' statements establish a strong inference of scienter.

### 3. CW Accounts Further Bolster the Inference of Scienter

The CW accounts further demonstrate that Defendants knew or recklessly disregarded that Carvana lowered its purchasing and verification standards when buying cars from customers to induce trade-ins and boost retail sales, and that this spiked logistical constraints, expenses, and low quality vehicles that had to be sold wholesale. ¶¶319-323.

For example, CW-11 reported that when vehicles did not meet prior standards, he and his team were told to buy the car anyway. ¶¶127-128. CW-2 was also overruled and directed to procure cars regardless of the condition, as "leadership would say take it" anyway. ¶322. CW-11 reported that he and other high-ranking employees had quarterly Zoom calls with C-level executives, including Garcia Jr., Jenkins, and Huston, and in every meeting someone in market operations raised the poor quality of the cars. ¶321. In early 2021, CW-11 attended a meeting where the issue of the poor quality of customer cars was again raised with Garcia Jr., Jenkins, Huston, and a C-level executive responded: ***Carvana is "just worried about growth and not procedural" operations***. *Id.* And CW-5 attended a leadership summit at headquarters in April

---

[44] *See also* ¶275 (acknowledging title violations in "2020 and 2021"); ¶¶182, 278 (Garcia Jr. admitting at the end of the Class Period "***we probably have about kind of 1/3 the rate of customers that are getting the delayed plates that we had even a year ago***," and "an e-commerce used car retailer needs a physical footprint").

- 41 -

4895-7085-5006.v1

2022 with Garcia Jr. and Huston, in which employees again raised this issue. ¶320.

Further, after operating under the directive "to purchase as much as was humanly possible," regardless of the quality, CW-1 explained that Carvana's inventory issues were "obvious to anyone with eyes." ¶322. Moreover, these issues were made explicitly known to Defendants and director-level employees. CW-8, who utilized Tableau, reported that, in fall and winter of 2021, his team began to raise concerns about the high level of inventory to director-level employees. ¶¶112-113.[45] Specifically, they raised these issues at weekly meetings every Thursday with an Associate Director, and CW-8's coworker, who was a Financial Analyst, made a report about this topic. ¶¶112-113. CW-5, a Market Operations Manager, reported the bloated inventory at his hub to the other Operational Managers in weekly meetings, who were experiencing this problem. ¶97. And, in Q1 2021, CW-4 was told in a meeting with Directors and Associate Directors there would be "a huge increase" in the volume of wholesale cars. ¶83.

CW accounts show Defendants knew or recklessly disregarded that, to boost sales, Carvana purchased and sold cars before it held title to those cars. CW-8 said that around the summer/fall of 2021 there was a lot of pressure to get every vehicle possible, with the expectation that titles could be acquired later. ¶¶112, 322. CW-9 reported that during a call in January 2022 employees told Garcia Jr. they were being inundated with calls regarding registration issues. ¶323. In February 2022, CW-4 attended a meeting with the Wholesale team, during which Huston stated Carvana would adopt ADESA's title processes to improve the title process. *Id.* CW-3 discussed the title problems throughout the Class Period with his manager and at weekly meetings with the Director of Wholesale, only to be met with excuses. *Id.* CW-10 also raised the title problems with a supervisor and a manager, only to be told other teams were experiencing similar issues. *Id.*; ¶124.

Faced with these compelling allegations, Defendants resort to contesting the CW accounts. Mtn. at 31. Here, because the CWs are particularly described by job description or responsibility,

---

[45] CW-8 reported that Tableau included inventory data and metrics, including how many vehicles Carvana had in inventory, average days to sale, website traffic, and supply/demand ratios. ¶¶110, 328-329. CW-7 also explained that Carvana used Tableau to monitor inventory and other metrics, which revealed declining GPU as the Company embarked on its scheme. ¶¶104-106, 328. Defendants' comments regarding the data available to them and "visibility" into inventory (*e.g.*, ¶¶334-335) confirms their access to Tableau.

4895-7085-5006.v1

and duration of employment, their reliability and personal knowledge is sufficiently established (CC, §V.). *Quality Sys.*, 865 F.3d at 1145. Nonetheless, Defendants quibble that they are low-level employees that lack "any personal basis to report on any Defendant's state of mind." Mtn. at 31. In doing so, "Defendants misapply the test" outlined in *Quality Sys. Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10 (D. Ariz. Nov. 27, 2018) (rejecting identical claim). Further, the Ninth Circuit routinely credits low-level CW accounts even when they did not interact with a defendant. *See, e.g.*, *Glazer*, 63 F.4th at 772 (crediting accounts of numerous low-level CWs who had no direct contact with defendants); *Quality Sys.*, 865 F.3d at 1144 (same).[46] And, while not required, multiple CWs recounted meetings that Garcia Jr., Jenkins, and Huston attended, and provided a reliable account in support of scienter based on those interactions. Lastly, the Court should reject Defendants' speculation about a presumed disagreement as they offer no evidence of a disagreement, the CWs spoke in factual terms, and Defendants failed their own standards. *See Glazer*, 63 F.4th at 772 (rejecting similar claim); *see also Karinski*, 2020 WL 281716, at *18 (same).[47] In sum, the CWs' accounts further support a strong inference of scienter.

### 4.    The "Core Operations" Doctrine Supports Scienter

This Court may also impute scienter to the Defendants "based on the inference that [they] have knowledge of the 'core operations' of the company." *Reese*, 747 F.3d at 575. The core operations doctrine supports an inference of scienter where "'defendants had actual access to the disputed information'" *or* where "it would be 'absurd' to suggest that management was without

---

[46] Relying on *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024 (N.D. Cal. 2020), Defendants argue accounts of "all-hands" meetings cannot support scienter. But the Ninth Circuit recently credited an account from a "'sales kickoff'" event. *Glazer*, 63 F.4th at 772. To the extent Defendants cite *Bajjuri v. Raytheon Techs. Corp.*, 2023 WL 3650554, at *10, *25 (D. Ariz. May 25, 2023), on reply, it is unavailing because there, the court recognized low-level employees support scienter where their accounts concern "information they would be expected to know," but found the accounts at issue were "inconsistent" and went "far beyond what their titles and job descriptions suggest they would know." Further, the plaintiffs could not satisfy the core-operations doctrine as the alleged fraud concerned "fewer than ten contracts," contributing only to reporting errors, "not . . . top-line metrics." *Id.* at *13, *33.

