FENNEMORE CRAIG, P.C.
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: +1.602.916.5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

LATHAM & WATKINS LLP
Jeff G. Hammel (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200
Email: jeff.hammel@lw.com

LATHAM & WATKINS LLP
Andrew B. Clubok (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200
Email: andrew.clubok@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

*Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Ryan Keeton, Benjamin Huston, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | CASE NO. 2:22-cv-02126-PHX-MTL |
| | **DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

Defendants Carvana Co. ("Carvana"), Ernest Garcia III, Mark Jenkins, Ryan Keeton, Benjamin Huston, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan ("Defendants"), respectfully notify the Court of a recent decision in *City of Warwick v. Ret. Sys. v. Carvana Co., et al.*, Case No. CV2022-013054 (Sup. Ct. Ariz., Maricopa Cnty. Oct. 26, 2023), attached hereto as Exhibit A, in support of Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Complaint (ECF 50). The *Warwick* decision dismisses with prejudice claims brought under Sections 11, 12, and 15 of the Securities Act arising out of Carvana's April 2022 secondary public offering and is relevant to the similar claims at issue here. Exhibit A at 9–10, 15–26.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

1

Dated:  October 31, 2023

Respectfully submitted,

FENNEMORE CRAIG, P.C.

By: */s/Andrea L. Marconi*
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: +1.602.916.5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

LATHAM & WATKINS LLP
Jeff G. Hammel (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200
Email: jeff.hammel@lw.com

LATHAM & WATKINS LLP
Andrew B. Clubok (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200
Email: andrew.clubok@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

*Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Ryan Keeton, Benjamin Huston, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

2

# Exhibit A

Clerk of the Superior Court
*** Electronically Filed ***
10/27/2023 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

|  |  |
|---|---|
| HONORABLE CHRISTOPHER COURY | CLERK OF THE COURT<br>S. Ortega<br>Deputy |

|  |  |
|---|---|
| CITY OF WARWICK RETIREMENT SYSTEM | GARY A GOTTO |
| v. |  |
| CARVANA CO, et al. | ANDREA L MARCONI |

GARY F BENDINGER
ALFRED L FATALE III
SUSAN E ENGEL
MATTHEW J PETERS
DAVID P FRIEDMAN
KARIM BASARIA
ALLISON L WHITEHILL
JUDGE COURY

**UNDER ADVISEMENT RULING -
MOTIONS TO DISMISS AMENDED COMPLAINT GRANTED**

Defendants Carvana Co. ("Carvana" or the "Company"), Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Ira Platt, Neha Parikh, and Greg Sullivan[1] (collectively the "Carvana Defendants") have moved to dismiss the Amended Class Action Complaint ("Amended Complaint")[2] pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defendant Grant Thornton LLP ("Grant Thornton") has also moved to dismiss the Amended Complaint. Defendants Citigroup Global Markets Inc. ("Citigroup") and J.P. Morgan Securities

---

[1] Messrs. Garcia, Jenkins, Palmer, Maroone, Platt, and Sullivan and Ms. Parikh are referred to as the "Individual Defendants."

[2] Citations to ("¶__") are to paragraphs in the Amended Complaint.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          10/26/2023

LLC ("J.P. Morgan") (collectively the "Underwriter Defendants") have joined in the Carvana Defendants' and Grant Thornton's Motions.

The Court has considered the Carvana Defendants' and Grant Thornton's Motions, the Underwriter Defendants' Joinder, plaintiff's Omnibus Response, the Replies and the Underwriter Defendants' Joinder in the Replies. The Court held oral argument on October 24, 2023, at which time the matter was taken under advisement. The Court now enters its ruling granting the Motions to Dismiss the Amended Complaint.

## I. BACKGROUND

Carvana is a publicly traded company. It sells used cars though an online platform across the United States. Carvana purchases cars from individuals and at wholesale auctions. It then sells the vehicles to retail customers through its website.

Carvana's used car sales increased dramatically during the COVID-19 pandemic beginning in 2020. However, the restrictions imposed during the pandemic put a strain on Carvana's operations, including its ability to timely deliver registration and certificates of title to buyers.

On April 22, 2022, Carvana conducted a secondary public offering ("SPO") of 15,625,000 shares of Class A common stock. Plaintiff purchased common stock in the SPO.

In connection with the SPO, Carvana filed a Registration Statement ("Registration Statement") and Prospectus ("Prospectus") (collectively the "Offering Documents"). The Offering Documents incorporated Carvana's 2021 Form 10-K, which contained year-end financial statements for 2020 and 2021.

Plaintiff filed this lawsuit on September 30, 2022, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). The Complaint named as defendants Carvana, five members of Carvana's Board of Directors, Carvana's Chief Financial Officer and Carvana's Vice President of Accounting and Finance. Carvana's auditor, Grant Thornton, is named as a defendant, as are the Underwriter Defendants who purchased shares that they then sold to investors.

## A. <u>The March 2023 Ruling</u>

In the notes of Carvana's financial statements reported in the 2021 Form 10-K, Carvana disclosed that it recognized revenue from the sale of used vehicles "*upon delivery* when the risks and rewards of ownership and control pass to the customer." (Carvana Ex. 9, 2021 Form 10-K at

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

84)[3] (emphasis added). The crux of plaintiff's initial Complaint was that Carvana prematurely recognized revenue from the sale of vehicles. According to plaintiff, Carvana's financial statements were misleading because revenue could only be properly recognized for the of sale a used vehicle when the government issued an updated certificate of title to the buyer. Defendants moved to dismiss arguing that Carvana appropriately recognized revenue when the customer received the vehicle.

In a March 13, 2023 Minute Entry (the "Ruling"), the Court granted defendants' Motions to Dismiss. The Court reasoned that because the recognition of revenue and profits involved an accounting judgment under the applicable Generally Accepted Accounting Principles ("GAAP"), Carvana's statements about its revenue and profits for the sale of used vehicles were opinions subject to the pleading requirements of *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund,* 575 U.S. 175, 178 (2015). (Ruling at 18).

The Court concluded that Complaint failed to meet the pleading standards of *Omnicare.* The Complaint did not allege that the Carvana Defendants did not honestly believe that revenue was properly recognized on the delivery of the vehicle to the customer. (Ruling at 18). The Complaint also did not allege an "embedded" fact that was misleading or untrue. (*Id.*). Finally, the Court found that the Complaint failed to allege any omitted material facts because Carvana's 2021 Form 10-K clearly disclosed that it recognized revenue "upon delivery." (*Id.*).

With regard to Carvana's accounting under GAAP, the Court observed that while transfer of "legal title" is among the factors indicating a transfer of control under ASC 606,[4] "ownership is not dependent on the existence of a certificate of title." (*Id.* at 10). "Issuance of a certificate of title, while evidence of ownership, does not determine ownership." (*Id.*). The Court further noted that "[n]owhere in ASC 606 does it state that the issuance of a state sponsored certificate of title to the buyer is required for control to be transferred," and that plaintiff had "cite[d] no authority for the proposition that the issuance of a certificate of title is even necessary for title to a vehicle to be transferred." (*Id.* at 15).

In its initial Complaint, plaintiff alleged that the state agencies in six states had announced regulatory investigations into customer complaints about delays in receiving title to used vehicles. (Complaint at ¶¶ 42-47, 65). A class action was filed alleging problems with delays in receiving

---

[3] Unless otherwise noted, all exhibit citations refer to Carvana Defendants' exhibits filed with their latest Motion to Dismiss.

