**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Association National Pension Fund, et al., | No. CV-22-02126-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Carvana Company, et al., | |
| Defendants. | |

Two pension plans, United Association National Pension Fund ("UANPF") and Saskatchewan Healthcare Employees' Pension Plan ("SHEPP"), bring this putative class action in a 229-page Consolidated Complaint against Carvana Company, its founders, officers, board members, and underwriters. (Doc. 36.) Carvana is a pre-owned vehicle dealer that sought to differentiate itself from others with its disruptive e-commerce business model.

Plaintiffs allege, in more than 477 paragraphs, Defendants manipulated Carvana's stock price and sought to persuade investors that Carvana would continue to experience hyper-growth because its business model meant that "our business gets better as it gets bigger." Plaintiffs allege that Defendants repeatedly explained that unlike traditional dealerships, Carvana would be a limitless growth machine because its disruptive model was full of competitive advantages, such as a scalable "capital-light" expansion model and a groundbreaking logistics network that could readily deliver or acquire cars nationwide. But Defendants' business practices, as alleged by Plaintiffs, were unsustainable and no

1   more profitable than other pre-owned car dealerships.

2        Pending before the Court are: (1) Defendants Carvana Company, Ernest Garcia III,

3   Mark Jenkins, Ryan Keeton, Benjamin Huston, Stephen Palmer, Michael Maroone, Neha

4   Parikh, Ira Platt, and Greg Sullivan's Motion to Dismiss (Doc. 50), which Defendants'

5   Citigroup Global Markets Inc., and J.P. Morgan Securities LLC join (Doc. 52); and (2)

6   Defendant Ernest Garcia II's Motion to Dismiss (Doc. 54).

7        For the reasons listed below, the Court dismisses the Consolidated Complaint

8   without prejudice because it finds it is an impermissible puzzle pleading, and grants

9   Plaintiffs leave to file an amended complaint.

10  **I.    BACKGROUND**

11       **A.    The Parties**

12            **1.    Plaintiffs**

13       Plaintiff UANPF is a Virginia-based, multi-employer defined benefit pension plan.

14  (Doc. 36 ¶ 18.) UANPF is one of the nation's largest Taft-Hartley funds with

15  approximately $6.5 billion in assets held for the benefit of approximately 150,000

16  participants. (*Id.*) UANPF alleges it purchased a significant number of shares of Carvana

17  Class A common stock at artificially inflated prices from May 6, 2020 to November 3,

18  2020 (the "Class Period") and suffered damages from Defendants' alleged misconduct.

19  (*Id.*) On April 22, 2022, UANPF also purchased 1,455 shares of Class A common stock in

20  the 2022 Public Offering (the "Offering") from Citigroup Global Markets Inc. for $80.00

21  per share. (*Id.*)

22       Plaintiff SHEPP is the largest defined benefit plan in the Canadian province of

23  Saskatchewan. (*Id.* ¶ 19.) It is a multi-employer defined benefit pension plan serving the

24  healthcare sector, with over 60,000 members and more than $10 billion in assets under

25  management. (*Id.*) SHEPP alleges it purchased a significant number of shares of Carvana

26  Class A common stock at artificially inflated prices during the Class Period and suffered

27  damages as a result of Defendants' alleged misconduct. (*Id.*) On April 22, 2022, SHEPP

28  purchased 3,838 shares of Class A common stock in the Offering from Citigroup Global

Markets Inc. for $80.00 per share. (*Id.*)

### 2. Defendants

Defendant Carvana Co. is a Delaware corporation with its principal executive offices located in Tempe, Arizona. (Doc. 36 ¶ 20.) Carvana's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CVNA." (*Id.*)

Defendant Ernest Garcia III ("Garcia Junior") is a co-founder of Carvana and has served as its Chief Executive Officer, President, and Chairman since 2012. (*Id.* ¶ 21.) His father is Defendant Ernest Garcia II ("Garcia Senior"), who is also a founder of Carvana. (*Id.* ¶¶ 21, 23.)

Garcia Senior is Carvana's controlling shareholder. (*Id.* ¶ 23.) Plaintiffs allege that Garcia Senior was the largest single seller of Carvana stock throughout the Class Period and sold over $3.6 billion in Class A common stock at artificially inflated prices. (*Id.*)

Plaintiffs also allege that Garcia Senior and Garcia Junior were next-door neighbors during the Class Period. (*Id.*)

Defendant Mark Jenkins is Carvana's Chief Financial Officer. (*Id.* ¶ 22.) Plaintiffs allege that during the Class Period, Defendant Jenkins sold 336,929 shares, nearly 34% of his holdings, at artificially inflated prices for proceeds of $79,246,195. (*Id.*)

Defendant Ryan Keeton is a co-founder of Carvana and serves as its Chief Brand Officer. (*Id.* ¶ 24.) During the Class Period, Plaintiffs allege Keeton sold 180,007 shares of Carvana stock, or nearly 63% of his stock, at artificially inflated prices for proceeds of more than $42.3 million. (*Id.*)

