ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
RACHEL A. COCALIS (CA 312376)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | No. CV-22-2126-PHX-MTL |
| This Document Relates To: | LEAD PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| All Actions. | DEMAND FOR JURY TRIAL |

4890-0865-5022.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................ 8

III.    PARTIES ............................................................................................... 8

    A.    Plaintiffs ..................................................................................... 8

    B.    Exchange Act Defendants ........................................................... 9

IV.    BACKGROUND ................................................................................. 11

    A.    Title and Registration ............................................................... 11

    B.    Carvana's Origins ..................................................................... 12

    C.    Carvana's Key Financial Metrics ............................................. 13

V.    CONFIDENTIAL WITNESS ACCOUNTS ........................................ 15

VI.    DEFENDANTS' PUMP-AND-DUMP SCHEME AND FRAUDULENT COURSE OF BUSINESS UNDER RULE 10b-5(a) and (c) ................. 37

    A.    Artifice No. 1: Garcia Junior and Garcia Senior Make a Sham Related-Party Deal Between Carvana and DriveTime to Boost Carvana's Retail Sales .................................................................. 39

    B.    Artifice No. 2: Defendants Lower Carvana's Purchasing and Verification Standards, Purchasing Lower Quality Cars to Induce Trade-In Sales ............................................................................. 41

    C.    Artifice No. 3: Garcia Junior and Jenkins Embark on a Rapid and Unsustainable Nationwide Expansion ..................................... 43

    D.    Artifice No. 4: Defendants Flout Title and Registration Laws .................. 46

    E.    Artifice No. 5: Garcia Junior and Jenkins Make Materially Misleading Statements and Omissions .......................................... 51

        1.    Garcia Junior and Jenkins Make False and Misleading Statements to Further Conceal the Fraudulent Scheme ................. 52

        2.    Garcia Junior and Jenkins Make Their Manufactured Growth Appear Sustainable .......................................................... 53

    F.    Artifice No. 6: Garcia Senior and Jenkins Manipulate Their 10b5-1 Plans to Capitalize on the Scheme .................................. 56

    G.    Artifice No. 7: Garcia Senior and Jenkins Dump Their Holdings ............. 57

    H.    The Truth Is Revealed ............................................................... 58

4890-0865-5022.v1

|  |  |  | Page |
|---|---|---|---|
| VII. | | DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b) | 60 |
| | A. | Defendants' Materially Misleading Statements and Omissions Concerning Title and Registration | 60 |
| | B. | Defendants' Materially False and Misleading Statements and Omissions Concerning Buying Cars from Customers | 80 |
| | C. | Defendants' Materially Misleading Statements and Omissions Concerning Retail Unit Sales Growth | 139 |
| | D. | Defendants' Materially False and Misleading Statements Regarding Expansion and Logistics Infrastructure | 146 |
| | E. | Defendants' Materially False and Misleading Statements Regarding Aged Inventory | 168 |
| | F. | Defendants' Materially False and Misleading Statements Regarding Profitability Per Vehicle Sold | 183 |
| VIII. | | ADDITIONAL ALLEGATIONS OF SCIENTER | 255 |
| | A. | Insider Stock Sales Support a Motive to Commit Fraud | 255 |
| | | 1. Garcia Senior's Class Period Sales and Insider Trading | 255 |
| | | 2. Jenkins's Class Period Sales and Insider Trading | 258 |
| | B. | Defendants' 10b5-1 Plans Support a Strong Inference of Scienter | 260 |
| | C. | Multiple Confidential Witnesses Raised Quality, Indiscriminate Growth, and Title Problems with Managers, Including Garcia Junior and Jenkins | 261 |
| | D. | The Fraud Involved the Company's Core Operations, About Which Defendants Held Themselves Out as Knowledgeable | 263 |
| | E. | Analysts and Investors Frequently Asked Questions About, and Garcia Junior and Jenkins Frequently Evinced Personal Knowledge by Commenting on, the Subjects of Their Fraud | 266 |
| | F. | Defendants' Decision to Cease Reporting Critical Metrics Bolsters Their Scienter | 268 |
| | | 1. Average Days to Sale | 269 |
| | | 2. Buying Cars from Customers | 269 |

4890-0865-5022.v1

1
2                                                                                    **Page**
3
4           G.    Garcia Junior's and Jenkins's SOX Certifications and Signing of
                  SEC Filings Support Scienter..................................................................... 270

5           H.    Garcia Senior's Control of and Related-Party Deals with Carvana.......... 271

6           I.    Garcia Senior's History of Similar and Fraudulent Misconduct
                  Supports a Strong Inference of Scienter...................................................... 274
7
            J.    Corporate Scienter ..................................................................................... 275
8
    IX.    LOSS CAUSATION ............................................................................................. 276
9
    X.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE
10          FRAUD-ON-THE MARKET DOCTRINE ........................................................ 286

11  XI.    NO SAFE HARBOR............................................................................................. 286

12  XII.   CLASS ACTION ALLEGATIONS...................................................................... 287

13  XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ................................ 288

14  XIV.   SECURITIES ACT ALLEGATIONS ................................................................. 293

15          A.    Plaintiffs' Purchases in the 2022 Public Offering..................................... 293

16          B.    Securities Act Defendants .......................................................................... 293

17          C.    Background of the 2022 Public Offering .................................................... 294

18          D.    The Registration Statement Contained Materially False and
                  Misleading Statements and Omitted Material Facts Required to be
19                Stated Therein ............................................................................................ 296

20          E.    The Registration Statement Contained Deficient and Inaccurate Risk
                  Disclosures ................................................................................................. 307
21
            F.    Events Subsequent to the 2022 Public Offering ........................................ 308
22
            G.    The Role of the Underwriter Defendants in Connection with the
23                2022 Public Offering................................................................................... 310

24          H.    Class Action Allegations for Securities Act Claims .................................. 313

25  XV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ................................ 314
26
27
28
4890-0865-5022.v1

Lead Plaintiffs United Association National Pension Fund ("UANPF") and Saskatchewan Healthcare Employees' Pension Plan ("SHEPP," and collectively, "Plaintiffs") allege the following against Defendants (defined herein), by and through Lead Counsel, upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.[1]

# I.    INTRODUCTION

1.    This action concerning a classic pump-and-dump scheme and materially misleading statements and omissions asserts violations of the federal securities laws against Carvana, its controlling shareholder, and certain officers on behalf of Plaintiffs and all other persons and entities that purchased or otherwise acquired Carvana Class A common stock between May 6, 2020 and February 23, 2023, inclusive (the "Class Period").[2]

2.    Throughout the Class Period, Defendants billed Carvana to investors as an e-commerce company, akin to the Amazon of the used car industry.  Unlike traditional car dealerships, Carvana would be a seemingly limitless growth machine because the Company's disruptive model was full of competitive advantages, such as a "capital-light" expansion model, a scalable business model, and a groundbreaking logistics network that could readily deliver or pick-up cars nationwide.  As Defendants promised investors, Carvana's "business gets better as it gets bigger."

---

[1]    Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to: (a) review of U.S. Securities and Exchange Commission ("SEC") filings by Carvana Co. ("Carvana" or the "Company"); (b) review of transcripts of Carvana's public conference calls, press releases, and other publications issued by the Company; (c) review of media reports about the Company; (d) review of public filings and court orders in other litigation against one or more defendant; and (e) interviews with third parties conducted by attorneys and/or investigators retained by attorneys.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control.  Plaintiffs' investigation is ongoing and they believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2]    Plaintiffs assert additional violations of the federal securities laws against Carvana, certain executives, directors, and underwriters in connection with Carvana's public offering on or about April 20, 2022 (the "2022 Public Offering"). *See* §§XIV.-XV. Unless otherwise stated, "stock" refers to Carvana Class A common stock and emphasis is added.

4890-0865-5022.v1

3.    But, unbeknownst to investors, Carvana's sustainable growth machine was a lemon, built on a fraudulent pump-and-dump scheme to boost Carvana's retail sales growth, and a series of misrepresentations and omissions designed to artificially inflate Carvana's share prices for long enough to allow the Company's founders and executives to sell nearly $3.76 billion of their personally held stock at artificially inflated prices.

4.    Carvana was founded by Ernest Garcia II ("Garcia Senior") and his son Ernest Garcia III ("Garcia Junior") as a wholly-owned subsidiary of Garcia Senior's other used car business, DriveTime Automotive Group, Inc. ("DriveTime"). The father-and-son team spun Carvana off and took it public, celebrating the culmination of their efforts by ringing the bell at the New York Stock Exchange (the "NYSE") side by side. But Garcia Senior had a problem. His federal felony conviction for fraud barred him from employment at any NYSE-listed company. Thus, he installed his son as the Company's Chief Executive Officer ("CEO") and Chairman, designed Carvana's voting structure so that he maintained more than 80% of the voting power and thus, controlled Carvana and its operations, and appointed his loyal friends (one of whom previously had been censured by the NYSE for actions he took on behalf of Garcia Senior) as board members.

5.    Leading up to the Class Period, Defendants faced a dilemma as investors were concerned that Carvana's retail sales growth was slowing and Carvana's bigger is better e-commerce growth story was in doubt. As a Morgan Stanley analyst noted on February 27, 2020, if Carvana's "growth starts to slow significantly, and the company is still not profitable, there will be a transition away from growth investors, and . . . how investors think about the valuation of the stock will change."

6.    Defendants could not let this happen; Garcia Junior, Garcia Senior, and Mark Jenkins ("Jenkins"), Carvana's Chief Financial Officer ("CFO"), needed the Company to have a high valuation so they could cash out their holdings in Carvana stock at a top dollar. Thus, to pump Carvana's stock price, Defendants planned and executed a scheme to inflate the Company's retail vehicle sales growth and convince investors that this growth was sustainable.

4890-0865-5022.v1

7. Accordingly, Defendants employed the following artifices to artificially boost Carvana's reported retail sales growth, and make the growth appear profitable and sustainable, in furtherance of their pump-and-dump scheme: (i) Garcia Senior caused DriveTime to enter into a sham pass-through sales arrangement with Garcia Junior at Carvana to boost materially Carvana's reported retail sales; (ii) Carvana drastically lowered or disregarded entirely its purchasing and verification standards, and began buying low-quality cars to induce trade-in sales which artificially boosted Carvana's reported sales growth; (iii) Carvana flouted state title and registration laws to secure retail sales before competitors; (iv) Garcia Junior and Jenkins spearheaded a rapid and unsustainable nationwide expansion without regard to profitability to boost Carvana's reported retail sales; and (v) Garcia Junior and Jenkins made materially misleading statements and omissions designed to conceal the scheme and convince investors that Carvana's retail growth was profitable and sustainable.

8. Defendants' limitless growth story produced its desired results. Carvana's retail sales growth skyrocketed, propelling Carvana to be named as one of the fastest companies to ever make the Fortune 500 list based on organic growth alone, along with Google and Amazon. Naturally, Carvana's stock price soared, rising as high as $376 per share during the Class Period. And Defendants took full advantage of the artificially inflated stock price by employing the final artifice of their pump-and-dump scheme: manipulating their trading plans and dumping nearly $3.76 billion of their shares on unsuspecting investors.

9. Garcia Senior alone reaped more than ***$3.6 billion*** in insider sales proceeds. Daniel Taylor, an accounting professor at the Wharton School of Business and director of the Wharton Forensic Analytics Lab, explained that Garcia Senior's insider trades were nefarious, concluding: "'***What I'm saying is the Garcias knew it was short-lived . . . . The Garcias knew the music would eventually end***.'"[3]

---

[3] *See* John Hyatt, *Carvana's 'Chaotic' Zoom Firing Caps Company's Struggles Amid Market Downturn*, Forbes (May 21, 2022).

10.     Critically, Garcia Junior and Jenkins furthered their scheme by making materially misleading statements and omissions designed to convince investors that Carvana's growth was profitable and sustainable.  After all, if Carvana could pair its explosive unit growth with purported profitability and a scalable logistics model that could expand across the country efficiently and cost effectively, the sky was the limit.  Thus, in addition to engaging in a scheme to defraud in violation of Rule 10b-5(a) and (c), Carvana, Garcia Junior, and Jenkins made misleading statements and omissions regarding the following subjects in violation of Rule 10b-5(b): (i) title and registration; (ii) buying cars from customers; (iii) retail unit growth; (iv) expansion and logistics infrastructure; (v) aged inventory; and (vi) profitability per vehicle sold.

11.     ***Title and Registration***.  In each of Carvana's SEC filings during the Class Period, Carvana purported to warn of material risks and related harms that ***could*** occur ***if*** it failed to comply with state and local laws and regulations, including those related to title and registration.  In fact, beginning at least by the date on which it filed its 2020 10-K (defined herein), these risks and harms had already materialized because states had begun investigating and penalizing Carvana for its title and registration noncompliance.  When the news of these investigations and penalties began to leak publicly, Defendants minimized the regulatory investigations as mere one-offs and trivialized the penalties imposed on the Company.  But, as Defendants later conceded, the reputational damage from just one of these suspensions was "'incalculable and irreparable.'"

12.     ***Buying Cars from Customers***.  As Defendants reminded investors throughout the Class Period, a critical part of Carvana's growth strategy was to "[i]ncrease the purchase of vehicles from customers."  However, unbeknownst to investors, by the second half of FY 2020, Defendants had drastically lowered or disregarded entirely their purchasing and verification standards to significantly increase the number of cars Carvana purchased from customers in order to induce more trade-ins and artificially boost retail sales.  While this action did increase retail unit sales, it adversely impacted Carvana's bottom line, flooded Carvana with low-quality cars that had to be sold via the wholesale market at a loss, and

- 4 -

1  crippled its logistics network.  Rather than disclose this adverse information, Defendants

2  touted only the positive "advantages" of buying cars from customers while assuring investors

3  that Carvana "***assess[es] vehicles on the basis of quality***."

4        13.  ***Retail Unit Sales Growth***.  Carvana told investors that "Objective #1" leading

5  up to and throughout the Class Period was to "Grow Retail Units."  During the Class Period,

6  Defendants consistently touted Carvana's retail unit sales growth and legitimate drivers of

7  such growth.  In truth, however, Defendants concealed that Carvana's sales growth was also

8  substantially fueled by nefarious tactics, such as: (i) sales in violation of title and registration

9  laws and regulations; (ii) "less profitable sales . . . in markets with lower profitability due to

10 long distance from inventory"; (iii) trade-in sales resulting from Carvana's lowered

11 purchasing and verification standards; and (iv) "sales that were less profitable in the

12 immediate period" because of artificially low pricing.  By failing to disclose these adverse

13 facts, Defendants created the materially misleading impression that Carvana's growth was

14 organic, profitable, and sustainable.

15       14.  ***Expansion and Logistics Infrastructure***.  Leading up to and throughout the

16 Class Period, Defendants repeated their mantra: "[W]e want to expand as much as we

17 possibly can."  Indeed, in every quarterly shareholder letter during the Class Period, Garcia

18 Junior and Jenkins dedicated an entire section to its expansion, in which they reported the

19 number of new markets added to tout the purported population coverage that Carvana had

20 achieved.  At the same time, Defendants exalted their "capital-light" expansion model (*i.e.*, a

21 business model that did not require a substantial number of physical locations).  Defendants'

22 statements were misleading, however, as the vast majority of their new markets were

23 significant distances from inspection and reconditioning centers ("IRCs"), which,

24 Defendants later admitted, required Carvana to incur significant additional logistics costs that

25 rendered sales in distant markets unprofitable.  Unsurprisingly, near the end of the Class

26 Period, Defendants were forced to come clean and take actions to intentionally reduce sales

27 in distant markets that generated "lower profitability due to long distance from inventory."

28 This caused the Company to report its first-ever quarterly sales decline in Q3 2022.

1  Defendants were also forced to fix Carvana's deficient logistics infrastructure by spending
2  over $4.5 billion to acquire ADESA, a wholesale auction company with locations
3  nationwide.  Contrary to Defendants' Class-Period assertions about Carvana's capital-light
4  expansion model, Garcia Junior admitted after the Class Period that "*we are without*
5  *question . . . a big physical infrastructure business*" and that "[a] major factor" behind
6  Carvana's ADESA purchase was that a "used car retailer needs a physical footprint . . .
7  undergirded by a network of massive distribution centers and transport depots."

8         15.    *Aged Inventory*.  Average days to sale, which measures the number of days
9  between when Carvana acquires a car and when it sells the car to a customer, was one of
10  Carvana's key internal metrics throughout the Class Period.  Defendants acknowledged that
11  "our business is dependent upon *our ability to expeditiously sell inventory*" and that an
12  increase in the average days to sale metric "*is unfavorable for retail GPU because if you*
13  *hold the car longer, it has more time to experience depreciation before you sell it*."  Despite
14  the fact Defendants clearly viewed average days to sale as a key internal metric, Defendants
15  abruptly stopped disclosing it to investors, claiming that it was no longer necessary given
16  "*the relative stability of average days to sale* over the past three years."  However, by early
17  2022, average days to sale was anything but "relative[ly] stab[le]," spiking nearly 60% in
18  just three quarters.  Thus, Defendants' statements were materially misleading because they
19  created an impression of a state of affairs (relatively stable average days to sale) that differed
20  in a material way from the one that actually existed (a spiking average days to sale metric).

21         16.    *Profitability per Vehicle Sold*.    During the Class Period, Carvana
22  acknowledged that "[t]he Company's primary business objective is to sell used vehicles to
23  retail customers and generate a profit doing so."  Thus, "Retail GPU," which measured the
24  gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue
25  and profit streams such as warranty, insurance, and financing), was a critical metric to
26  investors during the Class Period.  Throughout the Class Period, Defendants reported
27  positive Retail GPU in each of Carvana's earnings calls and shareholder letters and assured
28  investors that its retail vehicle sales were profitable.  However, Defendants concealed

- 6 -

1    Carvana's actual per-vehicle profitability – or lack thereof – by: (i) excluding certain per-
2    vehicle operations expenses from its calculation of Retail GPU; and (ii) not disclosing or
3    quantifying these excluded costs separately so investors could decipher Carvana's "unit
4    economics" (*i.e.*, overall profitability) of retail sales on their own.   These per-vehicle
5    operations expenses, which were only separately broken out and quantified for the first time
6    **after** the Class Period, included material costs associated with completing retail sales, such
7    as the full cost of shipping cars to a customers and title and registration costs.   By
8    intentionally hiding these significant costs, investors were left to rely on the positive Retail
9    GPU reported by Defendants as the sole measure of Carvana's retail sales profitability.
10   However, had Carvana included these operations expenses in its Retail GPU calculation or
11   separately disclosed and quantified the costs that were excluded from Retail GPU, it would
12   have revealed to investors that, on average, Carvana generated negative unit economics on
13   every retail car sold.   This created an impression of a state affairs (positive per-unit
14   profitability) materially different from the one that actually existed (negative per-unit
15   profitability).

16         17.    Through a series of partial disclosures, investors began to learn that Carvana
17   was a very different company from the one they were sold.   Defendants' bigger is better
18   Amazon-comparison story was a fiction.   Ultimately, Defendants admitted that Carvana's
19   retail sales growth was unprofitable and unsustainable – indeed, by the end of the Class
20   Period, Defendants disclosed that "retail units sold decreased for the first time in our history
21   this year" and "that going forward, Carvana was intentionally foregoing retail sales growth
22   for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail
23   sales that were actually profitable).   Moreover, Carvana was forced to write off over $50
24   million of aged and impaired vehicle inventory that was worth less than Carvana had paid to
25   acquire it and prepare it for sale.   Defendants further acknowledged that Carvana's "capital-
26   light" market expansion model was a farce, and Carvana was forced to issue billions of
27   dollars of high-interest junk bonds to acquire a nationwide auction house, ADESA, to
28   backfill its deficient infrastructure.

4890-0865-5022.v1

18.     By the time the truth about Carvana's unsustainable growth and business model was revealed, the price of Carvana's stock had plummeted from a Class Period high of $376 per share to $8.01 per share, representing a decline of more than 98%, leaving the Company on the verge of bankruptcy.  While investors suffered billions of dollars in damages, Defendants' fraudulent conduct permitted them to walk away with billions. Plaintiffs seek to recover those damages on behalf of the putative Class through this action.

## II.     JURISDICTION AND VENUE

19.     Jurisdiction is conferred by 28 U.S.C. §1331, §22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §77v), and §27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa).  The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77o) and §§10(b), 20(a), and 20(A) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act, and §22 of the Securities Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.     Plaintiffs

22.     Lead Plaintiff UANPF is an Alexandria, Virginia-based multi-employer defined benefit pension plan.  UANPF is one of the nation's largest Taft-Hartley funds with approximately $6.5 billion in assets held for the benefit of approximately 150,000

4890-0865-5022.v1

1  participants.  ECF 9-5, ¶2.  As detailed in UANPF's previously-filed certification (*see* ECF

2  9-3, ECF 9-4, and ECF 9-6) and certification attached hereto, UANPF purchased a

3  significant number of shares of Carvana stock at artificially inflated prices during the Class

4  Period and suffered damages as a result of Defendants' alleged misconduct.  As discussed

5  *infra* §XIV.A., on April 22, 2022, UANPF also purchased 1,455 shares of stock in the 2022

6  Public Offering from Citigroup Global Markets Inc. ("Citigroup") for $80.00 per share.

7         23.     Lead Plaintiff SHEPP, the largest defined benefit plan in the Saskatchewan

8  providence of Canada, is a multi-employer defined benefit pension plan serving the

9  healthcare sector with over 60,000 members and more than $10 billion in assets under

10  management.  ECF 9-5, ¶3.  As detailed in SHEPP's previously-filed certification (*see* ECF

11  9-3, ECF 9-4, and ECF 9-6) and certification attached hereto, SHEPP purchased a significant

12  number of shares of Carvana stock at artificially inflated prices during the Class Period and

13  suffered damages as a result of Defendants' alleged misconduct.  As discussed *infra*

14  §XIV.A., on April 22, 2022, SHEPP also purchased 3,838 shares of stock in the 2022 Public

15  Offering from Citigroup for $80.00 per share.

16     **B.     Exchange Act Defendants**

17         24.     Defendant Carvana is a Delaware corporation with its principal executive

18  offices located in Tempe, Arizona.  Carvana's stock trades on the NYSE under the symbol

19  "CVNA."

20         25.     Defendant Garcia Junior is a co-founder of the Company and has served as its

21  CEO, President, and Chairman since 2012.

22         26.     Defendant Garcia Senior is a founder of Carvana and was, at all relevant times,

23  and continues to be, the Company's controlling shareholder.  He maintained 84% of

24  Carvana's voting power during the Class Period.  Garcia Senior was a real estate developer

25  until federal investigators began investigating his real estate and stock deals in connection

26  with the Lincoln Savings & Loan scandal.  In 1990, Garcia Senior pled guilty to

27  "fraudulently obtain[ing] a $30-million line of credit in a series of transactions that also

28

4890-0865-5022.v1

helped Lincoln [Savings & Loan] hide its ownership . . . from regulators."[4]  As a result of his conviction, Garcia Senior was banned for life from serving as an employer, officer, or director with a company on the NYSE and, therefore, cannot hold a formal position at Carvana.  However, Carvana's SEC filings leading up to and during the Class Period make clear:  "***The Garcia Parties control us***"[5] ***and can, among other things***, "***elect all of the members of our Board [of Directors] and thereby effectively control our policies and operations***."  Garcia Senior is Garcia Junior's father and maintains a close relationship with his son, whom he lived next door to during the Class Period.  Garcia Senior is also the largest owner of Carvana's former parent company, DriveTime (of which Garcia Junior and his children own nearly a quarter through a trust).  During the Class Period, Defendant Garcia Senior sold 13,950,000 shares, at artificially inflated prices for proceeds of $3,676,933,685.13.

27.    Defendant Jenkins was, at all relevant times, and continues to be, Carvana's CFO.  During the Class Period, Defendant Jenkins sold 336,929 shares, at artificially inflated prices for proceeds of $79,246,194.95.

28.    The defendants referenced in ¶¶24-27, above, are collectively referred to as the "Exchange Act Defendants" or "Defendants."

29.    Defendants Garcia Senior, Garcia Junior, and Jenkins (collectively, the "Individual Defendants"), because of their voting power and/or positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

30.    Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

---

[4]    James S. Granelli, *Lincoln S&L; Figure Pleads Guilty to Fraud: Crime: Ernest C. Garcia II admits acting to help the thrift hide its ownership of some risky desert land in Arizona*, L.A. Times (Oct. 31, 1990).

[5]    "Garcia Parties" refers to Garcia Senior, Garcia Junior, and entities controlled by one or both of them.

- 10 -

1  ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

2  their positions and access to material, non-public information ("MNPI") available to them,

3  Defendants knew or recklessly disregarded that the adverse facts specified herein had not

4  been disclosed to, and were being concealed from, the public, and that the representations

5  that were being made were then materially false and/or misleading.  Defendants are liable for

6  the scheme and Garcia Junior and Jenkins are liable for the false and misleading statements

7  and omissions pleaded herein.

8      31.    Each Defendant is liable as a participant in a fraudulent scheme and course of

9  business that operated as a fraud or deceit on purchasers of Carvana stock by engaging in the

10  violative conduct alleged herein, which caused Carvana stock to trade at artificially inflated

11  prices during the Class Period.

12  **IV.    BACKGROUND**

13      **A.    Title and Registration**

14      32.    A vehicle's title is a legal document issued by the state that demonstrates the

15  vehicle's ownership.  In many states, such as Texas, Pennsylvania, Michigan, and Illinois, it

16  is illegal to sell a car without holding title.  Further, states generally set out the legal

17  requirements for transferring title when a new owner purchases a vehicle, often including a

18  time limit within which title must be transferred to the new owner.

19      33.    A vehicle registration reflects a state's certification that a car can be driven on

20  public roads.  Each state requires vehicles to be registered with a designated state

21  government agency.  It is illegal in every state to drive an unregistered car or one with a

22  lapsed registration.  License plates and tags are a part of the registration process as they

23  indicate that a car is properly registered.  During the brief window after one has purchased a

24  car and is waiting for permanent plates, states require drivers to display a temporary plate

25  provided by the dealer.  Many states, like Illinois and North Carolina, require the temporary

26  license and/or tag to be issued from the state in which the car is to be registered.

27

28

4890-0865-5022.v1

**B.    Carvana's Origins**

34.    Following his federal felony conviction for fraud, Garcia Senior bought a rental car franchise called Ugly Duckling and merged it with his finance company to become the largest subprime lender and seller of used cars.  After a short and litigation-punctuated stint on the Nasdaq Capital Market (the "NASDAQ"), Garcia Senior bought Ugly Duckling back to take it private for a pittance, settled a number of shareholder actions, and renamed the company DriveTime.

35.    In 2012, Garcia Senior and his son founded Carvana Group LLC as a wholly-owned subsidiary of DriveTime.  Garcia Senior installed his son as CEO of the Company.  According to Garcia Junior, Carvana's reliance on DriveTime cannot be understated as "'[w]e were able to build Carvana into a stronger company much quicker than we likely would have been able to do without the benefits . . . from being able to use the backbone of [DriveTime].'"[6]

36.    But shortly thereafter, DriveTime found itself in hot water.  In 2014, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Consumer Financial Protection Bureau brought an enforcement action against DriveTime and its finance company for violating federal financial laws.  DriveTime was fined $8 million, subjected to increased oversight, and forced to reform its business practices.  Thus, the father-and-son team decided to spin Carvana Group LLC off of DriveTime at that time.

37.    In 2017, Garcia Junior and Garcia Senior took the Company public on the NYSE.  The father-and-son duo, who live next door to one another, celebrated their accomplishment by ringing the NYSE bell side by side.  Because Garcia Senior was unable to have a formal role at Carvana, however, upon taking Carvana public, he maintained 97% of the voting power with his son, established a voting "'structure [that academics note] has allowed [the Garcias] to run this $60 billion public company as if it's a family firm and for

---

[6]    Bill Alpert, *Used-Car Prices Are Plunging.  So Why is Carvana's Stock Soaring?  Time for a Rethink*, Barron's (May 1, 2020).

- 12 -

1    the family's benefit,'"[7] and installed his former DriveTime employees and Lincoln Savings

2    & Loan cronies to Carvana's Board of Directors (the "Board").[8]

3        38.    As Garcia Senior had done with Carvana's predecessor, Garcia Senior and

4    Garcia Junior pitched Carvana as a disrupter and innovator in the used car market.

5        **C.    Carvana's Key Financial Metrics**

6        39.    In Carvana's Q1 2017 letter to shareholders dated June 6, 2017 (the "Q1 2017

7    Shareholder Letter"), Defendants told investors that Carvana should be measured by its

8    primary objectives and corresponding key metrics, including "Objective #1: Grow Retail

9    Units and Revenue."

10        40.    ***Retail Unit Growth***.    In Carvana's SEC Form S-1/A, filed April 27, 2017

11    ("2017 Registration Statement") and first-ever shareholder letter, Defendants were

12    unequivocal that the Company's number one objective – and metric to watch – was growth

13    in retail units sold.  Indeed, in the Q1 2017 Shareholder Letter – Defendants advised that

14    "[w]e view retail units sold as the single most important metric in our business."  In the

15    quarters that followed, Defendants would repeatedly advise investors that its number one

16    objective was to grow retail units sold because it is "the most important measure of our

17    growth."

18        41.    Critically, Defendants repeatedly told investors in the Company's SEC filings

19    that Carvana's retail sales were essential to the Company's profitability because they "drive[]

20    the majority of our revenue and allow[] us to capture additional revenue streams associated

21    with financing, vehicle service contracts ('VSCs') and trade-in vehicles."  Moreover, these

---

22
23    [7]    Carvana's dual-class ownership structure provides that any share owned by one of the
Garcia Parties is entitled to ten votes per share, compared to the single vote per share on each
share held by the public.

24    [8]    Garcia Senior was thick as thieves with Ira Platt ("Platt") and Greg Sullivan ("Sullivan"),
25    and they were, in fact, independent neither from him nor his son.  *In re Carvana Co.
S'holders Litig.*, 2022 WL 2352457, at *4 (Del. Ch. June 30, 2022).  For example, director
26    Sullivan "was censured by the NYSE due to actions he took on behalf of Garcia Senior" in
connection with Garcia Senior's fraud. *Id.* at *9.  But, as the court noted, while "[t]he NYSE
censure could have been career-ending for Sullivan, . . . it was not" as Garcia Senior hired
27    him at DriveTime and eventually installed him as DriveTime's CEO. *Id.* at *9-*13.  This led
to the court's "inference that Sullivan and Platt are beholden to the Garcias." *Id.* at *18.
28

- 13 -

sales "allow [Carvana] to benefit from economies of scale due to our centralized online sales model."   Accordingly, throughout the Class Period, Defendants highlighted Carvana's exponential growth in retail units sold in all of Carvana's investor presentations, earnings calls, SEC filings, and shareholder letters.

42.    ***Retail GPU***.   During the Class Period, Carvana acknowledged, in an August 23, 2022 letter to the SEC Division of Corporation Finance, that its "primary business objective is to sell used vehicles to retail customers and generate a profit doing so." Thus, Retail GPU, which measured "the difference between the retail selling price of the vehicle and [the] cost of sales associated with acquiring the vehicle and preparing it for sale" was a critical metric to investors during the Class Period.[9]   Accordingly, Used Vehicle Gross Profit (*i.e.*, Retail GPU) was included in Carvana's S-1 Registration Statement at the time of its IPO and in each of the Company's Form 10-K's filed with the SEC during the Class Period.    In addition, Defendants reported Carvana's Retail GPU in each quarterly shareholder letter and on each of Carvana's quarterly earnings calls.

43.    ***Average Days to Sale***.  As Defendants explained in their 2017 Registration Statement, average days to sale was one of Carvana's six "Key Operating Metrics" because Carvana's "business is dependent upon our ability to expeditiously sell inventory."  Indeed, Carvana's failure to do so, reflected in an increased average days to sale, "could have a material adverse effect on our business, sales and results of operations" because "[a]n over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins."   Accordingly, during much of the Class Period, Defendants reported average days to sale in its SEC filings as a key metric to evaluating Carvana's gross profit per unit sold.  Further, throughout the entire Class Period, Defendants continued to

---

[9]   Defendants separately disclosed a "Total GPU" metric, which included Retail GPU, wholesale gross profit, and "Other Gross Profit" that Carvana earned on ancillary revenue and profit streams, such as commissions from sales of extended warranties and insurance, and gains on sales of auto loans.

4890-0865-5022.v1

1  explain that reducing average days to sale was essential to "increase our total gross profit per

2  unit."

3      44.    ***Market Expansion***.  Carvana also reported the number of markets in which it

4  sold vehicles as a key metric.  Carvana's 2017 Registration Statement defined a market "as a

5  metropolitan area in which we have commenced local advertising and offer free home

6  delivery to customers with a Carvana employee and branded delivery truck."  Defendants

7  explained that market expansion drove retail sales growth because, as the number of markets

8  grow, "the population of consumers who have access to our fully integrated customer

9  experience increases."  Thus, Carvana also reported the percentage of the U.S. population it

10  served through these markets along with the number of IRCs as key metrics.

11  **V.    CONFIDENTIAL WITNESS ACCOUNTS**

12      45.    Several former Company employees have provided information demonstrating

13  that Defendants' Class Period statements were false and misleading, that Defendants knew or

14  recklessly disregarded the falsity or misleading nature of their statements, and that

15  Defendants engaged in a scheme to defraud investors.  The confidential witnesses ("CWs")

16  include individuals formerly employed at the Company during the Class Period whose

17  accounts corroborate one another, other sources set forth herein, and facts now admitted by

18  Carvana.  The CWs provided information to Plaintiffs' counsel and Plaintiffs' counsel's

19  investigators on a confidential basis and are particularly described by job description and/or

20  responsibility and duration of employment, thereby providing sufficient detail to establish

21  their reliability and personal knowledge.  As set forth below, the information provided by the

22  CWs supports a strong inference that the Exchange Act Defendants acted with scienter.

23      46.    **Confidential Witness No. 1 ("CW-1")** was employed by Carvana in a

24  supervisory role on the Wholesale Team at a large Carvana facility in the Northeast U.S. for

25  more than six months during the Class Period.  CW-1's role involved managing the

26  "lifecycle" of vehicles that were going to be sold wholesale.  This included overseeing a

27  team of inspectors who inspected vehicles before they were put up for auction and ensuring

28

4890-0865-5022.v1

1    that vehicles were picked up by wholesale buyers' haulers after they were purchased at

2    auction.

3         47.    CW-1 explained that the wholesale facility where he/she worked was

4    essentially an overflow for the IRCs because the IRCs did not have the capacity to store and

5    process all the vehicles that were going to be sold wholesale.  CW-1's facility was basically

6    a giant parking lot and thousands of vehicles could be stored there.

7         48.    CW-1 explained that vehicles that had been purchased with the intent to be

8    sold wholesale were shipped directly to CW-1's facility, but CW-1's facility also received

9    many vehicles from IRCs after they were "flipped" to wholesale.  CW-1 explained that

10   inspectors at the IRCs inspected vehicles that were supposed to be sold retail.  Sometimes the

11   inspectors at the IRCs decided to flip vehicles to wholesale, typically because it was going to

12   cost too much money or require too much labor to repair the vehicles well enough to sell

13   them as retail.  When this occurred, CW-1 would do an evaluation and approve the transfer

14   of the vehicles to wholesale, and they would be shipped to CW-1's facility.  CW-1 said that a

15   lot of the vehicles that CW-1's facility received were trade-ins.  CW-1 said that so many

16   vehicles had to be sold wholesale because Carvana had been trying to purchase "everything,"

17   regardless of the quality of their vehicles.

18        49.    CW-1 said that when an individual seller submitted information about a

19   vehicle, Carvana did very little or nothing to verify the accuracy of the information.  This

20   meant that Carvana would buy vehicles even if the condition had been misrepresented by the

21   seller.

22        50.    CW-1 also explained that sometimes Carvana used third-party contractors to

23   pick up vehicles from sellers when the market operations team was too busy.  CW-1 believed

24   that the third-party contractors just picked up the vehicles without looking at the quality at

25   all.  CW-1 provided the example of a vehicle that Carvana purchased that had bullet holes in

26   it, but the seller had rated it in fair condition.  CW-1 said that this vehicle should never have

27   been purchased.  CW-1 also recalled an instance when a vehicle that was supposedly in good

28   condition had missing seats.  CW-1 knew that sellers were rating poor quality vehicles in fair

4890-0865-5022.v1

1  or good condition because CW-1 saw what the sellers had reported about vehicles when

2  he/she approved them to be flipped from retail to wholesale based on data CW-1 pulled from

3  Carvana's Saleforce.com application. CW-1 wondered how these poor-quality vehicles had

4  been purchased at retail price and why Carvana did not seem to do anything to prevent

5  sellers from misrepresenting the quality of their cars.

6    51. CW-1 participated in Carvana all-hands meetings that were held by Zoom in

7  which Garcia Junior addressed employees. In these calls, Garcia Junior would discuss the

8  Company's performance. The tenor of the calls was always "upbeat." CW-1 is pretty sure

9  that his/her bosses, and "probably Garcia" had "talked about high growth" including how the

10  Company had grown and how the Company was expected to do.

11    52. CW-1 said that it was pretty much the case that Carvana lowered its standards

12  when it came to trade-ins as long as the customer was also buying a car from Carvana. CW-

13  1 explained that Carvana "wouldn't care" about the poor quality. CW-1 said that as long as

14  someone was also "buying from us," then Carvana would take the trade-ins. But this

15  practice resulted in, for instance, a car that had been missing its backseat being accepted,

16  which CW-1 is pretty sure had been a trade-in. CW-1 was also pretty sure the car with bullet

17  holes had been a trade-in because, with trade-ins, Carvana was not doing any verifications of

18  what the customer was representing (whereas with wholesale, usually what the seller was

19  representing about the vehicle's condition was in fact what was being sold).

20    53. CW-1 confirmed that the parties picking up a customer's trade-in were

21  supposed to assess the vehicle and not accept the vehicle if it was inoperable or did not meet

22  the description provided by the customer. CW-1 said that at the time he/she began working

23  at Carvana, his/her "partner" at the wholesale facility had previously been a Customer

24  Advocate and then transferred to wholesale. CW-1 believed that a lot of the cars that were

25  flipped to wholesale had been trade-ins because he/she heard this from CW-1's "counterpart"

26  who had been with Carvana "for years." According to CW-1, vehicles that ended up being

27  flipped to wholesale included vehicles that had also been procured with the intention of

28

- 17 -

1    being sold retail, but the quality of those vehicles ended up being too poor. CW-1 said this
2    reflected that Carvana "wanted to purchase as much as was humanly possible."

3        54.    CW-1 also said that Carvana did not make any efforts to stop purchasing
4    vehicles from sellers who had misrepresented the condition of vehicles to Carvana in
5    previous sales. CW-1 recalled an instance where he/she recognized a particular seller's
6    name when he/she was reviewing vehicles that were supposed to have been sold retail but
7    had to be flipped to wholesale. CW-1 determined that this seller had sold five vehicles to
8    Carvana at retail, or "full value" price, and all five of them had to be sold wholesale because
9    the seller had misrepresented the quality of the vehicles.

10        55.    CW-1 stated that the issues he/she observed at Carvana were "obvious to
11    anyone with eyes."

12        56.    **Confidential Witness No. 2 ("CW-2")** was employed by Carvana as a Sell to
13    Carvana ("STC") Advisor for more than six months during the Class Period at the
14    Company's facility in a Southeastern state. CW-2's duties entailed physically acquiring cars
15    from individuals who had sold their vehicles to Carvana. To that end, CW-2 travelled to
16    wherever the selling individual was located throughout a large portion of that Southeastern
17    state. CW-2 appraised the vehicle to validate that it was in the condition represented by the
18    customer at the time of the online sale to Carvana, obtain the title and registration
19    documentation, and arrange for a towing company to transport the vehicle to the Carvana
20    facility in which he/she worked, and sometimes to other Carvana facilities.

21        57.    CW-2's appraisal included a "functionality test" of the vehicle's interior and
22    exterior. CW-2 said that in the event his/her appraisal identified issues and concerns that the
23    seller had not identified at the time of the online sale, then he/she entered those matters into a
24    laptop computer he/she carried with him/her. There were times CW-2 was overruled by
25    his/her superiors and was directed to procure a car regardless of his/her concerns. And
26    CW-2 said it was definitely the case that Carvana had been overpaying for vehicles.

27

28

4890-0865-5022.v1

58.    CW-2 knew how much Carvana had agreed to pay for the vehicles because the amount was included in the appraisal.  CW-2 reiterated that he/she had been surprised at how much Carvana spent for some vehicles.

59.    Transporting the vehicles from the place of purchase to the Carvana distribution center ("DC") initially entailed coordinating with towing companies.  CW-2 said there were rumors that Carvana was incurring thousands of dollars of costs by engaging with a "wrecker" company.  CW-2 went on to say that he/she and the other STC Advisors used to drive to the seller's location using a Carvana-issued car.  However, in the last three months of CW-2's employment, a change was made whereby the STC Advisors instead took Uber rides to the seller's location and then drove the purchased vehicle back to the DC.  CW-2 was not completely comfortable with this change, in part because the vehicles that had been purchased were not always safe to drive.  To that point, two vehicles he/she had to drive died while CW-2 was driving them and he/she had to be picked up by an Uber.  While CW-2 had not thought it was efficient when he/she was driving a company vehicle to, say, drive two hours one way, handle a vehicle purchase and pick-up, only to then drive three hours to the next vehicle, he/she also did not think switching to Uber was much better.  Overall, CW-2 believed that Carvana had been "overscheduling" the STC Advisors because Carvana was focused more on the quantity of used vehicles it was procuring, as opposed to the quality of those vehicles and the efficiency of its operations.

60.    CW-2 was aware of "numerous instances" of Carvana buying vehicles very inexpensively (he/she used the amount of $400) that were "not safe to drive" and on which the "check engine light" came on right after they were purchased.  If it had been up to him/her, CW-2 would never have purchased these vehicles, but CW-2 was often overruled.  As CW-2 put it: "I was more cautious about quality."  At least a couple of times CW-2 reported his/her concerns and that he/she did not think a given vehicle should be purchased but "leadership would say take it" anyway.

61.    **Confidential Witness No. 3 ("CW-3")** was employed by Carvana in Phoenix, Arizona before the Class Period began until the middle of the Class Period.  During the Class

Period, CW-3 was employed as a Dealer Success Advocate on Carvana's Wholesale Team, where CW-3 assisted dealers that had purchased vehicles from Carvana through auction and had issues that made the vehicles unsellable to retail customers.

62.      CW-3 said that the vehicles Carvana sold at auction had been purchased from auctions and from individuals.  CW-3 believes that most of them were purchased from individuals.  CW-3 explained that these were vehicles that did not meet certain standards set by Carvana to sell retail.  CW-3 used Salesforce to document his/her communications with dealers.  CW-3 believes that more vehicles (both those that had been procured wholesale as well as from STC) were being sold wholesale because Carvana had lowered its standards for buying vehicles in 2019.

63.      CW-3 explained that whenever vehicles were sold through auction, there was an arbitration process where Carvana had to buy back vehicles when buyers wanted to return them because there were issues that had not been noted by Carvana at the time of the sale. CW-3 said that buybacks were common and missing titles were the main reason vehicles were bought back.  However, some of the buybacks also occurred because of quality issues. CW-3 commented that it was well known internally that the vehicles Carvana was buying from both wholesale and STC were "not the best."

64.      Regarding the missing titles, CW-3 said that Carvana had around 60 days to provide buyers with the titles for the vehicles they had purchased from Carvana and the buyers could request buybacks because of that issue during this period of time.  CW-3 estimated that Carvana generally had around half of the titles for the vehicles they sold wholesale at the time of sale.  One of the reasons why CW-3 quit was because so many vehicles were missing titles and he/she frequently was not able to get adequate answers from the Titles Team as to why.  CW-3 would reach out to the Titles Team and they would tell him/her to check back in a week, so CW-3 would, but sometimes a month would pass and it turned out that nothing had been done.  CW-3 said that one of the supposed reasons that it was difficult for the Titles Team to get the titles was because Departments of Motor Vehicles ("DMVs") were falling behind in their workload during the pandemic.  However, sometimes

4890-0865-5022.v1

1  CW-3 called the DMVs to try to get the titles himself/herself and sometimes CW-3 was
2  provided with different information than what he/she had been told by the Titles Team.  CW-
3  3 recalled that there was one dealer who had purchased over 100 vehicles from Carvana that
4  were missing titles and around half of them were past the arbitration deadline.  Prior to CW-
5  3's departure, CW-3 said there were other dealers who were so angry they told him/her they
6  would never work with Carvana again.

7       65.     In early 2020, CW-3 only received around 10 to 15 calls a week from dealers
8  regarding title issues.  CW-3 described early 2020 through May 2020 as a "slow time."  As
9  CW-3 recounted, after May 2020, it was as if a "fire started," with around 100 calls per week
10  from angry dealers regarding title issues.  In fact, additional employees had to be hired on
11  CW-3's team to deal with the increased call volume.

12       66.     CW-3 discussed the title issues with his/her manager, but nothing was done
13  and he/she was just given excuses like the DMVs were backed up, or the Titles Team had
14  been restructured.  The title issues also were discussed during weekly meetings with the
15  Wholesale Team that were led by the Director of Wholesale.

16       67.     CW-3 said that the process to sell vehicles to Carvana became "way too easy."
17  CW-3 explained that when he/she first started working at Carvana more than a year before
18  the beginning of the Class Period, Carvana refused to complete purchases when it was
19  discovered that sellers misrepresented information they provided to Carvana regarding
20  vehicle history and condition.  In those instances, CW-3 said customers may have been
21  required to re-submit the questionnaires with accurate information prior to purchase.
22  However, sometime in 2019, when CW-3 was a member of the Trades Team which is part of
23  the STC Team, Carvana started accepting "all vehicles" and did not inspect them before
24  purchasing them anymore.  CW-3 said that Carvana purchased a lot of "trash vehicles" after
25  this change, which had to be sold at auction.

26       68.     CW-3 said that these relaxed standards also led to Carvana accepting more
27  stolen vehicles and vehicles with fraudulent paperwork, which CW-3 observed when he/she
28  was a part of the High Risk Team near the end of 2019.  CW-3 said that one of the most

1    common problems he/she saw were sellers who did not disclose that they had a loan on their

2    vehicles.  CW-3 said that sometimes the team was able to catch the person, but if they could

3    not then Carvana would just pay off the loan after they had purchased the vehicles, which

4    could mean that they were out upwards of $10,000 on that sale.

5         69.    **Confidential Witness No. 4 ("CW-4")** was employed by Carvana as an

6    Operations Specialist in the Wholesale Department at an IRC in the Midwest from before the

7    Class Period began until early 2022.  CW-4 worked in a supervisory role from the middle of

8    2021 until he/she left Carvana.  The IRC at which CW-4 worked had over 600 employees

9    and housed over 10,000 vehicles when CW-4 left Carvana.   CW-4's duties and

10   responsibilities at Carvana included (but were not limited to) tracking inventory using

11   spreadsheets and various software programs, working with the Reconditioning Managers and

12   Department Leads to transition vehicles to wholesale, working with the Logistics and

13   Inventory Teams to transport wholesale inventory to other locations, and working with hubs

14   and auctions to manage inventory and arbitration claims.

15        70.    The team CW-4 oversaw at the IRC processed vehicles that were going to be

16   sold to the wholesale market, which meant that they would be sold through an auction,

17   usually to used car lots.  CW-4 explained that if a car met any of the following criteria that

18   car would automatically be transferred to the wholesale team: (i) vehicles that had over a

19   certain mileage; (ii) were over a certain year; or (iii) had been in a reported accident.  CW-4

20   also said that there was a separate retail team at the IRC.  Accordingly, if the retail team's

21   inspections of a vehicle discovered certain types of damage to the vehicles, those vehicles

22   would be sent to the wholesale team since they did not meet Carvana's criteria to sell to the

23   retail market.  CW-4 said that rust damage, including rusted out frames, was a common

24   reason why vehicles in the IRC were sent to the wholesale team.  CW-4 also said that any

25   inoperable vehicles were sent to the wholesale team.

26        71.    CW-4 explained that, beginning in the first quarter of 2021, he/she was told in

27   a meeting that there would be a "a huge increase" in the volume of cars to be sold wholesale

28   and was asked how much room he/she had at the IRC to store cars.  The meeting, which took

- 22 -

4890-0865-5022.v1

1    place over Zoom, included CW-4, an Area Manager, various Wholesale Managers,

2    Directors, and Associate Directors.  As CW-4 put it, Carvana was "looking to buy what cars

3    they could."  Carvana's initiative resulted in it buying "any car" that may have resulted in an

4    increase in trade-ins.  CW-4 said that the volume of cars at the IRC increased from just over

5    100 in the beginning of 2021 to almost 1,000 over the course of the year, a 10-fold increase

6    that CW-4 called "pretty epic," causing the IRC to run "out of room."

7        72.    CW-4 said that Carvana was "picking up anything" regardless of the condition,

8    including cars that literally had "no rear ends," even though the cars that were picked up

9    were supposed to be operable and drivable.  CW-4 reiterated that Carvana was not supposed

10   to be receiving these kinds of vehicles but that "we were getting them on a regular basis."

11       73.    CW-4 characterized Carvana as having a huge mess when it came to titles.

12   CW-4 recalled that when he/she left, there were over 70 wholesale vehicles at his/her IRC

13   alone for which Carvana lacked the title and were just sitting around.  CW-4 also recalled

14   that there was a Google spreadsheet that tracked vehicles that needed titles for the entire IRC

15   (retail and wholesale), which CW-4 believes existed since CW-4 first started working at

16   Carvana.  CW-4 emphasized that there were "a ridiculous amount of cars on the list."

17       74.    CW-4 said that it was well known internally that title issues were a very

18   common problem at Carvana, and everyone complained about it.  CW-4 recalled that the

19   Title Department was revamped three times, but they still had not gotten the title process

20   right, and CW-4's understanding was that the title team had "tons" of titles they needed to

21   process and sometimes titles were lost.  CW-4 recalled that the team was working on

22   acquiring some titles from years earlier.  CW-4 also recalled that retail titles were "Priority

23   1" and wholesale titles were "Priority 2."  CW-4 also said that sometimes there were

24   arbitrations after vehicles were sold by Carvana.  According to CW-4, title issues were the

25   most common reason for arbitrations.

26       75.    CW-4 said that the titles were supposed to be obtained at the time the vehicles

27   were being picked up (unless the vehicles were still being financed.)  CW-4 said that

28   Carvana had four levels regarding title status: A, B, C, and D.  The D category meant

1    Carvana did not have the title.  The C category meant that Carvana did not have the title, but

2    was working on getting it.  The B category meant that the necessary steps to get the title had

3    been done, but Carvana was still waiting to receive the title.  And the A category meant

4    Carvana had the title actually in-hand.  According to CW-4, there were "tons of D" category

5    cars.  As CW-4 explained, "everyone knew we have title issues."

6         76.    In February 2022, one week before the ADESA acquisition was announced

7    publicly, CW-4 attended a meeting with the wholesale team, including director-level

8    employees.  Carvana's Chief Operating Officer, Huston, also attended this meeting.  During

9    this meeting, Huston mentioned that ADESA's title department was good and Carvana

10   would adopt their processes and improve the title process.  These comments made CW-4

11   believe that Huston must have known about the title issues.

12        77.    CW-4 said that Carvana's acquisition of ADESA was part of its efforts to

13   expand into new markets that might have been far from existing Carvana IRCs.  According

14   to CW-4, when he/she was hired, "they were saying" that Carvana was not operating in

15   certain areas like the Pacific Northwest because of logistics.  Carvana's range for picking up

16   and delivering vehicles was only five hours out and five hours back (although third-party

17   haulers could go further).  As such, for example, a customer in Ohio purchasing a car from

18   Carvana that was in Oregon would exceed this range.  Although Carvana had operations in

19   some of the western states like California and Nevada, there was essentially not a hub or IRC

20   between Indiana and Oregon that would fall within the five-hour transportation limit.  The

21   sheer amount of money it would cost to pay third-party haulers to cover such distances was

22   cost prohibitive.  To that point, the "biggest reason" for acquiring ADESA had been its

23   locations which reflected that ADESA operated nationwide and had something like 51 or 52

24   locations.  This had been discussed at the meeting.

25        78.    CW-4 said Carvana had a logistics team that was "dysfunctional."  CW-4 also

26   said there were vehicles sitting "everywhere," and sometimes it seemed as though no one

27   was planning routes to pick them up.  CW-4 also recalled an incident where he/she found a

28   vehicle at the IRC that had been missing in the system for two years.  CW-4 found it just by

4890-0865-5022.v1

1   doing simple inventory tasks. CW-4 thought the logistics and inventory problems were "out

2   of this world," and did not understand why there were so many problems at Carvana,

3   especially since it was not a new company. CW-4 said that it was difficult to describe how

4   disorganized the logistics team was. CW-4 tried to give them advice, but they were "all over

5   the place," and logistics and inventory issues remained a constant problem throughout CW-

6   4's employment at Carvana.

7          79.    According to CW-4, cars delivered to retail were not being added to the retail

8   inventory on the day they were received. Instead, the retail group might wait a week before

9   adding the cars to inventory. The reason for this was that, as soon as a car was added to the

10  retail inventory, it began the aging process. Therefore, the aging report would "look bad" if

11  there were cars sitting there for 20 days. As CW-4 put it, Carvana's business was "all about

12  get-in/get-out" when it came to inventory, so the retail business would wait a week before

13  scanning vehicles into inventory, even if the vehicles were actually there. CW-4 said his/her

14  cars would "get caught in that mess." The General Managers and Logistics Managers made

15  the decision not to enter these vehicles into the retail inventory. The General Managers did

16  "not want anything aging," so they worked with the Logistics Managers to delay scanning in

17  vehicles.

18         80.    **Confidential Witness No. 5 ("CW-5")** was employed by Carvana as a Market

19  Operations Manager in a West Coast hub from shortly before the Class Period began until

20  the middle of 2022. Employees at the hub at which CW-5 worked delivered vehicles to

21  customers that they had purchased from Carvana via the Company's website and picked up

22  vehicles that customers had sold to Carvana. CW-5 was a high-level employee at the hub

23  and managed the hub's day-to-day operations, including ensuring that vehicles were properly

24  delivered to customers. CW-5 also managed the employees at the hub. Additionally, CW-5

25  oversaw key performance indicators, budgets, profit and loss, and inventory management for

26  the hub. The inventory management function included reviewing which vehicles were in the

27  lot at the hub and the vending machine, and being aware of how many vehicles were

28  "coming and leaving."

- 25 -

81.    CW-5 explained that the hub received vehicles from a Carvana IRC and many of the vehicles had issues even though they supposedly had been thoroughly inspected at the IRC.  Sometimes the vehicles were damaged during transit.  However, other times, the vehicles clearly had damage prior to being sent from the IRC to the hub (and therefore must have had this damage when they were at the IRC) but had not been noted on Carvana's website when the vehicle was sold, so the depiction of the vehicle on the website was not "100% honest."

82.    CW-5 said that because "so many cars" that came to the hub were damaged, it became, and continued to be, "way too much."  CW-5 heard from his/her predecessor at the hub that the issues with the quality of the vehicles had gotten worse "all of the sudden" (apparently prior to when CW-5 joined Carvana), and the quality problems persisted throughout CW-5's own employment at Carvana.  CW-5 explained that Carvana "overspent" on repairs for vehicles because there were so many quality issues and the third-party mechanics he/she hired for the repairs were very expensive.  Overall, CW-5 felt that he/she just "threw money" at vehicles that should have already been fixed at the IRC.  CW-5 mentioned there were a lot of returns since Carvana had a seven-day money back guarantee and there were so many issues with the vehicles.  CW-5 said that returns were not too common when he/she first started working at the hub, but got worse after spring 2022.

83.    CW-5 explained that when an individual wanted to sell their vehicle to Carvana, that person had to fill out a survey regarding the quality of the vehicle and Carvana essentially "took their word" for it when an offer was made.  When an Advocate from the hub went to pick up the car, the Advocate would try to confirm if the quality of the car matched what the seller had represented.  If it did not match, the Advocate was supposed to call an "inside team" to get a reappraisal.  However, there was only about a 50/50 chance that the inside team would do their job and reappraise the vehicle.  Sometimes Carvana's inside team would tell the Advocate to do the reappraisal, or Carvana's inside team would just agree to pay thousands of dollars for "super crappy" cars.

4890-0865-5022.v1

84. CW-5 said that the employees at the hub had to check the paperwork for the vehicles they were picking up from the sellers or that were dropped off at the purchaser's premises. They also had to check IDs to make sure they were not fake. CW-5 said that there were a lot of fake, or at least "sketchy," buyers and sellers, including some accounts that were obviously fraudulent. CW-5 also said that sometimes customers did not have insurance or did not show up for their appointments. CW-5 said that money was wasted when the hub employees hauled a vehicle out to a customer that had intended to purchase the vehicle, but the customer did not show up for the appointment.

85. CW-5 said that inventory for his/her hub was low when CW-5 first started working at the hub so it arguably made sense to overpay for poor quality vehicles, but Carvana continued to pay "crazy amounts" of money for vehicles after the inventory level at the hub was no longer low. CW-5 recalled that demand really slowed down around June or July 2022 because of increasing interest rates, but Carvana did not reduce the number of vehicles Carvana bought, so Carvana ended up with too much inventory. CW-5 said that demand started to slow down before June 2022, but it became a bigger problem around summer 2022. CW-5 heard this was a trend at other hubs from other Operations Managers. CW-5 said that there were weekly meetings for the Operations Managers, and CW-5 occasionally spoke with them outside of these meetings. CW-5 also saw communications from other managers on Slack messaging software.

86. The cost of the third-party mechanics was the main key performance indicator CW-5 was concerned about for his/her hub, and CW-5 discussed it with his/her manager during meetings.

87. CW-5 attended a leadership summit with all Market Operations Managers and senior leadership in April 2022 at Carvana's headquarters in Phoenix, Arizona. This summit included a Q&A session with Garcia Junior. During this session, the executives answered questions that had been submitted ahead of time and they also took additional questions afterward. CW-5 recalled that someone asked about what was going to be done regarding the quality issues with the vehicles that the hubs were receiving from the IRCs. CW-5

believes this individual may have asked something along the lines of whether the 150-point inspections were actually being performed since there were so many issues with the vehicles the hubs were receiving.

88. **Confidential Witness No. 6 ("CW-6")** was employed by Carvana as a Centralized Planning Analyst for more than six months during the Class Period and was also employed as a Finance Analyst for more than six months during the Class Period. CW-6's role in Centralized Planning involved managing vehicle pick-ups and deliveries to customers.

89. In the Finance Analyst role, CW-6 heard from other employees (possibly during a staff meeting) that there were inefficiencies with logistics. For instance, it was the practice of the Logistics Group to initiate delivery of a vehicle as soon as a customer placed an order for a vehicle, but before any payment had been made. If a customer subsequently canceled the order, which customers did, then the delivery that was en route had to be canceled, and Carvana incurred the cost unnecessarily. CW-6 pointed to other logistical inefficiencies. For instance, there might be two hubs fairly close to each other and a vehicle was scheduled to be delivered to one of the hubs, only for the delivery to be shifted to the other hub for one reason or another. Carvana's processes were such that sometimes, instead of simply routing the delivery en route to the nearby hub, the delivery would go back to the point of origin and then be shipped to the intended hub.

90. CW-6 said he/she "absolutely" learned that Carvana was incurring excessive costs in regards to transporting vehicles from the hubs and IRCs to customers, especially with the geographic expansion of Carvana. CW-6 said that picking up a customer's trade-in and delivering another car to the same customer who had provided the trade-in required two separate trips. CW-6 said "they were talking about consolidating" the trips into a single one, but he/she does not know if this was ever implemented.

91. **Confidential Witness No. 7 ("CW-7")** was employed by Carvana as an Associate Buyer in Tempe, Arizona for more than a year during the Class Period. As an Associate Buyer, CW-7 reviewed more than 15,000 digital vehicle condition reports and

- 28 -

1    purchased more than 2,000 vehicles valued at $65 million from various vehicle auction
2    platforms.  In addition, CW-7 appraised vehicles using standard vehicle appraisal tools and
3    audited more than 2,000 listings for errors and features that fell below inventory quality
4    standards.

5         92.    CW-7 said that Carvana used a Tableau server which distilled various financial
6    details, including "the total costs" Carvana incurred to acquire, recondition, and otherwise
7    make the cars available for sale, as well as what the vehicles had actually sold for, from
8    which was derived the gross profit per unit, *i.e.*, profit for each vehicle sold.  CW-7 said that
9    as of spring 2022, the Tableau server had shown the average GPU for the vehicles to which
10   CW-7 had access had been about $100, but in fall 2022, the GPU for the vehicles CW-7
11   could see in Tableau had declined to $23, meaning a near 80% decline in less than a year.

12        93.    CW-7 said he/she believed the Tableau server data was updated daily.  While
13   the majority of vehicles in the Tableau system to which CW-7 had access had been procured
14   by way of online wholesale auctions, some of the cars that had been procured by way of the
15   STC program may have been included.

16        94.    CW-7 said that another important metric available in the Tableau server was
17   the average number of days on-site, which was the number of days from when Carvana had
18   purchased a vehicle to when the vehicle had been sold.  In the same timeframe as when the
19   GPU was declining, the average number of days on-site for the same vehicles had been
20   increasing.

21        95.    CW-7 confirmed that Carvana definitely overpaid for vehicles.  In CW-7's
22   opinion, the reason Carvana ended up overpaying for vehicles reflected the Company's
23   "mission statement" to become the biggest online car company.  CW-7 noted that Carvana
24   "loved to compare" itself to CarMax and Amazon.  CW-7 believed Garcia Junior wanted to
25   make Carvana as big as possible regardless of the cost or internal differences in opinion in
26   regards to strategy.

27
28

4890-0865-5022.v1

96.    CW-7 said that he/she and other employees were told that Carvana acquired ADESA so that Carvana could get within 100 miles of the most populated areas of the country and thereby extend its reach.

97.    **Confidential Witness No. 8 ("CW-8")** was employed by Carvana as a Buyer and Category Analyst in Carvana's Tempe, Arizona, Corporate Headquarters for more than 18 months during Class Period.  As a Category Analyst, CW-8 oversaw all aspects of inventory management, pricing, inventory levels, margins, and analytics for certain vehicle segments.  CW-8 also managed pricing operations, including executing initial price targets and markdowns in order to move inventory.  As a Buyer, CW-8 worked to acquire vehicles for Carvana from auctions using a system called vAuto, which was owned by Manheim.

98.    CW-8 and his/her team used Tableau software, from which numerous reports could be derived, and Microsoft SQL, which connected to a computer server where data was stored.  Using this software enabled CW-8's team to see inventory data and various metrics, including how many vehicles Carvana had in inventory, how long these vehicles had been sitting around without being sold, Carvana's website traffic, and supply/demand ratios.

99.    Category Analysts like CW-8 set the final prices based upon the ranges from the algorithm and other factors, such as the current inventory Carvana had on hand.  CW-8 also worked with the data scientists on "markdowns" (*i.e.*, lowering prices on previously priced vehicles) for vehicles that were not selling.  This process involved lowering the price of a vehicle by $500 to $1,000 and then potentially lowering it again if the vehicle still did not sell after 7 days.

100.    According to CW-8, sometimes Carvana's Buyers paid "outrageous" prices for vehicles, which lowered margins because the vehicles could not support higher selling prices.  CW-8 explained that vehicles were rated Tier 1 to Tier 5, and sometimes the Buyers paid up to $5,000 over the market price to acquire vehicles in certain Tiers.  CW-8 also said that around the summer/fall 2021 timeframe there was a lot of pressure on CW-8's team, the Buyers, and the STC team to get every vehicle possible, no matter the price.  As a reflection of the efforts to procure as many vehicles as possible, CW-8 added that the expectation was

- 30 -

1 | that the titles for the vehicles could be acquired later if they were not available at the time of
2 | purchase.

3 | 101.    CW-8 said that, as a result of this pressure, Carvana essentially "overbought"
4 | vehicles during 2021, and CW-8's team started to become concerned as they saw the
5 | inventory levels rising.  Around fall and winter of 2021, CW-8's team began to raise
6 | concerns about the high level of inventory to director-level employees because it was
7 | becoming difficult to sell certain types of vehicles, CW-8's team had to lower prices, and
8 | margins were decreasing.  CW-8's team had weekly meetings every Thursday with an
9 | Associate Director where they would go over each segment and provide inventory updates.
10 | CW-8's teammates raised concerns about the excess inventory in a couple of these meetings
11 | and one of his/her coworkers, who was a Financial Analyst, made a report about this topic.
12 | However, his/her team's concerns were ignored and the Buyers were told to continue buying
13 | vehicles.   By March 2022, "everything was on fire" because Carvana was "totally
14 | overstocked" and the forecast had to be lowered.

15 | 102.    **Confidential Witness No. 9 ("CW-9")** was employed by Carvana as a Lead
16 | for Customer Experience in Carvana's Tempe, Arizona headquarters for more than six
17 | months during the Class Period.  As a Team Lead, CW-9 supervised more than a dozen
18 | Customer Experience Advocates.  Prior to Q1 2022, CW-9's team had handled only post-
19 | sales calls from customers, primarily pertaining to issues with vehicle delivery delays,
20 | registration and title delays, and vehicle quality and condition complaints.  Beginning around
21 | Q1 2022, Carvana merged the pre-sales and post-sales Customer Experience teams, so that
22 | CW-9's team began handling both types of calls.  Pre-sales calls primarily pertained to
23 | questions about the purchasing process, including the STC program.

24 | 103.    CW-9 observed a lack of action taken by other Carvana departments in regard
25 | to issues such as vehicle quality, including delivering vehicles without the vehicle
26 | inspections being completed, vehicle delivery delays, registration delays, the expiration of
27 | temporary plates, and Carvana encouraging these customers to continue driving the cars
28 | while reassuring them that Carvana would reimburse them if they were to be cited.

4890-0865-5022.v1

104.    CW-9 said the Customer Advocates on his/her team handled anywhere from 10 to 30 calls a day (the number varied depending on call duration).  The calls were from all over the country.  Registration delays, which primarily meant that a title had not been provided to the customer, amounted to roughly half of the calls the team had handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from customers experiencing title delays beginning in Q1 2022.

105.    CW-9 attended Carvana all-hands calls with Garcia Junior.  According to CW-9, the title and registration issues Carvana was experiencing were raised by employees on these calls.  CW-9 said that the questions to Garcia Junior from employees were along the lines that they were getting inundated with calls regarding registration problems and they asked Garcia Junior to elaborate on steps the Company was taking to mitigate the problems and provide better solutions.  Garcia Junior's response was always along the lines that Carvana was working on a solution.  CW-9 particularly remembered a call in January 2022 in which questions about registration were posed to Garcia Junior.

106.    Vehicle quality issues also represented a large portion of the calls that CW-9's team handled.  CW-9 said those issues ranged from check engine lights coming on, to mismatched tires, faulty emissions, damage to the vehicle (including at the time of delivery), accidents the vehicle had been in that had not been reported to CarFax, and vehicle recalls that had not been processed correctly – "or at all."

107.    When the pre-sales and post-sales teams were merged in Q1 2022, CW-9 estimated that probably 30% of calls pertained to pre-sales, 35% to 40% pertained to registration and title issues, and 25% to 30% pertained to quality.  Prior to the merger, the calls had been fairly evenly split between quality issues and registration and title issues.  CW-9 dealt with customers in other states who were experiencing quality problems.  According to CW-9, the quality shortcomings and problems seemed to CW-9 to be pervasive everywhere Carvana operated, not just in specific areas.

108.    CW-9 said that, as Carvana grew, it began accepting substandard cars and that the STC program took vehicles that were often converted for sale through wholesale channels.

109.    **Confidential Witness No. 10 ("CW-10")** was employed by Carvana as a Registration Specialist in Carvana's Tempe, Arizona headquarters for more than six months during the Class Period.  As a Registration Specialist, CW-10 reviewed documentation from customers registering vehicles in multiple states, made sure that certain documents (*i.e.*, proof of insurance, driver's license) were valid, completed vehicle title work with dealer and customer information, worked with multiple vendors to ensure that all deal and customer information had been entered correctly and that all necessary documentation had been received before submitting to the DMV, and created temporary operating plates for customers.  In mid-2022, CW-10 became a Specialist Point of Contact ("SPOC"), where CW-10 helped Customer Advocates answer customer questions regarding registration.  As a SPOC, CW-10 also worked with his/her team and others in the Company to make sure that a customer's registration was completed correctly.

110.    When CW-10 was on the SPOC team, he/she recalled one instance where a vehicle had been purchased from a seller in Texas, but the seller never provided a copy of the title.  Carvana then sold that car to a buyer in Illinois.  However, Carvana was unable to get a duplicate copy of the title, CW-10 believes, because there was an issue with the vehicle's Carfax report.  CW-10 also said that there were other issues with getting copies of the titles for new customers, including when sellers had not signed the paperwork that allowed Carvana to get a duplicate title, or when sellers had not signed a power of attorney form that allowed Carvana to transfer the title.  CW-10 said that sometimes getting the title could be a "big mess."

111.    CW-10 recounted that there had been two vehicle sales when he/she had been on the SPOC team for which the Customer Advocates had been trying to get the titles for over a year, which meant the buyers had been unable to drive their vehicles.  CW-10 said there had been a lot of research notes and in regards to one of them, there had been a major

1    discrepancy between the mileage in the Carfax report and the vehicle's odometer.  CW-10

2    reported this, and it was apparently found to have happened a "multitude" of other times.

3        112.    CW-10 recounted another incident in which the buyer had been unable to drive

4    the vehicle he/she had purchased from Carvana because Carvana was waiting to obtain the

5    title, but all CW-10 could say to that customer was "we're working on it."  CW-10 learned

6    about the other incidents when he/she had made a report to his/her Team Captain (who was

7    not CW-10's direct supervisor, but someone from whom he/she sought answers to questions

8    he/she had), and CW-10 brought it up to the Supervisor, and then to a manager.  In this

9    discussion, the Team Captain apparently referenced another team that was involved with

10   issues and discrepancies between the Carfax reports and the actual condition of the vehicles

11   Carvana had sold to customers, including the odometer readings not matching the Carfax

12   reports.  CW-10 said there was "a huge hiccup" with the Carfax report for another vehicle

13   that had a salvage title, which apparently set forth who had repaired the vehicle and when,

14   but the mileage on the title ended up being off by 100,000 miles.  This discrepancy had not

15   been picked up by Carvana before the erroneous mileage was entered into Carvana's system

16   and Carvana sold the vehicle.

17       113.    In CW-10's opinion, these kinds of problems transpired because Carvana

18   primarily just wanted to "get money."  Specifically, CW-10 thinks it is the case that mistakes

19   like these occurred because Carvana was so anxious to get and sell cars that they did not

20   adequately check everything.  CW-10 confirmed and said it was a common opinion amongst

21   personnel that Carvana was buying cars at a breakneck speed and that it was not adequately

22   checking them.  This common sentiment was also shared by CW-10's former supervisor.  On

23   the basis of customer questions and complaints, it had seemed to him/her that these kinds of

24   problems with poor vehicle quality had been happening a lot.

25       114.    **Confidential Witness No. 11 ("CW-11")** was employed by Carvana as a

26   Market Operations Team Lead at a hub in the Southeastern U.S. for over a year during the

27   Class Period.  CW-11's role involved running the team that delivered vehicles to customers

28   that customers had purchased online from Carvana.  CW-11's team also brought vehicles to

1    the Company's local vending machine, and they also picked up vehicles that customers had

2    sold to Carvana online.  CW-11 oversaw multiple Managers, Customer Advocates, and Lot

3    Attendants.

4        115.    CW-11 said that Carvana was essentially purchasing vehicles "sight unseen,"

5    and initially his/her team was not expected to do much to verify the condition of the vehicles.

6    However, he/she recalled attending a conference call with the buying department from the

7    corporate office, and was told that CW-11's team should call the buying department when

8    they went to pick up a vehicle if the vehicle was not in the condition that had been

9    represented by the seller.  CW-11 recalled an incident where a seller dropped off a Jeep

10    Wrangler that was in "awful" condition, including missing an entire panel, but the seller had

11    been offered "a ton of money" for the vehicle by Carvana's website because he/she had listed

12    the vehicle in perfect condition.  CW-11 called the buying department and sent them pictures

13    of the vehicle, but was told "it's fine" and that Carvana would purchase the vehicle for the

14    quote that had been provided by the website.

15        116.    CW-11 recounted that the same day as the Jeep Wrangler was picked up, three

16    other vehicles with similar problems were dropped off at the hub.  Two of these were

17    handled by CW-11's subordinates and one of them – a Ford Explorer – CW-11 had handled

18    himself/herself.  The Ford Explorer was completely lacking two A-frame pillars, even

19    though the seller had not identified any such deficiencies and had rated the car as in good

20    condition.   As with the Jeep Wrangler incident, when CW-11 contacted the buying

21    department, he/she was told to "do the deal."  The same thing happened to members of CW-

22    11's team, so they stopped calling the buying department when vehicles were in bad

23    condition since doing so did not seem to accomplish anything.  CW-11 said it was definitely

24    the case that Carvana's practices in such situations meant Carvana was purchasing vehicles

25    at inflated prices.  According to CW-11, the buying department did not actually care about

26    the condition of the vehicles and just wanted to "get as many cars as it could."

27        117.    CW-11 said the majority of reconditioned vehicles were stored at the IRCs.

28    However, as Carvana's accumulation of vehicles increased, this also necessitated his/her hub

- 35 -

1  to begin storing vehicles at an adjacent lot and then also at another lot located perhaps half-a-
2  mile away.  Altogether, there ended up being 300 vehicles stored at the 3 lots.  As CW-11
3  put it, Carvana was "always looking for places" to store vehicles.

4      118.    Employees at CW-11's level and market team leaders attended Zoom calls
5  with the Company's C-level executives (including Garcia Junior and Huston) probably every
6  quarter.  On one of these Zoom calls in early 2021 attended by Garcia Junior, a meeting
7  attendee expressed concern about the poor quality of the cars Carvana was purchasing.
8  According to CW-11, one of the C-level executives responded: Carvana was "just worried
9  about growth and not procedural" operations.  CW-11 recalled that this same C-level
10 executive spoke about the importance of growth on that call and suggested that employees
11 read a certain book (he/she could not remember which one) because it would help them
12 understand that growth is all that matters.  CW-11 remembers he/she recalled thinking:
13 "Wow, they don't care about operations, just growth."  There was time for questions and
14 answers at the end of these calls, and during every call someone in a market operations role
15 complained about the poor quality of the vehicles they received from the reconditioning
16 centers.  CW-11 said that this was the number one complaint from the operations side of the
17 business because they felt guilty delivering poor quality vehicles to customers.  CW-11 was
18 pretty sure that these C-level Zoom calls were recorded because he recalled listening to a
19 recording of one of the Zoom calls that he had missed.

20     119.    CW-11 eventually learned that selling vehicles without the title and issuing
21 temporary plates from other states was a common practice at Carvana.  CW-11 started to
22 learn the truth because he/she spoke with employees at the hub who worked on registering
23 vehicles.  They told CW-11 that there was a drawer of documentation for vehicles that had
24 been sold by Carvana but which they could not get registered since the titles were missing.

25     120.    CW-11 recalled reviewing a Google document spreadsheet of the cars for
26 which registration could not be completed since the titles were missing and there were notes
27 made by Carvana's Arizona personnel along the lines that they were working on obtaining
28 the title.

4890-0865-5022.v1

121. **Confidential Witness No. 12 ("CW-12")** was employed by ADESA before the Class Period as a Director responsible for working with large dealer consortiums to buy and sell wholesale vehicles. After Carvana purchased ADESA, CW-12 was promoted to Executive Director and continued to work with large dealer consortiums to buy and sell wholesale vehicles. CW-12 remained in that position until CW-12 left Carvana in the early part of 2023.

122. According to CW-12, a major reason that Carvana purchased ADESA was to have access to numerous additional centers across the country to recondition the cars. CW-12 met with Garcia Junior, who informed CW-12 that Carvana's management team needed ADESA's reconditioning centers, which were profitable and located nationwide. CW-12 spoke to Garcia Junior a few times, and he continuously inquired about how ADESA operated and functioned. CW-12 also attended quarterly town hall meetings conducted over Zoom and attended by Garcia Junior.

123. CW-12 observed that Carvana was setting up new marketing towers and adding new sites across the nation. Accordingly, CW-12 said Carvana needed to "get their lots filled and find cars." CW-12 continued that Carvana needed to show that they were growing and needed to buy cars to fill its lots. This resulted in Carvana aggressively buying vehicles.

124. CW-12 said that the aging of inventory items (also called "low turn") is something that everyone in the industry monitors. CW-12 continued that if a vehicle is on the list after 60-90-100 days, it does not look good.

## VI. DEFENDANTS' PUMP-AND-DUMP SCHEME AND FRAUDULENT COURSE OF BUSINESS UNDER RULE 10b-5(a) and (c)

125. As set forth below, Defendants engaged in a fraudulent pump-and-dump scheme and course of business to boost Carvana's retail sales – its most important metric – and thus, its stock price for the purpose of selling shares at an artificially inflated price. Unbeknownst to investors, Defendants carried out their pump-and-dump scheme through the following concealed methods and means:

4890-0865-5022.v1

1    (a)    Garcia Senior causes DriveTime to enter into a sham pass-through sales

2    arrangement with Garcia Junior at Carvana to boost materially Carvana's reported retail

3    sales;

4    (b)    Garcia Junior and Jenkins drastically lower Carvana's purchasing and

5    verification standards, buying low-quality cars to induce trade-in sales;

6    (c)    Garcia Junior and Jenkins flout state title and registration laws to secure

7    retail sales before competitors;

8    (d)    Garcia Junior and Jenkins spearhead a rapid and unsustainable

9    nationwide expansion without regard to profitability to boost Carvana's reported retail sales;

10    (e)    Garcia Junior and Jenkins make materially misleading statements and

11    omissions, including statements and omissions designed to conceal the scheme and convince

12    investors that Carvana's retail growth was sustainable;

13    (f)    Garcia Senior and Jenkins enter into and/or modify their 10b5-1 plans

14    while in possession of MNPI to capitalize on the artificial inflation in Carvana's stock price;

15    and

16    (g)    Garcia Senior and Jenkins sell nearly 14.3 million Carvana shares –

17    while in possession of MNPI – for proceeds of ***nearly $3.76 billion***.

18    **THE PUMP**

19    126.    Immediately preceding the Class Period, two events combined to drive down

20    Carvana's stock price.  First, COVID-19 created a global pandemic, driving down stock

21    markets.  Second, and most importantly, analysts expressed alarm that Carvana's growth was

22    slowing.  On February 27, 2020, a Morgan Stanley analyst stated: "If the growth starts to

23    slow significantly, and the company is still not profitable, ***there will be a transition away***

24    ***from growth investors, and we believe that how investors think about the valuation of the***

25    ***stock will change***."  That same day, an analyst from CFRA stated: "We think investors will

26    be less willing to look past CVNA's slowing top line growth and persistent lack of

27    profitability than they were in 2019."  In response, Carvana's stock price fell to a multi-year

28    low.  Defendants could not let this happen; they needed the Company to have a high

- 38 -

1   valuation so they could cash out their personal holdings in Carvana stock at a top dollar.

2   Thus, to pump Carvana's stock price, Defendants planned and executed a scheme to inflate

3   the Company's retail vehicle sales growth and convince investors that this growth was

4   sustainable.

5       **A.**   **Artifice No. 1: Garcia Junior and Garcia Senior Make a Sham**

6           **Related-Party Deal Between Carvana and DriveTime to Boost Carvana's Retail Sales**

7       127.   To increase Carvana's retail unit sales, Garcia Senior caused his company,

8   DriveTime, to enter into a series of revenue pass-through arrangements with Carvana by

9   September 2021.  There was no legitimate business purpose for these sham deals as they

10  lacked ***any*** economic substance for Carvana, and served only to inflate Carvana's reported

11  retail sales.  Under this father-and-son deal, Carvana would acquire cars from DriveTime,

12  sell the car on its website, and then ***pass the entire proceeds from the sale back to***

13  ***DriveTime***.  While Carvana merely acted as DriveTime's middle man or agent, it still

14  recorded the revenue and retail unit sales on ***its*** books to pump up Carvana's stock.[10]

15      128.   Defendants belatedly buried the fact that Carvana "purchase[d] reconditioned

16  vehicles from DriveTime . . . [and Carvana's] purchase price [paid to DriveTime] is the list

17  price on Carvana.com after a customer has placed an order on the vehicle" (*i.e.*, Carvana's

18  sales price) in its March 2022 Form DEF 14-A Proxy Statement (the "2022 Proxy

19  Statement") signed by Garcia Junior.  Further, Defendants concealed the full extent of these

20  arrangements from investors, offering only piecemeal and inconsistent disclosures

21  concerning the pass-through revenue arrangements.  For example, Carvana did not report

22

---

23  [10]   The SEC is currently investigating Carvana for its related-party deals.  Critically, Garcia

24  Senior's privately-held companies sell VSCs and GAP insurance coverage to Carvana's customers, generating an even greater revenue stream ***for him personally (and for Garcia Junior via his DriveTime trust)***.  As a law professor at Washburn University stated, Garcia

25  Junior and Garcia Senior "'have a convoluted tangle of interrelated companies and related-party transactions, and it's very difficult to understand or pull apart.'"  Jane Hahn, *Family*

26  *Business Deals Help Fuel Carvana's Explosive Growth*, Wall St. J. (Dec. 17, 2021) (the "December 17, 2021 *The Wall Street Journal* article").  Moreover, "[t]he problem with

27  related-party transactions with large shareholders . . . is 'they don't need to make money from this entity because they own the other entities.'"  Simply put, Carvana "'doesn't have to

28  make money for [the Garcias] to make money.'"

4890-0865-5022.v1

actual retail unit sales sold pursuant to these arrangements. Rather, they disclosed only information regarding the expense incurred to purchase vehicles from DriveTime. Carvana also disclosed inconsistent facts about these arrangements across its SEC filings, which included SOX certifications signed by Garcia Junior and Jenkins. For example, in Carvana's August 5, 2021 quarterly report on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 10-Q"), Defendants disclosed only the "cost of goods sold" incurred by Carvana. Then, Carvana's 2022 Proxy Statement belatedly revealed that these transactions lacked economic value and provided the "total expenses" incurred by Carvana for the first time. Tellingly, the Company's February 24, 2022 annual report on Form 10-K (the "2021 10-K"), for the fiscal year ended December 31, 2021 ("FY 2021") issued just a month before, fails to mention these terms, despite the fact that these deals had been occurring for months.

129.    Garcia Junior and Garcia Senior's sham DriveTime pass-through arrangements had a material impact on Carvana's reported retail sales volume and growth. Although the full details regarding them were concealed, certain expense figures can be used to estimate the number of cars involved in these arrangements. As shown below, Carvana's estimated unit sales from these arrangements were material as they made up over 169% of Carvana's reported sequential growth in Q4 2021 and 19% of its sequential growth in Q3 2021.[11]

| | Q3 2021 | Q4 2021 |
|---|---|---|
| Cost of sales on DriveTime pass-through arrangement | $ 17,000,000 | $ 43,000,000 |
| Avg. cost of sale per retail unit | $ 21,902 | $ 23,869 |
| Estimated Carvana retail units sold pursuant to DriveTime pass-through arrangement | 776 | 1801 |
| As a % of reported sequential retail unit sales growth | 19% | 169% |

---

[11]    Given Defendants' inconsistent and piecemeal disclosures on these sham deals, the chart depicts a conservative calculation of the unit sales pursuant to these arrangements. Alternatively, if one utilized: (i) the estimated retail units sold pursuant to the Wholesale Vehicle Purchase Agreements that Carvana and DriveTime entered into on September 29, 2022; and (ii) the estimated retail units sold pursuant to other "Retail Vehicle Acquisition" agreements that Carvana and DriveTime entered into during Q2 2021, which Plaintiffs believe is an accurate way to calculate the estimated retail units sold pursuant to the sham arrangements, these sales would have actually accounted for 660% of Carvana's sequential growth in Q4 2021, 19% of its sequential growth in Q3 2021, and 17% of its reported annual growth.

4890-0865-5022.v1

**B.    Artifice No. 2: Defendants Lower Carvana's Purchasing and Verification Standards, Purchasing Lower Quality Cars to Induce Trade-In Sales**

130.    As the Class Period progressed, Defendants drastically increased the number of cars Carvana purchased from customers to induce trade-ins and increase inventory, which increased retail sales and, thus, Carvana's stock price. To carry out this surge of purchases, unbeknownst to investors, Defendants abruptly and drastically lowered Carvana's purchasing and verification standards for the cars that it purchased following Q2 2020.

131.    For example, according to CW-3, before the beginning of the Class Period, Carvana was strict about not completing purchases when it discovered that sellers had not accurately described the condition of their vehicle, even making them re-submit questionnaires with accurate information. Immediately before and during the Class Period, however, CW-3 stated that Carvana relaxed its standards to accept "all vehicles" and did not genuinely inspect cars before purchasing them anymore. CW-3 observed that Carvana purchased a lot of "trash vehicles" after lowering its standards. CW-5 heard from his/her predecessor at the hub that the issues with the quality of the cars had gotten worse "all of the sudden." Likewise, CW-1 stated that Carvana lowered its standards when it came to accepting trade-ins as long as the customer bought a car from Carvana. In fact, CW-4 was told at a meeting of Carvana's initiative to buy "any car" to secure trade-ins.

132.    Indeed, CWs-1, 3, 4, 5, 8, 10, and 11 report that, during the Class Period, it was Carvana's general practice to purchase cars sight unseen and do little to nothing to verify the accuracy of sellers' representations of their vehicles. CW-11 reported that it appeared that the buying department did not actually care about the condition of the vehicles and just wanted to "get as many cars as they could." CW-5 stated that there was only a 50/50 chance that a vehicle would be reappraised if it did not match the seller's description. Likewise, CW-2 confirmed that he/she was overruled when voicing concerns about the quality of vehicles as "leadership would say take it." As CW-7 reported, he/she understood that the reason Carvana did this was the Company's "mission statement" to become the biggest online car company.

- 41 -

4890-0865-5022.v1

1    133.    CW-1 explained that Carvana "wouldn't care" about the poor quality. CW-1 said that as long as someone was also "buying from us," then Carvana would take the trade-ins. According to CW-1, this practice resulted in, for instance, Carvana purchasing cars as a trade-ins that were missing a backseat or were riddled with bullet holes.

134.    By lowering Carvana's stated purchasing and verification standards as multiple CWs describe, Carvana was able to increase the number of cars bought from customers in Q3 2020 by a staggering 261% from the prior quarter. Similarly, the following quarter, Carvana bought 100% more cars from customers than it had the prior year.

135.    Unbeknownst to investors, Defendants' concealed course of conduct caused Carvana to be flooded with "trash cars" that were unfit to be sold retail and had to be sold wholesale. Indeed, Carvana's wholesale volume spiked immediately after Defendants lowered their purchasing and verification standards, with wholesale volume growing over 100% year-over-year in Q4 2020 and Q1 2021 before surging 500% in Q2 2021. While investors were aware that buying cars from customers could potentially result in some increase in wholesale vehicles, investors did not know that Carvana was intentionally ignoring its purchasing standards *to ensure a flood of wholesale cars or that Carvana was losing money on wholesale vehicle sales*.

136.    Indeed, as alleged herein, Defendants concealed that Carvana lost money on its wholesale vehicle sales by obscuring one of its "*two key drivers of variable unit economics*" (*i.e.*, the amount of actual profit Carvana earned on each wholesale vehicle it sold): operations expenses. They did so by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could calculate overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs. *See, e.g.*, ¶192(c)(ii) (further detailing how Defendants obscured that Carvana sold wholesale vehicles at a loss).

137.    Further, unbeknownst to investors, this increase in wholesale volume created a costly, logistical nightmare as "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."[12]  Defendants later admitted that, on or about August 2021, the increased wholesale volume also led to "[m]ore vehicle moves, more miles traveled, . . . constrained routes," a "higher . . . backlog on constrained routes, . . . [l]ower performance on operational metrics," and "constraints in our logistics network."  At bottom, the problems Defendants created to maintain their growth story came at a steep price.  Indeed, in addition to the above, growth in wholesale volume from buying cars from customers spiked Carvana's logistical expenses, and eventually required Defendants to issue billions of dollars of high-interest junk bonds to acquire ADESA, a nationwide auction house (*i.e.*, a wholesale business), to stay afloat and address this strain.

138.    Garcia Junior and Jenkins were critical to this artifice.  In fact, as discussed in more detail below, they made materially false and misleading statements and omissions to further conceal this fraudulent conduct.  *See* ¶151, *see also* ¶¶190-210.

### C.    Artifice No. 3: Garcia Junior and Jenkins Embark on a Rapid and Unsustainable Nationwide Expansion

139.    To boost sales, Garcia Junior and Jenkins also spearheaded a rapid and unsustainable nationwide expansion plan to more than double the Company's footprint in just six quarters.  Critically, however, because Carvana had already achieved market coverage near its existing IRCs, the vast majority of new markets added were necessarily a significant distance from existing IRCs as demonstrated by the map below.  Thus, unbeknownst to investors, Garcia Junior and Jenkins were increasing Carvana's retail sales with unprofitable and less profitable sales in far-flung markets.

---

[12]   Update on Carvana Operating Plan Slide Deck (May 2022) (the "May 2022 Operating Plan").  Defendants' concealed conduct also created overwhelming inventory growth generally, as well, which similarly caused unsustainable "parking constraints," "load imbalances," and "increased the number of vehicles moved and total vehicle miles traveled, adding to costs and logistics network complexity."

4890-0865-5022.v1



140.    Garcia Junior and Jenkins knew or recklessly disregarded that these new markets were ***less profitable*** due to their greater distance from Carvana's existing IRCs. As stated in a September 13, 2022 *Vehicle Marketing* article, Garcia Junior knew all along, "'[y]ou need to warehouse and recon[dition] those cars to get them retail ready . . . . You need a place to stage the logistics . . . .'" In fact, Garcia Junior acknowledged he knew "how powerful proximity can be," when he later revealed that Carvana incurred at least $750 more in costs per retail car sold in markets 200 miles or more from a Carvana IRC. Even markets that were 100 miles from an existing IRC materially increased costs because "SHORTER DISTANCE = SAVINGS . . . Increased customer conversion; Faster inventory turn times; Lower inbound transport & logistics costs; [and] Lower shipping costs to customers." Nevertheless, a full 90% of the new markets opened during the Class Period were more than 100 miles away from an existing IRC and 65% were more than 200 miles from an existing IRC.

141.    In addition, unbeknownst to investors, Defendants' expansion ravaged Carvana's purportedly efficient nationwide logistics and reconditioning network and significantly increased Carvana's expenses. Indeed, Defendants later admitted that,

- 44 -

1   beginning on or around August 2021, it created "[m]ore vehicle moves, more miles

2   traveled," a "[h]igher number of constrained routes," and a "[h]igher degree of backlog on

3   constrained routes."

4       142.   Moreover, by the second half of FY 2021, Defendants were forced to begin

5   spending millions of dollars on costly third-party logistics and reconditioning providers to

6   make up for Carvana's internal logistics and reconditioning deficiencies.  After the Class

7   Period, Defendants disclosed "[r]econditioning and [i]nbound [t]ransport [c]osts [p]er [r]etail

8   [u]nit" for the very first time, which revealed that, by Q3 2021, these costs had spiked $201

9   per vehicle and were continuing to steadily increase throughout the Class Period.  In fact,

10  between mid-2021 and Q4 2021, these costs had spiked $369 per vehicle.  And by Q1 2022,

11  they had spiked more than $600 per vehicle.  Defendants further admitted the need to

12  "[r]educe third-party inbound transport share," "[i]n-sourc[e] third-party pickups" for

13  Carvana's "[l]ast-mile delivery," and "[r]educe third-party shipping" to curtail these excess

14  logistics expenses.

15      143.   Garcia Junior and Jenkins were able to conceal this fraudulent course of

16  conduct, in part, by: (i) excluding significant per-vehicle "operations expenses" (*i.e.*,

17  "expenses associated with completing retail and wholesale vehicle sales"), which included

18  outbound logistics and title and registration, from its calculation of wholesale and Retail

19  GPU; and (ii) not adequately disclosing or quantifying these excluded costs separately so

20  investors could calculate overall profitability of vehicle sales on their own.  This

21  concealment was meant to deceive investors as Garcia Junior included these operations

22  expenses in assessing the profitability of each car sold internally, and Carvana later admitted

23  that operations expenses (*i.e.*, "expenses associated with completing retail and wholesale

24  vehicle sales") were one of the "two key drivers" of profitability per vehicle sold.[13]  If

---

[13]  Indeed, during the Company's Q3 2022 earnings call held November 3, 2022, Garcia
Junior told analysts:

27  ***When we think about trying to aim for more profitable sales, what does that
mean?***  There's certainly variability in the kind of gross profit associated with
different types of sales. . . .

1    Defendants had not obscured these expenses, investors would have known that the limitless

2    growth story was a farce as the operations expenses skyrocketed with the scheme.

3          **D.    Artifice No. 4: Defendants Flout Title and Registration Laws**

4          144.    Because complying with title and registration laws slowed sales growth,

5    Defendants flouted these laws, pushing through retail sales to inflate Carvana's stock.

6    Indeed, as a June 24, 2022 *Barron's* article, entitled "Carvana Sought to Disrupt Auto Sales.

7    It Delivered Undriveable Cars" (the "*Barron's* exposé") later revealed, in Carvana's "haste

8    to seize market share from competitors" and report additional units sold, Carvana sold cars to

9    customers before it held title to those cars and before it could get them registered to their

10    new owners.

11          145.    Unbeknownst to investors, this practice was systematic and nationwide.  For

12    example, CW-3 (Phoenix, Arizona) estimated that Carvana only had around ***half*** of the titles

13    for the vehicles it sold wholesale at the time of sale.  Further, CW-3 reported that, after the

14    Class Period, a "fire started" and he/she started receiving 10 times the number of calls per

15    week regarding title issues than before the Class Period.  Corroborating CW-3's account,

16    CW-9 (Tempe, Arizona) said the Customer Advocates on his/her team handled calls from all

17    over the country.  Registration delays, which primarily meant that a title had not been

18    provided to the customer, amounted to roughly half of the calls the team had handled before

19    the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an

20    increase in the number of calls from customers experiencing title delays beginning in Q1

21    2022.  CW-10 (Tempe, Arizona) described instances where titles on vehicles Carvana sold

22    could not be obtained for over a year, which meant the buyers were unable to drive their cars.

23    CW-8 (Corporate Headquarters) said that Carvana's practice was simply to assume that titles

24    for vehicles could be acquired later if they were not available at the time of purchase.  CW-

25    11 (Southeastern U.S.) reported that there was a drawer of documentation for vehicles that

26    had been sold by Carvana but which could not be registered since the titles were missing.

27          . . . There's also kind of variation in the underlying costs of completing a

28    sale.

- 46 -

1    CW-11 also described reviewing a Google spreadsheet of the vehicles for which registration

2    could not be completed since the titles were missing.  Similarly, CW-4 (Midwestern U.S.)

3    said there was a Google spreadsheet that tracked vehicles without titles for the entire IRC,

4    and "there were a ridiculous amount of cars on the list."  According to CW-4, it was well

5    known internally that title issues were a common problem.

6        146.    Worse still, because Carvana could not register the cars it sold absent title, the

7    Company issued countless temporary plates, sometimes as many as ten times to a single

8    customer.  And these temporary plates were often issued by states with more liberal

9    registration requirements than the state in which the car was purchased, in violation of state

10   laws and regulations.  For example, CW-11 explained that the issuance of these temporary

11   plates was a common practice at Carvana.  Corroborating the confidential witness accounts,

12   an October 22, 2021 *The Wall Street Journal* article, entitled "Carvana Faces Government

13   Scrutiny and Fines Following Consumer Complaints" (the "*WSJ* exposé") revealed that

14   Carvana "provided [a Michigan buyer] with temporary registrations from Georgia,

15   Tennessee and Arizona in lieu of registering his car in Michigan."  Similarly, the *Barron's*

16   exposé revealed that "[i]nterviews with state officials and former Carvana employees show

17   the [registration delay] issue is ***wide[]-reaching***," and described instances where Carvana

18   had sent at least ten different license plates from different states to a customer.

19       147.    Defendants circumventing title and registration laws and regulations drastically

20   increased Carvana's SG&A expenses.  For example, in May 2022, Carvana belatedly

21   admitted that it relied on costly third parties for "a significant portion of [its] title and

22   registration processing."  In addition, unbeknownst to investors, Carvana had to: (i) create a

23   new department to deal with the title and registration problems in early 2021; (ii) hire even

24   more new staffers, or "paperwork specialists," by fall 2021; and (iii) create the "undriveable-

25   car task force" in 2022.  Notably, unlike Carvana's competitors, Carvana excluded title and

26   registration expenses from its Total and Retail GPU calculations.  Instead, Garcia Junior and

27

28

4890-0865-5022.v1

1    Jenkins buried these material costs in Carvana's "Other" SG&A category, where the costs

2    were unquantified.[14]

3        148.    Worse, Defendants' undisclosed decision to boost sales by sidestepping title

4    and registration laws and regulations exposed Carvana to devastating financial, regulatory,

5    legal, and reputational loss.  Indeed, as set forth below, multiple states revoked or suspended

6    Carvana's dealer license:

7        (a)    ***North Carolina***.  Following an investigation and hearing on July 21,

8    2021, Carvana entered into a settlement agreement with the North Carolina Division of

9    Motor Vehicles.  Pursuant to the settlement, North Carolina suspended Carvana's dealer

10   license for six months because Carvana failed to deliver titles, sold motor vehicles without a

11   state inspection, and illegally issued out-of-state temporary tags and plates for vehicles sold

12   to customers in North Carolina.

13       (b)    ***Michigan***.  Unbeknownst to investors, by February 2021, the Michigan

14   Department of State (the "MDOS") was investigating Carvana and met with Company

15   executives on March 23, 2021.  On May 7, 2021, unbeknownst to investors, Michigan fined

16   Carvana thousands of dollars and placed Carvana on an 18-month probation.  Carvana

17   repeatedly violated the terms of its probation agreement.  On February 7, 2022, following

18   additional meetings between Carvana and MDOS, Carvana "admi[tted] . . . several more

19   violations of the Code," paid thousands of dollars in additional fines, and agreed to extend its

20   probation.    Nevertheless, Carvana continued violating title and registration laws.

21   Accordingly, on October 7, 2022, Michigan suspended Carvana's license for: (i) "failing to

22   make application for title and registration within 15 days of delivery for 112 customers since

23   agreeing to an earlier probation extension"; (ii) "committing fraudulent acts in connection

24   with selling or otherwise dealing in vehicles where Carvana employees admitted to

25   destroying title applications and all applicable documents pertaining to the sale of [certain]

26

---

27   [14]   Defendants broke out "Other" SG&A for their first time in May 2022, revealing that
     transaction expenses, which primarily consisted of title, registration, and related expenses,

28   totaled $410 dollars per unit in FY 2021.

4890-0865-5022.v1

1    vehicles" that it later took back from customers; (iii) "improperly issuing temporary

2    registrations"; and (iv) "violating [the] terms of a probation agreement 127 times."  In

3    response, Carvana sued Michigan's Secretary of State, arguing that it was not given a

4    hearing on the license matter, and that "'***the damage to Carvana's reputation and goodwill***

5    ***posed by the suspension order is incalculable and irreparable***.'"  Thereafter, on January 11,

6    2023, Carvana paid thousands of additional dollars in fines and signed a plea deal with

7    Michigan, in which **Carvana** "'***agreed it had violated the law*** and to have its dealer license

8    revoked and be barred from reapplying for a new license for three years.'"

9            (c)      ***Illinois***.  In February 2022, unbeknownst to investors, Illinois began

10    investigating Carvana for issuing out-of-state temporary registration permits and for failing

11    to transfer titles in a timely manner as required by Illinois's regulations.  On May 12, 2022,

12    Illinois suspended Carvana's dealer license.  According to the Illinois Secretary of State

13    Office, Carvana was failing to timely transfer title and improperly supplying customers with

14    out-of-state temporary plates, causing some consumers to receive police citations.  Illinois

15    officials initially lifted the suspension.  As reported by *Barron's* mere months later, however,

16    Illinois reinstated the suspension because "'***Carvana continued to conduct business in a***

17    ***manner that violates Illinois state law***' . . . . ***by again issuing out-of-state temporary plates***

18    ***to Illinois customers, which is illegal in Illinois***, and by missing required deadlines to

19    process title and registration paperwork."  Defendants, nevertheless, continued to fight the

20    suspension in court and were granted a restrictive temporary restraining order.  Garcia Junior

21    referred to the suspensions as a "miscommunication" to inquiring analysts on August 4, 2022

22    during the Q2 2022 earnings call.  But, in January 2023, Carvana entered into a settlement

23    with Illinois's Secretary of State, in which **Carvana admitted to violating Illinois law**,

24    agreed to abide by new restrictions and increased oversight, and surrendered its $250,000

25    bond.  Moreover, the settlement agreement allows Illinois summarily to suspend and revoke

26    Carvana's dealership license once again if it fails to comply with either the agreement or the

27    law.

28

1    (d)    *Arizona*.  As first reported in the *Barron's* exposé on June 24, 2022, the

2    Arizona Department of Transportation (the "ADOT") canceled a program that allowed

3    Carvana to issue temporary plates for sales that occurred in other states after receiving more

4    than 80 complaints around "'such issues as missing, delayed, and altered title and

5    registration documents, contract discrepancies, [and] significant odometer discrepancies.'"

6    Further, while ADOT's spokesperson declined to provide further details due to open

7    investigations into Carvana's registration practices, he confirmed that while "'ADOT tries to

8    accommodate businesses like Carvana with their unique online business model as best we

9    can . . . . for consumer protection, we need to make sure that all car dealers operating in

10    Arizona are following state laws.'"

11    (e)    *Pennsylvania*.  As a local Pennsylvania media outlet revealed mere days

12    before the end of the Class Period, Pennsylvania had suspended the dealer license of one of

13    Carvana's dealership locations in Pennsylvania.  Initially, Carvana denied the reports until

14    Pennsylvania officials provided the suspension letters to the media.  It was later revealed that

15    Pennsylvania had suspended both of Carvana's locations in Philadelphia for title and

16    registration issues.

17    (f)    *Florida*.  As first reported in the *WSJ* exposé, unbeknownst to investors,

18    by October 22, 2021, Carvana had already settled a complaint with the Florida DMV for

19    failing to provide title paperwork for a number of customers for up to eight months.  In

20    December 2021, Florida's Department of Highway Safety and Motor Vehicles threatened the

21    Company with a statewide license suspension over Carvana's failure to timely register cars,

22    identifying hundreds of vehicles with issues.  While Florida withdrew that threat in February

23    after the Company had demonstrated progress in registering the hundreds of delinquent

24    vehicles, by August 2022, media outlets reported that Florida had filed two additional

25    complaints identifying numerous cases in which consumers waited more than 100 days and,

26    in one case, 253 days, to get the titles for their cars.

27    (g)    *Texas*.  As first reported in the *WSJ* exposé, by October 2021, Texas

28    had fined Carvana thousands of dollars for violations related to title and registration.

4890-0865-5022.v1

(h)     *Maryland*.  On October 11, 2022, media outlets reported that Maryland had joined the mounting number of states fining Carvana.  Further, according to the Maryland Motor Vehicle Administration, Carvana failed to timely register approximately 10% of its sales from June 2021 to July 2022.

(i)     *Ohio*.  On November 22, 2022, Fox 28 reported that Ohio had suspended Carvana's privileges to issue temporary tags nearly two years earlier. Specifically, the Ohio Bureau of Motor Vehicles ("BMV") told Fox28:

> "In December of 2020, the Ohio BMV became aware of an inordinately high number of recent temporary tag issuances by Carvana.  After investigating the matter, it was determined that the issuances did not comply with Ohio law. The Ohio BMV subsequently suspended temporary tag issuance privileges for all applicable Carvana locations in Ohio."

Although the Ohio BMV has since reinstated Carvana's privileges "'[a]fter a number of meetings with Carvana representatives and written assurance that prior practices have been halted, . . . . [t]he Ohio BMV continues to monitor Carvana.'"[15]

149.    Garcia Junior and Jenkins were essential to this fraudulent conduct, discussing it in countless Board meetings since at least July 2020.  *See, e.g.*, Exs. 1-2.  And, critically, once the truth about Carvana's widespread title and registration violations began to leak out, they minimized and downplayed the violations, misleading investors.  *See* ¶¶148(c), 152, 180-181.  Their misstatements were intended to conceal the scheme and maintain the artificial inflation in Carvana's stock.

E.    **Artifice No. 5: Garcia Junior and Jenkins Make Materially Misleading Statements and Omissions**

150.    In addition to the above methods and means, Garcia Junior and Jenkins also executed the pump-and-dump scheme through a series of materially false and misleading public statements and omissions, concerning the following subjects: (i) buying cars from customers; (ii) title and registration; (iii) average days to sale metric; (iv) gross profit earned

---

[15]    Over Defendants' vehement objections, on September 30, 2022, U.S. District Judge Edward G. Smith denied defendants' motion to dismiss a January 13, 2022 class action consumer complaint alleging that Carvana violated common law and the Pennsylvania Unfair and Deceptive Trade Practices Act by failing to timely transfer title.

4890-0865-5022.v1

per retail vehicle sold ("Retail GPU"); and (v) Carvana's "scalable" business model. Garcia Junior and Jenkins's public statements helped facilitate the fraudulent scheme and course of business by concealing the scheme and convincing investors that Carvana's growth was sustainable.

### 1. Garcia Junior and Jenkins Make False and Misleading Statements to Further Conceal the Fraudulent Scheme

151. ***First***, Garcia Senior and Jenkins misleadingly assured investors that Carvana "***assess[es] vehicles on the basis of quality***" when, in fact, they had substantially lowered their purchasing and verification standards and were "intentionally buying lower quality cars." *See* ¶¶191-192, 195-196, 199-200, 203-204, 207-210. In addition, they publicly touted the benefits of buying cars from customers (the good), while omitting that buying cars from customers was ravaging Carvana's bottom line by: (i) flooding Carvana with wholesale cars that had to be sold at a loss; and (ii) crippling its logistics network (the bad). *See* ¶¶193-194, 197-198, 201-202, 205-206.

152. ***Second***, Garcia Junior and Jenkins signed Forms 10-K and 10-Q purporting to warn investors of risks and harms, such as "administrative, civil, or criminal penalties," – that "***could*** result" ***if*** Carvana failed to comply with state title and registration laws and regulations when those risks had already come to fruition. *See* ¶¶174-179, 182-187. Further, when news regarding Defendants' title and registration violations began to leak out, Garcia Junior and Jenkins provided a misleading impression of the violations when they assured investors that Carvana's violations were mere "miscommunication[s]" and "North Carolina specific." *See* ¶¶148(c), 180-181.

153. ***Third***, Garcia Junior and Jenkins made misleading statements and omissions regarding Carvana's average days to sale metric to conceal the negative consequences of their scheme (growing inventory) and prop up Carvana's stock price long enough for Garcia Senior and Jenkins to cash out at top dollar. Average days to sale was one of Carvana's six "Key Operating Metrics" since becoming a public company. As Defendants emphasized, Carvana's "business is dependent upon our ability to expeditiously sell inventory." Simply

4890-0865-5022.v1

put, an "increase [in] our average days to sale" served as a warning to investors that Carvana was failing to rapidly sell its inventory, which "could have a material adverse effect" on Carvana's margins because of depreciation. Although Defendants continued to view average days to sale as a key metric during and after the Class Period, Defendants suddenly stopped publicly reporting the metric to investors. Instead, Garcia Junior and Jenkins replaced it with a metric showing the number of IRCs (which has nothing to do with average days to sale). Defendants repeatedly claimed that, somehow, Carvana's "number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and *the relative stability of average days to sale over the past three years*." ¶¶238, 240, 242. In truth, by the second half of the Class Period, Carvana was facing a glut of aging and rapidly depreciating inventory that was spiking the average days to sale metric far beyond historical norms as a result of Defendants' fraudulent scheme. ¶¶239, 241, 243. Thus, Garcia Junior and Jenkins's abrupt decision to hide this metric from the public ensured that investors were not alerted to the scheme.

### 2. Garcia Junior and Jenkins Make Their Manufactured Growth Appear Sustainable

154. Critical to the success of Defendants' fraudulent scheme was their fiction of sustainable hyper growth based on a scalable model where Carvana claimed: "*[O]ur business gets better as it gets bigger*." After all, if Carvana could pair its explosive unit growth with purported profitability and a scalable logistics model that could cost effectively expand across the country, the sky was the limit. At bottom, to secure a high valuation so Garcia Senior and Jenkins could cash out at top dollar, Garcia Junior and Jenkins made the following misleading statements and omissions to persuade investors that Carvana's inflated retail sales growth was sustainable.

(a) *First*, throughout the Class Period, Garcia Junior and Jenkins touted Carvana's retail sales growth while simultaneously touting positive Retail GPU in all of Carvana's investor presentations, earnings calls, and shareholder letters. ¶¶247, 249, 251, 253, 255, 257, 259. For example, the February 24, 2021 Q4 2021 letter to shareholders (the

"Q4 2021 Shareholder Letter") stated "Retail GPU was $1,495," an increase of almost 20% over the prior year, "driven by an increase in the percentage of retail units sourced from customers." Investors viewed Retail GPU as a proxy for Carvana's retail "unit economics" (*i.e.*, profitability per-vehicle). However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof. ¶¶248, 250, 252, 254, 256, 258, 260. They did so by: (i) excluding certain per-vehicle *operations expenses* from its calculation of Retail GPU; and (ii) not adequately disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of retail sales on their own. These excluded operations expenses included material "*costs associated with completing retail sales*," such as the full cost to ship cars to customers and title and registration costs. Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "*the underlying costs of completing a sale*" as a critical component of Carvana's actual retail vehicle profitability. Indeed, as Garcia Junior later acknowledged:

> *When we think about trying to aim for more profitable sales, what does that mean?* There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera. *There's also kind of variation in the underlying costs of completing a sale*.

155. By intentionally obscuring these significant operations expenses, investors were left to rely on the positive Retail GPU reported by Defendants as the sole measure of Carvana's per-vehicle retail profitability. Critically, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified the costs that were excluded from Retail GPU, *it would have revealed to investors that, on average, Carvana generated negative unit economics on every retail car sold during the Class Period*. ¶¶248, 250, 252, 254, 256, 258, 260. For example, in Q4 2021, rather than the $1,495 of positive Retail GPU reported by Defendants, Carvana actually generated negative unit economics of $1,248 per retail unit sold. This created an impression of a state affairs

1   (positive per-unit profitability) that was materially different from the one that actually

2   existed (negative per-unit profitability).  *See, e.g.*, ¶260(a).

3       156.   **Second**, Garcia Junior and Jenkins exalted Carvana's purportedly "capital-

4   light" expansion model, and "logistics capabilities" in Carvana's 2020 and 2021 10-Ks.

5   ¶¶224, 234.  For example, the 2021 10-K touted that Carvana has a "lower variable cost

6   structure at scale [as] . . . . [w]e do not require a network of brick-and-mortar dealerships . . .

7   instead, we utilize . . . an in-house logistics network."  They did so to persuade investors that

8   "[a]s we grow – by expanding geographically . . . – our business becomes stronger[,] . . . .

9   *[g]rowth . . . enables economies of scale*, . . . [and] these dynamics create a flywheel that

10  drives even more growth."   As discussed herein, Carvana neither had a capital-light

11  expansion model nor groundbreaking logistics.  ¶¶225, 235.

12      157.   When Carvana announced that it was "named to the Fortune 500 list for the

13  first time, becoming one of the four fastest companies to ever make the list with organic

14  growth, along with Amazon," Garcia Junior and Jenkins stated that this purportedly

15  demonstrated that Carvana's business "*model has uniquely powerful unit economics and*

16  *scalability*."   Likewise, in a "paid" interview/advertisement between Garcia Junior and

17  Fortune, Defendants touted "rapid ascension [to the Fortune 500] marks the fastest organic

18  growth of any automotive retailer in U.S. history and is a testament to the strength of its . . .

19  vertical integration, and innovative technology.  Carvana boasts *its own efficient internal*

20  *logistics network* that allows the company to purchase, inspect, and house its inventory."[16]

21      158.   To be sure, Garcia Junior and Jenkins' public statements facilitated

22  Defendants' fraudulent scheme and course of business by deceiving investors regarding

23  Carvana's purportedly disruptive business model and initiatives, persuading investors that

24  Carvana was demonstrating growth and profitability, reassuring investors that Carvana could

25  continue to do so because of its disruptive business model, and concealing the consequences

26  of Defendants' scheme.

---

27  [16]  Fortune made clear that its "editorial staff was not involved in its creation or production"
    of the paid article.

28

4890-0865-5022.v1

159.    Defendants' fraudulent scheme worked.  The market rewarded Defendants for their purported "scalable" and sustainable growth, allowing Carvana's stock to reach its record-high price of $376 per share.  In June 2021, Fortune noted: "How did Carvana make it onto the Fortune 500?  . . .  The business is a hub-and-spoke setup . . . .  [I]t turns out, the business is built on a foundation of legitimate scalability . . . ."

## THE DUMP

### F.    Artifice No. 6: Garcia Senior and Jenkins Manipulate Their 10b5-1 Plans to Capitalize on the Scheme

160.    After pumping up Carvana's stock price by inflating retail sales and profitability, Garcia Senior and Jenkins took action to enjoy the fruits of the Defendants' fraudulent labor.[17]  As such, during the Class Period, Garcia Senior – while in possession of MNPI – entered into a 10b5-1 plan on June 15, 2020.  On November 4, 2020 – just four days into trading and mere months into the new plan – Garcia Senior modified his trading plan while in possession of MNPI to accelerate the rate per day at which he could sell his shares to unsuspecting investors.  Indeed, on November 4, 2020, Garcia Senior: (i) controlled Carvana; (ii) held approximately 84% of Carvana's voting power; (iii) was engaging in hundreds of millions of dollars in related-party deals that were material to both his privately-held companies and Carvana; and (iv) was participating in and aware of the fraudulent scheme.

161.    Worse, on May 7, 2021 – less than six months after his first modification of his trading plan and weeks after Carvana was placed on probation in Michigan after admitting to violating state title and register laws (unbeknownst to investors), Carvana's shares continued to climb to record highs.  Once again, ***Garcia Senior modified his trading plan*** to accelerate the number of shares he could sell per day while in possession of MNPI.

162.    Professor Taylor of the Wharton School of Business noted: "'I've studied 20,000 10b5-1 plans [and] I can't recall another of this size where there are modifications

---

[17]    Garcia Junior, who is a beneficiary of his father's trust, benefited by Garcia Senior's insider trading.

1  every six months.'"[18]  Unsurprisingly, he concluded: "'***The Garcias knew it was short-lived***

2  *. . . . The Garcias knew the music would eventually end*.'"

3  **G.    Artifice No. 7: Garcia Senior and Jenkins Dump Their Holdings**

4      163.    Before the truth regarding Defendants' so-called "sustainable" growth was

5  revealed, Jenkins and "'***the Garcias kn[owing] it was short-lived***'" and that "'the music

6  would eventually end'" sold nearly ***14.3 million*** shares of their personal holdings of Carvana

7  stock for proceeds of ***nearly $3.76 billion*** before the bottom fell out.

8      164.    Jenkins' and Garcia Senior's suspiciously timed sales, made while each

9  possessed MNPI, are summarized in the chart below, in which the vertical axis on the left

10  shows Carvana's stock price and the vertical axis on the right depicts the dollar amount of

11  stock sold.  A detailed description of the insider trading is set forth in Appendix A, attached

12  hereto.



27  ────────────

[18]  Ben Foldy, *CEO's Father Gets a $3.6 Billion Stock Windfall at Carvana*, Wall St. J.

28  (Sept. 17, 2021) (the "September 17, 2021 *The Wall Street Journal* article").

165.    Simply put, as Professor Taylor concluded in a June 2022 *The Wall Street Journal* article: "'[T]he actions of [Carvana's] executives signal to me that **the executives knew what was coming, and consequently took advantage of the lofty valuations to . . . sell their own equity** . . . .'"

### H.    The Truth Is Revealed

166.    After Defendants sold nearly $3.76 billion shares at artificially inflated prices, Defendants' fraudulent scheme unraveled over several months during which Carvana acknowledged in a series of corrective disclosures that bigger was not better.  *See* §IX.  In truth, Carvana's growth model was not "scalable."  Its expansion model was not "capital-light."  It had not seen "economies of scale" or "uniquely powerful unit economics" as it grew.  And, its logistics model was neither efficient nor groundbreaking.  Indeed, as Carvana fell apart, the Company would be forced to do an about-face and change its entire ethos of being the largest auto retailer.  Now, for the first time, retail unit sales growth was not the Company's priority.

167.    For example, because Carvana needed critical infrastructure to support its new disparate markets spanning the country and to stem the increased costs and network complexity from the "wholesale [vehicles] acquired from customers," Carvana disclosed, over a few days, that it would be forced to take on more than $3.4 billion in high interest rate debt to purchase ADESA to "improve our logistics network," by placing the Company "within 200 miles of 94%" of the population, which "will have the benefit of reducing shipping distances, times, and costs."  Carvana also announced disappointing earnings that were caused by Defendants' fraudulent scheme and course of conduct, including that: (i) retail sales growth was hampered that quarter by significant "logistics network constraints," reconditioning expenses, and "higher wholesale volume from buying more cars from customers"; and (ii) Carvana no longer expected to sell 550,000 retail cars in 2022 as previously stated.

168.    Mere weeks later, as a result of Defendants' fraudulent scheme, Carvana disclosed that it was laying off 2,500 employees, transitioning operations away from some

- 58 -

logistical hubs and an IRC "in connection with these right-sizing initiatives," and that it would release an updated operating plan later that week. Carvana's stock plunged as investors took notice and awaited the new operating plan. For example, an article published by *Forbes* on May 21, 2022 reported that Carvana's disclosure "was a sign of much bigger problems at the company, according to 10 former employees . . . and several industry analysts. They describe a spendthrift business, whose growth-at-all-costs mentality undermined business operations" and led to its current poor condition.

169.    Then, on November 3, 2022, Defendants issued disappointing Q3 2022 financial results that were caused by Defendants' fraudulent scheme and course of conduct and revealed, in part, the unraveling of their scheme. Indeed, Defendants revealed that Carvana suffered an 8% decline in retail unit sales from the prior year. They further revealed that their singular focus would be on slashing expenses, eliminating "less profitable sales," "reduc[ing] advertising" aimed at acquiring "less profitable sales" in its new markets, and "take other actions to improve profitability, such as increasing long-distance shipping fees." As an analyst at Needham & Company noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, versus prior it was more about selling as many cars as possible.'" A February 2, 2023 *Motley Fool* article entitled, "3 Signs Carvana Hit the Wall" (the "*Hit the Wall* Article"), told investors to "[s]tep back and think about that [disclosure] for a moment" because "***[i]t means that the company had historically grown in these markets even though they weren't all that attractive. It was growth for growth's sake and not necessarily growth to improve profitability***."

170.    By the end of the Class Period, Defendants revealed the unraveling of their fraudulent scheme and course of conduct. Indeed, Defendants disclosed that "retail units sold decreased [23%] for the first time in our history this year," and "we stepped back on the key metrics of retail units sold" "for the first time." In fact, Carvana revealed that it was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable). Moreover, Carvana admitted gross profits had declined by 63% year-over-year. Further, Carvana

- 59 -

1  "significantly accelerated . . . reductions in inventory," "significantly reduc[ed] retail vehicle

2  acquisitions," and wrote off over $50 million of aged and impaired vehicle inventory that

3  was worth less than Carvana had paid to acquire it and prepare it for sale.

4      171.   At the same time, over a series of months, the media and multiple states

5  revealed what Defendants knew all along – Carvana routinely violated state title and

6  registration laws and regulations.  Critically, it was eventually revealed that Carvana's

7  violations were not one-offs or miscommunications, as Defendants claimed, but a

8  widespread course of conduct to increase sales.

9      172.   In sum, by the end of the Class Period, Carvana was merely a shell of the

10  limitless, e-commerce growth machine that Defendants' fraudulent scheme and course of

11  conduct had portrayed.  Instead, it needed to stop growing altogether and spend billions of

12  dollars to fix the Company.  The unsustainable growth-at-all-costs scheme – which pumped

13  up Carvana's stock price to historic highs and enabled Garcia Senior and Jenkins to pocket

14  *billions* of dollars in proceeds – proved very costly to investors.  By the end of the Class

15  Period, Carvana's stock price had declined by 98%, from its Class Period high, and it still

16  has not recovered.

17  **VII.  DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING**
    **STATEMENTS AND OMISSIONS UNDER RULE 10b-5(b)**
18

19      **A.    Defendants' Materially Misleading Statements and Omissions**
            **Concerning Title and Registration**

20      173.   As required by the SEC, Defendants disclosed Carvana's purported material

21  risks, and any changes thereto, in every Form 10-K and Form 10-Q.  In each of these SEC

22  filings during the Class Period, Carvana purported to warn of material risks and related

23  harms that *could* occur *if* it failed to comply with state and local laws and regulations,

24  including those related to title and registration.  While Defendants characterized the risks and

25  related harms as mere hypotheticals, they failed to disclose that, beginning at least by the

26  date on which Carvana filed its 2020 10-K, these risks and harms had already materialized

27  because states had begun investigating and penalizing Carvana for its title and registration

28  noncompliance.  Worse yet, as these violations became known to investors, Defendants

continued to conceal the extent of Carvana's title and registration issues, including then-ongoing investigations and penalties – minimizing the regulatory investigations as mere one-offs and trivializing the penalties imposed on the Company.  But, as Defendants later conceded, the reputational damage from just one of these suspensions was "'incalculable and irreparable.'"

174.  **Statement No. 1**: On February 25, 2021, Carvana filed its Form 2020 10-K (the "2020 10-K") with the SEC, signed by Garcia Junior and Jenkins and attaching Sarbanes-Oxley Act ("SOX") certifications signed by Garcia Junior and Jenkins.  The 2020 10-K contained the following purported risk disclosure:

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.

> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration* . . . .

> *            *            *

> *The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations.  Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*.

175.  As detailed below, Statement No. 1 by Carvana, Jenkins, and Garcia Junior was materially misleading when made because Defendants omitted to state material facts necessary in order to make the statement not misleading.

(a)  Defendants' February 25, 2021 statement that the violation of any state regulations and laws "*could* result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which *could* damage our reputation and have a material adverse effect on our business, sales, and results of

- 61 -

operations," was misleading because it omitted that the risks it was warning investors about had already come to fruition.  In fact: (i) the Ohio BMV had suspended Carvana's temporary tag issuance privileges for all Ohio locations and subjected the Company to increased oversight in December 2020; and (ii) by February 2021, the MDOS was investigating Carvana and, shortly thereafter, would fine Carvana and place it on an 18-month probation. Defendants also concealed the inevitably of the foregoing risks and identified harms materializing.

(b)    Defendants presented Carvana's "failure to comply" with title and registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks that could materially harm Carvana if they materialized when, in truth, these risks had already come to fruition.  Indeed, Carvana routinely and repeatedly: (i) sold cars before holding title to the vehicles; (ii) failed to register cars within the legally required timeframe; and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous state laws.  §VI.D.  For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before it received title.  Specifically, CW-3 estimated that Carvana only had around half of the titles for the vehicles it sold wholesale at the time of sale.  Further, he/she noted that, after the Class Period began, a "fire started" because he/she was flooded with calls regarding title issues.  CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana, but which Carvana could not register since the titles were missing.  CW-4 said it was well known internally that title issues were a problem.  CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a ridiculous amount of cars on the list." Further, the *Barron's* exposé revealed that: (i) "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is wide[]-reaching"; and (ii) Carvana admitted the violations had primarily occurred in 2020 and 2021.  In addition, a presentation from a July 2020 Board meeting that Jenkins and Garcia Junior attended reveals that Carvana had undertaken an initiative "to reduce registration delays," as part of its "Key Focus Areas and Risks."  Ex. 1.  Worse, title and registration issues and penalties continued to be a

prominent topic in every Board meeting thereafter through at least December 2021. *See, e.g.*, Exs. 1-2; *see also Schertz v. Garcia II*, No. 2023-0600-KSJM, Exhibits 10-23 to Transmittal Affidavit of R. Garrett Rice in Connection with Defendants' Opening Brief in Support of Their Motion to Dismiss or Stay Plaintiff's Verified Amended Stockholder Derivative Complaint (Del. Ch. Feb. 26, 2024) (ECF 23). Lastly, Defendants also concealed the inevitably of the foregoing risks and identified harms materializing because of the above omitted facts.

(c)     A reasonable investor would have viewed the above omitted facts as important for the reasons stated herein. Indeed, Defendants admitted in an October 2022 court filing that "'the damage to Carvana's reputation and goodwill posed by'" even one "'suspension order [wa]s incalculable and irreparable.'"

176.    **Statement No. 2**: On May 6, 2021, Carvana filed its quarterly report on Form 10-Q for the period ended March 31, 2021 ("Q1 2021 10-Q") with the SEC, signed by Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins. The Q1 2021 10-Q stated: "***There have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in our most recent Annual Report on Form 10-K, filed on February 25, 2021***." The risk factors in the 2020 10-K, stated:

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . ***[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition***.
>
> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration*** . . . .
>
> *              *              *
>
> ***The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these***

1

2

***laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results***.

3

177.    As detailed below, Statement No. 2 by Carvana, Jenkins, and Garcia Junior

4

was materially misleading when made because Defendants omitted to state material facts

necessary in order to make it not misleading.

5

6

(a)    Defendants' May 6, 2021 statement that "[t]here have been no material

7

changes to the risk factors disclosed under the heading 'Risk Factors' in" the 2020 10-K, was

misleading because it omitted that the material risks previously warned of – "administrative,

8

9

civil, or criminal penalties or in a cease-and-desist order against some or all of our business

10

activities" – had already come to fruition and materially changed since February 25, 2021.

In fact: (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance

11

12

privileges for all Ohio locations, and subjected the Company to increased oversight in

13

December 2020; and (ii) on March 23, 2021, MDOS had met with Carvana executives

following its investigation of the Company's violations, and, on May 7, 2021, MDOS fined

14

15

Carvana thousands of dollars and placed the Company on an 18-month probation.

16

Defendants also concealed the inevitably of the foregoing risks and identified harms

materializing because of the above omitted facts.

17

18

(b)    Defendants presented Carvana's "failure to comply" with title and

19

registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks

that could materially harm Carvana if they materialized when, in truth, these risks had

20

21

already come to fruition.  Indeed, Carvana routinely and repeatedly: (i) sold cars before

22

holding title to the vehicles; (ii) failed to register cars within the legally required timeframe;

23

and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous

state laws.  §VI.D.  For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that

24

25

Carvana would sell these vehicles before it received title.  Specifically, CW-3 estimated that

26

Carvana only had around half of the titles for the vehicles it sold wholesale at the time of

27

sale.  Further, he/she noted that, after the Class Period began, a "fire started" because he/she

28

was flooded with calls regarding title issues.  CW-11 reported that there was a drawer of

1   documentation for vehicles that had been sold by Carvana, but which Carvana could not

2   register since the titles were missing.  CW-8 said that Carvana's practice was simply to

3   assume that titles for vehicles could be acquired later if they were not available at the time of

4   purchase.  CW-4 said it was well known internally that title issues were a problem.  CW-4

5   also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire

6   IRC and there were "a ridiculous amount of cars on the list."  Further, the *Barron's* exposé

7   revealed that: (i) "[i]nterviews with state officials and former Carvana employees show the

8   [registration delay] issue is wide[]-reaching"; and (ii) Carvana admitted the violations had

9   primarily occurred in 2020 and 2021.  In addition, a presentation from a July 2020 Board

10  meeting that Jenkins and Garcia Junior attended reveals that Carvana had undertaken an

11  initiative "to reduce registration delays," as part of its "Key Focus Areas and Risks."  Ex. 1.

12  Worse, title and registration issues and penalties continued to be a prominent topic in every

13  Board meeting thereafter until at least December 2021.  *See, e.g.*, Exs. 1-2; *see also Schertz*,

14  ECF 23.  Lastly, Defendants also concealed the inevitably of the foregoing risks and

15  identified harms materializing because of the above omitted facts.

16          (c)     A reasonable investor would have viewed the above omitted facts as

17  important for the reasons stated herein.  Indeed, Defendants admitted in an October 2022

18  court filing that "'the damage to Carvana's reputation and goodwill posed by'" even one

19  "'suspension order [wa]s incalculable and irreparable.'"

20          178.    **Statement No. 3**: On August 5, 2021, Carvana filed its Q2 2021 10-Q with the

21  SEC, signed by Jenkins and attaching SOX certifications signed by Garcia Junior and

22  Jenkins.  The Q2 2021 10-Q stated: "***There have been no material changes to the risk***

23  ***factors disclosed under the heading 'Risk Factors' in our most recent Annual Report on***

24  ***Form 10-K, filed on February 25, 2021***."  The risk factors disclosed in the 2020 10-K,

25  stated:

26          We operate in several highly regulated industries and are subject to a
        wide range of federal, state, and local laws and regulations. . . . *[O]ur failure*
27      *to comply [with these laws and regulations], could have a material adverse*
        *effect on our business, results of operations, and financial condition*.

28

- 65 -

1
2
3
4

> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration*** . . . .

5

> \*     \*     \*

6
7
8
9

> ***The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results***.

10   179.   As detailed below, Statement No. 3 by Carvana, Jenkins, and Garcia Junior

11   was materially misleading when made because Defendants omitted to state material facts

12   necessary in order to make it not misleading.

13   (a)   Defendants' August 5, 2021 statement that "[t]here have been no

14   material changes to the risk factors" identified in the 2020 10-K was misleading because it

15   omitted that the material risks warned of – "administrative, civil, or criminal penalties or in a

16   cease-and-desist order against some or all of our business activities" – had already come to

17   fruition and materially changed since February 25, 2021.  In fact: (i) the Ohio BMV had

18   investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations,

19   and subjected the Company to increased oversight in December 2020; (ii) MDOS had fined

20   Carvana thousands of dollars and placed the Company on an 18-month probation – a

21   probation they would repeatedly violate – following months of investigation and a meeting

22   with Carvana executives in March of 2021; and (iii) North Carolina had fined and suspended

23   Carvana's license for six months following an investigation and a July 2021 hearing.  In

24   addition, Carvana had settled a complaint with Florida for title violations, and Texas had

25   fined Carvana thousands of dollars for violations related to title and registration no later than

26   October 22, 2021.  Defendants also concealed the inevitably of the foregoing risks and

27   identified harms materializing because of the above omitted facts.

28

4890-0865-5022.v1

(b)    Defendants presented Carvana's "failure to comply" with title and registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks that could materially harm Carvana if they materialized when, in truth, these risks had already come to fruition.  Indeed, Carvana routinely and repeatedly: (i) sold cars before holding title to the vehicles; (ii) failed to register cars within the legally required timeframe; and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous state laws.  §VI.D.  For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before it received title.  Specifically, CW-3 estimated that Carvana only had around half of the titles for the vehicles it sold wholesale at the time of sale.  Further, he/she noted that, after the Class Period began, a "fire started" because he/she was flooded with calls regarding title issues.  CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana, but which Carvana could not register since the titles were missing.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 said it was well known internally that title issues were a problem.  CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a ridiculous amount of cars on the list."  Further, the *Barron's* exposé revealed that: (i) "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is wide[]-reaching"; and (ii) Carvana admitted the violations had primarily occurred in 2020 and 2021.  In addition, a presentation from a July 2020 Board meeting that Jenkins and Garcia Junior attended reveals that Carvana had undertaken an initiative "to reduce registration delays," as part of its "Key Focus Areas and Risks."  Ex. 1.  Worse, title and registration issues and penalties continued to be a prominent topic in every Board meeting thereafter until at least December 2021.  *See, e.g.*, Exs. 1-2; *see also Schertz*, ECF 23.  Further, from June 2021 to July 2022, Carvana failed to timely register approximately 10% of its sales in Maryland, which would later result in additional fines.  Defendants also concealed the inevitably of the foregoing risks and identified harms materializing because of the above omitted facts.

1        (c)    A reasonable investor would have viewed the above omitted facts as

2   important for the reasons stated herein.  Indeed, Defendants admitted that, should the risks

3   occur, the effects could be material.  Further, Defendants admitted in an October 2022 court

4   filing that "'the damage to Carvana's reputation and goodwill posed by'" even one

5   "'suspension order [wa]s incalculable and irreparable.'"

6        180.    **Statement No. 4**: On August 11, 2021, Carvana was asked about the title and

7   licensing issue in North Carolina at the J.P. Morgan Auto Conference presentation attended

8   by investors and analysts.  Carvana's VP of IR, Mike Levin ("Levin") and Jenkins gave the

9   following responses:

10          [J.P. Morgan Analyst:]  Great.  Thanks.  So maybe let's just get right
            into it.  I wasn't expecting to ask this question, but since the news hit the
11          headlines around the North Carolina DMV in the suspension – in the Raleigh
            region.

12
            Just curious to know, any update you could provide in up front, like
13          what exactly happened.  What's going on?  Like is it just restricted to certain
            ZIP codes?  Is it the whole state?  Can you buy cars from consumers?  Just if
14          you could give us a quick rundown, just start would be helpful.

15          [Jenkins:] Yes, sure.  So the brief summary there is following COVID,
            I think there are a number of things that led to title and registration getting
16          backed up.  And I think since some of the delays associated with COVID,
            we've continued to be somewhat backed up in title and registration, and that's
17          impacted the customer experience on title and registration in certain instances.

18          In this particular case, *I think we had quite a small fraction of
            customers that were impacted by title and registration delays, but it did
19          happen in the state of North Carolina*.  And so I think the DMV there thought
            that with having a set of customers experienced title and registration delays
20          that they wanted to do something to reflect the fact that they didn't like
            customers in that state experiencing these delays.
21
            So what they did was they asked us to stop delivering cars from the
22          vending machine in Raleigh.  We can still deliver cars in the metro area of
            Raleigh, just not from the specific vending machine location.  And we can also
23          still do work in the vending team, but we just can't deliver cars from that
            particular location.  And so that's what they elected to do.  *Based on our
24          research, that's a relatively sort of unusual approach for something like this
            and having a set of customers have title and registration delays, but that's
25          where we are today*.  And yes, we announced it, and that's the background.

26          [J.P. Morgan Analyst:]  Got it.  *And are you comfortable that this is a
            very North Carolina specific issue and not something you might need to
27          investigate in like other states, just to make sure it's covered*?  Or just curious
            like has this led you to like maybe like just check what's happening and make
28          sure that this is not more of a widespread issue?

4890-0865-5022.v1

1      [Jenkins:]  Sure.  Well, I would make 2 points on that.  ***One, our***

2  ***understanding is that this is quite unprecedented***.  But having said that, our
goal is to provide the best customer experiences possible and make sure that

3  we're – our processes are dialed . . . .

4                         *     *     *

5      [Levin:]  ***Yes***.  Just I think that there is always a lot of room for us to
improve, and the #1 focus here is on customer experience, and we work with

6  DMVs in every single state around the country to achieve that goal.  And I
think this, based on the pandemic, what was an area where we saw delays.

7  ***And this was a relatively unusual action, but is also pretty small in scope,***
***relatively speaking***.

8      181.  As detailed below, Statement No. 4 by Carvana, Levin, and Jenkins omitted

9  material facts that affirmatively created an impression of a state of affairs that differed in a

10  material way from the one that actually existed.

11      (a)  Contrary to Defendants' statement that North Carolina's action was

12  "unusual," "unprecedented," and "specific" to North Carolina: (i) the Ohio BMV had

13  investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations,

14  and subjected the Company to increased oversight in December 2020; and (ii) MDOS had

15  fined Carvana thousands of dollars and placed the Company on an 18-month probation on

16  May 7, 2021 after meeting with its executives in March of 2021.  Further, the Board had

17  been discussing title and registration issues at every Board meeting for over a year.  *See, e.g.*,

18  Exs. 1-2; *see also Schertz*, ECF 23.

19      (b)  Contrary to the impression that the violations and penalties were a

20  "North Carolina specific issue," the *Barron's* exposé later revealed that "[i]nterviews with

21  state officials and former Carvana employees show the [registration delay] issue is ***wide[]-***

22  ***reaching***."  §VI.D.  CWs-3, 4, 8, 9, 10, and 11 universally reported that title issues were

23  pervasive at the Company.  Specifically, CW-3 estimated that Carvana only had around half

24  of the titles for the vehicles it sold wholesale at the time of sale.  Further, he/she noted that,

25  after the Class Period began, a "fire started" because he/she was flooded with calls regarding

26  title issues.  CW-11 reported that there was a drawer of documentation for vehicles that had

27  been sold by Carvana, but which Carvana could not register since the titles were missing.

28  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be

4890-0865-5022.v1

1   acquired later if they were not available at the time of purchase.  CW-4 said it was well

2   known internally that title issues were a problem.  CW-4 also said there was a Google

3   spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a

4   ridiculous amount of cars on the list."  Further, the *Barron's* exposé revealed that Carvana

5   had admitted the violations had primarily occurred in 2020 and 2021.  In addition, a

6   presentation from a July 2020 Board meeting that Jenkins and Garcia Junior attended reveals

7   that Carvana had undertaken an initiative "to reduce registration delays," as part of its "Key

8   Focus Areas and Risks."  Ex. 1.  Worse, title and registration issues and penalties continued

9   to be a prominent topic in every Board meeting thereafter until at least December 2021.  *See*

10  *Schertz*, ECF 23.  Indeed, the Company's October 18, 2021 Board minutes reveal that

11  internally Garcia Junior and Jenkins were discussing how to "explain the NC situation,

12  ***amongst others***."  Ex. 2.  Further, as alleged herein, subsequent government investigations,

13  plea agreements, suspensions, and media reports confirm that, during the Class Period,

14  Defendants also violated laws and regulations in Texas, Florida, Michigan, Maryland, Ohio,

15  Oklahoma, Illinois, Pennsylvania, and Georgia.

16          (c)     Notably, analysts bought Defendants' misleading assurances.  For

17  example, a William Blair analyst noted on August 11, 2021, that "[a]fter speaking with

18  management, . . . we are optimistic that this will be an isolated incident."

19          (d)     The omitted facts would have been viewed by a reasonable investor as

20  significant for the reasons stated herein, and because Defendants stated that, as to just one of

21  the state actions, "'the damage to Carvana's reputation and goodwill posed by the suspension

22  order is incalculable and irreparable.'"

23          182.    **Statement No. 5**: On November 4, 2021, Carvana filed its quarterly report

24  Form 10-Q for the period ended September 30, 2021 ("Q3 2021 10-Q"), with the SEC,

25  signed by Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins.

26  The Q3 2021 10-Q stated: "***There have been no material changes to the risk factors***

27  ***disclosed under the heading 'Risk Factors' in our most recent Annual Report on Form 10-***

28  ***K, filed on February 25, 2021***."  The risk factors disclosed in the 2020 10-K, stated:

- 70 -

We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration* . . . .

\*       \*       \*

*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*.

183.    As detailed below, Statement No. 5 by Carvana, Garcia Junior, and Jenkins was materially misleading when made because Defendants omitted to state material facts necessary in order to make it not misleading.

(a)    Specifically, Defendants' November 4, 2021 statement that "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors'" identified in the 2020 10-K was misleading because it omitted that the material risks previously warned of – "administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities" – had already come to fruition and materially changed since February 25, 2021. In fact: (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in December 2020; and (ii) Carvana was repeatedly violating its probation in Michigan and would be forced to extend it in three months *after* multiple meetings between Carvana and MDOS. At the same time, Defendants had portrayed the North Carolina fine and suspension as "unprecedented" and "North Carolina specific." Defendants also concealed the inevitably of the foregoing risks and identified harms materializing because of the above omitted facts.

4890-0865-5022.v1

(b)      Defendants presented Carvana's "failure to comply" with title and registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks that could materially harm Carvana if they materialized when, in truth, these risks had already come to fruition.  Indeed, Carvana routinely and repeatedly: (i) sold cars before holding title to the vehicles; (ii) failed to register cars within the legally required timeframe; and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous state laws.  §VI.D.  For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before they received title.  Specifically, CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana, but which Carvana could not register since the titles were missing.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 said it was well known internally that title issues were a problem.  CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a ridiculous amount of cars on the list."  As the *Barron's* exposé later revealed, "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is wide[]-reaching."  Further, from June 2021 to July 2022, Carvana failed to timely register approximately 10% of its sales in Maryland, which would later result in additional fines.  In addition, a presentation from a July 2020 Board meeting that Jenkins and Garcia Junior attended reveals that Carvana had undertaken an initiative "to reduce registration delays," as part of its "Key Focus Areas and Risks."  Ex. 1.  Worse, title and registration issues and penalties continued to be a prominent topic in every Board meeting thereafter until at least December 2021.  *See, e.g.*, Exs. 1-2; *see also Schertz*, ECF 23.  Defendants also concealed the inevitably of the foregoing risks and identified harms materializing because of the above omitted facts.

(c)      A reasonable investor would have viewed the above omitted facts as important for the reasons stated herein.  Indeed, Defendants admitted that, should the risks

occur, the effects could be material.  Further, Defendants admitted in an October 2022 court filing that "'the damage to Carvana's reputation and goodwill posed by'" even one "'suspension order [wa]s incalculable and irreparable.'"

184.    **Statement No. 6**: On February 24, 2022, Carvana filed its 2021 10-K with the SEC, signed by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins.  The 2021 10-K contained the following purported risk disclosure:

> ***We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . .  [O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition***.

> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration*** . . . .

> \*       \*       \*

> ***The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations.  Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results***.

185.    As detailed below, Statement No. 6 by Carvana, Jenkins, and Garcia Junior was materially misleading when made because Defendants omitted to state material facts necessary in order to make the statement made not misleading.

(a)    Defendants' February 24, 2022 statement that the violation of any state regulations and laws "***could*** result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations," was misleading because it omitted that the risks it was warning investors about had already come to fruition.  In fact: (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the

4890-0865-5022.v1

1    Company to increased oversight in December 2020; (ii) following additional meetings

2    between MDOS and Carvana, Carvana "admi[tted] . . . several more violations of

3    [Michigan's] code," faced thousands of dollars in additional fines, and had its 18-month

4    probation extended on February 7, 2022; and (iii) Illinois had begun investigating Carvana in

5    February 2022 for issuing out-of-state temporary registration permits and for failing to

6    transfer titles in a timely manner in violation of its laws.  Defendants also concealed the

7    inevitably of the foregoing risks and identified harms materializing because of the above

8    omitted facts.

9          (b)    Defendants presented Carvana's "failure to comply" with title and

10   registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks

11   that could materially harm Carvana if they materialized when, in truth, these risks had

12   already come to fruition.  Indeed, Carvana routinely and repeatedly: (i) sold cars before

13   holding title to the vehicles; (ii) failed to register cars within the legally required timeframe;

14   and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous

15   state laws.  §VI.D.  For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that

16   Carvana would sell these vehicles before they received title.  Specifically, CW-10 described

17   instances where titles on vehicles Carvana sold could not be obtained for over a year, which

18   meant the buyers were unable to drive their cars.  CW-8 said that Carvana's practice was

19   simply to assume that titles for vehicles could be acquired later if they were not available at

20   the time of purchase.  CW-4 said it was well known internally that title issues were a

21   problem.  CW-4 also said there was a Google spreadsheet that tracked vehicles without titles

22   for his/her entire IRC and there were "a ridiculous amount of cars on the list."  CW-9 said,

23   beginning in Q1 2022, registration delays amounted to roughly half of the calls the team had

24   handled and that employees informed Garcia Junior of this in January 2022.  Further, from

25   June 2021 to July 2022, Carvana failed to timely register approximately 10% of its sales in

26   Maryland, which would later result in additional fines.  In addition, the *Barron's* exposé

27   would later reveal that Carvana's violations were systematic and wide-reaching.  Defendants

28

1   also concealed the inevitably of the foregoing risks and identified harms materializing

2   because of the above omitted facts.

3        (c)    A reasonable investor would have viewed the above omitted facts as

4   important for the reasons stated herein.  Indeed, Defendants admitted in an October 2022

5   court filing that "'the damage to Carvana's reputation and goodwill posed by'" even one

6   "'suspension order [wa]s incalculable and irreparable.'"

7        186.    **Statement No. 7**: On May 10, 2022, Carvana filed its quarterly report on Form

8   10-Q for the period ended March 31, 2022 (the "Q1 2022 10-Q") with the SEC, signed by

9   Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins.  The Q1 2022

10  10-Q stated: "***There have been no material changes to the risk factors disclosed under the***

11  ***heading 'Risk Factors' in our most recent Annual Report on Form 10-K, filed on***

12  ***February 24, 2022, except***" as related to risks concerning a "***larger automotive ecosystem,***

13  ***including consumer demand, global supply chain challenges, and other macroeconomic***

14  ***issues***."  The risk factors disclosed in the 2021 10-K, stated:

15          We operate in several highly regulated industries and are subject to a
        wide range of federal, state, and local laws and regulations. . . . ***[O]ur failure***
16      ***to comply [with these laws and regulations], could have a material adverse***
        ***effect on our business, results of operations, and financial condition***.

17          We are subject to a wide range of evolving federal, state, and local laws
18      and regulations, many of which may have limited to no interpretation
        precedent as it relates to our business model.  ***Our sale and purchase of used***
19      ***vehicles and related activities, including the sale of complementary products***
        ***and services, are subject to state and local licensing requirements, state laws,***
20      ***regulations, and systems and process requirements related to title and***
        ***registration*** . . . .

21                      *      *      *

22          ***The violation of any of these laws or regulations could result in***
23      ***administrative, civil, or criminal penalties or in a cease-and-desist order***
        ***against some or all of our business activities, any of which could damage***
24      ***our reputation and have a material adverse effect on our business, sales, and***
        ***results of operations.  Additionally, even an allegation that we violated these***
25      ***laws, by regulators, competitors, individuals, or consumers, could result in***
        ***costly litigation with uncertain results***.

26

27

28

4890-0865-5022.v1

187.    As detailed below, Statement No. 7 made by Carvana, Garcia Junior, and Jenkins was materially misleading when made because Defendants omitted to state material facts necessary in order to make it not misleading.

(a)      Defendants' May 10, 2022 statement that "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in" the 2021 10-K was misleading because it omitted that the material risks and harms previously warned of – "administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities" – had already come to fruition and materially changed since February 24, 2022.  In fact: (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in December 2020; (ii) following additional meetings between MDOS and Carvana, Carvana "admi[tted] . . . several more violations of [Michigan's] code," faced thousands of dollars in additional fines, and had its 18-month probation extended on February 7, 2022; (iii) Carvana was continuing to violate the terms of its Michigan probation and would later have its license revoked for doing so 127 times; and (iv) Illinois had begun investigating Carvana in February 2022 for issuing out-of-state temporary registration permits and for failing to transfer titles in a timely manner.  Defendants also concealed the inevitably of the foregoing risks materializing because of the above facts.

(b)      Defendants' statement that "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in" the 2021 10-K, omitted that the material risks previously warned of – an "adverse effect on our . . . sales" – had already occurred as Defendants admitted on August 4, 2022 that "over the last several months," Carvana had to implement "buffers in many states to provide cushion for their title and registration teams to work with the various states to complete necessary registration paperwork," which materially slowed growth.

(c)      Defendants presented Carvana's "failure to comply" with title and registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks that could materially harm Carvana if they materialized when, in truth, these risks had

1  already come to fruition.  Carvana routinely and repeatedly: (i) sold cars before holding title
2  to the vehicles; (ii) failed to register cars within the legally required timeframe; and (iii)
3  issued out-of-state temporary tags and/or license plates in violation of numerous state laws.
4  §VI.D.   Indeed, just two days after this statement, Illinois suspended Carvana's dealer
5  license for failing to timely transfer title and improperly supplying customers with out-of-
6  state temporary plates, causing some consumers to receive police citations.  Even following
7  its suspension "'Carvana continued to conduct business in a manner that violates Illinois
8  state law.'"  In addition, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would
9  sell these vehicles before they received title.  Specifically, CW-10 described instances where
10  titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers
11  were unable to drive their cars.  CW-8 said that Carvana's practice was simply to assume
12  that titles for vehicles could be acquired later if they were not available at the time of
13  purchase.  CW-4 said it was well known internally that title issues were a problem.  CW-4
14  also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire
15  IRC and there were "a ridiculous amount of cars on the list."  CW-9 said, beginning in Q1
16  2022, registration delays amounted to roughly half of the calls the team had handled and that
17  employees informed Garcia Junior of this in January 2022.  Further, from June 2021 to July
18  2022, Carvana failed to timely register approximately 10% of its sales in Maryland, which
19  would later result in additional fines.  In addition, the *Barron's* exposé would later reveal
20  that Carvana's violations were systematic and wide-reaching.  Defendants also concealed the
21  inevitably of the foregoing risks and identified harms materializing because of the above
22  omitted facts.

23          (d)     A reasonable investor would have viewed the above omitted facts as
24  important for the reasons stated herein.  Indeed, Defendants admitted in an October 2022
25  court filing that "'the damage to Carvana's reputation and goodwill posed by'" even one
26  "'suspension order [wa]s incalculable and irreparable.'"

27

28

4890-0865-5022.v1

188.  **Statement No. 8**: On June 24, 2022, a Carvana spokesman minimized Carvana's title and registration problems and the nature of its disagreements with regulators, telling *Barron's*:

> "Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says.  "***In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states***."
>
> *      *      *
>
> ***Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021.  "We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward***," it says.

189.  As detailed below, Statement No. 8 made by Carvana omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)  Contrary to Carvana's statement that these challenges were occurring "[i]n a very small percentage of a very small percentage of instances": (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in December 2020; (ii) following additional meetings between MDOS and Carvana, Carvana "admi[tted] . . . several more violations of [Michigan's] code," faced thousands of dollars in additional fines, and had its 18-month probation extended on February 7, 2022; and (iii) Carvana was continuing to violate the terms of its Michigan probation and would later have its license revoked for doing so 127 times.  Further, far from being a rare or isolated occurrence, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before they received title.  Specifically, CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 said it was well known internally that

4890-0865-5022.v1

title issues were a problem. CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a ridiculous amount of cars on the list." CW-9 said, beginning in Q1 2022, registration delays amounted to roughly half of the calls the team had handled and that employees informed Garcia Junior of this in January 2022. Further, from June 2021 to July 2022, Carvana failed to timely register approximately 10% of its sales in Maryland, which would later result in additional fines. Not surprisingly, title and registration issues and penalties had been discussed in every Board meeting since July of 2020 until at least December 2021. *See, e.g.*, Exs. 1-2; *see also Schertz*, ECF 23. Moreover, as alleged herein, subsequent government investigations, plea agreements, suspensions, and media reports confirm that, during the Class Period, Defendants violated laws and regulations in Texas, Florida, Michigan, Maryland, Oklahoma, Illinois, Pennsylvania, Ohio, and Georgia.

(b)     Contrary to Carvana's statement that it was having "'productive conversations with regulators'" and "'fe[lt] very confident . . . going forward,'" mere weeks later, Michigan suspended Carvana's license for: (i) "[f]ailing to make application for title and registration within 15 days of delivery for 112 customers since agreeing to an earlier probation extension"; (ii) "[c]ommitting fraud in connection with selling or otherwise dealing in vehicles where Carvana employees admitted to destroying title applications and all applicable documents pertaining to the sale of [certain vehicles]" that it later took back from customers; (iii) "[i]mproperly issuing temporary registrations"; and (4) "[v]iolating [the] terms of a probation agreement 127 times." Further, shortly after Carvana's statement, the Company would see its licenses suspended or revoked in Pennsylvania and Illinois.

(c)     The omitted facts would have been viewed by a reasonable investor as significant for the reasons stated herein, and because Defendants stated that, as to just one of the state actions, "'the damage to Carvana's reputation and goodwill posed by the suspension order is incalculable and irreparable.'"

4890-0865-5022.v1

1

**B.    Defendants' Materially False and Misleading Statements and Omissions Concerning Buying Cars from Customers**

2

190.    As Jenkins reminded investors on the first day of the Class Period, buying cars from customers was purportedly "a major innovation and a major add to the business." Thus, during the Class Period, Carvana emphasized in its SEC filings that a critical part of its growth strategy was to "[i]ncrease the purchase of vehicles from customers." Accordingly, leading up to and during much of the Class Period, Garcia Junior and Jenkins dedicated an entire section of their shareholder letters to touting the number of customer-sourced cars and describing the advantages of their strategy. However, unbeknownst to investors, by the second half of fiscal year ended December 31, 2020 ("FY 2020"), Defendants had drastically lowered (or disregarded) their purchasing and verification standards to significantly increase the number of cars they were purchasing from customers in order to induce more trade-ins and increase retail sales. While this action did increase retail unit sales, it adversely impacted Carvana's bottom line, flooded Carvana with wholesale cars that had to be sold at a loss, and crippled its logistics network. At the same time, Defendants touted only the positive "advantages" of buying cars from customers while assuring investors that Carvana "*assess[es] vehicles on the basis of quality*." In short, Defendants' statements below were misleading by omission because Defendants touted positive information to the market but failed to disclose material adverse information that cut against that positive information.

191.    **Statement No. 9**: On October 29, 2020, after the market closed, Carvana filed its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "Q3 2020 10-Q"), signed by Jenkins and attaching SOX certifications signed by Jenkins and Garcia Junior. The Q3 2020 10-Q stated:

> •    *Vehicle sourcing and acquisition*. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. *We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory*. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- 80 -

4890-0865-5022.v1

1    192.    As detailed below, Statement No. 9 by Carvana, Jenkins, and Garcia Junior

2  omitted material facts that affirmatively created an impression of a state of affairs that

3  differed in a material way from the one that actually existed.

4    (a)    Contrary to Defendants' statement that they "assess vehicles on the

5  basis of quality," Defendants concealed from investors that Carvana "was **intentionally**

6  buying lower quality cars." (Emphasis in original.)[19]

7    (b)    Defendants omitted that Carvana abruptly and drastically lowered or

8  disregarded entirely the Company's purchasing and verification standards when buying cars

9  from customers in order to induce trade-ins and increase retail sales. §VI.B.  Indeed, by

10  lowering or disregarding the Company's purchasing and verification standards, Carvana

11  increased cars sourced from customers in Q3 2020 by 261% over the prior quarter, as shown

12  in the chart below.  CWs-1 and 4 confirmed that, to boost retail sales through trade-ins,

13  Carvana bought cars from customers that clearly did not meet its purchasing and verification

14  standards.  For example, CW-1 reported that Carvana had purchased a bullet-ridden car and a

15  car missing its back seat.  CW-3 stated that Carvana had relaxed its standards to accept "all

16  vehicles" and did not genuinely inspect vehicles before purchasing them anymore, resulting

17  in a lot of "trash vehicles."  CW-11 said that Carvana was buying vehicles "sight unseen"

18  and his/her team was not expected to do much to verify the condition of the vehicles.  CW-

19  11 observed that Carvana did not actually care about the condition of the vehicles and just

20  wanted to "get as many cars as it could."  In short, contrary to the statement that Carvana

21  was "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative

22  value, expected reconditioning costs, and vehicle location to identify what we believe

23  represent the most in-demand and profitable vehicles to acquire for inventory," Carvana

24  largely disregarded the condition of the vehicles they purchased as CWs-1, 3, 4, and 11 all

25  reported.

26

27  ───────────────────

[19]   Defendants judicially admitted this omitted fact by including it in a brief in this action.

28  ECF 58 at 12.

4890-0865-5022.v1



(c)    As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted Carvana's bottom line by flooding Carvana with wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's 128% spike in the number of cars purchased from customers during Q3 2020, its wholesale sales spiked by over 100% during Q4 2020 and Q1 2021.  Meanwhile, wholesale sales made up 20% of the Company's total sales in Q3 2020 compared to just 12% one quarter earlier.

4890-0865-5022.v1





(ii)    This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail. Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics. Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars. In Q3 2020, wholesale GPU was $1,113, 40% lower than Retail GPU of $1,857.[20]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material **costs associated with**

---

[20]    Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue. These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

4890-0865-5022.v1

*completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[21]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 letter to shareholders dated November 2, 2023 (the "Q3 2023 Shareholder Letter") and the November 2, 2023 Cost Structure Details presentation, that there are "***two key drivers***" *of* "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were ***not*** included in Carvana's reported GPU and had never been separately broken out to investors.[22] Instead, during the Class Period, these expenses that drove Carvana's actual profit per car sold, were lumped into and comingled with other SG&A expenses.[23]  Defendants later admitted, however, that these "operations expenses" were not typical fixed or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment, customer service, and transaction expenses ***associated with completing retail and wholesale vehicle sales***."[24]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded from

---

[21]  In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[22]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[23]  While Defendants included per-vehicle operations expenses in SG&A expenses (rather than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own. In fact, as detailed in ¶252(d), the disclosures that Defendants ***did*** make regarding SG&A expenses during Q3 2020 did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

[24]  During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology,

1    its reported GPU included: (i) "customer care, *multi-car logistics*, *last-mile delivery*, and

2    other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii) "non-

3    payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party transport*

4    *services*" "associated with completing . . . wholesale vehicle sales"; and (iii) "[t]ransaction

5    and other expenses, including limited warranty, *title and registration*, and finance platform

6    expenses" "associated with completing . . . wholesale vehicle sales."    Defendants'

7    concealment of "operations expenses" when describing Carvana's wholesale profitability

8    was especially misleading in light of the fact that Defendants internally viewed "*the*

9    *underlying costs of completing a sale*" as a critical component of Carvana's actual

10   wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

11              *When we think about trying to aim for more profitable sales, what does that*
               *mean?*  There's certainly variability in the kind of gross profit associated with
12             different types of sales. . . .

13                      And then I think there's a number of other dynamics kind of across car
               type, et cetera.  *There's also kind of variation in the underlying costs of*
14             *completing a sale*.

15   Because Defendants did not specifically break out operations expenses (*i.e.*, *the underlying*

16   *costs of completing a sale*) and instead buried and comingled them among SG&A expenses,

17   investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

18   sales, like Garcia Junior did internally.    As demonstrated in the chart below, upon

19   incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

20   incurred in completing wholesale vehicle sales), *Carvana lost money on wholesale vehicle*

21   *sales every quarter during the Class Period*.[25]  For example, in Q3 2020, Carvana's average

22   ───────────────────────────────────────────────
     product development, engineering, legal, accounting, finance, and business development."
23   Moreover, while Defendants made vague Class Period disclosures indicating that certain of
     expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
24   out "operations expenses" to investors; (ii) described that these vehicle "operations
     expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle*
25   *sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
     metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of
26   per-unit profitability.

27   [25]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and
     wholesale vehicle operations expenses in Q3 2020 divided by total retail and wholesale
28   vehicles sold in Q3 2020.

4890-0865-5022.v1

selling price per wholesale vehicle was $8,450 while its total costs (cost of sales in addition to estimated undisclosed operations expense) totaled $8,831, for a total loss of $381 per vehicle.



(iii)     Defendants omitted that the surplus of wholesale cars resulting from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network."  Carvana further admitted that "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."

(iv)     Defendants omitted that Carvana lacked critical infrastructure necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

- 86 -

1    customer's homes and transport them to a market hub and then transport these cars long

2    distances from their origin to our nearest IRC where they are either reconditioned or held

3    until they are wholesaled." Further, they admitted that "[w]ith this acquisition [of ADESA],

4    we can now position advocates at the auction locations and transport cars from our

5    customer's driveways directly to an ADESA U.S. location without any additional moves."

6    193.    **Statement No. 10**: On February 25, 2021, Carvana held a conference call for

7    analysts and investors to discuss the Q4 2020 results. During the Q4 2020 earnings call,

8    Garcia Junior responded to an analyst's question regarding the excess demand for consumers

9    to sell to Carvana:

10    [W]e've got a model where we can sell cars across geographies and across
      makes and models and across the price spectrum. *And we've got very*
11    *efficient ways to sell even wholesale cars*. It puts us in a position where we
      can be a very high-quality buyer. *And so we've seen a lot of success in that*
12    *business*.

13    So I think that we're excited by where we are. I think going forward,
      it's – there's no – until we get extremely large, there isn't necessarily a
14    fundamental ratio that we would shoot for with respect to cars bought relative
      to cars sold. I think we will just seek to grow both businesses as quickly as we
15    possibly can because we've set up the business to do so. *If we're buying*
      *significantly more cars than we're selling, then we have the capacity to sell*
16    *the excess wholesale*. If we're not, then we have the capacity to buy cars from
      other channels. And so we're just going to look to grow both businesses as
17    quickly as we can independently.

18    194.    As detailed below, Statement No. 10 made by Carvana and Garcia Junior

19    omitted material facts that affirmatively created an impression of a state of affairs that

20    differed in a material way from the one that actually existed.

21    (a)    Contrary to Defendants' statement that Carvana has "very efficient ways

22    to sell even wholesale cars," and it readily "ha[s] the capacity to sell the excess [cars from

23    customers] wholesale," Carvana lacked critical infrastructure necessary to process the huge

24    surplus of wholesale vehicles resulting from Carvana "***intentionally*** buying lower quality

25    cars." (Emphasis in original.) In Carvana's May 2022 Operating Plan, Defendants admitted

26    that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in

27    turn, led to "constraints in our nationwide logistics network." Carvana also admitted that

28    "wholesale units acquired from customers have typically been transported to the nearest

4890-0865-5022.v1

1   Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

2   multi-car logistics network."  Consequently, Carvana was forced to spend $3 billion to

3   purchase ADESA, a nationwide wholesale auction house.  In describing his rationale for the

4   purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5

5   million square feet of buildings on more than 4,000 acres of land, and as reported in a

6   September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the

7   logistics, and there's no better infrastructure than auctions to serve that purpose.'"  Indeed,

8   Defendants later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last

9   mile delivery advocates pick these cars up from customer's homes and transport them to a

10  market hub and then transport these cars long distances from their origin to our nearest IRC

11  where they are either reconditioned or held until they are wholesaled."  Further, they

12  admitted that "[w]ith this acquisition [of ADESA], we can now position advocates at the

13  auction locations and transport cars from our customer's driveways directly to an ADESA

14  U.S. location without any additional moves."

15          (b)      In addition, it was also materially misleading to tout Carvana's "very

16  efficient ways to sell" wholesale cars and "capacity to sell the excess [cars from customers]

17  wholesale," while omitting that the flood of wholesale cars was adversely impacting

18  Carvana's bottom line because the wholesale vehicles were sold at a loss and crippled

19  Carvana's logistic network, as detailed below.

20                  (i)      Carvana sold cars at wholesale at significantly lower prices than

21  those sold at retail.  Carvana, however, still incurred many of the same costs involved in

22  selling retail vehicles, including inbound transportation, reconditioning, and other logistics.

23  Thus, the lower average sales price combined with customary selling costs resulted in

24  significantly lower reported GPU on wholesale cars.  In Q4 2020, wholesale GPU was $358,

25  over 70% lower than Retail GPU of $1,265.[26]

26  ───────────────────

27  [26]   Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such
    as warranty, insurance, or financing-related revenue.  These "other" revenue streams
    represented the vast majority of Carvana's reported total GPU on its retail sales, but

28  generated $0 on wholesale sales.

4890-0865-5022.v1

(ii)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (1) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (2) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[27]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "***two key drivers*** *of* "***unit economics***" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were ***not*** included in Carvana's reported GPU and had never been separately broken out to investors.[28]  Instead, during the Class Period, these expenses that drove Carvana's actual profit per car sold, were lumped into and comingled with other SG&A expenses.[29]

---

[27]   In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[28]   After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[29]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own. In fact, as detailed in ¶252(d), the disclosures that Defendants ***did*** make regarding SG&A expenses during the Class Period did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

1  Defendants later admitted, however, that these "operations expenses" were not typical fixed

2  or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

3  customer service, and transaction expenses *associated with completing retail and wholesale*

4  *vehicle sales*."[30]   Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

5  from its reported GPU included: (1) "customer care, *multi-car logistics*, *last-mile delivery*,

6  and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (2)

7  "non-payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party*

8  *transport services*" "associated with completing . . . wholesale vehicle sales"; and (3)

9  "[t]ransaction and other expenses, including limited warranty, *title and registration*, and

10  finance platform expenses" "associated with completing . . . wholesale vehicle sales."

11  Defendants' concealment of "operations expenses" when describing Carvana's wholesale

12  profitability was especially misleading in light of the fact that Defendants internally viewed

13  "*the underlying costs of completing a sale*" as a critical component of Carvana's actual

14  wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

15      *When we think about trying to aim for more profitable sales, what does that*
        *mean?*  There's certainly variability in the kind of gross profit associated with
16      different types of sales. . . .

17          And then I think there's a number of other dynamics kind of across car
        type, et cetera.  *There's also kind of variation in the underlying costs of*
18      *completing a sale*.

19  Because Defendants did not specifically break out operations expenses (*i.e.*, the underlying

20  costs of completing a sale) and instead buried and comingled them among SG&A expenses,

21  investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

---

22  [30]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses
23  associated with advertising and providing customer service to customers, operating our
     vending machines and hubs, operating our logistics and fulfillment network and other
24  corporate overhead expenses, including expenses associated with information technology,
     product development, engineering, legal, accounting, finance, and business development."
25  Moreover, while Defendants made vague Class Period disclosures indicating that certain of
     expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
26  out "operations expenses" to investors; (ii) described that these vehicle "operations
     expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle*
27  *sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
     metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of
28  per-unit profitability.

sales, like Garcia Junior did internally.  As demonstrated in the chart below, upon incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle sales every quarter during the Class Period***.[31]  For example, in Q4 2020, Carvana's average selling price per wholesale vehicle was $8,545, while its total costs (cost of sales in addition to estimated undisclosed operations expense) totaled $9,877, for a total loss of $1,332 per wholesale vehicle sold.



(c)    Analysts were misled.  On February 26, 2021, a BofA Securities analyst stated, "[r]evenue upside seems to be at least mostly driven by non-core wholesale unit."

195.  **Statement No. 11**: On February 25, 2021, Carvana filed its 2020 10-K with the SEC, signed by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins.  The 2020 10-K stated:

> ***Vehicle acquisition***.  . . .  For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer.  ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***.  We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

---

[31]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and wholesale vehicle operations expenses in Q4 2020 divided by total retail and wholesale vehicles sold in Q4 2020.

4890-0865-5022.v1

1          196.    As detailed below, Statement No. 11 made by Carvana, Garcia Junior, and

2    Jenkins omitted material facts that affirmatively created an impression of a state of affairs

3    that differed in a material way from the one that actually existed.

4          (a)    Contrary to Defendants' statement that they "assess vehicles on the

5    basis of quality," Defendants concealed from investors that Carvana "was **intentionally**

6    buying lower quality cars."  (Emphasis in original.)[32]

7          (b)    Defendants omitted that Carvana abruptly and drastically lowered or

8    disregarded entirely the Company's purchasing and verification standards when buying cars

9    from customers in order to induce trade-ins and increase retail sales.  §VI.B.  Indeed, by

10    lowering or disregarding the Company's purchasing and verification standards, Carvana

11    increased cars sourced from customers during Q4 2020 by 110% year-over-year.  CWs-1 and

12    4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from customers

13    that clearly did not meet its purchasing and verification standards.  For example, CW-1

14    reported that Carvana had purchased a car missing its back seat and one with bullet holes in

15    it which the customer had rated in fair condition.  CW-3 stated that Carvana had relaxed its

16    standards to accept "all vehicles" and did not genuinely inspect vehicles before purchasing

17    them anymore, resulting in a lot of "trash vehicles."  CW-11 said that Carvana was buying

18    vehicles "sight unseen" and his/her team was not expected to do much to verify the condition

19    of the vehicles.  CW-11 observed that Carvana did not actually care about the condition of

20    the vehicles and just wanted to "get as many cars as it could."  In short, contrary to the

21    statement that Carvana was "assess[ing] vehicles on the basis of quality, inventory fit,

22    consumer desirability, relative value, expected reconditioning costs, and vehicle location to

23    identify what we believe represent the most in-demand and profitable vehicles to acquire for

24    inventory," Carvana largely disregarded the condition of the vehicles they purchased as

25    CWs-1, 3, 4, and 11 all reported.

26

27    ───────────────
[32]   Defendants judicially admitted this omitted fact by including it in a brief in this action.
28    ECF 58 at 12.

4890-0865-5022.v1

(c)    As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale. Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth. As shown in the charts below, immediately following Carvana's 128% spike in the number of cars purchased from customers during Q3 2020, its wholesale sales spiked by over 100% during Q4 2020 and Q1 2021. Meanwhile, wholesale sales made up over 20% of the Company's total sales in Q4 2020 as compared to just 12% two quarters earlier.

 

(ii)    This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail. Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics. Thus, the lower average sales price combined with customary selling costs

4890-0865-5022.v1

resulted in significantly lower reported GPU on wholesale cars.  In Q4 2020, wholesale GPU was $358, over 70% lower than Retail GPU of $1,265.[33]

              (2)     Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[34]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "*two key drivers*" of "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were *not* included in Carvana's reported GPU and had never been separately broken out to investors.[35]  Instead, during the Class Period, these expenses that drove Carvana's actual

---

[33]  Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

[34]  In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[35]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

profit per car sold, were lumped into and comingled with other SG&A expenses.[36]
Defendants later admitted, however, that these "operations expenses" were not typical fixed
or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,
customer service, and transaction expenses *associated with completing retail and wholesale
vehicle sales*."[37]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded
from its reported GPU included: (i) "customer care, *multi-car logistics*, *last-mile delivery*,
and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)
"non-payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party
transport services*" "associated with completing . . . wholesale vehicle sales"; and (iii)
"[t]ransaction and other expenses, including limited warranty, *title and registration*, and
finance platform expenses" "associated with completing . . . wholesale vehicle sales."
Defendants' concealment of "operations expenses" when describing Carvana's wholesale
profitability was especially misleading in light of the fact that Defendants internally viewed
"*the underlying costs of completing a sale*" as a critical component of Carvana's actual
wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> *When we think about trying to aim for more profitable sales, what does that
> mean?*  There's certainly variability in the kind of gross profit associated with
> different types of sales. . . .

---

[36]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather
than GPU), they did not separately disclose or quantify these expenses in a manner that
would have allowed investors to decipher the overall per-vehicle profitability on their own.
In fact, as detailed in ¶252(d), the disclosures that Defendants *did* make regarding SG&A
expenses during the Class Period did more to mislead investors than to provide transparency
around Carvana's true profitability per vehicle sold.

[37]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses
associated with advertising and providing customer service to customers, operating our
vending machines and hubs, operating our logistics and fulfillment network and other
corporate overhead expenses, including expenses associated with information technology,
product development, engineering, legal, accounting, finance, and business development."
Moreover, while Defendants made vague Class Period disclosures indicating that certain of
expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
out "operations expenses" to investors; (ii) described that these vehicle "operations
expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle
sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of
per-unit profitability.

- 95 -

1   And then I think there's a number of other dynamics kind of across car
2 type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

3 Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying***

4 ***costs of completing a sale***) and instead buried and comingled them among SG&A expenses,

5 investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

6 sales, like Garcia Junior did internally.    As demonstrated in the chart below, upon

7 incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

8 incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle***

9 ***sales every quarter during the Class Period***.[38]  For example, in Q4 2020, Carvana's average

10 selling price per wholesale vehicle was $8,545, while its total costs (cost of sales in addition

11 to estimated undisclosed operations expense) totaled $9,877, for a total loss of $1,332 per

12 wholesale vehicle sold.



21   (iii)    Defendants omitted that the surplus of wholesale cars resulting

22 from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics

23 constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that

24 "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

25 led to "constraints in our nationwide logistics network."    Carvana further admitted that

---

[38]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and wholesale vehicle operations expenses in Q4 2020 divided by total retail and wholesale vehicles sold in Q4 2020.

4890-0865-5022.v1

1    "wholesale units acquired from customers have typically been transported to the nearest

2    Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

3    multi-car logistics network."

4              (iv)    Defendants omitted that Carvana lacked critical infrastructure

5    necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was

6    forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In

7    describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-

8    mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

9    of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained

10   "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions

11   to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA,

12   Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

13   customer's homes and transport them to a market hub and then transport these cars long

14   distances from their origin to our nearest IRC where they are either reconditioned or held

15   until they are wholesaled."  Further, they admitted that "[w]ith this acquisition [of ADESA],

16   we can now position advocates at the auction locations and transport cars from our

17   customer's driveways directly to an ADESA U.S. location without any additional moves."

18             (d)    Analysts – unaware of the havoc Defendants' lowering of standards

19   wreaked on Carvana's operations and financials – were deceived.  A February 26, 2021 JMP

20   Securities analyst approved of Carvana's vehicle sourcing and noted, "customer inventory

21   remains a key source of inventory while also widening selection (more high-end options on

22   vehicles) and lowering vehicle acquisition prices."

23        197.  **Statement No. 12**: On May 6, 2021, Carvana held a conference call for

24   analysts and investors to discuss the Q1 2021 results.  During the Q1 2021 earnings call,

25   Jenkins responded to an analyst question regarding buying cars from customers:

26             Sure.  So I can take that one.  So I mean, ***I think our #1 channel for***
             ***sourcing inventory has now become sourcing cars directly from customers,***
27           ***which has several advantages that we've talked about historically***.  I think
             we're certainly going to continue to focus on that.  That's a business that we
28           want to build and continue to grow over the long term.  And so I think that's

- 97 -

our #1 area of focus and would be the – sort of the first answer to that question.

198.    As detailed below, Statement No. 12 by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.  While there were "advantages" of sourcing cars from customers, Defendants omitted that Carvana had lowered or disregarded its purchasing and verification standards and was, thus, purchasing thousands of cars that could only be sold via the wholesale market at a loss, as alleged herein.

(a)    CWs-1, 3, 4, and 11 confirm that Carvana omitted it was intentionally acquiring low-quality vehicles.  CWs-1 and 4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from customers that clearly did not meet its purchasing and verification standards.  For example, CW-1 reported that Carvana had purchased a bullet-ridden car and a car missing its back seat.  CW-3 stated that Carvana had relaxed its standards to accept "all vehicles" and did not genuinely inspect vehicles before purchasing them anymore, resulting in a lot of "trash vehicles."  CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do much to verify the condition of the vehicles.  CW-11 observed that Carvana did not actually care about the condition of the vehicles and just wanted to "get as many cars as it could."

(b)    As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's 119% spike in the number of cars purchased from customers during the last two quarters of FY 2020, its wholesale sales spiked by over

- 98 -

4890-0865-5022.v1

100% in Q1 2021, and over 500% in Q2 2021. Meanwhile, wholesale sales made up over 20% of the Company's total sales in Q1 2021 as compared to just 12% in Q2 2020.




(ii)    This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail. Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics. Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars. In Q1 2021, wholesale GPU was $806, 33% less than Retail GPU of $1,211.[39]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own.

---

[39]  Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue. These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

4890-0865-5022.v1

1   These per-vehicle operations expenses, which were only separately broken out and

2   quantified for the first time after the Class Period, included material ***costs associated with***

3   ***completing a wholesale sale***, such as the full cost to ship a car to a wholesale auction site

4   and title and registration costs.[40]  Tellingly, Carvana admitted after the Class Period in its Q3

5   2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there

6   are "***two key drivers***" ***of*** "***unit economics***" (*i.e.*, per-vehicle profitability): (i) cost of sales,

7   which were the expenses Carvana had always included in its reported GPU calculations; and

8   (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses

9   that were ***not*** included in Carvana's reported GPU and had never been separately broken out

10  to investors.[41]  Instead, during the Class Period, these expenses that drove Carvana's actual

11  profit per car sold, were lumped into and comingled with other SG&A expenses.[42]

12  Defendants later admitted, however, that these "operations expenses" were not typical fixed

13  or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

14  customer service, and transaction expenses ***associated with completing retail and wholesale***

15  ***vehicle sales***."[43]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

16

17  [40]   In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

18  [41]   After disclosing and quantifying operations expenses for the first time in November
19  2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the
20  unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our
21  selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car
22  today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives,
23  and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

24  [42]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather
25  than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own.
26  In fact, as detailed in ¶254(d), the disclosures that Defendants ***did*** make regarding SG&A expenses during Q1 2021 did more to mislead investors than to provide transparency around
27  Carvana's true profitability per vehicle sold.

28  [43]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our

4890-0865-5022.v1

1  from its reported GPU included: (i) "customer care, **multi-car logistics**, **last-mile delivery**,

2  and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)

3  "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party**

4  **transport services**" "associated with completing . . . wholesale vehicle sales"; and (iii)

5  "[t]ransaction and other expenses, including limited warranty, **title and registration**, and

6  finance platform expenses" "associated with completing . . . wholesale vehicle sales."

7  Defendants' concealment of "operations expenses" when describing Carvana's wholesale

8  profitability was especially misleading in light of the fact that Defendants internally viewed

9  "**the underlying costs of completing a sale**" as a critical component of Carvana's actual

10  wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

11          **When we think about trying to aim for more profitable sales, what does that**
           **mean?**  There's certainly variability in the kind of gross profit associated with
12         different types of sales. . . .

13          And then I think there's a number of other dynamics kind of across car
           type, et cetera.  **There's also kind of variation in the underlying costs of**
14         **completing a sale**.

15  Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying**

16  **costs of completing a sale**) and instead buried and comingled them among SG&A expenses,

17  investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

18  sales, like Garcia Junior did internally.  As demonstrated in the chart below, upon

19  incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

20  incurred in completing wholesale vehicle sales), **Carvana lost money on wholesale vehicle**

21

22

23  vending machines and hubs, operating our logistics and fulfillment network and other
24  corporate overhead expenses, including expenses associated with information technology,
   product development, engineering, legal, accounting, finance, and business development."
25  Moreover, while Defendants made vague Class Period disclosures indicating that certain of
   expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
26  out "operations expenses" to investors; (ii) described that these vehicle "operations
   expenses" were direct per-vehicle costs "**associated with completing . . . wholesale vehicle**
27  **sales**"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
   metric, these additional per-vehicle "operations expenses," were one of "**two key drivers**" of
28  per-unit profitability.

***sales every quarter during the Class Period***.[44]  For example, in Q1 2021, Carvana's average selling price per wholesale vehicle was $9,217, while its total costs (cost of sales in addition to estimated undisclosed operations expense) totaled $10,014, for a total loss of $797 per vehicle.



(iii)    Defendants omitted that the surplus of wholesale cars resulting from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network."  Carvana further admitted that "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."

(iv)    Defendants omitted that Carvana lacked critical infrastructure necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

---

[44]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and wholesale vehicle operations expenses in Q1 2021 divided by total retail and wholesale vehicles sold in Q1 2021.

4890-0865-5022.v1

1    of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained

2    "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions

3    to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA,

4    Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

5    customer's homes and transport them to a market hub and then transport these cars long

6    distances from their origin to our nearest IRC where they are either reconditioned or held

7    until they are wholesaled."  Further, they admitted that "[w]ith this acquisition [of ADESA],

8    we can now position advocates at the auction locations and transport cars from our

9    customer's driveways directly to an ADESA U.S. location without any additional moves."

10            (c)       Analysts, who consistently focused on Carvana's vehicle sourcing, were

11   duped by Carvana's and Jenkins's materially misleading misstatements and omissions.  For

12   example, on May 7, 2021, Truist Securities raised its price target because the increase in

13   "[c]onsumer-sourced vehicles . . . ***attest[ed] to the success of this program.  We believe the***

14   ***company has honed its efforts to efficiently acquire vehicles from the consumer and***

15   ***believe this represents a GPU growth opportunity over time***."  On the same day, a DA

16   Davidson analyst report stated that "[t]otal GPU was $3,656, . . . the upside came . . . mostly

17   from wholesale profits."  Additionally, a Wedbush analyst report stated "the company's

18   consolidated GPU still beat expectations because of . . . more wholesale units sold than

19   anticipated."

20          199.    **Statement No. 13**: Also on May 6, 2021, Carvana filed its Q1 2021 10-Q with

21   the SEC, signed by Jenkins and attaching SOX certifications signed by Garcia Junior and

22   Jenkins.  The Q1 2021 10-Q stated:

23          •       ***Vehicle acquisition***.  . . .  For vehicles sold to us through our website,
             we use proprietary algorithms to determine an appropriate offer.  ***We assess***
24          ***vehicles on the basis of quality, inventory fit, consumer desirability, relative***
             ***value, expected reconditioning costs, and vehicle location to identify what we***
25          ***believe represent the most in-demand and profitable vehicles to acquire for***
             ***inventory***.  We utilize a broad range of data sources, including proprietary site
26          data, and a variety of external data sources to support our assessments.

27

28

200.   As detailed below, Statement No. 13 made by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)   Contrary to Defendants' statement that they "assess vehicles on the basis of quality," Defendants concealed from investors that Carvana "was ***intentionally*** buying lower quality cars." (Emphasis in original.)[45]

(b)   Defendants omitted that Carvana abruptly and drastically lowered or disregarded entirely the Company's purchasing and verification standards when buying cars from customers to induce trade-ins and increase inventory, and thus, boost retail sales. §VI.B.  Indeed, by lowering or disregarding the Company's purchasing and verification standards, Carvana achieved a customer source ratio over 60% that quarter.  CWs-1 and 4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from customers that clearly did not meet its purchasing and verification standards.  For example, CW-1 reported that Carvana had purchased a bullet-ridden car and a car missing its back seat.  CW-3 stated that Carvana had relaxed its standards to accept "all vehicles" and did not genuinely inspect vehicles before purchasing them anymore, resulting in a lot of "trash vehicles."  CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do much to verify the condition of the vehicles.  CW-11 observed that Carvana did not actually care about the condition of the vehicles and just wanted to "get as many cars as it could."  In short, contrary to the statement that Carvana was "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory," Carvana largely disregarded the condition of the vehicles they purchased as CWs-1, 3, 4, and 11 all reported.

---

[45]  Defendants judicially admitted this omitted fact by including it in a brief in this action. ECF 58 at 12.

4890-0865-5022.v1

(c)      As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)      Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's 119% spike in the number of cars purchased from customers during the last two quarters of FY 2020, its wholesale sales spiked by over 100% during Q1 2021 and by over 500% in Q2 2021.  Meanwhile, wholesale sales made up over 20% of the Company's total sales in Q1 2021 compared to just 12% in Q2 2020.




(ii)      This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)      Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics.  Thus, the lower average sales price combined with customary selling costs

- 105 -

resulted in significantly lower reported GPU on wholesale cars. In Q1 2021, wholesale GPU was $806, 33% less than Retail GPU of $1,211.[46]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[47] Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "*two key drivers*" *of* "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were *not* included in Carvana's reported GPU and had never been separately broken out to investors.[48] Instead, during the Class Period, these expenses that drove Carvana's actual

---

[46]    Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue. These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

[47]    In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[48]    After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the unit economics of the business. In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

1    profit per car sold, were lumped into and comingled with other SG&A expenses.[49]

2    Defendants later admitted, however, that these "operations expenses" were not typical fixed

3    or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

4    customer service, and transaction expenses *associated with completing retail and wholesale*

5    *vehicle sales*."[50]   Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

6    from its reported GPU included: (i) "customer care, *multi-car logistics*, *last-mile delivery*,

7    and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)

8    "non-payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party*

9    *transport services*" "associated with completing . . . wholesale vehicle sales"; and (iii)

10   "[t]ransaction and other expenses, including limited warranty, *title and registration*, and

11   finance platform expenses" "associated with completing . . . wholesale vehicle sales."

12   Defendants' concealment of "operations expenses" when describing Carvana's wholesale

13   profitability was especially misleading in light of the fact that Defendants internally viewed

14   "*the underlying costs of completing a sale*" as a critical component of Carvana's actual

15   wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

16       *When we think about trying to aim for more profitable sales, what does that*
         *mean?*  There's certainly variability in the kind of gross profit associated with
17       different types of sales. . . .

18   _____

19   [49]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather
     than GPU), they did not separately disclose or quantify these expenses in a manner that
20   would have allowed investors to decipher the overall per-vehicle profitability on their own.
     In fact, as detailed in ¶254(d), the disclosures that Defendants *did* make regarding SG&A
21   expenses during Q1 2021 did more to mislead investors than to provide transparency around
     Carvana's true profitability per vehicle sold.

22   [50]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses
23   associated with advertising and providing customer service to customers, operating our
     vending machines and hubs, operating our logistics and fulfillment network and other
24   corporate overhead expenses, including expenses associated with information technology,
     product development, engineering, legal, accounting, finance, and business development."
25   Moreover, while Defendants made vague Class Period disclosures indicating that certain of
     expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
26   out "operations expenses" to investors; (ii) described that these vehicle "operations
     expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle*
27   *sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
     metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of
28   per-unit profitability.

4890-0865-5022.v1

1    And then I think there's a number of other dynamics kind of across car
2    type, et cetera. ***There's also kind of variation in the underlying costs of completing a sale***.

3    Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying***

4    ***costs of completing a sale***) and instead buried and comingled them among SG&A expenses,

5    investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

6    sales, like Garcia Junior did internally. As demonstrated in the chart below, upon

7    incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

8    incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle***

9    ***sales every quarter during the Class Period***.[51] For example, in Q1 2021, Carvana's average

10    selling price per wholesale vehicle was $9,217 while its total costs (cost of sales in addition

11    to estimated undisclosed operations expense) totaled $10,014, for a total loss of $797 per

12    vehicle.



21    (iii)    Defendants omitted that the surplus of wholesale cars resulting

22    from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics

23    constraints. For example, in Carvana's May 2022 Operating Plan, Defendants admitted that

24    "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

25    led to "constraints in our nationwide logistics network." Carvana further admitted that

---

51    Estimated operations expense per wholesale vehicle calculated as follows: total retail and wholesale vehicle operations expenses in Q1 2021 divided by total retail and wholesale vehicles sold in Q1 2021.

1    "wholesale units acquired from customers have typically been transported to the nearest

2    Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

3    multi-car logistics network."

4                (iv)    Defendants omitted that Carvana lacked critical infrastructure

5    necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was

6    forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In

7    describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-

8    mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

9    of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained

10   "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions

11   to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA,

12   Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

13   customer's homes and transport them to a market hub and then transport these cars long

14   distances from their origin to our nearest IRC where they are either reconditioned or held

15   until they are wholesaled."  Further, they admitted that "[w]ith this acquisition [of ADESA],

16   we can now position advocates at the auction locations and transport cars from our

17   customer's driveways directly to an ADESA U.S. location without any additional moves."

18          (d)     Analysts, focused on Carvana's vehicle sourcing metric because of its

19   importance to Carvana's purported profitability, were misled.  For example, a May 7, 2021

20   Truist Securities analyst report shows it raised its price target because the increase in

21   "[c]onsumer-sourced vehicles . . . ***attest[ed] to the success of this program.  We believe the***

22   ***company has honed its efforts to efficiently acquire vehicles from the consumer and***

23   ***believe this represents a GPU growth opportunity over time***."

24          201.    <u>**Statement No. 14**</u>: On August 5, 2021, Carvana held a conference call for

25   analysts and investors to discuss the Q2 2021 results.  On the Q2 2021 earnings call, Garcia

26   Junior responded to an analysts' questions regarding Carvana's pricing and profitability:

27          ***[W]e've built this channel of buying cars from customers that has performed***
             ***very well for us over a long period of time.  We've made continual high-***
28           ***quality progress in both the number of cars we're buying, the cars we're***

*buying relative to retail sales and the profits that we're making on cars that we buy from customers*.

\*        \*        \*

I think the thing that we would point to is that is the biggest by a long, long way, is just buying cars from customers.

*We just saw a massive, massive increase in the number of cars we're buying from customers and in the profitability of buying cars from customers*.

202.    As detailed below, Statement No. 14 by Carvana and Garcia Junior omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)        While Defendants touted the "high-quality progress in both the number of cars were buying" and "the profits that we're making on cars that we buy from customers," they omitted that Carvana was "*intentionally* buying lower quality cars." Further, Defendants omitted that Carvana abruptly and drastically lowered or disregarded entirely the Company's purchasing and verification standards when buying cars from customers in order to induce trade-ins and increase retail sales. §VI.B. CWs-1, 2, 3, 4, and 11 confirm that Carvana omitted that it had lowered or disregarded its purchasing and verification standards and was intentionally acquiring low-quality vehicles. CW-4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from customers that plainly did not meet its purchasing and verification standards. CW-3 stated that Carvana had relaxed its standards to accept "all vehicles" and did not genuinely inspect vehicles before purchasing them anymore, resulting in a lot of "trash vehicles." CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do much to verify the condition of the vehicles. CW-11 observed that Carvana did not actually care about the condition of the vehicles and just wanted to "get as many cars as it could." In addition, CW-2 was overruled when voicing concerns about the quality of vehicles as "leadership would say take it."

(b)        As detailed below, while Defendants touted "the profitability of buying cars from customers," Defendants omitted that buying low-quality cars from customers

4890-0865-5022.v1

1   adversely impacted the Company's bottom line by flooding Carvana with less profitable

2   wholesale cars and crippling its logistics network.

3           (i)       Because Carvana was "***intentionally*** buying lower quality cars,"

4   it was flooded with cars that did not meet its retail standards and, thus, had to be sold

5   wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards,

6   Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the

7   charts below, immediately following Carvana's 119% spike in the number of cars purchased

8   from customers during the last two quarters of FY 2020, its wholesale sales spiked by over

9   100% during the next three quarters, including over 500% in Q2 2021.  Meanwhile,

10  wholesale sales made up 30% of the Company's total sales in Q2 2021, nearly double the

11  ratio at the beginning of the Class Period.





21          (ii)      This massive increase in wholesale vehicles adversely impacted

22  Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale

23  vehicle sales, as detailed below:

24          (1)       Carvana sold cars at wholesale at significantly lower

25  prices than those sold at retail.  Carvana, however, still incurred many of the same costs

26  involved in selling retail vehicles, including inbound transportation, reconditioning, and

27  other logistics.  Thus, the lower average sales price combined with customary selling costs

28

4890-0865-5022.v1

resulted in significantly lower reported GPU on wholesale cars.  In Q2 2021, wholesale GPU was $1,254, almost 40% less than Retail GPU of $2,022.[52]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[53]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "*two key drivers*" *of* "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were *not* included in Carvana's reported GPU and had never been separately broken out to investors.[54]  Instead, during the Class Period, these expenses that drove Carvana's actual

---

[52]  Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

[53]  In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[54]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

1   profit per car sold, were lumped into and comingled with other SG&A expenses.[55]

2   Defendants later admitted, however, that these "operations expenses" were not typical fixed

3   or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

4   customer service, and transaction expenses *associated with completing retail and wholesale*

5   *vehicle sales*."[56]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

6   from its reported GPU included: (i) "customer care, *multi-car logistics*, *last-mile delivery*,

7   and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)

8   "non-payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party*

9   *transport services*" "associated with completing . . . wholesale vehicle sales"; and (iii)

10  "[t]ransaction and other expenses, including limited warranty, *title and registration*, and

11  finance platform expenses" "associated with completing . . . wholesale vehicle sales."

12  Defendants' concealment of "operations expenses" when describing Carvana's wholesale

13  profitability was especially misleading in light of the fact that Defendants internally viewed

14  "*the underlying costs of completing a sale*" as a critical component of Carvana's actual

15  wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

16      *When we think about trying to aim for more profitable sales, what does that*
        *mean?*  There's certainly variability in the kind of gross profit associated with
17      different types of sales. . . .

18  _____

19  [55]  While Defendants included per-vehicle operations expenses in SG&A expenses (rather
    than GPU), they did not separately disclose or quantify these expenses in a manner that
20  would have allowed investors to decipher the overall per-vehicle profitability on their own.
    In fact, as detailed in ¶256(d), the disclosures that Defendants *did* make regarding SG&A
21  expenses during Q2 2021 did more to mislead investors than to provide transparency around
    Carvana's true profitability per vehicle sold.

22  [56]  During the Class Period, Defendants described Carvana's SG&A costs as "expenses
23  associated with advertising and providing customer service to customers, operating our
    vending machines and hubs, operating our logistics and fulfillment network and other
24  corporate overhead expenses, including expenses associated with information technology,
    product development, engineering, legal, accounting, finance, and business development."
25  Moreover, while Defendants made vague Class Period disclosures indicating that certain of
    expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
26  out "operations expenses" to investors; (ii) described that these vehicle "operations
    expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle*
27  *sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
    metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of
28  per-unit profitability.

1    And then I think there's a number of other dynamics kind of across car
2    type, et cetera. ***There's also kind of variation in the underlying costs of
     completing a sale***.

3    Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying***

4    ***costs of completing a sale***) and instead buried and comingled them among SG&A expenses,

5    investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

6    sales, like Garcia Junior did internally. As demonstrated in the chart below, upon

7    incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

8    incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle***

9    ***sales every quarter during the Class Period***.[57] For example, in Q2 2021, Carvana's average

10   selling price per wholesale vehicle was $11,838 while its total costs (cost of sales in addition

11   to estimated undisclosed operations expense) totaled $12,082, for a total loss of $244 per

12   vehicle.



21   (iii)    Defendants omitted that the surplus of wholesale cars resulting

22   from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics

23   constraints. For example, in Carvana's May 2022 Operating Plan, Defendants admitted that

24   "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

25   led to "constraints in our nationwide logistics network." Carvana further admitted that

---

57   Estimated operations expense per wholesale vehicle calculated as follows: total retail and
wholesale vehicle operations expenses in Q2 2021 divided by total retail and wholesale
vehicles sold in Q2 2021.

4890-0865-5022.v1

1    "wholesale units acquired from customers have typically been transported to the nearest

2    Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

3    multi-car logistics network."

4              (iv)    Defendants omitted that Carvana lacked critical infrastructure

5    necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was

6    forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In

7    describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-

8    mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

9    of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained

10   "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions

11   to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA,

12   Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

13   customer's homes and transport them to a market hub and then transport these cars long

14   distances from their origin to our nearest IRC where they are either reconditioned or held

15   until they are wholesaled."  Further, they admitted that "[w]ith this acquisition [of ADESA],

16   we can now position advocates at the auction locations and transport cars from our

17   customer's driveways directly to an ADESA U.S. location without any additional moves."

18             (c)    Defendants omitted that as a result of ***seeing*** "***a massive increase in the***

19   ***number of cars we're buying from customers***," Carvana's wholesale vehicles sales far

20   outpaced the growth in retail sales between late 2020 and the end of the Class Period, as

21   described above.

22             (d)    Defendants omitted that at this time, Carvana's glut of low-quality

23   inventory was causing "parking constraints," "load imbalances," and "increased the number

24   of vehicles moved and total vehicle miles traveled, adding to costs and logistics network

25   complexity."  Indeed, Defendants would later admit that two of three primary drivers of the

26   Company's logistics costs and constraints were Carvana's increased inventory and increased

27   wholesale volume from buying cars from customers.

28

4890-0865-5022.v1

1        203.   **Statement No. 15**: Also on August 5, 2021, Carvana filed its Q2 2021 10-Q

2  with the SEC, signed by Jenkins and attaching SOX certifications signed by Garcia Junior

3  and Jenkins.  The Q2 2021 10-Q stated:

4       •    *Vehicle acquisition*. . . .  For vehicles sold to us through our website,
we use proprietary algorithms to determine an appropriate offer.  ***We assess***

5      ***vehicles on the basis of quality, inventory fit, consumer desirability, relative
value, expected reconditioning costs, and vehicle location to identify what we***

6      ***believe represent the most in-demand and profitable vehicles to acquire for
inventory***.  We utilize a broad range of data sources, including proprietary site

7      data, and a variety of external data sources to support our assessments.

8        204.   As detailed below, Statement No. 15 by Carvana, Garcia Junior, and Jenkins

9  omitted material facts that affirmatively created an impression of a state of affairs that

10  differed in a material way from the one that actually existed.

11        (a)    Contrary to Defendants' statement that they "assess vehicles on the

12  basis of quality," Defendants concealed from investors that Carvana "was ***intentionally***

13  buying lower quality cars."  (Emphasis in original.)[58]

14        (b)    Defendants omitted that Carvana had drastically lowered or disregarded

15  entirely the Company's purchasing and verification standards when buying cars from

16  customers to induce trade-ins and increase inventory, and thus, boost retail sales.  §VI.B.

17  CW-4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from

18  customers that plainly did not meet its purchasing and verification standards.  CW-3 stated

19  that Carvana had relaxed its standards to accept "all vehicles" and did not genuinely inspect

20  vehicles before purchasing them anymore, resulting in a lot of "trash vehicles."  CW-11 said

21  that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do

22  much to verify the condition of the vehicles.  CW-11 observed that Carvana did not actually

23  care about the condition of the vehicles and just wanted to "get as many cars as it could."  In

24  addition, CW-2 was overruled when voicing concerns about the quality of vehicles as

25  "leadership would say take it."  In short, contrary to the statement that Carvana was

26  "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative

27
28

---

[58]  Defendants judicially admitted this omitted fact by including it in a brief in this action.
ECF 58 at 12.

4890-0865-5022.v1

value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory," Carvana largely disregarded the condition of the vehicles they purchased as CWs-1, 2, 3, 4, and 11 reported.

(c)    As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's 119% spike in the number of cars purchased from customers during the last two quarters of FY 2020, its wholesale sales spiked by over 100% over the next three quarters, including over 500% in Q2 2021.  Meanwhile, wholesale sales made up 30% of the Company's total sales in Q2 2021, nearly double the ratio at the beginning of the Class Period.





(ii)    This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

- 117 -

(1)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics.  Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars.  In Q2 2021, wholesale GPU was $1,254, nearly 40% less than Retail GPU of $2,022.[59]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material ***costs associated with completing a wholesale sale***, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[60]  Tellingly, Carvana admitted after the Class Period in its Q3 2003 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "***two key drivers*** *of* "***unit economics***" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were ***not*** included in Carvana's reported GPU and had never been separately broken out to investors.[61]  Instead, during the Class Period, these expenses that drove Carvana's actual

---

[59]  Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

[60]  In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[61]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which

profit per car sold, were lumped into and comingled with other SG&A expenses.[62] Defendants later admitted, however, that these "operations expenses" were not typical fixed or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment, customer service, and transaction expenses *associated with completing retail and wholesale vehicle sales*."[63]   Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded from its reported GPU included: (i) "customer care, *multi-car logistics*, *last-mile delivery*, and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii) "non-payroll *logistics expenses*, including fuel, repairs and maintenance, and *third-party transport services*" "associated with completing . . . wholesale vehicle sales"; and (iii) "[t]ransaction and other expenses, including limited warranty, *title and registration*, and finance platform expenses" "associated with completing . . . wholesale vehicle sales." Defendants' concealment of "operations expenses" when describing Carvana's wholesale profitability was especially misleading in light of the fact that Defendants internally viewed

---

he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[62]  While Defendants included per-vehicle operations expenses in SG&A expenses (rather than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own. In fact, as detailed in ¶256(d), the disclosures that Defendants *did* make regarding SG&A expenses during Q2 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

[63]  During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development." Moreover, while Defendants made vague Class Period disclosures indicating that certain of expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke out "operations expenses" to investors; (ii) described that these vehicle "operations expenses" were direct per-vehicle costs "*associated with completing . . . wholesale vehicle sales*"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU metric, these additional per-vehicle "operations expenses," were one of "*two key drivers*" of per-unit profitability.

"***the underlying costs of completing a sale***" as a critical component of Carvana's actual wholesale vehicle profitability. Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?*** There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera. ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's wholesale vehicle sales, like Garcia Junior did internally. As demonstrated in the chart below, upon incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle sales every quarter during the Class Period***.[64] For example, in Q2 2021, Carvana's average selling price per wholesale vehicle was $11,838 while its total costs (cost of sales in addition to estimated undisclosed operations expense) totaled $12,081, for a total loss of $244 per vehicle.



---

[64] Estimated operations expense per wholesale vehicle calculated as follows: total retail and wholesale vehicle operations expenses in Q2 2021 divided by total retail and wholesale vehicles sold in Q2 2021.

4890-0865-5022.v1

1          (iii)    Defendants omitted that the surplus of wholesale cars resulting

2    from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics

3    constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that

4    "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

5    led to "constraints in our nationwide logistics network."  Carvana further admitted that

6    "wholesale units acquired from customers have typically been transported to the nearest

7    Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

8    multi-car logistics network."

9          (iv)    Defendants omitted that Carvana lacked critical infrastructure

10   necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was

11   forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In

12   describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-

13   mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

14   of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained

15   "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions

16   to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA,

17   Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

18   customer's homes and transport them to a market hub and then transport these cars long

19   distances from their origin to our nearest IRC where they are either reconditioned or held

20   until they are wholesaled."  Further, they admitted that "[w]ith this acquisition [of ADESA],

21   we can now position advocates at the auction locations and transport cars from our

22   customer's driveways directly to an ADESA U.S. location without any additional moves."

23        205.    **Statement No. 16**: On November 4, 2021, Carvana held a conference call for

24   analysts and investors to discuss the Q3 2021 results.  On the Q3 2021 earnings call, Garcia

25   Junior responded to an analyst's question regarding Carvana purchasing cars from

26   customers:

27        So I think first and foremost, on buying cars from customers, I think that's –
          necessity would not be the way that I would describe it. ***I think the way that I***

28        ***would describe it is it's better***.  It allows us to provide a high-quality

- 121 -

experience to a customer that we're buying a car from, and then ***it gets us access to a higher-quality pool of inventory that is, on average, more profitable.  And so we want to do as much of that as we possibly can.  We want to build the business capacity to be able to handle as much of that as we possibly can***.

206.    As detailed below, Statement No. 16 by Carvana and Garcia Junior omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    While Defendants touted positive information concerning buying cars from customers, including that "it gets us access to a higher-quality pool of inventory," Defendants omitted that Carvana had drastically lowered or disregarded entirely its purchasing and verification standards when buying cars from customers to induce trade-ins and increase inventory.  §VI.B.

(b)    While Defendants touted positive information about buying from customers, including that "it gets us access to a higher-quality pool of inventory," Defendants omitted that Carvana "was ***intentionally*** buying lower quality cars."  (Emphasis in original.)[65]

(c)    As detailed below, while Defendants touted the benefits of buying cars from customers, including that "it gets us access to a higher-quality pool of inventory," Defendants omitted that buying low-quality cars from customers adversely impacted Carvana's bottom line by flooding Carvana with less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's 119% spike in the number of cars purchased from customers during the last two quarters of FY 2020, its wholesale sales spiked by over

---

[65]  Defendants judicially admitted this omitted fact by including it in a brief in this action.  ECF 58 at 12.

4890-0865-5022.v1

100% during the next four quarters, including over 225% in Q3 2021. Meanwhile, wholesale sales made up over 30% of the Company's total sales in Q3 2021, nearly double the ratio at the beginning of the Class Period.




(ii)    This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)    Carvana sold cars at wholesale at significantly lower prices than those sold at retail. Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics. Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars. In Q3 2021, wholesale GPU was $936, nearly 50% less than Retail GPU of $1,769.[66]

(2)    Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs

---

[66] Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue. These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

separately so investors could decipher overall profitability of wholesale sales on their own.

These per-vehicle operations expenses, which were only separately broken out and

quantified for the first time after the Class Period, included material ***costs associated with***

***completing a wholesale sale***, such as the full cost to ship a car to a wholesale auction site

and title and registration costs.[67]  Tellingly, Carvana admitted after the Class Period in its Q3

2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there

are "***two key drivers***" ***of*** "***unit economics***" (*i.e.*, per-vehicle profitability): (i) cost of sales,

which were the expenses Carvana had always included in its reported GPU calculations; and

(ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses

that were ***not*** included in Carvana's reported GPU and had never been separately broken out

to investors.[68]  Instead, during the Class Period, these expenses that drove Carvana's actual

profit per car sold, were lumped into and comingled with other SG&A expenses.[69]

Defendants later admitted, however, that these "operations expenses" were not typical fixed

or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

customer service, and transaction expenses ***associated with completing retail and wholesale***

---

[67]  In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[68]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[69]  While Defendants included per-vehicle operations expenses in SG&A expenses (rather than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own. In fact, as detailed in ¶258(e), the disclosures that Defendants ***did*** make regarding SG&A expenses during Q3 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

- 124 -

*vehicle sales*."[70]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded from its reported GPU included: (i) "customer care, ***multi-car logistics***, ***last-mile delivery***, and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii) "non-payroll ***logistics expenses***, including fuel, repairs and maintenance, and ***third-party transport services***" "associated with completing . . . wholesale vehicle sales"; and (iii) "[t]ransaction and other expenses, including limited warranty, ***title and registration***, and finance platform expenses" "associated with completing . . . wholesale vehicle sales." Defendants' concealment of "operations expenses" when describing Carvana's wholesale profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
>         And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's wholesale vehicle sales, like Garcia Junior did internally.  As demonstrated in the chart below, upon incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle***

---

[70]  During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development." Moreover, while Defendants made vague Class Period disclosures indicating that certain of expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke out "operations expenses" to investors; (ii) described that these vehicle "operations expenses" were direct per-vehicle costs "***associated with completing . . . wholesale vehicle sales***"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU metric, these additional per-vehicle "operations expenses," were one of "***two key drivers***" of per-unit profitability.

1    ***sales every quarter during the Class Period***.[71]  For example, in Q3 2021, Carvana's average

2    selling price per wholesale vehicle was $10,995 while its total costs (cost of sales in addition

3    to estimated undisclosed operations expense) totaled $11,750, for a total loss of $755 per

4    vehicle.



13    (iii)    Defendants omitted that the surplus of wholesale cars resulting

14    from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics

15    constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that

16    "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

17    led to "constraints in our nationwide logistics network."  Carvana also admitted that

18    "wholesale units acquired from customers have typically been transported to the nearest

19    Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our

20    multi-car logistics network."

21    (iv)    Defendants omitted that Carvana lacked critical infrastructure

22    necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was

23    forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In

24    describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-

25    mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres

26

27    _____
      [71]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and
      wholesale vehicle operations expenses in Q3 2021 divided by total retail and wholesale

28    vehicles sold in Q3 2021.

4890-0865-5022.v1

of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'" Indeed, Defendants later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from customer's homes and transport them to a market hub and then transport these cars long distances from their origin to our nearest IRC where they are either reconditioned or held until they are wholesaled." Further, they admitted that "[w]ith this acquisition [of ADESA], we can now position advocates at the auction locations and transport cars from our customer's driveways directly to an ADESA U.S. location without any additional moves."

207.   **Statement No. 17**: Also on November 4, 2021, Carvana filed its Q3 2021 10-Q with the SEC, signed by Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins. The Q3 2021 10-Q stated:

> •   *Vehicle acquisition*. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. *We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory*. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

208.   As detailed below, Statement No. 17 by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)   Contrary to Defendants' statement that they "assess vehicles on the basis of quality," Defendants concealed from investors that Carvana "was *intentionally* buying lower quality cars." (Emphasis in original.)[72]

(b)   Defendants omitted that Carvana had drastically lowered or disregarded entirely the Company's purchasing and verification standards when buying cars from customers to induce trade-ins and increase inventory, and thus, boost retail sales. §VI.B. CW-4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars from

---

[72]   Defendants judicially admitted this omitted fact by including it in a brief in this action. ECF 58 at 12.

4890-0865-5022.v1

1  customers that plainly did not meet its purchasing and verification standards.  CW-11 said

2  that Carvana was buying vehicles "sight unseen" and his/her team was not expected to do

3  much to verify the condition of the vehicles.  CW-11 observed that Carvana did not actually

4  care about the condition of the vehicles and just wanted to "get as many cars as it could."

5  CW-10 corroborated this account, explaining that Carvana was buying cars at breakneck

6  speed and not adequately inspecting them.  In addition, CW-2 was overruled when voicing

7  concerns about the quality of vehicles as "leadership would say take it."  In short, contrary to

8  the statement that Carvana was "assess[ing] vehicles on the basis of quality, inventory fit,

9  consumer desirability, relative value, expected reconditioning costs, and vehicle location to

10  identify what we believe represent the most in-demand and profitable vehicles to acquire for

11  inventory," Carvana largely disregarded the condition of the vehicles they purchased as

12  CWs-1, 2, 3, 4, and 11 reported.

13            (c)    As detailed below, Defendants omitted that buying low-quality cars

14  from customers adversely impacted the Company's bottom line by flooding Carvana with

15  less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

16            (i)    Because Carvana was "***intentionally*** buying lower quality cars,"

17  it was flooded with cars that did not meet its retail standards and, thus, had to be sold

18  wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards,

19  Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the

20  charts below, immediately following Carvana's 119% spike in the number of cars purchased

21  from customers in late 2020, its wholesale sales spiked by over 100% in each of the next four

22  quarters, including over 225% in Q3 2021.  Meanwhile, wholesale sales made up over 30%

23  of the Company's total sales in Q3 2021, nearly double the ratio at the beginning of the Class

24  Period.

25

26

27

28

4890-0865-5022.v1




(ii)     This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)     Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics.  Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars.  In Q3 2021, wholesale GPU was $936, almost 50% lower than Retail GPU of $1,769.[73]

(2)     Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with*

---

[73]   Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

4890-0865-5022.v1

1   *completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site

2   and title and registration costs.[74]   Tellingly, Carvana admitted after the Class Period in its Q3

3   2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there

4   are "*two key drivers*" of "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales,

5   which were the expenses Carvana had always included in its reported GPU calculations; and

6   (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses

7   that were *not* included in Carvana's reported GPU and had never been separately broken out

8   to investors.[75]   Instead, during the Class Period, these expenses that drove Carvana's actual

9   profit per car sold, were lumped into and comingled with other SG&A expenses.[76]

10  Defendants later admitted, however, that these "operations expenses" were not typical fixed

11  or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment,

12  customer service, and transaction expenses *associated with completing retail and wholesale*

13  *vehicle sales*."[77]   Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

14  _____

15  [74]   In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

16  [75]   After disclosing and quantifying operations expenses for the first time in November
17  2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the
18  unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our
19  selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car
20  today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives,
21  and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

22  [76]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather
23  than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own.
24  In fact, as detailed in ¶258(e), the disclosures that Defendants *did* make regarding SG&A expenses during Q3 2021 did more to mislead investors than to provide transparency around
25  Carvana's true profitability per vehicle sold.

26  [77]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our
27  vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology,
28  product development, engineering, legal, accounting, finance, and business development." Moreover, while Defendants made vague Class Period disclosures indicating that certain of

- 130 -

4890-0865-5022.v1

1  from its reported GPU included: (i) "customer care, **multi-car logistics**, **last-mile delivery**,

2  and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)

3  "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party**

4  **transport services**" "associated with completing . . . wholesale vehicle sales"; and (iii)

5  "[t]ransaction and other expenses, including limited warranty, **title and registration**, and

6  finance platform expenses" "associated with completing . . . wholesale vehicle sales."

7  Defendants' concealment of "operations expenses" when describing Carvana's wholesale

8  profitability was especially misleading in light of the fact that Defendants internally viewed

9  "**the underlying costs of completing a sale**" as a critical component of Carvana's actual

10  wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

11  
12  > **When we think about trying to aim for more profitable sales, what does that mean?**  There's certainly variability in the kind of gross profit associated with different types of sales. . . .

13  
14  > And then I think there's a number of other dynamics kind of across car type, et cetera.  **There's also kind of variation in the underlying costs of completing a sale**.

15  Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying**

16  **costs of completing a sale**) and instead buried and comingled them among SG&A expenses,

17  investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

18  sales, like Garcia Junior did internally.   As demonstrated in the chart below, upon

19  incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

20  incurred in completing wholesale vehicle sales), **Carvana lost money on wholesale vehicle**

21  **sales every quarter during the Class Period**.[78]  For example, in Q3 2021, Carvana's average

22  selling price per wholesale vehicle was $10,995 while its total costs (cost of sales in addition

23  
24  expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke out "operations expenses" to investors; (ii) described that these vehicle "operations
25  expenses" were direct per-vehicle costs "**associated with completing . . . wholesale vehicle sales**"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
26  metric, these additional per-vehicle "operations expenses," were one of "**two key drivers**" of per-unit profitability.

27  [78]  Estimated operations expense per wholesale vehicle calculated as follows: total retail and
28  wholesale vehicle operations expenses in Q3 2021 divided by total retail and wholesale vehicles sold in Q3 2021.

- 131 -

4890-0865-5022.v1

to estimated undisclosed operations expense) totaled $11,750, for a total loss of $755 per vehicle.



(iii)    Defendants omitted that the surplus of wholesale cars resulting from Carvana "**intentionally** buying lower quality cars" also led to significant logistics constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network."  Carvana further admitted that "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."

(iv)    Defendants omitted that Carvana lacked critical infrastructure necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from customer's homes and transport them to a market hub and then transport these cars long

1    distances from their origin to our nearest IRC where they are either reconditioned or held

2    until they are wholesaled." Further, they admitted that "[w]ith this acquisition [of ADESA],

3    we can now position advocates at the auction locations and transport cars from our

4    customer's driveways directly to an ADESA U.S. location without any additional moves."

5    209. **Statement No. 18**: On February 24, 2022, Carvana filed its 2021 10-K with the

6    SEC, signed by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia

7    Junior and Jenkins. The 2021 10-K stated:

8    *Vehicle acquisition*. . . . For vehicles sold to us through our website,
     we use proprietary algorithms to determine an appropriate offer. ***We assess***

9    ***vehicles on the basis of quality, inventory fit, consumer desirability, relative***
     ***value, expected reconditioning costs, and vehicle location to identify what we***

10   ***believe represent the most in-demand and profitable vehicles to acquire for***
     ***inventory***. We utilize a broad range of data sources, including proprietary site

11   data, and a variety of external data sources to support our assessments.

12   210. As detailed below, Statement No. 18 made by Carvana, Garcia Junior, and

13   Jenkins omitted material facts that affirmatively created an impression of a state of affairs

14   that differed in a material way from the one that actually existed.

15   (a) Contrary to Defendants' statement that they "assess vehicles on the

16   basis of quality," Defendants concealed from investors that Carvana "was ***intentionally***

17   buying lower quality cars." (Emphasis in original.)[79]

18   (b) Defendants omitted that Carvana had drastically lowered or disregarded

19   entirely the Company's purchasing and verification standards when buying cars from

20   customers in order to induce trade-ins and increase inventory, and thus, boost retail sales.

21   §VI.B. CW-4 confirmed that, to boost retail sales through trade-ins, Carvana bought cars

22   from customers that plainly did not meet its purchasing and verification standards. CW-11

23   said that Carvana was buying vehicles "sight unseen" and his/her team was not expected to

24   do much to verify the condition of the vehicles. CW-11 observed that Carvana did not

25   actually care about the condition of the vehicles and just wanted to "get as many cars as it

26   could." CW-10 corroborated this account, explaining that Carvana was buying cars at

27   _____

[79] Defendants judicially admitted this omitted fact by including it in a brief in this action.
     ECF 58 at 12.

28

breakneck speed and not adequately inspecting them.  In addition, CW-2 was overruled when voicing concerns about the quality of vehicles as "leadership would say take it." Similarly, CW-5 stated that there was only a 50/50 chance that a vehicle would be reappraised if it did not match the seller's description.  In short, contrary to the statement that Carvana was "assess[ing] vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory," Carvana largely disregarded the condition of the vehicles they purchased as CWs-1, 2, 3, 4, 5, 10, and 11 reported.

(c)    As detailed below, Defendants omitted that buying low-quality cars from customers adversely impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars that had to be sold at a loss and crippling its logistics network.

(i)    Because Carvana was "***intentionally*** buying lower quality cars," it was flooded with cars that did not meet its retail standards and, thus, had to be sold wholesale.  Indeed, upon lowering or disregarding its purchasing and verification standards, Carvana's wholesale growth began to far outpace its retail sales growth.  As shown in the charts below, immediately following Carvana's spike in the number of cars purchased from customers during late 2020 and early 2021, its wholesale sales spiked by over 100% in each of the next five quarters, including 115% in Q4 2021.  Meanwhile, wholesale sales made up roughly 30% of the Company's total sales in Q4 2021, nearly double the ratio at the beginning of the Class Period.

- 134 -





(ii)     This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)     Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics.  Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported GPU on wholesale cars.  In Q4 2021, wholesale GPU was $1,326 while Retail GPU was $1,495.[80]

(2)     Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, Defendants masked the actual profitability – or lack thereof – of wholesale sales by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material ***costs associated with***

---

[80]   Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

*completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[81]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "*two key drivers*" of "*unit economics*" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were *not* included in Carvana's reported GPU and had never been separately broken out to investors.[82]  Instead, during the Class Period, these expenses that drove Carvana's actual profit per car sold, were lumped into and comingled with other SG&A expenses.[83] Defendants later admitted, however, that these "operations expenses" were not typical fixed or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment, customer service, and transaction expenses *associated with completing retail and wholesale vehicle sales*."[84]  Indeed, these vehicle selling expenses that Carvana had arbitrarily excluded

---

[81]   In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[82]   After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[83]   While Defendants included per-vehicle operations expenses in SG&A expenses (rather than GPU), they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own. In fact, as detailed in ¶260(e), the disclosures that Defendants *did* make regarding SG&A expenses during Q4 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

[84]   During the Class Period, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development." Moreover, while Defendants made vague Class Period disclosures indicating that certain of

1   from its reported GPU included: (i) "customer care, **multi-car logistics**, **last-mile delivery**,

2   and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii)

3   "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party**

4   **transport services**" "associated with completing . . . wholesale vehicle sales"; and (iii)

5   "[t]ransaction and other expenses, including limited warranty, **title and registration**, and

6   finance platform expenses" "associated with completing . . . wholesale vehicle sales."

7   Defendants' concealment of "operations expenses" when describing Carvana's wholesale

8   profitability was especially misleading in light of the fact that Defendants internally viewed

9   "**the underlying costs of completing a sale**" as a critical component of Carvana's actual

10   wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

11            **When we think about trying to aim for more profitable sales, what does that**
**mean?**  There's certainly variability in the kind of gross profit associated with

12         different types of sales. . . .

              And then I think there's a number of other dynamics kind of across car

13         type, et cetera.  **There's also kind of variation in the underlying costs of**
**completing a sale**.

14

15   Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying**

16   **costs of completing a sale**) and instead buried and comingled them among SG&A expenses,

17   investors could not calculate the actual overall profitability of Carvana's wholesale vehicle

18   sales, like Garcia Junior did internally.   As demonstrated in the chart below, upon

19   incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana

20   incurred in completing wholesale vehicle sales), **Carvana lost money on wholesale vehicle**

21   **sales every quarter during the Class Period**.[85]  For example, in Q4 2021, Carvana's average

22   selling price per wholesale vehicle was $12,211 while its total costs (cost of sales in addition

23

24   expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke
out "operations expenses" to investors; (ii) described that these vehicle "operations
expenses" were direct per-vehicle costs "**associated with completing . . . wholesale vehicle**

25   **sales**"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU
metric, these additional per-vehicle "operations expenses," were one of "**two key drivers**" of

26   per-unit profitability.

27   [85]   Estimated operations expense per wholesale vehicle calculated as follows: total retail and
wholesale vehicle operations expenses in Q4 2021 divided by total retail and wholesale

28   vehicles sold in Q4 2021.

to estimated undisclosed operations expense) totaled $12,830, for a total loss of $619 per vehicle.



(iii)    Defendants omitted that the surplus of wholesale cars resulting from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics constraints.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network."  Carvana further admitted that "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."

(iv)    Defendants omitted that Carvana lacked critical infrastructure necessary to process the huge surplus of wholesale vehicles.  Consequently, Carvana was forced to spend $3 billion to purchase ADESA, a nationwide wholesale auction house.  In describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, as reported in a September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"  Indeed, Defendants later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from customer's homes and transport them to a

- 138 -

market hub and then transport these cars long distances from their origin to our nearest IRC where they are either reconditioned or held until they are wholesaled." Further, they admitted that "[w]ith this acquisition [of ADESA], we can now position advocates at the auction locations and transport cars from our customer's driveways directly to an ADESA U.S. location without any additional moves."

### C. Defendants' Materially Misleading Statements and Omissions Concerning Retail Unit Sales Growth

211. Carvana's "Objective #1" leading up to and throughout the Class Period was to "Grow Retail Units." Indeed, Defendants reminded investors that retail sales growth was "Objective #1" in every SEC filing and shareholder letter. Accordingly, during the Class Period, Defendants consistently touted Carvana's retail unit sales growth and the non-fraudulent drivers of such growth. In truth, however, Carvana's sales growth was also substantially fueled by the following artifices: (i) sales in violation of title and registration laws and regulations; (ii) "less profitable sales" in "markets with lower profitability due to long distance from inventory"; (iii) trade-in sales resulting from Carvana's lowered purchasing and verification standards; and (iv) "sales that were less profitable in the immediate period." Thus, by omitting that Carvana's retail sales growth was fueled in part by Defendants' machinations, Defendants' statements created the materially misleading impression that Carvana's growth was organic and sustainable.

212. **Statement No. 19**: On August 5, 2021, after the market closed, Carvana published its Q2 2021 Shareholder Letter, signed by Garcia Junior and Jenkins. The Q2 2021 Shareholder Letter touted Carvana's retail unit sales growth and its drivers:

> *[R]etail units sold totaled 107,815 growing 96% YoY* vs. 55,098 in Q2 2020, and up 145% vs. Q2 2019. Q2 revenue grew to $3.336 billion, up 198% YoY from $1.118 billion, and up 238% vs. Q2 2019. *Year-over-year retail unit and revenue growth were . . . primarily driven by strong demand for our offering this year*.

213. As detailed below, Statement No. 19 by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

- 139 -

4890-0865-5022.v1

(a)    Although Defendants chose to speak about the drivers of retail unit growth, they did not disclose that this growth was primarily driven by a number of unsustainable artifices. Specifically, and discussed in more detail below, the stated retail unit sales growth was primarily fueled by: (i) sales to customers awaiting proper title and registration processing; (ii) "less profitable sales" in "markets with lower profitability due to long distance from inventory"; (iii) trade-in sales resulting from Carvana's lowered purchasing and verification standards; and (iv) "sales that were less profitable in the immediate period." For example:

(i)    Defendants omitted that Carvana routinely sold cars to customers before it held title to those cars and faster than it could get them registered to their new owners. §VI.D. Indeed, as of July 2020, the Board discussed this issue at every one of its meetings that Garcia Junior and Jenkins attended until at least December 2021. *See, e.g.*, Exs. 1-2. Further, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before it received title. Specifically, CW-3 estimated that Carvana only had around half of the titles for the vehicles it sold wholesale at the time of sale. Further, he/she noted that, after the Class Period began, a "fire started" because he/she was flooded with calls regarding title issues. CW-11 reported that there was a drawer of documentation for vehicles that had been sold by Carvana, but which Carvana could not register since the titles were missing. CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase. CW-4 said it was well known internally that title issues were a problem. CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and "there were a ridiculous amount of cars on the list." The CWs' accounts are corroborated by state investigations, findings, and suspensions of Carvana's dealership licenses in North Carolina, Michigan, Illinois, Arizona, Pennsylvania, Florida, Texas, Maryland, Georgia, and Ohio. In fact: (1) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in December 2020; (2) MDOS had fined Carvana thousands of dollars and placed the Company

1   on an 18-month probation – a probation they would repeatedly violate – following months of

2   investigation and a meeting with Carvana executives in March of 2021; and (3) North

3   Carolina had fined and suspended Carvana's license for six months following an

4   investigation and a July 2021 hearing.  In addition, Carvana had settled a complaint with

5   Florida for title violations, and Texas had fined Carvana thousands of dollars for violations

6   related to title and registration no later than October 22, 2021.  These omitted facts were

7   material as Defendants admitted that Carvana's retail sales growth was significantly hindered

8   by Defendants' belated enactment of "buffer" periods near the end of the Class Period to

9   allow for sufficient time to secure title.

10          (ii)     Defendants omitted that Carvana's retail sales were comprised of

11  less profitable, and thus, unsustainable sales in far-flung markets in connection with

12  Carvana's nationwide expansion.  §VI.C.  For example, in May 2021, Carvana opened its

13  first five new markets in the Pacific Northwest, which were unprofitable, as Garcia Junior

14  acknowledged: "[W]e didn't have an inspection center. . . .  So we would just kind of incur

15  all the cost associated with shipping the cars out there . . . ."  These costs were material.

16  Defendants would later admit that sales in markets more than 200 miles from an IRC

17  incurred at least $750 more per car in logistics and related expenses.  Indeed, near the end of

18  the Class Period, Defendants were forced to reduce sales in these markets.  As one misled

19  commentator realized near the end of the Class Period, "[Carvana's expansion] was growth

20  for growth's sake and not necessarily growth to improve profitability."

21          (iii)    Defendants omitted that Carvana's retail sales growth was

22  supported by its unsustainable action to lower the Company's purchasing and verification

23  standards when buying cars from customers.  §VI.B.  Indeed, CW-4 confirmed that, to boost

24  retail sales through trade-ins, Carvana bought cars from customers that plainly did not meet

25  its purchasing and verification standards.  CW-3 stated that Carvana had relaxed its standards

26  to accept "all vehicles" and did not genuinely inspect vehicles before purchasing them

27  anymore, resulting in a lot of "trash vehicles."  CW-11 said that Carvana was buying

28  vehicles "sight unseen" and his/her team was not expected to do much to verify the condition

4890-0865-5022.v1

1    of the vehicles.  CW-11 observed that Carvana did not actually care about the condition of

2    the vehicles and just wanted to "get as many cars as it could."  In addition, CW-2 was

3    overruled when voicing concerns about the quality of vehicles as "leadership would say take

4    it."  This omitted fact was material as it adversely impacted Carvana's bottom line, flooded

5    Carvana with low-quality cars that had to be sold via the wholesale market at a loss, and

6    crippled its logistics network.  In fact, Carvana was forced to meter (*i.e.*, not sell) some of its

7    purchases of cars from customers because of the strain it placed on its logistics network,

8    which would hinder Carvana's retail growth.

9                    (iv)    Defendants omitted that Carvana's retail sales growth was

10   unsustainable because Carvana "***frequently*** acquired sales that were less profitable in the

11   immediate period."  Unbeknownst to investors, Defendants' sales' calculation "incorporated

12   the value of future sales" because Carvana singularly focused on growth without regard to

13   profitability.  These sales were not sustainable, however, as Defendants would be forced to

14   forego these critical sales near the end of the Class Period to survive.

15                    (b)    The omitted facts above also would have been viewed by the reasonable

16   investor as significant for the reasons stated herein, and because Carvana's "Objective #1: [Is

17   to] Grow Retail Units and Revenue" and "Objective #2: [Is to] Increase Total Gross Profit

18   Per Unit."  Thus, a reasonable investor would have wanted to know that Carvana's growth

19   was inorganic and unsustainable, and the Company would have to begin foregoing growth to

20   survive.  As a Needham & Company analyst noted near the end of the Class Period, "'[t]he

21   [only] path forward for Carvana is to sell as many cars as possible, but to do so on a

22   profitable basis, versus prior it was more about selling as many cars as possible.'"

23                    214.    **Statement No. 20**: On February 24, 2022, Carvana held a conference call for

24   analysts and investors to discuss the Q4 2021 results.  On the Q4 2021 earnings call, Jenkins

25   stated: "***[R]etail units sold totaled 425,237, an increase of 74%, making us the fastest used***

26   ***automotive retailer to sell over 400,000 vehicles in 1 year. . . .  Our exceptional growth in***

27   ***2021 was driven by rapid growth within our market cohorts***."

28

- 142 -

215.    As detailed below, Statement No. 20 by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    Although Defendants chose to speak about the drivers of retail unit growth, they did not disclose that this growth was primarily driven by a number of unsustainable artifices.  Specifically, and discussed in more detail below, the stated retail unit sales growth was primarily fueled by: (i) sales to customers awaiting proper title and registration processing; (ii) "less profitable sales" in "markets with lower profitability due to long distance from inventory"; (iii) trade-in sales resulting from Carvana's lowered purchasing and verification standards; (iv) sales, pursuant to a pass-through sales agreement with Garcia Senior's DriveTime, that lacked economic substance for Carvana; and (iv) "sales that were less profitable in the immediate period."  For example:

(i)    Defendants omitted that Carvana routinely sold cars to customers before it held title to those cars and faster than it could get them registered to their new owners.  §VI.D.  Indeed, as of July 2020, the Board discussed this issue at every one of its meetings that Garcia Junior and Jenkins attended until at least December 2021.  *See, e.g.*, Exs. 1-2.  Further, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before they received title.  Specifically, CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-4 said it was well known internally that title issues were a problem.  CW-4 also said there was a Google spreadsheet that tracked vehicles without titles for his/her entire IRC and there were "a ridiculous amount of cars on the list."  CW-9 said, beginning in Q1 2022, registration delays amounted to roughly half of the calls the team had handled and that employees informed Garcia Junior of this in January 2022.  The CWs' accounts are corroborated by state investigations, findings, and suspensions of Carvana's dealership licenses in North Carolina, Michigan, Illinois, Arizona, Pennsylvania, Florida, Texas,

- 143 -

1    Maryland, Georgia, and Ohio.  In fact: (1) the Ohio BMV had investigated Carvana,
2    suspended its temporary tag issuance privileges for all Ohio locations, and subjected the
3    Company to increased oversight in December 2020; (2) following additional meetings
4    between MDOS and Carvana, Carvana "admi[tted] . . . several more violations of
5    [Michigan's] code," faced thousands of dollars in additional fines, and had its 18-month
6    probation extended on February 7, 2022; and (3) Illinois had begun investigating Carvana in
7    February 2022 for issuing out-of-state temporary registration permits and for failing to
8    transfer titles in a timely manner in violation of its laws.  These omitted facts were material
9    as Defendants admitted that Carvana's retail sales growth was significantly hindered by
10    Defendants' belated enactment of "buffer" periods near the end of the Class Period to allow
11    for sufficient time to secure title.

12                          (ii)      Defendants omitted that Carvana's retail sales growth was largely
13    driven by less profitable sales in far-flung markets in connection with Carvana's nationwide
14    expansion. §VI.C.  In fact, as alleged herein, in FY 2021, 100% of the new markets that
15    Defendants entered were over 200 miles from an existing IRC, which cost Carvana an
16    additional $750 more per retail car sold.  Further, these sales in far-flung markets stretched
17    Carvana's logistics and reconditioning network to the brink, and thus, forced Defendants to
18    spend millions of dollars on costly third-party logistics and reconditioning providers to make
19    up for Carvana's internal deficiencies in these critical functions.  After the Class Period, in
20    November 2023, Defendants separately broke out "[r]econditioning and [i]nbound
21    [t]ransport [c]ost [p]er [r]etail [u]nit" for the first time, revealing that, between mid-2021 and
22    Q4 2021, these costs had spiked $369 per vehicle.  For example, less than three months after
23    this statement was made, Defendants admitted that, beginning on or around August 2021,
24    Carvana had begun outsourcing logistics, including *increasing* "*third-party reconditioning*
25    locations" and "*add[ing] many third-party reconditioning locations*."  Then, near the end of
26    the Class Period, Defendants emphasized that, to curtail logistics expenses, Carvana needed
27    to quickly "[r]educe *third-party production* [*i.e., reconditioning*] volume," "[r]educe *third-*
28    *party inbound transport* share," "[i]n-sourc[e] *third-party pickups*" for Carvana's "[l]ast-

- 144 -

1   mile delivery," and "[r]educe *third-party shipping*."  Carvana also acknowledged that

2   "location growth" had led to "the addition of many third-party reconditioning locations."

3   These costs were material.  Indeed, near the end of the Class Period, Defendants were forced

4   to reduce sales in these markets.  As one misled commentator realized near the end of the

5   Class Period, "[Carvana's expansion] was growth for growth's sake and not necessarily

6   growth to improve profitability."

7              (iii)    Defendants omitted that Carvana's retail sales growth was

8   supported by its unsustainable action to lower the Company's purchasing and verification

9   standards when buying cars from customers.  §VI.B.  Indeed, CW-4 confirmed that, to boost

10  retail sales through trade-ins, Carvana bought cars from customers that plainly did not meet

11  its purchasing and verification standards.  CW-11 said that Carvana was buying vehicles

12  "sight unseen" and his/her team was not expected to do much to verify the condition of the

13  vehicles.  CW-11 observed that Carvana did not actually care about the condition of the

14  vehicles and just wanted to "get as many cars as it could."  CW-10 corroborated this account,

15  explaining that Carvana was buying cars at breakneck speed and not adequately inspecting

16  them.  In addition, CW-2 was overruled when voicing concerns about the quality of vehicles

17  as "leadership would say take it."  Similarly, CW-5 stated that there was only a 50/50 chance

18  that a vehicle would be reappraised if it did not match the seller's description.  This omitted

19  fact was material as it adversely impacted Carvana's bottom line, flooded Carvana with low-

20  quality cars that had to be sold via the wholesale market at a loss, and crippled its logistics

21  network.  In fact, Carvana was forced to meter (*i.e.*, not sell) some of its purchases of cars

22  from customers because of the strain it placed on its logistics network, which would hinder

23  Carvana's retail growth.

24             (iv)    Defendants omitted that Carvana "frequently acquired sales that

25  were less profitable in the immediate period."  Defendants omitted that Carvana's internal

26  sales' calculation "incorporated the value of future sales" as Carvana singularly focused on

27  growth without regard to profitability.  These sales were material and, near the end of the

28

4890-0865-5022.v1

1    Class Period, Defendants would be forced to forego these sales to survive, which adversely

2    impacted Carvana's retail sales growth.

3                    (v)    Defendants omitted that they entered a sham pass-through

4    arrangement with DriveTime.  §VI.A.  Carvana later admitted in inconsistent, piecemeal, and

5    buried disclosures that, for many of these sales, Carvana kept **none** of the proceeds, but still

6    recorded the revenue and retail unit sale on its books.  These vacuous sales were material as

7    they made up 169% of Carvana's reported sequential growth in Q4 2021.

8                    (b)    The omitted facts above also would have been viewed by the reasonable

9    investor as significant for the reasons stated herein, and because Carvana's "Objective #1: [Is

10   to] Grow Retail Units and Revenue" and "Objective #2: [Is to] Increase Total Gross Profit

11   Per [Retail] Unit."  Thus, a reasonable investor would have wanted to know that Carvana's

12   growth was inorganic and unsustainable, and the Company would have to begin foregoing

13   growth to survive.  As a Needham & Company analyst noted near the end of the Class

14   Period, "'[t]he [only] path forward for Carvana is to sell as many cars as possible, but to do

15   so on a profitable basis, versus prior it was more about selling as many cars as possible.'"

16   **D.    Defendants' Materially False and Misleading Statements**
     **Regarding Expansion and Logistics Infrastructure**

17

18       216.    Leading up to and throughout the Class Period, Defendants repeated their

19   mantra: "[W]e want to expand as much as we possibly can."  Indeed, market expansion was

20   one of Carvana's few key operating metrics.  Thus, in every quarterly shareholder letter

21   during the Class Period, Garcia Junior and Jenkins dedicated an entire section to Carvana's

22   expansion, in which they reported the number of new markets added to tout the purported

23   population coverage that Carvana had achieved.  At the same time, Defendants exalted their

24   "capital-light" expansion model (*i.e.*, a model that did not require a substantial number of

25   physical locations).  Defendants' statements, including those touting Carvana's purported

26   population coverage, were misleading, however, as the vast majority of new markets were

27   significant distances from IRCs.  The distance between IRCs and markets was material as

28   Carvana later admitted that it incurred $750 in additional per-vehicle cost in markets located

200 miles or more from an IRC.  Unsurprisingly, near the end of the Class Period, Defendants were forced to come clean that Carvana's sales in its new distant markets generated "lower profitability due to long distance from inventory."  Near the end of the Class Period, Defendants took action to reduce sales in these far-flung markets to avoid these less profitable sales.  This caused the Company to report its first-ever quarterly sales decline in Q3 2022.

217.    In sum, because Defendants chose to tout positive information to the market (its capital-light expansion model which enabled Carvana to launch new markets purportedly covering the vast majority of the U.S. population) but omitted adverse facts that cut against that information (Carvana's expansion was not capital-light, would require the last-minute purchase of ADESA's 56 locations around the country, and could not support sales in new markets), Defendants' statements below were materially misleading.

218.    **Statement No. 21**: On May 6, 2020, after the market closed, Carvana announced its financial results for the fiscal quarter ended March 31, 2020 by issuing a Form 8-K that included a letter to shareholders (the "Q1 2020 Shareholder Letter"), which was signed by Garcia Junior and Jenkins.  The Q1 2020 Shareholder Letter touted Carvana's purported population coverage, stating: "*[W]e launched 15 new markets and 1 vending machine in Q1, bringing our total markets to 161, our total U.S. population coverage to 68.7%, and our total vending machines to 24 as of March 31, 2020*."

219.    As detailed below, Statement No. 21 by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    While Defendants touted the addition of 15 new markets during Q1 2020, they omitted that all of the markets were more than 100 miles from an existing IRC and all but one of the new markets, 93%, were more than 200 miles from an existing IRC. Critically, Defendants would later admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per car in logistics and related expenses and that, thus, these distant markets generated "lower profitability due to long distance from inventory."

1        (b)    While Defendants touted Carvana's increase in "population coverage to

2   68.7%," they omitted that the vast majority of that purported "population coverage"

3   consisted of markets far from existing IRCs.  In fact, in Q1 2020, less than 32% of the total

4   U.S. population was located within 100 miles of an existing IRC and less than 54% was

5   located within 200 miles of an existing IRC.[86]  Indeed, as demonstrated below, the vast

6   majority of new markets opened during the Class Period, including the 15 new markets

7   added during Q1 2020, were greater than 100 miles from an existing IRC.



22        (c)    The omission of this information was material.  Defendants would later

23   admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per

24   car in logistics and related expenses and that, thus, these distant markets generated "lower

---

86   When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S. population was located within 100 miles of an existing IRC and 54% was located within 200 miles of an existing IRC.  Because Carvana added nine IRCs between the time of this statement and Q1 2022, the percent of the population located within 100 or 200 miles from an IRC was even lower.

1    profitability due to long distance from inventory." Indeed, Garcia Junior later acknowledged

2    Carvana expanded to places like the "Pacific Northwest" where "we didn't have an

3    inspection center. . . . So we would just kind of incur all the cost associated with shipping

4    the cars out there . . . ." Further, he acknowledged that the Pacific Northwest was only one

5    example of an unprofitable distant market, stating, "***there really are many, many, I mean,***

6    ***probably dozens of versions of the same story***."

7         (d)    While Defendants touted Carvana's expansion, they omitted the fact

8    that Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure,

9    including reconditioning centers and logistics capabilities, to operate its nationwide footprint.

10   In fact, it would later be revealed that they would have to spend $3 billion to purchase

11   ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings

12   on more than 4,000 acres of land. As reported in a September 13, 2022 *Vehicle Remarketing*

13   article, Garcia Junior knew from the outset, "'[y]ou need a place to stage the logistics, and

14   there's no better infrastructure than auctions to serve that purpose.'" In fact, he later

15   admitted that "[a] major factor motivating the deal is the fact that an e-commerce used car

16   retailer needs a physical footprint like Amazon, which is undergirded by a network of

17   massive distribution centers and transport depots." After the Class Period, Garcia Junior

18   went as far as to exalt this capital-heavy approach saying that, with ADESA, "we now have

19   6,500 acres and 500,000 parking spots connected by a logistics network." He also clarified

20   an analyst's characterization of Carvana as a technology business by stating, "I don't know

21   exactly what kind of business we are . . . [b]ut part of ***what we are without question is a big***

22   ***physical infrastructure business. Like that's part of what we have to be***."

23        (e)    Analysts were misled. On May 6, 2020, a William Blair analyst stated,

24   Carvana's "expansion will shift to opening smaller markets that can be served by Carvana's

25   existing logistics network with little incremental investment."

26        220.   **Statement No. 22**: On August 5, 2020, after the market closed, Carvana

27   announced its financial results for the fiscal quarter ended June 30, 2020 by issuing a Form

28   8-K that included a letter to shareholders (the "Q2 2020 Shareholder Letter"), which was

1    signed by Garcia Junior and Jenkins.  The Q2 2020 Shareholder Letter touted Carvana's

2    purported population coverage, stating: "***We opened a record 100 new markets in Q2 2020,***

3    ***increasing the total percentage of the U.S. population we serve in our 261 markets to***

4    ***73.2%, up from 68.7% at the end of Q1 2020***."

5        221.    As detailed below, Statement No. 22 by Carvana, Garcia Junior, and Jenkins

6    omitted material facts that affirmatively created an impression of a state of affairs that

7    differed in a material way from the one that actually existed.

8            (a)    While Defendants touted the addition of 100 new markets, they omitted

9    that 83% of these markets were more than 100 miles from an existing IRC and 46% were

10   more than 200 miles from an existing IRC.  Critically, Defendants would later admit that

11   sales in markets more than 200 miles from an IRC incurred at least $750 more per car in

12   logistics and related expenses and that, thus, these distant markets generated "lower

13   profitability due to long distance from inventory."

14           (b)    While Defendants touted Carvana's increase in the "total percentage of

15   the U.S. population we serve in our 261 markets to 73.2%" they omitted that the vast

16   majority of that purported "population coverage" consisted of markets far from existing

17   IRCs.  In fact, in Q2 2020, less than 32% of the total U.S. population was located within 100

18   miles of an existing IRC and less than 54% was located within 200 miles of an existing

19   IRC.[87]  These omissions were material.  Defendants would later admit that sales in markets

20   more than 200 miles from an IRC incurred at least $750 more per car in logistics and related

21   expenses and that, thus, these distant markets generated "lower profitability due to long

22   distance from inventory."  Garcia Junior later acknowledged Carvana expanded to "***many,***

23   ***many, I mean, probably dozens***" of places like the "Pacific Northwest" where "we didn't

24   have an inspection center. . . .  So we would just kind of incur all the cost associated with

25

26   [87]   When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S.
     population was located within 100 miles of an existing IRC and 54% was located within 200
27   miles of an existing IRC.  Because Carvana added eight IRCs between the time of this
     statement and Q1 2022, the percent of the population located within 100 or 200 miles from
28   an IRC was even lower.

4890-0865-5022.v1

1   shipping the cars out there . . . ."  Indeed, near the end of the Class Period, Defendants were

2   forced to reduce advertising in these markets and increase long-distance shipping fees to stay

3   afloat.

4           (c)      While Defendants touted Carvana's expansion, they omitted the fact

5   that Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure,

6   including reconditioning centers and logistics capabilities, to operate its nationwide footprint.

7   In fact, it would later be revealed that they would have to spend $3 billion to purchase

8   ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings

9   on more than 4,000 acres of land.  As reported in a September 13, 2022 *Vehicle Remarketing*

10  article, Garcia Junior knew from the outset, "'[y]ou need a place to stage the logistics, and

11  there's no better infrastructure than auctions to serve that purpose.'"  In fact, he later

12  admitted that "[a] major factor motivating the deal is the fact that an e-commerce used car

13  retailer needs a physical footprint like Amazon, which is undergirded by a network of

14  massive distribution centers and transport depots."  After the Class Period, Garcia Junior

15  went as far as to exalt this capital-heavy approach saying that, with ADESA, "we now have

16  6,500 acres and 500,000 parking spots connected by a logistics network."  He also clarified

17  an analyst's characterization of Carvana as a technology business by stating, "I don't know

18  exactly what kind of business we are . . . [b]ut part of ***what we are without question is a big***

19  ***physical infrastructure business.  Like that's part of what we have to be***."

20          (d)      Analysts were misled.  On August 6, 2020, a Cowen analyst stated,

21  "CVNA launched in a record 100 new markets in 2Q20, bringing coverage to 73.2% of the

22  US population . . . ***with minimal incremental cost by expanding into smaller adjacent***

23  ***markets that could be supported via their existing logistics and delivery network***."  As one

24  misled commentator realized near the end of the Class Period when Defendants disclosed

25  that they would reduce advertising in these new far-flung markets, "[Carvana's expansion]

26  was growth for growth's sake and not necessarily growth to improve profitability."

27        222.    **Statement No. 23**: On February 25, 2021, after the market closed, Carvana

28  announced its financial results for the fiscal quarter and year ended December 31, 2020, by

- 151 -

1    issuing a Form 8-K that included a letter to shareholders (the "Q4 2020 Shareholder Letter"),

2    which was signed by Garcia Junior and Jenkins.  The Q4 2020 Shareholder Letter stated:

3    **_The Company "[a]dded five new markets, bringing our end-of-year total to 266 covering_**

4    **_73.7% of the population_**."

5        223.    As detailed below, Statement No. 23 made by Carvana, Garcia Junior, and

6    Jenkins omitted material facts that affirmatively created an impression of a state of affairs

7    that differed in a material way from the one that actually existed.

8        (a)    While Defendants touted the addition of five new markets, they omitted

9    that 100% of these markets were more than 100 miles from an existing IRC and 60% – three

10   markets – were more than 200 miles from an existing IRC.  Defendants also omitted that, of

11   the 120 markets they added in FY 2020, 86% were more than 100 miles from an existing

12   IRC and 53% were more than 200 miles from an existing IRC.  Critically, Defendants would

13   later admit that sales in markets more than 200 miles from an IRC incurred at least $750

14   more per car in logistics and related expenses and that, thus, these distant markets generated

15   "lower profitability due to long distance from inventory."

16       (b)    While Defendants touted Carvana's increase in "population coverage"

17   to 73.7%, they omitted that the vast majority of that purported "population coverage"

18   consisted of markets far from existing IRCs.  In fact, in Q4 2020, less than 32% of the total

19   U.S. population was located within 100 miles of an existing IRC and less than 54% was

20   located within 200 miles of an existing IRC.[88]  Indeed, the vast majority of new markets

21   opened during the Class Period, including the five new markets added during Q4 2020, were

22   greater than 100 miles from an existing IRC.  The omission of this information was material.

23   Defendants would later admit that sales in markets more than 200 miles from an IRC

24   incurred at least $750 more per car in logistics and related expenses and that, thus, these

25

---

26   [88]  When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S. population was located within 100 miles of an existing IRC and 54% was located within 200 miles of an existing IRC.  Because Carvana added six IRCs between the time of this statement and Q1 2022, the percent of the population located within 100 or 200 miles from an IRC was even lower.

27

28

1    distant markets generated "lower profitability due to long distance from inventory."  Garcia

2    Junior later acknowledged Carvana expanded to "***many, many, I mean, probably dozens***" of

3    places like the "Pacific Northwest" where "we didn't have an inspection center. . . .  So we

4    would just kind of incur all the cost associated with shipping the cars out there . . . ."  Indeed,

5    near the end of the Class Period, Defendants were forced to reduce sales in these markets.

6              (c)       While Defendants touted Carvana's expansion, they omitted the fact

7    that Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure,

8    including reconditioning centers and logistics capabilities, to operate its nationwide footprint.

9    In fact, it would later be revealed that they would have to spend $3 billion to purchase

10   ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings

11   on more than 4,000 acres of land.  As reported in a September 13, 2022 *Vehicle Remarketing*

12   article, Garcia Junior knew from the outset, "'[y]ou need a place to stage the logistics, and

13   there's no better infrastructure than auctions to serve that purpose.'"  In fact, he later

14   admitted that "[a] major factor motivating the deal is the fact that an e-commerce used car

15   retailer needs a physical footprint like Amazon, which is undergirded by a network of

16   massive distribution centers and transport depots."  After the Class Period, Garcia Junior

17   went as far as to exalt this capital-heavy approach saying that, with ADESA, "we now have

18   6,500 acres and 500,000 parking spots connected by a logistics network."  He also clarified

19   an analyst's characterization of Carvana as a technology business by stating, "I don't know

20   exactly what kind of business we are . . . [b]ut part of ***what we are without question is a big***

21   ***physical infrastructure business.  Like that's part of what we have to be***."

22             (d)       The market was misled.  On February 25, 2021, a Benchmark analyst

23   stated it viewed Carvana as "[p]ositioned for growth: . . .  The company opened 120 new

24   markets in 2020, reaching 74% of the US market . . . ."  As one misled commentator realized

25   near the end of the Class Period when Defendants disclosed that they would reduce

26   advertising in these new far-flung markets, "[Carvana's expansion] was growth for growth's

27   sake and not necessarily growth to improve profitability."

28

- 153 -

224.   **Statement No. 24**: Also on February 25, 2021, Carvana filed its 2020 10-K with the SEC, signed by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia Junior and Jenkins.  The 2020 10-K exalted the strengths and advantages of Carvana's logistics capabilities and "capital-light expansion model," stating:

> Our business benefits from powerful network effects.  ***Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets***.

*       *       *

> We believe there is a substantial opportunity to utilize ***our capital-light expansion model*** and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets.

225.   As detailed below, Statement No. 24 made by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)   Contrary to Defendants' statement that Carvana had a "capital-light expansion model," Carvana's expansion actually required billions of dollars of critical brick-and-mortar infrastructure, including reconditioning centers and logistics capabilities, to operate its nationwide footprint.  In fact, it would later be revealed that Carvana would have to spend $3 billion to purchase ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land.  As reported in a September 13, 2022 *Vehicle Remarketing* article, Garcia Junior knew from the outset, "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"  In fact, he later admitted that "[a] major factor motivating the [ADESA] deal is the fact that an e-commerce used car retailer needs a physical footprint like Amazon, which is undergirded by a network of massive distribution centers and transport depots."  Moreover, CW-12 met with Garcia Junior, who informed CW-12 that Carvana's management team needed ADESA's reconditioning centers located nationwide.  CW-4 and CW-7 also stated that Carvana's acquisition of ADESA was part of Carvana's expansion efforts.  After the Class Period, Garcia Junior went as far as to exalt this capital-heavy approach saying that, with ADESA, "we now have 6,500 acres and 500,000 parking spots

1  connected by a logistics network." He also clarified an analyst's characterization of Carvana

2  as a technology business by stating, "I don't know exactly what kind of business we are . . .

3  [b]ut part of **what we are without question is a big physical infrastructure business. Like**

4  **that's part of what we have to be**."

5          (b)    In fact, prior to its purchase of ADESA, far from relying on "[o]ur

6  logistics network," Carvana was forced to rely on costly third-party providers for vital

7  logistics and reconditioning functions in its new far-flung markets. CW-4 explained that

8  Carvana's range for picking up and delivering vehicles was only five hours out and five

9  hours back (although third-party haulers could go further). Although Carvana had operations

10  in some of the western states like California and Nevada, there was not a hub or IRC

11  between Indiana and Oregon that would fall within the five-hour transportation limit. As

12  such, a customer in Ohio purchasing a car that was in Oregon would exceed this

13  range. However, the sheer amount of money it would cost to pay third-party haulers to cover

14  such distances was prohibitive. Indeed, it would inevitably cause logistic expenses to spike

15  300% from the start of the Class Period to Q1 2022. Defendants were able to largely conceal

16  these costs from investors until late in the Class Period when Defendants admitted the need

17  to "[r]educe third-party inbound transport share," "[i]n-sourc[e] third-party pickups" for

18  Carvana's "[l]ast-mile delivery," and "[r]educe third-party shipping" to curtail logistics

19  expenses. Further, Defendants were able to substantially conceal these costs until they

20  disclosed operations expenses and "[r]econditioning and [i]nbound [t]ransport [c]ost [p]er

21  [r]etail [u]nit" for the first time after the Class Period. Carvana also acknowledged near the

22  end of the Class Period that "location growth" had led to "the addition of many third-party

23  reconditioning locations." In sum, far from having a "capital-light expansion model,"

24  Carvana's costs **increased** as its geographic footprint expanded.

25          (c)    Contrary to Defendants' statement that "[o]ur logistics capabilities

26  allow us to offer every car in our inventory to customers across all of our markets,"

27  Defendants knew that it was unprofitable to pick up and deliver cars over "all of [their]

28  markets." Indeed, near the end of the Class Period, Defendants acknowledged the need to

- 155 -

"meter" (*i.e.*, stop) selling retail cars to reduce "less profitable sales" in "markets with lower profitability due to long distance from inventory."

226.    **Statement No. 25**: On May 6, 2021, after the market closed, Carvana held a conference call for analysts and investors to discuss the fiscal results for Q1 2021, in which Jenkins spoke about expansion:

> *So far in Q1, we have opened 22 new markets, bringing our total to 288 and increasing our population coverage to more than 77% of the U.S. population.  In May, we also launched our first 5 markets in the Pacific Northwest*, adding the last major region to our nationwide footprint.

227.    As detailed below, Statement No. 25 made by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    While Jenkins touted the addition of 22 new markets and five new markets in the Pacific Northwest, he omitted that 100% of these markets were more than 200 miles from an existing IRC.  Critically, Defendants would later admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per car in logistics and related expenses and that, thus, these distant markets generated "lower profitability due to long distance from inventory."

(b)    While Jenkins touted Carvana's increase in population coverage to "more than 77%," he omitted that the vast majority of that purported "population coverage" consisted of markets far from existing IRCs.  In fact, in Q1 2021 less than 32% of the total U.S. population was located within 100 miles of an existing IRC and less than 54% was located within 200 miles of an existing IRC.[89]  Indeed, the vast majority of new markets opened during the Class Period, including the five new markets added during Q1 2021, were greater than 100 miles from an existing IRC.  The omission of this information was material.  Defendants would later admit that sales in markets more than 200 miles from an IRC

---

[89]   When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S. population was located within 100 miles of an existing IRC and 54% was located within 200 miles of an existing IRC.  Because Carvana added five IRCs between the time of this statement and Q1 2022, the percent of the population located within 100 or 200 miles from an IRC was even lower.

4890-0865-5022.v1

1    incurred at least $750 more per car in logistics and related expenses and that, thus, these

2    distant markets generated "lower profitability due to long distance from inventory." Indeed,

3    Garcia Junior later acknowledged Carvana expanded to "***many, many, I mean, probably***

4    ***dozens***" of places like the "Pacific Northwest" where "we didn't have an inspection

5    center. . . . So we would just kind of incur all the cost associated with shipping the cars out

6    there . . . ." In fact, near the end of the Class Period, Defendants were forced to reduce

7    advertising in these markets and increase long-distance shipping fees to stay afloat.

8         (c)    When Jenkins touted Carvana's expansion, he omitted the fact that

9    Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure, including

10   reconditioning centers and logistics capabilities, to operate its nationwide footprint. In fact,

11   it would later be revealed that they would have to spend $3 billion to purchase ADESA's 56

12   brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than

13   4,000 acres of land. As reported in a September 13, 2022 *Vehicle Remarketing* article,

14   Garcia Junior later admitted, "[a] major factor motivating the deal is the fact that an e-

15   commerce used car retailer needs a physical footprint like Amazon, which is undergirded by

16   a network of massive distribution centers and transport depots." After the Class Period,

17   Garcia Junior went as far as to exalt this capital-heavy approach saying that, with ADESA,

18   "we now have 6,500 acres and 500,000 parking spots connected by a logistics network." He

19   also clarified an analyst's characterization of Carvana as a technology business by stating, "I

20   don't know exactly what kind of business we are . . . [b]ut part of ***what we are without***

21   ***question is a big physical infrastructure business. Like that's part of what we have to be***."

22        (d)    Unbeknownst to investors, Defendants were disregarding these

23   significant costs and sacrificing profitability for unit sales growth and "population coverage"

24   growth. Near the end of the Class Period, Defendants admitted that they had chased growth

25   with "less profitable sales" in "markets with lower profitability due to long distance from

26   inventory." Garcia Junior cited one of the "***many, many, I mean, probably dozens***" of

27   examples, explaining "[w]e used to sell cars in the Pacific Northwest, ***even though we didn't***

28

- 157 -

1   *have an inspection center there*. . . . ***So we would just kind of incur all the cost associated***

2   ***with shipping the cars out there*** because that was part of our long-term plan . . . ."

3          (e)     The market was misled.  On May 7, 2021, a JMP Securities analyst

4   stated, "[p]erhaps our biggest takeaway from the quarter was Carvana's continued market

5   expansion with the service now live in the Pacific Northwest with plans to cover 78-80% of

6   the U.S. population by year end."  As one misled commentator realized near the end of the

7   Class Period when Defendants disclosed that they would reduce advertising in these new far-

8   flung markets, "[Carvana's expansion] was growth for growth's sake and not necessarily

9   growth to improve profitability."

10         228.   **Statement No. 26**: Also during the Q1 2021 earnings call, Garcia Junior spoke

11  about the expansion:

12         *[W]e're excited about launching the Pacific Northwest.  That was kind of*
       *the last region in our footprint that we weren't yet in.  So I think opening*
13     *that up is exciting because it basically means from here to roughly our 95%*
       *population coverage goal, in the long run, we basically have markets to fill*
14     *in.  So that's very exciting*.

15         229.   As detailed below, Statement No. 26 made by Carvana and Garcia Junior

16  omitted material facts that affirmatively created an impression of a state of affairs that

17  differed in a material way from the one that actually existed.

18         (a)     While Garcia Junior touted the launch of the first markets in the Pacific

19  Northwest, he omitted that these markets were far from existing IRCs.  The omission of this

20  information was material.  Defendants would later admit that sales in markets more than 200

21  miles from an IRC incurred at least $750 more per car in logistics and related expenses and

22  that, thus, these distant markets generated "lower profitability due to long distance from

23  inventory."  Garcia Junior later acknowledged they expanded to "***many, many, I mean,***

24  ***probably dozens***" of places like the "Pacific Northwest" where "we didn't have an inspection

25  center. . . .  So we would just kind of incur all the cost associated with shipping the cars out

26  there . . . ."  Indeed, near the end of the Class Period, Defendants were forced to reduce sales

27  in these markets.

28

1          (b)    When Garcia Junior touted Carvana's expansion to the Pacific

2    Northwest, he omitted the fact that Carvana was lacking billions of dollars of critical brick-

3    and-mortar infrastructure, including reconditioning centers and logistics capabilities, to

4    operate its nationwide footprint and these markets in particular.  In fact, it would later be

5    revealed that they would have to spend $3 billion to purchase ADESA's 56 brick-and-mortar

6    locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land.

7    As reported in a September 13, 2022 *Vehicle Remarketing* article, Garcia Junior later

8    admitted in the ADESA Details Interview, "[a] major factor motivating the deal is the fact

9    that an e-commerce used car retailer needs a physical footprint like Amazon, which is

10    undergirded by a network of massive distribution centers and transport depots."  After the

11    Class Period, Garcia Junior went as far as to exalt this capital-heavy approach saying that,

12    with ADESA, "we now have 6,500 acres and 500,000 parking spots connected by a logistics

13    network."  He also clarified an analyst's characterization of Carvana as a technology

14    business by stating, "I don't know exactly what kind of business we are . . . [b]ut part of

15    ***what we are without question is a big physical infrastructure business.  Like that's part of***

16    ***what we have to be***."

17          (c)    Unbeknownst to investors, Defendants were disregarding these

18    significant costs and sacrificing profitability for unit sales growth and "population coverage"

19    growth.  Near the end of the Class Period, Defendants admitted that they had chased growth

20    with "less profitable sales" in "markets with lower profitability due to long distance from

21    inventory."  Garcia Junior cited one of the "***many, many, I mean, probably dozens***" of

22    examples, explaining "[w]e used to sell cars in the Pacific Northwest, ***even though we didn't***

23    ***have an inspection center there***. . . . ***So we would just kind of incur all the cost associated***

24    ***with shipping the cars out there*** because that was part of our long-term plan . . . ."

25          (d)    The market was misled.  On May 7, 2021, a JMP Securities analyst

26    stated, "[p]erhaps our biggest takeaway from the quarter was Carvana's continued market

27    expansion with the service now live in the Pacific Northwest with plans to cover 78-80% of

28    the U.S. population by year end."  As one misled commentator realized near the end of the

Class Period when Defendants disclosed that they would reduce advertising in these new far-flung markets, "[Carvana's expansion] was growth for growth's sake and not necessarily growth to improve profitability."

230.  **Statement No. 27**: On August 5, 2021, Carvana issued its Q2 2021 Shareholder Letter signed by Garcia Junior and Jenkins, which exalted the Company's population coverage, stating: "***In Q2 2021 we expanded the total percentage of the U.S. population we serve to 79.4%, up from 74.5% at the end of Q1 2021 through the addition of 27 new markets***."

231.  As detailed below, Statement No. 27 made by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)  While Defendants touted the addition of 27 new markets, they omitted that 100% of these markets were more than 200 miles from an existing IRC.  Critically, Defendants would later admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per car in logistics and related expenses and that, thus, these distant markets generated "lower profitability due to long distance from inventory."

(b)  While Defendants touted Carvana's increase in population coverage to 79.4%, they omitted that the vast majority of that purported "population coverage" consisted of markets far from existing IRCs.  In fact, in Q2 2021, less than 32% of the total U.S. population was located within 100 miles of an existing IRC and less than 54% was located within 200 miles of an existing IRC.[90]  Indeed, the vast majority of new markets opened during the Class Period, including the 27 new markets added during Q2 2021, were greater than 100 miles from an existing IRC.  The omission of this information was material.  Defendants would later admit that sales in markets more than 200 miles from an IRC

---

[90]  When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S. population was located within 100 miles of an existing IRC and 54% was located within 200 miles of an existing IRC.  Because Carvana added four IRCs between the time of this statement and Q1 2022, the percent of the population located within 100 or 200 miles from an IRC was even lower.

1    incurred at least $750 more per car in logistics and related expenses and that, thus, these

2    distant markets generated "lower profitability due to long distance from inventory."  Indeed,

3    Garcia Junior later acknowledged Carvana expanded to places like the "Pacific Northwest"

4    where "we didn't have an inspection center. . . .  So we would just kind of incur all the cost

5    associated with shipping the cars out there . . . ."  Further, he acknowledged that the Pacific

6    Northwest was only one example of an unprofitable distant market, stating, "***there really are***

7    ***many, many, I mean, probably dozens of versions of the same story***."  Indeed, near the end

8    of the Class Period, Defendants were forced to reduce sales in these markets.

9            (c)      While Defendants touted Carvana's expansion, they omitted the fact

10   that Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure,

11   including reconditioning centers and logistics capabilities, to operate its nationwide footprint.

12   In fact, it would later be revealed that they would have to spend $3 billion to purchase

13   ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings

14   on more than 4,000 acres of land.  According to Garcia Junior, a major factor for purchasing

15   ADESA was "the fact that an e-commerce used car retailer needs a physical footprint like

16   Amazon, which is undergirded by a network of massive distribution centers and transport

17   depots," and "'[y]ou need to warehouse and recon those cars to get them retail ready. . .

18   [y]ou need a place to stage the logistics.'"  After the Class Period, Garcia Junior went as far

19   as to exalt this capital-heavy approach saying that, with ADESA, "we now have 6,500 acres

20   and 500,000 parking spots connected by a logistics network."  He also clarified an analyst's

21   characterization of Carvana as a technology business by stating, "I don't know exactly what

22   kind of business we are . . . [b]ut part of ***what we are without question is a big physical***

23   ***infrastructure business.  Like that's part of what we have to be***."

24           (d)      As one misled commentator realized near the end of the Class Period,

25   when Defendants disclosed that they would reduce advertising in these new far-flung

26   markets, "[Carvana's expansion] was growth for growth's sake and not necessarily growth to

27   improve profitability."

28

4890-0865-5022.v1

232.    **Statement No. 28**: On November 4, 2021, Defendants issued a shareholder letter ("Q3 2021 Shareholder Letter"), which was signed by Garcia Junior and Jenkins. The Q3 2021 Shareholder Letter touted Carvana's purported population coverage: "***In Q3 2021 we expanded the total percentage of the U.S. population we serve to 80.6%, up from 79.4% at the end of Q2 2021 through the addition of 9 new markets***, taking another step toward our goal of 95% population coverage in the U.S."

233.    As detailed below, Statement No. 28 made by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    While Defendants touted the addition of nine new markets, they omitted that 100% of these markets were more than 200 miles from an existing IRC. Critically, Defendants would later admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per car in logistics and related expenses and that, thus, these distant markets generated "lower profitability due to long distance from inventory."

(b)    While Defendants touted Carvana's increase in the "total percentage of the U.S. population we serve to 80.6%" they omitted that less than 32% of the total U.S. population was located within 100 miles of an existing IRC and less than 54% was located within 200 miles of an existing IRC.[91] These omissions were material. Defendants would later admit that sales in markets more than 200 miles from an IRC incurred at least $750 more per car in logistics and related expenses and that, thus, these distant markets generated "lower profitability due to long distance from inventory." Defendants would also later admit that Carvana had spent billions of dollars on ADESA in order to bring its markets within 100 miles of a reconditioning facility. Indeed, Garcia Junior later admitted that Carvana expanded to "***many, many, I mean, probably dozens***" of places like the "Pacific Northwest"

---

[91]    When Carvana purchased ADESA in early 2022, it announced that 32% of the total U.S. population was located within 100 miles of an existing IRC and 54% was located within 200 miles of an existing IRC. Because Carvana added four IRCs between the time of this statement and Q1 2022, the percent of the population located within 100 or 200 miles from an IRC was even lower.

1  where "we didn't have an inspection center. . . .  So we would just kind of incur all the cost

2  associated with shipping the cars out there . . . ."  Indeed, near the end of the Class Period,

3  Defendants were forced to reduce sales in these markets.

4          (c)      While Defendants touted Carvana's expansion, they omitted the fact

5  that Carvana was lacking billions of dollars of critical brick-and-mortar infrastructure,

6  including reconditioning centers and logistics capabilities, to operate its nationwide footprint.

7  In fact, it would later be revealed that they would have to spend $3 billion to purchase

8  ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings

9  on more than 4,000 acres of land.  According to Garcia Junior, a major factor for purchasing

10  ADESA was "the fact that an e-commerce used car retailer needs a physical footprint like

11  Amazon, which is undergirded by a network of massive distribution centers and transport

12  depots," and "'[y]ou need to warehouse and recon those cars to get them retail ready . . .

13  [y]ou need a place to stage the logistics.'"  After the Class Period, Garcia Junior went as far

14  as to exalt this capital-heavy approach saying that, with ADESA, "we now have 6,500 acres

15  and 500,000 parking spots connected by a logistics network."  He also clarified an analyst's

16  characterization of Carvana as a technology business by stating, "I don't know exactly what

17  kind of business we are . . . [b]ut part of **what we are without question is a big physical**

18  **infrastructure business.  Like that's part of what we have to be**."

19          (d)      By the second half of FY 2021, Carvana's unsustainable nationwide

20  expansion had stretched its logistics and reconditioning network to the brink.  As would be

21  later revealed, Defendants were forced to spend millions of dollars on costly third-party

22  logistics and reconditioning providers to make up for Carvana's internal deficiencies in these

23  critical functions.   After the Class Period, Defendants disclosed "[r]econditioning and

24  [i]nbound [t]ransport [c]ost [p]er [r]etail [u]nit" for the first time, which revealed that, during

25  Q3 2021, these costs had spiked $201 per vehicle and were continuing to steadily increase,

26  as depicted in the graphic below.

27

28



These excess costs were highly material to Carvana's reported results. In fact, when Carvana reported Retail GPU of $1,769 in Q3 2021, a $253 decrease from the prior quarter, Defendants concealed that 79% of the decline was due to the excess reconditioning and inbound transportation costs. Defendants later conceded that the excess reconditioning and inbound transportation costs during late 2021 and early 2022 were ultimately the result of using costly third-party providers to perform these critical functions. For example, near the end of the Class Period, Defendants admitted that, beginning on or around August 2021, Carvana had begun outsourcing logistics, including *increasing* "***third-party reconditioning*** locations." Further, Defendants emphasized that, to curtail logistics, Carvana needed to quickly "[r]educe ***third-party production [i.e., reconditioning***] volume," "[r]educe ***third-party inbound transport*** share," "[i]n-sourc[e] ***third-party pickups***" for Carvana's "[l]ast-mile delivery," and "[r]educe ***third-party shipping***." Moreover, Defendants later attributed significant post-Class-Period cost reductions to the "in-sourcing" of these same logistics and reconditioning functions that Carvana had out-sourced to costly third-party providers during the Class Period. In an August 9, 2023 investor presentation, Jenkins stated "***[t]he single biggest source of the [cost-saving] gains over [the last three fiscal quarters] ha[s] been in-sourcing***." Tellingly, following the Class Period, Garcia Junior explained that, in bringing down reconditioning costs, "[i]n-sourcing was probably the single biggest driver. So basically ***taking services that had previously been provided by third parties in the***

1   *inspection and reconditioning centers and taking them in-house and doing them ourselves*.

2 And that obviously saves costs and allow us to have better control of the process."

3         (e)     As one misled commentator realized near the end of the Class Period

4 when Defendants disclosed that they would reduce advertising in these new far-flung

5 markets, "[Carvana's expansion] was growth for growth's sake and not necessarily growth to

6 improve profitability."

7         234.   **Statement No. 29**: On February 24, 2022, Carvana filed its 2021 10-K, signed

8 by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia Junior and

9 Jenkins attesting to the accuracy of financial reporting in the 10-K.  The 2021 10-K exalted

10 the strengths and advantages of Carvana's logistics capabilities and "capital-light expansion

11 model," stating:

12         Our business benefits from powerful network effects.  ***Our logistics
capabilities allow us to offer every car in our inventory to customers across
all of our markets***.

13

14                               \*      \*      \*

15         We believe there is a substantial opportunity to utilize ***our capital-light
expansion model*** and proven go-to-market strategy to enter additional markets

16         by expanding our existing logistics network and advertising in those markets.

17      235.   As detailed below, Statement No. 29 made by Carvana, Garcia Junior, and

18 Jenkins omitted material facts that affirmatively created an impression of a state of affairs

19 that differed in a material way from the one that actually existed.

20         (a)     While Defendants touted Carvana's expansion model as "capital-light,"

21 its expansion required the buildout of costly IRCs to support the new markets, including the

22 intake, storage, processing, and reconditioning of vehicle inventory.  However, in an effort to

23 appear "capital-light," Carvana delayed the buildout of new IRCs.  New IRC growth

24 significantly lagged behind Carvana's expansion into new markets.  Specifically, during

25 2021, Carvana added 45 new markets, but it added only 6 new IRCs.  As a result, the costs

26 per IRC ballooned as Carvana "frequently moved vehicles between IRCs in different markets

27 due to parking constraints" causing "total vehicle miles traveled" to increase and "adding to

28 costs and logistics network complexity."  Eventually, the lack of critical infrastructure

1    crippled the Company's operations, and Defendants were forced to spend $3 billion to

2    acquire ADESA and its 56 locations across the country to bridge the gap.  CW-4 and CW-7

3    said that Carvana's acquisition of ADESA was part of Carvana's efforts to expand into new

4    markets that might have been far from existing Carvana IRCs.  After the Class Period,

5    Garcia Junior went as far as to exalt this capital-heavy approach saying that, with ADESA,

6    "we now have 6,500 acres and 500,000 parking spots connected by a logistics network."  He

7    also clarified an analyst's characterization of Carvana as a technology business by stating, "I

8    don't know exactly what kind of business we are . . . [b]ut part of ***what we are without***

9    ***question is a big physical infrastructure business.  Like that's part of what we have to be***."

10           (b)    Defendants omitted that, by the second half of FY 2021, Carvana's

11   unsustainable "capital-light" nationwide "expansion model" had stretched its logistics and

12   reconditioning network to the brink.  As a result, Defendants were forced to spend millions

13   of dollars on costly third-party logistics and reconditioning providers to make up for

14   Carvana's internal deficiencies in these critical functions.  After the Class Period, in

15   November 2023, Defendants made an important admission – they provided additional details

16   regarding Class Period expenses and separately broke out "[r]econditioning and [i]nbound

17   [t]ransport [c]ost [p]er [r]etail [u]nit" for the first time.  The disclosures revealed that,

18   between mid-2021 and Q4 2021, these costs had spiked $369 per vehicle, as depicted in the

19   graphic below.  Simply put, Carvana's purportedly "capital-light" expansion model produced

20   the opposite results with costs ***increasing*** as its geographic footprint expanded.



4890-0865-5022.v1

1            (c)      These excess costs were highly material to Carvana's reported results.

2    In fact, of the $527 decrease in Carvana's reported Retail GPU between Q2 2021 and Q4

3    2021, 70% was due to excess reconditioning and inbound transportation costs.  Defendants

4    later conceded that the excess reconditioning and inbound transportation costs during late

5    2021 and early 2022 were ultimately the result of using costly third-party providers to

6    perform these critical functions.  For example, less than three months after this statement was

7    made, Defendants admitted that, beginning on or around August 2021, Carvana had begun

8    outsourcing logistics, including ***increasing*** "***third-party reconditioning*** locations" and

9    "***add[ing] many third-party reconditioning locations***."  Then, near the end of the Class

10   Period, Defendants emphasized that, to curtail logistics expenses, Carvana needed to quickly

11   "[r]educe ***third-party production [i.e., reconditioning***] volume," "[r]educe ***third-party***

12   ***inbound transport*** share," "[i]n-sourc[e] ***third-party pickups***" for Carvana's "[l]ast-mile

13   delivery," and "[r]educe ***third-party shipping***."  Carvana also acknowledged that "location

14   growth" had led to "the addition of many third-party reconditioning locations."  Moreover,

15   after the Class Period, Defendants attributed significant post-Class Period cost reductions to

16   the "in-sourcing" of these same logistics and reconditioning functions that Carvana had out-

17   sourced to costly third-party providers during the Class Period.  In an August 9, 2023

18   investor presentation, Jenkins stated "***[t]he single biggest source of the gains over [the last***

19   ***three fiscal quarters] ha[s] been in-sourcing***. . . . [W]e've really focused on . . . in-sourcing

20   services at more and more of IRCs as the single biggest driver [of cost savings]."  Tellingly,

21   following the Class Period, Garcia Junior explained that, in bringing down reconditioning

22   costs, "[i]n-sourcing was probably the single biggest driver.  So basically ***taking services***

23   ***that had previously been provided by third parties in the inspection and reconditioning***

24   ***centers and taking them in-house and doing them ourselves***.  And that obviously saves

25   costs and allow us to have better control of the process."

26

27

28

1

2

### E.    Defendants' Materially False and Misleading Statements Regarding Aged Inventory

236.    Average days to sale is the number of days between when Carvana acquires a car either from a customer or in the wholesale market and when they sell the car to a customer in a retail transaction.  Defendants described that an increase in the average days to sale metric "***is unfavorable for retail GPU because if you hold the car longer, it has more time to experience depreciation before you sell it, then thereby selling at a lower retail GPU***."  As such, Carvana has always considered average days to sale a key internal metric.  For example, in its S-1 registration statement, at the time of its IPO, Carvana defined average days to sale as one of just six "Key Operating Metrics."  Carvana also described:

> ***Our business is dependent upon our ability to expeditiously sell inventory.  Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales and results of operations***.

> . . . An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and ***increase our average days to sale***.

237.    Average days to sale remained a key internal metric throughout the Class Period.  For example, Carvana repeated the above disclosure in its 2021 10-K and identified the "[r]educ[tion of] average days to sale" as one of its primary "strategies designed to increase our total gross profit per unit."  Even after the Class Period, Carvana highlighted the importance of monitoring average days to sale.  For example, in an August 2023 investor presentation, Defendants highlighted average days to sale "impacts retail GPU through its impact on the cumulative depreciation on vehicles before they sell."  During the same presentation, Jenkins described average days to sale as "***one of the useful metrics***" to help investors understand changes in Retail GPU.  Despite the fact Defendants clearly viewed average days to sale as a key internal metric before, during, and after the Class Period, Defendants abruptly stopped disclosing it to investors in Q1 2021.  At that time, Defendants claimed "our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and ***the relative stability of average days to sale*** over the past three years."  Defendants repeated this statement every quarter, even as average

1   days to sale was spiking as a result of Defendants' scheme.  Thus, Defendants' statements

2   were materially misleading because they created an impression of a state of affairs (relatively

3   stable average days to sale) that differed in a material way from the one that actually existed

4   (a spiking average days to sale metric, which reflected Carvana's glut of aging and

5   depreciating inventory, that would eventually cause Carvana to reduce inventory and forego

6   retail growth).

7       238.    **Statement No. 30**: On February 24, 2022, Carvana filed its 2021 10-K with the

8   SEC, signed by Garcia Junior and Jenkins and attaching SOX certifications signed by Garcia

9   Junior and Jenkins.  The 2021 10-K disclosed that it would no longer be reporting the

10  average days to sale metric.  Further, Defendants stated: "***As we continue to grow, our***

11  ***number of IRCs is a more important metric than average days to sale due to the impact of***

12  ***IRC capacity on retail units sold and the relative stability of average days to sale in recent***

13  ***years***."

14      239.    As detailed below, Statement No. 30 made by Carvana, Garcia Junior, and

15  Jenkins omitted material facts that affirmatively created an impression of a state of affairs

16  that differed in a material way from the one that actually existed.

17          (a)    As demonstrated in the first chart below, contrary to Defendants'

18  statement that average days to sale was "relative[ly] stab[le] . . . in recent years," during Q4

19  2021, average days to sale had spiked to 71 days, increasing almost 20% above Q3 2021 and

20  the recent historical range in the low-60-days range.[92]  At the time that Statement No. 30 was

21  made on February 24, 2022 (*i.e.*, 55 days into Q1 2022), Carvana's average days to sale had

22  spiked even further above its recent historical norms.  Defendants' statements were

23  materially misleading because they created an impression of a state of affairs (relatively

24  stable average days to sale) that differed in a material way from the one that actually existed

25

26  [92]  Defendants' statement conveyed "***relative stability***" of the average days to sale metric in
    the context of recent historical ranges, which was consistently in the low-60-days range.  The
27  average days to sale in recent years were as follows: 64 in FY 2018; 62 in FY 2019; 58 in Q3
    2020 (67 in FY 2020 including the impact of a temporary spike in Q1 and Q2 2020 caused
28  by the COVID-19 disruption); 60 in Q1 2021; 54 in Q2 2021; and 60 in Q3 2021.

(a rapidly spiking average days to sale metric which had significant negative impact on Carvana's Retail GPU).

 

(b)    Defendants' omission of average days to sale was material.  Average days to sale is the number of days between when Carvana acquires a car either from a customer or in the wholesale market and when they sell the car to a customer in a retail transaction.  Defendants described that an increase in the average days to sale metric "*is unfavorable for retail GPU because if you hold the car longer, it has more time to experience depreciation before you sell it, then thereby selling at a lower retail GPU*."  As such, Carvana has always considered average days to sale a key internal metric.  For example, at the time of its IPO, Carvana defined average days to sale as one of just six "Key Operating Metrics" in its S-1 registration statement.  Carvana also stated:

> *Our business is dependent upon our ability to expeditiously sell inventory.  Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales and results of operations*.

> . . .  An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and *increase our average days to sale*.

Average days to sale remained a key internal metric throughout the Class Period.  For example, despite not disclosing the actual metric in its 2021 10-K, Carvana repeated the above disclosure and identified the "[r]educ[tion] average days to sale" as one of its primary "strategies designed to increase our total gross profit per unit" in the 2021 10-K.  After the Class Period, Carvana continued to highlight the importance of monitoring this key metric.  For example, in an August 2023 investor presentation, Defendants highlighted that average

- 170 -

1    days to sale "impacts retail GPU through its impact on the cumulative depreciation on

2    vehicles before they sell." Jenkins also stated in that presentation that average days to sale is

3    "**one of the useful metrics**" to help investors understand changes in Retail GPU.  Thus,

4    Defendants clearly viewed average days to sale as a key internal metric before, during, and

5    after the Class Period.

6         (c)    As detailed below, Defendants further concealed the fact that the spike

7    in average days to sale by the second half of FY 2021, was the direct result of several factors

8    associated with their fraudulent scheme and course of conduct.

9         (i)    First, Defendants' unsustainable increase in purchasing cars from

10   customers, including low-quality cars, left Carvana with a glut of aging inventory.  In Q3

11   2021, Defendants described "explosive growth in buying cars from customers over the last

12   two quarters."  This surplus of cars had a direct impact on average days to sale by Q4 2021.

13   At the end of Class Period, Defendants would admit that Carvana needed to "significantly

14   reduc[e] retail vehicle acquisitions."

15        (ii)    Second, Defendants were forced to significantly "meter," or

16   intentionally not list inventory for sale in certain markets as a result of its unsustainable

17   nationwide expansion.  Indeed, Defendants later admitted that it metered sales to reduce sales

18   in "markets with lower profitability due to long distance from inventory (*e.g.*, the Pacific

19   Northwest)."  This had a direct impact on average days to sale by Q4 2021.

20        (iii)   Third, Defendants admitted that "over the last several months,"

21   preceding August 2022, Carvana had to implement "buffers in many states to provide

22   cushion for their title and registration teams to work with the various states to complete

23   necessary registration paperwork," which materially slowed retail sales growth and adversely

24   impacted average days to sale.

25        (d)    Near the end of the Class Period, Defendants admitted that, far from

26   being at a "relative[ly] stab[le]" level, Carvana had to "reduce[] inventory," which was one

27   of the "largest drivers" of Carvana's disappointing retail unit sales decline in Q3 2022.

28   Carvana further acknowledged that it would be "continuing to normalize our inventory size

1    and expect to further reduce inventory in Q4 [2022]."  In addition, at the end of the Class

2    Period, Defendants were forced to write off millions of dollars of aged and impaired vehicle

3    inventory that was worth less than Carvana had paid to acquire it and prepare it for sale.  In

4    fact, Carvana recorded a $52 million retail inventory allowance adjustment, which reduced

5    Q4 2022 Retail GPU by $598 per retail unit – the equivalent per-unit cost of holding a

6    vehicle more than 90 days.  Carvana also recorded a $5 million wholesale inventory

7    allowance adjustment and elected to sell certain impaired retail vehicles in the wholesale

8    market, resulting in a loss of $4 million, which reduced Q4 2022 GPU by an additional $103

9    per retail unit.  Moreover, Defendants later reported a "substantial reduction in our inventory

10   size," admitting "[f]rom the end of Q1 to the end of Q4, we reduced our inventory balance by

11   43%."  Defendants also belatedly acknowledged that "[r]educing inventory size positively

12   impacts Retail GPU."  Finally, on August 9, 2023, Defendants acknowledged in an investor

13   presentation:

14          [T]he first key driver of . . . our recent success on retail GPU, is what I'll call
            normalizing inventory size or ***really it's more about normalizing inventory***
15          ***turn times***. . . .  Average days of sale is particularly – it's the number of days
            between when we acquire a car either from a customer or in the wholesale
16          market and when we sell a car to a customer on a completed retail transaction.

17          ***And so you can see just as a benchmark, 2021, we were running on***
            ***average in the low 60s average across the 4 quarters***.  ***We really increased***
18          ***this metric, which is unfavorable for retail GPU because if you hold the car***
            ***longer, it has more time to experience depreciation before you sell it, then***
19          ***thereby selling at a lower retail GPU***.  ***But it stayed really elevated through***
            ***2022*** when we overbuilt the business for the ultimate sales environment.  You
20          can see it sort of in the mid- to high 90s there through most of 2022.

21          (e)    Defendants conceded in the August 9, 2023 investor presentation that an

22   increase in average days to sale over Carvana's historical benchmark "in the low 60s" was

23   "unfavorable for retail GPU because if you hold the car longer, it has more time to

24   experience depreciation before you sell it, then thereby selling at a lower retail GPU."  For

25   example, because daily depreciation in the used car market could exceed $20/day at this

26   time, a ten-day spike in average days to sale could negatively impact GPU by more than

27   $200 per vehicle.  At the end of the Class Period, Carvana characterized the impact of an

28   increase in average days to sale, explaining that retail vehicles that were not sold within 90

days of acquisition realized ~$600 of lower Retail GPU compared to retail units sold within 90 days.  To put it in perspective, in Q4 2021, $600 represented 40% of Carvana's retail total GPU.

(f)    Defendants claim that "***our number of IRCs is a more important metric than average days to sale*** due to the impact of IRC capacity on retail units sold" was also false and misleading.  Average days to sale is the number of days between when Carvana acquires a car either from a customer or in the wholesale market and when they sell the car to a customer in a retail transaction.  The number of IRCs, a purportedly more important metric, had almost no relation to average days of sale as it was not a measure of how quickly Carvana sold its vehicles.  Defendants viewed average days to sale as a key internal metric before, during, and after the Class Period.  Indeed, in its S-1 registration statement, at the time of its IPO, Carvana defined average days to sale as one of just six "Key Operating Metrics" because "***[o]ur business is dependent upon our ability to expeditiously sell inventory***."  During the Class Period, despite concealing the metric in the 2021 10-K, Carvana still identified "[r]educe average days to sale" among its primary "strategies designed to increase our total gross profit per unit."  And even after the Class Period, Defendants highlighted average days to sale in an August 2023 investor presentation, noting that it "impacts retail GPU through its impact on the cumulative depreciation on vehicles before they sell."  In addition, Jenkins described average days to sale as "***one of the useful metrics***" to help investors understand changes in Retail GPU.  The number of IRCs, however, was not a "useful metric" to understanding changes in Retail GPU.

240.    **Statement No. 31**: On May 10, 2022, Carvana filed its Q1 2022 10-Q with the SEC, signed by Jenkins and attaching SOX certifications by Garcia Junior and Jenkins.  In the Q1 2022 10-Q, Defendants disclosed: "As we continue to grow, ***our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale in recent years***."

241.    As detailed below, Statement No. 31 made by Carvana, Garcia Junior, and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    As demonstrated in the first chart below, contrary to Defendants' statement that average days to sale was "relative[ly] stab[le] . . . in recent years," during Q1 2022, average days to sale had spiked to 82 days, increasing almost 38% above Q3 2021 and the recent historical range in the low-60-days range.[93]  At the time that Statement No. 31 was made on May 10, 2022, 40 days into Q2 2022, Carvana's average days to sale had spiked even further above its recent historical norms.  Defendants' statements were materially misleading because they created an impression of a state of affairs (relatively stable average days to sale) that differed in a material way from the one that actually existed (a rapidly spiking average days to sale metric which had significant negative impact on  Carvana's Retail GPU).




Q1 2022 10-Q May 10, 2022 (40 days into Q2 2022)

(b)    Defendants' omission of average days to sale was material.  Average days to sale is the number of days between when Carvana acquires a car either from a customer or in the wholesale market and when they sell the car to a customer in a retail

_____

[93]  Defendants' statement conveyed "***relative stability***" of the average days to sale metric in the context of recent historical ranges, which was consistently in the low-60-days range.  The average days to sale in recent years were as follows: 64 in FY 2018; 62 in FY 2019; 58 in Q3 2020 (67 in FY 2020 including the impact of a temporary spike in Q1 and Q2 2020 caused by the COVID-19 disruption); 60 in Q1 2021; 54 in Q2 2021; and 60 in Q3 2021.

transaction. Defendants described that an increase in the average days to sale metric "***is unfavorable for retail GPU because if you hold the car longer, it has more time to experience depreciation before you sell it, then thereby selling at a lower retail GPU***." As such, Carvana has always considered average days to sale a key internal metric. For example, at the time of its IPO, Carvana defined average days to sale as one of just six "Key Operating Metrics" in its S-1 registration statement. Carvana also described:

> ***Our business is dependent upon our ability to expeditiously sell inventory. Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales and results of operations***.

> . . . An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and ***increase our average days to sale***.

Average days to sale remained a key internal metric throughout the Class Period. For example, despite not disclosing the actual metric in the 2021 10-K, Carvana repeated the above disclosure and identified the "[r]educ[tion of] average days to sale" as one of its primary "strategies designed to increase our total gross profit per unit" in the 2021 10-K. After the Class Period, Carvana continued to highlight the importance of monitoring this metric. For example, in an August 2023 investor presentation, Defendants highlighted that average days to sale "impacts retail GPU through its impact on the cumulative depreciation on vehicles before they sell." Jenkins also stated during the presentation that average days to sale is "***one of the useful metrics***" to help investors understand changes in Retail GPU. Thus, Defendants clearly viewed average days to sale as a key internal metric before, during, and after the Class Period.

(c)     As detailed below, Defendants further concealed the fact that the spike in average days to sale by the second half of FY 2021 was the direct result of several factors associated with their fraudulent scheme and course of conduct.

(i)     First, Defendants' unsustainable increase in purchasing cars from customers, including low-quality cars, left Carvana with a glut of aging inventory. In Q3 2021, Defendants described "explosive growth in buying cars from customers over the last

4890-0865-5022.v1

1    two quarters." This surplus of cars had a direct impact on average days to sale by Q1 2022.

2    At the end of the Class Period, Defendants disclosed that Carvana needed to "significantly

3    reduc[e] retail vehicle acquisitions."

4            (ii)    Second, Defendants were forced to significantly "meter," or

5    intentionally not list inventory for sale in certain markets as a result of its unsustainable

6    nationwide expansion. Indeed, Defendants later admitted that it metered sales to reduce sales

7    in "markets with lower profitability due to long distance from inventory (*e.g.*, the Pacific

8    Northwest)." This had a direct impact on average days to sale by Q1 2022.

9            (iii)    Third, Defendants admitted that "over the last several months,"

10   preceding August 2022, Carvana had to implement "buffers in many states to provide

11   cushion for their title and registration teams to work with the various states to complete

12   necessary registration paperwork," which materially slowed retail sales growth and adversely

13   impacted average days to sale.

14           (d)    Near the end of the Class Period, Defendants admitted that, far from

15   being at a "relative[ly] stab[le]" level, Carvana had to "reduce[] inventory," which was one

16   of the "largest drivers" of Carvana's disappointing retail unit sales decline in Q3 2022.

17   Carvana further acknowledged that it would be "continuing to normalize our inventory size

18   and expect to further reduce inventory in Q4 [2022]." In addition, at the end of the Class

19   Period, Defendants were forced to write off millions of dollars of aged and impaired vehicle

20   inventory that was worth less than Carvana had paid to acquire it and prepare it for sale. In

21   fact, Carvana recorded a $52 million retail inventory allowance adjustment, which reduced

22   Q4 2022 Retail GPU by $598 per retail unit – the equivalent per-unit cost of holding a

23   vehicle more than 90 days. Carvana also recorded a $5 million wholesale inventory

24   allowance adjustment and elected to sell certain impaired retail vehicles in the wholesale

25   market, resulting in a loss of $4 million, which reduced Q4 2022 GPU by an additional $103

26   per retail unit. Moreover, Defendants later reported a "substantial reduction in our inventory

27   size," admitting "[f]rom the end of Q1 to the end of Q4, we reduced our inventory balance by

28   43%." Defendants also belatedly acknowledged that "[r]educing inventory size positively

1    impacts Retail GPU." Finally, on August 29, 2023, Defendants acknowledged in an investor

2    presentation:

> [T]he first key driver of . . . our recent success on retail GPU, is what I'll call
> normalizing inventory size or ***really it's more about normalizing inventory
> turn times***. . . . Average days of sale is particularly – it's the number of days
> between when we acquire a car either from a customer or in the wholesale
> market and when we sell a car to a customer on a completed retail transaction.
>
> ***And so you can see just as a benchmark, 2021, we were running on
> average in the low 60s average across the 4 quarters. We really increased
> this metric, which is unfavorable for retail GPU because if you hold the car
> longer, it has more time to experience depreciation before you sell it, then
> thereby selling at a lower retail GPU. But it stayed really elevated through
> 2022*** when we overbuilt the business for the ultimate sales environment. You
> can see it sort of in the mid- to high 90s there through most of 2022.

10        (e)    Defendants conceded in the August 9, 2023 investor presentation that an

11   increase in average days to sale over Carvana's historical benchmark "in the low 60s" was

12   "unfavorable for retail GPU because if you hold the car longer, it has more time to

13   experience depreciation before you sell it, then thereby selling at a lower retail GPU." For

14   example, because daily depreciation in the used car market could exceed $20/day at this

15   time, a ten-day spike in average days to sale could negatively impact GPU by more than

16   $200 per vehicle. At the end of the Class Period, Carvana characterized the impact of an

17   increase in average days to sale, explaining that retail vehicles that were not sold within 90

18   days of acquisition realized ~$600 of lower Retail GPU compared to retail units sold within

19   90 days. To put it in perspective, in Q4 2021, $600 represented 40% of Carvana's retail total

20   GPU.

21        (f)    Defendants claim that "***our number of IRCs is a more important metric

22   than average days to sale*** due to the impact of IRC capacity on retail units sold" was also

23   false and misleading. Average days to sale is the number of days between when Carvana

24   acquires a car either from a customer or in the wholesale market and when they sell the car to

25   a customer in a retail transaction. The number of IRCs, a purportedly more important metric,

26   had almost no relation to average days of sale as it was not a measure of how quickly

27   Carvana sold its vehicles. Defendants viewed average days to sale as a key internal metric

28   before, during, and after the Class Period. Indeed, in its S-1 registration statement, at the

1    time of its IPO, Carvana defined average days to sale as one of just six "Key Operating

2    Metrics" because "*[o]ur business is dependent upon our ability to expeditiously sell*

3    *inventory*."   During the Class Period, despite concealing the metric in the 2021 10-K,

4    Carvana still identified "[r]educe average days to sale" among its primary "strategies

5    designed to increase our total gross profit per unit."   And even after the Class Period,

6    Defendants highlighted average days to sale in an August 2023 investor presentation, noting

7    that it "impacts retail GPU through its impact on the cumulative depreciation on vehicles

8    before they sell."  In addition, Jenkins described average days to sale is "*one of the useful*

9    *metrics*" to help investors understand changes in Retail GPU.   The number of IRCs,

10   however, was not a "useful metric" to understanding changes in Retail GPU.

11        242.   **Statement No. 32**: On August 4, 2022, Carvana filed its quarterly report on

12   Form 10-Q for the period ended June 30, 2022 (the "Q2 2022 10-Q") with the SEC, signed

13   by Jenkins and attaching SOX certifications signed by Jenkins and Garcia Junior.  In the Q2

14   2022 10-Q Defendants stated: "As we continue to grow, *our number of IRCs is a more*

15   *important metric than average days to sale due to the impact of IRC capacity on retail*

16   *units sold and the relative stability of average days to sale over the past three years*."

17        243.   As detailed below, Statement No. 32 made by Carvana, Garcia Junior, and

18   Jenkins omitted material facts that affirmatively created an impression of a state of affairs

19   that differed in a material way from the one that actually existed.

20        (a)    As demonstrated in the chart below, contrary to Defendants' statement

21   that average days to sale was "relative[ly] stab[le] . . . in recent years," during Q2 2022,

22   average days to sale had spiked to 95 days, increasing almost 58% above Q3 2021 and the

23   recent historical range in the low-60-days range.[94]   At the time that Statement No. 32 was

24

25

---

94   Defendants' statement conveyed "*relative stability*" of the average days to sale metric in
the context of recent historical ranges, which was consistently in the low-60-days range.  The
average days to sale in recent years were as follows: 64 in FY 2018; 62 in FY 2019; 58 in Q3
2020 (67 in FY 2020 including the impact of a temporary spike in Q1 and Q2 2020 caused
by the COVID-19 disruption); 60 in Q1 2021; 54 in Q2 2021; and 60 in Q3 2021.

4890-0865-5022.v1

1   made on August 4, 2022, 35 days into Q3 2022, Carvana's average days to sale had spiked

2   even further above its recent historical norms.



13          (b)     Defendants' omission of average days to sale was material.  Average

14   days to sale is the number of days between when Carvana acquires a car either from a

15   customer or in the wholesale market and when they sell the car to a customer in a retail

16   transaction.  Defendants described that an increase in the average days to sale metric "***is***

17   ***unfavorable for retail GPU because if you hold the car longer, it has more time to***

18   ***experience depreciation before you sell it, then thereby selling at a lower retail GPU***."  As

19   such, Carvana has always considered average days to sale a key internal metric.  For

20   example, at the time of its IPO, Carvana defined average days to sale as one of just six "Key

21   Operating Metrics" in its S-1 registration statement.  Carvana also described:

22          ***Our business is dependent upon our ability to expeditiously sell***
           ***inventory.  Failure to expeditiously sell our inventory could have a material***
23          ***adverse effect on our business, sales and results of operations***.

24          . . .  An over-supply of used vehicle inventory will generally cause
           downward pressure on our product sales prices and margins and ***increase our***
25          ***average days to sale***.

26   Average days to sale remained a key internal metric throughout the Class Period.  For

27   example, despite not disclosing the actual metric in the 2021 10-K, Carvana repeated the

- 179 -

1   above disclosure and identified the "[r]educ[tion] average days to sale" as one of its primary

2   "strategies designed to increase our total gross profit per unit" in the 2021 Form 10-K.  After

3   the Class Period, Carvana continued to highlight the importance of monitoring this metric.

4   For example, in an August 2023 investor presentation, Defendants highlighted that average

5   days to sale "impacts retail GPU through its impact on the cumulative depreciation on

6   vehicles before they sell."  Jenkins also stated during the presentation that average days to

7   sale is "*one of the useful metrics*" to help investors understand changes in Retail GPU.

8   Thus, Defendants clearly viewed average days to sale as a key internal metric before, during,

9   and after the Class Period.

10          (c)     As detailed below, Defendants further concealed the fact that the spike

11  in average days to sale in the second half of FY 2021 and accelerating in early 2022 was the

12  direct result of Defendants' fraudulent scheme and course of conduct.

13          (i)     First, Defendants' unsustainable increase in purchasing cars from

14  customers, including low-quality cars, left Carvana with a glut of aging inventory.  In Q3

15  2021, Defendants described "explosive growth in buying cars from customers over the last

16  two quarters."  This surplus of cars had a direct impact on average days to sale by Q2 2022.

17  At the end of the Class Period, Defendants disclosed that Carvana needed to "significantly

18  reduc[e] retail vehicle acquisitions."

19          (ii)    Second, Defendants were forced to significantly "meter," or

20  intentionally not list inventory for sale in certain markets as a result of its unsustainable

21  nationwide expansion.  Indeed, Defendants later admitted that it metered sales to reduce sales

22  in "markets with lower profitability due to long distance from inventory (*e.g.*, the Pacific

23  Northwest)."  This had a direct impact on average days to sale by Q4 2021.

24          (iii)   Third, Defendants admitted that "over the last several months,"

25  preceding August 2022, Carvana had to implement "buffers in many states to provide

26  cushion for their title and registration teams to work with the various states to complete

27  necessary registration paperwork," which materially slowed retail sales growth and adversely

28  impacted average days to sale.

4890-0865-5022.v1

1            (d)    Near the end of the Class Period, Defendants admitted that, far from

2    being at a "relative[ly] stab[le]" level, Carvana had to "reduce[] inventory," which was one

3    of the "largest drivers" of Carvana's disappointing retail unit sales decline in Q3 2022.

4    Carvana further acknowledged that it would be "continuing to normalize our inventory size

5    and expect to further reduce inventory in Q4 [2022]."  In addition, at the end of the Class

6    Period, Defendants were forced to write off millions of dollars of aged and impaired vehicle

7    inventory that was worth less than Carvana had paid to acquire it and prepare it for sale.  In

8    fact, Carvana recorded a $52 million retail inventory allowance adjustment, which reduced

9    Q4 2022 Retail GPU by $598 per retail unit – the equivalent per-unit cost of holding a

10   vehicle more than 90 days.  Carvana also recorded a $5 million wholesale inventory

11   allowance adjustment and elected to sell certain impaired retail vehicles in the wholesale

12   market, resulting in a loss of $4 million, which reduced Q4 2022 GPU by an additional $103

13   per retail unit.  Moreover, Defendants later reported a "substantial reduction in our inventory

14   size," admitting "[f]rom the end of Q1 to the end of Q4, we reduced our inventory balance by

15   43%."  Defendants also belatedly acknowledged that "[r]educing inventory size positively

16   impacts Retail GPU."  Finally, on August 9, 2023, Defendants acknowledged in an investor

17   presentation:

18         [T]he first key driver of . . . our recent success on retail GPU, is what I'll call
     normalizing inventory size or ***really it's more about normalizing inventory***
19   ***turn times***. . . . Average days of sale is particularly – it's the number of days
     between when we acquire a car either from a customer or in the wholesale
20   market and when we sell a car to a customer on a completed retail transaction.

21         ***And so you can see just as a benchmark, 2021, we were running on***
     ***average in the low 60s average across the 4 quarters.  We really increased***
22   ***this metric, which is unfavorable for retail GPU because if you hold the car***
     ***longer, it has more time to experience depreciation before you sell it, then***
23   ***thereby selling at a lower retail GPU.  But it stayed really elevated through***
     ***2022*** when we overbuilt the business for the ultimate sales environment.  You
24   can see it sort of in the mid- to high 90s there through most of 2022.

25           (e)    Defendants conceded in the August 9, 2023 investor presentation that an

26   increase in average days to sale over Carvana's historical benchmark "in the low 60s" was

27   "unfavorable for retail GPU because if you hold the car longer, it has more time to

28   experience depreciation before you sell it, then thereby selling at a lower retail GPU."  For

1   example, because daily depreciation in the used car market could exceed $20/day at this

2   time, a ten-day spike in average days to sale could negatively impact GPU by more than

3   $200 per vehicle.  At the end of the Class Period, Carvana characterized the impact of an

4   increase in average days to sale, explaining that retail vehicles that were not sold within 90

5   days of acquisition realized ~$600 of lower Retail GPU compared to retail units sold within

6   90 days.  To put it in perspective, in Q4 2021, $600 represented 40% of Carvana's retail total

7   GPU.

8          (f)     Defendants claim that "***our number of IRCs is a more important metric***

9   ***than average days to sale*** due to the impact of IRC capacity on retail units sold" was also

10  false and misleading.  Average days to sale is the number of days between when Carvana

11  acquires a car either from a customer or in the wholesale market and when they sell the car to

12  a customer in a retail transaction.  The number of IRCs, a purportedly more important metric,

13  had almost no relation to average days of sale as it was not a measure of how quickly

14  Carvana sold its vehicles.  Defendants viewed average days to sale as a key internal metric

15  before, during, and after the Class Period.  Indeed, in its S-1 registration statement, at the

16  time of its IPO, Carvana defined average days to sale as one of just six "Key Operating

17  Metrics" because "***[o]ur business is dependent upon our ability to expeditiously sell***

18  ***inventory***."  During the Class Period, despite concealing the metric in the 2021 10-K,

19  Carvana still identified "[r]educe average days to sale" among its primary "strategies

20  designed to increase our total gross profit per unit."  And even after the Class Period,

21  Defendants highlighted average days to sale in an August 2023 investor presentation, noting

22  that it "impacts retail GPU through its impact on the cumulative depreciation on vehicles

23  before they sell."  In addition, Jenkins described average days to sale as "***one of the useful***

24  ***metrics***" to help investors understand changes in Retail GPU.  The number of IRCs,

25  however, was not a "useful metric" to understanding changes in Retail GPU.

26

27

28

1

2

**F.    Defendants' Materially False and Misleading Statements Regarding Profitability Per Vehicle Sold**

3

4

5

6

7

8

9

244.    During the Class Period, Carvana acknowledged that "[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so."  Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period. Accordingly, throughout the Class Period, Defendants reported Carvana's Retail GPU in each of Carvana's earnings calls and shareholder letters.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

245.    Defendants reported positive Retail GPU throughout the Class Period and assured investors that its retail vehicle sales were profitable.  However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof.  Carvana did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher Carvana's "unit economics" (*i.e.*, overall profitability) of retail sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material costs associated with completing a retail sale, such as the full cost to ship a car to a customer and title and registration costs.  By intentionally hiding these significant costs, investors were left to rely on the positive Retail GPU reported by Defendants as the sole measure of Carvana's retail sales profitability.  However, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified the costs that were excluded from Retail GPU, it would have revealed to investors that, on average, Carvana lost money on every retail car sold.  This created an impression of a state affairs (positive per-unit profitability) materially different from the one that actually existed (negative per-unit profitability).

27

28

246.    To be sure, Defendants could choose how to calculate Carvana's Retail GPU metric and whether to categorize certain expenses as SG&A, so as to exclude them from the

- 183 -

Retail GPU metric it touted to investors.  However, touting positive Retail GPU while failing to provide any meaningful disclosures or quantification of the per-vehicle operations expenses (*i.e.*, the costs to complete a retail sale, which Defendants themselves viewed as a key variable in measuring retail "unit economics" and profitability) that Defendants excluded from Carvana's Retail GPU metric created a misleading impression of the state of affairs that existed at the time.  The omission of material information regarding Carvana's operations expenses rendered numerous Class Period statements materially false and misleading, as described below.

247.    **Statement No. 33**: On May 6, 2020, Jenkins stated on the Carvana Q1 2020 earnings call: "Our growth in GPU was driven by ***strong retail GPU, which increased $299 to $1,581, our highest ever, driven primarily by buying cars from customers***."

248.    As detailed below, Statement No. 33 made by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    During the Class Period, Carvana acknowledged that "***[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so***."  Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period.  Accordingly, on the Q1 2020 earnings call, Defendants reported a "***strong retail GPU***" **of $1,581**, which investors viewed as a proxy for Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof.  Carvana did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher Carvana's overall profitability of retail sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material costs associated with completing a retail sale, such as the full cost to ship a car to a

customer and title and registration costs.  By intentionally hiding these significant costs, investors were left to rely on the Retail GPU reported by Defendants (*a positive Retail GPU of $1,581*) as the sole measure of Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified the per-vehicle costs associated with completing retail sales that had been excluded from reported Retail GPU, *Carvana would have revealed to investors that, on average, it generated negative unit economics of more than $840 per retail unit sold* in Q1 2020, as shown in the chart below.  This created an impression of a state affairs (positive per-vehicle profitability) materially different from the one that actually existed (negative per-vehicle profitability).

| | Q1 2020 |
|---|---|
| Disclosed  Average selling price per retail unit sold | $18,393 |
| Disclosed  Cost of sales per retail unit sold | $16,812 |
| Disclosed  Retail GPU | $1,581 |
| | |
| Undisclosed  Operations expense per retail unit sold | ~$2,425 |
| Undisclosed  Actual total expense per retail unit sold[95] | ~$19,237 |
| Undisclosed  Actual negative "unit economics" per retail unit sold[96] | ~($844) |

(b)    After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations

---

[95]    Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[96]    Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

4890-0865-5022.v1

expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[97]  Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per vehicle): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana **excluded** from Retail GPU during the Class Period and which had **never previously been separately disclosed or quantified for investors**).  Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs.  Rather, Defendants admitted that vehicle operations costs were the **direct per-vehicle costs of completing a vehicle sale** ("[o]perations expenses include the fulfillment, customer service, and transaction expenses associated with completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, **multi-car logistics**, **last-mile delivery**, and other operations payroll" associated with completing retail vehicle sales;

- "[n]on-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party transport services**" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, **title and registration**, and finance platform expenses" associated with completing retail vehicle sales.

---

[97]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

4890-0865-5022.v1

(c)     Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
>          And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

(d)     During Q1 2020, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as detailed below, the disclosures Defendants ***did*** make regarding SG&A expenses during Q1 2020 did more to mislead investors than to provide transparency around Carvana's true profitability per retail vehicle sold (*i.e.*, "unit economics").

(i)     ***First***, Defendants' Class Period description of SG&A expenses was so vague that investors could not have discerned that material operations expenses pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and

1  overhead expenses, as is common across all companies.[98]  Defendants, however, omitted the

2  fact that 46% of its total reported SG&A costs were actually not corporate and overhead

3  expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the

4  fulfillment, customer service, and transaction expenses *associated with completing retail*

5  *and wholesale vehicle sales*."[99]  Defendants' intentionally opaque SG&A disclosures kept

6  analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A

7  disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst

8  noted "*[w]e (and the investors we spoke with) continue to look for more disclosure on*

9  *Other SG&A* . . . [it] is a bit of *a 'black box*.'"  Likewise, on February 26, 2021, a J.P.

10  Morgan analyst referred to Carvana's disclosure of SG&A expenses as "*[t]he big 'black*

11  *box.*'"

12        (ii)    *Second*, beyond Defendants' vague general description of SG&A

13  expenses, any references to certain specific expenses that were included in SG&A during the

14  Class Period also painted a materially incomplete picture of which operations expenses had

15  been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

16  SG&A into five high-level categories during the Class Period, with general overhead

17  categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

18  and equity-based compensation"), advertising, and "other" (including "general and

19  administrative expenses such as IT expenses, corporate occupancy, professional services and

20  insurance"), making up over 90% of the total reported SG&A costs in Q1 2020.[100]  The only

21

22  ────────────

[98]  According to Carvana's Q1 2020 10-Q: "[S]elling, general and administrative ('SG&A')

23  expenses *include expenses associated with advertising and providing customer service to
     customers*, *operating our vending machines and hubs*, operating our logistics and

24  fulfillment network and *other corporate overhead expenses, including expenses associated
     with information technology, product development, engineering, legal, accounting,

25  finance, and business development*."

[99]  46% represents Q1 2020 total SG&A of $275.7 million compared to Q1 2020

26  approximate total operations expense of $127.1 million.

27  [100]  Q1 2020 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and

28  other.

1    specific SG&A category disclosed by Defendants that was loosely tied to Carvana's post-

2    Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were directly

3    "associated with completing retail and wholesale vehicle sales") was "logistics."  But even

4    the logistics disclosure was inconsistent with Carvana's post-Class Period disclosures

5    revealing actual per-vehicle operations expenses.[101]

6               (iii)    ***Third***, the quantification of any specifically identified operations

7    expenses within SG&A during Q4 2021 would have certainly left investors with a false

8    impression of which expenses had been excluded from Carvana's Retail GPU calculation

9    and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") looked like

10   during Q4 2021.  For example, the only specific retail vehicle operations expense Defendants

11   obliquely quantified during the Class Period was "logistics" costs, which Defendants vaguely

12   described as encompassing outbound shipping costs.  Carvana disclosed logistics costs of

13   $18.9 million in Q1 2020, or $360 per retail vehicle sold.  Meanwhile, operations expense

14   per retail vehicle sold totaled approximately $127.1 million in Q1 2020, or $2,425 per

15   vehicle sold.  Defendants did not specifically quantify any other specific vehicle operations

16   expenses in Carvana's Class Period SG&A disclosures.[102]  Thus, at most, investors would

17   have been specifically aware of ***just $360, less than 15%, of the $2,425 in actual per-vehicle***

18   ***operations expenses*** (*i.e.*, costs "associated with completing retail . . . vehicle sales") that

19   materially impacted Carvana's retail vehicles sales profitability ("unit economics").

20

21

---

22   [101] Carvana disclosed that the logistics SG&A category, also disclosed as shipping and
handling, included "fuel, maintenance and depreciation related to operating our own
23   transportation fleet, and third party transportation fees."  This disclosure, however, was
inconsistent with Carvana's post-Class Period disclosures revealing operations expenses
24   because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics
category – these were overhead costs rather than per-vehicle shipping costs and, thus, were
25   specifically excluded from operations expenses; and (ii) Carvana excluded compensation
associated with outbound shipping from the SG&A logistics category but included these
26   expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses
disclosed after the Class Period.

27   [102] Title and registration expenses were listed among expenses in the "Other" SG&A
28   category, but were not separately quantified.

1          (iv)    **Fourth**, Defendants' Class Period SG&A disclosures did not
2    break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred
3    variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed
4    expenses that did not significantly change based on the number of units sold).  Operations
5    expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each
6    incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.
7    Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly
8    impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period,
9    analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable
10   versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo
11   analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me
12   through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and
13   then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear
14   response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern
15   over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to
16   become more variable vs fixed in nature."  When Carvana finally disclosed operations
17   expense per retail unit in November 2023, a J.P. Morgan analyst commented that "***the
18   company finally provided disclosure on fixed vs. variable SG&A expenses***."  The same
19   analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures,
20   his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost
21   mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our
22   [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as
23   predominantly fixed and was surprised to learn that, in reality, a significantly higher
24   proportion of Carvana's SG&A expenses were variable operations expenses, which
25   increased with each incremental vehicle sold and negatively impacted Carvana's retail
26   profitability (*i.e.*, "unit economics").

27          (e)    The operations expenses that were excluded from Retail GPU (and not
28   separately disclosed or quantified to allow investors to decipher Carvana's overall

1    profitability of retail sales on their own) were directly tied to problems stemming from

2    Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by

3    concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll***

4    ***logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses***, [and]

5    ***title and registration*** . . . expenses" that "were associated with completing retail . . . vehicle

6    sales," Defendants were able to conceal numerous problems from investors, including that:

7    (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's

8    rapid increase in buying cars from customers left it with a glut of low-quality cars that were

9    causing massive logistics constraints and costs; and (iii) Carvana was experiencing

10   significant title and registration issues.

11          (f)      While Defendants stated that the increase in Q1 2020 Retail GPU was

12   "***driven primarily by buying cars from customers***," they omitted the fact that buying cars

13   from customers was adversely impacting operations expenses and unit economics – another

14   key measure of actual retail profitability.  As alleged herein, the rapid increase in buying

15   low-quality cars from customers caused a significant spike in wholesale vehicle sales.  In Q1

16   2020, wholesale sales growth had spiked 61% year-over-year, far outpacing retail sales

17   growth.  By Q4 2020, wholesale growth reached over 100%.  Carvana later admitted that it

18   experienced significant logistics constraints and costs as a result of buying cars from

19   customers and its corresponding surplus of wholesale vehicle sales.  For example, in

20   Carvana's May 2022 Operating Plan, Defendants admitted the need to "[r]apidly reduce

21   SG&A expense per retail unit sold" (*i.e.*, operations expenses).  Defendants admitted that

22   "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn,

23   led to "constraints in our nationwide logistics network" and a spike in SG&A logistics costs.

24   Defendants further disclosed that "wholesale units acquired from customers have . . .

25   increased complexity in our multi-car logistics network."  Nevertheless, the majority of the

26   negative cost impacts of these logistics constraints were not reflected in Carvana's Q1 2020

27   Retail GPU because Defendants categorized many of these logistics costs as operations

28   expenses, which were buried in SG&A and not separately broken out.  Meanwhile,

- 191 -

1  unbeknownst to investors, these costs did contribute to the $2,425 in undisclosed "operations

2  expense per retail unit sold" in Q1 2020 and did negatively impact Carvana's retail unit

3  economics.  Thus, it was materially misleading to describe buying cars from customers as the

4  main "driver" of Carvana's purported improvement in Retail GPU – the primary metric

5  Defendants provided for retail profitability – while simultaneously concealing that buying

6  cars from customers was also adversely impacting another key measure of profitability: unit

7  economics per retail vehicle sold.

8          (g)     The fact that Defendants created a misleading impression as to

9  Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further

10  supported by a series of revelations, and corresponding analyst reactions, that began during

11  2022.  First, in April 2022, Carvana disclosed a quarterly loss of $506 million and admitted it

12  needed to purchase ADESA to "improve our logistics network," and bring down "shipping

13  distances, times, and costs."  Analysts commented on these revelations.  For example, a J.P.

14  Morgan analyst labeled the news "'confidence shattering'" and commented on Carvana's

15  opaque SG&A disclosures, which encompassed operations expenses, stating: "'***we do not***

16  ***believe Carvana (CVNA) is likely to get a free pass on SG&A any longer***.'"  Then, in May

17  2022, Carvana announced that it was laying off approximately 2,500 employees "primarily

18  in operational groups. . ." and issued an updated operating plan that emphasized its need to

19  "***[r]apidly reduce SG&A expense per retail unit sold***" (*i.e.*, operations expenses) and ***make***

20  ***profitability a priority***.  Analysts commented on this surprising news.  For example, on

21  May 21, 2022, *Forbes* cited to several industry analysts who described Carvana's

22  "spendthrift business, ***whose growth-at-all-costs mentality undermined business operations***

23  ***and sowed the seeds of its recent layoffs***."  In November 2022, Carvana issued disappointing

24  Q3 2022 financial results and revealed that, unbeknownst to investors, Carvana had been

25  "frequently acquir[ing]" ***retail sales*** "***that were less profitable*** in the immediate period,"

26  including "***less profitable sales***" in "markets with ***lower profitability*** due to long distance

27  from inventory."  Carvana further admitted it was now taking actions "to improve

28  profitability."  Analysts and the media reported on the news regarding Carvana's retail sales

- 192 -

1   profitability.  For example, a Needham & Company analyst noted, "'[t]he path forward for

2   Carvana is to sell as many cars as possible, but to do so on a profitable basis, *versus prior it*

3   *was more about selling as many cars as possible*.'"  Another media outlet told investors to

4   "[s]tep back and think about [Carvana's disclosure] for a moment" because "*[i]t means that*

5   *the company had historically grown in these markets even though they weren't all that*

6   *attractive.  It was growth for growth's sake and not necessarily growth to improve*

7   *profitability*."  Finally, on the last day of the Class Period, Defendants revealed that Carvana

8   was intentionally foregoing retail sales growth for the foreseeable future to instead focus on

9   driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).  Analysts

10  commented on this disclosure.  For example, a Morgan Stanley analyst, on February 24,

11  2023, explained that "4Q was a sizeable miss," and commented on Carvana's "*[s]hift in*

12  *strategy away from growth* and towards EBITDA profitability."  The same day, a RBC

13  Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by

14  32% . . . due in large part to . . . *lower unit economics from cars*."  Additionally, a Stephens

15  analyst noted "*we do not foresee the company achieving its targeting unit economics this*

16  *year*."

17      249.  <u>**Statement No. 34**</u>: On August 5, 2020, Jenkins stated on the Carvana Q2 2020

18  earnings call:

19          *Retail GPU was $1,190* . . . .

20                          *       *       *

21          *[T]here are definitely some exciting trends in retail GPU*.  I think the
        most exciting is that, as I mentioned earlier, in July, we bought more than
22      100% as many cars from customers as we sold to customers. . . .

23          I think that's obviously a positive, that drives wholesale GPU, *that*
        *drives incremental retail GPU, because cars that you acquire from*
24      *customers are typically more profitable* than cars that you acquire at auction.

25      250.  As detailed below, Statement No. 34 made by Carvana and Jenkins omitted

26  material facts that affirmatively created an impression of a state of affairs that differed in a

27  material way from the one that actually existed.

28

(a)     During the Class Period, Carvana acknowledged that "*[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so*."  Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period. Accordingly, on the Q2 2020 earnings call, Defendants reported positive "*Retail GPU of $1,190*" and described "*exciting trends in retail GPU*," which investors viewed as a proxy for Carvana's "unit economics" (*i.e.*, per-vehicle profitability).  However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof.  Carvana did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher Carvana's overall profitability of retail sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material costs associated with completing a retail sale, such as the full cost to ship a car to a customer and title and registration costs.  By intentionally hiding these significant costs, investors were left to rely on the Retail GPU reported by Defendants (*a positive Retail GPU of $1,190*) as the sole measure of Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified the per-vehicle costs associated with completing retail sales that had been excluded from reported Retail GPU, *Carvana would have revealed to investors that, on average, it generated negative unit economics of more than $680 per retail unit sold* in Q2 2020, as shown in the chart below.  This created an impression of a state affairs (positive per-vehicle profitability) materially different from the one that actually existed (negative per-vehicle profitability).

| | Q2 2020 |
|---|---|
| Disclosed Average selling price per retail unit sold | $18,001 |
| Disclosed Cost of sales per retail unit sold | $16,811 |
| Disclosed Retail GPU | $1,190 |
| | |
| Undisclosed Operations expense per retail unit sold | ~$1,875 |
| Undisclosed Actual total expense per retail unit sold[103] | ~$18,686 |
| Undisclosed Actual negative "unit economics" per retail unit sold[104] | ~($685) |

(b)     After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[105]  Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU

[103]  Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[104]  Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[105]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana **excluded** from Retail GPU during the Class Period and which had **never previously been separately disclosed or quantified for investors**).  Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs.  Rather, Defendants admitted that vehicle operations costs were the **direct per-vehicle costs of completing a vehicle sale** ("[o]perations expenses include the fulfillment, customer service, and transaction expenses associated with completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, **multi-car logistics**, **last-mile delivery**, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party transport services**" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, **title and registration**, and finance platform expenses" associated with completing retail vehicle sales.

(c)    Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "**the underlying costs of completing a sale**" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> **When we think about trying to aim for more profitable sales, what does that mean?**  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  **There's also kind of variation in the underlying costs of completing a sale**.

Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying costs of completing a sale**) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales,

- 196 -

1  like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants
2  further admitted that, internally, they viewed operations expenses (*i.e.*, costs associated with
3  completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle
4  profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in
5  November 2023 as "clear evidence" of Carvana's potential profitability.

6         (d)     During Q2 2020, Defendants included per-vehicle operations expenses
7  in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify
8  these expenses in a manner that would have allowed investors to decipher the overall
9  profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as
10 detailed below, the disclosures Defendants ***did*** make regarding SG&A expenses during Q2
11 2020 did more to mislead investors than to provide transparency around Carvana's true
12 profitability per retail vehicle sold (*i.e.*, "unit economics").

13         (i)     ***First***, Defendants' Class Period description of SG&A expenses
14 was so vague that investors could not have discerned that material operations expenses
15 pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included
16 in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the
17 Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and
18 overhead expenses, as is common across all companies.[106]  Defendants, however, omitted the
19 fact that 43% of its total reported SG&A costs were actually not corporate and overhead
20 expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the
21 fulfillment, customer service, and transaction expenses ***associated with completing retail***
22 ***and wholesale vehicle sales***."[107]  Defendants' intentionally opaque SG&A disclosures kept

23

---

24 [106] According to Carvana's Q2 2020 10-Q: "[S]elling, general and administrative ('SG&A')
25 expenses ***include expenses associated with advertising and providing customer service to***
   ***customers***, ***operating our vending machines and hubs***, operating our logistics and
   fulfillment network and ***other corporate overhead expenses, including expenses associated***
26 ***with information technology, product development, engineering, legal, accounting,***
   ***finance, and business development***."

27 [107] 43% represents Q2 2020 total SG&A of $239.9 million compared to Q2 2020
28 approximate total operations expense of $103.3 million.

4890-0865-5022.v1

1    analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A

2    disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst

3    noted "*[w]e (and the investors we spoke with) continue to look for more disclosure on*

4    *Other SG&A* . . . [it] is a bit of *a 'black box*.'"  Likewise, on February 26, 2021, a J.P.

5    Morgan analyst referred to Carvana's disclosure of SG&A expenses as "*[t]he big 'black*

6    *box*.'"

7                    (ii)    *Second*, beyond Defendants' vague general description of SG&A

8    expenses, any references to certain specific expenses that were included in SG&A during the

9    Class Period also painted a materially incomplete picture of which operations expenses had

10   been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

11   SG&A into five high-level categories during the Class Period, with general overhead

12   categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

13   and equity-based compensation"), advertising, and "other" (including "general and

14   administrative expenses such as IT expenses, corporate occupancy, professional services and

15   insurance"), making up over 90% of the total reported SG&A costs in Q2 2020.[108]  The only

16   specific SG&A category disclosed by Defendants that was loosely tied to Carvana's post-

17   Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were directly

18   "associated with completing retail and wholesale vehicle sales") was "logistics."  But even

19   the logistics disclosure was inconsistent with Carvana's post-Class Period disclosures

20   revealing actual per-vehicle operations expenses.[109]

21   _____

22   [108]  Q2 2020 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and other.

23   [109]  Carvana disclosed that the logistics SG&A category, also disclosed as shipping and

24   handling, included "fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees."  This disclosure, however, was

25   inconsistent with Carvana's post-Class Period disclosures revealing operations expenses because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics

26   category – these were overhead costs rather than per-vehicle shipping costs and, thus, were specifically excluded from operations expenses; and (ii) Carvana excluded compensation

27   associated with outbound shipping from the SG&A logistics category but included these expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses

28   disclosed after the Class Period.

4890-0865-5022.v1

(iii)    ***Third***, the quantification of any specifically identified operations expenses within SG&A during the Class Period would have certainly left investors with a false impression of which expenses had been excluded from Carvana's Retail GPU calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics) looked like during the Class Period.  For example, the only specific retail vehicle operations expense Defendants obliquely quantified during the Class Period was "logistics" costs, which Defendants vaguely described as encompassing outbound shipping costs.  Carvana disclosed logistics costs of $16.7 million in Q2 2020, or $303 per retail vehicle sold.  Meanwhile, operations expense per retail vehicle sold totaled approximately $103.3 million in Q2 2020, or $1,875 per vehicle sold.  Defendants did not specifically quantify any other specific vehicle operations expenses in Carvana's Class Period SG&A disclosures.[110]  Thus, at most, investors would have been specifically aware of ***just $303, approximately 16%, of the $1,875 in actual per-vehicle operations expenses*** (*i.e.*, costs "associated with completing retail . . . vehicle sales") that materially impacted Carvana's retail vehicles sales profitability ("unit economics").

(iv)    ***Fourth***, Defendants' Class Period SG&A disclosures did not break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed expenses that did not significantly change based on the number of units sold).  Operations expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.  Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period, analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me

---

[110] Title and registration expenses were listed among expenses in the "Other" SG&A category, but were not separately quantified.

through how to think about the SG&A . . . ?  And what is expected to be a fixed cost, . . . and then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to become more variable vs fixed in nature."  When Carvana finally disclosed operations expense per retail unit in November 2023, a J.P. Morgan analyst commented that "***the company finally provided disclosure on fixed vs. variable SG&A expenses***."  The same analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures, his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost mix of ~55-60%  . . . was lower than our prior assumption of ~70% that was driving our [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as predominantly fixed and was surprised to learn that, in reality, a significantly higher proportion of Carvana's SG&A expenses were variable operations expenses, which increased with each incremental vehicle sold and negatively impacted Carvana's retail profitability (*i.e.*, unit economics).

(e)     The operations expenses that were excluded from Retail GPU (and not separately disclosed or quantified to allow investors to decipher Carvana's overall profitability of retail sales on their own) were directly tied to problems stemming from Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses***, [and] ***title and registration*** . . . expenses" that "were associated with completing retail . . . vehicle sales," Defendants were able to conceal numerous problems from investors, including that: (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's rapid increase in buying cars from customers left it with a glut of low-quality cars that were causing massive logistics constraints and costs; and (iii) Carvana was experiencing significant title and registration issues.

(f)    In describing what was driving Carvana's "exciting trends in retail GPU," Defendants cited buying cars from customers, claiming "that [it] drives incremental retail GPU, because cars that you acquire from customers are typically more profitable." While Defendants touted the beneficial impact of buying cars from customers, they omitted the fact that it was also adversely impacting operations expense and unit economics, which Defendants later admitted was another key measure of actual retail profitability.  As alleged herein, the rapid increase in buying low-quality cars from customers caused a significant spike in wholesale vehicle sales.  Following a temporary pause in buying cars from customers due to the pandemic, Carvana had resumed purchases as of August 5, 2020, when Jenkins described the GPU benefits of buying cars from customers.  In fact, Carvana increased its cars bought from customers by 261% during Q3 2020 (when the statement was made).  Carvana later admitted that it experienced significant logistics constraints and costs stemming from buying cars from customers and the resulting surplus of wholesale vehicle sales.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted the need to "[r]apidly reduce SG&A expense per retail unit sold" (*i.e.*, operations expenses).  Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network" and a spike in SG&A logistics costs.  Defendants further disclosed that "wholesale units acquired from customers have . . . increased complexity in our multi-car logistics network."  Nevertheless, the majority of the negative cost impacts of these logistics constraints were not reflected in Carvana's Q2 2020 Retail GPU because Defendants categorized many of these logistics costs as operations expenses, which were buried in SG&A and not separately broken out. Meanwhile, unbeknownst to investors, these costs did contribute to the $1,875 in undisclosed "operations expense per retail unit sold" in Q2 2020 did negatively impact Carvana's retail unit economics.  Thus, it was materially misleading to describe buying cars from customers as the main "driver" of Carvana's purported improvement in Retail GPU – the primary metric Defendants provided for retail profitability – while simultaneously concealing that

1  buying cars from customers was also adversely impacting another key measure of

2  profitability: unit economics per retail vehicle sold.

3          (g)    The fact that Defendants created a misleading impression as to

4  Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further

5  supported by a series of revelations, and corresponding analyst reactions, that began during

6  2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which

7  partially revealed the truth about Carvana's actual profitability, including the operations

8  expenses it had concealed from investors.  For example, Defendants disclosed a quarterly

9  loss of $506 million and explained that they needed to purchase ADESA to "improve our

10  logistics network," and bring down "shipping distances, times, and costs."  Analysts

11  commented on these revelations.  For example, a J.P. Morgan analyst labeled the news

12  "'confidence shattering'" and commented on Carvana's opaque SG&A disclosures, which

13  encompassed operations expenses, stating: "'***we do not believe Carvana (CVNA) is likely to***

14  ***get a free pass on SG&A any longer***.'"  Then, in May 2022, Carvana announced that it was

15  laying off approximately 2,500 employees "primarily in operational groups" and issued an

16  updated operating plan that emphasized the need to "***[r]apidly reduce SG&A expense per***

17  ***retail unit sold***" (*i.e.*, operations expenses) and ***make profitability a priority***.  Analysts

18  commented on this surprising news.  For example, on May 21, 2022, *Forbes* cited to several

19  industry analysts who described Carvana's "spendthrift business, ***whose growth-at-all-costs***

20  ***mentality undermined business operations and sowed the seeds of its recent layoffs***."  In

21  November 2022, Carvana issued disappointing Q3 2022 financial results and revealed that,

22  unbeknownst to investors, Carvana had been "frequently acquir[ing]" ***retail sales*** "***that were***

23  ***less profitable*** in the immediate period," including "***less profitable sales***" in "markets with

24  ***lower profitability*** due to long distance from inventory."  Carvana further admitted it was

25  now taking actions "to improve profitability."  Analysts and the media reported on the news

26  regarding Carvana's retail sales profitability.  For example, a Needham & Company analyst

27  noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a

28  profitable basis, ***versus prior it was more about selling as many cars as possible***.'"  Another

- 202 -

4890-0865-5022.v1

media outlet told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "*[i]t means that the company had historically grown in these markets even though they weren't all that attractive.  It was growth for growth's sake and not necessarily growth to improve profitability*."  Finally, on the last day of the Class Period, Defendants revealed that Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).  Analysts commented on this disclosure.  For example, a Morgan Stanley analyst, on February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's "*[s]hift in strategy away from growth* and towards EBITDA profitability."  The same day, a RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by 32% . . . due in large part to . . . *lower unit economics from cars*."  Additionally, a Stephens analyst noted "*we do not foresee the company achieving its targeting unit economics this year*."

251.    **Statement No. 35**: On October 29, 2020, Jenkins stated on the Carvana Q3 2020 earnings call:

Retail GPU was $1,857 in O3. an increase of $552.  *Growth in retail GPU was driven bv a significant increase in the share of our vehicles sourced from customers*.

252.    As detailed below, Statement No. 35 made by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    During the Class Period, Carvana acknowledged that "*[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so*."  Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period.  Accordingly, on the Q3 2020 earnings call, Defendants reported positive "*Retail GPU [of] $1,857*," which investors viewed as a proxy for Carvana's "unit economics" (*i.e.*, per-vehicle profitability).  However, as alleged herein, Defendants concealed Carvana's actual per-

1   vehicle profitability – or lack thereof.  Carvana did so by: (i) excluding certain per-vehicle

2   operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying

3   these excluded costs separately so investors could decipher Carvana's overall profitability of

4   retail sales on their own.  These per-vehicle operations expenses, which were only separately

5   broken out and quantified for the first time after the Class Period, included material costs

6   associated with completing a retail sale, such as the full cost to ship a car to a customer and

7   title and registration costs.  By intentionally hiding these significant costs, investors were left

8   to rely on the Retail GPU reported by Defendants (*a positive Retail GPU of $1,857*) as the

9   sole measure of Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However,

10  had Carvana included these operations expenses in its Retail GPU calculation or separately

11  disclosed and quantified the per-vehicle costs associated with completing retail sales that had

12  been excluded from reported Retail GPU, ***Carvana would have revealed to investors that,***

13  ***on average, it generated negative unit economics on retail vehicles sales*** Q3 2020, as

14  shown in the chart below.  This created an impression of a state affairs (positive per-vehicle

15  profitability) materially different from the one that actually existed (negative per-vehicle

16  profitability).

17

18  | | **Q3 2020** |
    |---|---|
    | Disclosed Average selling price per retail unit sold | $20,013 |
    | Disclosed Cost of sales per retail unit sold | $18,156 |
    | Disclosed Retail GPU | $1,857 |
    | | |
    | Undisclosed Operations expense per retail unit sold | ~$1,875 |

| Undisclosed Actual total expense per retail unit sold[111] | ~$20,031 |
|---|---|
| Undisclosed Actual negative "unit economics" per retail unit sold [112] | ~($18) |

(b)     After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[113]  Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana *excluded* from Retail GPU during the Class Period and which had *never previously been separately disclosed or quantified for investors*).  Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs.  Rather, Defendants admitted that vehicle operations costs were the *direct per-vehicle costs of completing a vehicle sale* ("[o]perations expenses include the fulfillment, customer service, and transaction expenses associated with

---

[111]  Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[112]  Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[113]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, **multi-car logistics**, **last-mile delivery**, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party transport services**" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, **title and registration**, and finance platform expenses" associated with completing retail vehicle sales.

(c)    Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> **When we think about trying to aim for more profitable sales, what does that mean?**  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying costs of completing a sale**) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

(d)    During Q3 2020, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall

- 206 -

1    profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as

2    detailed below, the disclosures Defendants *did* make regarding SG&A expenses during Q3

3    2020 did more to mislead investors than to provide transparency around Carvana's true

4    profitability per retail vehicle sold (*i.e.*, "unit economics").

5              (i)    ***First***, Defendants' Class Period description of SG&A expenses

6    was so vague that investors could not have discerned that material operations expenses

7    pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included

8    in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the

9    Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and

10   overhead expenses, as is common across all companies.[114]  Defendants, however, omitted the

11   fact that 45% of its total reported SG&A costs were actually not corporate and overhead

12   expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the

13   fulfillment, customer service, and transaction expenses ***associated with completing retail***

14   ***and wholesale vehicle sales***."[115]  Defendants' intentionally opaque SG&A disclosures kept

15   analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A

16   disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst

17   noted "***[w]e (and the investors we spoke with) continue to look for more disclosure on***

18   ***Other SG&A*** . . . [it] is a bit of *a* '***black box***.'"  Likewise, on February 26, 2021, a J.P.

19   Morgan analyst referred to Carvana's disclosure of SG&A expenses as "*[t]he big* '*black*

20   *box*.'"

21             (ii)   ***Second***, beyond Defendants' vague general description of SG&A

22   expenses, any references to certain specific expenses that were included in SG&A during the

23

24   [114] According to Carvana's Q2 2020 10-Q: "Selling, general and administrative ('SG&A')
     expenses ***include expenses associated with advertising and providing customer service to***
25   ***customers***, ***operating our vending machines and hubs***, operating our logistics and
     fulfillment network and ***other corporate overhead expenses, including expenses associated***
26   ***with information technology, product development, engineering, legal, accounting,***
     ***finance, and business development***."

27   [115] 45% represents Q3 2020 total SG&A of $267.8 million compared to Q3 2020
28   approximate total operations expense of $120.8 million.

1    Class Period also painted a materially incomplete picture of which operations expenses had

2    been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

3    SG&A into five high-level categories during the Class Period, with general overhead

4    categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

5    and equity-based compensation"), advertising, and "other" (including "general and

6    administrative expenses such as IT expenses, corporate occupancy, professional services and

7    insurance"), making up over 89% of the total reported SG&A costs in Q3 2020.[116]  The only

8    specific SG&A category disclosed by Defendants that was loosely tied to Carvana's post-

9    Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were directly

10   "associated with completing retail and wholesale vehicle sales") was "logistics."  But even

11   the logistics disclosure was inconsistent with Carvana's post-Class Period disclosures

12   revealing actual per-vehicle operations expenses.[117]

13         (iii)    **Third**, the quantification of any specifically identified operations

14   expenses within SG&A during the Class Period would have certainly left investors with a

15   false impression of which expenses had been excluded from Carvana's Retail GPU

16   calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics)

17   looked like during the Class Period.  For example, the only specific retail vehicle operations

18   expense Defendants obliquely quantified during the Class Period was "logistics" costs,

19   which Defendants vaguely described as encompassing outbound shipping costs.  Carvana

20   disclosed logistics costs of $18.0 million in Q3 2020, or $280 per retail vehicle sold.

21   _____

22   [116] Q3 2020 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and other.

23   [117] Carvana disclosed that the logistics SG&A category, also disclosed as shipping and

24   handling, included "fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees."  This disclosure, however, was inconsistent with Carvana's post-Class Period disclosures revealing operations expenses

25   because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics category – these were overhead costs rather than per-vehicle shipping costs and, thus, were

26   specifically excluded from operations expenses; and (ii) Carvana excluded compensation associated with outbound shipping from the SG&A logistics category but included these

27   expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses disclosed after the Class Period.

28

4890-0865-5022.v1

1    Meanwhile, operations expense per retail vehicle sold totaled approximately $120.8 million

2    in Q3 2020, or $1,875 per vehicle sold.  Defendants did not specifically quantify any other

3    specific vehicle operations expenses in Carvana's Class Period SG&A disclosures.[118]  Thus,

4    at most, investors would have been specifically aware of ***just $280, less than 15%, of the***

5    ***$1,875 in actual per-vehicle operations expenses*** (*i.e.*, costs "associated with completing

6    retail . . . vehicle sales") that materially impacted Carvana's retail vehicles sales profitability

7    ("unit economics").

8           (iv)    ***Fourth***, Defendants' Class Period SG&A disclosures did not

9    break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred

10   variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed

11   expenses that did not significantly change based on the number of units sold).  Operations

12   expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each

13   incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.

14   Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly

15   impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period,

16   analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable

17   versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo

18   analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me

19   through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and

20   then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear

21   response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern

22   over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to

23   become more variable vs fixed in nature."  When Carvana finally disclosed operations

24   expense per retail unit in November 2023, a J.P. Morgan analyst commented that "***the***

25   ***company finally provided disclosure on fixed vs. variable SG&A expenses***."  The same

26   analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures,

---

[118] Title and registration expenses were listed among expenses in the "Other" SG&A category, but were not separately quantified.

4890-0865-5022.v1

1    his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost

2    mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our

3    [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as

4    predominantly fixed and was surprised to learn that, in reality, a significantly higher

5    proportion of Carvana's SG&A expenses were variable operations expenses, which

6    increased with each incremental vehicle sold and negatively impacted Carvana's retail

7    profitability (*i.e.*, unit economics).

8        (e)    The operations expenses that were excluded from Retail GPU (and not

9    separately disclosed or quantified to allow investors to decipher Carvana's overall

10   profitability of retail sales on their own) were directly tied to problems stemming from

11   Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by

12   concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll***

13   ***logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses***, [and]

14   ***title and registration*** . . . expenses" that "were associated with completing retail . . . vehicle

15   sales," Defendants were able to conceal numerous problems from investors, including that:

16   (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's

17   rapid increase in buying cars from customers left it with a glut of low-quality cars that were

18   causing massive logistics constraints and costs; and (iii) Carvana was experiencing

19   significant title and registration issues.

20       (f)    Defendants described that "***[g]rowth in retail GPU was driven by a***

21   ***significant increase in the share of our vehicles sourced from customers***."  Defendants,

22   however, omitted the fact that buying cars from customers was also adversely impacting

23   operations expense and unit economics – another key measure of actual retail profitability.

24   As alleged herein, the rapid increase in buying low-quality cars from customers caused a

25   significant spike in wholesale vehicle sales.  In Q3 2020, Carvana increased its cars bought

26   from customers by 261%.  Meanwhile, wholesale sales made up 20% of the Company's total

27   sales in Q3 2020, as shown in the chart below.  By the following quarter, Q4 2020,

28   Carvana's wholesale sales spiked over 100% year-over-year.

1
2
3
4
5
6
7
8
9



10   Carvana later admitted that it experienced significant logistics constraints and costs
11   stemming from buying cars from customers and the resulting surplus of wholesale vehicle
12   sales.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted the need to
13   "[r]apidly reduce SG&A expense per retail unit sold" (*i.e.*, operations expenses).  Defendants
14   admitted that "[b]uying cars from customers growth" led to "additional wholesale volume"
15   which, in turn, led to "constraints in our nationwide logistics network" and a spike in SG&A
16   logistics costs.  Defendants further disclosed that "wholesale units acquired from customers
17   have . . . increased complexity in our multi-car logistics network."  Nevertheless, the
18   majority of the negative cost impacts of these logistics constraints were not reflected in
19   Carvana's Q3 2020 Retail GPU because Defendants categorized many of these logistics
20   costs as operations expenses, which were buried in SG&A and not separately broken out.
21   Meanwhile, unbeknownst to investors, these costs did contribute to the $1,875 in undisclosed
22   "operations expense per retail unit sold" in Q3 2020 and did negatively impact Carvana's
23   retail unit economics.  Thus, it was materially misleading to describe buying cars from
24   customers as the main "driver" of the purported improvement in Retail GPU – the primary
25   metric Defendants provided for retail profitability – while simultaneously concealing that
26   buying cars from customers was also adversely impacting another key measure of
27   profitability: unit economics per retail vehicle sold.
28

(g)     The fact that Defendants created a misleading impression as to Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further supported by a series of revelations, and corresponding analyst reactions that began during 2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which partially revealed the truth about Carvana's actual profitability, including the operations expenses it had concealed from investors.  For example, Defendants disclosed a quarterly loss of $506 million and explained that they needed to purchase ADESA to "improve our logistics network," and bring down "shipping distances, times, and costs."  Analysts commented on these revelations.  For example, a J.P. Morgan analyst labeled the news "'confidence shattering'" and commented on Carvana's opaque SG&A disclosures, which encompassed operations expenses, stating "'*we do not believe Carvana (CVNA) is likely to get a free pass on SG&A any longer*.'"  Then, in May 2022, Carvana announced that it was laying off approximately 2,500 employees "primarily in operational groups" and issued an updated operating plan that emphasized the need to "*[r]apidly reduce SG&A expense per retail unit sold*" and *make profitability a priority*.  Analysts commented on this surprising news.  For example, on May 21, 2022, *Forbes* cited to several industry analysts who described Carvana's "spendthrift business, *whose growth-at-all-costs mentality undermined business operations and sowed the seeds of its recent layoffs*."  In November 2022, Carvana issued disappointing Q3 2022 financial results and revealed that, unbeknownst to investors, Carvana had been "frequently acquir[ing]" *retail sales* "*that were less profitable* in the immediate period," including "*less profitable sales*" in "markets with *lower profitability* due to long distance from inventory."  Carvana further admitted it was now taking actions "to improve profitability."  Analysts and the media reported on the news regarding Carvana's retail sales profitability.  For example, a Needham & Company analyst noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, *versus prior it was more about selling as many cars as possible*.'"  Another media outlet told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "*[i]t means that the company had historically grown in these markets even though they*

4890-0865-5022.v1

1    *weren't all that attractive. It was growth for growth's sake and not necessarily growth to*

2    *improve profitability*." Finally, on the last day of the Class Period, Defendants revealed that

3    Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead

4    focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).

5    Analysts commented on this disclosure. For example, a Morgan Stanley analyst, on

6    February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's

7    "*[s]hift in strategy away from growth* and towards EBITDA profitability." The same day, a

8    RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations

9    by 32% . . . due in large part to . . . *lower unit economics from cars*." Additionally, a

10    Stephens analyst noted "*we do not foresee the company achieving its targeting unit*

11    *economics this year*."

12    253.   **Statement No. 36**: On May 6, 2021, Jenkins stated on the Carvana Q1 2021

13    earnings call:

14         *Retail GPU declined slightly to $1,211 from $1,265 in Q4,* reflecting a
         continuation of approximately $200 per unit of transitory costs . . . .

15

                          *      *      *

16

17    Q1 retail GPU was largely in line with our expectations when taking into
    account the transitory costs that we talked about in Q4. . . . I think when we

18    look at where we're headed from here, we did call out that we expect the
    majority of those transitory costs that impacted Q4 and Q1 this year to be gone

19    by Q2. And so *that's a tailwind to retail GPU as we move towards 2Q, other
    things being equal. Obviously, overall, we feel really good about our*

20    *progress there* . . . .

21    254.   As detailed below, Statement No. 36 made by Carvana and Jenkins omitted

22    material facts that affirmatively created an impression of a state of affairs that differed in a

23    material way from the one that actually existed.

24         (a)   During the Class Period, Carvana acknowledged that "*[t]he Company's*

25    *primary business objective is to sell used vehicles to retail customers and generate a profit*

26    *doing so*." Thus, Retail GPU, which measured the gross profit Carvana earned per retail

27    vehicle sold (before adding in other ancillary revenue and profit streams such as warranty,

28    insurance, and financing), was a critical metric to investors during the Class Period.

1  Accordingly, on the Q1 2021 earnings call, Defendants reported positive **Retail GPU of**
2  **$1,211** and described "**a tailwind to retail GPU**," which investors viewed as a proxy for
3  Carvana's "unit economics" (*i.e.*, per-vehicle profitability).  However, as alleged herein,
4  Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof.  Carvana
5  did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail
6  GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors
7  could decipher Carvana's overall profitability of retail sales on their own.  These per-vehicle
8  operations expenses, which were only separately broken out and quantified for the first time
9  after the Class Period, included material costs associated with completing a retail sale, such
10  as the full cost to ship a car to a customer and title and registration costs.  By intentionally
11  hiding these significant costs, investors were left to rely on the Retail GPU reported by
12  Defendants (**a positive Retail GPU of $1,211**) as the sole measure of Carvana's retail "unit
13  economics" (*i.e.*, per-vehicle profitability).  However, had Carvana included these operations
14  expenses in its Retail GPU calculation or separately disclosed and quantified the per-vehicle
15  costs associated with completing retail sales that had been excluded from reported Retail
16  GPU, **Carvana would have revealed to investors that, on average, it generated negative**
17  **unit economics on retail vehicles sales** in Q1 2021, as shown in the chart below.  This
18  created an impression of a state affairs (positive per-vehicle profitability) materially different
19  from the one that actually existed (negative per-vehicle profitability).

| | **Q1 2021** |
|---|---|
| Disclosed Average selling price per retail unit sold | $19,469 |
| Disclosed Cost of sales per retail unit sold | $18,258 |
| Disclosed Retail GPU | $1,211 |
| | |

- 214 -

| Undisclosed Operations expense per retail unit sold | $2,055 |
|---|---|
| Undisclosed Actual total expense per retail unit sold[119] | $20,313 |
| Undisclosed Actual negative "unit economics" per retail unit sold[120] | ~($844) |

(b)     After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[121]  Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana *excluded* from Retail GPU during the Class Period and which had *never previously been separately disclosed or quantified for investors*).  Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate

---

[119]  Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[120]  Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[121]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he continued included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

overhead expenses like typical SG&A costs.  Rather, Defendants admitted that vehicle operations costs were the ***direct per-vehicle costs of completing a vehicle sale*** ("[o]perations expenses include the fulfillment, customer service, and transaction expenses associated with completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, ***multi-car logistics***, ***last-mile delivery***, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll ***logistics expenses***, including fuel, repairs and maintenance, and ***third-party transport services***" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, ***title and registration***, and finance platform expenses" associated with completing retail vehicle sales.

(c)    Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

- 216 -

4890-0865-5022.v1

(d)     During Q1 2021, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as detailed below, the disclosures Defendants **did** make regarding SG&A expenses during Q1 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per retail vehicle sold (*i.e.*, "unit economics").

(i)     ***First***, Defendants' Class Period description of SG&A expenses was so vague that investors could not have discerned that material operations expenses pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and overhead expenses, as is common across all companies.[122]  Defendants, however, omitted the fact that 48% of its total reported SG&A costs were actually not corporate and overhead expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the fulfillment, customer service, and transaction expenses ***associated with completing retail and wholesale vehicle sales***."[123]  Defendants' intentionally opaque SG&A disclosures kept analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst noted "***[w]e (and the investors we spoke with) continue to look for more disclosure on Other SG&A*** . . . [it] is a bit of ***a 'black box.***'"  Likewise, on February 26, 2021, a J.P.

---

[122] According to Carvana's Q2 2020 10-Q: "Selling, general and administrative ('SG&A') expenses ***include expenses associated with advertising and providing customer service to customers***, ***operating our vending machines and hubs***, operating our logistics and fulfillment network and ***other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development***."

[123] 48% represents Q1 2021 total SG&A costs of $397 million compared to Q1 2021 total operations expense of $190 million.

1  Morgan analyst referred to Carvana's disclosure of SG&A expenses as "*[t]he big 'black*

2  *box*.'"

3          (ii)    *Second*, beyond Defendants' vague general description of SG&A

4  expenses, any references to certain specific expenses that were included in SG&A during the

5  Class Period also painted a materially incomplete picture of which operations expenses had

6  been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

7  SG&A into five high-level categories during the Class Period, with general overhead

8  categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

9  and equity-based compensation"), advertising, and "other" (including "general and

10  administrative expenses such as IT expenses, corporate occupancy, professional services and

11  insurance"), making up over 89.2% of the total reported SG&A costs in Q1 2021.[124]  The

12  only specific SG&A category disclosed by Defendants that was loosely tied to Carvana's

13  post-Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were

14  directly "associated with completing retail and wholesale vehicle sales") was "logistics."

15  But even the logistics disclosure was inconsistent with Carvana's post-Class Period

16  disclosures revealing actual per-vehicle operations expenses.[125]

17          (iii)    *Third*, the quantification of any specifically identified operations

18  expenses within SG&A during the Class Period would have certainly left investors with a

19  false impression of which expenses had been excluded from Carvana's Retail GPU

20  calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics)

---

[124] Q1 2021 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and other.

[125] Carvana disclosed that the logistics SG&A category, also disclosed as shipping and handling, included "fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees."  This disclosure, however, was inconsistent with Carvana's post-Class Period disclosures revealing operations expenses because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics category – these were overhead costs rather than per-vehicle shipping costs and, thus, were specifically excluded from operations expenses; and (ii) Carvana excluded compensation associated with outbound shipping from the SG&A logistics category but included these expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses disclosed after the Class Period.

1    looked like during the Class Period.  For example, the only specific retail vehicle operations

2    expense Defendants obliquely quantified during the Class Period was "logistics" costs,

3    which Defendants vaguely described as encompassing outbound shipping costs.  Carvana

4    disclosed logistics costs of $30 million in Q1 2021, or $324 per retail vehicle sold.

5    Meanwhile, operations expense per retail vehicle sold totaled approximately $190 million in

6    Q1 2021, or $2,055 per vehicle sold.  Defendants did not specifically quantify any other

7    specific vehicle operations expenses in Carvana's Class Period SG&A disclosures.[126]  Thus,

8    at most, investors would have been specifically aware of ***just $324, approximately 16%, of***

9    ***the $2,055 in actual per-vehicle operations expenses*** (*i.e.*, costs "associated with completing

10   retail . . . vehicle sales") that materially impacted Carvana's retail vehicles sales profitability

11   ("unit economics").

12                          (iv)    ***Fourth***, Defendants' Class Period SG&A disclosures did not

13   break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred

14   variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed

15   expenses that did not significantly change based on the number of units sold).  Operations

16   expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each

17   incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.

18   Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly

19   impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period,

20   analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable

21   versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo

22   analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me

23   through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and

24   then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear

25   response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern

26   over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to

27   _____

[126] Title and registration expenses were listed among expenses in the "Other" SG&A
28   category, but were not separately quantified.

- 219 -

1  become more variable vs fixed in nature."  When Carvana finally disclosed operations

2  expense per retail unit in November 2023, a J.P. Morgan analyst commented that "***the***

3  ***company finally provided disclosure on fixed vs. variable SG&A expenses***."  The same

4  analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures,

5  his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost

6  mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our

7  [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as

8  predominantly fixed and was surprised to learn that, in reality, a significantly higher

9  proportion of Carvana's SG&A expenses were variable operations expenses, which

10  increased with each incremental vehicle sold and negatively impacted Carvana's retail

11  profitability (*i.e.*, unit economics).

12          (e)     The operations expenses that were excluded from Retail GPU (and not

13  separately disclosed or quantified to allow investors to decipher Carvana's overall

14  profitability of retail sales on their own) were directly tied to problems stemming from

15  Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by

16  concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll***

17  ***logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses***, [and]

18  ***title and registration*** . . . expenses" that "were associated with completing retail . . . vehicle

19  sales," Defendants were able to conceal numerous problems from investors, including that:

20  (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's

21  rapid increase in buying cars from customers left it with a glut of low-quality cars that were

22  causing massive logistics constraints and costs; and (iii) Carvana was experiencing

23  significant title and registration issues.

24          (f)     The fact that Defendants created a misleading impression as to

25  Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further

26  supported by a series of revelations, and corresponding analyst reactions, that began during

27  2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which

28  partially revealed the truth about Carvana's actual profitability, including the operations

1   expenses it had concealed from investors.  For example, Defendants disclosed a quarterly
2   loss of $506 million and admitted they needed to purchase ADESA to "improve our logistics
3   network," and bring down "shipping distances, times, and costs."  Analysts commented on
4   these revelations.  For example, a J.P. Morgan analyst labeled the news "'confidence
5   shattering'" and commented on Carvana's opaque SG&A disclosures, which encompassed
6   operations expenses, stating "'*we do not believe Carvana (CVNA) is likely to get a free pass*
7   *on SG&A any longer*.'"  Then, in May 2022, Carvana announced that it was laying off
8   approximately 2,500 employees "primarily in operational groups" and issued an updated
9   operating plan that emphasized the need to "*[r]apidly reduce SG&A expense per retail unit*
10  *sold*" and *make profitability a priority*.  Analysts commented on this surprising news.  For
11  example, on May 21, 2022, *Forbes* cited to several industry analysts who described
12  Carvana's "spendthrift business, *whose growth-at-all-costs mentality undermined business*
13  *operations and sowed the seeds of its recent layoffs*."  In November 2022, Carvana issued
14  disappointing Q3 2022 financial results and revealed that, unbeknownst to investors,
15  Carvana had been "frequently acquir[ing]" *retail sales* "*that were less profitable* in the
16  immediate period," including "*less profitable sales*" in "markets with *lower profitability* due
17  to long distance from inventory."  Carvana further admitted it was now taking actions "to
18  improve profitability."  Analysts and the media reported on the news regarding Carvana's
19  retail sales profitability.  For example, a Needham & Company analyst noted, "'[t]he path
20  forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis,
21  *versus prior it was more about selling as many cars as possible*.'"  Another media outlet
22  told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because
23  "*[i]t means that the company had historically grown in these markets even though they*
24  *weren't all that attractive.  It was growth for growth's sake and not necessarily growth to*
25  *improve profitability*."  Finally, on the last day of the Class Period, Defendants revealed that
26  Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead
27  focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).
28  Analysts commented on this disclosure.  For example, a Morgan Stanley analyst on

February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's "*[s]hift in strategy away from growth* and towards EBITDA profitability." The same day, a RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by 32% . . . due in large part to . . . *lower unit economics from cars*." Additionally, a Stephens analyst noted "*we do not foresee the company achieving its targeting unit economics this year*."

255.    **Statement No. 37**: On August 5, 2021, Jenkins stated on the Carvana Q2 2021 earnings call:

> [O]n retail GPU, *we had our first quarter over $2,000 retail GPU*. We've come close a couple of times before. I think we've done $1,850 before and $1,700, not including adjustments also in 2020. *But the $2,000 is a record for us*. I think if we think through the drivers, I think maybe it's helpful to think through it sequentially from Q1. *The biggest driver there was certainly the performance [of] buying cars from customers*.
>
> *    *    *
>
> *[W]e feel really great about our retail GPU progress. Buying cars from customers continues to be a strong driver of the improvements in the business*, it's something we're going to look to continue to do going forward.

256.    As detailed below, Statement No. 37 made by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)    During the Class Period, Carvana acknowledged that "*[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so*." Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period. Accordingly, on the Q2 2021 earnings call, Jenkins touted a "*record*" *Retail GPU of $2,022*, which investors viewed as a proxy for Carvana's "unit economics (*i.e.*, per-vehicle profitability). However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof. Carvana did so by: (i) excluding certain per-vehicle

4890-0865-5022.v1

1    operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying

2    these excluded costs separately so investors could decipher Carvana's overall profitability of

3    retail sales on their own.  These per-vehicle operations expenses, which were only separately

4    broken out and quantified for the first time after the Class Period, included material costs

5    associated with completing a retail sale, such as the full cost to ship a car to a customer and

6    title and registration costs.  By intentionally hiding these significant costs, investors were left

7    to rely on the Retail GPU reported by Defendants (*a positive Retail GPU of $2,022*) as the

8    sole measure of Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However,

9    had Carvana included these operations expenses in its Retail GPU calculation or separately

10   disclosed and quantified the per-vehicle costs associated with completing retail sales that had

11   been excluded from reported Retail GPU, *Carvana would have revealed to investors that,*

12   *on average, it generated negative unit economics of $130 per retail unit sold* in Q2 2021, as

13   shown in the chart below.  This created an impression of a state affairs (positive per-unit

14   profitability) materially different from the one that actually existed (negative per-unit

15   profitability).

16

17

18

19

20

21

22

23

| Q2 2021 | |
|---|---|
| Disclosed Average selling price per retail unit sold | $23,225 |
| Disclosed Cost of sales per retail unit sold | $21,203 |
| Disclosed Retail GPU | $2,022 |
| | |
| Undisclosed Operations expense per retail unit sold | $2,152 |

24

25

26

27

28

| | |
|---|---|
| Undisclosed Actual total expense per retail unit sold[127] | $23,355 |
| Undisclosed Actual negative "unit economics" per retail unit sold[128] | ($130) |

(b)    After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[129] Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana *excluded* from Retail GPU during the Class Period and which had *never previously been separately disclosed or quantified for investors*). Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs. Rather, Defendants admitted that vehicle operations costs were the *direct per-vehicle costs of completing a vehicle sale* ("[o]perations

---

[127]  Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[128]  Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[129]  After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the unit economics of the business. In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

expenses include the fulfillment, customer service, and transaction expenses associated with completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, ***multi-car logistics***, ***last-mile delivery***, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll ***logistics expenses***, including fuel, repairs and maintenance, and ***third-party transport services***" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, ***title and registration***, and finance platform expenses" associated with completing retail vehicle sales.

(c)     Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .

> And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

(d)     During Q2 2021, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify

these expenses in a manner that would have allowed investors to decipher the overall profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own. In fact, as detailed below, the disclosures Defendants ***did*** make regarding SG&A expenses during Q2 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per retail vehicle sold (*i.e.*, "unit economics").

(i)    ***First***, Defendants' Class Period description of SG&A expenses was so vague that investors could not have discerned that material operations expenses pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included in SG&A and excluded from Carvana's Retail GPU calculation. For example, during the Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and overhead expenses, as is common across all companies.[130] Defendants, however, omitted the fact that 49% of its total reported SG&A costs were actually not corporate and overhead expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the fulfillment, customer service, and transaction expenses ***associated with completing retail and wholesale vehicle sales***."[131] Defendants' intentionally opaque SG&A disclosures kept analysts and investors in the dark. In fact, numerous analysts referred to Carvana's SG&A disclosures as a "black box." For example, on April 27, 2020, a Morgan Stanley analyst noted "***[w]e (and the investors we spoke with) continue to look for more disclosure on Other SG&A*** . . . [it] is a bit of ***a 'black box***.'" Likewise, on February 26, 2021, a J.P. Morgan analyst referred to Carvana's disclosure of SG&A expenses as "***[t]he big 'black box***.'"

---

[130] According to Carvana's Q2 2020 10-Q: "Selling, general and administrative ('SG&A') expenses ***include expenses associated with advertising and providing customer service to customers***, ***operating our vending machines and hubs***, operating our logistics and fulfillment network and ***other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development***."

[131] 49% represents Q2 2021 total SG&A costs of $470 million compared to Q2 2021 total operations expense of $232 million.

(ii)    **Second**, beyond Defendants' vague general description of SG&A expenses, any references to certain specific expenses that were included in SG&A during the Class Period also painted a materially incomplete picture of which operations expenses had been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out SG&A into five high-level categories during the Class Period, with general overhead categories like compensation ("all payroll and related costs, including benefits, payroll taxes, and equity-based compensation"), advertising, and "other" (including "general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance"), making up over 85% of the total reported SG&A costs in Q2 2021.[132]  The only specific SG&A category disclosed by Defendants that was loosely tied to Carvana's post-Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were directly "associated with completing retail and wholesale vehicle sales") was "logistics."  But even the logistics disclosure was inconsistent with Carvana's post-Class Period disclosures revealing actual per-vehicle operations expenses.[133]

(iii)    **Third**, the quantification of any specifically identified operations expenses within SG&A during Q2 2021 would have certainly left investors with a false impression of which expenses had been excluded from Carvana's Retail GPU calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics) looked like during the Class Period.  For example, the only specific retail vehicle operations expense Defendants obliquely quantified during the Class Period was "logistics" costs, which

---

[132]  Q2 2021 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and other.

[133]  Carvana disclosed that the logistics SG&A category, also disclosed as shipping and handling, included "fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees."  This disclosure, however, was inconsistent with Carvana's post-Class Period disclosures revealing operations expenses because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics category – these were overhead costs rather than per-vehicle shipping costs and, thus, were specifically excluded from operations expenses; and (ii) Carvana excluded compensation associated with outbound shipping from the SG&A logistics category but included these expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses disclosed after the Class Period.

1    Defendants vaguely described as encompassing outbound shipping costs.  Carvana disclosed

2    logistics costs of $34 million in Q2 2021, or $315 per retail vehicle sold.  Meanwhile,

3    operations expense per retail vehicle sold totaled approximately $232 million in Q2 2021, or

4    $2,152 per vehicle sold.  Defendants did not specifically quantify any other specific vehicle

5    operations expenses in Carvana's Class Period SG&A disclosures.[134]  Thus, at most,

6    investors would have been specifically aware of *just $315, less than 15%, of the $2,152 in*

7    *actual per-vehicle operations expenses* (*i.e.*, costs "associated with completing retail . . .

8    vehicle sales") that materially impacted Carvana's retail vehicles sales profitability ("unit

9    economics").

10                    (iv)    *Fourth*, Defendants' Class Period SG&A disclosures did not

11   break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred

12   variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed

13   expenses that did not significantly change based on the number of units sold).  Operations

14   expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each

15   incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.

16   Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly

17   impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period,

18   analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable

19   versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo

20   analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me

21   through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and

22   then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear

23   response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern

24   over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to

25   become more variable vs fixed in nature."  When Carvana finally disclosed operations

26   expense per retail unit in November 2023, a J.P. Morgan analyst commented that "*the*

27   ────────────────────

[134] Title and registration expenses were listed among expenses in the "Other" SG&A
28   category, but were not separately quantified.

1  *company finally provided disclosure on fixed vs. variable SG&A expenses*."  The same

2  analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures,

3  his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost

4  mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our

5  [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as

6  predominantly fixed and was surprised to learn that, in reality, a significantly higher

7  proportion of Carvana's SG&A expenses were variable operations expenses, which

8  increased with each incremental vehicle sold and negatively impacted Carvana's retail

9  profitability (*i.e.*, unit economics).

10          (e)     The operations expenses that were excluded from Retail GPU (and not

11  separately disclosed or quantified to allow investors to decipher Carvana's overall

12  profitability of retail sales on their own) were directly tied to problems stemming from

13  Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by

14  concealing a complete picture of "*multi-car logistics*, *last-mile delivery . . . [n]on-payroll*

15  *logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses*, [and]

16  *title and registration* . . . expenses" that "were associated with completing retail . . . vehicle

17  sales," Defendants were able to conceal numerous problems from investors, including that:

18  (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's

19  rapid increase in buying cars from customers left it with a glut of low-quality cars that were

20  causing massive logistics constraints and costs; and (iii) Carvana was experiencing

21  significant title and registration issues.

22          (f)     Defendants touted that "[t]he biggest driver [of the purported

23  improvement in retail sales profitability] was certainly. . . buying cars from customers" as

24  "[b]uying cars from customers continues to be a strong driver of the improvements in the

25  business."  Defendants, however, omitted the fact that buying cars from customers was also

26  adversely impacting operations expense and unit economics – another key measure of actual

27  retail profitability.  As alleged herein, the rapid increase in buying low-quality cars from

28  customers caused a significant spike in wholesale vehicle sales.  In Q2 2021, wholesale sales

growth had spiked to over 500% year-over-year, far outpacing retail sales growth, as shown in the first chart below. Meanwhile, wholesale sales made up made up 30% of the Company's total sales in Q2 2021, as shown in the second chart below.

 

Carvana later admitted that it experienced significant logistics constraints and costs as a result of buying cars from customers and its corresponding surplus of wholesale vehicle sales. For example, in Carvana's May 2022 Operating Plan, Defendants admitted the need to "[r]apidly reduce SG&A expense per retail unit sold" (*i.e.*, operations expenses). Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network" and a spike in SG&A logistics costs. Defendants further disclosed that "wholesale units acquired from customers have . . . increased complexity in our multi-car logistics network." Nevertheless, the majority of the negative cost impacts of these logistics constraints were not reflected in Carvana's Q2 2021 Retail GPU because Defendants categorized many of the logistics costs as operations expenses, which were buried in SG&A and not separately broken out. Meanwhile, unbeknownst to investors, these costs did contribute to the $2,152 in undisclosed "operations expense per retail unit sold" in Q2 2021 and did negatively impact Carvana's retail unit economics. Thus, it was materially misleading to describe buying cars from customers as the main "driver" of the purported improvement in Retail GPU, the primary metric Defendants provided for retail profitability, while simultaneously concealing that

1    buying cars from customers was also adversely impacting another key measure of

2    profitability: unit economics per retail vehicle sold.

3           (g)    The fact that Defendants created a misleading impression as to

4    Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further

5    supported by a series of revelations, and corresponding analyst reactions, that began during

6    2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which

7    partially revealed the truth about Carvana's actual profitability, including the operations

8    expenses it had concealed from investors.  For example, Defendants disclosed a quarterly

9    loss of $506 million and explained that they needed to purchase ADESA to "improve our

10   logistics network," and bring down "shipping distances, times, and costs."   Analysts

11   commented on these revelations.  For example, a J.P. Morgan analyst labeled the news

12   "'confidence shattering'" and commented on Carvana's opaque SG&A disclosures, which

13   encompassed operations expenses, stating: "'***we do not believe Carvana (CVNA) is likely to***

14   ***get a free pass on SG&A any longer***.'"   Then, in May 2022, Carvana announced that it was

15   laying off approximately 2,500 employees "primarily in operational groups" and issued an

16   updated operating plan that emphasized its need to "*[r]apidly reduce SG&A expense per*

17   *retail unit sold*" (*i.e.*, operations expenses) and ***make profitability a priority***.  Analysts

18   commented on this surprising news.  For example, on May 21, 2022, *Forbes* cited to several

19   industry analysts who described Carvana's "spendthrift business, ***whose growth-at-all-costs***

20   ***mentality undermined business operations and sowed the seeds of its recent layoffs***."  In

21   November 2022, Carvana issued disappointing Q3 2022 financial results and revealed that,

22   unbeknownst to investors, Carvana had been "frequently acquir[ing]" ***retail sales*** "***that were***

23   ***less profitable*** in the immediate period," including "***less profitable sales***" in "markets with

24   ***lower profitability*** due to long distance from inventory."  Carvana further admitted it was

25   now taking actions "to improve profitability."  Analysts and the media reported on the news

26   regarding Carvana's retail sales profitability.  For example, a Needham & Company analyst

27   noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a

28   profitable basis, ***versus prior it was more about selling as many cars as possible***.'"  Another

media outlet told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "***[i]t means that the company had historically grown in these markets even though they weren't all that attractive.  It was growth for growth's sake and not necessarily growth to improve profitability***."  Finally, on the last day of the Class Period, Defendants revealed that Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).  Analysts commented on this disclosure.  For example, a Morgan Stanley analyst, on February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's "***[s]hift in strategy away from growth*** and towards EBITDA profitability."  The same day, a RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by 32% . . . due in large part to . . . ***lower unit economics from cars***."  Additionally, a Stephens analyst noted "***we do not foresee the company achieving its targeting unit economics this year***."

257.  **Statement No. 38**: On November 4, 2021, Jenkins stated on the Carvana Q3 2021 earnings call:

> ***Retail GPU was $1,769,*** a decrease of $88.  ***The change in retail GPU was*** primarily driven by higher reconditioning costs, in part resulting from the impact of the Delta variant on production throughput, and higher wholesale acquisition prices, ***partially offset by higher customer-sourced ratio***.
>
> *        *        *
>
> So ***we had a strong quarter on retail GPU in Q3, came in at $1,769***.

258.  As detailed below, Statement No. 38 made by Carvana and Jenkins omitted material facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)  During the Class Period, Carvana acknowledged that "***[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so***."  Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric to investors during the Class Period.

- 232 -

1  Accordingly, on the Q3 2021 earnings call, Defendants disclosed **Retail GPU of $1,769 and**

2  **described that it was a "*strong quarter on retail GPU*,**" which investors viewed as a proxy

3  for Carvana's retail "unit economics" (*i.e.*, per-vehicle profitability).  However, as alleged

4  herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof.

5  Carvana did so by: (i) excluding certain per-vehicle operations expenses from its calculation

6  of Retail GPU; and (ii) not disclosing or quantifying these excluded costs separately so

7  investors could decipher Carvana's overall profitability of retail sales on their own.  These

8  per-vehicle operations expenses, which were only separately broken out and quantified for

9  the first time after the Class Period, included material costs associated with completing a

10  retail sale, such as the full cost to ship a car to a customer and title and registration costs.  By

11  intentionally hiding these significant costs, investors were left to rely on the Retail GPU

12  reported by Defendants (***a positive Retail GPU of $1,769***) as the sole measure of Carvana's

13  retail "unit economics" (*i.e.*, per-vehicle profitability).  However, had Carvana included these

14  operations expenses in its Retail GPU calculation or separately disclosed and quantified

15  these per-vehicle costs associated with completing retail sales that had been excluded from

16  reported Retail GPU, ***Carvana would have revealed to investors that, on average, it***

17  ***generated negative unit economics of $696 per retail unit sold*** in Q3 2021, as shown in the

18  chart below.  This created an impression of a state affairs (positive per-unit profitability)

19  materially different from the one that actually existed (negative per-unit profitability).

| | Q3 2021 |
|---|---|
| Disclosed  Average selling price per retail unit sold | $23,671 |
| Disclosed  Cost of sales per retail unit sold | $21,902 |
| Disclosed  Retail GPU | $1,769 |
| | |
| Undisclosed  Operations expense per retail unit sold | $2,465 |

4890-0865-5022.v1

| Undisclosed Actual total expense per retail unit sold[135] | $24,367 |
|---|---|
| Undisclosed Actual negative "unit economics" per retail unit sold[136] | ($696) |

(b)     After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[137] Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana *excluded* from Retail GPU during the Class Period and which had *never previously been separately disclosed or quantified for investors*). Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs. Rather, Defendants admitted that vehicle operations costs were the *direct per-vehicle costs of completing a vehicle sale* ("[o]perations expenses include the fulfillment, customer service, and transaction expenses associated with

---

[135] Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[136] Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[137] After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the unit economics of the business. In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ." Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives." Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, ***multi-car logistics***, ***last-mile delivery***, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll ***logistics expenses***, including fuel, repairs and maintenance, and ***third-party transport services***" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, ***title and registration***, and finance platform expenses" associated with completing retail vehicle sales.

(c)     Carvana's concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because Defendants did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a retail sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs "associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

(d)     Defendants' concealment of operations expenses when describing Carvana's retail profitability in Q3 2021 was also misleading because Defendants omitted

that operations expenses were spiking significantly during the second half of FY 2021. In fact, when Defendants disclosed and quantified operations expenses for the first time in November 2023, they revealed that these previously concealed expenses had spiked 75% during the Class Period, as shown in the first chart below.[138] By Q3 2021, the costs had spiked 32% year-over-year as depicted in the second chart below.





(e)      During Q3 2021, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall

---

[138] Source: November 2, 2023 Cost Structure Details presentation. (Emphasis in red added.)

4890-0865-5022.v1

profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as detailed below, the disclosures Defendants *did* make regarding SG&A expenses during Q3 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per retail vehicle sold (*i.e.*, "unit economics").

(i)    ***First***, Defendants' Class Period description of SG&A expenses was so vague that investors could not have discerned that material operations expenses pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and overhead expenses, as is common across all companies.[139]  Defendants, however, omitted the fact that 51% of its total reported SG&A costs were actually not corporate and overhead expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the fulfillment, customer service, and transaction expenses ***associated with completing retail and wholesale vehicle sales***."[140]  Defendants' intentionally opaque SG&A disclosures kept analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst noted "***[w]e (and the investors we spoke with) continue to look for more disclosure on Other SG&A*** . . . [it] is a bit of ***a* '*black box***.'"  Likewise, on February 26, 2021, a J.P. Morgan analyst referred to Carvana's disclosure of SG&A expenses as "***[t]he big* '*black box*.'"

(ii)    ***Second***, beyond Defendants' vague general description of SG&A expenses, any references to certain specific expenses that were included in SG&A during the

---

[139]  According to Carvana's Q2 2020 10-Q: "Selling, general and administrative ('SG&A') expenses ***include expenses associated with advertising and providing customer service to customers***, ***operating our vending machines and hubs***, operating our logistics and fulfillment network and ***other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development***."

[140]  51% represents Q3 2021 total SG&A costs of $546 million compared to Q3 2021 total operations expense of $276 million.

1   Class Period also painted a materially incomplete picture of which operations expenses had

2   been excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

3   SG&A into five high-level categories during the Class Period, with general overhead

4   categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

5   and equity-based compensation"), advertising, and "other" (including "general and

6   administrative expenses such as IT expenses, corporate occupancy, professional services and

7   insurance"), making up over 89.3% of the total reported SG&A costs in Q3 2021.[141]  The

8   only specific SG&A category disclosed by Defendants that was loosely tied to Carvana's

9   post-Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were

10  directly "associated with completing retail and wholesale vehicle sales") was "logistics."

11  But even the logistics disclosure was inconsistent with Carvana's post-Class Period

12  disclosures revealing actual per-vehicle operations expenses.[142]

13          (iii)    ***Third***, the quantification of any specifically identified operations

14  expenses within SG&A during the Class Period would have certainly left investors with a

15  false impression of which expenses had been excluded from Carvana's Retail GPU

16  calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics)

17  looked like during the Class Period.  For example, the only specific retail vehicle operations

18  expense Defendants obliquely quantified during the Class Period was "logistics" costs,

19  which Defendants vaguely described as encompassing outbound shipping costs.  Carvana

20  disclosed logistics costs of $40 million in Q3 2021, or $357 per retail vehicle sold.

21

22  [141] Q3 2021 10-Q: Compensation and benefits, advertising, market occupancy, logistics, and other.

23  [142] Carvana disclosed that the logistics SG&A category, also disclosed as shipping and
24  handling, included "fuel, maintenance and depreciation related to operating our own
    transportation fleet, and third party transportation fees."  This disclosure, however, was
25  inconsistent with Carvana's post-Class Period disclosures revealing operations expenses
    because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics
26  category – these were overhead costs rather than per-vehicle shipping costs and, thus, were
    specifically excluded from operations expenses; and (ii) Carvana excluded compensation
27  associated with outbound shipping from the SG&A logistics category but included these
    expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses
28  disclosed after the Class Period.

4890-0865-5022.v1

1    Meanwhile, operations expense per retail vehicle sold totaled approximately $276 million in

2    Q3 2021, or $2,465 per vehicle sold.  Defendants did not specifically quantify any other

3    specific vehicle operations expenses in Carvana's Class Period SG&A disclosures.[143]  Thus,

4    at most, investors would have been specifically aware of *just $357, less than 15%, of the*

5    *$2,465 in actual per-vehicle operations expenses* (*i.e.*, costs "associated with completing

6    retail . . . vehicle sales") that materially impacted Carvana's retail vehicles sales profitability

7    ("unit economics") in Q3 2021.

8    (iv)    *Fourth*, Defendants' Class Period SG&A disclosures did not

9    break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred

10   variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed

11   expenses that did not significantly change based on the number of units sold).  Operations

12   expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each

13   incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability.

14   Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly

15   impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period,

16   analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable

17   versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo

18   analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me

19   through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and

20   then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear

21   response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern

22   over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to

23   become more variable vs fixed in nature."  When Carvana finally disclosed operations

24   expense per retail unit in November 2023, a J.P. Morgan analyst commented that "*the*

25   *company finally provided disclosure on fixed vs. variable SG&A expenses*."  The same

26   analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures,

27   ---

[143] Title and registration expenses were listed among expenses in the "Other" SG&A
28   category, but were not separately quantified.

1    his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost

2    mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our

3    [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as

4    predominantly fixed and was surprised to learn that, in reality, a significantly higher

5    proportion of Carvana's SG&A expenses were variable operations expenses, which

6    increased with each incremental vehicle sold and negatively impacted Carvana's retail

7    profitability (*i.e.*, unit economics).

8              (f)    The operations expenses that were excluded from Retail GPU (and not

9    separately disclosed or quantified to allow investors to decipher Carvana's overall

10    profitability of retail sales on their own) were directly tied to problems stemming from

11    Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by

12    concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll***

13    ***logistics expenses . . . third-party transport services . . . [t]ransaction . . . expenses***, [and]

14    ***title and registration*** . . . expenses" that "were associated with completing retail . . . vehicle

15    sales," Defendants were able to conceal numerous problems from investors, including that:

16    (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's

17    rapid increase in buying cars from customers left it with a glut of low-quality cars that were

18    causing massive logistics constraints and costs; and (iii) Carvana was experiencing

19    significant title and registration issues.

20              (g)    In describing the drivers of retail sales profitability, Defendants pointed

21    to a positive impact from buying cars from customers, claiming the decline in Retail GPU

22    "partially ***offset by higher customer-sourced ratio***."  Meanwhile, Defendants omitted the

23    fact that buying cars from customers was also adversely impacting operations expense and

24    unit economics – another key measure of actual retail profitability.  As alleged herein, the

25    rapid increase in buying low-quality cars from customers caused a significant spike in

26    wholesale vehicle sales.  In Q3 2021, wholesale sales growth spiked 261% year-over-year,

27    far outpacing retail sales growth, as shown in the first chart below.  Meanwhile, wholesale

28

4890-0865-5022.v1

1    sales made up over 30% of the Company's total sales in Q3 2021, as shown in the second

2    chart below.

3

4

5

6

7

8

9

10

11





12    Carvana later admitted that it experienced significant logistics constraints and costs as a

13    result of buying cars from customers and its corresponding surplus of wholesale vehicle

14    sales.  For example, in Carvana's May 2022 Operating Plan, Defendants admitted the need to

15    "[r]apidly reduce SG&A expense per retail unit sold" (*i.e.*, operations expenses).  Defendants

16    admitted that "[b]uying cars from customers growth" led to "additional wholesale volume"

17    which, in turn, led to "constraints in our nationwide logistics network" and a spike in SG&A

18    logistics costs.  Defendants further disclosed that "wholesale units acquired from customers

19    have . . . increased complexity in our multi-car logistics network."   Nevertheless, the

20    majority of the negative cost impacts of these logistics constraints were not reflected in

21    Carvana's Q3 2021 Retail GPU because Defendants categorized many of these logistics

22    costs as operations expenses, which were buried in SG&A and not separately broken out.

23    Meanwhile, unbeknownst to investors, these costs did contribute to the $2,465 in undisclosed

24    "operations expense per retail unit sold" in Q3 2021 and did negatively impact Carvana's

25    retail unit economics.  Thus, it was materially misleading to describe buying cars from

26    customers as the main "driver" of the purported improvement in Retail GPU, the primary

27    metric Defendants provided for retail profitability, while simultaneously concealing that

28

1    buying cars from customers was also adversely impacting another key measure of

2    profitability: unit economics per retail vehicle sold.

3              (h)    The fact that Defendants created a misleading impression as to

4    Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further

5    supported by a series of revelations, and corresponding analyst reactions, that began during

6    2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which

7    partially revealed the truth about Carvana's actual profitability, including the operations

8    expenses it had concealed from investors.  For example, Defendants disclosed a quarterly

9    loss of $506 million and explained that they needed to purchase ADESA to "improve our

10   logistics network," and bring down "shipping distances, times, and costs."   Analysts

11   commented on these revelations.  For example, a J.P. Morgan analyst labeled the news

12   "'confidence shattering'" and commented on Carvana's opaque SG&A disclosures, which

13   encompassed operations expenses, stating: "'**we do not believe Carvana (CVNA) is likely to**

14   **get a free pass on SG&A any longer**.'"   Then, in May 2022, Carvana announced that it was

15   laying off approximately 2,500 employees "primarily in operational groups" and issued an

16   updated operating plan that emphasized its need to "*[r]apidly reduce SG&A expense per*

17   *retail unit sold*" (*i.e.*, operations expenses) and **make profitability a priority**.  Analysts

18   commented on this surprising news.  For example, on May 21, 2022, *Forbes* cited to several

19   industry analysts who described Carvana's "spendthrift business, **whose growth-at-all-costs**

20   **mentality undermined business operations and sowed the seeds of its recent layoffs**."  In

21   November 2022, Carvana issued disappointing Q3 2022 financial results and revealed that,

22   unbeknownst to investors, Carvana had been "frequently acquir[ing]" **retail sales** "**that were**

23   **less profitable** in the immediate period," including "**less profitable sales**" in "markets with

24   **lower profitability** due to long distance from inventory."  Carvana further admitted it was

25   now taking actions "to improve profitability."  Analysts and the media reported on the news

26   regarding Carvana's retail sales profitability.  For example, a Needham & Company analyst

27   noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a

28   profitable basis, **versus prior it was more about selling as many cars as possible**.'"  Another

media outlet told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "***[i]t means that the company had historically grown in these markets even though they weren't all that attractive. It was growth for growth's sake and not necessarily growth to improve profitability***." Finally, on the last day of the Class Period, Defendants revealed that Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable). Analysts commented on this disclosure. For example, a Morgan Stanley analyst, on February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's "***[s]hift in strategy away from growth*** and towards EBITDA profitability." The same day, a RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by 32% . . . due in large part to . . . ***lower unit economics from cars***." Additionally, a Stephens analyst noted "***we do not foresee the company achieving its targeting unit economics this year***."

259.  **Statement No. 39**: On February 24, 2022 Jenkins stated on the Carvana Q4 2021 earnings call:

> ***Retail GPU increased by $230 in Q4, primarily driven by an increase in the percentage of retail vehicles sourced from customers***.

260.  As detailed below, Statement No. 39 made by Carvana and Jenkins omitted facts that affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed.

(a)  During the Class Period, Carvana acknowledged that "***[t]he Company's primary business objective is to sell used vehicles to retail customers and generate a profit doing so***." Thus, Retail GPU, which measured the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing), was a critical metric for Carvana during the Class Period. Investors tracked Retail GPU to evaluate the profitability of Carvana's retail vehicle sales. Accordingly, in Q4 2021, Defendants disclosed "***Retail GPU increased by $230 in Q4" to $1,495***, which investors viewed as a proxy for Carvana's "unit economics" (*i.e.*, per-vehicle

profitability). However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof. Carvana did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could decipher Carvana's overall profitability of retail sales on their own. These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material costs associated with completing a retail sale, such as the full cost to ship a car to a customer and title and registration costs. By intentionally hiding these significant costs, investors were left to rely on the Retail GPU reported by Defendants – ***a positive GPU of $1,495 per retail vehicle sold in Q4 2021, and an 18% improvement versus Q4 2020***. However, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified these per-vehicle costs associated with completing retail sales, ***it would have revealed to investors that, on average, Carvana generated negative unit economics of more than $1,248 per retail unit sold*** and retail profitability actually decreased from Q4 2021, as shown in the chart below. This created an impression of a state affairs (positive per-unit profitability and profitability increased) materially different from the one that actually existed (negative per-unit profitability and profitability decreased).

|  | Q4 2020 | Q4 2021 |
|---|---|---|
| Disclosed    Average selling price per retail unit sold | $20,720 | $25,364 |
| Disclosed    Cost of sales per retail unit sold | $19,455 | $23,869 |
| Disclosed    Retail GPU | $1,265 | $1,495 |
| Disclosed    Improvement in profitability per retail unit sold | -- | +18% |
|  |  |  |
| Undisclosed    Operations expense per retail unit sold | $2,200 | $2,743 |

- 244 -

| Undisclosed Actual total expense per retail unit sold[144] | $21,655 | $26,612 |
|---|---|---|
| Undisclosed Actual negative "unit economics" per retail unit sold[145] | ($935) | ($1,248) |
| Undisclosed Actual decline in profitability per vehicle sold | -- | (34%) |

(b)    After the Class Period, Carvana admitted in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that the operations expenses it had concealed from investors during the Class Period were a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).[146]  Specifically, Defendants admitted that, internally, they viewed "two key drivers" of Carvana's "unit economics" (*i.e.*, profitability per retail vehicle sold): (i) retail cost of sales (costs which Carvana included in Retail GPU during the Class Period); and (ii) "operations expenses per retail unit sold" (costs which Carvana *excluded* from Retail GPU during the Class Period and which had *never previously been separately disclosed or quantified for investors*).  Defendants further admitted that, although these vehicle operations expenses had previously been buried and comingled in "SG&A" expenses and excluded from Retail GPU, they were not fixed or corporate overhead expenses like typical SG&A costs.  Rather, Defendants admitted that vehicle operations costs were the *direct per-vehicle costs of completing a vehicle sale* ("[o]perations

---

[144] Actual total expense per retail unit sold reflects the cost of sales per retail unit sold (as disclosed) in addition to the undisclosed operations expense per retail unit sold.

[145] Actual loss per retail unit sold reflects the average vehicle selling price per retail unit sold (as disclosed) less the undisclosed actual total expense per retail unit sold.

[146] After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana."  Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses."  Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

4890-0865-5022.v1

expenses include the fulfillment, customer service, and transaction expenses associated with completing retail and wholesale vehicle sales").  Defendants acknowledged that these previously undisclosed and unquantified vehicle "operations expenses" included:

- "customer care, **multi-car logistics**, **last-mile delivery**, and other operations payroll" associated with completing retail vehicle sales;

- "non-payroll **logistics expenses**, including fuel, repairs and maintenance, and **third-party transport services**" associated with completing retail vehicle sales; and

- "[t]ransaction and other expenses, including limited warranty, **title and registration**, and finance platform expenses" associated with completing retail vehicle sales.

(c)    Carvana's concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "**the underlying costs of completing a sale**" as a critical component of Carvana's actual retail vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> **When we think about trying to aim for more profitable sales, what does that mean?**  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  **There's also kind of variation in the underlying costs of completing a sale**.

Because Defendants did not specifically break out operations expenses (*i.e.*, **the underlying costs of completing a retail sale**), and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's retail vehicle sales, like Garcia Junior did internally.  After the Class Period, in November 2023, Defendants further admitted that, internally, they viewed operations expenses (*i.e.*, costs "associated with completing retail and wholesale vehicle sales" as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).  Garcia Junior also described Carvana's disclosure of operations expenses in November 2023 as "clear evidence" of Carvana's potential profitability.

- 246 -

1    (d)    Defendants touted the increase in Retail GPU in Q4 2021 as a purported

2  improvement in Carvana's per-vehicle profitability, but concealed that another "key driver[]"

3  of per-vehicle profitability, "operations expenses per retail unit sold," had spiked in Q4 2021.

4  In fact, when Defendants disclosed and quantified operations expenses for the first time in

5  November 2023, they revealed that these previously concealed expenses had spiked 75%

6  during the Class Period, as shown in the first chart below.[147]  By Q4 2021, these costs had

7  spiked 49% since Q2 2020, as depicted in the second chart below.



---

[147] *See* Source: Slide from November 2023 Cost Structure Details investor presentation (emphasis in red added).



(e)    During Q4 2021, Defendants included per-vehicle operations expenses in SG&A expenses (rather than Retail GPU), but they did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall profitability (*i.e.*, "unit economics") of Carvana's retail sales on their own.  In fact, as detailed below, the disclosures Defendants **did** make regarding SG&A expenses during Q4 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per retail vehicle sold (*i.e.*, "unit economics").

(i)    ***First***, Defendants' Class Period description of SG&A expenses was so vague that investors could not have discerned that material operations expenses pertaining to Carvana's actual per-vehicle profitability (*i.e.*, "unit economics") were included in SG&A and excluded from Carvana's Retail GPU calculation.  For example, during the Class Period, Defendants emphasized that SG&A costs consisted primarily of corporate and overhead expenses, as is common across all companies.[148]  Defendants, however, omitted the

---

[148] According to Carvana's Q2 2020 10-Q: "Selling, general and administrative ('SG&A') expenses ***include expenses associated with advertising and providing customer service to customers***, ***operating our vending machines and hubs***, operating our logistics and fulfillment network and ***other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development***."

1    fact that 50% of its total reported SG&A costs were actually not corporate and overhead

2    expenses but variable "[o]perations expenses" which, as they later revealed, "include[d] the

3    fulfillment, customer service, and transaction expenses *associated with completing retail*

4    *and wholesale vehicle sales*."[149]  Defendants' intentionally opaque SG&A disclosures kept

5    analysts and investors in the dark.  In fact, numerous analysts referred to Carvana's SG&A

6    disclosures as a "black box."  For example, on April 27, 2020, a Morgan Stanley analyst

7    noted "*[w]e (and the investors we spoke with) continue to look for more disclosure on*

8    *Other SG&A* . . . [it] is a bit of *a 'black box*.'"  Likewise, on February 26, 2021, a J.P.

9    Morgan analyst referred to Carvana's disclosure of SG&A expenses as "*[t]he big 'black*

10   *box*.'"

11           (ii)    *Second*, beyond Defendants' vague general description of SG&A

12   expenses, any references to certain specific expenses that were included in SG&A during Q4

13   2021 also painted a materially incomplete picture of which operations expenses had been

14   excluded from Carvana's Retail GPU calculation.  For example, Defendants broke out

15   SG&A into five high-level categories during the Class Period, with general overhead

16   categories like compensation ("all payroll and related costs, including benefits, payroll taxes,

17   and equity-based compensation"), advertising, and "other" (including "general and

18   administrative expenses such as IT expenses, corporate occupancy, professional services and

19   insurance"), making up over 89% of the total reported SG&A costs in Q4 2021.[150]  The only

20   specific SG&A category disclosed by Defendants that was loosely tied to Carvana's post-

21   Class Period disclosure of per-vehicle operations expenses (*i.e.*, expenses that were directly

22   "associated with completing retail and wholesale vehicle sales") was "logistics."  But even

23

24

25

26   [149]  50% represents FY 2021 total SG&A costs of $2.03 billion compared to FY 2021 total
     operations expense of $1.01 billion.

27   [150]  FY 2021 10-K: Compensation and benefits, advertising, market occupancy, logistics, and

28   other.

- 249 -

1   the logistics disclosure was inconsistent with Carvana's post-Class Period disclosures

2   revealing actual per-vehicle operations expenses.[151]

3              (iii)    *Third*, the quantification of any specifically identified operations

4   expenses within SG&A during the Class Period would have certainly left investors with a

5   false impression of which expenses had been excluded from Carvana's Retail GPU

6   calculation and, thus, what Carvana's actual per-vehicle profitability (*i.e.*, unit economics)

7   looked like during the Class Period.  For example, the only specific retail vehicle operations

8   expense Defendants obliquely quantified during the Class Period was "logistics" costs,

9   which Defendants vaguely described as encompassing outbound shipping costs.  Carvana

10   disclosed logistics costs of $44 million in Q4 2021, or $389 per retail vehicle sold.

11   Meanwhile, operations expense per retail vehicle sold totaled approximately $310 million in

12   Q4 2021, or $2,743 per vehicle sold.  Defendants did not specifically quantify any other

13   specific vehicle operations expenses in Carvana's Q4 2021 SG&A disclosures.[152]  Thus, at

14   most, investors would have been specifically aware of *just $389, less than 15%, of the*

15   *$2,743 in actual per-vehicle operations expenses* (*i.e.*, costs "associated with completing

16   retail . . . vehicle sales") that materially impacted Carvana's retail vehicles sales profitability

17   ("unit economics") in Q4 2021.

18              (iv)    *Fourth*, Defendants' Class Period SG&A disclosures did not

19   break out fixed versus variable SG&A expenses.  Like most companies, Carvana incurred

20   variable expenses (incremental expenses on each unit sold) and overhead expenses (fixed

---

[151] Carvana disclosed that the logistics SG&A category, also disclosed as shipping and handling, included "fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees."  This disclosure, however, was inconsistent with Carvana's post-Class Period disclosures revealing operations expenses because: (i) Carvana included depreciation and amortization expenses in the SG&A logistics category – these were overhead costs rather than per-vehicle shipping costs and, thus, were specifically excluded from operations expenses; and (ii) Carvana excluded compensation associated with outbound shipping from the SG&A logistics category but included these expenses in the per-vehicle shipping costs it incurred and, thus, in operations expenses disclosed after the Class Period.

[152] Title and registration expenses were listed among expenses in the "Other" SG&A category, but were not separately quantified.

expenses that did not significantly change based on the number of units sold).  Operations expenses, *i.e.*, variable costs incurred in completing retail sales, increased with each incremental vehicle sold and, thus, had a direct impact on per-vehicle profitability. Meanwhile, fixed SG&A expenses, such as corporate overhead expenses, did not directly impact the amount of profit Carvana earned on each vehicle it sold.  During the Class Period, analysts asked Defendants for more clarity on per-vehicle operations expenses (*i.e.*, variable versus fixed SG&A costs).  For example, on the Q4 2020 earnings call, a Wells Fargo analyst asked Jenkins: "[C]an you talk about incremental SG&A per unit, and walk me through how to think about the SG&A . . .?  And what is expected to be a fixed cost, . . . and then how much would be a variable cost?"  Tellingly, Jenkins declined to provide a clear response to the question.  On February 26, 2021, a J.P. Morgan analyst expressed concern over the lack of disclosure, stating "we are concerned if this bucket of SG&A is starting to become more variable versus fixed in nature."  When Carvana finally disclosed operations expense per retail unit in November 2023, a J.P. Morgan analyst commented that "***the company finally provided disclosure on fixed vs. variable SG&A expenses***."  The same analyst revealed that, due to the opaque nature of Carvana's Class Period SG&A disclosures, his estimate of fixed versus variable costs was significantly off: "[T]he implied fixed cost mix of ~55-60% . . . was lower than our prior assumption of ~70% that was driving our [earnings model]."  In other words, the analyst had viewed Carvana's SG&A expenses as predominantly fixed and was surprised to learn that, in reality, a significantly higher proportion of Carvana's SG&A expenses were variable operations expenses, which increased with each incremental vehicle sold and negatively impacted Carvana's retail profitability (*i.e.*, unit economics).

(f)    The operations expenses that were excluded from Retail GPU (and not separately disclosed or quantified to allow investors to decipher Carvana's overall profitability of retail sales on their own) were directly tied to problems stemming from Carvana's undisclosed growth-at-any-cost scheme, as described herein.  For example, by concealing a complete picture of "***multi-car logistics***, ***last-mile delivery . . . [n]on-payroll***

*logistics expenses . . . third-party transport services . . . [t]transaction . . . expenses*, [and] *title and registration* expenses" that "were associated with completing retail . . . vehicle sales," Defendants were able to conceal numerous problems from investors, including that: (i) Carvana was boosting retail sales with unprofitable sales in distant markets; (ii) Carvana's rapid increase in buying cars from customers left it with a glut of low-quality cars that were causing massive logistics constraints and costs, and (iii) Carvana was experiencing significant title and registration issues.

(g)     Defendants stated that increase in retail sales profitability was "*driven by an increase in the percentage of retail vehicles sourced from customers*." Meanwhile, Defendants omitted the fact that buying cars from customers was also adversely impacting operations expense and unit economics – another key measure of actual retail profitability. As alleged herein, the rapid increase in buying low-quality cars from customers caused a significant spike in wholesale vehicle sales. In Q4 2021, wholesale sales growth spiked over 100% year-over-year for the fifth straight quarter, far outpacing retail sales growth, as shown in the first chart below. Meanwhile, wholesale sales made up 30% of the Company's total sales in Q3 2021, as shown in the second chart below.




Carvana later admitted that it experienced significant logistics constraints and costs as a result of buying cars from customers and its corresponding surplus of wholesale vehicle sales. For example, in Carvana's May 2022 Operating Plan, Defendants admitted the need to

4890-0865-5022.v1

"[r]apidly reduce SG&A expense per retail unit sold" (*i.e.*, operations expenses).  Defendants admitted that "[b]uying cars from customers growth" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network" and a spike in SG&A logistics costs.  Defendants further disclosed that "wholesale units acquired from customers have . . . increased complexity in our multi-car logistics network."  Nevertheless, the majority of the negative cost impacts of these logistics constraints were not reflected in Carvana's Q4 2021 Retail GPU because Defendants categorized many of these costs as operations expenses, which were buried in SG&A.  Meanwhile, these costs did contribute to the $2,743 in undisclosed "operations expense per retail unit sold" in Q4 2021 and, therefore, negatively impacted Carvana's retail "unit economics" (*i.e.*, overall profitability per retail vehicle sold).  Thus, it was materially misleading to describe buying cars from customers as a driver of an increase in Retail GPU – the only metric Defendants provided for retail profitability in Q4 2021 – while simultaneously concealing that buying cars from customers was also adversely impacting another key measure of profitability: unit economics per retail vehicle sold.

(h)     The fact that Defendants created a misleading impression as to Carvana's actual retail sales profitability, or lack thereof, during the Class Period is further supported by a series of revelations, and corresponding analyst reactions, that began during 2022.  First, in April 2022, Carvana issued disappointing Q1 2022 financial results, which partially revealed the truth about Carvana's actual profitability, including the operations expenses it had concealed from investors.  For example, Defendants disclosed a quarterly loss of $506 million and conceded that Carvana needed to purchase ADESA to "improve our logistics network," and bring down "shipping distances, times, and costs."  Analysts commented on these revelations.  For example, a J.P. Morgan analyst labeled the news "'confidence shattering'" and commented on Carvana's opaque SG&A disclosures, which encompassed operations expenses, stating: "'***we do not believe Carvana (CVNA) is likely to get a free pass on SG&A any longer***.'"  Then, in May 2022, Carvana announced that it was

laying off approximately 2,500 employees "primarily in operational groups" and issued an updated operating plan that emphasized the need to "*[r]apidly reduce SG&A expense per retail unit sold*" (*i.e.*, operations expenses) and *make profitability a priority*.  Analysts commented on this surprising news.  For example, on May 21, 2022, *Forbes* cited to several industry analysts who described Carvana's "spendthrift business, *whose growth-at-all-costs mentality undermined business operations and sowed the seeds of its recent layoffs*."  In November 2022, Carvana issued disappointing Q3 2022 financial results and revealed that, unbeknownst to investors, Carvana had been "frequently acquir[ing]" *retail sales* "*that were less profitable* in the immediate period," including "*less profitable sales*" in "markets with *lower profitability* due to long distance from inventory."  Carvana further admitted it was now taking actions "to improve profitability."  Analysts and the media reported on the news regarding Carvana's retail sales profitability.  For example, a Needham & Company analyst noted, "'[t]he path forward for Carvana is to sell as many cars as possible, but to do so on a profitable basis, *versus prior it was more about selling as many cars as possible*.'"  Another media outlet told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "*[i]t means that the company had historically grown in these markets even though they weren't all that attractive.  It was growth for growth's sake and not necessarily growth to improve profitability*."  Finally, on the last day of the Class Period, Defendants revealed that Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).  Analysts commented on this disclosure.  For example, a Morgan Stanley analyst on February 24, 2023, explained that "4Q was a sizeable miss," and commented on Carvana's "*[s]hift in strategy away from growth* and towards EBITDA profitability."  The same day, a RBC Capital Markets analyst also noted that Carvana's GPU "miss[ed] Street expectations by 32% . . . due in large part to . . . *lower unit economics from cars*."  Additionally, a Stephens analyst noted "*we do not foresee the company achieving its targeting unit economics this year*."

- 254 -

# VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER

## A.    Insider Stock Sales Support a Motive to Commit Fraud

261.    Defendants were highly motivated to engage in their fraudulent scheme and course of conduct to sell nearly 14.3 million shares of Carvana stock for proceeds of nearly $3.76 billion.  Notably, Garcia Senior and Jenkins sold 13.7 million shares – worth nearly $3.6 billion – *before* the first partial disclosure of Defendants' scheme to defraud or misrepresentations and omissions.

### 1.    Garcia Senior's Class Period Sales and Insider Trading

262.    Garcia Senior was motivated to work hand-in-glove with his son, Garcia Junior, to manipulate Carvana's stock price.  Indeed, he sold 13.95 million shares of his personally held Carvana stock at prices as high as $376.55 per share – 43 times Carvana's stock price at the close of the Class Period – for nearly ***$3.7 billion in total proceeds***.

263.    The amount and time of Garcia Senior's sales were highly suspicious.  For example, all of his 13.95 million sales – 15% of his substantial shareholdings – were sold in a concentrated period between October 30, 2020 and August 23, 2021, when he sold every single trading day.[153]  Suspiciously, Garcia Senior chose to sell for only nine trading days following the first partial corrective disclosure; as noted by the media in the following fourteen months ***as Carvana's stock price collapsed, Garcia Senior never sold again during the Class Period***.  Remarkably, ***Garcia Sr. sold 96% of his Carvana stock before the first corrective disclosure***.[154]

264.    In stark contrast to his Class Period sales, in the nearly three years since Carvana's IPO, ***Garcia Senior did not sell a single share of his Carvana personal holdings***.  Rather, he sold fewer than 10.9 million shares of Carvana stock that he owned indirectly through DriveTime (of which Garcia Junior and his children own nearly a quarter through a

---

[153] Garcia Senior's first sale, which came ***after*** Defendants had pumped Carvana's stock more than 114% since the start of the Class Period, was larger than all his other sales.

[154] John Hyatt, *Carvana CEO's Net Worth Skids But His Dad, Who Controls Company, Is Worth Nearly $3 Billion*, Forbes (Dec. 8, 2022) (the "December 8, 2022 *Forbes* article").

4890-0865-5022.v1

1    trust) or his company Verde Investments for proceeds of $456.3 million – only 12% of the

2    personal proceeds he realized during the Class Period.[155]

3        265.    Further, during the Class Period, Garcia Senior sold ***two million shares outside***

4    ***of his trading plan***, enabling him to pocket $478.4 million as Carvana's stock price soared in

5    December 2020 as a result of the pump-and-dump scheme.  In addition, Garcia Senior's

6    trades pursuant to his 10b5-1 trading plan also support a strong inference as he modified his

7    June 15, 2020 10b5-1 plan ***twice*** within a year of its adoption date to ***accelerate*** the number

8    of shares he could sell at artificially inflated prices.  Indeed, on November 4, 2020 – less than

9    four days after his first trade and less than five months into his new 10b5-1 trading plan –

10   Garcia Senior modified his trading plan while in possession of MNPI to "adjust certain

11   minimum trading price conditions," which accelerated the rate per day at which he could sell

12   his Carvana shares to unsuspecting investors.  *See* Carvana's SEC Form SC 13D/A, filed on

13   November 6, 2020.  Worse, less than six months after this suspicious modification, Garcia

14   Senior modified his trading plan for a second time on May 20, 2021 – at the height of the

15   scheme – to accelerate the number of shares he could sell per day.  In fact, the day after this

16   modification became effective and the stock price reached $300 as a result of the scheme,

17   Garcia Senior began selling 60,000 Carvana shares per day, as compared to 30,000 a day –

18   his trading rate before any modifications.  As shown below, Garcia Senior sold the vast

19   majority of his stock during the Class Period outside of a 10b5-1 plan altogether or pursuant

20   to these modified plans.

21

22

23

24

25

26

27

28

---

[155]  Because DriveTime and Verde are private companies, complete information regarding
their ownership is unavailable.

4890-0865-5022.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    266.    Academics noted the unusual and suspicious nature of Garcia Senior's

17  modifications.  For example, as reported in a September 17, 2021 *The Wall Street Journal*

18  article, Professor Taylor of the Wharton School of Business explained that Garcia Senior's

19  frequent modification of his plan raises serious red flags: "'I've studied 20,000 10b5-1 plans,

20  [and] I can't recall another of this size where there are modifications every six months.'"

21  Unsurprisingly, Professor Taylor stated: "'***What I'm saying is the Garcias knew it was***

22  ***short-lived . . . . The Garcias knew the music would eventually end***.'"[156]  Additionally, in

23  the December 8, 2022 *Forbes* Article, David F. Larcker, a professor of accounting at

24  Stanford Graduate School of Business, told *Forbes*: "The active modification of a 10b5-1

25
26
27  ────────────────

28  [156] *See* John Hyatt, *Carvana's 'Chaotic' Zoom Firing Caps Company's Struggles Amid Market Downturn*, Forbes (May 21, 2022).

1    plan raises the question of whether someone is trying to rebalance their portfolio, time the

2    market, . . . or are they doing it for other reasons that may not pass regulatory scrutiny."[157]

3        267.    In sum, Garcia Senior's sales of a significant amount of his personal Carvana

4    shareholdings at artificially inflated prices while he was actively engaged in the fraudulent

5    scheme detailed herein and before the partial disclosures began further provides a compelling

6    inference of scienter.

7                    **2.    Jenkins's Class Period Sales and Insider Trading**

8        268.    During the Class Period, Jenkins sold 336,922 shares of his Carvana stock,

9    48% of his holdings, for proceeds of over $79 million.  These sales all occurred between

10   August 7, 2020 and November 8, 2021, just as Carvana's stock peaked.[158]  In the nearly three

11   years since Carvana's IPO, Jenkins sold 13,000 fewer shares of his Carvana stock for

12   proceeds of only $18.5 million – only 23% of the proceeds he realized during the Class

13   Period.  Moreover, Jenkins's annual salary for the fiscal year ended December 31, 2020 was

14   $384,395.  Thus, the proceeds from his insider sales during the Class Period were ***over 206***

15   ***times the amount he received in salary***.  His sales can be seen in the following chart:

16

17

18

19

20

21

22

---

23   [157]  In the April 2022 Offering, Garcia Senior purchased 5.1 million shares of Carvana stock

24   for $408 million and Garcia Junior purchased 2 million shares for $160 million.  Their
     purchases were necessary to ensure the execution of that offering.  Garcia Senior also

25   purchased on June 10, 2022 (793,790 shares for $17.4 million) and on June 13, 2022 (less
     than 1.2 million shares for $24.6 million) to artificially inflate Carvana's stock price and

26   once again dump his over-valued shares.

27   [158]  Following November 8, 2021, Jenkins made one additional sale during the Class Period
     on February 1, 2022.  On this day, Jenkins sold a mere 7 shares for $1,153.46, which were

28   required sales to pay tax withholdings upon vesting of restricted stock units.

4890-0865-5022.v1

1



**Jenkins's Insider Sales**

2
3
4
5
6
7
8
9
10
11
12
13
14
15

16   269.   Further, the timing of Jenkins's trades are suspicious.  After adopting a new

17   10b5-1 plan on June 15, 2020, Jenkins made his first sale on August 7, 2020 – an outsized

18   sale of 190,000 Carvana shares for proceeds of $38.5 million.  Nine months later, Jenkins

19   adopted another 10b5-1 plan on March 15, 2021.  There is no doubt that Jenkins was in

20   possession of MNPI at the time he entered his second plan in nine months.  Indeed, Jenkins

21   had been meeting with the Board about title and registration issues since July 2020.  *See,*

22   *e.g.*, Ex. 1.  Moreover, unbeknownst to investors, Ohio had already fined Carvana and

23   suspended its license, and MDOS was set to meet with Carvana's executives within days of

24   his adoption ***after*** an investigation.  By the time that this information was revealed Jenkins

25   had already sold $79.2 million worth of his Carvana stock.  In sum, Jenkins's sales of a

26   significant amount of his personal Carvana shareholdings at artificially inflated prices while

27   he was actively engaged in the fraudulent scheme and made materially misleading statements

28   and omissions detailed herein further provides a compelling inference of scienter.

- 259 -

**B.    Defendants' 10b5-1 Plans Support a Strong Inference of Scienter**

270.    Although Garcia Senior and Jenkins each had a 10b5-1 trading plan in place during the Class Period, they manipulated those plans while in possession of MNPI, which further supports a strong inference of scienter.  Indeed, during the Class Period, Jenkins adopted two new plans within nine months; and Garcia Senior adopted a new plan, modified his new plan, modified his plan again, and traded millions of shares outside of his modified plan in less than one year.  Thus, at every point that Defendants made the decision to trade, they were aware of and participating in the Company's pump-and-dump scheme and/or the falsity of their statements.

271.    Rule 10b5-1 was intended to provide a mechanism for insiders to sell while not in possession of MNPI.  By attempting to commit insiders to a predetermined plan, it moves the relevant date at which the insider possessed material information from the date of the trade to the date when the trade was planned.  However, this purpose has frequently been circumvented.  A January 19, 2021 Stanford study, entitled "Gaming the System: Three "Red Flags" of Potential 10b5-1 Abuse," that examined over 20,000 10b5-1 plans between January 2016 and May 2020 found that a 10b5-1 plan would perform demonstrably better than its counterparts when it had shorter periods between adoption or modification and the first trade, which allows insiders to "systematically avoid losses."  The Stanford study concluded that shorter periods between adoption or modification and the first trade were red flags of an insider abusing his 10b5-1 plan.  Additionally, a June 29, 2022 *The Wall Street Journal* article entitled "CEO Stock Sales Raise Questions About Insider Trading," analyzed 75,000 sales by corporate insiders from 2016 through 2021 and found that "insiders who sold within 60 days [of plan adoption] reaped $500 million more in profits than they would have if they sold three months later."

272.    This manipulation, which defeats the purpose of a trading plan, has prompted the SEC and the Department of Justice ("DOJ") to take recent action.  For example, in a March 1, 2023 DOJ press release, the DOJ indicted a CEO for insider trading "exclusively on [his] use of Rule 10b5-1 trading plans," explaining it "'will not allow corrupt executives

- 260 -

1  to misuse 10b5-1 plans as a shield for insider trading.'"  Further, the SEC effectively

2  amended the Rule on February 26, 2023 to "target corporate insider trading" and "remove

3  many of the loopholes that allowed corporate insiders to hide behind these trading plans."[159]

4  Notably, under these new rules, executives have to wait at least 90 days after starting or

5  modifying a 10b5-1 plan *before* they can trade under the plan.  *Id.*  Tellingly, certain sales by

6  both Garcia Senior and Jenkins during the Class Period would have been impermissible

7  under this new rule.

8      273.    Because Garcia Senior and Jenkins manipulated their 10b5-1 plans to defeat

9  the very purpose of Rule 10b5-1, their plans provide even further evidence of an already

10  compelling inference of scienter.

11      **C.    Multiple Confidential Witnesses Raised Quality, Indiscriminate
           Growth, and Title Problems with Managers, Including Garcia
12         Junior and Jenkins**

13      274.    As the confidential witness accounts demonstrate, Defendants knew or

14  recklessly disregarded that Carvana had lowered its purchasing and verification standards

15  when buying cars from customers to induce trade-ins to boost retail sales and concealed this

16  information from investors.  Defendants also knew or recklessly disregarded that the rapid

17  increase in buying cars from customers caused a spike in the number of cars that Carvana

18  was forced to sell wholesale at a loss.  Indeed, Garcia Junior and Jenkins participated in calls

19  and attended meetings at which the low quality of cars being purchased from customers was

20  frequently raised and discussed.

21      275.    For example, CW-5 attended a leadership summit with all Market Operations

22  Managers and senior leadership, including Garcia Junior, in April 2022 at Carvana's

23  headquarters.  During a Q&A session with Garcia Junior, CW-5 recalled that someone asked

24

25  ───────────────────
   [159]  Jonathan Weil, *New SEC Rules Target Corporate Insider Trading: Loopholes will close*
26  *for executives selling company stock*, Wall St. J. (Feb. 13, 2023).  Under these new rules,
   Garcia Senior and Jenkins would have had to certify that at the time of the adoption of their
27  new or modified plans they were: (1) not aware of MNPI about the issuer or its securities;
   and (2) adopting the plan in good faith and not as part of a plan or scheme to evade the
28  prohibitions of Rule 10b-5.

4890-0865-5022.v1

1    about what was going to be done regarding the quality issues affecting the vehicles that the

2    hubs were receiving from the IRCs.

3        276.    CW-11, too, attended a meeting where the poor quality of vehicles purchased

4    from customers was discussed with Garcia Junior. Further, employees at CW-11's level and

5    market team leaders attended Zoom calls with the Company's C-level executives (including

6    Garcia Junior) probably every quarter. On one of these Zoom calls in early 2021 attended by

7    Garcia Junior, an attendee expressed concern about the poor quality of the cars Carvana was

8    purchasing. According to CW-11, one of the C-level executives responded: Carvana was

9    "just worried about growth and not procedural" operations. CW-11 recalled that this same

10   C-level executive spoke about the paramount importance of growth on that call. There was

11   time for questions and answers at the end of these calls, and during every call someone in a

12   market operations role complained about the poor quality of the vehicles they received from

13   the IRCs. CW-11 said that this was the number one complaint from the operations side of

14   the business.

15       277.    Other confidential witnesses raised concerns about the eroding purchasing

16   standards and the mounting costs of excess inventory with director-level employees at

17   Carvana. Around the fall and winter of 2021, CW-8's team began to raise concerns about

18   the high level of inventory to director-level employees because it was becoming difficult to

19   sell certain types of vehicles and CW-8's team had to lower prices and margins were

20   decreasing. CW-8's team had weekly meetings every Thursday with an Associate Director

21   where they would go over each segment and provide inventory updates. CW-8's teammates

22   raised concerns about the excess inventory in a couple of these meetings and one of his/her

23   coworkers, who was a Financial Analyst, made a report about this topic. However, CW-8's

24   team's concerns were ignored, and the Buyers were told to continue buying vehicles.

25   Likewise, CW-1 said that, after operating under the directive "to purchase as much as was

26   humanly possible," which resulted in Carvana purchasing "everything" regardless of the

27   quality, Carvana's subpar and bloated inventory issues were "obvious to anyone with eyes."

28

1    Finally, when CW-2 reported his/her concerns that Carvana was purchasing vehicles that
2    were "not safe to drive," "leadership would say take it" anyway.

3         278.    In addition, the confidential witness accounts demonstrate that Defendants
4    knew or recklessly disregarded that Carvana was overrun with low-quality wholesale cars
5    and did not have a "capital-light" expansion model, such that Carvana had to issue billions of
6    dollars of high-interest junk bonds to acquire a nationwide auction house, ADESA.  In fact,
7    CW-12 met with Garcia Junior, who informed CW-12 that Carvana's management team
8    needed ADESA's reconditioning centers located nationwide.  CW-4 and CW-7 also stated
9    that Carvana's acquisition of ADESA was part of Carvana's expansion efforts.

10         279.    The confidential witness accounts also show that Defendants knew or
11    recklessly disregarded that, in order to boost sales, Carvana purchased cars without title and
12    sold cars before it held title to those cars.  For example, CW-9 described attending an all-
13    hands call in January 2022 in which employees told Garcia Junior that they were being
14    inundated with calls regarding registration problems.  In addition, CW-3 discussed the title
15    problems with his/her manager and at weekly meetings with the Director of Wholesale, but
16    the Company brushed off CW-3's concerns.  CW-10 also raised the title problems with a
17    supervisor and then with a manager.

18    **D.    The Fraud Involved the Company's Core Operations, About
19         Which Defendants Held Themselves Out as Knowledgeable**

20         280.    Throughout the Class Period, Garcia Junior and Jenkins were CEO and CFO,
21    respectively.   Moreover, as discussed in more detail below (§VIII.H.), Garcia Senior
22    controlled Carvana's policies and operations.  By virtue of their management and/or control
23    of the Company's operations and their access to confidential proprietary information
24    concerning the Company's operations and financial results, Defendants either knew about or
25    recklessly disregarded the alleged scheme and course of conduct, including Garcia Junior's
26    and Jenkins's material misstatements and omissions.

27         281.    Defendants' fraudulent course of conduct and material misstatements and
28    omissions concerned the very core of Carvana's operations – retail sales growth – which

1    Defendants emphasized as "the single most important metric in our business."  Indeed,

2    during the Class Period, Jenkins advised the SEC: "The Company's primary business

3    objective is to sell used vehicles to retail customers and generate a profit doing so."[160]

4    Further, Jenkins and Garcia Junior made and approved numerous specific statements

5    regarding the subject of the alleged fraudulent conduct and the information that Plaintiffs

6    allege was false or misleading.  Indeed, Garcia Junior and Jenkins discussed retail unit sales

7    in every shareholder letter, SEC filing, and conference call.  In addition, Garcia Junior and

8    Jenkins discussed Retail GPU in every shareholder letter and conference call.  Moreover,

9    they repeatedly discussed title and registration risks and issues, buying cars from customers,

10   the Company's capital-light, scalable expansion model, and the average days to sale metric

11   with their investors.  These statements evince their knowledge of the subject matter and

12   support a strong inference of scienter.

13        282.    Further, Defendants had actual access to the alleged fraudulent conduct and the

14   information that Plaintiffs allege was false or misleading.  For example, a presentation from

15   a July 2020 Board Meeting attended by Jenkins and Garcia Junior reveals that Carvana had

16   undertaken an initiative "to reduce registration delays," as part of the Company's "Key

17   Focus Areas and Risks."  Ex. 1.  Title and registration violations, including Carvana's

18   suspensions and fines continued to be a prominent topic in every Board meeting until at least

19   December 2021.  *See, e.g.*, Ex. 2 (October 18, 2021 Board Minutes revealing that the Board

20   and Jenkins discussed how they can "explain the NC situation, ***amongst others?***"); *see also*

21   *Schertz*, ECF 23.  Notably, these Board meetings occurred ***before*** every quarterly earnings

22   release and were consistently attended by both Garcia Junior and Jenkins.

23        283.    In addition, Defendants had access to data setting forth the total costs that

24   Carvana incurred to acquire, transport, and otherwise make cars available for sale, as well as

25   the final selling price of the vehicles, from which GPU was derived.  CW-7 explained

26   Carvana used a Tableau data server which was updated daily and which revealed declining

27   _____

28   [160] August 23, 2022 letter from Jenkins to SEC, Division of Corporation Finance.

4890-0865-5022.v1

GPU as the Company increasingly relied on purchasing vehicles from customers. The server also contained data showing an increase in the average number of days on-site, which measures the number of days between procuring and selling a vehicle. CW-8 and his/her team also used Tableau, from which numerous reports could be derived, and Microsoft SQL, which connected to a computer server where data was stored. Using this software enabled CW-8's team to see inventory data and various metrics, including how many vehicles Carvana had in inventory, how long these vehicles had been sitting around without being sold, Carvana's website traffic, and supply/demand ratios.

284. Critically, on November 3, 2022, in response to an analyst, Garcia Junior belatedly admitted that internally he viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's actual retail vehicle profitability. Indeed, Garcia Junior acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?*** There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera. ***There's also kind of variation in the underlying costs of completing a sale***.

Further, after the Class Period, in November 2023, Garcia Junior and Jenkins confirmed that, internally, they viewed operations expenses (*i.e.*, costs "associated with completing a retail vehicle sale) as a "key driver[]" of "unit economics" (*i.e.*, per-vehicle profitability).

285. Further, according to insiders, Carvana was run in a top-down fashion, with "*[t]he Garcias*" maintaining an "iron grip" over the Company's operations. For instance, the December 8, 2022 *Forbes* Article explained:

> ***The Garcias' iron grip*** on Carvana's is reflected in the younger Garcia's management style, according to one former Carvana executive who spoke with *Forbes* on the condition of anonymity. "You will often hear people talk about the good old boys club and it absolutely exists there," says the former employee. Higher ups who went against the CEO were quickly shown the door, according to the former employee. "The culture is ***you either are on board with us and everything we do and say and drink the Kool Aid, or you are not and get out***."

- 265 -

286.    To be sure, Defendants' control and management of Carvana's operations and their access to confidential information concerning the Company's operations and financial results, further supports a strong inference of scienter.

**E.    Analysts and Investors Frequently Asked Questions About, and Garcia Junior and Jenkins Frequently Evinced Personal Knowledge by Commenting on, the Subjects of Their Fraud**

287.    Throughout the Class Period, Wall Street analysts asked Garcia Junior and Jenkins specific, direct questions about Carvana's retail sales growth, buying cars from customers, Carvana's nationwide expansion, and title and registration issues.  Garcia Junior and Jenkins held themselves out to be knowledgeable about these subjects.  For example:

(a)    On August 5, 2020, an analyst asked Jenkins, "on the retail GPU side, you all had mentioned that you expected to see improvement . . . .  Is that basically tied to the increased production capacity . . . [o]r is there more that goes into that with pricing dynamics and acquisition?"  Jenkins responded:

> ***So there are definitely some exciting trends in retail GPU***.  I think the most exciting is that, as I mentioned earlier, in July, we bought more than 100% as many cars from customers as we sold to customers. . . .
>
> I think that's obviously a positive, that drives wholesale GPU, ***that drives incremental retail GPU, because cars that you acquire from customers are typically more profitable*** than cars that you acquire at auction.

(b)    On October 29, 2020, an analyst asked Jenkins, "[i]s there a lot of extra operating expense in that relative to buying at the auction?"  Jenkins identified a number of expenses and asserted, "[a]ll of those expenses are actually – those are reflected in our wholesale gross profit number as well as in our retail gross profit number."

(c)    On October 29, 2020, an analyst asked Garcia Junior to "give us a sense of growth rates going on in [the Company's older] markets."  Garcia Junior responded, "internally, what ***we're always focused on*** is what's happening to underlying demand" and that ***we're*** "***looking at what's happening to sales and looking at the drivers of conversion that impacts sales***, which include where inventory is, how much inventory is close to

- 266 -

1  different markets, what delivery times are in different markets, what our inventory

2  distribution looks like."

3          (d)    On March 1, 2021, an analyst asked, "how do you choose to expand

4  markets in any region specifically as you – on your way to getting to like that 95%

5  population coverage longer term?" Garcia Junior responded, "we're largely in a place now

6  where if we wanted to just like open it all up, we probably could. It's not operationally

7  difficult enough at this point where we couldn't open up all of it very quickly."

8          (e)    On May 6, 2021, an analyst asked Jenkins to "talk about the tight

9  inventory environment . . . and some of the measures Carvana has implemented to unlock

10  new channels for inventory acquisition and if you're expecting those measures to have any

11  notable impacts on the near-term vehicle GPU." Defendant Jenkins responded: "[O]ur #1

12  channel for sourcing inventory has now become sourcing cars directly from customers,

13  which has several advantages . . . from a sourcing perspective, our main area of focus is

14  going to be continue to grow the business of buying cars from customers."

15          (f)    On August 5, 2021, an analyst asked Jenkins whether "there [is] any

16  way to unpack [the retail GPU number] a little bit in terms of how much of that is temporary

17  versus structural improvements . . . that might sustain not just like in the second half but into

18  next year and beyond?" Jenkins responded:

19      [L]et me start by taking the retail GPU question . . . [o]n retail GPU, **we had
        our first quarter over $2,000 retail GPU.** We've come close a couple of
20      times before. I think we've done $1,850 before and $1,700, not including
        adjustments also in 2020. **But the $2,000 is a record for us.** I think if we
21      think through the drivers, I think maybe it's helpful to think through it
        sequentially from Q1. **The biggest driver there was certainly the**
22      **performance [of] buying cars from customers**. . . .

23      **[W]e feel really great about our retail GPU progress. Buying cars from**
24      **customers continues to be a strong driver of the improvements in the**
        **business** . . . .

25          (g)    On August 11, 2021, an analyst asked Jenkins about the North Carolina

26  suspension, and whether "you [are] comfortable that this is a very North Carolina specific

27  issue and not something you might need to investigate in like other states, just to make sure

28

it's covered?"   Jenkins misleadingly responded; "[W]e had quite a small fraction of customers that were impacted by title and registration delays, . . . in the state of North Carolina" and "[s]ure . . . our understanding is that this is quite unprecedented."

(h)    On November 4, 2021, an analyst asked Garcia Junior to "talk about how much of the increase in consumer purchases is just out of necessity . . . versus your view that it's just simply a more profitable and efficient channel for inventory?"  Further, an analyst asked, "do you envision pulling back on customer purchases perhaps to a point where its back towards the levels that you were targeting at your Investor Day?"  In a lengthy and detailed response, Garcia Junior stated: "[Sourcing cars from customers] i[s] better.  It allows us to provide a high-quality experience to a customer that we're buying a car from, and then it gets us access to a higher-quality pool of inventory that is, on average, more profitable."

(i)    On February 24, 2022, an analyst asked Garcia Junior about whether Carvana would utilize ADESA's title department "to make[] you more efficient on processing titles out of your core business."  Garcia Junior responded:

> Now because you brought it up, I do think the registration team and title team inside Carvana . . . [has] done an unbelievable job over the last probably 6 months . . . .  We're now kind of approaching similar levels of success in title and registration to what we were experiencing pre-pandemic. . . .  So there's a lot of great things going on there.

288.    Garcia Junior and Jenkins demonstrated their visibility into and knowledge of these critical areas at the heart of Defendants' fraud, supporting a strong inference that they issued the false and misleading statements alleged above with scienter.  Further, if Garcia Junior and Jenkins did not have detailed, up-to-date knowledge of these issues, then they acted recklessly in holding themselves out as knowledgeable about these issues and in discussing them in communications with investors and analysts.

## F.    Defendants' Decision to Cease Reporting Critical Metrics Bolsters Their Scienter

289.    Defendants' scienter is further supported by their decision to cease reporting key metrics that might have tipped investors off to their scheme.

### 1.    Average Days to Sale

290.    Average days to sale was one of Carvana's six "Key Operating Metrics" since becoming a public company.  This makes sense as Carvana's "business is dependent upon our ability to expeditiously sell inventory" given that cars quickly depreciate.  An "increase [in] our average days to sale" served as a warning to investors that Carvana was failing to rapidly sell its inventory, which "could have a material adverse effect" on Carvana's margins because of depreciation.

291.    Although Defendants continued to view average days to sale as a key metric during and after the Class Period, on May 6, 2021, as Carvana was facing a glut of inventory, Defendants stopped reporting "average days to sale."  Worse, Defendants misleadingly assured investors that it had replaced this "Key Operating Metric[]" with the number of IRCs purportedly because "our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold *and the relative stability of average days to sale over the past three years*."  Defendants' abrupt decision to pull an admittedly key operating metric – and replace it with an entirely unrelated metric that provided no visibility into whether Carvana was rapidly selling its inventory – supports an inference that Defendants chose to conceal the metric because it was trending in the wrong direction and would have alerted investors to their fraudulent conduct.

### 2.    Buying Cars from Customers

292.    At Carvana's Analyst Day, Jenkins and Garcia Junior announced Carvana's *long-term* goal to purchase 38%-52% of its vehicles from customers (as compared to Carvana's then-current level of 16% purchased from customers).  In the quarters following, the Company devoted an entire section of its shareholder letters to providing detailed metrics on buying cars from customers to demonstrate the Company's progress towards Defendants' purported goal of growth and long-term profitability.  These detailed metrics included graphics regarding the number of customer vehicles acquired, the customer-sourced ratio, and the percentage of customer vehicles acquired as a percent of retail units sold.

4890-0865-5022.v1

293.    Defendants' scheme, however, depended on drastically increasing the volume of cars purchased from customers far above the 38%-52% source ratio that Defendants had publicly reported as their goal.  Indeed, by Q4 2020, Carvana's customer-source ratio had already jumped to 65%, and had grown by 110% between 2019 and 2020.  As the adverse consequences of Defendants' scheme mounted, Defendants abruptly stopped reporting these metrics in order to hide the fraudulent scheme from investors.

294.    On May 6, 2021, Defendants announced that they would no longer "provide detailed statistics on buying cars from customers each quarter" as "[the Company's] success over the last 2 years has made the strength of our offering of buying cars from customers clear."  Accordingly, as explained in a May 7, 2021 analyst report, while Carvana's stock fell on this news, investors continued to believe that Defendants' strategy would contribute to the Company's growth and profitability.  Upon maintaining its outperform rating, an analyst at Cowen noted on May 7, 2021: "Cars Purchased from Customers Continues to Pace at ~100% of Retail Units Sold, Mgmt to Stop Providing Detailed Metrics: Mgmt. noted they had purchased approximately as many cars from customers as they had sold them . . . . ***Mgmt. indicated that they believe their strategy of buying cars from customers had been fully validated***, and that they would stop providing detailed metrics on these ratios in the future."  Upon revising its price target upward, an analyst at Truist Securities explained on May 7, 2021: "We believe the company has honed its efforts to efficiently acquire vehicles from the consumer and believe this represents a GPU growth opportunity over time.  Mgt noted that the strength continued into April, as the company set a new record for cars bought from customers . . . ."

## G.    Garcia Junior's and Jenkins's SOX Certifications and Signing of SEC Filings Support Scienter

295.    Garcia Junior and Jenkins signed SOX certifications throughout the Class Period, undertaking the affirmative obligation to ensure the Company's disclosures to the market were not materially false or misleading and so represented that they had evaluated the effectiveness of Carvana's disclosure controls.

4890-0865-5022.v1

### H.     Garcia Senior's Control of and Related-Party Deals with Carvana

296.     Because of his felony bank fraud conviction and ban from the NYSE, Garcia Senior is not identified in Carvana's SEC filings as a Carvana employee, officer, or director. Garcia Senior undoubtedly worked behind the scenes and controlled Carvana and its operations, however, and knew of or recklessly disregarded Defendants' fraudulent scheme and course of conduct.

297.     As Carvana's largest shareholder that held approximately 84% of the Company's voting power, Carvana's SEC filings make clear: "***The Garcia Parties control us*** *and can, among other things*, "*elect all of the members of our Board and thereby effectively control our policies and operations*, including the appointment of management [and] future issuances of our Class A common stock or other securities." 2020 10-K; 2021 10-K; February 23, 2023 annual report on Form 10-K for the fiscal year ended December 31, 2022. Moreover, as reported in a September 17, 2021 *The Wall Street Journal* article, according to Professor Taylor, because Carvana utilizes a capital structure that enables Garcia Junior and Garcia Senior to maintain supermajority voting control largely untethered from their economic interest in the Company, Carvana's "'structure has allowed [the Garcias] to run this $60 billion public company as if it's a family firm and for the family's benefit.'" Accordingly, Garcia Senior could and did install his son as Carvana's CEO and his loyal cronies and former employees to the Company's Board. Critically, he caused Carvana to do numerous related party deals with his privately held companies that were worth hundreds of millions of dollars.

298.     As reported by *The Wall Street Journal*:

> ***The companies themselves are as intertwined as the Garcia men***. Carvana leases properties and sources cars from its onetime parent. Other companies in the web of family businesses service Carvana's loans and sell insurance products to Carvana customers. ***The deals between the companies generate hundreds of millions of dollars of revenue for the family business***.[161]

---

[161] Ben Foldy, *For Clues About Carvana's Future, Look to Its Past*, Wall St. J. (July 17, 2023).

- 271 -

299.    Indeed, as detailed below, leading up to and throughout the Class Period, Garcia Senior engaged in countless related-party deals with Carvana – admittedly "not negotiated at arm's length" – demonstrating that he was integral to the fraudulent scheme and possessed MNPI concerning Carvana.  2020 10-K; 2022 Proxy Statement; March 2023 Form DEF 14-A Proxy Statement.[162]

- **IRC Leases**: Carvana leases IRCs in New Jersey, Georgia, Tennessee, Texas, and Ohio from DriveTime.

- **IRC Leases**: Carvana leased and later purchased an Arizona IRC from Verde Investments.

- **Lease Guarantee**: DriveTime guarantees Carvana's vending machine lease in Houston, Texas, its hub in Atlanta, Georgia, and part of its headquarters in Tempe, Arizona.

- **Corporate HQ Sublease**: Carvana subleases office space from DriveTime in Tempe, Arizona.

- **Office Lease**: Carvana leases office space from Verde Investments in Tempe, Arizona.

- **Hub Lease Agreement**: Carvana leases office space and parking spaces at various DriveTime IRCs and retail facilities.

- **Master Purchase and Sale Agreement ("MPSA")**: DriveTime is engaged as servicer of receivables under Carvana's MPSA.

- **Shared Services Agreement**: Carvana pays DriveTime for certain accounting and tax, legal and compliance, information technology, and other services.

- **Servicing Agreement**: Carvana pays DriveTime to perform certain servicing and functions on automotive finance receivables.

- **Transfer Agreements**: DriveTime services receivables in Carvana trusts.

- **Credit Facilities**: Carvana engages DriveTime as servicer of receivables.

- **GAP Waiver Insurance Policy**: Carvana purchases insurance policies from an affiliate of DriveTime.

- **Master Dealer Agreement**: DriveTime administers the VSCs and a portion of any and GAP waiver coverage sold to Carvana customers.

- **Limited Warranty Agreement**: DriveTime administers the limited warranties provided to all Carvana customers.

---

[162] In 2018, when Garcia Senior's company, SilverRock, "hit snags renewing an Arizona license in 2018 because it was in negative equity," it recovered by advising the "department that its financial position was improving from contracts with Carvana . . . and that it would soon be profitable."  December 17, 2021 *The Wall Street Journal* article.

- **Retail Vehicle Acquisition Agreements**: Carvana purchases reconditioned vehicles from DriveTime.

- **Wholesale Vehicle Purchase Agreements**: DriveTime purchases wholesale vehicles from Carvana.

- **Aircraft Time Sharing Agreement**: Carvana leases DriveTime's private aircrafts.

- **Profit Sharing Arrangement**: Carvana sells customers Road Hazard and Pre-Paid Maintenance contracts administered by DriveTime.

- **Insurance Services and Purchase Agreement**: Carvana purchases certain technology assets and ancillary services from DriveTime.

300.    Through these transactions, Garcia Senior's companies received approximately $534 million from Carvana through their deals during the Class Period.[163]

|  | **2021** | **2022** |
|---|---|---|
| Lease Agreements | $5.7 million | $4.9 million |
| Corporate Office Leases | $2 million | $2 million |
| Retail Vehicle Acquisitions | $168 million | $22 million |
| Master Dealer Agreement | $15.3 million | $18.1 million |
| Servicing and Administrative Fees | $81.7 million | $125.8 million |
| Shared Services Agreement | $1 million | $1 million |
| Private Plane Sharing Agreement | $0.5 million | $1 million |
| **Total** | **$274.2 million** | **$174.8 million** |

301.    Unsurprisingly, one of Carvana's creditors, which include Apollo Global Management Inc., Ares Management Corp., and Pacific Investment Management Inc.,

---

[163] In 2020, Garcia Senior's companies generated $85 million in revenue from providing extended warranties to Carvana's customers, collecting on customer loans, and selling or leasing real estate to Carvana.  December 17, 2021 *The Wall Street Journal* article.  Further, in 2021 and 2022, his companies brought in at least $449 million from its deals with Carvana.  Carvana's Related Party disclosures in its 2021 10-K, 2021 Proxy Statement; 2022 10-K; 2022 Proxy Statement.  And Garcia Senior's Bridgecrest saw its loan servicing portfolio more than double ***to over $10 billion*** due to its deals with Carvana.  December 17, 2021 *The Wall Street Journal* article.  Many of the above transactions are material to Carvana's operations and financials.  For example, Carvana sold $2.1 billion and $3.8 billion in principal balances of finance receivables under the Master Purchase and Sale Agreement, which DriveTime services, during 2021 and 2022, respectively.

- 273 -

asserted "*[a]s long as Ernie Sr. is involved in DriveTime, he's directly involved in Carvana*."[164]

302.   Garcia Senior is also Carvana's largest beneficiary of the Company's atypical tax receivable agreement.   Under the agreement, Carvana is required to pay 85% of the benefit of its tax assets – usually generated to reduce future tax bills – to Carvana Group LLC Unitholders, the largest of which is Garcia Senior.   During the Class Period, the portion of the Company's tax receivable agreement owed to the Carvana Group LLC Unitholders was $1.1 billion.

303.   In sum, according to Carvana's SEC filings, the Company's own creditors, and academics, Garcia Senior designed Carvana, controls Carvana, "is directly involved in Carvana," and runs Carvana to benefit himself and his family, which further supports a strong inference that he was aware of MNPI throughout the Class Period, including the scheme to defraud in which he participated.[165]

### I.   Garcia Senior's History of Similar and Fraudulent Misconduct Supports a Strong Inference of Scienter

304.   Garcia Senior's prior similar criminal conduct further supports an already compelling inference of scienter.   As explained in the 1990 *L.A. Times* article, Garcia Senior pled guilty to felony bank fraud in federal court as he "fraudulently obtained a $30-million line of credit in a series of transactions that also helped Lincoln [Savings & Loan] hide its ownership . . . from regulators."   Following his felony fraud conviction, Garcia Senior purchased Ugly Duckling and took it public on the NASDAQ (Garcia Senior was banned from the NYSE due to his fraud conviction).   As with Carvana, Garcia Senior maintained a

---

[164]  As noted in a July 17, 2023 *The Wall Street Journal* article, Carvana's creditors "took the unusual step of signing a pact to cooperate against the family, wary of company efforts to remove assets from Carvana."

[165]  Notably, an internal email between Garcia Senior and Garcia Junior confirm that he ran Carvana behind the scenes with his son.   For example, he coordinated and emailed with Garcia Junior about the list of potential investors for a 500 million dollar offering, and the need to "'figure out [a] plan on [his] money'" prior to the offering.   *In re Carvana Co. S'holders Litig.*, No. 2020-0415-KSM, Transmittal Affidavit of R. Garrett Rice in Connection with Nominal Defendant Carvana Co.'s Unopposed Motion for Continued Confidential Treatment, Ex. 2 at 58 (Del. Ch. Mar. 5, 2024) (Dkt. 155).

majority ownership of Ugly Duckling when it went public and touted the company's growth and innovation, claiming that "while the goal of CarMax and AutoNation is to restructure the retail auto business, Ugly Duckling is breaking new ground on the financing side."[166]  Not surprisingly, its stock price skyrocketed – like Carvana's did.  But just a few years later, Ugly Duckling was drowning.  The price of Ugly Duckling sank from $25 per share to just $2.50 per share, and Garcia Senior bought all the publicly owned shares for a pittance.

305.    As with Carvana, during Ugly Duckling's dive, Garcia Senior lined his pockets; at the time, "Garcia ha[d] been especially adept at feathering his own nest with Ugly Duckling's assets" with many investors calling "'fowl.'"[167]  Thereafter, Garcia Senior was compelled to swiftly settle a number of shareholder actions.  Garcia Senior's conviction for felony bank fraud and involvement in other similar misconduct further supports a strong inference of scienter.

## J.    Corporate Scienter

306.    The allegations above also establish a strong inference that Carvana as an entity acted with corporate scienter throughout the Class Period, as Defendants, its officers, management, and agents, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public.  By concealing these material facts from investors, Carvana maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

---

[166] Jerry Knight, *To Wall Street, It's a Swan*, Wash. Post (Sept. 26, 1997).

[167] Nathan Vardi, *Feathered Nest*, Forbes (Nov. 26, 2001).

1    **IX.    LOSS CAUSATION**

2    307.    Defendants' wrongful conduct, as alleged herein, directly and proximately

3    caused Plaintiffs' and Class members' economic loss.  Plaintiffs' claims for securities fraud

4    are asserted under the fraud-on-the-market and *Affiliated Ute Citizens of Utah v. United*

5    *States*, 406 U.S. 128 (1972) theories of reliance.  The markets for Carvana's stock were

6    open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed

7    herein, Defendants engaged in a scheme and made materially misleading statements and

8    omissions.  Defendants' conduct artificially inflated the price of Carvana stock and operated

9    as a fraud or deceit on the Class.

10    308.    The Class Period inflation in Carvana's stock price was removed when

11    information concealed by Defendants' scheme and misleading statements and omissions was

12    revealed to the market.  The information was disseminated through partial disclosures that

13    revealed the nature and effect of Defendants' alleged misconduct.  These disclosures, as

14    more particularly described below, removed artificial inflation from Carvana's stock price,

15    causing economic injury to Plaintiffs and other members of the Class.

16    309.    The corrective impact of the partial disclosures during the Class Period alleged

17    herein, however, was tempered by Defendants' continued scheme and misleading statements

18    and omissions that continued to conceal the true nature of Defendants' fraud.  Each partial

19    disclosure did not on its own fully remove the inflation from Carvana's stock price, because

20    it only partially revealed the nature and ramification of Defendants' previously

21    misrepresented and concealed conduct.    Defendants' continued scheme and

22    misrepresentations and omissions maintained the price of Carvana common stock at a level

23    that was inflated by fraud and induced members of the Class to continue purchasing shares in

24    Carvana even after Defendants' partial disclosures.

25    310.    The disclosures that corrected the market price to reduce the inflation

26    maintained by Defendants' fraud are detailed below.  These stock price declines were due to

27    firm-specific, fraud-related disclosures and were not the result of market, industry, or firm-

28    specific, non-fraud factors.  The following partial disclosures, resulting stock price declines,

1  and descriptions thereof are not necessarily comprehensive because fact and expert discovery

2  are not complete.

3      311.   On August 10, 2021, after the market closed, local media in North Carolina

4  reported that Carvana's dealer license in Raleigh, North Carolina was suspended for six

5  months for violating the state's title and registration laws.  *ABC 11* detailed the

6  "suspen[sion]," noting "[d]ocuments show the hearing determined that Carvana failed to

7  deliver titles to the DMV, sold motor vehicles without a state inspection, and issued out-of-

8  state temporary tags and plates for vehicles sold to customers in North Carolina."  As a result

9  of this partial disclosure, the price of Carvana stock declined by $9.40 per share, or 2.5%, to

10  close at $360.70 per share on August 11, 2021.  In contrast to the decline in Carvana stock,

11  the Standard & Poor's Composite Stock Index ("S&P 500") increased by 0.2% during this

12  period.[168]

13      312.   This partial disclosure did not on its own fully remove the inflation from

14  Carvana's stock price because it only partially revealed the nature and extent of Defendants'

15  previously misrepresented and concealed conduct.  In addition, on August 11, 2021, at the

16  J.P. Morgan 2021 Auto Conference, analysts questioned Defendants about the media reports

17  of title and registration violations and the prospect of issues in other states.  In response,

18  Defendants misleadingly reassured investors that the problems were a North Carolina

19  specific issue and that state action "was a relatively unusual action, but is also pretty small in

20  scope."  That same day, securities analysts at William Blair noted: "After speaking with

21  management . . . we are optimistic that this will be an isolated incident."  Thus, the price of

22  Carvana's stock remained artificially inflated.

23      313.   On October 22, 2021, the *WSJ* exposé was published.  The article exposed in

24  part certain of the Company's recent problems with various state title and registration laws,

25  revealing that "[a]t least four states have disciplined Carvana or are investigating the

26  company for violating vehicle-sales rules. . . .  These actions haven't been previously

---

27  [168]  For purposes of comparing its stock price performance vis-à-vis its peers and relevant

28  market, Carvana referred investors to the S&P 500 Index.

1    reported."   Following this news, the price of Carvana stock declined 1.4% on Friday,

2    October 22, 2021, and declined an additional 1.8% on Monday, October 25, 2021.   In

3    contrast to the total two-trading-day decline of 3.2% in Carvana common stock, the S&P 500

4    increased by 0.4% during this period.

5        314.   On April 20, 2022, after the market closed, Carvana issued disappointing Q1

6    2022 financial results and a stock offering to support its purchase of ADESA, which partially

7    revealed the ramifications and negative economic conditions caused by Defendants'

8    fraudulent scheme and course of conduct.   Among other things alleged herein, Defendants

9    disclosed that: (i) retail sales growth was hampered that quarter by significant "logistics

10   network constraints," "reconditioning" expenses, and "higher wholesale volume from buying

11   more cars from customers"; (ii) Carvana no longer expected to sell 550,000 retail cars in

12   2022 as previously stated; and (iii) Carvana needed to purchase ADESA to "improve our

13   logistics network," by placing the Company "within 200 miles of 94%" of the population,

14   which "will have the benefit of reducing shipping distances, times, and costs."   In addition,

15   while certain aspects of Defendants' fraud remained concealed, the ramifications and

16   negative economic conditions caused by their fraud contributed to Carvana's disappointing

17   Q1 2022 financial results.   For example, as later revealed, Carvana's Q1 2022 financial

18   results were negatively impacted by several factors, including: (i) significant logistics

19   constraints and cost overruns associated with its rapid nationwide expansion and surplus of

20   wholesale vehicles from buying cars from customers; (ii) "frequently acquir[ing] sales that

21   were less profitable in the immediate period," including sales "in markets with lower

22   profitability due to long distance from inventory (e.g., the Pacific Northwest)"; (iii) a spike

23   in aged inventory, which negatively impacted GPU and caused Carvana's average days to

24   sale metric to spike nearly 37% year-over-year in Q1 2022; (iv) the use of costly third-party

25   providers due to Carvana's significant logistics constraints, which caused reconditioning and

26   transport costs per retail vehicle to spike over $570 year-over-year in Q1 2022; and (v) a

27   62% year-over-year spike in operations expenses per retail vehicle – a key driver of "unit

28   economics" – in Q1 2022, and a near 80% spike since the start of the Class Period.   In the

- 278 -

1    days following the Q1 2022 results, Carvana disclosed that it was raising additional capital,

2    including $1.25 billion of stock and $3.275 billion of high-interest rate debt, to fund the

3    ADESA purchase and for general corporate purposes.  As a result of this partial disclosure,

4    the price of Carvana's stock declined 10.1% on volume of more than 17 million shares to

5    close at $83.14 per share on April 21, 2022, and continued to steadily decline, falling another

6    30.3% over the following six trading days to close at $57.96 per share on April 29, 2022.  In

7    contrast, the S&P 500 declined by 7.4% during this period.

8         315.    Analysts commented on these revelations and tied Carvana's sudden reset to its

9    "growth-at-all-costs mentality" that had "undermined business operations."  For example, a

10    J.P. Morgan analyst labeled the earnings call and follow-ups "'confidence shattering'" and

11    added "'we do not believe Carvana (CVNA) is likely to get a free pass on SG&A any

12    longer.'"  A Deutsche Bank Securities Inc. analyst noted that Carvana "surprised investors

13    with new details around capital raise" and linked Defendants' disclosures to the negative

14    economic conditions caused by Defendants' unsustainable nationwide expansion.  The same

15    analyst noted:  "Q1 results mainly demonstrate that the ongoing constraints throughout the

16    company's logistics network is starting to take a ***material*** toll on the company's performance

17    as it continues to grow its footprint rapidly."  In addition, on April 25, 2022, a Deutsche

18    Bank securities analyst noted that Carvana's announcements regarding its urgent need to

19    raise capital in order to purchase ADESA "***surprised*** investors," and were related to the fact

20    that Carvana's business model was "capital-intensive," not "capital-light."  Wedbush

21    analysts stated on May 3, 2022: "Undoubtedly, this is a capital-intensive business (even

22    without dealerships).  . . . **ADESA Transaction Adds Strategic Value** . . . The company

23    estimates that sales completed today to customers within 200 miles of the IRC where a

24    customer's car is stored will cost $750/unit less in COGS and SG&A than its average sale.

25    . . . **[b]ut [c]omes at a [s]teep [c]ost**."  (Emphasis in original.)  The next day, Morgan

26    Stanley analysts noted, upon downgrading Carvana, that "[i]n recent weeks, CVNA found

27    itself in the [unfortunate] position of raising capital at a time when they really needed it."

28

4890-0865-5022.v1

316.    Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.  In addition, Defendants falsely reassured investors that Carvana's issues were "transitory."  On April 21, 2022, BofA Securities analysts stated: "GPU misses on macro headwind . . . Omicron remained a headwind in 1Q, pressuring production and logistics capacity."  Thus, the price of Carvana's stock remained artificially inflated.

317.    On May 10, 2022, Carvana issued an 8-K announcing that it was: (i) laying off approximately 2,500 employees "primarily in operational groups in connection with its previously announced plans to better align staffing and expense levels with sales volumes"; (ii) transitioning operations away from some logistical hubs and an IRC "[i]n connection with these right-sizing initiatives"; and (iii) that it would release "materials on Carvana's [updated] operating plan" later that week.  In addition, while certain aspects of Defendants' fraud remained concealed from investors, the ramifications and negative economic conditions caused by their fraud contributed to the right-sizing initiatives, the layoffs, and the need to issue a new operating plan that Carvana disclosed.  For example, as later revealed, Carvana's financial condition in May 2022 was negatively impacted by several factors, including: (i) significant logistics constraints and cost overruns associated with its rapid nationwide expansion and surplus of wholesale vehicles from buying cars from customers (which was revealed mere days later); (ii) "frequently acquir[ing] sales that were less profitable in the immediate period," including sales "in markets with lower profitability due to long distance from inventory (*e.g.*, the Pacific Northwest)"; (iii) a spike in aged inventory, which negatively impacted GPU and caused Carvana's average days to sale metric to spike 76% year-over-year in Q2 2022; (iv) utilizing costly third-party providers due to its significant logistics constraints, which caused reconditioning and transport costs per retail vehicle to spike over $585 year-over-year in Q2 2022; and (v) a 62% year-over-year spike in operations expenses per retail vehicle as of May 2022 and a nearly 80% spike since the start of the Class Period.  As a result of this partial disclosure, the price of Carvana's stock

1    declined 5.4% on volume of more than 15.7 million shares on May 10, 2022, and declined an

2    additional 18.2% on volume of nearly 23 million shares on May 11, 2022. In contrast to the

3    total two-day decline of 22.6% in Carvana common stock, the S&P 500 declined a modest

4    1.4% during this period.

5    318.    Analysts commented on this corrective disclosure, linking it to the negative

6    economic conditions caused by Defendants' scheme. For example, an article published by

7    *Forbes* on May 21, 2022 reported: "***Carvana's mass firing was a sign of much bigger***

8    ***problems at the company, according to . . . several industry analysts***. They describe a

9    spendthrift business, ***whose growth-at-all-costs mentality undermined business operations***

10   ***and sowed the seeds of its recent layoffs***." Further, a Wedbush analyst explained on May

11   11, 2022, that it was "surprised by the workforce reduction," given Defendants' contrary

12   statements in "late April." Similarly, on May 10, 2022, Morgan Stanley reported on the

13   Form 8-K, noting, that it was likely the "first of many potential steps to address the cost

14   structure," and that "[b]eyond the actions disclosed in today's 8-K, we believe transparency

15   around future actions and management's disclosure and messaging around the path forward

16   will be critical to re-establishing investor confidence which has been lost over the past few

17   months."

18   319.    Defendants' partial disclosure did not on its own fully remove the inflation

19   from Carvana's stock price because it only partially revealed the nature and extent of

20   Defendants' previously misrepresented and concealed conduct. In addition, Defendants

21   falsely reassured investors in a Form 8-K issued May 10, 2022 that the changes were made

22   in connection with the Company's "previously announced plans to better align staffing and

23   expense levels with sales volumes" and the "macroeconomic environment." Thus, the price

24   of Carvana's stock remained inflated.

25   320.    On June 24, 2022, after the market closed, *Barron's* published an exposé,

26   which included interviews with Carvana customers and former employees. The exposé

27   further revealed the Company's problems regarding title and registration and its violations of

28   various state laws and regulations. Indeed, it revealed for the first time that Arizona had

- 281 -

canceled Carvana's temporary plate program, that "[i]nterviews with state officials . . . show the issue is ***wide[]-reaching***," and, that Carvana had revamped its title department three times and created an "'undriveable-car task force.'"  On the following two trading days, the price of Carvana stock declined 21% to close at $24.74 per share on June 28, 2022, in contrast to the S&P 500, which declined 2.3% during the same period.

321.    This partial disclosure did not on its own fully remove the inflation from Carvana's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.  In addition, Defendants falsely reassured investors by downplaying the Company's practices and problems with title and registration. Indeed, in the *Barron's* exposé, Defendants claimed only that "'[i]n a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states.'"  Further, they misleadingly assured investors that "'[w]e've had productive conversations with regulators in all of those states and feel very confident about our operations going forward.'"  Thus, the price of Carvana's stock remained inflated.

322.    On October 7, 2022, MDOS announced that it had suspended the license of the Carvana dealership in Novi, Michigan for "imminent harm to the public."  The suspension resulted from Carvana's recent title and licensing violations in Michigan.  Following this news, the price of Carvana stock declined 5.5% on volume of nearly 9.6 million shares to close at $18.21 per share on October 10, 2022.  In contrast to the decline of 5.5% in Carvana common stock, the S&P 500 declined a modest 0.8% during this period.  This partial disclosure did not on its own fully remove the inflation from Carvana's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.

323.    On November 3, 2022, after the market closed, Carvana issued disappointing Q3 2022 financial results, which further revealed the unraveling of Defendants' fraudulent course of conduct and its negative economic conditions.  Among other things alleged herein, Defendants disclosed that Carvana: (i) suffered an 8% decline in retail unit sales from the

- 282 -

1    prior year; (ii) had been "frequently acquir[ing] sales that were less profitable in the

2    immediate period but . . . [c]urrently, as we are primarily focused on profitability, we are

3    intentionally acquiring fewer of these sales"; (iii) had reduced and was continuing to

4    "reduce[] . . . advertising in distant markets with less profitable sales," including "markets

5    with lower profitability due to long distance from inventory (*e.g.*, the Pacific Northwest)";

6    (iv) had "take[n] other actions to improve profitability, such as increasing long-distance

7    shipping fees, in these [new, far-flung] markets"; (v) "reduced . . . inventory by -10%" in Q3

8    2022, which was one of the "largest drivers" of Carvana's retail unit sales decline that

9    quarter; and (vi) would be "continuing to normalize our inventory size and expect to further

10   reduce inventory in Q4 [2022]."  In addition, while certain aspects of Defendants' fraud

11   remained concealed from investors, the ramifications and negative economic conditions

12   caused by their fraud contributed to the disappointing Q3 2022 financial results.  For

13   example, as later revealed, Carvana's Q3 2022 results were negatively impacted by several

14   factors, including: (i) a spike in aged inventory, which negatively impacted GPU and caused

15   Carvana's average days to sale metric to spike over 60% year-over-year in Q3 2022; (ii)

16   significant logistics constraints that compelled Carvana to utilize costly third-party providers,

17   and caused its reconditioning and transport costs per retail vehicle to spike over $400 year-

18   over-year in Q3 2022; and (iii) an over 40% spike in operations expenses per retail vehicle

19   since the start of the Class Period.

20       324.    As a result of this corrective disclosure, the price of Carvana stock declined

21   39% on volume of more than 71 million shares on November 4, 2022, and declined an

22   additional 15.6% on volume of more than 52 million shares on November 7, 2022 to close at

23   $7.39 per share.  In contrast to the total two day decline of 54.6% in Carvana common stock,

24   the S&P 500 increased by 2.4% during this period.

25       325.    Analysts and the media reported on Defendants' November 3, 2022 corrective

26   disclosure.  For example, a Needham & Company analyst noted, "'[t]he path forward for

27   Carvana is to sell as many cars as possible, but to do so on a profitable basis, *versus prior it*

28   *was more about selling as many cars as possible*.'"  On November 4, 2023, D.A. Davidson

- 283 -

Institutional Equity Research stated: "CVNA is . . . shift[ing] from just growing sales to becoming profitable."  The *Hit the Wall* Article told investors to "[s]tep back and think about [Carvana's disclosure] for a moment" because "***[i]t means that the company had historically grown in these markets even though they weren't all that attractive.  It was growth for growth's sake and not necessarily growth to improve profitability***."

326.    Defendants' partial disclosure did not on its own fully remove the inflation from Carvana's stock price because it only partially revealed the nature and extent of Defendants' previously misrepresented and concealed conduct.  Thus, the price of Carvana's stock remained inflated.

327.    On February 23, 2023, after the market closed, Carvana issued disappointing Q4 2022 financial results that disclosed the unraveling of Defendants' fraudulent scheme and course of conduct, including its negative economic conditions.  Among other things alleged herein, Defendants disclosed that: (i) retail unit sales declined 23% year-over-year – a "first . . . in [Carvana's] history"; (ii) "it was the first year we stepped back on the key metrics of retail units sold"; (iii) gross profit declined by 63% year-over-year; (iv) Carvana had "significantly accelerated . . . reductions in inventory"; (v) Carvana had written off over $50 million of aged and impaired vehicle inventory that was worth less than Carvana had paid to acquire it and prepare it for sale; (vi) Carvana was "significantly reducing retail vehicle acquisitions"; and (vii) Carvana was intentionally foregoing retail sales growth for the foreseeable future to instead focus on driving "positive unit economics" (*i.e.*, retail sales that were actually profitable).  The ramifications and negative economic conditions caused by Defendants' fraudulent scheme and course of conduct contributed to the disappointing Q4 2022 financial results.  For example, as later revealed, Carvana's Q4 2022 results were negatively impacted by several factors, including: (i) a near 40% year-over-year spike in Carvana's average days to sale metric; (ii) significant logistics constraints that forced Carvana to utilize costly third-party providers and caused reconditioning and transport costs per retail vehicle to remain elevated in Q4 2022, up $377 since Q2 2021; and (iii) a 50% spike in operations expenses per retail vehicle since the start of the Class Period.  As a result

- 284 -

of this corrective disclosure, the price of Carvana stock declined 20.5% on volume of more than 35 million shares on February 24, 2022.[169]  In contrast, the S&P 500 declined by 1.0% during this period.

328.    Analysts reported on Defendants' February 23, 2023 corrective disclosure.  For example, a BNP Paribas analyst noted that "*[v]irtually every item of Carvana's metrics worsened materially in Q4* as units softened, retail [GPU]'s were the lowest since 2016 due primarily from *inventory write-downs and aged inventory*."  A J.P. Morgan analyst also noted that Retail GPU of $425 was now 60% below estimates and "included a ~$598 inventory write-down," which "reflects aging inventory."  In addition, a William Blair analyst noted that "*Retail GPU was also penalized by aged inventory*, with retail cars sold within 90 days of acquisition netting about $600 in higher GPU versus retail units in aggregate."  A Morgan Stanley analyst explained that "4Q was a sizeable miss" and noted Carvana's "*[s]hift in strategy away from growth* and towards EBITDA profitability."  A RBC Capital Markets analyst noted that GPU "miss[ed] Street expectations by 32% . . . due in large part to retail inventory allowance and wholesale adjustments . . . and *lower unit economics from cars held more than 90+ days*."  A Stephens analyst stated: "*[W]e do not foresee the company achieving its targeting unit economics this year*."  Further, a Deutsche Bank analyst observed: "As the company continues to focus on right-sizing its business and the costs "associated, we believe there is naturally *a transition period that may last for a couple of years before it can refocus on top-line growth*."  A D.A. Davidson Institutional Equity Research analyst noted: "*CVNA moved to fix their inventory position* this quarter" after "*carrying too much inventory* . . . which forced a decrease in Retail GPUs," and stated "*CVNA is still a long way from EBITDA profitability*."  A BofA Securities analyst also stated: "We now believe that without a cash infusion, Carvana is likely to run out of cash by the end of 2023."

---

[169]  The closing price of $8.01 per share on February 24, 2023 represented a total decline of 98% from the Class Period high of $376.83 per share in August 2021.

**X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE**

329.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the omissions and misrepresentations were material; (iii) Carvana stock is traded in an efficient market; (iv) the Company's stock is liquid and was heavily traded during the Class Period; (v) the Company's stock was traded on the NYSE and was covered by multiple analysts; and (vi) Plaintiffs and members of the Class purchased, acquired, and/or sold Carvana stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

330.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

331.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**XI.    NO SAFE HARBOR**

332.    Many (if not all) of Defendants' false and misleading statements and omissions during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

333.    Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

334.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Carvana who knew that the FLS was false or misleading.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of

- 286 -

4890-0865-5022.v1

future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XII.    CLASS ACTION ALLEGATIONS

335.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired Carvana stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

336.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Carvana stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Carvana or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337.    Common questions of law and fact predominate and include: (i) whether Defendants' acts violated the federal securities laws; (ii) whether Defendants engaged in a scheme to defraud; (iii) whether Jenkins and Garcia Junior omitted and/or misrepresented material facts; (iv) whether Defendants acted knowingly or recklessly disregarded the truth; (v) whether the prices of Carvana stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and (vi) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

338.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

4890-0865-5022.v1

339.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

340.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
#### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
#### (Against the Exchange Act Defendants)

341.    Plaintiffs repeat and allege each and every allegation set forth above as if fully set forth herein.

342.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

343.    During the Class Period, Defendants engaged in a scheme and wrongful course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class, made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and employed a scheme to defraud in connection with the purchase and sale of Carvana stock.  Defendants' scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Carvana stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Carvana stock at artificially inflated prices.  In furtherance of

4890-0865-5022.v1

1   this unlawful scheme and course of conduct, Defendants, and each of them, took the actions

2   set forth herein.

3         344.   Pursuant to the above wrongful course of conduct, each of the Defendants

4   participated directly or indirectly in: (i) Defendants' scheme; and/or (ii) the preparation

5   and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other

6   statements and documents described above, including statements made to securities analysts

7   and the media that were designed to influence the market for Carvana stock.  Such reports,

8   filings, releases, and statements were materially false and misleading in that they failed to

9   disclose material adverse information and misrepresented the truth about Carvana's finances

10   and business prospects.

11         345.   By virtue of their ownership and/or positions at Carvana, Defendants had

12   actual knowledge of the materially false and misleading statements and material omissions

13   alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class,

14   or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed

15   or refused to ascertain and disclose such facts as would reveal the false and misleading

16   nature of the statements made, although such facts were readily available to Defendants.

17   Said acts and omissions were committed willfully or with reckless disregard for the truth.

18         346.   Information showing that Defendants acted knowingly or with reckless

19   disregard for the truth is peculiarly within Defendants' knowledge and control.  As the

20   controlling shareholder, senior managers, and/or directors of Carvana, Defendants had

21   knowledge of the details of Carvana's internal affairs.

22         347.   The Defendants are directly and indirectly liable for the wrongs complained of

23   herein.  Because of their positions of control and authority, Defendants were able to and did,

24   directly or indirectly, control the content of the statements of Carvana.  As controlling

25   shareholders, officers and/or directors of a publicly held company, Defendants had a duty to

26   disseminate timely, accurate, and truthful information with respect to Carvana's businesses,

27   operations, future financial condition, and future prospects.  As a result of Defendants'

28   misconduct, the market price of Carvana's stock was artificially inflated throughout the

Class Period. In ignorance of the adverse facts concerning Carvana's business and financial condition which were concealed by the Individual Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Carvana stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and were damaged thereby.

348.    During the Class Period, Carvana stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Carvana stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock, or would not have purchased or otherwise acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Carvana stock was substantially lower than the prices paid by members of the Class. The market price of Carvana stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

349.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

350.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of Carvana stock during the Class Period, as the truth about Carvana's operations and prospects began to be disclosed to the investing public.

**COUNT II**
**Violations of §20(a) of the Exchange Act**
**(Against the Exchange Act Defendants)**

351.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

4890-0865-5022.v1

352.    During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Carvana, and conducted and participated, directly and indirectly, in the conduct of Carvana's business affairs.

353.    During all relevant times during the Class Period, Garcia Senior owned a majority of the voting power of all outstanding shares of the Company's common stock, effectively giving him full control over the Company's most important decisions, such that Carvana was a "controlled company" within the meaning of the corporate governance standards of the NYSE.

354.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Carvana's financial condition and results of operations, and to correct promptly any public statements issued by Carvana which had become materially false or misleading.

355.    Each of the Individual Defendants, therefore, acted as a controlling person of Carvana.  By reason of their senior management positions, and/or being directors, and/or the controlling shareholder of Carvana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Carvana to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over Carvana's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.  In addition, Garcia Junior and Garcia Senior owned a majority of Carvana's Class B shares, which shares guarantee Garcia Junior and Garcia Senior ten votes per share for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of stock.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Carvana to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Carvana within the meaning of §20(a) of the Exchange Act.

356.    Carvana had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control

1   the actions of its employees and their salaries, bonuses, incentive compensation, and other

2   employment considerations.  By virtue of the foregoing, Carvana had the power to influence

3   and control, and did influence and control, directly or indirectly, the decision-making of the

4   Individual Defendants, including the content of their public statements.

5        357.   By reason of the above conduct, the Individual Defendants are liable pursuant

6   to §20(a) of the Exchange Act for the violations committed by Carvana.

**COUNT III**
**Violations of §20(A) of the Exchange Act**
**(Against Garcia Senior and Jenkins)**

9        358.   Plaintiffs repeat and reallege each and every allegation set forth above as if

10  fully set forth herein.

11       359.   Count III is brought pursuant to §20(A) of the Exchange Act against Garcia

12  Senior and Jenkins on behalf of Plaintiffs and members of the Class who were damaged by

13  each of these Defendant's insider trading.

14       360.   During the Class Period, Garcia Senior sold nearly $3.7 billion of his Carvana

15  stock to unknowing investors.  Further, as detailed above, Garcia Senor possessed MNPI

16  concerning Carvana when he sold his stock, and he took advantage of his possession of

17  MNPI regarding Carvana to obtain billions of dollars of insider trading profits during the

18  Class Period.

19       361.   During the Class Period, Jenkins sold over $79 million of his stock to

20  unknowing investors.  As detailed above, Jenkins was in possession of MNPI concerning

21  Carvana when he sold his stock, and he took advantage of his possession of MNPI regarding

22  Carvana to obtain tens of millions of dollars in insider trading profits during the Class

23  Period.

24       362.   Defendants' sales of Carvana stock during the Class Period (set forth in

25  Appendix A attached hereto) were made contemporaneously with Plaintiffs' purchases of

26  Carvana stock (set forth in Appendix B and in Plaintiffs' certifications (attached hereto)

27  during the Class Period.

28

4890-0865-5022.v1

363.    As Carvana's controlling shareholder, Garcia Senior owed a duty to Carvana and its shareholders to maintain the MNPI in confidence and not trade on the basis of it. Jenkins, as Carvana's CFO, also owed a duty to Carvana and its shareholders to maintain the MNPI in confidence and not trade on the basis of it.

364.    Plaintiffs and members of the Class who purchased shares of Carvana stock contemporaneously with sales by Garcia Senior and Jenkins suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased Carvana stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## XIV.    SECURITIES ACT ALLEGATIONS

365.    In this section of the complaint, Plaintiffs assert a series of strict liability and negligence claims on behalf of purchasers in the 2022 Public Offering for violations of the Securities Act (the "Securities Act Class").  Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct or fraud.

### A.    Plaintiffs' Purchases in the 2022 Public Offering

366.    On April 22, 2022, Plaintiffs purchased shares of Class A common stock directly in the 2022 Public Offering from underwriter defendant Citigroup for $80.00 per share.

### B.    Securities Act Defendants

367.    Defendant Carvana was the issuer of the 2022 Public Offering.

368.    Defendants Ernest Garcia III ("Garcia Junior") and Mark Jenkins ("Jenkins") signed the Registration Statement (defined below).

369.    Defendant Stephen Palmer ("Palmer") served as Carvana's Vice President of Accounting and Finance and signed the Registration Statement.

370.    Defendants Michael Maroone ("Maroone"), Neha Parikh ("Parikh"), Ira Platt ("Platt"), and Greg Sullivan ("Sullivan") each served as members of Carvana's Board and

1  signed the Registration Statement.  Defendants Maroone, Parikh, Platt, and Sullivan are

2  collectively referred to herein as the "Director Defendants" and, together with defendants

3  Garcia Junior, Jenkins, and Palmer, as the "Individual Securities Act Defendants."

4       371.   Defendants Citigroup and J.P. Morgan Securities LLC ("J.P. Morgan") acted

5  as underwriters of, and as sellers in, Carvana's 2022 Public Offering (collectively, the

6  "Underwriter Defendants").  Each of the Underwriter Defendants served as underwriters

7  and/or underwriter representatives for the 2022 Public Offering.

8       372.   Defendants Carvana, the Individual Securities Act Defendants, and the

9  Underwriter Defendants are collectively referred to herein as the "Securities Act

10  Defendants."

11  **C.    Background of the 2022 Public Offering**

12       373.   On April 20, 2022, Carvana filed SEC Form S-3 Registration Statement (the

13  "Registration Statement"), an automatically effective shelf registration statement pursuant to

14  which Carvana could offer to sell shares of Class A common stock on terms to be determined

15  at the time of each offering, pursuant to a prospectus supplement to be filed with the SEC in

16  connection with each offering.  Five days later, on April 25, 2022, Carvana filed SEC Form

17  424B2 (the "Prospectus Supplement") offering to sell 15,625,000 shares of Class A common

18  stock at a price of $80.00 per share.  The Registration Statement, Prospectus Supplement,

19  and all documents incorporated therein are collectively referred to as the "Registration

20  Statement" or the "Offering Documents."

21       374.   The Offering Documents incorporated a number of previously filed documents

22  by reference, including the 2021 10-K.

23       375.   On April 26, 2022, Carvana announced the completion of the 2022 Public

24  Offering, which raised proceeds of $1,225,460,000.

25       376.   Prior to the 2022 Public Offering, and unbeknownst to investors, Carvana

26  faced numerous challenges that rendered the Company's growth unsustainable, including

27  worsening logistical constraints in acquiring cars, an increasing supply of low-quality

28  vehicles, and widespread title and registration issues.  Negligently failing to disclose these

1    problems, the Registration Statement made a number of false and misleading statements

2    about: (i) Carvana's retail units sold; (ii) the quality of Carvana's vehicle inventory; and (iii)

3    the purported risks surrounding regulatory compliance.

4        377.    Carvana's rapid market expansion created logistical constraints and additional

5    costs to support new markets at greater distances, which created mounting expenses.  As

6    Carvana later disclosed in the Company's May 2022 Operating Plan, following the 2022

7    Public Offering, Carvana's rapid "[l]ocation growth" created "[m]ore vehicle moves, more

8    miles traveled . . . [h]igher number of constrained routes," and a "[h]igher degree of backlog

9    on constrained routes."  Carvana's logistical constraints were increasingly costly as the

10    Company was forced to rely on expensive third-party providers for vital logistics and

11    reconditioning functions as the Company's own critical infrastructure lagged behind its

12    nationwide expansion.

13        378.    Carvana also had amassed a substantial inventory of vehicles purchased from

14    consumers, without regard to the vehicle's quality.  The impact of this was two-fold.  First,

15    the increasing inventory of vehicles from consumers worsened Carvana's logistical

16    constraints as cars had to be obtained from these individuals and then transported and stored

17    at Carvana IRCs – creating more vehicle moves, more miles traveled, constrained routes, a

18    higher backlog on constrained routes, poor performance on operational metrics, and the

19    inefficient use of Carvana's nationwide logistics network.    Second, there was an

20    overwhelming increase in low-quality vehicles that could only be sold at wholesale, which

21    was often unprofitable when taking into account the additional expenses of obtaining and

22    processing the vehicles.  This was especially true in light of the fact that Carvana frequently

23    overpaid for low-quality vehicles, as consumers selling their vehicles as trade-ins would

24    misrepresent the vehicle quality, with no reduction in trade-in value or other consequence

25    from Carvana.

26        379.    Finally, the massive influx of vehicles purchased from consumers exacerbated

27    widespread vehicle titling issues at Carvana, and ultimately resulted in countless vehicles

28

1    being sold to customers before title was procured and transferred, often in violation of state

2    law.

3        **D.    The Registration Statement Contained Materially False and
            Misleading Statements and Omitted Material Facts Required to
4            be Stated Therein**

5        380.    The Registration Statement was negligently prepared and, as a result: (i)

6    contained untrue statements of material fact; (ii) omitted to disclose material information

7    necessary to make statements made therein not misleading; and (iii) was not prepared in

8    accordance with SEC rules and regulations governing its preparation.

9        381.    **Statement A**: With regard to vehicle sourcing and acquisition, the 2021 10-K

10   stated:

11           ***Vehicle acquisition***.  . . .  For vehicles sold to us through our website,
            we use proprietary algorithms to determine an appropriate offer.  ***We assess***
12          ***vehicles on the basis of quality, inventory fit, consumer desirability, relative***
            ***value, expected reconditioning costs, and vehicle location to identify what we***
13          ***believe represent the most in-demand and profitable vehicles to acquire for***
            ***inventory***.  We utilize a broad range of data sources, including proprietary site
14          data, and a variety of external data sources to support our assessments.

15       382.    As detailed below, Statement A was materially false and misleading when

16   made because it negligently failed to disclose the following material facts necessary to be

17   disclosed in order to make the Registration Statement not misleading:

18           (a)    Carvana abruptly and drastically lowered the Company's purchasing

19   and verification standards when buying cars from customers in order to induce trade-ins and

20   increase retail sales.  CW-4 confirmed that, to boost retail sales through trade-ins, Carvana

21   bought cars from customers that plainly did not meet its purchasing and verification

22   standards.  CW-11 said that Carvana was buying vehicles "sight unseen" and his/her team

23   was not expected to do much to verify the condition of the vehicles.  CW-11 observed that

24   Carvana did not actually care about the condition of the vehicles and just wanted to "get as

25   many cars as it could."  CW-10 corroborated this account, explaining that Carvana was

26   buying cars at breakneck speed and not adequately inspecting them.  In addition, CW-2 was

27   overruled when voicing concerns about the quality of vehicles as "leadership would say take

28

- 296 -

1    it."  Similarly, CW-5 stated that there was only a 50/50 chance that a vehicle would be

2    reappraised if it did not match the seller's description.  In short, contrary to the statement that

3    Carvana was "assess[ing] vehicles on the basis of quality, inventory fit, consumer

4    desirability, relative value, expected reconditioning costs, and vehicle location to identify

5    what we believe represent the most in-demand and profitable vehicles to acquire for

6    inventory," Carvana largely disregarded the condition of the vehicles they purchased as

7    CWs-1, 2, 3, 4, 5, 10, and 11 reported.

8            (b)    Carvana later admitted that buying cars from customers adversely

9    impacted the Company's bottom line by flooding Carvana with less profitable wholesale cars

10   that had to be sold at a loss and crippling its logistics network, as detailed below.

11           (i)    Because Carvana was "***intentionally*** buying lower quality

12   cars,"[170] it was flooded with cars that did not meet its retail standards and, thus, had to be

13   sold wholesale.  Indeed, by lowering its purchasing and verification standards, Carvana's

14   wholesale growth began to far outpace its retail sales growth.  As shown in the charts below,

15   immediately following Carvana's spike in the number of cars purchased from customers

16   during late 2020 and early 2021, its wholesale sales spiked by over 100% in each of the next

17   five quarters, including 115% in Q4 2021.  Meanwhile, wholesale sales made up roughly

18   30% of the Company's total sales in Q4 2021, nearly double the ratio at the beginning of the

19   Class Period.

20

21

22

23

24

25

26

27   ───────────────────
[170] Defendants judicially admitted this omitted fact by including it in a brief in this action.
28   ECF 58 at 12.

4890-0865-5022.v1





(ii)     This massive increase in wholesale vehicles adversely impacted Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale vehicle sales, as detailed below:

(1)     Carvana sold cars at wholesale at significantly lower prices than those sold at retail.  Carvana, however, still incurred many of the same costs involved in selling retail vehicles, including inbound transportation, reconditioning, and other logistics.  Thus, the lower average sales price combined with customary selling costs resulted in significantly lower reported gross profit per unit on wholesale cars.  In Q4 2021, wholesale GPU was $1,396 while Retail GPU was $1,495.[171]

(2)     Although Carvana disclosed that it generated a modest gross profit on wholesale vehicle sales, its actual profitability – or lack thereof – of wholesale sales was not adequately disclosed because it: (i) excluded certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) did not disclose or quantify these excluded costs separately so investors could decipher overall profitability of wholesale sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included

---

[171]  Carvana also did not earn any ancillary revenue or profit on wholesale vehicle sales, such as warranty, insurance, or financing-related revenue.  These "other" revenue streams represented the vast majority of Carvana's reported total GPU on its retail sales, but generated $0 on wholesale sales.

4890-0865-5022.v1

material **costs associated with completing a wholesale sale**, such as the full cost to ship a car to a wholesale auction site and title and registration costs.[172]  Tellingly, Carvana admitted after the Class Period in its Q3 2023 Shareholder Letter and November 2, 2023 Cost Structure Details presentation that there are "**two key drivers**" **of** "**unit economics**" (*i.e.*, per-vehicle profitability): (i) cost of sales, which were the expenses Carvana had always included in its reported GPU calculations; and (ii) "operations expenses" per vehicle sold, which consisted of per-vehicle selling expenses that were ***not*** included in Carvana's reported GPU and had never been separately broken out to investors.[173]  Instead, during the Class Period, these expenses that drove Carvana's actual profit per car sold, were lumped into and comingled with other SG&A expenses.[174]  Carvana later admitted, however, that these "operations expenses" were not typical fixed or corporate overhead SG&A costs, conceding: "Operations expenses include the fulfillment, customer service, and transaction expenses ***associated with completing retail and wholesale vehicle sales***."[175]  Indeed, these vehicle

---

[172] In its November 2, 2023 Cost Structure Details presentation, Carvana disclosed and quantified retail and wholesale vehicle operations expense.

[173] After disclosing and quantifying operations expenses for the first time in November 2023, Jenkins acknowledged that the additional disclosure "allows a much deeper dive into the economics of Carvana." Jenkins added: "we've really been focused on . . . improving the unit economics of the business.  In other words, driving down variable costs per car," which he confirmed included "operations expenses, which are the more variable component of our selling, general and administrative expenses." Jenkins continued: "And the reason that we're focused on that is obviously, the more gains we make on reducing variable cost per car today, the more profitable our growth can be in the future . . . ."  Jenkins also described "driving down operational expenses per unit" as one of Carvana's "profitability initiatives, and in particular, . . . our unit economics initiatives."  Thus, according to Jenkins, operations expenses were a critical component of assessing Carvana's profitability.

[174] While Carvana included per-vehicle operations expenses in SG&A expenses (rather than GPU), it intentionally did not separately disclose or quantify these expenses in a manner that would have allowed investors to decipher the overall per-vehicle profitability on their own.  In fact, as detailed in ¶260(e), the disclosures Carvana ***did*** make regarding SG&A expenses during Q4 2021 did more to mislead investors than to provide transparency around Carvana's true profitability per vehicle sold.

[175] At the time of the 2022 Public Offering, Defendants described Carvana's SG&A costs as "expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development."  Moreover, while Defendants made vague Class Period disclosures indicating

- 299 -

selling expenses that Carvana had arbitrarily excluded from its reported GPU included: (i) "customer care, ***multi-car logistics***, ***last-mile delivery***, and other operations payroll" "associated with completing . . . wholesale vehicle sales"; (ii) "non-payroll ***logistics expenses***, including fuel, repairs and maintenance, and ***third-party transport services***" "associated with completing . . . wholesale vehicle sales"; and (iii) "[t]ransaction and other expenses, including limited warranty, ***title and registration***, and finance platform expenses" "associated with completing . . . wholesale vehicle sales."  When describing Carvana's wholesale profitability, the Registration Statement should have disclosed "operations expenses" because, internally at Carvana, "***the underlying costs of completing a sale***" were viewed as a critical component of Carvana's actual wholesale vehicle profitability.  Indeed, as Garcia Junior later acknowledged:

> ***When we think about trying to aim for more profitable sales, what does that mean?***  There's certainly variability in the kind of gross profit associated with different types of sales. . . .
>
> And then I think there's a number of other dynamics kind of across car type, et cetera.  ***There's also kind of variation in the underlying costs of completing a sale***.

Because the Registration Statement did not specifically break out operations expenses (*i.e.*, ***the underlying costs of completing a sale***) and instead buried and comingled them among SG&A expenses, investors could not calculate the actual overall profitability of Carvana's wholesale vehicle sales, like Garcia Junior did internally.  As demonstrated in the chart below, upon incorporating all of the estimated vehicle operations expenses (*i.e.*, the actual costs Carvana incurred in completing wholesale vehicle sales), ***Carvana lost money on wholesale vehicle sales every quarter during the Class Period***.[176]  For example, in Q4 2021,

---

that certain of expenses were recorded in SG&A, until the end of the Class Period Carvana never: (i) broke out "operations expenses" to investors; (ii) described that these vehicle "operations expenses" were direct per-vehicle costs "***associated with completing . . . wholesale vehicle sales***"; nor (iii) described that, in addition to the selling costs included in Carvana's GPU metric, these additional per-vehicle "operations expenses," were one of "***two key drivers***" of per-unit profitability.

[176] Estimated operations expense per wholesale vehicle is calculated as follows: total retail and wholesale vehicle operations expenses in Q4 2021 divided by total retail and wholesale vehicles sold in Q4 2021.

4890-0865-5022.v1

Carvana's average selling price per wholesale vehicle was $12,211 while its total costs (cost of sales in addition to estimated undisclosed operations expense) totaled $12,830, for a total loss of $619 per vehicle.



(iii)    The Registration Statement negligently omitted that the surplus of wholesale cars resulting from Carvana "***intentionally*** buying lower quality cars" also led to significant logistics constraints.  For example, in its May 2022 Operating Plan, Carvana admitted that "[b]uying cars from customers" led to "additional wholesale volume" which, in turn, led to "constraints in our nationwide logistics network."  Carvana also admitted that "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."

(iv)    The Registration Statement negligently omitted that Carvana lacked critical infrastructure necessary to process the huge surplus of wholesale vehicles, which is what led to Carvana's acquisition of ADESA, a nationwide wholesale auction house.  In describing his rationale for the purchase, Garcia Junior pointed to ADESA's 56 brick-and-mortar locations, consisting of 6.5 million square feet of buildings on more than 4,000 acres of land, and as reported in a September 13, 2022 *Vehicle Remarketing* article, explained "'[y]ou need a place to stage the logistics, and there's no better infrastructure than auctions to serve that purpose.'"  Indeed, Carvana later revealed that, prior to acquiring ADESA, Carvana "frequently ha[d] our last mile delivery advocates pick these cars up from

customer's homes and transport them to a market hub and then transport these cars long distances from their origin to our nearest IRC where they are either reconditioned or held until they are wholesaled." Further, Carvana admitted that "[w]ith this acquisition [of ADESA], we can now position advocates at the auction locations and transport cars from our customer's driveways directly to an ADESA U.S. location without any additional moves."

383. **Statement B**: In the 2021 10-K, Carvana reported:

[A]n increase in the number of used vehicles sold to 425,237 from 244,111 during the years ended December 31, 2021 and 2020, respectively. *The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, customer referrals, and growth in market population coverage to 81.0% as of December 31, 2021 from 73.7% as of December 31, 2020*.

384. As detailed below, Statement B was materially false and misleading when made because it negligently failed to disclose the following material facts necessary to be disclosed in order to make the Registration Statement not misleading:

(a) Although the Registration Statement described the drivers of retail unit growth, it did not disclose that this growth was primarily driven by a number of unsustainable practices. Specifically, and discussed in more detail below, the stated retail unit sales growth was primarily fueled by: (i) sales to customers awaiting proper title and registration processing; (ii) "less profitable sales" in "markets with lower profitability due to long distance from inventory"; (iii) trade-in sales resulting from Carvana's lowered purchasing and verification standards; (iv) sales, pursuant to a pass-through sales agreement with Garcia Senior's DriveTime, that lacked economic substance for Carvana; and (iv) "sales that were less profitable in the immediate period." For example:

(i) Statement B omitted that, in violation of state laws, Carvana routinely sold cars to customers before it held title to those cars and faster than it could get them registered to their new owners. For example, CWs-3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before they received title. Specifically, CW-10 described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars. CW-8 said that Carvana's

1   practice was simply to assume that titles for vehicles could be acquired later if they were not

2   available at the time of purchase.  CW-4 said Carvana had a Google spreadsheet that tracked

3   vehicles without titles for his/her entire IRC and "there were a ridiculous amount of cars on

4   the list."  CW-9 said, beginning in Q1 2022, registration delays amounted to roughly half of

5   the calls the team had handled.  The CWs' accounts are corroborated by state investigations,

6   findings, and suspensions of Carvana's dealership licenses in North Carolina, Michigan,

7   Illinois, Arizona, Pennsylvania, Florida, Texas, Maryland, Georgia, and Ohio.  In fact: (i) the

8   Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all

9   Ohio locations, and subjected the Company to increased oversight in December 2020; (ii)

10  following additional meetings between MDOS and Carvana, Carvana "admi[tted] . . . several

11  more violations of [Michigan's] Code," faced thousands of dollars in additional fines, and

12  had its 18-month probation extended on February 7, 2022; and (iii) Illinois had begun

13  investigating Carvana in February 2022 for issuing out-of-state temporary registration

14  permits and for failing to transfer titles in a timely manner in violation of its laws.  These

15  omitted facts were material as Defendants admitted that Carvana's retail sales growth was

16  significantly hindered by Defendants' belated enactment of "buffer" periods near the end of

17  the Class Period to allow for sufficient time to secure title.

18              (ii)     Statement B omitted that Carvana's retail sales growth was

19  largely driven by less profitable sales in far-flung markets in connection with Carvana's

20  nationwide expansion.  In fact, in FY 2021, 100% of the new markets that Carvana entered

21  were over 200 miles from an existing IRC, which cost Carvana an additional $750 more per

22  retail car sold.  These costs were material.  Indeed, near the end of the Class Period, Carvana

23  was forced to reduce sales in these markets.  As one misled commentator realized near the

24  end of the Class Period, "[Carvana's] was growth for growth's sake and not necessarily

25  growth to improve profitability."

26              (iii)    Statement B omitted that Carvana's retail sales growth was

27  supported by the lowering of the Company's purchasing and verification standards when

28  buying cars from customers.  Indeed, CW-4 confirmed that, to boost retail sales through

1   trade-ins, Carvana bought cars from customers that did not meet its purchasing and

2   verification standards.  CW-11 said that Carvana was buying vehicles "sight unseen" and

3   his/her team was not expected to do much to verify the condition of the vehicles.  CW-11

4   observed that Carvana did not actually care about the condition of the vehicles and just

5   wanted to "get as many cars as it could."  CW-10 corroborated this account, explaining that

6   Carvana was buying cars at breakneck speed and not adequately inspecting them.  In

7   addition, CW-2 was overruled when voicing concerns about the quality of vehicles as

8   "leadership would say take it."  Similarly, CW-5 stated that there was only a 50/50 chance

9   that a vehicle would be reappraised if it did not match the seller's description.  This omitted

10  fact was material as Carvana was forced to meter (*i.e.*, not sell) some of its purchases of cars

11  from customers because of the strain it placed on its logistics network, which would hinder

12  Carvana's retail growth.

13              (iv)    Statement B omitted that Carvana "frequently acquired sales that

14  were less profitable in the immediate period."  Carvana's internal sales' calculation

15  "incorporated the value of future sales" as Carvana singularly focused on growth without

16  regard to profitability.  These sales were material; near the end of the Class Period, Carvana

17  would be forced to forego these sales to survive, which adversely impacted Carvana's retail

18  sales growth.

19              (v)     Statement B omitted that Carvana had entered a sham pass-

20  through arrangement with DriveTime.  The 2021 10-K omitted that, for many of these sales,

21  Carvana kept ***none*** of the proceeds, but still recorded the revenue and retail unit sale on its

22  books.  These vacuous sales were material as they made up 169% of Carvana's reported

23  sequential growth in Q4 2021 and 19% in Q3 2021.

24          (b)     As a misled Needham & Company analyst noted near the end of the

25  Class Period, "'[t]he [only] path forward for Carvana is to sell as many cars as possible, but

26  to do so on a profitable basis, versus prior it was more about selling as many cars as

27  possible.'"

28          385.    **Statement C**: The 2021 10-K also contained the following risk disclosure:

- 304 -

We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . *[o]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration* . . . .

*    *    *

*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*.

386.    As detailed below, Statement C was materially false and misleading when made because it negligently failed to disclose the following material facts necessary to be disclosed in order to make the Registration Statement not misleading:

(a)    The disclosed risk – that the violation of any state regulations and laws "*could* result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations" – was misleading because it omitted that the risks it was warning investors about had already come to fruition. In fact: (i) the Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in December 2020; (ii) following additional meetings between MDOS and Carvana, Carvana "admi[tted] . . . several more violations of [Michigan's] Code," faced thousands of dollars in additional fines, and had its 18-month probation extended on February 7, 2022; and (iii) Illinois had begun investigating Carvana in February 2022 for issuing out-of-state temporary registration permits and for failing to transfer titles in a timely manner in violation of its

- 305 -

1    laws.  Defendants also concealed the inevitably of the foregoing risks and identified harms

2    materializing because of the above omitted facts.

3            (b)       Statement C presented Carvana's "failure to comply" with title and

4    registration laws and others' "allegation[s] that we violated these laws," as hypothetical risks

5    that could materially harm Carvana if they materialized when, in truth, these risks had

6    already come to fruition.  Carvana routinely and repeatedly sold cars before holding title to

7    the vehicles, failed to register cars within the legally required timeframe, and issued out-of-

8    state temporary tags and/or license plates in violation of numerous state laws.  Indeed, CWs-

9    3, 4, 8, 9, 10, and 11 universally reported that Carvana would sell these vehicles before they

10   received title.  Specifically, CW-10 described instances where titles on vehicles Carvana sold

11   could not be obtained for over a year, which meant the buyers were unable to drive their cars.

12   CW-8 said that Carvana's practice was simply to assume that titles for vehicles could be

13   acquired later if they were not available at the time of purchase.  CW-4 said Carvana had a

14   Google spreadsheet that tracked vehicles without titles for his/her entire IRC and "there were

15   a ridiculous amount of cars on the list."  CW-9 said, beginning in Q1 2022, registration

16   delays amounted to roughly half of the calls the team had handled.  Further, from June 2021

17   to July 2022, Carvana failed to timely register approximately 10% of its sales in Maryland,

18   which would later result in additional fines.  In addition, the *Barron's* expose would later

19   reveal that Carvana's violations were systematic and wide-reaching.  Carvana also concealed

20   the inevitably of the foregoing risks and identified harms materializing because of the above

21   omitted facts.

22           (c)       A reasonable investor would have viewed the above omitted facts as

23   important for the reasons stated herein.  Indeed, the Exchange Act Defendants admitted in an

24   October 2022 court filing that "'***the damage to Carvana's reputation and goodwill posed***

25   ***by***'" even one "'***suspension order is incalculable and irreparable***.'"

26

27

28

**E.     The Registration Statement Contained Deficient and Inaccurate Risk Disclosures**

387.    Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 105 of Regulation S-K, namely, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105.  None of the risk disclosures in the Registration Statement meaningfully disclosed the risks associated with Carvana's mounting titling issues and its practice of issuing temporary out-of-state licenses to customers for whom it was unable to procure vehicle title.

388.    The 2021 10-K warned that the Company is "subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration," and that "violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have material adverse effect on our business, sales, and results of operations."

389.    The Registration Statement did not warn, however, that, at the time of the 2022 Public Offering, Carvana was already experiencing widespread issues complying with state and local title and registration requirements, which the Company often addressed by issuing illegal, out-of-state temporary license plates to customers while they attempted to procure proper title.

390.    As a result of these practices, Carvana faced a mounting risk of regulatory action across the country, not merely as a result of being "subject to" state and local licensing requirements, but as a result of the Company's active violations of those requirements.  Moreover, the Company was already experiencing damage to its reputation as a result of the title and licensing issues as customers lodged numerous complaints, reported Carvana to local authorities, and increasingly sold their purchased vehicles back to Carvana after they were unable to obtain proper title.

391.    Accordingly, the Registration Statement negligently failed to disclose the material factors that made an investment in the offering risky or speculative, as required by Item 3 of Form S-1.

**F.    Events Subsequent to the 2022 Public Offering**

392.    Less than a month after the 2022 Public Offering, on May 10, 2022, Carvana issued an 8-K announcing "a workforce reduction . . . in operational groups in connection with . . . plans to better align staffing and expense levels with sale volumes."  Carvana further announced, in connection with "these right-sizing initiatives," that Carvana "will be transitioning operations away from" an IRC in Ohio as well as "a few logistics hubs." Carvana explained that it believed these initiatives "will result in Carvana restoring a better balance between its sales volumes and staffing levels and facilitate Carvana returning to efficient growth."  In addition, Carvana announced that it would release "materials on Carvana's [updated] operating plan" later that week.  On May 10, 2020, analyst Morgan Stanley also reported on the 8-K, noting, that it was likely the "first of many potential steps to address the cost structure," and that "[b]eyond the actions disclosed in today's 8-K, we believe transparency around future actions and management's disclosure and messaging around the path forward will be critical to re-establishing investor confidence which has been lost over the past few months."

393.    *Forbes* reported on the announcement, explaining, "Carvana's mass firing was a sign of much bigger problems at the company, according to 10 former employees . . . and several industry analysts.  They describe a spendthrift business, whose growth-at-all-costs mentality undermined business operations and sowed the seeds of its recent layoffs."

394.    On May 12, 2022, Carvana's license was suspended in Illinois for continued violation of title and registration requirements.

395.    On June 24, 2022, the *Barron's* exposé was published.  The article discussed Carvana's problems regarding title and registration and its violations of state laws and regulations, citing interviews with Carvana customers and former employees.  The article revealed for the first time that Arizona had canceled Carvana's temporary plate program, that

4890-0865-5022.v1

1    "[i]nterviews with state officials . . . show the issue is ***wide[]-reaching***," and, that Carvana had

2    revamped its title department three times and created an "undriveable-car task force."

3    396.    On October 7, 2022, MDOS announced that it had suspended Carvana's

4    license for its dealership in Novi, Michigan due to recent title and licensing violations.

5    MDOS cited "imminent harm to the public" in suspending Carvana's license.

6    397.    On November 3, 2022, Carvana announced its Q3 2022 financial results,

7    disclosing that: (i) retail car sales had declined 8% from the prior year; (ii) Carvana had been

8    "frequently acquiring sales that were less profitable in the immediate period but . . . .

9    [c]urrently, as we are primarily focused on profitability, we are intentionally acquiring fewer

10   of these sales"; (iii) Carvana had been "reducing advertising in [its new,] distant markets

11   with less profitable sales"; and (iv) Carvana had "take[n] other actions to improve

12   profitability, such as increasing long-distance shipping fees, in these [new, far-flung]

13   markets."

14   398.    On February 23, 2023, Carvana announced its Q4 2022 financial results,

15   disclosing that: (i) retail unit sales had declined 23% year-over-year – a "first . . . in

16   [Carvana's] history"; (ii) "it was the first year [Carvana] stepped back on the key metrics of

17   retail units sold"; (iii) gross profit had declined by 63% year-over-year; (iv) Carvana had

18   "significantly accelerated . . . reductions in inventory"; (v) Carvana had written off over $50

19   million of aged and impaired vehicle inventory that was worth less than Carvana had paid to

20   acquire it and prepare it for sale; (vi) Carvana was "significantly reducing retail vehicle

21   acquisitions"; and (vii) Carvana was intentionally foregoing retail sales growth for the

22   foreseeable future to instead focus on driving "positive unit economics."

23   399.    Purchasers in the 2022 Public Offering bought their shares for $80.00 per

24   share.  On the date this action was filed, August 3, 2022, Carvana's common stock traded in

25   a range of $35.59 to $32.50 per share.  On February 14, 2023, the day the Consolidated

26   Complaint was filed, Carvana's common stock traded in a range of $11.75 to $10.06 per

27   share.

28

4890-0865-5022.v1

**G.**     **The Role of the Underwriter Defendants in Connection with the 2022 Public Offering**

400.    The 2022 Public Offering was a firm commitment offering conducted by and through the Underwriter Defendants.

401.    The Registration Statement filed by Carvana in connection with the 2022 Public Offering explained: "We may sell these securities on a continuous or delayed basis, directly, through agents, dealers or underwriters as designated from time to time, or through a combination of these methods.  If any agents, dealers, or underwriters are involved in the sale of any securities, the applicable prospectus supplement will set forth their names and any applicable commissions and discounts."

402.    Carvana's Prospectus Supplement filed in connection with the 2022 Public Offering explained that Citigroup and J.P. Morgan would act as underwriters in the 2022 Public Offering, and further represented that they would collectively earn more than $24 million in underwriting discounts and commissions as a result of their efforts in the 2022 Public Offering.

403.    The Underwriter Defendants thus participated in the violations complained of herein as detailed below.

404.    The Underwriter Defendants are investment banking houses that, among other things, specialize in underwriting public offerings of securities.

405.    The Underwriter Defendants acted as Carvana's financial advisors at the time of the 2022 Public Offering.

406.    In connection with the 2022 Public Offering, the Underwriter Defendants marketed Carvana common stock to potential investors using materially false or misleading information about the Company, and/or omitted material information required to be disclosed in the Offering Documents.  The Underwriter Defendants also caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the 2022 Public Offering.  The Underwriter Defendants are liable to Plaintiffs and those similarly situated under the Securities Act.

407.    The Underwriter Defendants' participation in and solicitation of purchases of Carvana Class A common stock in the 2022 Public Offering was motivated by their financial interest.  They served as the underwriters of the 2022 Public Offering and shared nearly $25,000,000 in fees collectively for doing so.

408.    The Underwriter Defendants also obtained an agreement from Carvana to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

409.    In return, the Underwriter Defendants were willing to promote and sell Carvana's Class A common stock in the 2022 Public Offering.

410.    Concurrently with the 2022 Public Offering, Carvana received committed financing from J.P. Morgan Chase Bank N.A., an affiliate of J.P. Morgan, and an affiliate of Citigroup and conducted a senior unsecured notes offering, both of which were to help fund the acquisition and integration of ADESA.  The Underwriter Defendants acted as financial advisors in Carvana in structuring these finance arrangements, and similarly advised Carvana as to the 2022 Public Offering.

411.    According to an April 17, 2022 *The Wall Street Journal* article, entitled "Carvana, Once a Market Darling, Forced to Turn to Apollo for Cash," around the time of the 2022 Public Offering, "Carvana hired JP Morgan Chase & Co. to raise billions of dollars in debt and equity to pay for the purchase and subsequent integration" of ADESA.

412.    And according to an April 30, 2020 *Bloomberg* article, entitled "How Apollo's Last-Minute Twist Salvaged Carvana's Debt Sale," Carvana's disappointing financial results and worsening operational struggles made it difficult to find investors in Carvana's debt offering, which put "JPMorgan Chase & Co. and Citigroup Inc. . . . in a bind."

413.    Thus, on information and belief, the Underwriter Defendants were incentivized – by their connections with Carvana, including their financial entanglements with Carvana's acquisition of ADESA and their positions as Carvana's financial advisors – to maximize the value received in the 2022 Public Offering, which was a key source of financing for the Company at the time.

4890-0865-5022.v1

414.    Upon information and belief, representatives of the Underwriter Defendants also assisted Carvana in planning the 2022 Public Offering, and had access to confidential corporate information concerning Carvana's operations and financial prospects.

415.    In addition to availing themselves of virtually unlimited access to internal corporate documents, on information and belief, agents of the Underwriter Defendants met with Carvana's lawyers, management, and top executives prior to the 2022 Public Offering.

416.    Upon information and belief, during these meetings, agreements were reached as to: (i) the strategy to best accomplish the 2022 Public Offering; (ii) the terms of the 2022 Public Offering, including the price at which Carvana common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.

417.    As a result of those frequent contacts and communications between the Underwriter Defendants, Carvana, and the Individual Securities Act Defendants (as well as the Underwriter Defendants' direct involvement in material issues requiring disclosure, including Carvana's business performance and financials), the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the existing yet undisclosed conditions and material risks detailed herein, which were either misrepresented in or omitted from the Offering Documents.

418.    At a minimum, the Underwriter Defendants were negligent in not knowing, and failing to disclose in connection with the 2022 Public Offering, the adverse information alleged herein that was contrary to the disclosures in the Offering Documents, the omission of which rendered the Offering Documents false and misleading at the time it was made effective.

419.    Moreover, the Underwriter Defendants were required to investigate with due diligence the representations in the Offering Documents to confirm that they did not contain materially misleading statements or omit material facts.    None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief

4890-0865-5022.v1

1    that the statements in the Offering Documents (described herein) were true, were without

2    omission of any material facts, and/or were not misleading.  The Underwriter Defendants

3    thus negligently failed to conduct proper due diligence, and were negligent in not knowing of

4    the materially untrue statements and omissions contained in the Offering Documents, as

5    detailed herein.

6         420.    The Underwriter Defendants helped cause the Offering Documents to be filed

7    with the SEC and declared effective in connection with the offer and sale of the shares of

8    Carvana common stock registered thereby, including those shares purchased by Plaintiffs

9    and other members of the Securities Act Class.

10        **H.    Class Action Allegations for Securities Act Claims**

11        421.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

12   Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Carvana common stock

13   directly in the 2022 Public Offering pursuant to the Registration Statement.  This class

14   asserts claims only for violations of §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C.

15   §§77k, 77l, and 77o.  This class does not assert any claims sounding in fraud.

16        422.    Any person who did not purchase or acquire Carvana shares directly in the

17   2022 Public Offering and pursuant to the Registration Statement is not included in the

18   Securities Act Class.  Also excluded from the Securities Act Class are Defendants, the

19   officers and directors of the Company, members of their immediate families and their legal

20   representatives, heirs, successors or assigns, and any entity in which Defendants have or had

21   a controlling interest.

22        423.    The members of the Securities Act Class are so numerous that joinder is

23   impracticable.  The 2022 Public Offering involved the issuance and sale of millions of shares

24   of Carvana stock, which were publicly traded on the NYSE following the 2022 Public

25   Offering.  While the exact number of Securities Act Class members is unknown to Plaintiffs

26   at this time, Plaintiffs believe that there are thousands of members in the proposed Securities

27   Act Class.  Record owners and other members of the Securities Act Class may be identified

28   from records maintained by Carvana or its transfer agent and may be notified of the

1    pendency of this action by mail, using the form of notice similar to that customarily used in

2    securities class actions.

3        424.    Plaintiffs' claims are typical of the claims of the Securities Act Class, as all

4    Securities Act Class members were and are similarly affected by Defendants' conduct.

5        425.    Plaintiffs will fairly and adequately protect the interests of Securities Act Class

6    members and have retained counsel competent and experienced in securities class action

7    litigation.

8        426.    Common questions of law and fact exist as to all Securities Act Class members

9    and predominate over any questions solely affecting individual Securities Act Class

10   members.  Among the common questions of law and fact are:

11               (a)    whether the Securities Act Defendants violated the Securities Act;

12               (b)    whether the Registration Statement misrepresented and/or omitted

13   material facts in violation of the Securities Act; and

14               (c)    whether and to what extent Securities Act Class members have

15   sustained damages and the proper measure of damages.

16       427.    A class action is superior to all other available methods for the fair and

17   efficient adjudication of this controversy.  Because the damages suffered by individual

18   Securities Act Class members may be relatively small, the expense and burden of individual

19   litigation make it exceedingly difficult, if not impossible and impracticable, for Securities

20   Act Class members to individually redress the alleged wrongs done to them.  There will be

21   no difficulty in managing this action as a class action.

22   **XV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT**

23                              **COUNT IV**
                     **Violations of §11 of the Securities Act**
24                   **(Against the Securities Act Defendants)**

25       428.    Plaintiffs incorporate ¶¶19-23, 32-33, 39-42, 44, and 365-427 by reference.

26       429.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on

27   behalf of the Class, against the Securities Act Defendants.

28

4890-0865-5022.v1

430.    The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act.  Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with this Count.

431.    The Registration Statement used to complete the 2022 Public Offering contained untrue statements of material fact, omitted to state material facts required to be stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

432.    By reason of the conduct herein alleged, each Securities Act Defendant named herein violated §11 of the Securities Act.

433.    Plaintiffs purchased Carvana common stock in the 2022 Public Offering. Specifically: (a) UANPF and SHEPP purchased Carvana Class A common stock directly in the April 2022 Public Offering; (b) UANPF and SHEPP purchased Carvana Class A common stock on April 22, 2022 at $80.00 per share; and (c) UANPF and SHEPP purchased Carvana Class A common stock directly from underwriter defendant Citigroup.

434.    Plaintiffs and the Class sustained damages as the value of the stock issued in the 2022 Public Offering declined due to the Securities Act Defendants' violations.

435.    At the time of their purchases of Carvana Class A common stock issued in the 2022 Public Offering, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years have elapsed between the time that the stock upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

**COUNT V**
**Violations of §12(a)(2) of the Securities Act**
**(Against the Securities Act Defendants)**

436.    Plaintiffs repeat and re-allege the above allegations in ¶¶19-23, 32-33, 39-42, 44, and 365-435 as if fully set forth herein.

- 315 -

4890-0865-5022.v1

437.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of the Securities Act Class, against the Securities Act Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

438.    Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §771(a)(2).  Liability for a violation of §12(a)(2) extends to those, at a minimum, who passed title to the security to the purchaser, as well as those who solicited the purchase.

439.    By means of the defective Prospectus Supplement, which was incorporated in and formed part of the Registration Statement for the 2022 Public Offering, these Defendants promoted and sold, for the benefit of themselves and their associates, Carvana common stock to the Plaintiffs and other members of the Securities Act Class.  In the absence of their efforts to publicize the 2022 Public Offering and solicit Carvana common stock purchasers, the 2022 Public Offering could not have occurred.

440.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Offering Documents for their own financial benefit.  But for their participation in the 2022 Public Offering, including their solicitation, the 2022 Public Offering could not, and would not, have been accomplished.

441.    The Offering Documents contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above.  The Securities Act Defendants owed Plaintiffs and the other members of the Class who purchased Carvana common stock pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that

4890-0865-5022.v1

1    such statements were true and that there was no omission to state a material fact required to

2    be stated in order to make the statements contained therein not misleading.

3        442.    By reason of the conduct alleged herein, the Securities Act Defendants violated

4    §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs

5    and the other members of the Class who purchased Carvana common stock pursuant to the

6    Prospectus Supplement sustained damages in connection with their purchases.  Accordingly,

7    Plaintiffs and the other members of the Class who hold the common stock issued pursuant to

8    the Prospectus Supplement have the right to rescind and recover the consideration paid for

9    their shares, and hereby tender their common stock to the defendants sued herein.  Class

10   members who have sold their common stock seek damages to the extent permitted by law.

**COUNT VI**
**Violations of §15 of the Securities Act**
**(Against the Individual Securities Act Defendants)**

13       443.    Plaintiffs repeat and re-allege the above allegations in ¶¶19-23, 32-33, 39-42,

14   44, and 365-442 as if fully set forth herein.

15       444.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o,

16   against the Individual Securities Act Defendants.  This Count does not allege, and does not

17   intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any

18   implication of fraudulent intent is hereby expressly disclaimed.

19       445.    Where a violation of §11 or §12(a)(2) occurs, §15 gives rise to liability as to

20   "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant

21   to or in connection with an agreement or understanding with one or more other persons by or

22   through stock ownership, agency, or otherwise, controls any person liable under Sections

23   77k or 77l [§11 or §12(a)(2)]."  15 U.S.C. §77o(a).  Control persons under §15 are "liable

24   jointly and severally with and to the same extent as such controlled person to any person to

25   whom such controlled person is liable."  *Id.*

26       446.    As detailed herein, each of the Individual Securities Act Defendants committed

27   primary violations of the Securities Act and is directly responsible and primarily liable for

28   any such violations.  In addition, the Individual Securities Act Defendants acted as

- 317 -

controlling persons of Carvana within the meaning of §15 of the Securities Act by virtue of their position as a director and/or senior officer of Carvana.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Securities Act Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Carvana to engage in the conduct complained of herein.  By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to §15 of the Securities Act.

447.    Each of the Individual Securities Act Defendants was a culpable participant in the violations of §11 alleged in Count IV above.  Because of their senior executive management and/or director positions with Carvana, they each had access to the undisclosed adverse information about the Company's business, operations, market trends, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof.  Based on this knowledge and: (i) having signed and/or authorized the signing of the Registration Statement; (ii) being named in the Registration Statement and identified as a director and/or executive officer; and/or (iii) playing a material role or otherwise participating in the process which allowed the 2022 Public Offering to be successfully completed, each of the Individual Securities Act Defendants was a culpable participant in the violations of §11 alleged in Count IV above.

448.    By reason of the conduct alleged herein, the Individual Securities Act Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

- 318 -

4890-0865-5022.v1

1    B.    Awarding compensatory damages in favor of Plaintiffs and the other members

2    of the Class against all Defendants, jointly and severally, for all damages sustained as a

3    result of Defendants' wrongdoing, in an amount to be proven at trial, including interest

4    thereon;

5    C.    Awarding Plaintiffs and the Class rescission or a rescissory measure of

6    damages;

7    D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

8    in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and

9    other costs and disbursements; and

10    E.    Awarding Plaintiffs and other members of the Class such other injunctive or

11    equitable relief, including disgorgement and/or the imposition of a constructive trust, that

12    may be deemed just and proper by the Court.

13                         **DEMAND FOR TRIAL BY JURY**

14         Plaintiffs demand a trial by jury.

15    DATED:  March 29, 2024               ROBBINS GELLER RUDMAN
                                            & DOWD LLP
16                                         DANIEL S. DROSMAN
                                         (Admitted *pro hac vice*)
17                                         RACHEL A. COCALIS
                                         (Admitted *pro hac vice*)
18                                         SARAH A. FALLON
                                         (Admitted *pro hac vice*)

19

20                                              s/ DANIEL S. DROSMAN

21                                            DANIEL S. DROSMAN

22                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
23                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
24                                         ddrosman@rgrdlaw.com
                                         rcocalis@rgrdlaw.com
25                                         sfallon@rgrdlaw.com

26

27

28

4890-0865-5022.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
(Admitted *pro hac vice*)
DAVID A. ROSENFELD
(Admitted *pro hac vice*)
BRENT E. MITCHELL
(Admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com
bmitchell@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
DINAH S. LEVENTHAL
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
dleventhal@odonoghuelaw.com

Additional Counsel for Lead Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT PC
ANDREW FRIEDMAN
7301 N. 16th Street, Suite 102
Phoenix, AZ  85020
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com

Local Counsel

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

United Association National Pension Fund ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>27th</u> day of March, 2024.

United Association National Pension Fund

By:    _____
        Toni C. Inscoe, Fund Administrator

CARVANA

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

Common Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 09/24/2020 | 2 | $214.97 |
| 09/24/2020 | 74 | $208.45 |
| 09/24/2020 | 198 | $215.97 |
| 09/25/2020 | 126 | $203.41 |
| 09/28/2020 | 226 | $217.56 |
| 09/29/2020 | 74 | $223.24 |
| 10/01/2020 | 600 | $237.67 |
| 10/15/2020 | 700 | $224.04 |
| 10/16/2020 | 300 | $221.71 |
| 10/30/2020 | 800 | $184.01 |
| 11/04/2020 | 466 | $200.58 |
| 11/05/2020 | 234 | $206.89 |
| 11/06/2020 | 31 | $209.86 |
| 11/06/2020 | 188 | $209.35 |
| 11/09/2020 | 112 | $201.41 |
| 11/09/2020 | 169 | $200.39 |
| 11/12/2020 | 400 | $214.52 |
| 11/18/2020 | 217 | $224.12 |
| 11/19/2020 | 583 | $227.72 |
| 11/23/2020 | 731 | $242.08 |
| 12/08/2020 | 300 | $262.09 |
| 01/06/2021 | 1,175 | $253.43 |
| 01/06/2021 | 6,285 | $252.00 |
| 01/07/2021 | 17 | $265.48 |
| 01/08/2021 | 400 | $278.64 |
| 01/12/2021 | 292 | $288.68 |
| 01/12/2021 | 447 | $287.20 |
| 01/12/2021 | 544 | $285.94 |
| 01/12/2021 | 1,968 | $287.76 |
| 01/13/2021 | 445 | $292.57 |
| 01/13/2021 | 607 | $287.68 |
| 01/13/2021 | 633 | $289.26 |
| 01/13/2021 | 1,772 | $289.52 |
| 01/14/2021 | 104 | $297.93 |
| 01/14/2021 | 200 | $297.39 |
| 01/14/2021 | 3,591 | $297.36 |
| 01/21/2021 | 1,618 | $273.56 |
| 01/29/2021 | 400 | $262.34 |
| 02/10/2021 | 300 | $297.30 |
| 02/26/2021 | 167 | $288.01 |
| 02/26/2021 | 332 | $278.31 |
| 02/26/2021 | 3,220 | $281.61 |
| 03/12/2021 | 200 | $287.43 |
| 04/06/2021 | 360 | $280.73 |
| 04/15/2021 | 300 | $283.15 |
| 05/24/2021 | 400 | $253.93 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/11/2021 | 200 | $274.28 |
| 07/01/2021 | 106 | $305.42 |
| 07/02/2021 | 106 | $311.95 |
| 07/02/2021 | 395 | $309.73 |
| 07/06/2021 | 314 | $316.17 |
| 07/06/2021 | 319 | $317.89 |
| 07/07/2021 | 302 | $316.17 |
| 07/08/2021 | 131 | $320.62 |
| 07/08/2021 | 228 | $312.87 |
| 07/08/2021 | 368 | $322.51 |
| 07/09/2021 | 74 | $325.17 |
| 07/09/2021 | 249 | $322.53 |
| 07/12/2021 | 105 | $323.00 |
| 07/13/2021 | 97 | $326.12 |
| 07/13/2021 | 99 | $324.44 |
| 07/13/2021 | 438 | $323.61 |
| 07/14/2021 | 222 | $316.61 |
| 07/14/2021 | 661 | $318.54 |
| 07/15/2021 | 33 | $310.83 |
| 07/15/2021 | 529 | $311.42 |
| 07/16/2021 | 166 | $313.61 |
| 07/16/2021 | 666 | $314.16 |
| 07/19/2021 | 23 | $305.67 |
| 07/19/2021 | 209 | $306.80 |
| 07/20/2021 | 66 | $325.34 |
| 07/20/2021 | 312 | $320.69 |
| 07/21/2021 | 19 | $330.32 |
| 07/21/2021 | 30 | $332.05 |
| 07/21/2021 | 54 | $330.40 |
| 07/21/2021 | 63 | $330.38 |
| 07/21/2021 | 76 | $325.14 |
| 07/22/2021 | 22 | $334.62 |
| 07/22/2021 | 202 | $335.28 |
| 07/23/2021 | 49 | $338.92 |
| 07/23/2021 | 218 | $334.39 |
| 07/26/2021 | 323 | $337.23 |
| 07/27/2021 | 69 | $330.14 |
| 07/27/2021 | 72 | $330.27 |
| 07/27/2021 | 788 | $331.51 |
| 07/28/2021 | 163 | $337.62 |
| 07/28/2021 | 263 | $340.62 |
| 07/29/2021 | 416 | $338.40 |
| 07/29/2021 | 875 | $338.70 |
| 07/30/2021 | 36 | $336.17 |
| 07/30/2021 | 58 | $337.56 |
| 07/30/2021 | 115 | $336.77 |
| 07/30/2021 | 206 | $340.07 |
| 08/02/2021 | 14 | $335.97 |
| 08/09/2021 | 120 | $352.05 |
| 08/11/2021 | 3 | $356.97 |
| 08/12/2021 | 3 | $356.99 |
| 08/16/2021 | 13 | $356.91 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/16/2021 | 64 | $356.22 |
| 08/16/2021 | 90 | $356.93 |
| 08/17/2021 | 74 | $352.22 |
| 08/17/2021 | 233 | $352.22 |
| 08/30/2021 | 100 | $334.85 |
| 08/31/2021 | 200 | $330.93 |
| 10/08/2021 | 200 | $284.63 |
| 12/17/2021 | 500 | $214.07 |
| 01/10/2022 | 162 | $173.71 |
| 01/10/2022 | 438 | $173.39 |
| 01/12/2022 | 700 | $179.37 |
| 02/25/2022 | 374 | $153.32 |
| 02/25/2022 | 426 | $146.79 |
| 03/01/2022 | 300 | $139.04 |
| 03/04/2022 | 300 | $113.88 |
| 04/22/2022 | 1,455 | $80.00 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 04/08/2021 | 10,517 | $270.76 |
| 05/10/2021 | 279 | $245.11 |
| 10/12/2021 | 80 | $282.67 |
| 10/12/2021 | 157 | $282.29 |
| 10/13/2021 | 17 | $281.90 |
| 10/13/2021 | 480 | $282.41 |
| 10/14/2021 | 9 | $283.93 |
| 10/14/2021 | 221 | $286.00 |
| 10/15/2021 | 35 | $290.50 |
| 10/15/2021 | 99 | $287.61 |
| 10/15/2021 | 256 | $288.11 |
| 10/18/2021 | 69 | $289.45 |
| 10/18/2021 | 117 | $288.82 |
| 10/18/2021 | 152 | $288.90 |
| 10/19/2021 | 20 | $292.69 |
| 10/19/2021 | 118 | $293.46 |
| 10/20/2021 | 21 | $291.29 |
| 10/20/2021 | 68 | $292.95 |
| 10/20/2021 | 253 | $289.55 |
| 10/21/2021 | 19 | $302.00 |
| 11/02/2021 | 191 | $300.61 |
| 11/16/2021 | 399 | $298.31 |
| 11/30/2021 | 95 | $283.46 |
| 11/30/2021 | 105 | $279.68 |
| 03/22/2022 | 14,007 | $136.63 |
| 04/28/2022 | 8,262 | $61.88 |
| 11/07/2022 | 993 | $7.51 |
| 11/07/2022 | 1,348 | $7.48 |
| 11/07/2022 | 4,051 | $7.40 |
| 11/08/2022 | 6,174 | $7.12 |

**Bond**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 08/12/2021 | 4.875% due 09/01/2029 | 770,000 | $100.00 |
| 09/20/2021 | 4.875% due 09/01/2029 | 400,000 | $99.63 |
| 12/20/2021 | 4.875% due 09/01/2029 | 20,000 | $93.13 |
| 01/05/2022 | 4.875% due 09/01/2029 | 75,000 | $94.75 |
| 01/06/2022 | 4.875% due 09/01/2029 | 130,000 | $94.25 |
| 01/26/2022 | 4.875% due 09/01/2029 | 120,000 | $91.25 |
| 03/25/2021 | 5.5% due 04/15/2027 | 580,000 | $100.00 |
| 05/03/2021 | 5.5% due 04/15/2027 | 105,000 | $102.38 |
| 05/04/2021 | 5.5% due 04/15/2027 | 45,000 | $102.38 |
| 05/04/2021 | 5.5% due 04/15/2027 | 65,000 | $102.38 |
| 05/05/2021 | 5.5% due 04/15/2027 | 25,000 | $102.63 |
| 05/06/2021 | 5.5% due 04/15/2027 | 50,000 | $103.25 |
| 05/10/2021 | 5.5% due 04/15/2027 | 105,000 | $103.50 |
| 05/11/2021 | 5.5% due 04/15/2027 | 65,000 | $103.25 |
| 01/26/2022 | 5.5% due 04/15/2027 | 75,000 | $94.25 |
| 04/30/2021 | 5.625% due 10/01/2025 | 505,000 | $103.25 |
| 12/20/2021 | 5.875% due 10/01/2028 | 105,000 | $99.00 |
| 01/26/2022 | 5.875% due 10/01/2028 | 275,000 | $95.38 |

| Date Disposed | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 05/11/2022 | 4.875% due 09/01/2029 | 35,000 | $65.50 |
| 05/11/2022 | 4.875% due 09/01/2029 | 40,000 | $63.75 |
| 05/26/2022 | 4.875% due 09/01/2029 | 80,000 | $66.00 |
| 07/05/2022 | 4.875% due 09/01/2029 | 270,000 | $56.25 |
| 08/11/2022 | 4.875% due 09/01/2029 | 170,000 | $65.75 |
| 09/22/2022 | 4.875% due 09/01/2029 | 65,000 | $52.00 |
| 09/23/2022 | 4.875% due 09/01/2029 | 855,000 | $50.00 |
| 04/20/2022 | 5.5% due 04/15/2027 | 125,000 | $86.00 |
| 04/20/2022 | 5.5% due 04/15/2027 | 310,000 | $81.75 |
| 04/26/2022 | 5.5% due 04/15/2027 | 120,000 | $82.50 |
| 05/26/2022 | 5.5% due 04/15/2027 | 75,000 | $72.00 |
| 07/05/2022 | 5.5% due 04/15/2027 | 345,000 | $64.50 |
| 09/23/2022 | 5.5% due 04/15/2027 | 140,000 | $56.75 |
| 04/27/2022 | 5.625% due 10/01/2025 | 70,000 | $88.33 |
| 04/27/2022 | 5.625% due 10/01/2025 | 110,000 | $88.25 |
| 04/27/2022 | 5.625% due 10/01/2025 | 160,000 | $88.00 |
| 05/11/2022 | 5.625% due 10/01/2025 | 165,000 | $75.50 |
| 03/16/2022 | 5.875% due 10/01/2028 | 105,000 | $87.00 |
| 03/17/2022 | 5.875% due 10/01/2028 | 35,000 | $87.50 |
| 03/17/2022 | 5.875% due 10/01/2028 | 80,000 | $87.50 |
| 03/17/2022 | 5.875% due 10/01/2028 | 160,000 | $87.00 |

Prices listed are rounded to two decimal places.

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

Saskatchewan Healthcare Employees' Pension Plan ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Chin v. KE Holdings Inc.*, No. 1:21-cv-11196 (S.D.N.Y.)
*Retail Wholesale Dept. Store Union Local 338 Ret. Fund v. Beyond Meat, Inc.*, No. 2:23-cv-03602 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this  28  day of March, 2024.

Saskatchewan Healthcare Employees' Pension Plan

By:   *Dale Markewich*

Dale Markewich, Chief Financial Officer

CARVANA

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/05/2020 | 1,181 | $173.54 |
| 08/05/2020 | 2,229 | $174.85 |
| 08/06/2020 | 1,230 | $206.05 |
| 08/06/2020 | 1,923 | $202.24 |
| 08/07/2020 | 648 | $203.91 |
| 08/07/2020 | 3,677 | $203.27 |
| 08/10/2020 | 972 | $189.18 |
| 08/11/2020 | 810 | $188.84 |
| 08/12/2020 | 147 | $191.97 |
| 08/13/2020 | 250 | $193.84 |
| 08/14/2020 | 180 | $195.03 |
| 08/17/2020 | 1,664 | $195.41 |
| 08/19/2020 | 264 | $199.39 |
| 08/20/2020 | 55 | $200.92 |
| 08/21/2020 | 607 | $203.34 |
| 08/24/2020 | 1,114 | $199.60 |
| 08/25/2020 | 490 | $200.21 |
| 08/26/2020 | 581 | $205.36 |
| 08/27/2020 | 1,400 | $207.83 |
| 08/28/2020 | 2,163 | $216.98 |
| 11/25/2020 | 516 | $241.12 |
| 10/20/2021 | 217 | $289.28 |
| 10/22/2021 | 130 | $296.58 |
| 10/25/2021 | 104 | $292.22 |
| 10/26/2021 | 138 | $292.34 |
| 10/27/2021 | 281 | $295.21 |
| 11/18/2021 | 166 | $289.28 |
| 11/18/2021 | 202 | $286.09 |
| 11/19/2021 | 569 | $291.63 |
| 11/22/2021 | 2,426 | $284.57 |
| 11/23/2021 | 1,495 | $281.02 |
| 11/24/2021 | 1,121 | $287.73 |
| 11/26/2021 | 363 | $289.60 |
| 11/29/2021 | 734 | $292.23 |
| 11/30/2021 | 221 | $279.68 |
| 11/30/2021 | 2,167 | $283.65 |
| 12/01/2021 | 538 | $278.76 |
| 01/14/2022 | 2,084 | $156.39 |
| 04/04/2022 | 36 | $132.97 |
| 04/04/2022 | 183 | $130.31 |
| 04/04/2022 | 505 | $132.81 |
| 04/04/2022 | 1,885 | $130.19 |
| 04/05/2022 | 2,413 | $121.78 |
| 04/22/2022 | 3,838 | $80.00 |
| 06/27/2022 | 1,803 | $29.87 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/28/2022 | 1,803 | $26.79 |
| 07/20/2022 | 2,569 | $26.73 |
| 07/20/2022 | 6,897 | $26.28 |
| 07/21/2022 | 1,695 | $27.80 |
| 07/21/2022 | 3,921 | $27.66 |
| 07/22/2022 | 945 | $25.59 |
| 07/22/2022 | 1,219 | $27.70 |
| 07/22/2022 | 8,650 | $25.91 |
| 07/25/2022 | 2,421 | $25.18 |
| 07/26/2022 | 4,486 | $23.85 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 10/21/2020 | 3,224 | $195.69 |
| 12/11/2020 | 1,553 | $259.91 |
| 02/12/2021 | 1,611 | $296.99 |

Prices listed are rounded to two decimal places.