# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United Association National** | ) | |
| **Pension Fund, et al.,** | ) | No. 2:22-cv-02126-MTL |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 19, 2024 |
| **Carvana Company, et al.,** | ) | 10:07 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>HEARING ON MOTIONS TO DISMISS</u>**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:
    ROBBINS GELLER RUDMAN & DOWD, LLP
    By:  **Mr. Daniel S. Drosman, Esq.**
         **Ms. Rachel A. Cocalis, Esq.**
    655 West Broadway, Suite 1900
    San Diego, California  92101
    - and -
    BONNETT FAIRBOURN FRIEDMAN & BALINT, PC
    **By:  Mr. Andrew S. Friedman, Esq.**
    7301 North 16th Street, Suite 102
    Phoenix, Arizona  85020

For the Defendants Carvana, et al.:
    LATHAM & WATKINS
    By:  **Ms. Susan Engel, Esq.**
         **Mr. Matthew Peters, Esq.**
    555 11th Street NW, Suite 1000
    Washington, DC  20004-1304
    - and -
    LATHAM & WATKINS
    **By:  Mr. Kalana Kariyawasam, Esq.**
    1271 Avenue of the Americas
    New York, New York  10020
    - and -
    FENNEMORE CRAIG, PC
    **By:  Ms. Andrea Lynn Marconi, Esq.**
    2394 East Camelback Road, Suite 600
    Phoenix, Arizona  85016

For the Defendants Citigroup Global Markets, Incorporated, and J.P. Morgan Securities, LLC:
    PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
    By:  **Mr. David Phillip Friedman, Esq.**
    1285 Avenue of the Americas
    New York, New York  10019

For Defendant Ernest Garcia, Sr.:
    DLA PIPER, LLP
    By:  **Ms. Melanie E. Walker, Esq.**
    2000 Avenue of the Stars, Suite 400
    Los Angeles, California  90067
    - and -
    DLA PIPER, LLP
    By:  **Mr. Cameron Ailes Fine, Esq.**
         **Ms. Madeline Averi Cordray, Esq.**
    2575 East Camelback Road, Suite 800
    Phoenix, Arizona  85016

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 10:07 a.m.)

THE COURTROOM DEPUTY:  Civil Case 22-2126, United Association National Pension Fund, and others, vs. Carvana Company, and others.  This is the time set for hearing on motions to dismiss.

Please announce your presence for the record starting with the plaintiff.

MR. DROSMAN:  Good morning, Your Honor.  Daniel Drosman on behalf of plaintiffs from the law firm of Robbins Gellerman Rudman & Dowd.  Also, Andrew Friedman from the law firm of Bonnett Fairbourn Friedman & Balint, also on behalf of plaintiffs, is present.

THE COURT:  Good morning.

MR. DROSMAN:  Good morning.

MS. COCALIS:  And my name is Rachel Cocalis, and I'm also arguing on behalf of the plaintiffs.

THE COURT:  Tell me how you pronounce it again.

MS. COCALIS:  Cocalis.

THE COURT:  All right.  Thank you, ma'am.

MS. ENGEL:  Good morning, Your Honor.  Susan Engel from Latham & Watkins.  I represent Carvana and all of the individual defendants except for Mr. Garcia, Sr.  I'm also here with -- from Carvana, Greg Davis, the head of litigation, and

UNITED STATES DISTRICT COURT

also from Carvana, Jess O'Neal.  And my colleagues from Latham, Matt Peters and Kalana Kariyawasam.  And in the back corner, Andrea Marconi from Fennemore.

Thank you.

THE COURT:  Good morning.

MR. FRIEDMAN:  Good morning, Your Honor.  David Friedman from Paul Weiss on behalf of the underwriter defendants, Citigroup Global Markets, Inc., and JPMorgan Securities, LLC.

THE COURT:  Good morning to you.

MS. WALKER:  Good morning.  Your Honor.  Melanie Walker from DLA Piper on behalf of Mr. Ernest Garcia, II.  And I'm here with my colleagues, Madeline Cordray and Cameron Fine.

THE COURT:  Good morning to you all as well.

I have three motions to dismiss.  I'm counting the underwriter's joinder as a motion because you gave me a little bit more argument.  So that's why I said we have three motions to dismiss.  We have about 90 minutes this morning.

Ms. Engel, have you spoken to anybody else about perhaps how you wish to proceed and in terms of dividing up time amongst --

MS. ENGEL:  Yes.

THE COURT:  -- how --

MS. ENGEL:  Yes, Your Honor --

THE COURT:  Do you have a proposal?

MS. ENGEL:  Thank you.

For all of the defendants, I'm going to take the bulk of the time.  Counsel for Garcia, Sr., will take about five minutes.  And I believe underwriter's counsel is going to join in our arguments.

THE COURT:  Okay.  So does that mean underwriter's counsel won't be arguing separately?

MS. ENGEL:  Correct.

MR. FRIEDMAN:  That's right, Your Honor.  If you have any questions, I'm, of course, happy to address them.

THE COURT:  Okay.  Very good.

All right.  And how long did you think that you would want, Ms. Engel, for your presentation?

MS. ENGEL:  About 25 to 30 minutes at the outset.  I could be shorter if you -- --

THE COURT:  That's okay.

MS. ENGEL:  -- prefer.

THE COURT:  I think that would work, you know, with the understanding that everybody gets equal time and the movants will have a rebuttal opportunity.

All right.  So why don't you come on up.

MS. ENGEL:  All right.  Thank you.

Your Honor, we have exchanged slide decks with the plaintiffs before coming -- coming into court, and I've given one to the court reporter.  I'm happy to hand up one to you and

your clerks now or wait until after the argument, whichever you prefer.

THE COURT:  You know, you could wait until after.  And if I could just confirm with you, is this all information that comes from your brief?

MS. ENGEL:  Yes, Your Honor.

THE COURT:  Okay.  So nothing is outside of the briefs?

MS. ENGEL:  Correct.  I think we cite one Ninth Circuit decision from December, the *Facebook* case, and I believe that's the only case or any information that comes from outside of the briefing.

THE COURT:  All right.  Very good.  Come on up.

MS. ENGEL:  Thank you.

Okay.  Thank you, Your Honor.  Again, it's Susan Engel from Latham & Watkins.  And I'm speaking on behalf of the Carvana defendants, including Carvana and the individual defendants, except for Mr. Garcia, Sr.

Plaintiffs' complaint is built on hindsight.  Carvana had the strategy to be the biggest and the best.  Its sales grew rapidly for much of the class period.  It became the second largest used vehicle dealer.  It hit some rough spots. It tweaked its strategy.  Plaintiffs jump all over that.  But it is not a violation of the securities laws to change strategy.  It's good business.  Before I walk through the

challenge statements, I'd like to table set just a bit.

I have up on slide 1 the stock chart for the class period. Plaintiffs say their case is a pump and dump, but there's no pump. I would refer the Court also to the Ninth Circuit's decision, which we cite in our brief, the *Vantive* decision. Like that case, plaintiffs recycle virtually the same statements in their very long complaint for fiscal year 2020 and then for 2021 and then 2022. It's not plausible that the -- substantially the same statements are pumping the stock price for the first half of the class period, but then the stock price is declining with the same statements -- substantially the same statements in the second half. There's also no dump.

The CEO, Mr. Garcia, Jr., did not sell a single share. And it's important to note that the statements that they're challenging are made in SEC filings, in shareholder letters, which Mr. Garcia, Jr., signed in earnings calls. Garcia, Jr., made most of the statements, but he did not sell a single share. He even bought towards the end of the class period. Not at the very end, but seven months before the end. The CFO sold, but he retained 66 percent of his earnings. And he sold pursuant to trading plans. And, as the plaintiffs themselves note in paragraphs 302 of the complaint, the bulk of his sales were for -- from four months, from August to December of 2020. So he was dumping before plaintiffs allege that he was pumping

in 2021 and 2022 because the class period is so long.

There is no pump, and there is no dump.

Now, plaintiffs will point to the stock sales of Garcia, Sr.  But the Ninth Circuit is clear that the scienter that plaintiffs have to point to on a statement claim is the scienter of the speaker.  Plaintiffs must show that the speaker at the time he made a misleading statement did so with deliberate disregard for the truth.  There is no suggestion in the complaint that Garcia, Jr., tipped off Garcia, Sr., and certainly that is not the type of inference that you can draw without facts.

Plaintiffs will also point to their scheme liability claim, but the only acts alleged with particularity in the complaint are statements.  Plaintiffs will say that various defendants -- they won't say who, but they will say defendants as a whole participated in an offering.  They made statements, I suppose, or they orchestrated or they planned, but there are no specifics about what any defendant did, when they did it, or, again, they run into the same scienter problem.  There are no allegations that any defendant did anything or said anything while knowing or concealing information at the time of that statement or act.

Plaintiffs have also added Securities Act claims. These came in for the first time in the consolidated complaint. After the federal plaintiffs filed the consolidated complaint

in this case, state plaintiffs in a parallel Securities Act litigation add -- were allowed -- were granted leave to amend by Judge Thomason down the road, and they added substantially similar claims.

