1  FENNEMORE CRAIG, P.C.
   Douglas C. Northup (No. 013987)
2  Andrea L. Marconi (No. 022577)
   2394 E. Camelback Road, Suite 600
3  Phoenix, AZ 85016
   Telephone: +1.602.916.5000
4  Email: dnorthup@fennemorelaw.com
   Email: amarconi@fennemorelaw.com
5
   LATHAM & WATKINS LLP
6  Jeff G. Hammel (*pro hac vice*)
   1271 Avenue of the Americas
7  New York, NY 10020
   Telephone: +1.212.906.1200
8  Email: jeff.hammel@lw.com
9  LATHAM & WATKINS LLP
   Andrew B. Clubok (*pro hac vice*)
10 Susan E. Engel (*pro hac vice*)
   Matthew J. Peters (*pro hac vice*)
11 555 Eleventh Street, N.W., Suite 1000
   Washington, D.C. 20004
12 Telephone: +1.202.637.2200
   Email: aclubok@lw.com
13 Email: susan.engel@lw.com
   Email: matthew.peters@lw.com
14
   *Counsel for Defendants Carvana Co., Ernest*
15 *Garcia III, Mark Jenkins, Stephen Palmer, Michael*
   *Maroone, Neha Parikh, Ira Platt, and Greg*
16 *Sullivan*
17
18              UNITED STATES DISTRICT COURT
19                  DISTRICT OF ARIZONA
20
                                    CASE NO. 2:22-cv-02126-PHX-MTL
21 In re Carvana Co. Securities Litigation
                                    **DEFENDANTS' MOTION TO DISMISS**
22                                  **LEAD PLAINTIFFS' AMENDED**
                                    **CONSOLIDATED COMPLAINT AND**
23                                  **MEMORANDUM OF POINTS AND**
                                    **AUTHORITIES**
24
                                    **(Oral Argument Requested)**
25 This Document Relates to:
26     ALL ACTIONS.
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    An Arizona State Court Has Already Thrown Out Plaintiffs'
        Theories ...................................................................................... 3

    B.    Carvana Disclosed Its E-Commerce Model and Its Growth
        Strategy ...................................................................................... 4

    C.    The Pandemic and Rapid Growth Created Operational
        Constraints ................................................................................. 5

    D.    Carvana Disclosed a Sales Decline and Updated Business
        Strategy ...................................................................................... 7

    E.    Plaintiffs File This Lawsuit ....................................................... 8

ARGUMENT ...................................................................................................... 8

I.    LEGAL STANDARDS ............................................................................. 8

    A.    Sections 10(b), 20(a), and 20A of the Exchange Act ................ 9

    B.    Sections 11, 12(a)(2), and 15 of the Securities Act ................. 10

II.    PLAINTIFFS' COMPLAINT REMAINS A PUZZLE PLEADING. ................. 10

III.    PLAINTIFFS FAIL TO PLEAD ANY EXCHANGE ACT CLAIM. ................. 12

    A.    Plaintiffs Fail to Plead a Statement-Based Claim Under
        Section 10(b). ........................................................................... 12

        1.    Plaintiffs Fail to Plead Any Materially False Or
            Misleading Statement. .................................................. 12

            a.    Title and Registration (Statements 1-8) ............... 12

            b.    Buying Cars from Customers (Statements 9-18) ................. 18

            c.    Retail Unit Sales Growth (Statements 19-20)...................... 21

            d.    Nationwide Expansion (Statements 21-29) ......... 23

            e.    Aged Inventory (Statements 30-32)...................... 24

            f.    Carvana's Retail GPU (Statements 33-39) .......... 26

        2.    Plaintiffs Fail to Plead Loss Causation. ......................... 28

            a.    Carvana's Disclosures Regarding Its Financial

Condition ............................................................................. 28

        b.    Media Reports Regarding Regulatory Actions .................. 29

   3.    Plaintiffs Fail to Plead a Strong Inference of Scienter. .................. 31

        a.    Plaintiffs Do Not Allege a Motive to Commit Fraud ......................................................................... 31

        b.    Plaintiffs Do Not Allege Deliberate Recklessness .......................................................... 35

B.    Plaintiffs Fail to Plead Scheme Liability Under Section 10(b). ................ 39

C.    Plaintiffs Fail to Plead an Insider Trading Claim ....................................... 41

D.    Plaintiffs Fail to Plead a Claim Under Section 20(a). ................................ 42

II.    PLAINTIFFS FAIL TO PLEAD ANY SECURITIES ACT CLAIM. ................ 42

A.    Plaintiffs' Securities Act Claims Are Subject to Rule 9(b). ..................... 42

B.    Plaintiffs Fail to Plead a Claim Under Section 11 of the Securities Act. ............................................................................................. 42

   1.    Plaintiffs Fail to Plead Any Materially Untrue or Misleading Statement. ................................................................ 42

   2.    Plaintiffs Fail to Plead a Violation of Item 105. ............................ 43

   3.    Negative Causation Is Apparent on the Face of the Complaint. ...................................................................................... 44

C.    Plaintiffs Fail to Plead a Claim Under Section 12(a). ................................ 45

D.    Plaintiffs Fail to Plead a Claim Under Section 15 of the Securities Act. ............................................................................................. 45

CONCLUSION ................................................................................................. 45

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

# TABLE OF AUTHORITIES

## CASES

*60223 Trust v. Goldman Sachs & Co.*,
  540 F. Supp. 2d 449 (S.D.N.Y. 2007) .......................................................................... 31

*Abbate v. Wells Fargo Bank, N.A.*,
  2011 WL 9698215 (C.D. Cal. 2011) ............................................................................ 41

*Alich v. Opendoor Techs Inc.*,
  2024 WL 839146 (D. Ariz. 2024), *vacated in part on other grounds*,
  2024 WL 2153529 (D. Ariz. 2024) ............................................................................. 28

*Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*,
  2022 WL 3598246 (D. Ariz. 2022) .............................................................................. 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................................... 8

*Bajjuri v. Raytheon Techs. Corp.*,
  641 F.Supp.3d 735 (D. Ariz. 2022) ................................................................. 15, 28, 29

*Baker v. Seaworld Entm't, Inc.*,
  2016 WL 2993481 (S.D. Cal. 2016) ............................................................................ 19

*Baker v. Twitter, Inc.*,
  2024 WL 1178168 (C.D. Cal. 2024) ...................................................................... 12, 36

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ..................................................................................................... 10

*Belodoff v. Netlist, Inc.*,
  2009 WL 1293690 (C.D. Cal. 2009) ............................................................................ 42

*Berg. v. Velocity Fin., Inc.*,
  2021 WL 268250 (C.D. Cal. 2021) .............................................................................. 44

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) ......................................................................... 19

*Borteanu v. Nikola Corp.*,
  2023 WL 1472852 (D. Ariz. 2023) ........................................................................ 40, 41

*Brody v. Trans. Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ....................................................................................... 10

*Brown v. Ambow Educ. Hldg. Ltd.*,
    2014 WL 523166 (C.D. Cal. 2014) ................................................................ 10, 44, 45

*Carey Camp v. Qualcomm Inc.*,
    2020 WL 1157192 (S.D. Cal. 2020) ........................................................................ 30

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
    2023 WL 155861 (D. Ariz. 2023) .................................................................... passim

*City of Warwick Ret. Sys. v. Carvana Co.*,
    CV 2022-013054 (Sup. Ct., Maricopa Cnty.) (Sept. 30, 2022) ................................ 3

*Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1997) .................................................................................... 40

*Cupat v. Palantir Techs., Inc.*,
    2024 WL 1374903 (D. Colo. 2024) .............................................................. 1, 11, 12

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .................................................................................. 31

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
    583 U.S. 416 (2018) ................................................................................................... 3

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................. 9, 30

*Eng v. Edison Int'l*,
    2017 WL 1857243 (S.D. Cal. 2017) ........................................................................ 31

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) ............................................................................ passim

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) .................................................................................... 14

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir.
    2009) ........................................................................................................................ 17

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) .............................................................................. 32, 36

*Golubowski v. Robinhood Mkts., Inc.*,
    2023 WL 1927616 (N.D. Cal. 2023) ............................................................ 19, 22, 24

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) ................................................................................ 9

*Greenberg v. Sunrun Inc.*,
233 F. Supp. 3d 764 (N.D. Cal. 2017) .............................................................. 10, 45

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ............................................................................ 29

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. 2021) ................................................................... 21

*In re 3Com Sec. Litig.*,
1999 WL 1039715 (N.D. Cal. 1999) ................................................................... 41

*In re Alteryx Sec. Litig.*,
2021 WL 4551201 (C.D. Cal. 2021) ................................................................... 37

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ............................................................................ 34

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. 2020) ................................................................... 21

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) .............................................................. 42

*In re BofI Hldg., Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...................................................................... 9, 28, 29

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
932 F. Supp. 2d 1095 (C.D. Cal. 2013) .............................................................. 45

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................................. 41

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................ 10

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. 2020) ................................................................... 42

*In re Eargo, Inc. Sec. Litig.*,
656 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................ 27

*In re Fusion-io, Inc. Sec. Litig.*,
2015 WL 661869 (N.D. Cal. 2015) ................................................................ 22, 28

*In re FVC.COM Sec. Litig.*,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir.
  2002) ........................................................................................................... 33

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794 (C.D. Cal. 2008) ........................................................... 34

*In re Kalobios Pharms., Inc. Sec. Litig.*,
  258 F. Supp. 3d 999 (N.D. Cal. 2017) ......................................................... 16

*In re LeapFrog Enter., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ....................................................... 28

*In re Level 3 Commc'ns., Inc. Sec. Litig.*,
  2010 WL 5129524 (D. Colo. 2010) .............................................................. 12

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) .......................................................... 30

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ...................................................................... 36

*In re Peregrine Sys., Inc. Sec. Litig.*,
  2005 WL 8158825 (S.D. Cal. 2005) ............................................................. 22

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. 2020) ............................................................ 43

*In re Redback Networks, Inc. Sec. Litig.*,
  2007 WL 4259464 (N.D. Cal. 2007), aff'd, 329 F. App'x 715 (9th Cir.
  2009) ..................................................................................................... 21, 27

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ......................................................... 14, 20, 26

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) ..................................................... 30, 31

*In re Shoretel Inc. Sec. Litig.*,
  2009 WL 248326 (N.D. Cal. 2009) .............................................................. 45

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ........................................................................ 33

*In re Solarcity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ......................................................... 32

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ................................................................. 13, 14

*In re Talis Biomedical Corp. Sec. Litig.*,
    2022 WL 17551984 (N.D. Cal. 2022) ......................................................... 21

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................ 33, 35

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    328 F. Supp. 3d 963 (N.D. Cal. 2018) ....................................................... 9, 41

*In re Volkswagen "Clean Diesel"Mktg., Sales Practices & Prod. Liab.
    Litig.*,
    480 F. Supp. 3d 1050 (N.D. Cal. 2020) ..................................................... 13, 15

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................... 34

*Kang v. PayPal Hldgs.*,
    620 F.Supp.3d 884 (N.D. Cal. 2022) ........................................................... 40

*Kasilingam v. Stitch Fix, Inc.*,
    2022 WL 10966359 (9th Cir. 2022) ............................................................. 21

*Kempen Int'l Funds v. Syneos Health, Inc.*,
    2024 WL 1805011 (S.D.N.Y. 2024) ......................................................... 11, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .................................................................... 10

*Kolominsky v. Root, Inc.*,
    2024 WL 1854474 (6th Cir. 2024) ............................................................... 17

*Legacy Holdings, LLC v. OZY Media, Inc.*,
    2022 WL 2119122 (N.D. Cal. 2022) ............................................................. 35

*Lomingkit v. Apollo Ed. Grp. Inc.*,
    2017 WL 633148 (D. Ariz. 2017) ............................................................... 12

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .................................................................... 29

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024) ............................................................................ 42

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*Mehedi v. View, Inc.*,
   2024 WL 1560009 (N.D. Cal. 2024) ........................................................... 28

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..................................... 19, 29, 34, 39

*Miller v. Thane Int'l, Inc.*,
   615 F.3d 1095 (9th Cir. 2010) ........................................................ 30

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .................................... 9, 36, 39, 42

*Nozak v. N. Dynasty Mins. Ltd.*,
   804 F. App'x 732 (9th Cir. 2020) ............................................... 36

*Ok. Pol. Pens. & Ret. Sys. v. Boulder Brands, Inc.*,
   2017 WL 1148689 (D. Colo. 2017) .............................................. 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indust. Pens. Fund.*,
   575 U.S. 175 (2015) ............................................ 17, 18, 25

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................... 16, 19, 22, 31

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar*,
   2023 WL 4161355 (D. Ariz. 2023) ............................................. 37

*Petrie v. Elec. Game Card, Inc.*,
   2011 WL 131300015 (C.D. Cal. 2011) ........................................ 36

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ........................................................... 45

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ..................................................... 27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..................................... 36, 37, 38

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ..................................... 31, 32, 35

*Reckstin Family Tr. v. C3.ai, Inc.*,
   2024 WL 734497 (N.D. Cal. 2024) ............................................. 29

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ........................................................................ 10

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .............................................................................. 22, 24

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................................. 22, 25

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009) ........................................................................... 10, 42

*Ryan v. FIGS, Inc.*,
    2024 WL 187001 (C.D. Cal. 2024) ........................................................................... 44

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ..................................................................... 37

*Simpson v. AOL Time Warner, Inc.*,
    452 F.3d 1040 (9th Cir. 2006) ......................................................................... 9, 40, 41

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ........................................................................... 13, 14, 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .................................................................................................. 31

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2016 WL 4056209 (C.D. Cal. 2016) ......................................................................... 17

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................... 24

*Vignola v. FAT Brands, Inc.*,
    2019 WL 6138473 (C.D. Cal. 2019) ......................................................................... 45

*Waswick v. Torrid Holdings, Inc.*,
    2023 WL 9197563 (C.D. Cal. 2023) ................................................................. 13, 14, 25

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. 2017) ........................................................................... 17

*Weston Family P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .............................................................................. 10, 27

*Wochos v. Tesla*,
    985 F.3d 1180 (9th Cir. 2021) .................................................................................. 17

*Zaidi v. Adamas Pharms., Inc.*,
   650 F. Supp. 3d 848 (N.D. Cal. 2023) .......................................................... 35

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................... 32, 34, 37, 39

## STATUTES

15 U.S.C. § 78u *et seq.* ........................................................................... 1

15 U.S.C. § 78u-4(b)(1)-(2).......................................................................... 9

15 U.S.C. § 78u-4(b)(2) ............................................................................ 31

15 U.S.C. § 78u-5(c)............................................................................... 17

Exchange Act § 10(b) ....................................................................... 9, 41, 42

Exchange Act § 20(a) ........................................................................... 9, 42

Exchange Act § 20A ............................................................................ 9, 41

Securities Act § 11........................................................................ 10, 42, 45

Securities Act § 12.......................................................................... 10, 45

Securities Act § 12(a) .......................................................................... 45

Securities Act § 12(a)(2) ....................................................................... 10

Securities Act § 15.......................................................................... 10, 45

## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................ 1

Fed. R. Civ. P. 41(b) ............................................................................. 11

Fed. R. Civ. P. 8 ........................................................................... passim

Fed. R. Civ. P. 8(a) ............................................................................... 8

Fed. R. Civ. P. 8(d) ............................................................................... 8

Fed. R. Civ. P. 9(b) ...................................................................... 1, 9, 10, 42

Rule 10b-5 ................................................................................... 9, 41

Rule 10b-5(a) ..................................................................................... 9

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

x

Rule 10b-5(b)...................................................................................................... 41, 42

Rule 10b-5(c).......................................................................................................... 9

## REGULATIONS

17 C.F.R. § 229.105.............................................................................................. 43

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

Defendants Carvana Co. ("Carvana"), Ernest Garcia III ("Garcia Junior"), Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan, respectfully move to dismiss Lead Plaintiffs' Amended Consolidated Complaint, Dkt. 71 ("ACC," cited herein as "¶__"), with prejudice pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u *et seq.* ("PSLRA").

