In re Carvana Co. Securities Litigation
Case No. 2:22-cv-02126-PHX-MTL
Index of Exhibits in Support of
Defendants' Motion to Dismiss

| Exhibit | Date | Description |
|---------|------|-------------|
| 1 | 3/31/2017 | Carvana's Form S-1 |
| 2 | 6/1/2017 | Carvana's Letter to Shareholders for Q1 2017 |
| 3 | 5/8/2019 | Carvana's Letter to Shareholders for Q1 2019 |
| 4 | 5/6/2020 | Carvana's Letter to Shareholders for Q1 2020 |
| 5 | 5/6/2020 | Carvana's Form 10-Q for the quarterly period ended March 31, 2020 |
| 6 | 10/29/2020 | Carvana's Letter to Shareholders for Q3 2020 |
| 7 | 2/25/2021 | Carvana's Form 10-K for the fiscal year ended December 31, 2020 |
| 8 | 2/25/2021 | Carvana's Letter to Shareholders for Q4 2020 |
| 9 | 5/6/2021 | Carvana's Form 10-Q for the quarterly period ended March 31, 2021 |
| 10 | 5/6/2021 | Carvana's Q1 2021 Earnings Call Transcript |
| 11 | 8/5/2021 | Carvana's Q2 2021 Earnings Call Transcript |
| 12 | 8/11/2021 | Wall Street Journal article entitled, "Carvana Barred from Selling Vehicles in Raleigh, N.C Area Until January" |
| 13 | 8/11/2021 | Carvana's presentation to the August 11, 2021, J.P. Morgan Automotive Conference |
| 14 | 10/22/2021 | Wall Street Journal article entitled, "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," |
| 15 | 11/4/2021 | Carvana's Letter to Shareholders for Q3 2021 |
| 16 | 11/4/2021 | Carvana's Form 10-Q for the quarterly period ended September 30, 2021 |
| 17 | 2/24/2022 | Carvana's Letter to Shareholders for Q4 2021 |
| 18 | 2/24/2022 | Carvana's Form 10-K for the fiscal year ended December 31, 2021 |

In re Carvana Co. Securities Litigation
Case No. 2:22-cv-02126-PHX-MTL
Index of Exhibits in Support of
Defendants' Motion to Dismiss

| Exhibit | Date | Description |
|---------|------|-------------|
| 19 | 3/23/2022 | Carvana's Schedule 14A |
| 20 | 4/20/2022 | Carvana's Letter to Shareholders for Q1 2022 |
| 21 | 4/20/2022 | Carvana's Form S-3 |
| 22 | 5/10/2022 | Carvana's Form 10-Q for the quarterly period ended March 31, 2022 |
| 23 | 5/10/2022 | Carvana's Form 8-K |
| 24 | 6/24/2022 | Barron's article entitled, "Carvana Sought to Disrupt Auto Sales.  It Delivered Undriveable Cars." |
| 25 | 8/4/2022 | Carvana's Letter to Shareholders for Q2 2022 |
| 26 | 8/4/2022 | Carvana's Form 10-Q for the quarterly period ended June 30, 2022 |
| 27 | 10/7/2022 | Michigan Department of State announcement entitled, "Department of State suspends Novi Dealership." |
| 28 | 10/19/2022 | Order Denying Plaintiff's Motion for Temporary Restraining Order," *Carvana LLC v. Benson*, No. 22-000172-MZ, (Mi. Court of Claims) |
| 29 | 11/3/2022 | Carvana's Letter to Shareholders for Q3 2022 |
| 30 | 11/3/2022 | Carvana's Form 10-Q for the quarterly period ended September 30, 2022 |
| 31 | 11/22/2022 | ABC 6 article entitled, "No titles, no registration: Car owners in Ohio file complaints against Carvana." |
| 32 | 2/23/2022 | Carvana's Letter to Shareholders for Q4 2022 |
| 33 | 2/23/2022 | Carvana's Form 10-K for the fiscal year ended December 31, 2022 |
| 34 | 3/15/2023 | Minute Entry granting motions to dismiss in *City of Warwick Ret. Sys. v. Carvana Co.*, CV 2022-013054 (Sup. Ct., Maricopa Cnty.) |
| 35 | 8/9/2023 | Carvana's presentation to the J.P. Morgan Automotive Conference, |
| 36 | 11/2/2023 | Carvana's presentation entitled, "Cost Structure Details," |

In re Carvana Co. Securities Litigation
Case No. 2:22-cv-02126-PHX-MTL
Index of Exhibits in Support of
Defendants' Motion to Dismiss

| Exhibit | Date | Description |
|---------|------|-------------|
| 37 | 11/2/2023 | Carvana's Letter to Shareholders for Q3 2023 |
| 38 | 11/3/2023 | Carvana's Form 10-Q for the quarterly period ended September 30, 2023 |
| 39 | | Mark Jenkins' Form 4s filed with the SEC for the period May 2, 2018 to November 26, 2019 and May 6, 2020 to February 23, 2023 |
| 40 | 8/5/2021 | Carvana's Letter to Shareholders for Q2 2021 |

# Exhibit 1

As filed with the Securities and Exchange Commission on March 31, 2017.

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM S-1
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# Carvana Co.

(Exact name of registrant as specified in its charter)

| **Delaware** | **5500** | **81-4549921** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**4020 E. Indian School Road**
**Phoenix, Arizona 85018**
**Telephone: (602) 852-6604**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Ernie Garcia, III**
**Chief Executive Officer**
**4020 E. Indian School Road**
**Phoenix, Arizona 85018**
**Telephone: (602) 852-6604**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies of all communications, including communications sent to agent for service, should be sent to:*

| | |
|---|---|
| **Robert M. Hayward, P.C.** | |
| **Robert E. Goedert** | **Alan F. Denenberg, Esq.** |
| **Kirkland & Ellis LLP** | **Davis Polk & Wardwell LLP** |
| **300 North LaSalle** | **1600 El Camino Real** |
| **Chicago, Illinois 60654** | **Menlo Park, California 94025** |
| **Telephone: (312) 862-2000** | **Telephone: (650) 752-2000** |

**Approximate date of commencement of proposed sale to the public: As soon as practicable after this Registration Statement is declared effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box:  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price [1][2] | Amount of Registration Fee |
|---|---|---|
| Class A Common Stock, par value $0.001 per share | $100,000,000 | $11,590 |

(1)  Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.

(2)  Includes the aggregate offering price of additional shares that the underwriters have the option to purchase.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price [1][2] | Amount of Registration Fee |
|---|---|---|

**Table of Contents**

**The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. The prospectus is not an offer to sell these securities nor a solicitation of an offer to buy these securities in any jurisdiction where the offer and sale is not permitted.**

**SUBJECT TO COMPLETION DATED MARCH 31, 2017**

Preliminary Prospectus dated              , 2017

# Shares



## Class A Common Stock

This is the initial public offering of shares of Class A common stock of Carvana Co., par value $0.001 per share. Carvana Co. is offering          shares of its Class A common stock to be sold in the offering.

Prior to this offering, there has been no public market for the Class A common stock of Carvana Co. It is currently estimated that the initial public offering price per share will be between $        and $        . Carvana Co. intends to list its Class A common stock on the New York Stock Exchange (the "NYSE") under the symbol "CVNA."

Carvana Co. has two authorized classes of common stock: Class A and Class B. Holders of the Class A common stock are entitled to one vote per share. Ernest Garcia, II, Ernie Garcia, III, and entities controlled by one or both of them (collectively, the "Garcia Parties") are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). All other holders of Class B common stock are each entitled to one vote per share. All holders of Class A and Class B common stock will vote together as a single class except as otherwise required by applicable law. Holders of the Class B common stock do not have any right to receive dividends or distributions upon the liquidation or winding up of Carvana Co.

Carvana Co. will contribute the net proceeds from this offering to its wholly owned subsidiary, Carvana Co. Sub LLC ("Carvana Sub"), that will in turn use such net proceeds to purchase newly-issued units ("LLC Units") in Carvana Group, LLC ("Carvana Group"). The purchase price for the LLC Units will be equal to the initial public offering price of the shares of Class A common stock less the underwriting discounts and commissions referred to below. Carvana Group will use the net proceeds it receives in connection with this offering as described under "Use of Proceeds." Upon completion of this offering, Carvana Co. will have, indirectly through Carvana Sub, acquired          LLC Units representing a    % economic interest in Carvana Group and, although Carvana Co. will initially have an indirect minority economic interest in Carvana Group, Carvana Sub will be the sole manager of Carvana Group and, through Carvana Group, operate and control its business. The existing owners of Carvana Group will hold the remaining          LLC Units representing a    % economic interest in Carvana Group. LLC Units are, from time to time, exchangeable for shares of Class A common stock or, at our election, for cash. See "Organizational Structure — Exchange Agreement." Carvana Co. will be a holding company, and upon consummation of this offering and the application of the net proceeds therefrom, its sole asset will be its indirect equity interest in the LLC Units of Carvana Group. Immediately following this offering, the holders of Class A common stock will collectively own 100% of the economic interests in Carvana Co. and have    % of the voting power of Carvana Co. The holders of our Class B common stock will have the remaining    % of the voting power of Carvana Co.

Carvana Co. is an "emerging growth company" as the term is used in the Jumpstart Our Business Startups Act of 2012 and, as such, has elected to comply with certain reduced public company reporting requirements.

See " Risk Factors " beginning on page 17 to read about factors you should consider before buying shares of our Class A common stock.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discounts and commissions(1) | $ | $ |
| Proceeds, before expenses, to Carvana Co. | $ | $ |

(1)  See "Underwriting" for additional information regarding underwriting compensation.

The underwriters have the option to purchase up to an additional          shares of Class A common stock from us at the initial public offering price less the underwriting discounts and commissions for a period of 30 days after the date of this prospectus.

The underwriters expect to deliver shares of Class A common stock against payment in New York, New York on          , 2017.

| Wells Fargo Securities | BofA Merrill Lynch | Citigroup | Deutsche Bank Securities |
|---|---|---|---|
| **Baird** | **William Blair** | **BMO Capital Markets** | **JMP Securities** |

Prospectus dated              , 2017.

Table of Contents



Table of Contents



Table of Contents



# TABLE OF CONTENTS

|  | **Page** |
|---|---|
| Basis of Presentation | i |
| Market and Industry Data | ii |
| Trademarks and Tradenames | ii |
| Prospectus Summary | 1 |
| Risk Factors | 17 |
| Forward-Looking Statements | 49 |
| Use of Proceeds | 51 |
| Dividend Policy | 52 |
| Capitalization | 53 |
| Dilution | 55 |
| Selected Consolidated Financial Data | 57 |
| Unaudited Pro Forma Consolidated Financial Data | 58 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 65 |
| Business | 91 |
| Organizational Structure | 104 |
| Management | 115 |
| Executive Compensation | 120 |
| Principal Stockholders | 130 |
| Certain Relationships and Related Party Transactions | 132 |
| Description of Certain Indebtedness | 140 |
| Description of Capital Stock | 141 |
| Shares Eligible for Future Sale | 149 |
| Material U.S. Federal Income Tax Consideration for Non-U.S. Holders | 152 |
| Underwriting | 156 |
| Legal Matters | 165 |
| Experts | 165 |
| Where You Can Find More Information | 165 |
| Index to Consolidated Financial Statements | F-1 |

Through and including            , 2017 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

We have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date.

Table of Contents

## BASIS OF PRESENTATION

In connection with the consummation of this offering, we will effect certain organizational transactions. Unless otherwise stated or the context otherwise requires, all information in this prospectus reflects the consummation of the organizational transactions and this offering, which we refer to collectively as the ''Organizational Transactions.'' See ''Organizational Structure'' for a description of the Organizational Transactions and a diagram depicting our anticipated structure after giving effect to the Organizational Transactions, including this offering.

Unless we state otherwise or the context otherwise requires, the terms "we," "us," "our," "our business" and "our company" refer to and similar references refer: (1) on or following the consummation of the Organizational Transactions, including this offering, to Carvana Co. and its consolidated subsidiaries, including Carvana Group, and (2) prior to the consummation of the Organizational Transactions, including this offering, to Carvana Group and its consolidated subsidiaries.

We will be a holding company and upon consummation of this offering and the application of net proceeds therefrom our sole asset will be the capital stock of a wholly owned subsidiary, Carvana Sub, whose sole asset will be LLC Units of Carvana Group. Carvana Co. will be the sole managing member of Carvana Sub, and Carvana Sub will be the sole managing member of Carvana Group. Carvana Group will be the predecessor of the issuer, Carvana Co., for financial reporting purposes. Carvana Co. will be the reporting entity following this offering.

Accordingly, this prospectus contains the historical financial statements of Carvana Group and its consolidated subsidiaries. The unaudited pro forma consolidated financial data of Carvana Co. presented in this prospectus has been derived from the application of pro forma adjustments to the historical consolidated financial statements of Carvana Group and its subsidiaries included elsewhere in this prospectus. These pro forma adjustments give effect to the Organizational Transactions as described in ''Organizational Structure,'' including the consummation of this offering and other related transactions, as if all such transactions had occurred on January 1, 2016. See ''Unaudited Pro Forma Consolidated Financial Data'' for a complete description of the adjustments and assumptions underlying the unaudited pro forma consolidated financial data included in this prospectus.

Throughout this prospectus, we provide a number of key operating metrics used by management, some of which are used by our competitors in the automotive retail industry, including retail units sold, number of markets, monthly unique visitors, inventory units available, average days to sale and total gross profit. We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee and branded delivery truck. We define a monthly unique visitor as an individual who has visited our website within a calendar month. We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. We define average days to sale as the average number of days between vehicle acquisition by us and delivery to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We define total gross profit per unit as the aggregate gross profit in a given period divided by retail units sold in that period. See "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The consolidated financial statements of Carvana Group in this prospectus include Carvana Group's accounts presented on a consolidated basis. Carvana Group was formed as an Arizona limited liability company by DriveTime Automotive Group, Inc. (together with its subsidiaries and affiliates other than us, "DriveTime") and commenced operations in 2012. On March 10, 2015, Carvana Group converted to a Delaware limited liability company. Prior to November 1, 2014, we were a wholly-owned subsidiary of DriveTime. On November 1, 2014, DriveTime distributed the units of Carvana, LLC to its unitholders on a pro-rata basis (the "Spinoff"). Following the Spinoff, the unitholders of DriveTime contributed the Carvana, LLC units to Carvana Group. We have accounted for the distribution as a spinoff transaction in accordance with applicable U.S. generally accepted accounting principles and have reflected assets and liabilities before and after November 1, 2014 at their historical basis.

i

Table of Contents

Prior to November 1, 2014, Carvana Group's historical consolidated financial statements included expense allocations related to certain functions provided by DriveTime, including, but not limited to, general corporate expenses related to accounting and finance, human resources, payroll and benefits, equipment, corporate communications, software and production. These expenses have been allocated to us based on direct usage or benefit where identifiable, with the remainder allocated on a pro rata basis determined by management. Management considers the basis on which the expenses have been allocated to reasonably reflect the utilization of the services provided to, or the benefit received by, us for all periods presented prior to November 1, 2014. The allocations may not, however, reflect the expenses we would have incurred as an independent company for the periods presented prior to November 1, 2014. Actual costs that may have been incurred if we had been a stand-alone entity would depend on a number of factors, including the organizational structure, whether functions were outsourced or performed by employees, and strategic decisions made in areas such as information technology and infrastructure. We are unable to determine the amount of costs that would have been incurred had we been independent.

## MARKET AND INDUSTRY DATA

Unless otherwise indicated, information in this prospectus concerning economic conditions, our industry, our markets and our competitive position is based on a variety of sources, including information from independent industry analysts and publications, as well as our own estimates and research.

Our estimates are derived from publicly available information released by third party sources, as well as data from our internal research, and are based on such data and our knowledge of our industry, which we believe to be reasonable. The independent industry publications used in this prospectus were not prepared on our behalf. While we are not aware of any misstatements regarding any information presented in this prospectus, forecasts, assumptions, expectations, beliefs, estimates and projects involve risk and uncertainties and are subject to change based on various factors, including those described under the headings "Forward-Looking Statements" and "Risk Factors."

References in this prospectus to (i) "DealerSocket 2015" refer to the DealerSocket Independent Dealership Action Report Fall 2015 and (ii) "DealerSocket 2016" refer to the DealerSocket 2016 Independent Dealership Action Report.

## TRADEMARKS AND TRADENAMES

This prospectus includes our trademarks and service marks, "Carvana," "Carvana Certified," "CarvanaCare" and "Cardian Angel," which are protected under applicable intellectual property laws and are the property of the issuer or its subsidiaries. This prospectus also contains trademarks, service marks, trade names and copyrights of other companies, such as "Amazon," "Google," "Vroom" and "Shift" which are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this prospectus may appear without the ® or ™ symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names.

ii

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights information contained elsewhere in this prospectus. This summary does not contain all of the information that you should consider before investing in our Class A common stock. For a more complete understanding of us and this offering, you should read and carefully consider the entire prospectus, including the more detailed information set forth under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes. Some of the statements in this prospectus are forward-looking statements. See "Forward-Looking Statements." Unless otherwise stated, this prospectus assumes no exercise of the underwriters' option to purchase additional shares.*

### Our Company

Carvana is a leading eCommerce platform for buying used cars. We are transforming the used car buying experience by giving consumers what they want – a wide selection, great value and quality, transparent pricing and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

We provide a refreshingly different and convenient car buying experience that can save buyers time and money. On our platform, consumers can research and identify a vehicle, inspect it using our proprietary 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle and schedule delivery or pick-up, all from their desktop or mobile devices. Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase and schedule delivery online in as little as 10 minutes.

Our technology and infrastructure allow us to seamlessly and cost efficiently deliver this car buying experience to our customers. We use proprietary algorithms to optimize our nationally pooled inventory of over 7,300 vehicles, inspect and recondition our vehicles based on our "Carvana Certified" 150-point inspection process and operate our own logistics network to deliver cars directly to customers as soon as the next day. Customers in certain markets also have the option to pick up their vehicle at one of our proprietary vending machines, which provides an exciting pick-up experience for the customer while decreasing our variable costs, increasing scalability and building brand awareness.

From the launch of our first market in January 2013 through December 31, 2016, we purchased, reconditioned, sold and delivered approximately 27,500 vehicles to customers through our website, generating $541.8 million in revenue. Our sales have grown as we have added new markets and increased our market penetration in our current markets. As of December 31, 2016, our in-house distribution network services 21 metropolitan markets, and we plan to continue to expand our network into additional markets. Since we launched our first market in 2013, we have grown organically across the United States, adding two markets in 2014, six in 2015 and 12 in 2016.

Our revenues have grown from $4.6 million in 2013 and $41.7 million in 2014 to $130.4 million in 2015. For the year ended December 31, 2016, we generated $365.1 million in revenue, representing a 180.0% increase over the $130.4 million in revenue that we generated for the year ended December 31, 2015. We continue to invest heavily in growth and generated a net loss of $93.1 million for the year ended December 31, 2016, compared to a net loss of $36.8 million for the year ended December 31, 2015.

1

**Table of Contents**

The following graphic illustrates the cumulative number of vehicles sold through our website on a quarterly basis along with selected milestones of our business.



**Industry Overview**

The U.S. automotive industry generated approximately $1.1 trillion in sales in 2015, which comprised roughly 20% of the U.S. retail economy and made it the largest consumer retail market in the United States according to the U.S. Census Bureau. Edmunds.com estimates U.S. used vehicle sales at over $710 billion in 2015, representing approximately 38 million used vehicle transactions at an average sales price of $18,552.

The used car auto retail industry is highly fragmented. There are approximately 63,000 used car dealerships in North America, comprised of 45,000 independent used car dealerships and nearly 18,000 franchise dealerships, according to the DealerSocket 2015. The largest dealer brand commands approximately 1.6% of the U.S. market and the top 100 used car auto retailers collectively hold approximately 7.0% of U.S. market share, according to Edmunds.com, publicly-listed dealership filings and Automotive News.

Consumers in this large and fragmented market have a distinct set of expectations that are challenging for traditional used car retailers to address.

- *Wide selection .*   Traditional used car retailers are limited by staging capacity and anticipated local demand; and they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively.

- *Value .*   Traditional used car retailers have high overhead costs and must pass these costs on to their customers.

2

Table of Contents

- ***Confidence in quality .***    Traditional used car retailers may lack the scale and expertise to consistently purchase high quality vehicles and uniformly recondition them.

- ***Control and no pressure .***    According to DealerSocket 2016, 81% of North American consumers do not enjoy the car buying process, and U.S. car salespeople are among the least trusted professionals according to a 2015 Gallup poll.

- ***Fast, simple purchasing process .***    Buying a car at a traditional auto dealership is often a multi-part transaction including vehicle purchase, trade-in, financing and complementary products, and requires over three hours on average, according to the 2016 Car Buyer Journey report from Autotrader.

Historically, consumers have discovered vehicles for sale through local print and broadcast media as well as word of mouth, and would go to dealerships to educate themselves on potential purchases. However, 97% of customer vehicle purchases involve online research, according to the Cars Online 2014 report from Capgemini, and the typical used car buyer spends approximately nine hours researching a prospective car purchase online, according to the 2016 Car Buyer Journey report from Autotrader.

As eCommerce has become more established, reaching 8.4% of total retail sales in the U.S. in the third quarter of 2016 according to the U.S. Census Bureau, consumers have become more comfortable buying taste-driven, higher-priced products such as consumer electronics and home furnishings online. Similarly, auto consumers are interested in eCommerce solutions for their car purchasing needs — 75% of U.S. car buyers would consider completing their entire car purchase online if given the opportunity, according to Accenture's 2015 Automotive Digital Survey.

### Our Solution

In response to these evolving consumer needs, we built Carvana to provide a no pressure, no haggle experience with flexible and fast transactions. We aim to deliver the best selection, best value and best experience for used car buyers.

- ***The Best Selection.***    As of December 31, 2016, we offer all consumers a nationally pooled inventory of over 7,300 high-quality used vehicles. We evaluate all of the vehicles that we own and offer for sale using our 150-point "Carvana Certified" inspection process, which we are able to perform at scale across our network of inspection and reconditioning centers ("IRCs"). We use proprietary algorithms to optimize our inventory acquisition based on extensive used vehicle market and customer behavior data. Furthermore, our nationally pooled inventory system maximizes the breadth of vehicle selection for our customers in any given location. This results in a higher likelihood that customers are able to find the make, model, year and color combination that they desire. In contrast, traditional dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

- ***The Best Value.***    Our proprietary technology and vertically-integrated business model allow us to enjoy a significantly lower variable cost structure versus traditional dealerships and provide substantial value to our customers. We do not require a network of brick-and-mortar dealerships staffed with sales personnel; instead, we utilize both an in-house logistics network and proprietary vending machines to facilitate trade-ins and vehicle delivery. Additionally, we believe our pooled inventory approach will result in lower average days to sale, which we expect will help improve margins due to decreased vehicle depreciation resulting in higher unit selling price. These savings are passed on to the consumer through sales prices that averaged $1,430 below Kelley Blue Book Suggested Retail Value per vehicle during the year ended December 31, 2016. Furthermore, we are able to provide personalized and highly-transparent financing terms based on basic customer information that results in faster transaction times, clear lending terms and competitive interest rates.

3

Table of Contents

- ***The Best Experience*** .   We aim to provide the best car buying experience available for our customers through a fully-integrated, convenient online shopping experience. Our proprietary 360-degree vehicle imaging technology provides transparency by allowing customers to view vehicle features and imperfections. We provide automated trade-in valuations, financing and warranties. Customers can easily select among various pricing and pre-approved financing terms and receive approval in seconds. We offer a premium fulfillment experience with pick-up and delivery options available, including pick-up at our vending machines in some markets. Our in-house customer advocates are available to answer customer questions that arise throughout the process. Finally, we offer seven-day return and 100-day warranty policies with every car we sell.

We believe that our customers value the ease of use and transparency of our platform. They have responded favorably to our solution, as illustrated by the ratings we receive. Our customers rated us an average of 4.8 out of 5.0 as of December 31, 2016, and 95% of them said they would recommend us to a friend when responding to over 4,250 satisfaction surveys we solicited from our inception through December 31, 2016. These positive reactions create opportunities for repeat customers and a strong referral network.

## Our Competitive Strengths

Our business model is disrupting the traditional used vehicle sales model. Carvana's primary goal is to rapidly scale vehicle unit sales by focusing on delivering an unparalleled customer experience. Since our inception in 2012, we have been developing and leveraging the following key strengths of our robust platform, which we believe provide significant competitive advantages.

- ***Purpose-built vertically-integrated eCommerce platform.***    Our platform combines a comprehensive online sales experience with a vertically-integrated supply chain, which gives us control of all critical operations and transaction elements and facilitates a fast, simple and consistent user experience.

- ***Differentiated shopping experience.***    We have developed market-leading technology that makes the online vehicle purchasing process intuitive, transparent and fun. Coupled with our certification process and seven–day return policy, this generates the confidence and trust in our platform needed to buy a car online.

- ***Proprietary financing technology.***    Our differentiated financing solutions allow customers to choose their preferred financing from thousands of pre-approved down payment and monthly payment combinations and enable us to generate automotive finance receivables that we typically sell to third party financing partners at a premium.

- ***Efficient logistics network and attractive fulfillment experience.***    Our proprietary logistics software, in-house delivery network and multi-story glass tower vending machines differentiate us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience.

- ***Scaled used vehicle infrastructure.***    We currently leverage a network of three IRCs and supporting software for our vehicle reconditioning and logistics activities that required significant investments in time and capital and provide substantial capacity for growth.

- ***Scale driving powerful network effects.***    Our logistics capabilities allow us to offer every car in our inventory to customers across our markets. As we add markets, we expect to increase overall demand, which would enable us to carry a larger and broader inventory and in turn, improve our offering across markets and increase our market share.

4

Table of Contents

**Our Growth Strategies**

The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, vehicle service contracts ("VSCs") and trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenue streams and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and as a result, our growth strategies are primarily focused on this metric.

Our ability to generate vehicle sales is a function of the number of markets we operate in, our penetration in those markets and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service. We plan to continue growing our vehicle unit sales, number of markets, market penetration and complementary product revenues, while enhancing our competitive positioning, by executing the following key elements of our growth strategy:

- *Increase sales through further penetration of our existing markets.* We believe that our markets are at an early stage of growth when measured by market share. We plan to continue marketing and actively building our brand in existing markets by improving our operations, opening additional vending machines, increasing our inventory size and growing brand awareness.

- *Continue to enter key geographic markets.* We believe there is a substantial opportunity to utilize our capital-light expansion model and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets.

- *Continue to innovate and extend our technology leadership.* We believe that the complexity of the automotive retail transaction provides substantial opportunity for technology investment and that our leadership and continued growth will enable us to responsibly invest in further differentiating ourselves from competitors' offerings.

- *Develop broad consumer awareness of our brand.* We intend to attract new customers through advertising, public relations, and customer referrals. We also plan to build vending machines in additional markets to capitalize on the publicity they generate and believe our brand building efforts will be further enhanced once we are able to economically launch national advertising campaigns.

- *Develop new products.* We plan to leverage our platform to increase monetization opportunities by introducing new complementary products and services. The car purchasing and ownership cycle provides many opportunities to add value for our customers, and our technology and process automation knowledge position us well to provide these services in unique and differentiated ways.

**Risks Associated with Our Business**

There are a number of risks related to our business, this offering and our Class A common stock that you should consider before you decide to participate in this offering. You should carefully consider all the information presented in the section entitled "Risk Factors" in this prospectus. Some of the principal risks related to our business include the following:

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime;

- our management's accounting judgments and estimates;

5

Table of Contents

- the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles; and

- the Garcia Parties' control over the outcome of matters requiring stockholder approval, including the election of directors.

These and other risks are more fully described in the section entitled "Risk Factors" in this prospectus. If any of these risks actually occurs, our business, financial condition, results of operations, cash flows and prospects could be materially and adversely affected. As a result, you could lose all or part of your investment in our Class A common stock.

### General Corporate Information

Carvana Co. was incorporated as a Delaware corporation on November 29, 2016 in anticipation of this offering. Our corporate headquarters are located at 4020 East Indian School Road, Phoenix, Arizona 85018. Our telephone number is (602) 852-6604. Our website address is www.carvana.com. The information on, or accessible through, our website is not deemed to be part of this prospectus.

### Implications of Being an Emerging Growth Company

We qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. We will remain an emerging growth company until the earlier of the last day of the fiscal year following the fifth anniversary of the completion of this offering, the last day of the fiscal year in which we have total annual gross revenue of at least $1.0 billion, the date on which we are deemed to be a large accelerated filer (this means the market value of our ordinary shares that are held by non-affiliates exceeds $700 million as of the end of the second quarter of that fiscal year), or the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

An emerging growth company may take advantage of reduced reporting requirements that are otherwise applicable to public companies. These provisions include, but are not limited to:

- not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act");

- reduced disclosure obligations regarding executive compensation in our periodic reports, proxy statements and registration statements; and

- exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

We have elected to take advantage of certain of the reduced disclosure obligations regarding financial statements and executive compensation in this prospectus and expect to elect to take advantage of other reduced burdens in future filings. As a result, the information that we provide to our stockholders may be different than you might receive from other public reporting companies in which you hold equity interests.

The JOBS Act also permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We are choosing to "opt out" of this provision and, as a result, we will comply with new or revised accounting standards as required when they are adopted. This decision to opt out of the extended transition period is irrevocable.

### Ownership and Organizational Structure

Following this offering and the consummation of the Organizational Transactions, we will be a holding company and our sole asset will be the capital stock of a wholly owned subsidiary, Carvana Sub, whose sole

6

Table of Contents

asset will be its membership interest in Carvana Group. We will operate and control all of the business and affairs and consolidate the financial results of Carvana Group. See "Organizational Structure" for a complete description of the Organizational Transactions.

In connection with the Organizational Transactions:

- We will amend and restate Carvana Group's existing operating agreement (the "LLC Operating Agreement") to, among other things, (i) eliminate a class of preferred membership interests, (ii) provide for LLC Units consisting of two classes of common ownership interests in Carvana Group (Class B common units held by certain employees and consultants subject to vesting and a participation threshold ("Class B Units"), and Class A common units held by the other Carvana Group owners, including the Garcia Parties and Carvana Sub ("Class A Units")), and (iii) appoint our wholly owned subsidiary, Carvana Sub, as the sole manager of Carvana Group. See "Organizational Structure — Amended and Restated Operating Agreement of Carvana Group."

- We and our wholly owned subsidiary, Carvana Sub, will enter into an exchange agreement with the holders of LLC Units (the "LLC Unitholders") pursuant to which the LLC Unitholders (other than Carvana Sub) will be entitled to exchange LLC Units, together with shares of Class B common stock in the case of Class A Units, for a number of shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash. See "Organizational Structure — Exchange Agreement."

- We will enter into a tax receivable agreement (the "Tax Receivable Agreement") with the LLC Unitholders that will provide for the payment by Carvana Co. to LLC Unitholders of 85% of the amount of cash savings, if any, in U.S. federal, state, local and foreign income taxes we actually realize (or, under certain circumstances are deemed to realize in the case of an early termination payment by us, a change in control or a material breach by us of our obligations under the Tax Receivable Agreement, as discussed below) as a result of (i) the increase in our proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of purchases of LLC Units from the LLC Unitholders (other than Carvana Sub) by Carvana Sub and (ii) certain other tax benefits related to our entering into the Tax Receivable Agreement, including tax benefits attributable to payments that we are required to make under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. See "Organizational Structure — Tax Receivable Agreement."

We estimate that the net proceeds to us from the sale of our Class A common stock in this offering, after deducting underwriting discounts and commissions and estimated expenses payable by us, will be approximately $          million ($          million if the underwriters exercise their option to purchase additional shares in full), based on an assumed initial public offering price of $          per share (the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). We will contribute such net proceeds to our wholly owned subsidiary, Carvana Sub, that will in turn use such net proceeds as follows:

- pay $          million to acquire          newly-issued LLC Units in Carvana Group at a purchase price per LLC Unit equal to the initial offering price per share of Class A common stock in this offering, less underwriting discounts and commissions. In turn, Carvana Group intends to:

- repay all outstanding borrowings under a $50.0 million credit facility from Verde Investment, Inc., an affiliate of DriveTime, (the "Verde Credit Facility");

- pay an estimated $          million of expenses incurred in connection with the Organizational Transactions; and

- use the remaining proceeds for general corporate purposes. See "Use of Proceeds."

7

Table of Contents

The following diagram depicts our anticipated structure upon the completion of this offering and the use of proceeds therefrom. This chart is provided for illustrative purposes only and does not show all of our legal entities or ownership percentages of such entities.



(1)     Upon completion of this offering, the Garcia Parties will collectively control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full). The remaining LLC Unitholders will collectively control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full). See "Principal Stockholders" for additional information about the other LLC Unitholders that will beneficially own more than 5% of our outstanding shares of Class B common stock following the completion of this offering. In addition to the Garcia Parties, our existing owners include a limited number of third parties that have invested in Class A Units, as well as certain of our employees who have been issued Class B Units pursuant to the LLC Plan.

(2)     Shares of Class A common stock and Class B common stock will vote as a single class. Each outstanding share of Class A common stock will be entitled to one vote on all matters to be voted on by stockholders generally. The shares of Class B common stock have no economic rights. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain direct or indirect

8

Table of Contents

beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). All other shares of our Class B common stock entitle their holder to one vote per share on all matters to be voted on by stockholders generally. In accordance with the exchange agreement to be entered into in connection with the Organizational Transactions, LLC Unitholders will be entitled to exchange LLC Units, together with shares of Class B common stock in the case of Class A Units, for shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash.

(3)   During 2016, Carvana, LLC established a bonus plan for certain non-executive employees (the "Existing Performance Plan"), participants in which will be issued an aggregate of          restricted shares of Class A common stock upon the completion of this offering pursuant to the terms of our new 2017 Omnibus Incentive Plan (the "2017 Incentive Plan") (assuming an initial public offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). We will also issue an aggregate of          restricted shares of Class A common stock (assuming an initial public offering price of $          per shares, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus) upon the completion of this offering to certain of our non-executive employees who are not participants in the Existing Performance Plan. Upon the pricing of this offering, we also expect to award options to purchase an aggregate of          shares of Class A common stock to approximately          employees, with an exercise price set at the initial public offering price. The options awarded upon pricing of the offering will be contingent upon completion of the offering, and a portion of the options will be unvested as of the date of grant. All of the unvested option awards will be time-vesting over a five year period.

(4)   Assumes no exercise of the underwriters' option to purchase additional shares. If the underwriters exercise their option to purchase additional shares in full, (i) the holders of Class A common stock will have     % of the voting power in Carvana Co., (ii) the holders of Class B common stock will have     % of the voting power of Carvana Co., (iii) the LLC Units held by the remaining LLC Unitholders will constitute     % of the outstanding LLC Units in Carvana Group, and (iv) Carvana Co. will own, indirectly through its wholly owned subsidiary, Carvana Sub,     % of the outstanding LLC Units in Carvana Group.

Our corporate structure following the offering, as described above, is commonly referred to as an "Up-C" structure, which is commonly used by partnerships and limited liability companies when they undertake an initial public offering of their business. Our Up-C structure will allow the existing owners of Carvana Group to continue to realize tax benefits associated with owning interests in an entity that is treated as a partnership, or "passthrough" entity, for income tax purposes following the offering. One of these benefits is that future taxable income of Carvana Group that is allocated to such owners will be taxed on a flow-through basis and therefore will not be subject to corporate taxes at the entity level. Additionally, because the LLC Units that the existing owners will continue to hold are exchangeable for shares of our Class A common stock or, at our option, for cash from Carvana Sub, the Up-C structure also provides the existing owners of Carvana Group potential liquidity that holders of non-publicly traded limited liability companies are not typically afforded. See "Organizational Structure" and "Description of Capital Stock."

Following this offering, each of the existing owners of Carvana Group Class A Units will also hold a number of shares of our Class B common stock equal to          the number of Class A Units they own. Our Class A common stock and Class B common stock will have what is commonly referred to as a "high/low vote structure," which means that certain shares of our Class B common stock will have ten votes per share, while other shares of Class B common stock and all shares of Class A common stock will only have one vote per share. Each share of our Class B common stock held by the Garcia Parties, which includes Ernie Garcia, III, our Chief Executive Officer, as well as his father (who is also our controlling shareholder) will entitle its holder to ten votes per share for so long as the Garcia Parties maintain direct or indirect

9

Table of Contents

beneficial ownership of at least 25% of our total outstanding shares of common stock. All other shares of our Class B common stock will have one vote per share, which is on par with the voting rights of our Class A common stock. This high/low vote structure will enable the Garcia Parties to control the outcome of matters submitted to our stockholders for approval, including the election of our directors, as well as the overall management and direction of our company. Furthermore, the Garcia Parties will continue to exert a significant degree of influence, or actual control, over matters requiring shareholder approval until they own as little as approximately 25% of our outstanding common stock. We believe that maintaining this control by the Garcia Parties will be important for enabling them to successfully guide the implementation of our company's growth strategies and strategic vision. Meanwhile, holders of our Class A common stock will have economic and voting rights similar to those of holders of common stock of non-Up-C structured public companies that have a high/low vote structure.

Carvana Co. will hold, indirectly through its wholly owned subsidiary, Carvana Sub, LLC Units, and therefore receive the same benefits as our existing owners on account of its ownership in an entity treated as a partnership, or "passthrough" entity, for income tax purposes. As Carvana Sub purchases LLC Units from the existing owners under the mechanism described above, Carvana Co. will obtain a step-up in tax basis in its share of Carvana Group's assets. This step-up in tax basis will provide Carvana Co. with certain tax benefits, such as future depreciation and amortization deductions that can reduce the taxable income allocable to Carvana Co. Carvana Co. expects to enter into an agreement under which it will agree to pay the existing owners of Carvana Group 85% of the value of these tax benefits; however, the remaining 15% of the value of such benefits will be available to Carvana Co.

Generally, Carvana Co. will receive a pro rata share of any distributions made by Carvana Group to its members. However, pursuant to the LLC Operating Agreement, tax distributions will be made quarterly by Carvana Group to the holders of Class A Units on a pro rata basis based on Carvana Group's net taxable income and to the holders of Class B Units based on such holder's allocable share of Carvana Group's net taxable income (rather than on a pro rata basis). Such tax distributions will be calculated based upon an assumed tax rate, which, under certain circumstances, may cause Carvana Group to make tax distributions that, in the aggregate, exceed the amount of taxes that Carvana Group would have paid if it were a similarly situated corporate taxpayer. Funds used by Carvana Group to satisfy its tax distribution obligations will not be available for reinvestment in our business. See "Risk Factors — Risks Related to Our Organizational Structure."

Upon completion of this offering, we will be controlled by the Garcia Parties because the Garcia Parties will control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares of our Class A common stock in full).

As a result of the Organizational Transactions:

- the investors in this offering will collectively own          shares of our Class A common stock and we will hold, indirectly through our wholly owned Subsidiary, Carvana Sub,          LLC Units;

- certain of our former and current employees will own          shares of restricted Class A common stock issued pursuant to the 2017 Incentive Plan;

- the Garcia Parties will own          LLC Units and          shares of Class B common stock;

- the remaining LLC Unitholders will own          LLC Units and          shares of Class B common stock;

- our Class A common stock will collectively represent approximately     % of the voting power in us; and

- our Class B common stock will collectively represent approximately     % of the voting power in us.

10

Table of Contents

**THE OFFERING**

| | |
|---|---|
| Issuer | Carvana Co. |
| Class A common stock offered by us |      shares. |
| Option to purchase additional shares of our Class A common stock |      shares. |
| Class A common stock to be outstanding immediately after this offering |      shares (or    shares if the underwriters' option is exercised in full). If all outstanding LLC Units held by the LLC Unitholders were exchanged for newly-issued shares of Class A common stock in accordance with the Exchange Agreement (based upon an assumed offering price of $   per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus),    shares of Class A common stock (or    shares if the underwriters' option is exercised in full) would be outstanding. |
| Class B common stock to be outstanding immediately after this offering |      shares. Immediately after this offering, the LLC Unitholders will own 100% of the outstanding shares of our Class B common stock. |
| Ratio of shares of Class A common stock to LLC Units | After this offering, Carvana Group will maintain a one-to-   ratio between the number of shares of Class A common stock issued by us and the number of LLC Units owned by us (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the Exchange Agreement). |
| Voting | Each share of our Class A common stock entitles its holder to one vote on all matters to be voted on by stockholders generally. |
| | After this offering, the LLC Unitholders will hold a number of shares of Class B common stock equal to    the number of Class A Units held by the LLC Unitholders (other than Carvana Sub). Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of our Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). |
| | As a result, the Garcia Parties will have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our |

11

**Table of Contents**

outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. All other shares of our Class B common stock entitle their holders to one vote per share on all matters to be voted on by stockholders generally. See "Description of Capital Stock —Common Stock — Voting Rights."

Holders of our Class A and Class B common stock vote together as a single class on all matters presented to our stockholders for their vote or approval, except as otherwise required by applicable law.

Upon completion of this offering, we will be controlled by the Garcia Parties. Upon completion of this offering, the Garcia Parties will control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full). See "Organizational Structure" and "Management — Corporate Governance."

| | |
|---|---|
| Voting power held by holders of Class A common stock |    % (or 100% if all outstanding LLC Units were exchanged for newly-issued shares of Class A common stock in accordance with the Exchange Agreement). |
| Voting power held by holders of Class B common stock |    % (or 0% if all outstanding LLC Units were exchanged for newly-issued shares of Class A common stock in accordance with the Exchange Agreement). |
| Use of proceeds | We estimate, based upon an assumed initial public offering price of $       per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), we will receive net proceeds from this offering of approximately $         million (or $       million if the underwriters exercise their option in full to purchase additional shares of Class A common stock), after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. |

We intend to contribute the net proceeds to our wholly owned subsidiary, Carvana Sub, that will in turn acquire        newly-issued LLC Units (or        LLC Units if the underwriters exercise their option in full to purchase additional shares of Class A common stock) in Carvana Group at a purchase price per LLC Unit equal to            the initial public offering price per share of Class A common stock in this offering, less underwriting discounts and commissions. In turn, Carvana Group intends to apply the net proceeds it receives from us to repay all outstanding borrowings under the Verde Credit Facility, to pay expenses incurred in connection with the Organizational Transactions and for general corporate purposes.

See ''Use of Proceeds" and "Organizational Structure."

12

| | |
|---|---|
| Dividend policy | We currently intend to retain any future earnings for investment in our business and do not expect to pay any dividends in the foreseeable future. The declaration and payment of all future dividends, if any, will be at the discretion of our board of directors (our "Board") and will depend upon our financial condition, earnings, contractual restrictions, or applicable laws and other factors that our board of directors may deem relevant. See "Dividend Policy." |
| Exchange rights of holders of the LLC Units | Prior to this offering, we will enter into an exchange agreement with the LLC Unitholders so that they may exchange LLC Units, together with shares of Class B common stock, in the case of Class A Units, for shares of Class A common stock in accordance with the terms of the Exchange Agreement or, at our election, for cash. Any shares of Class B common stock so delivered will be cancelled. See "Organizational Structure —Exchange Agreement." |
| Tax receivable agreement | We will enter into a Tax Receivable Agreement with Carvana Group and the LLC Unitholders that will provide for the payment by us to such persons of 85% of the amount of tax benefits, if any, that we actually realize (or in some circumstances are deemed to realize) as a result of (1) the increase in our proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of any future exchanges of LLC Units held by the LLC Unitholders for shares of our Class A common stock or cash described under "Organizational Structure — Exchange Agreement" and (2) certain other tax benefits related to our making payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. See "Organizational Structure — Tax Receivable Agreement." |
| Registration rights agreement | We intend to enter into a Registration Rights Agreement with certain LLC Unitholders in connection with this offering. The Registration Rights Agreement will provide such LLC Unitholders certain registration rights whereby, following our initial public offering and the expiration of any related lock-up period, such LLC Unitholder can require us to register under the Securities Act shares of Class A common stock issuable to them upon exchange of their LLC Units. The Registration Rights Agreement will also provide for piggyback registration rights for certain LLC Unitholders. See "Certain Relationships and Related Party Transactions — Registration Rights Agreement." |

Table of Contents

| Risk factors | Investing in our Class A common stock involves a high degree of risk. See "Risk Factors" elsewhere in this prospectus for a discussion of factors you should carefully consider before deciding to invest in our Class A common stock. |
| Trading symbol | "CVNA." |

Unless otherwise indicated, all information in this prospectus:

- assumes the effectiveness of the Organizational Transactions, including the amendment and restatement of the operating agreement of Carvana Group, as well as the effectiveness of our amended and restated certificate of incorporation and bylaws, which we will adopt prior to the completion of this offering;

- assumes an initial public offering price of $        per share, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus;

- assumes that the underwriters' option to purchase        additional shares of Class A common stock from us is not exercised;

- excludes the shares of Class A common stock that may be issuable upon exercise of redemption and exchange rights held by the LLC Unitholders; and

- excludes        shares of Class A common stock reserved for future issuance,        restricted shares of Class A common stock to be issued to certain employees upon the completion of this offering and options to purchase an aggregate of        shares of common stock to be issued to approximately        employees upon the pricing of this offering, with an exercise price set at the initial public offering price, in each case under our 2017 Incentive Plan and assuming an initial public offering price of $        per shares, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus.

14

Table of Contents

**SUMMARY HISTORICAL FINANCIAL AND OTHER DATA**

The following tables present, as of the dates and for the periods indicated, (1) the summary historical consolidated financial and other data for Carvana Group and its consolidated subsidiaries and (2) the summary unaudited pro forma financial data for Carvana Co. and its consolidated subsidiaries including Carvana Group. Carvana Group is the predecessor of Carvana Co. for financial reporting purposes. The summary consolidated statement of operations data for the years ended December 31, 2014 and December 31, 2015 and December 31, 2016 and the summary consolidated balance sheet data as of December 31, 2015 and December 31, 2016 have been derived from the audited consolidated financial statements of Carvana Group and its subsidiaries included elsewhere in this prospectus. The summary consolidated balance sheet data as of December 31, 2014 presented below has been derived from the audited consolidated financial statements of Carvana Group and its subsidiaries not included in this prospectus.

The results of operations for the periods presented below are not necessarily indicative of the results to be expected for any future period. The information set forth below should be read together with ''Use of Proceeds,'' ''Capitalization,'' ''Selected Consolidated Financial Data,'' ''Unaudited Pro Forma Consolidated Financial Data'' and ''Management's Discussion and Analysis of Financial Condition and Results of Operations'' and the consolidated financial statements and the accompanying notes included elsewhere in this prospectus.

The summary unaudited pro forma consolidated financial data of Carvana Co. presented below have been derived from our unaudited consolidated financial statements included elsewhere in this prospectus. The summary unaudited pro forma financial data as of and for the year ended December 31, 2016, give effect to the Organizational Transactions as described in ''Organizational Structure,'' including the consummation of this offering, the use of proceeds therefrom and related transactions, as described in ''Use of Proceeds'' and ''Unaudited Pro Forma Consolidated Financial Data,'' as if all such transactions had occurred on January 1, 2016, with respect to the statement of operations data and as of December 31, 2016 with respect to the balance sheet data. The unaudited pro forma financial data include various estimates that are subject to material change and may not be indicative of what our operations or financial position would have been had this offering and related transactions taken place on the dates indicated, or that may be expected to occur in the future. See ''Unaudited Pro Forma Consolidated Financial Data'' for a complete description of the adjustments and assumptions underlying the summary unaudited pro forma consolidated financial data.

15

Table of Contents

The summary historical consolidated financial and other data of Carvana Co. have not been presented as Carvana Co. is a newly incorporated entity, has had no business transactions or activities to date and had no assets or liabilities during the periods presented in this section.

| | Historical Carvana Group | | | Pro Forma Carvana Co. [1] |
| | Years Ended December 31, | | | Year Ended December 31, |
| | 2014 | 2015 | 2016 | 2016 |
| | (in thousands, except per share and selected other data) | | | |
| **Consolidated Statements of Operations Data:** | | | | |
| Used vehicle sales, net | $ 41,123 | $124,972 | $341,989 | $ |
| Wholesale vehicle sales | 522 | 3,743 | 10,163 | |
| Other sales and revenues [2] | 34 | 1,677 | 12,996 | |
| Net sales and operating revenues | 41,679 | 130,392 | 365,148 | |
| Cost of sales | 42,103 | 129,046 | 345,951 | |
| Gross (loss) profit | (424) | 1,346 | 19,197 | |
| Selling, general and administrative expenses | 14,684 | 36,678 | 108,676 | |
| Interest expense | 108 | 1,412 | 3,587 | |
| Other expense, net | 22 | 36 | 46 | |
| Loss before income taxes | (15,238) | (36,780) | (93,112) | |
| Income tax provision | — | — | — | |
| Net loss | $(15,238) | $ (36,780) | $ (93,112) | $ |
| **Per Share Data [1]:** | | | | |
| Pro forma weighted average shares of Class A common stock outstanding: | | | | |
| Basic | | | | $ |
| Diluted | | | | $ |
| Pro forma net loss available to Class A common stock per share: | | | | |
| Basic | | | | $ |
| Diluted | | | | $ |
| **Selected Other Data:** | | | | |
| Number of markets at period end | 3 | 9 | 21 | |
| Retail units sold | 2,105 | 6,523 | 18,761 | |
| Inventory units available on website | 652 | 1,842 | 7,310 | |
| Total gross (loss) profit per unit | $ (201) | $ 206 | $ 1,023 | |
| **Consolidated Balance Sheets Data (at period end):** | | | | |
| Cash and cash equivalents | $ 6,929 | $ 43,134 | $ 39,184 | $ |
| Vehicle inventory | 26,371 | 68,038 | 185,506 | |
| Total assets | 40,104 | 136,012 | 335,833 | |
| Floor Plan Facility | 5,619 | 42,302 | 165,313 | |

(1) See "Unaudited Pro Forma Consolidated Financial Data" for the description of the assumptions underlying the pro forma calculations.

(2) Includes $460 of other sales and revenues from related parties for the year ended December 31, 2016.

16

Table of Contents

## RISK FACTORS

*This offering and an investment in our Class A common stock involve a high degree of risk. You should carefully consider the risks described below, together with the financial and other information contained in this prospectus, before you decide to purchase shares of our Class A common stock. If any of the following risks actually occurs, our business, financial condition, results of operations, cash flows and prospects could be materially and adversely affected. As a result, the trading price of our Class A common stock could decline and you could lose all or part of your investment in our Class A common stock.*

### Risks Related to Our Business

#### We have a history of losses and we may not achieve or maintain profitability in the future.

We have not been profitable since our inception in 2012 and had an accumulated loss of approximately $152.6 million as of December 31, 2016. We incurred net losses of $15.2 million, $36.8 million and $93.1 million, respectively, in the years ended December 31, 2014, December 31, 2015 and December 31, 2016. We expect to make significant investments to further develop and expand our business and these investments may not result in increased revenue or growth on a timely basis or at all. In addition, as a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. As a result of these increased expenditures, we will have to generate and sustain increased revenue to achieve and maintain profitability.

We expect to continue to incur losses at least in the near term as we invest in and strive to grow our business. We may incur significant losses in the future for a number of reasons, including slowing demand for used cars and our related products and services, increasing competition, weakness in the automotive retail industry generally, as well as other risks described in this prospectus, and we may encounter unforeseen expenses, difficulties, complications and delays in generating revenue or profitability. If our revenue slows, we may not be able to reduce costs in a timely manner because many of our costs are fixed at least in the short term. In addition, if we reduce variable costs to respond to losses, this may limit our ability to acquire customers and grow our revenues. Accordingly, we may not achieve or maintain profitability and we may continue to incur significant losses in the future.

#### Our recent, rapid growth may not be indicative of our future growth and, if we continue to grow rapidly, we may not be able to manage our growth effectively.

Our revenue grew from $41.7 million for the year ended December 31, 2014 to $130.4 million and $365.1 million for the years ended December 31, 2015 and December 31, 2016, respectively. We expect that, in the future, even if our revenue increases, our rate of growth may decline. In any event, we will not be able to grow as fast or at all if we do not:

- increase the number of unique visitors to our website and the number of customers;
- further improve the quality of our product offering, features and complementary products and services, and introduce high quality new products, services and features;
- introduce additional third party products and services; or
- acquire sufficient appropriate inventory at an attractive cost and high quality to meet the increasing demand for our vehicles.

There can be no assurance that we will meet these objectives. We expect to continue to expend substantial financial and other resources on:

- marketing and advertising, including an increase to our television advertising expenditures;
- expansion of our vehicle inventory; and
- general administration, including legal, accounting and other compliance expenses related to being a public company.

17

Table of Contents

Our historical rapid growth has placed and may continue to place significant demands on our management and our operational and financial resources. We have experienced significant growth in the number of users of our platform as well as the amount of data that we analyze. We have hired and expect to continue hiring additional personnel to support our rapid growth. Our organizational structure is becoming more complex as we add staff, and we will need to improve our operational, financial and management controls as well as our reporting systems and procedures. We will require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas without undermining our corporate culture of rapid innovation, teamwork and attention to the car buying experience for the consumer. If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' car buying experience and the quality of the vehicles we sell, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

Our business has grown rapidly as additional customers have purchased used cars and complementary products and services through our platform. However, our business is relatively new and has operated at substantial scale for only a limited period of time. Given this limited history, it is difficult to predict whether we will be able to maintain or grow our business. We also expect that our business will evolve in ways that may be difficult to predict. For example, over time our investments intended to drive new customer traffic to our website may be less productive than expected. In the event of this or any other adverse developments, our continued success will depend on our ability to successfully adjust our strategy to meet changing market dynamics. If we are unable to do so, our business could be harmed and our results of operations and financial condition could be materially and adversely affected.

***Our limited operating history makes it difficult to evaluate our current business and future prospects and the risk of your investment.***

We launched our first market in 2013 and do not have a long history operating as a commercial company. In addition, we have only operated independently of DriveTime since November 1, 2014 and following our Spinoff, we remained dependent on DriveTime for a number of important operations, including locations for certain of our inspection and reconditioning centers ("IRCs"), vehicle inventory purchasing and a number of administrative services. We continue to utilize DriveTime for certain services. Due to this and other factors, our operating results are not predictable and our historical results may not be indicative of our future results. In order for our revenues to continue to increase, we need to successfully enter new markets, acquire more customers and expand our brand awareness. The foregoing may not happen at all or may not happen as quickly as we expect. Our failure to expand our brand awareness, successfully enter new markets, acquire new customers and gain repeat customers would harm our business, financial condition and results of operation.

***We may experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business.***

We expect our quarterly results of operations, including our revenue, gross profit and profitability, if any, and cash flow to vary significantly in the future, based in part on, among other things, consumers' car buying patterns. Used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year. Historically, this has led our gross profit per unit to be higher on average in the first half of the year than in the second half of the year. Other factors that may cause our quarterly results to fluctuate include, without limitation:

- our ability to attract new customers;
- changes in the competitive dynamics of our industry;
- the regulatory environment;

18

**Table of Contents**

- expenses associated with unforeseen quality issues and manufacturer recalls; and

- litigation or other claims against us.

In addition, a significant portion of our expenses are fixed and do not vary proportionately with fluctuations in revenues. Accordingly, our results in any quarter may not indicate the results we may achieve in any subsequent quarter or for the full year, and period-to-period comparisons of our operating results may not be meaningful.

***Through shared service and other agreements that were not negotiated at arm's length, we historically benefited from DriveTime's expertise and economies of scale, and continue to utilize DriveTime and its affiliates for certain services and processes and as a lender to us.***

We were incubated by, and benefited from, our relationship and a series of arrangements with DriveTime that were not negotiated at arm's length, as DriveTime is controlled by our controlling shareholder, who is also the father of our Chief Executive Officer. Currently, many services that DriveTime historically provided to us (including certain accounting, finance, legal, human resources, payroll and benefits, information technology, real estate and inventory purchasing) are now provided by alternative vendors or have been brought in-house. Consequently, certain of our historical costs may not accurately reflect our future costs to the extent that DriveTime no longer provides us with such services or refuses to continue doing so at currently contracted-for prices.

For example, DriveTime built our existing IRCs and now leases them to us. If we are unable to time-efficiently and cost effectively construct or acquire additional IRCs in the future, our production capacity may not be sufficient to satisfy customer demand. In addition, we lease most of our logistics hubs from DriveTime. If we cannot similarly lease space for logistics hubs in our future markets from DriveTime, we may not be able to expand into new markets as quickly as we have historically and we may incur additional costs in such expansion.

We continue to engage DriveTime and its affiliates, and other entities controlled by our controlling shareholder, to provide us with certain services, including the administration of VSCs sold to our customers. We also continue to utilize DriveTime for certain information technology and tax systems and services. For example, we rely on DriveTime's inventory management system and accounting system to support our revenue recognition process. Should DriveTime fail to adequately perform any of these services or maintain these systems, our financial condition and results of operations may be adversely affected. Additionally, DriveTime has in the past and may in the future purchase automotive finance receivables from us.

DriveTime performs ongoing servicing and collections on automotive finance receivables originated by us before and after we sell such automotive finance receivables. If DriveTime is unwilling to enter into servicing arrangements in our future facilities on terms or at prices consistent with their historical prices or at all, our ability to sell such receivables may be adversely affected, and if DriveTime refuses to continue servicing and collecting on automotive finance receivables originated by us prior to our sale of the same to third parties, our ability to adequately prepare such receivables for sale may be adversely affected.

In February 2017, we entered into the $50.0 million Verde Credit Facility with an affiliate of DriveTime. We can not assure you that similar funds would have been available to us from a third party lender.

DriveTime is currently in the process of evaluating strategic alternatives, including the potential sale of the company to interested third parties. If such a sale is completed, there can be no assurances that DriveTime will enter into any new agreements or arrangements, or extensions or renewals of existing agreements or arrangements, with us on the same or similar terms or at all.

See "Certain Relationships and Related Party Transactions—Our Relationship with DriveTime."

19

Table of Contents

***Our results of operations and financial condition are subject to management's accounting judgments and estimates, as well as changes in accounting policies.***

The preparation of our financial statements requires us to make estimates and assumptions affecting the reported amounts of our assets, liabilities, revenues and expenses. If these estimates or assumptions are incorrect, it could have a material adverse effect on our results of operations or financial condition. We have identified several accounting policies as being "critical" to the fair presentation of our financial condition and results of operations because they involve major aspects of our business and require us to make judgments about matters that are inherently uncertain. These policies are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and the notes to consolidated financial statements included in this prospectus.

The implementation of new accounting requirements or other changes to U.S. generally accepted accounting principles could have a material adverse effect on our reported results of operations and financial condition.

***We participate in a highly competitive industry, and pressure from existing and new companies may adversely affect our business and operating results.***

We face significant competition from companies that provide listings, information, lead generation, and car buying services designed to reach consumers and enable dealers to reach these consumers.

Our current and future competitors may include:

- traditional used car dealerships that could increase investment in technology and infrastructure to compete directly with our online model;
- Internet and online automotive sites that could change their models to directly compete with us, such as Google, Amazon, AutoTrader.com, eBay Motors, Edmunds.com, KBB.com, Autobytel.com, TrueCar.com and Cars.com;
- providers of offline, membership-based car buying services such as the Costco Auto Program;
- used car dealers or marketplaces with eCommerce business or online platforms such as Vroom and Shift; and
- automobile manufacturers such as General Motors, Ford and Volkswagon that could change their sales models through technology and infrastructure investments.

We also expect that new competitors will continue to enter the online and traditional automotive retail industry with competing brands, business models, products and services, which could have an adverse effect on our revenue, business and financial results. For example, traditional car dealerships could transition their selling efforts online allowing them to sell cars across state lines and compete directly with our online offering and pricing model with no negotiation. There can be no assurance we will not experience competition from DriveTime, the company from which we were spun off and with which we currently have a number of business relationships. In addition, DriveTime is currently in the process of evaluating strategic alternatives, including the potential sale of the company to interested third parties. If such a sale is completed, it may be more likely that DriveTime determines to compete with us to a greater extent than presently. Furthermore, there can be no assurances that DriveTime will enter into any new agreements or arrangements, or extensions or renewals of existing agreements or arrangements, with us on the same or similar terms or at all. Furthermore, we have a cross-license agreement with DriveTime pursuant to which DriveTime has obtained limited licenses to some of our intellectual property. Additionally, existing eCommerce businesses, such as Amazon, could directly enter the online used car market. Some of these companies have significantly greater resources than we do and may be able to provide customers access to a greater inventory of vehicles at lower prices while delivering a competitive online experience.

Our competitors may also develop and market new technologies that render our existing or future business model, products and services less competitive, unmarketable or obsolete. For example,

20

Table of Contents

technology is currently being developed to produce automated, driverless vehicles that could eventually reduce the demand for, or replace, traditional cars including the used vehicles that we sell. Additionally, car rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used cars we sell, particularly as urbanization increases. Furthermore, new technologies such as autonomous driving software have the potential to change the dynamics of car ownership in the future. In addition, if our competitors develop business models, products or services with similar or superior functionality to our solutions, it may adversely impact our business.

Our competitors may also impede our ability to reach consumers or commence operations in certain jurisdictions. For example, our competitors may increase their search engine optimization efforts and outbid us for search terms on various search engines. Additionally, our competitors could use their political influence and increase lobbying efforts resulting in new regulations or interpretations of existing regulations that would prevent us from operating in certain jurisdictions.

Our current and potential competitors may have significantly greater financial, technical, marketing and other resources than we have, and the ability to devote greater resources to the development, promotion and support of their products and services. Additionally, they may have more extensive automotive industry relationships, longer operating histories and greater name recognition than we have. As a result, these competitors may be able to respond more quickly with new technologies and to undertake more extensive marketing or promotional campaigns. If we are unable to compete with these companies, the demand for our used cars, products and services could substantially decline.

Private plaintiffs and federal, state and local regulatory and law enforcement authorities continue to scrutinize advertising, sales, financing and insurance activities in the sale and leasing of used vehicles. If, as a result, other automotive retailers adopt more transparent, consumer-oriented business practices, our differentiation versus those retailers could be reduced.

In addition, if one or more of our competitors, or DriveTime, were to merge or partner with another of our competitors, the change in the competitive landscape could adversely affect our ability to compete effectively. Our competitors may also establish or strengthen cooperative relationships with our current or future third party data providers, technology partners, or other parties with whom we have relationships, thereby limiting our ability to develop, improve and promote our solutions. We may not be able to compete successfully against current or future competitors, and competitive pressures may harm our revenue, business and financial results.

***Our business is sensitive to changes in the prices of new and used vehicles.***

Any significant changes in retail prices for new or used vehicles could have a material adverse effect on our revenues and results of operations. For example, if retail prices for used vehicles rise relative to retail prices for new vehicles, it could make buying a new vehicle more attractive to our customers than buying a used vehicle, which could have a material adverse effect on our results of operations and could result in reduced used car sales and lower revenue. Additionally, manufacturer incentives could contribute to narrowing the price gap between new and used vehicles. Used vehicle prices may also decline due to an increased number of new vehicle lease returns over the next several years. While lower used vehicle prices reduce our cost of acquiring new inventory, lower prices could also lead to reductions in the value of inventory we currently hold, which could have a negative impact on gross profit. Furthermore, any significant changes in wholesale prices for used vehicles could have a material adverse effect on our results of operations by reducing wholesale margins.

***Our business is dependent upon access to desirable vehicle inventory. Obstacles to acquiring attractive inventory, whether because of supply, competition, or other factors may have a material adverse effect on our business, sales and results of operations.***

We acquire cars for sale through numerous sources, including wholesale auction and directly from consumers. There can be no assurance that the supply of desirable used vehicles will be sufficient to meet

21

Table of Contents

our needs. A reduction in the availability of or access to sources of inventory could have a material adverse effect on our business, sales and results of operations.

Additionally, we evaluate tens of thousands of potential cars daily using a proprietary algorithm to predict mechanical soundness, consumer desirability and relative value as prospective inventory. If we fail to adjust appraisal offers to stay in line with broader market trade-in offer trends, or fail to recognize those trends, it could adversely affect our ability to acquire inventory. Our ability to source vehicles through our appraisal process could also be affected by competition, both from new and used car dealers directly and through third party websites driving appraisal traffic to those dealers. In addition, we remain dependent on third parties to sell us used vehicles, and there can be no assurance of an adequate supply of such vehicles on terms that are attractive to us.

### Our business is dependent upon our ability to expeditiously sell inventory. Failure to expeditiously sell our inventory could have a material adverse effect on our business, sales and results of operations.

Our purchases of used vehicles are based in large part on projected demand. If actual sales are materially less than our forecasts, we would experience an over-supply of used vehicle inventory. An over-supply of used vehicle inventory will generally cause downward pressure on our product sales prices and margins and increase our average days to sale.

Used vehicle inventory has typically represented a significant portion of total assets. Having such a large portion of our total assets in the form of used vehicle inventory for an extended period of time subjects us to depreciation and other risks that affect our results of operations. Accordingly, if we have excess inventory or our average days to sale increases, we may be unable to liquidate such inventory at prices that allow us to meet margin targets or to recover our costs could have a material adverse effect on our results of operations.

### Our ability to sell automotive finance receivables and generate gains on sales of these finance receivables may decline in the future and any material reduction could harm our business, results of operations and financial condition.

We provide financing to customers and typically sell the receivables related to the financing contract to third party investors or, in limited instances, DriveTime. For example, we entered into agreements in December 2016 pursuant to which third party purchasers committed to purchase an aggregate of $667.2 million of automotive finance receivables we originate. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Finance Receivables." Consistent with our experience under similar prior arrangements, we expect to exceed our capacity to sell automotive finance receivables under these agreements prior to the fourth quarter of 2017. As we use the available capacity under each agreement, we plan to enter into new arrangements to sell additional vehicle finance receivables. If we reach our capacity under these or future arrangements, and we cannot replace them with new arrangements, we may be unable to generate adequate liquidity and our business, financial condition and results of operations may be adversely affected.

Additionally, there can be no assurance that our relationships with the investors who purchase these receivables or DriveTime will continue in the future or that such investors will renew our agreements with them when they expire or that they will not terminate them due to a breach by us of our agreements with them or otherwise. If they or DriveTime cease to purchase these receivables, it would have a material adverse effect on our ability to continue originating finance receivables and adversely impact our operating results. Furthermore, we would be subject to the risk that some of these receivables are not paid when due and we are forced to incur unexpected asset write-offs and bad debt expense.

### We depend on the sale of automotive finance receivables for a substantial portion of our gross profit.

In connection with the sale of used cars, many of our customers use our financing services to finance a portion of the purchase price of their vehicle. The prices we are able to charge for finance receivables that we sell are based on a variety of factors, including the terms and credit risk associated with the automotive

22

Table of Contents

finance receivables, the historical credit performance of the finance receivables we sell, investor demand and other factors. If these variables or others were to change, we might be required to reduce our sales prices on finance receivables, sell fewer of them or both, which could reduce our gains on sales of finance receivables. Any material reduction in our interest rate spread or gains on sale of finance receivables could have a material adverse effect on our business, results of operations and financial condition. Furthermore, customers may elect to finance their car purchases through other parties who may be able to offer more attractive terms in which case we would lose the source of a significant portion of our historical gross profit.

***Our ability to resell automotive finance receivables is dependent on our ability to originate desirable finance receivables. If customers or third parties provide us incorrect or fraudulent data, we may offer credit terms that do not align with the customer's credit profile, and our operating results may be harmed.***

We offer financing to our customers to facilitate their purchases of used vehicles. The terms of the financing we offer are dependent in part on our assessment of such customers' credit-worthiness, which is based on data gathered from customers and third parties. If the information we rely on is inaccurate or fraudulent, we may offer inappropriate terms to our customers, resulting in originating receivables that we are unable to collect or sell because they are based on an inaccurate credit profile. Originating a material amount of receivables with inaccurate or fraudulent credit profiles could have a material adverse effect on our business, results of operations and financial condition.

***The success of our business relies heavily on our marketing and branding efforts and these efforts may not be successful.***

We believe that an important component of our growth will be the growth of visitors to our website. Because we are a consumer brand, we rely heavily on marketing and advertising to increase brand visibility with potential customers. We currently advertise through a blend of brand and direct advertising channels with the goal of increasing the strength, recognition and trust in the Carvana brand and driving more unique visitors to our website. We recorded expenses of approximately $4.1 million, $10.8 million and $27.0 million on advertising in the years ended December 31, 2014, December 31, 2015 and December 31, 2016, respectively.

Our business model relies on our ability to scale rapidly and to decrease incremental customer acquisition costs as we grow. If we are unable to recover our marketing costs through increases in customer traffic and in the number of transactions by users of our platform, or if our broad marketing campaigns are not successful or are terminated, it could have a material adverse effect on our growth, results of operations and financial condition.

***We rely on Internet search engines and social networking sites to help drive traffic to our website, and if we fail to appear prominently in the search results or fail to drive traffic through paid advertising, our traffic would decline and our business would be adversely affected.***

We depend in part on Internet search engines, such as Google, Bing and Yahoo! and social networking sites such as Facebook to drive traffic to our website. Our ability to maintain and increase the number of visitors directed to our website is not entirely within our control. Our competitors may increase their search engine optimization efforts and outbid us for search terms on various search engines, resulting in their websites receiving a higher search result page ranking than ours. Additionally, Internet search engines could revise their methodologies in a way that would adversely affect our search result rankings. If Internet search engines modify their search algorithms in ways that are detrimental to us, or if our competitors' efforts are more successful than ours, overall growth in our customer base could slow or our customer base could decline. Internet search engine providers could provide automotive dealer and pricing information directly in search results, align with our competitors or choose to develop competing services. Our website has experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of users directed to our website through Internet search engines could harm our business and operating results.

23

**Table of Contents**

***We operate in a highly regulated industry and are subject to a wide range of federal, state and local laws and regulations. Failure to comply with these laws and regulations could have a material adverse effect on our business, results of operations and financial condition.***

We are subject to a wide range of federal, state and local laws and regulations. Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, federal and state laws regulating vehicle advertising, state laws related to title and registration and state laws regulating vehicle sales and service. The financing we offer to customers is subject to federal and state laws regulating the provision of consumer finance. Our facilities and business operations are subject to laws and regulations relating to environmental protection and health and safety. In addition to these laws and regulations that apply specifically to our business, we will also be subject to laws and regulations affecting public companies upon the completion of this offering, including securities laws and NYSE listing rules. The violation of any of these laws or regulations could result in administrative, civil or criminal penalties or in a cease-and-desist order against our business operations, any of which could damage our reputation and have a material adverse effect on our business, sales and results of operations. We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

Our logistics operations, which we depend upon to transport vehicles from auctions to our inspections and reconditioning centers, then on to our logistics hubs, and finally to our vending machines, fulfillment centers or directly to customers, are subject to the regulatory jurisdiction of the U.S. Department of Transportation (the "DOT") and states through which our vehicles travel, which have broad administrative powers with respect to our logistics operations. Vehicle dimensions and driver hours of service are also subject to both federal and state regulation. More restrictive limitations on vehicle weight and size, trailer length and configuration, or driver hours of service would increase our costs, and if we are unable to pass these cost increases on to our customers, may increase our operating expenses and adversely affect our financial condition, operating results and cash flows. If we fail to comply with the DOT regulations or regulations become more stringent, we could experience increased inspections, regulatory authorities could take remedial action including imposing fines or shutting down our operations or we could be subject to increased audit and compliance costs. If any of these events occur, our financial condition, operating results and cash flows would be adversely affected.

Our sale of used vehicles and financing offerings are subject to the state and local licensing requirements of the jurisdictions in which we operate. Regulators of jurisdictions in which our customers reside, but for which we do not have a dealer or financing license, could require that we obtain a license or otherwise comply with various state regulations. Despite our belief that we are not subject to the licensing requirements of those jurisdictions, regulators may seek to impose punitive fines for operating without a license or demand we seek a license in those jurisdictions, any of which may inhibit our ability to do business in those jurisdictions, increase our operating expenses and adversely affect our financial condition and results of operations.

The foregoing description of laws and regulations to which we are or may be subject is not exhaustive, and the regulatory framework governing our operations is subject to continuous change.

***Changes in the laws and regulations to which our business and industry is subject could have a material adverse effect on our business, sales, results of operations and financial condition.***

Recent federal legislative and regulatory initiatives and reforms may result in an increase in expenses or a decrease in revenues, which could have a material adverse effect on our results of operations. For example, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") regulates, among other things, the provision of consumer financing. The Dodd-Frank Act established a new consumer financial protection agency, the Consumer Financial Protection Bureau ("CFPB"), with broad regulatory powers. The CFPB is responsible for administering and enforcing laws and regulations related to consumer financial products and services, including our provision of vehicle financing and our receivables sale facilities. The evolving regulatory environment in the wake of the Dodd-Frank Act and the creation of

24

Table of Contents

the CFPB may increase the cost of regulatory compliance or result in changes to business practices that could have a material adverse effect on our results of operations.

The Patient Protection and Affordable Care Act of 2010, as it is phased in over time, significantly affects the provision of health care services and will increase the costs we incur to provide our employees with health coverage. Current federal labor policy could lead to increased unionization efforts, which could increase labor costs, disrupt facility operations, and have a material adverse effect on our business, sales and results of operations.

The enactment of new laws and regulations or the interpretation of existing laws and regulations in an unfavorable way may affect the operation of our business, directly or indirectly, which could result in substantial regulatory compliance costs, civil or criminal penalties, including fines, adverse publicity, decreased revenues and increased expenses.

### *If we fail to comply with the Telephone Consumer Protection Act, we may face significant damages, which could harm our business, financial condition, results of operations and cash flows.*

We utilize telephone calls and text messaging as a means of responding to customer interest in purchasing and/or financing vehicles. We generate leads from our website by prompting potential customers to provide their phone numbers so that we can contact them in response to their interest in financing terms or a specific vehicle. We also pay third parties for leads. A portion of our revenue comes from sales and/or financing that involves a call made by our internal call centers to these potential customers.

The Telephone Consumer Protection Act (the "TCPA"), as interpreted and implemented by the Federal Communications Commission (the "FCC"), imposes significant restrictions on utilization of telephone calls and text messages to residential and mobile telephone numbers as a means of communication, when the prior consent of the person being contacted has not been obtained. Violations of the TCPA may be enforced by the FCC or by individuals through litigation, including class actions, and statutory penalties for TCPA violations range from $500 to $1,500 per violation, which is often interpreted to mean per phone call.

While we have implemented processes and procedures to comply with the TCPA, any failure by us or the third parties on which we rely for data to adhere to, or successfully implement, appropriate processes and procedures in response to existing or future regulations could result in legal and monetary liability, fines and penalties, or damage to our reputation in the marketplace, any of which could have a material adverse effect on our business, financial condition and results of operations. Additionally, any changes to the TCPA or its interpretation that further restrict the way we contact and communicate with our potential customers or generate leads, or any governmental or private enforcement actions related thereto, could adversely affect our ability to attract customers and harm our business, financial condition, results of operations and cash flows.

### *Government regulation of the Internet and eCommerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.*

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and eCommerce. Existing and future regulations and laws could impede the growth of the Internet, eCommerce or mobile commerce. These regulations and laws may involve taxes, privacy and data security, anti-spam, pricing, content protection, electronic contracts and communications, mobile communications, consumer protection, information reporting requirements, unencumbered Internet access to our services and the design and operation of websites. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or eCommerce. Unfavorable regulations and laws could diminish the demand for used cars and complementary products and services and increase our cost of doing business.

25

Table of Contents

***Our failure to maintain a reputation of integrity and to otherwise maintain and enhance our brand could adversely affect our business, sales and results of operations.***

Our business model is based on our ability to provide customers with a transparent and simplified solution to car buying that will save them time and money. Accordingly, our reputation as a company that is founded on the fundamental principle of integrity is critical to our success. If we fail to maintain the high standards on which our reputation is built, or if an event occurs that damages this reputation, it could adversely affect consumer demand and have a material adverse effect on our business, sales and results of operations. Even the perception of a decrease in the quality of our brand could impact results.

Complaints or negative publicity about our business practices, marketing and advertising campaigns, compliance with applicable laws and regulations, the integrity of the data that we provide to users, data privacy and security issues, and other aspects of our business, especially on blogs and social media websites, and irrespective of their validity, could diminish customer confidence in our platform and adversely affect our brand. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which reputation can be affected. If we fail to correct or mitigate misinformation or negative information, including information spread through social media or traditional media channels, about us or the vehicles we offer, our customer experience, or any aspect of our brand, it could have a material adverse effect on our business, sales and results of operations.

***Our ability to grow our complementary product and service offerings may be limited, which could negatively impact our growth rate, revenues and financial performance.***

If we introduce or expand additional offerings for our platform, such as services or products involving new cars, vehicle trade-ins, financing, insurance, deficiency waivers, customized accessories, leasing or maintenance, we may incur losses or otherwise fail to enter these markets successfully. Our expansion into these markets will place us in competitive and regulatory environments with which we are unfamiliar and involve various risks, including the need to invest significant resources and the possibility that returns on such investments will not be achieved for several years, if at all. In attempting to establish new service or product offerings, we expect to incur significant expenses and face various other challenges, such as expanding our customer advocate and management personnel to cover these markets and complying with complicated regulations that apply to these markets. In addition, we may not successfully demonstrate the value of these complementary products and services to consumers, and failure to do so would compromise our ability to successfully expand into these additional revenue streams. Any of these risks, if realized, could adversely affect our business and results of operations.

***If we do not adequately address the shift to mobile device technology by our customers, operating results could be harmed and our growth could be negatively affected.***

Our future success depends in part on our ability to provide adequate functionality for visitors who use mobile devices to shop for used cars and the number of transactions with us that are completed by those users. In the year ended December 31, 2015, approximately 52.2% of unique visitors to our website were attributable to mobile devices and in the year ended December 31, 2016, this figure grew to approximately 54.1%. The shift to mobile technology by our users may harm our business in the following ways:

- customers visiting our website from a mobile device may not accept mobile technology as a viable long-term platform to buy or sell a vehicle. This may occur for a number of reasons, including our ability to provide the same level of website functionality to a mobile device that we provide on a desktop computer, the actual or perceived lack of security of information on a mobile device and possible disruptions of service or connectivity;

- we may not continue to innovate and introduce enhanced products that can be suitably conveyed on mobile platforms;

- consumers using mobile devices may believe that our competitors offer superior products and features based in part on our inability to provide sufficient website functionality to convince a mobile device user to transact with us; or

26

**Table of Contents**

- regulations related to consumer finance disclosures, including the Truth in Lending Act, may be interpreted, in the context of mobile devices, in a manner which could expose us to legal liability in the event we are found to have violated applicable laws.

If we do not develop suitable functionality for users who visit our website using a mobile device, our business and operating results could be harmed.

### Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges and other macroeconomic issues.

Decreases in consumer demand could adversely affect the market for used vehicle purchases and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. For example, the number of new vehicle sales in the United States decreased from approximately 16.4 million in 2007 to approximately 10.6 million in 2009, according to the Bureau of Economic Analysis. Purchases of new and used vehicles are typically discretionary for consumers and have been, and may continue to be, affected by negative trends in the economy and other factors, including rising interest rates, the cost of energy and gasoline, the availability and cost of credit, reductions in business and consumer confidence, stock market volatility, increased regulation and increased unemployment. Increased environmental regulation has made, and may in the future make, used cars more expensive and less desirable for consumers. In addition, our business may be negatively affected by challenges to the larger automotive ecosystem, including urbanization, global supply chain challenges and other macroeconomic issues. For example, car rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used cars we sell, particularly as urbanization increases. Additionally, new technologies such as autonomous driving software have the potential to change the dynamics of car ownership in the future. Any of the foregoing could have a material adverse effect on our business, results of operations and financial condition.

### The current geographic concentration where we provide services creates an exposure to local economies, regional downturns or severe weather or catastrophic occurrences that may materially adversely affect our financial condition and results of operations.

We currently conduct business through three IRCs located in Winder, Georgia, Blue Mound, Texas and Delanco, New Jersey, managing fulfillment to 21 metropolitan areas across the southeast, mid-Atlantic, and Midwest regions and Texas. We hold the significant majority of our inventory at these three locations. While we have insurance to cover losses on those vehicles, events such as fire, flood, or hail could impact our business. In addition, our business is currently more susceptible to regional conditions than the operations of more geographically diversified competitors, and we are vulnerable to economic downturns in those regions. Any unforeseen events or circumstances that negatively affect these areas could materially adversely affect our revenues and profitability. These factors include, among other things, changes in demographics and population. Severe weather conditions and other catastrophic occurrences in areas in which we operate or from which we obtain inventory may materially adversely affect our results of operations. Such conditions may result in physical damage to our properties, loss of inventory, delays in the delivery of vehicles to our logistics hubs, fulfillment centers and vending machines or to our customers. Any of these factors may disrupt our businesses and materially adversely affect our financial condition and result of operations. Furthermore, there can be no assurance that we will be able to successfully replicate our business model and achieve levels of success as we enter new markets.

### We may require additional debt and equity capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances. If such capital is not available to us, our business, operating results and financial condition may be harmed.

We may require additional capital to pursue our business objectives and respond to business opportunities, challenges or unforeseen circumstances, including to increase our marketing expenditures to improve our brand awareness, build and maintain our inventory of quality used vehicles, develop new

27

**Table of Contents**

products or services (including vehicle financing services) or further improve existing products and services, enhance our operating infrastructure and acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. However, additional funds may not be available when we need them on terms that are acceptable to us, or at all. In addition, any debt financing that we secure in the future could involve restrictive covenants which may make it more difficult for us to obtain additional capital and to pursue business opportunities. Volatility in the credit markets may also have an adverse effect on our ability to obtain debt financing. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our Class A common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to pursue our business objectives and to respond to business opportunities, challenges or unforeseen circumstances could be significantly limited, and our business, operating results, financial condition and prospects could be adversely affected.

*We rely on agreements with third parties to finance our vehicle inventory purchases. If we fail to maintain adequate relationships with third parties to finance our vehicle inventory purchases, we may be unable to maintain sufficient inventory, which would adversely affect our business and results of operations.*

We rely on agreements with third party lenders to finance our vehicle inventory purchases. If we are unable to extend the agreements on favorable terms or at all, or if the agreements expire and are not renewed, our inventory supply may decline, resulting in fewer vehicles available for sale on our website. Obtaining new funding arrangements may be at higher interest rates or other less favorable terms. These financing risks, in addition to rising interest rates and changes in market conditions, if realized could negatively impact our results of operations and financial condition.

*We make certain representations concerning the automotive finance receivables we sell. If those representations are not correct, we could be required to repurchase the receivables. Any significant required repurchases could have an adverse effect upon our ability to operate and fund our business.*

We generally seek to sell automotive finance receivables to third parties. If these receivables do not meet the specified representations, we have in the past, and may in the future, be forced to repurchase these receivables. If we sell a significant amount of receivables that do not meet the predetermined representations, we may be required to use cash on hand or obtain alternative financing in order to repurchase them. Any significant repurchases could have a material adverse effect on our business, results of operations and financial condition.

*We rely on our proprietary credit scoring model in the forecasting of automotive finance receivable loss rates. If we are unable to effectively forecast loss rates, it may negatively impact our operating results.*

We rely on our internally developed models to forecast loss rates of the automotive finance receivables we originate. We generally seek to sell these receivables to third parties. If the receivables we sell to third parties experience higher loss rates than forecasted, we may obtain less favorable pricing on the receivables we sell to those parties in the future and suffer reputational harm in the marketplace for the receivables we sell and our business, results of operations and financial condition may be adversely affected. We hold receivables we originate on our balance sheet until we sell them to third parties, and to the extent those receivables fail to perform during our holding period, they may become ineligible for sale. If we rely on a model that fails to effectively forecast loss rates on receivables we originate and these receivables suffer higher losses than expected, our business, results of operations and financial condition may be adversely affected.

28

Table of Contents

***We rely on internal and external logistics to transport our vehicle inventory throughout our markets and the United States. Thus, we are subject to business risks and costs associated with the transportation industry. Many of these risks and costs are out of our control, and any of them could have a material adverse effect on our business, financial condition and results of operations.***

We rely on a combination of internal and external logistics to transport vehicles from auctions to our IRCs, then to our logistics hubs, and finally to our vending machines, fulfillment centers or directly to customers. As a result, we are exposed to risks associated with the transportation industry such as weather, traffic patterns, gasoline prices, recalls affecting our vehicle fleet, local and federal regulations, vehicular crashes, insufficient internal capacity, rising prices of external transportation vendors, fuel prices and taxes, license and registration fees, insurance premiums, self-insurance levels, difficulty in recruiting and retaining qualified drivers, disruption of our technology systems, and increasing equipment and operational costs. Our failure to successfully manage our logistics and fulfillment process could cause a disruption in our inventory supply chain and distribution, which may adversely affect our operating results and financial condition.

***We face a variety of risks associated with the construction and operation of our vending machines and fulfillment centers, any of which could adversely affect our financial condition and results of operations.***

We are required to obtain approvals, permits and licenses from state regulators and local municipalities to construct and operate our vending machines and fulfillment centers. We may face delays in obtaining the requisite approvals, permits and licenses to construct and operate our vending machines and fulfillment centers or we may not be able to obtain them at all. If we encounter delays in obtaining or cannot obtain the requisite approvals, permits and licenses to construct and operate our vending machines and fulfillment centers in desirable locations our financial condition and results of operations may be adversely affected.

We often lease the real estate on which we construct and operate our vending machines. Our landlords may recognize the unique nature and use of our vending machines and the difficulty they could have finding a replacement tenant if we vacate the site. Consequently, our landlords may offer us unfavorable leasing terms. If we are required to enter into inflexible and expensive leases to construct and operate our vending machines our financial condition and results of operations may be adversely affected.

We depend on one supplier to construct portions of our vending machines and to provide technical support and maintenance on our vending machines. If we are unable to maintain our relationship with our supplier, such supplier ceases to produce the vending machines, or such supplier is unable to effectively deliver our vending machine orders on timelines and at the price we have negotiated, and we are unable to contract with an alternative supplier we may not be able to construct new vending machines or continue to operate existing vending machines and our financial condition and operating results may be adversely affected. Additionally, the durability of our vending machines is unknown and we may be required to incur significant maintenance and other expenses to keep them operating properly. If we are required to incur significant expenses to maintain our vending machines our financial condition and operating results may be adversely affected.

***We collect, process, store, share, disclose and use personal information and other data, and our actual or perceived failure to protect such information and data could damage our reputation and brand and harm our business and operating results.***

We collect, process, store, share, disclose and use personal information and other data provided by consumers. We rely on encryption and authentication technology licensed from third parties to effect secure transmission of such information. We may need to expend significant resources to protect against security breaches or to address problems caused by breaches. Any failure or perceived failure to maintain the security of personal and other data that is provided to us by consumers and vendors could harm our reputation and brand and expose us to a risk of loss or litigation and possible liability, any of which could adversely affect our business and operating results.

29

Table of Contents

Additionally, concerns about our practices with regard to the collection, use or disclosure of personal information or other privacy related matters, even if unfounded, could harm our business and operating results.

There are numerous federal, state and local laws regarding privacy and the collection, processing, storing, sharing, disclosing, using and protecting of personal information and other data, the scope of which are changing, subject to differing interpretations, and which may be costly to comply with and may be inconsistent between jurisdictions or conflict with other rules. We generally comply with industry standards and are subject to the terms of our privacy policies and privacy-related obligations to third parties. We strive to comply with applicable laws, policies, legal obligations and industry codes of conduct relating to privacy and data protection, to the extent possible. However, it is possible that these obligations may be interpreted and applied in new ways or in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices or that new regulations could be enacted. Any failure or perceived failure by us to comply with our privacy policies, our privacy-related obligations to consumers or other third parties, or our privacy-related legal obligations, or any compromise of security that results in the unauthorized release or transfer of sensitive information, which may include personally identifiable information or other customer data, may result in governmental enforcement actions, litigation or public statements against us by consumer advocacy groups or others and could cause consumers, vendors and receivable purchasers to lose trust in us, which could have an adverse effect on our business. Additionally, if vendors, developers or other third parties that we work with violate applicable laws or our policies, such violations may also put consumer, vendor or receivables purchasers' information at risk and could in turn harm our reputation, business and operating results.

*A significant disruption in service on our website could damage our reputation and result in a loss of consumers, which could harm our business, brand, operating results and financial condition.*

Our brand, reputation and ability to attract customers depend on the reliable performance of our website and the supporting systems, technology and infrastructure. We may experience significant interruptions with our systems in the future. Interruptions in these systems, whether due to system failures, programming or configuration errors, computer viruses, or physical or electronic break-ins, could affect the availability of our inventory on our website and prevent or inhibit the ability of customers to access our website. Problems with the reliability or security of our systems could harm our reputation, result in a loss of customers and result in additional costs.

Substantially all of the communications, network and computer hardware used to operate our website are located at co-location facilities. Although we have multiple locations, our systems are not fully redundant. In addition, we do not own or control the operation of these facilities. Our systems and operations are vulnerable to damage or interruption from fire, flood, power loss, telecommunications failure, terrorist attacks, acts of war, electronic and physical break-ins, computer viruses, earthquakes, and similar events. The occurrence of any of these events could damage our systems and hardware or could cause them to fail.

Problems faced by our third party web hosting providers could adversely affect the experience of our customers. For example, our third party web hosting providers could close their facilities without adequate notice. Any financial difficulties, up to and including bankruptcy, faced by our third party web hosting providers or any of the service providers with whom they contract may have negative effects on our business, the nature and extent of which are difficult to predict. If our third party web hosting providers are unable to keep up with our growing capacity needs, our business could be harmed.

Any errors, defects, disruptions, or other performance or reliability problems with our network operations could interrupt our customers' access to our inventory and our access to data that drives our inventory purchase operations as well as cause delays and additional expense in arranging access to new facilities and services, any of which could harm our reputation, business, operating results and financial condition.

30

Table of Contents

***Failure to adequately protect our intellectual property, technology and confidential information could harm our business and operating results.***

Our business depends on our intellectual property, technology and confidential information, the protection of which is crucial to the success of our business. For example, we have developed proprietary algorithms to price the vehicles we purchase and sell and the financing we offer customers. We rely on a combination of patent, trademark, trade secret and copyright law and contractual restrictions to protect these algorithms and our other intellectual property, technology and confidential information. In addition, we attempt to protect our intellectual property, technology and confidential information by requiring certain of our employees and consultants to enter into confidentiality and assignment of inventions agreements and certain third parties to enter into nondisclosure agreements. These agreements may not effectively grant all necessary rights to any inventions that may have been developed by the employees and consultants. In addition, these agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property or technology and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information, intellectual property, or technology. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our website features, software and functionality or obtain and use information that we consider proprietary. Changes in the law or adverse court rulings may also negatively affect our ability to prevent others from using our technology.

We currently hold rights to the "carvana.com" Internet domain name and various other related domain names. The regulation of domain names in the United States is subject to change. Regulatory bodies could establish additional top-level domains, appoint additional domain name registrars, or modify the requirements for holding domain names. As a result, we may not be able to acquire or maintain all domain names that use the name Carvana or are otherwise important for our business.

***We may be subject to claims asserting that our employees, consultants or advisors have wrongfully used or disclosed alleged trade secrets of their current or former employees or claims asserting ownership of what we regard as our own intellectual property.***

Although we try to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that these individuals or we have used or disclosed intellectual property, including trade secrets or other proprietary information, of any such individual's current or former employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management.

In addition, while it is our policy to require our employees and contractors who may be involved in the conception or development of intellectual property to execute agreements assigning such intellectual property to us, we may be unsuccessful in executing such an agreement with each party who, in fact, conceives or develops intellectual property that we regard as our own. The assignment of intellectual property may not be self-executing or the assignment agreement may be breached, and we may be forced to bring claims against third parties, or defend claims that they may bring against us, to determine the ownership of what we regard as our intellectual property.

***We may in the future be subject to intellectual property disputes, which are costly to defend and could harm our business and operating results.***

We may from time to time face allegations that we have infringed the trademarks, copyrights, patents and other intellectual property rights of third parties, including from our competitors or non-practicing entities. We may be unaware of the intellectual property rights that others may claim cover some or all of our technology or services. Patent and other intellectual property litigation may be protracted and expensive, and the results are difficult to predict and may require us to stop offering some features,

31

**Table of Contents**

purchase licenses or modify our products and features while we develop non-infringing substitutes or may result in significant settlement costs.

Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our business, our operating results and our reputation.

*Our platform utilizes open source software, and any failure to comply with the terms of one or more of these open source licenses could negatively affect our business.*

In addition, we use open source software in our platform and expect to use open source software in the future. The term of various open source licenses have not been interpreted by United States courts, and there is a risk that such licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to market our platform. By the terms of certain open source licenses, we could be required to release the source code of our proprietary software, and to make our proprietary software available under open source licenses, if we combine our proprietary software with open source software in a certain manner. In the event that portions of our proprietary software are determined to be subject to an open source license, we could be required to publicly release the affected portions of our source code, or to re-engineer all or a portion of our technologies or otherwise be limited in the licensing of our technologies, each of which could reduce or eliminate the value of our technologies and services. In addition to risks related to license requirements, usage of open source software can lead to greater risks than use of third-party commercial software, as open source licensors generally do not provide warranties or controls on the origin of the software. Many of the risks associated with usage of open source software cannot be eliminated and could negatively affect our business and operating results.

*Our business is sensitive to conditions affecting automotive manufacturers, including manufacturer recalls.*

Adverse conditions affecting one or more automotive manufacturers could have a material adverse effect on our sales and results of operations and could impact the supply of vehicles. In addition, manufacturer recalls are a common occurrence that have accelerated in frequency and scope in recent years. Recalls and the increased regulatory scrutiny surrounding selling used vehicles with open safety recalls could adversely affect used vehicle sales or valuations, could cause us to temporarily remove vehicles from inventory, could cause us to sell affected vehicles at a loss, could force us to incur increased costs and could expose us to litigation and adverse publicity related to the sale of recalled vehicles, which could have a material adverse effect on our business, financial condition and results of operations.

*We rely on third party technology to complete critical business functions. If that technology fails to adequately serve our needs and we cannot find alternatives, it may negatively impact our operating results.*

We rely on third party technology for certain of our critical business functions, including customer identity verification for financing, transportation fleet telemetry, network infrastructure for hosting the website and inventory data, software libraries and development environments and tools, services to allow customers to digitally sign contracts, customer service call center management software and automation controls and software for our vending machines. If these technologies fail or we cannot maintain our relationships with the technology providers and we cannot find suitable alternatives, our financial condition and operation results may be adversely affected.

*We depend on key personnel to operate our business, and if we are unable to retain, attract and integrate qualified personnel, our ability to develop and successfully grow our business could be harmed.*

We believe our success has depended, and continues to depend, on the efforts and talents of our executives and employees. Our future success depends on our continuing ability to attract, develop,

32

Table of Contents

motivate and retain highly qualified and skilled employees. Qualified individuals are in high demand, and we may incur significant costs to attract and retain them. In addition, the loss of any of our key employees or senior management, including our Chief Executive Officer, Ernie Garcia, III, or our Chief Financial Officer, Mark Jenkins, could materially adversely affect our ability to execute our business plan and strategy, and we may not be able to find adequate replacements on a timely basis, or at all. Our executive officers and other employees are at-will employees, which means they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. We may not be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business could be materially and adversely affected.

***The obligations associated with being a public company will require significant resources and management attention, and we will incur increased costs as a result of becoming a public company.***

As a public company, we will face increased legal, accounting, administrative and other costs and expenses that we have not incurred as a private company. We expect to incur additional costs related to operating as a public company. After the completion of this offering, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which requires that we file annual, quarterly and current reports with respect to our business and financial condition and proxy and other information statements, and the rules and regulations implemented by the SEC, the Sarbanes-Oxley Act, the Dodd-Frank Act and the Public Company Accounting Oversight Board ("PCAOB") and the listing requirements of the NYSE, each of which imposes additional reporting and other obligations on public companies. As a public company, we will be required to, among other things:

- prepare and distribute periodic reports, proxy statements and other stockholder communications in compliance with the federal securities laws and rules and the NYSE rules;

- expand the roles and duties of our Board and committees thereof and management;

- hire additional financial and accounting personnel and other experienced accounting and finance staff with the expertise to address complex accounting matters applicable to public companies;

- institute more comprehensive financial reporting and disclosure compliance procedures;

- involve and retain to a greater degree outside counsel and accountants to assist us with the activities listed above;

- enhance our investor relations function;

- establish new internal policies, including those relating to trading in our securities and disclosure controls and procedures;

- comply with the NYSE listing standards; and

- comply with the Sarbanes-Oxley Act.

We expect these rules and regulations and changes in laws, regulations and standards relating to corporate governance and public disclosure, which have created uncertainty for public companies to increase legal and financial compliance costs and make some activities more time consuming and costly. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. Our investment in compliance with existing and evolving regulatory requirements will result in increased administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities, which could have a material adverse effect on our business, financial condition and results of operations.

33

**Table of Contents**

We also expect that being a public company and being subject to new rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These increased costs may require us to divert a significant amount of money that we could otherwise use to expand our business and achieve our strategic objectives.

***We may acquire other companies or technologies, which could divert our management's attention, result in additional dilution to our stockholders and otherwise disrupt our operations and harm our operating results.***

Our success will depend, in part, on our ability to grow our business in response to the demands of consumers and other constituents within the automotive industry as well as competitive pressures. In some circumstances, we may determine to do so through the acquisition of complementary businesses and technologies rather than through internal development. The identification of suitable acquisition candidates can be difficult, time-consuming, and costly, and we may not be able to successfully complete identified acquisitions. The risks we face in connection with acquisitions include:

- diversion of management time and focus from operating our business to addressing acquisition integration challenges;

- coordination of technology, research and development and sales and marketing functions;

- transition of the acquired company's users to our website and mobile applications;

- retention of employees from the acquired company;

- cultural challenges associated with integrating employees from the acquired company into our organization;

- integration of the acquired company's accounting, management information, human resources and other administrative systems;

- the need to implement or improve controls, policies and procedures at a business that prior to the acquisition may have lacked effective controls, policies and procedures;

- potential write-offs of intangibles or other assets acquired in such transactions that may have an adverse effect our operating results;

- liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, violations of laws, commercial disputes, tax liabilities and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired company, including claims from terminated employees, consumers, former stockholders, or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and investments could cause us to fail to realize the anticipated benefits of these acquisitions or investments, cause us to incur unanticipated liabilities and otherwise harm our business. Future acquisitions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, amortization expenses, or the write-off of goodwill, any of which could harm our financial condition. Also, the anticipated benefits of any acquisitions may not materialize. Any of these risks, if realized, could materially and adversely affect our business and results of operations.

***We are, and may in the future be, subject to legal proceedings in the ordinary course of our business. If the outcomes of these proceedings are adverse to us, it could have a material adverse effect on our business, results of operations and financial condition.***

We are subject to various litigation matters from time to time, which could have a material adverse effect on our business, results of operations and financial condition. Claims arising out of actual or alleged

34

Table of Contents

violations of law could be asserted against us by individuals, either individually or through class actions, by governmental entities in civil or criminal investigations and proceedings or by other entities. These claims could be asserted under a variety of laws, including but not limited to consumer finance laws, consumer protection laws, intellectual property laws, privacy laws, labor and employment laws, securities laws and employee benefit laws. These actions could expose us to adverse publicity and to substantial monetary damages and legal defense costs, injunctive relief and criminal and civil fines and penalties, including but not limited to suspension or revocation of licenses to conduct business. See "Business — Legal Proceedings."

***Errors in our retail installment contracts with our customers may render them unenforceable.***

We enter into purchase agreements, buyer's orders, retail installment contracts and other contracts with our customers that are generated automatically based upon information the customer enters into our website. The contracts are intended to comply with the applicable consumer lending and other commercial and legal requirements of the relevant jurisdiction in which the sale is made. We face the risk, however, that the auto-generated forms may inadvertently contain errors, omissions or otherwise fail to comply with applicable regulations in a manner that would render such contracts unenforceable. For example, most jurisdictions impose a maximum interest rate cap that we can charge our customers. If we inadvertently or otherwise exceed the relevant cap, our retail installment contracts in such jurisdiction may be unenforceable, and in some instances, we may be required to pay damages or repay any financing charges previously collected. If a significant number of our retail installment contracts are rendered unenforceable, our financial condition and results of operations may be adversely affected.

## Risks Related to Our Organizational Structure

***Our principal asset after the completion of this offering will be our indirect interest in Carvana Group, and, accordingly, we will depend on distributions from Carvana Group to pay our taxes and expenses, including payments under the Tax Receivable Agreement. Carvana Group's ability to make such distributions may be subject to various limitations and restrictions.***

Upon the consummation of this offering, we will be a holding company and will have no material assets other than our indirect ownership of LLC Units of Carvana Group. As such, we will have no independent means of generating revenue or cash flow, and our ability to pay our taxes and operating expenses or declare and pay dividends in the future, if any, will be dependent upon the financial results and cash flows of Carvana Group and its subsidiaries and distributions we receive from Carvana Group. There can be no assurance that our subsidiaries will generate sufficient cash flow to distribute funds to us or that applicable state law and contractual restrictions, including negative covenants in our debt instruments, will permit such distributions.

Carvana Group will continue to be treated as a partnership for U.S. federal income tax purposes and, as such, will not be subject to any entity-level U.S. federal income tax. Instead, taxable income of Carvana Group will be allocated to the LLC Unitholders, including Carvana Sub, our wholly owned subsidiary. Accordingly, we will incur income taxes on our allocable share of any net taxable income of Carvana Group. Under the terms of the LLC Operating Agreement, Carvana Group will be obligated to make tax distributions to LLC Unitholders, including us. In addition to tax expenses, we will also incur expenses related to our operations, including payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." We intend to cause Carvana Group to make cash distributions to the owners of LLC Units in an amount sufficient to (1) fund all or part of their tax obligations in respect of taxable income allocated to them and (2) cover our operating expenses, including payments under the Tax Receivable Agreement. However, Carvana Group's ability to make such distributions may be subject to various limitations and restrictions, such as restrictions on distributions that would either violate any contract or agreement to which Carvana Group is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering Carvana Group insolvent. If

35

Table of Contents

we do not have sufficient funds to pay tax or other liabilities or to fund our operations, we may have to borrow funds, which could materially adversely affect our liquidity and financial condition and subject us to various restrictions imposed by any such lenders. To the extent that we are unable to make payments under the Tax Receivable Agreement, such payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds. See "Organizational Structure — Tax Receivable Agreement" and "Organizational Structure — Amended and Restated Operating Agreement of Carvana Group." In addition, if Carvana Group does not have sufficient funds to make distributions, our ability to declare and pay cash dividends will also be restricted or impaired. See "— Risks Related to This Offering and Ownership of Our Class A Common Stock" and "Dividend Policy."

*The Garcia Parties will continue to control us following this offering and their interests may conflict with or differ from your interests as a stockholder.*

Based on shares outstanding as of December 31, 2016, prior to this offering, the Garcia Parties beneficially owned approximately     % of the LLC Units. Immediately following this offering and the application of net proceeds therefrom, the Garcia Parties will beneficially own approximately     % of the LLC Units and are entitled to ten votes per share for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock), thereby giving the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. Because the Garcia Parties hold their economic ownership interest in our business through the LLC, rather than through the public company, the Garcia Parties may have conflicting interests with holders of shares of our Class A common stock. For example, the Garcia Parties may have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, whether and when to incur new or refinance existing indebtedness, especially in light of the existence of the Tax Receivable Agreement that we will enter into in connection with this offering, and whether and when we should terminate the Tax Receivable Agreement and accelerate the obligations thereunder. In addition, the structuring of future transactions may take into consideration these tax considerations or other considerations even where no similar benefit would accrue to us. See "Organizational Structure — Tax Receivable Agreement."

*Conflicts of interest could arise between our stockholders and the LLC Unitholders, which may impede business decisions that could benefit our stockholders.*

Holders of LLC Units have the right to consent to certain amendments to the operating agreement of the LLC, as well as to certain other matters. Holders of these voting rights may exercise them in a manner that conflicts with the interests of our stockholders. Circumstances may arise in the future when the interests of the LLC Unitholders conflict with the interests of our stockholders. As we control the LLC, we have certain obligations to the LLC Unitholders that may conflict with fiduciary duties our officers and directors owe to our stockholders. These conflicts may result in decisions that are not in the best interests of stockholders.

*Upon the listing of our shares on the NYSE, we will be a "controlled company" within the meaning of the rules of the NYSE and, as a result, will qualify for, but do not currently intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.*

Upon completion of this offering, the Garcia Parties will continue to control a majority of the combined voting power of Carvana Co. As a result, we will be a "controlled company" within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and need not comply

36

**Table of Contents**

with certain requirements, including the requirement that a majority of the Board consist of independent directors and the requirements that our compensation and nominating and governance committees be composed entirely of independent directors. Following this offering, we do not intend to utilize these exemptions. For so long as we qualify as a "controlled company," we will maintain the option to utilize some or all of these exemptions. If we utilize these exemptions, we may not have a majority of independent directors and our compensation and nominating and governance committees may not consist entirely of independent directors, and such committees will not be subject to annual performance evaluations. Accordingly, in the event we rely on these exemptions in the future, you would not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE. See "Management — Controlled Company Status."

***The Tax Receivable Agreement with the LLC Unitholders requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that the payments we will be required to make will be substantial.***

In connection with the consummation of this offering, we will enter into a Tax Receivable Agreement with the LLC Unitholders. Pursuant to the Tax Receivable Agreement, we will be required to make cash payments to such LLC Unitholders equal to 85% of the tax benefits, if any, that we actually realize, or, in some circumstances, are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of the LLC and an adjustment in the tax basis of the assets of the LLC reflected in that proportionate share as a result of any future exchanges of LLC Units held by the LLC Unitholders for shares of our Class A common stock or cash, as described under "Organizational Structure — Exchange Agreement" and (2) certain other tax benefits related to payments we make under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, which tax reporting positions will be based on the advice of our tax advisors. Any payments made by us to the LLC Unitholders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make payments under the Tax Receivable Agreement, such payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that may be deemed realized under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are also not conditioned upon the LLC Unitholders maintaining a continued ownership interest in the LLC. See "Organizational Structure — Tax Receivable Agreement."

The actual amount and timing of any payments under the Tax Receivable Agreement will vary depending upon a number of factors, including the timing of exchanges by the LLC Unitholders, the amount of gain recognized by such LLC Unitholders, the amount and timing of the taxable income we generate in the future and the federal tax rates then applicable.

***The amounts that we may be required to pay to the LLC Unitholders under the Tax Receivable Agreement may be accelerated in certain circumstances and may also significantly exceed the actual tax benefits that we ultimately realize.***

The Tax Receivable Agreement provides that if (1) certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, (2) we materially breach any of our material obligations under the Tax Receivable Agreement or (3) that if, at any time, we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our

37

Table of Contents

obligations, or our successor's obligations, to make payments under the Tax Receivable Agreement would accelerate and become immediately due and payable. The amount due and payable in that circumstance is based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. See "Organizational Structure — Tax Receivable Agreement." We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

As a result of a change in control or our election to terminate the Tax Receivable Agreement early, (1) we could be required to make cash payments to the LLC Unitholders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement and (2) we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

***Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the LLC Unitholders that will not benefit Class A common stockholders to the same extent as they will benefit the LLC Unitholders.***

Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the LLC Unitholders that will not benefit the holders of our Class A common stock to the same extent. We will enter into a Tax Receivable Agreement with the LLC Unitholders, which will provide for the payment by us to the LLC Unitholders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of the LLC and an adjustment in the tax basis of the assets of the LLC reflected in that proportionate share as a result of any future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash, as described under "Organizational Structure — Exchange Agreement" and (2) certain other tax benefits related to our making payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. See "Organizational Structure — Tax Receivable Agreement." Although we will retain 15% of the amount of such tax benefits, this and other aspects of our organizational structure may adversely impact the future trading market for the Class A common stock.

***We will not be reimbursed for any payments made to the LLC Unitholders under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

We will not be reimbursed for any cash payments previously made to the LLC Unitholders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to an LLC Unitholder will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement and, as a result, there may not be future cash payments to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax

38

Table of Contents

Receivable Agreement that are substantially greater than our actual cash tax savings. See "Organizational Structure — Tax Receivable Agreement."

***We may not be able to realize all or a portion of the tax benefits that are currently expected to result from future exchanges of LLC Units for our Class A common stock, the utilization of certain tax attributes previously held by Carvana Group and from payments made under the Tax Receivable Agreement.***

Our ability to realize the tax benefits that we currently expect to be available as a result of the increases in tax basis created by any future exchanges of LLC Units (together with shares of our Class B common stock in the case of Class A Units) for our Class A common stock and by the payments made pursuant to the Tax Receivable Agreement, and our ability to utilize the pre-offering net operating losses of Carvana Group and the interest deductions imputed under the Tax Receivable Agreement all depend on a number of assumptions, including that we earn sufficient taxable income each year during the period over which such deductions are available and that there are no adverse changes in applicable law or regulations. If our actual taxable income were insufficient or there were adverse changes in applicable law or regulations, we may be unable to realize all or a portion of these expected benefits and our cash flows and stockholders' equity could be negatively affected. See "Organizational Structure — Tax Receivable Agreement."

***In certain circumstances, Carvana Group will be required to make distributions to us and the LLC Unitholders and the distributions may be substantial.***

Carvana Group will be treated as a partnership for U.S. federal income tax purposes and, as such, will not be subject to U.S. federal income tax. Instead, taxable income will be allocated to its members, including us. We intend to cause Carvana Group to make tax distributions quarterly to the holders of Class A Units on a pro rata basis based on Carvana Group's net taxable income and to the holders of Class B Units based on such holder's allocable share of Carvana Group's net taxable income (rather than on a pro rata basis). Funds used by Carvana Group to satisfy its tax distribution obligations will not be available for reinvestment in our business. Moreover, these tax distributions may be substantial, and will likely exceed (as a percentage of Carvana Group's income) the overall effective tax rate applicable to a similarly situated corporate taxpayer. As a result of the potential differences in the amount of net taxable income allocable to us and the LLC Unitholders, it is possible that we will receive distributions significantly in excess of our tax liabilities and obligations to make payments under the Tax Receivable Agreement. To the extent we do not distribute such cash balances as dividends on our Class A common stock and instead, for example, hold such cash balances or lend them to Carvana Group, the LLC Unitholders would benefit from any value attributable to such accumulated cash balances as a result of its ownership of Class A common stock following an exchange of its LLC Units (including any exchange upon an acquisition of us). See "Dividend Policy."

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our operating results and financial condition.***

We are subject to income taxes in the United States, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- expiration of, or detrimental changes in, research and development tax credit laws; or

- changes in tax laws, regulations or interpretations thereof.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. Outcomes from these audits could have an adverse effect on our operating results and financial condition.

39

Table of Contents

*If we were deemed to be an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations.*

Under Sections 3(a)(1)(A) and (C) of the 1940 Act, a company generally will be deemed to be an "investment company" for purposes of the 1940 Act if it (1) is, or holds itself out as being, engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities or (2) is engaged, or proposes to engage, in the business of investing, reinvesting, owning, holding or trading in securities and it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We do not believe that we are an "investment company," as such term is defined in either of those sections of the 1940 Act.

As the sole managing-member of Carvana Sub, we will control and manage Carvana Sub, which, by virtue of being the sole managing-member of Carvana Group, will, in turn, control and manage Carvana Group. On that basis, we believe that neither our interest in Carvana Sub nor Carvana Sub's interest in Carvana Group are "investment securities" under the 1940 Act. Therefore, we have less than 40% of the value of our total assets (exclusive of U.S. government securities and cash items) in "investment securities." However, if we were to lose the right to manage and control Carvana Sub or if Carvana Sub were to lose the right to manage and control Carvana Group, interests in Carvana Group or Carvana Sub could be deemed to be "investment securities" under the 1940 Act.

We intend to conduct our operations so that we will not be deemed to be an investment company. However, if we were deemed to be an investment company, restrictions imposed by the 1940 Act, including limitations on our capital structure and our ability to transact with affiliates, could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business, financial condition and results of operations.

## Risks Related to Our Liquidity

*Our substantial indebtedness could adversely affect our financial flexibility and our competitive position and prevent us from fulfilling our obligations under our credit agreement.*

As of December 31, 2016, we had, on a consolidated basis, $170.8 million aggregate principal amount of outstanding indebtedness represented by our vehicle inventory financing and security agreement dated as of December 30, 2015 and amended on November 9, 2016 and February 10, 2017 (as amended, the "Floor Plan Facility") between us and Ally Bank and promissory note agreements as of various dates in 2016 between us and third party providers of equipment financing. Additionally, we may borrow up to an aggregate of $50.0 million under the Verde Credit Facility under which $        was drawn as of        .

Our substantial indebtedness could have significant effects on our business. For example, it could:

- make it more difficult for us to satisfy our obligations with respect to our current and future indebtedness, including our Floor Plan Facility;

- increase our vulnerability to adverse changes in prevailing economic, industry and competitive conditions;

- require us to dedicate a substantial portion of our cash flow from operations to make payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions, the execution of our business strategy and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- increase our cost of borrowing;

40

Table of Contents

- restrict us from exploiting business opportunities;

- place us at a disadvantage compared to our competitors that have fewer debt obligations; and

- limit our ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy and other general corporate purposes.

We expect to use cash flow from operations to meet current and future financial obligations, including funding our operations, debt service requirements and capital expenditures. The ability to make these payments depends on our financial and operating performance, which is subject to prevailing economic, industry and competitive conditions and to certain financial, business, economic and other factors beyond our control.

*Despite current indebtedness levels, we may incur substantially more indebtedness, which could further exacerbate the risks associated with our substantial indebtedness.*

We may incur significant additional indebtedness in the future. We may also consider investments in joint ventures or acquisitions, which may increase our indebtedness. If new debt is added to our currently anticipated indebtedness levels, the related risks that we face could intensify.

*We may not be able to generate sufficient cash flow to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under such indebtedness, which may not be successful.*

Our ability to make scheduled payments or to refinance outstanding debt obligations depends on our financial and operating performance, which will be affected by prevailing economic, industry and competitive conditions and by financial, business and other factors beyond our control. We may not be able to maintain a sufficient level of cash flow from operating activities to permit us to pay the principal, premium, if any, and interest on the our indebtedness. Any failure to make payments of interest and principal on our outstanding indebtedness on a timely basis would likely result in a reduction of our credit rating, which would also adversely affect our ability to incur additional indebtedness.

We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all. If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or seek to restructure or refinance our indebtedness. Any refinancing of our indebtedness could be at higher interest rates and may require us to comply with more onerous covenants. These alternative measures may not be successful, and we may be unable to meet our scheduled debt service obligations.

In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to sell material assets or operations to attempt to meet our debt service obligations. We may not be able to consummate these asset sales to raise capital or sell assets at prices and on terms that we believe are fair and any proceeds that we do receive may not be adequate to meet any debt service obligations then due. If we cannot meet our debt service obligations, the holders of our indebtedness may accelerate such indebtedness and, to the extent such indebtedness is secured, foreclose on our assets. In such an event, we may not have sufficient assets to repay our indebtedness. If any of these risks are realized, our business and financial condition would be adversely affected.

### Risks Related to This Offering and Ownership of our Class A Common Stock

*The Garcia Parties control us and will continue to control us following this offering and their interests may conflict with ours or yours in the future.*

Immediately following this offering of Class A common stock, the Garcia Parties will not hold any of our Class A common stock, but will together hold approximately    % of the voting power of our outstanding capital stock through their beneficial ownership of our Class B common stock. The Garcia Parties are

41

Table of Contents

entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Our Class A common stock, which is the stock we are selling in this offering, will have one vote per share. So long as the Garcia Parties continue to beneficially own a sufficient number of shares of Class B common stock, even if they beneficially own significantly less than 50% of the shares of our outstanding capital stock, the Garcia Parties will continue to be able to effectively control our decisions. For example, if the Garcia Parties hold Class B common stock amounting to 25% of our outstanding capital stock, they would collectively control     % of the voting power of our capital stock.

As a result, the Garcia Parties will have the ability to elect all of the members of our Board and thereby control our policies and operations, including the appointment of management, future issuances of our Class A common stock or other securities, the payment of dividends, if any, on our Class A common stock, the incurrence of debt by us, amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions, and the interests of the Garcia Parties may not in all cases be aligned with your interests.

In addition, the Garcia Parties will be able to determine the outcome of all matters requiring stockholder approval and will be able to cause or prevent a change of control of our company or a change in the composition of our Board and could preclude any acquisition of our company. This concentration of voting control could deprive you of an opportunity to receive a premium for your shares of Class A common stock as part of a sale of our company and ultimately might affect the market price of our Class A common stock.

In addition, the Garcia Parties may have an interest in pursuing acquisitions, divestitures and other transactions that, in their judgment, could enhance their investment, even though such transactions might involve risks to you. For example, the Garcia Parties could cause us to make acquisitions that increase our indebtedness or cause us to sell revenue-generating assets. The Garcia Parties may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. One of the Garcia Parties, Ernest Garcia, II, is the chairman of the board of directors and largest shareholder of DriveTime, which could compete more directly with us in the future. In particular, DriveTime is currently in the process of evaluating strategic alternatives, including the potential sale of the company to interested third parties. If such a sale is completed, it may be more likely that DriveTime determines to compete with us to a greater extent than presently. Furthermore, there can be no assurances that DriveTime will enter into any new agreements or arrangements, or extensions or renewals of existing agreements or arrangements, with us on the same or similar terms or at all. Our amended and restated certificate of incorporation will provide that none of the Garcia Parties or any director who is not employed by us (including any non-employee director who serves as one of our officers in both his or her director and officer capacities) or his or her affiliates will have any duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. The Garcia Parties also may pursue acquisition opportunities that may otherwise be complementary to our business, and, as a result, those acquisition opportunities may not be available to us.

For a description of the dual class structure, see the section "Description of Capital Stock."

### *You will suffer immediate and substantial dilution in the net tangible book value of the Class A common stock you purchase.*

The price you pay for shares of our Class A common stock sold in this offering is substantially higher than our pro forma net tangible book value per share. Based on the initial public offering price for our Class A common stock of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus, you will incur immediate dilution in net tangible book value per share of $          . Dilution is the difference between the offering price per share and the pro forma as adjusted net tangible book value per share of our Class A common stock immediately after the offering.

42

Table of Contents

As a result of this dilution, investors purchasing stock in this offering may receive significantly less than the full purchase price that they paid for the stock purchased in this offering in the event of liquidation. See ''Dilution.''

**You may be diluted by future issuances of additional Class A common stock or LLC Units in connection with our incentive plans, acquisitions or otherwise; future sales of such shares in the public market, or the expectations that such sales may occur, could lower our stock price.**

Our amended and restated certificate of incorporation will authorize us to issue shares of our Class A common stock and options, rights, warrants and appreciation rights relating to our Class A common stock for the consideration of and on the terms and conditions established by our Board in its sole discretion, whether in connection with acquisitions or otherwise. The LLC Operating Agreement also authorizes Carvana Group to issue additional LLC Units whether in connection with an acquisition or otherwise. The LLC Unitholders may, at any time following the expiration of the lock-up period under the lock-up agreements, require Carvana Group to redeem all or a portion of their LLC Units in exchange for, at our election, (1) a cash payment by Carvana Group or (2) newly issued shares of Class A common stock, in each case in accordance with the terms and conditions of the Exchange Agreement. See "Organizational Structure — Exchange Agreement." The market price of shares of our Class A common stock could decline as a result of these exchanges or the perception that an exchange could occur. These exchanges, or the possibility that these exchanges may occur, also might make it more difficult for holders of our Class A common stock to sell such stock in the future at a time and at a price that they deem appropriate.

We have reserved          shares of Class A common stock for issuance under our 2017 Incentive Plan, and we will grant an aggregate of          restricted shares of Class A common stock to certain employees upon completion of this offering and options to purchase          shares of Class A common stock to certain directors and employees upon pricing of this offering with an exercise price set at the initial public offering price, in each case assuming an initial public offering price of $          per shares, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus. Any Class A common stock that we issue, including under our 2017 Incentive Plan or other equity incentive plans that we may adopt in the future, would dilute the percentage ownership held by the investors who purchase Class A common stock in this offering.

We and our officers and directors and certain LLC Unitholders, subject to certain exceptions, will agree that, without the prior written consent of Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., on behalf of the underwriters, we and they will not, during the period ending 180 days after the date of this prospectus (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of Class A common stock or any securities convertible into or exercisable or exchangeable for shares of Class A common stock; or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of Class A common stock, subject to certain exceptions. Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., in their sole discretion, may release the Class A common stock and other securities subject to the lock-up agreements described above in whole or in part at any time with or without notice. See ''Underwriting.''

The market price of our Class A common stock may decline significantly when the restrictions on resale by our existing stockholders lapse. A decline in the price of our Class A common stock might impede our ability to raise capital through the issuance of additional shares of Class A common stock or other equity securities.

Pursuant to the LLC Operating Agreement, we may elect to issue shares of Class A common stock to fund a redemption of LLC Units for cash. Any sales in connection with exchange rights, or the prospect of any such sales, could materially impact the market price of our Class A common stock and could impair our ability to raise capital through future sales of equity securities. For a further description of the exchange rights, see ''Organizational Structure — Exchange Agreement.''

43

Table of Contents

In connection with the completion of this offering, we intend to enter into a Registration Rights Agreement with certain LLC Unitholders. Any sales in connection with the Registration Rights Agreement, or the prospect of any such sales, could materially impact the market price of our Class A common stock and could impair our ability to raise capital through future sales of equity securities. For a further description of our Registration Rights Agreement, see ''Certain Relationships and Related Party Transactions —Registration Rights Agreement.''

***Our Class A common stock price may be volatile or may decline regardless of our operating performance and you may not be able to resell your shares at or above the initial public offering price.***

Prior to this offering, there has not been a public trading market for shares of our Class A common stock. It is possible that after this offering an active trading market will not develop or continue or, if developed, that any market will be sustained, which could make it difficult for you to sell your shares of Class A common stock at an attractive price or at all. The initial public offering price of our Class A common stock will be determined by negotiations between us and the representatives of the underwriters based upon a number of factors and may not be indicative of prices that will prevail in the open market following the consummation of this offering. See ''Underwriting.'' Consequently, you may not be able to sell our shares of Class A common stock at prices equal to or greater than the price you paid in this offering.

Volatility in the market price of our Class A common stock may prevent you from being able to sell your shares at or above the price you paid for them. Many factors, which are outside our control, may cause the market price of our Class A common stock to fluctuate significantly, including those described elsewhere in this ''Risk Factors'' section and this prospectus, as well as the following:

- our operating and financial performance and prospects;
- our quarterly or annual earnings or those of other companies in our industry compared to market expectations;
- future announcements concerning our business or our competitors' businesses;
- the public's reaction to our press releases, other public announcements and filings with the SEC;
- the size of our public float;
- coverage by or changes in financial estimates by securities analysts or failure to meet their expectations;
- market and industry perception of our success, or lack thereof, in pursuing our growth strategy;
- strategic actions by us or our competitors, such as acquisitions or restructurings;
- changes in laws or regulations which adversely affect our industry or us;
- changes in accounting standards, policies, guidance, interpretations or principles;
- changes in senior management or key personnel;
- issuances, exchanges or sales, or expected issuances, exchanges or sales of our capital stock;
- adverse resolution of new or pending litigation against us; and
- changes in general market, economic and political conditions in the United States and global economies or financial markets, including those resulting from natural disasters, terrorist attacks, acts of war and responses to such events.

As a result, volatility in the market price of our Class A common stock may prevent investors from being able to sell their Class A common stock at or above the initial public offering price or at all. These broad market and industry factors may materially reduce the market price of our Class A common stock, regardless of our operating performance. In addition, price volatility may be greater if the public float and trading volume of our Class A common stock is low. As a result, you may suffer a loss on your investment.

Table of Contents

***Substantial blocks of our total outstanding shares may be sold into the market when "lock-up" or "market standoff" periods end. If there are substantial sales of shares of our Class A common stock, the price of our Class A common stock could decline.***

The price of our Class A common stock could decline if there are substantial sales of our Class A common stock, particularly sales by our directors, executive officers, and significant stockholders, or if there is a large number of shares of our Class A common stock available for sale. After this offering, we will have outstanding          shares of our Class A common stock, based on the number of shares outstanding as of December 31, 2016. All of the shares of Class A common stock sold in this offering will be available for sale in the public market. Substantially all of our outstanding shares of Class A common stock are currently restricted from resale as a result of market standoff and "lock-up" agreements, as more fully described in "Shares Eligible for Future Sale." These shares will become available to be sold 181 days after the date of this prospectus. Shares held by directors, executive officers and other affiliates will be subject to volume limitations under Rule 144 under the Securities Act of 1933, as amended, or the Securities Act, and various vesting agreements.

After our initial public offering, certain of our LLC Unitholders will have rights, subject to some conditions, to require us to file registration statements covering Class A common stock issuable to them upon exchange of their LLC Units. We would be required to include Class A common shares in registration statements that we may file for ourselves or our stockholders, subject to market standoff and lockup agreements. We also intend to register shares of common stock that we have issued and may issue under our employee equity incentive plans. Once we register these shares, they will be able to be sold freely in the public market upon issuance, subject to existing market standoff or lock-up agreements.

Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. may, in their sole discretion, permit our stockholders to sell shares prior to the expiration of the restrictive provisions contained in those lock-up agreements.

The market price of the shares of our Class A common stock could decline as a result of the sale of a substantial number of our shares of Class A common stock in the public market or the perception in the market that the holders of a large number of such shares intend to sell their shares.

***We do not intend to pay dividends on our Class A common stock for the foreseeable future.***

We currently have no intention to pay dividends on our Class A common stock at any time in the foreseeable future. Any decision to declare and pay dividends in the future will be made at the discretion of our Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that our Board may deem relevant. Certain of our debt instruments contain covenants that restrict the ability of our subsidiaries to pay dividends to us. In addition, despite our current indebtedness, we may still be able to incur additional debt in the future, and such indebtedness may restrict or prevent us from paying dividends on our Class A common stock. Furthermore, our ability to declare and pay dividends may be limited by instruments governing future indebtedness we may incur.

***Delaware law and certain provisions in our certificate of incorporation may prevent efforts by our stockholders to change the direction or management of our company.***

We are a Delaware corporation, and the anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change of control would be beneficial to our existing stockholders. In addition, our certificate of incorporation and our amended and restated by-laws contain provisions that may make the acquisition of our company more difficult without the approval of our Board, including, but not limited to, the following:

- the Garcia Parties are entitled to ten votes for each share of our Class B common stock they hold of record on all matters submitted to a vote of stockholders for so long as the Garcia Parties maintain

45

Table of Contents

direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock);

• at such time as there are no outstanding shares of Class B common stock, only our Board may call special meetings of our stockholders;

• we have authorized undesignated preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval; and

• we require advance notice and duration of ownership requirements for stockholder proposals.

Our amended and restated certificate of incorporation also contains a provision that provides us with protections similar to Section 203 of the Delaware General Corporation Law (the "DGCL"), and will prevent us from engaging in a business combination with a person (excluding the Garcia Parties and their transferees) who acquires at least 15% of our common stock for a period of three years from the date such person acquired such common stock, unless board or stockholder approval is obtained prior to the acquisition. See "Description of Capital Stock — Anti-Takeover Provisions." These provisions could discourage, delay or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and cause us to take other corporate actions you desire, including actions that you may deem advantageous, or negatively affect the trading price of our Class A common stock. In addition, because our Board is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace current members of our management team.

These and other provisions in our certificate of incorporation, bylaws and Delaware law could make it more difficult for stockholders or potential acquirers to obtain control of our Board or initiate actions that are opposed by our then-current Board, including delay or impede a merger, tender offer or proxy contest involving our company. The existence of these provisions could negatively affect the price of our common stock and limit opportunities for you to realize value in a corporate transaction.

For information regarding these and other provisions, see "Description of Capital Stock."

***Our certificate of incorporation will provide, subject to certain exceptions, that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.***

Pursuant to our certificate of incorporation, as will be in effect upon the completion of this offering, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action asserting a claim against us arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against us that is governed by the internal affairs doctrine. The forum selection clause in our certificate may have the effect of discouraging lawsuits against us or our directors and officers and may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us.

***We may issue shares of preferred stock in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our Class A common stock, which could depress the price of our Class A common stock.***

Our certificate of incorporation will authorize us to issue one or more series of preferred stock. Our Board will have the authority to determine the preferences, limitations and relative rights of the shares of preferred stock and to fix the number of shares constituting any series and the designation of such series,

46

**Table of Contents**

without any further vote or action by our stockholders. Our preferred stock could be issued with voting, liquidation, dividend and other rights superior to the rights of our Class A common stock. The potential issuance of preferred stock may delay or prevent a change in control of us, discouraging bids for our Class A common stock at a premium to the market price, and materially adversely affect the market price and the voting and other rights of the holders of our Class A common stock.

***For as long as we are an emerging growth company, we will not be required to comply with certain reporting requirements, including those relating to auditor attestation requirements and disclosure about our executive compensation, that apply to other public companies.***

We are an ''emerging growth company,'' as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not ''emerging growth companies,'' including, but not limited to, (1) not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, (2) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements and (3) exemptions from the requirements of holding a non-binding advisory vote on executive compensation and of shareholder approval of any golden parachute payments not previously approved. We have elected to adopt these reduced disclosure requirements. We cannot predict if investors will find our Class A common stock less attractive as a result of our taking advantage of these exemptions and as a result, there may be a less active trading market for our Class A common stock and our stock price may be more volatile.

We will remain an ''emerging growth company'' for up to five years or until the earliest of (a) the last day of the first fiscal year in which our annual gross revenue exceeds $1 billion, (b) the date that we become a ''large accelerated filer'' as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most-recently completed second fiscal quarter and (c) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the preceding three-year period.

***As a public reporting company, we will be subject to rules and regulations established from time to time by the SEC regarding our internal control over financial reporting. If we fail to remediate material weaknesses in our internal control over financial reporting or otherwise establish and maintain effective internal control over financial reporting and disclosure controls and procedures, we may not be able to accurately report our financial results, or report them in a timely manner.***

Upon completion of this offering, we will become a public reporting company subject to the rules and regulations established from time to time by the SEC and the NYSE. These rules and regulations will require that, among other things, we establish and periodically evaluate procedures with respect to our internal control over financial reporting. Reporting obligations as a public company are likely to place a considerable strain on our financial and management systems, processes and controls, as well as on our personnel. Our management team, including our Chief Executive Officer and Chief Financial Officer, has limited experience managing a publicly traded company, and limited experience complying with the increasingly complex and changing laws pertaining to public companies.

In addition, as a public company we will be required to document and test our internal control over financial reporting pursuant to Section 404 of the 'Sarbanes-Oxley Act so that our management can certify as to the effectiveness of our internal control over financial reporting by the time our second annual report is filed with the SEC and thereafter, which will require us to document and make significant changes to our internal control over financial reporting. Likewise, our independent registered public accounting firm will be engaged to provide an attestation report on the effectiveness of our internal control over financial reporting at such time as we cease to be an ''emerging growth company,'' as defined in the JOBS Act.

If our senior management is unable to conclude that we have effective internal control over financial reporting, or to certify the effectiveness of such controls, or if our independent registered public accounting firm cannot render an unqualified opinion on management's assessment and the effectiveness of our

47

Table of Contents

internal control over financial reporting, when required, or if material weaknesses in our internal control over financial reporting is identified, we could be subject to regulatory scrutiny, a loss of public and investor confidence, and to litigation from investors and stockholders, which could have a material adverse effect on our business and our stock price. In addition, if we do not maintain adequate financial and management personnel, processes and controls, we may not be able to manage our business effectively or accurately report our financial performance on a timely basis, which could cause a decline in our common stock price and adversely affect our results of operations and financial condition.

### *An active trading market for our Class A common stock may never develop or be sustained.*

Although we have applied to list the shares of our Class A common stock for trading on the NYSE, an active trading market for our Class A common stock may not develop on that exchange or elsewhere or, if developed, that market may not be sustained. Accordingly, if an active trading market for our Class A common stock does not develop or is not maintained, the liquidity of our Class A common stock, your ability to sell your shares of our Class A common stock when desired and the prices that you may obtain for your shares of Class A common stock will be adversely affected.

### *We will have broad discretion in the use of net proceeds from this offering.*

We intend to contribute the net proceeds from this offering to our wholly owned subsidiary, Carvana Sub, that will in turn acquire newly-issued LLC Units in Carvana Group at a purchase price per LLC Unit equal to the initial offering price per share of Class A common stock in this offering less underwriting discounts and commissions. In turn, Carvana Group intends to apply the net proceeds it receives from us to repay all outstanding borrowings under the Verde Credit Facility, to pay expenses incurred in connection with the Organizational Transactions and for general corporate purposes. Our management will have broad discretion over the use and investment of the net proceeds of this offering, and accordingly, investors in this offering will need to rely upon the judgment of our management with respect to the use of proceeds with only limited information concerning management's specific intentions. See "Use of Proceeds."

### *If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. We do not currently have and may never obtain research coverage by securities and industry analysts. If no securities or industry analysts commence coverage of our company, the trading price for our stock would be negatively impacted. If we obtain securities or industry analyst coverage and if one or more of the analysts who covers us downgrades our stock or publishes inaccurate or unfavorable research about our business, our stock price would likely decline. If we fail to meet the expectations of analysts for our operating results, our stock price would likely decline. If one or more of these analysts ceases coverage of us or fails to publish reports on us regularly, demand for our stock could decrease, which could cause our stock price and trading volume to decline.

Table of Contents

## FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe," "may," "will," "should," "can have," "likely" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events. For example, all statements we make relating to our estimated and projected costs, expenditures, cash flows, growth rates and financial results, our plans and objectives for future operations, growth or initiatives, strategies or the expected outcome or impact of pending or threatened litigation are forward-looking statements. All forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we expected, including:

- our history of losses and ability to maintain profitability in the future;
- our ability to effectively manage our rapid growth;
- our limited operating history;
- the seasonal and other fluctuations in our quarterly operating results;
- our relationship with DriveTime;
- our management's accounting judgments and estimates, as well as changes to accounting policies;
- our ability to compete in the highly competitive industry in which we participate;
- the changes in prices of new and used vehicles
- our ability to acquire desirable inventory;
- our ability to sell our inventory expeditiously;
- our ability to sell and generate gains on the sale of automotive finance receivables;
- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;
- our reliance on potentially fraudulent credit data for the automotive finance receivables we sell;
- our ability to successfully market and brand our business;
- our reliance on Internet searches to drive traffic to our website;
- our ability to comply with the laws and regulations to which we are subject;
- the changes in laws and regulations to which we are subject;
- our ability to comply with the TCPA;
- the evolution of regulation of the Internet and eCommerce;
- our ability to maintain reputational integrity and enhance our brand;
- our ability to grow complementary product and service offerings;
- our ability to address the shift to mobile device technology by our customers;
- risks related to the larger automotive ecosystem;
- the geographic concentration where we provide services;

49

Table of Contents

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the third parties that finance our vehicle inventory purchases;

- the representations we make in our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, fulfillment centers and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to protect the personal information and other data that we collect, process and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the costs associated with becoming a public company;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the legal proceedings to which we may be subject in the ordinary course of business;

- potential errors in our retail installment contracts with our customers that could render them unenforceable; and

- other factors disclosed in the section entitled "Risk Factors" and elsewhere in this prospectus.

We derive many of our forward-looking statements from our operating budgets and forecasts, which are based on many detailed assumptions. While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual results. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus. All written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by these cautionary statements as well as other cautionary statements that are made from time to time in our other SEC filings and public communications. You should evaluate all forward-looking statements made in this prospectus in the context of these risks and uncertainties.

We caution you that the important factors referenced above may not contain all of the factors that are important to you. In addition, we cannot assure you that we will realize the results or developments we expect or anticipate or, even if substantially realized, that they will result in the consequences or affect us or our operations in the way we expect. The forward-looking statements included in this prospectus are made only as of the date hereof. We undertake no obligation to update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law.

Table of Contents

**USE OF PROCEEDS**

We estimate, based upon an assumed initial public offering price of $         per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), we will receive net proceeds from this offering of approximately $          million (or $          million if the underwriters exercise their option in full to purchase additional shares of Class A common stock), after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

We intend to contribute such net proceeds to our wholly owned subsidiary, Carvana Sub, that will in turn use such net proceeds as follows:

• $         million to acquire         newly-issued LLC Units (or         LLC Units if the underwriters exercise their option in full to purchase additional shares of Class A common stock) in Carvana Group at a purchase price per LLC Unit equal to          the initial public offering price per share of Class A common stock in this offering, less underwriting discounts and commissions. In turn, Carvana Group intends to:

• repay all outstanding borrowings under the Verde Credit Facility, under which $         million was outstanding as of         , 2017, and which has a current interest rate of 12.0% per annum and matures in August 2018 (borrowings under the Verde Credit Facility were used to fund working capital on a short term basis);

• pay an estimated $         million of expenses incurred in connection with the Organizational Transactions; and

• use the remaining proceeds for general corporate purposes.

Pending use of the net proceeds from this offering described above, we may invest the net proceeds in short- and intermediate-term interest-bearing obligations, investment-grade instruments, certificates of deposit or direct or guaranteed obligations of the United States government.

Assuming no exercise of the underwriters' option to purchase additional shares, each $1.00 increase or decrease in the assumed initial public offering price of $         per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) would increase or decrease the net proceeds to us from this offering by approximately $         million, assuming the number of shares offered, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

Each 1,000,000 increase or decrease in the number of shares offered in this offering would increase or decrease the net proceeds to us from this offering by approximately $         million, assuming that the initial public offering price per share for the offering remains at $         (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

51

Table of Contents

**DIVIDEND POLICY**

We currently intend to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness and, therefore, we do not anticipate paying any cash dividends in the foreseeable future. Additionally, because we are a holding company, our ability to pay dividends on our Class A common stock may be limited by restrictions on the ability of our subsidiaries to pay dividends or make distributions to us. Any future determination to pay dividends will be at the discretion of our Board, subject to compliance with covenants in current and future agreements governing our and our subsidiaries' indebtedness, and will depend on our results of operations, financial condition, capital requirements and other factors that our Board deems relevant.

52

Table of Contents

Table of Contents

# CAPITALIZATION

The following table describes our cash and cash equivalents and consolidated capitalization as of December 31, 2016:

- of Carvana Group on an actual basis; and

- of Carvana Co. on a pro forma as adjusted basis, after giving effect to the Organizational Transactions, including our sale of        shares of class A common stock in this offering at an assumed initial public offering price of $        per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us and repayment of all outstanding borrowings under the Verde Credit Facility.

You should read this table in conjunction with the consolidated financial statements and the related notes, ''Use of Proceeds,'' ''Organizational Structure,'' ''Unaudited Pro Forma Consolidated Financial Data'' and ''Management's Discussion and Analysis of Financial Condition and Results of Operations'' included elsewhere in this prospectus.

| | As of December 31, 2016 | |
| --- | --- | --- |
| | Historical Carvana Group | Pro Forma As Adjusted |
| | (dollars in millions, except per share data) | |
| Cash and cash equivalents [1] | $    39.2 | $ |
| Indebtedness: | | |
| Notes payable | $     5.5 | $ |
| Floor Plan Facility [2] | 165.3 | |
| Verde Credit Facility [1] | — | |
| Total indebtedness | 170.8 | |
| Temporary equity — Class C redeemable preferred units [3] | 251.0 | |
| Total equity: | | |
| Members' deficit | (116.0) | |
| Class A common stock, $0.001 par value per share,        million shares authorized;        million shares issued and outstanding, on an actual basis;        shares authorized, on a pro forma as adjusted basis;        shares issued and outstanding, on a pro forma as adjusted basis | — | |
| Class B common stock, $0.001 par value per share,        million shares authorized;        million shares issued and outstanding, on an actual basis;        shares authorized, on a pro forma as adjusted basis;        shares issued and outstanding, on a pro forma as adjusted basis | — | |
| Additional paid-in-capital | — | |
| Retained earnings (deficit) | — | |
| Members'/ stockholders' equity (deficit) | (116.0) | |
| Non-controlling interests [4] | — | |
| Total members'/ stockholders' equity (deficit) | (116.0) | |
| Total capitalization | $   305.8 | $ |

53

Table of Contents

(1)     On February 27, 2017, we entered into the Verde Credit Facility with aggregate borrowing availability up to $50.0 million. Amounts borrowed and repaid under the agreement cannot be reborrowed. The Verde Credit Facility bears interest at a rate of 12% and is scheduled to mature in August 2018. The Verde Credit Facility will be repaid entirely with the proceeds of this offering.

Pro forma as adjusted cash and cash equivalents assumes the repayment of $          which is outstanding under the Verde Credit Facility as of               , 2017. An increase in the amount outstanding under the Verde Credit Facility will result in a decrease in the amount of cash and cash equivalents as of the closing of this offering.

(2)     Our Floor Plan Facility provides for aggregate borrowings of up to $200.0 million. As of December 31, 2016, approximately $165.3 million was outstanding under the Floor Plan Facility and $34.7 million of borrowing capacity remained available (reflecting an aggregate total commitment of $200.0 million). See "Description of Certain Indebtedness — Floor Plan Facility."

(3)     In connection with the Organizational Transactions, the holders of Class C redeemable preferred units (the "Class C Preferred Units") will exchange Class C Preferred Units for Class A common units ("Class A Units") of Carvana Group. As the Class C Preferred Units are redeemable on a one-to-one basis into Class A units, we classify them as temporary equity.

(4)     On a pro forma basis, includes the Carvana Group interests not owned by our wholly owned subsidiary, Carvana Sub, which represents          % of Carvana Group's LLC Units. The LLC Unitholders will hold the non-controlling economic interest in Carvana Group. Carvana Co. will hold     % of the economic interest in Carvana Group.

A $1.00 increase or decrease in the assumed initial public offering price of $          per share (which is the midpoint of the price range set forth on the cover page of this prospectus) would increase or decrease each of cash and cash equivalents, additional paid-in capital, total stockholders' equity and total capitalization on a pro forma basis by approximately $          million, assuming the number of shares offered, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

Each 1,000,000 increase or decrease in the number of shares of Class A common stock offered in this offering would increase or decrease each of cash and cash equivalents, additional paid-in capital, total stockholders' equity and total capitalization on a pro forma basis by approximately $          million, based on an assumed initial public offering price of $          per share (which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus) and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

The number of shares of our Class A common stock to be outstanding after the completion of this offering excludes          shares of Class A common stock reserved for future issuance,          restricted shares of Class A common stock to be issued to certain employees upon the completion of this offering and options to purchase an aggregate of          shares of common stock to be issued to approximately          employees upon the pricing of this offering, with an exercise price set at the initial public offering price, in each case under our 2017 Incentive Plan and assuming an initial public offering price of $          per shares, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus.

54

Table of Contents

**DILUTION**

Because the LLC Unitholders do not own any Class A common stock or other economic interests in Carvana Co., we have presented dilution in pro forma net tangible book value per share assuming that all of the LLC Unitholders (other than Carvana Sub) had their LLC Units redeemed or exchanged for newly-issued shares of Class A common stock rather than for cash (based upon an assumed offering price of $        per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) and the cancellation for no consideration of all of their shares of Class B common stock (which are not entitled to receive distributions or dividends, whether cash or stock from Carvana Co.) in order to more meaningfully present the dilutive impact to the investors in this offering. We refer to the assumed redemption or exchange of all LLC Units for shares of Class A common stock as described in the previous sentence as the "Assumed Redemption."

Dilution results from the fact that the initial public offering price per share of the Class A common stock is substantially in excess of the pro forma net tangible book value per share of Class A common stock after this offering. Net tangible book value per share represents the amount of our total tangible assets less total liabilities, divided by the number of shares of Class A common stock outstanding. If you invest in our Class A common stock, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share of our Class A common stock and the pro forma net tangible book value per share of our Class A common stock after this offering

Pro forma net tangible book value per share is determined at any date by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of Class A common stock, after giving effect to the Organizational Transactions, the incurrence of amounts borrowed under the Verde Credit Facility as of                 , 2017 assuming such amount remains drawn at the time of the completion of this offering, and the Assumed Redemption. Our pro forma net tangible book value as of December 31, 2016 was $        million, or $        per share of Class A common stock. This represents an immediate increase in net tangible book value to the LLC Unitholders of $        per share and an immediate dilution to new investors in this offering of $        per share. We determine dilution by subtracting the pro forma net tangible book value per share after this offering from the amount of cash that a new investor paid for a share of Class A common stock. The following table illustrates this dilution:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $ |
| Pro forma net tangible book value per share as of December 31, 2016 before this offering [1] | $ | |
| Increase in net tangible book value per share attributable to the investors in this offering | $ | |
| Pro forma net tangible book value per share after this offering and repayment of the Verde Credit Facility | | $ |
| Dilution per share to the investors in this offering | | $ |

(1)    The computation of pro forma net tangible book value per share as of December 31, 2016 before this offering is as follows:

| (in thousands, except per share data) | |
|---|---|
| Book value of tangible assets | $ |
| Less: total liabilities | |
|     Pro forma net tangible book value | $ |
| Shares of Class A common stock to be outstanding after the Organizational Transactions | |
| Assumed redemption | |
| Shares of Class A common stock outstanding after assumed redemption | |
| Pro forma net tangible book value per share | $ |

Table of Contents

A $1.00 increase or decrease in the assumed initial public offering price of $        per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) would increase or decrease pro forma net tangible book value by $        million, or $        per share, and would increase or decrease the dilution per share to the investors in this offering by $        based on the assumptions set forth above.

The following table summarizes as of December 31, 2016, after giving effect to the Organization Transactions (including this offering), the number of shares of Class A common stock purchased from us, the total consideration paid and the average price per share paid by the LLC Unitholders and by the purchasers in this offering, based upon an assumed initial public offering price of $        per share (the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) and before deducting estimated underwriting discounts and commissions and offering expenses, after giving effect to the Assumed Redemption:

| | Shares of Class A Common Stock Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing owners | | % | $ | % | $ |
| Investors in this offering | | | | | |
| Total | | 100% | $ | 100% | |

The discussion and tables above assume no exercise of the underwriters' option to purchase additional shares of Class A common stock. In addition, the discussion and tables above exclude shares of Class B common stock, because holders of the Class B common stock are not entitled to distributions or dividends, whether cash or stock, from Carvana Co. If the underwriters' option to purchase additional shares of Class A common stock is exercised in full, after giving effect to the Assumed Redemption, the LLC Unitholders would own approximately       % and the investors in this offering would own approximately       % of the total number of shares of our Class A common stock outstanding after this offering. If the underwriters exercise their option to purchase additional shares of Class A common stock in full, after giving effect to the Assumed Redemption, the pro forma net tangible book value (deficit) per share after this offering would be $        per share, and the dilution in the pro forma net tangible book value (deficit) per share to the investors in this offering would be $        per share.

The tables and calculations above are based on the number of shares of Class A common stock outstanding as of December 31, 2016 (after giving effect to the Organizational Transactions), and exclude an aggregate of        shares of Class A common stock reserved for issuance under our 2017 Incentive Plan that we expect to adopt in connection with this offering. To the extent that any new options or other equity incentive grants are issued in the future with an exercise price or purchase price below the initial public offering price, new investors will experience further dilution.

56

Table of Contents

## SELECTED CONSOLIDATED FINANCIAL DATA

The following tables present, as of the dates and for the periods indicated, the selected consolidated financial data for Carvana Group and its subsidiaries. Carvana Group is the predecessor of Carvana Co. for financial reporting purposes. The selected consolidated statement of operations data for each of the years ended December 31, 2014, 2015 and 2016 and the selected consolidated balance sheet data as of December 31, 2015 and December 31, 2016 presented below have been derived from the audited consolidated financial statements of Carvana Group and its subsidiaries, included elsewhere in this prospectus. The selected consolidated balance sheet data as of December 31, 2014 presented below has been derived from the audited consolidated financial statements of Carvana Group and its subsidiaries not included in this prospectus. The results of operations for the periods presented below are not necessarily indicative of the results to be expected for any future period.

The information set forth below should be read together with the ''Prospectus Summary — Summary Historical Financial and Other Data,'' ''Use of Proceeds,'' ''Capitalization,'' ''Unaudited Pro Forma Consolidated Financial Data,'' and ''Management's Discussion and Analysis of Financial Condition and Results of Operations'' and the consolidated financial statements and the accompanying notes included elsewhere in this prospectus.

The selected consolidated financial data of Carvana Co. have not been presented as Carvana Co. is a newly incorporated entity, has had no business transactions or activities to date and had no assets or liabilities during the periods presented in this section.

| | Historical Carvana Group | | |
| | Year Ended December 31, | | |
| | 2014 | 2015 | 2016 |
| | (in thousands) | | |
| **Consolidated Statements of Operations Data:** | | | |
| Sales and operating revenues: | | | |
| Used vehicle sales, net | $ 41,123 | $ 124,972 | $ 341,989 |
| Wholesale vehicle sales | 522 | 3,743 | 10,163 |
| Other sales and revenue [1] | 34 | 1,677 | 12,996 |
| Net sales and operating revenues | 41,679 | 130,392 | 365,148 |
| Cost of sales | 42,103 | 129,046 | 345,951 |
| Gross (loss) profit | (424) | 1,346 | 19,197 |
| Selling general and administrative expenses | 14,684 | 36,678 | 108,676 |
| Interest expense | 108 | 1,412 | 3,587 |
| Other expense, net | 22 | 36 | 46 |
| Loss before income taxes | (15,238) | (36,780) | (93,112) |
| Income tax provision | — | — | — |
| Net loss | $ (15,238) | $ (36,780) | $ (93,112) |
| **Consolidated Balance Sheet Data (at period end):** | | | |
| Cash and cash equivalents | $ 6,929 | $ 43,134 | $ 39,184 |
| Vehicle inventory | 26,371 | 68,038 | 185,506 |
| Total assets | 40,104 | 136,012 | 335,833 |
| Floor Plan Facility | 5,619 | 42,302 | 165,313 |

(1)    Includes $460 of other sales and revenues from related parties for the year ended December 31, 2016.

Table of Contents

**UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL DATA**

The following unaudited pro forma condensed consolidated information sets forth our unaudited pro forma and historical condensed consolidated statements of operations for the year ended December 31, 2016 and the unaudited pro forma and historical consolidated balance sheet at December 31, 2016. The unaudited pro forma consolidated financial information gives effect to the Organizational Transactions and related agreements, including the issuance of shares of Class A common stock in this offering and the use of proceeds from this offering as if each had occurred on December 31, 2016, for the the unaudited pro forma consolidated balance sheet, and January 1, 2016, for the unaudited pro forma consolidated statements of operations for the year ended December 31, 2016. The unaudited pro forma adjustments are based on available information and certain assumptions that we believe are reasonable.

The unaudited pro forma consolidated financial information should be read in conjunction with the sections of this prospectus entitled "Use of Proceeds," "Organizational Structure," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical consolidated financial statements and related notes thereto included elsewhere in this prospectus. The unaudited pro forma consolidated financial information is for informational purposes only and is not intended to represent or be indicative of the consolidated results of operations or financial position that we would have reported had the Organizational Transactions, borrowings under the Verde Credit Facility and this offering been completed on the dates indicated and should not be taken as representative of our future consolidated results of operations or financial position.

The pro forma adjustments related to the Organizational Transactions and borrowings under the Verde Credit Facility, both excluding this offering, which we refer to as the Organizational Transaction Adjustments and Borrowings Under the Verde Credit Facility, are described in the notes to the unaudited pro forma consolidated financial information, and principally include the following:

- the conversion of our Class C Preferred Units into Class A Units of Carvana Group;

- the amendment and restatement of Carvana Group's LLC Operating Agreement to, among other things, (i) eliminate a class of preferred membership interests, (ii) provide for LLC Units consisting of the Class B Units and Class A Units, and (iii) appoint our wholly owned subsidiary, Carvana Sub, as the sole manager of Carvana Group;

- the amendment and restatement of Carvana Co.'s certificate of incorporation to, among other things, provide for Class A common stock and Class B common stock;

- the issuance of shares of Class B common stock to holders of Class A Units, on a one-to-     basis with the number of Class A Units they own, for nominal consideration;

- the impact of federal, state, local and foreign income taxes on the income allocated to us as a taxable corporation; and

- borrowings under the Verde Credit Facility and the use of the related proceeds for general working capital needs both occurring subsequent to December 31, 2016 through         , 2017.

The pro forma adjustments related to this offering, which we refer to as the Offering Adjustments, are described in the notes to the unaudited pro forma consolidated financial information, and principally include the following:

- the issuance of shares of our Class A common stock in this offering in exchange for net proceeds of approximately $       , assuming an initial public offering price of $       per share (the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), after deducting underwriting discounts and commissions but before estimated offering expenses payable by us;

- the repayment of all outstanding borrowings under the Verde Credit Facility;

58

Table of Contents

- the application of a portion of the net proceeds from this offering to acquire, indirectly through our wholly owned subsidiary, Carvana Sub, newly-issued LLC Units from Carvana Group at a purchase price per LLC Unit equal to                     the initial public offering price per share of Class A common stock, less underwriting discounts and commissions;

- compensation expense related to the granting of options to purchase shares of our Class A common stock, which we expect will be granted to certain employees at the time of this offering; and

- compensation expense related to the issuance of restricted Class A common stock, which we expect will be granted to certain employees at the time of this offering.

Except as otherwise indicated, the unaudited pro forma consolidated financial information presented assumes no exercise by the underwriters of their option to purchase additional shares of Class A common stock from us.

As described in greater detail under "Organizational Structure — Tax Receivable Agreement," in connection with the closing of this offering, we will enter into the Tax Receivable Agreement with the LLC Unitholders that will provide for the payment by us to the continuing Carvana Group unitholders of 85% of the amount of cash savings, if any, in U.S. federal, state, local and foreign income tax we actually realize (or, under certain circumstances, are deemed to realize) as a result of (i) the increase in our proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of purchases of LLC Units from the LLC Unitholders (other than Carvana Sub) by Carvana Sub and (ii) certain other tax benefits related to our making payments under the Tax Receivable Agreement.

Due to the uncertainty in the amount and timing of future exchanges of the LLC Units by LLC Unitholders, the unaudited pro forma consolidated financial information assumes that no exchanges of LLC Units have occurred and therefore no increases in tax basis in Carvana Group assets or other tax benefits that may be realized thereunder have been assumed in the unaudited pro forma consolidated financial information. However, if all of the LLC Unitholders were to exchange their LLC Units immediately following the completion of this offering, we would recognize a deferred tax asset of approximately $        and a liability of approximately $        , assuming: (i) all exchanges occurred on the same day; (ii) a price of $        per share (the midpoint of the estimated public offering price range set forth on the cover page of this prospectus); (iii) a constant corporate tax rate of     %; (iv) we will have sufficient taxable income to fully utilize the tax benefits; and (v) no material changes in tax law. These amounts are estimates and have been prepared for informational purposes only. The actual amount of deferred tax assets and related liabilities that we will recognize will differ based on, among other things: (i) the amount and timing of future exchanges of LLC Units by LLC Unitholders, and the extent to which such exchanges are taxable, (ii) the price per share of our Class A common stock at the time of the exchanges, (iii) the amount and timing of future income against which to offset the tax benefits, and (iv) the tax rates then in effect.

As a public company, we will be implementing additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. We expect to incur additional annual expenses related to these steps and, among other things, additional directors' and officers' liability insurance, director fees, reporting requirements of the SEC, transfer agent fees, hiring additional accounting, legal and administrative personnel, increased auditing and legal fees and similar expenses. We have not included any pro forma adjustments relating to these costs.

59

Table of Contents

**Carvana Co. and Subsidiaries**
**Unaudited Pro Forma Consolidated Balance Sheet as of December 31, 2016**
**(in thousands)**

| | Historical Carvana Group | Organizational Transaction Adjustments and Borrowings Under the Verde Credit Facility (a)(g) | As Adjusted for the Organizational Transactions | Offering Adjustments | Pro Forma Carvana Co., as Adjusted for this Offering and Use of Proceeds |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets:** | | | | | |
| Cash and cash equivalents | $ 39,184 | $ | $ | $ (b)(c) | $ |
| Restricted cash | 10,266 | | | | |
| Accounts receivable, net | 5,692 | | | | |
| Finance receivables held for sale, net | 24,771 | | | | |
| Vehicle inventory | 185,506 | | | | |
| Other current assets | 9,822 | | | (c) | |
| Total current assets | 275,241 | | | | |
| Property and equipment, net | 60,592 | | | | |
| Total assets | $ 335,833 | $ | $ | $ | $ |
| **LIABILITIES, TEMPORARY EQUITY, AND MEMBERS'/ STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable and accrued liabilities | $ 28,164 | $ | $ | $ (c) | $ |
| Accounts payable due to related party | 1,884 | | | | |
| Floor Plan Facility | 165,313 | | | | |
| Current portion of notes payable | 1,057 | | | | |
| Total current liabilities | 196,418 | | | | |
| Notes payable, excluding current portion | 4,404 | | | | |
| Verde Credit Facility | — | (h) | | (b) | |
| Total liabilities | 200,822 | | | | |
| Commitments and contingencies | | | | | |
| Temporary equity — Class C redeemable preferred stock | 250,972 | (f) | | | |
| **Members'/Stockholders' equity (deficit):** | | | | | |
| Members deficit | (115,961) | (d)(e)(f)(h) | | | |
| Class A common stock | — | (e) | | (b) | |
| Class B common stock | — | (e) | | | |
| Additional paid-in capital | — | (e) | | (b)(c)(d) | |
| Retained earnings (accumulated deficit) | — | | | | |
| Total members'/ stockholders' equity (deficit) attributable to Carvana Co | (115,961) | | | | |
| Non-controlling interest | — | (d)(e)(f) | | (d) | |
| Total members' / stockholders' equity (deficit) | (115,961) | | | | |
| Total liabilities, and members' / stockholders' equity (deficit) | $ 335,833 | $ | $ | $ | $ |

60

**Table of Contents**

**Carvana Co. and Subsidiaries**
**Notes to Unaudited Pro Forma Consolidated Balance Sheet**

(a)    Carvana Co. was formed on November 29, 2016 and will have no material assets or results of operations until the completion of this offering and therefore its historical financial position and results of operation are not shown in a separate column in the unaudited pro forma consolidated balance sheet.

(b)    We estimate that net proceeds to us from this offering, after deducting estimated underwriting discounts and commissions, estimated offering expense payable by us and repayment of all outstanding borrowings under the Verde Credit Facility, will be approximately $         , based on an assumed initial public offering price of $         per share, (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). This amount has been determined based on the assumption that the underwriters' option to purchase additional shares of our Class A common stock is not exercised. A reconciliation of the gross proceeds from this offering to net cash proceeds is set forth below (in thousands, except share and per share data):

| | |
|---|---:|
| Assumed initial public offering price per share | $ |
| Shares of Class A common stock issued in this offering | |
| Gross proceeds | |
| Less: estimated underwriting discounts and commissions | |
| Less: estimated offering expenses (including amounts previously deferred) | |
| Less: repayment of Verde Credit Facility | |
| Net cash proceeds | $ |

(c)    We are deferring certain costs associated with this offering, including certain legal, accounting and other related expenses, which have been recorded in other assets in our consolidated balance sheet. Upon completion of this offering, these deferred costs will be charged against the proceeds from this offering with a corresponding reduction to additional paid-in-capital.

(d)    Upon completion of the Organizational Transactions, Carvana Sub will become the sole manager of Carvana Group. Although we will have an indirect minority economic interest in Carvana Group, through Carvana Sub, we will have the sole voting interest in, and control the management of, Carvana Group. As a result, we will consolidate the financial results of Carvana Group and will report a non-controlling interest related to the LLC Units held by the LLC Unitholders on our consolidated balance sheet. The computation of the non-controlling interest following the consummation of this offering, based on an assumed initial public offering price of $         per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus) is as follows:

| | Units | Percentage |
|---|---:|---:|
| LLC Units indirectly held by Carvana Co. | | % |
| Non-controlling interest in Carvana Group held by the LLC Unitholders | | |
| | | % |

If the underwriters exercise their option to purchase additional shares of our Class A common stock in full, Carvana Co. would own , indirectly through its wholly owned subsidiary,         % of the economic interest of Carvana Group and the LLC Unitholders would own the remaining         % of the economic interest of Carvana Group.

Following the consummation of this offering, the LLC Units held by the LLC Unitholders, representing the non-controlling interest, will be exchangeable at the election of the LLC Unitholders for shares of Class A common stock, (subject to customary adjustments, including for stock splits, stock dividends and reclassifications), or, at our election, for cash, in accordance with the terms of the Exchange Agreement.

(e)    As a C corporation we will no longer record members' deficit in the consolidated balance sheet. To reflect the C corporation structure of our equity, we will separately present the value of our common stock, additional pain-in capital and retained earnings. The portion of members' deficit associated with additional paid-in capital was estimated as the remainder of capital contributions we have received less amounts attributed to the par value of common stock and the amount allocated to the non-controlling interest.

In connection with this offering we will issue         shares of Class B common stock to LLC Unitholders, on a one-to-         basis with the number of LLC Units they own, for nominal consideration. The Garcia Parties are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). All other holders of Class B common stock are each entitled to one vote per share. The holders of the Class B common stock will not be entitled to receive any distributions from or participate in any dividends declared by our board of directions.

(f)    In connection with the Organizational Transactions, the holders of Class C Preferred Units will exchange Class C Preferred Units for Class A Units on a one-to-one basis.

(g)    Due to the uncertainty in the amount and timing of future exchanges of LLC Units by the LLC Unitholders, the unaudited pro forma consolidated financial information assumes that no exchanges of interests have occurred and therefore no increases in tax basis in Carvana Group assets or other tax benefits that may be realized thereunder have been assumed in the unaudited pro forma consolidated financial information.

(h)    Adjustment reflects borrowings of $         made under the Verde Credit Facility and the use of the related proceeds for general working capital needs both occurring subsequent to December 31, 2016.

61

Table of Contents

**Carvana Co. and Subsidiaries**
**Unaudited Pro Forma Statements of Operations For the Year Ended December 31, 2016**
**(in thousands, except per share data)**

| | Historical Carvana Group | Organizational Transaction Adjustments and Borrowings Under the Verde Credit Facility [(i)] | As Adjusted for the Organizational Transactions | Offering Adjustments | Pro Forma Carvana Co., as Adjusted for this Offering and Use of Proceeds |
|---|---|---|---|---|---|
| Sales and operating revenues: | | | | | |
| Used vehicles sales, net | $ 341,989 | $ | $ | $ | $ |
| Wholesale vehicles sales | 10,163 | | | | |
| Other sales and revenues [(1)] | 12,996 | | | | |
| Net sales and operating revenues | 365,148 | | | | |
| Cost of sales | 345,951 | | | | |
| Gross profit | 19,197 | | | | |
| Selling, general and administrative expenses | 108,676 | | | (j)(k) | |
| Loss from operations | (89,479) | | | | |
| Interest expense | (3,587) | | | | |
| Other income (expense), net | (46) | | | | |
| Loss before income taxes | (93,112) | | | | |
| Income tax provision | — | (l) | | (l) | |
| Net loss | (93,112) | | | | |
| Net loss attributable to non-controlling interests | — | (m) | | (m) | |
| Net loss attributable to Carvana Co. | $ (93,112) | $ | $ | $ | $ |
| Pro forma net loss available to Class A common stock per share [(n)]: | | | | | |
| Basic | | | | | $ |
| Diluted | | | | | $ |
| Pro forma weighted-average shares of Class A common stock [(n)]: | | | | | |
| Basic | | | | | |
| Diluted | | | | | |

(1)   Historical Carvana Group includes $460 of other sales and revenues from related parties.

62

Table of Contents

**Carvana Co. and Subsidiaries**
**Notes to Unaudited Pro Forma Consolidated Statements of Operations**

(i)   Carvana Co. was formed on November 29, 2016 and will have no material assets or results of operations until the completion of this offering and therefore its historical results of operation are not shown in a separate column in the unaudited pro forma consolidated statements of operations.

(j)   In connection with this offering, we intend to issue           shares of restricted Class A common stock to certain employees with an aggregate value of $     based on an assumed initial public offering price of $          per share (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). This adjustment represents the increase in compensation expense we expect to incur following the completion of this offering assuming the restricted stock was granted on January 1, 2016. The restricted Class A common stock will be issued to participants in the Existing Performance Plan.

(k)   In connection with this offering, we expect to grant           stock options to certain employees. This adjustment represents the increase in compensation expense we expect to incur following the completion of this offering. The amount was calculated assuming the stock options were granted on January 1, 2016 at exercise price of $          (which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). The grant date fair value was determined using the Black-Scholes valuation model using the following assumptions:

| | |
|---|---|
| Expected volatility | % |
| Expected dividend yield | % |
| Expected term (in years) | |
| Risk-free interest rate | |

Expected volatility is based on comparable companies using daily stock prices.

(l)   Carvana Group has been, and will continue to be, treated as a partnership for U.S. federal and state income tax purposes. As such, income generated by Carvana Group will flow through to its partners, including us, and is generally not subject to tax at the Carvana Group level. Following the Organizational Transactions, we will be subject to U.S. federal income taxes, in addition to state, local and foreign income taxes with respect to our allocable share of any taxable income of Carvana Group. As a result, the unaudited pro forma consolidated statements of operations reflect adjustments to our income tax expense to reflect an effective income tax rate of       % for the year ended December 31, 2016, which was calculated assuming the U.S. federal rates currently in effect and the highest statutory rates apportioned to each applicable state and local jurisdiction.

(m)   Upon completion of the Organizational Transactions, Carvana Sub will become the sole manager of Carvana Group. Although we will have an indirect minority economic interest in Carvana Group, through Carvana Sub we will have the sole voting interest in, and control the management of, Carvana Group. As a result, we will consolidate the financial results of Carvana Group and will report a non-controlling interest related to the LLC Units held by the LLC Unitholders in our consolidated statements of operations. Adjustment relates to a reclassification from net loss to net loss attributable to non-controlling interests in Carvana Group.

63

**Table of Contents**

(n)  Pro forma basic net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Pro forma diluted net loss per share is computed by adjusting the net loss attributable to Class A common stockholders and the weighted-average shares of Class A common stock outstanding to give effect to potentially dilutive securities. Shares of our Class B common stock are not entitled to receive any distributions or dividends and are therefore not included in the computation of pro forma basic or diluted net loss per share. The following table sets forth the adjustments to determine net loss attributable to Class A common stockholders, basic and diluted, and pro forma weighted-average shares of Class A common stock outstanding, basic and diluted (in thousands, except per share data):

|  | Unaudited Pro Forma Carvana Co. Year ended December 31, 2016 |
| --- | --- |
| Basic net loss per share: | |
| Net loss | $ |
| Less: Net loss attributable to non-controlling interests | |
| Net loss attributable to Class A common stockholders | $ |
| Weighted-average shares of Class A common stock outstanding, basic | |
| Basic net loss per share | $ |
| Diluted net loss per share [1] : | |
| Net loss attributable to Class A common stockholders | $ |
| Add: Net loss attributable to non-controlling interests [2] | |
| Net loss attributable to Class A common stockholders | $ |
| Weighted-average shares of Class A common stock outstanding, basic | |
| Add: Assumed conversion of LLC Units to shares of Class A common stock [2] | |
| Weighted-average shares of Class A common stock outstanding, diluted | |
| Diluted net loss per share | $ |

(1)  Excludes the effect of common stock equivalents as their inclusion would have been anti-dilutive.

(2)  The LLC Units held by the LLC Unitholders are potentially dilutive securities and the calculation of pro forma diluted net loss per share assumes that all LLC Units were exchanged for shares of Class A common stock at the beginning of the period (based upon an assumed offering price of $        per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). This adjustment was made for purposes of calculating pro forma diluted net loss per share only and does not necessarily reflect the amount of exchanges that may occur subsequent to this offering.

64

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS

*The following discussion and analysis summarizes the significant factors affecting the consolidated operating results, financial condition, liquidity and cash flows of our company as of and for the periods presented below. The following discussion and analysis should be read in conjunction with our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, our management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this prospectus, particularly in the sections entitled "Risk Factors" and "Forward-Looking Statements."*

### Overview

Carvana is a leading eCommerce platform for buying used cars. We are transforming the used car buying experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

From the launch of our first market in January 2013 through December 31, 2016, we purchased, reconditioned, sold and delivered approximately 27,500 vehicles to customers through our website, generating $541.8 million in revenue. The following graphic illustrates the cumulative number of vehicles sold through our website on a quarterly basis along with selected milestones of our business.



65

Table of Contents

Our business combines a comprehensive online sales experience with a vertically-integrated supply chain that allows us to sell high quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- *Purchase a used vehicle.*    As of December 31, 2016, we list over 7,300 vehicles for sale on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs") and trade-ins.

- *Finance their purchase.*    Customers can pay for their Carvana vehicle using cash, our proprietary loan origination platform or financing from third parties such as banks or credit unions. Customers who choose to apply for our in-house financing fill out a short application form, select from a range of financing terms we provide, and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the automotive finance receivables we originate to third party financing partners and earn a premium on each sale.

- *Protect their purchase.*    Customers have the option to protect their vehicle with a CarvanaCare-branded VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of an affiliate of DriveTime and, historically, third parties, who are the obligors under these VSCs. We generally have no contractual liability to customers for claims under these agreements.

- *Sell us their car.*    We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can complete a short appraisal form and receive an offer for their trade-in nearly instantaneously. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer behavior data. When customers accept our offer, we take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- *Vehicle sourcing and acquisition.*    We acquire the majority of our used vehicle inventory from wholesale auctions. We also, to a lesser extent, acquire vehicles from consumers and directly from used vehicle suppliers, including franchise and independent dealers, leasing companies, and car rental companies. Using proprietary machine learning algorithms and data from a variety of internal and external sources, we evaluate tens of thousands of vehicles daily to determine their fit with consumer demand, internal profitability targets, and our existing inventory mix.

- *Inspection and reconditioning.*    After acquiring a vehicle, we transport it to one of our inspection and reconditioning centers ("IRCs"), where it undergoes a 150-point inspection and is reconditioned to meet "Carvana Certified" standards. This process is supported by a custom used vehicle inventory management system, which tracks vehicles through each stage of the process and is seamlessly integrated with auto parts suppliers to facilitate the procurement of required parts.

- *Photography and merchandising.*    We photograph vehicles using our proprietary photo booths located at each of our IRCs. This allows us to display interactive, 360-degree images of each vehicle on our website. We also annotate each vehicle image with a list of features and imperfections to assist our customers in their evaluation of each vehicle for purchase. Our 360-degree photo and annotation processes are enabled by proprietary imaging technology and integrations with various vehicle data providers for vehicle feature and option information.

66

Table of Contents

- ***Logistics and fulfillment.*** We transport vehicles purchased by our customers to their local market for home delivery or pick-up. In markets where we have launched operations, delivery to the customer is completed by a Carvana employee in a branded delivery truck. In a subset of these markets, customers have the option of picking up their car at one of our vending machines. These vending machines are multi-story glass towers where our customers deposit a token into a coin slot and an automated platform delivers the purchased vehicle to a garage bay where the customer is waiting. Our vending machines provide an attractive and unique customer pick-up experience, developing brand awareness while lowering our variable vehicle delivery expense. Our logistics and fulfillment operations are supported by our proprietary vehicle transportation management system, which optimizes the scheduling of transport routes and delivery slots.

### Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website. During the year ended December 31, 2016, the number of vehicles we sold to retail customers grew by 187.6% to 18,761, compared to 6,523 in the year ended December 31, 2015. During the year ended December 31, 2015, our unit sales grew by 209.9% to 6,523, compared to 2,105 in the year ended December 31, 2014.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, and the sale of vehicles acquired from customers as trade-ins.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer becomes a candidate to refer future customers and can become a repeat buyer in the future.

- Retail unit sales allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service and delivery.

We plan to invest heavily in technology and infrastructure to support growth in unit sales. This includes continued investment in our acquisition, reconditioning, and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets

Our growth in retail units sold is driven by expansion into new markets and increased penetration in our existing markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee and branded delivery truck. Opening a new market involves hiring a market operations manager and a team of customer advocates, connecting the market to our existing logistics network, and initiating local advertising. Each new market has typically required approximately $500,000 in capital expenditures, primarily related to the acquisition of 1 to 2 branded delivery trucks, a multi-car hauler to connect the market to our logistics network, and furniture, fixtures and equipment in a local office space. As a market scales, we may elect to build a vending machine in the market to improve fulfillment and further increase customer awareness. Each new vending machine has required $4.5 million to $5.5 million of capital expenditures, depending on the number of stories in the vending machine tower and local market conditions.

Our capital- and headcount-light expansion model has enabled us to increase our rate of market openings in each of the past four years. After opening Atlanta, Georgia in 2013, we opened two markets in

67

Table of Contents

2014, six in 2015, and 12 in 2016, bringing our total number of markets to 21 at December 31, 2016. Over this period, we have continually improved our market expansion playbook, which we believe provides us with the capability to accelerate this rate of market openings in the future.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality and special events such as vending machine openings. Each market takes time to ramp due to the prolonged nature of the used vehicle sales cycle. According to IHS Automotive, the average consumer buys a used vehicle about once every five years, meaning many customers we reach through our advertising will not be in the market for a used vehicle for several years. Moreover, with a five-year sales cycle, word of mouth, referrals and repeat purchases impact sales over an extended time period. These effects historically have led to increased market penetration over time following the market opening. This pattern is presented on a one-time basis in the chart below.



(1)    Market penetration is based on our retail unit sales to customers in that market compared to an estimate of used vehicle market size in that market based on U.S. used vehicle sales per capita. For additional details see "—Market Cohorts." The quarter in which a market opens is its first quarter of operation.

68

Table of Contents

**Market Cohorts**

Many of our markets are in a nascent stage, making company-wide measures potentially less informative than measurements of seasoned markets. More than half of our markets opened in 2016. The table below provides alternative metrics related to unit sales performance, examining our progress based on when we commenced operations in the market. Markets are grouped into cohorts based on the year in which they began local delivery operations; for example, all markets opened during 2015 are included in the 2015 cohort.

We measure penetration in each cohort based on our retail unit sales to customers in that cohort and an estimate of used vehicle market size in that cohort based on U.S. used vehicle sales per capita. Cohorts differ based on the number and average population of markets in the cohort, the timing of market openings in the first fiscal year of the cohort, and differences in used vehicle sales per capita or other demographic or economic differences across cohorts. However, taken as a whole, they illustrate how our penetration over time evolves as markets age. The following tables present additional data for each of the cohorts for the years ended December 31, 2016 and 2015.

| | Year Ended December 31, 2016 | | | | | |
|---|---|---|---|---|---|---|
| Cohort [1] | Market Population (in millions) [2] | Retail Units Sold [3] | YoY Growth [3] | Market Penetration [4] | Advertising Expense per Retail Unit Sold [5] | |
| 2013 | 5.7 | 6,288 | 85.0% | 0.9% | $ | 568 |
| 2014 | 4.3 | 2,715 | 182.5% | 0.5% | $ | 991 |
| 2015 | 21.1 | 4,337 | 622.8% | 0.2% | $ | 2,363 |
| 2016 | 32.1 | 1,458 | n/a | 0.0% | $ | 5,093 |

| | Year Ended December 31, 2015 | | | | | |
|---|---|---|---|---|---|---|
| Cohort [1] | Market Population (in millions) [2] | Retail Units Sold [3] | YoY Growth [3] | Market Penetration [4] | Advertising Expense per Retail Unit Sold [5] | |
| 2013 | 5.7 | 3,399 | 165.1% | 0.5% | $ | 875 |
| 2014 | 4.3 | 961 | 436.9% | 0.2% | $ | 2,866 |
| 2015 | 21.1 | 600 | n/a | 0.0% | $ | 5,731 |

(1)   Markets are grouped into cohorts based on the year in which they began local delivery operations. For example, all markets opened during 2015 are included in the 2015 cohort.

(2)   Total market population is equal to the sum of population for all markets in the cohort based on 2015 data from the U.S. Census Bureau. A list of markets included in each cohort is provided under "— Markets."

(3)   Retail units sold is equal to total retail units sold in the cohort in the reporting period. Year-over-year growth in retail units sold is the percent change in retail units sold from the prior period.

(4)   Market penetration is equal to total retail unit sales in each cohort divided by estimated total used vehicle sales in each cohort in the reporting period. Estimated total used vehicle sales is equal to total population in the cohort multiplied by estimated 2015 U.S. used vehicle sales per capita. Estimated 2015 U.S. used vehicle sales per capita is calculated by dividing total U.S. used vehicle sales of 38.3 million in 2015 from Edmunds.com by total U.S. population of 321.4 million in 2015 from the U.S. Census Bureau.

(5)   Advertising expense per retail unit sold in each cohort is the advertising expenses incurred by the open markets in the cohort divided by the retail units sold in the cohort in the reporting period. Actual advertising expense per market varies. Advertising expense in each market is budgeted based on market size, as well as the specific characteristics of that market. Corporate advertising expenses are excluded from the cohort advertising expenses.

Table of Contents

Our oldest cohort, the 2013 cohort, contains one market, Atlanta, GA, where we began delivery operations to customers in January 2013. Retail sales for this cohort totaled 6,288 vehicles in the year ended December 31, 2016, an increase of 85.0% from the prior year. Market penetration for this cohort in this time period expanded to 0.9% compared to 0.5% in the prior year. This growth in market penetration was accompanied by a 35.1% reduction in advertising expense per retail unit sold to $568 per unit from $875 per unit in the prior year period. This reflects advertising expenditures being spread over an increased number of units sold, as well as growing brand recognition, increasing word of mouth referrals and internal improvements, including more extensive vehicle inventory and various mobile and desktop website enhancements.

Our second oldest cohort, the 2014 cohort, is comprised of two markets, Nashville, TN and Charlotte, NC. We launched operations in Nashville, TN in May 2014 and in Charlotte, NC in September 2014. Retail sales in this cohort totaled 2,715 units in the year ended December 31, 2016, a 182.5% increase over the prior year. Market penetration in this cohort increased to 0.5% in the year ended December 31, 2016 from 0.2% in the year ended December 31, 2015. Subsequent cohorts have followed similar patterns of increased market penetration and declining advertising expense per retail unit sold as each cohort matures. We believe this illustrates the replicability of our model as we expand into new markets.

In addition to sales in our markets, we also sell vehicles to customers outside of our markets. Retail units sold to customers outside of our markets were 3,963 or 21.1% of total retail units sold in the year ended December 31, 2016 and 1,563 or 24.0% of total retail units sold in the year ended December 31, 2015. Since we primarily advertise in our markets, customers who buy a vehicle from outside of our markets do so with limited incremental advertising expense above our local advertising budget. In the future, we may begin national advertising, which we anticipate will increase sales outside our markets; however, we ultimately expect these sales to decline as a percent of total sales as we open more markets over time.

### Revenue and Gross Profit

Our expansion into new markets and increased penetration in existing ones has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicle, gains on the sales of loans originated to finance the vehicle, sales of VSCs, and wholesale sales of vehicles we acquire from customers as trade-ins.

Our largest source of revenue, used vehicle sales, totaled $342.0 million during the year ended December 31, 2016. As we continue to expand to new markets and increase penetration in existing ones, we expect used vehicle sales to increase as we increase retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales of trade-ins and other vehicles acquired from customers totaled $10.2 million during the year ended December 31, 2016. We expect wholesale sales to increase with retail units sold and as we expand our suite of product offerings to customers who may wish to trade-in or to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which includes gains on the sales of loans we originate and sales commissions on VSCs, totaled $13.0 million during the year ended December 31, 2016. We expect other sales and revenues to increase with retail units sold and as we improve our ability to offer attractive financing solutions and VSCs to our customers. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

Our total gross profit per retail unit sold has increased from a gross loss of $1,165 per unit in 2013, to a gross loss of $201 per unit in 2014, to a gross profit of $206 per unit in 2015, to a gross profit of $1,023 per unit in 2016. Our increases in gross profit per unit were driven by several factors, including decreases in average days to sale over the first two years of our operations, enhanced vehicle purchasing and pricing

70

Table of Contents

algorithms, increased efficiencies in vehicle reconditioning and transport, increased conversion on complementary products, such as VSCs, and increased monetization of customer financing.

During our growth phase, our highest priority will continue to be generating demand and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Reduce average days to sale.*    As we continue to expand our number of markets and increase penetration in our existing markets, we expect our average days to sale to decline, leading to higher average selling prices and increased used vehicle gross profit. However, gross profit increases may not always be commensurate with any reductions in average days to sale. See "— Inventory and Pricing."

- *Increase conversion on existing products.*    We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs and trade-ins.

- *Add new products and services.*    We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

### Inventory and Pricing

We establish prices for our vehicles using proprietary pricing algorithms that recommend initial retail price points, as well as retail price markdowns for specific vehicle-based factors, including sales history, consumer interest, and prevailing market prices. We typically price our vehicles at a discount to Kelley Blue Book's Suggested Retail Value, as well as the average retail market price for each vehicle in the relevant market. According to Blackbook and Fitch, the average used car price declines by approximately 18% per year, or approximately $10 per day on a $20,000 vehicle. This reduction in price over time is incorporated into our vehicle prices, which we reduce periodically.

Reductions in used vehicle prices over time means that average days to sale impacts the average selling price of our vehicles. Average days to sale depends on the number of vehicles we hold in inventory and the number of customers we attract to purchase those vehicles. Since the second quarter of 2015, we have increased the size of our inventory pool as we have increased our number of markets. This balancing of markets and inventory has resulted in average days to sale that have been roughly flat over this period.

Our goal is to increase both our number of markets and our sales growth at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, other things being equal. Higher average selling prices in turn lead to higher gross profit per unit sold all other factors being equal.

### Relationship with DriveTime

Carvana was founded as a subsidiary of DriveTime in 2012 and subsequently spun out of DriveTime as a standalone entity in November 2014. DriveTime consolidated Carvana in its financial statements through July 2015. DriveTime has over 23 years of operating history purchasing, reconditioning, selling and financing vehicles throughout the United States. DriveTime is controlled by our controlling shareholder, who is also the father of Ernie Garcia, III, our Chief Executive Officer.

We were incubated by, and benefit from, our relationship and a series of arrangements with DriveTime that were not negotiated at arm's length. For example, we have contractual lease agreements with DriveTime allowing us to utilize three of their largest IRCs for vehicle reconditioning and distribution. Under these lease agreements, we presently operate IRCs in Winder, Georgia, Blue Mound, Texas and Delanco, New Jersey, which at full utilization will provide us with the ability to purchase and recondition over 150,000 vehicles per year. We also benefit from favorable leases from DriveTime for our office locations, as well as storage lots for our vehicle inventory. Through September 30, 2016, we also purchased

71

Table of Contents

most of our inventory of vehicles through DriveTime. Beginning in October 2016, however, we began to purchase all of our vehicle inventory independently and made payments ourselves through our vehicle inventory financing and security agreement. Through December 31, 2015, DriveTime purchased all of our customers' loans from us. We also historically relied on DriveTime to provide certain accounting, finance, legal, human resources and information technology services for us. DriveTime is currently in the process of evaluating strategic alternatives, including the potential sale of the company to interested third parties. If such a sale is completed, there can be no assurances that DriveTime will enter into any new agreements or arrangements, or extensions or renewals of existing agreements or arrangements, with us on the same or similar terms or at all. See "Certain Relationships and Related Party Transactions — Relationship with DriveTime."

## Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress, and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including opening new markets, increasing brand awareness and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2014** | **2015** | **2016** |
| Retail units sold | 2,105 | 6,523 | 18,761 |
| Number of markets | 3 | 9 | 21 |
| Average monthly unique visitors | 108,551 | 198,521 | 378,776 |
| Inventory units available on website | 652 | 1,842 | 7,310 |
| Average days to sale | 117 | 95 | 89 |
| Total gross (loss) profit per unit | $ (201) | $ 206 | $ 1,023 |

### *Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

### *Number of Markets*

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee and branded delivery truck. We view the number of markets we serve as a key driver of our growth. As we increase our number of markets, the population of consumers who have access to our fully-integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

### *Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns and consumer awareness.

72

Table of Contents

*Inventory Units Available*

We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. Until we reach an optimal pooled inventory level, we view inventory units available as a key measure of our growth. Growth in inventory units available increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in inventory units available is an indicator of our ability to scale our vehicle purchasing, inspection and reconditioning operations.

*Average Days to Sale*

We define average days to sale as the average number of days between vehicle acquisition by us and delivery to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price, as discussed under "— Inventory and Pricing."

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period divided by retail units sold in that period. Total gross profit per unit is driven by sales of used vehicles, each of which generates up to three additional revenue sources: gains on the sales of loans originated to finance the vehicle, sales of VSCs and wholesale sales of vehicles we acquire from customers as trade-ins. We believe gross profit per unit is a key measure of our growth and long-term profitability.

## Factors Affecting our Performance

We believe that our performance and future success depend on a number of factors that present significant opportunities for us but also pose risks and challenges, including those discussed below and in the section titled "Risk Factors" of this prospectus.

*Growth in Number of Markets*

We plan to continue to open new markets to expand the number of consumers we serve with our fully-integrated customer experience. As of December 31, 2016, we operated in 21 markets that collectively represent approximately 19.7% of the U.S. population based on 2015 data from the U.S. Census Bureau, leaving a significant fraction of consumers unserved. Growth in our number of markets depends on our ability to hire qualified employees, identify cost-effective logistics routes, and secure local and national, as applicable, advertising availability.

*Growth in Penetration of Existing Markets*

We believe that many of our markets remain in a nascent stage of market penetration and that our growing brand awareness, continued inventory optimization, and ongoing product enhancement efforts will enable us to substantially grow sales in existing markets. We plan to pursue several strategies to increase penetration in existing markets, including:

- *Growth in brand awareness.* Our growth depends on our ability to strengthen our brand through advertising, and the construction of new vending machines, which have historically increased customer awareness in the markets where they are located. The goal of these endeavors is to increase the number of visitors to our website and increase the likelihood that visitors will purchase vehicles from us.

- *Optimization of inventory selection.* We plan to continue to optimize and broaden the selection of vehicles we make available to our customers. Expanding our inventory selection increases the likelihood that each visitor to our site finds a vehicle that matches his or her preferences and benefits all existing markets simultaneously due to our nationally pooled inventory model. Expanding our

73

Table of Contents

inventory selection depends on our ability to source and acquire a sufficient number of appropriate used vehicles, to develop processes for effectively utilizing capacity in our IRCs, and to hire and train employees to staff these centers.

- *Enhancement of mobile sales platform.*    We plan to continue investing in our mobile platform to enhance our customers' ability to search for, research, finance, and purchase vehicles entirely on mobile devices, including smartphones and tablets. According to DealerSocket 2016, over 33% of auto research occurred on a mobile device. Data from eMarketer indicates that U.S. consumers bought nearly $75 billion in goods and services via mobile devices in 2015. This accounted for 22% of total eCommerce and represented 80% growth since 2013. Growth in mobile-only sales depends on our ability to deliver innovative products that facilitate our customers' mobile experience, as well as customers' tastes for buying exclusively on mobile devices.

- *Referrals and repeat customers.*    Our growth is enhanced by providing a superior customer experience, which drives our ability to generate customer referrals and repeat sales.

### Growth in Monetization of Retail Units Sold

We plan to pursue several strategies to increase our gross profit per retail unit sold.

- *Reduction in average days to sale.*    As discussed in "— Inventory and Pricing," we believe our gross profit per retail unit sold will increase as average days to sale decreases, since used vehicle prices decline over time. Our average days to sale depends on our ability to open new markets and increase penetration in existing markets by increasing brand awareness, enhancing our mobile and desktop website, and providing great customer experiences.

- *Growth in existing complementary revenue streams.*    We plan to continue to improve our website to highlight the benefits of our current complementary product and service offerings, including financing, trade-ins, and VSCs. In particular, we believe we have an opportunity to grow our penetration of trade-ins by developing new products and advertising campaigns that are focused on our automated online appraisal tool, the Cardian Angel.

- *Addition of new products and services.*    We plan to utilize our online sales platform to offer additional complementary products and services to our customers. To the extent that our customers purchase these products and services, this could lead to increased revenue and gross profit per retail unit sold.

### Capacity Utilization

We believe our network of IRCs and connecting logistics routes has excess capacity, and we plan to utilize this capacity as we increase retail sales volumes. Increasing capacity utilization will positively affect gross profit per unit by reducing per unit overhead costs.

### Seasonality

Used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year. Historically, this has led our gross profit per unit to be higher on average in the first half of the year than in the second half of the year. See "Risk Factors — Risks Related to Our Business — We may experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business."

74

Table of Contents

*Investment in Growth*

We have aggressively invested in the growth of our business and we expect this investment to continue. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending, including increases in television advertising expenditures. These investments are expected to increase our losses at least in the near term, and there is no guarantee that we will be able to realize the return on our investments.

## Components of Results of Operations

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery or pick-up of the vehicle by the customer and reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. At our current stage of growth, changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicle units we sell depends on the number of markets we serve, our volume of website traffic in these markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer sales experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships, and general economic conditions. On a quarterly basis, the number of used vehicle units we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter.

Our average retail selling price depends on the mix of vehicles we acquire and hold in inventory, retail market prices in our markets, our average days to sale, and our pricing strategy. We may opportunistically choose to shift our inventory mix to higher or lower cost vehicles, or to opportunistically raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We anticipate that our average days to sale will decline over time as we continue to launch new markets, which we believe will have a positive impact on our average retail selling price, other things being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from our customers who trade-in their existing vehicles when making a purchase from us, although, to a lesser extent, we also acquire vehicles from customers who do not purchase another vehicle from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is driven by the mix of wholesale vehicles we purchase, as well as general supply and demand conditions in the applicable wholesale vehicle market.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of automotive finance receivables we originate and sell to third parties and commissions we receive on VSCs. Prior to December 9, 2016, the VSCs were sold and administered by third parties. On December 9, 2016, the Company entered into a master dealer agreement with DriveTime, pursuant to which we sell VSCs that DriveTime administers. The commission revenues we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency, product features and regional and statutory restrictions.

75

Table of Contents

We generally seek to sell the automotive finance receivables we generate under committed forward flow arrangements with third parties who acquire these receivables at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of automotive finance receivables we originate, the average principal balance of these receivables, the credit quality of the portfolio and the price at which we are able to sell them to third parties. The number of receivables we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average receivable balances. The price at which we resell these automotive finance receivables is driven by the terms of our forward flow arrangements and applicable interest rates.

### Cost of Sales

Cost of sales includes the cost to acquire vehicles and the reconditioning and transportation costs associated with preparing the vehicles for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply and demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

### Used Vehicle Gross Profit

Used vehicle gross profit equals the vehicle sales price minus our costs of sales associated with vehicles that we list for retail sale on our website. Used vehicle gross profit per unit equals our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in such period.

### Wholesale Vehicle Gross Profit

Wholesale vehicle gross profit equals the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the acquisition price we offer to the customer.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

### Selling, General and Administrative Expenses

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising to customers, operating our logistics hub, fulfillment center and vending machine operations, operating our logistics and fulfillment network, and other corporate overhead expenses, including expenses associated with IT, product development, engineering, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles, which are included in cost of sales.

76

Table of Contents

*Interest Expense*

Interest expense includes interest incurred on our Floor Plan Facility and interest incurred on our notes payable, which are used to fund inventory and our transportation fleet, respectively.

**Results of Operations**

|  | Year Ended December 31, | | | | |
|  | 2014 | 2015 | Change | 2016 | Change |
|  | (dollars in thousands, except per unit amounts) | | | | |
| **Net sales and operating revenues:** | | | | | |
| Used vehicle sales, net | $41,123 | $124,972 | 203.9% | $341,989 | 173.7% |
| Wholesale vehicle sales | 522 | 3,743 | 617.0% | 10,163 | 171.5% |
| Other sales and revenues [1] | 34 | 1,677 | 4,832.4% | 12,996 | 675.0% |
| Total net sales and operating revenues | $41,679 | $130,392 | 212.8% | $365,148 | 180.0% |
| **Gross profit:** | | | | | |
| Used vehicle gross (loss) profit | $ (449) | $ (212) | n/a | $ 5,944 | n/a |
| Wholesale vehicle (loss) gross profit | (9) | (119) | n/a | 257 | n/a |
| Other gross profit [1] | 34 | 1,677 | 4,832.4% | 12,996 | 675.0% |
| Total gross (loss) profit | $ (424) | $ 1,346 | n/a | $ 19,197 | 1,326.2% |
| **Market information:** | | | | | |
| Markets, beginning of period | 1 | 3 | 200.0% | 9 | 200.0% |
| Market launches | 2 | 6 | 200.0% | 12 | 100.0% |
| Markets, end of period | 3 | 9 | 200.0% | 21 | 133.3% |
| **Unit sales information:** | | | | | |
| Used vehicles unit sales | 2,105 | 6,523 | 209.9% | 18,761 | 187.6% |
| Wholesale vehicles unit sales | 137 | 1,070 | 681.0% | 2,651 | 147.8% |
| **Per unit selling prices:** | | | | | |
| Used vehicles | $19,536 | $ 19,159 | (1.9%) | $ 18,229 | (4.9%) |
| Wholesale vehicles | $ 3,810 | $ 3,498 | (8.2%) | $ 3,834 | 9.6% |
| **Per unit gross profit: [2]** | | | | | |
| Used vehicle gross profit | $ (213) | $ (33) | n/a | $ 317 | n/a |
| Wholesale vehicle gross profit | $ (65) | $ (111) | n/a | $ 97 | n/a |
| Other gross profit | $ 16 | $ 257 | 1,506.3% | $ 693 | 169.6% |
| Total gross (loss) profit | $ (201) | $ 206 | n/a | $ 1,023 | 396.6% |

(1)    Includes $460 of other sales and revenues from related parties for the year ended December 31, 2016.

(2)    All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit which is per wholesale vehicle sold.

*Used Vehicle Sales*

*Fiscal 2016 Versus Fiscal 2015.*    Used vehicle sales increased by $217.0 million to $342.0 million during the year ended December 31, 2016, compared to $125.0 million during the year ended December 31, 2015. The increase in revenue was primarily due to an increase in the number of used vehicles sold from 6,523 to 18,761. The increase in unit sales was driven in part by growth to 21 markets as of December 31, 2016 from nine markets as of December 31, 2015. The increase in units sold was also driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, and customer referrals. We anticipate that unit sales will continue to grow as we launch new markets and increase penetration in existing markets. The average selling price of our retail

77

Table of Contents

units sold decreased to $18,229 in the year ended December 31, 2016 from $19,159 in the prior period, reflecting a broadening of our inventory mix to include lower cost vehicles.

*Fiscal 2015 Versus Fiscal 2014.*     Used vehicle sales increased by $83.8 million to $125.0 million during the year ended December 31, 2015, compared to $41.1 million during the year ended December 31, 2014. The increase in revenue was primarily due to an increase in the number of used vehicles sold from 2,105 to 6,523, which was the result of operating in nine markets as of December 31, 2015 compared to three markets as of December 31, 2014 and growth in the existing markets as a result of our marketing efforts, increased brand awareness and customer referrals. The average selling price of our retail units sold decreased to $19,159 in 2015 from $19,536 in 2014, reflecting a broadening of our inventory mix to include lower cost vehicles.

### Wholesale Vehicle Sales

*Fiscal 2016 Versus Fiscal 2015.*     Wholesale vehicle sales increased by $6.4 million to $10.2 million during the year ended December 31, 2016, compared to $3.7 million during the year ended December 31, 2015. We primarily obtain our wholesale inventory from customer trade-ins. As our retail unit sales have increased, so have the trade-ins we receive. Therefore, we have had more units available for sale to wholesalers over time and our revenues attributed to wholesale vehicle sales have increased.

*Fiscal 2015 Versus Fiscal 2014.*     Wholesale vehicle sales increased by $3.2 million to $3.7 million during the year ended December 31, 2015, compared to $0.5 million during the year ended December 31, 2014. This increase was primarily due to an increase in retail units sold since we obtain most of our wholesale inventory from customer trade-ins.

### Other Sales and Revenues

*Fiscal 2016 Versus Fiscal 2015.*     Other sales and revenues primarily consist of gains on the sales of loans we originate and commissions we receive on VSCs. Other sales and revenues increased by $11.3 million to $13.0 million during the year ended December 31, 2016, compared to $1.7 million during the year ended December 31, 2015. Our increase in VSC sales was driven by the increase in units sold, as well as an increase in the attachment rate of VSCs to retail units sold. In January 2016, we began selling most of the automotive finance receivables we originated to third parties at a premium. Prior to 2016, we sold the loans we originated to DriveTime, at par. See "Certain Relationships and Related Party Transactions—Relationship with DriveTime."

*Fiscal 2015 Versus Fiscal 2014.*     Other sales and revenues increased by $1.6 million to $1.7 million during the year ended December 31, 2015, compared to an inconsequential amount during the year ended December 31, 2014. This increase was driven primarily by an increase in VSC sales resulting from growth in retail units sold and a higher conversion rate on VSCs for retail units sold. We did not recognize gain on loan sales in either 2015 or 2014 because prior to 2016, we sold all of the loans we originated to DriveTime, at par. See "Certain Relationships and Related Party Transactions — Relationship with DriveTime."

### Used Vehicle Gross Profit

*Fiscal 2016 Versus Fiscal 2015.*     Used vehicle gross profit increased by $6.1 million to $5.9 million during the year ended December 31, 2016, compared to a loss of $0.2 million during the year ended December 31, 2015. This increase was driven primarily by an increase in used vehicle gross profit per unit to $317 for the year ended December 31, 2016 compared to a loss of $33 for the year ended December 31, 2015. The increase in vehicle gross profit per unit was driven by enhancements in our proprietary vehicle purchasing and pricing technology, as well as by cost efficiencies in the reconditioning and transportation of our vehicles.

*Fiscal 2015 Versus Fiscal 2014.*     Used vehicle gross loss improved by $0.2 million to a loss of $0.2 million in 2015, compared to a loss of $0.4 million in 2014. This decrease in gross loss was driven primarily

78

Table of Contents

by a decrease in used vehicle gross loss per unit to a loss of $33 from a loss of $213. The decrease in vehicle gross loss per unit was driven primarily by a decrease in average days to sale, commensurate with the launch of several new markets in late 2014 and in 2015.

### Wholesale Vehicle Gross Profit

*Fiscal 2016 Versus Fiscal 2015.* Wholesale vehicle gross profit increased by $0.4 million to $0.3 million during the year ended December 31, 2016, compared to a loss of $0.1 million during the year ended December 31, 2015. This increase was driven primarily by an increase in wholesale gross profit per wholesale unit to $97 from a loss of $111. The increase in wholesale gross profit per unit was driven by improvements in our automated appraisal algorithms and wholesale disposition processes.

*Fiscal 2015 Versus Fiscal 2014.* Wholesale vehicle gross profit decreased by $0.1 million to a loss of $0.1 million during the year ended December 31, 2015, compared to a loss of $0.0 million during the year ended December 31, 2014. This decrease was driven primarily by a decrease in wholesale gross profit per wholesale unit to a loss of $111 from a loss of $65 and an increase in wholesale units sold.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

### Components of SG&A

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| | (in thousands) | | |
| Compensation and benefits [1] | $  4,413 | $ 11,657 | $   37,220 |
| Advertising expense | 4,078 | 10,779 | 26,988 |
| Market occupancy costs [2] | 526 | 554 | 1,768 |
| Logistics [3] | 488 | 1,382 | 8,350 |
| Other overhead costs [4] | 5,179 | 12,306 | 34,350 |
| Total | $ 14,684 | $ 36,678 | $  108,676 |

(1)    Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and unit-based compensation, except those related to reconditioning vehicles which are included in cost of sales.

(2)    Market occupancy costs includes rent, utilities, security, repairs and maintenance, and depreciation of buildings and improvements, including vending machines and fulfillment centers, excluding the portion related to reconditioning vehicles which is included in cost of sales, and excluding the portion related to our corporate office which is included in other overhead costs.

(3)    Logistics includes fuel, maintenance, and depreciation related to owning and operating our own transportation fleet, and third party transportation fees.

(4)    Other overhead costs include all other overhead and depreciation expenses such as IT expenses, limited warranty, travel, insurance, bad debt, title and registration, and other administrative expenses.

*Fiscal 2016 Versus Fiscal 2015* . Selling, general and administrative expenses increased by $72.0 million to $108.7 million during the year ended December 31, 2016, compared to $36.7 million during the year ended December 31, 2015. The increase is partially due to an increase in compensation and benefits of $25.6 million, which was driven by expansion into new markets and growth in headcount at our Phoenix headquarters, including in our product and engineering, accounting, finance, legal, real estate, information

79

Table of Contents

technology, and human resources departments. These expenses will increase as we expand to additional markets and as we incur increased expenses as a public company, in absolute terms. Advertising, market occupancy, logistics and other overhead expenses increased during the year ended December 31, 2016 compared to the prior period primarily due to an increase in number of markets. In 2016, logistics expenses also included significant charges from third parties prior to the development of our in-house logistics network.

    *Fiscal 2015 Versus Fiscal 2014.*    Selling, general and administrative expenses increased by $22.0 million to $36.7 million during the year ended December 31, 2015, compared to $14.7 million during the year ended December 31, 2014. The increase is primarily due to an increase of $6.7 million in advertising, commensurate with expansion to six new markets. The increase is also due to an increase of $7.2 million in compensation and benefits, which was driven by a rise in total headcount associated with our growth.

### Interest Expense

    *Fiscal 2016 Versus Fiscal 2015.*    Interest expense increased by $2.2 million to $3.6 million during the year ended December 31, 2016, compared to $1.4 million during the year ended December 31, 2015. In order to expand the inventory we make available to customers, we increased our borrowings under our Floor Plan Facility. The increase in interest expense is due to the increases in the outstanding balance.

    *Fiscal 2015 Versus Fiscal 2014.*    Interest expense increased by $1.3 million to $1.4 million during the year ended December 31, 2015, compared to $0.1 million during the year ended December 31, 2014. The interest expense was associated with the interest incurred on our Floor Plan Facility which commenced in December 2014 and interest incurred on our note payable to related parties which commenced in November 2014. This note was repaid in July 2015.

<div align="center">80</div>

**Table of Contents**

**Quarterly Key Metrics and Results of Operations**

The following table sets forth selected key metrics and unaudited quarterly results of operations data for each of the quarters indicated. We have prepared the unaudited quarterly information on a basis consistent with the audited financial statements included elsewhere in this prospectus. In the opinion of management, the financial information in these tables reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of this data. This information should be read in conjunction with the consolidated financial statements and related notes included elsewhere in this prospectus. The historical quarterly operating results presented below are not necessarily indicative of the results that may be attained during a full year of operations or any future period.

| | Quarter Ended — All Periods Unaudited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2014 | Jun 30, 2014 | Sept 30, 2014 | Dec 31, 2014 | Mar 31, 2015 | Jun 30, 2015 | Sept 30, 2015 | Dec 31, 2015 | Mar 31, 2016 | Jun 30, 2016 | Sept 30, 2016 | Dec 31, 2016 |
| | (Dollars in thousands, except per unit amounts) | | | | | | | | | | | |
| Number of markets | 1 | 2 | 3 | 3 | 4 | 5 | 5 | 9 | 11 | 14 | 16 | 21 |
| Average days to sale | 168 | 114 | 109 | 107 | 95 | 97 | 105 | 85 | 83 | 93 | 92 | 89 |
| Average monthly unique visitors | 46,923 | 94,874 | 160,747 | 131,661 | 155,953 | 197,730 | 196,031 | 244,370 | 337,486 | 326,791 | 388,673 | 462,153 |
| Inventory units available on website | 270 | 485 | 517 | 652 | 895 | 1,367 | 1,107 | 1,842 | 2,951 | 4,516 | 4,565 | 7,310 |
| Retail units sold | 315 | 436 | 579 | 775 | 1,212 | 1,343 | 1,776 | 2,192 | 3,783 | 4,355 | 5,023 | 5,600 |
| Total gross (loss) profit per retail unit sold | $ (29) | $ 390 | $ (428) | $ (435) | $ 117 | $ 308 | $ 130 | $ 255 | $ 1,046 | $ 1,386 | $ 1,347 | $ 435 |
| **Sales and operating revenue** | | | | | | | | | | | | |
| Used vehicle sales, net | $ 6,220 | $ 9,269 | $ 11,648 | $ 13,986 | $ 22,845 | $ 27,174 | $ 34,062 | $ 40,891 | $ 68,495 | $ 80,488 | $ 92,115 | $100,891 |
| Wholesale vehicle sales | 70 | 170 | 144 | 138 | 436 | 1,184 | 1,167 | 956 | 1,559 | 2,475 | 2,870 | 3,259 |
| Other sales and revenues [1] | 8 | 10 | 3 | 13 | 322 | 249 | 439 | 667 | 2,897 | 3,563 | 3,859 | 2,677 |
| **Total sales and operating revenues** | 6,298 | 9,449 | 11,795 | 14,137 | 23,603 | 28,607 | 35,668 | 42,514 | 72,951 | 86,526 | 98,844 | 106,827 |
| Cost of sales | 6,307 | 9,279 | 12,043 | 14,474 | 23,461 | 28,193 | 35,438 | 41,954 | 68,994 | 80,489 | 92,078 | 104,390 |
| **Gross (loss) profit** | (9) | 170 | (248) | (337) | 142 | 414 | 230 | 560 | 3,957 | 6,037 | 6,766 | 2,437 |
| Selling, general and administrative expenses | 2,082 | 2,961 | 4,012 | 5,629 | 6,637 | 7,621 | 9,218 | 13,202 | 20,632 | 23,344 | 27,995 | 36,705 |
| Interest expense | — | — | — | 108 | 269 | 439 | 310 | 394 | 710 | 796 | 725 | 1,356 |
| Other (income) expense, net | (2) | 4 | — | 20 | — | 2 | (21) | 55 | (60) | 5 | 31 | 70 |
| **Net Loss** | $ (2,089) | $ (2,795) | $ (4,260) | $ (6,094) | $ (6,764) | $ (7,648) | $ (9,277) | $(13,091) | $(17,325) | $(18,108) | $(21,985) | $(35,694) |

(1)  Includes $460 of other sales and revenues from related parties for the quarter ended December 31, 2016.

81

Table of Contents

### *Quarterly Revenue and Gross Profit Trends*

Our revenues have increased in each quarter since our inception. The sequential increases in quarterly revenues have been the result of increases in the number of retail units sold as well as the introduction of new revenue streams. Retail units sold have increased as we have opened new markets and increased penetration in our existing markets, and also as we have expanded our selection of vehicle inventory, advertising and word of mouth referrals.

Used vehicle sales generally exhibit seasonality with sales usually peaking late in the first calendar quarter and diminishing through the rest of the year, resulting in the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns have not matched the general seasonality of the used vehicle industry; however, we have historically experienced higher revenue growth rates in the first quarter of the calendar year than in each of the last three quarters of the calendar year. As we mature, we expect revenues may decrease in each of the last three quarters of the calendar year relative to the first quarter.

Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year. Historically, this has led our gross profit per retail unit sold to be higher on average in the first half of the year than in the second half of the year. See "Risk Factors — Risks Related to Our Business — We may experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business."

Gross profit in the fourth quarter of each year has also historically been adversely affected by our Cyber Monday promotion, which lowers average selling price in late November and early December. Gross profit in the fourth quarter of 2016 was also particularly impacted by the sale and markdown of certain inventory that was no longer a fit for our retail inventory due to open manufacturer recalls. Additionally, our transition to new receivables purchasers on December 29, 2016 temporarily delayed our sale of certain receivables, and an increase in market interest rates prior to the closing of the master purchase and sale agreement and master transfer agreement adversely affected the premium at which we were able to sell receivables originated prior to such increase.

### *Quarterly Selling, General, and Administrative Trends*

Selling, general and administrative expenses have increased in each quarter as a result of the expansion of our business. Volume of sales, continued expansion of our infrastructure and employee headcount has contributed to the increase in these expenses. During the fourth quarter of 2016, we increased our headcount substantially in preparation for the anticipated increase in sales as we continue to enter new markets, as well as in preparation for becoming a public company.

### Liquidity and Capital Resources

### *General*

Our principal sources of liquidity are our cash generated from operations and financing activities. Cash generated from our operating activities primarily includes cash derived from the sale of used retail vehicles, wholesale vehicles, commissions on VSCs sold in connection with the sale of used vehicles, and proceeds from the sale of automotive finance receivables we originated in connection with the sale of used vehicles. Historically, cash generated from our financing activities has also reflected proceeds from our sale of Class C Preferred Units, which total $227.4 million since inception. Additionally, we issued Class A Units in repayment of a $50.0 million note payable to DriveTime.

We have incurred accumulated losses of $152.6 million from our operations from inception through December 31, 2016, and expect to incur additional losses in the future. Our ability to service our debt, fund working capital, capital expenditures and business development efforts will depend on our ability to generate

82

Table of Contents

cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory and other conditions, some of which may be beyond our control. We believe that our existing sources of liquidity including future debt and equity financing, will be sufficient to fund our operations, including lease obligations, debt service requirements, capital expenditures, and working capital obligations for at least the next 12 months. However, our future capital requirements will depend on many factors, including our rate of revenue growth, the expansion of our sales and marketing activities into new and existing markets, and the timing and extent of our spending to support our technology and software development efforts. To the extent that existing cash and cash from operations are insufficient to fund our future activities, we may need to raise additional funds through public or private equity or debt financing. Additional funds may not be available on terms favorable to us or at all.

*Floor Plan Facility*

In October 2014, DriveTime and Carvana entered into an inventory and financing agreement and a cross collateral, cross default and guaranty with Ally Bank and Ally Financial (together "Ally") to finance our used vehicle inventory, which was secured by DriveTime and Carvana's vehicle inventory. On July 27, 2015, the agreement was amended and restated to remove DriveTime as a guarantor party to the agreements. On December 30, 2015, we amended and restated our inventory financing and security agreement with Ally governing the $125.0 million line of credit available under our floor plan facility (the "Floor Plan Facility"). We further amended the Floor Plan Facility on November 9, 2016 to increase the line of credit to $200.0 million and extend the maturity to December 27, 2017. This agreement may be extended for an additional 364-day period at Ally's sole discretion. As of December 31, 2016, $165.3 million borrowings were outstanding under the Floor Plan Facility, the interest rate was 4.57% and $34.7 million remained available for borrowing. See "Description of Certain Indebtedness."

*Other Notes Payable*

Throughout 2016, we issued notes payable to acquire haulers and equipment for use in our logistics operations. The assets purchased with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a five-year term, fixed interest rate and requires monthly principal and interest payments. As of December 31, 2016, the outstanding principal of these notes totaled approximately $5.5 million and had a weighted-average interest rate of approximately 4.8%.

*Finance Receivables*

Our customers can obtain vehicle financing directly on our website. Historically, we have entered into various arrangements to sell the finance receivables we originate to third parties and to a lesser extent related parties. In January 2016, we entered into transfer agreements pursuant to which we indirectly sell automotive finance receivables meeting certain underwriting criteria to third party purchasers. Sales of receivables are a source of cash from operations and remove these loans from our balance sheet without recourse for their post-sale performance. See "Certain Relationships and Related Party Transactions — Transfer Agreements and Note Purchase and Security Agreements." Under the transfer agreements and note purchase and security agreements, we could sell up to $230.0 million in principal balances of the finance receivables in this manner. As of December 31, 2016, we had sold all $230.0 million. We plan to enter into similar arrangements in the future. We have also continued to sell automotive finance receivables to DriveTime.

In December 2016, we entered into a master purchase and sale agreement with Ally pursuant to which we sell Ally automotive finance receivables meeting certain underwriting criteria. Under such sale agreement, Ally has committed to purchase up to an aggregate of $375.0 million in principal balances of automotive finance receivables that we originate, subject to adjustment as described in the agreement. During the year ended December 31, 2016, we sold approximately $21.3 million in principal balances of

83

Table of Contents

automotive finance receivables under this agreement and there was approximately $353.7 million of unused capacity under this agreement as of December 31, 2016. See "Certain Relationships and Related Party Transactions — Other Agreements — Master Purchase and Sale Agreement."

In December 2016, we entered into a master transfer agreement with an unrelated third party pursuant to which we sell automotive finance receivables meeting certain underwriting criteria to such party. Under such sale agreement, the third party has committed to purchase up to an aggregate of $292.2 million in principal balances of automotive finance receivables that we originate. The third party purchaser finances a majority of these purchases with borrowings from Ally. During the year ended December 31, 2016, we sold approximately $8.5 million in principal balances of automotive finance receivables under this agreement and there was approximately $283.7 million of unused capacity under this agreement as of December 31, 2016. See "Certain Relationships and Related Party Transactions — Other Agreements — Master Transfer Agreement."

### Credit Facility with Verde

On February 27, 2017, we entered into a credit facility with Verde Investments, Inc., an affiliate of DriveTime, ("Verde") for an amount up to $50.0 million. We may, but are not required to, draw up to five loans in minimum amounts of $10.0 million each during the term of the agreement. Amounts borrowed and repaid under the agreement cannot be reborrowed. As of March 31, 2017, $20.0 million has been drawn under the credit facility. Amounts outstanding accrue interest at a rate of 12.0% per annum, compounding semi-annually and payable in kind and mature in August 2018. The credit facility requires prepayment without penalty upon a sale of Carvana Group's equity with proceeds of at least $5.0 million, upon issuance by Carvana Group of unsecured debt of at least $5.0 million or upon a change of control transaction involving Carvana Group. The proceeds of the borrowings under the credit facility will be used to provide cash for working capital and general corporate purposes. Upon execution of the agreement, Carvana Group paid to Verde a fee of $1.0 million in consideration of their commitment to make the financing available. The credit facility may at Verde's request be secured by certain real property owned by us and, upon such request, would be subject to recording of a mortgage evidencing such security interest. The credit facility is subject to certain customary covenants, and as of March 31, 2017, we were in compliance with all covenants and such covenants will not restrict our ability to consummate this offering. All outstanding borrowings under the credit facility will be repaid in full and the credit facility agreement will be terminated in connection with this offering. See "Use of Proceeds."

### Cash Flows

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the years ended December 31, 2014, 2015 and 2016.

|  | Year Ended December 31, | | |
|  | 2014 | 2015 | 2016 |
|  | (in thousands) | | |
| Net cash used in operating activities | $ (30,161) | $ (53,508) | $ (240,225) |
| Net cash used in investing activities | (3,768) | (16,065) | (47,690) |
| Net cash provided by financing activities | 39,614 | 105,778 | 283,965 |
| Net increase in cash and cash equivalents | 5,685 | 36,205 | (3,950) |
| Cash and cash equivalents at beginning of period | 1,244 | 6,929 | 43,134 |
| Cash and cash equivalents at end of period | $ 6,929 | $ 43,134 | $ 39,184 |

84

Table of Contents

*Operating Activities*

For the year ended December 31, 2016, net cash used in operating activities was $240.2 million, an increase of $186.7 million compared to net cash used in operating activities of $53.5 million for the year ended December 31, 2015. Significant changes impacting net cash used in operating activities comparing the year ended December 31, 2016 and 2015 are as follows:

- Our net loss was $93.1 million during the year ended December 31, 2016, an increase of $56.3 million from a net loss of $36.8 million during the year ended December 31, 2015 due to costs associated with our operating in additional markets and expanding our corporate infrastructure.

- Purchases of vehicle inventory were $117.5 million during the year ended December 31, 2016, an increase of $75.8 million from $41.7 million during the year ended December 31, 2015 related to the increase in the number of vehicles available to our customers.

- During the year ended December 31, 2016, our automotive finance receivables originations and repurchases exceeded proceeds from the sales of these receivables by $16.5 million due to the timing of originations and repurchases and the subsequent sales of the related receivables to third parties.

- At December 31, 2015, our accounts payable to related party was $21.4 million, primarily related to vehicle inventory purchases, which we repaid during the year ended December 31, 2016. At December 31, 2016, we had accounts payable to related party of $1.9 million, primarily related to shared service fees, repayments to DriveTime for invoices paid on our behalf and lease payments. See "Certain Relationships and Related Party Transactions — Our Relationship with DriveTime."

For the year ended December 31, 2015, net cash used in operating activities was $53.5 million, an increase of $23.3 million compared to net cash used in operating activities of $30.2 million for the year ended December 31, 2014. Significant changes impacting net cash used in operating activities comparing the year ended December 31, 2015 and 2014 are as follows:

- Our net loss was $36.8 million during the year ended December 31, 2015, an increase of $21.5 million from a net loss of $15.2 million during the year ended December 31, 2014 due to costs associated with our operating in additional markets and expanding our corporate infrastructure.

- Purchases of vehicle inventory were $41.7 million during the year ended December 31, 2015, an increase of $24.3 million from $17.4 million during the year ended December 31, 2014 related to the increase in the number of vehicles available to our customers.

- The cash provided by operating activities associated with accounts payable to related party was $21.4 million during the year ended December 31, 2015 compared to $0.0 during the year ended December 31, 2014 due to the timing of payments to DriveTime primarily related to vehicle inventory purchased during 2015.

*Investing Activities*

Cash used in investing activities was $47.7 million and $16.1 million during the year ended December 31, 2016 and 2015, respectively, an increase of $31.6 million. The increase relates to the increase in purchases of property and equipment of $25.6 million, reflecting the expansion of our business operations into new markets and the increase in restricted cash of $8.2 million due to the increase in our Floor Plan Facility of $123.0 million to fund the increase in our vehicle inventory.

Cash used in investing activities was $16.1 million and $3.8 million during the years ended December 31, 2015 and 2014, respectively, an increase of $12.3 million. The increase relates to the increase in purchases of property and equipment of $10.2 million, reflecting the expansion of our business operations into new markets and the restricted cash requirement of $2.1 million in 2015 due to our Floor Plan Facility established in 2015 to fund the vehicle inventory purchases.

85

Table of Contents

*Financing Activities*

Cash provided by financing activities was $284.0 million and $105.8 million during the years ended December 31, 2016 and 2015, respectively, an increase of $178.2 million. The net increase relates to the following significant financing activities:

- Proceeds from the issuance of Class C Preferred Units increased by $97.4 million from $65.0 million in the year ended December 31, 2015 to $162.4 million in the year ended December 31, 2016. The issuance of preferred units has been utilized to fund our continuing expansion into new markets and general working capital needs.

- In the year ended December 31, 2015, we paid a cash dividend of $33.5 million to facilitate the sale of our Class C Preferred Units. We did not make any dividend payments in the year ended December 31, 2016, which resulted in a related increase in cash provided by financing activities in 2016 compared to the prior period.

- Proceeds from the Floor Plan Facility increased by $285.5 million due to increased borrowing requirements to fund the expansion of our vehicle inventory.

- Payments on the Floor Plan Facility increased by $199.2 million due to the timing of payments under the facility.

Cash provided by financing activities was $105.8 million and $39.6 million during the years ended December 31, 2015 and 2014, respectively, an increase of $66.2 million. The net increase relates to the following significant financing activities:

- Proceeds from the issuance of Class C Preferred Units were $65.0 million during the year ended December 31, 2015. The issuance of preferred units has been utilized to fund our continuing expansion into new markets and general working capital needs.

- We made a dividend payment of $33.5 million during the year ended December 31, 2015 and did not make any dividend payments during 2014, which resulted in a decreased in cash provided by financing activities in 2015.

- Proceeds from Floor Plan Facility increased $119.5 million in the year ended December 31, 2015 due to increased borrowing requirements to fund the expansion of our vehicle inventory.

- Payments on the Floor Plan Facility were $88.4 million in the year ended December 31, 2015 while no payments related to the facility were made during 2014.

- Proceeds from the issuance of related party notes payable were $50.0 million and $11.8 million during the years ended December 31, 2015 and 2014, respectively. The $11.8 million related party note payable issued in 2014 was repaid in 2015 resulting in a decrease in cash provided by financing activities. During 2015, we issued 11.8 million Class A Units in repayment of the $50.0 million related party note payable.

86

Table of Contents

## Contractual Obligations and Commitments

The following table sets forth the amounts of our significant contractual obligations and commitments with definitive payment terms as of December 31, 2016:

| | | Payments due by Period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| | | | (in thousands) | | |
| Floor Plan Facility [1] | $165,313 | $ 165,313 | $ — | $ — | $ — |
| Notes payable | 5,461 | 1,057 | 2,272 | 2,132 | — |
| Interest payments on outstanding notes payable | 649 | 238 | 318 | 93 | — |
| Vending machines and fulfillment centers [2] | 4,785 | 4,785 | — | — | — |
| Related party operating lease obligations | 28,396 | 1,512 | 3,400 | 3,537 | 19,947 |
| Operating lease obligations | 41,714 | 2,590 | 5,344 | 5,495 | 28,285 |
| Total | $246,318 | $ 175,495 | $ 11,334 | $ 11,257 | $ 48,232 |

(1)   Represents the principal amounts outstanding as of December 31, 2016. Due to the uncertainty of forecasting the timing of expected variable interest rate payments, interest payment amounts are not included in the table. Borrowings under the Floor Plan Facility are payable when the underlying vehicle is sold which is expected to be within one year. See "Description of Certain Indebtedness."

(2)   Includes minimum remaining fixed payments related to vending machine construction and excludes variable installation costs, which fluctuate based on actual completion time.

## Off-Balance Sheet Arrangements

We did not have any off-balance sheet arrangements as of December 31, 2016.

## Post-Offering Taxation and Expenses

Carvana Group has been treated as a pass-through entity for U.S. federal income tax purposes and accordingly has not been subject to U.S. federal income tax. After consummation of this offering, Carvana Group will continue to be treated as a pass-through entity for U.S. federal income tax purposes. As a result of its indirect ownership of LLC Units, Carvana Co. will become subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income of Carvana Group and will be taxed at the prevailing corporate tax rates. In addition to tax expenses, we also will incur expenses related to our operations, plus we will be required to make payments under the Tax Receivable Agreement. Due to the uncertainty of various factors, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement; however, we estimate that such payments may be substantial. We intend to cause Carvana Group to make distributions in an amount sufficient to allow us to pay our tax obligations and operating expenses, including distributions to fund any ordinary course payments due under the Tax Receivable Agreement. See ''Organizational Structure — Amended and Restated Operating Agreement of Carvana Group'' and ''Organizational Structure — Tax Receivable Agreement.''

Additionally, as a public company, we expect to implement additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. We expect to

Table of Contents

incur additional annual expenses related to these activities including, among other things, additional directors' and officers' liability insurance, director fees, costs to comply with the reporting requirements of the SEC, compliance with the requirements of the Sarbanes-Oxley Act, transfer agent fees, hiring additional accounting, legal and administrative personnel, increased auditing and legal fees and similar expenses.

## JOBS Act

We qualify as an "emerging growth company" pursuant to the provisions of the JOBS Act. For as long as we are an "emerging growth company," we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, exemptions from the requirements of holding advisory "say-on-pay" votes on executive compensation and shareholder advisory votes on golden parachute compensation.

The JOBS Act also permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We are choosing to "opt out" of this provision and, as a result, we will comply with new or revised accounting standards as required when they are adopted. This decision to opt out of the extended transition period is irrevocable.

## Critical Accounting Policies

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with United States generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenue and expenses, and related disclosures of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions, impacting our reported results of operations and financial condition.

Certain accounting policies involve significant judgments and assumptions by management, which have a material impact on the carrying value of assets and liabilities and the recognition of income and expenses. Management considers these accounting policies to be critical accounting policies. The estimates and assumptions used by management are based on historical experience and other factors, which are believed to be reasonable under the circumstances. The significant accounting policies which we believe are the most critical to aid in fully understanding and evaluating our reported financial results are described below. Refer to "Note 2 — Summary of Significant Accounting Policies" to the consolidated financial statements, appearing elsewhere in this document for more detailed information regarding our critical accounting policies.

### Revenue Recognition

Revenue consists of used vehicle sales, wholesale vehicle sales and other sales and revenues, which includes commissions on VSCs, gains on the sales of automotive finance receivables, interest income received on finance receivables and delivery fee revenues. We recognize revenue when the earnings process is completed.

Our used vehicle sales are to customers who purchase used vehicles on our website. Revenue is recognized upon delivery, when the sales contract is signed and the agreed-upon down payment or

88

Table of Contents

purchase price has been received or financing has been arranged, net of a reserve for returns. Our return policy allows customers to return their purchases within seven days from delivery. Our reserve for sales returns is estimated using historical experience and trends. The establishment of reserves for sales returns is dependent on a number of variables. In future periods additional provisions may be necessary due to a variety of factors, including changing customer return patterns due to the maturation of the online vehicle buying market, macro- and micro- economic factors that could influence customer return behavior and future pricing environments. If these factors result in adjustments to sales returns, they could significantly impact our future operating results.

We recognize commission revenue on VSCs at the time of sale, net of a reserve for estimated contract cancellations. The reserve for cancellations is estimated based on historical experience and recent trends. Our risk related to contract cancellations is limited to the commissions that we receive. Cancellations fluctuate depending on the customer financing default or prepayment rates, and shifts in customer behavior, including those related to changes in the coverage or term of the product. To the extent that actual experience differs from historical trends, there could be significant adjustments to our contract cancellation reserves.

Sales of automotive finance receivables are recognized when the asset is sold and cash is received. Sales of automotive finance receivables are contingent on customers meeting certain underwriting standards established by the investors purchasing the related automotive finance receivable. To the extent that automotive finance receivables sold do not meet these underwriting standards we could potentially be required to repurchase the loan which could have a significant impact on the amount of gain or loss on loan sales previously recognized.

### Finance Receivables Held for Sale, Net

Finance receivables include automotive finance receivables we originate to facilitate vehicle sales. We classify these receivables as held for sale, as we do not intend to hold the finance receivables we originate to maturity. We report finance receivables that we retain at the lower of cost or fair value by recording a valuation allowance when the fair value is less than cost. We estimate the allowance based upon historical experience, credit quality of the underlying receivables and loss trends and evaluate the allowance periodically, taking into account recent trends in losses and the overall economic environment. To the extent that actual experience differs from historical trends, there could be significant adjustments to our valuation allowance.

### Valuation of Inventory

Vehicle inventory consists of used vehicles, primarily acquired at auction. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental costs are capitalized as a component of inventory. Vehicle inventory is stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is based on the estimated selling price derived from historical data and trends, such as sales price and average days to sale of similar vehicles, as well as independent, market resources less costs to complete, dispose and transport the vehicles. To the extent that there are significant changes to estimated vehicle selling prices or decreases in demand for used vehicles, there could be significant adjustments to reflect our inventory at net realizable value.

### Unit-Based Compensation

We classify unit-based awards granted in exchange for services as either equity awards or as liability awards. Unit-based compensation expense for equity and liability awards is measured based on the fair value of the award at the grant date. The calculation of unit-based compensation expense is based on the Black-Sholes valuation model which requires significant estimates including the expected volatility of our common units, expected dividend yield, option term and risk-free interest rate. We also estimate when and if contingency-based awards

89

Table of Contents

will be earned. If an award is not considered probable of being earned, no amount of unit-based compensation is recognized. If the award is deemed probable of being earned, related compensation expense is recorded over the estimated service period. To the extent our estimates of awards considered probable of being earned changes, the amount of unit-based compensation recognized will also change. Adjustments related to changes in the fair value and probability assessments could result in a significant increase or decrease in compensation expense.

### Temporary Equity

We record the issuance and sale of preferred units with redemption features out of our control at fair value, net of issuance costs, as temporary equity. We recognize any returns as an increase in temporary equity and increase to members' deficit.

### Income Taxes

Carvana Group was organized in Delaware as a limited liability company and treated as a partnership for U.S. federal and state income tax purposes. Carvana Group is not subject to income taxes and passes through consolidated taxable income to our members, allocated pursuant to the our LLC Agreement, as amended and restated. Accordingly, no provision for income taxes, except for any amount of entity level state tax in certain jurisdictions, has been recorded.

After consummation of this offering, we will become subject to U.S. federal, state and local income taxes with respect to our allocable share of any taxable income of Carvana Group and will be taxed at prevailing corporate tax rates. In addition to tax expense, we will be required to make payments under the Tax Receivable Agreement. We intend to cause Carvana Group to make distributions in an amount sufficient to allow us to pay our tax obligations and operating expenses, including distributions to fund any payments under the Tax Receivable Agreement. See "Organizational Structure — Tax Receivable Agreement."

## Quantitative and Qualitative Disclosures About Market Risk

Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of exposure due to potential changes in inflation or interest rates. We do not hold financial instruments for trading purposes.

### Inflation Risk

Based on our analysis of the periods presented, we believe that inflation has not had a material effect on our operating results. There can be no assurance that future inflation will not have an adverse impact on our operating results and financial condition.

### Interest Rate Risk

We had total outstanding debt under our Floor Plan Facility and notes payable of approximately $170.8 million at December 31, 2016. Amounts outstanding under our Floor Plan Facility are due within one year and amounts outstanding under our other notes payable are due in 2021. Amounts outstanding under our Floor Plan Facility bear a variable interest rate of a fixed spread to the one-month LIBOR rate. Our notes payable each have a fixed interest rate. At December 31, 2016, the applicable one month LIBOR rate was 0.77%. A 100-basis point increase in market interest rates would have increased our interest expense during the year ended December 31, 2016 by approximately $0.9 million. A 100-basis point decrease in market interest rates would have decreased our interest expense during the year ended December 31, 2016 by approximately $0.7 million.

Table of Contents

## BUSINESS

### Our Mission

Our mission is to change the way people buy cars.

### Our Company

Carvana is a leading eCommerce platform for buying used cars. We are transforming the used car buying experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing and a simple, no-pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

We provide a refreshingly different and convenient car buying experience that can save buyers time and money. On our platform, consumers can research and identify a vehicle, inspect it using our proprietary 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle, and schedule delivery or pick-up, all from their desktop or mobile devices. Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase and schedule delivery online in as little as 10 minutes.

Our technology and infrastructure allow us to seamlessly and cost efficiently deliver this car buying experience to our customers. We use proprietary algorithms to optimize our nationally pooled inventory of over 7,300 vehicles, inspect and recondition our vehicles based on our 150-point inspection process, and operate our own logistics network to deliver cars directly to customers as soon as the next day. Customers in certain markets also have the option to pick up their vehicle at one of our proprietary vending machines, which provides an exciting pick-up experience for the customer while decreasing our variable costs, increasing scalability and building brand awareness.

The automotive retail industry's structure presents an opportunity for disruption. It is the largest consumer retail industry in the United States and is highly fragmented. According to the U.S. Census Bureau, the U.S. automotive industry generated approximately $1.1 trillion in sales in 2015, while Edmunds.com estimates the U.S. used vehicle sales market at over $710 billion in 2015. With little brand differentiation, there are approximately 63,000 used car dealerships in North America according to DealerSocket 2015 and the largest dealer brand commands approximately 1.6% of the U.S. market according to Edmunds.com and publicly-listed dealership filings. Additionally, consumers are often dissatisfied with the car buying process. According to DealerSocket 2016, 81% of North American consumers do not enjoy the car buying process, and car salesmen are among the least trusted professionals, according to a 2015 Gallup poll.

Carvana has demonstrated that its custom-built business model can capitalize on this opportunity. From the launch of our first market in January 2013 through December 31, 2016, we purchased, reconditioned, sold and delivered approximately 27,500 vehicles to customers through our website, generating $541.8 million in revenue. Our sales have grown as we have added new markets and increased our market penetration in our current markets. As of December 31, 2016, our in-house distribution network services 21 metropolitan markets, and we plan to continue to expand our network into additional markets. Since we launched our first market in 2013, we have grown organically across the United States, adding two markets in 2014, six in 2015 and 12 in 2016.

Our revenues have grown from $4.6 million in 2013 and $41.7 million in 2014 to $130.4 million in 2015. For the year ended December 31, 2016, we generated $365.1 million in revenue, representing a 180.0% increase over the $130.4 million in revenue that we generated for the year ended December 31, 2015. We continue to invest heavily in growth and generated a net loss of $93.1 million for the year ended December 31, 2016, compared to a net loss of $36.8 million for the year ended December 31, 2015.

91

Table of Contents

**Industry Background & Market Opportunity**

*Exceptionally Large and Fragmented Market*

The U.S. automotive industry generated approximately $1.1 trillion in sales in 2015, which comprised roughly 20% of the U.S. retail economy and made it the largest consumer retail market in the United States according to the U.S. Census Bureau. Edmunds.com estimates the U.S. used vehicle sales market at over $710 billion in 2015, representing approximately 38 million used vehicle transactions at an average sales price of $18,552.

The used car auto retail industry is highly fragmented. There are approximately 63,000 used car dealerships in North America, comprised of 45,000 independent used car dealerships and nearly 18,000 franchise dealerships, according to the DealerSocket 2015. The largest dealer brand commands approximately 1.6% of the U.S. market and the top 100 used car auto retailers collectively hold approximately 7.0% market share, according to Edmunds.com, publicly-listed dealership filings and Automotive News.

The traditional used car retailing model is costly, operationally challenging and difficult to scale. Providing an end-to-end solution requires inspection, repair, reconditioning and showroom facilities, as well as inventory sourcing and financing capabilities, substantially all of which is traditionally done at each dealership location. According to publicly-listed dealership filings, some full service dealerships providing all of these services can require an initial investment of up to $30 million. Additional variable costs include the salaries of on-site employees, inventory financing fees and vehicle transportation costs.

Customer acquisition is expensive and inefficient for traditional automotive retailers as they are typically confined to local advertising channels and have to drive foot traffic to their physical locations, where they offer an often undifferentiated service and limited inventory.

Additional challenges in auto retailing, both online and offline, stem from the following unique characteristics of selling cars:

- big ticket item, often representing one of the customer's largest and longest lifecycle purchases;
- range of taste in make, model, body style, price, year, mileage, color, drivetrain and features;
- second most expensive purchase many consumers make and finance;
- complex transaction often involving a vehicle trade-in and the purchase of add-on service products to protect the customer's investment;
- reliance on third parties for critical business functions; and
- state and local regulatory compliance variability.

*The Way Consumers Buy Cars Is Changing*

Historically, consumers discovered vehicles for sale through local print and broadcast media, as well as word of mouth, and would go to dealerships to educate themselves on potential purchases. However, consumers no longer rely solely on traditional media and dealerships to discover and research vehicles. According to the Cars Online 2014 report from Capgemini, 97% of customer vehicle purchases involve online research. In fact, the 2016 Car Buyer Journey report from Autotrader indicates that a typical used car buyer spends approximately nine hours researching his or her prospective car purchase online.

As eCommerce has become more established, reaching 8.4% of total retail sales in the U.S. in the third quarter of 2016 according to the U.S. Census Bureau, consumers have become more comfortable buying taste-driven, higher-priced products such as consumer electronics and home furnishings online. Similarly, auto consumers are interested in eCommerce solutions for their car purchasing needs — 75% of U.S. car buyers would consider completing their entire car purchase online if given the opportunity, according to Accenture's 2015 Automotive Digital Survey.

92

Table of Contents

*What Auto Consumers Want*

As a result of the unique aspects of purchasing a vehicle, consumers have a distinct set of expectations that are challenging for traditional used auto retailers to address.

- *Wide selection.*    Automobiles vary widely in model, style, color, age and price, and consumers exhibit differing tastes, style and purchasing goals and budgets. This requires dealers to maintain a broad inventory and offer multiple financing, warranty and service plan choices.

  - Traditional used auto retailers are limited by staging capacity and anticipated local demand at each dealership; they generally lack the logistical capabilities to source vehicles from other locations quickly and cost-effectively.

- *Value.*    Auto consumers want consistent, fair value.

  - Traditional used car retailers have high overhead costs and must pass these costs on to their customers.

- *Confidence in quality.*    Auto consumers want to have comfort that the vehicle they purchase is mechanically sound and will not require costly repairs or replacement in the near term.

  - Traditional used auto retailers may lack the scale and expertise to consistently purchase high quality vehicles and uniformly recondition them, increasing the incidence of selling a "lemon."

- *Control and no pressure.*    Auto consumers want to feel in control of the buying process, without being pressured.

  - According to DealerSocket 2016, 81% of North American consumers do not enjoy the car buying process, and U.S. car salespeople are among the least trusted professionals, according to a 2015 Gallup poll.

- *Fast, simple purchasing process.*    Auto consumers want their transaction to be convenient, fair and on their own desired timeline.

  - Buying a car at a traditional auto dealership is often a multi-part transaction including vehicle purchase, trade-in, financing and complementary products, and requires over three hours on average, according to the 2016 Car Buyer Journey report from Autotrader.

**Carvana's Solution**

In response to these evolving consumer needs, we built Carvana to provide a no-pressure, no-haggle experience with flexible and fast transactions. Consumers can research and identify a vehicle, inspect it using interactive high definition photography, obtain financing and warranty coverage, complete their purchase and schedule delivery or pick up, all from our online platform. Our uniformed employees deliver cars to customers in branded single car haulers as soon as the next day, and we offer a seven-day return policy on all our cars sold. The sales process we have built enables our customers to execute their purchases, once a car has been selected, in as little as 10 minutes.

We aim to deliver the best selection, best value and best experience for used car buyers.

*The Best Selection*

As of December 31, 2016, we offer all customers a nationally pooled inventory of over 7,300 high-quality used vehicles. We evaluate all of the vehicles that we own and offer for sale using our 150-point "Carvana Certified" inspection process, which we are able to perform at scale across our network of inspection and reconditioning centers ("IRCs"). Our customer research indicates that size and range of selection are primary determinants of where customers will transact. We use proprietary algorithms to optimize our inventory acquisition based on extensive used vehicle market and customer behavior data. Furthermore, our nationally pooled inventory system maximizes the breadth of vehicle selection for our

93

Table of Contents

customers in any given location. This results in a higher likelihood that customers are able to find the make, model, year and color combination that they desire. In contrast, traditional dealerships are limited in range of selection because they typically optimize a local inventory of a few hundred vehicles at each dealership location, even if they own thousands of vehicles across multiple distributed locations.

### The Best Value

Our proprietary technology and vertically-integrated business model allow us to enjoy a significantly lower variable cost structure versus traditional dealerships and provide substantial value to our customers. We do not require a network of brick-and-mortar dealerships, staffed with sales personnel; instead, we utilize both an in-house logistics network and proprietary vending machines to facilitate trade-ins and vehicle delivery. Additionally, we believe our pooled inventory approach will result in lower average days to sale, which we expect will help improve margins due to decreased vehicle depreciation resulting in higher unit selling price. These savings are passed on to the consumer through sales prices that averaged approximately $1,430 below Kelley Blue Book Suggested Retail Value per vehicle during the year ended December 31, 2016. Furthermore, we are able to provide personalized and highly-transparent financing terms based on basic customer information that results in faster transaction times, clear lending terms and competitive interest rates.

### The Best Experience

We aim to provide the best car buying experience available for our customers through a fully-integrated, convenient online shopping experience. Our proprietary 360-degree vehicle imaging technology provides transparency by allowing customers to view vehicle features and imperfections. We also provide automated trade-in valuations, financing and vehicle service contracts ("VSC"). Customers can easily select among various pricing and pre-approved financing terms and receive approval in seconds. We offer a premium fulfillment experience with pick-up and delivery options available, including pick-up at our vending machines in some markets. Our in-house customer advocates are available to answer customer questions that arise throughout the process. At every customer touch point, we strive to provide the level of customer service that makes purchasing a car from us an enjoyable, memorable experience. Finally, we offer seven-day return and 100-day warranty policies with every car we sell.

We believe that our customers value the ease of use and transparency of our platform. They have responded favorably to our solution, as illustrated by the ratings we receive. Our customers rated us an average of 4.8 out of 5.0 as of December 31, 2016, and 95% of them said they would recommend us to a friend when responding to over 4,250 satisfaction surveys we solicited from our inception through December 31, 2016. These positive reactions create opportunities for repeat customers and a strong referral network.

### Strengths & Competitive Advantages

Our business model is disrupting the traditional used vehicle sales model. Our primary goal is to rapidly scale vehicle unit sales by focusing on delivering an unparalleled customer experience. Since our inception in 2012, we have been developing and leveraging the following key strengths of our robust platform, which we believe provide significant competitive advantages.

### Purpose-Built Vertically-Integrated eCommerce Platform

We built our used car eCommerce platform because we believe a lower and differentiated cost structure is critical to providing a seamless, best-in-class car buying experience. We believe that traditional dealerships and other technology-enabled auto platforms do not provide this type of experience, and that our end-to-end model allows us to offer a superior solution while reducing our cost of operations and enhancing our ability to offer complementary products and services. Our vertically-integrated platform gives us control of all critical operations and transaction elements, which facilitates a fast, simple and consistent user experience. We control the algorithms that help determine the vehicles we make available

94

Table of Contents

to our customers, the prices of those vehicles, the financing terms and VSC options available to our customers and the trade-in values we offer. Additionally, we control the logistics infrastructure that enables us to offer customers fast, specific and reliable delivery times. We have invested heavily in our custom designed website to provide a cutting edge user interface, and have built a team of in-house customer advocates that is dedicated to providing first-rate customer service.

### Differentiated Shopping Experience

We have developed market-leading technology that makes the online vehicle purchasing process intuitive, transparent and fun. Our proprietary photo booth, paired with custom photo processing and display technology, provides an interactive way for consumers to search for vehicles and take a virtual tour of the interior and exterior of a vehicle using annotated, high definition photography. We believe this market-leading technology, coupled with our certification process and seven-day return policy, generates the confidence and trust in our platform needed to buy a car online.

### Proprietary Financing Technology

Our differentiated financing solutions provide customers with near instantaneous credit decisions as well as flexibility and transparency in financing their vehicle purchase. We preapprove thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. We preapprove these terms utilizing "soft credit checks" which do not impact a customer's credit unless they complete a purchase and financing transaction. Due to our relatively low car prices, our customers generally have lower PTI (Payment to Income) and LTV (Loan to Value) ratios on their loans than they would have at higher prices. This significantly enhances the quality of the loans that we generate and the premium we can capture when we sell the loans to our financing partners.

### Efficient Logistics Network and Attractive Fulfillment Experience

We have developed proprietary logistics software and an in-house delivery network that differentiates us from competitors by allowing us to predictably and efficiently transport cars while providing customers a distinctive fulfillment experience. Our home delivery is conducted by a Carvana employee on a branded delivery truck. Customers in certain markets can also pick up their vehicles at one of our proprietary car vending machines, which are multi-story glass towers that store purchased vehicles, or at one of our fulfillment centers. These vending machines provide an attractive and unique experience for our customers and develop brand awareness while lowering our vehicle fulfillment expenses. Following the opening of our first vending machine in Nashville, Tennessee, our market penetration significantly increased while our variable operational costs per car sold decreased. We intend to grow our logistics network and build vending machine in many of the metropolitan markets that we serve.

### Scaled Used Vehicle Infrastructure

We currently leverage a network of three IRCs and supporting software for our vehicle reconditioning and logistics activities that required significant investment in time and capital to develop. We believe these facilities at full utilization give us capacity to inspect and recondition about 150,000 cars per year. Our proprietary inventory management system and Transportation Management System ("TMS"), combined with our expertise and experience gained from operating these facilities, position us well to continue to build out additional reconditioning and distribution centers as needed.

### Scale Driving Powerful Network Effects

Our business benefits from powerful network effects. Our logistics capabilities allow us to offer every car in our inventory to customers across our markets. As we add markets, we expect to increase overall demand, which would enable us to carry a larger inventory. A broader vehicle inventory would further improve our offering across our markets, enabling us to increase market share. Furthermore, we anticipate increased brand awareness, driven by national advertising, will allow us to expand our national inventory and further these network effects.

95

Table of Contents

**Our Growth Strategies**

The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle units sales and as a result, our growth strategies are primarily focused on this metric.

Our ability to generate vehicle sales is a function of the number of markets we operate in, our penetration in those markets and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service. We plan to continue growing our vehicle unit sales, number of markets, market penetration and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

*Increase Sales Through Further Penetration of Our Existing Markets*

We believe that our markets are at an early stage of growth when measured by market penetration. In Atlanta, our first and most mature market, we have approximately 1% market penetration, which makes us one of the largest used car dealers in Atlanta. We plan to continue marketing and actively building our brand in existing markets by improving our operations, opening additional vending machines, increasing our inventory size and growing brand awareness.

*Continue to Enter Key Geographic Markets.*

We believe there is a substantial opportunity to utilize our capital-light expansion model and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. We believe we can enter more markets than many of the larger dealership groups because of our lower cost structure, which allows us to efficiently operate in smaller markets. Furthermore, our nationally pooled inventory creates an even larger competitive advantage in these smaller markets, where customers typically have access to less inventory selection at local dealerships.

*Continue to Innovate and Extend Our Technology Leadership*

We will continue to make significant investments in improving and adding to our customer offering. We believe that the complexity of the automotive retail transaction provides substantial opportunity for technology investment and that our leadership and continued growth will enable us to responsibly invest in further separating ourselves from our competitors' offerings.

*Develop Broad Consumer Awareness of Our Brand*

We believe our brand development efforts will meaningfully impact our ability to acquire new customers. We intend to attract new customers through advertising, public relations, and customer referrals. We believe these efforts will be further enhanced once we are able to economically launch national advertising campaigns. We also plan to build vending machines in additional markets to capitalize on word of mouth publicity in building our brand awareness.

*Develop New Products*

We plan to leverage our existing eCommerce and logistics infrastructure to increase monetization opportunities by introducing new complementary products and services. The car purchasing and ownership cycle provides many opportunities to add value for our customers and our technology expertise and process automation position us well to provide these services in unique and differentiated ways.

96

**Table of Contents**

**Customer Lifecycle**

*Search and Discovery.*    We have developed a mobile-optimized website, where prospective car buyers can immediately begin browsing, researching, filtering and identifying their choice from an inventory of over 7,300 vehicles that we offer for sale. We have also developed a series of innovative features to enhance the customer experience on our website and enable better product discovery, such as highly engaging visual imagery and merchandising, as well as easy-to-use site navigation tools and personalization features. We also feature integrations with various vehicle data providers for vehicle feature and option information as a research tool to assist our customers with their purchase decisions.

*Virtual Tour.*    Once customers select a vehicle, they have the ability to take an annotated virtual vehicle tour on our website, which includes a 360-degree view of the interior and exterior of the actual vehicle. This interactive tour allows customers to review vehicle imperfections through high definition photography and provides them with an extensive list of vehicle details, accessories and safety features presented in an intuitive and easy to review manner.

*Seamless Transaction Technology.*    Once customers have chosen a vehicle, our platform allows them to complete the purchase in as little as 10 minutes, saving them both time and money.

- *Financing.*    We pre-approve thousands of down payment and monthly payment combinations that allow customers to choose their preferred financing. Our website includes unique, highly engaging and intuitive financing tools that are transparent and demonstrate the relationship between pre-approved down payment, monthly payment, and term combinations. Our innovative financing tool allows borrowers to select an exact dollar payment plan based on thousands of permutations of APR, down payment, monthly payment and term. Our customers can obtain a financing decision in seconds generated by our proprietary credit scoring and loan structuring algorithms for every car in our inventory. This involves a short process that only requires ten fields to be completed and will not impact customers' credit unless they complete a purchase and finance transaction.

- *Complementary products.*    Our customers can further supplement their online vehicle purchase by electing to purchase a fully-integrated VSC, or extended warranty, which is serviced by DriveTime. In order to help improve the transaction experience, we have evaluated numerous potential options to ultimately provide our customers with two plans that we believe will best meet their needs.

- *Trade-in.*    For customers interested in pursuing a trade-in, our Cardian Angel tool provides customers with an automated valuation of their existing vehicle that can be applied to any vehicle purchase. Carvana will also purchase vehicles directly from customers without an associated vehicle purchase.

- *Documentation and payment.*    To further improve the ease of financing, complementary products, and trade-ins, we have developed a seamless, fully-integrated online documentation process. We have established partnerships with several technology providers that allow for automated down payment income verification and payment processing through simple, easy to use tools such as the ability to take pictures of required documents with a smartphone.

*Fulfillment* .    Customers can choose to have their vehicle delivered or pick up their vehicle at one of our proprietary vehicle vending machines or fulfillment centers. We deliver cars as soon as the next day with a Carvana-uniformed employee in a branded, custom single-car hauler. Our vending machines provide an attractive and unique customer pick-up experience. At our vending machines, the customer deposits a Carvana-branded token into a coin slot and an automated platform selects the customer's car from the multi-story tower and delivers it to a garage bay where the customer is waiting with a Carvana delivery associate.

*Post-sale customer support.*    Once customers have their car, our customer advocates manage the post-sale coordination and service call process including any claims from our standard 100-day / 4,189 mile bumper-to-bumper "Worry Free Guarantee" warranty and the seven-day return policy.

97

Table of Contents

Our customers rated us an average of 4.8 out of 5.0 as of December 31, 2016, and 95% of them said they would recommend us to a friend when responding to over 4,250 satisfaction surveys we solicited from our inception through December 31, 2016. These positive reactions create opportunities for repeat customers and a strong referral network.

## Vehicle Lifecycle

*Vehicle Acquisition.*    We acquire the substantial majority of our used vehicle inventory through the large and liquid national used-car auction market. The remainder of our inventory is acquired directly from customers, vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on and how much to bid; our software can evaluate tens of thousands of potential vehicle purchases per day, creating a distinct competitive advantage versus in-person sourcing methods used by traditional dealerships. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data and a variety of external data sources to support our assessments. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory sourcing professionals.

*Inspection and Reconditioning.*    Once we acquire a vehicle, we leverage our in-house logistics or a third party delivery service to transport the vehicle to one of our IRCs, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair and paint capabilities and receives on-site support from third party vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing to be made available for sale on our website.

*Photography and Merchandising.*    To provide transparency to our customers, our proprietary, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while annotating material defects based on visibility threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

*Transportation and Fulfillment.*    Third party vehicle transportation is often slow, expensive and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary TMS to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs, logistics hubs and vending machines via our owned fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks and drivers while also dynamically optimizing for speed and cost. We store inventory at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

## Markets

As of December 31, 2016, we have an established logistics network and a direct marketing presence in 21 major metropolitan cities and have purchased, reconditioned, sold and delivered approximately 27,500 vehicles since the launch of our first market in January 2013. We initially launched in Atlanta, Georgia in 2013 and have since grown our network across the United States, adding two markets in 2014, six in 2015 and 12 in 2016. We are committed to providing an honest, transparent and customer-centric used car buying experience online, which is achieved through our hub and spoke market approach. While our entire

98

Table of Contents

inventory of vehicles is available for sale across the United States through our own and third party delivery services, our focus is on serving our markets and providing the best possible car buying experience to our customers at a low, transparent cost. Our established logistics network and ability to deliver any car in our inventory on Carvana branded haulers to customers within our markets allow us to provide a low-cost, simple car buying experience.

### Atlanta, Georgia Case Study

We launched in our first market, Atlanta, Georgia, in January 2013. In only 16 quarters of operations, we have grown to become one of the largest used car dealers in Georgia, achieving a market penetration of 0.9% and revenue of over $119 million in the Atlanta market for the year ended December 31, 2016. In the quarter ended December 31, 2016, we sold 1,623 units in Atlanta, representing a market penetration of 1.1%, an increase from 1.0% in the previous quarter and from 0.6% in the quarter ended December 31, 2015. As our Atlanta operations have achieved greater volume, our local advertising expense per retail unit sold has fallen substantially overall, though quarterly periods fluctuate as we launch advertising campaigns. The reduction of advertising expense per retail unit sold has been driven by increased sales, a more comprehensive car inventory, and stronger brand recognition. For a description of the metrics in the tables below see "Management Discussion and Analysis of Financial Condition and Results of Operations – Market Cohorts."

| | March 31, 2014 | June 30, 2014 | Sept. 30, 2014 | Dec. 31, 2014 | March 31, 2015 | June 30, 2015 | Sept. 30, 2015 | Dec. 31, 2015 | March 31, 2016 | June 30, 2016 | Sept. 30, 2016 | Dec. 31, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (dollars in thousands, except per unit amounts) | | | | | | | | | | | |
| Retail units sold | 220 | 279 | 345 | 438 | 735 | 773 | 911 | 980 | 1,481 | 1,551 | 1,633 | 1,623 |
| YoY growth | 1057.9% | 506.5% | 430.8% | 563.6% | 234.1% | 177.1% | 164.1% | 123.7% | 101.5% | 100.6% | 79.3% | 65.6% |
| Market penetration | 0.1% | 0.2% | 0.2% | 0.3% | 0.4% | 0.5% | 0.5% | 0.6% | 0.8% | 0.9% | 1.0% | 1.1% |
| Net sales and operating revenues | $ 4,137 | $ 5,744 | $ 6,615 | $ 7,970 | $ 13,780 | $ 15,932 | $ 17,760 | $18,480 | $ 27,510 | $ 29,794 | $ 31,289 | $30,853 |
| Advertising expense per retail unit sold | $ 1,500 | $ 1,794 | $ 1,514 | $ 1,323 | $ 1,067 | $ 907 | $ 850 | $ 728 | $ 692 | $ 497 | $ 539 | $ 551 |

### Nashville, Tennessee Case Study

We launched in our second market, Nashville, Tennessee, in May 2014. While our Nashville operations benefitted from a larger inventory selection at launch and operational know-how gained in the Atlanta market, the launch of our first fully automated vending machine contributed to the market's outsized growth relative to Atlanta. Shortly following the car vending machine launch in November 2015, Nashville saw sales increase significantly, with market penetration more than doubling from approximately 0.3% to 0.7% from the three months ending September 30, 2015 to the three months ending March 31, 2016. This growth following the vending machine launch led Nashville to reach a market penetration of 1.1%, five quarters faster than Atlanta. In Nashville, customers are increasingly utilizing the convenient and unique buying experience provided by the vending machine.

| | June 30, 2014 | Sept. 30, 2014 | Dec. 31, 2014 | March 31, 2015 | June 30, 2015 | Sept. 30, 2015 | Dec. 31, 2015 | March 31, 2016 | June 30, 2016 | Sept. 30, 2016 | Dec. 31, 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (dollars in thousands, except per unit amounts) | | | | | | | | | | |
| Retail units sold | 22 | 60 | 56 | 93 | 120 | 138 | 204 | 403 | 429 | 489 | 523 |
| YoY growth | n/a | n/a | n/a | n/a | 445.5% | 130.0% | 264.3% | 333.3% | 257.5% | 254.3% | 156.4% |
| Market penetration | 0.0% | 0.1% | 0.1% | 0.2% | 0.2% | 0.3% | 0.4% | 0.7% | 0.8% | 0.9% | 1.1% |
| Net sales and operating revenues | $ 497 | $ 1,147 | $ 999 | $ 1,920 | $ 2,484 | $ 2,749 | $ 3,747 | $ 7,676 | $ 8,212 | $ 9,283 | $ 9,702 |
| Advertising expense per retail unit sold | $ 9,995 | $ 5,369 | $ 6,093 | $ 3,732 | $ 2,920 | $ 2,002 | $ 1,346 | $ 897 | $ 651 | $ 682 | $ 682 |

99

Table of Contents

We have been able to successfully expand into new markets to date and plan to continue entering additional markets. Our success in Nashville is a testament to the efficient, capital-light expansion model and go-to-market strategy that we have successfully replicated in our other new markets. Recently launched markets have continued to grow more rapidly than our initial markets. We believe that increased scale, improved brand awareness, scaled logistics network, expanded vehicle inventory and additional vending machines will continue to drive market ramp speed.

## Marketing

We believe our customer base is similar to the overall market for used cars at average price points of our vehicles. Our sales and marketing efforts utilize a multi-channel approach, built on a seasonality-adjusted, market-based model budget. We utilize a combination of brand building as well as direct response channels to efficiently seed and scale our local markets. Our paid advertising efforts include advertisements through local television, search engine marketing, inventory site listing, retargeting, organic referral, display, digital radio, direct mail and branded pay-per-click channels. We believe our strong customer focus ensures customer loyalty which will drive both repeat purchases and referrals. In addition to our paid channels, we intend to attract new customers through enhancing our earned media and public relations efforts and further investing in our proprietary vending machines.

## Customer Advocates

We have a team of in-house customer support specialists who provide assistance 13 hours per day, seven days per week to our customers located around the country. Operating as advocates, our specialists are available to assist customers with questions that arise throughout the car buying process. These advocates are available via web chat or telephone and help customers navigate the website, answer specific questions and assist in loan verification by working with our customers to establish proof of identity, income and insurance. We take a consultative approach with our customers, offering live support and acting as a trusted partner to guide them through each phase of the purchase lifecycle. We are committed to providing our customers with the highest quality transaction experience and believe our advocates, who receive no commission income, are a meaningful reason why customers prefer transacting with us. The effectiveness of our model is reflected in the high ratings we receive from our customers and strong customer referrals. We focus on developing our advocates and providing them with the information and resources they need to offer exceptional customer service.

## Competition

The U.S. used car marketplace is highly fragmented. There are approximately 45,000 independent used car dealerships and nearly 18,000 franchise dealerships in North America, according to the DealerSocket 2015. The largest dealer brand commands approximately 1.6% of the U.S. market and the top 100 used car auto retailers collectively hold approximately 7.0% market share, according to Edmunds.com, publicly-listed dealership filings and Automotive News. We believe the primary competitive factors in this market include transparency, convenience, price, selection and vehicle quality. Our current competitors can be largely classified into the following segments:

- franchised dealerships – 29% of establishments;

- independent dealerships – 71% of establishments; and

- online dealerships/marketplaces.

A number of used vehicles are also bought and sold through privately negotiated transactions.

We believe that our vertically-integrated business model provides a meaningful and sustainable competitive advantage.

100

**Table of Contents**

## Technology

Our business is driven by data and technology at all stages of the process, from inventory purchasing, reconditioning, photography and annotation through online merchandising, sales, financing, logistics, and delivery. Carvana's proprietary and exclusive-use technology portfolio includes:

- a decisioning model for consolidating internal and third party data to provide profitability estimates for inventory available for purchase;

- a limited exclusivity license to an inventory management system that handles vehicles from acquisition through photography;

- a custom-built automated photography system with software that combines high-quality photos to produce an interactive, 360-degree virtual tour of both the exterior and interior of the vehicle;

- a website that includes advanced filtering and search technology that helps customers find a car that suits their tastes;

- a logistical model to optimize the transport of purchased inventory to the customer; and

- a custom automated delivery tower, or vending machine, including customer experience enhancements such as automatically generated video (suitable for posting to social media) that captures the customer's pick-up experience.

We also rely on third party technology, including the following:

- customer identity verification for financing;

- transportation fleet telemetry;

- network infrastructure for hosting the website and inventory data;

- software libraries, development environments and tools;

- services to allow customers to digitally sign contracts;

- customer service call center management software; and

- automation controls and software for the vending machine.

## Employees

As of December 31, 2016, we had 1,067 employees. None of our employees is represented by a labor union or covered by a collective bargaining agreement. We consider our relationship with our employees to be satisfactory.

## Facilities

*Corporate Offices.*    We lease 37,800 square feet of office space at our corporate headquarters in Phoenix, Arizona. In September 2016, we entered into a lease agreement effective through February 2024 with the option to extend to February 2039 for approximately 69,000 square feet of office space for a new corporate headquarters in Tempe, Arizona that we currently partially inhabit and expect to fully inhabit before the third quarter of 2017. In January 2017, we entered into a sublease agreement with a related party for approximately 65,000 square feet of office space in that same building.

101

Table of Contents

*Other Facilities.*    The below chart summarizes our material facilities other than our corporate headquarters. Each of the facilities listed in the table below is leased other than our Austin Vending Machine and San Antonio Vending Machine. We recondition, photograph and store inventory at our IRCs and provide customers with the option to pick up their purchased vehicles at certain facilities, including multi-story glass tower fulfilment centers that we refer to as vending machines. In markets not listed in the table below, where we do not have an IRC or vending machine that can function as a logistics hub, we lease or sublease office and parking space to facilitate deliveries. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Markets."

| Operations | City |
| --- | --- |
| GA IRC | Winder, GA |
| TX IRC | Blue Mound, TX |
| NJ IRC | Delanco, NJ |
| Nashville Vending Machine | Nashville, TN |
| Atlanta Fulfillment Center | Atlanta, GA |
| Houston Vending Machine | Houston, TX |
| San Antonio Vending Machine | San Antonio, TX |
| Austin Vending Machine | Austin, TX |
| Palo Alto Office | Palo Alto, CA |
| Venice Office | Los Angeles, CA |
| Brady Corporate Apartment | Atlanta, GA |
| Houston Corporate Apartment | Houston, TX |
| Inventory Storage | Raleigh, NC |
| Inventory Storage | Saginaw, TX |

### Intellectual Property

We protect our intellectual property through a combination of trademarks, domain names, copyrights, trade secrets, patents and contractual provisions and restrictions on access and use of our proprietary information and technology.

As of December 31, 2016, we hold one issued patent covering our photo booth and imaging technology, and six pending patent applications and one provisional application covering various technologies including our website user interface technology, our loan underwriting technology, and our vending machine technology.

As of December 31, 2016, we have eight trademark registrations, including registrations for "Carvana," the Carvana logo, and various slogans. We also have one pending registration as of December 31, 2016.

We are the registered holder of a variety of domestic and international domain names, including "carvana.com."

In addition to the protection provided by our intellectual property rights, we enter into confidentiality and proprietary rights agreements with certain of our employees, consultants, contractors and business partners. Certain of our employees and contractors are also subject to invention assignment agreements. We further control the use of our proprietary technology and intellectual property through provisions in both our general and product-specific terms of use on our website.

Furthermore, we have a cross-license agreement with DriveTime pursuant to which DriveTime has obtained limited licenses to some of our intellectual property. See "Certain Relationship and Related Party Transactions — Relationship with DriveTime — IP License Agreement" and "Risk Factors — Risks Related to Our Business — We participate in a highly competitive industry, and pressure from existing and new companies may adversely affect our business and operating results."

Table of Contents

## Seasonality

We expect our quarterly results of operations, including our revenue, gross profit, profitability, if any, and cash flow to vary significantly in the future, based in part on, among other things, consumers' car buying patterns. We are an early stage company and our revenues have increased every quarter from our inception to date. However, we have experienced higher revenue growth rates in the first quarter of the calendar year than in each of the last three quarters of the calendar year. As we mature, we expect revenues may decrease in each of the last three quarters of the calendar year. We believe these results are due to seasonal buying patterns driven in part by the timing of income tax refunds, which we believe are a primary source of our customers' down payments on used vehicle purchases. Due to our short operating history and the overall growth of our business, these seasonal trends have not yet been pronounced, but we expect that in the future our revenues may be affected by these seasonal trends as well as cyclical trends affecting the overall economy, specifically the automotive retail industry. See "Risk Factors — Risks Related to Our Business—We may experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business."

## Government Regulation

Various aspects of our business are or may be subject to U.S. federal and state regulation. In particular, the advertising, sale, financing and transport of used motor vehicles are highly regulated by states in which we do business, as well as the U.S. federal government. Regulatory bodies include the CFPB, FTC, USDOT, DOJ, various state dealer licensing authorities, various state consumer protection agencies and various state financial regulatory agencies. We are subject to compliance audits of our operations by many of these authorities.

Certain states have concluded that our activities are subject to vehicle dealer licensing laws, requiring us to maintain a used vehicle dealer license in order to conduct business in that state. We have at least one licensed facility in each of Alabama, Georgia, New Jersey, Ohio, Tennessee and Texas.

Most states regulate retail installment sales, including setting a maximum interest rate, caps on certain fees, or maximum loan amounts. In addition, certain (but not all) states require that finance companies in general and Carvana in particular have a sales finance license in order to originate loans in that state. We have obtained a sales finance license in New Jersey and Texas.

For a discussion of the various risks we face from regulation and compliance matters, see "Risk Factors — Risks Related to Our Business — We operate in a highly regulated industry and are subject to a wide range of federal, state and local laws and regulations. Failure to comply with these laws and regulations could have a material adverse effect on our business, sales, results of operations and financial condition."

## Legal Proceedings

From time to time we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity, and capital resources.

Future litigation may be necessary to defend ourselves, our partners and our customers by determining the scope, enforceability, and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

103

Table of Contents

## ORGANIZATIONAL STRUCTURE

### Overview

Carvana Co. is a Delaware corporation formed to serve as a holding company that will hold an indirect interest in Carvana Group through its wholly owned subsidiary, Carvana Sub. Neither Carvana Co. nor Carvana Sub have engaged in any business or other activities other than in connection with their formation and this offering. Following this offering, Carvana Co. will remain a holding company, its sole asset will be the capital stock of its wholly owned subsidiary, Carvana Sub, whose sole asset will be a membership interest in Carvana Group, and it will operate and control all of the business and affairs and consolidate the financial results of Carvana Group. Prior to the closing of this offering, the operating agreement of Carvana Group will be amended and restated to, among other things, modify its capital structure by eliminating a class of preferred membership interests, and providing for LLC Units consisting of two classes of common ownership interests in Carvana Group (one held by certain employees and consultants subject to vesting and a participation threshold, and one held by the other Carvana Group owners, including the Garcia Parties and Carvana Sub). We, Carvana Sub and the LLC Unitholders will also enter into an exchange agreement under which each LLC Unitholder (and certain permitted transferees thereof) may (subject to the terms of the exchange agreement) exchange their LLC Units for shares of our Class A common stock. To the extent such owners also hold Class B common stock, they will be required to deliver to Carvana Sub a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be cancelled. As a holder exchanges its LLC Units, our indirect interest in Carvana Group will be correspondingly increased.

Upon completion of this offering, we will be controlled by the Garcia Parties because the Garcia Parties will control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full).

### Incorporation of Carvana Co.

Carvana Co. was incorporated in Delaware on November 29, 2016, and has not engaged in any business or other activities except in connection with its formation and the offering. Our certificate of incorporation will be amended and restated immediately prior to the effectiveness of this registration statement in connection with this offering. Our amended and restated certificate of incorporation will authorize two classes of common stock, Class A common stock and Class B common stock, each having the terms described in "Description of Capital Stock." In addition, our amended and restated certificate will authorize shares of undesignated preferred stock, the rights, preferences and privileges of which may be designated from time to time by our Board.

Shares of our Class B common stock, which provide no economic rights, will be distributed to the holders of Class A Units of Carvana Group (other than Carvana Sub) in connection with this offering. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Each other share of our Class B common stock entitles its holder to one vote on all matters to be voted on by stockholders generally. See "Description of Capital Stock — Class B common stock — Voting Rights." Holders of our Class A common stock and Class B common stock vote together as a single class on all matters presented to our stockholders for their vote or approval, except as otherwise required by applicable law.

### Organizational Transactions

The following transactions, referred to collectively herein as the "Organizational Transactions," will each be completed prior to or in connection with the completion of this offering.

104

Table of Contents

Immediately prior to the effectiveness of this Registration Statement, we will take the following actions:

- We will convert the outstanding Class C Preferred Units into          Class A Units.

- We will amend and restate the LLC Operating Agreement of Carvana Group to, among other things, (i) eliminate a class of preferred membership interests, (ii) provide for LLC Units consisting of two classes of common ownership interests in Carvana Group (Class B common units held by certain employees and consultants subject to vesting and a participation threshold ("Class B Units"), and Class A common units held by the other Carvana Group owners, including the Garcia Parties and Carvana Sub ("Class A Units")), and (iii) appoint our wholly owned subsidiary Carvana Sub, as the sole manager of Carvana Group.

- We will amend and restate the certificate of incorporation of Carvana Co. to, among other things, provide for Class A common stock and Class B common stock. See "Description of Capital Stock."

- We will issue shares of Class B common stock to holders of Class A Units, on a one-to-          basis with the number of Class A Units they own, for nominal consideration.

- Certain employees will be issued an aggregate of          restricted shares of Class A common stock pursuant to the terms of our new 2017 Incentive Plan upon the completion of this offering (assuming an initial public offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). Upon the pricing of this offering, we also expect to award options to purchase an aggregate of          shares of Class A common stock to approximately          employees, with an exercise price set at the initial public offering price. The options awarded upon pricing of the offering will be contingent upon completion of the offering, and a portion of the options will be unvested as of the date of grant. All of the unvested option awards will be time-vesting over a five year period.

- We and Carvana Sub will enter into an exchange agreement with the LLC Unitholders pursuant to which the LLC Unitholders (other than Carvana Sub) will be entitled to exchange LLC Units, together with shares of Class B common stock, in the case of Class A Units, for shares of Class A common stock in accordance with the terms of the Exchange Agreement or, at our election, for cash. See "— Exchange Agreement."

- We will enter into the Tax Receivable Agreement with the LLC Unitholders that will provide for the payment by Carvana Co. to LLC Unitholders of 85% of the amount of cash savings, if any, in U.S. federal, state, local and foreign income taxes we actually realize (or, under certain are deemed to realize in the case of an early termination payment by us, a change in control or a material breach by us of our obligations under the Tax Receivable Agreement, as discussed below) as a result of (i) the increase in our proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of purchases of LLC Units from the LLC Unitholders (other than Carvana Sub) by Carvana Sub and (ii) certain other tax benefits related to our entering into the Tax Receivable Agreement, including tax benefits attributable to payments that we are required to make under the Tax Receivable Agreement. See "— Tax Receivable Agreement."

- Ernest Garcia, II will transfer his 0.1% ownership interest in Carvana, LLC to Carvana Sub for $          (assuming an initial public offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus).

In connection with the completion of this offering, we will issue          shares of our Class A common stock to the investors in this offering (or          shares if the underwriters exercise their option to purchase additional shares in full) in exchange for net proceeds of approximately $          million (or approximately $          million if the underwriters exercise their option to purchase additional shares in full).

105

Table of Contents

Immediately following the completion of this offering, we will take the following actions:

- We will contribute approximately $          million of the net proceeds of this offering to our wholly owned subsidiary, Carvana Sub, to acquire          Class A Units in Carvana Group at a purchase price per LLC Unit equal to          the initial offering price per share of Class A common stock in this offering, less underwriting discounts and commissions.

- Carvana Group will apply a portion of the proceeds it receives from us to repay all outstanding borrowings under the Verde Credit Facility, to pay expenses incurred in connection with the Organizational Transactions and for general corporate purposes. Carvana Group will bear or reimburse us for all of the expenses of this offering, including the underwriters' discounts and commissions. See "Use of Proceeds."

As a result of the Organizational Transactions:

- the investors in this offering will collectively own          shares of our Class A common stock and we will hold, indirectly through our wholly owned subsidiary, Carvana Sub,          LLC Units;

- certain of our former and current employees will own          shares of restricted Class A common stock and options to purchase          shares of Class A common stock with an exercise price set at the initial public offering price, in each case issued pursuant to the 2017 Incentive Plan;

- the Garcia Parties will own          LLC Units and          shares of Class B common stock;

- the remaining LLC Unitholders will own          LLC Units and          shares of Class B common stock;

- our Class A common stock will collectively represent approximately      % of the voting power in us; and

- our Class B common stock will collectively represent approximately      % of the voting power in us.

106

Table of Contents

The diagram below depicts our expected organizational structure immediately following completion of the Organizational Transactions. This diagram is provided for illustrative purposes only and does not purport to represent all legal entities owned or controlled by us, or owning a beneficial interest in us.



(1)    Upon completion of this offering, the Garcia Parties will collectively control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full). The remaining LLC Unitholders will collectively control approximately     % of the voting interest in us (or approximately     % if the underwriters exercise their option to purchase additional shares in full). See "Principal Stockholders" for additional information about the other LLC Unitholders that will beneficially own more than 5% of our outstanding shares of Class B common stock following the completion of this offering. In addition to the Garcia Parties, our existing owners include a limited number of third parties that have invested in Class A Units, as well as certain of our employees who have been issued Class B Units pursuant to the LLC Plan.

(2)    Shares of Class A common stock and Class B common stock will vote as a single class. Each outstanding share of Class A common stock will be entitled to one vote on all matters to be voted on by stockholders generally. The shares of Class B common stock have no economic rights. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock

107

Table of Contents

(determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). All other shares of our Class B common stock entitle its holder to one vote on all matters to be voted on by stockholders generally. In accordance with the exchange agreement to be entered into in connection with the Organizational Transactions, LLC Unitholders will be entitled to exchange LLC Units, together with shares of Class B common stock in the case of Class A Units, for shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash.

(3)    Participants in the Existing Performance Plan will be issued an aggregate of          restricted shares of Class A common stock pursuant to the terms of our new 2017 Incentive Plan upon the completion of this offering (assuming an initial public offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). We will also issue an aggregate of          restricted shares of Class A common stock (assuming an initial public offering price of $          per shares, which is the midpoint of the estimated public offering price range set forth on the cover of this prospectus) upon the completion of this offering to certain of our non-executive employees who are not participants in the Existing Performance Plan. Upon the pricing of this offering, we also expect to award options to purchase an aggregate of          shares of Class A common stock to approximately          employees, with an exercise price set at the initial public offering price. The options awarded upon pricing of the offering will be contingent upon completion of the offering, and a portion of the options will be unvested as of the date of grant. All of the unvested option awards will vest over a five year period.

(4)    Assumes no exercise of the underwriters' option to purchase additional shares. If the underwriters exercise their option to purchase additional shares in full, (i) the holders of Class A common stock will have     % of the voting power in Carvana Co., (ii) holders of Class B common stock will have     % of the voting power of Carvana Co., (iii) the LLC Units held by the remaining LLC Unitholders will constitute     % of the outstanding LLC Units in Carvana Group, and (iv) Carvana Co. will own, indirectly through its wholly owned subsidiary, Carvana Sub,     % of the outstanding LLC Units in Carvana Group.

Following the consummation of the Organizational Transactions, Carvana Co. will be a holding company and its sole assets will be its indirect equity interest in Carvana Group. Carvana Co. will operate and control all of the business and affairs of Carvana Group and its subsidiaries. Accordingly, although Carvana Co. will own an indirect minority economic interest in Carvana Group following the consummation of this offering, Carvana Co. will have 100% of the voting power and will control management of Carvana Group, subject to certain exceptions. The combined financial results of Carvana Group and its consolidated subsidiaries will be consolidated in our financial statements.

Our post-offering organizational structure will allow the LLC Unitholders to retain their equity ownership in Carvana Group, an entity that is classified as a partnership for United States federal income tax purposes, in the form of LLC Units. Investors in this offering will, by contrast, hold their equity ownership in Carvana Co., a Delaware corporation that is a domestic corporation for United States federal income tax purposes, in the form of shares of Class A common stock. We believe that the LLC Unitholders generally will find it advantageous to hold their equity interests in an entity that is not taxable as a corporation for United States federal income tax purposes. The LLC Unitholders, like Carvana Co., will incur U.S. federal, state and local income taxes on their proportionate share of any taxable income of Carvana Group.

The holders of Class A Units (other than Carvana Sub) will also hold shares of our Class B common stock. Although these shares of Class B common stock have only voting and no economic rights, they will allow the holders of Class A Units to exercise voting power over Carvana Co. (which controls Carvana Sub, the sole manager of Carvana Group) at a level that is greater than their overall equity ownership of our business. Under our amended and restated certificate of incorporation, the Garcia Parties holding shares of Class B common stock are entitled to ten votes per share for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). All other LLC Unitholders holding Class B common stock are entitled to one vote per share. When an LLC Unitholder exchanges LLC Units for shares of our Class A common stock pursuant to the exchange agreement described below, to the extent that they hold shares of Class B common stock, they

108

Table of Contents

will also be required to deliver a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be cancelled.

### Amended and Restated Operating Agreement of Carvana Group

In connection with the completion of this offering, we will amend and restate Carvana Group's existing operating agreement, which we refer to as the "LLC Operating Agreement." The operations of Carvana Group, and the rights and obligations of the LLC Unitholders, will be set forth in the LLC Operating Agreement. The LLC Operating Agreement will be filed as an exhibit to the registration statement of which this prospectus forms a part.

*Appointment as Manager.*    In connection with this offering, our wholly owned subsidiary, Carvana Sub, will become a member of Carvana Group and the sole manager of Carvana Group. As the sole manager, we will be able to control all of the day-to-day business affairs and decision-making of Carvana Group without the approval of any other member, unless otherwise stated in the LLC Operating Agreement. As such, through our officers and directors, we will be responsible for all operational and administrative decisions of Carvana Group and the day-to-day management of Carvana Group's business. Pursuant to the LLC Operating Agreement, Carvana Sub cannot be removed, under any circumstances, as the sole manager of Carvana Group except by our election.

*Compensation.*    Carvana Sub will not be entitled to compensation for our services as manager. We and Carvana Sub will be entitled to reimbursement by Carvana Group for fees and expenses incurred on behalf of Carvana Group, including all expenses associated with this offering and maintaining our corporate existence.

*Recapitalization.*    The LLC Operating Agreement eliminates the Class C Preferred Units of Carvana Group and provides for the Class A Units and Class B Units, which we refer to collectively as the "LLC Units." The LLC Operating Agreement will also reflect an increase in the authorized LLC Units such that LLC Unit can be acquired with the net proceeds received in the initial offering from the sale of one share of our Class A common stock. Each LLC Unit will entitle the holder to a pro rata share of the net profits and net losses and distributions of Carvana Group. Holders of LLC Units will have no voting rights, except as expressly provided in the LLC Operating Agreement.

*Distributions.*    The LLC Operating Agreement will require "tax distributions," as that term is defined in the LLC Operating Agreement, to be made by Carvana Group to its "members," as that term is defined in the LLC Operating Agreement. Tax distributions generally will be made quarterly (i) to each member of Carvana Group holding Class A Units, including us, on a pro rata basis, based on the net taxable income of Carvana Group and (ii) to each member of Carvana Group holding Class B Units, based on such member's allocable share of the net taxable income of Carvana Group, in each case at an assumed tax rate. The tax rate used to determine tax distributions will apply regardless of the actual final tax liability of any such member. We expect Carvana Group may make distributions out of distributable cash periodically to the extent permitted by our agreements governing our indebtedness and necessary to enable us to cover our operating expenses and other obligations, including our tax liability and obligations under the Tax Receivable Agreement, as well as to make dividend payments, if any, to the holders of our Class A common stock.

*Exchange Rights.*    The LLC Operating Agreement provides that the LLC Unitholders (and certain permitted transferees thereof) may, pursuant to the terms of the exchange agreement described below, exchange their LLC Units for shares of our Class A common stock or cash. To the extent such owners also hold Class B common stock, they will be required to deliver to us a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. As a holder exchanges its LLC Units, our interest in Carvana Group will be correspondingly increased. See "—Exchange Agreement."

Table of Contents

***Issuance of LLC Units Upon Exercise of Options or Issuance of Other Equity Compensation.*** Upon the exercise of options issued by us, or the issuance of other types of equity compensation by us (such as the issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock), our wholly owned subsidiary, Carvana Sub, will be required to acquire from Carvana Group a number of LLC Units equal to the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation subject to adjustment as set forth in the Exchange Agreement. When we issue shares of Class A common stock in settlement of stock options granted to persons that are not officers or employees of Carvana Group or its subsidiaries, we will cause Carvana Sub to make, or be deemed to make, a capital contribution to Carvana Group equal to the aggregate value of such shares of Class A common stock, and Carvana Group will issue to Carvana Sub a number of LLC Units equal to          the number of shares of Class A common stock we issued subject to adjustment as set forth in the Exchange Agreement. When we issue shares of Class A common stock in settlement of stock options granted to persons that are officers or employees of Carvana Group or its subsidiaries, we will be deemed to have sold directly to the person exercising such award a portion of the value of each share of Class A common stock equal to the exercise price per share, and Carvana Sub will be deemed to have sold directly to Carvana Group (or the applicable subsidiary of Carvana Group) the difference between the exercise price and market price per share for each such share of Class A common stock. In cases where we grant other types of equity compensation to employees of Carvana Group or its subsidiaries, on each applicable vesting date Carvana Sub will be deemed to have sold to Carvana Group (or such subsidiary) the number of vested shares at a price equal to the market price per share, Carvana Group (or such subsidiary) will deliver the shares to the applicable person, and Carvana Sub will be deemed to have made a capital contribution in Carvana Group equal to the purchase price for such shares in exchange for a number of LLC Units corresponding to the ratio of shares of Class A common stock to LLC Units.

***Maintenance of One-to-          Ratio of Shares of Class A Common Stock and LLC Units Owned by Carvana Co.*** The LLC Operating Agreement will require that (1) we at all times maintain a ratio of          LLC Units owned by Carvana Sub for each share of Class A common stock issued by us (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the Exchange Agreement), and (2) Carvana Group at all times maintain a one-to-          ratio between the number of shares of Class A common stock issued by us and the number of LLC Units owned by Carvana Sub.

***Transfer Restrictions.*** The LLC Operating Agreement generally does not permit transfers of LLC Units by members, subject to limited exceptions. Any transferee of LLC Units that is admitted as a member of Carvana Group must assume all of the obligations of a transferring member with respect to the transferred units.

***Dissolution.*** The LLC Operating Agreement will provide that Carvana Group may be dissolved voluntarily only at the election of the manager. In addition to a voluntary dissolution, Carvana Group will be dissolved upon the entry of a decree of judicial dissolution or other circumstances in accordance with Delaware law. Upon a dissolution event, the proceeds of a liquidation will be distributed in the following order: (1) first, to pay the expenses of winding up Carvana Group; (2) second, to pay debts and liabilities owed to creditors of Carvana Group, other than members; (3) third, to pay debts and liabilities owed to members; and (4) fourth, to the members pro-rata in accordance with their respective percentage ownership interests in Carvana Group (after accounting for the participation thresholds of outstanding Class B Units and as determined based on the number of vested LLC Units held by a member relative to the aggregate number of all outstanding vested LLC Units).

***Confidentiality.*** Each member will agree to maintain the confidentiality of Carvana Group's confidential information. This obligation excludes information independently obtained or developed by the members, information that is in the public domain or otherwise disclosed to a member, in either such case not in violation of a confidentiality obligation or disclosures required by law or judicial process or approved by our chief executive officer.

110

Table of Contents

***Indemnification and Exculpation.*** The LLC Operating Agreement provides for indemnification of the manager, members and officers of Carvana Group and their respective subsidiaries or affiliates. To the extent permitted by applicable law, Carvana Group will indemnify us, Carvana Sub as its manager, its authorized officers, its other employees and agents from and against any losses, liabilities, damages, costs, expenses, fees or penalties incurred by any acts or omissions of these persons, provided that the acts or omissions of these indemnified persons are not the result of fraud, intentional misconduct or a violation of the implied contractual duty of good faith and fair dealing, or any lesser standard of conduct permitted under applicable law.

We, Carvana Sub, as the manager, and the authorized officers and other employees and agents of Carvana Group will not be liable to Carvana Group, its members or their affiliates for damages incurred by any acts or omissions of these persons, provided that the acts or omissions of these exculpated persons are not the result of fraud, or intentional misconduct.

***Amendments.*** The LLC Operating Agreement may be amended with the consent of the holders of a majority in voting power of the outstanding LLC Units. Notwithstanding the foregoing, no amendment to any of the provisions that expressly require the approval or action of certain members may be made without the consent of such members and no amendment to the provisions governing the authority and actions of the manager or the dissolution of Carvana Group may be amended without the consent of the manager.

### Tax Receivable Agreement

The LLC Unitholders may from time to time (subject to the terms of the exchange agreement) exercise a right to exchange LLC Units and, if applicable, shares of Class B common stock held by such LLC Unitholders for shares of our Class A common stock, or, at our election, for cash. We intend to treat such acquisitions of LLC Units as direct purchases by our wholly owned subsidiary of LLC Units from the LLC Unitholders for U.S. federal income and other applicable tax purposes, regardless of whether such LLC Units are surrendered by the LLC Unitholders to Carvana Group for redemption or sold to us upon the exercise of our election to acquire such LLC Units directly. Carvana Group (and each of its subsidiaries that is classified as a partnership for U.S. federal income tax purposes) intends to make an election under Section 754 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") effective for each taxable year in which an exchange of LLC Units for Class A common stock or cash occurs. As a result, an exchange of LLC Units is expected to result in (1) an increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of Carvana Group and (2) an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share. Any increases in our wholly owned subsidiary's share of tax basis will generally have the effect of reducing the amounts that we would otherwise be obligated to pay in the future to various tax authorities. Such basis increases may also decrease gains (or increase losses) on future dispositions of certain assets to the extent tax basis is allocated to those assets.

We intend to enter into a Tax Receivable Agreement with the LLC Unitholders. The Tax Receivable Agreement will provide for the payment by us to the LLC Unitholders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) the aforementioned increase in our wholly owned subsidiary's proportionate share of, and adjustment in, the tax basis as a result of an exchange, (2) any incremental increases in tax basis attributable to payments made under the Tax Receivable Agreement and (3) any deductions attributable to imputed interest and other payments of interest pursuant to the Tax Receivable Agreement (collectively, the "Tax Attributes"). The payment obligations under the Tax Receivable Agreement are not conditioned upon any LLC Unitholder maintaining a continued ownership interest in us or Carvana Group and the rights of the LLC Unitholders under the Tax Receivable Agreement are assignable to transferees of its LLC Units (other than Carvana Sub as transferee pursuant to an exchange of LLC Units). We expect to benefit from the remaining 15% of the tax benefits, if any, that we may actually realize.

For purposes of the Tax Receivable Agreement, the tax benefit deemed realized by us will generally be computed by comparing our actual cash income tax liability to the amount of such taxes that we would have

111

Table of Contents

been required to pay had there been no Tax Attributes. The Tax Receivable Agreement will generally apply to each of our taxable years, beginning with the taxable year of this offering. There is no maximum term for the Tax Receivable Agreement and the Tax Receivable Agreement will continue until all such tax benefits have been utilized or expired unless we exercise our right to terminate the Tax Receivable Agreement for an agreed-upon amount equal to the estimated present value of the remaining payments to be made under the agreement (calculated with certain assumptions, including utilization of the Tax Attributes).

The actual Tax Attributes, as well as any amounts paid to the LLC Unitholders under the Tax Receivable Agreement, will vary depending on a number of factors, including:

- *the timing of any future exchanges* — for instance, the increase in any tax deductions will vary depending on the fair value, which may fluctuate over time, of the depreciable or amortizable assets of Carvana Group at the time of each exchange;

- *the price of shares of our Class A common stock at the time of any future exchanges* — the Tax Attributes are directly related to the price of shares of our Class A common stock at the time of future exchanges;

- *the extent to which such exchanges are taxable* — if an exchange is not taxable for any reason, increased tax deductions as a result of the Section 754 election mentioned above will not be available to generate payments under the Tax Receivable Agreement;

- *the amount and timing of our income* — the Tax Receivable Agreement generally will require us to pay 85% of the tax benefits as and when those benefits are treated as realized by us under the terms of the Tax Receivable Agreement. If we do not have taxable income in a particular taxable year, we generally will not be required (absent a change of control or other circumstances requiring an early termination payment) to make payments under the Tax Receivable Agreement for that taxable year because no tax benefits will have been actually realized. Nevertheless, any tax benefits that do not result in realized tax benefits in a given taxable year will likely generate tax attributes that may be utilized to generate tax benefits in previous or future taxable years. The utilization of any such tax attributes will result in payments under the Tax Receivable Agreement; and

- *applicable tax rates* — the tax rates in effect at the time of the Tax Receivable Agreement.

The amount and timing of future tax benefits we realize as a result of exchanges of LLC Units by LLC Unitholders, and the resulting amounts we will be required to pay to LLC Unitholders pursuant to the Tax Receivable Agreement, is dependent upon the factors outlined above, which we cannot currently predict or estimate. As a result, we cannot estimate the likely tax benefits we will realize as a result of LLC Unit exchanges, and the resulting amounts we are likely to pay out to LLC Unitholders pursuant to the Tax Receivable Agreement. We estimate, however, that the amount of such tax benefits and the resulting payments to LLC Unitholders may be substantial. If all of the LLC Unitholders were to exchange their LLC Units immediately following the completion of this offering, we would recognize a deferred tax asset of approximately $      and a liability of approximately $      , assuming: (i) all exchanges occurred on the same day; (ii) a price of $      per share (the midpoint of the estimated public offering price range set forth on the cover page of this prospectus); (iii) a constant corporate tax rate of      %; (iv) we will have sufficient taxable income to fully utilize the tax benefits; and (v) no material changes in tax law. The foregoing numbers are merely hypothetical estimates — the actual payments could differ materially. It is possible that future transactions or events could increase or decrease the actual tax benefits realized and the corresponding Tax Receivable Agreement payments. Further, it is possible that there could be major tax legislation in 2017 and in later years which would change the relevant tax law, and therefore alter this analysis in material ways. We are not able to predict the specific effect of such future tax legislation on these estimates. There may be a material negative effect on our liquidity if, as a result of timing discrepancies or otherwise, the payments under the Tax Receivable Agreement exceed the actual benefits we realize in respect of the tax attributes subject to the Tax Receivable Agreement and/or distributions to Carvana Co. by Carvana Group are not sufficient to permit Carvana Co. to make payments under the Tax Receivable Agreement after it has paid taxes.

112

Table of Contents

The payment obligations under the Tax Receivable Agreement are obligations of Carvana Co. and not of Carvana Group. Any payments made by us to the LLC Unitholders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us or to Carvana Group and, to the extent that we are unable to make payments under the Tax Receivable Agreement, such payments generally will be deferred and will accrue interest until paid. Nonpayment for a specified period, however, may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore accelerate payments due under the Tax Receivable Agreement, unless, generally, such nonpayment is due to a lack of sufficient funds. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of Carvana Group and its subsidiaries, available cash and/or available borrowings under certain credit facilities.

Decisions made by us in the course of running our business, including with respect to mergers, asset sales, other forms of business combinations or other changes in control, may influence the timing and amount of payments that are received by an LLC Unitholder under the Tax Receivable Agreement. For example, the earlier a disposition of an asset occurs following an exchange or acquisition transaction will generally accelerate payments under the Tax Receivable Agreement and increase the present value of such payments to the LLC Unitholders; whereas, a disposition of an asset prior to an exchange or acquisition transaction will generally increase the tax liability of the LLC Unitholders without giving rise to any obligations to make payments under the Tax Receivable Agreement.

The Tax Receivable Agreement provides that if (1) certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, (2) we materially breach any of our material obligations under the Tax Receivable Agreement or (3) we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, under the Tax Receivable Agreement will accelerate and become due and payable, based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement and, to the extent applicable, that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of our Class A common stock at the time of termination.

As a result of a change in control, material breach, or our election to terminate the Tax Receivable Agreement early, (1) we could be required to make cash payments to the LLC Unitholders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement and (2) we will be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a material adverse effect on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine. Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, we will not be reimbursed for any cash payments previously made to the LLC Unitholders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently disallowed, in whole or in part, by the IRS or other applicable taxing authority. Instead, any excess cash payments made by us to an LLC Unitholder will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. Nevertheless, any tax benefits initially claimed by us may not be disallowed for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. Accordingly, there may not be sufficient future cash payments from which to net against. The applicable U.S. federal income tax rules are complex, and there can be no assurance that the IRS or a court will not disagree with our tax reporting

113

**Table of Contents**

positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings.

Under the Tax Receivable Agreement, we are required to provide the LLC Unitholders with a schedule setting forth the calculation of payments that are due under the Tax Receivable Agreement with respect to each taxable year in which a payment obligation arises within ninety (90) days after filing our U.S. federal income tax return for such taxable year. This calculation will be based upon the advice of our tax advisors. Payments under the Tax Receivable Agreement will generally be made to the LLC Unitholders within five (5) business days after this schedule becomes final pursuant to the procedures set forth in the Tax Receivable Agreement, although interest on such payments will begin to accrue at a rate of LIBOR plus 100 basis points from the due date (without extensions) of such tax return. Any late payments that may be made under the Tax Receivable Agreement will continue to accrue interest at LIBOR plus 100 basis points until such payments are made, generally including any late payments that we may subsequently make because we did not have enough available cash to satisfy our payment obligations at the time at which they originally arose. See "Certain Relationships and Related Party Transactions — Tax Receivable Agreement."

## Exchange Agreement

We will enter into an exchange agreement with Carvana Sub and the LLC Unitholders. Under the exchange agreement, each LLC Unitholder (and certain permitted transferees thereof) may (subject to the terms of the exchange agreement) exchange their LLC Units for shares of our Class A common stock or, at our election, for cash. To the extent such owners also hold Class B common stock, they will be required to deliver to us a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be cancelled. As a holder exchanges its LLC Units, our indirect interest in Carvana Group will be correspondingly increased. LLC Unitholders may exchange LLC Units for shares of our Class A common stock (or, at our election, for cash) at any time upon their election.

When an LLC Unitholder exchanges Class A Units and, if applicable, shares of Class B common stock, they will receive one share of Class A common stock for every          Class A Units or, at our option, cash equal to the value of a share of Class A common stock (the "Class A Common Stock Value") multiplied by the number of Class A Units being exchanged. The Class A Common Stock Value will equal the average of the volume weighted average prices for a share of Class A common stock for each of the three consecutive full trading days ending on and including the last full trading day immediately prior to the related date of exchange. Class B Units are subject to vesting and a Participation Threshold, and as a result, LLC Unitholders exchanging Class B Units will receive a number of shares of Class A Common Stock equal to (x) the Class A Common Stock Value less (y) the applicable Participation Threshold multiplied by (z) the number of Class B Units being exchanged, subject to adjustment as set forth in the Exchange Agreement. See "Executive Compensation — Equity Incentives — Summary of Current Awards Under the Carvana Group Equity Incentive Plan" for a discussion of the Participation Thresholds.

## Registration Rights Agreement

We intend to enter into a Registration Rights Agreement with certain LLC Unitholders in connection with this offering. The Registration Rights Agreement will provide certain registration rights whereby, following our initial public offering and the expiration of any related lock-up period, certain LLC Unitholders can require us to register under the Securities Act shares of Class A common stock issuable to them upon exchange of their LLC Units. The Registration Rights Agreement will also provide for piggyback registration rights for certain LLC Unitholders. See "Certain Relationships and Related Party Transactions — Registration Rights Agreement."

114

Table of Contents

## MANAGEMENT

Below is a list of the names, ages as of date of this prospectus, positions and a brief account of the business experience of the individuals who serve as (1) executive officers of Carvana Group who will also perform similar functions at the company upon completion of this offering and (2) directors and director nominees of the company. Upon the completion of this offering, Messrs.          and          are anticipated to be elected to our Board.

| Name | Age | Position |
|------|-----|----------|
| Ernie Garcia, III | 34 | President, Chief Executive Officer and Chairman |
| Mark Jenkins | 38 | Chief Financial Officer |
| Benjamin Huston | 34 | Chief Operating Officer |
| Ryan Keeton | 39 | Chief Brand Officer |
| Daniel Gill | 34 | Chief Product Officer |
| Paul Breaux | 33 | Vice President, General Counsel and Secretary |
| Michael Maroone | 63 | Director Nominee |
| Ira Platt | 53 | Director Nominee |
| Dan Quayle | 70 | Director Nominee |
| Greg Sullivan | 58 | Director Nominee |

### Executive Officers, Directors and Director Nominees

*Ernie Garcia, III* co-founded Carvana and has served as our President and Chief Executive Officer since our inception in 2012. Mr. Garcia is also Chairman of the Carvana Co. Board. Prior to founding Carvana, Mr. Garcia held various roles at the DriveTime Automotive Group, Inc. from January 2007 to January 2013. From January 2007 to December 2008, he served as a financial strategist. He was a managing director of corporate finance from December 2008 to November 2009. From November 2009 until January 2013, he served as a Vice President and Treasurer and Director of Quantitative Analytics. As Director of Quantitative Analytics, Mr. Garcia was responsible for the firm's ongoing development of consumer credit scoring models, and its utilization of those tools in retail vehicle sales deal structuring and vehicle price optimization. Prior to DriveTime, Mr. Garcia was an associate in the Principal Transactions Group at RBS Greenwich Capital from 2005 to 2006, where he focused on consumer credit based investments. Mr. Garcia holds a B.S. in Management Science and Engineering from Stanford University. We believe that Mr. Garcia is qualified to serve on our Board because of his extensive knowledge of our business and strategy, as well as his experience in the automotive retail industry and leadership role with us.

*Mark Jenkins* has served as our Chief Financial Officer since July 2014. Prior to joining Carvana, Mr. Jenkins was a professor in the finance department at The Wharton School of the University of Pennsylvania, where his teaching and research focused on consumer and corporate credit markets from 2009 to 2014. While at Wharton, Mr. Jenkins was responsible for teaching courses in the undergraduate, MBA, and executive education programs on corporate restructuring, corporate credit and leveraged finance. Prior to his time at Wharton, Mr. Jenkins worked at The Brattle Group from 2001 to 2004, an economic consulting firm, where he focused on corporate valuation and demand forecasting in technology markets. Mr. Jenkins received a Ph.D. in economics from Stanford University and a B.S.E. from Duke University in Mathematics and Civil Engineering.

*Ben Huston* co-founded Carvana and has served as our Chief Operating Officer since our inception in 2012. Prior to joining Carvana, Mr. Huston co-founded Looterang, a card-linking platform that enabled personalized deals to be automatically administered through consumer credit or debit cards, in 2011. Mr. Huston was chief executive officer of Looterang from 2011-2012. From 2008 to 2011, Mr. Huston served as an associate at Latham and Watkins, a full service global law firm, where he focused on regulatory affairs. Mr. Huston holds a J.D. from Harvard Law School and a B.A. in American Studies from Stanford University.

*Ryan Keeton* co-founded Carvana and has served as our Chief Brand Officer since our inception in 2012. Prior to joining Carvana, Mr. Keeton was a principal at the Montero Group, a strategic consultancy firm, from 2010 to 2012, where he advised global public and private companies on strategic and business initiatives. From 2008 to 2010, Mr. Keeton served as Director of Strategic Marketing for George P. Johnson, a global marketing agency. Mr. Keeton holds a B.A. in English and American Literature and Language from Harvard University.

115

Table of Contents

**Daniel Gill** has served as our Chief Product Officer since March 2015, overseeing all technology functions, as well as strategic partnerships for the business. Prior to joining Carvana, Mr. Gill spent his career in both enterprise software and consumer internet businesses. Mr. Gill served as Head of Strategy and Business Development for Inflection from May 2014 to March 2015. He co-founded and served as CEO of Huddler from 2007 until the company's acquisition by Wikia in May of 2014. Mr. Gill holds a degree in Biology from Stanford University.

**Paul Breaux** has served as our General Counsel since August 2015. Prior to joining Carvana, Mr. Breaux practiced law at the Houston, Texas office of the firm Andrews Kurth LLP (now Andrews Kurth Kenyon LLP) from 2008 to 2015. While at Andrews Kurth, Mr. Breaux's representative experience encompassed a broad range of general business transactions matters. Mr. Breaux holds a J.D. from Harvard Law School, a B.A. in Plan II Honors from The University of Texas at Austin, and a B.B.A. in Finance from The University of Texas at Austin.

**Michael Maroone** will begin serving on our Board upon the completion of this offering. From July 2005 to April 2015, Mr. Maroone served on the board of AutoNation, Inc., an automotive retailer and provider of new and used vehicles and related services. From August 1999 until his retirement in February 2015, Mr. Maroone also served as President and Chief Operating Officer of AutoNation, Inc. Prior to joining AutoNation, Inc., Mr. Maroone was President and Chief Executive Officer of the Maroone Automotive Group, a privately-held automotive retail group, from 1977 to 1997. Mr. Maroone currently serves on the board of Cox Automotive, Inc., a privately held combination of global automotive wholesale and services businesses including automotive auctions, financial services, media, and software, and is the Co-Chairman of the Florida Leadership Board of the Cleveland Clinic, a non-profit, multispecialty academic hospital. He holds a B.S. degree in Small Business Management from the University of Colorado Boulder. We believe that Mr. Maroone's board and advisory experience, coupled with his extensive experience in the automotive retail industry, will make him a valuable member of our Board.

**Ira Platt** will begin serving on our Board upon the completion of this offering. Since its inception in 2009, Mr. Platt has been the President of Georgiana Ventures, LLC, a firm that provides equity and debt capital to specialty finance companies, acquires portfolios of consumer finance receivables and offers consulting services to the specialty finance industry. From May 2009 to December 2013, Mr. Platt served as the President of 221 Capital Partners, LLC, a firm that provides advisory services. From 2009 to 2011, Mr. Platt was the Portfolio Manager for the Rosemont TALF Opportunity Fund, a partnership investing in asset-backed securities. In addition, Mr. Platt was a Managing Director and Head of the Principal & Distressed Capital Business for RBS Greenwich Capital, the domestic fixed income banking unit of the Royal Bank of Scotland Group, from 1997 to 2009. Mr. Platt was an Executive Vice President of the Aegis Consumer Funding Group, a publicly traded non-prime automotive finance company, from 1991 to 1997. Mr. Platt earned a B.A. degree in 1985 from Emory University and an M.B.A. from The Fuqua School of Business at Duke University. Mr. Platt has served on DriveTime's board of directors since February 2014. We believe that Mr. Platt's service on DriveTime's board, as well as his extensive experience in consumer finance and the automotive retail industry, will make him a valuable member of our Board.

**Dan Quayle** will begin serving on our Board upon the completion of this offering. Mr. Quayle has served the United States Federal Government in various capacities, including as the 44th Vice President of the United States of America from 1989 to 1993. Since 1999, Mr. Quayle has been the Chairman of Cerberus Global Investments, LLC, a private investment firm. He also currently serves on the board of Nuverra Environmental Solutions, Inc., previously known as Heckmann Corporation, an environmental solutions company, a position he has held since May 2007. Mr. Quayle earned a B.A. degree in Political Science from DePauw University and a J.D. from the Indiana University Robert H. McKinney School of Law. We believe that Mr. Quayle's service on the board of Nuverra Environmental Solutions, Inc. and as the Chairman of Cerberus Global Investments, LLC, as well as his extensive experience in the areas of government, foreign relations and private investment, will make him a valuable member of our Board.

**Greg Sullivan** will begin serving on our Board upon the completion of this offering. Mr. Sullivan is the Chief Executive Officer of AFAR Media, a travel media company he co-founded in 2007. From 1995 to 2007, Mr. Sullivan served DriveTime in various capacities, including as President from 1995 to 2004, Chief Executive Officer from 1999 to 2004, and Vice Chairman from 2004 to 2007. Mr. Sullivan earned a B.B.A.

116

Table of Contents

degree in Finance from the University of Notre Dame and a J.D. from the University of Virginia School of Law. We believe that Mr. Sullivan's senior management experience in the automotive and media industries will make him a valuable member of our Board.

## Family Relationships

There are no family relationships between any of our executive officers or directors.

## Corporate Governance

### Board Composition and Director Independence

Our business and affairs are managed under the direction of our Board. Following completion of this offering, our Board will be composed of five directors. Our certificate of incorporation will provide that the authorized number of directors may be changed only by resolution of our Board. Our certificate will also provide that our Board will be divided into three classes of directors, with the classes as nearly equal in number as possible. Subject to any earlier resignation or removal in accordance with the terms of our certificate and bylaws, our Class I directors will serve until the first annual meeting of stockholders following the completion of this offering, our Class II directors will serve until the second annual meeting of stockholders following the completion of this offering and our Class III directors will serve until the third annual meeting of stockholders following the completion of this offering. Upon completion of this offering, we expect that each of our directors will serve in the classes as indicated above. In addition, our certificate will provide that our directors may be removed with or without cause by the affirmative vote of at least a majority of the voting power of our outstanding shares of stock entitled to vote thereon, voting together as a single class for so long as the Garcia Parties holding Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote. If the Garcia Parties holding Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, then our directors may be removed only for cause upon the affirmative vote of at least 66 $2/3$% of the voting power of our outstanding shares of stock entitled to vote thereon.

The listing standards of the NYSE require that, subject to specified exceptions, each member of a listed company's audit, compensation and nominating and governance committees be independent and that audit committee members also satisfy independence criteria set forth in Rule 10A-3 under the Exchange Act.

Our Board has determined that each of the director nominees meet the requirements to be independent directors. In making this determination, our Board considered the relationships that each such director nominee has with the company and all other facts and circumstances that our Board deemed relevant in determining their independence, including beneficial ownership of our Class A common stock.

### Controlled Company Status

For purposes of the corporate governance rules of the NYSE, we expect to be a "controlled company" upon completion of this offering. Controlled companies under those rules are companies of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company. The Garcia Parties will beneficially own more than 50% of the combined voting power of Carvana Co. upon completion of this offering. Accordingly, we expect to be eligible for, but do not currently intend to take advantage of, certain exemptions from the corporate governance requirements of the NYSE. Specifically, as a "controlled company," we would not be required to have (1) a majority of independent directors, (2) a nominating and corporate governance committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, (3) a compensation committee composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities or (4) an annual performance evaluation of the nominating and governance and compensation committees. In the event we choose to rely on some or all of these exemptions in the future, you would not have the same protections afforded to stockholders of companies that are subject to all of the applicable corporate governance rules of the NYSE.

117

Table of Contents

## Board Committees

Upon completion of this offering, our Board will have an Audit Committee and a Compensation and Nominating Committee. The composition, duties and responsibilities of these committees are as set forth below. In the future, our board may establish other committees, as it deems appropriate, to assist it with its responsibilities.

| Board Member | Audit Committee | Compensation and Nominating Committee |
|---|---|---|
| Michael Maroone | ✓ | |
| Ira Platt | ✓ | ✓ |
| Dan Quayle | | ✓ |
| Greg Sullivan | ✓ | ✓ |

### Audit Committee

The Audit Committee will be responsible for, among other matters: (1) appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm; (2) discussing with our independent registered public accounting firm their independence from management; (3) reviewing with our independent registered public accounting firm the scope and results of their audit; (4) approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm; (5) overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC; (6) reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; (7) establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters; (8) reviewing and approving related party transactions; and (9) overseeing our enterprise risk management program.

Our Board has affirmatively determined that Mr. Maroone, Mr. Platt and Mr. Sullivan meet the definition of "independent director" for purposes of serving on an Audit Committee under Rule 10A-3 of the Exchange Act and the NYSE rules. In addition, our Board has determined that Mr. Platt will qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our Board will adopt a new written charter for the Audit Committee, which will be available at our corporate website at www.investors.carvana.com after the completion of this offering. Our website is not part of this prospectus.

### Compensation and Nominating Committee

The Compensation and Nominating Committee will be responsible for, among other matters: (1) reviewing key employee compensation goals, policies, plans and programs; (2) reviewing and providing recommendations to the Board regarding the compensation of our directors, chief executive officer and other executive officers; (3) reviewing and approving employment agreements and other similar arrangements between us and our executive officers; (4) administration of stock plans and other incentive compensation plans; (5) identifying individuals qualified to become members of our Board, consistent with criteria approved by our Board; (6) overseeing the organization of our Board to discharge the board's duties and responsibilities properly and efficiently; (7) identifying best practices and recommending corporate governance principles; and (8) developing and recommending to our Board a set of Corporate Governance Guidelines and principles applicable to us.

Our Board will adopt a new written charter for the Compensation and Nominating Committee, which will be available on our corporate website at www.carvana.com after the completion of this offering. Our website is not part of this prospectus.

118

*Compensation Committee Interlocks and Insider Participation*

For the year ended December 31, 2016, the board of managers of Carvana Group made all compensation decisions. See "Certain Relationships and Related Party Transactions" for information with respect to transactions with DriveTime.

No interlocking relationships exist between the members of our Board and the Board or compensation committee of any other company.

### Risk Oversight

The Board, as a whole and through the Audit Committee, oversees our risk management program, which is designed to identify, evaluate and respond to our high priority risks and opportunities. The risk management program facilitates constructive dialog at the senior management and Board level to proactively realize opportunities and manage risks. Our Audit Committee is primarily responsible for overseeing our risk management processes on behalf of the full Board. Our management, including our executive officers, is primarily responsible for managing the risks associated with the operation and business of our company and provides regular updates to the Audit Committee and annual updates to the full board on the risk management program and reports on the identified high priority risks and opportunities.

*Code of Ethics and Conduct*

Prior to completion of this offering, we intend to adopt a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. Upon the closing of this offering, our code of business conduct and ethics will be available on our website at www.carvana.com. We intend to disclose any amendments to the code, or any waivers of its requirements, on our website.

119

Table of Contents

## EXECUTIVE COMPENSATION

The following section provides compensation information pursuant to the scaled disclosure rules applicable to "emerging growth companies" under the rules of the SEC and may contain statements regarding future individual and company performance targets and goals. These targets and goals should not be understood to be statements of management's expectations or estimates of results or other guidance. We specifically caution investors not to apply these statements to other contexts.

This section discusses the material components of the executive compensation program for our Chief Executive Officer and our two other most highly compensated officers; who we refer to as our "Named Executive Officers." As of the year ended December 31, 2016, our Named Executive Officers and their positions were as follows:

- Ernie Garcia, III, Chief Executive Officer;
- Mark Jenkins, Chief Financial Officer; and
- Benjamin Huston, Chief Operating Officer.

This discussion may contain forward-looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt following the consummation of this offering may differ materially from the currently planned programs summarized in this discussion.

### Overview

Historically, the board of managers at Carvana Group has set the compensation of our executive officers. The primary objectives of our executive compensation program have been to:

- attract, engage and retain superior talent who contribute to our long-term success;
- motivate, inspire and reward executive officers whose knowledge, skills and performance are critical to our business;
- ensure compensation is aligned with our corporate strategies and business objectives; and
- provide our executive officers with incentives that effectively align their interests with those of our stockholders.

### Executive Compensation Design Overview

During the year ended December 31, 2016, all of our Named Executive Officers were employees of Carvana, LLC. Prior to the completion of this offering, we have not been subject to exchange listing requirements requiring us to have a majority independent board or to exchange or SEC rules relating to the formation and functioning of board committees, including audit, nominating and compensation committees. As a result, our compensation policies and determinations applicable to our executive officers have been the product of negotiation between our executive officers and the board of managers of Carvana Group.

Historically, our executive compensation program has reflected our growth and development-oriented corporate culture. To date, the compensation of our Named Executive Officers has consisted of a combination of base salary, performance-based cash bonuses and long-term incentive compensation in the form of Class B Unit grants. Our executive officers and all salaried employees also are eligible to receive health and welfare benefits. Additionally, pursuant to unit subscription agreements, our executive officers' Class B Units are subject to acceleration of vesting in connection with a change in control of the Company. As we transition from a private company to a publicly-traded company, we will evaluate our philosophy and compensation plans and arrangements as circumstances require. At a minimum, we expect to review executive compensation annually.

120

Table of Contents

Upon completion of this offering, we will establish a Compensation and Nominating Committee comprised of Dan Quayle, Ira Platt and Greg Sullivan. We expect that our Compensation and Nominating Committee will undertake a substantial review of our existing compensation programs, objectives and philosophy and determine whether such programs, objectives and philosophy are appropriate given that we will have become a public company. In addition, as we gain experience as a public company, we expect that the specific direction, emphasis and components of our executive compensation program will continue to evolve.

<h3 style="text-align:center">Risk Assessment and Compensation Practices</h3>

Following the completion of this offering our Compensation and Nominating Committee will undertake a thorough review of our compensation policies and practices, but we do not believe that these policies and practices create risks that are reasonably likely to have a material adverse effect on us.

<h3 style="text-align:center">Summary Compensation Table</h3>

The following table presents summary information regarding the total compensation awarded to, earned by, and paid to each individual who served as our Chief Executive Officer and the two most highly-compensated executive officers (other than the Chief Executive Officer) who were serving as executive officers as of December 31, 2016 for services rendered in all capacities to the company for the years ended December 31, 2015 and 2016. These individuals are our "Named Executive Officers."

| Name and principal position | Year | Salary ($) | Bonus ($) | Stock awards ($) [1] | Option awards ($) | Nonequity incentive plan compensation ($) | Nonqualified deferred compensation earnings ($) | All other compensation ($) [3] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Ernie Garcia, III | | | | | | | | | |
| *Chief Executive Officer* | 2016 | 400,000 | — | — | — | — | — | 54,008 | 454,008 |
| | 2015 | 354,231 | 126,328[2] | — | — | — | — | 29,539 | 510,098 |
| Mark Jenkins | | | | | | | | | |
| *Chief Financial Officer* | 2016 | 347,923 | — | 57,200 | — | — | — | 12,294 | 417,417 |
| | 2015 | 260,615 | 28,385 | 418,000 | — | — | — | 12,538 | 719,538 |
| Benjamin Huston | | | | | | | | | |
| *Chief Operating Officer* | 2016 | 347,923 | — | 57,200 | — | — | — | 19,370 | 424,493 |
| | 2015 | 260,615 | 28,385 | 418,000 | — | — | — | — | 707,000 |

(1)    The amounts reported in the Stock Awards column represent the grant date fair value of the Class B Units granted to the Named Executive Officers during the years presented as computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. The assumptions used in calculating the grant date fair value of the restricted unit awards reported in the Stock Awards column are set forth in Note 8 to the consolidated financial statements included elsewhere in this prospectus.

(2)    The 2015 amount represents a $47,308 bonus made in 2016 as well as the payment of a $79,020 bonus awarded in 2011 with payment contingent on continued employment through January 2015.

(3)    Included in "All Other Compensation" for 2016 were the following items:

| Name | 401(k) Plan Company Match [i] | Non-Business Aircraft Usage [ii] | Incremental Cost of Company Car [iii] | Cellphone Expense [iv] | Total |
|---|---|---|---|---|---|
| Ernie Garcia, III | — | $ 34,349 | $  16,460 | $3,199 | $54,008 |
| Mark Jenkins | — | — | 12,294 | — | 12,294 |
| Benjamin Huston | 4,200 | — | 11,399 | 3,771 | 19,370 |

(i)    Represents discretionary matching contributions under our 401(k) Plan.

(ii)    The 2016 amount for Mr. Garcia is the incremental cost to Carvana of flights relating to a personal event on the private aircraft operated by Bridgecrest Credit Company, f/k/a DT Credit Company, LLC ("Bridgecrest"), an affiliate of DriveTime, and leased by Carvana. See "Certain Relationships and Related Party Transactions — Relationship with DriveTime — Aircraft Time Sharing Agreement." The incremental cost to Carvana of aircraft used under the aircraft time sharing agreement for a non-business flight is calculated by multiplying the aircraft's per mile variable operating cost by a flight's total mileage,

<div style="text-align:center">121</div>

Table of Contents

which includes the mileage of an empty return flight. Variable operating costs include: (1) landing, parking, passenger ground transportation, crew travel and flight planning services expenses; (2) supplies, catering and crew traveling expenses; (3) aircraft fuel and oil expenses; (4) maintenance, parts and external labor (inspections and repairs); and (5) any customs, foreign permit and similar fees. Fixed costs that do not vary based upon usage are not included in the calculation of direct operating cost. On certain occasions, a Named Executive Officer or a Named Executive Officer's spouse or other family member may fly on the corporate aircraft as additional passengers. No additional direct operating cost is incurred in such situations under the foregoing methodology because the costs would not be incremental. Carvana does not pay its Named Executive Officers any amounts in respect of taxes (so called gross up payments) on income imputed to them for non-business aircraft usage.

(iii)    The incremental cost of the company car to us has been calculated based on the depreciation value of the vehicle.

(iv)    Represents the value of company-paid cell phone service.

## Outstanding Equity Awards at 2016 Fiscal Year End

| Name | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested ($) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($) | |
|---|---|---|---|---|---|
| | | **Stock Awards** | | | |
| **Ernie Garcia, III** | — | — | — | | — |
| **Mark Jenkins:** | | | | | |
| Class B Units | — | — | 516,667[1] | $ | 1,116,000[2] |
| Class B Units | — | — | 130,000[3] | $ | 72,800[2] |
| Class B Units | — | — | 39,000[4] | $ | 21,840[2] |
| Class B Units | — | — | 100,000[5] | $ | 43,000[2] |
| **Benjamin Huston:** | | | | | |
| Class B Units | — | — | 400,000[6] | $ | 864,000[2] |
| Class B Units | — | — | 130,000[3] | $ | 72,800[2] |
| Class B Units | — | — | 39,000[4] | $ | 21,840[2] |
| Class B Units | — | — | 100,000[5] | $ | 43,000[2] |

(1)    These Class B Units (the "B1 Units") were granted on March 24, 2015 with a participation threshold of $0.00; 200,000 of which vested on July 1, 2015 and 16,667 of which vest on the first of each month beginning on August 1, 2015.

(2)    Amounts were determined based on the $2.16, $0.56 and $0.43 per share fair market value of our B1 Units, B2 Units (as defined below) and B3 Units (as defined below), respectively, in each case as of December 31, 2016, which value was based on a valuation analysis of the "fair market value" (as defined in our applicable equity documents) of Carvana Group equity. These values may not reflect the value actually realized by the Named Executive Officers upon vesting.

(3)    These Class B Units (the "B2 Units") were granted on March 24, 2015 with a participation threshold of $4.878; 40,000 vested on March 1, 2016 and 3,333 vest on the first of each month thereafter.

(4)    These B2 Units were granted on January 29, 2016 with a participation threshold of $4.878; 12,000 vested on March 1, 2016 and 1,000 vest on the first of each month thereafter.

(5)    These Class B Units (the "B3 Units") were granted on October 21, 2016 with a participation threshold of $5.8114; 20,000 vest on January 1, 2017 and 1,667 vest on the first of each month thereafter.

(6)    These B1 Units were granted on March 24, 2015 with a participation threshold of $0.00; 250,000 of which vested on the date of grant and 16,667 vest on the first of each month following the date of grant.

122

Table of Contents

### Employment Agreements and Post-Termination Arrangements

None of our Named Executive Officers is party to an employment agreement.

In the event of a change in control of Carvana Group, all outstanding unvested Class B Common Unit awards held by participants in the Carvana Group Equity Incentive Plan, whose employment has not previously terminated, will accelerate in full, subject to certain escrow demand rights held by a purchaser of control of Carvana Group. Except for these arrangements, none of our Named Executive Officers have entered into any plans, arrangements or agreements with Carvana providing for payments upon termination of employment or change in control of Carvana, other than payments generally available to all salaried employees that do not discriminate in scope, terms or operation in favor of the executive officers of Carvana.

### Equity Incentives — Summary of Current Awards Under the Carvana Group Equity Incentive Plan

In March 2015, the board of managers of Carvana Group approved the Carvana Group Equity Incentive Plan, which we refer to as the LLC Plan. The LLC Plan provided for the grant of Class B Units to employees and consultants of Carvana Group and to members of its board of managers. The maximum aggregate number of membership units available for grant under the LLC Plan as of December 31, 2016 was 10,000,000. In connection with the completion of this offering, we will discontinue the grant of new awards under the LLC Plan, however the LLC Plan will continue in connection with administration of existing awards that remain outstanding following the completion of this offering.

The Class B Units granted under the LLC Plan contain a minimum valuation threshold (the "Participation Threshold") that must be met upon a liquidity event, such as a change in control, dissolution, or sale of the company, before the participant is entitled to a distribution on the Units. The Participation Threshold for each grant is set on the date of grant.

The LLC Plan is administered by the board of managers of Carvana Group. Following the completion of this offering, the LLC Plan will be administered by Carvana Sub, the sole manager of Carvana Group. Subject to the provisions of the LLC Plan, the plan administrator determines in its discretion the persons to whom and the times at which awards are granted, the sizes of such awards, and all of their terms and conditions. All awards are evidenced by a written agreement between us and the holder of the award. The plan administrator has the authority to construe and interpret the terms of the LLC Plan and awards granted under it.

In the event of a change in control of Carvana Group, the vesting of all outstanding awards held by participants whose employment has not previously terminated will accelerate in full, subject to certain escrow demand rights held by a purchaser of control of the company. In addition, the plan administrator has the authority to require that outstanding awards be assumed or replaced with substantially equivalent awards by the successor corporation or to cancel the outstanding awards in exchange for a payment in cash or other property equal to the fair market value of restricted units.

### Equity and Cash Incentives — Summary of the 2017 Incentive Plan

In connection with this offering, we intend to adopt the 2017 Incentive Plan. The 2017 Incentive Plan will provide for grants of stock options, stock appreciation rights, restricted stock, other stock-based awards and other cash-based awards. Directors, officers and other employees of us and our subsidiaries, as well as others performing consulting or advisory services for us, are eligible for grants under the 2017 Incentive Plan. The purpose of the 2017 Incentive Plan is to provide incentives that will attract, retain and motivate high performing officers, directors, employees and consultants by providing them with appropriate incentives and rewards either through a proprietary interest in our long-term success or compensation based on their performance in fulfilling their personal responsibilities. Set forth below is a summary of the material terms of the 2017 Incentive Plan. For further information about the 2017 Incentive Plan, we refer you to the complete copy of the 2017 Incentive Plan, which is attached as an exhibit to the registration statement of which this prospectus is a part.

**Table of Contents**

*Administration*

The 2017 Incentive Plan will be administered by the Compensation and Nominating Committee of our Board. Among the Compensation and Nominating Committee's powers is determining the form, amount and other terms and conditions of awards; clarifying, construing or resolving any ambiguity in any provision of the 2017 Incentive Plan or any award agreement; amending the terms of outstanding awards; and adopting such rules, forms, instruments and guidelines for administering the 2017 Incentive Plan as it deems necessary or proper. The Compensation and Nominating Committee has authority to administer and interpret the 2017 Incentive Plan, to grant discretionary awards under the 2017 Incentive Plan, to determine the persons to whom awards will be granted, to determine the types of awards to be granted, to determine the terms and conditions of each award, to determine the number of shares of Class A common stock to be covered by each award, to make all other determinations in connection with the 2017 Incentive Plan and the awards thereunder as the Compensation and Nominating Committee deems necessary or desirable and to delegate authority under the 2017 Incentive Plan to our executive officers.

*Available Shares*

The aggregate number of shares of Class A common stock which may be issued or used for reference purposes under the 2017 Incentive Plan or with respect to which awards may be granted may not exceed          shares. The number of shares available for issuance under the 2017 Incentive Plan may be subject to adjustment in the event of a reorganization, stock split, merger or similar change in the corporate structure or the outstanding shares of Class A common stock. In the event of any of these occurrences, we may make any adjustments we consider appropriate to, among other things, the number and kind of shares, options or other property available for issuance under the plan or covered by grants previously made under the plan. The shares available for issuance under the plan may be, in whole or in part, either authorized and unissued shares of our Class A common stock or shares of Class A common stock held in or acquired for our treasury. In general, if awards under the 2017 Incentive Plan are for any reason cancelled, or expire or terminate unexercised, the shares covered by such awards may again be available for the grant of awards under the 2017 Incentive Plan. With respect to stock appreciation rights and options settled in Class A common stock, upon settlement, only the number of shares of Class A common stock delivered to a participant will count against the aggregate and individual share limitations. If any shares of Class A common stock are withheld to satisfy tax withholding obligations on an award issued under the 2017 Incentive Plan, the number of shares of Class A common stock withheld shall again be available for purposes of awards under the 2017 Incentive Plan. Any award under the 2017 Incentive Plan settled in cash shall not be counted against the foregoing maximum share limitations.

The maximum number of shares of Class A common stock subject to any stock option which may be granted under the 2017 Incentive Plan during any fiscal year to any eligible individual will be          shares.

The maximum number of shares of our Class A common stock with respect to which any stock option, stock appreciation right, shares of restricted stock or other stock-based awards that are subject to the attainment of specified performance goals and intended to satisfy Section 162(m) of the Internal Revenue Code and may be granted under the 2017 Incentive Plan during any fiscal year to any eligible individual will be          shares (per type of award). The total number of shares of our Class A common stock with respect to all awards that may be granted under the 2017 Incentive Plan during any fiscal year to any eligible individual will be          shares. There are no annual limits on the number of shares of our Class A common stock with respect to an award of restricted stock that are not subject to the attainment of specified performance goals to eligible individuals. The maximum number of shares of our Class A common stock subject to any performance award which may be granted under the 2017 Incentive Plan during any fiscal year to any eligible individual will be          shares. The maximum value of a cash payment made under a performance award which may be granted under the 2017 Incentive Plan during any fiscal year to any eligible individual will be $          . The aggregate grant date fair value (computed as of the date of grant in accordance with applicable financial accounting rules) of all types of awards granted under the 2017

124

Table of Contents

Incentive Plan to any individual non-employee director in any fiscal year (excluding awards made pursuant to deferred compensation arrangements in lieu of all or a portion of cash retainers and any stock dividends payable in respect of outstanding awards) may not exceed $                  .

### Eligibility for Participation

Independent members of our Board, as well as employees of, and consultants to, us or any of our subsidiaries and affiliates are eligible to receive awards under the 2017 Incentive Plan.

### Award Agreement

Awards granted under the 2017 Incentive Plan are evidenced by award agreements, which need not be identical, that provide additional terms, conditions, restrictions and/or limitations covering the grant of the award, including, without limitation, additional terms providing for the acceleration of exercisability or vesting of awards in the event of a change of control or conditions regarding the participant's employment, as determined by the Compensation and Nominating Committee.

### Stock Options

The Compensation and Nominating Committee may grant nonqualified stock options to eligible individuals and incentive stock options only to eligible employees. The Compensation and Nominating Committee will determine the number of shares of our Class A common stock subject to each option, the term of each option, which may not exceed ten years, or five years in the case of an incentive stock option granted to a ten percent stockholder, the exercise price, the vesting schedule, if any, and the other material terms of each option. No incentive stock option or nonqualified stock option may have an exercise price less than the fair market value of a share of our Class A common stock at the time of grant or, in the case of an incentive stock option granted to a ten percent stockholder, 110% of such share's fair market value. Options will be exercisable at such time or times and subject to such terms and conditions as determined by the Compensation and Nominating Committee at grant and the exercisability of such options may be accelerated by the Compensation and Nominating Committee.

### Stock Appreciation Rights

The Compensation and Nominating Committee may grant stock appreciation rights, which we refer to as SARs, either with a stock option, which may be exercised only at such times and to the extent the related option is exercisable, which we refer to as a Tandem SAR, or independent of a stock option, which we refer to as a Non-Tandem SAR. Each SAR represents a right to receive a payment in shares of our Class A common stock or cash, as determined by the Compensation and Nominating Committee, equal in value to the excess of the fair market value of one share of our Class A common stock on the date of exercise over the exercise price per share established in connection with the grant of the SAR. The term of each SAR may not exceed ten years. The exercise price per share covered by an SAR will be the exercise price per share of the related option in the case of a Tandem SAR and will be the fair market value of our Class A common stock on the date of grant in the case of a Non-Tandem SAR. The Compensation and Nominating Committee may also grant limited SARs, either as Tandem SARs or Non-Tandem SARs, which may become exercisable only upon the occurrence of a change in control, as defined in the 2017 Incentive Plan, or such other event as the Compensation and Nominating Committee may designate at the time of grant or thereafter.

### Restricted Stock

The Compensation and Nominating Committee may award shares of restricted stock. Except as otherwise provided by the Compensation and Nominating Committee upon the award of restricted stock, the recipient generally has the rights of a stockholder with respect to the shares, including the right to receive dividends, the right to vote the shares of restricted stock and, conditioned upon full vesting of

125

Table of Contents

shares of restricted stock, the right to tender such shares, subject to the conditions and restrictions generally applicable to restricted stock or specifically set forth in the recipient's restricted stock agreement. The Compensation and Nominating Committee may determine at the time of award that the payment of dividends, if any, will be deferred until the expiration of the applicable restriction period.

Recipients of restricted stock are required to enter into a restricted stock agreement with us that states the restrictions to which the shares are subject, which may include satisfaction of pre-established performance goals, and the criteria or date or dates on which such restrictions will lapse.

If the grant of restricted stock or the lapse of the relevant restrictions is based on the attainment of performance goals, the Compensation and Nominating Committee will establish for each recipient the applicable performance goals, formulae or standards and the applicable vesting percentages with reference to the attainment of such goals or satisfaction of such formulae or standards while the outcome of the performance goals are substantially uncertain. Such performance goals may incorporate provisions for disregarding, or adjusting for, changes in accounting methods, corporate transactions, including, without limitation, dispositions and acquisitions, and other similar events or circumstances. Section 162(m) of the Code requires that performance awards be based upon objective performance measures. The performance goals for performance-based restricted stock will be based on one or more of the objective criteria set forth on Exhibit A to the 2017 Incentive Plan and are discussed in general below.

### Other Stock-Based Awards

The Compensation and Nominating Committee may, subject to limitations under applicable law, make a grant of such other stock-based awards, including, without limitation, performance units, dividend equivalent units, stock equivalent units, restricted stock and deferred stock units under the 2017 Incentive Plan that are payable in cash or denominated or payable in or valued by shares of our Class A common stock or factors that influence the value of such shares. The Compensation and Nominating Committee may determine the terms and conditions of any such other awards, which may include the achievement of certain minimum performance goals for purposes of compliance with Section 162(m) of the Code and/or a minimum vesting period. The performance goals for performance-based other stock-based awards will be based on one or more of the objective criteria set forth on Exhibit A to the 2017 Incentive Plan and discussed in general below.

### Other Cash-Based Awards

The Compensation and Nominating Committee may grant awards payable in cash. Cash-based awards will be in such form, and dependent on such conditions, as the Compensation and Nominating Committee will determine, including, without limitation, being subject to the satisfaction of vesting conditions or awarded purely as a bonus and not subject to restrictions or conditions. If a cash-based award is subject to vesting conditions, the Compensation and Nominating Committee may accelerate the vesting of such award in its discretion.

### Performance Awards

The Compensation and Nominating Committee may grant a performance award to a participant payable upon the attainment of specific performance goals. The Compensation and Nominating Committee may grant performance awards that are intended to qualify as performance-based compensation under Section 162(m) of the Code as well as performance awards that are not intended to qualify as performance-based compensation under Section 162(m) of the Code. If the performance award is payable in cash, it may be paid upon the attainment of the relevant performance goals either in cash or in shares of restricted stock, based on the then current fair market value of such shares, as determined by the Compensation and Nominating Committee. Based on service, performance and/or other factors or criteria, the Compensation and Nominating Committee may, at or after grant, accelerate the vesting of all or any part of any performance award.

126

Table of Contents

*Performance Goals*

The Compensation and Nominating Committee may grant awards of restricted stock, performance awards, and other stock-based awards that are intended to qualify as performance-based compensation for purposes of Section 162(m) of the Code. These awards may be granted, vest and be paid based on attainment of specified performance goals established by the committee. These performance goals may be based on the attainment of a certain target level of, or a specified increase or decrease in, one or more of the following measures selected by the Compensation and Nominating Committee: (1) earnings per share; (2) operating income; (3) gross income; (4) net income, before or after taxes; (5) cash flow; (6) gross profit; (7) gross margin return on investment; (8) gross margin; (9) operating margin; (10) working capital; (11) earnings before interest and taxes; (12) earnings before interest, tax, depreciation and amortization; (13) return on equity; (14) return on assets; (15) return on capital; (16) return on invested capital; (17) net revenues; (18) gross revenues; (19) revenue growth; (20) sales or market share; (21) total shareholder return; (22) economic value added; (23) specified objectives with regard to limiting the level of increase in all or a portion of our bank debt or other long-term or short-term public or private debt or other similar financial obligations, which may be calculated net of cash balances and other offsets and adjustments as may be established by the Compensation and Nominating Committee; (24) the fair market value of a share of our Class A common stock; (25) the growth in the value of an investment in our Class A common stock assuming the reinvestment of dividends; or (26) reduction in operating expenses.

To the extent permitted by law, the Compensation and Nominating Committee may also exclude the impact of an event or occurrence which the Compensation and Nominating Committee determines should be appropriately excluded, such as (1) restructurings, discontinued operations, extraordinary items and other unusual or non-recurring charges; (2) an event either not directly related to our operations or not within the reasonable control of management; or (3) a change in tax law or accounting standards required by generally accepted accounting principles.

Performance goals may also be based on an individual participant's performance goals, as determined by the Compensation and Nominating Committee.

In addition, all performance goals may be based upon the attainment of specified levels of our performance, or the performance of a subsidiary, division or other operational unit, under one or more of the measures described above relative to the performance of other corporations. The Compensation and Nominating Committee may designate additional business criteria on which the performance goals may be based or adjust, modify or amend those criteria.

*Change in Control*

In connection with a change in control, as defined in the 2017 Incentive Plan, the Compensation and Nominating Committee may accelerate vesting of outstanding awards under the 2017 Incentive Plan. In addition, such awards may be, in the discretion of the committee, (1) assumed and continued or substituted in accordance with applicable law; (2) purchased by us for an amount equal to the excess of the price of a share of our Class A common stock paid in a change in control over the exercise price of the awards; or (3) cancelled if the price of a share of our Class A common stock paid in a change in control is less than the exercise price of the award. The Compensation and Nominating Committee may also provide for accelerated vesting or lapse of restrictions of an award at any time.

*Stockholder Rights*

Except as otherwise provided in the applicable award agreement, and with respect to an award of restricted stock, a participant has no rights as a stockholder with respect to shares of our Class A common stock covered by any award until the participant becomes the record holder of such shares.

127

**Table of Contents**

### Amendment and Termination

Notwithstanding any other provision of the 2017 Incentive Plan, our Board may at any time amend any or all of the provisions of the 2017 Incentive Plan, or suspend or terminate it entirely, retroactively or otherwise, subject to stockholder approval in certain instances; provided, however, that, unless otherwise required by law or specifically provided in the 2017 Incentive Plan, the rights of a participant with respect to awards granted prior to such amendment, suspension or termination may not be adversely affected without the consent of such participant.

### Transferability

Awards granted under the 2017 Incentive Plan generally are nontransferable, other than by will or the laws of descent and distribution, except that the committee may provide for the transferability of nonqualified stock options at the time of grant or thereafter to certain family members.

### Recoupment of Awards

The 2017 Incentive Plan provides that awards granted under the 2017 Incentive Plan are subject to any recoupment policy that we may have in place or any obligation that we may have regarding the clawback of "incentive-based compensation" under the Securities Act or under any applicable rules and regulations promulgated by the SEC.

### Effective Date; Term

We expect the 2017 Incentive Plan to be effective upon the completion of this offering. No award will be granted under the 2017 Incentive Plan on or after          , 2027. Any award outstanding under the 2017 Incentive Plan at the time of termination will remain in effect until such award is exercised or has expired in accordance with its terms.

### IPO Grants

Participants in the Existing Performance Plan will be issued an aggregate of          restricted shares of Class A common stock pursuant to the terms of our new 2017 Incentive Plan upon the completion of this offering (assuming an initial public offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). Upon the pricing of this offering, we also expect to award options to purchase an aggregate of          shares of common stock to approximately          non-executive employees, with an exercise price set at the initial public offering price. The options awarded upon pricing of the offering will be contingent upon completion of the offering, and a portion of the options will be unvested as of the date of grant. All of the unvested option awards will vest over a five year period.

128

**Table of Contents**

**Director Compensation**

Carvana Group did not pay the members of its board of managers any compensation for serving as managers for the years ended December 31, 2015 and 2016.

Following the completion of this offering, the annual fees paid to our non-employee directors will be as follows:

| Description | Amount |
| --- | --- |
| Annual retainer | $60,000 |
| Board meeting fees | $2,000 per each Board meeting in excess of six Board meetings in any calendar year that a non-employee director attends in person |
| Additional retainer for committee members | $10,000 per committee |
| Additional retainer for chair of committee | $20,000 for Audit Committee; $15,000 for Compensation and Nominating Committee |
| Additional retainer for lead director | $20,000 |

All non-employee directors will also be entitled to be reimbursed for their reasonable expenses to attend meetings of our Board and related committees and otherwise attend to our business.

In addition, at pricing of this offering, each of our non-employee directors will be awarded approximately $        worth of options to purchase an aggregate of        shares of Class A common stock, with an exercise price set at the initial public offering price. The option awards will be time-vesting over a three year period.

129

Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth information about the beneficial ownership of our Class A common stock and Class B common stock as of            , 2017, after giving effect to the Organizational Transactions:

- each person or group known to us who beneficially owns more than 5% of our Class A common stock or Class B common stock immediately prior to this offering;

- each of our directors and director nominees;

- each of our Named Executive Officers; and

- all of our directors and executive officers as a group.

Unless otherwise noted below, the address for each beneficial owner listed on the table is 4020 East Indian School Road, Phoenix, Arizona 85018. We have determined beneficial ownership in accordance with the rules of the SEC. Except as indicated by the footnotes below, we believe, based on the information furnished to us, that the persons and entities named in the tables below have sole voting and investment power with respect to all Class A common stock that they beneficially own, subject to applicable community property laws.

The numbers of shares of Class A common stock and Class B common stock (together with the same amount of LLC Units) beneficially owned and percentages of beneficial ownership before this offering that are set forth below are based on the number of shares and LLC Units to be issued and outstanding prior to this offering after giving effect to the Organizational Transactions. See "Organizational Structure." The numbers of shares of Class A common stock and Class B common stock (together with the same amount of LLC Units) beneficially owned and percentages of beneficial ownership after the offering that are set forth below are based on            shares of Class A common stock to be issued and outstanding immediately after the offering, assuming no exercise by the underwriters of their option to purchase additional shares of Class A common stock. This number excludes            shares of Class A common stock issuable in exchange for LLC Units (based upon an assumed offering price of $           per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), as described under "Organizational Structure" and "Certain Relationships and Related Party Transactions — Amended and Restated Operating Agreement." If all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted (based upon an assumed offering price of $           per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus), we would have            shares of Class A common stock outstanding immediately after this offering.

Concurrently with this offering, we will issue to the LLC Unitholders            shares of Class B common stock.

| | Shares Beneficially Owned Prior to this Offering | | | | | Shares Beneficially Owned After this Offering | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name of Beneficial Owner | Shares of Class A Common Stock | % of Class A Common Stock Outstanding | Shares of Class B Common Stock | % of Class B Common Stock Outstanding | % of Combined Voting Power(1) | Shares of Class A Common Stock | Shares of Class B Common Stock | % of Combined Voting Power Assuming the Underwriters' Option Is Not Exercised(1) | % of Combined Voting Power Assuming the Underwriters' Option Is Exercised in Full(1) |
| **5% Stockholders:** | | | | | | | | | |
| Ernest Garcia, II(2)(3) | | | | | | | | | |
| CVAN Holdings, LLC(4) | | | | | | | | | |
| **Named Executive Officers, Directors and Director Nominees:** | | | | | | | | | |
| Ernie Garcia, III(5) | | | | | | | | | |
| Benjamin Huston (6) | | | | | | | | | |
| Mark Jenkins(7) | | | | | | | | | |
| Michael Maroone | | | | | | | | | |
| Ira Platt | | | | | | | | | |
| Dan Quayle | | | | | | | | | |
| Greg Sullivan | | | | | | | | | |
| All executive officers, directors and director nominees as a group(8) (10 individuals) | | | | | | | | | |

130

Table of Contents

(1)   Each share of Class A common stock entitles the registered holder thereof to one vote on all matters presented to stockholders for a vote generally, including the election of directors. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally, including the election of directors, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Each other share of our Class B common stock entitles its holder to one vote on all matters to be voted on by stockholders generally, including the election of directors. The Class A common stock and Class B common stock will vote as a single class on all matters except as required by law or the certificate of incorporation.

(2)   This number includes          shares of Class B common stock owned directly by Mr. Garcia and          shares of Class B common stock owned by DriveTime Sales and Finance Company LLC. Mr. Garcia is the chairman of the board of directors and largest stockholder of DriveTime, of which DriveTime Sales and Finance Company LLC is a wholly owned subsidiary. Mr. Garcia has also granted an option to purchase up to an aggregate amount of $17.0 million of his Class C Preferred Units to a third party. These shares are included in the total for Mr. Garcia in the table above. This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by Mr. Garcia. These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(3)   Mr. Garcia has an option to purchase Class C Preferred Units from CVAN Holdings, LLC in connection with this offering. Mr. Garcia will exercise the option in connection with this offering and, following the conversion of the Class C Preferred Units into LLC Units, will receive an additional          shares of Class B common stock pursuant to the Organizational Transactions. These shares are included in the total for Mr. Garcia, and excluded from the total for CVAN Holdings, LLC.

(4)   CVAN Holdings, LLC is indirectly controlled by Mark Walter. This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by CVAN Holdings, LLC. These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(5)   This number includes          shares of Class B common stock owned directly by Mr. Garcia,          shares of Class B common stock owned by the Ernest Irrevocable 2004 Trust III, of which Mr. Garcia is the sole beneficiary, and          shares of Class B common stock owned by the Ernest C. Garcia III Multi-Generational Trust III, of which Mr. Garcia is a beneficiary together with his children. While Ernest Garcia, II is the investment trustee over both of the trusts, the trusts are each irrevocable and he is not a beneficiary. This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by Mr. Garcia. These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(6)   This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by Mr. Huston (based upon an assumed offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(7)   This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by Mr. Jenkins (based upon an assumed offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

(8)   This number excludes          shares of Class A common stock issuable in exchange for LLC Units held by our executive officers and directors (based upon an assumed offering price of $          per share, which is the midpoint of the estimated public offering price range set forth on the cover page of this prospectus). These shares of Class A common stock represent approximately     % of the shares of Class A common stock that would be outstanding immediately after this offering if all outstanding LLC Units were exchanged and all outstanding shares of Class B common stock were converted at that time.

131

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

### Policies for Approval of Related Party Transactions

Prior to completion of this offering, we intend to adopt a policy with respect to the review, approval and ratification of related party transactions. Under the policy, our Audit Committee is responsible for reviewing and approving related party transactions. In the course of its review and approval of related party transactions, our Audit Committee will consider the relevant facts and circumstances to decide whether to approve such transactions. In particular, our policy requires our Audit Committee to consider, among other factors it deems appropriate:

- the related person's relationship to us and interest in the transaction;

- the material facts of the proposed transaction, including the proposed aggregate value of the transaction;

- the impact on a director's independence in the event the related person is a director or an immediate family member of the director;

- the benefits to us of the proposed transaction;

- if applicable, the availability of other sources of comparable products or services; and

- an assessment of whether the proposed transaction is on terms that are comparable to the terms available to an unrelated third party or to employees generally.

The Audit Committee may only approve those transactions that are in, or are not inconsistent with, our best interests and those of our stockholders, as the Audit Committee determines in good faith.

### Amended and Restated Operating Agreement

In connection with the completion of this offering, we will amend and restate the Carvana Group's existing operating agreement, which we refer to as the "LLC Operating Agreement." The operations of Carvana Group, and the rights and obligations of the LLC Unitholders, will be set forth in the LLC Operating Agreement. See "Organizational Structure — Amended and Restated Operating Agreement of the LLC."

### Registration Rights Agreement

In connection with this offering, we intend to enter into a registration rights agreement with certain LLC Unitholders. These LLC Unitholders will be entitled to request that we register their shares on a long-form or short-form registration statement on one or more occasions in the future, which registrations may be "shelf registrations." All of such LLC Unitholders will be entitled to participate in certain of our registered offerings, subject to the restrictions in the registration rights agreement. We will pay expenses in connection with the exercise of these rights. The registration rights described in this paragraph apply to (1) shares of our Class A common stock held by certain LLC Unitholders, and (2) any of our capital stock (or that of our subsidiaries) issued or issuable with respect to the Class A common stock described in clause (1) with respect to any dividend, stock split, recapitalization, reorganization, or certain other corporate transactions ("Registrable Securities"). These registration rights are also for the benefit of any subsequent holder of Registrable Securities; provided that any particular securities will cease to be Registrable Securities when they have been sold in a registered public offering, sold in compliance with Rule 144 of the Securities Act or repurchased by us or our subsidiaries. In addition, any Registrable Securities held by a person other than an LLC Unitholder and their affiliates will cease to be Registrable Securities if they can be sold without limitation under Rule 144 of the Securities Act.

132

**Table of Contents**

## Tax Receivable Agreement

We intend to enter into a Tax Receivable Agreement with the LLC Unitholders that will provide for the payment from time to time by us to such persons of 85% of the amount of the benefits, if any, that we realize or, under certain circumstances, are deemed to realize as a result of (1) the increase in our wholly owned subsidiary's proportionate share of the existing tax basis of the assets of Carvana Group and an adjustment in the tax basis of the assets of Carvana Group reflected in that proportionate share as a result of any future exchanges of LLC Units held by an LLC Unitholder for shares of our Class A common stock or cash, described under "Organizational Structure — Exchange Agreement" and (2) certain other tax benefits related to our making payments under the Tax Receivable Agreement. These payment obligations are obligations of Carvana Co. and not of Carvana Group. See "Organizational Structure — Tax Receivable Agreement."

## Indemnification of Officers and Directors

Upon completion of this offering, we intend to enter into indemnification agreements with each of our officers and directors. The indemnification agreements will provide the officers and directors with contractual rights to indemnification, expense advancement and reimbursement, to the fullest extent permitted under Delaware law. Additionally, we may enter into indemnification agreements with any new directors or officers that may be broader in scope than the specific indemnification provisions contained in Delaware law.

## Relationship with DriveTime

Prior to November 1, 2014, Carvana, LLC was a wholly-owned subsidiary of DriveTime. On November 1, 2014, DriveTime distributed the units of Carvana, LLC to the unit holders of DriveTime on a pro-rata basis, which we refer to as the Spinoff. DriveTime is controlled by our controlling shareholder, Ernest Garcia, II, who is also the father of our Chief Executive Officer. Following the Spinoff, the unitholders of DriveTime contributed the Carvana, LLC units to Carvana Group.

For periods prior to the Spinoff, our consolidated historical financial statements include charges related to certain DriveTime corporate functions, including senior management, accounting and finance, legal, human resources, payroll and benefits, equipment, corporate communications, software and production incurred under our shared services agreement. These expenses have been allocated to us based on direct usage or benefit where identifiable, with the remainder charged on a pro rata basis determined on relative revenues, headcount, production rate or other measures determined by management. We consider the expense allocation methodology and results to reasonably reflect the utilization of the services provided to, or the benefit received by, us for all periods prior to the Spinoff. However, the allocations may not be indicative of the actual expenses that would have been incurred had we operated as an independent company for the periods presented prior to the Spinoff. Actual costs that may have been incurred if we had been a stand-alone entity would depend on a number of factors, including the organizational structure, whether functions were outsourced or performed by employees, and strategic decisions made in areas such as information technology and infrastructure. We are unable to determine the amount of costs that would have been incurred had we been independent. During the period from our inception to December 31, 2012, and the years ended December 31, 2013 and 2014, DriveTime incurred approximately $7.2 million, $13.7 million and $22.2 million, respectively, of costs on our behalf and charged them to us as a capital contribution.

Subsequent to the Spinoff, we entered into several agreements with DriveTime that, among other things, were intended to facilitate our transition to a standalone company, which are described below. DriveTime is currently in the process of evaluating strategic alternatives, including the potential sale of the company to interested third parties. If such a sale is completed, there can be no assurances that DriveTime will enter into any new agreements or arrangements, or extensions or renewals of existing agreements or arrangements, with us on the same or similar terms or at all.

Table of Contents

### Guarantees on Behalf of DriveTime

We guaranteed the obligations under the indenture dated as of June 3, 2014 governing DriveTime's $250.0 million 12.625% senior secured notes due 2017. The guarantee remained in effect until July 27, 2015, at which time we were released of our guarantee in consideration for a $33.5 million capital contribution by certain DriveTime shareholders that were also Class A Unit holders of Carvana Group. See "—Note Payable."

### Note Payable

On July 21, 2015, Carvana Group issued a $50.0 million note payable to DriveTime. The note payable accrued interest at one-month LIBOR plus 7.816% and was scheduled to mature on September 21, 2015. The proceeds from the note payable were used, in part, to fund a $33.5 million dividend to Class A Unit holders on July 27, 2015. Certain of the Class A Unit holders used the proceeds from the dividend to make a $33.5 million capital contribution to DriveTime in order to release us from our guarantees on the obligations under the governing documents for DriveTime's outstanding senior secured notes dated as of June 3, 2014. See "—Guarantees on Behalf of DriveTime."

On July 27, 2015, Carvana Group also issued a stock dividend of 1,521,552 Class A Units to Class A Unit holders on a pro rata basis in satisfaction, together with the $33.5 million cash dividend, of such Class A Unit holders' remaining $40.0 million preference. Satisfaction of the preference owing to the Class A Unit holders was necessary in order to facilitate Carvana Group's sale of the Class C Preferred Units on July 27, 2015. See "—Sale of Class C Preferred Units."

On July 27, 2015, Carvana Group issued 11,764,706 Class A Units to DriveTime in exchange for the cancellation of the $50.0 million note plus all accrued interest.

### Shared Services Agreement with DriveTime

Prior to the Spinoff, we relied on DriveTime for its administrative functions. In connection with the Spinoff, we entered into a shared services agreement under which DriveTime historically provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production and other services to facilitate our transition of these functions to us on a standalone basis. The shared services agreement was most recently amended and restated as of February 27, 2017 and operates on a year-to-year basis after February of 2019, with Carvana having the right to terminate any or all services with 30 days prior written notice and DriveTime having the right to terminate certain services effective December 2017 and other services effective July 2018, in each case with 90 days prior written notice. DriveTime provides us with benefits, tax reporting and compliance, telecommunications and IT services under the amended agreement. Total expenses related to the shared services agreement were approximately $0.7 million, $1.0 million and $0.2 million for the year ended December 31, 2016, for the year ended December 31, 2015 and for the period from the Spinoff date through December 31, 2014, respectively.

### Lease Agreement with DriveTime

In connection with the Spinoff, we entered into a lease agreement dated as of November 1, 2014 with DriveTime that governs our access to and utilization of space at DriveTime IRCs for vehicle inspection and reconditioning in Blue Mound, Texas and Delanco, New Jersey and for temporary storage at Stockbridge, Georgia. The lease agreement was most recently amended on March 31, 2017. The agreement also governs utilization of office space and parking spaces at various IRCs and dealerships that we use as delivery hubs. Under the amended lease agreement, delivery hubs generally have two-year terms, with the earliest expiration of a delivery hub lease occurring in 2017, subject to certain two consecutive one-year renewal options and subject to the terms of any master lease under which we are subleasing. The lease agreement provides that we may take over the lease for DriveTime IRC facilities in Blue Mound, Texas and Delanco, New Jersey in their entirety on July 31, 2018, subject to us obtaining releases of DriveTime's liability under the leases and causing DriveTime to be paid for any unamortized costs.

134

Table of Contents

Under the lease agreement, we pay a monthly rental fee related to our pro-rata utilization of space at such facilities plus a pro-rata share of each facility's actual insurance costs and real estate taxes. We are also responsible for paying for any tenant improvements we require to conduct operations and our share of actual costs incurred by DriveTime related to vehicle reconditioning. As it relates to locations where we recondition vehicles, our share of facility and shared reconditioning supplies expenses are calculated monthly by multiplying the actual costs for operating the inspection centers by our pro rata share of total reconditioned vehicles and parking spaces used at such IRCs in a given month. Total expenses related to these lease agreements were approximately $2.8 million, $0.8 million and $0.3 million for the year ended December 31, 2016, for the year ended December 31, 2015 and for the period from the Spinoff date through December 31, 2014, respectively. We were also charged approximately $0.8 million related to direct labor costs associated with vehicle refurbishing during the period from the Spinoff date through December 31, 2014.

In February 2017, we entered into a new lease with DriveTime for a fully-operational IRC in Winder, Georgia where we have maintained partial occupancy previously and will now be the sole occupant. The lease has a 8-year term, subject to our ability to exercise three renewal option terms of five years each. We will pay base rent of $83,333 per month, commencing March 1, 2017, and will be subject to adjustment each year beginning January 1, 2018, increasing in an amount equal to the percentage increase in the Consumer Price Index, which amount shall not exceed 5% and shall not be less than 2%.

### Office Lease Agreements

We paid a monthly rental fee for our use of space at DriveTime's corporate headquarters from the Spinoff date through December 2015. The monthly rental fees related to this agreement totaled approximately $0.3 million and $0.0 million for the year ended December 31, 2015 and for the period from the Spinoff date through December 31, 2014, respectively.

In November 2015, we entered into a new lease with an affiliate of DriveTime and relocated our headquarters in December 2015 to a location separate from DriveTime's corporate headquarters. The rent expense incurred related to this agreement for the year ended December 31, 2016 and the year ended December 31, 2015 was approximately $0.9 million and $0.1 million, respectively. In December 2016, the landlord affiliate of DriveTime sold its interest in this property to a third party.

In January 2017, we began subleasing on a month-to-month basis certain office space at DriveTime's corporate headquarters in Tempe, Arizona. Pursuant to this arrangement, we pay DriveTime monthly rent of approximately $30,000. This arrangement terminated in March of 2017.

### Vehicle Inventory Purchases

Through September 2016, we purchased all of our inventory under DriveTime's auction numbers, and subsequent payment for these vehicles was made by DriveTime. We had an arrangement to repay DriveTime for inventory purchased on our behalf. Vehicles purchased under this arrangement were acquired by the company at DriveTime's cost of the vehicles purchased with no markup. As of December 31, 2015, approximately $21.4 million was due to DriveTime primarily related to vehicle inventory purchases. As of December 31, 2014, we had an outstanding balance of approximately $11.8 million under a note payable bearing interest at 5.6% with DriveTime related to vehicle inventory purchases. We repaid the note in full during 2015 and paid $546.0 thousand in interest during the life of the note. As of December 31, 2016, we no longer utilized DriveTime for vehicle inventory purchases.

### Floor Plan Facility

In October 2014, we were a party to the DriveTime vehicle inventory financing and security agreement and a cross collateral, cross default and guaranty agreement with Ally Bank and Ally Financial (together, "Ally") secured by DriveTime and our vehicle inventory. The facility provided for up to $20.0 million of available credit and the interest rate under the facility was based on the one month LIBOR rate plus 3.10%. On July 27, 2015, we were removed as a party to the cross collateral agreement and the vehicle inventory financing agreement was

135

Table of Contents

amended and restated to remove DriveTime. The new facility provided for up to $60.0 million of available credit and the interest rate under the facility is based on the one month LIBOR rate plus 3.80%.

In December 2015, we increased the amount available under the credit facility to an aggregate of $125.0 million. In connection with this increase, two of our existing owners, Ernest Garcia, II and the 2014 Fidel Family Trust, unconditionally guaranteed the payment of all of our indebtedness up to $25.0 million. In April 2016, Mr. Garcia invested $100.0 million in the company through the purchase of approximately 18.3 million Class C Preferred Units, $25.0 million of which satisfied certain conditions required to terminate those guarantees.

### Finance Receivable Purchase Agreement with DriveTime

In June 2014, we entered into a receivable purchase agreement to sell automotive financing receivables that we originated in conjunction with the sale of vehicles to a special purpose entity controlled by DriveTime. Through December 31, 2015, we sold all of our automotive finance receivables to DriveTime under this arrangement. As of December 31, 2015 we had approximately $1.5 million in receivables due from DriveTime for the sales of automotive financing receivables. During the year ended December 31, 2016, DriveTime purchased a portion of the automotive financing receivables we originated representing approximately $11.5 million of outstanding principal balance. The price for the sales was mutually agreed upon based on prevailing market conditions and resulted in a gain of approximately $0.3 million. As of December 31, 2016, DriveTime is not obligated to make any additional purchases under the agreement.

### Repurchase of Automotive Finance Receivables from DriveTime

On January 20, 2016, we repurchased $72.4 million of automotive finance receivables from DriveTime related to loans we originated and previously sold under the terms of the DriveTime receivable purchase agreement for a price of $74.6 million. Such receivables were immediately sold by us to third party purchasers under the transfer and note purchase and security agreements described below for a price of $74.6 million.

### Aircraft Time Sharing Agreement

On October 22, 2015, we entered into an agreement to share usage of two aircraft operated by DriveTime. Pursuant to the agreement, we agreed to reimburse DriveTime for actual expenses for each of our flights. The agreement lasts for 12 months, with perpetual 12-month automatic renewals. Either the lessors or the lessees can terminate the lease with 30 days' written notice. We reimbursed DriveTime $0.6 million and $0.1 million under this agreement during the years ended December 31, 2016 and 2015, respectively.

### Vehicle Transfer to DriveTime

On November 30, 2016, we sold used vehicle inventory with a carrying value of approximately $4.9 million to DriveTime to dispose of used vehicle inventory that no longer met our inventory specifications. We recorded a loss of approximately $0.8 million related to this disposal. In March 2017, we repurchased approximately $0.2 million of this inventory that did not meet the agreed upon terms of the sales arrangement with DriveTime.

### Servicing Agreement with DriveTime

In December 2015, we entered into a Servicing Agreement with DriveTime pursuant to which DriveTime agreed to perform certain servicing and collections activities with respect to automotive finance receivables we own after origination and before sale. In connection with such Servicing Agreement, DriveTime entered into a Subservicing Agreement with GFC Lending LLC, an affiliate of DriveTime, to perform certain subservicing functions, payment for which would be made from proceeds earned by DriveTime from us. As of December 31, 2016, DriveTime had earned $41.7 thousand and GFC Lending

136

Table of Contents

LLC had earned $41.7 thousand for performing servicing functions for such receivables. Additionally, DriveTime has in the past and may in the future purchase automotive finance receivables from us.

### Master Purchase and Sale Agreement

In December 2016, we entered into a master purchase and sale agreement with Ally pursuant to which we sell automotive finance receivables meeting certain underwriting criteria to Ally. Ally has engaged DriveTime as servicer of the receivables it purchases under this agreement. Under the agreement, Ally has committed to purchase up to an aggregate of $375.0 million in principal balances of automotive finance receivables that we originate, subject to adjustments as described in the agreement. DriveTime had no earnings pursuant to the agreement for performing servicing functions for the year ended December 31, 2016.

### Master Transfer Agreement

In December 2016, we entered into a master transfer agreement with an unrelated third party pursuant to which we sell automotive finance receivables meeting certain underwriting criteria to such third party. The purchaser engaged Carvana as Trust Administrator and DriveTime as servicer of the receivables. Under the agreement, such third party has committed to purchase up to an aggregate of $292.2 million in principal balances of automotive finance receivables that we originate. The third party purchaser finances a majority of these purchases with borrowings from Ally. We had earnings of $83 for performing Trust Administrator functions for such purchaser and DriveTime had no earnings for performing servicing functions for the year ended December 31, 2016.

### Tempe Office Lease

In September 2016, we entered into a new lease with a third party for the second floor of a new corporate headquarters in Tempe, Arizona that we expect to inhabit before the third quarter of 2017. Pursuant to such lease, we will pay monthly base rent in the amount of approximately $107,000, which amount shall increase throughout the duration of the lease. The lease has an initial term of 83 months and we have three 5-year extension options. At the request of the landlord, DriveTime agreed to partially guarantee our lease payments until the 30th full calendar month of such lease. In connection with this lease, we entered into a sublease with DriveTime for our use of the first floor of the Tempe, Arizona building. Pursuant to the sublease, which is co-terminus with the master lease under which we sublease and has a term of 83 months, subject to our right to exercise three 5-year extension options, we will pay DriveTime rent equal to the amounts due under the master lease, including monthly base rent of $107,000 beginning April 1, 2018, subject to increases over the duration of the sublease and master lease.

### Tolleson, AZ Inspection and Reconditioning Center Lease

In December 2016, we entered into a new lease with Verde, an affiliate of DriveTime, for us to occupy an IRC that we will construct in Tolleson, Arizona. The lease expires in December 2031 subject to our right to extend for four 5-year terms. Pursuant to the lease, we will pay base rent of $137,500 per month commencing February 1, 2017, which amount shall be subject to adjustment each year beginning January 1, 2018, in accordance with the Consumer Price Index, subject to a minimum increase of 2% per year and a maximum increase of 5% per year.

### IP License Agreement

In February 2017 we entered into a license agreement that governs the rights of certain intellectual property owned by us and the rights of certain intellectual property owned by DriveTime. The license agreement generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property. The exclusive license to DriveTime is limited to the business that is primarily of sub-prime used car sales to retail customers. However, upon a change of control of either party, the license rights of the

137

Table of Contents

party that experienced the change of control are terminated. The agreement does not provide a license to any of our patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to our vending machine, automated vehicle photography or certain other elements of our brand. See "Risk Factors — Risks Related to Our Business — We participate in a highly competitive industry, and pressure from existing and new companies may adversely affect our business and operating results."

### Credit Facility with Verde

On February 27, 2017, we entered into a credit facility with Verde Investments, Inc., an affiliate of DriveTime, for an amount up to $50.0 million. We may, but are not required to, draw up to five loans in minimum amounts of $10.0 million each during the term of the agreement. Amounts borrowed and repaid under the agreement cannot be reborrowed. As of March 31, 2017, $20.0 million has been drawn under the credit facility. All outstanding borrowings under the credit facility will be repaid in full and the credit facility will be terminated in connection with this offering. See "Use of Proceeds" and "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Credit Facility with Verde."

<div align="center">

**Other Agreements**

</div>

### Master Dealer Agreement

On December 9, 2016, we entered into a master dealer agreement with an affiliate of DriveTime, pursuant to which we may sell VSCs to customers purchasing a vehicle from us through our transaction platform. We earn a commission on each VSC sold to Carvana customers and such affiliate subsequently administers the VSC. We had earnings of $0.2 million for VSCs sold pursuant to the master dealer agreement as of December 31, 2016.

### Transfer and Note Purchase and Security Agreements

In January 2016, we entered into transfer agreements pursuant to which we sell automotive finance receivables meeting certain underwriting criteria to certain trusts who each engage Carvana as Trust Administrator of the trusts and DriveTime as servicer of the receivables. DriveTime engaged GFC Lending LLC, an affiliate of DriveTime, to perform certain subservicing functions with respect to these automotive finance receivables, payment for which would be made from proceeds received by DriveTime from the third party purchasers. Pursuant to certain note purchase and security agreements entered into in connection with the transfer agreements, the trusts issued notes to certain parties, including Delaware Life Insurance Company ("Delaware Life"), in which Mark Walter has a substantial ownership interest. Mark Walter also indirectly controls CVAN Holdings, LLC and has non-controlling ownership interests in other note purchasers under the note purchase and security agreements. Delaware Life also serves as administrative agent and paying agent on behalf of the note purchasers. Under the transfer agreements and initial note purchase and security agreements, we could sell up to an aggregate of $200.0 million in principal balances of automotive finance receivables in this manner. In September 2016, we amended the agreements to sell up to $230.0 million in principal balances of the finance receivables. As of December 31, 2016, we have sold all $230.0 million of automotive finance receivables, including the approximately $72.4 million of automotive finance receivables repurchased from DriveTime.

Pursuant to the note purchase and security agreements, Delaware Life has advanced $63.0 million through December 31, 2016 to the trusts that purchased our automotive finance receivables. As of December 31, 2016, there was no unused capacity under the note purchase and security agreements. On February 27, 2017, Delaware Life sold its interest in the notes under the note purchase and security agreements to an unrelated third party, but remains the administrative agent and paying agent for the note purchasers. On September 27, 2016, we sold approximately $2.6 million of automotive finance receivables to DriveTime, which receivables were ineligible for sale to the third party purchasers that are party to the transfer and note purchase and security agreements. We have earned $2.0 thousand for performing Trust

138

Table of Contents

Administrator functions for the trusts that purchased our receivables and DriveTime has earned $1.2 million and GFC Lending LLC has earned $1.2 million (paid to GFC Lending LLC by DriveTime) for performing servicing functions for the receivables sold pursuant to the transfer agreements as of December 31, 2016.

### Loan from Ernest Garcia, II

On March 31, 2016, we entered into a loan and security agreement with Ernest Garcia, II, for $10.0 million. The loan bore interest at an annual rate of 4.0% and had a maturity date of May 1, 2016. On April 28, 2016, we repaid the principal and $30.0 thousand of accrued interest, thereby terminating the loan.

### Sale of Class C Preferred Units

On July 27, 2015, we issued and sold 14,051,214 Class C Preferred Units to CVAN Holdings, LLC, for $65.0 million. On April 27, 2016, we issued and sold 18,300,293 Class C Preferred Units for $100.0 million to Ernest Garcia, II. On July 12, 2016, we issued and sold 8,597,319 Class C Preferred Units to CVAN Holdings, LLC, and 1,672,179 Class C Preferred Units to GV Auto I, LLC for approximately $50.0 million and $9.7 million, respectively. On December 9, 2016, we authorized the issuance of and sold 468,000 Class C Redeemable Preferred Units to the 2014 Fidel Family Trust for approximately $2.7 million.

In accordance with our Operating Agreement, the Class C Preferred Units accrue a return ("Class C Return") at a coupon rate of 12.5% compounding annually on the aggregate amount of capital contributions made with respect to the Class C Preferred Units. If we have a public offering in which the offering price per Class A Unit is greater than or equal to 200% of the original Class C Preferred Unit issuance price, or if we have a sale transaction in which the proceeds payable with respect to the Class C Preferred Units is greater than or equal to 200% of the original Class C Preferred Unit issuance price, we are no longer liable for the Class C Return. In the event of a public offering in which the offering price per Class A Unit is greater than or equal to 150% of the original Class C Preferred Unit issuance price, the Class C Preferred Units are automatically converted to Class A Units on a one to one basis. On or after July 27, 2018, the Class C Preferred Unit holders may require us to redeem the Class C Preferred Units at a price per unit equal to the original issuance price of the Class C Preferred Units plus the Class C Return outstanding at the time of redemption. At any time, the Class C Preferred Units can be converted to Class A Units at the option of the Class C Preferred Unit holders.

We record the issuance and sale of Class C Preferred Units at fair value, net of issuance costs. As the redemption feature of the Class C Preferred Units is out of our control, the preferred stock is classified as temporary equity on the accompanying unaudited condensed consolidated balance sheets. We recognize the Class C Return as an increase in temporary equity and a reduction to members' equity. The accrued Class C Return included in Series C Redeemable Preferred Units as of December 31, 2016 and December 31, 2015 was approximately $24.1 million and $3.5 million, respectively.

The liquidation preference of the Class C Preferred Units is such that distributions from members' capital are first paid to the holders of the Class C Preferred Units until the unpaid Class C Return is reduced to zero and either (i) the aggregate of the unreturned initial capital investment is reduced to zero or (ii) such holders of Class C Preferred Units receive the amount they would receive if they converted to Class A Common Units, whichever is greater. Following such payments to holders of the Class C Preferred Units, any excess funds from distribution are then paid on a pro rata basis to the holders of Class A Units and Class B Units that are vested and outstanding.

In connection with the Organizational Transactions, the holders of Class C Preferred Units will exchange Class C Preferred Units for Class A Units.

139

**Table of Contents**

## DESCRIPTION OF CERTAIN INDEBTEDNESS

Set forth below is a summary of the terms of the agreements governing certain of our outstanding indebtedness. This summary is not a complete description of all of the terms of the agreements. The agreements setting forth the principal terms and conditions of certain of our outstanding indebtedness are filed as exhibits to the registration statement of which this prospectus forms a part.

### *Floor Plan Facility*

We have maintained a floor plan facility with Ally since our inception that is used to finance our used vehicle inventory and is secured by substantially all of our assets, including our used vehicle inventory. On December 30, 2015, we entered into an amendment to our amended and restated inventory financing and security agreement with Ally governing the $125.0 million line of credit available under our floor plan facility (the "Floor Plan Facility"). We further amended the Floor Plan Facility on November 9, 2016 to increase the line of credit to $200.0 million and to extend the maturity to December 27, 2017, which may be extended for an additional 364-day period at Ally's sole discretion. As of December 31, 2016, $165.3 million borrowings were outstanding under the Floor Plan Facility and $34.7 million remained available.

We are required to make monthly interest payments on borrowings under the Floor Plan Facility at a rate per annum equal to 1-month LIBOR plus 380 basis points. We are also required to make monthly principal reduction payments equal to 10% of the original principal amount for each vehicle subject to the floor plan for more than 180 days until the outstanding principal amount for such vehicle is reduced to the lesser of 50% of the original principal amount of such vehicle or 50% of such vehicle's wholesale value. Additionally, we are permitted at our election to make payments to Ally to be held as principal payments under the Floor Plan Facility, which Ally will hold and treat as a reduction of our indebtedness under the facility (a "Credit Balance").

In addition to other customary covenants, the agreement governing our Floor Plan Facility requires us to maintain (1) a Credit Balance of at least 5% of the total principal amount owed to Ally for used vehicle inventory financed under the facility, (2) unrestricted cash and cash equivalents on hand of at least 10% of all outstanding borrowing under the Floor Plan Facility, (3) a net worth of at least $30.0 million and (4) at least 5% equity in our used vehicle inventory, calculated as a percentage equal to one minus our outstanding borrowings under the facility divided by the sum of the purchase price of our vehicle inventory and certain fees incurred in connection with our purchases. As of December 31, 2016, we were in compliance with all of these covenants and such covenants will not restrict our ability to consummate this offering.

This summary describes the material provisions of the Floor Plan Facility, but may not contain all information that is important to you. We urge you to read the provisions of the amended and restated inventory financing and security agreement governing the Floor Plan Facility, which has been filed as an exhibit to the registration statement of which this prospectus forms a part. See "Where You Can Find More Information."

140

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

The following is a description of the material terms of our amended and restated certificate of incorporation and amended and restated bylaws as will each be in effect at or prior to the completion of this offering. The following description may not contain all of the information that is important to you. To understand the material terms of our Class A common stock, you should read our amended and restated certificate of incorporation and amended and restated bylaws, copies of which are or will be filed with the SEC as exhibits to the registration statement, of which this prospectus is a part.

### General

At or prior to the consummation of this offering, we will file our amended and restated certificate of incorporation (our "certificate", and we will adopt our amended and restated by-laws (our "bylaws"). Our certificate will authorize capital stock consisting of:

•          shares of Class A common stock, par value $0.001 per share;

•          shares of Class B common stock, par value $0.001 per share; and

•          shares of preferred stock, with a par value per share that may be established by the Board in the applicable certificate of designations.

We are selling          shares of Class A common stock in this offering (          shares if the underwriters exercise in full their option to purchase additional shares of our Class A common stock). All shares of our Class A common stock outstanding upon consummation of this offering will be fully paid and non-assessable. We are issuing          shares of Class B common stock to holders of Class A Units simultaneously with this offering.

The following summary describes the material provisions of our capital stock. We urge you to read our amended and restated certificate of incorporation and our amended and restated bylaws, which are included as exhibits to the registration statement of which this prospectus forms a part.

Certain provisions of our certificate and our bylaws summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of common stock.

### Class A Common Stock

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. The holders of our Class A common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class A common stock will vote together with holders of our Class B common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate of incorporation described below or as otherwise required by applicable law or the certificate.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our Board out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation or the sale of all or substantially all of our assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock will be entitled to receive pro rata our remaining assets available for distribution.

141

Table of Contents

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class A common stock.

## Class B Common Stock

Each holder of Class B common stock is entitled to one vote for each share of Class B Common Stock held of record by such holder; provided that each holder that, together with its affiliates (which, in the case of the Garcia Parties, includes each other Garcia Party), (1) beneficially owns 50% or more of the LLC Units immediately following the completion of this offering and (2) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least 25% of the outstanding shares of Class A common stock (determined assuming that each Class A Unit held by holders other than the Carvana Sub were exchanged for Class A common stock), is entitled to ten votes for each share of Class B common stock held of record by such holder. As a result, because only the Garcia Parties will meet the 50% ownership threshold at the completion of this offering, only the Garcia Parties will be entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock). Each other share of our Class B common stock entitles its holder to one vote on all matters to be voted on by stockholders generally. The Garcia Parties holding shares of our Class B common stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders when the Garcia Parties' direct or indirect beneficial ownership of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is less than 25%. The holders of our Class B common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class B common stock will vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate of incorporation described below or as otherwise required by applicable law or the certificate.

Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation or the sale of all or substantially all of our assets. Additionally, holders of shares of our Class B common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class B common stock. Any amendment of our certificate of incorporation that gives holders of our Class B common stock (1) any rights to receive dividends or any other kind of distribution, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Upon the consummation of this offering, holders of Class A Units will own 100% of our outstanding Class B common stock.

## Preferred Stock

Upon the consummation of this offering, we will have no shares of preferred stock outstanding.

Under the terms of our certificate that will become effective prior to completion of this offering, our Board is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our Board has the discretion to determine the rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our Board to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other

142

Table of Contents

corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

## Forum Selection

Our certificate will provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the United States District Court for the District of Delaware) will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action asserting a claim against the company or any director or officer of the company arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against the company or any director or officer of the company that is governed by the internal affairs doctrine. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

## Anti-Takeover Provisions

Our certificate, bylaws and the DGCL contain provisions, which are summarized in the following paragraphs, that are intended to enhance the likelihood of continuity and stability in the composition of our Board. These provisions are intended to avoid costly takeover battles, reduce our vulnerability to a hostile change of control and enhance the ability of our Board to maximize stockholder value in connection with any unsolicited offer to acquire us. However, these provisions may have an anti-takeover effect and may delay, deter or prevent a merger or acquisition of us by means of a tender offer, a proxy contest or other takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the prevailing market price for the shares of Class A common stock held by stockholders.

These provisions include:

*Dual Class of Common Stock.*    As described above in "— Class A Common Stock " and "— Class B Common Stock," our certificate provides for a dual class common stock structure pursuant to which the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units were exchanged for Class A common stock), thereby giving the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.

*Classified Board.*    Our certificate provides that our Board will be divided into three classes of directors, with the classes as nearly equal in number as possible, and with the directors serving three-year terms. As a result, approximately one-third of our Board will be elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our Board. Our certificate will also provide that, subject to any rights of holders of preferred stock to elect additional directors under specified circumstances, the number of directors will be fixed exclusively pursuant to a resolution adopted by our Board. Upon completion of this offering, we expect that our Board will have          members.

143

Table of Contents

*Stockholder Action by Written Consent.*    Our certificate will preclude stockholder action by written consent at any time the Garcia Parties holding of our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote.

*Special Meetings of Stockholders.*    Except as required by law, special meetings of our stockholders shall be called at any time only by or at the direction of our Board or the chairman of our Board; provided, however, (1) at any time when the Garcia Parties beneficially owns any of our Class B common stock, special meetings of our stockholders shall also be called by our Board or the chairman of our Board at the request of the Garcia Parties and (2) at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, special meetings of our stockholders shall also be called by holders of a majority in voting power of the outstanding shares of our capital stock entitled to vote on all matters to be voted on by stockholders generally, voting together as a single class. Our bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of us.

*Advance Notice Procedures.*    Our bylaws will establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our Board; provided, however, such advance notice procedure will not apply to the Garcia Parties. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our Board or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the bylaws will not give our Board the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of us.

*Removal of Directors; Vacancies.*    Directors may be removed with or without cause upon the affirmative vote of a majority in voting power of all outstanding shares of stock entitled to vote thereon, voting together as a single class; provided, however, at any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, directors may only be removed for cause, and only by the affirmative vote of holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class. In addition, our certificate will also provide that, subject to the rights granted to one or more series of preferred stock then outstanding, any newly created directorship on our Board that results from an increase in the number of directors and any vacancies on our Board will be filled at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, either (1) upon the affirmative vote of a majority in voting power of all outstanding shares of capital stock entitled to vote thereon, voting together as a single class or (2) if no such appointment has been made by the tenth day following the occurrence of the vacancy, or if such shareholders holding a majority in voting power of all outstanding shares of capital stock notify our Board that no appointment shall be made, by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director. At any time the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any newly created directorship on our Board that results from an increase in the number of directors and any vacancy occurring on our Board will be filled by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director.

*Supermajority Approval Requirements.*    Our Board is expressly authorized to make, alter, amend, change, add to, rescind or repeal, in whole or in part, our bylaws without a stockholder vote in any matter not inconsistent with the laws of the State of Delaware and our certificate. For as long as the Garcia Parties

144

Table of Contents

holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of a majority in voting power of the outstanding shares of our stock entitled to vote on such amendment, alteration, change, addition, rescission or repeal. When the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of the holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class.

The DGCL provides generally that the affirmative vote of a majority of the outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's certificate of incorporation, unless the certificate requires a greater percentage.

At any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, the following provisions in our amended and restated certificate of incorporation may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 2/3% (as opposed to a majority threshold that would apply when holders of our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote) in voting power of all the then-outstanding shares of stock entitled to vote thereon, voting together as a single class:

- the provision requiring a 66 2/3% supermajority vote for stockholders to amend our bylaws;

- the provisions providing for a classified Board (the election and term of our directors);

- the provisions regarding resignation and removal of directors;

- the provisions regarding entering into business combinations with interested stockholders;

- the provisions regarding stockholder action by written consent;

- the provisions regarding calling special meetings of stockholders;

- the provisions regarding filling vacancies on our Board and newly created directorships;

- the provisions eliminating monetary damages for breaches of fiduciary duty by a director; and

- the amendment provision requiring that the above provisions be amended only with a 66 2/3% supermajority vote.

The combination of the classification of our Board, the lack of cumulative voting and the supermajority voting requirements will make it more difficult for our existing stockholders to replace our Board as well as for another party to obtain control of us by replacing our Board. Because our Board has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management.

*Authorized but Unissued Shares.*    Our authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval, subject to stock exchange rules. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. One of the effects of the existence of authorized but unissued common stock or preferred stock may be to enable our Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive our stockholders of opportunities to sell their shares of common stock at prices higher than prevailing market prices.

*Business Combinations.*    Upon completion of this offering, we will not be subject to the provisions of Section 203 of the DGCL. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the

145

Table of Contents

time that the person becomes an interested stockholder, unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns, or did own within three years prior to the determination of interested stockholder status, 15% or more of the corporation's voting stock.

Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions: (1) before the stockholder became an interested stockholder, the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder; (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans, in some instances; or (3) at or after the time the stockholder became an interested stockholder, the business combination was approved by the Board and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares.

We have opted out of Section 203; however, our certificate of incorporation will contain similar provisions providing that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the stockholder became an interested stockholder, unless:

- prior to such time, our Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;
- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, excluding certain shares; or
- at or subsequent to that time, the business combination is approved by our Board and by the affirmative vote of holders of at least 66 2/3% of our outstanding voting stock that is not owned by the interested stockholder.

Under certain circumstances, this provision will make it more difficult for a person who would be an "interested stockholder" to effect various business combinations with the company for a three-year period. This provision may encourage companies interested in acquiring the company to negotiate in advance with our Board because the stockholder approval requirement would be avoided if our Board approves either the business combination or the transaction which results in the stockholder becoming an interested stockholder. These provisions also may have the effect of preventing changes in our Board and may make it more difficult to accomplish transactions which stockholders may otherwise deem to be in their best interests.

Our certificate of incorporation will provide that the Garcia Parties, and any of their direct or indirect transferees and any group as to which such persons are a party, do not constitute "interested stockholders" for purposes of this provision.

**Limitations on Liability and Indemnification of Officers and Directors**

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties, subject to certain exceptions. Our certificate of incorporation will include a provision that eliminates the

146

Table of Contents

personal liability of directors for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL. The effect of these provisions will be to eliminate the rights of us and our stockholders, through stockholders' derivative suits on our behalf, to recover monetary damages from a director for breach of fiduciary duty as a director, including breaches resulting from grossly negligent behavior. However, exculpation will not apply to any director if the director has acted in bad faith, knowingly or intentionally violated the law, authorized illegal dividends or redemptions or derived an improper benefit from his or her actions as a director.

Our bylaws will provide that we must indemnify and advance expenses to our directors and officers to the fullest extent authorized by the DGCL. We also will be expressly authorized to carry directors' and officers' liability insurance providing indemnification for our directors, officers and certain employees for some liabilities. We believe that these indemnification and advancement provisions and insurance will be useful to attract and retain qualified directors and officers.

The limitation of liability, indemnification and advancement provisions that will be included in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breaches of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

### Corporate Opportunity Doctrine

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our certificate of incorporation will, to the maximum extent permitted from time to time by Delaware law, renounce any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to certain of our officers, directors or stockholders or their respective affiliates, other than those officers, directors, stockholders or affiliates acting in their capacity as our employee or director. Our certificate will provide that, to the fullest extent permitted by law, any director or stockholder who is not employed by us or our affiliates will not have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (2) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or stockholder, other than directors or stockholders acting in their capacity as our director or as a stockholder, acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. Our certificate will not renounce our interest in any business opportunity that is expressly offered to an employee director or employee in his or her capacity as a director or employee of Carvana Co. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our certificate, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

### Dissenters' Rights of Appraisal and Payment

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of Carvana Co. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

147

**Table of Contents**

**Stockholders' Derivative Actions**

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock will be        . Its address is        .

**Listing**

We will apply for listing of our Class A common stock on the NYSE under the trading symbol "CVNA."

148

**Table of Contents**

**SHARES ELIGIBLE FOR FUTURE SALE**

Prior to this offering, there has been no public market for our Class A common stock. Future sales of substantial amounts of our Class A common stock in the public market (including shares of our Class A common stock issuable upon redemption or exchange of LLC Units), or the perception that such sales may occur, could adversely affect the prevailing market price of our Class A common stock. No prediction can be made as to the effect, if any, future sales of shares, or the availability of shares for future sales, will have on the prevailing market price of our Class A common stock from time to time. The number of shares available for future sale in the public market is subject to legal and contractual restrictions, some of which are described below. The expiration of these restrictions will permit sales of substantial amounts of our Class A common stock in the public market, or could create the perception that these sales may occur, which could adversely affect the prevailing market price of our Class A common stock. These factors could also make it more difficult for us to raise funds through future offerings of Class A common stock.

**Sale of Restricted Shares**

Upon completion of this offering, we will have                shares of Class A common stock outstanding. Of these shares of Class A common stock, the                shares of Class A common stock being sold in this offering, plus any shares sold upon exercise of the underwriters' option to purchase additional shares, will be freely tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any such shares which may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"), which shares will be subject to the volume limitations and other restrictions of Rule 144 described below. The remaining                shares of Class A common stock (or                shares of Class A common stock, including shares of Class A common stock issuable upon redemption or exchange of the LLC Units, as described below) will be "restricted securities," as that phrase is defined in Rule 144, and may be resold only after registration under the Securities Act or pursuant to an exemption from such registration, including, among others, the exemptions provided by Rule 144 and 701 under the Securities Act, which rules are summarized below. These remaining shares of Class A common stock that will be outstanding upon completion of this offering will be available for sale in the public market after the expiration of market stand-off agreements with us and the lock-up agreements described in "Underwriting," taking into account the provisions of Rules 144 and 701 under the Securities Act.

In addition, pursuant to the Exchange Agreement, the LLC Unitholders may from time to time after the consummation of this offering, exchange their LLC Units for shares of Class A common stock or, at our option, cash. To the extent such LLC Unitholders also hold Class B common stock, they will be required to deliver to us a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged to effectuate an exchange. Any shares of Class B common stock so delivered will be cancelled. Upon consummation of this offering, the LLC Unitholders will hold                LLC Units, all of which will be exchangeable for shares of our Class A common stock. The shares of Class A common stock we issue upon such exchanges would be "restricted securities" as defined in Rule 144 unless we register such issuances. However, we will enter into one or more registration rights agreements with certain LLC Unitholders that will require us to register these shares of Class A common stock, subject to certain conditions. See "— Registration Rights" and "Certain Relationships and Related Party Transactions — Registration Rights Agreement."

Under the terms of the LLC Operating Agreement, except pursuant to a valid exchange under the terms of the Exchange Agreement, all of the LLC Units received by the existing members of Carvana Group in the Organizational Transactions will be subject to restrictions on disposition.

**Rule 144**

Persons who became the beneficial owner of shares of our Class A common stock prior to the completion of this offering may not sell their shares until the earlier of (1) the expiration of a six-month

149

Table of Contents

holding period, if we have been subject to the reporting requirements of the Exchange Act and have filed all required reports for at least 90 days prior to the date of the sale, or (2) a one-year holding period.

At the expiration of the six-month holding period, a person who was not one of our affiliates at any time during the three months preceding a sale would be entitled to sell an unlimited number of shares of our Class A common stock provided current public information about us is available, and a person who was one of our affiliates at any time during the three months preceding a sale would be entitled to sell within any three-month period only a number of shares of Class A common stock that does not exceed the greater of either of the following:

- 1% of the number of shares of our Class A common stock then outstanding, which will equal approximately            shares immediately after this offering, based on the number of shares of our Class A common stock outstanding after completion of this offering; or
- the average weekly trading volume of our Class A common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

At the expiration of the one-year holding period, a person who was not one of our affiliates at any time during the three months preceding a sale would be entitled to sell an unlimited number of shares of our Class A common stock without restriction. A person who was one of our affiliates at any time during the three months preceding a sale would remain subject to the volume restrictions described above.

Sales under Rule 144 by our affiliates are also subject to manner of sale provisions and notice requirements and to the availability of current public information about us. The sale of these shares, or the perception that sales will be made, could adversely affect the price of our common stock after this offering.

### Rule 701

In general, under Rule 701, any of our employees, directors, officers, consultants or advisors who acquired shares from us in connection with a compensatory stock or option plan or other written agreement before the effective date of this offering are eligible to resell such shares in reliance upon Rule 144 beginning 90 days after the date of this prospectus. If such person is not an affiliate, the sale may be made subject only to the manner-of-sale restrictions of Rule 144. If such a person is an affiliate, the sale may be made under Rule 144 without compliance with its one-year minimum holding period, but subject to the other Rule 144 restrictions described above.

### Stock Plans

We intend to file one or more registration statements on Form S-8 under the Securities Act to register shares of our Class A common stock issued or reserved for issuance under the 2017 Incentive Plan. The first such registration statement is expected to be filed soon after the date of this prospectus and will automatically become effective upon filing with the SEC. Accordingly, shares registered under such registration statement will be available for sale in the open market following the effective date, unless such shares are subject to vesting restrictions with us, Rule 144 restrictions applicable to our affiliates or the lock-up restrictions described below.

### Lock-Up Agreements

We and each of our officers and directors and substantially all stockholders and optionholders have agreed, subject to certain exceptions, with the underwriters not to dispose of or hedge any of the shares of Class A common stock or securities convertible into or exchangeable for, or that represent the right to receive, shares of Class A common stock or units during the period from the date of the first public filing of the registration statement on Form S-1 filed in connection with this offering continuing through the date that is 180 days after the date of the underwriting agreement, except with the prior written consent of Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. See "Underwriting."

Table of Contents

**Registration Rights Agreement**

We intend to enter into a Registration Rights Agreement with the LLC Unitholders in connection with this offering. The Registration Rights Agreement will provide such LLC Unitholders certain registration rights whereby, following our initial public offering and the expiration of any related lock-up period, such LLC Unitholders can require us to register under the Securities Act shares of Class A common stock issuable to them upon exchange of their LLC Units. The Registration Rights Agreement will also provide for piggyback registration rights for the LLC Unitholders (other than Carvana Sub). See "Certain Relationships and Related Party Transactions — Registration Rights Agreement."

151

Table of Contents

**MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATION FOR NON-U.S. HOLDERS**

The following is a discussion of material U.S. federal income tax consequences of the purchase, ownership and disposition of our Class A common stock to a non-U.S. holder (as defined below) that purchases shares of our Class A common stock in this offering. This discussion applies only to a non-U.S. holder that holds our Class A common stock as a capital asset, within the meaning of Section 1221 of the Code. For purposes of this discussion, a "non-U.S. holder" means any beneficial owner of our Class A common stock that is, for U.S. federal income tax purposes, an individual, corporation, estate or trust other than:

- an individual citizen or resident of the U.S., as defined for U.S. federal income tax purposes;

- a corporation or other entity treated as a corporation for U.S. federal income tax purposes created or organized in the U.S. or under the laws of the U.S. or any political subdivision thereof;

- an estate whose income is subject to U.S. federal income tax regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the U.S. and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in place to be treated as a U.S. person for U.S. federal income tax purposes.

If you are an individual, you may, in many cases, be deemed to be a resident alien, as opposed to a nonresident alien, by virtue of being present in the U.S. for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year. Such an individual is urged to consult his or her own tax advisor regarding his or her status as a resident alien for U.S. federal income tax purposes under these rules and the U.S. federal income tax consequences of the ownership or disposition of our Class A common stock. In the case of a beneficial owner that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partner and the partnership. If you are a partner in a partnership considering an investment in our Class A common stock, then you should consult your tax advisor.

This discussion is based upon the provisions of the Code, the Treasury regulations promulgated thereunder and administrative and judicial interpretations thereof, all as of the date hereof. Those authorities may be changed, perhaps retroactively, so as to result in U.S. federal income tax consequences different from those summarized below. We cannot assure you that a change in law, including the possibility of major tax legislation in 2017 and later years, possibly with retroactive application, will not alter significantly the tax considerations that we describe herein. We have not sought and do not plan to seek any ruling from the U.S. Internal Revenue Service, which we refer to as the IRS, with respect to statements made and the conclusions reached in the following discussion, and there can be no assurance that the IRS or a court will agree with our statements and conclusions.

This discussion assumes that a non-U.S. holder will hold our Class A common stock as a capital asset within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all aspects of U.S. federal income taxes that may be relevant to non-U.S. holders in light of their personal circumstances, and does not deal with federal taxes other than the U.S. federal income tax (such as U.S. federal estate and gift tax laws or the Medicare tax on certain investment income) or with non-U.S., state or local tax considerations. Special rules, not discussed here, may apply to certain non-U.S. holders, including:

- former citizens or residents of the United States;

- financial institutions;

- insurance companies;

- an entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes (or a partner in a partnership or a beneficial owner of a pass-through entity that holds our Class A common stock);

152

Table of Contents

- a person who acquired shares of our Class A common stock as compensation or otherwise in connection with the performance of services;

- brokers, dealers or traders in securities, commodities or currencies;

- traders that elect to mark–to–market their securities;

- persons who hold our Class A common stock as a position in a "straddle," "conversion transaction" or other risk reduction transaction;

- controlled foreign corporations or passive foreign investment companies; and

- tax exempt organizations.

Such non-U.S. holders should consult their tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.

**THIS SUMMARY IS FOR GENERAL INFORMATION ONLY AND IS NOT INTENDED TO CONSTITUTE A COMPLETE DESCRIPTION OF ALL U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES FOR NON-U.S. HOLDERS RELATING TO THE OWNERSHIP AND DISPOSITION OF SHARES OF OUR CLASS A COMMON STOCK. INVESTORS CONSIDERING THE PURCHASE OF OUR CLASS A COMMON STOCK SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPLICATION OF THE U.S. FEDERAL INCOME AND ESTATE TAX LAWS TO THEIR PARTICULAR SITUATIONS AND THE CONSEQUENCES OF NON-U.S., STATE OR LOCAL LAWS, AND TAX TREATIES.**

**Dividends**

As discussed under the section entitled "Dividend Policy" above, we do not currently anticipate paying dividends. In the event that we do make a distribution of cash or property (other than certain stock distributions) with respect to our Class A common stock (or that we engage in certain redemptions that are treated as distributions with respect to Class A common stock), any such distribution or redemption will be treated as a dividend for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Dividends paid to you generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by you within the U.S. are not subject to the withholding tax, but instead are subject to U.S. federal income tax on a net-income basis at applicable graduated individual or corporate rates, unless an applicable income tax treaty provides otherwise. Certain certification and disclosure requirements, including delivery of a properly executed IRS Form W-8ECI, must be satisfied for effectively connected income to be exempt from withholding. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

If the amount of a distribution paid on our Class A common stock exceeds our current and accumulated earnings and profits, such excess will be allocated ratably among your shares of Class A common stock with respect to which the distribution is paid and treated first as a tax-free return of capital to the extent of your adjusted tax basis in each such share, and thereafter as capital gain from a sale or other taxable disposition of such share of Class A common stock that is taxed to you as described below under the heading "Gain on disposition of Class A common stock." Your adjusted tax basis in a share is generally the purchase price of such share, reduced by the amounts of any such tax-free returns of capital.

If you wish to claim the benefit of an applicable treaty rate to avoid or reduce withholding of U.S. federal income tax for dividends, then you must (a) provide the withholding agent with a properly completed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable form) and certify under penalties of perjury that you are not a U.S. person and are eligible for treaty benefits, or (b) if our Class A common stock is held through certain foreign intermediaries, satisfy the relevant certification requirements

153

Table of Contents

of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. holders that act as intermediaries (including partnerships).

If you are eligible for a reduced rate of U.S. federal income tax pursuant to an income tax treaty, then you may obtain a refund or credit of any excess amounts withheld by filing timely an appropriate claim with the IRS.

If you are a non-U.S. holder (including for this purpose, a partnership) and not an individual, you may be subject to a 30% withholding under FATCA even if you are eligible to claim the benefits of a tax treaty if certain information reporting rules are not complied with, as discussed below under "— Legislation affecting taxation of Class A common stock held by or through foreign entities."

### Gain on Disposition of Class A Common Stock

Subject to the discussions below of the backup withholding tax and FATCA withholding, you generally will not be subject to U.S. federal income tax with respect to gain realized on the sale or other taxable disposition of our Class A common stock, unless:

- the gain is effectively connected with a trade or business you conduct in the U.S., and, where a tax treaty applies, is attributable to a U.S. permanent establishment or fixed base;
- if you are an individual, you are present in the U.S. for 183 days or more in the taxable year of the sale or other taxable disposition and certain other conditions are met; or
- we are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes, and certain other conditions are met.

We believe that we are not, and we do not anticipate becoming, a "U.S. real property holding corporation" for U.S. federal income tax purposes. Even if we are or become a U.S. real property holding corporation, a non-U.S. holder generally will not be subject to U.S. federal income tax on any gain in respect of our Class A common stock as long as our Class A common stock is traded on an established securities market and such non-U.S. holder actually or constructively owned no more than 5% of our Class A common stock during the specified testing period. If we are or become a U.S. real property holding corporation and you actually or constructively owned more than 5% of our Class A common stock at any time during the specified testing period, you will be subject to tax on the net gain derived from the sale under regular graduated U.S. federal income tax rates. If you are a person described in the first bullet point above, you generally will be subject to tax on the net gain derived from the sale under regular graduated U.S. federal income tax rates. In addition, a non-U.S. holder that is a corporation may be subject to the branch profits tax at a 30% rate on its effectively connected earnings and profits or such lower rate as may be specified by an applicable income tax treaty. If you are an individual described in the second bullet point above, you generally will be subject to a flat 30% tax on the gain derived from the sale (unless an applicable tax treaty provides otherwise), which may be offset by U.S.-source capital losses.

### Information Reporting and Backup Withholding

The applicable withholding agent must file information returns with the IRS in connection with dividends paid to you on shares of our Class A common stock. The IRS may make this information available to the tax authorities in the country in which you are resident. In addition, you may be subject to backup withholding (currently at a rate of 28%) with respect to dividends paid on shares of Class A common stock, unless, generally, you certify under penalties or perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E or another appropriate version of IRS Form W-8) that you are not a U.S. person or you otherwise establish an exemption.

Additional rules relating to information reporting requirements and backup withholding with respect to payments of the proceeds from the disposition of shares of our Class A common stock are as follows:

- If the proceeds are paid to or through the U.S. office of a broker, the proceeds generally will be subject to backup withholding and information reporting, unless you certify under penalties of

154

Table of Contents

perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E or another appropriate version of IRS Form W-8) that you are not a U.S. person or you otherwise establish an exemption.

• If the proceeds are paid to or through a non-U.S. office of a broker that is not a U.S. person and is not a foreign person with certain specified U.S. connections (a "U.S.-related person"), information reporting and backup withholding generally will not apply.

• If the proceeds are paid to or through a non-U.S. office of a broker that is a U.S. person or a U.S.-related person, the proceeds generally will be subject to information reporting and may be subject to backup withholding, unless you certify under penalties of perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E or another appropriate version of IRS Form W-8) that you are not a U.S. person or you otherwise establish an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished by you to the IRS.

### Legislation Affecting Taxation of Class A Common Stock Held By or Through Foreign Entities

In addition to the withholding discussed above, Sections 1471 to 1474 of the Code (such provisions commonly referred to as "FATCA") will impose withholding of 30% on dividend income from our Class A common stock and, beginning on January 1, 2019, the gross proceeds of a disposition of our Class A common stock paid to "foreign financial institutions" and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied or an exemption applies. If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). An intergovernmental agreement between the United States and an applicable non-U.S. country may modify these requirements. Investors are encouraged to consult their tax advisors regarding the implications of this legislation on their investment in our Class A common stock.

THE PRECEDING DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY. IT IS NOT TAX ADVICE. POTENTIAL PURCHASERS OF OUR CLASS A COMMON STOCK ARE URGED TO CONSULT THEIR TAX ADVISORS TO DETERMINE THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSIDERATIONS OF PURCHASING, OWNING AND DISPOSING OF OUR CLASS A COMMON STOCK, INCLUDING THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAWS.

Table of Contents

## UNDERWRITING

Subject to the terms and conditions set forth in an underwriting agreement, we have agreed to sell to the underwriters named below, and the underwriters, for whom Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. are acting as joint-book running managers and representatives, have severally agreed to purchase, the respective numbers of shares of Class A common stock appearing opposite their names below:

| Underwriter | Number of Shares |
|---|---|
| Wells Fargo Securities, LLC | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Citigroup Global Markets Inc. | |
| Deutsche Bank Securities Inc. | |
| Robert W. Baird & Co. Incorporated | |
| William Blair & Company, L.L.C. | |
| BMO Capital Markets Corp. | |
| JMP Securities LLC | |
| Total | |

All of the shares to be purchased by the underwriters will be purchased from us.

The underwriting agreement provides that the obligations of the several underwriters are subject to various conditions, including approval of legal matters by counsel. The shares of common stock are offered by the underwriters, subject to prior sale, when, as and if issued to and accepted by them. The underwriters reserve the right to withdraw, cancel or modify the offer and to reject orders in whole or in part.

The underwriting agreement provides that the underwriters are obligated to purchase all the shares of common stock offered by this prospectus if any are purchased, other than those shares covered by the option to purchase additional shares described below. If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the non-defaulting underwriters may be increased or the underwriting agreement may be terminated.

### Option to Purchase Additional Shares

We have granted a 30-day option to the underwriters to purchase up to a total of                additional shares of our Class A common stock at the initial public offering price per share less the underwriting discounts and commissions per share, as set forth on the cover page of this prospectus, and less any dividends or distributions declared, paid or payable on the shares that the underwriters have agreed to purchase from us but that are not payable on such additional shares. The underwriters may exercise this option to cover sales of shares by the underwriters which exceed the number of shares specified in the table above. If the underwriters exercise this option in whole or in part, then the underwriters will be severally committed, subject to the conditions described in the underwriting agreement, to purchase the additional shares of our Class A common stock in proportion to their respective commitments set forth in the prior table.

### Discounts and Commissions

Shares sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus and to certain dealers at that price less a concession of not more than $         per share. After the initial offering, the public offering price and concession to dealers may be changed.

156

Table of Contents

The following table summarizes the underwriting discounts and commissions and the proceeds, before expenses, payable to us, both on a per share basis and in total, assuming either no exercise or full exercise by the underwriters of their option to purchase additional shares:

|  | Per Share | Total Without Option | With Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discounts and commissions |  |  |  |
| Proceeds, before expenses, to us | $ | $ | $ |

We estimate that the expenses of this offering payable by us, not including underwriting discounts and commissions, will be approximately $       million. We have agreed to reimburse the underwriters for their expenses, in an amount up to $50,000, relating to clearance of the offering with the Financial Industry Regulatory Authority, or FINRA, which amount is deemed by FINRA to be underwriting compensation.

### Indemnification of Underwriters

The underwriting agreement provides that we will indemnify the underwriters against specified liabilities, including liabilities under the Securities Act, or contribute to payments that the underwriters may be required to make in respect of those liabilities.

### Lock-Up Agreements

We, each of our directors and officers and substantially all stockholders and optionholders have agreed, subject to specified limited exceptions, that, without the prior written consent of Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., we and they will not, during the period beginning on and including the date of the first public filing of the registration statement on Form S-1 related to this offering and through and including the date that is the 180th day after the date of this prospectus, directly or indirectly:

- issue (in the case of us), offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of any shares of our common stock or other capital stock or any securities convertible into or exercisable or exchangeable for our common stock or other capital stock, including units;

- in the case of us, file or cause the filing of any registration statement under the Securities Act with respect to any shares of our common stock or other capital stock or any securities convertible into or exercisable or exchangeable for our common stock or other capital stock, other than Rule 462(b) registration statements filed to register securities to be sold to the underwriters in this offering; or

- enter into any swap or other agreement, arrangement, hedge or transaction that transfers to another, in whole or in part, directly or indirectly, any of the economic consequences of ownership of our common stock or other capital stock or any securities convertible into or exercisable or exchangeable for our common stock or other capital stock, including units,

whether any transaction described in any of the foregoing bullet points is to be settled by delivery of our common stock units, other capital stock, other securities, in cash or otherwise, or publicly announce an intention to do any of the foregoing.

The restrictions in the immediately preceding paragraph will not apply to limited exceptions, including: (1) certain transfers by will or by intestate succession; (2) gifts not requiring a filing under Section 16(a) of the Exchange Act; (3) certain transfers to partners or members of a partnership or limited liability company not requiring a filing under Section 16(a) of the Exchange Act; (4) transfers by operation

Table of Contents

of law not requiring a filing under Section 16(a) of the Exchange Act; (5) in any exchange of units and a corresponding number of shares of our Class B common stock into or for shares of our Class A common stock; (6) pursuant to a third party tender offer or a merger involving a change of control of us occurring after this offering that has been approved by our board of directors; (7) pursuant to the exercise of options to purchase common stock under stock option or incentive plans disclosed in this prospectus; (8) transfers to us pursuant to the "cashless" exercise of options or for satisfying any withholding taxes; (9) transfers to us in connection with the termination of service of an employee; (10) in connection with the Organizational Transactions; and (11) the establishment of a trading plan meeting the requirements of Rule 10b5-1 under the Exchange Act; (12) with respect to DriveTime Sales and Finance Company LLC and Ernest Garcia, II, a transfer or distribution to DriveTime Sales and Finance Company LLC's direct or indirect members or other beneficial owners (including through a dividend by DriveTime Automotive Group, Inc.) and/or transfer or contribution to any entity controlled by such members or beneficial owners; (13) with respect to Ernest Garcia, II, a transfer pursuant to an option to purchase certain Class C Preferred Units of Carvana Group, LLC granted to a third party; and (14) with respect to us, (a) the issuance of Class A common stock to the underwriters pursuant to this offering, (b) the issuance of shares and options to purchase shares of Class A common stock pursuant to certain equity incentive plans, (c) the issuance of Class A common stock upon exercise of stock options issued under certain equity incentive plans or upon the vesting, exercise or conversion of warrants or convertible securities and (d) the issuance of up to 10% of the number of shares of Class A common stock outstanding as of the closing date of this initial public offering in connection with an acquisition or business combination.

Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc. may, in their sole discretion and at any time or from time to time, without notice, release all or any portion of the shares or other securities subject to the lock-up agreements. Any determination to release any shares or other securities subject to the lock-up agreements would be based on a number of factors at the time of determination, which may include the market price of the common stock, the liquidity of the trading market for the common stock, general market conditions, the number of shares or other securities proposed to be sold or otherwise transferred and the timing, purpose and terms of the proposed sale or other transfer.

## Listing

We intend to apply to have our Class A common stock listed on the NYSE under the symbol "CVNA."

## Stabilization

In order to facilitate this offering of our Class A common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the market price of our Class A common stock. Specifically, the underwriters may sell more shares of Class A common stock than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares of Class A common stock available for purchase by the underwriters under the option to purchase additional shares. The underwriters may close out a covered short sale by exercising their option to purchase additional shares or purchasing Class A common stock in the open market. In determining the source of Class A common stock to close out a covered short sale, the underwriters may consider, among other things, the market price of Class A common stock compared to the price payable under the option to purchase additional shares. The underwriters may also sell shares of Class A common stock in excess of the option to purchase additional shares, creating a naked short position. The underwriters must close out any naked short position by purchasing shares of Class A common stock in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the Class A common stock in the open market after the date of pricing of this offering that could adversely affect investors who purchase in this offering.

158

Table of Contents

As an additional means of facilitating this offering, the underwriters may bid for, and purchase, Class A common stock in the open market to stabilize the price of our Class A common stock, so long as stabilizing bids do not exceed a specified maximum. The underwriting syndicate may also reclaim selling concessions allowed to an underwriter or a dealer for distributing Class A common stock in this offering if the underwriting syndicate repurchases previously distributed Class A common stock to cover syndicate short positions or to stabilize the price of the Class A common stock.

The foregoing transactions, if commenced, may raise or maintain the market price of our Class A common stock above independent market levels or prevent or retard a decline in the market price of the Class A common stock.

The foregoing transactions, if commenced, may be effected on the NYSE or otherwise. Neither we nor any of the underwriters makes any representation that the underwriters will engage in any of these transactions and these transactions, if commenced, may be discontinued at any time without notice. Neither we nor any of the underwriters makes any representation or prediction as to the direction or magnitude of the effect that the transactions described above, if commenced, may have on the market price of Class A our common stock.

### Discretionary Accounts

The underwriters have informed us that they do not intend to confirm sales to accounts over which they exercise discretionary authority in excess of 5% of the total number of shares of Class A common stock offered by them.

### Pricing of this Offering

Prior to this offering, there has been no public market for our Class A common stock. Consequently, the initial public offering price for our Class A common stock will be determined between us and the representatives of the underwriters. We and the representatives expect to consider a number of factors, including:

- prevailing market conditions;
- our results of operations and financial condition;
- financial and operating information and market valuations with respect to other companies that we and the representatives of the underwriters believe to be comparable or similar to us;
- the present state of our development; and
- our future prospects.

An active trading market for our Class A common stock may not develop. It is possible that the market price of our Class A common stock after this offering will be less than the initial public offering price.

### Relationships

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. Citigroup Global Markets Inc., one of the underwriters, is acting as financial advisor to DriveTime, a company controlled by Ernest Garcia, II, our controlling shareholder, who is also the father of our Chief Executive Officer, in its consideration of strategic alternatives, including its potential sale. In addition, certain of the underwriters and their respective affiliates may have, from time to time, performed, and may in the future perform, various commercial and investment banking and financial advisory services for us and our affiliates, for which they received or may in the future receive customary fees, commissions and expenses.

Table of Contents

In the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities or instruments of us or our affiliates. The underwriters and their respective affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

<div align="center">

**Sales Outside the United States**

</div>

No action has been or will be taken in any jurisdiction (except in the United States) that would permit an initial public offering of the Class A common stock, or the possession, circulation or distribution of this prospectus or any other material relating to us or the Class A common stock in any jurisdiction where action for that purpose is required. Accordingly, the Class A common stock may not be offered or sold, directly or indirectly, and neither of this prospectus nor any other offering material or advertisements in connection with the Class A common stock may be distributed or published, in or from any country or jurisdiction except in compliance with any applicable rules and regulations of any such country or jurisdiction.

Each of the underwriters may arrange to sell Class A common stock offered by this prospectus in certain jurisdictions outside the United States, either directly or through affiliates, where they are permitted to do so.

*European Economic Area*

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive, each, a Relevant Member State, an offer to the public of any shares of Class A common stock which are the subject of the offering contemplated by this prospectus, the Shares, may not be made in that Relevant Member State except that an offer to the public in that Relevant Member State of any Shares may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representatives of the underwriters; or

- in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Shares shall result in a requirement for the publication by us or any underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any Shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any Shares to be offered so as to enable an investor to decide to purchase any Shares, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in the Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71 EC (including the 2010 PD Amending Directive, in the case of Early Implementing Member States) and includes any relevant implementing measure in each Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

<div align="center">

160

</div>

Table of Contents

### United Kingdom

This prospectus and any other material in relation to the shares described herein is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospective Directive, or qualified investors, that also (i) have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Order, (ii) who fall within Article 49(2)(a) to (d) of the Order or (iii) to whom it may otherwise lawfully be communicated (all such persons together being referred to as "relevant persons"). The shares are only available to, and any invitation, offer or agreement to purchase or otherwise acquire such shares will be engaged in only with, relevant persons. This offering memorandum and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other person in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this prospectus or any of its contents.

The distribution of this prospectus in the United Kingdom to anyone not falling within the above categories is not permitted and may contravene the Financial Services and Markets Act of 2000. No person falling outside those categories should treat this prospectus as constituting a promotion to him, or act on it for any purposes whatever. Recipients of this prospectus are advised that we, the underwriters and any other person that communicates this prospectus are not, as a result solely of communicating this prospectus, acting for or advising them and are not responsible for providing recipients of this prospectus with the protections which would be given to those who are clients of any aforementioned entities that is subject to the Financial Services Authority Rules.

### France

This prospectus (including any amendment, supplement or replacement thereto) have not been approved either by the *Autorité des Marchés Financiers* or by the competent authority of another State that is a contracting party to the Agreement on the European Economic Area and notified to the *Autorité des Marchés Financiers* ; no security has been offered or sold and will be offered or sold, directly or indirectly, to the public in France within the meaning of Article L. 411-1 of the French *Code Monétaire et Financier* except to permitted investors, or Permitted Investors, consisting of persons licensed to provide the investment service of portfolio management for the account of third parties, qualified investors ( *investisseurs qualifiés* ) acting for their own account and/or a limited circle of investors ( *cercle restreint d'investisseurs* ) acting for their own account, with "qualified investors" and "limited circle of investors" having the meaning ascribed to them in Articles L. 411-2, D. 411-1, D. 411-2, D. 411-4, D. 744-1, D. 754-1 and D. 764-1 of the French *Code Monétaire et Financier* ; none of this prospectus or any other materials related to the offer or information contained therein relating to our securities has been released, issued or distributed to the public in France except to Permitted Investors; and the direct or indirect resale to the public in France of any securities acquired by any Permitted Investors may be made only as provided by Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 to L. 621-8-3 of the French *Code Monétaire et Financier* and applicable regulations thereunder.

### Germany

This document has not been prepared in accordance with the requirements for a securities or sales prospectus under the German Securities Prospectus Act ( *Wertpapierprospektgesetz* ), the German Sales Prospectus Act ( *Verkaufsprospektgesetz* ), or the German Investment Act ( *Investmentgesetz* ). Neither the German Federal Financial Services Supervisory Authority ( *Bundesanstalt fur Finanzdienstleistungsaufsicht — BaFin* ) nor any other German authority has been notified of the intention to distribute the securities in Germany. Consequently, the securities may not be distributed in Germany by way of public offering, public advertisement or in any similar manner AND THIS DOCUMENT AND ANY OTHER DOCUMENT RELATING TO THE OFFERING, AS WELL AS INFORMATION OR STATEMENTS CONTAINED THEREIN, MAY NOT BE SUPPLIED TO THE PUBLIC IN GERMANY OR USED IN CONNECTION WITH ANY OFFER FOR

161

Table of Contents

SUBSCRIPTION OF THE SECURITIES TO THE PUBLIC IN GERMANY OR ANY OTHER MEANS OF PUBLIC MARKETING. The securities are being offered and sold in Germany only to qualified investors which are referred to in Section 3, paragraph 2 no. 1, in connection with Section 2, no. 6, of the German Securities Prospectus Act. This document is strictly for use of the person who has received it. It may not be forwarded to other persons or published in Germany.

### Switzerland

This document does not constitute a prospectus within the meaning of Art. 652a of the Swiss Code of Obligations. The shares of Class A common stock may not be sold directly or indirectly in or into Switzerland except in a manner which will not result in a public offering within the meaning of the Swiss Code of Obligations. Neither this document nor any other offering materials relating to the shares of Class A common stock may be distributed, published or otherwise made available in Switzerland except in a manner which will not constitute a public offer of the shares of Class A common stock in Switzerland.

This prospectus does not constitute an issue prospectus pursuant to Article 652a or Article 1156 of the Swiss Code of Obligations (CO) and the shares will not be listed on the SIX Swiss Exchange. Therefore, the prospectus may not comply with the disclosure standards of the CO and/or the listing rules (including any prospectus schemes) of the SIX Swiss Exchange. Accordingly, the shares may not be offered to the public in or from Switzerland, but only to a selected and limited circle of investors, which do not subscribe to the shares with a view to distribution.

### Canada

The shares may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Australia

This prospectus is not a formal disclosure document and has not been, nor will be, lodged with the Australian Securities and Investments Commission. It does not purport to contain all information that an investor or their professional advisers would expect to find in a prospectus or other disclosure document (as defined in the Corporations Act 2001 (Australia)) for the purposes of Part 6D.2 of the Corporations Act 2001 (Australia) or in a product disclosure statement for the purposes of Part 7.9 of the Corporations Act 2001 (Australia), in either case, in relation to the securities.

The securities are not being offered in Australia to "retail clients" as defined in sections 761G and 761GA of the Corporations Act 2001 (Australia). This offering is being made in Australia solely to "wholesale clients" for the purposes of section 761G of the Corporations Act 2001 (Australia) and, as such, no prospectus, product disclosure statement or other disclosure document in relation to the securities has been, or will be, prepared.

Table of Contents

This prospectus does not constitute an offer in Australia other than to persons who do not require disclosure under Part 6D.2 of the Corporations Act 2001 (Australia) and who are wholesale clients for the purposes of section 761G of the Corporations Act 2001 (Australia). By submitting an application for our securities, you represent and warrant to us that you are a person who does not require disclosure under Part 6D.2 and who is a wholesale client for the purposes of section 761G of the Corporations Act 2001 (Australia). If any recipient of this prospectus is not a wholesale client, no offer of, or invitation to apply for, our securities shall be deemed to be made to such recipient and no applications for our securities will be accepted from such recipient. Any offer to a recipient in Australia, and any agreement arising from acceptance of such offer, is personal and may only be accepted by the recipient. In addition, by applying for our securities you undertake to us that, for a period of 12 months from the date of issue of the securities, you will not transfer any interest in the securities to any person in Australia other than to a person who does not require disclosure under Part 6D.2 and who is a wholesale client.

### Hong Kong

The contents of this prospectus have not been reviewed by any regulatory authority in Hong Kong. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this prospectus, you should obtain independent professional advice. Please note that (i) our securities may not be offered or sold in Hong Kong, by means of this prospectus or any document other than to "professional investors" within the meaning of Part I of Schedule 1 of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) (SFO) and any rules made thereunder, or in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong) (CO) or which do not constitute an offer or invitation to the public for the purpose of the CO or the SFO, and (ii) no advertisement, invitation or document relating to our securities may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere) which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to the securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the SFO and any rules made thereunder.

### Japan

Our securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (the Financial Instruments and Exchange Law) and our securities will not be offered or sold, directly or indirectly, in Japan, or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan, or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

### Singapore

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

163

Table of Contents

Where the shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

- to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

- where no consideration is or will be given for the transfer;

- where the transfer is by operation of law; or

- as specified in Section 276(7) of the SFA.

### *Greece*

The securities have not been approved by the Hellenic Capital Markets Commission for distribution and marketing in Greece. This document and the information contained therein do not and shall not be deemed to constitute an invitation to the public in Greece to purchase the securities. The securities may not be advertised, distributed, offered or in any way sold in Greece except as permitted by Greek law.

### *Dubai International Finance Centre*

This prospectus relates to an Exempt Offer in accordance with the Markets Rules of the Dubai Financial Services Authority. This prospectus is intended for distribution only to Professional Clients who are not natural persons. It must not be delivered to, or relied on by, any other person. The Dubai Financial Services Authority has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The Dubai Financial Services Authority has not approved this document nor taken steps to verify the information set out in it, and has no responsibility for it. The securities to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the securities offered should conduct their own due diligence on the securities. If you do not understand the contents of this document you should consult an authorized financial adviser.

164

[Table of Contents](#)

## LEGAL MATTERS

The validity of the Class A common stock offered hereby will be passed upon for us by Kirkland & Ellis LLP, Chicago, Illinois. Certain legal matters will be passed upon for the underwriters by Davis Polk & Wardwell LLP, Menlo Park, California.

## EXPERTS

The consolidated financial statements of Carvana Group, LLC for the years ended December 31, 2016, 2015 and 2014 and as of December 31, 2016 and 2015, included in this prospectus and elsewhere in the registration statement have been so included in reliance upon the report of Grant Thornton LLP, independent registered public accountants, upon the authority of said firm as experts in auditing and accounting.

The financial statement of Carvana Co. as of December 31, 2016 included in this prospectus and elsewhere in the registration statement has been so included in reliance upon the report of Grant Thornton LLP, independent registered public accountants, upon the authority of said firm as experts in auditing and accounting.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act to register our Class A common stock being offered in this prospectus. This prospectus, which forms part of the registration statement, does not contain all of the information included in the registration statement and the attached exhibits. You will find additional information about us and our Class A common stock in the registration statement. References in this prospectus to any of our contracts, agreements or other documents are not necessarily complete, and you should refer to the exhibits attached to the registration statement for copies of the actual contracts, agreements or documents.

You may read and copy the registration statement, the related exhibits and other information we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. You may also obtain copies of this information by mail from the Public Reference Room at prescribed rates. You may obtain information regarding the operation of the Public Reference Room by calling 1-800-SEC-0330. The SEC also maintains a website that contains reports, proxy statements and other information about companies like us, who file electronically with the SEC. The address of that website is www.sec.gov. This reference to the SEC's website is an inactive textual reference only and is not a hyperlink.

Upon the effectiveness of the registration statement, we will be subject to the reporting, proxy and information requirements of the Exchange Act, and will be required to file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information will be available for inspection and copying at the SEC's Public Reference Room and the website of the SEC referred to above, as well as on our website, www.carvana.com. This reference to our website is an inactive textual reference only and is not a hyperlink. The contents of our website are not part of this prospectus, and you should not consider the contents of our website in making an investment decision with respect to our Class A common stock. We will furnish our stockholders with annual reports containing audited financial statements and quarterly reports containing unaudited interim financial statements for each of the first three quarters of each year.

<div align="center">165</div>

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page Number |
|---|---|
| **Audited Historical Financial Statement of Carvana Co.** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet as of December 31, 2016 | F-3 |
| Notes to Balance Sheet as of December 31, 2016 | F-4 |
| **Audited Consolidated Financial Statements of Carvana Group, LLC** | |
| Report of Independent Registered Public Accounting Firm | F-5 |
| Consolidated Balance Sheets as of December 31, 2015 and 2016 | F-6 |
| Consolidated Statements of Operations for the Years Ended December 31, 2014, 2015 and 2016 | F-7 |
| Consolidated Statements of Members' Equity (Deficit) for the Years Ended December 31, 2014, 2015 and 2016 | F-8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2014, 2015 and 2016 | F-9 |
| Notes to Consolidated Financial Statements | F-10 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Shareholders
Carvana Co.

We have audited the accompanying balance sheet of Carvana Co. (a Delaware corporation) (the "Company") as of December 31, 2016. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statement referred to above presents fairly, in all material respects, the financial position of Carvana Co. as of December 31, 2016 in conformity with accounting principles generally accepted in the United States of America.

/s/ GRANT THORNTON LLP

Phoenix, Arizona
February 28, 2017

F-2

Table of Contents

**CARVANA CO.**
**BALANCE SHEET**

| | December 31, 2016 |
|---|---|
| **ASSETS** | |
| Total assets | $ — |
| Commitments and contingencies | |
| **STOCKHOLDER'S EQUITY** | |
| Common stock $0.001 par value per share, 1,000 shares authorized, none issued or outstanding | $ — |
| Total stockholder's equity | $ — |

The accompanying notes are an integral part of this balance sheet.

F-3

**Table of Contents**

**CARVANA CO.**
**NOTES TO BALANCE SHEET**

**1.    Organization**

Carvana Co. (the "Company") was formed as a Delaware corporation on November 29, 2016. The Company was formed for the purpose of completing a public offering and related transactions in order to carry on the business of Carvana Group, LLC.

**2.    Summary of Significant Accounting Policies**

**Basis of Accounting**

The balance sheet is presented in accordance with accounting principles generally accepted in the United States of America. Separate statements of operations, comprehensive income, changes in stockholder's equity, and cash flows have not been presented because there have been no activities in this entity as of December 31, 2016.

**3.    Common Stock**

The Company is authorized to issue 1,000 shares of common stock, par value $0.001 per share, none of which have been issued or are outstanding.

**4.    Subsequent Events**

The Company has evaluated subsequent events through February 28, 2017, the date that this financial statement was available to be issued. For purposes of this financial statement, the Company has not evaluated any subsequent events after this date.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors
Carvana Group, LLC

We have audited the accompanying consolidated balance sheets of Carvana Group, LLC and subsidiaries (the "Company") as of December 31, 2016 and 2015, and the related consolidated statements of operations, members' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Carvana Group, LLC and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America.

/s/ GRANT THORNTON LLP

Phoenix, Arizona
February 28, 2017

F-5

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**Consolidated Balance Sheets**
**(In thousands, except units)**

|  | December 31, 2015 | December 31, 2016 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 43,134 | $ 39,184 |
| Restricted cash | 2,115 | 10,266 |
| Accounts receivable, net | 2,861 | 5,692 |
| Finance receivables held for sale, net | — | 24,771 |
| Receivables due from related party | 1,531 | — |
| Vehicle inventory | 68,038 | 185,506 |
| Other current assets | 1,539 | 9,822 |
| Total current assets | 119,218 | 275,241 |
| Property and equipment, net | 16,794 | 60,592 |
| Total assets | $ 136,012 | $ 335,833 |
| **LIABILITIES, TEMPORARY EQUITY & MEMBERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 7,070 | $ 28,164 |
| Accounts payable due to related party | 21,436 | 1,884 |
| Floor plan facility | 42,302 | 165,313 |
| Current portion of notes payable | — | 1,057 |
| Total current liabilities | 70,808 | 196,418 |
| Notes payable, excluding current portion | — | 4,404 |
| Total liabilities | 70,808 | 200,822 |
| Commitments and contingencies (Note 12) | | |
| Temporary equity — Class C redeemable preferred units — 14,051,214 and 43,089,005 units authorized and outstanding as of December 31, 2015 and December 31, 2016, respectively | 68,025 | 250,972 |
| Members' equity (deficit): | | |
| Class A Units — 103,286,258 units authorized and outstanding as of December 31, 2015 and December 31, 2016 | 59,654 | 59,654 |
| Class B Units — 5,645,000 and 6,740,500 units authorized and outstanding as of December 31, 2015 and December 31, 2016, respectively | — | — |
| Accumulated deficit | (62,475) | (175,615) |
| Total members' equity (deficit) | (2,821) | (115,961) |
| Total liabilities, temporary equity & members' equity (deficit) | $ 136,012 | $ 335,833 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**Consolidated Statements of Operations**
**(In thousands, except per unit data)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| **Sales and operating revenues:** | | | |
| Used vehicle sales, net | $ 41,123 | $124,972 | $ 341,989 |
| Wholesale vehicle sales | 522 | 3,743 | 10,163 |
| Other sales and revenues, including $0, $0 and $460 from related parties | 34 | 1,677 | 12,996 |
| **Net sales and operating revenues** | 41,679 | 130,392 | 365,148 |
| Cost of sales | 42,103 | 129,046 | 345,951 |
| **Gross (loss) profit** | (424) | 1,346 | 19,197 |
| Selling, general and administrative expenses | 14,684 | 36,678 | 108,676 |
| Interest expense | 108 | 1,412 | 3,587 |
| Other expense, net | 22 | 36 | 46 |
| **Net loss** | $(15,238) | $ (36,780) | $ (93,112) |
| Net loss attributable to Class A Units | $(15,238) | $ (40,275) | $(113,695) |
| Net loss per Class A Unit, basic and diluted | $ (0.17) | $ (0.42) | $ (1.10) |
| Weighted-average Class A Units outstanding, basic and diluted | 91,522 | 96,582 | 103,286 |
| Pro forma information (unaudited): | | | |
| Net loss | | | $ |
| Pro forma provision for income taxes | | | |
| Pro forma net loss | | | $ |
| Pro forma net loss per Class A Unit, basic and diluted | | | $ |
| Pro forma weighted-average Class A Units outstanding, basic and diluted | | | |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

CARVANA GROUP, LLC AND SUBSIDIARIES

Consolidated Statements of Members' Equity (Deficit)
(In thousands, except units)

| | Class A | | Class B | | Accumulated Deficit | Total Members' Equity (Deficit) |
| | Units | Amount | Units | Amount | | |
|---|---|---|---|---|---|---|
| Balance, December 31, 2013 | 90,000,000 | $ 20,944 | — | $ — | $ (7,452) | $ 13,492 |
| Contributions from members | — | 22,243 | — | — | — | 22,243 |
| Net loss | — | — | — | — | (15,238) | (15,238) |
| Balance, December 31, 2014 | 90,000,000 | 43,187 | — | — | (22,690) | 20,497 |
| Exchange of note payable for Class A Units | 11,764,706 | 50,000 | — | — | — | 50,000 |
| Dividends paid | — | (33,533) | — | — | — | (33,533) |
| Class A Unit dividends paid | 1,521,552 | — | — | — | — | — |
| Unit-based compensation expense | — | — | — | — | 490 | 490 |
| Issuance of Class B Units | — | — | 5,650,000 | — | — | — |
| Cancellation of Class B Units | — | — | (5,000) | — | — | — |
| Accrued return on Class C Redeemable Preferred Units | — | — | — | — | (3,495) | (3,495) |
| Net loss | — | — | — | — | (36,780) | (36,780) |
| Balance, December 31, 2015 | 103,286,258 | 59,654 | 5,645,000 | — | (62,475) | (2,821) |
| Unit-based compensation expense | — | — | — | — | 555 | 555 |
| Issuance of Class B Units | — | — | 1,313,000 | — | — | — |
| Cancellation of Class B Units | — | — | (217,500) | — | — | — |
| Accrued return on Class C Redeemable Preferred Units | — | — | — | — | (20,583) | (20,583) |
| Net loss | — | — | — | — | (93,112) | (93,112) |
| Balance, December 31, 2016 | 103,286,258 | $ 59,654 | 6,740,500 | $ — | $ (175,615) | $ (115,961) |

The accompanying notes are an integral part of these consolidated financial statements.

F-8

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**Consolidated Statements of Cash Flows**
**(In thousands)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| **Cash Flows from Operating Activities:** | | | |
| Net loss | $ (15,238) | $ (36,780) | $ (93,112) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 1,705 | 2,800 | 4,658 |
| Provision for bad debt and valuation allowance | — | 299 | 1,348 |
| Gain on loan sales, including $0, $0 and $269 from a related party | — | — | (7,446) |
| Unit-based compensation expense | — | 490 | 555 |
| Originations of finance receivables | (24,012) | (80,070) | (224,169) |
| Proceeds from sale of finance receivables | — | — | 269,262 |
| Proceeds from sale of finance receivables to related party | 23,765 | 79,362 | 13,015 |
| Purchase of finance receivables from related party | — | — | (74,589) |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (450) | (2,711) | (3,492) |
| Vehicle inventory | (17,387) | (41,667) | (117,468) |
| Other assets | (169) | (789) | (7,157) |
| Accounts payable and accrued liabilities | 1,625 | 4,122 | 17,922 |
| Accounts payable to related party | — | 21,436 | (19,552) |
| Net cash used in operating activities | (30,161) | (53,508) | (240,225) |
| **Cash Flows from Investing Activities:** | | | |
| Purchases of property and equipment | (3,768) | (13,950) | (39,539) |
| Change in restricted cash | — | (2,115) | (8,151) |
| Net cash used in investing activities | (3,768) | (16,065) | (47,690) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from floor plan facility | 5,619 | 125,080 | 410,562 |
| Payments on floor plan facility | — | (88,397) | (287,551) |
| Payments on notes payable | — | — | (284) |
| Proceeds from note payable to related party | 11,752 | 50,000 | — |
| Payment of note payable to related party | — | (11,752) | — |
| Payments of debt issuance costs | — | (150) | (728) |
| Proceeds from issuance of Class C redeemable preferred units | — | 65,000 | 162,446 |
| Class C redeemable preferred units issuance costs | — | (470) | (82) |
| Payments of costs related to planned initial public offering | — | — | (398) |
| Contributions from members | 22,243 | — | — |
| Dividends paid | — | (33,533) | — |
| Net cash provided by financing activities | 39,614 | 105,778 | 283,965 |
| **Net increase (decrease) in cash and cash equivalents** | 5,685 | 36,205 | (3,950) |
| Cash and cash equivalents at beginning of period | 1,244 | 6,929 | 43,134 |
| Cash and cash equivalents at end of period | $ 6,929 | $ 43,134 | $ 39,184 |
| **Supplemental cash flow information:** | | | |
| Cash payments for interest to third parties | $ 14 | $ 626 | $ 2,855 |
| Cash payments for interest to related parties | $ 80 | $ 617 | $ 30 |
| **Non-cash investing and financing activities:** | | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ — | $ — | $ 3,172 |
| Capital expenditures financed through notes payable | $ — | $ — | $ 5,745 |
| Costs related to planned initial public offering included in accrued liabilities | $ — | $ — | $ 879 |
| Accrual of return on Class C redeemable preferred units | $ — | $ 3,495 | $ 20,583 |
| Note payable to related parties exchanged for Class A Units | $ — | $ 50,000 | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1 — DESCRIPTION OF BUSINESS

Carvana Group, LLC and its wholly-owned subsidiaries (the "Company") is a leading eCommerce platform for buying used cars. The Company is transforming the used car buying experience by giving consumers a wide selection, great value and quality, transparent pricing and a simple, no pressure transaction. Using the Company's website, consumers can research and identify a vehicle, inspect it using the Company's proprietary 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle, and schedule delivery or pick-up, all from their desktop or mobile devices.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The Company was formed as an Arizona limited liability company by DriveTime Automotive Group, Inc. (together with its subsidiaries and affiliates "DriveTime") and commenced operations in 2012. On March 10, 2015, the Company converted to a Delaware limited liability company. Prior to November 1, 2014, the Company was a wholly-owned subsidiary of DriveTime. On November 1, 2014 (the "Distribution Date"), DriveTime distributed its member units in the Company to the unit holders of DriveTime on a pro rata basis (the "Distribution"). The Company has accounted for the Distribution as a spinoff transaction in accordance with ASC 505-60, *Equity — Spinoffs and Reverse Spinoffs* and has reflected assets and liabilities before and after the Distribution Date at their historical basis. For purposes of presenting outstanding units, it is assumed that the conversion of the Company's member units to Class A Units had occurred for all periods presented and therefore the authorized and outstanding Class A units have been adjusted to reflect the conversion of member units to Class A Units that took place on March 24, 2015.

The accompanying consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). All intercompany balances and transactions have been eliminated. Prior to the Distribution Date, the historical consolidated financial statements included expense allocations related to certain functions provided by DriveTime, including, but not limited to, general corporate expenses related to accounting and finance, human resources, payroll and benefits, equipment, corporate communications, software and production. These expenses have been allocated to the Company based on direct usage or benefit where identifiable, with the remainder allocated on a pro rata basis determined by management. Management considers the basis on which the expenses have been allocated to reasonably reflect the utilization of the services provided to, or the benefit received by, the Company for all periods presented prior to the Distribution Date. The allocations may not, however, reflect the expenses the Company would have incurred as an independent company for the periods presented prior to the Distribution Date. Actual costs that may have been incurred if the Company had been a stand-alone entity would depend on a number of factors, including the organizational structure, whether functions were outsourced or performed by employees, and strategic decisions made in areas such as information technology and infrastructure. The Company is unable to determine the amount of costs that would have been incurred had the Company been independent.

The Company reviews subsidiaries and affiliates, as well as other entities, to determine if it should be considered variable interest entities ("VIE"s), and whether it should change the consolidation determinations based on changes in its characteristics. The Company considers an entity a VIE if its equity investors own an interest therein that lacks the characteristics of a controlling financial interest or if such investors do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support or if the entity is structured with non-substantive voting interests. To determine whether or not the entity is consolidated with the Company's results, the Company also evaluates which interests are variable interests in the VIE and which party is the primary beneficiary of the VIE.

F-10

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Liquidity**

The accompanying consolidated financial statements of the Company have been prepared in conformity with U.S. GAAP, which contemplate continuation of the Company as a going concern. The Company generated negative cash flows from operations of approximately $30.2 million, $53.5 million and $240.2 million for the years ended December 31, 2014, 2015 and 2016, respectively, and generated net losses of approximately $15.2 million, $36.8 million and $93.1 million for the years ended December 31, 2014, 2015 and 2016, respectively. From inception, the Company has funded operations through the sales of Class A Units and Class C Redeemable Preferred Units, capital contributions from DriveTime and short-term funding from the Company's majority owner. The Company has historically funded vehicle inventory purchases through its Floor Plan Facility described in further detail in Note 7 — Debt Instruments and has approximately $34.7 million available under the Floor Plan Facility to fund future vehicle inventory purchases as of December 31, 2016. On February 27, 2017, the Company entered into a $50.0 million credit facility with Verde Investments, Inc., an affiliate of DriveTime, ("Verde") (the "Credit Facility"), which can be used for general working capital requirements. Management believes that it has the ability to obtain additional debt or equity financing, if required, and has historically been able to do so. Management also believes that current working capital, borrowings available under the Credit Facility and future equity or debt financing will provide the Company with sufficient capital to fund operations for at least one year from the financial statement issuance date. There is no assurance that the Company would be able to obtain sufficient additional funds when needed or that such funds, if available, will be obtainable on terms satisfactory to the Company. If the Company is unable to raise sufficient capital, management could reduce planned capital expenditures, slow its planned expansion into new markets, reduce general and administrative spending and pursue other opportunities to allow the Company to fund its operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of income and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

Significant items subject to estimates and assumptions include inventory valuation, fair value measurements, reserves for sales returns, allowances for bad debt, valuation allowances for finance receivables held for sale and unit-based compensation. Estimates used in deriving these amounts are described in the footnotes herein. Actual results could differ from these estimates.

**Comprehensive Loss**

During the years ended December 31, 2014, 2015 and 2016, the Company did not have any other comprehensive income and, therefore, the net loss and comprehensive loss were the same for all periods presented.

F-11

Table of Contents

**Cash and Cash Equivalents**

The Company has cash deposits and cash equivalents deposited in or managed by major financial institutions. Cash equivalents include highly liquid investment instruments with original maturities of three months or less, and consist primarily of money market funds. At times the related amounts are in excess of the amounts insured by the Federal Deposit Insurance Corporation. The Company has not experienced any losses with these financial institutions and does not believe it represents significant credit risk.

**Restricted Cash**

The restricted cash includes the deposit required under the Company's Floor Plan Facility, which is 5% of the outstanding floor plan facility principal balance, as explained in Note 7 — Debt Instruments and amounts held as restricted cash as required under letter of credit agreements, as explained in Note 12 — Commitments and Contingencies.

**Accounts Receivable, Net**

Accounts receivable, net of an allowance for doubtful accounts, includes certain amounts due from third party finance providers and customers. The allowance for doubtful accounts is estimated based upon historical experience, current economic conditions and other factors and is evaluated periodically. The allowance for doubtful accounts was approximately $0.3 million and $0.6 million as of December 31, 2015 and 2016, respectively.

**Finance Receivables Held for Sale, Net**

Finance receivables include vehicle loans the Company originates to facilitate vehicle sales. The Company classifies these receivables as held for sale, as it does not intend to hold the finance receivables it originates to maturity. The Company sells the finance receivables it originates as explained in Note 5 — Related Party Transactions and Note 6 — Finance Receivable Sale Agreements. The Company records a valuation allowance to report finance receivables at the lower of cost or fair value. To determine the fair value of finance receivables the Company utilizes industry-standard modeling, such as discounted cash flow analysis, factoring in the Company's historical experience, the credit quality of the underlying receivables, loss trends and recovery rates, as well as the overall economic environment. For purposes of determining the valuation allowance, finance receivables are evaluated collectively to determine the allowance as they represent a large group of smaller-balance homogeneous loans. The allowance was approximately $0.0 million and $0.2 million as of December 31, 2015 and 2016, respectively. Principal balances of finance receivables are charged-off when the Company is unable to sell the finance receivable and the related vehicle has been repossessed and liquidated or the receivable has otherwise been deemed uncollectible.

The Company has made certain representations related to the sales of finance receivables. Any significant estimated post-sale obligations or contingent obligations to the purchaser of the loans would be accrued if probable and estimable in accordance with ASC 450, *Contingencies* . Any such obligations are considered in our determination of the accounting for the transfers of the finance receivables under ASC Topic 860, *Transfers and Servicing of Financial Assets.*

**Vehicle Inventory**

Vehicle inventory consists of used vehicles, primarily acquired at auction. Direct and indirect vehicle reconditioning costs including parts and labor, inbound transportation costs and other incremental costs are capitalized as a component of inventory. Through December 31, 2015, inventory was stated at the lower

F-12

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

of cost or market value. On January 1, 2016, the Company early adopted Accounting Standards Update ("ASU") 2015-11 issued by the Financial Accounting Standards Board ("FASB") as discussed further in "Recently Issued Accounting Pronouncements" below. This update requires inventory to be stated at the lower of cost or net realizable value. Vehicle inventory cost is determined by specific identification. Net realizable value is the estimated selling price less costs to complete, dispose and transport the vehicles. Selling prices are derived from historical data and trends, such as sales price and inventory turn times of similar vehicles, as well as independent, market resources. Each reporting period the Company recognizes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value through cost of sales in the accompanying consolidated statements of operations.

**Property and Equipment**

Property and equipment consists of land, buildings and improvements, transportation fleet equipment, software and furniture, fixtures and equipment and is stated at cost less accumulated depreciation and amortization. Repairs and maintenance costs that extend the life or utility of an asset are also capitalized. Ordinary repairs and maintenance are charged to expense as incurred. Costs incurred during construction are capitalized as construction in progress and reclassified to the appropriate fixed asset categories when the project is completed. Costs incurred during the preliminary project planning phase are charged to expense as incurred.

The Company capitalizes direct costs of materials and services consumed in developing or obtaining internal use software. The Company also capitalizes payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use, to the extent of the time spent directly on the project. Capitalization of costs begins during the application development stage and ends when the software is available for general use. Costs incurred during the preliminary project and post-implementation stages are charged to expense as incurred.

Depreciation and amortization are computed using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Buildings and improvements | 5-30 years |
| Transportation fleet equipment | 5-8 years |
| Software | 3 years |
| Furniture, fixtures and equipment | 3-5 years |

Buildings and improvements are depreciated using the straight-line method over the lesser of the remaining lease term or the estimated useful life of the asset.

Management reviews long-lived assets for impairment when events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. The Company recognizes impairment when the sum of undiscounted estimated future cash flows expected to result from the use of the asset is less than the carrying value of the asset. See Note 3 — Property and Equipment, Net for additional information on property and equipment.

**Revenue Recognition**

Revenue consists of used vehicle sales, wholesale vehicle sales and other sales and revenues. The Company recognizes revenue when the earnings process is complete.

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. Revenue from used vehicle sales is recognized upon delivery, when the sales contract is signed and the purchase price has been

F-13

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

received or financing has been arranged. Used vehicle sales revenue is recognized net of a reserve for returns, which is estimated using historical experience and trends. Revenues exclude any sales taxes that are collected from customers.

### *Wholesale Vehicle Sales*

The Company sells vehicles to wholesalers. These vehicles are primarily from customers who trade-in their existing vehicles when making a used vehicle purchase that do not meet the Company's quality standards to list and sell through its website. Revenue from wholesale vehicle sales is recognized when the vehicle is sold at auction or directly to a wholesaler.

### *Other Sales and Revenues*

Other sales and revenues include commissions on vehicle service contracts ("VSCs"), gains on the sales of finance receivables, interest income received on finance receivables prior to selling them to investors and delivery fee revenues charged to customers taking delivery of the purchased used vehicle outside the Company's free delivery area. The Company sells and receives a commission on VSCs. Prior to December 9, 2016, the VSCs were sold and administered by third parties. On December 9, 2016, the Company entered into a master dealer agreement with DriveTime, pursuant to which the Company sells VSCs that DriveTime administers. The Company recognizes commission revenue at the time of sale, net of a reserve for estimated contract cancellations. The reserve for cancellations is estimated based upon historical experience and recent trends and is reflected as a reduction of other sales and revenues on the accompanying consolidated statements of operations and a component of accounts payable and accrued liabilities on the accompanying consolidated balance sheets.

The Company originates finance receivables to facilitate the sale of used vehicles and sells them to both third parties and to a lesser extent related parties. Any unsold finance receivables at the end of the reporting period are reported net of a valuation allowance as finance receivables held for sale on the accompanying consolidated balance sheets. Interest income is recognized when the Company receives periodic payments contractually due from customers prior to selling the underlying finance receivable.

The Company accounts for the sale of finance receivables in accordance with ASC Topic 860, *Transfers and Servicing of Financial Assets* . ASC 860 states that a transfer of an entire financial asset, a group of entire financial assets, or a participating interest in an entire financial asset in which the transferor surrenders control over those financial assets is accounted for as a sale only if all of the following conditions are met:

- The transferred financial assets have been isolated from the transferor — put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

- Each transferee has the right to pledge or exchange the assets (or beneficial interests) it received, and no condition both constrains the transferee (or third-party holder of its beneficial interests) from taking advantage of its right to pledge or exchange the asset and provides more than a trivial benefit to the transferor.

- The transferor, its consolidated affiliates included in the financial statements being presented or its agents do not maintain effective control over the transferred financial assets or third-party beneficial interests related to those transferred assets.

For the years ended December 31, 2014, 2015 and 2016, all transfers of finance receivables met the requirements for sale treatment. The Company records the gain or loss on the sale of a finance receivable at the sale date, which is contingent upon cash receipt, in an amount equal to the net proceeds received less the carrying amount of the finance receivable.

F-14

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Cost of Sales**

Cost of sales includes the cost to acquire used vehicles and direct and indirect vehicle reconditioning costs associated with preparing the vehicles for resale. Vehicle reconditioning costs include parts, labor, inbound transportation costs and other incremental costs, which are allocated to inventory via specific identification and standard costing. The Company has certain inventory that does not meet its specifications to sell to customers and disposes of this inventory through sales at auction or through other channels. The cost of these disposals are recorded on a net basis in cost of sales. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

**Selling, General and Administrative Expenses**

Selling, general and administrative ("SG&A") expenses primarily include payroll and benefits, other than those related to reconditioning vehicles, as well as advertising, depreciation expense, unit-based compensation expense, facilities costs other than those related to reconditioning vehicles, technology expenses, fulfillment and other administrative expenses.

**Advertising Costs**

Advertising costs are expensed as incurred and are included in SG&A expenses on the accompanying consolidated statements of operations. Advertising expense was approximately $4.1 million, $10.7 million and $27.0 million during the years ended December 31, 2014, 2015 and 2016, respectively.

**Unit-Based Compensation**

The Company classifies unit-based awards granted in exchange for services as either equity awards or as liability awards. The classification of an award as either an equity award or a liability award is generally based upon cash settlement options. Unit-based compensation expense for equity and liability awards is measured based on the fair value of the award at the grant date. Each reporting period, the Company recognizes compensation expense based on the change in fair value of the liability award immediately for vested awards and over the remaining service period for unvested awards. Each reporting period the Company recognizes the change in fair value of awards issued to non-employees as expense. The Company recognizes unit-based compensation expense of equity awards on a straight-line basis over the award's requisite service period, which is generally the vesting period of the award, based on the grant-date fair value of the award. For equity and liability awards earned based on performance or upon occurrence of a contingent event, when and if the awards will be earned is estimated. If an award is not considered probable of being earned, no amount of unit-based compensation is recognized. If the award is deemed probable of being earned, related compensation expense is recorded over the estimated service period. To the extent the estimate of awards considered probable of being earned changes, the amount of unit-based compensation expense recognized will also change. As discussed below, the Company adopted ASU 2016-09, *Compensation — Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* ("ASU 2016-09") on January 1, 2016 and elected to recognize forfeitures as they occur.

Prior to the adoption of ASU 2016-09, the Company was required to estimate forfeitures at the time of grant and revised those estimates in subsequent periods if actual forfeitures differed from its estimates. The differences were recorded as a cumulative adjustment in the period the estimates were revised.

See Note 10 — Unit-Based Compensation for additional information on unit-based compensation.

F-15

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Shipping and Handling Fees and Costs**

Transportation fees billed to customers that take delivery of the purchased used vehicle outside the Company's free delivery area are a component of other sales and revenues in the accompanying consolidated statements of operations. Third party transportation costs related to these deliveries were approximately $0.1 million, $0.2 million and $0.4 million during the years ended December 31, 2014, 2015 and 2016, respectively, and are included in selling, general and administrative expenses in the accompanying consolidated statements of operations.

**Defined Contribution Plan**

The Company sponsors a qualified 401(k) retirement plan (defined contribution plan) for its employees. The plan covers substantially all employees having no less than 31 days of service, who have attained the age of 18 and work at least 1,000 hours per year. Participants may voluntarily contribute to the plan up to the maximum limits established by Internal Revenue Service regulations. The Company provides matching contributions of 40% on the first 6% of an employee's contribution, which vests evenly over the employee's initial five-year service period. Employer contributions to the plan, net of forfeitures, were approximately $0.0 million, $0.1 million and $0.3 million for the years ended December 31, 2014, 2015 and 2016, respectively. Employer contributions are included in selling, general and administrative expenses in the accompanying consolidated statements of operations.

**Fair Value Measurements**

The fair value of financial instruments is based on estimates using quoted market prices, discounted cash flows or other valuation techniques. Those techniques are significantly affected by the assumptions used, including the discount rate and the estimated timing and amount of future cash flows. Therefore, the estimates of fair value may differ substantially from amounts that ultimately may be realized or paid at settlement or maturity of the financial instruments, and those differences may be material. Accordingly, the aggregate fair value amounts presented may not represent the Company's underlying institutional value.

The Company uses the three-tier hierarchy established by U.S. GAAP, which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value to determine the fair value of its financial instruments. This hierarchy indicates to what extent the inputs used in the Company's calculations are observable in the market. The different levels of the hierarchy are defined as follows:

| | |
|---|---|
| **Level 1:** | Unadjusted quoted prices in active markets for identical assets or liabilities. |
| **Level 2:** | Other than quoted prices that are observable in the market for the asset or liability, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or model-derived valuations or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities |
| **Level 3:** | Inputs are unobservable and reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. |

See Note 13 — Fair Value of Financial Instruments for additional information.

**Segments**

Business segments are defined as components of an enterprise about which discrete financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing operating performance. Based on the way the Company manages its

F-16

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

business, the Company has determined that it currently operates with one reportable segment. The chief operating decision maker focuses on consolidated results in assessing operating performance and allocating resources. Furthermore, the Company offers similar products and services and uses similar processes to sell those products and services to similar classes of customers throughout the United States ("U.S."). All revenue is generated and all assets are held in the U.S. for all periods presented.

**Income Taxes**

The Company is organized in Delaware as a limited liability company and treated as a partnership for U.S. federal and state income tax purposes. The Company is not subject to income taxes and passes through consolidated taxable income to the Company's members, allocated pursuant to the Company's LLC Agreement, as amended and restated (the "Operating Agreement"). Accordingly, no provision for income taxes, except for any amount of entity level state tax in certain jurisdictions, has been recorded in these consolidated financial statements.

The Company accounts for income taxes pursuant to the asset and liability method which requires deferred income tax assets and liabilities to be computed for temporary differences between the consolidated financial statement and tax basis of assets and liabilities that will result in taxable or deductible amounts in the future based on enacted tax laws and rates applicable to the periods in which the temporary differences are expected to affect taxable income. A valuation allowance is recognized if the Company determines it is more likely than not that all or some portion of the deferred tax asset will not be realized. The Company has not established a valuation allowance as of December 31, 2015 and December 31, 2016.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of December 31, 2014, 2015 and 2016, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

**Adoption of New Accounting Standards**

The Company adopted the following accounting standards during 2016, none of which have a material impact on its financial statements:

The Company adopted ASU 2015-02, *Consolidation-Amendments to the Consolidation Analysis* ("ASU 2015-02") *,* which amends the consolidation requirements under U.S. GAAP, changing the analysis performed by a company to determine whether it has a variable interest in an entity and when to consolidate such entities. The Company adopted this update on January 1, 2016.

The Company adopted ASU 2015-11, *Simplifying the Measurement of Inventory* ("ASU 2015-11"), which simplifies the subsequent measurement of inventory by replacing the lower of cost or market test with a lower of cost or net realizable value ("NRV") test. NRV is calculated as the estimated selling price less reasonably predictable costs of completion, disposal and transportation. The Company adopted ASU 2015-11 on January 1, 2016 and it did not have a material impact on the Company's consolidated financial statements.

The Company adopted ASU 2015-03, *Imputation of Interest — Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03") and ASU 2015-15, *Presentation and Subsequent Measurement of Debt Issuance Costs Associated with Line-of-Credit Arrangements* ("ASU 2015-15"). ASU 2015-03 and ASU 2015-15 require that debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with the presentation of debt discounts. ASU 2015-03 and ASU 2015-15 allow an entity to continue to defer and present debt issuance costs under a revolving debt arrangement as an asset and amortize the deferred debt issuance

F-17

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

costs ratably over the term of the revolving debt arrangement. The recognition and measurement of debt issuance costs and the amortization of debt issuance costs as interest expense is not affected by ASU 2015-03 and ASU 2015-15. The Company adopted these updates on January 1, 2016. The Company's only debt issuance costs for periods presented relate to revolving debt arrangements and are included in other current assets on the accompanying consolidated balance sheets. Therefore, the adoption of these updates did not require retrospective adjustments and had no impact on the Company's consolidated financial statements.

In March 2016, the FASB issued ASU 2016-09, *Compensation — Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* ("ASU 2016-09"). The ASU simplifies several aspects of the accounting for share-based compensation.

- On a prospective basis, all income tax effects of awards should be recognized in the income statement as tax expense or benefit at the time that the awards vest or are settled, rather than recording excess tax benefit and certain deficiencies in additional paid in capital, and eliminates the requirement that excess tax benefits be realized through a reduction in income taxes payable before they can be recognized.

- Awards may be classified as equity when an employer withholds the maximum amount of taxes on behalf of the employee. This aspect is to be adopted using a modified retrospective transition method, with a cumulative effect adjustment to retained earnings. The cash paid to a tax authority when shares are withheld to satisfy the tax withholding obligation should be classified as a financing activity on the statement of cash flows on a retrospective basis.

- Companies are required to elect the method of accounting for forfeitures of share-based payments, either by recognizing such forfeitures as they occur or estimating the number of awards expected to be forfeited and adjusting such estimate when it is deemed likely to change. This aspect is to be adopted using a modified retrospective transition method, with a cumulative effect adjustment to retained earnings.

ASU 2016-09 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2016. Early application of the ASU is permitted. The Company adopted this ASU on January 1, 2016 and it did not require any retrospective adjustments and had no impact on the Company's consolidated financial statements.

In August 2014, the FASB issued ASU 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern* ("ASU 2014-15") which provides guidance for disclosure of uncertainties about an entity's ability to continue as a going concern. ASU 2014-15 defines management's responsibility to assess an entity's ability to continue as a going concern, and to provide related footnote disclosures in certain circumstances. The Company adopted this ASU on December 31, 2016 and has provided additional footnote disclosures. See "Liquidity" disclosure within this footnote.

**Accounting Standards Issued But Not Yet Adopted**

Since May 2014, the FASB has issued several accounting standards updates related to revenue recognition including ASC 606, *Revenue From Contracts with Customers* , which amends the guidance in ASC 605, Revenue Recognition, and provides a single, comprehensive revenue recognition model for all contracts with customers. These updates contain principles that an entity will apply to determine the measurement of revenue and timing of when it is recognized. The entity will recognize revenue to reflect the transfer of goods or services to customers at an amount that the entity expects to be entitled to in exchange for those goods or services. The updates address how entities should identify goods and services being provided to a customer, the unit of account for a principal versus agent assessment, how to evaluate

F-18

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

whether a good or service is controlled before being transferred to a customer and how to assess whether an entity controls services performed by another party. These updates are effective for fiscal years, and interim periods within those years, beginning after December 15, 2017 with early adoption permitted. The Company currently plans to adopt these updates for the fiscal year beginning January 1, 2018 and is evaluating its transition method. Based on the manner in which the Company recognizes revenue, the Company does not anticipate a material impact on its consolidated financial statements as a result of adopting these updates.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ("ASU 2016-02") related to the accounting for leases. This ASU introduces a lessee model that requires a right-of-use asset and lease obligation to be presented on the balance sheet for all leases, whether operating or financing. The ASU eliminates the requirement in current U.S. GAAP for an entity to use bright-line tests in determining lease classification. Expense recognition on the income statement remains similar to current lease accounting guidance. The ASU is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2018. The Company plans to adopt this ASU for its fiscal year beginning January 1, 2019. The adoption of this ASU will require the recognition of a right-of-use asset and a lease obligation for the Company's leases (see Note 12 — Commitments and Contingencies). As of December 31, 2016, the future minimum lease payments of the Company's operating leases totaled approximately $70.1 million.

In June 2016, the FASB issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. ASU 2016-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, and earlier adoption is permitted beginning in the first quarter of fiscal 2019. The Company plans to adopt this ASU for its fiscal year beginning January 1, 2020. Finance receivables originated in connection with the Company's vehicle sales are held for sale and are sold to third parties and related parties. As a result, the Company does not hold any finance receivables until maturity and does not expect adoption of ASU 2016-13 to have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows — Classification of Certain Receipts and Payments* ("ASU 2016-15"), which provides additional clarity on the classification of specific events on the statement of cash flows including debt prepayment and extinguishment costs, settlement of zero-coupon debt instruments, contingent consideration payments made after a business combination, proceeds from settlement of insurance claims, distributions received from equity method investees and beneficial interests in securitization transactions. The update is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted. The Company plans to adopt this ASU for its fiscal year beginning January 1, 2018. ASU 2016-15 requires retrospective application to all periods presented, unless retrospective application would be impracticable, in which case prospective application is permissible. The Company does not expect the adoption of ASU 2016-15 to have a material effect on its consolidated statements of cash flows.

In October 2016, the FASB issued ASU 2016-17, *Interests Held through Related Parties That Are Under Common Control* ("ASU 2016-17"), which updates the consolidation requirements when evaluating whether or not the entity is the primary beneficiary of a VIE with regard to interests held by related parties under common control. Under ASU 2016-17, entities will consider all indirect economic interests in a VIE held by related parties on a proportionate basis regardless of whether or not the related parties are under common control. The update is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2016, with early adoption permitted. Since the Company has adopted ASU 2015-02, ASU 2016-17 requires retrospective application to all periods presented. The Company will adopt

F-19

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

this ASU for its fiscal year beginning January 1, 2017. The Company does not expect the adoption of ASU 2016-17 to have a material impact on its consolidated financial statements.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows — Restricted Cash* ("ASU 2016-18"), which requires the statement of cash flows to include restricted cash with its cash and cash equivalents balance and a reconciliation between all cash items on the balance sheet and the balance per the statement of cash flows. In addition, changes in restricted cash related to transfers between cash, cash equivalents and restricted cash will not be presented as cash flow activities in the statement of cash flows. Entities with a material amount of restricted cash will continue to be required to disclose the nature of the restrictions. ASU 2016-18 requires retrospective application and is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted. The Company plans to adopt this ASU for its fiscal year beginning January 1, 2018. The Company is currently evaluating the impact on its consolidated financial statements.

## NOTE 3 — PROPERTY AND EQUIPMENT, NET

The following table summarizes property and equipment, net as of December 31, 2015 and December 31, 2016 (in thousands):

|  | December 31, 2015 | December 31, 2016 |
|---|---|---|
| Land and site improvements | $ — | $ 9,355 |
| Buildings and improvements | 8,018 | 14,750 |
| Transportation fleet | 3,942 | 16,520 |
| Software | 5,511 | 10,065 |
| Furniture, fixtures and equipment | 1,465 | 3,704 |
| Total property and equipment excluding construction in progress | 18,936 | 54,394 |
| Less: accumulated depreciation and amortization | (5,112) | (9,752) |
| Property and equipment excluding construction in progress, net | 13,824 | 44,642 |
| Construction in progress | 2,970 | 15,950 |
| Property and equipment, net | $ 16,794 | $ 60,592 |

Depreciation and amortization expense was approximately $1.7 million, $2.8 million and $4.7 million for the years ended December 31, 2014, 2015 and 2016, respectively. These amounts relate to assets associated with selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying consolidated statements of operations.

The Company capitalized internal use software costs totaling approximately $1.2 million, $2.7 million and $4.4 million for the years ended December 31, 2014, 2015 and 2016, respectively, included in software and construction in progress in the table above. For the years ended December 31, 2014, 2015 and 2016, these amounts included approximately $1.0 million, $2.1 million and $3.7 million, respectively, of payroll and payroll-related costs for employees who are directly associated with and who devote time to the development of software products for internal use.

F-20

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

## NOTE 4 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of December 31, 2015 and December 31, 2016 (in thousands):

| | December 31, 2015 | December 31, 2016 |
|---|---|---|
| Accounts payable | $ 341 | $ 6,208 |
| Sales taxes and vehicle licenses and fees | 1,382 | 4,265 |
| Accrued inventory costs | 390 | 3,480 |
| Accrued compensation and benefits | 1,035 | 3,398 |
| Accrued property and equipment | — | 3,045 |
| Accrued advertising costs | 2,016 | 1,281 |
| Other accrued liabilities | 1,906 | 6,487 |
| Total accounts payable and other accrued liabilities | $ 7,070 | $ 28,164 |

## NOTE 5 — RELATED PARTY TRANSACTIONS

**DriveTime**

As discussed in Note 2 — Summary of Significant Accounting Policies, the Company was initially formed as a wholly-owned subsidiary of DriveTime and commenced operations in 2012. Through the Distribution Date, DriveTime incurred approximately $43.1 million of costs on the Company's behalf and charged them to the Company as capital contributions. DriveTime did not charge the Company interest on these capital contributions.

On July 21, 2015, the Company issued a $50.0 million note payable to DriveTime. The note payable accrued interest at one-month LIBOR plus 7.816% and was scheduled to mature on September 21, 2015. The proceeds from the note payable were used, in part, to fund an approximately $33.5 million dividend to Class A Unit holders on July 27, 2015. Certain of the Class A Unit holders used the proceeds from the dividend to make an approximately $33.5 million capital contribution to DriveTime in order to release the Company from its guarantees on the obligations under DriveTime's outstanding senior secured notes.

On July 27, 2015, the Company also issued a stock dividend of 1,521,552 Class A Units to Class A Unit holders on a pro rata basis in satisfaction, together with the approximately $33.5 million cash dividend, of such Class A Unit holders' remaining $40.0 million preference. Satisfaction of the Class A Unit holders' preference was necessary in order to facilitate the Company's sale of Class C redeemable preferred units (the "Class C Redeemable Preferred Units") on July 27, 2015. The issuance of the Class A Unit dividend increased the number of Class A Units authorized and outstanding and did not impact the Company's members' equity (deficit).

On July 27, 2015, the Company issued 11,764,706 Class A Units to DriveTime in exchange for the cancellation of the $50.0 million note payable to DriveTime plus accrued interest.

**Shared Services Agreement with DriveTime**

During 2014 in connection with the Distribution, the Company and DriveTime entered into a shared services agreement whereby DriveTime historically provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production and other services to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The agreement was most recently amended and restated in February 2017 and operates on a year-to-year basis after February

F-21

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2019, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate certain services effective December 2017 and other services effective July 2018, in each case with 90 days prior written notice. DriveTime provides the Company with benefits, tax reporting and compliance, telecommunications and IT services under the amended agreement. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. Total expenses related to the shared services agreement were approximately $0.2 million, $1.0 million and $0.7 million for the period from the Distribution Date through December 31, 2014 and for the years ended December 31, 2015 and 2016, respectively, which are included in selling, general and administrative expenses in the accompanying consolidated statements of operations.

**Aircraft Time Sharing Agreement**

On October 22, 2015, the Company entered into an agreement to share usage of two aircraft operated by DriveTime. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The agreement lasts for 12 months, with perpetual 12-month automatic renewals. Either the lessors or the lessees can terminate the lease with 30 days' written notice. The Company reimbursed DriveTime approximately $0.1 million and $0.6 million under this agreement during the years ended December 31, 2015 and 2016, respectively.

**Lease Agreements**

In connection with the Distribution, the Company and DriveTime entered into a lease agreement with an initial term effective through March 2021, which governs the Company's access to and utilization of space at various DriveTime inspection and reconditioning centers, temporary storage locations, office space and parking spaces (the "DriveTime Lease Agreement"). Lease duration varies at each location, with the earliest expiration occurring in 2019, subject to certain two consecutive one-year renewal options. As of December 31, 2016, the Company or DriveTime may terminate the leases with 90 days' notice or 360 days' notice, respectively, prior to the end of any renewal period.

Under the DriveTime Lease Agreement, the Company pays a monthly rental fee related to its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. The Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations and its share of estimated costs incurred by DriveTime related to preparing these sites for use. As it relates to locations where the Company reconditions vehicles, the Company's share of facility and shared reconditioning supplies expenses are calculated monthly by multiplying the actual costs for operating the inspection centers by the Company's pro rata share of total reconditioned vehicles and parking spaces at such inspection centers in a given month. Management has determined that the costs allocated to the Company are based on a reasonable methodology and currently represent the best operational and financial option. Under lease agreements where only the Company has operations, monthly rental payments are set forth in the underlying agreements.

In December 2016, the Company entered into a lease agreement related to a vehicle inspection and reconditioning facility with Verde with an initial term of approximately 15 years. The lease agreement requires monthly rental payments and can be extended for four additional five- year periods.

Expenses related to these lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the year ended December 31, 2014, total costs related to these lease agreements were approximately $0.3 million with $0.2 million and $0.1 million allocated to inventory and selling, general and

F-22

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

administrative expenses, respectively. During the year ended December 31, 2015, total costs related to these lease agreements were approximately $0.8 million with approximately $0.5 million and $0.3 million allocated to inventory and selling, general and administrative expenses, respectively. During the year ended December 31, 2016, total costs related to these lease agreements were approximately $2.8 million with approximately $1.9 million and $0.9 million allocated to inventory and selling, general and administrative expenses, respectively. The Company was also charged approximately $0.8 million by DriveTime related to direct labor costs associated with vehicle reconditioning during the year ended December 31, 2014, which is reflected in cost of sales when the related vehicle is sold.

**Corporate Office Leases**

The Company paid a monthly rental fee for its use of space at DriveTime's corporate headquarters through December 2015, at which time this agreement terminated. In November 2015, the Company entered into a new lease agreement with Verde (the "Office Lease") and relocated its headquarters in December 2015. The monthly rental fees for the corporate headquarters incurred from DriveTime for the years ended December 31, 2014 and December 31, 2015 were approximately $0.1 million and $0.3 million, respectively. The rent expense incurred related to the Office Lease for the years ended December 31, 2015 and December 31, 2016 were approximately $0.1 million and $0.9 million, respectively. In December 2016, Verde sold the building and assigned the Office Lease to a third party.

**Vehicle Inventory Purchases**

Prior to the Distribution, inventory purchases were treated as a capital contribution from DriveTime. From the Distribution Date through July 2015, DriveTime purchased inventory on behalf of the Company and charged interest at 5.6% on the unpaid balance. During the year ended December 31, 2014 and 2015, the Company incurred interest expense of approximately $0.1 million and $0.6 million, respectively, under this arrangement. From July 2015 through September 2016, the Company purchased vehicle inventory under DriveTime's auction numbers under a non-interest bearing agreement requiring periodic repayments. Vehicles purchased under this agreement were acquired by the Company at DriveTime's cost of the vehicles purchased with no markup. Beginning October 1, 2016, the Company purchased its vehicle inventory independently and made the payments itself through its vehicle inventory financing and security agreement. See Note 7 — Debt Instruments for further information.

**Floor Plan Facility**

In October 2014, DriveTime entered into a vehicle inventory financing and security agreement (the "Floor Plan Facility") and a cross collateral, cross default and guaranty agreement (the "Cross Collateral Agreement") with Ally Bank and Ally Financial (collectively, "Ally") secured by DriveTime and the Company's vehicle inventory. The facility provided for up to $20.0 million of available credit, and the interest rate under the facility was based on the one month LIBOR rate plus 3.10%. The Company was removed as a party to the Cross Collateral Agreement in July 2015, and the Floor Plan Facility was amended and restated in July 2015 to remove DriveTime. Refer to Note 7 — Debt Instruments for further information.

**Repurchase of Finance Receivables from DriveTime**

On January 20, 2016, the Company repurchased approximately $72.4 million of finance receivables from DriveTime related to loans the Company originated and previously sold under the terms of the DriveTime receivable purchase agreement (the "Finance Receivable Purchase Agreement with DriveTime") discussed below for a price of approximately $74.6 million. Such receivables were immediately sold by the

F-23

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Company to third party purchasers under the transfer and note purchase and security agreements for a price of approximately $74.6 million. See Note 6 — Finance Receivable Sale Agreements for further information about the Transfer Agreements and Note Purchase and Security Agreements.

**Finance Receivable Purchase Agreements with DriveTime**

From the beginning of 2013 to June 2014, the Company had an agreement with DriveTime, whereby each month DriveTime purchased certain finance receivables that the Company originated. All receivables sold under this arrangement were sold at par. For the period from January 2014 to May 2014, DriveTime purchased $5.7 million in loans under this arrangement.

In June 2014, the Company entered into the DriveTime Receivable Purchase Agreement to sell DriveTime finance receivables that the Company originates in conjunction with the sale of vehicles. During the period from June 2014 through December 31, 2015, the Company sold all of its finance receivables to DriveTime at par under this arrangement and recognized no gain or loss on the sales. As of December 31, 2015, the Company had approximately $1.5 million in receivables due from DriveTime for the sales of finance receivables included as receivables due from related party on the accompanying consolidated balance sheet. During the year ended December 31, 2016, DriveTime purchased a portion of the finance receivables the Company originated representing approximately $11.5 million of gross outstanding principal balance, resulting in a gain on loan sale from related party of approximately $0.3 million. As of December 31, 2016, DriveTime is not obligated to make any additional purchases under the agreement.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime, pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company, which VSCs are subsequently administered by DriveTime. The Company earns a commission on each VSC sold to its customers. During the year ended December 31, 2016, the Company recognized approximately $0.2 million of commissions earned on VSCs sold by DriveTime. The commission earned on the sale of these VSCs is included in other sales and revenues from related parties in the accompanying consolidated statement of operations.

**Loan from Ernest Garcia, II**

The Company entered into a loan and security agreement with Ernest Garcia, II ("Mr. Garcia"), a related party, of $10.0 million on March 31, 2016, as described in Note 7 — Debt Instruments.

**Sales of Series C Redeemable Preferred Units**

On July 27, 2015, the Company issued and sold 14,051,214 Class C redeemable preferred units (the "Class C Redeemable Preferred Units") for $65.0 million to CVAN Holdings, LLC.

On April 27, 2016, the Company issued and sold 18,300,293 Class C Redeemable Preferred Units for $100.0 million to Mr. Garcia.

On July 12, 2016, the Company issued and sold 8,597,319 Class C Redeemable Preferred Units for $50.0 million to CVAN Holdings, LLC.

On December 9, 2016, the Company issued and sold 468,000 Class C Redeemable Preferred Units for approximately $2.7 million to the 2014 Fidel Family Trust.

Refer to Note 8 — Class C Redeemable Preferred Units for additional information.

F-24

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Vehicle Inventory Transfer to DriveTime**

During the year ended December 31, 2016, the Company transferred used vehicle inventory with a carrying value of approximately $4.9 million to DriveTime to dispose of used vehicle inventory that no longer met the Company's inventory specifications. The Company recorded a loss of approximately $0.8 million related to this disposal, which is included in cost of sales on the accompanying consolidated statement of operations.

**Accounts Payable Due to Related Party**

Amounts payable to DriveTime under the agreements explained above, as well as invoices DriveTime initially paid on behalf of the Company for general and administrative expenses, are included in accounts payable to related party in the accompanying consolidated balance sheets. As of December 31, 2015, approximately $21.4 million was due to DriveTime primarily related to its purchases of vehicles on behalf of the Company. As of December 31, 2016, approximately $1.9 million was due to DriveTime primarily related to shared service fees, repayments to DriveTime for invoices paid on behalf of the Company and leases.

**NOTE 6 — FINANCE RECEIVABLE SALE AGREEMENTS**

**Transfer Agreements and Note Purchase and Security Agreements**

In January 2016, the Company entered into transfer agreements pursuant to which it sells finance receivables meeting certain underwriting criteria to certain third party purchasers who engage DriveTime as servicer of such receivables. Pursuant to certain note purchase and security agreements, entered into in connection with the transfer agreements, such third party purchasers of receivables issued notes to certain parties, including Delaware Life Insurance Company ("Delaware Life"), which is controlled by Mark Walter, who also controls CVAN Holdings, LLC and has non-controlling ownership interests in the other note purchasers under the note purchase and security agreements. Delaware Life also serves as an administrative agent and paying agent on behalf of the note purchasers. Under the transfer agreements and initial note purchase and security agreements, the Company could sell up to an aggregate of $200.0 million in principal balances of vehicle finance receivables in this manner. The Company amended the agreements, effective September 16, 2016, to sell up to $230.0 million in principal balances of the finance receivables. Under this agreement through December 31, 2016, the Company had sold all $230.0 million of finance receivables, including approximately $72.4 million of finance receivables repurchased from DriveTime. As of December 31, 2016, there was no unused capacity under the note purchase and security agreements. See Note 5 — Related Party Transactions for further discussion on the repurchase of finance receivables from DriveTime.

**Master Purchase and Sale Agreement and Master Transfer Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Purchase and Sale Agreement") and a master transfer agreement (the "Master Transfer Agreement") pursuant to which it sells finance receivables meeting certain underwriting criteria to certain third party purchasers, including Ally. DriveTime is the servicer of finance receivables sold under both agreements. Under the Purchase and Sale Agreement and the Master Transfer Agreement, the Company can sell up to an aggregate of $375.0 million, and $292.2 million, respectively, in principal balances of finance receivables subject to adjustment as described in the respective agreements. During the year ended December 31, 2016, the Company had sold approximately $21.3 million and $8.5 million in principal balances of finance receivables under the Purchase and Sale Agreement and the Master Transfer Agreement, respectively. As of December 31, 2016, there was approximately $353.7 million and $283.7 million of unused capacity under the Purchase and Sale Agreement and the Master Transfer Agreement, respectively.

F-25

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

During the year ended December 31, 2016, the Company incurred approximately $0.9 million of costs directly attributable to establishing the Purchase and Sale Agreement and the Master Transfer Agreement. These costs are included as a component of other assets on the accompanying consolidated balance sheet and will be expensed as a component of selling, general and administrative expenses over the period the Company sells finance receivables under these agreements.

### Gains on the Sales of Finance Receivables with Third Parties

The total gain on loan sales related to finance receivables sold to third parties under these agreements during the year ended December 31, 2016 was approximately $7.2 million, which is included in other sales and revenues in the accompanying consolidated statement of operations.

### Finance Receivable Purchase Agreement with DriveTime

In December 2016, the Company sold certain finance receivables to DriveTime. See Note 5 — Related Party Transactions for further discussion.

### NOTE 7 — DEBT INSTRUMENTS

### Floor Plan Facility

In October 2014, DriveTime entered into the Floor Plan Facility and a cross collateral, cross default and guaranty agreement with Ally secured by DriveTime and the Company's vehicle inventory. In July 2015, the Company was removed as a party to the cross collateral agreement and the Floor Plan Facility was amended and restated to remove DriveTime. The amended facility provided for up to $60.0 million of available credit to the Company and had an interest rate based on one month LIBOR plus 3.80%. All borrowings under the amended Floor Plan Facility are required to be used to acquire used vehicle inventory and are collateralized by substantially all the Company's assets, other than the Company's interests in real property. The Floor Plan Facility requires that at least 5% of the total principal amount owed to Ally is held as restricted cash. Principal payments in an amount equal to the amount of the advance or loan must be made within several days of selling or otherwise disposing of the underlying vehicle inventory. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of i) 50% of the original principal amount or ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty.

In December 2015, the Company increased the amount available under the Floor Plan Facility to an aggregate of $125.0 million, subject to credit availability and certain other conditions. In connection with this increase of the available credit line, two unit-holders of the Company, Mr. Garcia and the 2014 Fidel Family Trust ("Mr. Fidel") unconditionally guaranteed the payment of all indebtedness of the Company up to $24.4 million and $0.6 million, respectively. In April 2016, Mr. Garcia invested $100.0 million in the Company through the purchase of approximately 18.3 million Class C Redeemable Preferred Units, $25.0 million of which satisfied certain conditions required to terminate those guarantees. See Note 8 — Class C Redeemable Preferred Units for additional information regarding the Class C Redeemable Preferred Units.

On November 9, 2016, the Company and Ally amended the Floor Plan Facility to extend the maturity to December 27, 2017 and the amount available to fund vehicle inventory purchases to $200.0 million. The Company paid Ally a one-time non-refundable commitment fee of $0.5 million on the effective date of the amendment.

As of December 31, 2015, the Company had an outstanding balance under this facility of approximately $42.3 million, borrowing capacity available of approximately $82.7 million and held

F-26

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

approximately $2.1 million in restricted cash related to this facility. As of December 31, 2016, the interest rate on the Floor Plan Facility was 4.57%, the Company had an outstanding balance under this facility of approximately $165.3 million, borrowing capacity available of approximately $34.7 million and held approximately $8.4 million in restricted cash related to this facility.

Prior to July 2015, the Company financed the majority of its vehicle inventory purchases through DriveTime, as explained in Note 5 — Related Party Transactions.

**Notes Payable**

During 2016, the Company entered into eight promissory note agreements totaling approximately $5.7 million to purchase equipment for its transportation fleet used to transport vehicles. The principal amounts range from approximately $0.3 million to $1.4 million with fixed annual interest rates ranging from 4.56% to 6.29%. Each of the notes require monthly payments and mature in 2021. All of the notes are secured by the Company's equipment acquired using the notes, including but not limited to any additions, replacements and proceeds. As of December 31, 2016, the outstanding amount of these notes totaled approximately $5.5 million, of which approximately $1.1 million is due within the next twelve months and included as current portion of notes payable on the accompanying consolidated balance sheet.

The following table summarizes the future minimum debt principal payments due in each period under the terms of the note agreements as of December 31, 2016 (in thousands):

| | |
|---|---|
| 2017 | $1,057 |
| 2018 | 1,109 |
| 2019 | 1,163 |
| 2020 | 1,221 |
| 2021 | 911 |
| Thereafter | — |
| Total | $5,461 |

**Related Party Loan from Mr. Garcia**

On March 31, 2016, the Company entered into a loan and security agreement with Mr. Garcia of $10.0 million. The loan bore interest at an annual rate of 4.0% and had a maturity date of May 1, 2016, at which time all unpaid principal and accrued interest were payable to Mr. Garcia. On April 1, 2016, the Company received the proceeds from the loan and on April 28, 2016, the Company repaid the principal and accrued interest, thereby terminating the loan.

**NOTE 8 — CLASS C REDEEMABLE PREFERRED UNITS**

On July 27, 2015, the Company authorized the issuance of and sold 14,051,214 Class C Redeemable Preferred Units to CVAN Holdings, LLC, for $65.0 million. On April 27, 2016, the Company authorized the issuance of and sold 18,300,293 Class C Redeemable Preferred Units for $100.0 million to Mr. Garcia. On July 12, 2016, the Company authorized the issuance of and sold 8,597,319 Class C Redeemable Preferred Units to CVAN Holdings, LLC, and 1,672,179 Class C Redeemable Preferred Units to GV Auto I, LLC for approximately $50.0 million and $9.7 million, respectively. On December 9, 2016, the Company authorized the issuance of and sold 468,000 Class C Redeemable Preferred Units to the Fidel Family Trust for approximately $2.7 million.

In accordance with the Company's Operating Agreement, the Class C Redeemable Preferred Units accrue a return ("Class C Return") at a coupon rate of 12.5% compounding annually on the aggregate amount of capital contributions made with respect to the Class C Redeemable Preferred Units. If the Company has a public offering in which the offering price per Class A Unit is greater than or equal to 200%

F-27

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

of the original Class C Redeemable Preferred Unit issuance price, or if the Company has a sale transaction in which the proceeds payable with respect to the Class A Units is greater than or equal to 200% of the original Class C Redeemable Preferred Unit issuance price, the Company is no longer liable for the Class C Return. In the event of a public offering in which the offering price per Class A Unit is greater than or equal to 150% of the original Class C Redeemable Preferred Unit issuance price, the Class C Redeemable Preferred Units are automatically converted to Class A Units on a one to one basis. On or after July 27, 2018, the majority of Class C Redeemable Preferred Unit holders may require the Company to redeem the Class C Redeemable Preferred Units at a price per unit equal to the original issuance price of the Class C Redeemable Preferred Units plus the Class C Return outstanding at the time of redemption. At any time, the Class C Redeemable Preferred Units can be converted to Class A Units at the option of the Class C Redeemable Preferred Unit holders.

The Company records the issuance and sale of Class C Redeemable Preferred Units at fair value, net of issuance costs. As the redemption feature of the Class C Redeemable Preferred Units is out of the control of the Company, the preferred stock is classified as temporary equity on the accompanying consolidated balance sheets. The Company recognizes the Class C Return as an increase in temporary equity and increase to members' equity (deficit). The Class C Return accrued during 2015 and 2016 was approximately $3.5 million and $20.6 million, respectively. The total accrued Class C Return included in Class C Redeemable Preferred Units on the accompanying consolidated balance sheets as of December 31, 2015 and December 31, 2016 was approximately $3.5 million and $24.1 million, respectively.

**NOTE 9 — MEMBERS' EQUITY (DEFICIT)**

The Company's three classes of member units are Class A (the "Class A Units), Class B (the "Class B Units) and Class C Redeemable Preferred Units. Class A Units and Class B Units are components of members' equity (deficit) and Class C Redeemable Preferred Units are temporary equity, as explained in Note 8 — Class C Redeemable Preferred Units. As of December 31, 2016, there were approximately 103.3 million, 6.7 million and 43.1 million Class A Units, Class B Units and Class C Redeemable Preferred Units, respectively, issued and outstanding.

**Liquidation and Voting Rights Privileges**

The liquidation preference of the Class C Redeemable Preferred Units, assuming they are not first converted to Class A Units, is such that distributions from members' deficit are first paid to the holders of Class C Redeemable Preferred Units until the aggregate unpaid Class C Return is reduced to zero and such holders receive the greater of the amount (i) required to reduce the aggregate unreturned initial capital investment of such holders to zero and (ii) the holders of Class C Redeemable Preferred Units would receive if they were converted to Class A Units. Any excess funds from distribution after the payment to Class C Redeemable Preferred Unit holders are then paid on a pro rata basis to holders of Class A and Class B Units that are vested and outstanding. Class B Units must meet certain participation threshold requirements ranging from $0.0000 to $5.8114 to participate in any distributions. Class A Unit holders are entitled to appoint two board members and Class C Unit holders are entitled to appoint one board member. The issuance of additional LLC units, liquidation of the Company, and any corporate reorganization of the Company require approval of the holders of the majority of the aggregate of Class A Units and Class C Redeemable Preferred Units. Certain Class A Unit and Class C Redeemable Preferred Unit holders also have certain other veto rights outlined in the Company's Operating Agreement.

**Class A Units**

On November 1, 2014, DriveTime distributed its Class A member units in the Company to the unit holders of DriveTime on a pro rata basis. On July 27, 2015, the Company paid a cash dividend of

F-28

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

approximately $33.5 million to Class A Unit holders and issued a unit dividend of 1,521,552 Class A Units to Class A Unit holders on a pro rata basis. The issuance of the Class A Unit dividend increased the number of Class A Units authorized and outstanding and did not impact members' equity (deficit). The dividends were paid in order to facilitate the Company's authorization of the Class C Redeemable Preferred Units discussed in Note 8 — Class C Redeemable Preferred Units. Also on July 27, 2015, the Company issued 11,764,706 Class A Units to DriveTime in repayment for the $50.0 million note payable to DriveTime.

**Class B Units**

Class B Units are issued under the Company's Equity Incentive Plan (the "Equity Incentive Plan") and are earned over the requisite service period. See Note 10 — Unit-Based Compensation for further details.

**Transaction Costs**

During the year ended December 31, 2016, the Company incurred costs of approximately $1.3 million directly related to issuing equity of which approximately $0.4 million had been paid as of December 31, 2016. These costs are included in other assets on the accompanying consolidated balance sheet.

**NOTE 10 — UNIT-BASED COMPENSATION**

**Class B Units**

Prior to March 2015, the Company did not have an equity incentive plan. In March 2015, the Company adopted the Equity Incentive Plan, which was amended in July 2015 and September 2016, and it was approved by the Board of Managers. Under the Equity Incentive Plan, the Company may grant up to 10,000,000 Class B Common Units to eligible employees, non-employee officers, consultants and directors with service vesting conditions. In July 2016, the Company's Operating Agreement amended the number of units, including all types of awards issued under the Equity Incentive Plan and the Company Performance Plan (the "Performance Plan") discussed below, for issuance to not exceed 10% of the number of issued and outstanding Class A Units. Forfeited and canceled Class B Units are returned to the pool of available Class B Units to be granted. As of December 31, 2016, the maximum number of Class B Units available for grant was 3,259,500, subject to the limitations under the Equity Incentive Plan and the Performance Plan. The awards granted under the Equity Incentive Plan are earned over the requisite service period, which is typically four to five years, and must meet the participation threshold requirements to participate in any distributions. As of December 31, 2016, outstanding Class B Units had participation thresholds between $0.00 to $5.8114. Vested Class B Units participate in any distributions of the Company based on the excess, if any, of the fair value of Class A Units over the Class B Unit's participation threshold. Class B Units do not expire.

A summary of the Class B Unit activity for the year ended December 31, 2016 is as follows:

| | Number of Units (in thousands) | | Weighted Average Participation Threshold per Unit |
|---|---|---|---|
| Balance at December 31, 2015 | 5,645 | $ | 1.17 |
| Granted | 1,313 | $ | 5.40 |
| Forfeited | (218) | $ | 3.64 |
| Balance at December 31, 2016 | 6,740 | $ | 1.91 |
| Vested as of December 31, 2016 | 2,464 | $ | 0.94 |
| Units expected to vest as of December 31, 2016 | 4,276 | $ | 2.48 |

F-29

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The weighted-average grant date fair value of Class B Units granted during each of the years ended December 31, 2015 and 2016 was $0.34. The fair value of Class B Units that vested during the years ended December 31, 2015 and 2016 was $0.40 and $0.32, respectively.

**Assumptions used to estimate fair values**

The Company uses a third party valuation specialist to assist management in its estimation of the fair value of the grants on the respective grant dates. As the participation threshold provides a threshold similar to that of an exercise price for a stock option, option pricing models are utilized to estimate the fair values of Class B Units. The fair value of Class B Units awarded were estimated on the grant date using the following weighted average assumptions:

|  | Years Ended December 31, | |
|---|---|---|
|  | **2015** | **2016** |
| Dividend yield | —% | —% |
| Expected volatility [1] | 65.0% | 68.0% |
| Risk-free interest rate | 1.2% | 0.9% |
| Expected term (in years) [2] | 2.5 | 1.8 |

(1)  Measured using selected high-growth guideline companies corresponding to the expected term to a liquidity event and consideration of the risk factors that would influence the range of expected volatility.

(2)  Expected term represents the estimated period of time until an award is exercised and was determined using the simplified method because the Company does not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected term.

**Unit-Based Compensation Expense**

Class B Unit compensation expense is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. Compensation expense related to Class B Units included in the accompanying consolidated statements of operations was as follows (in thousands):

|  | For the Years Ended December 31, | | | |
|---|---|---|---|---|
|  | **2015** | | **2016** | |
| Cost of sales | $ | 1 | $ | 4 |
| Selling, general and administrative | | 489 | | 551 |
| Total unit-based compensation expense expense | $ | 490 | $ | 555 |

As of December 31, 2016, the total unrecognized compensation expense related to outstanding Class B Units was approximately $1.6 million, which the Company expects to recognize over a weighted-average period of approximately 3.2 years. Total unrecognized unit-based compensation expense will be adjusted for actual forfeitures.

**Company Performance Plan**

The Company created the Performance Plan on July 25, 2016, whereby the Company may grant up to 1,000,000 performance units (the "Performance Units") to certain individual employees and consultants. The Performance Units granted are subject to continued employment and are only exercisable upon a qualifying transaction, which is either a change of control or an initial public offering, each as defined in the

F-30

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Performance Plan. Upon the occurrence of a qualifying transaction, each Performance Unit entitles the holder to receive a payment from the Company with such payment, and related compensation expense, determined by multiplying (i) the excess, if any, of the qualifying transaction price over the base amount of the Performance Unit, by (ii) the stated number of Class B units deemed covered by the Performance Unit. In the event of an initial public offering the Company has the option to settle the award in cash or equity. The Performance Units terminate on the tenth anniversary of the grant date or upon termination of employment, if earlier. The planned public offering constitutes a qualifying transaction under the terms of the Performance Plan and would result in the recognition of compensation expense. The Company would recognize such compensation expense in the period in which the planned public offering is deemed probable. During 2016, 572,725 Performance Units were granted at participation thresholds between $0.00 to $5.8114. As of December 31, 2016, there were 427,275 Performance Units available for grant under the plan. No compensation expense has been recorded in 2016 related to the outstanding Performance Units as no qualifying transactions were deemed probable to occur during 2016.

**NOTE 11 — NET LOSS PER UNIT**

Basic and diluted net loss per unit attributable to Class A Unit holders is calculated using the two-class method required for entities with participating securities. Vested Class B Units and Class C Redeemable Preferred Units are considered participating securities for purposes of calculating basic and diluted net loss per Class A Unit. As holders of Class B Units and Class C Redeemable Preferred Units do not have a contractual obligation to share in the losses of the Company, the net loss is not allocated between Class A Units and participating securities. Accordingly, Class B Units and Class C Redeemable Preferred Units are excluded from the calculation of basic and diluted net loss per unit attributable to Class A Unit holders. The Company's basic and diluted net loss per unit attributable to Class A Unit holders are the same because the Company has generated a net loss attributed to Class A Unit holders and Class A Unit equivalents are excluded from diluted net loss per unit attributed to Class A Unit holders because they have an anti-dilutive impact.

The following table presents the calculation of basic and diluted net loss per unit attributable to Class A Unit holders, as adjusted to reflect the Class A Unit dividend for all years presented, (in thousands, except per share data):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Net loss | $ (15,238) | $ (36,780) | $ (93,112) |
| Series C Redeemable Preferred Unit accrued dividends | — | (3,495) | (20,583) |
| Net loss attributable to Class A Unit holders, basic and diluted | $ (15,238) | $ (40,275) | $ (113,695) |
| Weighted average Class A Units outstanding, basic and diluted | 91,522 | 96,582 | 103,286 |
| Net loss per unit attributable to Class A Unit holders, basic and diluted | $ (0.17) | $ (0.42) | $ (1.10) |

As of December 31, 2014, the only outstanding units were Class A Units, thus there were no outstanding units to evaluate for potentially dilutive effects. Class C Redeemable Preferred Units of approximately 6.0 million and 31.4 million as of December 31, 2015 and 2016, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Class B Units of approximately 4.0 million and 3.7 million for the years ended December 31, 2015 and 2016, respectively, were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

F-31

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**NOTE 12 — COMMITMENTS AND CONTINGENCIES**

**Lease Commitments**

As of December 31, 2016, the Company is a tenant under various operating leases with third parties related to certain of its delivery hubs, vending machines and office space. The initial terms expire at various dates between 2017 and 2027. Many of the leases include one or more renewal options of five to ten year periods. Rent expense for these operating leases was approximately $0.1 million, $0.3 million and $0.9 million for the years ended December 31, 2014, 2015 and 2016, respectively. The Company also has operating leases with related parties as described in Note 5 — Related Party Transactions.

The following table summarizes the scheduled minimum lease payments due in each period under the lease terms of the Company's operating leases as of December 31, 2016 (in thousands):

| | Future Minimum Lease Payments | | |
| | Related Party [1] | Non-Related Party | Total |
|---|---|---|---|
| 2017 | $ 1,512 | $ 2,590 | $ 4,102 |
| 2018 | 1,683 | 2,668 | 4,351 |
| 2019 | 1,717 | 2,676 | 4,393 |
| 2020 | 1,751 | 2,806 | 4,557 |
| 2021 | 1,786 | 2,689 | 4,475 |
| Thereafter | 19,947 | 28,285 | 48,232 |
| Total | $ 28,396 | $ 41,714 | $70,110 |

(1)   Related party lease payments exclude rent payments due under the DriveTime Lease, as those are contingent upon the Company's utilization of the leased assets.

**Letters of Credit**

In October 2016, the Company obtained an unconditional, irrevocable, stand-by letter of credit for $1.9 million to satisfy a condition of a new lease agreement. The Company is required to maintain a cash deposit of $1.9 million with the financial institution that issued the stand-by letter of credit and has classified this amount as restricted cash as of December 31, 2016.

**Legal matters**

In the ordinary course of business, the Company may become subject to litigation or claims. The Company is not aware of any pending legal proceedings of which the outcome is reasonably possible to have a material effect on its results of operations, financial condition or cash flows.

**NOTE 13 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

As of December 31, 2015, the Company did not hold any assets or liabilities that were required to be measured at fair value on a recurring or non-recurring basis. As of December 31, 2016, the Company held certain assets that were required to be measured at fair value on a recurring basis. The following is a summary of fair value measurements at December 31, 2016 (in thousands):

| | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds [1] | $ 20,088 | $20,088 | — | $ — |

(1)   Classified in cash and cash equivalents in the accompanying consolidated balance sheet.

F-32

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The carrying amounts of restricted cash, receivables due from related party, accounts payable and accrued liabilities and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the Floor Plan Facility was determined to approximate fair value due to its short-term duration and variable interest rate that approximates prevailing interest rates as of each reporting period. The carrying value of notes payable was determined to approximate fair value as each of the notes was issued during 2016 at prevailing interest rates, which have not materially changed as of December 31, 2016. The fair value of finance receivables, net was determined to be $0 and approximately $25.6 million as of December 31, 2015 and 2016, respectively, utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement is considered Level 2 under the fair value hierarchy.

## NOTE 14 — SUBSEQUENT EVENTS

The Company has evaluated subsequent events through February 28, 2017, the date that these consolidated financial statements were available to be issued. For purposes of these financial statements, the Company has not evaluated any subsequent events after this date.

**Office Sublease Agreements with DriveTime**

In connection with the lease for the new corporate headquarters in Tempe, Arizona, the Company entered into a sublease with DriveTime in January 2017 to use the first floor of the same building, which DriveTime leases from the same third party as the Company. The sublease has a term of 84 months with three five-year extension options.

In January 2017, the Company began subleasing on a month-to-month basis certain office space at DriveTime's corporate headquarters in Tempe, Arizona. Pursuant to this arrangement, the Company pays DriveTime a fixed monthly rent amount.

**IP License Agreement**

In February 2017, the Company entered into a license agreement that governs the rights of certain intellectual property owned by the Company and the rights of certain intellectual property owned by DriveTime. The license agreement generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property. The exclusive license to DriveTime is limited to the business that is primarily of sub-prime used car sales to retail customers. However, upon a change of control of either party, the license rights of the party that experienced the change of control are terminated. The agreement does not provide a license to any of the Company's patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to the company's vending machine, automated vehicle photography or certain other elements of its brand.

**Credit Facility with Verde**

On February 27, 2017, the Company entered into a credit facility with Verde for an amount up to $50.0 million, as increased by payment in kind interest. Under the agreement, the Company can draw up to five loans in minimum amounts of $10.0 million during the term of the agreement. Amounts outstanding accrue interest at a rate of 12.0% per annum, compounding semi-annually and payable in arrears and mature in August 2018. Upon execution of the agreement, the Company paid a commitment fee of $1.0 million to Verde.

Table of Contents

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Inspection and Reconditioning Center Lease with DriveTime**

In February 2017, the Company entered into a new lease with DriveTime for an inspection and reconditioning center where the Company had previously maintained partial occupancy under the DriveTime Lease Agreement. The Company will pay an initial fixed monthly base rent of approximately $0.1 million, commencing on the date the Company ceases rent payments for the property pursuant to the DriveTime Lease Agreement, which is expected to be March 1, 2017.

F-34

Table of Contents



Shares

# Carvana Co.

## Class A Common Stock

---

**P R O S P E C T U S**

**, 2017**

---

| **Wells Fargo Securities** | **BofA Merrill Lynch** | **Citigroup** | **Deutsche Bank Securities** |
| **Baird** | **William Blair** | **BMO Capital Markets** | **JMP Securities** |

Table of Contents

Table of Contents

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

### Item 13. Other Expenses of Issuance and Distribution.

The following table sets forth all costs and expenses, other than the underwriting discounts and commissions payable by us, in connection with the offer and sale of the securities being registered. All amounts shown are estimates except for the SEC registration fee and the Financial Industry Regulatory Authority, Inc., ("FINRA"), filing fee.

| | | |
|---|---|---|
| SEC registration fee | $ | * |
| FINRA filing fee | | * |
| listing fee | | * |
| Printing expenses | | * |
| Legal fees and expenses | | * |
| Accounting fees and expenses | | * |
| Miscellaneous expenses | | * |
| Total expenses | $ | * |

\*   To be provided by amendment.

### Item 14. Indemnification of Directors and Officers.

Section 102(b)(7) of the General Corporation Law of the State of Delaware (the "DGCL") allows a corporation to provide in its certificate of incorporation that a director of the corporation will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except where the director breached the duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of Delaware corporate law or obtained an improper personal benefit. Our certificate of incorporation will provide for this limitation of liability.

Section 145 of the DGCL ("Section 145") provides that a Delaware corporation may indemnify any person who was, is or is threatened to be made, party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of such corporation), by reason of the fact that such person is or was an officer, director, employee or agent of such corporation or is or was serving at the request of such corporation as a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the corporation's best interests and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his conduct was illegal. A Delaware corporation may indemnify any persons who are, were or are a party to any threatened, pending or completed action or suit by or in the right of the corporation by reason of the fact that such person is or was a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the corporation's best interests, provided that no indemnification is permitted without judicial approval if the officer, director, employee or agent is adjudged to be liable to the corporation. Where an officer or director is successful on the merits or otherwise in the defense of any action referred to above, the corporation must indemnify him against the expenses which such officer or director has actually and reasonably incurred.

Section 145 further authorizes a corporation to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation or is or was serving at the

II-1

Table of Contents

request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would otherwise have the power to indemnify him under Section 145.

Our bylaws will provide that we will indemnify our directors and officers to the fullest extent authorized by the DGCL and must also pay expenses incurred in defending any such proceeding in advance of its final disposition upon delivery of an undertaking, by or on behalf of an indemnified person, to repay all amounts so advanced if it should be determined ultimately that such person is not entitled to be indemnified under this section or otherwise.

We intend to enter into indemnification agreements with each of our executive officers and directors. The indemnification agreements will provide the executive officers and directors with contractual rights to indemnification, expense advancement and reimbursement, to the fullest extent permitted under the DGCL.

The LLC Operating Agreement provides for indemnification of the manager, members and officers of Carvana Group and their respective subsidiaries or affiliates. To the extent permitted by applicable law, Carvana Group will indemnify us, Carvana Sub as its manager, its authorized officers, its other employees and agents from and against any losses, liabilities, damages, costs, expenses, fees or penalties incurred by any acts or omissions of these persons, provided that the acts or omissions of these indemnified persons are not the result of fraud, intentional misconduct or a violation of the implied contractual duty of good faith and fair dealing, or any lesser standard of conduct permitted under applicable law.

We, Carvana Sub as Carvana Group's manager, and the authorized officers and other employees and agents of Carvana Group will not be liable to Carvana Group, its members or their affiliates for damages incurred by any acts or omissions of these persons, provided that the acts or omissions of these exculpated persons are not the result of fraud, or intentional misconduct.

The indemnification rights set forth above shall not be exclusive of any other right which an indemnified person may have or hereafter acquire under any statute, provision of our certificate of incorporation or bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

We will maintain standard policies of insurance that provide coverage (1) to our directors and officers against loss arising from claims made by reason of breach of duty or other wrongful act and (2) to us with respect to indemnification payments that we may make to such directors and officers. The proposed form of Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification of our directors and officers by the underwriters party thereto against certain liabilities.

### Item 15. Recent Sales of Unregistered Securities.

Set forth below is information regarding securities sold by us within the past three years that were not registered under the Securities Act. Also included is the consideration, if any, received by us for such securities and information relating to the section of the Securities Act, or rule of the SEC, under which exemption from registration was claimed.

Prior to completion of this offering, the Registrant will issue          shares of Class B common stock to the LLC Unitholders. The issuance of such shares of Class B common stock will not be registered under the Securities Act because the shares will be offered and sold in a transaction exempt from registration under Section 4(a)(2) of the Securities Act.

### Item 16. Exhibits and Financial Statement Schedules.

(i)    Exhibits

The exhibit index attached hereto is incorporated herein by reference.

II-2

**Table of Contents**

(ii)     Financial statement schedules

No financial statement schedules are provided because the information called for is not applicable or is shown in the financial statements or notes.

*Item 17. Undertakings.*

The undersigned registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions referenced in Item 14 of this Registration Statement, or otherwise, the registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered hereunder, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1)     For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this Registration Statement in reliance upon Rule 430A and contained in the form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this Registration Statement as of the time it was declared effective;

(2)     For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at the time shall be deemed to be the initial bona fide offering thereof; and

(3)     For the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)      Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii)     Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii)    The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)     Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

II-3

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Phoenix, State of Arizona, on March 31, 2017.

**Carvana Co.**

By: /s/ Ernie Garcia, III
      Name: Ernie Garcia, III
      Title: Chief Executive Officer

\*\*\*

## POWER OF ATTORNEY

The undersigned directors and officers of Carvana Co. hereby appoint each of Paul Breaux, Christopher Olson and John McKeon, as attorney-in-fact for the undersigned, with full power of substitution and resubstitution, for and in the name, place and stead of the undersigned, to sign and file with the Securities and Exchange Commission under the Securities Act of 1933 any and all amendments (including post-effective amendments) and exhibits to this registration statement on Form S-1 (or any other registration statement for the same offering that is to be effective upon filing pursuant to Rule 462(b) under the Securities Act of 1933) and any and all applications and other documents to be filed with the Securities and Exchange Commission pertaining to the registration of the securities covered hereby, with full power and authority to do and perform any and all acts and things whatsoever requisite and necessary or desirable, hereby ratifying and confirming all that said attorney-in-fact, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities indicated on March 31, 2017.

| Signature | Title |
|---|---|
| /s/ Ernie Garcia, III | Chief Executive Officer and Director |
| Ernie Garcia, III | (Principal Executive Officer) |
| | |
| /s/ Mark Jenkins | Chief Financial Officer |
| Mark Jenkins | (Principal Financial and Accounting Officer) |

II-4

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement. |
| 3.1 | Form of Amended and Restated Certificate of Incorporation of Carvana Co., to be effective upon completion of this offering. |
| 3.2 | Form of Amended and Restated Bylaws of Carvana Co., to be effective upon completion of this offering. |
| 4.1 | Form of Second Amended and Restated Registration Rights Agreement, by and among Carvana Co. and the other signatories party thereto. |
| 5.1 | Form of Opinion of Kirkland & Ellis LLP. |
| 10.1 | Form of Tax Receivable Agreement. |
| 10.2 | Form of Exchange Agreement. |
| 10.3 | Form of Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC. |
| 10.4+ | Form of Carvana Co. 2017 Omnibus Incentive Plan. |
| 10.5+ | Form of Incentive Stock Option Agreement. |
| 10.6+ | Form of Restricted Stock Agreement. |
| 10.7+ | Form of Nonqualified Stock Option Agreement. |
| 10.8+ | Form of Stock Appreciation Rights Agreement. |
| 10.9+ | Form of Restricted Stock Unit Agreement. |
| 10.10 | Form of Indemnification Agreement. |
| 10.11† | Amended and Restated Inventory Financing and Security Agreement, dated as of July 27, 2015 among Ally Bank, Ally Financial and Carvana, LLC. |
| 10.12† | Amendment to Amended and Restated Inventory Financing and Security Agreement, dated as of July 30, 2015 among Ally Bank, Ally Financial and Carvana, LLC. |
| 10.13† | Third Amendment to Amended and Restated Inventory Financing and Security Agreement, dated as of November 9, 2016 among Ally Bank, Ally Financial and Carvana, LLC. |
| 10.14† | Fourth Amendment to Amended and Restated Inventory Financing and Security Agreement, dated as of February 10, 2017 among Ally Bank, Ally Financial and Carvana, LLC. |
| 10.15+ | Carvana Group, LLC Equity Incentive Plan. |
| 10.16+ | Form of Award Agreement under Carvana Group Equity Incentive Plan. |
| 10.17† | Fourth Amended and Restated Lease Agreement, dated February 24, 2017 by and between DriveTime Car Sales Company, LLC, as landlord, and Carvana LLC and Carvana Shipping & Delivery, LLC, as tenant. |
| 10.18 | Second Amended and Restated Shared Services Agreement, dated February 27, 2017, by and between DriveTime Automotive Group, Inc., and Bridgecrest Acceptance Corporation, f/k/a DT Acceptance Corporation and Carvana LLC. |
| 10.19 | Origination Agreement, dated June 1, 2014, by and between Carvana, LLC, as seller, and Bridgecrest Acceptance Corporation, f/k/a DT Acceptance Corporation, as purchaser. |

**Table of Contents**

| Exhibit Number | Description |
|---|---|
| 10.20 | Amendment No 1 to Origination Agreement, dated December 31, 2015, by and between Carvana, LLC, as seller, and Bridgecrest Acceptance Corporation, f/k/a DT Acceptance Corporation, as purchaser. |
| 10.21 | Time Sharing Agreement, dated October 22, 2015, by and among Bridgecrest Credit Company, LLC, f/k/a DT Credit Company, LLC, as lessor, and Carvana Group, LLC, Verde Investments, Inc., GO Capital Holdings, LLC and Oreno Holdings, LLC, as lessees. |
| 10.22† | Amended and Restated Master Purchase and Sale Agreement, among Ally Bank, Ally Financial, Inc. and Carvana Auto Receivables 2016-1 LLC. |
| 10.23† | Amended and Restated Master Transfer Agreement, among Sonoran Auto Receivables Trust 2016-1 and Carvana Auto Receivables 2016-1 LLC. |
| 10.24 | SilverRock Automotive Master Dealer Agreement, dated December 8, 2016 among SilverRock Automotive, Inc., SilverRock Automotive of Florida, Inc. and Carvana, LLC. |
| 10.25 | IP License Agreement, dated as of February 27, 2017, among DriveTime Automotive Group, Inc., DriveTime Car Sales Company LLC, Bridgecrest Acceptance Corporation f/k/a DT Acceptance Corporation and their respective wholly owned subsidiaries and Carvana, LLC. |
| 10.26 | Master Loan Agreement, dated as of February 27, 2017 among Carvana Group, LLC, as borrower, Verde Investments, Inc. and the other lenders party thereto. |
| 10.27 | Guarantee, dated as of February 27, 2017 between Carvana, LLC and Verde Investments, Inc. |
| 10.28 | Form of Limited Liability Company Agreement of Carvana Co. Sub LLC. |
| 10.29 | First Amendment to Fourth Amended and Restated Lease, dated March 31, 2017 among DriveTime Car Sales Company, LLC, Carvana, LLC and Carvana Shipping and Delivery, LLC. |
| 21.1 | List of subsidiaries of Carvana Co. |
| 23.1 | Consent of Grant Thornton LLP, independent registered public accounting firm, as to Carvana Co. |
| 23.2 | Consent of Grant Thornton LLP, independent registered public accounting firm, as to Carvana Group, LLC. |
| 23.3 | Consent of Kirkland & Ellis LLP (included in Exhibit 5.1). |
| 24.1 | Powers of Attorney (included on signature page). |
| 99.1 | Consent of Director Nominees |

\*   Indicates to be filed by amendment.

\*\* Indicates previously filed.

+   Indicates a management contract or compensatory plan or agreement.

†   Confidential treatment requested as to certain portions, which portions have been provided separately to the Securities and Exchange Commission.

II-6

**Exhibit 3.1**

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
CARVANA CO.**

**ARTICLE ONE**

The name of the corporation is Carvana Co. (the " Corporation ").

**ARTICLE TWO**

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808. The name of its registered agent at such address is Corporation Service Company.

**ARTICLE THREE**

The nature and purpose of the business of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (" DGCL ").

**ARTICLE FOUR**

Section 1.    Authorized Shares . The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is [            ] shares, consisting of:

1.   [            ] shares of Preferred Stock, par value $0.01 per share (the " Preferred Stock ");

2.   [            ] shares of Class A Common Stock, par value $0.001 per share (the " Class  A Common Stock "); and

3.   [            ] shares of Class B Common Stock, par value $0.001 per share (the " Class  B Common Stock " and together with the Class A Common Stock, the " Common Stock ").

The Preferred Stock and the Common Stock shall have the designations, rights, powers and preferences and the qualifications, restrictions and limitations thereof, if any, set forth below.

Section 2.    Preferred Stock . The Board of Directors of the Corporation (the " Board of Directors ") is authorized, subject to limitations prescribed by law, to provide, by resolution or resolutions for the issuance of shares of Preferred Stock in one or more series, and with respect to each series, to establish the number of shares to be included in each such series, and to fix the voting powers (if any), designations, powers, preferences, and relative, participating, optional or other special rights, if any, of the shares of each such series, and any qualifications, limitations or restrictions thereof. The powers, preferences, and relative, participating, optional and other special rights of each series of Preferred Stock and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding. Subject

1

to applicable law and within the limitations or restrictions stated in any resolution or resolutions of the Board of Directors fixing the number of shares constituting a series of Preferred Stock, the Board of Directors may increase or decrease (but not below the number of shares of any such series of Preferred Stock then outstanding and not above the total number of authorized shares of Preferred Stock) by resolution the number of shares of any such series of Preferred Stock. In the event that the number of shares of any series of Preferred Stock shall be so decreased, the shares constituting such decrease shall resume the undesignated status of authorized and unissued shares of Preferred Stock subject to the requirements of applicable law. Subject to the rights of the holders of any series of Preferred Stock, the number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the approval of the Board of Directors and by the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, without the separate vote of the holders of the Preferred Stock as a class, irrespective of the provisions of Section 242(b)(2) of the DGCL.

Section 3.    Common Stock .

(a)    Voting Rights . Except as otherwise required by the DGCL or as provided by or pursuant to the provisions of this Certificate of Incorporation:

(i)    Each holder of Class A Common Stock shall be entitled to one (1) vote for each share of Class A Common Stock held of record by such holder.

(ii)    Each holder of Class B Common Stock shall be entitled to one (1) vote for each share of Class B Common Stock held of record by such holder; provided that each holder that, together with its Affiliates (which, in the case of the Garcia Parties (as defined below), shall be deemed to include each other Garcia Party), (A) beneficially owns fifty percent (50%) or more of the LLC Units immediately following the consummation of the initial public offering of the Corporation's Class A Common Stock and (B) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least twenty-five percent (25%) of the outstanding shares of Class A Common Stock (determined assuming that each Class A Common Unit held by holders other than Carvana Co. Sub LLC was exchanged for Class A Common Stock in accordance with the terms and conditions of the Exchange Agreement (as defined below) and the LLC Agreement (as defined below)), shall be entitled to ten (10) votes for each share of Class Common B Stock held of record by such holder. The " Garcia Parties " means each of Ernest C. Garcia, II, Ernest C. Garcia, III, and each of the entities controlled by one or both of them, including trusts over which one or both of them exercise investment control. " Affiliate " means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person. " LLC Unit " means the Common Units of Carvana Group, LLC, consisting of Class A Common Units (the " Class A Common Units ") and Class B Common Units (the " Class B Common Units "). " Exchange Agreement " means that certain Exchange Agreement, dated as of or about the date hereof, by and among Carvana Co. Sub LLC, Carvana Group, LLC and the LLC Unitholders party thereto (as the

same may be amended, supplemented or modified from time to time in accordance with the terms thereof). "LLC Agreement" means that certain Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated as of or about the date hereof, by and among the Corporation, as manager, and the members of Carvana Group, LLC (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(iii)    Except as otherwise required in this Certificate of Incorporation or by applicable law, the holders of Class A Common Stock and Class B Common Stock shall vote together as a single class on all matters on which stockholders are generally entitled to vote (and, if any holders of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with such holders of Preferred Stock).

(iv)    The holders of shares of Common Stock shall not have cumulative voting rights.

(b)    Dividends . Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock or any class or series of stock having a preference over or the right to participate with the Class A Common Stock with respect to the payment of dividends in cash, stock or property of the Corporation, such dividends may be declared and paid on the Class A Common Stock out of the assets of the Corporation that are by law available therefor at such times and in such amounts as the Board of Directors in its discretion shall determine. Except as provided in Section 2(d) of this Article IV, dividends shall not be declared or paid on the Class B Common Stock.

(c)    Liquidation, Dissolution, etc. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation as required by law and of the preferential and other amounts, if any, to which the holders of Preferred Stock shall be entitled, the holders of all outstanding shares of Class A Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder. The holders of shares of Class B Common Stock, as such, shall not be entitled to receive any assets of the Corporation in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

(d)    Reclassification . Neither the Class A Common Stock nor the Class B Common Stock may be subdivided, split, consolidated, reclassified, or otherwise changed unless contemporaneously therewith the other class of Common Stock and the LLC Units are subdivided, consolidated, reclassified, or otherwise changed in the same proportion and in the same manner.

(e)    Exchange . The holders of LLC Units other than the Corporation shall, to the extent provided in the Exchange Agreement and the LLC Agreement and in accordance with the terms and conditions of the Exchange Agreement and the LLC

Agreement, as applicable, have the right to exchange such LLC Units, together with shares of Class B Common Stock (in the case of Class A Common Units), for such number of fully paid and nonassessable shares of Class A Common Stock determined in accordance with the terms of the Exchange Agreement. The Corporation shall at all times when any LLC Units shall be outstanding, reserve and keep available out of its authorized but unissued Class A Common Stock such number of shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding LLC Units in accordance with the terms of the Exchange Agreement and the LLC Agreement and shall deliver such shares of Class A Common Stock to Carvana Co. Sub LLC as may be necessary to enable Carvana Co. Sub LLC to satisfy its obligations under the Exchange Agreement. If at any time the number of authorized but unissued shares of Class A Common Stock shall not be sufficient to effect the conversion of all outstanding LLC Units, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase the number of authorized shares of Class A Common Stock to such number as shall be sufficient for such purpose.

(f)    Automatic Transfer . No share of Class B Common Stock may be sold, exchanged or otherwise transferred, other than as part of (i) the exchange of a Class A Common Unit as set forth in Section 3(e) of Article Fourth hereof, and (ii) the transfer of a Class A Common Unit by a holder of LLC Units to a permitted transferee of such holder in accordance with the LLC Agreement. In the event that any outstanding shares of Class B Common Stock are sold, exchanged or otherwise transferred other than as provided in the foregoing clauses (i) and (ii), or such outstanding shares of Class B Common Stock shall otherwise cease to be held by a holder of a corresponding number, based on the exchange rate then in effect, of Class A Common Units (including a transferee of a Class A Common Unit) for any reason, such shares of Class B Common Stock shall automatically and without further action on the part of the Corporation or any holder of Class B Common Stock be deemed to be transferred to the Corporation and thereupon shall be retired.

(g)    No Preemptive or Subscription Rights . No holder of shares of Common Stock shall be entitled to preemptive or subscription rights.

**ARTICLE FIVE**

The Corporation is to have perpetual existence.

**ARTICLE SIX**

Section 1.    Board of Directors . The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the Bylaws of the Corporation (as amended and restated, the " Bylaws "), the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation except for such powers, acts and things that are by the DGCL, the Certificate of Incorporation, or the Bylaws required to be exercised or done by the stockholders.

Section 2.    <u>Number of Directors</u> . Subject to any rights of the holders of any class or series of Preferred Stock to elect additional directors under specified circumstances or otherwise, the number of directors which shall constitute the Board of Directors shall initially be five (5) and, thereafter, shall be fixed from time to time exclusively by resolution of the Board.

Section 3.    <u>Classes of Directors</u> . The directors of the Corporation, other than those who may be elected by the holders of any series of Preferred Stock, shall be divided into three classes, as nearly equal in number as possible, hereby designated Class I, Class II and Class III.

Section 4.    <u>Election and Term of Office</u> . The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting of the stockholders and entitled to vote in the election of directors; *provided that* , whenever the holders of any class or series of capital stock of the Corporation are entitled to elect one or more directors pursuant to the provisions of this Certificate of Incorporation (including, but not limited to, any duly authorized certificate of designation), such directors shall be elected by a plurality of the votes of such class or series present in person or represented by proxy at the meeting of the stockholders and entitled to vote in the election of such directors. The term of office of the initial Class I directors shall expire at the first annual meeting of stockholders after the Effective Time, the term of office of the initial Class II directors shall expire at the second succeeding annual meeting of stockholders after the Effective Time and the term of office of the initial Class III directors shall expire at the third succeeding annual meeting of the stockholders after the Effective Time. For the purposes hereof, the Board of Directors may assign directors already in office to Class I, Class II and Class III to take effect at the Effective Time. At each annual meeting of stockholders after the Effective Time, directors elected to replace those of a class whose terms expire at such annual meeting shall be elected to hold office until the third succeeding annual meeting after their election and until their respective successors shall have been duly elected and qualified. Each director shall hold office until the annual meeting of stockholders for the year in which such director's term expires and a successor is duly elected and qualified or until his or her earlier death, resignation or removal. Nothing in this Certificate of Incorporation shall preclude a director from serving consecutive terms. Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

Section 5.    <u>Newly-Created Directorships and Vacancies</u> . Subject to the rights of the holders of any series of Preferred Stock then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, disqualification, removal from office or any other cause may be filled (i) prior to the Trigger Date, either (x) upon the affirmative vote (a " <u>Shareholder Appointment</u> ") of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class (the " <u>Majority Shareholders</u> ") or (y) if no Shareholder Appointment has been made by the tenth (10th) day following the occurrence of the vacancy, or if the Majority Shareholders have notified the Board of Directors that no Shareholder Appointment shall be made, by resolution of a majority of the directors then in office, although less than a quorum, or by a sole remaining director and (ii) on and after the Trigger Date, only by resolution of a majority of the directors then in office, although less than a quorum, or by a sole remaining director. A director elected or appointed to fill a vacancy shall serve for the unexpired term of his or her predecessor in office and until his or her successor is elected and qualified or

until his or her earlier death, resignation or removal. A director elected or appointed to fill a position resulting from an increase in the number of directors shall hold office until the next election of the class for which such director shall have been elected or appointed and until his or her successor is elected and qualified, or until his or her earlier death, resignation or removal. No decrease in the authorized number of directors shall shorten the term of any incumbent director.

Section 6.    Removal and Resignation of Directors . Subject to the rights of the holders of any series of Preferred Stock then outstanding and notwithstanding any other provision of this Certificate of Incorporation, (i) prior to the Trigger Date, directors may be removed with or without cause upon the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class and (ii) on and after the Trigger Date, directors may only be removed for cause and only upon the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 $2/3$ %) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class, at a meeting of the Corporation's stockholders called for that purpose. Any director may resign at any time upon written notice to the Corporation. " Trigger Date " means the first date on which the Garcia Parties cease to beneficially own in the aggregate (directly or indirectly) at least twenty-five percent (25%) of the outstanding shares of Class A Common Stock (determined assuming that each LLC Unit owned by holders other than the Corporation were exchanged for Class A Common Stock in accordance with the terms and conditions of either the Exchange Agreement and the LLC Agreement).

Section 7.    Rights of Holders of Preferred Stock . Notwithstanding the provisions of this ARTICLE SIX, whenever the holders of one or more series of Preferred Stock shall have the right, voting separately or together by series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorship shall be subject to the rights of such series of Preferred Stock.

Section 8.    Advance Notice . Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws of the Corporation.

## ARTICLE SEVEN

Section 1.    Limitation of Liability .

(a)    To the fullest extent permitted by the DGCL as it now exists or may hereafter be amended (but, in the case of any such amendment, only to the extent such amendment permits the Corporation to provide broader exculpation than permitted prior thereto), no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages arising from a breach of fiduciary duty as a director.

(b)    Any amendment, repeal or modification of the foregoing paragraph by the stockholders of the Corporation shall not adversely affect any right or protection of a

director of the Corporation existing at the time of such amendment, repeal or modification with respect to any act, omission or other matter occurring prior to such amendment, repeal or modification.

## ARTICLE EIGHT

Section 1.    Action by Written Consent . Prior to the Trigger Date, any action which is required or permitted to be taken by the Corporation's stockholders may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of the Corporation's stock entitled to vote thereon were present and voted. From and after the Trigger Date, any action required or permitted to be taken by the Corporation's stockholders may be taken only at a duly called annual or special meeting of the Corporation's stockholders and the power of stockholders to consent in writing without a meeting is specifically denied.

Section 2.    Special Meetings of Stockholders . Subject to the rights of the holders of any series of Preferred Stock then outstanding and to the requirements of applicable law, special meetings of stockholders of the Corporation shall be called only (i) by or at the direction of the Board of Directors or the Chairman of the Board of Directors pursuant to a written resolution adopted by the affirmative vote of the majority of the total number of directors that the Corporation would have if there were no vacancies, (ii) by the Chairman of the Board of Directors at the written request of a Garcia Party so long as such Garcia Party beneficially owns any shares of Class B Common Stock or (iii) prior to the Trigger Date, by the Majority Shareholders. Any business transacted at any special meeting of stockholders shall be limited to the purpose or purposes stated in the notice of the meeting.

## ARTICLE NINE

Section 1.    Certain Acknowledgments . In recognition and anticipation that (i) certain of the Garcia Parties may serve as directors or officers of the Corporation and (ii) certain of the Garcia Parties engage and may continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, and (iii) that the Corporation and its Affiliated Companies may engage in material business transactions with the Garcia Parties and their Affiliated Companies, and that the Corporation is expected to benefit therefrom, the provisions of this ARTICLE NINE are set forth to regulate and define the conduct of certain affairs of the Corporation as they may involve the Garcia Parties and/or their Affiliated Companies and/or their respective directors, partners, principals, officers, members, managers and/or employees, including any of the foregoing who serve as officers or directors of the Corporation (collectively, the " Exempted Persons "), and the powers, rights, duties and liabilities of the Corporation and its officers, directors and stockholders in connection therewith. As used in this Certificate of Incorporation, " Affiliated Companies " shall mean (a) in respect of the Garcia Parties, any entity that controls, is controlled by or is under common control with a Garcia Party (other than the Corporation and any company that is controlled by the Corporation) and (b) in respect of the Corporation, any company controlled by the Corporation.

Section 2.    <u>Competition and Corporate Opportunities</u> . To the fullest extent permitted by applicable law, none of the Exempted Persons shall have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its Affiliated Companies, and no Exempted Person shall be liable to the Corporation or its stockholders for breach of any fiduciary duty solely by reason of any such activities of the Garcia Parties, their Affiliated Companies or such Exempted Person. To the fullest extent permitted by applicable law, the Corporation, on behalf of itself and its Affiliated Companies, renounces any interest or expectancy of the Corporation and its Affiliated Companies in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to the Exempted Persons, even if the opportunity is one that the Corporation or its Affiliated Companies might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each Exempted Person shall have no duty to communicate or offer such business opportunity to the Corporation or its Affiliated Companies and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation, any of its Affiliated Companies or its stockholders for breach of any fiduciary or other duty, as a director, officer or stockholder of the Corporation solely, by reason of the fact that a Garcia Party, one of their Affiliated Companies or any such Exempted Person pursues or acquires such business opportunity, sells, assigns, transfers or directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or any of its Affiliated Companies. Notwithstanding anything to the contrary in this Section 2, the Corporation does not renounce any interest or expectancy it may have in any business opportunity that is expressly offered to any Exempted Person solely in his or her capacity as a director or officer of the Corporation, and not in any other capacity.

Section 3.    <u>Certain Matters Deemed Not Corporate Opportunities</u> . In addition to and notwithstanding the foregoing provisions of this ARTICLE NINE, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy.

Section 4.    <u>Amendment of this Article</u> . Notwithstanding anything to the contrary elsewhere contained in this Certificate of Incorporation, subject to the rights of the holders of any series of Preferred Stock then outstanding, and in addition to any vote required by applicable law, the affirmative vote of the holders of at least eighty percent (80%) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class, shall be required to alter, amend or repeal, or to adopt any provision inconsistent with, this ARTICLE NINE; *provided however* , that, to the fullest extent permitted by law, neither the alteration, amendment or repeal of this ARTICLE NINE nor the adoption of any provision of this Certificate of Incorporation inconsistent with this ARTICLE NINE shall apply to or have any effect on the liability or alleged liability of any Exempted Person for or with respect to any activities or opportunities which such Exempted Person becomes aware prior to such alteration, amendment, repeal or adoption.

Section 5.    <u>Deemed Notice</u> . Any person or entity purchasing or otherwise acquiring or holding any interest in any shares of the Corporation shall be deemed to have notice of and to have consented to the provisions of this ARTICLE NINE.

Section 6.    <u>Severability</u> . To the extent that any provision or part of any provision of this ARTICLE NINE is found to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provision or part of any other provision of this ARTICLE NINE.

**ARTICLE TEN**

Section 1.    <u>Section 203 of the DGCL</u> . The Corporation expressly elects not to be subject to the provisions of Section 203 of the DGCL.

Section 2.    <u>Business Combinations with Interested Stockholders</u> . Notwithstanding any other provision in this Certificate of Incorporation to the contrary, the Corporation shall not engage in any Business Combination (as defined hereinafter) with any Interested Stockholder (as defined hereinafter) for a period of three years following the time that such stockholder became an Interested Stockholder, unless:

(a)    prior to such time the Board of Directors approved either the Business Combination or the transaction which resulted in such stockholder becoming an Interested Stockholder;

(b)    upon consummation of the transaction which resulted in such stockholder becoming an Interested Stockholder, such stockholder owned at least eighty-five percent (85%) of the Voting Stock of the Corporation outstanding at the time the transaction commenced, excluding for purposes of determining the Voting Stock outstanding (but not the outstanding Voting Stock owned by such Interested Stockholder) those shares owned (i) by Persons (as defined hereinafter) who are directors and also officers of the Corporation and (ii) employee stock plans of the Corporation in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

(c)    at or subsequent to such time the Business Combination is approved by the Board of Directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least sixty-six and two-thirds percent (66 $2/3$ %) of the outstanding Voting Stock which is not owned by such Interested Stockholder.

Section 3.    <u>Exceptions to Prohibition on Interested Stockholder Transactions</u> . The restrictions contained in this ARTICLE TEN shall not apply if:

(a)    a stockholder becomes an Interested Stockholder inadvertently and (i) as soon as practicable divests itself of ownership of sufficient shares so that the stockholder ceases to be an Interested Stockholder; and (ii) would not, at any time within the three- year period immediately prior to a Business Combination between the Corporation and such stockholder, have been an Interested Stockholder but for the inadvertent acquisition of ownership; or

(b)    the Business Combination is proposed prior to the consummation or abandonment of and subsequent to the earlier of the public announcement or the notice required hereunder of a proposed transaction which (i) constitutes one of the transactions described in the second sentence of this Section 3(b) of ARTICLE TEN; (ii) is with or by a Person who either was not an Interested Stockholder during the previous three years or who became an Interested Stockholder with the approval of the Board of Directors; and (iii) is approved or not opposed by a majority of the directors then in office (but not less than one) who were directors prior to any Person becoming an Interested Stockholder during the previous three years or were recommended for election or elected to succeed such directors by a majority of such directors. The proposed transactions referred to in the preceding sentence are limited to (x) a merger or consolidation of the Corporation (except for a merger in respect of which, pursuant to Section 251(f) of the DGCL, no vote of the stockholders of the Corporation is required); (y) a sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation (other than to any direct or indirect wholly-owned subsidiary or to the Corporation) having an aggregate market value equal to fifty percent (50%) or more of either that aggregate market value of all of the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding Stock (as defined hereinafter) of the Corporation; or (z) a proposed tender or exchange offer for fifty percent (50%) or more of the outstanding Voting Stock of the Corporation. The Corporation shall give not less than 20 days' notice to all Interested Stockholders prior to the consummation of any of the transactions described in clause (x) or (y) of the second sentence of this Section 3(b) of ARTICLE TEN.

Section 4.    Definitions . As used in this ARTICLE TEN only, and unless otherwise provided by the express terms of this ARTICLE TEN, the following terms shall have the meanings ascribed to them as set forth in this Section 4:

(a)    " Affiliate " means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another Person;

(b)    " Associate ," when used to indicate a relationship with any Person, means: (i) any corporation, partnership, unincorporated association or other entity of which such Person is a director, officer or partner or is, directly or indirectly, the owner of twenty percent (20%) or more of any class of Voting Stock; (ii) any trust or other estate in which such Person has at least a twenty percent (20%) beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such Person, or any relative of such spouse, who has the same residence as such Person;

(c)    " Business Combination " means:

(i)    any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation with (A) the Interested Stockholder, or (B) any other corporation, partnership, unincorporated association or entity if the merger or consolidation is caused by the Interested Stockholder and as a result of such merger or consolidation Section 2 of this ARTICLE TEN is not applicable to the surviving entity;

(ii)    any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the Interested Stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to ten percent (10%) or more of either the aggregate market value of all the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding Stock of the Corporation;

(iii)    any transaction which results in the issuance or transfer by the Corporation or by any direct or indirect majority-owned subsidiary of the Corporation of any Stock of the Corporation or of such subsidiary to the Interested Stockholder, except: (A) pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into Stock of the Corporation or any such subsidiary which securities were outstanding prior to the time that the Interested Stockholder became such; (B) pursuant to an exchange of LLC Units into Class A Common Stock, to the extent provided in the Exchange Agreement and the LLC Agreement, (C) pursuant to a merger under Section 251(g) of the DGCL; (D) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into Stock of the Corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of Stock of the Corporation subsequent to the time the Interested Stockholder became such; (E) pursuant to an exchange offer by the Corporation to purchase Stock made on the same terms to all holders of such Stock; or (F) any issuance or transfer of Stock by the Corporation; *provided however* , that in no case under items (D)-(F) of this Section 4(c)(iii) of ARTICLE TEN shall there be an increase in the Interested Stockholder's proportionate share of the Stock of any class or series of the Corporation or of the Voting Stock of the Corporation;

(iv)    any transaction involving the Corporation or any direct or indirect majority-owned subsidiary of the Corporation which has the effect, directly or indirectly, of increasing the proportionate share of the Stock of any class or series, or securities convertible into the Stock of any class or series, of the Corporation or of any such subsidiary which is owned by the Interested Stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of Stock not caused, directly or indirectly, by the Interested Stockholder; or

(v)   any receipt by the Interested Stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges or other financial benefits (other than those expressly permitted in Sections 4(c)(i)-(iv) of ARTICLE TEN) provided by or through the Corporation or any direct or indirect majority-owned subsidiary of the Corporation;

(d)   " Control ," including the terms " controlling ," " controlled by " and " under common control with ," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Voting Stock, by contract or otherwise. A Person who is the owner of twenty percent (20%) or more of the outstanding Voting Stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary; notwithstanding the foregoing, a presumption of control shall not apply where such Person holds Voting Stock, in good faith and not for the purpose of circumventing this ARTICLE TEN, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group (as such term is used in Rule 13d-5 under the Securities Exchange Act of 1934, as such Rule is in effect as of the date of this Amended and Restated Certificate of Incorporation) have control of such entity;

(e)   " Interested Stockholder " means any Person (other than the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) that (i) is the owner of fifteen percent (15%) or more of the outstanding Voting Stock of the Corporation, or (ii) is an Affiliate or Associate of the Corporation and was the owner of fifteen percent (15%) or more of the outstanding Voting Stock of the Corporation at any time within the three-year period immediately prior to the date on which it is sought to be determined whether such Person is an Interested Stockholder, and the affiliates and associates of such Person. Notwithstanding anything in this ARTICLE TEN to the contrary, the term "Interested Stockholder" shall not include: (x) the Garcia Parties or any of their Affiliated Companies, or any other Person with whom any of the foregoing are acting as a group or in concert for the purpose of acquiring, holding, voting or disposing of shares of Stock of the Corporation, (y) any Person who would otherwise be an Interested Stockholder either in connection with or because of a transfer, sale, assignment, conveyance, hypothecation, encumbrance, or other disposition of five percent (5%) or more of the outstanding Voting Stock of the Corporation (in one transaction or a series of transactions) by the Garcia Parties or any of their affiliates or associates to such Person; *provided* , *however* , that such Person was not an Interested Stockholder prior to such transfer, sale, assignment, conveyance, hypothecation, encumbrance, or other disposition; or (z) any Person whose ownership of shares in excess of the fifteen percent (15%) limitation set forth herein is the result of action taken solely by the Corporation, *provided that* , for purposes of this clause (z) only, such Person shall be an Interested Stockholder if thereafter such Person acquires additional shares of Voting Stock of the Corporation, except as a result of further action by the Corporation not caused, directly or indirectly, by such Person;

(f)    " Owner ," including the terms " own " and " owned ," when used with respect to any Stock, means a Person that individually or with or through any of its Affiliates or Associates beneficially owns such Stock, directly or indirectly; or has (A) the right to acquire such Stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; *provided , however* , that a Person shall not be deemed the owner of Stock tendered pursuant to a tender or exchange offer made by such Person or any of such Person's Affiliates or Associates until such tendered Stock is accepted for purchase or exchange; or (B) the right to vote such Stock pursuant to any agreement, arrangement or understanding; *provided , however* , that a Person shall not be deemed the owner of any Stock because of such Person's right to vote such Stock if the agreement, arrangement or understanding to vote such Stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more Persons; or has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in (B) of this Section 4(f) of ARTICLE TEN), or disposing of such Stock with any other Person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such Stock; *provided* , that, for the purpose of determining whether a Person is an Interested Stockholder, the Voting Stock of the Corporation deemed to be outstanding shall include Stock deemed to be owned by the Person through application of this definition of "owned" but shall not include any other unissued Stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise;

(g)    " Person " means any individual, corporation, partnership, unincorporated association or other entity;

(h)    " Stock " means, with respect to any corporation, any capital stock of such corporation and, with respect to any other entity, any equity interest of such entity; and

(i)    " Voting Stock " means, with respect to any corporation, Stock of any class or series entitled to vote generally in the election of directors and, with respect to any entity that is not a corporation, any equity interest entitled to vote generally in the election of the governing body of such entity. Every reference to a percentage of Voting Stock shall refer to such percentage of the votes of such Voting Stock.

**ARTICLE ELEVEN**

Section 1.    Amendments to the Bylaws . Subject to the rights of holders of any series of Preferred Stock then outstanding, in furtherance and not in limitation of the powers conferred by law, prior to the Trigger Date, the Bylaws may be amended, altered or repealed and new bylaws made by, (i) the Board or (ii) in addition to any other vote otherwise required by law, the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation, voting together as a single class. On and after the Trigger Date, the Bylaws may be amended, altered or repealed and new bylaws made by (i) the Board or (ii) in addition to any other vote otherwise required by law, the affirmative vote of the holders of at

least sixty-six and two-thirds percent (66 $2/3$ %) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class.

Section 2.    <u>Amendments to this Certificate of Incorporation</u> . Subject to the rights of holders of any series of Preferred Stock then outstanding, notwithstanding any other provision of this Certificate of Incorporation or the Bylaws, and in addition to any affirmative vote of the holders of any particular class or series of the capital stock required by law or otherwise, no provision of ARTICLE SIX, ARTICLE SEVEN, ARTICLE EIGHT, ARTICLE TEN, ARTICLE ELEVEN or ARTICLE TWELVE of this Certificate of Incorporation may be altered, amended or repealed in any respect, nor may any provision of this Certificate of Incorporation or the Bylaws inconsistent therewith be adopted, unless in addition to any other vote required by this Certificate of Incorporation or otherwise required by law, (i) prior to the Trigger Date, such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class, and (ii) from and after the Trigger Date, such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 $2/3$ %) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in an election of directors, voting together as a single class, at a meeting of the Corporation's stockholders called for that purpose.

**ARTICLE TWELVE**

Section 1.    <u>Exclusive Forum</u> . Unless this Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the United States District Court for the District of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware, the Certificate of Incorporation or the Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine. As used in this Certificate of Incorporation, the term " <u>Claim</u> " means the actions, proceedings or claims referred to in clauses (i) through (iv) on this Section 1.

Section 2.    <u>Notice</u> . Any Person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation (including, without limitation, shares of Common Stock) shall be deemed to have notice of and to have consented to the provisions of this ARTICLE TWELVE.

**AMENDED AND RESTATED BYLAWS**

**OF**

**CARVANA CO.**

*A Delaware corporation*
(Adopted as of          , 2017)

ARTICLE I
OFFICES

Section 1.    Offices . Carvana Co. (the " Corporation ") may have an office or offices other than its registered office at such place or places, either within or outside the State of Delaware, as the Board of Directors of the Corporation (the " Board of Directors ") may from time to time determine or the business of the Corporation may require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

Section 1.    Place of Meetings . The Board of Directors may designate a place, if any, either within or outside the State of Delaware, as the place of meeting for any annual meeting or for any special meeting of stockholders.

Section 2.    Annual Meeting . An annual meeting of the stockholders shall be held at such date and time as is specified by resolution of the Board of Directors. At the annual meeting, stockholders shall elect directors to succeed those whose terms expire at such annual meeting and transact such other business as properly may be brought before the annual meeting pursuant to Section 10 of this ARTICLE II of these Amended and Restated Bylaws (these "Bylaws"). The Board of Directors may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board of Directors.

Section 3.    Special Meetings . Special meetings of the stockholders may only be called in the manner provided in the Corporation's certificate of incorporation as then in effect (the " Certificate of Incorporation "). Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice. The Board of Directors may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board of Directors.

Section 4.    Notice of Meetings . Whenever stockholders are required or permitted to take action at a meeting, notice of the meeting shall be given that shall state the place, if any, date, and time of the meeting of the stockholders, the means of remote communications, if any, by which stockholders and proxyholders not physically present may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given, not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the

record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided herein or required by law (meaning, here and hereinafter, as required from time to time by the General Corporation Law of the State of Delaware (the " DGCL ")) or the Certificate of Incorporation.

      (a)    Form of Notice . All such notices shall be delivered in writing or in any other manner permitted by the DGCL. If mailed, such notice shall be deemed given when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation. If given by facsimile telecommunication, such notice shall be deemed given when directed to a number at which the stockholder has consented to receive notice by facsimile. Subject to the limitations of Section 4(c) of this ARTICLE II, if given by electronic transmission, such notice shall be deemed to be delivered: (i) by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to the stockholder. An affidavit of the secretary or an assistant secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

      (b)    Waiver of Notice . Whenever notice is required to be given under any provisions of the DGCL, the Certificate of Incorporation or these Bylaws, a written waiver thereof, signed by the stockholder entitled to notice, or a waiver by electronic transmission given by the stockholder entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any meeting of the stockholders of the Corporation need be specified in any waiver of notice of such meeting. Attendance of a stockholder of the Corporation at a meeting of such stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened and does not further participate in the meeting.

      (c)    Notice by Electronic Transmission . Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the DGCL, the Certificate of Incorporation or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given. Any such consent shall be deemed revoked if: (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent or other person responsible for the giving of notice. However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. For purposes of these Bylaws, except as otherwise limited by applicable law, the term " electronic transmission " means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such recipient through an automated process.

2

Section 5.    <u>List of Stockholders</u> . The officer who has charge of the stock ledger of the Corporation shall prepare and make available, at least 10 days before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, <u>provided</u> , <u>however</u> , if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each such stockholder and the number of shares registered in the name of each such stockholder. Nothing contained in this section shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours, at the principal place of business of the Corporation. In the event the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Except as otherwise provided by law, the list shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 5 or to vote in person or by proxy at any meeting of stockholders.

Section 6.    <u>Quorum</u> . The holders of a majority in voting power of the outstanding capital stock entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by law, by the Certificate of Incorporation or these Bylaws. If a quorum is not present, the chairman of the meeting or the holders of a majority of the voting power present in person or represented by proxy at the meeting and entitled to vote at the meeting may adjourn the meeting to another time and/or place from time to time until a quorum shall be present or represented by proxy. When a specified item of business requires a vote by a class or series (if the Corporation shall then have outstanding shares of more than one class or series) voting as a separate class or series, the holders of a majority in voting power of the outstanding stock of such class or series shall constitute a quorum (as to such class or series) for the transaction of such item of business. A quorum once established at a meeting shall not be broken by the withdrawal of enough votes to leave less than a quorum.

Section 7.    <u>Adjourned Meetings</u> . Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place. When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted

3

at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and, except as otherwise required by law, shall not be more than 60 days nor less than 10 days before the date of such adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 8.    Vote Required . Subject to the rights of the holders of any series of preferred stock then outstanding, when a quorum has been established, all matters other than the election of directors shall be determined by the affirmative vote of the majority of voting power of capital stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter, unless by express provisions of an applicable law, the rules of any stock exchange upon which the Corporation's securities are listed, any regulation applicable to the Corporation or its securities, the Certificate of Incorporation or these Bylaws a minimum or different vote is required, in which case such express provision shall govern and control the vote required on such matter. Directors shall be elected by a plurality of the votes of the shares present and entitled to vote on the election of such directors.

Section 9.    Proxies . Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

Section 10.    Advance Notice of Stockholder Business and Director Nominations .

(a) Business at Annual Meetings of Stockholders .

(i)    Only such business (other than nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 10(b) of this ARTICLE II) shall be conducted at an annual meeting of the stockholders as shall have been brought before the meeting (A) as specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors or any committee thereof, (B) by or at the direction of the Board of Directors or any committee thereof, or (C) by any stockholder of the Corporation who (1) was a stockholder of record at the time of giving of notice provided for in Section 10(a)(iii) of this ARTICLE II and at the time of the meeting, (2) is entitled to vote at the meeting and (3) complies with the notice procedures set forth in Section 10(a)(iii) of this ARTICLE II. For the avoidance of doubt, the foregoing clause (C) of this Section 10(a)(i) of ARTICLE II shall be the exclusive means for a stockholder to propose

4

such business (other than business included in the Corporation's proxy materials pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the " Exchange Act ") or business brought by a Garcia Party (as defined in the Certificate of Incorporation) prior to the Trigger Date) before an annual meeting of stockholders. " Trigger Date " means the first date on which the Garcia Parties cease to beneficially own in the aggregate (directly or indirectly) at least twenty-five percent (25%) of the outstanding shares of Class A Common Stock (determined assuming that each LLC Unit owned by holders other than the Corporation were exchanged for Class A Common Stock in accordance with the terms and conditions of either the Exchange Agreement or the LLC Agreement). " LLC Unit " means the Common Units of Carvana Group, LLC. " Exchange Agreement " means that certain Exchange Agreement, dated as of or about the date hereof, by and among the Carvana Co. Sub LLC, Carvana Group, LLC and the LLC Unitholders party thereto (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof). " LLC Agreement " means that certain Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated as of or about the date hereof, by and among the Corporation, as manager, and the members of Carvana Group, LLC (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(ii)    For any business (other than (A) nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 10(b) of this ARTICLE II or (B) business brought by a Garcia Party) to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in proper written form as described in Section 10(a)(iii) of this ARTICLE II to the Secretary; any such proposed business must be a proper matter for stockholder action and the stockholder and the Stockholder Associated Person (as defined in Section 10(e) of this ARTICLE II) must have acted in accordance with the representations set forth in the Solicitation Statement (as defined in Section 10(a)(iii) of this ARTICLE II) required by these Bylaws. To be timely, a stockholder's notice for such business (other than such a notice by a Garcia Party prior to the Trigger Date, which may be delivered at any time up to thirty-five (35) days prior to the next annual meeting of stockholders) must be received by the Secretary at the principal executive offices of the Corporation in proper written form not less than ninety (90) days and not more than one hundred twenty (120) days prior to the first anniversary of the preceding year's annual meeting of stockholders (which date shall, for purposes of the Corporation's first annual meeting of stockholders after its shares of Class A Common Stock are first publicly traded, be deemed to have occurred on          , 2017); provided , however , that if and only if the annual meeting is not scheduled to be held within a period that commences thirty (30) days before such anniversary date and ends thirty (30) days after such anniversary date, or if no annual meeting was held in the preceding year (other than for purposes of the Corporation's first annual meeting of stockholders after its shares of Class A Common Stock are first publicly traded), such stockholder's notice must be delivered by the later of (A)

5

the tenth day following the day the Public Announcement (as defined in Section 10(e) of this ARTICLE II) of the date of the annual meeting is first made or (B) the date which is ninety (90) days prior to the date of the annual meeting. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above. Notices delivered pursuant to Section 10(a) of this ARTICLE II will be deemed received on any given day if received prior to the close of business on such day (and otherwise on the next succeeding day).

(iii)   To be in proper written form, a stockholder's notice to the Secretary must set forth as to each matter of business the stockholder proposes to bring before the annual meeting

(A)   a brief description of the business desired to be brought before the annual meeting (including the specific text of any resolutions or actions proposed for consideration and if such business includes a proposal to amend these Bylaws, the specific language of the proposed amendment) and the reasons for conducting such business at the annual meeting,

(B)   the name and address of the stockholder proposing such business, as they appear on the Corporation's books, the name and address (if different from the Corporation's books) of such proposing stockholder, and the name and address of any Stockholder Associated Person,

(C)   the class or series and number of shares of stock of the Corporation which are directly or indirectly held of record or beneficially owned by such stockholder or by any Stockholder Associated Person, a description of any Derivative Positions (as defined in Section 10(e) of this ARTICLE II) directly or indirectly held or beneficially held by the stockholder or any Stockholder Associated Person, and whether and to the extent to which a Hedging Transaction (as defined in Section 10(e) of this ARTICLE II) has been entered into by or on behalf of such stockholder or any Stockholder Associated Person,

(D)   a description of all arrangements or understandings between or among such stockholder or any Stockholder Associated Person and any other person or entity (including their names) in connection with the proposal of such business by such stockholder and any material interest of such stockholder, any Stockholder Associated Person or such other person or entity in such business,

(E)   a representation that such stockholder is a stockholder of record of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the annual meeting to bring such business before the meeting,

6

(F)    any other information related to such stockholder or any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with the solicitation of proxies or consents (even if a solicitation is not involved) by such stockholder or Stockholder Associated Person in support of the business proposed to be brought before the meeting pursuant to Section 14 of the Exchange Act, and the rules, regulations and schedules promulgated thereunder and

(G)    a representation as to whether such stockholder or any Stockholder Associated Person intends or is part of a group which intends to deliver a proxy statement and/or form of proxy to the holders of at least the percentage of the Corporation's outstanding capital stock required to approve the proposal or otherwise to solicit proxies or votes from stockholders in support of the proposal (such representation, a " Solicitation Statement ").

In addition, any stockholder who submits a notice pursuant to Section 10(a) of this ARTICLE II is required to update and supplement the information disclosed in such notice, if necessary, in accordance with Section 10(d) of this ARTICLE II.

(iv)    Notwithstanding anything in these Bylaws to the contrary, no business (other than nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 10(b) of this ARTICLE II) shall be conducted at an annual meeting except in accordance with the procedures set forth in Section 10(a) of this ARTICLE II.

(b)    Nominations at Annual Meetings of Stockholders .

(i)    Only persons who are nominated in accordance and compliance with the procedures set forth in this Section 10(b) of ARTICLE II shall be eligible for election to the Board of Directors at an annual meeting of stockholders.

(ii)    Nominations of persons for election to the Board of Directors of the Corporation may be made at an annual meeting of stockholders only (A) by or at the direction of the Board of Directors or any committee thereof or (B) by any stockholder of the Corporation who (1) was a stockholder of record at the time of giving of notice provided for in this Section 10(b)(iii) of ARTICLE II and at the time of the annual meeting, (2) is entitled to vote at the meeting and (3) complies with the notice procedures set forth in this Section 10(b) (iii) of ARTICLE II. For the avoidance of doubt, clause (B) of this Section 10(b)(ii) of ARTICLE II shall be the exclusive means for a stockholder to make nominations of persons for election to the Board of Directors at an annual meeting of stockholders. For nominations to be properly brought by a stockholder at an annual meeting of stockholders, the stockholder must have given timely notice thereof in proper written form as described in Section 10(b)(iii) of this ARTICLE II to the Secretary and the stockholder and the Stockholder Associated Person must have

7

acted in accordance with the representations set forth in the Nomination Solicitation Statement required by these Bylaws. To be timely, a stockholder's notice for the nomination of persons for election to the Board of Directors (other than such a notice by a Garcia Party prior to the Trigger Date, which may be delivered at any time up to thirty-five (35) days prior to the next annual meeting of stockholders) must be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not less than ninety (90) days and not more than one hundred twenty (120) days prior to the first anniversary of the preceding year's annual meeting of stockholders (which date shall, for purposes of the Corporation's first annual meeting of stockholders after its shares of Class A Common Stock are first publicly traded, be deemed to have occurred on        , 2017); provided , however , that if and only if the annual meeting is not scheduled to be held within a period that commences thirty (30) days before such anniversary date and ends thirty (30) days after such anniversary date, or if no annual meeting was held in the preceding year (other than for purposes of the Corporation's first annual meeting of stockholders after its shares of Class A Common Stock are first publicly traded), such stockholder's notice must be delivered by the later of the tenth day following the day the Public Announcement of the date of the annual meeting is first made and the date which is ninety (90) days prior to the date of the annual meeting. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above. Notices delivered pursuant to this Section 10(b) of ARTICLE II will be deemed received on any given day if received prior to the close of business on such day (and otherwise on the next succeeding day).

(iii)   To be in proper written form, a stockholder's notice to the Secretary shall set forth (A) as to each person that the stockholder proposes to nominate for election or re-election as a director of the Corporation, (1) the name, age, business address and residence address of the person, (2) the principal occupation or employment of the person, (3) the class or series and number of shares of capital stock of the Corporation which are directly or indirectly owned beneficially or of record by the person, (4) the date such shares were acquired and the investment intent of such acquisition and (5) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitation of proxies or consents for a contested election of directors (even if an election contest or proxy solicitation is not involved), or is otherwise required, pursuant to Section 14 of the Exchange Act, and the rules, regulations and schedules promulgated thereunder (including such person's written consent to being named in the proxy statement as a nominee, if applicable, and to serving as a director if elected), (B) as to the stockholder giving the notice, the name and address of such stockholder, as they appear on the Corporation's books, the name and address (if different from the Corporation's books) of such proposing stockholder, and the name and address of any Stockholder Associated Person, (C) the class or series and number of shares of stock of the Corporation which are directly or indirectly held of record or beneficially owned by such stockholder or by any Stockholder Associated Person

8

with respect to the Corporation's securities, a description of any Derivative Positions directly or indirectly held or beneficially held by the stockholder or any Stockholder Associated Person, and whether and the extent to which a Hedging Transaction has been entered into by or on behalf of such stockholder or any Stockholder Associated Person, (D) a description of all arrangements or understandings (including financial transactions and direct or indirect compensation) between or among such stockholder or any Stockholder Associated Person and each proposed nominee and any other person or entity (including their names) pursuant to which the nomination(s) are to be made by such stockholder, (E) a representation that such stockholder is a holder of record of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the persons named in its notice, (F) any other information relating to such stockholder or any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitation of proxies or consents for a contested election of directors (even if an election contest or proxy solicitation is not involved), or otherwise required, pursuant to Section 14 of the Exchange Act, and the rules, regulations and schedules promulgated thereunder, and (G) a representation as to whether such stockholder or any Stockholder Associated Person intends or is part of a group which intends to deliver a proxy statement and/or form of proxy to the holders of a sufficient number of the Corporation's outstanding shares reasonably believed by the stockholder or any Stockholder Associated Person, as the case may be, to elect each proposed nominee or otherwise to solicit proxies or votes from stockholders in support of the nomination (such representation, a " Nomination Solicitation Statement "). In addition, any stockholder who submits a notice pursuant to this Section 10(b) of ARTICLE II is required to update and supplement the information disclosed in such notice, if necessary, in accordance with Section 10(d) of this ARTICLE II and shall comply with Section 10(f) of this ARTICLE II.

(iv)    Notwithstanding anything in Section 10(b)(ii) of this ARTICLE II to the contrary, if the number of directors to be elected to the Board of Directors is increased effective after the time period for which nominations would otherwise be due under paragraph 10(b)(ii) of this Article II and there is no Public Announcement naming the nominees for additional directorships at least ten (10) days prior to the last day a stockholder may deliver a notice of nomination in accordance with Section 10(b)(ii), a stockholder's notice required by Section 10(b)(ii) of this ARTICLE II shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth day following the day on which such Public Announcement is first made by the Corporation.

(c)    Special Meetings of Stockholders . Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the notice of meeting. Only persons who are nominated in accordance and compliance with the procedures set forth in this Section 10(c) of ARTICLE II shall be eligible for election to the

9

Board of Directors at a special meeting of stockholders at which directors are to be elected. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the notice of meeting only (i) by or at the direction of the Board of Directors, any committee thereof, or stockholders (if stockholders are permitted to call a special meeting of stockholders pursuant to Section 2 of Article EIGHT of the Certificate of Incorporation) or (ii) provided that the Board of Directors or stockholders (if stockholders are permitted to call a special meeting of stockholders pursuant to Section 2 of Article Eight of the Certificate of Incorporation) has determined that directors are to be elected at such special meeting, by any stockholder of the Corporation who (A) was a stockholder of record at the time of giving of notice provided for in this Section 10(c) of ARTICLE II and at the time of the special meeting, (B) is entitled to vote at the meeting and (C) complies with the notice procedures provided for in this Section 10(c) of ARTICLE II. For the avoidance of doubt, the foregoing clause (ii) of this Section 10(c) of ARTICLE II shall be the exclusive means for a stockholder to propose nominations of persons for election to the Board of Directors at a special meeting of stockholders at which directors are to be elected. For nominations to be properly brought by a stockholder at a special meeting of stockholders, the stockholder must have given timely notice thereof in proper written form as described in this Section 10(c) of ARTICLE II to the Secretary. To be timely, a stockholder's notice for the nomination of persons for election to the Board of Directors (other than such a notice by a Garcia Party prior to the Trigger Date, which may be delivered at any time up to the later of (i) thirty-five (35) days prior to the special meeting of stockholders and (ii) the tenth day following the day on which a Public Announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting) must be received by the Secretary at the principal executive offices of the Corporation not earlier than the 120th day prior to such special meeting and not later than the close of business on the later of the 90th day prior to such special meeting or the tenth day following the day on which a Public Announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall any adjournment or postponement of a special meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above. Notices delivered pursuant to this Section 10(c) of ARTICLE II will be deemed received on any given day if received prior to the close of business on such day (and otherwise on the next succeeding day). To be in proper written form, such stockholder's notice shall set forth all of the information required by, and otherwise be in compliance with, Section 10(b)(iii) of this ARTICLE II. In addition, any stockholder who submits a notice pursuant to this Section 10(c) of ARTICLE II is required to update and supplement the information disclosed in such notice, if necessary, in accordance with Section 10(d) of this ARTICLE II and shall comply with Section 10(f) of this ARTICLE II.

(d)    Update and Supplement of Stockholder ' s Notice. Any stockholder who submits a notice of proposal for business or nomination for election pursuant to this Section 10 of ARTICLE II is required to update and supplement the information disclosed in such notice, if necessary, so that the information provided or required to be provided in such notice shall be true and correct as of the record date for determining the stockholders entitled to notice of the meeting of stockholders and as of the date that is ten (10) business days prior to such meeting of the stockholders or any adjournment or postponement thereof, and such update and supplement shall be received by the Secretary at the principal executive offices of the Corporation not later

10

than the close of business on the fifth business day after the record date for the meeting of stockholders (in the case of the update and supplement required to be made as of the record date), and not later than the close of business on the eighth business day prior to the date for the meeting of stockholders or any adjournment or postponement thereof (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting of stockholders or any adjournment or postponement thereof).

(e)  Definitions . For purposes of this Section 10 of ARTICLE II, the term:

(i)  " Derivative Positions " means, with respect to a stockholder or any Stockholder Associated Person, any derivative positions including, without limitation, any short position, profits interest, option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the Corporation or otherwise and any performance-related fees to which such stockholder or any Stockholder Associated Person is entitled based, directly or indirectly, on any increase or decrease in the value of shares of capital stock of the Corporation;

(ii)  " Hedging Transaction " means, with respect to a stockholder or any Stockholder Associated Person, any hedging or other transaction (such as borrowed or loaned shares) or series of transactions, or any other agreement, arrangement or understanding, the effect or intent of which is to increase or decrease the voting power or economic or pecuniary interest of such stockholder or any Stockholder Associated Person with respect to the Corporation's securities;

(iii)  " Public Announcement " means disclosure in a press release reported by the Dow Jones News Service, Associated Press, Business Wire, PR Newswire or comparable news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and

(iv)  " Stockholder Associated Person " of any stockholder means (A) any person controlling, directly or indirectly, or acting in concert with, such stockholder, (B) any beneficial owner of shares of stock of the Corporation owned of record or beneficially by such stockholder or (C) any person directly or indirectly controlling, controlled by or under common control with such Stockholder Associated Person.

(f)  Submission of Questionnaire, Representation and Agreement . To be qualified to be a nominee for election or reelection as a director of the Corporation, a person must deliver (in the case of a person nominated by a stockholder in accordance with Sections 10(b) or 10(c) of this ARTICLE II, in accordance with the time periods prescribed for delivery of notice under such sections) to the Secretary at the principal executive offices of the Corporation

11

a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request) and a written representation and agreement (in the form provided by the Secretary upon written request) that such person (i) is not and will not become a party to (A) any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (a " Voting Commitment ") that has not been disclosed to the Corporation or (B) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (ii) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed therein and (iii) would be in compliance, and if elected as a director of the Corporation will comply, with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation. The Corporation may also require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve either as a director of the Corporation or as an independent director of the Corporation under applicable Securities and Exchange Commission and stock exchange rules and the Corporation's publicly disclosed corporate governance guidelines, or that could be material to a reasonable stockholder's understanding of the qualifications and/or independence, or lack thereof, of such nominee, as determined in the Board of Directors' sole discretion.

(g)    Authority of Chairman; General Provisions . Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, the chairman of the meeting shall have the power and duty to determine whether any nomination or other business proposed to be brought before the meeting was made or brought in accordance with the procedures set forth in these Bylaws (including whether the stockholder or Stockholder Associated Person, if any, on whose behalf the nomination or proposal is made or solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies or votes in support of such stockholder's nominee or proposal in compliance with such stockholder's representation as required by Section 10(a)(iii)(G) or Section 10(b)(iii)(G), as applicable, of these Bylaws) and, if any nomination or other business is not made or brought in compliance with these Bylaws, to declare that such nomination or proposal of other business be disregarded and not acted upon. Notwithstanding the foregoing provisions of this Section 10, unless otherwise required by law, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or proposed business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 10, to be considered a qualified representative of the stockholder, a person must be a duly authorized officer, manager or partner of such stockholder or must be authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders.

12

(h)    Compliance with Exchange Act . Notwithstanding the foregoing provisions of these Bylaws, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules, regulations and schedules promulgated thereunder with respect to the matters set forth in these Bylaws; provided, however, that any references in these Bylaws to the Exchange Act or the rules, regulations and schedules promulgated thereunder are not intended to and shall not limit the requirements applicable to any nomination or other business to be considered pursuant to Section 10 of this ARTICLE II.

(i)    Effect on Other Rights . Nothing in these Bylaws shall be deemed to (A) affect any rights of the stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act, (B) confer upon any stockholder a right to have a nominee or any proposed business included in the Corporation's proxy statement, except as set forth in the Certificate of Incorporation or these Bylaws, (C) affect any rights of the holders of any series of preferred stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation or (D) limit the exercise, the method or timing of the exercise of, the rights of any person granted by the Corporation to nominate directors, which rights may be exercised without compliance with the provisions of this Section 10 of ARTICLE II.

Section 11.    Fixing a Record Date for Stockholder Meetings . In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, except as otherwise required by law, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 days nor less than 10 days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is first given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting in conformity herewith; and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 11 at the adjourned meeting.

Section 12.    Action by Stockholders Without a Meeting . So long as stockholders of the Corporation have the right to act by written consent in accordance with Section 1 of ARTICLE EIGHT of the Certificate of Incorporation, the following provisions shall apply:

(a)    Record Date . For the purpose of determining the stockholders entitled to consent to corporate action in writing without a meeting as may be permitted by the Certificate of Incorporation or the certificate of designation relating to any outstanding class or series of

13

preferred stock, the Board of Directors may fix a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) (or the maximum number permitted by applicable law) days after the date on which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder of record seeking to have the stockholders authorize or take action by written consent shall, by written notice to the Secretary, request that the Board of Directors fix a record date, which notice shall include the text of any proposed resolutions. If no record date has been fixed by the Board of Directors pursuant to this Section 12(a) or otherwise within ten (10) days of receipt of a valid request by a stockholder, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required pursuant to applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation pursuant to Section 12(b); provided , however , that if prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall in such an event be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(b)     Generally . Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless written consents signed by a sufficient number of stockholders to take such action are delivered to the Corporation, in the manner required by this Section 12, within sixty (60) (or the maximum number permitted by applicable law) days of the date of the earliest dated consent delivered to the Corporation in the manner required by applicable law. The validity of any consent executed by a proxy for a stockholder pursuant to an electronic transmission transmitted to such proxy holder by or upon the authorization of the stockholder shall be determined by or at the direction of the Secretary. A written record of the information upon which the person making such determination relied shall be made and kept in the records of the proceedings of the stockholders. Any such consent shall be inserted in the minute book as if it were the minutes of a meeting of stockholders. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given by the Corporation (at its expense) to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consent signed by a sufficient number of holders to take the action were delivered to the Corporation.

Section 13.     Conduct of Meetings .

(a)     Generally . Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in the Chairman's absence or disability, by the Chief Executive Officer, or in the Chief Executive Officer's absence or disability, by the President, or in the President's absence or disability, by a Vice President (in the order as determined by the Board of Directors), or in the absence or disability of the foregoing persons by a chairman designated by the Board of Directors, or in the absence or disability of such person, by a chairman chosen at the meeting. The Secretary shall act as secretary of the meeting, but in the Secretary's absence or disability the chairman of the meeting may appoint any person to act as secretary of the meeting.

14

(b)     Rules, Regulations and Procedures . The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate including, without limitation, such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. Except to the extent inconsistent with such rules, regulations and procedures as adopted by the Board of Directors, the chairman of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The chairman of the meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a nomination or matter or business was not properly brought before the meeting and if such chairman should so determine, such chairman shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The chairman of the meeting shall announce at the meeting when the polls for each matter to be voted upon at the meeting will be opened and closed. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted. The chairman of the meeting shall have the power, right and authority, for any or no reason, to convene, recess and/or adjourn any meeting of stockholders.

(c)     Inspectors of Elections . The Corporation may, and to the extent required by law shall, in advance of any meeting of stockholders, appoint one or more inspectors of election to act at the meeting and make a written report thereof. One or more other persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Unless otherwise required by law, inspectors may be officers, employees or agents of the Corporation. No person who is a candidate for an office at an election may serve as an inspector at such election. Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability. The inspector shall have the duties prescribed by law and, when the vote is completed, shall make a certificate of the result of the vote taken and of such other facts as may be required by law. Every vote taken by ballot shall be counted by a duly appointed inspector or duly appointed inspectors.

15

ARTICLE III
DIRECTORS

Section 1.    General Powers . The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by the Certificate of Incorporation or these Bylaws, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation except for such powers, acts and things that are by the DGCL, the Certificate of Incorporation or these Bylaws required to be exercised or done by the stockholders.

Section 2.    Annual Meetings . The annual meeting of the Board of Directors shall be held without other notice than this Bylaw immediately after, and at the same place as, the annual meeting of stockholders. In the event that the annual meeting of stockholders takes place telephonically or through any other means by which the stockholders do not convene in any one location, the annual meeting of the Board of Directors shall be held at the principal offices of the Corporation immediately after the annual meeting of the stockholders.

Section 3.    Regular Meetings and Special Meetings . Regular meetings, other than the annual meeting, of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by resolution of the Board of Directors and publicized among all directors. Special meetings of the Board of Directors may be called by (i) the Chairman of the Board, if any, (ii) by the Secretary upon the written request of a majority of the directors then in office or (iii) by a Garcia Party so long as such Garcia Party beneficially owns any shares of the Corporation's Class B Common Stock, and in each case shall be held at the place, if any, on the date and at the time as he, she or they shall fix. Any and all business may be transacted at a special meeting of the Board of Directors.

Section 4.    Notice of Meetings . Notice of regular meetings of the Board of Directors need not be given except as otherwise required by law or these Bylaws. Notice of each special meeting of the Board of Directors, and of each regular and annual meeting of the Board of Directors for which notice is required, shall be given by the Secretary as hereinafter provided in this Section 4. Such notice shall be state the date, time and place, if any, of the meeting. Notice of any special meeting, and of any regular or annual meeting for which notice is required, shall be given to each director at least (a) twenty-four (24) hours before the meeting if by telephone or by being personally delivered or sent by telex, telecopy, electronic transmission, email or similar means or (b) five (5) days before the meeting if delivered by mail to the director's residence or usual place of business. Such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage prepaid, or when transmitted if sent by telex, telecopy, electronic transmission, email or similar means. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

Section 5.    Waiver of Notice . Any director may waive notice of any meeting of directors by a writing signed by the director or by electronic transmission. Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the

16

express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened and does not further participate in the meeting. Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

Section 6.    Chairman of the Board, Quorum, Required Vote and Adjournment . The Board of Directors may elect, by the affirmative vote of a majority of the directors then in office, a Chairman of the Board. The Chairman of the Board must be a director and may be an officer of the Corporation. Subject to the provisions of these Bylaws and the direction of the Board of Directors, he or she shall perform all duties and have all powers which are commonly incident to the position of Chairman of the Board or which are delegated to him or her by the Board of Directors, preside at all meetings of the stockholders and Board of Directors at which he or she is present and have such powers and perform such duties as the Board of Directors may from time to time prescribe. If the Chairman of the Board is not present at a meeting of the Board of Directors, the Chief Executive Officer (if the Chief Executive Officer is a director and is not also the Chairman of the Board) shall preside at such meeting, and, if the Chief Executive Officer is not present at such meeting, a majority of the directors present at such meeting shall elect one of the directors present at the meeting to so preside. At all meetings of the Board of Directors, a majority of the total number of directors shall constitute a quorum for the transaction of business. Unless by express provision of an applicable law, the Certificate of Incorporation or these Bylaws a different vote is required, the vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may, to the fullest extent permitted by law, adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 7.    Committees .

(a)    The Board of Directors may designate one or more committees, including an executive committee, consisting of one or more of the directors of the Corporation, and any committees required by the rules and regulations of such exchange as any securities of the Corporation are listed. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Except to the extent restricted by applicable law or the Certificate of Incorporation, each such committee, to the extent provided by the DGCL and in the resolution creating it, shall have and may exercise all the powers and authority of the Board of Directors. Each such committee shall serve at the pleasure of the Board of Directors. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors upon request.

(b)    Each committee of the Board of Directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a

17

resolution of the Board of Directors designating such committee. Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum. All matters shall be determined by a majority vote of the members present at a meeting at which a quorum is present. Unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board of Directors, of such committee is or are absent or disqualified, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

Section 8.    Action by Written Consent . Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 9.    Compensation . The Board of Directors shall have the authority to fix the compensation, including fees, reimbursement of expenses and equity compensation, of directors for services to the Corporation in any capacity, including for attendance of meetings of the Board of Directors or participation on any committees. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 10.    Reliance on Books and Records . A member of the Board of Directors, or a member of any committee designated by the Board of Directors shall, in the performance of such member's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board of Directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 11.    Telephonic and Other Meetings . Unless restricted by the Certificate of Incorporation, any one or more members of the Board of Directors or any committee thereof may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at a meeting.

ARTICLE IV
OFFICERS

Section 1.    Number and Election . Subject to the authority of Chief Executive Officer to appoint officers as set forth in Section 11 of this Article IV, the officers of the Corporation shall be elected by the Board of Directors and shall consist of a Chief Executive Officer, a

18

President, one or more Vice Presidents, a Secretary, a Chief Financial Officer, a Treasurer and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors. Any number of offices may be held by the same person. In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable.

Section 2.    Term of Office . Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3.    Removal . Any officer or agent of the Corporation may be removed with or without cause by the Board of Directors, a duly authorized committee thereof or by such officers as may be designated by a resolution of the Board of Directors, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any officer appointed by the Chief Executive Officer in accordance with Section 11 of this Article IV may also be removed by the Chief Executive Officer in his or her sole discretion.

Section 4.    Vacancies . Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors or the Chief Executive Officer in accordance with Section 11 of this Article IV.

Section 5.    Compensation . Compensation of all executive officers shall be approved by the Board of Directors or a duly authorized committee thereof, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

Section 6.    Chief Executive Officer . The Chief Executive Officer shall have the powers and perform the duties incident to that position. The Chief Executive Officer shall, in the absence of the Chairman of the Board, or if a Chairman of the Board shall not have been elected, preside at each meeting of (a) the Board of Directors if the Chief Executive Officer is a director or (b) the stockholders. Subject to the powers of the Board of Directors and the Chairman of the Board, the Chief Executive Officer shall be in general and active charge of the entire business and affairs of the Corporation, and shall be its chief policy making officer. The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or provided in these Bylaws. The Chief Executive Officer is authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation. Whenever the President is unable to serve, by reason of sickness, absence or otherwise, the Chief Executive Officer shall perform all the duties and responsibilities and exercise all the powers of the President.

Section 7.    The President . The President of the Corporation shall, subject to the powers of the Board of Directors, the Chairman of the Board and the Chief Executive Officer, have general charge of the business, affairs and property of the Corporation, and control over its officers, agents and employees. The President shall see that all orders and resolutions of the Board of Directors are carried into effect. The President is authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation, except where

19

required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation. The President shall, in the absence of the Chief Executive Officer, act with all of the powers and be subject to all of the restrictions of the Chief Executive Officer. The President shall have such other powers and perform such other duties as may be prescribed by the Chairman of the Board, the Chief Executive Officer, the Board of Directors or as may be provided in these Bylaws.

Section 8.    Vice Presidents . The Vice President, or if there shall be more than one, the Vice Presidents, in the order determined by the Board of Directors or the Chairman of the Board, shall, perform such duties and have such powers as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe. The Vice Presidents may also be designated as Executive Vice Presidents or Senior Vice Presidents, as the Board of Directors may from time to time prescribe.

Section 9.    The Secretary and Assistant Secretaries . The Secretary shall attend all meetings of the Board of Directors (other than executive sessions thereof) and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose or shall ensure that his or her designee attends each such meeting to act in such capacity. Under the Board of Directors' supervision, the Secretary shall give, or cause to be given, all notices required to be given by these Bylaws or by law; shall have such powers and perform such duties as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe; and shall have custody of the corporate seal of the Corporation. The Secretary, or an Assistant Secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature. The Assistant Secretary, or if there be more than one, any of the assistant secretaries, shall in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President, or Secretary may, from time to time, prescribe.

Section 10.    The Chief Financial Officerand the Treasurer . The Chief Financial Officer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation as shall be necessary or desirable in accordance with applicable law or generally accepted accounting principles; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the Chairman of the Board or the Board of Directors; shall receive, and give receipts for, moneys due and payable to the Corporation from any source whatsoever; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the financial condition and operations of the Corporation; shall have such powers and perform such duties as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe. The Treasurer, if any, shall in the absence or disability of the chief financial officer, perform the duties and exercise the

20

powers of the chief financial officer, subject to the power of the board of directors. The Treasurer, if any, shall perform such other duties and have such other powers as the board of directors may, from time to time, prescribe.

Section 11.    Appointed Officers . In addition to officers designated by the Board in accordance with this ARTICLE IV, the Chief Executive Officer shall have the authority to appoint other officers below the level of Board-appointed Vice President as the Chief Executive Officer may from time to time deem expedient and may designate for such officers titles that appropriately reflect their positions and responsibilities. Such appointed officers shall have such powers and shall perform such duties as may be assigned to them by the Chief Executive Officer or the senior officer to whom they report, consistent with corporate policies. An appointed officer shall serve until the earlier of such officer's resignation or such officer's removal by the Chief Executive Officer or the Board of Directors at any time, either with or without cause.

Section 12.    Other Officers, Assistant Officers and Agents . Officers, assistant officers and agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

Section 13.    Officers' Bonds or Other Security . If required by the Board of Directors, any officer of the Corporation shall give a bond or other security for the faithful performance of his duties, in such amount and with such surety as the Board of Directors may require.

Section 14.    Delegation of Authority . The Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

<div align="center">

ARTICLE V
CERTIFICATES OF STOCK

</div>

Section 1.    Form . The shares of stock of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. If shares are represented by certificates, the certificates shall be in such form as required by applicable law and as determined by the Board of Directors. Each certificate shall certify the number of shares owned by such holder in the Corporation and shall be signed by, or in the name of the Corporation by two authorized officers of the Corporation including but not limited to the Chairman of the Board, the President, a Vice President, the Treasurer, the Secretary or an Assistant Secretary of the Corporation. Any or all signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer, transfer agent or registrar of the Corporation whether because of death, resignation or otherwise before such certificate or certificates have been issued by the Corporation, such certificate or certificates may nevertheless be issued as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures

<div align="center">

21

</div>

have been used thereon had not ceased to be such officer, transfer agent or registrar of the Corporation at the date of issue. All certificates for shares shall be consecutively numbered or otherwise identified. The Board of Directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the Corporation. The Corporation, or its designated transfer agent or other agent, shall keep a book or set of books to be known as the stock transfer books of the Corporation, containing the name of each holder of record, together with such holder's address and the number and class or series of shares held by such holder and the date of issue. When shares are represented by certificates, the Corporation shall issue and deliver to each holder to whom such shares have been issued or transferred, certificates representing the shares owned by such holder, and shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation or its designated transfer agent or other agent of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps. In that event, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates and record the transaction on its books. When shares are not represented by certificates, shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, with such evidence of the authenticity of such transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps, and within a reasonable time after the issuance or transfer of such shares, the Corporation shall, if required by applicable law, send the holder to whom such shares have been issued or transferred a written statement of the information required by applicable law. Unless otherwise provided by applicable law, the Certificate of Incorporation, Bylaws or any other instrument, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

Section 2.    Lost Certificates . The Corporation may issue or direct a new certificate or certificates or uncertificated shares to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the owner of the lost, stolen or destroyed certificate. When authorizing such issue of a new certificate or certificates or uncertificated shares, the Corporation may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to give the Corporation a bond in such sum as it may direct, sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 3.    Registered Stockholders . The Corporation shall be entitled to recognize the exclusive right of a person registered on its records as the owner of shares of stock to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner. The Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares of stock on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by applicable law.

Section 4.    <u>Fixing a Record Date for Purposes Other Than Stockholder Meetings or Actions by Written Consent</u> . In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action (other than stockholder meetings and stockholder written consents which are expressly governed by Sections 12 and 13 of ARTICLE II hereof), the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

ARTICLE VI
GENERAL PROVISIONS

Section 1.    <u>Dividends</u> . Subject to and in accordance with applicable law, the Certificate of Incorporation and any certificate of designation relating to any series of preferred stock, dividends upon the shares of capital stock of the Corporation may be declared and paid by the Board of Directors, in accordance with applicable law. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock, subject to the provisions of applicable law and the Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends a reserve or reserves for any proper purpose. The Board of Directors may modify or abolish any such reserves in the manner in which they were created.

Section 2.    <u>Checks, Notes, Drafts, Etc</u> . All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

Section 3.    <u>Contracts</u> . In addition to the powers otherwise granted to officers pursuant to ARTICLE IV hereof, the Board of Directors may authorize any officer or officers, or any agent or agents, in the name and on behalf of the Corporation to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

Section 4.    <u>Loans</u> . Subject to compliance with applicable law (including Section 13(k) of the Securities Exchange Act of 1934), the Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiaries, including any officer or employee who is a director of the Corporation or its subsidiaries, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation. The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board of

23

Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation. Nothing in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

Section 5.    Fiscal Year . The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 6.    Corporate Seal . The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise. Notwithstanding the foregoing, no seal shall be required by virtue of this Section.

Section 7.    Voting Securities Owned By Corporation . Voting securities in any other corporation or entity held by the Corporation shall be voted by the Chairman of the Board, Chief Executive Officer, the President or the Chief Financial Officer, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer. Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8.    Inspection of Books and Records . Subject to applicable law, the Board of Directors shall have power from time to time to determine to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation, except as conferred by the laws of the State of Delaware, unless and until authorized so to do by resolution of the Board of Directors.

Section 9.    Facsimile Signatures . In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws and subject to applicable law, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Board of Directors.

Section 10.    Section Headings . Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 11.    Inconsistent Provisions . In the event that any provision (or part thereof) of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, any other applicable law or the Nomination Agreement, the provision (or part thereof) of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

Section 12.    Time Periods . Unless otherwise provided by applicable law or expressly provided herein, in applying any provision of these Bylaws that requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded and the day of the event shall be included.

24

ARTICLE VII

<u>INDEMNIFICATION</u>

Section 1.    <u>Right to Indemnification and Advancement</u> . Each person who was or is made a party or is threatened to be made a party to or is otherwise involved (including involvement, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative (a " <u>proceeding</u> "), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an " <u>indemnitee</u> "), whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), against all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time (" <u>ERISA</u> ") and any other penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided, however, that, except as provided in this Section 2 of this ARTICLE VII with respect to proceedings to enforce rights to indemnification and advance of expenses (as defined below), the Corporation shall indemnify and advance expenses to any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized in the specific case by the Board of Directors of the Corporation. The rights to indemnification and advance of expenses conferred in this Section 1 of ARTICLE VII shall be contract rights. In addition to the right to indemnification conferred herein, an indemnitee shall also have the right, to the fullest extent not prohibited by law, to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (an " <u>advance of expenses</u> "); provided, however, that if and to the extent that the DGCL requires, an advance of expenses shall be made only upon delivery to the Corporation of an undertaking (an " <u>undertaking</u> "), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a " <u>final adjudication</u> ") that such indemnitee is not entitled to be indemnified for such expenses under this Section 1 or otherwise. The Corporation may also, by action of its Board of Directors, provide indemnification and advancement to employees and agents of the Corporation. Any reference to an officer of the Corporation in this ARTICLE VII shall be deemed to refer exclusively to the Chairman of the Board of Directors, Chief Executive Officer, President, Secretary and Treasurer of the Corporation appointed pursuant to ARTICLE IV, and to any Vice President, Assistant Secretary, Assistant Treasurer or other officer of the Corporation appointed by the Board of Directors pursuant to ARTICLE IV of these By-laws, and any reference to an officer of any other enterprise shall be deemed to refer exclusively to an officer appointed by the board of directors or equivalent governing body of such other entity pursuant to the certificate of incorporation and bylaws or equivalent organizational documents of such other enterprise. The

25

fact that any person who is or was an employee of the Corporation or an employee of any other enterprise has been given or has used the title of "Vice President" or any other title that could be construed to suggest or imply that such person is or may be an officer of the Corporation or of such other enterprise shall not result in such person being constituted as, or being deemed to be, an officer of the Corporation or of such other enterprise for purposes of this ARTICLE VII.

Section 2.    Procedure for Indemnification . Any claim for indemnification or advance of expenses by an indemnitee under this Section 2 of ARTICLE VII shall be made promptly, and in any event within forty-five days (or, in the case of an advance of expenses, twenty days, provided that the director or officer has delivered the undertaking contemplated by Section 1 of this ARTICLE VII if required), upon the written request of the indemnitee. If the Corporation denies a written request for indemnification or advance of expenses, in whole or in part, or if payment in full pursuant to such request is not made within forty-five days (or, in the case of an advance of expenses, twenty days, provided that the indemnitee has delivered the undertaking contemplated by Section 1 of this ARTICLE VII if required), the right to indemnification or advances as granted by this ARTICLE VII shall be enforceable by the indemnitee in any court of competent jurisdiction. Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the Corporation to the fullest extent permitted by applicable law. It shall be a defense to any such action (other than an action brought to enforce a claim for the advance of expenses where the undertaking required pursuant to Section 1 of this ARTICLE VII, if any, has been tendered to the Corporation) that the claimant has not met the applicable standard of conduct which make it permissible under the DGCL for the Corporation to indemnify the claimant for the amount claimed, but the burden of proof shall be on the Corporation to the fullest extent permitted by law. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 3.    Insurance . The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was or has agreed to become a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise against any expense, liability or loss asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify such person against such expenses, liability or loss under the DGCL.

Section 4.    Service for Subsidiaries . Any person serving as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, at least 50% of whose equity interests are owned by the Corporation (a " subsidiary " for purposes of this ARTICLE VII) shall be conclusively presumed to be serving in such capacity at the request of the Corporation.

26

Section 5.    <u>Reliance</u> . Persons who after the date of the adoption of this provision become or remain directors or officers of the Corporation or who, while a director or officer of the Corporation, become or remain a director, officer, employee or agent of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this ARTICLE VII in entering into or continuing such service. To the fullest extent permitted by law, the rights to indemnification and to the advance of expenses conferred in this ARTICLE VII shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof. Any amendment, alteration or repeal of this ARTICLE VII that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

Section 6.    <u>Non-Exclusivity of Rights; Continuation of Rights of Indemnification</u> . The rights to indemnification and to the advance of expenses conferred in this ARTICLE VII shall not be exclusive of any other right which any person may have or hereafter acquire under the Certificate of Incorporation or under any statute, by-law, agreement, vote of stockholders or disinterested directors or otherwise. All rights to indemnification under this ARTICLE VII shall be deemed to be a contract between the Corporation and each director or officer of the Corporation who serves or served in such capacity at any time while this ARTICLE VII is in effect. Any repeal or modification of this ARTICLE VII or repeal or modification of relevant provisions of the DGCL or any other applicable laws shall not in any way diminish any rights to indemnification and advancement of expenses of such director or officer or the obligations of the Corporation arising hereunder with respect to any proceeding arising out of, or relating to, any actions, transactions or facts occurring prior to the final adoption of such repeal or modification.

Section 7.    <u>Merger or Consolidation</u> . For purposes of this ARTICLE VII, references to the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this ARTICLE VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 8.    <u>Savings Clause</u> . To the fullest extent permitted by law, if this ARTICLE VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify and advance expenses to each person entitled to indemnification under Section 1 of this ARTICLE VII as to all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, ERISA excise taxes and penalties and any other penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such person and for which indemnification and

27

advancement of expenses is available to such person pursuant to this ARTICLE VII to the fullest extent permitted by any applicable portion of this ARTICLE VII that shall not have been invalidated.

## ARTICLE VIII
### AMENDMENTS

These Bylaws may be amended, altered, changed or repealed or new Bylaws adopted only in accordance with Section 1 of ARTICLE ELEVEN of the Certificate of Incorporation.

\* \* \* \* \*

28

**SECOND AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT**

THIS SECOND AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this " Agreement ") is made as of [    ], 2017, by and among (i) Carvana Group, LLC, a Delaware limited liability company (the " Company "), (ii) Carvana Co., a Delaware corporation ( " Pubco "), (iii) the Person listed on the Schedule of Investors attached hereto as of the date hereof, and (iv) each of the other Persons (including Permitted Transferees of the CVAN Investor) set forth from time to time on the Schedule of Investors who, at any time, own securities of the Company or Pubco and enter into a joinder to this Agreement agreeing to be bound by the terms hereof (each Person identified in the foregoing (iii) and (iv), an " Investor " and, collectively, the " Investors "). Unless otherwise provided in this Agreement, capitalized terms used herein shall have the meanings set forth in Section  10 hereof.

WHEREAS, certain of the Investors are parties to a Unit Purchase Agreement, dated as of July 27, 2015 (the " July 2015 Purchase Agreement "), pursuant to which, among other things, such Investors agreed to purchase certain of the Company's Units;

WHEREAS, in order to induce the Investors to enter into the July 2015 Purchase Agreement and consummate the transactions contemplated thereby, the Company agreed to provide the registration rights set forth in that certain Registration Rights Agreement, dated as of July 27, 2015 (the " Original Agreement ");

WHEREAS, certain of the Investors are parties to a Unit Purchase Agreement, dated July 12, 2016 (the " July 2016 Purchase Agreement "), pursuant to which, among other things, such Investors agreed to purchase certain of the Company's Units;

WHEREAS, in order to induce the Investors to enter into the July 2016 Purchase Agreement and consummate the transactions contemplated thereby, the Company agreed to amend and restate the Original Agreement pursuant to that certain Amended and Restated Registration Rights Agreement, dated as of July 12, 2016 (the " Existing Agreement ") to provide the registration rights set forth in the Existing Agreement;

WHEREAS, the Existing Agreement contemplates the reorganization or conversion of the Company into a corporation prior to the Company's Initial Public Offering but does not contemplate an "Up-C" structure in connection with which proceeds from Pubco's Initial Public Offering would be contributed to a wholly owned subsidiary (" Carvana Co. Sub ") and then used to purchase Units and thereafter Units held by parties other than Carvana Co. Sub would be exchangeable for Common Stock of Pubco (an " Up-C IPO ");

WHEREAS, the Company intends to effect an Up-C IPO; and

WHEREAS, the parties hereto desire to amend and restate the Existing Agreement in its entirety by entering into this Agreement in order to provide for the Up-C IPO and to make certain other changes to the registration rights of the Investors.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.  Demand Registrations .

(a)   Requests for Registration . Subject to the terms and conditions of this Agreement, at any time after 180 days following the consummation of Pubco's Initial Public Offering pursuant to an Up-C IPO, the holders of Registrable Securities may request registration under the Securities Act of all or any portion of their Registrable Securities on Form S-1 or any similar long-form registration statement (" Long -Form Registrations ") or, if available, on Form S-3 (including a shelf registration pursuant to Rule 415 under the Securities Act) or any similar short-form registration statement, including an automatic shelf registration statement (as defined in Rule 405) (an " Automatic Shelf Registration Statement "), if available to Pubco (" Short -Form Registrations ") in accordance with Section 1(b) and Section 1(c) below (such holders being referred to herein as the " Initiating Investors " and all registrations requested by the Initiating Investors being referred to herein as " Demand Registrations "). Each request for a Demand Registration shall specify the approximate number of Registrable Securities requested to be registered and the intended method of distribution. Within five days after receipt of any such request, Pubco shall give written notice of such requested registration to all other holders of Registrable Securities and, subject to the terms and conditions set forth herein, shall include in such registration (and in all related registrations and qualifications under state blue sky laws or in compliance with other registration requirements and in any related underwriting) all such Registrable Securities with respect to which Pubco has received written requests for inclusion therein within five days after the receipt of Pubco's notice. Each holder of Registrable Securities agrees that such holder shall treat as confidential the receipt of the notice of Demand Registration and shall not disclose or use the information contained in such notice of Demand Registration without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by the holder in breach of the terms of this Agreement.

(b)   Long -Form Registrations . The holders of a majority of the Controlling Investor Registrable Securities may request one (1) Long-Form Registration in which Pubco shall pay all Registration Expenses whether or not any such Long-Form Registration has become effective; provided that , Pubco shall not be obligated to effect, or to take any action to effect, any Long-Form Registration unless the aggregate market price of the Registrable Securities requested to be registered in such Long-Form Registration exceeds $25,000,000 at the time of request; provided , further , that Pubco shall only be obligated to effect, or take any action to effect, one (1) Long-Form Registration. A registration shall not count as the sole permitted Long-Form Registration until it has become effective and unless the holders of Registrable Securities are able to register and sell at least 90% of the Registrable Securities requested to be included in such registration; provided that in any event Pubco shall pay all Registration Expenses in connection with any registration initiated as a Long-Form Registration whether or not it has become effective and whether or not such registration has counted as one of the permitted Long-Form Registrations hereunder.

(c)   Short -Form Registrations . In addition to the Long-Form Registration provided pursuant to Section  1(b) , any Controlling Investor or the holders of a majority of the CVAN Registrable Securities shall be entitled to request an unlimited number of Short-Form Registrations in which Pubco shall pay all Registration Expenses whether or not any such Long-Form Registration has become effective; provided , however , that Pubco shall not be obligated to effect any such Short-Form Registration: (i) if the holders of Registrable Securities, together with the holders of any other securities of Pubco entitled to inclusion in such Short-Form Registration, propose to sell Registrable Securities with an aggregate market price at the time of request of less than $5,000,000, or (ii) if Pubco has, within the twelve (12) month period preceding the date of such request, already effected two (2) Short-Form Registrations for the holders of Registrable Securities pursuant to this Section 1(c) . Demand Registrations shall be Short-Form Registrations whenever Pubco is permitted to use any applicable short form registration and if the managing underwriters (if any) agree to the use of a Short-Form Registration. After Pubco has become subject to the reporting requirements of the Exchange Act, Pubco shall use its reasonable best efforts to make Short-Form Registrations available for the offer and sale of Registrable

- 2 -

Securities. If Pubco is qualified to and, pursuant to the request of the holders of a majority of the Registrable Securities, has filed with the Securities and Exchange Commission a registration statement under the Securities Act on Form S-3 pursuant to Rule 415 (a " Shelf Registration "), then Pubco shall use its reasonable best efforts to cause the Shelf Registration to be declared effective under the Securities Act as soon as practicable after filing, and, if Pubco is a WKSI at the time of any such request, to cause such Shelf Registration to be an Automatic Shelf Registration Statement, and once effective, Pubco shall cause such Shelf Registration to remain effective (including by filing a new Shelf Registration, if necessary) for a period ending on the earlier of (i) the date on which all Registrable Securities included in such registration have been sold or distributed pursuant to the Shelf Registration or (ii) the date as of which all of the Registrable Securities included in such registration are able to be sold within a 90-day period in compliance with Rule 144 under the Securities Act. If for any reason Pubco ceases to be a WKSI or becomes ineligible to utilize Form S-3, Pubco shall prepare and file with the Securities and Exchange Commission a registration statement or registration statements on such form that is available for the sale of Registrable Securities.

(d)     Shelf Takedowns . At any time when a Shelf Registration for the sale or distribution by holders of Registrable Securities on a delayed or continuous basis pursuant to Rule 415, including by way of an underwritten offering, block sale or other distribution plan (a " Resale Shelf Registration ") is effective and its use has not been otherwise suspended by Pubco in accordance with the terms of Section 1(c) above, upon a written demand (a " Takedown Demand ") by any Controlling Investor or the holders of a majority of the CVAN Registrable Securities that is, in either case, a Shelf Participant holding Registrable Securities at such time (the " Initiating Holder "), Pubco will facilitate in the manner described in this Agreement a "takedown" of Registrable Securities off of such Resale Shelf Registration (a " take down offering ") and Pubco shall pay all Registration Expenses in connection therewith; provided that Pubco will provide (x) in connection with any non-marketed underwritten takedown offering (other than a Block Trade), at least two (2) Business Days' notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant, (y) in connection with any Block Trade initiated prior to the three (3) year anniversary of the consummation of Pubco's Initial Public Offering, notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant no later than noon Eastern time on the Business Day prior to the requested Takedown Demand and (z) in connection with any marketed underwritten takedown offering, at least five (5) Business Days' notice of such Takedown Demand to each holder of Registrable Securities (other than the Initiating Holder) that is a Shelf Participant. In connection with (x) any non-marketed underwritten takedown offering initiated prior to the three (3) year anniversary of the consummation of Pubco's Initial Public Offering and (y) any marketed underwritten takedown offering, if any Shelf Participants entitled to receive a notice pursuant to the preceding sentence request inclusion of their Registrable Securities (by notice to Pubco, which notice must be received by Pubco no later than (A) in the case of a non-marketed underwritten takedown offering (other than a Block Trade), the Business Day following the date notice is given to such participant, (B) in the case of a Block Trade, by 10:00 p.m. Eastern time on the date notice is given to such participant and (C) in the case of a marketed underwritten takedown offering, three (3) Business Days following the date notice is given to such participant), the Initiating Holder and the other Shelf Participants that request inclusion of their Registrable Securities shall be entitled to sell their Registrable Securities in such offering subject to Section 1(e) below. Each holder of Registrable Securities that is a Shelf Participant agrees that such holder shall treat as confidential the receipt of the notice of a Takedown Demand and shall not disclose or use the information contained in such notice without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by the holder in breach of the terms of this Agreement.

(e)     Priority on Demand Registrations and Takedown Offerings . Pubco shall not include in any Demand Registration that is an underwritten offering any securities that are not Registrable

- 3 -

Securities without the prior written consent of the managing underwriters and the holders of a majority of the Registrable Securities then outstanding. If a Demand Registration or a takedown offering is an underwritten offering and the managing underwriters advise Pubco in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such offering exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the Registrable Securities held by Initiating Investors, Pubco shall include in such offering prior to the inclusion of any securities which are not Registrable Securities (i) first , the Class C Unit Registrable Securities requested to be included in such registration by the holders of Class C Unit Registrable Securities, excluding the GV Investor (pro rata among the holders of such Class C Unit Registrable Securities on the basis of the number of Class C Unit Registrable Securities owned by each such holder), and (ii) second , the Controlling Investor Registrable Securities requested to be included in such registration by the Controlling Investors (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder).

(f)    Restrictions on Demand Registrations and Takedown Offerings . Any demand for the filing of a registration statement or for a registered offering (including a takedown offering) hereunder will be subject to the constraints of any applicable lock-up arrangements, and any such demand must be deferred until such lock-up arrangements no longer apply.

(i)    Pubco shall not be obligated to effect any Demand Registration within 30 days prior to Pubco's good faith estimate of the date of filing of an underwritten public offering of Pubco's securities and for such a period of time after such a filing as the managing underwriters request, provided that such period shall not exceed 180 days from the effective date of Pubco's Initial Public Offering or 90 days from the effective date of any subsequent underwritten public offering of Pubco's securities. Pubco may postpone, for up to 90 days from the date of the request (the " Suspension Period "), the filing or the effectiveness of a registration statement for a Demand Registration or suspend the use of a prospectus that is part of any Shelf Registration (and therefore suspend sales of the Registrable Securities included therein) by providing written notice to the holders of Registrable Securities if Pubco reasonably determines in good faith that the offer or sale of Registrable Securities would be expected to have a material adverse effect on any proposal or plan by Pubco or any subsidiary thereof to engage in any material acquisition or disposition of assets or stock (other than in the ordinary course of business) or any material merger, consolidation, tender offer, recapitalization, reorganization or similar transaction or would require Pubco to disclose any material nonpublic information which would reasonably be likely to be detrimental to Pubco and its subsidiaries; provided that in such event, the holders of Registrable Securities initially requesting such Demand Registration or Takedown Demand shall be entitled to withdraw such request. Pubco may delay or suspend the effectiveness of a Demand Registration or takedown offering pursuant to this Section 1(f)(i) only once in any consecutive twelve-month period; provided that, for the avoidance of doubt, Pubco may in any event delay or suspend the effectiveness of Demand Registration or takedown offering in the case of an event described under Section 4(f) to enable it to comply with its obligations set forth in Section 4(e). Pubco may extend the Suspension Period for an additional consecutive 60 days with the consent of the Applicable Approving Party.

(ii)    In the case of an event that causes Pubco to suspend the use of the Resale Shelf Registration or any Shelf Registration as set forth in Section 1(f)(i) or pursuant to Section 4(f) (a " Suspension Event "), Pubco shall give a notice to the holders of Registrable Securities registered pursuant to such Shelf Registration (a " Suspension Notice ") to suspend sales of the Registrable Securities and such notice shall state generally the basis for the notice and that such suspension shall continue only for so long as the Suspension Event or its effect is continuing. A holder of Registrable Securities shall not effect any sales of the Registrable Securities pursuant to such Resale Shelf Registration or Shelf Registration (or such filings) at any time after it has received a Suspension Notice from Pubco and prior to receipt of an

- 4 -

End of Suspension Notice (as defined below). Each holder of Registrable Securities agrees that such holder shall treat as confidential the receipt of the Suspension Notice and shall not disclose or use the information contained in such Suspension Notice without the prior written consent of Pubco until such time as the information contained therein is or becomes available to the public generally, other than as a result of disclosure by such holder in breach of the terms of this Agreement. The holders of Registrable Securities may recommence effecting sales of the Registrable Securities pursuant to the Shelf Registration (or such filings) following further written notice to such effect (an " End of Suspension Notice ") from Pubco, which End of Suspension Notice shall be given by Pubco to the holders of Registrable Securities and to such holders' counsel, if any, promptly following the conclusion of any Suspension Event.

(iii)    Notwithstanding any provision herein to the contrary, if Pubco shall give a Suspension Notice with respect to any Shelf Registration pursuant to this Section 1(e) , Pubco agrees that it shall extend the period of time during which such Shelf Registration shall be maintained effective pursuant to this Agreement by the number of days during the period from the date of receipt by the holders of the Suspension Notice to and including the date of receipt by the holders of the End of Suspension Notice and provide copies of the supplemented or amended prospectus necessary to resume sales, with respect to each Suspension Event; provided that such period of time shall not be extended beyond the date that Common Stock covered by such Shelf Registration are no longer Registrable Securities.

(g)    Selection of Underwriters . In connection with any Demand Registration, the Applicable Approving Party shall have the right to select the investment banker(s) and manager(s) to administer the offering. If any takedown offering is an underwritten offering, the Applicable Approving Party shall have the right to select the investment banker(s) and manager(s) to administer such takedown offering. In each case, the Applicable Approving Party shall have the right to approve the underwriting arrangements with such investment banker(s) and manager(s) on behalf of all holders of Registrable Securities participating in such offering. All Investors proposing to distribute their securities through underwriting shall (together with Pubco and the Company) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

(h)    Other Registration Rights . Except as provided in this Agreement, Pubco shall not grant to any Persons the right to request Pubco to register any equity securities of Pubco, or any securities, options or rights convertible or exchangeable into or exercisable for such securities, without the prior written consent of the holders of a majority of the Registrable Securities then outstanding; provided that Pubco may grant rights to participate in any Piggyback Registrations so long as such rights are subordinate to the priority rights of the Controlling Investors and the CVAN Investors with respect to such Piggyback Registrations as provided in Sections 2(c) and 2(d) below.

(i)    Revocation of Demand Notice or Takedown Notice . At any time prior to the effective date of the Registration Statement relating to a Demand Registration or the "pricing" of any offering relating to a Takedown Demand, the holders of Registrable Securities that requested such Demand Registration or takedown offering may revoke such request for a Demand Registration or takedown offering on behalf of all holders of Registrable Securities participating in such Demand Registration or takedown offering without liability to such holders of Registrable Securities, in each case by providing written notice to Pubco.

2.    Piggyback Registrations .

(a)    Right to Piggyback . Whenever Pubco proposes to register any of its securities under the Securities Act (other than (i) pursuant to a Demand Registration, (ii) pursuant to a Takedown Demand, (iii) in connection with registrations on Form S-4 or S-8 promulgated by the Securities and

- 5 -

Exchange Commission or any successor forms, (iv) a registration relating solely to employment benefit plans, (v) in connection with a registration the primary purpose of which is to register debt securities, or (vi) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities) and the registration form to be used may be used for the registration of Registrable Securities (a " Piggyback Registration "), Pubco shall give prompt written notice to all holders of Registrable Securities of its intention to effect such a Piggyback Registration and, subject to the terms of Sections  2(c) and 2(d) hereof, shall include in such Piggyback Registration (and in all related registrations or qualifications under blue sky laws or in compliance with other registration requirements and in any related underwriting) all Registrable Securities with respect to which Pubco has received written requests for inclusion therein within 10 business days after the delivery of Pubco's notice; provided that any such other holder may withdraw its request for inclusion at any time prior to executing the underwriting agreement or, if none, prior to the applicable registration statement becoming effective.

(b)      Piggyback Expenses . The Registration Expenses of the holders of Registrable Securities shall be paid by Pubco in all Piggyback Registrations, whether or not any such registration became effective.

(c)      Priority on Primary Registrations . If a Piggyback Registration is an underwritten primary registration on behalf of Pubco, and the managing underwriters advise Pubco in writing that in their opinion the number of securities requested to be included in such registration exceeds the number of securities which can be sold in such offering without adversely affecting the marketability, proposed offering price, timing or method of distribution of the offering, Pubco shall include in such registration (i)  first , the securities Pubco proposes to sell, (ii)  second , the Class C Unit Registrable Securities requested to be included in such registration by the holders of Class C Unit Registrable Securities which, in the opinion of such underwriters, can be sold, without any such adverse effect (pro rata among the holders of such Class C Unit Registrable Securities on the basis of the number of Class C Unit Registrable Securities owned by each such holder), (iii) third , the Controlling Investor Registrable Securities requested to be included in such registration by the Controlling Investors which, in the opinion of such underwriters, can be sold, without any such adverse effect (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder), and (iv)  fourth , other securities requested to be included in such registration which, in the opinion of such underwriters, can be sold, without any such adverse effect.

(d)      Priority on Secondary Registrations . If a Piggyback Registration is an underwritten secondary registration on behalf of holders of Pubco's securities other than holders of Registrable Securities, and the managing underwriters advise Pubco in writing that in their opinion the number of securities requested to be included in such registration exceeds the number of securities which can be sold in such offering without adversely affecting the marketability, proposed offering price, timing or method of distribution of the offering, Pubco shall include in such registration (i)  first , the securities requested to be included therein by the holders initially requesting such registration and the Class C Unit Registrable Securities requested to be included in such registration by the holders of Class C Unit Registrable Securities (pro rata among the holders of such Class C Unit Registrable Securities on the basis of the number of Class C Unit Registrable Securities owned by each such holder), (ii)  second , the Controlling Investor Registrable Securities requested to be included in such registration by the Controlling Investors which, in the opinion of such underwriters, can be sold, without any such adverse effect (pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such holder), and (iii)  third , other securities requested to be included in such registration which, in the opinion of such underwriters, can be sold, without any such adverse effect.

- 6 -

(e)  Other Registrations . If Pubco has previously filed a registration statement with respect to Registrable Securities pursuant to Section 1 or pursuant to this Section 2 , and if such previous registration has not been withdrawn or abandoned, then Pubco shall not not be required to file or cause to be effected any other registration of any of its equity securities or securities convertible or exchangeable into or exercisable for its equity securities under the Securities Act (except on Form S-8 or any successor form) at the request of any holder or holders of such securities until a period of at least 90 days has elapsed from the effective date of such previous registration.

(f)  Right to Terminate Registration . Pubco shall have the right to terminate or withdraw any registration initiated by it under this Section 2 whether or not any holder of Registrable Securities has elected to include securities in such registration. The Registration Expenses of such withdrawn registration shall be borne by Pubco in accordance with Section 6 .

3.  Holdback Agreements.

(a)  Holders of Registrable Securities . If required by the Applicable Approving Party, each holder of Registrable Securities (in the case of Pubco's Initial Public Offering) and each holder of 1% or more of the outstanding Registrable Securities (in the case of any other underwritten Public Offering) shall enter into lock-up agreements with the managing underwriter(s) of such underwritten Public Offering in such form as agreed to by the Applicable Approving Party. In the absence of any such lock-up agreement:

(i)  each holder of Registrable Securities and each of the directors and executive officers of Pubco or any of its subsidiaries agrees that in connection with Pubco's Initial Public Offering, such Person shall not (A) offer, sell, contract to sell, pledge or otherwise dispose of (including sales pursuant to Rule 144), directly or indirectly, any Capital Stock of Pubco (including Capital Stock of Pubco that may be deemed to be owned beneficially by such Person in accordance with the rules and regulations of the Securities and Exchange Commission) (collectively, " Securities "), (B) enter into a transaction which would have the same effect as described in clause (A) above, (C) enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences or ownership of any Securities, whether such transaction is to be settled by delivery of such Securities, in cash or otherwise (each of (A), (B) and (C) above, a " Sale Transaction "), or (D) publicly disclose the intention to enter into any Sale Transaction, from the date on which Pubco gives notice to the holders of Registrable Securities that a preliminary prospectus has been circulated for such Initial Public Offering to the date that is 180 days following the date of the final prospectus for such IPO (the " Holdback Period "), unless the Applicable Approving Party and the underwriters managing the IPO otherwise agree in writing;

(ii)  each holder of at least 1% of the outstanding Registrable Securities and each of the directors and executive officers of Pubco or any of its subsidiaries agrees that in connection with any non-marketed underwritten takedown offering, such Person shall not effect any Sale Transaction from the date on which Pubco gives notice to the holders of Registrable Securities of the Public Offering to the earlier of (A) the date that is 45 days following the date of the final prospectus for such Public Offering and (B) the date on which such shelf takedown offering is otherwise abandoned (a " Block Holdback Period "), unless the Applicable Approving Party and the underwriters managing the such Public Offering otherwise agree in writing; and

(iii)  each holder of at least 1% of the outstanding Registrable Securities and each of the directors and executive officers of Pubco or any of its Subsidiaries agrees that in connection with all other underwritten Public Offerings other than those covered by clauses (i) and (ii) above, such Person shall not effect any Sale Transaction from the date on which Pubco gives notice to the holders of Registrable Securities of the circulation of a preliminary or final prospectus for such Public Offering to

- 7 -

the date that is 60 days following the date of the final prospectus for such Public Offering (a " Marketed Holdback Period " and, together with a Block Holdback Period, a " Follow-On Holdback Period "), unless, if an underwritten Public Offering, the Applicable Approving Party and the underwriters managing such Public Offering otherwise agree in writing.

Pubco may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the restrictions set forth in this Section 3(a) until the end of such period.

(b)    Pubco (i) shall not file any registration statement for a Public Offering or cause any such registration statement to become effective, or effect any public sale or distribution of its equity securities, or any securities, options or rights convertible into or exchangeable or exercisable for such securities during any Holdback Period or Follow-On Holdback Period, and (ii) shall use its reasonable best efforts to cause (A) each holder of at least 1% (on a fully-diluted basis) of its Common Stock, or any securities convertible into or exchangeable or exercisable for Common Stock, purchased from Pubco at any time after the date of this Agreement (other than in a Public Offering) and (B) each of its directors and executive officers to agree not to effect any Sale Transaction or publicly disclose the intention to enter into any Sale Transaction during any Holdback Period or Follow-On Holdback Period, except as part of such underwritten registration, if otherwise permitted, unless the underwriters managing the Public Offering otherwise agree in writing.

4.    Registration Procedures . Whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement or have initiated a takedown offering, Pubco shall use its reasonable best efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto Pubco shall as expeditiously as reasonably possible:

(a)    prepare in accordance with the Securities Act and all applicable rules and regulations promulgated thereunder and file with the Securities and Exchange Commission a registration statement, and all amendments and supplements thereto and related prospectuses as may be necessary to comply with applicable securities laws, with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective ( provided that before filing a registration statement or prospectus or any amendments or supplements thereto, Pubco shall furnish to counsel selected by the Applicable Approving Party copies of all such documents proposed to be filed, which documents shall be subject to the review and comment of such counsel);

(b)    notify each holder of Registrable Securities of (A) the issuance by the Securities and Exchange Commission of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose, (B) the receipt by Pubco or its counsel of any notification with respect to the suspension of the qualification of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose, and (C) the effectiveness of each registration statement filed hereunder;

(c)    prepare and file with the Securities and Exchange Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period ending when all of the securities covered by such registration statement have been disposed of in accordance with the intended methods of distribution by the sellers thereof set forth in such registration statement (but not in any event before the expiration of any longer period required under the Securities Act or, if such registration statement relates to an underwritten Public Offering, such longer period as in the opinion of counsel for the underwriters a prospectus is required by law to be delivered in connection with sale of Registrable Securities by an underwriter or dealer) and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such registration statement;

- 8 -

(d)    furnish to each seller of Registrable Securities thereunder such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), each Free Writing Prospectus and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(e)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the lead underwriter or the Applicable Approving Party reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided that Pubco shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 4(e) (ii) consent to general service of process in any such jurisdiction) or (C) subject itself to taxation in any such jurisdiction;

(f)    promptly notify in writing each seller of such Registrable Securities (i) after it receives notice thereof, of the date and time when such registration statement and each post-effective amendment thereto has become effective or a prospectus or supplement to any prospectus relating to a registration statement has been filed and when any registration or qualification has become effective under a state securities or blue sky law or any exemption thereunder has been obtained, (ii) after receipt thereof, of any request by the Securities and Exchange Commission for the amendment or supplementing of such registration statement or prospectus or for additional information, and (iii) at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such registration statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading, and, at the request of any such seller, Pubco promptly shall prepare, file with the Securities and Exchange Commission and furnish to each such seller a reasonable number of copies of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading;

(g)    cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by Pubco are then listed and, if not so listed, to be listed on a securities exchange and, without limiting the generality of the foregoing, to arrange for at least two market makers to register as such with respect to such Registrable Securities with FINRA;

(h)    provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement;

(i)    enter into and perform such customary agreements (including underwriting agreements in customary form) and take all such other actions as the Applicable Approving Party or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including, without limitation, effecting a stock split or a combination of shares and preparing for and participating in such number of "road shows", investor presentations and marketing events as the underwriters managing such offering may reasonably request);

(j)    make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or

- 9 -

other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate and business documents and properties of Pubco as shall be necessary to enable them to exercise their due diligence responsibility, and cause Pubco's officers, managers, directors, employees, agents, representatives and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with such registration statement;

(k)    take all reasonable actions to ensure that any Free-Writing Prospectus utilized in connection with any Demand Registration (including any Shelf Registration) or Piggyback Registration hereunder complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, shall not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(l)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Securities and Exchange Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months beginning with the first day of Pubco's first full calendar quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158;

(m)    permit any holder of Registrable Securities who, in its good faith judgment (based on the advice of counsel), could reasonably be expected to be deemed to be an underwriter or a controlling Person of Pubco to participate in the preparation of such registration or comparable statement and to require the insertion therein of material furnished to Pubco in writing, which in the reasonable judgment of such holder and its counsel should be included;

(n)    in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Common Stock included in such registration statement for sale in any jurisdiction, Pubco shall use its reasonable best efforts promptly to obtain the withdrawal of such order;

(o)    use its reasonable best efforts to cause such Registrable Securities covered by such registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of such Registrable Securities;

(p)    cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or agent, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement and enable such securities to be in such denominations and registered in such names as the managing underwriter, or agent, if any, or such holders may request;

(q)    cooperate with each holder of Registrable Securities covered by the registration statement and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(r)    if such registration includes an underwritten public offering, use its reasonable best efforts to obtain a cold comfort letter from Pubco's independent public accountants and addressed to the underwriters, in customary form and covering such matters of the type customarily covered by cold comfort letters as the underwriters in such registration and the Applicable Approving Party reasonably request;

- 10 -

(s)    provide a legal opinion of Pubco's outside counsel, dated the effective date of such registration statement (and, if such registration includes an underwritten Public Offering, dated the date of the closing under the underwriting agreement), with respect to the registration statement, each amendment and supplement thereto, the prospectus included therein (including the preliminary prospectus) and such other documents relating thereto in customary form and covering such matters of the type customarily covered by legal opinions of such nature, which opinion shall be addressed to the underwriters and the holders of such Registrable Securities;

(t)    if Pubco files an Automatic Shelf Registration Statement covering any Registrable Securities, use its reasonable best efforts to remain a WKSI (and not become an ineligible issuer (as defined in Rule 405)) during the period during which such Automatic Shelf Registration Statement is required to remain effective;

(u)    if Pubco does not pay the filing fee covering the Registrable Securities at the time an Automatic Shelf Registration Statement is filed, pay such fee at such time or times as the Registrable Securities are to be sold; and

(v)    subject to the terms of Section 1(c) and Section 1(d) , if an Automatic Shelf Registration Statement has been outstanding for at least three years, at the end of the third year, refile a new Automatic Shelf Registration Statement covering the Registrable Securities, and, if at any time when Pubco is required to re-evaluate its WKSI status Pubco determines that it is not a WKSI, use its reasonable best efforts to refile the registration statement on Form S-3 and keep such registration statement effective (including by filing a new Resale Shelf Registration or Shelf Registration, if necessary) during the period throughout which such registration statement is required to be kept effective.

5.    Termination of Rights . Notwithstanding anything contained herein to the contrary, the right of any Investor to include Registrable Securities in any Demand Registration or any Piggyback Registration shall terminate on such date after the consummation of Pubco's Initial Public Offering that such Investor may sell all of the Registrable Securities owned by such Investor pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise; provided, however, that with respect to any Investor whose rights have terminated pursuant to this Section 5 , if following such a termination, such Investor loses the ability to sell all of its Registrable Securities pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise due to a change in interpretive guidance by the Securities and Exchange Commission, then such Investor's right to include Registrable Securities in any Demand Registration or any Piggyback Registration shall be reinstated until such time as the Investor is once again able to sell all of its Registrable Securities pursuant to Rule 144 of the Securities Act without any restrictions as to volume or the manner of sale or otherwise.

6.    Registration Expenses .

(a)    All expenses incident to Pubco's performance of or compliance with this Agreement, including, without limitation, all registration, qualification and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for Pubco and all independent certified public accountants, underwriters (excluding underwriting discounts and commissions) and other Persons retained by Pubco (all such expenses being herein called " Registration Expenses "), shall be borne by Pubco as provided in this Agreement and, for the avoidance of doubt, Pubco also shall pay all of its

- 11 -

internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by Pubco are then listed. Each Person that sells securities pursuant to a Demand Registration, a Takedown Demand or Piggyback Registration hereunder shall bear and pay all underwriting discounts and commissions and transfer taxes applicable to the securities sold for such Person's account.

(b)    Pubco shall reimburse the holders of Registrable Securities included in such registration for the reasonable fees and disbursements of one counsel and one local counsel (if necessary) chosen by the Applicable Approving Party for the purpose of rendering a legal opinion on behalf of such holders in connection with any underwritten Demand Registration, takedown offering or Piggyback Registration.

(c)    To the extent Registration Expenses are not required to be paid by Pubco, each holder of securities included in any registration hereunder shall pay those Registration Expenses allocable to the registration of such holder's securities so included, and any Registration Expenses not so allocable shall be borne by all sellers of securities included in such registration in proportion to the aggregate selling price of the securities to be so registered.

7.    <u>Indemnification</u> .

(a)    Pubco agrees to (i) indemnify and hold harmless, to the fullest extent permitted by law, each Investor and their respective officers, directors, members, partners, agents, affiliates and employees and each Person who controls such Investor (within the meaning of the Securities Act or the Exchange Act) against all losses, claims, actions, damages, liabilities and expenses caused by (A) any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, or (B) any violation or alleged violation by Pubco of the Securities Act or any other similar federal or state securities laws or any rule or regulation promulgated thereunder applicable to Pubco and relating to action or inaction required of Pubco in connection with any such registration, qualification or compliance, and (ii) pay to each Investor and their respective officers, directors, members, partners, agents, affiliates and employees and each Person who controls such Investor (within the meaning of the Securities Act or the Exchange Act), as incurred, any legal and any other expenses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability or action, except insofar as the same are caused by or contained in any information furnished in writing to Pubco or any managing underwriter by such Investor expressly for use therein; <u>provided</u> , <u>however</u> , that the indemnity agreement contained in this <u>Section  7</u> shall not apply to amounts paid in settlement of any such claim, loss, damage, liability or action if such settlement is effected without the consent of Pubco (which consent shall not be unreasonably withheld. conditioned or delayed), nor shall Pubco be liable in any such case for any such claim, loss, damage, liability or action to the extent that it solely arises out of or is based upon an untrue statement of any material fact contained in the registration statement or omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was made in the registration statement, in reliance upon and in conformity with written information furnished by such Investor expressly for use in connection with such registration statement. In connection with an underwritten offering, Pubco shall indemnify any underwriters or deemed underwriters, their officers and directors and each Person who controls such underwriters (within the meaning of the Securities Act or the Exchange Act) to the same extent as provided above with respect to the indemnification of the holders of Registrable Securities.

-12 -

(b)    In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder shall furnish to Pubco in writing such information and affidavits as Pubco reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, shall indemnify Pubco, its officers, directors, employees, agents and representatives and each Person who controls Pubco (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses resulting from any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such holder; provided that the obligation to indemnify shall be individual, not joint and several, for each holder and shall be limited to the net amount of proceeds actually received by such holder from the sale of Registrable Securities pursuant to such registration statement.

(c)    Any Person entitled to indemnification hereunder shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification ( provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. In such instance, the conflicted indemnified parties shall have a right to retain one separate counsel, chosen by the holders of a majority of the Registrable Securities included in the registration, at the expense of the indemnifying party. No indemnifying party, in the defense of such claim or litigation, shall, except with the consent of each indemnified party, consent to the entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

(d)    Each party hereto agrees that, if for any reason the indemnification provisions contemplated by Section s  7(a) or 7(b) are unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities or expenses (or actions in respect thereof) referred to therein, then each indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party in connection with the actions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, relates to information supplied by such indemnifying party or indemnified party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section  7(d) were determined by pro rata allocation (even if the holders or any underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section  7(d) . The amount paid or payable by an

- 13 -

indemnified party as a result of the losses, claims, damages, liabilities or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 7(c), defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The sellers' obligations in this Section 7(d) to contribute shall be several in proportion to the amount of securities registered by them and not joint and shall be limited to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Securities effected pursuant to such registration.

(e)    The indemnification and contribution provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and shall survive the transfer of Registrable Securities and the termination or expiration of this Agreement.

8.    Participation in Underwritten Registrations. No Person may participate in any registration hereunder which is underwritten unless such Person (a) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including, without limitation, pursuant to any over-allotment or "green shoe" option requested by the underwriters; provided that no holder of Registrable Securities shall be required to sell more than the number of Registrable Securities such holder has requested to include) and (b) completes and executes all questionnaires, powers of attorney, custody agreements, stock powers, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements; provided that no holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to Pubco or the underwriters (other than representations and warranties regarding such holder, such holder's title to the securities, such Person's authority to sell such securities and such holder's intended method of distribution) or to undertake any indemnification obligations to Pubco or the underwriters with respect thereto that are materially more burdensome than those provided in Section 7. Each holder of Registrable Securities shall execute and deliver such other agreements as may be reasonably requested by Pubco and the lead managing underwriter(s) that are consistent with such holder's obligations under Section 3, Section 4 and this Section 7 or that are necessary to give further effect thereto. To the extent that any such agreement is entered into pursuant to, and consistent with, Section 3 and this Section 7, the respective rights and obligations created under such agreement shall supersede the respective rights and obligations of the holders, Pubco and the underwriters created pursuant to this Section 7.

9.    Other Agreements. At all times after Pubco has filed a registration statement with the Securities and Exchange Commission pursuant to the requirements of either the Securities Act or the Exchange Act, Pubco agrees to use best efforts to file all reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Securities and Exchange Commission thereunder and shall take such further action as the Investors may reasonably request, all to the extent required to enable such Persons to sell securities pursuant to (a) Rule 144 adopted by the Securities and Exchange Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Securities and Exchange Commission or (b) a registration statement on Form S-3 or any similar registration form hereafter adopted by the Securities and Exchange Commission. Upon request, Pubco shall deliver to the Investors a written statement as to whether it has complied with such requirements. Pubco shall at all times after it has consummated an Initial Public Offering use its reasonable best efforts to cause the securities so registered to be listed on one or more of the New York Stock Exchange, the American Stock Exchange and the NASDAQ Stock Market.

- 14 -

10.    Definitions .

(a)    " Agreement " has the meaning set forth in the preamble hereof.

(b)    " Applicable Approving Party " means (i) if the Controlling Investor is participating in the applicable offering, the Controlling Investor, or (ii) if the Controlling Investor is not participating in the applicable offering, the holders of a majority of the Registrable Securities participating in the applicable offering.

(c)    " April 2016 Unit Purchase Agreements " means, together, (a) that certain Unit Purchase Agreement, dated April 27, 2016, by and between the Company and the Ernest C. Garcia II, and (b) that certain Unit Purchase Agreement, dated April 27, 2016, by and between the Company and the Ernest C. Garcia II.

(d)    " Block Holdback Period " has the meaning set forth in Section 3(a)(ii) .

(e)    " Block Trade " means any non-marketed underwritten takedown offering taking the form of a bought deal or block sale to a financial institution.

(f)    " Business Day " means any day that is not a Saturday or Sunday or a legal holiday in the state in which Pubco's chief executive office is located or in New York, NY.

(g)    " Capital Stock " means (i) with respect to any Person that is a corporation, any and all shares, interests or equivalents in capital stock of such corporation (whether voting or nonvoting and whether common or preferred) and (ii) with respect to any Person that is not a corporation, individual or governmental entity, any and all partnership, membership, limited liability company or other equity interests of such Person that confer on the holder thereof the right to receive a share of the profits and losses of, or the distribution of assets of, the issuing Person, including in each case any and all warrants, rights (including conversion and exchange rights) and options to purchase any of the foregoing.

(h)    " Class C Unit Registrable Securities " means Registrable Securities issued with respect to (i) any Units issued to the CVAN Investor in exchange for Company securities purchased pursuant to the July 2015 Purchase Agreement or the July 2016 Purchase Agreement, (ii) any Units issued to the GV Investor in exchange for Company securities purchased pursuant to the July 2016 Purchase Agreement, and (iii) any Units issued to Ernest C. Garcia II in exchange for Company securities purchased pursuant to the April 2016 Purchase Agreements.

(i)    " Common Stock " means the Class A Common Stock of Pubco.

(j)    " Company " has the meaning set forth in the preamble hereof.

(k)    " Controlling Investors " means Ernest C. Garcia II, Ernest C. Garcia III, Ernest Garcia II Multi-Generational Trust III and Ernest Irrevocable 2004 Trust, and each of such Person's Permitted Transferees, in each case only so long as such Person continues to hold Units.

(l)    " Controlling Investor Registrable Securities " means the Registrable Securities held by the Controlling Investors to the extent such Registrable Securities are not Class C Unit Registrable Securities.

(m)    " CVAN Investor " means CVAN Holdings, LLC (f/k/a Carvana Holdings, LLC), a Delaware limited liability company.

- 15 -

(n)  " CVAN Registrable Securities " means the Registrable Securities held by the CVAN Investors and their Permitted Transferees other than any Permitted Transferee Without Registration Rights. All CVAN Registrable Securities shall be deemed to be Class C Unit Registrable Securities.

(o)  " Demand Registrations " has the meaning set forth in Section 1(a) .

(p)  " End of Suspension Notice " has the meaning set forth in Section 2(g)(ii) .

(q)  " Exchange Act " means the Securities Exchange Act of 1934, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

(r)  " FINRA " means the Financial Industry Regulatory Authority.

(s)  " Free-Writing Prospectus " means a free-writing prospectus, as defined in Rule 405 of the Securities Act.

(t)  " GV Investor " means GV Auto I, LLC, a Delaware limited liability company.

(u)  " Holdback Period " has the meaning set forth in Section 3(a)(i) .

(v)  " Initial Public Offering " means an initial public offering of equity securities under the Securities Act.

(w)  " Initiating Investors " has the meaning set forth in Section 1(a) .

(x)  " Investor " has the meaning set forth in the preamble hereof.

(y)  " IPO Holdback Period " has the meaning set forth in the Section 3(a) .

(z)  " July 2015 Purchase Agreement " has the meaning set forth in the recitals hereof.

(aa)  " July 2016 Purchase Agreement " has the meaning set forth in the recitals hereof.

(bb)  " LLC Agreement " means the Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated as of or about the date hereof, by and among the Company, Pubco and the other members of Carvana Group, LLC (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(cc)  " Long-Form Registrations " has the meaning set forth in Section 1(a) .

(dd)  " Marketed Holdback Period " has the meaning set forth in Section 3(a)(iii) .

(ee)  " Permitted Transferee " has the meaning set forth in the LLC Agreement.

(ff)  " Permitted Transferee Without Registration Rights " means any Permitted Transferee of the CVAN Investor holding CVAN Registrable Securities that may be sold under Rule 144(b)(1)(i) without limitation under any of the other requirements of Rule 144 (as confirmed by an opinion of Pubco's counsel).

- 16 -

(gg)    " Person " means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

(hh)    " Piggyback Registration " has the meaning set forth in Section  2(a) .

(ii)    " Public Offering " means any sale or distribution by Pubco and/or holders of Registrable Securities to the public of Common Stock pursuant to an offering registered under the Securities Act.

(jj)    " Registration Expenses " has the meaning set forth in Section  6 .

(kk)    " Registrable Securities " means (i) any Common Stock issued with respect to or in exchange for any Units held by the Controlling Investors, (ii) any Common Stock issued with respect to or in exchange for any Units issued to the CVAN Investor in exchange for Company securities purchased pursuant to the July 2015 Purchase Agreement or the July 2016 Purchase Agreement, (iii) any Common Stock issued with respect to any Units issued to the GV Investor in exchange for Company securities purchased pursuant to the July 2016 Purchase Agreement, and (iv) any Common Stock issued or issuable with respect to the securities referred to in clauses (i), (ii) and (iii) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when they have been sold or distributed to the public pursuant to an offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 following the consummation of Pubco's Initial Public Offering or repurchased by Pubco or any Subsidiary. For purposes of this Agreement, a Person shall be deemed to be a holder of Registrable Securities, and the Registrable Securities shall be deemed to be in existence, whenever such Person has the right to acquire directly or indirectly such Registrable Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Registrable Securities hereunder; provided a holder of Registrable Securities may only request that Registrable Securities in the form of Common Stock be registered pursuant to this Agreement.

(ll)    " Rule 144 ", " Rule 158 ", " Rule 405 ", " Rule 415 " and " Rule 430B " mean, in each case, such rule promulgated under the Securities Act (or any successor provision) by the Securities and Exchange Commission, as the same shall be amended from time to time, or any successor rule then in force.

(mm)    " Securities " has the meaning set forth in Section 3(a)(i) .

(nn)    " Securities Act " means the Securities Act of 1933, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

(oo)    " Shelf Participant " means any holder of Registrable Securities listed as a potential selling stockholder in connection with the Shelf Registration or any such holder that could be added to such Shelf Registration without the need for a post-effective amendment thereto or added by means of an automatic post-effective amendment thereto.

(pp)    " Shelf Registrations " has the meaning set forth in Section  1(c) .

- 17 -

(qq)  " Short-Form Registrations " has the meaning set forth in Section 1(a) .

(rr)  " Suspension Event " has the meaning set forth in Section 1(f)(ii) .

(ss)  " Suspension Notice " has the meaning set forth in Section 1(f)(ii) .

(tt)  " Suspension Period " has the meaning set forth in Section 1(f)(i) .

(uu)  " Takedown Demand " has the meaning set forth in Section 1(d) .

(vv)  " Units " means the Company's common units, as constituted in the LLC Agreement.

(ww)  " WKSI " means a "well-known seasoned issuer" as defined under Rule 405.

11.    Miscellaneous .

(a)    No Inconsistent Agreements . Neither the Company nor Pubco shall hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Investors in this Agreement.

(b)    Adjustments Affecting Registrable Securities . Pubco shall not take any action, or permit any change to occur, with respect to its securities which would materially and adversely affect the ability of the holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement or which would materially and adversely affect the marketability of such Registrable Securities in any such registration (including effecting a split or a combination of securities).

(c)    Remedies . Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies existing in its favor, any party shall be entitled to specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

(d)    Amendments and Waivers . Except as otherwise provided herein, the provisions of this Agreement may be amended or waived only with the prior written consent of Pubco and the holders of a majority of the Registrable Securities then outstanding; provided that no amendment or waiver that has an adverse effect on any rights which specify the CVAN Investors or the GV Investor (as the case may be) as the beneficiary of such rights shall be binding on such Investors without the prior written consent of the holders of a majority of the related Registrable Securities. Any amendment or waiver effected in accordance with this Section 11(d) shall be binding upon each Investor, Pubco and the Company. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

(e)    Successors and Assigns . All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not. In addition, whether or not any express

- 18 -

assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent holder of Registrable Securities.

(f)     Severability . Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid, illegal or unenforceable in any respect under any applicable law, such provision shall be ineffective only to the extent of such prohibition, invalidity, illegality or unenforceability, without invalidating the remainder of this Agreement.

(g)     Counterparts . This Agreement may be executed simultaneously in counterparts (including by means of telecopied, facsimile or portable data format (PDF) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(h)     Descriptive Headings; Interpretation . The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. The use of the word "including" herein shall mean "including without limitation."

(i)     Governing Law; Jurisdiction . All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal or state court located in the State of Delaware, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

(j)     Notices . All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent by confirmed electronic mail if sent during normal business hours of the recipient, but if not, then on the next business day, (iii) one business day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three days after it is mailed to the recipient by first class mail, return receipt requested. Such notices, demands and other communications shall be sent to each Investor at the address indicated on the Schedule of Investors attached hereto and to Pubco and the Company at the address indicated below:

19

c/o Carvana Group, LLC
4020 E. Indian School Road
Phoenix, Arizona 85018
Attention: Ernest C. Garcia III and Paul W. Breaux
Email: ernie.garcia@carvana.com and paul.breaux@carvana.com

With copies (which shall not constitute notice to the Company) to :

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: Robert M. Hayward, P.C.
            Robert E. Goedert
Email: robert.hayward@kirkland.com
       robert.goedert@kirkland.com

or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

(k)    Mutual Waiver of Jury Trial . As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

(l)    No Strict Construction . The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(m)    Information . Ernest C. Garcia, II (" ECGII "), on behalf of the Controlling Investors, shall be entitled to receive notice of all meetings of the board of directors of Pubco (the " Board ") and any Board committee, including any executive committee, and all materials and documents distributed to the members of the Board (or Board committee) in connection with such meetings, including at or after such meetings, in each case at such time and as provided to the members of the Board (or Board committee). In addition to the foregoing, promptly following any Board or Board committee meeting, the Board shall notify ECGII as to any material transaction or action, including any debt or equity offering or material acquisition or disposition, change in executive officers or Board members, Board nominees, charter or bylaw amendment, annual budget or material change to any annual budget, change to Pubco's "Up-C" status, or other significant matter approved at such Board or Committee meeting, whether or not subject to further approval by the stockholders of Pubco. The foregoing provisions of this Section 11(m) are subject in all respects to the right of the Board or the Chairman thereof to determine not to provide ECGII with Board or Board committee materials or other information if (i) such materials, other information or action relate to transactions in which the Controlling Investors have a material direct interest (other than solely as a result of their direct or indirect ownership of Pubco), (ii) the Board or Chairman determines in good faith that such omission is appropriate in order to (a) avoid a conflict of interest in connection with the Board's discussion of a

- 20 -

particular matter, (b) fulfill the contractual obligations of Pubco or its subsidiaries with respect to confidential or proprietary information of third parties, (c) protect the attorney client privilege (including protecting any attorney work product) or (d) satisfy the Board's fiduciary duties (as advised by outside counsel) and/or (iii) such meeting, materials, other information or action would result in loss of the protection of trade secrets, provided that with respect to subsections (ii)(b) and (c) and (iii), if despite the following sentence, Pubco determines additional measures are necessary in order to satisfy such sections, ECGII shall execute a confidentiality agreement in form and substance reasonable acceptable to the parties in order to be able to provide ECGII access to the information. Any information ECGII receives pursuant to this Section 11(m) shall be kept confidential, and the Controlling Investors agree to and shall hold in confidence and trust all such information.

*   *   *   *   *

- 21 -

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**COMPANY:**

CARVANA GROUP, LLC

By: _____
Name:   Ernest C. Garcia III
Title:   Chief Executive Officer

*Signature Page to Amended and Restated Registration Rights Agreement*

**PUBCO:**

CARVANA CO.

By: _____
Name:   Ernest C. Garcia III
Title:    Chief Executive Officer

*Signature Page to Amended and Restated Registration Rights Agreement*

**CVAN INVESTOR:**

CVAN HOLDINGS, LLC

By: _____

Name:   Kelly Van Meter
Title:    Vice President

*Signature Page to Amended and Restated Registration Rights Agreement*

**GV INVESTOR:**

GV AUTO I, LLC

By:    Georgiana Ventures, LLC
Its:    Manager

By:    _____
Name:  Ira J. Platt
Title:  Managing Member

*Signature Page to Amended and Restated Registration Rights Agreement*

**CONTROLLING INVESTOR:**

ERNEST C. GARCIA II

_____

*Signature Page to Amended and Restated Registration Rights Agreement*

**CONTROLLING INVESTOR:**

ERNEST C. GARCIA III

_____

*Signature Page to Amended and Restated Registration Rights Agreement*

**CONTROLLING INVESTORS:**

ERNEST GARCIA III MULTI-GENERATIONAL TRUST III

By: _____
Name:    Steven P. Johnson
Its:        Administrative Trustee

By: _____
Name:    Ernest C. Garcia II
Its:        Investment Trustee

ERNEST IRREVOCABLE 2004 TRUST III

By: _____
Name:    Steven P. Johnson
Its:        Administrative Trustee

By: _____
Name:    Ernest C. Garcia II
Its:        Investment Trustee

*Signature Page to Amended and Restated Registration Rights Agreement*

SCHEDULE OF INVESTORS

| Name and Address |
| --- |
| CVAN Holdings, LLC (f/k/a Carvana Holdings, LLC)<br>227 W. Monroe, Suite 4800<br>Chicago, IL 60606<br>Attn: Jack Salerno<br>Email: J.R.Salerno@guggenheimpartners.com<br><br>With a copy to:<br><br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006<br>Attn: Christopher Zochowski<br><br>Email: czochowski@winston.com |
| GV Auto I, LLC<br>65 Sturges Hwy<br>Westport, CT 06880<br>Attn: Ira J. Platt<br>Email: platt_ira@yahoo.com |
| Ernest C. Garcia II<br>1720 W. Rio Salado Parkway<br>Tempe, Arizona 85281<br>Attention: Ernest C. Garcia II |
| Ernest C. Garcia III<br>4020 E. Indian School Road, Suite A<br>Phoenix, Arizona 85018<br>Attention: Ernest C. Garcia III<br>Email: ernie.garcia@carvana.com |
| Ernest Garcia III Multi-Generational Trust III<br>c/o Steven Johnson, Investment Trustee<br>1720 W. Rio Salado Parkway<br>Tempe, Arizona 85281<br>Attention: Steven Johnson |
| Ernest Irrevocable 2004 Trust III<br>c/o Steven Johnson, Investment Trustee<br>1720 W. Rio Salado Parkway<br>Tempe, Arizona 85281<br>Attention: Steven Johnson |

AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT

<u>JOINDER</u>

The undersigned is executing and delivering this Joinder pursuant to the Amended and Restated Registration Rights Agreement dated as of _____(as the same may hereafter be amended, the " <u>Registration Rights Agreement</u> "), among _____ , a Delaware limited liability company (the " <u>Company</u> "), and the other person named as parties therein.

By executing and delivering this Joinder to Pubco, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Registration Rights Agreement as a holder of [Controlling Investor // CVAN] Registrable Securities in the same manner as if the undersigned were an original signatory to the Registration Rights Agreement, and the undersigned's _____Units shall be included as [Controlling Investor // CVAN] Registrable Securities under the Registration Rights Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ____day of _____, _____.

INVESTOR:

[●]

By: _____
Its:

Address for Notices:

[●]
[●]
[●]
[●]

Agreed and Accepted as of
_____.

**[COMPANY]**

By: _____

Its: _____

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, Illinois 60654

www.kirkland.com

[FORM OF OPINION TO BE RECEIVED FROM COUNSEL]

, 2017

Carvana Co.
4020 E. Indian School Road
Phoenix, Arizona 85018

Re:    Registration Statement on Form S-1

Ladies and Gentlemen:

We are acting as special counsel to Carvana Co., a Delaware corporation (the " Company "), in connection with the proposed registration by the Company of            shares of its Class A common stock, par value $0.001 per share (the " Common Stock "), including            shares of Common Stock, if any, to cover the exercise of an option to purchase additional shares, pursuant to a Registration Statement on Form S-1 (Registration No. 333-            ), originally filed with the Securities and Exchange Commission (the " Commission ") on            , 2017, under the Securities Act of 1933, as amended (the " Act ") (such Registration Statement, as amended or supplemented, is hereinafter referred to as the " Registration Statement "). The shares of Common Stock to be registered by the Company pursuant to the Registration Statement are referred to herein as the " Shares ."

In connection therewith, we have examined originals, or copies certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary for the purposes of this opinion, including (i) the corporate and organizational documents of the Company, including the Amended and Restated Certificate of Incorporation of the Company (the " Amended and Restated Certificate ") to be filed with the Secretary of State of the State of Delaware prior to the sale of the Shares, (ii) minutes and records of the proceedings of the Company with respect to the issuance and sale of the Shares, (iii) the form of Underwriting Agreement in the form filed as Exhibit 1.1 to the Registration Statement (the " Underwriting Agreement "), filed with the Commission on            , 2017 and (iv) the Registration Statement.

For purposes of this opinion, we have assumed the authenticity of all documents submitted to us as originals, the conformity to the originals of all documents submitted to us as copies and the authenticity of the originals of all documents submitted to us as copies. We have also assumed the legal capacity of all natural persons, the genuineness of the signatures of persons signing all documents in connection with which this opinion is rendered, the authority of

Hong Kong    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai    Washington, D.C.

Carvana Co.
, 2017
Page 2

such persons signing on behalf of the parties thereto other than the Company and the due authorization, execution and delivery of all documents by the parties thereto other than the Company. We have not independently established or verified any facts relevant to the opinions expressed herein, but have relied upon statements and representations of officers and other representatives of the Company and others.

Based upon and subject to the foregoing qualifications, assumptions and limitations and the further limitations set forth below, we are of the opinion that when the Amended and Restated Certificate is duly filed with the Secretary of State of the State of Delaware, the Shares will be duly authorized, and, when the Registration Statement becomes effective under the Act, the final Underwriting Agreement is duly executed and delivered by the parties thereto and the Shares are registered by the Company's transfer agent and delivered against payment of the agreed consideration therefor, all in accordance with the final Underwriting Agreement, the Shares will be validly issued, fully paid and non-assessable.

Our opinion expressed above is subject to the qualification that we express no opinion as to the applicability of, compliance with, or effect of any laws except the General Corporation Law of the State of Delaware (including the statutory provisions, all applicable provisions of the Delaware constitution and reported judicial decisions interpreting the foregoing).

We hereby consent to the filing of this opinion with the Commission as Exhibit 5.1 to the Registration Statement. We also consent to the reference to our firm under the heading "Legal Matters" in the Registration Statement. In giving this consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission. This opinion and consent may be incorporated by reference in a subsequent registration statement on Form S-1 filed pursuant to Rule 462(b) under the Act with respect to the registration of additional securities for sale in the offering contemplated by the Registration Statement and shall cover such additional securities, if any, registered on such subsequent registration statement.

We do not find it necessary for the purposes of this opinion, and accordingly we do not purport to cover herein, the application of the securities or "Blue Sky" laws of the various states to the issuance and sale of the Shares.

This opinion is limited to the specific issues addressed herein, and no opinion may be inferred or implied beyond that expressly stated herein. This opinion speaks only as of the date that the Registration Statement becomes effective under the Act, and we assume no obligation to revise or supplement this opinion after the date of effectiveness should the General Corporation Law of the State of Delaware be changed by legislative action, judicial decision or otherwise after the date hereof.

Sincerely,

KIRKLAND & ELLIS LLP

Exhibit 10.1

**FORM OF**

**TAX RECEIVABLE AGREEMENT**

**by and among**

**CARVANA CO.,**

**CERTAIN OTHER PERSONS NAMED HEREIN,**

**and**

**THE AGENT**

**DATED AS OF [ ● ], 2017**

**TAX RECEIVABLE AGREEMENT**

This TAX RECEIVABLE AGREEMENT (this " Agreement "), dated as of [●], 2017, is hereby entered into by and among Carvana Co., a Delaware corporation (together with its Subsidiaries that are consolidated for U.S. federal income and applicable state and local Tax purposes, the " Corporate Taxpayer "), Carvana Group, LLC, a Delaware limited liability company (the " Company "), the TRA Holders and the Agent.

**RECITALS**

WHEREAS, the TRA Holders currently hold limited liability company interests (" Units ") the Company, which is classified as a partnership for U.S. federal income tax purposes;

WHEREAS, the Corporate Taxpayer is the sole managing member of Carvana Co. Sub LLC, a Delaware limited liability company and a wholly-owned subsidiary of the Corporate Taxpayer (" Carvana Co. Sub ");

WHEREAS, Carvana Co. Sub, which has elected to be taxed as a corporation for U.S. federal income tax purposes, is a holder of Units and the sole manager of the Company;

WHEREAS, the Company and each of its direct and indirect Subsidiaries that is treated as a partnership for U.S. federal income tax purposes will have in effect an election under Section 754 of the Internal Revenue Code of 1986, as amended (the " Code "), and any corresponding provisions of state and local Tax law, for each Taxable Year in which an Exchange (as defined below) occurs, which election is expected to result, with respect to the Corporate Taxpayer, in an adjustment to the Tax basis of the assets owned by the Company and such Subsidiaries;

WHEREAS, from and after the closing of IPO Date (as defined below), the TRA Holders may sell all or a portion of their Units (solely to the extent such Units are Exchangeable Units (as defined below)), together with shares of Class B Common Stock (as defined below), to Carvana Co. Sub for cash and/or Class A Common Stock (as defined below) in one or more Exchanges, and as a result of such Exchanges, the Corporate Taxpayer is expected to obtain or be entitled to certain Tax benefits as further described herein; and

WHEREAS, this Agreement is intended to set forth the agreements among the parties hereto regarding the sharing of the Tax benefits realized by the Corporate Taxpayer as a result of the Exchanges.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    Definitions . As used in this Agreement, the terms set forth in this Article I shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

" Accrued Amount " has the meaning set forth in Section 3.1(b) of this Agreement.

" Actual Tax Liability " means, with respect to any Taxable Year, the actual liability for Taxes of (i) the Corporate Taxpayer and (ii) without duplication, the Company, but only with respect to Taxes imposed on the taxable income of the Company that is allocable to the Corporate Taxpayer or to the other members of the consolidated, combined, or unitary group of which the Corporate Taxpayer is a member for such Taxable Year.

" Affiliate " means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

" Agent " means [●] or such other Person designated as such pursuant to Section 7.6(c) .

" Agreed Rate " means a per annum rate of LIBOR plus 100 basis points.

" Agreement " has the meaning set forth in the preamble to this Agreement.

" Amended Schedule " has the meaning set forth in Section 2.3(b) of this Agreement.

" Attributable " has the meaning set forth in Section 3.1(b) of this Agreement.

" Basis Adjustment " means any adjustment to the Tax basis of a Reference Asset as a result of an Exchange and the payments made pursuant to this Agreement with respect to such Exchange (as calculated under Section  2.1 of this Agreement), including, but not limited to: (i) under Sections 734(b), 743(b), and 754 of the Code (in situations where, following an Exchange, the Company remains classified as a partnership for U.S. federal income tax purposes); and (ii) under Sections 732(b), 734(b) and 1012 of the Code (in situations where, as a result of one or more Exchanges, the Company becomes an entity that is disregarded as separate from its owner for U.S. federal income tax purposes), and in each case, comparable sections of state and local Tax laws. For the avoidance of doubt, (i) the amount of any Basis Adjustment resulting from an Exchange of Exchangeable Units shall be determined without regard to any Section 743(b) adjustment attributable to such Exchangeable Units prior to such Exchange, (ii) payments made under this Agreement shall not be treated as resulting in a Basis Adjustment to the extent such payments are treated as Imputed Interest, and (iii) for the purpose of calculating any Basis Adjustment resulting from an Exchange, all consideration shall be allocated to the purchase of Exchangeable Units (and none to the Class B Common Stock, if any) in such Exchange.

" Beneficial Owner " means, with respect to a security, a Person who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares: (i) voting power, which includes the power to vote, or to direct the voting of, such security

2

and/or (ii) investment power, which includes the power to dispose of, or to direct the disposition of, such security. The terms "Beneficially Own" and "Beneficial Ownership" shall have correlative meanings.

" Board " means the board of directors of the Corporate Taxpayer.

" Business Day " means any day other than a Saturday, Sunday or other day on which the banks in New York, New York or Phoenix, Arizona are authorized by law to be closed.

" Cash Payment " has the meaning set forth in the Exchange Agreement.

" Change of Control " has the meaning set forth in the Exchange Agreement.

" Change of Control Exchange " has the meaning set forth in the Exchange Agreement.

" Change of Control Exchange Date " has the meaning set forth in the Exchange Agreement.

" Class A Common Stock " has the meaning set forth in the LLC Agreement.

" Class B Common Stock " has the meaning set forth in the LLC Agreement.

" Code " has the meaning set forth in the recitals of this Agreement.

" Common Units " has the meaning set forth in the LLC Agreement.

" Company " has the meaning set forth in the recitals of this Agreement.

" Control " means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

" Corporate Taxpayer " has the meaning set forth in the preamble to this Agreement.

" Corporate Taxpayer Return " means the U.S. federal and/or state and local Tax Return of the Corporate Taxpayer (including any consolidated group of which the Corporate Taxpayer is a member, as further described in Section 7.13(a) of this Agreement) filed with respect to any Taxable Year.

" Cumulative Net Realized Tax Benefit " for a Taxable Year means the cumulative amount (but not less than zero) of Realized Tax Benefits for all Taxable Years of the Corporate Taxpayer, up to and including such Taxable Year, net of the cumulative amount of Realized Tax Detriments for the same period. The Realized Tax Benefit and Realized Tax Detriment for each Taxable Year shall be determined based on the most recent Tax Benefit Schedule or Amended Schedule, if any, in existence at the time of such determination.

" Default Rate " means a per annum rate of LIBOR plus 500 basis points.

" Determination " shall have the meaning ascribed to such term in Section 1313(a) of the Code or similar provision of any state and local Tax law or any other event (including the execution of IRS Form 870-AD) that finally and conclusively establishes the amount of any liability for Tax.

3

" Disputing Party " has the meaning set forth in Section 7.9 of this Agreement.

" Early Termination " has the meaning set forth in Section 4.1 of this Agreement.

" Early Termination Date " means the date of an Early Termination Notice for purposes of determining the Early Termination Payment.

" Early Termination Effective Date " has the meaning set forth in Section 4.4 of this Agreement.

" Early Termination Notice " has the meaning set forth in Section 4.4 of this Agreement.

" Early Termination Payment " has the meaning set forth in Section 4.5(b) of this Agreement.

" Early Termination Rate " means a per annum rate of LIBOR plus 100 basis points.

" Early Termination Schedule " has the meaning set forth in Section 4.4 of this Agreement.

" Exchange " has the meaning set forth in the Exchange Agreement and shall include, for the avoidance of doubt, any Change of Control Exchange.

" Exchange Act " has the meaning set forth in the LLC Agreement.

" Exchangeable Unit " has the meaning set forth in the Exchange Agreement.

" Exchange Agreement " means that certain Exchange Agreement, dated as of [•], 2017, by and among Carvana Co. Sub, the Company and the other parties thereto.

" Exchange Date " has the meaning set forth in the Exchange Agreement.

" Exchange Schedule " has the meaning set forth in Section 2.1 of this Agreement.

" Expert " means [●] or such nationally recognized expert in the particular area of disagreement as is mutually acceptable to both parties.

" Hypothetical Tax Liability " means, with respect to any Taxable Year, the liability for Taxes of the Corporate Taxpayer and, without duplication, the Company, but only with respect to Taxes imposed on taxable income of the Company allocable to the Corporate Taxpayer or to the other members of the consolidated, combined, or unitary group of which the Corporate Taxpayer is a member for such Taxable Year (in each case, using the same methods, elections, conventions, and similar practices used on the relevant Corporate Taxpayer Return), but without taking into account (i) any Basis Adjustments and (ii) any deduction attributable to Imputed Interest for the Taxable Year. For the avoidance of doubt, Hypothetical Tax Liability shall be determined without taking into account the carryover or carryback of any Tax item (or portions thereof) that is attributable to any Basis Adjustments and Imputed Interest.

4

" Imputed Interest " means any interest imputed under Section 1272, 1274 or 483 or other provision of the Code and any similar provision of any state and local Tax law with respect to the Corporate Taxpayer's payment obligations under this Agreement. For the avoidance of doubt, Imputed Interest shall not include any Accrued Amount.

" IPO " means an initial public offering of Class A Common Stock of the Corporate Taxpayer or its successor in interest or a wholly-owned subsidiary of the Corporate Taxpayer pursuant to which such Class A Common Stock is registered under Section 12 of the Exchange Act and is listed on a national securities exchange.

" IPO Date " means the closing date of the IPO.

" IRS " means the U.S. Internal Revenue Service.

" LIBOR " means during any period, an interest rate per annum equal to the one-year LIBOR rate reported, on the date two (2) calendar days prior to the first day of such period, on the Telerate Page 3750 (or if such screen shall cease to be publicly available, as reported on Reuters Screen page "LIBOR01" or by any other publicly available source of such market rate) for London interbank offered rates for United States dollar deposits for such period.

" LLC Agreement " means the Fourth Amended and Restated Limited Liability Company Agreement of the Company, as amended from time to time.

" Material Objection Notice " has the meaning set forth in Section 4.4 of this Agreement.

" Net Tax Benefit " has the meaning set forth in Section 3.1(b) of this Agreement.

" Objection Notice " has the meaning set forth in Section 2.3(a) of this Agreement.

" Payment Date " means any date on which a payment is required to be made pursuant to this Agreement.

" Person " means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity.

" Realized Tax Benefit " means, for a Taxable Year, the excess, if any, of the Hypothetical Tax Liability over the Actual Tax Liability. If all or a portion of the Actual Tax Liability for the Taxable Year arises as a result of an audit by a Taxing Authority for any Taxable Year, such liability shall not be included in determining the Realized Tax Benefit unless and until there has been a Determination.

" Realized Tax Detriment " means, for a Taxable Year, the excess, if any, of the Actual Tax Liability over the Hypothetical Tax Liability. If all or a portion of the Actual Tax Liability for the Taxable Year arises as a result of an audit by a Taxing Authority for any Taxable Year, such liability shall not be included in determining the Realized Tax Detriment unless and until there has been a Determination.

" Reconciliation Dispute " has the meaning set forth in Section 7.9 of this Agreement.

5

" Reconciliation Procedures " means the procedures described in Section  7.9 of this Agreement.

" Reference Asset " means, with respect to any Exchange, an asset that is held by the Company, or any of its direct or indirect Subsidiaries that is treated as a partnership or disregarded entity for purposes of the applicable Tax (but only to the extent such Subsidiaries are not held through any entity treated as a corporation for purposes of the applicable Tax), at the time of such Exchange. A Reference Asset also includes any asset that is "substituted basis property" under Section 7701(a)(42) of the Code with respect to a Reference Asset.

" Schedule " means any of the following: (i) an Exchange Schedule, (ii) a Tax Benefit Schedule, or (iii) the Early Termination Schedule.

" Senior Obligations " has the meaning set forth in Section  5.1 of this Agreement.

" Subsidiaries " means, with respect to any Person, as of any date of determination, any other Person as to which such Person, owns, directly or indirectly, or otherwise controls more than 50% of the voting power or other similar interests or the sole general partner interest or managing member or similar interest of such Person.

" Tax Benefit Payment " has the meaning set forth in Section 3.1(b) of this Agreement.

" Tax Benefit Schedule " has the meaning set forth in Section  2.2 of this Agreement.

" Tax Proceeding " has the meaning set forth in Section  6.1 of this Agreement.

" Tax Return " means any return, declaration, report or similar statement filed or required to be filed with respect to Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

" Taxable Year " means a taxable year of the Corporate Taxpayer as defined in Section 441(b) of the Code or comparable section of state or local Tax law, as applicable (which, for the avoidance of doubt, may include a period of less than twelve (12) months for which a Tax Return is made), ending on or after the date hereof.

" Taxes " means any and all U.S. federal, state and local taxes, assessments or similar charges that are based on or measured with respect to net income or profits, and any interest related to such Tax.

" Taxing Authority " means any federal, national, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any taxing authority or any other authority exercising Tax regulatory authority.

" TRA Holder " means each of those Persons set forth on Schedule  A and their respective successors and permitted assigns pursuant to Section 7.6(a) .

" Transferor " has the meaning set forth in Section 7.13(b) of this Agreement.

6

" <u>Treasury Regulations</u> " means the final, temporary and proposed regulations under the Code promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant Taxable Year.

" <u>Units</u> " has the meaning set forth in the recitals of this Agreement.

" <u>Valuation Assumptions</u> " means, as of an Early Termination Date, the assumptions that (i) in each Taxable Year ending on or after such Early Termination Date, the Corporate Taxpayer will have taxable income sufficient to fully utilize the deductions arising from all Basis Adjustments and the Imputed Interest during such Taxable Year or future Taxable Years (including, for the avoidance of doubt, Basis Adjustments and Imputed Interest that would result from future Tax Benefit Payments that would be paid in accordance with the Valuation Assumptions, further assuming such future Tax Benefit Payments would be paid on the due date, without extensions, for filing the Corporate Taxpayer Return for the applicable Taxable Year) in which such deductions would become available, (ii) any loss or credit carryovers generated by deductions or losses arising from any Basis Adjustment or Imputed Interest that are available in the Taxable Year that includes the Early Termination Date will be utilized by the Corporate Taxpayer in the earliest possible Taxable Year permitted by the Code and the Treasury Regulations from the Early Termination Date, (iii) the U.S. federal, state and local income and franchise tax rates that will be in effect for each Taxable Year ending on or after such Early Termination Date will be those specified for each such Taxable Year by the Code and other law as in effect on the Early Termination Date, (iv) any non-amortizable Reference Assets to which any Basis Adjustment is attributable will be disposed of in a fully taxable transaction for Tax purposes on the earlier of (A) the fifteenth anniversary of the Exchange which gave rise to such Basis Adjustment or (B) the Early Termination Date, and (v) if, at the Early Termination Date, there are Exchangeable Units that have not been transferred in an Exchange, then all Exchangeable Units and (if applicable) shares of Class B Common Stock shall be deemed to be transferred in an Exchange effective on the Early Termination Date.

Section 1.2    <u>Other Definitional and Interpretative Provisions</u> . The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

7

**ARTICLE II**
**DETERMINATION OF CERTAIN REALIZED TAX BENEFITS**

Section 2.1    Exchange Schedule . Within ninety (90) calendar days after the filing of the U.S. federal Corporate Taxpayer Return for each Taxable Year in which any Exchange has been effected by a TRA Holder, the Corporate Taxpayer shall deliver to the Agent a schedule (the " Exchange Schedule ") that shows, in reasonable detail necessary to perform the calculations required by this Agreement, including with respect to each TRA Holder participating in any Exchange during such Taxable Year, (i) the Basis Adjustments with respect to the Reference Assets as a result of the Exchanges effected by such TRA Holder in such Taxable Year and (ii) the period (or periods) over which such Basis Adjustments are amortizable and/or depreciable.

Section 2.2    Tax Benefit Schedule .

(a)    Tax Benefit Schedule . Within ninety (90) calendar days after the filing of the U.S. federal Corporate Taxpayer Return for any Taxable Year in which there is a Realized Tax Benefit or Realized Tax Detriment, the Corporate Taxpayer shall provide to the Agent: (i) a schedule showing, in reasonable detail, (A) the calculation of the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year, (B) the portion of the Net Tax Benefit, if any, that is Attributable to each TRA Holder who has participated in any Exchange, (C) the Accrued Amount with respect to any such Net Tax Benefit that is Attributable to such TRA Holder, (D) the Tax Benefit Payment determined pursuant to Section 3.1(b) of this Agreement due to each such TRA Holder, and (E) the portion of such Tax Benefit Payment that the Corporate Taxpayer intends to treat as Imputed Interest (a " Tax Benefit Schedule "), (ii) a reasonably detailed calculation by the Corporate Taxpayer of the Hypothetical Tax Liability, (iii) a reasonably detailed calculation by the Corporate Taxpayer of the Actual Tax Liability, (iv) a copy of the Corporate Taxpayer Return for such Taxable Year, and (v) any other work papers reasonably requested by the Agent. In addition, the Corporate Taxpayer shall allow the Agent reasonable access at no cost to the appropriate representatives of the Corporate Taxpayer in connection with a review of such Tax Benefit Schedule. The Tax Benefit Schedule will become final as provided in Section 2.3(a) and may be amended as provided in Section 2.3(b) (subject to the procedures set forth in Section 2.3(b) ).

(b)    Applicable Principles . The Realized Tax Benefit or Realized Tax Detriment for each Taxable Year is intended to measure the decrease or increase in the Corporate Taxpayer's actual liability for Taxes for such Taxable Year that is attributable to the Basis Adjustments and Imputed Interest, determined using a "with and without" methodology. For the avoidance of doubt, such actual liability for Taxes will take into account the deduction of the portion of the Tax Benefit Payment that must be accounted for as interest under the Code based upon the characterization of Tax Benefit Payments as additional consideration payable by the Corporate Taxpayer. For purposes of calculating the Realized Tax Benefit or Realized Tax Detriment for any Taxable Year, carryforwards or carrybacks of any Tax item (such as a net operating loss) attributable to the Basis Adjustments and Imputed Interest shall be considered to be subject to the rules of the Code and the Treasury Regulations and the corresponding provisions of state and local Tax laws, as applicable, governing the use, limitation and expiration of carryforwards or carrybacks of the relevant type. If a carryforward or carryback of any Tax item includes a portion

8

that is attributable to the Basis Adjustment or Imputed Interest (a " TRA Portion ") and another portion that is not so attributable (a " Non-TRA Portion "), such respective portions shall be considered to be used in accordance with the "with and without" methodology so that: (i) the    amount of any Non-TRA Portion is deemed utilized first, followed by the amount of any TRA Portion; and (ii) in the case of a carryback of a Non-TRA Portion, such carryback shall not affect the original "with and without" calculation made in the applicable prior Taxable Year. For the avoidance of doubt, the TRA Portion of any Tax item when such item is incurred shall be determined using a marginal "with and without" methodology by calculating (i) the amount of such Tax item for all Tax purposes taking into account the Basis Adjustments or Imputed Interest and (ii) the amount of such Tax item for all Tax purposes without taking into account the Basis Adjustments or Imputed Interest, with the TRA Portion equal to the excess of the amount specified in clause (i) over the amount specified in clause (ii) (but only if such excess is greater than zero). The parties agree that (i) any payment under this Agreement, including the Accrued Amount (other than amounts accounted for as Imputed Interest) will be treated as a subsequent upward adjustment to the purchase price of the relevant Exchangeable Units and will have the effect of creating additional Basis Adjustments to Reference Assets for the Corporate Taxpayer in the year of payment, and (ii) as a result, such additional Basis Adjustments will be incorporated into the current year calculation and into future year calculations, as appropriate.

Section 2.3    Procedure; Amendments .

(a)    An applicable Schedule or amendment thereto shall become final and binding on all parties thirty (30) calendar days from the first date on which the Agent has received the applicable Schedule or amendment thereto unless (i) the Agent, within thirty (30) calendar days after receiving an applicable Schedule or amendment thereto, provides the Corporate Taxpayer with notice of a material objection to such Schedule (" Objection Notice ") made in good faith or (ii) the Agent provides a written waiver of such right of any Objection Notice within the period described in clause (i) above, in which case such Schedule or amendment thereto becomes binding on the date a waiver from the Agent has been received by the Corporate Taxpayer. If the Corporate Taxpayer and Agent, for any reason, are unable to successfully resolve the issues raised in an Objection Notice within thirty (30) calendar days after receipt by the Corporate Taxpayer of such Objection Notice, the Corporate Taxpayer and Agent shall employ the Reconciliation Procedures under Section  7.9 .

(b)    The applicable Schedule for any Taxable Year may be amended from time to time by the Corporate Taxpayer (i) in connection with a Determination affecting such Schedule, (ii) to correct inaccuracies in the Schedule identified as a result of the receipt of additional factual information relating to a Taxable Year after the date the Schedule was provided to the Agent, (iii) to comply with the Expert's determination under the Reconciliation Procedures, (iv) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to a carryback or carryforward of a loss or other Tax item to such Taxable Year, (v) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to an amended Corporate Taxpayer Return filed for such Taxable Year or (vi) to adjust an Exchange Schedule to take into account payments made pursuant to this Agreement (any such Schedule, an " Amended Schedule ").The Corporate Taxpayer shall provide an Amended Schedule to the Agent within sixty (60) calendar days of the occurrence of an event referenced in clauses (i) through (vi) of the preceding sentence. For the avoidance of doubt, in

9

the event a Schedule is amended after such Schedule becomes final pursuant to Section 2.3(a) , the Amended Schedule shall not be taken into account in calculating any Tax Benefit Payment in the Taxable Year to which the amendment relates but instead shall be taken into account in calculating the Cumulative Net Realized Tax Benefit for the Taxable Year in which the amendment actually occurs.

### ARTICLE III
### TAX BENEFIT PAYMENTS

Section 3.1    Payments .

(a)    Within five (5) calendar days after a Tax Benefit Schedule delivered to the Agent becomes final in accordance with Section 2.3(a) , the Corporate Taxpayer shall pay to each TRA Holder the Tax Benefit Payment in respect of such TRA Holder determined pursuant to Section 3.1(b) for such Taxable Year. Each such payment shall be made by check, by wire transfer of immediately available funds to the bank account previously designated by the TRA Holder to the Corporate Taxpayer, or as otherwise agreed by the Corporate Taxpayer and the TRA Holder. For the avoidance of doubt, no Tax Benefit Payment shall be made in respect of estimated Tax payments, including, without limitation, U.S. federal or state estimated income Tax payments. Notwithstanding anything herein to the contrary, unless otherwise specified by a TRA Holder in the Exchange Notice for any Exchange, the aggregate Tax Benefit Payments in respect of such Exchange (other than amounts accounted for as interest under the Code) shall not exceed 50% of the fair market value of the consideration received on such Exchange (whether as a Cash Payment or as shares of Class A Common Stock).

(b)    A " Tax Benefit Payment " in respect of a TRA Holder for a Taxable Year means an amount, not less than zero, equal to the sum of the portion of the Net Tax Benefit Attributable to such TRA Holder and the Accrued Amount with respect thereto. A Net Tax Benefit is " Attributable " to a TRA Holder to the extent that it is derived from any Basis Adjustment or Imputed Interest that is attributable to the Exchangeable Units acquired or deemed acquired by the Corporate Taxpayer in an Exchange undertaken by or with respect to such TRA Holder. Subject to Section  3.3 , the " Net Tax Benefit " for a Taxable Year shall be an amount equal to the excess, if any, of (i) 85% of the Cumulative Net Realized Tax Benefit as of the end of such Taxable Year over (ii) the total amount of payments previously made under this Section  3.1 (excluding payments attributable to Accrued Amounts); provided , for the avoidance of doubt, that no TRA Holder shall be required to return any portion of any previously made Tax Benefit Payment. The " Accrued Amount " with respect to any portion of a Net Tax Benefit shall equal an amount determined in the same manner as interest on such portion of the Net Tax Benefit for a Taxable Year calculated at the Agreed Rate from the due date (without extensions) for filing the Corporate Taxpayer Return for such Taxable Year until the Payment Date. For the avoidance of doubt, for Tax purposes, the Accrued Amount shall not be treated as interest but shall instead be treated as additional consideration for the acquisition of Exchangeable Units in an Exchange unless otherwise required by law. Notwithstanding the foregoing, for each Taxable Year ending on or after the date of a Change of Control Exchange where the provisions of Section  4.2 do not apply, all Tax Benefit Payments, whether paid with respect to Exchangeable Units that were the subject of an Exchange (i) prior to the related Change of Control Exchange Date or (ii) on or after such Change of Control Exchange Date, shall be calculated by utilizing the assumptions in clauses (i), (ii) and (iv) of the definition of Valuation Assumptions, substituting in each case the term "Change of Control Exchange Date" for an "Early Termination Date".

10

Section 3.2    No Duplicative Payments . It is intended that the provisions of this Agreement will not result in duplicative payment of any amount (including interest) required under this Agreement. It is also intended that the provisions of this Agreement will result in 85% of the Cumulative Net Realized Tax Benefit, and the Accrued Amount thereon, being paid to the TRA Holders. The provisions of this Agreement shall be construed in the appropriate manner to achieve these fundamental results.

Section 3.3    Pro Rata Payments; Coordination of Benefits .

(a)    Notwithstanding anything in Section  3.1 to the contrary, to the extent that the aggregate amount of the Corporate Taxpayer's Tax benefit subject to this Agreement is limited in a particular Taxable Year because the Corporate Taxpayer does not have sufficient taxable income to fully utilize available deductions and other attributes, the limitation on the Tax benefit for the Corporate Taxpayer shall be allocated among the TRA Holders in proportion to the respective amounts of Net Tax Benefit that would have been determined under this Agreement if the Corporate Taxpayer had sufficient taxable income so that there were no such limitation.

(b)    After taking into account Section 3.3(a) , if for any reason the Corporate Taxpayer does not fully satisfy its payment obligations to make all Tax Benefit Payments due under this Agreement in respect of a particular Taxable Year, then (i) the Corporate Taxpayer will pay the same proportion of each Tax Benefit Payment due to each TRA Holder in respect of such Taxable Year, without favoring one obligation over the other, and (ii) no Tax Benefit Payment shall be made in respect of any Taxable Year until all Tax Benefit Payments in respect of prior Taxable Years have been made in full.

(c)    To the extent the Corporate Taxpayer makes a payment to a TRA Holder in respect of a particular Taxable Year under Section 3.1(a) of this Agreement (taking into account Section 3.3(a) and (b) , but excluding payments attributable to Accrued Amounts) in an amount in excess of the amount of such payment that should have been made to such TRA Holder in respect of such Taxable Year, then (i) such TRA Holder shall not receive further payments under Section 3.1(a) until such TRA Holder has foregone an amount of payments equal to such excess and (ii) the Corporate Taxpayer will pay the amount of such TRA Holder's foregone payments to the other Persons to whom a payment is due under this Agreement in a manner such that each such Person to whom a payment is due under this Agreement, to the maximum extent possible, receives aggregate payments under Section 3.1(a) (taking into account Section 3.3(a) and (b) , but excluding payments attributable to Accrued Amounts) in the amount it would have received if there had been no excess payment to such TRA Holder.

**ARTICLE IV**
**TERMINATION**

Section 4.1    Early Termination by the Corporate Taxpayer . With the written approval of a majority of its independent directors, the Corporate Taxpayer may terminate this Agreement at any time by paying to each TRA Holder the Early Termination Payment due to such TRA

11

Holder pursuant to Section 4.5(b) (such termination, an " Early Termination "); provided , however , that this Agreement shall only terminate upon the receipt of the Early Termination Payment by the TRA Holders. Upon payment of the Early Termination Payment by the Corporate Taxpayer, the Corporate Taxpayer shall not have any further payment obligations under this Agreement, other than for any (i) Tax Benefit Payment previously due and payable but unpaid as of the Early Termination Notice and (ii) any Tax Benefit Payment due for any Taxable Year ending prior to, with or including the Early Termination Date (except to the extent that the amount described in clause (ii) is included in the Early Termination Payment).

Section 4.2    Early Termination upon Change of Control Exchange . In the event of a Change of Control Exchange, all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the Change of Control Exchange Date and shall include, but not be limited to the following: (a) payment of the Early Termination Payment calculated as if an Early Termination Notice had been delivered on such Change of Control Exchange Date, (b) payment of any Tax Benefit Payment in respect of a TRA Holder agreed to by the Corporate Taxpayer and such TRA Holder as due and payable but unpaid as of the Early Termination Notice, and (c) payment of any Tax Benefit Payment due for any Taxable Year ending prior to, with or including such Exchange Date (except to the extent that the amount described in clause (c) is included in the Early Termination Payment). In the event of a Change of Control Exchange, the Early Termination Payment shall be calculated utilizing the Valuation Assumptions and by substituting in each case the term "Change of Control Exchange Date" for the term "Early Termination Date."

Section 4.3    Breach of Agreement .

(a)    In the event that the Corporate Taxpayer breaches any of its material obligations under this Agreement, whether as a result of failure to make any payment when due, as a result of failure to honor any other material obligation required hereunder or by operation of law as a result of the rejection of this Agreement in a case commenced under the Bankruptcy Code or otherwise, then, unless otherwise waived in writing by a majority of the TRA Holders, such breach shall be treated as an Early Termination and all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the date of such breach and shall include, but shall not be limited to, (i) the Early Termination Payment calculated as if an Early Termination Notice had been delivered on the date of a breach, (ii) any Tax Benefit Payment previously due and payable but unpaid as of the date of the breach, and (iii) any Tax Benefit Payment due for any Taxable Year ending prior to, with or including the date of the breach (except to the extent that the amount described in clause (iii) is included in the Early Termination Payment). Notwithstanding the foregoing, in the event that the Corporate Taxpayer breaches any of its material obligations under this Agreement, a majority of the TRA Holders shall be entitled to elect to receive the amounts set forth in clauses (i), (ii), and (iii) above or to seek specific performance of the terms hereof.

(b)    The parties agree that the failure to make any payment due pursuant to this Agreement within three (3) months of the date such payment is due shall be deemed to be a breach of a material obligation under this Agreement for all purposes of this Agreement, and that it shall not be considered to be a breach of a material obligation under this Agreement to make a payment due pursuant to this Agreement within three (3) months of the date such payment is

12

due. Notwithstanding anything in this Agreement to the contrary: (i) it shall not be a breach of this Agreement (and Section 5.2 shall apply, but the Default Rate shall be replaced by the Agreed Rate) if the Corporate Taxpayer fails to make any Tax Benefit Payment when due to the extent that the Corporate Taxpayer has insufficient funds to make such payment as a result of limitations imposed by credit agreements in respect of indebtedness for borrowed money to which the Company, the Corporate Taxpayer, or any of their Subsidiaries is a party (including, without limitation, limitations on the ability of the Company and its direct or indirect Subsidiaries to make distributions or payments to the Corporate Taxpayer) or the Board determines reasonably and in good faith that making any such distribution or payment would result in a default under any such existing credit agreement in respect of indebtedness for borrowed money to which the Company, the Corporate Taxpayer, or any of their Subsidiaries is a party and (ii) it shall not be a breach of this Agreement (and Section 5.2 shall apply with the Default Rate applied to any late payments) if the Corporate Taxpayer fails to make any Tax Benefit Payment when due to the extent that the Board determines reasonably and in good faith that the Corporate Taxpayer has insufficient funds (taking into account the ability of the Company and its direct or indirect Subsidiaries to make distributions or payments to the Corporate Taxpayer) to make such payment for reasons other than those specified in clause (i) of this sentence. The Corporate Taxpayer shall use its commercially reasonable efforts to maintain sufficient available funds for the purpose of making required payments under this Agreement and shall use its commercially reasonable efforts to avoid entering into credit agreements that could be reasonably anticipated to materially delay the timing of any payments under this Agreement.

Section 4.4    Early Termination Notice . If the Corporate Taxpayer chooses to exercise its right of early termination under Section 4.1 above, the Corporate Taxpayer shall deliver to the Agent notice of such intention to exercise such right (the " Early Termination Notice "). Upon delivery of the Early Termination Notice or the occurrence of an event described in Section 4.2 or Section 4.3(a) , the Corporate Taxpayer shall deliver (i) a schedule showing in reasonable detail the calculation of the Early Termination Payment (the " Early Termination Schedule ") and (ii) any other work papers reasonably requested by the Agent. In addition, the Corporate Taxpayer shall allow the Agent reasonable access at no cost to the appropriate representatives of the Corporate Taxpayer in connection with a review of such Early Termination Schedule. The Early Termination Schedule shall become final and binding on all parties thirty (30) calendar days from the first date on which the Agent has received such Schedule or amendment thereto unless (x) the Agent, within thirty (30) calendar days after receiving the Early Termination Schedule, provides the Corporate Taxpayer and each other Agent with notice of a material objection to such Schedule made in good faith (" Material Objection Notice ") or (y) the Agent provides a written waiver of such right of a Material Objection Notice within the period described in clause (x) above, in which case such Schedule becomes binding on the date a waiver from the Agent has been received by the Corporate Taxpayer (the " Early Termination Effective Date "). If the Corporate Taxpayer and Agent, for any reason, are unable to successfully resolve the issues raised in such notice within thirty (30) calendar days after receipt by the Corporate Taxpayer of the Material Objection Notice, the Corporate Taxpayer and Agent shall employ the Reconciliation Procedures under Section 7.9 .

13

Section 4.5    Payment upon Early Termination .

(a)    Within three (3) calendar days after the Early Termination Effective Date, the Corporate Taxpayer shall pay to each TRA Holder its Early Termination Payment. Each such payment shall be made by check, by wire transfer of immediately available funds to a bank account or accounts designated by the TRA Holder, or as otherwise agreed by the Corporate Taxpayer and the TRA Holder.

(b)    The " Early Termination Payment " shall equal, with respect to each TRA Holder, the present value, discounted at the Early Termination Rate as of the Early Termination Date, of all Tax Benefit Payments that would be required to be paid by the Corporate Taxpayer to such TRA Holder beginning from the Early Termination Date and assuming that the Valuation Assumptions are applied.

## ARTICLE V
## SUBORDINATION AND LATE PAYMENTS

Section 5.1    Subordination . Notwithstanding any other provision of this Agreement to the contrary, any Tax Benefit Payment, Early Termination Payment or any other payment required to be made by the Corporate Taxpayer to any TRA Holder under this Agreement shall rank subordinate and junior in right of payment to any principal, interest or other amounts due and payable in respect of any obligations in respect of indebtedness for borrowed money of the Corporate Taxpayer and its Subsidiaries (such obligations, " Senior Obligations ") and shall rank *pari passu* with all current or future unsecured obligations of the Corporate Taxpayer that are not Senior Obligations. For the avoidance of doubt, notwithstanding the above, the determination of whether it is a breach of this Agreement if the Corporate Taxpayer fails to make any Tax Benefit Payment when due is governed by Section 4.3(a) .

Section 5.2    Late Payments by the Corporate Taxpayer . The amount of all or any portion of any Tax Benefit Payment, Early Termination Payment or any other payment under this Agreement not made to any TRA Holder when due under the terms of this Agreement shall be payable together with any interest thereon, computed at the Default Rate (or, if so provided in Section 4.3(a) , at the Agreed Rate) and commencing from the date on which such Tax Benefit Payment, Early Termination Payment or any other payment under this Agreement was due and payable.

## ARTICLE VI
## NO DISPUTES; CONSISTENCY; COOPERATION

Section 6.1    Participation in the Corporate Taxpayer ' s and Tax Matters . Except as otherwise provided herein, the Corporate Taxpayer shall have full responsibility for, and sole discretion over, all Tax matters concerning the Corporate Taxpayer, including without limitation preparing, filing or amending any Tax Return and defending, contesting or settling any issue pertaining to Taxes of the Corporate Taxpayer. Notwithstanding the foregoing, the Corporate Taxpayer (i) shall notify the Agent of, and keep the Agent reasonably informed with respect to, the portion of any audit, examination, or any other administrative or judicial proceeding (a "Tax Proceeding") of the Corporate Taxpayer by a Taxing Authority the outcome of which is reasonably expected to affect the rights and obligations of the TRA Holders under this Agreement, (ii) shall provide the Agent with reasonable opportunity to provide information and

14

other input to the Corporate Taxpayer and its advisors concerning the conduct of any such portion of a Tax Proceeding, and (iii) shall not enter into any settlement with respect to any such portion of a Tax Proceeding that could have a material effect on the TRA Holders' rights (including the right to receive payments) under this Agreement without the written consent of the Agent, such consent not to be unreasonably withheld, conditioned or delayed; provided , however , that the Corporate Taxpayer shall not be required to take any action, or refrain from taking any action, that is inconsistent with any provision of the LLC Agreement; provided , further , that, notwithstanding anything to the contrary contained herein, the Corporate Taxpayer shall prepare, file, and/or amend all Tax Returns in accordance with applicable law (including with respect to the calculation of taxable income and any calculations required to be made under this Agreement) and nothing in this Agreement shall prevent the Agent or any TRA Holder from disputing such Tax matters in accordance with Section  7.9 .

Section 6.2    Consistency . The Corporate Taxpayer and the TRA Holders agree to report and cause to be reported for all purposes, including U.S. federal, state and local Tax purposes and financial reporting purposes, all Tax-related items (including, without limitation, the Basis Adjustments, Imputed Interest, and each Tax Benefit Payment), but, for financial reporting purposes, only in respect of items that are not explicitly characterized as "deemed" or in a similar manner by the terms of this Agreement, in a manner consistent with that set forth in any Schedule required to be provided by or on behalf of the Corporate Taxpayer under this Agreement, as finally determined pursuant to Section  2.3 , unless otherwise required by applicable law. If the Corporate Taxpayer and any TRA Holder, for any reason, are unable to successfully resolve any disagreement concerning such treatment within thirty (30) calendar days, the Corporate Taxpayer and such TRA Holder shall employ the Reconciliation Procedures under Section  7.9 .

Section 6.3    Cooperation . Each TRA Holder shall (i) furnish to the Corporate Taxpayer in a timely manner such information, documents and other materials as the Corporate Taxpayer may reasonably request for purposes of making any determination or computation necessary or appropriate under this Agreement, preparing any Tax Return or contesting or defending any Tax Proceeding, (ii) make itself available to the Corporate Taxpayer and its representatives to provide explanations of documents and materials and such other information as the Corporate Taxpayer or its representatives may reasonably request in connection with any of the matters described in clause (i) above, and (iii) reasonably cooperate in connection with any such matter. The Corporate Taxpayer shall reimburse the TRA Holder for any reasonable third-party costs and expenses incurred pursuant to this Section  6.3 .

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    Notices . All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) delivered by means of electronic mail (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 5:00 p.m. Phoenix, Arizona time on a Business Day, and otherwise on the next Business Day, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). All notices

15

hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

If to the Corporate Taxpayer or the Company, to :

c/o Carvana Co.
4020 E. Indian School Road
Phoenix, AZ 85018
Telephone: (602) 852-6604
Attention: Paul Breaux, General Counsel
E-mail: paul.breaux@carvana.com

with a copy (which shall not constitute notice to the Corporate Taxpayer or the Company) to :

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2133
Attention: Robert M. Hayward, P.C.
E-mail: robert.hayward@kirkland.com

If to the Agent, to :

[ _____ ]
[ _____ ]
[ _____ ]
Attention: [ _____ ]
Email:

If to a TRA Holder other than the Agent, to :

The address set forth in the records of the Company.

Any party may change its address or fax number by giving the other party written notice of its new address or fax number in the manner set forth above.

Section 7.2    Counterparts . This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 7.3    Entire Agreement; No Third Party Beneficiaries . This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their respective

16

successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except as expressly provided in Section 3.3 .

Section 7.4    Governing Law . This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware, without regard to the conflicts of laws principles thereof that would mandate the application of the laws of another jurisdiction.

Section 7.5    Severability . If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 7.6    Successors; Assignment .

(a)    No TRA Holder may assign this Agreement to any person without the prior written consent of the Corporate Taxpayer; provided , however, that

(i)    to the extent Common Units are transferred in accordance with the terms of the LLC Agreement, the transferring TRA Holder shall have the option to assign to the transferee of such Common Units the transferring TRA Holder's rights under this Agreement with respect to such transferred Common Units as long as such transferee has executed and delivered, or, in connection with such transfer, executes and delivers, a joinder to this Agreement, in form and substance reasonably satisfactory to the Corporate Taxpayer, agreeing to become a "TRA Holder" for all purposes of this Agreement, and

(ii)    any and all payments payable or that may become payable to a TRA Holder pursuant to this Agreement that, once an Exchange has occurred, arise with respect to the Exchangeable Units transferred in such Exchange, may be assigned to any Person or Persons as long as any such Person has executed and delivered, or, in connection with such assignment, executes and delivers, a joinder to this Agreement, in form and substance reasonably satisfactory to the Corporate Taxpayer, agreeing to be bound by Section 7.14 and acknowledging specifically the terms of Section 7.6(b) .

For these purposes, a pledge by a TRA Holder of some or all of its rights, interests or entitlements under this Agreement to any U.S. bank in connection with a bona fide loan or other indebtedness shall not constitute an assignment of this agreement; provided that (y) if Common Units are transferred to such U.S. bank as a result of a foreclosure or other action relating to such pledge, such transfer shall be a transfer within the meaning of Section 7.6(a)( i ) or (z) if such U.S. bank becomes entitled to payments payable or that may become payable to a TRA Holder as a result of such pledge, such U.S. bank will be treated as a Person to whom such payments were assigned within the meaning of Section 7.6(a)(ii) . For the avoidance of doubt, if a TRA Holder

17

transfers Common Units but does not assign to the transferee of such Common Units the rights of such TRA Holder under this Agreement with respect to such transferred Common Units, such TRA Holder shall continue to be entitled to receive the Tax Benefit Payments, if any, due hereunder with respect to, including any Tax Benefit Payments arising in respect of a subsequent Exchange of, such Common Units.

(b)    Notwithstanding the foregoing provisions of this Section 7.6 , no assignee described in Section 7.6(a )( ii) shall have any rights under this Agreement except for the right to enforce its right to receive payments under this Agreement.

(c)    The Person designated as the Agent may not be changed without the prior written consent of the Corporate Taxpayer and TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of Early Termination on the date of the most recent Exchange prior to such amendment (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange).

(d)    Except as otherwise specifically provided herein, all of the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives. The Corporate Taxpayer shall cause any direct or indirect successor (whether by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Corporate Taxpayer, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Corporate Taxpayer would be required to perform if no such succession had taken place.

Section 7.7    Amendments; Waivers . No provision of this Agreement may be amended unless such amendment is approved in writing by each of the Corporate Taxpayer and by TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of Early Termination on the date of the most recent Exchange prior to such amendment (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange); provided , however, that no such amendment shall be effective if such amendment would have a disproportionate effect on the payments certain TRA Holders will or may receive under this Agreement unless all such disproportionately affected TRA Holders consent in writing to such amendment.

Section 7.8    Titles and Subtitles . The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

Section 7.9    Reconciliation . In the event that the Corporate Taxpayer and the Agent or any TRA Holder (as applicable, the " Disputing Party ") are unable to resolve a disagreement with respect to the calculations required to produce the schedules described in Section 2.3 , Section 4.4 and Section 6.2 within the relevant period designated in this Agreement (" Reconciliation

18

Dispute "), the Reconciliation Dispute shall be submitted for determination to the Expert. The Expert shall be a partner or principal in a nationally recognized accounting or law firm, and unless the Corporate Taxpayer and the Disputing Party agree otherwise, the Expert shall not, and the firm that employs the Expert shall not, have any material relationship with the Corporate Taxpayer or the Disputing Party or other actual or potential conflict of interest. If the parties are unable to agree on an Expert within fifteen (15) calendar days of receipt by the respondent(s) of written notice of a Reconciliation Dispute, the Expert shall be appointed by the International Chamber of Commerce Centre for Expertise. The Expert shall resolve (a) any matter relating to the Exchange Schedule or an amendment thereto or the Early Termination Schedule or an amendment thereto within thirty (30) calendar days, (b) any matter relating to a Tax Benefit Schedule or an amendment thereto within fifteen (15) calendar days , and (c) any matter related to treatment of any tax-related item as contemplated in Section 6.2 within fifteen (15) calendar days, or, in each case, as soon thereafter as is reasonably practicable after such matter has been submitted to the Expert for resolution. Notwithstanding the preceding sentence, if the matter is not resolved before any payment that is the subject of a disagreement would be due (in the absence of such disagreement) or any Tax Return reflecting the subject of a disagreement is due, any portion of such payment that is not under dispute shall be paid on the date prescribed by this Agreement and such Tax Return may be filed as prepared by the Corporate Taxpayer, subject to adjustment or amendment upon resolution. The costs and expenses relating to the engagement of such Expert or amending any Tax Return shall be borne by the Corporate Taxpayer except as provided in the next sentence. The Corporate Taxpayer and the Disputing Party shall each bear its own costs and expenses of such proceeding, unless (i) the Expert adopts such Disputing Party's position, in which case the Corporate Taxpayer shall reimburse such Disputing Party for any reasonable out-of-pocket costs and expenses in such proceeding, or (ii) the Expert adopts the Corporate Taxpayer's position, in which case such Disputing Party shall reimburse the Corporate Taxpayer for any reasonable out-of-pocket costs and expenses in such proceeding. Any dispute as to whether a dispute is a Reconciliation Dispute within the meaning of this Section 7.9 shall be decided by the Expert. The Expert shall finally determine any Reconciliation Dispute and the determinations of the Expert pursuant to this Section 7.9 shall be binding on the Corporate Taxpayer and its Subsidiaries and the Disputing Party and may be entered and enforced in any court having jurisdiction.

Section 7.10    Consent to Jurisdiction . Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the State of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto further agrees that service of any process, summons, notice or document by United States certified or registered mail (in each such case, prepaid return receipt requested) to such party's respective address set forth in the Company's books and records or such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

19

Section 7.11    Waiver of Jury Trial . BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

Section 7.12    Withholding . The Corporate Taxpayer shall be entitled to deduct and withhold from any payment payable pursuant to this Agreement such amounts as the Corporate Taxpayer is required to deduct and withhold with respect to the making of such payment under the Code or any provision of U.S. federal, state, local or non-U.S. Tax law. To the extent that amounts are so withheld and paid over to the appropriate Taxing Authority by the Corporate Taxpayer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the relevant TRA Holder.

Section 7.13    Admission of the Corporate Taxpayer into a Consolidated Group; Transfers of Corporate Assets .

(a)    If the Corporate Taxpayer becomes a member of an affiliated, consolidated, combined, or unitary group of corporations that files a consolidated, combined, or unitary income Tax Return pursuant to Sections 1501 *et seq.* of the Code or any corresponding provisions of U.S. state or local Tax law, or would be eligible to become a member of such a group at the election of one or members of that group, then, subject to the application of the Valuation Assumptions upon a Change of Control: (i) the provisions of this Agreement shall be applied with respect to the group as a whole; and (ii) Tax Benefit Payments, Early Termination Payments and other applicable items hereunder shall be computed with reference to the consolidated taxable income of the group as a whole.

(b)    If any entity that is obligated to make a Tax Benefit Payment or Early Termination Payment hereunder transfers one or more assets to a corporation (or a Person classified as a corporation for Tax purposes) with which such entity does not file a consolidated Tax Return pursuant to Section 1501 of the Code or any provisions of state or local Tax law, such entity, for purposes of calculating the amount of any Tax Benefit Payment or Early Termination Payment (e.g., calculating the gross income of the entity and determining the Realized Tax Benefit or Realized Tax Detriment of such entity) due hereunder, shall be treated as having disposed of such asset in a fully taxable transaction on the date of such contribution.

20

The consideration deemed to be received by such entity shall be equal to the fair market value of the contributed asset. Thus, for example, in determining the Hypothetical Tax Liability of the entity, the taxable income of the entity shall be determined by treating the entity as having sold the asset for its fair market value, recovering any basis applicable to such asset (using the Tax basis that such asset would have had at such time if no Basis Adjustments had been made), while the Actual Tax Liability of the entity would be determined by recovering the actual Tax basis of the asset that reflects any Basis Adjustments. For purposes of this Section 7.13, a transfer of a partnership interest shall be treated as a transfer of the transferring partner's share of each of the assets and liabilities of that partnership. If any entity that is obligated to make a Tax Benefit Payment or Early Termination Payment hereunder transfers one or more assets to a partnership (or a Person classified as a partnership for Tax purposes), the principles of this Section 7.13(b) and this Agreement shall govern the treatment of such transfer and any subsequent allocations of income, gain, loss or deductions from such partnership to such entity.

Section 7.14    Confidentiality .

(a)    The Agent, each TRA Holder and each of the TRA Holder's assignees acknowledges and agrees that the information of the Corporate Taxpayer is confidential and, except in the course of performing any duties as necessary for the Corporate Taxpayer and its Affiliates, as required by law or legal process or to enforce the terms of this Agreement, such person shall keep and retain in the strictest confidence and not disclose to any Person any confidential matters, acquired pursuant to this Agreement, of the Corporate Taxpayer and its Affiliates and successors, concerning the Company and its Affiliates and successors or the TRA Holders, learned by the Agent or any TRA Holder heretofore or hereafter. This Section 7.14 shall not apply to (i) any information that has been made publicly available by the Corporate Taxpayer or any of its Affiliates, becomes public knowledge (except as a result of an act of the Agent or a TRA Holder in violation of this Agreement) or is generally known to the business community and (ii) the disclosure of information (A) as may be proper in the course of performing such TRA Holder's obligations, or monitoring or enforcing such TRA Holder's rights, under this Agreement, (B) as part of such TRA Holder's normal reporting, rating or review procedure (including normal credit rating and pricing process), or in connection with such TRA Holder's or such TRA Holder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such TRA Holder's (or any of its Affiliates') Affiliates, auditors, accountants, attorneys or other agents, (C) to any bona fide prospective assignee of such TRA Holder's rights under this Agreement, or prospective merger or other business combination partner of such TRA Holder, provided that such assignee or merger partner agrees to be bound by the provisions of this Section 7.14, (D) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation; provided that any TRA Holder required to make any such disclosure to the extent legally permissible shall provide the Corporate Taxpayer prompt notice of such disclosure, or to regulatory authorities or similar examiners conducting regulatory reviews or examinations (without any such notice to the Corporate Taxpayer), or (E) to the extent necessary for a TRA Holder to prepare and file its Tax Returns, to respond to any inquiries regarding such Tax Returns from any Taxing Authority or to prosecute or defend any Tax Proceeding with respect to such Tax Returns. Notwithstanding anything to the contrary herein, the Agent (and each employee, representative or other agent of Agent or its assignees, as applicable) and each TRA Holder and each of its assignees (and each employee, representative or other agent of such

21

TRA Holder or its assignees, as applicable) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the Corporate Taxpayer, Carvana Co. Sub, the Company, the Agent, the TRA Holders and their Affiliates, and any of their transactions, and all materials of any kind (including opinions or other Tax analyses) that are provided to the Agent or the TRA Holder relating to such Tax treatment and Tax structure.

(b)    If the Agent or an assignee or a TRA Holder or an assignee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 7.14 , the Corporate Taxpayer shall have the right and remedy to have the provisions of this Section 7.14 specifically enforced by injunctive relief or otherwise by any court of competent jurisdiction without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Corporate Taxpayer or any of its Subsidiaries or the TRA Holders and the accounts and funds managed by the Corporate Taxpayer and that money damages alone shall not provide an adequate remedy to such Persons. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

Section 7.15    No Similar Agreements . Neither the Corporate Taxpayer nor any of its Subsidiaries shall enter into any additional agreement providing rights similar to this Agreement to any Person (including any agreement pursuant to which the Corporate Taxpayer is obligated to pay amounts with respect to tax benefits resulting from any net operating losses or other tax attributes to which the Corporate Taxpayer becomes entitled as a result of a transaction) without the prior written consent of the TRA Holders who would be entitled to receive more than fifty percent (50%) of the aggregate amount of the Early Termination Payments payable to all TRA Holders hereunder if the Corporate Taxpayer had exercised its right of early termination on the date of the most recent Exchange (excluding, for purposes of this sentence, all payments made to any TRA Holder pursuant to this Agreement since the date of such most recent Exchange).

Section 7.16    Change in Law . Notwithstanding anything herein to the contrary, if, in connection with an actual or proposed change in law, a TRA Holder reasonably believes that the existence of this Agreement could cause income (other than income arising from receipt of a payment under this Agreement) recognized by such TRA Holder upon any Exchange to be treated as ordinary income rather than capital gain (or otherwise taxed at ordinary income rates) for U.S. federal income and all applicable state and local Tax purposes or would have other material adverse Tax consequences to the TRA Holder and/or its direct or indirect owners, then at the election of the TRA Holder and to the extent specified by the TRA Holder, this Agreement (i) shall cease to have further effect with respect to such TRA Holder, (ii) shall not apply to an Exchange by the TRA Holder occurring after a date specified by it, or (iii) shall otherwise be amended in a manner determined by the TRA Holder to waive any benefits to which such TRA Holder would otherwise be entitled under this Agreement, provided that such amendment shall not result in an increase in or acceleration of payments under this Agreement at any time as compared to the amounts and times of payments that would have been due in the absence of such amendment.

*[Signature Pages Follow]*

22

IN WITNESS WHEREOF, the Corporate Taxpayer, the Company, the Agent, and the TRA Holders have duly executed this Agreement as of the date first written above.

**CORPORATE TAXPAYER:**

CARVANA CO.

By: _____
Name:
Title:

**COMPANY:**

CARVANA GROUP, LLC

By: _____
Name:
Title:

**AGENT:**

[ _____ ]

*[The signatures of the TRA Holders are attached in <u>Schedule A</u> .]*

*Signature Page to Tax Receivable Agreement*

**SCHEDULE A**
**TRA HOLDERS**

**FORM OF EXCHANGE AGREEMENT**

This EXCHANGE AGREEMENT (as it may be amended from time to time in accordance with the terms hereof, the " Agreement "), dated as of [●], 2017 and effective as of immediately prior to the consummation of the IPO (as defined below) (the " Effective Time "), is made by and among Carvana Co., a Delaware corporation (" Pubco "), Carvana Co. Sub LLC, a Delaware limited liability company that has elected to be taxed as a corporation for U.S. federal income tax purposes (the " Corporation "), Carvana Group, LLC, a Delaware limited liability company (the " Company "), and the holders from time to time of the Company's Common Units (as defined below) listed on Exhibit A hereto (collectively, the " Members " and individually, a " Member ").

WHEREAS, the Corporation is a wholly owned Subsidiary (as defined below) of Pubco;

WHEREAS, in connection with the initial public offering of Pubco's Class A Common Stock (the " IPO "), Pubco intends to consummate the transactions described in the Registration Statement on Form S-1, as amended (Registration No. 333-[●]); and

WHEREAS, the parties to this Agreement desire to provide for the exchange of Exchangeable Units together with shares of Class B Common Stock (as defined below) for shares of Class A Common Stock (as defined below), on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**

**Section 1.1    Definitions.**

As used in this Agreement, the following terms have the following meanings:

" Adjusted Participation Threshold " means, with respect to any Class B Common Unit as of any date of determination, an amount equal to (i) the Participation Threshold of such Class B Common Unit as of such date divided by (ii) the Exchange Rate as of such date.

" Affiliate " has the meaning set forth in the LLC Agreement.

" Agreement " has the meaning set forth in the preamble.

" Business Day " means any day other than a Saturday, Sunday or other day on which the banks in New York, New York or Phoenix, Arizona are authorized by law to be closed.

" Cash Payment " means, with respect to any Exchange, an amount in cash equal to the product of (x) the Net Exchanged Unit Amount, (y) the then-applicable Exchange Rate, and (z) the Class A Common Stock Value.

A " <u>Change of Control</u> " shall be deemed to have occurred if or upon:

(i) the stockholders and the Board of Directors of Pubco approve, in accordance with its certificate of incorporation and applicable law, the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the Corporation's assets (determined on a consolidated basis), including a sale of all of the equity interests in the Company, to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than to any directly or indirectly wholly owned subsidiary of Pubco, and such sale, lease or transfer is consummated;

(ii) the stockholders and the Board of Directors of Pubco approve, in accordance with its certificate of incorporation and applicable law, a merger or consolidation of Pubco with any other Person, other than a merger or consolidation which would result in the Voting Securities of Pubco outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into Voting Securities of the surviving entity) at least 50.01% of the total voting power represented by the Voting Securities of the Corporation or such surviving entity outstanding immediately after such merger or consolidation, and such merger or consolidation is consummated; or

(iii) the acquisition, directly or indirectly, by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act) (other than (a) a trustee or other fiduciary holding securities under an employee benefit plan of Pubco, or (b) a corporation or other entity owned, directly or indirectly, by all of the stockholders of Pubco in substantially the same proportions as their ownership of stock of Pubco) of beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of at least 50.01% of the aggregate voting power of the Voting Securities of Pubco; <u>provided</u> , that Pubco's Board of Directors recommends or otherwise approves or determines that such acquisition is in the best interests of Pubco and its stockholders.

" <u>Change of Control Exchange</u> " has the meaning set forth in <u>Section 2.1(b)(i)</u> .

" <u>Change of Control Exchange Date</u> " has the meaning set forth in <u>Section 2.1(b)(iii)</u> .

" <u>Class A Common Stock</u> " means the Class A common stock, par value $0.001 per share, of Pubco.

" <u>Class A Common Stock Value</u> " means, with respect to any Exchange, the arithmetic average of the volume weighted average prices for a share of Class A Common Stock on the principal U.S. securities exchange or automated or electronic quotation system on which the Class A Common Stock trades, as reported by Bloomberg, L.P., or its successor, for each of the three (3) consecutive full Trading Days ending on and including the last full Trading Day immediately prior to the related Exchange Date, subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. If the Class A Common Stock no longer trades on a securities exchange or automated or electronic quotation system, then the Class A Common Stock Value shall be determined in good faith by a majority of the directors of Pubco that do not have an interest in the Exchangeable Units and shares of Class B Common Stock being Exchanged.

" <u>Class A Common Unit</u> " has the meaning set forth in the LLC Agreement.

2

" <u>Class B Common Stock</u> " means the Class B common stock, par value $0.001 per share, of Pubco.

" <u>Class B Common Unit</u> " has the meaning set forth in the LLC Agreement.

" <u>Code</u> " means the Internal Revenue Code of 1986, as amended.

" <u>Common Unit</u> " has the meaning set forth in the LLC Agreement.

" <u>Contribution Notice</u> " has the meaning set forth in <u>Section 2.1(a)(iv)</u> .

" <u>Corporation</u> " has the meaning set forth in the preamble.

" <u>Effective Time</u> " has the meaning set forth in the preamble.

" <u>Exchange</u> " has the meaning set forth in <u>Section 2.1(a)(i)</u> .

" <u>Exchange Act</u> " means the Securities Exchange Act of 1934, as amended.

" <u>Exchange Date</u> " has the meaning set forth in <u>Section 2.1(a)(iii)</u> .

" <u>Exchange Notice</u> " has the meaning set forth in <u>Section 2.1(a)(iii)</u> .

" <u>Exchange Rate</u> " means the number of shares of Class A Common Stock for which one Class A Common Unit is entitled to be Exchanged. The Exchange Rate will also be used to determine the number of shares of Class B Common Stock that a Member must surrender upon an Exchange, to the extent such Member holds Class B Common Stock. On the date of this Agreement, the Exchange Rate shall be [●], subject to adjustment pursuant to <u>Section 2.2</u> of this Agreement.

" <u>Exchangeable Class B Common Unit</u> " means, with respect to any Exchange and any Member, a Vested Class B Common Unit (as of the applicable Exchange Date) with an Adjusted Participation Threshold less than the applicable Class A Common Stock Value.

" <u>Exchangeable Unit</u> " means a Class A Common Unit or an Exchangeable Class B Common Unit. For the avoidance of doubt, the Class A Common Units held by the Corporation are not Exchangeable Units.

" <u>First Exchange Time</u> " means the expiration or earlier waiver of any lockup agreement relating to the IPO.

" <u>Governmental Entity</u> " means any court, administrative agency, regulatory body, commission, or other governmental authority, board, bureau, or instrumentality, domestic or foreign, and any subdivision thereof.

" <u>IPO</u> " has the meaning set forth in the recitals.

3

"Liens" means any and all liens, charges, security interests, options, claims, mortgages, pledges, proxies, voting trusts or agreements, obligations, understandings or arrangements, or other restrictions on title or transfer of any nature whatsoever.

"LLC Agreement" means the Fourth Amended and Restated Limited Liability Company Agreement of the Company dated as of the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"Manager" has the meaning set forth in the LLC Agreement.

"Member" has the meaning set forth in the preamble.

"Net Exchangeable Class B Common Units" means, with respect to an Exchange, an amount equal to the product of (i) the number of Exchangeable Class B Common Units set forth in the applicable Exchange Notice and (ii) an amount (greater than zero) equal to (A) one (1) minus (B) a fraction, the numerator of which is the weighted average Adjusted Participation Threshold of the Exchangeable Class B Common Units set forth in the applicable Exchange Notice and the denominator of which is the applicable Class A Common Stock Value. For purposes of this calculation, the number of Exchangeable Class B Common Units will be calculated on the close of business on the day before the Exchange Date based upon the applicable Class A Common Stock Value and the exchanging Member's Class B Common Unit vesting schedule, and, if necessary, the number of Exchangeable Class B Common Units that such Member requested to be exchanged in the related Exchange Notice will be adjusted accordingly.

"Net Exchanged Unit Amount" means, with respect to an Exchange, (i) the number of Class A Common Units set forth in the applicable Exchange Notice and (ii) the Net Exchangeable Class B Common Units set forth in the applicable Exchange Notice.

"Participation Threshold" has the meaning set forth in the LLC Agreement

"Permitted Transferee" has the meaning set forth in the LLC Agreement.

"Person" means any natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, bank trust company, land trust, business trust or other organization, whether or not a legal entity, custodian, trustee-executor, administrator, nominee or entity in a representative capacity, and any government or agency or political subdivision thereof.

"Pubco" has the meaning set forth in the recitals.

"Registration Rights Agreement" means the Second Amended and Restated Registration Rights Agreement by and among Pubco and the other parties thereto, dated as of the date hereof, as the same may be amended, amended and restated or replaced from time to time.

"Retraction Notice" has the meaning set forth in Section 2.1(a)(vi).

"SEC" means the Securities and Exchange Commission.

4

" <u>Securities Act</u> " means the U.S. Securities Act of 1933, as amended.

" <u>Subsidiary</u> " means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a " <u>Subsidiary</u> " of any Person shall be given effect only at such times that such Person has one or more Subsidiaries.

" <u>Takeover Laws</u> " has the meaning set forth in <u>Section 3.1</u> .

" <u>Tax Receivable Agreement</u> " means that certain Tax Receivable Agreement, dated on or about the date hereof, among Pubco, the Company and the other parties thereto, as the same may be amended, amended and restated or replaced from time to time.

" <u>Trading Day</u> " means a day on which the principal U.S. securities exchange on which the Class A Common Stock is listed or admitted to trading is open for the transaction of business (unless such trading shall have been suspended for the entire day).

" <u>Vested Class B Common Unit</u> " has the meaning set forth in the LLC Agreement.

" <u>Voting Securities</u> " means any equity securities of Pubco that are entitled to vote generally in matters submitted for a vote of Pubco's stockholders or generally in the election of Pubco's Board of Directors.

<div align="center">

**ARTICLE II**

</div>

**Section 2.1    <u>Exchange of Common Units</u> .**

(a)    <u>Elective Exchanges</u> .

(i)    From and after the First Exchange Time, each Member shall be entitled, upon the terms and subject to the conditions hereof and the LLC Agreement, to surrender Exchangeable Units and, if such Member also holds Class B Common Stock, a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate (in each case, free and clear of all Liens) to the Corporation in exchange for the delivery to such Member (or its

<div align="center">5</div>

designee) of either, at the option of the Corporation, (x) a number of shares of Class A Common Stock that is equal to the product of the applicable Net Exchanged Unit Amount multiplied by the Exchange Rate or (y) the applicable Cash Payment. Any exchange of Exchangeable Units and, if applicable, Class B Common Stock for Class A Common Stock or the Cash Payment, as applicable, is defined herein as an " Exchange ." Subject to Section 2.1(a)(ii) , after the First Exchange Time a Member may Exchange Class A Common Units at any time and from time to time, but a Member may not Exchange Class B Common Units more than once per fiscal quarter without the prior consent of the Corporation. The minimum number of Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate, if any) that may be exchanged by any Member shall be the lesser of (A) 20,000 (twenty thousand) and (B) all of the Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate, if any) then held by such Member and its Affiliates, except that such minimum shall not apply if such Exchange is in connection with the exercise of any incidental registration rights pursuant to the Registration Rights Agreement.

(ii)    Notwithstanding anything to the contrary contained herein, no Member shall be entitled to effectuate an Exchange of Exchangeable Units (and a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate, if any) as set forth in this Section 2.1(a) , and the Corporation and Company shall have the right to refuse to honor any request for such an Exchange, if at any time the Corporation or the Company determines based on the advice of counsel that such Exchange (1) would be prohibited by law or regulation (including, without limitation, the unavailability of a registration of such Exchange under the Securities Act, or an exemption from the registration requirements thereof), (2) would not be permitted under any agreement with the Corporation, the Company or any of their Subsidiaries to which the applicable Member is party (including, without limitation, the LLC Agreement), (3) would result in a negative adjustment from the Exchange under Section 743(b) of the Code with respect to the Corporation's interest in the Company so acquired, or (4) solely in the case of an Exchange requested by an officer, director or other personnel of Pubco, the Corporation, the Company or any of their Subsidiaries, would not be permitted under any written policy of Pubco, the Corporation, the Company or any of their Subsidiaries related to restrictions on trading by such officers, directors or other personnel. Upon such determination, the Corporation or the Company (as applicable) shall notify the Member requesting the Exchange of such determination, which such notice shall include an explanation in reasonable detail as to the reason that the Exchange has not been honored.

(iii)    A Member shall exercise its right to effectuate an Exchange of Exchangeable Units, and a corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate (if any), as set forth in this Section 2.1(a) by delivering to the Company, with a contemporaneous copy delivered to the Corporation, during normal business hours, (A) a written election of exchange in respect of the Exchangeable Units to be exchanged substantially in

6

the form of Exhibit B hereto (an " Exchange Notice "), duly executed by such Member, (B) any certificates in such Member's possession representing such Exchangeable Units, (C) any stock certificates in such Member's possession representing such shares of Class B Common Stock and (D) if the Corporation, the Company or any exchanging Subsidiary requires the delivery of the certification contemplated by Section 2.4(b) , such certification or written notice from such Member that it is unable to provide such certification. Unless such Member timely has delivered a Retraction Notice pursuant to Section 2.1(a)(vi) , an Exchange pursuant to this Section 2.1(a) shall be effected on the fifth Business Day following the Business Day on which the Corporation and the Company have received the items specified in clauses (A)-(D) of the first sentence of this Section 2.1(a)(iii) or such later date that is a Business Day specified in the Exchange Notice (such Business Day, the " Exchange Date "); provided , that the Company may establish alternate exchange procedures as necessary in order to facilitate the establishment by a Member of a trading plan meeting the requirements of Rule 10b5-1 under the Exchange Act. On the Exchange Date, all rights of the exchanging Member as a holder of the Exchangeable Units and shares of Class B Common Stock that are subject to the Exchange shall cease, and unless the Corporation has elected Cash Payment, such Member (or its designee) shall be treated for all purposes as having become the record holder of the shares of Class A Common Stock to be received by the exchanging Member in respect of such Exchange.

(iv)    Within two (2) Business Days following the Business Day on which the Corporation and the Company have received the Exchange Notice, the Corporation shall give written notice (the " Contribution Notice ") to the Company (with a copy to the exchanging Member) of its intended settlement method; provided that if the Corporation does not timely deliver a Contribution Notice, the Corporation shall be deemed to have not elected the Cash Payment method.

(v)    A Member may specify, in an applicable Exchange Notice, that the Exchange is to be contingent (including as to timing) upon the occurrence of any transaction or event, including the consummation of a purchase by another Person (whether in a tender or exchange offer, an underwritten offering, Change of Control transaction or otherwise) of shares of Class A Common Stock or any merger, consolidation or other business combination.

(vi)    Notwithstanding anything herein to the contrary, a Member may withdraw or amend its Exchange Notice, in whole or in part, at any time prior to 5:00 p.m. Phoenix, Arizona time, on the Business Day immediately prior to the Exchange Date by giving written notice to the Company (with a copy to the Corporation) specifying (A) the number of withdrawn Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate), (B) the number of Exchangeable Units (and corresponding number of shares of Class B Common Stock after taking into account the Exchange Rate) as to which the Exchange Notice remains in effect, if any, and (C) if the Member so determines, a new Exchange Date or any other new or revised information permitted in the Exchange Notice.

7

(b)    Change of Control . In connection with a Change of Control, and subject to any approval of the Change of Control by the holders of Class A Common Stock and Class B Common Stock that may be required:

(i)    The Corporation shall have the right to require each Member to effectuate an Exchange of some or all of such Member's Exchangeable Units, and a corresponding number of shares of Class B Common Stock (if any) after taking into account the Exchange Rate (in each case, free and clear of all Liens), with the Corporation or, at the option of the Corporation, with any Subsidiary of Pubco, in each case, in exchange for the delivery to the exchanging Member (or its designee) of a number of shares of Class A Common Stock that is equal to the product of the applicable Net Exchanged Unit Amount and the Exchange Rate (such Exchange, a " Change of Control Exchange "); provided that, if the Corporation requires the Members to Exchange less than all of their outstanding Exchangeable Units (and corresponding number of shares of Class B Common Stock (if any) after taking into account the Exchange Rate), each Member's participation in the required Exchange shall be reduced pro rata based on ownership of Exchangeable Units. For the avoidance of doubt, any Exchangeable Units and a corresponding number of shares of Class B Common Stock (if any) held by a Member that are not Exchanged pursuant to a Change of Control Exchange may be Exchanged by such Member pursuant to Section 2.1(a) subject to and in accordance with the terms thereof.

(ii)    The election of the Corporation pursuant to this Section 2.1(b) shall be at the sole discretion of the Corporation upon the approval thereof by a majority of the Board of Directors of Pubco.

(iii)    Any Exchange pursuant to this Section 2.1(b) shall be effective immediately prior to the consummation of the Change of Control (and, for the avoidance of doubt, shall not be effective if such Change of Control is not consummated) (the " Change of Control Exchange Date "). From and after the Change of Control Exchange Date, (x) the Exchangeable Units and shares of Class B Common Stock Exchanged pursuant to this Section 2.1(b) shall be deemed to be transferred to the Corporation, or the exchanging Subsidiary, as applicable, on the Change of Control Exchange Date and (y) the exchanging Member shall cease to have any rights with respect to the Exchangeable Units and shares of Class B Common Stock Exchanged pursuant to this Section 2.1(b) (other than the right to receive shares of Class A Common Stock pursuant to Section 2.1(b)( i ) upon compliance with its obligations under Section 2.1(c) ).

(iv)    The Corporation shall provide written notice of an expected Change of Control to all Members within the earlier of (x) five (5) Business Days following the execution of the agreement with respect to such Change of Control and (y) ten (10) Business Days before the proposed date upon which the

8

contemplated Change of Control is to be effected, indicating in such notice such information as may reasonably describe the Change of Control transaction, subject to applicable law, including the date of execution of such agreement or such proposed effective date, as applicable, the amount and types of consideration to be paid for Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, in the Change of Control (which consideration shall be equivalent whether paid for Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock), any election with respect to types of consideration that a holder of Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, shall be entitled to make in connection with the Change of Control, the percentage of total Exchangeable Units and shares of Class B Common Stock or shares of Class A Common Stock, as applicable, to be transferred to the acquirer by all shareholders in the Change of Control, and the number of Exchangeable Units and shares of Class B Common Stock held by each Member that the Corporation intends to require to be Exchanged for shares of Class A Common Stock in connection with the Change of Control. The Corporation shall update such notice from time to time to reflect any material changes to such notice. The Corporation may satisfy any such notice and update requirements described in the preceding two sentences by providing such information on a Form 8-K, Schedule TO, Schedule 14D-9, Preliminary Merger Proxy on Schedule 14A, Definitive Merger Proxy on Schedule 14A or similar form filed with the SEC.

(c)    Exchange Procedure on Change of Control Exchange . On or prior to the Change of Control Exchange Date, the Member shall deliver to the Corporation or the exchanging Subsidiary, as applicable, with a contemporaneous copy delivered to the Company, in each case during normal business hours at the principal executive offices of the Company and the Corporation, respectively: (A) an Exchange Notice, duly executed by such Member, (B) any certificates in such Member's possession representing all Exchangeable Units being surrendered by the Member, (C) any stock certificates in such Member's possession representing all shares of Class B Common Stock being surrendered by the Member and (D) if the Corporation, the Company or the exchanging Subsidiary requires the delivery of the certification contemplated by Section 2.4(b) , such certification or written notice from such Member that it is unable to provide such certification.

(d)    Exchange Consideration . As promptly as practicable on or after the Exchange Date or Change of Control Exchange Date, as applicable, provided the Member has satisfied its obligations under Section 2.1(a)(iii) or Section 2.1(c) , as applicable, the Company or the Corporation shall deliver or cause to be delivered to such Member (or its designee), either certificates or evidence of book-entry shares representing the number of shares of Class A Common Stock deliverable upon the applicable Exchange, registered in the name of the relevant exchanging Member (or its designee) or, if the Corporation has so elected, the Cash Payment. Notwithstanding anything set forth in this Section 2.1(d) to the contrary, to the extent the Class A Common Stock issued in the exchange will be settled through the facilities of The Depository Trust Company, the Company or the Corporation will, upon the written

9

instruction of an exchanging Member, deliver the shares of Class A Common Stock deliverable to such Member through the facilities of The Depository Trust Company to the account of the participant of The Depository Trust Company designated by such Member in the Exchange Notice. Upon a Member exercising its right to Exchange in accordance with Section 2.1(a)(i) or the occurrence of a Change of Control Exchange, the Company or the Corporation shall take such actions as (A) may be required to ensure that such Member receives the shares of Class A Common Stock or the Cash Payment that such exchanging Member is entitled to receive in connection with such Exchange pursuant to this Section 2.1 , and (B) may be reasonably within its control that would cause such Exchange to be treated for purposes of the Tax Receivable Agreement as an "Exchange" under the Tax Receivable Agreement.

(e)    Legends .

(i)    The shares of Class A Common Stock issued upon an Exchange, other than any such shares issued in an Exchange subject to an effective registration statement under the Securities Act, shall bear a legend in substantially the following form:

THE TRANSFER OF THESE SECURITIES HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION, AND MAY NOT BE SOLD OR TRANSFERRED OTHER THAN IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (OR OTHER APPLICABLE LAW), OR AN EXEMPTION THEREFROM.

(ii)    If (A) any shares of Class A Common Stock have been sold pursuant to a registration statement that has been declared effective by the SEC, (B) all of the applicable conditions of Rule 144 are met, or (C) the legend (or a portion thereof) otherwise ceases to be applicable, Pubco, upon the written request of the holder thereof, shall promptly provide such holder or its respective transferees with new certificates (or evidence of book-entry share) for securities of like tenor not bearing the provisions of the legend with respect to which the restriction has terminated. In connection therewith, such holder shall provide Pubco with such information in its possession as Pubco may reasonably request (which may include an opinion of counsel reasonably acceptable to Pubco) in connection with the removal of any such legend.

(f)    Cancellation of Class B Common Stock . Any shares of Class B Common Stock surrendered in an Exchange shall automatically be deemed cancelled without any action on the part of any Person, including the Corporation or Pubco. Any such cancelled shares of Class B Common Stock shall no longer be outstanding, and all rights with respect to such shares shall automatically cease and terminate.

(g)    Expenses . Subject to any other arrangement or agreement among the Company and an applicable Member, the Corporation, the Company, any exchanging

10

Subsidiary and each exchanging Member shall bear their own expenses in connection with the consumption of any Exchange, whether or not any such Exchange is ultimately consummated, except that the Corporation shall bear any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, any Exchange; <u>provided</u>, however, that if any shares of Class A Common Stock are to be delivered in a name other than that of the Member that requested the Exchange (or The Depository Trust Company or its nominee for the account of a participant of The Depository Trust Company that will hold the shares for the account of such Member) or the Cash Payment is to be paid to a Person other than the Member that requested the Exchange, then such Member or the Person in whose name such shares are to be delivered or to whom the Cash Payment is to be paid shall pay to the Corporation the amount of any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, such Exchange or shall establish to the reasonable satisfaction of the Corporation that such tax has been paid or is not payable.

(h)    <u>Publicly Traded Partnership</u>. Notwithstanding anything to the contrary herein, if the Manager of the Company, after consultation with its outside legal counsel and tax advisor, shall determine in good faith that interests in the Company do not meet the requirements of Treasury Regulation Section 1.7704-1(h) (or other provisions of those Regulations as determined by the Manager in its sole discretion), the Company may impose such restrictions on Exchanges as the Company may reasonably determine to be necessary or advisable so that the Company is not treated as a "publicly traded partnership" under Section 7704 of the Code.

**Section 2.2    <u>Adjustment.</u>**

The Exchange Rate shall be adjusted accordingly if there is: (a) any subdivision (by any stock or unit split, stock or unit dividend or distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse stock or unit split, reclassification, reorganization, recapitalization or otherwise) of the shares of Class B Common Stock or Common Units that is not accompanied by a substantively identical subdivision or combination of the Class A Common Stock; or (b) any subdivision (by any stock or unit split, stock or unit dividend or distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse stock or unit split, reclassification, reorganization, recapitalization or otherwise) of the shares of Class A Common Stock that is not accompanied by a substantively identical subdivision or combination of the shares of Class B Common Stock or Common Units. To the extent not reflected in an adjustment to the Exchange Rate, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, then upon any subsequent Exchange, an exchanging Member shall be entitled to receive the amount of such security, securities or other property that such exchanging Member would have received if such Exchange had occurred immediately prior to the effective date of such reclassification, reorganization, recapitalization or other similar transaction, taking into account any adjustment as a result of any subdivision (by any split, distribution or dividend, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse split, reclassification, recapitalization or otherwise) of such security, securities or other property that occurs after the effective time of such reclassification, reorganization, recapitalization or other

11

similar transaction. For the avoidance of doubt, if there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed or exchanged into or for another security, securities or other property, this Section 2.2 shall continue to be applicable, *mutatis mutandis* , with respect to such security or other property.

**Section 2.3    Class A Common Stock to be Issued.**

(a)    Pubco shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, such number of shares of Class A Common Stock as shall be sufficient to effect the conversion of all outstanding Common Units; provided , however, that nothing contained herein shall be construed to preclude Pubco from satisfying its obligations in respect of any such Exchange by delivery of unencumbered purchased shares of Class A Common Stock (which may or may not be held in the treasury of Pubco or any subsidiary thereof).

(b)    Pubco has taken and will take all such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions or dispositions of equity securities of Pubco (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of Pubco for such purposes that result from the transactions contemplated by this Agreement, by each director or officer of Pubco (including directors-by-deputization) who may reasonably be expected to be subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to Pubco upon the registration of any class of equity security of Pubco pursuant to Section 12 of the Exchange Act (with the authorizing resolutions specifying the name of each such officer or director whose acquisition or disposition of securities is to be exempted and the number of securities that may be acquired and disposed of by each such Person pursuant to this Agreement).

(c)    If any Takeover Law or other similar law or regulation becomes or is deemed to become applicable to this Agreement or any of the transactions contemplated hereby, Pubco shall use its reasonable best efforts to render such law or regulation inapplicable to all of the foregoing.

(d)    Pubco covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable and not subject to any preemptive right of stockholders of Pubco or to any right of first refusal or other right in favor of any Person.

**Section 2.4    Withholding; Certification of Non-Foreign Status.**

(a)    If the Corporation or the Company shall be required to withhold any amounts by reason of any federal, state, local or foreign tax rules or regulations in respect of any Exchange, the Corporation or the Company, as the case may be, shall be entitled to take such action as it deems appropriate in order to ensure compliance with such withholding requirements, including, at its option, withholding shares of Class A Common Stock with a fair market value equal to the minimum amount of any taxes that

12

the Corporation or the Company, as the case may be, may be required to withhold with respect to such Exchange. To the extent that amounts are (or property is) so withheld and paid over to the appropriate taxing authority, such withheld amounts (or property) shall be treated for all purposes of this Agreement as having been paid (or delivered) to the applicable Member.

(b)    Notwithstanding anything to the contrary herein, each of the Corporation and the Company may, in its discretion, require that an exchanging Member deliver to the Corporation or the Company, as the case may be, a certification of non-foreign status in accordance with Treasury Regulation Section 1.1445-2(b) prior to an Exchange. In the event the Corporation or the Company has required delivery of such certification but an exchanging Member does not provide such certification, the Corporation or the Company, as the case may be, shall nevertheless deliver or cause to be delivered to the exchanging Member the Class A Common Stock or the Cash Payment in accordance with Section  2.1 , but subject to withholding as provided in Section 2.4(a) .

**Section 2.5    Tax Treatment.**

Unless otherwise required by applicable law, the parties hereto acknowledge and agree that any Exchange with the Company or the Corporation shall be treated as a direct exchange between the Corporation and the Member for U.S. federal and applicable state and local income tax purposes. The parties hereto intend to treat any Exchange consummated hereunder as a taxable sale of the Exchangeable Units by the exchanging Member to the Corporation for U.S. federal and applicable state and local income tax purposes except as otherwise mutually agreed to in writing by the exchanging Member and the Corporation and no party hereto shall take an position inconsistent with such intended tax treatment on any tax return, amendment thereof or any other communication with a taxing authority, in each case unless otherwise required by a "determination" within the meaning of Section 1313 of the Code.

**Section 2.6    Contribution of the Corporation.**

In connection with any Exchange between a Member and the Corporation, Pubco shall contribute to the Corporation the shares of Class A Common Stock or Cash Payment that the Member is entitled to receive in such Exchange. Unless the Member has timely delivered a Retraction Notice as provided in Section 2.1(a) (vi) , on the Exchange Date (to be effective immediately prior to the close of business on the Exchange Date) (i) Pubco shall make a capital contribution to the Corporation (in the form of the shares of Class A Common Stock or the Cash Payment that the Member is entitled to receive in such Exchange) required under this Section  2.6 , (ii) the Corporation shall transfer such shares of Class A Common Stock or Cash Payment to the exchanging Member, and (iii) in the case of an Exchange for Class A Common Stock, the Company shall issue to the Corporation a number of Class A Common Units equal to the Net Exchanged Unit Amount surrendered by the Member.

**Section 2.7    Distributions.**

No Exchange will impair the right of an exchanging Member to receive any distribution for periods ending on or prior to the Exchange Date for such Exchange (but for which payment

13

had not yet been made with respect to the Exchangeable Units in question at the time the Exchange is consummated); provided that, for purposes of this Section 2.7 , the exchanging Member's right to receive its pro rata portion of any distribution by the Company in respect of such periods shall not be deemed impaired to the extent that the Company has not paid the Corporation its pro rata portion of such distribution prior to the consummation of the applicable Exchange.

## ARTICLE III

**Section 3.1    Representations and Warranties of the Corporation.**

The Corporation represents and warrants that (i) it is a corporation duly incorporated and is existing and in good standing under the laws of the State of Delaware, (ii) it has all requisite corporate power and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby and to deliver the Class A Common Stock in accordance with the terms hereof, (iii) the execution and delivery of this Agreement by the Corporation and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Corporation, including all actions necessary to ensure that the acquisition of shares of Class A Common Stock pursuant to the transactions contemplated hereby, to the fullest extent of each of the Corporation's Board of Directors' power and authority and to the extent permitted by law, shall not be subject to any "moratorium," "control share acquisition," "business combination," "fair price" or other form of anti-takeover laws and regulations of any jurisdiction that may purport to be applicable to this Agreement or the transactions contemplated hereby (collectively, " Takeover Laws "), (iv) this Agreement constitutes a legal, valid and binding obligation of the Corporation enforceable against the Corporation in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, and (v) the execution, delivery and performance of this Agreement by the Corporation and the consummation by the Corporation of the transactions contemplated hereby will not (A) result in a violation of the certificate of incorporation of the Corporation or the bylaws of the Corporation or (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Corporation is a party, or (C) based on the representations to be made by each Member pursuant to the written election in the form of Exhibit A attached hereto in connection with Exchanges made pursuant to the terms of the Agreement, result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Corporation or by which any property or asset of the Corporation is bound or affected, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not reasonably be expected to have a material adverse effect on the Corporation or its business, financial condition or results of operations.

**Section 3.2    Representations and Warranties of Pubco.**

Pubco represents and warrants that (i) it is a corporation duly incorporated and is existing and in good standing under the laws of the State of Delaware, (ii) it has all requisite corporate power and authority to enter into and perform this Agreement and to consummate the

14

transactions contemplated hereby and to issue the Class A Common Stock in accordance with the terms hereof, (iii) the execution and delivery of this Agreement by Pubco and the consummation by it of the transactions contemplated hereby (including the issuance of the Class A Common Stock) have been duly authorized by all necessary corporate action on the part of Pubco, including all actions necessary to ensure that the acquisition of shares of Class A Common Stock pursuant to the transactions contemplated hereby, to the fullest extent of each of Pubco's Board of Directors' power and authority and to the extent permitted by law, shall not be subject to any Takeover Laws, (iv) this Agreement constitutes a legal, valid and binding obligation of Pubco enforceable against Pubco in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, and (v) the execution, delivery and performance of this Agreement by Pubco and the consummation by Pubco of the transactions contemplated hereby will not (A) result in a violation of the certificate of incorporation of Pubco or the bylaws of Pubco or (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which Pubco is a party, or (C) based on the representations to be made by each Member pursuant to the written election in the form of Exhibit A attached hereto in connection with Exchanges made pursuant to the terms of the Agreement, result in a violation of any law, rule, regulation, order, judgment or decree applicable to Pubco or by which any property or asset of Pubco is bound or affected, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not reasonably be expected to have a material adverse effect on Pubco or its business, financial condition or results of operations.

Section 3.3    **Representations and Warranties of the Company.**

The Company represents and warrants that (i) it is a limited liability company duly formed and is existing and in good standing under the laws of the State of Delaware, (ii) it has all requisite power and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby, (iii) the execution and delivery of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company, (iv) this Agreement constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, (v) it is an entity treated as a partnership for U.S. federal income tax purposes and is not classified as a "publicly traded partnership" as defined under Section 7704 of the Code, and (vi) the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not (A) result in a violation of the certificate of formation of the Company or the LLC Agreement or (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company is a party, or (C) result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Company or by which any property or asset of the Company is bound or affected, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not reasonably be expected to have a material adverse effect on the Company or its business, financial condition or results of operations.

15

**Section 3.4**    **Representations and Warranties of the Members.**

Each Member, severally and not jointly, represents and warrants that (i) if it is not a natural person, that it is duly incorporated or formed and, to the extent such concept exists in its jurisdiction of organization, is existing and in good standing under the laws of such jurisdiction, (ii) it has all requisite legal capacity and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby, (iii) if it is not a natural person, the execution and delivery of this Agreement by it and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate or other entity action on the part of such Member, (iv) this Agreement constitutes a legal, valid and binding obligation of such Member enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally and (v) the execution, delivery and performance of this Agreement by such Member and the consummation by such Member of the transactions contemplated hereby will not (A) if it is not a natural person, result in a violation of the certificate of incorporation, bylaws or other organizational documents of such Member, (B) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Member is a party or by which any property or asset of such Member is bound or affected, or (C) result in a violation of any law, rule, regulation, order, judgment or decree applicable to such Member, except with respect to clause (B) or (C) for any conflicts, defaults, accelerations, terminations, cancellations or violations that would not in any material respect result in the unenforceability against such Member of this Agreement.

**ARTICLE IV**

**Section 4.1**    **Notices.**

All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) delivered by means of electronic mail (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 5:00 p.m. Phoenix, Arizona time on a Business Day, and otherwise on the next Business Day, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records (or below, with respect to the Corporation), or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

16

If to the Company, the Corporation or Pubco to :

    c/o Carvana Co.
    4020 E. Indian School Road
    Phoenix, AZ 85018
    Telephone: (602) 852-6604
    Attention: Paul Breaux, General Counsel
    E-mail: paul.breaux@carvana.com

with a copy (which shall not constitute notice to the Company, the Corporation or Pubco) to :

    Kirkland & Ellis LLP
    300 North LaSalle
    Chicago, IL 60654
    Telephone: (312) 862-2133
    Attention: Robert M. Hayward, P.C.
    E-mail: robert.hayward@kirkland.com

**Section 4.2**    **Permitted Transferees.**

To the extent that a Member (or an applicable Permitted Transferee of such Member) validly transfers after the date hereof any or all of its Common Units and corresponding shares of Class B Common Stock after taking into account the Exchange Rate (to the extent that such Member holds such shares), to a Permitted Transferee of such Person or to any other Person in a transaction not in contravention of, and in accordance with, the LLC Agreement, then the transferee thereof shall have the right to execute and deliver a joinder to this Agreement, in the form attached hereto as Exhibit C. Upon execution of any such joinder, such transferee shall, with respect to such transferred Common Units and shares of Class B Common Stock (to the extent that such Member holds such shares), be entitled to all of the rights and bound by each of the obligations applicable to the relevant transferor hereunder; _provided_ that the transferor shall remain entitled to all of the rights and bound by each of the obligations with respect to Common Units and shares of Class B Common Stock (to the extent that such Member holds such shares) that were not so transferred.

**Section 4.3**    **Severability.**

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or entity or any circumstance, is found to be invalid or unenforceable in any jurisdiction, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

17

**Section 4.4    Counterparts.**

This Agreement and any amendments may be executed simultaneously in two or more counterparts and delivered via facsimile or .pdf, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

**Section 4.5    Entire Agreement.**

This Agreement together with the LLC Agreement and the Tax Receivables Agreement (a) constitutes the entire agreement and supersedes all other prior agreements, both written and oral, among the parties with respect to the subject matter hereof and (b) is not intended to confer upon any Person, other than the parties hereto and their Permitted Transferees, any rights or remedies hereunder.

**Section 4.6    Further Assurances.**

Each party hereto shall execute, deliver, acknowledge and file such other documents and take such further actions as may be reasonably requested from time to time by any other party hereto to give effect to and carry out the transactions contemplated herein.

**Section 4.7    Governing Law.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**Section 4.8    Consent to Jurisdiction.**

Each party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the State of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto further agrees that service of any process, summons, notice or document by United States certified or registered mail (in each such case, prepaid return receipt requested) to such party's respective address set forth in the Company's books and records or such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

18

**Section 4.9**    **Waiver of Jury Trial.**

BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

**Section 4.10**    **Amendments.**

The provisions of this Agreement may be amended only by the affirmative vote or written consent of each of (i) the Corporation, (ii) the Company and (iii) Members holding a majority of the then outstanding Class A Common Units (excluding Class A Common Units held by the Corporation); provided that no amendment may disproportionately affect the rights of a Member compared to other Members without the consent of such Member. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**Section 4.11**    **Assignment.**

Neither this Agreement nor any of the rights or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors, assigns and Permitted Transferees.

**Section 4.12**    **Independent Obligations.**

The obligations of each Member hereunder are several and not joint with the obligations of any other Member, and no Member shall be responsible in any way for the performance of the obligations of any other Member under hereunder. The decision of each Member to enter into to this Agreement has been made by such Member independently of any other Member. Nothing contained herein, and no action taken by any Member pursuant hereto, shall be deemed to constitute the Members as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Members are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated hereby.

19

**Section 4.13** <u>**Specific Enforcement.**</u>

The parties hereto acknowledge that the remedies at law of the other parties for a breach or threatened breach of this Agreement would be inadequate and, in recognition of this fact, any party to this Agreement, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

*[Signature Pages to Follow]*

20

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year first above written.

CARVANA CO.

By:

Name:

Title:

CARVANA CO. SUB LLC

By:

Name:

Title:

CARVANA GROUP, LLC

By:

Name:

Title:

[Members of Carvana Group, LLC]

By:

Name:

Title:

*[Signature Page to Exchange Agreement]*

**Exhibit A**

| | Immediately Following IPO | |
|---|---|---|
| Name and Address of Member | **Number of Common Units Owned** | **Number of Class B Shares Owned** |
| [●] | [●] | [●] |
| [●] | | |
| [●] | | |
| [●] | [●] | [●] |
| [●] | | |
| [●] | | |

**Exhibit B**

[Form of]
Exchange Notice

Carvana Co. Sub LLC
c/o Carvana Co.
4020 E. Indian School Road
Phoenix, AZ 85018
Telephone: (602) 852-6604
Attention: Ernest C. Garcia III, Paul Breaux
Email: ernie.garcia@carvana.com , paul.breaux@carvana.com

Reference is hereby made to the Exchange Agreement, dated as of [●], 2017 (as amended from time to time, the " Exchange Agreement "), by and among Carvana Co., a Delaware corporation (" Pubco "), Carvana Co. Sub LLC, a Delaware limited liability company that has elected to be taxed as a corporation for U.S. federal income tax purposes (the " Corporation "), Carvana Group, LLC, a Delaware limited liability company (the " Company "), and the holders from time to time of the Company's Common Units listed on Exhibit A to the Exchange Agreement (collectively, the " Members " and individually, a " Member "). Capitalized terms used but not defined herein shall have the meanings given to them in the Exchange Agreement.

The undersigned Member hereby transfers to the Corporation (or the Company, if applicable) effective as of the Exchange Date, the number of Exchangeable Units in Exchange for either shares of Class A Common Stock to be issued in its name as set forth below or, at the option of the Corporation, the Cash Payment payable to the account set forth below, in accordance with the terms of the Exchange Agreement.

Legal Name of Member: [●]
Address: [●]

Number and Type of Exchangeable Units to be Exchanged: [●]

Participation Threshold(s) of such Exchangeable Units (if any): [●]

Number of shares of Class B Common Stock to be Exchanged (if any) : [●]

Please write the words "Elect Out" in the following space and provide your initials next to those words if you wish to elect out of the last sentence of Section 3.1(a) of the Tax Receivable Agreement:

_____

If the Corporation elects a Cash Payment:

Account Number: [●]

Legal Name of Account Holder: [●]

The undersigned hereby represents and warrants that (i) the undersigned has full legal capacity to execute and deliver this Exchange Notice and to perform the undersigned's obligations hereunder; (ii) this Exchange Notice has been duly executed and delivered by the undersigned and is the legal, valid and binding obligation of the undersigned enforceable against it in accordance with the terms thereof or hereof, as the case may be, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies; (iii) the Exchangeable Units and shares of Class B Common Stock (if any) subject to this Exchange Notice are being transferred to the Corporation (or the Company, if applicable) free and clear of any Liens; (iv) no consent, approval, authorization, order, registration or qualification of any third party or with any court or governmental agency or body having jurisdiction over the undersigned, the Exchanged Units or shares of Class B Common Stock (if any) subject to this Exchange Notice is required to be obtained by the undersigned for the transfer of such Exchanged Units or shares of Class B Common Stock (if any) to the Corporation; and (v) the undersigned is either not currently in possession of material non-public information concerning Pubco or will not be in possession of such material non-public information at the time the shares of Class A Common Stock are sold by the undersigned in any public sale.

The undersigned hereby irrevocably constitutes and appoints any officer of Pubco, the Corporation or the Company as the attorney of the undersigned, with full power of substitution and resubstitution in the premises, to do any and all things and to take any and all actions that may be necessary to transfer to the Corporation (or the Company, if applicable) the Exchanged Units and shares of Class B Common Stock (if any) subject to this Exchange Notice and to deliver to the undersigned the shares of Class A Common Common Stock or Cash Payment to be delivered in Exchange therefor.

IN WITNESS WHEREOF, the undersigned, but authority duly given, has caused this Exchange Notice to be executed and delivered by the undersigned or by its duly authorized attorney.

[●]

Name:
Title:

Dated: _____

B2

**Exhibit C**

[Form of]
Joinder

This Joinder (" Joinder ") is a joinder to the Exchange Agreement, dated as of [●], 2017 (as amended from time to time, the " Exchange Agreement "), by and among Carvana Co., a Delaware corporation (" Pubco "), Carvana Co. Sub LLC, a Delaware limited liability company that has elected to be taxed as a corporation for U.S. federal income tax purposes (the " Corporation "), Carvana Group, LLC, a Delaware limited liability company (the " Company "), and the holders from time to time of the Company's Common Units listed on Exhibit A to the Exchange Agreement (collectively, the " Members " and individually, a " Member "). Capitalized terms used but not defined herein shall have the meanings given to them in the Exchange Agreement.

The Company, the Corporation, Pubco and the undersigned agree that all questions concerning the construction, validity and interpretation of this Joinder shall be governed by, and construed in accordance with, the law of the State of Delaware, without giving effect to any choice or conflict of law provision or rule, notwithstanding that public policy in Delaware or any other forum jurisdiction might indicate that the laws of that or any other jurisdiction should otherwise apply based on contacts with such state or otherwise. In the event of any conflict between this Joinder and the Exchange Agreement, the terms of this Joinder shall control.

The undersigned, having acquired Common Units and, if applicable, shares of Class B Common Stock, hereby joins and enters into the Exchange Agreement. By signing and returning this Joinder to the Company, the Corporation and Pubco, the undersigned (i) accepts and agrees to be bound by and subject to all of the terms and conditions of and agreements of a Member contained in the Exchange Agreement, with all attendant rights, duties and obligations of a Member thereunder and (ii) makes each of the representations and warranties of a Member set forth in Section 3.4 of the Exchange Agreement as fully as if such representations and warranties were set forth herein. The parties to the Exchange Agreement shall treat the execution and delivery hereof by the undersigned as the execution and delivery of the Exchange Agreement by the undersigned and, upon receipt of this Joinder by the Company, the Corporation and Pubco, the signature of the undersigned set forth below shall constitute a counterpart signature to the signature page of the Agreement.

[●]

_____
Name:
Title:

Dated:  _____

Address for Notice: [●]

4

**Carvana Group, LLC**

FORM OF FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Dated as of [●], 2017

THE UNITS ISSUED PURSUANT TO THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN UNITS MAY ALSO SUBJECT TO VESTING PROVISIONS, REPURCHASE OPTIONS, REDEMPTION RIGHTS, ADDITIONAL RESTRICTIONS ON TRANSFER, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH HEREIN AND/OR IN A SEPARATE AGREEMENT WITH THE INITIAL HOLDER OF SUCH UNITS. A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER OF SUCH UNITS UPON WRITTEN REQUEST TO THE COMPANY AND WITHOUT CHARGE.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS** | | **2** |
| **ARTICLE II ORGANIZATIONAL MATTERS** | | **10** |
| Section 2.1 | Formation of LLC | 10 |
| Section 2.2 | Limited Liability Company Agreement | 10 |
| Section 2.3 | Name | 11 |
| Section 2.4 | Purpose | 11 |
| Section 2.5 | Principal Office; Registered Office | 11 |
| Section 2.6 | Term | 11 |
| Section 2.7 | No State-Law Partnership | 11 |
| **ARTICLE III UNITS, CAPITAL CONTRIBUTIONS AND ACCOUNTS** | | **12** |
| Section 3.1 | Common Units; Capitalization | 12 |
| Section 3.2 | Authorization and Issuance of Additional Common Units | 13 |
| Section 3.3 | Repurchase or Redemption of Class A Common Stock | 16 |
| Section 3.4 | Changes in Common Stock | 16 |
| Section 3.5 | Class B Common Units | 16 |
| Section 3.6 | Capital Accounts | 18 |
| Section 3.7 | Negative Capital Accounts; No Interest Regarding Positive Capital Accounts | 19 |
| Section 3.8 | No Withdrawal | 19 |
| Section 3.9 | Loans From Unitholders | 19 |
| Section 3.10 | Adjustments to Capital Accounts for Distributions In-Kind | 20 |
| Section 3.11 | Transfer of Capital Accounts | 20 |
| Section 3.12 | Adjustments to Book Value | 20 |
| Section 3.13 | Compliance With Section 1.704-1(b) | 20 |
| **ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS** | | **21** |
| Section 4.1 | Distributions | 21 |
| Section 4.2 | Allocations | 22 |
| Section 4.3 | Special Allocations | 22 |
| Section 4.4 | Offsetting Allocations | 24 |
| Section 4.5 | Tax Allocations | 24 |
| Section 4.6 | Indemnification and Reimbursement for Payments on Behalf of a Unitholder | 25 |
| **ARTICLE V MANAGEMENT AND CONTROL OF BUSINESS** | | **25** |
| Section 5.1 | Management | 25 |
| Section 5.2 | Investment Company Act | 26 |
| Section 5.3 | Officers | 26 |
| Section 5.4 | Competition and Corporate Opportunities | 27 |
| Section 5.5 | Fiduciary Duties | 28 |
| Section 5.6 | Confidentiality | 29 |

i

**ARTICLE VI EXCULPATION AND INDEMNIFICATION**     **31**

| | | |
|---|---|---|
| Section 6.1 | Exculpation | 31 |
| Section 6.2 | Indemnification | 32 |
| Section 6.3 | Expenses | 32 |
| Section 6.4 | Non-Exclusivity; Savings Clause | 32 |
| Section 6.5 | Insurance | 33 |

**ARTICLE VII ACCOUNTING AND RECORDS; TAX MATTERS**     **33**

| | | |
|---|---|---|
| Section 7.1 | Accounting and Records | 33 |
| Section 7.2 | Preparation of Tax Returns | 33 |
| Section 7.3 | Tax Elections | 33 |
| Section 7.4 | Tax Controversies | 33 |
| Section 7.5 | Code §83 Safe Harbor Election | 34 |

**ARTICLE VIII TRANSFER OF UNITS; ADMISSION OF NEW MEMBERS**     **36**

| | | |
|---|---|---|
| Section 8.1 | Transfer of Common Units | 36 |
| Section 8.2 | Transfer of Carvana Co. Sub's Interest | 36 |
| Section 8.3 | Recognition of Transfer; Substituted and Additional Members | 36 |
| Section 8.4 | Expense of Transfer; Indemnification | 38 |
| Section 8.5 | Exchange Agreement | 38 |
| Section 8.6 | Change of Control Transactions | 38 |
| Section 8.7 | Divorce/Separation of Unitholder | 38 |

**ARTICLE IX WITHDRAWAL AND RESIGNATION OF UNITHOLDERS**     **39**

| | | |
|---|---|---|
| Section 9.1 | Withdrawal and Resignation of Unitholders | 39 |

**ARTICLE X DISSOLUTION AND LIQUIDATION**     **39**

| | | |
|---|---|---|
| Section 10.1 | Dissolution | 39 |
| Section 10.2 | Liquidation and Termination | 40 |
| Section 10.3 | Securityholders Agreement | 41 |
| Section 10.4 | Cancellation of Certificate | 41 |
| Section 10.5 | Reasonable Time for Winding Up | 41 |
| Section 10.6 | Return of Capital | 41 |
| Section 10.7 | Hart-Scott-Rodino | 41 |

**ARTICLE XI GENERAL PROVISIONS**     **42**

| | | |
|---|---|---|
| Section 11.1 | Power of Attorney | 42 |
| Section 11.2 | Amendments | 42 |
| Section 11.3 | Title to the Company Assets | 42 |
| Section 11.4 | Remedies | 43 |
| Section 11.5 | Successors and Assigns | 43 |
| Section 11.6 | Severability | 43 |
| Section 11.7 | Counterparts; Binding Agreement | 43 |
| Section 11.8 | Descriptive Headings; Interpretation | 43 |
| Section 11.9 | Applicable Law | 44 |
| Section 11.10 | Addresses and Notices | 44 |
| Section 11.11 | Creditors | 44 |

| Section 11.12 | No Waiver | 44 |
|---|---|---|
| Section 11.13 | Further Action | 44 |
| Section 11.14 | Offset Against Amounts Payable | 44 |
| Section 11.15 | Entire Agreement | 45 |
| Section 11.16 | Delivery by Electronic Means | 45 |
| Section 11.17 | Certain Acknowledgments | 45 |
| Section 11.18 | Consent to Jurisdiction; WAIVER OF TRIAL BY JURY | 45 |
| Section 11.19 | Representations and Warranties | 46 |
| Section 11.20 | Tax Receivable Agreement | 46 |

iii

**CARVANA GROUP, LLC**
**FOURTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of Carvana Group, LLC, a Delaware limited liability company (the " Company "), is entered into as of [●], 2017, by and among the Company, [●, LLC], a Delaware limited liability company (" Carvana Co. Sub "), its Members and Unitholders, and, solely for purposes of Section 3.1(d) , Section 3.2 and Section 8.6 below and not as a Member, Unitholder or manager, Carvana Co., a Delaware corporation (" Carvana Co. "). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I .

WHEREAS, the Company was initially formed as a limited liability company in accordance with the Arizona Limited Liability Company Act;

WHEREAS, pursuant to the Arizona Limited Liability Company Act, the Company's original operating agreement and the Delaware Act, the Company was re-domiciled in the state of Delaware;

WHEREAS, in connection with the admission of GV Auto I, LLC, a Delaware limited liability company, as a Member, the Company's board of Managers and certain other Members, in accordance with Section 16.2 of the Company's Second Amended and Restated Agreement, amended and restated the Company's Second Amended and Restated Agreement in its entirety pursuant to that certain Third Amended and Restated Limited Liability Company Agreement, dated as of July 12, 2016 (the " Third A&R Agreement ");

WHEREAS, Carvana Co. Sub, which has elected to be taxed as a corporation for U.S. federal income tax purposes, is a wholly owned subsidiary of Carvana Co.;

WHEREAS, in connection with the initial public offering (the " IPO ") of Class A Common Stock (as defined below) of Carvana Co., which is a Qualified Public Offering as such term was defined in the Third A&R Agreement, (i) all of the issued and outstanding Class C Preferred Units automatically converted into Class A Common Units pursuant to Section 5.1(b) of the Third A&R Agreement, (ii) each Investor Member will be issued [●]shares of Class B Common Stock (as defined below) for each Class A Common Unit held by such Investor Member, (iii) Carvana Co. Sub will be admitted as a Member of the Company and will purchase Units in the Company with the proceeds of the IPO as contemplated by clause ( v) of Section 11.1(b) of the Third A&R Agreement, (iv) Carvana Co. Sub, the Company and the other parties thereto will enter into an Exchange Agreement (as defined below), pursuant to which Members (other than Carvana Co. Sub) will be permitted to exchange Common Units (together with the corresponding number of shares of Class B Common Stock, to the extent such Member holds Class B Common Stock) for Class A Common Stock or the Cash Payment (as defined therein), (v) Carvana Co. will cause Carvana Co. Sub to contribute a portion of the net proceeds of the IPO to the Company in exchange for newly-issued Class A Common Units and for other purposes and (vi) Carvana Co., the Company and certain other parties will enter into a Tax Receivable Agreement (as defined below), pursuant to which Carvana Co. will be obligated to make payments to certain parties related to tax benefits realized ( clauses (ii) through (vi) , collectively, the " IPO Transactions "); and

WHEREAS, as contemplated by Section 11.1(b) of the Third A&R Agreement, the parties desire to amend and restate the Third A&R Agreement as set forth herein to give effect to the IPO Transactions and reflect the admission of Carvana Co. Sub as a Member and the sole manager of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

ARTICLE I

DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

" Additional Member " means a Person admitted to the Company as a Member pursuant to Section 8.3 .

" Adjusted Capital Account Deficit " means, with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be (i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4 ) , (5), and (6), and (ii) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Sections 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to Minimum Gain).

" Affiliate " of any Person means any other Person controlled by, controlling or under common control with such Person, and in the case of any Unitholder that is a partnership, limited liability company, corporation or similar entity, any partner, member or stockholder of such Unitholder; provided , that the Company and its Subsidiaries shall not be deemed to be Affiliates of any Unitholder. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities, by contract or otherwise). With respect to any Person who is an individual, "Affiliates" shall also include, without limitation, any member of such individual's Family Group.

" Agreement " means this Fourth Amended and Restated Limited Liability Company Agreement, as it may be amended, modified and/or waived from time to time in accordance with the terms hereof.

2

" Amended and Restated Certificate of Incorporation " means the Amended and Restated Certificate of Incorporation of the Company, dated on or about the date hereof, as the same may be amended, amended and restated or replaced from time to time.

" Applicable Tax Rate " means, for any calendar year, a percentage determined by the Manager to be the sum of the highest marginal federal, state, and local income tax rates that would be applicable to any Unitholder (or its partners or members, as applicable) assuming such Unitholder was residing in New York, New York (whether such Unitholder was a corporation or individual taxpayer) based on the information available to it (taking into account the character of the Company's income and the deductibility of state and local taxes for federal income tax purposes).

" Base Rate " means, as of any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

" Book Value " means, with respect to any the Company property, the Company's adjusted basis for federal income Tax purposes, adjusted from time to time to reflect the adjustments required or permitted (in the case of permitted adjustments, to the extent the Company makes such permitted adjustments) by Treasury Regulation Sections 1.704-1(b)(2)(iv)(d)-(g).

" Business " means the business carried on by the Company and/or any of its Subsidiaries from time to time, and which shall include the business of the online sale and delivery of automobiles and other products, services and all other activities conducted by the Company and/or any of its Subsidiaries which are ancillary to the online sale and delivery of automobiles.

" Business Day " means any day other than a Saturday, Sunday or other day on which the banks in New York, New York or Phoenix, Arizona are authorized by law to be closed.

" Capital Account " means the capital account maintained for a Member pursuant to Section 3.6 and the other applicable provisions of this Agreement.

" Capital Contributions " means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Unitholder contributes or is deemed by the Manager to have contributed to the Company with respect to any Unit pursuant to Section 3.1 or Section 3.11 .

" Carvana Co ." has the meaning set forth in the Preamble.

" Carvana Co. Sub " has the meaning set forth in the Preamble.

" Cash Payment " has the meaning set forth in the Exchange Agreement.

" Certificate " means the Company's Certificate of Formation as filed with the Secretary of State of Delaware, as the same may be amended from time to time.

3

" <u>Class A Common Stock</u> " means the class A common stock, par value $0.001 per share, of Carvana Co.

" <u>Class A Common Unit</u> " means a Unit having the rights and obligations specified with respect to a Class A Common Unit in this Agreement; <u>provided</u> , that a Class A Common Unit shall not have any voting rights under this Agreement or the Delaware Act.

" <u>Class A Common Stock Value</u> " has the meaning set forth in the Exchange Agreement.

" <u>Class B Common Stock</u> " means the class B common stock, par value $0.001 per share, of Carvana Co.

" <u>Class B Common Unit</u> " means a Unit having the rights and obligations specified with respect to a Class B Common Unit in this Agreement; <u>provided</u> , that a Class B Common Unit shall not have any voting rights under this Agreement or the Delaware Act.

" <u>Class C Preferred Units</u> " has the meaning set forth in the Third A&R Agreement.

" <u>Code</u> " means the United States Internal Revenue Code of 1986, as amended. Such term, if elected by the Manager in its sole discretion, shall be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary).

" <u>Common Units</u> " means the Class A Common Units and the Class B Common Units.

" <u>Company</u> " has the meaning set forth in the Preamble.

" <u>Confidential Information</u> " has the meaning set forth in <u>Section 5.6(a)</u> .

" <u>Delaware Act</u> " means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, et seq., as it may be amended from time to time, and any successor thereto.

" <u>DGCL</u> " has the meaning set forth in <u>Section 5.5(a)</u> .

" <u>Dissolution Notice</u> " has the meaning set forth in <u>Section 8.7(a)</u> .

" <u>Distribution</u> " means each distribution made by the Company to a Unitholder, with respect to such Person's Units, whether in cash, property or securities and whether by liquidating distribution, redemption, repurchase or otherwise; <u>provided</u> that notwithstanding anything in the foregoing, none of the following shall be deemed to be a Distribution hereunder: (i) any redemption or repurchase by the Company of any securities of the Company in connection with the termination of employment of an employee of the Company or any of its Subsidiaries or any service provider of the Company or any of its Subsidiaries, (ii) any recapitalization, exchange or conversion of securities of the Company, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units and (iii) any repurchase of Units pursuant to any right of first refusal or similar repurchase right in favor of the Company.

4

" Equity Agreement " has the meaning set forth in Section 3.2(a) .

" Equity Securities " means (i) any Units, capital stock, partnership, membership or limited liability company interests or other equity interests (including other classes, groups or series thereof having such relative rights, powers and/or obligations as may from time to time be established by the Manager, including rights, powers and/or duties different from, senior to or more favorable than existing classes, groups and series of Units, capital stock, partnership, membership or limited liability company interests or other equity interests, and including any profits interests), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units, capital stock, partnership interests, membership or limited liability company interests or other equity interests, and (iii) warrants, options or other rights to purchase or otherwise acquire Units, capital stock, partnership interests, membership or limited liability company interests or other equity interests. Unless the context otherwise indicates, the term "Equity Securities" refers to Equity Securities of the Company.

" Event of Withdrawal " means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company.

" Exchange " has the meaning set forth in the Exchange Agreement.

" Exchange Agreement " means the Exchange Agreement dated as of the date hereof among Carvana Co. Sub, the Company and the other parties thereto, as the same may be amended, amended and restated or replaced from time to time.

" Exchange Rate " has the meaning set forth in the Exchange Agreement.

" Exchangeable Unit " has the meaning set forth in the Exchange Agreement.

" Fair Market Value " means, as of any date of determination, (i) with respect to a Unit, such Unit's Pro Rata Share as of such date, (ii) with respect to a share of Class A Common Stock, the Class A Common Stock Value as of such date, and (iii) with respect to any other non-cash assets, the fair market value for such property as between a willing buyer under no compulsion to buy and a willing seller under no compulsion to sell in an arm's-length transaction occurring on such date, taking into account all relevant factors determinative of value (including in the case of securities, any restrictions on transfer applicable thereto or, if such securities are traded on a securities exchange or automated or electronic quotation system, the quoted price for such securities as of the date of determination), as reasonably determined in good faith by the Manager.

" Family Group " means, with respect to a Person who is an individual, (i) such individual's spouse and descendants (whether natural or adopted) (collectively, for purposes of this definition, " relatives "), (ii) such individual's executor or personal representative, (iii) any trust, the trustee of which is such individual or such individual's executor or personal representative and which at all times is and remains solely for the benefit of such individual

5

and/or such individual's relatives, (iv) any corporation, limited partnership, limited liability company or other tax flow-through entity the governing instruments of which provide that such individual or such individual's executor or personal representative shall have the exclusive, nontransferable power to direct the management and policies of such entity and of which the sole record and beneficial owners of stock, partnership interests, membership interests or any other equity interests are limited to such individual, such individual's relatives and/or the trusts described in clause (iii) above, and (v) any retirement plan for such individual.

" Fiscal Period " means any interim accounting period within a Taxable Year established by the Manager and which is permitted or required by Code Section 706.

" Fiscal Quarter " means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Manager or as required by the Code.

" Fiscal Year " means the 12-month period ending on December 31, or such other annual accounting period as may be established by the Manager or as may be required by the Code.

" Forfeiture Allocations " has the meaning set forth in Section  4.2 .

" Former Spouse " has the meaning set forth in Section  8.7 .

" Former Spouse's Units " has the meaning set forth in Section  8.7 .

" Governmental Entity " means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

" Grossed - Up Amount " means, with respect to any Distribution pursuant to Section 4.1(b) , the sum of (i) the amount of the Distribution pursuant to Section 4.1(b) , and (ii) the sum of the Participation Thresholds of all Participating Class B Common Units.

" HSR Act " has the meaning set forth in Section  10.7 .

" Indemnitee " has the meaning set forth in Section 6.1(b) .

" Investment Company Act " means the Investment Company Act of 1940, as amended from time to time.

" Investor Member " means any Member holding Class A Common Units other than Carvana Co. Sub.

" IRS Notice " has the meaning set forth in Section  7.5 .

" Liquidation Assets " has the meaning set forth in Section 10.2(b) .

" Liquidation FMV " has the meaning set forth in Section 10.2(b) .

6

"Liquidation Statement" has the meaning set forth in Section 10.2(b).

"Losses" means items of the Company loss and deduction determined according to Section 3.6.

"Management Investors" means the holders of Class B Common Units and any other Member who acquires Equity Securities after the date of this Agreement and/or enters into an Equity Agreement after the date of this Agreement pursuant to the terms of Section 3.2(a) and is designated as a "Management Investor" by the Manager.

"Manager" means (i) Carvana Co. Sub so long as Carvana Co. Sub has not withdrawn as the Manager pursuant to Section 5.1(c) and (ii) any successor thereof appointed as Manager in accordance with Section 5.1(c). Unless the context otherwise requires, references herein to the Manager shall refer to the Manager acting in its capacity as such.

"Member" means each Person listed on the Unit Ownership Ledger and any Person admitted to the Company as a Substituted Member or Additional Member in accordance with the terms and conditions of this Agreement; but in each case only for so long as such Person is shown on the Company's books and records as the owner of one or more Units. Carvana Co. shall not be deemed to be a Member.

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Net Exchanged Unit Amount" has the meaning set forth in the Exchange Agreement.

"Obligations" has the meaning set forth in Section 6.1(b).

"Participating Class B Common Unit" means, with respect to any Distribution pursuant to Section 4.1(b), a Class B Common Unit that has a Participation Threshold that is less than the amount determined by dividing (i) the sum of (A) the amount of such Distribution pursuant to Section 4.1(b) and (B) the Participation Thresholds of all outstanding Class B Common Units that have an equal or lesser Participation Threshold, by (ii) the sum of (A) the number of outstanding Class A Common Units and (B) the number of outstanding Class B Common Units that have an equal or lesser Participation Threshold.

"Participating Unit" means, with respect to any Distribution pursuant to Section 4.1(b), a Class A Common Unit and/or a Participating Class B Common Unit.

"Participation Threshold" means, with respect to each outstanding Class B Common Unit, an amount determined, and adjusted from time to time, in accordance with Section 3.5(b).

"Partnership Tax Audit Rules" means Code Sections 6221 through 6241, as amended by the Bipartisan Budget Act of 2015, together with any guidance issued thereunder or successor provisions and any similar provision of state or local Tax laws.

7

" <u>Permitted Transferee</u> " means (i) with respect to any Person who is an individual, a member of such Person's Family Group, (ii) with respect to any Person which is an entity (other than any Person that is a Management Investor), (x) any of such Person's Affiliates and (y) any direct or indirect partner, member, stockholder or other equityholder of such Person and (iii) solely with respect to Ernest C. Garcia II, in addition to the foregoing, the holder (and any subsequent holder) of the option to purchase certain of the Class C Preferred Units held by Ernest C. Garcia II, as such option may be amended from time to time in accordance with its terms.

" <u>Person</u> " means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

" <u>PR</u> " has the meaning set forth in <u>Section 7.4(a)</u> .

" <u>Pro Rata Share</u> " means with respect to each Unit, the proportionate amount such Unit would receive if an amount equal to the Total Equity Value were distributed to all Units in accordance with <u>Section 4.1</u> , as determined in good faith by the Manager.

" <u>Profits</u> " means items of the Company income and gain determined according to <u>Section 3.6</u> .

" <u>Regulatory Allocations</u> " has the meaning set forth in <u>Section 4.3(e)</u> .

" <u>Second Amended and Restated Registration Rights Agreement</u> " means that certain Second Amended and Restated Registration Rights Agreement, dated as of the date of this Agreement, by and among Carvana Co. and certain Members, as the same may be amended, amended and restated or replaced from time to time.

" <u>Securities Act</u> " means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

" <u>Securities Exchange Act</u> " means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

" <u>Separated Member</u> " has the meaning set forth in <u>Section 8.7</u> .

" <u>Subsidiary</u> " means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of

8

partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

" Substituted Member " means a Person that is admitted as a Member to the Company pursuant to Section  8.3 .

" Tax " or " Taxes " means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

" Tax Distribution " has the meaning set forth in Section 4.1(a) .

" Tax Matters Partner " has the meaning set forth in Section 6231 of the Code.

" Tax Receivable Agreement " means the Tax Receivable Agreement dated as of the date hereof, by and among Carvana Co., the Company and the other parties thereto, as the same may be amended, amended and restated or replaced from time to time.

" Taxable Year " means the Company's accounting period for federal income Tax purposes determined pursuant to Section  7.3 .

" Total Equity Value " means, as of any date of determination, the aggregate proceeds which would be received by the Unitholders if: (i) the assets of the Company were sold at their fair market value to an independent third-party on arm's-length terms, with neither the seller nor the buyer being under compulsion to buy or sell such assets; (ii) the Company satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses incurred in connection with such transaction and any amounts reserved by the Manager with respect to any contingent or other liabilities); and (iii) such net sale proceeds were then distributed in accordance with Section  4.1 , all as determined by the Manager in good faith based upon the Class A Common Stock Value as of such date.

" Transaction Documents " means, collectively, this Agreement, the Exchange Agreement, the Second Amended and Restated Registration Rights Agreement and the Tax Receivable Agreement.

9

" Transfer " has the meaning set forth in Section 8.1 .

" Treasury Regulations " means the income Tax regulations promulgated under the Code and effective as of the date of this Agreement. Such term, if elected by the Manager in its sole discretion, shall be deemed to include any future amendments to such regulations and any corresponding provisions of succeeding regulations (whether or not such amendments and corresponding provisions are mandatory or discretionary).

" Unit " means a limited liability company interest in the Company of a Member or representing a fractional part of the interests in Profits, Losses and Distributions of the Company held by all Members and shall include, without limitation, Class A Common Units and Class B Common Units; provided that any class, group or series of Units issued shall have the relative rights, powers and obligations set forth in this Agreement.

" Unit Ownership Ledger " has the meaning set forth in Section 3.1(a) .

" Unitholder " means any owner of one or more Units as reflected on the Company's books and records. Carvana Co. shall not be deemed to be a Unitholder.

" Unvested Class B Common Units " means, with respect to any Class B Common Units that are subject to vesting pursuant to the applicable Equity Agreement pursuant to which they were issued, any Class B Common Units other than Vested Class B Common Units.

" Vested Class B Common Units " means any Class B Common Units that are not subject to vesting or, with respect to Class B Common Units that are subject to vesting pursuant to the applicable Equity Agreement pursuant to which they were issued, any Class B Common Units that have vested in accordance with the terms of the applicable Equity Agreement pursuant to which they were issued.

## ARTICLE II

## ORGANIZATIONAL MATTERS

Section 2.1    Formation of LLC . The Company was formed in the State of Arizona on September 20, 2012 pursuant to the provisions of the Arizona Limited Liability Company Act, and was re-domiciled in the State of Delaware on March 10, 2015, pursuant to the provisions of the Arizona Limited Liability Company Act and the Delaware Act.

Section 2.2    Limited Liability Company Agreement . The Members hereby execute this Agreement for the purpose of amending and restating the Third A&R Agreement and establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Delaware Act. The Members hereby agree that during the term of the Company set forth in Section 2.6 the rights, powers and obligations of the Unitholders with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the Delaware Act provides that such rights, powers and obligations specified in the Delaware Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights, powers and obligations are set forth in this Agreement, the Delaware Act; provided that, notwithstanding the foregoing

10

and anything else to the contrary, Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and Section 18-305(a) of the Delaware Act (entitled "Access to and Confidentiality of Information; Records") shall not apply to or be incorporated into this Agreement and each Unitholder hereby expressly waives any and all rights under such Sections of the Delaware Act.

Section 2.3    Name. The name of the Company shall be "Carvana Group, LLC". The Manager may change the name of the Company at any time and from time to time. Notification of any such name change shall be given to all Unitholders. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Manager.

Section 2.4    Purpose. The purpose and business of the Company shall be to manage and direct the business operations and affairs of the Company and its Subsidiaries and to engage in any other lawful acts or activities for which limited liability companies may be organized under the Delaware Act.

Section 2.5    Principal Office; Registered Office. The principal office of the Company shall be located at 4020 E. Indian School Road, Phoenix, Arizona 85018, or at such other place inside or outside the state of Delaware as the Manager may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Manager deems advisable. The address of the registered office of the Company in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by applicable law, and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be the registered agent named in the Certificate or such Person or Persons as the Manager may designate from time to time in the manner provided by applicable law.

Section 2.6    Term. The term of the Company commenced upon the filing of the Articles of Organization for the Company with the Arizona Corporation Commission Certificate in accordance with the Arizona Limited Liability Company Act and shall continue in existence until the Company shall be terminated and dissolved in accordance with the provisions of Article X.

Section 2.7    No State - Law Partnership. The Unitholders intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Unitholder be a partner or joint venturer of any other Unitholder by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.7, and neither this Agreement nor any other document entered into by the Company or any Unitholder relating to the subject matter hereof shall be construed to suggest otherwise. The Unitholders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income Tax purposes, and that each Unitholder and the Company shall file all Tax returns and shall otherwise take all Tax and financial reporting positions in a manner consistent with such treatment.

11

ARTICLE III

UNITS, CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1    Common Units ; Capitalization .

(a)    Common Units; Capitalization . The total number of authorized Common Units consists of an unlimited number of authorized Common Units. The ownership by a Unitholder of Common Units shall entitle such Member to allocations of Profits and Losses and other items and Distributions of cash and other property as set forth in Article IV hereof.

(b)    Unit Ownership Ledger; Capital Contributions . The Manager shall create and maintain a ledger (the " Unit Ownership Ledger ") setting forth the name and address of each Unitholder, the number of each class of Units held of record by each such Unitholder, and the amount of the Capital Contribution made with respect to each class of Units and the date of such Capital Contribution. Upon any change in the number or ownership of outstanding Units (whether upon an issuance of Units, a Transfer of Units, a cancellation of Units or otherwise), the Manager shall amend and update the Unit Ownership Ledger. Absent manifest error, the ownership interests recorded on the Unit Ownership Ledger shall be conclusive record of the Units that have been issued and are outstanding. Each Unitholder named in the Unit Ownership Ledger has made (or shall be deemed to have made) Capital Contributions to the Company as set forth in the Unit Ownership Ledger in exchange for the Units specified in the Unit Ownership Ledger. Any reference in this Agreement to the Unit Ownership Ledger shall be deemed a reference to the Unit Ownership Ledger as amended and in effect from time to time.

(c)    Certificates; Legends . Common Units shall be issued in uncertificated form; provided that, at the request of any Member, the Manager may cause the Company to issue one or more certificates to any such Member holding Common Units representing in the aggregate the Common Units held by such Member. If any certificate representing Common Units is issued, then such certificate shall bear a legend substantially in the following form:

THIS CERTIFICATE EVIDENCES COMMON UNITS REPRESENTING A MEMBERSHIP INTEREST IN CARVANA GROUP, LLC. THE MEMBERSHIP INTEREST IN CARVANA GROUP, LLC REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR ANY NON-U.S. OR STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THE MEMBERSHIP INTEREST IN CARVANA GROUP, LLC REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO RESTRICTIONS ON TRANSFER SET FORTH IN THE FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF CARVANA GROUP, LLC, DATED AS OF [●], 2017, AS THE SAME MAY BE AMENDED FROM TIME TO TIME, A COPY OF WHICH SHALL BE FURNISHED BY THE COMPANY TO THE RECORD HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE.

12

To the extent applicable, Unit certificates may also bear a legend in substantially the following form:

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY ALSO BE SUBJECT TO CERTAIN VESTING PROVISIONS, REPURCHASE OPTIONS, REDEMPTION RIGHTS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH IN THE FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF CARVANA GROUP, LLC, DATED AS OF [●], 2017, AS THE SAME MAY BE AMENDED FROM TIME TO TIME, AND/OR A SEPARATE AGREEMENT WITH THE INITIAL HOLDER, A COPY OF WHICH SHALL BE FURNISHED BY THE COMPANY TO THE RECORD HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE.

(d)    Conversion of Class C Preferred Units; Contribution. Contemporaneous with the execution and effectiveness of this Agreement, the Class C Preferred Units that were issued and outstanding and held by the Members immediately prior hereto are hereby converted into an equal number of Class A Common Units. The Class A Common Units and Class B Common Units that were issued and outstanding and held by the Members prior to the date of this Agreement shall remain unchanged. In addition, (i) Carvana Co. shall contribute to Carvana Co. Sub all of the net proceeds received by Carvana Co. with respect to the shares of Class A Common Stock issued and sold in the IPO, (ii) Carvana Co. Sub shall contribute promptly such net proceeds to the Company in exchange for [●] Class A Common Units and be admitted as a Member of the Company; and (iii) Carvana Co. shall issue and deliver to Carvana Co. Sub, and Carvana Co. Sub shall deliver to each Investor Member, [●] share of Class B Common Stock in respect of each Class A Common Unit held by such Member after giving effect to the conversion of Class C Preferred Units described above.

Section 3.2    Authorization and Issuance of Additional Common Units.

(a)    The Manager shall have the right to cause the Company to issue and/or create and issue at any time after the date hereof, and for such amount and form of consideration as the Manager may determine, additional Common Units or other Equity Securities of the Company (including creating classes or series thereof having such powers, designations, preferences and rights as may be determined by the Manager). The Manager shall have the power to make such amendments to this Agreement in order to provide for such powers, designations, preferences and rights as the Manager in its discretion deems necessary or appropriate to give effect to such additional authorization or issuance in accordance with the provisions of this Section 3.2(a). In connection with any issuance of Units (whether on or after the date of this Agreement), the Person who acquires such Units shall execute a counterpart to this Agreement accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents, instruments and agreements to effect such purchase as are required by the Manager (including such documents, instruments and agreements entered into on or prior to the date of this Agreement by the Members, each, an "Equity Agreement").

(b)    At any time Carvana Co. issues one or more shares of Class A Common Stock (other than an issuance of the type covered by Section 3.2(d) or an issuance to a holder of

13

Exchangeable Units pursuant to the Exchange Agreement, as described in Section 3.2(c) ), Carvana Co. shall contribute to Carvana Co. Sub, and shall cause Carvana Co. Sub to promptly contribute to the Company all of the net proceeds (if any) received by Carvana Co. with respect to such share or shares of Class A Common Stock. Upon the contribution by Carvana Co. Sub to the Company of all of such net proceeds so received by Carvana Co., the Manager shall cause the Company to issue a number of Class A Common Units determined based upon the Exchange Rate then in effect, registered in the name of Carvana Co. Sub; provided , however, that if Carvana Co. issues one or more shares of Class A Common Stock, some or all of the net proceeds of which are to be used to fund expenses or other obligations of Carvana Co. Sub for which Carvana Co. Sub would be permitted a Distribution pursuant to Article IV , then neither Carvana Co. nor Carvana Co. Sub shall be required to transfer such net proceeds to the Company which are used or will be used to fund such expenses or obligations; provided further , if Carvana Co. issues any shares of Class A Common Stock in order to purchase or fund the purchase of Units from a Member (other than a Subsidiary of Carvana Co.), then the Company shall not issue any new Class A Common Units registered in the name of Carvana Co. Sub in accordance with Section 3.2(c) and neither Carvana Co. nor Carvana Co. Sub shall be required to transfer such net proceeds to the Company (it being understood that such net proceeds shall instead be contributed by Carvana Co. to Carvana Co. Sub and subsequently transferred by Carvana Co. Sub to such other Member as consideration for such purchase). Notwithstanding the foregoing, this Section 3.2(b) shall not apply to the issuance and distribution to holders of shares of Class A Common Stock of rights to purchase Equity Securities of Carvana Co. under a "poison pill" or similar shareholder's rights plan (it being understood that (i) upon exchange of Exchangeable Units for Class A Common Stock pursuant to the Exchange Agreement, such Class A Common Stock would be issued together with any such corresponding right and (ii) in the event such rights to purchase Equity Securities of Carvana Co. are triggered, Carvana Co. will ensure that the holders of Common Units that have not been Exchanged prior to such time will be treated equitably vis-à-vis the holders of Class A Common Stock under such plan).

(c)    At any time a holder of Exchangeable Units exchanges such Units for shares of Class A Common Stock or a Cash Payment, the Company shall cancel such Exchangeable Units. Upon the cancellation by the Company of the Exchangeable Units exchanged for shares of Class A Common Stock, the Manager shall cause the Company to issue a number of Class A Common Units equal to the Net Exchanged Unit Amount, registered in the name of Carvana Co. Sub in accordance with Section  2.6 of the Exchange Agreement.

(d)    At any time Carvana Co. issues one or more shares of Class A Common Stock in connection with an equity incentive program, whether such share or shares are issued upon exercise (including cashless exercise) of an option, settlement of a restricted stock unit, as restricted stock or otherwise, the Manager shall cause the Company to issue a corresponding number of Class A Common Units, registered in the name of Carvana Co. Sub (determined based upon the Exchange Rate then in effect); provided that Carvana Co. shall be required to, or shall be required to cause Carvana Co. Sub to, contribute all (but not less than all) of the net proceeds (if any) received by Carvana Co. from or otherwise in connection with such issuance of one or more shares of Class A Common Stock, including the exercise price of any option exercised, to the Company. If any such shares of Class A Common Stock so issued by Carvana Co. in connection with an equity incentive program are subject to vesting or forfeiture provisions, then the Class A Common Units that are issued by the Company to Carvana Co. Sub

14

in connection therewith in accordance with the preceding provisions of this Section 3.2(d) shall be subject to vesting or forfeiture on the same basis; if any of such shares of Class A Common Stock vest or are forfeited, then a corresponding number of the Class A Common Units (determined based upon the Exchange Rate then in effect) issued by the Company in accordance with the preceding provisions of this Section 3.2(d) shall automatically vest or be forfeited. Any cash or property held by Carvana Co., Carvana Co. Sub or the Company or on any of such Person's behalf in respect of dividends paid on restricted shares of Class A Common Stock that fail to vest shall be returned to the Company upon the forfeiture of such restricted shares of Class A Common Stock.

(e)    Carvana Co. shall at all times reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon an Exchange, the maximum number of shares of Class A Common Stock as shall be issuable upon Exchange of all outstanding Common Units and shares of Class B Common Stock, and shall deliver such shares of Class A Common Stock to Carvana Co. Sub as may be necessary to enable Carvana Co. Sub to satisfy its obligations under the Exchange Agreement; provided that nothing contained herein shall be construed to preclude Carvana Co. from satisfying its obligations in respect of any such Exchange by delivery of purchased shares of Class A Common Stock (which may or may not be held in the treasury of Carvana Co.). If any shares of Class A Common Stock require registration with or approval of any Governmental Entity under any federal or state law before such shares may be issued upon an Exchange, Carvana Co. shall use reasonable efforts to cause the exchange of such shares of Class A Common Stock to be duly registered or approved, as the case may be. Carvana Co. shall list and use its reasonable efforts to maintain the listing of the Class A Common Stock required to be delivered upon any such Exchange prior to such delivery upon the national securities exchange upon which the outstanding shares of Class A Common Stock are listed at the time of such Exchange (it being understood that any such shares may be subject to transfer restrictions under applicable securities laws). Carvana Co. covenants that all shares of Class A Common Stock issued upon an Exchange will, upon issuance, be validly issued, fully paid and non-assessable.

(f)    For purposes of this Section 3.2, "net proceeds" means gross proceeds to Carvana Co. from the issuance of Class A Common Stock or other securities less all reasonable bona fide out-of-pocket fees and expenses of Carvana Co., the Company and their respective Subsidiaries actually incurred in connection with such issuance.

15

Section 3.3    Repurchase or Redemption of Class A Common Stock . If, at any time, any shares of Class A Common Stock are repurchased or redeemed (whether by exercise of a put or call, automatically or by means of another arrangement) by Carvana Co. for cash, then the Manager shall cause the Company, immediately prior to such repurchase or redemption of such shares, to redeem a corresponding number of Common Units held by Carvana Co. Sub (determined based upon the Exchange Rate then in effect), at an aggregate redemption price equal to the aggregate purchase or redemption price of the share or shares of Class A Common Stock being repurchased or redeemed by Carvana Co. (plus any reasonable expenses related thereto) and upon such other terms as are the same for the share or shares of Class A Common Stock being repurchased or redeemed by Carvana Co.

Section 3.4    Changes in Common Stock . In addition to any other adjustments required hereby, any subdivision (by stock split, stock dividend, reclassification, recapitalization or otherwise) or combination (by reverse stock split, reclassification, recapitalization or otherwise) of Class A Common Stock, Class B Common Stock or other capital stock of Carvana Co. shall be accompanied by an identical subdivision or combination, as applicable, of the Common Units or other Equity Securities, as applicable.

Section 3.5    Class B Common Units .

(a)    Grant of Units . The Company may (with the approval of the Manager) issue Class B Common Units to existing or new employees, managers, officers, directors, consultants or other service providers of the Company or any of its Subsidiaries pursuant to Equity Agreements approved by the Manager, which Equity Agreements shall contain such provisions as the Manager shall determine in its sole discretion, which may include (i) the forfeiture of, or the right of the Company and/or such other Persons as the Manager shall designate to repurchase from each holder thereof, all or any portion of such Class B Common Units issued to such Person in the event such Person ceases to be an employee, officer, manager, director or consultant of, or to perform services for, the Company or its Subsidiaries or upon such other conditions as determined by the Manager and (ii) provisions regarding vesting of such Class B Common Units, including upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company and/or its Subsidiaries of certain performance goals. This Section 3.5(a) , together with the Equity Agreements pursuant to which the Class B Common Units are issued, are intended to qualify as a compensatory benefit plan within the meaning of Rule 701 of the Securities Act and the issuance of Class B Common Units pursuant hereto is intended to qualify for the exemption from registration under the Securities Act provided by Rule 701; provided that the foregoing shall not restrict or limit the Company's ability to issue any Class B Common Units pursuant to any other exemption from registration under the Securities Act available to the Company. The Company may make the Class B Common Units and any issuance thereof and any applicable Equity Agreement subject to the terms and conditions of any other equity incentive plan consistent with the terms of this Agreement, as may have been adopted by the Company or any of its Subsidiaries. Notwithstanding anything herein or in any Equity Agreement to the contrary, in connection with any restructuring, merger, refinancing or other strategic transaction, the Company may terminate and cancel without any payment or other consideration with respect thereto any Class B Common Unit that, immediately prior to the consummation of such transaction(s), has a Pro Rata Share equal to $0.00.

16

(b)    Participation Threshold . As of the date of each grant of Class B Common Units, the Manager shall establish an initial " Participation Threshold " amount with respect to each Class B Common Unit granted on such date. Unless otherwise determined by the Manager (who shall determine the Participation Threshold in such a manner that newly granted Class B Common Units have a liquidation value of zero in accordance with IRS Revenue Procedure 93-27 and other authorities), the Participation Threshold with respect to each such Class B Common Unit granted on such date shall be equal to or greater than the amount (as determined by the Manager in its sole discretion) that would be distributed with respect to a Class A Common Unit pursuant to Section 4.1(b) if the Company distributed to the Unitholders an amount equal to the Total Equity Value as of such date in accordance with Section 4.1(b) ; provided that, for the avoidance of doubt, in making such calculation prior Tax Distributions shall be treated as if made on such date as part of such hypothetical Distribution. The purchase price of each Class B Common Unit, if any, shall be as determined by the Manager. The Manager may designate a series number for Class B Common Units that have the same Participation Threshold, which Participation Threshold may differ from the Participation Thresholds of other series of Class B Common Units not included in such subset. Each Class B Common Unit's Participation Threshold shall be adjusted (in the discretion and as determined by the Manager) after the grant of such Class B Common Unit in the following manner:

(i)    In the event any Distribution with respect to Class A Common Units is made pursuant to Section 4.1(b) , the Participation Threshold of each Class B Common Unit outstanding at the time of such Distribution shall be reduced (but not below zero) by the amount that each Class A Common Unit receives in such Distribution (with such reduction occurring immediately after the determination of the portion of such Distribution, if any, that such Class A Common Unit is entitled to receive); provided that, the Participation Threshold of such Class B Common Unit shall not be reduced by (x) such Distribution to the extent that such Class B Common Unit is entitled to receive such Distribution or (y) any Tax Distribution made pursuant to Section 4.1(a) .

(ii)    If the Company at any time subdivides (by any Unit split or otherwise) the Common Units into a greater number of Units, the Participation Threshold of each Class B Common Unit outstanding immediately prior to such subdivision shall be proportionately reduced, and if the Company at any time combines (by reverse Unit split or otherwise) the Common Units into a smaller number of Units, the Participation Threshold of each Class B Common Unit outstanding immediately prior to such combination shall be proportionately increased.

(iii)    Notwithstanding anything in the foregoing to the contrary, no adjustment shall be made in connection with (A) any non pro rata redemption or repurchase by the Company or any Unitholder of any Units or (B) any non pro rata Capital Contribution by any Unitholder in exchange for newly issued Units.

(iv)    In the event of any change in the Company's capital structure not addressed in Section 3.5(b)( i ) or Section 3.5(b)(iii) above, the Manager may (but shall not be obligated to) equitably adjust the Participation Thresholds of the outstanding Class B Common Units to the extent necessary (in the Manager's good faith judgment) to prevent such capital structure change from changing the economic rights represented by the Class B Common Units in a manner that is disproportionately favorable or unfavorable in relation to the economic rights of other classes of outstanding Common Units.

17

(c)    Adjustments to Unit Ownership Ledger For Participation Thresholds . The Participation Thresholds of each Unitholder's Class B Common Units shall be set forth on the Unit Ownership Ledger, and the Unit Ownership Ledger shall be amended by the Manager (without the requirement of an approval from any Unitholder) from time to time by the Company as necessary to reflect any adjustments to the Participation Thresholds of outstanding Class B Common Units required pursuant to this Section  3.5 .

(d)    Amendments of this Section . Notwithstanding anything in this Section  3.5 to the contrary, the Manager shall have the power to amend the provisions of this Section  3.5 to achieve the economic results intended by this Agreement, including, if applicable, that any Units that are granted to executives of, or other service providers to, the Company in exchange for services provided or to be provided to the Company or any Subsidiary thereof are intended to be profits interests when issued for United States federal income tax purposes.

Section 3.6    Capital Accounts .

(a)    Maintenance of Capital Accounts . The Company shall maintain a separate Capital Account for each Unitholder according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). For this purpose, the Company may (in the sole discretion of the Manager), upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of the Company property; provided that unless otherwise determined by the Manager, the Company will not increase the Capital Accounts of the Unitholders in connection with any issuance of Class B Common Units. Without limiting the foregoing, each Unitholder's Capital Account shall be adjusted:

(i)    by adding any additional Capital Contributions made by such Unitholder in consideration for the issuance of Units;

(ii)    by deducting any amounts paid to such Unitholder in connection with the redemption or other repurchase by the Company of Units;

(iii)    by adding any Profits allocated in favor of such Unitholder and subtracting any Losses allocated in favor of such Unitholder; and

(iv)    by deducting any distributions paid in cash or other assets to such Unitholder by the Company.

(b)    Computation of Income, Gain, Loss and Deduction Items . For purposes of computing the amount of any item of the Company income, gain, loss or deduction to be allocated pursuant to Article IV and to be reflected in the Capital Accounts, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income Tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); provided that:

18

(i) the computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(1)(B), Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income Tax purposes;

(ii) if the Book Value of any the Company property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(iii) items of income, gain, loss or deduction attributable to the disposition of the Company property having a Book Value that differs from its adjusted basis for Tax purposes shall be computed by reference to the Book Value of such property;

(iv) items of depreciation, amortization and other cost recovery deductions with respect to the Company property having a Book Value that differs from its adjusted basis for Tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(v) to the extent an adjustment to the adjusted Tax basis of any the Company asset pursuant to Code Sections 732(d), 734(b) or 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(vi) this Section 3.6 shall be applied in a manner consistent with the principles of Prop. Reg. Sections 1.704-1(b)(2)(iv)(d), (f)(1), (h)(2) and (s).

Section 3.7   Negative Capital Accounts; No Interest Regarding Positive Capital Accounts . No Unitholder shall be required to pay to any other Unitholder or the Company any deficit or negative balance which may exist from time to time in such Unitholder's Capital Account (including upon and after dissolution of the Company). Except as otherwise expressly provided herein, no Unitholder shall be entitled to receive interest from the Company in respect of any positive balance in its Capital Account, and no Unitholder shall be liable to pay interest to the Company or any Unitholder in respect of any negative balance in its Capital Account.

Section 3.8   No Withdrawal . No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

Section 3.9   Loans From Unitholders . Loans by Unitholders to the Company shall not be considered Capital Contributions. If any Unitholder shall loan funds to the Company in excess of the amounts required hereunder to be contributed by such Unitholder to the capital of the Company, the making of such loans shall not result in any increase in the amount of the Capital Account of such Unitholder. The amount of any such loans shall be a debt of the Company to such Unitholder and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made.

19

Section 3.10    Adjustments to Capital Accounts for Distributions In - Kind . To the extent that the Company distributes property in-kind to the Members, the Company shall be treated as making a distribution equal to the Fair Market Value of such property (as of the date of such distribution) for purposes of Section  4.1 and such property shall be treated as if it were sold for an amount equal to its Fair Market Value and any resulting gain or loss shall be allocated to the Members' Capital Accounts in accordance with Section  4.2 through Section  4.4 .

Section 3.11    Transfer of Capital Accounts . The original Capital Account established for each Substituted Member shall be in the same amount as the Capital Account of the Member (or portion thereof) to which such Substituted Member succeeds at the time such Substituted Member is admitted to as a Member of the Company. The Capital Account of any Member whose interest in the Company shall be increased or decreased by means of (a) the Transfer to it of all or part of the Units of another Member or (b) the repurchase or forfeiture of Units pursuant to any Equity Agreement shall be appropriately adjusted to reflect such Transfer or repurchase. Any reference in this Agreement to a Capital Contribution of or Distribution to a Member that has succeeded any other Member shall include any Capital Contributions or Distributions previously made by or to the former Member on account of the Units of such former Member Transferred to such Member.

Section 3.12    Adjustments to Book Value . The Company shall adjust the Book Value of its assets to Fair Market Value in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as of the following times: (a) at the Manager's discretion in connection with the issuance of Units in the Company or a more than de minimis Capital Contribution to the Company; (b) at the Manager's discretion in connection with the Distribution by the Company to a Member of more than a de minimis amount of the Company's assets, including money; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g). Any such increase or decrease in Book Value of an asset shall be allocated as a Profit or Loss to the Capital Accounts of the Members under Section  4.2 (determined immediately prior to the event giving rise to the revaluation).

Section 3.13    Compliance With Section 1.704 - 1( b) . The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts are computed in order to comply with such Treasury Regulations, the Manager may make such modification, notwithstanding anything in Section  11.2 to the contrary. The Manager also shall (a) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of the Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(iv)( g ), and (b) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

20

ARTICLE IV

DISTRIBUTIONS AND ALLOCATIONS

Section 4.1    Distributions .

(a)    Tax Distributions . To the extent funds of the Company may be available for distribution by the Company (as determined by the Manager in its sole discretion), with respect to each Fiscal Quarter, the Company shall distribute to each holder of Class A Common Units an amount of cash (a " Tax Distribution ") equal to the excess, if any, of (i) (A) the aggregate taxable income of the Company for the Taxable Year to date allocated with respect to the Class A Common Units held (with taxable income reflecting, without limitation, adjustments under Sections 704(c), 734 and 743 of the Code and net of Taxable losses of the Company allocated in respect of prior Fiscal Quarters and not previously taken into account under this clause), multiplied by (B) the Applicable Tax Rate over (ii) the cumulative amount of prior Tax Distributions made pursuant to this Section 4.1(a) with respect to such Class A Common Units for the Taxable Year in question; provided that the amount of Tax Distributions made with respect to the Class A Common Units shall be the same for every Class A Common Unit and shall be equal to the highest amount that any holder of Class A Common Units would otherwise be entitled to receive on a per Unit basis under this Section  4.1 . If the Manager determines there are insufficient funds available to pay the Tax Distributions in full, then Tax Distributions shall be made to each holder of Class A Common Units on a pro rata basis, with each Class A Common Unit receiving the same amount on a per Unit basis. Tax Distributions shall be made with respect to each holder of Class B Common Units under the same principles as set forth above for Class A Common Units, except that the amount distributed with respect to each Class B Common Unit shall be based on the amount of taxable income allocated with respect to such Unit, with no requirement that the amounts distributed with respect to each Class B Common Unit be equal to amounts distributed for other Class B Common Units. If the Manager determines there are insufficient funds available to pay Tax Distributions in full, Tax Distributions shall be made to each holder of Class B Common Units on a pro rata basis in proportion to the amount otherwise distributable to such holder with respect to such Class B Common Units. Any cash available for Tax Distributions shall be initially apportioned between (i) the Class A Common Units and (ii) the Class B Common Units in proportion to the aggregate amounts otherwise distributable to each class of Units as Tax Distributions. To the extent that any Unitholders have not received Tax Distributions in full under this Section  4.1 , such unpaid amounts shall carryforward and shall be distributed in future periods as Tax Distributions under this Section. Tax Distributions shall be treated as advances of any amounts Unitholders are entitled to receive pursuant to Section 4.1(b) . For the avoidance of doubt, unless the Manager specifies that a distribution is not a Tax Distribution pursuant to this Section 4.1(a) , each Distribution with respect to a Unit shall be treated as a Tax Distribution.

(b)    Other Distributions . Except as otherwise set forth in Section 4.1(a) , the Manager may (but shall not be obligated to) make Distributions at such time, in such amounts and in such form (including in-kind property) as determined by the Manager in its sole discretion, in each case to the holders of Participating Units immediately prior to such Distribution as follows: (A) with respect to each Class A Common Unit, an amount equal to the amount determined by dividing the Grossed-Up Amount by the number of Participating Units

21

and (B) with respect to each Participating Class B Common Unit, an amount equal to the excess of (I) the amount determined by dividing the Grossed-Up Amount by the number of Participating Units over (II) the Participation Threshold with respect to such Participating Class B Common Unit.

Notwithstanding the foregoing, (A) the portion of any Distribution (other than a Tax Distribution) that would otherwise be made with respect to any Unvested Class B Common Unit shall not be distributed with respect to such Unvested Class B Common Unit and shall instead be retained, (B) in the event that such Unvested Class B Common Unit subsequently vests, then all Distributions pursuant to Section 4.1(b) made following the vesting of such Unit shall be made such that, on a cumulative basis, the Distributions with respect to such Unit under such clauses equal the Distributions that would have been made with respect to such Unit under such clauses if it had been a Vested Class B Common Unit beginning on the date of its original issue, and (C) if such Unvested Class B Common Unit is repurchased or forfeited (or otherwise becomes incapable of vesting) then such Unvested Class B Common Unit shall not be entitled to receive or retain any Distributions other than (I) any Tax Distributions that have been made with respect to such Unvested Class B Common Unit and (II) the amount, if any, paid or payable to repurchase such Unvested Class B Common Unit.

Section 4.2    Allocations . Profits or Losses for any Fiscal Year shall be allocated among the Unitholders in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such Fiscal Year, between (a) the sum of (i) the Capital Account of each Unitholder, (ii) such Unitholder's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and (iii) such Unitholder's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(2)) and (b) the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to the Company under this Agreement and the Delaware Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such liquidation pursuant to Section 10.2 . For purposes of allocating Profits and Losses pursuant to this Section 4.2 , (and Section 4.3 and Section 4.4 , to the extent applicable), all outstanding Class B Common Units shall be treated as vested; provided that, in the event that a Unitholder's Unvested Class B Common Units are forfeited or repurchased, Forfeiture Allocations as described in Section 4.3(f) may, in the discretion of the Manager, be made.

Section 4.3    Special Allocations .

(a)    Minimum Gain Chargeback . Losses attributable to partner nonrecourse debt (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i). If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(2)), Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Unitholders in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(i)(4).

(b)    Unitholder Nonrecourse Debt Minimum Chargeback . Nonrecourse deductions (as determined according to Treasury Regulation Section 1.704-2(b)(1)) for any

22

Taxable Year shall be allocated to each holder of Class A Common Units ratably among such Unitholders based upon their ownership of Class A Common Units. Except as otherwise provided in Section 4.3(a) , if there is a net decrease in the Minimum Gain during any Taxable Year, each Unitholder shall be allocated Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(f). This Section 4.3(b) is intended to be a Minimum Gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c)     Qualified Income Offset . If any Unitholder that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Section 4.3(a) and Section 4.3(b) , but before the application of any other provision of this Article IV , then Profits for such Taxable Year shall be allocated to such Unitholder in proportion to, and to the extent of, such Adjusted Capital Account Deficit. This Section 4.3(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)     Allocation of Certain Profits and Losses . Profits and Losses described in Section 3.6(b)(v) shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(j), (k) and (m).

(e)     Regulatory Allocations . The allocations set forth in Sections 4.3(a ) - (d) (the " Regulatory Allocations ") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Unitholders intend to allocate Profit and Loss of the Company or make the Company distributions. Accordingly, notwithstanding the other provisions of this Article IV , but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Unitholders so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Unitholders to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Unitholders anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Unitholders so that the net amount of the Regulatory Allocations and such special allocations to each such Unitholder is zero. In addition, if in any Fiscal Year or Fiscal Period there is a decrease in partnership Minimum Gain, or in partner nonrecourse debt Minimum Gain, and application of the Minimum Gain chargeback requirements set forth in Section 4.3(a) or Section 4.3(b) would cause a distortion in the economic arrangement among the Unitholders, the Unitholders may, if they do not expect that the Company will have sufficient other income to correct such distortion, request the Internal Revenue Service to waive either or both of such Minimum Gain chargeback requirements. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such Minimum Gain chargeback requirement.

<div align="center">23</div>

(f)    The Unitholders acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) (" Forfeiture Allocations ") may result from the allocations of Profits and Losses provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of Profits and Losses will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

(g)    Any item of deduction with respect to a Tax that is offset for a Unitholder under Section  4.6 shall be allocated to the Unitholder in which such payment is to be offset.

Section 4.4    Offsetting Allocations . If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and the Company pursuant to Sections 83, 482, or 7872 of the Code or any similar provision now or hereafter in effect, the Manager shall use its commercially reasonable efforts to allocate any corresponding Profit or Loss to the Member who recognizes such item in order to reflect the Members' economic interest in the Company.

Section 4.5    Tax Allocations .

(a)    Allocations Generally . Except as provided in Section 4.5(b) below, for federal, state and local income Tax purposes, each item of income, gain, loss or deduction shall be allocated among the Unitholders in the same manner and in the same proportion that the corresponding book items have been allocated among the Unitholders' respective Capital Accounts; provided that, if any such allocation is not permitted by the Code or other applicable law, then each subsequent item of income, gains, losses, deductions and credits will be allocated among the Unitholders so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)    Code Section 704(c) Allocations . Items of the Company Taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for Tax purposes, be allocated among the Unitholders in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such asset for federal income Tax purposes and its initial Book Value. Such allocations shall be made using a reasonable method specified in Treasury Regulations Section 1.704-3. In addition, if the Book Value of any the Company asset is adjusted pursuant to the requirements of Treasury Regulation Section 1.704—1(b)(2)(iv)(e) or (f), then subsequent allocations of items of Taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income Tax purposes and its Book Value in the same manner as under Code Section 704(c). Notwithstanding the foregoing, the Manager shall determine all allocations pursuant to this Section 4.5(b) using the "traditional method" as described under Treasury Regulation Section 1.704-3.

(c)    Section 754 Election . The Company has made an election under Section 754 of the Code for its Taxable Year beginning 2014, and the Manager may cause the Company to make a "protective" election under Section 754 of the Code for its Taxable Year beginning as of the date of this Agreement, in each case, to adjust the basis of the Company

24

property as permitted and provided in Sections 734 and 743 of the Code. Such election shall be effective solely for federal (and, if applicable, state and local) income Tax purposes and shall not result in any adjustment to the Book Value of any the Company asset or to the Member's Capital Accounts (except as provided in Treasury Regulations Section 1.704- 1(b)(2)(iv)(m)).

(d)    Allocation of Tax Credits, Tax Credit Recapture, Etc. Allocations of Tax credits, Tax credit recapture, and any items related thereto shall be allocated to the Unitholders according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii) and (viii).

(e)    Effect of Allocations . Allocations pursuant to this Section 4.5 are solely for purposes of federal, state and local Taxes and shall not affect, or in any way be taken into account in computing, any Unitholder's Capital Account or share of Profits, Losses, Distributions (other than Tax Distributions) or other items pursuant to any provision of this Agreement.

Section 4.6    Indemnification and Reimbursement for Payments on Behalf of a Unitholder . Except as otherwise provided in Section 6.1 , if the Company is required by law to make any payment to a Governmental Entity that is specifically attributable to a Unitholder or a Unitholder's status as such (including federal withholding Taxes, state personal property Taxes, and state unincorporated business Taxes), then such Unitholder shall indemnify and contribute to the Company in full for the entire amount paid (including interest, penalties and related expenses). The Manager may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company under this Section 4.6 or with respect to any other amounts owed by the Unitholder to the Company or any of its Subsidiaries. A Unitholder's obligation to indemnify and make contributions to the Company under this Section 4.6 shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 4.6 , the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Unitholder under this Section 4.6 , including instituting a lawsuit to collect such indemnification and contribution, with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law), compounded on the last day of each Fiscal Quarter.

ARTICLE V

MANAGEMENT AND CONTROL OF BUSINESS

Section 5.1    Management .

(a)    Except as otherwise specifically provided in this Agreement or the Delaware Act, the business, property and affairs of the Company shall be managed, operated and controlled at the sole, absolute and exclusive direction of the Manager in accordance with the terms of this Agreement. No Members shall have management authority or voting or other rights over, or any other ability to take part in the conduct or control of the business of, the Company. The Manager is hereby designated as a "manager" within the meaning of Section 18-101(10) of the Delaware Act. The Manager is, to the extent of its rights and powers set forth in this

25

Agreement, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company (and no Member shall have such right). The Manager shall have all necessary powers to carry out the purposes, business and objectives of the Company. The Manager may delegate in its discretion the authority to sign agreements and other documents and take other actions on behalf of the Company to any Person (including any Member, officer or employee of the Company) to enter into and perform any document on behalf of the Company.

(b)    Without limiting Section 5.1(a), the Manager shall have the sole power and authority to effect any of the following by the Company or any of its Subsidiaries in one or a series of related transaction, in each case without the vote, consent or approval of any Unitholder: (i) any sale, lease, transfer, exchange or other disposition of any, all or substantially all of the assets of the Company (including the exercise or grant of any conversion, option, privilege or subscription right or any other right available in connection with any assets at any time held by the Company); (ii) any merger, consolidation, reorganization or other combination of the Company with or into another entity, (iii) any acquisition; (iv) any issuance of debt or equity securities; (v) any incurrence of indebtedness; or (vi) any dissolution. Except for any vote, consent or approval of any Unitholder expressly required by this Agreement, if a vote, consent or approval of the Unitholders is required by the Delaware Act or other applicable law with respect to any action to be taken by the Company or matter considered by the Manager, each Unitholder will be deemed to have consented to or approved such action or voted on such matter in accordance with the consent or approval of the Manager on such action or matter.

(c)    Carvana Co. Sub may withdraw as the Manager and appoint as its successor at any time upon written notice to the Company (a) any wholly-owned Subsidiary of Carvana Co., (b) any Person of which Carvana Co. is a wholly-owned Subsidiary, (c) any Person into which Carvana Co. is merged or consolidated or (d) any transferee of all or substantially all of the assets of Carvana Co., which withdrawal and replacement shall be effective upon the delivery of such notice. No appointment of a Person other than Carvana Co. Sub (or its successor, as the case may be) as Manager shall be effective unless Carvana Co. Sub (or its successor, as the case may be) and the new Manager provide all Members with contractual rights, directly enforceable by such Members against the new Manager, to cause the new Manager to comply with all of the Manager's obligations under this Agreement.

Section 5.2    Investment Company Act. The Manager shall use reasonable best efforts to ensure that the Company shall not be subject to registration as an investment company pursuant to the Investment Company Act.

Section 5.3    Officers.

(a)    Officers. Unless determined otherwise by the Manager, the officers of the Company shall be a Chief Executive Officer, a Treasurer and a Secretary and each other officer of Carvana Co. shall also be an officer of the Company, with the same title. All officers shall be appointed by the Manager (or by the Chief Executive Officer to the extent the Manager delegates such authority to the Chief Executive Officer) and shall hold office until their successors are appointed by the Manager (or by the Chief Executive Officer to the extent the Manager delegates such authority to the Chief Executive Officer). Two or more offices may be held by the same

26

individual. The officers of the Company may be removed by the Manager (or by the Chief Executive Officer to the extent the Manager delegates such authority to the Chief Executive Officer) at any time for any reason or no reason.

(b)     Other Officers and Agents . The Manager may appoint such other officers and agents as it may deem necessary or advisable, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager.

(c)     Chief Executive Officer . The Chief Executive Officer shall be the chief executive officer of the Company and shall have the general powers and duties of supervision and management usually vested in the office of a chief executive officer of a company. He or she shall preside at all meetings of Members if present threat.

(d)     Treasurer . The Treasurer shall have the custody of Company funds and securities and shall keep full and accurate account of receipts and disbursements. He or she shall deposit all moneys and other valuables in the name and to the credit of the Company in such depositaries as may be designated by the Manager or the Chief Executive Officer. The Treasurer shall disburse the funds of the Company as may be ordered by the Manager or the Chief Executive Officer, taking proper vouchers for such disbursements. He or she shall render to the Manager and the Chief Executive Officer whenever either of them may request it, an account of all his or her transactions as Treasurer and of the financial condition of the Company. If required by the Manager, the Treasurer shall give the Company a bond for the faithful discharge of his or her duties in such amount and with such surety as the Manager shall prescribe.

(e)     Secretary . The Secretary shall give, or cause to be given, notice of all meetings of Members and all other notices required by applicable law or by this Agreement, and in case of his or her absence or refusal or neglect so to do, any such notice may be given by any person thereunto directed by the Chief Executive Officer, or by the Manager. He or she shall record all the proceedings of the meetings of the Company, and shall perform such other duties as may be assigned to him or her by the Manager or by the Chief Executive Officer.

(f)     Other Officers . Other officers, if any, shall have such powers and shall perform such duties as shall be assigned to them, respectively, by the Manager or by the Chief Executive Officer.

Section 5.4     Competition and Corporate Opportunities .

(a)     Management Investors . Unless the Manager otherwise agrees in writing (e.g., in an Equity Agreement), each Management Investor, for so long as such Management Investor is employed by the Company or its Subsidiaries, shall, and shall cause each of such Person's Affiliates to, bring all investment or business opportunities to the Company of which such Management Investor becomes aware and which are, or may be, (y) within the scope and investment objectives related to the Business, or (z) otherwise competitive with the Business.

(b)     Investor Members . To the fullest extent permitted by applicable law and notwithstanding any duty otherwise existing at law or in equity, in furtherance (and not in limitation) of the elimination of fiduciary duties set forth in Section 5.5(a) below, no Investor

27

Member shall have any duty (including any fiduciary duty) to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Company or any of its Affiliates, and no Investor Member shall be liable to the Company, its Unitholders or any other Person bound by this Agreement (for breach of any fiduciary duty or otherwise) solely by reason of any such activities of such Investor Member or its Affiliates. To the fullest extent permitted by applicable law, the Company, on behalf of itself and its Affiliates, renounces any interest or expectancy of the Company and its Affiliates in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Investor Member or its Affiliates, even if the opportunity is one that the Company or its Affiliates might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so. Each Investor Member shall have no duty to communicate or offer such business opportunity to the Company or its Affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Company, any of its Affiliates or its Unitholders or any other Person bound by this Agreement (for breach of any fiduciary or other duty or otherwise), solely by reason of the fact that an Investor Member or one of its Affiliates pursues or acquires such business opportunity, sells, assigns, transfers or directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or any of its Affiliates. Notwithstanding anything to the contrary in this Section 5.4 , the Company does not renounce any interest or expectancy it may have in any business opportunity that is expressly offered to any Investor Member solely in his or her capacity as a manager or officer of the Company or any of its Affiliates.

(c)    Other Limitations . In addition to and notwithstanding the foregoing provisions of this Section 5.4 , a corporate opportunity shall not be deemed to belong to the Company if it is a business opportunity the Company is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Company's business or is of no practical advantage to it or that is one in which the Company has no interest or reasonable expectancy.

(d)    Other Agreements . This Section 5.4 shall not in any way affect, limit or modify any liabilities, obligations, duties or responsibilities of any Person under any employment agreement, consulting agreement, confidentiality agreement, non-compete agreement, non-solicit agreement or any similar agreement with the Company or any of its Subsidiaries.

Section 5.5    Fiduciary Duties .

(a)    Members and Unitholders . To the fullest extent permitted by law and notwithstanding any duty otherwise existing at law or in equity, no Member or Unitholder, solely in its capacity as such, shall owe any fiduciary duty to the Company, the Manager, any Member, any Unitholder or any other Person bound by this Agreement, provided that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. Nothing in this Section 5.5(a) shall limit the liabilities, duties or obligations of any Member, Management Investor or Unitholder acting in his or her capacity as an officer or manager pursuant to any other provision of this Agreement.

(b)    Manager and Officers . Notwithstanding Section 5.4 above or any other provision to the contrary in this Agreement, except as set forth in Section 5.5(c) , (i) the Manager

28

shall, in its capacity as Manager, and not in any other capacity, have the same fiduciary duties to the Company and the Unitholders and Members as a member of the board of directors of a Delaware corporation; and (ii) each officer of the Company shall, in his or her capacity as such, and not in any other capacity, have the same fiduciary duties to the Company and the Unitholders and Members as an officer of a Delaware corporation. For the avoidance of doubt, the fiduciary duties described in clause (i) above shall not be limited by the fact that the Manager shall be permitted to take certain actions in its sole or reasonable discretion pursuant to the terms of this Agreement or any agreement entered into in connection herewith.

(c)    Manager Conflicts . The parties hereto acknowledge that the Manager will act through its managing member, Carvana Co., and that the members of Carvana Co.'s board of directors will owe fiduciary duties to Carvana Co. and its stockholders. The Manager will use commercially reasonable and appropriate efforts and means, as determined in good faith by the Manager, to minimize any conflict of interest between the Members, on the one hand, and the stockholders of Carvana Co., on the other hand, and to effectuate any transaction that involves or affects any of the Company, the Manager, the Members and/or the stockholders of Carvana Co. in a manner that does not (i) disadvantage the Members of their interests relative to the stockholders of Carvana Co. or (ii) advantage the stockholders of Carvana Co. relative to the Members or (iii) treat the Members and the stockholders of Carvana Co. differently; provided that in the event of a conflict between the interests of the stockholders of Carvana Co. and the interests of the Members, such Members agree that the Manager shall discharge its fiduciary duties to such Members by acting in the best interests of Carvana Co.'s stockholders.

(d)    Waiver . Any duties and liabilities set forth in this Agreement shall replace those existing at law or in equity and each of the Company, each Member and Unitholder and any other Person bound by this Agreement hereby, to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Delaware Act, waives the right to make any claim, bring any action or seek any recovery based on any duties or liabilities existing at law or in equity other than any such duties and liabilities set forth in this Agreement.

(e)    Survival . The provisions of this Section 5.5 shall survive any amendment, repeal or termination of this Agreement.

Section 5.6    Confidentiality .

(a)    Each Unitholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (including their predecessors), (collectively, the " Confidential Information ") including Confidential Information of the Company and its Subsidiaries (and their predecessors, if any) regarding identifiable, specific and discrete business opportunities being pursued by the Company or its Subsidiaries. Except as otherwise consented to by the Manager in writing and subject to Section 5.5 and Section 5.6(c) , each Unitholder (on behalf of itself and, to the extent that such Unitholder would be responsible for the acts of the following Persons under principles of agency law, its managers, directors, officers, shareholders, partners, employees, agents and members) agrees that it will not, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for

29

any reason or purpose whatsoever, except (i) to authorized directors, officers, representatives, agents and employees of the Company or its Subsidiaries and as otherwise may be proper in the course of performing such Unitholder's obligations, or enforcing such Unitholder's rights, under this Agreement and the agreements expressly contemplated hereby, or (ii) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided that the Unitholder required to make such disclosure pursuant to clause (ii) above shall provide to the Company prompt written notice of such disclosure to enable the Company to seek an appropriate protective order or confidential treatment with respect to the Confidential Information required to be disclosed and such disclosed Person shall use commercially reasonable efforts to obtain, at the request of the Company, an order or other assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed as the Company shall designate. For purposes of this Section 5.6 , the term " Confidential Information " shall not include any information of which (x) such Person learns from a source other than the Company or its Subsidiaries, or any of their respective representatives, employees, agents or other service providers, and in each case who is not known by such Person to be bound by a confidentiality obligation to the Company or any of its Subsidiaries, or (y) at the time of disclosure or thereafter becomes generally available to the public other than as a result of disclosure directly or indirectly by such Person or any of such Person's Affiliates, employees or representatives. Nothing in this Section 5.6 shall in any way limit or otherwise modify any confidentiality covenants entered into by the Management Investors pursuant to any other agreement entered into with the Company or any of its Subsidiaries. Notwithstanding the foregoing, Carvana Co. may disclose any Confidential Information pursuant to any disclosure obligation under any applicable law or stock exchange rule with no obligation to provide written notice to the Company or any Member to whom such Confidential Information relates.

(b)    18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, Management Investors have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. Management Investors also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(c)    Each Management Investor acknowledges and agrees that the individual ownership of Units by each of the Management Investors is sensitive and Confidential Information and that information regarding the individual ownership of the Company by Management Investors relates to such Person's compensation as an employee of the Company or one or more of its Subsidiaries. Therefore, notwithstanding anything in this Agreement to the contrary, in no event shall any Management Investor have the right, and each Management Investor hereby waives any right, whether by contract or under applicable law, to the fullest

30

extent of the law, to have access to or receive any information with respect to what Equity Securities are, or have been, issued to or held by any other Management Investor, including the Unit Ownership Ledger. In no event shall any Management Investor request, or be entitled to receive, any such information (including the Unit Ownership Ledger and any other books and records with respect to ownership of the Equity Securities of the Company); provided that nothing in this Section 5.6(c) shall prohibit any Management Investor from receiving a capitalization schedule showing (i) the aggregate number of each class and type of Equity Securities held by the Management Investors and other advisors of the Company and its Subsidiaries collectively as a group, (ii) the aggregate number of Class B Common Units outstanding and the Participation Thresholds with respect to such outstanding Class B Common Units, (iii) the aggregate number of each class and type of Equity Securities outstanding as of any particular date and (iv) the number and type of Equity Securities held by such Management Investor and such Management Investor's Permitted Transferees. Nothing in this Section 5.6(c) shall restrict any Person's express right to receive information pursuant to any contract with the Company or any of its Subsidiaries, regardless of whether such Person is also a Management Investor.

ARTICLE VI

EXCULPATION AND INDEMNIFICATION

Section 6.1    Exculpation .

(a)    Actions in Capacity as a Member or Unitholder . To the fullest extent permitted by applicable law, and except as otherwise expressly provided herein, no Member, Unitholder (other than (i) any Management Investor in his or her capacity as an officer, employee or service provider of Carvana Co., the Company or any of their Subsidiaries, or (ii) the Manager, acting in its capacity as such) or its respective Indemnitees shall be liable to the Company, any Member, any Unitholder or any other Person bound by this Agreement as a result of or arising out any action of or omission by such Member or Unitholder solely in its capacity as a Member or Unitholder, except to the extent such Obligations arise out of such Member's (1) material breach of this Agreement or any other Transaction Document or (2) bad faith violation of the implied contractual covenant of good faith and fair dealing, in each case as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected).

(b)    Other Actions . To the fullest extent permitted by applicable law, and except as otherwise expressly provided herein, including Section 6.1(a) , no Indemnitee shall be liable to the Company, any Member, any Unitholder or any other Person bound by this Agreement as a result of or arising out of the activities of the Indemnitee on behalf of the Company to the extent within the scope of the authority reasonably believed by such Indemnitee to be conferred on such Indemnitee, except to the extent such Indemnitee would not be entitled to exculpation or indemnification pursuant to the articles of incorporation and bylaws of Carvana Co. (as the same may be amended from time to time).

31

Section 6.2    Indemnification . To the fullest extent permitted by applicable law, each of (a) the Manager and its managing member Carvana Co., (b) the Unitholders and Members and their respective Affiliates, (c) the stockholders, members, managers, directors, officers, partners, employees and agents of the Unitholders, Members and their respective Affiliates, and (c) the officers and directors of Carvana Co., the Manager, the Company and each of their Subsidiaries (each, an " Indemnitee ") shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (collectively, " Obligations "), which at any time may be imposed on, incurred by, or asserted against, the Indemnitee as a result of or arising out of this Agreement, Carvana Co., the Company, their respective assets, businesses or affairs, or the activities of the Indemnitee on behalf of Carvana Co., the Company or any of their Subsidiaries to the extent within the scope of the authority reasonably believed to be conferred on such Indemnitee; provided, however , that, to the extent such Indemnitee is not entitled to exculpation with respect to such Obligations pursuant to Section 6.1(a) , the Indemnitee shall not be entitled to indemnification for any such Obligations to the extent such Indemnitee would not be entitled to exculpation or indemnification pursuant to the articles of incorporation and bylaws of Carvana Co. (as the same may be amended from time to time); provided further , that, to the extent such Indemnitee is entitled to exculpation with respect to such Obligations pursuant to Section 6.1(a) , the Indemnitee shall not be entitled to indemnification for any such Obligations to the extent they arise out of such Indemnitee's (1) material breach of this Agreement or any other Transaction Document or (2) bad faith violation of the implied contractual covenant of good faith and fair dealing. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* , or its equivalent, shall not, of itself, create a presumption that the Indemnitee was not entitled to indemnification hereunder. Any indemnification pursuant to this Section 6.1(b) shall be made only out of the assets of the Company and no Member shall have any personal liability on account thereof.

Section 6.3    Expenses . Expenses (including reasonable legal fees and expenses) incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding described in Section 6.1(b) shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that the Indemnitee is not entitled to be indemnified as provided in Section 6.1(b) ; provided that such undertaking shall be unsecured and interest free and shall be accepted without regard to an Indemnitee's ability to repay amounts advanced and without regard to an Indemnitee's entitlement to indemnification.

Section 6.4    Non-Exclusivity ; Savings Clause . The indemnification and advancement of expenses set forth in Section 6.1(b) and Section  6.3 shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any other agreement, policy of insurance or otherwise. The indemnification and advancement of expenses set forth in Section 6.1(b) and Section  6.3 shall continue as to an Indemnitee who has ceased to be a named Indemnitee and shall inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of such a Person. If Section  6.1 , Section  6.2 or Section  6.3 or any portion hereof shall be invalidated on any ground by any court

32

of competent jurisdiction, then the Company shall nevertheless exculpate, indemnify and advance expenses each Indemnitee to the fullest extent permitted by any applicable portion of such sections not so invalidated and to the fullest extent permitted by applicable law. The exculpation, indemnification and advancement of expenses provisions set forth in Section 6.1 , Section 6.2 and Section 6.3 shall be deemed to be a contract between the Company and each of the persons constituting Indemnitees at any time while such provisions remain in effect, whether or not such Person continues to serve in such capacity and whether or not such Person is a party hereto. In addition, neither Section 6.1 , Section 6.2 nor Section 6.3 may be retroactively amended to adversely affect the rights of any Indemnitee arising in connection with any acts, omissions, facts or circumstances occurring prior to such amendment.

Section 6.5    Insurance . The Company may purchase and maintain insurance on behalf of the Indemnitees against any liability asserted against them and incurred by them in such capacity, or arising out of their status as Indemnitees, whether or not the Company would have the power to indemnify them against such liability under this Section 6.5 .

ARTICLE VII

ACCOUNTING AND RECORDS; TAX MATTERS

Section 7.1    Accounting and Records . The books and records of the Company shall be made and maintained, and the financial position and the results of its operations recorded, at the expense of the Company, in accordance with such method of accounting as is determined by the Manager. The books and records of the Company shall reflect all Company transactions and shall be made and maintained in a manner that is appropriate and adequate for the Company's business.

Section 7.2    Preparation of Tax Returns . The Company shall arrange for the preparation and timely filing of all Tax returns required to be filed by the Company, including making the elections described in Section 7.3 . Each Unitholder shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's income Tax returns to be prepared and filed.

Section 7.3    Tax Elections . The Taxable Year shall be the Fiscal Year unless the Manager shall determine otherwise. The Manager shall determine whether to make or revoke any available election pursuant to the Code. Each Unitholder will upon request supply any information necessary to give proper effect to such election.

Section 7.4    Tax Controversies .

(a)    The Manager shall be the Tax Matters Partner (to the extent applicable for taxable years beginning before January 1, 2018) and the "partnership representative" (or " PR ") of the Company for purposes of the Partnership Tax Audit Rules, and, as such, (i) shall be authorized to designate any other Person selected by the Manager as the partnership representative and (ii) shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Tax authorities, including resulting administrative and judicial proceedings, and to expend the

33

Company's funds for professional services and reasonably incurred in connection therewith. Each Unitholder agrees to reasonably cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.

(b)    In the event of an audit by the Internal Revenue Service, unless otherwise approved by all of the Members, the PR shall make on a timely basis, to the extent permissible under applicable Law, the election provided by Section 6226(a) of the Partnership Tax Audit Rules to treat a "partnership adjustment" as an adjustment to be taken into account by each Member in accordance with Section 6226(b) of the Partnership Tax Audit Rules. If the election under Section 6226(a) of the of the Partnership Tax Audit Rules is made, the PR shall furnish to each Member for the year under audit a statement reflecting the Member's share of the adjusted items as determined in the notice of final partnership adjustment, and each such Member shall take such adjustment into account as required under Section 6226(b) of the Partnership Tax Audit Rules and shall be liable for any related tax, interest, penalty, addition to tax, or additional amounts.

(c)    In the event of an audit by the Internal Revenue Service, if the PR does not make the election provided by Section 6226(a) of the Partnership Tax Audit Rules as noted above, the PR shall allocate the burden of any taxes (including, for the avoidance of doubt, any "imputed underpayment" within the meaning of Section 6225 of the Partnership Tax Audit Rules), penalties, interest and related expenses imposed on the Company pursuant to the Partnership Tax Audit Rules among the Members to whom such amounts are attributable (whether as a result of their status, actions, inactions or otherwise), as reasonably determined by the PR and each Member shall promptly reimburse the Company in full for the entire amount the PR determines to be attributable to such Member; *provided* that the Company will also be allowed to recover any amount due from such Member pursuant to this sentence from any distribution otherwise payable to such Member pursuant to this Agreement. Solely for purposes of determining the current Member(s) to which any taxes or other amounts are attributable under this provision, references to any Member in this Section 7.4(c) shall include a reference to each Person that previously held the Units currently held by such Member (but only to the extent of such Person's interest in such Units).

(d)    The PR is authorized to, and shall follow principles (to the extent available) similar to those set forth in Section 7.4(b) and Section 7.4(c) with respect to any audits by state, local, or foreign tax authorities and any tax liabilities that result therefrom.

Section 7.5    Code § 83 Safe Harbor Election .

(a)    By executing this Agreement, each Unitholder authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in the Internal Revenue Service Notice 2005-43 (the " IRS Notice ") or in any successor, guidance or provision apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company. For purposes of making such Safe Harbor election, the Tax Matters Partner is hereby designated as the "partner who has responsibility for federal income Tax reporting" by the Company and, accordingly, that execution of such Safe Harbor election by

34

the Tax Matters Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. Each Unitholder hereby agrees to comply with all requirements of the Safe Harbor described in the IRS Notice, including, the requirement that each Unitholder shall prepare and file all federal income Tax returns reporting the income Tax effects of each Unit issued by the Company that qualifies for the Safe Harbor in a manner consistent with the requirements of the IRS Notice.

(b)    Any Unitholder or former Unitholder that fails to comply with requirements set forth in Section 7.5(a) shall indemnify and hold harmless the Company and each adversely affected Unitholder and former Unitholder from and against any and all losses, liabilities, Taxes, damages, judgments, fines, costs, penalties, amounts paid in settlement and reasonable out-of-pocket costs and expenses incurred in connection therewith (including, costs and expenses of suits and proceedings, and reasonable fees and disbursements of counsel), in each case resulting from such Unitholder's or former Unitholder's failure to comply with such requirements. The Manager may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company and any other Person under this Section 7.5(b) (and any amount so offset with respect to such Person's obligation to indemnify a Person other than the Company shall be paid over to such other Person by the Company). A Unitholder's obligations to comply with the requirements of Section 7.5(a) and to indemnify the Company and any Unitholder or former Unitholder under this Section 7.5(b) shall survive such Unitholder's ceasing to be a Unitholder of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 7.5 , the Company shall be treated as continuing in existence. The Company and any Unitholder or former Unitholder may pursue and enforce all rights and remedies it may have against each Unitholder or former Unitholder under this Section 7.5(b) , including (i) instituting a lawsuit to collect such indemnification and contribution, with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law), compounded on the last day of each Fiscal Quarter and (ii) specific performance and/or immediate injunctive or other equitable relief from any court of competent jurisdiction (without the necessity of showing actual money damages, or posting any bond or other security) in order to enforce or prevent any violation of the provisions of Section 7.5(a) .

(c)    Each Unitholder authorizes the Manager to amend paragraphs (a) and (b) of this Section 7.5 to the extent necessary to achieve substantially the same Tax treatment with respect to any interest in the Company Transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided that such amendment is not materially adverse to any Unitholder (as compared with the after-Tax consequences that would result if the provisions of the IRS Notice applied to all interests in the Company Transferred to a service provider by the Company in connection with services provided to the Company).

35

ARTICLE VIII

TRANSFER OF UNITS; ADMISSION OF NEW MEMBERS

Section 8.1    Transfer of Common Units . Other than as provided for below in this Section 8.1 or in Section 8.2 , no Member may sell, assign, transfer, grant a participation in, pledge, hypothecate, encumber or otherwise dispose of (such transaction being herein collectively called a " Transfer ") all or any portion of its Common Units except with the approval of the Manager, which may be granted or withheld in its sole discretion. Without the approval of the Manager (but otherwise in compliance with Section 8.1 and Section 8.2 ), a Member may, at any time, (a) Transfer any portion of such Member's Common Units pursuant to the Exchange Agreement, and (b) Transfer any portion of such Member's Common Units to a Permitted Transferee of such Member. Any Transfer of Class A Common Units to a Permitted Transferee of such Member by a Member which also holds Class B Common Stock must be accompanied by the transfer of a corresponding number of shares of Class B Common Stock (determined based upon the Exchange Rate then in effect) to such Permitted Transferee. Any purported Transfer of all or a portion of a Member's Common Units not complying with this Section 8.1 shall be void *ab initio* and shall not create any obligation on the part of the Company or the other Members to recognize that purported Transfer or to recognize the Person to which the Transfer purportedly was made as a Member. A Person acquiring a Member's Common Units pursuant to this Section 8.1 shall not be admitted as a substituted or Additional Member except in accordance with the requirements of Section 8.3 , but such Person shall, to the extent of the Common Units transferred to it, be entitled to such Member's (i) share of Distributions, (ii) share of Profits and Losses and (iii) Capital Account in accordance with Section 3.6 . Notwithstanding anything in this Section 8.1 or elsewhere in this Agreement to the contrary, if a Member Transfers all or any portion of its Common Units after the designation of a record date and declaration of a Distribution pursuant to Section 4.1 and before the payment date of such distribution, the transferring Member (and not the Person acquiring all or any portion of its Common Units) shall be entitled to receive such Distribution in respect of such transferred Common Units.

Section 8.2    Transfer of Carvana Co. Sub ' s Interest . Carvana Co. Sub may not Transfer all or any portion of its Class A Common Units at any time, except to (a) the Company, (c) any wholly-owned Subsidiary of Carvana Co. Sub or Carvana Co., (d) any Person of which Carvana Co. Sub or Carvana Co. is a wholly-owned Subsidiary, (e) any Person into which Carvana Co. Sub or Carvana Co. is merged or consolidated or (f) any transferee of all or substantially all of the assets of Carvana Co. Sub or Carvana Co.

Section 8.3    Recognition of Transfer; Substituted and Additional Members .

(a)    No direct or indirect Transfer of all or any portion of a Member's Common Units may be made, and no purchaser, assignee, transferee or other recipient of all or any part of such Common Units shall be admitted to the Company as a substituted or Additional Member hereunder, unless:

(i)    the provisions of Section 8.1 or in Section 8.2 , as applicable, shall have been complied with;

36

(ii)    in the case of a proposed substituted or Additional Member that is (A) a competitor or potential competitor of Carvana Co. or the Company or their respective Subsidiaries, (B) a Person with whom Carvana Co. or the Company or their respective Subsidiaries has had or is expected to have a material commercial or financial relationship or (C) likely to subject Carvana Co. or the Company or their respective Subsidiaries to any material legal or regulatory requirement or obligation, or materially increase the burden thereof, in each case as determined by the Manager in its sole discretion, the admission of the purchaser, assignee, transferee or other recipient as a substituted or Additional Member shall have been approved by the Manager;

(iii)    the Manager shall have been furnished with the documents effecting such Transfer, in form and substance reasonably satisfactory to the Manager, executed and acknowledged by both the seller, assignor or transferor and the purchaser, assignee, transferee or other recipient, and the Manager shall have executed (and the Manager hereby agrees to execute) any other documents on behalf of itself and the Members required to effect the Transfer;

(iv)    the provisions of Section 8.3(b) shall have been complied with;

(v)    the Manager shall be reasonably satisfied that such Transfer will not (A) result in a violation of the Securities Act or any other applicable law; or (B) cause an assignment under the Investment Company Act;

(vi)    such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code or any other association taxable as a corporation for federal income tax purposes and, without limiting the generality of the foregoing, such Transfer shall not be effected on or through an "established securities market" or a "secondary market or the substantial equivalent thereof," as such terms are used in Treas. Reg. § 1.7704-1;

(vii)    the Manager shall have received the opinion of counsel, if any, required by Section 8.3(c) in connection with such Transfer; and

(viii)    all necessary instruments reflecting such Transfer and/or admission shall have been filed in each jurisdiction in which such filing is necessary in order to qualify the Company to conduct business or to preserve the limited liability of the Members.

(b)    Each Substituted Member and Additional Member shall be bound by all of the provisions of this Agreement. Each Substituted Member and Additional Member, as a condition to its admission as a Member, shall execute and acknowledge such instruments (including a counterpart of this Agreement and the Exchange Agreement or a joinder agreement in customary form), in form and substance reasonably satisfactory to the Manager, as the Manager reasonably deems necessary or desirable to effectuate such admission and to confirm the agreement of such substituted or Additional Member to be bound by all the terms and provisions of this Agreement with respect to the Common Units acquired by such substituted or Additional Member. The admission of a substituted or Additional Member shall not require the consent of any Member (but shall require the consent of the Manager, if and to the extent such

37

consent of the Manager is expressly required by this Article VIII ). As promptly as practicable after the admission of a substituted or Additional Member, the Unit Ownership Ledger and other books and records of the Company and Exhibit A shall be changed to reflect such admission.

(c)    As a further condition to any Transfer of all or any part of a Member's Common Units, the Manager may, in its discretion, require a written opinion of counsel to the transferring Member reasonably satisfactory to the Manager, obtained at the sole expense of the transferring Member, reasonably satisfactory in form and substance to the Manager, as to such matters as are customary and appropriate in transactions of this type, including, without limitation (or, in the case of any Transfer made to a Permitted Transferee, limited to an opinion) to the effect that such Transfer will not result in a violation of the registration or other requirements of the Securities Act or any other federal or state securities laws. No such opinion, however, shall be required in connection with a Transfer made pursuant to the Exchange Agreement.

Section 8.4    Expense of Transfer; Indemnification . All reasonable costs and expenses incurred by the Manager and the Company in connection with any Transfer of a Member's Common Units, including any filing and recording costs and the reasonable fees and disbursements of counsel for the Company, shall be paid by the transferring Member. In addition, the transferring Member hereby indemnifies the Manager and the Company against any losses, claims, damages or liabilities to which the Manager, the Company, or any of their Affiliates may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferring Member or such transferee in connection with such Transfer.

Section 8.5    Exchange Agreement . In connection with any Transfer of any portion of a Member's Common Units pursuant to the Exchange Agreement, the Manager shall cause the Company to take any action as may be required under the Exchange Agreement or requested by any party thereto to effect such Transfer promptly.

Section 8.6    Change of Control Transactions . In the event (i) Carvana Co. enters into an agreement to consummate a Change of Control transaction (as defined in the Exchange Agreement) or (ii) any Person commences a tender offer or exchange offer for any of the outstanding shares of Carvana Co.'s stock, Carvana Co. will take all reasonable actions in order to effect any Change of Control Exchange as defined in the Exchange Agreement.

Section 8.7    Divorce/Separation of Unitholder . If required by the Manager, each Member or Unitholder who is an individual shall, at the time of his or her execution of this Agreement or, if any such Person is currently unmarried, at such later time as such Person becomes married or is later required by Manager, cause his or her spouse to execute and deliver to the Company a Consent and Agreement of Spouse in the form attached hereto. If any Member who is an individual (for purposes of this Section  8.7 , a " Separated Member ") and his or her spouse (for purposes of this Section  8.7 , a " Former Spouse ") become legally separated or divorced and a court or any property settlement or other agreement awards any Units owned by such Separated Member to such Former Spouse, then in such case, notwithstanding the provisions of, such Units (the " Former Spouse ' s Units ") held by such Member shall be dealt with as follows:

38

(a)    Each Separated Member shall promptly provide the Company with written notice (the " Dissolution Notice ") of (i) the entry of any judicial decree or order resolving the property rights of the Separated Member and the Former Spouse in connection with their marital dissolution or legal separation, or (ii) the execution of any contract or agreement relating to the distribution or division of such property rights. The Dissolution Notice shall be accompanied by a copy of the actual decree of dissolution, settlement agreement, or other agreement between the Separated Member and the Former Spouse, which provides for the award to the Former Spouse of the Former Spouse's Units in settlement of any community property or other marital property rights such Former Spouse may have in such Units.

(b)    Notwithstanding the making of any such award or agreement with respect to the Former Spouse's Units, the Former Spouse shall not have any rights of a Member, except the right to receive distributions occurring at the times and equal in amounts to those distributions the Separated Member would otherwise have received in respect of the Former Spouse's Units.

(c)    In the event that there is an award of a Separated Member's Unvested Class B Common Units to a Former Spouse, such Unvested Class B Common Units shall be forfeited and terminated. In the event there is an award of a Separated Member's Vested Class B Common Units to a Former Spouse, such Vested Class B Common Units may, at the option of the Company or the Manager, be acquired for an amount equal to fifty percent (50%) of the Fair Market Value of such Vested Units.

ARTICLE IX

WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

Section 9.1    Withdrawal and Resignation of Unitholders . No Unitholder shall have the power or right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company pursuant to Article X , without the prior written consent of the Manager (which consent may be withheld by the Manager in its sole discretion), except as otherwise expressly permitted by this Agreement. Upon a Transfer of all of a Unitholder's Units in a Transfer permitted by this Agreement, and (if applicable) the Equity Agreements, such Unitholder shall cease to be a Unitholder. Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Unitholder will not be considered a Unitholder for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Unitholder's Capital Account (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

ARTICLE X

DISSOLUTION AND LIQUIDATION

Section 10.1    Dissolution . The Company shall not be dissolved by the admission of Additional Members or Substituted Members. The Company shall dissolve, and its affairs shall be wound up upon the first of the following to occur:

(a)    at the election of the Manager; and

39

(b)    the entry of a decree of judicial dissolution of the Company under Section 33.5 of the Delaware Act or an administrative dissolution under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article X the Company is intended to have perpetual existence. An Event of Withdrawal shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

Section 10.2    Liquidation and Termination . On the dissolution of the Company, the Manager shall act as liquidator or may appoint one or more representatives, Members or other Persons as liquidator(s). The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Delaware Act. The costs of liquidation shall be borne as the Company's expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Manager. The steps to be accomplished by the liquidators are as follows:

(a)    The liquidators shall pay, satisfy or discharge from the Company's funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine).

(b)    As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the " Liquidation FMV ") of the Company's remaining assets (the " Liquidation Assets ") in accordance with Article X hereof, (ii) determine the amounts to be distributed to each Unitholder in accordance with Section 4.1 , and (iii) deliver to each Unitholder a statement (the " Liquidation Statement ") setting forth the Liquidation FMV and the amounts and recipients of such Distributions, which Liquidation Statement shall be final and binding on all Unitholders.

(c)    As soon as the Liquidation FMV and the proper amounts of Distributions have been determined in accordance with Section 10.2(b) above, the liquidators shall promptly distribute the Company's Liquidation Assets to the holders of Units in accordance with Section 4.1(b) above. In making such distributions, the liquidators shall allocate each type of Liquidation Assets (i.e., cash or cash equivalents, preferred or common equity securities, etc.) among the Unitholders ratably based upon the aggregate amounts to be distributed with respect to the Units held by each such holder; provided that the liquidators may allocate each type of Liquidation Assets so as to give effect to and take into account the relative priorities of the different Units; provided further that, in the event that any securities are part of the Liquidation Assets, each Unitholder that is not an "accredited investor" as such term is defined under the Securities Act may, in the sole discretion of the Manager, receive, and hereby agrees to accept, in lieu of such securities, cash consideration with an equivalent value to such securities as determined by the Manager. Any non-cash Liquidation Assets will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Section 4.2 and Section 4.3 . If any Unitholder's Capital Account is not equal to

40

the amount to be distributed to such Unitholder pursuant to Section 10.2(b) , Profits and Losses for the Fiscal Year in which the Company is dissolved shall be allocated among the Unitholders in such a manner as to cause, to the extent possible, each Unitholder's Capital Account to be equal to the amount to be distributed to such Unitholder pursuant to Section 10.2(b) . The distribution of cash and/or property to a Unitholder in accordance with the provisions of this Section 10.2(b) constitutes a complete return to the Unitholder of its Capital Contributions and a complete distribution to the Unitholder of its interest in the Company and all the Company property and constitutes a compromise to which all Unitholders have consented within the meaning of the Delaware Act. To the extent that a Unitholder returns funds to the Company, it has no claim against any other Unitholder for those funds.

Section 10.3    Securityholders Agreement . To the extent that units or other equity securities of any Subsidiary are distributed to any Unitholders and unless otherwise agreed to by the Manager, such Unitholders hereby agree to enter into a securityholders agreement with such Subsidiary and each other Unitholder which contains rights and restrictions in form and substance similar to the provisions and restrictions set forth herein (including in Article VIII ).

Section 10.4    Cancellation of Certificate . On completion of the distribution of the Company's assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Manager (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section  10.4 .

Section 10.5    Reasonable Time for Winding Up . A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section  10.2 in order to minimize any losses otherwise attendant upon such winding up.

Section 10.6    Return of Capital . The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Unitholders (it being understood that any such return shall be made solely from the Company assets).

Section 10.7    Hart - Scott - Rodino . In the event the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the " HSR Act ") is applicable to any Unitholder, the dissolution of the Company shall not be consummated until such time as the applicable waiting period (and extensions thereof) under the HSR Act have expired or otherwise been terminated with respect to each such Unitholder.

41

ARTICLE XI

GENERAL PROVISIONS

Section 11.1    Power of Attorney . Each Unitholder hereby constitutes and appoints the Manager and the liquidators, if any and as applicable, and their respective designees, with full power of substitution, as his, her or its true and lawful agent and attorney-in-fact, with full power and authority in his, her or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (to the same extent such Person could take such action): (a) this Agreement, all certificates and other instruments and all amendments hereof or thereof in accordance with the terms hereof which the Manager deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property or as otherwise permitted herein; (b) all instruments, agreements, amendments or other documents which the Manager deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (c) all conveyances and other instruments or documents which the Manager and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Unitholder pursuant to Article VIII or Article IX . The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Unitholder and the Transfer of all or any portion of his, her or its Units and shall extend to such Unitholder's heirs, successors, permitted assigns and personal representatives.

Section 11.2    Amendments . This Agreement may be amended (including, for purposes of this Section 11.2 , any amendment effected directly or indirectly by way of a merger or consolidation of the Company) or waived, in whole or in part, by the Manager; provided , however , that to the extent any amendment or waiver, including any amendment or waiver of the Exhibits attached hereto, would disproportionately and adversely affect the rights of any Member of a class compared with the rights of any other Member of such class, such amendment or waiver may only be made by the Manager upon the prior written consent of such disproportionately and adversely affected Member. Class A Common Units and Class B Common Units shall be treated as the same class of Units for the purposes of this Section 11.2 .

Section 11.3    Title to the Company Assets . The Company's assets shall be deemed to be owned by the Company as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such assets or any portion thereof. Legal title to any or all of such assets may be held in the name of the Company or one or more nominees, as the Manager may determine. The Manager hereby declares and warrants that any the Company assets for which legal title is held in the name of any nominee shall be held in trust by such nominee for the use and benefit of the Company in accordance with the provisions of this Agreement. All the Company assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such assets is held.

42

Section 11.4    Remedies . Each Unitholder and the Company shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

Section 11.5    Successors and Assigns . All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

Section 11.6    Severability . Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein or if such term or provision could be drawn more narrowly so as not to be illegal, invalid, prohibited or unenforceable in such jurisdiction, it shall be so narrowly drawn, as to such jurisdiction, without invalidating the remaining terms and provisions of this Agreement or affecting the legality, validity or enforceability of such term or provision in any other jurisdiction.

Section 11.7    Counterparts; Binding Agreement . This Agreement may be executed simultaneously in two or more separate counterparts, any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto. This Agreement and all of the provisions hereof shall be binding upon and effective as to each Person who (a) executes this Agreement in the appropriate space provided in the signature pages hereto notwithstanding the fact that other Persons who have not executed this Agreement may be listed on the signature pages hereto and (b) may from time to time become a party to this Agreement by executing a counterpart of or joinder to this Agreement.

Section 11.8    Descriptive Headings; Interpretation . The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an

43

ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

Section 11.9    Applicable Law . This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 11.10    Addresses and Notices . All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) telecopied to the recipient, or delivered by means of electronic mail (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied/emailed before 5:00 p.m. Phoenix, Arizona time on a Business Day, and otherwise on the next Business Day, or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

Section 11.11    Creditors . None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in the Company's Profits, Losses, Distributions, capital or property other than as a secured creditor. Notwithstanding the foregoing, each of the Indemnitees are intended third party beneficiaries of Section 6.1(b) . and shall be entitled to enforce such provision (as it may be in effect from time to time).

Section 11.12    No Waiver . No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 11.13    Further Action . The parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 11.14    Offset Against Amounts Payable . Whenever the Company is to pay any sum to any Unitholder or any Affiliate or related Person thereof, any amounts that such Unitholder or such Affiliate or related Person owes to the Company or any of its Subsidiaries may be offset or deducted from that sum before payment.

44

Section 11.15    Entire Agreement . This Agreement and the other Transaction Documents embody the complete agreement and understanding among the parties with respect to the subject matter herein and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

Section 11.16    Delivery by Electronic Means . This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format (pdf) or comparable electronic transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or pdf electronic transmission or comparable electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 11.17    Certain Acknowledgments . This Agreement shall be considered for all purposes as having been prepared through the joint efforts of the parties. No presumption shall apply in favor of any party in the interpretation of this Agreement or in the resolution of any ambiguity of any provision hereof based on the preparation, substitution, submission or other event of negotiation, drafting or execution hereof. Each Member and Unitholder acknowledges that it/he/she is entitled to and has been afforded the opportunity to consult legal counsel of its choice regarding the terms, conditions and legal effects of this Agreement, as well as the advisability and propriety thereof. Each Member and Unitholder further acknowledges that having so consulted with legal counsel of its choosing, such Member or Unitholder hereby waives any right to raise or rely upon the lack of representation or effective representation in any future proceedings or in connection with any future claim resulting from this Agreement or the formation of the Company. THE COMPANY, THE MEMBERS AND THE UNITHOLDERS ACKNOWLEDGE THAT KIRKLAND & ELLIS LLP HAS ONLY REPRESENTED THE COMPANY WITH RESPECT TO THE NEGOTIATION AND PREPARATION OF THIS AGREEMENT, AND HAS NOT REPRESENTED THE MEMBERS OR THE UNITHOLDERS WITH RESPECT TO SUCH MATTERS.

Section 11.18    Consent to Jurisdiction; WAIVER OF TRIAL BY JURY .

(a)    Consent to Jurisdiction . Each Unitholder irrevocably submits to the exclusive jurisdiction of the United States District Court for the State of Delaware and the state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each Unitholder further agrees that service of any process, summons, notice or document by United States certified or registered mail (in each such case, prepaid return receipt requested) to such Unitholder's respective address set forth in the Company's books and records or such other address or to the attention of such

45

other person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each Unitholder irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

(b)    WAIVER OF TRIAL BY JURY . BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT (INCLUDING THE COMPANY) HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

Section 11.19    Representations and Warranties . By execution of this Agreement, each Member severally represents and warrants as follows:

(a)    Such Member has full legal right, power, and authority to deliver this Agreement and the other Transaction Documents and to perform such Member's obligations hereunder and thereunder;

(b)    This Agreement and the other Transaction Documents constitute the legal, valid, and binding obligation of such Member enforceable in accordance with its respective terms, except as the enforcement thereof may be limited by bankruptcy and other laws of general application relating to creditors' rights or general principles of equity;

(c)    Neither this Agreement nor the other Transaction Documents violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default under any other agreement of which such Member is a party; and

(d)    Such Member's investment in Units in the Company is made for such Member's own account for investment purposes only and not with a view to the resale or distribution of such Units.

Section 11.20    Tax Receivable Agreement . The Tax Receivable Agreement and the Exchange Agreement shall each be treated as part of this Agreement as described in

46

Section 761(c) of the Code, and Treas. Reg. § 1.704-1(b)(2)(ii)(h) and § 1.761-1(c) with respect to payments to a Member with respect to an Exchange (as defined in the Tax Receivable Agreement) by such Member.

\* \* \* \* \*

47

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Fourth Amended and Restated Limited Liability Company Agreement as of the date first written above.

CARVANA GROUP, LLC

By: _____
Name:  Ernest C. Garcia III
Its:      Chief Executive Officer

CARVANA CO.

By: _____
Name:
Title:

CARVANA CO. SUB LLC, as a Member and the sole Manager

By: _____
Name:
Its:

ERNEST C. GARCIA II, a Member

By: _____
Name:  Ernest C. Garcia II

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

2014 FIDEL FAMILY TRUST DATED JUNE 16, 2014, A
MEMBER

By:      _____

Name:    Kathryn L. Fidel

Its:     Trustee

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

ERNEST C. GARCIA III, a Member

By: _____
      Ernest C. Garcia III

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

ERNEST GARCIA III MULTI-GENERATIONAL TRUST III, a Member

By: _____
Name:   Steven P. Johnson
Its:    Administrative Trustee

By: _____
Name:   Ernest C. Garcia II
Its:    Investment Trustee

ERNEST IRREVOCABLE 2004 TRUST III, a Member

By: _____
Name:   Steven P. Johnson
Its:    Administrative Trustee

By: _____
Name:   Ernest C. Garcia II
Its:    Investment Trustee

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

CVAN HOLDINGS, LLC

By: _____
Name:   Kelly Van Meter
Its:    Vice President

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

DRIVETIME CAR SALES AND FINANCE COMPANY, LLC

By: _____

Name:   Kurt Wood

Its:    CFO

**Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

GV AUTO I, LLC

By:    Georgiana Ventures, LLC
Its:    Manager

By:    _____
Name:  Ira J. Platt
Its:    Manager

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Joinder

The undersigned hereby agrees to become a party to the Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, a Delaware limited liability company, dated as of [●], 2017 (the " <u>Agreement</u> "), and agrees to be bound by the terms and conditions of the Agreement as a Member.

MEMBER:

[●]

By: _____

Its:

Address for Notices:

[●]
[●]
[●]
[●]

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

**CONSENT AND AGREEMENT OF SPOUSE**

    The undersigned (" Spouse ") is the spouse of the individual identified below (" Married Unitholder ") who owns units in Carvana Group, LLC (the " Company "). Spouse acknowledges that he or she has read the Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, effective as of [●], 2017 (the " Agreement "), and understands its provisions. Specifically, Spouse has read Section 8.7 (Divorce/Separation of Unitholder) and is aware that by the provisions of the Agreement both Spouse and Married Unitholder have agreed to sell, transfer, and restrict all of Married Unitholder's or Spouse's units in the Company, including any community property interest or quasi-community property interest therein, in accordance with the terms and provisions of the Agreement. Spouse hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including but not limited to those provisions relating to the sales and transfers of the units and the restrictions thereon and not to make any transfer or other disposition of his or her community property or other interest in the units, whether by bequest or the application of the residuary clause of his or her will or otherwise, in any manner that would have the effect of causing the units to be held by anyone other than Married Unitholder. If Spouse predeceases Married Unitholder when Married Unitholder owns any units in the Company, then Spouse agrees not to transfer, devise or bequeath whatever community property interest or quasi-community property interest Spouse may have in the units of the Company in contravention of the Agreement. Spouse hereby appoints Married Unitholder as his or her attorney-in-fact to exercise all rights that Spouse may have with respect to the units, including, but not limited to, the encumbrance or disposition thereof.

Date: _____

_____
Married Unitholder

_____
Spouse

_____
Print Name of Spouse

**[Signature Page to Carvana Group, LLC Fourth Amended and Restated Limited Liability Company Agreement]**

**CARVANA CO.**

---

**2017 OMNIBUS INCENTIVE PLAN**

---

**ARTICLE I**
**PURPOSE**

The purpose of this Carvana Co. 2017 Omnibus Incentive Plan is to enhance the profitability and value of the Company for the benefit of its stockholders by enabling the Company to offer Eligible Individuals cash and stock-based incentives in order to attract, retain and reward such individuals and strengthen the mutuality of interests between such individuals and the Company's stockholders. The Plan is effective as of the date set forth in Article XV.

**ARTICLE II**
**DEFINITIONS**

For purposes of the Plan, the following terms shall have the following meanings:

**2.1**    " **Affiliate** " means each of the following: (a) any Subsidiary; (b) any Parent; (c) any corporation, trade or business (including, without limitation, a partnership or limited liability company) which is directly or indirectly controlled 50% or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) by the Company or one of its Affiliates; (d) any trade or business (including, without limitation, a partnership or limited liability company) which directly or indirectly controls 50% or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) of the Company; and (e) any other entity in which the Company or any of its Affiliates has a material equity interest and which is designated as an "Affiliate" by resolution of the Committee; provided that, unless otherwise determined by the Committee, the Common Stock subject to any Award constitutes "service recipient stock" for purposes of Section 409A of the Code or otherwise does not subject the Award to Section 409A of the Code.

**2.2**    " **Award** " means any award under the Plan of any Stock Option, Stock Appreciation Right, Restricted Stock Award, Performance Award, Other Stock-Based Award or Other Cash-Based Award. All Awards shall be granted by, confirmed by, and subject to the terms of, a written Award Agreement executed by the Company and the Participant.

**2.3**    " **Award Agreement** " means the written or electronic agreement setting forth the terms and conditions applicable to an Award.

**2.4**    " **Board** " means the Board of Directors of the Company.

**2.5**    " **Cause** " means, unless otherwise determined by the Committee in the applicable Award Agreement, with respect to a Participant's Termination of Employment or Termination of Consultancy, the following: (a) in the case where there is no employment agreement, consulting

agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant at the time of the grant of the Award (or where there is such an agreement but it does not define "cause" (or words of like import)), termination due to a Participant's insubordination, dishonesty, fraud, incompetence, moral turpitude, willful misconduct, refusal to perform the Participant's duties or responsibilities for any reason other than illness or incapacity, repeated or material violation of any employment policy, violation or breach of any confidentiality agreement, work product agreement or other agreement between the Participant and the Company or materially unsatisfactory performance of the Participant's duties for the Company or an Affiliate, as determined by the Committee in its good faith discretion; or (b) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant at the time of the grant of the Award that defines "cause" (or words of like import), "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" only applies on occurrence of a change in control, such definition of "cause" shall not apply until a change in control actually takes place and then only with regard to a termination thereafter. With respect to a Participant's Termination of Directorship, "cause" means an act or failure to act that constitutes cause for removal of a director under applicable Delaware law.

2.6    " **Change in Control** " has the meaning set forth in 11.2.

2.7    " **Change in Control Price** " has the meaning set forth in Section 11.1.

2.8    " **Code** " means the Internal Revenue Code of 1986, as amended. Any reference to any section of the Code shall also be a reference to any successor provision and any treasury regulation and other official guidance or regulations promulgated thereunder.

2.9    " **Committee** " means any committee of the Board duly authorized by the Board to administer the Plan. If no committee is duly authorized by the Board to administer the Plan, the term "Committee" shall be deemed to refer to the Board for all purposes under the Plan.

2.10    " **Common Stock** " means the shares of Class A common stock, $0.01 par value per share, of the Company.

2.11    " **Company** " means Carvana Co., a Delaware corporation, and its successors by operation of law.

2.12    " **Consultant** " means any natural person who is an advisor or consultant to the Company or its Affiliates.

2.13    " **Disability** " means, unless otherwise determined by the Committee in the applicable Award Agreement, with respect to a Participant's Termination, a permanent and total disability as defined in Section 22(e)(3) of the Code. A Disability shall only be deemed to occur at the time of the determination by the Committee of the Disability. Notwithstanding the foregoing, for Awards that are subject to Section 409A of the Code, Disability shall mean that a Participant is disabled under Section 409A(a)(2)(C)(i) or (ii) of the Code.

2.14    " **Effective Date** " means the effective date of the Plan as defined in Article XV.

2

**2.15**    " **Eligible Employees** " means each employee of the Company or an Affiliate.

**2.16**    " **Eligible Individual** " means an Eligible Employee, Non-Employee Director or Consultant who is designated by the Committee in its discretion as eligible to receive Awards subject to the conditions set forth herein.

**2.17**    " **Exchange Act** " means the Securities Exchange Act of 1934, as amended. Reference to a specific section of the Exchange Act or regulation thereunder shall include such section or regulation, any valid regulation or interpretation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

**2.18**    " **Fair Market Value** " means, for purposes of the Plan, unless otherwise required by any applicable provision of the Code or any regulations issued thereunder, as of any date and except as provided below, the last sales price reported for the Common Stock on the applicable date: (a) as reported on the principal national securities exchange in the United States on which it is then traded or (b) if the Common Stock is not traded, listed or otherwise reported or quoted, the Committee shall determine in good faith the Fair Market Value in whatever manner it considers appropriate taking into account the requirements of Section 409A of the Code. For purposes of the grant of any Award, the applicable date shall be the trading day immediately prior to the date on which the Award is granted. For purposes of any Award granted in connection with the Registration Date, the Fair Market Value shall be the public offering price in the initial public offering as set forth on the cover of the prospectus. For purposes of the exercise of any Award, the applicable date shall be the date a notice of exercise is received by the Committee or, if not a day on which the applicable market is open, the next day that it is open.

**2.19**    " **Family Member** " means the Participant's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the Participant's household (other than a tenant or employee), a trust in which these persons have more than fifty percent (50%) of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than fifty percent (50%) of the voting interests.

**2.20**    " **Garcia Parties** " means each of Ernest C. Garcia, II, Ernest C. Garcia, III, and each of the entities controlled by one or both of them, including trusts over which one or both of them exercise investment control.

**2.21**    " **Incentive Stock Option** " means any Stock Option awarded to an Eligible Employee of the Company, its Subsidiaries and its Parents (if any) under the Plan intended to be and designated as an "Incentive Stock Option" within the meaning of Section 422 of the Code.

**2.22**    " **Lead Underwriter** " has the meaning set forth in Section 14.20.

**2.23**    " **Lock-Up Period** " has the meaning set forth in Section 14.20.

3

**2.24**    " **Non-Employee Director** " means a director or a member of the Board of the Company or any Affiliate who is not an active employee of the Company or any Affiliate.

**2.25**    " **Non-Qualified Stock Option** " means any Stock Option awarded under the Plan that is not an Incentive Stock Option.

**2.26**    " **Non-Tandem Stock Appreciation Right** " means the right to receive an amount in cash and/or stock equal to the difference between (x) the Fair Market Value of a share of Common Stock on the date such right is exercised, and (y) the aggregate exercise price of such right, otherwise than on surrender of a Stock Option.

**2.27**    " **Other Cash-Based Award** " means an Award granted pursuant to Section 10.3 of the Plan and payable in cash at such time or times and subject to such terms and conditions as determined by the Committee in its sole discretion.

**2.28**    " **Other Stock-Based Award** " means an Award under Article X of the Plan that is valued in whole or in part by reference to, or is payable in or otherwise based on, Common Stock, including, without limitation, an Award valued by reference to an Affiliate.

**2.29**    " **Parent** " means any parent corporation of the Company within the meaning of Section 424(e) of the Code.

**2.30**    " **Participant** " means an Eligible Individual to whom an Award has been granted pursuant to the Plan.

**2.31**    " **Performance Award** " means an Award granted to a Participant pursuant to Article IX hereof contingent upon achieving certain Performance Goals.

**2.32**    " **Performance Goals** " means goals established by the Committee as contingencies for Awards to vest and/or become exercisable or distributable based on one or more of the performance goals set forth in Exhibit A hereto.

**2.33**    " **Performance Period** " means the designated period during which the Performance Goals must be satisfied with respect to the Award to which the Performance Goals relate.

**2.34**    " **Person** " means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a government or any branch, department, agency, political subdivision or official thereof.

**2.35**    " **Plan** " means this Carvana Co. 2017 Omnibus Incentive Plan, as amended from time to time.

**2.36**    " **Proceeding** " has the meaning set forth in Section 14.9.

**2.37**    " **Reference Stock Option** " has the meaning set forth in Section 7.1.

4

**2.38** " **Registration Date** " means the date on which the Company consummates the sale of its Common Stock in a bona fide, firm commitment underwriting pursuant to a registration statement under the Securities Act.

**2.39** " **Reorganization** " has the meaning set forth in Section 4.2(b)(ii).

**2.40** " **Restricted Stock** " means an Award of shares of Common Stock under the Plan that is subject to restrictions under Article VIII.

**2.41** " **Restriction Period** " has the meaning set forth in Section 8.3(a) with respect to Restricted Stock.

**2.42** " **Rule 16b-3** " means Rule 16b-3 under Section 16(b) of the Exchange Act as then in effect or any successor provision.

**2.43** " **Section 162(m) of the Code** " means the exception for performance-based compensation under Section 162(m) of the Code and any applicable treasury regulations thereunder.

**2.44** " **Section 409A of the Code** " means the nonqualified deferred compensation rules under Section 409A of the Code and any applicable treasury regulations and other official guidance thereunder.

**2.45** " **Securities Act** " means the Securities Act of 1933, as amended and all rules and regulations promulgated thereunder. Reference to a specific section of the Securities Act or regulation thereunder shall include such section or regulation, any valid regulation or interpretation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

**2.46** " **Stock Appreciation Right** " means the right pursuant to an Award granted under Article VII.

**2.47** " **Stock Option** " or " **Option** " means any option to purchase shares of Common Stock granted to Eligible Individuals granted pursuant to Article VI.

**2.48** " **Subsidiary** " means any subsidiary corporation of the Company within the meaning of Section 424(f) of the Code.

**2.49** " **Tandem Stock Appreciation Right** " means the right to surrender to the Company all (or a portion) of a Stock Option in exchange for an amount in cash and/or stock equal to the difference between (i) the Fair Market Value on the date such Stock Option (or such portion thereof) is surrendered, of the Common Stock covered by such Stock Option (or such portion thereof), and (ii) the aggregate exercise price of such Stock Option (or such portion thereof).

**2.50** " **Ten Percent Stockholder** " means a Person owning stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company, its Subsidiaries or its Parent.

5

**2.51** " **Termination** " means a Termination of Consultancy, Termination of Directorship or Termination of Employment, as applicable.

**2.52** " **Termination of Consultancy** " means: (a) that the Consultant is no longer acting as a consultant to the Company or an Affiliate; or (b) when an entity which is retaining a Participant as a Consultant ceases to be an Affiliate unless the Participant otherwise is, or thereupon becomes, a Consultant to the Company or another Affiliate at the time the entity ceases to be an Affiliate. In the event that a Consultant becomes an Eligible Employee or a Non-Employee Director upon the termination of such Consultant's consultancy, unless otherwise determined by the Committee, in its sole discretion, no Termination of Consultancy shall be deemed to occur until such time as such Consultant is no longer a Consultant, an Eligible Employee or a Non-Employee Director. Notwithstanding the foregoing, the Committee may otherwise define Termination of Consultancy in the Award Agreement or, if no rights of a Participant are reduced, may otherwise define Termination of Consultancy thereafter, provided that any such change to the definition of the term "Termination of Consultancy" does not subject the applicable Award to Section 409A of the Code.

**2.53** " **Termination of Directorship** " means that the Non-Employee Director has ceased to be a director of the Company; except that if a Non-Employee Director becomes an Eligible Employee or a Consultant upon the termination of such Non-Employee Director's directorship, such Non-Employee Director's ceasing to be a director of the Company shall not be treated as a Termination of Directorship unless and until the Participant has a Termination of Employment or Termination of Consultancy, as the case may be.

**2.54** " **Termination of Employment** " means: (a) a termination of employment (for reasons other than a military or personal leave of absence granted by the Company) of a Participant from the Company and its Affiliates; or (b) when an entity which is employing a Participant ceases to be an Affiliate, unless the Participant otherwise is, or thereupon becomes, employed by the Company or another Affiliate at the time the entity ceases to be an Affiliate. In the event that an Eligible Employee becomes a Consultant or a Non-Employee Director upon the termination of such Eligible Employee's employment, unless otherwise determined by the Committee, in its sole discretion, no Termination of Employment shall be deemed to occur until such time as such Eligible Employee is no longer an Eligible Employee, a Consultant or a Non-Employee Director. Notwithstanding the foregoing, the Committee may otherwise define Termination of Employment in the Award Agreement or, if no rights of a Participant are reduced, may otherwise define Termination of Employment thereafter, provided that any such change to the definition of the term "Termination of Employment" does not subject the applicable Award to Section 409A of the Code.

**2.55** " **Transfer** " means: (a) when used as a noun, any direct or indirect transfer, sale, assignment, pledge, hypothecation, encumbrance or other disposition (including the issuance of equity in any entity), whether for value or no value and whether voluntary or involuntary (including by operation of law), and (b) when used as a verb, to directly or indirectly transfer, sell, assign, pledge, encumber, charge, hypothecate or otherwise dispose of (including the issuance of equity in any entity) whether for value or for no value and whether voluntarily or involuntarily (including by operation of law). "Transferred" and "Transferable" shall have a correlative meaning.

6

**2.56**    " **Transition Period** " means the period beginning with the Registration Date and ending as of the earlier of: (i) the date of the first annual meeting of stockholders of the Company at which directors are to be elected that occurs after the close of the third calendar year following the calendar year in which the Registration Date occurs; and (ii) the expiration of the "reliance period" under Treasury Regulation Section 1.162-27(f)(2).

<div align="center">

**ARTICLE III**
**ADMINISTRATION**

</div>

**3.1**    **The Committee** . The Plan shall be administered and interpreted by the Committee. To the extent required by applicable law, rule or regulation, it is intended that each member of the Committee shall qualify as (a) a "non-employee director" under Rule 16b-3, (b) an "outside director" under Section 162(m) of the Code and (c) an "independent director" under the rules of any national securities exchange or national securities association, as applicable. If it is later determined that one or more members of the Committee do not so qualify, actions taken by the Committee prior to such determination shall be valid despite such failure to qualify.

**3.2**    **Grants of Awards** . The Committee shall have full authority to grant, pursuant to the terms of the Plan, to Eligible Individuals: (i) Stock Options, (ii) Stock Appreciation Rights, (iii) Restricted Stock Awards, (iv) Performance Awards, (v) Other Stock-Based Awards and (vi) Other Cash-Based Awards. In particular, the Committee shall have the authority:

    (a)    to select the Eligible Individuals to whom Awards may from time to time be granted hereunder;

    (b)    to determine whether and to what extent Awards, or any combination thereof, are to be granted hereunder to one or more Eligible Individuals;

    (c)    to determine the number of shares of Common Stock to be covered by each Award granted hereunder;

    (d)    to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder (including, but not limited to, the exercise or purchase price (if any), any restriction or limitation, any vesting schedule or acceleration thereof, or any forfeiture restrictions or waiver thereof, regarding any Award and the shares of Common Stock relating thereto, based on such factors, if any, as the Committee shall determine, in its sole discretion);

    (e)    to determine the amount of cash to be covered by each Award granted hereunder;

    (f)    to determine whether, to what extent and under what circumstances grants of Stock Options and other Awards under the Plan are to operate on a tandem basis and/or in conjunction with or apart from other awards made by the Company outside of the Plan;

    (g)    to determine whether and under what circumstances a Stock Option may be settled in cash, Common Stock and/or Restricted Stock under Section 6.4(d);

<div align="center">7</div>

(h)    to determine whether a Stock Option is an Incentive Stock Option or Non-Qualified Stock Option;

(i)    to impose a "blackout" period during which Stock Options may not be exercised;

(j)    to determine whether to require a Participant, as a condition of the granting of any Award, to not sell or otherwise dispose of shares of Common Stock acquired pursuant to the exercise of an Award for a period of time as determined by the Committee, in its sole discretion, following the date of the acquisition of such Award;

(k)    to modify, extend or renew an Award, subject to Article XII and Section 6.4(l), provided, however, that such action does not subject the Award to Section 409A of the Code without the consent of the Participant; and

(l)    solely to the extent permitted by applicable law, to determine whether, to what extent and under what circumstances to provide loans (which may be on a recourse basis and shall bear interest at the rate the Committee shall provide) to Participants in order to exercise Options under the Plan.

**3.3    Guidelines** . Subject to Article XII hereof, the Committee shall have the authority to adopt, alter and repeal such administrative rules, guidelines and practices governing the Plan and perform all acts, including the delegation of its responsibilities (to the extent permitted by applicable law and applicable stock exchange rules), as it shall, from time to time, deem advisable; to construe and interpret the terms and provisions of the Plan and any Award issued under the Plan (and any agreements relating thereto); and to otherwise supervise the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any agreement relating thereto in the manner and to the extent it shall deem necessary to effectuate the purpose and intent of the Plan. The Committee may adopt special guidelines and provisions for Persons who are residing in or employed in, or subject to, the taxes of, any domestic or foreign jurisdictions to comply with applicable tax and securities laws of such domestic or foreign jurisdictions. Notwithstanding the foregoing, no action of the Committee under this Section 3.3 shall impair the rights of any Participant without the Participant's consent. To the extent applicable, the Plan is intended to comply with the applicable requirements of Rule 16b-3, and with respect to Awards intended to be "performance-based," the applicable provisions of Section 162(m) of the Code, and the Plan shall be limited, construed and interpreted in a manner so as to comply therewith.

**3.4    Decisions Final** . Any decision, interpretation or other action made or taken in good faith by or at the direction of the Company, the Board or the Committee (or any of its members) arising out of or in connection with the Plan shall be within the absolute discretion of all and each of them, as the case may be, and shall be final, binding and conclusive on the Company and all employees and Participants and their respective heirs, executors, administrators, successors and assigns.

**3.5    Procedures** . If the Committee is appointed, the Board shall designate one of the members of the Committee as chairman and the Committee shall hold meetings, subject to the By-Laws

8

of the Company, at such times and places as it shall deem advisable, including, without limitation, by telephone conference or by written consent to the extent permitted by applicable law. A majority of the Committee members shall constitute a quorum. All determinations of the Committee shall be made by a majority of its members. Any decision or determination reduced to writing and signed by all of the Committee members in accordance with the By-Laws of the Company, shall be fully effective as if it had been made by a vote at a meeting duly called and held. The Committee shall keep minutes of its meetings and shall make such rules and regulations for the conduct of its business as it shall deem advisable.

**3.6**    **Designation of Consultants/Liability** .

(a)    The Committee may designate employees of the Company and professional advisors to assist the Committee in the administration of the Plan and (to the extent permitted by applicable law and applicable exchange rules) may grant authority to officers to grant Awards and/or execute agreements or other documents on behalf of the Committee. In the event of any designation of authority hereunder, subject to applicable law, applicable stock exchange rules and any limitations imposed by the Committee in connection with such designation, such designee or designees shall have the power and authority to take such actions, exercise such powers and make such determinations that are otherwise specifically designated to the Committee hereunder.

(b)    The Committee may employ such legal counsel, consultants and agents as it may deem desirable for the administration of the Plan and may rely upon any opinion received from any such counsel or consultant and any computation received from any such consultant or agent. Expenses incurred by the Committee or the Board in the engagement of any such counsel, consultant or agent shall be paid by the Company. The Committee, its members and any Person designated pursuant to Section 3.6(a) shall not be liable for any action or determination made in good faith with respect to the Plan. To the maximum extent permitted by applicable law, no officer of the Company or member or former member of the Committee or of the Board shall be liable for any action or determination made in good faith with respect to the Plan or any Award granted under it.

**3.7**    **Indemnification** . To the maximum extent permitted by applicable law and the Certificate of Incorporation and By-Laws of the Company and to the extent not covered by insurance directly insuring such Person, each officer or employee of the Company or any Affiliate and member or former member of the Committee or the Board shall be indemnified and held harmless by the Company against any cost or expense (including reasonable fees of counsel reasonably acceptable to the Committee) or liability (including any sum paid in settlement of a claim with the approval of the Committee), and advanced amounts necessary to pay the foregoing at the earliest time and to the fullest extent permitted, arising out of any act or omission to act in connection with the administration of the Plan, except to the extent arising out of such officer's, employee's, member's or former member's own fraud or bad faith. Such indemnification shall be in addition to any right of indemnification the employees, officers, directors or members or former officers, directors or members may have under applicable law or under the Certificate of Incorporation or By-Laws of the Company or any Affiliate. Notwithstanding anything else herein, this indemnification will not apply to the actions or determinations made by an individual with regard to Awards granted to such individual under the Plan.

9

**ARTICLE IV**
**SHARE LIMITATION**

4.1    <u>Shares</u> . (a) The aggregate number of shares of Common Stock that may be issued or used for reference purposes or with respect to which Awards may be granted under the Plan shall not exceed [          ] shares (subject to any increase or decrease pursuant to Section 4.2), which may be either authorized and unissued Common Stock or Common Stock held in or acquired for the treasury of the Company or both. The maximum number of shares of Common Stock with respect to which Incentive Stock Options may be granted under the Plan shall be [          ] shares. With respect to Stock Appreciation Rights settled in Common Stock, upon settlement, only the number of shares of Common Stock delivered to a Participant (based on the difference between the Fair Market Value of the shares of Common Stock subject to such Stock Appreciation Right on the date such Stock Appreciation Right is exercised and the exercise price of each Stock Appreciation Right on the date such Stock Appreciation Right was awarded) shall count against the aggregate and individual share limitations set forth under Sections 4.1(a) and 4.1(b). If any Option, Stock Appreciation Right or Other Stock-Based Awards granted under the Plan expires, terminates or is canceled for any reason without having been exercised in full, the number of shares of Common Stock underlying any unexercised Award shall again be available for the purpose of Awards under the Plan. If any shares of Restricted Stock, Performance Awards or Other Stock-Based Awards denominated in shares of Common Stock awarded under the Plan to a Participant are forfeited for any reason, the number of forfeited shares of Restricted Stock, Performance Awards or Other Stock-Based Awards denominated in shares of Common Stock shall again be available for purposes of Awards under the Plan. If a Tandem Stock Appreciation Right or a Limited Stock Appreciation Right is granted in tandem with an Option, such grant shall only apply once against the maximum number of shares of Common Stock which may be issued under the Plan. Any Award under the Plan settled in cash shall not be counted against the foregoing maximum share limitations. The maximum number of shares of Common Stock subject to any Award of Stock Options which may be granted under the Plan during any fiscal year of the Company to any Participant shall be [          ] shares (which shall be subject to any further increase or decrease pursuant to Section 4.2).

(b)    <u>Individual Participant Limitations</u> . To the extent required by Section 162(m) of the Code for Awards under the Plan to qualify as "performance-based compensation," the following individual Participant limitations shall only apply after the expiration of the Transition Period:

(i)    The maximum number of shares of Common Stock subject to any Award of (a) Stock Options, or (b) Stock Appreciation Rights, or (c) Other Stock-Based Awards or (d) shares of Restricted Stock for which the grant of such Award or the lapse of the relevant Restriction Period is subject to the attainment of Performance Goals in accordance with Section 8.3(a)(ii), in each case, which may be granted under the Plan during any fiscal year of the Company to any Participant shall be [          ] shares per type of Award (which shall be subject to any further increase or decrease pursuant to Section 4.2), provided that the maximum number of shares of Common Stock for all types of Awards does not exceed [          ] shares (which shall be subject to any further increase or decrease pursuant to Section 4.2) during any fiscal year of the Company. If a Tandem Stock Appreciation Right is granted or a Limited Stock Appreciation Right is granted in tandem with a Stock Option, it shall apply against the Participant's individual share limitations for both Stock Appreciation Rights and Stock Options.

10

(ii)   There are no annual individual share limitations applicable to Participants on Restricted Stock or Other Stock-Based Awards for which the grant, vesting or payment (as applicable) of any such Award is not subject to the attainment of Performance Goals.

(iii)   The maximum number of shares of Common Stock subject to any Performance Award which may be granted under the Plan during any fiscal year of the Company to any Participant shall be [          ] shares (which shall be subject to any further increase or decrease pursuant to Section 4.2) with respect to any fiscal year of the Company.

(iv)   The maximum value of a cash payment made under a Performance Award which may be granted under the Plan with respect to any fiscal year of the Company to any Participant shall be $10,000,000.

(v)   The individual Participant limitations set forth in this Section 4.1(b) (other than Section 4.1(b)(iii)) shall be cumulative; that is, to the extent that shares of Common Stock for which Awards are permitted to be granted to a Participant during a fiscal year are not covered by an Award to such Participant in a fiscal year, the number of shares of Common Stock available for Awards to such Participant shall automatically increase in the subsequent fiscal years during the term of the Plan until used.

(c)   Annual Non-Employee Director Award Limitation . The aggregate grant date fair value (computed as of the date of grant in accordance with applicable financial accounting rules) of all Awards granted under the Plan to any individual Non-Employee Director in any fiscal year of the Company (excluding Awards made pursuant to deferred compensation arrangements in lieu of all or a portion of cash retainers and any stock dividends payable in respect of outstanding Awards) shall not exceed $500,000.

4.2   **Changes** .

(a)   The existence of the Plan and the Awards granted hereunder shall not affect in any way the right or power of the Board, the Committee or the stockholders of the Company to make or authorize (i) any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, (ii) any merger or consolidation of the Company or any Affiliate, (iii) any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the Common Stock, (iv) the dissolution or liquidation of the Company or any Affiliate, (v) any sale or transfer of all or part of the assets or business of the Company or any Affiliate or (vi) any other corporate act or proceeding.

(b)   Subject to the provisions of Section 11.1:

(i)   If the Company at any time subdivides (by any split, recapitalization or otherwise) the outstanding Common Stock into a greater number of shares of Common Stock, or combines (by reverse split, combination or otherwise) its outstanding Common Stock into a lesser number of shares of Common Stock, then the respective exercise prices for outstanding Awards that provide for a Participant elected exercise and the number of

11

shares of Common Stock covered by outstanding Awards shall be appropriately adjusted by the Committee to prevent dilution or enlargement of the rights granted to, or available for, Participants under the Plan.

(ii)    Excepting transactions covered by Section 4.2(b)(i), if the Company effects any merger, consolidation, statutory exchange, spin-off, reorganization, sale or transfer of all or substantially all the Company's assets or business, or other corporate transaction or event in such a manner that the Company's outstanding shares of Common Stock are converted into the right to receive (or the holders of Common Stock are entitled to receive in exchange therefor), either immediately or upon liquidation of the Company, securities or other property of the Company or other entity (each, a **" Reorganization "** ), then, subject to the provisions of Section 11.1, (A) the aggregate number or kind of securities that thereafter may be issued under the Plan, (B) the number or kind of securities or other property (including cash) to be issued pursuant to Awards granted under the Plan (including as a result of the assumption of the Plan and the obligations hereunder by a successor entity, as applicable), or (C) the purchase price thereof, shall be appropriately adjusted by the Committee to prevent dilution or enlargement of the rights granted to, or available for, Participants under the Plan.

(iii)    If there shall occur any change in the capital structure of the Company other than those covered by Section 4.2(b)(i) or 4.2(b)(ii), including by reason of any extraordinary dividend (whether cash or equity), any conversion, any adjustment, any issuance of any class of securities convertible or exercisable into, or exercisable for, any class of equity securities of the Company, then the Committee may adjust any Award and make such other adjustments to the Plan to prevent dilution or enlargement of the rights granted to, or available for, Participants under the Plan.

(iv)    Any such adjustment determined by the Committee pursuant to this Section 4.2(b) shall be final, binding and conclusive on the Company and all Participants and their respective heirs, executors, administrators, successors and permitted assigns. Any adjustment to, or assumption or substitution of, an Award under this Section 4.2(b) shall be intended to comply with the requirements of Section 409A of the Code and Treasury Regulation §1.424-1 (and any amendments thereto), to the extent applicable. Except as expressly provided in this Section 4.2 or in the applicable Award Agreement, a Participant shall have no additional rights under the Plan by reason of any transaction or event described in this Section 4.2.

(v)    Fractional shares of Common Stock resulting from any adjustment in Awards pursuant to Section 4.2(a) or this Section 4.2(b) shall be aggregated until, and eliminated at, the time of exercise or payment by rounding-down for fractions less than one-half and rounding-up for fractions equal to or greater than one-half. No cash settlements shall be required with respect to fractional shares eliminated by rounding. Notice of any adjustment shall be given by the Committee to each Participant whose Award has been adjusted and such adjustment (whether or not such notice is given) shall be effective and binding for all purposes of the Plan.

**4.3**    **Minimum Purchase Price** . Notwithstanding any provision of the Plan to the contrary, if authorized but previously unissued shares of Common Stock are issued under the Plan, such shares shall not be issued for a consideration that is less than as permitted under applicable law.

12

**ARTICLE V**
**ELIGIBILITY**

**5.1**    **General Eligibility** . All current and prospective Eligible Individuals are eligible to be granted Awards. Eligibility for the grant of Awards and actual participation in the Plan shall be determined by the Committee in its sole discretion.

**5.2**    **Incentive Stock Options** . Notwithstanding the foregoing, only Eligible Employees of the Company, its Subsidiaries and its Parent (if any) are eligible to be granted Incentive Stock Options under the Plan. Eligibility for the grant of an Incentive Stock Option and actual participation in the Plan shall be determined by the Committee in its sole discretion.

**5.3**    **General Requirement** . The vesting and exercise of Awards granted to a prospective Eligible Individual are conditioned upon such individual actually becoming an Eligible Employee, Consultant or Non-Employee Director, respectively.

**ARTICLE VI**
**STOCK OPTIONS**

**6.1**    **Options** . Stock Options may be granted alone or in addition to other Awards granted under the Plan. Each Stock Option granted under the Plan shall be of one of two types: (a) an Incentive Stock Option or (b) a Non-Qualified Stock Option.

**6.2**    **Grants** . The Committee shall have the authority to grant to any Eligible Employee one or more Incentive Stock Options, Non-Qualified Stock Options, or both types of Stock Options. The Committee shall have the authority to grant any Consultant or Non-Employee Director one or more Non-Qualified Stock Options. To the extent that any Stock Option does not qualify as an Incentive Stock Option (whether because of its provisions or the time or manner of its exercise or otherwise), such Stock Option or the portion thereof which does not so qualify shall constitute a separate Non-Qualified Stock Option.

**6.3**    **Incentive Stock Options** . Notwithstanding anything in the Plan to the contrary, no term of the Plan relating to Incentive Stock Options shall be interpreted, amended or altered, nor shall any discretion or authority granted under the Plan be so exercised, so as to disqualify the Plan under Section 422 of the Code, or, without the consent of the Participants affected, to disqualify any Incentive Stock Option under such Section 422.

**6.4**    **Terms of Options** . Options granted under the Plan shall be subject to the following terms and conditions and shall be in such form and contain such additional terms and conditions, not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

(a)    Exercise Price . The exercise price per share of Common Stock subject to a Stock Option shall be determined by the Committee at the time of grant, provided that the per share exercise price of a Stock Option shall not be less than 100% (or, in the case of an Incentive Stock Option granted to a Ten Percent Stockholder, 110%) of the Fair Market Value of the Common Stock at the date of grant.

13

(b) <u>Stock Option Term</u> . The term of each Stock Option shall be fixed by the Committee, provided that no Stock Option shall be exercisable more than 10 years after the date the Option is granted; and provided further that the term of an Incentive Stock Option granted to a Ten Percent Stockholder shall not exceed five years.

(c) <u>Exercisability</u> . Unless otherwise provided by the Committee in accordance with the provisions of this Section 6.4, Stock Options granted under the Plan shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant. If the Committee provides, in its discretion, that any Stock Option is exercisable subject to certain limitations (including, without limitation, that such Stock Option is exercisable only in installments or within certain time periods), the Committee may waive such limitations on the exercisability at any time at or after the time of grant in whole or in part (including, without limitation, waiver of the installment exercise provisions or acceleration of the time at which such Stock Option may be exercised), based on such factors, if any, as the Committee shall determine, in its sole discretion.

(d) <u>Method of Exercise</u> . Subject to whatever installment exercise and waiting period provisions apply under Section 6.4(c), to the extent vested, Stock Options may be exercised in whole or in part at any time during the Option term, by giving written notice of exercise to the Company specifying the number of shares of Common Stock to be purchased. Such notice shall be accompanied by payment in full of the purchase price as follows: (i) in cash or by check, bank draft or money order payable to the order of the Company; (ii) solely to the extent permitted by applicable law, if the Common Stock is traded on a national securities exchange, and the Committee authorizes, through a procedure whereby the Participant delivers irrevocable instructions to a broker reasonably acceptable to the Committee to deliver promptly to the Company an amount equal to the purchase price; (iii) having the Company withhold shares of Common Stock issuable upon exercise of the Stock Option, or by payment in full or in part in the form of Common Stock owned by the Participant, based on the Fair Market Value of the Common Stock on the payment date as determined by the Committee; or (iv) on such other terms and conditions as may be acceptable to the Committee. No shares of Common Stock shall be issued until payment therefor, as provided herein, has been made or provided for.

(e) <u>Non-Transferability of Options</u> . No Stock Option shall be Transferable by the Participant other than by will or by the laws of descent and distribution, and all Stock Options shall be exercisable, during the Participant's lifetime, only by the Participant. Notwithstanding the foregoing, the Committee may determine, in its sole discretion, at the time of grant or thereafter that a Non-Qualified Stock Option that is otherwise not Transferable pursuant to this Section is Transferable to a Family Member in whole or in part and in such circumstances, and under such conditions, as specified by the Committee. A Non-Qualified Stock Option that is Transferred to a Family Member pursuant to the preceding sentence (i) may not be subsequently Transferred other than by will or by the laws of descent and distribution and (ii) remains subject to the terms of the Plan and the applicable Award Agreement. Any shares of Common Stock acquired upon the exercise of a Non-Qualified Stock Option by a permissible transferee of a Non-Qualified Stock Option or a permissible transferee pursuant to a Transfer after the exercise of the Non-Qualified Stock Option shall be subject to the terms of the Plan and the applicable Award Agreement.

14

(f)    <u>Termination by Death or Disability</u> . Unless otherwise determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, if a Participant's Termination is by reason of death or Disability, all Stock Options that are held by such Participant that are vested and exercisable at the time of the Participant's Termination may be exercised by the Participant (or in the case of the Participant's death, by the legal representative of the Participant's estate) at any time within a period of one (1) year from the date of such Termination, but in no event beyond the expiration of the stated term of such Stock Options; provided, however, that, in the event of a Participant's Termination by reason of Disability, if the Participant dies within such exercise period, all unexercised Stock Options held by such Participant shall thereafter be exercisable, to the extent to which they were exercisable at the time of death, for a period of one (1) year from the date of such death, but in no event beyond the expiration of the stated term of such Stock Options.

(g)    <u>Involuntary Termination Without Cause</u> . Unless otherwise determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, if a Participant's Termination is by involuntary termination by the Company without Cause, all Stock Options that are held by such Participant that are vested and exercisable at the time of the Participant's Termination may be exercised by the Participant at any time within a period of ninety (90) days from the date of such Termination, but in no event beyond the expiration of the stated term of such Stock Options.

(h)    <u>Voluntary Resignation</u> . Unless otherwise determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, if a Participant's Termination is voluntary (other than a voluntary termination described in Section 6.4(i)(y) hereof), all Stock Options that are held by such Participant that are vested and exercisable at the time of the Participant's Termination may be exercised by the Participant at any time within a period of ninety (90) days from the date of such Termination, but in no event beyond the expiration of the stated term of such Stock Options.

(i)    <u>Termination for Cause</u> . Unless otherwise determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, if a Participant's Termination (x) is for Cause or (y) is a voluntary Termination (as provided in Section 6.4(h)) after the occurrence of an event that would be grounds for a Termination for Cause, all Stock Options, whether vested or not vested, that are held by such Participant shall thereupon terminate and expire as of the date of such Termination.

(j)    <u>Unvested Stock Options</u> . Unless otherwise determined by the Committee at the time of grant, or if no rights of the Participant are reduced, thereafter, Stock Options that are not vested as of the date of a Participant's Termination for any reason shall terminate and expire as of the date of such Termination.

(k)    <u>Incentive Stock Option Limitations</u> . To the extent that the aggregate Fair Market Value (determined as of the time of grant) of the Common Stock with respect to which Incentive Stock Options are exercisable for the first time by an Eligible Employee during any

15

calendar year under the Plan and/or any other stock option plan of the Company, any Subsidiary or any Parent exceeds $100,000, such Options shall be treated as Non-Qualified Stock Options. In addition, if an Eligible Employee does not remain employed by the Company, any Subsidiary or any Parent at all times from the time an Incentive Stock Option is granted until three months prior to the date of exercise thereof (or such other period as required by applicable law), such Stock Option shall be treated as a Non-Qualified Stock Option. Should any provision of the Plan not be necessary in order for the Stock Options to qualify as Incentive Stock Options, or should any additional provisions be required, the Committee may amend the Plan accordingly, without the necessity of obtaining the approval of the stockholders of the Company.

(l)    Form, Modification, Extension and Renewal of Stock Options . Subject to the terms and conditions and within the limitations of the Plan, Stock Options shall be evidenced by such form of agreement or grant as is approved by the Committee, and the Committee may (i) modify, extend or renew outstanding Stock Options granted under the Plan (provided that the rights of a Participant are not reduced without such Participant's consent and provided further that such action does not subject the Stock Options to Section 409A of the Code without the consent of the Participant), and (ii) accept the surrender of outstanding Stock Options (to the extent not theretofore exercised) and authorize the granting of new Stock Options in substitution therefor (to the extent not theretofore exercised). Notwithstanding the foregoing except in connection with a corporate transaction involving the Company in accordance with Section 4.2 (including, without limitation, any stock dividend, stock split, extraordinary cash dividend, recapitalization, reorganization, merger, consolidation, split up, spin off, combination or exchanges of shares, an outstanding Option may not be modified to reduce the exercise price thereof nor may a new Option at a lower price be substituted for a surrendered Option (other than adjustments or substitutions in accordance with Section 4.2), unless such action is approved by the stockholders of the Company.

(m)    Deferred Delivery of Common Stock . The Committee may in its discretion permit Participants to defer delivery of Common Stock acquired pursuant to a Participant's exercise of an Option in accordance with the terms and conditions established by the Committee in the applicable Award Agreement, which shall be intended to comply with the requirements of Section 409A of the Code.

(n)    Early Exercise . The Committee may provide that a Stock Option include a provision whereby the Participant may elect at any time before the Participant's Termination to exercise the Stock Option as to any part or all of the shares of Common Stock subject to the Stock Option prior to the full vesting of the Stock Option and such shares shall be subject to the provisions of Article VIII and be treated as Restricted Stock. Unvested shares of Common Stock so purchased may be subject to a repurchase option in favor of the Company or to any other restriction the Committee determines to be appropriate.

(o)    Other Terms and Conditions . The Committee may include a provision in an Award Agreement providing for the automatic exercise of a Non-Qualified Stock Option on a cashless basis on the last day of the term of such Option if the Participant has failed to exercise the Non-Qualified Stock Option as of such date, with respect to which the Fair Market Value of the shares of Common Stock underlying the Non-Qualified Stock Option exceeds the exercise price of such Non-Qualified Stock Option on the date of expiration of such Option, subject to Section 14.4. Stock Options may contain such other provisions, which shall not be inconsistent with any of the terms of the Plan, as the Committee shall deem appropriate.

16

## ARTICLE VII
## STOCK APPRECIATION RIGHTS

**7.1**    **Tandem Stock Appreciation Rights** . Stock Appreciation Rights may be granted in conjunction with all or part of any Stock Option (a " Reference Stock Option ") granted under the Plan (" Tandem Stock Appreciation Rights "). In the case of a Non-Qualified Stock Option, such rights may be granted either at or after the time of the grant of such Reference Stock Option. In the case of an Incentive Stock Option, such rights may be granted only at the time of the grant of such Reference Stock Option.

**7.2**    **Terms and Conditions of Tandem Stock Appreciation Rights** . Tandem Stock Appreciation Rights granted hereunder shall be subject to such terms and conditions, not inconsistent with the provisions of the Plan, as shall be determined from time to time by the Committee, and the following:

(a)    Exercise Price . The exercise price per share of Common Stock subject to a Tandem Stock Appreciation Right shall be determined by the Committee at the time of grant, provided that the per share exercise price of a Tandem Stock Appreciation Right shall not be less than 100% of the Fair Market Value of the Common Stock at the time of grant.

(b)    Term . A Tandem Stock Appreciation Right or applicable portion thereof granted with respect to a Reference Stock Option shall terminate and no longer be exercisable upon the termination or exercise of the Reference Stock Option, except that, unless otherwise determined by the Committee, in its sole discretion, at the time of grant, a Tandem Stock Appreciation Right granted with respect to less than the full number of shares covered by the Reference Stock Option shall not be reduced until, and then only to the extent that the exercise or termination of the Reference Stock Option causes, the number of shares covered by the Tandem Stock Appreciation Right to exceed the number of shares remaining available and unexercised under the Reference Stock Option.

(c)    Exercisability . Tandem Stock Appreciation Rights shall be exercisable only at such time or times and to the extent that the Reference Stock Options to which they relate shall be exercisable in accordance with the provisions of Article VI, and shall be subject to the provisions of Section 6.4(c).

(d)    Method of Exercise . A Tandem Stock Appreciation Right may be exercised by the Participant by surrendering the applicable portion of the Reference Stock Option. Upon such exercise and surrender, the Participant shall be entitled to receive an amount determined in the manner prescribed in this Section 7.2. Stock Options which have been so surrendered, in whole or in part, shall no longer be exercisable to the extent that the related Tandem Stock Appreciation Rights have been exercised.

(e)    Payment . Upon the exercise of a Tandem Stock Appreciation Right, a Participant shall be entitled to receive up to, but no more than, an amount in cash and/or Common Stock (as chosen by the Committee in its sole discretion) equal in value to the excess of the Fair

17

Market Value of one share of Common Stock over the Option exercise price per share specified in the Reference Stock Option agreement multiplied by the number of shares of Common Stock in respect of which the Tandem Stock Appreciation Right shall have been exercised, with the Committee having the right to determine the form of payment.

(f)  <u>Deemed Exercise of Reference Stock Option</u> . Upon the exercise of a Tandem Stock Appreciation Right, the Reference Stock Option or part thereof to which such Stock Appreciation Right is related shall be deemed to have been exercised for the purpose of the limitation set forth in Article IV of the Plan on the number of shares of Common Stock to be issued under the Plan.

(g)  <u>Non-Transferability</u> . Tandem Stock Appreciation Rights shall be Transferable only when and to the extent that the underlying Stock Option would be Transferable under Section 6.4(e) of the Plan.

**7.3**    **Non-Tandem Stock Appreciation Rights** . Non-Tandem Stock Appreciation Rights may also be granted without reference to any Stock Options granted under the Plan.

**7.4**    **Terms and Conditions of Non-Tandem Stock Appreciation Rights** . Non-Tandem Stock Appreciation Rights granted hereunder shall be subject to such terms and conditions, not inconsistent with the provisions of the Plan, as shall be determined from time to time by the Committee, and the following:

(a)  <u>Exercise Price</u> . The exercise price per share of Common Stock subject to a Non-Tandem Stock Appreciation Right shall be determined by the Committee at the time of grant, provided that the per share exercise price of a Non-Tandem Stock Appreciation Right shall not be less than 100% of the Fair Market Value of the Common Stock at the time of grant.

(b)  <u>Term</u> . The term of each Non-Tandem Stock Appreciation Right shall be fixed by the Committee, but shall not be greater than 10 years after the date the right is granted.

(c)  <u>Exercisability</u> . Unless otherwise provided by the Committee in accordance with the provisions of this Section 7.4, Non-Tandem Stock Appreciation Rights granted under the Plan shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant. If the Committee provides, in its discretion, that any such right is exercisable subject to certain limitations (including, without limitation, that it is exercisable only in installments or within certain time periods), the Committee may waive such limitations on the exercisability at any time at or after grant in whole or in part (including, without limitation, waiver of the installment exercise provisions or acceleration of the time at which such right may be exercised), based on such factors, if any, as the Committee shall determine, in its sole discretion.

(d)  <u>Method of Exercise</u> . Subject to whatever installment exercise and waiting period provisions apply under Section 7.4(c), Non-Tandem Stock Appreciation Rights may be exercised in whole or in part at any time in accordance with the applicable Award Agreement, by giving written notice of exercise to the Company specifying the number of Non-Tandem Stock Appreciation Rights to be exercised.

18

(e)  Payment . Upon the exercise of a Non-Tandem Stock Appreciation Right a Participant shall be entitled to receive, for each right exercised, up to, but no more than, an amount in cash and/or Common Stock (as chosen by the Committee in its sole discretion) equal in value to the excess of the Fair Market Value of one share of Common Stock on the date that the right is exercised over the Fair Market Value of one share of Common Stock on the date that the right was awarded to the Participant.

(f)  Termination . Unless otherwise determined by the Committee at grant or, if no rights of the Participant are reduced, thereafter, subject to the provisions of the applicable Award Agreement and the Plan, upon a Participant's Termination for any reason, Non-Tandem Stock Appreciation Rights will remain exercisable following a Participant's Termination on the same basis as Stock Options would be exercisable following a Participant's Termination in accordance with the provisions of Sections 6.4(f) through 6.4(j).

(g)  Non-Transferability . No Non-Tandem Stock Appreciation Rights shall be Transferable by the Participant other than by will or by the laws of descent and distribution, and all such rights shall be exercisable, during the Participant's lifetime, only by the Participant.

**7.5  Limited Stock Appreciation Rights** . The Committee may, in its sole discretion, grant Tandem and Non-Tandem Stock Appreciation Rights either as a general Stock Appreciation Right or as a Limited Stock Appreciation Right. Limited Stock Appreciation Rights may be exercised only upon the occurrence of a Change in Control or such other event as the Committee may, in its sole discretion, designate at the time of grant or thereafter. Upon the exercise of Limited Stock Appreciation Rights, except as otherwise provided in an Award Agreement, the Participant shall receive in cash and/or Common Stock, as determined by the Committee, an amount equal to the amount (i) set forth in Section 7.2(e) with respect to Tandem Stock Appreciation Rights, or (ii) set forth in Section 7.4(e) with respect to Non-Tandem Stock Appreciation Rights.

**7.6  Other Terms and Conditions** . The Committee may include a provision in an Award Agreement providing for the automatic exercise of a Stock Appreciation Right on a cashless basis on the last day of the term of such Stock Appreciation Right if the Participant has failed to exercise the Stock Appreciation Right as of such date, with respect to which the Fair Market Value of the shares of Common Stock underlying the Stock Appreciation Right exceeds the exercise price of such Stock Appreciation Right on the date of expiration of such Stock Appreciation Right, subject to Section 14.4. Stock Appreciation Rights may contain such other provisions, which shall not be inconsistent with any of the terms of the Plan, as the Committee shall deem appropriate.

<div align="center">

**ARTICLE VIII**
**RESTRICTED STOCK**

</div>

**8.1  Awards of Restricted Stock** . Shares of Restricted Stock may be issued either alone or in addition to other Awards granted under the Plan. The Committee shall determine the Eligible Individuals, to whom, and the time or times at which, grants of Restricted Stock shall be made, the number of shares to be awarded, the price (if any) to be paid by the Participant (subject to Section 8.2), the time or times within which such Awards may be subject to forfeiture, the vesting schedule and rights to acceleration thereof, and all other terms and conditions of the Awards.

<div align="center">19</div>

The Committee may condition the grant or vesting of Restricted Stock upon the attainment of specified performance targets (including the Performance Goals) or such other factor as the Committee may determine in its sole discretion, including to comply with the requirements of Section 162(m) of the Code.

**8.2**    **Awards and Certificates** . Eligible Individuals selected to receive Restricted Stock shall not have any right with respect to such Award, unless and until such Participant has delivered a fully executed copy of the agreement evidencing the Award to the Company, to the extent required by the Committee, and has otherwise complied with the applicable terms and conditions of such Award. Further, such Award shall be subject to the following conditions:

(a)    Purchase Price . The purchase price of Restricted Stock shall be fixed by the Committee. Subject to Section 4.3, the purchase price for shares of Restricted Stock may be zero to the extent permitted by applicable law, and, to the extent not so permitted, such purchase price may not be less than par value.

(b)    Acceptance . Awards of Restricted Stock must be accepted within a period of 60 days (or such shorter period as the Committee may specify at grant) after the grant date, by executing a Restricted Stock agreement and by paying whatever price (if any) the Committee has designated thereunder.

(c)    Legend . Each Participant receiving Restricted Stock shall be issued a stock certificate in respect of such shares of Restricted Stock, unless the Committee elects to use another system, such as book entries by the transfer agent, as evidencing ownership of shares of Restricted Stock. Such certificate shall be registered in the name of such Participant, and shall, in addition to such legends required by applicable securities laws, bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Award, substantially in the following form:

> "The anticipation, alienation, attachment, sale, transfer, assignment, pledge, encumbrance or charge of the shares of stock represented hereby are subject to the terms and conditions (including forfeiture) of the Carvana Co. (the "Company") 2017 Omnibus Incentive Plan (the "Plan") and an Agreement entered into between the registered owner and the Company dated _____. Copies of such Plan and Agreement are on file at the principal office of the Company."

(d)    Custody . If stock certificates are issued in respect of shares of Restricted Stock, the Committee may require that any stock certificates evidencing such shares be held in custody by the Company until the restrictions thereon shall have lapsed, and that, as a condition of any grant of Restricted Stock, the Participant shall have delivered a duly signed stock power or other instruments of assignment (including a power of attorney), each endorsed in blank with a guarantee of signature if deemed necessary or appropriate by the Company, which would permit transfer to the Company of all or a portion of the shares subject to the Restricted Stock Award in the event that such Award is forfeited in whole or part.

20

**8.3**     **Restrictions and Conditions** . The shares of Restricted Stock awarded pursuant to the Plan shall be subject to the following restrictions and conditions:

(a)     Restriction Period . (i) The Participant shall not be permitted to Transfer shares of Restricted Stock awarded under the Plan during the period or periods set by the Committee (the **" Restriction Period "** ) commencing on the date of such Award, as set forth in the Restricted Stock Award Agreement and such agreement shall set forth a vesting schedule and any event that would accelerate vesting of the shares of Restricted Stock. Within these limits, based on service, attainment of Performance Goals pursuant to Section 8.3(a)(ii) and/or such other factors or criteria as the Committee may determine in its sole discretion, the Committee may condition the grant or provide for the lapse of such restrictions in installments in whole or in part, or may accelerate the vesting of all or any part of any Restricted Stock Award and/or waive the deferral limitations for all or any part of any Restricted Stock Award.

(ii)    If the grant of shares of Restricted Stock or the lapse of restrictions is based on the attainment of Performance Goals, the Committee shall establish the objective Performance Goals and the applicable vesting percentage of the Restricted Stock applicable to each Participant or class of Participants in writing prior to the beginning of the applicable fiscal year or at such later date as otherwise determined by the Committee and while the outcome of the Performance Goals are substantially uncertain. Such Performance Goals may incorporate provisions for disregarding (or adjusting for) changes in accounting methods, corporate transactions (including, without limitation, dispositions and acquisitions) and other similar type events or circumstances. With regard to a Restricted Stock Award that is intended to comply with Section 162(m) of the Code, to the extent that any such provision would create impermissible discretion under Section 162(m) of the Code or otherwise violate Section 162(m) of the Code, such provision shall be of no force or effect.

(b)     Rights as a Stockholder . Except as provided in Section 8.3(a) and this Section 8.3(b) or as otherwise determined by the Committee in an Award Agreement, the Participant shall have, with respect to the shares of Restricted Stock, all of the rights of a holder of shares of Common Stock of the Company, including, without limitation, the right to receive dividends, the right to vote such shares and, subject to and conditioned upon the full vesting of shares of Restricted Stock, the right to tender such shares. The Committee may, in its sole discretion, determine at the time of grant that the payment of dividends shall be deferred until, and conditioned upon, the expiration of the applicable Restriction Period.

(c)     Termination . Unless otherwise determined by the Committee at grant or, if no rights of the Participant are reduced, thereafter, subject to the applicable provisions of the Award Agreement and the Plan, upon a Participant's Termination for any reason during the relevant Restriction Period, all Restricted Stock still subject to restriction will be forfeited in accordance with the terms and conditions established by the Committee at grant or thereafter.

(d)     Lapse of Restrictions . If and when the Restriction Period expires without a prior forfeiture of the Restricted Stock, the certificates for such shares shall be delivered to the Participant. All legends shall be removed from said certificates at the time of delivery to the Participant, except as otherwise required by applicable law or other limitations imposed by the Committee.

21

## ARTICLE IX
## PERFORMANCE AWARDS

**9.1**     __Performance Awards__ . The Committee may grant a Performance Award to a Participant payable upon the attainment of specific Performance Goals. The Committee may grant Performance Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code, as well as Performance Awards that are not intended to qualify as "performance-based compensation" under Section 162(m) of the Code. If the Performance Award is payable in shares of Restricted Stock, such shares shall be transferable to the Participant only upon attainment of the relevant Performance Goal in accordance with Article VIII. If the Performance Award is payable in cash, it may be paid upon the attainment of the relevant Performance Goals either in cash or in shares of Restricted Stock (based on the then current Fair Market Value of such shares), as determined by the Committee, in its sole and absolute discretion. Each Performance Award shall be evidenced by an Award Agreement in such form that is not inconsistent with the Plan and that the Committee may from time to time approve. With respect to Performance Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code, the Committee shall condition the right to payment of any Performance Award upon the attainment of objective Performance Goals established pursuant to Section 9.2(c).

**9.2**     __Terms and Conditions__ . Performance Awards awarded pursuant to this Article IX shall be subject to the following terms and conditions:

(a)     __Earning of Performance Award__ . At the expiration of the applicable Performance Period, the Committee shall determine the extent to which the Performance Goals established pursuant to Section 9.2(c) are achieved and the percentage of each Performance Award that has been earned.

(b)     __Non-Transferability__ . Subject to the applicable provisions of the Award Agreement and the Plan, Performance Awards may not be Transferred during the Performance Period.

(c)     __Objective Performance Goals, Formulae or Standards__ . With respect to Performance Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code, the Committee shall establish the objective Performance Goals for the earning of Performance Awards based on a Performance Period applicable to each Participant or class of Participants in writing prior to the beginning of the applicable Performance Period or at such later date as permitted under Section 162(m) of the Code and while the outcome of the Performance Goals are substantially uncertain. Such Performance Goals may incorporate, if and only to the extent permitted under Section 162(m) of the Code, provisions for disregarding (or adjusting for) changes in accounting methods, corporate transactions (including, without limitation, dispositions and acquisitions) and other similar type events or circumstances. To the extent that any such provision would create impermissible discretion under Section 162(m) of the Code or otherwise violate Section 162(m) of the Code, such provision shall be of no force or effect, with respect to Performance Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code.

22

(d)    <u>Dividends</u>. Unless otherwise determined by the Committee at the time of grant, amounts equal to dividends declared during the Performance Period with respect to the number of shares of Common Stock covered by a Performance Award will not be paid to the Participant.

(e)    <u>Payment</u>. Following the Committee's determination in accordance with Section 9.2(a), the Company shall settle Performance Awards, in such form (including, without limitation, in shares of Common Stock or in cash) as determined by the Committee, in an amount equal to such Participant's earned Performance Awards. With respect to any Award that is intended to qualify as "performance-based compensation" under Section 162(m) of the Code, the Committee shall be precluded from having discretion to increase the amount of compensation payable under the terms of such Award. Notwithstanding the foregoing, the Committee may, in its sole discretion, award an amount less than the earned Performance Awards and/or subject the payment of all or part of any Performance Award to additional vesting, forfeiture and deferral conditions as it deems appropriate.

(f)    <u>Termination</u>. Subject to the applicable provisions of the Award Agreement and the Plan, upon a Participant's Termination for any reason during the Performance Period for a given Performance Award, the Performance Award in question will vest or be forfeited in accordance with the terms and conditions established by the Committee at grant.

(g)    <u>Accelerated Vesting</u>. Based on service, performance and/or such other factors or criteria, if any, as the Committee may determine, the Committee may, at or after grant, accelerate the vesting of all or any part of any Performance Award.

<div align="center">

**ARTICLE X**
**OTHER STOCK-BASED AND CASH-BASED AWARDS**

</div>

**10.1    <u>Other Stock-Based Awards</u>**. The Committee is authorized to grant to Eligible Individuals Other Stock-Based Awards that are payable in, valued in whole or in part by reference to, or otherwise based on or related to shares of Common Stock, including but not limited to, shares of Common Stock awarded purely as a bonus and not subject to restrictions or conditions, shares of Common Stock in payment of the amounts due under an incentive or performance plan sponsored or maintained by the Company or an Affiliate, stock equivalent units, restricted stock units, and Awards valued by reference to book value of shares of Common Stock. Other Stock-Based Awards may be granted either alone or in addition to or in tandem with other Awards granted under the Plan.

Subject to the provisions of the Plan, the Committee shall have authority to determine the Eligible Individuals, to whom, and the time or times at which, such Awards shall be made, the number of shares of Common Stock to be awarded pursuant to such Awards, and all other conditions of the Awards. The Committee may also provide for the grant of Common Stock under such Awards upon the completion of a specified Performance Period.

The Committee may condition the grant or vesting of Other Stock-Based Awards upon the attainment of specified Performance Goals as the Committee may determine, in its sole discretion; provided that to the extent that such Other Stock-Based Awards are intended to comply with

<div align="center">23</div>

Section 162(m) of the Code, the Committee shall establish the objective Performance Goals for the grant or vesting of such Other Stock-Based Awards based on a Performance Period applicable to each Participant or class of Participants in writing prior to the beginning of the applicable Performance Period or at such later date as permitted under Section 162(m) of the Code and while the outcome of the Performance Goals are substantially uncertain. Such Performance Goals may incorporate, if and only to the extent permitted under Section 162(m) of the Code, provisions for disregarding (or adjusting for) changes in accounting methods, corporate transactions (including, without limitation, dispositions and acquisitions) and other similar type events or circumstances. To the extent that any such provision would create impermissible discretion under Section 162(m) of the Code or otherwise violate Section 162(m) of the Code, such provision shall be of no force or effect, with respect to Performance Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code.

10.2     **Terms and Conditions** . Other Stock-Based Awards made pursuant to this Article X shall be subject to the following terms and conditions:

(a)     Non-Transferability . Subject to the applicable provisions of the Award Agreement and the Plan, shares of Common Stock subject to Awards made under this Article X may not be Transferred prior to the date on which the shares are issued, or, if later, the date on which any applicable restriction, performance or deferral period lapses.

(b)     Dividends . Unless otherwise determined by the Committee at the time of Award, subject to the provisions of the Award Agreement and the Plan, the recipient of an Award under this Article X shall not be entitled to receive, currently or on a deferred basis, dividends or dividend equivalents in respect of the number of shares of Common Stock covered by the Award.

(c)     Vesting . Any Award under this Article X and any Common Stock covered by any such Award shall vest or be forfeited to the extent so provided in the Award Agreement, as determined by the Committee, in its sole discretion.

(d)     Price . Common Stock issued on a bonus basis under this Article X may be issued for no cash consideration. Common Stock purchased pursuant to a purchase right awarded under this Article X shall be priced, as determined by the Committee in its sole discretion.

10.3     **Other Cash-Based Awards** . The Committee may from time to time grant Other Cash-Based Awards to Eligible Individuals in such amounts, on such terms and conditions, and for such consideration, including no consideration or such minimum consideration as may be required by applicable law, as it shall determine in its sole discretion. Other Cash-Based Awards may be granted subject to the satisfaction of vesting conditions or may be awarded purely as a bonus and not subject to restrictions or conditions, and if subject to vesting conditions, the Committee may accelerate the vesting of such Awards at any time in its sole discretion. The grant of an Other Cash-Based Award shall not require a segregation of any of the Company's assets for satisfaction of the Company's payment obligation thereunder.

24

**ARTICLE XI**
**CHANGE IN CONTROL PROVISIONS**

**11.1**    **Benefits** . In the event of a Change in Control of the Company (as defined below), and except as otherwise provided by the Committee in an Award Agreement, a Participant's unvested Award shall not vest automatically and a Participant's Award shall be treated in accordance with one or more of the following methods as determined by the Committee:

(a)    Awards, whether or not then vested, shall be continued, assumed, or have new rights substituted therefor, as determined by the Committee in a manner consistent with the requirements of Section 409A of the Code, and restrictions to which shares of Restricted Stock or any other Award granted prior to the Change in Control are subject shall not lapse upon a Change in Control and the Restricted Stock or other Award shall, where appropriate in the sole discretion of the Committee, receive the same distribution as other Common Stock on such terms as determined by the Committee; provided that the Committee may decide to award additional Restricted Stock or other Awards in lieu of any cash distribution. Notwithstanding anything to the contrary herein, for purposes of Incentive Stock Options, any assumed or substituted Stock Option shall comply with the requirements of Treasury Regulation Section 1.424-1 (and any amendment thereto).

(b)    The Committee, in its sole discretion, may provide for the purchase of any Awards by the Company or an Affiliate for an amount of cash equal to the excess (if any) of the Change in Control Price (as defined below) of the shares of Common Stock covered by such Awards, over the aggregate exercise price of such Awards. For purposes hereof, **" Change in Control Price "** shall mean the highest price per share of Common Stock paid in any transaction related to a Change in Control of the Company.

(c)    The Committee may, in its sole discretion, terminate all outstanding and unexercised Stock Options, Stock Appreciation Rights, or any Other Stock-Based Award that provides for a Participant elected exercise, effective as of the date of the Change in Control, by delivering notice of termination to each Participant at least twenty (20) days prior to the date of consummation of the Change in Control, in which case during the period from the date on which such notice of termination is delivered to the consummation of the Change in Control, each such Participant shall have the right to exercise in full all of such Participant's Awards that are then outstanding (without regard to any limitations on exercisability otherwise contained in the Award Agreements), but any such exercise shall be contingent on the occurrence of the Change in Control, and, provided that, if the Change in Control does not take place within a specified period after giving such notice for any reason whatsoever, the notice and exercise pursuant thereto shall be null and void.

(d)    The Committee may, in its sole discretion, make any other determination as to the treatment of Awards in connection with such Change in Control as the Committee may determine. The treatment of Awards need not be the same for all Participants. Any escrow, holdback, earnout or similar provisions in the definitive relating to such transaction may apply to any payment to the holders of Awards to the same extent and in the same manner as such provisions apply to the holders of shares of Common Stock.

25

(e)    Notwithstanding any other provision herein to the contrary, the Committee may, in its sole discretion, provide for accelerated vesting or lapse of restrictions, of an Award at any time.

**11.2**    **Change in Control** . Unless otherwise determined by the Committee in the applicable Award Agreement or other written agreement with a Participant approved by the Committee, a **" Change in Control "** shall be deemed to occur if:

(a)    any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, the Garcia Parties, any trustee or other fiduciary holding securities under any employee benefit plan of the Company, or any company owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of Common Stock of the Company), becoming the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities;

(b)    during any period of 24 consecutive calendar months, individuals who were directors of the Company on the first day of such period (the " Incumbent Directors ") cease for any reason to constitute a majority of the Board; provided , however , that any individual becoming a director subsequent to the first day of such period whose election, or nomination for election, by the Company's stockholders was approved by a vote of at two-thirds of the Incumbent Directors will be considered as though such individual were an Incumbent Director, but excluding, for purposes of this proviso, any such individual whose initial assumption of office occurs as a result of an actual or threatened proxy contest with respect to election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a "person" (as used in Section 13(d) of the Exchange Act), in each case other than the Board;

(c)    consummation of a reorganization, merger, consolidation or other business combination (any of the foregoing, a " Business Combination ") of the Company or any direct or indirect subsidiary of the Company with any other corporation, in any case with respect to which the Company voting securities outstanding immediately prior to such Business Combination do not, immediately following such Business Combination, continue to represent (either by remaining outstanding or being converted into voting securities of the Company or any ultimate parent thereof) more than 50% of the then outstanding voting securities entitled to vote generally in the election of directors of the Company (or its successor) or any ultimate parent thereof after the Business Combination; or

(d)    a complete liquidation or dissolution of the Company or the consummation of a sale or disposition by the Company of all or substantially all of the Company's assets other than the sale or disposition of all or substantially all of the assets of the Company to a Person or Persons who beneficially own, directly or indirectly, 50% or more of the combined voting power of the outstanding voting securities of the Company at the time of the sale.

Notwithstanding the foregoing, with respect to any Award that is characterized as "nonqualified deferred compensation" within the meaning of Section 409A of the Code, an event shall not be considered to be a Change in Control under the Plan for purposes of payment of such Award unless such event is also a "change in ownership," a "change in effective control" or a "change in the ownership of a substantial portion of the assets" of the Company within the meaning of Section 409A of the Code.

26

**11.3** **Initial Public Offering not a Change in Control** . Notwithstanding the foregoing, for purposes of the Plan, the occurrence of the Registration Date or any change in the composition of the Board within one year following the Registration Date shall not be considered a Change in Control.

## ARTICLE XII
## TERMINATION OR AMENDMENT OF PLAN

Notwithstanding any other provision of the Plan, the Board may at any time, and from time to time, amend, in whole or in part, any or all of the provisions of the Plan (including any amendment deemed necessary to ensure that the Company may comply with any regulatory requirement referred to in Article XIV or Section 409A of the Code), or suspend or terminate it entirely, retroactively or otherwise; provided, however, that, unless otherwise required by law or specifically provided herein, the rights of a Participant with respect to Awards granted prior to such amendment, suspension or termination, may not be impaired without the consent of such Participant and, provided further, that without the approval of the holders of the Company's Common Stock entitled to vote in accordance with applicable law, no amendment may be made that would (i) increase the aggregate number of shares of Common Stock that may be issued under the Plan (except by operation of Section 4.2); (ii) increase the maximum individual Participant limitations for a fiscal year under Section 4.1(b) (except by operation of Section 4.2); (iii) change the classification of individuals eligible to receive Awards under the Plan; (iv) decrease the minimum option price of any Stock Option or Stock Appreciation Right; (v) extend the maximum option period under Section 6.4; (vi) alter the Performance Goals for Restricted Stock, Performance Awards or Other Stock-Based Awards as set forth in Exhibit A hereto; (vii) award any Stock Option or Stock Appreciation Right in replacement of a canceled Stock Option or Stock Appreciation Right with a higher exercise price than the replacement award; or (viii) require stockholder approval in order for the Plan to continue to comply with the applicable provisions of Section 162(m) of the Code or, to the extent applicable to Incentive Stock Options, Section 422 of the Code. In no event may the Plan be amended without the approval of the stockholders of the Company in accordance with the applicable laws of the State of Delaware to increase the aggregate number of shares of Common Stock that may be issued under the Plan, decrease the minimum exercise price of any Award, or to make any other amendment that would require stockholder approval under Financial Industry Regulatory Authority (FINRA) rules and regulations or the rules of any exchange or system on which the Company's securities are listed or traded at the request of the Company. Notwithstanding anything herein to the contrary, the Board may amend the Plan or any Award Agreement at any time without a Participant's consent to comply with applicable law including Section 409A of the Code. The Committee may amend the terms of any Award theretofore granted, prospectively or retroactively, but, subject to Article IV or as otherwise specifically provided herein, no such amendment or other action by the Committee shall impair the rights of any holder without the holder's consent.

27

ARTICLE XIII
UNFUNDED STATUS OF PLAN

The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payment as to which a Participant has a fixed and vested interest but which are not yet made to a Participant by the Company, nothing contained herein shall give any such Participant any right that is greater than those of a general unsecured creditor of the Company.

ARTICLE XIV
GENERAL PROVISIONS

**14.1** **Legend** . The Committee may require each person receiving shares of Common Stock pursuant to a Stock Option or other Award under the Plan to represent to and agree with the Company in writing that the Participant is acquiring the shares of Common Stock without a view to distribution thereof. In addition to any legend required by the Plan, the certificates for such shares may include any legend that the Committee deems appropriate to reflect any restrictions on Transfer. All certificates for shares of Common Stock delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Common Stock is then listed or any national securities exchange system upon whose system the Common Stock is then quoted, any applicable federal or state securities law, and any applicable corporate law, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions.

**14.2** **Other Plans** . Nothing contained in the Plan shall prevent the Board from adopting other or additional compensation arrangements, subject to stockholder approval if such approval is required, and such arrangements may be either generally applicable or applicable only in specific cases.

**14.3** **No Right to Employment/Directorship/Consultancy** . Neither the Plan nor the grant of any Option or other Award hereunder shall give any Participant or other employee, Consultant or Non-Employee Director any right with respect to continuance of employment, consultancy or directorship by the Company or any Affiliate, nor shall there be a limitation in any way on the right of the Company or any Affiliate by which an employee is employed or a Consultant or Non-Employee Director is retained to terminate such employment, consultancy or directorship at any time.

**14.4** **Withholding of Taxes** . The Company shall have the right to deduct from any payment to be made pursuant to the Plan, or to otherwise require, prior to the issuance or delivery of shares of Common Stock or the payment of any cash hereunder, payment by the Participant of, any federal, state or local taxes required by law to be withheld. Upon the vesting of Restricted Stock (or other Award that is taxable upon vesting), or upon making an election under Section 83(b) of the Code, a Participant shall pay all required withholding to the Company. Any minimum statutorily required withholding obligation with regard to any Participant may be satisfied, subject to the consent of the Committee, by reducing the number of shares of Common Stock otherwise deliverable or by delivering shares of Common Stock already owned. Any fraction of a share of Common Stock required to satisfy such tax obligations shall be disregarded and the amount due shall be paid instead in cash by the Participant.

28

**14.5**    **No Assignment of Benefits** . No Award or other benefit payable under the Plan shall, except as otherwise specifically provided by law or permitted by the Committee, be Transferable in any manner, and any attempt to Transfer any such benefit shall be void, and any such benefit shall not in any manner be liable for or subject to the debts, contracts, liabilities, engagements or torts of any Person who shall be entitled to such benefit, nor shall it be subject to attachment or legal process for or against such Person.

**14.6**    **Listing and Other Conditions** .

(a)    Unless otherwise determined by the Committee, as long as the Common Stock is listed on a national securities exchange or system sponsored by a national securities association, the issuance of shares of Common Stock pursuant to an Award shall be conditioned upon such shares being listed on such exchange or system. The Company shall have no obligation to issue such shares unless and until such shares are so listed, and the right to exercise any Option or other Award with respect to such shares shall be suspended until such listing has been effected.

(b)    If at any time counsel to the Company shall be of the opinion that any sale or delivery of shares of Common Stock pursuant to an Option or other Award is or may in the circumstances be unlawful or result in the imposition of excise taxes on the Company under the statutes, rules or regulations of any applicable jurisdiction, the Company shall have no obligation to make such sale or delivery, or to make any application or to effect or to maintain any qualification or registration under the Securities Act or otherwise, with respect to shares of Common Stock or Awards, and the right to exercise any Option or other Award shall be suspended until, in the opinion of said counsel, such sale or delivery shall be lawful or will not result in the imposition of excise taxes on the Company.

(c)    Upon termination of any period of suspension under this Section 14.6, any Award affected by such suspension which shall not then have expired or terminated shall be reinstated as to all shares available before such suspension and as to shares which would otherwise have become available during the period of such suspension, but no such suspension shall extend the term of any Award.

(d)    A Participant shall be required to supply the Company with certificates, representations and information that the Company requests and otherwise cooperate with the Company in obtaining any listing, registration, qualification, exemption, consent or approval the Company deems necessary or appropriate.

**14.7**    **Stockholders Agreement and Other Requirements** . Notwithstanding anything herein to the contrary, as a condition to the receipt of shares of Common Stock pursuant to an Award under the Plan, to the extent required by the Committee, the Participant shall execute and deliver a stockholder's agreement or such other documentation that shall set forth certain restrictions on transferability of the shares of Common Stock acquired upon exercise or purchase, and such other terms as the Board or Committee shall from time to time establish. Such stockholder's agreement or other documentation shall apply to the Common Stock acquired under

29

the Plan and covered by such stockholder's agreement or other documentation. The Company may require, as a condition of exercise, the Participant to become a party to any other existing stockholder agreement (or other agreement).

**14.8** **Governing Law** . The Plan and actions taken in connection herewith shall be governed and construed in accordance with the laws of the State of Delaware (regardless of the law that might otherwise govern under applicable Delaware principles of conflict of laws).

**14.9** **Jurisdiction; Waiver of Jury Trial** . Any suit, action or proceeding with respect to the Plan or any Award Agreement, or any judgment entered by any court of competent jurisdiction in respect of any thereof, shall be resolved only in the courts of the State of Delaware or the United States District Court for the District of Delaware and the appellate courts having jurisdiction of appeals in such courts. In that context, and without limiting the generality of the foregoing, the Company and each Participant shall irrevocably and unconditionally (a) submit in any proceeding relating to the Plan or any Award Agreement, or for the recognition and enforcement of any judgment in respect thereof (a " Proceeding "), to the exclusive jurisdiction of the courts of the State of Delaware, the court of the United States of America for the District of Delaware, and appellate courts having jurisdiction of appeals from any of the foregoing, and agree that all claims in respect of any such Proceeding shall be heard and determined in such Delaware State court or, to the extent permitted by law, in such federal court, (b) consent that any such Proceeding may and shall be brought in such courts and waives any objection that the Company and each Participant may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court and agree not to plead or claim the same, (c) waive all right to trial by jury in any Proceeding (whether based on contract, tort or otherwise) arising out of or relating to the Plan or any Award Agreement, (d) agree that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party, in the case of a Participant, at the Participant's address shown in the books and records of the Company or, in the case of the Company, at the Company's principal offices, attention General Counsel, and (e) agree that nothing in the Plan shall affect the right to effect service of process in any other manner permitted by the laws of the State of Delaware.

**14.10** **Construction** . Wherever any words are used in the Plan in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

**14.11** **Other Benefits** . No Award granted or paid out under the Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of the Company or its Affiliates nor affect any benefit under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

**14.12** **Costs** . The Company shall bear all expenses associated with administering the Plan, including expenses of issuing Common Stock pursuant to Awards hereunder.

**14.13**    <u>**No Right to Same Benefits**</u> . The provisions of Awards need not be the same with respect to each Participant, and such Awards to individual Participants need not be the same in subsequent years.

**14.14**    <u>**Death/Disability**</u> . The Committee may in its discretion require the transferee of a Participant to supply it with written notice of the Participant's death or Disability and to supply it with a copy of the will (in the case of the Participant's death) or such other evidence as the Committee deems necessary to establish the validity of the transfer of an Award. The Committee may also require that the agreement of the transferee to be bound by all of the terms and conditions of the Plan.

**14.15**    <u>**Section 16(b) of the Exchange Act**</u> . All elections and transactions under the Plan by Persons subject to Section 16 of the Exchange Act involving shares of Common Stock are intended to comply with any applicable exemptive condition under Rule 16b-3. The Committee may establish and adopt written administrative guidelines, designed to facilitate compliance with Section 16(b) of the Exchange Act, as it may deem necessary or proper for the administration and operation of the Plan and the transaction of business thereunder.

**14.16**    <u>**Section 409A of the Code**</u> . The Plan is intended to comply with the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent. To the extent that any Award is subject to Section 409A of the Code, it shall be paid in a manner that will comply with Section 409A of the Code, including proposed, temporary or final regulations or any other guidance issued by the Secretary of the Treasury and the Internal Revenue Service with respect thereto. Notwithstanding anything herein to the contrary, any provision in the Plan that is inconsistent with Section 409A of the Code shall be deemed to be amended to comply with Section 409A of the Code and to the extent such provision cannot be amended to comply therewith, such provision shall be null and void. The Company shall have no liability to a Participant, or any other party, if an Award that is intended to be exempt from, or compliant with, Section 409A of the Code is not so exempt or compliant or for any action taken by the Committee or the Company and, in the event that any amount or benefit under the Plan becomes subject to penalties under Section 409A of the Code, responsibility for payment of such penalties shall rest solely with the affected Participants and not with the Company. Notwithstanding any contrary provision in the Plan or Award Agreement, any payment(s) of "nonqualified deferred compensation" (within the meaning of Section 409A of the Code) that are otherwise required to be made under the Plan to a "specified employee" (as defined under Section 409A of the Code) as a result of such employee's separation from service (other than a payment that is not subject to Section 409A of the Code) shall be delayed for the first six (6) months following such separation from service (or, if earlier, the date of death of the specified employee) and shall instead be paid (in a manner set forth in the Award Agreement) upon expiration of such delay period.

**14.17**    <u>**Successor and Assigns**</u> . The Plan shall be binding on all successors and permitted assigns of a Participant, including, without limitation, the estate of such Participant and the executor, administrator or trustee of such estate.

<div align="center">31</div>

**14.18**    **Severability of Provisions** . If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and the Plan shall be construed and enforced as if such provisions had not been included.

**14.19**    **Payments to Minors, Etc** . Any benefit payable to or for the benefit of a minor, an incompetent Person or other Person incapable of receipt thereof shall be deemed paid when paid to such Person's guardian or to the party providing or reasonably appearing to provide for the care of such Person, and such payment shall fully discharge the Committee, the Board, the Company, its Affiliates and their employees, agents and representatives with respect thereto.

**14.20**    **Lock-Up Agreement** . As a condition to the grant of an Award, if requested by the Company and the lead underwriter of any public offering of Common Stock (the **" Lead Underwriter "** *),* a Participant shall irrevocably agree not to sell, contract to sell, grant any option to purchase, transfer the economic risk of ownership in, make any short sale of, pledge or otherwise transfer or dispose of, any interest in any Common Stock or any securities convertible into, derivative of, or exchangeable or exercisable for, or any other rights to purchase or acquire Common Stock (except Common Stock included in such public offering or acquired on the public market after such offering) during such period of time following the effective date of a registration statement of the Company filed under the Securities Act that the Lead Underwriter shall specify (the **" Lock -Up Period "** ). The Participant shall further agree to sign such documents as may be requested by the Lead Underwriter to effect the foregoing and agree that the Company may impose stop-transfer instructions with respect to Common Stock acquired pursuant to an Award until the end of such Lock-Up Period.

**14.21**    **Headings and Captions** . The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

**14.22**    **Section 162(m) of the Code** . Notwithstanding any other provision of the Plan to the contrary, (i) prior to the Registration Date and during the Transition Period, the provisions of the Plan requiring compliance with Section 162(m) of the Code for Awards intended to qualify as "performance-based compensation" shall only apply to the extent required by Section 162(m) of the Code, and (ii) the provisions of the Plan requiring compliance with Section 162(m) of the Code shall not apply to Awards granted under the Plan that are not intended to qualify as "performance-based compensation" under Section 162(m) of the Code.

**14.23**    **Post-Transition Period** . Following the Transition Period, any Award granted under the Plan that is intended to be "performance-based compensation" under Section 162(m) of the Code, shall be subject to the approval of the material terms of the Plan by a majority of the stockholders of the Company in accordance with Section 162(m) of the Code and the treasury regulations promulgated thereunder.

**14.24**    **Company Recoupment of Awards** . A Participant's rights with respect to any Award hereunder shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy or other agreement or arrangement with a Participant, or (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

32

## ARTICLE XV
## EFFECTIVE DATE OF PLAN

The Plan shall become effective on [                    ], 2017, which is the date of its adoption by the Board, subject to the approval of the Plan by the stockholders of the Company in accordance with the requirements of the laws of the State of Delaware.

## ARTICLE XVI
## TERM OF PLAN

No Award shall be granted pursuant to the Plan on or after the tenth anniversary of the earlier of the date that the Plan is adopted or the date of stockholder approval, but Awards granted prior to such tenth anniversary may extend beyond that date; provided that no Award (other than a Stock Option or Stock Appreciation Right) that is intended to be "performance-based compensation" under Section 162(m) of the Code shall be granted on or after the fifth anniversary of the stockholder approval of the Plan unless the Performance Goals are re-approved (or other designated Performance Goals are approved) by the stockholders no later than the first stockholder meeting that occurs in the fifth year following the year in which stockholders approve the Performance Goals.

## ARTICLE XVII
## NAME OF PLAN

The Plan shall be known as the "Carvana Co. 2017 Omnibus Incentive Plan."

33

**EXHIBIT A**

**PERFORMANCE GOALS**

To the extent permitted under Section 162(m) of the Code, performance goals established for purposes of Awards intended to be "performance-based compensation" under Section 162(m) of the Code, shall be based on the attainment of certain target levels of, or a specified increase or decrease (as applicable) in one or more of the following performance goals:

- earnings per share;

- operating income;

- gross income;

- net income (before or after taxes);

- cash flow;

- gross profit;

- gross profit return on investment;

- gross margin return on investment;

- gross margin;

- operating margin;

- working capital;

- earnings before interest and taxes;

- earnings before interest, tax, depreciation and amortization;

- adjusted earnings before interest, tax, depreciation and amortization;

- return on equity;

- return on assets;

- return on capital;

- return on invested capital;

- net revenues;

- gross revenues;

- net recurring revenues;

- revenue growth;

- annual recurring revenues;

- recurring revenues;

- license revenues;

- sales or market share;

- total shareholder return;

- economic value added;

- specified objectives with regard to limiting the level of increase in all or a portion of the Company's bank debt or other long-term or short-term public or private debt or other similar financial obligations of the Company, which may be calculated net of cash balances and/or other offsets and adjustments as may be established by the Committee in its sole discretion;

- the fair market value of a share of Common Stock;

- the growth in the value of an investment in the Common Stock assuming the reinvestment of dividends;

A-1

- reduction in operating expenses;

- cash earnings per share;

- adjusted net income;

- adjusted net income per share;

- volume/volume growth;

- in year volume;

- merchant account production;

- distribution partner account production;

- new merchant locations;

- new merchant locations using a particular product;

- calculated attrition;

- product revenue;

- goals based on product performance;

- annual cash adjusted earnings per share growth;

- annual stock price growth;

- diluted earnings per share;

- total shareholder return positioning within a comparator group; or

- adjusted cash net income per share.

With respect to Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code, to the extent permitted under Section 162(m) of the Code, the Committee may, in its sole discretion, also exclude, or adjust to reflect, the impact of an event or occurrence that the Committee determines should be appropriately excluded or adjusted, including:

(a)    restructurings, discontinued operations, extraordinary items or events, and other unusual or non-recurring charges as described in Accounting Standards Codification 225-20, "Extraordinary and Unusual Items," and/or management's discussion and analysis of financial condition and results of operations appearing or incorporated by reference in the Company's Form 10-K for the applicable year;

(b)    an event either not directly related to the operations of the Company or not within the reasonable control of the Company's management; or

(c)    a change in tax law or accounting standards required by generally accepted accounting principles.

Performance goals may also be based upon individual participant performance goals, as determined by the Committee, in its sole discretion. In addition, Awards that are not intended to qualify as "performance-based compensation" under Section 162(m) of the Code may be based on the performance goals set forth herein or on such other performance goals as determined by the Committee in its sole discretion.

In addition, such performance goals may be based upon the attainment of specified levels of Company (or subsidiary, division, other operational unit, administrative department or product category of the Company) performance under one or more of the measures described above

A-2

relative to the performance of other corporations. With respect to Awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code, to the extent permitted under Section 162(m) of the Code, but only to the extent permitted under Section 162(m) of the Code (including, without limitation, compliance with any requirements for stockholder approval), the Committee may also:

(a)    designate additional business criteria on which the performance goals may be based; or

(b)    adjust, modify or amend the aforementioned business criteria.

A-3

**INCENTIVE STOCK OPTION AGREEMENT**
**PURSUANT TO THE**
**CARVANA CO. 2017 OMNIBUS INCENTIVE PLAN**

* * * * *

Participant: _____

Grant Date: _____

Per Share Exercise Price: $ _____

Number of Shares subject to this Option: _____

* * * * *

THIS INCENTIVE STOCK OPTION AWARD AGREEMENT (this " Agreement "), dated as of the Grant Date specified above, is entered into by and between Carvana Co., a corporation organized in the State of Delaware (the " Company "), and the Participant specified above, pursuant to the Carvana Co. 2017 Omnibus Incentive Plan, as in effect and as amended from time to time (the " Plan "), which is administered by the Committee; and

WHEREAS , it has been determined under the Plan that it would be in the best interests of the Company to grant the Incentive Stock Option provided for herein to the Participant.

NOW, THEREFORE , in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1. **Incorporation By Reference; Plan Document Receipt** . This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. Any capitalized term not defined in this Agreement shall have the same meaning as is ascribed thereto in the Plan. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content. In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

2. **Grant of Option** . The Company hereby grants to the Participant, as of the Grant Date specified above, an Incentive Stock Option (this " Option ") to acquire from the Company at the Per Share Exercise Price specified above, the aggregate number of shares of Common Stock specified above (the " Option Shares "). Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason. The Participant shall have no rights as a stockholder with

respect to any shares of Common Stock covered by the Option unless and until the Participant has become the holder of record of such shares, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such shares, except as otherwise specifically provided for in the Plan or this Agreement.

3. **Tax Matters** . The Option granted hereunder is intended to qualify as an "incentive stock option" under Section 422 of the Code. Notwithstanding the foregoing, the Option will not qualify as an "incentive stock option," among other events, (a) if the Participant disposes of the Option Shares at any time during the two-year period following the date of this Agreement or the one-year period following the date of any exercise of the Option; (b) except in the event of the Participant's death or Disability, if the Participant is not employed by the Company, a Parent or a Subsidiary at all times during the period beginning on the date of this Agreement and ending on the day that is three months before the date of any exercise of the Option; or (c) to the extent that the aggregate fair market value of the Common Stock subject to "incentive stock options" held by the Participant which become exercisable for the first time in any calendar year (under all plans of the Company, a Parent or a Subsidiary) exceeds $100,000. For purposes of clause (c) above, the "fair market value" of the Common Stock shall be determined as of the Grant Date. To the extent that the Option does not qualify as an "incentive stock option," it shall not affect the validity of the Option and shall constitute a separate non-qualified stock option. In the event that the Participant disposes of the Option Shares within either two (2) years following the Grant Date or one year following the date of exercise of the Option, the Participant must deliver to the Company, within seven (7) days following such disposition, a written notice specifying the date on which such shares were disposed of, the number of shares so disposed, and, if such disposition was by a sale or exchange, the amount of consideration received.

4. **Vesting and Exercise** .

(a) <u>Vesting</u> . Subject to the provisions of Sections 4(b) and 4(c) hereof, the Option shall vest and become exercisable as follows, provided that the Participant has not incurred a Termination prior to each such vesting date:

| Vesting Date | Percentage of Option Shares |
|---|---|
| [          ] | [          ]% |
| [          ] | [          ]% |
| [          ] | [          ]% |
| [          ] | [          ]% |

There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the appropriate vesting date, subject to the Participant's continued service with the Company or any of its Subsidiaries on each applicable vesting date. Upon expiration of the Option, the Option shall be cancelled and no longer exercisable.

(b) <u>Committee Discretion to Accelerate Vesting</u> . Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the Option at any time and for any reason.

(c) <u>Expiration</u> . Unless earlier terminated in accordance with the terms and provisions of the Plan and/or this Agreement, all portions of the Option (whether vested or not vested) shall expire and shall no longer be exercisable after the expiration of ten (10) years from the Grant Date.

2

5. **Termination** . Subject to the terms of the Plan and this Agreement, the Option, to the extent vested at the time of the Participant's Termination, shall remain exercisable as follows:

(a) Termination due to Death or Disability . In the event of the Participant's Termination by reason of death or Disability, the vested portion of the Option shall remain exercisable until the earlier of (i) one (1) year from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 4(d) hereof; provided , however , that in the case of a Termination due to Disability, if the Participant dies within such one year exercise period, any unexercised Option held by the Participant shall thereafter be exercisable by the legal representative of the Participant's estate or the recipient of the unexercised Option by will or by the laws of descent and distribution, to the extent to which it was exercisable at the time of death, for a period of one year from the date of death, but in no event beyond the expiration of the stated term of the Option pursuant to Section 4(d) hereof.

(b) Involuntary Termination Without Cause . In the event of the Participant's involuntary Termination by the Company without Cause, the vested portion of the Option shall remain exercisable until the earlier of (i) ninety (90) days from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 4(d) hereof.

(c) Voluntary Resignation . In the event of the Participant's voluntary Termination (other than a voluntary Termination described in Section 5(d) hereof), the vested portion of the Option shall remain exercisable until the earlier of (i) thirty (30) days from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 4(d) hereof.

(d) Termination for Cause . In the event of the Participant's Termination for Cause or in the event of the Participant's voluntary Termination (as provided in Section 5(c) hereof) after an event that would be grounds for a Termination for Cause, the Participant's entire Option (whether or not vested) shall terminate and expire upon such Termination.

(e) Treatment of Unvested Options upon Termination . Any portion of the Option that is not vested as of the date of the Participant's Termination for any reason shall terminate and expire as of the date of such Termination.

6. **Method of Exercise and Payment** . Subject to Section 9 hereof, to the extent that the Option has become vested and exercisable with respect to a number of shares of Common Stock as provided herein, the Option may thereafter be exercised by the Participant, in whole or in part, at any time or from time to time prior to the expiration of the Option as provided herein and in accordance with Sections 6.4(c) and 6.4(d) of the Plan, including, without limitation, by the filing of any written form of exercise notice as may be required by the Committee and payment in full of the Per Share Exercise Price specified above multiplied by the number of shares of Common Stock underlying the portion of the Option exercised.

7. **Non-Transferability** . The Option, and any rights and interests with respect thereto, issued under this Agreement and the Plan shall not be sold, exchanged, transferred, assigned or

3

otherwise disposed of in any way by the Participant (or any beneficiary(ies) of the Participant), other than by testamentary disposition by the Participant or the laws of descent and distribution. Any attempt to sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of or hypothecate in any way the Option, or the levy of any execution, attachment or similar legal process upon the Option, contrary to the terms and provisions of this Agreement and/or the Plan shall be null and void and without legal force or effect.

8. **Governing Law** . All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9. **Withholding of Tax** . The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the Option and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any shares of Common Stock otherwise required to be issued pursuant to this Agreement. Any minimum statutorily required withholding obligation with regard to the Participant may, at the Company's discretion, be satisfied by reducing the amount of cash or shares of Common Stock otherwise deliverable upon exercise of the Option.

10. **Entire Agreement; Amendment** . This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

11. **Notices** . Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

12. **No Right to Employment** . Any questions as to whether and when there has been a Termination and the cause of such Termination shall be determined in the sole discretion of the Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without cause.

13. **Transfer of Personal Data** . The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the Option awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

4

14. **Compliance with Laws**. The issuance of the Option (and the Option Shares upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the Option or any of the Option Shares pursuant to this Agreement if any such issuance would violate any such requirements.

15. **Section 409A**. Notwithstanding anything herein or in the Plan to the contrary, the Option is intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent.

16. **Binding Agreement; Assignment**. This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. The Participant shall not assign (except in accordance with Section 7 hereof) any part of this Agreement without the prior express written consent of the Company.

17. **Headings**. The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

19. **Further Assurances**. Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

20. **Severability**. The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

21. **Acquired Rights**. The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

*[Remainder of Page Intentionally Left Blank]*

5

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**CARVANA CO.**

By: _____

Name: _____

Title: _____

**PARTICIPANT**

_____

Name: _____

6

**RESTRICTED STOCK AGREEMENT**
**PURSUANT TO THE**
**CARVANA CO. 2017 OMNIBUS INCENTIVE PLAN**

* * * * *

Participant: _____

Grant Date: _____

Number of Shares of Restricted Stock Granted: _____

* * * * *

**THIS RESTRICTED STOCK AWARD AGREEMENT** (this " Agreement "), dated as of the Grant Date specified above, is entered into by and between Carvana Co., a corporation organized in the State of Delaware (the " Company "), and the Participant specified above, pursuant to the Carvana Co. 2017 Omnibus Incentive Plan, as in effect and as amended from time to time (the " Plan "), which is administered by the Committee; and

**WHEREAS** , it has been determined under the Plan that it would be in the best interests of the Company to grant the shares of Restricted Stock provided herein to the Participant.

**NOW, THEREFORE** , in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1.     **Incorporation By Reference; Plan Document Receipt .** This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. Any capitalized term not defined in this Agreement shall have the same meaning as is ascribed thereto in the Plan. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content. In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

2.     **Grant of Restricted Stock Award .** The Company hereby grants to the Participant, as of the Grant Date specified above, the number of shares of Restricted Stock specified above. Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such shares, except as otherwise specifically provided for in the Plan or this Agreement. Subject to Section 5 hereof, the Participant shall not have the rights of a stockholder in respect of the shares underlying this Award until such shares are delivered to the Participant in accordance with Section 4 hereof.

**3.**    **Vesting** .

(a)    Subject to the provisions of Sections 3(b) and 3(c) hereof, the Restricted Stock subject to this grant shall become unrestricted and vested as follows, provided that the Participant has not incurred a Termination prior to each such vesting date:

| Vesting Date | Number of Shares |
|---|---|
| [          ] | [       ] |
| [          ] | [       ] |
| [          ] | [       ] |
| [          ] | [       ] |

There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the appropriate vesting date, subject to the Participant's continued service with the Company or any of its Subsidiaries on each applicable vesting date.

(b)    Committee Discretion to Accelerate Vesting . Notwithstanding the foregoing, the Committee may, in its sole discretion, accelerate vesting of the Restricted Stock at any time and for any reason.

(c)    Forfeiture . Subject to the Committee's discretion to accelerate vesting hereunder, all unvested shares of Restricted Stock shall be immediately forfeited upon the Participant's Termination for any reason.

4.    **Period of Restriction; Delivery of Unrestricted Shares** . During the Period of Restriction, the Restricted Stock shall bear a legend as described in Section 8.2(c) of the Plan. When shares of Restricted Stock awarded by this Agreement become vested, the Participant shall be entitled to receive unrestricted shares and if the Participant's stock certificates contain legends restricting the transfer of such shares, the Participant shall be entitled to receive new stock certificates free of such legends (except any legends requiring compliance with securities laws).

5.    **Dividends and Other Distributions; Voting** . Participants holding Restricted Stock shall be entitled to receive all dividends and other distributions paid with respect to such shares, provided that any such dividends or other distributions will be subject to the same vesting requirements as the underlying Restricted Stock and shall be paid at the time the Restricted Stock becomes vested pursuant to Section 3 hereof. If any dividends or distributions are paid in shares, the shares shall be deposited with the Company and shall be subject to the same restrictions on transferability and forfeitability as the Restricted Stock with respect to which they were paid. The Participant may exercise full voting rights with respect to the Restricted Stock granted hereunder.

2

6. **Non-Transferability** . The shares of Restricted Stock, and any rights and interests with respect thereto, issued under this Agreement and the Plan shall not, prior to vesting, be sold, exchanged, transferred, assigned or otherwise disposed of in any way by the Participant (or any beneficiary of the Participant), other than by testamentary disposition by the Participant or the laws of descent and distribution. Any attempt to sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of or hypothecate in any way any of the Restricted Stock, or the levy of any execution, attachment or similar legal process upon the Restricted Stock, contrary to the terms and provisions of this Agreement and/or the Plan shall be null and void and without legal force or effect.

7. **Governing Law** . All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

8. **Withholding of Tax** . The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the Restricted Stock and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any shares of Common Stock otherwise required to be issued pursuant to this Agreement. Any minimum statutorily required withholding obligation with regard to the Participant may, at the Company's discretion, be satisfied by reducing the amount of cash or shares of Common Stock otherwise deliverable to the Participant hereunder.

9. **Section 83(b)** . If the Participant properly elects (as required by Section 83(b) of the Code) within 30 days after the issuance of the Restricted Stock to include in gross income for federal income tax purposes in the year of issuance the Fair Market Value of such shares of Restricted Stock, the Participant shall pay to the Company or make arrangements satisfactory to the Company to pay to the Company upon such election, any federal, state or local taxes required to be withheld with respect to the Restricted Stock. If the Participant shall fail to make such payment, the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind otherwise due to the Participant any federal, state or local taxes of any kind required by law to be withheld with respect to the Restricted Stock, as well as the rights set forth in Section 8 hereof. The Participant acknowledges that it is the Participant's sole responsibility, and not the Company's, to file timely and properly the election under Section 83(b) of the Code and any corresponding provisions of state tax laws if the Participant elects to make such election, and the Participant agrees to timely provide the Company with a copy of any such election.

10. **Legend** . All certificates representing the Restricted Stock shall have endorsed thereon the legend set forth in Section 8.2(c) of the Plan. Notwithstanding the foregoing, in no event shall the Company be obligated to deliver to the Participant a certificate representing the Restricted Stock prior to the vesting dates set forth above.

11. **Securities Representations** . The shares of Restricted Stock are being issued to the Participant and this Agreement is being made by the Company in reliance upon the following

3

express representations and warranties of the Participant. The Participant acknowledges, represents and warrants that:

(a)    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 11.

(b)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the shares of Restricted Stock must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to the shares of Restricted Stock and the Company is under no obligation to register the shares of Restricted Stock (or to file a "re-offer prospectus").

(c)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that (i) the exemption from registration under Rule 144 will not be available unless (A) a public trading market then exists for the Common Stock of the Company, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the shares of vested Restricted Stock hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

12.    **Entire Agreement; Amendment .** This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

13.    **Notices .** Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

14.    **Acceptance .** As required by Section 8.2 of the Plan, the Participant shall forfeit the Restricted Stock if the Participant does not execute this Agreement within a period of sixty (60) days from the date that the Participant receives this Agreement (or such other period as the Committee shall provide).

15.    **No Right to Employment .** Any questions as to whether and when there has been a Termination and the cause of such Termination shall be determined in the sole discretion of the

4

Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    **Transfer of Personal Data .** The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the Restricted Stock awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

17.    **Compliance with Laws .** The issuance of the Restricted Stock or unrestricted shares pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the Restricted Stock or any of the shares pursuant to this Agreement if any such issuance would violate any such requirements.

18.    **Section 409A .** Notwithstanding anything herein or in the Plan to the contrary, the shares of Restricted Stock are intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent.

19.    **Binding Agreement; Assignment .** This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. The Participant shall not assign (except in accordance with Section 6 hereof) any part of this Agreement without the prior express written consent of the Company.

20.    **Headings .** The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

21.    **Counterparts .** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

22.    **Further Assurances .** Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

23.    **Severability .** The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

5

24.    **Acquired Rights .** The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of Restricted Stock made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Restricted Stock awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

*[Remainder of Page Intentionally Left Blank]*

6

**IN WITNESS WHEREOF** , the parties hereto have executed this Agreement as of the date first written above.

**CARVANA CO.**

By: _____

Name: _____

Title: _____

**PARTICIPANT**

_____

Name: _____

7

## NONQUALIFIED STOCK OPTION AGREEMENT
## PURSUANT TO THE
## CARVANA CO. 2017 OMNIBUS INCENTIVE PLAN

\* \* \* \* \*

Participant: _____

Grant Date: _____

Per Share Exercise Price: $ _____

Number of Shares subject to this Option: _____

\* \* \* \* \*

THIS NON-QUALIFIED STOCK OPTION AWARD AGREEMENT (this " Agreement "), dated as of the Grant Date specified above, is entered into by and between Carvana Co., a corporation organized in the State of Delaware (the " Company "), and the Participant specified above, pursuant to the Carvana Co. 2017 Omnibus Incentive Plan, as in effect and as amended from time to time (the " Plan "), which is administered by the Committee; and

WHEREAS, it has been determined under the Plan that it would be in the best interests of the Company to grant the Non-Qualified Stock Option provided herein to the Participant.

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1. **Incorporation By Reference; Plan Document Receipt** . This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. Except as provided otherwise herein, any capitalized term not defined in this Agreement shall have the same meaning as is ascribed thereto in the Plan. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content. In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control. No part of the Option granted hereby is intended to qualify as an "incentive stock option" under Section 422 of the Code.

2. **Grant of Option** . The Company hereby grants to the Participant, as of the Grant Date specified above, a Non-Qualified Stock Option (this " Option ") to acquire from the Company at the Per Share Exercise Price specified above, the aggregate number of shares of Common Stock specified above (the " Option Shares "). Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides,

or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason. The Participant shall have no rights as a stockholder with respect to any shares of Common Stock covered by the Option unless and until the Participant has become the holder of record of such shares, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such shares, except as otherwise specifically provided for in the Plan or this Agreement.

3.    **Vesting and Exercise** .

(a)    Vesting . Subject to the provisions of Sections 3(b) to 3(e) , the Option shall vest and become exercisable as follows, provided that the Participant has not incurred a Termination prior to each such vesting date:

| Vesting Date | Percentage of Option Shares |
|---|---|
| **First Anniversary of Grant Date** | [          ] % |
| **Second Anniversary of Grant Date** | [          ] % |
| **Third Anniversary of Grant Date** | [          ] % |
| **Fourth Anniversary of Grant Date** | [          ] % |

There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the appropriate vesting date, subject to the Participant's continued service with the Company or any of its Subsidiaries on each applicable vesting date. Upon expiration of the Option, the Option shall be cancelled and no longer exercisable.

(b)    Death or Disability . In the event of the Participant's Termination by reason of death or Disability, the portion of the Option that would have vested pursuant to Section 3(a) above in the first twelve (12) months following such Termination will vest as of the Termination.

(c)    Termination Without Cause . In the event of the Participant's Termination by the Company without Cause, the portion of the Option that would have vested pursuant to Section 3(a) above in the first twelve (12) months following such Termination will vest as of the Termination.

(d)    Committee Discretion to Accelerate Vesting . In addition to the foregoing, the Committee may, in its sole discretion, accelerate vesting of the Option at any time and for any reason.

(e)    Expiration . Unless earlier terminated in accordance with the terms and provisions of the Plan and/or this Agreement, all portions of the Option (whether vested or not vested) shall expire and shall no longer be exercisable after the expiration of ten (10) years from the Grant Date.

2

(f)    Treatment of Unvested Options upon Termination . Subject to this Section 3 , any portion of the Option that is not vested as of the date of the Participant's Termination for any reason shall terminate and expire as of the date of such Termination.

4.    **Exercise Following Termination** . Subject to the terms of the Plan and this Agreement, the Option, to the extent vested at the time of the Participant's Termination, shall remain exercisable as follows:

(a)    Termination Due to Death or Disability . In the event of the Participant's Termination by reason of death or Disability, the vested portion of the Option shall remain exercisable until the earlier of (i) one year from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 3(f) hereof; provided , however , that in the case of a Termination due to Disability, if the Participant dies within such one year exercise period, any unexercised Option held by the Participant shall thereafter be exercisable by the legal representative of the Participant's estate or the recipient of the unexercised Option by will or by the laws of descent and distribution, to the extent to which it was exercisable at the time of death, for a period of one year from the date of death, but in no event beyond the expiration of the stated term of the Option pursuant to Section 3(f) hereof.

(b)    Termination Without Cause . In the event of the Participant's involuntary Termination by the Company without Cause, the vested portion of the Option shall remain exercisable until the earlier of (i) ninety (90) days from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 3(d) hereof.

(c)    Voluntary Resignation . In the event of the Participant's voluntary Termination (other than a voluntary Termination described in Section 4(d) hereof), the vested portion of the Option shall remain exercisable until the earlier of (i) ninety (90) days from the date of such Termination, and (ii) the expiration of the stated term of the Option pursuant to Section 3(d) hereof.

(d)    Termination for Cause . In the event of the Participant's Termination for Cause or in the event of the Participant's voluntary Termination (as provided in Section 4(c) hereof) after an event that would be grounds for a Termination for Cause, the Participant's entire Option (whether or not vested) shall terminate and expire upon such Termination. Additionally, during the first sixty (60) days after the Participant's Termination for any reason other than Cause, the Company shall have the right to re-characterize such Termination as a Termination for Cause; upon such re-characterization, the entire outstanding Option will be forfeited.

5.    **Method of Exercise and Payment** . Subject to Section 8 hereof, to the extent that the Option has become vested and exercisable with respect to a number of shares of Common Stock as provided herein, the Option may thereafter be exercised by the Participant, in whole or in part, at any time or from time to time prior to the expiration of the Option as provided herein and in accordance with Sections 6.4(c) and 6.4(d) of the Plan.

6.    **Non-Transferability** . The Option, and any rights and interests with respect thereto, issued under this Agreement and the Plan shall not be sold, exchanged, transferred, assigned, pledged, encumbered or otherwise disposed of or hypothecated in any way

3

by the Participant (or any beneficiary of the Participant who holds the Option as a result of a Transfer by will or by the laws of descent and distribution), other than by testamentary disposition by the Participant or the laws of descent and distribution. Notwithstanding the foregoing, the Committee may, in its sole discretion, permit the Option to be Transferred to a Family Member for no value, provided that such Transfer shall only be valid upon execution of a written instrument in form and substance acceptable to the Committee in its sole discretion evidencing such Transfer and the transferee's acceptance thereof signed by the Participant and the transferee, and provided, further, that the Option may not be subsequently Transferred other than by will or by the laws of descent and distribution or to another Family Member (as permitted by the Committee in its sole discretion) in accordance with the terms of the Plan and this Agreement, and shall remain subject to the terms of the Plan and this Agreement. Any attempt to sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of or hypothecate in any way the Option, or the levy of any execution, attachment or similar legal process upon the Option, contrary to the terms and provisions of this Agreement and/or the Plan shall be null and void and without legal force or effect.

7. **Governing Law**. All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

8. **Withholding of Tax**. The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the Option and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any shares of Common Stock otherwise required to be issued pursuant to this Agreement. Any minimum statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or shares of Common Stock otherwise deliverable upon exercise of the Option.

9. **Entire Agreement; Amendment**. This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

10. **Notices**. Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

4

11.  **No Right to Employment** . Any questions as to whether and when there has been a Termination and the cause of such Termination shall be determined in the sole discretion of the Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

12.  **Transfer of Personal Data** . The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the Option awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

13.  **Compliance with Laws** . The issuance of the Option (and the Option Shares upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the Option or any of the Option Shares pursuant to this Agreement if any such issuance would violate any such requirements.

14.  **Section 409A** . Notwithstanding anything herein or in the Plan to the contrary, the Option is intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent.

15.  **Binding Agreement; Assignment** . This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. The Participant shall not assign (except in accordance with Section 6 hereof) any part of this Agreement without the prior express written consent of the Company.

16.  **Headings** . The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

17.  **Counterparts** . This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

18.  **Further Assurances** . Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

19.  **Severability** . The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

20.    **Acquired Rights** . The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

*[Remainder of Page Intentionally Left Blank]*

6

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**CARVANA CO.**

By: _____

Name: _____

Title: _____

**PARTICIPANT**

_____

Name: _____

7

**STOCK APPRECIATION RIGHTS AGREEMENT**
**PURSUANT TO THE**
**CARVANA CO. 2017 OMNIBUS INCENTIVE PLAN**

\* \* \* \* \*

Participant: _____

Grant Date: _____

Base Price: $ _____

Number of Shares subject to this SAR: _____

\* \* \* \* \*

THIS STOCK APPRECIATION RIGHTS AGREEMENT (this " Agreement "), dated as of the Grant Date specified above, is entered into by and between Carvana Co., a corporation organized in the State of Delaware (the " Company "), and the Participant specified above, pursuant to the Carvana Co. 2017 Omnibus Incentive Plan, as in effect and as amended from time to time (the " Plan "), which is administered by the Committee; and

WHEREAS , it has been determined under the Plan that it would be in the best interests of the Company to grant the Stock Appreciation Rights (" SAR ") provided for herein to the Participant.

NOW, THEREFORE , in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1. **Incorporation By Reference; Plan Document Receipt** . This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. Any capitalized term not defined in this Agreement shall have the same meaning as is ascribed thereto in the Plan. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content. In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

2. **Grant of SAR** . The Company hereby grants to the Participant, as of the Grant Date, a SAR on the number of shares specified above. The SAR represents the right, upon exercise, to receive **[either cash or]** a number of shares of Common Stock, or a combination of cash and shares of Common Stock, with a Fair Market Value on the date of exercise equal, in each case, to the product of (i) the aggregate number of shares with respect to which this SAR is exercised and (ii) the excess of (A) the Fair Market Value of a share of Common Stock as of the date of exercise over (B) the SAR Base Price specified above. Except as otherwise provided by the Plan,

the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason. The Participant shall have no rights as a stockholder with respect to any shares of Common Stock covered by the SAR unless and until the Participant has become the holder of record of such shares, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such shares, except as otherwise specifically provided for in the Plan or this Agreement.

3. **Vesting and Exercise** .

(a) Vesting . Subject to the provisions of Sections 3(b) and 3(c) hereof, the SAR shall vest and become exercisable as follows, provided that the Participant has not incurred a Termination prior to each such vesting date:

| Vesting Date | Number of Shares |
|---|---|
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |

There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the appropriate vesting date, subject to the Participant's continued service with the Company or any of its Subsidiaries on each applicable vesting date. Upon expiration of the SAR, the SAR shall be cancelled and no longer exercisable.

(b) Committee Discretion to Accelerate Vesting . Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the SAR at any time and for any reason.

(c) Expiration . Unless earlier terminated in accordance with the terms and provisions of the Plan and/or this Agreement, all portions of the SAR (whether vested or not vested) shall expire and shall no longer be exercisable after the expiration of ten (10) years from the Grant Date.

4. **Termination** . Subject to the terms of the Plan and this Agreement, the SAR, to the extent vested at the time of the Participant's Termination, shall remain exercisable as follows:

(a) Termination due to Death or Disability . In the event of the Participant's Termination by reason of death or Disability, the vested portion of the SAR shall remain exercisable until the earlier of (i) one (1) year from the date of such Termination, and (ii) the expiration of the stated term of the SAR pursuant to Section 3(d) hereof; provided , however , that in the case of a Termination due to Disability, if the Participant dies within such one (1) year exercise period, any unexercised SAR held by the Participant shall thereafter be exercisable by the legal representative of the Participant's estate, to the extent to which it was exercisable at the time of death, for a period of one (1) year from the date of death, but in no event beyond the expiration of the stated term of the SAR pursuant to Section 3(d) hereof.

2

(b) <u>Involuntary Termination Without Cause</u> . In the event of the Participant's involuntary Termination by the Company without Cause, the vested portion of the SAR shall remain exercisable until the earlier of (i) ninety (90) days from the date of such Termination, and (ii) the expiration of the stated term of the SAR pursuant to Section 3(d) hereof.

(c) <u>Voluntary Resignation</u> . In the event of the Participant's voluntary Termination (other than a voluntary Termination described in Section 4(d) hereof), the vested portion of the SAR shall remain exercisable until the earlier of (i) thirty (30) days from the date of such Termination, and (ii) the expiration of the stated term of the SAR pursuant to Section 3(d) hereof.

(d) <u>Termination for Cause</u> . In the event of the Participant's Termination for Cause or in the event of the Participant's voluntary Termination (as provided in Section 4(c) hereof) after an event that would be grounds for a Termination for Cause, the Participant's entire SAR (whether or not vested) shall terminate and expire upon such Termination.

(e) <u>Treatment of Unvested SAR upon Termination</u> . Any portion of the SAR that is not vested as of the date of the Participant's Termination for any reason shall terminate and expire as of the date of such Termination.

5. **Method of Exercise** . Subject to Section 8, to the extent that all or a portion of the SAR has become vested and exercisable, such portion of the SAR may thereafter be exercised by the Participant, in whole or in part, at any time or from time to time prior to the expiration of the SAR as provided herein and in accordance with Sections 7.4(c) and 7.4(d) of the Plan, including, without limitation, by the filing of any written form of exercise notice as may be required by the Committee.

6. **Non-Transferability** . The SAR, and any rights and interests with respect thereto, issued under this Agreement and the Plan shall not be sold, exchanged, transferred, assigned or otherwise disposed of in any way by the Participant (or any beneficiary(ies) of the Participant), other than by testamentary disposition by the Participant or the laws of descent and distribution. Any attempt to sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of or hypothecate in any way the SAR, or the levy of any execution, attachment or similar legal process upon the SAR, contrary to the terms and provisions of this Agreement and/or the Plan shall be null and void and without legal force or effect.

7. **Governing Law** . All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

8. **Withholding of Tax** . The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the SAR and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any shares of Common Stock otherwise required to be issued pursuant to this Agreement. Any minimum statutorily required withholding obligation with regard to the Participant may, at the Company's discretion, be satisfied by reducing the amount of cash or shares of Common Stock otherwise deliverable upon exercise of the SAR.

9. **Entire Agreement; Amendment** . This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

10. **Notices** . Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

11. **No Right to Employment** . Any questions as to whether and when there has been a Termination and the cause of such Termination shall be determined in the sole discretion of the Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

12. **Transfer of Personal Data** . The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the SAR awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

13. **Compliance with Laws** . The issuance of this SAR (and the shares of Common Stock upon exercise of this SAR) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the SAR or any of the shares pursuant to this Agreement if any such issuance would violate any such requirements.

14. **Section 409A** . Notwithstanding anything herein or in the Plan to the contrary, this SAR award is intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent.

15. **Binding Agreement; Assignment** . This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. The Participant shall not assign (except in accordance with Section 6 hereof) any part of this Agreement without the prior express written consent of the Company.

16. **Headings** . The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

4

17. **Counterparts** . This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

18. **Further Assurances** . Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

19. **Severability** . The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

20. **Acquired Rights** . The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the SAR made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the SAR awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

*[Remainder of Page Intentionally Left Blank]*

5

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**CARVANA CO.**

By: _____

Name: _____

Title: _____

**PARTICIPANT**

_____

Name: _____

6

**RESTRICTED STOCK UNIT AGREEMENT**
**PURSUANT TO THE**
**CARVANA CO. 2017 OMNIBUS INCENTIVE PLAN**

\* \* \* \* \*

Participant: _____

Grant Date: _____

Number of Restricted Stock Units Granted: _____

\* \* \* \* \*

THIS RESTRICTED STOCK UNIT AWARD AGREEMENT (this " Agreement "), dated as of the Grant Date specified above, is entered into by and between Carvana Co., a corporation organized in the State of Delaware (the " Company "), and the Participant specified above, pursuant to the Carvana Co. 2017 Omnibus Incentive Plan, as in effect and as amended from time to time (the " Plan "), which is administered by the Committee; and

WHEREAS , it has been determined under the Plan that it would be in the best interests of the Company to grant the Restricted Stock Units (" RSUs ") provided herein to the Participant.

NOW, THEREFORE , in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1. **Incorporation By Reference; Plan Document Receipt** . This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. Any capitalized term not defined in this Agreement shall have the same meaning as is ascribed thereto in the Plan. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content. In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

2. **Grant of Restricted Stock Unit Award** . The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above. Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the shares of Common Stock underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3. **Vesting** .

(a) Subject to the provisions of Sections 3(b) and 3(c) hereof, the RSUs subject to this Award shall become vested as follows, provided that the Participant has not incurred a Termination prior to each such vesting date:

| Vesting Date | Number of RSUs |
|---|---|
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |
| [          ] | [          ] |

There shall be no proportionate or partial vesting in the periods prior to each vesting date and all vesting shall occur only on the appropriate vesting date, subject to the Participant's continued service with the Company or any of its Subsidiaries on each applicable vesting date.

(b) Committee Discretion to Accelerate Vesting . Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason.

(c) Forfeiture . Subject to the Committee's discretion to accelerate vesting hereunder, all unvested RSUs shall be immediately forfeited upon the Participant's Termination for any reason.

4. **Delivery of Shares** .

(a) General . Subject to the provisions of Sections 4(b) and 4(c) hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of shares of Common Stock that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the shares of Common Stock to be issued within ten (10) days following the issuance of such shares unless such shares have been issued by the Company from the Company's treasury.

(b) Blackout Periods . If the Participant is subject to any Company "blackout" policy or other trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4(a) hereof, such distribution shall be instead made on the earlier of (i) the date that the Participant is not subject to any such policy or restriction and (ii) the later of (A) the end of the calendar year in which such distribution would otherwise have been made and (B) a date that is immediately prior to the expiration of two and one-half months following the date such distribution would otherwise have been made hereunder.

2

(c) <u>Deferrals</u> . If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the shares of Common Stock that would otherwise be distributed to the Participant hereunder (the " <u>Deferred Shares</u> "), consistent with the requirements of Section 409A of the Code. Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the " <u>Account</u> "). Subject to Section 5 hereof, the number of shares of Common Stock equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5. **Dividends; Rights as Stockholder** . Cash dividends on shares of Common Stock issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, <u>provided</u> that such cash dividends shall not be deemed to be reinvested in shares of Common Stock and shall be held uninvested and without interest and paid in cash at the same time that the shares of Common Stock underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Stock dividends on shares of Common Stock shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, <u>provided</u> that such stock dividends shall be paid in shares of Common Stock at the same time that the shares of Common Stock underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any shares of Common Stock covered by any RSU unless and until the Participant has become the holder of record of such shares.

6. **Non-Transferability** . No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested shares of Common Stock issuable hereunder.

7. **Governing Law** . All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

8. **Withholding of Tax** . The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any shares of Common Stock otherwise required to be issued pursuant to this Agreement. Any minimum statutorily required withholding obligation with regard to the Participant may, at the Company's discretion, be satisfied by reducing the amount of cash or shares of Common Stock otherwise deliverable to the Participant hereunder.

<div align="center">3</div>

9. **Legend** . The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing shares of Common Stock issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing shares of Common Stock acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 9.

10. **Securities Representations** . This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

(a) The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 10.

(b) If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the shares of Common Stock issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such shares of Common Stock and the Company is under no obligation to register such shares of Common Stock (or to file a "re-offer prospectus").

(c) If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that (i) the exemption from registration under Rule 144 will not be available unless (A) a public trading market then exists for the Common Stock of the Company, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the shares of Common Stock issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

11. **Entire Agreement; Amendment** . This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

12. **Notices** . Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

13. **No Right to Employment** . Any questions as to whether and when there has been a Termination and the cause of such Termination shall be determined in the sole discretion of the

4

Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

14. **Transfer of Personal Data** . The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

15. **Compliance with Laws** . The grant of RSUs and the issuance of shares of Common Stock hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule regulation or exchange requirement applicable thereto. The Company shall not be obligated to issue the RSUs or any shares of Common Stock pursuant to this Agreement if any such issuance would violate any such requirements. As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

16. **Binding Agreement; Assignment** . This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. The Participant shall not assign (except in accordance with Section 6 hereof) any part of this Agreement without the prior express written consent of the Company.

17. **Headings** . The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

18. **Counterparts** . This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

19. **Further Assurances** . Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

20. **Severability** . The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

21. **Acquired Rights** . The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this

5

Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

*[Remainder of Page Intentionally Left Blank]*

6

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**CARVANA CO.**

By: _____

Name: _____

Title: _____

**PARTICIPANT**

_____

Name: _____

7

**Exhibit 10.10**

**INDEMNIFICATION AGREEMENT**

THIS INDEMNIFICATION AGREEMENT (this " Agreement ") is made and entered into as of                    , 2017 between Carvana Co., a Delaware corporation (the " Company "), and [            ] (" Indemnitee ").

WHEREAS, highly competent persons have become more reluctant to serve corporations as directors or officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

WHEREAS, the Board of Directors of the Company (the " Board ") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the corporation or business enterprise itself. The Bylaws of the Company (the " Bylaws ") require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (" DGCL "). The Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers of the Company and other persons with respect to indemnification;

WHEREAS, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

WHEREAS, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company and its stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and in furtherance of the Bylaws and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

WHEREAS, Indemnitee may not be willing to serve or continue to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve or continue to serve in such capacity; Indemnitee is willing to serve, continue to serve and take on additional service for or on behalf of the Company on the condition that he be so indemnified.

NOW, THEREFORE, in consideration of Indemnitee's agreement to serve as a director or officer from and after the date hereof, the parties hereto agree as follows:

1. <u>Indemnity of Indemnitee</u> . Subject to the provisions of <u>Section 9</u> , the Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time, if Indemnitee was or is, or is threatened to be made, a party to, or otherwise becomes involved in, any Proceeding (as hereinafter defined) by reason of Indemnitee's Corporate Status (as hereinafter defined). In furtherance of the foregoing indemnification, and without limiting the generality thereof:

(a) <u>Proceedings other than Proceedings by or in the Right of the Company</u> . Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section l(a)</u> if, by reason of his Corporate Status, Indemnitee is, or is threatened to be made, a party to or participant, or otherwise becomes involved in, in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company. Pursuant to this <u>Section 1(a)</u> , Indemnitee shall be indemnified against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him, or on his behalf, in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful.

(b) <u>Proceedings by or in the Right of the Company</u> . Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(b)</u> if, by reason of his Corporate Status, Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company. Pursuant to this <u>Section 1(b)</u> , Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee, or on Indemnitee's behalf, in connection with such Proceeding if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; <u>provided</u> , <u>however</u> , if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company unless and only to the extent that the court in which the Proceeding was brought shall determine that Indemnitee is fairly and reasonably entitled to indemnification.

(c) <u>Indemnification for Expenses of a Party Who is Wholly or Partly Successful</u> . Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a party to or participant in and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or

2

matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection with each successfully resolved claim, issue or matter. For purposes of this Section 1(c) and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

2. Additional Indemnity . In addition to, and without regard to any limitations on the indemnification provided for in Section 1 of this Agreement, the Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf if, by reason of his Corporate Status, he is, or is threatened to be made, a party to or participant in any Proceeding (including a Proceeding by or in the right of the Company). The only limitation that shall exist upon the Company's obligations pursuant to this Agreement, other than those set forth in Section 9 hereof, shall be that the Company shall not be obligated to make any payment to Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in Sections 6 and 7 hereof) to be unlawful.

3. Contribution .

(a) Whether or not the indemnification provided in Sections 1 and 2 hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), to the fullest extent permitted by applicable law, the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee. The Company shall not, without the Indemnitee's prior written consent, enter into any such settlement of any action, suit or proceeding (in whole or in part) unless such settlement (i) provides for a full and final release of all claims asserted against Indemnitee and (ii) does not impose any Expense, judgment, fine, penalty or limitation on Indemnitee.

(b) Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), to the fullest extent permitted by applicable law, the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction from which such action, suit or proceeding arose; provided , however , that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and

3

Indemnitee, on the other hand, in connection with the events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which the law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c) To the fullest extent permitted by applicable law, the Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d) To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding, and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4. <u>Indemnification for Expenses of a Witness</u> . Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is, by reason of his Corporate Status, a witness, is made (or asked) to respond to discovery requests, or is otherwise asked to participate, in any Proceeding to which Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

5. <u>Advancement of Expenses</u> . Notwithstanding any other provision of this Agreement (other than <u>Section 7(e)</u> and <u>Section 9</u> ), the Company shall advance, to the extent not prohibited by law, all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding (or part of any Proceeding) not initiated by Indemnitee or any Proceeding initiated by Indemnitee with the prior approval of the Board as provided in <u>Section 9(d)</u> , within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee. Any advances pursuant to this <u>Section 5</u> shall be unsecured and interest free. In accordance with <u>Sections 7(d)</u> and <u>7(e)</u> of this Agreement, advances shall include any and all reasonable Expenses incurred pursuing an action to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. This <u>Section 5</u> shall not apply to claim by Indemnitee for expenses in a matter for which indemnity and advancement of expenses is excluded pursuant to <u>Section 9</u> .

4

6. <u>Procedures and Presumptions for Determination of Entitlement to Indemnification</u> . It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the DGCL and public policy of the State of Delaware. Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

(a) To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification. Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

(b) Upon written request by Indemnitee for indemnification pursuant to the first sentence of <u>Section 6(a)</u> hereof, a determination with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board: (1) by a majority vote of the Disinterested Directors (as hereinafter defined), even though less than a quorum, (2) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum, (3) if there are no Disinterested Directors, or if the Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee, or (4) if so directed by the Board, by the stockholders of the Company; <u>provided</u> , <u>however</u> , that if a Change in Control has occurred, the determination with respect to Indemnitee's entitlement to indemnification shall be made by Independent Counsel. For purposes hereof, Disinterested Directors are those members of the Board who are not parties to the action, suit or proceeding in respect of which indemnification is sought by Indemnitee.

(c) In the event the determination of entitlement to indemnification is to be made by Independent Counsel, the Independent Counsel shall be selected as provided in this <u>Section 6(c)</u> . If a Change in Control has not occurred, the Independent Counsel shall be selected by the Board, and the Company shall give written notice to the Indemnitee advising him of the identity of the Independent Counsel so selected. Indemnitee may, within 10 days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; <u>provided</u> , <u>however</u> , that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in <u>Section 12</u> of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person so selected shall act as Independent Counsel. If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If a Change in Control has occurred, the Independent Counsel shall be selected by the Indemnitee

5

(unless the Indemnitee shall request that such selection be made by the Board, in which event the preceding sentence shall apply), and approved by the Board within 20 days after notification by Indemnitee. If (i) an Independent Counsel is to make the determination of entitlement pursuant to this Section 6 , and (ii) within 20 days after submission by Indemnitee of a written request for indemnification pursuant to Section 6(a) hereof, no Independent Counsel shall have been selected (including as a result of an objection to the selected Independent Counsel), either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a Person selected by the court or by such other Person as the court shall designate, and the Person with respect to whom all objections are so resolved or the Person so appointed shall act as Independent Counsel under Section 6(b) hereof. The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 6(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 6(c) , regardless of the manner in which such Independent Counsel was selected or appointed.

(d) In making a determination with respect to entitlement to indemnification hereunder, the Person making such determination shall to the fullest extent permitted by law presume that Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof to overcome such presumption. Neither the failure of the Company (including by its directors or independent legal counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e) Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise (as hereinafter defined), including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise. In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this Section 6(e) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f) If the Person empowered or selected under this Section 6 to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall to the fullest extent permitted by law be

6

deemed to have been made and Indemnitee shall be entitled to such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided , however , that such 60-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and provided , further , that the foregoing provisions of this Section 6(f) shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 6(b) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy-five (75) days after such receipt and such determination is made thereat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made thereat.

(g) Indemnitee shall cooperate with the Person making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such Person upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including reasonable attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the Person making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h) The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall to the fullest extent permitted by law be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i) The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

7

7. Remedies of Indemnitee .

(a) In the event that (i) a determination is made pursuant to Section 6 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 5 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 6(b) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification or (iv) payment of indemnification is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to Section 6 of this Agreement, Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Delaware, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification, contribution or advancement of Expenses. Alternatively, Indemnitee, at his option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b) In the event that a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 7 shall be conducted in all respects as a de novo trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 6(b) . In any judicial proceeding or arbitration commenced pursuant to this Section 7 , Indemnitee shall be presumed to be entitled to indemnification under this Agreement and the Company shall have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be, and the Company may not refer to or introduce into evidence any determination pursuant to Section 6(b) of this Agreement adverse to Indemnitee for any purpose other than to establish its compliance with the terms of this Agreement. If Indemnitee commences a judicial proceeding or arbitration pursuant to this Section 7 , Indemnitee shall not be required to reimburse the Company for any advances pursuant to Section 5 until a final determination is made with respect to Indemnitee's entitlement to indemnification (as to which all rights of appeal have been exhausted or lapsed).

(c) If a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 7 , absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading, in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d) In the event that Indemnitee, pursuant to this Section 7 , incurs costs, in a judicial or arbitration proceeding or otherwise, attempting to enforce his rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on his behalf, in advance, any and all expenses (of the types described in the definition of Expenses in Section 12 of this Agreement) actually and reasonably incurred by him in such efforts, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery, to the fullest extent permitted by applicable law.

8

It is the intent of the Company that, to the fullest extent permitted by applicable law, Indemnitee not be required to incur legal fees or other Expenses associated with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to Indemnitee hereunder.

(e) The Company shall, to the fullest extent not prohibited by law, be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 7 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.

(f) Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8. Non-Exclusivity; Survival of Rights; Insurance; Subrogation .

(a) The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation of the Company (the " Charter "), the Bylaws, any agreement, a vote of stockholders, a resolution of directors or otherwise, of the Company. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Charter, Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b) The Company shall, if commercially reasonable, obtain and maintain in effect during the entire period for which the Company is obligated to indemnify Indemnitee under this Agreement, one or more policies of insurance with reputable insurance companies to provide the directors and officers of the Company with coverage for losses from wrongful acts and omissions and to ensure the Company's performance of its indemnification obligations under this Agreement. Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such officer or director under such policy or policies. In all such insurance policies, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee with the same rights and benefits as are accorded to the most favorably insured of the Company's directors and officers. At the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with

9

the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c) In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d) The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable (or for which advancement of Expenses is provided) hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e) The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

9. <u>Exception to Right of Indemnification</u>. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity or advancement of expenses in connection with any claim made against Indemnitee:

(a) for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b) for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act (as hereinafter defined), or similar provisions of state statutory law or common law; or

(c) for reimbursement to the Company of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company in each case as required under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act" or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act in connection with an accounting restatement of the Company or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act);

(d) in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by

10

Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Company has joined in or the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, or (iii) the Proceeding is one to enforce Indemnitee's rights under this Agreement or;

(e) any reimbursement of the Company by Indemnitee of any compensation pursuant to any compensation recoupment or clawback policy adopted by the Board or the compensation committee of the Board, including but not limited to any such policy adopted to comply with stock exchange listing requirements implementing Section 10D of the Exchange Act.

10. <u>Non-Disclosure of Payments</u> . Except as expressly required by the securities laws of the United States of America, neither party shall disclose any payments under this Agreement unless prior approval of the other party is obtained. If any payment information must be disclosed, the Company shall afford the Indemnitee an opportunity to review all such disclosures and, if requested, to explain in such statement any mitigating circumstances regarding the events to be reported.

11. <u>Duration of Agreement</u> . All agreements and obligations of the Company contained herein shall continue until and terminate upon the later of (i) twenty (20) years after the date that Indemnitee shall have ceased to serve as a director or officer of the Company or a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise which Indemnitee served at the request of the Company, and (ii) one (1) year after the final termination of any Proceeding (including any rights of appeal thereto) in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any Proceeding commenced by Indemnitee pursuant to <u>Section 7</u> of this Agreement relating thereto (including any rights of appeal of any <u>Section 7</u> Proceeding). Termination of this Agreement shall not adversely affect any right or protection hereunder of any Indemnitee in respect of any Proceeding (regardless of when such Proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to the time of such termination. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

12. <u>Definitions</u> . For purposes of this Agreement:

(a) " <u>Beneficial Owner</u> " shall have the meaning given to such term in Rule 13d-3 under the Exchange Act; <u>provided</u> , <u>however</u> , that Beneficial Owner shall exclude any Person otherwise becoming a Beneficial Owner by reason of the stockholders of the Company approving a merger of the Company with another entity.

(b) " <u>Change in Control</u> " shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

11

(i) *Acquisition of Stock by Third Party* . Any Person (as defined below), other than each of Ernest C. Garcia, II, Ernest C. Garcia, III, and each of the entities controlled by one or both of them and other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the Beneficial Owner (as defined above), directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities, unless the change in relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding securities entitled to vote generally in the election of directors;

(ii) *Change in Board of Directors* . During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a Person who has entered into an agreement with the Company to effect a transaction described in Section 12(b)(i) , 12(b)(iii) or 12(b)(iv) ) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Board;

(iii) *Corporate Transactions* . The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity; and

(iv) *Liquidation* . The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement or series of agreements for the sale or disposition by the Company of all or substantially all of the Company's assets, or, if such approval is not required, the decision by the Board to proceed with such a liquidation, sale, or disposition in one transaction or a series of related transactions.

12

(c) " Corporate Status " describes the status of a person who is or was a director, officer, employee, agent or fiduciary of the Company, any direct or indirect subsidiary of the Company, or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(d) " Disinterested Director " means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e) " Enterprise " shall mean the Company and any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that Indemnitee is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, employee, agent or fiduciary.

(f) " Exchange Act " shall mean the Securities Exchange Act of 1934, as amended.

(g) " Expenses " shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts and other professionals, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, ERISA excise taxes and penalties, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding. Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) " Independent Counsel " means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five (5) years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement. The Company agrees to pay the reasonable fees and disbursements of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

13

(i) " Person " shall have the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act; provided , however , that Person shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(j) " Proceeding " includes any threatened, pending or completed action, suit, claim, counterclaim, cross claim, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of the fact that Indemnitee is or was an officer or director of the Company, by reason of any action taken by him or of any inaction on his part while acting as an officer or director of the Company, or by reason of the fact that he is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise; in each case whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; including one pending on or before the date of this Agreement, but excluding one initiated by an Indemnitee pursuant to Section 7 of this Agreement to enforce his rights under this Agreement.

13. Severability . If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the fullest extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby. Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee indemnification rights to the fullest extent permitted by applicable laws.

14. Enforcement and Binding Effect .

(a) The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving or continuing to serve as a director or officer of the Company.

14

(b) Without limiting any of the rights of Indemnitee under the Charter or Bylaws of the Company as they may be amended from time to time, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c) The indemnification and advancement of expenses provided by, or granted pursuant to, this Agreement shall be binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise at the Company's request, and shall inure to the benefit of Indemnitee and his spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

(d) The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(e) The Company and Indemnitee agree herein that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause Indemnitee irreparable harm. Accordingly, the parties hereto agree that Indemnitee may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, Indemnitee shall not be precluded from seeking or obtaining any other relief to which he may be entitled. The Company and Indemnitee further agree that Indemnitee shall be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bonds or other undertaking in connection therewith. The Company acknowledges that in the absence of a waiver, a bond or undertaking may be required of Indemnitee by the court, and the Company hereby waives any such requirement of such a bond or undertaking.

15. <u>Modification and Waiver</u>. No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

16. <u>Notice By Indemnitee</u>. Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses covered hereunder. The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

15

17. <u>Notices</u> . All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

    (a)   To Indemnitee at the address set forth below Indemnitee's signature hereto.

    (b)   To the Company at:

> Carvana Co.
> 4020 East Indian School Road
> Phoenix, Arizona 85018
> Attention: General Counsel
> E-mail: DL-CarvanaLegal@carvana.com

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

18. <u>Counterparts</u> . This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19. <u>Headings</u> . The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

20. <u>Usage of Pronouns</u> . Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate.

21. <u>Governing Law and Consent to Jurisdiction.</u> This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict-of-laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to <u>Section 7</u> of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the " <u>Delaware Court</u> "), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to

16

the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

17

**IN WITNESS WHEREOF** , the parties hereto have executed this Agreement on and as of the day and year first written above.

**CARVANA CO.**

By: _____
Name:
Title:

**INDEMNITEE**

_____
Name:

Address:

_____

_____

_____

_____

S IGNATURE P AGE TO I NDEMNIFICATION A GREEMENT

**AMENDED AND RESTATED INVENTORY FINANCING
AND SECURITY AGREEMENT**

I. THE PARTIES TO THIS AGREEMENT

This Amended and Restated Inventory Financing and Security Agreement ("Agreement") is effective as of July 27, 2015, and is made by and among the following parties:

A.    Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah chartered state bank ("Bank"), with its principal executive offices located at 6985 Union Park Center, Midvale, Utah 84047; and

B.    Ally Financial, a Delaware entity ("Ally") with a local business office currently located at 5208 Tennyson Parkway, Suite 120, Plano, TX 75024 (together with Bank, the "Ally Parties" and Bank and Ally each being, an "Ally Party"); and

C.    Carvana, LLC, an Arizona limited liability company, with its principal executive office currently located at 4020 East Indian School Road, Phoenix, AZ 85018 ("Dealership").

II. THE RECITALS

The essential facts relied on by Bank, Ally and Dealership as true and complete, and giving rise to this Agreement, are as follows:

A.    From time to time, Dealership has and/or intends to acquire one or more Vehicles (defined below) from one or more manufacturer, distributor, dealers, auctioneer, merchant, customer, broker, seller, or other supplier ("Vehicle Seller(s)"), for the principal purpose of selling or leasing them to retail customers in the ordinary course of business.

B.    To enable Dealership to acquire Vehicles and hold them in inventory, Dealership wants the Ally Parties to provide Dealership with wholesale inventory floorplan finance accommodations by i) advancing the purchase price of the Vehicles directly to the Vehicle Sellers; ii) advancing funds to other third parties who are not Vehicle Sellers; or iii) by loaning money directly to Dealership for Vehicles that were previously purchased from Vehicle Sellers by Dealership ("Inventory Financing"). (Vehicles acquired with or held as a result of Inventory Financing may be referred to as "Inventory Financed Vehicles.")

C.    Bank is willing to provide Dealership with Inventory Financing in accordance with all of the provisions of this Agreement.

D.    Ally is willing to provide Dealership with Inventory Financing in accordance with all of the provisions of this Agreement.

E.    The Inventory Financing will be governed by the terms of this Agreement. Accordingly, this Agreement sets forth the rights and duties between Bank and Dealership and between Ally and Dealership concerning Inventory Financing, including establishment of a credit line by which inventory financing advances will be made by either or both of the Ally Parties, payment of principal, interest, and other charges, the grant of security interests in collateral, and other terms and conditions. Before execution, each party has carefully read this Agreement and each related document and has consulted with or had an opportunity to consult with an attorney.

III. THE AGREEMENT

In consideration of the premises and the mutual promises in this Agreement, which are acknowledged to be sufficient, Bank, Ally and Dealership agree to the following:

A.    Inventory Finance Accommodations .

1.    Definition of "Vehicle" . As used in this Agreement, "Vehicle" means an automobile, van, or light duty truck that is not manufactured for a particular commercial purpose. Notwithstanding anything to the contrary in this Agreement or otherwise, Inventory Financing is available only for a Vehicle that can be registered for use on public highways, and is not a vehicle that is titled outside the United States or has been previously titled outside the United States, in each case:

(a)    of the then-current model year, or nine previous model years,

(b)    having fewer than 150,000 miles,

(c)    that Dealership has purchased for at least $1,500,

(d)    for which such Dealership has received the title and purchase documentation,

(e)    that has not been purchased by Dealership for the use of its employees,

(f)    that is not subject to a current arbitration proceeding between the purchaser and the Dealership with respect to the sale of such vehicle, and

(g)    that is not subject to an existing consumer lease from Dealership or an affiliate of Dealership.

2.    Establishment of a 364-Day Committed Inventory Financing Credit Line . Subject to the terms and conditions of this Agreement,

(a)    Each of the Ally Parties commits to provide Inventory Financing to Dealership until the 364 th calendar day (inclusive) from the effective date of this Agreement ("Day 364"). At least 45 calendar days before Day 364, Dealership may request the Ally Parties to extend this commitment by an additional 364 calendar day period, and the Ally Parties, in their sole discretion, may extend this commitment by an additional 364 day period. If the Ally Parties extend this commitment by an additional 364 day period, then, at least 45 calendar days before the second anniversary of Day 364, Dealership may request the Ally Parties to extend this commitment by an additional 364-day period, and the Ally Parties may, in their sole discretion, extend this commitment by an additional 364-day period.

2

(b)  The sum of all Inventory Financing by each Ally Party, plus any obligation of each Ally Party to make specific advances to a Vehicle Seller or other party, constitutes a single obligation of Dealership to such Ally Party. The sum of all Inventory Financing plus the sum of all obligations of both of the Ally Parties to make specific advances to Vehicle Sellers or other parties constitutes the Dealership's "Wholesale Outstandings."

3.  Amount of the Credit Line . The aggregate amount of credit available pursuant to this Agreement (the "Credit Line") is $60,000,000.00.

4.  Advance . The advance rate for Inventory Financing, is as follows:

(a)  Auction and rental Vehicles: initially funded within 30 calendar days of purchase, [***] of:

(i)  the purchase price of such Vehicle, plus

(ii)  fees charged by an auction in connection with the purchase of such Vehicle, plus

(iii)  post-sale inspection fees in connection with the purchase of such Vehicle.

The Ally Parties have no obligation to advance any amount for costs related to transportation or labor with respect to a Vehicle.

(b)  Trade-in Vehicles and any amounts re-borrowed against a Vehicle after repayment of the initial advance for that Vehicle and any amounts initially funded for an Auction or rental Vehicle after 30 calendar days from the purchase date: [***] of clean wholesale value (as used in this Agreement, clean wholesale value means BlackBook "clean" wholesale value with no addition for options) of trade-in Vehicles; Vehicles purchased directly from customers; and amounts that are re-borrowed under the Credit Line.

5.  Method of Providing Inventory Financing . The Credit Line must be used exclusively for Inventory Financing in any of the following ways:

(a)  Advances Directly to Vehicle Sellers . From time to time, upon notice from Dealership or Vehicle Sellers, either or both of the Ally Parties may advance money directly to Vehicle Sellers for Vehicles acquired or proposed to be acquired by Dealership as Inventory Financed Vehicles. The Ally Parties will make payment in accordance with and in reliance on any invoice, draft, debit, contract, advice or other communication received by the Ally Parties from the Vehicle Seller. The Ally Parties are not

---

[***]  *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

3

required to verify the order or shipment of any Vehicle for which it pays a Vehicle Seller and are not responsible for any nonconformity of the Vehicle, delivery, or transaction between Dealership and a Vehicle Seller. If requested, Dealership will promptly provide invoices, bills of sale, title other transaction documents pertaining to such Vehicles.

(b)     Advances Directly to or on behalf of Dealership . From time to time, either or both of the Ally Parties may advance money directly to Dealership or to other third parties who are not Vehicle Sellers on behalf of Dealership to finance Vehicles then owned or proposed to be acquired by Dealership. The amount that will be advanced to or on behalf of Dealership for the Vehicles will be determined in accordance with Subsection III.A.4 above. Upon request by either or both of the Ally Parties, Dealership must provide the Ally Parties with satisfactory evidence of the value, ownership, and title status of the Vehicle(s), including the manufacturer's certificate of origin or title certificate (original or valid copy), invoice or bill of sale, and the shipping receipt, bill of lading, and the like.

6.     Evidence of Inventory Financing . The Ally Parties will maintain on their books and records in accordance with their usual practices, one or more accounts detailing the Inventory Financing, Wholesale Outstandings, and all Interest, Principal Reductions, net settlements (as described in Section III.C.4 below), Other Charges and any other related fees, costs, expenses, and payments owed by Dealership. From time to time, ordinarily monthly, the Ally Parties will furnish Dealership with statements of its account information ("Wholesale Billing Statement"). If only one Wholesale Billing Statement is provided by the Ally Parties, the Wholesale Billing Statement will indicate (by account number or otherwise) the Inventory Financing provided by each of the Ally Parties. Unless Dealership advises the Ally Parties in writing of any discrepancy on the Wholesale Billing Statement within ten (10) calendar days of receipt, and absent manifest error, the Wholesale Billing Statement will be deemed acknowledged and agreed to by Dealership and conclusive proof of Dealership's actual obligation to each of the Ally Parties as of the date of the Wholesale Billing Statement last received by Dealership.

7.     Other Financing Accommodations . Upon Dealership's request, either or both of the Ally Parties may provide other forms of finance and / or credit accommodations which arise out of or relate to the business operations of Dealership and / or any of its owners, officers, or affiliates, including, without limitation, the discount purchase of retail installment sale and lease agreements, working capital, revolving credit, equipment, and realty loans (such accommodations from either of the Ally Parties being, the "Other Financing Accommodations"). The availability, amount, terms, conditions, provisions, continuation, documentation, and administration of Other Financing Accommodations are separate and distinct from the Inventory Financing under this Agreement and may be provided, if at all, only according to the terms and conditions of the written agreement between such Ally Party and Dealership. If

4

Dealership requests additional Inventory Financing beyond the aggregate amount of the Credit Line stated in Subsection III.A.3 above, and the Ally Parties decline the request, then Dealership and the Ally Parties will negotiate in good faith to restructure the credit and collateral arrangements this Agreement to facilitate Dealership's efforts to obtain the additional financing from another financial institution.

B.    <u>Interest, Principal Reductions, Late Charges, Costs, Expenses and Other Charges and Fees</u> .

1.    <u>Interest Accrual. Rate, and Method of Calculation</u> . Wholesale Outstandings owed to the Ally Parties will bear interest on and from the day after each advance or loan through the date of repayment in full. Interest will be at a per annum rate and will be determined using a 365/360 simple interest method of calculation, unless expressly prohibited by law ("Interest"). The Interest rate is 1-M LIBOR Index Rate* plus 380 basis points.

The 1-M LIBOR Index Rate in effect for a monthly billing period is defined as the arithmetic mean of the 1-Month LIBOR Rate for the calendar days from and including the 26th of the calendar month which is two months prior to the applicable monthly billing period and ending with the 25 th of the month immediately preceding the applicable monthly billing period ("Measurement Period"). The 1-Month LIBOR Rate applicable to any day on which no rate is published will be the rate last quoted prior to such day. The "1-Month LIBOR Rate" is defined as: The per annum rate of interest for one month deposits in U.S. Dollars for each day of the Measurement Period that appears on the Bloomberg screen US0001M Index (London Interbank Offered Rate administered by the British Bankers' Association, New York Stock Exchange Euronext or other successor administrator for LIBOR) at approximately 11:00 a m. London time, or if such source becomes unavailable or there is no such successor, the per annum rate of interest for one month deposits in U.S. Dollars for each day of the Measurement Period obtained from such other commercially available source providing quotations of LIBOR as Ally Bank may designate.

2.    <u>Maximum Interest</u> . In no event will Interest owed to either or both of the Ally Parties under this Agreement exceed the maximum rate of interest allowed by law in effect at the time it is assessed. Each of the Ally Parties and Dealership intend to faithfully comply with applicable usury laws, and this Agreement is to be construed in accordance with this intent. If circumstances cause the actual or imputed interest contracted for, charged, or received by either or both of the Ally Parties to be in excess of the maximum rate of interest allowed by law, Dealership must promptly notify the affected Ally Party(ies) of the circumstance, and such Ally Party(ies) will either, at their sole discretion, refund to Dealership, or credit the Wholesale Outstandings owed by Dealership to such Ally Party(ies), with so much of the imputed interest as will reduce the effective rate of interest to an amount one-tenth of one per cent (0.10%) per annum less than the maximum rate of interest allowed by law for the applicable period.

3.  <u>Principal Reductions</u>. Dealership must pay a monthly principal reduction of 10% of the original principal amount (each a "Principal Reduction") for each Vehicle on Dealership's floorplan for more than 180 days (regardless of repayment and re-borrowing) until the outstanding principal amount for that Vehicle is reduced to lesser of 50% of the original principal amount or 50% of the clean wholesale value. Principal Reductions may be billed to Dealership and will reduce the amount of the Wholesale Outstandings when paid by Dealership. Any change in the Principal Reductions required by either or both of the Ally Parties will not constitute an amendment to this Agreement.

4.  <u>Late Charge</u>. Unless prohibited by law, each of the Ally Parties may assess a late charge of up to five percent (5%) of any amount owed to such Ally Party(ies) that is not paid when due and payable after giving effect to applicable grace periods ("Late Charge"). The Late Charge is in addition to Interest.

5.  <u>Costs, Expenses, Fees</u>. Unless prohibited by law, Dealership must pay all expenses and reimburse each of the Ally Parties for any cost, expense, or other expenditures, including reasonable attorney fees and legal expenses; amounts expended by the Ally Parties on behalf of Dealership; collection and bankruptcy costs, fees and expenses; and all other amounts incurred by each of the Ally Parties in the enforcement of any right or remedy, collection of any Obligation (as defined in Subsection III.D.2, below), or defense of any claim or action in respect of this Agreement.

6.  <u>Other Charges and Fees</u>. The Ally Parties may assess and Dealership will pay charges in connection with Inventory Financing in the areas of audit, collateral monitoring, non- compliance, and returned item ("Other Charges"). Provided no Default has occurred, the Ally Parties will provide advance notice of at least 30 calendar days of new charges or changes to existing charges.

7.  <u>Acquisition Fee</u>. Simultaneously with the signing of this Agreement, Dealership will pay to the Ally Parties an acquisition fee in the amount of [***]. No additional acquisition fee is required in connection with any commitment extension pursuant to Section III.A.2.a.

C.  <u>Payments by Dealership</u>.

1.  <u>Permissive Principal Payments</u>. Except as otherwise expressly stated in this Agreement, Dealership may pay to the Ally Parties some or all of the Wholesale Outstandings and any other payment obligations at any time before they are due and payable without premium or penalty.

2.  <u>Required Payments</u>. Dealership must fully, promptly, and faithfully pay to the Ally Parties the Wholesale Outstandings, Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees and any other payment obligations due under this Agreement, as follows:

---

[***]   *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

6

(a)     the principal amount of the advance or loan by the Ally Parties for each Inventory Financed Vehicle as and when such Vehicle is sold, leased, consigned, gifted, exchanged, transferred, otherwise disposed of, registered, placed into service, or no longer in the possession of the Dealership, or if it is otherwise lost, stolen, confiscated, missing, or otherwise not received, or if it is damaged or destroyed; and

(b)     the total amount specified in the Wholesale Billing Statement or other billing statements for Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees and any other payment obligations, immediately upon receipt from the Ally Parties.

3.    Method of Payment . All payments must be made by Dealership to the Ally Parties by one or more of the following methods: (i) in good funds by draft, check, or other negotiable instrument, (ii) in good funds by wire transfer, electronic fund transfer, automated clearing house transfer, or other electronic means, or (iii) chattel paper assigned to one of the Ally Parties that is acceptable to such Ally Party in its sole discretion. Upon request by either or both of the Ally Parties, Dealership must make all payments to such Ally Party(ies) in immediately available funds, certified check, bank check, and the like. Dealership must remit all payments owed to Ally and Bank under this Agreement to Ally at the local business office set forth in Section I.A above, or any other place as each of the Ally Parties designates from time to time.

4.    "Full" Payment Defined . The requirement for making payments "fully" as set forth in this Agreement means that the required payment amount must be either actually remitted to and received by the Ally Parties in whole, without setoff or recoupment, or credited by either of the Ally Parties or any affiliate of either of the Ally Parties in accordance with the SmartCash Agreement among the Ally Parties and Dealership. This does not include funds actually received by the Ally Parties from or on behalf of Dealership for specific application to a required payment by way of:

(a)     subvention, discount, subsidy, support, or supplementation from a Vehicle Seller; or

(b)     credit, rebate, bonus, debit, disbursement, or other payment from either of the Ally Parties or any other person for the purchase of chattel paper, distribution from finance reserve accounts, application of account balances, and the like.

Absent payment actually being remitted by Dealership to the Ally Parties or actually credited by either of the Ally Parties or any of their affiliates, payment is not "fully" made because either or both of the Ally Parties have:

(a)     a right of setoff, recoupment, and the like;

7

(b)     a Security Interest in or an assignment of Collateral (each as defined in Section III. D. below), or the proceeds thereof; or

(c)     a direct or indirect claim against a Vehicle Seller, surety, guarantor, or any other person.

Dealership's obligation to pay each of the Ally Parties as set forth in this Agreement is independent of any other rights that Dealership or either of the Ally Parties may have to effect payment from other sources and persons, and neither of the Ally Parties has any duty to undertake the enforcement of any other rights.

5.     <u>"Prompt" Payment Defined</u> . The requirement for making payments "promptly" as set forth in this Agreement means that the required payment amount must be tendered to the Ally Parties within [***] business days.

In their sole discretion, either or both of the Ally Parties may permit more time between the event and payment due date to take into account factors such as delays in the administration, processing, and delivery of the payments ("Release Period"). The Release Period is available only for payments required under Subsection III.C.2.(a) above. The existence, duration, terms, and continuation of the Release Period are subject to change from time to time by each of the Ally Parties. Changes in the Release Period by the Ally Parties do not constitute amendments of this Agreement.

6.     <u>"Sold" Defined</u> . "Sold" as set forth in this Agreement means the delivery or transfer of ownership, title or interest in the property by Dealership to a third party (whether an affiliate or non-affiliate of Dealership).

7.     <u>Source and Application of Payment</u> . The source of all payments due under this Agreement is presumptively deemed to be Collateral (as defined in III.D.1. below). Absent Default (as defined in Section III.H. below), the Ally Parties will apply payments pursuant to Dealership's instructions. Absent instruction from Dealership or in the event of Default, the Ally Parties will apply payments against any obligation due and owing by Dealership under this Agreement or other Financing Accommodations. A payment is not final to the extent of any defeasance of it by application of law. Payment made by check, draft, or other instrument will be deemed made by Dealership not later than one (1) business day after the instrument is accepted by the payor bank. Except as otherwise provided in any SmartCash Agreement between Dealership and either or both of the Ally Parties, payments made by wire transfer, electronic fund transfer, automated clearing house transfer, and other electronic means will be deemed made by Dealership upon posting of such payment by the Ally Parties.

---

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

8

D.    The Ally Parties' Security Interests .

1.    Grant of Security Interest . Dealership hereby grants to each of Bank and Ally a continuing security interest in and a collateral assignment of ("Security Interest") all of the following described property in which Dealership has or may have any rights, wherever located, whether now existing or hereafter arising or acquired and any and all accessions, additions, attachments, replacements, substitutions, returns, profits, and proceeds in whatever form or type, of any of the property ("Collateral"):

all Vehicles, including but not limited to those for which either of the Ally Parties provides Inventory Financing; other inventory; equipment; accounts, including factory open accounts of Dealership; deposit and other accounts with banks and other financial institutions; cash and cash equivalents; general intangibles; all documents; instruments; investment property; and chattel paper.

2.    The Obligations Secured . The Collateral secures payment and performance of all debts, obligations, and duties of Dealership to Bank and Ally of every kind and description, now existing or hereafter arising under this Agreement, whether primary or secondary, absolute or contingent, due or to become due, direct or indirect, presently contemplated or not contemplated by Bank, Ally or Dealership, or otherwise designated by the parties as secured or unsecured ("Obligations").

3.    Status of Collateral . The Collateral is held by Dealership in trust for each of the Ally Parties. The Collateral must be and remain free from all confiscations, assessments, forfeitures, loss, destruction, impairment, tax liens and other liens, security interests, pledges, claims, and encumbrances except for:

(a)    the Security Interest arising under this Agreement, or as otherwise contemplated by this Agreement;

(b)    non-consensual statutory liens resulting from deposits made in the ordinary course of business in connection with workers compensation, unemployment insurance, social security, and other similar laws;

(c)    other security interests to which each of the Ally Parties specifically consents in writing.

The grant of the Security Interest and the execution of any document, instrument, promissory note, or the like, in connection with it or the Obligations do not constitute payment or performance of any of the Obligations, except to the extent of actual, indefeasible payment of the Obligations from the realization by Dealership or the Ally Parties of the Collateral or otherwise. The Security Interest continues to the full extent provided in this Agreement until all Obligations are fully and indefeasibly paid and performed, even if the Credit Line is from time to time modified, suspended, or terminated and reestablished.

9

4.    Perfection of Security Interest . The Ally Parties may each file financing statements, note their liens on titles, and take any other steps in order to establish, confirm, and maintain a perfected Security Interest in the Collateral. Dealership will execute and deliver any documents necessary and appropriate for these purposes and otherwise irrevocably appoints each of the Ally Parties to do so. Each of the Ally Parties may require Dealership to pay any fee, cost, tax, or assessment required by any government entity to perfect and / or maintain each of the Ally Parties' Security Interest in the Collateral. All financing statements previously filed by either or both of the Ally Parties are hereby ratified and authorized by Dealership as of the date of filing.

5.    Protection of Security Interest. Unless expressly prohibited by law, in the event of Default and unless and until the Default is cured to the satisfaction of the Ally Parties or in the event of material jeopardy to 10% or more of the Collateral pledged hereunder (based on clean wholesale value), upon either of the Ally Parties' request, Dealership must immediately:

(a)    turn over to Ally or some other party designated by the Ally Parties custody or control of all manufacturer's certificates of origin, certificates of title, documents of title, bills of sale, invoices, and other records or instruments of ownership by Dealership pertaining to the Vehicles;

(b)    establish and maintain an account, separate from other Dealership accounts, at a federally insured financial institution with which Dealership and/or its affiliates have had no business or lending relationship for a minimum of six (6) months before setting up the account, into which cash, instruments, and other proceeds of Collateral are to be deposited and segregated from other funds of Dealership;

(c)    protect and defend the Collateral against the claims and demands of all other persons, including, but not limited to obtaining waivers from landlords, depository institutions and other parties which have access to or control over the Ally Parties' Collateral or proceeds of the Ally Parties' Collateral; and

(d)    permit representative(s) of each of the Ally Parties to monitor Collateral by taking one or more of the following actions:

(i)    to enter any locations where Dealership conducts business or maintains Collateral, and to remain on the premises for such time as such Ally Party(ies) may deem desirable;

(ii)    to take possession and control over certificates of origin, title, and keys with respect to each Vehicle comprising Dealership's inventory or equipment;

10

(iii)   to take constructive or actual possession and control over all documents, books, records, papers, accounts, chattel paper, electronic chattel paper, instruments, promissory notes, general intangibles, payment intangibles, supporting obligations, contract rights, software, or any similar types of tangible or intangible property relating to or comprising the Collateral;

(iv)   to receive payment of all Collateral proceeds; and

(v)   to take whatever additional actions as either or both of the Ally Parties may deem necessary or desirable to protect and preserve the Collateral, and to carry out, and to protect and preserve each of the Ally Parties' security rights and remedies.

6.   <u>Offset</u> . In addition to the Security Interest, each of the Ally Parties retains any and all rights of offset, recoupment, netting-out, and any other legal or equitable rights, in each case provided to it under applicable law, to credit those assets of Dealership in the possession or control of Ally Bank or Ally Financial, as applicable, against any Obligations of Dealership to Ally Bank or Ally Financial under this Agreement or any other auto finance related agreement (e.g., inventory financing; SmartAuction; purchase of retail installment sale contracts and leases), whether then matured, liquidated, or due. For clarity, the term "Obligations of Dealership" in the preceding sentence does not include the obligations of any affiliate of Dealership.

7.   <u>Authorization Regarding Proceeds of Collateral</u> . Dealership hereby authorizes and empowers each of Bank and Ally to demand, collect and receive from auctions and others, and give such parties binding receipts for, all proceeds of Collateral and, in Dealership's name or otherwise, to prosecute suits therefor. With or without a default, each of the Ally Parties may, at any time notify auctions and others to make payment directly to the Ally Parties of proceeds of Collateral. Dealership unconditionally and irrevocably authorizes and instructs auctions and others to make payment of proceeds of Collateral directly to the Ally Parties as instructed, and authorizes auctions and others to rely on a copy of this Agreement as evidence of the authorization and instruction. The Ally Parties will account to Dealership for all sums received pursuant to this Section III.D.7 and applied in the manner described in Subsection III.C.7 above. This authorization is irrevocable without the prior written consent of each of the Ally Parties and is provided as additional security for and not as payment of obligations now or hereafter arising to the Ally Parties. Dealership hereby appoints each Bank and Ally as its agent and attorney-in-fact for the sole purpose of executing or endorsing, on Dealership's behalf, any document, check or other instrument necessary to cause payment of proceeds of Collateral, or to perfect Bank's and/or Ally's security interest in the proceeds of Collateral.

11

E.  Dealership's Handling of Vehicles .

1.  Ownership and Taxes . Dealership will have and maintain absolute title to and ownership of each Vehicle, subject to each Ally Party's respective Security Interest in the Vehicle. Dealership will pay all taxes and assessments at any time levied on any Vehicle as and when they become due and payable.

2.  Location . Dealership will keep Vehicles at Dealership's locations (including without limitation retail business locations, temporary holding locations, inspection and repair center locations) and will not remove them from those locations (other than transportation and relocation among such locations or to customers after sale), except:

    (a)  for temporary relocation for repair, restoration, reconditioning, governmental inspection, and the like;

    (b)  as consistent with the usage of the Vehicle as a Demonstrator or Shop Rental (each as defined in Subsection III.E.4. below);

    (c)  upon advance or concurrent notice to the Ally Parties, for bailment to another person for upfitting, completion, upgrading, modification, and the like; or

    (d)  upon advance or concurrent notice to the Ally Parties, for storage and display at a temporary location.

3.  Condition . Dealership will keep Vehicles in good operating condition and repair, in good and marketable condition and will not alter or substantially modify any of them, except as otherwise contemplated in Subsection III.E.2.(c) above.

4.  Usage . Dealership may permit a potential customer to use and examine any Vehicle for the purpose of inspecting, test-driving, and considering the purchase or lease of a Vehicle. Dealership will not use Vehicles illegally or improperly and will hold and consider them as inventory held in the ordinary course of business (including without limitation for repair, restoration, reconditioning, storage, exhibition, sale or lease to retail customers), except as follows:

    (a)  Demonstrators . From time to time, Dealership may use one or more Vehicles for demonstration and promotional purposes ("Demonstrator"), pursuant to the following additional terms and conditions:

        (i)  Reserved .

        (ii)  Dealership may provide a Vehicle to a person whose use of it will directly or indirectly promote the Dealership's business including:

            •  owners or employees of the Dealership, provided the Vehicle is for local use, for short duration, and no fee is assessed;

            •  service customers, provided the Vehicle is for local use, short duration, and no fee is assessed.

        (iii)  Reserved .

12

(iv)    Upon either or both of the Ally Parties' request, Demonstrators are subject to:

- a term of no more than twelve months;

- inspection by each of the Ally Parties (including all related documents);

- reductions in principal balance in an amount determined by such Ally Party(ie)s;

- removal from service as a Demonstrator; and

- any other limitation imposed by either or both of the Ally Parties from time to time.

(v)    Dealership must obtain and maintain liability insurance coverage insuring Dealership and the Demonstrator user in an amount that is at least the greater of the minimum required by law or $100,000/$300,000 bodily injury and $25,000 property damage for vehicles used as Demonstrators.

(b)    <u>Shop Rentals</u>. From time to time, Dealership may use one or more Vehicles for short term rental to customers ("Shop Rental"), pursuant to the following additional terms and conditions:

(i)    Dealership must request permission from each of the Ally Parties to make the designation and use of the Vehicle as a Shop Rental. The request must be made in advance on a form provided by the Ally Parties for this purpose and include a detailed description of the Vehicle proposed for designation as a Shop Rental, including:

- Vehicle information: vehicle identification number; stock number;

- Shop Rental service information: term of service; effective date of service period;

- Vehicle financing information: amount financed; monthly amortization; first payment due date; balloon payment; and

- any additional information or document that either or both of the Ally Parties may request from time to time.

(ii)    The Ally Parties may approve or deny the request for a Shop Rental and may rescind any approval previously granted. Any approval must be in writing.

(iii)    The Shop Rental must be confined to a customer of Dealership who is in need of a temporary replacement motor vehicle:

- while the customer's vehicle is being repaired by Dealership;

- for a thirty (30) day period following theft of the customer's motor vehicle; or

13

- pending delivery of a motor vehicle to customer pursuant to a bona fide order with Dealership.

(iv)   Unless changed by either or both of the Ally Parties in their sole discretion, Dealership must make monthly principal reduction payments in the amount designated from time to time by the such Ally Party(ies) for the Shop Rental plus monthly interest or other service charges established by each of the Ally Parties from time to time.

(v)   A Vehicle may not be used as a Shop Rental for a term longer than the term specified in the written approval provided by the Ally Parties, unless each of the Ally Parties consents in writing to a longer period.

(vi)   Dealership must maintain insurance coverage on the Shop Rental as follows:

- comprehensive and collision coverage insuring each of the Ally Parties and Dealership (as their interests may appear); and

- liability insurance coverage insuring Dealership and the Shop Rental user in an amount that is at least the greater of the minimum required by law or $100,000/$300,000 bodily injury and $25,000 property damage.

(vii)   Dealership must immediately notify each of the Ally Parties whenever a Shop Rental ceases to be used in this way by reason of its sale, lease, re-designation by either or both of the Ally Parties or Dealership, or otherwise.

(viii)   All other terms and conditions of this Agreement will apply to a Shop Rental.

5.   Inspection . Without any advance notice to Dealership, each of the Ally Parties may at all times have access to, examine, audit, appraise, verify, protect, or otherwise inspect the Vehicles (to the extent not in transit to a customer after sale) wherever located as frequently as each of the Ally Parties elects. The inspection may include examination and copying of all documents, titles, certificates of origin, invoices, instruments, chattel paper, computer records, bank statements, and all other books and records of the Dealership of or pertaining to the Vehicles or to determine compliance with this Agreement. Bank and Ally each have Dealership's continuing consent to enter the Dealership's premises to carry out inspections. In connection with the inspection, the Ally Parties may be assisted by, cooperate with, or discuss the financial and business affairs of Dealership with any of the officers, owners, employees, sureties, creditors, or agents of Dealership. Notwithstanding anything in this Agreement to the contrary and, the Ally Parties will not conduct such inspection and/or audit more than one (1) time in any calendar month unless a Default occurred and has not been cured to the Ally Parties' satisfaction.

14

6.    Reserved .

7.    Report of Damage, Loss . Concurrent with discovery that a Vehicle has been destroyed, lost, stolen, or missing, Dealership will notify each of the Ally Parties of the discovery by reporting the Vehicle in the reports delivered pursuant to Section III.G.1.(a). In addition, Dealership will notify each of the Ally Parties if more than 10% (based on clean wholesale value) of the Vehicles at, or attributable to, any Dealership retail location are damaged. Dealership must use reasonable means to diligently repair and restore such Vehicle to its original condition, replace, or locate any of these Vehicles, and keep the Ally Parties apprised of these efforts.

8.    Risks . Neither of the Ally Parties has any risk or responsibility concerning the ownership, location, condition, usage, inspection, or disposition of any Vehicle or other Collateral whether or not permitted by this Agreement, including fire, theft, vandalism, mischief, collision, acts of terrorism, acts of God, property damage, personal injury, public liability, and the like ("Risks"). Dealership bears and assumes the Risks, unless imposed by law on another person and except to the extent of any insurance proceeds actually received by the Ally Parties. Dealership will indemnify and hold harmless Bank and Ally against all Risks, including injury and damage to persons, property, or Collateral caused by any of these Risks.

9.    Insurance . Except to the extent that both of the Ally Parties obtain insurance for themselves on one or more of the Risks, Dealership must acquire and maintain one or more policies of insurance on losses which may arise as a consequence of the Risks on any of the Vehicles or, as requested by either or both of the Ally Parties, on other Collateral. The amounts, deductibles, provider, term, cancellation rights, types of insurance, and required ratings of insurer are attached to this Agreement as Exhibit 1. Each of the Ally Parties must be named as a loss payee, as each of their interests may appear. Dealership must provide each of the Ally Parties with one or more certificates of insurance evidencing compliance with this Subsection III.E.9.

F.    Representations and Warranties of Dealership . Dealership represents and warrants to each of the Ally Parties the accuracy and completeness of each of the following statements as of the effective date of this Agreement. Dealership will immediately notify each of the Ally Parties of any known or expected material change to any of these statements. Otherwise, they are deemed as continuing and reaffirmed each time either of the Ally Parties provides Inventory Financing to Dealership.

1.    Dealership Existence . Dealership is duly formed, constituted, and is in good standing in the jurisdiction in which it is located, as "location" is determined under Article 9 of the Uniform Commercial Code, as amended from time to time. Dealership has all government and other permits, licenses, authorizations, and approvals necessary to do business lawfully in the jurisdiction in which any of its business operations are located.

15

2.  <u>Dealership Authorization</u>. Dealership is authorized and empowered to execute and deliver this Agreement and to do all things necessary and appropriate to fulfill and implement the terms and conditions of it.

3.  <u>Legal Compliance</u>. Dealership is in compliance with all federal, state, and local laws, regulations, and ordinances.

4.  <u>Financial Condition</u>. Information on the financial condition of Dealership which has or may be submitted to either or both of the Ally Parties, either directly or indirectly (e.g., through a Vehicle Seller), by Dealership or an agent of Dealership (e.g., accountant), fairly presents the financial condition of Dealership in accordance with generally accepted accounting principles applied on a consistent basis.

5.  <u>Relationship of Ally Parties and Dealership</u>. The relationship between each of the Ally Parties and Dealership is one of creditor and debtor, respectively, based upon this Agreement and/or Other Financing Accommodations. There is no fiduciary, trust, representative, confidential, partnership, or other special relationship between either of the Ally Parties and Dealership. The Ally Parties do not have and will not have any investment in Dealership, whether equity or otherwise. Dealership is not a counselor, advisor, agent or legal or other representative of Bank or Ally. Neither Bank nor Ally is a counselor, advisor, agent, or legal or other representative of the Dealership, except for the limited power of attorney expressly described in Subsections III.D.4. and 7. above and Subsections III.J.10. and III.K.18. below, and each of them recognizes the ability, importance, and freedom to consult with any accountants, attorneys, agents, advisors, and business consultants of their choice in connection with the review, execution, and administration of this Agreement. Neither of the Ally Parties controls, supervises, or manages Dealership.

6.  <u>Relationship with Vehicle Sellers</u>. The Ally Parties do not represent the interests of any Vehicle Seller. The relationships of each of the Ally Parties and Dealership to any Vehicle Seller are separate and distinct from one another. Neither of the Ally Parties is under the control of any Vehicle Seller, despite any business, consultative, investment, ownership, legal, or other relationship either of the Ally Parties may have with one or more Vehicle Seller. Nothing in this Agreement obligates Dealership to obtain Inventory Financing from the Ally Parties based on any relationship that either of the Ally Parties may have with one or more Vehicle Sellers.

G.    <u>Additional Promises of Dealership</u> . Dealership will:

1.    Provide (directly or by posting to a secure site accessible by the Ally Parties) each of the Ally Parties with accurate and complete information, data, books, records, documentation, and the like, concerning:

(a)    all financial and business matters of Dealership, upon request by either or both of the Ally Parties; and

(b)    any of the following proposed or actual changes, immediately:

(i)    the Dealership's name, address, tax status, entity, structure, and

(ii)    the Dealership's solvency.

(iii)    any change in ownership of the Dealership; and

(c)    all financial and other reports made and information provided to any Vehicle Sellers and will allow each of the Ally Parties direct access to all such reports and information, and upon request by either or both of the Ally Parties, provide copies of such reports and information.

2.    Provide audited financial statements within 120 days after the end of each of its fiscal years, and unaudited financial statements within 60 days after the end of the first three fiscal quarters of each fiscal year.

3.    At all times, remain in good standing under, and have not received or sent notice of termination of, any contracts, franchise agreements, dealer sales and service agreements, and the like, provided by Vehicles Sellers which manufacture or distribute new Vehicles to Dealership.

4.    Maintain, at all times, a Credit Balance (as defined in Dealership's Credit Balance Agreement, dated as of July 27, 2015) of at least 5% of the total principal amount owed to the Bank from time to time for used vehicle inventory financed by the Bank under this Agreement so long as Dealership owes any debt to Bank or until Bank otherwise agrees in writing.

5.    Maintain unrestricted cash and cash equivalents on hand in immediately available funds, excluding funds held by any of the Ally Parties under the above-referenced Credit Balance Agreement, of at least 10% of the Wholesale Outstandings, and submit to Ally a monthly certification by an officer of Dealership that this requirement was met.

6.    Maintain minimum net worth of at least $15,000,000.00.

7.    Maintain, at all times, at least 5% equity in its inventory, calculated as the amount expressed as a percentage equal to

(a)    1 minus

17

  (b) the amount of

    (i) total Wholesale Outstandings divided by

    (ii) with respect to Eligible Vehicles, 100% of the sum of:

- the purchase price of such Vehicle,

- fees charged by an auction in connection with the purchase of such Vehicle,

- post-sale inspection fees in connection with the purchase of such Vehicle, and

- the reconditioning parts, repair parts, and related labor cost with respect to such Vehicle.

"Eligible Vehicles" means Vehicles that Dealership acquired by any means, excluding each Exception Vehicle.

"Exception Vehicle" means a Vehicle for which any part of the purchase price remains unpaid; a Vehicle that is or has been subject to a consumer lease from Dealership or an affiliate of Dealership; and/or a Vehicle provided to a Dealership employee or other representative for long-term use (i.e., a company vehicle).

(the foregoing calculation will not include any costs related to transportation with respect to a Vehicle),

8. Promptly notify the Ally Parties of any material reduction in availability of loans, financing, credit lines, or other credit accommodations provided or made available by any bank, finance company, or other source.

9. <u>Reserved</u> .

H. <u>Default by Dealership</u> . An occurrence of any one or more of the following events constitutes a default under this Agreement ("Default"):

1. Failure of Dealership to pay when due the full amount owing to either of the Ally Parties under Section III.B. and C. above;

2. Material jeopardy to 10% or more of the Collateral (based on clean wholesale value) and such jeopardy has not abated for a period of two (2) calendar days after notice thereof by either of the Ally Parties;

3. The breach of, or the failure of Dealership to fully comply with or duly perform, any term, condition, or promise of this Agreement or any other Obligation and such failure continues unremedied for a period of five (5) business days after notice thereof by either of the Ally Parties;

18

4.   Any representation, statement, or warranty made by Dealership to either of the Ally Parties in this Agreement or otherwise, which was false or materially misleading when made;

5.   The inability of Dealership to pay debts as they mature, or any proceeding in bankruptcy, insolvency, or receivership, instituted by or against Dealership or Dealership's property; and/or

6.   This Agreement is unenforceable or the security interest in the collateral created by this Agreement ceases to be in full force and effect.

I.   <u>Waiver and Modification of Certain Important Rights</u>. Unless and only to the extent not expressly prohibited by law, Dealership, Bank and Ally expressly and affirmatively waive and modify certain very important rights, as follows:

1.   <u>Claims</u>. Any and all claims, causes of action, suits, rights, remedies, disputes, complaints, defenses, and counterclaims between either or both of the Ally Parties on the one hand and Dealership on the other hand, or any of their officers, agents, employees, subsidiaries, affiliates, members, owners, or shareholders directly or indirectly arising out of or relating to the terms or subject matter of this Agreement, whether in contract, tort, equity, statute, or regulation, or pertaining to conversion, fraud, defamation, negligence, franchise, licensing, or distribution or the defect, non-conformity, price, or allocation of Vehicles by any Vehicle Seller, or otherwise, but not including actions for and enforcement of provisional remedies otherwise provided by law, equity, or agreement between the parties, suits for debt, enforcement of security interests, or claims pursuant to Section III.J. below, ("Claim") are subject to each of the following:

(a)   <u>Claim Resolution</u>. The resolution of any Claim ("Claim Resolution") will occur, if at all, only in accordance with the following provisions and sequence:

(i)   Informal discussion and negotiation between executive level managers of the Dealership and the Ally Party(ies) asserting a Claim or against which a Claim is asserted;

(ii)   Mediation in accordance with the rules of commercial mediation as published from time to time by the American Arbitration Association, Endispute, the Better Business Bureau, or any other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted; and (iii.) Binding arbitration in accordance with the rules of commercial arbitration as published from time to time by the American Arbitration Association, Endispute, the Better Business Bureau, or other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted ("Arbitration"), except that the Arbitration must be decided based upon the terms and conditions of this Agreement.

19

(b) <u>Jurisdiction and Venue</u>.

    (i) All mediation and arbitration hearings and proceedings brought pursuant to Subsections III.I.1(a)(ii) and (iii) above shall occur at a location within fifty (50) miles of Ally's local business office set forth in Section I.B above, or the current replacement for it.

    (ii) The enforcement of any Claim or Claim Resolution provision and the enforcement of any Arbitration award must be brought, if at all, solely and exclusively in the state or federal court of original jurisdiction for the location of the Ally local business office set forth in Section I.B. above, or the current replacement for it.

(c) **<u>JURY WAIVER</u>. BANK, ALLY AND DEALERSHIP WAIVE AND RENOUNCE THE RIGHT UNDER FEDERAL AND STATE LAW TO A TRIAL BY JURY FOR ANY CLAIM.**

2.   <u>Choice of Law</u>. This Agreement must be construed, interpreted, and enforced in accordance with the laws of the state of Arizona without regard to its conflict of laws rules.

3.   <u>Limitation of type and nature of damage Claims for violation</u>. With respect to any Claim:

(a) Dealership's damages under this Agreement are expressly limited to the following;

    (i) the actual dollar amount of Dealership's economic or financial loss; and

    (ii) reasonable dollar amount of lost future profits for not more than two (2) years from the accrual date of the Claim.

(b) Neither party may assert a claim for any of the following:

    (i) punitive or exemplary damages, unless the Claim would constitute a felony under the law of the state indicated in Subsection III.I.2, above; or

    (ii) consequential and incidental damages.

(c) Any liability of either Ally Party to Dealership related to any Claim is limited to and will not exceed the amount of total Interest assessed by the Ally Party(ies) against whom the Claim is brought and actually paid by Dealership in the twenty-four (24) calendar months immediately preceding accrual of the Claim.

20

4.    <u>Notification of information to Others</u> . Bank and Ally each have the right, but not the obligation, to notify guarantors, sureties, Vehicle Sellers, Account Debtors and other third parties (e.g., owners, officers, etc.) of the terms, administration, or performance of this Agreement.

5.    <u>Information From and To Third Persons</u> . Dealership irrevocably and continuously consents to the disclosure of all types and kinds of information in any format concerning the Dealership by third persons to each of the Ally Parties and by each of the Ally Parties to third persons, including regulators of either Ally Party, and the obtaining of information by each of the Ally Parties from third persons, including, by way of example, credit, financial, and business information, whether of direct actual experience or obtained from other sources. The exchange of information is limited to persons having an ownership, business, financial, audit, official, credit, trade, suretyship, lending, legal, regulatory, supervisory, or other suitable reason to have or know the information. Each of the Ally Parties may, but is not required to, report to others on its credit relationship with Dealership and Dealership acknowledges that though each of the Ally Parties will endeavor to ensure the accuracy of such reports, neither of the Ally Parties has any liability and is exculpated from any liability for any inaccuracy in its reports, unless provided by such Ally Party in a grossly negligent manner.

J.    <u>Default</u> . Notwithstanding and without regard to the provisions of Section III.I. above, in the event of Default by Dealership, then either or both of the Ally Parties may exercise any one or more of the following provisional rights and remedies in addition to those otherwise provided by law. These provisional rights and remedies are cumulative and not alternative, are non-exclusive, and may be enforced successively or concurrently. The single or partial exercise of any right or remedy does not waive or exhaust any other rights or remedies or waive any present or future Default of any kind. Unless and until a Default is completely remedied to the Ally Parties' satisfaction:

1.    <u>Demand</u> . Either or both of the Ally Parties may demand immediate payment in full of all Obligations owed by Dealership to such Ally Party(ies).

2.    <u>Repossession of Collateral</u> . Either or both of the Ally Parties may take immediate possession of the Collateral, without demand, further notice to or consent of Dealership, and with or without legal process. Upon request by either or both of the Ally Parties, Dealership must assemble the Collateral and make it available to such Ally Party(ies) at a reasonably convenient place designated by such Ally Party(ies), including the Dealership premises. Dealership irrevocably authorizes and empowers each of the Ally Parties and their agents to enter upon the premises where the Collateral is located and remove it or render portions of it unusable ("Collateral Recovery"). Dealership irrevocably waives any bonds, surety, or security which may be required by any rule, law, or procedure in connection with Collateral Recovery.

21

3.    Suit at Law or in Equity . Either or both of the Ally Parties may institute proceedings in a proper court of law or equity to enforce any and all provisional remedies such Ally Party(ies) have at law or equity, including injunctive relief and action for possession of Collateral, an order for accounting, appointment of a receiver or examiner, or the like. Either or both of the Ally Parties may apply for and have granted any equitable or other legal relief appropriate to enforce any right or remedy including specific performance and the issuance of any ex parte preliminary injunction to protect the Collateral.

4.    Refrain from Disposition . Upon request by either or both of the Ally Parties, Dealership will not sell, lease, or otherwise dispose of any Vehicles or other Collateral without the prior written consent of each of the Ally Parties.

5.    Turnover of All Proceeds . All amounts received by Dealership upon the sale, lease, or other disposition of any Vehicle must be paid to the Ally Parties even if it exceeds the specific amount for which the Ally Parties provided Inventory Financing for that Vehicle. Payments may be applied by the Ally Parties to the Obligations, as determined by the Ally Parties, unless otherwise required by law.

6.    Direct Collection of Collateral . Either or both of the Ally Parties may make direct collection of any Collateral in the possession or control of any third party, including, but not limited to, chattel paper, accounts, accounts with Vehicle Sellers, instruments, and proceeds.

7.    Disposition of Collateral . Following total or partial Collateral Recovery, either or both of the Ally Parties may sell, lease, or otherwise dispose of all or any portion of the Collateral not less than ten (10) calendar days after giving Dealership written notice of the public or private sale or as permitted by law which it proposes for the account of Dealership. The sale of Vehicles at an auction at which only other dealers or Vehicle Sellers are generally invited to attend is deemed to be a "private sale."

8.    "Commercially Reasonable" Defined . Any of the following, nonexclusive, methods of Collateral disposition is deemed "commercially reasonable" in accordance with Article 9 of the Uniform Commercial Code:

(a)    repurchase of any Vehicle, parts, or accessories manufactured by the original Vehicle Seller pursuant to the terms of a repurchase agreement between such Ally Party and Vehicle Seller;

(b)    sale of any parts or accessories to the highest bidder in an auction sale, in lieu of a sale to a Vehicle Seller pursuant to a repurchase agreement, where the proceeds to either or both of the Ally Parties are reasonably believed to be higher than they would be under the repurchase agreement;

(c)    sale to the highest cash bid from dealers in the type of property repossessed, whether in bulk or parcels; and

22

(d)   sale at any physical or virtual auction, including SmartAuction, at which only dealers of multiple or single Vehicle manufacturer are generally invited to attend.

9.   <u>Deficiency</u> . Dealership must fully and promptly pay to each of the Ally Parties any deficiency remaining after disposition of the Collateral, except to the extent expressly modified by each of the Ally Parties in writing.

10.   <u>Limited Power of Attorney</u> . Dealership hereby irrevocably appoints each Bank and Ally, acting through any of their respective officers and employees, its true and lawful attorney for and in its name, stead, and behalf as if fully done by Dealership, to sign, endorse, execute, negotiate, compromise, settle, complete, and deliver:

(a)   any invoice, bill of sale, certificate of title, manufacturer's certificate of origin, application, and any other instrument or document pertaining to title or ownership or the transference thereof of any Collateral;

(b)   any financing statement, notice, filing, or document pertaining to the enforcement of the Security Interest in Collateral; and

(c)   any check, draft, certificate of deposit, credit voucher, or any other medium of payment, insurance claims, proof of loss, instrument, or document pertaining to or proceeds of any Collateral;

This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

11.   <u>Default Rate of Interest</u> . To the extent permitted by law, each of the Ally Parties may immediately assess a default rate of Interest up to the current rate of Interest plus five percent (5%).

12.   <u>Duty of Care</u> . Neither of the Ally Parties has any duty as to the collection or protection of Collateral, nor as to the preservation of any rights pertaining to it, except for the use of reasonable care in the custody and preservation of the Collateral when in the possession of such Ally Party.

K.   <u>Additional Provisions</u> .

1.   <u>Authenticity and Authority</u> . Each of the Ally Parties may rely and act upon any form of communication purportedly sent by Dealership as the authentic and duly authorized act of Dealership, in the implementation or furtherance of the purposes of this Agreement, whether by electronic, computer, telegraphic, facsimile, telephonic, personal or paper delivery, transmission, or otherwise; provided such Ally Party:

23

(a)     acts in good faith;

(b)     has no actual knowledge of information to the contrary; and

(c)     the practice is customary with dealers generally or Dealership specifically.

The Ally Parties have no obligation to scrutinize, inquire, or confirm any communication.

2.     <u>Written Waivers Only</u> . A waiver, release, estoppel, or defense of any provision of this Agreement is effective only if it is in writing signed by the party sought to be bound by it.

    (a)     No course of dealing nor the delay or failure of either or both of the Ally Parties to enforce any right or remedy, in whole or in part, to demand payment or to declare an event of Default under this Agreement will:

        (i)     alter or affect any of Dealership's obligations or such Ally Party's(ies') rights and remedies; or

        (ii)     operate as a waiver, release, estoppel, or defense thereof.

    (b)     Any notice to or demand on Dealership by either or both of the Ally Parties in any event not specifically required under this Agreement does not entitle Dealership to any other or further notice or demand in the same, similar, or other circumstances unless specifically required by this Agreement.

    (c)     There can be no waiver of this Subsection III.K.2., except in writing signed by the party against whom the alleged waiver is asserted. Reliance by any party on an oral representation will be deemed unreasonable.

3.     <u>Assignment</u> . Dealership must not assign or cause the transfer of any duties or obligations under this Agreement without the express prior written consent of each of the Ally Parties. Each of the Ally Parties may freely assign its rights, duties and obligations under this Agreement, so long as the assignee(s) assumes all obligations under this Agreement.

4.     <u>Amendments</u> . No amendment of any provision of this Agreement is effective without the written, signed agreement of Dealership and the Ally Parties.

5.     <u>Use of Tracking Devices</u> . If Dealership decides, in its sole discretion, to acquire internet accessible reporting with respect to any tracking device in or on any Vehicle used in order to locate the Vehicle, subject to applicable law, Dealership will provide Bank with access to such reporting.

24

6.    <u>Definitions and Word Meanings</u> . The word "may" or any other term in this Agreement signifying a permissive, elective, or optional right of a party to act or decide, or to refuse to act or decide, will mean and be construed as providing the complete and absolute prerogative of that party to do so in its sole, unfettered discretion. The word "will" is a mandatory word denoting an obligation to pay or perform. Otherwise, unless the context otherwise clearly requires, the terms used in this Agreement must be given the meaning ascribed to them in accordance with the capitalized definitions established throughout this Agreement; the Uniform Commercial Code, as amended from time to time; and common and ordinary usage in law and commercial practice, respectively.

7.    <u>Section Captions</u> . The captions inserted at the beginning of each article, section, and subsection are for convenience only and do not limit, enlarge, modify, explain, or define the text thereof nor affect the construction or interpretation of this Agreement.

8.    <u>Effective</u> . This Agreement substitutes and supersedes any previously executed agreement between Dealership and either or both of the Ally Parties concerning wholesale inventory floor plan finance accommodations and will govern Dealership's inventory floor plan finance indebtedness to each of the Ally Parties now outstanding under any prior agreement (e.g., Wholesale Security Agreement, Bank or Ally Form 178 and all amendments to it) or incurred under this Agreement. This Agreement is not a novation or transformation of any prior obligation but merely restates and substitutes for any prior agreement related to inventory floor plan finance accommodations.

9.    <u>Termination</u> . This Agreement is effective until terminated upon the earlier of: Day 364 (or such subsequent anniversaries of that date for which the Ally Parties have granted a commitment extension pursuant to Section III.A.2(a)) of the effective date of this Agreement; an event of Default, at the non-defaulting party's option exercised by sending written notice of termination to the defaulting party; or the parties mutually agree in writing to terminate the Agreement. Termination will not relieve any party from any duty or obligation incurred, or right, waiver, modification, or benefit bestowed, prior to the effective date of the termination.

10.    <u>Binding</u> . This Agreement is binding on Bank, Ally and Dealership and their respective successors, administrators, and assigns.

11.    <u>No Third Party Beneficiary</u> . Except as outlined in Section III.D, no Vehicle Seller or any person (other than Bank, Ally and Dealership) may rely on this Agreement or any term or provision contained in this Agreement.

12.    <u>Severability</u> . Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.

<center>25</center>

13.   Notice . Any notice required to be given by this Agreement or by law is deemed reasonably and properly given if sent to the other party within the time frame set forth in this Agreement, but in any event no less than ten (10) calendar days, at the address set forth in Section I. above by any one of the following nonexclusive methods:

(a)      United States certified, registered, or first class mail, postage prepaid;

(b)      Use of a commercially recognized express delivery service;

(c)      Electronic mail or facsimile transmission; or

(d)      Personal delivery.

14.   Separate Credit Accommodations . Despite the fact that Ally may be acting as a servicer or agent on behalf of Bank, Dealership recognizes that Ally and Bank are providing separate credit accommodations to Dealership with the terms consolidated in a single document and credit line for the convenience of the parties. Bank is not responsible for the performance or conduct of Ally and Ally is not responsible for the performance or conduct of Bank. Dealership shall not assert against Bank any claim, defense or set-off relating to Ally and Dealership will not assert against Ally any claim, defense or set-off relating to Bank. This Agreement does not create any rights and obligations between Ally and Bank.

15.   Time of the Essence . Time is of the essence as to this Agreement. There is no grace period, right to cure, or other indulgence provided in the terms and conditions of this Agreement unless expressly provided for in this Agreement or in a separate writing signed by the party against whom it is asserted.

16.   Entire Agreement . This document amends and restates the Inventory Financing and Security Agreement, dated as of October 17, 2014, and, as amended and restated, contains the entire agreement of Bank, Ally and Dealership concerning the subject matter set forth herein. There are no other oral or implied agreements, understandings, or representations between them. Dealership has not relied on any statement, promise, or representation made by anyone connected with Bank or Ally, except as provided in this Agreement or any related document.

17.   No Interpretive Presumptions . The language in this Agreement will be construed according to the fair and usual meaning of the language and will not be strictly construed for or against either party.

18.   Continued Cooperation . Dealership will execute and deliver to each of the Ally Parties any and all documents, notices, instruments, and other writings and perform all acts necessary and appropriate to fully implement the terms and conditions of this Agreement. Dealership hereby irrevocably appoints each Bank and Ally, acting through any of their officers and employees, its true and lawful attorney for and in its name, stead and behalf as if fully done by Dealership to execute, complete and deliver any other document, instrument, or agreement in connection with this Agreement to supply any omitted information and correct any patent errors in any of them. This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

26

19. <u>Use of Pronouns</u> . All personal pronouns, whether used in the masculine, feminine or neuter gender, will include all other genders; the singular will include plural, and the plural will include the singular.

20. <u>Counterparts</u> . This Agreement may be signed in counterparts, each of which is deemed an original and all of which taken together constitute one and the same agreement. Any electronically placed or delivered (e.g., via fax or email) signatures of the parties constitute and are deemed original signatures for all purposes.

**Ally Bank**

By:  /s/ Stephen B. Joseph

Print Name:    Stephen B. Joseph

Title:   Asst. Secy.

Date:   7/27/2015

**Ally Financial**

By:  /s/ Stephen B. Joseph

Print Name:    Stephen B. Joseph

Title:   Asst. Secy.

Date:  7/27/2015

**Carvana, LLC**

By:  /s/ Ernie Garcia

Print Name:    Ernie Garcia

Title:   CEO

Date:   7/27/2015

27

**AMENDMENT TO AMENDED AND RESTATED INVENTORY FINANCING AND SECURITY AGREEMENT**

I. <u>THE PARTIES TO THIS AGREEMENT</u>

This Amendment to Amended and Restated Inventory Financing and Security Agreement ("Agreement") is effective as of <u>12/30/2015</u>, and is made by and among the following parties:

A.    Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah chartered state bank ("Bank"), with its principal executive offices located at 6985 Union Park Center, Midvale, Utah 84047; and

B.    Ally Financial, a Delaware entity ("Ally''") with a local business office currently located at 5208 Tennyson Parkway, Suite 120, Plano, TX 75024 (together with Bank, the "Ally Parties" and Bank and Ally each being, an "Ally Party"); and

C.    Carvana, LLC, an Arizona limited liability company, with its principal executive office currently located at 4020 East Indian School Road, Phoenix, AZ 85018 ("Dealership").

II. <u>THE RECITALS</u>

The essential facts relied on by Bank, Ally and Dealership as true and complete, and giving rise to this Agreement, are as follows:

A.    The Ally Parties and the Dealership are parties to an Amended and Restated Inventory Financing and Security Agreement, effective as of July 27, 2015, as this agreement may have been amended from time to time, including by the letter agreement dated <u>12/30/2015</u>, by and among each of the Ally Parties, the Dealership, Ernest C. Garcia II and 2014 Fidel Family Trust dated June 16, 2014 (the "IFSA").

B.    The parties to this Agreement desire to amend the IFSA as outlined in this Agreement.

III. <u>THE AGREEMENT</u>

In consideration of the premises and the mutual promises in this Agreement, which are acknowledged to be sufficient, Bank, Ally and Dealership agree to the following:

A.    Capitalized words used, but not defined, in this Agreement have the meanings given to them in the IFSA.

B.    Section III.A.3. of the IFSA is amended and restated in its entirety as follows:

<u>Amount of the Credit Line</u>. The aggregate amount of credit available pursuant to this Agreement (the "Credit Line") is $125,000,000.00.

C.    Section III.G.6. of the IFSA is amended and restated in its entirety as follows:

Maintain a minimum net worth of at least $30,000,000.00.

D.    In connection with the Dealership's request to extend their commitment to provide financing, each of the Ally Parties commits to provide Inventory Financing to Dealership until the 364 th calendar day (inclusive) from the effective date of this Agreement ("Revised Day 364"). At least 45 calendar days before Revised Day 364, Dealership may request the Ally Parties to extend this commitment by an additional 364 calendar day period, and the Ally Parties, in their sole discretion, may extend this commitment by an additional 364 day period. If the Ally Parties extend this commitment by an additional 364 day period, then, at least 45 calendar days before the second anniversary of Revised Day 364, Dealership may request the Ally Parties to extend this commitment by an additional 364- day period, and the Ally Parties may, in their sole discretion, extend this commitment by an additional 364-day period.

E.    The IFSA is effective until terminated upon the earlier of: Revised Day 364 (or such subsequent anniversaries of that date for which the Ally Parties have granted a commitment extension pursuant to Section III.A.2(a)) of the effective date of this Agreement; an event of Default, at the non-defaulting party's option exercised by sending written notice of termination to the defaulting party; or the parties mutually agree in writing to terminate the Agreement. Termination will not relieve any party from any duty or obligation incurred, or right, waiver, modification, or benefit bestowed, prior to the effective date of the termination.

F.    Notwithstanding the provisions of Section III.B.7, the Dealership will pay the Ally Parties a commitment fee equal to [***] (Assumes a December 31, 2015 closing date. Subject to change should closing date change).

G.    All other provisions of the IFSA and all other agreements between each of the Ally Parties and the Dealership will remain unchanged and in full force and effect as written.

H.    If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, all other provisions remain valid and enforceable.

I.    This Agreement:

1.    May be modified only by a writing signed by all parties.

2.    May be signed in counterparts, each of which is deemed an original, and all of which taken together constitute one and the same agreement. The signatures of the parties, exchanged via fax or e-mail, shall constitute and be deemed original signatures for all purposes.

---

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

2

3.      Binds and inures to the benefit of the parties' respective successors and assigns.

4.      Constitutes the entire agreement of the parties with respect to its subject matter.

3

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative effective the date first written above

**Ally Bank**

By:  /s/ Stephen B. Gambrel

Print Name:    Stephen B. Gambrel

Title:   Asst Secretary

Date:   12/30/2015

**Ally Financial**

By:  /s/ Stephen B. Gambrel

Print Name:    Stephen B. Gambrel

Title:   Asst Secretary

Date:   12/30/2015

**Carvana, LLC**

By:  /s/ Ernie Garcia

Print Name:    Ernie Garcia

Title:   President

Date:   12/30/15

4

**Exhibit 10.13**

**THIRD AMENDMENT TO**
**AMENDED AND RESTATED INVENTORY FINANCING AND SECURITY AGREEMENT**

I. PARTIES

This Third Amendment to Amended and Restated Inventory Financing and Security Agreement (" Amendment ") is effective as of November 9, and is made by and among the following parties:

A.    Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah chartered state bank (the " Bank "), with its principal executive office located at 6985 Union Park Center, Midvale, Utah 84047; and

B.    Ally Financial, a Delaware entity (" Ally ") with a business office located at 5851 Legacy Circle, Suite 200, Plano, TX 75024 (together with the Bank, the " Ally Parties " and Bank and Ally each being, an " Ally Party "); and

C.    Carvana, LLC, an Arizona limited liability company, with its principal executive office located at 4020 East Indian School Road, Phoenix, AZ 85018 (the " Dealership ")

II. RECITALS

The essential facts relied on by the Bank, Ally and the Dealership as true and complete, and giving rise to this Agreement, are as follows:

A.    The Ally Parties and the Dealership are parties to an Amended and Restated Inventory Financing and Security Agreement, effective as of July 27, 2015, as amended by: (i) a Letter Agreement, dated December 30, 2015, by and among the Ally Parties, the Dealership, Ernest C. Garcia II, and 2014 Fidel Family Trust, and (ii) an Amendment to Amended and Restated Inventory Financing and Security Agreement, effective as of December 30, 2015 (collectively, the " IFSA ").

B.    Under the terms of the IFSA, the Ally Parties committed to provide Inventory Financing through " Revised Day 364 ," which the parties acknowledge is December 28, 2016.

C.    The parties desire to amend the IFSA as outlined in this Amendment.

III. AGREEMENT

In consideration of the premises and the mutual promises in this Amendment, which are acknowledged to be sufficient, the Ally Parties and the Dealership agree to the following:

A.    Capitalized terms used but not defined in this Amendment have the meanings given to them in the IFSA.

B.      in connection with the Dealership's request that the Ally Parties extend their commitment to provide financing, each of the Ally Parties commits to provide Inventory Financing to Dealership until December 27, 2017 (the " New Expiration Date ") (calculated as the 364th calendar day following Revised Day 364). At least 45 calendar days before the New Expiration Date, Dealership may request the Ally Parties extend this commitment by an additional 364 calendar days, and the Ally Parties may, in their sole discretion, so extend the commitment. If the Ally Parties extend the commitment term, then, at least 45 calendar days before the end of such term, the Dealership may request the Ally Parties extend the commitment by an additional 364-day period, and the Ally Parties may, in their sole discretion, further extend the commitment.

C.      Section III.A.3 of the IFSA is amended and restated in its entirety as follows:

>       3.       Amount of the Credit Line . The aggregate amount of the credit available pursuant to this Agreement (the "Credit Line") is $200,000,000.

D.      Dealership will pay the Ally Parties a one-time non-refundable "Commitment Fee" equal to [***] [calculated as [***] of the Credit Line provided under Section III.A.3 above: ($200,000,000 x [***] = [***])], payable on the effective date of this Amendment.

E.      All other provisions of the IFSA remain unchanged and in full force and effect as written. In the event of a conflict between the terms of the IFSA and this Amendment, the terms of this Amendment prevail.

F.      Except as provided above, the IFSA and all other agreements between each of the Ally Parties and the Dealership remain in full force and effect as written.

G.      If any provision of this Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, all other provisions remain valid and enforceable.

H.      This Amendment:

>       a.       May be modified only by a writing signed by all parties.

>       b.       May be signed in counterparts, each of which is deemed an original, and all of which taken together constitute one and the same agreement. The signatures of the parties, exchanged via fax or e-mail, shall constitute and be deemed original signatures for all purposes.

>       c.       Binds and inures to the benefit of the parties and their respective successors and assigns.

>       d.       Constitutes the entire agreement of the parties with respect to its subject matter.

---

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

2

IN WITNESS WHEREOF, each of the parties has caused this Amendment to be executed by its duly authorized representative effective the date first written above

**Ally Bank**

Signature:   /s/ Stephen B. Gambrel

By (Print):   Stephen B. Gambrel

Title:   Asst Secretary

Date:   November 9, 2016

**Ally Financial**

Signature:   /s/ Stephen B. Gambrel

By (Print):   Stephen B. Gambrel

Title:   Asst Secretary

Date:   November 9, 2016

**Carvana, LLC**

Signature:   /s/ Ernie Garcia

By (Print):   Ernie Garcia

Title:   CEO

Date:   11/9/2016

3



Western Regional Business Center
5851 Legacy Circle, Suite 200
Plano, Texas 75024

February 10, 2017

Carvana, LLC
Attn: Kevin Hogan, Corporate Counsel
4020 East Indian School Road
Phoenix, Arizona 85018

Dear Mr. Hogan:

**Re:    Notice of Change in Release Period for Certain Vehicles**

Under the terms of the Amended and Restated Inventory Financing and Security Agreement, dated July 27, 2015 (as amended, the "IFSA"), Carvana, LLC must make payment to the Ally Parties within [***] business days of the date a vehicle is sold. The IFSA also provides that the Ally Parties may, in their sole discretion, permit more time to take into account factors such as delays in the administration, processing and delivery of payments (the "Release Period," as defined in the IFSA). The IFSA further provides that the existence, duration, terms, and continuation of the Release Period are subject to change from time to time by the Ally Parties, and a change in the Release Period does not constitute an amendment of the IFSA.

Consistent with the foregoing, the Ally Parties hereby provide notice that, with respect to vehicles sold by Carvana pursuant to a retail installment contract that becomes subject to the so-called "Part A" or "Part B" credit facilities between the Ally Parties and Carvana and/or its affiliates, Carvana may make payment to the Ally Parties (under IFSA Section III.C.2(a)) on or before the <u>earlier</u> of: [***] business days after the date of sale. In all other circumstances, the Release Period shall remain [***] business days. The Ally Parties reserve the right to adjust, increase or decrease these periods in the future, in their discretion.

Please execute this letter below and return a copy to me to acknowledge Carvana's receipt and understanding of this notice.

ALLY BANK

By: /s/ Stephen Gambrel
Name:   Stephen Gambrel
Title:    Assistant Secretary

**ALLY FINANCIAL**

By: /s/ Stephen Gambrel
Name:   Stephen Gambrel
Title:    Assistant Secretary

<u>Acknowledged by Carvana, LLC:</u>

By: /s/ Paul Breaux
Name:   Paul Breaux
Title:    Vice President

[***]        *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

**Amended September 16, 2016**

**CARVANA GROUP, LLC**
**EQUITY INCENTIVE PLAN**

Carvana Group, LLC, a Delaware limited liability company (the " **Company** "), has adopted this Carvana Group, LLC Equity Incentive Plan (as may be amended from time to time, the " **Plan** "), effective as of March 24, 2015, for the benefit of eligible Employees, non-Employee Officers, Consultants and Directors. The purpose of this Plan is to provide such eligible Employees, non-Employee Officers, Consultants and Directors with an opportunity to participate in the future growth of the Company by offering them equity Awards so as to enhance the ability of the Company and/or its Subsidiaries to attract and retain individuals of exceptional talent to contribute to the sustained progress, growth and profitability of the Company and/or its Subsidiaries.

Pursuant to this Plan, Participants will be granted one or more awards of Class B Common Units (each an " **Award** " and collectively the " **Awards** ") and will thereby become Members of the Company. Class B Common Units so acquired shall be governed by, and will be subject to, the terms and conditions (including, without limitation, the transfer and other restrictions) contained in (a) this Plan, (b) an Equity Award Agreement to be executed by and between the Company and each such Participant (including exhibits thereto), and (c) the Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated as of March 24, 2015 (as amended, amended or restated or replaced from time-to-time, the " **LLC Agreement** ").

**ARTICLE I.**
**DEFINITIONS**

Whenever the following terms are used in this Plan, they shall have the meaning specified below unless the context clearly indicates to the contrary. Any other capitalized terms used in this Plan but not otherwise defined herein shall have their respective meanings set forth in the LLC Agreement. The masculine pronoun shall include the feminine and neuter and the singular shall include the plural, where the context so indicates.

1.1.   C Corporation . " **C Corporation** " shall mean a corporation subject to taxation under Subchapter C of the Code.

1.2.   Carvana . " **Carvana** " shall mean Carvana, LLC, an Arizona limited liability company.

1.3.   Class B Common Units . " **Class B Common Units** " shall mean Class B Common Units in the Company as defined in the LLC Agreement. Class B Common Units may be issued in one or several series, each with its own Participation Threshold.

1.4.   Code . " **Code** " shall mean the Internal Revenue Code of 1986, as amended, or any successor statute or statutes thereto. Reference to any particular Code section shall include any successor section, and any regulations promulgated thereunder.

1.5.   Consultant . " **Consultant** " shall mean any consultant or advisor to the Company, Carvana or its Affiliates (other than as a Director).

1

1.6.    Director . " **Director** " shall mean any director or manager of the Company, Carvana or its Affiliates.

1.7.    Disability . **"Disability"** mean Participant's inability to perform the essential duties, responsibilities and functions of his position with the Company, Carvana or its Affiliates for a period of 90 consecutive days or for a total of 180 days during any 12-month period as a result of any mental or physical illness, disability or incapacity even with reasonable accommodations for such illness, disability or incapacity provided by the Company, Carvana or its Subsidiaries or if providing such accommodations would be unreasonable, all as determined by the Board in its reasonable good faith judgment; provided that if any such Disability would not be a "disability" within the meaning of Code §409A, no payment shall be made hereunder as a result of any such Disability that would be deferred compensation for purposes of Code §409A. Participant shall cooperate in all respects with the Board if a question arises as to whether he or she has become disabled (including, without limitation, submitting to reasonable examinations by one or more medical doctors and other health care specialists selected by the Board and authorizing such medical doctors and other health care specialists to discuss Participant's condition with Carvana and/or its Affiliates).

1.8.    Dispute . " **Dispute** " means any dispute or claim between the Company and any Participant involving or arising under the Plan, any Award or the related Equity Award Unit Agreement, other than any dispute or claim involving or arising under the covenants and agreements set forth in Section 6 of any Equity Award Agreement.

1.9.    Employee . " **Employee** " shall mean an employee, as defined in accordance with Section 3401(c) of the Code) of Carvana or its Affiliates. For avoidance of doubt, in order to be an Employee, an individual must be classified by Carvana or its Affiliates as (i) an employee, (ii) on its U.S. payroll, and (iii) subject to U.S. payroll tax withholdings.

1.10.    Equity Award Agreement . " **Equity Award Agreement** " shall mean any Equity Award Agreement pursuant to which Class B Common Units shall be issued to a Participant under this Plan, and shall be referenced herein as "Equity Award Agreement" or "Award Agreement." An Equity Award Agreement shall be deemed to be an "Equity Agreement" as such term is defined in the LLC Agreement.

1.11.    Equity Securities . " **Equity Securities** " shall mean, as to any Person (i) shares of capital stock, units or other equity interests in such Person, (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into capital stock, units or other equity interests in such Person and (iii) subscriptions, calls, warrants, options or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire, any capital stock, units or other equity interests in such Person.

1.12.    Exchange Act . " **Exchange Act** " shall mean the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto. Reference to any particular Exchange Act section shall include any successor section and any regulations promulgated thereunder.

1.13.    Executive Securities . **"Executive Securities** " means all Class B Common Units, whether vested or unvested, at any time held by Participant. Executive Securities will continue to be Executive Securities in the hands of any holder other than Participant (except for the

2

Company, the Controlling Investors and for transferees in a Public Sale), and except as otherwise provided herein, each such other holder of Executive Securities will succeed to all rights and obligations attributable to Participant as a holder of Executive Securities hereunder. Executive Securities will also include equity of the Company (or a corporate successor to the Company or a Subsidiary of the Company) issued with respect to Executive Securities (i) by way of a unit split, distribution of units, conversion, or other recapitalization, (ii) by way of reorganization or recapitalization of the Company in connection with the incorporation of a corporate successor prior to a Public Offering or (iii) by way of a distribution or transfer of securities of a Subsidiary of the Company to the members of the Company following or with respect to a Public Offering of a Subsidiary of the Company. Notwithstanding the foregoing, all Unvested Units shall remain Unvested Units after any Transfer thereof and shall only become Vested Units thereafter to the extent provided in the Governing Documents.

1.14.    Governing Documents . " **Governing Documents** " shall mean the Plan, the LLC Agreement, the applicable Equity Award Agreement, and any holdback agreement, registration agreement, stockholders agreement, security holders agreement or other document, instrument or agreement relating to the Executive Securities and entered into in connection with a Corporate Conversion or a Public Offering.

1.15.    Officer . " **Officer** " shall mean any officer of the Company, Carvana or its Affiliates.

1.16.    Participant . " **Participant** " shall mean any Employee, non-Employee Officer, Director or Consultant who is selected by the Board of Managers of the Company to receive an Award pursuant to the provisions of Section  3.1 and who executes an Equity Award Agreement pursuant to the provisions of Section  3.2 .

1.17.    Permitted Transferee . " **Permitted Transferee** " shall have the meaning ascribed to such term in the LLC Agreement.

1.18.    Person . " **Person** " shall mean and include an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated organization, a government or any department or agency thereof, or any other entity.

1.19.    Plan . " **Plan** " shall mean this Carvana Group, LLC Equity Incentive Plan, as may be amended from time to time.

1.20.    Rule 16b-3 . " **Rule 16b-3** " shall mean that certain Rule 16b-3 under the Exchange Act, as such rule may be amended from time to time.

1.21.    Substantial Cause . " **Substantial Cause** " means, with respect to a Participant, (a) if such Participant is a party to an employment or other similar agreement entered into by Participant on or after the date hereof and approved by the Board, Substantial Cause will have the meaning given to such term (or similar term) in such agreement or (b), in the absence of such an agreement (or if such agreement does not define such term or a similar term), the Participant's (i) engaging in fraud; (ii) engaging in misconduct or gross negligence leading to material harm to Carvana and/or its Affiliates, including but not limited to conduct that contributed to the need for a material financial restatement by Carvana and/or its Affiliates; (iii) being convicted of, or pleading guilty or no contest to, a felony or crime involving dishonesty or moral turpitude; (iv)

3

the Participant's willful failure to perform the Participant's duties to Carvana or to follow the lawful directives of the Board or any executive to which the Participant reports (other than as a result of death or Disability); or (v) any other material breach of any of the Governing Documents which is not cured to the Board's reasonable satisfaction within 15 days after written notice thereof to Participant. The Company's Board of Managers shall make a good faith determination as to the existence of Substantial Cause, in its sole discretion. If a Participant's Termination of Service occurs for any reason other than termination by Carvana for Substantial Cause, but at a time when the Company's Board of Managers would have determined that Substantial Cause existed, if it had known all relevant facts, then the Participant's Termination of Service shall be treated as a termination by Carvana for Substantial Cause.

1.22.    Termination of Service . " **Termination of Service** " shall mean the cessation for any reason, including death, disability, resignation, retirement or termination with or without Substantial Cause, at any time, of a Participant's employment, services as a director or manager, or engagement as a Consultant to Carvana and/or its Affiliates.

## ARTICLE II.
## PROFITS INTEREST UNITS SUBJECT TO PLAN

2.1.    Amount of Awards Subject to Plan . The Awards that may be granted under this Plan shall be Class B Common Units. Subject to the provisions of Section 5.3 hereof, the maximum aggregate number of Profits Interest Units which may be granted hereunder is 10,000,000 Class B Common Units, subject to increase or decrease in accordance with the LLC Agreement. Class B Common Units granted under this Plan may be subject to time vesting and/or other requirements, as set forth in the Participant's Award Agreement.

2.2.    Add-back . If any Award is forfeited by a Participant, the Class B Common Units covered by such Award may thereafter be awarded or regranted under this Plan, subject to the limitations of Section 2.1 on the total amount of Class B Common Units that may be granted under this Plan.

## ARTICLE III.
## AWARDS

3.1.    Awards .

(a)    The Board of Managers may from time to time, in its sole discretion:

(i)    Select those Employees, non-Employee Officers, Directors or Consultants who in its opinion should receive Awards; and

(ii)    Determine the terms and conditions applicable to such Awards, including provisions for vesting (if any) and forfeiture (if any), consistent with this Plan and with the LLC Agreement.

(b)    Upon the selection of an Employee, non-Employee Officer, Director or Consultant to receive an Award, the Board of Managers shall grant such Award and may impose such conditions on the issuance of such Award as the Board of Managers deems appropriate.

4

3.2.    Equity Award Agreement . Awards shall be issued only pursuant to an Award Agreement, which shall be executed by the Participant and an officer of the Company and which shall contain such terms and conditions as the Board of Managers shall determine in its sole discretion. Upon execution of the Award Agreement, a Participant shall, automatically and without further action on his or her part, be deemed to be a party to, signatory of and bound by the LLC Agreement. At the request of the Board of Managers, such Participant shall execute a joinder to the LLC Agreement or a counterpart signature page thereto. Any Award or Award Agreement under this Plan need not be the same with respect to each Participant.

3.3.    Restrictions on Awards . All Awards issued under this Plan shall be subject to the Governing Documents. The applicable Award Agreement shall contain such additional restrictions as the Board of Managers shall provide (which restrictions may include, without limitation, restrictions concerning vesting, transferability, and forfeiture and repurchase); *provided, however* , that, by action taken in its sole discretion after the Award is issued, the Board of Managers may, on such terms and conditions as it determines to be appropriate, in writing remove any or all of the restrictions imposed by the terms of the Award Agreement.

3.4.    Eligibility . An Award of Class B Common Units may only be issued to a Participant for the performance of services to or for the benefit of the Company (i) in the Participant's capacity as a Member of the Company, (ii) in anticipation of the Participant becoming a Member of the Company, or (iii) as otherwise determined by the Board of Managers, provided that the Class B Common Units would constitute "profits interests" within the meaning of the Code, Treasury Regulations promulgated thereunder and any published guidance by the Internal Revenue Service with respect thereto.

3.5.    Rights as Members . Upon the grant of Awards pursuant to this Plan, the Participant shall have, unless otherwise provided by the Board of Managers, all the rights of a Member holding Class B Common Units with respect to said Awards as provided in the LLC Agreement, subject to the restrictions in his or her Award Agreement. As set forth in the LLC Agreement, the Participants shall not, by virtue of their holding Awards, have the right to influence or control the management or operation of the Company, Carvana or any of their Affiliates.

3.6.    Escrow . The Board of Managers or such other escrow holder as the Board of Managers may appoint shall retain physical custody of each certificate, if any, representing any Executive Securities until all of the restrictions, if any, imposed under the Award Agreement with respect to the Executive Securities expire or shall have been removed.

## ARTICLE IV.
## ADMINISTRATION

4.1.    Powers of Board of Managers . The Board of Managers shall conduct the general administration of this Plan. The Board of Managers shall have the power to interpret this Plan, any Awards granted under this Plan and the Award Agreements pursuant to which Awards are issued, and to adopt such rules for the administration, interpretation, and application of this Plan and to interpret, amend or revoke any such rules. The Board of Managers' interpretation of this Plan, any Awards granted under this Plan, any Award Agreement and all decisions and determinations by the Board of Managers with respect to this Plan, any Awards granted under

5

this Plan and any Award Agreement are final, binding, and conclusive upon all Participants, the Company and all other interested Persons. The Board of Managers may delegate its powers under this Plan to a compensation committee or other committee established by the Board of Managers.

4.2.    Expenses; Liabilities and Good Faith Actions . All expenses and liabilities which members of the Board of Managers incur in connection with the administration of this Plan shall be borne by the Company. No member of the Board of Managers shall be personally liable for any action, determination or interpretation made in good faith with respect to this Plan, including grants of Awards, and all members of the Board of Managers shall be fully protected by the Company in respect of any such action, determination or interpretation.

# ARTICLE V.
## MISCELLANEOUS PROVISIONS

5.1.    Restrictions on Transfer of Awards . Each Award granted to a Participant under this Plan is subject to the terms of the Governing Documents, including, without limitation, the provisions regarding restrictions on Transfer of Units set forth in the LLC Agreement. Any Permitted Transferee of Executive Securities shall take such Executive Securities subject to the terms of the Governing Documents and must, upon the request of the Company, agree to be bound by the Governing Documents, and shall execute documentation to such effect on request, as applicable, and must agree to such other waivers, limitations, and restrictions as Carvana or the Company may reasonably require. Any attempted Transfer of any Executive Securities which is not made in compliance with the Governing Documents shall be null and void and of no effect.

5.2.    Approval, Amendment, Modification and Termination of this Plan .

(a)    Subject to the provisions of the LLC Agreement and applicable law, the Board of Managers may terminate, amend or modify this Plan in its sole discretion. Unless terminated earlier pursuant to the preceding sentence, this Plan will terminate on January 1, 2025. No termination of this Plan shall adversely affect in any material way any outstanding Award that was previously granted under this Plan prior to the termination of this Plan, without the written consent or approval of either (a) the Participant holding such award or (b) the holders of a majority in interest of all Executive Securities awarded and then outstanding under the Plan. No Award may be granted or awarded after termination of this Plan.

(b)    This Plan was adopted by the Company and approved by Majority Controlling Investors.

5.3.    Changes in Capitalization and Other Corporate Events .

(a)    In General . Except in the case of a Change in Control (in which case the provisions of Section 5.3(b) shall apply), and subject to the provisions of the LLC Agreement, in the event that the Board of Managers determines, in its sole discretion, that any dividend or other distribution (whether in the form of cash, additional Class B Common Units, other Equity Securities, or other property), any Capital Contributions, any recapitalization, reclassification, reorganization, change to corporate form, merger, consolidation, split-up, spin-off, combination, repurchase, liquidation, dissolution, or sale, transfer, exchange or other disposition of assets of

6

the Company, or exchange of Executive Securities or other Equity Securities of the Company, issuance of warrants or other rights to purchase Executive Securities or other Equity Securities of the Company, or other similar corporate transaction or event, affects the Executive Securities such that an adjustment is determined by the Board of Managers, in its sole discretion, to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under this Plan or with respect to an Award, then the Board of Managers may, in such manner as it deems appropriate (in its sole discretion), make such adjustments as it deems appropriate (in its sole discretion), including, without limitation, any or all of the following: (i) adjusting the number and type of Executive Securities subject to any outstanding Award; (ii) adjusting the number and type of Executive Securities with respect to which Awards may be granted under this Plan (including, but not limited to, adjustments of the limitations in Section 2.1 on the maximum number and type of Class B Common Units which may be issued); and (iii) substituting for such Executive Securities then subject to an Award the number and type of Units or other Equity Securities of the Company, or of another corporation or entity, into which, or for which, such Executive Securities may be changed or exchanged.

(b)    Change in Control .

(i)    A " **Change in Control** " means that one of the following has occurred:

(1)    Any one Person, or more than one Person acting as a group, acquires beneficial ownership of equity of the Company that, together with equity beneficially owned by such Person or group, constitutes more than fifty percent of the fair market value and total voting power of the equity of the Company.

(2)    Any one Person, or more than one Person acting as a group, acquires beneficial ownership of assets of the Company that, together with assets beneficially owned by such Person or group, constitutes 80% or more of the assets of the Company.

Notwithstanding the foregoing, none of the following events shall constitute a Change in Control: (a) the incorporation of the Company; (b) the re-domiciling of the Company; (c) a transaction in which there is a successor to the Company and the majority holders of equity and voting power of the Company immediately prior to the transaction hold a majority ownership of equity and voting power in the successor immediately after the transaction, directly, indirectly, or beneficially; (d) a transaction in which a Person who already owns at least fifty percent of the Company's equity or assets acquires additional equity or assets, directly, indirectly, or beneficially; (e) the acquisition of additional equity or assets of the Company or its Subsidiaries by Ernest C. Garcia II, Mr. Garcia's spouse, Mr. Garcia's son and/or trusts for the benefit of heirs of Mr. Garcia, directly, indirectly, or beneficially; and (f) the passing of ownership of equity or assets of the Company or its Subsidiaries, in whole or part, from, to, or between Mr. Garcia, Mr. Garcia's spouse, Mr. Garcia's son, and/or trusts for the benefit of heirs of Mr. Garcia.

(ii)    In the event of a Change in Control, the Board of Managers may provide, in its sole discretion, either by the terms of an agreement relating to such Change in Control or by action taken prior to the occurrence of such Change in Control:

(1)    To the extent that any Executive Securities are Vested Units, for the Participant holding such Vested Units to receive an amount of cash, or other rights, Equity Securities or property selected by the Board of Managers in its sole discretion, or a

7

combination thereof, equivalent to the amount such Vested Units is entitled to receive in connection with distributions made by the Company pursuant to such Change in Control, and such Vested Units thereafter shall terminate.

(2)    To the extent that any Executive Securities are Unvested Units, for assumption, substitution, or continuation of such Unvested Units by the successor entity in such Change in Control transaction (which may be the Company), in its sole discretion, to the extent that such assumption, substitution, or continuation does not result in a violation of Section 409A of the Code. Upon assumption, the successor entity may, in its sole discretion, elect to terminate such Unvested Units and provide to the Participant the fair market value thereof. To the extent that the successor entity does not assume, substitute, or continue such Unvested Units, the Board of Managers shall have the option, in its sole discretion, to arrange for (i) termination of such Unvested Units in exchange for fair market value or (ii) termination of such Unvested \Units and forfeiture to the Company without any further action.

(c)    <u>Conversion to C Corporation</u> . Any conversion of the Company and/or its Subsidiaries to a C Corporation shall be completed in accordance with the terms and conditions of the LLC Agreement.

(d)    <u>Initial Public Offering</u> . In the event that the Company completes an Initial Public Offering (" **IPO** "), to the extent that any Executive Securities remain Unvested Units (or, if the Company previously has converted to a C Corporation at the time of such IPO, to the extent that unvested or restricted awards or securities previously converted from Class B Common Units under this Plan remain unvested (" **Converted Unvested Award** ")), such Award or Converted Unvested Award shall not, unless otherwise permitted by the Board of Managers in its sole discretion, vest upon completion of such IPO.

(e)    <u>Discretion Regarding Further Provisions and Restrictions</u> . The Board of Managers may, in its sole discretion, include such further provisions and restrictions, or remove such provisions or restrictions, in any Award, as it may deem appropriate and in the best interests of the Company to effectuate the intent of this Section 5.3.

5.4.    <u>No Rights to Award</u> . No Participant, Employee or other Person shall have any claim to be granted any Award under this Plan, and neither the Board of Managers of the Company, Carvana nor any of their Affiliates is obligated to treat Participants, Employees, and other Persons uniformly.

5.5.    <u>Tax Withholding</u> . The Company (or any Affiliate of the Company) shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, and local taxes required by law to be withheld with respect to any Award or any taxable event relating to or arising from any Award, this Plan or any Award Agreement.

5.6.    <u>No Right to Employment</u> . The Plan is not a contract of employment. Unless an Award Agreement or employment agreement with Carvana or any of its Affiliates provides otherwise, a Participant's employment is "at will" (meaning that either Participant or Carvana (or

8

applicable Affiliate) may terminate the employment relationship at any time for any reason, with or without notice), and nothing in the Governing Documents shall change this at-will relationship. A Participant's at-will status may only be changed by a written agreement signed by Participant and Carvana (or applicable Affiliate) expressly stating this at-will relationship is being modified.

5.7.    Unfunded Status of Awards . With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in this Plan or any Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company, or any of its Affiliates.

5.8.    Indemnification . To the extent allowable under applicable law and the LLC Agreement, each Manager shall be indemnified and held harmless by the Company from any loss, claim, damage, cost, liability, or expense that may be imposed upon or reasonably incurred by such Manager in connection with or resulting from any claim, action, suit, or proceeding to which such Manager may be a party or in which such Manager may be involved by reason of any action or failure to act under this Plan performed or omitted by such Manager in good faith on behalf of the Company or any of its Affiliates and in a manner reasonably believed to be within the scope of authority conferred on such Manager under this Plan and the LLC Agreement. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such Managers may be entitled under the LLC Agreement, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

5.9.    Relationship to Other Benefits . The adoption of this Plan shall not affect any other compensation or incentive plans in effect for Carvana, the Company, or any Affiliate. Nothing in this Plan shall be construed to limit the right of Carvana or the Company (a) to establish any other forms of incentives or compensation for Employees, non-Employee, Officers, Directors or Consultants or (b) to grant or assume Units or other rights or interests other than under this Plan.

5.10.    Compliance with Laws . This Plan, the granting and vesting of Awards under this Plan, the issuance and delivery of Executive Securities pursuant to the Awards, and the payment of money and other benefits under this Plan or under the Awards granted hereunder are subject to compliance with all applicable federal and state laws, rules and regulations (including, but not limited to, state and federal securities law and federal margin requirements) and to such approvals by any listing, regulatory or governmental authority as the Company may, in its sole discretion, deem necessary or desirable in connection therewith. Any Equity Securities delivered under this Plan shall be subject to such restrictions, and the Person acquiring such Equity Securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may, in its sole discretion, deem necessary or desirable to assure compliance with all applicable legal requirements. the Company shall be under no obligation to register under the Securities Act of 1933, as amended, or any other securities laws any of the Units or other securities issued under this Plan. If any of the securities issued under this Plan may in certain circumstances be exempt from registration under such Act, the Company may restrict the transfer of such securities in such manner as it deems advisable to ensure the availability of any such exemption.

5.11.    Section 16 Compliance . With respect to any person who is, on the relevant date, obligated to file reports under Section 16 of the Exchange Act, transactions under this Plan are

9

intended to comply with all applicable conditions of Rule 16b-3, or its successors under such Act. To the extent any provision of this Plan or action by the Board of Managers fails to so comply, it shall be void to the extent permitted by law and voidable as deemed necessary or desirable by the Board of Managers.

5.12.    Expenses . The expenses of administering this Plan shall be borne by the Company.

5.13.    Titles and Headings . The titles and headings of the sections in this Plan are for convenience of reference only, and in the event of any conflict, the text of this Plan, rather than such titles or headings, shall control.

5.14.    LLC Agreement . In the event of any conflict or inconsistency between the provisions of this Plan or any Award Agreement and the provisions of the LLC Agreement, the provisions of the LLC Agreement shall govern and take precedence over the provisions of this Plan or such Award Agreement.

5.15.    Governing Law . This Plan and all Award Agreements and any other agreement hereunder shall be construed in accordance with and governed by the laws of the State of Delaware (regardless of the laws that might otherwise apply under applicable principles of conflicts of laws).

5.16.    Section 409A . No Award is intended to constitute or provide for "nonqualified deferred compensation" within the meaning of Section 409A of the Code, and, provided that Section 409A of the Code, Treasury Regulations and related Department of Treasury guidance do not require otherwise, neither Carvana nor the Company shall treat any Award as nonqualified deferred compensation. Notwithstanding any provision of this Plan to the contrary, in the event that following the effective date hereof the Board of Managers determines that any Award may be subject to Section 409A of the Code and related Department of Treasury guidance (including such Department of Treasury guidance as may be issued after the effective date hereof), the Board of Managers may (but shall not be required to) adopt such amendments to the Plan and the applicable Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Board of Managers determines are necessary or appropriate to (a) exempt the Award from Section 409A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance. To the extent any right acquired by a Participant under the Plan would otherwise result in adverse tax consequences under Section 409A of the Code, such right shall retroactively lapse to the date of grant and shall remain so lapsed unless the Company takes action contemplated above in this Section 5.16. Notwithstanding any other provision of the Plan, neither the Company nor Carvana (1) shall have any obligation to indemnify or hold harmless any Person against any taxes (or any interest or penalties thereon) attributable to the transfer, ownership, exercise, or disposition of, or any other transaction involving, Awards or Executive Securities (including, without limitation, as the result of the application of Section 409A), or (2) represents or warrants any particular tax outcome for any Participant with respect to any Award or Executive Securities.

10

5.17.    Arbitration . If a Participant and the Company are unable to resolve a Dispute by negotiation in a timely manner (which, in any case, shall not exceed 60 days from the first written notice of a Dispute from one party to the other), either Participant or the Company may, by written notice to the other person, require that the Dispute be resolved through final, binding arbitration held in Phoenix, Arizona, before a single arbitrator in accordance with the CPR Rules for Non-Administered Arbitration in effect as of such date. Unless otherwise agreed, Participant and the Company shall jointly select the arbitrator from the CPR Panels of Distinguished Neutrals based on a list of arbitrator candidates supplied by the CPR Institute. If, within 14 days after written notice of requirement for arbitration under this Section 5.17, Participant and the Company have not reached agreement on the selection of an arbitrator, the arbitrator shall be selected in accordance with the CPR Rules for Non-Administered Arbitration in effect as of such date. The Arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any award of the arbitrator shall be final, conclusive and binding on Participant and the Company; provided , however that Participant or the Company may seek to vacate, modify or correct the arbitrator's decision or award as provided under Section 10 and Section 11 of the Federal Arbitration Act. The arbitrator shall be bound to follow the laws of the State of Arizona, decisional and statutory, in reaching any decision and making any award and shall deliver a written award, including written findings of fact and conclusions of law, with respect to the Dispute to each of Participant and the Company, who shall promptly act in accordance therewith. In no event shall the arbitrator have the power to award damages in connection with any dispute in excess of actual compensatory damages. In particular, the arbitrator may not multiply actual damages or award consequential, indirect, special or punitive damages, including damages for lost profits or loss of business opportunity. Participant or the Company may enforce any award rendered pursuant to the arbitration provisions of this Section 5.17 by bringing suit in any court of competent jurisdiction. All costs and expenses attributable to the arbitrator shall be allocated between Participant and the Company in such manner as the arbitrator determines to be appropriate under the circumstances. Any references in any Equity Award Agreement to the arbitration provisions in Section 15.19 of the LLC Agreement shall be deemed to be amended to refer to this Section 5.17.

5.18.    Protected Rights . Participant understands that nothing in this Plan or any Equity Award Agreement limits Participant's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission (" **Government Agencies** "). Participant further understands that nothing in this Plan or any Equity Award Agreement limits (1) Participant's ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company, or (2) Participant's right to receive an award for information provided to any Government Agency. In addition, 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Plan or any Equity Award Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are

11

expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this have the right to disclose in confidence trade secrets to Government Agencies, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

12

**CARVANA GROUP, LLC**
**FORM OF EQUITY AWARD AGREEMENT**

THIS EQUITY AWARD AGREEMENT (this " **Agreement** ") is made and entered into as of [          , 201[]] (the " **Effective Date** "), by and between Carvana Group, LLC, a Delaware limited liability company (the " **Company** "), and [          ] (" **Participant** "). Capitalized terms used in this Agreement but not otherwise defined herein shall have their respective meanings set forth in the Plan and the LLC Agreement (each as defined below), as applicable.

THE PARTIES HERETO AGREE AS FOLLOWS:

1.    Issuance of Award . In consideration of Participant's agreement to provide services to or for the benefit of the Company, effective as of the Effective Date, the Company hereby issues to Participant [          ] Series 2 Class B Common Units of the Company (the " **Units** "), in each case on the terms and conditions set forth in this Agreement, the LLC Agreement and the Plan. The purchase price for such Units shall be zero dollars ($0.00).

2.    Participation Threshold . The Participation Threshold for the Units shall be $ [          ] per Unit.

3.    Acknowledgement . Participant acknowledges that Participant is already a member of the Company and a party to and bound by the terms and conditions of the LLC Agreement, as well as the terms and conditions of any prior Equity Award Agreement by and between Participant and the Company.

4.    Vesting; Restrictions on Transfer of Awards; Governing Documents; Transition Period .

4.1    Vesting . The Units vest over time and, subject to the last paragraph of this Section 4.1, shall vest as follows:

(a)    20% of the Units shall vest on [          ], 2016 (the " **Vesting Start Date** "), so long as a Termination of Service with respect to Participant has not occurred prior to such Vesting Start Date, and

(b)    thereafter, $1\,2/3$ % the Units shall vest on the first day of each month after the Vesting Start Date, in each case so long as a Termination of Service with respect to Participant has not occurred prior to each such first day of the month.

Notwithstanding the foregoing, and subject to Section 4.4 below, upon the occurrence of a Sale Transaction (as defined in the LLC Agreement), all Unvested Units shall become Vested Units as of the date of consummation of such Sale Transaction if a Termination of Service with respect to Participant has not occurred prior to such date.

4.2    Governing Documents . The Units are subject to the terms of the Governing Documents, including, without limitation, the provisions set forth in the LLC Agreement regarding restrictions on Transfer of Units. Participant shall be deemed to be a

" **Management Investor** " as such term is defined in the LLC Agreement, and all of the Units and Participant's status as a Management Investor shall be subject to the terms and conditions of the LLC Agreement. All Units are deemed to be Executive Securities as defined in the Plan.

4.3    Transfers and Transferees . Any Permitted Transferee of the Units shall take such Executive Securities subject to the terms of the Governing Documents and must, upon the request of the Company, agree to be bound by the Governing Documents, and shall execute documentation to such effect on request, as applicable, and must agree to such other waivers, limitations, and restrictions as the Company may reasonably require. Any Transfer of the Executive Securities which is not made in compliance with the Governing Documents shall be null and void and of no effect.

4.4    Transition Period Upon Sale Transaction . Notwithstanding anything in the Plan, in the case of a Sale Transaction (as defined in the LLC Agreement), Participant agrees that, if the Person who is acquiring the equity securities or assets of the Company resulting in such Sale Transaction (the " **Acquiror** ") requests that a Participant continue to provide any services to the Acquiror, the Company or any of their respective Affiliates from and after the consummation of the Sale Transaction (whether as a full-time employee, consultant or otherwise), for a period of not greater than 12 months (the " **Transition Period** "), then (a) such holder will agree to continue in his or her role for the Transition Period; provided that the Acquiror agrees to provide base salary, bonus opportunity and fringe benefits (other than equity-based compensation) (collectively, the " **Post-Sale Compensation** ") at least as generous as those in place immediately prior to such Sale Transaction (excluding any equity-based compensation) and (b) the Continuing Incentive Amount (which shall be withheld from the proceeds otherwise to be received by such Participant in respect of Participant's Units) shall be handled as follows (in lieu of being paid to Participant and/or his or her Permitted Transferee(s)):

(a)    if Participant declines to provide such requested services, the Continuing Incentive Amount shall be paid to the holders of Class A Common Units as of immediately prior to the consummation of such Sale Transaction (pro rata among such holders based on the number of Class A Common Units then owned by each such holder), and, thereafter, neither Participant nor his or her Permitted Transferee(s) shall have any rights in respect of or other claims on such amounts (other than his or her status as a holder of Units); or

(b)    if Participant agrees to provide such requested services, the Continuing Incentive Amount shall be deposited into an escrow account with an escrow agent designated by the Company, and the Continuing Incentive Amount shall be handled as follows:

(1)    if Participant provides such requested services from and after consummation of the Sale Transaction through the earliest of (w) the date on which Acquiror reduces Participant's Post-Sale Compensation below the base salary, bonus opportunity, and fringe benefits provided to Participant by Carvana or its Affiliates immediately prior to such Sale Transaction (excluding any equity-based compensation), (x) the date on which the Acquiror terminates such services (other than with cause), (y) Participant's death or Disability, and (z) the last day of the Transition Period (the earliest of (w), (x), (y) and (z), the " **Final Vesting Date** "), then the Continuing Incentive Amount, together with any income earned thereon, shall be released to Participant and/or his or her Permitted Transferee(s), as applicable, within five (5) business days after the Final Vesting Date; or

2

(2)  if Participant fails to provide such requested services from and after the consummation of the Sale Transaction through the Final Vesting Date, then the Continuing Incentive Amount, together with any income earned thereon, shall be paid to the holders of Class A Common Units as of immediately prior to the consummation of such Sale Transaction (pro rata among such holders based on the number of Class A Common Units then owned by each such holder), and, thereafter, neither Participant nor his or her Permitted Transferee(s) shall have any rights in respect of or other claims on such amounts (other than his or her status as a holder of Units).

(c)  For purposes of this Agreement, " **Continuing Incentive Amount** " means all consideration to which a Participant and, to the extent necessary, his or her Permitted Transferee(s) are otherwise entitled in connection with such Sale Transaction in respect of the number of Participant's Unvested Units that vested pursuant to the last sentence of Section 4.1 above as a result of such Sale Transaction.

5.  Forfeiture and Repurchase .

5.1  Forfeiture . In the event of a Termination of Service, (i) each Unvested Unit and any other Executive Securities issued with respect to such Unvested Unit, if any, will be automatically forfeited as of the date of such Termination of Service for no consideration and (ii) if such Termination of Service was with Substantial Cause, then each Vested Unit and any other Executive Securities issued with respect to such Vested Unit, if any, will also be automatically forfeited as of the date of such Termination of Service for no consideration. For any Unit or other Executive Security that is forfeited, Participant will immediately return to the Company any unit (or other similar) certificates evidencing any such unit or securities (to the extent not held by the Company).

5.2  Events Giving Rise to Repurchase Right . In the event of a Termination of Service (other than a Termination of Service with Substantial Cause, which shall be subject to Section  5.1 above), the Vested Units and other Executive Securities issued with respect to such Vested Units, if any (the " **Other Executive Securities** ") (whether held by Participant or one or more of Participant's Transferees, other than the Company and any Member holding Class A Common Units) will be subject to repurchase, in each case, by the Company and Members holding Class A Common Units pursuant to the terms and conditions set forth in this Section  5 (the " **Repurchase Option** "). Members of the Company holding Class A Common Units may assign their repurchase rights set forth in this Section  5 to any Person.

5.3  Company Repurchase Right . In the event of a Termination of Service other than for Substantial Cause, the Company may elect to purchase all or any portion of the Vested Units and Other Executive Securities pursuant to this Section  5 by delivering written notice (a " **Company Repurchase Notice** ") to the holder or holders of such securities within a period of seven months after the date of the Termination of Service (such period, a " **Repurchase Option Period** "). Any Company Repurchase Notice will set forth the number and type of Vested Units and Other Executive Securities to be acquired from each holder, the aggregate consideration to be paid for such Vested Units and Other Executive Securities and the time and place for the closing of the transaction.

3

5.4     Class A Common Unit Member Repurchase Right . If for any reason the Company does not elect to purchase all of the Vested Units and Other Executive Securities it is entitled to purchase pursuant to the Repurchase Option, Members holding Class A Common Units shall be entitled to exercise the Repurchase Option for all or any portion of such Vested Units and Other Executive Securities that the Company has not elected to purchase (the " **Available Securities** "). As soon as practicable after the Company has determined that it will not exercise the Repurchase Option with respect to the Available Securities, but in any event within 20 days prior to the expiration of the Repurchase Option Period, the Company shall give written notice (an " **Option Notice** ") to the Members holding Class A Common Units setting forth the number of Available Securities such Members are entitled to purchase and the purchase price for the Available Securities. The Members holding Class A Common Units may elect to purchase all or any portion of the Available Securities by giving written notice to the Company within 20 days after receiving the Option Notice. If such Member collectively elect to purchase an aggregate number of Vested Units and Other Executive Securities greater than the total number of Available Securities, the Vested Units and Other Executive Securities to be purchased by each such Member shall be allocated among such Members based upon the number of Class A Common Units owned by each such Member. If the Members holding Class A Common Units have elected to purchase any Available Securities, within ten days after the expiration of the 20-day period set forth above, the Company shall notify each holder of Vested Units and Other Executive Securities as to the number and type of Available Securities each such Member is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction (the " **Investor Repurchase Notice** "). At the time the Company delivers the Investor Repurchase Notice to the holder(s) of Vested Units and Other Executive Securities, the Company shall also deliver written notice to each such Member setting forth the number of Available Securities such Investor is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.

5.5     Closing of Repurchase . The closing of the purchase of the Executive Securities pursuant to an exercise of the Repurchase Option shall take place on the later of the date designated by the Company in the Company Repurchase Notice or the Investor Repurchase Notice, as applicable, which date shall not be more than 30 days nor less than five days after the later of the delivery of the Company Repurchase Notice or the Investor Repurchase Notice, as applicable (the " **Repurchase Closing** ").

5.6     Payment of Repurchase Price . The Company will pay for the Executive Securities to be purchased by it pursuant to the Repurchase Option (i) first by offsetting amounts outstanding under any other bona fide, undisputed debts owed by Participant to the Company or any of its Subsidiaries and (ii) second, by, at its option, (A) a check or wire transfer of funds, (B) the issuance of a subordinated promissory note of the Company bearing interest at a per annum rate determined by the Board in its sole discretion (provided that such rate shall not be less than the prime rate as published in The Wall Street Journal from time to time) which interest shall be payable upon maturity of the note, and becoming due and payable on the earlier to occur of a Change of Control and the fifth anniversary of the date of issuance of the note or (C) any combination of (A) and (B) as the Board may elect in its discretion. The Members holding Class

4

A Common Units will pay for the Executive Securities purchased by them by a check or wire transfer of funds. The Company and the Members holding Class A Common Units will be entitled to receive customary representations and warranties from the sellers regarding such sale.

5.7    Repurchase Price . In connection with the exercise of a Repurchase Option, the purchase price for each Vested Unit and each Other Executive Security will be the Fair Market Value of such unit as of the date of the sending of the Company Repurchase Notice or the Investor Repurchase Notice, whichever is later. For the avoidance of doubt, if the Fair Market Value of the Vested Units or Other Executive Securities to be repurchased pursuant to an exercise of the Repurchase Option is zero, the repurchase shall nonetheless be consummated as provided herein and the Company and/or the Members holding Class A Common Units as applicable, shall not be required delivery any consideration at the closing of such repurchase.

5.8    Certain Restrictions on Repurchases . Notwithstanding anything to the contrary in the Plan and any Equity Award Agreement, all repurchases by the Company pursuant to this Section  5 shall be subject to the following conditions (as determined by the Board): (A) the Company having funds being legally available for such repurchase, (B) the Company not being in financial distress, (C) the Company having sufficient liquidity to make such repurchase, and (D) the repurchase and the funding of cash by the Company or its Subsidiaries to make such repurchase not being prohibited under any credit facility to which the Company or any Subsidiary is party or by applicable law. In the event that any of the foregoing conditions in (A) through (D) are not satisfied in connection with such repurchase, then the Company may defer consummation of such repurchases until it is able to make such repurchase and satisfy such conditions.

5.9    Former Permitted Transferees . If a Participant Transfers any interests in any Executive Securities to a Permitted Transferee under clause (i) of the definition thereof and such Transferee ceases to be a Permitted Transferee of such Participant (including if such Permitted Transferee was a Permitted Transferee by reason of being the spouse of such Participant and such Permitted Transferee is no longer the spouse of such Participant), then such transferee shall, prior to ceasing to be a Permitted Transferee, transfer such interest to the Participant (or other Permitted Transferee thereof) who made such transfer and, if such transfer back to the Participant (or other Permitted Transferee thereof) does not occur within 30 days, the Company shall have the right to repurchase the Executive Securities transferred to such Permitted Transferee on the same terms that it may repurchase Units following a Termination of Service in accordance with the provisions of this Section  5 .

6.    Restrictive Covenants . Participant acknowledges that Participant is bound by the confidentiality, non-competition, non-solicitation, non-interference and other provisions set forth in Sections 6.1 through 6.10 (inclusive) of any prior Equity Award Agreement by and between Participant and the Company (the " Restrictive Covenants "), and that the Company's issuance of the Units to Participant hereunder is made in consideration for such Restrictive Covenants. Participant further represents and warrants to the Company that, prior to the date of this Agreement, Participant has not breached any such Restrictive Covenant.

5

7.    <u>Representations, Warranties, Covenants, and Acknowledgments of Participant</u> . Participant hereby represents, warrants, covenants, acknowledges and agrees on behalf of Participant and his or her spouse, if applicable, that:

7.1    <u>Capacity</u> . Participant is of legal age, competent to enter into a contractual obligation, and a citizen of the United States. The principal residence of Participant is as shown on the signature page of this Agreement.

7.2    <u>Binding Agreement</u> . This Agreement, the LLC Agreement, the Plan and any other Governing Document by which any Units are acquired by Participant constitute the legal, valid and binding obligations of Participant, enforceable in accordance with their respective terms, and the execution, delivery and performance of any Governing Document by Participant does not and will not conflict with, violate or cause a breach of any agreement or instrument to which Participant is a party or subject or any judgment, order or decree to which Participant is subject.

7.3    <u>Investment; Accredited Investor</u> . Participant is holding the Units for Participant's own account, and not for the account of any other Person. Participant is holding the Units for investment and not with a view to distribution or resale thereof except in compliance with applicable laws regulating securities. Participant (1) is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the " **Securities Act** ")), and/or (2) has such knowledge and experience in financial and business matters so that Participant is capable of evaluating the merits and risks of Participant's investment in the Company. Participant (i) has the capacity to protect Participant's own interests in connection with the transactions contemplated by this Agreement, (ii) is able to bear the risk of investment in the Company, and (iii) is able, without impairing Participant's financial condition, to hold the Units for an indefinite period of time and to suffer a complete loss of Participant's investment.

7.4    <u>Relationship to Carvana and the Company</u> . Participant is currently an Employee, non-Employee Officer, Director or Consultant and in such capacity has become personally familiar with the business of Carvana and the Company.

7.5    <u>Access to Information</u> . Participant has had the opportunity to ask questions of, and to receive answers from, Carvana and the Company with respect to the terms and conditions of the transactions contemplated hereby and with respect to the business, affairs, financial conditions, and results of operations of Carvana and the Company.

7.6    <u>Dilution</u> . Participant acknowledges and agrees that there may be additional issuances of Units of the Company or one of its Subsidiaries on or after Participant's acquisition of Units and the equity interests of Participant may be diluted in connection with any such issuance.

7.7    <u>Registration</u> . Participant understands that the Units have not been registered under the Securities Act, and the Units cannot be transferred by Participant other than in accordance with the terms and conditions set forth in the Governing Documents and, in any event, unless such transfer is registered under the Securities Act or an exemption from such

6

registration is available. Neither Carvana nor the Company has made any agreements, covenants or undertakings whatsoever to register the Units under the Securities Act. Neither Carvana nor the Company has made any representations, warranties or covenants whatsoever as to whether any exemption from the Securities Act will be available.

7.8    Public Trading . None of the Company's Equity Securities is currently publicly traded, and neither Carvana nor the Company has made any representations, covenants or agreements as to whether there will be a public market for any of the Company's Equity Securities.

7.9    Tax Advice . Neither Carvana nor the Company has made any warranties or representations to Participant with respect to the income tax consequences of the Units (or the ownership or issuance thereof) or the transactions contemplated by this Agreement, and Participant is in no manner relying on Carvana, the Company, or their representatives for an assessment of such tax consequences. Participant is advised to consult with his or her own tax advisor with respect to such tax consequences and his or her ownership of the Units.

7.10    Reliance by the Company . Participant acknowledges that the Company is relying upon the accuracy and completeness of the representations contained herein in complying with its obligations under applicable securities laws.

8.    Capital Account . Participant shall make no Capital Contribution to the Company in connection with the Units and, as a result, Participant's Capital Account balance in the Company with respect to such Units immediately after his or her receipt of the Units shall be equal to zero.

9.    Binding Effect . Subject to the limitations set forth in the Governing Documents, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors and permitted assigns of the parties hereto.

10.    Section 83(b) Election . Participant and Participant's spouse, if applicable, shall execute and deliver to the Company with this executed Agreement, a copy of the Election Pursuant to Section 83(b) of the Internal Revenue Code, substantially in the form attached hereto as Exhibit  B . Participant represents that Participant is not relying on Carvana or the Company with respect to making such election and has consulted any tax consultant(s) that Participant deems advisable in connection with the filing of an election under Section 83(b) of the Code and similar tax provisions. Participant acknowledges that it is Participant's sole responsibility and not Carvana's or the Company's to timely file an election under Section 83(b) of the Code, even if Participant requests that Carvana, the Company or any representative of either entity make such filing on Participant's behalf. Participant should consult his or her tax advisor to determine if there is a comparable election to file in the state of his or her residence and whether such filing is desirable under the circumstances.

11.    Taxes . The Company and Participant intend that (i) the Units be treated as "profits interests" within the meaning of the Code, Treasury Regulations promulgated thereunder, and any published guidance by the Internal Revenue Service with respect thereto, including, without limitation, Internal Revenue Service Revenue Procedure 93-27, as clarified by

7

Internal Revenue Service Revenue Procedure 2001-43, (ii) the issuance of such interests not be a taxable event to the Company or Participant as provided in such Revenue Procedures, and (iii) the Governing Documents be interpreted consistently with such intent. Notwithstanding the foregoing, each of the Company and Participant acknowledge that the Internal Revenue Service or other taxing authority could in the future disagree with the valuation used by the Company to determine that the Units are profits interests, and conclude that the liquidation value of the Units as of the Effective Date was greater than zero, resulting in taxable income to the Participant. The Board of Managers may take any actions it deems in its sole discretion to be necessary or appropriate to cause the Units granted hereunder to be treated as "profits interests" for all United States federal income tax purposes. Notwithstanding the foregoing, Participant acknowledges that Participant may incur certain liabilities for federal, state or local taxes, and is responsible for satisfaction of such taxes.

12.    Lock-Up Agreement . In connection with any underwritten public offering of the Company's securities, Participant hereby agrees that Participant shall execute a customary "lock-up" or "holdback" agreement in the form requested by the underwriter(s) for such offering whereby Participant shall agree not to sell, transfer, offer to sell or otherwise dispose of any securities other than pursuant to such offering for such period of time following the consummation of such offering as is required by such underwriter(s) pursuant to such "lock-up" or "holdback" agreement.

13.    Remedies . Participant shall be liable to the Company for all costs and damages, including incidental and consequential damages, resulting from a disposition of the Units which is in violation of the provisions of the Governing Documents. Without limiting the generality of the foregoing, Participant agrees that the Company shall be entitled to obtain specific performance of the obligations of Participant under this Agreement and, to the extent available under applicable law, both interim and permanent injunctive relief, as applicable. Participant agrees and acknowledges that Participant will not urge as a defense that there is an adequate remedy at law.

14.    Governing Law . This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware (regardless of the laws that might otherwise apply under applicable principles of conflicts of laws.

15.    Certificate Restrictive Legends . Certificates evidencing the Units, to the extent such certificates are issued, may bear such restrictive legends as the Company and/or the Company's counsel may deem necessary or advisable under applicable law or pursuant to this Agreement, including, without limitation, the legends set forth in Section 9.6 of the LLC Agreement.

16.    Arbitration . Each of the parties hereby irrevocably waives any right to trial by jury and irrevocably agrees that any claims or disputes arising out of this Agreement or relating to the Units shall be resolved by binding arbitration in accordance with Section 15.19 of the LLC Agreement. Notwithstanding the foregoing, nothing contained herein shall prevent court action for interim injunctive and equitable relief in aid of arbitration, to the extent otherwise available under applicable law. The prevailing party in any ancillary measures in aid of arbitration shall be entitled to receive its reasonable attorneys' fees and attorneys' costs from the losing party, to the extent available under applicable law.

8

17. <u>Counterparts</u> . This Agreement may be executed in any number of counterparts, any of which may be executed and transmitted by facsimile, and each of which shall be deemed to be an original, but all of which together shall be deemed to be one and the same instrument.

18. <u>Successors and Assigns</u> . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors and assigns of the parties hereto, including, without limitation, any business entity that succeeds to the business of the Company.

19. <u>Entire Agreement</u> . This Agreement, together with the Plan, the LLC Agreement and any other Governing Document constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties concerning such subject matter.

20. <u>Amendments and Waivers</u> . This Agreement (or any provisions hereof) may be amended or waived only by the written approval of (a) Participant and the Company or (b) the Company and the holders of a majority in interest of all Class B Common Units awarded and then outstanding under the Plan; provided, however, that no amendment or waiver may be made without the written approval of Participant if such amendment or waiver would materially adversely affect Participant in a manner different than the other Participants. For the avoidance of doubt, Participant shall have no other right to approve any amendment to either the LLC Agreement or the Plan. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

21. <u>Invalidity</u> . If for any reason one or more of the provisions contained in this Agreement or in any other instrument referred to herein, or any word, phrase, clause, sentence or other portion thereof, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument, and such provision or portion thereof will be modified or deleted in such a manner as to make this Agreement, as modified, legal and enforceable to the fullest extent permitted under applicable laws.

22. <u>Titles</u> . The titles, captions or headings of the sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement

23. <u>Notices</u> . All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (i) when personally delivered, (ii) when sent by facsimile (with hard copy to follow) during a business day (or on the next

9

business day if sent after the close of normal business hours or on any non-business day), (iii) when sent by electronic mail (with hard copy to follow) during a business day (or on the next business day if sent after the close of normal business hours or on any non-business day), (iv) one (1) business day after being sent by reputable overnight express courier (charges prepaid), or (v) three (3) business days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

To the Company :

Carvana Group, LLC
4020 E. Indian School Road
Phoenix AZ 85018
Attn:            Ernest C. Garcia III, President and CEO
Telephone:    800-334-4554
Fax:             866-221-3833
Email:           ernie.garcia@carvana.com

To Participant : at the address set forth in the Company's records

24.    Additional Matters Regarding Employees . This Agreement is not a contract of employment. To the extent that Participant is an Employee, Participant acknowledges and agrees that Participant's employment is with Carvana, not the Company. Participant further acknowledges that, unless an employment agreement between Participant and Carvana provides otherwise, such employment relationship is "at will" (meaning that either Participant or Carvana may terminate the employment relationship at any time for any reason, with or without notice), and that nothing in this Agreement or the Governing Documents shall change this "at will" employment relationship. Participant also acknowledges and agrees that the "at will" employment relationship can only be changed by a written agreement signed by Participant and Carvana expressly stating this at-will relationship is being modified.

[ *Signature page follows* ]

10

*[Signature page to Award Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first written above.

CARVANA GROUP, LLC,
a Delaware limited liability company

By: _____
Name:  Ernest C. Garcia III
Title:   President and CEO

Participant hereby accepts and agrees to be bound by all of the terms and conditions of this Agreement.

Participant:

_____
(Sign Name)

_____
(Print Name)

Address:  _____

_____

Email:  _____

Participant's spouse indicates by the execution of this Agreement his or her consent to be bound by the terms herein as to his or her interests, whether as community property or otherwise, if any, in the Units.

Participant's Spouse:

_____
(Sign Name)

_____
(Print Name)

S-1

**EXHIBIT A [R ESERVED ]**

A-1

**EXHIBIT B**

**ELECTION PURSUANT TO SECTION 83(b) OF THE
INTERNAL REVENUE CODE TO INCLUDE IN GROSS
INCOME THE EXCESS OVER THE PURCHASE PRICE,
IF ANY, OF THE VALUE OF PROPERTY TRANSFERRED
IN CONNECTION WITH SERVICES**

On [       ], 2016 (the " **Acquisition Date** "), the undersigned acquired a limited liability company membership interest (the " **Membership Interest** ") in Carvana Group, LLC, a Delaware limited liability company (the " **Company** "), for $0.00. Pursuant to the Second Amended and Restated Limited Liability Company Agreement of the Company, the undersigned is entitled to an interest in Company capital exactly equal to the amount paid therefor and an interest in Company profits.

Therefore, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the " **Code** "), and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election, with respect to the Membership Interest, to report as taxable income for the calendar year 2016 the excess (if any) of the value of the Membership Interest on the Acquisition Date over the purchase price thereof.

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1.   The undersigned's name, address and taxpayer identification (social security) number are:

Name: _____

Address: _____

Social Security #: _____

The undersigned's spouse's name, address and taxpayer identification (social security) number are (complete if applicable):

Name: _____

Address: _____

Social Security #: _____

2.   The property with respect to which the election is made consists of 60,000 Class B Common Units in the Company, representing an interest in Company capital exactly equal to the amount paid therefor and the profits, losses and distributions of the Company.

B-1

3.    The date on which the above property was transferred to the undersigned was [              ], 2016, and the taxable year to which this election relates is 2016.

4.    The above property is subject to the following restrictions: (a) forfeiture and/or a right of repurchase by the Company if the undersigned ceases to be an employee of, manager or director of, or consultant to, the Company (or any of its affiliates) under certain circumstances pursuant to the Equity Award Agreement with the Company, dated as of [              ], 2016 (the " **Award Agreement** ") and the Second Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, dated as of July 27, 2015, as amended and/or restated from time to time (the " **LLC Agreement** "), and (b) certain other restrictions pursuant to the Award Agreement and the LLC Agreement should the undersigned wish to transfer the Membership Interest (in whole or in part).

5.    The fair market value of the above property at the time of transfer (determined without regard to any restrictions other than those which by their terms will never lapse) was $0.

6.    The amount paid for the above property by the undersigned was $0.

7.    A copy of this election is being furnished to the Company pursuant to Treasury Regulation §1.83-2(d). A copy of this election will be submitted with the 2015 federal income tax return of the undersigned pursuant to Treasury Regulation §1.83-2(c).

Date: _____

_____
Participant

Date: _____

_____
Participant's Spouse

B-2

**FOURTH AMENDED AND RESTATED LEASE AGREEMENT**

| | |
|---|---|
| **Amendment Date:** | **February 24, 2017** |
| **Landlord:** | **DriveTime Car Sales Company, LLC, an Arizona limited liability company** |
| **Tenant:** | **Carvana, LLC and Carvana Shipping & Delivery LLC, each, an Arizona limited liability company** |

This Fourth Amended and Restated Lease Agreement (this " **Lease** ") is amended and restated as of the Amendment Date by and between Landlord and Tenant as the entire and exclusive statement of all agreements, covenants, understandings, representations, warranties and liabilities of Landlord and Tenant regarding the lease of the Premises. This Lease supersedes, amends and restates that Lease Agreement dated November 1, 2014, that Amended and Restated Lease Agreement, dated March 15, 2015, that Second Amended and Restated Lease Agreement dated July 1, 2015 (as modified August 17, 2015) and that Third Amended and Restated Lease Agreement dated March 18, 2016 between DriveTime Car Sales Company, LLC, as Landlord and Carvana, LLC and Carvana Shipping and Delivery, LLC as Tenants, and it is intended to be effective as of the November 1, 2014 (the " **Lease Date** "), except as otherwise set forth herein (e.g. updated Exhibits).

**SECTION  1: BASIC TERMS .** The following defined terms (the "Basic Terms") are applicable to this Lease:

1.1 **Premises** : The premises (the " **Premises** ") shall be as set forth in the applicable attached Exhibit(s) and covers the real property to be leased (the " **Land** "), including any parking spaces (the " **Parking Spaces** "), any lifts (the " **Lifts** "), equipment and machinery related to the operations of Tenant (the Lifts, equipment and machinery collectively the " **Equipment** "), equipment designated for the photographing of vehicles (the " **Photo Booth** "), and any existing buildings and any other improvements located on the Land (the " **Buildings** "). The Premises is usable by Tenant as of the Commencement Date. For any shared space, Landlord shall allocate any Lifts and Parking Spaces to Tenant in a reasonable manner so Tenant's Lifts and Parking Spaces are grouped together and the Parking Spaces are located in reasonable proximity to the Lifts allocated to Tenant.

1.2 **Lease Term** : The Lease Term for each portion of the Premises shall be as set forth below:

1.2.1 Unless otherwise specified on Exhibit A, all Hubs shall be deemed to have a two-year initial lease term beginning on the applicable Site Commencement Date listed on Exhibit A. Tenant shall have the continuing right until December 31, 2018 to from time to time designate up to ten (10) Hubs as " **Renewal Hubs** ". At each so-designated Renewal Hub, Tenant shall have two (2) consecutive 1-year renewal options and exercising (or not exercising) a renewal option at any Renewal Hub will not affect any other Renewal Hub. Tenant agrees to use commercially reasonable efforts, taking into account Tenant's expansion plans, to designate all Renewal Hubs before December 31, 2018. To the extent Tenant has not designated 10 Renewal Hubs on January 1, 2019, Tenant shall be deemed to have forfeited the right to designate any Hubs as Renewal Hubs as of such date (but such forfeiture shall not affect Tenant's rights with respect to Hubs previously designated as Renewal Hubs).

1.2.2 Landlord does not own the premises upon which any Inspection Center is located and instead leases (pursuant to an " **IC Lease** ") such premises. Consequently, any sublease between Landlord and Tenant for such premises shall be coterminous with the underlying IC Lease. To the extent that Landlord does not own the premises upon which any Hub is located and instead leases such premises, any sublease between Landlord and tenant for such premises shall be coterminous with the underlying lease.

EXECUTION COPY

1.2.3 Each renewal option may be exercised by Tenant by providing written notice to Landlord no less than one month prior to the expiration of the applicable Premises' Lease Term (as the same may have been previously extended), which notice shall specify the Hub for which Tenant is extending the Lease Term, subject to Section 1.2.1.

Tenant acknowledges that Landlord may not own but leases the Premises from another party. Tenant may be a sublessee of the Premises. For Landlord leased properties, notwithstanding anything herein to the contrary, any Lease Term shall always end upon the expiration date of the underlying Landlord lease. In addition, for Landlord leased properties, that Tenant uses as Hubs (but expressly excluding the Blue Mound, Texas IRC and the Delanco, NJ IRC), notwithstanding anything herein to the contrary, Landlord shall be entitled to exit any of the leased Premises prior to the expiration date of the underlying Landlord lease ("Early Exit") provided that Landlord gives Tenant at least ninety (90) days' prior written notice of such Early Exit. With respect to the Premises, Landlord agrees to provide Tenant with information regarding its lease expirations, Early Exits, and renewals upon request from Tenant, to provide Tenant with copies of any written communication with Landlord's landlord regarding lease expirations, Early Exits and renewals, and to reasonably cooperate with Tenant regarding assuming or renewing such leases. For the avoidance of doubt, Landlord does not have the right to perform an Early Exit at either the Blue Mound, Texas Property or the Delanco, NJ Property.

1.3 **Commencement Date** : The Amendment Date, or as otherwise set forth on Exhibit A .

1.4 **Expiration Date** : With respect to any portion of the Premises, the earlier of (i) the expiration of such portion of the Premises' Lease Term, subject to renewals, and (ii) the expiration date of the underlying Landlord lease, if applicable. Notwithstanding the foregoing, Tenant may from time to time in Tenant's sole discretion terminate this Lease with respect to any one or more Hubs by providing Landlord with sixty (60) days' prior written notice.

1.5 **Base Rent** : As set forth in Exhibit A .

1.6 **Tenant ' s Share** : As set forth in Exhibit A .

1.7 **Hubs:** As set forth on Exhibit A .

1.8 **Inspection Center:** As set forth on Exhibit A .

1.9 **Landlord Address:**  DriveTime
Attn: Property Manager
1720 W. Rio Salado Parkway
Tempe, Arizona 85281
E-mail: Dan.Packowski@DriveTime.com (with a copy to: DL-Legal@DriveTime.com)

1.10 **Tenant Address:**  Carvana, LLC
Attn: General Counsel
4020 E. Indian School Road, Suite A
Phoenix, Arizona 85018
E-mail: paul.breaux@carvana.com

DT-Carvana Lease                                         2

EXECUTION COPY

1.11 **Property** : The real property underlying the Premises and any real property contiguous thereto in which Landlord has a right, title or interest, including any buildings or improvements thereon

1.12 **Exhibits** : Exhibit A attached hereto is incorporated herein and made a part hereof for all purposes.

1.13 **Supplemental Premises:** As mutually agreed upon by Tenant and Landlord (and subject to Landlord's obligations to use commercially reasonable efforts, as described below), Tenant may lease or sublease other Landlord-operated property from Landlord (" **Supplemental Premises** ") as a Hub. Collectively, each of the Premises described on Exhibit A , together with any Supplemental Premises, shall be referred to herein as the " **Total Leased Premises** ". The applicable terms of any such leases or subleases of Supplemental Premises, including the Site Commencement Date (as described on Exhibit A ) for such Supplemental Premises will be set forth on the form of Exhibit A , which may be amended, modified or replaced from time to time to the extent such amendment, modification or replacement is executed by both Tenant and Landlord. The terms of this Lease will apply to the Supplemental Premises, except as otherwise set forth in Exhibit A ; provided that the parties agree that they intend for each Supplemental Premises to have a 2-year initial lease term and for Hub Supplemental Premises to be eligible to be Renewal Hubs, subject to Section 1.2.1 . As Tenant expands its' operations, it may have the need to expand certain Premises and/or lease other Landlord-operated property from Landlord as identified from time to time by Tenant via written notice to Landlord at least three (3) months prior to such property becoming Supplemental Premises (the " **Occupancy Date** "). For any Landlord-operated Property identified by Tenant prior to March 31, 2017, Landlord will make commercially reasonable efforts to make any such Landlord-operated premises available to Tenant on or before the Occupancy Date for Tenant's requested use consistent with and on the same or similar terms to the uses and terms of the existing Premises and Supplemental Premises. Landlord's commercially reasonable efforts as described above will be based on Tenant's requested use, historical occupancy and usage of similar locations shared with Landlord (" **Tenant's Historical Use** "). If after using such commercially reasonable efforts to accommodate Tenant's requests, Landlord is unable to accommodate any such expansion request on the specific Landlord-operated property requested by Tenant, then Landlord shall use commercially reasonable efforts based on Tenant's Historical Use to make available alternative (but reasonably similar) space for Tenant operated by Landlord and located within the same sub-market requested by Tenant on or before the Occupancy Date. For the avoidance of doubt, without Landlord's written consent in Landlord's sole discretion, Tenant may not use Supplemental Premises as Inspection Centers. Once Tenant and Landlord have agreed upon Tenant's addition of Supplemental Premises, such Premises shall be described on Exhibit A and thereafter be considered part of the Premises after such Premises' Commencement Date until such Premises' Expiration Date.

1.14 **Inspection Center Occupancy:** Notwithstanding Tenant's Expected Share and Landlord's current usage of Property at the Inspection Center Properties described on Exhibit A , Landlord and Tenant agree that Tenant's Share of Landlord's Blue Mound, TX and Delanco, NJ Inspection Center Properties shall each be 100% upon the earlier of (i) July 31, 2018 and (ii) the date that Landlord vacates such Premises (the " **100% Date** "). As of the 100% Date, Tenant shall assume all Rent in connection with each such Inspection Center and all Landlord insurance obligations described in Section 7.2 with respect to such Premises. Tenant may request additional usage of Landlord's Blue Mound, TX and Delanco, NJ Inspection Center Properties prior to the 100% Date, which request Landlord may grant in its discretion. At Landlord's option, Landlord may condition Tenant obtaining 100% Tenant's Share at each Inspection Center on any or both of the following:

DT-Carvana Lease                                    3

(a) Landlord being released from all lease obligations at such Inspection Center; provided that Landlord agrees to use commercially reasonable efforts to cooperate with Tenant in Tenant's pursuit of obtaining a direct lease of such Inspection Center with the owner of such property; and/or

(b) Tenant purchasing or causing the owner of the applicable Inspection Center Land to purchase from Landlord any and all unamortized tenant improvements and furnitures, fixtures and equipment belonging to Landlord at such Property, at a price equal to the net book value of the foregoing, as applicable.

## SECTION 2: LEASE OF PREMISES, COMMON AREAS; AND EXPANSION AREA .

2.1 **Lease of Premises** . In consideration of the representations, warranties and covenants of the parties stated entirely and exclusively in this Lease, Landlord leases the Premises exclusively to Tenant and Tenant leases the Premises from Landlord. Landlord occupies the balance of each Property not included in the Premises. Landlord and Tenant shall cooperate in good faith and deal fairly in the location of office space, Parking Spaces and Lifts allocated to Tenant and in their respective occupancy and use of the Property. Without Tenant's prior written consent, Landlord shall not have any right to reduce or relocate the amount of office space or the number of Lifts or Parking Spaces available to Tenant to less than Tenant's Expected Share as described on Exhibit A (nor shall Landlord have the right to reallocate amongst components of Tenant's Share). Without Tenant's prior written consent, all office space at a particular Premises shall be contiguous, all Parking Spaces at a particular Premises shall be contiguous, and all Lifts at a particular Premises shall be contiguous. In the event that a Photo Booth is located on the Premises, such Photo Booth is for the exclusive use of Tenant. Though the Photo Booth structure belongs to Landlord as a fixture to the Property constructed by Tenant, all movable equipment and machinery in the Photo Booth belong to Tenant and may be removed by Tenant at any time on or prior to expiration or termination of this Lease. Unless otherwise agreed by Landlord and Tenant, all Equipment located on the Premises may be used by Tenant and Landlord shall make any other equipment and machinery located on the Property reasonably available to Tenant, but all Equipment belongs to Landlord and may not be removed by Tenant at any time.

2.2 **Common Areas** . In addition to the exclusive right to occupy and use the Premises, Landlord grants to Tenant the nonexclusive right to use the Common Areas of any shared Property. Common Areas include all areas within the Property that are available for the common use of Landlord and Tenant. Common Areas include, but may not be limited to, driveways, access roads, transport delivery areas, restrooms, break rooms, parts rooms and Buildings dedicated for providing services used by Landlord and Tenant such as vehicle detail areas and paint and body repair areas. Tenant's and Landlord's rights to use Common Areas are nonexclusive and shall be exercised by Landlord and Tenant in a manner that does not interfere with the use of the Common Areas by the other party. However, with the mutual consent of the parties, certain Common Areas such as break rooms and parts rooms may be allocated to the exclusive use of one of the parties. At any time after the first anniversary of the Commencement Date and provided Landlord delivers to Tenant 180-days advance written notice, Landlord may remove existing ancillary buildings, such as detail or paint and body structures being shared by Landlord or Tenant and remove them from the Common Areas, in which case the Premises shall no longer include, and Tenant shall no longer use, said specific buildings as portions of the Common Areas. If Landlord removes the existing buildings from the Common Areas, thereby making them unavailable to Tenant, then Tenant may, but shall not be required to, construct similar buildings on the Premises in a location reasonably adjacent to Lifts or other Equipment or Parking Spaces allocated to Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Such construction shall be at Tenant's cost but without any additional rent payable to Landlord.

2.3 **[Reserved]** .

DT-Carvana Lease                                    4

2.4 **Expansion Area** . As applicable, the area in reasonable proximity to any Premises (each Hub and Inspection Center) may include an area for expansion (" **Expansion Area** "). Either party may at any time during the Term of this Lease elect to develop the Expansion Area by delivery of written notice to the other party. If Landlord elects to develop the Expansion Area then Tenant shall respond in writing to Landlord's election within 30 days with Tenant's election to participate or not participate in the development of the Expansion Area. If Tenant elects in its sole discretion to participate then Tenant shall pay an agreed-upon portion of the actual costs incurred to effect such construction or development (" **Expansion Costs** ") and Tenant shall be entitled to use an equivalent portion of the Expansion Area as part of the Premises. If Tenant elects to not participate then Tenant shall not pay any of the Expansion Costs and shall not be entitled to use any of the Expansion Area as part of the Premises. If Tenant elects to develop the Expansion Area before receiving Landlord's election to develop the Expansion Area then Tenant shall deliver written notice to Landlord and Landlord shall respond in writing to Tenant's election within 30 days with Landlord's election to participate or not participate in the development of the Expansion Area. If Landlord elects to participate then Landlord and Tenant shall mutually agree upon the use of the Expansion Area and whether Tenant will participate in paying for the actual Expansion Costs or pay additional Base Rent. Tenant shall be entitled to use that portion of the Expansion Area as mutually agreed to by the parties and as part of the Premises in the same manner as if Landlord first elected to develop the Expansion Area and Tenant elected to participate. If Landlord does not elect to participate in Tenant's development of the Expansion Area then Tenant may elect to develop all or less than all of the Expansion Area and Tenant shall pay the entire actual Expansion Cost incurred but be entitled to use the entire developed Expansion Area as part of the Premises and without Tenant consent Landlord shall not be entitled to use any of the Expansion Area developed by Tenant without Landlord's participation. If less than all of the Expansion Area is developed then the same rights of development and participation shall continue to apply to the balance of the Expansion Area until the earlier of the development of the entire Expansion Area or expiration of this Lease. If Tenant and Landlord agree that Tenant shall pay a portion or all of the Expansion Costs, then Tenant is not required to pay additional Base Rent for the Expansion Area for a period of three years after the development of the Expansion Area, as the parties acknowledge that Tenant's payment of actual Expansion Costs is sufficient consideration for Tenant's use of the Expansion Area for that time period.

## SECTION 3: TERM

3.1 **Commencement Date and Expiration Date** . The Lease Term or " **Term** " is the period stated in the Basic Terms. The Term expires on the Expiration Date.

3.2 **Acceptance of Premises** . Tenant's acceptance of Landlord's delivery of the Premises conclusively establishes that Tenant unconditionally accepts and approves of the Premises, the Building, the Land, the Common Areas and all matters relating to the Property and this Lease. Tenant acknowledges that neither Landlord nor any agent, contractor or employee of Landlord has made any representation or warranty of any kind (express or implied) with respect to the Premises, specifically including, but not limited to, any representation or warranty of suitability or fitness for any particular purpose or use and Tenant is not relying on any duties of disclosure by Landlord or its agents regarding the condition of the Premises or any other matter relating to the Property. Tenant accepts the Premises and every aspect of the Property in an **" AS IS – WHERE IS "** condition, with all faults and defects, both patent and latent and without any improvements, renovations, alterations or replacements required to be made by Landlord.

## SECTION 4: RENT

4.1 **Base Rent** . Tenant will pay to Landlord Base Rent stated in Exhibit A attached hereto, commencing upon the Commencement Date.

DT-Carvana Lease                                                    5

4.2 **Additional Rent** . In addition to the Base Rent, Tenant shall pay when due all other amounts required by this Lease (" **Additional Rent** "), including Tenant's Share of Operating Expenses. " **Operating Expenses** " are out-of-pocket costs specific to the Property (and excluding any corporate overhead allocated to the Property) paid by Landlord for real property taxes on the Property, insurance but only if it includes Tenant as an insured and Tenant is not required to provide duplicate coverage, utilities services to the Property and used by Tenant, maintenance and repairs to Common Areas, Buildings and Parking Spaces included in the Premises and other services for care of the Property generally or that benefit Tenant's operations at the Premises. Within a reasonable time after the end of each calendar year and again after expiration of the Lease Term, Landlord will determine the actual amount of Operating Expenses and Tenant's Share of Operating Expenses for the expired calendar year and deliver to Tenant a written statement of such amounts along with reasonable documentation evidencing such amounts. Upon the mutual agreement of Landlord and Tenant, no such determination is required. If Tenant paid less than the amount of Tenant's Share of Operating Expenses specified in the statement, Tenant will pay the difference to Landlord within 30 days. If Tenant paid more than the amount of Tenant's Share of Operating Expenses specified in the statement, Landlord will, within 30 days, either (a) refund the excess amount to Tenant, or (b) credit the excess amount against Tenant's next due monthly installment of estimated Operating Expenses. Any other Additional Rent shall be paid within 15 days after receiving Landlord's invoice for such Additional Rent. Base Rent and Additional Rent may be collectively referred to herein as " **Rent** ".

4.3 **Delinquent Rent** . If Tenant does not pay any installment of Base Rent or any undisputed Additional Rent within five days after the date payment is due, then Tenant will pay Landlord interest on the delinquent payment at the annual rate of 15% from the date when the payment was first due through the date the payment is made. Landlord's right to such compensation for delinquency is in addition to all of Landlord's rights and remedies under this Lease, at law or in equity. The assessment or payment of interest on delinquent Rent does not grant to Tenant a grace period or extension of time to pay any Rent or prevent Landlord from exercising any right or remedy provided for under this Lease. All payments to Landlord shall not be considered paid until received by Landlord.

## SECTION 5: TENANT'S USE

5.1 **Permitted Use** . Tenant shall occupy and use the Premises (i) designated as Hubs exclusively for vehicle and single-car hauler storage and marshalling, vehicle painting, detailing, and other similar reconditioning, vehicle delivery and related office space, and (ii) designated as Inspection Centers exclusively for reconditioning and retail sale or wholesale of vehicles and related uses, such as vehicle and single and multi-car hauler storage, vehicle and single and multi-car hauler marshalling, vehicle delivery and related office space (collectively, the " **Permitted Use** "). At any Hubs that are retail facilities for Landlord, Tenant may not store any multi-car haulers, but at other Hubs Tenant may store multi-car haulers. At any Hub, Tenant shall not have the right to use any of Landlord's equipment for the painting, detailing, or other similar reconditioning of vehicles. Tenant shall not do anything in or about the Premises which will cause damage to any part of the Property, normal wear and tear excepted. Tenant shall not commit any waste in or about the Premises or Property, and Tenant shall keep the Premises in a neat, clean, attractive and orderly condition, free of any nuisances. Tenant shall keep all fire corridors and mechanical equipment rooms in the Premises free and clear of all obstructions at all times. At Tenant's expense, Tenant will conform and comply with all Laws applicable to Tenant's particular manner of use of the Premises. Landlord does not make any representation, warranty or covenant regarding current or future laws and regulations applicable to Tenant's use of the Premises for the Permitted Use. This Lease is subject and subordinate to all applicable federal, state and municipal laws and regulations and all covenants, conditions and restrictions of record (collectively, " **Laws** "). Tenant shall at all times comply with the Laws. Without Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant may not place any signs on the Property other than one sign at the entrance to the Property and Tenant may not place any signs on the Building other than on the Premises portion of the Building. Tenant is solely responsible for all signs installed and operated by Tenant on the Property and Landlord is not required to install or operate any signs for Tenant. All signs must comply with all applicable Laws and with the Landlord Rules.

DT-Carvana Lease                                          6

EXECUTION COPY

5.2 **Hazardous Materials** . As used herein, the term " **Hazardous Material** ," means any substance, material or waste which is or becomes regulated by laws of any local governmental authority, the State in which the applicable Premises are located or the United States Government as a threat to human health or the environment (" **Hazardous Material Laws** "). Tenant will not cause any Hazardous Material to be brought upon, kept or used in the Premises in violation of applicable Hazardous Material Laws. Tenant acknowledges and agrees that all reporting and warning obligations required under Hazardous Material Laws resulting from or in any way relating to Tenant's use of the Premises or Property are Tenant's sole responsibility, regardless whether the Hazardous Material Laws permit or require Landlord to report or warn. Tenant releases and will indemnify, defend (with counsel reasonably acceptable to Landlord), protect and hold harmless the Landlord from and against any and all claims whatsoever arising or resulting, in whole or in part, directly or indirectly, from the presence, treatment, storage, transportation, disposal, release or management of any Hazardous Material in, on, under, upon or from the Premises or Property resulting from or in any way related to Tenant's use of the Premises or Property in violation of applicable Hazard Material Laws. Landlord represents and warrants to Tenant that the Premises, Building, Land and Common Areas do not contain any Hazardous Materials and the Premises, Building, Land and Common Areas are in substantial compliance with applicable Hazard Material Laws. Landlord shall release and indemnify, defend (with counsel reasonably acceptable to Tenant), protect and hold harmless Tenant from and against any and all claims whatsoever arising or resulting, in whole or in part, directly or indirectly, from Landlord's breach of this environmental representation and warranty, as well as any Hazardous Materials present at the Property prior to the Commencement Date. The obligations of Landlord and Tenant under this Section survive the expiration or earlier termination of this Lease.

## SECTION 6: IMPROVEMENTS AND SERVICES

6.1 **Landlord Improvements and Maintenance** . Landlord is not required to construct any improvements to the Property at any time to make the Premises, Building, Land or any part of the Property usable by Tenant as the Premises are delivered to Tenant and accepted by Tenant AS IS – WHERE IS and with all faults and defects, latent and patent. However, Landlord shall promptly maintain, repair and replace improvements to the Premises, Land, Buildings and Common Areas required for them to be maintained in good operating condition and usable by Tenant for the uses permitted by this Lease. Landlord is not required to maintain, repair or replace Equipment used exclusively by Tenant but Landlord shall maintain, repair and replace all Equipment, equipment and machinery included in or operated as Common Areas. Landlord's costs of such maintenance, repair and replacement shall be included in Operating Expenses but capitalized repairs and replacements shall be amortized over their useful life and only the portion amortized in a calendar year shall be included in Operating Expenses for that calendar year.

6.2 **Security** . Landlord is not required to provide any security services to the Premises, the Common Areas or any other portion of the Property. Any alarm systems or other security services that Tenant seeks shall be provided by Tenant at Tenant's sole cost. Landlord shall not have any liability for any loss or damage suffered by Tenant or Tenant's employees or invitees due to theft, burglary, vandalism or other causes at any time, whether in the Building or the Common Areas, unless resulting from the acts or omissions of Landlord. If Tenant obtains any security systems or services Tenant shall provide to Landlord access passes, codes and keys and may be required to enable Landlord to enter the Premises.

6.3 **Tenant Alterations and Maintenance** . Tenant may, from time to time, make alterations, improvements and expansions to the Premises (" **Alterations** ") with Landlord's prior written consent, which consent Landlord shall not unreasonably withhold, condition or delay. Alterations may include walls separating the Premises from other areas of Buildings occupied by Landlord, expansion of the Photo Booth

DT-Carvana Lease                                                 7

EXECUTION COPY

and the addition of out-buildings required for Tenant's operations. Before commencing the Alterations, Tenant will deliver to Landlord copies of all necessary plans and permits for the Alterations as Landlord reasonably requests. All Alterations (excluding Tenant's furniture, trade fixtures and equipment) shall be owned by Landlord and not by Tenant and may not be removed by Tenant, unless Landlord, as a condition of Landlord's approval thereof, requires the removal of such items on expiration or termination of this Lease. Tenant shall promptly maintain, repair and replace any of the Equipment included in the Premises. Tenant shall also repair any damage to the Property caused by Tenant's use of the Property. For the avoidance of doubt, Tenant shall have the right to without Landlord's approval remove any Photo Booth equipment, but not structure, from the Premises at any time provided that Tenant repairs any damage to the Property caused by Tenant's removal of such Photo Booth equipment.

6.4 **Landlord Services** . Landlord will perform or provide the services described in this paragraph during the Term of the Lease (the " **Landlord Services** "), the reasonable costs of Landlord Services shall be Operating Expenses and Tenant shall pay Tenant's Share thereof. Landlord shall pay the public utility companies for public utilities services to the Property, including electricity, water and sewer services (the " **Property Utilities** "). Landlord shall perform or provide periodic cleaning of the Property and Premises by a qualified janitorial services company identified to Tenant. Tenant shall dispose of its waste in outside trash containers and enclosures designated by Landlord. Landlord shall cause all waste to be regularly removed from the Premises. No interruption in, or temporary stoppage of, any of the Landlord Services, nor any interruption or stoppage of any public utilities services is deemed an eviction or disturbance of Tenant's use and possession of the Premises. Tenant may elect at any time by written notice to Landlord to perform all or any of the Landlord Services itself or obtain the same from third parties, in which case the Landlord Services no longer performed by Landlord for Tenant shall no longer be included in Operating Expenses.

**SECTION 7: INSURANCE**

7.1 **Tenant ' s Insurance Obligations** . As mutually agreed to by Tenant and Landlord, Tenant will, at Tenant's sole cost and expense, maintain commercial general liability insurance (providing coverage at least as broad as the current ISO form) with respect to Tenant's activities in the Premises and upon and about the Property, on an "occurrence" basis, with minimum limits as agreed upon by Tenant and Landlord, including specific coverage provisions naming Landlord as additional insured and waiving the insurer's subrogation rights against Landlord and providing Landlord with at least 30 days prior notice of modification, cancellation or expiration. To the extent not prohibited by applicable Laws, Tenant, on behalf of Tenant and its insurers, waives, releases and discharges Landlord and Landlord's employees, agents, contractors and invitees (" **Landlord Parties** ") from all claims arising out of personal injury or damage to or destruction of the Premises, Property or Tenant's personal property or business, occasioned by any fire or other casualty or occurrence whatsoever, unless any such claim results from the criminal conduct of Landlord, and Tenant will look only to Tenant's insurance coverage in the event of any such claim. Tenant's furniture, trade fixtures, equipment, other personal property and all other property in Tenant's care, custody or control, is located at the Property at Tenant's sole risk. After the 100% Date, Tenant will maintain property insurance on the Buildings and all other improvements and real property at the Property, including the Photo Booth, providing coverage at least as broad as the current ISO Special Form ("all-risks") policy in an amount not less than the full insurable replacement cost, in whole or in part under blanket policies.

7.2 **Landlord ' s Insurance Obligations** . Subject to the preceding sentence, Landlord will at all times during the Term maintain property insurance on the Buildings and all other improvements and real property at the Property, including the Photo Booth, providing coverage at least as broad as the current ISO Special Form ("all-risks") policy in an amount not less than the full insurable replacement cost. Landlord may maintain such insurance in whole or in part under blanket policies. Such insurance will not cover or be applicable to any personal property of Tenant within the Premises or otherwise located at the Property.

DT-Carvana Lease                                                 8

EXECUTION COPY

Landlord may also obtain commercial general liability insurance and/or errors and omissions liability against claims for bodily injury, personal injury, and property damage occurring at the Property in such amounts as Landlord deems necessary or appropriate. Such liability insurance will protect only Landlord and, at Landlord's option, Landlord's lender and some or all of the Landlord Parties, and does not replace or supplement the liability insurance this Lease obligates Tenant to carry. To the extent not prohibited by the Laws, Landlord, on behalf of Landlord and its insurers, waives, releases and discharges Tenant and Tenant's employees, agents, contractors and invitees (" **Tenant Parties** ") from all claims arising out of personal injury or damage to or destruction of the Building, Land, Common Areas and/or Property, or loss of use of the Building, Land, Common Areas and/or Property, occasioned by any fire or other casualty or occurrence whatsoever (whether similar or dissimilar) unless any such claim results from the criminal conduct of Tenant, and Landlord will look only to Landlord's insurance coverage (regardless whether Landlord maintains any such coverage) in the event of any such claim. Landlord's policy or policies of property insurance will permit releases of liability and will provide for waiver of subrogation as provided in this Section. Premiums for property insurance, but not liability insurance, paid by Landlord shall be included in Operating Expenses and Tenant shall pay Tenant's Share thereof.

## SECTION 8: DAMAGE OR DESTRUCTION

8.1 **For all Hubs and, with respect to Inspection Centers, prior to the applicable Premises ' 100% Date** . If fire or other casualty renders the whole or a substantial part of the Premises untenantable and Landlord determines (in Landlord's reasonable discretion) that Landlord can make the Premises tenantable within 120 days after the date of the casualty, then Landlord will notify Tenant that Landlord will repair and restore the Premises to their condition prior to the casualty as is reasonably possible within the 120 day period. Landlord will provide the notice within 15 days after the date of the casualty. If fire or other casualty renders the whole or any material part of the Premises untenantable and Landlord determines (in Landlord's reasonable discretion) that Landlord cannot make the Premises tenantable within 120 days after the date of the casualty, then Landlord will so notify Tenant within 15 days after the date of the casualty and either party may, by written notice to the other within five business days thereafter, terminate this Lease effective on the date of such party's termination notice. If the Premises is substantially damaged or destroyed by fire or other casualty that substantially limits or interferes with Tenant's occupancy of the Premises, either party may, at its option, by notifying the other party, terminate this Lease effective on the date of the termination notice. If this Lease is not terminated under this Section following a fire or other casualty, then Landlord will repair and restore the Premises and Property to their condition prior to the fire or other casualty as is reasonably possible with all diligence and speed and Base Rent and Tenant's Share of Operating Expenses for the period during which the Premises are untenantable will abate pro rata (based upon the rentable area of the untenantable portion of the Premises as compared with the rentable area of the entire Premises).

8.2 **With respect to Inspection Centers, after such Inspection Center's 100% Date** . If fire or other casualty renders the whole or a substantial part of the Premises untenantable, Landlord will at Tenant's request use commercially reasonable efforts to exercise any rights Landlord has under the applicable IC Lease with respect to such Premises; provided that (i) Tenant shall fully reimburse Landlord for any cost, expense, or fee Landlord incurs in exercising such rights and (ii) Tenant shall indemnify, defend (with counsel reasonably acceptable to Landlord), protect and hold harmless the Landlord from and against any and all claims whatsoever arising or resulting, in whole or in part, directly or indirectly, from Landlord's actions or inactions taken at the request of Tenant.

## SECTION 9: EMINENT DOMAIN

If any governmental unit with the power of eminent domain (the " **Condemning Authority** ") desires to acquire all or any portion of the Premises (a " **Taking** "), Landlord will notify Tenant and Tenant

DT-Carvana Lease                                                9

EXECUTION COPY

will reasonably determine whether the Taking will render the Premises unsuitable for Tenant's intended purposes. If Tenant concludes that the Taking will render the Premises unsuitable for Tenant's intended purposes, Landlord and Tenant will document such determination and this Lease will terminate as of the date the Condemning Authority takes possession of the portion of the Premises taken. Tenant will pay Rent to the date of termination. If a Condemning Authority takes all or any material part of the Premises or if a Taking reduces the value of the Property by 50% or more (as reasonably determined by Landlord), regardless, then Landlord may, by notifying Tenant terminate this Lease effective on the date the Condemning Authority takes possession of the portion of the Property taken. If this Lease does not terminate with respect to the entire Premises under this Section and the Taking includes a portion of the Premises, this Lease automatically terminates as to the portion of the Premises taken as of the date the Condemning Authority takes possession of the portion taken and Landlord will, at its sole cost and expense, restore the remaining portion of the Premises to a complete architectural unit with all commercially reasonable diligence and speed and will equitably reduce the Base Rent for the period after the date the Condemning Authority takes possession of the portion of the Premises taken. Landlord will also equitably adjust Tenant's Share of Operating Expenses for the same period to account for the reduction in the rentable area of the Premises resulting from the Taking. Tenant's obligation to pay Base Rent and Tenant's Share of Operating Expenses will abate on a proportionate basis with respect to that portion of the Premises remaining after the Taking that Tenant is unable to use for Tenant's business purposes during Landlord's restoration for the period of time that Tenant is unable to use such portion of the Premises. Landlord and Tenant are entitled to receive and keep all damages, awards or payments resulting from or paid on account of a Taking as provided by Law. Tenant may prove in any condemnation proceedings and may receive any separate award for damages to or condemnation of Tenant's unamortized costs of all Alterations including but not limited to, movable trade fixtures and equipment and for moving expenses; provided however, that Tenant has no right to receive any award for its interest in this Lease or for loss of Landlord Improvements.

## SECTION 10: TRANSFERS

10.1 **Transfer by Tenant** . Tenant shall not, without the prior written consent of Landlord: (i) sublet all or any part of the Premises or allow it to be occupied or used by any person or entity other than Tenant; or (ii) assign its interest in this Lease. Any attempted Transfer without Landlord's consent shall constitute an Event of Default and shall be voidable at Landlord's option. However, Tenant may assign this Lease or sublease all or a portion of the Premises to an entity controlled by, controlling or under common control with Tenant or an entity acquiring or succeeding to substantially all of the business and assets of Tenant by merger, spin-off, reorganization, consolidation, acquisition (of assets or equity) or otherwise (a " **Permitted Transfer** ").

10.2 **Transfer by Landlord** . Landlord and its successors in interest shall have the right to transfer their interest in this Lease and the Property at any time and to any person or entity, provided such person or entity assumes in writing all obligations of Landlord under this Lease accruing after the date of such transfer. In the event of any such transfer, Landlord shall be automatically relieved, without any further act by any person or entity, of all liability for the performance of the obligations of the Landlord accruing after the date of such transfer. After the date of any such transfer the term "Landlord" as used herein shall mean the transferee of such interest in the Premises.

## SECTION 11: DEFAULTS AND REMEDIES

11.1 **Events of Default** . Any of the following constitutes an " **Event of Default** " by Tenant under this Lease. Landlord and Tenant agree that the notices required by this Section are intended to satisfy any and all notice requirements imposed by the Laws and are not in addition to any such requirements.

DT-Carvana Lease                                        10

11.1.1 **Failure to Pay Rent** . Tenant fails to pay Base Rent, any monthly installment of Tenant's Share of Operating Expenses or any other Additional Rent amount as and when due and such failure continues for 10 days after delivery to Tenant of written notice thereof from Landlord.

11.1.2 **Failure to Perform** . Tenant breaches or fails to perform any of Tenant's nonmonetary obligations under this Lease and the breach or failure continues for a period of 15 days after Tenant receives written notice of Tenant's breach or failure from Landlord; provided that if Tenant cannot cure its breach or failure within a 15 day period, Tenant's breach or failure is not an Event of Default if Tenant commences to cure its breach or failure within the 15 day period and thereafter diligently pursues the cure and effects the cure within a reasonable period of time.

11.1.3 **Other Defaults** . (a) Tenant makes a general assignment for the benefit of creditors; (b) a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by Tenant; (c) a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed against Tenant and is not dismissed within 90 days; (d) a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease; or (e) substantially all of Tenant's assets, or substantially all of Tenant's assets located at the Premises, or Tenant's interest in this Lease is subjected to attachment, execution or other judicial seizure not discharged within 90 days.

11.2 **Remedies** . Upon the occurrence of any Event of Default of Tenant and expiration of any applicable cure period, Landlord may at any time and from time to time, and without preventing Landlord from exercising any other right or remedy, exercise any one or more of the following remedies:

11.2.1 **Termination of Tenant ' s Possession/Re-entry and Reletting Right** . Terminate Tenant's right to possess the Premises by any lawful means with or without terminating this Lease, in which event Tenant will immediately surrender possession of the Premises to Landlord. In such event, this Lease continues in full force and effect (except for Tenant's right to possess the Premises) and Tenant continues to be obligated for and must pay all Rent as and when due under this Lease. Unless Landlord specifically states that it is terminating this Lease, Landlord's termination of Tenant's right to possess the Premises is not to be construed as an election by Landlord to terminate this Lease or Tenant's obligations and liabilities under this Lease. If Landlord terminates Tenant's right to possess the Premises, Tenant shall have five (5) days to re-enter the Premises and remove all persons and property from the Premises. After the five (5) days, Landlord is not obligated to, but may re-enter the Premises and remove all persons and property from the Premises. Upon such re-entry, Landlord is not obligated to, but may relet all or any part of the Premises to a third party or parties for Tenant's account. Tenant is immediately liable to Landlord for all costs and expenses Landlord incurs re-entering or reletting all or any part of the Premises (the " **Re-entry Costs** "), including, without limitation, all costs and expenses Landlord incurs (a) maintaining or preserving the Premises after an Event of Default; (b) recovering possession of the Premises, recovering persons and property from the Premises and storing such property (including court costs and reasonable attorneys' fees); (c) reletting, renovating or altering the Premises; and (d) real estate commissions, advertising expenses and similar expenses paid or payable in connection with reletting all or any part of the Premises. Landlord may relet the Premises for a period shorter or longer than the remaining Term. If Landlord relets all or any part of the Premises, the proceeds of reletting will be applied towards Rent and all amounts payable by Tenant pursuant to this Lease. If the amount Landlord actually collects from any reletting exceeds such Rent (" **Net Rent** "), Landlord will apply the excess sum to future Rent due under this Lease.

11.2.2 **Termination of Lease** . Terminate this Lease effective on the date Landlord specifies in Landlord's notice to Tenant. Upon termination, Tenant will immediately surrender possession of the Premises to Landlord. If Landlord terminates this Lease, Landlord may recover from Tenant and Tenant will pay to Landlord on demand all damages Landlord incurs by reason of Tenant's default, including, without limitation, (a) all Rent due and payable under this Lease as of the effective date of the

DT-Carvana Lease                                                11

EXECUTION COPY

termination; (b) any amount necessary to compensate Landlord for any damages proximately caused Landlord by Tenant's failure to perform its obligations under this Lease or which in the ordinary course would likely result from Tenant's failure to perform, including, but not limited to, any Re-entry Costs; and (c) an amount equal to the positive difference, if any, between the Rent, including Tenant's Share of Operating Costs, for the balance of the Term remaining after the effective date of the termination (assuming no termination) and the amount of Rent, including Tenant's Share of Operating Costs, for the Premises that Tenant proves that Landlord will receive from reletting the Premises for the same period, with such positive difference discounted to present value at the Prime Rate. Nothing in this Section limits or prejudices Landlord's right to prove and obtain damages in an amount equal to the maximum amount allowed by the Laws, regardless whether such damages are greater than the amounts set forth in this Section.

11.2.3 **Right to Cure** . If Tenant defaults in the performance of any obligation under this Lease and Tenant fails to cure the default within the time permitted by this Section, then, Landlord may, but is not obligated to, perform any such obligation on Tenant's part without waiving any rights based upon such default and without releasing Tenant from any obligations hereunder. Tenant must pay to Landlord, within 15 days after delivery by Landlord to Tenant of statements therefor, sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults. Such obligations survive the termination or expiration of this Lease.

11.2.4 **Other Remedies** . Exercise any other right or remedy available to Landlord under this Lease, or otherwise at law or in equity, including without limitation statutory liens on Tenant's tangible personal property located on the Premises. Landlord acknowledges its duty under applicable law to mitigate damages resulting from and Event of Default by Tenant.

11.3 **Waiver and Release by Tenant** . Tenant waives and releases all claims Tenant may have after an Event of Default resulting from Landlord's re-entry and taking possession of the Premises by any lawful means and removing and storing Tenant's property as permitted under this Lease, regardless whether this Lease is terminated and, to the fullest extent allowable under the Laws, Tenant releases and will indemnify, defend (with counsel reasonably acceptable to Landlord), protect and hold harmless the Landlord Parties from and against any and all claims occasioned thereby. No such reentry is to be considered or construed as a forcible entry by Landlord.

11.4 **Landlord ' s Default and Tenant ' s Remedies** . If Landlord breaches any covenant, representation or warranty in this Lease, or defaults in the performance of any of its obligations under this Lease and fails to cure the default within the applicable cure period the breach or failure shall be an "Event of Default" of Landlord under this Lease. If Landlord defaults in the performance of any of its obligations under this Lease, Tenant will notify Landlord of the default and Landlord will have 15 days after receiving such notice to cure the default; provided that if Landlord cannot cure its breach or failure within a 15 day period, Landlord's breach or failure is not an Event of Default if Landlord commences to cure its breach or failure within the 15 day period and thereafter diligently pursues the cure and effects the cure within a reasonable period of time. If an Event of Default of Landlord occurs and is not cured within the applicable cure period then Tenant may perform all actions required to cure the Event of Default and offset all costs incurred by Tenant against future Rent. If an Event of Default of Landlord causes the Premises to be unusable by Tenant for more than five business days, then in such event Tenant shall have the right to terminate this Lease effective immediately, provided Tenant delivers written notice of termination to Landlord within the next five business days. The remedies provided for in this Section 13.4 are not exclusive and are in addition to any and all other remedies available to Tenant in this lease or at law or equity, but subject to the waivers and limitations stated in this Lease.

DT-Carvana Lease                                   12

EXECUTION COPY

## SECTION 12: SURRENDER OF PREMISES

Tenant will surrender the Premises to Landlord at the expiration or earlier termination of this Lease in substantially the same condition as existed at the Commencement Date, except for normal wear and tear and any alterations permitted by this Lease. Tenant will at such time remove all of its property from the Premises and promptly repair any damage to the Premises caused by such removal. If Tenant possesses the Premises after the Term expires or is otherwise terminated without executing a new lease and without the Landlord's express written consent, Tenant is deemed to be occupying the Premises as a tenant at sufferance and may be removed by Landlord in accordance with applicable Law. The Base Rent payable for any period of Tenant's possession while a tenant at sufferance shall be at a rate equal to 150% of Base Rent payable by Tenant in the last full calendar month of the Term and the increase in the rate of Base Rent is received by Landlord as Base Rent and not as a payment of damages.

## SECTION 13: RIGHTS RESERVED TO LANDLORD

13.1 **Landlord ' s Entry** . Landlord and its authorized representatives may at all reasonable times during Business Hours and upon reasonable notice to Tenant enter the Premises to: (a) inspect the Premises; (b) show the Premises to prospective purchasers, mortgagees and tenants; (c) post notices of non-responsibility or other protective notices available under the Laws; or (d) exercise and perform Landlord's rights and obligations under this Lease, including the Landlord Services. Landlord may in the event of any emergency enter the Premises without notice to Tenant. Landlord's entry into the Premises is not to be construed as a forcible or unlawful entry into, or detainer of, the Premises or as an eviction of Tenant from all or any part of the Premises. So long as Landlord does not unreasonably interfere with Tenant's use, Tenant will also permit Landlord (or its designees) to enter the Premises to make any repairs and replacements to the Building and to erect, install, use, maintain, replace and repair pipes, cables, conduits, plumbing and vents, and telephone, electric and other wires or other items, in, to and through the Premises if Landlord determines that such activities are necessary or appropriate for properly operating and maintaining the Building.

13.2 **Landlord Representation of Title** . Landlord covenants that it has full right and power to execute and perform this Lease, and that Tenant shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges thereunto without hindrance by Landlord or any person or entity claiming under or through Landlord, subject, however, to the reservations and conditions of this Lease.

## SECTION 14: MISCELLANEOUS PROVISIONS

14.1 **Notices** . All Notices must be in writing and must be sent by personal delivery, United States registered or certified mail (postage prepaid), by an independent overnight courier service, e-mail, or by telephonic facsimile "fax", addressed to the addresses specified in the Basic Terms or at such other place as either party may designate to the other party by written notice given in accordance with this Section. Notices are deemed delivered upon receipt. Receipt of any notice shall be evidenced by the date of receipt or rejection on the return receipt, provided refusal to accept or the inability to deliver at the address designated in accordance with this section because of changed address of which no notice was given or because of failure to provide procedures for the delivery of mail at such address shall be deemed to be receipt of such notice. Notices to either party may be given by the attorney for the other party acting on behalf of such other party.

14.2 **Successors** . The covenants and agreements contained in this Lease bind and inure to the benefit of Landlord, its successors and assigns, bind Tenant and its successors and assigns and inure to the benefit of Tenant and its permitted successors and assigns.

DT-Carvana Lease                                         13

14.3 **Relationship of Parties** . This Lease does not create the relationship of principal and agent, or of partnership, joint venture, or of any association or relationship between Landlord and Tenant other than that of landlord and tenant.

14.4 **Entire Agreement; Amendment** . The Basic Term and all exhibits, addenda and schedules attached to this Lease are incorporated into this Lease as though fully set forth in this Lease and together with this Lease contain the entire agreement between the parties with respect to the improvement and leasing of the Premises. All preliminary and contemporaneous negotiations, including, without limitation, any letters of intent or other proposals and any drafts and related correspondence, are merged into and superseded by this Lease. No subsequent alteration, amendment, change or addition to this Lease (other than as expressly permitted by this Lease) is binding on Landlord or Tenant unless it is in writing and signed by the party to be charged with performance.

14.5 **Severability** . If any covenant, condition, provision, term or agreement of this Lease is, to any extent, held invalid or unenforceable, the remaining portion thereof and all other covenants, conditions, provisions, terms and agreements of this Lease will not be affected by such holding, and will remain valid and in force to the fullest extent permitted by law.

14.6 **Survival** . All of Tenant's and Landlord's representations, warranties, covenants, releases and indemnification, defense and hold harmless obligations under this Lease survive the expiration or other termination of this Lease.

14.7 **Attorneys ' Fees** . If either Landlord or Tenant commences any litigation or judicial action to determine or enforce any of the provisions of this Lease, the prevailing party in any such litigation or judicial action is entitled to recover all of its costs and expenses (including, but not limited to, reasonable attorneys' fees, costs and expenditures) from the non-prevailing party.

14.8 **GOVERNING LAW . THIS LEASE IS GOVERNED BY, AND MUST BE INTERPRETED UNDER, THE INTERNAL LAWS OF THE STATE WHERE THE APPLICABLE PROPERTY IS LOCATED. ANY SUIT ARISING FROM OR RELATING TO THIS LEASE MUST BE BROUGHT IN THE COUNTY WHERE THE APPLICABLE PROPERTY IS LOCATED; LANDLORD AND TENANT WAIVE THE RIGHT TO BRING SUIT ELSEWHERE. LANDLORD AND TENANT ALSO WAIVE TRIAL BY JURY.**

14.9 **Time is of the Essence** . Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

14.10 **Force Majeure** . If either party is delayed or prevented from performing any obligation under this Lease (excluding, however, the payment of money) by reason of Force Majeure, such party's performance of such obligation is excused for a period equal to (a) the duration of the Force Majeure event, or (b) if longer, the period of delay actually caused by the Force Majeure event.

By their execution below, Landlord and Tenant each acknowledge its receipt, reading, understanding and acceptance of every provision of the Lease, including all Exhibits, as of the dates stated below, effective as of the Lease Date.

DT-Carvana Lease                                          14

**Landlord:**                                              **DriveTime Car Sales Company, LLC**
                                                           an Arizona limited liability company

                                                           By:      /s/ Jon Ehlinger
                                                           Name:  Jon Ehlinger
                                                           Title:     Secretary

DT-Carvana Lease                                          1

**Tenant:**

**Carvana, LLC**
an Arizona limited liability company

By:    /s/ Paul Breaux

Name:  Paul Breaux

Title:  Vice President

**Carvana Delivery & Shipping, LLC**
an Arizona limited liability company

By:    /s/ Paul Breaux

Name:  Paul Breaux

Title:  Manager

DT-Carvana Lease                                2

**EXHIBIT A**

**Premises Schedule –**
**Date of Last Revision: February 3, 2017**

Definitions for All Premises:

*Base Rent* for Premises leased by Landlord = 1.10 multiplied by (Tenant's Share for such month for the applicable Premises) multiplied by (Landlord's actual location-coded costs for the applicable Property (including rent and depreciation of land and equipment but excluding Operating Expenses and labor) )

Base Rent for Premises owned by Landlord or an affiliate of Landlord = (Tenant's Share for such month for the applicable Premises) multiplied by (Landlord's actual location-coded costs for the applicable Property (including rent and depreciation of land (assuming a 10% cap rate) and equipment but excluding Operating Expenses and labor) )

*Tenant's Share with respect to each type of Premises is described further below.

*It is understood that the Tenant's Expected Share listed below is merely an estimate based on Tenant's projected actual usage of each Property.

*Actual Tenant's Share and actual Base Rent for each month shall be calculated by Landlord based on Tenant's actual usage of each Premises pursuant to the formulas and definitions below.

**Hubs:**

| Premises | Location | Tenant's Expected Share of Property | Site Commencement Date | Expiration Date (subject to renewals at Renewal Hubs) |
|---|---|---|---|---|
| [***] | Charlotte Hub | ~1.2% | February 3, 2017 | February 2, 2019 |
| [***] | Alabama Hub | ~4.4% | February 3, 2017 | February 2, 2019 |
| [***] | Raleigh Hub | ~6.7% | February 3, 2017 | February 2, 2019 |
| [***] | Richmond Hub | ~9.7% | February 3, 2017 | February 2, 2019 |
| [***] | Miami Hub | ~6.6% | February 3, 2017 | February 2, 2019 |
| [***] | Jacksonville Hub | ~13.1% | February 3, 2017 | February 2, 2019 |

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

| | | | | |
|---|---|---|---|---|
| [***] | Tampa Hub | ~5.8% | February 3, 2017 | February 2, 2019 |
| [***] | Washington DC Hub | ~8.7%^ | February 3, 2017 | February 2, 2019 |
| [***] | Cincinnati Hub | ~8.2% | February 3, 2017 | February 2, 2019 |
| [***] | Pittsburgh Hub | ~3.9% | February 3, 2017 | February 2, 2019 |
| [***] | Memphis Hub | ~8.3% | February 3, 2017 | February 2, 2019 |
| [***] | Indianapolis Hub | ~3.1% | February 3, 2017 | February 2, 2019 |
| [***] | Cleveland Hub | ~1.1% | February 3, 2017 | February 2, 2019 |
| [***] | Stockbridge Temporary Storage | ~13.65% | February 3, 2017 | February 2, 2019 |
| [***] | Austin Hub | ~5.8% | February 3, 2017 | February 2, 2019 |
| [***] | San Antonio Hub | ~1.5% | February 3, 2017 | February 2, 2019 |
| [***] | Orlando Hub | ~3.9% | February 3, 2017 | February 2, 2019 |
| [***] | Columbus Hub | ~7.3% | February 3, 2017 | February 2, 2019 |
| [***] | Memphis Hub (Storage Lot) | ~7.6% | February 3, 2017 | February 2, 2019 |
| [***] | Nashville Hub | ~2.7% | February 3, 2017 | February 2, 2019 |

Hub Definitions:

*Tenant ' s Share for Hubs* =

For such month, the sum of (x) one-half of Tenant's Share of Parking Spaces and (y) one-half of Tenant's Share of Building Sq. Footage.

*Tenant's Share of Building Sq. Footage* = For such month, Tenant's pro rata usage of building office space at the Property as Premises, expressed as a percentage.

[***]  *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

*Tenant ' s Share of Parking Spaces* = For such month, Tenant's pro rata usage of parking spaces at the Property as Premises, expressed as a percentage.

^With respect to the Washington DC Hub only, Base Rent shall equal: $3,000 plus [(Tenant's Share for such month for the applicable Premises) multiplied by (Landlord's actual location-coded costs for the applicable Property (including rent and depreciation of land but excluding Operating Expenses and labor) minus $3,000)]. Additionally, only for purposes of calculating Tenant's Share of Parking Spaces at the Washington, DC Hub, the number of parking spaces used by Tenant shall be reduced by 30 parking spaces.

With respect to the Stockbridge Hub, Tenant shall make commercially reasonable efforts to vacate the premises by August 1, 2017, and in no event, shall Tenant fail to vacate such premises later than November 1, 2017, absent consent from Landlord.

With respect to the Orlando Hub, Tenant shall make commercially reasonable efforts to vacate the premises by June 1, 2017, and in no event, shall Tenant fail to vacate such premises later than August 1, 2017, absent consent from Landlord.

**Inspection Centers** :

| Premises | Location | Tenant's Expected Share of Property | Site Commencement Date |
|---|---|---|---|
| 1123 Cantrell Sansom Road, Blue Mound, TX 76131 | Blue Mound Inspection Center | ~50.0% | February 3, 2017 |
| 600 Creek Road, Delanco, NJ 08075 | Delanco Inspection Center | ~33.33% | February 3, 2017 |

Inspection Center Definitions:

*Tenant ' s Share for Inspection Centers* =

For such month, the sum of (x) one-half of Tenant's Share of Parking Spaces and (y) one-half of Tenant's Share of Produced Units.

*Tenant ' s Share of Produced Units* = For such month, Tenant's pro rata portion of vehicle units produced at the Property, expressed as a percentage.

*Tenant ' s Share of Parking Spaces* = For such month, Tenant's pro rata usage of parking spaces at the Property as Premises, expressed as a percentage.

**[Signature Page Follows]**

**Tenant:**

**Carvana, LLC ("Carvana")** an Arizona limited liability company

By:     /s/ Paul Breaux

Name:   Paul Breaux

Title:   Vice President

**Carvana Delivery & Shipping, LLC ("Carvana Shipping")** an Arizona limited liability company

By:     /s/ Paul Breaux

Name:   Paul Breaux

Title:   Manager

**Landlord:**

**DriveTime Car Sales Company, LLC** an Arizona limited liability company

By:     /s/ Jon Ehlinger

Name:   Jon Ehlinger

Title:   Secretary

**SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

This **SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT** (this " **Agreement** ") is being entered into on February 27, 2017 and shall be effective as of such date, by and between **DriveTime Automotive Group, Inc.** , (" **DTAG** ") a Delaware corporation and **Bridgecrest Acceptance Corporation** f/k/a DT Acceptance Corporation, an Arizona corporation and their affiliates and subsidiaries (severally and collectively " **Provider** " or " **DriveTime** ") and **Carvana, LLC** , an Arizona limited liability company (" **Carvana** "). In this Agreement, Provider and CARVANA are referred to collectively as the " **Parties** " and each of them is sometimes referred to individually as a " **Party** ."

**R ECITALS**

A. This Shared Services Agreement (the " **Shared Services Agreement** ") is being entered into to arrange for certain services to be provided by Provider to CARVANA.

**A GREEMENT**

The Parties, intending to be legally bound, agree as follows:

1. **D EFINITIONS** Any capitalized term that is used but not expressly defined in this Agreement will have the same meaning in this Agreement as the meaning (if any) given to such term in the Purchase and Sale Agreement. For purposes of this Agreement:

   1.1. " **Confidential Information** " means all or any part of, whether originals or copies of, any technical and non-technical information, in whatever form embodied, either Party provides the other hereunder that is confidential or proprietary, including trade secrets, know-how, firmware, designs, schematics, techniques, software code, technical documentation, specifications, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either Party, its present or future products, sales, suppliers, customers, employees, investors or business, whether in written, oral, graphic or electronic form.

   1.2. " **Pass-Through Expenses** " means the reasonable and actual out-of-pocket expenses paid to unaffiliated third parties in connection with the provision of the Services to CARVANA (which, for the avoidance of doubt shall not include salaries and benefits of employees of Provider or its Affiliates, or costs incurred for subcontracting out Services otherwise being provided for by Provider).

   1.3. " **Services** " means the services, functions, and tasks to be provided by Provider to CARVANA pursuant to this Agreement as expressly described in the applicable Service Schedule, as such services, functions, and tasks may be changed or supplemented during the Term of this Agreement pursuant to the terms of this Agreement.

   1.4. " **Service Schedule** " means a Schedule to this Agreement, describing (among other things) the particular Services being provided, the Provider, CARVANA, and the Service Term.

**1.5.** " **Service Term** " means the period of time during which a particular Service will be provided, as set forth in this Agreement or the applicable Service Schedule.

## 2.    SERVICES

**2.1. Performance of Services.** The Provider will use commercially reasonable efforts to provide, and as necessary will cause its controlled Affiliates to use commercially reasonable efforts to provide, the Services to CARVANA (and, as necessary, its Affiliates) during the Service Term for the applicable Services. Except as otherwise expressly provided in this Agreement (including in the applicable Service Schedule), the Provider will be responsible for providing the equipment, personnel, and other resources required for the Provider's performance of the Services. Notwithstanding anything to the contrary contained in this Agreement, the Provider shall not be obligated to provide any Services to the extent the provision of such Services would violate (i) any agreement or license with a third party to which the Provider or any of its Affiliates are subject or (ii) any applicable Law.

**2.2. Quarterly Updates; Reduction in Services.** The Parties will meet periodically to make a mutual assessment of the Services then being provided, and shall adjust the Monthly Fee by removing the applicable fee for such Service from the Monthly Fee to account for the termination of any Service then being provided. CARVANA may elect to terminate all or any part of the Services at any time upon 30 days' prior written notice to the Provider. Provider may elect to terminate any Service upon 90 days' prior written notice to Carvana; provided that such termination shall not be effective until the later of (i) December 31, 2017 and (ii) the "Minimum Term" assigned to such Service on the applicable Service Schedule.

**2.3. Additional Services.** If CARVANA reasonably requests that the Provider perform additional services not included within the scope of any Services Schedule (an " **Omitted Servic** e"), then Provider will review such request from Carvana in good faith and if it determines in its reasonable discretion to provide such service, the parties shall promptly negotiate in good faith with a view toward adding another Services Schedule to this Agreement covering such Omitted Service, with any fees payable in connection therewith to be reasonable in light of the nature of the services and consistent with the fees charged for other Services hereunder; provided; however, no additional Services Schedule will take effect or be binding on either Party until both Parties have agreed in writing to such Services Schedule. Once a Services Schedule with respect to an Omitted Service has been agreed in writing, such Omitted Service shall be considered a Service hereunder, the agreed upon fee will be added to the Monthly Fee to account for the additional Service being provided and the Service shall be subject to the terms and conditions herein and in such Service Schedule.

**2.4. Subcontracting.** The Provider may contract with third parties to provide such Services, provided that the Provider will remain responsible for all obligations, Services and functions performed by such subcontractor pursuant to this Agreement to the same extent as if these obligations, services and functions were performed by the Provider so long as Provider remains responsible for the performance of such Services in accordance with the terms and conditions of this Agreement and provided that that no additional fees will be charged to CARVANA for such subcontracted Services in excess of the monthly fee applicable to such Service.

**2.5. Representations and Warranties; Standard of Performance.**

(a) **Representations and Warranties.** Provider represents and warrants that it shall, and shall cause its respective Affiliates and subcontractors to provide Services in compliance with applicable Laws.

(b) **Standard of Performance.** Notwithstanding anything to the contrary in this Agreement, CARVANA understands and agrees that (i) the Provider and its subsidiaries are not in the business of providing to third parties services such as those provided under this Agreement, (ii) accordingly, the standard of performance to which each Provider will be accountable under this Agreement will be the use of commercially reasonable efforts to achieve a comparable level of service as the Provider provides to its own internal organization with respect to its business and affairs, subject to applicable Law, and in any event no greater than the level of service provided by Service Recipient or its Affiliates to the Business immediately before the Closing and (iii) under no circumstance will the Provider or any of its employees or contractors be held to a higher standard of performance.

**2.6. Consents.** Provider or one of its applicable Affiliates has obtained all consents, approvals, or agreements of any third party (a " **Consent** "), required for the Provider to provide the Services pursuant to this Agreement (or to use any equipment or software owned by or leased or licensed to the Provider or any of its Affiliates in connection with the provision of such Services), and no further Consent to provide Services hereunder is required.

**2.7. Cooperation; Access.** (a) In order to enable the Provider to perform Services, CARVANA will provide (and, as necessary, cause its Affiliates to provide) the Provider with such cooperation and assistance as the Provider reasonably requests. Such cooperation and assistance will include providing to the Provider, in a timely manner, answers to questions, information, and technical consultation. Each Party acknowledges that its failure to perform its obligations under this Agreement could result in delays on the part of the other Party in performing the affected Services, or prevent performance by the other Party of the affected Services.

(b) CARVANA shall provide to the Provider reasonable access to the premises of CARVANA and the systems, software and networks located therein, solely to the extent necessary for the purpose of providing the Services. The Provider shall use its reasonable best efforts to ensure that it and its employees and agents comply with CARVANA's contractor, supplier and security policies and procedures as may be provided to the Provider by CARVANA from time to time.

**2.8. Services Managers.** If requested by either party, each Party will each appoint a single " **Services Manager** " for each Service. The initial Services Manager for each Party will be identified in the applicable Service Schedule and will serve as the primary point of contact for the other Party for matters related to such Service. Either Party may replace any of its Services Managers with an individual of comparable qualifications and experience by notifying the other Party of such new appointment.

3

3.    C OMPENSATION

**3.1. Fees.** Provider has delivered to Carvana in writing a Schedule of the Services Fees (the " **Services Fees** "). Provider may change the Servicer Fees upon thirty days' prior written notice to Carvana or as otherwise agreed to by the parties. If Carvana does not provide written notice within the 30-day period that it is discontinuing the Service, then the change will take effect upon the expiration of the 30 days. If Carvana does not agree with the change, Carvana shall provide written notice within the 30-day period and Provider shall continue to provide the Services for the Servicer Fees at the prior amount for up to 90 days after the expiration of the notice period, at which time those Services will be discontinued. The Services Fees are calculated by taking the number of employees providing services for Carvana and multiplying that number by the average compensation (i.e., salary, bonus, benefits, taxes) for that department or function plus a markup to cover the location costs of those services (i.e., computer, desk, pens). These charges will be consistent with what has historically been charged to Carvana. The Services Fees do not include charges for real estate licenses or subleases as all charges for real estate licenses and subleases are payable pursuant to a separate agreement between CARVANA and Provider.

**3.2. Pass-Through Expense Reimbursement.** Without duplication of any fees payable pursuant to Section  3.1 above, CARVANA will reimburse the Provider for all Pass-Through Expenses that are incurred by the Provider in performing the Services and are invoiced to the CARVANA in accordance with Section  3.3 . Depending upon the expense, the allocation method will be done based upon the applicable and most reasonably accurate measure, such as headcount, revenue or produced units.

**3.3. Invoicing and Payment.**

(a) **Monthly Fees and Expenses.** Unless other payment terms are set forth in the applicable Service Schedule or as otherwise mutually agreed to by the parties, within 30 days following the end of each calendar month during the Term, the Provider will issue to CARVANA an invoice for the amount of the Monthly Fee and Pass-Through Expenses payable to the Provider for such calendar month. CARVANA will pay the amount invoiced by the Provider within thirty days after receipt thereof. All such payments may be made as reasonably agreed upon by the parties.

(b) **Records.** Provider shall cause to be maintained appropriate files and records relating to the Services and the invoices and statements of account to be provided hereunder, consistent with its normal practices and procedures, and as otherwise mutually agreed to by the parties. CARVANA and its representatives will have access during normal business hours, upon 48 hours' notice, to review or inspect such files and records upon request.

**3.4. Taxes.** The fees of Provider for Services provided pursuant to this Agreement exclude all excise, sales, use, gross receipts, value added, and services, or similar transaction or revenue-based taxes applicable to the provision of services and imposed by any federal, state, or local taxing authority (such taxes, together with any applicable interest, penalties, or additions to tax imposed with respect to such taxes, " **Taxes** "), and CARVANA will be responsible for payment of all such Taxes. To the extent any such Taxes fall upon the Provider, the amount of such Taxes shall be added to the fees payable to Provider (grossed up for any Taxes owed by Provider as a result of such payment).

4

**3.5. Expenses.** Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses incurred in the performance of this Agreement.

## 4.    CONFIDENTIALITY

**4.1. Restrictions on Use of Confidential Information.** All Confidential Information exchanged between the Parties pursuant to this Agreement shall not be distributed, disclosed, or disseminated in any way or form by the receiving Party to anyone except its own employees and contractors who have a reasonable need to know such Confidential Information and who have been advised of the confidential nature and required to observe the terms and conditions hereof; nor shall Confidential Information be used by the receiving Party for its own purpose, except for the purposes of exercising its rights or fulfilling its obligations under this Agreement. The recipient shall treat all of the disclosing Party's Confidential Information with the same degree of care as the recipient accords to recipient's own Confidential Information, but not less than reasonable care. All customer information shall be deemed to be Confidential Information and shall be held consistent with all applicable laws; each party has the right to audit the other party with respect to any such information. The recipient shall immediately give notice to the disclosing Party of any unauthorized use or disclosure of disclosing Party's Confidential Information. The recipient shall assist the disclosing Party in remedying any such unauthorized use or disclosure of the disclosing Party's Confidential Information. The restriction on disclosure will not apply to Confidential Information which is required to be disclosed by a court, government agency or regulatory requirement, provided that recipient shall first notify the disclosing Party of such disclosure requirement or order and shall, at the request of the disclosing Party, reasonably cooperate with the disclosing Party to obtain confidential treatment or a protective order; provided further that in such case, the disclosure of the Confidential Information shall not relieve the receiving Party of its obligation of confidentiality and non-use for any other purpose.

**4.2. Exceptions.** The obligation not to disclose information under Section 4.1 hereof shall not apply to information that, as of the Closing Date or thereafter, (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to recipient by the disclosing Party through no fault of the recipient; (b) was rightfully in the recipient's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to the recipient by the disclosing Party; (c) was developed by employees or agents of the recipient independently of and without reference to any of the disclosing Party's Confidential Information; or (d) was received from a third party who had a lawful right to disclose such information to the recipient. Nothing in this Section 4.2 shall limit in any respect a Party's ability to disclose information in connection with the enforcement by such Party of its rights under this Agreement.

**4.3. Duration.** The obligations of the Parties set forth in this Section 4 with respect to the protection of Confidential Information shall remain in effect until three (3) years after (a) the Closing Date, with respect to Confidential Information of one Party that is known to or in the possession of the other Party as of the Closing Date, or (b) the date of disclosure, with respect to

5

Confidential Information that is disclosed by the one Party to the other Party after the Closing Date; provided, however, with respect to Confidential Information that constitute trade secrets, such Confidential Information shall be subject to the foregoing confidentiality obligations until such Confidential Information no longer constitute trade secrets under applicable law.

## 5.    INTELLECTUAL PROPERTY RIGHTS

**5.1. Intellectual Property Rights.** The intellectual property rights of the Parties hereto in respect of any existing, or any modifications, enhancements or creations of derivative works in respect of any technology, hardware, know-how, process, designs, drawings, blueprints, models, parts list, vendor list, software, firmware, works of authorship, mask works, technical specifications, schematics, manufacturing equipment requirements, manufacturing data and procedures, performance data, quality standards and specifications, and other technical information shall be and remain the property of each party respectively.

## 6.    LIMITATIONS OF LIABILITY; INDEMNIFICATION

**6.1. Waiver.** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT FOR BREACHES OF CONFIDENTIALITY OBLIGATIONS, IN NO EVENT SHALL A PARTY BE LIABLE TO THE OTHER PARTIES OR TO ANY PARTY CLAIMING THROUGH OR UNDER ANOTHER PARTY, FOR ANY LOST PROFITS, OR FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, WHETHER IN AN ACTION IN CONTRACT, TORT (INCLUDING STRICT LIABILITY), BASED ON A WARRANTY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**6.2. Liability Limit.** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT FOR BREACHES OF CONFIDENTIALITY OBLIGATIONS OR IN THE CASE OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT WILL THE AGGREGATE LIABILITY OF A PROVIDER UNDER THIS AGREEMENT, IN ITS CAPACITY AS A PROVIDER ONLY, EXCEED THE TOTAL AMOUNT OF FEES AND PASS-THROUGH EXPENSES RECEIVED BY SUCH PROVIDER FROM THE RECEIVING PARTY. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 6.2 SHALL NOT LIMIT A PARTY'S AGGREGATE LIABILITY IN THEIR CAPACITY HEREUNDER.

**6.3. Indemnification.** (a) CARVANA hereby releases the Provider and its Affiliates and Representatives (each, a "**Provider Indemnified Party**"), and agrees to indemnify, defend and hold harmless each such Provider Indemnified Party from and against any and all Losses arising from claims of third parties that arise out of, relate to or are a consequence of the gross negligence or willful misconduct of CARVANA or its employees in connection with CARVANA's performance under this Agreement.

(b) Provider hereby releases CARVANA and its Affiliates and Representatives (each a "**Receiver Indemnified Party**"), and agrees to indemnify, defend and hold harmless each such Receiver Indemnified Party from and against any and all Losses arising from claims of third parties that arise out of, relate to or are a consequence of the applicable Provider Indemnified Party's gross negligence or willful misconduct.

6

(c) Nothing in this Section 6.3 shall be deemed to eliminate or limit, in any respect, CARVANA's express obligation under this Agreement to pay the fees and Pass-Through Expenses for Services rendered in accordance with this Agreement.

7.    **D ISCLAIMER**

**7.1. Disclaimer of Warranties.** EXCEPT AS EXPRESSLY SET FORTH IN SECTION 2.5 , EACH PARTY ACKNOWLEDGES AND AGREES THAT ALL SERVICES PROVIDED UNDER THIS AGREEMENT ARE PROVIDED "AS IS," WITHOUT ANY WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, EACH PARTY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES WITH REGARD TO THE SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, SUITABILITY, ADEQUACY, TITLE, ENFORCEABILITY OR NON-INFRINGEMENT.

**7.2. No Impairment.** Nothing in Section 6 or in this Section 7 will impair any rights or remedies of either Service Recipient or Provider under any other Agreement.

8.    **T ERM AND T ERMINATION**

**8.1. Term of Agreement.** The term of this Agreement shall be for a period of two years, and will automatically renew for one-year periods, absent 90 days' prior written notice of termination by either Party (the " **Term** ").

**8.2. Effect of Termination.** In the event of the termination of this Agreement as provided in this Section 8 , this Agreement shall forthwith become void and have no further effect, except that Section 3 , Section 4 , Section 6 , Section 7 , this Section 8.4 , and Section 9 (and any related defined terms) shall survive the termination of this Agreement. The termination of this Agreement will not terminate, affect or impair any rights, obligations or liabilities of any Party that have accrued prior to such termination or which, under the terms of this Agreement, continue after termination.

9.    **G ENERAL P ROVISIONS**

**9.1. Compliance with Laws.** No provision of this Agreement shall be interpreted to require any Party to take any action or fail to take any action that would violate applicable Law.

**9.2. Independent Contractors.** This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the Parties except that of independent contractors.

**9.3. Resolution of Disputes.** With respect to any dispute that arises from or relates to this Agreement, the Parties will first attempt to resolve the dispute cooperatively by escalating resolution of the dispute within each Party; provided that this Section 9.3 shall not prevent either Party from exercising any other remedy available to it under this Agreement or applicable Law.

**9.4. Governing Law.** This Agreement will be construed in accordance with, and governed in all respects by, the laws of the State of Arizona (without giving effect to principles of conflicts of law).

**9.5. Notices.** All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or other electronic delivery or sent, postage prepaid, by registered, certified or express mail or overnight courier service, as follows:

if to Provider, to:

DriveTime
1720 W Rio Salado Pkwy
Tempe, AZ 85281
Attention: General Counsel
E-mail: Jon.Ehlinger@DriveTime.com (with a copy to: DL-Legal@drivetime.com)

and if to CARVANA, to:

Carvana, LLC
4020 E. Indian School Road, Suite A
Phoenix, Arizona 85018
Attention: General Counsel
E-mail: DL-CarvanaLegal@carvana.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**9.6. Force Majeure.** " **Force Majeure** " means any act, event, or occurrence beyond a Party's control, including acts of God, fires, floods, storms, landslides, epidemics, lightning, earthquakes, drought, blight, famine, quarantine, blockade, governmental acts or inaction, orders or injunctions, war, insurrection, terrorist activities, and civil strife. A Party will not be liable for any delay or failure in performance of its obligations under this Agreement caused by a Force Majeure, provided that each Party agrees to exercise commercially reasonable efforts to minimize the effect of any such act, event or occurrence.

**9.7. Assignment.** Unless otherwise expressly set forth in this Agreement, neither Party may assign any of its rights or delegate any of its obligations under this Agreement (whether voluntarily, involuntarily, by way of merger, operation of law or otherwise) to any third party without the prior written consent of the other Party. Notwithstanding the foregoing, each Party may assign this entire Agreement to any of its Affiliates or to any successor in the event of a change in control of such Party, provided that such Affiliate or successor agrees in writing to

8

be bound by this Agreement and to assume all of the assigning Party's obligations under this Agreement. Any attempted assignment of rights or delegation of obligations under this Agreement in breach or violation of this Section 9.7 will be null and void.

**9.8. Parties in Interest.** Nothing in this Agreement is intended to provide any rights or remedies to any other person or entity other than the Parties and each Party's Affiliates, to the extent such Affiliates are entitled to receive Services under this Agreement; provided that the Provider Indemnified Parties and the Receiver Indemnified Parties shall be third-party beneficiaries of the provisions of Section 6.3 .

**9.9. Severability.** If any provision of this Agreement, or the application of such provision to any person or entity or set of circumstances, is determined to be invalid, unlawful, void, or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons, entities or circumstances other than those as to which it is determined to be invalid, unlawful, void, or unenforceable, will not be affected and will continue to be valid and enforceable to the fullest extent permitted by Law.

**9.10. Entire Agreement.** This Agreement sets forth the entire understanding of the Parties with respect to the subject matter hereof and supersedes all other agreements and understandings between the Parties relating to the subject matter hereof and thereof.

**9.11. Waiver.** No failure on the part of either Party to exercise any power, right, privilege, or remedy under this Agreement, and no delay on the part of either Party in exercising any power, right, privilege, or remedy under this Agreement, will operate as a waiver thereof; and no single or partial exercise of any such power, right, privilege, or remedy will preclude any other or further exercise thereof or of any other power, right, privilege, or remedy.

**9.12. Amendments.** This Agreement may not be amended, modified, altered, or supplemented except by means of a written instrument executed on behalf of both Parties.

**9.13. Counterparts.** This Agreement may be executed in several counterparts, each of which will constitute an original and all of which, when taken together, will constitute one agreement.

**9.14. Interpretation of Agreement**

(a) Each Party acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in connection with the construction or interpretation of this Agreement.

(b) Whenever required by the context hereof, the singular number will include the plural, and vice versa; the masculine gender will include the feminine and neuter genders; and the neuter gender will include the masculine and feminine genders.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, and will be deemed to be followed by the words "without limitation."

9

(d) For purposes of this Agreement, the word "will" is equivalent in meaning to the word "shall," both of which describe an act or forbearance which is mandatory under this Agreement.

(e) Unless the context otherwise requires, references in this Agreement to "Sections" and "Attachments" are intended to refer to Sections of and Attachments to this Agreement.

(f) The bold-faced headings contained in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement.

(g) The Provider and CARVANA intend for this Amendment to be retroactive and for all purposes to be effective as of the Closing Date.

[ *The remainder of this page is intentionally left blank* .]

10

**Exhibit 10.17**

I N W ITNESS W HEREOF , the Parties have executed this Agreement on the date first written above.

<div align="right">

**PROVIDER**

**DriveTime Automotive Group, Inc.,** a Delaware corporation

By:  /s/ Jon D. Ehlinger
　　　Jon D. Ehlinger
　　　Secretary

**Bridgecrest Acceptance Corporation, fka DT Acceptance Corporation,** an Arizona corporation

By:  /s/ Jon D. Ehlinger
　　　Jon D. Ehlinger
　　　Secretary

**Carvana, LLC** , an Arizona limited liability company

By:  /s/ Paul Breaux
　　　Paul Breaux
　　　Vice President

</div>

[ *Signature Page to Shared Services Agreement* ]

**Exhibit 10.17**

S ERVICES S CHEDULES

Attached below.

**Service Schedule 1**

**Functional Area:** Human Resources
**Summary of Services:** Carvana Benefits
**Minimum Term:** December 31, 2017, unless a different Minimum Term is specified below with respect to a particular Service.

| **Services** | **Description** |
|---|---|
| Description | Benefits Services to support CARVANA personnel. Specifically, these Services include: |

   (ii)   Administration of services required to maintain the DriveTime 401(k) plan under which Carvana is a participating employer.

Notwithstanding anything herein to the contrary, the applicable Benefits Services set forth in this Service Schedule will be provided only to the extent that employees of CARVANA participate in one or more of the benefit plans, programs, policies and arrangements of DriveTime or its subsidiaries that relate to such Benefits Services.

Required Personnel and Availability of Such Required Personnel   DriveTime's Benefits Department representative(s) will be available on a limited and partial time basis to support the services as described above.

CARVANA                                                                           PROVIDER

By:  /s/ Paul Breaux                                                        By:  /s/ Jon D. Ehlinger

   (Authorized Signature)                                              (Authorized Signature)
   Paul Breaux                                                                  Jon D. Ehlinger
   Vice President                                                               Secretary

13

**Service Schedule 2**

**Functional Area:** Telecomm
**Summary of Services:** CARVANA Telecomm Services & Maintenance

| **Services** | **Description** |
|---|---|
| Description | All telecommunications services to operate and maintain the existing Telecomm infrastructure includes telephone lines, telephone number, data circuits and all telecommunications support systems. |
| | Specifically, these Services include, but are not limited to: |
| | (i)  Daily Maintenance and troubleshooting. |
| | (ii)  Moves, adds and changes. |
| | (iii)  Operation and support of Contact (outbound dialer). |
| | (iv)  Maintain vendor relationships and support existing orders. |
| | (v)  Design and development of future projects |
| Required Personnel and Availability of Such Required Personnel | DriveTime's Telecommunications Team Representatives(s) will be available on a limited and partial time basis to support the services as described above. |
| | Key personnel include the roles of: |
| | a.   Director IT — Telecom Support |
| | b.   Telecomm Senior Engineer |
| | c.   Telecomm Support Personnel. |

CARVANA                                                      PROVIDER

By:  /s/ Paul Breaux                                          By:  /s/ Jon D. Ehlinger

    (Authorized Signature)                          (Authorized Signature)
    Paul Breaux                                             Jon D. Ehlinger
    Vice President                                          Secretary

14

**Service Schedule 3**

**Functional Area:** IT
**Summary of Services:** Information Technology for CARVANA
**Minimum Term:** December 31, 2017, unless a different Minimum Term is specified below with respect to a particular Service.

| <u>Services</u> | <u>Description</u> | |
|---|---|---|
| Description | Information Technology including application development, infrastructure, data storage, and business analysis, along with maintenance and support of the same. Specifically, these Services include: | |
| | | <u>Minimum Term:</u> |
| | (i)    Infrastructure | |
| |     a.    Application Servers | |
| |     b.    SAN storage | |
| |     c.    Networking | |
| |     d.    DriveTime Managed On-Premise SQL Server Environments | Jul 31, 2018 |
| |     e.    Circuits | |
| |     f.    Phone systems | |
| |     g.    Security | |
| | (ii)   Integration with third party services | |
| |     a.    SPCIO Letter Service | |
| |     b.    Avaya Systems | |
| |     c.    LexisNexis | |
| |     d.    SmartyStreets | |
| |     e.    Vertex | |
| |     f.    SMEAD | |
| |     g.    CITRIX Dynamics | |
| |     h.    Smart Search | |
| | (iii)  Applications and services development | |
| |     a.    Inventory Management System (including CLASS modules related to same) | Jul 31, 2018 |
| |     b.    Verification Web Application and Verification Service | |
| |     c. | |
| |     d.    Accutrack | Jul 31, 2018 |
| |     e.    Payment Poster | |
| |     f.    Look Up Editor | |
| |     g.    Loan Doc Inquiry | |
| |     h.    Loan Service | Jul 31, 2018 |
| |     i.    Lead Service | Jul 31, 2018 |
| |     j.    Person Service | Jul 31, 2018 |
| |     k.    Vehicle Service | Jul 31, 2018 |

15

| Services | Description |
|---|---|

|  |  |  |
|---|---|---|
| l. | Square 9 | |
| m. | Scoring Engine Service (used to pull credit) | Jul 31, 2018 |
| n. | DataOne VIN Decoder Service | |
| o. | Vehicle Decode Application | Jul 31, 2018 |
| p. | Stock-In (used to scan vehicles into IMS) | Jul 31, 2018 |
| (iv) | Data Warehousing | Jul 31, 2018 |

**Required Personnel and Availability of Such Required Personnel**

DriveTime's CIO, Managing Director, Directors and IT Department representative(s) will be available on a limited and partial time basis to support the services as described above.

CARVANA

By: /s/ Paul Breaux
    (Authorized Signature)
    Paul Breaux
    Vice President

PROVIDER

By: /s/ Jon D. Ehlinger
    (Authorized Signature)
    Jon D. Ehlinger
    Secretary

16

**Service Schedule 4**

**Functional Area:** Tax Reporting and Compliance
**Summary of Services:** Tax Services
**Minimum Term:** December 31, 2017, unless a different Minimum Term is specified below with respect to a particular Service.

| **Services** | **Description** |
| --- | --- |
| Description | Tax services to support the CARVANA business operations including tax reporting, compliance and consulting services. Specifically, these Services include, but are not limited to: |

    (i)    Federal and state income tax return preparation and filing

    (ii)    Federal and state estimated income tax payment preparation

    (iii)    Review of tax reporting created by CARVANA software

    (iv)    Sales and use tax reporting and compliance, if necessary

    (v)    Maintenance of sales tax exemption certificates or resale certificates, if necessary

    (vi)    Personal and real property tax reporting and compliance, if necessary

    (vii)    Maintenance of tax basis fixed asset records

    (viii)    Various tax consulting, modeling and forecasting

    (ix)    Analysis of appropriate intercompany transfer pricing methodology, if necessary

    (x)    Responding to and analyzing tax audit assessments and notices

    (xi)    Legal entity maintenance including set up and elections required

    (xii)    Tax general ledger account reconciliation

    (xiii)    Tax reporting for GAAP and financial statement purposes

    (xiv)    Calculation of available distributions to shareholders

    (xv)    Preparation of data needed for CARVANA and/or dealers to file and claim sales tax refund

| | |
| --- | --- |
| Required Personnel and Availability of Such Required Personnel | DriveTime's Tax Department representative(s) will be available on a limited and partial time basis to support the services as described above. |

Key personnel include the roles of:

    a.    Director of Tax

    b.    Staff Tax Accountant

    c.    SalesTax Accountant

CARVANA

By: /s/ Paul Breaux
    (Authorized Signature)
    Paul Breaux
    Vice President

PROVIDER

By: /s/ Jon D. Ehlinger
    (Authorized Signature)
    Jon D. Ehlinger
    Secretary

17

**CARVANA, LLC**

**as Seller**

**and**

**DT ACCEPTANCE CORPORATION**

**as Purchaser**

---

**ORIGINATION AGREEMENT**

---

**ORIGINATION AGREEMENT**

This Origination Agreement is effective as of June 1, 2014, by and between Carvana, LLC, an Arizona limited liability company (" <u>Carvana</u> "). as Seller, and DT Acceptance Corporation, an Arizona corporation as successor in interest to DT Acceptance Corporation (" <u>DTAC</u> "), as purchaser.

AGREEMENTS

In consideration of the mutual agreements and subject to the terms and conditions herein contained, each party agrees as follows for the benefit of the other party:

ARTICLE I
<u>DEFINITIONS</u>

Section 1.1    <u>Definitions</u> . Whenever used in this Agreement, the following words and phrases shall have the following meanings:

" <u>Affiliate</u> " of any Person means any Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with such Person. For purposes of this definition of "Affiliate," the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause a direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

" <u>Agreement</u> " means this Origination Agreement as the same may be amended and supplemented from time to time.

" <u>Amount Financed</u> " with respect to a Receivable means the aggregate amount originally advanced under the Receivable toward the purchase price of the Financed Vehicle and any related costs.

" <u>Annual Percentage Rate</u> " or " <u>APR</u> " of a Receivable means the annual percentage rate of finance charges stated in the Receivable.

" <u>Assignment</u> " means an assignment substantially in the form of <u>Exhibit A</u> hereto.

" <u>Business Day</u> " means any day other than a Saturday, a Sunday or a day on which banking institutions in the State of Arizona shall be authorized or obligated by law, executive order, or governmental decree to be closed.

" <u>Carvana</u> " means Carvana, LLC, an Arizona limited liability company, and any successor thereto.

" <u>Cash Down Payment</u> " means, with respect to a Receivable, the cash paid by the relevant Obligor to the Seller at the time of the execution of the Contract relating thereto, plus the actual cash value of any vehicle trade-in made by the Obligor (which value equals the trade allowance

as stated in the Receivable less the amount required to satisfy and discharge all existing Liens on the vehicle trade-in less the amount by which such trade allowance exceeds the wholesale value of the vehicle trade-in as determined by the best estimate of the Seller).

"Certificate of Title" means the certificate of title issued by the applicable state governmental agency for a Financed Vehicle.

"Contract" means, with respect to a Receivable, the retail installment sale contract, with any amendments or modifications thereto, pursuant to which the Obligor has purchased the Financed Vehicle.

"Cram Down Loss" means, with respect to a Receivable, if a court of appropriate jurisdiction in an insolvency proceeding shall have issued an order reducing the amount owed on a Receivable or otherwise modifying or restructuring Scheduled Payments to be made on a Receivable, an amount equal to such reduction in Principal Balance of such Receivable or the reduction in the net present value (using as the discount rate the lower of the contract rate or the rate of interest specified by the court in such order) of the Scheduled Payments as so modified or restructured. A "Cram Down Loss" shall be deemed to have occurred on the date such order is entered.

"Credit and Collection Policy" means the Underwriting Guidelines and the Collection General Instructions Manual of GFC Lending, LLC as in effect on the date that the Contract was originated, as such policies and manuals may be amended from time to time.

"Debtor Relief Laws" means the Bankruptcy Code (Title 11 of the United States Code) of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, readjustment of debt, marshaling of assets or similar debtor relief laws of the United States or any State of the United States from time to time in effect affecting the rights of creditors generally.

"DTAC" means DT Acceptance Corporation, an Arizona corporation, and any successor thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Financed Vehicle" means, with respect to a Receivable, the used automobile, light duty truck, van or minivan, together with all accessions thereto, securing an Obligor's indebtedness under a Receivable.

"Liabilities" means any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations).

"Lien" means a security interest, lien, charge, pledge, equity or encumbrance of any kind.

3

" <u>Obligor</u> " with respect to a Receivable means the purchaser or co-purchasers of the related Financed Vehicle or any other Person who owes or may be liable for payments under such Receivable.

" <u>Person</u> " means any individual, corporation, estate, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, or other entity.

" <u>Principal Balance</u> " means, with respect to any Receivable as of any date, the Amount Financed minus the sum of the following amounts without duplication: (i) that portion of all Scheduled Payments actually received on or prior to such day allocable to principal; (ii) any payment of the Purchase Amount with respect to the Receivable allocable to principal; (iii) any Cram Down Loss in respect of such Receivable; and (iv) any prepayment in full or any partial prepayments applied to reduce the Principal Balance of the Receivable.

" <u>Purchase Amount</u> " means, with respect to a Receivable, the amount, as of the close of business on the last day of a month, required to prepay in full such Receivable under the terms thereof including interest (calculated at the APR) to the end of such month.

" <u>Purchase Price</u> " means the consideration paid to the Seller for the applicable Receivables, which consideration shall be equal to a price discounted according to expected loss and on that basis grades the investment risk of the Receivables which are being transferred and assigned by the Seller to the Purchaser, such amounts being equal to the fair market value of such Receivables.

" <u>Purchaser</u> " means DTAC in its capacity as purchaser of the Receivables under this Agreement, and its successors and assigns.

" <u>Receivable</u> " means each Contract that has been or will be originated by the Seller and not previously sold or conveyed to another Person, but shall not include any obligation under any Special Program, which shall remain a separate corporate obligation of the Seller.

" <u>Receivable Files</u> " means the following:

(i) the fully executed original of the Contracts (together with any agreements modifying the Contracts, including, without limitation, any extension agreements) with either (1) an appropriate assignment executed in favor of Purchaser upon Purchaser's request or (2) the assignment portion of the Contract properly completed and executed in favor of the Purchaser;

(ii) the original Certificate of Title (or its equivalent) (or, if not yet received, a copy of the application for the Certificate of Title) and such other documents that Seller would, in accordance with its customary procedures, keep on file (A) indicating that the Financed Vehicle is owned by the Obligor, and (B) evidencing the security interest (and perfection thereof) of the Purchaser as the holder of a first priority perfected security interest in the Financed Vehicle, showing the Purchaser as secured party;

4

(iii)    the fully executed credit application; and

(iv)    any and all other documents that the Purchaser would keep on file, in accordance with its customary procedures, relating to a Receivable, an Obligor or a Financed Vehicle.

" Repurchase Ratio " means, with respect to any Receivable, the quotient obtained by dividing the Purchase Price paid for such Receivable pursuant to Article III by the original Amount Financed on such Receivable.

" Sale Date " means each date on which the Seller offers to sell any Receivable and the Transferred Property related to such Receivable to DTAC, and DTAC accepts such offer pursuant to the terms of this Agreement.

" Scheduled Payment " means, for any month for any Receivable, the amount indicated in such Receivable as required to be paid by the Obligor in such month (without giving effect to any rescheduling of payments in any insolvency or similar proceedings).

" Seller " means, Carvana, in its capacity as Seller of the Receivables under this Agreement.

" Simple Interest Method " means the method of allocating a generally fixed level payment between principal and interest, pursuant to which the portion of such payment that is allocated to interest is equal to the product of the APR multiplied by the unpaid balance multiplied by the period of time (expressed as a fraction of a year, based on the actual number of days in the calendar month and the actual number of days in the calendar year) elapsed since the date through which interest was last paid and the remainder of such payment is allocable to principal.

" Simple Interest Receivable " means any Receivable under which the portion of a payment allocable to interest and the portion allocable to principal are determined in accordance with the Simple Interest Method.

" Special Programs " means any purchaser incentive programs of Seller.

" State " means any State of the United States of America, or the District of Columbia.

" Transferred Property " means all of the following: (i) the Receivables, all instruments and any and all monies and payments (including in kind collections) received or due or to become due thereunder after the applicable Sale Date with respect to such Receivables and all other rights and benefits thereunder; (ii) the security interests in the Financed Vehicles granted by Obligors pursuant to the Receivables and any other interest of the Seller in the Financed Vehicles, including, without limitation, the Certificates of Title with respect to Financed Vehicles, and in and to all other security, warranties, guaranties and credit support with respect to the Receivables; (iii) any proceeds from claims on any physical damage, credit life and credit accident and health insurance policies or other insurance (including vendor's single or dual interest insurance) or certificates relating to the Financed Vehicles or the Obligors; (iv) refunds for the costs of extended service contracts with respect to Financed Vehicles, refunds of

5

unearned premiums with respect to credit life and credit accident and health insurance policies or other insurance or certificates covering an Obligor or Financed Vehicle or the Obligor's obligations with respect to a Financed Vehicle; (v) the Receivable File related to each Receivable; and (vi) the proceeds of any and all of the foregoing.

"UCC" means the Uniform Commercial Code as in effect in the respective jurisdiction.

Section 1.2    Other Preliminary Provisions.

(a) Definitional. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; Section, subsection, Exhibit and Schedule references contained in this Agreement are references to Sections, subsections, Exhibits and Schedules in or to this Agreement unless otherwise specified; and the word "including" means including without limitation.

<center>

ARTICLE II
CONVEYANCE OF RECEIVABLES

</center>

Section 2.1    Conveyance of Receivables.

(a) On each Sale Date, commencing with the date hereof, (i) the Seller shall sell and deliver and does hereby sell and deliver to DTAC, and (ii) DTAC does hereby confirm that it shall purchase and does hereby as of such date purchase from the Seller, all of Seller's right, title and interest in, to and under all Receivables originated by the Seller on each such date, together with all other Transferred Property relating thereto. In connection with any purchase and sale of a Receivable hereunder, Seller agrees, at its own expense, (i) to annotate and indicate on its books and records (including any computer files) that the Receivables were sold and transferred to DTAC pursuant to this Agreement, (ii) to deliver to DTAC (or its assigns) the original Contract duly assigned to DTAC as required by relevant law; (iii) to deliver to or upon the order of DTAC all collections on the Receivables, if any, received since the Sale Date and (iv) deliver to DTAC such other and further documents, including any reconciliations, reasonably required by DTAC.

The parties hereto intend that each transfer hereunder be a sale of the Receivables and the other Transferred Property from Seller to the Purchaser and not a financing secured by such property; and the beneficial interest in and title to the Receivables and the other Transferred Property shall not be a part of Seller's estate in the event of the filing of a bankruptcy petition by or against Seller under any bankruptcy law. However, if, notwithstanding the intent of Seller and Purchaser, this transaction is deemed to be a financing arrangement, or it is otherwise determined that any conveyance hereunder is for any reason not considered a sale and that the beneficial interest in and title to the Receivables and such other Transferred Property remain part of Seller's bankruptcy estate, the parties intend that with respect to any such Transferred Property this Agreement shall constitute a security agreement under the UCC as in effect in the State of Arizona, and Seller hereby grants to Purchaser on the terms and conditions in this Agreement a first priority perfected security interest in and against all of Seller's right, title and interest in and to the Receivables and the other Transferred Property, and other property conveyed hereunder and all proceeds of any of the foregoing.

<center>6</center>

Section 2.2    Representations and Warranties of the Seller .

(a) Seller makes the following representations and warranties to Purchaser as of the date of this Agreement and each Sale Date thereafter, and on which such Purchaser shall rely in acquiring the Receivables.

(i)    Organization and Good Standing . Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation, and has power and authority to execute, deliver and perform its obligations under the Agreement, and to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted, and at all relevant times has had, and shall have the power, authority and legal right to acquire, own and sell the Receivables and the other Transferred Property and to enter into and perform its obligations under the Agreement.

(ii)    Due Qualification . Seller is duly qualified to do business as a foreign limited liability company in good standing, and has obtained all necessary licenses and approvals, in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(iii)    Power and Authority . Seller has the power and authority to execute and deliver the Agreement and to carry out its terms. Seller has full power and authority to sell and assign the property to be sold and assigned to the Purchaser and has duly authorized such sale and assignment to the Purchaser by all necessary corporate action; and the execution, delivery and performance of the Agreement have been duly authorized by Seller by all necessary corporate action.

(iv)    Valid Sale, Binding Obligation . The Agreement constitute a valid sale, transfer and assignment of the Receivables and the other Transferred Property to the Purchaser, enforceable against creditors of and purchasers from Seller; and the Agreement constitutes the legal, valid and binding obligations of the Seller, enforceable against Seller in accordance with its terms.

(v)    No Violation . The execution, delivery and performance by Seller of the Agreement and consummation of the transactions contemplated hereby and thereby and the fulfillment of the terms hereof and thereof do not conflict with, result in any breach of any of the terms and provisions of, nor constitute (with or without notice or lapse of time) a default under, the certificate of incorporation, bylaws, certificate of formation or partnership agreement of Seller, or any indenture, agreement, mortgage, deed of trust, or other instrument to which Seller is a party or by which Seller is bound or any of Seller's properties are subject; nor result in the creation or imposition of any Lien upon Seller's properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust, or other instrument (other than this Agreement); nor violate any law, order, rule or regulation applicable to Seller or any of Seller's properties of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over Seller or any of their respective properties.

7

(vi)    No Proceedings . There are no proceedings or investigations pending or, to the best knowledge of Seller, threatened, before any court, regulatory body, administrative agency or other tribunal or governmental instrumentality having jurisdiction over Seller or its properties: (A) asserting the invalidity of this Agreement, or the transactions herein or therein, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (C) seeking any determination or ruling that, if determined adversely to Seller, would or could materially and adversely affect the performance by Seller of its obligations under, or the validity or enforceability of, the Receivables, or this Agreement, or (D) which might adversely affect the sale, transfer and assignment of the Receivables and the other Transferred Property hereunder.

(vii)    Receivables . Seller has good, indefeasible and marketable title to the Receivables and the other Transferred Property and upon sale to Purchaser under this Agreement, Purchaser will be the sole owner of, and have good, indefeasible and marketable title to the Receivables and the other Transferred Property, free and clear of all Liens, claims, charges, defenses, counterclaims, offsets, encumbrances and security interests of any kind or nature whatsoever and, to the extent the Obligor has a contractual right to return the Financed Vehicle to Seller for repurchase, the applicable repurchase period has expired.

(viii)    Financial Condition . Seller is in stable financial condition with a positive net worth, is not insolvent and is able to and does pay its liabilities as they mature. Seller is not in default under any obligation to pay money to any Person. Seller will not use the proceeds from the transactions contemplated by this Agreement to give any preference to any creditor or class of creditors, and this transaction will not leave Seller with remaining assets which are unreasonably small compared to its ongoing operations.

(ix)    Disclosure . There is no fact known to Seller with respect to the Receivables or the assets, liabilities, financial condition or activities of Seller which Seller believes would have a material adverse effect on the Receivables, in the aggregate, or Seller's ability to perform its respective obligations under this Agreement. All information and documents prepared by Seller and provided to Purchaser or any of its Affiliates at any time are true and accurate in all material respects.

(x)    No Consents . No consent, license, approval, authorization or order of, or registration, declaration or filing with, any governmental authority or other Person is required to be made by Seller in connection with the execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby and thereby, except such as have been duly made, effected or obtained.

(xi)    Compliance . Seller (A) has complied in all material respects with all applicable laws, rules, regulations and orders with respect to it, its business and properties, (B) has not failed to obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of its property or to the conduct of its business, and (C) is not in violation in any material respect of any term of any agreement, charter, bylaws or instrument in which it is a party or by which it may be bound.

8

(xii)    No Insolvency . The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby were not made in contemplation of the insolvency of Seller or after the commission of any act of insolvency by Seller. Seller does not believe, nor does it have any reasonable cause to believe, that it cannot perform its covenants contained in this Agreement. The transactions contemplated by this Agreement are being consummated by the Seller in furtherance of its ordinary business purposes, with no intent to hinder, delay or defraud any of its present or future creditors and with no view to preferring one creditor of the Seller over another or to preventing the application of Seller's assets in the manner required by applicable law or regulations. The consideration received by Seller as set forth in this Agreement is fair consideration having value reasonably equivalent to or in excess of the value of the Receivables and the other Transferred Property and the performance of Seller's obligations hereunder. Neither on the date of the transactions contemplated by this Agreement and each Sale Date nor immediately before or after such transactions, nor as a result of the transactions, will Seller:

(1)    be insolvent such that the sum of its debts is greater than all of its property, at a fair valuation;

(2)    be engaged in or about to engage in business or transactions for which any property remaining with Seller will be an unreasonably small capital or the remaining assets of Seller will be unreasonably small in relation to its business or the transaction; and

(3)    have intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts mature or become due. Seller's assets and cash flow enable it to meet its present obligations in the ordinary course of business as they become due.

Both immediately before and after the transactions contemplated by this Agreement: (a) the present fair salable value of Seller's assets was or will be in excess of the amount that will be required to pay Seller's probable liabilities as they then exist and as they become absolute and matured; and (b) the sum of Seller's assets was or will be greater than the sum of Seller's debts, valuing its assets at a fair salable value. The Agreement reflects bona fide transactions for legitimate business purposes.

(xiii)    Taxes . All tax returns or extensions required to be filed by Seller in any jurisdiction have been filed, and all taxes, assessments, fees and other governmental charges upon Seller, or upon any of the respective properties, income or franchises of Seller, shown to be due and payable on such returns have been, or will be, paid when due. All such tax returns are true and correct and Seller has no knowledge of any proposed additional tax assessment against it in any material amount nor of any basis therefor.

(xiv)    ERISA . The present value of all benefits vested under all "employee pension benefit plans" as such term is defined in Section 3 of ERISA, maintained by

9

Seller, or in which employees of Seller are entitled to participate, as from time to time in effect (herein called " Pension Plans "), does not exceed the value of the assets of the Pension Plans allocable to such vested benefits (based on the value of such assets as of the last annual valuation date). No prohibited transactions, accumulated funding deficiencies, withdrawals or reportable events have occurred with respect to any Pension Plans that, in the aggregate, could subject Seller to any material tax, penalty or other liability. No notice of intent to terminate a Pension Plan has been filed, nor has any Pension Plan been terminated under Section 4041(f) of ERISA, nor has the Pension Benefit Guaranty Corporation instituted proceedings to terminate, or appoint a trustee to administer, a Pension Plan and no event has occurred or condition exists which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan.

(b)    The representations and warranties set forth in this Section 2.2 shall survive the sale and delivery of the Receivables by the Seller to the Purchaser. Upon discovery by Seller or by Purchaser of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the other parties.

Section 2.3    Representations and Warranties of Seller as to the Receivables .

(a) Eligibility of Receivables . Seller hereby makes the following representations and warranties only as to each Receivable conveyed by Seller to Purchaser hereunder on which Purchaser shall rely in acquiring the Receivables. Unless otherwise indicated, such representations and warranties shall speak as of each Sale Date, but shall survive the sale, transfer and assignment of the Receivables by Seller to the Purchaser hereunder:

(i)    Characteristics of Receivables. Each Receivable

(1)    has been fully and properly executed by the parties thereto in the ordinary course of business, and has been validly sold and assigned pursuant to this Agreement, free from all claims and liens;

(2)    has created a valid, subsisting, and enforceable first priority perfected security interest in favor of the Purchaser in the Financed Vehicle;

(3)    contains customary and enforceable provisions such that the rights and remedies of the holder or assignee thereof shall be adequate for enforcement of the Obligor's obligation to pay the amounts due thereunder, and are adequate for realization of the security interest against the Financed Vehicle and related collateral in the event of default under the Receivable;

(4)    except for irregular payments in the first two (2) months after the date of the Contract, provides for level payments (not less frequently than monthly) that fully amortize the Amount Financed over the original term (except for the last payment, which as originally scheduled may be different from the level payment but shall not be more than two (2) times the level payment amount) and yield interest at the Annual Percentage Rate;

10

(5)    provides for, in the event that such contract is prepaid, a prepayment that fully pays the Principal Balance and unpaid interest, including interest in the month of prepayment to the date of prepayment, at the Annual Percentage Rate and without penalty;

(6)    is a Simple Interest Receivable;

(7)    was originated by Seller and was sold by Seller, each without any fraud or misrepresentation on the part of Seller;

(8)    contains the original or electronic signature of the Obligor;

(9)    is the only unsatisfied original manually executed Receivable for the purchase of the Financed Vehicle;

(10)    accurately reflects the actual terms and conditions of the Obligor's purchase of the Financed Vehicle and the financing therefor other than Special Programs which are separate corporate obligations of the Seller, and which do not alter the terms of the Receivable; and

(11)    was originated in accordance with and meets the creditworthiness and other purchase criteria contained in the Credit and Collection Policy.

(ii)    Compliance with Law . Each Receivable, the sale of the Financed Vehicle and the sale of any physical damage, credit life and credit accident and health insurance and any extended service contracts and any Special Programs complied at the time the related Receivable was originated or made and at the time of the sale hereunder, in all material respects, with all requirements of applicable Federal, State, and local laws, and regulations thereunder including, without limitation, usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board's Regulations B and Z, the Soldiers' and Sailors' Civil Relief Act of 1940, the Texas Finance Code and State adaptations of the National Consumer Act and of the Uniform Consumer Credit Code, and other consumer credit laws and equal credit opportunity and disclosure laws. All amounts financed under the Receivable which are currently due and payable to governments (including sales and transfer taxes) and other Persons have been paid. The form of each Contract and the manner in which it was completed and executed and all documents delivered and disclosures made in connection therewith are in compliance with all requirements of applicable Federal, State and local laws, and all applicable regulations thereunder, except to the extent a failure to so comply would not have an adverse effect.

(iii)    Security Interest in Financed Vehicle . Immediately subsequent to the sale, assignment, and transfer thereof to Purchaser, each Receivable shall be secured by a validly perfected first priority security interest in the Financed Vehicle in favor of the Purchaser

11

as secured party, and such security interest is prior to all other liens upon and security interests in such Financed Vehicle, which now exist or may hereafter arise or be created (except, as to priority, for any tax liens or mechanics' liens which may arise after the Sale Date) or the Seller has commenced procedures that will result in the perfection of a first priority security interest in the related Financed Vehicle. On the date of the Contract, each Financed Vehicle was located in, and an application for a Certificate of Title was filed for with the applicable state governmental agency or, in states or if the appropriate governmental body issues a letter or other form of evidence of lien (whether in paper or electronic form) in lieu of a certificate of title, the lien entry letter has been issued.

(iv)    No Amendments . No Receivable has been amended, waived, extended, altered or modified in any respect except as has been indicated in the related Receivable File transferred to the Purchaser. No Receivable has been amended or rewritten to extend the due date for any payment date other than in connection with a change of the monthly due date in accordance with the Credit and Collection Policy.

(v)    No Defenses . No right of rescission, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to any Receivable including specifically without limitation any such right arising from or related to any of the Special Programs or will exist with respect to any Receivable arising from or relating to any Special Program. The operation of the terms of any Receivable and the exercise of any right thereunder pursuant to applicable law will not render such Receivable unenforceable in whole or in part nor subject such Receivable to any such right of rescission, setoff, claim, counterclaim, or defense.

(vi)    Title . It is the intention of Seller that the transfer and assignment herein contemplated constitute a sale of the Receivables and the other Transferred Property from Seller to Purchaser and that the beneficial interest in and title to such Receivables and the other Transferred Property not be part of Seller's estate in the event of the filing of a bankruptcy petition by or against Seller under any bankruptcy law. No Receivable has been sold, transferred, or assigned (other than grants of security interests) by the Seller to any Person other than Purchaser. Immediately prior to the transfer and assignment herein contemplated, Seller had good and marketable title to each Receivable and the other Transferred Property, and was the sole owner thereof, free and clear of all Liens, claims, encumbrances, security interests, and rights of others. Immediately upon transfer thereof, Purchaser shall have good and marketable title to each such Receivable and the other Transferred Property, and will be the sole owner thereof, free and clear of all liens, encumbrances, security interests, and rights of others and the transfer has been perfected under applicable law.

(vii)    Lawful Assignment . No Receivable has been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer, and assignment of such Receivable under this Agreement or pursuant to the transactions with respect thereto contemplated hereby, shall be unlawful, void, or voidable; Seller has not entered into any agreement with any account debtor that prohibits, restricts or conditions the assignment of any portion of the Receivables. No consent of any Obligor or other Person is required for the sale and assignment of the Transferred Property to the Purchaser hereunder except such consents which have been previously obtained.

12

(viii)    <u>All Filings Made</u> . All filings (including, without limitation, UCC filings) and other action (including delivery of the Receivable Files to Purchaser) necessary in any jurisdiction to provide third parties with notice of transfer and assignment herein contemplated and to give Purchaser a perfected first priority ownership or security interest in the Receivables and the other Transferred Property have been made or taken within ten (10) days of the Sale Date.

(ix)    <u>Receivable File; One Original</u> . Seller will deliver to the Purchaser a complete Receivable File with respect to each Receivable. There is only one original or certified electronic original executed copy of each Receivable.

(x)    <u>Chattel Paper</u> . Each Receivable constitutes "chattel paper" that is in the form of either "tangible chattel paper" or "electronic chattel paper" as such term is defined in the UCC.

(xi)    <u>Valid and Binding Obligation of Obligor</u> . Each Receivable represents the genuine, legal, valid and binding obligation of the Obligor thereunder and is enforceable by the holder thereof in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally, and all parties to such contract had full legal capacity to execute and deliver such contract and all other documents related thereto and to grant the security interest purported to be granted thereby. Each Receivable is in full force and effect in accordance with its respective terms. The Receivables represent undisputed, *bona fide* transactions completed in accordance with the terms and provisions contained in the Contracts relating thereto.

(xii)    <u>Tax Liens</u> . There is no Lien against any Financed Vehicle for delinquent taxes. All taxes currently due and payable for the purchase, use and ownership of each Financed Vehicle have been paid. All taxes on the transfer of the Receivables and the other Transferred Property to the Purchaser have been paid.

(xiii)    <u>Down Payments; Payments; Contract Terms</u> . The Cash Down Payment with respect to each Receivable has been paid in full by the Obligor and not loaned to the Obligor by Seller or any Affiliate. Subject to any right of prepayment, the Receivable requires the payment of the entire Amount Financed and the entire "Finance Charge". The schedule of payments contained in the Contract has periodic monthly payments and the final payment must be less than the other periodic payments, and the payment obligation is in United States dollars. The first Scheduled Payment is due within forty-five (45) days after the date of the Contract, and the Contract date is within one (1) day of the delivery of the Financed Vehicle to the Obligor. The Receivable is for the absolute sale of the Financed Vehicle to the Obligor, and the Financed Vehicle is not on approval or subject to any agreement between the Obligor and the Seller for the repurchase or return of the Financed Vehicle.

(xiv)    <u>Origination</u> . Seller has been paid all amounts due and payable for the purchase of the Receivable by the Purchaser. There is no other payment due to Seller for the purchase of such Receivable.

13

(xv)    Full Amount Advanced . The full amount of each Receivable has been advanced to each Obligor, and there are no requirements for future advances thereunder. The Obligor with respect to the Receivable does not have any option under the Receivable to borrow from any Person additional funds secured by the Financed Vehicle.

(xvi)    Payment Currency . All payments on each Receivable are required to be made in United States dollars.

(xvii)    Records Marked . The Seller's records have been marked to reflect the sale of the Receivables and other Transferred Property to the Purchaser.

(xviii)    Proceedings. There are no proceedings pending, or to the best of Seller's knowledge, threatened, wherein the Obligor or any governmental agency has alleged that any Receivable is illegal or unenforceable.

(xix)    No Substitution. No Receivable provides for the substitution, exchange or addition of any Financed Vehicle subject to such Receivable.

(xx)    Entire Agreement . Seller has entered into this Agreement, and this Agreement constitutes the entire agreement between Seller and the Purchaser with respect to the sale of the Receivables. This Agreement is in full force and effect and is the legal, valid and binding obligation of the parties hereto; there have been no material defaults by any party to this Agreement; Seller has fully performed all of its respective obligations under this Agreement; Seller has not made any statements or representations (whether written or oral) inconsistent with any term of this Agreement.

(xxi)    Condition of Vehicles . Each Financed Vehicle was properly delivered to the related Obligor in good repair, without defects and in satisfactory order. Each Financed Vehicle was accepted by the Obligor after reasonable opportunity to inspect and test same and, at the time of such delivery and acceptance, no Obligor informed the Seller of any defect therein.

(xxii)    Full Performance . Seller has fully and timely performed all of its obligations under each Receivable and each Special Program. Any obligation under a Special Program is a separate corporate obligation of the Seller and no Special Program shall give rise to any defense, claim or right of setoff as to any Receivable.

(xxiii)    Computer Tape . The electronic medium containing the data concerning the Receivables was made available to the Purchaser, and such information was complete and accurate as of its date and includes a description of such Receivables.

(xxiv)    Insurance . Each Receivable requires the Obligor to obtain physical insurance covering the Financed Vehicle.

(xxv)    No Default; No Repossession . Except for payment delinquencies that, as of the date of the sale hereunder, have been continuing for a period of not more than 29 days, no default, breach, violation, or event permitting acceleration under the terms of any Receivable shall have occurred as of the date of the sale hereunder; no continuing condition that

14

with notice or the lapse of time would constitute a default, breach or event permitting acceleration under the terms of any Receivable shall have arisen; the Seller shall not have waived any of the foregoing; and no Financed Vehicle has been repossessed without reinstatement as of the date of the sale hereunder.

(xxvi)    Receivables in Force . No Receivable has been satisfied, subordinated or rescinded, nor has any Financed Vehicle been released from the Lien granted by the related Receivable in whole or in part.

(b)    Survival of Representations and Warranties . The representations and warranties set forth in this Section shall speak as of the execution and delivery of this Agreement and as of the applicable Sale Date of the applicable Receivables, but shall survive the sale, transfer and assignment of the Receivables to the Purchaser and any subsequent assignment or transfer by Purchaser.

(c)    Repurchase of Receivables . In the event of a breach of any representation or warranty set forth in Section 2.3(a) that materially and adversely affects any Receivable or the interest of the Purchaser in any Receivable and unless the breach shall have been cured within thirty (30) days following discovery of the breach or receipt of notice of such breach as the case may be, the Seller shall repurchase such Receivable from the Purchaser, in the event that the breach relates to a characteristic of the Receivables in the aggregate, and if the Purchaser's interest as determined by the Purchaser, is materially and adversely affected by such breach, unless the breach shall have been cured by the end of such thirty (30) day period, the Seller shall repurchase such aggregate Principal Balance of Receivables, such that following such repurchase such representation shall be true and correct with respect to the remainder of Receivables in the aggregate.

In consideration of the repurchase of any Receivable by Seller, Seller shall remit to the Purchaser an amount equal to the product of the applicable Repurchase Ratio multiplied by the Purchase Amount with respect to such Receivable.

Seller undertakes to deliver (or cause to be delivered) to the Purchaser on the applicable Sale Date the Receivable File for each Receivable conveyed hereunder by Seller. Seller and the Purchaser shall reconcile the Receivable Files and, to the extent necessary, Seller hereby agrees to take all necessary action to deliver to Purchaser a completed Receivable File.

The sole and exclusive remedy of Purchaser with respect to a breach of Seller's representations and warranties pursuant to Section 2.3(a) or with respect to the existence of any such Liens or claims shall be to require the Seller to repurchase such Receivable pursuant to this Section; provided , however, that the Seller shall indemnify Purchaser against all costs, expenses, losses, damages, claims and liabilities, including reasonable fees and expenses of counsel, which may be asserted against or incurred by any of them as a result of third party claims arising out of the events or facts giving rise to such breach. The foregoing indemnity shall survive the termination of this Agreement and the transfer of the Receivables to any assign. Upon receipt of the Purchase Amount, the Purchaser shall release to the Seller the related Receivables Files and shall assign the Receivable to Seller.

15

(d)  No Guaranty as to Future Payments . The representations and warranties contained in this Agreement shall not be construed as a warranty or guaranty by Seller as to the future payments by any Obligor.

Section 2.4    Delivery of Receivable Files . Seller will transfer and deliver to Purchaser (or its assigns), with respect to each Receivable, the Receivable File.

Section 2.5 Covenants of Seller . Seller hereby covenants as to the Receivables Seller has sold to Purchaser hereby that:

(a)  Security Interests . The Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur or assume any Lien on any Transferred Property or related Financed Vehicle, whether now existing or hereafter created, or any interest therein; Seller will immediately notify Purchaser of the existence of any Lien on any Receivable, any other Transferred Property or Financed Vehicle and, in the event that the interests of the Purchaser (or any assign) in such Receivable may be or are materially and adversely affected, Seller shall repurchase such Receivable from the Purchaser or its assigns, as applicable, in the manner and with the effect specified in Section 2.3(c), and Seller shall defend the right, title and interest of Purchaser or any assign, as applicable, in, to and under the Receivables, whether now existing or hereafter created, against all claims of third parties claiming through or under Seller.

(b)  Delivery of Payments . Seller agrees to deposit in the Purchaser's accounts all payments received by Seller in respect of the Receivables as soon as practicable, but no later than three (3) Business Days, after receipt thereof by Seller.

(c)  Conveyance of Receivables . Seller covenants and agrees that it will not convey, assign, exchange or otherwise transfer the Receivables or any other Transferred Property to any Person.

(d)  No Impairment . Seller shall take no action, or omit to take any action, which would impair the rights of Purchaser or any of Purchaser's assigns in any Receivable or any other Transferred Property, nor shall it, except as otherwise provided in this Agreement, reschedule, revise or defer payments due on any Receivable. Seller will not do anything to impair the rights of the Purchaser or any assign in the Receivables or the Financed Vehicles. If the rights of Seller under any Receivable, any guaranty of the related Obligor's obligations under any Receivable or any insurance policy related to a Financed Vehicles are not assignable or have not been assigned to the Purchaser, the Seller will enforce such rights on behalf of the Purchaser.

(e)  Compliance . Seller will comply, in all material respects, with all acts, rules, regulations, orders, decrees and directions of any Governmental Authority applicable to the Seller or the Transferred Property or any part thereof; provided , however, that Seller may contest any act, regulation, order, decree or direction in any reasonable manner which shall not materially and adversely affect the rights of the Purchaser in the Transferred Property.

(f)  Notices . Seller will advise the Purchaser, in reasonable detail, of the occurrence of any breach by Seller of any of its representations, warranties and covenants contained herein following discovery by Seller of any such breach. Seller shall notify the Purchaser promptly after becoming aware of any Lien on any Transferred Property.

16

(g)     Further Assurances . Seller will execute or endorse, acknowledge and deliver to the Purchaser from time to time such schedules, confirmatory assignments, conveyances, powers of attorney, and other assurances or instruments and take such further similar actions relating to the Receivables, the related Financed Vehicles and the rights covered by this Agreement, the Assignment and the Related Documents, as the Purchaser may reasonably request to preserve and maintain title to the Transferred Property and the rights of the Purchaser therein against the claims of all Persons and parties.

(h)     Existence . Seller shall maintain limited liability company existence and shall at all times continue to be duly organized under the laws of the United States of America and duly qualified and duly authorized and shall conduct its business in accordance with the terms of its certificate of formation and limited liability company agreement.

(i)     No Disturbance . Seller shall do nothing to disturb or impair the acquisition hereunder by the Purchaser or its assignees of the Receivables, the related Financed Vehicles and the other Transferred Property.

(j)     Tax-Related Recordkeeping . Seller and Purchaser will at all times maintain their books and records in such a manner that any state department of revenue or similar authority may at all times determine the amount of taxes paid related to the retail sales made by the Seller. Purchaser will as a matter of course supply the Sellers with this required information on a regular basis, at least quarterly.

ARTICLE III
PAYMENT OF PURCHASE PRICE

In consideration of the sale of the Receivables from the Seller to the Purchaser as provided herein, the Purchaser shall pay the Seller the Purchase Price in cash. On each Sale Date, the Purchase Price shall be paid on the applicable Sale Date for Receivables purchased on such Sale Date.

ARTICLE IV
[RESERVED]

ARTICLE V
MISCELLANEOUS PROVISIONS

Section 5.1     Amendment .

Except as set forth below, this Agreement may be amended or terminated only with the written consent of the Purchaser, the Seller and any Person to whom the Purchaser has assigned any rights hereunder, including, but not limited to, any trustee or insurer in any securitization or warehouse transaction (such a party, a " Third Party "). Notwithstanding the foregoing, upon written notice by either the Purchaser or Seller to all the other parties hereto, such party may cancel its obligation under Section 2.1 hereunder to, in the case of the Seller to sell, or in the case of the Purchaser to purchase, the Receivables originated by the Seller effective as of the date of such written cancellation (such cancellation, a " Cancellation "). A copy of any cancellation notice provided hereunder to any party hereto shall be delivered to all Third Parties.

17

No termination, cancellation or amendment hereof shall in any manner cancel, rescind, terminate or otherwise affect in any manner (i) the sale of any Receivables hereunder prior to such Cancellation or (ii) the assignment of any rights of the Purchaser (to the extent permitted in Section 5.7) hereunder prior to such Cancellation.

Section 5.2    <u>Protection of Right Title and Interest in and to Receivables</u> .

(a) Seller, at its expense, shall cause this Agreement and/or all financing statements and continuation statements and any other necessary documents covering each Purchaser's right, title and interest in and to the Receivables and other Transferred Property to be promptly recorded, registered and filed, and at all times to be kept recorded, registered and filed, all in such manner and in such places as may be required by law fully to preserve and protect the right, title and interest of the Purchaser hereunder in and to all of the Receivables and such other Transferred Property. Seller shall deliver to the Purchaser file-stamped copies of, or filing receipts for, any document recorded, registered or filed as provided above, as soon as available following such recording, registration or filing. The Purchaser shall cooperate fully with Seller in connection with the obligations set forth above and will execute any and all documents reasonably required to fulfill the intent of this subsection.

(b)    Seller shall not make any change in its name, identity or structure in any manner which would, could or might make any financing statement or continuation statement filed in accordance with paragraph (a) above seriously misleading within the meaning of Section 9-506(b) of the UCC, unless Seller shall have given the Purchaser thirty (30) days' prior written notice thereof and shall have promptly filed appropriate amendments to all previously filed financing statements or continuation statements.

(c)    Seller shall have an obligation to give the Purchaser at least sixty (60) days' prior written notice of any relocation of its principal executive office or its jurisdiction of organization if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement, and shall promptly file any such amendment.

(d)    Seller shall maintain its respective computer systems relating to installment loan record keeping so that, from and after the time of sale under this Agreement of its Receivables, Seller's master computer records (including any backup archives) that refer to a Receivable shall indicate clearly the interest of the Purchaser.

(e)    If at any time Seller shall propose to sell, grant a security interest in or otherwise transfer any interest in automotive receivables to any prospective purchaser, lender or other transferee, Seller shall give to such prospective purchaser, lender or other transferee computer tapes, records or printouts (including any restored from backup archives) that, if they shall refer in any manner whatsoever to any Receivable, shall indicate clearly that such Receivable has been sold to the Purchaser.

(f)    Seller shall permit the Purchaser and their respective agents, at any time during normal business hours, to inspect, audit and make copies of and abstracts from Seller's records regarding any Receivable or other Transferred Property to the extent permitted by applicable banking, privacy and other laws limiting such access.

18

Section 5.3    Costs and Expenses . Seller agrees to pay all reasonable costs and disbursements in connection with the perfection, as against all third parties, of the Purchaser's rights, title and interest in and to the Receivables.

Section 5.4 Governing Law . This Agreement shall be construed in accordance with the laws of the State of Arizona and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 5.5    Notices . All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, return receipt requested, to (a) in the case of the Purchaser, 4020 East Indian School Road, Phoenix, Arizona 85018, Suite C; and (b) in the case of Seller, 4020 East Indian School Road, Phoenix, Arizona 85018, Attention: President; or as to any of such Persons, at such other address as shall be designated by such Person in a written notice to the other Persons.

Section 5.6 Severability of Provisions . If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions and terms of this Agreement and shall in no way affect the validity or unenforceability of the other provisions of this Agreement.

Section 5.7    Assignment; Conveyance of Receivables and Transferred Property to the Trust . This Agreement may not be assigned by the Purchaser or Seller except as contemplated by this Section 5.7. Seller acknowledges that the Purchaser may, pursuant to certain agreements, convey the Receivables and the other Transferred Property, together with certain rights under this Agreement, to one or more special purpose companies to obtain financing, either through its warehouse or securitization programs. Seller acknowledges and consents to such conveyance and waives any further notice thereof and covenants and agrees that the representations and warranties of Seller contained in this Agreement and the rights of Purchaser hereunder are intended to benefit such subsequent assignees. In furtherance of the foregoing, Seller covenants and agrees to perform its duties and obligations hereunder (but subject to the limitations and conditions on such duties and obligations) for the benefit of such subsequent assignees, notwithstanding anything to the contrary in this Agreement, Seller shall be directly liable to such subsequent assignees (notwithstanding any failure by Seller or Purchaser to perform their respective duties and obligations hereunder) and that such subsequent assignees may enforce the duties and obligations of Seller under this Agreement against Seller for the benefit of such subsequent assignees.

Section 5.8 Further Assurances . Seller and Purchaser agree to do and perform, from time to time, any and all acts and to execute any and all further instruments required or reasonably requested by the other party hereto to effect the purposes of this Agreement, including, without limitation, the execution of any financing statements, amendments, continuation statements or releases relating to the Receivables for filing under the provisions of the UCC or other law of any applicable jurisdiction. Seller agrees that, as additional

19

consideration for the sale hereunder, Seller shall enter into a purchase agreement in connection with any subsequent sale of the Receivables and make such representations, warranties and covenants as are customary and reasonable.

Section 5.9    No Waiver; Cumulative Remedies . No failure to exercise and no delay in exercising, on the part of the Purchaser or Seller, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 5.10 Counterparts . This Agreement may be executed in two (2) or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

Section 5.11    Third-Party Beneficiaries . This Agreement will inure to the benefit of and be binding upon the parties hereto and shall inure to the benefit of any assignee of Purchaser and such assignee shall be considered to be third party beneficiaries hereof. Except as otherwise provided in this Agreement, no other Person will have any right or obligation hereunder.

Section 5.12 Merger and Integration . Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

Section 5.13    Headings . The headings herein are for purposes of references only and shall not otherwise affect the meaning or interpretation of any provision hereof.

Section 5.14 Seller Indemnification .

(a)    Purchaser . Seller shall indemnify and hold harmless the Purchaser from and against any loss, liability, expense (including, without limitation, reasonable attorneys' fees and costs) or damage suffered or sustained by reason of third party claims which may be asserted against or incurred by any of them as a result of (a) the sale by Seller of the Receivables, (b) breach of Seller's representations and warranties, or (c)the failure of Seller to perform its covenants under this Agreement, including, but not limited to, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened third party action, proceeding or claim. Notwithstanding the foregoing, such indemnification shall not extend to any credit losses on the Receivables.

(b)    Seller shall indemnify, defend and hold harmless the Purchaser, and any assignee and their respective officers, directors, employees and agents from and against any taxes that may at any time be asserted against the Purchaser, and any assignee or any of their respective officers, directors, employees or agents with respect to, and as of the date of, the sale of the Receivables sold by Seller to the Purchaser pursuant to the Agreement, including (without limitation) any sales, gross receipts, general corporation, tangible or intangible personal property, privilege, or license taxes and costs and expenses in defending against the same.

20

Indemnification under this Section 5.14 shall include reasonable fees and expenses of counsel and expenses of litigation. The indemnity obligations hereunder shall be in addition to any obligations that Seller may otherwise have.

Section 5.15    Submission to Jurisdiction .

(a)    Any action or proceeding relating in any way to this Agreement may be brought and enforced in the courts of the State of Arizona, or of the United States for the District of Arizona and each party hereto irrevocably submits to the jurisdiction of each such court (and any appellate court from any thereof) in respect of any such action or proceeding. Each party hereto irrevocably appoints Jon D. Ehlinger, 4020 East Indian School Road, Suite C, Phoenix, Arizona 85018, as its agent (the " Process Agent ") to receive service of process or other legal summons for purposes of any such action or proceeding in the State of Arizona. So long as any party hereto has any obligation under this Agreement, it will maintain a duly appointed agent for the service of such process or summons. Such service may be made by mailing or delivering a copy of such process to the applicable party in care of the Process Agent at the address specified above for such Process Agent, and each party hereto hereby irrevocably authorizes and directs such Process Agent to accept such service on its behalf. As an alternative method of service, each party hereto also irrevocably consents to the service of any and all process in any such action or proceeding in the State of Arizona by the mailing of copies of such process to such party at its address as provided for notices hereunder.

(b)    Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the Superior Court of the State of Arizona, or the United States District Court for the District of Arizona, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 5.16    Waiver of Jury Trial . EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

DT ACCEPTANCE CORPORATION, an Arizona corporation, as Purchaser

By: */s/ Paul I. Kaplan*
    Paul I. Kaplan, President

CARVANA, LLC, an Arizona limited liability company, as Seller

By: */s/ Jon D. Ehlinger*
    Jon D. Ehlinger, Secretary

[Signature Page to Carvana Origination Agreement]

**AMENDMENT NO 1 TO ORIGINATION AGREEMENT**

This Amendment No 1 to Origination Agreement (the " <u>Amendment</u> ") is effective as of December 28, 2015, by and between Carvana, LLC, an Arizona limited liability company (" <u>Carvana</u> "), as Seller, and DT Acceptance Corporation, an Arizona corporation as successor in interest to DT Acceptance Corporation (" <u>DTAC</u> "), as purchaser.

WHEREAS, Carvana and DTAC are parties to that certain Origination Agreement, effective as of June 1, 2014 (the " <u>Existing Origination Agreement</u> ") and desire to amend the Existing Origination Agreement as set forth herein.

AGREEMENTS

In consideration of the mutual agreements and subject to the terms and conditions herein contained, each party agrees as follows for the benefit of the other party:

Section 1.     <u>Amendment to the Existing Origination Agreement</u> .

(a)    Effective as of the date hereof, Section 1.1 of the Existing Origination Agreement is hereby amended by deleting the term "Transferred Property and inserting the following in place thereof:

""<u>Transferred Property</u> " means, with respect to the Transferred Receivables (or, as context may require, any one or more thereof), all of the following: (i) such Transferred Receivables, all instruments and any and all monies and payments (including in kind collections) received or due or to become due thereunder after the applicable Sale Date with respect to such Receivables and all other rights and benefits thereunder; (ii) the security interests in the Financed Vehicles granted by Obligors pursuant to such Receivables and any other interest of the Seller in such Financed Vehicles, including, without limitation, the Certificates of Title with respect to such Financed Vehicles, and in and to all other security, warranties, guaranties and credit support with respect to such Receivables; (iii) any proceeds from claims on any physical damage, credit life and credit accident and health insurance policies or other insurance (including vendor's single or dual interest insurance) or certificates relating to such Financed Vehicles or the related Obligors; (iv) refunds for the costs of extended service contracts with respect to such Financed Vehicles, refunds of unearned premiums with respect to credit life and credit accident and health insurance policies or other insurance or certificates covering a related Obligor or Financed Vehicle or the Obligor's obligations with respect to such Financed Vehicle; (v) the Receivable File related to each such Receivable; and (vi) the proceeds of any and all of the foregoing. For the avoidance of doubt, in no event shall Transferred Property include any of the foregoing relating to a Receivable other than a Transferred Receivable."

(b)    Effective as of the date hereof, Section 1.1 of the Existing Origination Agreement is hereby amended by inserting the following defined term in the applicable alphabetical location:

""<u>Transferred Receivable</u> " has the meaning set forth in Section 2.1 hereof."

(c)    Effective as of the date hereof, Section 1.2 of the Existing Origination Agreement is hereby amended by adding a new Section 1.2(b) as follows:

"(b)    Interpretation . For the avoidance of doubt, (i) all references herein (whether singular or plural) to Financed Vehicles, Receivable Files or Transferred Property are in each case intended, and shall be deemed for all purposes, to refer solely and exclusively to such Financed Vehicles, Receivable Files and/or Transferred Property (as the case may be) relating to Transferred Receivables, and shall be deemed to exclude any of foregoing that relate to a Receivable other than a Transferred Receivable, and (ii) all references herein to "the Receivables" are in each case intended, and shall be deemed for all purposes, to refer solely and exclusively to the applicable Transferred Receivables."

(d)    Effective as of the date hereof, Section 2.1 of the Existing Origination Agreement is hereby amended and restated in its entirety as follows:

"Section 2.1    Conveyance of Receivables .

On each Sale Date, commencing with the date hereof, (i) the Seller shall sell and deliver and does hereby sell and deliver to DTAC, and (ii) DTAC does hereby confirm that it shall purchase and does hereby as of such date purchase from the Seller, all of Seller's right, title and interest in, to and under all Receivables offered for sale by, and in the sole discretion of, the Seller on each such date (each such Receivable so offered by the Seller and purchased (or, prior to the date of Cancellation (as defined in Section 5.1), to be so purchased) by the Purchaser, a " Transferred Receivable "), together with all other Transferred Property relating thereto. In connection with any purchase and sale of a Receivable hereunder, Seller agrees, at its own expense, (i) to annotate and indicate on its books and records (including any computer files) that such Receivable was sold and transferred to DTAC pursuant to this Agreement, (ii) to deliver to DTAC (or its assigns) the original Contract relating to such Receivable duly assigned to DTAC as required by relevant law; (iii) to deliver to or upon the order of DTAC all collections on such Receivable, if any, received since the Sale Date and (iv) deliver to DTAC such other and further documents, including any reconciliations, reasonably required by DTAC.

The parties hereto intend that each transfer hereunder be a sale of the Receivables offered for sale hereunder and the other Transferred Property relating thereto from Seller to the Purchaser and not a financing secured by such property; and the beneficial interest in and title to such Receivables and such other Transferred Property shall not be a part of Seller's estate in the event of the filing of a bankruptcy petition by or against Seller under any bankruptcy law. However, if, notwithstanding the intent of Seller and Purchaser, this transaction is deemed to be a financing arrangement, or it is otherwise determined that any conveyance hereunder is for any reason not considered a sale and that the beneficial interest in and title to such Receivables and such other Transferred Property remain part of Seller's bankruptcy estate, the parties intend that with respect to any such Transferred Property this Agreement shall constitute a security agreement under the UCC as in effect in the State of Arizona, and Seller hereby grants to Purchaser on the terms and conditions in this Agreement a first priority perfected security interest in and against all of Seller's

2

right, title and interest in and to such Transferred Receivables and such other Transferred Property, and other property conveyed hereunder and all proceeds of any of the foregoing."

(e)    Effective as of the date hereof, Section 2.3(a)(vi), 2.3(c), 2.4, 2.5(h) and 5.2(d), (e) and (f), of the Existing Origination Agreement are hereby amended by inserting the word "Transferred" immediately prior to each reference to the word "Receivable" and "Receivables" contained therein (excluding any reference therein to "Receivable File" or "Receivable Files").

Section 2.    Representations, Warranties and Confirmations . Each of DTAC and Carvana hereby represents and warrants that:

(a)    It has the power and authority, and is duly authorized, including by all corporate or limited liability company action on its part, to execute and deliver this Amendment.

(b)    This Amendment has been duly and validly executed and delivered by such party.

(c)    This Amendment and the Existing Origination Agreement as amended hereby, constitute legal, valid and binding obligations of such parties and are enforceable against such parties in accordance with their terms.

Section 3.    Governing Law . This Amendment shall be construed in accordance with the laws of the State of Arizona and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 4.    Counterparts . This Amendment may be executed in two (2) or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Amendment by email or facsimile shall be effective as delivery of a manually executed counterpart of this Amendment.

**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective officers as of the day and year first above written.

DT ACCEPTANCE CORPORATION, an Arizona corporation, as Purchaser

By: /s/ Gregory Sax
_____
Gregory Sax, President

[Signature Page to Amendment No 1 to Carvana Origination Agreement]

CARVANA, LLC, an Arizona limited
liability company, as Seller

By: /s/ Ernest C. Garcia III

Ernest C. Garcia III, President

*[Signature Page to Amendment No 1 to Carvana Origination Agreement]*

## TIME SHARING AGREEMENT

Dated as of the 22 day of October 2015.
among
**DT Credit Company, LLC,**
as Lessor,
and
**The Entities Listed on the Signature Page hereto,**
as Lessees,

concerning the aircraft listed on Exhibit A hereto.

\*       \*       \*

**INSTRUCTIONS FOR COMPLIANCE WITH
"TRUTH IN LEASING" REQUIREMENTS UNDER FAR § 91.23**

*Before execution of this Agreement:*
Fill in appropriate dates on this page, the next page and Exhibit A.
Supply information needed in paragraph 19.

*Within 24 hours after execution of this Agreement:*
Mail a copy of the executed document to the
following address via certified mail, return receipt requested:

Federal Aviation Administration
Aircraft Registration Branch
ATTN: Technical Section
P.O. Box 25724
Oklahoma City, Oklahoma 73125

*At least 48 hours prior to the first flight in each aircraft to be conducted under this Agreement:*

Provide notice (in the form of the FSDO notification letter in Exhibit B hereto) of (a) the Aircraft registration number, (b) the departure airport and (c) the proposed time of departure of the first flight, by facsimile to the FAA Flight Standards District Office located nearest the departure airport.

*Carry a copy of this Time Sharing Agreement in the Aircraft at all times.*

## TIME SHARING AGREEMENT

This Time Sharing Agreement (the "Agreement") is made, effective as of the 22 day of October 2015 (the "Effective Date"), by and among **DT CREDIT COMPANY, LLC** ("Lessor"), an Arizona limited liability company, and **the Entities listed on the Signature Page A hereto** (collectively "Lessees" and separately "a Lessee").

**R E C I T A L S:**

WHEREAS , Lessor is in lawful possession of and is the operator of those certain U.S. registered civil aircraft listed on Exhibit A hereto (together "the Aircraft" and each individually "an Aircraft"));

WHEREAS , Lessor employs/ and/or contracts for the services of a fully qualified flight crew, consisting of a pilot in command and second in command, to operate the Aircraft;

WHEREAS , Lessor operates the Aircraft within the scope of and incidental to its own business; and

WHEREAS , Lessor and Lessees desire to lease said Aircraft and flight crew, from time to time as needed, on a time sharing basis as authorized in Section 91.501 (b)(6) of the Federal Aviation Regulations ("FAR") and defined in Section 91.501 (c) (1) of the FAR.

NOW, THEREFORE , in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the parties agree as follows:

1. **Term** . The term of this Agreement shall commence on the Effective Date and shall continue for a period of 12 months.

2. **Renewal** . This Agreement shall be automatically renewed for successive 12 month terms unless terminated in writing by either of the parties.

3. **Termination** . This Agreement may be terminated by either party upon 30 days written notice to the other party.

4. **Aircraft Lease** . From time to time during the term of this Agreement, a Lessee may request that Lessor lease an Aircraft with crew to such Lessee on a time sharing basis. Each Lessee shall not request use of an Aircraft for more than 50% of the total hours of use of the Aircraft in each calendar year during term of this Agreement. Lessor agrees to make its best efforts to accommodate use requests of each Lessee, but it shall have no obligation to lease an Aircraft to any Lessee if such Aircraft is needed for the business of Lessor or is otherwise unavailable.

5. **Lease Term** . The term of each lease period under this Agreement shall begin upon the commencement of the flight or series of flights requested by Lessee and shall end upon the conclusion of such flight or series of flights.

6.    **Applicable Regulations** . The parties agree that for all flights under this Agreement, the Aircraft shall be operated under the pertinent provisions of Subpart F of Part 91 of the FAR, If any provision of this Agreement is determined to be inconsistent with any of the requirements of those regulations, it shall be deemed amended in any respect necessary to bring it into compliance with such requirements.

7.    **Flight Expenses** . For each flight under this Agreement, including any ferry or positioning flights, a Lessee shall reimburse Lessor for such of the actual expenses of each specific flight as are authorized by Section 91.501 (d) of the FAR, or so much of such authorized expenses as may be requested for payment by Lessor. These expenses include and are strictly limited to:

(1)    Fuel, oil, lubricants, and other additives;

(2)    Travel expenses of the crew, including food, lodging and ground transportation;

(3)    Hangar and tie down costs away from the Aircraft's base of operation;

(4)    Insurance obtained for the specific flight;

(5)    Landing fees, airport taxes and similar assessments;

(6)    Customs, foreign permit, and similar fees directly related to the flight;

(7)    In-flight food and beverages;

(8)    Passenger ground transportation;

(9)    Flight planning and weather contract services; and

(10)    An additional charge equal to 100% of the expenses listed in subparagraph (1) of this paragraph.

It is agreed and understood between Lessor and each Lessee that the actual flight expenses enumerated above are the maximum amounts that may be charged for any flight under this Agreement and that Lessor may, in Lessor's sole discretion, charge less than the enumerated maximum amounts.

8.    **Federal Excise Tax** . In addition to Lessor's actual expenses listed in Paragraph 7 herein, for each flight under this Agreement Lessee shall pay to Lessor the amount of the federal excise tax imposed by Internal Revenue Code Section 4261. Lessor agrees to timely remit such amounts to the Internal Revenue Service ("IRS") accompanied by the appropriate IRS reporting form.

9.    **Invoices** . Lessor will pay all expenses related to the operation of an Aircraft when incurred, and will provide an invoice to the Lessee in accordance with Paragraphs 7 and 8 herein within thirty (30) days from the last day of the calendar month in which any flight for such Lessee is operated. Lessee shall pay Lessor for said expenses and excise taxes within fifteen (15) days of receipt of the invoice.

10.    **Flight Information** . A Lessee will provide Lessor with requests for flights and proposed flight schedules as far in advance of any given flight as possible, and in any case, at least twenty-four (24) hours in advance of Lessee's planned initial departure. Requests for flights shall be in a form, whether written or oral, mutually convenient to, and agreed upon by the parties and unless accepted by Lessor, shall be deemed rejected. In addition to the proposed schedules and flight times, a Lessee shall provide at least the following information for each proposed flight at some time prior to scheduled departure as specified by Lessor or Lessor's flight crew:

(a)    proposed departure point;

3

(b)     any intermediate stops;

(c)     final destination;

(d)     date and time of flight;

(e)     the number of anticipated passengers, including, if required by aviation security regulations, the names of such passenger and such personal identification information as my be required by any applicable security, immigration or customs regulations;

(f)     the nature and extent of luggage and/or cargo to be carried;

(g)     the date and time of return flight, if any;

(h)     any requests for special services (such as special catering, ground transportation, or security arrangements) that may be required in conjunction with the flight(s); and

(i)     any other information concerning the proposed flight that may be pertinent or required by Lessor or Lessor's flight crew.

11.     **Scheduling of Aircraft** . Lessor shall have final authority over the scheduling of the Aircraft; provided, however, that Lessor will make reasonable efforts to accommodate Lessees' needs and avoid conflicts in scheduling.

12.     **Control of Aircraft** . During all flights under this Agreement, the Aircraft shall be exclusively within the possession, command, and control of Lessor, and all such flights shall be under the operational control (as that term is defined in Section 1.1 of the FAR) of Lessor,

13.     **Maintenance of Aircraft** . Lessor shall be solely responsible for providing for the inspection, maintenance, preventive maintenance, overhaul, and servicing (hereinafter "Maintenance") of the Aircraft, and shall take such requirements into account in scheduling the Aircraft, No period of required Maintenance shall be delayed or postponed for the purpose of scheduling the Aircraft, unless such Maintenance can be safely and lawfully be conducted at a later time in compliance with all applicable laws and regulations.

14.     **Authority of Pilot in Command** . In accordance with Section 91.3 of the FAR, the pilot in command of any flight under this Agreement shall have final and complete authority to initiate, divert a flight, terminate a flight, refuse to commence a flight, cancel any flight, or take any other action required for safety without liability for loss, injury, damage, or delay. Further, each Lessee agrees that Lessor shall not be liable for delay or failure to provide the Aircraft and/or flight crew when such delay or failure is the result of force majeure, including without limitation, government regulation or authority, mechanical difficulty, war, civil commotion, strikes or labor disputes, weather conditions, or acts of God.

15.     **Flight Crew.** Lessor shall contract for or employ, pay for and provide to Lessee a fully-qualified and trained flight crew, consisting of at least a pilot in command and a second in command, for each flight undertaken under this Agreement.

4

16.    **Passengers and Baggage** . There may be carried on the Aircraft on all flights under this Agreement such passengers and baggage/cargo as the Lessee in its reasonable discretion shall determine; provided, however, that the passengers to be carried on such flights shall be limited to those permitted under the pertinent provisions of Part 91 of the FAR and any applicable aviation security, immigration or customs regulations, and that the number of such passengers shall in no event exceed the number of passenger seats legally available in the Aircraft and the total load, including fuel and oil in such quantities as the pilot in command shall determine to be required, shall not exceed the maximum allowable load for the Aircraft.

17.    **Prohibited Items** . A Lessee agrees that it shall not permit the carriage of any contraband, prohibited dangerous goods, or illegal controlled substances on the Aircraft at any time.

18.    **Damage to Aircraft.** A Lessee agrees that it shall be solely responsible for any damage, normal wear and tear excepted, to the Aircraft which may be caused by its passengers, baggage, or cargo

19.    **Insurance** . Lessor shall maintain in full force and effect, at its sole expense, bodily injury and property damage liability insurance in an amount no less than US$150,000,000.00 combined single limit for the benefit of itself and each Lessee in connection with the operation and use of the Aircraft under this Agreement. Such insurance shall be an occurrence policy naming each Lessee and its owners, shareholders, officers, and employees as additional insureds. At Lessee's request, Lessor will provide a Certificate of Insurance.

20.    **Additional Insurance** . Lessor will make its best efforts to provide such additional insurance coverage as Lessee shall request or require; provided, however, that the cost of such additional insurance shall be borne by Lessee as set forth in paragraph 7(4) herein.

21.    **Indemnities** . Each Lessee hereby agrees to indemnify and hold Lessor harmless from any liability arising from its use of the Aircraft under this Agreement, excepting only that liability that is caused by the sole negligence of Lessor's crew. Notwithstanding the foregoing, Lessor shall be solely responsible for any fines, penalties, and forfeitures (except for those fines, penalties and forfeitures levied directly against the flight crew) related to the operation of the Aircraft hereunder.

22.    **Warranties** . Each Lessee represents and warrants that:

(a)    It will only use the Aircraft for and on account of its own business use, for the carriage of its officials, owners and guests, or for the permitted personal use of its owners, officers and employees, and will not use the Aircraft for the purpose of providing transportation of passengers or cargo for compensation or hire;

(b)    It shall refrain from incurring any mechanic's or other lien in connection with inspection, preventative maintenance, maintenance servicing or storage of an Aircraft, whether permissible or impermissible under this Agreement, nor shall there be any attempt by Lessee to convey, mortgage, assign, lease or any way alienate the Aircraft or create any kind of lien or security interest involving the Aircraft or do anything or take any action that might mature into such a lien; and

5

(c)     during the term of this Agreement, each Lessee will abide by and conform to all such laws, governmental and airport orders, and rules and regulations, as shall from time to time be in effect relating in any way to the operation and use of the Aircraft by such Lessee.

(d)     It shall only use the Aircraft in accordance with all applicable policies of insurance.

23.    **Assignment** . Neither this Agreement nor any party's interest herein shall be assignable to any other party whatsoever. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives and successors.

24.    **Modification** . This Agreement cannot be and shall not be modified, altered, or amended except by written agreement executed by all parties.

25.    **Aircraft Base** . For the purposes of this Agreement, the base of operations of the Aircraft shall be Sky Harbor Airport, Phoenix, Arizona.

26.    **Governing Law** . The parties agree and acknowledge that this Agreement was reached and executed in the State of Arizona and the laws of the State of Arizona, without giving effect to its conflict of law provisions, shall govern this Agreement. Notwithstanding the foregoing, this Agreement shall also be subject to and governed by all applicable Federal law including, without limitation, the FAR

27.    **Headings** . The headings in this Agreement are inserted for convenience only and shall not affect the terms hereof.

28.    **Counterparts** . This Agreement may be signed in multiple counterparts, each of which and collectively shall constitute but one original.

**29.    TRUTH IN LEASING STATEMENT UNDER SECTION 91** . **23 OF THE FAR** .

WITHIN THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE OF THIS AGREEMENT, THE AIRCRAFT HAVE BEEN INSPECTED AND MAINTAINED IN ACCORDANCE WITH THE FOLLOWING PROVISIONS OF THE FAR:

CHECK ONE:

☐    91.409 (f)(1): A continuous airworthiness inspection program that is part of a continuous airworthiness maintenance program currently in use by a person holding an air carrier operating certificate or an operating certificate issued under FAR Part 121,127, or 13 5 and operating that make and model aircraft under FAR Part 121 or operating that make and model under FAR Part 135 and maintaining it under FAR 135.411(a)(2).

6

☐     91.409 (f)(2): An approved aircraft inspection program approved under FAR 135,419 and currently in use by a person holding an operating certificate issued under FAR Part 135.

☒     91,409 (f)(3): A current inspection program recommended by the manufacturer.

☐     91.409 (f)(4): Any other inspection program established by the registered owner or operator of the Aircraft and approved by the Administrator of the Federal Aviation Administration in accordance with FAR 91.409 (g).

THE PARTIES HERETO CERTIFY THAT DURING THE TERM OF THIS AGREEMENT AND FOR OPERATIONS CONDUCTED HEREUNDER, THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED IN ACCORDANCE WITH THE PROVISIONS OF FA:

CHECK ONE:

☐     91.409(f)(1)    ☐      91.409(f)(2)    ☒      91.409(f)(3)    ☐      91.409(f)(4)

LESSOR SHALL HAVE AND RETAIN OPERATIONAL CONTROL OF THE AIRCRAFT DURING ALL OPERATIONS CONDUCTED PURSUANT TO THIS AGREEMENT. EACH PARTY HERETO CERTIFIES THAT IT UNDERSTANDS THE EXTENT OF ITS RESPONSIBILITIES, SET FORTH HEREIN, FOR COMPLIANCE WITH APPLICABLE FEDERAL AVIATION REGULATIONS.

AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FEDERAL AVIATION ADMINISTRATION FLIGHT STANDARDS DISTRICT OFFICE,

THE PARTIES HERETO CERTIFY THAT A TRUE COPY OF THIS AGREEMENT SHALL BE CARRIED ON THE AIRCRAFT AT ALL TIMES, AND SHALL BE MADE AVAILABLE FOR INSPECTION UPON REQUEST BY AN APPROPRIATELY CONSTITUTED AND IDENTIFIED REPRESENTATIVE OF THE ADMINISTRATOR OF THE FAA.

7

*\*\*\*\* Signature Page Follows \*\*\*\**

**IN WITNESS WHEREOF** , the, parties have executed this Agreement as of the date and year first written above.

Lessor:                                                         Lessees:

**DT CREDIT COMPANY, LLC**                                      **GO CAPITAL HOLDINGS, LLC**

By:    */s/ Jon D. Ehlinger*                                    By:    */s/ Steven P. Johnson*
Print:  Jon D. Ehlinger                                         Print:  Steven P. Johnson
Title:  Secretary                                               Title:  Secretary

**CARVANA GROUP, LLC**                                          **ORENO HOLDINGS, LLC**

By:    */s/ Ernest C. Garcia II*                                By:    */s/ Ernest C. Garcia II*
Print:  Ernest C. Garcia II                                     Print:  Ernest C. Garcia II
Title:  Manager                                                 Title:  Manager

**VERDE INVESTMENTS, INC.**

By:    */s/ Steven P. Johnson*
Print:  Steven P. Johnson
Title:  Secretary

Exhibit A
Time Sharing Agreement
Effective: October 22, 2015

Canadair Model CL-600-2B16 aircraft bearing U.S. Registration Number N604DT and manufacturer's serial number 5627.

Bombardier Aerospace Model Global 5000 aircraft bearing U.S. Registration Number N50VC and manufacturer's serial number 9539

Exhibit B
FSDO Notification Letter

Date: [                    ]

Federal Aviation Administration
Flight Standards District Office
1777 North Perimeter Drive
Scottsdale, AZ 85255

RE: [Aircraft Make/Model and Reg.No,]

To Whom It May Concern:

Pursuant to FAR 91.23(c)(3), you are hereby notified that the first flight in the above-referenced aircraft under a Time Sharing Agreement will depart from _____Airport at _____on [Date] at approximately _____am/pm.

**DT CREDIT COMPANY, LLC**

By:     _____
Print:  _____
Title:  _____

Exhibit 10.22

**AMENDED AND RESTATED**

**MASTER PURCHASE AND SALE AGREEMENT**

among

**CARVANA AUTO RECEIVABLES 2016-1 LLC**

**as Transferor**

**and**

**ALLY BANK and ALLY FINANCIAL INC.**

**each a Purchaser**

**DATED AS OF MARCH 6, 2017**

TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| ARTICLE I DEFINITIONS AND USAGE |  | 1 |
| Section 1.1 | Definitions | 1 |
| ARTICLE II COMMITMENT TO SELL RECEIVABLES POOLS |  | 2 |
| Section 2.1 | Commitments to Sell and Purchase Receivables Pools | 2 |
| Section 2.2 | Payment of Second Step Receivables Purchase Price | 3 |
| Section 2.3 | Pricing Model | 3 |
| Section 2.4 | Termination Options | 4 |
| Section 2.5 | Taxes | 7 |
| Section 2.6 | Loss and Liquidation Data | 8 |
| Section 2.7 | Re-Liening Trigger Events | 8 |
| ARTICLE III PURCHASE AND SALE OF RECEIVABLES |  | 9 |
| Section 3.1 | Sale of Receivables | 9 |
| Section 3.2 | The Closing | 12 |
| ARTICLE IV |  | 12 |
| CLOSINGS |  | 12 |
| Section 4.1 | Effecting Purchases | 12 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES |  | 13 |
| Section 5.1 | Representations and Warranties of the Purchasers | 13 |
| Section 5.2 | Representations and Warranties of the Transferor | 15 |
| ARTICLE VI CONDITIONS |  | 23 |
| Section 6.1 | Conditions to Effectiveness | 23 |
| Section 6.2 | Conditions to Obligation of the Purchasers | 24 |
| Section 6.3 | Conditions to Obligation of the Transferor | 27 |
| ARTICLE VII COVENANTS OF THE TRANSFEROR |  | 27 |
| Section 7.1 | Protection of Right, Title and Interest | 27 |
| Section 7.2 | Other Liens or Interests | 29 |
| Section 7.3 | Perfection Costs and Expenses | 29 |
| Section 7.4 | Separateness | 29 |
| Section 7.5 | Notice of Servicer Termination; Etc. | 29 |
| Section 7.6 | Conduct of Business; Ownership | 30 |
| Section 7.7 | Collections | 30 |
| Section 7.8 | Consolidations, Mergers and Sales of Assets | 30 |
| Section 7.9 | Master Sale Agreement | 30 |
| Section 7.10 | Operation of the Transferor | 30 |
| Section 7.11 | Selection Standards; Quarterly Meetings | 30 |
| Section 7.12 | Furnishing of Information and Inspection of Records | 31 |

i

Section 7.13      Compliance with Laws, Etc.                                    31
Section 7.14      Indemnity                                                     31
Section 7.15      Publicity                                                     32
Section 7.16      No Solicitation                                               33
Section 7.17      Remediation                                                   33
Section 7.18      Quarterly Statements as to Compliance                         33
Section 7.19      Additional Covenants                                          33
Section 7.20      Negative Covenants                                            37
Section 7.21      Accountant's Letter                                           38

ARTICLE VIII MISCELLANEOUS PROVISIONS                                          39
Section 8.1       Obligations of the Transferor                                39
Section 8.2       Repurchase of Receivables Upon Breach by the Transferor      39
Section 8.3       Assignment of Warranty Receivables                           39
Section 8.4       Amendment                                                    39
Section 8.5       Waivers                                                       39
Section 8.6       Notices                                                      40
Section 8.7       Costs and Expenses                                           40
Section 8.8       Survival                                                     41
Section 8.9       Headings and Cross-References                                41
Section 8.10      Governing Law, Submission to Jurisdiction, Etc.              41
Section 8.11      Counterparts                                                 42
Section 8.12      Further Assurances                                           42
Section 8.13      No Reliance                                                  42
Section 8.14      Severability of Provisions                                   42
Section 8.15      Assignment                                                   42
Section 8.16      No Third Party Beneficiaries                                 42
Section 8.17      No Petition Covenant                                         42
Section 8.18      Special Acknowledgement of Purchasers                        43
Section 8.19      Effect of Amendment and Restatement                          43

EXHIBITS

EXHIBIT A       FORM OF POOL SUPPLEMENT
EXHIBIT B       [RESERVED]
EXHIBIT C       FORM OF NOTICE OF CLOSING DATE
EXHIBIT D       PURCHASE-BID FILE TAPE DATA LAYOUT
EXHIBIT E       CREDIT POLICY
EXHIBIT F       SYSTEM DESCRIPTION

APPENDIX

APPENDIX A      Definitions

ii

**AMENDED AND RESTATED MASTER PURCHASE AND SALE AGREEMENT**

THIS AMENDED AND RESTATED MASTER PURCHASE AND SALE AGREEMENT (as from time to time amended, supplemented or otherwise modified and in effect, this " Agreement ") is made as of March 6, 2017, among Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the " Transferor "), Ally Bank., a Utah chartered bank, and Ally Financial Inc., a Delaware corporation (each a " Purchaser " and collectively, the " Purchasers ").


RECITALS:

In the regular course of its business, the Seller (as defined below) sells used automobiles and light trucks and originates automobile and light truck retail installment sale contracts secured by such automobiles and light trucks.

1. On the Original Execution Date, the Seller and the Transferor have entered into the Master Sale Agreement (Flow) (the " Master Sale Agreement ") pursuant to which the Seller has agreed to sell, from time to time, Receivables and related property to the Transferor pursuant to the terms and conditions set forth therein.

2. The Transferor wishes to sell, and the Purchasers wish to purchase, from time to time, Receivables and related property (including the security interests in the related Financed Vehicles) pursuant to the terms of this Agreement.

3. Bridgecrest has agreed to service the Receivables Pools and related Purchased Property for the benefit of the Purchasers pursuant to the Master Servicing Agreement.

4. The Transferor and the Purchasers wish to provide in this Agreement, among other things, the terms on which the Receivables Pools and related property are to be sold by the Transferor to the Purchasers.

In consideration of the foregoing, other good and valuable consideration, and the mutual terms and covenants contained herein, the parties hereto agree as follows:


ARTICLE I

DEFINITIONS AND USAGE

Section 1.1 Definitions . Certain capitalized terms used in the above recitals and in this Agreement are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to this Agreement. All references herein to " the Agreement " or " this Agreement " are to this Master Purchase and Sale Agreement as it may be amended, supplemented or modified from time to time, the exhibits and attachments hereto and the capitalized terms used herein which are defined in such Appendix A, and all references herein to Articles, Sections and subsections are to Articles, Sections or subsections of this Agreement unless otherwise specified. The rules of construction and usage set forth in such Appendix A shall be applicable to this Agreement.

ARTICLE II

COMMITMENT TO SELL RECEIVABLES POOLS

Section 2.1 Commitments to Sell and Purchase Receivables Pools

(a) Transferor Obligation . Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 51% (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 51% of the aggregate principal balance of all receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided , that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the " Transferor Obligation ").

(b) Purchaser Obligation . Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period on each Closing Date designated by the Transferor pursuant to Section 4.1(a) ; provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount (the " Purchaser Obligation ").

(c) Basic Documents; Pool Supplement . The Transferor's right, title and interest in the Receivables and related Purchased Property purchased, from time to time, by the Purchaser pursuant to Section 3.1 shall be transferred and assigned by the execution and delivery of a Pool Supplement, in form and content substantially similar to Exhibit A attached hereto, and the satisfaction of the terms and conditions and the performance of the transactions contained in this Agreement and such Pool Supplement, as applicable. The Transferor shall deliver the Pool Supplement to the Purchaser for any Receivables Pool in accordance with the time periods specified in Section 4.1 .

(d) Selection of Receivables Pools . The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures, as selected by the Seller in accordance with the Selection Procedures and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) each such Receivables Pool (after giving effect to such sale) meets the Eligible Receivables Pool criteria. If any of the Purchaser, the Seller or the Transferor

2

determines that such Receivables Pool does not satisfy the criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this Section 2.1(d) and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection.

Section 2.2 Payment of Second Step Receivables Purchase Price . Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Second Step Receivables Purchase Price due on each Closing Date shall be paid by the Purchasers to the Transferor on such Closing Date by wire transfer of immediately available funds to an account or accounts designated by the Transferor. The Second Step Receivables Purchase Price will be set forth in the Settlement Report for each Receivables Pool, in the form set forth in Exhibit A .

Section 2.3 Pricing Model . On the initial Closing Date, the Pricing Model shall be as agreed upon by the Parties and may thereafter be amended in accordance with this Section  2.3 . The " Pricing Model " shall be delivered by the Purchaser to the Transferor in a Microsoft excel file format by electronic mail. The Parties shall not modify the Pricing Model other than in accordance with this Section  2.3 , or by the Purchasers as necessary to cure any ambiguity, correct any error, or to make it consistent with this Agreement; provided , that, for the avoidance of doubt, the inputs and variables used by the Pricing Model (including, for example, any Specified Variables) shall be freely changeable by the Purchasers based on attributes of the Receivables Pool in order to determine the Purchase Price without regard to this Section  2.3 . Otherwise, the Pricing Model may only be changed as follows:

(a) At any time, but no more frequently than weekly, the Purchasers will have the right to send a written notice to the Transferor (a " Pricing Model Change Notice ") proposing changes to the Pricing Model, including any assumptions within the Pricing Model (the " Pricing Model Amendments "), applicable to all Receivable Pools to be purchased on or after the effective date of such Pricing Model Amendment (which effective date shall be at least 30 days, but no longer than ninety (90) days, after delivery of a Pricing Model Change Notice as described below, or such earlier date as otherwise agreed to by the Transferor and the Purchasers). A Pricing Model Change Notice shall be provided by the Purchasers to the Transferor at least ninety (90) days prior to the effectiveness of the related Pricing Model Amendment; provided that, such notice need only be provided thirty (30) days prior to

3

effectiveness of the related Pricing Model Amendment if the changes based upon (A) 15% deviation in quarterly vintage loss or liquidation experience for any Receivables as compared against prior assumptions, including experience reflected in Vintage Data reports provided to the Purchasers from the Servicer, (B) changes in any of the Credit Policy or the definitions of Eligible Receivable or Eligible Receivables Pool, (C) changes impacting the Purchasers or their Affiliates due to or arising out of any Banking Regulatory Change or change in Requirements of Law, (D) changes in the cost of funds (including any internal allocation of costs or cost of funds) to the auto finance division of the Purchasers, (E) at any time during the existence and continuance of any Catalyst Event or (F) changes to the methodology (including underlying loss assumptions for comparably-designated dealers) for calculating the NAALR.

(b) If the Purchasers and the Transferor reach mutual written agreement regarding such Pricing Model Amendments, then the Pricing Model shall be amended to include such Pricing Model Amendments for Pools purchased subsequent to the date of such mutual agreement. If the Purchasers and the Transferor are not able to reach mutual agreement regarding such Pricing Model Amendments within thirty (30) days after receipt of the related Pricing Model Change Notice, then, the Purchasers may elect, in their sole discretion, to (A) remove or amend and resubmit such Pricing Model Change Notice upon written notice to the Transferor (and the Transferor shall have the longer of (i) the remainder of such thirty (30) day period and (ii) ten (10) days to consider such amended notice) or (B) terminate their obligation to make any further purchases hereunder effective immediately, upon written notice to the Transferor (the " Pricing Termination Notice "). If there is no agreement to amend the Pricing Model and this Agreement is not so terminated, the Pricing Model will remain in effect without the proposed change.

(c) If a change to the Pricing Model was previously made based on a Pricing Model Change Notice delivered in connection with the occurrence of a Catalyst Event under Section 2.3(a )( E) , within thirty (30) days after the end of such Catalyst Event, the Purchasers shall send a subsequent Pricing Model Change Notice to the Transferor proposing changes to the Pricing Model that reasonably reflect the change of circumstances that caused the cessation of such Catalyst Event. Notwithstanding the forgoing, if (i) the Pricing Model Amendment has not yet taken effect and (ii) the Catalyst Event is not continuing, Purchasers shall immediately withdraw the Pricing Model Change Notice upon the termination of the Catalyst Event.

Section 2.4 Termination Options .

(a) Transferor Termination Options . The Transferor may terminate the Transferor Obligation and the Purchaser Obligation by providing the Purchaser written notice thereof at any time after the occurrence of any of the following (the " Transferor Termination Option "):

(i) the commencement of a voluntary case by either Purchaser under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by either Purchaser to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of either Purchaser;

4

(ii) If the Purchasers and the Transferor are not able to reach mutual agreement regarding a Pricing Model Amendment; provided , that such termination shall not take effect until the last day of the applicable 90 day or 30 day notice period described in Section 2.3(a) , as applicable);

(iii) the breach of any representation, warranty or covenant in this Agreement or the Master Sale Agreement in any material respect by a Purchaser and, if such breach is capable of being cured and such Purchaser is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such failure is received from the Transferor or after discovery of such failure by the related Purchaser; or

(iv) for any reason with one hundred twenty (120) days' prior written notice to the Purchaser.

(b) Purchaser Termination Options . The Purchasers may terminate the Transferor Obligation and the Purchaser Obligation by providing the Transferor written notice thereof at any time after the occurrence of any of the following (the " Purchaser Termination Option "):

(i) the commencement of a voluntary case by the Transferor, the Seller, the Performance Guarantor, or the Servicer under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Transferor, the Seller, the Performance Guarantor, or the Servicer to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Transferor, the Seller, the Performance Guarantor, or the Servicer;

(ii) the Seller or the Performance Guarantor (x) consolidates or merges with or into another Person and is not the surviving entity, or (y) is a party to a merger, conversion or consolidation and is not the surviving entity, or (z) has a Person succeed to its business and, in each case, in the case of the Performance Guarantor, the Guaranty ceases to be legally enforceable against the successor entity;

(iii) a Servicer Termination Event shall be continuing pursuant to the terms of the Servicing Agreement;

(iv) if for any reason, a modification to the servicing of the Purchased Property in respect of any Banking Regulatory Change is not made pursuant to Section 3.17 of the Servicing Agreement;

(v) if the System of Record, including the components thereof, is updated or otherwise modified, or replaced by a successor computer system utilized by the Seller to select receivables, such that the updated, modified or replaced System of Record, including the components thereof, cannot apply the Selection Procedures, as determined by the Purchasers after consultation with the Seller during the Quarterly Selection Standards Meeting following the update, modification or replacement of the System of Record, including the components thereof;

5

(vi) (y) the occurrence of a "Termination Event" or "Commitment Termination Event" under the Receivables Warehouse Facility or a termination event, event of default, or servicer default under any other credit or purchase facility by the Purchasers or any of their Affiliates to the Seller or the Transferor or any of their consolidated Affiliates that enables or permits the holder or holders of such indebtedness or any trustee or agent on its or their behalf to cause such indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (z) any indebtedness of the Seller or the Transferor or any of their consolidated Affiliates which exceeds $20,000,000 in aggregate principal or face amount becoming due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(vii) a Material Adverse Effect occurs with respect to the Seller or the Transferor;

(viii) failure of the Seller or the Transferor to pay any amount owed to the Purchasers or any other transaction party under any Basic Document for at least five (5) Business Days;

(ix) the failure of the Seller or the Transferor to deliver a report or data file under in any Basic Document for at least five (5) Business Days after written notice of such failure is received from either Purchaser or after discovery of such failure by the Seller or the Transferor;

(x) the breach of any representation, warranty or covenant in any Basic Document in any material respect by the Seller or Transferor and, if such breach is capable of being cured and the Seller or the Transferor is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such breach is received from either Purchaser or after discovery of such breach by the Seller or the Transferor;

(xi) the Transferor is required to register as an "investment company" under the Investment Company Act of 1940;

(xii) the entry of (y) one or more judgments against the Transferor of $25,000 or more or (z) a judgment against the Seller of $2,500,000 or more or one or more judgments, in the aggregate, of $5,000,000 or more;

(xiii) the Purchasers shall cease to have a valid and perfected first-priority security interest in any Purchased Property related to 5.0% or more of the Aggregate Outstanding Principal Balance of any Purchased Receivables, and, upon and following the Seller's breach of its purchase obligations pursuant to Section 7.2 of the Master Sale Agreement or the Transferor's breach of its repurchase obligations pursuant to Section 8.2 of this Agreement, any of the Purchased Property;

(xiv) a Pension Benefit Guaranty Corporation or tax lien is filed against the Seller or Transferor;

6

(xv) a Change in Control;

(xvi) for any reason with one hundred twenty (120) days' prior written notice to the Transferor; or

(xvii) upon delivery of a Pricing Termination Notice pursuant to Section 2.3(b)

Section 2.5 Taxes .

(a) All payments made by the Transferor, the Servicer, the Seller, the Performance Guarantor or the Purchasers under this Agreement and the other Basic Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes or any other tax based upon net income (including any income or capital gain earned by such Party or subsequent transferee or assignee thereof in respect of any Receivable) imposed on any Party as a result of a present or former connection between such Party and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Party having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings (" Non -Excluded Taxes ") are required to be withheld from any amounts payable to any Party hereunder, the amounts so payable to such Party shall be increased to the extent necessary to yield to such Party (after payment of all Non-Excluded Taxes) the amounts payable hereunder in the amounts specified in or pursuant to this Agreement or the other Basic Documents. Whenever any Non-Excluded Taxes are payable by any Party, as promptly as possible thereafter the Party subject to such Non-Excluded Taxes shall send to the paying Party a certified copy of an original official receipt received by the Party subject to such Non-Excluded Taxes showing payment thereof. If any Party fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or other required documentary evidence, such Party shall indemnify the Party subject to such Non-Excluded Taxes for any incremental taxes, interest or penalties that may become payable by such Party as a result of any such failure. The agreements in this Section 2.5(a) shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

(b) Notice of Increased Costs; Relocation of Purchasing Office; Mandatory Assignment .

(i) In the event that a Purchaser becomes aware that any amounts are or will be owed to it pursuant to Section 2.5(a) , then it shall promptly notify the Transferor thereof and, as soon as possible thereafter, such Purchaser shall submit to the Transferor a certificate indicating the amount of such Purchaser's increased costs, Non-Excluded Taxes and the calculation thereof. Such certificate shall only be prima facie evidence of such increased costs or Non-Excluded Taxes.

7

(ii) If such Purchaser claims any additional amounts payable pursuant to Section 2.5(a) , it shall use its reasonable efforts (consistent with legal and regulatory restrictions) to avoid the need for changing the methodology for calculating the Second Step Receivables Purchase Price Purchase Price, including changing the jurisdiction of its applicable purchasing office, provided that the taking of any such action would not, in the reasonable judgment of such Purchaser, be disadvantageous to such Purchaser.

(c) No Assignee Rights to Increased Costs . The terms and conditions of Section 2.5 hereof are personal to the Purchaser and shall not accrue to the benefit of any other Person, including any assignee or transferee of any direct or indirect interest in the Receivables.

Section 2.6 Loss and Liquidation Data. No later than 60 days after the end of each calendar quarter during the period beginning on the date hereof and ending on the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables), the Transferor shall, or shall cause the Seller, Bridgecrest or any other Affiliate holding or aggregating such information to, deliver to the Purchasers a cumulative net loss ratio as of the end of the related calendar quarter (and a narrative description of the methodology for making such calculation), which may be included in the Monthly Servicer Report delivered within 60 days after the end of each calendar quarter to the extent the information is available at that time, for the Seller's entire originated portfolio of retail installment sales contracts as of the end of the related calendar quarter.

Section 2.7 Re-Liening Trigger Events . Upon the occurrence of a Re-Liening Trigger Event, at the direction of the Purchasers, the Transferor shall, and the Transferor shall direct and cause any Affiliate that is a Title Lien Nominee to and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles (or if such Re-Liening Trigger Event relates to (i) one or more States, the related Financed Vehicles titled in such States or (ii) a Title Lien Nominee, the related Financed Vehicles liened in the name of such Title Lien Nominee) to be revised to name the Purchasers or their designee as lienholder; any Re-Liening Expenses shall be paid by the Servicer, and to the extent such costs are not paid by the Servicer but are paid by the Purchasers, such costs shall be recovered by adjusting the Second Step Receivables Purchase Price for an upcoming Receivables Pool as described in Section 2.2 and Schedule 2 attached to the related Pool Supplement. In addition, at the sole expense of the Purchasers, upon the request of the Purchasers, the Transferor shall, and the Transferor shall direct and cause the any Affiliate that is a Title Lien Nominee and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles identified, individually or by characteristic, by the Purchasers to be revised to name the Purchasers or their designee as lienholder. The Purchasers shall not direct the Servicer or the Transferor to take any steps to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicle to be revised to name any other Person. The Transferor shall cause any Affiliate that is a Title Lien Nominee to irrevocably appoint or cause each relevant subservicer to irrevocably appoint, the Purchasers as its attorney-in-fact, such appointment being coupled with an interest, to take any and all steps required to be performed pursuant to this Section 2.7 , including execution of Certificates of Title or any other documents in the name of

8

the Transferor or such Title Lien Nominee and, in connection with the appointment of any successor Servicer, to execute a power of attorney with respect to such successor Servicer promptly after its appointment as such, naming such successor Servicer as its attorney-in-fact for the same purposes.

ARTICLE III

PURCHASE AND SALE OF RECEIVABLES

Section 3.1 <u>Sale of Receivables</u> .

(a) On each Closing Date during the Commitment Period, subject to the terms and conditions of this Agreement, the Transferor agrees to sell to the Purchasers, and the Purchasers agree to purchase from the Transferor, a Receivables Pool and the following other property relating thereto (collectively, the " <u>Purchased Property</u> "):

(i) all right, title and interest of the Transferor in, to and under each Receivable included in the applicable Receivables Pool listed on a Schedule of Receivables (the form of which is attached as <u>Schedule  7 </u>to the Pool Supplement) delivered to the Purchaser on such Closing Date and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Seller or the Servicer, as applicable, covering any related Financed Vehicle;

(ii) the interest of the Transferor in the security interests in the related Financed Vehicles granted by Obligors pursuant to the Receivables in the applicable Receivables Pool and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premium or other payment with respect to any of the foregoing;

(iv) all of the Transferor's right, title and interest in, to and under the related Receivable Files;

(v) all right, title and interest of the Transferor in, to and under the Master Sale Agreement and the applicable First Step Pool Supplement and First Step Receivables Assignment, including the right of the Transferor to cause the Seller to repurchase Receivables under certain circumstances and the right of the Transferor to be indemnified under the circumstances specified in the Master Sale Agreement; and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in <u>clauses ( i )</u>  through <u>(v)</u> above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of

9

any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

(b) Second Step Receivables Purchase Price . On each Closing Date, in consideration for the related Purchased Property, the Purchasers shall pay to the Transferor an amount (the " Second Step Receivables Purchase Price ") equal to the Purchase Price for such Purchased Property.

The Cutoff Date Aggregate Outstanding Principal Balance, the purchase price designated by the Pricing Model, the Pre-closing Interest Carry Amount, the re-liening expenses described in Section 2.7 and the Second Step Receivables Purchase Price for each Receivables Pool shall be set forth on the related Pool Supplement.

(c) Wire Transfer . The Purchasers shall pay each Second Step Receivables Purchase Price by federal wire transfer (same day) funds to the Transferor (or its designee) to the account set forth below:

> Account Name: Carvana LLC
> Account Number: 4124114661
> Bank: Wells Fargo Bank, N.A.
> ABA: 121000248

Within two (2) Business Days after each Closing Date, the Transferor shall pay to or as directed by the Purchasers in (same day) funds an amount equal to the aggregate amount of all Collections received by the Transferor after the related Cutoff Date, including from the Seller or the Servicer, with respect to the Receivables Pool sold to the Purchasers on such Closing Date through (but excluding) the applicable Closing Date.

(d) Purchase Price Adjustment Payments . Purchase price adjustment payments may be due to the Transferor by the Purchasers as agreed upon by the Parties.

(e) Purchase Cadence and Settlement Report . Not later than the second (2 nd ) Business Day following an Origination Period, the Transferor shall provide the Purchasers with the Purchase Percentage and supply the Purchasers with an initial data tape in form and substance acceptable to the Purchasers containing the information as called for in Exhibit D with respect to all Receivables originated or acquired by the Seller in the preceding Origination Period (and any Previously Originated Receivables to be included in the Related Receivables Pool) that the Seller and the Transferor intend in good faith to sell to the Purchasers under this Agreement meeting the selection criteria for sale to the Transferor and those Receivables meeting the eligibility criteria for sale by the Transferor to the Purchasers, a Receivables Pool. Not later than the first (1 st ) Business Day of the second week following an Origination Period (but at least two (2) Business Days prior to the related Closing Date), the Transferor shall supply the Purchasers with

10

a final data tape in form and substance acceptable to the Purchasers containing the final information as called for in Exhibit D with respect to all Receivables in the related Receivables Pool and identifying any receivable in the initial data tape that was determined not to be an Eligible Receivable, including any receivable with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable. Not less than two (2) Business Days prior to each proposed Closing Date, the Transferor will deliver to the Purchasers a settlement report substantially in the form of Schedule 2 attached to the Pool Supplement (the " Settlement Report "), in form and substance reasonably acceptable to the Purchaser setting forth amounts due the Transferor with respect to the applicable Receivables Pool and containing at least the calculation of the related Cutoff Date Aggregate Outstanding Principal Balance, the Pre-closing Interest Carry Amount, the purchase price designated by the Pricing Model, the re-liening expenses described in Section 2.7 and the Second Step Receivables Purchase Price.

(f) No Recourse . It is understood that each sale of Purchased Property by the Transferor to the Purchaser pursuant to this Agreement, a Pool Supplement and the related Second Step Receivables Assignment shall be without recourse (except as set forth herein and in the other Basic Documents) and the Transferor does not guarantee collection of any Receivable. However, each such sale shall be made pursuant to and in reliance by the Purchaser on the representations, warranties and covenants of the Transferor as set forth in Section 5.2 , the indemnities set forth in Section 7.14 and the repurchase obligation set forth in Section 8.2 .

(g) Intent of the Parties . This Agreement, the applicable Pool Supplement and the related Second Step Receivables Assignment is intended to effect a sale of each Receivables Pool by the Transferor to the Purchasers, and the parties intend to treat each such transaction as an independent sale for federal income tax and financial reporting purposes. It is the intention of the Transferor that each sale, transfer, assignment and other conveyance of each Receivables Pool contemplated by this Agreement, the applicable Pool Supplement and the related Second Step Receivables Assignment constitutes an independent sale of the related Purchased Property from the Transferor to the Purchasers and that the beneficial interest in and title to each such Receivables Pool shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Pool Supplement and the related Second Step Receivables Assignment does not constitute and is not intended to result in any assumption by the Purchasers (or any of its assigns) of any obligation of the Seller or the Transferor to the Obligors, Affiliates of the Seller, insurers or any other Person in connection with any Receivables, any insurance policies or any agreement or instrument relating to any of them, in each case related to such transfer and assignment. Although the parties intend that each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Pool Supplement and the related Second Step Receivables Assignment to be an independent sale, in the event any such transfer and assignment is deemed to be other than a sale, the parties intend and agree (i) that all filings described in this Agreement shall give the Purchasers a first priority perfected security interest in, to and under the Receivables Pool and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Agreement, together with the applicable Pool Supplement and the related Second Step Receivables Assignment, shall be

11

deemed to be the grant of, and the Transferor hereby grants to the Purchasers, a security interest from the Transferor to the Purchasers in such Receivables and the related Purchased Property in order to secure its obligations hereunder with respect to such transfer and assignment; (iii) this Agreement, together with the applicable Pool Supplement and the related Second Step Receivables Assignment, shall be a security agreement under applicable law for the purpose of each such transfer and assignment; and (iv) the Purchasers shall have all of the rights, powers and privileges of a secured party under the UCC with respect to each such transfer and assignment and the Purchased Property related thereto.

Section 3.2 <u>The Closing</u> . The initial closing during the Commitment Period shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

<div align="center">

ARTICLE IV

CLOSINGS

</div>

Section 4.1 <u>Effecting Purchases</u> .

(a) <u>General Procedures</u> . During the Commitment Period, the purchase and sale of a Receivables Pool pursuant to the Transferor Obligation will occur on the Closing Date for the calendar week that follows receipt of notification from the Transferor of its intent to complete such a sale at such time (which Closing Date, for the avoidance of doubt, will fall in the second calendar week following the related Origination Period). For the avoidance of doubt, subject to the terms and conditions of this Agreement, the Transferor is obligated to sell a Receivables Pool to the Purchasers hereunder during each calendar week during the Commitment Period; <u>provided</u> , that the Transferor, by written notice to be delivered to the Purchasers no later than the second (2nd) Business Day following an Origination Period, may elect to defer the related sale if it reasonably determines in good faith that consummating such sale would be administratively burdensome (e.g., due to shortened holiday weeks or other similar events not in its control) and the Receivables Pool that would have been sold to the Purchasers on such Closing Date will be combined with the Receivables Pool to be sold to the Purchasers on the next succeeding Closing Date; <u>provided</u> , <u>further</u> , that the Transferor may not make such an election more than six (6) times per twelve month period and such election may not be made to skip closings in consecutive calendar weeks.

(i) Notification of each sale must be provided by the Transferor to the Purchasers no later the second (2nd) Business Day following an Origination Period (which date falls in the week prior to the week in which the proposed Closing Date for such sale falls), substantially in the form of <u>Exhibit C</u> attached hereto. Such notification must specify for each such proposed Receivables Pool (i) the approximate Cutoff Date Aggregate Outstanding Principal Balance, (ii) the applicable proposed Closing Date, and (iii) the proposed Cutoff Date.

(ii) Not later than the third (3rd) Business Day after receipt of the initial data tape received in <u>Section 3.1(e)</u> above (but at least three (3) Business Days prior to the

<div align="center">12</div>

related Closing Date), the Purchasers shall notify the Seller of the Purchase Price for each Eligible Receivable on the initial data tape by the Purchasers and the allocation of purchases between Ally Bank and Ally Financial.

(iii) Not later than the second (2 nd ) Business Day of the second week following an Origination Period (but at least one (1) Business Day prior to the related Closing Date), the Purchasers shall notify the Seller of the final Purchase Price for the Receivables Pool and the final allocation of purchase between Ally Bank and Ally Financial.

(iv) Not less than two (2) Business Days prior to the proposed Closing Date, the Transferor shall deliver to the Purchaser the Settlement Report in the form of Schedule 2 to the related Pool Supplement, a receivables pool schedule (the " Receivables Pool Schedule "), which shall identify as of the Cutoff Date the pool of Receivables (the " Receivables Pool ") to be sold and which shall contain data for each Receivable for the fields specified in Schedules 6, 7 and 10 to the related Pool Supplement , as well as Schedules 8 and 9 of the related Pool Supplement. The Transferor shall promptly provide to the Purchaser all data related to the Receivables Pool that are necessary to determine the Purchase Price for such Receivables Pool or that are reasonably requested by the Purchaser.

(v) On the Pricing Date, the Purchase Price shall be calculated in accordance with Section  2.3 .

(vi) Not less than two (2) Business Days prior to the Closing Date, the Transferor shall provide the Officer's Certificate in the form of Schedule 1 as well as the fully executed Schedule 5 of the related Pool Supplement.

(b) Upon the satisfaction or written waiver of the conditions specified in Section  6.3 , on each Closing Date, the Seller will sell the related Purchased Property to the Transferor and the Transferor will sell the Purchased Property in such Receivables Pool to the Purchaser in accordance with the applicable Basic Documents.

(c) Due Diligence . With respect to each proposed purchase of a Receivables Pool the Seller and the Transferor agree to cooperate with the Purchasers, with respect to all reasonable requests for documents or other information and due diligence procedures.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.1 Representations and Warranties of the Purchasers. The Purchasers represent and warrant to the Transferor as of the date hereof and as of each Closing Date:

(a) Organization and Good Standing . Ally Bank has been duly organized and is validly existing as a Utah chartered bank in good standing, with power and authority to own its properties and to conduct its business as such properties are presently owned and such business

13

is presently conducted; and as of the date hereof, Ally Bank's deposits are insured by the Federal Deposit Insurance Corporation and Ally Bank is subject to the Federal Deposit Insurance Act. Ally Financial has been duly organized and validly exists as an entity in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted, including to acquire and own the Receivables.

(b) <u>Due Qualification</u>. Ally Bank is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America. Ally Financial is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America.

(c) <u>Power and Authority</u>. The Purchasers have full power and authority to execute and deliver this Agreement and the Master Servicing Agreement and to perform the terms and provisions hereof and thereof and the execution, delivery and performance of this Agreement and the Master Servicing Agreement have been duly authorized by the Purchasers by all necessary action.

(d) <u>Due Authorization; Enforceability; No Violation</u>. This Agreement and the Master Servicing Agreement have been duly authorized, executed and delivered by the Purchasers, and each is the legal, valid and binding obligation of the Purchasers, enforceable against the Purchasers in accordance with its terms, except as such enforceability may be limited by applicable insolvency, bankruptcy, reorganization, conservatorship, receivership, liquidation or other laws and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law. The consummation of the transactions contemplated by this Agreement and the Master Servicing Agreement and the fulfillment of the terms of this Agreement and the Master Servicing Agreement shall not conflict with, result in any breach of any of the terms and provisions of or constitute (with or without notice or lapse of time) a default under, the articles of incorporation or bylaws of the Purchasers, or, in any material respect, any indenture, agreement, mortgage, deed of trust or other instrument to which the Purchasers is a party or by which it is bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument, or violate, in any material respect, any law or, to the best of the Purchaser's knowledge, any order, rule or regulation applicable to the Purchasers of any Governmental Authority having jurisdiction over the Purchasers or any of its properties, in each case, that would materially and adversely affect the performance by the Purchasers of its obligations under, or the validity and enforceability of, this Agreement.

(e) <u>No Proceedings</u>. There are no proceedings or investigations pending, or, to the best of the Purchasers' knowledge, threatened, before any Governmental Authority having jurisdiction over either Purchaser or any of their properties (i) asserting the invalidity of this Agreement and the Master Servicing Agreement, or (ii) seeking any determination or ruling that might materially and adversely affect the performance by either Purchaser of its obligations under, or the validity or enforceability of, this Agreement and the Master Servicing Agreement against the Purchasers.

14

Section 5.2 <u>Representations and Warranties of the Transferor</u>. The Transferor represents and warrants to the Purchasers as of the date hereof and as of each Closing Date (except as provided herein otherwise):

(a) <u>Organization and Good Standing</u>. It has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its formation, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and had at all relevant times, and now has all necessary power, authority and legal right to own or lease its properties and conduct its business as such business is presently conducted, including to acquire, own and sell the Receivables and the other Purchased Property except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) <u>Due Qualification</u>. It is duly qualified to do business and is in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination, purchase, sale and servicing of the Receivables) except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c) <u>Power and Authority; Due Authorization</u>. It (i) has all necessary power, authority and legal right to (A) execute and deliver the Basic Documents to which it is a party, (B) carry out the terms of the Basic Documents to which it is a party and (C) to assign or grant the security interest in the assets transferred by it on the terms and conditions in this Agreement and (ii) has taken all necessary action to authorize the execution, delivery and performance of the Basic Documents to which it is a party and to assign or grant a security interest in the assets transferred by it on the terms and conditions in this Agreement.

(d) <u>Binding Obligation</u>. The Basic Documents to which it is a party have been duly executed and delivered by it and constitute legal, valid and binding obligations of it enforceable against it in accordance with their terms.

(e) <u>No Violation</u>. The consummation of the transactions contemplated by the Basic Documents to which it is a party and the fulfillment of the terms thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its formation documents or any agreement to which it is bound, (ii) result in the creation or imposition of any Lien upon any of its properties, other than pursuant to the Master Sale Agreement and this Agreement, or (iii) violate any Requirements of Law, except, in each case, for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f) <u>No Proceedings</u>. There is no litigation, proceeding or investigation pending or, to the best of its knowledge, threatened against it, before any governmental authority (i) asserting the invalidity of any Basic Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Basic Documents, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect.

15

(g) <u>All Consents Required</u> . All approvals, authorizations, consents, orders, licenses or other actions of any person or of any governmental authority required for the due execution, delivery and performance by it of the Basic Documents to which it is a party have been obtained except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h) <u>Compliance.</u> It is not in violation in any material respect of any Basic Document to which it is a party or any laws, ordinances, Governmental Rules or regulations to which it is subject except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(i) <u>Bulk Sales</u> . The execution, delivery and performance of the Basic Documents to which it is a party is in the ordinary course of business and does not require compliance with any bulk sales act or similar law.

(j) <u>Solvency</u> . As of each Closing Date, (i) the Transferor is not and shall not become insolvent as a result of the transfer of the related Purchased Property on such date, (ii) the Transferor did not intend to or believe that it would incur debts that would be beyond its ability to pay as such debts matured, (iii) the Transferor did not transfer the related Purchased Property with the actual intent to hinder, delay or defraud any Person and (iv) the assets of the Transferor did not constitute unreasonably small capital to carry out its business as conducted.

(k) <u>Selection Procedures</u> . No procedures believed by it to be materially adverse to the interests of the Purchasers were utilized by it in identifying or selecting Receivables to be transferred by it. In addition, each Receivable assigned pursuant to this Agreement has been underwritten in accordance with and satisfies the standards of the Credit Policy in all material respects.

(l) <u>Taxes</u> . It has filed, caused to be filed, or received an extension of time for filing that has not yet expired, all federal and material state, local or foreign tax returns that are required to be filed by it. It has paid or made adequate provisions for the payment of all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves have been provided on the books of it), and no tax lien has been filed and, to the its knowledge, no claim is being asserted, with respect to any such tax, fee or other charge.

(m) <u>Exchange Act Compliance; Regulations T, U and X</u> . None of the transactions contemplated in the Basic Documents to which it is a party (including the use of the proceeds from the advances) will violate or result in a violation of Section 7 of the Exchange Act, or any regulations issued pursuant thereto, including Regulations T, U and X of the Federal Reserve Board, 12 C.F.R., Chapter II. It does not own or intend to carry or purchase, and no proceeds from the sale of the Purchased Property will be used to carry or purchase, any "margin stock" within the meaning of Regulation U or to extend "purchase credit" within the meaning of Regulation U.

16

(n) <u>Quality of Title</u> . Each Receivable, together with the Contract related thereto, transferred by it were, prior to the transfer thereof, owned by it free and clear of any Lien except for Permitted Liens, and the Purchasers upon the providing of value described herein shall acquire a valid ownership interest and a perfected first priority security interest in each Receivable and the related Purchased Property then-existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Purchased Property shall, after the relevant Cutoff Date, be on file in any recording office except such as may be filed in favor of the Transferor or the Purchasers in accordance with the Master Sale Agreement and this Agreement.

(o) <u>Security Interest</u> . It has granted a security interest (as defined in the UCC) to the Purchasers in the Purchased Property, which is enforceable in accordance with applicable law upon execution and delivery of the Basic Documents. Upon the filing of UCC-1 financing statements naming the Purchasers as secured party, or upon the Collateral Custodian obtaining possession, in the case of that portion of the Purchased Property which constitutes tangible chattel paper, or upon the E-Vault Provider granting control to the Purchasers, in the case of that portion of the Purchased Property which constitutes electronic chattel paper, the Purchasers shall have a first priority (except for any Permitted Liens) perfected security interest in the Purchased Property.

(p) <u>Reports Accurate</u> . All Monthly Reports, information, exhibits, financial statements, documents, books, records or reports (including the data file indicating characteristics of the Receivables and including electronic writings) furnished or to be furnished by the Seller or the Transferor directly or indirectly to the Purchasers, the Servicer, the Collateral Custodian or the bank holding the Collection Account under or in connection with the Basic Documents to which it is a party (including the information delivered in connection with each sale in the form of <u>Schedule 6 </u>attached to the related Pool Supplement) are true, correct and complete in all material respects as of the date specified therein or the date so furnished (as applicable).

(q) <u>Location of Offices.</u> The principal place of business and chief executive office of it and the office where it keeps all the Records related to the tangible Contracts are located at the address set forth in <u>Section 8.6</u> ; <u>provided</u> , that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251 (or at such other locations as to which the notice and other specified requirements shall have been satisfied).

(r) <u>Tradenames and Place of Business</u> . (i) Except as specified in this Agreement, it has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and (ii) its principal place of business and chief executive office is located at the address set forth in <u>Section 8.6</u> and has been so for the last four (4) months; <u>provided</u> , that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251.

<div align="center">17</div>

(s) <u>Transfer Agreements</u> . The Master Sale Agreement and this Agreement are the only agreements pursuant to which it purchases or sells the Receivables and the related Contracts.

(t) <u>Value Given</u> . The Purchasers shall have given reasonably equivalent value to the Transferor in consideration for the transfer by the Transferor to the Purchasers of the Receivables and the related Purchased Property under this Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by the Transferor to the Purchasers and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code. The Transferor shall have given reasonably equivalent value to the Seller in consideration for the transfer by the Seller to the Transferor of the Receivables and the related 2016-1 Purchased Property under the Master Sale Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by the Seller to the Transferor and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code.

(u) <u>Accounting</u> . The Transferor accounts for the transfers to the Purchasers of Receivables and related Purchased Property under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents. The Seller accounts for the transfers to the Transferor of Receivables and related Purchased Property and by the Transferor to the Purchasers under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents, other than for income tax and consolidated accounting purposes.

(v) <u>Investment Company Act</u> . The Transferor is not (i) an "investment company" and is not controlled by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and (ii) a "covered fund" as defined in the final regulations issued December 10, 2013, implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. In making that determination, the Transferor is entitled to rely upon the exemption provided in Section 3(c)(5)(A) or (B) of the Investment Company Act, although there may be additional exemptions or exclusions available to the Transferor.

(w) <u>ERISA</u> . (i) No prohibited transactions or Reportable Events have occurred with respect to any Pension Plan (if any), (ii) no notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA has been filed, nor has any Pension Plan been terminated under Section 4041(c) of ERISA, nor has the Pension Benefit Guaranty Corporation instituted proceedings to terminate, or appointed a trustee to administer a Pension Plan and no event has occurred or condition exists that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, and (iii) no liability under Title IV (other than accrued premiums to the Pension Benefit Guaranty Corporation) has been incurred (whether or not assessed), which individually or in the aggregate with respect to all or any of (i), (ii) and (iii) above, would reasonably be expected to have a Material Adverse Effect on the Seller or Transferor (including its rights and interests in, to or under any Contracts or related Receivables), with respect to the Seller or Transferor.

18

(x) <u>Accuracy of Representations and Warranties</u> . Each representation or warranty by the Transferor contained in the Basic Documents to which it is a party or in any certificate or other document furnished by the Seller or Transferor pursuant thereto or in connection therewith is true and correct in all material respects as of the date made.

(y) <u>OFAC</u> . Neither the Transferor nor any Affiliate is a Sanctioned Person. The proceeds of any funding will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

(z) <u>Master Sale Agreement</u> . As of each Closing Date, the Transferor has not taken any action that would cause the representations and warranties of the Seller under the Master Sale Agreement or the applicable First Step Pool Supplement, or Bridgecrest under the Master Servicing Agreement, or the Collateral Custodian under the Collateral Custodian Agreement, to be false.

(aa) <u>Use of Proceeds</u> . No proceeds of a purchase hereunder shall be used by the Transferor for a purpose that violates or would be inconsistent with Regulations T, U or X promulgated by the Board of Governors of the Federal Reserve System from time to time.

(bb) <u>Remediation</u> . In the event that the Seller, the Transferor or the Servicer or any of their Affiliates has been required under any Requirements of Law, or has agreed or made arrangements with any Governmental Authority, to make any Remediation, such Person shall have taken such action as so agreed or arranged or in compliance with all Requirements of Law, as applicable.

(cc) <u>Receivables</u> . The Transferor makes the following representations and warranties as of each Closing Date (except to the extent otherwise provided) with respect to the Receivables the Transferor sold to the Purchasers on such Closing Date, on which the Purchasers relies in accepting such Receivables. Such representations and warranties speak as of the applicable Closing Date (except as provided herein otherwise), and shall survive the sale, transfer and assignment of such Receivables to the Purchasers and any subsequent sale, assignment or transfer of any such Receivables:

(i) <u>Characteristics of Receivables.</u> As of each Cutoff Date (except to the extent otherwise provided in the definition of "Eligible Receivable") with respect to the related Receivables to be purchased, (A) each Receivable is an Eligible Receivable, (B) all of the Receivables, together, constitute an Eligible Receivables Pool and (C) the Receivables Pool was selected as described in <u>Section 2.1(d)</u> .

(ii) <u>Creation, Perfection and Priority of Security Interests</u> . The following representations and warranties regarding creation, perfection and priority of security interests in the related Purchased Property are true and correct:

(A) While it is the intention of the Transferor and the Purchasers that the transfer and assignment contemplated by this Agreement, each Pool Supplement and each Second Step Receivables Assignment shall constitute sales

19

of the related Purchased Property from the Transferor to the Purchaser, this Agreement, each Pool Supplement and each Second Step Receivables Assignment shall create a valid and continuing security interest (as defined in the applicable UCC) in the related Purchased Property in favor of the Purchaser, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Transferor.

(B) Prior to the sale of such Purchased Property to the Purchaser under this Agreement, the Receivables constituted "tangible chattel paper" or "electronic chattel paper" within the meaning of the applicable UCC.

(C) All filings (including such UCC filings) as are necessary in any jurisdiction to perfect the security interest of the Purchasers in the Purchased Property have been (or prior to the applicable Closing Date will be) made.

(D) Other than the sale and backup security interest granted to the Purchasers pursuant to this Agreement, the Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of such Purchased Property. The Transferor has not authorized the filing of, and is not aware of, any financing statements against the Transferor that include a description of collateral covering such Purchased Property other than the financing statements relating to the security interests granted to the Purchasers under this Agreement or any financing statement that has been effectively terminated. The Transferor is not aware of any judgment or tax lien filings against it or such Purchased Property.

(E) Wells Fargo, as Collateral Custodian, or a permitted subcontractor, has in its possession all original copies of the related Original Contract Documents and other documents that constitute or evidence such Receivables and the related Purchased Property that are tangible chattel paper. The E-Vault Provider has in its "control" (as such term is used in Section 9-105 of the UCC), for the benefit of the Purchasers as the "secured party" (as such term is used in Section 9-105 of the UCC), all electronic records constituting or forming a part of the Receivables that are electronic chattel paper, such that the Purchasers have had and will at all times have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivables. Such Receivable Files and other documents that constitute or evidence such Purchased Property do not have any marks or notations indicating that any ownership or security interest therein has been pledged, assigned or otherwise conveyed to any Person other than the Purchasers.

(F) None of the Seller, the Transferor, the Servicer or a custodian or vaulting agent thereof holding any Receivable that is electronic chattel paper has communicated an Authoritative Copy of any loan agreement that constitutes or evidences such Receivable to any Person other than the Purchasers and the Collateral Custodian.

(iii) <u>Schedule of Receivables</u> . The information set forth in the related Schedule of Receivables and in any computer tape regarding the Receivables is true, accurate and complete, and, other than as may be a result of the application of the criteria included in the definitions of Eligible Receivables Pool set forth in <u>Exhibit A</u> , no selection procedures believed to be adverse to the Purchasers were utilized in selecting such Receivables, with respect to the related Receivables Pool, from those receivables of the Seller or the Transferor that otherwise meet such criteria as well as the definition of Eligible Receivables.

(iv) <u>Compliance With Law</u> . All Requirements of Law in respect of any aspect of such Receivables and the related Purchased Property (including the origination thereof), in each case, have been complied with in all material respects and each Receivable and the sale of the related Financed Vehicle evidenced thereby [***] now complies in all material respects with all applicable Requirements of Law.

(v) <u>Binding Obligation</u> . Each such Receivable with respect to the related Receivables Pool represents the genuine, legal, valid and binding payment obligation in writing of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights in general and by equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(vi) <u>Security Interest in Financed Vehicle</u> . Immediately prior to the sale, transfer and assignment thereof pursuant hereto and the related Second Step Receivables Assignment, each such Receivable with respect to the related Receivables Pool was secured by a valid security interest in the Financed Vehicle in favor of the Transferor as secured party.

(vii) <u>Receivables In Force</u> . As of the applicable Cutoff Date, no such Receivable has been satisfied, subordinated or rescinded, and the Financed Vehicle securing each such Receivable has not been released from the lien of the related Receivable in whole or in part.

(viii) <u>No Waiver</u> . Since the applicable Cutoff Date, no provision of a Receivable has been, or shall be, waived, altered or modified in any respect other than with respect to alterations and modifications so that such Receivable is an Eligible Receivable (other than <u>clause (ix)</u> thereof, which must have been satisfied at the time of origination) and such Receivable is enforceable after giving effect thereto.

(ix) <u>No Defenses</u> . No right of rescission, setoff, counterclaim or defense has been asserted or threatened with respect to any such Receivable.

(x) <u>No Liens</u> . To the best of the Transferor's knowledge: (1) there are no Lien or claims that have been filed for work, labor or materials affecting any Financed

[***]   *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

21

Vehicle securing any such Receivable that are or may be Lien prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by such Receivable; (2) no contribution failure has occurred with respect to any Benefit Plan which is sufficient to give rise to a Lien under Section 303(k) of ERISA with respect to any such Receivable; and (3) no tax lien has been filed and no claim related thereto is being asserted with respect to any such Receivable.

(xi) Insurance . Each Obligor under such Receivables is required to maintain a physical damage insurance policy of the type that the Seller requires in accordance with the Credit Policy.

(xii) Good Title . No such Receivable or the related Purchased Property has been sold, transferred, assigned or pledged by the Transferor to any Person other than the Purchasers; immediately prior to the conveyance of such Receivables and the related Purchased Property pursuant to this Agreement, the related Pool Supplement and the related Second Step Receivables Assignment, the Transferor had good and marketable title thereto, free of any Lien other than Permitted Liens; and, upon execution and delivery of the Pool Supplement and the related Second Step Receivables Assignment by the Transferor, the Purchasers shall acquire a valid and enforceable perfected ownership interest in each such Receivable and Purchased Property, the unpaid indebtedness evidenced thereby and the collateral security therefor, free of any Lien other than Permitted Liens.

(xiii) Lawful Assignment . No such Receivable or the related Purchased Property was originated in, or is subject to Requirements of Law of, any jurisdiction the Requirements of Law of which would make unlawful, void or voidable the sale, transfer and assignment of such Receivable and the other related Purchased Property under this Agreement and the related Second Step Receivables Assignment. None of the Seller, the Transferor or the Servicer has entered into any agreement with any Obligor that prohibits, restricts or conditions the assignment of such Receivable or any other Purchased Property.

(xiv) All Filings Made . All filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected ownership interest in the Receivables and the related Purchased Property shall have been made.

(xv) One Original . There is only one original executed copy of each tangible record constituting or forming a part of such Receivable that is tangible chattel paper or a single Authoritative Copy of each electronic record constituting or forming a part of each Purchased Receivable that is electronic chattel paper.

(xvi) No Documents or Instruments . No such Receivable, or constituent part thereof, constitutes a "negotiable instrument" or "negotiable document of title" (as such terms are used in the UCC).

(xvii) Accounts and Receivables Analysis . The information set forth in the Accounts and Receivables Analysis with respect to such Receivable and the related Receivables Pool, as applicable, provided on Schedule 6 of the related Pool Supplement is true and correct in all material respects.

22

ARTICLE VI

CONDITIONS

Section 6.1 <u>Conditions to Effectiveness</u> . The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent as of the date hereof:

(a) <u>Basic Documents</u> . Each of the Purchasers, the Transferor, the Seller, Bridgecrest, the Collateral Custodian and the Performance Guarantor, as the case may be, shall have executed and delivered each of the Basic Documents to which it is a party, and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on or about the Original Execution Date or the date hereof, as applicable, prior to the effectiveness hereof or thereof, hereunder or thereunder. (b)

(c) <u>Documents to be Delivered by the Transferor</u> .

(i) <u>Good Standing Certificates</u> . The Purchasers shall have received a certificate from the Secretary of State of the States of Arizona and Delaware as to the formation and good standing of the Seller and the Transferor, respectively.

(ii) <u>Corporate Documents</u> . The Purchasers shall have received duly certified copies of the Seller and the Transferor's certificate of formation and limited liability company agreement, resolutions of its directors approving the execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party and the transactions contemplated hereby and thereby, and such other evidence of the authority and incumbency of officers and other appropriate personnel of the Seller and the Transferor, respectively.

(iii) <u>Opinions</u> . External counsel (which shall be satisfactory to the Purchasers in its reasonable judgment) for the Transferor, the Seller, Bridgecrest, the Collateral Custodian (which may be internal counsel) and the Performance Guarantor shall have furnished to the Purchasers written opinions dated as of the Original Execution Date in the form satisfactory to the Purchasers in its reasonable judgment.

(iv) <u>Evidence of UCC Filing</u> . On or prior to Effective Date of this Agreement, the Transferor shall record and file, at its own expense, a UCC-1 financing statement in each jurisdiction in which it is required by applicable law, authorized by and naming the Transferor as seller or debtor, naming the Purchasers as purchaser or secured party, naming the Receivables and the other Purchased Property as collateral, meeting the requirements of the laws of each such jurisdiction and in such manner as is necessary to perfect each sale, transfer, assignment and conveyance of Receivables to the Purchasers hereunder. Such UCC-1 financing statement shall be provided to the Purchasers on or prior to such Effective Date.

23

(v) <u>Other Documents</u> . The Transferor, the Servicer, the Collateral Custodian and the Performance Guarantor shall have provided such other documents as the Purchaser may reasonably request.

(d) <u>Representations and Warranties</u> . Each of the representations and warranties of each of the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects as of the date hereof (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to the date hereof.

(e) <u>UCC Search Reports</u> . (A) The Transferor shall deliver to the Purchasers (i) certified copies of requests for information or copies (Form UCC-11) (or a similar search report certified by parties acceptable to the Purchasers) dated a date reasonably near the Original Execution Date listing all effective financing statements which name the Seller and the Transferor (under each of its present names and any previous names) as debtor or seller and which are filed in Arizona and Delaware, respectively, and such other jurisdictions where the Purchasers may reasonably request, together with copies of such financing statements, none of which shall cover any Receivables or other Purchased Property, (ii) search reports, each dated a date reasonably near the Original Execution Date with respect to federal, state and local tax liens, judgment liens and liens of the PBGC, respectively, filed against the Seller and the Transferor from the Secretaries of State of the States of Arizona and Delaware and from Maricopa County, Arizona and New Castle County, Delaware, respectively, or such other jurisdictions as the Purchasers shall reasonably request, in each case, showing no such Lien on any of the Receivables or other Purchased Property.

(f) <u>Receivables Warehouse Facility</u> . Each of Ally Bank, the Seller, Sonoran Auto Receivables Trust 2016-1 and the Transferor, as the case may be, shall have executed and delivered the Receivables Warehouse Facility, and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on the Original Execution Date or the date hereof, as applicable, prior to the effectiveness thereof or thereunder.

Section 6.2 <u>Conditions to Obligation of the Purchasers</u> . The obligation of the Purchasers to purchase Receivables and the related Purchased Property with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Aggregate Purchase Commitment</u> . After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date.

24

(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than 51% (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of 51%) of the aggregate principal balance of all receivables meeting the criteria described in the definition of "Eligible Receivable" originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers.

(c) <u>Commitment Termination Event</u>. No Commitment Termination Event shall have occurred and the Sale shall occur during the Commitment Period.

(d) <u>Scheduled Commitment Termination Date</u>. The Scheduled Commitment Termination Date shall not have occurred.

(e) <u>Representations and Warranties</u>. Each of the representations and warranties of each of the Transferor, the Servicer the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects at the time of each Closing Date (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to each Closing Date.

(f) <u>Master Sale Agreement</u>. Each of the conditions to the obligations of the Seller under the Master Sale Agreement shall have been satisfied without any waiver thereof.

(g) <u>Security Interests</u>. The security interest granted by the Transferor in favor of the Purchasers in each Receivables Pool previously sold to the Purchasers is a valid and continuing security interest prior to all other Liens, and is enforceable as against such other creditors of and purchasers from the Transferor.

(h) <u>Computer Files Marked</u>. Each of the Seller and the Servicer shall have, on or prior to each Closing Date, indicated in its Receivables System, that such Purchased Property has been sold to the Purchasers pursuant to this Agreement and the related Second Step Receivables Assignment.

(i) <u>Documents to be Delivered By the Transferor</u>. On or before such Closing Date, the Transferor shall have delivered to the Purchasers the following documents:

(i) <u>The Pool Supplement</u>. The Transferor will execute and deliver the related Pool Supplement and each of the other documents, certificates and instruments required to be attached thereto as set forth in <u>Exhibit A</u> (a final completed draft of which shall be delivered to the Purchasers at least one Business Day prior to the Closing Date).

(ii) <u>Master Sale Agreement Documents</u>. The Transferor shall deliver to the Purchasers a set of all documents and other writings delivered in connection with the Master Sale Agreement.

25

(iii) <u>Opinions</u> . On the initial Closing Date, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of the initial Closing Date, with respect to true sale characterization of the sales from the Seller to the Transferor pursuant to the Master Sale Agreement, nonconsolidation of the Transferor with the Seller and security interest matters (including creation, perfection and filing priority and control of electronic chattel paper) along with bring-downs of the opinions referred to in <u>Section 6.1(c)(iii)</u> . For any subsequent Closing Date, such counsel shall deliver such bring-downs of the foregoing opinions or new opinions with respect to such matters or such other matters, in each case, due to material changes in circumstances or Requirements of Law (since previously delivered), in each case that the Purchaser shall reasonably request. For the first Closing Date for which there is, or will be, a concentration with respect to any State of outstanding Receivables in all Eligible Receivables Pools purchased by the Purchasers that exceeds 10% of the aggregate Outstanding Principal Balance of all Receivables in all purchased Eligible Receivables Pools after giving effect to such sale, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of such Closing Date, with respect to state titling statute opinions with respect to the Lien on the related Financed Vehicles.

(iv) <u>Officer's Certificate of the Seller and the Transferor</u> . The Purchasers shall receive on each Closing Date an Officer's Certificate of the Seller and the Transferor representing and warranting that, as of such Closing Date, except to the extent that they relate to another date, in which case, they shall be true and correct as of such date, the representations and warranties of the Seller and the Transferor in the Basic Documents to which they are a party are true and correct in all material respects and that each of the Seller and the Transferor has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date in all material respects.

(v) <u>Accountants' Letter</u> . The Purchasers shall have received an agreed upon procedures letter described in <u>Section  7.21</u> for the calendar quarter preceding such the related Closing Date.

(vi) <u>Other Documents</u> . On each Closing Date, the Transferor, the Servicer and the Performance Guarantor shall provide such other documents as the Purchasers may reasonably request.

(j) <u>Collateral Custodian Certificate</u> . With respect to all Receivables included in the related Receivables Pool, the Transferor shall, or shall have caused the Seller to, have Delivered each related Original Contract Document to the Collateral Custodian, and the Purchasers shall have received the related executed Document Receipt in accordance with the requirements of the Collateral Custodian Agreement, and the Seller, the Transferor and the Servicer shall have marked their computer files with respect to such Receivables to indicate the interest of the Purchasers.

26

(k) Other Transactions . The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder.

Section 6.3 Conditions to Obligation of the Transferor . The obligation of the Transferor to sell the Receivables with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) Second Step Receivables Purchase Price . On such Closing Date, the Purchasers shall deliver to the Transferor the Second Step Receivables Purchase Price for such Receivables Pool, in accordance with Section 3.1(b) of this Agreement.

(b) Representations and Warranties True . The representations and warranties of the Purchasers under this Agreement and each of the other Basic Documents to which it is a party shall be true and correct in all material respects as of such Closing Date, and the Purchasers shall have performed in all material respects all covenants and agreements, if any, required to be performed by it hereunder and thereunder on or prior to such Closing Date.

(c) Documents to be Delivered By the Purchaser . On or before such Closing Date, the Purchasers shall have delivered to the Transferor the related Pool Supplement.

(d) Other Transactions . The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder in connection with such sale and such Closing Date.

(e) Other Documents . On such Closing Date, the Purchasers shall provide such other documents as the Transferor may reasonably request.

ARTICLE VII

COVENANTS OF THE TRANSFEROR

Section 7.1 Protection of Right, Title and Interest . The Transferor covenants and agrees with the Purchasers as follows:

(a) Protection of Title; Filings . The Transferor shall authorize and file such financing statements and amendments to financing statements and cause to be authorized, as applicable, and filed such continuation and other statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interest of the Purchasers under this Agreement, each Pool Supplement and each Second Step Receivables Assignment in the Receivables and the other Purchased Property and in the proceeds thereof. The Transferor shall deliver (or cause to be delivered) to the Purchasers file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing.

27

(b) <u>Name Change</u> . The Transferor shall not change its State of organization or its name, identity or corporate structure in any manner that would, could or might make any financing statement or continuation statement filed by the Transferor in accordance with <u>Section 7.1(a)</u> seriously misleading within the meaning of the UCC, unless it shall have given the Purchasers (i) at least 30 days prior written notice thereof if such change would create a new debtor under the UCC (which for purposes of this <u>Section 7.1(b)</u> , shall not include a name change) or change the jurisdiction that would govern the perfection or effect of perfection against the Transferor and after delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents, or (ii) otherwise, notice thereof within 30 calendar days after effectiveness of such change, together with delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents.

(c) <u>Executive Office; Maintenance of Offices</u> . The Transferor shall (i) give the Purchasers at least 30 days prior written notice of any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement Records; <u>provided</u> , that on or about April 1, 2017, the its principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251 and (ii) deliver to the Purchasers acknowledgment copies of the applicable financing statements necessary to perfect or continue the perfection of their respective security or ownership interests hereunder and under the other Basic Documents (it being understood that amendments to all relevant financing statements will be filed in connection with the change in chief executive office described above). The Transferor shall at all times maintain offices from which it primarily services Receivables and its principal executive office within the United States of America.

(d) <u>New Debtor</u> . In the event that the Transferor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Transferor hereunder, the Transferor shall comply fully with the obligations of <u>Section 7.1(a)</u> .

(e) <u>Receivables Systems</u> . If the Transferor maintains computer systems, the Transferor shall maintain, or cause to be maintained, its computer systems so that, from and after the time of sale of the Receivables under this Agreement, if the computer systems and records (including any backup archives) shall refer to any such Receivable, they shall indicate clearly the interest of the Purchasers in such Receivable and that such Receivable is owned by the Purchasers. Indication of the Purchaser's ownership of a Receivable shall be deleted from or modified on the computer systems and records of the Transferor, if any, when, and only when, the related Receivable shall have been paid in full or repurchased. The Transferor shall cause the Collateral Custodian or the E-Vault Provider on its behalf at all times to maintain "control" (as such term is used in Section 9-105 of the UCC) of all electronic records constituting or forming a part of a Receivable constituting electronic chattel paper on behalf of the Purchasers, as "secured party" (as such term is used in Section 9-105 of the UCC) such that the Purchasers have had and at all times will have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivable.

28

(f) <u>Certificates of Title</u> . If the Seller has not received a Certificate of Title related to a Purchased Receivable naming a Title Lien Nominee the first lien holder on such Certificate of Title for the related Financed Vehicle or the title application or other documentation necessary to obtain a Certificate of Title thereto noting such lien holder has not been submitted, then, promptly, but no later than [***] days following the related date of origination, the Transferor shall, or shall cause the Seller, to take all steps necessary to perfect the security interest against each Obligor in the related Financed Vehicle.

Section 7.2 <u>Other Liens or Interests</u> . Except for the sale contemplated by this Agreement and the Second Step Receivables Assignment, the Transferor shall not sell, pledge, assign or transfer any Receivable or the related Purchased Property (or any portion thereof) to any other Person, or grant, create, incur, assume or suffer to exist any Lien thereon or on any interest therein, and the Transferor shall defend the right, title and interest of the Purchasers in, to and under such Receivables and the related Purchased Property against all claims of third parties claiming through or under the Transferor. The Transferor shall not do anything to impair the right, title, ownership or security interest of the Purchasers in the Purchased Property.

Section 7.3 <u>Perfection Costs and Expenses</u> . The Transferor agrees to pay all reasonable costs and disbursements in connection with the perfection, as against all third parties, of the Purchaser's right, title and interest in and to the Purchased Property with respect to each Receivables Pool.

Section 7.4 <u>Separateness</u> . Each of the Seller and the Transferor has taken, and shall continue to take, steps to make it unlikely that a voluntary or involuntary application for relief by the Seller under the Bankruptcy Code or similar applicable Requirements of Law in any state jurisdiction, would result in consolidation of the assets and liabilities of the Transferor with those of the Seller. These steps include the maintenance of the Transferor as a separate, limited-purpose subsidiary pursuant to the limitations in the Transferor's limited liability company agreement and compliance with any assumptions or statements of fact in the non-consolidation opinion delivered to the Purchasers in connection with this Agreement. These limitations include restrictions on the nature of the Transferor's business and a restriction on the Transferor's ability to commence a voluntary case or proceeding under the United States Bankruptcy Code or similar applicable state Requirements of Law without the unanimous affirmative vote of all of the Transferor's directors. Under the circumstances set forth in the Transferor's limited liability company agreement, the Transferor is required to have at least one (1) director who qualifies thereunder as an independent director.

Section 7.5 <u>Notice of Servicer Termination; Etc.</u> The Transferor shall notify the Purchasers (A) as soon as possible and in any event within five (5) Business Days after it obtains knowledge of the occurrence of an Event of Servicing Termination; and (B) promptly after the Transferor obtains knowledge thereof, notice of any litigation, investigation or proceeding that may exist at any time between the Transferor and any Person or any litigation or proceeding relating to this Agreement, any other Basic Document or the Purchased Property.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

29

Section 7.6 <u>Conduct of Business; Ownership</u> . The Transferor shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted and do all things necessary to remain duly organized, validly existing and in good standing as a domestic limited liability company in its jurisdictions of formation and maintain all requisite authority, licenses and permits to conduct its business in each jurisdiction in which its business is conducted, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents. The Transferor shall at all times be a wholly-owned subsidiary of the Seller.

Section 7.7 <u>Collections</u> . In the event the Transferor receives any Collections after the related Cutoff Date with respect to the Purchased Property, it shall turn over any Collections received by it with respect to any Purchased Property to the Servicer within two (2) Business Days after its identification of such Collections.

Section 7.8 <u>Consolidations, Mergers and Sales of Assets</u> .

(a) The Transferor shall not consolidate or merge with or into any other Person or sell, lease or otherwise transfer all or substantially all of its assets to any other Person.

(b) The Transferor hereby agrees that, until the last Business Day of the twelfth (12th) month following the latest maturing Receivable, it shall not (i) take any action prohibited by (or inconsistent with) its limited liability company agreement, or (ii) without the prior written consent of the Purchasers, amend its limited liability company agreement.

Section 7.9 <u>Master Sale Agreement</u> . The Transferor, on its own behalf and on behalf of the Purchasers and the other Seller Indemnified Parties, shall promptly enforce all covenants, indemnities and other obligations of the Seller contained in the Master Sale Agreement (including <u>Sections 6.11</u> and <u>7.2</u> thereof). The Transferor shall deliver consents, approvals, directions, notices, waivers and take other actions under the Master Sale Agreement as may be directed by the Purchasers.

Section 7.10 <u>Operation of the Transferor</u> . Without limiting the generality of <u>Sections 7.4</u> and <u>7.8(b)</u> , the Transferor shall be operated and managed in accordance with rating agency requirements for single-use special purpose entities.

Section 7.11 <u>Selection Standards; Quarterly Meetings.</u>

(a) Until the Commitment Termination Date, in addition to the Quarterly Operations Review (as defined in the Master Servicing Agreement), the Transferor shall participate in quarterly meetings with the Purchasers (" <u>Quarterly Selection Standards Meeting</u> ") on the 60 th day (or such other day as soon thereafter as the Transferor and the Purchasers shall mutually agree) of each quarter and if such day is not a Business Day, then on the next Business Day (or as Parties may mutually agree) by telephone or, if agreed to by the parties, in person, to discuss and review, among other things, loss and delinquency performance of the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, any material changes to the Seller's Credit Policy and other origination or underwriting guidelines, processes or

30

policies, including special origination programs, that could influence, modify or impact the Purchased Property or the mix or characteristics of future Receivables Pools, as well as any proposed amendments or modifications to the definitions of Eligible Receivable or Eligible Receivables Pool since the preceding Quarterly Selection Standards Meeting.

(b) During, or following, any Quarterly Selection Standards Meeting, the Purchasers may propose a change by delivering a written request to the Transferor containing such proposed changes (" Selection Standards Change Notice ") to the definitions of Eligible Receivable or Eligible Receivables Pool. If Purchasers and the Transferor reach mutual written agreement regarding such changes (" Selection Standards Modification "), then the definitions of Eligible Receivable or Eligible Receivables Pool shall be amended to include such Selection Standards Modification for any Receivables Pools purchased on or after the date of such mutual agreement, or if Purchasers and the Transferor are not able to reach mutual agreement regarding such Selection Standards Modification within 30 days after receipt of the related Selection Standards Change Notice, then no change will occur to the definitions of Eligible Receivable or Eligible Receivables Pool.

Section 7.12 Furnishing of Information and Inspection of Records . If at any time the Transferor maintains any information regarding the Purchased Property, the Transferor shall furnish to the Purchasers from time to time such information with respect to the Purchased Property as the Purchasers may reasonably request. If the Transferor maintains such information, the Transferor shall, at any time and from time to time during regular business hours, as requested by the Purchasers, permit the requesting party, or its agents, representatives or regulators, (i) to examine and make copies of and take abstracts from all books, records and documents (including computer tapes and disks) relating to the Receivables or other Purchased Property, and (ii) to visit the offices and properties of the Transferor for the purpose of examining such materials described in clause (i), and to discuss matters relating to the Purchased Property or the Transferor's performance hereunder and under the other Basic Documents to which such Person is a party with any of the officers, directors, employees or independent public accountants of the Transferor having knowledge of such matters.

Section 7.13 Compliance with Laws, Etc. The Transferor shall comply with all Requirements of Law applicable to it, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents.

Section 7.14 Indemnity .

(a) The Transferor shall indemnify, defend and hold harmless the Purchasers and its officers, directors, employees, Affiliates and agents (the " Indemnified Parties ") from and against any and all costs, expenses, losses, damages, claims and liabilities arising out of or resulting from the use, ownership or operation by the Transferor or any of its Affiliates of any Financed Vehicle.

(b) The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all reasonable and documented costs, expenses, losses, claims, damages and liabilities solely to the extent that such cost, expense, loss, claim, damage or

31

liability arose out of or resulted from the action or inaction (including any failure to comply with any applicable Requirements of Law) of any third party to whom the Transferor subcontracted or delegated the performance of its duties under this Agreement or the other Basic Documents and only to the extent such cost, expense, loss, claim, damage or liability is not related to any credit loss.

(c) The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all costs, expenses, losses, claims, damages and liabilities, including reasonable external legal fees and expenses (i) to the extent that such cost, expense, loss, claim, damage, or liability arose out of, resulted from or was imposed upon any such Indemnified Party through the negligence (except for reasonable errors in judgment), willful misfeasance or bad faith of the Transferor or agent in the performance of its duties under this Agreement or the other Basic Documents to which it is a party or by reason of a breach of its obligations or duties under this Agreement or the other Basic Documents to which it is a party, (ii) arising out of, or resulting from, any breach of any representation, warranty, covenant or obligation of the Transferor in this Agreement, the other Basic Documents to which it is a party or in any Schedule, Exhibit, written statement or certificate furnished by the Transferor pursuant to this Agreement or the other Basic Documents to which it is a party (in each case, as each such representation or warranty would read if all qualifications as to knowledge or materiality, including each reference to the defined term "Material Adverse Effect," were deleted therefrom), (iii) arising out of, or resulting from, any untrue statement of a material fact in any written information provided or delivered by the Transferor, or any Affiliate of the Transferor on its behalf, to the Purchasers pursuant to, for the purposes of, or in connection with, this Agreement or the other Basic Documents to which it is a party, (iv) arising out of, or resulting from, any action, suit, proceeding or claim or other litigation to the extent resulting from the actions or omissions of the Seller, the Transferor or any of their consolidated Affiliates or any of their respective agents, directors, officers, servants or employees, excluding, however, any costs, expenses, losses, claims, damages or liabilities resulting from the gross negligence, bad faith or willful misconduct on the part of any such Indemnified Party, and (v) resulting from any conduct or omission of the Seller or the Transferor that results in failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle, including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable. Indemnification under this Section 7.14 shall include reasonable fees and expenses of one external counsel and reasonable costs and expenses of litigation; provided, however, that the Transferor pursuant to this Section 7.14, the Seller pursuant to Section 5.4 of the Master Sale Agreement and the Servicer pursuant to Section 5.2 of the Master Servicing Agreement shall only be responsible collectively for reasonable fees and expenses of one external counsel. If the Transferor has made any indemnity payments pursuant to this Section 7.14 and the recipient thereafter collects any of such amounts from others with respect to such claim, the recipient shall promptly repay such amounts collected to the Servicer, without interest.

(d) This Section 7.14 shall survive any termination of this Agreement.

Section 7.15 Publicity. All media releases, public announcements and public disclosures by any Party or its respective employees or agents, relating to this Agreement or the other Basic Documents or the transactions contemplated hereby or thereby or the name of the

32

Purchasers or the Transferor, including promotional or marketing material, shall be coordinated with and consented to by the other Party in writing prior to the release thereof, which consent shall not be unreasonably withheld or delayed; provided , however , that any announcement intended solely for internal distribution by the disclosing Party to its directors, employees, officers and agents or any disclosure required by Requirements of Law or by accounting requirements, shall not require such coordination or consent.

Section 7.16 No Solicitation . The Transferor agrees that it will not, directly or indirectly, specifically solicit, and will not permit any of its Affiliates to, directly or indirectly, specifically solicit, any Obligor (in writing or otherwise) to refinance any Purchased Receivable (including solicitations for the purchase of a new vehicle); provided , however , that each of Transferor and its Affiliates may, directly or indirectly, engage in a general solicitation directed generally at the obligors of receivables originated or serviced by the Seller or the Servicer at large, so long as the Obligors under the Purchased Receivables are not the predominant targets of such general solicitation for refinancing.

Section 7.17 Remediation . The Transferor shall (i) provide the Purchasers with written notice, to the extent not prohibited by any applicable Requirements of Law, of any Remediation if such Remediation could reasonably be expected, individually or in the aggregate with any other Remediation, to have a Material Adverse Effect on the Purchasers or any of the Purchased Property and (ii) implement any Remediation in accordance with all terms thereof and all applicable Requirements of Law.

Section 7.18 Quarterly Statements as to Compliance . The Transferor shall deliver to the Purchasers, on or before the forty-fifth (45th) day following each calendar quarter, beginning February 14, 2017 (or, if such day is not a Business Day, the next succeeding Business Day), an Officer's Certificate of the Transferor, dated as of the last Business Day of the immediately preceding calendar quarter, in each instance stating that (i) a review of the activities of the Transferor during the preceding calendar quarter (or, with respect to the first such certificate, such period as shall have elapsed from the Effective Date to the date of such certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Transferor has fulfilled all its obligations under this Agreement in all material respects throughout such period, or, if there has been a default in the fulfillment of any such obligation, in any material respect specifying each such default known to such officer and the nature and status thereof.

Section 7.19 Additional Covenants . From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will:

(a) Preservation of Existence; License . It will preserve and maintain its existence, rights, franchises and privileges in its State of formation, and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or would reasonably be expected to have, a Material Adverse Effect and (without suspension or limitation) will not terminate or let lapse any licenses, consents or approval currently held by it necessary to ensure its performance of any duty contemplated by this Agreement and the other Basic Document to which it is a party.

33

(b) <u>Performance and Compliance with Contracts</u> . It will, at its expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Contracts and in and all other agreements related to such Contracts. It shall enforce its rights under this Agreement and the other Basic Documents.

(c) <u>Keeping of Records and Books of Account</u> . It will (or will cooperate with the Servicer to) maintain and implement administrative and operating procedures (including an ability to re-create records evidencing Receivables in the event of the destruction of the originals thereof, in the case of tangible Contracts, or loss of access to the vault system of the Contracts maintained therein, in the case of electronic Contracts), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables.

(d) <u>Transferred Assets</u> . With respect to each Receivable transferred or acquired by it, it will: (i) transfer or acquire such Receivable pursuant to and in accordance with the terms of the Master Sale Agreement and this Agreement, (ii) take all action necessary to perfect, protect and more fully evidence the assignee's interest in such Receivable, including (A) filing and maintaining, effective financing statements (Form UCC-1) in all necessary or appropriate filing offices, and filing continuation statements, amendments or assignments with respect thereto in such filing offices and (B) executing or causing to be executed such other instruments or notices as may be necessary or appropriate and (iii) taking all additional action that the Purchasers may reasonably request, including the filing of financing statements to perfect, protect and more fully evidence the respective interests of the parties to the Master Sale Agreement and this Agreement in the Purchased Property.

(e) <u>Collection Policy</u> . It will (or will cooperate with the Servicer to), to the extent applicable, comply with the Collection Policy with respect to each Receivable.

(f) <u>Taxes</u> . It will file or cause to be filed all federal and material state, local or foreign tax returns that are required to be filed by it. It will shall pay all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of which it plans to contest in good faith by appropriate proceedings and with respect to which it retains reserves on its books).

(g) <u>Use of Proceeds</u> . The Transferor will use the proceeds only to acquire Receivables from the Seller.

(h) <u>Liens</u> . It will not create, or participate in the creation of, or permit to exist, any Lien with respect to the Collection Account or any account into which collections on the Receivables are deposited, except as set forth in the Basic Documents.

(i) <u>Reporting</u> . It will distribute, or cause to be distributed, to the Purchasers:

    (i) <u>Monthly Reports</u> . Not later than the Reporting Date preceding each Payment Date, a Monthly Servicer Report.

34

(ii) <u>Additional Data</u> . Additionally, and solely to the extent such data is available, the Transferor shall provide, or reasonably cooperate with the Servicer to provide the Purchasers the Monthly Servicer Report or Monthly Data File, as applicable, in a format reasonably acceptable to the Purchasers, with data regarding the characteristics of the Receivables, in form and substance reasonably acceptable to the Purchasers, including (A) delinquencies (including a list of Delinquent Receivables), and (B) annualized losses or loss information by vintage origination year on the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, presented on a quarterly basis, in each case of <u>clause (A)</u> and <u>(B)</u> , until the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables).

(iii) <u>Income Tax Liability</u> . Within ten (10) Business Days after the receipt of revenue agent reports or other written proposals, determinations or assessments of the Internal Revenue Service or any other taxing authority which propose, determine or otherwise set forth positive adjustments to the tax liability of any "Affiliated Group" (within the meaning of Section 1504(a)(l) of the Code) which equal or exceed one million dollars ($1,000,000) with respect to the Seller or twenty-five thousand dollars ($25,000) with respect to the Transferor, telephonic or emailed notice (confirmed in writing within five (5) Business Days) specifying the nature of the items giving rise to such adjustments and the amounts thereof.

(iv) <u>Tax Returns</u> . Upon demand by the Purchasers, copies of all federal, State and local tax returns and reports filed by the Seller or the Transferor (excluding sales, use and like taxes), to the extent the Seller or the Transferor is required to file such tax returns.

(v) <u>Auditors' Management Letters</u> . Promptly after any auditors' management letters are received by the Seller or the Transferor or by its accountants, which refer in whole or in part to any inadequacy, defect, problem, qualification or other lack of fully satisfactory accounting controls utilized by the Seller or the Transferor.

(vi) <u>ERISA</u> . Promptly after receiving written notice of any "Reportable Event" (as defined in Title IV of ERISA) with respect to the Seller or the Transferor (or any ERISA Affiliate thereof), a copy of such written notice.

(vii) <u>Notice of Material Events</u> . Promptly after obtaining knowledge of an event or circumstance that is likely to result in a Commitment Termination Event, Event of Servicing Termination or have a Material Adverse Effect on the Seller or the Transferor, the Purchased Property, or the Purchasers, notice of such event or circumstance. Promptly upon the entry of a judgment against the Seller of $1,000,000 or more.

(j) <u>Accounting Policy</u> . It will promptly notify the Purchasers of any material change in its accounting policies.

<div align="center">35</div>

(k) <u>Other</u> . It will furnish to the Purchasers promptly, from time to time, such other information, documents, records or reports respecting the Purchased Property or the condition or operations, financial or otherwise, of it as the Purchasers may from time to time reasonably request in order to protect the interests of the Purchasers under or as contemplated by the Basic Documents.

(l) <u>Compliance with System Description</u> . It will, and will cause the Collateral Custodian and E-Vault Provider to, at all times comply in all material respects with the System Description with respect to matters related to the perfection in the Receivables and the Purchased Receivables by "control" (as such term is used in Section 9-105 of the UCC).

(m) <u>Financial Statements</u> . To the extent not filed with the Commission and publicly available on EDGAR, within 120 days after the end of each fiscal year and 60 days after each fiscal quarter (or if the Seller is a reporting company under the Securities and Exchange Act of 1934, such period as required thereunder for the filing thereof), the Transferor will cause the Seller to provide to the Purchasers copies of its audited financial statements for the prior fiscal year or unaudited financial statements with respect to each of the first three fiscal quarters.

(n) <u>Access to Systems</u> . During the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, or cause the Seller to, give the Purchasers and their duly authorized representatives, attorneys and auditors, upon reasonable request of Purchaser, on-site access to the Transferor and the Seller's loan originations systems and document repository, which access shall facilitate quality assurance and quality control reviews, to enable the Purchasers to back-up Receivables Files to the Purchasers' systems, enable the Purchasers to review Receivables originations processes, procedures, approvals and boarding and permit the Purchasers with reasonable access to the Seller's quality reporting and backup documentation (e.g., workpapers, sampled transactions and account-level results). Promptly following the end of each calendar month during the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, and shall cause the Seller to, at the reasonable request of Purchasers, provide the Purchasers with screenshots that would enable the Purchasers to complete the foregoing review on a sample of Receivables determined by the Purchasers (limited to one hundred (100) Receivables in any calendar week).

(o) <u>Annual Opinion of Counsel</u> . Counsel for the Transferor shall deliver on or before March 15 of each year (or, if such date is not a Business Day, the next succeeding Business Day), beginning March 15, 2018, an Opinion or Opinions of Counsel addressed to the Purchasers stating that, in the opinion of such counsel, such action has been taken with respect to the authorization, execution and filing of any financing statements and continuation statements as is necessary to maintain the liens and security interests created under this Agreement and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the liens and security interests created under this Agreement.

(p) <u>Delivery of Servicer Files</u> . To the extent that any portion of the Servicer Files related to any Purchased Receivable is not in the possession of the Servicer immediately prior to any related Closing Date, the Transferor shall, and shall cause the Seller to, deliver such portion of the Servicer Files for each Receivable listed on the Schedule of Receivables delivered to the Purchasers on each Closing Date.

36

Section 7.20 <u>Negative Covenants</u> . From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will not:

(a) <u>Other Business</u> . It will not (i) engage in any business other than the transactions contemplated by the Basic Documents, (ii) incur any indebtedness, obligation, liability or contingent obligation of any kind other than pursuant to or as contemplated by the Basic Documents (excluding any incidental expenses incurred in connection with the performance of its obligations under the Basic Documents) or (iii) form any subsidiary or make any investments in any other person.

(b) <u>Receivables Not to be Evidenced by Instruments</u> . It will take no action to cause any Receivable that is not, as of the Closing Date or the related Settlement Date, as the case may be, evidenced by an "instrument" (as defined in Article 9 of the UCC), other than an instrument that constitutes part of chattel paper, to be so evidenced except in connection with the enforcement or collection of such Receivable.

(c) <u>True Sale</u> . It will not account for or treat (whether in its financial statements or otherwise) the transfers by the Seller to the Transferor or the Transferor to the Purchasers in any manner other than as the sale, or absolute assignment, of the Receivables and related assets.

(d) <u>ERISA Matters</u> . It will not, to the extent it could reasonably result in material liability to or impairment of any assets of or interests of the Purchaser in assets of the Transferor, (i) engage or permit any ERISA affiliate to engage in any prohibited transaction for which an exemption is not available or has not previously been obtained from the United States Department of Labor, (ii) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Code with respect to any Pension Plan, (iii) fail to make any payments to a Multiemployer Plan that it or any ERISA Affiliate is required to make under the agreement relating to such Multiemployer Plan or any law pertaining thereto, (iv) permit the filing of any notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, (v) permit the termination of any Pension Plan under Section 4041(c) of ERISA or the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate or appoint a trustee to administer a Pension Plan, or (vi) permit any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e) <u>Formation Documents; Transfer Agreement</u> . Without the prior consent of the Purchasers, the Transferor will not amend, modify, waive or terminate any provision of its formation documents, and the Seller and the Transferor will not amend, modify, waive or terminate any provision of the Basic Documents.

(f) <u>Changes in Payment Instructions to Obligors</u> . It will not add or make any change, or permit the Servicer to make any change, in its instructions to Obligors regarding payments to be

37

made with respect to the Receivables, unless the Purchasers shall have consented to such change and has received duly executed copies of all documentation related thereto, which documentation shall be satisfactory in form and substance to the Purchasers.

(g) Extension or Amendment of Receivables . It will not, except as otherwise permitted in pursuant to this Agreement or the other Basic Documents, extend, amend or otherwise modify, or permit the Servicer to extend, amend or otherwise modify, the terms of any Receivables.

(h) Credit Policy . During the Commitment Period, the Transferor will not, and it will not permit the Seller to, amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to Exhibit E attached hereto, without written notification to the Purchasers; provided that the prior written consent of the Purchasers shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Purchasers under this Agreement or any other Basic Document. At the Purchasers' request, but no more frequently than [***], the Transferor will, or shall cause to be provided, to the Purchasers an explanation of all material changes to the Seller's policies concerning generation of financing terms over the preceding [***]. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms.

(i) Collection Policy . The Transferor will not amend, modify, restate or replace, in whole or in part, the Collection Policy, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement, and as modified by the Servicing Exceptions, if any, or with respect to any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement.

(j) No Assignments . It will not assign or delegate, grant any interest in or permit any Lien (other than Permitted Liens) to exist upon any of its rights, obligations or duties under this Agreement or any other Basic Document without the prior written consent of the Purchasers.

Section 7.21 Accountant ' s Letter . Not later than thirty (30) days after the end of each calendar quarter, upon the request of the Purchasers, the Transferor shall cause a firm of independent certified public accountants, to furnish to the Purchasers a letter in form and substance acceptable to the Purchasers, stating as of the Cutoff Date that they have performed specified procedures with respect to each Receivables Pool sold to the Purchasers during the preceding calendar quarter. The Transferor shall be responsible for all expenses associated with obtaining such agreed upon procedures letters up to $[***] annually; provided that in the event an agreed upon procedures letter reveals deviations material in nature or amount, then the Transferor shall be obligated to reimburse up to an additional $[***] of agreed upon procedure letters costs incurred in the following 12-month period.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

38

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.1 <u>Obligations of the Transferor</u>. The obligations of the Transferor under this Agreement shall not be affected by reason of any invalidity, illegality or irregularity of any Receivable with respect to any Receivables Pool.

Section 8.2 <u>Repurchase of Receivables Upon Breach by the Transferor</u>. Upon (i) the discovery of any breach of any representation or warranty as set forth in <u>Section 5.2(cc)</u> of this Agreement (and with respect to <u>paragraph (x)</u> therein, without giving effect to any knowledge requirements) or (ii) the Purchasers incurring any cost, expense, loss, claim, damage or liability resulting from any conduct or omission of the Seller or the Transferor that results in the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Unless the breach described in <u>clause (i)</u> above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in <u>clause (ii)</u> above, in each such circumstance, the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit, or cause to be remitted the Warranty Payment to the applicable Collection Account for distribution pursuant to <u>Section 4.2</u> of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in <u>Section 7.14</u> of this Agreement) against the Transferor for such breach available to the Purchasers.

Section 8.3 <u>Assignment of Warranty Receivables</u>. With respect to all Receivables repurchased pursuant to this Agreement, the Purchasers shall assign to the Transferor, without recourse, representation or warranty to the Transferor, all the Purchaser's right, title and interest in and to such Receivables, and all security and documents relating thereto.

Section 8.4 <u>Amendment</u>. This Agreement may be amended from time to time by a written amendment duly executed and delivered by the Transferor and the Purchasers.

Section 8.5 <u>Waivers</u>. No failure or delay on the part of the Purchasers in exercising any power, right or remedy under this Agreement, any Pool Supplement or any Second Step Receivables Assignment shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy.

39

Section 8.6 <u>Notices</u> . All communications and notices pursuant hereto to either Party must be in writing personally delivered, sent by facsimile or email, in each case with a copy to follow via first class mail or mailed by certified mail-return receipt requested, and shall be deemed to have been duly given at the address, fax number or email for each Party set forth below.

| To Transferor: | Carvana Auto Receivables 2016-1 LLC |
| | c/o Carvana, LLC, its sole member |
| | 4020 East Indian School Road |
| | Phoenix, Arizona 85018 |
| | Attention: General Counsel |
| | Email: DL-CarvanaLegal@carvana.com |

| <u>With a copy to</u> : | Snell  & Wilmer L.L.P. |
| | 400 East Van Buren |
| | Phoenix, Arizona 85004-2202 |
| | Attention: Brian Burke |
| | 602.382.6379 |
| | bburke@swlaw.com |

| To Purchasers: | Ally Bank |
| | 6985 Union Park Center |
| | Midvale, UT 84047 |
| | Attn: Greg Behrmann |
| | Telephone No.: (801) 790-5068 |
| | Email: greg.behrmann@ally.com |

| <u>and</u> : | Ally Financial |
| | Ally Detroit Center |
| | 500 Woodward Avenue |
| | MC: MI-01-14-LEGAL |
| | Detroit, MI 48225 |
| | Attn: General Counsel |
| | Fax No.: (313) 334-3276 |

Section 8.7 <u>Costs and Expenses</u> . Except as otherwise provided in this Agreement or the other Basic Documents, the Transferor agrees to pay to the Purchasers all reasonable costs and expenses in connection with the preparation, execution and delivery of this Agreement and the other Basic Documents and the other documents to be delivered hereunder or in connection herewith and any requested amendments, waivers or consents hereof including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Purchasers (which shall not exceed $[***] under both the Basic Documents and the Receivables Warehouse

[***]  *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

40

Facility), with respect thereto and all costs and expenses, if any, in connection with the enforcement of this Agreement and the other documents delivered hereunder or in connection herewith.

Section 8.8 <u>Survival</u> . The respective agreements, representations, warranties and other statements by the Transferor and the Purchasers set forth in or made pursuant to this Agreement shall remain in full force and effect and shall survive the closing under <u>Section 3.2</u> and any sale, transfer or other assignment of the Receivables or other Purchased Property by the Purchasers.

Section 8.9 <u>Headings and Cross-References</u> . The various headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 8.10 <u>Governing Law, Submission to Jurisdiction, Etc</u> .

(a) THIS AGREEMENT AND THE SECOND STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND PURCHASERS EACH HEREBY WAIVES (TO THE EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. INSTEAD, ANY DISPUTE RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

41

Section 8.11 <u>Counterparts</u> . This Agreement may be executed in two or more counterparts and by different parties on separate counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement electronically or by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 8.12 <u>Further Assurances</u> . The Transferor and Purchasers shall each, at the request of the other, execute and deliver to the other all other instruments that either may reasonably request in order to more fully effect the sale of the Purchased Property to the Purchasers.

Section 8.13 <u>No Reliance</u> . The Purchasers acknowledges and agrees that it is purchasing the Receivables without recourse to the Transferor (other than as otherwise provided in this Agreement).

Section 8.14 <u>Severability of Provisions</u> . If any provision of this Agreement is invalid or unenforceable, then, to the extent such invalidity or unenforceability shall not deprive either Party of any material benefit intended to be provided by this Agreement, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

Section 8.15 <u>Assignment</u> . Subject to the terms of the Confidentiality and Reconstitution Agreement, neither the Transferor nor the Purchasers may assign or otherwise transfer its rights and obligations under this Agreement without the prior written consent of the other Party.

Section 8.16 <u>No Third Party Beneficiaries</u> . This Agreement does not create, and shall not be deemed to create, a relationship between the Parties or any of them and any third party in the nature of a third party beneficiary or fiduciary relationship; <u>provided</u> , <u>however</u> , that the existence of this <u>Section 8.15</u> shall not relieve the Transferor of its indemnity obligations set forth in <u>Section 7.14</u> of this Agreement and the Purchasers may enforce such indemnification claims for the Indemnified Parties set forth in <u>Section 7.14</u> .

Section 8.17 <u>No Petition Covenant</u> . Notwithstanding any prior termination of this Agreement, the Purchasers shall not, prior to the date which is one year and one day after (i) the final payment or liquidation of all the Receivables and (ii) and payment in full of all obligations owing to Ally Bank under the Receivables Warehouse Facility, acquiesce, petition or otherwise invoke or cause the Transferor to invoke the process of any Governmental Authority for the purpose of commencing or sustaining a case against the Transferor under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Transferor or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Transferor under any federal or state bankruptcy or Insolvency Proceeding.

Section 8.18 <u>Special Acknowledgement of Purchasers</u>. Each Purchaser hereby acknowledges that it is a sophisticated purchaser capable of analyzing the risk of purchasing the Receivables and that subsequent to the consummation of the transaction contemplated hereby, the Purchasers shall bear all of the risks of ownership of the Receivables, including the risks of defaults and credit losses with respect thereto, except as otherwise set forth in any of the Basic Documents.

Section 8.19 <u>Effect of Amendment and Restatement</u>. It is the intent of the parties hereto that this Amended and Restated Master Purchase and Sale Agreement shall, as of the date hereof, amend and restate and replace in its entirety the Master Purchase and Sale Agreement (the "<u>Original Master Purchase and Sale Agreement</u>"), dated December 22, 2016, among the Transferor and the Purchasers; <u>provided</u> that, with respect to the period of time from December 22, 2016, through the date hereof, the rights, obligations, representations and warranties of the parties shall be governed by the Original Master Purchase and Sale Agreement; <u>provided</u> further, that the amendment and restatement of the Original Master Purchase and Sale Agreement shall not affect any of the grants, transfers or conveyances contemplated by the Original Master Purchase and Sale Agreement to have occurred prior to the date hereof. Each of the parties hereto, in each of its respective capacities hereunder and under each of the other Basic Documents, as applicable, hereby consents to the amendment and restatement of the Original Master Purchase and Sale Agreement and each of the other Basic Documents on the date hereof, and does hereby acknowledge receipt of notice of such amendments and restatements and waives any further notice requirement with respect thereto, if and to the extent any such consent or notice was required hereunder or thereunder

\* \* \*

43

The Parties have caused this Amended and Restated Master Purchase and Sale Agreement to be executed by their respective duly authorized officers as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By: /s/ Paul Breaux
    Name: Paul Breaux
    Title: Vice President

ALLY BANK, as
Purchaser

By: /s/ D.P. Shevsky
    Name: D.P. Shevsky
    Title: Chief Risk Officer

ALLY FINANCIAL INC.,
as Purchaser

By: /s/ D.T. Rowe
    Name: D.T. Rowe
    Title: Regional Vice President

**Agreed to and accepted by:**

CARVANA, LLC, as Seller

By: /s/ Paul Breaux
    Name: Paul Breaux
    Title:  Vice President

S-1

**EXHIBIT A**

FORM OF POOL SUPPLEMENT

THIS POOL SUPPLEMENT TO THE AMENDED AND RESTATED MASTER PURCHASE AND SALE AGREEMENT (this " Supplement "), dated as of [ **INSERT DATE** ], by and among Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the " Transferor "), and Ally Bank and Ally Financial Inc. (collectively, the " Purchaser "). Except as otherwise expressly provided herein or unless the context otherwise requires, all capitalized terms used herein shall have the meanings attributed to them in Appendix A to the Amended and Restated Master Purchase and Sale Agreement (the " Master Purchase and Sale Agreement "), dated as of March 6, 2017, by and among the Transferor and the Purchasers, as amended, supplemented or otherwise modified from time to time.

**Section 1. Receivables Pool Specific Information .**

(a) The following information shall apply to the Receivables Pool sold to the Purchasers on the date hereof:

| | |
|---|---|
| Receivables Pool Number: | [Insert Pool Number] |
| Pool Cutoff Date: | [       , 20   ]. |
| Closing Date: | [       , 20   ]. |
| Cutoff Date Aggregate Outstanding Principal Balance: | $        [       ]. |
| Purchase Price set by Pricing Model: | $        [       ]. |
| Pre-closing Interest Carry Amount | $        [       ]. |
| Minus Re-Liening Expenses: | $        [       ]. |
| Second Step Receivables Purchase Price: | $        [       ]. |
| Total to be Wired | $        [       ]. |
| The first Distribution Date: | [       , 20   ]. |
| The first Reporting Date: | [       , 20   ]. |

(b) The following Schedules are attached hereto and incorporated herein by reference:

SCHEDULE 1    Officer's Certificate of the Transferor

SCHEDULE 2    Settlement Report

Ex. A-1

SCHEDULE 3       Schedule of Purchaser's Estimated Cumulative Net Losses

SCHEDULE 4       Schedule of Transferor's Estimated Cumulative Net Losses

SCHEDULE 5       Second Step Receivables Assignment

SCHEDULE 6       Accounts and Receivables Analysis for the subject Receivables Pool

SCHEDULE 7       Schedule of Receivables for the subject Receivables Pool

SCHEDULE 8       Collection Account

SCHEDULE 9       Validation of Selection Procedures pursuant to Section 2.1(d)

SCHEDULE 10      Pool Stratifications and Other Pool Characteristics

Each such Schedule shall be completed and executed (as applicable) as of the Closing Date.

**Section 2. Representations and Warranties of the Transferor .**

The representations and warranties of the Transferor set forth in Section 5.2 of the Master Purchase and Sale Agreement shall be true as of the Closing Date.

**Section 3. Effect of Supplement .** Except as specifically supplemented herein, the Master Purchase and Sale Agreement shall continue in full force and effect in accordance with its original terms. Reference to this specific Supplement need not be made in the Master Purchase and Sale Agreement, or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to or with respect to the Master Purchase and Sale Agreement, any reference in any of such items to the Master Purchase and Sale Agreement being sufficient to refer to the Master Purchase and Sale Agreement as supplemented hereby.

**Section 4. Counterparts .** This Supplement may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Supplement electronically or by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement. Any of the parties hereto may execute this Supplement by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original. This Supplement shall be governed by the internal laws of the State of New York.

<div align="center">Ex. A-2</div>

* * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Pool Supplement to Amended and Restated Master Purchase and Sale Agreement to be duly executed by their respective officers duly authorized as of the day and year first above written.

<div style="margin-left:60%">

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By: _____
    Name:
    Title:

ALLY BANK,
as Purchaser

By: _____
    Name:
    Title:

ALLY FINANCIAL INC.,
as Purchaser

By: _____
    Name:
    Title:

</div>

Ex. A-3

**Schedule 1**

**<u>Officer's Certificate of the Transferor</u>**

In accordance with <u>Section 1(b)</u> of the Pool Supplement dated **[          ]** [    ], 20    , by and among Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the " <u>Transferor</u> ") and Ally Bank and Ally Financial Inc. (collectively, the " <u>Purchasers</u> "), the undersigned hereby certifies to the Purchasers that, as of the date hereof, the representations and warranties of the Transferor under the Master Purchase and Sale Agreement and the other Basic Documents to which it is a party are true and correct in all material respects (or, if another date for such representation or warranty is specified therein, then as of such other date), and that the Transferor has complied with all agreements and satisfied all conditions on its part to be performed or satisfied in all material respects on or prior to the date hereof pursuant to the Master Sale Agreement and the other Basic Documents to which it is a party.

Sch. 1-1

IN WITNESS WHEREOF, the undersigned has executed this Officer's Certificate as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC, as Transferor

By

Name:

Its:

Sch. 1-2

**Schedule 2**

FORM OF SETTLEMENT REPORT [1]

| | |
|---|---|
| Pool Cutoff Date | /  /20 |
| Closing Date | /  /20 |
| Days Elapsed between Cutoff and Closing | [    ] |
| | |
| A. Cutoff Date Aggregate Outstanding Principal Balance | $[         ] |
| | |
| B. Purchase Price set by Pricing Model | $[         ] |
| C. Plus Pre-closing Interest Carry Amount | $[         ] |
| D. Less Re-Liening Expenses | $[         ] |
| | |
| Second Step Receivables Purchase Price | $[         ] |
| | |
| Total to be Wired | $[         ] |

Collections after the related Cutoff Date of each Receivable to the Closing Date to be paid by the Seller to the Purchasers on [         ] [     ], 20[    ] pursuant to Section 2.1 of the Master Purchase and Sale Agreement.

---

[1]  Example – not actual

Sch. 2-1

**Schedule 3**

**Schedule of Purchaser's Estimated Cumulative Net Losses**

| Month 0-[83] | Monthly Net Charge Offs $ | Cumulative Net Charge Offs $ |
|---|---|---|
| 0 | | |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |
| 33 | | |
| 34 | | |
| 35 | | |
| 36 | | |
| 37 | | |

Sch. 3-1

Sch. 3-2

**Schedule 4**

**Schedule of Transferor's Estimated Cumulative Net Losses**

| Month 0-83 | Monthly Net Charge Offs $ | Cumulative Net Charge Offs $ |
|---|---|---|
| 0 | | |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |
| 33 | | |
| 34 | | |
| 35 | | |
| 36 | | |

Sch. 4-1

| 37 |
| 38 |
| 39 |
| 40 |
| 41 |
| 42 |
| 43 |
| 44 |
| 45 |
| 46 |
| 47 |
| 48 |
| 49 |
| 50 |
| 51 |
| 52 |
| 53 |
| 54 |
| 55 |
| 56 |
| 57 |
| 58 |
| 59 |
| 60 |
| 61 |
| 62 |
| 63 |
| 64 |
| 65 |
| 66 |
| 67 |
| 68 |
| 69 |
| 70 |
| 71 |
| 72 |
| 73 |
| 74 |
| 75 |
| 76 |
| 77 |
| 78 |
| 79 |
| 80 |
| 81 |
| 82 |
| 83 |

Sch. 4-2

**Schedule 5**

**<u>Second Step Receivables Assignment</u>**

[DATE]

For value received, in accordance with the Amended and Restated Master Purchase and Sale Agreement dated as of March 6, 2017 (the " <u>Master Purchase and Sale Agreement</u> "), among the undersigned and Ally Bank and Ally Financial Inc. (collectively, the " <u>Purchasers</u> "), as amended, supplemented, restated or otherwise modified from time to time, the undersigned does hereby sell, assign, transfer and otherwise convey to the Purchaser, without recourse (except as provided in the Master Purchase and Sale Agreement) the following (collectively, the " <u>Purchased Property</u> "):

1.  all right, title and interest of the Transferor in, to and under the Receivables listed on the Schedule of Receivables attached as Schedule 7 to the related Pool Supplement, delivered to the Purchasers on the date hereof, and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Seller or the Servicer covering any related Financed Vehicle;

2.  the interest of the Transferor in the security interests in the Financed Vehicles granted by Obligors pursuant to the Receivables and, to the extent permitted by law, any accessions thereto;

3.  the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premiums or other payment with respect to any of the foregoing;

4.  all of the Transferor's right, title and interest in, to and under the Receivable Files;

5.  all right, title and interest of the Transferor in, to and under the Master Sale Agreement and the applicable First Step Pool Supplement and the applicable First Step Receivables Assignment, including the right of the Transferor to cause the Seller to repurchase Receivables under certain circumstances and the right of the Transferor to be indemnified under the circumstances specified in the Master Sale Agreement; and

6.  all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in <u>clauses (1)</u> through <u>(5)</u> above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

Sch. 5-1

It is the intention of the Transferor and the Purchasers that the sale, transfer, assignment and other conveyance of the Receivables contemplated by this Second Step Receivables Assignment shall constitute an independent sale of such Receivables from the Transferor to the Purchasers and the beneficial interest in and title to such Receivables shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Although the parties intend that the sale, transfer, assignment and other conveyance contemplated by this Second Step Receivables Assignment to be an independent sale, in the event any such sale, transfer, assignment and other conveyance is deemed to be other than a sale, the parties intend and agree (i) that all filings described in the Master Purchase and Sale Agreement shall give the Purchasers a first priority perfected security interest in, to and under such Receivables and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Second Step Receivables Assignment together with the Master Purchase and Sale Agreement and the related Pool Supplement shall be deemed to be the grant of, and the Transferor hereby grants to the Purchasers, a security interest from the Transferor to the Purchasers in such Receivables and the related Purchased Property in order to secure its obligations with respect to such transfer and assignment; (iii) this Second Step Receivables Assignment together with the Master Purchase and Sale Agreement and the related Pool Supplement shall be a security agreement under applicable law for the purpose of each such transfer and assignment; and (iv) the Purchasers shall have all of the rights, powers and privileges of a secured party under the UCC with respect to such transfer and assignment and the Purchased Property related thereto.

The foregoing conveyance does not constitute and is not intended to result in any assumption by the Purchasers of any obligation of the undersigned to the Obligors, insurers or any other Person in connection with such Receivables, the applicable Receivable Files, any insurance policies or any agreement or instrument relating to any of them.

This Second Step Receivables Assignment is made pursuant to and upon the representations, warranties and agreements on the part of the undersigned contained in the Master Purchase and Sale Agreement and is to be governed by the Master Purchase and Sale Agreement.

Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Master Purchase and Sale Agreement.

* * * * *

Sch. 5-2

IN WITNESS WHEREOF, the undersigned has caused this Second Step Receivables Assignment to be duly executed as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC

By: _____

Name:
Title:

Sch. 5-3

**Schedule 6**

<u>Accounts and Receivables Analysis</u>

Any form of Analysis approved in writing from time to time by Transferor and the Purchasers.

Sch. 6-4

**Schedule 7**

**<u>Schedule of Receivables</u>**

For each Receivables Pool, to include final information as called for in <u>Exhibit D</u>, Purchase-Bid File Tape Data Layout.

Electronic files sent to Purchasers at the following date and time:        .xls - sent        AM/PM on            , 20

Sch. 7-1

**Schedule 8**

**<u>Collection Account</u>**

Ally Bank
ABA # [wire only]
Account # [    ]
Attn.: [    ]

Ally Financial
ABA # [wire only]
Account # [    ]
Attn.: [    ]

Sch. 8-1

**Schedule 9**

**Selection Validation pursuant to <u>Section 2.1(d)</u>**

Sch. 9-1

**Schedule 10**

**Pool Stratifications and Other Pool Characteristics**

Any form of pool stratifications and other pool characteristics approved in writing from time to time by Transferor and the Purchasers.

Sch. 10-1

**EXHIBIT B**

[RESERVED]

Ex. B-1

**EXHIBIT C**

FORM OF NOTICE OF CLOSING DATE

[Letterhead of Transferor]

[INSERT DATE]

[Ally Bank/Ally Financial]

Attention: [                    ]

        Re:    Purchase Request

Dear [                ]:

        Reference is hereby made to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017 (the " Master Purchase and Sale Agreement "), by and among Carvana Auto Receivables 2016-1 LLC (the " Transferor ") and Ally Bank and Ally Financial Inc. (collectively, the " Purchasers "). Capitalized terms used herein without definition shall have the meanings set forth in the Master Purchase and Sale Agreement.

        The Seller hereby gives notice of its intent to sell a Receivables Pool during the following week which would result in a Closing Date of [INSERT DATE] for the sale of such Receivables Pool pursuant to Section 4.1 of the Master Purchase and Sale Agreement.[ 2 ]

        The proposed Cutoff Date for such Receivables is [INSERT DATE] and the Cutoff Date Aggregate Outstanding Principal Balance is approximately $[INSERT AMOUNT].

        In connection with the sale of the Receivables Pool to be made on the Closing Date, the Seller hereby certifies that the following statements are true on the date hereof, and will be true on the Closing Date:

        (a) the representations and warranties of the Seller set forth in Article V of the Master Purchase and Sale Agreement are true and correct on and as of the Closing Date as though made on and as of such date;

        (b) no Commitment Termination Event has occurred;

        (c) the Scheduled Commitment Termination Date has not occurred;

        (d) the sum of the Cutoff Date Aggregate Outstanding Principal Balance for this Closing Date and the Cutoff Date Aggregate Outstanding Principal Balance for the previous [Closing Date does/Closing Dates do] not, within the Commitment Period, exceed the Purchaser's Obligation;

---

2   To be updated with the applicable information for each transaction.

Ex. C-1

(e) the amount of the Purchaser's Obligation for the Commitment Period outstanding is $          prior to giving effect to the purchase of the Receivables Pool to be made on the Closing Date;

(f) the amount of the Purchaser's Obligation for the Commitment Period outstanding is $          after giving effect to the purchase of the Receivables Pool to be made on the Closing Date; and

(g) the conditions to closing specified in Section 6.2 of the Master Purchase and Sale Agreement have been satisfied and/or will be satisfied as of the applicable Closing Date.

The Purchasers, as applicable, shall remit to the Seller's account the Purchase Price no later than 1:00 p.m. (New York City time) in immediately available funds on the Closing Date.

Very truly yours,

CARVANA AUTO RECEIVABLES 2016-1 LLC

By _____

Authorized Signatory

Ex. C-2

**EXHIBIT D**

**PURCHASE-BID FILE TAPE DATA LAYOUT**

Any form of Layout approved in writing from time to time by Transferor and the Purchasers.

Ex. D-1

**EXHIBIT E**

**CREDIT POLICY**

The Microsoft Word files contained in the file named "Carvana-UnderwritingPolicyandProcedure.docx" that the Seller delivered to the Transferor and the Purchasers by electronic mail at 4:41 P.M. eastern time on December 13, 2016

Ex. E-1

**EXHIBIT F**

**SYSTEM DESCRIPTION**

The Microsoft Word files contained in the file named "2014-6-18 eOriginal Authoritative Copy System Description doc" that the Seller's counsel Snell & Wilmer L.L.P. delivered to the Transferor and the Purchasers' counsel Kirkland & Ellis LLP by electronic mail at 10:23 A.M. eastern time on December 21, 2016.

Ex. F-1

**APPENDIX A**

**DEFINITIONS AND USAGE**

(a) <u>Construction and Usage.</u> Unless otherwise provided in the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement or any other Basic Documents, the following rules of construction and usage are applicable to this Appendix and the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement and any other Basic Documents.

(i) As used in this Appendix or in any Basic Document and in any certificate or other document made or delivered pursuant thereto, accounting terms not defined herein, or in any such Basic Document, or in any such certificate or other document, and accounting terms partly defined herein or in any such certificate or other document, to the extent not defined herein, have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms herein, in any such Basic Document or in any such certificate or other document are inconsistent with the meanings of such terms under such generally accepted accounting principles, the definitions contained herein, in such Basic Document or in any such certificate or other document control.

(ii) The words "hereof," "herein," "hereunder" and words of similar import when used in any Basic Document refer to such Basic Document as a whole and not to any particular provision or subdivision thereof. References in any Basic Document to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such Basic Document. The term "including" means "including without limitation." The word "or" is not exclusive.

(iii) The definitions contained in any Basic Document are equally applicable to both the singular and plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(iv) Any agreement, instrument, statute or regulation defined or referred to below means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

(v) Any interest calculated over a period under any Basic Document shall be based on the actual number of days in such period and 365-day years.

(b) <u>Definitions</u>

All terms defined in this Appendix shall have the defined meanings when used in any Basic Document, unless otherwise specified or defined therein.

App. A-1

" 2-year Prime ABS Spread " means, as of any day, the "2-year Prime ABS Spread" for the most recent week set forth in the Morgan Markets Auto ABS Index; provided , that, if the Morgan Markets Auto ABS Index ceases or fails to publish the 2-year Prime ABS Spread, the 2-year Prime ABS Spread shall be the 2-year Prime ABS Spread as determined by the Purchasers from time to time in the ordinary course of their business and provided to the Transferor; and provided , further , that if the Purchasers no longer periodically determine the 2-year Prime ABS Spread in the ordinary course of their business, then the Purchasers and the Transferor will otherwise establish a methodology for determining the 2-year Prime ABS Spread in a manner mutually acceptable to the Purchasers and the Transferor.

" Accounts and Receivables Analysis " means, with respect to a Receivables Pool and a First Tier Receivables Pool, the accounts and receivables analysis set forth in Schedule 6 attached to the related Pool Supplement and Schedule 4 attached to the related First Step Pool Supplement, respectively.

" Action Plan ", with respect to a Receivables Pool, has the meaning set forth in Section 3.16(d) of the Master Servicing Agreement.

" Action Plan Meeting ", with respect to a Receivables Pool, has the meaning set forth in Section 3.16(c) of the Master Servicing Agreement.

" Administrative Purchase Payment " means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i)  above, (y) the APR of such Administrative Receivable and (z) 30/360.

" Administrative Receivable " means a Receivable which the Servicer has repurchased pursuant to Section 3.8 of the Master Servicing Agreement.

" Affiliate " means, with respect to any specified Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms " controlling " and " controlled " have meanings correlative to the foregoing.

" Aggregate Outstanding Principal Balance " means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of any date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool, as applicable.

" Ally Bank " means Ally Bank, a Utah chartered bank, and its permitted successors and assigns.

App. A-2

" <u>Ally Bank Controls Effectiveness Review</u> " means the Ally Bank process that assesses a suppliers' risk management controls in compliance with FDIC/FFIEC Third Party Vendor Management guidelines.

" <u>Ally Financial</u> " means Ally Financial Inc., a Delaware corporation, and its permitted successors and assigns.

" <u>Anti-Corruption Laws</u> " has the meaning set forth in <u>Section 3.30</u> of the Master Servicing Agreement.

" <u>Annual Percentage Rate</u> " or " <u>APR</u> " of a Receivable means the annual rate of finance charges stated in the Receivable.

" <u>Applicable Servicing Modification</u> ," with respect to a Banking Regulatory Change, shall be the modification to the Servicer's servicing standards and practices (i) approved by the Banking Regulator, if the Banking Regulator has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, (ii) if clause (i) is inapplicable, then as approved by the Purchaser, if the Purchaser has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, or (iii) otherwise, the modification proposed by the Purchaser in the related Notice of Banking Regulatory Change.

" <u>Authoritative Copy</u> " means with respect to any Electronic Contract, a copy of such Contract that is unique, identifiable and, except as otherwise provided in Section 9-105 of the UCC, unalterable, and is marked "original" or has no watermark or other marking that would indicate that it is a "copy" or "duplicate" or not an original or not an "authoritative" copy.

" <u>Available Collections</u> " means, with respect to a Receivables Pool for any date or period of determination, the sum of the following amounts with respect to such date or period:

(i)     all monies collected from whatever source on such date or during such period with respect to the Receivables within such Receivables Pool;

(ii)    all Liquidation Proceeds received with respect to a Receivable within such Receivables Pool during such period; and

(iii)   the Administrative Purchase Payments or Warranty Payments received with respect to each Receivable within such Receivables Pool that became an Administrative Receivable or Warranty Receivable on such date or during such period pursuant to <u>Section 8.2</u> of the Master Purchase and Sale Agreement or pursuant to <u>Section 3.8</u> of the Master Servicing Agreement;

<u>provided, however</u> , that in calculating the Available Collections the following will be <u>excluded</u> :

(i)     all payments and proceeds of any Receivables the Warranty Payment or Administrative Purchase Payment of which has previously been included in Available Collections for such Receivables Pool;

App. A-3

" <u>Banking Regulator</u> " means a United States federal or State regulatory agency or instrumentality having authority over U.S. national banks or state chartered banks, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Financial Institutional Examination Council and the Utah Department of Financial Institutions, or any successor federal or state agency or instrumentality.

" <u>Banking Regulatory Change</u> " will occur if (i) a Banking Regulator adopts or modifies regulations or policies which alter the obligations of U.S. national or state chartered banks in general, or Ally Bank in particular, with respect to the servicing of retail automotive loans and retail automotive installment sales contracts, (ii) such regulations apply to retail automotive installment sale contracts owned or serviced by Ally Bank, (iii) compliance by third parties servicing receivables (as servicer for Ally Bank) owned by Ally Bank is required by law and (iv) such regulations require the Servicer (as servicer for Ally Bank) to implement new servicing standards or practices, or otherwise modify the existing standards or practices, other than those set forth in the Basic Documents.

" <u>Bankruptcy Code</u> " means the United States Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended from time to time.

" <u>Basic Documents</u> " means the Master Sale Agreement (including the First Step Receivables Assignment), the Master Purchase and Sale Agreement (including the Second Step Receivables Assignment), the Master Servicing Agreement, the Pool Supplements, the First Step Pool Supplements, the Master Confidentiality and Reconstitution Agreement, the Collateral Custodian Agreement, the Letter Agreement and any other document, certificate, opinion, agreement or writing the execution of which is necessary or incidental to carrying out the transactions contemplated by this Agreement or any of the other foregoing documents.

" <u>Benefit Plan</u> " means any of (i) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (ii) a plan subject to Section 4975 of the Code or (iii) any entity whose underlying assets include plan assets by reason of investment by an employee benefit plan or plan in such entity.

" <u>Bridgecrest</u> " means Bridgecrest Credit Company, LLC, an Arizona limited liability company, and its permitted successors and assigns.

" <u>Business Continuity Plan</u> " means the document in which the Servicer plans to protect its employees, and continue its most critical business functions in situations where the facilities, people or information technology resources are interrupted for an extended period.

" <u>Business Day</u> " means any day other than a Saturday, a Sunday or any other day on which banking institutions or trust companies in New York, New York, Minneapolis, Minnesota or Detroit, Michigan may, or are required to, remain closed.

" <u>CAR 2016-1</u> " means the Transferor.

" <u>CAR 2016-1 Purchased Property</u> " has the meaning set forth in <u>Section 3.1(a)</u> of the Master Sale Agreement.

<div align="center">App. A-4</div>

" Carvana " means Carvana, LLC, an Arizona limited liability company, and its permitted successors and assigns.

" Catalyst Event " means a period of time commencing on the date when the 2-year Prime ABS Spread exceeds 0.75% and continuing until the earliest time as of which the 2-year Prime ABS Spread is equal to or less than 0.75%.

" CER " has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

" Certificate of Title " means with respect to a Financed Vehicle, (i) the original certificate of title relating thereto, or copies of correspondence to the applicable Registrar of Titles, and all enclosures thereto, for issuance of the original Certificate of Title or (ii) if the applicable Registrar of Titles issues a letter or other form of evidence of lien in lieu of a Certificate of Title (including electronic titling), either notification of an electronic recordation, by either a Title Intermediary or the applicable Registrar of Titles, or the original lien entry letter or form or copies of correspondence to such applicable Registrar of Titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, shall name the related Obligor as the owner of such Financed Vehicle and a Title Lien Nominee as secured party.

" Change in Contro l" means the (i) failure of Carvana to maintain, directly or indirectly, (A) control of the board of directors (or similar governing body) and (B) a beneficial ownership of 100% percent of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of the Transferor or (ii) failure of Persons that, as of the Closing Date, directly or indirectly maintain, (X) control of the board of directors (or similar governing body) and (Y) a beneficial ownership of more than fifty percent (50%) of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana to maintain such control or more than 50% ownership, other than as a result of (1) a registered public offering of securities of Carvana or (2) transfers of equity interests to Affiliates of such Persons or to other Persons that, individually or collectively, as of the Closing Date, owned equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana representing not less than ten percent (10%) of such equity interests or Affiliates thereof.

" Change Order " has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

" Change Request " has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

" Closing " means the initial closing that shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

" Closing Date " means, with respect to a First Tier Receivables Pool and subject to Section 3.1(e) of the Master Sale Agreement or a Receivables Pool and subject to Section 4.1(a) of the Master Purchase and Sale Agreement, the date on which the related First Step Pool Supplement or Pool Supplement is executed and delivered and the Purchase Price is paid, which generally will be the third (3rd) Business Day of the calendar week that follows receipt by the Purchasers of notification from the Transferor of its intent to complete such a sale; provided that, if there is a corresponding Funding Date under the Master Transfer Agreement (Warehouse) in the same calendar week, the Closing Date shall occur on the same day as such Funding Date.

App. A-5

" <u>CNL</u> " means, with respect to any Receivables Pool and any Distribution Date, the Cumulative Net Losses for such Receivables Pool through the last day of the related Collection Period.

" <u>Code</u> " means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

" <u>Collateral Custodian</u> " means Wells Fargo Bank, National Association.

" <u>Collateral Custodian Agreement</u> " means the Collateral Custodian Agreement, dated as of December 29, 2016, among the Purchasers, the Collateral Custodian, the Servicer, the Transferor and the Seller, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" <u>Collateral Custodian Fee</u> : The fees set forth in the Collateral Custodian Agreement as the Collateral Custodian Fees.

" <u>Collection Account</u> " has the meaning set forth in <u>Section 4.1</u> of the Master Servicing Agreement.

" <u>Collection Period</u> " means each calendar month during the term of the Master Servicing Agreement or, in the case of the initial Collection Period, the period from and including the Cutoff Date of the related Receivables to and including the last day of the month preceding the month in which the first related Distribution Date occurs. Any amount stated "as of the close of business of the last day of a Collection Period" gives effect to all applications of Collections and all remittances or distributions as of the end of the day on such last day.

" <u>Collection Policy</u> " means, with respect to (i) the initial Servicer, the customary servicing and collection guidelines, policies and procedures of the Servicer, including those as attached as <u>Exhibit D</u> to the Master Servicing Agreement, in effect on the date of the Master Servicing Agreement, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement, and as modified by the Servicing Exceptions and the Process Remediations attached to the Master Servicing Agreement as <u>Exhibit F</u> , if any, or (ii) any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement.

" <u>Collections</u> " means, with respect to a First Tier Receivables Pool or a Receivables Pool, all amounts collected by the Servicer or its agents (from whatever source) or otherwise turned over to the Collection Account on or with respect to the related Receivables or the other CAR 2016-1 Purchased Property or Purchased Property, as applicable.

App. A-6

" Commission " means the Securities and Exchange Commission.

" Commitment Amount " means the sum of (i) $375,000,000 less 62.5% of the aggregate Outstanding Principal Balance of all retail installment sales contracts which would be Eligible Contracts under the definition thereof sold by the Seller during the Commitment Period to parties other than the Transferor plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool.

" Commitment Period " means the period from the Effective Date to the earliest of (i) the Scheduled Commitment Termination Date, (ii) the occurrence of a Commitment Termination Event and (iii) the purchase by the Purchasers of Receivables Pools with a total Cutoff Date Aggregate Outstanding Principal Balance in an amount equal to the Commitment Amount.

" Commitment Termination Event " means the occurrence of a termination pursuant to Section 2.4(a) or 2.4(b) of the Master Purchase and Sale Agreement.

" Confidential Information " means all information and material of any type, scope or subject matter whatsoever relating to the Purchasers, the Transferor, the Seller, the Servicer or any of their subsidiaries, whether oral or written, and howsoever evidenced or embodied, which each Party, each Party's representatives or agents (including any officers of any Party or any of their subsidiaries) may furnish to the other, or to which either Party is afforded access by the other Party, either directly or indirectly for purposes of such Party's participation in the transactions contemplated by the Master Purchase and Sale Agreement. However, "Confidential Information" shall not include information or material of a Party which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its agents and other representatives, (ii) was available to the receiving Party on a non-confidential basis prior to its disclosure by the disclosing Party, (iii) becomes available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or the disclosing Party's representatives or agents, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information to the Purchaser, the Seller, the Servicer or the Transferor by a contractual, legal or fiduciary obligation or (iv) consists of the documents evidencing the consummation of the transactions contemplated by the Basic Documents so long as all references to the other Party and all information specific to the assets sold or price paid pursuant to the transactions are removed.

" Confidentiality Agreement " has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

" Contract " means, a fully-executed retail installment sale contract, direct purchase money loan or conditional sale contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract under which an extension of credit is made in the ordinary course of business of the Seller to such Obligor and which is secured by the related Financed Vehicle.

" Credit Policy " means the credit underwriting guidelines, policies and procedures that Carvana or its Subsidiaries utilize in originating or acquiring retail installment sales contracts, including the credit policies as attached as Exhibit E to the Master Purchase and Sale Agreement,

App. A-7

as such guidelines, policies and procedures may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 7.20(h) of the Master Purchase and Sale Agreement and Section 6.22(f) of the Master Sale Agreement.

" Cumulative Net Losses " means, with respect to a Receivables Pool as of any Distribution Date, the sum of (i) the aggregate Net Losses experienced on all Liquidating Receivables with such Receivables Pool from the first day of the related Origination Period through the end of the related Collection Period and (ii) the Outstanding Principal Balance as of the Pool Termination Date of any Receivables within such Receivables Pool outstanding on the related Pool Termination Date.

" Customer Information " has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

" Cutoff Date " means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week.

" Cutoff Date Aggregate Outstanding Principal Balance " means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of the applicable Cutoff Date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool as of the applicable Cutoff Date, as applicable.

" Defaulted Receivable " means any Receivable upon the first occurrence of any of the following: (i) all, or any part in excess of 10% of any scheduled payment (the " Default Threshold ") is one hundred and twenty-one (121) (or such shorter period as shall be specified in the Collection Policy, it being understood that such period in the Collection Policy shall not be lengthened without the prior written consent of the Purchasers) or more days delinquent on the last day of a calendar month (taking into account the application by the Servicer of payments received in any Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy); provided however , during the period beginning on the initial Closing Date and ending on December 31, 2016, the Default Threshold shall be the lesser of 50% of any scheduled payment and the lowest Default Threshold applied in accordance with the Collection Policy; provided , further , that during such period, all reporting and the calculations of Outstanding Principal Balance and similar amounts with respect to the Receivables shall be made as if the 10% standard is in place, (ii) for which the Financed Vehicle has been surrendered or repossessed and the redemption period granted the Obligor or required by applicable law has expired, or is to be repossessed but is unable to be located or is otherwise subject to being repossessed, (iii) which has been settled for less than the Outstanding Principal Balance, (iv) which has been liquidated by the Servicer through the sale of the related Financed Vehicle, (v) for which proceeds have been received which in the Servicer's judgment, constitute the final amounts recoverable in respect of such Receivable, or (vi) which has been charged-off (or should have been charged-off) in accordance with the Collection Policy.

" Delinquent Receivable " means any Receivable (other than a Defaulted Receivable) for which all or any part of a scheduled payment (the " Delinquency Threshold ") is one (1) or more days past due, taking into account the application by the Servicer of payments received in any

App. A-8

Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy. For purposes of determining delinquency, in accordance with the Collection Policy, the Servicer applies payments from Obligors in order of delinquency of outstanding scheduled payments, with payments first applied to the longest overdue and outstanding scheduled payment or portion thereof.

" Deliver " means, (x) With respect to a Tangible Contract or other document in a Receivable File other than an Electronic Contract or an electronic Certificate of Title, to deliver physical possession of such Tangible Contract or other document via reputable overnight delivery service, (y) with respect to an Electronic Contract, to direct Wells Fargo Bank, National Association, to transfer such Electronic Contract to the Forward Flow Vault Partition and (z) with respect to electronic Certificates of Title, to cause the applicable Title Intermediary to provide the Collateral Custodian with full electronic access to view such electronic Certificates of Title on the records of the Title Intermediary. The terms " Delivery " and " Delivered " shall have corollary meanings.

" Disclosure Information " has the meaning set forth in Section 3(a)(iv) of the Master Confidentiality and Reconstitution Agreement.

" Distribution Date " means, with respect to each First Tier Receivables Pool or Receivables Pool, the 15 th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day, beginning on the date specified in the applicable First Step Pool Supplement or Pool Supplement, as applicable.

" Document Receipt " means the Document Receipt substantially in the form attached as an exhibit to the Collateral Custodian Agreement executed by the Collateral Custodian and delivered to the Purchasers and the Servicer.

" DriveTime " means DriveTime Automotive Group, Inc., a Delaware corporation, and its permitted successors and assigns.

" Effective Date " means, the date upon which all of the conditions described in Section 6.1 to the Master Purchase and Sale Agreement are met.

" Electronic Contract " means a Contract that constitutes "electronic chattel paper" under and as defined in Section 9-102(31) of the UCC.

" Eligible Receivable " means, with respect to each Receivable in a First Tier Receivables Pool or a Receivables Pool, as applicable that such Receivable:

(i) Such Receivable was underwritten by the Seller in its ordinary course of business and in accordance with the Credit Policies of the Seller as approved by the Purchasers;

(ii) Such Receivable was purchased by the Transferor from the Seller in the ordinary course of business and as soon as is practicable after the file with respect to such Receivable is complete and the related Cutoff Date shall not, without the prior consent of the Purchasers, be more than [***] days after the date of origination of such Receivable;

App. A-9

provided , however, such [***] day limit shall not apply to any Receivable that was repurchased from the Purchasers as a result of a breach of the representations, warranties or covenants in the Master Sale Agreement or the Master Purchase and Sale Agreement, such breach has been cured in all respects and such Receivable is not as of the date of sale past due;

(iii) Each such sale and assignment of such Receivable was made without any fraud or misrepresentation;

(iv) With respect to each such sale and assignment of such Receivable, the Seller and the Transferor have taken all steps reasonably necessary to ensure that such sale and assignment has been perfected under the relevant UCC;

(v) With respect to such Receivable, the Seller shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Transferor a first priority perfected security interest in the CAR 2016-1 Purchased Property shall have been made and the Transferor shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected security interest in the Purchased Property shall have been made;

(vi) The terms of such Receivable (a) create a valid enforceable security interest in favor of the holder thereof, and (b) contain customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for realization against the Financed Vehicle;

(vii) With respect to such Receivable, the related Original Contract Documents are in the possession of the Custodian and the Custodian has issued a collateral receipt to the Purchasers as required under the Collateral Custodian Agreement and the related Servicer Files are in the possession of the Servicer;

(viii) (a) a Title Lien Nominee is named as the first lien holder on the Certificate of Title for the related Financed Vehicle, or if a new or replacement Certificate of Title is being or will be applied for with respect to such Financed Vehicle, documentation has been or will be submitted to obtain title thereto noting such Person as lien holder and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns and (i) if the Certificate of Title has not been received, the Collateral Custodian will have received a copy of the title application within 45 days of inclusion as part of the Purchased Property and (ii) such Certificate of Title will be received within 180 days of inclusion as part of the Purchased Property or (b) in those states that permit electronic recordation of Liens, such Person is named as the first lien holder on the Certificate of Title for the related Financed Vehicle on the electronic Lien and title system of the applicable state, or the Servicer or the Originator has submitted for electronic recordation, by either a third-party service provider or the relevant state registrar of titles, for such Person to be named as the lien

[***]   *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

App. A-10

holder on the Certificate of Title on the electronic Lien and title system of the applicable state and (i) if a confirmation has not been received, the Collateral Custodian will have received a copy of the electronic submission within 45 days of inclusion as part of the Purchased Property and (ii) a confirmation document is received within 180 days of inclusion as part of the Purchased Property and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns;

(ix) Such Receivable (including the related Contract) is currently [***] in compliance with all Requirements of Law;

(x) At the time of origination by the Seller, the related Financed Vehicle was covered by an insurance policy that covers physical loss or damage in at least the minimum amount required by the state in which the related Obligor resides, the related Obligor is required under the terms of the related Contract to maintain such insurance policy, and there are no forced-placed insurance premiums added to the Original Amount Financed;

(xi) Such Receivable arises under a Contract which, together with such Receivable (a) has been executed and delivered (or electronically authenticated) by the related Obligor, (b) is in full force and effect and constitutes the legal, valid and binding obligation of the related Obligor, (c) is evidenced by only one executed original copy (or with respect to electronic chattel paper, one Authoritative Copy) (in each case within the meaning of the UCC), (d) contains customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for the realization against the Purchased Property of the benefits of the security provided thereby, including all the rights of a secured party under the relevant UCC, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (e) does not require the Obligor under such Contract to consent to the transfer of the rights and duties of the Seller under such Contract, and (f) does not contain a confidentiality provision that purports to restrict the ability of the Purchasers, to exercise their rights under the Basic Documents, including its right to review the Contract. With respect to a Contract that is electronic chattel paper, the record or records composing the electronic chattel paper are created, stored and assigned in such a manner that (A) a single Authoritative Copy of the record or records exists which is unique, identifiable and unalterable (other than a revision that is readily identifiable as an authorized or unauthorized revision) other than with the participation of the Collateral Custodian in the case of an addition or amendment of a permitted and identifiable assignee and), (B) each copy of the Authoritative Copy and any copy of a copy is readily identifiable as a copy that is not the Authoritative Copy, and (C) the Authoritative Copy has been communicated to and is maintained by the Collateral Custodian;

(xii) The maturity date of such Receivable has not been deferred or extended, except in accordance with the Credit Policy and the Collection Policy and no other provision of the related Contract has been waived, amended or rewritten or amounts due

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

and owing thereunder deferred or waived (except waivers, amendments, rewrites, deferrals or waivers in all material respects in accordance with the Credit Policy and the Collection Policy and alterations and modifications so that such Receivable is an Eligible Receivable (other than clause [***] hereof, which must have been satisfied at the time of origination)) and such Receivable is enforceable after giving effect thereto;

(xiii) Such Receivable (a) is not subject to any dispute, offset, counterclaim or defense whatsoever (except the discharge in bankruptcy of such Obligor), and (b) with respect thereto (i) there is no material breach, default, violation or event of acceleration existing under the related Contract, and there is no event which, with the passage of time, or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and (ii) to the best of the its knowledge, no right of rescission, setoff, counterclaim or defense shall have been asserted or threatened;

(xiv) Such Receivable is assignable without notice to or the consent of the related Obligor;

(xv) The Obligor of such Receivable is not a government or government agency, and such Obligor is not an individual that was included on OFAC's List of Specially Designated Nationals at the time of origination;

(xvi) Such Receivable is denominated and payable only in Dollars by an Obligor with a billing address in any State or territory of the United States or United States military installation;

(xvii) Such Receivable is not, as of the Closing Date for the related Receivables Pool, (a) a Delinquent Receivable, (b) a Defaulted Receivable or (c) a Liquidating Receivable;

(xviii) Each Receivable constitutes any of "chattel paper," "an account," an "instrument" or a "general intangible" as defined in the UCC;

(xix) The Transferor has good and marketable title to such Receivable free and clear of all liens (other than Permitted Liens) and such Receivable, together with the Contract related thereto, has not been satisfied, subordinated or rescinded, nor shall any Financed Vehicle or other related security have been released from the security interest granted under the related Contract in whole or in part;

(xx) The Transferor has acquired a valid and perfected first priority security interest in such Receivable and, upon the sale by the Transferor to the Purchasers pursuant to the Master Purchase and Sale Agreement, the Purchasers have acquired a valid and perfected first priority security interest in such Receivable;

(xxi) The Contract related to such Receivable is a Simple Interest Receivable, and scheduled payments under each Receivable have been applied in accordance with the method for allocating principal and interest set forth in such Receivable;

[***] *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

App. A-12

(xxii) The first scheduled payment in respect of such Receivable is no more than [***] days from the related contract date;

(xxiii) If such Receivable is a Receivable newly originated by the Seller, at the time of sale of such Receivable, the first scheduled payment was not past due; provided , that no funds have been advanced by the Transferor or the Seller, or anyone acting on behalf of any of them in order to cause such Receivable to comply with this clause (xxiii) ;

(xxiv) The Financed Vehicle related to such Receivable (a) was purchased with the proceeds of such Receivable, (b) has all accessories and optional equipment described in the Contract, (c) is not at the time of origination designated for racing or modified for use as a public livery vehicle or any other commercial use, (d) has a history verified by Carvana through an Autocheck report (which may be an aggregate report in a data tape format) reflecting no disclosed accidents, no title issues or odometer discrepancies with respect to each Financed Vehicle;

(xxv) Such Receivable shall have been originated in the United States of America to an Obligor domiciled in the United States for the retail sale of a Financed Vehicle by the Seller who, at the time of origination, had all material licenses, permits and consents necessary to originate Receivables in the jurisdiction in which such Contract was originated;

(xxvi) Such Receivable shall not have been originated in, or be subject to the laws of, any jurisdiction under which the transfer of such Receivable under the transaction documents shall be unlawful, void or voidable;

(xxvii) With respect to such Receivable, none of the Seller or the Transferor is required to perform any additional service for, or perform or incur any additional obligation to, the related Obligor in order to enforce the related Contract;

(xxviii) With respect to such Receivable there exists a Receivable File that contains, without limitation, each of the items described in the definition of "Receivable File", including the applicable Original Contract Documents, and the Servicer File and Original Contract Documents are in the possession of the Servicer and the Custodian, respectively, and, with respect to each document contained therein, each form has been correctly prepared in all material respects;

(xxix) The information relating to the Receivables set forth in the related Schedule of Receivables is true and correct;

(xxx) The Financed Vehicle related to such Receivable is not of a model year older than 10 years as of the date of origination;

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

App. A-13

(xxxi) The Financed Vehicle related to such Receivable does not, as of the date of origination of the related Contract, have mileage in excess of 100,000 miles;

(xxxii) The original term of such Receivable is not more than seventy-two (72) months;

(xxxiii) The Loan-to-Value at origination did not exceed [***]%; provided , however , that notwithstanding the foregoing, up to 50 Receivables transferred to the Purchasers or pledged under the Receivables Warehouse Facility, in the aggregate, in any calendar year will be exempt from the eligibility criteria specified in this clause (xxxiii)  for so long as such Receivables are held by the Purchasers and pledged to the Borrower;

(xxxiv) The Obligor has a FICO score of not less than 590 which, except for a Receivable included in the initial Receivables Pool on the initial Closing Date, shall not, without the consent of the Purchasers, has been obtained by Carvana within thirty (30) days prior to the origination of the related Receivable;

(xxxv) Contract provides for level payments, except for the last payment, which is less than or equal to the amount of the preceding level payments, that fully amortized the financed amount and requires that any prepayment must fully pay the Original Amount Financed plus accrued interest to date;

(xxxvi) Obligor is a natural person, is not an Affiliate of Carvana, is the end user of the Financed Vehicle and the Financed Vehicle is intended for personal, family or household use;

(xxxvii) The Contract does not permit the Obligor to reduce or delay payment or return the Financed Vehicle in lieu or cancellation of payment or to substitute, exchange or add a vehicle as CAR 2016-1 Purchased Property or Purchased Property, respectively; and

(xxxviii) Has a governing law provision approved by the Purchasers for use in the jurisdiction where the Obligor (but not any of the Obligor's agents) took delivery of the vehicle.

" Eligible Receivables Pool " is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

" ERISA " means The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

" E-Vault Provider " means eOriginal, Inc.

" Event of Servicing Termination " means an event specified in Section 6.1 of the Master Servicing Agreement.

[***]   *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

"Exchange Act" means The Securities Exchange Act of 1934.

"FDIC/FFIEC Third Party Vendor Management" means the guidance to address the management by a regulated entity of third and fourth party suppliers issued by the Federal Deposit Insurance Corporation, the Federal Financial Institutions Examination Council or any other regulatory entity that covers a business in which Ally Bank or an Ally Bank Affiliate currently operates or may look to operate in the future.

"FICO Score" means, as of any date of determination, the credit score for the applicable Obligor using the Fair, Isaac & Co. FICO Auto Version 3.0 methodology, as provided to Carvana or the Servicer by Experian or such other version as approved by the Purchasers, which, except for Receivables included in the initial Receivables Pool on the initial Closing Date, shall not, without the consent of the Purchasers, be obtained more than thirty (30) days prior to the applicable origination date.

"Financed Vehicle" means a used automobile or light truck, together with all accessories thereto, securing an Obligor's indebtedness under a Receivable.

"First Step Pool Supplement" means the First Step Pool Supplement, in the form of Exhibit A to the Master Sale Agreement, executed by CAR 2016-1 and the Seller on each Closing Date.

"First Step Receivables Assignment" means the document of assignment attached as Schedule 3 to the First Step Pool Supplement.

"First Step Receivables Purchase Price" means, with respect to a First Tier Receivables Pool, an amount equal to the related Closing Date Purchase Price.

"First Tier Receivables Pool" has the meaning set forth in the recitals to the Master Sale Agreement.

"Forward Flow Vault Partition" means the segregated vault partition of the E-Vault System established in the name of the Purchasers.

"Freestyle Selection" means the random order that the Receivables are to be selected in the System of Record, after consideration of the Purchase Percentage, Eligible Receivable criteria and Eligible Receivables Pool criteria. The Receivables to be sold to the Transferor will be based on the contract number of the Receivables. The Seller shall sell to the Transferor all Receivables where the ninth and tenth digits of the contract number (such number, the "randomization code") are a number from 01 through the number equal to the Purchase Percentage (it being understood that a Purchase Percentage of 100 would have a randomization code of 00) or, with respect to any Previously Originated Receivable that later becomes an Eligible Receivable, such Previously Originated Receivable shall be included in such Eligible Receivables Pool if its randomization code falls within the Purchase Percentage for its related Origination Period. For example, if the Purchase Percentage for an Origination Period is 85%, the Seller would sell Receivables with contract numbers ending in 01 through 85, and retain Receivables with contract numbers ending in 86 through 00. The Seller shall ensure that contract numbers are assigned randomly as they are entered into the System of Record and in no way adverse to the Purchasers.

" <u>GAP Letter</u> " has the meaning set forth in <u>Section 3.13</u> of the Master Servicing Agreement.

" <u>GLBA</u> " means the Gramm-Leach-Bliley Act and its implementing regulations.

" <u>GLBA Privacy Requirements</u> " has the meaning set forth in <u>Section 2(b)</u> of the Master Confidentiality and Reconstitution Agreement.

" <u>General Change</u> " has the meaning set forth in <u>Section 3.18(d)</u> of the Master Servicing Agreement.

" <u>Governmental Authority</u> " means any government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the applicable Person.

" <u>Governmental Rules</u> " means any and all laws, statutes, codes, rules, regulations, ordinances, orders, writs, decrees and injunctions, of any Governmental Authority and any and all legally binding conditions, standards, prohibitions, requirements and judgments of any Governmental Authority.

" <u>Indemnified Parties</u> " has the meaning set forth in <u>Section 7.14</u> of the Master Purchase and Sale Agreement.

" <u>Individual Pre-closing Interest Carry Amount</u> " means, with respect to a Receivable in a Receivables Pool therein and as of the related Closing Date, an amount equal to (i) the Outstanding Principal Balance of such Receivable as of the Cutoff Date, <u>multiplied by</u> (ii) the Pricing Model all-in cost of funds of the Purchasers, for the related FICO band related to such Receivable, <u>multiplied by</u> (iii) (A) with respect to a Receivable for which the last scheduled payment for such Receivable was on or prior to the Cutoff Date, the number of days from the day following such last scheduled payment date through (and including) the related Closing Date for such Receivable and (B) with respect to a Receivable for which the first scheduled payment date for such Receivable does not occur on or prior to the Cutoff Date, the number of days from the day following the date of origination of such Receivable through (and including) the related Closing Date for such Receivable, <u>divided by</u> (iv) 365.

" <u>Information Security Program</u> " has the meaning set forth in <u>Section 3.17(b)</u> of the Master Servicing Agreement.

" <u>Information Recipient</u> " has the meaning set forth in <u>Section 3.28</u> of the Master Servicing Agreement.

" <u>Insolvency Event</u> " means with respect to a specified Person, such Person shall (A) file a petition or commence a proceeding (1) to take advantage of any Insolvency Law or (2) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to

App. A-16

such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, (B) consent or fail to object to any such petition filed or proceeding commenced against or with respect to it or all or substantially all of its property, or any such involuntary petition or proceeding shall not have been dismissed or stayed within sixty (60) days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or proceeding, (C) admit in writing its inability to pay its debts generally as they become due, (D) make an assignment for the benefit of its creditors, (E) voluntarily suspend payment of its obligations or (F) take any action in furtherance of any of the foregoing

" Insolvency Laws " means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

" Insolvency Proceeding " means with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

" Inspection Standard " has the meaning set forth in Section 3.18(a) of the Master Servicing Agreement.

" Letter Agreement " means the amended and restated letter agreement, dated as of March 6, 2017, among the Purchasers, the Seller, the Transferor and the Servicer, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Lien " means any security interest, lien, charge, pledge, equity, or encumbrance of any kind.

" Liquidating Receivable " means a Receivable as to which the Servicer (i) has reasonably determined, in accordance with its customary servicing procedures, that eventual payment of amounts owing on such Receivable is unlikely, or (ii) has repossessed and disposed of the Financed Vehicle.

" Liquidation Expenses " means, with respect to a Liquidating Receivable, the actual reasonable out-of-pocket costs of liquidation not to exceed $550 (or such greater amount as the Servicer determines is reasonably necessary in accordance with its customary procedures to refurbish and dispose of a liquidated Financed Vehicle.

" Liquidation Proceeds " means, with respect to a Liquidating Receivable, all amounts realized with respect to such Receivable net of Liquidation Expenses and any amounts that are required to be refunded to the Obligor on such Receivable, but in any event not less than zero.

" Loan-to-Value Ratio " means, with respect to any Receivable, the ratio (expressed as a percentage) of (x) the original Principal Balance of such Receivable on the date such Receivable was originated by the Seller, to (y) the lesser of (1) the Transferor's reported book value based on Carvana's total capitalized cost or (2) the customer's purchase price for the automobile

financed pursuant to the related Contract, as specified in such Contract. Notwithstanding the foregoing, it is understood that, for determinations by the Purchasers under the Pricing Model, Loan-to-Value Ratio will be calculated as the ratio (expressed as a percentage) of the Original Amount Financed for such Receivable and the good wholesale value of the Financed Vehicle as determined by Kelly Blue Book as of the date of origination of the related Receivable or, if such value is not available, the clean trade-in value as determined by National Appraisal Guides, Inc. in the most recent NADA guide or such other source as shall be approved in writing by the Purchasers.

" Master Confidentiality and Reconstitution Agreement " means the Master Confidentiality and Reconstitution Agreement, dated as of December 29, 2016, by and among Carvana, Bridgecrest, the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Master Purchase and Sale Agreement " means the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, by and among the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Master Sale Agreement " means the Amended and Restated Master Sale Agreement (Flow), dated as of March 6, 2017, by and among the Seller and CAR 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Master Sale Agreement (Warehouse) " means the Amended and Restated Master Sale Agreement (Warehouse), dated as of March 6, 2017, by and among Carvana and CAR 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Master Servicing Agreement " means the Master Servicing Agreement (Flow), dated as of December 29, 2016, by and among Carvana, Bridgecrest and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Master Transfer Agreement (Warehouse) " means the Amended and Restated Master Transfer Agreement, dated as of March 6, 2017, by and among CAR 2016-1 and Sonoran Auto Receivables Trust 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" Material Adverse Effect " means, with respect to any Person and to any event or circumstance, a material adverse effect on (i) the business, financial condition, operations, performance or properties of such Person, (ii) the validity or enforceability of the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document or the validity, enforceability or collectability of (a) a material portion of the Receivables purchased by the Purchasers, or (b) a material portion of the collections of such Receivables or the security interests in the Financed Vehicles, (iii) the rights and remedies of either Purchaser, (iv) the ability of such Person to perform its obligations under the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document to which it is a party or (v) the status, existence, perfection, priority or enforceability of either Purchaser interest in any Purchased Property.

App. A-18

" <u>Monthly Data File</u> " has the meaning set forth in <u>Section 4.3</u> of the Master Servicing Agreement.

" <u>Monthly Servicer Report</u> " has the meaning set forth in <u>Section 4.3</u> of the Master Servicing Agreement.

" <u>NAALR</u> " means the net average annualized loss rate for the related FICO band or Eligible Receivables Pool, as applicable, as determined by the Purchasers in accordance with their customary policies and procedures, without specific deviation for the Seller or Transferor other than deviation with respect to performance of the Receivables resulting from the application of such customary policies and procedures applied consistently.

" <u>Net Loss</u> " means, with respect to a Receivables Pool, (i) as of any Distribution Date, for each Liquidating Receivable in such Receivables Pool, the Outstanding Principal Balance of such Liquidating Receivable when it became a Liquidating Receivable minus all Liquidation Proceeds received with respect to such Liquidating Receivable on or before the last day of the related Collection Period and (ii) as of the related Pool Termination Date, and with respect to each Receivable then outstanding within such Receivables Pool, the Outstanding Principal Balance of such Receivable as of the last day of the related Collection Period.

" <u>Non-Excluded Taxes</u> " has the meaning set forth in <u>Section 2.5(c)</u> of the Master Purchase and Sale Agreement.

" <u>Notice of Banking Regulatory Change</u> " has the meaning set forth in <u>Section 3.18(a)</u> of the Master Servicing Agreement.

" <u>Notified Total Costs</u> " has the meaning set forth in <u>Section 3.18(b)</u> of the Master Servicing Agreement.

" <u>NPPI</u> " means "non-public personal information" as defined in 16 C.F.R. § 314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms are defined by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. § 6801 et seq.), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. NPPI also includes any information Ally Financial or Ally Bank (including any of their Affiliates) may directly or indirectly disclose to the Servicer or any Servicer agent or which the Servicer or any Servicer agent may collect or otherwise have access to due to the Servicer or the Servicer agents' relationship with Ally Financial, Ally Bank or any of their Affiliates that relates to an individual. This includes, but is not limited to, financial information; medical or health related information; credit history; income; financial benefits; application, loan or claim information; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Ally Financial, Ally Bank or any of their Affiliates; and the identification of an individual as an Ally Financial or Ally Bank customer or as an individual Ally Financial or Ally Bank claimant.

" <u>Obligor</u> " means the purchaser or co-purchasers of the Financed Vehicle or any other Person who owes payments under a Receivable.

App. A-19

" OFAC " means the U.S. Department of the Treasury's Office of Foreign Assets Control.

" Officer's Certificate " means with respect to any Person, a certificate signed by a Responsible Officer of such Person.

" OFSS " has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

" Operations Diligence " has the meaning set forth in Section 3.15(b) of the Master Servicing Agreement.

" Opinion of Counsel " means a written opinion of counsel, which counsel may be internal or external counsel to a Party, reasonably acceptable to the Party receiving such opinion.

" Original Amount Financed " means, with respect to a Receivable and as of the date on which such Receivable was originated, the aggregate amount advanced under the Receivable toward the purchase price of the Financed Vehicle, including accessories, vehicle delivery fees, insurance premiums, service and warranty contracts and other items customarily financed as part of automobile and light truck retail installment sale contracts or direct purchase money loans and related costs.

" Original Contract Documents " means, with respect to each Receivable, (i) the original Contract and (ii) the Certificate of Title or evidence that such Certificate of Title has been applied for. For the avoidance of doubt, an Authoritative Copy of an electronic document shall constitute an original.

" Original Execution Date " means December 22, 2016.

" Origination Period " means, each calendar week during the period beginning with the week of December 12, 2016 and ending with the week containing the last day of the Commitment Period; provided , that, with respect to the initial First Tier Receivables Pool and Receivables Pool, respectively, the "Origination Period" shall be the period consented to by the Purchasers.

" Other Information " has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

" Outstanding Principal Balance " means, with respect to a Receivable and as of any date, the Original Amount Financed, less:

(i) payments received from or on behalf of the related Obligor prior to such date allocable to principal;

(ii) any refunded portion of extended warranty protection plan costs, physical damage, credit life or disability, warranties, debt cancellation and other insurance premiums included in the Original Amount Financed and allocable to principal;

(iii) any Administrative Purchase Payment or Warranty Payment to the extent allocable to principal; and

(iv) any Liquidation Proceeds previously received on or prior to the last day of the related Collection Period allocable to principal with respect to such Receivable.

<div align="center">App. A-20</div>

" <u>Outward Facing Supplier Standards</u> " means Ally Bank's "Outward Facing Supplier Standards" as provided by Ally Bank to the Servicer.

" <u>Party</u> " means, with respect to each Basic Document, each Person that is a party to such Basic Document, and its permitted successors and assigns.

" <u>Patriot Act</u> " has the meaning set forth in <u>Section 2(f)</u> of the Master Confidentiality and Reconstitution Agreement.

" <u>Performance Guarantor</u> " means, DriveTime and its successors and permitted assigns under the Master Servicing Agreement.

" <u>Permitted Disclosures</u> " has the meaning set forth in <u>Section 2(c)</u> of the Master Confidentiality and Reconstitution Agreement.

" <u>Permitted Liens</u> " any of (a) Liens created pursuant to any Basic Document or (b) with respect to any Financed Vehicle, the Lien noted on the Certificate of Title related to the Financed Vehicle in favor of a Title Lien Nominee.

" <u>Person</u> " means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

" <u>Pool Balance</u> " means, with respect to a First Tier Receivables Pool or a Receivables Pool, as applicable, as of the close of business of the last day of a Collection Period, the Aggregate Outstanding Principal Balance of the Receivables in such First Tier Receivables Pool or Receivables Pool (excluding Administrative Receivables and Warranty Receivables and Liquidating Receivables as of such date).

" <u>Pool Supplement</u> " means the Pool Supplement, in the form of <u>Exhibit A</u> to the Master Purchase and Sale Agreement executed by the Seller and the Purchaser on each Closing Date.

" <u>Pool Termination Date</u> " means, with respect to each Receivables Pool, the date that occurs on the last day of the sixth (6 th ) month after the maturity date of the Receivable within such Receivables Pool with the longest original term to maturity as of the Cutoff Date for such Receivables Pool.

" <u>Pre-closing Interest Carry Amount</u> " means, with respect to a Receivables Pool and as of the related Closing Date, an amount equal to the sum of the Individual Pre-closing Interest Carry Amounts for each of the Receivables in such Receivables Pool.

" <u>Previously Originated Receivable</u> " means, for any Closing Date and the related Eligible Receivables Pool, an Eligible Receivable originated in a prior Origination Period that met the eligibility criteria to be included in an Eligible Receivables Pool that could have been sold to the Purchasers pursuant to the Master Purchase and Sale Agreement on a prior Closing Date but for

App. A-21

(i) the Seller not having completed ministerial administrative procedures for such Receivable (such as validating receipt of the down payment) or (ii) the failure to satisfy the representations and warranties regarding the information provided for such Receivable on the related Schedule of Receivables in Section 5.2(cc)(iii) of the Master Purchase and Sale Agreement and clause (xxiv) of the definition of "Eligible Receivable" and such Receivables was removed or repurchased from a prior First Tier Receivables Pool or Receivables Pool, as applicable, solely as a result of such failure (and not for any other reason); provided, that no such Receivable shall have been originated earlier than the [***] day prior to the related Cutoff Date.

" Pricing Date " shall mean, with respect to any Receivables Pool, the date on which the Purchase Price is agreed, which date shall be no more than two (2) Business Days prior to such Closing Date.

" Pricing Model " has the meaning set forth in Section 2.3 of the Master Purchase and Sale Agreement.

" Pricing Model Amendments " has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

" Pricing Model Change Notice " has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

" Pricing Termination Notice " has the meaning set forth in Section 2.3(b) of the Master Purchase and Sale Agreement

" Program " has the meaning set forth in Section 3.27 of the Master Servicing Agreement.

" Protective Measures " means the steps specified in Section 2(d) of the Master Confidentiality and Reconstitution Agreement.

" Public Securitization " means a public offering registered with the Commission or a private offering under Rule 144A of the Securities Act of asset backed securities backed by United States automotive retail installment sale contracts originated or acquired by Carvana or its Affiliates and sponsored by Carvana or any U.S. special purpose subsidiary thereof engaged in such offerings.

" Purchase Percentage " for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In the event that the Purchase Percentage is less than 100% in a Origination Period, the Commitment Amount shall be reduced by 62.5% of the amount that the Purchase Percentage has

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

been reduced by with respect to the dollar value of the receivables that will not be sold to the Transferor for such Origination Period, <u>provided</u>, <u>however</u>, that in no event shall the Purchase Percentage be less than 51% and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply; provided, further, however, in addition, for each Origination Period the Purchase Percentage under the Master Sale Agreement and the Master Purchase and Sale Agreement must be equal or greater than the purchase percentage for the corresponding origination period in the Master Sale Agreement (Warehouse).

" <u>Purchase Price</u> " means the price applicable to the Purchased Receivables purchased in any Receivables Pool, which shall be equal to the sum of (i) the price for such Receivables Pool designated by the Pricing Model (for the avoidance of doubt, the Pricing Model will, for each Purchased Receivable in such Receivables Pool, (A) increase the related purchase price for any interest scheduled to accrue (ignoring any non-scheduled payment that may be received by the Seller) for the period from the date of origination (or, if such Purchased Receivable has at least one scheduled monthly payment occurring prior to the related Cutoff Date, from such most recent scheduled monthly payment date) through the related Closing Date and (B) decrease the related purchase price for the portion of any non-scheduled payment received by the Seller prior to the related Cutoff Date allocated to accrued interest) <u>plus</u> (ii) the Pre-closing Interest Carry Amount for such Receivables Pool as of the Closing Date.

" <u>Purchased Property</u> " has the meaning set forth in <u>Section 3.1(a)</u> of the Master Purchase and Sale Agreement.

" <u>Purchased Receivables</u> " means, as applicable, all Receivables purchased by CAR 2016-1 in any First Tier Receivables Pool pursuant to the Master Sale Agreement and all Receivables purchased by the Purchaser in any Receivables Pool pursuant to the Master Purchase and Sale Agreement.

" <u>Purchasers</u> " means either Ally Bank or Ally Financial, and its permitted successors and assigns, if the reference to "Purchaser" relates to Receivables purchased by a specified Purchaser, or both Ally Bank and Ally Financial, and their permitted successors and assigns, if the reference to "Purchaser" or "Purchasers" relates to the Receivables or the Receivables Pools as a whole, as the context may require.

" <u>Purchaser Estimated Cumulative Net Losses</u> " means, with respect to a Receivables Pool and any Distribution Date, the Cumulative Net Losses estimated as of the related Closing Date that the Receivables within such Receivables Pool will incur as of the end of the related Collection Period, as set forth on <u>Schedule 3</u> in the applicable Pool Supplement.

" <u>Purchaser Inspection Parties</u> " has the meaning set forth in <u>Section 3.19(a)</u> of the Master Servicing Agreement.

" <u>Purchaser Obligation</u> " has the meaning set forth in <u>Section 2.1(b)</u> of the Master Purchase and Sale Agreement.

App. A-23

" Purchaser Termination Option " has the meaning set forth in Section 2.4(b) of the Master Purchase and Sale Agreement.

" Quarterly Operations Review " has the meaning set forth in Section 3.15(a) of the Master Servicing Agreement.

" Quarterly Review Event " has the meaning set forth in Section 3.15(c) of the Master Servicing Agreement.

" Quarterly Selection Standards Meeting " has the meaning set forth in Section 7.11(a) of the Master Purchase and Sale Agreement.

" Receivable " means a Contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract that is included in the Schedule of Receivables attached as Schedule 7 to each Pool Supplement. The term "Receivable" does not include any Repurchased Receivable.

" Receivable Files " means, with respect to each Receivable and the related Contract, collectively, the Original Contract Documents and the Servicer Files.

" Receivable Structure Constraints " is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

" Receivables Pool " shall have the meaning given to such term in Section 4.1 of the Master Purchase and Sale Agreement.

" Receivables Pool CNL Ratio " means, for any Distribution Date, the ratio of (i) net losses with respect to the Receivables included in a Receivables Pool during the related Collection Period to (ii) the difference between the beginning balance of the Outstanding Principal Balance for such Collection Period and the ending balance of the Outstanding Principal Balance for such Collection Period, in each case with respect to the Receivables included in such Receivables Pool.

" Receivables Pool CNL Ratio Comparison " means, with respect to a Receivables Pool on any Distribution Date, (x) the Receivables Pool CNL Ratio for such Receivables Pool reported on any Distribution Date for the related Collection Period, divided by (y) the Carvana entire portfolio cumulative net loss ratio for the same Collection Period.

" Receivables Pool Schedule " has the meaning set forth in Section 4.1(a) of the Master Purchase and Sale Agreement.

" Receivables Purchase Rate " means, with respect to Receivables, the percentage equivalent of a fraction, the numerator of which is the Purchase Price for such Receivable, and the denominator of which is the Cutoff Date Aggregate Outstanding Principal Balance of such Receivables.

"<u>Receivables System</u>" means the principal computer system of the Servicer used in the servicing of retail installment sales contracts and direct purchase money loans, including back-up archives.

"<u>Receivables Warehouse Facility</u>" means the Loan and Security Agreement, dated as of December 22, 2016, by and among Sonoran Auto Receivables Trust 2016-1, the Transferor, Carvana and Ally Bank, as the same may be amended, restated, supplemented or otherwise modified from time to time,

"<u>Reconstitution</u>" means a direct or indirect encumbrance, risk transfer or disposition of the Purchased Property, or any part thereof, by the Purchaser in the form of a whole loan sale transaction, a securitization transaction funded by securities sold to the public and/or private capital markets or by an asset backed commercial paper conduit, a synthetic transaction where all or a portion of the risk of loss on a reference pool of Receivables is transferred to an investor or counterparty, or any combination of the foregoing; <u>provided</u>, <u>however</u>, that the Purchaser shall not engage in more than three Reconstitutions with respect to the Receivables included in a Receivables Pool sold to the Purchaser under the Master Purchase and Sale Agreement on any Closing Date.

"<u>Reconstitution Assets</u>" has the meaning set forth in <u>Section 3(a)(iii)</u> of the Master Confidentiality and Reconstitution Agreement.

"<u>Reconstitution Assets Servicing Agreement</u>" has the meaning set forth in <u>Section 3(c)</u> of the Master Confidentiality and Reconstitution Agreement.

"<u>Registrar of Titles</u>" means with respect to any State, the governmental agency or body responsible for the registration of, and the issuance of certificates of title relating to, motor vehicles and liens thereon.

"<u>Regulation AB</u>" Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)), in the adopting release (Asset-Backed Securities Disclosure and Registration, Securities Act Release 33-9638, 79 Fed. Reg. 57,184 (September 24, 2014)) and in any adopting release in respect of any amendment with respect to any of the foregoing or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"<u>Regulator Inspection Parties</u>" has the meaning set forth in <u>Section 3.19(a)</u> of the Master Servicing Agreement.

"<u>Re-Liening Expenses</u>" means, any costs associated with the revision of the Certificates of Title pursuant to <u>Section 2.7</u> of the Master Sale and Purchase Agreement.

"<u>Re-Liening Trigger Event</u>" has the meaning agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

<div align="center">App. A-25</div>

" <u>Relationship Manager</u> " has the meaning set forth in <u>Section 3.26</u> of the Master Servicing Agreement.

" <u>Remediation</u> " has the meaning set forth in <u>Section 5.1(r)</u> of the Master Servicing Agreement.

" <u>Report of Assessment of Compliance with Servicing Criteria</u> " has the meaning set forth in <u>Section 3.12</u> of the Master Servicing Agreement.

" <u>Reporting Date</u> " means the 10 th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day.

" <u>Repurchased Receivable</u> " means any repurchased Administrative Receivable or repurchased Warranty Receivable.

" <u>Requirements of Law</u> " means all (a) requirements of applicable federal, state and local laws, and regulations thereunder and (b) orders, decrees, directives, rules and binding guidelines of, or agreements, with any Governmental Authority that are directed to or binding on such Person or such Person's business, operations, services (including, with respect to the Servicer, the Servicer's obligation to service the Purchased Property on behalf of the Purchasers pursuant to the Master Servicing Agreement) or assets, including, in each case, usury laws, Utah banking laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Consumer Financial Protection Bureau's Regulations "B" and "Z," the Servicemembers Civil Relief Act of 2003, the Texas Consumer Credit Code, the United States Foreign Corrupt Practices Act of 1977, the Patriot Act and state adaptations of the National Consumer Act and the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity and disclosure laws; <u>provided</u> , that, in each case with respect to <u>clauses (a)</u> and <u>(b)</u> above, with respect to the Servicer's obligations described in the Master Servicing Agreement, "Requirements of Law" shall not include any items described in <u>clauses (a)</u> or <u>(b)</u> above that are directed to or binding on Ally Financial or Ally Bank solely as a result of such Peron's status as a bank holding company or Utah charted bank, respectively, unless otherwise specified on <u>Exhibit E</u> to the Master Servicing Agreement. Following the date of the Master Servicing Agreement Date during the term of the Master Servicing Agreement, should the Servicer offer or enter into any subsequent agreement with another Person to service assets on behalf of such Person in compliance with, or provide indemnity for breach of, Requirements of Law applicable to Ally Financial or Ally Bank that are excluded from this definition as a result of the preceding proviso, then this definition shall be deemed to be modified to include such broader provision without any further action of the Parties.

" <u>Responsible Officer</u> " means, when used with respect to any Person, any officer of such Person, including any president, vice president, assistant vice president, secretary, assistant secretary or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject.

<p style="text-align:center">App. A-26</p>

" <u>Rule 193 Receivables</u> " has the meaning set forth in <u>Section 3(a)(iv)</u> of the Master Confidentiality and Reconstitution Agreement.

" <u>Schedule of Receivables</u> " means, the list identifying the Receivables attached as <u>Schedule 7</u> to each Pool Supplement (which list may be in the form of electronic file, microfiche, disk or other means acceptable to the Purchaser, or pursuant to the Master Sale Agreement).

" <u>Scheduled Commitment Termination Date</u> " means the date that is the 364 day anniversary of the date of the Master Purchase and Sale Agreement.

" <u>SEC Reporting Date</u> " has the meaning set forth in <u>Section 3.18(b)</u> of the Master Servicing Agreement.

" <u>Second Step Receivables Assignment</u> " means the document of assignment attached as <u>Schedule 5</u> to each Pool Supplement.

" <u>Second Step Receivables Purchase Price</u> " has the meaning set forth in <u>Section 3.1(b)</u> of the Master Purchase and Sale Agreement.

" <u>Securities Act</u> " means the Securities Act of 1933.

" <u>Selection Procedures</u> " means, the process for selecting Eligible Receivables for inclusion in any First Tier Receivables Pool and Receivables Pool pursuant to <u>Section 3.1(d)</u> of the Master Sale Agreement and <u>Section 2.1(d)</u> of the Master Purchase and Sale Agreement, respectively, whereby such First Tier Receivables Pool and Receivables Pool is selected by the Seller and Transferor utilizing the System of Record under a Freestyle Selection. Such selection shall be made subject to the Eligible Receivable criteria and Eligible Receivables Pool criteria and the sequential contract number assignment described in <u>Section 2.1(d)</u> of the Master Sale Agreement and <u>Section 3.1(d)</u> of the Master Purchase and Sale Agreement.

" <u>Seller</u> " means Carvana, as the seller of the CAR 2016-1 Purchased Property under the Master Sale Agreement, and its permitted successors and assigns.

" <u>Seller Indemnified Parties</u> " has the meaning set forth in <u>Section 6.11(a)</u> of the Master Sale Agreement.

" <u>Servicer</u> " means Bridgecrest as the servicer of the Receivables, or any permitted successor or assignee thereto under the Master Servicing Agreement.

" <u>Servicer Coverage</u> " has the meaning set forth in <u>Section 3.22</u> of the Master Servicing Agreement.

" <u>Servicer Files</u> " means the documents specified in <u>Section 2.1</u> of the Master Servicing Agreement.

" <u>Servicer Indemnified Parties</u> " has the meaning set forth in <u>Section 5.2(a)</u> of the Master Servicing Agreement.

App. A-27

" Servicer Review Trigger Event " has the meaning set forth in Section 3.15 of the Master Servicing Agreement.

" Servicer Termination Threshold Event " means, with respect to the sold Receivables Pools, on any Distribution Date, the aggregate CNL for such Receivables Pools shall be equal to [***] or greater of the aggregate Purchaser Estimated Cumulative Net Losses for such Receivables Pools on such Distribution Date.

" Servicing Criteria " means "Servicing Criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

" Servicing Exception " means any exceptions or supplements to the Collections Policy specified on Exhibit E to the Servicing Agreement (including any requirement of federal, state or local law, or any regulation or any order, decree, directive, rule and binding guideline of, or agreement, with any Governmental Authority applicable to either Purchaser solely as a result of such Purchaser's status as a bank holding company or Utah charted bank, as applicable, that the Purchasers determine requires revisions to the existing Collections Policy), as may be amended or supplemented from time to time by the Purchasers.

" Servicing Fee " means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Servicer for services rendered during the related Collection Period, which will be equal to one-twelfth of the Servicing Fee Rate multiplied by the Pool Balance of such Receivables Pool as of the first day of such Collection Period; provided that in connection with any initial Collection Period that includes days falling in more than one calendar month, the Servicing Fee shall be calculated for such initial Collection Period giving effect to the reduction of the Pool Balance of such Receivables Pool as of the first day of each such calendar month following the related Cutoff Date during such initial Collection Period.

" Servicing Fee Rate " is as agreed upon by the Parties to the Master Servicing Agreement.

" Settlement Date " means with respect to each Origination Period in which Transferor has submitted notification of its intent to complete a sale, the third (3 rd ) Business Day of the second calendar week that follows such Origination Period.

" Settlement Report " has the meaning set forth in Section 3.1(e) of the Master Purchase and Sale Agreement.

" Simple Interest Method " means the method of allocating each monthly payment (including multiple monthly payments) on a Simple Interest Receivable to principal and interest, pursuant to which the portion of such payment that is allocated to interest is equal to the Outstanding Principal Balance thereon multiplied by the fixed rate of interest applicable to such Receivable multiplied by the period of time elapsed (expressed as a fraction of a calendar year) since the preceding payment of interest with respect to such Outstanding Principal Balance was made.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

" <u>Simple Interest Receivable</u> " means any Receivable under which the portion of each payment allocable to earned interest and the portion allocable to the principal is determined in accordance with the Simple Interest Method. For purposes hereof, all payments with respect to a Simple Interest Receivable shall be allocated to principal and interest in accordance with the Simple Interest Method.

" <u>SOC 1</u> " has the meaning set forth in <u>Section 3.13</u> of the Master Servicing Agreement.

" <u>Specified Variables</u> " is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

" <u>State</u> " means any of the 50 states of the United States of America, or the District of Columbia.

" <u>Supplemental Fees</u> " means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Purchaser during the related Collection Period, determined pursuant to and defined in <u>Section 3.10(b)</u> of the Master Servicing Agreement.

" <u>System Description</u> " means the written description of the eOriginal e-contract system attached to the Master Purchase and Sale Agreement as <u>Exhibit F</u> .

" <u>System of Record</u> " means the computer system and programs in place on the date that the Master Sale Agreement and Master Purchase and Sale Agreement become effective (as such system may be updated or otherwise modified) utilized by the Seller to select Receivables for each First Tier Receivables Pool and Receivables Pool under the Master Sale Agreement and by the Transferor to select Receivables for each Receivables Pool under the Master Purchase and Sale Agreement, respectively.

" <u>TPSM</u> " means Ally Bank's Third Party Supplier Management team.

" <u>Title Intermediary</u> " means, VINTek or another title administration service provider approved in writing by the Seller and Purchasers.

" <u>Title Lien Nominee</u> " means Carvana or GFC Lending LLC (or any other name approved in writing by the Purchasers).

" <u>Three-Month Average Receivables Pool CNL Ratio Comparison</u> " means, on any Distribution Date, the average of the Receivables Pool CNL Ratio Comparison with respect to a Receivable Pool for such Distribution Date and the two Distribution Dates preceding such Distribution Date.

" <u>Transferor</u> " means Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company, and its permitted successors and assigns.

" <u>Transferor Obligation</u> " has the meaning set forth in <u>Section 2.1(a)</u> of the Master Purchase and Sale Agreement.

App. A-29

" <u>Transferor Termination Option</u> " has the meaning set forth in <u>Section 2.4(a)</u> of the Master Purchase and Sale Agreement.

" <u>Treasury Regulations</u> " means the regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

" <u>UCC</u> " means the Uniform Commercial Code as in effect in any relevant jurisdiction, from time to time.

" <u>Vehicle Age</u> " with respect to a Financed Vehicle, means the year of origination of the Contract for such Financed Vehicle minus the model year of such Financed Vehicle.

" <u>Warranty Payment</u> " means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to <u>the sum</u> of (i) the product of (a) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in <u>clause (i)</u> above, (y) the APR of such Administrative Receivable and (z) 30/360.

" <u>Warranty Receivable</u> " means a Receivable which the Transferor has repurchased pursuant to <u>Section 8.2</u> of the Master Purchase and Sale Agreement or Seller has repurchased pursuant to <u>Section 7.2</u> of the Master Sale Agreement.

<p align="center">*    *    *    *    *</p>

<p align="center">App. A-30</p>

**AMENDED AND RESTATED**

**MASTER TRANSFER AGREEMENT**

between

**CARVANA AUTO RECEIVABLES 2016-1 LLC**

**as Transferor**

**and**

**SONORAN AUTO RECEIVABLES TRUST 2016-1**

**DATED AS OF MARCH 6, 2017**

TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| ARTICLE I DEFINITIONS AND USAGE | | | 1 |
| Section 1.1 | Definitions | | 1 |
| ARTICLE II RECEIVABLES POOLS | | | 2 |
| Section 2.1 | Purchase and Sale of Receivables Pools | | 2 |
| Section 2.2 | Payment of Receivables Purchase Price | | 2 |
| Section 2.3 | Loss and Liquidation Data | | 3 |
| Section 2.4 | Re-Liening Trigger Events | | 3 |
| ARTICLE III PURCHASE AND SALE OF RECEIVABLES | | | 3 |
| Section 3.1 | Sale of Receivables | | 3 |
| Section 3.2 | The Closing | | 6 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES | | | 6 |
| Section 4.1 | Representations and Warranties of the Trust | | 6 |
| Section 4.2 | Representations and Warranties of the Transferor | | 8 |
| ARTICLE V CONDITIONS | | | 17 |
| Section 5.1 | Conditions to Effectiveness | | 17 |
| Section 5.2 | Conditions to Obligation of the Trust | | 18 |
| Section 5.3 | Conditions to Obligation of the Transferor | | 19 |
| ARTICLE VI COVENANTS OF THE TRANSFEROR | | | 20 |
| Section 6.1 | Protection of Right, Title and Interest | | 20 |
| Section 6.2 | Other Liens or Interests | | 21 |
| Section 6.3 | Perfection Costs and Expenses | | 22 |
| Section 6.4 | Separateness | | 22 |
| Section 6.5 | Notice of Servicer Termination; Etc. | | 22 |
| Section 6.6 | Conduct of Business; Ownership | | 22 |
| Section 6.7 | Collections | | 22 |
| Section 6.8 | Selection Standards; Quarterly Meetings | | 22 |
| Section 6.9 | Furnishing of Information and Inspection of Records | | 23 |
| Section 6.10 | Compliance with Laws, Etc. | | 23 |
| Section 6.11 | Indemnification | | 23 |
| Section 6.12 | Forbearance | | 24 |
| Section 6.13 | Consolidations, Mergers and Sales of Assets | | 25 |
| Section 6.14 | Operation of the Transferor | | 25 |
| Section 6.15 | Furnishing of Information and Inspection of Records | | 25 |
| Section 6.16 | Publicity | | 25 |
| Section 6.17 | No Solicitation | | 25 |
| Section 6.18 | Remediation | | 26 |
| Section 6.19 | Quarterly Statements as to Compliance | | 26 |
| Section 6.20 | Additional Covenants | | 26 |
| Section 6.21 | Negative Covenants | | 29 |

i

| | | | |
|---|---|---|---|
| ARTICLE VII MISCELLANEOUS PROVISIONS | | | 31 |
| Section 7.1 | Obligations of the Transferor | | 31 |
| Section 7.2 | Repurchase of Receivables Upon Breach by the Transferor | | 31 |
| Section 7.3 | Assignment of Warranty Receivables | | 32 |
| Section 7.4 | Amendment | | 32 |
| Section 7.5 | Waivers | | 32 |
| Section 7.6 | Notices | | 32 |
| Section 7.7 | Costs and Expenses | | 33 |
| Section 7.8 | Survival | | 33 |
| Section 7.9 | Headings and Cross-References | | 33 |
| Section 7.10 | Governing Law, Submission to Jurisdiction, Etc. | | 33 |
| Section 7.11 | Counterparts | | 34 |
| Section 7.12 | Further Assurances | | 34 |
| Section 7.13 | Severability of Provisions | | 34 |
| Section 7.14 | Assignment | | 34 |
| Section 7.15 | Further Assignment; Third Party Beneficiary | | 35 |
| Section 7.16 | Limitations on Rights of Others | | 35 |
| Section 7.17 | No Petition Covenant | | 35 |
| Section 7.18 | Concerning the Owner Trustee | | 35 |
| Section 7.19 | Effect of Amendment and Restatement | | 36 |

EXHIBITS

| | |
|---|---|
| EXHIBIT A | FORM OF POOL SUPPLEMENT |
| EXHIBIT B | CREDIT POLICY |

APPENDICES

| | |
|---|---|
| APPENDIX A | DEFINITIONS AND USAGE |

**AMENDED AND RESTATED MASTER TRANSFER AGREEMENT**

THIS AMENDED AND RESTATED MASTER TRANSFER AGREEMENT (as from time to time amended, supplemented or otherwise modified and in effect, this " Agreement ") is made as of March 6, 2017, between Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the " Transferor "), and Sonoran Auto Receivables Trust 2016-1 LLC, a Delaware statutory trust (the " Trust ").

RECITALS:

1. In the regular course of its business, Carvana, LLC ("Carvana") sells used automobiles and light trucks and originates automobile and light truck retail installment sale contracts secured by such automobiles and light trucks.

2. On the Original Execution Date, Carvana and the Transferor have entered into the Master Sale Agreement (Warehouse) (the " Master Sale Agreement (Warehouse) ") pursuant to which Carvana has agreed to sell, and the Transferor has agreed to purchase, from time to time, certain Receivables and related property (including the security interests in the related Financed Vehicles).

3. The Transferor wishes to sell, and the Trust wishes to purchase, from time to time, such Receivables and related property (including the security interests in the related Financed Vehicles) pursuant to the terms of this Agreement.

4. Pursuant to the Loan and Security Agreement, dated as of December 22, 2016 (the " Loan and Security Agreement "), by and among the Transferor, the Trust, Carvana, Ally Bank, as Administrative Agent (the " Administrative Agent "), and the Lenders party thereto, the Lenders will provide advances to the Trust to finance the purchase of the Receivables and related property by the Trust under this Agreement.

5. The Transferor and the Trust wish to provide in this Agreement, among other things, the terms on which each pool of Receivables (each, a " Receivables Pool ") and related property are to be sold by the Transferor to the Trust.

In consideration of the foregoing, other good and valuable consideration, and the mutual terms and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND USAGE

Section 1.1 Definitions . Certain capitalized terms used in the above recitals and in this Agreement and not defined herein are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A hereto; provided that, if not defined therein, as defined in the Loan and Security Agreement. All references herein to " the Agreement " or " this Agreement " are to this Amended and Restated Master Transfer Agreement as it may be amended, supplemented or modified from time to time, the exhibits and attachments hereto and the capitalized terms used herein which are defined in such Appendix A, and all references herein to Articles, Sections and subsections are to Articles, Sections or subsections of this Agreement unless otherwise specified. The rules of construction and usage set forth in such Appendix A shall be applicable to this Agreement.

ARTICLE II

RECEIVABLES POOLS

Section 2.1 Purchase and Sale of Receivables Pools

(a) Transferor Obligation . Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor agrees to sell to the Trust each First Tier Receivables Pool it acquires from Carvana in each calendar week during the Commitment Period; provided, however , in no event shall Receivables required to be sold by Transferor to the Purchasers (as defined in the Master Sale Agreement (Flow) pursuant to the Master Sale Agreement (Flow) be sold to the Trust pursuant to this Agreement and in no event shall the randomization code (as defined in the definition of Freestyle Selection) of any Receivables in any such Receivables Pool exceed the Purchase Percentage for the Origination Period in which such Receivable was originated.

(b) Trust Obligation . Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Trust agrees to purchase each such Receivables Pool on each Closing Date described in Section 3.1(e); provided that in no event shall the Trust be obligated to purchase from Transferor hereunder Receivables with a principal amount exceeding an aggregate principal balance as of each Receivable's applicable Closing Date of $292,207,792.21 plus the aggregate principal balance (as of each Receivable's applicable resold Closing Date) of all Receivables previously sold to the Trust, repurchased, remediated, and resold to the Trust.

(c) Transaction Documents; Pool Supplement . The Transferor's right, title and interest in the Receivables and related Purchased Property purchased, from time to time, by the Trust pursuant to Section 3.1 shall be transferred and assigned by the execution and delivery of a Pool Supplement, in form and content substantially similar to Exhibit A attached hereto, and the satisfaction of the terms and conditions and the performance of the transactions contained in this Agreement and such Pool Supplement, as applicable. The Transferor shall deliver the Pool Supplement to the Trust for any Receivables Pool on the applicable Closing Date.

Section 2.2 Payment of Receivables Purchase Price . Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Receivables Purchase Price due on each Closing Date shall be paid by the Trust to the Transferor on such Closing Date by wire transfer of immediately available funds to an account or accounts designated by the Transferor. The Receivables Purchase Price will be set forth in the Settlement Report attached to the Pool Supplement for the related Receivables Pool, in the form set forth in Exhibit A .

2

Section 2.3 <u>Loss and Liquidation Data.</u> (a) No later than 60 days after the end of each calendar quarter during the period beginning on the date hereof and ending on the date all amounts outstanding under the Loan and Security Agreement (other than inchoate obligations for which no claim has been made) have been paid in full, the Transferor shall, or shall cause the Servicer or any other Affiliate holding or aggregating such information to, deliver to the Trust (who shall deliver such information to the Administrative Agent pursuant to the Loan and Security Agreement) a cumulative net loss ratio as of the end of the related calendar quarter (and a narrative description of the methodology for making such calculation), which may be included in the Monthly Servicer Report delivered within 60 days after the end of each calendar quarter to the extent the information is available at that time, for Carvana's entire originated portfolio of retail installment sales contracts as of the end of the related calendar quarter.

Section 2.4 <u>Re-Liening Trigger Events</u> . Upon the occurrence of a Re-Liening Trigger Event, at the direction of the Trust or, upon the pledge of such property to the Administrative Agent pursuant to the Loan and Security Agreement, the Administrative Agent, the Transferor shall, and the Transferor shall direct and cause any Title Lien Nominee (if not and Affiliate of the Transferor) to and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles (or if such Re-Liening Trigger Event relates to (i) one or more States, the related Financed Vehicles titled in such State or (ii) a Title Lien Nominee, the related Financed Vehicles liened in the name of such Title Lien Nominee) to be revised to name the Administrative Agent or its designee as lienholder. In addition, at the sole expense of the Administrative Agent and the Lenders, upon the request of the Administrative Agent, the Transferor shall, and the Transferor shall direct and cause any Title Lien Nominee (if not an Affiliate of the Transferor) and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles identified, individually or by characteristic, by the Administrative Agent to be revised to name the Administrative Agent or its designee as lienholder. The Transferor shall cause any Title Lien Nominee to irrevocably appoint the Administrative Agent as its attorney-in-fact, such appointment being coupled with an interest, to take any and all steps required to be performed pursuant to this <u>Section  2.4</u> , including execution of Certificates of Title or any other documents in the name of the Transferor or such Title Lien Nominee.

ARTICLE III

PURCHASE AND SALE OF RECEIVABLES

Section 3.1 <u>Sale of Receivables</u>

(a) <u>Purchased Property</u> . On each Closing Date, subject to the terms and conditions of this Agreement, the Transferor agrees to sell to the Trust, and the Trust agrees to purchase from the Transferor, a Receivables Pool and the following other property relating thereto (collectively, the " <u>Purchased Property</u> "):

(i) all right, title and interest of the Transferor in, to and under each Receivable included in the applicable Receivables Pool listed on a Schedule of Receivables (the form of which is attached as <u>Schedule  5</u> to the Pool Supplement)

3

delivered to the Trust on such Closing Date and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Transferor or the Servicer, as applicable, covering any related Financed Vehicle;

(ii) the interest of the Transferor in the security interests in the related Financed Vehicles granted by Obligors pursuant to the Receivables in the applicable Receivables Pool and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premium or other payment with respect to any of the foregoing;

(iv) all of the Transferor's right, title and interest in, to and under the related Receivable Files;

(v) all of the Transferor's right, title and interest in and to the Master Sale Agreement (Warehouse) and remedies thereunder and the assignment to the Trust of all UCC financing statements filed against Carvana under or in connection with the Master Sale Agreement (Warehouse); and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in clauses (i) through (v) above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

(b) Receivables Purchase Price . On each Closing Date, in consideration for the related Purchased Property, the Trust shall pay to the Transferor an amount (the " Receivables Purchase Price ") equal to the Purchase Price for such Purchased Property. The Receivables Purchase Price for each Receivables Pool shall be set forth in the Settlement Report attached to the related Pool Supplement.

(c) Payment Within two (2) Business Days after each Closing Date, the Transferor shall pay to or as directed by the Trust in (same day) funds an amount equal to the aggregate amount of all Collections received by the Transferor after the related Cutoff Date, including from the Servicer, with respect to the Receivables Pool sold to the Trust on such Closing Date through (but excluding) the applicable Closing Date.

(d) Selection of Receivables Pools . The Receivables to be sold in each Receivables Pool shall be all of the Receivables purchased by the Transferor pursuant to the Master Sale Agreement (Warehouse) and shall have been selected in accordance with Section 3.1(d) of the

4

Master Sale Agreement (Warehouse). If the Administrative Agent reasonably determines that such Receivables Pool does not appear to have been selected on a random basis (based on information reasonably requested by the Administrative Agent and provided by the Transferor comparing the Receivables to be sold to the Trust on the related Closing Date as compared against receivables originated by Carvana during the related Origination Period that meet the definition of an Eligible Receivable under the Loan and Servicing Agreement and are not being transferred to the Transferor pursuant to the Master Sale Agreement (Flow)), then the Administrative Agent, Carvana, the Transferor and the Trust will determine an approach to adjust the mix of Eligible Receivables in such Receivables Pool and the related CAR 2016-1 Purchased Property (as defined in the Master Sale Agreement (Warehouse) (including adding or removing Receivables meeting the definition of Eligible Receivables in the Loan and Security Agreement) to ensure that such Receivables Pool was randomly selected by Carvana and the Transferor and the Trust, as applicable. In such circumstance, Carvana, the Transferor, the Trust and the Administrative Agent will revisit this Section 3.1(d) to determine if changes thereto are needed to ensure future Receivables Pools and the related CAR 2016-1 Purchased Property are representative of receivables originated by Carvana during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection. The Transferor acknowledges and agrees that Carvana's computer systems assign contract numbers to Contracts on a random basis and Carvana may not change such contract numbering system at any time without the Administrative Agent's prior written consent (upon which, the Administrative Agent, Carvana, the Trust and the Transferor each agree to develop an alternative methodology in order to randomly select Contracts to be included in succeeding Receivables Pools and the related CAR 2016-1 Purchased Property).

(e) Settlement Report . Not later than the third (3 rd ) Business Day prior to a Closing Date, the Transferor shall supply the Trust a final data tape in form and substance necessary for the Trust to comply with the information requirements under the Loan and Security Agreement. Not less than three (3) Business Days prior to each proposed Closing Date, the Transferor will deliver to the Trust and the Administrative Agent a Settlement Report substantially in the form of Schedule 2 attached to the Pool Supplement in form and substance necessary for the Trust to comply with the information requirements under the Loan and Security Agreement setting forth amounts due the Transferor with respect to the applicable Receivables Pool and containing at least the calculation of the related Receivables Purchase Price. Each sale hereunder shall occur immediately after the related sale for the related First Tier Receivables Pool under the Master Sale Agreement (Warehouse).

(f) No Recourse . It is understood that each sale of Purchased Property by the Transferor to the Trust pursuant to this Agreement, the related Pool Supplement and the related Receivables Assignment shall be without recourse (except as set forth herein, and as the Trust's rights in such recourse shall be pledged by the Trust to the Administrative Agent pursuant to the Loan and Security Agreement) and the Transferor does not guarantee collection of any Receivable. However, each such sale shall be made pursuant to and in reliance by the Trust on the representations, warranties and covenants of the Transferor as set forth in Section 4.2 , the indemnities set forth in Section 6.11 and the repurchase obligation set forth in Section 7.2 and the corresponding provisions of the Master Sale Agreement (Warehouse) assigned to the Trust.

5

(g) <u>Intent of the Parties</u> . This Agreement, the applicable Pool Supplement and the related Receivables Assignment is intended to effect a sale of each Receivables Pool by the Transferor to the Trust, and the parties intend to treat each such transaction on a standalone basis as an independent sale for financial reporting purposes. It is the intention of the Transferor and the Trust that each sale, transfer, assignment and other conveyance of Receivables Pools contemplated by this Agreement, the applicable Pool Supplement and the related Receivables Assignment constitutes an independent sale of the related Purchased Property from the Transferor to the Trust and that the beneficial interest in and title to each such Receivables Pool shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Pool Supplement and the related Receivables Assignment does not constitute and is not intended to result in any assumption by the Trust (or any of its assigns) of any obligation of the Transferor to the Obligors, Affiliates of the Transferor, insurers or any other Person in connection with any Receivables, any insurance policies or any agreement or instrument relating to any of them, in each case related to such transfer and assignment. Although the Parties intend that each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Pool Supplement and the related Receivables Assignment to be an independent sale, in the event any such transfer and assignment is deemed to be other than a sale, the parties intend and agree: (i) that all filings described in this Agreement shall give the Trust a first priority perfected security interest in, to and under the Receivables Pool and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Agreement, together with the applicable Pool Supplement and the related Receivables Assignment, shall be deemed to be the grant of, and the Transferor hereby grants to the Trust, a security interest from the Transferor to the Trust and the Administrative Agent as assignee in such Receivables and the related Purchased Property in order to secure its obligations hereunder with respect to such transfer and assignment; (iii) this Agreement, together with the applicable Pool Supplement and the related Receivables Assignment, shall be a security agreement under applicable law for the purposes of each such transfer and assignment; and (iv) the Trust shall have all of the rights, powers and privileges of a secured party under the UCC with respect to each such transfer and assignment and the Purchased Property related thereto.

(h) Due Diligence. The Transferor shall provide to the Trust such documents and other information necessary for the Trust to comply with Section 4.2(m) of the Loan and Security Agreement.

Section 3.2 <u>The Closing</u> . The initial closing (the " <u>Closing</u> ") shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1 <u>Representations and Warranties of the Trust.</u> The Trust represents and warrants to the Transferor as of the date hereof and as of each Closing Date:

(a) <u>Organization and Good Standing</u> . It has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its formation, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and had at all relevant times, and now has all necessary power, authority and legal right to own or lease its properties and conduct its business as such business is presently conducted, including to acquire, own and sell the Receivables and the other Purchased Property except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

6

(b) <u>Due Qualification</u> . It is duly qualified to do business and is in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination, purchase, sale and servicing of the Receivables) except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c) <u>Power and Authority; Due Authorization</u> . It (i) has all necessary power, authority and legal right to (A) execute and deliver the Transaction Documents to which it is a party, (B) carry out the terms of the Transaction Documents to which it is a party and (C) to assign or grant the security interest in the assets transferred by it on the terms and conditions in the Transaction Documents to which it is a party and (ii) has taken all necessary action to authorize the execution, delivery and performance of the Transaction Documents to which it is a party and to assign or grant a security interest in the assets transferred by it on the terms and conditions in the Transaction Documents to which it is a party.

(d) <u>Binding Obligation</u> . The Transaction Documents to which it is a party have been duly executed and delivered by it and constitute legal, valid and binding obligations of it enforceable against it in accordance with their terms.

(e) <u>No Violation</u> . The consummation of the transactions contemplated by the Transaction Documents to which it is a party and the fulfillment of the terms thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its formation documents or any agreement to which it is bound, (ii) result in the creation or imposition of any Lien upon any of its properties, other than pursuant to the Transaction Documents, or (iii) violate any Requirements of Law, except, in each case, for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f) <u>No Proceedings</u> . There is no litigation, proceeding or investigation pending or, to the best of its knowledge, threatened against it, before any governmental authority (i) asserting the invalidity of any Transaction Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Transaction Documents, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect.

(g) <u>All Consents Required</u> . All approvals, authorizations, consents, orders, licenses or other actions of any person or of any governmental authority required for the due execution,

7

delivery and performance by it of the Transaction Documents to which it is a party have been obtained except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h) Compliance. It is not in violation in any material respect of any Transaction Documents to which it is a party or any laws, ordinances, Governmental Rules or regulations to which it is subject except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 4.2 Representations and Warranties of the Transferor. The Transferor represents and warrants to the Trust as of the date hereof and as of each Closing Date (except as provided herein otherwise):

(a) Organization and Good Standing. It has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its formation, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and had at all relevant times, and now has all necessary power, authority and legal right to own or lease its properties and conduct its business as such business is presently conducted, including to acquire, own and sell the Receivables and the other Purchased Property except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) Due Qualification. It is duly qualified to do business and is in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination, purchase, sale and servicing of the Receivables) except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c) Power and Authority; Due Authorization. It (i) has all necessary power, authority and legal right to (A) execute and deliver the Transaction Documents to which it is a party, (B) carry out the terms of the Transaction Documents to which it is a party and (C) to assign or grant the security interest in the assets transferred by it on the terms and conditions in this Agreement and (ii) has taken all necessary action to authorize the execution, delivery and performance of the Transaction Documents to which it is a party and to assign or grant a security interest in the assets transferred by it on the terms and conditions in this Agreement.

(d) Binding Obligation. The Transaction Documents to which it is a party have been duly executed and delivered by it and constitute legal, valid and binding obligations of it enforceable against it in accordance with their terms.

(e) No Violation. The consummation of the transactions contemplated by the Transaction Documents to which it is a party and the fulfillment of the terms thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its formation documents

8

or any agreement to which it is bound, (ii) result in the creation or imposition of any Lien upon any of its properties, other than pursuant to this Agreement, or (iii) violate any Requirements of Law, except, in each case, for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f)  No Proceedings . There is no litigation, proceeding or investigation pending or, to the best of its knowledge, threatened against it, before any governmental authority (i) asserting the invalidity of any Transaction Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Transaction Documents, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect.

(g)  All Consents Required . All approvals, authorizations, consents, orders, licenses or other actions of any person or of any governmental authority required for the due execution, delivery and performance by it of the Transaction Documents to which it is a party have been obtained except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h)  Compliance. It is not in violation in any material respect of any Transaction Document to which it is a party or any laws, ordinances, Governmental Rules or regulations to which it is subject except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(i)  Bulk Sales . The execution, delivery and performance of the Transaction Documents to which it is a party is in the ordinary course of business and does not require compliance with any bulk sales act or similar law.

(j)  Solvency . As of each Closing Date, (i) the Transferor is not and shall not become insolvent as a result of the transfer of the related Purchased Property on such date, (ii) the Transferor did not intend to or believe that it would incur debts that would be beyond its ability to pay as such debts matured, (iii) the Transferor did not transfer the related Purchased Property with the actual intent to hinder, delay or defraud any Person and (iv) the assets of the Transferor did not constitute unreasonably small capital to carry out its business as conducted.

(k)  Selection Procedures . No procedures believed by it to be materially adverse to the interests of the Trust, the Administrative Agent or the Lenders were utilized by it in identifying or selecting Receivables to be transferred by it. In addition, each Receivable assigned pursuant to this Agreement has been underwritten in accordance with and satisfies the standards of the Credit Policy in all material respects.

(l)  Taxes . It has filed, caused to be filed, or received an extension of time for filing that has not yet expired, all federal and material state, local or foreign tax returns that are required to be filed by it. It has paid or made adequate provisions for the payment of all federal or material amounts of state, local or foreign taxes and all material assessments made

9

against it or any of its property (other than any amount of tax the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves have been provided on the books of it), and no tax lien has been filed and, to the its knowledge, no claim is being asserted, with respect to any such tax, fee or other charge.

(m)     Exchange Act Compliance; Regulations T, U and X . None of the transactions contemplated in the Transaction Documents to which it is a party (including the use of the proceeds from the advances) will violate or result in a violation of Section 7 of the Exchange Act, or any regulations issued pursuant thereto, including Regulations T, U and X of the Federal Reserve Board, 12 C.F.R., Chapter II. It does not own or intend to carry or purchase, and no proceeds from the sale of the Purchased Property will be used to carry or purchase, any "margin stock" within the meaning of Regulation U or to extend "purchase credit" within the meaning of Regulation U.

(n)     Quality of Title . Each Receivable, together with the Contract related thereto, transferred by it were, prior to the transfer thereof, owned by it free and clear of any Lien except for Permitted Liens, and the Trust upon the providing of value described herein shall acquire a valid ownership interest and a perfected first priority security interest in each Receivable and the related Purchased Property then-existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. Immediately upon the transfer thereof pursuant to this Agreement, each Receivable, together with the Contract related thereto, shall be owned by the Trust free and clear of any Lien except for Permitted Liens, and the Administrative Agent upon the providing of value described in the Loan and Security Agreement shall acquire a valid perfected first priority security interest in each Receivable and the related Purchased Property then-existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Purchased Property or the Purchased Property or the Collateral shall, after the relevant Closing Date, be on file in any recording office except such as may be filed in favor of Carvana, the Transferor, the Trust or the Administrative Agent in accordance with the Master Sale Agreement (Warehouse), this Agreement and the Loan and Security Agreement.

(o)     Security Interest . It has granted a security interest (as defined in the UCC) to the Trust in the Purchased Property, which is enforceable in accordance with applicable law upon execution and delivery of this Agreement. Upon the filing of UCC-1 financing statements naming the Trust as secured party, or upon the Collateral Custodian obtaining possession, in the case of that portion of the Purchased Property which constitutes tangible chattel paper, or upon the E-Vault Provider granting control to the Trust, in the case of that portion of the Purchased Property which constitutes electronic chattel paper, the Trust shall have a first priority (except for any Permitted Liens) perfected security interest in the Purchased Property. Upon the sale of thereof to the Trust pursuant to the Master Transfer Agreement, the Trust shall have granted a security interest (as defined in the UCC) to the Trust in the Purchased Property, which is enforceable in accordance with applicable law upon execution and delivery of the Master Transfer Agreement. Upon the pledge thereof to the Administrative Agent pursuant to the Loan and Security Agreement,

10

the Trust shall have granted a security interest (as defined in the UCC) to the Administrative Agent in the Collateral, which is enforceable in accordance with applicable law upon execution and delivery of the Loan and Security Agreement. Upon the filing of UCC-1 financing statements naming the Administrative Agent as secured party, or upon the Collateral Custodian obtaining possession, in the case of that portion of the Collateral which constitutes tangible chattel paper, or upon the E-Vault Provider granting control to the Administrative Agent, in the case of that portion of the Collateral which constitutes electronic chattel paper, the Administrative Agent shall have a first priority (except for any Permitted Liens) perfected security interest in the Collateral.

(p)    Reports Accurate . All Settlement Reports, Funding Reports, information, exhibits, financial statements, documents, books, records or reports (including the data file indicating characteristics of the Receivables and including electronic writings) furnished or to be furnished by the Transferor directly or indirectly to the Trust, the Administrative Agent, the Lenders, the Servicer, the Collateral Custodian or the Account Bank under or in connection with the Transaction Documents to which the Transferor is a party (including the information delivered in connection with each sale in the form of Schedule 4 attached to the related Pool Supplement) are true, correct and complete in all material respects as of the date specified therein or the date so furnished (as applicable).

(q)    Location of Offices. The principal place of business and chief executive office of it and the office where it keeps all the Records related to the tangible Contracts are located at the address set forth in Section  7.6 ; provided , that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251 (or at such other locations as to which the notice and other specified requirements shall have been satisfied).

(r)    Tradenames and Place of Business . (i) Except as specified in this Agreement, it has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and (ii) its principal place of business and chief executive office is located at the address set forth in Section  7.6 and has been so for the last four (4) months; provided , that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251.

(s)    Transfer Agreements . This Agreement, the Master Sale Agreement (Warehouse), the Master Sale Agreement (Flow) and the Flow Purchase Agreement are the only agreements pursuant to which it purchases or sells the Receivables and the related Contracts.

(t)    Value Given . The Trust shall have given reasonably equivalent value to the Transferor in consideration for the transfer by the Transferor to the Trust of the Receivables and the related Purchased Property under this Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by the Transferor to the Trust and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code.

11

(u)    <u>Accounting</u> . The Transferor accounts for the transfers to the Trust of Receivables and related Purchased Property under this Agreement on a standalone basis as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in this Agreement. The Trust accounts for the transfers to the Administrative Agents of the Collateral under the Loan and Security Agreement as pledges in its books, records and financial statements. Carvana may account for such transfers as pledges for income tax and consolidated accounting purposes.

(v)    <u>Investment Company Act</u> . The Transferor is not an "investment company" and is not controlled by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(w)    <u>ERISA</u> . (i) No prohibited transactions or Reportable Events have occurred with respect to any Pension Plan (if any), (ii) no notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA has been filed, nor has any Pension Plan been terminated under Section 4041(c) of ERISA, nor has the Pension Benefit Guaranty Corporation instituted proceedings to terminate, or appointed a trustee to administer a Pension Plan and no event has occurred or condition exists that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, and (iii) no liability under Title IV (other than accrued premiums to the Pension Benefit Guaranty Corporation) has been incurred (whether or not assessed), which individually or in the aggregate with respect to all or any of (i), (ii) and (iii) above, would reasonably be expected to have a Material Adverse Effect on the Transferor, the Trust or the Administrative Agent or the Lenders (including its rights and interests in, to or under any Contracts or related Receivables), with respect to the Transferor or the Trust.

(x)    <u>Accuracy of Representations and Warranties</u> . Each representation or warranty by the Transferor contained in the Transaction Documents to which it is a party or in any certificate or other document furnished by the Transferor or the Trust pursuant thereto or in connection therewith is true and correct in all material respects as of the date made.

(y)    <u>OFAC</u> . Neither the Transferor nor any Affiliate is a Sanctioned Person. The proceeds of any funding will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

(z)    <u>Other Agreements</u> . As of each Closing Date, the Transferor has not taken any action that would cause the representations and warranties of Carvana, the Trust, the Servicer, the Collateral Custodian or the Account Bank under the Transaction Documents to be false.

(aa)    <u>Use of Proceeds</u> . No proceeds of a purchase hereunder shall be used by the Transferor for a purpose that violates or would be inconsistent with Regulations T, U or X promulgated by the Board of Governors of the Federal Reserve System from time to time.

12

(bb)    Remediation . In the event that Carvana, the Transferor, the Trust or the Servicer or any of their Affiliates has been required under any Requirements of Law, or has agreed or made arrangements with any Governmental Authority, to make any Remediation, such Person shall have taken such action as so agreed or arranged or in compliance with all Requirements of Law, as applicable.

(cc)    Receivables . The Transferor makes the following representations and warranties as of each Closing Date (except to the extent otherwise provided) with respect to the Receivables the Transferor sold to the Trust on such Closing Date, on which the Trust, the Administrative Agent and the Lenders relies in accepting such Receivables. Such representations and warranties speak as of the applicable Closing Date (except as provided herein otherwise), and shall survive the sale, transfer and assignment of such Receivables to the Trust and any subsequent sale, assignment or transfer of any such Receivables:

(i) Selection of Receivables. As of each Cutoff Date with respect to the related Receivables to be purchased, the Receivables Pool was selected as described in Section 2.1(a) .

(ii) Creation, Perfection and Priority of Security Interests . The following representations and warranties regarding creation, perfection and priority of security interests in the Purchased Property or the Collateral, as applicable, are true and correct:

(A) While it is the intention of the Transferor and the Trust that the transfer and assignment contemplated by this Agreement, each Pool Supplement and each Receivables Assignment shall constitute sales of the related Purchased Property from the Transferor to the Trust, this Agreement, each Pool Supplement and, upon execution and delivery, each Receivables Assignment shall create a valid and continuing security interest (as defined in the applicable UCC) in the related Purchased Property in favor of the Trust, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Transferor. The Loan and Security Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Collateral in favor of the Administrative Agent, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Trust.

(B) Prior to the sale of such Purchased Property to the Trust under this Agreement, the Receivables constituted "tangible chattel paper" or "electronic chattel paper" within the meaning of the applicable UCC.

(C) All filings (including such UCC filings) as are necessary in any jurisdiction to perfect the security interest of the Trust and the Administrative Agent in the Purchased Property and the Collateral (subject to permitted exceptions for titling), as applicable, have been (or prior to the applicable Closing Date will be) made.

13

(D) Other than the sale and backup security interest granted to the Trust or the Administrative Agent pursuant to this Agreement, the Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of such Purchased Property or Collateral. The Transferor has not authorized the filing of, and is not aware of, any financing statements against the Transferor that include a description of collateral covering such Purchased Property other than the financing statements relating to the security interests granted to the Trust and the Administrative Agent, as assignees, under this Agreement or any financing statement that has been effectively terminated. The Transferor is not aware of any judgment or tax lien filings against it or such Purchased Property or the Collateral.

(E) Wells Fargo, as Collateral Custodian, or a permitted subcontractor, has in its possession all original copies of the related Original Contract Documents and other documents that constitute or evidence such Receivables and the related Purchased Property that are tangible chattel paper. The E-Vault Provider has in its "control" (as such term is used in Section 9-105 of the UCC), for the benefit of the Trust, and upon the pledge of the Collateral to the Administrative Agent pursuant to the Loan and Security Agreement, as the "secured party" (as such term is used in Section 9-105 of the UCC), all electronic records constituting or forming a part of the Receivables that are electronic chattel paper, such that the Trust has had, and will have, and the Administrative Agent has had and will have, at all times a first priority perfected security interest against the Transferor, the Trust and their respective creditors in such Receivables or Collateral, as applicable. Such Receivable Files and other documents that constitute or evidence such Purchased Property do not have any marks or notations indicating that any ownership or security interest therein has been pledged, assigned or otherwise conveyed to any Person other than the Trust and, upon assignment to the Administrative Agent pursuant to the Loan and Security Agreement, the Administrative Agent.

(F) None of the Transferor, the Trust, the Servicer or a custodian or vaulting agent thereof holding any Receivable that is electronic chattel paper has communicated an Authoritative Copy of any loan agreement that constitutes or evidences such Receivable to any Person other than the Collateral Custodian for the benefit of the Trust and, upon assignment of the Collateral to the Administrative Agent pursuant to the Loan and Security Agreement, the Administrative Agent.

(iii) Schedule of Receivables . The information set forth in the related Schedule of Receivables and in any computer tape regarding the Receivables is true, accurate and complete, and no selection procedures believed to be adverse to the Trust, the Administrative Agent or the Lenders were utilized in selecting such Receivables, with respect to the related Receivables Pool, from those receivables of Carvana that otherwise meet such criteria as well as the definition of Eligible Receivables.

14

(iv) <u>Compliance With Law</u> . All Requirements of Law in respect of any aspect of such Receivables and the related Purchased Property (including the origination thereof), in each case, have been complied with in all material respects and each Receivable and the sale of the related Financed Vehicle evidenced thereby complied at the time it was originated or made and now complies in all material respects with all applicable Requirements of Law.

(v) <u>Binding Obligation</u> . Each such Receivable with respect to the related Receivables Pool represents the genuine, legal, valid and binding payment obligation in writing of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights in general and by equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(vi) <u>Security Interest in Financed Vehicle</u> . Immediately prior to the sale, transfer and assignment thereof pursuant hereto and the related Receivables Assignment, each such Receivable with respect to the related Receivables Pool was secured by a valid security interest in the Financed Vehicle in favor of the Transferor as secured party. Immediately prior to the sale, transfer and assignment thereof pursuant to the Loan and Security Agreement, each such Receivable with respect to the related Receivables Pool was secured by a valid security interest in the Financed Vehicle in favor of the Trust as secured party.

(vii) <u>Receivables In Force</u> . As of the applicable Cutoff Date, no such Receivable has been satisfied, subordinated or rescinded, and the Financed Vehicle securing each such Receivable has not been released from the lien of the related Receivable in whole or in part.

(viii) <u>No Waiver</u> . Since the applicable Cutoff Date, no provision of a Receivable has been, or shall be, waived, altered or modified in any respect other than with respect to alterations and modifications so that such Receivable meets the Eligible Receivable criteria (other than <u>clause (ix)</u> thereof, which must have been satisfied at the time of origination and at all times since that date) and such Receivable is enforceable after giving effect thereto.

(ix) <u>No Defenses</u> . No right of rescission, setoff, counterclaim or defense has been asserted or threatened with respect to any such Receivable.

(x) <u>No Liens</u> . To the best of the Transferor's knowledge: (1) there are no Lien or claims that have been filed for work, labor or materials affecting any Financed Vehicle securing any such Receivable that are or may be Lien prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by such Receivable; (2) no contribution failure has occurred with respect to any Benefit Plan which is

15

sufficient to give rise to a Lien under Section 303(k) of ERISA with respect to any such Receivable; and (3) no tax lien has been filed and no claim related thereto is being asserted with respect to any such Receivable.

(xi) <u>Insurance</u> . Each Obligor under such Receivables is required to maintain a physical damage insurance policy of the type that Carvana requires in accordance with the Credit Policy.

(xii) <u>Good Title</u> . No such Receivable or the related Purchased Property or the Collateral has been sold, transferred, assigned or pledged by the Transferor to any Person other than the Trust, the Trust and the Administrative Agent; immediately prior to the conveyance of such Receivables and the related Purchased Property pursuant to this Agreement, the related Pool Supplement and the related Receivables Assignment, the Transferor had good and marketable title thereto, free of any Lien other than Permitted Liens; and, upon execution and delivery of the Loan and Security Agreement, the Administrative Agent shall acquire a valid and enforceable perfected security interest in each such Receivable and Purchased Property and the Collateral (subject to permitted exceptions for titling), the unpaid indebtedness evidenced thereby and the collateral security therefor, free of any Lien other than Permitted Liens.

(xiii) <u>Lawful Assignment</u> . No such Receivable or the related Purchased Property was originated in, or is subject to Requirements of Law of, any jurisdiction the Requirements of Law of which would make unlawful, void or voidable the sale, transfer and assignment of such Receivable and the other related Purchased Property under this Agreement and the related Receivables Assignment or the pledge of the Collateral under the Loan and Security Agreement. None of the Transferor, the Trust, the Trust or the Servicer has entered into any agreement with any Obligor that prohibits, restricts or conditions the assignment of such Receivable or any other Purchased Property or Collateral.

(xiv) <u>All Filings Made</u> . All filings (including UCC filings) necessary in any jurisdiction to give the Trust and the Administrative Agent a first priority perfected ownership interest in the Receivables and the related Purchased Property or the Collateral (subject to permitted exceptions for titling), as applicable, shall have been made.

(xv) <u>One Original</u> . There is only one original executed copy of each tangible record constituting or forming a part of such Receivable that is tangible chattel paper or a single Authoritative Copy of each electronic record constituting or forming a part of each Purchased Receivable that is electronic chattel paper.

(xvi) <u>No Documents or Instruments</u> . No such Receivable, or constituent part thereof, constitutes a "negotiable instrument" or "negotiable document of title" (as such terms are used in the UCC).

(xvii) <u>Accounts and Receivables Analysis</u> . The information set forth in the Accounts and Receivables Analysis with respect to such Receivable and the related Receivables Pool, as applicable, provided on <u>Schedule 4</u> of the related Pool Supplement is true and correct in all material respects.

16

ARTICLE V

CONDITIONS

Section 5.1 <u>Conditions to Effectiveness</u> . The effectiveness of this Agreement (the " <u>Effective Date</u> ") is subject to the satisfaction of the following conditions precedent as of the date hereof:

(a) <u>Transaction Documents</u> . Each of Carvana, the Transferor, the Trust, the Administrative Agent, the Lenders, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor, as the case may be, shall have executed and delivered each of the Transaction Documents to which it is a party, and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on the Original Execution Date or the date hereof, as applicable, prior to the effectiveness hereof or thereof, hereunder or thereunder. (b)

(b) <u>Documents to be Delivered by the Transferor</u> .

(i) <u>Evidence of UCC Filing</u> . On or prior to Effective Date, the Transferor shall record and file, at its own expense, a UCC-1 financing statement in each jurisdiction in which it is required by applicable law, authorized by and naming and the Transferor as seller or debtor, naming the Trust as purchaser or secured party, naming the Administrative Agent as assignee, naming the Receivables and the other Purchased Property as collateral, meeting the requirements of the laws of each such jurisdiction and in such manner as is necessary to perfect each sale, transfer, assignment and conveyance of Receivables to the Trust hereunder. Such UCC-1 financing statement shall be provided to the Trust (who will in turn provide such UCC-1 financing statement to the Administrative Agent) on or prior to such Effective Date.

(ii) <u>Other Documents</u> . Carvana, the Transferor, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor shall have provided such other documents as the Trust or the Administrative Agent may reasonably request or otherwise require for the Trust to comply with the requirements to effectiveness under the Loan and Security Agreement.

(c) <u>Representations and Warranties</u> . Each of the representations and warranties of each of Carvana, the Transferor, the Trust, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor, under each of the Transaction Documents shall be true and correct in all material respects as of the date hereof (or, if another date for such representation or warranty is specified herein or therein, then such other date), and Carvana, the Transferor, the Trust, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to the date hereof.

17

(d) <u>Flow Purchase Agreement</u> . Each of Ally Bank, Ally Financial, Carvana and the Transferor, as the case may be, shall have executed and delivered the Flow Purchase Agreement and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on the Original Execution Date or the date hereof, as applicable, prior to the effectiveness thereof or thereunder.

Section 5.2 <u>Conditions to Obligation of the Trust</u> . The obligation of the Trust to purchase Receivables and the related Purchased Property with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Pool Supplement and the related Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Maximum Sales Amount</u> . The Receivables to be sold shall not include any receivables sold by Transferor to the Purchasers (as defined in the Master Sale Agreement (Flow) pursuant to the Master Sale Agreement (Flow) and the randomization code (as defined in the definition of Freestyle Selection) of any Receivables to be sold shall not exceed the Purchase Percentage for the Origination Period in which such Receivable was originated as specified in <u>Section 2.1(a)</u> .

(b) <u>Representations and Warranties</u> . Each of the representations and warranties of each of Carvana, the Transferor, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor, under each of the Transaction Documents shall be true and correct in all material respects at the time of each Closing Date (or, if another date for such representation or warranty is specified herein or therein, then such other date), and Carvana, the Transferor, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to each Closing Date.

(c) <u>Security Interests</u> . The security interest granted by the Transferor in favor of the Trust and by the Trust to the Administrative Agent in each Receivables Pool previously sold is a valid and continuing security interest prior to all other Liens, and is enforceable as against such other creditors of and purchasers from the Transferor and the Trust, as applicable.

(d) <u>Computer Files Marked</u> . Each of the Transferor and the Servicer shall have, on or prior to each Closing Date, indicated in its Receivables System, that such Purchased Property has been sold to the Trust and, upon pledge to the Administrative Agent under the Loan and Security Agreement, pledged to the Administrative Agent.

(e) <u>Documents to be Delivered By the Transferor</u> . On or before such Closing Date, the Transferor shall have delivered to the Trust the following documents:

(i) <u>The Pool Supplement</u> . The Transferor will execute and deliver the related Pool Supplement and each of the other documents, certificates and instruments required to be attached thereto as set forth in <u>Exhibit A</u> (a final completed draft of which shall be delivered to the Trust at least one Business Day prior to the Closing Date).

(ii) <u>Other Documents</u> . On each Closing Date, Carvana, the Trust, the Servicer, the Collateral Custodian, the Account Bank and the Performance Guarantor shall provide

18

or cause to be provided such other documents as the Trust may reasonably request or otherwise require for the Trust to comply with the conditions precedent under the Loan and Security Agreement.

(f) <u>Collateral Custodian Certificate</u> . With respect to all Receivables included in the related Receivables Pool, the Transferor shall have Delivered each related Original Contract Document to the Collateral Custodian and the Trust shall have received the related executed Document Receipt in accordance with the requirements of the Collateral Custodian Agreement, and the Transferor and the Servicer shall have marked their computer files with respect to such Receivables to indicate the interest of the Trust or its or their assignee.

(g) <u>First Step Sale</u> . The closing of the transactions contemplated to occur on such Closing Date pursuant to the Master Sale Agreement (Warehouse) shall occur simultaneously with the closing of the transactions contemplated herein.

(h) <u>Other Transactions</u> . The transactions contemplated by the Loan and Security Agreement and the other Transaction Documents shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder.

Section 5.3 <u>Conditions to Obligation of the Transferor</u> . The obligation of the Transferor to sell the Receivables with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Pool Supplement and the related Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Receivables Purchase Price</u> . On such Closing Date, the Trust shall deliver to the Transferor the Receivables Purchase Price for such Receivables Pool, in accordance with <u>Section 2.1(b)</u> of this Agreement.

(b) <u>Representations and Warranties True</u> . The representations and warranties of the Trust under this Agreement and each of the other Transaction Documents to which it is a party shall be true and correct in all material respects as of such Closing Date, and the Trust shall have performed in all material respects all covenants and agreements, if any, required to be performed by it hereunder and thereunder on or prior to such Closing Date.

(c) <u>Documents to be Delivered By the Trust</u> . On or before such Closing Date, the Trust shall have delivered to the Transferor the related Pool Supplement.

(d) <u>Other Documents</u> . On such Closing Date, the Trust shall provide such other documents as the Transferor may reasonably request.

(e) <u>First Step Sale</u> . The closing of the transactions contemplated to occur on such Closing Date pursuant to the Master Sale Agreement (Warehouse) shall occur simultaneously with the closing of the transactions contemplated herein.

(f) <u>Other Transactions</u> . The transactions contemplated by the Loan and Security Agreement and the other Transaction Documents shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder in connection with such sale and such Closing Date.

19

ARTICLE VI

COVENANTS OF THE TRANSFEROR

Section 6.1 <u>Protection of Right, Title and Interest</u> . The Transferor covenants and agrees with the Trust as follows:

(a) <u>Protection of Title; Filings</u> . The Transferor shall authorize and file such financing statements and amendments to financing statements and cause to be authorized, as applicable, and filed such continuation and other statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interest of (i) the Trust under this Agreement, each Pool Supplement and each Receivables Assignment and (ii) the interests of the Administrative Agent and the Lenders under the Loan and Security Agreement. The Transferor shall deliver (or cause to be delivered) to the Trust and the Administrative Agent file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing.

(b) <u>Name Change</u> . The Transferor shall not change its State of organization or its name, identity or corporate structure in any manner that would, could or might make any financing statement or continuation statement filed by the Transferor in accordance with <u>Section 6.1(a)</u> seriously misleading within the meaning of the UCC, unless it shall have given the Trust and the Administrative Agent (i) at least 30 days prior written notice thereof if such change would create a new debtor under the UCC (which for purposes of this <u>Section 6.1(b)</u> , shall not include a name change) or change the jurisdiction that would govern the perfection or effect of perfection against the Transferor and after delivery to the Trust and the Administrative Agent of the applicable financing statements necessary to perfect or continue the perfection of the Trust's and the Administrative Agent's security and ownership interests hereunder and under the other Transaction Documents, or (ii) otherwise, notice thereof within 30 calendar days after effectiveness of such change, together with delivery to the Trust and the Administrative Agent of the applicable financing statements necessary to perfect or continue the perfection of their respective security and ownership interests hereunder and under the other Transaction Documents.

(c) <u>Executive Office; Maintenance of Offices</u> . The Transferor shall (i) give the Trust and the Administrative Agent at least 30 days prior written notice of any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement Records; <u>provided</u> , that on or about April 1, 2017, the its principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85251 and (ii) deliver to the Trust and the Administrative Agent acknowledgment copies of the applicable financing statements necessary to perfect or continue the perfection of their respective security or ownership interests hereunder and under the other Transaction Documents (it being understood that amendments to all relevant financing statements will be filed in connection with the change in chief executive office described above). The Transferor shall at all times maintain offices from which it primarily services Receivables and its principal executive office within the United States of America.

20

(d) <u>New Debtor</u>. In the event that the Transferor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Transferor hereunder, the Transferor shall comply fully with the obligations of <u>Section 6.1(a)</u>.

(e) <u>Receivables System</u>. The Transferor shall maintain its Receivables System so that, from and after the time of sale of the Receivables under this Agreement, if the computer systems and records (including any backup archives) shall refer to any such Receivable, they shall indicate clearly the ownership interest of the Trust and, upon pledge to the Administrative Agent under the Loan and Security Agreement, the security interest of the Administrative Agent in such Receivable, as applicable. Indication of the Trust's ownership of and the Administrative Agent's security interest in a Receivable shall be deleted from or modified on the Receivables System and records of the Transferor, if any, when, and only when, the related Receivable shall have been paid in full or repurchased. The Transferor shall cause the Collateral Custodian or the E-Vault Provider on its behalf at all times to maintain "control" (as such term is used in Section 9-105 of the UCC) of all electronic records constituting or forming a part of a Receivable constituting electronic chattel paper on behalf of the Trust and, upon pledge to the Administrative Agent under the Loan and Security Agreement, the Administrative Agent as "secured party" (as such term is used in Section 9-105 of the UCC) such that the Trust and the Administrative Agent, as applicable, have had and at all relevant times will have a first priority perfected security interest against the Transferor and the Trust, as applicable, and their creditors in such Receivable.

(f) <u>Certificates of Title</u>. If the Transferor has not received a Certificate of Title related to a Purchased Receivable naming a Title Lien Nominee the first lien holder on such Certificate of Title for the related Financed Vehicle or the title application or other documentation necessary to obtain a Certificate of Title thereto noting such lien holder has not been submitted, then, promptly, but no later than 30 days after the related date of origination, the Transferor shall take all steps necessary to perfect the security interest against each Obligor in the related Financed Vehicle.

(g) <u>Maintenance of Records</u>. If at any time the Transferor proposes to sell, grant a security interest in, or otherwise transfer any interest in automotive contracts to any prospective purchaser, lender or other transferee, the Transferor shall give to such prospective purchaser, lender or other transferee computer tapes, records or printouts (including any restored from back-up archives) that, if they refer in any manner whatsoever to any specific Receivable, indicate that such Receivable has been sold to the Trust and pledged to the Administrative Agent, unless such Receivable has been paid in full or purchased by Carvana, the Transferor or the Servicer in accordance with the terms of the applicable Transaction Documents.

Section 6.2 <u>Other Liens or Interests</u>. Except for the sale contemplated by this Agreement and the Receivables Assignment, the Transferor shall not sell, pledge, assign or transfer any Receivable or the related Purchased Property (or any portion thereof) to any other Person, or grant, create, incur, assume or suffer to exist any Lien thereon or on any interest

21

therein, and the Transferor shall defend the right, title, and interest of the Trust and the Administrative Agent in, to and under such Receivables and the related Purchased Property or the Collateral, as applicable, against all claims of third parties claiming through or under the Transferor or the Trust, in the case of the Administrative Agent. The Transferor shall not do anything to impair the, right, title, ownership or security interest of the Trust and the Administrative Agent in the Purchased Property.

Section 6.3 <u>Perfection Costs and Expenses</u> . The Transferor agrees to pay all reasonable costs and disbursements in connection with the perfection, as against all third parties, of the Trust's right, title and interest in and to the Purchased Property with respect to each Receivables Pool.

Section 6.4 <u>Separateness</u> . The Transferor has taken, and shall continue to take, steps to make it unlikely that a voluntary or involuntary application for relief by Carvana under the Bankruptcy Code or similar applicable Requirements of Law in any state jurisdiction, would result in consolidation of the assets and liabilities of the Transferor with those of Carvana. These steps include the maintenance of the Transferor as a separate, limited-purpose subsidiary pursuant to the limitations in the Transferor's limited liability company agreement and compliance with any assumptions or statements of fact in the non-consolidation opinion delivered to the Administrative Agent in connection with the Transaction Documents.

Section 6.5 <u>Notice of Servicer Termination; Etc.</u> The Transferor shall notify the Trust and the Administrative Agent (A) as soon as possible and in any event within five (5) Business Days after it obtains knowledge of the occurrence of an Event of Servicing Termination; and (B) promptly after the Transferor obtains knowledge thereof, notice of any litigation, investigation or proceeding that may exist at any time between the Transferor and any Person or any litigation or proceeding relating to this Agreement, the other Transaction Documents or the Purchased Property.

Section 6.6 <u>Conduct of Business; Ownership</u> . The Transferor shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted and do all things necessary to remain duly organized, validly existing and in good standing as a domestic limited liability company in its jurisdictions of formation and maintain all requisite authority, licenses and permits to conduct its business in each jurisdiction in which its business is conducted, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect.

Section 6.7 <u>Collections</u> . In the event the Transferor receives any Collections after the applicable Cutoff Date with respect to the Purchased Property for any amount due, it shall turn over any Collections received by it with respect to any Purchased Property to the Servicer within two (2) Business Days after its identification of such Collections.

Section 6.8 <u>Selection Standards; Quarterly Meetings.</u> Until the Commitment Termination Date, in addition to the Quarterly Operations Review (as defined in the Master Servicing Agreement), the Transferor shall participate in quarterly meetings with the Administrative Agent and the Lenders (" <u>Quarterly Selection Standards Meeting</u> ") on the 60 <u>th</u> day (or such other day as soon thereafter as the Transferor and the Administrative Agent shall

22

mutually agree) of each quarter and if such day is not a Business Day, then on the next Business Day (or as Parties may mutually agree) by telephone or, if agreed to by the parties, in person, to discuss and review, among other things, loss and delinquency performance of Carvana's originated portfolio of motor vehicle installment sales contracts and installment loans, any material changes to the Carvana's Credit Policy and other origination or underwriting guidelines, processes or policies, including special origination programs, that could influence, modify or impact the Purchased Property or the mix or characteristics of future Receivables Pools, as well as any proposed amendments or modifications to the definitions of Eligible Receivable or Eligible Receivables Pool since the preceding Quarterly Selection Standards Meeting.

Section 6.9 Furnishing of Information and Inspection of Records . If at any time the Transferor maintains any information regarding the Purchased Property, the Transferor shall furnish to the Administrative Agent from time to time such information with respect to the Purchased Property as the Administrative Agent may reasonably request. If the Transferor maintains such information, the Transferor shall, at any time and from time to time during regular business hours, as requested by the Administrative Agent, permit the requesting party, or its agents, representatives or regulators, (i) to examine and make copies of and take abstracts from all books, records and documents (including computer tapes and disks) relating to the Receivables or other Purchased Property, and (ii) to visit the offices and properties of the Transferor for the purpose of examining such materials described in clause (i), and to discuss matters relating to the Purchased Property or the Transferor's performance hereunder and under the other Transaction Documents to which such Person is a party with any of the officers, directors, employees or independent public accountants of the Transferor having knowledge of such matters.

Section 6.10 Compliance with Laws, Etc. The Transferor shall comply with all Requirements of Law applicable to it, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Trust, the Administrative Agent, the Lenders or any of the Purchased Property or any of the transactions contemplated by the Transaction Documents.

Section 6.11 Indemnification.

(a) The Transferor shall indemnify, defend and hold harmless the Trust, the Owner Trustee, the Administrative Agent, the Lenders and their respective assigns and their respective officers, directors, employees, Affiliates and agents (the " Transferor Indemnified Parties ") from and against any and all costs, expenses, losses, damages, claims and liabilities arising out of or resulting from the use, ownership or operations by the Transferor or any of its Affiliates of any Financed Vehicle.

(b) The Transferor shall indemnify, defend and hold harmless the Transferor Indemnified Parties from and against any and all reasonable and documented costs, expenses, losses, claims, damages and liabilities solely to the extent that such cost, expense, loss, claim, damage or liability arose out of or resulted from the action or inaction (including any failure to comply with any applicable Requirements of Law) of any third party to whom the Transferor subcontracted or delegated the performance of its duties under this Agreement or the other Transaction Documents to which it is a party and only to the extent such cost, expense, loss, claim, damage or liability is not related to any credit loss.

23

(c) The Transferor shall indemnify, defend and hold harmless the Transferor Indemnified Parties from and against any and all costs, expenses, losses, claims, damages and liabilities, including reasonable external legal fees and expenses (i) to the extent that such cost, expense, loss, claim, damage, or liability arose out of, resulted from or was imposed upon any such Transferor Indemnified Party through the negligence (except for reasonable errors in judgment), willful misfeasance or bad faith of the Transferor or agent in the performance of its duties under this Agreement or the other Transaction Documents to which it is a party or by reason of a breach of its obligations or duties under this Agreement or the other Transaction Documents to which it is a party, (ii) arising out of, or resulting from, any breach of any representation, warranty, covenant or obligation of the Transferor in this Agreement, or the other Transaction Documents to which it is a party or in any Schedule, Exhibit, written statement or certificate furnished by the Transferor pursuant to this Agreement or the other Transaction Documents to which it is a party (in each case, as each such representation or warranty would read if all qualifications as to knowledge or materiality, including each reference to the defined term "Material Adverse Effect," were deleted therefrom), (iii) arising out of, or resulting from, any untrue statement of a material fact in any written information provided or delivered by the Transferor, or any Affiliate of the Transferor on its behalf, to the Trust, the Administrative Agent or the Lenders pursuant to, for the purposes of, or in connection with, this Agreement or the other Transaction Documents to which it is a party, (iv) arising out of, or resulting from, any action, suit, proceeding or claim or other litigation to the extent resulting from the actions or omissions of the Transferor, the Trust or any of their consolidated Affiliates or any of their respective agents, directors, officers, servants or employee, excluding, however, any costs, expenses, losses, claims, damages or liabilities resulting from the gross negligence, bad faith or willful misconduct on the part of such Transferor Indemnified Party and (v) resulting from any conduct or omission of the Transferor or the Trust that results in failure of the Trust or the Administrative Agent, as applicable, to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle, including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable. Indemnification under this Section 6.11 shall include reasonable fees and expenses of one external counsel and reasonable costs and expenses of litigation; provided, however, that the Transferor pursuant to this Section 6.11, Carvana pursuant to Section 6.11 of the Master Sale Agreement (Warehouse), the Trust, the Transferor or the Trust Administrator pursuant to Article XI of the Loan and Security Agreement, and the Servicer pursuant to Section 5.2 of the Master Servicing Agreement shall only be responsible collectively for reasonable fees and expenses of one external counsel. If the Transferor has made any indemnity payments pursuant to this Section 6.11 and the recipient thereafter collects any of such amounts from others with respect to such claim, the recipient shall promptly repay such amounts collected to the Servicer, without interest.

(d) This Section 6.11 shall survive any termination of this Agreement.

Section 6.12 Forbearance. The Transferor shall not cause or permit the Trust to take any action which would result in the Trust's failure to comply with Sections 6.4 or 6.14 hereunder or the Trust's failure to comply with Sections 6.1(o) of the Loan and Security Agreement.

24

Section 6.13 <u>Consolidations, Mergers and Sales of Assets</u> . The Transferor and the Trust will not be a party to any merger or consolidation, or purchaser or otherwise acquire all or substantially all of the assets or any stock of any class of, or any partnership or joint venture interest in, any other Person, or sell, transfer, covey or lease all or any substantial part of its assets, or sell or assign with or without recourse any portion of its assets or the Collateral or any interest therein (other than pursuant to the Transaction Documents.

Section 6.14 <u>Operation of the Transferor</u> . Without limiting the generality of <u>Section  6.4</u> , the Transferor shall be operated and managed in accordance with rating agency requirements for single-use special purpose entities.

Section 6.15 <u>Furnishing of Information and Inspection of Records</u> . The Transferor shall furnish to the Trust and the Administrative Agent from time to time such information with respect to the Purchased Property or the origination or acquisition thereof as the Trust and the Administrative Agent may reasonably request to the extent that such information is not held by or under the control of the Servicer. The Transferor shall, at any time and from time to time during regular business hours, as requested by the Trust or the Administrative Agent, permit the requesting party, or its agents, representatives or regulators, (i) to examine and make copies of and take abstracts from all books, records and documents (including computer tapes and disks) relating to the Receivables or other Purchased Property to the extent that such information is not held by or under the control of the Servicer, and (ii) to visit the offices and properties of the Transferor for the purpose of examining such materials described in clause (i), and to discuss matters relating to the Purchased Property or the origination or acquisition thereof or the Transferor's performance hereunder and under the other Transaction Documents to which such Person is a party with any of the officers, directors, employees or independent public accountants of the Transferor having knowledge of such matters.

Section 6.16 <u>Publicity</u> . All media releases, public announcements and public disclosures by any Party or its respective employees or agents, relating to this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby or the name of the Transferor, the Trust, the Administrative Agent or the Lenders, including promotional or marketing material, shall be coordinated with and consented to by the other Party in writing prior to the release thereof, which consent shall not be unreasonably withheld or delayed; <u>provided</u> , <u>however</u> , that any announcement intended solely for internal distribution by the disclosing Party to its directors, employees, officers and agents or any disclosure required by Requirements of Law or by accounting requirements, shall not require such coordination or consent.

Section 6.17 <u>No Solicitation</u> . The Transferor agrees that it will not, directly or indirectly, specifically solicit, and will not permit any of its Affiliates to, directly or indirectly, specifically solicit, any Obligor (in writing or otherwise) to refinance any Purchased Receivable (including solicitations for the purchase of a new vehicle); <u>provided</u> , <u>however</u> , that each of Transferor and its Affiliates may, directly or indirectly, engage in a general solicitation directed generally at the obligors of receivables originated or serviced by the Transferor or the Servicer at large, so long as the Obligors under the Purchased Receivables are not the predominant targets of such general solicitation for refinancing.

Section 6.18 <u>Remediation</u> . The Transferor shall (i) provide the Trust and the Administrative Agent with written notice, to the extent not prohibited by any applicable Requirements of Law, of any Remediation if such Remediation could reasonably be expected, individually or in the aggregate with any other Remediation, to have a Material Adverse Effect on the Trust, the Administrative Agent or the Lenders or any of the Purchased Property or the Collateral and (ii) implement any Remediation in accordance with all terms thereof and all applicable Requirements of Law.

Section 6.19 <u>Quarterly Statements as to Compliance</u> . The Transferor shall deliver to the Trust and the Administrative Agent and the Lenders on or before the forty-fifth (45th) day following each calendar quarter, beginning February 14, 2018 (or, if such day is not a Business Day, the next succeeding Business Day), an Officer's Certificate of the Transferor, dated as of the last Business Day of the immediately preceding calendar quarter, in each instance stating that (i) a review of the activities of the Transferor during the preceding calendar quarter (or, with respect to the first such certificate, such period as shall have elapsed from the Effective Date to the date of such certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Transferor has fulfilled all its obligations under this Agreement in all material respects throughout such period, or, if there has been a default in the fulfillment of any such obligation, in any material respect specifying each such default known to such officer and the nature and status thereof.

Section 6.20 <u>Additional Covenants.</u> From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will:

(a) <u>Preservation of Existence; License</u> . It will preserve and maintain its existence, rights, franchises and privileges in its State of formation, and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or would reasonably be expected to have, a Material Adverse Effect and (without suspension or limitation) will not terminate or let lapse any licenses, consents or approval currently held by it necessary to ensure its performance of any duty contemplated this Agreement or the other Transaction Documents to which it is a party.

(b) <u>Performance and Compliance with Contracts</u> . It will, at its expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Contracts and in and all other agreements related to such Contracts. It shall enforce its rights under this Agreement or the other Transaction Documents to which it is a party.

(c) <u>Keeping of Records and Books of Account</u> . It will (or will cooperate with the Servicer to) maintain and implement administrative and operating procedures (including an ability to re-create records evidencing Receivables in the event of the destruction of the originals thereof, in the case of tangible Contracts, or loss of access to the vault system of the Contracts maintained therein, in the case of electronic Contracts), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables.

26

(d) <u>Transferred Assets</u>. With respect to each Receivable transferred or acquired by it, it will: (i) transfer or acquire such Receivable pursuant to and in accordance with the terms of this Agreement, (ii) take all action necessary to perfect, protect and more fully evidence the assignee's interest in such Receivable, including (A) filing and maintaining, effective financing statements (Form UCC-1) in all necessary or appropriate filing offices, and filing continuation statements, amendments or assignments with respect thereto in such filing offices and (B) executing or causing to be executed such other instruments or notices as may be necessary or appropriate and (iii) taking all additional action that the Trust or the Administrative Agent may reasonably request, including the filing of financing statements to perfect, protect and more fully evidence the respective interests of the parties to this Agreement, the Master Sale Agreement (Warehouse) and the Loan and Security Agreement in the Purchased Property.

(e) <u>Collection Policy</u>. It will (or will cooperate with the Servicer to), to the extent applicable, comply with the Collection Policy with respect to each Receivable.

(f) <u>Taxes</u>. It will file or cause to be filed all federal and material state, local or foreign tax returns that are required to be filed by it. It will shall pay all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of which it plans to contest in good faith by appropriate proceedings and with respect to which it retains reserves on its books).

(g) <u>Liens</u>. It will not create, or participate in the creation of, or permit to exist, any Lien with respect to the Collection Account or any account into which collections on the Receivables are deposited, except as set forth in the Transaction Documents.

(h) <u>Reporting</u>. It will distribute, or cause to be distributed, to the Trust and the Administrative Agent:

(i) <u>Settlement Reports</u>. Not later than the second Business Day preceding each Settlement Date, a Settlement Report, and not later than the third Business Day preceding any Funding Date, a Funding Report.

(ii) <u>Additional Data</u>. Additionally, and solely to the extent such data is available, the Transferor shall provide, or reasonably cooperate with the Servicer to provide the Administrative Agent the Monthly Servicer Report or Monthly Data File, as applicable, in a format reasonably acceptable to the Administrative Agent, with data regarding the characteristics of the Receivables, in form and substance necessary for the Trust and the Servicer to comply with the information requirements under the Loan and Security Agreement and the Master Servicing Agreement, respectively, and the reasonably acceptable to the Administrative Agent, including (A) delinquencies (including a list of Delinquent Receivables), and (B) annualized losses or loss information by vintage origination year on Carvana's originated portfolio of motor vehicle installment sales contracts and installment loans, presented on a quarterly basis, in each case of <u>clause (A)</u> and <u>(B)</u>, until the date all amounts outstanding under the Loan and Security Agreement (other than inchoate obligations for which no claim has been made) have been paid in full.

27

(iii) <u>Income Tax Liability</u> . Within ten (10) Business Days after the receipt of revenue agent reports or other written proposals, determinations or assessments of the Internal Revenue Service or any other taxing authority which propose, determine or otherwise set forth positive adjustments to the tax liability of any "Affiliated Group" (within the meaning of Section 1504(a)(l) of the Code) which equal or exceed twenty-five thousand dollars ($25,000) with respect to the Transferor or the Trust, telephonic or emailed notice (confirmed in writing within five (5) Business Days) specifying the nature of the items giving rise to such adjustments and the amounts thereof.

(iv) <u>Tax Returns</u> . Upon demand by the Administrative Agent, copies of all federal, State and local tax returns and reports filed by the Transferor (excluding sales, use and like taxes), to the extent the Transferor is required to file such tax returns.

(v) <u>Auditors' Management Letters</u> . Promptly after any auditors' management letters are received by the Transferor or by its accountants, which refer in whole or in part to any inadequacy, defect, problem, qualification or other lack of fully satisfactory accounting controls utilized by the Transferor.

(vi) <u>ERISA</u> . Promptly after receiving written notice of any "Reportable Event" (as defined in Title IV of ERISA) with respect to the Transferor (or any ERISA Affiliate thereof), a copy of such written notice.

(vii) <u>Notice of Material Events</u> . Promptly after obtaining knowledge of an event or circumstance that is likely to result in a Commitment Termination Event, Event of Servicing Termination or have a Material Adverse Effect on the Transferor or the Trust, the Purchased Property, the Administrative Agent or the Lenders, or entry of a judgment against the Transferor or the Trust of $25,000 or more, notice of such event or circumstance.

(i) <u>Accounting Policy</u> . It will promptly notify the Trust and the Administrative Agent of any material change in its accounting policies.

(j) <u>Other</u> . It will furnish to the Administrative Agent promptly, from time to time, such other information, documents, records or reports respecting the Purchased Property or the condition or operations, financial or otherwise, of it as the Administrative Agent may from time to time reasonably request in order to protect the interests of the Trust, the Administrative Agent and the Lenders under or as contemplated by the Transaction Documents.

(k) <u>Compliance with System Description</u> . It will, and will cause the Collateral Custodian and E-Vault Provider, at all times comply in all material respects with the System Description with respect to matters related to the perfection in the Receivables, the Purchase Receivable and the Collateral by "control" (as such term is used in Section 9-105 of the UCC).

(l) <u>Financial Statements</u> . To the extent not filed with the Securities and Exchange Commission and publicly available on EDGAR, within 120 days after the end of each fiscal year

28

and 60 days after each fiscal quarter (or if the Transferor is a reporting company under the Securities and Exchange Act of 1934, such period as required thereunder for the filing thereof), the Transferor will provide to the Administrative Agent copies of its unaudited financial statements for the prior fiscal year or unaudited financial statements with respect to each of the first three fiscal quarters.

(m) Access to Systems . During the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall give the Administrative Agent and the Lender and their duly authorized representatives, attorneys and auditors, upon reasonable request of the Administrative Agent, on-site access to the Transferor's loan tracking systems and document repository, which access shall facilitate quality assurance and quality control reviews, enable the Administrative Agent and the Lenders to back-up Receivables Files to the their respective systems, to enable them to review Receivables tracking processes, procedures, approvals and boarding and permit them with reasonable access to the Transferor's quality reporting and backup documentation (e.g., workpapers, sampled transactions and account-level results). Promptly following the end of each calendar month during the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, at the reasonable request of the Administrative Agent, provide the Administrative Agent and the Lenders with screenshots that would enable them to complete the foregoing review on a sample of Receivables determined by the Administrative Agent (limited to one hundred (100) Receivables in any calendar week.

(n) Annual Opinion of Counsel . Counsel for the Transferor shall deliver on or before March 15 of each year (or, if such date is not a Business Day, the next succeeding Business Day), beginning March 15, 2018, an Opinion or Opinions of Counsel addressed to the Trust and the Administrative Agent and the Lenders stating that, in the opinion of such counsel, such action has been taken with respect to the authorization, execution and filing of any financing statements and continuation statements as is necessary to maintain the liens and security interests created under this Agreement and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the liens and security interests created under this Agreement.

(o) Delivery of Servicer Files . To the extent that any portion of the Servicer Files related to any Purchased Receivable is not in the possession of the Servicer immediately prior to any related Closing Date, the Transferor shall deliver such portion of the Servicer Files for each Receivable listed on the Schedule of Receivables delivered to the Administrative Agent on each Closing Date.

Section 6.21 Negative Covenants . From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will not:

(a) Receivables Not to be Evidenced by Instruments . It will take no action to cause any Receivable that is not, as of the Closing Date or the related Settlement Date, as the case may be, evidenced by an "instrument" (as defined in Article 9 of the UCC), other than an instrument that constitutes part of chattel paper, to be so evidenced except in connection with the enforcement or collection of such Receivable.

29

(b) <u>True Sale</u>. It will not account for or treat (whether in its financial statements or otherwise) the transfers by Carvana to the Transferor or the Transferor to the Trust in any manner other than as the sale, or absolute assignment, of the Receivables and related assets.

(c) <u>ERISA Matters</u>. It will not, to the extent it could reasonably result in material liability to or impairment of any assets of or interests of the Trust, the Administrative Agent or the Lenders in assets of the Transferor, (i) engage or permit any ERISA affiliate to engage in any prohibited transaction for which an exemption is not available or has not previously been obtained from the United States Department of Labor, (ii) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Code with respect to any Pension Plan, (iii) fail to make any payments to a Multiemployer Plan that it or any ERISA Affiliate is required to make under the agreement relating to such Multiemployer Plan or any law pertaining thereto, (iv) permit the filing of any notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, (v) permit the termination of any Pension Plan under Section 4041(c) of ERISA or the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate or appoint a trustee to administer a Pension Plan, or (vi) permit any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(d) <u>Changes in Payment Instructions to Obligors</u>. It will not add or make any change, or permit the Servicer to make any change, in its instructions to Obligors regarding payments to be made with respect to the Receivables, unless the Administrative Agent shall have consented to such change and has received duly executed copies of all documentation related thereto, which documentation shall be satisfactory in form and substance to the Administrative Agent.

(e) <u>Extension or Amendment of Receivables</u>. It will not, except as otherwise permitted in pursuant to this Agreement or the other Transaction Documents, extend, amend or otherwise modify, or permit the Servicer to extend, amend or otherwise modify, the terms of any Receivables.

(f) <u>Credit Policy</u>. During the Commitment Period, the Transferor will not permit Carvana to amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to <u>Exhibit B</u> attached hereto, without written notification to the Administrative Agent; <u>provided</u> that the prior written consent of the Administrative Agent shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Administrative Agent or the Lenders under this Agreement or any other Transaction Document. At the Administrative Agent's request, but no more frequently than [***], the Transferor will cause Carvana to provide to the Administrative Agent an explanation of all material changes to Carvana's policies concerning generation of financing terms over the preceding [***]. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

30

(g) Collection Policy . The Transferor will not amend, modify, restate or replace, in whole or in part, the Collection Policy, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement, and as modified by the Servicing Exceptions, if any, or with respect to any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Administrative Agent and agreed to in writing by such successor Servicer and the Administrative Agent, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement.

(h) No Assignments . It will not assign or delegate, grant any interest in or permit any Lien (other than Permitted Liens) to exist upon any of its rights, obligations or duties under this Agreement or any other Transaction Document without the prior written consent of the Administrative Agent.

ARTICLE VII

MISCELLANEOUS PROVISIONS

Section 7.1 Obligations of the Transferor . The obligations of the Transferor under this Agreement shall not be affected by reason of any invalidity, illegality or irregularity of any Receivable with respect to any Receivables Pool.

Section 7.2 Repurchase of Receivables Upon Breach by the Transferor . Upon (i) the discovery of any breach of any representation or warranty as set forth in Section 4.2(cc) of this Agreement (and with respect to paragraph (x) therein, without giving effect to any knowledge requirements) or (ii) The Transferor, the Trust, the Administrative Agent or the Lenders incurring any cost, expense, loss, claim, damage or liability resulting from any conduct or omissions of Carvana or the Transferor that results in the failure of the Trust or the Administrative Agent to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Unless the breach described in clause (i) above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in clause (ii) above, in each such circumstance, or unless Carvana has repurchased such Receivables pursuant to Section 7.2 of the Master Sale Agreement (Warehouse) the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit the Warranty Payment to the Trust, who shall in turn remit, or cause to be remitted, such payment to the Collection Account for distribution pursuant to Section 4.2 of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in Section 6.11 of this Agreement) against the Transferor for such breach available to the Trust, the Administrative Agent and the Lenders.

31

Section 7.3 <u>A ssignment of Warranty Receivables</u> . With respect to all Receivables repurchased pursuant to this Agreement, the Trust shall assign to the Transferor, without recourse, representation or warranty to the Transferor, all of the Trust's right, title and interest in and to such Receivables, and all security and documents relating thereto

Section 7.4 <u>Amendment</u> . This Agreement may be amended from time to time, with prior written consent of the Administrative Agent and the Lenders, by a written amendment duly executed and delivered by the Transferor and the Trust.

Section 7.5 <u>Waivers</u> . No failure or delay on the part of the Trust or any assignee thereof in exercising any power, right or remedy under this Agreement, any Pool Supplement or any Receivables Assignment shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy.

Section 7.6 <u>Notices</u> . All communications and notices pursuant hereto to either Party must be in writing personally delivered, sent by facsimile or email, in each case with a copy to follow via first class mail or mailed by certified mail-return receipt requested, and shall be deemed to have been duly given at the address, fax number or email for each Party set forth below.

| | |
|---|---|
| To the Transferor: | Carvana Auto Receivables 2016-1 LLC<br>c/o Carvana, LLC, its sole member<br>4020 East Indian School Road<br>Phoenix, Arizona 85018<br>Attention: General Counsel<br>Email: DL-CarvanaLegal@carvana.com |
| With a copy to: | Snell & Wilmer L.L.P.<br>400 East Van Buren<br>Phoenix, Arizona 85004-2202<br>Attention: Brian Burke<br>602.382.6379<br>bburke@swlaw.com |
| To the Trust: | Sonoran Auto Receivables Trust 2016-1<br>CAIH, LLC<br>227 West Monroe, Suite 4800<br>Chicago, Illinois 60606<br>Attention: Gregory Drake<br>Email: [                    ] |

32

| | |
|---|---|
| With a copy to: | Carvana, LLC<br>4020 East Indian School Road<br>Phoenix, Arizona 85018<br>Attention: General Counsel<br>Email: DL-CarvanaLegal@carvana.com |
| To Administrative Agent: | Ally Bank<br>6985 Union Park Center<br>Midvale, UT 84047<br>Attn: Greg Behrmann<br>Telephone No.: (801) 790-5068<br>Email: greg.behrmann@ally.com |
| To Carvana: | Carvana, LLC<br>4020 East Indian School Road<br>Phoenix, Arizona 85018<br>Attention: General Counsel<br>Email: DL-CarvanaLegal@carvana.com@carvana.com |
| With a copy to: | Snell & Wilmer L.L.P.<br>400 East Van Buren<br>Phoenix, Arizona 85004-2202<br>Attention: Brian Burke<br>602.382.6379<br>bburke@swlaw.com |

Section 7.7 <u>Costs and Expenses</u> . Except as otherwise provided in this Agreement or the other Transaction Documents, the Transferor and the Trust shall each pay its own expenses incident to the performance of its respective obligations under this Agreement.

Section 7.8 <u>Survival</u> . The respective agreements, representations, warranties and other statements by the Transferor and the Trust set forth in or made pursuant to this Agreement shall remain in full force and effect and shall survive the closing under <u>Section  2.2</u> and any sale, transfer or other assignment of the Receivables or other Purchased Property by the Trust.

Section 7.9 <u>Headings and Cross-References</u> . The various headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 7.10 <u>Governing Law, Submission to Jurisdiction, Etc</u> .

(a) THIS AGREEMENT AND THE RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

33

(b) THE TRANSFEROR AND THE TRUST HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE TRUST HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE TRUST EACH HEREBY WAIVES (TO THE EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. INSTEAD, ANY DISPUTE RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 7.11 <u>Counterparts</u> . This Agreement may be executed in two or more counterparts and by different parties on separate counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement electronically or by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 7.12 <u>Further Assurances</u> . The Transferor and the Trust shall each, at the request of the other or the Administrative Agent execute and deliver to the other all other instruments that either may reasonably request in order to more fully effect the sale of the Purchased Property to the Trust or the sale of the Purchased Property to the Trust or the pledge thereof to the Administrative Agent.

Section 7.13 <u>Severability of Provisions</u> . If any provision of this Agreement is invalid or unenforceable, then, to the extent such invalidity or unenforceability shall not deprive either Party of any material benefit intended to be provided by this Agreement, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

Section 7.14 <u>Assignment</u> . Neither the Transferor nor the Trust may assign or otherwise transfer its rights and obligations under this Agreement without the prior written consent of the other Party and the Administrative Agent except that the Trust may pledge such rights to the Administrative Agent pursuant to the Loan and Security Agreement.

Section 7.15 <u>Further Assignment; Third Party Beneficiary</u> . The Transferor acknowledges that the Trust may, pursuant to the Loan and Security Agreement, pledge such Receivables and related Purchase Property to the Administrative Agent. The Parties hereby acknowledge and agree that the Administrative Agent and the Lenders may rely on, and each is an express third party beneficiary of, this Agreement and the Receivables Assignment, and each of the representations, warranties, covenants and agreements hereunder and thereunder.

Section 7.16 <u>Limitations on Rights of Others</u> . The provisions of this Agreement, each Pool Supplement and each Receivables Assignment are solely for the benefit of the Transferor, the Trust and the Administrative Agent and the Lenders, and nothing in this Agreement, whether express or implied, shall be construed to give to any other Person any legal or equitable right, remedy or claim in, under, or in respect of this Agreement or any covenants, conditions or provisions contained herein. This Agreement does not create, and shall not be deemed to create, a relationship between the Parties or either of them and any third party, other than the Administrative Agent and the Lenders, as described in <u>Section  7.15 </u>above in the nature of a third party beneficiary or fiduciary relationship; <u>provided</u> , <u>however</u> , that the existence of this <u>Section  7.16 </u>shall not relieve the Transferor of its indemnity obligations set forth in <u>Section  6.11 </u>of this Agreement and the Trust may, and shall when requested, enforce such indemnification claims for the Transferor Indemnified Parties set forth in <u>Section  6.11 </u>.

Section 7.17 <u>No Petition Covenant</u> . Notwithstanding any prior termination of this Agreement, the Trust shall not, prior to the date which is one year and one day after the later (i) of the final payment or liquidation of all Receivables purchased by Ally Bank and Ally Financial, Inc. under the Flow Purchase Agreement and (ii) the repayment in full of all obligations owing to the Administrative Agent and the Lenders pursuant to the Loan and Security Agreement, acquiesce, petition or otherwise invoke or cause the Transferor to invoke the process of any Governmental Authority for the purpose of commencing or sustaining a case against the Transferor under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Transferor or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Transferor under any federal or state bankruptcy or Insolvency Proceeding.

Section 7.18 <u>Concerning the Owner Trustee</u> . It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust, National Association (" <u>WTNA</u> "), not individually or personally but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by WTNA but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on WTNA, individually or personally, to perform any covenant either expressed or implied contained herein of the Trust, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, (d) WTNA has made no investigation as to the accuracy or completeness of any representations and warranties made by the Trust in this Agreement and (e) under no circumstances shall WTNA be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other Transaction Documents.

<div align="center">35</div>

Section 7.19 <u>Effect of Amendment and Restatement</u> . It is the intent of the parties hereto that this Amended and Restated Master Transfer Agreement shall, as of the date hereof, amend and restate and replace in its entirety the Master Transfer Agreement (the " <u>Original Master Transfer Agreement</u> "), dated December 29, 2016, among the Transferor and the Trust; provided that, with respect to the period of time from December 29, 2016, through the date hereof, the rights, obligations, representations and warranties of the parties shall be governed by the Original Master Transfer Agreement; provided further, that the amendment and restatement of the Original Master Transfer Agreement shall not affect any of the grants, transfers or conveyances contemplated by the Original Master Transfer Agreement to have occurred prior to the date hereof. Each of the parties hereto, in each of its respective capacities hereunder and under each of the other Transaction Documents, as applicable, hereby consents to the amendment and restatement of the Original Master Transfer Agreement and each of the other Transaction Documents on the date hereof, and does hereby acknowledge receipt of notice of such amendments and restatements and waives any further notice requirement with respect thereto, if and to the extent any such consent or notice was required hereunder or thereunder.

\* \* \*

36

The Parties have caused this Amended and Restated Master Transfer Agreement to be executed by their respective duly authorized officers as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC, as Transferor

By:  /s/ Paul Breaux
     Name: Paul Breaux
     Title: Vice President

SONORAN AUTO RECEIVABLES
TRUST 2016-1

By:  WILMINGTON TRUST,
     NATIONAL ASSOCIATION,
     not in its individual capacity, but solely
     as Owner Trustee

By:  /s/ Dorri Costello
     Name: Dorri Costello
     Title: Vice President

S-1

**EXHIBIT A**

FORM OF POOL SUPPLEMENT

THIS POOL SUPPLEMENT (this " <u>Supplement</u> ") to the Amended and Restated Master Transfer Agreement (the " <u>Master Transfer Agreement</u> "), dated as of March 6, 2017, by and between Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the " <u>Transferor</u> ") and Sonoran Auto Receivables Trust 2016-1, a Delaware statutory trust (the " <u>Trust</u> "). Except as otherwise expressly provided herein or unless the context otherwise requires, all capitalized terms used herein shall have the meanings attributed to them in <u>Appendix A</u> to the Master Transfer Agreement.

**<u>Receivables Pool Specific Information</u>** .

(a) The following information shall apply to the Receivables Pool sold by the Transferor to the Trust on the date hereof:

| | |
|---|---|
| Receivables Pool Number: | [Insert Pool Number] |
| Pool Cutoff Date: | [          , 20   ]. |
| Closing Date: | [          , 20   ]. |
| Cutoff Date Aggregate Outstanding Principal Balance: | $ [          ]. |
| Purchase Price: | $ [          ]. |
| Total to be Wired | $ [          ]. |
| The first Payment Date: | [          , 20   ]. |
| The first Reporting Date: | [          , 20   ]. |

(b) The following Schedules are attached hereto and incorporated herein by reference:

| | |
|---|---|
| SCHEDULE 1 | Officer's Certificate of the Transferor |
| SCHEDULE 2 | Settlement Report |
| SCHEDULE 3 | Receivables Assignment |
| SCHEDULE 4 | Accounts and Receivables Analysis for the subject Receivables Pool |
| SCHEDULE 5 | Schedule of Receivables for the subject Receivables Pool |
| SCHEDULE 6 | Pool Stratifications and Other Pool Characteristics |

Each such Exhibit shall be completed and executed (as applicable) as of the Closing Date.

> **Section 2. <u>Representations and Warranties of the Transferor</u> .**

> The representations and warranties of the Transferor set forth in <u>Section  4.2(n)</u> of the Master Transfer Agreement shall be true as of the Closing Date.

> **Section  3. <u>Effect of Supplement</u> .** Except as specifically supplemented herein, the Master Transfer Agreement shall continue in full force and effect in accordance with its original terms. Reference to this specific Supplement need not be made in the Master Transfer Agreement, or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to or with respect to the Master Transfer Agreement, any reference in any of such items to the Master Transfer Agreement being sufficient to refer to the Master Transfer Agreement as supplemented hereby.

> **Section  4. <u>Counterparts</u> .** This Supplement may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Supplement electronically or by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement. Any of the parties hereto may execute this Supplement by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original. This Supplement shall be governed by the internal laws of the State of New York.

> **Section  5 <u>Concerning the Owner Trustee</u> .** It is expressly understood and agreed by the parties hereto that (a) this Pool Supplement is executed and delivered by Wilmington Trust, National Association ("WTNA"), not individually or personally but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by WTNA but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on WTNA, individually or personally, to perform any covenant either expressed or implied contained herein of the Trust, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, (d) WTNA has made no investigation as to the accuracy or completeness of any representations and warranties made by the Trust in this Pool Supplement and (e) under no circumstances shall WTNA be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Pool Supplement or any other Transaction Documents.

<center>* * * * *</center>

<center>Ex. A- 2 -</center>

IN WITNESS WHEREOF, the parties hereto have caused this Pool Supplement to the Amended and Restated Master Transfer Agreement to be duly executed by their respective officers duly authorized as of the day and year first above written.

SONORAN AUTO RECEIVABLES TRUST 2016-1

By:    WILMINGTON TRUST,
        NATIONAL ASSOCIATION,
        not in its individual capacity, but solely
        as Owner Trustee

By: _____
Name:
Title:

CARVANA AUTO RECEIVABLES 2016-1 LLC, as Transferor

By: _____
Name:
Title:

Ex. A- 3 -

**Schedule 1**

**Officer's Certificate of the Transferor**

In accordance with <u>Section 1(b)</u> of the Pool Supplement dated as of [          ], 20[   ], by and between Sonoran Auto Receivables Trust 2016-1, a Delaware statutory trust (the " <u>Trust</u> "), and Carvana Auto Receivables 2016-1 LLC (the " <u>Transferor</u> "), a Delaware limited liability company, the undersigned hereby certifies to the Trust that, as of the date hereof, the representations and warranties of the Transferor under the Master Transfer Agreement and the other Transaction Documents to which it is a party are true and correct in all material respects (or, if another date for such representation or warranty is specified therein, then as of such other date), and that the Transferor has complied with all agreements and satisfied all conditions on its part to be performed or satisfied in all material respects on or prior to the date hereof pursuant to the Master Transfer Agreement and the other Transaction Documents to which it is a party.

Sch. 1-1

IN WITNESS WHEREOF, the undersigned has executed this Officer's Certificate as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1, LLC, as Transferor

By
Name:
Title:

Sch. 1-2

**Schedule 2**

**FORM OF SETTLEMENT REPORT** [1]

| | |
|---|---|
| Pool Cutoff Date | /  /20 |
| Closing Date | /  /20 |
| Days Elapsed between Cutoff and Closing | [   ] |
| A. Cutoff Date Aggregate Outstanding Principal Balance | $[          ] |
| B. Purchase Price | $[          ] |
| Receivables Purchase Price | $[          ] |
| Total to be Wired | $[          ] |

Collections after the related Cutoff Date of each Receivable to the Closing Date to be paid by the Transferor to the Trust on [          ] [    ], 20[    ] pursuant to Section 2.1 of the Master Transfer Agreement.

---

[1]  Example - not actual

Sch. 2-1

**Schedule 3**

**Receivables Assignment**

[          ], 201[   ]

For value received, in accordance with the Amended and Restated Master Transfer Agreement dated as of March 6, 2017 (the " Master Transfer Agreement "), between the undersigned and Sonoran Auto Receivables Trust 2016-1 (the " Trust "), as amended, supplemented or otherwise modified from time to time, the undersigned does hereby sell, assign, transfer and otherwise convey to the Trust (except as provided in the Master Transfer Agreement), without recourse (except as provided in the Master Transfer Agreement) the following (collectively, the " Purchased Property "):

(i) all right, title and interest of the Transferor in, to and under the Receivables listed on the Schedule of Receivables attached as Schedule 5 to the related Pool Supplement, delivered to the Trust on the date hereof, and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Transferor or the Servicer covering any related Financed Vehicle;

(ii) the interest of the Transferor in the security interests in the Financed Vehicles granted by Obligors pursuant to the Receivables and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premiums or other payment with respect to any of the foregoing;

(iv) all of the Transferor's right, title and interest in, to and under the Receivable Files;

(v) all of the Transferor's right, title and interest in and to the Master Sale Agreement (Warehouse), dated as of December 29, 2016, between the Transferor and Carvana, LLC, and remedies thereunder and the assignment to the Trust of all UCC financing statements filed against Carvana under or in connection with such Master Sale Agreement (Warehouse); and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in clauses (i) through (v) above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

Sch. 3-1

It is the intention of the Transferor and the Trust that the sale, transfer, assignment and other conveyance of the Receivables contemplated by this Receivables Assignment shall constitute an independent sale of such Receivables from the Transferor to the Trust and the beneficial interest in and title to such Receivables shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Although the parties intend that the sale, transfer, assignment and other conveyance contemplated by this Receivables Assignment to be an independent sale, in the event any such sale, transfer, assignment and other conveyance is deemed to be other than a sale, the parties intend and agree (i) that all filings described in the Master Transfer Agreement shall give the Trust a first priority perfected security interest in, to and under such Receivables and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Receivables Assignment together with the Master Transfer Agreement and the related Pool Supplement shall be deemed to be the grant of, and the Transferor hereby grants to the Trust, a security interest from the Transferor to the Trust in such Receivables and the related Purchased Property in order to secure its obligations with respect to such transfer and assignment; (iii) this Receivables Assignment together with the Master Transfer Agreement and the related Pool Supplement shall be a security agreement under applicable law for the purpose of each such transfer and assignment; and (iv) the Trust shall have all of the rights, powers and privileges of a secured party under the UCC with respect to such transfer and assignment and the Purchased Property related thereto.

The foregoing conveyance does not constitute and is not intended to result in any assumption by the Trust of any obligation of the undersigned to the Obligors, insurers or any other Person in connection with such Receivables, the applicable Receivable Files, any insurance policies or any agreement or instrument relating to any of them.

This Receivables Assignment is made pursuant to and upon the representations, warranties and agreements on the part of the undersigned contained in the Master Transfer Agreement and is to be governed by the Master Transfer Agreement.

Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Master Transfer Agreement.

Sch. 3-2

IN WITNESS WHEREOF, the undersigned has caused this Receivables Assignment to be duly executed as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1, LLC, as Transferor

By: _____

    Name:
    Title:

Sch. 3-3

**Schedule 4**

Accounts and Receivables Analysis

Any form of Analysis approved in writing from time to time by Transferor, the Trust and the Administrative Agent.

Sch. 4-4

**Schedule 5**

**Schedule of Receivables**

For each Receivables Pool, to include final information required for the Trust to complete the related Funding Request and Funding Report.

Electronic files sent to Trust at the following date and time:          .xls - sent        AM/PM on            , 20

Sch. 5-1

**Schedule 6**

**Pool Stratifications and Other Pool Characteristics**

Any form of pool stratifications and other pool characteristics approved in writing from time to time by Transferor, the Trust and the Administrative Agent.

Sch. 6-1

**EXHIBIT B**

**CREDIT POLICY**

The Microsoft Word files contained in the file named "Carvana-UnderwritingPolicyandProcedure.docx" that Carvana delivered to the Trust and the Administrative Agent by electronic mail at 4:41 P.M. eastern time on December 13, 2016

Exh B-1

**APPENDIX A**

**DEFINITIONS AND USAGE**

(a) <u>Construction and Usage</u>. Unless otherwise provided in the Master Sale Agreement (Warehouse), the Master Transfer Agreement, or the Master Servicing Agreement (the " <u>Specified Documents</u> "), the following rules of construction and usage are applicable to this Appendix and the Specified Documents.

(i) As used in this Appendix or in Specified Documents and in any certificate or other document made or delivered pursuant thereto, accounting terms not defined herein, or in any such Specified Document, or in any such certificate or other document, and accounting terms partly defined herein or in any such certificate or other document, to the extent not defined herein, have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms herein, in any such Specified Document or in any such certificate or other document are inconsistent with the meanings of such terms under such generally accepted accounting principles, the definitions contained herein, in such Specified Document or in any such certificate or other document control.

(ii) The words "hereof," "herein," "hereunder" and words of similar import when used in any Specified Document refer to such Specified Document as a whole and not to any particular provision or subdivision thereof. References in any Specified Document to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such Specified Document. The term "including" means "including without limitation." The word "or" is not exclusive.

(iii) The definitions contained in any Specified Document are equally applicable to both the singular and plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(iv) Any agreement, instrument, statute or regulation defined or referred to below means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

(b) <u>Definitions</u>

All terms defined in this Appendix shall have the defined meanings when used in any Specified Document, unless otherwise specified or defined therein.

" <u>Account Bank</u> " means Wells Fargo Bank, National Association, or any successor thereto in its capacity as Account Bank under the Account Control Agreement.

App. A-1

" Account Control Agreement " means the Securities Account Control Agreement, dated on or about the date hereof, among the Borrower, the Administrative Agent and the Account Bank, pursuant to which the Borrower grants exclusive control over the Accounts to the Administrative Agent.

" Accounts and Receivables Analysis " means, with respect to a Receivables Pool and a First Tier Receivables Pool, the accounts and receivables analysis set forth in Schedule 6 attached to the related Pool Supplement and Schedule 4 attached to the related First Step Pool Supplement, respectively.

" Action Plan ", with respect to a Receivables Pool, has the meaning set forth in Section 3.16(d) of the Master Servicing Agreement.

" Action Plan Meeting ", with respect to a Receivables Pool, has the meaning set forth in Section 3.16(c) of the Master Servicing Agreement.

" Administrative Purchase Payment " means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (ii) the product of (x) the amount set forth in clause (i)(a) above, (y) the APR of such Administrative Receivable and (z) the number of days from the last payment of principal with respect to such Receivable/360.

" Administrative Receivable " means a Receivable which the Servicer has repurchased pursuant to Section 3.8 of the Master Servicing Agreement.

" Affiliate " means, with respect to any specified Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

" Aggregate Outstanding Principal Balance " means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of any date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool, as applicable.

" Ally Bank " means Ally Bank, a Utah chartered bank, and its permitted successors and assigns.

" Ally Bank Controls Effectiveness Review " means the Ally Bank process that assesses a supplier's risk management controls in compliance with FDIC/FFIEC Third Party Vendor Management guidelines.

" Ally Financial " means Ally Financial Inc., a Delaware corporation, and its permitted successors and assigns.

App. A-2

" Annual Percentage Rate " or " APR " means, with respect to a Receivable, the annual rate of finance charges stated in the Receivable.

" Anti-Corruption Laws " has the meaning set forth in Section 3.28 of the Master Servicing Agreement.

" Applicable Servicing Modification ," with respect to a Banking Regulatory Change, shall be the modification to the Servicer's servicing standards and practices (i) approved by the Banking Regulator, if the Banking Regulator has approved a different modification than that proposed by the Administrative Agent in the related Notice of Banking Regulatory Change, (ii) if clause (i) is inapplicable, then as approved by the Administrative Agent, if the Administrative Agent has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, or (iii) otherwise, the modification proposed by the Purchaser in the related Notice of Banking Regulatory Change.

" Authoritative Copy " means, with respect to any Electronic Contract, a copy of such Contract that is unique, identifiable and, except as otherwise provided in Section 9-105 of the UCC, unalterable, and is marked "original" or has no watermark or other marking that would indicate that it is a "copy" or "duplicate" or not an original or not an "authoritative" copy.

" Banking Regulator " means a United States federal or State regulatory agency or instrumentality having authority over U.S. national banks or state chartered banks, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Financial Institutional Examination Council and the Utah Department of Financial Institutions, or any successor federal or state agency or instrumentality.

" Banking Regulatory Change " will occur if (i) a Banking Regulator adopts or modifies regulations or policies which alter the obligations of U.S. national or state chartered banks in general, or Ally Bank in particular, with respect to the servicing of retail automotive loans and retail automotive installment sales contracts, (ii) such regulations apply to retail automotive installment sale contracts owned or serviced by Ally Bank, (iii) compliance by third parties servicing receivables (as servicer for Ally Bank) owned by Ally Bank is required by law and (iv) such regulations require the Servicer (as servicer for Ally Bank) to implement new servicing standards or practices, or otherwise modify the existing standards or practices, other than those set forth in the Transaction Documents.

" Bankruptcy Code " means the United States Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended from time to time.

" Benefit Plan " means any of (i) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (ii) a plan subject to Section 4975 of the Code or (iii) any entity whose underlying assets include plan assets by reason of investment by an employee benefit plan or plan in such entity.

" Bridgecrest " means Bridgecrest Credit Company, LLC, an Arizona limited liability company, and its permitted successors and assigns.

<center>App. A-3</center>

" <u>Business Continuity Plan</u> " means the document in which the Servicer plans to protect its employees, and continue its most critical business functions in situations where the facilities, people or information technology resources are interrupted for an extended period.

" <u>Business Day</u> " means any day other than a Saturday, a Sunday or any other day on which banking institutions or trust companies in New York, New York, Wilmington, Delaware, Minneapolis, Minnesota or Detroit, Michigan may, or are required to, remain closed.

" <u>CAR 2016-1</u> " means Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company.

" <u>Carvana</u> " Carvana, LLC, an Arizona limited liability company.

" <u>CER</u> " has the meaning set forth in <u>Section  3.23</u> of the Master Servicing Agreement.

" <u>Certificate of Title</u> " means, with respect to a Financed Vehicle, (i) the original Certificate of Title relating thereto, or copies of correspondence to the applicable Registrar of Titles, and all enclosures thereto, for issuance of the original Certificate of Title or (ii) if the applicable Registrar of Titles issues a letter or other form of evidence of lien in lieu of a Certificate of Title (including electronic titling), either notification of an electronic recordation, by either a Title Intermediary or the applicable Registrar of Titles, or the original lien entry letter or form or copies of correspondence to such applicable Registrar of Titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, shall name the related Obligor as the owner of such Financed Vehicle and a Title Lien Nominee as secured party.

" <u>Change Order</u> " has the meaning set forth in <u>Section 7.1(b)</u> of the Master Servicing Agreement.

" <u>Change Request</u> " has the meaning set forth in <u>Section 7.1(b)</u> of the Master Servicing Agreement.

" <u>Closing Date</u> " means, with respect to a First Tier Receivables Pool and subject to <u>Section 3.1(e)</u> of the Master Sale Agreement (Warehouse) or a Receivables Pool and subject to <u>Section 4.1(a)</u> of the Master Transfer Agreement, the date on which the related First Step Pool Supplement or Pool Supplement, as applicable, is executed and delivered and the First Step Receivables Purchase Price or the Purchase Price, as applicable, is paid, which will be the same day as the Funding Date in that calendar week under the Loan and Security Agreement.

" <u>CNL</u> " means, with respect to any Receivables Pool and any Settlement Date, the Cumulative Net Losses for such Receivables Pool through the last day of the related Collection Period.

" <u>Code</u> " means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

" <u>Collateral</u> " has the meaning set forth in Section 1.1 of the Loan and Security Agreement.

App. A-4

" Collateral Custodian " means Wells Fargo Bank, National Association, and its successors and permitted assigns as Collateral Custodian under the Collateral Custodian Agreement.

" Collateral Custodian Agreement " means the Collateral Custodian Agreement, dated on or about December 29, 2016, among the Borrower, the Administrative Agent, the Collateral Custodian and the Account Bank.

" Collection Account " means the segregated account established by the Borrower with Account Bank and subject to the Account Control Agreement, into which all Collections are to be deposited.

" Collection Period " means, with respect to any Settlement Date, the immediately preceding calendar month or, in the case of the initial Collection Period, the Cut-off Date to and including the last day of the month preceding the month in which the first Settlement Date occurs.

" Collection Policy " means, with respect to (i) the initial Servicer, the customary servicing and collection guidelines, policies and procedures of the Servicer, including those attached as Exhibit D to the Servicing Agreement, in effect on the date of the Servicing Agreement, as such guidelines, policies and procedures may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 3.1(c) of the Servicing Agreement, and as modified by the Servicing Exceptions and the Process Remediations attached to the Servicing Agreement as Exhibit F, if any, or (ii) any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Administrative Agent and agreed to in writing by such successor Servicer and the Administrative Agent, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with Section 3.1(c) of the Servicing Agreement.

" Collections " means all amounts collected by the Servicer or its agents (from whatever source) or otherwise turned over to the Collection Account on or with respect to the related Receivables or the other Collateral.

" Commission " means the Securities and Exchange Commission.

" Commitment Period " means the period beginning on December 29, 2016 and ending on the Commitment Termination Date.

" Commitment Termination Date " means any date agreed upon in writing by Seller, the Trust and the Administrative Agent pursuant to which the Trust's commitment to purchase Receivables from Transferor shall expire.

" Commitment Termination Event " has the meaning specified in the Loan and Security Agreement.

" Confidential Information " means all information and material of any type, scope or subject matter whatsoever relating to the Administrative Agent, the Lenders, the Transferor,

App. A-5

Carvana, the Servicer or any of their subsidiaries, whether oral or written, and howsoever evidenced or embodied, which each Party, each Party's representatives or agents (including any officers of any Party or any of their subsidiaries) may furnish to the other, or to which either Party is afforded access by the other Party, either directly or indirectly for purposes of such Party's participation in the transactions contemplated by the Loan and Security Agreement. However, "Confidential Information" shall not include information or material of a Party which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its agents and other representatives, (ii) was available to the receiving Party on a non-confidential basis prior to its disclosure by the disclosing Party, (iii) becomes available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or the disclosing Party's representatives or agents, provided that such source is not, to receiving Party's knowledge, bound by a confidentiality agreement or otherwise prohibited from transmitting the information to the Administrative Agent, the Lenders, Carvana, the Servicer or the Transferor by a contractual, legal or fiduciary obligation or (iv) consists of the documents evidencing the consummation of the transactions contemplated by the Transaction Documents so long as all references to the other Party and all information specific to the assets sold or price paid pursuant to the transactions are removed.

" Contract " means any fully-executed retail installment sale contract, direct purchase money loan or conditional sale contract for a Financed Vehicle under which an extension of credit is made in the ordinary course of business of Carvana to an Obligor and which is secured by the related Financed Vehicle.

" Credit Policy " means the credit underwriting guidelines, policies and procedures that Carvana and its Subsidiaries utilize in originating or acquiring retail installment sales contracts, including the credit policies as attached as Exhibit D to the Loan and Security Agreement, as such guidelines, policies and procedures may be changed from time to time in accordance with Section 6.2(k) of the Loan and Security Agreement.

" Cumulative Net Losses " means, with respect to a Receivables Pool as of any Settlement Date, the sum of (i) the aggregate Net Losses experienced on all Liquidating Receivables with such Receivables Pool from the first day of the related Origination Period through the end of the related Collection Period and (ii) the Outstanding Principal Balance as of the Pool Termination Date of any Receivables within such Receivables Pool outstanding on the related Pool Termination Date.

" Customer Information " has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

" Cut-off Date " or " Cutoff Date " means, with respect to any Receivable acquired by the Borrower and made a part of the Collateral, the last day of the preceding calendar week; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week.

" Cutoff Date Aggregate Outstanding Principal Balance " means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of the applicable Cutoff Date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool as of the applicable Cutoff Date, as applicable.

" <u>Disclosure Information</u> " has the meaning set forth in <u>Section  3(a)(iv)</u> of the Master Confidentiality and Reconstitution Agreement.

" <u>DriveTime</u> " means DriveTime Automotive Group, Inc., a Delaware corporation, and its permitted successors and assigns.

" <u>Electronic Contract</u> " means a Contract that constitutes "electronic chattel paper" under and as defined in Section 9-102(31) of the UCC.

" <u>Eligible Receivable</u> " has the meaning set forth in <u>Section  1.1</u> of the Loan and Security Agreement.

" <u>E-Vault Provider</u> " means eOriginal, Inc.

" <u>Event of Servicing Termination</u> " or " <u>Servicing Termination Event</u> " means an event specified in <u>Section  6.1</u> of the Master Servicing Agreement.

" <u>Exchange Act</u> " means The Securities Exchange Act of 1934.

" <u>FDIC/FFIEC Third Party Vendor Management</u> " means the guidance to address the management by a regulated entity of third and fourth party suppliers issued by the Federal Deposit Insurance Corporation, the Federal Financial Institutions Examination Council or any other regulatory entity that covers a business in which Ally Bank or an Ally Bank Affiliate currently operates or may look to operate in the future.

" <u>Financed Vehicle</u> " means, with respect to a Receivable, any new or used automobile, light-duty truck, minivan or sport utility vehicle, together with all accessories thereto, securing such Receivable.

" <u>First Step Pool Supplement</u> " means the First Step Pool Supplement, in the form of <u>Exhibit  A</u> to the Master Sale Agreement, executed by CAR 2016-1 and the Seller on each Closing Date.

" <u>First Step Receivables Assignment</u> " means the document of assignment attached as <u>Schedule 4</u> to the First Step Pool Supplement executed by the Seller.

" <u>First Step Receivables Purchase Price</u> " means, with respect to a First Tier Receivables Pool, an amount equal to the Purchase Price for such First Tier Receivables Pool for the related Closing Date.

" <u>First Tier Receivables Pool</u> " has the meaning set forth in the recitals to the Master Sale Agreement.

" <u>Freestyle Selection</u> " means the random order that the Receivables are to be selected in the System of Record, after consideration of the Purchase Percentage and the criteria for a Receivable to be an Eligible Receivable. The Receivables to be sold to by the Seller to the Transferor will be based on the contract number of the Receivables. Subject to the provisions

App. A-7

and restrictions contained in the Master Sale Agreement (Warehouse), the Seller shall sell to the Transferor all Receivables where the ninth and tenth digits of the contract number (such number, the " randomization code ") are a number from 01 through the number equal to the Purchase Percentage (it being understood that a Purchase Percentage of 100 would have a randomization code of 00) or, with respect to any Previously Originated Receivable that later becomes an Eligible Receivable, such Previously Originated Receivable shall be included in such Receivables Pool if its randomization code falls within the Purchase Percentage for its related Origination Period. For example, if the Purchase Percentage for an Origination Period is 85%, the Seller would sell Receivables with contract numbers ending in 01 through 85, and retain Receivables with contract numbers ending in 86 through 00. The Seller shall ensure that contract numbers are assigned randomly as they are entered into the System of Record and in no way adverse to the Trust, the Administrative Agent or the Lender(s).

" GAP Letter " has the meaning set forth in Section 3.13 of the Master Servicing Agreement.

" General Change " has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

" GLBA " means the Gramm-Leach-Bliley Act and its implementing regulations.

" Governmental Authority " means any government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the applicable Person.

" Governmental Rules " means any and all laws, statutes, codes, rules, regulations, ordinances, orders, writs, decrees and injunctions, of any Governmental Authority and any and all legally binding conditions, standards, prohibitions, requirements and judgments of any Governmental Authority.

" Information Recipient " has the meaning set forth in Section 3.26 of the Master Servicing Agreement.

" Information Security Program " has the meaning set forth in Section 3.17(b) of the Master Servicing Agreement.

" Insolvency Event " means with respect to a specified Person, such Person shall (A) file a petition or commence a proceeding (1) to take advantage of any Insolvency Law or (2) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, (B) consent or fail to object to any such petition filed or proceeding commenced against or with respect to it or all or substantially all of its property, or any such involuntary petition or proceeding shall not have been dismissed or stayed within sixty (60) days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or proceeding, (C) admit in writing its inability to pay its debts generally as they become due, (D) make an assignment for the benefit of its creditors, (E) voluntarily suspend payment of its obligations or (F) take any action in furtherance of any of the foregoing

"<u>Insolvency Laws</u>" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"<u>Insolvency Proceeding</u>" means with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

"<u>Inspection Standard</u>" has the meaning set forth in <u>Section 3.18(a)</u> of the Master Servicing Agreement.

"<u>Insurance Policy</u>" means, with respect to any Receivable, an insurance policy covering physical damage, warranties, debt cancellation, credit life, credit disability, theft, mechanical breakdown or similar event with respect to the related Financed Vehicle or the related Obligor, as applicable.

"<u>Lender</u>" means each signatory to the Loan and Security Agreement as a lender, and the successors and permitted assigns of any lender from time to time that becomes a party hereto by execution of an assignment.

"<u>Lien</u>" means any security interest, lien, charge, pledge, equity, or encumbrance of any kind.

"<u>Liquidating Receivable</u>" means a Receivable as to which the Servicer (i) has reasonably determined, in accordance with its customary servicing procedures, that eventual payment of amounts owing on such Receivable is unlikely, or (ii) has repossessed and disposed of the Financed Vehicle.

"<u>Liquidation Expenses</u>" means, with respect to a Liquidating Receivable, the actual reasonable out-of-pocket costs of liquidation not to exceed $550 (or such greater amount as the Servicer determines is reasonably necessary in accordance with its customary procedures to refurbish and dispose of a liquidated Financed Vehicle).

"<u>Liquidation Proceeds</u>" means, with respect to a Liquidating Receivable, all amounts realized with respect to such Receivable net of Liquidation Expenses and any amounts that are required to be refunded to the Obligor on such Receivable, but in any event not less than zero.

"<u>Loan-to-Value Ratio</u>" or "<u>LTV</u>" has the meaning set forth for LTV in <u>Section 1.1</u> of the Loan and Security Agreement.

"<u>Master Sale Agreement</u>" or "<u>Master Sale Agreement (Warehouse)</u>" means the Master Sale Agreement (Warehouse), dated on or about December 29, 2016, by and among Carvana, LLC and Carvana Auto Receivables 2016-1 LLC, as the same may be amended, restated, supplemented or otherwise modified from time to time.

App. A-9

" <u>Master Sale Agreement (Flow)</u> " means the Master Sale Agreement (Flow), dated as of December 22, 2016, by and among Carvana, LLC and Carvana Auto Receivables 2016-1 LLC, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" <u>Master Servicing Agreement</u> " or " <u>Servicing Agreement</u> " means the Master Servicing Agreement (Warehouse), to be dated on or about December 29, 2016, by and among Carvana, the Servicer, the Trust and the Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" <u>Master Servicing Agreement (Flow)</u> " means the Master Servicing Agreement (Flow), to be dated on or about December 29, 2016, by and among Carvana, the Servicer and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" <u>Master Transfer Agreement</u> " means the Master Transfer Agreement, dated on or about December 29, 2016, by and among Carvana Auto Receivables 2016-1 LLC and Sonoran Auto Receivables Trust 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

" <u>Material Adverse Effect</u> " means, with respect to any Person and to any event or circumstance, a material adverse effect on (i) the business, financial condition, operations, performance or properties of such Person, (ii) the validity or enforceability of the Loan and Security Agreement or any other Transaction Document or the validity, enforceability or collectability of (a) a material portion of the Receivables, or (b) a material portion of the Collections or the security interests in the Financed Vehicles, (iii) the rights and remedies of the Administrative Agent and Secured Parties, (iv) the ability of such Person to perform its obligations under the Loan and Security Agreement or any Transaction Document to which it is a party or (v) the status, existence, perfection, priority or enforceability of the Administrative Agent's or any Lender's interest in the Collateral.

" <u>Monthly Data File</u> " has the meaning set forth in <u>Section 4.3</u> of the Master Servicing Agreement.

" <u>Monthly Servicer Report</u> " has the meaning set forth in <u>Section 4.3</u> of the Master Servicing Agreement.

" <u>Net Loss</u> " means, with respect to a Receivables Pool, (i) as of any Settlement Date, for each Liquidating Receivable in such Receivables Pool, the Outstanding Principal Balance of such Liquidating Receivable when it became a Liquidating Receivable minus all Liquidation Proceeds received with respect to such Liquidating Receivable on or before the last day of the related Collection Period and (ii) as of the related Pool Termination Date, and with respect to each Receivable then outstanding within such Receivables Pool, the Outstanding Principal Balance of such Receivable as of the last day of the related Collection Period.

App. A-10

"Notice of Banking Regulatory Change" has the meaning set forth in Section 3.18(a) of the Master Servicing Agreement.

"Notified Total Costs" has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

"NPPI" means "non-public personal information" as defined in 16 C.F.R. § 314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms are defined by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. § 6801 et seq.), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. NPPI also includes any information Ally Financial or Ally Bank (including any of their Affiliates) may directly or indirectly disclose to the Servicer or any Servicer agent or which the Servicer or any Servicer agent may collect or otherwise have access to due to the Servicer or the Servicer agents' relationship with Ally Financial, Ally Bank or any of their Affiliates that relates to an individual. This includes, but is not limited to, financial information; medical or health related information; credit history; income; financial benefits; application, loan or claim information; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Ally Financial, Ally Bank or any of their Affiliates; and the identification of an individual as an Ally Financial or Ally Bank customer or as an individual Ally Financial or Ally Bank claimant.

"Obligor" means the purchaser or co-purchasers of the Financed Vehicle or any other Person who owes payments under a Receivable.

"Officer's Certificate" means, with respect to any Person, a certificate signed by a Responsible Officer of such Person.

"OFSS" or "Outward Facing Supplier Standards" has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

"Operations Diligence" has the meaning set forth in Section 3.15(c) of the Master Servicing Agreement.

"Opinion of Counsel" means a written opinion of counsel, which counsel may be internal or external counsel to a Party, reasonably acceptable to the Party receiving such opinion.

"Original Amount Financed" means, with respect to a Receivable and as of the date on which such Receivable was originated, the aggregate amount advanced under the Receivable toward the purchase price of the Financed Vehicle, including accessories, vehicle delivery fees, insurance premiums, service and warranty contracts and other items customarily financed as part of automobile and light truck retail installment sale contracts or direct purchase money loans and related costs.

"Original Contract Documents" means with respect to each Receivable, (i) the original Contract and (ii) the Certificate of Title or evidence that such Certificate of Title has been applied for. For the avoidance of doubt, an Authoritative Copy of an electronic document shall constitute an original.

App. A-11

" Origination Period " means, each calendar week during the period beginning with the week of December 12, 2016, and ending with the week containing the last day of the Commitment Period; provided , that, with respect to the initial First Tier Receivables Pool and Receivables Pool, respectively, the "Origination Period" shall be the period consented to by the Administrative Agent.

" Outstanding Principal Balance " means, with respect to a Receivable and as of any date, the Original Amount Financed, less:

(i) payments received from or on behalf of the related Obligor prior to such date allocable to principal;

(ii) any refunded portion of extended warranty protection plan costs, physical damage, credit life or disability, warranties, debt cancellation and other insurance premiums included in the Original Amount Financed and allocable to principal;

(iii) any Administrative Purchase Payment or Warranty Payment to the extent allocable to principal; and

(iv) any Liquidation Proceeds previously received on or prior to the last day of the related Collection Period allocable to principal with respect to such Receivable.

" Owner Trustee " means Wilmington Trust, National Association, acting not in its individual capacity, but solely as Owner Trustee for the Borrower, or any successor Owner Trust pursuant to the terms of the Trust Agreement.

" Party " means, with respect to each Transaction Document, each Person that is a party to such Transaction Document, and its permitted successors and assigns.

" Performance Guarantor " means DriveTime Automotive Group, Inc. and its successors and permitted assigns under the Servicing Agreement.

" Pool Balance " means, with respect to a First Tier Receivables Pool or a Receivables Pool, as applicable, as of the close of business of the last day of a Collection Period, the Aggregate Outstanding Principal Balance of the Receivables in such First Tier Receivables Pool or Receivables Pool (excluding Administrative Receivables and Warranty Receivables and Liquidating Receivables as of such date).

" Pool Supplement " means the Pool Supplement, in the form of Exhibit A to the Master Transfer Agreement executed by the Transferor and the Trust on each Closing Date.

" Previously Originated Receivable " means, for any Closing Date and the related Receivables Pool, an Eligible Receivable originated in a prior Origination Period that met the eligibility criteria to be included in a Receivables Pool that could have been sold to the

App. A-12

Purchasers pursuant to the Master Sale Agreement (Warehouse) and Master Transfer Agreement on a prior Closing Date but for (i) the Seller not having completed ministerial administrative procedures for such Receivable (such as validating receipt of the down payment) or (ii) the failure to satisfy the representations and warranties regarding the information provided for such Receivable on the related Schedule of Receivables in Section 4.2(cc)(iii) of the Master Sale Agreement (Warehouse) and the Master Transfer Agreement and such Receivable was removed or repurchased from a prior First Tier Receivables Pool or Receivables Pool, as applicable, solely as a result of such failure (and not for any other reason); provided , that no such Receivable shall have been originated earlier than the [***] day prior to the related Cutoff Date.

"Program " has the meaning set forth in Section  3.25 of the Master Servicing Agreement.

"Purchase Percentage " means, for an Origination Period, the corresponding "Purchase Percentage" for the corresponding origination period pursuant to the Master Sale Agreement (Flow).

"Purchase Price " means for any First Tier Receivables Pool or Receivables Pool, the fair market value determined from time to time by Carvana, the Transferor and the holder of the certificates issued by the Trust.

"Purchased Property " has the meaning set forth in Section 3.1(a) of the Master Transfer Agreement.

"Purchased Receivables " means, as applicable, all Receivables purchased by CAR 2016-1 in any First Tier Receivables Pool pursuant to the Master Sale Agreement and all Receivables purchased by the Purchaser in any Receivables Pool pursuant to the Master Purchase and Sale Agreement.

"Purchaser Inspection Parties " has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

"Purchasers " means either Ally Bank or Ally Financial, and its permitted successors and assigns, if the reference to "Purchaser" relates to Receivables purchased by a specified Purchaser, or both Ally Bank and Ally Financial, and their permitted successors and assigns, if the reference to "Purchaser" or "Purchasers" relates to the Receivables or the Receivables Pools as a whole, as the context may require.

"Quarterly Operations Review " has the meaning set forth in Section 3.15(a) of the Master Servicing Agreement.

"Quarterly Review Event " has the meaning set forth in Section 3.15(c) of the Master Servicing Agreement.

"Receivable " means a Contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract that is included in the Schedule of Receivables attached as Schedule 5 to each Pool Supplement. The term "Receivable" does not include any Repurchased Receivable.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

App. A-13

" Receivable Files " means, with respect to each Receivable and the related Contract, collectively, the Original Contract Documents and the Servicer Files.

" Receivables Assignment " means, with respect to each Receivables Pool, the document of assignment attached as Schedule 3 to the related Pool Supplement.

" Receivables Pool " shall have the meaning given to such term in Section 3.1 of the Master Transfer Agreement.

" Receivables Pool CNL Ratio " means, for any Settlement Date, the ratio of (i) net losses with respect to the Receivables included in a Receivables Pool during the related Collection Period to (ii) the difference between the beginning balance of the Outstanding Principal Balance for such Collection Period and the ending balance of the Outstanding Principal Balance for such Collection Period, in each case with respect to the Receivables included in such Receivables Pool.

" Receivables Pool CNL Ratio Comparison " means, with respect to a Receivables Pool on any Settlement Date, (x) the Receivables Pool CNL Ratio for such Receivables Pool reported on any Settlement Date for the related Collection Period, divided by (y) the Carvana entire portfolio cumulative net loss ratio for the same Collection Period.

" Receivables Purchase Rate " the rate agreed upon from time to time by Carvana, the Transferor and the holders of the certificates issued by the Trust.

" Receivables System " means the principal computer system of the Servicer used in the servicing of retail installment sales contracts and direct purchase money loans, including back up archives.

" Regulation AB " Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)), in the adopting release (Asset-Backed Securities Disclosure and Registration, Securities Act Release 33-9638, 79 Fed. Reg. 57,184 (September 24, 2014)) and in any adopting release in respect of any amendment with respect to any of the foregoing or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

" Regulator Inspection Parties " has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

" Relationship Manager " has the meaning set forth in Section 3.24 of the Master Servicing Agreement.

<div align="center">App. A-14</div>

" <u>Re-Liening Expenses</u> " means any costs associated with the revision of the Certificates of Title pursuant to <u>Section 2.14</u> of the Loan and Security Agreement.

" <u>Re-Liening Trigger Event</u> " has the meaning agreed upon by the Seller, the Trust and the Administrative Agent.

" <u>Remediation</u> " has the meaning set forth in <u>Section 5.1(r)</u> of the Master Servicing Agreement.

" <u>Repurchased Receivable</u> " means any repurchased Administrative Receivable or repurchased Warranty Receivable.

" <u>Requirements of Law</u> " means, with respect to any Person, all (a) requirements of applicable federal, state and local laws, and regulations thereunder and (b) orders, decrees, directives, rules and binding guidelines of, or agreements, with any Governmental Authority that are directed to or binding on such Person or such Person's business, operations, services (including, with respect to the Servicer, the Servicer's obligation to service the Collateral for the benefit of the Lenders pursuant to the Servicing Agreement) or assets, including, in each case, usury laws, Utah banking laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Consumer Financial Protection Bureau's Regulations "B" and "Z," the Servicemembers Civil Relief Act of 2003, the Texas Consumer Credit Code, the United States Foreign Corrupt Practices Act of 1977, the Patriot Act and state adaptations of the National Consumer Act and the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity and disclosure laws; provided, that, in each case with respect to clauses (a) and (b) above, with respect to the Servicer's obligations described in the Servicing Agreement, "Requirements of Law" shall not include any items described in clauses (a) or (b) above that are directed to or binding on Ally Financial or Ally Bank solely as a result of such Peron's status as a bank holding company or Utah charted bank, respectively, unless otherwise specified on Exhibit E to the Servicing Agreement. Following the Closing Date during the term of the Servicing Agreement, should the Servicer offer or enter into any subsequent agreement with another Person to service assets on behalf of such Person in compliance with, or provide indemnity for breach of, Requirements of Law applicable to Ally Financial or Ally Bank that are excluded from this definition as a result of the preceding proviso, then this definition shall be deemed to be modified to include such broader provision without any further action of the Parties.

" <u>Responsible Officer</u> " means (a) When used with respect to any Person other than the Owner Trustee, Collateral Custodian or Account Bank, any officer of such Person, including any president, vice president, assistant vice president, secretary, assistant secretary or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject, (b) with respect to the Owner Trustee, any officer within the Corporate Trust Administration office of the Owner Trustee with direct responsibility for the administration of the Trust Agreement and also, with respect to a particular matter, any other officer to whom such matter is referred because of such

App. A-15

officer's knowledge of, and familiarity with, the particular subject, (c) with respect to the Borrower, the Owner Trustee or the Trust Administrator, and (d) with respect to the Collateral Custodian or Account Bank, any officer in the Corporate Trust Office of the such Person, including any president, vice president, executive vice president, assistant vice president, treasurer, secretary, assistant secretary, corporate trust officer or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject, and, in each case, having direct responsibility for the administration of the Loan and Security Agreement and the other Transaction Agreements to which such Person is a party.

" Schedule of Receivables " means, the list identifying the Receivables attached as Schedule  5 to each Pool Supplement (which list may be in the form of electronic file, microfiche, disk or other means acceptable to the Purchaser, or pursuant to the Master Sale Agreement).

" Securities Act " means the Securities Act of 1933.

" Selection Procedures " means, the process for selecting Eligible Receivables for inclusion in any First Tier Receivables Pool and Receivables Pool pursuant to Section 3.1(d) of the Master Sale Agreement whereby such First Tier Receivables Pool and Receivables Pool is selected by the Seller and Transferor utilizing the System of Record under a Freestyle Selection. Such selection shall be made subject to the Eligible Receivable criteria and the sequential contract number assignment described in Section 3.1(d) of the Master Sale Agreement.

" Seller Indemnified Parties " has the meaning set forth in Section  6.11 of the Master Sale Agreement (Warehouse).

" Servicer " means initially Bridgecrest Credit Company, LLC as the servicer of the Receivables, or any permitted successor or assignee thereto under the Master Servicing Agreement.

" Servicer Coverage " has the meaning set forth in Section  3.22 of the Master Servicing Agreement.

" Servicer Files " means the documents specified in Section  2.1 of the Master Servicing Agreement.

" Servicer Review Trigger Event " has the meaning set forth in Section  3.16 of the Master Servicing Agreement.

" Servicer Termination Threshold Event " means, with respect to the sold Receivables Pools, on any Settlement Date, the aggregate CNL for such Receivables Pools shall be equal to [***]% or greater of the aggregate Administrative Agent's estimated Cumulative Net Losses for such Receivables Pools on such Settlement Date.

[***]    *Indicates that text has been omitted which is the subject of a confidential treatment request. The text has been separately filed with the Securities and Exchange Commission.*

App. A-16

" <u>Servicing Criteria</u> " means "Servicing Criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

" <u>Servicing Exception</u> " means any exceptions or supplements to the Collections Policy specified on **Exhibit E** to the Servicing Agreement (including any requirement of federal, state or local law, or any regulation or any order, decree, directive, rule and binding guideline of, or agreement, with any Governmental Authority applicable to the Lender solely as a result of the Lender's status as a bank holding company or a bank, as applicable, that the Administrative Agent determines requires revisions to the existing Collections Policy), as may be amended or supplemented from time to time by the Administrative Agent

" <u>Servicing Fee</u> " means the fee payable to the Servicer in accordance with the Servicing Agreement and Section 2.11(a) of the Loan and Security Agreement, which fee shall be equal to the product of (x) the Servicing Fee Rate, (y) the Principal Balance of the Receivables held by the Borrower as of the open of business on first Business Day of the related Monthly Period, and (z) a fraction, the numerator of which is thirty (30) and the denominator of which is three hundred sixty (360).

" <u>Servicing Fee Rate</u> " has the meaning agreed upon by the Parties.

" <u>Settlement Date</u> " means the fifteenth (15th) day of each calendar month beginning in the calendar month after the Closing Date.

" <u>Settlement Report</u> " means a monthly statement (including a data tape) prepared and delivered on or prior to the Business Day preceding the applicable Settlement Date to the Administrative Agent, the Lender(s), the Owner Trustee, the Account Bank and the other Persons specified in the Servicing Agreement by the Servicer with respect to the immediately preceding calendar month, which shall be in substantially the form of Exhibit G-1 to the Loan and Security Agreement, as such form may be amended from time to time.

" <u>SOC 1</u> " has the meaning set forth in <u>Section  3.13</u> of the Master Servicing Agreement.

" <u>State</u> " means any of the 50 states of the United States of America, or the District of Columbia.

" <u>System of Record</u> " means the computer system and programs in place on the date that the Master Sale Agreement (Warehouse) become effective (as such system may be updated or otherwise modified) utilized by Carvana to select Receivables for each First Tier Receivables Pool under the Master Sale Agreement (Warehouse).

" <u>Three-Month Average Receivables Pool CNL Ratio Comparison</u> " means, on any Settlement Date, the average of the Receivables Pool CNL Ratio Comparison with respect to a Receivable Pool for such Settlement Date and the two Settlement Dates preceding such Settlement Date.

" <u>Title Intermediary</u> " means, VINTek or another title administration service provider approved in writing by the Seller and Purchasers.

App. A-17

" <u>Title Lien Nominee</u> " means Carvana LLC or GFC Lending LLC (or any other name approved in writing by the Administrative Agent).

" <u>Transaction Documents</u> " means the Loan and Security Agreement, the Master Sale Agreement (Warehouse), the Master Transfer Agreement, the Servicing Agreement, the Collateral Custodian Agreement, the Account Control Agreement, the Trust Agreement, and any other document, certificate, opinion, agreement or writing the execution of which is necessary or incidental to carrying out the transactions contemplated by the Loan and Security Agreement or any of the other foregoing documents.

" <u>Transferor Indemnified Parties</u> " has the meaning set forth in <u>Section 6.11</u> of the Master Transfer Agreement.

" <u>Treasury Regulations</u> " means the regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

" <u>Trust Administrator</u> " means Carvana, or any successor Trust Administrator pursuant to the Loan and Security Agreement or the Trust Agreement.

" <u>Trust Agreement</u> " means that certain amended and restated trust agreement of the Borrower, dated on or about the date hereof, between the Transferor and the Owner Trustee.

" <u>Warranty Payment</u> " means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to <u>the sum</u> of (i) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (ii) the product of (x) the amount set forth in clause (i)(a) above, (y) the APR of such Warranty Receivable and (z) the number of days from the last payment of principal with respect to such Receivable/360.

" <u>Warranty Receivable</u> " means a Receivable which the Transferor has repurchased pursuant to <u>Section 7.2</u> of the Master Transfer Agreement or the Seller has repurchased pursuant to <u>Section 7.2</u> of the Master Sale Agreement (Warehouse).

\*    \*    \*    \*    \*

App. A-18



# SILVERROCK AUTOMOTIVE MASTER DEALER AGREEMENT

**Agreement Date:** 12/8/2016

**Dealer No.** _____

**COMPANY:**
**SilverRock Automotive, Inc.**
**SilverRock Automotive of Florida, Inc.**
**(Collectively "SilverRock Automotive")**
1720 W Rio Salado Pkwy
Tempe, Arizona 85281

Phone: 877.532.8528 Fax: 866.837.8258
Email: dealer@silverrockinc.com
Tax ID: 47-3217165

**DEALER:**
**Carvana, LLC**
4020 E Indian School Rd
Phoenix, Arizona 85018

Phone: 602.852.6604 Fax: 602.667.2581
Email: legal@carvana.com
Tax ID: 45-4788036

This SilverRock Automotive Master Dealer Agreement, including the Exhibits and other attached or referenced documents (collectively, this " Agreement "), is made by and between Company and Dealer and supersedes all prior written or oral agreements or understandings of the parties, effective as of the Agreement Date.

1. **DEALER'S AUTHORITY** .

    **1.1.** <u>Authorization.</u> Company authorizes Dealer, pursuant to the terms and conditions of the Agreement, to issue or sell the Company programs (each a "Contract Program") available from time to time through the Company to customers purchasing vehicles ("Purchaser") from Dealer. Dealer may only issue or sell Contract Programs on the date vehicle is sold to Purchaser. The Company-approved contract signed by Purchaser with respect to a Contract Program shall be referred to herein as a "Customer Contract".

    **1.2.** <u>Contract Programs</u> . All Contract Programs shall be issued or sold in accordance with and subject to the contract forms, rules, coverages, guidelines, retail rates, and costs authorized by Company and furnished to Dealer. Dealer shall not have any authority to alter, modify, waive, or discharge any terms of a Contract Program without Company's prior written consent. The Customer Contract shall be sold or issued only on an eligible vehicle, as defined in the applicable Customer Contract and provided Company documentation.

    **1.3.** <u>Jurisdiction</u> . Dealer may only sell or offer Contract Programs in the state(s) authorized by Company.

2. **COMPANY OBLIGATIONS.**

    **2.1.** Issuing, modifying, amending, rejecting and cancelling contracts, as applicable;

    **2.2.** Processing cancellations and non-renewals consistent with applicable contract, statutory, and regulatory requirements;

    **2.3.** Administering and handling claims consistent with applicable contract, statutory, and regulatory requirements, provided that SilverRock shall have no responsibility to handle any claims and no obligation to administer any contract if the fees due to SilverRock have not been remitted;

    **2.4.** Complying with all applicable regulatory and statutory requirements, including all licensing requirements related to the products or services provided under this Agreement;

    **2.5.** Providing Dealer with standard reports for the products or services provided pursuant to this Agreement, and may provide non-standard reports as Dealer may reasonably request from time to time;

    **2.6.** Making and filing all applicable tax returns and reports as required by any municipal, state, or federal statute or regulation, and paying all taxes levied on SilverRock, but excluding taxes levied on Dealer; and

    **2.7.** Maintaining program records and procedures;



**SILVERROCK AUTOMOTIVE
MASTER DEALER AGREEMENT**

**3.    DEALER OBLIGATIONS.**

**3.1.**    <u>Vehicle Condition</u> . Dealer agrees to fully inspect, and correct or repair and mechanical malfunctions, prior to issuing a warranty or service contract on any vehicle. Dealer assumes responsibility for any defects found to be evident at time of sale.

**3.2.**    <u>Dealer Cost and Dealer Compensation</u> . For each Customer Contract issued or sold, Dealer will pay Company the amount due as calculated by the Company ("Dealer Cost"). Dealer's compensation will be determined by the Dealer upon submission of the Customer Contract to the Company. Dealer shall not charge the Purchaser a separate fee for any Limited Warranty.

**3.3.**    <u>Cancellation Refunds</u> . Dealer shall be obligated to refund a pro rata share of the Dealer Compensation for any Customer Contract cancelled prior to its scheduled expiration date. Upon cancellation request by Purchaser or Lienholder, Company shall calculate refund due as specified in the Customer Contract. Company shall advise Dealer of Dealer's pro rata share of refund and Dealer will be solely responsible for remitting Dealer's pro rata share of the refund, along with any applicable refund amounts to the Purchaser or Lienholder. Dealer shall not be entitled to any portion of any cancellation fee set forth in the Customer Contract. If Company pays Dealer the pro rata portion of Dealer Cost, Dealer will be solely responsible for remitting full refund amount to Purchaser or Lienholder within 30 days after request from Company. Dealer will indemnify Company for any amounts required to be paid by Company as a result of Dealer's failure to make full and timely refunds. Dealer's obligation to make refunds and indemnify Company shall survive termination or expiration of this Agreement. Dealer shall keep all documentation required to be maintained under applicable law demonstrating that applicable refund amounts due to Purchasers or Lienholders were properly made. Dealer shall provide copies of this documentation to Company within thirty (30) days after Company's request therefor.

**3.4.**    <u>Reports and Remittances</u> . After the close of each calendar month, Company will submit to Dealer an electronic invoice for all Customer Contracts issued or sold during the previous month. Not later than seven (7) days after the invoice date, Dealer shall remit to Company the total invoiced amount. Dealer agrees that Company may deduct any outstanding invoice balance from other amounts due Dealer and apply such amounts directly to Company.

**3.5.**    <u>Contract Program Benefits</u> . Company shall be solely responsible for administering and paying all benefits under its Contract Programs. Dealer shall have no authority to adjudicate, settle, or pay any benefits under the Contract Programs. Dealer shall instruct Purchaser to follow the claims reporting instructions set forth in the Customer Contract and provide all reasonable and necessary assistance to Purchaser.

**3.6.**    <u>Mechanical Breakdown Repairs</u> . If Dealer maintains a service department and performs repairs under the Contract Programs, Company shall reimburse Dealer for the cost of such repair services at the amounts and in the manner prescribed by Company. Prior to commencing repairs, Dealer shall diagnose nature and cause of mechanical breakdown and prepare an estimate of the cost of the required repairs. In preparing its estimated cost of repairs, Dealer shall utilize the agreed upon labor rate for the repair time required as specified in the recognized labor manual used by Dealer and approved by Company (e.g., Alldata, Motors, Chilton, Mitchell, Factory, etc.), and the agreed upon price for required parts. Dealer shall obtain Company's prior approval before commencing any repair work for which reimbursement is sought from Company. In order to obtain reimbursement for repair services,

3.6.1.    Dealer must submit to Company a completed repair invoice not more than thirty (30) days after the date the repair is completed.

3.6.2.    Dealer must warranty all workmanship and parts in connection with a covered repair he performs for a period of 12 months and 12,000 miles after the date the repair is completed.

**4.    DEALER REPRESENTATIONS, WARRANTIES AND COVENANTS.** Dealer hereby makes the following representations, warranties and covenants to Company:

**4.1.**    <u>Licenses</u> . Dealer and Dealer's employees and agents currently have and at all times during the term of this Agreement shall maintain in good standing, all licenses, permits, and certifications necessary to transact Dealer's business as presently conducted and to perform the transactions contemplated by this Agreement.



**SILVERROCK AUTOMOTIVE
MASTER DEALER AGREEMENT**

**4.2.** <u>Laws and Regulations</u> . Dealer and Dealer's employees and agents are familiar with and, at all times during the term of this Agreement, shall comply with all applicable state and federal laws and regulations including, without limitation the Magnusson-Moss Act and its implementing regulations, the Truth in Lending Act and Regulation Z, the Equal Credit Opportunity Act ("ECOA") and Regulation B ("Reg. B"), the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act (including, but not limited to, the Red Flag Rule), the Fair Debt Collections Practices Act, the Gramm-Leach-Bliley Act ("GLBA") and the Federal Trade Commission rules, the Dodd Frank Act, the USA PATRIOT Act, state motor vehicle dealer laws, state retail installment sales acts, trade practices and all other statutes, rules and regulations of governmental agencies applicable to the sale and financing of motor vehicles and/or the sale or issuance of the Contract Programs.

**4.3.** <u>Compliance/Sales Practices; Company Rules</u> . Dealer has and shall maintain formal, written policies and procedures regarding the sale of vehicles and ancillary products. Dealer and Dealer's employees and agents shall adhere to all rules, manuals, procedures, and instructions prescribed by Company concerning the Contract Programs.

**4.4.** <u>Property and Supplies</u> . Dealer shall maintain and account for all supplies and materials furnished by Company (if any) in a secure and safe place. Upon termination of this Agreement, Dealer shall return all supplies and materials to Company.

**4.5.** <u>Representations Regarding Contracts</u> . Dealer shall not make any representations or warranties regarding the Contract Programs except those expressly set forth in the Customer Contracts.

**4.6.** <u>Legal Notices</u> . Dealer shall promptly notify Company of any pending or threatened suits, investigations, subpoenas or other inquiries affecting Dealer relating to Company or the Contract Programs.

**4.7.** <u>Inducement to Lapse</u> . While this Agreement is in force or at any time thereafter, Dealer shall not induce the lapse, cancellation, or termination of any Contract Programs sold.

**4.8.** <u>Audit</u> . Subject to reasonable prior notice, Dealer shall grant Company and its authorized representatives right of free access during normal business hours at Dealer's place of business for the purpose of inspecting and auditing the books and records maintained by Dealer with respect to the Contract Programs.

**4.9.** <u>Fiduciary Funds</u> . Dealer shall be considered a fiduciary of all monies received by Dealer on behalf of Company or otherwise due Company and shall not convert same to its own use, until remittance to Company or otherwise applied by Dealer in accordance with this Agreement. Such funds shall be held in trust by Dealer for the benefit of Company and shall be due and payable to Company by Dealer until actually received by Company.

**4.** **MUTUAL REPRESENTATIONS AND WARRANTIES.** Each of Dealer and Company represents and warrants to the other that: (i) It has the full right and authority to enter into this Agreement and perform its obligations hereunder; and, (ii) this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms.

**5.** **MUTUAL INDEMNIFICATION.** Dealer shall indemnify, defend, and hold harmless Company, its partners, agents and employees, and their respective successors and assigns of, for, from and against any and all claims, losses, damages, liabilities, judgments, penalties, fines and expenses, including, but not limited to, reasonable attorneys' fees and costs, to the extent resulting from or arising out of (a) any wrongful or negligent act, error, or omission committed by Dealer or its employees, (b) the failure of Dealer to observe and comply with any state or federal law or regulation applicable to the business conducted by Dealer pursuant to this Agreement, and (c) the material breach by Dealer of any of the terms of this Agreement. Company shall indemnify, defend, and hold harmless Dealer, its partners, agents and employees, and their respective successors and assigns of, for, from and against any and all claims, losses, damages, liabilities, judgments, penalties, fines and expenses, including, but not limited to, reasonable attorneys' fees and costs, to the extent resulting from or arising out of (a) any wrongful or negligent act, error, or omission committed by Company or its employees, (b) the failure of Company to observe and comply with any state or federal law or regulation applicable to the business conducted by Company pursuant to this Agreement, and (c) the material breach by Company of any of the terms of this Agreement.



**SILVERROCK AUTOMOTIVE
MASTER DEALER AGREEMENT**

6. **EFFECTIVE DATE AND TERMINATION** . This Agreement shall become effective as of the Effective Date and terminated by either party by giving 90 days' prior written notice to the other party. The termination of this Agreement shall not affect or diminish the obligations of the parties under this Agreement with respect to Contract Programs sold prior to the termination date. Dealer shall have no further right to use or distribute any of the documents or instruments relating to the Contract Programs including, but not limited to, Customer Contracts or application.

7. **MISCELLANEOUS**

   7.1    <u>Governing Law</u> . This Agreement shall be interpreted and enforced in accordance with the laws of Arizona, without reference to the conflicts of laws principles thereof. **Any judicial action relating to this Agreement and required either because arbitration is unenforceable or to enforce an arbitration award shall be prosecuted in a court of competent jurisdiction in Maricopa County, Arizona as the court of exclusive jurisdiction and proper venue, and the parties hereby consent to the jurisdiction and venue of said court. All parties waive trial by jury in all judicial actions relating to this Agreement.**

   7.2    <u>Waiver</u> . Failure by either party to exercise or enforce any of its rights or remedies under this Agreement shall not be construed as a waiver or relinquishment to any extent of such party's right to assert or rely upon any such provision, right, or remedy.

   7.3    <u>Successors and Assigns</u> . Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective lawful successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective lawful successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

   7.4    <u>Assignment</u> . Neither this Agreement, nor any of the authority, rights, duties, obligations, liabilities afforded or created by this Agreement may be assigned or delegated by Dealer to any other person without the prior written consent of Company.

   7.5    <u>Modifications</u> . This Agreement may not be amended or modified except by written agreement signed by both of the parties hereto.

   7.6    <u>Severability</u> . If one or more provisions of this Agreement are held to be unenforceable under applicable laws, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

   7.7    <u>Notices</u> . All notices and communications hereunder shall be in writing and shall be given by (a) personal delivery, (b) overnight delivery, (c) facsimile telephonic transmission, (d) email, or (e) mailed first class, registered or certified mail, postage prepaid, and shall be deemed received upon the earlier of actual delivery, confirmed facsimile transmission or email transmission or three days after deposit in the United States Mail. Notices shall be delivered to the addresses stated in this Agreement or updated as provided herein.

   7.8    <u>Access Authorization</u> . Dealer hereby authorizes Company to access Dealer Systems (herein, "Systems") as needed to perform services related to the providing of the Company's Products, including for purposes of extracting the Dealer data, finance and insurance deal information, and other similar data contained therein. Dealer agrees that Company is permitted, to the extent necessary to perform its obligations under any administered consumer contracts, to access and retain Dealer data to the extent necessary in order for Company and Licensor to perform its obligations or as required by applicable law.

8. **Privacy / Confidentiality / Intellectual Property** . The parties shall comply with all applicable provisions of the GLBA in collecting, storing and using "nonpublic personal information" (as defined in the GLBA). The parties shall not use or disclose for any purpose other than as required by this Agreement or permitted by law any "nonpublic personal information" received from customers or Purchasers.



## SILVERROCK AUTOMOTIVE
## MASTER DEALER AGREEMENT

9.  **Company Brand** . Dealer acknowledges and agrees that all right, title and interest to the "SilverRock" name, brand, logo, trademark and other intellectual property rights of Company including, but not limited to the Contract Program documents (collectively, the "Company Brand") are the sole property of Company. Dealer acknowledges and agrees that any use of the Company Brand or the intellectual property rights of any affiliates of Company without the prior written consent of Company, or any misrepresentation of Company or the Contract Programs will cause Company immediate and irreparable harm and, therefore, Company shall be entitled to seek equitable remedies in addition to legal damages for such harm.

10. **Nature of Relationship.** The relationship between Dealer and Company is that of an independent contractor, and shall not be construed as a joint venture, partnership or contractual servicer of consumer installment sale contracts, and there is no intention to create any relationship beyond that of an independent contractor. This Agreement shall not be construed as authority for either party to act for the other in any agency or any other capacity or to make commitments of any kind for the account of or on behalf of the other, except as expressly set forth in this Agreement. Neither Company nor Dealer has any obligations or duties to the other except as specifically provided for in this Agreement or as imposed by applicable laws. This Agreement is for the sole benefit of Dealer and Company and no third parties are intended to be beneficiaries of or have any rights under this Agreement.

11. **Arbitration . The parties agree that instead of litigation in a court, if any dispute, claim or controversy occurs arising out of, connected with or relating to this Agreement, at the request of a party, the parties shall resolve such dispute by binding arbitration administered and conducted under the then current Commercial Arbitration Rules of the American Arbitration Association and Title 9 of the United States Code. The parties agree that once one party has elected to arbitrate, binding arbitration is the exclusive method for resolving any and all disputes and that by agreeing to this arbitration provision and entering into this Agreement, the parties are waiving their right to a jury trial. The arbitration shall be conducted by a single arbitrator, unless the dispute involves more than $100,000 in which case the arbitration shall be conducted by a panel of three arbitrators if requested by either party. If the parties hereto are unable to agree on the arbitrator(s), then the AAA shall select the arbitrator(s). The arbitrator shall be an attorney or retired judge. The arbitrator shall apply and be bound by governing state or federal law when making an award. The arbitrator shall award only those damages or other relief permitted by applicable state or federal law and this Agreement. The arbitrator shall prepare a written decision stating reasoned findings of fact and conclusions of law. A party may enter judgment on the award in any court of competent jurisdiction. The arbitrator's award shall be final and binding on all parties. The arbitrator deciding the disputes shall have the authority to award fees, costs, injunctive or equitable relief in accordance with this arbitration provision, this Agreement and applicable law. The parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern any arbitration under this arbitration provision and Agreement. All arbitration hearings shall take place in Phoenix, Arizona unless the parties mutually agree on a different location to hold any such arbitration hearing. No attorneys' fees shall be awarded by the arbitrator unless a party fails to arbitrate as required under this arbitration provision, in which case only the party demanding arbitration shall, to the extent allowed by applicable law, be entitled to recover attorneys' fees and costs incurred in compelling the other party to arbitrate the dispute.**

12. **Limitation of Liability . The liability of either party under any claim related to this Agreement shall in no event exceed the aggregate Dealer Costs paid to Company during the then most recent twelve (12) month period, regardless of the form of action.**

**[END OF DEALER AGREEMENT. SIGNATURES ON FOLLOWING PAGE.]**

Page 5 of 6



**SILVERROCK AUTOMOTIVE
MASTER DEALER AGREEMENT**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

Company:                                                      Dealer:

**SilverRock Automotive, Inc.**                              **Carvana, LLC**
An Arizona corporation                                       4020 E Indian School Rd
1720 W Rio Salado Pkwy, Tempe, AZ 85281                      Phoenix, Arizona 85018

Signature: _____                        Signature: _____
*Authorized SilverRock Representative*                       *Authorized Dealer Representative*

Name:      Joan B Saunders                                   Name:      Paul Breaux
Title:     Chief Operating Officer                           Title:     General Counsel
Date:      12/08/2016                                        Date:      12/9/2016

Page 6 of 6

**IP L ICENSE A GREEMENT**

This IP L ICENSE A GREEMENT (hereinafter referred to as the " **IP Agreement** ") is entered into on this 27th day of February, 2017 (" **Effective Date** "), by and between DriveTime Automotive Group, Inc., DriveTime Car Sales Company LLC, Bridgecrest Acceptance Corporation f/k/a DT Acceptance Corporation and their respective wholly owned subsidiaries (individually and collectively, " **DT** "), and Carvana, LLC and any consolidated affiliates hereafter formed (" **CARVANA** ") and shall be deemed effective as of the Effective Date. DT and CARVANA are referred to herein collectively, as the " **Parties** " and individually as a " **Party** ."

Whereas , CARVANA desires to continue to conduct its businesses utilizing (a) certain intellectual property, works of authorship and technology, and related copyrights and trade secrets for such purposes, developed, acquired, owned or held and retained by CARVANA and further defined herein as the "CARVANA-IP"; and (b) certain intellectual property, works of authorship and technology, and related copyrights and trade secrets for such purposes, developed, acquired, owned or held by DT and further defined herein as the "DT-IP" that CARVANA is currently using and DT is willing to grant such a license to CARVANA.

Whereas , DT desires to continue to conduct its businesses utilizing (a) the DT-IP retained by DT; and (b) certain CARVANA-IP that DT is currently using and CARVANA is willing to grant such a license to DT.

Now, Therefore , in consideration of the representations, warranties and covenants of the Parties stated in this IP Agreement, the Parties mutually agree as follows:

**1 Definitions.** For the purpose of this IP Agreement and all Exhibits hereto, the following capitalized terms are defined in this Section 1 and shall have the meaning specified herein.

1.1 " **DT-IP** " shall mean and be limited to the (a) reserved, (b) Trade Secrets, (c) Copyrights, (d) Software, including the Software set forth on Exhibit A attached hereto, (e) DT Licensed Intellectual Property, as further defined herein, the Contracts for which are set forth on Exhibit A hereto (but only to the extent a license of such DT Licensed Intellectual Property to CARVANA hereunder is permitted by each such Contract and subject to the terms and conditions of each such Contract), (f) Data, and (g) any other Intellectual Property or proprietary rights, in each case of (a) through (g) to the extent existing as of the Effective Date and entitled to legal protection as such and to the extent owned by DT and related to a Party's business. Notwithstanding the foregoing sentence and anything else contained in this IP Agreement, (A) "DT-IP" shall expressly exclude, and Carvana shall have no license or rights to, the subject matters, technologies and Intellectual Property described in Exhibit B and (B) no rights to Trademarks or any Patents are included in DT-IP.

1.2 " **DT Licensed Intellectual** Property" means Intellectual Property that DT is licensed to use pursuant to a Contract (other than CARVANA-IP licensed to DT pursuant to this IP Agreement) to which DT is a party.

1.3 " **Change of Control** " means the occurrence of any of the following: (a) the direct or indirect acquisition of more than fifty percent (50%) of any class of a Party's or a Party's Parent's voting stock (or any class of non-voting security convertible into voting stock) by a

1

third party, whether occurring in a single transaction or a series of related transactions, resulting in an effective change of control of a Party or a Parent of a Party; (b) any merger, divestiture or split-off or spin-off transaction, which results in the acquisition by a third party of the beneficial direct or indirect ownership of more than fifty percent (50%) of any class of a Party's or a Party's Parent's voting stock (or any class of non-voting security convertible into voting stock), whether occurring in a single transaction or a series of related transactions; or (c) the direct or indirect sale, divestiture or disposal of all or substantially all of a Party's or a Party's Parent's assets to a third party, whether occurring in a single transaction or a series of related transactions, and with respect to DT, the direct or indirect sale, divestiture or disposal of all or substantially all of the DT Business to a third party even if such sale, divestiture or disposal does not constitute all or substantially all of DT's assets.

1.4 " **Confidential Information** " means any and all technical and non-technical information a Party provides to another Party in connection with this IP Agreement or any other information that is marked or otherwise identified at the time of disclosure as confidential or proprietary or is material that should be readily recognized as confidential by the recipient, including Trade Secrets, know-how, firmware, designs, schematics, techniques, software code, technical documentation, specifications, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to a Party, its present or future products, sales, suppliers, customers, employees, investors or business, whether in written, oral, graphic or electronic form

1.5 "Contract" means any license, contract, or agreement.

1.6 " **Improvements** " means any improvements, enhancements, changes, modifications or derivative works with respect to any Intellectual Property that perform substantially the same function as the Intellectual Property in a better or more efficient or economical way or that perform the substantially same function as the Intellectual Property and costs less to manufacture or operate than the prior Intellectual Property.

1.7 " **Intellectual Property** " means (a) reserved (b) works of authorship (including source code, databases and other compilations of information), whether copyrightable or not, and copyrights therein and thereto, in any jurisdiction (collectively, " **Copyrights** "), (c) all discoveries, concepts, ideas, research and development, know-how, formulae, inventions, compositions, processes and techniques, technical data, credit scoring systems, procedures, designs, drawings, specifications, including customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals, in each case that both relates to a Party's business as presently conducted and derives economic value (actual or potential) from not being generally known to third parties who can obtain economic value from its disclosure, but excluding any rights in respect of any of the Intellectual Property that comprise or are protected by Copyrights (collectively, " **Trade Secrets** "), (d) all Software, (e) all data (including, without limitation, static pool data with respect to retail installment sales contracts or similar assets, whether owned, managed or serviced, relating to delinquency, repossession, prepayment and cumulative net credit losses), databases (including, without limitation, databases of historical performance with respect to retail installment sales contracts or similar assets, whether owned, managed or serviced), and other compilations of information, including formulas for searching,

2

sorting and analyzing such information whether or not also constituting Copyrights, Trade Secrets or Software (collectively, " **Data** "), and (f) the right to sue or make claims for any past, present, or future infringement, misappropriation, or unauthorized use of any Intellectual Property.

1.8 " **Parent** " means any corporation or other legal entity that owns or controls, directly or indirectly, whether by contract or otherwise, (a) more than fifty percent (50%) of the shares or other securities of an entity entitled to vote for election of directors (or other managing authority) of such entity or (b) if such entity does not have outstanding shares or securities, more than fifty percent (50%) of the equity interest in such entity, but only for so long as and during the period such ownership or control exists in (a) or (b) above.

1.9 " **Software** " means any and all (a) computer programs, including any and all software implementations of Intellectual Property, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the Intellectual Property, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the Intellectual Property.

1.10 " **CARVANA-IP** " means and shall be limited to (a) reserved (b) Trade Secrets (collectively, the " **CARVANA Trade Secrets** "), (c) Copyrights (collectively, the " **CARVANA Copyrights** "), (d) Software, including the Software set forth on Exhibit C attached hereto (collectively, the " **CARVANA Software** "), (e) CARVANA Licensed Intellectual Property, as further defined herein, the Contracts for which are set forth on Exhibit C hereto (but only to the extent a license of such CARVANA Licensed Intellectual Property to DT is permitted by each such Contract and subject to the terms and conditions of each such Contract), (f) Data (collectively, the " **CARVANA Data** "), and (g) any other Intellectual Property or proprietary rights, in each case of (a) through (g) to the extent existing as of the Effective Date and entitled to legal protection as such and to the extent owned by CARVANA and related to a Party's business. Notwithstanding the foregoing sentence & anything else contained in this IP Agreement, (1) "CARVANA-IP" shall expressly exclude, and DT shall have no license or rights to, the subject matters, technologies and Intellectual Property described in Exhibit D and (2) no rights to any Trademarks or Patents are included in CARVANA-IP.

1.11 " **CARVANA Licensed Intellectual Property** " means Intellectual Property that CARVANA is licensed to use pursuant to a Contract (other than DT-IP licensed to CARVANA pursuant to this IP Agreement) to which CARVANA is a party.

1.12 **"CARVANA Business** " means the business of selling and financing the purchase of used automobiles.

1.13 **"DT Business"** means business that is primarily of sub-prime used car sales to retail consumers and may include the provision of sales financing to such consumers through the use of retail installment contracts "(Retail Installment Contracts")" in the United States and its territories (including Puerto Rico). For these purposes, "primarily of sub-prime" or "primarily sub-prime" shall mean 75% or more of the sales or financing on a unit basis (i.e., one sale is one unit, one sale with financing is one unit) is to customers with a FICO score of 620 or below.

3

1.14 **"Non-Exclusive Business"** means any business other than (a) the CARVANA Business or DT Business in the United States and its territories (including Puerto Rico); (b) the business of selling and financing the purchase of used automobiles outside the United States and its territories (including Puerto Rico); and (c) the business of primarily sub-prime used car sales to retail consumers and the provision of sales financing to such consumers outside the United States and its territories (including Puerto Rico).

1.15 " **Person** " means an individual, a partnership, a corporation, a limited liability company, an association, a trust, a joint venture, an unincorporated organization, or a governmental authority (or any department, agency, or political subdivision thereof).

**2** License to CARVANA

2.1 **Exclusive License of DT-IP** . Subject to the terms and conditions in this IP Agreement, DT hereby grants to CARVANA a perpetual, irrevocable (except as provided for in Sections 9 and 11), exclusive (other than with respect to DT and its Affiliates), worldwide, fully-paid-up, royalty-free, non-transferable (except as provided for in Section 11) license in the field of the CARVANA Business to the DT-IP:

(a) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain CARVANA products and services;

(b) to practice any method or process in connection with the exercise of the licenses granted in (a) above;

(c) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain CARVANA's own Improvements of and to the DT-IP solely for purposes of inclusion into CARVANA products and services that CARVANA uses, makes, has made, imports, offers to sell or sell;

(d) to create and have created CARVANA's own Improvements of and to the DT-IP for incorporation into CARVANA products and services;

(e) to distribute and have distributed (through multiple tiers of distribution) through means now known or later developed all or any portion of the DT-IP solely as incorporated into CARVANA products and services; and

(f) to otherwise freely exploit the DT-IP as part of any products or services being offered or to be offered by CARVANA and its Affiliates.

2.2 **Non-Exclusive License of DT-IP** .Subject to the terms and conditions in this IP Agreement, DT hereby grants to CARVANA a perpetual, irrevocable (except as provided for in Sections 9 and 11), non-exclusive, worldwide, fully-paid-up, royalty-free (except as provided for in Section 11), non-transferable (except as provided for in Section 11) license in the field of the Non-Exclusive Business to the DT-IP:

(a) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain CARVANA products and services;

4

(b) to practice any method or process in connection with the exercise of the licenses granted in (a) above;

(c) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain CARVANA's own Improvements of and to the DT-IP solely for purposes of inclusion into CARVANA products and services that CARVANA uses, makes, has made, imports, offers to sell or sell;

(d) to create and have created CARVANA's own Improvements of and to the DT-IP for incorporation into CARVANA products and services;

(e) to distribute and have distributed (through multiple tiers of distribution) through means now known or later developed all or any portion of the DT-IP solely as incorporated into CARVANA products and services; and

(f) to otherwise freely exploit the DT-IP as part of any products or services being offered or to be offered by CARVANA and its Affiliates.

2.3 **Retention of Title** . The licenses granted in Sections 2.1 (Exclusive License to DT-IP) and 2.2 (Non-Exclusive License to DT-IP) are not a sale of the DT-IP. As between the Parties, subject to the licenses granted in Sections 2.1 and 2.2, DT owns and will continue to own all right, title and interest in and to the DT-IP, and shall in its sole discretion seek registrations, or applications for registration, of any of the DT-IP or any Improvements thereto that are developed by DT. Any rights to the DT-IP not expressly granted to CARVANA in this IP Agreement are hereby reserved by DT.

2.4 **Delivery of DT Materials** . Anytime following the Effective Date, CARVANA may request one (1) copy of Software, Data, Trade Secrets or other materials used or maintained by DT (collectively "DT Materials") that: (a) is subject to the license granted to CARVANA under Sections 2.1 or 2.2; (b) has not already been provided to CARVANA; and (c) is not otherwise in CARVANA's possession. For the avoidance of doubt, nothing in this Section 2.4 shall require DT to deliver copies of any DT Improvements to CARVANA. Unless agreed otherwise by CARVANA, such DT Materials shall be delivered electronically in files and formats suitable for use by CARVANA by such means and methods as are customary for the delivery of electronic information.

## 3 License to DT

3.1 **Exclusive License of CARVANA-IP** . Subject to the terms and conditions in this IP Agreement, CARVANA hereby grants to DT a perpetual, irrevocable (except as provided for in Sections 9 and 11), exclusive (other than with respect to CARVANA and its Affiliates), worldwide, fully-paid-up, royalty-free (except as provided for in Section 11), non-transferable (except as provided for in Section 11) license in the field of the DT Business to the CARVANA-IP:

(a) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain DT products and services;

5

(b) to practice any method or process in connection with the exercise of the licenses granted in (a) above;

(c) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain DT's own Improvements of and to the CARVANA-IP solely for purposes of inclusion into DT products and services that DT uses, makes, has made, imports, offers to sell or sell;

(d) to create and have created DT's own Improvements of and to the CARVANA-IP for incorporation into DT products and services;

(e) to distribute and have distributed (through multiple tiers of distribution) through means now known or later developed all or any portion of the CARVANA-IP solely as incorporated into DT products and services; and

(f) to otherwise freely exploit the CARVANA-IP as part of any products or services being offered or to be offered by DT and its Affiliates.

3.2 **Non-Exclusive License of CARVANA-IP** . Subject to the terms and conditions in this IP Agreement, CARVANA hereby grants to DT a perpetual, irrevocable (except as provided for in Sections 9 and 11), non-exclusive, worldwide, fully-paid-up, royalty-free (except as provided for in Section 11), non-transferable (except as provided for in Section 11) license in the field of the Non-Exclusive Business to the CARVANA-IP:

(a) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain DT products and services;

(b) to practice any method or process in connection with the exercise of the licenses granted in (a) above;

(c) to design, have designed, develop, use, make, have made, sell, offer for sale, dispose of, import, export, support and maintain DT's own Improvements of and to the CARVANA-IP solely for purposes of inclusion into DT products and services that DT uses, makes, has made, imports, offers to sell or sell;

(d) to create and have created DT's own Improvements of and to the CARVANA-IP for incorporation into DT products and services;

(e) to distribute and have distributed (through multiple tiers of distribution) through means now known or later developed all or any portion of the CARVANA-IP solely as incorporated into DT products and services; and

(f) to otherwise freely exploit the CARVANA-IP as part of any products or services being offered or to be offered by DT and its Affiliates.

6

3.3 **Retention of Title** . The licenses granted in Sections 3.1 (Exclusive License to CARVANA-IP) and 3.2 (Non-Exclusive License to CARVANA-IP) are not a sale of the CARVANA-IP. As between the Parties, subject to the licenses granted in Sections 3.1 and 3.2, CARVANA owns and will continue to own all right, title and interest in and to the CARVANA-IP, and shall in its sole discretion seek registrations, or applications for registration, of any of the CARVANA-IP or any Improvements thereto that are developed by CARVANA. Any rights to the CARVANA-IP not expressly granted to DT in this IP Agreement are hereby reserved by CARVANA.

3.4 **Delivery of CARVANA Materials** . Anytime following the Effective Date, DT may request one (1) copy of Software, Data, Trade Secrets or other materials used or maintained by CARVANA (collectively "CARVANA Materials") that: a) is subject to the license granted to DT under Sections 3.1 or 3.2; (b) has not already been provided to DT; and (c) is not otherwise in DT's possession. For the avoidance of doubt, nothing in this Section 3.4 shall require CARVANA to deliver copies of any CARVANA Improvements to DT. Unless agreed otherwise by DT, such CARVANA Materials shall be delivered electronically in files and formats suitable for use by DT by such means and methods as are customary for the delivery of electronic information.

## 4 Improvements

4.1 **DT Improvements** . DT shall solely own all right, title, and interest to any Improvements to the DT-IP or CARVANA-IP made solely by or for DT from and after the Effective Date, and all Intellectual Property in such Improvements, subject to the ownership of the underlying DT-IP or CARVANA-IP (collectively **"DT Improvements** "). DT shall, in its sole discretion, seek registrations, or applications for registration, of any DT Improvements.

4.2 **CARVANA Improvements** . CARVANA shall solely own all right, title, and interest to any Improvements to the DT-IP or CARVANA-IP made solely by or for CARVANA from and after the Effective Date, and all Intellectual Property in such Improvements, subject to the ownership of the underlying DT-IP or CARVANA-IP (collectively **"CARVANA Improvements** "). CARVANA shall, in its sole discretion, seek registrations, or applications for registration, of the CARVANA Improvements.

4.3 **Joint Improvements.**

(a) The Parties shall jointly own equal, undivided shares of all right, title, and interest to any Improvements to the DT-IP or CARVANA-IP made jointly by or for DT and CARVANA from and after the Effective Date, and all Intellectual Property in such Improvements, subject to the ownership of the underlying DT-IP or CARVANA-IP (collectively **"Joint Improvements"** ). DT shall have the exclusive rights to all Joint Improvements in the field of the DT Business, CARVANA shall have the exclusive rights to all Joint Improvements in the field of the CARVANA Business, and each Party shall have the non-exclusive rights to all Joint Improvements in the field of the Non-Exclusive Business.

(b) The Parties shall select mutually-acceptable outside counsel to conduct the preparation, filing, prosecution and maintenance of any patents and applications for patents, and

7

any renewals, extensions and reissues thereof, in any jurisdiction (collectively, the " **Patents** ") directed to the Joint Improvements. The costs of procuring any such Patents shall be shared equally by the Parties. Any use or disclosure of confidential information is subject to the restrictions set forth in Section 8. If a Party elects not to share the cost of a Patent directed to a Joint Improvement or elects to discontinue sharing expenses for any Patent directed to a Joint Improvement, such Party will notify the other Party in writing of such election and will agree to assign its interest in any such Patent to the other Party, after which the other Party will solely own any such Patent. Notwithstanding the foregoing, such assignment of any ownership interest in any such Patent does not alter or modify the exclusive rights to practice such Patent in the Parties' respective field of business.

(c) Each Party, at its own expense, may initiate an action to enforce any Joint Improvements against accused infringer(s) within its respective field of exclusivity. The Party initiating the action will notify the other Party and identify the accused infringer(s). The other Party will cooperate in any such action (i) by agreeing to be named as party to the action solely to the extent necessary to maintain the action, and (ii) by not granting any license under the Joint Improvements to the identified accused infringer(s) until after such action is finally resolved. No Party will settle the action without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed, if the terms of the settlement would deprive the other Party of its rights in the asserted Joint Improvements. The costs of any such action shall be born solely by the Party initiating such suit, claim or action, and any recovery realized as a result of such suit, claim, or action or related settlement will be retained by the Party initiating the action.

(d) With respect to enforcement of the Joint Improvements in the field of the Non-Exclusive Business, the parties will cooperate in deciding whether and how to initiate an action to enforce any Joint Improvements against accused infringer(s) within the field of the Non-Exclusive Business; provided, however, that neither Party shall initiate any action without the other Party's consent. If a Party fails to cooperate or refuses to consent to initiating such an action upon the other Party's request, a Party may initiate such an action at its sole expense without the consent of the non-cooperating or refusing Party if the third party is a Competing Business of the initiating Party (provided that for purposes of this Section 4.3(d) an Affiliate shall not be deemed to be a third party), as further defined herein, and the initiating Party shall be entitled to retain all proceeds of such proceedings. In such instances, the initiating Party may join the other Party to the action solely to the extent necessary to maintain the action, and the initiating Party shall indemnify the other Party against all reasonable expenses incurred by reason of its joinder. In any event, neither Party shall (i) grant any license under the Joint Improvements to the identified accused infringer(s) until after an action is finally resolved, or (ii) settle an action without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed, if the terms of the settlement would deprive the other Party of its rights in the asserted Joint Improvements. The Parties may, but are not obligated to, share equally in the costs of any such action, in which case any recovery realized as a result of such action will first be applied *pro rata* to reimburse the Parties' reasonable costs and any remaining amounts will be divided equally between the Parties. If either Party declines, at its sole discretion, to share equally in such fees or expenses, but consents to the other Party initiating such action, the initiating Party shall solely bear the costs of any such action and shall indemnify the declining Party against all reasonable expenses incurred by reason of its joinder, and any recovery realized as a result of such action or related settlement will be retained by the initiating

8

Party. For purposes of the Agreement, the term " **Competing Business"** shall mean (i) with respect to any such assignment or sublicense by, or Change of Control of, CARVANA, a Person that competes with DT in the business of primarily sub-prime used car sales to retail consumers and the provision of sales financing to such consumers in the United States and its territories (including Puerto Rico), or (ii) with respect to any such assignment or sublicense by, or Change of Control of, DT, a Person that competes with CARVANA in the business of selling and financing the purchase of used automobiles.

## 5 Warranty Disclaimers

EXCEPT AS EXPRESSLY SET FORTH IN THIS IP AGREEMENT AND SUBJECT TO THE LIMITATIONS AND LIMITED REMEDIES SET FORTH HEREIN AND THEREIN, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES REGARDING THE DT-IP, THE CARVANA-IP OR OTHERWISE IN CONNECTION WITH THIS IP AGREEMENT. EACH OF CARVANA AND DT DISCLAIM ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, ANY WARRANTY OR CONDITION WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT. NEITHER PARTY WARRANTS THAT ANY ITEMS DELIVERED TO OR RETAINED BY THE OTHER PARTY HEREUNDER WILL BE ERROR-FREE. ALL WARRANTIES OR CONDITIONS CONCERNING THIS IP AGREEMENT, THE DT-IP, THE CARVANA-IP OR ANY INTELLECTUAL PROPERTY RIGHTS, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, NON-INFRINGEMENT, REASONABLE SKILL AND CARE, FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED TO THE FULLEST EXTENT PERMISSIBLE BY LAW.

## 6 No Support; Infringement

6.1 Neither Party will have any obligations under this IP Agreement to provide any support to the other Party for any DT-IP or CARVANA-IP, respectively, from and after a Change of Control of DT or a Change of Control of CARVANA, except as may be expressly agreed to by such Party in a separate written agreement. Neither Party will have any obligations under this IP Agreement to provide any support or disclosure to the other Party of any Improvements it makes to any DT-IP or CARVANA-IP, except as may be expressly agreed to by such Party in a separate written agreement.

6.2 Each Party will retain the exclusive right to seek enforcement of its own Intellectual Property (except with respect to Joint Improvements, enforcement of which is set forth in Section 4.3), including the recovery of any damages. Each Party will use its commercially reasonable efforts to cooperate with the other Party in the prosecution or defense of third-party claims of infringement with respect to the Intellectual Property licensed to such first Party hereunder. Each Party agrees to notify the other Party if it becomes aware of any actual or suspected third party infringement, misappropriate or other violation of the DT-IP or the CARVANA-IP licensed hereunder. In any event, neither Party may settle with an infringer or grant a sublicense to an infringer without the prior approval of the other Party if such settlement or sublicense would affect the rights of the other Party under the terms of this IP Agreement.

9

**7 Third Party Contractors**

In the exercise of the licenses granted under this IP Agreement, each Party may utilize independent contractors (" **Contractors** ") in connection with the exercise of the licenses granted in this IP Agreement; provided, however, that any such use is solely to support the Party's permitted sublicensees in connection with CARVANA's or DT's rights under this IP Agreement. Any such Contractors that receive any Confidential Information of DT will be bound by a written agreement containing terms substantially similar to the terms and conditions applicable to CARVANA and DT under this IP Agreement.

**8 Confidential Information**

8.1 Each Party, including all Affiliates thereof, will maintain in confidence all Confidential Information disclosed by the other Party and its Affiliates (each a " **Disclosing Party** ") which it has obtained from a Disclosing Party or its Representatives in connection with this IP Agreement. A receiving Party hereunder (a " **Receiving Party** ") will not use, disclose or grant use of such Confidential Information except as expressly authorized or otherwise permitted by this IP Agreement, or any other agreements between the parties. Notwithstanding the following, (a) with respect to Confidential Information primarily relating to the CARVANA Business or that is CARVANA-IP, CARVANA shall be considered the Disclosing Party and DT shall be considered the Receiving Party, and (b) with respect to Confidential Information primarily relating to the DT Business or that is DT-IP, DT shall be considered the Disclosing Party and CARVANA shall be considered the Receiving Party. To the extent that disclosure of one Party's Confidential Information to a third party is authorized or otherwise permitted by this IP Agreement, a Receiving Party will obtain prior written agreement from such third party to whom disclosure is to be made to hold in confidence and not make use of such Confidential Information for any purpose other than those expressly authorized or otherwise permitted by this IP Agreement, and in any event the Receiving Party shall be liable to the Disclosing Party for breaches by such third parties. A Receiving Party will use at least the same standard of care as it uses to protect its own information of comparable importance to ensure that its representatives do not disclose or make any unauthorized use of such Confidential Information, and in no event less than reasonable care. The Receiving Party will promptly notify the Disclosing Party upon discovery of any unauthorized use or disclosure of such Confidential Information. The Parties will take all reasonable steps to minimize the risk of disclosure of Confidential Information by ensuring that only they and such of their Representatives whose duties will require them to possess any of such information shall have access thereto, and will be instructed to treat the same as confidential.

8.2 The obligations of confidentiality contained in Section 8.1 above will not apply to the extent that such Confidential Information: (a) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party; (b) became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Receiving Party in breach of this IP Agreement; (c) was disclosed to the Receiving Party by a third party who had no obligation not

10

to disclose such information to others; (d) was developed independently by the Receiving Party without any use of the Disclosing Party's Confidential Information; or (e) is required to be disclosed publicly by applicable law. In addition, notwithstanding any provision to the contrary herein, either Party is permitted to disclose the terms of this IP Agreement, or any of the other agreements between the Parties, any Confidential Information, or any other information or action covered by the limitations of this Section (collectively " **Information** ") if required to do so by law, legal process or court order. In the event any Party or its Affiliates receives either a subpoena (or other legal process) or court order seeking Information, such Party shall (and shall cause its Affiliate to), before responding thereto, if permitted by applicable law, provide the other Party with written notice of such legal process, order or legal requirement in sufficient time, and shall reasonably cooperate, to permit the other Party the opportunity to object, to seek to limit such production of such Information and/or obtain the highest level of protection available for such Information, including limiting the disclosure of such Information to disclosure under seal.

## 9 Termination

9.1 The term of this IP Agreement will commence on the Effective Date and will continue in perpetuity thereafter, except with regard to any Patents contemplated herein the license to which will continue until the expiration of the last to expire Patent. In the event of a material breach of this IP Agreement by either Party, relating to a specific DT-IP or CARVANA-IP, that is not cured within thirty (30) days following delivery of written notice of such breach by the non-breaching Party, the non-breaching Party may terminate this Agreement and seek all available remedies at law and in equity relating to such breach, including without limitation monetary damages, injunctive relief, specific performance and/or termination by an appropriate court (as contemplated in Section 11) of the relevant license grant contemplated in this IP Agreement relating specifically to such DT-IP or CARVANA-IP being breached . Either Party may, in its discretion, terminate one or more of the licenses granted to itself under this IP Agreement by written notice to the other Party.

9.2 To the extent this Agreement is terminated pursuant to its terms, the provisions of Sections 2.3, 3.3, 8, 9.2, 10, 11, and 12 shall survive any such termination.

## 10 Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT FOR BREACHES OF CONFIDENTIALITY OBLIGATIONS, AND BREACH OF THE LICENSE GRANT IN SECTION 2.1 AND SECTION 3.1, RESPECTIVELY, IN NO EVENT SHALL A PARTY BE LIABLE UNDER THIS IP AGREEMENT TO THE OTHER PARTY OR TO ANY PARTY CLAIMING THROUGH OR UNDER ANOTHER PARTY, FOR ANY LOST PROFITS, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER IN AN ACTION IN CONTRACT, TORT (INCLUDING STRICT LIABILITY), BASED ON A WARRANTY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS IP AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**11 Assignment; Sublicense**

Neither Party may assign or sublicense any of its rights, or delegate any of its obligations, under this IP Agreement (whether voluntarily, involuntarily, by way of merger, operation of law or otherwise) to any third party without the prior written consent of the other Party. In the event of a Change of Control of a Party, all rights granted to such Party as a licensee under this IP Agreement (including with respect to a Change of Control of DT, the licenses granted in Section 3.1 and 3.2, and with respect to a Change of Control of CARVANA, the licenses granted in Section 2.1 and 2.2) shall terminate immediately. Any attempted assignment or sublicense of rights, or delegation of obligations, under this IP Agreement in breach or violation of this Section 11 will be null and void.

**12 General Provisions**

12.1 **Severability** . If any provision in this IP Agreement shall be held to be invalid or unenforceable, the remaining portions shall remain in effect, and any provision deemed invalid in one jurisdiction shall not affect the validity of such provision in any other jurisdiction. In the event such invalid or unenforceable provision is considered an essential element of this IP Agreement, the Parties shall use commercially reasonable efforts to negotiate a replacement provision.

12.2 **Non-Waiver; Remedies Cumulative** . No waiver of the terms and conditions of this IP Agreement, or the failure of either Party strictly to enforce any such term or condition on one or more occasions shall be construed as a waiver of the same or of any other term or condition of this IP Agreement on any other occasion. Any waiver of the terms and conditions of this IP Agreement must be set forth in writing by the Party granting such waiver. All rights and remedies conferred under this Agreement or by any other instrument or law shall be cumulative and may be exercised singularly or concurrently.

12.3 **Notices** . All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by e-mail or other electronic delivery or sent, postage prepaid, by registered, certified or express mail or overnight courier service, as follows:

if to DT, to:

DriveTime Automotive Group, Inc.
1720 W. Rio Salado Parkway
Tempe, AZ 85281
Attention: General Counsel
Email: Jon.Ehlinger@drivetime.com (with a copy to: DL-Legal@drivetime.com)

and;

if to CARVANA, to:

Carvana, LLC
4020 East Indian School Rd.
Phoenix, AZ 85018
Attention: General Counsel
Email: DL-CarvanaLegal@carvana.com

12

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

12.4 **Applicable Law and Jurisdiction** . This IP Agreement is made and entered into in the State of Arizona and shall be governed by, and construed and enforced in accordance with, the laws of the State of Arizona, determined without regard to any conflict of laws principles that would result in the application of the laws of a different state. A court of proper venue within the State of Arizona will have exclusive jurisdiction over all disputes between the Parties relating to breaches of this IP Agreement. The Parties hereby consent and agree to submit to such court and waive any objection to the jurisdiction of such court on grounds that such court would be an inconvenient forum.

12.5 **Injunctive Relief** . It is understood and agreed that, notwithstanding any other provisions of this Agreement, breach of the provisions of this IP Agreement by DT or CARVANA may cause the other Party irreparable damage for which recovery of money damages would be inadequate, and that such other Party shall therefore be entitled to seek timely injunctive relief, without the posting of a bond or proof of money damages, to protect its rights under this IP Agreement in addition to any and all remedies available at law.

12.6 **Entire Agreement; Amendment** . As of the Effective Date, this IP Agreement amends and restates in its entirety and supersedes that certain IP License Agreement by and between DT and CARVANA dated February 29, 2016 and supersedes all other prior oral or written understandings between the Parties with respect to the subject matter thereof and constitutes the entire agreement of the Parties with respect to such subject matter. Such terms and conditions shall not be modified or amended except by a writing that is signed by an authorized representative of each Party. Any amendment or waiver affected in accordance with this Section shall be binding upon the Parties and their respective successors and assigns.

12.7 **Relationship Between Parties** . DT and CARVANA shall at all times and for all purposes be deemed to be independent contractors and neither Party, nor either Party's employees, representatives, subcontractors or agents, shall have the right or power to bind the other Party. This IP Agreement shall not itself create or be deemed to create a joint venture, partnership or similar association between DT and CARVANA or either Party's employees, representatives, subcontractors or agents.

12.8 **Headings; Construction.** The headings to the clauses, sub-clauses and parts of this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this IP Agreement. The terms "this IP Agreement," "hereof," "hereunder" and any similar expressions refer to this IP Agreement and not to any particular Section or other portion hereof. The Parties hereto agree that any rule of construction

13

to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the construction or interpretation of this IP Agreement. As used in this IP Agreement, the words "include" and "including," and variations thereof, will be deemed to be followed by the words "without limitation" and "discretion" means sole discretion.

12.9 **Counterparts** . This IP Agreement may be executed by facsimile or email and in counterparts, each of which shall be deemed an original and both of which together shall constitute one agreement. Faxed or emailed signatures shall have the same effect as original signatures.

*[Remainder of page intentionally left blank.]*

14

IN WITNESS WHEREOF, the Parties hereto have caused this IP Agreement to be entered into effective as of the Effective Date.

**DRIVETIME AUTOMOTIVE GROUP, INC.** , a Delaware corporation

By:  /s/ Jon D. Ehlinger
_____
    Jon D. Ehlinger
    EVP and General Counsel

**DRIVETIME CAR SALES COMPANY, LLC,**
an Arizona limited liability company

By:  /s/ Jon D. Ehlinger
_____
    Jon D. Ehlinger
    EVP and General Counsel

**BRIDECREST ACCEPTANCE CORPORATION,**
an Arizona corporation

By:  /s/ Jon D. Ehlinger
_____
    Jon D. Ehlinger
    EVP and General Counsel

**CARVANA, LLC** , an Arizona limited liability company doing business as CARVANA

By:  /s/ Paul Breaux
_____
    Paul Breaux
    Vice President

[ *Signature Page to IP License Agreement - CARVANA* ]

15

**EXHIBIT A**

Certain Intellectual Property Included in DT-IP

| System | Description | Owned or 3rd Party* | Functional Area |
|---|---|---|---|
| Accutrack | Access 97 front end system that tracks location of titles associated with owned inventory. Also manages the paperwork (original contract and title) with our custodian. Handles request documents, sending of documents, etc. | Owned | Loan Servicing |
| IMS | IMS is our Inventory Management System with respect to vehicles held in inventory, and a workflow system to provide visibility of work in process and completed units. It also includes certain modules such as the CLASS Stock Purchase, which allows entry of vehicles into the system. | Owned | Inventory |
| Look Up | Tool to manage content and define business rules and configuration without code changes | Owned | IT |
| Pricing Shared Services—DT and Carvana | Tool used to allow input of lookup sets based on proprietary financing models that determine loan structure. Such financing models are not included in this License. | Owned | Retail |

CONFIDENTIAL

**EXHIBIT B**

Subject matters, technologies, and Intellectual Property Excluded from DT-IP

- Logos, including the DriveTime green circle logo

- Marketing materials, including commercials and radio advertisements

- Personally identifiable information of customers or employees

- Website user interface elements

- Credit scoring model

- Loan servicing procedures

- Vehicle purchase algorithms

- Other information that would be unlawful to disclose to third-party

Appendix p. 2

CONFIDENTIAL

**EXHIBIT C**

Certain Intellectual Property Included in CARVANA-IP

- The Carvana Buying Portal

Appendix p. 3

CONFIDENTIAL

**EXHIBIT D**

Subject matters, technologies and Intellectual Property excluded from CARVANA-IP

- Logos, including the Carvana blue circle logo

- Marketing materials, including commercials and radio advertisements

- Intellectual Property related to automated car delivery tower, also known as Vending Machine

- Transportation Management System, including revisions, improvements or subsequent versions thereto

- Intellectual Property related to automated vehicle photography

- Website user interface elements

- Personally identifiable information of customers or employees

- Other information that would be unlawful to disclose to third-party

Appendix p. 4

## MASTER LOAN AGREEMENT

THIS MASTER LOAN AGREEMENT (this " Agreement "), dated as of February 27, 2017, is entered into by and among CARVANA GROUP, LLC, a Delaware limited liability company (" Borrower "), the lenders listed on the signature pages hereof or that become party hereto pursuant to Section 8.8 (" Lenders "), and VERDE INVESTMENTS, INC., an Arizona corporation, as a Lender and as the administrative agent for the Lenders (" Agent "). In consideration of the mutual covenants and agreements contained herein, the Borrower, the Lenders and the Agent agree as follows:

### W I T N E S S E T H :

In consideration of the premises and of the mutual covenants herein contained and to induce Lenders to extend credit to Borrower, the parties agree as follows:

**1. Definitions** . Capitalized terms that are not otherwise defined herein shall have the meanings set forth in this Section 1.

**1.1 Defined Terms:**

" **Affiliate** " of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

" **Applicable Capital Gain Tax Rate** " means a rate equal to the sum of:

(i) the highest marginal Federal income tax rate applicable to net long-term capital gain of an individual who is a citizen of the United States of America, *plus*

(ii) to the extent Borrower is subject to treatment on a basis under applicable state or local income tax law substantially similar to a Flow Through Entity, (x) an amount equal to the sum of the highest marginal state and local income tax rates applicable to net capital long-term gain amongst the individual beneficial owners of the outstanding shares of common stock of Borrower *multiplied by* (y) a factor equal to 1 *minus* the highest marginal Federal income tax rate described in clause (i) above.

" **Applicable Income Tax Rate** " means a rate equal to the sum of:

(i) the highest marginal Federal ordinary income tax rate applicable to an individual who is a citizen of the United States of America, *plus*

(ii) to the extent Borrower is subject to treatment on a basis under applicable state or local income tax law substantially similar to a Flow Through Entity, (x) an amount equal to the sum of the highest marginal state and local ordinary income tax rates applicable amongst the individual beneficial owners of the outstanding shares of common stock of Borrower *multiplied by* (y) a factor equal to 1 *minus* the highest marginal Federal income tax rate described in clause (i) above.

" **Business Day** " means any day except a Saturday, Sunday or other day on which commercial banks in Arizona or in the city where the chief executive office of Agent is located is authorized by law to close.

" **Capital Stock** " means:

(i) in the case of a corporation, corporate stock or shares;

(ii) in the case of an association or business entity other than a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

" **Class B Common Units** " shall have the meaning set forth in the Operating Agreement.

" **Class C Preferred Units** " shall have the meaning set forth in the Operating Agreement.

" **Change of Control** " means the occurrence of any of the following:

(i) the direct or indirect sale, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Borrower and its Subsidiaries, taken as a whole, to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act);

(ii) the adoption of a plan relating to the liquidation or dissolution of Borrower; or

(iii) Borrower becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the consummation of any transaction (including any merger or consolidation) the result of which is that any "person" (as defined above) other than the Controlling Investors, becomes the "beneficial owner" (as such term is defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (iii) such person shall be deemed to have "beneficial ownership" of all shares that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 50% of the voting power of Borrower;

*provided* that the contribution of the Equity Interests of Borrower to a holding company that holds no assets other than such Equity Interests and has the same composition of ownership immediately after such contribution that owned such Equity Interests immediately before, shall not by itself constitute a "Change of Control."

2

" **Code** " means the Internal Revenue Code of 1986, as amended.

" **Collateral** " if and when pledged hereunder, means the Property, all Fixtures of the Property, and an assignment of the Leases and the rents derived from the Leases pledged by Borrower as security for the Loans.

" **Controlling Investors** " shall have the meaning set forth in the Operating Agreement.

" **Default** " means any event that is or with the passage of time or the giving of notice or both would be an Event of Default (as defined in Section  5 herein).

" **Default Rate** " on any date, means a rate per annum that is equal to 5.0% in excess of the rate otherwise applicable to the Loan or any other Obligations outstanding on such date.

" **De Minimis Amounts** " means a quantity of Hazardous Materials or Regulated Materials, which, in all instances are transported, used and/or stored, as the case may be, in a manner that (i) does not constitute a violation of any Environmental Law or require any reporting or disclosure under any Environmental Law and (ii) is consistent with customary business practice for Borrower's or Tenant's operations at the Property both in the state where the Property is located and under Federal law, and which is (x) transported on or from the Property in connection with Borrower's or Tenant's current operations; or (y) stored for use on the Property by Borrower or Tenant in connection with Borrower's or Tenant's current operations; or (z) currently used by Borrower or Tenant on the Property.

" **Draw Termination Date** " means the earliest of (i) August 27, 2018, and (ii) if the Maximum Aggregate Amount of Loans has been made prior to August 27, 2018, the Funding Date of the last Loan made to Borrower.

" **Environmental Laws** " collectively means the following acts and laws, as amended: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Superfund Amendments and Reauthorization Act of 1986; the Resource Conservation and Recovery Act; the Toxic Substances Act; the Clean Water Act; the Clean Air Act; the Oil Pollution and Hazardous Substances Control Act of 1978; or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree relating to, or imposing liability or standards of conduct concerning, any Hazardous Materials or Regulated Materials, as now or at any time hereafter in effect.

" **Equity Interests** " means all Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for Capital Stock).

" **Event of Default** " this term has the meaning provided in Section  5 of this Agreement.

" **Fixtures** " has the meaning set forth in the UCC.

" **Flow Through Entity** " means an entity that for U.S. Federal income tax purposes

3

constitutes (i) an "S corporation" (as defined in Section 1361(a) of the Code, (ii) a "qualified subchapter S subsidiary" (as defined in Section 1361(b)(3)(B) of the Code), (iii) a "partnership" (within the meaning of Section 7701(a)(2) of the Code) other than a "publicly traded partnership") (as defined in Section 7704 of the Code), (iv) an entity that is disregarded as an entity separate from its owner under the Code, the Treasury regulations or any published administrative guidance of the Internal Revenue Service, or (v) a trust, the income of which is includible in the taxable income of the grantor or another person under sections 671 through 679 of the Code.

" **Funding Date** " means each date on which a Loan is made hereunder.

" **GAAP** " means generally accepted accounting principles adopted by the Financial Accounting Standards Board from time to time.

" **Governmental Authority** " means any domestic or foreign court or other governmental or regulatory authority, agency, or other body with jurisdiction over Borrower or any Subsidiary, or any of assets or property of Borrower or any Subsidiary.

" **Guarantor** " means Carvana, LLC and Arizona limited liability company.

" **Guaranty** " means that certain Guaranty executed by Guarantor in favor of Agent on behalf of Lenders, in the form attached hereto as Exhibit A-2

" **Hazardous Materials** " means oil, petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials, radioactive materials, polychlorinated biphenyls (" PCBs "), and compounds containing them; lead and lead based paint, asbestos and asbestos-containing materials in any form that is or could become friable, underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence and quantity of which at any Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other hazardous or toxic substances, hazardous waste, regulated substances or hazardous air pollutants defined as such under any existing or future Environmental Law.

" **Improvements** " means all buildings and improvements now or hereafter erected on the Property and all fixtures, machinery, equipment and other articles of real, personal or mixed property attached to or installed in or upon, or used in the operation or maintenance of, the Property or any buildings or improvements situated thereon, whether or not such real, personal or mixed property is or shall be affixed to the Property.

" **Indebtedness** " means, as of a particular time without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business which are not more than one hundred twenty (120) days past due), (iv) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), and (v) any credit or loan agreement or facility or other agreement, instrument or document evidencing, creating or relating to any of the foregoing.

4

" **Investments** " means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of direct or indirect loans (including guarantees of Indebtedness or other obligations), advances or capital contributions (excluding commissions, payroll, travel, moving and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

" **Lien** " means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, encumbrance or hypothecation of any kind in respect of that asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any other agreement to give a security interest in and any filing of any financing statement under the UCC (or equivalent statutes) of any jurisdiction).

" **Loan** " or " **Loans** " means the Loan or Loans made by Lenders to Borrower from time to time pursuant to Section 2.2.4 of this Agreement.

" **Loan Commitment** " means the commitment of each Lender to make the Loans in accordance with the provisions of Section 2.1.1 of this Agreement.

" **Loan Documents** " means this Agreement, each Note, each Mortgage, the Guaranty, UCC-1 financing statements, and all other documents and instruments now or hereafter evidencing, describing, guaranteeing or securing the Obligations contemplated hereby or delivered in connection herewith, as they may be modified, amended, extended, renewed or substituted from time to time.

" **Loan Maturity Date** " means August 27, 2018.

" **Material Adverse Effect** " means a material adverse effect on (i) the condition (financial or otherwise), operations, properties or business of Borrower and its Subsidiaries taken as a whole, (ii) the ability of Borrower to perform its obligations under this Agreement or (iii) the rights and remedies of Agent under this Agreement.

" **Maximum Aggregate Amount** " this term has the meaning provided in Section 2.1.1 .

" **Maximum Lawful Rate** " this term has the meaning provided in Section 2.3.4 .

" **Mortgage** " means any mortgage, deed of trust or similar instrument now or hereafter executed by Borrower or any other Person granting Agent a security interest in any Collateral to secure the Obligations, as modified, restated or replaced from time to time.

" **Note** " has the meaning set forth in Section 2.1.3 of this Agreement.

" **Operating Agreement** " means that certain third Amended and Restated Limited Liability Company Agreement of Borrower, dated July 12, 2016, without regard to any amendments, modifications and supplements after the date hereof.

" **Obligations** " means the Loans and all other amounts, including but not limited to all other amounts advanced, expended or applied by the Agent under this Agreement or any other Loan Document to or for the benefit of the Borrower or to perform or enforce the Borrower's covenants in this Agreement or any other Loan Document, together with all interest accruing thereon, including any interest on pre-petition debt accruing after bankruptcy, all fees, all costs of collection, attorneys' fees and expenses of or advances by the Agent which the Agent pays or incurs in discharge of obligations of the Borrower or to inspect, repossess, protect, preserve, store or dispose of any Collateral, whether such amounts are now due or hereafter become due, direct or indirect and whether such amounts due are from time to time reduced or entirely extinguished and thereafter re-incurred.

" **Permitted Investments** " means:

(i) any Investment in Borrower or a Subsidiary of Borrower;

(ii) any Investment in cash or cash equivalents;

(iii) any Investment existing on the date hereof or made pursuant to binding commitments in effect on the date hereof or an Investment consisting of any amendment, restatement, supplement, refunding, replacement, refinancing, exchange, extension, modification or renewal of any Investment existing on or made pursuant to a binding commitment in effect on, the date hereof; *provided* that the amount of any such Investment is increased thereby, if at all, only to the extent permitted by another clause of this definition;

(iv) Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits;

(v) any Investment consisting of a guarantee permitted hereunder incurred in the ordinary course of business;

(vi) Investments received in settlement, compromise or resolution of bona fide disputes or as distributions in bankruptcy, insolvency or similar proceedings;

(vii) Investments acquired after the date hereof as a result of the acquisition by Borrower or any Subsidiary of Borrower of another Person, including by way of a merger, amalgamation or consolidation with or into Borrower or any of its Subsidiaries in a transaction that is not prohibited hereunder to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(viii) Investments consisting of licensing or contribution of intellectual property pursuant to joint development, marketing, manufacturing or similar agreements with other Persons;

(ix) Investments representing amounts held for employees of Borrower or any Subsidiary under deferred compensation plans; and

(x) other Investments in any Person having an aggregate fair market value

6

(measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (xi) that are at the time outstanding, not to exceed Five Million and No/100 Dollars ($5,000,000).

" **Permitted Liens** " means:

(i) Liens securing the Obligations;

(ii) Liens for Taxes, assessments and other governmental charges or levies not yet due and payable or which are being contested in good faith and by appropriate proceedings and adequate reserves therefor in compliance with GAAP have been set aside on Borrower's or any applicable Subsidiary's books;

(iii) The claims of materialmen, mechanics, carriers, warehousemen, processor or landlords arising out of operation of law so long as the obligations secured thereby are not past due or are being contested in good faith and by appropriate proceedings and adequate reserves therefor in compliance with GAAP have been set aside on Borrower's or any applicable Subsidiary's books;

(iv) Liens consisting of deposits or pledges made in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security and similar laws;

(v) Judgment and other similar non-tax Liens arising in connection with court proceedings but only if and for so long as (x) the execution or enforcement of such Liens is and continues to be effectively stayed and bonded on appeal, (y) the validity and/or amount of the claims secured thereby are being contested in good faith and by appropriate proceedings and adequate reserves therefor in compliance with GAAP have been set aside on Borrower's or any applicable Subsidiary's books and (z) such Liens do not, in the aggregate, materially detract from the value of the Collateral or materially impair the use thereof in the operation of the Property;

(vi) Liens, other than Liens securing obligations for borrowed money and Liens of the type set forth in clauses (ii) through (v) above, which do not, in the aggregate, materially detract from the value of the affected Property or materially impair the use thereof in the operation of the Property, including without limitation, easements (including without limitation billboard and access easements), zoning restrictions, rights-of-way and similar encumbrances on the Property imposed by law or arising in the ordinary course of business and minor defects or irregularities in title.

" **Permitted Tax Distributions** " in respect of Borrower (but without duplication) means, with respect to any taxable year or portion thereof in which Borrower is a Flow Through Entity, the sum of:

(i) the product of (x) the excess of (1) all items of taxable income or gain (other than capital gain) of Borrower for such year or portion thereof over (2) all items of taxable deduction or loss (other than capital loss) of Borrower for such year or portion thereof and (y) the Applicable Income Tax Rate, *plus*

7

(ii) the product of (x) the net capital gain ( *i.e.* , net long-term capital gain over net short-term capital loss), if any, of Borrower for such year or portion thereof and (y) the Applicable Capital Gain Tax Rate, *plus*

(iii) the product of (x) the net short-term capital gain (for this purpose, net short-term capital gain in excess of net long-term capital loss), if any, of Borrower for such year or portion thereof and (y) the Applicable Income Tax Rate, *minus*

(iv) the aggregate Tax Loss Benefit Amount for Borrower for such year or portion thereof. For purposes of calculating the amount of the Permitted Tax Distributions the items of taxable income, gain, deduction or loss (including capital gain or loss) of any Subsidiary that is a Flow Through Entity (but only for periods for which such Subsidiary is treated as a Flow Through Entity), which items of income, gain, deduction or, loss are allocated to or otherwise treated as items of income, gain, deduction or loss of Borrower for Federal income tax purposes, shall be included in determining the taxable income, gain, deduction or loss (including capital gain or loss) of Borrower.

" **Person** " means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock corporation, trust, unincorporated organization or government or agency or political subdivision thereof or any other entity.

" **PIK Interest** " means interest that is added to the principal amount of this Agreement in accordance with Section 2.3.1 of this Agreement.

" **Preferred Stock** " as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

" **Pro Rata Share** " for each Lender, means the percentage equivalent of a fraction, the numerator of which is the Loan Commitment of such Lender and the denominator of which is the Maximum Aggregate Amount (or, at any time after the Draw Termination Date, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of all Loans then outstanding).

" **Property** " means each, any and all real property owned now or in the future by Borrower or its Subsidiaries and the Fixtures and Improvements thereon, whether or not pledged as security for the Loans, other than the real property, Fixtures and Improvements located at 6014 S IH 35 Frontage Road, Austin, Texas and such other real property, Fixtures and Improvements which are expressly excluded in writing by Agent.

" **Public Offering** " means any underwritten sale of common equity securities of a Person (or any successor thereto, whether by merger, conversion, consolidation, recapitalization, reorganization or otherwise) pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission on Forms S-1 or S-3 (or any successor forms adopted by the Securities and Exchange Commission); provided that the following shall not be considered a Public Offering: (i) any issuance of common equity securities in connection with and as consideration for a merger or acquisition, and (ii) any issuance of common equity

8

securities or rights to acquire common equity securities to employees, officers, directors, consultants or other service providers of the Company or any of its Subsidiaries or others as part of an incentive or compensation plan, agreement or arrangement. Unless otherwise indicated herein, "Public Offering" shall refer to a Public Offering of the securities of Borrower or an entity of which Borrower is a consolidated Subsidiary.

" **Qualifying Capital Transaction** " means, with respect to Borrower or entity of which Borrower is a consolidated Subsidiary, (i) any sale, issuance, placement or assumption of funded Indebtedness of such entity, whether or not evidenced by a promissory note or other written evidence of Indebtedness; or (ii) any issuance or sale of shares of its Capital Stock, other than an issuance (a) to a current member of such entity, or (b) in connection with the exercise by a present or former employee, officer or director under a stock incentive plan, stock option plan or other equity-based compensation plan or arrangement, in each case of items (i) and (ii), to the extent the net cash proceeds of such transaction exceed Five Million and No/100 Dollars ($5,000,000).

" **Qualified Public Offering** " shall have the meaning set forth in the Operating Agreement.

" **Regulated Materials** " means any hazardous, toxic or dangerous waste, substance or material, the generation, handling, storage, disposal, treatment or emission of which is subject to any Environmental Law.

**"Required Lenders"** means one or more Lenders whose aggregate Pro Rata Shares (without regard to the Pro Rata Share of the Agent) exceeds 51%.

" **Restricted Investments** " means any Investments, other than Permitted Investments.

" **Sale Transaction** " shall have the meaning set forth in the Operating Agreement.

" **Securities Act** " means the Securities Act of 1933, as amended.

" **Similar Business** " means any business conducted or proposed to be conducted by Borrower and the Subsidiaries on the date hereof or any business that is similar, reasonably related, incidental or ancillary thereto, including without limitation, any business that derives a majority of its revenues from purchasing, originating, brokering and marketing, pooling and selling, securitization and servicing Receivables, and entering into agreements and engaging in transactions involving motor vehicle purchasing, leasing or sales, fleet purchasing, leasing, sales, financing, and insurance.

" **Subsidiary** " means, with respect to any Person, (a) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person (or a combination thereof) and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (ii) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

9

" **Tax Loss Benefit Amount** " means with respect to any taxable year, the amount by which the Permitted Tax Distributions would be reduced were a net operating loss or net capital loss from a prior taxable year of Borrower ending subsequent to the first day of the taxable year of Borrower that includes the date hereof (such day, the " Loss Date ") carried forward to the applicable taxable year; provided that for such purpose the amount of any such net operating loss or net capital loss shall be used only once and in each case shall be carried forward to the next succeeding taxable year until so used. For purposes of calculating the Tax Loss Benefit Amount, the proportionate part of the items of taxable income, gain, deduction or loss (including capital gain or loss) of any Subsidiary that is a Flow Through Entity for a taxable year of such Subsidiary ending subsequent to the Loss Date, which items of income, gain, deduction or loss are allocated to or otherwise treated as items of income, gain, deduction or loss of Borrower for Federal income tax purposes, shall be included in determining the amount of net operating loss or net capital loss of Borrower.

" **Taxes** " means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto.

" **Tenant** " means any tenant under a Lease for any Property.

" **UCC** " means the Uniform Commercial Code (or any successor statute), as adopted and in force in the State of Arizona or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state. Any term used in this Agreement and in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or in any other Loan Document has the meaning given to the term in the UCC.

**1.2 Other Terms** . All other terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided in the UCC to the extent the same are defined therein.

**1.3 Accounting Terms** . Any accounting terms used in this Agreement which are not specifically defined shall have the meanings customarily given them in accordance with GAAP.

**2. The Credit Facility; Interest and Fees.**

**2.1 The Credit Facility; Commitment Fee** .

2.1.1 Loan Commitment . Subject to all of the terms and conditions of this Agreement, during the period from and including the date hereof to but excluding the Draw Termination Date, and provided that no Default or Event of Default shall have occurred and be continuing hereunder, each Lender agrees from time to time at the request of Borrower, to make its Pro Rata Share of Loans to Borrower in a maximum aggregate principal amount for all Loans not to exceed Fifty Million and No/100 Dollars ($50,000,000.00) (the " Maximum Aggregate Amount ").

10

2.1.2 <u>Non-Revolving Facility</u>. Each Lender's Loan Commitment shall terminate upon the Draw Termination Date.

2.1.3 <u>Note</u>. Each of the Lender's Loans shall be evidenced by a promissory note (each, a " <u>Note</u> ") in the form of <u>Exhibit A-1</u> attached hereto and made a part hereof. The outstanding principal amount and all accrued interest under each Note shall be due and payable in accordance with the terms of each Note and this Agreement.

2.1.4 <u>Required Collateral; Mortgages</u>. Upon written request of any Lender, within twenty-five (25) days of such request, Borrower shall cause Guarantor to execute and deliver to Agent for recording Mortgages for each Property in form and substance reasonably satisfactory to Guarantor and Lenders. If, after the date hereof, Borrower or Guarantor directly or indirectly through a Subsidiarity acquires any real property, upon request of any Lender, Borrower shall cause Guarantor or such Subsidiary to execute and deliver to Agent for recording in the applicable county recorder's office, a Mortgage in substantially the form as prior Mortgages, subject to those changes deemed necessary by Agent and its counsel to provide for local law requirements.

**2.2 <u>Commitment Fee; Procedures for Borrowing; Conditions Precedent to Extensions of Credit</u> .**

2.2.1 <u>Commitment Fee</u>. Borrower shall pay to the Lenders, based on their Pro Rata Share, on the initial Funding Date, a non-refundable commitment fee in the aggregate amount of One Million and No/100 Dollars ($1,000,000).

2.2.2 <u>Procedure</u>. During the term of this Agreement, from and including the date hereof to but excluding the Draw Termination Date, the Borrower may request the Lenders to make, and the Lenders shall make, on the terms and conditions set forth herein, Loans from time to time.

2.2.3 <u>Request for Borrowing</u>. Any request for a Loan by the Borrower shall be made by delivering to Agent and Lenders a written request for borrowing. Provided that (i) no Default or Event of Default is continuing, (ii) the representations and warranties contained in this Agreement are true and correct in all material respects, and (iii) if applicable, Agent, for the benefit of the Lenders, has a first priority perfected mortgage and security interest in the Collateral, then, each Lender hereby agrees to, and shall, make their Pro Rata Share of all requested Loans under this Agreement. Notwithstanding the foregoing, Borrower may not request more than five (5) Loans and all Loans shall be in an amount of not less than Ten Million and No/100 Dollars ($10,000,000.00). All Loans shall be requested in writing and delivered to Agent and each of the Lenders at least three (3) Business Days prior to the date Borrower requests such Loan. All such Loans shall be Indebtedness hereunder. The date and amount of each Loan made by Lenders to Borrower and each repayment made to Lenders on account of the principal thereof shall be recorded by Agent in its books; provided that the failure of Agent to make any such recordation (or any failure in any such recordation) shall not affect the obligations of Borrower to make any payment when due of any amount owing hereunder in respect of the Loans. The aggregate principal amount of Loans (without regard to PIK Interest) shall not exceed the Maximum Aggregate Amount.

11

2.2.4 <u>Funding Date; Lender Direct Funding</u>. Upon satisfaction of all conditions precedent set forth in this Section, the Funding Date of each Loan requested by Borrower under <u>Section 2.2.3</u> hereof shall occur no later than the third (3rd) Business Day following such request. Each Lender shall fund its Pro Rata Share of the applicable Loan directly to Borrower.

**2.3 <u>Interest; Maximum Lawful Rate</u>**.

2.3.1 <u>Interest Rate</u>. Each Loan shall accrue interest on the unpaid principal balance of such Loan at a rate per annum equal to 12.00% (the " <u>Interest Rate</u> "). Interest on the outstanding principal amount of this Agreement shall accrue from and including the date of the first Loan hereunder until the date paid at the Interest Rate and shall be payable semi-annually on the last day of the second and fourth calendar quarters beginning on June 30, 2017 (" <u>Current Pay Interest</u> "); provided, however, that, at the option of Borrower, payments of Current Pay Interest may be added to and become part of the principal amount of the Notes on the relevant date due (which will, for the avoidance of doubt, result in semi-annual compounding of interest). Borrower shall make all payments to each Lender in accordance with their Pro Rata Share of the applicable payment.

2.3.2 <u>Default Rate</u>. In addition to all other rights contained in the Loan Documents, if an Event of Default occurs and is continuing, the principal amount of all outstanding Obligations, shall bear interest at the Default Rate. The Default Rate shall apply from acceleration until such Obligations or any judgment thereon is paid in full.

2.3.3 <u>Computations</u>. All fees and other charges provided for in this Agreement that are calculated as a per annum percentage of any amount and all interest shall be calculated daily and shall be computed on the actual number of days elapsed over a year of 360 days.

2.3.4 <u>Maximum Lawful Rate</u>. Notwithstanding any provision in this Agreement, or in any other document, if at any time before the payment in full of the Obligations, any of the rates of interest specified in this Agreement (the " <u>Stated Rates</u> ") exceeds the highest rate of interest permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the " <u>Maximum Lawful Rate</u> "), then in such event and so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; <u>provided</u> , <u>however</u> , that if at any time thereafter the Stated Rates shall be less than the Maximum Lawful Rate, then, subject to <u>Section 2.3.5</u> below, the Borrower shall continue to pay interest at the Maximum Lawful Rate until such time as the total interest received by Lenders is equal to the total interest which Lenders would have received had the Stated Rates been (but for the operation of this <u>Section 2.3.3</u> ) the interest rates payable; thereafter, the interest rates payable shall be the Stated Rates unless and until any of the Stated Rates shall again exceed the Maximum Lawful Rate, in which event this <u>Section 2.3.3</u> shall again apply. In the event interest payable hereunder is calculated at the Maximum Lawful Rate, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.

2.3.5 <u>Amount of Interest</u>. In no event shall the total interest contracted for, charged, received or owed pursuant to the terms of this Agreement exceed the amount,

12

which Lenders may lawfully receive. In the event that a court of competent jurisdiction, notwithstanding the provisions of this <u>Section 2.3.5</u>, shall make a final determination that Lenders have received, charged, collected, or contracted for interest hereunder in excess of the amount which Lenders could lawfully have, to the extent permitted by law, such excess shall promptly be applied to the reduction of the principal balance of each Note and not to the payment of interest, and any excess remaining thereafter shall be refunded to the Borrower. In determining whether the interest exceeds the Maximum Lawful Rate or the maximum amount which Lenders could lawfully have received, the total amount of interest shall, to the extent allowed by law, be spread over the term of the Loans.

**2.4 <u>Repayment of Loans; Making of Payments</u>**.

2.4.1 <u>Optional Principal Payments</u>. All Loans are prepayable without premium or penalty, in whole or in part, at any time.

2.4.2 <u>Mandatory Principal Payments</u>. All principal and accrued interest for each Loan shall be due and payable on the Loan Maturity Date. Notwithstanding the foregoing, upon receipt of cash proceeds from a Qualifying Capital Transaction, Borrower shall prepay without penalty or premium the entire outstanding principal amount of this Agreement, including all unpaid PIK Interest, together with all accrued and unpaid interest. Borrower shall make all payments to each Lender in accordance with their Pro Rata Share of the applicable payment.

**3. <u>Representations and Warranties</u>**. In order to induce Lenders to enter into this Agreement and to make the Loans or otherwise extend credit as provided for herein, the Borrower hereby makes the following representations and warranties. The representations and warranties are made as of the execution and delivery of the Agreement, and each time the Borrower requests a Loan the representations and warranties are deemed to be made again at that time.

**3.1 <u>Organization; Powers; Etc</u>**. Borrower (i) is duly formed, validly existing, and in good standing under the laws of the state of its formation, (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of its properties or the nature of its business requires such qualification, except where failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, and (iii) has all requisite legal power and limited liability company power to own and operate its assets and to carry on its business and to enter into and perform its obligations under this Agreement.

**3.2 <u>Due Authorization; No Violations; Etc</u>**. The execution and delivery by Borrower of, and the performance by Borrower of its obligations under, this Agreement have been duly authorized by all requisite limited liability company action and do not and will not (i) violate its articles or certificate of formation or the Operating Agreement, any provision of any law of any Governmental Authority, any agreement or any indenture, mortgage, or other instrument to which Borrower is a party or by which Borrower or its properties are bound, or (ii) conflict with, result in a breach of, or constitute with the giving of notice or lapse of time, or both, a default under any such agreement, indenture, mortgage, or other instrument.

<div align="center">13</div>

**3.3 Binding Agreement** . This Agreement is the legal, valid, and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject only to limitations on enforceability imposed by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally, and (ii) general equitable principles.

**3.4 Consents and Approvals** . No consent or approval of any Governmental Authority or of any party to any agreement to which Borrower is a party or by which it or any of its property is bound in connection with the execution and delivery by Borrower of, and the performance by Borrower of its obligations under, this Agreement, is necessary, except as such have been obtained and are in full force and effect.

**3.5 Compliance** . Borrower is in compliance with all laws, the failure to comply with which could reasonably be expected to have a Material Adverse Effect. Borrower is in compliance, in all material respects, with all of the terms of each document or agreement evidencing or governing any material agreement to which Borrower is a party or by which it or any of its property is bound, and no Event of Default or Default exists.

**3.6 Litigation** . There is no pending legal, arbitral, or governmental action or proceeding to which Borrower is a party or to which it or any of its properties is subject that, if adversely determined, could reasonably be expected to have a Material Adverse Effect, and to the best of Borrower's knowledge, no such action or proceeding is threatened.

**3.7 Taxes** . Borrower and its Subsidiaries has filed or caused to be filed prior to delinquency all federal, state and local tax returns that are required to be filed, and has paid and shall continue to pay when due all Taxes as shown on such returns, and has paid and shall continue to pay when due all other Taxes, assessments and governmental charges or levies upon it and its property, income, profits and assets which are due and payable, except where the payment of such tax, assessment, government charge or levy is being contested in good faith and by appropriate proceedings and adequate reserves therefor in compliance with GAAP have been set aside on Borrower's or such Subsidiary's books.

**3.8 Title** . Borrower or a Subsidiary of Borrower has insurable title to the Property. Borrower or a Subsidiary of Borrower owns the Property free and clear of all Liens, except Permitted Liens. Neither Borrower nor any Subsidiary of Borrower owns any Property other than Property listed on Schedule I attached hereto.

**3.9 Collateral** . Other than Permitted Liens, the security interests granted to Lenders pursuant to any Mortgage, to the extent so pledged, (i) constitute and, as to subsequently acquired property included in the Collateral covered by the Mortgage or security agreement, will constitute, security interests entitled to all of the rights, benefits and priorities provided by the UCC and applicable State law and (ii) are, and as to such subsequently acquired Collateral will be, fully perfected, superior and prior to the rights of all third persons, now existing or hereafter arising.

**3.10 Environmental** . Except as disclosed on Exhibit 3.10 , Borrower warrants and represents to Lenders, that: (i) Borrower has undertaken all appropriate inquiry and investigation as to the environmental condition of each Property; (ii) each Property and

14

Borrower, and any occupants of the Property, are in compliance with and shall continue to be in compliance with all applicable Environmental Laws; (iii) each Property is not and has never been used to generate, handle, treat, store or dispose of Hazardous Materials in excess of De Minimis Amounts or otherwise in violation of any Environmental Laws; (iv) no Hazardous Materials (including asbestos, mold or lead paint in any form) in excess of De Minimis Amounts are located on or under any Property or emanate from any Property or have been disposed of, stored or treated on or about any Property; (v) there are no unregistered underground storage tanks on the Property that are subject to any underground storage tank registration laws or regulations; (vi) no notice has been received with regard to any Hazardous Material on any Property; (vii) no action, investigation or proceeding is pending or to Borrower's knowledge threatened which seeks to enforce any right or remedy against Borrower or any Property under any Environmental Law; (viii) neither Borrower nor any occupant of the Property, is subject to any remedial obligations as to the Property under Environmental Laws relating to Hazardous Materials, health or the environment; (ix) Borrower has not, nor will Borrower, release or waive the liability of any previous owner, lessee or operator of the Property or any party who may be potentially responsible for the presence of or removal of Hazardous Material from the Property, nor has it made promises of indemnification regarding Hazardous Material on the Property to any party, except as contained herein and in the Loan Documents; and (x) all licenses, permits and other governmental or regulatory actions necessary for each Property to comply with Environmental Laws shall be obtained and maintained and Borrower shall assure compliance therewith.

**3.11** **Utilities** . With respect to each Property on which Borrower or Guarantor is currently operating its business:

3.11.1 To Borrower's knowledge, each Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and drain facilities adequate to service such Property for its intended use;

3.11.2 All public utilities necessary or convenient to the full use and enjoyment of each Property are located either in the public right of way abutting such Property (which are connected so as to serve such Property without passing over other property) or in recorded easements serving such Property; and

3.11.3 To the best of Borrower's knowledge after due inquiry, all roads necessary for the use of each Property for its current respective purpose have been completed, are physically open and dedicated to public use and have been accepted by all Governmental Authorities.

**3.12** **Certificate of Occupancy; Licenses** . With respect to each Property on which Borrower or Guarantor is currently operating its business:

3.12.1 To Borrower's knowledge, all material certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the " Licenses ") have been obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture;

15

3.12.2 Borrower shall keep and maintain all Licenses necessary for the operation of the Property for its permitted use; and

3.12.3 To Borrower's knowledge, the use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

**3.13 Flood Zone** . To Borrower's knowledge, none of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, Borrower or Guarantor has obtained flood insurance with respect to the Property in an amount that a prudent, similarly situated real property owner would obtain.

**3.14 Physical Condition** . Except as disclosed on Exhibit 3.14 , the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, is in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond. The Property is free from material damage caused by fire or other casualty. To Borrower's knowledge after due inquiry, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in material compliance with all applicable legal requirements.

**3.15 Boundaries** . All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property.

**3.16 Leases** . No Person has any possessory interest in or right to occupy any Property other than the Borrower or a Subsidiary of Borrower, other than pursuant to billboard licenses or easements which do not, individually or in the aggregate, materially adversely affect Borrower's or such Subsidiary's interest in such Property.

**3.17 Fixtures** . Borrower is the owner of all Fixtures at the Property.

**4. Covenants of Borrower** . The following covenants shall remain in effect until the payment and performance of all of the Borrower's obligations to the Lenders:

**4.1 Existence** . Borrower will do or cause to be done all things necessary to preserve and keep in full force and effect its existence in accordance with its organizational documents, and the material rights, licenses and franchises of Borrower, *provided* that Borrower is not required to preserve any such right, license or franchise if the maintenance or preservation thereof is no longer desirable in the conduct of its business.

16

**4.2 Payment of Taxes and Other Claims** . Borrower will pay or discharge, and cause each of its Subsidiaries to pay or discharge before the same become delinquent all material Taxes, assessments and governmental charges levied or imposed upon such Borrower or any Subsidiary or its income or profits or property, other than any such tax, assessment, charge or claim the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

**4.3 Incurrence of Indebtedness and Issuance of Preferred Stock** . Borrower will neither issue any Preferred Stock with preferences and rights senior to the Class C Preferred Units nor incur any Indebtedness. The provisions of this subsection will not apply to:

4.3.1 Indebtedness between Borrower and any of its Subsidiaries;

4.3.2 the Incurrence by Borrower of Indebtedness (including capital lease obligations) incurred for the purpose of financing (or refinancing) all or any part of the purchase price or cost of construction or improvement of property (real or personal), plant or equipment used in the business of the Borrower or any of its Subsidiaries that does not exceed the greater of the purchase price or fair market value of such property;

4.3.3 Indebtedness incurred pursuant to asset-based financing arrangements, including loans to finance inventory, equipment, accounts receivable or real estate (including sale-leaseback arrangements), including but not limited to financing for automotive finance receivables coincident with vehicles sold to consumers; and

4.3.4 unsecured Indebtedness that, when added to all other Indebtedness incurred pursuant to this clause and then outstanding, will not exceed Five Million and No/100 Dollars ($5,000,000) in the aggregate.

**4.4 Restricted Payments** . Borrower will not, directly or indirectly: (i) declare or pay any dividend on, or make any other payment or distribution in respect of, its Equity Interests or similar payment to the direct or indirect Lenders thereof in their capacity as such; (ii) purchase, redeem or otherwise acquire or retire for value any Equity Interests of Borrower held by any Person or any Equity Interests of any Subsidiary held by any Affiliate of Borrower (in each case other than held by Borrower); or (iii) make any Restricted Investment; (Clauses (i) through (iii) are collectively referred herein to as " Restricted Payments ").

4.4.1 The provisions of this subsection will not prohibit:

(A) redemption, repurchase, retirement or other acquisition for value and payments of dividends on Class C Preferred Units;

(B) the redemption, repurchase, retirement or other acquisition for value of any Class B Common Units held by employees, former employees, directors, former directors, consultants or former consultants of Borrower (or any of its Subsidiaries); provided that in accordance with the terms of the grant agreements pursuant to which such Class B Common Units were issued; and

(C) Permitted Tax Distributions.

17

**4.5 <u>Sale Transaction</u>** . Borrower will not, directly or indirectly, enter into any Sale Transaction unless such Sale Transaction is permitted under the Operating Agreement.

**4.6 <u>Liens</u>** . Except for Permitted Liens, Borrower will not, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on the Property.

**4.7 <u>Issuance and Sales of Equity Interests in Borrower and Wholly-Owned Subsidiaries</u>** .

4.7.1 Borrower will not, directly or indirectly, enter in to a Public Offering unless it is a Qualified Public Offering;

4.7.2 Borrower will not issue any Class B Common Units to Ernest C. Garcia II or Ernest C. Garcia III;

4.7.3 Borrower will not, directly or indirectly, transfer, convey, sell, lease or otherwise dispose of any Equity Interests in any wholly-owned Subsidiary of Borrower to any Person (other than Borrower or a wholly-owned Subsidiary of Borrower), unless such transfer, conveyance, sale, lease or other disposition is of all the Equity Interests in such wholly-owned Subsidiary; and

4.7.4 Borrower will not permit any wholly-owned Subsidiary of Borrower to issue any of its Equity Interests to any Person other than to Borrower or a wholly-owned Subsidiary of Borrower or in connection with grants of phantom stock or similar options, restricted stock, restricted stock units or other awards to management, directors, consultants or employees of such Subsidiary.

**4.8 <u>Transactions with Affiliates</u>** .

4.8.1 Borrower will not make any payment to, or sell, lease, exchange, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of Borrower (each of the foregoing, an " <u>Affiliate Transaction</u> "), unless such Affiliate Transaction is on terms that are no less favorable to Borrower or Subsidiary than those that would have been obtained in a comparable transaction at the time in an arm's-length transaction with a person who was not an Affiliate.

4.8.2 The foregoing provisions do not apply to the following:

(A) Customary employment arrangements and benefit programs, in each case on commercially reasonable terms and, to the extent related to the employment of any executive officer, director or manager of Borrower or any of its Subsidiaries approved by the Board of Directors of Borrower;

(B) transactions exclusively between or among Borrower and/or its Subsidiaries;

(C) agreements, transactions, commitments or arrangements in effect as of the date hereof (including pursuant to any modification, amendment, or restatement thereto, *provided* that any such modification, amendment or restatement is not prohibited pursuant to the Operating Agreement;

18

(D) the issuance or sale of any Equity Interests of Borrower that are permitted hereunder and any agreements, transactions, commitments or arrangements pursuant thereto; and

(E) Restricted Payments that are permitted hereunder.

**4.9 <u>Business Activities</u>** . Borrower will not, and will not permit any of its Subsidiaries to, engage in any business other than Similar Businesses, except to such extent as would not be material to Borrower and its Subsidiaries taken as a whole.

**4.10 <u>Financial Statements</u>** . To the extent not filed with the United Stated Securities and Exchange Commission and publicly available on EDGAR, within 120 days after the end of each fiscal year and 60 days after each fiscal quarter (or if Borrower is a reporting company under the Securities and Exchange Act of 1934, such period as required thereunder for the filing thereof), Borrower will provide to Lenders copies of the audited financial statements of Borrower and all of its consolidated Affiliates for the prior fiscal year or unaudited financial statements of Borrower and all of its consolidated Affiliates with respect to each of the first three fiscal quarters of each fiscal year.

**4.11 <u>Maintain Properties</u>** . Borrower shall maintain, preserve and keep or cause each applicable Tenant to maintain preserve and keep its property, including, without limitation, each Property in good repair, working order and condition (ordinary wear and tear excepted), making all replacements, additions and improvements thereto necessary for the proper conduct of its business, unless prohibited by the Loan Documents.

**4.12 <u>Use of Property</u>** . Borrower shall use and operate, and require its lessees or licensees to use and operate, each Property in compliance with all applicable laws (including, for example, the Americans with Disabilities Act) and ordinances, covenants, and restrictions, and with all applicable requirements of any Lease now or hereafter affecting each Property. Borrower shall not permit any unlawful use of any Property or any use that may give rise to a claim of forfeiture of any of such Property. Borrower shall not allow changes in the stated use of any Property from that disclosed to Lenders at the time of execution hereof. Borrower shall not initiate or acquiesce to a zoning change of any Property without prior notice to, and written consent of, Lenders.

**4.13 <u>Maintenance, Repairs and Alterations</u>** . Without the prior written consent of Lenders (which consent shall not be unreasonably withheld or delayed), Borrower will not remove, demolish or structurally alter, or permit any Tenant to remove, demolish or structurally alter, any of the buildings or other Improvements on any Property after Borrower has opened such Property to the public for business (" <u>Alterations</u> "). Borrower shall promptly notify Lenders in writing of any material loss, damage or adverse condition affecting any Property. Notwithstanding anything to the contrary set forth in the foregoing, Borrower may make or permit Tenant to make Alterations without the consent of Lenders in the event that such Alterations (a) may be required by laws, ordinances or regulations, (b) would not have a Material Adverse Effect on a Property, or (c) are improvement work which are commercially reasonable to facilitate or compliment to the current and future operations on such Property and do not materially and adversely affect the value of such Property.

19

**4.14 <u>Environmental Condition of Property and Indemnity</u>** . Except as set forth in <u>Exhibit 4.14</u> , Borrower represents to Agent and each Lender that no portion of any Property is a protected wetland. Borrower agrees to notify Agent and Lenders immediately upon receipt of any citations, warnings, orders, notices, consent agreements, process or claims alleging or relating to violations of any Environmental Laws or to the environmental condition of each Property and shall conduct and complete all investigations and all cleanup actions necessary to comply with the Environmental Laws and to remove, in accordance with Environmental Laws, any Hazardous Material in excess of De Minimis Amounts from each Property. BORROWER SHALL DEFEND, AND HOLD AGENT, LENDERS AND ANY PARTICIPANTS, SUCCESSORS OR ASSIGNS TO LENDERS' INTEREST IN THE LOANS, AND ANY OTHER PARTY WHO ACQUIRES ANY PORTION OF THE LOANS AT A FORECLOSURE SALE OR OTHERWISE THROUGH THE EXERCISE OF AGENT'S AND LENDERS' RIGHTS AND REMEDIES UNDER THE LOAN DOCUMENTS, AND ALL DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF ALL OF THE AFOREMENTIONED INDEMNIFIED PARTIES, HARMLESS FROM AND AGAINST ANY AND ALL ACTUAL OR POTENTIAL DAMAGES, PENALTIES, FINES, CLAIMS, SUITS, LIABILITIES, COSTS, JUDGMENTS AND EXPENSES, INCLUDING REASONABLE ATTORNEYS', CONSULTANTS' OR EXPERTS' FEES OF EVERY KIND AND NATURE INCURRED, SUFFERED BY OR ASSERTED AGAINST AGENT OR LENDERS AS A DIRECT OR INDIRECT RESULT OF OR WHICH ARISE OUT OF OR RELATE IN ANY WAY TO: (A) REPRESENTATIONS MADE BY BORROWER IN THIS SECTION BEING OR BECOMING UNTRUE IN ANY MATERIAL RESPECT; (B) BORROWER'S VIOLATION OF OR FAILURE TO MEET THE REQUIREMENTS OF ANY ENVIRONMENTAL LAWS; OR (C) HAZARDOUS MATERIALS WHICH, WHILE ANY PROPERTY IS SUBJECT TO THE MORTGAGE, EXIST ON ANY PROPERTY IN EXCESS OF DE MINIMIS AMOUNTS OR OTHERWISE IN VIOLATION OF ANY ENVIRONMENTAL LAW. HOWEVER, BORROWER'S OBLIGATIONS UNDER THIS SECTION SHALL NOT APPLY TO ANY ACT OF AGENT OR LENDERS WHICH TAKES PLACE AFTER FORECLOSURE OR SATISFACTION OF THE MORTGAGE. THESE INDEMNIFICATION OBLIGATIONS ARE IN ADDITION TO GENERAL INDEMNIFICATION PROVISIONS SET FORTH HEREAFTER. BORROWER'S OBLIGATIONS UNDER THIS SECTION SHALL CONTINUE, SURVIVE AND REMAIN IN FULL FORCE AND EFFECT NOTWITHSTANDING THE REPAYMENT OF THE OBLIGATIONS, A FORECLOSURE OF OR EXERCISE OF POWER OF SALE UNDER THIS INSTRUMENT, A DELIVERY OF A DEED IN LIEU OF FORECLOSURE, A CANCELLATION OR TERMINATION OF RECORD OF THIS INSTRUMENT AND THE TRANSFER OF ANY PROPERTY.

**4.15 <u>Further Assurances</u>** . Borrower shall take such further action and provide to Agent such further assurances as may be reasonably requested to ensure perfection of the security interest granted herein.

**5. Events of Default.**

**5.1 <u>Events of Default</u>** . An Event of Default means the occurrence or existence of one or more of the following events or conditions (whatever the reason for the Event of Default and whether voluntary, involuntary or caused by operation of law) which is not waived in writing by Lenders or cured to the extent a cure is applicable:

5.1.1 (i) Borrower's or Guarantor's failure to pay to Lenders to any amount of principal, when and as due under the Loan Documents or (ii) Borrower's or Guarantor's failure to pay to Lenders any other amounts when due hereunder, if such failure continues for a period of at least three Business Days;

5.1.2 (i) any payment default or other default occurs under any Indebtedness of Borrower or Guarantor that results in a redemption of or acceleration prior to maturity of Ten Million and No/100 Dollars ($10,000,000) or more of such Indebtedness in the aggregate; or (ii) any material default occurs under any Indebtedness of Borrower or Guarantor having an aggregate outstanding balance in excess of Twenty Five Million and No/100 Dollars ($25,000,000) or Borrower receives written notice of the occurrence of any default under any such Indebtedness, and in each case, such default continues uncured for more than ten Business Days;

5.1.3 (i) Borrower or Guarantor commences a voluntary case under Title 11 of the U.S. Code or any similar federal, foreign or state law for the relief of debtors (collectively, " Bankruptcy Law "), (ii) an involuntary case is commenced against Borrower or Guarantor under any Bankruptcy Law and such involuntary case is not discharged or dismissed within sixty (60) days following the commencement of such case, (iii) Borrower or Guarantor consents to the entry of an order for relief against it in an involuntary case under any Bankruptcy Law, (iv) Borrower or Guarantor consents to the appointment of a receiver, trustee, assignee, liquidator or similar official, (v) Borrower or Guarantor makes a general assignment for the benefit of its creditors, or (vi) Borrower or Guarantor admits in writing that it is generally unable to pay its debts as they become due;

5.1.4 any material provision of any Loan Document shall at any time for any reason be declared to be null and void by a court of competent jurisdiction, or the validity or enforceability thereof shall be contested by Borrower or Guarantor, or a proceeding shall be commenced by Borrower or Guarantor seeking to establish the invalidity or unenforceability thereof, or Borrower or Guarantor shall deny that Borrower or Guarantor has any liability or obligation hereunder;

5.1.5 a representation or warranty contained in any Loan Document shall prove to have been false or misleading in any material respect and Borrower fails to cure same within thirty (30) days after receiving notice from Agent;

5.1.6 Borrower or Guarantor shall fail to comply with any of its covenants or obligations contained in this Agreement after giving effect to applicable grace and cure periods;

5.1.7 a Change of Control shall occur; or

5.1.8 a proceeding shall be instituted by Borrower or Guarantor seeking liquidation or dissolution; or

21

5.1.9 Loss, theft, damage or destruction of any material portion of any Property for which there is either no insurance coverage or for which, in the reasonable opinion of Lenders, there is insufficient insurance coverage, and either Borrower or Guarantor has failed to commence repairs and/or restoration of the affected Property for a period of twenty (20) calendar days or, if Borrower or Guarantor is prohibited by a Governmental Authority from commencing such repairs and/or restoration within such time period, and Borrower or Guarantor intends to continue occupying or to reoccupy such Property; or

5.1.10 Sale, transfer or any conveyance, whether voluntary or involuntary of any Property without Agent's written consent in its sole discretion.; or

5.1.11 Any Guarantor shall have repudiated its obligations under the Guaranty or the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law.

**5.2 Remedies** . Whenever a Default or an Event of Default has occurred, the Lenders may immediately withhold further Loans or other extensions of credit to Borrower. If an Event of Default shall have occurred and be continuing, Agent may, and upon request of a Lender, shall take any or all of the following actions with respect to Borrower, and with respect to the Collateral for the Loans:

5.2.1 Acceleration . Agent may, and upon request of a Lender, shall declare any or all Obligations to be immediately due and payable (if not earlier demanded), terminate its obligation to make Loans and other extensions of credit to Borrower, bring suit against Borrower and Guarantor to collect the Obligations, exercise any remedy available to Lenders hereunder or at law and take any action or exercise any remedy provided herein or in any other Loan Document or under applicable law. No remedy shall be exclusive of other remedies or impair the right of Agent to exercise any other remedies.

5.2.2 UCC Rights . Without waiving any of its other rights hereunder or under any other Loan Document, Agent shall have all rights and remedies of a secured party under the UCC (and the Uniform Commercial Code of any other applicable jurisdiction) and such other rights and remedies as may be available hereunder, under other applicable law or pursuant to contract. Borrower agrees that any notice by Agent of the sale or disposition of the Collateral or any other intended action hereunder, whether required by the UCC or otherwise, shall constitute reasonable notice to Borrower if the notice is mailed to Borrower by regular or certified mail, postage prepaid, at least five (5) days before the action to be taken. Borrower shall be liable for any deficiencies in the event the proceeds of the disposition of the Collateral do not satisfy the Obligations in full.

5.2.3 Foreclosure . Agent may, and upon request of a Lender, shall exercise any or all of Agent's remedies under the Mortgage or other Loan Documents including, without limitation, acceleration of the maturity of all payments and Obligations. Agent may, and upon request of a Lender, shall take immediate possession of each, any and all Property or any part thereof (which Borrower agrees to surrender to Agent) and manage, control or lease the same to such Persons and at such rental as it may deem proper and collect and apply Rents (as defined in the applicable Mortgage) to the payment of: (i) the Obligations, together with all costs and attorneys' fees; (ii) all levies, assessments or liens which may be prior in lien or

22

payment to the Obligations, and premiums for insurance, with interest on all such items; and (iii) the cost of all alterations, repairs, replacements and expenses incident to taking and retaining possession of each, any and all Property and the management and operation thereof; all in such order or priority as Agent in its sole discretion may determine. The taking of possession shall not prevent concurrent or later proceedings for the foreclosure sale of each, any and all Property. Agent may, and upon request of a Lender, shall apply to any court of competent jurisdiction for the appointment of a receiver for all purposes including, without limitation, to manage and operate each, any and all Property or any part thereof, and to apply the Rents (as defined in the applicable Mortgage) therefrom as hereinabove provided. In the event of such application, Borrower consents to the appointment of a receiver, and agrees that a receiver may be appointed without notice to Borrower, without regard to whether Borrower has committed waste or permitted deterioration of each, any or all of the Property, without regard to the adequacy of any security for the Obligations, and without regard to the solvency of Borrower or any other person, firm or corporation who or which may be liable for the payment of the Obligations. Agent may, and upon request of a Lender, shall exercise all the remedies of a mortgagee as provided by law and in equity including, without limitation, foreclosure upon the Mortgage and sale of each, any and all Property, or any part of the Property, at public sale conducted according to applicable law (referred to as " Sale ") and conduct additional Sales as may be required until all of the Property is sold or the Obligations are satisfied. With respect to any portion of each, any and all Property governed by the UCC, Agent shall have all of the rights and remedies of a secured party thereunder. Agent may elect to foreclose upon any Property that is Fixtures under law applicable to foreclosure of interests in real estate or law applicable to personal property. Agent may, and upon request of a Lender, shall bid at Sale and may accept, as successful bidder, credit of the bid amount against the Obligations as payment of any portion of the purchase price. Agent shall apply the proceeds of Sale, first to any fees or attorney fees permitted Agent by law in connection with Sale, second to expenses of foreclosure, publication, and sale permitted Agent by law in connection with Sale, third to the Obligations, and any remaining proceeds as required by law.

**5.3 <u>Receiver</u>** . In addition to any other remedy available to it, Agent may, and upon request of a Lender, shall have the absolute right, upon the occurrence of an Event of Default, to seek and obtain the appointment of a receiver to take possession of and operate and/or dispose of the business and assets of Borrower and any costs and expenses incurred by Agent and Lenders in connection with such receivership shall bear interest at the Default Rate, at Agent's option, and shall be secured by all Collateral.

**5.4 <u>Injunctive Relief</u>** . Borrower recognizes that if there is an Event of Default then, depending on the nature of the Event of Default, it may be that no remedy at law will provide complete or adequate relief to Agent or Lenders, and Agent shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. The injunctive relief shall not be a waiver of Agent's or Lenders' rights to other relief and remedies.

**5.5 <u>Lenders ' Default</u>** . In the event of any default of the Loan Documents by Lenders or any claim by Borrower related to the Loan Documents, the Borrower's sole and exclusive remedy against Lenders shall be a cause of action sounding in contract with damages limited to actual and direct damages incurred. Lenders shall not in any event be liable to

23

Borrower or Guarantor for ordinary negligence, delay in performance or any consequential, special, punitive, incidental or indirect damages, including without limitation, loss of profit or goodwill. Lenders shall in no event be liable to Borrower or Guarantor for any loss or damage directly or indirectly resulting from the furnishing of services or reports under this Agreement. With respect to any goods and services provided by Lenders, LENDER MAKES NO WARRANTIES, WHETHER EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, TO BORROWER OR ANY GUARANTOR.

**6. Indemnification** . In addition to all other Obligations, the Borrower shall defend, protect, indemnify and hold harmless Agent, Lenders and their Affiliates and all of their respective officers, directors, employees, attorneys, consultants, agents and any other Person acting on behalf of Lenders, solely in such capacity as Agent, Lender or Person acting on behalf of Lenders (each, an " Indemnified Party ") from and against any and all losses, claims, damages, obligations, costs, good faith settlements, expenses, Taxes, penalties, fines, reasonable attorneys' fees or other liabilities, including but not limited to costs of investigation, litigation fees and expenses, and costs in successfully asserting the right to indemnification hereunder (each a " Loss " and collectively, " Losses ") incurred by such Indemnified Party at any time and pertaining to (a) any suit, investigation, action or proceeding by any Person (other than Borrower), whether threatened or initiated, asserting a claim for any legal or equitable remedy against any Person under any statute, regulation or common law principle, arising from or in connection with Lenders' furnishing of funds to Borrower under this Agreement (other than for any Loss arising from such Indemnified Party's gross negligence or willful misconduct), (b) Lenders' preservation, administration and enforcement of its rights under the Loan Documents and applicable law, including the reasonable fees and disbursements of counsel for Lenders in connection therewith, whether suit be brought or not and whether incurred at trial or on appeal, and all costs of foreclosure, repossession, storage, disposition, protection and collection of Collateral, (c) any matter relating to the financing transactions contemplated by the Loan Documents or by any document executed in connection with the transactions contemplated thereby, other than for such loss, damage, liability, obligation, penalty, fee, cost or expense arising from such Indemnified Party's gross negligence or willful misconduct, (d) facts which are, or allegations which if true would be, a breach of any representation, warranty, obligation, agreement or covenant of Borrower contained in the Loan Documents, and/or (e) an Event of Default or a Default. If Borrower should fail to pay any Tax or other amount required by this Agreement to be paid or which may be reasonably necessary to protect or preserve any Collateral or Borrower's, Agent's or any Lender's interests therein, Agent may, and upon request of the Required Lenders, shall make such payment and the amount thereof shall be payable on demand, shall bear interest at the Default Rate from the date of demand until paid and shall be deemed to be Obligations entitled to the benefit and security of the Loan Documents. In addition, the Borrower agrees to pay and save each Indemnified Party harmless against any liability for payment of any state documentary stamp taxes, intangible taxes or similar taxes (including interest or penalties, if any) which may now or hereafter be determined to be payable in respect to the execution, delivery or recording of any Loan Document or the making of any Loan, whether originally thought to be due or not, and regardless of any mistake of fact or law on the part of any Indemnified Party or Borrower with respect to the applicability of such Tax. The Borrower's obligation for indemnification for all of the foregoing losses, damages, liabilities, obligations, penalties, fees, costs and expenses of the Indemnified Parties shall be part of the

24

Obligations, secured by the Collateral, and shall survive termination of this Agreement. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PARTY WITH RESPECT TO LOSSES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT (OTHER THAN WILLFUL MISCONDUCT OR A GROSSLY NEGLIGENT ACT) OR OMISSION OF SUCH INDEMNIFIED PARTY OR OF ANY OTHER PERSON.

**7. <u>Administration</u>**

      **7.1 <u>Appointment of Agent; Authorization</u>** . Each of the Lenders hereby designates and appoints Agent for the other Lenders for all purposes when Agent is acting on behalf of the Lenders under this Agreement and the other Loan Documents. Each of the Lenders hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as administrative agent for and on behalf of the Lenders on the conditions contained in this <u>Section  7.1</u> . Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent, in its capacity as Agent, shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing, the use of the term "agent" or "administrative agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each of the Lenders hereby further authorizes Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the payments made by Borrower, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) exclusively receive, apply, and distribute the payments of Borrower as provided in the Loan Documents, (d) perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to Borrower or the Guarantor, the Obligations, the Collateral, the payments of Borrower, or otherwise related to any of same as provided in the Loan Documents, and (e) incur and pay the expenses of the Lenders as Agent may deem necessary or appropriate for the performance and fulfillment of its functions

and powers pursuant to the Loan Documents. The provisions of this Section 7.1 are solely for the benefit of the Lenders and no Borrower shall have rights as a third-party beneficiary of any provisions contained herein.

**7.2 Agent not Payment Agent; Payments** . Borrower and Guarantor are required to make all payments directly to each Lender in accordance with their Pro Rata Share of the applicable payment. Agent is not required to, and shall not, accept and disburse payments on behalf of the Lenders. At any time or times that the Agent receives by foreclosure or other action against Collateral, any such proceeds of Collateral with respect to the Obligations arising under, or relating to, this Agreement or the other Loan Documents, the Agent shall act as agent for the other Lenders as to all amounts owing to the other Lenders and shall distribute all such amounts to the other Lenders in accordance with their Pro Rata Share and the terms of this Agreement or the Loan Documents, as applicable.

**7.3 Rights of Agent** . As to any matters not expressly provided for by the Loan Documents, the Agent shall not exercise any discretion or take any action (including, without limitation, enforcement or collection of the Notes), but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders; provided , however , that the Agent shall not be required to take any action that exposes the Agent to personal liability or that is contrary to this Agreement or applicable law. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agent may perform any of its duties by or through its officers, directors, agents or employees, it being understood that all such actions taken by such officers, directors, agents or employees shall be on behalf of the Agent.

**7.4 Duties and Responsibilities** . Agent, in its capacity as Agent hereunder, shall not have any duties or responsibilities except for those expressly set forth in this Agreement and the other Loan Documents. Neither the Agent nor any of its officers, directors, agents or employees shall be liable for any action taken or omitted by it or them under any Loan Document or in connection herewith or therewith unless caused by its or by their gross negligence or willful misconduct or material violation of a Requirement of Law or this Agreement or the other Loan Documents.

**7.5 Request for Instructions** . If the Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with any Loan Document, the Agent shall be entitled to refrain from acting or taking the action unless and until the Agent shall have received instructions from the Required Lenders, and the Agent shall not incur liability to any Person by reason of so refraining.

**7.6 Reliance by Agent** . The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, e-mail, order or other document or telephone message signed, sent or made by any Person that the Agent believed to be the proper Person. The Agent may consult with legal counsel (including counsel for any Lender), independent public accountants and other experts selected by the Agent and shall not be liable for any action taken or omitted to be taken in good faith in accordance with the advice of such counsel, accountants or experts with respect to matters within their expertise.

26

**7.7 Liability of Agent** . Independently and without reliance upon the Agent, each of the Lenders, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and the Guarantor in connection with the making and the continuation of each Loan and the taking or not taking of any action in connection herewith, (ii) its own appraisal of the creditworthiness of the Borrower and the Guarantor and the merits and risks of extensions of credit hereunder and (iii) its own independent appraisal of the Collateral. The Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of the Loan Documents, Collateral or the financial condition of the Borrower and the Guarantor or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of any Loan Document, or the financial condition of the Borrower and the Guarantor or the existence or possible existence of any Event of Default.

**7.8 Notice of Default or Event of Default** . Agent, acting solely in its capacity as Agent hereunder, shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent, acting solely in its capacity as Agent hereunder, has obtained actual knowledge, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent, acting solely in its capacity as Agent hereunder, has obtained actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Subject to the provisions of this Section 7.8 , Agent shall take such action with respect to such Event of Default as may be requested by the Required Lenders in accordance with Section 5.2 ; provided , however , that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable.

**7.9 Successor Agent** . Agent may resign as Agent upon 30 days prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrower (unless such notice is waived by Borrower). If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrower, a successor Agent. Upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 7.9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall

27

nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

**7.10** <u>**Several Obligations; No Liability**</u> . Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Loan Commitment. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lenders. Except as expressly provided herein, no Lender shall have any liability for the acts of any other Lenders. No Lender shall be responsible to Borrower or any other Person for any failure by any other Lenders to fulfill its obligations to make credit available hereunder, or to advance for such Lenders or on its behalf, nor to take any other action on behalf of such Lenders hereunder or in connection with the financing contemplated herein.

**7.11** <u>**Costs and Expenses; Indemnification**</u> . Agent may incur and pay certain costs and expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not the Borrower are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from the payments of Borrower received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses by Borrower, each of the Lenders hereby agrees that it is and shall be obligated to pay to Agent such Lenders' Pro Rata Share thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent and its Lenders Affiliates and all of their respective officers, directors, employees, attorneys, consultants and agents (each, an " <u>Agent Indemnified Party</u> ") (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so) from and against any and all Losses (as hereinafter defined); <u>provided</u> , <u>however</u> , that no Lender shall be liable for the payment to any Agent Indemnified Party of any portion of such Losses resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any other Lenders in failing to make its Pro Rata Share of any Loan or other extension of credit hereunder. Without limitation of the foregoing, each of the Lenders shall reimburse Agent upon demand for such Lenders' ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrower. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

28

**8. Miscellaneous.**

**8.1 <u>Remedies Cumulative</u>** . The remedies herein provided are cumulative and are in addition to any other remedies provided by law, any Loan Document or otherwise.

**8.2 <u>Survival</u>** . All representations and warranties made herein shall survive the making of the Loans hereunder and the delivery of the Notes, and shall continue in full force and effect so long as any Obligations are outstanding, there exists any commitment by Lenders to Borrower, and until this Agreement is formally terminated in writing. The obligations of the Borrower under <u>Section 6</u> hereof shall survive the repayment of the Loans and the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

**8.3 <u>Notices</u>** . Any notice or other communication hereunder or under the Notes to any party hereto or thereto shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, telegram, or registered or certified United States mail with return receipt and unless otherwise provided herein shall be deemed to have been given or made when delivered, telegraphed or, if sent via United States mail, when receipt signed by the receiver, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing):

| | |
|---|---|
| If to the Borrower: | Carvana Group, LLC<br>4020 East Indian School Road<br>Phoenix, Arizona 85018<br>Attention: General Counsel<br>Email: DL-CarvanaLegal@carvana.com |
| With a copy to: | Snell & Wilmer L.L.P.<br>One Arizona Center<br>Phoenix, Arizona 85004<br>Attention: Brian William Burke<br>Facsimile No.: (602) 382-6070<br>Telephone No.: (602) 382-6379<br>Email: bburke@swlaw.com |
| If to the Agent: | Verde Investments, Inc.<br>1720 W. Rio Salado Parkway<br>Tempe, Arizona 85281<br>Attention: Steven Johnson |
| With copies to: | |
| If to the Lenders: | At the address set forth on the signature pages hereto |

**8.4 <u>Governing Law</u>** . Except as otherwise provided in this Agreement and, as to the other Loan Documents, in such Loan Documents, this Agreement and the Loan Documents shall be deemed contracts made under the laws of the State of Arizona and shall be governed by and construed in accordance with the laws of the State of Arizona (excluding its conflict of laws provisions if such provisions would require application of the laws of another jurisdiction).

**8.5 <u>Binding Effect</u>** . This Agreement shall be binding upon and shall inure to the benefit of Borrower and Lenders, and their respective successors and assigns.

**8.6 <u>Powers</u>** . All powers of attorney granted to Lenders are coupled with an interest and are irrevocable.

**8.7 <u>Approvals; Amendments</u>** . If this Agreement calls for the approval or consent of Lenders, such approval or consent may be given or withheld in the sole and absolute discretion of Lenders unless otherwise specified herein. This Agreement and the other Loan Documents may not be modified, altered or amended, except by an agreement in writing signed by Borrower and Lenders.

**8.8 <u>Assignments and Participation</u>** . Borrower may not assign any of their rights hereunder without the prior written consent of Lenders, and any such assignment made without such consent will be void. Each Lender may from time to time, without the consent of Borrower, sell, transfer, pledge, assign and convey the Notes, the Loan and the Loan Documents (or any interest therein), and delegate any and all of its obligations with respect thereto, and may grant participations in the Loan to another financial institution or other Person on terms and conditions reasonably acceptable to Agent and split the Loan into multiple parts, or the Notes into multiple component notes or tranches. In connection with any such sale, transfer, assignment, conveyance or participation, the applicable Lender may, acting for this purpose as an agent of Borrower, maintain at its offices a register for the recordation of the names and addresses of Lenders' participants or assignees, and the amount and terms of Lender's sales, transfers, assignments, conveyances and participations including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such sale, transfer, assignment, conveyance or participation. Upon prior notice to Borrower of such participation or assignment, Borrower shall thereafter furnish to such participant or assignee any information furnished by Borrower to Lenders pursuant to the terms of the Loan Documents. Nothing in this Agreement or any other Loan Document shall prohibit Lenders from pledging or assigning this Agreement and Lenders' rights under any of the other Loan Documents, including Collateral therefor, to any Federal Reserve Lenders in accordance with applicable law.

**8.9 <u>Waiver of Certain Defenses</u>** . To the fullest extent permitted by applicable law, upon the occurrence of any Event of Default, neither Borrower nor anyone claiming by or under Borrower will claim or seek to take advantage of any law requiring Lenders to attempt to realize upon any Collateral or collateral of any surety or guarantor, or any appraisement, evaluation, stay, extension, homestead, redemption or exemption laws now or hereafter in force in order to prevent or hinder the enforcement of this Agreement. Borrower, for itself and all who may at any time claim through or under Borrower, hereby expressly waives to the fullest extent permitted by law the benefit of all such laws. All rights of Lenders and all obligations of Borrower hereunder shall be absolute and unconditional irrespective of (a) any change in the time, manner or place of payment of, or any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any provision of the Loan Documents, (b) any exchange, release or non-perfection of any Collateral given as security for the Obligations, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Obligations, or (c) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower or any third party, other than payment and performance in full of the Obligations.

**8.10 <u>Integration; Final Agreement</u>** . This Agreement and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**8.11 <u>LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES</u>** . EACH OF THE PARTIES HERETO, INCLUDING LENDER BY ACCEPTANCE HEREOF, AGREES THAT IN ANY JUDICIAL, MEDIATION OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM (A " <u>DISPUTE</u> ") THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO THE OTHER FOR, (A) INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR (B) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY DISPUTE, WHETHER THE DISPUTE IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY OR OTHERWISE.

**8.12 <u>WAIVER OF JURY TRIAL</u>** . TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO, INCLUDING LENDER BY ACCEPTANCE HEREOF, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL

31

INDUCEMENT TO EACH PARTY TO ACCEPT THIS AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

**8.13** **Disgorgement of Payments** . If Lenders are required in any bankruptcy, insolvency or receivership proceeding by or against Borrower or any Guarantor or any of its respective property or otherwise to disgorge, turn over or otherwise pay to the estate of Borrower or any Guarantor any amount (a " Recovery "), because such Recovery was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be fraudulent or preferential transfer, whether received as proceeds of security, enforcement or any right of set-off or otherwise, then the Obligations shall be reinstated to the extent of such Recovery and, for purposes of this Agreement, deemed to be outstanding as if such payment had not occurred. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

**8.14** **Interpretation** . Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lenders or the Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**8.15** **Counterparts; Electronic Execution** . This Agreement may be executed in two or more counterparts, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis* .

**8.16** **Severability** . If any one or more of the provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision or provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

**8.17** **Waiver by Borrower** . Except as otherwise provided for in this Agreement, Borrower waive (a) notice and consummation of presentment, demand, protest, dishonor, intent to accelerate, acceleration; (b) all rights to notice and a hearing prior to taking possession or control of, or the Lenders' replevy, attachment or levy upon, the Collateral; (c) any bond or security in a judicial proceeding as a condition to the Agent exercising any of the its remedies; and (d) the benefit of all valuation, appraisement and exemption laws. The failure or delay of Borrower to strictly enforce the terms of this Agreement shall not be a waiver of Borrower's right to do so.

**[Signatures on following page]**

32

**IN WITNESS WHEREOF** , the parties hereto have caused this Agreement to be duly executed under seal as of the day and year first above written.

**BORROWER:**                                      **CARVANA GROUP, LLC**

                                                  By:    /s/ Paul Breaux
                                                  Name:  Paul Breaux
                                                  Title: Vice President


**AGENT:**                                         **VERDE INVESTMENTS, INC.**

                                                  By:    /s/ Steven P. Johnson
                                                  Name:  Steven P. Johnson
                                                  Title: Vice President


**LENDERS:**                                       **VERDE INVESTMENTS, INC.**

                                                  By:    /s/ Steven P. Johnson
                                                  Name:  Steven P. Johnson
                                                  Title: Vice President

                                                  Address for notices:
                                                  1720 W. Rio Salado Parkway
                                                  Tempe, AZ 85281



                                      [                    ]

                                      By:
                                      Name:
                                      Title:

                                      Address for notices:

**EXHIBIT A-1**

**FORM OF NOTE**

See attached.

**PROMISSORY NOTE**

Up to $

FOR VALUE RECEIVED, the undersigned, CARVANA GROUP, LLC, a Delaware limited liability company (" Borrower "), hereby promises to pay to the order of _____, a _____, the principal sum of up to _____ DOLLARS ($      ) or such amount as may be advanced and outstanding from time to time under this Agreement.

This Agreement is subject to the provisions of that certain Master Loan Agreement dated as of February [●], 2017, by and among the Borrower and the Agent and Lenders party thereto, as modified from time to time (the " Loan Agreement "). Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Loan Agreement. This Agreement is entitled to the benefits of, and evidences Obligations incurred under, the Loan Agreement, to which reference is made for a description of the security for this Agreement and for a statement of the additional terms and conditions on which Borrower is permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Agreement and on which such Obligations may be declared to be immediately due and payable. This Agreement is one of the Notes referred to in the Loan Agreement.

The unpaid principal amount of this Agreement from time to time outstanding is subject to mandatory repayment from time to time as provided in the Loan Agreement and shall bear interest as provided in the Loan Agreement. All payments of principal and interest on this Agreement shall be payable to Lender of this Agreement in lawful currency of the United States of America in immediately available funds in the manner and location indicated in the Loan Agreement or wherever else the Lender may specify.

Notwithstanding the grant of the Collateral, Borrower hereby acknowledges, admits and agrees that the Borrower's obligations under this Agreement are recourse obligations of Borrower for which Borrower pledge Borrower's full faith and credit. Borrower promise to pay all of the Lenders' costs of collection and enforcement in respect of this Agreement when incurred including, without limitation, all reasonable attorneys' fees and disbursements.

Borrower, and any endorsers or guarantors hereof, hereby (i) severally waive diligence, presentment, protest and demand, and notice of protest, demand, dishonor or any non-payment of this Agreement, (ii) expressly agree that this Agreement, or any payment hereunder, may be extended from time to time and consent to the acceptance of further Collateral, release of any Collateral for this Agreement and/or release of any party primarily or secondarily liable hereon, and (iii) expressly agree that it shall not be necessary for the Lenders, in order to enforce payment of this Agreement, to first institute or exhaust the Lenders' remedies against Borrower or any other party liable hereon, or against any Collateral for this Agreement. No extension of time for the payment of this Agreement, or any installment hereof, made by agreement of the Lenders with any Person now or hereafter liable for the payment of this Agreement shall affect

the liability under this Agreement of the Borrower, even if the Borrower is not a party to such agreement; provided that the Lenders and the Borrower, by written agreement between them, may affect the liability of the Borrower.

Upon the occurrence of any Event of Default specified in the Loan Agreement, all amounts remaining unpaid on this Agreement shall become, or may be declared to be, immediately due and payable, as provided in the Loan Agreement.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF ARIZONA (WITHOUT REFERENCE TO CHOICE-OF-LAW DOCTRINE), WHICH THE BORROWER EXPRESSLY ELECT TO APPLY TO THIS AGREEMENT.

[Signatures on following page]

**IN WITNESS WHEREOF** , the undersigned have executed and delivered this Promissory Note effective as of the day and year first above written.

**CARVANA GROUP, LLC**

By: _____

Name:   Paul Breaux

Title:    Vice President

**EXHIBIT A-2**

**FORM OF GUARANTY**

See attached.

**GUARANTY**

THIS AGREEMENT, dated as of February [●], 2017, is entered into by and among CARVANA, LLC, an Arizona limited liability company (" Guarantor "), and VERDE INVESTMENTS, INC., an Arizona corporation (" Agent "), as agent on behalf of the lenders (" Lenders ") from time to time party to that certain Master Loan Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the " Loan Agreement ") by and between Carvana Group, LLC, a Delaware limited liability company, as borrower (" Borrower "), Lenders and Agent.

## W I T N E S S E T H:

WHEREAS , pursuant to the Loan Agreement, Lenders have agreed to make certain financial accommodations available to Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS , in order to induce the Lenders to enter into the Loan Agreement and to induce the Lenders to make financial accommodations to Borrower as provided for in the Loan Agreement, Guarantor has agreed to guaranty the Guaranteed Obligations (as hereinafter defined); and

WHEREAS , Guarantor is an Affiliate of Borrower and, as such, will benefit by virtue of the financial accommodations extended to Borrower by the Lenders.

NOW, THEREFORE , for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**1. Definitions**

      **1.1** <u>**Construction**</u> . All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Loan Agreement. When the terms are used in the plural, the plural forms of the meanings shall apply. Any terms (whether capitalized or lower case) used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein or in the Loan Agreement; provided, that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

      **1.2** <u>**Definitions**</u> . In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

**Agreement:** this Agreement.

**Guaranteed Obligations:** all liabilities and obligations (i) of Borrower to Agent and Lenders with respect to the Obligations evidenced by the Loan Documents, (ii) of Guarantor to Agent and Lenders with respect to the Obligations evidenced by the Loan Documents, in each case, however and whenever incurred or evidenced, whether primary, secondary, direct, indirect, absolute, contingent, due or to become due, now existing or hereafter contracted or acquired, and all modifications, extensions and renewals thereof, fees and expenses incurred by Agent or

2

Lenders (including any fees or expenses that accrue after the commencement of an insolvency proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency proceeding), or otherwise, and any and all expenses (including reasonable counsel fees and expenses) incurred by Agent and Lenders, in enforcing any rights under this Agreement. Without limiting the generality of the foregoing, Guaranteed Obligations shall include all amounts that constitute part of the Guaranteed Obligations and would be owed by Borrower to Agent and Lenders but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other insolvency proceeding or similar proceeding involving Borrower or Guarantor.

## 2. Guaranty

**2.1 Guaranty** . In recognition of the direct and indirect benefits to be received by Guarantor from the proceeds of the Loans, Guarantor hereby unconditionally and irrevocably guarantees as a primary obligor and not merely as a surety the full and prompt payment when due, whether upon maturity, acceleration, or otherwise, of all of the Guaranteed Obligations. If any or all of the Guaranteed Obligations becomes due and payable, Guarantor, unconditionally and irrevocably, and without the need for demand, protest, or any other notice or formality, promises to pay such indebtedness to Agent and Lenders, together with any and all expenses that may be incurred by Agent and Lenders in demanding, enforcing, or collecting any of the Guaranteed Obligations (including the enforcement of any Collateral for such Guaranteed Obligations or any Collateral for the obligations of the Guarantor under this Agreement). If claim is ever made upon Agent or Lenders for repayment or recovery of any amount or amounts received in payment of or on account of any or all of the Guaranteed Obligations and Agent or a Lender repays all or part of said amount by reason of (i) any judgment, decree, or order of any court or administrative body having jurisdiction over such payee or any of its property, or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including Borrower or Guarantor), then and in each such event, Guarantor agrees that any such judgment, decree, order, settlement, or compromise shall be binding upon the Guarantor, notwithstanding any revocation (or purported revocation) of this Agreement or other instrument evidencing any liability of Guarantor, and the Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

**2.2 Bankruptcy** . Additionally, Guarantor unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to Agent and Lenders, whether or not due or payable by Borrower upon the occurrence of any of the events specified in Section 5.1.3 of the Loan Agreement, and irrevocably and unconditionally promises to pay such indebtedness to Agent and Lenders, without the requirement of demand, protest, or any other notice or other formality, in lawful money of the United States.

**2.3 Nature of Liability** . The liability of Guarantor hereunder is primary, absolute, and unconditional, and is independent of any security for or other guaranty of the Obligations, whether executed by any other guarantor or by any other Person, and the liability of Guarantor hereunder shall not be affected or impaired by (i) any direction as to application of payment by Borrower or by any other Person, (ii) any payment on, or in reduction of, any such other guaranty or undertaking, (iii) any dissolution, termination, or increase, decrease, or change

3

in personnel by Borrower or Guarantor, (iv) any payment made to Agent or Lenders on account of the Guaranteed Obligations which Lenders repays to Borrower or Guarantor pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (or any settlement or compromise of any claim made in such a proceeding relating to such payment), and Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (v) any action or inaction by Agent or Lenders, or (vi) any invalidity, irregularity, avoidability, or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

2.4 **Continuing Guaranty** . This Agreement includes all present and future Guaranteed Obligations including any under transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guaranteed Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guaranteed Obligations after prior Guaranteed Obligations have been satisfied in whole or in part. To the maximum extent permitted by law, Guarantor hereby waives any right to revoke this Agreement as to future Guaranteed Obligations. If such a revocation is effective notwithstanding the foregoing waiver, Guarantor acknowledges and agrees that (i) no such revocation shall be effective until written notice thereof has been received by Agent and Lenders, (ii) no such revocation shall apply to any Guaranteed Obligations in existence on the date of receipt by Agent and Lenders of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (iii) no such revocation shall apply to any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of Agent and Lenders in existence on the date of such revocation, (iv) no payment by Guarantor, Borrower, or from any other source, prior to the date of Agent and Lenders' receipt of written notice of such revocation shall reduce the maximum obligation of such Guarantor hereunder, and (v) any payment by Borrower or from any source other than such Guarantor subsequent to the date of such revocation shall first be applied to that portion of the Guaranteed Obligations as to which the revocation is effective and which are not, therefore, guaranteed hereunder, and to the extent so applied shall not reduce the maximum obligation of such Guarantor hereunder. This Agreement shall be binding upon Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Agent and Lenders and their successors, transferees, or assigns.

2.5 **Independent Obligations** . The guaranty by Guarantor hereunder is a guaranty of payment and not of collection. The obligations of Guarantor hereunder are independent of the obligations of any other guarantor or Borrower or any other Person and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Borrower or any other Person and whether or not Borrower or any other Person be joined in any such action or actions. Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof. Any payment by Borrower or other circumstance which operates to toll any statute of limitations as to Borrower shall operate to toll the statute of limitations as to Guarantor.

2.6 **Authorization** . Guarantor authorizes Agent and Lenders, without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

2.6.1 change the manner, place, or terms of payment of, or change or extend the time of payment of, renew, increase, accelerate, or alter, any of the Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Agreement shall apply to the Obligations as so changed, extended, renewed, or altered;

4

2.6.2 take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Obligations or any of the Guaranteed Obligations (including any of the obligations of Guarantor under this Agreement) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof;

2.6.3 exercise or refrain from exercising any rights against Borrower or any other guarantor;

2.6.4 release or substitute any one or more endorsers, guarantors, Borrower, or other obligors;

2.6.5 settle or compromise any of the Obligations, any security therefor, or any liability (including any of those of Guarantor under this Agreement) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of Borrower to its creditors;

2.6.6 apply any sums by whomever paid or however realized to any liability or liabilities of Borrower to Agent and Lenders, regardless of what liability or liabilities of such Borrower remain unpaid; and

2.6.7 consent to or waive any breach of, or any act, omission, or default under, this Agreement, any other Loan Document, or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify, or supplement this Agreement, any other Loan Document, or any of such other instruments or agreements.

**2.7 <u>Reliance</u>** . It is not necessary for Agent or Lenders to inquire into the capacity or powers of Guarantor or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

**2.8 <u>Guaranty Absolute</u>** . Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Agent and Lenders with respect thereto. The obligations of Guarantor under this Agreement are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against Guarantor to enforce such obligations, irrespective of whether any action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor is joined in any such action or actions. The liability of Guarantor under this Agreement shall be absolute and unconditional irrespective of, and Guarantor hereby irrevocably waives any defense it may now or hereafter have in any way relating to, any or all of the following:

2.8.1 any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

5

2.8.2 any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit;

2.8.3 any taking, exchange, release, or non-perfection of any Lien in and to any Collateral, or any taking, release, amendment, waiver of, or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

2.8.4 the existence of any claim, set-off, defense, or other right that Guarantor may have at any time against any Person, including Lenders;

2.8.5 any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor;

2.8.6 any right or defense arising by reason of any claim or defense based upon an election of remedies by Agent or Lenders, including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against Borrower or sureties;

2.8.7 any change, restructuring, or termination of the corporate, limited liability company, or partnership structure or existence of Borrower or any other guarantor; or

2.8.8 any other circumstance that might otherwise constitute a defense available to, or a discharge of, Borrower or any other guarantor or surety.

**2.9 <u>Waivers</u>** .

2.9.1 Guarantor waives any right (except as shall be required by applicable statute and cannot be waived) to require Agent and Lenders to (i) proceed against Borrower or any other guarantor or any other Person, (ii) proceed against or exhaust any security held from Borrower or any other guarantor or any other Person, or (iii) protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against Borrower, any other guarantor, any other Person, or any Collateral, or (iv) pursue any other remedy in Lenders' power whatsoever. Guarantor waives any defense based on or arising out of any defense of Borrower or Guarantor or any other Person, other than payment of the Obligations to the extent of such payment, based on or arising out of the disability of Borrower or Guarantor or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower or any other guarantor other than payment of the Obligations to the extent of such payment.

6

2.9.2 Agent may, and upon request of a Lender, shall take immediate possession of each, any and all Property or any part thereof (which Guarantor agrees to surrender to Agent) and manage, control or lease the same to such Persons and at such rental as it may deem proper and collect and apply Rents (as defined in the applicable Mortgage) to the payment of: (i) the Obligations, together with all costs and attorneys' fees; (i) all levies, assessments or liens which may be prior in lien or payment to the Obligations, and premiums for insurance, with interest on all such items; and (iii) the cost of all alterations, repairs, replacements and expenses incident to taking and retaining possession of each, any and all Property and the management and operation thereof; all in such order or priority as Agent in its sole discretion may determine. The taking of possession shall not prevent concurrent or later proceedings for the foreclosure sale of each, any and all Property. Agent may, and upon request of a Lender, shall exercise all the remedies of a mortgagee as provided by law and in equity including, without limitation, foreclosure upon the Mortgage and sale of each, any and all Property, or any part of the Property, at public sale conducted according to applicable law (referred to as "Sale") and conduct additional Sales as may be required until all of the Property is sold or the Obligations are satisfied. With respect to any portion of each, any and all Property governed by the UCC, Agent shall have all of the rights and remedies of a secured party thereunder. Agent may elect to foreclose upon any Property that is Fixtures under law applicable to foreclosure of interests in real estate or law applicable to personal property. Agent may, and upon request of a Lender, shall bid at Sale and may accept, as successful bidder, credit of the bid amount against the Obligations as payment of any portion of the purchase price. Agent shall apply the proceeds of Sale, first to any fees or attorney fees permitted Agent by law in connection with Sale, second to expenses of foreclosure, publication, and sale permitted Agent by law in connection with Sale, third to the Obligations, and any remaining proceeds as required by law.

2.9.3 Guarantor waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement, and notices of the existence, creation, or incurring of new or additional Obligations. Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's and Guarantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope, and extent of the risks which Guarantor assumes and incurs hereunder, and agrees that Lenders shall not have any duty to advise Guarantor of information known to them regarding such circumstances or risks.

2.9.4 No Guarantor will exercise any rights that it may now or hereafter acquire against Borrower or Guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Agreement, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Agent or Lenders against Borrower, any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from Borrower or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Agreement shall have been paid in full in cash and Lenders' obligation to make Loans under the Loan Agreement has been terminated. If any amount shall be paid to Guarantor in violation of the immediately preceding

7

sentence, such amount shall be held in trust for the benefit of Lenders, and shall forthwith be paid to Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of the Loan Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Agreement thereafter arising.

2.9.5 Guarantor represents, warrants, and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

3. **Representations and Warranties of Guarantor**

**3.1 Organization; Powers; Etc** . Guarantor (i) is duly formed, validly existing, and in good standing under the laws of the state of its formation, (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of its properties or the nature of its business requires such qualification, except where failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, and (iii) has all requisite legal power and limited liability company power to own and operate its assets and to carry on its business and to enter into and perform its obligations under this Agreement.

**3.2 Due Authorization; No Violations; Etc** . The execution and delivery by Guarantor of, and the performance by Guarantor of its obligations under, this Agreement have been duly authorized by all requisite limited liability company action and do not and will not (i) violate its articles or certificate of formation or operating agreement, any provision of any law of any Governmental Authority, any agreement or any indenture, mortgage, or other instrument to which Guarantor is a party or by which Guarantor or its properties are bound, or (ii) conflict with, result in a breach of, or constitute with the giving of notice or lapse of time, or both, a default under any such agreement, indenture, mortgage, or other instrument.

**3.3 Binding Agreement** . This Agreement is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject only to limitations on enforceability imposed by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally, and (ii) general equitable principles.

**3.4 Consents and Approvals** . No consent or approval of any Governmental Authority or of any party to any agreement to which Guarantor is a party or by which it or any of its property is bound in connection with the execution and delivery by Guarantor of, and the performance by Guarantor of its obligations under, this Agreement, is necessary, except as such have been obtained and are in full force and effect.

**3.5 Title** . Borrower, Guarantor or a Subsidiary of Borrower has insurable title to the Property. Borrower, Guarantor or a Subsidiary of Borrower owns the Property free and clear of all Liens, except Permitted Liens.

**3.6 Collateral** . Other than Permitted Liens, the security interests granted to Lenders pursuant to any Mortgage, to the extent so pledged, (i) constitute and, as to subsequently

8

acquired property included in the Collateral covered by the Mortgage or security agreement, will constitute, security interests entitled to all of the rights, benefits and priorities provided by the UCC and applicable State law and (ii) are, and as to such subsequently acquired Collateral will be, fully perfected, superior and prior to the rights of all third persons, now existing or hereafter arising.

**3.7** **Environmental** . Except as disclosed on Exhibit 3.10 to the Loan Agreement, Guarantor warrants and represents to Lenders, that: (i) Guarantor has undertaken all appropriate inquiry and investigation as to the environmental condition of each Property; (ii) each Property and Guarantor, and any occupants of the Property, are in compliance with and shall continue to be in compliance with all applicable Environmental Laws; (iii) each Property is not and has never been used to generate, handle, treat, store or dispose of Hazardous Materials in excess of De Minimis Amounts or otherwise in violation of any Environmental Laws; (iv) no Hazardous Materials (including asbestos, mold or lead paint in any form) in excess of De Minimis Amounts are located on or under any Property or emanate from any Property or have been disposed of, stored or treated on or about any Property; (v) there are no unregistered underground storage tanks on the Property that are subject to any underground storage tank registration laws or regulations; (vi) no notice has been received with regard to any Hazardous Material on any Property; (vii) no action, investigation or proceeding is pending or to Guarantor's knowledge threatened which seeks to enforce any right or remedy against Guarantor or any Property under any Environmental Law; (viii) neither Guarantor nor any occupant of the Property, is subject to any remedial obligations as to the Property under Environmental Laws relating to Hazardous Materials, health or the environment; (ix) Guarantor has not, nor will Guarantor, release or waive the liability of any previous owner, lessee or operator of the Property or any party who may be potentially responsible for the presence of or removal of Hazardous Material from the Property, nor has it made promises of indemnification regarding Hazardous Material on the Property to any party, except as contained herein and in the Loan Documents; and (x) all licenses, permits and other governmental or regulatory actions necessary for each Property to comply with Environmental Laws shall be obtained and maintained and Guarantor shall assure compliance therewith.

**3.8** **Utilities** . With respect to each Property on which Guarantor is currently operating its business:

3.8.1 To Guarantor's knowledge, each Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and drain facilities adequate to service such Property for its intended use;

3.8.2 All public utilities necessary or convenient to the full use and enjoyment of each Property are located either in the public right of way abutting such Property (which are connected so as to serve such Property without passing over other property) or in recorded easements serving such Property; and

3.8.3 To the best of Guarantor's knowledge after due inquiry, all roads necessary for the use of each Property for its current respective purpose have been completed, are physically open and dedicated to public use and have been accepted by all Governmental Authorities.

9

**3.9 <u>Certificate of Occupancy; Licenses</u>** . With respect to each Property on which Guarantor is currently operating its business:

3.9.1 To Guarantor's knowledge, all material certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "Licenses") have been obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture;

3.9.2 Guarantor shall keep and maintain all Licenses necessary for the operation of the Property for its permitted use; and

3.9.3 To Guarantor's knowledge, the use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

**3.10 <u>Flood Zone</u>** . To Guarantor's knowledge, none of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, Guarantor has obtained flood insurance with respect to the Property in an amount that a prudent, similarly situated real property owner would obtain.

**3.11 <u>Physical Condition</u>** . Except as disclosed on Exhibit 3.14 to the Loan Agreement, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, is in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Guarantor has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond. The Property is free from material damage caused by fire or other casualty. To Guarantor's knowledge after due inquiry, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in material compliance with all applicable legal requirements.

**3.12 <u>Boundaries</u>** . All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property.

**3.13 <u>Leases</u>** . No Person has any possessory interest in or right to occupy any Property other than the Guarantor, other than pursuant to billboard licenses or easements which do not, individually or in the aggregate, materially adversely affect Borrower's or such Subsidiary's interest in such Property.

**3.14 <u>Fixtures</u>** . Guarantor is the owner of all Fixtures at the Property.

10

**4. Covenants of Guarantor** . The following covenants shall remain in effect until the payment and performance of all of the Guarantor's obligations to the Lenders:

      **4.1 Existence** . Guarantor will do or cause to be done all things necessary to preserve and keep in full force and effect its existence in accordance with its organizational documents, and the material rights, licenses and franchises of Guarantor, provided that Guarantor is not required to preserve any such right, license or franchise if the maintenance or preservation thereof is no longer desirable in the conduct of its business.

      **4.2 Liens** . Except for Permitted Liens, Guarantor will not, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on the Property.

      **4.3 Maintain Properties** . Guarantor shall maintain, preserve and keep or cause each applicable Tenant to maintain preserve and keep each Property in good repair, working order and condition (ordinary wear and tear excepted), making all replacements, additions and improvements thereto necessary for the proper conduct of its business, unless prohibited by the Loan Documents.

      **4.4 Use of Property** . Guarantor shall use and operate, and require its lessees or licensees to use and operate, each Property in compliance with all applicable laws (including, for example, the Americans with Disabilities Act) and ordinances, covenants, and restrictions, and with all applicable requirements of any Lease now or hereafter affecting each Property. Guarantor shall not permit any unlawful use of any Property or any use that may give rise to a claim of forfeiture of any of such Property. Guarantor shall not allow changes in the stated use of any Property from that disclosed to Lenders at the time of execution hereof. Guarantor shall not initiate or acquiesce to a zoning change of any Property without prior notice to, and written consent of, Lenders.

      **4.5 Maintenance, Repairs and Alterations** . Without the prior written consent of Lenders (which consent shall not be unreasonably withheld or delayed), Guarantor will not remove, demolish or structurally alter, or permit any Tenant to remove, demolish or structurally alter, any of the buildings or other Improvements on any Property after Guarantor has opened such Property to the public for business ("Alterations"). Guarantor shall promptly notify Lenders in writing of any material loss, damage or adverse condition affecting any Property. Notwithstanding anything to the contrary set forth in the foregoing, Guarantor may make or permit Tenant to make Alterations without the consent of Lenders in the event that such Alterations (i) may be required by laws, ordinances or regulations, (ii) would not have a Material Adverse Effect on a Property, or (iii) are improvement work which are commercially reasonable to facilitate or compliment to the current and future operations on such Property and do not materially and adversely affect the value of such Property.

      **4.6 Environmental Condition of Property and Indemnity** . Guarantor agrees to notify Agent and Lenders immediately upon receipt of any citations, warnings, orders, notices, consent agreements, process or claims alleging or relating to violations of any Environmental Laws or to the environmental condition of each Property and shall conduct and complete all investigations and all cleanup actions necessary to comply with the Environmental Laws and to remove, in accordance with Environmental Laws, any Hazardous Material in excess

11

of De Minimis Amounts from each Property. GUARANTOR SHALL DEFEND, AND HOLD AGENT, LENDERS AND ANY PARTICIPANTS, SUCCESSORS OR ASSIGNS TO LENDERS' INTEREST IN THE LOANS, AND ANY OTHER PARTY WHO ACQUIRES ANY PORTION OF THE LOANS AT A FORECLOSURE SALE OR OTHERWISE THROUGH THE EXERCISE OF AGENT'S AND LENDERS' RIGHTS AND REMEDIES UNDER THE LOAN DOCUMENTS, AND ALL DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF ALL OF THE AFOREMENTIONED INDEMNIFIED PARTIES, HARMLESS FROM AND AGAINST ANY AND ALL ACTUAL OR POTENTIAL DAMAGES, PENALTIES, FINES, CLAIMS, SUITS, LIABILITIES, COSTS, JUDGMENTS AND EXPENSES, INCLUDING REASONABLE ATTORNEYS', CONSULTANTS' OR EXPERTS' FEES OF EVERY KIND AND NATURE INCURRED, SUFFERED BY OR ASSERTED AGAINST AGENT OR LENDERS AS A DIRECT OR INDIRECT RESULT OF OR WHICH ARISE OUT OF OR RELATE IN ANY WAY TO: (I) REPRESENTATIONS MADE BY GUARANTOR IN THIS SECTION BEING OR BECOMING UNTRUE IN ANY MATERIAL RESPECT; (II) GUARANTOR'S VIOLATION OF OR FAILURE TO MEET THE REQUIREMENTS OF ANY ENVIRONMENTAL LAWS; OR (III) HAZARDOUS MATERIALS WHICH, WHILE ANY PROPERTY IS SUBJECT TO THE MORTGAGE, EXIST ON ANY PROPERTY IN EXCESS OF DE MINIMIS AMOUNTS OR OTHERWISE IN VIOLATION OF ANY ENVIRONMENTAL LAW. HOWEVER, GUARANTOR'S OBLIGATIONS UNDER THIS SECTION SHALL NOT APPLY TO ANY ACT OF AGENT OR LENDERS WHICH TAKES PLACE AFTER FORECLOSURE OR SATISFACTION OF THE MORTGAGE. THESE INDEMNIFICATION OBLIGATIONS ARE IN ADDITION TO GENERAL INDEMNIFICATION PROVISIONS SET FORTH HEREAFTER. GUARANTOR'S OBLIGATIONS UNDER THIS SECTION SHALL CONTINUE, SURVIVE AND REMAIN IN FULL FORCE AND EFFECT NOTWITHSTANDING THE REPAYMENT OF THE OBLIGATIONS, A FORECLOSURE OF OR EXERCISE OF POWER OF SALE UNDER THIS INSTRUMENT, A DELIVERY OF A DEED IN LIEU OF FORECLOSURE, A CANCELLATION OR TERMINATION OF RECORD OF THIS INSTRUMENT AND THE TRANSFER OF ANY PROPERTY.

**4.7 Further Assurances .** Upon written request of Borrower or Agent, within twenty-five (25) days of such request, Guarantor shall execute and deliver to Agent for recording Mortgages for each Property in form and substance reasonably satisfactory to Guarantor and Lenders. If, after the date of such recording, Guarantor directly or indirectly through a Subsidiarity acquires any real property, upon request of Borrower or any Lender, Guarantor shall, or shall cause such Subsidiary to, execute and deliver to Agent for recording in the applicable county recorder's office, a Mortgage in substantially the form as prior Mortgages, subject to those changes deemed necessary by Agent and its counsel to provide for local law requirements.

**5. Events of Default; Remedies**

**5.1 Default .** An event of default (" Event of Default ") under this Agreement shall exist if there shall be an Event of Default under any of the Loan Documents. If an Event of Default occurs, the Guaranteed Obligations shall be due immediately and payable upon demand and Lenders may exercise any rights and remedies as provided in this Agreement and other Loan Documents, or as provided at law or equity. Guarantor shall pay interest on the Guaranteed Obligations from such Event of Default at the highest rate of interest charged on any of the Guaranteed Obligations.

12

**5.2 Remedies .** Upon the occurrence and during the continuance of an Event of Default, Agent and Lenders may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies set forth in the Loan Agreement. The rights and remedies shall be cumulative, and not exclusive, except to the extent required by law. The exercise of any right, remedy or attorney-in-fact appointment by Agent of any Lender shall not relieve the Guarantor of any of their obligations hereunder.

**5.3 Injunctive Relief .** Guarantor recognizes that if there is an Event of Default then, depending on the nature of the Event of Default, it may be that no remedy at law will provide complete or adequate relief to Agent or Lenders, and Agent shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. The injunctive relief shall not be a waiver of Lenders' rights to other relief and remedies.

**6. Indemnities and Expenses .**

**6.1** Indemnification. Guarantor agrees to indemnify Lenders and any other Person acting on behalf of Lenders from and against all claims, lawsuits and liabilities (including reasonable attorneys fees) growing out of or resulting from this Agreement (including enforcement of this Agreement) or any other Loan Document to which such Guarantor is a party, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the party seeking indemnification as determined by a final non-appealable order of a court of competent jurisdiction. This provision shall survive the termination of this Agreement and the Loan Agreement and the repayment of the Guaranteed Obligations.

**6.2 Fees and Expenses .** Guarantor shall, upon demand, pay to Lenders and any other Person acting on its behalf all the fees and expenses which Lenders or such Person may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (iii) the exercise or enforcement of any of the rights of Lenders hereunder, or (iv) the failure by Guarantor to perform or observe any of the provisions hereof.

**7. General Terms and Conditions .**

**7.1 Applicable Law .** This Agreement shall be governed and construed in accordance with the laws of the State of Arizona without reference to the choice of law doctrine.

13

**7.2 <u>Notices</u> .** Any notice or other communication hereunder to any party hereto shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, telegram, or registered or certified United States mail with return receipt and unless otherwise provided herein shall be deemed to have been given or made when delivered, telegraphed, or, if sent via United States mail, when receipt signed by the receiver, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing):

| | |
|---|---|
| If to the Guarantor: | Carvana, LLC<br>4020 East Indian School Road<br>Phoenix, Arizona 85018<br>Attention: General Counsel<br>Email: DL-CarvanaLegal@carvana.com |
| With a copy to: | Snell & Wilmer L.L.P.<br>One Arizona Center<br>Phoenix, Arizona 85004<br>Attention: Brian William Burke<br>Facsimile No.: (602) 382-6070<br>Telephone No.: (602) 382-6379<br>Email: bburke@swlaw.com |
| If to the Agent: | Verde Investments, Inc.<br>1720 W. Rio Salado Parkway<br>Tempe, Arizona 85281<br>Attention: Steven Johnson |
| If to the Lenders: | At the address set forth on the signature pages to the Loan Agreement. |

**7.3 <u>Headings</u> .** Section and paragraph headings have been inserted in this Agreement as a matter of convenience for reference only. The section and paragraph headings shall not be used in the interpretation of this Agreement.

**7.4 <u>Severability</u> .** If any one or more of the provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision or provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

**7.5 <u>Successors and Assigns</u> .** This Agreement shall be binding upon Guarantor and Agent, and shall inure to the benefit of Guarantor, Agent, Lenders, and their respective successors and assigns.

**7.6** Amendments. This Agreement may not be modified, altered or amended, and no provision hereof may be waived, except by an agreement in writing signed by the Guarantor and Agent and, upon approval of the Lenders. The rights of the Agent and Lenders granted in or referred to in this Agreement shall apply to any modification of or supplement to the Loan Documents.

**7.7** Assignments and Participation. Guarantor may not assign any of their rights hereunder without the prior written consent of Lenders, and any such assignment made without such consent will be void. Each Lender may from time to time, without the consent of Guarantor, sell, transfer, pledge, assign and convey the Note, the Loan,

14

this Agreement and the other Loan Documents (or any interest therein), and delegate any and all of its obligations with respect thereto, and may grant participations in the Loan to another financial institution or other Person on terms and conditions reasonably acceptable to Agent and split the Loan into multiple parts, or the Note into multiple component notes or tranches. In connection with any such sale, transfer, assignment, conveyance or participation, Lenders may, acting for this purpose as an agent of Guarantor, maintain at its offices a register for the recordation of the names and addresses of Lenders' participants or assignees, and the amount and terms of Lenders' sales, transfers, assignments, conveyances and participations including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such sale, transfer, assignment, conveyance or participation. Upon prior notice to Guarantor of such participation or assignment, Guarantor shall thereafter furnish to such participant or assignee any information furnished by Guarantor to Lenders pursuant to the terms of the Loan Documents. Nothing in this Agreement or any other Loan Document shall prohibit Lenders from pledging or assigning this Agreement and Lenders' rights under any of the other Loan Documents, including Collateral therefor, to any Federal Reserve Lenders in accordance with applicable law.

**7.8** Waiver by Guarantor. Except as otherwise provided for in this Agreement, Guarantor waives (i) notice and consummation of presentment, demand, protest, dishonor, intent to accelerate, and acceleration; (ii) all rights to notice and a hearing prior to taking possession or control of, or the Lenders' replevy, attachment or levy upon, the Collateral; (iii) any bond or security in a judicial proceeding as a condition to the Lenders exercising any of the Lenders' remedies; and (iv) the benefit of all valuation, appraisement and exemption laws. The failure or delay of Guarantor to strictly enforce the terms of this Agreement shall not be a waiver of such Guarantor's right to do so.

**7.9** Counterparts; Electronic Execution. This Agreement may be executed in two or more counterparts, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

**7.10** Entire Agreement. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**7.11** Survival. The obligations of the Guarantor under 6.1 and 6.2 hereof shall survive the repayment of the Loans and the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

**7.12** LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES. EACH OF THE PARTIES HERETO, INCLUDING LENDER, BY ACCEPTANCE HEREOF, AGREES THAT IN ANY JUDICIAL, MEDIATION OR

15

ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM (A " DISPUTE ") THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO ANY OTHER PARTY FOR, (A) INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR (B) PUNITIVE OR EXEMPLARY DAMAGES.   EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY DISPUTE ARISING HEREUNDER, WHETHER THE DISPUTE IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY OR OTHERWISE.

**7.13 WAIVER OF JURY TRIAL** . TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO, INCLUDING LENDER BY ACCEPTANCE HEREOF, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH PARTY TO ACCEPT THIS AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

Signature pages to follow.

16

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first written above.

**GUARANTOR:**                                    **CARVANA, LLC**

By: _____

Name:   Paul Breaux

Title:    Vice President

**AGENT:**                                        **VERDE INVESTMENTS, INC.**

By: _____

Name:

Title:

**SCHEDULE I**

1.  5435 N. Loop 1604 W, San Antonio, TX 78257

2.  3507 Rio Vista Ave, Orlando, FL 32805

3.  4777 Lenoir Ave, Jacksonville 32216

4.  356 Atlanta Hwy NW, Winder, GA 30680

5.  6014 S IH 35 Frontage Road, Austin, Texas

**EXHIBIT 3.10**

## ENVIRONMENTAL DISCLOSURES

1.    5435 N. Loop 1604 W, San Antonio, TX 78257: None.

2.    3507 Rio Vista Ave, Orlando, FL 32805: None.

3.    4777 Lenoir Ave, Jacksonville 32216: None.

4.    356 Atlanta Hwy NW, Winder, GA 30680: None.

**EXHIBIT 3.14**

## PHYSICAL CONDITION DISCLOSURES

1.  5435 N. Loop 1604 W, San Antonio, TX 78257 – N/A at this time, as the site is currently under construction.

2.  3507 Rio Vista Ave, Orlando, FL 32805 - N/A at this time, as the site is currently under construction.

3.  4777 Lenoir Ave, Jacksonville 32216 - N/A at this time, as the site is currently under construction.

4.  356 Atlanta Hwy NW, Winder, GA 30680 - N/A at this time, as the site is currently under construction.

**EXHIBIT 4.14**

**ENVIRONMENTAL CONDITION OF PROPERTY**

1.  5435 N. Loop 1604 W, San Antonio, TX 78257: None.

2.  3507 Rio Vista Ave, Orlando, FL 32805: None.

3.  4777 Lenoir Ave, Jacksonville 32216: None.

4.  356 Atlanta Hwy NW, Winder, GA 30680:

    a.  A title report obtained from First American Title Insurance Company indicated that a Conservation Easement dated March 2, 1964, was recorded in connection to this property. We obtained a termination of this easement from the Conservation District, which was recorded on November 10, 2016, with Clerk of Barrow County Superior Court.

        Pursuant to the Environmental Phase I Report, dated May 13, 2016, the northeast portion of the site was observed to be overgrown with dense undergrowth where an intermittent stream and several inundated wetland areas were observed in this area. The stream starts in the northern central portion of the site and drains to the east-southeast. The stream flows off site in the eastern-central portion of the site. Several roadside drainages and inundated areas were observed in the northeast portion of the site along Atlanta Highway.

## GUARANTY

THIS AGREEMENT, dated as of February 27, 2017, is entered into by and among CARVANA, LLC, an Arizona limited liability company (" Guarantor "), and VERDE INVESTMENTS, INC., an Arizona corporation (" Agent "), as agent on behalf of the lenders (" Lenders ") from time to time party to that certain Master Loan Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the " Loan Agreement ") by and between Carvana Group, LLC, a Delaware limited liability company, as borrower (" Borrower "), Lenders and Agent.

## W I T N E S S E T H:

WHEREAS , pursuant to the Loan Agreement, Lenders have agreed to make certain financial accommodations available to Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS , in order to induce the Lenders to enter into the Loan Agreement and to induce the Lenders to make financial accommodations to Borrower as provided for in the Loan Agreement, Guarantor has agreed to guaranty the Guaranteed Obligations (as hereinafter defined); and

WHEREAS , Guarantor is an Affiliate of Borrower and, as such, will benefit by virtue of the financial accommodations extended to Borrower by the Lenders.

NOW, THEREFORE , for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**1. Definitions**

**1.1 Construction** . All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Loan Agreement. When the terms are used in the plural, the plural forms of the meanings shall apply. Any terms (whether capitalized or lower case) used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein or in the Loan Agreement; provided, that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

**1.2 Definitions** . In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

**Agreement** : this Agreement.

**Guaranteed Obligations:** all liabilities and obligations (i) of Borrower to Agent and Lenders with respect to the Obligations evidenced by the Loan Documents, (ii) of Guarantor to Agent and Lenders with respect to the Obligations evidenced by the Loan Documents, in each

case, however and whenever incurred or evidenced, whether primary, secondary, direct, indirect, absolute, contingent, due or to become due, now existing or hereafter contracted or acquired, and all modifications, extensions and renewals thereof, fees and expenses incurred by Agent or Lenders (including any fees or expenses that accrue after the commencement of an insolvency proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such insolvency proceeding), or otherwise, and any and all expenses (including reasonable counsel fees and expenses) incurred by Agent and Lenders, in enforcing any rights under this Agreement. Without limiting the generality of the foregoing, Guaranteed Obligations shall include all amounts that constitute part of the Guaranteed Obligations and would be owed by Borrower to Agent and Lenders but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other insolvency proceeding or similar proceeding involving Borrower or Guarantor.

## 2. Guaranty

**2.1 Guaranty** . In recognition of the direct and indirect benefits to be received by Guarantor from the proceeds of the Loans, Guarantor hereby unconditionally and irrevocably guarantees as a primary obligor and not merely as a surety the full and prompt payment when due, whether upon maturity, acceleration, or otherwise, of all of the Guaranteed Obligations. If any or all of the Guaranteed Obligations becomes due and payable, Guarantor, unconditionally and irrevocably, and without the need for demand, protest, or any other notice or formality, promises to pay such indebtedness to Agent and Lenders, together with any and all expenses that may be incurred by Agent and Lenders in demanding, enforcing, or collecting any of the Guaranteed Obligations (including the enforcement of any Collateral for such Guaranteed Obligations or any Collateral for the obligations of the Guarantor under this Agreement). If claim is ever made upon Agent or Lenders for repayment or recovery of any amount or amounts received in payment of or on account of any or all of the Guaranteed Obligations and Agent or a Lender repays all or part of said amount by reason of (i) any judgment, decree, or order of any court or administrative body having jurisdiction over such payee or any of its property, or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including Borrower or Guarantor), then and in each such event, Guarantor agrees that any such judgment, decree, order, settlement, or compromise shall be binding upon the Guarantor, notwithstanding any revocation (or purported revocation) of this Agreement or other instrument evidencing any liability of Guarantor, and the Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

**2.2 Bankruptcy** . Additionally, Guarantor unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to Agent and Lenders, whether or not due or payable by Borrower upon the occurrence of any of the events specified in Section 5.1.3 of the Loan Agreement, and irrevocably and unconditionally promises to pay such indebtedness to Agent and Lenders, without the requirement of demand, protest, or any other notice or other formality, in lawful money of the United States.

2

**2.3 Nature of Liability** . The liability of Guarantor hereunder is primary, absolute, and unconditional, and is independent of any security for or other guaranty of the Obligations, whether executed by any other guarantor or by any other Person, and the liability of Guarantor hereunder shall not be affected or impaired by (i) any direction as to application of payment by Borrower or by any other Person, (ii) any payment on, or in reduction of, any such other guaranty or undertaking, (iii) any dissolution, termination, or increase, decrease, or change in personnel by Borrower or Guarantor, (iv) any payment made to Agent or Lenders on account of the Guaranteed Obligations which Lenders repays to Borrower or Guarantor pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (or any settlement or compromise of any claim made in such a proceeding relating to such payment), and Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (v) any action or inaction by Agent or Lenders, or (vi) any invalidity, irregularity, avoidability, or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

**2.4 Continuing Guaranty** . This Agreement includes all present and future Guaranteed Obligations including any under transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guaranteed Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guaranteed Obligations after prior Guaranteed Obligations have been satisfied in whole or in part. To the maximum extent permitted by law, Guarantor hereby waives any right to revoke this Agreement as to future Guaranteed Obligations. If such a revocation is effective notwithstanding the foregoing waiver, Guarantor acknowledges and agrees that (i) no such revocation shall be effective until written notice thereof has been received by Agent and Lenders, (ii) no such revocation shall apply to any Guaranteed Obligations in existence on the date of receipt by Agent and Lenders of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (iii) no such revocation shall apply to any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of Agent and Lenders in existence on the date of such revocation, (iv) no payment by Guarantor, Borrower, or from any other source, prior to the date of Agent and Lenders' receipt of written notice of such revocation shall reduce the maximum obligation of such Guarantor hereunder, and (v) any payment by Borrower or from any source other than such Guarantor subsequent to the date of such revocation shall first be applied to that portion of the Guaranteed Obligations as to which the revocation is effective and which are not, therefore, guaranteed hereunder, and to the extent so applied shall not reduce the maximum obligation of such Guarantor hereunder. This Agreement shall be binding upon Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Agent and Lenders and their successors, transferees, or assigns.

**2.5 Independent Obligations** . The guaranty by Guarantor hereunder is a guaranty of payment and not of collection. The obligations of Guarantor hereunder are independent of the obligations of any other guarantor or Borrower or any other Person and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Borrower or any other Person and whether or not Borrower or any other Person be joined in any such action or actions. Guarantor waives, to the fullest extent permitted

3

by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof. Any payment by Borrower or other circumstance which operates to toll any statute of limitations as to Borrower shall operate to toll the statute of limitations as to Guarantor.

**2.6 Authorization** . Guarantor authorizes Agent and Lenders, without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

2.6.1 change the manner, place, or terms of payment of, or change or extend the time of payment of, renew, increase, accelerate, or alter, any of the Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Agreement shall apply to the Obligations as so changed, extended, renewed, or altered;

2.6.2 take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Obligations or any of the Guaranteed Obligations (including any of the obligations of Guarantor under this Agreement) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof;

2.6.3 exercise or refrain from exercising any rights against Borrower or any other guarantor;

2.6.4 release or substitute any one or more endorsers, guarantors, Borrower, or other obligors;

2.6.5 settle or compromise any of the Obligations, any security therefor, or any liability (including any of those of Guarantor under this Agreement) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of Borrower to its creditors;

2.6.6 apply any sums by whomever paid or however realized to any liability or liabilities of Borrower to Agent and Lenders, regardless of what liability or liabilities of such Borrower remain unpaid; and

2.6.7 consent to or waive any breach of, or any act, omission, or default under, this Agreement, any other Loan Document, or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify, or supplement this Agreement, any other Loan Document, or any of such other instruments or agreements.

**2.7 Reliance** . It is not necessary for Agent or Lenders to inquire into the capacity or powers of Guarantor or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

4

**2.8 Guaranty Absolute** . Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Agent and Lenders with respect thereto. The obligations of Guarantor under this Agreement are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against Guarantor to enforce such obligations, irrespective of whether any action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor is joined in any such action or actions. The liability of Guarantor under this Agreement shall be absolute and unconditional irrespective of, and Guarantor hereby irrevocably waives any defense it may now or hereafter have in any way relating to, any or all of the following:

2.8.1 any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

2.8.2 any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit;

2.8.3 any taking, exchange, release, or non-perfection of any Lien in and to any Collateral, or any taking, release, amendment, waiver of, or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

2.8.4 the existence of any claim, set-off, defense, or other right that Guarantor may have at any time against any Person, including Lenders;

2.8.5 any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor;

2.8.6 any right or defense arising by reason of any claim or defense based upon an election of remedies by Agent or Lenders, including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against Borrower or sureties;

2.8.7 any change, restructuring, or termination of the corporate, limited liability company, or partnership structure or existence of Borrower or any other guarantor; or

2.8.8 any other circumstance that might otherwise constitute a defense available to, or a discharge of, Borrower or any other guarantor or surety.

**2.9 Waivers** .

2.9.1 Guarantor waives any right (except as shall be required by applicable statute and cannot be waived) to require Agent and Lenders to (i) proceed against

5

Borrower or any other guarantor or any other Person, (ii) proceed against or exhaust any security held from Borrower or any other guarantor or any other Person, or (iii) protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against Borrower, any other guarantor, any other Person, or any Collateral, or (iv) pursue any other remedy in Lenders' power whatsoever. Guarantor waives any defense based on or arising out of any defense of Borrower or Guarantor or any other Person, other than payment of the Obligations to the extent of such payment, based on or arising out of the disability of Borrower or Guarantor or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower or any other guarantor other than payment of the Obligations to the extent of such payment.

2.9.2 Agent may, and upon request of a Lender, shall take immediate possession of each, any and all Property or any part thereof (which Guarantor agrees to surrender to Agent) and manage, control or lease the same to such Persons and at such rental as it may deem proper and collect and apply Rents (as defined in the applicable Mortgage) to the payment of: (i) the Obligations, together with all costs and attorneys' fees; (i) all levies, assessments or liens which may be prior in lien or payment to the Obligations, and premiums for insurance, with interest on all such items; and (iii) the cost of all alterations, repairs, replacements and expenses incident to taking and retaining possession of each, any and all Property and the management and operation thereof; all in such order or priority as Agent in its sole discretion may determine. The taking of possession shall not prevent concurrent or later proceedings for the foreclosure sale of each, any and all Property. Agent may, and upon request of a Lender, shall exercise all the remedies of a mortgagee as provided by law and in equity including, without limitation, foreclosure upon the Mortgage and sale of each, any and all Property, or any part of the Property, at public sale conducted according to applicable law (referred to as "Sale") and conduct additional Sales as may be required until all of the Property is sold or the Obligations are satisfied. With respect to any portion of each, any and all Property governed by the UCC, Agent shall have all of the rights and remedies of a secured party thereunder. Agent may elect to foreclose upon any Property that is Fixtures under law applicable to foreclosure of interests in real estate or law applicable to personal property. Agent may, and upon request of a Lender, shall bid at Sale and may accept, as successful bidder, credit of the bid amount against the Obligations as payment of any portion of the purchase price. Agent shall apply the proceeds of Sale, first to any fees or attorney fees permitted Agent by law in connection with Sale, second to expenses of foreclosure, publication, and sale permitted Agent by law in connection with Sale, third to the Obligations, and any remaining proceeds as required by law.

2.9.3 Guarantor waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement, and notices of the existence, creation, or incurring of new or additional Obligations. Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's and Guarantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope, and extent of the risks which Guarantor assumes and incurs hereunder, and agrees that Lenders shall not have any duty to advise Guarantor of information known to them regarding such circumstances or risks.

6

2.9.4 No Guarantor will exercise any rights that it may now or hereafter acquire against Borrower or Guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Agreement, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Agent or Lenders against Borrower, any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from Borrower or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Agreement shall have been paid in full in cash and Lenders' obligation to make Loans under the Loan Agreement has been terminated. If any amount shall be paid to Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Lenders, and shall forthwith be paid to Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of the Loan Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Agreement thereafter arising.

2.9.5 Guarantor represents, warrants, and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

**3. Representations and Warranties of Guarantor**

**3.1 Organization; Powers; Etc** . Guarantor (i) is duly formed, validly existing, and in good standing under the laws of the state of its formation, (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of its properties or the nature of its business requires such qualification, except where failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, and (iii) has all requisite legal power and limited liability company power to own and operate its assets and to carry on its business and to enter into and perform its obligations under this Agreement.

**3.2 Due Authorization; No Violations; Etc** . The execution and delivery by Guarantor of, and the performance by Guarantor of its obligations under, this Agreement have been duly authorized by all requisite limited liability company action and do not and will not (i) violate its articles or certificate of formation or operating agreement, any provision of any law of any Governmental Authority, any agreement or any indenture, mortgage, or other instrument to which Guarantor is a party or by which Guarantor or its properties are bound, or (ii) conflict with, result in a breach of, or constitute with the giving of notice or lapse of time, or both, a default under any such agreement, indenture, mortgage, or other instrument.

**3.3 Binding Agreement** . This Agreement is the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, subject only to limitations on enforceability imposed by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally, and (ii) general equitable principles.

**3.4 Consents and Approvals** . No consent or approval of any Governmental Authority or of any party to any agreement to which Guarantor is a party or by which it or any of its property is bound in connection with the execution and delivery by Guarantor of, and the performance by Guarantor of its obligations under, this Agreement, is necessary, except as such have been obtained and are in full force and effect.

**3.5 Title** . Borrower, Guarantor or a Subsidiary of Borrower has insurable title to the Property. Borrower, Guarantor or a Subsidiary of Borrower owns the Property free and clear of all Liens, except Permitted Liens.

**3.6 Collateral** . Other than Permitted Liens, the security interests granted to Lenders pursuant to any Mortgage, to the extent so pledged, (i) constitute and, as to subsequently acquired property included in the Collateral covered by the Mortgage or security agreement, will constitute, security interests entitled to all of the rights, benefits and priorities provided by the UCC and applicable State law and (ii) are, and as to such subsequently acquired Collateral will be, fully perfected, superior and prior to the rights of all third persons, now existing or hereafter arising.

**3.7 Environmental** . Except as disclosed on Exhibit 3.10 to the Loan Agreement, Guarantor warrants and represents to Lenders, that: (i) Guarantor has undertaken all appropriate inquiry and investigation as to the environmental condition of each Property; (ii) each Property and Guarantor, and any occupants of the Property, are in compliance with and shall continue to be in compliance with all applicable Environmental Laws; (iii) each Property is not and has never been used to generate, handle, treat, store or dispose of Hazardous Materials in excess of De Minimis Amounts or otherwise in violation of any Environmental Laws; (iv) no Hazardous Materials (including asbestos, mold or lead paint in any form) in excess of De Minimis Amounts are located on or under any Property or emanate from any Property or have been disposed of, stored or treated on or about any Property; (v) there are no unregistered underground storage tanks on the Property that are subject to any underground storage tank registration laws or regulations; (vi) no notice has been received with regard to any Hazardous Material on any Property; (vii) no action, investigation or proceeding is pending or to Guarantor's knowledge threatened which seeks to enforce any right or remedy against Guarantor or any Property under any Environmental Law; (viii) neither Guarantor nor any occupant of the Property, is subject to any remedial obligations as to the Property under Environmental Laws relating to Hazardous Materials, health or the environment; (ix) Guarantor has not, nor will Guarantor, release or waive the liability of any previous owner, lessee or operator of the Property or any party who may be potentially responsible for the presence of or removal of Hazardous Material from the Property, nor has it made promises of indemnification regarding Hazardous Material on the Property to any party, except as contained herein and in the Loan Documents;

8

and (x) all licenses, permits and other governmental or regulatory actions necessary for each Property to comply with Environmental Laws shall be obtained and maintained and Guarantor shall assure compliance therewith.

**3.8 <u>Utilities</u>** . With respect to each Property on which Guarantor is currently operating its business:

3.8.1 To Guarantor's knowledge, each Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and drain facilities adequate to service such Property for its intended use;

3.8.2 All public utilities necessary or convenient to the full use and enjoyment of each Property are located either in the public right of way abutting such Property (which are connected so as to serve such Property without passing over other property) or in recorded easements serving such Property; and

3.8.3 To the best of Guarantor's knowledge after due inquiry, all roads necessary for the use of each Property for its current respective purpose have been completed, are physically open and dedicated to public use and have been accepted by all Governmental Authorities.

**3.9 <u>Certificate of Occupancy; Licenses</u>** . With respect to each Property on which Guarantor is currently operating its business:

3.9.1 To Guarantor's knowledge, all material certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the " <u>Licenses</u> ") have been obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture;

3.9.2 Guarantor shall keep and maintain all Licenses necessary for the operation of the Property for its permitted use; and

3.9.3 To Guarantor's knowledge, the use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

**3.10 <u>Flood Zone</u>** . To Guarantor's knowledge, none of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, Guarantor has obtained flood insurance with respect to the Property in an amount that a prudent, similarly situated real property owner would obtain.

**3.11 <u>Physical Condition</u>** . Except as disclosed on <u>Exhibit 3.14</u> to the Loan Agreement, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors,

9

landscaping, irrigation systems and all structural components, is in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Guarantor has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond. The Property is free from material damage caused by fire or other casualty. To Guarantor's knowledge after due inquiry, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in material compliance with all applicable legal requirements.

**3.12 Boundaries** . All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property.

**3.13 Leases** . No Person has any possessory interest in or right to occupy any Property other than the Guarantor, other than pursuant to billboard licenses or easements which do not, individually or in the aggregate, materially adversely affect Borrower's or such Subsidiary's interest in such Property.

**3.14 Fixtures** . Guarantor is the owner of all Fixtures at the Property.

**4. Covenants of Guarantor** . The following covenants shall remain in effect until the payment and performance of all of the Guarantor's obligations to the Lenders:

**4.1 Existence** . Guarantor will do or cause to be done all things necessary to preserve and keep in full force and effect its existence in accordance with its organizational documents, and the material rights, licenses and franchises of Guarantor, provided that Guarantor is not required to preserve any such right, license or franchise if the maintenance or preservation thereof is no longer desirable in the conduct of its business.

**4.2 Liens** . Except for Permitted Liens, Guarantor will not, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on the Property.

**4.3 Maintain Properties** . Guarantor shall maintain, preserve and keep or cause each applicable Tenant to maintain preserve and keep each Property in good repair, working order and condition (ordinary wear and tear excepted), making all replacements, additions and improvements thereto necessary for the proper conduct of its business, unless prohibited by the Loan Documents.

**4.4 Use of Property** . Guarantor shall use and operate, and require its lessees or licensees to use and operate, each Property in compliance with all applicable laws (including, for example, the Americans with Disabilities Act) and ordinances, covenants, and restrictions, and with all applicable requirements of any Lease now or hereafter affecting each Property.

10

Guarantor shall not permit any unlawful use of any Property or any use that may give rise to a claim of forfeiture of any of such Property. Guarantor shall not allow changes in the stated use of any Property from that disclosed to Lenders at the time of execution hereof. Guarantor shall not initiate or acquiesce to a zoning change of any Property without prior notice to, and written consent of, Lenders.

**4.5 <u>Maintenance, Repairs and Alterations</u>** . Without the prior written consent of Lenders (which consent shall not be unreasonably withheld or delayed), Guarantor will not remove, demolish or structurally alter, or permit any Tenant to remove, demolish or structurally alter, any of the buildings or other Improvements on any Property after Guarantor has opened such Property to the public for business (" <u>Alterations</u> "). Guarantor shall promptly notify Lenders in writing of any material loss, damage or adverse condition affecting any Property. Notwithstanding anything to the contrary set forth in the foregoing, Guarantor may make or permit Tenant to make Alterations without the consent of Lenders in the event that such Alterations (i) may be required by laws, ordinances or regulations, (ii) would not have a Material Adverse Effect on a Property, or (iii) are improvement work which are commercially reasonable to facilitate or compliment to the current and future operations on such Property and do not materially and adversely affect the value of such Property.

**4.6 <u>Environmental Condition of Property and Indemnity</u>** . Guarantor agrees to notify Agent and Lenders immediately upon receipt of any citations, warnings, orders, notices, consent agreements, process or claims alleging or relating to violations of any Environmental Laws or to the environmental condition of each Property and shall conduct and complete all investigations and all cleanup actions necessary to comply with the Environmental Laws and to remove, in accordance with Environmental Laws, any Hazardous Material in excess of De Minimis Amounts from each Property. GUARANTOR SHALL DEFEND, AND HOLD AGENT, LENDERS AND ANY PARTICIPANTS, SUCCESSORS OR ASSIGNS TO LENDERS' INTEREST IN THE LOANS, AND ANY OTHER PARTY WHO ACQUIRES ANY PORTION OF THE LOANS AT A FORECLOSURE SALE OR OTHERWISE THROUGH THE EXERCISE OF AGENT'S AND LENDERS' RIGHTS AND REMEDIES UNDER THE LOAN DOCUMENTS, AND ALL DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF ALL OF THE AFOREMENTIONED INDEMNIFIED PARTIES, HARMLESS FROM AND AGAINST ANY AND ALL ACTUAL OR POTENTIAL DAMAGES, PENALTIES, FINES, CLAIMS, SUITS, LIABILITIES, COSTS, JUDGMENTS AND EXPENSES, INCLUDING REASONABLE ATTORNEYS', CONSULTANTS' OR EXPERTS' FEES OF EVERY KIND AND NATURE INCURRED, SUFFERED BY OR ASSERTED AGAINST AGENT OR LENDERS AS A DIRECT OR INDIRECT RESULT OF OR WHICH ARISE OUT OF OR RELATE IN ANY WAY TO: (I) REPRESENTATIONS MADE BY GUARANTOR IN THIS SECTION BEING OR BECOMING UNTRUE IN ANY MATERIAL RESPECT; (II) GUARANTOR'S VIOLATION OF OR FAILURE TO MEET THE REQUIREMENTS OF ANY ENVIRONMENTAL LAWS; OR (III) HAZARDOUS MATERIALS WHICH, WHILE ANY PROPERTY IS SUBJECT TO THE MORTGAGE, EXIST ON ANY PROPERTY IN EXCESS OF DE MINIMIS AMOUNTS OR OTHERWISE IN VIOLATION OF ANY ENVIRONMENTAL LAW. HOWEVER, GUARANTOR'S OBLIGATIONS UNDER THIS SECTION SHALL NOT APPLY TO ANY ACT OF AGENT

11

OR LENDERS WHICH TAKES PLACE AFTER FORECLOSURE OR SATISFACTION OF THE MORTGAGE. THESE INDEMNIFICATION OBLIGATIONS ARE IN ADDITION TO GENERAL INDEMNIFICATION PROVISIONS SET FORTH HEREAFTER. GUARANTOR'S OBLIGATIONS UNDER THIS SECTION SHALL CONTINUE, SURVIVE AND REMAIN IN FULL FORCE AND EFFECT NOTWITHSTANDING THE REPAYMENT OF THE OBLIGATIONS, A FORECLOSURE OF OR EXERCISE OF POWER OF SALE UNDER THIS INSTRUMENT, A DELIVERY OF A DEED IN LIEU OF FORECLOSURE, A CANCELLATION OR TERMINATION OF RECORD OF THIS INSTRUMENT AND THE TRANSFER OF ANY PROPERTY.

**4.7 Further Assurances** . Upon written request of Borrower or Agent, within twenty-five (25) days of such request, Guarantor shall execute and deliver to Agent for recording Mortgages for each Property in form and substance reasonably satisfactory to Guarantor and Lenders. If, after the date of such recording, Guarantor directly or indirectly through a Subsidiarity acquires any real property, upon request of Borrower or any Lender, Guarantor shall, or shall cause such Subsidiary to, execute and deliver to Agent for recording in the applicable county recorder's office, a Mortgage in substantially the form as prior Mortgages, subject to those changes deemed necessary by Agent and its counsel to provide for local law requirements.

## 5. Events of Default; Remedies

**5.1 Default** . An event of default (" Event of Default ") under this Agreement shall exist if there shall be an Event of Default under any of the Loan Documents. If an Event of Default occurs, the Guaranteed Obligations shall be due immediately and payable upon demand and Lenders may exercise any rights and remedies as provided in this Agreement and other Loan Documents, or as provided at law or equity. Guarantor shall pay interest on the Guaranteed Obligations from such Event of Default at the highest rate of interest charged on any of the Guaranteed Obligations.

**5.2 Remedies** . Upon the occurrence and during the continuance of an Event of Default, Agent and Lenders may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies set forth in the Loan Agreement. The rights and remedies shall be cumulative, and not exclusive, except to the extent required by law. The exercise of any right, remedy or attorney-in-fact appointment by Agent of any Lender shall not relieve the Guarantor of any of their obligations hereunder.

**5.3 Injunctive Relief** . Guarantor recognizes that if there is an Event of Default then, depending on the nature of the Event of Default, it may be that no remedy at law will provide complete or adequate relief to Agent or Lenders, and Agent shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. The injunctive relief shall not be a waiver of Lenders' rights to other relief and remedies.

12

6. **Indemnities and Expenses** .

      **6.1 Indemnification** . Guarantor agrees to indemnify Lenders and any other Person acting on behalf of Lenders from and against all claims, lawsuits and liabilities (including reasonable attorneys fees) growing out of or resulting from this Agreement (including enforcement of this Agreement) or any other Loan Document to which such Guarantor is a party, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the party seeking indemnification as determined by a final non-appealable order of a court of competent jurisdiction. This provision shall survive the termination of this Agreement and the Loan Agreement and the repayment of the Guaranteed Obligations.

      **6.2 Fees and Expenses** . Guarantor shall, upon demand, pay to Lenders and any other Person acting on its behalf all the fees and expenses which Lenders or such Person may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (iii) the exercise or enforcement of any of the rights of Lenders hereunder, or (iv) the failure by Guarantor to perform or observe any of the provisions hereof.

7. **General Terms and Conditions** .

      **7.1 Applicable Law** . This Agreement shall be governed and construed in accordance with the laws of the State of Arizona without reference to the choice of law doctrine.

      **7.2 Notices** . Any notice or other communication hereunder to any party hereto shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, telegram, or registered or certified United States mail with return receipt and unless otherwise provided herein shall be deemed to have been given or made when delivered, telegraphed, or, if sent via United States mail, when receipt signed by the receiver, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing):

If to the Guarantor:

      Carvana, LLC
      4020 East Indian School Road
      Phoenix, Arizona 85018
      Attention: General Counsel
      Email: DL-CarvanaLegal@carvana.com

With a copy to:

      Snell & Wilmer L.L.P.
      One Arizona Center
      Phoenix, Arizona 85004
      Attention: Brian William Burke
      Facsimile No.: (602) 382-6070
      Telephone No.: (602) 382-6379
      Email: bburke@swlaw.com

13

If to the Agent:

Verde Investments, Inc.
1720 W. Rio Salado Parkway
Tempe, Arizona 85281
Attention: Steven Johnson

If to the Lenders:      At the address set forth on the signature pages to the Loan Agreement.

**7.3** **Headings** . Section and paragraph headings have been inserted in this Agreement as a matter of convenience for reference only. The section and paragraph headings shall not be used in the interpretation of this Agreement.

**7.4** **Severability** . If any one or more of the provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision or provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

**7.5** **Successors and Assigns** . This Agreement shall be binding upon Guarantor and Agent, and shall inure to the benefit of Guarantor, Agent, Lenders, and their respective successors and assigns.

**7.6** Amendments. This Agreement may not be modified, altered or amended, and no provision hereof may be waived, except by an agreement in writing signed by the Guarantor and Agent and, upon approval of the Lenders. The rights of the Agent and Lenders granted in or referred to in this Agreement shall apply to any modification of or supplement to the Loan Documents.

**7.7** Assignments and Participation. Guarantor may not assign any of their rights hereunder without the prior written consent of Lenders, and any such assignment made without such consent will be void. Each Lender may from time to time, without the consent of Guarantor, sell, transfer, pledge, assign and convey the Note, the Loan, this Agreement and the other Loan Documents (or any interest therein), and delegate any and all of its obligations with respect thereto, and may grant participations in the Loan to another financial institution or other Person on terms and conditions reasonably acceptable to Agent and split the Loan into multiple parts, or the Note into multiple component notes or tranches. In connection with any such sale, transfer, assignment, conveyance or participation, Lenders may, acting for this purpose as an agent of Guarantor, maintain at its offices a register for the recordation of the names and addresses of Lenders' participants or assignees, and the amount and terms of Lenders' sales, transfers, assignments, conveyances and participations including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such sale, transfer, assignment, conveyance or participation. Upon prior notice to Guarantor of such participation or assignment, Guarantor shall thereafter furnish to such participant or assignee any information furnished by Guarantor to Lenders pursuant to the terms of the Loan Documents. Nothing in this Agreement or any other Loan Document shall prohibit Lenders from pledging or assigning this Agreement and Lenders' rights under any of the other Loan Documents, including Collateral therefor, to any Federal Reserve Lenders in accordance with applicable law.

**7.8** Waiver by Guarantor. Except as otherwise provided for in this Agreement, Guarantor waives (i) notice and consummation of presentment, demand, protest, dishonor, intent to accelerate, and acceleration; (ii) all rights to notice and a hearing prior to taking possession or control of, or the Lenders' replevy, attachment or levy upon, the Collateral; (iii) any bond or security in a judicial proceeding as a condition to the Lenders exercising any of the Lenders' remedies; and (iv) the benefit of all valuation, appraisement and exemption laws. The failure or delay of Guarantor to strictly enforce the terms of this Agreement shall not be a waiver of such Guarantor's right to do so.

**7.9** Counterparts; Electronic Execution. This Agreement may be executed in two or more counterparts, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

14

**7.10** Entire Agreement. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**7.11** Survival. The obligations of the Guarantor under 6.1 and 6.2 hereof shall survive the repayment of the Loans and the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

**7.12** LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES. EACH OF THE PARTIES HERETO, INCLUDING LENDER, BY ACCEPTANCE HEREOF, AGREES THAT IN ANY JUDICIAL, MEDIATION OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM (A " <u>DISPUTE</u> ") THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO ANY OTHER PARTY FOR, (A) INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR (B) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY DISPUTE ARISING HEREUNDER, WHETHER THE DISPUTE IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY OR OTHERWISE.

**7.13** <u>**WAIVER OF JURY TRIAL**</u> . TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO, INCLUDING LENDER BY

15

ACCEPTANCE HEREOF, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO EACH PARTY TO ACCEPT THIS AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

Signature pages to follow.

16

**Exhibit 10.26**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first written above.

**GUARANTOR:**                                   **CARVANA, LLC**

                                                 By:     /s/ Paul Breaux
                                                 Name:   Paul Breaux
                                                 Title:  Vice President

**AGENT:**                                       **VERDE INVESTMENTS, INC.**

                                                 By:     /s/ Steven P. Johnson
                                                 Name:   Steven P. Johnson
                                                 Title:  Vice President

**Carvana Co. Sub LLC**

A Delaware Limited Liability Company

FORM OF LIMITED LIABILITY COMPANY AGREEMENT

Dated as of [●], 2017

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CARVANA CO. SUB LLC**
A Delaware Limited Liability Company

THIS LIMITED LIABILITY COMPANY AGREEMENT (this " Agreement ") of Carvana Co. Sub LLC, a Delaware limited liability company (the " Company "), is entered into as of [●], 2017 by Carvana Co., a Delaware corporation (the " Member ").

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the Act by the filing of a Certificate of Formation on March 15, 2017; and

WHEREAS, the Member and the Company desire to enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Name . The name of the limited liability company governed hereby is "Carvana Co. Sub LLC."

2.     Purpose . The Company does and will exist for the object and purpose of engaging in any lawful act or activity for which limited liability companies may be formed under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as in effect from time to time (the " Act "), and engaging in any and all activities necessary or incidental to accomplish the foregoing.

3.     Term . The existence of the Company commenced on the date a Certificate of Formation was filed with the office of the Secretary of State of Delaware under and pursuant to the Act and shall continue until the Company is dissolved pursuant to Section 12 of this Agreement.

4.     Member . As of the date hereof, the Member is the sole member of the Company. The name and mailing address of the Member are as follows:

| Name | Address, Facsimile and E-Mail |
|------|-------------------------------|
| Carvana Co. | 4020 E. Indian School Road<br>Phoenix, Arizona 85018 |

5.     Capitalization . The Member's interest in the Company, including the Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company, and the right to vote, if any, on matters affecting the Company or the Member's interest therein, as provided by the Act or this Agreement, shall be represented by units of limited liability company interest (each, a " Unit "). All Units issued hereunder shall be issued in uncertificated form unless otherwise determined by the Member. The initial Units issued to the Member are set forth on the attached Schedule 1 , which schedule shall be amended from time to time in accordance with the terms of this Agreement.

6.    Additional Interests . The Company shall not have the right to issue or sell to any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, or any other business entity, or a governmental entity or any department, agency, or political subdivision thereof (each, a " Person ") (including the Member) any of the following (" Additional Interests ") without the express written consent of the Member: (a) additional Units or other interests in the Company (including new classes or series thereof having different rights); (b) obligations, evidences of indebtedness or other securities or interests convertible into or exchangeable for Units or other interests in the Company; and (c) rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Units or securities exercisable for or convertible or exchangeable into Units, whether at the time of issuance or upon the passage of time or the occurrence of some future event. The Member shall determine the terms and conditions governing the issuance of such Additional Interests, including the number and designation of such Additional Interests, the preference (with respect to distributions) over any other membership interests and any required contributions in connection therewith. Upon the issuance or sale of Additional Interests, the Member or an authorized Officer shall amend Schedule 1 without further vote, act or consent of any other Person to reflect the issuance or sale of such Additional Interests.

7.    Capital Contributions ; .

    (a) Except to the extent required under the Member's articles of incorporation or as may be necessary for the Company to comply with its obligations under the Transaction Documents (defined below), the Member shall not be obligated to make capital contributions to the Company and the Units shall be nonassessable.

8.    Distributions . Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of the Member's interest in the Company if such distribution would violate Section 18-607 of the Act or any other applicable law.

9.    Member . Except as otherwise required by the Act, the business and affairs of the Company shall be managed by or under the direction of the Member.

    (a)    Powers . The Member shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business, operations and affairs of the Company and to take all such actions as the Member deems necessary or appropriate to accomplish the purpose of the Company as set forth herein. The Member may delegate its duties to officers, agents or employees of the Company as the Member may deem appropriate from time to time. The actions of the Member taken in such capacity and in accordance with this Agreement shall bind the Company. Notwithstanding the foregoing, the Member will use commercially reasonable efforts to cause the Company to comply with the terms and conditions of the (i) Fourth Amended and Restated Limited Liability

2

Company Agreement of Carvana Group, LLC, dated on or about the date hereof and (ii) Exchange Agreement, dated on or about the date hereof, among the Member, the Company and the other parties signatory thereto (together with the Tax Receivable Agreement, dated on or about the date hereof, among the Company, Carvana Group, LLC and the other parties signatory thereto, the " Transaction Documents ").

(b)    Limitations on Authority . The authority of the Member over the conduct of the business affairs of the Company shall be subject only to such limitations as are expressly stated in this Agreement or in the Act.

10.    Officer . The Member may, from time to time, designate one or more persons to be the officers of the Company. Any officers so designated shall have such authority and perform such duties as the Member may, from time to time, delegate to them. The Member may assign titles to particular officers. Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until such officer shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Member.

11.    Tax Elections .

(a)    Tax Year . The fiscal and taxable year of the Company shall be the calendar year, unless otherwise required by the Code.

(b)    Tax Classification . Unless the Member determines otherwise, in its sole discretion, or as otherwise provided by Treasury Regulation Section 301.7701-3, the Company shall be treated as an association taxable as a corporation for federal income tax purposes and, if applicable, state or local income or franchise tax purposes, and the Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. The Company shall make an election on IRS Form 8832 to be classified as an association taxable as a corporation effective as of its date of formation, and any Officer is hereby authorized to make and execute such election (or any further election the Member determines shall be made) on behalf of the Company. Notwithstanding any other provision in this Agreement to the contrary, any provision in this Agreement that is applicable or relevant only to entities that are classified as partnerships for federal income tax purposes shall not have operative effect so long as the Company is not treated as a partnership for federal income tax purposes.

12.    Dissolution; Liquidation .

(a)    Dissolution . The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (a) the written consent of the Member; and (b) the entry of a decree of dissolution under Section 18-802 of the Act.

(b)    Liquidation . Upon the dissolution of the Company, the Member shall wind up the affairs of the Company. Following the payment of or provision for all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Member to set up such cash reserves as may be reasonably necessary for any contingent or unforeseen

3

liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining assets) of the Company shall be distributed, in cash or in kind or partly in each, to the Member in accordance with Section 8 .

13.    Fiduciary Duties .

(a)    Member . The Member shall have the same fiduciary duties to the Company as a member of the board of directors of a Delaware corporation. For the avoidance of doubt, such fiduciary duties shall not be limited by the fact that the Member shall be permitted to take certain actions in its sole or reasonable discretion pursuant to the terms of this Agreement or any agreement entered into in connection herewith. Notwithstanding the foregoing, the Company acknowledges that the Member will act through its board of directors, and that the board of directors will owe fiduciary duties to the Member and its stockholders. The Member will use commercially reasonable and appropriate efforts and means, as determined in good faith by the Member, to minimize any conflict of interest between the Company, on the one hand, and the stockholders of the Member, on the other hand, and to effectuate any transaction that involves or affects any of the Company, the Member and/or the stockholders of the Member in a manner that does not (i) disadvantage the Company of its interests relative to the stockholders of the Member, (ii) advantage the stockholders of the Member relative to the Company or (iii) treat the Company and the stockholders of the Member differently; provided that in the event of a conflict between the interests of the stockholders of the Member and the interests of the Company, the Company agrees that the Member shall discharge its fiduciary duties to the Company by acting in the best interests of the Member's stockholders.

(b)    Officers . Each officer of the Company shall, in his or her capacity as such, and not in any other capacity, have the same fiduciary duties to the Company and Member as an officer of a Delaware corporation.

(c)    Waiver . Any duties and liabilities set forth in this Agreement shall replace those existing at law or in equity and each of the Company and the Member and any other Person bound by this Agreement hereby, to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, waives the right to make any claim, bring any action or seek any recovery based on any duties or liabilities existing at law or in equity other than any such duties and liabilities set forth in this Agreement. Notwithstanding the foregoing, the Member shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

(d)    Survival . The provisions of this Section 13 shall survive any amendment, repeal or termination of this Agreement.

14.    Exculpation and Indemnification .

(a)    To the fullest extent permitted by applicable law, and except as otherwise expressly provided herein, no Indemnitee shall be liable to the Company, the Member or any other Person bound by this Agreement as a result of or arising out of the activities of the Indemnitee on behalf of the Company to the extent within the scope of the authority reasonably believed by such Indemnitee to be conferred on such Indemnitee, except to the extent such Indemnitee would not be entitled to exculpation or indemnification pursuant to the articles of incorporation and bylaws of the Member (as the same may be amended from time to time).

4

(b)    Rights to Indemnification . To the fullest extent permitted by applicable law, each of (a) the Member, (b) the Member's affiliates, (c) the stockholders, members, managers, directors, officers, partners, employees and agents of the Member and its affiliates, and (c) the officers and directors of the Member, the Company and each of their Subsidiaries (each, an " Indemnitee ") shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (collectively, " Obligations "), which at any time may be imposed on, incurred by, or asserted against, the Indemnitee as a result of or arising out of this Agreement, the Member, the Company, their respective assets, businesses or affairs, or the activities of the Indemnitee on behalf of the Member, the Company or any of their Subsidiaries to the extent within the scope of the authority reasonably believed to be conferred on such Indemnitee; provided, however , that, no Indemnitee shall be entitled to indemnification for any such Obligations to the extent such Indemnitee would not be entitled to exculpation or indemnification pursuant to the articles of incorporation and bylaws of the Member (as the same may be amended from time to time). The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* , or its equivalent, shall not, of itself, create a presumption that the Indemnitee was not entitled to indemnification hereunder.

(c)    Expenses . Expenses (including reasonable legal fees and expenses) incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding described in Section 14(b) shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that the Indemnitee is not entitled to be indemnified as provided in Section 14(b) ; provided that such undertaking shall be unsecured and interest free and shall be accepted without regard to an Indemnitee's ability to repay amounts advanced and without regard to an Indemnitee's entitlement to indemnification.

(d)    Nonexclusivity; Savings Clause . The indemnification and advancement of expenses set forth in Section 14(b) and Section 14(c) shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any other agreement, policy of insurance or otherwise. The indemnification and advancement of expenses set forth in Section 14(b) and Section 14(c) shall continue as to an Indemnitee who has ceased to be a named Indemnitee and shall inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of such a Person. If Section 14(a) , Section 14(b) or Section 14(c) or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless exculpate, indemnify and advance expenses to each Indemnitee to the fullest extent permitted by any applicable portion of such sections not so invalidated and to the fullest extent permitted by applicable law. The exculpation, indemnification and advancement of expenses provisions set forth in Section 14(a) , Section 14(b) , and Section 14(c) shall be deemed to be a contract between the Company and each of the persons constituting Indemnitees at any time while such provisions remain in effect,

5

whether or not such Person continues to serve in such capacity and whether or not such Person is a party hereto. In addition, none of <u>Sections 14(a)</u> , <u>14(b)</u> , or <u>14(c)</u> may be retroactively amended to adversely affect the rights of any Indemnitee arising in connection with any acts, omissions, facts or circumstances occurring prior to such amendment.

(e)    <u>Insurance</u> . The Company may purchase and maintain insurance on behalf of the Indemnitees against any liability asserted against them and incurred by them in such capacity, or arising out of their status as Indemnitees, whether or not the Company would have the power to indemnify them against such liability under this <u>Section 14</u> .

15.    Amendments. Except as otherwise provided in this Agreement or in the Act, this Agreement may be amended only by the Member.

16.    Governing Law. This Agreement shall be governed by, and construed under, the internal laws of the State of Delaware, all rights and remedies being governed by said laws.

<div align="center">*   *   *   *   *</div>

<div align="center">6</div>

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date first written above.

MEMBER :

CARVANA CO.

By: _____

Name:

Title:

**[ ● ], LLC**
**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**Schedule 1**

As of January [●] 2017

**Initial Units**

| Member | Units |
|--------|-------|
| Carvana Co. | [1,000] |
| **Total** | **N/A** |

**FIRST AMENDMENT TO FOURTH AMENDED AND RESTATED LEASE**

| | |
|---|---|
| **Amendment Date:** | **March 31, 2017** |
| **Landlord:** | **DriveTime Car Sales Company, LLC,**<br>**An Arizona limited liability company** |
| **Tenant:** | **Carvana, LLC and Carvana Shipping & Delivery, LLC,**<br>**each, an Arizona limited liability company** |
| **Premises:** | **As defined in Section 1.1 to the Lease and as depicted in the applicable Exhibit(s) attached thereto** |

## RECITALS:

The Parties acknowledge that the following recitals are true and correct and are a material part of this First Amendment (this " Amendment ") to Lease:

A. Landlord leases the Premises to Tenant pursuant to that certain Lease Agreement by and between Landlord and Tenant dated November 1, 2014, as amended by that certain Amended and Restated Lease Agreement dated March 15, 2015, as amended by that certain Second Amended and Restated Lease Agreement dated July 1, 2015 (as modified August 17, 2015), as amended by that certain Third Amended and Restated Lease Agreement dated March 18, 2016, as amended by that certain Fourth Amended and Restated Lease Agreement dated February 24, 2017 (the " Lease ").

B. Landlord and Tenant desire to modify the Lease as set forth herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the acknowledgements, representations, warranties, and covenants of the Parties stated herein, Landlord and Tenant hereby mutually agree to amend the Lease as follows:

1. Incorporation of Recitals; Capitalized Terms . The recitals set forth above are deemed to be true and accurate in all respects and are hereby incorporated into this Amendment by this reference. Capitalized terms used in this Amendment shall have the same meanings as ascribed to them in the Lease, unless otherwise defined in this Amendment. For purposes of this Lease and the Amendment, the terms "Inspection Center" and "IRC" shall be deemed equivalent.

2.  <u>Maximum Renewal Hubs</u> . Section 1.2.1 is hereby amended to reflect that Tenant's right to designate up to ten (10) Hubs as Renewal Hubs before December 31, 2018 shall be net of any renewal options exercised by Tenant after the date of this Amendment at any locations leased by Tenant from Landlord that Tenant uses as "Hubs" (but not "Inspection Centers"), whether pursuant to this Lease or pursuant to any other agreement between Tenant and Landlord. By way of example only, in the event Tenant leases locations as "Hubs" from Landlord pursuant to an agreement other than this Lease and exercises renewal options at two (2) such Hubs after the date of this Amendment, Tenant may only designate up to eight (8) Hubs leased under this Lease as Renewal Hubs. In addition, certain locations leased under this Lease and identified on <u>Exhibit A</u> to this Amendment are not eligible to be Renewal Hubs.

3.  <u>Renewals and Early Exit</u> . Section 1.2.3 is hereby deleted in its entirety and replaced with the following (changes in bold):

"1.2.3 Each renewal option **at a Renewal Hub** may be exercised by Tenant by providing written notice to Landlord no less than one month prior to the expiration of the applicable Premises' Lease Term (as the same may have been previously extended), which notice shall specify the Hub for which Tenant is extending the Lease Term, subject to Section 1.2.1.

Tenant acknowledges that Landlord may not own but leases the Premises from another party. Tenant may be a sublessee of the Premises. For Landlord leased properties, notwithstanding anything herein to the contrary, **(a)  Landlord agrees to comply with the terms of any lease of the Premises under which Landlord is a tenant and (b)**  any Lease Term shall always end upon the expiration date of the underlying Landlord lease. In addition, for Landlord leased properties that Tenant uses as Hubs (but expressly excluding the Blue Mound, Texas IRC and the Delanco, NJ IRC), notwithstanding anything herein to the contrary, Landlord shall be entitled to exit any of the leased Premises prior to the expiration date of the underlying Landlord lease ("Early Exit") provided that **(i)  Landlord may only effect an Early Exit at a Premises if Landlord is, effective as of the Early Exit date, terminating its lease of the applicable Premises (or the Property connected thereto) and abandoning its occupancy and operations at such Property and (ii)**  Landlord gives Tenant at least ninety (90) days' prior written notice of such Early Exit. With respect to the Premises, Landlord agrees to provide Tenant with information regarding its lease expirations, Early Exits, and renewals upon request from Tenant, to provide Tenant with copies of any written communication with Landlord's landlord regarding lease expirations, Early Exits and renewals, and to reasonably cooperate with Tenant regarding assuming or renewing such leases **; provided that nothing contained herein will obligate Landlord to renew its lease agreement with Landlord ' s landlord** . For the avoidance of doubt, Landlord does not have the right to perform an Early Exit at either the Blue Mound, Texas Property or the Delanco, NJ Property.

4.  <u>Supplemental Premises</u> . Section 1.13 is hereby amended to reflect that Tenant has identified to Landlord in writing all Supplemental Premises that Tenant requests be made available by Landlord to Tenant, and that Landlord is deemed released from any obligation under this Lease to make commercially reasonable efforts to accommodate Tenant requests for Supplemental Premises.

5.  <u>Tenant's Share of Inspection Center Lines</u> . The following sentences is hereby added to Section 2.1: "Without Tenant's prior written consent, Landlord shall not have any right to reduce Tenant's pro rata share of physical lines (as opposed to line shifts) at the applicable Inspection Centers to less than 2/3 at the Blue Mound Inspection, TX Inspection Center or less than 1/3 at the Delanco, NJ Inspection Center."

6.  <u>Access to Public Rights of Way</u> . Section 2.2 is hereby supplemented to reflect that Landlord and Tenant agree that neither will unreasonably interfere with the other's access between their respectively occupied areas at each Property that is subject to this Lease and public rights of way.

7.  <u>Ancillary Buildings</u> . Section 2.2 is hereby modified to reflect that Tenant may only "construct similar buildings" at Inspection Centers, but shall have no such right at Hubs.

8.  <u>Expansion Area</u> . Section 2.4 is hereby deleted in its entirety.

9.  <u>Branded Items</u> . Section 5.1 is hereby supplemented to reflect that Tenant agrees to make commercially reasonable efforts at Hubs that are retail facilities for Landlord to (i) store vehicle haulers and (ii) display Tenant-branded materials in portions of the Premises that are not readily visible to customer-areas at such facility.

10. <u>Landlord's Default and Tenant's Remedies</u> . The reference in Section 11.4 to "Section 13.4" is hereby replaced with "Section 11.4."

11. <u>Premises Schedule</u> . Subject to Section 1.14 of the Lease, <u>Exhibit A</u> to the Lease is hereby modified as follows:

    i.   By replacing in its entirety the "Tenant's Expected Share of Property" and "Expiration Date (subject to renewals at Renewal Hubs)" columns with the columns provided on <u>Exhibit A</u> attached to this Amendment;

    ii.  By incorporating the additional columns and information described on <u>Exhibit A</u> to this Amendment; and

    iii. To reflect that "Actual Tenant's Share" with respect to Hubs shall be deemed to be the amount provided in the column on <u>Exhibit A</u> with such

name; provided that in the event Tenant's actual pro rata utilization of a Property materially deviates from the percentage reflected in Actual Tenant's Share, the parties shall mutually negotiate in good faith to revise Actual Tenant's Share appropriately.

12. <u>Miscellaneous</u> . Except as modified by this Amendment, the Lease remains in full force and effect and is hereby ratified and affirmed by Landlord and Tenant. This Amendment evidences the entire agreement among the parties regarding the subject matter hereof. In the event of any conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern and control.

13. <u>Counterparts</u> . This Amendment may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all counterparts together shall constitute a single agreement.

***[Signature Page Follows]***

IN WITNESS WHEREOF, the Parties acknowledge their receipt, review, understanding, and acceptance of this Amendment, effective as of the Amendment Date.

**Landlord:**                                         **DriveTime Car Sales Company, LLC**
an Arizona limited liability company

By:    /s/ Jon Ehlinger

Name:  Jon Ehlinger

Title:  Title Manager


**Tenant:**                                           **Carvana, LLC**
an Arizona limited liability company

By:    /s/ Paul Breaux

Name:  Paul Breaux

Title:  Vice President


**Tenant:**                                           **Carvana Shipping & Delivery, LLC**
an Arizona limited liability company

By:    /s/ Paul Breaux

Name:  Paul Breaux

Title:  Vice President

**Exhibit A to Amendment**

**Carvana Hub and Inspection Center Schedule**

| *Market / State | **Incremental Base Rent | Actual Tenant's Share | Expiration Date (subject to renewals at Renewal Hubs) |
|---|---|---|---|
| **Stockbridge Temp Storage** | | 14% | 11/1/2017 |
| **Nashville Hub** | | 2% | 3/31/2019 |
| **Charlotte Hub** | | 2% | 3/31/2019 |
| **Alabama Hub (Birmingham)** | | 5% | 3/31/2019 |
| **Raleigh Hub** | | 4% | 3/31/2019 |
| ***Orlando Hub** | | 4% | 8/1/2017 |
| ***Jacksonville Hub** | | 13% | 3/31/2019 |
| **Tampa Hub** | | 6% | 3/31/2019 |
| **Miami Hub** | | 7% | 3/31/2019 |
| **Richmond Hub** | | 10% | 3/31/2019 |
| **Washington DC Hub** | $ 3,000** | 3% | 3/31/2019 |
| **Columbus Hub** | | 7% | 3/31/2019 |
| **Cincinnati Hub** | | 8% | 3/31/2019 |
| ***Pittsburgh Hub** | | 4% | 3/31/2019 |
| **Memphis Hub** | | 8% | 3/31/2019 |
| **Indianapolis Hub** | | 4.2% | 3/31/2019 |
| **Cleveland Hub** | | 1% | 3/31/2019 |
| | | | |
| **Blue Mound Inspection Center^** | $ 7,291.67** | 66% | 6/30/2024 |
| **Delanco Inspection Center** | | 33% | 6/30/2020 |

\*      Not Available for Extension

\*\*    Incremental Base Rent= Rent due for property added to DT Lease for Carvana's exclusive use.

^     Note: The Blue Mound Inspection Center also includes as Premises a portion of 1051 Cantrell Sansom Road, Fort Worth, TX 76131

-     Tenant's Expected Share shall equal Actual Tenant's Share

-     During each renewal term, Base Rent at each Premises shall increase by two percent (2%) over the previous term.

Exhibit 21.1

## LIST OF SUBSIDIARIES

The following will be the direct and indirect subsidiaries of Carvana Co. at the time of this offering:

| Subsidiary | Jurisdiction of Organization |
| --- | --- |
| Carvana Group, LLC | Delaware |
| Carvana, LLC | Arizona |
| Carvana Shipping and Delivery, LLC | Arizona |
| Carvana Auto Receivables, LLC | Delaware |
| Carvana Auto Receivables 2016-1 LLC | Delaware |

We have issued our report dated February 28, 2017, with respect to the financial statement of Carvana Co. contained in the Registration Statement and Prospectus. We consent to the use of the aforementioned report in the Registration Statement and Prospectus, and to the use of our name as it appears under the caption "Experts".

/s/ GRANT THORNTON LLP

Phoenix, Arizona
March 31, 2017

**Exhibit 23.2**

We have issued our report dated February 28, 2017, with respect to the consolidated financial statements of Carvana Group, LLC contained in the Registration Statement and Prospectus. We consent to the use of the aforementioned report in the Registration Statement and Prospectus, and to the use of our name as it appears under the caption "Experts".

/s/ GRANT THORNTON LLP

Phoenix, Arizona
March 31, 2017

**Exhibit 99.1(a)**

**Consent of Director Nominee**

Carvana Co. (the "Company") is filing a Registration Statement on Form S-1 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the initial public offering ("IPO") of its Class A common stock. In connection with the IPO, I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of the Company in the Registration Statement, as may be amended from time to time. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

/s/ Michael Maroone
Name:   Michael Maroone
Date:    March 31, 2017

**Exhibit 99.1(b)**

**Consent of Director Nominee**

Carvana Co. (the "Company") is filing a Registration Statement on Form S-1 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the initial public offering ("IPO") of its Class A common stock. In connection with the IPO, I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of the Company in the Registration Statement, as may be amended from time to time. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

/s/ Ira Platt
_____
Name:   Ira Platt
Date:    March 31, 2017

**Exhibit 99.1(c)**

**Consent of Director Nominee**

Carvana Co. (the "Company") is filing a Registration Statement on Form S-1 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the initial public offering ("IPO") of its Class A common stock. In connection with the IPO, I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of the Company in the Registration Statement, as may be amended from time to time. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

/s/ Dan Quayle

Name:   Dan Quayle
Date:     March 31, 2017

**Exhibit 99.1(d)**

**Consent of Director Nominee**

Carvana Co. (the "Company") is filing a Registration Statement on Form S-1 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the initial public offering ("IPO") of its Class A common stock. In connection with the IPO, I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of the Company in the Registration Statement, as may be amended from time to time. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

/s/ Greg Sullivan

Name:   Greg Sullivan

Date:   March 31, 2017

# Exhibit 2

**CARVANA**
# Letter to Shareholders
## Q1 2017



June 6, 2017

Dear Shareholders,

We're pleased to write our first shareholder letter as a public company and are excited to share strong first quarter 2017 financials with you today.  During Q1 total retail units sold were up 120%, we grew total revenue 118%, and we increased total gross profit 146% over Q1 2016. We previously reported Q1 flash financial results in an amendment to our S-1 filing on April 17, 2017. This letter provides significantly more detail on these results, as well as guidance on Q2 and the remainder of the year. We look forward to further discussion with you on our conference call at 2 p.m. Pacific Time today.

## Summary of Q1 Results

We achieved significant unit and revenue growth in Q1 2017, coupled with increased total gross profit per unit. All financial comparisons are versus Q1 2016, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 8,334, an increase of 120%
- Revenue totaled $159.1 million, an increase of 118%
- Total gross profit was $9.7 million, an increase of 146%
- Total gross profit per unit was $1,169, an increase of $123 per unit
- Net loss was $38.4 million, an increase of 122%
- EBITDA margin was (21.6%), an improvement from (30.6%) in Q4 2016 and flat versus Q1 2016
- GAAP basic and diluted net loss per Class A unit was $0.44, based on 103.3 million Class A units outstanding
- Adjusted net loss per Class A share, a non-GAAP measure, was $0.28, based on 136.8 million shares of Class A common stock outstanding assuming the exchange of all outstanding LLC Units for shares of Class A common stock and the issuance of 15.0 million shares of Class A common stock pursuant to our initial public offering
- We opened 2 new markets, bringing our end-of-quarter total to 23

## Q2 and Fiscal 2017 Outlook

We anticipate further unit and revenue growth, as well as total gross profit per unit improvement. For Q2 2017, we expect:

- Retail unit sales of 10,000 – 10,500
- Total revenue of $193 million – $203 million
- Total gross profit per unit of $1,375 – $1,425
- EBITDA margin of (18%) – (18.5%)

For fiscal year 2017, we expect:

- Retail unit sales of 44,000 – 46,000, an increase from 18,761 in 2016
- Revenue of $850 million – $910 million, an increase from $365 million in 2016
- Total gross profit per unit of $1,475 – $1,575, an increase from $1,023 in 2016
- EBITDA margin of (14%) – (16%), an improvement from (23.2%) in 2016
- 16 – 18 new market openings, bringing our end-of-year total to 37 – 39

2

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter. Guidance for EBITDA margin excludes depreciation and amortization expense and interest expense. We have not reconciled EBITDA guidance to GAAP net loss as a result of the uncertainty regarding, and the potential variability of, interest expense. Accordingly, a reconciliation of the non-GAAP financial measure guidance to the corresponding GAAP measure is not available without unreasonable effort. Depreciation and amortization expense, which is a component of the reconciliation between EBITDA and GAAP net loss, is expected to be between 1.0% and 1.5% of total revenues for both Q2 2017 and FY 2017.

## Our Vision (Carvana 101)

In this initial shareholder letter, we'd like to briefly outline our opportunity, philosophy, and operating strategy, and how they coalesce into our financial strategy. We believe this will provide valuable context through which our results can be assessed, and we hope making this detail available in a letter will allow us to focus our earnings calls on Q&A. Future letters will not include as much company background information. For additional detail, including a video and slideshow deck, please visit https://investors.carvana.com/events-and-presentations.

One core belief drives our vision for Carvana: we believe that the consistently poor customer experiences in automotive retail are systemic, and we believe those poor customer experiences result from high variable cost structures and a lack of differentiation between traditional dealerships. Our goal has been to offer customers what they want: lower prices, wider selection and simpler experiences, which we believe is enabled by reducing the variable costs associated with selling cars.

To achieve our goal, we've made significant investments in technologies that reduce those variable costs and simplify the customer experience: creating an intuitive, dynamic, and self-service website, designing proprietary photography techniques and merchandising, building out the infrastructure to certify used cars and prepare them for their new owner, and developing unique logistics and fulfillment channels to deliver any car in our nationally-pooled inventory to any customer quickly and efficiently.  Integrating those technology investments allows us to provide customers with the quality of experience that has driven our growth to date, and we expect will continue to drive it in the future.

We believe that customer experience quality is the single most important focal-point for any management team with a long-term view. We believe it is particularly true for us, for the following reasons.

First, the automotive retail industry's reputation suggests there is more opportunity to improve customer experiences than in many other verticals.

Second, our investments in technology build significant leverage into the model in both total gross profit per unit and operating expenses, and great customer experiences are the primary driver of growth. Therefore, customer experience quality is also the primary driver of our unit economics.

As we pursue our vision, we are focused on three primary objectives to drive the long-term success of our business.

3

## Management Objectives

**1. Grow Retail Units and Revenue** by opening new markets and increasing penetration in existing markets. Growth tops our priority list for two reasons: (1) it is driven by customer experience and aligns with our strategic vision; and (2) given the leverage in our business, growth at the top of the income statement leads to higher revenue per unit (less sticker price depreciation), lower cost of sales (better utilization of infrastructure), and lower operating costs (fixed cost leverage).

**2. Increase Total Gross Profit per Unit** through a number of complementary strategies, including reducing average days to sale, leveraging efficiencies in our inspection and reconditioning centers ("IRCs"), utilizing our in-house logistics network to cost-effectively transport vehicles to our IRCs, increasing attachment and profitability of our existing ancillary products, adding desirable, high-margin ancillary products to our checkout flow, and optimizing pricing across all parts of the transaction.

**3. Demonstrate Operating Leverage** by efficiently leveraging our investments in technology, brand, reconditioning, logistics, and corporate infrastructure.

## Objective #1: Grow Retail Units and Revenue

We view retail units sold as the single most important metric in our business. We continued our rapid growth in the first quarter of 2017, with retail units sold increasing to 8,334 from 3,783 in the prior year period, a growth rate of 120%.  Revenue in the first quarter grew to $159.1 million, an increase from $73.0 million in the first quarter of 2016, a growth rate of 118%.

We posted a strong growth quarter despite the impact of delayed IRS refunds compared to prior years. This delay in tax refunds, which many used car buyers use for down payments, dampened unit sales growth in the quarter and also led to additional sticker price depreciation during this period, contributing to slightly lower average selling prices.

We anticipate year-over-year growth accelerating in the second quarter. Our second quarter guidance of 10,000 to 10,500 retail units sold reflects annual growth of 130 to 141%, an increase from 120% year-over-year growth in the first quarter. We also anticipate revenue growth accelerating in Q2, consistent with growth in retail units sold.

### *A Carvana Milestone*

In addition to the broad-based growth we experienced across the business, we're proud to share that in Q1 we also achieved a noteworthy sales milestone. In March, our Atlanta hub became the first of 23 Carvana locations to fulfill more than 1,000 sales in a month. We believe this milestone is clear evidence of a significant number of customers' desire to experience "The New Way to Buy a Car."

4



*Q2 2017E bars represent high and low end points of Quarterly Retail Unit Sales and Quarterly Total Revenue ranges.*

### Markets

We opened two new markets in the first quarter – Virginia Beach and Philadelphia. This brought our total number of markets to 23 on March 31, 2017, an increase from 11 at the end of Q1 2016 and from 21 at the end of 2016. This expansion increases the total percentage of the U.S. population our markets collectively serve to 22.1%, up from 10.9% at the end of Q1 2016 and from 19.7% at the end of 2016. Our goal is to open at least 16 new markets this year and to serve over half the U.S. population by the end of 2018. We believe we can accomplish this due to the headcount- and capital-light nature of our expansion model, a significant competitive advantage. In addition, over time, we believe the dynamics of transitioning to national television advertising will help us more efficiently scale future markets due to increased brand awareness at market launch.



*Footprint as of March 31, 2017*

5

### *Vending Machines*

During Q1 we opened two of our proprietary car vending machines ("VMs") in Austin and San Antonio, bringing our total number of VMs to four. Our VMs provide a unique fulfillment option for consumers and are a key part of our growth strategy. In addition to reducing our variable fulfillment costs, VMs offer customers a fun way to pick up their purchased vehicles while simultaneously creating significant branding and marketing opportunities for us. For example, after each customer's pickup, we e-mail them a multi-angle video capturing their individual visit to the VM that they can share with their friends and family on social media.



Houston, Austin, and San Antonio have already begun to benefit from sales increases following the VM launch, similar to our increased Nashville market penetration following the launch of its VM. We believe the replicability of customers' response to the VM demonstrates the impact the VM has on generating awareness, building our brand, and providing a great customer experience. We believe the VM provides a significant ROI as an incremental investment in a market.

### *Inspection and Reconditioning Centers*

We support our market growth with regional IRCs, where we inspect, recondition, photograph, and store vehicles for sale on our website. We currently operate three IRCs located near Atlanta, Dallas, and Philadelphia, with combined total reconditioning capacity of 150,000 vehicles per year. Construction is in progress at our fourth IRC location near Phoenix. We intend to use this IRC to support growth into markets in the Southwest and southern California in the second half of 2017.

### *Product Development*

Our continued growth has been bolstered by ongoing product development focused on enhancing the customer experience we deliver from website through delivery. As a digital-first business, we can consume and analyze data across more customer and operational touchpoints than traditional dealers, which can enable rapid technology development across the enterprise. We're pleased with our momentum, and want to call out a few key milestones from the first quarter:

- We launched an end-to-end redesign of our search experience, featuring a mobile-first design and a focus on page load speed. Additionally, we added "Suggested Filters" that dynamically process information about each user, combined with the exact result-set being

6

viewed, to power personalized suggestions to quickly find exactly the right car within our entire inventory.

- In Q4 2016, we introduced a mobile-first purchase process. After continued iteration through Q1, nearly 15% of customers now complete their entire vehicle purchase without ever leaving their phones. We're also observing all-time lows in average check-out time, as well as improvements in conversion rates.

- We completed the launch of enhanced RFID-based tracking of our inventory from stock-in through delivery to improve our vehicle transportation network's speed and efficiency.

We believe we have created the first and best end-to-end online automotive retail experience available, and yet we're only scratching the surface of what we can be for our customers.

### *Partnerships*

Our seamless car buying experience is a customer acquisition asset we leverage not only with organic traffic, but also with customers who start their buying journeys elsewhere, and we've invested in partnership-based customer acquisition strategies alongside our organic and paid customer acquisition efforts. We developed a partnership product that enables lenders to refer pre-financed, or "Pre-Fi" customers to us with their pre-approval terms via secure APIs and/or web forms in order to complete the vehicle purchase without the risk of being offered alternative financing at the dealership. Our 19 Pre-Fi partners, 5 of which signed in Q1, now send interested customers to a co-branded shopping portal immediately upon pre-approval. Our Pre-Fi network includes a number of credit unions, which collectively served more than 2 million members at the end of Q1.

### *Marketing*

Increasing brand awareness and market penetration were key marketing initiatives in the first quarter. In Q1 we launched a new integrated advertising campaign led by a 30-second television commercial. Based on the hit song "I Would Do Anything for Love," the commercial follows a customer who would do anything for the car she fell in love with, but she won't do that – waste time at a traditional dealership. This integrated campaign included creative assets across the majority of our core advertising mix – from television, traditional/streaming radio, social, digital, and experiential channels – and was launched across all current markets.



In addition to growing market penetration in existing markets, in Q1 we also began testing national cable television advertising. As our footprint expands, we are reaching an inflection point where it is becoming more efficient for us to purchase television ads on a national level rather than in all of our local markets. As national television advertising becomes efficient, it enables us to reach consumers at a lower cost per impression.

## Objective #2: Increase Total Gross Profit Per Unit

Total gross profit per unit in the first quarter of 2017 was $1,169, reflecting an increase of $123 compared to the first quarter of 2016. As you see in our guidance, we anticipate a further increase in total gross profit per unit in the second quarter.



*Q2 2017E points represent high and low end of total gross profit per unit range.*

We view gross profit per unit holistically and focus on our combined gross profit across all parts of the transaction, including the retail vehicle sale, wholesale sale of trade-ins and other vehicles acquired from customers, financing, and vehicle service contracts ("total gross profit per unit"). We discuss several of these components below.

- **Used vehicle gross profit.** Used vehicle gross profit per unit increased to $555 in the first quarter of 2017 compared to $299 in the first quarter of 2016, an increase of $256 per unit year-over-year. We believe the delay in IRS refunds contributed to higher than historical used vehicle depreciation rates in the early part of the quarter and an increase in average

8

days to sale to 93 days in the first quarter of 2017 from 83 days in the prior year. Despite these headwinds, our used vehicle gross profit per unit increased, driven by enhancements in our proprietary vehicle purchasing and pricing technology, as well as by cost efficiencies in the reconditioning and transportation of our vehicles.

- **Wholesale gross profit.** Wholesale vehicle gross profit divided by retail units sold was $19 in the first quarter of 2017, an increase from a loss of $19 in the first quarter of 2016. The improvement in our wholesale gross profit per retail unit was driven by enhancements in our automated appraisal algorithms and wholesale disposition processes.

- **Other gross profit.** Other gross profit per unit was $596 in the first quarter of 2017, a decline from $766 in the first quarter of 2016. This decline was partially driven by a temporary reduction in financing gross profit per unit that occurred while we transitioned to new finance partners beginning in December 2016. We believe we can increase other gross profit per unit over time through several channels, including increasing attachment of our existing products, optimizing pricing, and adding new, high-margin products to our checkout flow.

## Objective #3: Demonstrate Operating Leverage

In the second half of 2016 we made significant investments in various areas of our business, including launching new markets, building out our logistics network, expanding our engineering, product, and analytics capabilities, and investing in corporate infrastructure to support our growth as a public company.

We began to see leverage from these investments in the first quarter of 2017, when compared to Q4 2016. In total, SG&A as a percent of revenue fell to 28.9% of revenue in Q1 2017, compared to 34.4% in Q4 2016, a reduction of 16.0% quarter-over-quarter. Advertising expense totaled 7.2% of revenue in Q1 2017, a decline of 15.3% quarter-over-quarter. Compensation and other overhead costs declined to 10.2% and 9.0% of revenue, respectively, a reduction of 15.0% and 15.9% from Q4 2016, respectively. Logistics expense as a percent of revenue declined to 1.8% in Q1 2017 from 2.7% in Q4 2016, a decrease of 33.3% driven by flat spend coupled with 48.8% quarter-over-quarter growth in retail units sold. This leverage was driven by increased efficiencies in our logistics network, paired with reduced utilization of third-party transport for customer deliveries. Market occupancy expense as a percent of revenue increased to 0.6% of revenue in Q1 2017, compared to 0.5% in Q4 2016.

Our net loss for the quarter was $38.4 million compared to $17.3 million in the first quarter of 2016. The increase in the net loss reflects the increase in costs resulting from our expansion into new markets and increases in other costs due to the significant growth in our business. In Q1 2017 we operated as an LLC and did not have common shares outstanding. Our GAAP basic and diluted net loss per Class A unit in Q1 2017 was $0.44 based on 103.3 million Class A units outstanding. Adjusted net loss per share, a non-GAAP measure, was $0.28, based on 136.8 million shares of Class A common stock outstanding assuming the exchange of all outstanding LLC Units for shares of Class A common stock and the issuance of 15.0 million shares of Class A common stock pursuant to our initial public offering. A reconciliation of adjusted net loss per share to its most directly comparable GAAP measure is provided in the appendix.

9

We consider EBITDA margin to be an important measure of the leverage in our business. As we grow, we believe our EBITDA margin will improve as we leverage our existing investments. EBITDA margin in the first quarter of 2017 was (21.6%), continuing a trend of improvement, as can be seen below. We anticipate improvements in EBITDA margin to accelerate in the second quarter, based on increasing unit sales, increasing total gross profit per unit, and continued efficiency through our cost structure. A reconciliation of EBITDA, a non-GAAP measure, to net loss, its most directly comparable GAAP measure is provided in the appendix.



*\* Q2 2017E points represents high and low end of EBITDA margin range.*

## Summary

Thank you for taking the time to review this letter. While we are extremely proud of what we have built and the results we have shared with you today, we also believe we are in the very early stages of fulfilling the incredible potential this opportunity provides to deliver better customer experience and create long-term value for shareholders. As we progress toward that potential, we will always seek to clearly and actively communicate with you and plan to make ourselves available at investor conferences and other events. We look forward to your questions on our earnings call, and in the future.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

10

# Appendix

*Conference Call Details*

Carvana will host a conference call today, June 6, 2017 at 2p.m. PDT (5p.m. EDT) to discuss financial results. To participate in the live call, analysts and investors should dial (412) 902-6510. A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will be available on the website for one year. A telephonic replay of the conference call will be available until Tuesday, June 13, 2017, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10107789#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to: (1) our history of losses and ability to maintain profitability in the future, (2) our ability to effectively manage our rapid growth, (3) our limited operating history, (4) the seasonal and other fluctuations in our quarterly operating results, (5) our relationship with DriveTime Automotive Group, Inc.,(6) our management's accounting judgments and estimates, as well as changes to accounting policies, (7) our ability to compete in the highly competitive industry in which we participate, (8) the changes in prices of new and used vehicles, (9) our ability to acquire desirable inventory, (10) our ability to sell our inventory expeditiously, (11) our ability to sell and generate gains on the sale of automotive finance receivables, (12) our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits, (13) our reliance on potentially fraudulent credit data for the automotive finance receivables we sell, (14) our ability to successfully market and brand our business;  (15) our reliance on Internet searches to drive traffic to our website, (16) our ability to comply with the laws and regulations to which we are subject, (17) the changes in the laws and regulations to which we are subject, (18) our ability to comply with the Telephone Consumer Protection Act of 1991;(19) the evolution of regulation of the Internet and eCommerce, (20) our ability to maintain reputational integrity and enhance our brand, (21) our ability to grow complementary product and service offerings, (22) our ability to address the shift to mobile device technology by our customers, (23) risks related to the larger automotive ecosystem, (24) the geographic concentration where we provide services, (25) our ability to raise additional capital, (26) our ability to maintain adequate relationships with the third parties that finance our vehicle inventory purchases, (27) the representations we make in our finance receivables we sell, (28) our

11

reliance on our proprietary credit scoring model in the forecasting of loss rates, (29) our reliance on internal and external logistics to transport our vehicle inventory, (30) the risks associated with the construction and operation of our inspection and reconditioning centers, fulfillment centers and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines, (31) our ability to protect the personal information and other data that we collect, process and store, (32) disruptions in availability and functionality of our website, (33) our ability to protect our intellectual property, technology and confidential information, (34) our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property, (35) our ability to defend against intellectual property disputes, (36) our ability to comply with the terms of open source licenses, (37) conditions affecting automotive manufacturers, including manufacturer recalls, (38) our reliance on third party technology to complete critical business functions, (39) our dependence on key personnel to operate our business, (40) the costs associated with becoming a public company, (41) the diversion of management's attention and other disruptions associated with potential future acquisitions, (42) the legal proceedings to which we may be subject in the ordinary course of business, (43) potential errors in our retail installment contracts with our customers that could render them unenforceable and (44) risks relating to our corporate structure and tax receivable agreements.

 There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ( "GAAP" ) with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

**CARVANA GROUP, LLC AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands, except units)**

| | | March 31, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 8,307 | $ | 39,184 |
| Restricted cash | | 11,488 | | 10,266 |
| Accounts receivable, net | | 8,023 | | 5,692 |
| Finance receivables held for sale, net | | 24,951 | | 24,771 |
| Vehicle inventory | | 199,882 | | 185,506 |
| Other current assets | | 12,522 | | 9,822 |
| Total current assets | | 265,173 | | 275,241 |
| Property and equipment, net | | 80,974 | | 60,592 |
| Other assets | | 2,856 | | — |
| Total assets | $ | 349,003 | $ | 335,833 |
| **LIABILITIES, TEMPORARY EQUITY & MEMBERS' DEFICIT** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities | $ | 29,068 | $ | 28,164 |
| Accounts payable due to related party | | 4,392 | | 1,884 |
| Floor plan facility | | 189,736 | | 165,313 |
| Current portion of notes payable | | 1,363 | | 1,057 |
| Total current liabilities | | 224,559 | | 196,418 |
| Notes payable, excluding current portion | | 5,460 | | 4,404 |
| Verde credit facility | | 20,000 | | — |
| Other liabilities | | 2,254 | | — |
| Total liabilities | | 252,273 | | 200,822 |
| Temporary equity - Class C redeemable preferred units - 43,089,005 units authorized and outstanding as of March 31, 2017 and December 31, 2016 | | 258,233 | | 250,972 |
| Members' equity (deficit): | | | | |
| Class A Units - 103,286,258 units authorized and outstanding as of March 31, 2017 and December 31, 2016 | | 59,654 | | 59,654 |
| Class B Units - 6,727,000 and 6,740,500 units authorized and outstanding as of March 31, 2017 and December 31, 2016, respectively | | — | | — |
| Accumulated deficit | | (221,157) | | (175,615) |
| Total members' deficit | | (161,503) | | (115,961) |
| Total liabilities, temporary equity & members' deficit | $ | 349,003 | $ | 335,833 |

13

**CARVANA GROUP, LLC AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per unit amounts)**

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2017 | | 2016 |
| **Sales and operating revenues:** | | | |
| Used vehicle sales, net | $ | 148,382 | $ 68,495 |
| Wholesale vehicle sales | | 5,726 | 1,559 |
| Other sales and revenues, including $1,758 and $0 from related parties | | 4,965 | 2,897 |
| **Net sales and operating revenues** | | 159,073 | 72,951 |
| Cost of sales | | 149,327 | 68,994 |
| **Gross profit** | | 9,746 | 3,957 |
| Selling, general and administrative expenses | | 45,908 | 20,632 |
| Interest expense, including $141 and $0 to related parties | | 2,059 | 710 |
| Other expense (income), net | | 218 | (60) |
| **Net loss** | $ | (38,439) | $ (17,325) |
| Net loss attributable to Class A Unit holders, basic and diluted | $ | (45,700) | $ (19,350) |
| Net loss per Class A Unit, basic and diluted | $ | (0.44) | $ (0.19) |
| Weighted-average Class A Units outstanding, basic and diluted | | 103,286 | 103,286 |

14

**CARVANA GROUP, LLC AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited) (In thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (38,439) | $ (17,325) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 2,061 | 866 |
| Loss on disposal of property and equipment | 200 | — |
| Provision for bad debt and valuation allowance | 285 | 453 |
| Gain on loan sales | (2,942) | (1,526) |
| Unit-based compensation expense | 158 | 147 |
| Amortization of debt issuance costs | 181 | — |
| Originations of finance receivables | (96,528) | (48,669) |
| Proceeds from sale of finance receivables | 99,144 | 113,238 |
| Proceeds from sale of finance receivables to related party | — | 1,531 |
| Purchase of finance receivables from related party | — | (74,589) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (2,470) | (1,129) |
| Vehicle inventory | (14,044) | (23,098) |
| Other current assets | 292 | (1,196) |
| Other assets | (2,856) | — |
| Accounts payable and accrued liabilities | (2,690) | 7,827 |
| Accounts payable to related party | 2,508 | (14,901) |
| Other liabilities | 2,254 | — |
| **Net cash used in operating activities** | (52,886) | (58,371) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (18,556) | (6,821) |
| Change in restricted cash | (1,222) | (1,825) |
| **Net cash used in investing activities** | (19,778) | (8,646) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from floor plan facility | 147,390 | 95,488 |
| Payments on floor plan facility | (122,967) | (58,998) |
| Proceeds from Verde credit facility | 20,000 | — |
| Payments on notes payable | (260) | (13) |
| Payments of debt issuance costs | — | (228) |
| Payments of debt issuance costs to related parties | (1,000) | — |
| Payments of costs related to planned initial public offering | (1,376) | — |
| **Net cash provided by financing activities** | 41,787 | 36,249 |
| **Net decrease in cash and cash equivalents** | (30,877) | (30,768) |
| Cash and cash equivalents at beginning of period | 39,184 | 43,134 |
| Cash and cash equivalents at end of period | $ 8,307 | $ 12,366 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 6,220 | $ 580 |
| Capital expenditures financed through notes payable | $ 1,622 | $ 891 |
| Costs related to planned initial public offering included in accrued liabilities | $ 1,424 | $ — |
| Accrual of return on Class C redeemable preferred units | $ 7,261 | $ 2,025 |

15

**CARVANA GROUP, LLC AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**
**(In thousands)**

| | | Three Months Ended | | | |
|---|---|---|---|---|---|
| | | March 31, 2017 | | December 31, 2016 | March 31, 2016 |
| Compensation and benefits [1] | $ | 16,303 | $ | 12,830 $ | 6,647 |
| Advertising expense | | 11,439 | | 9,060 | 5,660 |
| Market occupancy costs [2] | | 983 | | 578 | 453 |
| Logistics [3] | | 2,808 | | 2,836 | 1,431 |
| Other overhead costs [4] | | 14,375 | | 11,401 | 6,441 |
| Total | $ | 45,908 | $ | 36,705 $ | 20,632 |

(1)  Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and unit-based compensation, except those related to reconditioning vehicles which are included in cost of sales.

(2)  Market occupancy costs includes rent, utilities, security, repairs and maintenance, and depreciation of buildings and improvements, including vending machines and fulfillment centers, excluding the portion related to reconditioning vehicles which is included in cost of sales, and excluding the portion related to our corporate office which is included in other overhead costs.

(3)  Logistics includes fuel, maintenance, and depreciation related to owning and operating our own transportation fleet, and third party transportation fees.

(4)  Other overhead costs include all other overhead and depreciation expenses such as IT expenses, limited warranty, travel, insurance, bad debt, title and registration, and other administrative expenses.

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**
**(In thousands, except per unit amounts)**

**Adjusted Net Loss to Net Loss and Computation of Adjusted Net Loss per Share**

Adjusted net loss and adjusted net loss per share are supplemental measures of operating performance that do not represent and should not be considered alternatives to net loss and net loss per share, as determined under GAAP. We believe that adjusted net loss and adjusted net loss per share supplement GAAP measures and enable us to more effectively evaluate our performance period-over-period. A reconciliation of adjusted net loss to net loss, the most directly comparable GAAP measure, and the computation of adjusted net loss per share are as follows:

| | Three Months Ended March 31, |
|---|---|
| *(in thousands, except per share amounts)* | **2017** |
| Numerator: | |
| Net loss | $ (38,439) |
| Add: Net loss attributable to non-controlling interests [1] | — |
| Adjusted net loss attributable to Carvana Co. | $ (38,439) |
| | |
| Denominator: | |
| Weighted-average shares of Class A common stock outstanding - basic | — |
| Adjustments: | |
| Assumed exchange of LLC Units for shares of Class A common stock [1] | 121,760 |
| Assumed issuance of Class A common stock in connection with the initial public offering [2] | 15,000 |
| Adjusted shares of Class A common stock outstanding | 136,760 |
| | |
| Adjusted net loss per share | $ (0.28) |

(1) Assumes exchange of all outstanding LLC Units for shares of Class A common stock retroactively applied as if the exchanges had occurred at the beginning of the period presented under the terms of the exchange

(2) Adjustment to give effect to 15,000,000 shares issued in connection with the initial public offering retroactively applied as if the shares had been issued at the beginning of the period.

17

**CARVANA GROUP, LLC AND SUBSIDIARIES**

**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES – (Continued)**
**(Unaudited)**
**(In thousands, except per unit amounts)**

**Net Loss to EBITDA**

EBITDA is a non-GAAP supplemental measure of operating performance that does not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense and depreciation and amortization expense. We use EBITDA to measure the operating performance of our business, excluding specifically identified items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations. EBITDA may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss, the most directly comparable GAAP measure, is as follows:

|  | Three Months Ended | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
|  | March 31, 2017 | December 31, 2016 | March 31, 2016 | 2016 | 2015 | 2014 |
| Net loss | $ (38,439) | $ (35,694) | $ (17,325) | $ (93,112) | $ (36,780) | $ (15,238) |
| Depreciation and amortization expense | 2,061 | 1,638 | 866 | 4,658 | 2,800 | 1,706 |
| Interest expense | 2,059 | 1,356 | 710 | 3,587 | 1,412 | 108 |
| EBITDA | $ (34,319) | $ (32,700) | $ (15,749) | $ (84,867) | $ (32,568) | $ (13,424) |
|  |  |  |  |  |  |  |
| Total revenues | $ 159,073 | $ 106,827 | $ 72,951 | $ 365,148 | $ 130,392 | $ 41,679 |
| EBITDA Margin | (21.6%) | (30.6%) | (21.6%) | (23.2%) | (25.0%) | (32.2%) |

18