[47] Defendants' authority is inapt. *Zucco*, 552 F.3d at 999 (unlike here where there were stated standards, one CW sent "an email to management about *his preferred* scrap rates"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (unlike here, plaintiffs relied on "a single statement by a lone witness, a clinical sales representative . . . who worked for Intuitive for three months and said, '100% that hospitals were cutting back'" to allege that defendants knew they would not meet their projections).

4895-7085-5006.v1

knowledge of the matter." *Id.* at 575-76. Here, taking the allegations holistically – including that: (i) Defendants repeatedly acknowledged that "retail units sold [i]s the single most important metric in our business" and "most important measure of our growth" (¶¶48-49); (ii) Defendants participated in the scheme to inflate Carvana's retail sales, including by entering into an agreement with Garcia Sr.'s DriveTime (§I.C.; ¶¶348, 351); (iii) Carvana revamped its title department at least three times to handle the consequences of flouting state laws (¶340); (iv) several states were actively investigating and sanctioning Carvana (¶¶185-198); (v) Defendants had actual access to the information as demonstrated by their public statements about the relevant issues, including in response to analysts' questions, ***and*** the data available to them (§I.C.; ¶¶328-332); and (vi) Garcia Jr., Jenkins, and Huston attended meetings where the omitted facts and issues were discussed (§I.C.; ¶¶320-323) – it would be absurd to suggest Defendants were "without knowledge" of the scheme. *Shenwick*, 282 F. Supp. 3d at 1147 (actual access based on defendants' statements).

Further, the Ninth Circuit has explained that "we may consider a senior executive's role . . . includ[ing] . . . whether, given the importance of the information, 'it would be "absurd" to suggest that management was without knowledge of the matter.'" *Alphabet*, 1 F.4th at 706 (scienter alleged as it was absurd to suggest no one told the CEO about key operations information at issue); *In re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *10 (C.D. Cal. July 13, 2022) (same). To be sure, here, it would be absurd to suggest that Carvana's controlling shareholder, CEO, and its highest executive officers were unaware of a widespread scheme devastating their core business they oversaw and that was Carvana's primary objective as it drove the "***majority***" of Carvana's profit. ¶¶324-326. *See Shenwick*, 282 F. Supp. 3d at 1145-46 (finding it would be "'absurd'" to argue defendants were unaware of trends in metric that they described "as one of its five 'major growth drivers'"). This is particularly true here, as the Garcias maintained an "***iron grip*** on Carvana," firing any "[h]igher ups who went against the CEO." ¶326 ("'The culture is ***you either are on board with us and everything we do and say . . . or you . . . get out***."); *VeriFone*, 704 F.3d at 710 (defendant's hands-on management style weighs in favor of scienter).

Defendants only challenge Plaintiffs' allegations of actual "access" (Mtn. at 30-32) and, thus, concede that this doctrine supports finding scienter. *Friends of Yosemite Valley*, 520 F.3d at

- 44 -

1033.  Further, their argument – a conclusory rejection of the CWs and Defendants' statements (Mtn. at 31) – fails.  *Supra* §VI.C.3.  Garcia Sr.'s access argument fares no better.  GMtn. at 7-8. Relying on *Align* (856 F.3d at 620), Garcia Sr. (wrongly) claims Plaintiffs must plead "allegations that defendant 'personally accessed' or others 'personally disclosed' to him specific information that ***contradicted statements***." GMtn. at 7-8.[48]  *Align*, however, ***held the core operations doctrine*** "***may be sufficient to establish [defendants'] knowledge*** of Align's financial information," but not of a subsidiary's financials "given that [subsidiary's fraud] predated Align's acquisition of [the subsidiary]."  856 F.3d at 620.  Thus, *Align* supports finding scienter here where Garcia Sr. controlled Carvana and participated in the fraudulent scheme during the Class Period.  *Id.* at 621.[49]

### 5.    Abundant Other Facts Support Scienter

***Given Garcia Jr.'s and Jenkins's positions and the importance of retail sales, their SOX certifications support scienter***.  ¶¶356-357; *see Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (defendant's "position as CEO" and "the overall importance" of the concealed information to the company's "business model" supported scienter); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (same).[50]

***The government investigations support scienter***.  Because the Ninth Circuit routinely infers scienter from government investigations, the host of investigations and findings of wrongdoing further bolster the inference of scienter.  *See VeriFone*, 704 F.3d at 706-07 (SEC

[48] Critically, Garcia Sr.'s argument misunderstands that Plaintiffs' claim is based on his actionable omissions (§VI.B.) and engagement in the scheme (§V.), not the other Defendants' misstatements.

[49] Plaintiffs' allegations are even stronger than in *Align*, 856 F.3d at 621, as the plaintiffs there failed to allege a strong motive from the defendants' less than $15 million in stock sales.  Garcia Sr.'s other authority (GMtn. at 7-8) is distinguishable.  *Veltex*, 2010 WL 3834045, at *7 (unlike here, where Plaintiffs have sufficiently alleged Garcia Sr.'s participation in the scheme, his prior fraudulent conduct, and suspicious insider trades, the plaintiffs in *Veltex* simply alleged the defendant was involved "'in the day-to-day operations'"); *Zucco*, 552 F.3d at 1005 (plaintiffs "'fail[ed] to provide any information on the trading history'" of the stock sales or allege a scheme claim); *Borteanu*, 2023 WL 1472852, at *31 (unlike here, plaintiffs alleged a scheme and misrepresentation based on defendants' failure to stop another defendant's misstatements).