[4] "ASC" refers to the Accounting Standards Codification. ASC 606 provides the GAAP standard for recognizing revenue from contracts with customers.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

updated title and registration. (Plaintiff's Ex. 3).[5] The Court noted, however, that plaintiff had not alleged that the customer complaints about delays in receiving certificates of title and registrations had anything to do with Carvana's revenue recognition. (Ruling at 19). As the Court noted, "transfer of title" and "the issuance of a certificate of title" are "two different things." (*Id*. at 8 n.4).

With respect to Grant Thornton, the Court determined that the audit opinion was a statement of opinion under *Omnicare,* 575 U.S. 175. (*Id.* at 21). The Court concluded that the Complaint failed to state a Section 11 claim because it did not allege facts supporting subjective-falsity or omission. (*Id*. at 22–23). In addition, the Court noted that plaintiff had disclaimed any allegation of fraud. (*Id.* at 22).

Finally, the Court also dismissed the claims against the Underwriter Defendants, finding that the allegations did not meet the pleading requirements of Omnicare. (*Id.* at 23).

The Court granted the Motions and dismissed the Complaint with leave to amend. Plaintiff filed its Amended Complaint on April 28, 2023.

### B. <u>Summary of Amended Complaint Allegations</u>

The Amended Complaint alleges that the Offering Documents "misleadingly touted that Carvana operates 'seamlessly and cost efficiently,' 'optimize[s]' its nationally pooled inventory of used vehicles, and operates its own logistics network to deliver cars directly to customers." (¶ 5). The Offering Documents also "misleadingly touted Carvana's purported 'strengths & competitive advantages,' including the Company's 'efficient logistics network and attractive fulfillment experience' and 'scaled used vehicle infrastructure.'" (*Id.*). Carvana boasted about its logistical network and infrastructure. (¶ 7).

According to plaintiff, the Offering Documents omitted material adverse facts, trends and risks that should have been disclosed to investors at the time of the SPO. For example, Carvana did not disclose that it had a poor system for tracking certificates of title and that as many as 40% of its customers experienced delays in receiving title to the vehicle. (¶ 6). Carvana allegedly did not disclose the title and registration delays experienced by its customers and that it was issuing large numbers of temporary operating plates ("TOPs") to customers. (¶¶ 10, 13). Carvana also did not disclose that as its inventory was reaching capacity in late 2021 and early 2022, it temporarily changed its policy to allow for the listing and sale of vehicles before obtaining a paper certificate of title in its name. (¶ 8).

---

[5] "Plaintiff's Exhibit 3" refers to plaintiff's exhibits filed with its Omnibus Response to the Motions to Dismiss the initial Complaint. Exhibit 3 is a copy of the complaint filed in a putative class action lawsuit filed in Pennsylvania federal court.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                         10/26/2023

1. *Former Employee Allegations*

The Amended Complaint sets forth allegations made by eight former employees ("FE").

Former Employee 1

FE-1 recalled that Carvana started buying more cars during the COVID-19 pandemic. Later in 2021, Carvana stopped buying vehicles through auctions and only purchased vehicles from retail customers. By April 2022, the storage lots were full. FE-1 claimed that the high inventory was due to: (1) delays in DMVs processing title and registration paperwork during the pandemic; (2) several states suspending the Company's dealer licenses; (3) the Company not having certificates of title on hand.

Due to the long delays in transferring title to the buyers, in 2021, Carvana hired personnel to fill out "thousands" of TOPs. FE-1 claims that Carvana would sometimes issue TOPs from a different state than the buyer's residence.

FE-1 claimed that in either late 2021 or early 2022, but no later than February 2022, Carvana starting listing cars for sale without having the certificate of title in hand. This was a change in the Company's prior policy of not listing a car a car for sale until it had the certificate of title.

Former Employee 2

According to FE-2, Carvana's system for tracking titles was "poor." He recalled one car that sat in inventory for over 400 days without title and some instances where cars could not be sold because title could not be obtained. FE-2 claimed that the policy of requiring a certificate of title before listing a car changed around January or February 2022. Under the new policy, it was no longer necessary to have the title in hand before listing and selling the vehicle. In May or June 2022, Carvana changed the policy back to requiring titles in hand before listing and selling cars.

Former Employee 3

FE-3 recalled that in early 2022, Carvana no longer required that it have titles in hand before listing and delivering cars to customers. He claimed that there were instances where customers went six to twelve months without a title. In cases where there was little hope of obtaining proper registration, the Company would buy the customers out or provide a new vehicle.

Former Employee 4

Docket Code 926                    Form V000A                         Page 5

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              10/26/2023


FE-4 was employed by Carvana until April 2021. At some point, FE-4 discovered that Carvana was issuing tags from his Tennessee location for cars that were not sold at his location. When doing some research online, FE-4 came across many customers who were angry and confused because they received temporary tags from one state and extension tags from another state. He thought the practice was inappropriate and left the Company.

Former Employee 5

FE-5 worked at Carvana until July 2021. He recalled that the title department more than doubled during his tenure and that problems arose because of the rapid growth of inventory. Carvana had a policy of not saying no to buying a car, even if the car was "junk," did not run or had high miles.

During FE-5's tenure, the Company did not list cars for sale without possession of title. This policy motivated the title department to work quickly to get the title transferred. He recalled instances where cars waited for over 300 days without a clear means of obtaining title.

Former Employee 6

During FE-6's tenure, Carvana had a strict "title in hand" policy. He stated that the Company could not accept a car unless the seller provided title and that Carvana never sold a car without the title. He said that there were "buckets and buckets" of packets with missing titles. He said he saw "dozens of filing cabinets dedicated to cars sold that were waiting to have their titles resolved." FE-6 also claimed that he received complaints from wholesalers about the delays in getting title from Carvana.

Former Employee 7

FE-7 claimed that Carvana's registration department grew massively during his tenure because of increasing delays in getting titles and tags to customers. Carvana had to get temporary tags from states where its dealer license had not been suspended.

According to FE-7, the inability to provide titles prevented buyers from properly registering their cars. FE-7 estimated that "around 40% of Carvana's customer experienced delays in getting their titles, including some who waited 4-7 months." (¶ 142). FE-7 recalled one friend who waited seven months to get his title from Carvana and another friend who canceled an order after waiting months for the title. According to FE-7, Carvana purchased "tens of thousands" of TOPs and had teams of employees to process the paperwork.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                      10/26/2023

Former Employee 8

FE-8 worked for Carvana beginning in the second quarter 2022. According to FE-8, in June 2022, it was required that Carvana have title to any car listed for sale on its website. FE-8 claimed that some customers were unable to drive cars because of lack of title and others received citations because they lacked the proper plates. He knew of one customer who was arrested because police believed the car was stolen. In another case, title could not be obtained because the car was stolen.

2. *Six Alleged Material Omissions*

The Amended Complaint repeatedly alleges that the Offering Documents were materially misleading because Carvana omitted the following six material facts about Carvana's inventory, title, delivery and revenue recognition practice:

a.      From January or February 2020 through August 2022, Carvana focused on buying more cars from individual sellers instead of through auctions because there was a higher profit margin buying from individuals; by October or November 2021, Carvana stopped buying cars through auction but continued buying from individuals, but a negative impact of this change was that wholesalers who sold through auctions had titles in hand, whereas individuals often did not have title in hand.

b.      In late 2020, Carvana reached the 500,000 cars purchased milestone, and approximately six months later, in mid-2021, Carvana reached the 1,000,000 cars purchased milestone. The Company had an official policy that it would never say no to buying a used car – regardless of whether the car was junk, did not run, or had 300,000 miles on it – because each such acquisition created another customer.

c.      By late 2021, Carvana's IRCs[6] and storage lots around the country reached full capacity because (1) Carvana faced delays selling cars starting in 2020 due to delays at DMVs processing title and registration due to the pandemic, (2) Carvana's dealer license had been suspended in various states, and 3) Carvana was buying cars faster than they could sell them due to the Company not having titles to list and sell cars.

d.      From as early as late 2021, but no later than February 2022, through May or June 2022, Carvana changed its policy and practice and listed, sold and delivered cars without first having title, which is the opposite of Carvana's previous policy and practice that cars could only be listed, sold and delivered with title.