Defendant Benjamin Huston is a co-founder of Carvana and serves as its Chief Operating Officer. (*Id.* ¶ 25.)  During the Class Period, Huston sold 336,937 shares of Carvana stock, or more than 34% of his stock at, allegedly, artificially inflated prices, for proceeds of nearly $79.3 million. (*Id.*) Huston was responsible for Carvana operations, including inventory management and wholesale, inspection and reconditioning, logistics and fulfillment, customer service operations, real estate, and market expansion. (*Id.*)

Plaintiffs allege that these Defendants—Carvana, Garcia Junior, Jenkins, Garcia

Senior, Keeton, and Huston (collectively, the "Exchange Act Defendants")—violated Section 10(b), Rule 10b-5, Section 20(a), and Section 20A of the Securities Exchange Act.

Defendant Stephen Palmer served as Carvana's Vice President of Accounting and Finance and signed the Registration Statement issued in connection with the 2022 Public Offering. (*Id.* ¶ 414.)  Defendants Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan each served as members of Carvana's Board of Directors and signed the Registration Statement issued in connection with the Offering. (*Id.* ¶ 415.) Plaintiffs allege that these Defendants—Palmer, Maroone, Parikh, Platt, and Sullivan—together with Carvana, Garcia Junior, and Jenkins (collectively the "Individual Securities Act Defendants") violated Section 11, Section 12(a)(2), and Section 15 of the Securities Act.

### 3.    Underwriter Defendants

Plaintiffs allege Defendants Citigroup Global Markets Inc. and J.P. Morgan Securities LLC acted as underwriters and/or underwriter representatives of, and as sellers in, Carvana's 2022 Public Offering (collectively, the "Underwriter Defendants"). (*Id.* ¶ 416.)

Plaintiffs allege that in connection with the 2022 Public Offering, the Underwriter Defendants marketed Carvana common stock to potential investors using materially false or misleading information about the Company, or omitted material information required to be disclosed in the Registration Statement. (*Id.* ¶ 417.) Plaintiffs also allege that the Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the 2022 Public Offering. (*Id.*) Plaintiffs claim this conduct deems them liable under the Securities Act. (*Id.*)

### B.    Carvana's Founding & Business Model

Plaintiffs allege that Garcia Senior and his son, Garcia Junior—along with Keeton and Huston—founded Carvana as a wholly owned subsidiary of DriveTime Automotive ("DriveTime"), which was Garcia Senior's used car business. (*Id.* ¶¶ 4, 39, 41.) Carvana described itself as an "e-commerce company dealing in used cars" and "the Amazon of the used car industry." (*Id.* ¶ 2.) In 2017, the Garcias took Carvana public on the NYSE and

pitched it as "a disrupter and innovator in the used car market." (*Id.* ¶ 41.) The Consolidated Complaint alleges Carvana marketed itself as a "seemingly limitless growth machine because the Company's disruptive model was full of competitive advantages, such as a 'capital-light' expansion model, a scalable business model, and a groundbreaking logistics network that could readily deliver or pick-up cars nationwide." (*Id.* ¶ 2.) The Exchange Act Defendants marketed to investors that Carvana's "business gets better as it gets bigger." (*Id.*) Garcia Junior advertised that "a unique attribute of our business model relative to automotive retail and then not unique relative to e-commerce is that all of our cars are available to customers everywhere" and "you're increasing conversion across all of your markets . . . we feel really, really good about that model." (*Id.* ¶ 55.)

Carvana held its "first and only Analyst Day" on November 29, 2018. (*Id.* ¶ 53.) There, Garcia Junior broadcasted that Carvana's "long-term goal was to sell two million-plus units a year to become the largest automotive retailer." (*Id.*) Plaintiffs further allege the Exchange Act Defendants touted to analysts and investors that Carvana sought to become the largest and most profitable automotive retailer. (*Id.*) Jenkins then explained that Carvana's goal—to be the largest and most profitable automotive retailer—was attainable. (*Id.*) Jenkins explained that "the scalability of the online sales model, we believe, will lead to being a larger industry player than we've historically seen in automotive retail and more profitable player than we've historically seen due to a long-term lower cost structure." (*Id.* (cleaned up).) The Consolidated Complaint further alleges that the Exchange Act Defendants touted to investors that Carvana could achieve its "lofty goals" due to its innovative business model. (*Id.* ¶ 54.) Specifically, the Exchange Act Defendants explained that "unlike traditional dealerships, Carvana's e-commerce model offered structural cost advantages that enabled the Company to become more profitable as it grew in scale." (*Id.*)

C.    **Carvana's Stock Price Decline**

Leading up to the Class Period, Carvana's growth slowed and its stock price declined. (*Id.* ¶¶ 6, 134.) The Consolidated Complaint alleges that analysts expressed

alarm. (*Id.* ¶ 134.) On February 27, 2020, for example, Morgan Stanley reported that: "If the growth starts to slow significantly, and the company is still not profitable, there will be a transition away from growth investors, and we believe that how investors think about the valuation of the stock will change." (*Id.*) That same day, the Center for Financial Research and Analysis told its readers that "[w]hile we remain positive on e-commerce growth in the auto retail space, we think investors will be less willing to look past CVNA's slowing top line growth and persistent lack of profitability than they were in 2019." (*Id.*) The COVID-19 pandemic also slowed Carvana's growth. (*Id.*)