Now, plaintiffs will say that case was different. And it did start off as an accounting-based case. But as Judge Coury, who took over the case when Judge Thomason retired, as you'll see, and that -- we submitted that decision at Docket 63.

THE COURT: And I do have that. And I was actually wondering if you could tell me a little bit more about the state case. And if you have that built into your presentation, I could wait.

MS. ENGEL: So here on slide 2, we have excerpted part of Judge Coury's dismission -- dismissal decision. In October he -- in a second decision in the case, he dismissed the claims with prejudice and in a very thorough, well-reasoned decision. Plaintiffs in that case challenged some of -- some, but not all, of the same statements and ultimately argued the same type of claim, you know, in part because their complaint was filed after the -- after this federal one.

They argued that Carvana touted its business strategy of buying cars without disclosing costs that came along with that strategy as well as operational constraints, including delivering title and processing registration in a timely

fashion.  They relied on the Barron's article from June 2022, just as the plaintiffs do here.  And Judge Coury, applying a notice pleading standard, because there were no fraud claims alleged in that complaint, dismissed applying the Ninth Circuit's case law where you -- that says, for example, the *Apollo* decision, a plaintiff cannot bring an omission-based claim where the omitted information is actually disclosed.

And here the information that plaintiffs say was disclosed about the costs of the business strategy, including buying lower quality vehicles that have to be sold at wholesale or operational constraints because Carvana was investing in its growth.

THE COURT:  Why was that case not removed to federal court?

MS. ENGEL:  The Securities -- a Securities Act claim cannot be removed to federal court under the SLUSA.

THE COURT:  Is that right?

MS. ENGEL:  The *Cyan* decision from -- I will say I did it back in the glory days --

THE COURT:  Okay.

MS. ENGEL:  -- but the *Cyan* decision, C-Y-A-N, ended that removal.

THE COURT:  Interesting.

MS. ENGEL:  It's because of the very -- I could have walked through the statute.  It was an interesting argument --

THE COURT:  Okay.

MS. ENGEL:  -- a number of years ago, but, anyway --

THE COURT:  All right.  Go ahead.

MS. ENGEL:  -- Exchange Act claims can only be brought in federal court.  And so the state case had only Securities Claim Act claims.

THE COURT:  Okay.

MS. ENGEL:  But we just excerpted -- and I think the decision also speaks for itself, about how similar the arguments are.  But we excerpted some of Judge Coury's decision here.  Carvana disclosed challenges associated with buying more cars from customers, disclosed that it purchased lower quality cars, that it sold to wholesalers.  It disclosed that its title and registration processing became more difficult during the pandemic.  It disclosed regulatory suspensions.  He recognized that the plaintiff pointed to the same Barron's article and said, "Plaintiff has not identified any material fact in the Barron's article or other news article that was required to be disclosed.  A $2500 penalty is not something a company needs to list out in an SEC filing."

All right.  With that brief, I hope, attempt to table set a bit, I'd like to walk through some of the various grounds that we addressed in our briefing as well for dismissal.

Right at the outset, the complaint is an improper puzzle pleading.  And plaintiffs object to our Appendix A where

we were attempting to pull all of the statements together. That appendix does not even have all of the same statements. We have 76 listed. But plaintiffs also have paragraphs in their complaint, including at paragraph 209, where plaintiff says this other quarterly report has substantially similar statements as another quarterly report related to various topics. 240 is another example. They do it several times. The specific statements are not even called out.

Plaintiffs say it's fine. They've bolded the relevant language. But then in their opposition, they challenge statements, including a risk disclosure that is not bolded in the complaint. And plaintiffs also have a deck, and I noticed that the relevant language is bolded on their deck, but it is not bolded in the complaint. So that's like we had a 1,000-piece puzzle, and now we're doing a 1,002-piece puzzle.

Even getting to the merits, though, the statement-based claim fails. And I have up here on slide 7 -- I'm not going to walk through all of them. We tried to pull examples from throughout the class period. We're not trying to -- we think we've laid out all of the statement numbers at the bottom that we believe fall into the -- the inactionable categories. But these statements are classic puffery. And that's not a surprise, because the statements they're challenging are Carvana promoting its business strategy describing what it -- what it said in its SEC filing was a

disruptor, like novel business strategy.  It was selling cars online nationwide.  And this is an industry that is regulated locally.  The regulations are designed -- and this is in Carvana's SEC filings.  The regulations are designed for brick-and-mortar dealers.  Carvana was working under patchwork of regulations that were not built for it.

Up here, the puffery statement's, "Our business gets better as it gets bigger."

THE COURT:  Pardon me for interrupting, but they did have the appropriate licenses in every state that they did business.  So they did obtain a used car dealership license wherever they were going to sell a vehicle.  That's -- I think that's in the record; right?

MS. ENGEL:  That's correct.  And I'll point the Court to one of the 10-Ks that we've put in at Exhibit 8 at page 15 where Carvana discloses the states in which it has dealer licenses.  And it says that it also has obtained dealer licenses in some states even where it may not have believed it was required --

THE COURT:  Okay.

MS. ENGEL:  -- to do so, but it did it anyway in order to advance its relationship with its regulators.

THE COURT:  So the novelty, the disruption, if you will, is that it was -- it -- is that this company offered an Internet-based interface for customers in various states to see

what the inventory looked -- like a national inventory.  Is that -- is that --

MS. ENGEL:  I think that's right.  It's not just buying it online, but it is, as Carvana described, offering a nationwide inventory to expand the customers' choices.  And so if a customer in Arizona purchases a vehicle that Carvana itself has acquired from a customer in North Carolina, that involves changing the license plates and changing the registration and moving that from the locally regulated, you know, State A, where the car has been, moving it over to State B.  And these states have different laws about -- you know, they all give a certain time period.  States give a certain time period when you sell a car to a consumer for the title to be reissued by the DMV in the consumer's name.  But one state might have 60 days; another state might have 30.  So these are also inconsistent regulations.

So some -- some of the novelty was just basically changing who the regulator was, if a car started in one state and went to another state.

THE COURT:  Okay.  Thank you.

MS. ENGEL:  Okay.  So I'll move through these.

So I -- we think this is classic puffery.  The same thing for the opinion statements.  Example's on slide 8.  I think, I think, I think.  Plaintiffs doesn't -- do not point to any particular facts that any of the speakers, Garcia, Jr., the

CEO, or Jenkins, the CFO, had in his possession at the time of making any of these statements. That type of particularity is required, but it is missing from the complaint.

The forward-looking statements. And I mentioned particular risk disclosure here on 203. This is now bolded. And plaintiffs talk about it a lot on page 19 of their opposition. This is a forward-looking statement. "Could" is identified as forward-looking language. And the safe harbor of the PSLRA protects a forward-looking statement in two independent circumstances: One, where it is accompanied by cautionary language; or, two, where the plaintiff fails to plead that the speaker had actual knowledge of the falsity of the statement at the time he made it. Again, for all of the forward-looking statements, they stay within the safe harbor in the absence of those particular facts.

Plaintiffs are also challenging a number of statements from every quarter when Carvana announced the amount by which its retail sales had grown up, but they don't dispute the accuracy of the data. Even if any statement were actionable, they have seven sets of statements. We've lumped three of them together under A on slide 11. These are all statements that are describing the business strategy. Buying cars from customers, including cars that Carvana would sell at wholesale, which was a distinct revenue stream. Cars could be sold at wholesale when they weren't of a sufficient quality to put up

on the website for a retail consumer.  Expanding nationwide.  Precisely to expand the inventory available to a consumer.

This first group of statements where supposedly plaintiffs say were misleading because Carvana's scheme, in quotes, "to inflate retail sales," supposedly was not sustainable.

Well, there's no facts of any scheme or any intent to violate any law.  Carvana was not obliged to predict the failure of its business strategy.  We cite *Ronconi* from the Ninth Circuit, *Robinhood* from the Northern District -- District of California.  A company does not have to, you know, be all gloomy and doomy in its SEC filings.  It is allowed to promote its business strategy.

Plaintiff also will say that the strategy was disclosed but not the costs.  And, again, I would refer the Court to Judge Coury's extensive decision, particularly around page 17 and 18.  The costs of the strategy and the constraints under which Carvana was working as its sales skyrocketed, Carvana disclosed time and again that it was working to keep up.  It disclosed that title and registration processing had gotten backed up.  We all know that the DMV's shutdown for a period in 2020.  Banks, who held title to cars when consumers financed it, their employees were going into the -- were not going into the office.  Things shut down.  Carvana's sales skyrocketed.  Put that together.  Carvana disclosed on their

earnings calls and its very transparent shareholder letters, a very short document that it issued every quarter, that it was working to catch up.

The next set of statements about retail sales. Again, Carvana didn't have to predict a slowdown, but it did actually warn investors its rate of growth may decline. "Rapid growth has placed and may continue to place significant demands on its operational and financial resources."

And I'm reading from the 2020 10-K, Exhibit 8.