## **INTRODUCTION**

The Court granted Plaintiffs leave to amend their Consolidated Complaint ("CC") with instructions to present the claims in a "simple, concise, and direct" manner. Dkt. 70 at 13-14, 18. At 332 pages and full of repetition, the ACC ignores the Court's order and "confuse[s] length and repetition with particularity." *Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903, at *2 n.2 (D. Colo. 2024).

Plaintiffs again allege a pump and dump scheme that has neither a pump nor a dump. The CEO did not sell a single share—and in fact he *purchased* shares. And Plaintiffs challenge entirely accurate statements, alleging that Carvana omitted information that it repeatedly disclosed. The ACC is, at its core, a hindsight challenge to Carvana's business strategy and accounting judgments. As the Ninth Circuit has reiterated, Plaintiffs' "[d]issatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, make for interesting reading but not an actionable securities fraud claim." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024). The ACC is neither "interesting reading," nor "clear and concise," and it does not come close to stating a claim.

Plaintiffs fail to allege a statement-based claim under either the Exchange Act or the Securities Act, because they do not allege **falsity** or **materiality**. Plaintiffs were required to allege material facts that were not disclosed to investors *and* that contradicted something Defendants said. The only individual Defendants who made any statements are Garcia Junior (the CEO) and Jenkins (the CFO), who described—in SEC filings, on earnings calls, and at investor conferences—Carvana's business strategy, its growth, and the challenges of operating in a highly regulated environment under rules not designed for it. Plaintiffs

1  devote literally hundreds of pages to spinning a (repetitive) tale of undisclosed information,
2  but all of it either was in fact disclosed, is entirely consistent with everything Carvana said,
3  or reflects Plaintiffs' after-the-fact opinion that Carvana should have abandoned its growth
4  strategy. Plaintiffs complain repeatedly about how Carvana reported costs incurred after a
5  vehicle is sold, but they admit that Carvana had a choice (under the accounting rules) about
6  how to allocate those costs, which Carvana has reported consistently—to this day—as
7  SG&A expenses. And the fact that Plaintiffs identify instances in which Carvana incurred
8  de minimis fines of, for example, $2,500 in a complex regulatory environment is
9  unsurprising and immaterial for a company with almost $13 billion in revenues at the time.

10      All of Plaintiffs' claims also fail on **loss causation** (or for the Securities Act,
11  **negative causation**) grounds. Plaintiffs point to negative financial results and media
12  reports, which they claim caused significant stock drops. But Carvana's financial results
13  did not reveal any alleged fraud—and Plaintiffs' allegations admit that the financial results
14  reflected bad news from the immediately-completed quarter, not Plaintiff's alleged pump
15  and dump scheme. Media reports about consumer complaints and regulatory penalties were
16  old news in the context of what Carvana had already disclosed and the media had already
17  reported, and so, unsurprisingly, had no discernible effect on Carvana's stock price.

18      Plaintiffs also do not plead the requisite strong inference of **scienter** for their
19  Exchange Act claims, namely, a fraudulent intent to make misleading statements or
20  orchestrate a "scheme." The fact that Garcia Junior made no stock sales undermines an
21  inference of scienter, and Plaintiffs fail to allege any particular facts attributing Garcia
22  Senior's sales to his son or suggesting that Jenkins' sales were unusual or suspicious. In
23  fact, Jenkins acquired more stock during the Class Period than he sold and he made no
24  sales at all for the last *year* of the Class Period even though Plaintiffs allege Jenkins
25  continued to pump the stock price through that time. Apart from their failure to plead any
26  financial motive for the alleged pump and dump scheme, Plaintiffs also never identify any
27  piece of contradictory information that Defendants supposedly were motivated to conceal.
28  Of course, the more plausible inference is that the Company grew rapidly but faced

significant operational constraints during the pandemic, that costs mounted as Carvana expanded to keep up with demand, and that rising interest rates and unprecedented used vehicle prices led to a slowdown in demand and a prudent change in the Company's business priorities to align costs with reduced demand. Plaintiffs may see 20-20 in hindsight but that's not a fraud claim.

Plaintiffs fail to plead **scheme** or **insider trading** claims under the Exchange Act either. Plaintiffs label the supposedly deceptive acts as "artifices" in their scheme version of the complaint, but labels are no substitute for particular facts, and the challenged statements are no more deceptive when pled as "artifices." The scheme version of their claim doubly fails because Plaintiffs never identify with particularity what each supposed scheme participant did and how the public was deceived. And Plaintiffs' insider trading claim against Defendant Jenkins fails without a predicate Exchange Act violation, or allegations establishing he had material non-public information.

The ACC should be dismissed, this time with prejudice because Plaintiffs have already had an opportunity to remedy the pleading deficiencies but instead acted in bad faith in filing an ACC longer than its predecessor in direct violation of the Court's order.

## BACKGROUND

### A.    An Arizona State Court Has Already Thrown Out Plaintiffs' Theories

The ACC is not only a longer version of the prior federal complaint but also of a complaint that the Arizona state court already dismissed. Shortly after this case was filed, an investor filed a state court action alleging claims under the Securities Act of 1933 relating to Carvana's April 2022 securities offering. Compl., *City of Warwick Ret. Sys. v. Carvana Co.*, CV 2022-013054 (Sup. Ct., Maricopa Cnty.) (Sept. 30, 2022). That action was not removable. *See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 443 (2018). The state complaint initially challenged Carvana's accounting judgments in recognizing revenues before title and registration had been processed. In a decision by Judge Thomason, the state court rejected plaintiff's allegations but granted leave to amend. Ex. 34, Minute Entry, "*Warwick I*," *Warwick Ret. Sys.*, CV 2022-013054 (Mar. 13, 2023).

The amended state complaint copied (more concisely) the federal complaint. Just like Plaintiffs here, the state plaintiff alleged that Carvana concealed its business strategy, including buying lower-quality cars from customers and expanding nationwide; resulting operational constraints, costs, and inventory buildup; as well as consumer complaints about title and registration delays. *Warwick Ret. Sys.*, CV 2022-013054, Amended Class Action Complaint (Apr. 28, 2023). In a decision dismissing with prejudice, Judge Coury held that "Carvana did not omit any material information about its car buying strategy or the issues the strategy had on title processing." Dkt. 63, Ruling, "*Warwick II*," *Warwick Ret. Sys.*, CV 2022-013054, at 16-22, 25-26 (Oct. 26, 2023). Judge Coury also again rejected the plaintiff's accounting claim. *Id.* at 23-24. Plaintiffs' allegations here are substantively the same and should meet the same fate.

## B.    Carvana Disclosed Its E-Commerce Model and Its Growth Strategy

Carvana is an online dealer of used cars that went public in 2017 as a "disruptor and innovator in the used car market." ¶¶ 2, 37-38. From its IPO, Carvana disclosed a nationwide e-commerce model, ¶ 2; Ex. 1 (S-1 at 4-6),[1] which came with risks, including a patchwork of state regulations not designed for it, *e.g.*, *id.* at 24-26; ¶ 174. The media described this as running into real-world "red tape," "taking the car-dealership business—which for decades has been a mostly local and in-person undertaking—and putting it fully online." Ex. 14 (Oct. 22, 2021 WSJ Article) at 1, 4-5; *see also* ¶¶ 146, 148, 313.

Carvana disclosed its growth strategy from the time it went public in 2017, *e.g.*, Ex. 1 (S-1) at 5, and every quarter thereafter. In its first letter to shareholders in June 2017, Carvana disclosed in bold: "Objective #1: Grow Retail Units and Revenue," explaining its

---

[1] Unless otherwise noted, all Exhibits are to the Peters Declaration filed herewith and include SEC filings, earnings and investor call transcripts, shareholder letters, as well as news articles. Most were previously submitted on April 19, 2023, Dkt. 51-1, with Carvana Defendants' motion to dismiss the CC. Defendants submit them all together here for the Court's convenience. Plaintiffs quote or refer extensively to Exhibits in the ACC—but unlike the CC, Plaintiffs have deleted the source information, *compare* ACC ¶ 148(b), *with* CC ¶ 188; Dkt. 72-1 at 89, obfuscating when and in what context particular statements were made. Given Plaintiffs' prior objection to the Exhibits, Dkt. 56 at 12 n.4, Defendants are taking a belt-and-suspenders approach and filing herewith a Request for Judicial Notice, explaining that the Court may consider the Exhibits in deciding the Motion to Dismiss through judicial notice or the doctrine of incorporation by reference.

plans to expand nationwide, and to invest in growth, including by adding production capacity with Inspection & Reconditioning Centers ("IRCs") across the country. ¶ 39; Ex. 2 (Q1 2017 S'holder Ltr.) at 4-5. Beginning in Q1 2019, Carvana disclosed its intent to expand its inventory by buying more vehicles from customers, including buying lower-quality vehicles that it either reconditioned or sold to wholesalers, which Carvana described as one of its "largest opportunities." Ex. 3 (Q1 2019 S'holder Ltr.) at 6; Ex. 7 (2020 10-K) at 86. Every quarter, Carvana reported metrics, including in easy-to-read shareholder letters, that detailed Carvana's growth and its retail and wholesale sales. For 2019, Carvana reported its sixth consecutive year of triple digit revenue growth (101%), selling more cars that year than in its entire history combined. Ex. 4 (Q1 2020 S'holder Ltr.) at 8-9.

While Carvana's annual revenue has grown enormously, from $3.9 billion to $13.6 billion between 2019 and 2022, Ex. 18 (2021 10-K) at 18; Ex. 33 (2022 10-K) at 19, Carvana disclosed before and throughout the Class Period that it has never been profitable and did not expect to be any time soon. *E.g.*, *id.* at 18 ("We have not been profitable since our inception . . . . We expect to make significant investments to further develop and expand our business. . . . We expect to continue to incur losses . . . for a number of reasons, including investing in growth, slowing demand [and] a decline in global financial conditions."). Carvana consistently warned investors that its growth might not continue, and that its "rapid growth has placed and may continue to place significant demands on [its] . . . operational and financial resources."

**C.**     **The Pandemic and Rapid Growth Created Operational Constraints**

Carvana's growth slowed in March 2020 when the pandemic began and state and local governments issued shelter in place orders. Ex. 4 (Q1 2020 S'holder Ltr.) at 3. Sales "rebounded" by May 2020, *id.*, and by the third quarter of 2020, Carvana's sales growth was up 41% year-over-year, Ex. 6 (Q3 2020 S'holder Ltr.) at 10. At the same time, the pandemic created significant operational constraints. As Carvana explained in its shareholder letters, during the first wave of COVID-19, it initially paused buying cars from customers and reduced employee hours at IRCs—but then after rebounding demand

depleted available inventory, Carvana began buying cars again and worked to restore inventory. Ex. 4 (Q1 2020 S'holder Ltr.) at 3; Ex. 8 (Q4 2020 S'holder Ltr.) at 7.

Both increased demand and additional waves of COVID-19 created "significant operational constraints" throughout 2021. Ex. 15 (Q3 2021 S'holder Ltr.) at 3. By Q3 2021, despite increasing available inventory, Carvana was limiting vehicles visible on its website in order "to allow our operational capacity to catch up to demand and ensure we are providing the best possible customer experiences." *Id.* This meant that Carvana was buying more cars, but inventory growth was not flowing through to customers yet, because it lacked operational capacity. *Id.* at 2 ("We . . . expect retail units sold to be governed primarily by our operational capacity."). Throughout 2021, Carvana "remain[ed] focused on increasing capacity through all parts of our operational chain, including vehicle production, fulfillment, and customer care," Ex. 15 (Q3 2021 S'holder Ltr.) at 3, and in February 2022, Carvana announced a plan to purchase ADESA, a vehicle auction house with reconditioning facilities across the U.S. ¶ 14; Ex. 17 (Q4 2021 S'holder Ltr.) at 5.

Carvana also disclosed that the pandemic and Carvana's "high rate of growth" created delays in title and registration processing. *E.g.*, ¶ 180; Ex. 7 (2020 10-K) at 17; Ex. 19 (J.P. Morgan Aug. 2021 Auto Conference Presentation) at 2; Ex. 5 (Q3 2021 S'holder Ltr.) at 3 ("Buying more cars from customers leads to . . . more complex title processing requirements, which in turn leads to more complex registration processing"); *see also Warwick II* (Dkt. 63) at 17-21. During 2021 and through the end of the Class Period, a few state regulators investigated customer complaints, and in some cases took the position that Carvana had run afoul of regulations—the Complaint identifies nine such states across the nearly three-year Class Period. *E.g.*, ¶ 148. Carvana typically contested those determinations, and in some cases, was successful in assuring regulators that their concerns were not warranted. *E.g.*, ¶¶ 148(f),(i). In other instances, certain states imposed penalties that were small in size and scope. *E.g.*, ¶¶ 148(a)-(b), 180. Carvana obtained additional dealer's licenses, sometimes to comply with requirements and other times to "maximize operational flexibility and efficiency and invest in relationships with state regulators." *E.g.*,

1  Ex. 7 (2020 10-K) at 15 (disclosing states in which it had obtained dealer's licenses); Ex.

2  18 (2021 10-K) at 15 (same).