[50] Thus, Defendants' reliance on *Zucco* is unavailing as the court simply held that SOX certifications "'are not sufficient, ***without more***.'" 552 F.3d at 1004.  In addition, the timing of the statements – made within days and months of the corrective disclosures – further supports scienter. *See Shenwick*, 282 F. Supp. 3d at 1148 (strong inference of scienter where only a few months elapsed between misstatements and disclosures); *see also Reese*, 747 F.3d at 571, 575 ("three to six months" between "statements and the contradictory disclosures" supports scienter).

4895-7085-5006.v1

complaint bolstered scienter); *Reese*, 747 F.3d at 574.  Further, the SEC investigation (¶176), even without proof of wrongdoing, supports scienter.  *Mylan*, 2018 WL 1595985, at *13.

***Garcia Sr.'s history of similar fraudulent conduct supports scienter***.  Scienter "is partially satisfied by allegations of a regular pattern of related and repeated conduct."  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002); *Austin v. Loftsgaarden*, 675 F.2d 168, 180 (8th Cir. 1982) (trial court in securities fraud action properly admitted evidence of defendant's prior fraud as probative of intent).  Here, Garcia Sr. followed his playbook for engaging in corporate fraud for financial gain.  After being convicted of engaging in a white collar scheme, Garcia Sr. started Ugly Duckling, which he pitched (like Carvana) as a disrupter and touted its (unsustainable) growth.  ¶¶35-37.  When its stock price dove 90%, Garcia Sr. "feather[ed] his own nest with Ugly Duckling's assets," bought it back for a pittance, and settled a number of investor suits.  ¶38.  His similar conduct supports scienter.

***Defendants' decision to cease reporting key metrics***.  As the adverse consequences of Defendants' scheme mounted, they stopped reporting "statistics on buying cars from customers" and "average days to sale," a "Key Operating Metric[]" consistently identified in Carvana's SEC filings.  ¶¶351-355.  Their abrupt decision to cease reporting these key metrics to avoid tipping investors off to the scheme bolsters the inference of scienter, and renders "the competing inference" that Defendants were "merely negligent," "not plausible."  *Alphabet*, 1 F.4th at 707.[51]

### D.    Plaintiffs Adequately Allege Loss Causation

Pleading loss causation is "not meant to impose a great burden" as it requires "no more than the familiar test for proximate cause."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  Thus, loss causation is ordinarily "'not to be decided on a Rule 12(b)(6) motion to dismiss.'" *Gilead*, 536 F.3d at 1057; *see also Rudolph v. UTStarcom*, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) ("loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage").  Loss causation simply requires a linkage between defendants' alleged

---

[51] *Petrie v. Elec. Game Card, Inc.*, 2011 WL 13130015, at *7 (C.D. Cal. Oct. 19, 2011), is inapt as it does not concern the decision to cease reporting metrics.

fraud and plaintiffs' loss. *First Solar*, 881 F.3d at 753. There are an "'"infinite variety"'" of "'"context-dependent"'" ways to plead and prove that linkage, and the corrective disclosures "'need not precisely mirror'" the misrepresentations. *Id.*; *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020), *cert. denied*, ___ U.S. ___, 142 S. Ct. 71 (2021). Plaintiffs readily satisfy this standard by alleging Defendants' scheme, misrepresentations, and omissions artificially inflated Carvana's stock; the inflation dissipated through seven disclosures that partially revealed the economic and operational truth concealed by the fraud; and each disclosure caused a Carvana-specific stock price decline. ¶¶359-375. These allegations provide the "indication" of the causal connection Plaintiffs "ha[ve] in mind." *Dura*, 544 U.S. at 347.[52]

### 1. Defendants' Attacks on the April 20, May 10, and November 3, 2022 Corrective Disclosures Fail

Relying on an overly-restrictive view of loss causation enunciated in *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008), *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010), and *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014), Defendants incorrectly claim that these disclosures do not identify any omitted facts or demonstrate that investors "'"learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendants poor financial health generally."'" Mtn. at 25 (citing ¶¶366, 369, 375). The Ninth Circuit has distinguished *Metzler*, *Oracle*, and *Loos*, clarifying that the "more restrictive test" they suggest "should be understood as fact-specific variants of the basic proximate cause test" and held that "'there are an "***infinite variety***" of ways for a tort to cause a loss.'" *First Solar*, 881 F.3d at 753-54. Indeed, *First Solar* made clear that a "plaintiff may . . . prove loss causation by ***showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss***." *Id.* at 754; *see also N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax Lab'ys, Inc.*, 843 F. App'x 27, 31

[52] Another approach to loss causation concerns the materialization of the risk. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). Under this test, "'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk ***concealed*** by the misrepresentations and omissions alleged by a disappointed investor.'" *Id.* (emphasis in original). The CC alleges that materialized risk here: the risks concealed by Defendants' scheme and misrepresentations materialized through regulatory actions, the ADESA purchase, declining sales, and layoffs.

- 47 -

(9th Cir. 2021) (loss causation where defendants attributed earnings misses to competition but misses were due to undisclosed scheme). To be sure, "'[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'" *First Solar*, 881 F.3d at 753. Thus, courts repeatedly reject Defendants' argument. *See, e.g.*, *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020); *Weston*, 2023 WL 3000583, at *23. Defendants' argument also fails because "a disclosure 'need not precisely mirror the earlier misrepresentation.'" *BofI*, 977 F.3d at 790. Garcia Sr.'s claim that the disclosures must have revealed his stock transactions fails for the same reasons. GMtn. at 10-11 (citing Mtn. at 24-27).[53] Because these disclosures revealed the negative conditions caused by the fraud, Plaintiffs adequately allege loss causation.

### 2. Defendants' Attacks on the August 10, 2021, October 22, 2021, June 24, 2022 and October 7, 2022 Disclosures Fail

Relying on *Loos*, Defendants wrongly contend that Plaintiffs fail to plead loss causation because these disclosures "'revealed' that states were investigat[ing] Carvana, [and] an investigation is not a finding of wrongdoing." Mtn. at 26 (citing *Loos*, 762 F.3d at 890). But the disclosures revealed wrongdoing. ¶¶151, 186-188, 265, 275, 194-195, 363-366, 372, 374. And the Ninth Circuit has made clear that "the announcement of an investigation can 'form the basis for a viable loss causation theory.'" *Lloyd*, 811 F.3d at 1210 (disclosures revealing investigation with subsequent confirming event establishes loss causation); *see also In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *11-*13 (C.D. Cal. Jan. 26, 2021). Loss causation is adequately pled as the disclosures revealed more than an investigation and there were subsequent confirming events.