_____

[6] "IRC" refers to Carvana's Inspection and Reconditioning Centers, which were located across the country.

Docket Code 926                         Form V000A                              Page 7

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

        e.     In 2021, Carvana hired a team of people in its Registration Department whose focus was to continuously fill out thousands of TOPs because of the severe delays Carvana had by that time in getting titles from sellers and/or having paperwork processed by local DMVs in respective states: The TOPs were often from different states than the state the buyer resided in, and some TOPs were issued from Carvana brick-and-mortar locations that had not sold those cars.

        f.     Carvana's system for tracking titles was poor and did not correctly track whether titles were in-house or not, (sic) there were instances where cars would be sold and then be in the customer's possession from six to over twelve months without title, and around 40% of Carvana's customers experienced delays in getting their titles.

(¶¶ 167, 171, 177, 183).

3. *Events After the SPO*

The Amended Complaint alleges that after the SPO, the extent of Carvana's title and registration problems came to light in press reports that exposed the lengthy registration delays faced by Carvana customers and regulatory actions taken in several states against the Company. Media reports in April 2022 revealed that "numerous" complaints had been made in Oklahoma and Maryland about title and registration problems. (¶ 212). In May and July 2022, the state of Illinois barred Carvana from selling cars in the state, after hundreds of customers complained that it took months to receive title and registration documents. (¶ 213). In June 2022, the Arizona Department of Transportation confirmed that it had received more than 80 complaints about Carvana over delays in title and registration documents. (¶ 214). In August 2022, Florida filed multiple complaints against Carvana. (¶ 233).[7]

The Amended Complaint also discusses in detail a June 24, 2022 Barron's article, which detailed some of Carvana's problems. The Barron's article stated that during the pandemic Carvana was "selling cars faster than it could get them registered to their new customers." (¶ 215). The article also discussed that many of the issues were due to "internal paperwork problems" and that there were instances where Carvana sold cars before it had title to the vehicles, which the article claimed was illegal in many states where Carvana did business. (¶ 216). The article disclosed that some customers were filed a class action lawsuit, with about two dozen potential plaintiffs, in Pennsylvania federal court over the paperwork delays. (¶ 218). It also mentioned a

---

[7] Plaintiff never explains how these regulatory actions that occurred AFTER the April 2022 SPO were omitted from the Offering Documents. There is no allegation that Defendants knew about these actions or the customer complaints before the SPO. In any event, this quantum customer complaints are *de minimis* for a company the size of Carvana.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                        10/26/2023

Nevada customer who had been pulled over for driving on expired temporary plates. (¶ 220). The article discussed how Carvana had been sanctioned in several states for its practice of issuing temporary plates from multiple states to customers. (¶¶ 221-22). The article claimed that after the SPO Carvana established an undrivable-car task force to address the title delays. (¶ 223).

Plaintiff acknowledges that it does not know the number of customers who experienced title delays. (¶ 234-36). It claims that hundreds of customers experienced significant delays in each state. (*Id*.).

4.  *Allegations Against Grant Thornton*

The Amended Complaint alleges that Grant Thornton's audit opinion misleadingly stated that Carvana's financial statements conformed with GAAP. (¶ 203). The audit opinion was allegedly materially false and misleading because it failed to disclose that as early as late 2021, "Carvana changed its policy and practice and listed, sold, and delivered cars without title, which is the opposite of Carvana's previous policy and practice that cars could only be listed, sold, and delivered with title." (¶ 204). Grant Thornton's opinion also allegedly failed to disclose "any change to Carvana's judgment regarding the importance of transfer of title" in making a judgment about the timing of revenue recognition under GAAP, specifically ACS 606. (*Id*.). The Amended Complaint alleged that ASC 606 required disclosure of the change that Carvana, for a time, did not require a certificate of title before listing for sale. (*Id*.).

## II.  LEGAL PRINCIPLES

The Amended Complaint alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act. Count 1 which alleges a for violation of Section 11, is brought against all defendants. Count 2 which alleges a violation of Section 12(a)(2), is asserted against only Citigroup. Count 3 which alleges a violation of Section 15, is against the Individual Defendants.

A claim under Section 11 of the Securities Act, requires proof that the offering registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). To establish a claim under Section 12(a)(2), a plaintiff must prove that the defendant sold or offered a security by means of a prospectus that included an untrue statement of material fact or omitted a material fact necessary to make such statement not misleading. 15 U.S.C. § 77l(a)(2). Section 15 extends liability for primary violations of the Securities Act to "control persons." 15 U.S.C. § 77o(a). The Amended Complaint does not allege that any statement in the Offering Documents was untrue, only that statements were misleading because material facts were omitted.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054　　　　　　　　　　　　　　　　　10/26/2023

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Rather, an omission is only actionable under Sections 11 and 12(a)(2) if the corporation had a duty to disclose the omitted facts. 15 U.S.C. § 77k(a); *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008)*, aff'd*, 347 F. App'x 665 (2d Cir. 2009).

Regulation C requires a registration statement to include "such further material information, if any as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading. 17 C.F.R. § 230.408(a). Item 303 of Regulation S-K requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Item 105 (formerly 503) requires that a registration statement "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). The "Risk Factors" section of SEC filings are insufficient if the disclosures only discuss the possibility of future problems but fail to warn investors of the existing issues facing the company. *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019).

The duty to disclose only applies to omissions of material facts, meaning that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Industries, Inc. v. Northway*, 426 U.S. 438, 499 (1976). Although materiality is in part a question of fact, *see TSC*, 426 U.C. at 450, a complaint can be dismissed on materiality grounds if the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Garber,* 537 F. Supp. 2d at 611 (*quoting Milman v. Box Hill Ss. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999)).

A fact is not omitted if the fact was disclosed in public filings before the offering. *Oregon Public Employees Retirement Fund v. Apollo Group Inc.,* 774 F.3d 598, 607 (9th Cir. 2014). A company has no duty to disclose information in offering materials that is already publicly reported in news articles. *Garber,* 537 F. Supp. 2d at 612; *Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at *8, 10 (C.D. Cal. July 25, 2016) (facts not omitted when disclosed in conference call with analysts).

A securities claim cannot arise from generalized positive statements about a business, i.e., "puffery." *Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2 (9th Cir. Feb. 21, 2023). A statement is puffery if it is "not capable of objective verification.*" Veal v. LendingClub Corp.,* 423 F. Supp. 3d 785, 803–04 (N.D. Cal. 2019).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                             10/26/2023


**III.    CARVANA DEFENDANTS' REQUEST FOR INCORPORATION OF DOCUMENTS BY REFERENCE AND JUDICIAL NOTICE AND EXHIBITS INCLUDED WITH GRANT THORNTON'S MOTION**

Carvana Defendants have requested that the Court take judicial notice of and incorporate by reference 18 exhibits submitted with its Motion. Grant Thornton submitted one exhibit with its Motion and two exhibits with its Reply. Plaintiff did not object to the Court considering any of these exhibits.

Carvana Defendants' Exhibit 2 (2020 Form 10-K), Exhibit 9 (2021 Form 10-K), Exhibit 12 (Form S-3/Registration Statement) and Exhibit 13 (Form 424(b)(2)/Prospectus Supplement) are documents Carvana filed with the Securities and Exchange Commission ("SEC") and are extensively quoted in and central to the Amended Complaint. Carvana Defendants' Exhibit 14 is a copy of ASC 606-10-25, which is discussed extensively in the Amended Complaint.