### D.    Garcia Senior's Role in Carvana

Plaintiffs allege that although Garcia Senior is a Carvana founder, "[b]ecause of his conviction and ban from the NYSE, Garcia Senior is not identified in Carvana's SEC filings as a Carvana employee, officer, or director," but "there can be no doubt that Garcia Senior controls Carvana." (*Id.* ¶ 43.)[1] This control—Plaintiffs allege—was through his status as Carvana's largest shareholder at 84% of voting power, which allowed him to "install" Garcia Junior as CEO of Carvana as well as "his former DriveTime employees and Lincoln Savings & Loan cronies to Carvana's Board of Directors." (*Id.*) Plaintiffs allege that Garcia Senior exercised that control throughout the Class Period, encouraging Carvana to enter transactions with his other companies, which were designed to financially benefit him. (*Id.* ¶¶ 44–46.)

Plaintiffs also allege as Carvana's stock price was declining, on March 30, 2020, the Exchange Act Defendants "orchestrated" a direct stock offering so that Garcia Senior, as Carvana's controlling shareholder, "could purchase $25 million of Class A common stock at [an] unreasonably low price to make billions once Carvana's stock price increased." (*Id.* ¶ 135.) Plaintiffs further allege that once Garcia Senior substantially increased his Carvana stock holdings at a depressed price, the Exchange Act Defendants implemented their scheme to artificially inflate Carvana's shares so they could make

---

[1] The Consolidated Complaint explains Garcia Senior pled guilty to fraudulently obtaining lines of credit that assisted Lincoln Savings & Loan to conceal its ownership from regulators. (*Id.* ¶¶ 35–36.) After his conviction, he was "banned for life from serving as an employer, officer, or director with a company on the NYSE." (*Id.*)

billions of dollars. (*Id.* ¶¶ 8, 11–12.)

**E.    The Purported Scheme**

The purported scheme was not easily discernable from the Consolidated Complaint. But with the assistance of Defendants' Motions to Dismiss and Plaintiffs' Omnibus Opposition, the Court attempts to detail the scheme alleged by Plaintiffs.

**1.    Carvana Lowered Its Standards**

Plaintiffs allege that the Exchange Act Defendants lowered Carvana's purchasing and verification standards to buy "as [many cars] as was humanly possible." (*Id.* ¶¶ 9, 65, 139, 322.) By lowering these standards, Defendants were able to encourage trade-ins and display broader inventory on Carvana's website—all of which increased sales. (*Id.* ¶¶139–142.) Confidential Witness ("CW") 3, a Dealer Success Advocate at Carvana, explains that before the start of the Class Period, Carvana "refused to complete purchases when it was discovered that sellers misrepresented information they provided to Carvana regarding vehicle history and condition." (*Id.* ¶ 79.) Just before, and during the Class Period, however, CW-3 describes Carvana relaxed its standards to accept "all vehicles" and stopped genuinely inspecting vehicles before purchasing them. (*Id.* ¶ 140.) CW-3 observed Carvana purchasing many "trash vehicles" after lowering its standards. (*Id.*) Another confidential witness, CW-5, who was a Market Operations Manager, heard "from his/her predecessor at the hub that the issues with the quality of the vehicles had gotten worse 'all of the sudden.'" (*Id.* ¶¶ 94, 140.) CW-1, who held a supervisory role on the wholesale team, also explains Carvana lowered its purchasing standards from those who were also purchasing a vehicle from Carvana. (*Id.* ¶¶ 64, 140.) Another confidential witness, CW-4, an area manager, explains that in a Zoom-meeting with other wholesale managers, directors, and associate directors, they were told that "Carvana was 'looking to buy what cars they could.'" (*Id.* ¶ 83.)

According to the Consolidated Complaint, "CWs-1, 3, 4, 5, 8, 10, and 11 all report that during the Class Period it was Carvana's general practice to purchase cars sight unseen and do little to nothing to verify the accuracy of sellers' representations of their vehicles."

(*Id.* ¶ 141.) Furthermore, and according to CWs-1, 3, 4, 5, 7, 8, and 11, "Carvana routinely paid customers 'outrageous' prices, sometimes thousands of dollars over asking price, for vehicles in terrible condition." (*Id.* ¶ 142.) As a result, Plaintiffs allege that Carvana was inundated with "trash cars," which were unfit to sell at retail and "had to be sold wholesale." (*Id.* ¶ 166.) "Unbeknownst to investors, this sudden and overwhelming increase in wholesale volume created a costly, logistical nightmare as 'wholesale units acquired from customers have typically been transported to the nearest Carvana [inspection and reconditioning centers ("IRCs")], generating additional vehicle moves and increased complexity in our multi-car logistics network." (*Id.* ¶¶ 166, 231(c), 263(c), 282(b).) Plaintiffs also allege, and take issue with, wholesale sales not capturing additional revenue streams that were associated only with retail sales. (*Id.* ¶¶ 49, 231(d), 263(d), 282(c).)