I'll also note that this is a long class period, so we keep going with the warnings. In February of 2022 in its shareholder letter, which reported results from Q4 2021, Carvana attached a very unusual appendix, and what that was was a mid-quarter update for the next quarter. It warned investors that given the macro-economic circumstances, like high interest rates, high used vehicle prices, these were impacting sales and expenses. Carvana also said, "We plan for sales volume six to 12 months ahead."

And so it was locked into certain costs and overhead. And this is in both the Q4 2021 share letter -- shareholder letter and also in the next quarter from Q1 2022.

There are allegations about certain transactions with DriveTime. DriveTime isn't actually mentioned in the section of plaintiffs' complaint that challenges statements. It's also mentioned in the scheme liability. What is the allegation? It

appears to be Carvana's retail sales statements.  When Carvana said retail sales increased by this amount, plaintiffs say in two particular quarters in 2021 they didn't really because some of those sales were fake.  Carvana didn't make money off of them.

That is contradicted by what Carvana disclosed. Carvana disclosed it was not conducting transactions with DriveTime at arm's length.  It disclosed that for some vehicles DriveTime would recondition them, get them in shape for sale. Carvana would place the vehicles on its website for sale.  When a consumer bought the car, the purchase price would get passed back to DriveTime.  And Carvana disclosed -- and this is in the 10-K from 2021, Exhibit 19 at 92.  It disclosed that Carvana made money on those sales through other revenue streams, typical dealer revenue streams, such as financing for the consumer and also service contracts.  So there is no -- there are no particular facts suggested in the complaint that anyone -- that these transactions were not making money for Carvana.  Or let alone, you know, plaintiffs run into a scienter obstacle there, too.

Slide 15, we have up here that there's a couple statements about a metric Carvana disclosed how it was calculated.  Carvana did not have to calculate it the same way CarMax did or the way, say, plaintiffs want them to.  And certainly a gross profit per-unit metric did not suggest even

by its title alone that it was measuring actual profit.

The title statements.  Plaintiffs point to a handful of different statements, including one from August 2021, where Carvana at an investor conference were asked by analysts about media reports saying North Carolina has suspended sales from one of your vending machines in the state.  Not all, but one. Carvana responded, said this type of penalty is unusual, but we believe it's limited in scope.  In fact, the person who said that is not a named defendant, and plaintiffs don't allege scienter.

But Carvana discussed this small penalty, which plaintiffs don't point to prior examples of it, with investors at the conference.  This was also discussed by Judge Coury, who rejected the same argument.  Carvana disclosed that its title and registration processing had become more difficult.

Another set of statements, Carvana -- plaintiffs say Carvana blamed costs and constraints on external macro-factors. We all remember what they were.  When the ports, you know, were closed in summer 2021, the back half of 2021 interest rates were rising, financing became more difficult, sales began to -- sales growth began to slow down.  Plaintiffs don't say those external factors were not affecting Carvana.  They fault Carvana for not disclosing internal factors and the costs and constraints.  But here, Exhibit 24 at 1, Carvana said at the same breath, "We're being affected by both external and

internal factors."

Let me turn to loss causation.  And it's plaintiffs' burden to plead loss causation with particularity for the Exchange Act claims.  We also think the negative causation defense appears on the face of the complaint for the Securities Act claims.  All of these allegations are -- in the complaint, they point to seven different corrective disclosures.  For three of them, the disclosure -- there's not a lot said about it.  We quote the three paragraphs, 366, 369, and 375 here on slide 20.  They're disclosures of disappointing financial news.  That's it.  There are no particular facts connecting that disappointing financial news to any of the statements.  And the Ninth Circuit has said time and again, and here we are citing -- this is the -- the Ninth Circuit case from December of 2023 *In Re Facebook*.  But it reaffirms the *First Solar* decision from 2018 and -- in the Ninth Circuit.  "Establishing loss causation requires more than an earnings mess or the market's reaction to a 'company's poor financial health generally.'"

Plaintiffs do not allege that any concealed facts that were concealed in 2020 or 2021 or before April 2022, they don't allege that any of that information that they say was concealed or schemed about, there are no -- there's no connection -- there's no facts connecting it to the disappointing financial news.  That's not in the complaint.

Your Honor in the *First Solar* decision said similarly causal connection between the statements and the announcements is required.  Certainly there's no DriveTime disclosure.

For the other four corrective disclosures, these are all discussions of a $2500 penalty, for example, from one state in the Wall Street Journal or the North Carolina suspension that I mentioned.  The Barron's article that appeared in the state case, too.  What's missing from the complaint is any explanation for the stock drop we see here on slide 22.  In the middle of the class period, the stock price began a steady decline.

So the problem with the four title disclosures is twofold:  One, the percentage decline that was caused right after the article came out was very tiny.  *Dura* says a significant stock drop is required.  And we cite a couple cases, including from the Southern District of California, Eng, E-N-G is one of them, that say this type of small single-digit percent drop is not enough on its face.  But here we have these tiny drops coupled with, two, this extended gradual stock decline.

Plaintiffs ignore it.  They have no explanation for why these tiny drops on these four days were caused by something different than what was causing the stock drop for, I mean, well over a year.  And it's their burden on the Exchange Act claims to prove loss causation with particularity.  And, of

course, none of these title articles, plaintiffs don't connect them back, certainly not to any statements that don't have anything to do with title.  And plaintiffs will get up here and say, our confidential witnesses say all this stuff about title being delayed and not getting to consumers on time.  Their own news article from June of 2022 at that time says, "No states are known to have sanctioned Carvana over the practice of selling vehicles without holding title."

Lastly, on scienter.  Well, almost lastly.  As I said, as I previewed at the beginning, plaintiffs have to plead scienter as to the individuals who made the statements or for their scheme liability claim as the individuals who actually engaged in a particular act.  There are no particular facts alleged about any defendant's state of mind.  The -- using the phrase defendants over and over again as a group is not sufficient under the PSLRA or 9(b).  There are no allegations that any speaker had access to particular information about DriveTime transactions or any other kind of information contradicting their optimistic assessment of their business strategy.  Likewise, for core operations, there's no admissions of involvement in, for example, DriveTime transaction data or calculating the total GPU metric.

So they're left with stock sales.  But stock sales alone, motive or mere recklessness, that's not enough. Plaintiffs have to allege that the speaker acted with

deliberate recklessness when he made a statement. And so insider trading can contribute to a strong inference of scienter only when it is dramatically out of line with prior trading practices, and, also, it's done at times calculated to maximize the personal benefit. I'm reading from the Zucco case. This -- this is well-established case law.

As I said, the CEO made no sales. He bought. The CFO and also the other two Carvana individual defendants, who do not make a challenge statement, they all sold mostly in the four months between August and December of 2020 by plaintiffs' only allegations. They had trading plans. Plaintiffs complain that these were modified, but the class period was two and a half years. Trading plans are typically entered into. They can span, but very typical to have a 12-month trading plan. It's not unusual to modify and enter into a new plan when the class period is so long.

I mentioned the *Vantive* decision before. We think it's particularly instructive. And I'll just read one quote here that I have here on slide 27. "Where the class period alleged is so long, and the virtually identical allegations recycled throughout the complaint so many times, it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made," [as read].

I think I left out a couple of words, so it wasn't an exact quote.  The exact quote is on slide 27.

Again, plaintiffs cannot rely on Garcia, Sr., to allege scienter for Garcia, Jr.  They cite two cases that they found, *Barron* and *China Auto*, which involved, they say in their brief, finding scienter -- scienter based on the family member sales.  But what they leave out is in those cases the individual defendant himself had also personally sold shares.  We have not found any case that imputes sales and finds that an individual defendant acted with scienter because someone else sold.

And, again, on scheme liability, we don't see any particular acts alleged in the complaint other than the statements.  We're not saying -- and we agree with plaintiffs on this point.  It is not the case that just because a statement claim fails a scheme liability necessarily fails, but it is the case that a scheme liability claim has to be based on something different.  If it's only based on statements, then the two fall side by side.  There are no other particular acts alleged, and the law is clear that the plaintiff has the burden to allege that each defendant engaged in particular acts.  They cite the *Vaxart* case from the Northern District.  In that case, Judge Chhabria found that nonspeaker defendants had, for example, worked to help draft a misleading press release.  So even though that nonspeaker defendant had not signed or

authored publicly the press release, they had worked behind the scenes. That's strikingly similar to the Supreme Court's *Lorenzo* decision. There's no -- there's just none of those allegations are in this case.

The insider trading claims here on 30 -- 33 fail, again, for the lack of particularity. The group pleading doesn't get them, you know, over the threshold hold. They've got to show that a particular defendant had in his possession material nonpublic information at the time. 10b-5(b). They don't allege an insider trading claim in the 10b-5(b) count of their complaint. And for good reason. 10b-5(b) requires a statement, and that's what the Supreme Court said in the *matrix* decision. Statement liability, not surprisingly, requires a plaintiff to allege a statement that is rendered misleading by a material omitted fact.

The 20A claim for Keeton and Huston also fail for lack of particularized allegations.