3        **D.**    **Carvana Disclosed a Sales Decline and Updated Business Strategy**

4       Carvana's stock price peaked in Q3 2021 and followed a significant downward trend

5  through June 2022, before remaining persistently lower for the rest of the Class Period

6  (ending February 23, 2023). *See* App. B. As Carvana explained, operational constraints

7  had worsened by "[t]he end of 2021 and the start of 2022," with the impact of another wave

8  of COVID on its supply chain, "the fastest increase in interest rates in recent memory," and

9  "historic vehicle price increases," Ex. 17 (Q4 2021 S'holder Ltr.) at 3. Carvana was

10  transparent about its challenges—disclosing in its Q4 2021 shareholder letter (on February

11  24, 2022) that data for the not-yet-completed Q1 2022 showed slowing retail sales and

12  mounting expenses. *Id.* at 14-15. On April 20, 2022, before the secondary offering that is

13  the basis for Plaintiffs' Securities Act claims, Carvana reported that retail sales fell for the

14  first time in Q1 2022. Ex. 20 (Q1 2022 S'holder Ltr.) at 9. Carvana explained that macro

15  factors had been challenging for Carvana in particular because it had built up capacity in

16  2021 expecting continued growth—so when sales slowed, Carvana was stuck with

17  relatively high short-term costs, causing lower than expected profit margins. *E.g.*, ¶ 316;

18  Ex. 20 (Q1 2022 S'holder Ltr.) at 1, 3. Carvana announced it would no longer provide

19  guidance for the remainder of FY 2022, given the uncertain environment. *Id.* at 3.

20       Carvana announced on May 10, 2022 that it was updating its business strategy to

21  focus on "efficient growth" and reducing expenses to better align with lower sales volume.

22  ¶ 317; Ex. 23 (May 10, 2022 8-K) at 9, 20. For Q2 2022, on August 4, 2022, Carvana

23  announced a sequential decrease in retail sales but progress on reducing SG&A expenses.

24  Ex. 25 (Q2 2022 S'holder Ltr.) at 3. Carvana warned that "[l]ogistics continues to be an

25  important area where there is significant room for additional improvement in reliability,

26  costs, and delivery speed," and that its "title and registration teams [were] work[ing] with

27  the various states to complete necessary registration paperwork." *Id.* at 11. The stock price

28  went up with that announcement (which Plaintiffs do not point to as a corrective disclosure

despite substantively similar disclosures). For the third quarter, on November 3, 2022, Carvana reported a small sequential increase in sales and also significant gains in operational efficiency. Ex. 29 (Q3 2022 S'holder Ltr.) at 3.

At the close of the Class Period, on February 23, 2023, Carvana reiterated what it had said in Q1 2022, namely, that it "came into the year positioned for growth, similar to what [it] had experienced in [the] prior nine years" but macro-factors led to "markedly lower volumes than [Carvana] had positioned for," leading to "carrying excess costs." Ex. 33 (Q4 2022 S'holder Ltr.) at 2; *see also* ¶ 327.[2]

### E.    **Plaintiffs File This Lawsuit**

In response to the lower stock price, shareholders filed this action in August 2022. From its original 33 pages, Dkt. 1, Plaintiffs' complaint ballooned in both allegations and Class Period with each of their two amendments. Dkt. 36, 71. The Court granted Defendants' motion to dismiss the CC, finding it "an impermissible puzzle pleading." Dkt. 70 at 2. Plaintiffs have responded with the 320-page ACC, which is a far cry from the Court's instruction that any amendment be as "clear and concise." *Id.* at 18, 22.

# ARGUMENT

## I.    **LEGAL STANDARDS**

Rule 8 requires Plaintiffs to set forth a "short and plain statement" of claims and "simple, concise, and direct" allegations. Dkt. 70 at 14 (citing Fed. R. Civ. P. 8(a) and 8(d)). The Court need not accept as true legal conclusions, mere conclusory statements, or implausible inferences. *See v. Iqbal*, 556 U.S. 662, 677-79 (2009). Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

---

[2] More than eight months after the Class Period ended, Carvana reported "significant gains" in operational efficiency, and along with its usual shareholder letter, Ex. 37 (Q3 2023 S'holder Ltr.) at 3, presented details on its progress in reducing both the cost of goods sold (*i.e.*, costs of preparing a car for sale, including acquisition and reconditioning costs) and SG&A expenses (*i.e.*, operations and overhead expenses, including outbound logistics and title and registration costs following a sale). Ex. 36 (Nov. 2, 2023 Presentation) at 3-7.

1    **A.    Sections 10(b), 20(a), and 20A of the Exchange Act**

2    Private lawsuits under Section 10(b) and Rule 10b-5 are not meant "to provide

3    investors with broad insurance against market losses." *Dura Pharms., Inc. v. Broudo*, 544

4    U.S. 336, 345 (2005). To separate potentially meritorious claims from those merely

5    attempting to recoup market losses, plaintiffs must allege "(1) a material misrepresentation

6    or omission; (2) made with scienter; (3) in connection with the purchase or sale of a

7    security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss

8    causation." *In re BofI Hldg., Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020). In narrow

9    circumstances, the requirement of a misrepresentation or omission may be substituted with

10   "scheme liability" (c). To plead scheme liability, a plaintiff must plead that each defendant

11   "engaged in conduct that had the *principal purpose and effect* of creating a false appearance

12   of fact" in furtherance of a scheme to defraud investors. *Simpson v. AOL Time Warner,*

13   *Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) (emphasis added).[3]

14   The circumstances constituting fraud must be alleged "with particularity" under

15   Rule 9(b) and the PSLRA, which "*significantly*" heightened pleading requirements for

16   securities fraud actions, *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002); 15

17   U.S.C. § 78u-4(b)(1)-(2) (plaintiff must "state with particularity" facts establishing that a

18   statement was misleading and facts giving rise to a "strong inference" of scienter).

19   Congress implemented these heightened requirements "to eliminate abusive and

20   opportunistic securities litigation and to put an end to the practice of pleading fraud by

21   hindsight." *Gompper*, 298 F.3d at 897.

22   Section 10(b) and Rule 10b-5 "do not require real-time business updates or complete

23   disclosure of all material information whenever a company speaks on a particular topic."

24   *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615 (9th Cir. 2022) (*Twitter II*).

25

26   [3] Section 20(a) allows a claim against a "controlling person" for a predicate Section 10(b) violation. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 419 (9th Cir. 2020). Section 20A similarly requires a predicate insider trading violation of the Exchange Act, and allows

27   recovery where a plaintiff makes a particularized pleading that insiders traded on material non-public information ("MNPI") contemporaneously with the plaintiff. *In re Volkswagen*

28   *"Clean Diesel" Mktg., Sales Pracs. & Prod. Liab. Litig.*, 328 F. Supp. 3d 963, 987 (N.D. Cal. 2018).

1 Instead, to plead falsity, a plaintiff must allege particular material facts that "the defendant

2 knew at that time" and that "directly contradict" the defendant's statements. *Khoja v.*

3 *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *Brody v. Trans. Hosp.*

4 *Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). There is no duty to disclose "information

5 already in the public domain." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1162-63 (9th

6 Cir. 2009) (citation omitted). And to allege "materiality," "there must be a substantial

7 likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

8 investor as having significantly altered the 'total mix' of information made available."

9 *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted).

10    **B.    Sections 11, 12(a)(2), and 15 of the Securities Act**

11    Like Exchange Act claims, a Section 11 claim requires a plaintiff to plead a material

12 misrepresentation or omission, but specifically within a registration statement. *In re Daou*

13 *Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005). While loss causation is not an element of

14 the claim, "negative causation" (a lack of loss causation) is an affirmative defense, and a

15 Section 11 claim should be dismissed where negative causation appears on the face of the

16 complaint. *Brown v. Ambow Educ. Hldg. Ltd.*, 2014 WL 523166, at *15-16 (C.D. Cal.

17 2014). Securities Act claims are subject to Rule 9(b)'s heightened standards where they

18 sound in fraud; this is so where a plaintiff's Securities Act and Exchange Act claims are

19 substantially similar. *Rubke*, 551 F.3d at 1161.[4]

20 **II.    PLAINTIFFS' COMPLAINT REMAINS A PUZZLE PLEADING.**

21    The ACC again violates Rule 8 and the PSLRA's heightened pleading standards and

22 Rule 9(b). This Court granted leave to amend with instructions to be "clear and concise"

23 and "explain why each statement on its face was false given the information known at the

24 time." Dkt. 70 at 14, 17. Plaintiffs' 320-page ACC—excluding 107 pages of appendices

25 and exhibits—violates the Court's instructions and the pleading standards. The Court

26

27 [4] Sections 11 and 12(a)(2) are "Securities Act siblings" with similar elements—Section 12(a)(2) allows recovery "only against a 'statutory seller' from which the plaintiff purchased the security." *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 925 (N.D. Cal.

28 2015). Section 15 allows a secondary claim against control persons for a predicate Section 11 or 12 violation. *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 772 (N.D. Cal. 2017).

previously declined to "use its inherent authority under Rule 41(b) . . . to dismiss the Amended Complaint," but allowed Defendants to raise Plaintiffs' failure to comply with Rule 8 in this motion to dismiss. Dkt. 81 at 1. Defendants now request that the ACC be dismissed with prejudice because Plaintiffs have "confuse[d] length and repetition with particularity." *Cupat*, 2024 WL 1374903, at *2 n.2.

In response to the Court's instruction to match the challenged statements with the reasons each was allegedly false, Plaintiffs now group the challenged statements by subject matter (instead of chronologically). But then in purporting to explain why each purported statement is misleading, Plaintiffs impermissibly repeat the same purported omissions even where the omissions have no connection to, and are divorced in time from, the challenged statements—and nowhere do Plaintiffs offer any facts raising an inference of any Defendant's scienter with respect to each statement. *See Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL 1805011, at *2 (S.D.N.Y. 2024).

To take one example (of many), Plaintiffs challenge a statement about how Carvana "determine[d] an appropriate offer" on "vehicles sold to [it] through its website." *E.g.*, ¶ 191 (Statement 9). Plaintiffs include six pages of purported explanation as to why this statement was false or misleading. They first allege that Carvana's statement failed to disclose that Carvana "was intentionally buying lower quality cars," but then they challenge *different* statements, complaining that Carvana's GPU metric concealed certain expenses—with no explanation about how the GPU metric is connected to the challenged statement or any facts about the speaking Defendants' supposed knowledge of the alleged omission. ACC at pp. 83-86. Plaintiffs repeat their allegations for each of the ten "Buying Cars" statements, without regard to the timing of the challenged statements. ¶¶ 191-210.[5]

Other examples disclose the indigestible length of Plaintiffs' purported explanations as to why each challenged statement is misleading. Take Statement 33 about Carvana's Q1 2020 retail GPU. Plaintiffs devote ten pages to argument (rather than facts) that the retail

---

[5] Because Plaintiffs copy and paste their allegations, they repeatedly allege that Defendants omitted certain facts that post-date the challenged statement. *E.g.*, ¶ 192(c)(iv) (challenging October 2020 statement based on ADESA acquisition in April 2022).

1  GPU metric was supposedly misleading. ACC at pp. 184-93. Statement 38's explanation

2  is even worse, running twelve pages in length. ACC at pp. 232-43.

3      Courts have repeatedly "admonished" the same law firm as Plaintiffs' counsel for

4  submitting "hydra-like" complaints with "unnecessary summaries and recapitulation,

5  boilerplate, and simply excess verbiage" that violate Rule 8. *Cupat*, 2024 WL 1374903, at

6  *1-2 (dismissing 212-page complaint); *In re Level 3 Commc'ns., Inc. Sec. Litig.*, 2010 WL

7  5129524, at *7 (D. Colo. 2010) (dismissing same counsel's 135-page complaint with

8  prejudice); *Ok. Pol. Pens. & Ret. Sys. v. Boulder Brands, Inc.*, 2017 WL 1148689, at *3

9  (D. Colo. 2017) (dismissing same counsel's "hefty" 69-page complaint).

10      Courts also have dismissed complaints like the ACC for puzzle pleading where the

11  plaintiff "formulaically lists the information omitted from such statements," *Lomingkit v.

12  Apollo Ed. Grp. Inc.*, 2017 WL 633148, at *11 n.6 (D. Ariz. 2017), or "cop[ies] and

13  past[es]" "pages of less-than-specific facts" "[w]ithout specifically alleging when these

14  issues arose or when Defendants knew about them." *Kempen Int'l Funds*, 2024 WL

15  1805011, at *2.

16      Given that Plaintiffs were explicitly instructed to submit a concise complaint free of

17  puzzle pleading, Plaintiffs have "acted in bad faith by submitting yet another unnecessary

18  lengthy, puzzling and burdensome complaint," and the ACC should be dismissed without

19  leave to amend. *Baker v. Twitter, Inc.*, 2024 WL 1178168, at *12 (C.D. Cal. 2024).

20  **III.    PLAINTIFFS FAIL TO PLEAD ANY EXCHANGE ACT CLAIM.**

21      **A.    <u>Plaintiffs Fail to Plead a Statement-Based Claim Under Section 10(b).</u>**

22          **1.    Plaintiffs Fail to Plead Any Materially False Or Misleading**

23              **Statement.**

24              a.    <u>**Title and Registration (Statements 1-8)**</u>

25  <u>**Risk Disclosures**</u>. Plaintiffs challenge a compliance risk factor in Carvana's SEC

26  filings. ¶¶ 174-87. In the challenged 10-Ks, Carvana warned both that "our failure to

27  comply with" "a wide range of" "laws and regulations" "could have an material adverse

28  [business] impact," and that any violation of "these laws and regulations could result in

administrative, civil, or criminal penalties or in a cease-and-desist order," "any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations." ¶¶ 174, 184. And in each challenged 10-Q, Carvana stated that there were no material changes to the risk factors disclosed in the prior 10-K. ¶¶ 176, 178, 182, 186. Plaintiffs repeat the same falsity theory six times, but it fares no better with repetition.

Start with Plaintiffs' attack on the "penalty" clause. *E.g.*, ¶ 175(a). As one district court recently explained, "a risk disclosure is not misleading as a matter of law where it concerns a risk that is inherent in running a business, always present to some extent, and the significance of which is not a yes-or-no question of occurrence but one of degree." *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *7 (C.D. Cal. 2023); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (recognizing that "acknowledgements of the complexity and numerosity of applicable regulations . . . suggests caution (rather than confidence) regarding the extent of [defendant's] compliance"). Carvana's risk factor explained that Carvana "operate[s] in several highly regulated industries" and is "subject to a wide range of evolving . . . laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model." Ex. 7 (2020 10-K) at 24; Ex 18 (2021 10-K) at 24. Reading this disclosure "in context," *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996), no reasonable investor would have taken Carvana's warning to mean that despite selling thousands of vehicles a year across state lines, Carvana had never had a single run in with a regulator on *any* issue. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*, 480 F. Supp. 3d 1050, 1062 (N.D. Cal. 2020) (dismissing claim based on "generic warnings about product quality and potential recalls writ large").[6] Many of the alleged penalties, *e.g.*, ¶ 183(a), also pre-date by many months or post-date the challenged statement, and thus cannot show any were "false or

---

[6] To the extent Plaintiffs complain that Carvana did not disclose "increased oversight," *e.g.*, ¶ 175(a), that is incorrect. Ex. 7 (2020 10-K) at 15 ("Certain states have concluded that our activities are subject to vehicle dealer licensing laws, requiring us to maintain a used vehicle dealer license in order to conduct business in that state."); Ex. 18 (2021 10-K) at 15 (similar).