Grasping at straws, Defendants move the goalposts by concocting causation requirements

---

[53] *FirstEnergy* is instructive. 2022 WL 681320, at *28. There, like here, a defendant argued loss causation was inadequately pled where the corrective disclosures did not reveal his involvement in the alleged scheme. In rejecting that argument, the court aptly noted "'proof of loss causation requires demonstrating that the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered. If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss causation is established.'" *Id.* at *27 n.38 (emphasis in original) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016)). Garcia Sr.'s authority is inapt. *Alpine*, 2022 WL 3598246, at *3-*4 (unlike here, plaintiffs did not allege reliance, "any losses," including the prices at which they bought their Alpine shares, or that the misrepresentations caused their economic loss).

- 48 -

that nowhere exist. ***First***, Defendants suggest there is some absolute requirement of how much a stock price must drop. Mtn. at 36-37. Not so. Indeed, the Ninth Circuit recently found loss causation adequately pled with regard to a disclosure that was followed by a 2.7% stock decline. *Impax*, 843 F. App'x at 30-31; Appellants' Opening Brief at 15, *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C. v. Impax Lab'ys, Inc.*, 2020 WL 957066 (No. 19-16744) (9th Cir. Feb. 14, 2020); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1203 (9th Cir. 2020) (finding district court erred in dismissing disclosure followed by 4.57% stock drop). Unsurprisingly, courts, including those cited by Defendants, find similar stock declines sufficient at this stage. *See, e.g.*, *Maverick*, 2018 WL 6181241, at *9 (loss causation pled for a series of eight disclosures, including disclosure followed by 5.5% drop).[54] Thus, Defendants' claim that Plaintiffs must explain the reasons for the "relatively small declines" falls flat. Mtn. at 26-27. This is particularly true here, given the movement of the S&P 500 and that the declines are tied to specific disclosures.[55] Further, Plaintiffs pled that these were ***partial*** disclosures and their corrective impact was tempered by Defendants' continued scheme and misstatements that continued to conceal the true nature of the fraud. ¶361; *e.g.*, ¶¶363-364 (assuring investors that violations were "North Carolina specific"). Defendants' argument also fails because the Ninth Circuit has explained that disclosures may have smaller stock drops where prior disclosures removed some of the inflation. *Lloyd*, 811 F.3d at 1210. Thus, while Carvana's stock dropped 5.5% on October 7, 2022 in response to the news that Michigan suspended Carvana's license, it had already dropped by ***more than 26%*** on three other partial disclosures concerning title violations. ¶¶363, 365, 372, 374.[56]

---

[54] *See also Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) (loss causation pled where disclosure "had a ***minimal*** effect on . . . stock price"); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *19 (D. Ariz. Aug. 1, 2017) (4.72% sufficient); *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *3 (E.D.N.Y. June 6, 2022) ("3.3% [drop] ***one day after***" disclosure sufficient); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *14 (S.D.N.Y. Apr. 1, 2015) (3.2% sufficient). Defendants' authority (GMtn. at 13-14 (citing *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *11, *19 (D. Ariz. Feb. 7, 2023)), found causation pled where plaintiffs did not allege a price decline after a disclosure.

[55] For example, while Carvana's stock dropped on the August 10 and October 22, 2021 disclosures, ***the S&P 500 increased***. Carvana referred its investors to the S&P 500 for purposes of comparing its stock price performance to its peers and market. ¶363. And the stock declined 5.5% on a ***high trading volume*** in response to the October 7, 2022 disclosure. ¶374.

[56] Defendants' citation to two inapt cases that predate *Impax* and *BofI* is unpersuasive. In *Camp v.*

- 49 -

4895-7085-5006.v1

***Second***, Defendants wrongly claim the market must react "immediately" to a disclosure. Mtn. at 26 n.20. But the Supreme Court has specifically declined to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.28 (1988). The Ninth Circuit is in accord. *See Am. W.*, 320 F.3d at 934 ("As recognized by the Supreme Court, [market] distortions ***may not be corrected immediately. . . . [A]doption of a bright-line rule assuming that the stock price will instantly react would fail to address the realities of the market***."). Thus, courts repeatedly reject Defendants' position. *See, e.g.*, *WageWorks*, 2020 WL 2896547, at \*8 (two day decline supported loss causation); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1227 (N.D. Cal. 2015) (same).[57]

***Third***, Defendants claim Plaintiffs must "account for most of Carvana's stock price decreases" during the Class Period. Mtn. at 26-27. But "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *Mattel*, 2021 WL 1259405, at \*12; *see also Karinski*, 2020 WL 281716, at \*18 (same); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (noting "alternative causes for the losses" are "for resolution in the later stages," and finding defendant's claim "baseless . . . [c]ontrary to [his] apparent misconception, a stock price can decline during the

*Qualcomm Inc.*, 2020 WL 1157192, at \*6-\*7 (S.D. Cal. Mar. 10, 2020), unlike here, the stock price ***collectively*** fell 9% following alleged disclosures, "there [was] a more plausible explanation" for the declines that were "quite evident," and the plaintiffs neither alleged that the corrective impact of the disclosures were tempered by defendants nor that a comparable index reacted in an inapposite manner. Similarly, in *Eng v. Edison Int'l*, 2017 WL 1857243, at \*4 (S.D. Cal. May 5, 2017), upon which the *Carey* court relied, the stock collectively dropped 9.21% in response to six disclosures, and the plaintiffs did not allege any information regarding the movement of an index or defendants' efforts to temper the corrective impact of the disclosures. To the extent Defendants cite *Bajjuri*, on reply, it is inapt because there, unlike here, the stock price had a "quick and ***sustained*** recovery," causation was based only on the disclosure of an investigation, and there was no subsequent revelation. 2023 WL 3650554, at \*18-\*19.