Carvana Defendants' Exhibits 1, 5, 7 and 10 are earnings call transcripts. Carvana Defendants' Exhibits 3 and 6 are 2021 Form 10-Qs filed with the SEC. Exhibits 4, 8 and 11 are Form 8-K shareholder letters filed with the SEC. These exhibits were not referenced in or central to the Amended Complaint.

Carvana Defendants' Exhibits 15-18 are news articles about Carvana. These articles were not referenced in, nor are they central to, the Amended Complaint.

Grant Thornton's Exhibit A to its Motion is a copy of Carvana's 2021 Form 10-K. Grant Thornton's Exhibit A to its Reply is ASC 606. Exhibit B to Grant Thornton's Reply is a copy of its audit opinion on Carvana's financial statements included on the 2021 Form 10-K. All three exhibits are referenced in and central to the Amended Complaint.

When ruling on a motion to dismiss, the Court can consider documents referenced in the complaint and matters of public record that are central to the complaint, without converting the motion into one for summary judgment. *ELM Retirement Center, LP v. Callaway*, 226 Ariz. 287, 289, ¶¶ 6-8 (App. 2010) (trial court's consideration of purchase contract attached to motion to dismiss did not convert it to a motion for summary judgment); *Strategic Development and Const., Inc. v. 7th & Roosevelt Partners*, LLC, 224 Ariz. 60, 63, ¶ 10 (App. 2010). Ordinarily, if the matters are presented on a motion to dismiss that are outside the complaint, the motion is converted to one for motion for summary judgment. *See* Ariz. R. Civ. P. 12(d). As such, the Court can consider those exhibits that were referenced in and central to the Amended Complaint in deciding these Motions to Dismiss.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

As noted, several of Carvana Defendants' exhibits were neither referenced in nor central to the Amended Complaint. Plaintiff, however, has not objected to the Court considering those exhibits within the framework of a motion to dismiss. Plaintiff has also not asked that the Court strike the exhibits or argued that the Carvana Defendants' Motion be converted to a motion for summary judgment. Plaintiff has also not asserted that it did not have an adequate opportunity to refute the contents of those exhibits or request discovery. Plaintiff did in fact address the earnings calls and news articles in its Omnibus Response. Having failed to timely object, plaintiff has waived any objection to the Court's consideration of the defendants' exhibits in considering the Motions to Dismiss. *See Kresock v. DePaoli*, No. 1 CA-CV 15-0622, 2017 WL 5895368, at ¶¶ 8-11 (Ariz. App. Nov. 30, 2017).

The Court can take judicial notice of defendants' exhibits. *See Nucor Corp. v. Emps. Ins. Co. of Wausau*, 2012 WL 12827813, at *3 (D. Ariz. Oct. 1, 2012) (granting judicial notice of financial statements filed with the SEC); *Burritt v. NutraCea*, 2010 WL 668806, at *3 (D. Ariz. Feb. 25, 2010) (granting judicial notice of a publicly available letter to shareholders); *Karpov v. Insight Enters., Inc.*, 2010 WL 2105448, at *2 (D. Ariz. Apr. 30, 2010); (taking judicial notice of transcripts of investor calls); *In re TASER Int'l S'holder Deriv. Litig.*, 2006 WL 687033, at *7 (D. Ariz. Mar. 17, 2006) (taking judicial notice of published accounting rules). The Court can also take judicial notice of news articles to show "what was in the public realm at the time, not whether the contents of [the] article[] [was] in fact true.'" *Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at *5 (D. Ariz. July 22, 2021) (*quoting Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015)).

In their Reply, Carvana Defendants cited Exhibit 3 of plaintiff's Omnibus Response to the Motions to Dismiss the initial Complaint. Plaintiff's Exhibit 3 is a copy of the class action complaint filed in Pennsylvania federal court brought by several Carvana customers complaining about TOPs and long delays in receiving registration and certificates of title for cars they purchased from Carvana. In the March 2023 Ruling, the Court noted that the Complaint did not refer to the Pennsylvania lawsuit and stated that Exhibit 3 should not be considered when deciding those Motions. (Ruling at 8). The Amended Complaint, however, makes several references to the Pennsylvania federal lawsuit. (¶¶ 218, 228). As such, the Court may consider the Pennsylvania complaint in addressing current Motions to Dismiss. *See Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record . . . including documents on file in federal or state courts.").

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                        10/26/2023

## IV. MOTIONS TO DISMISS THE AMENDED COMPLAINT

### A. Carvana Defendants' Position

Carvana Defendants argue that the Amended Complaint fails to plead any accounting misstatement or omission. Plaintiff's claim that Carvana failed to disclose that it recognized revenue upon delivery of cars to customers without certificates of title violated GAAP was rejected by the Court in the prior Ruling.

The Carvana Defendants further argue that many of the alleged omitted facts were disclosed by the Company prior to the SPO. Some of the facts were publicly reported in news articles months before the SPO. Customer complaints about temporary plates and title delays were also made public in the Pennsylvania class action. In short, there were no material facts, trends or risks omitted from the Offering Documents.

### B. Grant Thornton's Position

Grant Thornton gives three reasons for dismissal of the Amended Complaint First, the Amended Complaint does not allege a false statement of opinion under *Omnicare*. Second, the Amended Complaint does not allege facts demonstrating that Carvana's financial statements violated GAAP. Third, the Amended Complaint does not allege Carvana's financial statements were materially misstated.

### C. Plaintiff's Position

Plaintiff asserts that the "root issue" of Carvana's problems is that it was unable to provide its customers with a certificate of title in a timely manner. Plaintiff claims that Carvana failed to disclose the severe operational issues it was facing due to the COVID-19 pandemic, the high demand for vehicles and the delays in processing titles and registrations.

According to plaintiff, the operational issues were terrible for Carvana's customers. For a period, Carvana delivered vehicles to customers without first obtaining a certificate of title, which meant that some customers had purchased vehicles they allegedly could not legally drive. Some unknown number of customers had to wait six months to a year before the certificate of title was properly processed. About 40% of Carvana's customers experienced some delay in getting a certificate of title. The Amended Complaint alleges that Carvana's practice of selling cars without title was illegal in many states where the company does business.

Carvana also allegedly employed "risky" TOP practices. Sometime in 2021, Carvana hired a team to fill out TOPs, which was necessary because of the delays in processing title paperwork.

Docket Code 926                    Form V000A                         Page 13

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              10/26/2023

One Carvana customer was arrested, allegedly for driving with an invalid TOP issued by Carvana. In early 2022, Pennsylvania suspended Carvana's right to issue TOPs. For a time, Arizona allowed car dealers to issue TOPs for sales that occurred in other states but cancelled that program in May 2022, after the SPO.

Plaintiff argues that the Offering Documents contained misleading and incomplete statements due to the failure to disclose the title processing problems and other operational issues. Carvana stated it had the ability to "deliver cars as soon as the next day" and to "manage post-sale coordination and service call process." Although the statements were literally true, they were misleading because they gave the impression of a seamless sale process with strong customer support, without disclosing that the title and registration process was slow and cumbersome, leading to a terrible customer experience.

Plaintiff asserts that the explanation of the pandemic risk factors was misleading and incomplete. Carvana did not disclose that the pandemic "had unleashed chaos" on the title processing process, leading to inventory issues, customer service problems and regulatory scrutiny. The disclosure was too general and did not fully reveal the problems facing the Company.