### 2.      Carvana's Footprint

Plaintiffs next take issue with Carvana's expansion without "any regard to profitability." (*Id.* ¶¶ 232(a), 264(a), 283(a).) The Consolidated Complaint alleges that the Exchange Act Defendants "embarked on a rapid and unsustainable nationwide expansion plan to enter over 150 new markets, more than doubling Carvana's footprint in just six quarters." (*Id.* ¶ 144.) Plaintiffs take issue that the Exchange Act Defendants "did so even though they knew or recklessly disregarded that many of these markets were less profitable due to their distance from Carvana's existing IRCs and that they strained Carvana's underbuilt logistics network." (*Id.*) Plaintiffs say that in Q2 2020—the beginning of the Class Period—the Exchange Act Defendants "added 100 new markets without adding a single IRC." (*Id.* ¶¶ 145, 232(b), 232(f).) The Exchange Act Defendants knew, but concealed, that this would dramatically increase costs, admitting: "SHORTER DISTANCE = SAVINGS . . . Lower inbound transport & logistics costs; Lower shipping costs to customers." (*Id.* ¶¶ 146, 168.) As a result, and during the Class Period, "Carvana's logistics expenses spiked by 300% and its market occupancy costs (i.e., facilities expenses) increased by nearly 250% between the start of the Class Period and Q1 2022." (*Id.* ¶ 162.) Plaintiffs allege that the Exchange Act Defendants also concealed that Carvana's retail

growth was predicated on "unprofitable" and "less profitable" sales—rather than logistics expenses. (*Id.* ¶¶ 168, 229(b), 261(b), 281(b).) It wasn't until the end of Class Period, where the Exchange Act Defendants admitted that Carvana's retail growth was composed of "less profitable sales . . . in markets with lower profitability due to long distance from inventory." (*Id.* ¶ 168.)

Plaintiffs allege the Exchange Act Defendants masked these "unprofitable" and "less profitable" sales during the Class Period by manipulating Carvana's total gross profit per unit metric by excluding certain selling costs like outbound logistics expenses and title and registration expenses. (*Id.* ¶¶ 51, 169–172, 230, 262.) Such excluded costs, Plaintiffs allege, were material. (*Id.* ¶¶ 170–172.) For example, on sales to customers in markets greater than 200 miles from an IRC, outbound logistics contributed an additional $750 per unit of expenses incurred by Carvana. (*Id.* ¶¶ 146, 171, 230(a), 232(a), 262(a), 264(a), 283(a).) Title, registration, and related expenses totaled $410 per unit in FY 2021. (*Id.* ¶¶ 172, 230(b), 262(b).) The Consolidated Complaint alleges that "on average Carvana lost money on each wholesale vehicle sold when accounting for [selling general and administrative] [("]SG&A["]) expenses, such as logistics and title and registration expenses (both of which Carvana's biggest competitor, CarMax, considered)." (*Id.* ¶ 173.)

These logistical constraints and increased expenses, Plaintiffs allege, eventually required the Exchange Act Defendants to spend billions of dollars to purchase and integrate ADESA, a nationwide auction house, in order to fix the problem. (*Id.* ¶ 164.) CWs 4 and 7 confirmed that Carvana's acquisition of ADESA was a consequence of its efforts to expand into new markets far from existing IRCs. (*Id.* ¶¶ 88–89, 108.) Towards the end of the Class Period, Carvana's rapid "location growth" created "more vehicle moves," "more miles traveled," a "higher number of constrained routes," and a "higher degree of backlog on constrained routes." (*Id.* ¶¶ 160, 166, 231(c), 263(c), 282(b).)

### 3.    Carvana & DriveTime's Relationship

Plaintiffs further allege, to inflate reported unit sales, the Exchange Act Defendants concealed certain revenue pass-through transactions with Garcia Senior's company,

DriveTime. (*Id.* ¶ 153.) Such arrangements involved Carvana purchasing thousands of fully reconditioned vehicles from DriveTime, which were then resold on the Carvana website. (*Id.*) Plaintiffs allege that in certain instances, those transactions "lacked any economic substance for Carvana, and served only to inflate Carvana's reported retail sales volume." (*Id.*) To support that assertion, Plaintiff explain that "on certain sales of cars acquired from DriveTime, Carvana would pass the entire proceeds from the sale back to DriveTime." (*Id.*) Plaintiffs allege that Carvana acted as DriveTime's middle man, but would record the revenue and retail unit sales in its books. (*Id.*) Plaintiffs take issue with Carvana concealing the full extent of these arrangements with DriveTime from investors, and only offering piecemeal and inconsistent disclosures concerning the pass-through revenue arrangements. (*Id.* ¶ 154.)