And, lastly, for the Securities Act claims, we don't think plaintiffs really meaningfully dispute that they've alleged kind of a unified scheme even if the Securities Act claims are separated out in their complaint. So Rule 9(b) applies. And, again, I think it's important to point out that the Securities Act claims flow from the April 2022 offering. All of the statements are in the offering documents. Some of the statements are in an incorporated 10-K.

There's nothing in the complaint showing any of this information about costs or operational constraints or any -- even a small title penalty, that those were concealed at the time of that April 2022 offering.  Plaintiffs' own allegations point to correct disclosures that they say disclosed this information before the offering.

And, lastly, item 105.  And this is related only to the Securities Act claims.  It requires that a company disclose the most significant risks when it holds an offering.  Car- -- Carvana did that.  Carvana disclosed that it was subject to regulatory and reputational and financial harm from any inability to comply with the patchwork of regulations that it was subject to, and it, in fact, warned that this had been challenging.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Engel.

MS. WALKER:  Good morning, Your Honor.  Melanie Walker on behalf of Ernest Garcia, Sr.

Notwithstanding the length of the complaint, there are actually very few allegations concerning Mr. Garcia, Sr.  Plaintiffs do not allege that Mr. Garcia, Sr., was involved in any of the allegedly false or misleading statements.  In fact, they concede in their opposition that they are not seeking to impose liability on Mr. Garcia, Sr., based on any of the alleged false or misleading statements because he was not a

maker of those statements.

There are also lengthy allegations concerning Carvana's operations that are not tied in any way to Mr. Garcia, Sr. There are no allegations that Mr. Garcia, Sr., was involved in Carvana allegedly lowering its purchasing and verification standards. There are not allegations from confidential witnesses, or otherwise, showing that Mr. Garcia, Sr., was ever made aware of this. Likewise, there are no allegations that Mr. Garcia, Sr., was involved in Carvana's expansion plans or that he was ever made aware that this was allegedly leading to less profitable sales. There are also no allegations that Mr. Garcia, Sr., was involved with Carvana's compliance with state title and registration laws or was aware of any communications from state regulators.

And, finally, none of the confidential witnesses has anything to say about Mr. Garcia, Sr. There are no allegations from confidential witnesses regarding an immediate meeting that Mr. Garcia, Sr., attended, a report that he received, a call that he was on about any of the issues in the complaint. None of the confidential witnesses even says that they ever saw Mr. Garcia, Sr., at Carvana's offices or at any of its locations.

So what does the complaint say about Mr. Garcia, Sr.? And I emphasize here that I'm focusing on the allegations of fact, because the complaint is full of conclusory assertions

regarding Mr. Garcia, Sr., and innuendo, but it is very light on facts.  And one thing I'd like to point out on that is plaintiffs rely on allegations from a complaint in the Delaware Chancery Courts and the Court's decision on the motion to dismiss in that case.  And they suggest that because certain of the allegations were repeated in the Court's decision that there's somehow established facts, and that is simply not the case.  And so I would caution Your Honor to be yourself cautious when looking at those allegations.

So what the complaint does allege about Mr. Garcia, Sr., is that he purchased stock in a direct offering before the start of the class -- class period.  Plaintiffs also repeatedly emphasize Mr. Garcia, Sr.'s stock sales during the class period.  And the actual facts there are that Mr. Garcia, Sr., sold roughly the same amount of stock, 40 to 60,000 shares per day every day for a ten-month period, and that he eventually sold 19 percent of his holdings.

Significantly, however -- and plaintiffs ignore this -- that means that Mr. Garcia, Sr., retained over 80 percent of his holdings worth billions of dollars as Carvana's stock price declined.  And to be sure, Mr. Garcia, Sr., made a lot of money on his stock sales.  I'm not going to shy away from that, because making money in the stock market is not securities fraud.  The complaint also notes that Mr. Garcia, Sr., modified his 10b-5 trading plan twice during

the class period.  But, of course, the result of that was that Mr. Garcia, Sr., continued to sell about the same amount of stock every day throughout the class period.

Mr. Garcia, Sr., was Carvana's largest shareholder, and he had majority voting power.  He is also the largest owner of DriveTime.  He lives next door to his son, who's Carvana's CEO.  And he entered into a guilty plea for fraud over 30 years ago in 1990.  Those are the facts in the complaint regarding Mr. Garcia, Sr.  None of these facts are sufficient to state a claim against Mr. Garcia, Sr., and we would ask that the claims against him be dismissed with prejudice.

First -- and I'm not going to repeat all of the points in our motion to dismiss briefing, but there are a few things I would like to emphasize.  And first is there are no allegations of a deceptive act by Mr. Garcia, Sr., to support this alleged scheme liability.

And I -- as Judge Logan noted in the *Borteanu v. Nikola Corporation* case, in order to state a claim for scheme liability, a plaintiff must allege that each defendant committed their own deceptive act in furtherance of the scheme. And that deceptive act has to have the principal purpose and effect of creating a false appearance of fact in the marketplace.

Here there's no deceptive act by Mr. Garcia, Sr. Plaintiffs point to two things in their briefing and a third

30

thing in the slides that they'll present later.  First they point to Mr. Garcia, Sr.'s stock sales, but stock sales are not a deceptive act.  In this case plaintiffs don't allege, and they can't allege, that these stock sales created the false impression of a fact in the marketplace.  Slapping the label pump and dump does not change that.  And typically, and this is counter to plaintiffs' theory, selling stock usually lowers the stock price.  It doesn't pump it up.

As for the transactions between Carvana and DriveTime, the way plaintiffs try to connect Mr. Garcia, Sr., to those transactions is simply based on the fact that he also owns a majority stack in DriveTime.  Plaintiffs don't allege any specific act by Mr. Garcia with respect to those transactions, much less a deceptive one.  The only thing that plaintiffs allege was deceptive about those transactions was Carvana's disclosures about them, but there are no allegations that Mr. Garcia -- Garcia, Sr., was involved in those disclosures at all.

In their -- their slide deck, plaintiffs also point to the direct offering, which predates the beginning of the class period, as a -- as part of the scheme, but, again, there's nothing deceptive about having a direct offering or Mr. Garcia injecting equity into Carvana.

The complaint also does not allege scienter as to Mr. Garcia, Sr.  As Ms. Engel noted, pointing to stock sales,

pointing to a motive is not sufficient in the Ninth Circuit to allege a strong inference of scienter. It may give some inference of scienter, but not a strong inference. And on that, I would point Your Honor's attention to two Ninth Circuit cases, the *Ronconi vs. Larkin* case in which the Ninth Circuit noted that stock sales have to be dramatically out of line with prior sales and made at times to maximize personal benefit.

In this case, Mr. Garcia, Sr.'s stock sales, which occurred every day, clearly were not timed to take advantage of any particular information and are not suspicious. The more reasonable inference is that because Mr. Garcia, Sr., had such a large stake in Carvana was that he was selling his stock in order to diversify his portfolio. I would also point you to the *In Re Worlds of Wonder* securities litigation case that's another Ninth Circuit case in which the Court held that there was no scienter where the defendants held on to the bulk of their shares as the price declined.

And that's exactly the case here with respect to Mr. Garcia, Sr. As I mentioned, he held on to 80 percent of his holdings as Carvana's stock price plummeted, in plaintiffs' terms.

Plaintiffs also tried to lump Mr. Garcia in when they talk about the Core Operations Doctrine. But, significantly, every case that plaintiffs cite on the Core Operations Doctrine involved an officer of the company. And there's a good reason

for that.  It's because core operations, which itself really should only be applied in limited circumstances, but it applies where because of a officer's or executive's position in the company you can see that they received or were exposed to certain information by virtue of their position.

That is not the case for Mr. Garcia, Sr., who was not an officer of the company.  The complaint does not allege any facts regarding Mr. Garcia, Sr.'s actual access to specific information either by virtue of being a majority stockholder, by virtue of living next door to his son, or otherwise.

This is also fatal to plaintiffs' insider trading claim against Mr. Garcia, Sr.  There are no allegations of fact showing that he possessed material nonpublic information at the time of his sales.  No information about what the information he had, how or when he obtained it, or that he actually used any such information in deciding to make trades.

Finally, on the control person claim, plaintiffs simply point to the fact that Mr. Garcia, Sr., was a controlling stockholder.  And they rely in large part on cases that predate *Twombly* and *Iqbal*.  So in those cases a conclusory assertion that a controlling shareholder exercised control was found to be sufficient.  But more recent cases hold that that sort of allegation does not suffice.  Plaintiffs have to tie the control to the actual challenged conduct.

But there are no allegations here that Mr. Garcia,

Sr., by virtue had it -- of having voting control, that he controlled Carvana's disclosures, nor are there any allegations of fact that he was actually involved in Carvana's day-to-day operations. Now, to be sure, there are lots of conclusory assertions that he was involved in the day-to-day operations, but no allegations of fact to support that. And on that point, I think the *Bao vs. SolarCity* case is instructive. In that case the Court found that the facts that the defendant held 30 percent of the stock and had a family relationship to the officers of the company did not suffice to allege control for a 20A claim. The *Welgus vs. TriNet Group* case is also instructive. In that case the defendant was a controlling shareholder and had the power to appoint two board members, and that was insufficient to allege control.