1    misleading at the time they were made." *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d

2    869, 876 (9th Cir. 2012).

3        Plaintiffs fare no better in challenging the our "failure to comply" clause. *E.g.*,

4    ¶ 175(b). Carvana did not describe its "failure to comply" as a *hypothetical* risk, as

5    Plaintiffs misleadingly suggest, *see*, *e.g.*, ¶ 173 ("*if* it failed to comply"). Rather, Carvana

6    warned that "*our* failure to comply" with laws "could have a material adverse effect on our

7    business." *E.g.*, ¶ 174 (emphasis added). Again read in context, no reasonable investor

8    would have read a disclosure about operating in a highly regulated industry to say that

9    Carvana was in 100 percent compliance with all applicable laws. *See Singh*, 918 F.3d at

10   64; *In re Syntex Corp.*, 95 F.3d at 929; *Waswick*, 2023 WL 9197563, at \*7.

11       Plaintiffs also never allege that the warned-of material effect on Carvana's

12   "business, results of operation, and financial condition" had materialized by the time of

13   any challenged statement. Plaintiffs point to CW allegations of title and registration delays,

14   *e.g.*, ¶ 175(b)—but vague allegations about delays do not show an undisclosed material

15   adverse business impact, and Plaintiffs fail to plead with particularity facts showing that

16   those delays violated the law.[7] *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d

17   Cir. 2019) ("[W]hen a complaint claims that statements were rendered false or misleading

18   through the nondisclosure of illegal activity, the facts of those underlying illegal acts must

19   also be pleaded with particularity."). As the state court already found, the mere practice of

20   selling cars prior to holding certificates of title is not illegal. *See Warwick II* (Dkt. 63) at

21   22-23; *see also* Ex. 24 (June 24, 2022 *Barron's* Article) at 5 ("No states are known to have

22   sanctioned Carvana over the practice of selling vehicles without holding titles.").[8]

---

[7] In fact, the CW allegations *contradict* Plaintiffs' alleged law-violating scheme by showing that the company expected that delays in obtaining title paperwork would be resolved (CW-8), and at least in CW-4's Midwest IRC, the Company kept diligent track on a single spreadsheet of cars with unresolved delays. *E.g.*, ¶¶ 73, 100.

[8] Plaintiffs allege that two Board documents show that Carvana concealed its failure to comply with title and registration laws. *E.g.*, ¶ 175(b) (citing Compl. Exs. 1-2). Those Exhibits say no such thing. Exhibit 1 is a Board presentation from a July 2020 meeting noting that "[m]any DMVs paused operations over the last few months," and Carvana was working to reduce registration delays. Exhibit 2 is a Board presentation from an October

Plaintiffs also fail to allege materiality. *E.g.*, ¶ 175(b). The risk factor is a generic compliance warning that no investor would rely on. *See In re Volkswagen*, 480 F. Supp. 3d at 1062; *Singh*, 918 F.3d at 64 ("tentative and generic" statements not plausibly alleged as material). Even putting aside the disclosure's generic nature, Plaintiffs plead no particular facts showing "how the [allegedly omitted penalties] affected the company's financial statements and whether they were material in light of the company's overall financial position." *Bajjuri v. Raytheon Techs. Corp.*, 641 F.Supp.3d 735, 761 (D. Ariz. 2022) (citation omitted). The few facts Plaintiffs allege confirm that the state court was correct in finding the same alleged penalties to be immaterial, particularly given the Company's annual sales and revenues. *See Warwick II* (Dkt. 63) at 17-22.[9] Plaintiffs also point (twelve times) to a request Carvana made *months after the last challenged statement* to enjoin the Michigan Secretary of State from suspending Carvana's dealer's license. *E.g.*, ¶ 175(c). But that request post-dates the challenged statements and regardless, the court *denied* Carvana relief because there was no showing that the suspension (which did not apply to online sales) had any impact on Carvana's overall operations or economic well-being. Ex. 28 (Order, *Carvana v. Benson* (Oct. 19, 2022)) at 3-5.[10]

---

2021 meeting, listing the North Carolina regulatory action as a key item to explain to investors "following Q2." These documents do not purport to suggest that Carvana was concealing, instead of working to improve, delays in registration following DMV shutdowns. Carvana had *already* discussed the North Carolina regulatory action with investors two months earlier, and shortly after the October 2021 meeting, Carvana explained to investors that it was facing more complex title and registration processing, given the growth in buying cars and the pandemic. Ex. 15 (Q3 2021 S'holder Ltr.) at 3.

[9] As in the CC, Plaintiffs quote a Michigan state press release to allege facts related to an October 2022 license suspension. *Compare* CC ¶ 188 *with* ACC ¶ 148(b). But in the ACC, Plaintiffs delete the CC's footnotes citing source material. CC ¶ 188 n.61. Plaintiffs' now-deleted footnote disclosed that Carvana paid an immaterial $2,500 administrative fine in May 2021. Ex. 27 (Oct. 7, 2022 Mich. Dept. of State Press Release) at 2.

[10] Plaintiffs suggest in one paragraph that there was "an 'adverse effect on our … sales'" for "several months" leading up to August 2022, ¶ 187(b), because Carvana was *working to address* delays in title and registration by adding "[delivery time] buffers in many states to provide cushion . . . to complete necessary registration paperwork." *E.g.*, ¶ 187(b) (quoting Ex. 25 (Q2 2022 S'holder Ltr.) at 11). But Carvana's *compliance strategy* does not show an adverse impact on sales—and this allegation only confirms the *absence* of any supposed scheme to "flout[] [title and registration] laws." *E.g.*, ¶ 144.

Plaintiffs' omission theory cannot be reconciled with Carvana's repeated disclosures of title and registration delays and run-ins with regulators. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,* 774 F.3d 598, 607 (9th Cir. 2014); *Warwick II* (Dkt. 63) at 17–22 (detailing how "Carvana disclosed that title and registration processing became more difficult during the pandemic," and "regulatory suspensions were disclosed in the press and by the Company"). Carvana has long disclosed not only that certain states had required it to obtain dealer licenses, but also that "[i]n certain other states, we have elected to obtain a used vehicle dealer license to maximize operational flexibility and efficiency and invest in relationships with state regulators." Ex. 7 (2020 10-K) at 15; Ex. 18 (2021 10-K) at 15. After the pandemic began, Carvana disclosed that shutdowns had impacted its own and vendors' operations. Ex. 4 (Q1 2020 S'holder Ltr.) at 4-6; Ex. 5 (Q1 2020 10-Q) at 17; Ex. 18 (2021 10-K) at 17. It warned of "particularly difficult challenge[s]" with title and registration, Ex. 7 (2020 10-K) at 19, 24; Ex. 18 (2021 10-K) at 19, 24, including that processing title "can take longer" than it did pre-pandemic, ¶ 180.[11]

As Plaintiffs admit, the media also consistently reported title and registration delays and consumer complaints. For example, in August 2021, the media reported that the North Carolina DMV had temporarily suspended Carvana's dealer's license for a vending machine in Raleigh and imposed a $500 fine. ¶¶ 148(a), 311 (discussing *ABC News* Article); *see also* Ex. 12 (Aug. 11, 2021 *Wall Street Journal* Article). Carvana discussed the suspension at an investor conference the next day. ¶ 180; Ex. 13 (Aug. 11, 2021 JPM Conference) at 5. In October 2021, the *Wall Street Journal* reported that states beyond North Carolina, including Florida, Texas, and Michigan, had found Carvana violated state dealer rules. Ex. 14 (Oct. 22, 2021 *Wall Street Journal* Article) at 1, 8. Plaintiffs nowhere explain how any of the alleged penalties either were not already public or how they were materially different from the information "substantively disseminated by the press," *In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1009 (N.D. Cal. 2017), and

---

[11] Carvana repeatedly disclosed that it was "enhancing [its] systems and processes to adapt" to title and registration processing challenges, Ex. 15 (Q3 2021 S'holder Ltr.) at 3.

discussed by Carvana itself. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) (no duty to disclose information publicly reported in news articles prior to offering); *Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at *8, 10 (C.D. Cal. 2016) (omitted facts were disclosed in defendant's conference call with analysts).

Lastly, the challenged statements are inactionable. Carvana's risk disclosures were forward-looking and thus protected by the PSLRA safe harbor and bespeaks caution doctrine because they were accompanied by cautionary language, Ex 7 (2020 10-K) at 1; Ex. 18 (2021 10-K) at 15-16, and were themselves cautionary, *Kolominsky v. Root, Inc.*, 2024 WL 1854474, at *8 (6th Cir. 2024), and Plaintiffs do not allege (as they were required to do) any Defendants' actual knowledge of falsity. *See Wochos v. Tesla*, 985 F.3d 1180, 1195-65 (9th Cir. 2021); 15 U.S.C. § 78u-5(c). Carvana's "no material changes" statements in the challenged 10-Qs were also opinion statements which Plaintiffs do not allege any Defendant subjectively disbelieved or that are otherwise false under *Omnicare, Inc. v. Laborers Dist. Council Const. Indust. Pens. Fund.*, 575 U.S. 175, 187-88 (2015).

**Statement 4**. Plaintiffs challenge Defendant Jenkins' and non-defendant Michael Levin's[12] response to analyst questions in August 2021 about the North Carolina DMV's suspension of its dealer's license. ¶ 180. Plaintiffs argue Jenkins and Levin misled investors into believing that title and registration delays were specific to North Carolina. ¶ 181(a)-(b). But that's not what Jenkins and Levin said.[13] They said that since the pandemic, "we've continued to be somewhat backed up in title and registration" (Jenkins), that Carvana was working "with DMVs in every single state around the country" (Levin), and that "I think this, based on the pandemic, . . . was an area where we saw delay" (Levin). ¶ 180; Ex. 13 (Aug. 11, 2021 JPM Conference) at 5. Neither suggested that delays only

---

[12] Plaintiffs never allege Michael Levin spoke with scienter. *See* Section III.A.3, *infra*.

[13] As with the other title and registration statements, Plaintiffs repeat their allegations from an October 2021 Board presentation and the June 2022 *Barron*'s article, ¶ 181, which not only fail to contradict Jenkins' or Levin's statements, but also post-date them. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *6 (N.D. Cal. 2017) (plaintiff must allege facts establishing statement was false "*when made*") (emphasis added).

1   happened in North Carolina. Rather, Jenkins said that a suspension from a "specific

2   vending machine location" was "a relatively sort of unusual approach," and "quite

3   unprecedented," and "[i]n this particular case, I think we had quite a small fraction of

4   customers that were impacted." *Id.* Plaintiffs do not allege any facts suggesting another

5   regulator had ever suspended Carvana's license from just one vending machine while still

6   allowing sales in the state. Nor do they allege facts suggesting more than a small fraction

7   was affected in North Carolina—or that Jenkins' *belief* that a small fraction was affected

8   is actionable. *Omnicare*, 575 U.S. at 187-88.

9       **Statement 8**. Plaintiffs challenge a Carvana spokesperson's response to the June

10  2022 *Barron's* article, ¶ 188, arguing the spokesperson misleadingly stated that it was only

11  in a "small percentage of instances" that customers did not receive title and registration

12  paperwork within legally-required timeframes, and that conversations with regulators had

13  been "productive," ¶ 189(a).[14] But Plaintiffs fail to allege facts suggesting that *more* than

14  a "small percentage" of customers had *unlawful* delays. Ex. 18 (2021 10-K) at 53. Nor do

15  Plaintiffs point to any *material* facts about delays that both existed as of the June 2022

16  article and had not already been disclosed, including through Carvana's repeated disclosure

17  of title and registration delays after the pandemic and media reporting of regulatory

18  penalties (which Plaintiffs themselves repeatedly allege). *See* Ex. 14 (Oct. 2021 WSJ

19  Article); Ex. 24 (June 2022 Barron's Article); *Warwick II* (Dkt. 63) at 17-22. To the extent

20  Plaintiffs attack the Carvana spokesperson's description of conversations with regulators

21  as "productive," and "confiden[ce] about our operations," ¶¶ 188, 189(b), those are

22  inactionable puffery and opinion—and the ACC admits they were true. *E.g.*, ¶ 148(b)-(c)

23  (describing numerous "meetings between Carvana and [regulators]" and "agree[ment] to

24  abide by new restrictions and increased oversight"); ¶ 148(f) (Florida withdrew threat of

25  license suspension in February 2022 after the Company "demonstrated progress.").

26          b.    **Buying Cars from Customers (Statements 9-18)**

27      **Statements 9, 11, 13, 15, 17, 18**. Plaintiffs allege that Carvana's description of how

28  _____

[14] Plaintiffs never allege the spokesperson spoke with scienter. *See* Section III.A.3, *infra*.

it "determine[s] an appropriate offer" "[f]or vehicles sold to us through our website," was misleading because Carvana was buying low quality cars without inspecting them first.[15] Plaintiffs' falsity theory again ignores the context of the statement. *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) ("A statement is misleading only if a reasonable investor, reading the statement fairly and in context, would be misled."). The challenged statement does not suggest Carvana was buying only high-quality vehicles; nor does it speak to in-person inspections or website misrepresentations. It explains that Carvana's "algorithms" consider "quality" in determining an offer for vehicles sold through its website. Plaintiffs do not allege a single fact suggesting Carvana was *not* considering quality in support of a higher or lower offer.[16] Instead, Plaintiffs devote five pages (and then repeat those five pages six times) to arguing that Carvana failed to disclose it was buying low-quality vehicles that it resold wholesale; the costs of that strategy; and the exclusion of certain costs from Carvana's GPU. ¶¶ 192, 196, 200, 204, 208, 210; *e.g.*, Ex. 18 (2021 10-K) at 58-59. None of that has anything to do with—and does not contradict— Carvana's description of how it determines an offer price. Plaintiffs' claim fails for this reason alone. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008) (to plead falsity, plaintiff must "connect [purportedly undisclosed fact's] non-disclosure with any [challenged] statement").

Plaintiffs' claim also fails because the five pages of alleged "omissions" relate to a disclosed business strategy. It is black-letter law that there can be no omission where a fact has been disclosed to investors. *Apollo Grp.*, 774 F.3d at 607; *see also Golubowski v.*

---

[15] Plaintiffs fail to establish the reliability of either CW on which they rely. CW-3 is only alleged to have been involved with Carvana's car-buying program *before* the Class Period, ¶ 67, and Plaintiffs never allege when CW-11 was employed at Carvana during the nearly three-year Class Period. Plaintiffs also do not establish that either had personal knowledge of company-wide practices. *See Espy*, 99 F.4th at 536-37 (9th Cir. 2024) (finding FE testimony lacked reliability including because one FE's position in human resources would not lead to personal knowledge of defendants' management practices); *Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. 2016) (CW accounts that "attendance at the SeaWorld-branded park in California was down before the IPO, [say nothing] . . . about the ten other parks during the relevant period").