[57] *See also In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 846 (D. Ariz. 2007) (rejecting similar argument to multi-day window at summary judgment); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015) ("three-day window is common"); *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) (overturning court as it did not credit a two-day window); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (two-day window); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011) (same). Even Defendants' case, *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010), held "markets are sometimes not immediately responsive."

- 50 -

class period").[58]  ***Fourth***, citing their November 2021 misstatement – made ***after*** two of the four title disclosures – Defendants boldly claim ***all*** of the disclosures fail because "the market was well aware that Carvana had challenges with title and registration."  Mtn. at 27.  Not so.  Indeed, Defendants do not dispute that the disclosures each revealed new information (nor could they).  Their sole authority holds this is sufficient.  *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 5973340, at *3 (S.D. Cal. Dec. 1, 2017).[59]  Loss causation is more than adequately pled.

### E.    The CC States a Claim Under §20(A)

Plaintiffs established the elements of a §20A claim: (1) a predicate Exchange Act violation and (2) contemporaneous trading with a corporate insider (3) who possesses material, nonpublic information at the time of the trade(s).  *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007).

As demonstrated *supra* §§V., VI.A.-D., Plaintiffs have sufficiently pled a §10(b) claim.[60] Next, the trading periods here, ranging from same-day to seven-day periods, are contemporaneous. *McKesson*, 411 F. Supp. 3d at 606 (nine-day trading period contemporaneous); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (eight days); *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023) (five days); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14-*15 (N.D. Cal. Aug. 14, 2008) (same); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (same).

---

[58] Defendants' non-binding authority is inapt as they do not suggest this is a unique situation where Plaintiffs' "loss coincides with a marketwide phenomenon causing comparable losses to other investors," such that Plaintiffs must plead "'facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'"  *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (internet bubble bursting caused most internet companies' stocks to drop); *60223 Tr. v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (stock lost most of its value ***before*** any alleged disclosure).

[59] *E.g.*, ¶¶151, 265, 275, 372 (June 2022 exposé revealing Arizona had canceled Carvana's temporary plate program; "[i]nterviews with state officials . . . show the issue is ***wide[]-reaching***"; Carvana had revamped its title department three times and created an "undriveable task-force"); ¶¶187-188, 374 (October 2022 disclosure first revealing Michigan had suspended Carvana's license for "failing to make application for title and registration within" required time, "committing fraudulent acts," including, "destroying" documents, and "violating terms of [an undisclosed] probation agreement 127 times").

[60] Garcia Sr. is wrong that Plaintiffs failed to allege scienter (GMtn. at 13).  *Supra* §VI.C.  And his authority supports Plaintiffs.  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1203 (C.D. Cal. 2008) (finding §20A claim adequately pled as the "[d]efendants ***must have known*** that Countrywide's true operations would eventually be revealed").

- 51 -

4895-7085-5006.v1

Indeed, "[t]he Ninth Circuit has ***not*** endorsed [Defendants'] preferred standard for contemporaneousness (trading 'on the same day . . . or at most the day after')." *McKesson*, 411 F. Supp. 3d at 606 (citing *Brody*, 280 F.3d at 1002).[61]  Lastly, Defendants possessed knowledge that Carvana's unsustainable retail growth was the product of the undisclosed scheme.  *Supra* §§V., VI.C.  Accordingly, "a strong inference arises that such information was used by the insider in trading." *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004).

As explained *supra* §VI.C.1., Defendants' suspect, manipulated 10b5-1 plans do not shield them from liability.  *See also* ¶¶313-318.  Further, Defendants admit 10b5-1 plans are no defense where, as here, "Defendants created or modified their 10b5-1 plans while in possession of material non-public information." Mtn. at 33.  Here, each Defendant modified or entered into a plan when they were aware of and participating in the scheme (¶313), and Garcia Sr. made trades outside of his ***twice*** modified plan.  ¶¶294, 297.  Thus, the insider trading claim should proceed.

### F.    The CC States a Claim Under §20(a)

Plaintiffs have alleged control as to Huston, Keeton, and Garcia Sr. (Mtn. at 34; GMtn. at 11-13).[62]  Control person claims are subject to the more general notice pleading requirements of Rule 8.[63]  Further, "'[w]hether [a defendant] is a controlling person is an intensely factual

---

[61] Thus, Defendants' authority (Mtn. at 33-34; GMtn. at 14) is inapt.  Garcia Sr. also seeks to add even more requirements, claiming Plaintiffs must have purchased their shares after and at a lower price than Garcia Sr.  GMtn. at 11.  But "[w]hen interpreting Section 20A, we must give words their ordinary or plain meaning." *Johnson*, 490 F.3d at 780 (citing *United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006)).  Here, the statute does not set forth ***any*** such requirements.  Further, even by his standard, Plaintiffs' claim remains as Plaintiffs sold stock after and at a higher price than Garcia Sr. in 492 transactions.  And, in *Orbis*, the Court reasoned that the defendant must have traded with an "unfair advantage." 2023 WL 1800963, at *20.  Here, Garcia Sr.'s unfair ***informational*** advantage is sufficient.  *See, e.g.*, *Lamartina*, 2023 WL 2763541, at *19 (§20(A) claim adequately pled over identical objections).

[62] The other Defendants' only basis for contesting the §20(a) claims is Plaintiffs' purported failure to plead primary violations of §10(b).  Mtn. at 34.  Because Plaintiffs have adequately alleged primary violations, the control-person claims should proceed.

[63] *Vanguard Specialized Funds v. VEREIT Inc.*, 2016 WL 5858735, at *17 n.19 (D. Ariz. Oct. 3, 2016) ("Defendants argue the Rule 9(b) pleading standards should apply to . . . controlling person allegations, but they do not."); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *14 (N.D. Cal. Feb. 27, 2018) (citing recent cases); *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 969-70 (D. Ariz. 2010) ("20(a) control person claims are subject to . . . [Rule] 8(a)(2)" as the "case law . . . support[s] this holding" and "adopting a heightened pleading standard for section 20(a) claims would run afoul of the PSLRA").