Plaintiff further asserts that Carvana's operational issues resulted in state regulatory trouble. For instance, after receiving hundreds of customer complaints about delays in title processing, in May and July 2022, Illinois barred Carvana from selling cars and brought a criminal action against the company.  Plaintiff also notes that customers in Maryland and Arizona complained to state officials about delays in the processing of title paperwork. According to plaintiff the situation before the SPO was terrible for Carvana.[8]

Plaintiff alleges that Grant Thornton omitted disclosing any change to Carvana's financial status regarding "the importance of transfer of title in determining satisfaction of its performance obligations for used vehicle sales or when customers obtained control of used vehicles." Specifically, the financial statements failed to disclose Carvana's change beginning as early as late 2021 to list cars for sale before possessing a certificate of title. Plaintiff asserts that the allegations satisfy *Omnicare's* omissions standard because the Amended Complaint alleges facts that were missing from the financial statements.

**D.  Discussion**

---

[8] At oral argument, Plaintiff shifted its focus from the specific alleged omissions and suggested that, when considered "holistically," the alleged undisclosed problems reveal that the Company was in a "quagmire" and its business mode was broken. As discussed below, however, Carvana's alleged problems were either disclosed before the offering or immaterial. Even taking a "holistic" view of the allegations, the Amended Complaint still fails to state a claim.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

### 1.  Puzzle Pleading

Carvana Defendants argue that the Amended Complaint should be dismissed because it is a "puzzle pleading." "In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *In re Cisco Sys. Inc. Sec. Litig.*, No. 11-cv-01568, 2013 WL 1402788, at *5 (N.D. Cal. Mar. 29, 2013). "[A] securities fraud complaint that employs a true puzzle-style pleading format will recite lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Tarapara v. K12 Inc.*, No. 16-cv-04069, 2017 WL 3727112, at *9 (N.D. Cal. Aug. 30, 2017).

Carvana Defendants argue that the Amended Complaint recites comments from eight former employees. It also includes long quotes from Carvana's Form 10-Ks and repeats the same six allegedly omitted facts, without explaining how any of the six facts were improperly omitted.

The Amended Complaint is repetitive and somewhat confusing. The Amended Complaint does little to tie the quotes from the Form 10-Ks to the alleged omissions. It cites to several undisclosed events that occurred after the SPO. As Carvana Defendants point out, the problem is compounded by the fact that the Omnibus Response asserts omissions that are not alleged in the Amended Complaint.

Despite its deficiencies, however, the Amended Complaint is not so deficient that defendants could not figure out what facts were allegedly omitted. *See In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) (finding that a 113-page complaint, which "ramble[d] through long stretches of material quotes from defendants' public statement," suffered from "poor draftsmanship," and was "cumbersome almost to the point of abusiveness," was not "puzzle pleading"). The Amended Complaint is not a puzzle pleading. Even if it were, this is plaintiff's second attempt to state a claim, and the Court is not inclined to allow a third attempt at a more coherent pleading. (*See* Omnibus Response at 6 n.3, asking for leave to amend again).

### 2.  Alleged Omissions

Alleged Omission 1 – "From January or February 2020 through at least August 2022, Carvana focused more on buying cars from individual sellers instead of through auctions because there was a higher profit margin buying from individuals; by October or November 2021, Carvana stopped buying cars through auctions but continued buying from individuals, but a negative impact of this change was that wholesalers who sold through auctions had titles in hand, whereas individuals often did not have title in hand." (¶ 167(a)).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

Plaintiff does not explain what material fact was allegedly omitted. Prior to the SPO, Carvana repeatedly disclosed its strategy of increasing the purchase of cars from its customers. Carvana's 2020 and 2021 Forms 10-Ks explained that it was increasing the purchase of cars from customers.

> *Increase the purchase of vehicles from customers*. We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

(Ex. 2, 2020 10-K at 54; Ex. 9, 2021 10-K at 8-9, 55) (emphasis in originals).

Carvana also disclosed that there were challenges associated with buying more cars from customers. In its Form 8-K filed November 4, 2021, Carvana disclosed:

> "Our explosive growth in *buying cars from customers* over the last two quarters created significant operational constraints in our system. *Buying more cars from customers leads to* more last mile pickups, more customer care interactions, and *more complex title processing requirements, which in turn leads to more complex registration processing*. Our teams are responding by enhancing our systems and processes to adapt to this rapid change*."*

(Ex. 8, Q3 2021 Shareholder Letter at 3) (emphasis added). During the November 4, 2021 earnings call, Carvana disclosed more about the complexity of purchasing cars from customers:

> Many different groups that we deal -- when we buy cars from customers, for example, we're generally reaching out to a bank, and we're dealing with the payoff. And then we're asking for the title and return. Many banks are understaffed in this environment relative to where they'd like to be. *Those processes can take longer*.

(Ex. 7, Q3 2021 Earnings Call at 8) (emphasis added).

The alleged omitted information was disclosed by Carvana prior to the SPO. Carvana did not omit any material information about its car buying strategy or the issues the strategy had on title processing.

Alleged Omission 2 -- **"**In late 2020, Carvana reached the 500,000 cars purchased milestone, and approximately six months later, in mid-2021, Carvana reached the 1,000,000 cars purchased

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              10/26/2023

milestone, and the Company had an official policy that it would never say no to buying a used car—regardless of whether the car was junk, did not run, or had 300,000 miles on it—because each such acquisition created another customer." (¶ 167(b)).

Plaintiff has not explained exactly what fact was omitted that allegedly made the Offering Documents misleading. Carvana disclosed in its 2021 10-K that it purchased lower quality cars that it sold to wholesalers because the cars did not meet the company's quality standards for selling through its website. The 2021 10-K stated: "The Company sells vehicles to wholesalers. These vehicles sold to wholesalers are primarily acquired from customers and do not meet the Company's quality standards to list and sell through its website." (Ex. 9, 2021 10-K at 84).   In sum, Alleged Omission 2 in the Amended Complaint fails to identify a material omission.

Alleged Omission 3 **--** "By late 2021, Carvana's IRCs and storage lots around the country reached full capacity because (1) Carvana faced delays selling cars starting in 2020 due to delays at DMVs processing title and registration due to the pandemic, (2) Carvana's dealer license had been suspended in various states, and (3) Carvana was buying cars faster than they could sell them due to the Company not having titles to list and sell cars." (¶ 167(c)).

This statement contains no material omission. First, Carvana's 2021 10-K disclosed that its inventory was increasing and its strategy for increasing its ability to process more vehicles. Second, Carvana disclosed that that title and registration processing became more difficult during the pandemic. Third, prior to the SPO, regulatory suspensions were disclosed in the press and by the Company.

In addition to disclosing total inventory, Carvana disclosed "total website Units" and immediately available inventory. By every metric, the numbers reported by Carvana revealed that inventory was increasing throughout 2021. For example, total website units (cars listed for sale) increased from 45,822 units as of June 30, 2021 (Ex. 3, 10-Q2 2021 at 37) to "over 71,000 total website units" as of December 31, 2021. (Ex. 9, 2021 10-K at 2). The 71,000 website units at year-end 2021 was more than double the 31,000 website units reported at year-end 2020. (*Id.* at 56).

Carvana also disclosed its strategy for expanding inventory, capacity and immediately available. For instance, in the February 24, 2022 Shareholder Letter, Carvana explained: "We made significant progress in scaling our production capacity in 2021. We opened three new inspection and reconditioning centers (IRCs) during the year. … These new IRCs increased our total IRC count to 14 at the end of 2021. Our 2021 progress in scaling IRCs enabled us to increase our average immediately available inventory from 9k in Q1 to 25k in Q4." (Ex. 11, Form 8-K 2/24/2022 at 10). During the earnings call that same day, Carvana reported that "[i]n 2021, we added 3 inspection and reconditioning centers, increasing our total IRC count to 14. Following year-end, we also opened our 15th IRC near Cincinnati, Ohio, bringing our total capacity at full

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

utilization to approximately 880,000 units as of February 24." (Ex. 10, Earnings Call 2/24/2022 at 6). From these disclosures, a reasonable investor would understand that Carvana's storage lots and IRCs were filling up, and the Company was expanding its capacity.