### 4.    Carvana's Attempt to Accelerate Growth

The Consolidated Complaint further alleges that because complying with state title and registration laws slowed sales, the Exchange Act Defendants violated these laws to accelerate growth. (*Id.* ¶¶ 185–199, 229(f), 233, 261(g), 265, 284.) According to numerous Carvana employees and regulators from across the country, this practice was systematic and nationwide. For example, CW-3 in Phoenix, Arizona, witnessed that Carvana had just half of the titles for the vehicles it sold wholesale at the time of sale. (*Id.* ¶¶ 76, 149). In Arizona, where Carvana is headquartered, CW-8, observed that Carvana's practice was to assume that titles for vehicles could be acquired later if they were not available at the time of purchase. (*Id.* ¶ 112.) CW-9 noticed an increase in calls from customers experiencing title delays beginning in Q1 2022 and Carvana encouraged customers to continue driving despite lapsed paperwork. (*Id.* ¶¶ 116, 149.) CW-10 also explained that titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars. (*Id.* ¶¶123, 149.) In other parts of the country—like the Midwest or Southeast—other CWs described seeing a drawer of documentation for vehicles sold by Carvana for which the titles were missing. (*Id.* ¶ 131.) Additionally, there were "a ridiculous amount of cars on" a Google spreadsheet that tracked vehicles without titles for

the entire IRC, and it was "a huge mess." (*Id.* ¶¶ 85, 149.)

Plaintiffs allege that they, and other investors, were unaware that the State of Michigan fined Carvana thousands of dollars and placed it on an 18-month probation in May 2021. (*Id.* ¶¶ 176, 187.) Plaintiffs allege that by not disclosing their decision to "sidestep" the title and registration laws and regulations, the Exchange Act Defendants exposed Carvana to "devastating financial, regulatory, legal, and reputational loss." (*Id.* ¶¶ 149, 176.)

### 5.    Sustainability

Finally, Plaintiffs allege that the Exchange Act Defendants made materially false and misleading statements regarding their business to convince investors that Carvana's growth was sustainable. (*Id.* ¶ 10.) They misled investors by stating incorrectly that Carvana "assess[ed] vehicles on the basis of quality," was a "very high-quality buyer," and would "open many smaller markets that can be served by our existing logistics and delivery infrastructure." (*Id.* ¶¶ 200, 202, 222, 227.) Plaintiffs take issue that the Exchange Act Defendants claimed that Carvana's "logistics capabilities allow us to offer every car in our inventory to customers across all of our markets." (*Id.* ¶ 226.) The Exchange Act Defendants also falsely told investors that Carvana experienced "a massive, massive increase" in "profitability of buying cars from customers." (*Id.* ¶ 245.) Plaintiffs also take issue with the Exchange Act Defendants downplaying their various title and registration violations, calling them "pretty small in scope," impacting "quite a small fraction of customers," and "technical, paperwork violations." (*Id.* ¶¶ 248, 280, 349, 364.) And that Garcia Junior explained, "there are no states where we're not able to sell vehicles today and no issues with the clean title issue as well." (*Id.* ¶ 278.)

### F.    The 2022 Offering

On April 20, 2022, Carvana sold 15,625,000 shares of common stock at $80 per share. (*Id.* ¶ 419.) The Offering documents include the April 20, 2022 Registration Statement, the April 25, 2022 Prospectus Supplement, and other documents incorporated within them, including Carvana's 2021 10-K (collectively, the "Offering Documents"). (*Id.*

¶¶ 419–420.) Plaintiffs allege the Registration Statement contained materially false and misleading statements, and failed to disclose material information about the mounting costs and complexities of Carvana's operations. (*Id.* ¶¶ 426–438.) Plaintiffs allege that with the assistance of the Underwriter Defendants, Carvana completed the Offering on April 26, 2022, raising more than $1.2 billion in proceeds. (*Id.* ¶¶ 421, 447–456.)

### G. Procedural Posture

Plaintiffs originally filed this action in the United States District Court for the District of New Jersey. A similar action was also originally filed in the United States District Court for the District of New Jersey, styled *Rodeo Collection Ltd v. Carvana Co. et al*, 2:22-cv-02190-MTL. These actions were consolidated and then transferred to this Court. (Docs. 20, 24.) The Court held a status conference, granted Plaintiffs the opportunity to file the Consolidated Complaint, and set a new briefing schedule. (Doc. 32.) All Defendants move to dismiss the Consolidated Complaint. (Docs. 50, 52, 54.) Plaintiffs filed their Omnibus Opposition to the motions and the Court heard Oral Argument on all motions. (Docs. 56, 65.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief may be granted. Because Plaintiffs have brought claims as a federal securities fraud action, Plaintiffs must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA")." *Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Plaintiffs must include "an account of the time, place, and specific content of the false representations" at issue. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (cleaned up). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." *Apollo Grp.*, 774 F.3d at 605.

PSLRA "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* at 877 (cleaned up). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (cleaned up).