Plaintiffs have not suggested in their opposition brief, or otherwise, that they could amend their complaint to cure these deficiencies. They have not alleged that they have more to say about Mr. Garcia, Sr.'s involvement with Carvana. And for that reason, we would request that the complaint -- the claims against him be dismissed with prejudice.

Thank you.

THE COURT: Thank you, Ms. Walker.

Mr. Drosman, how are -- how do you want to proceed here? Are you -- are you going to make an argument?

MR. KARIYAWASAM: I'm just moving this technology.

THE COURT: All right. Good.

MR. DROSMAN: Your Honor, if I could have a moment to hook up our laptops so that we could provide you with our PowerPoint presentation?

THE COURT: I was going to suggest a five-minute break.

MR. DROSMAN: That would be excellent. We may not need that much time. That would be perfect.

I have hard copies to provide the Court. Would you like them now? I could provide them after the argument.

THE COURT: You could give them to the courtroom deputy. I'm going to watch what you have on the monitor --

MR. DROSMAN: That's fine.

THE COURT: -- and follow along with your brief.

MR. DROSMAN: Okay.

THE COURT: So will you be arguing the response to both motions, or is Ms. Cocalis -- did I pronounce your name correctly?

MS. COCALIS: Close enough. Cocalis.

THE COURT: Cocalis?

MS. COCALIS: That's perfect.

THE COURT: Good. Are you going to have some argument time as well?

MS. COCALIS: I, yes, Your Honor, will with regard to Garcia, Sr., the 20A -- large 20A claims regarding insider

training and the Securities Act claims.

THE COURT:  Okay.  All right.  So --

MR. DROSMAN:  And --

THE COURT:  -- who will go first then?

MR. DROSMAN:  I'll go first.  I argue the remainder of the case.

THE COURT:  All right.  Very good.  Let's just take a five-minute break just so everybody could stretch and plaintiffs' counsel could hook up their computer.

MR. DROSMAN:  Great.  Thank you.

THE COURT:  I'll see you shortly.

(Recess from 11:00 a.m. to 11:11 a.m.)

THE COURT:  Mr. Drosman, whenever you're ready.

MR. DROSMAN:  Thank you very much, Your Honor.

As we discussed before the break, I'm going to cover scheme liability under Sections 10b-5(a) and (c) and liability for false and misleading statements under 10b-5(b).  And my colleague will distinguish the state court case, cover Section 20A liability and Mr. Garcia's liability.

THE COURT:  We're running pretty over on time, so how much time do you think you'll need?

MR. DROSMAN:  I think collectively we'd try to do it in 40 minutes, if that works for Your Honor.

THE COURT:  Okay.  That'll be fine.  If you could target that.  I want to make sure you have as much equal time

as you can.

MR. DROSMAN:  Okay.

THE COURT:  So --

MR. DROSMAN:  I'll do my best.

THE COURT:  -- go -- go ahead, Mr. Drosman.

MR. DROSMAN:  Okay.

THE COURT:  Thank you.

MR. DROSMAN:  Sure.

The class period for defendants pump-and-dump scheme to defraud begins on May 6th, 2020, when Carvana's stock price, as you can see, was $96.50.  Defendants told investors that Carvana was different from traditional car dealers.  Carvana would experience hypergrowth because Carvana's business model meant that, quote, "Our business gets better as it gets bigger. It's scaleable.  There's economies of scale."

Defendants touted competitive advantages such as a scaleable capital light expansion model and a groundbreaking logistics model that could readily deliver cars, as we discussed, nationwide.  Defendants' scheme had its intended effect.  Defendants were able to pump the stock price 318 percent in 15 months.  When the truth could no longer be concealed, defendants made their first partial corrective disclosure on August 10th, 2021, and continued making corrective disclosures shown by a red X on the chart until November 3rd, 2022.  This caused Carvana's stock price to

plummet 98 percent and left Carvana on the verge of bankruptcy and facing an SEC investigation.

THE COURT:  Tell me what -- what the -- what the red circles are.

MR. DROSMAN:  Sure.  I apologize.  I should have done that.

THE COURT:  That's okay.  You might have, and I might have missed it.

MR. DROSMAN:  No, I did not.  And those are all of the statements that we allege were misleading, false and misleading, those red circles or -- that's what those identify.  And then, of course, the red Xs are the partial corrective disclosures.

THE COURT:  But the stock could have gone up based on nonactionable statements.

MR. DROSMAN:  Of course.

THE COURT:  Puffery.  Puffery, forward-looking statements, that sort of thing.  So I think what I'd be looking for is if you could point to actionable statements.

MR. DROSMAN:  Of course, Your Honor.

And, likewise, the stock -- we don't contend, nor will we contend at trial, that the stock declined 98 percent because of the corrective disclosures.  The -- there will be a regression analysis done by an expert which will net out all of the nonfraud-related declines.  We will only seek to capture as

damages at a later stage those declines that were fraud related, which would be less than the 98 percent decline, Your Honor.

THE COURT:  Okay.

MR. DROSMAN:  Before the stock plummeted, defendants enriched themselves.  In possession of material nonpublic information that the growth, the hypergrowth, was unsustainable, Defendants Garcia, Sr., Keeton, Jenkins, and Huston took full advantage of Carvana's inflated stock price by dumping almost $3.9 billion of their stock.  And I've been doing this, Your Honor, for about 25 years.  I've never seen insider trading of $4 billion.  Not even close.  I had the First -- I litigated the *First Solar* case in front of Judge Campbell.  And in that case, I think we had $500 million worth of insider trading.  And that seemed extraordinarily high to me then.  I've never seen something like this.

And, as you could see from the chart, defendants sold 99 percent of their stock before the first corrective disclosure on August 10th, 2021, and the 98 percent stock decline.  And as Wharton Professor Daniel Taylor observed, "Carvana's actions and the actions of its executives signal to me that the executives knew what was coming and consequently took advantage of the lofty valuations to sell their own equity."

Defendants largely ignore plaintiffs' scheme

UNITED STATES DISTRICT COURT

allegations, devoting just two conclusory paragraphs to those allegations.

THE COURT:  Oh, one moment here.  I don't see the -- the slide up on that video.

Counsel, do you all have access to the slide?

MS. ENGEL:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Ms. Richter.

Go on.

MR. DROSMAN:  Sure, Your Honor.

But as the Supreme Court made clear, a scheme to defraud, like the one defendants engaged in here, violates Section 10b-5(a) and (c) -- (c) of the securities laws.  And this is the *Lorenzo* case out of the Supreme Court.  "It is unlawful for any person to employ any device, scheme, or artifice to defraud or engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

These provisions capture a wide range of conduct.  What do plaintiffs need to plead in order to state a fraud claim -- a securities scheme claim?  Well, because the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation in a scheme.  At the

early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.

Defendants' claim that the consolidated complaint does not plead any fraudulent scheme distinct from its allegations and fraudulent statements under Rule 10b-5.  You saw that in the brief.  You heard that again today, Your Honor.

But the recent Ninth Circuit decision in *Alphabet* forecloses defendants' argument.  The defendants in that case made the identical argument the defendants make here, but the Ninth Circuit held that *Alphabet's* argument is foreclosed by *Lorenzo*.  The Ninth Circuit went on, "*Lorenzo* explained that considerable overlap exists among the subsections of Rule 10b-5 and held that disseminating false statements," quote, "ran afoul of subsections (a) and (c)."

Those are the scheme liability subsections, Your Honor.

Here plaintiffs have adequately alleged the nature, purpose, and effect of the scheme to defraud.  Plaintiffs allege the defendants engaged in a course of conduct to boost retail sales, Carvana's most important metric for the purpose of selling shares at an artificially inflated price for billions of dollars.  Defendants claim that plaintiffs failed to allege any deceptive conduct, that the fraud was limited to false statements.  In reality, the complaint details

defendants' manifold deceptive conduct.  The conduct entailed three types, Your Honor.

First, defendants pump the stock by inflating resale sales.  That conduct included buying any car to induce trade-ins, unsustainable expansion, ignoring title and registration laws to sell cars that much faster, and entering into sham sales arrangements with Garcia, Sr.'s DriveTime.  And this scheme worked.  At every presentation they were able to show investors the graphic at the bottom left and reported dramatically increased car sales.

Second, to make that growth appear sustainable, defendants concealed the truth by making misleading statements. They made misleading statements like "bigger is better" and told investors that Carvana's title and registration problems were limited to a single city in a single state and were minor at best.  Again, the scheme worked.  Investors were duped, and the stock price climbed to an all-time high.  To capitalize, defendants dumped almost $4 billion of their own stock while the stock price was inflated.

Plaintiffs have adequately alleged a scheme claim. Defendants really have no rebuttal, as evidenced by the mere two paragraphs that they spent on it in their motion to dismiss.

In addition to alleging a scheme claim pursuant to 10b-5(a) and (c), plaintiffs also allege misleading statements

under 10b-5(b).  And let me talk about those.