[16] Plaintiffs' CWs *confirm* that when Carvana bought lower quality vehicles, it did so "very inexpensively," ¶ 60, *i.e.*, Carvana considered low quality when making a low offer.

*Robinhood Mkts., Inc.*, 2023 WL 1927616, at *10 (N.D. Cal. 2023) ("Plaintiffs' disagreement" with defendants' "corporate approach" failed to state a claim). As the state court already held, "Carvana repeatedly disclosed its strategy of increasing the purchase of cars from its customers and that there were challenges associated with buying more cars from customers," and "that it purchased lower quality cars that it sold to wholesalers because the cars did not meet the company's quality standards for selling through its website." *Warwick II* (Dkt. 63) at 16-17. Every quarter, it disclosed financial details for both retail vehicles and wholesale vehicles. *E.g.*, Ex. 7 (2020 10-K) at 60-61.[17]

Because they cannot fight these obvious disclosures, Plaintiffs also complain that Carvana's wholesale GPU metric did not include outbound selling expenses. To begin with, this argument makes no sense as a challenge to *Carvana's description of how it determines an offer*. Plaintiffs make no effort to connect the supposedly concealed expenses to the statement they are actually challenging. In any event, Plaintiffs' complaint about how Carvana calculated wholesale GPU fails for the same reasons as their challenge to retail GPU: as discussed *infra*, Plaintiffs admit that Carvana "could choose" how to allocate costs (*i.e.*, under accounting rules), ¶ 246, and Plaintiffs' preference for a different method of accounting does not amount to fraud. *See* Section III.A.1.f; *Rigel Pharms.*, 697 F.3d at 877-78; Ex. 34 (*Warwick I*) at 17-19.

**Statements 10, 12, 14, 16**. Plaintiffs also rely on the same alleged five pages of omissions in challenging statements about "advantages" of Carvana's car-buying strategy (Statement 10), again without attempting to connect the purported omissions to the statements. All of the statements speak generally about, *e.g.*, "efficient ways to sell even wholesale cars" (Statement 12) or the "profitability of buying cars from customers" rather

---

[17] Plaintiffs repeat eight times that Carvana previously said in briefing that it was intentionally buying lower-quality cars from consumers. But of course this was true. Carvana disclosed a strategy of buying cars from consumers, including low-quality cars that it either reconditioned or sold wholesale.

than buying "in the auction market" (Statements 14, 16).[18] None suggest Carvana did not buy lower-quality cars, that the car-buying strategy was without challenges, or that—contrary to disclosures in every SEC filing—Carvana was actually profitable. *See Kasilingam v. Stitch Fix, Inc.*, 2022 WL 10966359, at *2 (9th Cir. 2022) (general descriptions of company's marketing strategy did not mislead investor about success of nationwide campaign).

These statements are also inactionable puffery and opinion, *e.g.*, ¶ 193 ("very efficient ways"), ¶ 196 ("I think"), ¶ 201 ("performed very well for us" and "continual high-quality progress"), ¶ 205 ("I think"). *See In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *27 (N.D. Cal. 2022) ("We think we've got a great product," "our results really look terrific," and "we're way ahead" inactionable puffery); *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *14 (N.D. Cal. 2021) ("words like 'I think' or 'I believe'" denote an opinion) (internal quotations omitted).

c.    **Retail Unit Sales Growth (Statements 19-20)**

Plaintiffs challenge two statements from Q2 2021 and Q4 2021 reporting Carvana's exceptional year-over-year growth in retail sales. ¶¶ 212, 214. Plaintiffs do not dispute that Carvana's retail sales were "real," and therefore, Carvana's "accurate reporting" of its sales did not require disclosures about the underlying sales practices. *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal. 2007), aff'd, 329 F. App'x 715 (9th Cir. 2009) (rejecting allegations that undisclosed bribery had boosted revenues and rendered otherwise accurately reported revenues misleading); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *11 (N.D. Cal. 2020).

---

[18] Statements 14 and 16 challenge Defendants' responses to analyst questions about the margins of buying cars from customers versus buying cars at wholesale in the auction market. Plaintiffs delete this context from the ACC, despite including it in the CC. Dkt. 72-1 at 197 (showing deletion of reference to lower margins in auction market). Carvana repeatedly disclosed its view that it was more profitable to buy cars from customers rather than at wholesale, without suggesting that it was *net* profitable by doing so and without suggesting there were not related costs. *E.g.*, Ex. 11 (Q2 2021 Earnings Call) at 7-8, 11 (describing both GPU benefits and SG&A expenses associated with buying more cars form customers, and explaining that buying cars from customers had better margins given increasing wholesale prices).

Instead, Plaintiffs allege that Carvana misleadingly described its growth as driven by "strong demand" and "rapid growth within our market cohorts," ¶ 214, when in Plaintiffs' view, Carvana's sales growth was "primarily driven by" unsustainable sales practices, including (for Statement 20) "a sham pass-through arrangement with DriveTime." ¶ 215(a)(v). That claim fails at the outset because Carvana's descriptions of its growth as driven by "strong demand" or "rapid growth within our market cohorts," are inactionable puffery, *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *15 (N.D. Cal. 2015), and subjective assessments of its business, *Apollo Grp.*, 774 F.3d at 606.

Even if they were actionable, there is not a single alleged fact suggesting Carvana's growth was *not* primarily driven by "strong demand" or "rapid growth." Plaintiffs point to supposedly unsustainable sales practices, ¶¶ 213(a), 215(a)—but these are Carvana's disclosed car-buying and expansion business strategies, as well as challenges with title processing. Plaintiffs do not plead any facts suggesting that delays in title and registration affected a material number of sales or were the primary driver of sales in either Q2 2021 or Q4 2021. *E.g.*, ¶ 213(a). And Plaintiffs' after-the-fact disagreement with Carvana's business strategy is not grounds for a securities claim. *See Robinhood*, 2023 WL 1927616, at *10 ("Plaintiffs' disagreement about how to 'democratize finance' on a trading platform does not mean that Robinhood violated the Securities Act by choosing a different corporate approach."); *see also Ronconi v. Larkin*, 253 F.3d 423, 430 & n.12 (9th Cir. 2001) (claim may not be based on "hindsight"). Carvana was not required to predict that its growth was not sustainable. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *50 (S.D. Cal. 2005). And Carvana warned investors that its growth rate could change, that Carvana "ha[s] not been profitable since [its] inception," and that it "will continue" to incur losses. *E.g.*, Ex. 7 (2020 10-K) at 18.

Buried in their allegations about Statement 20, Plaintiffs also suggest that Carvana's growth in Q4 2021 was fueled by "a sham pass-through arrangement with DriveTime," ¶ 215(a)(v) (citing ¶¶ 127-29). Plaintiffs' "sham" accusation has not a single fact to support

it. To the contrary, Plaintiffs admit that Carvana *disclosed* its arrangement with DriveTime,

¶¶ 128-29 & n.11,[19] namely, that (i) DriveTime transactions were not at arms-length, (ii)

for certain cars, Carvana received cars from DriveTime—that DriveTime had

reconditioned—and it put them up on its website; when they sold, Carvana passed the full

purchase price back to DriveTime, and (iii) Carvana made money on those sales through

financing or service contracts. ¶ 41; *see* Ex. 18 (2021 10-K) at 92; Ex. 30 (Q3 2022 10-Q)

at 15; Ex. 33 (2022 10-K) at 98 (Carvana "earns a commission on each VSC sold to its

customers and DriveTime is obligated by and subsequently administers the VSCs"); Ex 19

(Form DEF14A Mar. 23, 2022) at 50-51 (Carvana would purchase reconditioned vehicles

from DriveTime at a "purchase price . . . equal to the wholesale price . . . plus a fee for

transportation and reconditioning" or "the list price on Carvana.com after a customer has

placed an order on the vehicle").

d.   **Nationwide Expansion (Statements 21-29)**

Plaintiffs challenge Carvana's discussion of market figures (Statement 21-23, 25-

28), and its logistics capabilities and "capital-light expansion model" (Statements 24, 29).

At the outset, the statements are all inactionable. The seven statements reporting

data on market launches—*e.g.*, "[w]e launched 15 new markets and 1 vending machine in

Q1," ¶ 218, accurately described Carvana's new markets, and Plaintiffs do not dispute the

figures. Statement 26 ("excited about launching" and "I think opening that up is exciting")

is inactionable puffery and opinion. And Statements 24 and 29 describing the advantages

of Carvana's expansion model—"[w]e believe there is a substantial opportunity to utilize

our capital-light expansion model," and "our logistics capabilities allow us to offer"—are

---

[19] Plaintiffs allege no particular facts to support their invented claim that up to 660% of Carvana's growth was a result of supposedly fraudulent arrangements. ¶ 129 & n.11. Plaintiffs cobble together numbers from disclosed data, Ex. 16 (Q3 2021 10-Q) at 13, Ex. 19 (Form DEF14A Mar. 23, 2022) at 50-51, Ex. 18 (2021 10-K) at 92, which alone defeats their claim. But they also rely on apples-to-oranges calculations. Plaintiffs' calculations purport to compare "total expenses" with "cost of sales," which were separately disclosed (*e.g.*, Ex. 16 (Q3 2021 10-Q) at 13; Ex. 18 (2021 10-K) at 92), even though "total expenses" encompasses "costs of sales" *and other additional costs*. By using "total expenses," Plaintiffs inflate the costs associated with DriveTime transactions and calculate an inflated number of retail units associated with DriveTime transactions.

puffery and opinion, "not capable of objective verification." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 803-04 (N.D. Cal. 2019).

In any event, as discussed *supra* Section III.A.1.c, this claim too fails because Carvana was not required to disparage its business strategy when it reported accurate information, *see Robinhood*, 2023 WL 1927616, at *10, including the new markets it launched each quarter, the number of existing IRCs, and the planned pace for building more.[20] Nor was it "required to take a gloomy, fearful or defeatist view" of its path to profitability. *Rombach*, 355 F.3d at 174. And as the state court found, Carvana disclosed logistics costs and operational constraints, *Warwick II* (Dkt. 63) at 17-18; *see also* Ex. 7 (2020 10-K) at 62 (disclosing costs associated with "transportation fleet" and "third party transportation"). Carvana also explained that improving its logistics network was one of its "rationales" for acquiring ADESA. *E.g.*, Ex. 17 (Q4 2021 S'holder Ltr.) at 5-6.

### e.    **Aged Inventory (Statements 30-32)**

In Q1 2021, Carvana stopped reporting its "average days to sale" metric ("ADTS"), because "[a]s we continue to grow, our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale over the past three years." Ex. 9 (Q1 2021 10-Q) at 35. Carvana disclosed that its immediately "available inventory," *i.e.*, cars that had been reconditioned and were available for immediate sale, had dropped, and that it was focused on increasing production capacity at IRCs to increase that "available inventory." Ex. 40 (Q2 2021 S'holder Ltr.) at 3. Plaintiffs do not challenge Carvana's statement in Q1 2021, nor do they dispute that the metric was relatively stable in 2018, 2019, and 2020. Instead, they complain that Carvana used similar language in three SEC filings in 2022 when the undisclosed metric had supposedly increased on a quarterly basis by that time and so was

---

[20] In each quarterly shareholder letter, Carvana included maps showing IRC and market locations. *E.g.*, Ex. 8 (Q4 2020 S'holder Ltr.) at 10. To allege the supposed omissions, the ACC copies and slightly modifies these maps. *E.g.*, ¶ 218(b). The shareholder letters also directed investors to a webpage containing "a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs." *E.g.*, Ex. 8 (Q4 2020 S'holder Ltr.) at 10.

1  allegedly no longer "relatively stable." ¶¶ 237, 239(a), 241(a), 243(a).

2         Plaintiffs' claim is meritless because phrases like "relatively stable" are subjective

3  assessments, and Plaintiffs fail to allege that any Defendant did not believe the metric had

4  been relatively stable in recent years. *See Omnicare*, 575 U.S. at 187-88; *Waswick*, 2023

5  WL 9197563, at *4 ("consistent and stable base of core products").

6         Moreover, read in context, the challenged statement explains why Carvana *stopped*

7  reporting the metric in Q1 2021. Plaintiffs want to read the statement as doing precisely

8  what Carvana said it was not doing—*continuing to report the metric*. But that's the

9  opposite of what Carvana said. Plaintiffs also do not allege any facts that *existed at the time*

10 of the challenged statements showing that the metrics were *not* relatively stable (or that

11 any Defendant believed that). *Ronconi*, 253 F.3d at 430 & n.12.[21] And Plaintiffs do not and

12 cannot allege that any omission relating to average days to sale was *materially misleading*

13 to investors. The fact that Carvana *previously* considered the metric to be key does not

14 mean Carvana was required to continue to disclose it, particularly given that it was newly

15 reporting the number of IRCs because that metric reflected Carvana's focus on increasing

16 production capacity. Nor could any reasonable investor have been misled about the "glut"

17 of inventory, as Plaintiffs suggest, *e.g.*, ¶ 239(c)(i), because Carvana *disclosed its inventory*

18 *numbers*, including not just the inventory immediately available for sale but also total

19 inventory (*i.e.*, "Total Website Units," which included vehicles *not yet* reconditioned for

20 sale). As the state court recognized, in light of Carvana's extensive disclosures, "a

21 reasonable investor would understand that Carvana's storage lots and IRCs were filling

22 up" by early 2022. *Warwick II* (Dkt. 63) at 17-18.[22]

23 _____

24 [21] Plaintiffs pull their ADTS data from a presentation from August 2023, six months after
    the Class Period, ended, *e.g.*, ¶ 239(a),(f); Ex. 35 (Aug. 2023 Presentation) at 6, without
25 any allegations that any Defendant knew that quarterly information at the time of the
    challenged statements. Plaintiffs also allege that ADTS started increasing in Q3 2021, *e.g.*,
26 ¶ 239(a), but the ADTS figure for FY 2021 was in fact *lower* than the 2020 figure. *Id.*

27 [22] Carvana disclosed "Total Website Units" as a key metric throughout the Class Period,
    including reporting in (i) February 2022 (with Statement 30) that its inventory had almost
28 tripled between 2019 and 2021 (to 71,062 units), Ex. 18 (2021 10-K) at 56; (ii) in May
    2022 (with Statement 31) that its inventory had almost tripled just year-over-year (to

f.    **Carvana's Retail GPU (Statements 33-39)**

Plaintiffs challenge Carvana's discussion of its retail GPU metric on most (but not all) earnings calls between May 2020 and February 2022. ¶¶ 247-260. Plaintiffs allege that the metric and Carvana's description of the reasons for its growth were misleading because the metric excluded certain expenses—and once those costs are added into the GPU metric, the metric shows that Carvana was not actually profitable. The pages and pages Plaintiffs devote to this discussion do not save their claim for several reasons.