- 52 -

question.'" *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "'[C]ontrol'" is defined as "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, ***whether through ownership of voting securities***, by contract, or otherwise.'" *Id.* at 1065 n.9. Plaintiffs "need not show" the controlling person's scienter or that he "culpab[ly] particip[ated]" in the alleged wrongdoing." *Id.* at 1065; *see also Am. W.*, 320 F.3d at 945-46 ("'it is not necessary to show actual participation or the exercise of power'").[64] In this Circuit, "'[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control.'" *Montage*, 78 F. Supp. 3d at 1228.

Plaintiffs have established control as to Garcia Sr., Carvana's controlling shareholder who held approximately 84% of the voting power throughout the Class Period. ¶43. As here, "a majority or otherwise controlling shareholder is prima facie a controlling person." *In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *16-*17 (C.D. Cal. June 4, 2001) (37% indirect owner is "control person"); *see also Batwin*, 2008 WL 2676364, at *1; *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 946-47 (S.D. Cal. 2019).[65] Further, Carvana's unique dual-class structure, which provides Garcia Sr. ten votes per share, ensures he maintains supermajority voting control. ¶44. As Professor Taylor put it, this "'allowed [the Garcias] to run this . . . company as if it's a family firm and for the family's benefit'"; Carvana's SEC filings put it more bluntly: "***The Garcia Parties control us***" and can, among other things, "***elect all of the members of our Board and thereby effectively control our policies and operations***." ¶44 & n.13; Decl., Ex. 8 at 40 (some emphasis in original). Other "traditional indicia of control," such as a "prior lending

[64] As such, Garcia Sr.'s claim that Plaintiffs must show he "exercise[d] decision-making power" and "'day-to-day involvement'" (GMtn. at 12) fails. Indeed, his authority holds otherwise. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *13 (N.D. Cal. Jan. 17, 2017).

[65] Thus, Garcia Sr.'s claim that "[b]eing the majority stockholder of Carvana is not enough" to establish control (GMtn. at 11-12) is meritless. None of his authority concerns a shareholder with more than 30% voting ownership. *See Bao v. SolarCity Corp.*, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015) (30%); *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *74 (S.D. Cal. Mar. 30, 2005) (mere "'stock ownership'" for 11 defendants insufficient); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1048-49 (N.D. Cal. 2017) (not controlling shareholder); *Abdo v. Fitzsimmons*, 2018 WL 11220494, at *23 (N.D. Cal. May 22, 2018) (same). Garcia Sr.'s reliance on *Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018), and *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1026-27 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008), is perplexing as the dismissal of the §20(a) claims were solely for failure to state a predicate violation.

- 53 -

relationship" are also present. *Am. W.*, 320 F.3d at 945. Prior to the Class Period, Carvana, as DriveTime's wholly owned subsidiary at the time, relied heavily on Garcia Sr.'s lending (¶39), and that relationship continued during the Class Period as Garcia Sr. made many deals with Carvana "not negotiated at arm's length." ¶¶44-45.

Faced with these overwhelming facts, Garcia Sr. relies on his lack of an official day-to-day position. GMtn. at 11-12. But Garcia Sr. knows he was banned from holding such a position because of his felony rap sheet. ¶¶5, 43-46. And while he could not *appear* to have a daily role, he did in fact control Carvana's operations. *Id.* Indeed, Carvana documents produced in a derivative action confirm he worked "'behind the scenes'" to run the Company. ¶8. To be sure, "20(a) was intended to impose liability on controlling persons, *such as controlling shareholders*" like Garcia Sr. *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990).

Plaintiffs also established control as to Huston and Keeton. Huston, as Carvana's co-founder and COO, was directly responsible for day-to-day operations concerning the very subject of Defendants' misrepresentations and scheme, including inventory management and wholesale, inspection and reconditioning, logistics, customer service, and market expansion. ¶¶25, 27-28; *see Montage*, 78 F. Supp. 3d at 1228. And Keeton, Carvana's co-founder and Chief Brand Officer, made statements on Carvana's behalf (¶¶24, 216). *See, e.g.*, *In re Apple, Inc. Sec. Litig.*, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020) ("plaintiff adequately alleges that [executive] acted as a control person because he spoke on the Company's behalf"); *Petrie v. Elec. Game Card, Inc.*, 2015 WL 475958, at *7 (C.D. Cal. Feb. 5, 2015) (same).

## VII.   THE SECURITIES ACT CLAIMS ARE ADEQUATELY ALLEGED

### A.    Plaintiffs Adequately State a Claim Under §11 and §12(a)(2)

Where, as here, Securities Act allegations "do not sound in fraud," they "are subject to Rule 8, not Rule 9(b)" (*Flynn*, 2016 WL 3360676, at *17), and require only "'a short and plain statement'" of a claim for relief. *Uber*, 2020 WL 4569846, at *3-*4 (applying Rule 8 to Securities Act claims). Plaintiffs allege claims under §§11, 12(a)(2), and 15 of the Securities Act, which require that companies "make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare*, 575 U.S. at 178. "To prevail on a Section 11 claim, a plaintiff must

- 54 -

demonstrate that (1) 'the registration statement contained an omission or misrepresentation,' and (2) 'the omission or misrepresentation was material . . . .'" *Lowthorp*, 2021 WL 3089118, at *6 (quoting *Daou*, 411 F.3d at 1027).  Where these requirements are met, "'defendants will be liable for innocent or negligent material misstatements or omissions.'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859-60 (9th Cir. 2013).  Section 12(a)(2) "creates . . . liability for any person who offers or sells a security" through a materially misleading "prospectus or an oral communication" and "applies the same standard" as Section 11.  *Uber*, 2020 WL 4569846, at *4.  "Section 15 creates liability for anyone who 'controls' a defendant who is themselves liable under Section 11 or 12(a)(2)," which includes the underwriters and signatories of the RS.  *Id.*

### 1.    Plaintiffs Pled Material Misstatements or Omissions

The CC alleges the RS made four categories of materially false and misleading statements:

- ***Retail unit sales*** – which the RS called "an indicator of our ability to successfully scale our logistics" (¶434), while touting growth drivers (¶¶433, 435), but negligently failing to disclose that drivers of retail unit growth increased logistics costs and complexity, resulting in low-profit sales and an inability to scale (¶438);

- ***Benefits of buying cars from customers*** (¶435) – falsely claiming Carvana "assess[ed]" vehicles "on the basis of quality" (¶432) despite a mass inventory of poor-quality vehicles plaguing Carvana at a huge logistical expense (¶439);

- ***Nationwide-market expansion*** – which the RS mischaracterized as "capital-light" (¶431), "cost efficient[]"(¶429) "end-to-end" (¶428), and having a "significantly lower variable cost structure at scale versus traditional dealerships" (¶¶427, 430), despite the reality that Carvana's expansion was inefficient, unprofitable, un-scalable, and costly over large geographies (¶440); and

- ***Titling issues*** – which the RS framed as merely hypothetical (¶¶436-437), despite widespread titling problems at the time of the Offering (¶441).

As the Securities Act Defendants point out, the Securities Act statements are "substantively the same" as the Exchange Act statements, as they draw from the same false and misleading 2021 Form 10-K.  Mtn. at 35.  Absent authority, the Securities Act Defendants perfunctorily reassert the same baseless arguments as Defendants made in response to the Exchange Act statements.  *Id.* at 35-36; UW Mtn. at 4-5.  Because those arguments are meritless (*supra* §VI.A.), they also fail here.

### 2.    Plaintiffs Pled Actionable Omissions Under Item 105

Item 105 of Regulation S-K creates a duty to disclose "material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. §229.105(a).  Plaintiffs

- 55 -

4895-7085-5006.v1

allege the Securities Act Defendants failed to disclose risks associated with Carvana's mounting titling issues and practice of issuing temporary out-of-state licenses in lieu of title (¶442), including regulatory action and brand damage (¶445). This is "sufficient at this stage." *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769 n.4 (N.D. Cal. 2020) (Item 105 pled where defendants "'saw an increase in the number of sexual assaults'" and faced "'severe risk of brand damage'"). The risk disclosure identified by the Securities Act Defendants – that regulators could assess violations of state laws (Mtn. at 37) – says nothing of the specific risks associated with Carvana's mounting titling issues and practice of issuing temporary licenses that **had already occurred** at the time of the Offering. As the CC explains, it was "[a]s a result of these practices" that an investment in Carvana was speculative and risky, "not merely as a result of being 'subject to' state and local licensing requirements." ¶445. That risk did come to pass, to the detriment of investors. ¶425. The more relevant risk disclosure which the Securities Act Defendants cite without discussing trivializes the issue of titling and registration, relegating it to an "ancillary part[]" of the transaction, and is framed – like the risk disclosures – in hypothetical terms. ¶436 ("**If** we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs . . . .").[66] As explained in detail *supra* §VI.A.2., these fail "to render what was **not** disclosed, not misleading." *Uber*, 2020 WL 4569846, at \*6 (emphasis in original). Thus, Plaintiffs have pled an actionable omission under Item 105.

### 3. The Securities Act Claims Do Not "Sound In Fraud"

Plaintiffs have adequately pled false and misleading statements even under Rule 9(b)'s heightened pleading standard. *See supra* §VI.A. Still, the Securities Act claims do not sound in fraud, and are governed by Rule 8, because Plaintiffs have "expressly plead only negligence" and "carefully crafted the complaint so that their negligence-based claims are wholly separate from their allegations of fraud." *Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 275405, at \*7 (D. Ariz. Feb. 4, 2009) (applying Rule 8 "[a]lthough plaintiffs rely on the same alleged consignment sales

---

[66] This is in stark contrast to *Berg v. Velocity Fin., Inc.*, 2021 WL 268250 (C.D. Cal. Jan. 25, 2021), cited by the Securities Act Defendants (Mtn. at 37), where there was "nothing hypothetical about" the risk disclosure at issue. 2021 WL 268250, at \*8.

4895-7085-5006.v1

and 'tooling deposits' in both their 1933 Act and 1934 Act claims"); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010) (sounds in fraud where claims allege "'a unified course of *fraudulent conduct*'").

Here, the conduct pled with the Securities Act claims – that the RS was "negligently prepared" (¶426) and "negligently fail[ed] to disclose" material information about Carvana's business (¶422; *see also* ¶¶427, 454-455, 459-460, 466, 468, 470) – is neither fraudulent nor unified with the Exchange Act claims, which allege fraud and a pump-and-dump scheme. *See Flynn*, 2016 WL 3360676, at *17 ("Plaintiffs have 'stripped' their Securities Act allegations of fraud . . . ."). While "'a disclaimer alone is insufficient . . . here [Plaintiffs have] made an effort to plead a non-fraudulent basis for Section 11 liability.'" *Uber*, 2020 WL 4569846, at *4. A contrary rule "discourage[s] plaintiffs from bringing Section 10(b) and Section 11 claims in the same lawsuit," encouraging the "inefficiency of multiple lawsuits." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 406 n.143 (S.D.N.Y. 2013).[67]

### 4. Defendants Have Not Proven Negative Causation

Loss causation is not an element of a Securities Act claim as Plaintiffs "need only show a material misstatement or omission to establish [a] *prima facie* case." *Hildes*, 734 F.3d at 859 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).[68] Because negative causation is an affirmative defense, a defendant "bears a 'heavy burden' . . . of 'prov[ing], as a matter of law, that the depreciation of value of [the security] resulted from factors other than the alleged false and misleading statements.'" *Hildes*, 734 F.3d at 860-61.