Carvana disclosed to investors that its business model created problems processing title and registration paperwork. Carvana's 2020 and 2021 10-Ks explained that it is "subject to a wide range of evolving federal, state and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to [Carvana's] business model." (Ex. 2, 2020 10-K at 24; Ex. 9, 2021 10-K at 24). The 10-Ks explicitly mentioned the varying state "process requirements related to title and registration," and warned of the "particularly difficult challenge[s]" associated with the use of third-party vendors to submit title and registration paperwork to state entities. (Ex. 2, 2020 10-K at 19, 24; Ex. 9, 2021 10-K at 19, 24).

Carvana also explained the impact its rapid growth was having on its operations. The "explosive growth in buying cars from customers we experienced in the past 2 quarters also placed significant constraints throughout our system in Q3." (Ex. 7, Q3 2021 Earnings Call at 5). Carvana further explained that not all its inventory was immediately available to customers. "[T]he inventory growth that we've seen … [in the] expan[sion of] our production capabilities is not really flowing through to customers yet in the form of as much growth in kind of available inventory. So we are very focused on alleviating the constraints in our logistics network. And once we do that, we have the ability to make more of that inventory visible to more customers, which is something we look forward to being able to do."" (Ex. 10, 2/24/2022 Earnings Call at 13). Carvana warned about the risks associated with its strategy of growing inventory. For example, Carvana explained that the "Our business is dependent upon our ability to expeditiously sell inventory. Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales, and results of operations." (Ex. 9, 2021 10-K at 22).

In its 2021 10-K, Carvana noted that its rapid growth created challenges in maintaining quality customer service. "Our high rate of growth, the operationally intensive aspect of our offering, and the nature of automotive retail that necessitates the use of third-party vendors and systems to complete certain ancillary parts of the customer transaction (e.g. vehicle inspections, submitting title and registration paperwork to state entities) makes maintaining the quality of our customer experience a particularly difficult challenge." (Ex. 9, 2021 10-K at 18).

Carvana further explained that the restrictions imposed during the pandemic complicated its business. For instance, the various restrictions, including shelter in place orders and shutdowns, "have impacted and may further impact all or portions of our workforce and operations… In addition to governmental measures, we are also facing increased operational challenges." (Ex. 13, Prospectus at S-8). Carvana specifically mentioned that the pandemic caused "a number of things that led to title and registration getting backed up" and that the company "continued to be

Docket Code 926                         Form V000A                              Page 18

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              10/26/2023

somewhat backed up in title and registration, and that's impacted customer experience on title and registration in certain instances." (Ex. 5, Investor Conference Call 8/11/2021 at 2).

Carvana also disclosed that processing title "can take longer" than it did before the pandemic. (Ex. 7, Q3 2021 Earnings Call at 8). Carvana's President and CEO described how the pandemic affected operations:

> I think it extends to inside of Carvana, across all of the different operational groups and then also outside of Carvana. Many different groups that we deal -- when we buy cars from customers, for example, we're generally reaching out to a bank, and we're dealing with the payoff. And then we're asking for the title and return. Many banks are understaffed in this environment relative to where they'd like to be. Those processes can take longer. So I think it's first order a person issue inside of Carvana and outside of Carvana.

(*Id.*).

In addition to the Company's statement, prior to the SPO, Carvana's operational problems and title delays were reported in the press. For example, in August 2021, the media reported that North Carolina had imposed a six-month suspension of Carvana's license to sell cars from a vending machine in Raleigh after an investigation revealed that Carvana had sold motor vehicles without a state inspection and had issued out-of-state temporary tags and plates for vehicles sold to North Carolina customers. (Ex. 15 at 2). North Carolina also directed Carvana to pay fines and fees of $700.

The Company publicly addressed the situation in North Carolina. Carvana explained that it "had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina. And so I think the DMV there thought that with having a set of customers experienced title and registration delays that they wanted to do something to reflect the fact that they didn't like customers in that state experiencing these delays." (Id). So what [North Carolina] did was … ask [the company] to stop delivering cars from the vending machine in Raleigh." (Id.).

Other news articles were published prior to the SPO reporting on Carvana's title and registration problems. For example, on October 22, 2021, the Wall Street Journal noted that customers had filed "dozens" of complaints with state regulators and "hundreds" with the Better Business Bureau about title and registration delays. (Ex. 16 at 1). The article revealed that at least four states had disciplined Carvana or were investigating Carvana for violations of vehicle sales rules. (Id). The Wall Street Journal article reported on other complaints and regulatory actions related to title issues, including the following:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                    10/26/2023

- In Michigan put Carvana on an 18-month probation and fined it $2,500 for seven violations of laws on title transfers and registration laws. (*Id*. at 1, 8).

- Texas assessed $10,500 in fines for paperwork issues. (*Id.* at 1).

- Carvana received a six-month suspension of its license to sell cars from its Raleigh, North Carolina dealership for violated dealer licensing laws and another location was put on probation for more than a year. (*Id.* at 2).

- Carvana paid $850,000 to settle a civil lawsuit with four counties in California for selling cars without a license to do so. (*Id*).

- "Some Carvana customers said delays in getting documents from the company left them unable to register their cars for nearly a year," putting them at risk for getting ticketed or towed. Others were "stuck making payments" on cars with expired tags. (*Id*).

- One customer in Tempe returned a car to Carvana because it didn't possess the title. (*Id*).

- One customer in Kentucky said she was ticketed for driving on expired temporary tags. (*Id*).

- Through September 2021, the Better Business Bureau had received 899 complaints from Carvana shoppers. (*Id.* at 3).

- Carvana customers had filed "dozens" of complaints with state officials in Ohio, Texas, Georgia and North Carolina, many because of title delays. (*Id*.).

- In Florida, Carvana paid a $6,000 fine because of title paperwork delays involving 12 customers for up to eight months. (*Id*. at 6).

The Wall Street Journal reported that Carvana explained that its efforts to buy more cars left it short on manpower, leading to registration delays. (*Id*. at 4).

In November 2021, CBS News reported that the Texas DMV had received "dozens" of complaints from Carvana customers about months-long delays in getting title and registration. (Ex. 17, Nov. 15, 2021 CBS New Article at 1). Since 2019, the Texas DMV had cited Carvana for more

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                        10/26/2023

than 30 violations and fined the company $10,000 for violating state registration laws. (*Id*. at 2). Texas officials also reported having additional open investigations involving Carvana over paperwork issues. *Id.*

On January 13, 2022, more than three months before the SPO, the class action complaint was filed in Pennsylvania federal court. (Plaintiff's Ex. 3). The class action plaintiffs alleged that Carvana had failed to transfer title for "months and months," leaving customers unable to legally drive the cars they purchased. (*Id.* at 1). The complaint recounted allegations from more than 20 dissatisfied Carvana customers who had problems obtaining title and registration. Several customers complained of having been issued multiple TOPs from states other than where they reside. (Id. at ¶¶ 17-19, 28-30, 40-41, 50, 62, 67, 77, 81, 93, 98, 102, 115, 125, 129, 136, 142, 148, 154, 162, 164). Some customers were arrested while driving with the temporarily registered cars. (*Id.* at 1).