Because the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," courts in this Circuit have held that unwieldy complaints that do not easily provide a one-to-one connection between misleading statements and the reasons why the statements are misleading violates Federal Rule of Civil Procedure 8(a) by not setting forth a "short and plain" statement of the claims and the PSRLA. *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001); *Primo v. Pac. Biosciences of Cal.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013); *Patel v. Parnes*, 253 F.R.D. 531, 551–54 (C.D. Cal. 2008). These kinds of complaints are commonly referred to as puzzle pleadings because, like loose pieces of a jigsaw puzzle, the reader must actively put together random allegations of misleading statements and other elements to form the basis of a securities fraud claim.

## III.   DISCUSSION

Defendants argue that the Consolidated Complaint is a textbook puzzle pleading. (Doc. 50 at 20.) They say that Plaintiffs fail to craft a clear and concise complaint explaining why statements were false and misleading, what information Defendants allegedly knew at the time of the statement and deliberately concealed, and how the "truth" was revealed, causing investors' losses. (*Id.*) Plaintiffs argue that the Consolidated Complaint is appropriately organized and clear because they have "bolded and italicized relevant portions of lengthy statements; identified the source, speaker, and date of each

statement; organized the misstatements chronologically; and matched statements to specific factual reasons why each was misleading when made." (Doc. 56 at 32.)

"Courts may dismiss cases for puzzle pleading, where the complaint recites lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Xiaojiao Lu v. Align Tech., Inc.,* 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (cleaned up). "In the securities fraud context, the term puzzle pleading refers to a pleading that requires the defendant(s) and the court to match up the allegedly false and misleading statements that form the basis of the plaintiff's claims with the reasons those statements are misleading." *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-CV-07142-HSG, 2019 WL 3817849, at *7 (N.D. Cal. Aug. 14, 2019).

After reviewing the 229-page Consolidated Complaint, the Court finds that Plaintiffs have failed to set forth a "short and plain statement" of their claims in violation of Rule 8(a), to make their allegations "simple, concise, and direct" in violation of Rule 8(d), or to fulfill the requirements of the PSLRA for their securities claims.

### A.     The Securities Exchange Act Claims

#### 1.     Section 10(b) of the Exchange Act and Rule 10b-5 Claim

Plaintiffs' first claim alleges that the Exchange Act Defendants engaged in a fraudulent scheme, made false and misleading statements to the public, and employed a scheme to defraud in connection with the purchase and sale of Carvana Class A common stock in violation of Section 10(b) and Rule 10b-5 of the Exchange Act.

Rule 10b-5 contains three different subsections regarding different fraudulent conduct. The Supreme Court has explained that:

> [S]ubsection (a) of the Rule makes it unlawful to "employ any device, scheme, or artifice to defraud." Subsection (b) makes it unlawful to "make any untrue statement of a material fact." And subsection (c) makes it unlawful to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit."

*Lorenzo v. SEC*, 587 U.S. —, 139 S. Ct. 1094, 1100 (2019) (citing 17 C.F.R. § 240.10b-5).

Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). The Supreme Court has drawn a "clean line" between those who "make" a statement within the meaning of the rule and those who do not—the "maker is the person or entity with ultimate authority over a statement and others are not." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143 n.6 (2011). In delivering the opinion for the Court, Justice Thomas explained that even someone who is "significantly involved in preparing" a statement cannot be held liable under Rule 10b-5(b) if the statement was "made" by someone else. *Id.* at 148. This standard "might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143.

Under Rules 10b-5(a) and (c), it is unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). The Supreme Court has rejected the argument that these provisions are "violated only when conduct other than misstatements is involved." *Lorenzo*, 587 U.S. at —, 139 S. Ct. at 1101–02 (2019)*; In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021). Rather, there is "considerable overlap" between the subsections of Rule 10b-5, and scheme liability under (a) and (c) can be based on a scheme to take advantage of misleading statements—even while subsection (b) speaks to the actual making of such statements. *See Lorenzo*, 587 U.S. at —, 139 S. Ct. at 1102; *see also SEC v. Familant*, 910 F. Supp. 2d 83, 95 (D.D.C. 2012). In *Lorenzo*, the Supreme Court held that the "dissemination of false or misleading statements with intent to defraud can fall within the scope" of subsection (a) and (c). 587 U.S. at —, 139 S. Ct. at 1100.

The crux of Plaintiffs Section 10(b) and Rule 10b-5 claims are Defendants' alleged false statements about Carvana's retail unit sales, title and registration concerns, expansion

efforts, purchasing strategy, cost advantages, profitability and macro-economic factors.[2] To assert a claim under the PSLRA for false and misleading statements, Plaintiffs must identify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). Allegations of misleading statements based on omissions must meet the materiality requirement—that is, Plaintiffs must show that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)).

The Consolidated Complaint references over 29 public disclosures and other publicly available sources, which are summarized and quoted over a span of 200 paragraphs, without alleging in detail which statement is misleading and why the alleged misstatement is misleading or false. Instead, the Consolidated Complaint generally groups the alleged statements by fiscal year and then follows each group of allegedly false or misleading statements with broad, general explanations that fail to identify the specific statements to which they apply. (*See, e.g.*, Doc. 36 ¶¶ 229–233, 261–267, 281–285.)