Defendants claim -- I want to focus now on falsity. Defendants claim the complaint fails to identify a single -- a single undisclosed adverse fact, not a single false statement. Defendants try to explain everything away by pointing to puffery, opinion statements, forward-looking statements.  I want to walk through blatant false statements and omissions in the three most important areas of Carvana's business, issues that defendants knew were critical to investors in selling them on Carvana's business model.

In fact, plaintiffs adequately allege that defendants made misleading statements about buying cars from customers, nationwide expansion logistics, and title and registration. The legal standard in the Ninth Circuit is well established.  A duty to disclose does arrive -- arise where an omission is misleading because it affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.  And the Ninth Circuit indicated that once defendants choose to tout positive information to the market, they are bound -- duty bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.  This means that defendants cannot give the good without the bad. They can't give so-called half-truths.  Once defendants chose to publicly tout positive information, they had a duty to

disclose adverse information that cuts against that positive information.

When defendants spoke about buying cars from customers, they violated the securities laws by giving the good without the bad. They told people it -- it was better. It resulted in higher-quality inventory. It was more profitable. Always the good. Always the positive.

Defendants made misleading statements in SEC filings signed by Garcia, Jr., and Jenkins. They told investors, "We assess vehicles on the basis of quality in order to identify the most in-demand and profitable vehicles."

No puffery here. No forward-looking statement here. No opinion here. And this simply was not true.

Carvana -- multiple confidential witnesses confirm that Carvana did not assess vehicles based on quality. Multiple confidential witnesses said that it was Carvana's practices -- practice to purchase cars sight unseen without even verifying the accuracy of the seller's representation. Hard to know how Carvana was assessing cars based on quality when they were buying cars sight unseen.

Other confidential witnesses say that Carvana had an initiative to buy any car to increase trade-ins and that Carvana began accepting all vehicles and did not expect them -- inspect them before purchasing them anymore. And, as a result, not surprisingly, Carvana purchased a lot of trash vehicles.

In their brief for the first time defendants have now admitted that Carvana did not assess vehicles based on quality. They admitted to the Court that Carvana was intentionally buying lower quality cars.  That's what they told you.

The bad that Carvana neglected to tell investors? Carvana intentionally purchased low-quality trash vehicles. Carvana was forced to liquidate the cars on the wholesale market, and that when Carvana did so, when they liquidated those cars on the wholesale market, they lost money selling cars wholesale.

At the end of the class period, defendants finally admitted that Carvana's forced to liquidate low-quality cars on the wholesale market, the excess wholesale volume created crippling logistical constraints and restrictions, the logistics constraints forced Carvana to throttle back on resale car sales, and the glut of cars forced Carvana to spend $4 billion to purchase ADESA.

Remember, defendants have claimed that plaintiffs have not alleged a single actionable statement.  As I've shown, plaintiffs have alleged misleading statements about buying cars from customers.  In fact, defendants' statements that Carvana assesses vehicles on the basis of quality to acquire the most in-demand and profitable vehicles was false on its face.

The other statements about buying cars from customers that we just discussed were misleading because defendants gave

45

the good without the bad about buying cars from customers. They breached their duty to provide the negative information that undercut their positive representations.

Defendants say the plaintiffs failed to explain how any of the purported omissions contradicted defendants' statements about expanding geographically. Let's put that assertion to the test, Your Honor. Defendants repeatedly touted Carvana's expansion model. "The scaleability of our model is apparent. Our business gets better as it gets bigger. Our capital-light expansion model. Our established logistics network and ability to deliver or pick up any car in our inventory. Economies of scale. Nationally pooled inventory."

That's what defendants told investors. Always positive. Always favorable. Always good.

Defendants failed to tell investors the adverse information, the bad. While Carvana told investors about new geographic markets they were adding and the sales they were generating in those locations, they failed to tell investors that it was cost prohibitive to serve many of these far-flung markets. Plaintiffs created a map, which is shown in the complaint, Your Honor, and also shown here on the right of the slide, showing just how many of its new markets were at least 200 miles from its existing infrastructure. Defendants would later admit that these 200-mile-plus markets were unprofitable because of the extra expense to ship cars to and from those

markets.  Defendants never told investors during the class period that the drag that these far-away locations had on Carvana's bottom line.  They, Carvana, only gave investors the good.

So, again, just like with buying cars from customers, defendants gave the good without the bad when they spoke about nationwide expansion and logistics.  And as the Ninth Circuit instructed in *Schueneman*, once defendants chose to tout positive information, they had a duty to disclose adverse information that cuts against that positive information, and they breached that duty.

With title and registration, too, defendants violated the securities laws by issuing misleading risk disclosures.  As an initial matter, risk disclosures are actionable in the Ninth Circuit.  For example, *Alphabet* says that risk warnings could occur -- that -- that warning risks could occur, could occur, are misleading when the company knew that those risks had already materialized.

That's what *Alphabet* says.  The *Orexigen* and *Bursan* cases say the same thing.  For example, in Carvana's August 5th, 2021, 10-Q, Carvana told investors that the violation of state laws related to title and registration could -- could result in administrative, civil, or criminal penalties.  But by August 5th, 2021, the same date, those risks had already materialized.  Michigan had already fined Carvana

and put it on an 18-month probation for title and registration violations.  That wasn't disclosed by Carvana.  North Carolina had fined Carvana and suspended its license for title and registration violations.  Again, defendants failed to disclose this.  Ohio had revoked Carvana's license to issue temporary tags for title and registration violations.  No disclosure by Carvana.

Defendants now claim that these were just de minimis violations that no investor could have really cared about.  The reality is far different.  Carvana told another court that the damage to Carvana's reputation and goodwill from just a single one of these state suspensions is incalculable and irreparable.  And Barron's ran a cover story on these state violations showing that at least some people cared a lot.

Now, I'd like to turn to scienter.  A holistic review of plaintiffs' complaint supports a strong inference of scienter.  Scienter can be established by the fact that defendants touched upon the specific issue in their public statements.  Here defendants spoke often about buying cars from customers.  Defendants also insured investors that they had real-time visibility into markets, pricing, demand, and inventory, another statement that contributes to scienter.

The Ninth Circuit said that when information is of critical importance to the company, it would be absurd to suggest that management did not know about the matter.  Courts

call it the Core Operations Doctrine.  It really boils down to common sense.  The subject of the statements here, Carvana's sales growth and gross profit per unit, were the most important metrics and things to the company.

In addition, government investigations support a strong inference of scienter.  Carvana faced an SEC violation -- I'm sorry -- faced an SEC investigation. Defendants' decision to stop reporting key metrics, like average days to sale and number of cars purchased from customers, also supports scienter.

The confidential witness allegations support a strong inference of scienter.  Directives to purchase cars sight unseen and regardless of condition, their condition, that came from management.

Several confidential witnesses also demonstrate that defendants knew or recklessly disregarded that Carvana sold cars before it held title to those cars.  This also supports a strong inference of scienter.

And, as the Supreme Court in *Tellabs* held, all of these factors supporting scienter must be analyzed holistically in the aggregate.  When the Court engages in this holistic analysis, there's little question that plaintiffs have adequately pled scienter.

Now, I'd also like to spend a moment, Your Honor, on loss causation.  Defendants talked a bit about loss causation.

Let's -- let me take a few sample dates for Your Honor.  We'll start with the very first corrective disclosure.  That was on August 10th, 2021.  And, as you'll recall, the corrective disclosure in that case was local media in North Carolina reported that Carvana's dealer license in Raleigh, North Carolina, was suspended for six months for violating the state's title and registration laws.  Okay?

Carvana says, well, an investigation is not a finding of wrongdoing.

But, in fact, Your Honor, the disclosure did reveal wrongdoing.  The Ninth Circuit in the *Lloyd* case has made it clear that the announcement of investigation can form a viable loss causation theory, especially when subsequent confirming events establish that.  And that's the *Lloyd* case.  And here, of course, we have subsequent confirming events.

They also say that this stock drop was insignificant.  The stock, by the way, fell on August 10th by 2.5 percent.  The S&P 500 increased by .2 percent.  Okay?  The Ninth Circuit has found that it's -- that a drop of just 2.7 percent in the impact -- *Impac's* case is sufficient to allege loss causation.  Loss causation, as I'm sure Your Honor is aware, is a highly fact-intensive analysis that is often and usually inappropriate for resolution on a motion to dismiss.  That's what the Ninth Circuit says.

And, finally, defendants say the market was where

it -- well aware that Carvana had challenges with title and registration. Defendants don't dispute that each disclosure revealed new information. Their sole authority holds this is sufficient. And that's the *In Re Bofl Holding* case out of the Southern District of California.

And so those are a few -- a few answers to that particular disclosure.

We also have a -- another disclosure on April 20th through April 28th, 2022. And I wanted to discuss that disclosure because defendants make a different argument. They say, well, these aren't mere image disclosures. Okay? That's what they say. But, first, one of the disclosures is that they were forced to purchase ADESA in order to remedy this glut of cars that they had accumulated from buying a car, any car, from a customer at an accelerated rate. Okay? So that is, in fact, a mirror image disclosure.

But even if it weren't a mirror image disclosure, that's not what is required. The *First Solar* case says very clearly that the underlying facts concealed by fraud caused the earnings miss. And in that situation, an earnings miss itself can be -- can create loss causation.