To start, no reasonable investor could have believed that Carvana was actually profitable when Carvana repeatedly disclosed that it had never been. *E.g.*, Ex. 7 (2020 10-K) at 18. A metric that measures *gross* profit does not cast any doubt on those disclosures. Indeed, its name alone—*gross* profit—belies Plaintiffs' contention.

Even putting aside Plaintiffs' profitability notion, Plaintiffs are simply wrong that the GPU metric "concealed" "significant" operations expenses. Carvana never suggested that its operations expenses were not significant; nor did it suggest that the GPU metric *included* those expenses. Instead, Carvana allocated the costs Plaintiffs are complaining about—outbound expenses incurred after a customer purchased a vehicle on the website—to a cost category (SG&A) different from the one Plaintiffs would have preferred (costs of goods sold, which is incorporated into the GPU metric). That's not a securities claim. First, it is well-settled in the Ninth Circuit that Plaintiffs cannot state a securities claim just because they would have preferred a different method of accounting. *See Rigel Pharms.*, 697 F.3d at 877–78 (finding inadequate plaintiff's allegations which "concern[ed] two different judgments about the appropriate statistical methodology to be used . . . not about false statements"). Additionally, Plaintiffs *admit* they are challenging Carvana's *judgment* on how to allocate costs. ¶ 246 ("Defendants could choose how to calculate Carvana's Retail GPU metric and whether to categorize certain expenses as SG&A, so as to exclude them from the Retail GPU metric."). As the state court recognized, "where a financial

---

89,011), Ex. 22 (Q1 2022 10-Q) at 36; and (iii) in August 2022 (with Statement 32), even after implementing its updated business strategy, that its Q2 2022 numbers were still almost as high as at the close of FY 2021 at 78,910 units, Ex. 26 (Q2 2022 10-Q) at 40.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

metric reflects an accounting judgment, the resulting financial result reflects a statement of opinion," *Warwick I*, Ex. 34 at 15-18 (collecting cases and holding that Carvana's revenue figures were an opinion statement under *Omnicare* because plaintiff was challenging underlying accounting judgment); *see also, e.g.*, *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 939-940 (N.D. Cal. 2023). Plaintiffs fail to plead a single fact suggesting Carvana's cost allocation was not allowed under accounting standards applicable to the GPU metric— or that any Defendant believed the metric should be calculated differently.

Plaintiffs point to an investor presentation about Q3 2023 results *nine months after the Class Period*, *e.g.*, ¶ 248(b), suggesting that Carvana "admitted" that additional costs should have been included in the GPU metric all along. That's not what it said. Carvana has consistently (and to this day) allocated the complained-of costs to its SG&A figure, not GPU, Ex. 38 (Q3 2023 10-Q) at 54 n.4. The November 2023 presentation was a report on Carvana's progress towards operational efficiency, including a breakdown of costs. Carvana did not suggest that *all* of those costs should have been reported in the GPU metric or broken out in every SEC filing, as Plaintiffs suggest. *E.g.*, *Twitter II*, 29 F.4th at 615 (Securities laws "do not require . . . complete disclosure of all material information whenever a company speaks on a particular topic"). Rather, the breakdown repeated what Carvana had disclosed in SEC filings throughout the Class Period—inbound logistics and reconditioning costs (incurred before a consumer purchases a vehicle) are included within the GPU metric (*e.g.*, Ex. 7 (2020 10-K) at 57), but outbound logistics and title and registration costs (incurred *after* a sale is made)—are captured as operations expenses in SG&A expenses (*e.g.*, *id.*).

In any event, *all* of the statements are inactionable. Each reports historical data regarding Carvana's retail GPU, *e.g.*, ¶ 249 ("Retail GPU was $1,190"), and Plaintiffs do not dispute its accuracy. *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021); *Redback Networks*, 2007 WL 4259464, at *3. Defendants' qualitative statements that, for example, the Company had a "strong quarter on retail GPU," ¶ 257, or buying cars from customers was a "strong driver" of

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

improvements, ¶ 255, were puffery. *See Fusion-io*, 2015 WL 661869, at *15 ("terms like 'strong' and 'spectacular' are not actionable"); *In re LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) ("This is going to be a very big second half for us," not actionable). Many of the statements were also subjective opinions prefaced with classic markers such as "I think," ¶¶ 249, 253, 255, and "we feel," ¶¶ 253, 255. And further still, some are forward-looking statements regarding future tailwinds, *e.g.*, ¶ 253 ("I think when we look at where we're headed from here. . . that's a tailwind to retail GPU as we move towards 2Q."), which are protected by the safe harbor both because of cautionary language, Ex. 10 (Q1 2021 Earnings Call) at 4; Ex. 11 (Q2 2021 Earnings Call) at 4, and because Plaintiffs do not allege any Defendant had actual knowledge of falsity.

### 2.    Plaintiffs Fail to Plead Loss Causation.

Plaintiffs fail to allege particular facts showing that "[Defendants'] misstatement, as opposed to some other fact, foreseeably caused [Plaintiffs'] loss." *Espy*, 99 F.4th at 540; *see also BofI* , 977 F.3d at 791 ("[A]llegations of loss causation must satisfy [Rule] 9(b)'s heightened 'particularity' requirement.") (citation omitted).

#### a.    Carvana's Disclosures Regarding Its Financial Condition

Plaintiffs point to four disclosures of disappointing financial news, which predictably had negative effects on Carvana's stock price. ¶¶ 314 ("disappointing Q1 2022 financial results" and announcement of stock and debt offerings), 317 ("right-sizing initiatives"), 323 ("disappointing Q3 2022 financial results"), 327 ("disappointing Q4 2022 financial results"[23]). Plaintiffs allege those events were "partial disclosures" that "revealed the nature and effect of Defendants' alleged misconduct." *E.g.*, ¶¶ 308-10.

Plaintiffs' conclusory allegations aside, the Complaint lacks any "specific, particularized allegations connecting Plaintiffs' theory of pervasive fraud and the stock drop after [any of these four] disclosure[s]." *Bajjuri*, 641 F. Supp. 3d at 771; *see also Alich v. Opendoor Techs Inc.*, 2024 WL 839146, at *13 (D. Ariz. 2024), *vacated in part on other*

---

[23] Plaintiff UANPF disposed of all of its shares by November 2022, Dkt. 71 at 326-28, and thus cannot attribute any losses to the February 2023 disclosure. *See Mehedi v. View, Inc.*, 2024 WL 1560009, at *8 (N.D. Cal. 2024).

*grounds*, 2024 WL 2153529 (D. Ariz. 2024). Plaintiffs allege a pump and dump scheme to inflate retails sales, including allegations relating to supposedly fraudulent metrics, sham transactions, and undisclosed costs dating back to the beginning of the Class Period. But Plaintiffs do not allege with particularity "that the market 'learned of and reacted to the fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (quoting *Metzler*, 540 F.3d at 1065). Instead, Plaintiffs admit that on each of the four days, the negative financial news was accompanied by disclosures relating to slowing sales growth "*that quarter*," ¶ 314, or a quarterly decline in year-over-year sales, ¶ 327. These revelations do not "reveal" Plaintiffs' alleged scheme or purport to suggest that any scheme caused the financial results or right-sizing initiatives. Rather, they report *recent* developments from the announced quarter, *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207-08 (9th Cir. 2020) (a corrective disclosure must relate back to an "earlier misrepresentation"), without providing the "analytical missing link between the concealed fact and the [disappointing results]." *Reckstin Family Tr. v. C3.ai, Inc.*, 2024 WL 734497, at 24 (N.D. Cal. 2024).[24]

### b.    <u>Media Reports Regarding Regulatory Actions</u>

Plaintiffs also cannot rely on the four title and registration disclosures: (1) an August 10, 2021 media report about a North Carolina suspension; (2) an October 22, 2021 *Wall Street Journal* article discussing other state investigations; (3) a June 24, 2022, *Barron's* article discussing other state investigations; and (4) an October 7, 2022 announcement about a Michigan suspension. ¶¶ 311, 313, 320, 322.

First, these disclosures did not "correct" any of Carvana's statements because they did not "reveal new information to the market" that was previously "concealed." *BofI*, 977

---

[24] Similarly, the various analyst reactions Plaintiffs cite serve only to underscore that the market reacted to *contemporaneous* developments from the most recent quarter, *e.g.*, ¶¶ 315 ("Q1 results mainly demonstrate . . ."), 328 ("Carvana's metrics worsened materially in Q4"), or merely provide critical views of Carvana. *Bajjuri*, 641 F. Supp. 3d at 770 (analyst reports did not establish loss causation where they did not "directly connect" the disclosure to the alleged fraud).

F.3d at 790, 794. Plaintiffs do not attempt to argue that the media reports corrected any of the statements or "artifices" *not* relating to title and registration. But they also do not reveal any "new" information relating to title and registration. *Espy*, 99 F.4th at 542 (no loss causation where corrective disclosure was "already publicly available").

Second, the disclosures on these four dates did not discernibly affect Carvana's stock price, even though they happened to coincide with some of Carvana's hundreds of down days during the Class Period. Carvana's stock price only dropped between 1.38% and 5.50% on the relevant trading days.[25] *See* App. B. Even in the abstract, those are not significant drops. *See Dura Pharms.*, 544 U.S. 336 at 347 (plaintiff must allege "share price fell significantly"); *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. 2020) ("securities complaints tend to be predicated on double digit declines"). They were especially unremarkable in light of the fact that Carvana's stock price was on a long, consistent downward trajectory, as Carvana faced serious macroeconomic difficulties. *See In re Sec. Cap. Assur. Ltd. Sec. Litig.* ("*SCA*"), 729 F. Supp. 2d 569, 599-600 (S.D.N.Y. 2010). In fact, the decreases in Carvana's stock price following each disclosure were so small that each was smaller than other price decreases within one to four trading days. *See* App. B. And all four disclosures *cumulatively* account for $15.81 of Carvana's stock price decrease, while Plaintiffs allege Carvana's stock price fell $368.82. ¶ 327 n.169.

Plaintiffs do not attempt to explain why their alleged corrective disclosures coincide with relatively small declines or why they fail to account for most of Carvana's stock price decline. *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) ("[T]he present Complaint does not address the ten-month decline of CMGI's stock price and does not attempt to explain how the decline of the stock price following the issuance of the October 4, 2000 report was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted CMGI during the Internet

---

[25] Plaintiffs allege Carvana's stock traded in an efficient market, *i.e.*, that its stock price immediately reflected all publicly available information. ¶ 329. *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010). Thus, they cannot ask the Court to attribute multi-day decreases in the stock price to the alleged corrective disclosures. ¶¶ 313, 320.

1 sector's collapse."); *60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449, 461

2 (S.D.N.Y. 2007) (no loss causation where "[t]he loss in value of the stock occurred

3 gradually over the course of the entire class period"); *Eng v. Edison Int'l*, 2017 WL

4 1857243, at *4 (S.D. Cal. 2017) (allegations did not establish "scanty" declines in stock

5 price were "statistically significant"). Further, each price decrease was associated with

6 unusually *low* trading volumes—each decrease was on lower volume than at least one

7 directly neighboring trading day. *See* App. B. But if there was truly some kind of revelatory

8 event, market volumes would have been abnormally *high*. For all those reasons, Plaintiffs'

9 allegations do not establish the necessary "correlation between 'revealed' facts and a

10 decline in [Carvana's] stock price." *SCA*, 729 F. Supp. 2d at 599-600.

### 3.     Plaintiffs Fail to Plead a Strong Inference of Scienter.

12          Under the PSLRA, Plaintiffs must plead specific facts raising a "strong inference"

13 of scienter as to "[each] defendant . . . [and] each act or omission." 15 U.S.C. § 78u-4(b)(2);

14 *see also City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861, at *6

15 (D. Ariz. 2023) (citing *Apollo Grp.*, 774 F.3d at 607, for the proposition that plaintiffs are

16 required to "allege scienter with respect to *each of the individual defendants*" (emphasis

17 added)). This "strong inference" must be "cogent and at least as compelling as any

18 opposing inference one could draw from the facts alleged." *Curry v. Yelp Inc.*, 875 F.3d

19 1219, 1226 (9th Cir. 2017) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S.

20 308, 324 (2007)). Here, Plaintiffs have failed to allege any particularized facts supporting

21 an inference that any Defendant made any challenged statement "with an intent to deceive,

22 manipulate, or defraud, or with deliberate recklessness." *Prodanova  v. H.C. Wainwright*

23 *& Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021).

### a.     <u>Plaintiffs Do Not Allege a Motive to Commit Fraud</u>

25          Plaintiffs advance a "pump and dump" theory of fraud, but there is not a single fact

26 establishing any inference, let alone a strong inference, that either Defendant Garcia Junior

27 or Defendant Jenkins had a financial motive to commit fraud. "Generally . . . a financial

28 motive for securities fraud will be clear; for example, someone inside a company stands to

gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Prodanova*, 993 F.3d at 1107. And under Ninth Circuit law, Plaintiffs had to allege particular facts showing that the *speaker* acted with scienter. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) ("PSLRA requires [plaintiff] to plead scienter with respect to those individuals who actually made the false statements"). Here, Plaintiffs' motive theory for scienter is implausible because one of the two speakers never sold a single share (Garcia Junior) and the other one (Jenkins) sold fewer shares than he acquired, consistent with his prior trading, and with timing that cuts *against* any inference of scienter.

Garcia Junior sold *no* Carvana stock during the Class Period, which "supports an inference of no scienter." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017). In fact, Garcia Junior *purchased two million shares* during the time when Plaintiffs say he knew Carvana's stock price was artificially inflated. ¶ 266 n.157.[26]

Plaintiffs' motive allegations against Jenkins fare no better. ¶¶ 261, 268-73. Plaintiffs find no support in any of the three factors that courts consider to determine whether stock sales raise a strong inference of scienter—"(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history," *First Solar*, 2023 WL 155861, at *8 (citation omitted). Furthermore, Jenkins' sales were all pursuant to 10b5-1 plans.

Plaintiffs allege that Jenkins sold 336,492 shares, or 48% of his holdings, during the Class Period. ¶ 268. But sales of 48% of holdings (or even more) do not necessarily support a strong inference of scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005-06 (9th Cir. 2009) (no scienter where defendant sold approximately 48% of holdings because plaintiff failed to allege that "sales, though significant, are inconsistent with their

---

[26] Plaintiffs vaguely assert, "Garcia Junior, who is a beneficiary of his father's trust, benefited [sic] by Garcia Senior's insider trading." ¶ 160 n.17. But they provide no well-pled allegations (1) substantiating that a trust owned by Garcia Senior made stock sales, or the timing or amounts of any sales; (2) who controlled this trust; or (3) that Garcia Junior directed whoever controlled the trust to maximize his personal benefit based on insider information. And even if Junior *did* benefit, there is no fact alleged suggesting he *knew* about or had anything to do with Senior's trades.

usual trading patterns"). That is particularly true here where Plaintiffs do not tie specific sales to specific statements. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) ("[S]tock sales are helpful only . . . when those sales are able to be related to the challenged statements."). In any event, Plaintiffs' alleged percentage is fabrication. It ignores that Jenkins *acquired more shares* during the Class Period than he sold,[27] which "strongly negates an inference of scienter." *First Solar*, 2023 WL 155861, at *8; *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999).