Here, the Securities Act Defendants cannot meet that heavy burden as they cite no alternative factors and only contend the disclosures do not "'reveal anything'" about the misrepresentations. Mtn. at 38. But Plaintiffs allege that, following the Offering, Carvana

---

[67] The Securities Act Defendants decry the "similarity" between the 1934 and 1933 Act claims (Mtn. at 34; UW Mtn. at 3), but as their cases acknowledge, "it is the conduct pled that matters." *Bare Escentuals*, 745 F. Supp. 2d at 1068; *see also In re Eargo, Inc. Sec. Litig.*, 2023 WL 1997918, at *6 (N.D. Cal. Feb. 14, 2023) (claims sounded in fraud "based on Eargo's alleged fraudulent act of submitting false or improper insurance claims").

[68] Indeed, the Securities Act establishes a presumption that investors suffered a loss and can allege damages. *See* 15 U.S.C. §§77k(e), 77l(b).

- 57 -

disclosed increased costs from rapid growth and logistical constraints (¶423); that the allegedly concealed risks of its titling issues came to pass, Carvana's Illinois license was suspended (¶425); and that Plaintiffs and the Class "sustained damages" as Carvana's "stock . . . declined due to the Securities Act Defendants' violations" (¶463). This suffices, as "'a disclosure reveal[ed] adverse information . . . that the misrepresentation had concealed, and this cause[d] a drop in stock price.'" *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1123 (E.D. Cal. 2017). Overcoming the defense "requires merely that 'the misrepresentation ***touches upon the reasons*** for an investment's decline in value.'" *Hildes*, 734 F.3d at 861 (emphasis in original).[69] Because the alleged misstatements "played a role in the causal chain," the Securities Act Defendants' "heavy burden" has not been met. *Hildes*, 734 F.3d at 862.

### 5.    The §12(a)(2) Defendants Are Statutory Sellers

Because Rule 8 governs the §12(a)(2) claims, all that is required is "'a short and plain statement'" showing that "'defendants are statutory sellers and that plaintiffs purchased securities from them.'" *Flynn*, 2016 WL 3360676, at *18. A person is a "seller" under §12(a)(2) where they "either: (1) pass[] title to the securities to the plaintiff; or (2) 'engage[] in solicitation,' *i.e.*, 'solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257-58 (9th Cir. 2022) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643, 648 (1988)).[70] Plaintiffs need only "allege[] more than mere participation" in the Offering. *Primo*, 940 F. Supp. 2d at 1126.

Plaintiffs allege the Securities Act Defendants "promoted and sold, for the benefit of

[69] Because the Securities Act claims do not allege a "'systemic' course of illegal conduct" – only negligence (*see* §VII.A.3. *supra*) – Plaintiffs need not show that disclosures revealed a systemic course of illegal conduct, as the Securities Act Defendants wrongly contend. Mtn. at 38. The Securities Act Defendants' authority (Mtn. at 38) is inapt. *In re Shoretel Inc., Sec. Litig.*, 2009 WL 248326, at *5-*6 (N.D. Cal. Feb. 2, 2009) (plaintiffs alleged "vocational schools engaged in certain fraudulent acts to obtain federal funding, a major source of the schools' revenue" but the disclosure "merely disclosed that Shor[e]tel's results . . . fell short of expectations . . . although sales to existing customers had increased"); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *12 (C.D. Cal. Feb. 6, 2014) (unlike here, "none of the alleged disclosures . . . reveal[ed] ***any*** of the facts relied upon by Plaintiffs") (emphasis in original).

[70] Cases requiring "direct" solicitation either pre-date *Pino* or are out-of-circuit (Mtn. at 38; UW Mtn. at 5-6), and thus rely on the misreading of *Pinter* that *Pino* rejected. *Pino*, 55 F.4th at 1259 ("*Pinter* contains no indication that Congress was concerned with regulating only a certain type of solicitations, let alone specifically targeted 'active and direct solicitations'" as defendants urge).

- 58 -

themselves and their associates, Carvana common stock to the Plaintiffs and other members of the Class" and that without these efforts "to publicize the 2022 Public Offering and solicit Carvana common stock purchasers, the 2022 Public Offering could not have occurred." ¶468. This, in addition to signing the RS, is all that is required. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020) (plaintiff "alleged enough facts to support an active solicitation theory" where they allege defendants "signed the Offering Materials, that certain defendants solicited sales" and defendants "were financially motivated to solicit sales").

The CC further alleges that the Underwriter Defendants "assisted Carvana in planning the 2022 Public Offering" (¶451), reached agreements as to the strategy for the Public Offering, including its terms and the price at which the stock would be sold (¶453), "marketed Carvana common stock to potential investors" (¶417), and that "[b]ut for their participation in the 2022 Public Offering, ***including their solicitation***, the 2022 Public Offering could not, and would not, have been accomplished" (¶469). These allegations suffice to support that J.P. Morgan and Citigroup were statutory sellers. *See In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *4 (N.D. Cal. Apr. 30, 2015); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009); *Primo*, 940 F. Supp. 2d at 1126. In any event, solicitation "is 'a factual question which should generally be left to the jury.'" *Slack*, 445 F. Supp. 3d at 384.

### B.    Plaintiffs Adequately State a Claim Under §15

Because the CC adequately alleges control (*supra* §VI.F.), and the §§11 and 12(a)(2) claims, the CC's §15 claims survive. *See Lowthorp*, 2021 WL 3089118, at *13.

## VIII.   CONCLUSION

For the foregoing reasons, the Motions should be denied. If the Court finds otherwise, Plaintiffs respectfully request leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality'").

DATED: June 7, 2023                              Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP

s/ Daniel S. Drosman
DANIEL S. DROSMAN

- 59 -

4895-7085-5006.v1

DANIEL S. DROSMAN (Admitted *pro hac vice*)
RACHEL A. COCALIS (Admitted *pro hac vice*)
SARAH A. FALLON (Admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN (Admitted *pro hac vice*)
DAVID A. ROSENFELD (Admitted *pro hac vice*)
BRENT E. MITCHELL (Admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com
bmitchell@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
DINAH S. LEVENTHAL
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
dleventhal@odonoghuelaw.com

Additional Counsel for Lead Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT PC
ANDREW FRIEDMAN
7301 N. 16th Street, Suite 102
Phoenix, AZ  85020
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com

Local Counsel

- 60 -

4895-7085-5006.v1