Plaintiff argues that the Court can only look to the four corners of the Offering Documents to determine whether facts were disclosed. According to plaintiff, in a Section 11 claim, information that is publicly available but not disclosed in the Offering Documents cannot be considered when determining whether information was omitted. To do so, plaintiff argues, would insert the "truth-on-the-market" doctrine, a defense which only applies in securities fraud cases.

According to plaintiff, Section 11 requires completeness and accuracy within the registration statement itself. *See* 15 U.S.C. § 77k(a) ("In case any part of the registration statement … omitted to state a material fact…"). Investors are not required to look elsewhere for more complete or adequate information. Thus, plaintiff argues that facts omitted from a registration statement are actionable even if the information was disclosed in news articles before the offering.

Plaintiff cited only one case where the court did not consider unfavorable press coverage in the context of a motion to dismiss a Section 11 claim. *See Bos. Ret. Sys. v. Uber Techs., Inc.,* 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020). Other courts, however, have held that "Sections 11 and 12(a)(2) do not require the disclosure of publicly available information." *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.,* 272 F. Supp. 2d 243, 249–50 (S.D.N.Y. 2003); *Garber*, 537 F. Supp. 2d at 611 (*quoting In re Progress Energy, Inc.,* 371 F. Supp. 2d 548, 552-23 (S.D.N.Y. 2005) ("It is well-established that the securities laws do not require disclosure of information that is publicly known."). As the Ninth Circuit has stated: "[i]t is pointless and costly to compel firms to reprint information already in the public domain." *Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1162–63 (9th Cir. 2009) (*quoting Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 517 (7th Cir. 1989) (Section 11 did not require disclosure of information publicly reported a year earlier about a prior tender offer).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          10/26/2023

In *Garber,* a case involving a Section 11 claims "sounding in negligence", the court held that the company had no duty under the securities laws to disclose information that was already publicly reported in news articles. *Id.* at 612. Similarly, there is no duty to disclose information already disclosed during conference calls with analysts. *See Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at \*10 (C.D. Cal. July 25, 2016). Following the reasoning of *Rubke* and *Garber*, the Court finds that defendants were not required to disclose information that Carvana had already disclosed or that was publicly available.

In any event, even if the Court only considered the four corners of the Offering Documents, the Amended Complaint fails to allege an omission of material fact related to title processing delays and regulatory suspensions. As discussed above, Carvana disclosed the fact that there were delays in processing title and registration. Plaintiff has not identified what additional information about the difficulties in processing title was required to be disclosed. Further, as discussed below, the Amended Complaint does not quantify the extent of the title processing delays. Although one FE claims the delays affected about 40% of Carvana's customers, plaintiff does not allege that these delays were impermissibly long. One a few hundred customers, at most, allegedly suffered months-long delays/ Plaintiff has also not alleged why this information would be important to a reasonable investor given the totality of information available.

The Amended Complaint also fails to allege the specific information about license suspensions that was improperly omitted. Prior to the SPO, North Carolina had imposed a six-month suspension of Carvana's license to sell cars from a vending machine in Raleigh. (Ex. 15 at 2). As mentioned above, Carvana discussed the North Carolina suspension with investors. Several other states imposed small fines. (*See* Ex. 16). The Barron's article revealed that sometime in early 2022, Pennsylvania temporarily, until August, suspended Carvana's license to issue temporary plates at two vending machine locations. (Ex. 18). Plaintiff does not explain why these two temporary suspensions involving only three vending machine locations were material to a reasonable investor.

Plaintiff claims that Carvana's issues did not come to light until after the publication of the Barron's article and other news articles. Plaintiff, however, has not identified any material fact in the Barron's article or other news articles that was required to be disclosed. Some of the matters discussed in those articles occurred after the SPO. The Barron's article details complaints of various customers, but complaints from a handful of individual customers would likely not be important or material to a reasonable investor.

Alleged Omission 4 -- "From as early as late 2021, but no later than February 2022, through May or June 2022, Carvana changed its policy and practice and listed, sold, and delivered cars without title, which is the opposite of Carvana's previous policy and practice that cars could only be listed, sold, and delivered with title. (¶ 167(d)).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                          10/26/2023

For a short period, beginning at the earliest in late 2021, Carvana listed cars for sale for which it did not possess the certificates of title. This was a temporary change in policy apparently implemented to free up inventory. This was a change from its prior policy of only listing and selling cars when a certificate of title had been issued in Carvana's name.

Plaintiff alleges that Carvana's failure to disclose this change in car listing policy was a material omission. Plaintiff, however, fails to explain why listing some unknown number of cars for sale was a material omission. Plaintiff has not alleged that this change in policy applied to a material number of vehicles listed for sale. It is unknown whether tens, hundreds or thousands of vehicles were listed under this new policy. Plaintiff has also not alleged how many, if any, vehicles were sold to customers before Carvana had the certificate of title. According to Carvana, the Company only offered "a small percentage of cars for sale prior to receiving the paper certificate of title." (¶ 226). There are no factual allegations refuting the claim that a small number of cars were listed under the new policy.

Plaintiff also has not established that there was anything improper about the new car listing policy. Although the Barron's article vaguely refers to regulators in Texas, Pennsylvania, Michigan, and Illinois stating the practice was illegal (Ex. 18 at 5), plaintiff cited no authority holding that the policy was unlawful in any jurisdiction. As Barron's noted: "No states are known to have sanctioned Carvana over the practice of selling vehicles without holding title." (*Id*).

It seems that plaintiff is trying to use the change in the listing policy to relitigate the Court's prior ruling. Plaintiff states that the Amended Complaint does not allege that recognizing revenue without a certificate of title violated GAAP. Rather, it alleges that GAAP was violated because Carvana did not explain the change in Carvana's revenue recognition policy.

There are several things wrong with plaintiff's argument. First, Plaintiff only alleges a change in the car listing and sale policy. The Amended Complaint does not allege any change in Carvana's revenue recognition policy. As such, there was no change in revenue recognition policy to disclose.

Further, the Amended Complaint is still focused on the issuance of a certificate of title. The Court made clear that "certificate of title" and "legal title" are different concepts. (Ruling at 20). Plaintiff argues, however, that revenue for a sale contract should not be recognized under GAAP until legal title is transferred. (Omnibus Response at 18). Plaintiff asserts that ASC 606-10-25-25 requires the transfer of title to recognize revenue. The policy change allowed Carvana to sell a vehicle before it had a *certificate of title*. There is no allegation Carvana listed and sold cars for which it did not have legal title.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                        10/26/2023

Plaintiff's suggestion that the transfer of legal title is required for revenue recognition is contrary to the Court's ruling.  The Court clearly explained that ASC 606 provides a list of five non-exclusive indicators of the transfer of control: (1) the seller has a present right to payment; (2) the buyer has legal title to the asset; (3) the seller has transferred physical possession; (4) the buyer has the significant risks and rewards of ownership; and (5) the buyer has accepted the asset. (Ruling at 5 citing ASC 606-10-25-30). ASC 606 explains that the presence of one or more indicators "may" reflect that control of the asset has passed to the buyer. (*Id*.). As the Court noted, "[n]one of the indicators discussed above is individually determinative; rather, an entity should consider all of the indicators collectively to make a determination as to when control passes to the customer." (*Id*., citing Grant Thornton guidance at 202). "Legal title" is only one of the indicators of control. (Ruling at 10, 20). Issuance of a certificate of title to the buyer is not a factor to be considered for control. (*Id.* at 15).