For example, with respect to statements in paragraphs 204 through 226 of the Consolidated Complaint, Plaintiffs attempt to explain why the statements related to Carvana's nationwide market expansion are misleading with a generalized list of allegations. (*Id.* ¶ 232.) It is not obvious to the Court what subset of the dozens of allegedly false and misleading statements listed throughout paragraphs 204 through 226 were made with the understating "that it was unprofitable to pick-up and deliver cars over significant distances" or that "Carvana's expansion model" could not achieve "economies of scale." (*Id.* ¶ 232 (d), (e).) Any or all of the statements listed in the preceding paragraphs arguably could be so characterized. *See McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008

---

[2] The Court notes again that these different groups of misstatements and omissions were not easily discernable from the Consolidated Complaint—it was only with the benefit of the parties' briefing that these groups of alleged misstatements and omissions became more apparent.

WL 2951275, at *7 (N.D. Cal. July 25, 2008) ("[T]he complaint here contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity.") Plaintiffs repeat this pattern throughout the Consolidated Complaint with other alleged statements.

While the length and scope of the Consolidated Complaint do not, by themselves, result in a puzzle pleading warranting dismissal, Plaintiffs ask the Court to match nearly 100 individual statements with corresponding allegations of falsity presented in a web of inter-referenced paragraphs strewn throughout. For example, in paragraph 229, Plaintiffs generally allege that "[t]he statements detailed in ¶¶200-201, 206-207, 213, 218, 220, *supra*, regarding retail unit sales were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts, which were known to or recklessly disregarded by Defendants" followed by seven different sub-paragraphs to allege why those preceding statements were false. They do not explain why each one of those statements were either a misstatement or an omission and do not explain why each statement on its face was false given the information known at the time. Elsewhere, Plaintiffs allege "[t]he 2021 10-K contained similar disclosures as the 2020 10-K with regard to Carvana's numerous purported competitive advantages, including its vehicle acquisitioning, logistics network, cost-structure, and national footprint, as described at ¶¶224-227 above" followed by "[i]n addition, the 2021 10-K contained similar disclosures as the 2020 10-K regarding the disadvantages of traditional used car retailers as compared to Carvana's disruptive business model, as described at ¶223 above." (Doc. ¶ 259.) The Consolidated Complaint is replete with allegations such as these and places "the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (cleaned up).

Separately, and with respect to the alleged statements themselves, merely bolding and italicizing swaths of text does not assist the Court in determining which statements are allegedly misleading or why. As the Court in *In re ECOtality, Inc. Sec. Litig.*, No. 13-

03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014), explained:

> Plaintiff's complaint highlights certain portions of those documents with bold and italic type. The quotations are followed by paragraphs describing various alleged deficiencies. However, not a single sentence connects any of the allegedly misleading statements with contradictory facts known to defendants at the time. The Court will not attempt to divine Plaintiffs' intentions by trying to match potentially misleading statements with the alleged problems facing [Defendant].

*Id.* at *3.

Because Plaintiffs' Consolidated Complaint contains many purported false statements with no explanation as to which specific statement in the long blocks of text is alleged to be false or misleading, Plaintiffs also fail to meet the exacting pleading requirements of the PSLRA. Plaintiffs also fail to meet their pleading requirements of clearly and concisely alleging Exchange Act Defendants either engaged in or employed the alleged fraudulent scheme. "Neither courts nor defendants should have to wade through the morass of 'puzzle pleadings' as this wastes judicial resources and undermines the requisite notice for a defendant to respond." *In re New Century*, 588 F. Supp. 2d at 1218–19. Plaintiffs fail to meet their various pleading standards required for their Section 10(b) and Rule 10b-5 claim.

Therefore, the Court grants Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claim with leave to amend. If Plaintiffs choose to file an amended complaint, Plaintiffs must identify and specify each allegedly false or misleading statement, whether such statement is alleged to be an affirmative misrepresentation or false or misleading by omission, and describe why the specific statement was materially false or misleading when made. For any statements that are alleged to be false or misleading by omission, Plaintiffs must clearly specify what the omission is and why the omission is material. This must be done on a statement-by-statement basis. Plaintiffs should also, in a clear and concise manner, explain which Exchange Act Defendant, if he did not make the

statement, disseminated the false or misleading statements or how a Defendant either engaged in or employed the alleged fraudulent scheme.

### 2. Section 20(a) Claim

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U.S.C. § 78t(a). "[T]o prove a prima facie case under § 20(a), a plaintiff must prove: (1) a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of section 20(a). *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 n.6 (9th Cir. 2010). Accordingly, Defendants' Motion to Dismiss Plaintiffs' Section 20(a) claim is also granted.

### 3. Section 20A Claim

"Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading. To satisfy § 20A, a plaintiff must plead (i) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" *Xiaojiao Lu*, 417 F. Supp. 3d at 1282 (quoting *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)).