Your Honor, if there are no questions, I'll turn it over to my colleague, Ms. Cocalis, for the remainder of the argument.

THE COURT: Thank you.

MR. DROSMAN:  Thank you.

MS. COCALIS:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. COCALIS:  My name is Rachel Cocalis.  I'd like to speak to Garcia, Sr.'s motion to dismiss plaintiffs' Section 10(b) and insider trading claims first and then move to the Securities Act and that state court case you had questions about.

THE COURT:  Okay.  Thank you.

MS. COCALIS:  All right.  Garcia, Sr.'s attempt to portray him as someone who's an outsider, who has no knowledge of what's going on at Carvana, is specious.  Garcia, Sr., had an iron grip on the company, and that's because he founded Carvana.  He held 84 percent of the voting power during the class period.  He established a dual class voting structure that allowed -- that scholars know allowed him to run it as if it was a family firm and for his family's benefit.  He could elect every single board member.  Carvana's own SEC disclosure state that he and his son, quote, "control us."  Not only that, he controlled their policies and their operations.  And because of that, he could do nearly half a billion dollars' worth of related party transactions with his private companies during the class period.

What's important about these deals is that even defendants concede that they weren't negotiated at arm's

length.  And the reason they weren't negotiated at arm's length is because he controlled Carvana, he controlled their operations, and he controlled the related company, such as DriveTime.  Thus, any suggestion he has no idea what's going on with Carvana, who he's doing half a billion dollars' worth of transactions with, is just not consistent with common sense.

Turning to the frauds -- the scheme liability claims, plaintiffs allege that Garcia, Sr., engaged in a scheme to artificially inflate Carvana's retail sales and less its stock price so that he could dump the shares at artificially inflated prices.  Garcia, Sr., moves to dismiss this claim in just two paragraphs alleging that plaintiffs failed to allege that he engaged in a deceptive act.

As my colleague mentioned, the scheme liability provisions capture a wide range of conduct and that plaintiff need only allege the nature, purpose, and effect of the fraudulent conduct.  We have done so here for Garcia, Sr., at every stage of the scheme.

First, a district court held in its order that he participated behind the scenes in the planning and execution of Carvana's direct offering, even emailing with his son about a plan for his money.  The purpose of this was so that he could load up on Carvana's stock at a depressed price and then later dump them.  Next, he made a pass-through sales agreement between his company, DriveTime, and Carvana.  These deals were

sham transactions. There was no purpose except to inflate Carvana's retail sales. That is because Carvana would buy these cars from DriveTime; then they would sell the cars. They would record the sales on their books, as well as the revenue from those sales on their books, but really give the entire proceeds back to DriveTime.

And counsel noted that apparently they made money on ancillary products, such as servicing of cars and I believe they said financing. If you go back and look at that slide I just showed you about the deals, the related party deals, who was doing Carvana's financing? Who was helping them with that? Garcia, Sr.'s company, SilverRock, Veraday [phonetic], DriveTime.

And these deals were material. For example, in Q4 2021, they accounted for nearly 600 percent of Carvana's retail growth that quarter. They accounted for 17 percent of Carvana's retail growth but cost Carvana $168 million. There could be no purpose for them other than the fact that they were giving a boost to their retail sales.

Next, Garcia, Sr., modified his 10b5-1 trading plan twice to capitalize on the scheme, thereby defeating the very purpose of a 10b5-1 plan.

In total -- and this is apart from the nearly half a billion dollars that he sold outside of his 10b5-1 trading plan at the same time. In total, he dumped 13.95 million shares for

$3.7 billion while in possession of materially known public information.  Garcia, Sr.'s motion to dismiss only addressed the stock sales saying that they alone are insufficient.  But as noted in the *Galena* case, citing Ninth Circuit and Supreme Court authority, "Trading while in possession of material nonpublic information is the epitome of a deceptive device under Section 10(b)."

Because our motion to dismiss did not discuss any of this additional deceptive conduct, any argument now or in their reply is waived under the *Friends of Yosemite*, a Ninth Circuit case.  Nevertheless, their arguments fail.  For example, they noted that the direct offering occurred weeks before the class period.  They don't cite any authority for saying that means it's not deceptive conduct in furtherance of the scheme.  And in the *Galina* case, the Court held that where the defendant hired an investor relations company in furtherance of the scheme months before the class period, that was sufficient deceptive conduct to plead a scheme liability claim.

Sorry.  Sorry about that.

So because this scheme -- because their motion to dismiss the scheme liability claim was just limited to two paragraphs and only the deceptive conduct, the Court should end its inquiry here.  They don't allege anything regarding scienter regarding the scheme, nothing regarding loss causation, and so we would argue that it is waived.

UNITED STATES DISTRICT COURT

Given, though, however, that they've addressed the stock sales, I'd like to address it now.

Garcia, Sr., had a $3.7 billion motive in this case. And as the Supreme Court held in *Tellabs*, personal financial gain weighs heavily in finding a strong inference of scienter, as the Ninth Circuit outlined the following three factors to look at when determining whether sales are unusual or suspicious.  All three of them are relevant here and support finding scienter.

First, Garcia, Sr., sold 13.95 million shares.  That's 82 times the amount of any defendant in the *America West* Ninth Circuit case.  Now, they said that he only sold 19 percent of his holdings, but that doesn't matter.  The Ninth Circuit in *Oracle* overturned a district court when it found that 2 percent and 7 percent weren't sufficient, because it's a novel situation when you can sell that -- a lower amount of your holdings for 900 million.  Here we have 3.7 billion.

Next, they were suspiciously timed.  His rate of sales peak as Carvana's stock price peaked and ended just nine trading days after the first corrective disclosure.

Now, I noted that they cited the *Ronconi* case.  But in that case, the Court found that the insiders missed the boat because they sold their stock after the -- after the corrective disclosures when it -- the truth was already coming out.  And that makes sense.  Here we have the exact opposite situation.

Moreover, they cited the *Wonder* case, but in that case there was un- -- uncontradicted deposition testimony at summary judgment for credible and wholly innocent explanations for these sales.  We're not at summary judgment, and we certainly don't have deposition testimony saying that these were credible sales.

Next, it was inconsistent with his prior trading.  He did not sell a single share of his personal holdings during the prior period.

They noted that he had a 10b5-1 plan, but he cannot rely on that 10b5-1 plan here because he modified it.  When you think about a 10b5-1 plan, it's entered in -- sorry -- it's entered into when you don't have material nonpublic information, and it's supposed to give investors comfort because you have a predetermined plan where you can sell a predetermined amount for a predetermined amount of money -- number of shares.  But modifications defeat that very purpose. And that's exactly what the *Countrywide* case held, and that's exactly why other courts, such as the *Novotel* case holds, that modifications support scienter.

And this isn't just me saying that modifications are unusual.  Daniel Taylor, the professor of the Wharton School of Business, said that he had cited 20,000 10b5-1 plans and couldn't recall modifications like this, signalling to him that the Garcias knew it was short-lived.  And, in addition, the

Securities and Exchange Commission is drafting revisions to the rules regarding 10b5-1 plans to do away with modifications like this.  And apart from that, they failed to acknowledge that he sold nearly half a billion dollars outside of his trading plan.

I notice that they tried to make modifications seem normal, but in none of the cases that they cite, not one was there someone entering a plan during the cost period, modifying a plan during the cost period, modifying it again during the class period, and then selling nearly half a billion outside of a plan.  Not one of their cases, in fact, deal with any modifications.  They only deal with entering a plan.

Apart from alleging this incredibly strong motive in this case, plaintiffs have alleged that he had actual access because he was involved in the scheme.  Remember, a Court found that looking at internal documents that Garcia, Sr., participated behind the scenes emailing with his son about a plan for his money.  And I note that, you know, they try and downplay that -- that case, but Garcia, Sr., wanted to get kicked out of that case and couldn't because of his allegations of control and his relationship with Carvana.

Next, he was the one -- it was his company, DriveTime, that entered into the sham trans- -- transactions.  It's not plausible to think that Garcia, Sr., didn't know that he was getting paid by Carvana at DriveTime to acquire these cars and that he was getting all the money from their sales.

In addition, the Core Operations Doctrine supports scienter here as he had an iron grip on the company, and that's from insiders who have reported that. He -- and he held 84 percent of the voting power.

In addition, we have his prior similar history of fraud, not only his felony conviction, but also his past with UglyDuckling, where he had performed a similar pump-and-dump scheme. In addition, we have the SEC investigation concerning related party transactions, and the related party transactions are transactions with Garcia, Sr.'s.

Unless Your Honor has any questions, I'll turn to the 20A claim.

THE COURT: Please proceed.

MS. COCALIS: Okay.

So to establish a 20A claim, we need an Exchange Act violation, contemporaneous trading with a corporate insider who possesses material nonpublic information at the time of the trade. We've clearly alleged a predicate Exchange Act violation for Garcia, Sr. And I would also remind the Court that trading while in possession of material nonpublic information is itself a deceptive act under Section 10(b). Moreover, for the reasons I just stated, there can be no argument that he did not possess a material nonpublic information.