The timing of Jenkins' Class Period sales is also inconsistent with Plaintiffs' "pump and dump" theory, much less with a strong inference of scienter. Ten out of the 34 "pumping" statements that Jenkins allegedly made occurred *after* he stopped selling. ¶¶ 184, 186, 188, 209, 214, 234, 238, 240, 242, 259. Jenkins sold stock in only the first 18 months of the 33-month-long Class Period, and the vast majority of the sales were made in 2020 (260,000 shares)—long before Carvana's stock price peaked in August 2021 and *more than two years* before the supposed fraudulent price inflation allegedly lifted in February 2023. Compl. App. A; *Vantive*, 283 F.3d at 1093-94 (no strong inference of scienter where the defendant sold most shares for $20-$24 as the price continued to climb for months to $39); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002) (failure to sell was inconsistent with a belief that the stock was artificially inflated).

As to Jenkins' prior trading practices, Plaintiffs allege only that Jenkins sold "13,000 fewer" shares in the three years between Carvana's 2017 IPO and the Class Period than he sold during the Class Period, ¶ 268. Such conclusory allegations are insufficient. *First Solar*, 2023 WL 155861, at *8 (comparable "unparticularized allegations le[ft] the Court guessing as to . . . whether the Class Period sales are dramatically inconsistent with prior trading history."). But they also underscore that Jenkins' sales cannot support scienter for any challenged statement (even those before the sales), because selling "13,000 fewer"

---

[27] Jenkins acquired or converted 465,583 shares during the Class Period, and sold only 336,929. Ex. 39 (Jenkins Form 4 Compilation).

shares, or *3.8%* fewer shares, ¶ 268, in the three years before the Class Period than during the Class Period, is not "*dramatically out of line* with" his Class Period sales. *Zucco*, 552 F.3d at 1005; *Metzler*, 540 F.3d at 1067 (defendants "were simply trading in line with prior patterns" so "fail to raise the necessary 'strong inference' of scienter").[28]

All of Jenkins' trades were also made pursuant to 10b5-1 plans, which cuts against an inference of scienter. *Metzler*, 540 F.3d at 1067 n. 11 (9th Cir. 2008). Plaintiffs try to discredit the trading plans by asserting that "[t]here is no doubt" Jenkins possessed MNPI when he entered into 10b5-1 plans on June 15, 2020 and March 15, 2021, but Plaintiffs' conclusory allegation is insufficient. *E.g.*, ¶ 269.[29] Plaintiffs also point to excerpted materials from Carvana's July 22, 2020 Board meeting to broadly exclaim that Jenkins had been meeting with the Board "about title and registration issues since July 2020." ¶ *id.* (citing Compl. Ex. 1). Those excerpted materials obviously cannot shed any light on what, if any, relevant MNPI Jenkins knew earlier, on June 15, 2020, but they also do not suggest that the Board was discussing Plaintiffs' alleged scheme. Rather, the Board materials underscore Carvana's efforts to reduce delays following DMVs paused operations. Acting to avoid "registration delays" is a good thing, not evidence of fraud. Furthermore, as already discussed, Carvana repeatedly disclosed the challenges associated with title and registration and none of the information discussed internally reflected material differences from what was publicly known. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1180 (C.D. Cal. 2007) (plaintiffs failed to "explain how acquisitions of the line from the

---

[28] Plaintiffs' allegation also omits that in the pre-Class Period timeframe, Jenkins acquired or converted 336,278 shares and sold 323,000, selling 96% of the common stock he obtained, *see* Ex. 39 (Jenkins Form 4 Compilation). *First Solar*, 2023 WL 155861, at *8 (noting lack of allegations regarding overall holdings of individual defendants prior to Class Period); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period."). Then during the Class Period, he acquired or converted 465,583 shares and sold 336,929, selling only 72% of the common stock he obtained. *See* Ex. 39 (Jenkins Form 4 Compilation). In other words, he sold *less* of the stock he was obtaining during the Class Period.

[29] Jenkins entering into 10b5-1 plans during the prolonged alleged Class Period is unremarkable. *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *19 (C.D. Cal. 2008) (long class period precluded finding that entry of 10b5-1 during the class period was suspicious).

open market could constitute material, non-public information when Wet Seal repeatedly disclosed that it used a mix of in-house and open market designs").

Plaintiffs also point to two regulatory actions in Ohio and Michigan, ¶ 269, but with not a single fact suggesting that either was *material* or Jenkins knew about either at the time he entered into a trading plan. About the Ohio DMV, Plaintiffs allege it fined Carvana and "suspended its license," but the article that the ACC quotes for support does not mention a fine and states that the Ohio DMV "suspended temporary tag issuance privileges"—as opposed to Carvana's operating license—and then reinstated Carvana's temporary tag issuance privileges. ¶ 148(i); Ex. 31 (November 22, 2022 Ohio Article). And the Michigan regulator supposedly met with unidentified "Carvana executives" on March 23, 2021—*after* Jenkins entered into his trading plans. ¶¶148(b), 269. There are no allegations about what was said at the meeting, that Jenkins attended, or that he even knew about it. *See Vantive*, 283 F.3d at 1091 (no scienter from allegations of meetings with various distributors without "specifics or corroborating details of time, persons, places, and subjects"); *Zaidi v. Adamas Pharms., Inc.*, 650 F. Supp. 3d 848, 864 (N.D. Cal. 2023) (no scienter where plaintiff failed to allege details about specific information learned during meetings).

Plaintiffs' attempt to establish a cogent and compelling motive for fraud fails; their allegations not only lack the requisite well-pled facts but are also undermined by the timing, size, and nature of the stock sales.

b.    **Plaintiffs Do Not Allege Deliberate Recklessness**

Even if Plaintiffs had pled a motive for fraud, that would not be sufficient. *Prodanova*, 993 F.3d at 1108. And where, as here, Plaintiffs have failed to do so, the "lack of a plausible motive . . . makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.*; *Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4 (N.D. Cal. 2022) ("[P]lausible motive generally is required to plead scienter.").

None of Plaintiffs allegations—relating to Defendants' (1) alleged access to purportedly concealed information, ¶¶ 274-88; (2) choice to stop reporting certain metrics,

1  ¶¶ 289-94; and (3) SOX certifications, ¶ 295—shows that any Defendant "made false or

2  misleading statements either intentionally or with deliberate recklessness." *Nguyen v.*

3  *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).[30] The "more plausible inference" is that

4  Defendants intended to—and *did*—speak truthfully, "not that [they] were intentionally or

5  with deliberate recklessness seeking to mislead the market." *Id.* at 419.

6      **Access to Information**. To plead scienter, Plaintiffs must allege not only that

7  Defendants had knowledge of undisclosed contradictory facts, but that they "knew or

8  should have known that their failure to disclose those facts *present[ed] a danger of*

9  *misleading buyers or sellers.*" *Petrie v. Elec. Game Card, Inc.*, 2011 WL 131300015, at *8

10  (C.D. Cal. 2011) (emphasis added); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046,

11  1056-57 (9th Cir. 2014). Here, Plaintiffs fail to allege particular facts showing either. *See*

12  *Espy*, 99 F.4th at 537.

13      CW allegations purport to show that Defendants were aware of delays in title and

14  registration, buying low-quality vehicles, and build-up. *E.g.*, ¶¶ 274-79. But the CWs are

15  all low-level employees who lack any reliable or personal basis to report about any

16  Defendant's state of mind—and nothing they allege contradicts anything Defendants said.

17  *Espy*, 99 F.4th at 536-37 (CW allegations failed to show Defendants knew of allegedly

18  omitted information and intended to conceal it); *Police Ret. Sys. of St. Louis v. Intuitive*

19  *Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

20      Only CW-12 alleges any personal interaction with a Defendant—a meeting with

21  Garcia Junior where he said Carvana "needed ADESA's reconditioning centers located

22  nationwide." ¶ 278. But Defendants repeatedly disclosed the Company's lack of

---

23  [30]Plaintiffs challenge statements made by non-Defendant Levin and a non-Defendant

24  spokesperson without alleging any facts suggesting either did so fraudulently. Their claim
as to their statements necessarily fails. More broadly, Plaintiffs' failure to plead that any

25  Defendant (or any speaker) acted with scienter, *see infra*, also forecloses Plaintiffs'
argument that *Carvana* acted with corporate scienter. ¶ 306. The Ninth Circuit has not

26  adopted the corporate scienter doctrine. *See Nozak v. N. Dynasty Mins. Ltd.*, 804 F. App'x
732, 734 (9th Cir. 2020). Because they fail to "plead scienter with respect to those

27  individuals who actually made the false statements," *Glazer*, 549 F.3d at 745; *accord
Baker*, 2024 WL 1178168, at *11 n.10, they have not pled scienter as to Carvana. And even

28  if the corporate scienter doctrine were adopted, Plaintiffs fail to allege any statement "so
dramatically false" to warrant its application. *NVIDIA Corp.*, 768 F.3d at 1063.

production capacity and the reasons for its ADESA acquisition, *see, e.g.*, Ex 17 (Q4 2021 S'holder Ltr.) at 5-6, so Plaintiffs' allegations are only that Garcia Junior was saying the same thing to employees internally that he was saying to investors. The other CWs allegedly only attended a handful of "all-hands"-style meetings, which does not show the requisite "direct contact" with any Defendant. *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1041-42 (N.D. Cal. 2020). And CW accounts of vague hearsay from anonymous sources, including "C-level executives" and "leadership," ¶¶ 276-277; *Zucco*, 552 F.3d at 997, and subjective interpretations from these meetings, like CW-11's belief that "they don't care about operations, just growth," ¶ 118, are at most "disagreement among employees," which does not establish a cogent or compelling scienter allegation as to any particular Defendant. *Zucco*, 552 F.3d at 999; *Espy*, 99 F.4th at 536-37 (CW "criticisms of [defendant's] management practices" and "negative opinions" could not establish scienter); *Intuitive Surgical*, 759 F.3d at 1063 ("unsubstantiated" "impression of a low-level employee" insufficient). Plaintiffs do no better with their CW allegations that Carvana used a "Tableau data server" containing profits and inventory data. ¶ 283. There is no allegation that any Defendant even knew the server existed, much less that it contained data contradicting a specific challenged statement that a Defendant knew at the time he made the statement, ¶¶ 92-94, 98. This failure to "bridge the gap between existence of internal reports and actual knowledge on the part of the defendants" fails to plead any inference of scienter. *In re Alteryx Sec. Litig.*, 2021 WL 4551201, at *8 (C.D. Cal. 2021); *see Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar*, 2023 WL 4161355, at *5 (D. Ariz. 2023).

Plaintiffs also point again to materials from two Board meetings on July 22, 2020 and October 18, 2021, ¶ 282, but again, those documents only underscore the Board's attention to "operational challenges due to COVID-19," Compl. Ex. 1 at 2, and its laudable goal of "reduc[ing] registration delays" following pandemic shutdowns, *id.* at 7. The October 18, 2021 Board presentation listing the North Carolina regulatory action as a key item to explain to investors "following Q2," Compl. Ex. 2 at 5, also came three months

*after* the North Carolina suspension was publicly discussed. ¶¶ 148(a), 180. Rather than raising an inference of fraudulent intent, the Board materials support the "competing innocuous inference[]," *Espy*, 99 F.4th at 537, that Carvana did *not* seek to "flout title and registration laws," *contra, e.g.*, ACC at 46.

Plaintiffs also fail to show how Defendants' *public* statements, ¶¶ 280-88, demonstrate that Defendants knew any omitted or contradictory fact, much less contemporaneously with a specific challenged statement. "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter." *Espy*, 99 F.4th at 539. That is true even when the alleged fraud concerns the company's purported "core operations," ¶¶ 280-86. Establishing scienter through reference to a "core operations theory" is "not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports," *Intuitive Surgical*, 759 F.3d at 1062. Here, Plaintiffs provide none.

**Decisions to Cease Reporting Metrics.** Plaintiffs allege that Defendants' decisions to stop reporting certain metrics show scienter. ¶¶ 289-94. Plaintiffs' group pleading dooms their argument at the outset, because they fail to allege any particular facts suggesting any Defendant was involved in, let alone acted fraudulently with respect to, those decisions. *See First Solar*, 2023 WL 155861, at *6. In addition, Plaintiffs' own allegations show the far more plausible inference—Defendants stopped reporting certain metrics in favor of *different* metrics for the non-fraudulent reasons Carvana publicly provided at the time.

The ADTS metric was not, as Plaintiffs suggest, "trending in the wrong direction" when Carvana stopped reporting it *on May 6, 2021*. ¶ 291. Rather, ADTS was *decreasing*— it fell from 67 in FY 2020 to 60 in Q1 2021 and to 54 in Q2 2021. Ex 35 (Aug. 2023 Presentation) 6; ¶ 239(a) n.92. Carvana also disclosed *why* it was no longer reporting the metric—namely, because it had been "relative[ly] stab[le]" (which was indisputably true on May 6, 2021) and because the company's focus on production capacity made the

"number of IRCs" a more important metric, which it started reporting as soon as it stopped reporting the ADTS metric. Ex. 9 (Q1 2021 10-Q) at 35; *see also* Ex. 7 (2020 10-K) at 54 (showing ADTS metric in the years 2018, 2019, and 2020, Carvana's ADTS was 64, 62, and 67 respectively). Carvana repeated that rationale in disclosures over the next five quarters, and Plaintiffs challenge the last three disclosures, *see* Section III.A.1.e, *supra*. Yet Plaintiffs allege no facts suggesting that any Defendant intended to mislead investors as to the current status of the ADTS metric (or even knew about it)—rather than intending *not* to report the current ADTS metric.[31] No CW purports to say anything at all about ADTS, let alone suggest that Jenkins or Garcia Junior knew ADTS was rising (on a *quarterly* basis rather than a year-to-year basis) in 2022, at the time of the challenged statements. *Metzler*, 540 F.3d at 1066 ("[C]omplaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.").

Plaintiffs' additional claim that Carvana stopped providing "detailed statistics on buying cars from customers each quarter" in order to hide that it was "drastically increasing the volume of cars purchased from customers," ¶¶ 292-94, makes no sense. Carvana repeatedly disclosed that it was increasing the volume of cars purchased from customers, starting in 2019. The "more plausible inference" is that Carvana stopped reporting those statistics for the reasons it disclosed at the time—it had succeeded in expanding its car buying program, ¶ 294. *Nguyen*, 962 F.3d at 419.

**SOX Certifications.** "[R]equired certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003-04.

**B.     Plaintiffs Fail to Plead Scheme Liability Under Section 10(b).**

Plaintiffs allege that Defendants carried out a "fraudulent pump-and-dump scheme" to "boost Carvana's retail sales" and "sell[] shares at an artificially inflated price." ¶ 125.

---

[31] If, as Plaintiffs suggest, concealing ADTS was intended to hide an increase in inventory, Carvana did a terrible job of it, given that Carvana continued to disclose its over-supply of used vehicle inventory. *See Espy*, 2024 WL 1689091, at *8 (finding "more relevant details were disclosed" and the combination of "omitted information and the context of the disclosure does not compel a strong inference of scienter").

This supposed "scheme"—which allegedly has seven "artifices"—is no different from Plaintiffs' statement-based theory of fraud, and fails for the same reasons. Artifice 5 is that "Garcia Junior and Jenkins ma[de] materially misleading statements and omissions" that supposedly contradicted or concealed the facts in Artifices 1-4. ¶¶ 150-59. Plaintiffs challenge *all* of the same statements recited in Artifice 5 as misstatements in their statement-based claim (*see* Section VII of the ACC), and those statements are supposedly misleading because Defendants omitted the "concealed" facts recited in Artifices 1-4. ¶¶ 174-260 (especially, *e.g.*, ¶ 215, which cross references Artifices Nos. 1-4). In addition, Artifice 6-7 are allegations about Garcia Senior and Jenkins' stock sales that mirror Plaintiffs' allegations in Section VIII ("Additional Allegations of Scienter") and fail for the same reasons—and also because Plaintiffs do not allege the sales were "intended to mislead investors by artificially affecting market activity." *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*, 2022 WL 3598246, at *4 (D. Ariz. 2022). ¶¶ 160-65. Thus, "this alleged scheme consists entirely of (and fails for the same reasons as) the misstatements analyzed above." *Kang v. PayPal Hldgs.*, 620 F.Supp.3d 884, 902 (N.D. Cal. 2022).

Independently, Plaintiffs' "scheme liability" allegations fail because Plaintiffs target "Defendants" as a group and do not allege, as required, "that *each defendant* committed *their own* deceptive act in furtherance of the scheme." *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22 (D. Ariz. 2023) (citing *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir. 1997)). Nor do Plaintiffs allege an actionable deceptive act at all because they fail to plead that any Defendant "engaged in conduct that had the *principal purpose and effect* of creating a false appearance of fact in furtherance of the scheme." *Id.* at *22 (citing *Simpson*, 452 F.3d at 1048) (emphasis added). Conduct that is reasonable for "a company acting in the regular course of business" does not support a scheme liability claim. *See id.* at *24-25. But that is all Plaintiffs allege: conduct in support of Carvana's disclosed business strategy without any allegations that any Defendant was attempting to mislead the public with those strategies or was even involved in crafting those strategies (*e.g.*, expanding the business nationwide, entering a deal with DriveTime to make money on

VSCs, or buying cars from customers and selling them for a higher price). Plaintiffs cannot plausibly allege (much less with particularity) that business strategies like expanding nationwide had a "principal purpose and effect" of deceiving the public, *Borteanu*, 2023 WL 1472852, at *22, or that the public actually relied on any alleged deception, *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *2-4 (C.D. Cal. 2011). Nor do they plead any inference of scienter or particularized allegations of loss causation with respect to any of the alleged artifices, and labels alone do not state a claim for fraud. *Simpson*, 452 F.3d at 1047-48 (scienter and loss causation required for scheme liability); *see also* Section III.A.2-3, *supra*.

## C.    Plaintiffs Fail to Plead an Insider Trading Claim.

Because Plaintiffs fail to plead a "predicate" Section 10(b) violation, the Section 20A claim (and any insider trading claim[32]) against Defendant Jenkins fails too. *In re Volkswagen*, 328 F. Supp. 3d at 987. Plaintiffs' Section 20A claim further fails because they do not plead with particularity that Jenkins was in possession of MNPI at the time of a contemporaneous trade, as required. *In re 3Com Sec. Litig.*, 1999 WL 1039715, at *8 (N.D. Cal. 1999). They assert without any particularized basis that Jenkins "[was] in possession of MNPI concerning Carvana." ¶ 361. But that "allegation is too conclusory to give rise to liability for insider trading under Section 20A," and does not even attempt to tie the possession of MNPI to the time of any trade. *Id.* And as discussed in Section III.A.3, *supra*, Plaintiffs fail to allege scienter or Jenkins' possession of MNPI.

In any case, a stock purchase is only "contemporaneous" when made on the same day or the day after an insider sold. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1204 (C.D. Cal. 2008). Many of the purchases that Plaintiffs assert were "contemporaneous" do not support a Section 20A claim, *id. See* Compl. App. B at 31.[33]

---

[32] There is no Section 20A claim against Defendant Garcia Junior, as he sold no stock.

[33] Plaintiffs previously argued that Carvana Defendants had waived any challenge to Plaintiffs' "insider trading omissions" claim under Rule 10b-5(b). Dkt. 56 at 33-34. As Defendants explained, Dkt. 58 at 18, Plaintiffs' "gotcha" attempt failed because the CC did not allege an insider trading claim in its Rule 10b-5 count (Count I), which was also alleged

1    **D.    Plaintiffs Fail to Plead a Claim Under Section 20(a).**

2    Plaintiffs' Section 20(a) claims fail due to the absence of a predicate Section 10(b)

3    violation. *Nguyen*, 962 F.3d at 419.

4    **II.    PLAINTIFFS FAIL TO PLEAD ANY SECURITIES ACT CLAIM.**

5    **A.    Plaintiffs' Securities Act Claims Are Subject to Rule 9(b).**

6    Securities Act claims are subject to the heightened pleading requirements of Rule

7    9(b) when they "sound[] in fraud." *Rubke*, 551 F.3d at 1161. Where "there is a remarkable

8    similarity between the conduct forming the basis for Plaintiffs' Section 11 claims, and the

9    conduct forming a basis for Plaintiffs' Section 10(b) claims," a court "'can assume that it

10    sounds in fraud,'" despite any attempts to disclaim fraud. *In re Bare Escentuals, Inc. Sec.*

11    *Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010) (quoting *Rubke*, 551 F.3d at 1161).

12    Here, Plaintiffs' Securities Act claims are not only similar to their Exchange Act

13    claims—Plaintiffs' theories under each Act are identical. *Compare, e.g.*, ¶ 382 *with* ¶ 210.

14    Further, the statements challenged under the Securities Act come from the same 2021 10-K

15    as those challenged under the Exchange Act, *compare* ¶¶ 381, 383, 385 *with* ¶¶ 184, 209,

16    and there is "obvious overlap," *Bare Escentuals*, 745 F. Supp. 2d at 1068.

17    **B.    Plaintiffs Fail to Plead a Claim Under Section 11 of the Securities Act.**

18    **1.    Plaintiffs Fail to Plead Any Materially Untrue or Misleading**

19    **Statement.**

20    Regardless of the pleading standard, Plaintiffs' claims must be dismissed because

21    even Rule 8 requires a plaintiff to allege facts showing the material falsity of a Defendants'

22    statements. *See Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *11 (C.D. Cal. 2009); *In re*

23    *Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. 2020). Plaintiffs challenge

24    substantially the same statements in the April 20, 2022 Registration Statement (which

25    incorporated Carvana's 2021 Form 10-K) under the Securities Act as they do under the

26    _____

27    against non-trading defendants including Garcia Junior. Count I of the ACC similarly does
    not allege an insider trading claim. Nor is there any such claim. As the Supreme Court has
    again made clear, Rule 10b-5(b) claims "require[] identifying affirmative assertions (*i.e.*,

28    'statements made')." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S.
    257, 258 (2024). In any event, the claim would fail for the same reasons as the 20A claim.

Exchange Act, and for the same reasons. Statement A (describing how Carvana made an offer) and Statement C (the compliance risk factor) are identical to Statements 6 and 18. ¶¶ 184-85, 209-10, 381-82, 385-86. Statement B, a statement in Carvana's 2021 10-K about Carvana's retail sales growth is substantively identical to Statements 19 and 20, which also described Carvana's retail sales growth (with Statement 20 describing it on the same day). ¶¶ 212-15. Plaintiffs also offer copy-and-pasted lists of purported omissions that render the statements misleading, ¶¶ 382, 384, 386, and those allegations fail for the same reasons set forth in Section III.A.1, *supra*, including because Plaintiffs are challenging inactionable language. Plaintiffs also fail to identify any material omitted fact undisclosed by the time of the April 20, 2022 Registration Statement—not least because Carvana had already disclosed the ADESA acquisition, increased costs, and a first time drop in retail sales in Q1 2022. Ex. 20 (Q1 2022 S'holder Ltr.) at 9; Ex. 17 (Q4 2021 S'holder Ltr.) at 6, 14-15. And by Plaintiffs' own allegations, "exposés" about title and registration were published months earlier. *E.g.*, ¶ 313.

### 2.    Plaintiffs Fail to Plead a Violation of Item 105.

Plaintiffs also allege that Carvana's Registration Statement violated Item 105 of Regulation S-K, 17 C.F.R. § 229.105, because it "did not warn . . . that, at the time of the 2022 Public Offering, Carvana was already experiencing widespread issues complying with state and local title and registration requirements" and "faced a mounting risk of regulatory action across the country . . . as a result of the Company's active violations [and] was already experiencing damage to its reputation." ¶¶ 387-90. But Carvana's Registration Statement contained extensive "Risk Factors" as required by Item 105, including an entire section dedicated to the very risks Plaintiffs identify: that violations of laws or regulations could result in penalties, which could have material adverse effects. ¶ 385; Ex. 21 (Apr. 20, 2022 Registration Statement) at 3; Ex. 18 (2021 10-K) at 24-25. *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (N.D. Cal. 2020) (dismissing Item 105 claims where "risk disclosures discuss exactly these possibilities").

Plaintiffs fail to allege Carvana should have disclosed anything else. Item 105

requires disclosure only of "the most significant factors that make an investment in the registrant or offering speculative or risky." *Ryan v. FIGS, Inc.*, 2024 WL 187001, at \*16 (C.D. Cal. 2024). It did not require Carvana to provide real-time updates on regulatory "issues" that it was "already experiencing." ¶¶ 387-90. Indeed, the regulatory penalties Plaintiffs allege occurred prior to the April 2022 offering were insignificant, isolated, and/or were not materially affecting the business, such as minor fines from Texas and Michigan paid in 2021, and a brief license suspension in North Carolina in mid-2021 that was over by the time of the offering. ¶ 148; *see also* Section III.A.1.a, *supra*. Plaintiffs have not alleged how any regulatory penalties made an investment in Carvana "speculative or risky" in April 2022. In addition to being immaterial, Carvana's title and registration issues were repeatedly disclosed by Carvana and in the media prior to the April 2022 offering. *See* Section III.A.1.a, *supra* (citing *Warwick II* (Dkt. 63) at 17-22 (discussing in depth how, "[i]n addition to the Company's statement, prior to the [April 2022 offering], Carvana's operational problems and title delays were reported in the press," and how plaintiff failed to allege that "small fines" and "temporary suspensions . . . were material to a reasonable investors")).

As for the regulatory penalties after April 2022, Carvana was not required to predict future penalties with "speculative future-facing warnings." *FIGS*, 2024 WL 187001 at \*18. Plaintiffs have not alleged how Defendants would have known about those specific forthcoming events at the time of the April 2022 offering such that they could have provided a more specific warning than the one they gave. *See Berg. v. Velocity Fin., Inc.*, 2021 WL 268250, at \*10 (C.D. Cal. 2021).

### 3.    Negative Causation Is Apparent on the Face of the Complaint.

Dismissal of Plaintiffs' Securities Act claims is warranted because "on the face of the complaint, the absence of loss causation is apparent," for the reasons discussed in Section III.A.2, *supra*. *Brown*, 2014 WL 523166, at \*14. For Statements A and B (relating to how Carvana determined appropriate offers for cars bought through its website, and retail sales growth), the three disclosures of financial news that post-date the secondary

1    offering "do not reasonably reveal anything about the purported misrepresentations . . . [so]

2    the face of the [Complaint] demonstrates negative causation." *Id.* at *15. They also did not

3    provide any *new financial* information, given Carvana's disclosures of disappointing

4    financial news before and in its offering documents. For Statement C, which related to title

5    and registration issues, the same is true. Plaintiffs do not allege anything new or corrective

6    in the two post-secondary offering media reports. *Id.* at *16 (citing *In re Shoretel Inc. Sec.*

7    *Litig.*, 2009 WL 248326, at *4-6 (N.D. Cal. 2009)).

8        **C.    Plaintiffs Fail to Plead a Claim Under Section 12(a).**

9        Plaintiffs' Section 12 claim is based on the same misstatements as their Section 11

10   claims and should be dismissed for that reason alone. In addition, it should be dismissed

11   because Plaintiffs fail to allege any moving Defendant was a "statutory seller"—*i.e.*, they

12   do not allege that any moving Defendant directly sold stock to or solicited a purchase of

13   stock from any Plaintiff in the April 2022 offering. *See In re Countrywide Fin. Corp.*

14   *Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1118 (C.D. Cal. 2013) (citing *Pinter v.*

15   *Dahl*, 486 U.S. 622, 650 (1988) (statutory sellers are solely those "persons who pass title

16   and persons who 'offer,' including those who 'solicit' offers")). Courts routinely reject as

17   insufficient allegations that an individual defendant signed the Registration Statement,

18   ¶¶ 368-70. *Vignola v. FAT Brands, Inc.*, 2019 WL 6138473, at *9 (C.D. Cal. 2019).

19       **D.    Plaintiffs Fail to Plead a Claim Under Section 15 of the Securities Act.**

20       Plaintiffs' Section 15 claim must be dismissed because there is no underlying

21   primary violation. *Greenberg*, 233 F. Supp. 3d at 772.

22                          **CONCLUSION**

23       Defendants respectfully request that the Court dismiss the ACC with prejudice.

24

25

26

27

28

Dated: May 24, 2024                    Respectfully submitted,

                                       FENNEMORE CRAIG, P.C.


                                       By: /s/ *Andrea L. Marconi*
                                       Douglas C. Northup
                                       Andrea L. Marconi

                                       LATHAM & WATKINS LLP
                                       Jeff G. Hammel (*pro hac vice*)
                                       Andrew B. Clubok (*pro hac vice*)
                                       Susan E. Engel (*pro hac vice*)
                                       Matthew J. Peters (*pro hac vice*)

                                       *Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

1

**<u>Certificate of Notice</u>**

2       Pursuant to Local Rule 12.1, I hereby certify that on May 24, 2024, I caused counsel

3 for Plaintiffs to be notified of the issues asserted in the foregoing motion and no amendment

4 to cure the pleading was proposed by Plaintiffs on which the parties were able to agree.

5

6                                          */s/ Matthew J. Peters*
                                          Matthew J. Peters

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28