As the Court previously ruled, the title paperwork is irrelevant to the accounting judgments Carvana made in determining when to recognize revenues. As the Court stated:

> [P]laintiff's Complaint … confuses the concept of the passing of title with the issuance of a certificate of title. … As explained herein, the issuance of a certificate of title is not necessary for legal title to be transferred to the buyer. Rather, a certificate of title is simply an administrative step that memorializes the transfer of title. … Transference of legal title is not dependent on the administrative issuance of a certificate by the State. As such, even if revenue should not be recognized until title is transferred, Carvana complied with ACS 606.

(Ruling at 20) (internal citations omitted).

The Court also rejected plaintiff's argument that the notes to Carvana's 2019 financial statements referencing the "transfer of title" were an acknowledgment that title transfer was critical to revenue recognition and evidence of the Company's failure to properly disclose its revenue recognition policy. (*Id*. at 4 n.3). The Court stated that, "[a]lthough the wording of the notes to the financial statements changed slightly after 2019," the language in the footnote referred to "the transfer of title and not the issuance of a certificate of title, which are two different things." (*Id*); (*see also id*. at 8 n.4).

One of the factors of control is transfer of physical possession. As the Court noted, Carvana disclosed in its notes to its financial statements that Carvana exercised its accounting judgment and in applying ASC 606 and recognized revenue "upon delivery." (*Id*. at 18, 20). The Court concluded that no reasonable investor could have been misled because the financial statements plainly stated that Carvana recognized revenue at the time of delivery. (*Id*. at 20). The change in the listing policy allowing for the sale of cars without certificates would not change Carvana's

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                    10/26/2023

revenue recognition policy which did not consider the transfer of a certificate of title in its revenue recognition judgment.

Finally, plaintiff's claim that the change in the language of the notes to the financial statements was related the change in listing policy is implausible. The notes to Carvana's financial statements in its 2019 10-K stated that revenue was recognized "upon delivery when the *transfer of title*, risks and rewards of ownership, and control pass to the customer." The words "transfer of title" were removed from the notes in the 2020 year-end financial statements. The change in listing policy occurred in late 2021 and could not have been the reason for the language change in 2020.

Alleged Omission 5 -- "In 2021, Carvana hired a team of people in its Registration Department whose focus was to continuously fill out thousands of temporary operating plates or TOPs because of the severe delays Carvana had by that time in getting titles from sellers and/or having paperwork processed by local DMVs in respective states; the TOPs were often from different states than the state the buyer resided in; and some TOPs were issued from Carvana brick-and-mortar locations that had not sold those cars." (¶ 167(e)).

Carvana issued TOPs to customers waiting for a certificate of title. Plaintiff describes this as a "risky" practice but does not explain those risks. Plaintiff refers to several minor regulatory issues related to the TOPs but does not allege that the issuance of TOPs to customers posed a risk to Carvana's income and operations in any material way. Plaintiff has not adequately alleged an undisclosed risk or trend concerning the issuance of TOPs.

Further, as discussed above, the issues involving delays in titles and registration were discussed by the Company and in the press. The Pennsylvania lawsuit also exposed these issues. The Pennsylvania lawsuit also revealed the practice of issuing multiple TOPs from states other than where the customer lived while the customer waited for permanent title to be issued. (*See* Plaintiff's Ex. 3 at ¶¶ 17-19, 28-30, 40-41, 50, 62, 67, 77, 81, 93, 98, 102, 115, 125, 129, 136, 142, 148, 154, 162, 164).

Alleged Omission 6 -- "Carvana's system for tracking titles was poor and did not correctly track whether titles were in house or not, (sic) there were instances where cars would be sold and then be in the customer's possession from six to over twelve months without a title, and around 40% of Carvana's customers experienced delays in getting their titles." (¶ 167(f)).

Carvana's title and registration challenges were publicized in the media before the SPO, as discussed above. Plaintiff attempts to make this a material issue by citing FE-7 who claims that about 40% of Carvana's customers experienced delays in getting their titles. (¶ 142). The 40% figure is vague and meaningless because it says nothing about whether the delays were impermissibly long. A delay of a few days or weeks, even for a large number of customers, is

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                              10/26/2023

probably excusable given the circumstances of the pandemic. No reasonable investor would find briefs delays important to their investment decision.

According to FE-7, only "some" customers waited 4 to 7 months for their titles. Although there were reports of customers waiting six months to a year for title, those were few and isolated cases. The Amended Complaint does not allege widespread, unduly long delays.

### 3.  Claims Against Grant Thornton

In the Ruling, the Court stated that to state a claim against Grant Thornton, plaintiff needed to:

> allege facts "calling into question [Grant Thornton's] basis for offering the opinion" and "identify particular (and material) facts going to the basis for [Grant Thornton's] opinion – facts about the inquiry [Grant Thornton] did [or] did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."

(Ruling at 7) *(quoting Omnicare*, 575 U.S. at 194).

The Amended Complaint alleges that Grant Thornton "incorrectly certified that Carvana's financial statements were prepare[d] in accordance with applicable accounting standards and falsely represented that [Grant Thornton] conducted its audit and review in accordance with applicable accounting standards." (¶ 250). The Amended Complaint alleges that Grant Thornton's opinion on the financial statements was "a materially false and misleading statement of material fact when made because it failed to disclose and misrepresented" various "significant, then-existing material events, trends, and uncertainties" related to Carvana's alleged change in accounting judgment regarding the sale of cars for which the company did not possess a certificate of title. (¶ 204).

The Amended Complaint fails to state a claim against Grant Thornton for the same reasons the Complaint did not. The Amended Complaint does not allege any facts demonstrating that Grant Thornton did not subjectively believe its audit opinions. The Amended Complaint's conclusory allegations are insufficient to state a claim under *Omnicare*. (*See* Ruling at 22).

The Amended Complaint also disavows any allegation of fraud or intentional misconduct. (¶ 246). As such, there can be no inference that Grant Thornton did not sincerely believe its opinions. *Omnicare*, 575 U.S. at 186 (by expressly "'exclud[ing] and disclaim[ing]' any allegation

Docket Code 926                    Form V000A                         Page 26

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-013054                                                  10/26/2023

sounding in fraud or deception," the plaintiffs do not contest that defendant's opinion was honestly held).

The Amended Complaint also does not allege any material omission of fact against Grant Thornton. The Amended Complaint alleges that Grant Thornton failed to comply with certain Public Company Accounting Oversight Board ("PCAOB") auditing standards. (¶¶ 207–210). The Amended Complaint mentions the standards but makes no effort to connect the PCAOB standards to material facts about Grant Thornton's audit.

Finally, GAAP requires the disclosure of changes in accounting judgment only if they "significantly affect the determination of the amount and timing of revenue." (¶ 196) (*quoting* ASC 606-10-50-17). As discussed above, the Amended Complaint does not allege that Carvana's decision to allow the listing of cars for sale before possessing "title in hand" was a change in accounting judgment. Carvana's change in policy concerned "paper certificate[s] of title" (¶¶ 24, 226), not transfer of legal title.

### 4. **The Underwriter Defendants**

The Amended Complaint does not allege any untrue statement or omitted material fact by the Underwriter Defendants in the registration statement or prospectus. As such, the Amended Complaint fails to state a claim against the Underwriter Defendants.

## V. DISPOSITION

For the foregoing reasons and good cause appearing,

**IT IS ORDERED** granting the Carvana Defendants' and Grant Thornton's Motions to Dismiss the Amended Complaint. The Underwriter Defendants' Joinder in the Motions is also granted.  This dismissal is with prejudice.

**IT IS FURTHER ORDERED** directing Defendants to lodge a single form of Judgment, incorporating a Rule 54(c) finding, with the Court **no later than November 15, 2023**.  Plaintiff may file any objections to the form of Judgment by **November 30, 2023**.