As explained above, the Court finds that Plaintiffs failed to plead with particularity an independent violation of section 10(b) and Rule 10b-5. Thus, because the Consolidated Complaint does not allege a predicate violation, the Court also dismisses Plaintiffs' Section 20A claim.

### 4. Garcia Senior

Although Garcia Senior did not move to dismiss the allegations against him on the ground that the Consolidated Complaint is an impermissible puzzle pleading, a "District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving

1    defendants or where claims against such defendants are integrally related." *Silverton v.*
2    *Dep't of Treasury of U. S. of Am.*, 644 F.2d 1341, 1345 (9th Cir. 1981).

3        The issues with the Consolidated Complaint apply with equal force against
4    Defendant Garcia Senior. Plaintiffs have failed to set forth a "short and plain statement" of
5    their claims against Garcia Senior in violation of Rule 8(a) or to fulfill the requirements of
6    the PSLRA for their securities claims against him. For example, like the Section 10b and
7    Rule 10b-5 claim, Plaintiffs cross-reference throughout the Consolidated Complaint rather
8    than detail which misstatements or omissions Garcia Senior made or what the precise
9    deceptive or manipulative act he engaged in regarding Carvana. (*See e.g.* Doc. 36 ¶ 23.)
10   The Consolidated Complaint heavily focuses on Garcia Senior's previous misconduct with
11   his other businesses rather than detail his culpable conduct with respect to Carvana.
12   (*Id.* ¶¶ 4, 5, 23, 35–38.) The Court will dismiss the claims against Garcia Senior for this
13   reason. *See Abigninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 743 (9th Cir. 2008) (holding
14   the district court did not err when it dismissed the case as to all defendants, even those who
15   had not appeared or made the same challenges to the pleadings).

16       **B.    The Securities Act Claims**

17           **1.    Section 11 Claim**

18       Under Section 11 of the Securities Act, issuers, underwriters, and other participants
19   in a public securities offering are liable for material misstatements of fact or material
20   omissions in a registration statement. *See* 15 U.S.C. § 77k. Plaintiffs allege that the
21   Offering Documents in connection with the April 20, 2022 Public Offering were false and
22   misleading. (Doc. 36 ¶¶ 419–420, 427–437.) Plaintiffs allege Carvana completed the
23   Offering on April 26, 2022, with the assistance of the Underwriter Defendants. (*Id.* ¶¶ 421,
24   447–456.) For the same reasons as discussed in the Court's analysis of Plaintiffs' Section
25   10(b) and Rule 10b-5 claim, the Court finds that Plaintiffs' puzzle pleading complaint fails
26   to fulfill the exacting pleading requirements of the PSLRA and grants the Motion to
27   Dismiss as to the Section 11 claim. *See* Section III(A)(1), *supra*.

28

### 2.     Section 12(a)(2) Claim

In many cases—including this one—two issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). "The definition of materiality is the same for these provisions as it is under section 10(b) of the Exchange Act: Whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Id.* (cleaned up.) To support their Section 12(a)(2) claim, Plaintiffs generally allege that the "Offering Documents contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above." (Doc. 36 ¶ 470.) Like their other claims, Plaintiffs fail to specifically allege the misstatement or unlawful omission at issue for this claim, or why it was material, and instead asks the Court to cross-reference its puzzle pleading. The Court grants the Motion to Dismiss as to the Section 12(a)(2) claim.

### 3.     Section 15 Claim

Plaintiffs' claim under Section 15 of the Securities Act is expressly premised on the Section 11 violation. (Doc. 36 ¶¶ 472–77.) Because Plaintiffs fail to allege a Section 11 claim against the Individual Securities Act Defendants, the Section 15 claim will also be dismissed. *See Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1023 (N.D. Cal. 2011); *see also In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *11.

## IV.    LEAVE TO AMEND

Under Federal Rule of Civil Procedure 15(a), when a court grants dismissal, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up). Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, be futile, or if the party moving for leave to amend has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Finding none of these exceptions present here, the Court grants

1  Plaintiffs leave to amend. Plaintiffs are directed to comply with the standards stated above.

2  **V.     CONCLUSION**

3      Accordingly,

4      **IT IS ORDERED** granting Defendants' Motion to Dismiss (Doc. 50) and

5  Underwriters' Joinder (Doc. 52).  For the reasons stated above, all Defendants, including

6  Garcia Senior, are dismissed, without prejudice.

7      **IT IS FURTHER ORDERED** denying Garcia Senior's Motion to Dismiss (Doc.

8  54) without prejudice.

9      **IT IS FURTHER ORDERED** that Plaintiffs may file an amended complaint no

10 later than 30 days from the date of this Order.

11     **IT IS FURTHER ORDERED** that if no amended complaint is filed within 30 days

12 from the date of this Order, the Clerk of Court shall enter judgment of dismissal and close

13 the action.

14     Dated this 29th day of February, 2024.

15

16

17  _____
                 Michael T. Liburdi
18            United States District Judge

19

20

21

22

23

24

25

26

27

28