And moving on to contemporaneous trading, the Ninth

Circuit has not adopted defendants' version of what is contemporaneous, as periods ranging from one to nine days is what courts typically find contemporaneous.

Looking at the -- at the sales here, though, for Garcia, Sr., we do allege same-day transactions.  Garcia, Sr., tries to add additional argument that -- regarding the prices that they must be sold at.  As you just saw, that's not in the requirements at all.  But even under that standard, plaintiffs' claim would remain because we have met that because Garcia, Sr., was selling so much.

Turning to the Securities Act claims, my colleague just explained why there was false and misleading statements in the registration agreement because -- registration statement because the registration statement included the 2021 10-K.  And I would note that for the Securities Act claims there's no scienter requirement, no loss causation requirement, and there is a lower standard.

Addressing the state court case, they say it's on all fours.  It is not on all fours with our case.  First -- this is on your screen -- you have how the Court described plaintiffs' case, our claims in that case.  And it says that plaintiffs -- "Plaintiffs claim that Carvana failed to disclose that it recognized revenue upon delivery of cars to customers without certificates of title, violated GAAP," which was rejected by the Court in its prior ruling.

UNITED STATES DISTRICT COURT

We have nothing regarding the recognition of revenue here.  Nothing regarding violations of GAAP.  Moreover, the Court said that plaintiff also asserted that the root issue was that it could not provide certificate of title and that Carvana failed to disclose severe operational issues it was facing during the COVID-19 pandemic.  We have nothing in our case regarding the COVID-19 pandemic.  That case concerned COVID-19 risk disclosures.  As my colleague just discussed, our risk disclosures don't have to do with COVID-19.  They have to do with defendants could be subject to fines, they could be subject to cease and desist orders, when in truth they were already subject to that.

And I would briefly like to address the fact that they say -- they quote that saying the Courts -- the Court's finding that the -- that the plaintiffs did not allege that there was anything new in the Barron's article.  To the contrary.  I would say that at the time of -- at the time of the offering, at this point Carvana had already been put on an extended probation in Michigan, and this is the -- because they had been put on probation, which people were aware of.  But they didn't know that Carvana had already admitted that they were violating that.  They had their probation extended, and they would soon have their license suspended, which would eventually lead them to do a plea agreement with Michigan with their license revoked, and they could not seek to reinstate it for three

years.  And they said that this suspension was an irreparable harm.  Investors would have wanted to know that.

I would also note that they say that that case did not involve fraud claims.  Yet they're trying to say that that case is exactly on all fours with our case, but they're saying that our case is only about fraud.  They can't have it both ways.  Either our case has nothing to do with fraud and it's just like the state court case, or it is -- it is about fraud and it's a different case.

And unless you have any other questions, that's all I have.

THE COURT:  I do not.  Thank you.

MS. COCALIS:  Thank you.

We're almost to noon, so I thought I'd give defense counsel five minutes each --

MS. ENGEL:  Thank you, Your Honor.

THE COURT:  -- for a very quick --

MS. ENGEL:  Thank you, Your Honor.

THE COURT:  -- concise rebuttal.

MS. ENGEL:  Can I --

MR. DROSMAN:  I'll just -- I'll grab it.

MS. COCALIS:  Oh, I'm sorry.

MR. DROSMAN:  I'll grab that laptop, if it's okay with Your Honor?

THE COURT:  Yeah, please.  I was actually going to

suggest that just now.

MR. DROSMAN:  All right.

MS. ENGEL:  Thank you.

Thank you, Your Honor.  I'll just make a few points.

I'll start with Judge Coury's decision.  We submitted it.  We think it speaks for itself, particularly 16, 17, and 18.  The accounting portion of that case became the tail, because the state plaintiffs amended after the federal plaintiffs had filed their complaint.  The information that is alleged to have been omitted here, Judge Coury walks through extensively the disclosures that Carvana made throughout the class period in its filings, earnings calls, et cetera.

The good, but not the bad.  The bad is the costs and constraints that came along with Carvana's expansion, buying cars from customers.  The bad was disclosed.  If you -- if it -- I don't know that it is bad, selling cars at wholesale. Carvana disclosed that all of the wholesale cars were not cars of sufficient quality to be sold at retail.  This isn't an admission in our reply brief.  It's in Carvana's 10-Ks and 10-Qs describing the wholesale sales.

For scheme liability, I didn't see any particular acts.  No one -- I don't know what the acts were.  I don't know when they were taken, and I don't know by whom.  Plaintiffs cite the *Galena* case.  Which I mentioned the *Vaxart* case earlier.  But *Galena* they cite for the proposition that it

gives them a free pass on meeting the heightened pleading burden for a scheme liability claim.

*Galina*, I think, is quite instructive on how a plaintiff might plead a scheme liability under a heightened burden, but it certainly does not give a plaintiff a pass. I'll point to 1193 to -94 where the Court in its decision specified the additional conduct beyond statements that was alleged, including, as in *Lorenzo*, the behind-the-scenes work on preparing statements that were disseminated to the market.

And *Ahn* -- oh, let's see. Sorry. *Ahn and Bernarda [phonetic]*, reviewing, editing, and improving the articles, specific conduct that a particular defendant took different from a statement.

So the first slide that we saw, the red dots were the statements. Plaintiffs stopped the red dots halfway through the class period because the second set of red dots in the back half, the other statements, half of the statements that they challenge, do not -- or render implausible their pump and dump theory.

I'll just point out the Ninth Circuit's *Impac's* decision which they say involved a 2 percent stock decline. The question wasn't addressed. No one raised in that case whether a 2 percent stock decline was a significant stock drop.

Plaintiffs also reference ADESA, this acquisition that happened at the end of the class period. It was announced in

February of 2022, long before the end of the class period. The information that was supposedly concealed was disclosed repeatedly. At bottom, plaintiffs are challenging, and you saw it on the statements that they put up, Carvana's optimistic description of its business. The fact that it had to tweak its strategy down the road does not state a claim for fraud, and neither can group pleading or innuendo and rhetoric.

Thank you very much, Your Honor.

THE COURT: Thank you.

MS. WALKER: Thank you, Your Honor. Melanie Walker on behalf of Mr. Garcia, Sr.

Going through plaintiffs' slides, on plain -- on slide 37 they list the Garcia's family deals, they call them. But these related party transactions were all disclosed. They're not challenged in the complaint. And, most importantly, they're not relevant to the key issues here. The fact that they're related party transactions does not tell you that Mr. Garcia, Sr., had access to the specific information about the issues challenged in the complaint.

On slide 40 there's a list of the alleged deceptive acts by Mr. Garcia, Sr. In going through the four deceptive acts, the key issue is, what false impression did these acts create in the marketplace? And the answer is that they didn't. They didn't create a false impression in the marketplace, and so they're not deceptive.

I also would like quickly to point out that the Delaware Chancery Court did not make a holding about Mr. Garcia, Sr.  It ruled on a motion to dismiss, and it accepted the allegations in the complaint as true for purposes of the motion.

Mr. Garcia, Sr., also did not waive any arguments regarding the scheme claim.  I actually think that assertion is quite outrageous, because the truth is that plaintiffs' theory keeps shifting.  And it goes to the puzzle pleading points that Ms. Engel made.  If we can't tell what the deceptive acts were regarding Mr. Garcia, Sr., then the complaint needs to be dismissed.  And we can't tell.  And, in fact, some of the deceptive acts listed on the slide are not discussed at all in plaintiffs' opposition brief.  They say nothing, for example, about the direct offering be a deceptive act.  They don't talk about the modification of the 10b5-1 plan being a deceptive act.  And those aren't deceptive acts, but it shows that plaintiffs' theory keeps shifting, and it's very hard to respond to arguments that have not been made and are not clear in the complaint.

On the modification of the 10b5-1 trading plan, I think we've addressed that in our briefing, but I would point out that plaintiffs do not tie what material nonpublic information Mr. Garcia allegedly had at the time of those modifications.  It's just not there, and they try to gloss over

it with this sort of innuendo.

Thank you, Your Honor.

THE COURT:   Thank you.

Counsel, thank you for your briefs and your advocacy today.  I thought the written work product was excellent on both sides, and I thought you all did a very engaging job today, and I enjoyed listening to what you've had to say.

For those of you from out of town, thank you for coming to be here in Phoenix today, and I hope you may take some extra time to stay and enjoy the weather.  I hear it's getting pummelled out in D.C., I think, and in New York.  So if you have the opportunity to stay a little longer, you can. But San Diego, I mean, we just can't -- we can't compete, so I understand.

I'll share with you this.  You may find this amusing. I was -- I flew to the northeast a few weeks ago, and I downloaded your case materials to work on the flight, and I didn't get through the complaint on that four-and-a-half-hour flight, but -- but I did -- I did do as much as I can.

Thank you, everybody.

Court is adjourned.

MS. ENGEL:   Thank you, Your Honor.

MR. DROSMAN:   Thank you, Your Honor.

(Proceedings conclude at 12:03 p.m.)

---oOo---

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 5th day of February, 2024.

/s/ Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT