**Exhibit 3**





# LETTER TO
## SHAREHOLDERS

## Q1 | 2019







# CARVANA
## MAY 8, 2019





Dear Shareholders,

We're pleased to announce our first quarter 2019 results. We delivered another exceptional quarter of growth in both units and revenue while simultaneously setting records for GPU and EBITDA margin. In addition, we had our highest ever sequential reduction in EBITDA dollar losses. Our continued investments in further improving our customers' experiences and driving our business's scalability are manifesting in sustained hyper growth, strong execution, and operating leverage and have us positioned for a very exciting 2019.

These results reinforce our confidence in achieving our long term goals of selling 2M+ cars per year and of becoming the most profitable automotive retailer. We are extremely proud of the business we have built over the last 6 years, and are even more excited by the opportunity we see in front of us.

Our market is enormous, we have a highly differentiated offering that our customers love, and we are executing.

## Summary of Q1 2019 Results

Complete financial tables appear at the end of this letter. We will refer to items as "including Gift" that include the impact of the compensation expense related to the 100k Milestone Gift to employees, in accordance with GAAP. We will also refer to several measures presented "ex-Gift," which exclude the impact of the 100k Milestone Gift to employees and are non-GAAP metrics with reconciliations available at the end of this letter. For additional information please refer to the details provided in our Q3 2018 shareholder letter.

Q1 2019: We grew units and revenue by 99% and 110% respectively in Q1 YoY, marking our 21st consecutive quarter of triple-digit revenue growth. Unless otherwise noted, all financial comparisons stated below are versus Q1 2018.

Q1 2019 GAAP Results
- Retail units sold totaled 36,766, an increase of 99%
- Revenue totaled $755.2 million, an increase of 110%
- Total gross profit, including Gift, was $88.5 million, an increase of 159%
- Net loss, including Gift, was $82.6 million, an increase of 57%
- Basic and diluted net loss, including Gift, per Class A share was $0.69 based on 41.4 million shares of Class A common stock outstanding

Q1 2019 Ex-Gift Results, non-GAAP
- Total gross profit per unit ex-Gift was $2,429, an increase of $575
- EBITDA margin ex-Gift was (7.4%), an improvement from (12.4%)
- Adjusted net loss per Class A share, was $0.53, based on 150.3 million adjusted shares of Class A common stock outstanding, assuming the exchange of all outstanding LLC Units for shares of Class A common stock

Q1 2019 Other Results
- Opened 24 new markets and a vending machine in Pittsburgh, bringing our end-of-quarter totals to 109 and 16, respectively
- Completed our first auto loan securitization, marking a major step forward in monetizing our finance platform. See investors.carvana.com/resources/investor-materials for a more detailed 101 on the transaction and our strategy going forward
- Completed the sale and leaseback of our Indianapolis inspection and reconditioning center (IRC), continuing the efficient financing of our balance sheet
- Began production at our 6th IRC outside of Cleveland, Ohio

## Recent Events

We would also like to highlight several recent notable accomplishments:

- Thus far in Q2 we opened 15 markets and a vending machine in Chicago bringing our totals as of May 8, 2019, to 124 and 17 respectively
- We elected a new member to our Board—Neha Parikh, President of Hotwire—who brings a wealth of expertise in online customer experience and customer acquisition
- Began production at our 7th IRC outside of Nashville, Tennessee

## 2019 Outlook

Following solid execution in the first quarter, we are increasing our guidance for units and revenue and reiterating guidance for GPU and EBITDA margin. After a strong start to market launches, we are raising the low end of our market openings range for the year.

Our FY 2019 guidance is as follows. All financial comparisons stated below are versus FY 2018, unless otherwise noted.

- Retail unit sales of 165,000 – 170,000, an increase of 75% – 81%
- Revenue of $3.5 billion – $3.6 billion, an increase of 79% – 84%
- Total gross profit per unit ex-Gift of $2,450 – $2,650, an increase from $2,133
- EBITDA margin ex-Gift of (5.5%) – (3.5%), an improvement from (9.9%)
- 55-60 market openings, an increase from 41 market openings in 2018, bringing our end-of-year total to 140-145 markets and our total U.S. population coverage to at least 65%

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter. Guidance for GPU ex-Gift excludes compensation expense from the 100k Milestone Gift that is capitalized to inventory and ultimately reflected in cost of sales. We have not reconciled GPU ex-Gift guidance to GAAP gross profit as a result of the uncertainty regarding, and the potential variability of, the stock price of our class A common shares, which will directly impact the amount of expense ultimately incurred as a result of the 100k Milestone Gift granted during FY 2019. Guidance for EBITDA margin ex-Gift excludes depreciation and amortization expense, interest expense, and expenses related to the 100k Milestone Gift. We have not reconciled EBITDA margin ex-Gift guidance to GAAP net loss as a result of the uncertainty regarding, and the potential variability of, interest expense and expenses related to the 100k Milestone Gift. Accordingly, reconciliations of the non-GAAP financial measure guidance above to the corresponding GAAP measures are not available without unreasonable effort. Depreciation and amortization expense, which is a component of the reconciliation between EBITDA margin and GAAP net loss, is expected to be between 1.0% and 1.4% of total revenues for FY 2019.

## Expansion

We launched 24 new markets in the first quarter to reach a total of 109 as of March 31, 2019. This increases the total percentage of the U.S. population our markets collectively serve to 62.3%, up from 58.6% at the end of FY 2018. We also opened our 16th vending machine in Pittsburgh in Q1, and 17th in Chicago in April. We now target opening 55-60 markets this year covering at least 65% of the population by year end.



Carvana's New Car Vending Machine in Pittsburgh, Pennsylvania

After launching Indianapolis late last year and ramping production at two additional IRCs, we are now producing inventory at seven IRCs. We also remain on track to begin construction of our 8th IRC this year.

Our IRC build-out will continue to ramp both by expanding existing facilities (adding shifts and lines) and adding new facilities. These additional locations will benefit our customers by moving inventory closer to them on average, which reduces delivery time and delivery expense, thereby increasing conversion all else being equal. However we expect average delivery distances to remain at similar levels in the near term, until the IRC network further expands, and then to come down significantly over time.

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with additional details on our IRCs, please see: investor materials.

### CARVANA MARKETS AT END OF PERIOD



*2019E bar represents end-of-year total market guidance.

3



*Represents facilities and markets as of May 8, 2019

## Investing for Scalability

As we progress toward selling 2M+ vehicles annually we are focused on further simplifying our customer experiences while simultaneously building a more scalable and efficient business. This means investing in data and technology for greater customer self-service, automating more manual work throughout our supply chain and advocate organizations, and providing better software tools for our advocate teams to help them deliver their amazing service even more efficiently.

Though in its early stages, one notable initiative is integrating technology we acquired from Propel AI, and more broadly improving how we communicate with our customers through the next generation of our communication platform. This includes AI-powered chat that seamlessly interfaces with our advocates to give our customers efficient, high quality, rapid responses to their questions while maintaining the human touch when necessary, and personalized adaptive content including intuitive videos and targeted FAQs that we can put in front of customers before they even ask us a question. Initial deployments of many of these features are being actively tested to randomly selected portions of customers on our website today with encouraging early results.

Additionally, we are beginning to reap the benefits of previous investments in improving customer document verifications and logistics network scheduling. These proprietary systems help us deliver vehicles to customers as quickly as possible while optimizing our utilization of our advocates and logistics assets.

All of these efforts, and many others like them are constantly being developed, deployed, and iterated upon as our team relentlessly focuses on the twin goals of delivering incredible customer experiences and maximizing efficiency.

## Management Objectives

As discussed in previous shareholder letters, our management team focuses on delivering an exceptional and unparalleled customer experience while simultaneously growing the business rapidly and achieving our financial objectives. We firmly believe wowing the customer is the core of our model and drives all other metrics. To realize our long-term vision, our three primary financial objectives remain unchanged: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

Below we present our long-term financial model that we introduced at our Analyst Day on November 29, 2018. We believe this is the appropriate frame through which to evaluate our results and progress towards each of our financial objectives.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | Q1 2019 | Long Term Target |
|---|---|---|---|---|---|
| *YoY Revenue Growth* | 180% | 135% | 128% | 110% | – |
| *Gross Margin (incl. Gift / ex. Gift)* | 5.3% | 7.9% | 10.1% / 10.3% | 11.7% / 11.8% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A (incl. Gift / ex. Gift) | 21.1% | 18.2% | 14.9% / 14.5% | 14.3% / 14.0% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.1% | 0.5 – 1.0% |
| *SG&A Total as % of Revenue (incl. Gift / ex. Gift)* | 29.8% | 26.0% | 21.7% / 21.3% | 20.6% / 20.3% | 6 – 8% |
| Net Loss Margin (incl. Gift / ex. Gift) | (25.5)% | (19.1)% | (13.0)% / (12.4)% | (10.9)% / (10.5)% | – |
| **EBITDA Margin (ex. Gift)** | (23.2%) | (16.9%) | (9.9%) | (7.4%) | 8 – 13.5% |

Note: Figures for FY2016-FY2018 and Q1 2019 are actual as reported in our financial statements.

## Objective #1: Grow Retail Units and Revenue

We grew units and revenue significantly again in Q1. Retail units sold increased to 36,766, up 99% from 18,464 in the prior year period. Revenue in Q1 grew to $755.2 million, up 110% from $360.4 million in Q1 2018. Our growth in the first quarter was broad-based, driven by gains across our markets nationwide. The 2019 cohort continued the historical trend of new cohorts ramping faster than previous cohorts.



**QUARTERLY RETAIL UNIT SALES**

### Buying Cars from Customers

We sourced substantially more cars from our customers in Q1 than in any previous quarter, aided by our first TV advertising campaign that highlights Carvana's offer of buying cars from customers. We are actively enhancing and developing the customer experience for selling a vehicle to Carvana and believe this remains one of our business's largest opportunities.

Total vehicles acquired from customers grew by 232% in Q1 2019 vs. Q1 2018, meaning that we bought 40% as many cars from our customers as we sold in the first quarter, up from 24% in Q1 2018 and 36% last quarter. The industry leader in our market buys approximately 100% as many cars as they sell, illustrating the huge potential in this business. Wholesale units sold, which are primarily sourced from customers, increased by 186% to 6,701 in Q1 2019 from 2,342 in Q1 2018. Retail units sold sourced from customers increased to about 14% from about 6% in Q1 2018. This was lower than the 17% in Q4 due to the expected rapid growth in auction-sourced inventory in preparation for Q1 2019.

These powerful results reflect the quality of the customer experience we offer, which to date has resulted in even higher NPS scores than our retail business.

## Objective #2: Increase Total Gross Profit Per Unit

We achieved another strong quarter of total GPU growth in Q1, demonstrating additional progress toward our $3,000 midterm goal. Items "including Gift" reflect the impact of the compensation expense related to the 100k Milestone Gift to employees, in accordance with GAAP. Ex-Gift items exclude the compensation expense impact of the 100k Milestone Gift to employees and are non-GAAP metrics.

For Q1 2019:

- Total
  - Total GPU (incl. Gift): $2,408 vs. $1,854 in Q1 2018
  - Total GPU ex-Gift: $2,429 vs. $1,854 in Q1 2018
- Retail
  - Retail GPU (incl. Gift): $1,282 vs. $902 in Q1 2018
  - Retail GPU ex-Gift: $1,302 vs. $902 in Q1 2018
  - Gains in Retail GPU were primarily driven by market conditions, as the prior first quarter was impacted by Hurricane Harvey, incremental shipping revenue, and a reduction in average days to sale to 63 from 70
- Wholesale
  - Wholesale GPU (incl. Gift) was $83 vs. $73 in Q1 2018
  - Wholesale GPU ex-Gift was $83 vs. $73 in Q1 2018
  - Changes in Wholesale GPU were driven by higher wholesale unit volume (+186%) relative to retail units (+99%), partially offset by lower gross profit per wholesale unit sold ($453 incl. Gift and $456 ex-Gift vs. $579 in Q1 2018)
- Other
  - Other GPU was $1,044 vs. $879 in Q1 2018
  - Gains in Other GPU were driven by improvement in loan monetization from our inaugural auto loan securitization. Total finance GPU, including gain on loan sale and interest income net of securitization fees and expenses, was $625 in Q1 compared to $561 in Q1 2018 (see the 101 for more detail). Additional GPU gains were primarily driven by higher attachment of VSC and GAP waiver coverage.



*2019E lines represent high and low end points of annual GPU ex-Gift guidance range.

## Objective #3: Demonstrate Operating Leverage

We demonstrated meaningful operating leverage again in Q1 2019 as Net Loss margin incl. Gift levered by 3.7% and EBITDA margin ex-Gift levered by 4.9%, reaching record levels for both metrics. We expect to make additional progress toward our long-term SG&A goals over the remainder of 2019.

For Q1 2019:

- Total SG&A levered by 2.5% incl. Gift and 2.8% ex-Gift, primarily reflecting increased cohort advertising leverage and benefits from scale
- Compensation and benefits levered by 0.2% incl. Gift and 0.5% ex-Gift, primarily reflecting benefits from scale
- Advertising levered by 1.7%, reflecting leverage in existing markets, shifting mix towards older markets, and benefits of lower initial CACs in the 2019 cohort
- Logistics and market occupancy levered by 0.2%, reflecting improving efficiency and volumes through our fulfillment network
- Other SG&A levered by 0.4%, primarily reflecting benefits from scale

For the full year 2019, we expect to significantly improve our EBITDA margin ex-Gift as the underlying leverage in our cohorts continues to become more visible at the corporate level.



*2019E lines represent high and low end points of annual EBITDA Margin ex-Gift guidance range.

## Summary

We had a tremendous first quarter in just about every aspect of the business. Even more importantly, and a little less apparent in the numbers, is how well the business is currently running. Across Carvana, we have more high quality initiatives underway that are making real, tangible progress, run by passionate leaders and highly motivated teams than ever before. Our growth continues to make clear the size of our opportunity, the speed of customer preference migration in our direction, the quality of our execution, and the large and growing difference in experience quality that we offer relative to anything else available. We are also still very early in the game. Over the last 3 years, we have taken our unaided awareness in our oldest market of Atlanta from 2% to 7% suggesting both meaningful progress and significant head room. Our eyes are firmly fixed on our goals of selling 2M+ cars per year and of being the most profitable automotive retailer, and we are systematically marching towards those goals.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

# Appendix

*Conference Call Details*

Carvana will host a conference call today, May 8, 2019, at 5:30 p.m. EDT (2:30 p.m. PDT) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until May 15, 2019, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10130283#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2018 and our Quarterly Report on Form 10-Q for Q1 2019.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | March 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 85,321 | $ 78,861 |
| Restricted cash | 21,734 | 9,848 |
| Accounts receivable, net | 38,179 | 33,120 |
| Finance receivables held for sale, net | 151,186 | 105,200 |
| Vehicle inventory | 525,694 | 412,243 |
| Beneficial interests in securitizations | 19,531 | — |
| Other current assets | 35,141 | 23,582 |
| Total current assets | 876,786 | 662,854 |
| Property and equipment, net | 353,486 | 296,839 |
| Operating lease right-of-use assets, including $42,779 and $0, respectively from leases with related parties | 77,754 | — |
| Intangible assets, net | 8,496 | 8,869 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $2,492 and $1,895, respectively, due from related parties | 12,526 | 13,098 |
| Total assets | $ 1,338,401 | $ 991,013 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 165,024 | $ 117,524 |
| Accounts payable due to related party | 5,739 | 3,891 |
| Floor plan facility | 434,777 | 196,963 |
| Current portion of other long-term debt | 15,331 | 11,133 |
| Other current liabilities, including $4,519 and $0, respectively from leases with related parties | 9,159 | — |
| Total current liabilities | 630,030 | 329,511 |
| Senior unsecured notes [1] | 343,251 | 342,869 |
| Other long-term debt, excluding current portion | 135,788 | 82,480 |
| Operating lease liabilities, including $41,030 and $0, respectively from leases with related parties, excluding current portion | 74,641 | — |
| Other liabilities | 1,844 | 8,725 |
| Total liabilities | 1,185,554 | 763,585 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2019 and December 31, 2018 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 43,243 and 41,208 shares issued and outstanding as of March 31, 2019 and December 31, 2018, respectively | 43 | 41 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 102,352 and 104,336 shares issued and outstanding as of March 31, 2019 and December 31, 2018, respectively | 102 | 104 |
| Additional paid-in capital | 157,830 | 147,916 |
| Accumulated deficit | (103,202) | (74,653) |
| Total stockholders' equity attributable to Carvana Co. | 54,773 | 73,408 |
| Non-controlling interests | 98,074 | 154,020 |
| Total stockholders' equity | 152,847 | 227,428 |
| Total liabilities & stockholders' equity | $ 1,338,401 | $ 991,013 |

(1) As of both March 31, 2019 and December 31, 2018, a related party held $15.0 million of the senior unsecured notes.

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Sales and operating revenues:** | | |
| Used vehicle sales, net | $ 683,829 | $ 334,056 |
| Wholesale vehicle sales | 33,030 | 10,133 |
| Other sales and revenues, including $10,573 and $4,111, respectively, from related parties | 38,375 | 16,233 |
| **Net sales and operating revenues** | 755,234 | 360,422 |
| Cost of sales, including $1,273 and $1,047, respectively, to related parties | 666,702 | 326,188 |
| **Gross profit** | 88,532 | 34,234 |
| Selling, general and administrative expenses, including $2,735 and $1,819, respectively, to related parties | 155,241 | 83,186 |
| Interest expense, including $333 and $0, respectively, to related parties | 15,648 | 3,541 |
| Other expense, net | 239 | 179 |
| **Net loss before income taxes** | (82,596) | (52,672) |
| Income tax provision | — | — |
| **Net loss** | (82,596) | (52,672) |
| Net loss attributable to non-controlling interests | (54,047) | (45,629) |
| **Net loss attributable to Carvana Co.** | (28,549) | (7,043) |
| Dividends on Class A convertible preferred stock | — | (1,345) |
| Accretion of beneficial conversion feature on Class A convertible preferred stock | — | (1,380) |
| **Net loss attributable to Class A common stockholders** | $ (28,549) | $ (9,768) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.69) | $ (0.53) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 41,352 | 18,346 |

(1)  Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (82,596) | $ (52,672) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 7,943 | 4,605 |
| Loss on disposal of property and equipment | 49 | 103 |
| Provision for bad debt and valuation allowance | 1,385 | 597 |
| Gain on loan sales | (19,200) | (9,891) |
| Equity-based compensation expense | 7,711 | 1,510 |
| Amortization and write-off of debt issuance costs | 979 | 323 |
| Originations of finance receivables | (532,066) | (228,595) |
| Principal payments received on finance receivables held for sale | 11,227 | — |
| Proceeds from sale of finance receivables, net | 601,557 | 220,357 |
| Purchase of finance receivables | (127,710) | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | (5,435) | (6,969) |
| Vehicle inventory | (112,536) | (72,030) |
| Other current assets | (13,111) | (2,998) |
| Other assets | 238 | 297 |
| Operating lease right-of-use assets | (1,262) | — |
| Accounts payable and accrued liabilities | 46,784 | 12,957 |
| Accounts payable to related party | 1,848 | 800 |
| Operating lease liabilities | 68 | — |
| Other liabilities | (382) | 157 |
| Net cash used in operating activities | (214,509) | (131,449) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $4,257 and $0 from related parties | (43,199) | (28,011) |
| Net cash used in investing activities | (43,199) | (28,011) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from floor plan facility | 807,890 | 393,119 |
| Payments on floor plan facility | (570,076) | (293,378) |
| Proceeds from long-term debt | 41,817 | 15,608 |
| Payments on long-term debt | (3,003) | (1,309) |
| Payments of debt issuance costs | (567) | (141) |
| Proceeds from exercise of stock options | 426 | 63 |
| Tax withholdings related to restricted stock awards | (433) | (160) |
| Dividends paid | — | (1,528) |
| Net proceeds from issuance of Class A Convertible Preferred Stock | — | (12) |
| Net cash provided by financing activities | 276,054 | 112,262 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 18,346 | (47,198) |
| Cash, cash equivalents and restricted cash at beginning of period | 88,709 | 187,123 |
| Cash, cash equivalents and restricted cash at end of period | $ 107,055 | $ 139,925 |

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

*Adjusted Net Loss and Adjusted Net Loss per Share*

Adjusted net loss and adjusted net loss per share are supplemental measures of operating performance that do not represent and should not be considered alternatives to net loss and net loss per share, as determined under GAAP. We believe that by assuming the full exchange of all outstanding LLC Units and excluding the expense associated with the 100k Milestone Gift for the reasons described above, adjusted net loss and adjusted net loss per share supplement GAAP measures and enable us and our investors to more effectively evaluate our performance period-over-period and relative to our competitors that have different organizational and tax structures because the assumption eliminates the effect of any changes in net income attributable to Carvana Co. driven by increases in our ownership of Carvana Group, LLC as well as the expense associated with the 100k Milestone Gift, which are unrelated to our operating performance. A reconciliation of adjusted net loss to net loss attributable to Carvana Co., the most directly comparable GAAP measure, and the computation of adjusted net loss per share are as follows (in thousands, except per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Numerator: | | |
| Net loss attributable to Carvana Co. | $ (28,549) | $ (7,043) |
| Net loss attributable to non-controlling interests | (54,047) | (45,629) |
| Dividends on Class A convertible preferred stock | — | (1,345) |
| Accretion of beneficial conversion feature on Class A convertible preferred stock | — | (1,380) |
| 100k Milestone Gift | 2,974 | — |
| Adjusted net loss attributable to Carvana Co. Class A common stock | $ (79,622) | $ (55,397) |
| | | |
| Denominator: | | |
| Weighted-average shares of Class A common stock outstanding[1] | 41,352 | 18,346 |
| Adjustments: | | |
| Weighted-average assumed exchange of LLC Units for shares of Class A common stock | 108,974 | 118,858 |
| Adjusted shares of Class A common stock outstanding | 150,326 | 137,204 |
| Adjusted net loss per share | $ (0.53) | $ (0.40) |

(1)  Excludes approximately 0.7 million nonvested restricted stock awards and units and 1.3 million vested and nonvested stock options outstanding at March 31, 2019, because they were determined to be anti-dilutive. Excludes approximately 0.4 million nonvested restricted stock awards and units and 0.8 million vested and nonvested stock options outstanding at March 31, 2018, because they were determined to be anti-dilutive.

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

*Gross Profit ex-Gift and Gross Profit per Unit ex-Gift*

Gross Profit ex-Gift and Gross Profit per Unit ex-Gift are non-GAAP supplemental measures of operating performance that do not represent and should not be considered an alternative to gross profit, as determined by GAAP. Gross Profit ex-Gift is defined as gross profit before compensation expense related to the 100k Milestone Gift included in cost of sales. Gross Profit per Unit ex-Gift is Gross Profit ex-Gift divided by units sold. We use Gross Profit ex-Gift to measure the operating performance of our business and Gross Profit per Unit ex-Gift to measure our operating performance relative to our units sold. We believe that Gross Profit ex-Gift and Gross Profit per Unit ex-Gift are useful measures to us and to our investors because they exclude the expense associated with the 100k Milestone Gift recognized in cost of sales. We expect the 100k Milestone Gift to be a one-time award program for which we will recognize varying amounts of expense through the first half of 2020, and therefore we believe the related expense does not reflect our core operations, is not included in our past operations, and may not be indicative of our future operations. Additionally, the shares issued to settle the 100k Milestone Gift are offset by share contributions from Mr. Garcia to the Company, and therefore we expect the impact on shares outstanding to be zero. We believe that excluding it enables us to more effectively evaluate our performance period-over-period and relative to our competitors. For all periods prior to the three months ended September 30, 2018, gross profit ex-Gift equals gross profit. A reconciliation of the Gross Profit ex-Gift amounts to each corresponding gross profit amount, which are the most directly comparable GAAP measures and include expenses attributable to the 100k Milestone Gift, and calculations of each Gross Profit per Unit ex-Gift amount are as follows (dollars in thousands, except per unit amounts):

| | **Three Months Ended March 31, 2019** | | | |
| --- | --- | --- | --- | --- |
| | **GAAP** | **Less: Gift** | **ex-Gift** | **Gross Profit per Unit ex-Gift** |
| Used vehicle unit sales | 36,766 | | | |
| Wholesale vehicle unit sales | 6,701 | | | |
| | | | | |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 683,829 | $ — | $ 683,829 | |
| Wholesale vehicle sales | 33,030 | — | 33,030 | |
| Other sales and revenues, including $10,573 from related parties | 38,375 | — | 38,375 | |
| **Net sales and operating revenues** | 755,234 | — | 755,234 | |
| **Cost of sales, including $1,273 to related parties** | 666,702 | (786) | 665,916 | |
| Used vehicle gross profit [1] | 47,122 | (764) | 47,886 | $ 1,302 |
| Wholesale vehicle gross profit [2] | 3,035 | (22) | 3,057 | $ 456 |
| Other gross profit [1] | 38,375 | — | 38,375 | $ 1,044 |
| **Total gross profit [1]** | 88,532 | (786) | 89,318 | $ 2,429 |
| Selling, general and administrative expenses, including $2,735 to related parties | 155,241 | 2,188 | 153,053 | |
| Interest expense, including $333 to related parties | 15,648 | — | 15,648 | |
| Other expense, net | 239 | — | 239 | |
| **Net loss before income taxes** | (82,596) | (2,974) | (79,622) | |
| Income tax provision | — | — | — | |
| **Net loss** | $ (82,596) | $ (2,974) | $ (79,622) | |

(1)   Used vehicle, other and total gross profit per unit amounts are per used vehicle sold.
(2)   Wholesale vehicle gross profit per unit amounts are per wholesale vehicle sold.

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

| | Year Ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | GAAP | Less: Gift | ex-Gift | Gross Profit per Unit ex-Gift |
| Used vehicle unit sales | 94,108 | | | |
| Wholesale vehicle unit sales | 15,125 | | | |
| | | | | |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 1,785,045 | $ — | $ 1,785,045 | |
| Wholesale vehicle sales | 73,584 | — | 73,584 | |
| Other sales and revenues, including $25,572 from related parties | 96,838 | — | 96,838 | |
| **Net sales and operating revenues** | 1,955,467 | — | 1,955,467 | |
| **Cost of sales** | 1,758,758 | (4,003) | 1,762,761 | |
| Used vehicle gross profit [(1)] | 94,319 | (3,870) | 98,189 | $ 1,043 |
| Wholesale vehicle gross profit [(2)] | 5,552 | (133) | 5,685 | $ 376 |
| Other gross profit [(1)] | 96,838 | — | 96,838 | $ 1,029 |
| **Total gross profit [(1)]** | 196,709 | (4,003) | 200,712 | $ 2,133 |
| Selling, general and administrative expenses | 425,258 | 7,818 | 417,440 | |
| Interest expense, including $370 to related parties | 25,018 | — | 25,018 | |
| Other expense, net | 1,178 | — | 1,178 | |
| **Net loss before income taxes** | (254,745) | (11,821) | (242,924) | |
| Income tax provision | — | — | — | |
| **Net loss** | $ (254,745) | $ (11,821) | $ (242,924) | |

(1)   Used vehicle, other and total gross profit per unit amounts are per used vehicle sold.
(2)   Wholesale vehicle gross profit per unit amounts are per wholesale vehicle sold.

15

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

### *EBITDA ex-Gift and EBITDA Margin ex-Gift*

EBITDA ex-Gift and EBITDA Margin ex-Gift are non-GAAP supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA ex-Gift is defined as net loss before interest expense, income tax expense, depreciation and amortization expense, and the expense related to the 100k Milestone Gift. EBITDA Margin ex-Gift is EBITDA ex-Gift as a percentage of total revenues. We use EBITDA ex-Gift to measure the operating performance of our business and EBITDA Margin ex-Gift to measure our operating performance relative to our total revenues. We believe that EBITDA ex-Gift and EBITDA Margin ex-Gift are useful measures to us and to our investors because they exclude certain financial and capital structure items and the expense associated with the 100k Milestone Gift, that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. In particular, we expect the 100k Milestone Gift to be a one-time award program for which we will recognize varying amounts of expense through the first half of 2020, and therefore we believe the related expense does not reflect our core operations, is not included in our past operations, and may not be indicative of our future operations. Additionally, the shares issued to settle the 100k Milestone Gift are offset by share contributions from Mr. Garcia to the Company, therefore we expect the impact on shares outstanding to be zero. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA ex-Gift and EBITDA Margin ex-Gift may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA ex-Gift to net loss (which includes Gift expense), the most directly comparable GAAP measure, and calculation of EBITDA Margin ex-Gift is as follows (dollars in thousands):

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Mar 31, 2018 | Jun 30, 2018 | Sep 30, 2018 | Dec 31, 2018 | Mar 31, 2019 |
| Net loss | $ (52,672) | $ (51,250) | $ (64,419) | $ (86,404) | $ (82,596) |
| Depreciation and amortization expense | 4,605 | 5,257 | 6,439 | 7,238 | 7,943 |
| Interest expense | 3,541 | 4,165 | 5,649 | 11,663 | 15,648 |
| 100k Milestone Gift | — | — | 7,761 | 4,060 | 2,974 |
| EBITDA ex-Gift | $ (44,526) | $ (41,828) | $ (44,570) | $ (63,443) | $ (56,031) |
| | | | | | |
| Total revenues | $ 360,422 | $ 475,286 | $ 534,921 | $ 584,838 | $ 755,234 |
| Net Loss Margin | (14.6)% | (10.8)% | (12.0)% | (14.8)% | (10.9)% |
| EBITDA Margin ex-Gift | (12.4)% | (8.8)% | (8.3)% | (10.8)% | (7.4)% |

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Net loss | $ (15,238) | $ (36,780) | $ (93,112) | $ (164,316) | $ (254,745) |
| Depreciation and amortization expense | 1,705 | 2,800 | 4,658 | 11,568 | 23,539 |
| Interest expense | 108 | 1,412 | 3,587 | 7,659 | 25,018 |
| 100k Milestone Gift | — | — | — | — | 11,821 |
| EBITDA ex-Gift | $ (13,425) | $ (32,568) | $ (84,867) | $ (145,089) | $ (194,367) |
| | | | | | |
| Total revenues | $ 41,679 | $ 130,392 | $ 365,148 | $ 858,870 | $ 1,955,467 |
| Net Loss Margin | (36.6)% | (28.2)% | (25.5)% | (19.1)% | (13.0)% |
| EBITDA Margin ex-Gift | (32.2)% | (25.0)% | (23.2)% | (16.9)% | (9.9)% |

16

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Change |
| | (dollars in thousands, except per unit amounts) | | | |
| **Net sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ | 683,829 | $ | 334,056 | 104.7 % |
| Wholesale vehicle sales | | 33,030 | | 10,133 | 226.0 % |
| Other sales and revenues [1] | | 38,375 | | 16,233 | 136.4 % |
| Total net sales and operating revenues | $ | 755,234 | $ | 360,422 | 109.5 % |
| **Gross profit (incl. Gift):** | | | | |
| Used vehicle gross profit | $ | 47,122 | $ | 16,646 | 183.1 % |
| Wholesale vehicle gross profit | | 3,035 | | 1,355 | 124.0 % |
| Other gross profit [1] | | 38,375 | | 16,233 | 136.4 % |
| Total gross profit | $ | 88,532 | $ | 34,234 | 158.6 % |
| **Gross profit ex-Gift:[3]** | | | | |
| Used vehicle gross profit ex-Gift | $ | 47,886 | $ | 16,646 | 187.7 % |
| Wholesale vehicle gross profit ex-Gift | | 3,057 | | 1,355 | 125.6 % |
| Other gross profit[1] | | 38,375 | | 16,233 | 136.4 % |
| Total gross profit ex-Gift | $ | 89,318 | $ | 34,234 | 160.9 % |
| **Market information:** | | | | |
| Markets, beginning of period | | 85 | | 44 | 93.2 % |
| Market launches | | 24 | | 12 | 100.0 % |
| Markets, end of period | | 109 | | 56 | 94.6 % |
| **Unit sales information:** | | | | |
| Used vehicle unit sales | | 36,766 | | 18,464 | 99.1 % |
| Wholesale vehicle unit sales | | 6,701 | | 2,342 | 186.1 % |
| **Per unit selling prices:** | | | | |
| Used vehicles | $ | 18,599 | $ | 18,092 | 2.8 % |
| Wholesale vehicles | $ | 4,929 | $ | 4,327 | 13.9 % |
| **Per unit gross profit (incl. Gift):[2]** | | | | |
| Used vehicle gross profit | $ | 1,282 | $ | 902 | 42.1 % |
| Wholesale vehicle gross profit | $ | 453 | $ | 579 | (21.8)% |
| Other gross profit | $ | 1,044 | $ | 879 | 18.8 % |
| Total gross profit | $ | 2,408 | $ | 1,854 | 29.9 % |
| **Per unit gross profit ex-Gift:[2][3]** | | | | |
| Used vehicle gross profit ex-Gift | $ | 1,302 | $ | 902 | 44.3 % |
| Wholesale vehicle gross profit ex-Gift | $ | 456 | $ | 579 | (21.2)% |
| Other gross profit | $ | 1,044 | $ | 879 | 18.8 % |
| Total gross profit ex-Gift | $ | 2,429 | $ | 1,854 | 31.0 % |

(1)   Includes $10,573 and $4,111 for the three months ended March 31, 2019 and 2018, respectively of other sales and revenues from related parties.

(2)   All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

(3)   Ex-Gift amounts exclude the expense related to the 100k Milestone Gift. See "Reconciliation of GAAP to Non-GAAP Financial Measures" for a reconciliation to the most directly comparable GAAP-based measure, when applicable.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | Mar 31, 2018 | Jun 30, 2018 | Sep 30, 2018 | Dec 31, 2018 | Mar 31, 2019 |
| | (in thousands) | | | | |
| Compensation and benefits [1] | $ 24,987 | $ 29,251 | $ 34,411 | $ 43,065 | $ 48,804 |
| 100k Milestone Gift | — | — | 6,760 | 1,058 | 2,188 |
| Advertising expense | 25,009 | 26,782 | 27,467 | 31,971 | 39,522 |
| Market occupancy costs [2] | 2,510 | 2,618 | 3,110 | 3,859 | 4,370 |
| Logistics [3] | 6,318 | 7,826 | 9,913 | 11,140 | 12,249 |
| Other costs [4] | 24,362 | 29,175 | 34,107 | 39,559 | 48,108 |
| Total | $ 83,186 | $ 95,652 | $ 115,768 | $ 130,652 | $ 155,241 |

(1)  Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.

(2)  Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3)  Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4)  Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty and title and registration.

18

**Liquidity Resources**
**(Unaudited)**

| | March 31, 2019 | | December 31, 2018 |
|---|---|---|---|
| Cash and cash equivalents | $ | 85,321 | $ | 78,861 |
| Availability under Floor Plan Facility [1] | | 181,762 | | 253,601 |
| Availability under sale-leaseback agreements [2][3] | | 75,248 | | 77,359 |
| Total liquidity resources available | $ | 342,331 | $ | 409,821 |

(1) Based on pledging all eligible vehicles.

(2) Under the Master Sale-Leaseback Agreement with VMRE, the total sales price of properties the Company has sold and is leasing back at any point in time is limited to $75.0 million. We are also party to other sale-leaseback arrangements.

(3) We had $112.1 million and $132.4 million of total unpledged gross real estate assets as of March 31, 2019 and December 31, 2018, respectively.

In addition, we had $19.5 million and $0.0 million of total unpledged beneficial interests in securitizations as of March 31, 2019 and December 31, 2018, respectively.







### HALO AWARDS
WE'RE ALL IN THIS TOGETHER EDITION

**WINNER**
## STELLA LIU
Manager, Data Science and Decision Support Systems (Home Office)

**NOMINEES**
**JULIA YAGLE:** Vehicle Transporter (Indianapolis)
**MICAH GRAF:** Engineer I (Home Office)
**JENNY KIM:** Project Manager, Market Operations (Atlanta)
**MICHELLE RASCON:** Manager, Payroll (Home Office)
**BOBBY KITTISACK:** Line Lead, Photobooth and Annotation (Winder IC)



# CARVANA
## CULTURE

## Q1 | 2019



**Exhibit 4**





# LETTER TO SHAREHOLDERS

## Q1 | 2020





# CARVANA

MAY 6, 2020







Dear Shareholders,

A lot has changed since we last reported. The COVID-19 pandemic has brought unprecedented change at an unprecedented pace.

For all of us, this pandemic is a battle on two fronts: personal health and financial health. Carvana is addressing both proactively and decisively. Our initial response was to quickly adopt policies across the business to keep our team and our customers safe, including implementing a touchless delivery experience, reconfiguring our inspection centers and field locations to support social distancing and other CDC guidance, providing masks to our field employees, and executing a work from home solution for as many people as possible.

On the financial health front, we took numerous strides to position the business for this new environment. Our focus has been to thoughtfully manage risks to our baseline assumptions, fortify our financial position, and to ensure that, even as we make necessary changes, we preserve and improve what is most important to our long-term success— delivering the best experience available anywhere when buying or selling a car. These experiences are powered by our unique culture, technology, and supply chain. Maintaining our leadership in these areas is central to every decision we make.

We think that, so far, we have been successful in achieving these goals. Our team, at every level, has risen to the occasion and come together to take on this crisis. We have always believed in the power of a culture that emerges from a team of mission-driven people who find meaning in their work, and the last two months have cemented that belief. We have an incredible team.

Today, the immediate future is even more difficult than usual to predict. There will undoubtedly be additional challenges in the coming weeks and months as the world continues to evolve, and those challenges are obscured by the fog of the pandemic and economic uncertainty. But we have the right team to handle those challenges, and we are confident that we will continue to execute and delight our customers with a safer way to buy or sell a car.

Looking further into the future, we remain as optimistic as ever and potentially more so. In our minds, the most enduring things that have changed are that our team has grown stronger and our offering more desirable.

COVID-19 is an unexpected detour, but it hasn't changed the destination.

## Summary of Q1 2020 Results

All financial comparisons stated below are versus Q1 2019, unless otherwise noted. Complete financial tables appear at the end of this letter. In prior periods we calculated certain non-GAAP measures including Gross Profit per Unit ex-Gift, EBITDA Margin ex-Gift, and Adjusted Net Loss to exclude the impact of the 100k Milestone Gift program. This program has now concluded and is no longer material to current or future periods, and the adjustment is no longer included within our reported results.

Q1 2020 Financial Results:
- Retail units sold totaled 52,427, an increase of 43%
- Revenue totaled $1.098 billion, an increase of 45%
- Total gross profit was $138.4 million, an increase of 56%
- Total gross profit per unit was $2,640, an increase of $232 [1]
- Net loss was $183.6 million, an increase of 122%
- EBITDA margin was (12.6%), a decrease from (7.8%) [2]
  - Includes (2.4%) impact from non-cash adjustments to asset carrying values related to COVID-19

---

[1] Includes a $10 and $21 impact for the current and prior year period, respectively from the 100k Milestone Gift
[2] Includes a 0.0% and 0.4% impact for the current and prior year period, respectively from the 100K Milestone Gift

- GAAP basic and diluted net loss per Class A share was $1.19 based on 50.4 million shares of Class A common stock outstanding
- Adjusted net loss per Class A share, a non-GAAP measure, was $1.18, based on 155.6 million adjusted shares of Class A common stock outstanding, assuming the exchange of all outstanding LLC Units for shares of Class A common stock

Q1 2020 Other Results:

- Opened 15 new markets and 1 vending machine, bringing our end-of-quarter totals to 161 and 24, respectively.
- Completed our first nonprime securitization selling $495 million in principal balances.
- Transitioned to selling our prime loans through our existing forward flow agreement due to securitization market volatility late in the quarter.
- Amended our forward flow agreement with Ally, upsizing the purchase commitment to $2 billion, extending it to March 2021, and broadening the set of customers it covers.

## Recent Events

We would also like to highlight a recent notable accomplishment:

- Closed a $600 million registered direct offering of 13.3 million Class A common shares placed with certain existing shareholders, including $25 million each from Ernest Garcia III, the Company's founder and CEO, and Ernest Garcia II, the Company's largest shareholder.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

## Outlook

2020 was off to a very strong start, and prior to the COVID-19 outbreak we were on track to meet or exceed our annual guidance on all key financial metrics. As previously communicated, in light of the ongoing uncertainty surrounding COVID-19, we withdrew our 2020 full year guidance provided on February 26 and we are not providing guidance at this time.

In an effort to be helpful in this uncertain environment, we are providing recent sales performance data. In mid-March, demand slowed following the various state and local government orders to shelter in place. This slowdown persisted into April with weekly retail unit sales down approximately 30% year-over-year early in the month. In recent weeks, sales have rebounded to approximately 20-30% growth year-over-year, significantly outperforming the industry.

## Managing the Business Through COVID-19

As we face COVID-19, our approach has been to decisively position the business for this new environment while preserving and enhancing our customer experience and our other long-term advantages. We are ensuring the business remains lean and flexible by managing near-term expenses lower to align with current demand levels. We are also closely monitoring macroeconomic factors impacting our business and are proactively responding to changes in demand, retail prices, wholesale prices, and the credit environment.

Our business model and our culture drove triple digit growth rates for 6 consecutive years and position us to scale up to meet additional customer demand when COVID-19 impacts subside.

### People

Carvana's customers and team are at the heart of everything we do. Our first priority is ensuring everyone's health and safety.  Our company values have been key drivers of Carvana's success from the beginning, and as we manage through this difficult time, our values provide the framework for our decision making.

Our Team: Throughout the COVID-19 crisis, we carefully monitored state and local orders and conferred with relevant officials as necessary to ensure we could safely operate across our markets. After temporarily pausing operations in several states pursuant to local orders, we are currently operating in all 33 states we serve. This has been and will likely remain a fluid situation as the pandemic evolves. We've taken precautionary measures by transitioning corporate and customer care functions to work from home, rolling out enhanced sanitation processes, enforcing social distancing policies, and mandating additional safety equipment for those in the field. To keep remote team members informed and connected, we've increased the frequency of company-wide communications, recognized employees who are exemplifying our core values by making our internal awards show (the HALOs) virtual, and implemented a 'We're All In This Together Fund' to help employees impacted by reduced hours (more details below).

Customers: Now, more than ever, it's important that we're here for our customers. We're committed to providing the safest and easiest way to buy or sell a car. With our 'Touchless Delivery' offering, our customers can now purchase a vehicle online and have it delivered without having any face-to-face contact. In addition, last month we designed and implemented a flexible financing solution for our customers, allowing certain customers who finance with Carvana up to 90 days to make their first payment.



4

## Risk Mitigation

In light of the current economic uncertainty we think it's prudent to take a conservative approach and focus on managing risk.

Cost structure: In response to the demand slowdown, we prioritized reducing expenses in ways that are easily reversible when demand rebounds. To this end, we temporarily paused new market openings and vending machine launches and significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and IT investments. We have also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust.

We also made the difficult decision to substantially reduce working hours for our operations and customer care teams. Our goals were to protect our team's jobs, ensure they keep access to their benefits, and align costs with lower demand.

To offset the financial impact of reduced hours, we also launched the 'We're All In This Together Fund'. Over 500 employees voluntarily participated and donated a portion of their salary into the fund, including our executive team and Board of Directors, who all donated 100% of their salaries during this time. This money is being distributed to those who lost hours.

Effectively managing the business to rapidly increase volumes to pre-COVID-19 levels and bring our operations and customer care teams back to full schedules has become an additional and powerful source of motivation inside Carvana.

Inventory: In mid-March we paused inventory acquisitions in anticipation of lower demand and pricing uncertainty. We have been continuing to recondition our work-in-process units and bring down absolute inventory levels to match current demand. As of May 6, 2020, we have reduced total inventory by approximately 30% compared to the end of the first quarter. Because inventory levels have declined and demand has begun to increase, we are selectively acquiring vehicles again. As we gain greater clarity on demand and industry pricing, we will continue adapting our policies to maintain an attractive selection of vehicles for our customers.

Financial Flexibility: In March and April, we took action to fortify our balance sheet and increase our financial flexibility. We upsized our loan purchase agreement with Ally to $2 billion of capacity, demonstrating the strength of our partnership. As a result of the volatility in the securitization market, we sold our Q1 prime loans that were originally intended to be part of our two-shelf securitization program through our forward flow agreement. We also successfully completed a $600 million registered direct equity offering bringing our total liquidity resources to over $1 billion as of April 1st. We believe we have sufficient liquidity resources to provide multiple years of runway even under a deep stress scenario.

## Long-Term Opportunity

Our mission is to change the way people buy cars. To accomplish this, we built a business model and supporting culture that delivers the experiences customers want. At inception, we arrived at three pillars of the customer experience we wanted to create: the best selection, the best price, and the simplest, easiest, and most fun experience.

Those pillars have informed every process and product design decision we have made and they have powered 6 straight years of triple-digit growth. These are enduring customer preferences that aren't likely to change, and therefore the long-term opportunity and our approach to unlocking that opportunity won't change either.

What may have changed after this pandemic is a new customer awareness of safety and a preference for less contact when shopping. We don't know how strong this new preference will be or how long it will last, but we do know our business is well positioned to meet it.

Accordingly, we view this period as an opportunity. It is an opportunity to evolve around the edges to meet this

new customer preference. It is an opportunity to come together as a team to fight and scrap to adapt, and it is an opportunity to take advantage of secular trends accelerating. In turbulent times, evolution often happens more quickly. Change forces progress.

Our goal is to look back on this unprecedented change as a time that strengthened us and accelerated our progress.



## Expansion

Our markets, vending machines, inspection and reconditioning centers (IRCs), and the logistics network that connects them are the backbone of Carvana's differentiated supply chain. Prior to COVID-19, we launched 15 new markets and 1 vending machine in Q1, bringing our total markets to 161, our total U.S. population coverage to 68.7%, and our total vending machines to 24 as of March 31, 2020.

During this period of heightened uncertainty, we took several steps to reduce discretionary capital expenditures, including pausing new market openings and new vending machine and IRC purchases. Even with this reduced capex, we have ample capacity for growth within our existing footprint. We are currently operating in 8 IRCs with an annual production capacity of approximately 400k units at full utilization. We are also continuing construction on three previously identified new IRCs with existing sale-leaseback agreements in place, bringing an additional approximately 200k units of annual production capacity at full utilization when completed.

While we view these steps as prudent in light of the present uncertainty, the pandemic has also made our offering even more valuable to many consumers. As a result, we expect to open many smaller markets that can be efficiently served from our existing logistics and last-mile delivery infrastructure with limited incremental investment, which will increase our population coverage to approximately 73% in the near term.

## CARVANA MARKETS AND POPULATION COVERAGE





*Represents facilities and markets as of May 6, 2020

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: investors.carvana.com/resources/investor-materials.

7

## Management Objectives

As discussed in previous shareholder letters, our management team focuses on delivering an exceptional and unparalleled customer experience while simultaneously growing the business rapidly and achieving our financial objectives. We firmly believe wowing the customer is the core of our model and drives all other metrics. To realize our long-term vision, our three primary financial objectives remain unchanged: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

Below we present our long-term financial model that we introduced at our Analyst Day on November 29, 2018. We believe this is the appropriate frame through which to evaluate our results and progress towards each of our financial objectives.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | Q1 2020 | Long Term Target |
|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 45% | – |
| Gross Margin [1] | 5.3% | 7.9% | 10.1% | 12.9% | 12.6% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 6.8% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A [2] | 21.1% | 18.2% | 14.9% | 13.7% | 16.9% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.4% | 0.5 – 1.0% |
| SG&A Total [2] | 29.8% | 26.0% | 21.7% | 20.0% | 25.1% | 6 – 8% |
| Net Loss Margin [3] | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (16.7)% | – |
| EBITDA Margin [3] | (23.2%) | (16.9%) | (10.5%) | (6.2%) | (12.6%) | 8 – 13.5% |

[1] Gift impact of 0.2%, 0.1%, and 0.0% in 2018, 2019, and Q1 2020, respectively.
[2] Gift impact of 0.4%, 0.2%, and 0.0% in 2018, 2019, and Q1 2020, respectively.
[3] Gift impact of 0.6%, 0.4%, and 0.0% in 2018, 2019, and Q1 2020, respectively.
Note: Numbers may not foot due to rounding

## Objective #1: Grow Retail Units and Revenue

Retail units and revenue grew significantly this quarter despite lower demand starting in mid-March due to COVID-19. Retail units sold increased to 52,427, up 43% from 36,766 in Q1 2019. Revenue in Q1 grew to $1.098 billion, up 45% from $755 million.



**QUARTERLY RETAIL UNIT SALES**

### Buying Cars from Customers

Our offering of buying cars from customers continued to gain momentum. In Q1 2020 total vehicles acquired from customers grew 157% year-over-year. This translates to buying 72% as many vehicles from customers as we sold to them, up from 40% in Q1 2019. In Q1 2020, 41% of retail units sold were sourced from customers, up from 14% in Q1 2019. Due to the uncertainty in demand and industry-wide used vehicle pricing from COVID-19, we temporarily paused standalone vehicle purchases from customers in March; however, we are now beginning to selectively acquire vehicles from customers again as demand has increased and our inventory level has declined. We will continue to monitor demand and industry pricing trends and plan to further expand this offering over time with a bias toward risk mitigation until a more normalized environment returns. Buying cars from customers is integral to simplifying the automotive value chain and accessing high-quality selection while simultaneously benefiting GPU.



**CUSTOMER ACQUIRED VEHICLES**



## Objective #2: Increase Total Gross Profit Per Unit

We achieved another strong quarter of total GPU growth, primarily driven by strength in retail GPU, partially offset by a decrease in finance GPU. Retail GPU was the highest in company history, and our finance GPU remained resilient despite an environment of extreme volatility.

For Q1 2020:

- Total
  - Total GPU was $2,640 vs. $2,408 in Q1 2019[3]
- Retail
  - Retail GPU was $1,581 vs. $1,282 in Q1 2019[3]
  - Changes in retail vehicle GPU were primarily driven by increases in buying cars from customers partially offset by an adjustment to the value of our unsold inventory to reflect current market conditions.
- Wholesale
  - Wholesale GPU was $23 vs. $83 in Q1 2019[3]
  - Changes in wholesale GPU were driven by a reduction in gross profit per wholesale unit sold to $114 from $453, primarily driven by an adjustment to the value of our unsold inventory to reflect current market conditions.
- Other
  - Other GPU was $1,036 vs. $1,044 in Q1 2019
  - Changes in Other GPU were driven by higher attachment of VSC and GAP waiver coverage, and lower finance GPU. Total finance GPU was $528 in Q1 compared to $625 in Q1 2019. We completed our inaugural nonprime securitization in March and sold our prime loans under our forward flow agreement in place of a prime securitization. Due to significant market volatility following COVID-19, the premiums we earned on both pools were less than we earned on similar loan pools sold in Q4, leading to a sequential reduction in finance GPU of $451.

---

[3] Total GPU includes a $10 and $21 impact in Q1 2020 and Q1 2019, respectively, from the 100K milestone Gift. This includes a $10 and $20 impact, respectively, in retail GPU and a $0 and $1 impact, respectively, in wholesale GPU.

**TOTAL GROSS PROFIT PER UNIT**



*2018, 2019, and Q1 2020 include a $43, $31, and $10 impact from the 100K Milestone Gift, respectively

## Objective #3: Demonstrate Operating Leverage

Following the spread of COVID-19, we made swift changes to reduce SG&A expenses to better match the lower demand caused by the pandemic. However, the reduction in sales and the transitional expenses associated with rapidly changing our operations outweighed these cost reductions, leading to increased SG&A as a percentage of revenue.

For Q1 2020, as a percentage of revenue:

- Total SG&A increased by 4.6% as a percentage of revenue, primarily reflecting spending in anticipation of higher volumes that didn't materialize to the extent expected due to COVID-19.[4]
- Compensation and benefits increased by 0.9%[4], Advertising increased by 1.6%, Logistics and Market occupancy increased by 0.3%, and Other SG&A increased by 1.8%, also primarily driven by impacts from COVID-19.



*2018, 2019, and Q1 2020 include a 0.6%, 0.4%, and 0.0% impact from the 100K Milestone Gift, respectively

---

[4] Prior year period includes a 0.3% impact from the 100k Milestone Gift, contained within Compensation and Benefits

## Summary

This pandemic has been an incredible test for us so far. It is testing our business model and it is testing our people. We came into it a team of passionate people who had been tested by the trials of building a company, but not by the trials of a global crisis. We are now facing these tests, at least the first wave of them. And we are incredibly proud of how we are faring.

We have always been a company with ambitious goals, and we've known that fulfilling that ambition would require passing several tests. A good indicator of your ability to pass any given test is whether your last test strengthened or weakened you. This test is strengthening us. Our team is standing tall. We know this battle isn't over, and we know it won't be our last. We also know that there is no other team we would rather be a part of as we face these battles together.

We remain firmly on the path to selling 2 million+ cars and to becoming the largest and most profitable automotive retailer.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

## Appendix

*Conference Call Details*

Carvana will host a conference call today, May 6, 2020, at 5:30 p.m. EDT (2:30 p.m. PDT) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until May 13, 2020, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10142237#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2019 and our Quarterly Report on Form 10-Q for Q1 2020.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ( "GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

13

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 72,435 | $ 76,016 |
| Restricted cash | 72,600 | 42,443 |
| Accounts receivable, net | 26,591 | 39,864 |
| Finance receivables held for sale, net | 199,045 | 286,969 |
| Vehicle inventory | 844,681 | 762,696 |
| Beneficial interests in securitizations | 118,923 | 98,780 |
| Other current assets | 59,309 | 52,654 |
| Total current assets | 1,393,584 | 1,359,422 |
| Property and equipment, net | 645,485 | 543,471 |
| Operating lease right-of-use assets, including $43,677 and $44,583, respectively, from leases with related parties | 169,741 | 123,420 |
| Intangible assets, net | 6,685 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $8,372 and $6,138, respectively, due from related parties | 14,370 | 14,850 |
| Total assets | $ 2,239,218 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $10,173 and $9,549, respectively, due to related parties | $ 246,783 | $ 234,443 |
| Short-term revolving facilities | 812,214 | 568,840 |
| Current portion of long-term debt | 53,286 | 48,731 |
| Other current liabilities, including $4,436 and $4,518, respectively, from leases with related parties | 16,141 | 12,856 |
| Total current liabilities | 1,128,424 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 936,121 | 883,060 |
| Operating lease liabilities, excluding current portion, including $40,732 and $41,829, respectively, from leases with related parties | 159,751 | 116,071 |
| Other liabilities | 1,696 | 1,808 |
| Total liabilities | 2,225,992 | 1,865,809 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 50,660 and 50,507 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 51 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 285,874 | 280,994 |
| Accumulated deficit | (242,921) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 43,105 | 98,112 |
| Non-controlling interests | (29,879) | 93,827 |
| Total stockholders' equity | 13,226 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,239,218 | $ 2,057,748 |

14

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ | 964,279 | $ | 683,829 |
| Wholesale vehicle sales | | 79,606 | | 33,030 |
| Other sales and revenues, including $20,562 and $10,573, respectively, from related parties | | 54,331 | | 38,375 |
| **Net sales and operating revenues** | | 1,098,216 | | 755,234 |
| Cost of sales, including $842 and $1,273, respectively, to related parties | | 959,794 | | 666,702 |
| **Gross profit** | | 138,422 | | 88,532 |
| Selling, general and administrative expenses, including $4,426 and $2,735, respectively, to related parties | | 275,711 | | 155,241 |
| Interest expense, including $333 to related parties | | 28,862 | | 15,648 |
| Other expense, net | | 17,406 | | 239 |
| **Net loss before income taxes** | | (183,557) | | (82,596) |
| Income tax provision | | — | | — |
| **Net loss** | | (183,557) | | (82,596) |
| Net loss attributable to non-controlling interests | | (123,670) | | (59,481) |
| **Net loss attributable to Carvana Co.** | $ | (59,887) | $ | (23,115) |
| Net loss per share of Class A common stock, basic and diluted | $ | (1.19) | $ | (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | | 50,399 | | 41,352 |

(1)   Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

15

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (183,557) | $ (82,596) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 15,811 | 7,943 |
| Loss on disposal of property and equipment | 145 | 49 |
| Provision for bad debt and valuation allowance | 5,213 | 1,385 |
| Gain on loan sales | (12,976) | (19,200) |
| Equity-based compensation expense | 5,940 | 7,711 |
| Amortization and write-off of debt issuance costs and bond premium | 1,932 | 979 |
| Originations of finance receivables | (782,240) | (532,066) |
| Proceeds from sale of finance receivables, net | 812,868 | 601,557 |
| Purchase of finance receivables | — | (127,710) |
| Principal payments received on finance receivables held for sale | 25,653 | 11,227 |
| Unrealized loss on beneficial interests in securitization | 11,405 | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | 12,995 | (5,435) |
| Vehicle inventory | (80,014) | (112,536) |
| Other assets | (3,985) | (12,873) |
| Accounts payable and accrued liabilities | 1,820 | 48,632 |
| Operating lease right-of-use assets | (46,321) | (1,262) |
| Operating lease liabilities | 46,965 | 68 |
| Other liabilities | (112) | (382) |
| Net cash used in operating activities | (168,458) | (214,509) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $0 and $4,257, respectively, from related parties | (89,433) | (43,199) |
| Principal payments received on beneficial interests in securitizations | 725 | — |
| Net cash used in investing activities | (88,708) | (43,199) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 1,964,496 | 807,890 |
| Payments on short-term revolving facilities | (1,721,122) | (570,076) |
| Proceeds from issuance of long-term debt | 51,963 | 41,817 |
| Payments on long-term debt | (5,912) | (3,003) |
| Payments of debt issuance costs | (3,472) | (567) |
| Proceeds from exercise of stock options | 145 | 426 |
| Tax withholdings related to restricted stock awards | (2,356) | (433) |
| Net cash provided by financing activities | 283,742 | 276,054 |
| **Net increase in cash, cash equivalents and restricted cash** | 26,576 | 18,346 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 145,035 | $ 107,055 |

16

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three months ended March 31, 2020, there was approximately $0.5 million of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three months ended March 31, 2019, there was approximately $3.0 million of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $0.8 million within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

***Adjusted Net Loss and Adjusted Net Loss per Share***

Adjusted net loss represents net loss attributable to Carvana Co. assuming the full exchange of all outstanding LLC Units for shares of Class A common stock. Adjusted net loss per share is calculated by dividing adjusted net loss by the weighted-average shares of Class A common stock outstanding assuming the full exchange of all outstanding LLC Units.

Adjusted net loss and adjusted net loss per share are supplemental measures of operating performance that do not represent and should not be considered alternatives to net loss and net loss per share, as determined under GAAP. We believe that by assuming the full exchange of all outstanding LLC Units, adjusted net loss and adjusted net loss per share supplement GAAP measures and enable us and our investors to more effectively evaluate our performance period-over-period and relative to our competitors that have different organizational and tax structures because the assumption eliminates the effect of any changes in net loss attributable to Carvana Co. driven by increases in our ownership of Carvana Group, LLC, which are unrelated to our operating performance.

A reconciliation of adjusted net loss to net loss attributable to Carvana Co., the most directly comparable GAAP measure, and the computation of adjusted net loss per share are as follows (in thousands, except per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Numerator: | | |
| Net loss attributable to Carvana Co. | $ (59,887) | $ (23,115) |
| Net loss attributable to non-controlling interests | (123,670) | (59,481) |
| Adjusted net loss attributable to Carvana Co. Class A common stock [2] | $ (183,557) | $ (82,596) |
| | | |
| Denominator: | | |
| Weighted-average shares of Class A common stock outstanding[1] | 50,399 | 41,352 |
| Adjustments: | | |
| Weighted-average assumed exchange of LLC Units for shares of Class A common stock | 105,241 | 108,974 |
| Adjusted shares of Class A common stock outstanding | 155,640 | 150,326 |
| Adjusted net loss per share [3] | $ (1.18) | $ (0.55) |

(1)  Excludes approximately 1.1 million and 0.7 million nonvested service-based restricted stock awards and units outstanding at March 31, 2020 and 2019, respectively, and 1.3 million vested and nonvested stock options outstanding at both March 31, 2020 and 2019 because they were determined to be anti-dilutive.
(2)  Includes $0.5 million and $3.0 million, respectively, related to the 100k Milestone Gift.
(3)  Includes $0.00 and $0.02 per share, respectively, related to the 100k Milestone Gift.

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows (dollars in thousands):

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | Mar 31, 2019 | Jun 30, 2019 | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 |
| Net loss [1] | $ (82,596) | $ (64,059) | $ (92,244) | $ (125,740) | $ (183,557) |
| Depreciation and amortization expense | 7,943 | 8,887 | 10,675 | 13,760 | 15,811 |
| Interest expense | 15,648 | 19,315 | 20,990 | 24,653 | 28,862 |
| EBITDA | $ (59,005) | $ (35,857) | $ (60,579) | $ (87,327) | $ (138,884) |
| | | | | | |
| Total revenues | $ 755,234 | $ 986,221 | $1,094,854 | $1,103,587 | $1,098,216 |
| Net Loss Margin | (10.9)% | (6.5)% | (8.4)% | (11.4)% | (16.7)% |
| EBITDA Margin [2] | (7.8)% | (3.6)% | (5.5)% | (7.9)% | (12.6)% |

(1) Includes $3.0 million, $3.3 million, $4.4 million, $2.5 million, and $0.5 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.4%, 0.3%, 0.4%, 0.2%, and 0.0%, respectively, related to the 100k Milestone Gift.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| Net loss [1] | $ (36,780) | $ (93,112) | $ (164,316) | $ (254,745) | $ (364,639) |
| Depreciation and amortization expense | 2,800 | 4,658 | 11,568 | 23,539 | 41,265 |
| Interest expense | 1,412 | 3,587 | 7,659 | 25,018 | 80,606 |
| EBITDA | $ (32,568) | $ (84,867) | $ (145,089) | $ (206,188) | $ (242,768) |
| | | | | | |
| Total revenues | $ 130,392 | $ 365,148 | $ 858,870 | $1,955,467 | $3,939,896 |
| Net Loss Margin | (28.2)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% |
| EBITDA Margin [2] | (25.0)% | (23.2)% | (16.9)% | (10.5)% | (6.2)% |

(1) Includes $0.0 million, $0.0 million, $0.0 million, $11.8 million, and $13.2 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.0%, 0.0%, 0.6%, and 0.4%, respectively, related to the 100k Milestone Gift.

18

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | Change |
| | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | |
| Used vehicle sales, net | $ 964,279 | $ 683,829 | 41.0 % |
| Wholesale vehicle sales | 79,606 | 33,030 | 141.0 % |
| Other sales and revenues [1] | 54,331 | 38,375 | 41.6 % |
| Total net sales and operating revenues | $ 1,098,216 | $ 755,234 | 45.4 % |
| **Gross profit:** | | | |
| Used vehicle gross profit[3] | $ 82,862 | $ 47,122 | 75.8 % |
| Wholesale vehicle gross profit[4] | 1,229 | 3,035 | (59.5)% |
| Other gross profit [1] | 54,331 | 38,375 | 41.6 % |
| Total gross profit | $ 138,422 | $ 88,532 | 56.4 % |
| **Market information:** | | | |
| Markets, beginning of period | 146 | 85 | 71.8 % |
| Market launches | 15 | 24 | (37.5)% |
| Markets, end of period | 161 | 109 | 47.7 % |
| **Unit sales information:** | | | |
| Used vehicle unit sales | 52,427 | 36,766 | 42.6 % |
| Wholesale vehicle unit sales | 10,754 | 6,701 | 60.5 % |
| **Per unit selling prices:** | | | |
| Used vehicles | $ 18,393 | $ 18,599 | (1.1)% |
| Wholesale vehicles | $ 7,402 | $ 4,929 | 50.2 % |
| **Per unit gross profit:[2]** | | | |
| Used vehicle gross profit[3] | $ 1,581 | $ 1,282 | 23.3 % |
| Wholesale vehicle gross profit[4] | $ 114 | $ 453 | (74.8)% |
| Other gross profit | $ 1,036 | $ 1,044 | (0.8)% |
| Total gross profit | $ 2,640 | $ 2,408 | 9.6 % |

(1)  Includes $20,562 and $10,573 for the three months ended March 31, 2020 and 2019, respectively, of other sales and revenues from related parties.

(2)  All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

(3)  Includes $510 and $764, or $10 and $20 per unit, related to the 100k Milestone Gift.

(4)  Includes $17 and $22, or $2 and $3 per wholesale unit, related to the 100k Milestone Gift.

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | Mar 31, 2019 | Jun 30, 2019 | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 |
| | (in thousands) | | | | |
| Compensation and benefits [1] | $ 48,804 | $ 54,184 | $ 60,655 | $ 72,939 | $ 84,250 |
| 100k Milestone Gift | 2,188 | 1,415 | 2,903 | 1,263 | — |
| Advertising | 39,522 | 50,367 | 55,264 | 58,867 | 74,788 |
| Market occupancy [2] | 4,370 | 4,720 | 5,517 | 6,644 | 8,103 |
| Logistics [3] | 12,249 | 13,643 | 14,068 | 18,090 | 18,914 |
| Other [4] | 48,108 | 57,514 | 69,563 | 83,860 | 89,656 |
| Total | $ 155,241 | $ 181,843 | $ 207,970 | $ 241,663 | $ 275,711 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.

(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Cash and cash equivalents | $              72,435 | $              76,016 |
| Availability under short-term revolving facilities [1] | 163,775 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 103,317 | 104,680 |
| Committed liquidity resources available | $            339,527 | $            459,776 |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.

(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $28.3 million and $29.7 million as of March 31, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.

(3) We have $174.8 million and $158.7 million of total unfunded gross real estate assets as of March 31, 2020 and December 31, 2019, respectively.

As of March 31, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1,875.0 million and $1,600.0 million, an outstanding balance of $812.2 million and $568.8 million, and unused capacity of $1,062.8 million and $1,031.2 million, respectively.

We also had $87.1 million and $137.7 million of committed funds for future construction costs of four IRCs with unfinished construction as of March 31, 2020 and December 31, 2019, respectively. In addition, we had $49.0 million and $13.5 million of total unpledged beneficial interests in securitizations as of March 31, 2020 and December 31, 2019, respectively.

Additionally, on April 1, 2020, we completed a registered direct offering of approximately 13.3 million shares of our Class A common stock and received net proceeds from the offering of approximately $599.5 million.













# Exhibit 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended March 31, 2020**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **1930 W. Rio Salado Parkway     Tempe     Arizona** | **85281** |
| (Address of principal executive offices) | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of May 1, 2020, the registrant had 64,063,049 shares of Class A common stock outstanding and 101,200,276 shares of Class B common stock outstanding.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

## INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

|  |  |  | Page |
|---|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** |  |  |
| Item 1. | Financial Statements |  |  |
|  | Unaudited Condensed Consolidated Balance Sheets as of March 31, 2020 and December 31, 2019 |  | 1 |
|  | Unaudited Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2020 and 2019 |  | 2 |
|  | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2020 and 2019 |  | 3 |
|  | Unaudited Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2020 and 2019 |  | 5 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements |  | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 31 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk |  | 50 |
| Item 4. | Controls and Procedures |  | 50 |
| **PART II.** | **OTHER INFORMATION** |  |  |
| Item 1. | Legal Proceedings |  | 51 |
| Item 1A. | Risk Factors |  | 51 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds |  | 51 |
| Item 3. | Defaults Upon Senior Securities |  | 52 |
| Item 4. | Mine Safety Disclosures |  | 52 |
| Item 5. | Other Information |  | 52 |
| Item 6. | Exhibits |  | 53 |

## PART I. FINANCIAL INFORMATION

## ITEM I. FINANCIAL STATEMENTS

### CARVANA CO. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS
#### (Unaudited)
#### (In thousands)

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 72,435 | $ 76,016 |
| Restricted cash | 72,600 | 42,443 |
| Accounts receivable, net | 26,591 | 39,864 |
| Finance receivables held for sale, net | 199,045 | 286,969 |
| Vehicle inventory | 844,681 | 762,696 |
| Beneficial interests in securitizations | 118,923 | 98,780 |
| Other current assets | 59,309 | 52,654 |
| Total current assets | 1,393,584 | 1,359,422 |
| Property and equipment, net | 645,485 | 543,471 |
| Operating lease right-of-use assets, including $43,677 and $44,583, respectively, from leases with related parties | 169,741 | 123,420 |
| Intangible assets, net | 6,685 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $8,372 and $6,138, respectively, due from related parties | 14,370 | 14,850 |
| Total assets | $ 2,239,218 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** |  |  |
| Current liabilities: |  |  |
| Accounts payable and accrued liabilities, including $10,173 and $9,549, respectively, due to related parties | $ 246,783 | $ 234,443 |
| Short-term revolving facilities | 812,214 | 568,840 |
| Current portion of long-term debt | 53,286 | 48,731 |

| | | |
|---|---:|---:|
| Other current liabilities, including $4,436 and $4,518, respectively, from leases with related parties | 16,141 | 12,856 |
| Total current liabilities | 1,128,424 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 936,121 | 883,060 |
| Operating lease liabilities, excluding current portion, including $40,732 and $41,829, respectively, from leases with related parties | 159,751 | 116,071 |
| Other liabilities | 1,696 | 1,808 |
| Total liabilities | 2,225,992 | 1,865,809 |
| Commitments and contingencies (Note 16) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 50,660 and 50,507 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 51 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 285,874 | 280,994 |
| Accumulated deficit | (242,921) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 43,105 | 98,112 |
| Non-controlling interests | (29,879) | 93,827 |
| Total stockholders' equity | 13,226 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,239,218 | $ 2,057,748 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | **2020** | | **2019** |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ | 964,279 | $ | 683,829 |
| Wholesale vehicle sales | | 79,606 | | 33,030 |
| Other sales and revenues, including $20,562 and $10,573, respectively, from related parties | | 54,331 | | 38,375 |
| **Net sales and operating revenues** | | 1,098,216 | | 755,234 |
| Cost of sales, including $842 and $1,273, respectively, to related parties | | 959,794 | | 666,702 |
| **Gross profit** | | 138,422 | | 88,532 |
| Selling, general and administrative expenses, including $4,426 and $2,735, respectively, to related parties | | 275,711 | | 155,241 |
| Interest expense, including $333 to related parties | | 28,862 | | 15,648 |
| Other expense, net | | 17,406 | | 239 |
| **Net loss before income taxes** | | (183,557) | | (82,596) |
| Income tax provision | | — | | — |
| **Net loss** | | (183,557) | | (82,596) |
| Net loss attributable to non-controlling interests | | (123,670) | | (59,481) |
| **Net loss attributable to Carvana Co.** | $ | (59,887) | $ | (23,115) |
| Net loss per share of Class A common stock, basic and diluted | $ | (1.19) | $ | (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted[1] | | 50,399 | | 41,352 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 41,208 | $  41 | 104,336 | $  104 | $ 147,916 | $  (68,375) | $ 147,742 | $  227,428 |
| Net loss | — | — | — | — | — | (23,115) | (59,481) | (82,596) |
| Exchanges of LLC Units | 2,020 | 2 | (1,984) | (2) | 1,899 | — | (1,899) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 25,582 | — | — | 25,582 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (25,582) | — | — | (25,582) |
| Contribution of Class A common stock from related party | (72) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 74 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (14) | — | — | — | (433) | — | — | (433) |
| Options exercised | 27 | — | — | — | 426 | — | — | 426 |
| Equity-based compensation | — | — | — | — | 8,022 | — | — | 8,022 |
| **Balance, March 31, 2019** | 43,243 | $  43 | 102,352 | $  102 | $ 157,830 | $  (91,490) | $  86,362 | $  152,847 |

3

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 50,507 | $ 51 | 101,219 | $ 101 | $ 280,994 | $ (183,034) | $ 93,827 | $ 191,939 |
| Net loss | — | — | — | — | — | (59,887) | (123,670) | (183,557) |
| Exchanges of LLC Units | 116 | — | (19) | — | 36 | — | (36) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1,949 | — | — | 1,949 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1,949) | — | — | (1,949) |
| Issuance of Class A common stock to settle vested restricted stock units | 38 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (8) | — | — | — | (2,356) | — | — | (2,356) |
| Options exercised | 7 | — | — | — | 145 | — | — | 145 |
| Equity-based compensation | — | — | — | — | 7,055 | — | — | 7,055 |
| **Balance, March 31, 2020** | 50,660 | $ 51 | 101,200 | $ 101 | $ 285,874 | $ (242,921) | $ (29,879) | $ 13,226 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (183,557) | $ (82,596) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 15,811 | 7,943 |
| Loss on disposal of property and equipment | 145 | 49 |
| Provision for bad debt and valuation allowance | 5,213 | 1,385 |
| Gain on loan sales | (12,976) | (19,200) |
| Equity-based compensation expense | 5,940 | 7,711 |
| Amortization and write-off of debt issuance costs and bond premium | 1,932 | 979 |
| Originations of finance receivables | (782,240) | (532,066) |
| Proceeds from sale of finance receivables, net | 812,868 | 601,557 |
| Purchase of finance receivables | — | (127,710) |
| Principal payments received on finance receivables held for sale | 25,653 | 11,227 |
| Unrealized loss on beneficial interests in securitization | 11,405 | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | 12,995 | (5,435) |
| Vehicle inventory | (80,014) | (112,536) |
| Other assets | (3,985) | (12,873) |
| Accounts payable and accrued liabilities | 1,820 | 48,632 |
| Operating lease right-of-use assets | (46,321) | (1,262) |
| Operating lease liabilities | 46,965 | 68 |
| Other liabilities | (112) | (382) |
| Net cash used in operating activities | (168,458) | (214,509) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $0 and $4,257, respectively, from related parties | (89,433) | (43,199) |
| Principal payments received on beneficial interests in securitizations | 725 | — |
| Net cash used in investing activities | (88,708) | (43,199) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 1,964,496 | 807,890 |
| Payments on short-term revolving facilities | (1,721,122) | (570,076) |
| Proceeds from issuance of long-term debt | 51,963 | 41,817 |
| Payments on long-term debt | (5,912) | (3,003) |
| Payments of debt issuance costs | (3,472) | (567) |
| Proceeds from exercise of stock options | 145 | 426 |
| Tax withholdings related to restricted stock awards | (2,356) | (433) |
| Net cash provided by financing activities | 283,742 | 276,054 |
| **Net increase in cash, cash equivalents and restricted cash** | 26,576 | 18,346 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 145,035 | $ 107,055 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is a leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Senior Notes (as defined in Note 9 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 10 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of March 31, 2020, Carvana Co. owned approximately 32.5% of Carvana Group and the LLC Unitholders (as defined in Note 10 — Stockholders' Equity) owned the remaining 67.5%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of March 31, 2020, results of operations and changes in stockholder's equity for the three months ended March 31, 2020 and 2019. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

**Liquidity**

The accompanying interim unaudited condensed consolidated financial statements of the Company have been prepared in conformity with GAAP, which contemplate continuation of the Company as a going concern. The Company has incurred losses from inception through March 31, 2020, and expects to incur additional losses in the future. As the Company continues to grow

6

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

into new markets, build vending machines and inspection and reconditioning centers ("IRCs"), and enhance technology and software development efforts, it may need access to additional capital. Historically, the Company has raised additional capital through equity issuances or debt instruments to fund its expansion (refer to Note 10 — Stockholders' Equity and Note 9 — Debt Instruments). The Company has also funded some of its capital expenditures through long-term financing with lenders and other investors, as described further in Note 9 — Debt Instruments. At March 31, 2020, the Company had $87.1 million of committed funds for future construction costs at four IRCs currently under construction. The Company funds vehicle inventory purchases through its Floor Plan Facility, as described further in Note 9 — Debt Instruments. As of March 31, 2020, the Company had approximately $211.8 million available under its $950.0 million Floor Plan Facility and may draw upon this facility through October 2020 to fund future vehicle inventory purchases, as described further in Note 9 — Debt Instruments. Further, the Company plans to increase the amount and maturity date of financing available to purchase vehicle inventory within the next year by amending its existing Floor Plan Facility or by entering into a new agreement. The Company has historically sold the finance receivables it generates through forward flow agreements and fixed pool loan sales, including securitization transactions. In March 2020, the Company amended its Master Purchase and Sale Agreement with Ally to provide for the sale of up to $2.0 billion of principal balance of finance receivables through March 2021. Prior to selling the finance receivables as part of a securitization transaction, the Company funds the finance receivables through Finance Receivable Facilities (as defined and further discussed in Note 9 — Debt Instruments). At March 31, 2020, the Company had $851.0 million available under its Finance Receivable Facilities, which have a current total capacity of $925.0 million. The Company may draw upon these facilities through July 2021 and February 2022 to fund future finance receivable originations. The aggregate capacity of these facilities may be increased to $1.0 billion with the consent of certain lenders. On April 1, 2020, the Company completed a registered direct offering of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Due to the impact of COVID-19 on the economy, the Company has temporarily paused certain new market openings and vending machine launches and significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and information technology investments. The Company has also rebalanced its marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust in the future. Management believes that the actions taken in respect of the COVID-19 pandemic, current working capital, results of operations, and expected continued inventory and capital expenditure financing are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. The COVID-19 pandemic has adversely impacted the global economy, as well as the Company's operations, and the extent and duration of the impacts remain unclear. The Company's future estimates, including, but not limited to, the Company's allowance for loan losses, inventory valuations, fair value measurements, cancellation reserves, asset impairment charges, and discount rate assumptions, may be impacted and continue to evolve as conditions change as a result of the COVID-19 pandemic. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Financial instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), which amends the guidance on the impairment of financial instruments by requiring measurement and recognition of expected credit losses for financial assets held. The Company adopted ASU 2016-13 on January 1, 2020. Financial assets measured at fair value through net income are excluded from the scope of ASU 2016-13. The Company's beneficial interests in securitizations are carried at fair value and are thus excluded from ASU 2016-13. Finance receivables originated in connection with the Company's vehicle sales are held for sale and presented at the lower of amortized cost or fair value. The Company intends to sell the finance receivables prior to their contractual maturity, therefore the recovery of the asset is from its sale rather than maturity and the Company is not required to measure the expected lifetime credit losses. The adoption of ASU 2016-13 did not have a material effect on the Company's consolidated financial statements.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") related to updated requirements over the disclosures of fair value measurements. Under ASU 2018-13, certain disclosure requirements for fair value measurements will be eliminated, modified or added to facilitate better communication around recurring and nonrecurring fair value measurements. ASU 2018-13 is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with some amendments applied prospectively, some applied retrospectively and early adoption permitted. The Company adopted ASU 2018-13 for its fiscal year beginning January 1, 2020 and it did not have a material effect on the Company's fair value disclosures within its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The intent of this pronouncement is to align the requirements for capitalizing implementation costs incurred in a cloud computing arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software as defined in ASC 350-40. Under ASU 2018-15, the capitalized implementation costs related to a cloud computing arrangement will be amortized over the term of the arrangement and all capitalized implementation amounts will be required to be presented in the same line items of the financial statements as the related hosting fees. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have a material effect on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"). ASU 2018-17 requires reporting entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety for determining whether a decision-making fee is a variable interest. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, with early adoption permitted. Entities are required to apply the amendments in ASU 2018-17 retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Company adopted ASU 2018-15 for its fiscal year beginning January 1, 2020 and it did not have an effect on its consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"). ASU 2020-04 provides optional guidance for a limited period of time related to contract modifications and hedge accounting to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The standard is effective from March 12, 2020 through December 31, 2022, except for hedging relationships existing as of December 31, 2022 that an entity has elected certain optional expedients for and that are retained through the end of the hedging relationship. The Company may elect to take advantage of this optional guidance in its transition away from LIBOR within certain debt contracts but does not expect a material impact on its consolidated financial statements. As of March 31, 2020, the Company had not modified any contracts or had any hedge accounting activity that fell under ASU 2020-04.

**Accounting Standards Issued But Not Yet Adopted**

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). ASU 2019-12 removes certain exceptions to the general principles in Topic 740 and also clarifies and amends existing guidance to improve consistent application. ASU 2019-12 will be effective for interim and annual periods beginning after December 15, 2020, with early adoption permitted. The Company plans to adopt ASU 2019-12 for its fiscal year beginning January 1, 2021 and is currently assessing the impact, if any, the guidance will have on its consolidated financial statements.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 3 — PROPERTY AND EQUIPMENT, NET

The following table summarizes property and equipment, net as of March 31, 2020 and December 31, 2019 (in thousands):

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Land and site improvements | $ 103,536 | $ 98,530 |
| Buildings and improvements | 275,707 | 229,640 |
| Transportation fleet | 128,740 | 110,302 |
| Software | 78,707 | 66,875 |
| Furniture, fixtures and equipment | 45,955 | 38,123 |
| Total property and equipment excluding construction in progress | 632,645 | 543,470 |
| Less: accumulated depreciation and amortization on property and equipment | (105,922) | (88,795) |
| Property and equipment excluding construction in progress, net | 526,723 | 454,675 |
| Construction in progress | 118,762 | 88,796 |
| Property and equipment, net | $ 645,485 | $ 543,471 |

Depreciation and amortization expense on property and equipment was approximately $15.3 million and $7.6 million for the three months ended March 31, 2020 and 2019, respectively. These amounts primarily relate to selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying unaudited condensed consolidated statements of operations.

## NOTE 4 — GOODWILL AND INTANGIBLE ASSETS, NET

On April 12, 2018, the Company acquired Car360, Inc. ("Car360"), a provider of app-based photo capture technology, for approximately $16.7 million, net of cash acquired of approximately $0.4 million. The purchase price was comprised of approximately $6.7 million cash, net of cash acquired, and approximately 0.5 million Class A Units of Carvana Group, with a fair value of approximately $10.0 million.

The purchase price was allocated to net tangible assets of approximately $0.2 million and intangible assets of approximately $9.9 million based on their fair values on the acquisition date and a related deferred tax liability of approximately $2.5 million. The deferred tax liability will amortize over 2 years to 7 years, and approximately $0.1 million and $0.4 million was amortized during the three months ended March 31, 2020 and 2019, respectively. The excess of the purchase price over the amounts allocated to assets acquired, liabilities assumed and the deferred tax liability was approximately $9.4 million, which has been recorded as goodwill. The historical results of operations for Car360 were not significant to the Company's consolidated results of operations for the periods presented.

The following table summarizes intangible assets and goodwill related to the Car360 acquisition as of March 31, 2020 and December 31, 2019 (in thousands):

| | Useful Life | March 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Intangible assets: | | | |
| Developed technology | 7 years | $ 8,642 | $ 8,642 |
| Customer relationships | 2 years | 523 | 523 |
| Non-compete agreements | 5 years | 774 | 774 |
| Intangible assets, acquired cost | | 9,939 | 9,939 |
| Less: accumulated amortization | | (3,254) | (2,707) |
| Intangible assets, net | | $ 6,685 | $ 7,232 |
| | | | |
| Goodwill | N/A | $ 9,353 | $ 9,353 |

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Amortization expense was approximately $0.5 million and $0.4 million during the three months ended March 31, 2020 and 2019, respectively. As of March 31, 2020, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 4.9 years. The anticipated annual amortization expense to be recognized in future years as of March 31, 2020 is as follows (in thousands):

|  | Expected Future Amortization |
|---|---|
| Remainder of 2020 | $ 1,042 |
| 2021 | 1,389 |
| 2022 | 1,389 |
| 2023 | 1,279 |
| 2024 | 1,235 |
| 2025 | 351 |
| Thereafter | — |
| Total | $ 6,685 |

## NOTE 5 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of March 31, 2020 and December 31, 2019 (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Accounts payable, including $10,173 and $9,549, respectively, due to related parties | $ 56,008 | $ 63,576 |
| Sales taxes and vehicle licenses and fees | 50,364 | 45,812 |
| Accrued interest expense | 31,210 | 15,650 |
| Accrued property and equipment | 27,270 | 23,433 |
| Reserve for returns and cancellations | 20,024 | 19,721 |
| Accrued compensation and benefits | 14,096 | 21,726 |
| Accrued advertising costs | 12,687 | 11,403 |
| Customer deposits | 6,249 | 6,379 |
| Other accrued liabilities | 28,875 | 26,743 |
| Total accounts payable and accrued liabilities | $ 246,783 | $ 234,443 |

## NOTE 6 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group ("DriveTime") entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2021 and 2024. Most of the facilities allow the Company to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in December 2018. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring in 2021 and the Company having the right to

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco inspection and reconditioning centers ("IRCs"). At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations and its share of estimated costs incurred by DriveTime related to preparing these sites for use. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In December 2016, the Company entered into a lease agreement related to an IRC in Tolleson, Arizona, with Verde Investments, Inc., an affiliate of DriveTime ("Verde"), with an initial term of approximately 15 years. In August 2018, the Company entered into an additional lease agreement with a coterminous initial term with Verde for contiguous space to that IRC. The lease agreements require monthly rental payments and can each be extended for four additional five-year periods.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a lease agreement with DriveTime for access to and utilization of a fully operational IRC near Cleveland, Ohio. DriveTime vacated the facility in February 2019, at which point the Company became the sole occupant and began leasing the full facility from DriveTime. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. Before DriveTime vacated the facility, the Company paid a monthly rental fee for facility and shared reconditioning costs, calculated based on the Company's pro rata utilization of space at the IRC in a given month, along with a pro rata share of the facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. During the three months ended March 31, 2020, total costs related to these operating lease agreements, including those noted above, were approximately $1.8 million with approximately $0.8 million and $1.0 million allocated to inventory and selling, general and administrative expenses, respectively. During the three months ended March 31, 2019, total costs related to these lease agreements were approximately $1.0 million with approximately $0.8 million and $1.2 million allocated to inventory and selling, general and administrative expenses, respectively.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. The Company became the sole occupant in April 2019. The lease expires in four years, subject to the ability to exercise three renewal options of five years each. DriveTime remained an occupant of the facility through April 1, 2019 but is not fully released from the lease obligations by the landlord.

During the three months ended March 31, 2019, in connection with the Company becoming the sole occupant of the IRC near Cleveland, Ohio, the Company purchased certain leasehold improvements and equipment from DriveTime for DriveTime's net book value of approximately $4.3 million.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. DriveTime guaranteed up to $0.5 million of the Company's rent payments under that lease through September 2019. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was approximately $0.2 million during each of the three months ended March 31, 2020 and March 31, 2019, respectively.

In December 2019, Verde purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was approximately $0.2 million during the three months ended March 31, 2020.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended March 31, 2020 and March 31, 2019, the Company recognized approximately $18.3 million and $10.1 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. During the three months ended March 31, 2020 and March 31, 2019, the Company recognized approximately $2.3 million and $0.5 million, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers a portion of the Company's GAP waiver coverage and the limited warranty provided to all customers under the Master Dealer Agreement. The Company pays a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers and a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase. The Company incurred approximately $1.3 million and $0.8 million during the three months ended March 31, 2020 and March 31, 2019, respectively, related to the administration of GAP waiver coverage and limited warranty. As of March 31, 2020, the majority of the Company's GAP waiver coverage sales were administered by an unrelated party.

**GAP Waiver Insurance Policy**

During the three months ended March 31, 2020 and 2019, the Company purchased insurance policies from BlueShore Insurance Company ("BlueShore"), an affiliate of DriveTime, for approximately $0.0 million and $1.0 million, respectively, that reimburses the lienholder of finance receivables with GAP waiver coverage for any GAP waiver claims on a defined set of finance receivables that the Company sold in its securitization transactions. This insurance is transferred with the underlying finance receivable. In March 2019, the Company entered into a retrospective profit sharing agreement with BlueShore under which the Company will share in the profits generated from the insurance policies by receiving a portion of the excess of the premium it paid to BlueShore, net of a fee, compared to the amount BlueShore pays out related to the GAP waiver claims. As of March 31, 2020 and December 31, 2019, the Company held a receivable of approximately $0.1 million and $0.2 million, respectively, which is included in other assets on the accompanying unaudited condensed consolidated balance sheets, related to this retrospective profit sharing agreement.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $1.6 million and $0.5 million during the three months ended March 31, 2020 and 2019, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime approximately $0.1 million under this agreement during both the three months ended March 31, 2020 and 2019, respectively.

**Senior Notes Held by Verde**

As of both March 31, 2020 and December 31, 2019, Verde held $15.0 million of principal of the Company's outstanding Senior Notes, as defined and further discussed in Note 9 — Debt Instruments.

**Accounts Payable Due to Related Party**

As of March 31, 2020 and December 31, 2019, approximately $10.2 million and $9.5 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contribution Agreements**

On September 10, 2018, the Company announced a commitment by its Chief Executive Officer, Ernest Garcia III, to contribute shares of the Company's Class A common stock, for each then-current employee from his personal shareholdings to the Company at no charge (the "Share Contributions"). His contributions funded equity awards of 165 restricted stock units to each of the Company's then-current employees upon their satisfying certain employment tenure requirements (the "100k Milestone Gift"). The Company entered into certain contribution agreements related to his commitment in order to effect the transfer of shares from Mr. Garcia to the Company. The Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contributions, but pursuant to a series of contribution agreements, it has indemnified Mr. Garcia from any such obligations that may arise. See Note 10 — Stockholders' Equity and Note 12 — Equity-Based Compensation for further discussion. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**IP License Agreement**

In February 2017, the Company entered into a license agreement that governs the rights of certain intellectual property owned by the Company and the rights of certain intellectual property owned by DriveTime. The license agreement, which was amended and restated in April 2017, generally provides that each party grants to the other certain limited exclusive (other than with respect to the licensor party and its affiliates) and non-exclusive licenses to use certain of its intellectual property, and each party agrees to certain covenants not to sue the other party, its affiliates and certain of its service providers in connection with various patent claims. The exclusive license to DriveTime is limited to the business that is primarily of subprime used car sales to retail customers. However, upon a change of control of either party, both parties' license rights as to certain future improvements to licensed intellectual property and all limited exclusivity rights are terminated. The agreement does not provide a license to any of the Company's patents, trademarks, logos, customers' personally identifiable information or any intellectual property related to the Company's vending machines, automated vehicle photography or certain other elements of the Company's brand.

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 7 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of agreements: forward flow agreements, including a Master Purchase and Sale Agreement and Master Transfer Agreement, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with certain financing partners, including Ally Bank and Ally Financial (the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. In March and April 2020, the Company and the Ally Parties amended the MPSA to, among other things and subject to the terms of the agreement, commit the purchaser to purchase up to a maximum of $2.0 billion of principal balances of finance receivables from the amendment date through March 23, 2021 and broaden the set of finance receivables covered by the MPSA.

During the three months ended March 31, 2020 and 2019, the Company sold approximately $351.1 million and $65.3 million, respectively, in principal balances of finance receivables under the MPSA and had approximately $1.9 billion of unused capacity as of March 31, 2020.

**Master Transfer Agreement**

Through May 7, 2019, the Company was party to a master transfer agreement (the "Master Transfer Agreement") with a purchaser trust (the "Purchaser Trust") under which the Purchaser Trust committed to purchase finance receivables meeting certain underwriting criteria. During the three months ended March 31, 2019, the Company sold approximately $58.3 million in principal balances of finance receivables under the Master Transfer Agreement.

During the three months ended March 31, 2019, the Company entered into a separate agreement to purchase finance receivables that it previously sold to the Purchaser Trust under the Master Transfer Agreement for a total price of approximately $127.7 million and immediately resold such finance receivables into a securitization transaction, which is described further in Note 8 — Securitizations and Variable Interest Entities.

On May 7, 2019, the Company purchased the certificate of the Purchaser Trust for $34.0 million, net of cash acquired. At the time of acquisition the trust assets included $139.7 million of finance receivables that the Company had previously sold to the Purchaser Trust under the Master Transfer Agreement, and its liabilities included $105.7 million in associated debt and other liabilities. In February 2020, the Master Transfer Agreement terminated in connection with the termination of a past finance receivable facility discussed in Note 9 — Debt Instruments.

**Securitization Transactions**

Beginning in 2019, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 8 — Securitizations and Variable Interest Entities.

During the three months ended March 31, 2020 and 2019, the Company sold approximately $494.8 million and $350.0 million, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners under the MPSA, the Master Transfer Agreement, and to investors in securitization transactions was approximately $13.0 million and $19.2 million during the three months ended

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

March 31, 2020 and 2019, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

## NOTE 8 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES

As noted in Note 7 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include but are not limited to rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of March 31, 2020, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. The Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets at fair value, which as of March 31, 2020 and December 31, 2019 were approximately $118.9 million and $98.8 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of March 31, 2020.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at March 31, 2020 and December 31, 2019. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

|  | March 31, 2020 | | December 31, 2019 | |
|  | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
|---|---|---|---|---|
|  | (in thousands) | | | |
| Rated notes | $ 94,158 | $ 94,158 | $ 85,234 | $ 85,234 |
| Certificates and other assets | 24,765 | 24,765 | 13,546 | 13,546 |
| Total unconsolidated VIEs | $ 118,923 | $ 118,923 | $ 98,780 | $ 98,780 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. These securities are interests in securitization

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of March 31, 2020 and December 31, 2019 were as follows (in thousands):

|  | March 31, 2020 | | December 31, 2019 | |
|  | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|
| Rated notes | $ 101,678 | $ 94,158 | $ 84,983 | $ 85,234 |
| Certificates and other assets | 27,750 | 24,765 | 13,456 | 13,546 |
| Total securities available for sale | $ 129,428 | $ 118,923 | $ 98,439 | $ 98,780 |

**NOTE 9 — DEBT INSTRUMENTS**

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by substantially all of its assets, other than the Company's interests in real property and finance receivables pledged under its Finance Receivable Facilities (as defined below). The facility has a maturity date of October 31, 2020 and requires monthly interest payments on borrowings under the Floor Plan Facility. The Company most recently amended the Floor Plan Facility in November 2019 to, among other things, increase the available capacity to $950.0 million from $650.0 million, adding flexibility to acquire more vehicles from customers. The annual interest rate was reduced to one-month LIBOR plus 3.15% if the average outstanding balance on the Floor Plan Facility in the previous calendar month is greater than $500.0 million and otherwise remains unchanged from one-month LIBOR plus 3.40%. The amendment also requires that at least 7.5% of the total principal amount owed to the lender is held as restricted cash, a change from 5%.

Repayment in an amount equal to the amount of the advance or loan must be made within five business days of selling or otherwise disposing of the underlying vehicle inventory, unless customers financed the purchase by originating an automotive finance receivable. For used vehicle sales involving financing originated by the Company and sold or pledged under either the MPSA or the Finance Receivable Facilities, repayment is due upon the earlier of fifteen business days after the sale of the used vehicle or one business day following the sale or pledge of the related finance receivable. With respect to such used vehicle sales involving financing that are not sold under either the MPSA or the Finance Receivable Facilities, repayment of the advance or the loan for such vehicles is due upon the earlier of fifteen business days after the sale of the vehicle or two business days following the funding of the related finance receivable. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts.

As of March 31, 2020, the interest rate on the Floor Plan Facility was approximately 4.14%, the Company had an outstanding balance under this facility of approximately $738.2 million, unused capacity of approximately $211.8 million, and held approximately $55.4 million in restricted cash related to this facility. As of December 31, 2019, the interest rate on the Floor Plan Facility was approximately 4.91%, the Company had an outstanding balance of approximately $515.5 million, unused capacity of approximately $434.5 million, and held approximately $38.7 million in restricted cash related to this facility.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain automotive finance receivables originated by the Company. As of March 31, 2020, the lender has

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

committed $425.0 million under this facility. The Company can increase this commitment in $25.0 million increments up to $500.0 million with the lender's consent, and draw upon this facility until July 23, 2021.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until February 20, 2022.

Both facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. Both facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of March 31, 2020, the Company had an outstanding balance under these facilities of approximately $74.0 million, and unused capacity of approximately $851.0 million. During the three months ended March 31, 2020, the Company's effective interest rate on these facilities was 3.57%.

*Past Finance Receivable Facilities*

In April 2019, the Company entered in a Loan and Security Agreement pursuant to which Ally Bank agreed to provide a $300.0 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus a spread ranging from 1.00% to 1.80%.

In May 2019, in connection with the acquisition of the Purchaser Trust described in Note 7 — Finance Receivable Sale Agreements, the Company and Ally Bank entered into an Amended and Restated Loan and Security Agreement to provide an additional $350.0 million revolving credit facility to fund certain other automotive finance receivables originated by the Company. The Company could draw upon this credit facility until April 17, 2020, and it had an annual interest rate of one-month LIBOR plus 1.95%.

Both credit facilities required that at least 2% of the outstanding pledged finance receivables principal balances, plus any undistributed amounts collected on the pledged finance receivables amount, be held as restricted cash.

Interest payments on these credit facilities were payable monthly on each draw date. Principal repayments occurred on the fifteenth day of each calendar month in an amount equal to the undistributed receivables collected.

The Company voluntarily terminated these facilities in February 2020 after entering into the active finance receivable facilities described above.

**Long-Term Debt**

*Senior Unsecured Notes*

On September 21, 2018, the Company issued an aggregate of $350.0 million in senior unsecured notes due 2023 (the "Existing Notes") under an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). On May 24, 2019, the Company issued $250.0 million in aggregate principal amount of additional notes (the "New Notes") under the Indenture, at a 100.5% premium. The Existing Notes and New Notes (together the "Senior Notes") are treated as a single class for all purposes and have the same terms. The Senior Notes accrue interest at a rate of 8.875% per annum, which is payable semi-annually in arrears on April 1 and October 1 of each year. The Senior Notes mature on October 1, 2023, unless earlier repurchased or redeemed, and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed solely for the purpose of facilitating the Company's sales or funding of its finance receivables, if any). The Company may redeem some or all of the Senior Notes on or after October 1, 2020 at redemption prices set forth in the Indenture, plus any accrued and unpaid interest to the redemption date. Prior to October 1, 2020, the Company may redeem up to 35.0% of the aggregate principal amount of the Senior Notes at a redemption price equal to 108.875%, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to October 1, 2020, by paying a make-whole premium plus any accrued and unpaid interest, to, but not

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101.0% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indenture governing the Senior Notes contains restrictive covenants that, subject to certain conditions, limit the ability of the Company to, among other things, incur additional debt or issue preferred stock, create liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default. As of March 31, 2020, the Company was in compliance with all covenants.

In connection with the issuance of these Senior Notes, Carvana Group amended its LLC agreement to create a class of non-convertible preferred units, which Carvana Co. purchased with its net proceeds from the issuance of these Senior Notes, as further discussed in Note 10 — Stockholders' Equity.

The outstanding principal of the Senior Notes, net of debt issuance costs and including the premium, was approximately $591.7 million and $591.1 million as of March 31, 2020 and December 31, 2019, respectively, of which $15.0 million of principal was held by Verde as of both periods, and is included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two to five-year term and requires monthly payments. As of March 31, 2020, the outstanding principal of these notes had a weighted-average interest rate of 6.7% and totaled approximately $29.7 million, of which approximately $12.6 million is due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheet.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of March 31, 2020, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of March 31, 2020 and December 31, 2019, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $226.7 million and $174.7 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheet.

In November 2017, the Company entered into a master sale-leaseback agreement (the "Master Sale-Leaseback Agreement" or "MSLA"), which was amended in November 2018, pursuant to which it may sell and lease back certain of its owned or leased properties and construction improvements. Under the MSLA, at any time the Company may elect to, and beginning in November 2020 or until a property owner of a leased site consents to the sale-leaseback, the purchaser has the right to demand that the Company repurchase one or more of the properties sold and leased back pursuant to the MSLA for an amount equal to the repurchase price. Repurchase prices are defined in each of the applicable leases and are generally the original purchase prices plus any accrued and unpaid rent. Under the MSLA, the total sales price of properties the Company has sold and is leasing back at any point in time is limited to $75.0 million. As of March 31, 2020 and December 31, 2019, the Company may sell and lease back approximately $75.0 million of its property and equipment under the MSLA.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

*Financing of Beneficial Interests in Securitizations*

In June 2019, the Company entered into a secured borrowing facility through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase. As discussed in Note 8 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules.

As of March 31, 2020 and December 31, 2019, the Company has pledged approximately $77.7 million and $85.0 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreement with expected repurchases ranging from January 2026 to October 2026. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lender, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transaction. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of this facility, net of debt issuance costs, was approximately $75.5 million and $82.7 million as of March 31, 2020 and December 31, 2019, respectively, of which approximately $25.4 million and $26.4 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

**NOTE 10 — STOCKHOLDERS' EQUITY**

Immediately prior to the IPO, Carvana Co. amended and restated its certificate of incorporation to, among other things authorize (i) 50.0 million shares of Preferred Stock, par value $0.01 per share, (ii) 500.0 million shares of Class A common stock, par value $0.001 per share, and (iii) 125.0 million shares of Class B common stock, par value $0.001 per share. On December 5, 2017, Carvana Co. amended and restated its certificate of incorporation to authorize 100,000 shares of Convertible Preferred Stock, with an initial stated value of $1,000 per share and a par value of $0.01 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of March 31, 2020, there were approximately 189.9 million and 4.6 million Class A Units and Class B Units (as adjusted for the participation thresholds and closing price of Class A common stock on March 31, 2020), respectively, issued and outstanding. As discussed in Note 12 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold and are earned over the requisite service period.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC units issued subsequent to the IPO (the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain Class A Units and Class B Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they will be required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended March 31, 2020, certain LLC Unitholders exchanged 0.1 million LLC Units and 0.0 million shares of Class B common stock for 0.1 million newly-issued shares of Class A common stock. Simultaneously, and in connection with these exchanges, Carvana Co. received approximately 0.1 million LLC Units, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of the Senior Notes in September 2018 and May 2019, as discussed further in Note 9 — Debt Instruments. Carvana Co. used its net proceeds from the Senior Notes to purchase 600,000 Class A Non-Convertible Preferred Units. In the event Carvana Co. makes payments on the Senior Notes, Carvana Group will make an equal cash distribution to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit shall be canceled and retired.

**Contribution of Class A Common Shares From Ernest Garcia III**

During the three months ended March 31, 2019, the Company and its Chief Executive Officer, Ernest Garcia III, entered into a contribution agreement (the "Contribution Agreement") in connection with the 100k Milestone Gift, as defined in Note 6 — Related Party Transactions. Pursuant to the Contribution Agreement, Mr. Garcia contributed approximately 0.1 million shares of the Company's Class A common stock to the Company during the three months ended March 31, 2019 at no charge. The Company subsequently granted approximately 0.1 million restricted stock units during the three months ended March 31, 2019 to employees. Refer to Note 12 — Equity-Based Compensation for further discussion. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the Share Contribution, it has indemnified Mr. Garcia from any such obligations that may arise. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift had been fulfilled.

**NOTE 11 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the three months ended March 31, 2020 and 2019, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $0.0 million and $1.9 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of March 31, 2020, Carvana Co. owned approximately 32.5% of Carvana Group with the LLC Unitholders owning the remaining 67.5%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

## NOTE 12 — EQUITY-BASED COMPENSATION

Equity-based compensation expense is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation expense recognized during the three months ended March 31, 2020 and 2019 is as follows (in thousands):

|  | Three Months Ended March 31, | | | |
|---|---|---|---|---|
|  | **2020** | | **2019** | |
| Class B Units | $ | 458 | $ | 578 |
| Restricted Stock Units and Awards excluding those granted in relation to the 100k Milestone Gift | | 4,495 | | 2,467 |
| Restricted Stock Units granted in relation to the 100k Milestone Gift | | — | | 3,124 |
| Options | | 1,607 | | 1,207 |
| Class A Units | | 495 | | 646 |
| Total equity-based compensation | | 7,055 | | 8,022 |
| Equity-based compensation capitalized to property and equipment | | (1,115) | | (311) |
| Equity-based compensation capitalized to inventory | | (91) | | (877) |
| Equity-based compensation, net of capitalized amounts | $ | 5,849 | $ | 6,834 |

As of March 31, 2020, the total unrecognized compensation expense related to outstanding equity awards was approximately $75.8 million, which the Company expects to recognize over a weighted-average period of approximately 3.1 years. Total unrecognized equity-based compensation expense will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14.0 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units ("RSUs") and other stock-based awards to employees, directors, officers and consultants. The majority of the Company's equity awards, other than those granted in relation to the 100k Milestone Gift, vest over four year periods based on continued employment with the Company. As of March 31, 2020, approximately 10.4 million shares remain available for future equity award grants under this plan.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four- year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five- years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three months ended March 31, 2020 or March 31, 2019. As of March 31, 2020, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 13 — LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented.

The following table presents the calculation of basic and diluted net loss per share during the three months ended March 31, 2020 and 2019 (in thousands, except per share data):

|  | Three Months Ended March 31, | | | |
|  | 2020 | | 2019 | |
|---|---|---|---|---|
| Numerator: | | | | |
| Net loss | $ | (183,557) | $ | (82,596) |
| Net loss attributable to non-controlling interests | | 123,670 | | 59,481 |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ | (59,887) | $ | (23,115) |
| Denominator: | | | | |
| Weighted-average shares of Class A common stock outstanding | | 50,555 | | 41,632 |
| Nonvested weighted-average restricted stock awards | | (156) | | (280) |
| Weighted-average shares of Class A common stock to compute basic and diluted net loss per Class A common share | | 50,399 | | 41,352 |
| Net loss per share of Class A common stock, basic and diluted | $ | (1.19) | $ | (0.56) |

On April 1, 2020, the Company completed a registered direct offering of approximately 13.3 million shares of its Class A common stock and received net proceeds from the offering of approximately $599.5 million.

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented. LLC Units (adjusted for the Exchange Ratio and participation thresholds) are considered potentially dilutive

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash.

Weighted-average as-converted Class A Units of approximately 101.4 million and 104.4 million together with the related Class B common stock for the three months ended March 31, 2020 and 2019, respectively, were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive. Outstanding Class B Units of approximately 5.0 million and 6.3 million at March 31, 2020 and 2019, respectively, were evaluated for potentially dilutive effects and were determined to be anti-dilutive. Weighted-average potentially dilutive restricted stock awards and units of approximately 0.8 million and 0.7 million for the three months ended March 31, 2020 and 2019, respectively, were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive. As of both March 31, 2020 and 2019, 1.3 million options were outstanding and evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

## NOTE 14 — INCOME TAXES

As described in Note 1 — Business Organization, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 10 — Stockholders' Equity, the Company acquired approximately 0.1 million LLC Units during the three months ended March 31, 2020 in connection with exchanges with LLC Unitholders. During the three months ended March 31, 2020, the Company recorded a gross deferred tax asset of approximately $1.9 million associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statement of stockholders' equity.

As described in Note 4 — Goodwill and Intangible Assets, Net, Carvana Group acquired Car360 on April 12, 2018. The acquisition included various intangible assets, and as a result the Company recognized a deferred tax liability of approximately $2.5 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheet. The deferred tax liability will be amortized over two to seven years and approximately $0.1 million and $0.4 million was amortized during the three months ended March 31, 2020 and 2019, respectively.

During the three months ended March 31, 2020, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of March 31, 2020 and December 31, 2019, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

In March 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in response to the COVID-19 pandemic. The Company does not expect the provisions of the legislation to have a significant impact on the effective tax rate or income tax payable and deferred income tax positions of the Company.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 10 — Stockholders' Equity, each

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of March 31, 2020, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of March 31, 2020, the total unrecorded TRA liability is approximately $180.1 million. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

## NOTE 15 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of March 31, 2020, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2020 and 2032. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options. The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 6 — Related Party Transactions for further discussion of operating leases with related parties.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

**Lease Costs and Activity**

The Company's lease costs and activity during the three months ended March 31, 2020 and 2019 were as follows (in thousands):

| | | **Three Months Ended March 31,** | | |
| --- | --- | --- | --- | --- |
| | | **2020** | | **2019** |
| **Lease costs:** | | | | |
| Finance leases: | | | | |
| Amortization of finance lease assets | $ | 3,470 | $ | 1,267 |
| Interest obligations under finance leases | | 805 | | 331 |
| Total finance lease costs | $ | 4,275 | $ | 1,598 |
| | | | | |
| Operating leases: | | | | |
| Fixed lease costs | $ | 5,638 | $ | 2,328 |
| Fixed lease costs to related parties | | 2,118 | | 1,806 |
| Variable short-term lease costs to related parties | | 178 | | 454 |
| Total operating lease costs | $ | 7,934 | $ | 4,588 |
| | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | |
| Operating lease liabilities to third parties | $ | 3,905 | $ | 1,817 |
| Operating lease liabilities to related parties | $ | 2,153 | $ | 2,137 |
| Interest payments on finance lease liabilities | $ | 805 | $ | 331 |
| | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | |
| Principal payments on finance lease liabilities | $ | 4,064 | $ | 1,208 |

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of March 31, 2020 (in thousands):

| | Finance Leases | Operating Leases [1] Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| Remainder of 2020 | $ 14,033 | $ 6,110 | $ 12,384 | $ 18,494 | $ 32,527 |
| 2021 | 17,058 | 7,737 | 18,739 | 26,476 | 43,534 |
| 2022 | 16,471 | 7,775 | 17,249 | 25,024 | 41,495 |
| 2023 | 15,360 | 7,834 | 15,166 | 23,000 | 38,360 |
| 2024 | 8,238 | 6,621 | 13,680 | 20,301 | 28,539 |
| Thereafter | 2,308 | 28,622 | 147,118 | 175,740 | 178,048 |
| Total minimum lease payments | 73,468 | 64,699 | 224,336 | 289,035 | 362,503 |
| Less: amount representing interest | (7,738) | (19,531) | (93,612) | (113,143) | (120,881) |
| Total lease liabilities | $ 65,730 | $ 45,168 | $ 130,724 | $ 175,892 | $ 241,622 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of March 31, 2020 and December 31, 2019, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of March 31, 2020 and 2019 were as follows, excluding short-term operating leases:

| | Three Months Ended March 31, | |
|---|---|---|
| | **2020** | **2019** |
| Weighted-average remaining lease terms (years) | | |
| Operating leases | 10.9 | 10.9 |
| Finance leases | 4.5 | 4.9 |
| Weighted-average discount rate | | |
| Operating leases | 8.3 % | 9.0 % |
| Finance leases | 5.4 % | 5.6 % |

**NOTE 16 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $5.4 million and $3.7 million as of March 31, 2020 and December 31, 2019, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, as of March 31, 2020 the Company does not believe that the ultimate resolution of any legal actions, either individually or in the aggregate, will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its own proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

**NOTE 17 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

As of March 31, 2020 and December 31, 2019, the Company held certain assets that were required to be measured at fair value on a recurring basis and beneficial interests in securitizations for which it elected the fair value option.

The following tables are a summary of fair value measurements and hierarchy level at March 31, 2020 and December 31, 2019 (in thousands):

**As of March 31, 2020:**

| | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds [1] | $ 2,720 | $ 2,720 | $ — | $ — |
| Beneficial interests in securitizations | 118,923 | — | — | 118,923 |

**As of December 31, 2019:**

| | Carrying Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds [1] | $ 56,435 | $ 56,435 | $ — | $ — |
| Beneficial interests in securitizations | 98,780 | — | 29,222 | 69,558 |

_____

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of March 31, 2020 and December 31, 2019, the Company has a purchase price adjustment receivable of approximately $1.9 million and $6.9 million, respectively, which is carried at fair value and classified as other assets in the accompanying unaudited condensed consolidated balance sheets. Under the Master Purchase and Sale Agreement, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivable is determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the Master Purchase and Sale Agreement. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data this receivable is classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivable during the three months ended March 31, 2020 and 2019 were approximately $5.1 million and $0.0 million, respectively, and are reflected in other expense, net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 8 — Securitizations and Variable Interest Entities. Level 2 assets typically include

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

beneficial interests in the most recent securitization due to the proximity to the end of the period and lack of observable changes in economic inputs. Given the changes in the market and overall economic inputs between pricing and closing of the most recent securitization transaction completed in March 2020, it was classified as Level 3 as of March 31, 2020.

The Company's beneficial interests in securitizations, which are classified as Level 3, are classified as such due to the lack of observable market data to corroborate either the non-binding market consensus prices or the non-binding broker quotes. The significant unobservable market data includes market yields. Significant increases or decreases in market yields would result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense, net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. During the three months ended March 31, 2020, the Company transferred beneficial interests acquired as part of the securitization transaction in December 2019 from Level 2 to Level 3. The assets are typically initially classified as Level 2 due to the transactions' proximity to the end of each respective reporting period and the lack of observable changes in economic inputs. As noted above, the Company uses significant unobservable inputs to measure the fair value of these assets on a recurring basis, thus they will be classified as Level 3 in future periods. There were no transfers out of Level 3 during the three months ended March 31, 2020. There were no transfers into or out of Level 3 during the three months ended March 31, 2019.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three months ended March 31, 2020 (in thousands):

|  | March 31, 2020 |
|---|---|
| **Opening Balance, December 31, 2019** | $ 69,558 |
| Transfers into Level 3 | 29,222 |
| Received in securitization transactions | 39,578 |
| Cash receipts | (8,030) |
| Change in fair value | (11,405) |
| **Ending Balance, March 31, 2020** | $ 118,923 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value because their respective maturities are less than three months. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended March 31, 2020 and December 31, 2019. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of March 31, 2020 and December 31, 2019 was as follows (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value, net of unamortized debt issuance costs | $ 591,731 | $ 591,124 |
| Fair value | 562,144 | 625,114 |

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of March 31, 2020 and December 31, 2019 were as follows (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Carrying value | $ 199,045 | $ 286,969 |
| Fair value | 199,045 | 304,532 |

**Derivative Instruments**

As of March 31, 2020 and December 31, 2019, the Company had no outstanding derivative instruments.

**NOTE 18 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the three months ended March 31, 2020 and 2019 (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2020 | 2019 |
| **Supplemental cash flow information:** |  |  |
| Cash payments for interest | $ 13,272 | $ 3,917 |
| **Non-cash investing and financing activities:** |  |  |
| Capital expenditures included in accounts payable and accrued liabilities | $ 35,886 | $ 11,246 |
| Property and equipment acquired under finance leases | $ 18,326 | $ 11,395 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 50,253 | $ 4,940 |
| Equity-based compensation expense capitalized to property and equipment | $ 1,115 | $ 311 |
| Fair value of beneficial interests received in securitization transactions | $ 39,578 | $ 19,531 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 7,305 | $ — |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented (in thousands):

|  | March 31, 2020 | December 31, 2019 | March 31, 2019 | December 31, 2018 |
|---|---|---|---|---|
| Cash and cash equivalents | $ 72,435 | $ 76,016 | $ 85,321 | $ 78,861 |
| Restricted cash [(1)] | 72,600 | 42,443 | 21,734 | 9,848 |
| Total cash, cash equivalents and restricted cash | $ 145,035 | $ 118,459 | $ 107,055 | $ 88,709 |

(1) Amounts included in restricted cash represent the deposits required under the Company's short-term revolving facilities. Refer to Note 9 — Debt Instruments for additional information.

**NOTE 19 — SUBSEQUENT EVENTS**

**Registered Direct Offering**

On April 1, 2020, the Company completed a registered direct offering to investors of approximately 13.3 million shares of its Class A common stock at an offering price of $45.00 per share and received net proceeds from the offering of approximately $599.5 million. Ernest Garcia II, through Verde, and Ernest Garcia III each invested approximately $25.0 million, or

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

approximately 0.6 million shares of the Class A common stock, in the offering. Following the completion of the offering, Carvana Co. owns approximately 37.8% of Carvana Group and the LLC Unitholders own the remaining 62.2%.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Item 1 of this Form 10-Q.*

**Overview**

Carvana is a leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a used vehicle.*** As of March 31, 2020, we listed approximately 33,500 vehicles for sale on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- ***Finance their purchase.*** Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we earn a premium upon sale.

- ***Protect their purchase.*** Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- ***Sell us their car.*** We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle sourcing and acquisition.*** We primarily acquire our used vehicle inventory through the large and liquid national used-car auction market and directly from customers when they trade in or sell us their vehicles. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary

31

algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

• *Inspection and reconditioning.*    Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to one of our IRCs, at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

• *Photography and merchandising.*    To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

• *Transportation and fulfillment.*    Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory at our IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays, and ensuring a seamless and reliable customer experience.

## COVID-19 Update

COVID-19 is having an impact on retail and consumer lending businesses nationwide, with local governments, businesses, and consumers increasingly limiting commercial activity and capital markets experiencing instability. The worldwide spread of the COVID-19 outbreak is expected to result in a global slowdown of economic activity which is likely to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the outbreak is contained. This is impacting our business and the automotive industry as a whole. We are positioning the business today to be lean and flexible in this period of lower demand and higher uncertainty. To this end, we have temporarily paused certain new market openings and vending machine launches and significantly reduced discretionary growth expenditures on new hiring, travel, facilities, and information technology investments. We have also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up to meet expected customer demand when the current COVID-19 pandemic subsides.

Our most important priority is the well-being of our employees and customers. We have taken several steps to provide a healthy working environment, including implementing work from home policies for employees who are able to work remotely, pausing all non-essential travel and group meetings, performing deep cleaning and sanitization in all of our facilities, and implementing social distancing policies. For many customers, buying or selling a car is an important component of their transportation and financial planning needs. We believe our online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. Our touchless delivery process allows customers to shop for a car from the comfort of their home, complete their transaction on their phone or laptop, and take

32

delivery of their new car without coming into physical contact with our delivery personnel. At delivery, we sanitize the car and communicate with the customer over the phone as they feel out the car and complete paperwork. Our employees and customers have given us positive feedback on this approach, and we believe it represents a significant step forward in the safety of retail auto sales in the current environment. In April 2020, we introduced a promotion that provides qualifying customers that finance their used vehicle purchase with us additional financial flexibility by offering the option to delay their first payment until 90 days after their purchase.

Our financial statements reflect estimates and assumptions made by management that affect the carrying values of the Company's assets and liabilities, disclosures of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, including as a result of the COVID-19 pandemic, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations. We will continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

Our operational and financial performance will depend on future developments related to the continuously evolving COVID-19 pandemic. Future developments include the duration, scope and severity of the pandemic, the actions taken to contain or mitigate its impact, the development of treatments or vaccines, the resumption of widespread economic activity, and changes in consumer sentiment. Due to the inherent uncertainty of the unprecedented and rapidly evolving situation, we are unable to predict the impact of the COVID-19 pandemic will have on our future operations.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the three months ended March 31, 2020, the number of vehicles we sold to retail customers grew by 42.6% to 52,427 compared to 36,766 in the three months ended March 31, 2019. We expect our used vehicle sales to be negatively impacted by COVID-19.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer

33

advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings in each of the past seven years. After opening Atlanta, Georgia in 2013, we opened two markets in 2014, six in 2015, 12 in 2016, 23 in 2017, 41 in 2018, 61 in 2019, and 15 in the first three months of 2020, bringing our total number of markets to 161 as of March 31, 2020. Our 15 market openings since December 31, 2019 increased the total percentage of the U.S. population serviced in our markets to 68.7% as of March 31, 2020 from 66.9% as of December 31, 2019. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. In light of the COVID-19 pandemic, we temporarily paused certain new market openings and vending machine launches. We plan to continually evaluate consumer demand and our operational capacity to determine our market opening strategy. We expect to launch many small markets near our existing infrastructure soon.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness. With our growth into new markets, national television advertising has become more economically efficient compared to purchasing several local television advertising campaigns.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has led to growth in retail units sold. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $964.3 million and $683.8 million during the three months ended March 31, 2020 and 2019, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $79.6 million and $33.0 million during the three months ended March 31, 2020 and 2019, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $54.3 million and $38.4 million during the three months ended March 31, 2020 and 2019, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

We expect the COVID-19 pandemic to impact all three sources of revenue and gross profit. First, we expect the pandemic to negatively impact retail units sold, which directly impacts retail, wholesale, and other revenue and gross profit. Second, we expect the pandemic to negatively impact retail and wholesale gross profit per unit due to the impact of lower demand on average days to sale and industry-wide used vehicle pricing. Specifically, we expect our average days to sale to increase and average retail and wholesale selling prices to fall in the near-term as dealers and wholesale suppliers work through inventory across the industry. Finally, we expect the pandemic to negatively impact gain on loan sale revenue due to higher required yields from loan investors during this period of uncertainty. While significant in the near-term, we believe all of these impacts are transitory, and we plan to stay lean during this period and maintain strength and flexibility for a return to normal conditions.

34

During our growth phase, our highest priority will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- ***Increase the purchase of vehicles from customers.*** We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In light of the COVID-19 pandemic, we temporarily paused purchasing vehicles from customers independent of a retail sale, and subsequently resumed these purchases in limited circumstances.

- ***Reduce average days to sale.*** Our goal is to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- ***Leverage existing IRC infrastructure.*** As we scale, we intend to more fully utilize the capacity in our eight existing IRCs, which collectively have capacity to inspect and recondition over 400,000 vehicles per year at full utilization**.**

- ***Increase utilization on logistics network.*** As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from wholesale auctions or customers.

- ***Increase conversion on existing products.*** We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- ***Add new products and services.*** We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- ***Increase monetization of our finance receivables.*** We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- ***Optimize purchasing and pricing.*** We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

**Seasonality**

Absent the impact of COVID-19, used vehicle sales exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, which may not fully reflect the underlying performance of our business. The impact of COVID-19 on seasonality is uncertain.

**Investment in Growth**

Absent the impact of COVID-19, we have aggressively invested in the growth of our business and we expect this investment to continue following a return to normal conditions. We anticipate that our operating expenses will increase substantially as we continue to open new markets, expand our logistics network and increase our advertising spending. There is no guarantee that we will be able to realize the return on our investments.

The worldwide spread of COVID-19 is expected to result in a global slowdown of economic activity which is likely to decrease demand for a broad variety of goods and services, including from our customers, while also disrupting sales channels, marketing activities and supply chains for an unknown period of time until the pandemic is contained. Due to the COVID-19

35

pandemic, we have temporarily paused new market openings and vending machine launches and significantly reduced discretionary growth expenditures on hiring, travel, IRC and vending machine construction, and information technology investments. We have also rebalanced our marketing, staffing, and purchasing levels to align with demand, while closely monitoring key metrics to determine when and how quickly to adjust. We believe our business model makes us well-positioned to scale up to meet customer demand when the current COVID-19 pandemic subsides.

### Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 6 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

### Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, opening new markets, and enhancing the selection of vehicles we make available to our customers. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Retail units sold | 52,427 | 36,766 |
| Number of markets | 161 | 109 |
| Average monthly unique visitors | 6,807,631 | 3,790,052 |
| Inventory units available on website | 33,570 | 18,221 |
| Average days to sale | 68 | 63 |
| Total gross profit per unit [1] | $ 2,640 | $ 2,408 |

(1) Includes $10 and $21, respectively, related to the 100k Milestone Gift discussed below.

#### *Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

#### *Number of Markets*

We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers by a Carvana employee in a branded delivery truck. We view the number of markets we serve as a key driver of our growth. As we increase our number of markets, the population of consumers who have access to our fully integrated customer experience increases, which in turn helps to increase the number of vehicles we sell.

#### *Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Inventory Units Available*

We define inventory units available as the number of vehicles listed for sale on our website on the last day of a given reporting period. We view inventory units available as a key measure of our growth. Growth in inventory units available increases the selection of vehicles available to consumers in all of our markets simultaneously, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in inventory units available indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand inventory units available while continuing to grow sales, thereby improving other key operating metrics of the business.

*Average Days to Sale*

We define average days to sale as the average number of days between when we acquire the vehicle and when we deliver it to a customer for all retail units sold in a period. However, this metric does not include any retail units that remain unsold at period end. We view average days to sale as a useful metric due to its impact on used vehicle average selling price.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

In the second half of 2018, we announced a commitment by our Chief Executive Officer, Ernest Garcia III ("Mr. Garcia"), to contribute 165 shares of Class A common stock to us from his personal shareholdings for every one of our then-existing employees upon their satisfying certain employment tenure requirements. In connection with such contributions, we made corresponding grants of 165 restricted stock units under our 2017 Omnibus Incentive Plan to each employee who satisfied the requirements (the "100k Milestone Gift" or "Gift"). Under GAAP, the 100k Milestone Gift was treated as compensation expense, a portion of which related to the production of our used vehicle inventory and was therefore capitalized to inventory and subsequently recognized within costs of sales when the related inventory was sold. As of December 31, 2019, Mr. Garcia's commitment related to the 100k Milestone Gift has been fulfilled and as of March 31, 2020, all of the compensation expense related to the 100k Milestone Gift has been recognized. For the three months ended March 31, 2020 and 2019, total gross profit per unit includes $10 and $21, respectively, related to the 100k Milestone Gift.

### Components of Results of Operations

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our number of markets, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our average days to sale and our pricing strategy. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenues we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish. The securitization trusts issue asset-backed securities, which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under a committed forward-flow arrangement with financing partners who acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

*Cost of Sales*

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the wholesale vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

*Used Vehicle Gross Profit*

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

*Wholesale Vehicle Gross Profit*

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

38

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes (including amounts due to Verde), our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 9 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other Expense*

Other expense, net includes changes in fair value on our beneficial interests in securitizations and purchase price adjustment receivable, as discussed in Note 17 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general operating expenses such as gains or losses from disposals of long-lived assets.

**Results of Operations**

| | Three Months Ended March 31, | | | | Change |
|---|---|---|---|---|---|
| | 2020 | | 2019 | | |
| | (dollars in thousands, except per unit amounts) | | | | |
| **Net sales and operating revenues:** | | | | | |
| Used vehicle sales, net | $ | 964,279 | $ | 683,829 | 41.0 % |
| Wholesale vehicle sales | | 79,606 | | 33,030 | 141.0 % |
| Other sales and revenues [1] | | 54,331 | | 38,375 | 41.6 % |
| Total net sales and operating revenues | $ | 1,098,216 | $ | 755,234 | 45.4 % |
| **Gross profit:** | | | | | |
| Used vehicle gross profit[3] | $ | 82,862 | $ | 47,122 | 75.8 % |
| Wholesale vehicle gross profit[4] | | 1,229 | | 3,035 | (59.5)% |
| Other gross profit [1] | | 54,331 | | 38,375 | 41.6 % |
| Total gross profit | $ | 138,422 | $ | 88,532 | 56.4 % |
| **Market information:** | | | | | |
| Markets, beginning of period | | 146 | | 85 | 71.8 % |
| Market launches | | 15 | | 24 | (37.5)% |
| Markets, end of period | | 161 | | 109 | 47.7 % |
| **Unit sales information:** | | | | | |
| Used vehicle unit sales | | 52,427 | | 36,766 | 42.6 % |
| Wholesale vehicle unit sales | | 10,754 | | 6,701 | 60.5 % |
| **Per unit selling prices:** | | | | | |
| Used vehicles | $ | 18,393 | $ | 18,599 | (1.1)% |
| Wholesale vehicles | $ | 7,402 | $ | 4,929 | 50.2 % |
| **Per unit gross profit:[2]** | | | | | |
| Used vehicle gross profit[3] | $ | 1,581 | $ | 1,282 | 23.3 % |
| Wholesale vehicle gross profit[4] | $ | 114 | $ | 453 | (74.8)% |
| Other gross profit | $ | 1,036 | $ | 1,044 | (0.8)% |
| Total gross profit | $ | 2,640 | $ | 2,408 | 9.6 % |

(1) Includes $20,562 and $10,573 for the three months ended March 31, 2020 and 2019, respectively, of other sales and revenues from related parties.
(2) All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.
(3) Includes $510 and $764, or $10 and $20 per unit, related to the 100k Milestone Gift.
(4) Includes $17 and $22, or $2 and $3 per wholesale unit, related to the 100k Milestone Gift.

*Used Vehicle Sales*

    *Three months ended March 31, 2020 Versus* 2019. Used vehicle sales increased by $280.5 million to $964.3 million during the three months ended March 31, 2020, compared to $683.8 million during the three months ended March 31, 2019. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 52,427 from 36,766 during the three months ended March 31, 2020 and 2019, respectively. The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness and customer referrals. The increase in unit sales was also driven by growth to 161 markets as of March 31, 2020 from 109 markets as of March 31, 2019. Retail units sold in March was negatively impacted by COVID-19 as consumers increasingly sheltered-in-place and reduced commercial activity and we reduced advertising expenditures. Following COVID-19, we anticipate that unit sales will continue to grow as we increase penetration in existing markets and launch new markets. The average selling price of our retail units sold decreased

to $18,393 during the three months ended March 31, 2020 from $18,599 during the three months ended March 31, 2019, partially offsetting the increase in used vehicle revenue resulting from the increase in unit sales.

### Wholesale Vehicle Sales

*Three months ended March 31, 2020 Versus* 2019. Wholesale vehicle sales increased by $46.6 million to $79.6 million during the three months ended March 31, 2020, compared to $33.0 million during the three months ended March 31, 2019. We primarily obtain our wholesale inventory by acquiring vehicles from customers. The increase in revenue was partially driven by an increase in wholesale units sold to 10,754 from 6,701 during the three months ended March 31, 2020 and 2019. As our retail unit sales have increased, so have the trade-ins we receive. Moreover, during the three months ended March 31, 2020, we also acquired more vehicles from customers who did not purchase a retail unit from us. Therefore, we have had more units available for sale to wholesalers over time and our revenues attributed to wholesale vehicle sales have increased. In addition, the average selling price of our wholesale units sold increased to $7,402 during the three months ended March 31, 2020 from $4,929 during the three months ended March 31, 2019.

### Other Sales and Revenues

*Three months ended March 31, 2020 Versus* 2019. Other sales and revenues primarily consist of gains on the sales of loans we originate, commissions we receive on sales of VSCs and GAP waiver coverage. Other sales and revenues increased by $16.0 million to $54.3 million during the three months ended March 31, 2020, compared to $38.4 million during the three months ended March 31, 2019. This increase was primarily driven by the increase in retail units sold which led to an increase in loans originated, as well as an increase in VSC sales and GAP waiver coverage sales. The increase in loan originations resulted in an increase in interest income from interest earned on finance receivables held on balance sheet prior to our securitization transactions. Although the number of loans sold increased year-over-year, the gain on loan sale decreased as a result of the disruption in the overall securitization market experienced near the end of the three months ended March 31, 2020 as a result of the COVID-19 pandemic.

### Used Vehicle Gross Profit

*Three months ended March 31, 2020 Versus* 2019. Used vehicle gross profit increased by $35.7 million to $82.9 million during the three months ended March 31, 2020, compared to $47.1 million during the three months ended March 31, 2019. This increase was driven primarily by an increase in retail units sold, as well as an increase in used vehicle gross profit per unit to $1,581 for the three months ended March 31, 2020 compared to $1,282 for the three months ended March 31, 2019. The per unit increase was primarily driven by acquiring more vehicles from customers. Due to COVID-19, the increase in used vehicle gross profit was partially offset by an adjustment to the value of our unsold used vehicle inventory of approximately $6.5 million to reflect its net realizable value as of March 31, 2020.

### Wholesale Vehicle Gross Profit

*Three months ended March 31, 2020 Versus* 2019. Wholesale vehicle gross profit decreased by $1.8 million to $1.2 million, during the three months ended March 31, 2020, compared to $3.0 million during the three months ended March 31, 2019. Although there was an increase in wholesale units sold to 10,754 during the three months ended from 6,701 during the three months ended March 31, 2019, there was a decrease in wholesale vehicle gross profit per wholesale unit, to $114 in the three months ended March 31, 2020 compared to $453 in the three months ended March 31, 2019. The decrease in wholesale vehicle gross profit per unit was primarily a result of the decline in the overall wholesale market conditions caused by the COVID-19 pandemic toward the end of the quarter, leading to an adjustment to the value of our unsold wholesale inventory of approximately $2.8 million to reflect its net realizable value as of March 31, 2020.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

41

*Components of SG&A*

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2020 | 2019 |
|  | (in thousands) | |
| Compensation and benefits [1] | $ 84,250 | $ 48,804 |
| 100k Milestone Gift | — | 2,188 |
| Advertising | 74,788 | 39,522 |
| Market occupancy [2] | 8,103 | 4,370 |
| Logistics [3] | 18,914 | 12,249 |
| Other [4] | 89,656 | 48,108 |
| Total | $ 275,711 | $ 155,241 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.
(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $120.5 million to $275.7 million during the three months ended March 31, 2020, compared to $155.2 million during the three months ended March 31, 2019. The increase was partially due to an increase in compensation and benefits by $35.4 million during the three months ended March 31, 2020, compared to the three months ended March 31, 2019, which was primarily driven by expansion of our logistics and delivery network, as well as growth in our corporate and technology teams. The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $35.3 million during the three months ended March 31, 2020, compared to the three months ended March 31, 2019. Market occupancy, logistics, and other overhead costs also increased during the three months ended March 31, 2020 compared to the prior period primarily due to an increase in number of markets and units sold.

*Interest Expense*

Interest expense increased by $13.2 million to $28.9 million during the three months ended March 31, 2020, compared to $15.6 million during the three months ended March 31, 2019. The increase is primarily due to the increase in the outstanding balance of the Senior Notes as a result of the issuance in May 2019 which incurred interest expense of $13.3 million during the three months ended March 31, 2020, compared to $7.8 million during the three months ended March 31, 2019. The remaining increase is due to increased interest expense incurred on our short-term revolving facilities, capital and finance leases, and long-term debt due to larger outstanding balances in the three months ended March 31, 2020 compared to the three months ended March 31, 2019.

*Other Expense, Net*

Other expense, net increased by $17.2 million to $17.4 million during the three months ended March 31, 2020, compared to $0.2 million during the three months ended March 31, 2019. The increase is primarily due to the uncertainty in the capital markets caused by the COVID-19 pandemic, driving a $16.5 million decline in certain assets carried at fair value, including our beneficial interests in securitizations and purchase price adjustment receivable, as of March 31, 2020.

### Non-GAAP Financial Measures

To supplement the consolidated financial statements, which are prepared and presented in accordance with GAAP, we also present the following non-GAAP measures: EBITDA, EBITDA margin, adjusted net loss and adjusted net loss per share. We

believe the presentation of both GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable GAAP financial measures.

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three months ended March 31, 2020, there was approximately $0.5 million of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three months ended March 31, 2019, there was approximately $3.0 million of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $0.8 million within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### EBITDA and EBITDA Margin

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows (dollars in thousands):

|  | Three Months Ended March 31, | | | |
|  | 2020 | | 2019 | |
|---|---|---|---|---|
| Net loss[1] | $ | (183,557) | $ | (82,596) |
| Depreciation and amortization expense | | 15,811 | | 7,943 |
| Interest expense | | 28,862 | | 15,648 |
| EBITDA | $ | (138,884) | $ | (59,005) |
| | | | | |
| Total revenues | $ | 1,098,216 | $ | 755,234 |
| EBITDA Margin[2] | | (12.6)% | | (7.8)% |

(1) Includes $0.5 million and $3.0 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0% and 0.4%, respectively, related to the 100k Milestone Gift.

### Adjusted Net Loss and Adjusted Net Loss per Share

Adjusted net loss represents net loss attributable to Carvana Co. assuming the full exchange of all outstanding LLC Units for shares of Class A common stock. Adjusted net loss per share is calculated by dividing adjusted net loss by the weighted-average shares of Class A common stock outstanding assuming the full exchange of all outstanding LLC Units.

Adjusted net loss and adjusted net loss per share are supplemental measures of operating performance that do not represent and should not be considered alternatives to net loss and net loss per share, as determined under GAAP. We believe that by assuming the full exchange of all outstanding LLC Units, adjusted net loss and adjusted net loss per share supplement GAAP measures and enable us and our investors to more effectively evaluate our performance period-over-period and relative to our competitors that have different organizational and tax structures because the assumption eliminates the effect of any changes in net loss attributable to Carvana Co. driven by increases in our ownership of Carvana Group, LLC, which are unrelated to our operating performance.

43

A reconciliation of adjusted net loss to net loss attributable to Carvana Co., the most directly comparable GAAP measure, and the computation of adjusted net loss per share are as follows (in thousands, except per share amounts):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Numerator: | | |
| Net loss attributable to Carvana Co. | $ (59,887) | $ (23,115) |
| Net loss attributable to non-controlling interests | (123,670) | (59,481) |
| Adjusted net loss attributable to Carvana Co. Class A common stock[2] | $ (183,557) | $ (82,596) |
| Denominator: | | |
| Weighted-average shares of Class A common stock outstanding[1] | 50,399 | 41,352 |
| Adjustments: | | |
| Weighted-average assumed exchange of LLC Units for shares of Class A common stock | 105,241 | 108,974 |
| Adjusted shares of Class A common stock outstanding | 155,640 | 150,326 |
| Adjusted net loss per share[3] | $ (1.18) | $ (0.55) |

(1) Excludes approximately 1.1 million and 0.7 million nonvested service-based restricted stock awards and units outstanding at March 31, 2020 and March 31, 2019, respectively, and 1.3 million vested and nonvested stock options outstanding at both March 31, 2020 and March 31, 2019 because they were determined to be anti-dilutive.
(2) Includes $0.5 million and $3.0 million, respectively, related to the 100k Milestone Gift.
(3) Includes $0.00 and $0.02 per share, respectively, related to the 100k Milestone Gift.

### Liquidity and Capital Resources

*General*

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

On March 24, 2020, we amended our Master Purchase and Sale Agreement with Ally to provide for the sale of up to $2.0 billion of principal balance of finance receivables to Ally. The amended agreement upsizes Ally's purchase commitment by approximately $1.6 billion, extends it to March 23, 2021, and broadens the set of customers covered by the agreement. This agreement gives us significant flexibility to serve customers during this period of heightened uncertainty.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including the impact of COVID-19, our rate of revenue growth, our expansion into new markets, construction of vending machines and IRCs, and the timing and extent of our spending to support our technology and software development efforts.

44

We had the following liquidity resources available as of March 31, 2020 and December 31, 2019 (in thousands):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Cash and cash equivalents | $ 72,435 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 163,775 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 103,317 | 104,680 |
| Committed liquidity resources available | $ 339,527 | $ 459,776 |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $28.3 million and $29.7 million as of March 31, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.
(3) We have $174.8 million and $158.7 million of total unfunded gross real estate assets as of March 31, 2020 and December 31, 2019, respectively.

As of March 31, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1,875.0 million and $1,600.0 million, an outstanding balance of $812.2 million and $568.8 million, and unused capacity of $1,062.8 million and $1,031.2 million, respectively.

We also had $87.1 million and $137.7 million of committed funds for future construction costs of four IRCs with unfinished construction as of March 31, 2020 and December 31, 2019, respectively. In addition, we had $49.0 million and $13.5 million of total unpledged beneficial interests in securitizations as of March 31, 2020 and December 31, 2019, respectively.

Additionally, on April 1, 2020, we completed a registered direct offering of approximately 13.3 million shares of our Class A common stock and received net proceeds from the offering of approximately $599.5 million.

As of March 31, 2020 and December 31, 2019, our outstanding principal amount of indebtedness, including finance leases, was $1.8 billion and $1.5 billion, respectively, summarized in the table below (in thousands). See Note 9 — Debt Instruments and Note 15 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **Asset-Based Financing:** |  |  |
| Inventory | $ 738,214 | $ 515,487 |
| Finance receivables and beneficial interests | 151,677 | 138,335 |
| Transportation fleet [1] | 85,561 | 73,369 |
| Real estate [2] | 239,045 | 187,082 |
| Total asset-based financing | 1,214,497 | 914,273 |
| Senior unsecured notes [3] | 600,000 | 600,000 |
| Total debt | 1,814,497 | 1,514,273 |
| Less: unamortized premium and debt issuance costs [4] | (12,876) | (13,642) |
| **Total debt, net** | $ 1,801,621 | $ 1,500,631 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) As of both March 31, 2020 and December 31, 2019, Verde held $15.0 million of the Senior Notes.
(4) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other current assets and other assets on our consolidated balance sheets. The unamortized premium is presented as an increase to the carrying amount of the senior unsecured notes on our consolidated balance sheets.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the three months ended March 31, 2020 and 2019 (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Net cash used in operating activities | $ (168,458) | $ (214,509) |
| Net cash used in investing activities | (88,708) | (43,199) |
| Net cash provided by financing activities | 283,742 | 276,054 |
| Net increase in cash, cash equivalents and restricted cash | 26,576 | 18,346 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 145,035 | $ 107,055 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. For the three months ended March 31, 2020, net cash used in operating activities was $168.5 million, a decrease of $46.1 million compared to net cash used in operating activities of $214.5 million for the three months ended March 31, 2019. The decrease in our net cash used in operating activities was primarily due to decreased cash used to purchase finance receivables, as well as changes in working capital during each period, primarily vehicle inventory and accounts receivable. These decreases in use of cash were partially offset by increased net loss as a result of increased selling, general and administrative expenses and a decrease in net cash inflows associated with the change in accounts payable and accrued liabilities.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $88.7 million and $43.2 million during the three months ended March 31, 2020 and 2019, respectively, an increase of $45.5 million. The increase primarily relates to the increase in purchases of property and equipment, specifically related to the construction of new IRCs and vending machines. Constructing new IRCs and vending machines allows us to recondition more vehicles and reach additional customers. To finance these investments we have entered into various financing transactions, such as sale-leasebacks.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $283.7 million and $276.1 million during the three months ended March 31, 2020 and 2019, respectively, an increase of $7.7 million. The change primarily relates to increased proceeds from long-term debt net of payments driven by increased proceeds on sale-leaseback arrangements on four IRCs currently under construction during the three months ended March 31, 2020.

**Contractual Obligations and Commitments**

We have not entered into any material contractual obligations or commitments outside of the ordinary course of business since the most recently ended fiscal year as disclosed in the header "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our most recent Annual Report on Form 10-K.

46

**Fair Value Measurements**

We report money market securities, certain receivables, and beneficial interests in securitizations at fair value. See Note 17 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Off-Balance Sheet Arrangements**

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivables by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 8 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

Except as discussed above, we did not have any off-balance sheet arrangements as of March 31, 2020.

**Critical Accounting Policies**

Refer to Note 2 — Summary of Significant Accounting Policies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for accounting pronouncements and material changes to our critical accounting policies since December 31, 2019. There have been no other material changes to our critical accounting policies and use of estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

47

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the effect and consequences of the COVID-19 public health crisis on matters including U.S. and local economies; our business operations and continuity; the availability of corporate and consumer financing; the health and productivity of our employees; the ability of third-party providers to continue uninterrupted service; and the regulatory environment in which we operate;

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime and its affiliates;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

48

- our ability to sell and generate gains on the sale of automotive finance receivables;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the Internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance vending machines and IRCs;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

49

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indenture governing our senior unsecured notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Controls Over Financial Reporting

There were no changes to our internal control over financial reporting that occurred during the three months ended March 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

# PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

## ITEM 1A. RISK FACTORS

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, except as follows:

### *The COVID-19 pandemic is adversely affecting, and could continue to adversely affect, our business, operating results, financial condition and prospects.*

COVID-19 was identified in China in late 2019 and has spread globally. The rapid spread has resulted in authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place orders and shutdowns. These measures have impacted and may further impact all or portions of our workforce and operations, the behavior of our customers, and the operations of our partners, vendors, and suppliers. While the federal and state governments have taken measures to try to contain the COVID-19 pandemic, there is considerable uncertainty regarding such measures and potential future measures. Future restrictions on our access to and utilization of our logistics and distribution network, our corporate offices, our inspection and reconditioning centers, our hubs, our vending machines, and/or our support operations or workforce, or similar limitations for our partners, vendors, or suppliers, and restrictions or disruptions of transportation, could limit our ability to conduct our business and have a material adverse effect on our business, operating results, financial condition and prospects. There is no certainty that measures taken by governmental authorities will be sufficient to mitigate the risks posed by the COVID-19 pandemic, and our ability to perform critical functions could be harmed.

The COVID-19 pandemic has also significantly increased economic and demand uncertainty, and has led to disruption and volatility in the global capital markets, which can increase the cost of capital and adversely impact access to capital. It is likely that the COVID-19 pandemic will cause an economic slowdown, and it is possible that it could cause a global recession. Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our platform. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further risks related to negative economic conditions are described in our risk factor titled "Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues." under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019.

The ultimate magnitude of COVID-19, including the extent of its impact on our financial and operational results, which could be material, will be determined by the length of time that the pandemic continues, its effect on the demand for our vehicles, our inventory supply chain and distribution, and the capital markets, as well as the effect of governmental regulations imposed in response to the pandemic. We cannot at this time predict the impact of the COVID-19 pandemic, but it could continue to have a material adverse effect on our business, operating results, financial condition and prospects.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Recent Sales of Unregistered Securities

There were no unregistered sales of equity during the three months ended March 31, 2020, except as otherwise previously reported.

During the three months ended March 31, 2020, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged approximately 0.1 million LLC Units and approximately 0.0 million shares of Class B common stock for approximately 0.1 million newly-issued shares of Class A common stock.

51

These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 10.1 | Seventh Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.2* | Eighth Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.3* | Ninth Amendment to the Amended and Restated Master Purchase and Sale Agreement, filed herewith. |
| 10.4 | Transfer Agreement, dated March 30, 2020, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, filed herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

\* Certain portions of the exhibit (indicated by "[***]") have been omitted as the Registrant has determined (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:     May 6, 2020

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins

Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

54

**SEVENTH AMENDMENT**

SEVENTH AMENDMENT, dated as of March 19, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, and by the Sixth Amendment, dated as of April 19, 2019 (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 Defined Terms. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 Amendments to Appendix A (Definitions). Appendix A to the Master Purchase and Sale Agreement is hereby amended by:

(a) inserting each of the following terms which are double underlined in the place where such term appears below to the "Cutoff Date" definition:

""Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to

any First Tier Receivables Pool and Receivables Pool sold <u>(i)</u> from and including March 7, 2019 to and including April 4, 2019, respectively, <u>and (ii) on March 20, 2020,</u> the "Cutoff Date" shall be the date consented to by the Purchasers."

(b) inserting the following terms to the end of clause (xxxiv) to the "Eligible Receivable" definition:

"provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply."

(c) inserting each of the following terms which are double underlined in the place where such term appears below and deleting the stricken text to the "Origination Period" definition:

""<u>Origination Period</u>" means, each calendar week during the period beginning with the week of December 12, 2016 and ending with the week containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, ~~and~~ (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, <u>and (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020,</u> "Origination Period" shall be the period consented to by the Purchasers."

SECTION III
MISCELLANEOUS

Section 3.01 <u>Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of a signed counterpart to this Amendment that has been duly executed and delivered by each of the parties hereto.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.04 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the

subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.05 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

*[remainder of the page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**CARVANA AUTO RECEIVABLES 2016-1 LLC**, as Transferor

By:     /s/ Paul Breaux

Name:   Paul Breaux

Title:  Vice President

**ALLY BANK**, as Purchaser

By:     /s/ William R. Thompson

Name:   William R. Thompson

Title:  Authorized Representative

**ALLY FINANCIAL INC**, as Purchaser

By:     /s/ Thomas Elkins

Name:   Thomas Elkins

Title:  Authorized Representative

Agreed to and Accepted by:

**CARVANA, LLC**, as Seller

By:     /s/ Paul Breaux

Name:   Paul Breaux

Title:  Vice President

**EIGHTH AMENDMENT**

EIGHTH AMENDMENT, dated as of March 24, 2020 (this "Amendment") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, and by the Seventh Amendment, effective as of March 19, 2020, (the "Master Purchase and Sale Agreement"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "Transferor"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "Purchaser"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "Purchaser" and, together with Ally Bank, the "Purchasers").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION I
## DEFINITIONS

Section 1.01 <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

## SECTION II
## AMENDMENTS

Section 2.01 <u>Amendments to Appendix A (Definitions)</u>. <u>Appendix A</u> to the Master Purchase and Sale Agreement is hereby amended by:

(a) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Commitment Amount" definition:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

""Commitment Amount" means the sum of (i) $2,000,000,000~~1,000,000,000~~ plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool."

(b) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Commitment Period" definition:

""Commitment Period" means the period from the Fourth~~Third~~ Extension Amendment Effective Date to the earliest of (i) the Scheduled Commitment Termination Date, (ii) the occurrence of a Commitment Termination Event and (iii) the purchase by the Purchasers of Receivables Pools with a total Cutoff Date Aggregate Outstanding Principal Balance in an amount equal to the Commitment Amount."

(c) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Cutoff Date" definition:

""Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to any First Tier Receivables Pool and Receivables Pool sold (i) from and including March 7, 2019 to and including April 4, 2019, respectively, ~~and~~ (ii) on March 20, 2020, and (iii) on any other date consented to by the Purchasers in their sole discretion, the "Cutoff Date" shall be the date consented to by the Purchasers."

(d) deleting clauses (xlii) and (xliii) to the "Eligible Receivable" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Eligible Receivable" definition:

"(xxxiii) (A) for Receivables with a related Cutoff Date on or after February 24, 2019 and on or prior to March 19, 2020, the LTV at origination did not exceed [***] and (B) for Receivables with a related Cutoff Date after March 19, 2020, where the Obligor has a FICO score (a) greater than or equal to 640, then the LTV at origination is less than or equal to [***]%; (b) greater than or equal to 600 and less than 640, then the LTV at origination is less than or equal to [***]%, (c) greater than or equal to 580 and less than 600, then the LTV at origination is less than or equal to 140%; and (d) less than 580, then the LTV at origination is less than or equal to [***]%;"

[***] Redacted for confidentiality purposes.

"(xxxiv) The Obligor has a FICO score of not less than 520~~590~~ and, not more than the Upper Bound FICO Score, which, except for a Receivable included in the initial Receivables Pool on the initial Closing Date, shall have been obtained by Carvana within the [***] days prior to the origination of the related Receivable, unless otherwise consented to by the Purchasers; <u>provided</u> that, if the Seller exercises a Limited Sale Option on any Closing Date occurring on or after March 7, 2019 through and including April 4, 2019, the maximum FICO score limit described in this clause (xxxiv) shall not apply; provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply;"

(e) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Origination Period" definition:

""<u>Origination Period</u>" means, each calendar week during the period beginning with the week of December 12, 2016 and ending with the week containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, ~~and~~ (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, <u>and (iv) any other date consented to by the Purchasers in their sole discretion,</u> "Origination Period" shall be the period consented to by the Purchasers."

(f) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Purchase Percentage" definition:

""<u>Purchase Percentage</u>" for an Origination Period, means, the percentage <u>equal or greater than</u> to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable"<u> and such other documented administrative criteria as the Purchasers may agree to from time to time</u> during such Origination Period (which, for purposes of <u>clause (ii)</u> shall be reduced by the aggregate principal balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than <u>100%</u>~~50%~~ and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply."

[***] Redacted for confidentiality purposes.

(g) inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Scheduled Commitment Termination Date" definition:

""Scheduled Commitment Termination Date" means March 23, 2021April 17, 2020."

(h) adding a new definition of "Fourth Extension Amendment Effective Date" in proper alphabetical order to read as follows:

""Fourth Extension Amendment Effective Date" means March 24, 2020."

(i) deleting the "Third Extension Amendment Effective Date" definition.

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100%50% (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%50%) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination

Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage."

Section 2.02 <u>Amendments to Section 2.1(d) (Selection of Receivables Pools)</u>. Section 2.1(d) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(d) <u>Selection of Receivables Pools.</u> The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures <u>and such other documented administrative criteria as the Purchasers may agree to from time to time</u>, as selected by the Seller in accordance with the Selection Procedures and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) upon consultation with the Purchasers, each such Receivables Pool (after giving effect to such sale) meets the Eligible Receivables Pool criteria. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis <u>after applying such documented administrative criteria as the Purchasers may agree to from time to time</u> (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this <u>Section 2.1(d)</u> and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection."

Section 2.03 <u>Amendments to Section 6.2(b) (Minimum Sales Amount)</u>. <u>Section 6.2(b)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) <u>Minimum Sales Amount</u>. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than <u>100%</u>50% (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection at a Purchase Percentage of <u>100%</u>50%) of the aggregate principal balance of weekly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" <u>and such other documented administrative criteria as the</u>

<u>Purchasers may agree to from time to time</u> originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers.

Section 2.04 <u>Amendments to Section 7.20(h) (Credit Policy)</u>. Section 7.20(h) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

(h) <u>Credit Policy</u>. During the Commitment Period, the Transferor will not, and it will not permit the Seller to, amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to <u>Exhibit E</u> attached hereto, without written notification to the Purchasers; <u>provided</u> that the prior written consent of the Purchasers shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Purchasers under this Agreement or any other Basic Document. The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's policies concerning generation of financing terms as well as (i) a comparison showing all changes to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month, noting that the Purchasers may also request a current version of the Seller's policies concerning generation of financing terms at any point in time. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms. <u>The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's Credit Policy as well as (i) a comparison showing all changes to the Seller's Credit Policy as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's Credit Policy as provided to the Purchasers during the previous calendar month, noting that the Purchasers may also request a current version of the Seller's Credit Policy at any point in time.</u>

Section 2.05 <u>Amendments to Exhibit A</u>. <u>Schedule 6</u> (Accounts and Receivables Analysis for the subject Receivables Pool) to <u>Exhibit A</u> to the Master Purchase and Sale Agreement is hereby deleted in its entirety and replaced with "[Reserved]".

SECTION III<br>MISCELLANEOUS

Section 3.01 <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto;

(b) a signed counterpart to the Twelfth Amended and Restated Letter Agreement re Master Purchase and Sale Agreement, dated as of the date hereof, shall have been duly

executed and delivered by Carvana, LLC, Bridgecrest Credit Company, LLC, the Transferor, Ally Financial, and Ally Bank; and

(c) a signed copy of the Sixth Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 <u>Continuing Effect of the Master Purchase and Sale Agreement</u>. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 <u>Representations and Warranties</u>. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

*[remainder of the page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor


By:   /s/ Paul Breaux
      Name: Paul Breaux
      Title: Vice President


ALLY BANK,
as Purchaser


By:   /s/ William R. Thompson
      Name: William R. Thompson
      Title: Authorized Representative


ALLY FINANCIAL INC.,
as Purchaser


By:   /s/ Thomas Elkins
      Name: Thomas Elkins
      Title: Authorized Representative

   Agreed to and Accepted by:

   CARVANA, LLC,
   as Seller
   By:      /s/ Paul Breaux
   Name:    Paul Breaux
   Title:   Vice President

**NINTH AMENDMENT**

NINTH AMENDMENT, dated as of April 29, 2020 (this "<u>Amendment</u>") to the Amended and Restated Master Purchase and Sale Agreement, dated as of March 6, 2017, as amended by the First Amendment, dated as of September 14, 2017, by the Second Amendment, dated as of November 3, 2017, by Omnibus Amendment No. 2 to Basic Documents (Ally-Carvana Flow), dated as of January 4, 2018, by the Third Amendment, dated as of November 2, 2018, by the Fourth Amendment, effective as of January 4, 2019, by the Fifth Amendment, effective as of March 6, 2019, by the Sixth Amendment, effective as of April 19, 2019, by the Seventh Amendment, effective as of March 19, 2020, and by the Eighth Amendment, effective as of March 24, 2020 (the "<u>Master Purchase and Sale Agreement</u>"), among CARVANA AUTO RECEIVABLES 2016-1 LLC, a Delaware limited liability company, as Transferor (the "<u>Transferor</u>"), ALLY BANK, a Utah chartered bank, as a Purchaser (in such capacity, a "<u>Purchaser</u>"), and ALLY FINANCIAL INC., a Delaware corporation, as a Purchaser (in such capacity, a "<u>Purchaser</u>" and, together with Ally Bank, the "<u>Purchasers</u>").

WITNESSETH:

WHEREAS, the Transferors and the Purchasers are parties to the Master Purchase and Sale Agreement pursuant to which the Purchasers have agreed to purchase specified portfolios of receivables and related property from the Transferor; and

WHEREAS, the parties wish to amend the Master Purchase and Sale Agreement in certain respects;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I
DEFINITIONS

Section 1.01 <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used in the above recitals and in this Amendment are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to the Master Purchase and Sale Agreement.

SECTION II
AMENDMENTS

Section 2.01 <u>Amendments to Appendix A (Definitions)</u>. <u>Appendix A</u> to the Master Purchase and Sale Agreement is hereby amended by:

(a) adding a definition of "Flex Receivable" in the proper alphabetical order to read as follows:

Certain information has been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

""Flex Receivable" means a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including [***] (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller. For the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable."

(b) adding a definition of "Flex Amount" in the proper alphabetical order to read as follows:

""Flex Amount" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement."

(c) revising the "Administrative Purchase Payment" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Administrative Purchase Payment" definition

""Administrative Purchase Payment" means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360."

(d) revising clause (xii) to the "Eligible Receivable" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Eligible Receivable" definition:

""(xii) (A) For a Receivable that is not a Flex Receivable, the The first scheduled payment in respect of such Receivable is no more than forty-five (45) days from the related contract date or (B) is a Flex Receivable;""

(e) revising the "Warranty Payment" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "Warranty Payment" definition:

""Warranty Payment" means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days

[***] Redacted for confidentiality purposes.

from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360."

(f) revising the "Purchase Price" definition and inserting each of the following terms which are double underlined in the place where such term appears below to the "Purchase Price" definition:

""Purchase Price" means the price applicable to the Purchased Receivables purchased in any Receivables Pool, which shall be equal to (x) the sum of (i) the price for such Receivables Pool designated by the Pricing Model (for the avoidance of doubt, the Pricing Model will, for each Purchased Receivable in such Receivables Pool, (A) increase the related purchase price for any interest scheduled to accrue (ignoring any non-scheduled payment that may be received by the Seller) for the period from the date of origination (or, if such Purchased Receivable has at least one scheduled monthly payment occurring prior to the related Cutoff Date, from such most recent scheduled monthly payment date) through the related Closing Date and (B) decrease the related purchase price for the portion of any non-scheduled payment received by the Seller prior to the related Cutoff Date allocated to accrued interest) plus (ii) the Pre-closing Interest Carry Amount for such Receivables Pool as of the Closing Date, minus (y) the Flex Amount (if any) for such Receivables Pool."

(g) revising the "First Step Receivables Purchase Price" definition and inserting each of the following terms which are double underlined in the place where such term appears below to, and deleting the stricken terms from, the "First Step Receivables Purchase Price" definition:

""First Step Receivables Purchase Price" means, with respect to a First Tier Receivables Pool, an amount equal to the related ~~Closing Date~~ Second Step Receivables Purchase Price."

Section 2.02 Amendments to Section 2.1(a) (Transferor Obligation). Section 2.1(a) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance equal to at least 100% (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, at a Purchase Percentage of 100%) of the aggregate principal balance of weekly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale

[***] Redacted for confidentiality purposes.

Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than 590 and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including [***], taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)."

Section 2.03 Amendments to Section 2.1(b) (Purchaser Obligation). Section 2.1(b) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(b) Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar week during the Commitment Period, except for the calendar weeks within the period from January 4, 2019 to February 9, 2019, on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including [***], taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation")."

Section 2.04 Amendments to Section 2.1(d) (Selection of Receivables Pools). Section 2.1(d) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each of the following terms which are double underlined in the place where such term appears below and deleting the stricken text:

"(d) Selection of Receivables Pools. The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures and such other documented administrative criteria as the Purchasers may agree to from time to time, as selected by the Seller in accordance with the Selection Procedures and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) (a) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria and (b) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, such Receivables Pool together with all Receivable Pools previously purchased,

[***] Redacted for confidentiality purposes.

meet the applicable Eligible Receivables Pool criteria~~each such Receivables Pool (after giving effect to such sale) meets the Eligible Receivables Pool criteria~~. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the <u>applicable</u> criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis after applying such documented administrative criteria as the Purchasers may agree to from time to time (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this Section 2.1(d) and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection."

Section 2.05 <u>Amendments to Section 3.1(e) (Purchase Cadence and Settlement Report)</u>. <u>Section 3.1(e)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(e) <u>Purchase Cadence and Settlement Report</u>. Not later than the third (3rd) Business Day following an Origination Period, the Transferor shall provide the Purchasers with the Purchase Percentage and supply the Purchasers with an initial data tape in form and substance acceptable to the Purchasers containing the information as called for in <u>Exhibit D</u> <u>and indicating which Receivables listed in such initial data tape are Flex Receivables</u> with respect to all Receivables originated or acquired by the Seller in the preceding Origination Period (and any Previously Originated Receivables to be included in the Related Receivables Pool) that the Seller and the Transferor intend in good faith to sell to the Purchasers under this Agreement meeting the selection criteria for sale to the Transferor and those Receivables meeting the eligibility criteria for sale by the Transferor to the Purchasers, a Receivables Pool. Not later than the first (1st) Business Day of the second week following an Origination Period (but at least two (2) Business Days prior to the related Closing Date), the Transferor shall supply the Purchasers with a final data tape in form and substance acceptable to the Purchasers containing the final information as called for in <u>Exhibit D</u> <u>and indicating which Receivables listed in such initial data tape are Flex Receivables</u> with respect to all Receivables in the related Receivables Pool and identifying any receivable in the initial data tape that was determined not to be an Eligible Receivable, including any receivable with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable. Not less than two (2) Business Days prior to each proposed Closing Date, the Transferor will deliver to the Purchasers a settlement report substantially in the form of <u>Schedule 2</u> attached to the Pool Supplement (the "<u>Settlement Report</u>"), in form and substance reasonably acceptable to the Purchaser setting forth amounts due the Transferor with respect to the applicable Receivables Pool and containing at least the calculation of the related Cutoff Date Aggregate Outstanding Principal Balance, the Pre-closing Interest Carry Amount, the purchase price designated by the Pricing Model, the re-liening expenses described in <u>Section 2.7</u> and the Second Step Receivables Purchase Price."

[***] Redacted for confidentiality purposes.

Section 2.06 <u>Amendments to Section 4.1(a) (General Procedures)</u>. <u>Section 4.1(a)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(iii) Not later than the second (2nd) Business Day of the second week following an Origination Period (but at least one (1) Business Day prior to the related Closing Date), the Purchasers shall notify the Seller of the final Purchase Price <u>(including any Flex Amount)</u> for the Receivables Pool and the final allocation of purchase between Ally Bank and Ally Financial."

Section 2.07 <u>Amendments to Section 5.2(cc)(i) (Characteristics of the Receivables)</u>. Section 5.2(cc)(i) of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(i) <u>Characteristics of Receivables</u>. As of each Cutoff Date (except to the extent otherwise provided in the definition of "Eligible Receivable") with respect to the related Receivables to be purchased, (A) each Receivable is an Eligible Receivable, (B) ~~all of the Receivables, together, constitute an Eligible Receivables Pool~~<u>(i) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (ii) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable)</u> and (C) the Receivables Pool was selected as described in Section 2.1(d)."

Section 2.08 <u>Amendments to Section 6.2(a) (Aggregate Purchase Commitment)</u>. <u>Section 6.2(a)</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"(a) <u>Aggregate Purchase Commitment</u>. After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date <u>and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including [***], taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion)</u>."

Section 2.09 <u>Amendments to Section 8.2 (Repurchase of Receivables Upon Breach by the Transferor)</u>. <u>Section 8.2</u> of the Master Purchase and Sale Agreement is hereby amended as set forth below by inserting each term thereof which is double underlined in the place where such term appears below and deleting the stricken text:

"Upon (i) the discovery of any breach of any representation or warranty as set forth in <u>Section 5.2(cc)</u> of this Agreement (and with respect to <u>paragraphs (i)(B)(ii) and (x)</u> therein, without

[***] Redacted for confidentiality purposes.

giving effect to any knowledge requirements) or (ii) the Purchasers incurring any cost, expense, loss, claim, damage or liability resulting from any conduct or omission of the Seller or the Transferor that results in the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Such notice shall specify the reason for such ineligibility or breach and shall identify all Receivables that the party preparing such notice knows is so ineligible or in breach as of such date. Unless the breach described in clause (i) above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in clause (ii) above, in each such circumstance, the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit, or cause to be remitted the Warranty Payment to the applicable Collection Account for distribution pursuant to Section 4.2 of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in Section 7.14 of this Agreement) against the Transferor for such breach available to the Purchasers."

SECTION III
MISCELLANEOUS

Section 3.01 Conditions to Effectiveness. This Amendment shall become effective as of the date first written above upon the receipt of the following:

(a) a signed counterpart to this Amendment duly executed and delivered by each of the parties hereto;

(b) a signed copy of the Thirteenth Amended and Restated Letter Agreement re Master Purchase and Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC, Bridgecrest Credit Company, LLC, the Transferor, Ally Financial, and Ally Bank; and

(c) a signed copy of the Seventh Amendment to Master Sale Agreement, dated as of the date hereof, shall have been duly executed and delivered by Carvana, LLC the Transferor, Ally Financial, and Ally Bank.

Section 3.02 Continuing Effect of the Master Purchase and Sale Agreement. Except as specifically amended and modified above, the Master Purchase and Sale Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Purchasers under the Master Purchase and Sale Agreement, nor constitute a waiver of any provision of the Master Purchase and Sale Agreement.

Section 3.03 Representations and Warranties. The representations and warranties of the Seller and the Transferor contained in the Basic Documents shall be true and correct in all material respects as of the effective date of this Amendment.

[***] Redacted for confidentiality purposes.

Section 3.04 <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the Purchasers, the Servicer and their respective successors and permitted assigns.

Section 3.05 <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties intend that faxed signatures and electronically imaged signatures including as .pdf files shall constitute original signatures and are binding on all parties. In case any provision in or obligation under this Amendment shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. This Amendment contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings other than any fee letter contemplated hereby.

Section 3.06 <u>GOVERNING LAW. SUBMISSION TO JURISDICTION, ETC</u>.

(a) THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AMENDMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(b) THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) THE TRANSFEROR AND THE PURCHASERS EACH HEREBY WAIVES (TO EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AMENDMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 3.07 <u>Effect of Headings</u>. The section headings herein are for convenience only and shall not affect the construction hereof.

[***] Redacted for confidentiality purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor


By:   /s/ Paul Breaux
　　　Name:    Paul Breaux
　　　Title:    Vice President

ALLY BANK,
as Purchaser


By:   /s/ William R. Thompson
　　　Name:    William R. Thompson
　　　Title:    Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser


By:   /s/ Thomas Elkins
　　　Name:    Thomas Elkins
　　　Title:    Authorized Representative


Agreed to and Accepted by:

CARVANA, LLC,
as Seller

By:        /s/ Paul Breaux
Name:    Paul Breaux
Title:    Vice President

**RECEIVABLES TRANSFER AGREEMENT**

This RECEIVABLES TRANSFER AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of March 30, 2020, is by and between Carvana Receivables Depositor LLC, a Delaware limited liability company (the "Depositor"), and Carvana Auto Receivables Trust 2020-NP1, a Delaware statutory trust (the "Issuing Entity").

**AGREEMENTS**

WHEREAS, on the Closing Date, Carvana, LLC (the "Seller") has sold automobile retail installment contracts and related rights to the Depositor;

WHEREAS, the Depositor is willing to sell such contracts and related rights to the Issuing Entity pursuant to this Agreement;

WHEREAS, the Issuing Entity intends to contribute or otherwise transfer such contracts and related rights, or interests therein, to Carvana Auto Receivables Grantor Trust 2020-NP1, a Delaware statutory trust (the "Grantor Trust"), pursuant to the Receivables Contribution Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Receivables Contribution Agreement"), between the Issuing Entity and the Grantor Trust, in exchange for the Grantor Trust Certificate;

WHEREAS, the Grantor Trust intends to pledge such contracts and related rights to Wells Fargo Bank, National Association ("Wells Fargo"), as indenture trustee (the "Indenture Trustee"), and the Issuing Entity will issue notes backed by the Grantor Trust Certificate pursuant to the Indenture, dated as of the date hereof (as amended, modified or supplemented from time to time, the "Indenture"), among the Issuing Entity, Carvana Auto Receivables Grantor Trust 2020-NP1 (the "Grantor Trust"), and the Indenture Trustee; and

WHEREAS, Bridgecrest Credit Company, LLC, an Arizona limited liability company (the "Servicer"), is willing to service such contracts in accordance with the terms of the Servicing Agreement, dated as of the date hereof, among the Issuing Entity, the Grantor Trust, the Backup Servicer and the Servicer.

NOW, THEREFORE, in consideration of the mutual agreements and subject to the terms and conditions herein contained, each party agrees as follows for the benefit of the other party:

ARTICLE I
DEFINITIONS

Section 1.1 <u>Definitions; Rules of Construction.</u> Certain capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings assigned to them in Part I of Appendix A of the Indenture. All references herein to "the Agreement" or "this Agreement" are to this Receivables Transfer Agreement as it may be amended, supplemented or modified from time to time, and all references herein to Articles and Sections are to Articles or Sections of this Agreement unless otherwise specified (and for such purposes only, references in

those sections to the Agreement (including references to "this Agreement", "hereof", "hereunder" and words of like effect) shall be deemed to refer this Agreement). The rules of construction set forth in Part II of Appendix A of the Indenture shall be applicable to this Agreement.

ARTICLE II
CONVEYANCE OF RECEIVABLES

Section 2.1 <u>Conveyance of Receivables.</u>

(a) On the Closing Date, the Depositor hereby agrees to sell, transfer, assign, set over and otherwise convey to the Issuing Entity and the Issuing Entity hereby agrees to purchase from the Depositor, without recourse, all right, title and interest of the Depositor in, to and under the following property, whether now existing or hereafter created or acquired (all of the property described in this <u>Section 2.1(a)</u> being collectively referred to herein as the "<u>Second Step Transferred Property</u>"):

(i) the Receivables and all instruments and all monies due or to become due or received by any Person in payment of any of the foregoing on or after the Cutoff Date;

(ii) the Financed Vehicles securing such Receivables (including any such Financed Vehicles that have been repossessed), any document or writing evidencing any security interest in any such Financed Vehicle and each security interest in each Financed Vehicle;

(iii) the Receivable Files and the Servicer Files related to such Receivables;

(iv) all rights to payment under all Insurance Policies with respect to the Financed Vehicles or the Obligors, including any monies collected from whatever source in connection with any default of an Obligor or with respect to any such Financed Vehicle and any proceeds from claims or refunds of premiums on any Insurance Policy;

(v) all guaranties, indemnities, warranties, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of the Receivables, whether pursuant to the related Contracts or otherwise;

(vi) all rights to payment under all service contracts and other contracts and agreements associated with such Receivables;

(vii) all Liquidation Proceeds related to any such Receivable received on or after the Cutoff Date;

(viii) subject to the Transaction Documents and the Master Agency Agreement, all deposit accounts, monies, deposits, funds, accounts and instruments relating to the foregoing (excluding payments or recoveries in respect of the Receivables received prior to the Cutoff Date);

(ix) the Receivables Purchase Agreement, including the right of the Depositor to cause the Seller to repurchase Receivables under certain circumstances;

(x) the proceeds of any and all of the foregoing; and

(xi) all present and future claims, demands, causes of action and choses in action in respect of any of all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property; all accounts, general intangibles, chattel paper, instruments, documents, money, investment property, deposit accounts, letters of credit, letter-of-credit rights, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations; and all other property which at any time constitutes all or part of or is included in the proceeds of any of the foregoing.

(b) In connection with the purchase and sale of the Second Step Transferred Property hereunder, the Depositor agrees, at its own expense, (i) to annotate and indicate on its books and records (including any computer files) that the Receivables were sold and transferred to the Issuing Entity pursuant to this Agreement, (ii) to deliver to the Issuing Entity (or its designee) all Collections on the Receivables, if any, received on or after the Cutoff Date, and (iii) to deliver to the Issuing Entity an assignment in the form attached hereto as Exhibit A (the "Second Step Receivables Assignment").

(c) In consideration of the sale of the Receivables from the Depositor to the Issuing Entity as provided herein, the Issuing Entity shall deliver to, or upon the order of, the Depositor the Notes and Certificates (the "Purchase Price"). The Issuing Entity hereby directs the Depositor to transfer all Electronic Contracts included in the Second Step Transferred Property directly to the Grantor Trust, as assignee under the Receivables Contribution Agreement of the Issuing Entity.

Section 2.2 Intent of the Parties.

It is the intention of the parties that each conveyance hereunder of the Receivables and the other Second Step Transferred Property from the Depositor to the Issuing Entity as provided in Section 2.1 be, and be construed as, an absolute sale, without recourse, of the Receivables and other Second Step Transferred Property by the Depositor to the Issuing Entity. Furthermore, no such conveyance is intended to be a pledge of the Second Step Transferred Property by the Depositor to the Issuing Entity to secure a debt or other obligation of the Issuing Entity. If,

however, notwithstanding the intention of the parties, the conveyance provided for in Section 2.1 is determined, for any reason, not to be an absolute sale, then the parties intend that this Agreement shall be deemed to be a "security agreement" within the meaning of Article 9 of the UCC and the Depositor hereby grants to the Issuing Entity a "security interest" within the meaning of Article 9 of the UCC in all of the Depositor's right, title and interest in and to the Second Step Transferred Property, now existing and hereafter created or acquired, to secure a loan in an amount equal to Purchase Price and each of the Depositor's other payment obligations under this Agreement.

ARTICLE III
REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.1 <u>Representations and Warranties of the Depositor.</u>

(a) <u>General Representations and Warranties</u>. The Depositor makes the following representations and warranties to the Issuing Entity as of the date of this Agreement, which shall survive the delivery of the Second Step Transferred Property and on which representations and warranties the Issuing Entity shall rely in acquiring the Second Step Transferred Property.

(i) <u>Organization and Good Standing</u>. The Depositor has been duly organized, and is validly existing as a limited liability company, in good standing under the laws of the state of its formation, with all requisite limited liability company power and authority to own or lease its properties and conduct its business as such business is presently conducted, and the Depositor had at all relevant times, and now has the power, authority and legal right to acquire, own and sell the Receivables and other Second Step Transferred Property.

(ii) <u>Due Qualification</u>. The Depositor is duly qualified to do business and is in good standing under the laws of each jurisdiction, and has obtained all necessary licenses and approvals in all jurisdictions, in which the ownership or lease of its property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination, purchase, sale, pledge and servicing of the Receivables) except where the failure to so qualify or obtain such license or approval could not reasonably be expected to result in a Material Adverse Effect.

(iii) <u>Power and Authority; Due Authorization</u>. The Depositor (i) has the power and authority to (A) execute and deliver this Agreement and the other Transaction Documents to which it is a party, (B) carry out the terms of the Transaction Documents to which it is a party and (C) sell the Second Step Transferred Property on the terms and conditions herein provided and (ii) has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and the sale of the Second Step

Transferred Property on the terms and conditions herein and therein provided.

(iv) <u>Valid Sale, Binding Obligation</u>. This Agreement, when duly executed and delivered by the Depositor, and the Second Step Receivables Assignment constitute a valid sale, transfer and assignment of the applicable Receivables and other Second Step Transferred Property to the Issuing Entity, enforceable against creditors of and purchasers from the Depositor; and this Agreement, when duly executed and delivered by the Depositor, and the Second Step Receivables Assignment constitute a legal, valid and binding obligation of the Depositor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(v) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which the Depositor is a party and the fulfillment of the terms hereof and thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Depositor's certificate of formation, limited liability company agreement or other constituent documents or any Contractual Obligation of the Depositor, (ii) result in the creation or imposition of any Lien upon any of the Depositor's properties, other than Liens permitted or created pursuant to the Transaction Documents, or (iii) violate any Applicable Law; in each case, except where such failure to comply could not reasonably be expected to have a Material Adverse Effect with respect to the Depositor.

(vi) <u>No Proceedings</u>. There are no proceedings or investigations pending or, to the knowledge of the Depositor, threatened against the Depositor, before any Governmental Authority (i) asserting the invalidity of this Agreement or any other Transaction Document to which the Depositor is a party, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document to which the Depositor is a party or (iii) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to the Depositor.

(vii) <u>No Consents</u>. All approvals, authorizations, consents, orders, or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Depositor of this Agreement and any other Transaction Document to which the Depositor is a party have been obtained.

(b) <u>Representations and Warranties Regarding the Receivables</u>. The Depositor makes the following representations and warranties to the Issuing Entity regarding each Receivable as of the Closing Date, which shall survive the sale, transfer and assignment of the Receivables and on which representations and warranties the Issuing Entity shall rely in acquiring the Receivables.

(i) <u>Receivables</u>. Pursuant to <u>Section 2.1(a)(ix)</u>, the Depositor assigns to the Issuing Entity all of its right, title and interest in, to and under the Receivables Purchase Agreement. Such assigned right, title and interest includes the benefit of the representations and warranties of the Seller made to the Depositor pursuant to Section 3.1(b) of the Receivables Purchase Agreement. The Depositor hereby represents and warrants to the Issuing Entity that the Depositor has taken no action which would cause such representations and warranties of the Seller to be false in any material respect as of the Closing Date.

(ii) <u>Good Title</u>.

(A) Immediately prior to the conveyance of each Receivable and the related Second Step Transferred Property to the Issuing Entity pursuant to this Agreement and the Second Step Receivables Assignment, the Depositor had good and marketable title thereto, free and clear of all Liens except for Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Second Step Transferred Property shall, on or after the Closing Date, be on file in any recording office except such as may be filed in favor of (i) the Issuing Entity in accordance with this Agreement, (ii) the Grantor Trust in connection with the Receivables Contribution Agreement or (iii) the Indenture Trustee in connection with the Indenture.

(B) Upon the conveyance of such Receivable and the other related Second Step Transferred Property to the Issuing Entity pursuant to this Agreement and the Second Step Receivables Assignment, the Issuing Entity will be the sole owner of, and have good, indefeasible and marketable title to such Receivable and other related Second Step Transferred Property, free and clear of any Lien (other than Liens created hereunder and Permitted Liens); and, to the extent the related Obligor has a contractual right to return the Financed Vehicle to the Seller for repurchase, the applicable repurchase period has expired. As of the Closing Date, each Receivable and the related Financed Vehicle is free and clear of any Lien of any Person (other than Liens created hereunder and Permitted Liens or those Liens that will be released simultaneously with the conveyance hereunder) and is in compliance with all Applicable Laws.

(iii) <u>All Filings Made</u>. With respect to the sale and assignment of the Second Step Transferred Property to the Issuing Entity, the Depositor has taken all steps reasonably necessary to ensure that such sale and assignment has been perfected under the relevant UCC. With respect to the Second Step Transferred Property, the Depositor has taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Indenture Trustee a first priority perfected security interest in the Second Step Transferred Property have been made.

(iv) <u>Value Given</u>. The Issuing Entity shall have given reasonably equivalent value to the Depositor in consideration for the transfer by the Depositor to the Issuing Entity of each of the Receivables and the related Second Step Transferred Property under this Agreement.

(c) <u>Repurchase of Receivables</u>.

(i) In the event of

(A) a breach of any representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement or <u>Section 3.1(b)</u> hereof with respect to any Receivables that materially and adversely affects the interests of the Noteholders or the Certificateholders taken as a whole, unless the breach by the Depositor shall have been cured within thirty (30) days following (i) discovery of the breach or receipt of notice of such breach by the Depositor from the Issuing Entity or the Grantor Trust (which notice shall provide sufficient detail so as to allow the Seller to reasonable investigate the alleged breach), or (ii) in the case of the Owner Trustee, the Grantor Trust Trustee or the Indenture Trustee, a Responsible Officer of such trustee has actual knowledge or receives written notice of a breach of such representation or warranty, then

(B) the Depositor shall (1) repurchase from the Issuing Entity each Receivable related to such breach by remitting to the Collection Account an amount equal to the Purchase Amount of each such Receivable or (2) in the event of a breach of any representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement that results in a Repurchase Event, use reasonable efforts to enforce, at the direction of the Issuing Entity or any of it assigns, including the Indenture Trustee, the obligations of the Seller under Section 3.1(c) of the Receivables Purchase Agreement to repurchase each Receivable related to such breach by remitting to the Collection Account an amount equal to the Purchase Amount of each such Receivable. Any such breach of a representation or warranty set forth in <u>Section 3.1(b)</u> hereof shall be deemed not to materially and adversely affect the interests of the Noteholders or the Certificateholders taken as a whole, if such Repurchase Event does not affect the ability of the Issuing Entity (or its assignee) to receive and retain timely payment in full on such Receivable. The Depositor shall not interfere with or act to hinder the Issuing Entity's or any assignee's exercise of rights and remedies under this <u>Section 3.1(c)</u> or under Section 3.1(c) or Section 4.13 of the Receivables Purchase Agreement.

(ii) It is understood and agreed that the obligation of the Depositor to repurchase any Receivable as to which a breach of a representation or

warranty set forth in Section 3.1(b), which materially and adversely affects the interests of the Noteholders or the Certificateholders taken as a whole, has occurred and is continuing, and the obligation of the Depositor to enforce the Seller's obligation to repurchase such Receivables pursuant to the Receivables Purchase Agreement in connection with a breach of a representation or warranty set forth in Section 3.1(b) of the Receivables Purchase Agreement shall, if such obligations are fulfilled, constitute the sole and exclusive remedy (other than any indemnities available pursuant to Section 4.13 or Section 4.13 of the Receivables Purchase Agreement) against the Depositor or the Seller for such breach available to the Issuing Entity, the Grantor Trust, the Financial Parties, the Owner Trustee, the Grantor Trust Trustee or the Indenture Trustee.

(iii) Upon the receipt of the applicable Purchase Amount, the applicable Receivable and any and all related Second Step Transferred Property shall be automatically and immediately assigned and re-conveyed by the Issuing Entity (or its applicable assign, as the case may be) to the Depositor.

(d) Upon discovery by the Depositor or by the Issuing Entity of a breach of any of the representations and warranties set forth in Section 3.1(a) or Section 3.1(b) or Section 3.1(a) or Section 3.1(b) of the Receivables Purchase Agreement, the party discovering such breach shall give prompt written notice to the other party.

Section 3.2 Representations and Warranties of the Issuing Entity.

(a) The Issuing Entity makes the following representations and warranties to the Depositor as of the date of this Agreement, and on which representations and warranties the Depositor shall rely in selling the Receivables.

(i) Organization and Good Standing. The Issuing Entity has been duly organized, and is validly existing as a statutory trust and in good standing under the laws of the state of its formation, with all requisite power and authority to own or lease its properties and to conduct its business as such business is presently conducted and to enter into and perform its obligations pursuant to this Agreement.

(ii) Power and Authority; Due Authorization. The Issuing Entity (i) has the power and authority to (A) execute and deliver this Agreement and the other Transaction Documents to which it is a party and (B) carry out the terms of this Agreement and the other Transaction Documents to which it is a party and (ii) has duly authorized by all necessary action on its part the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party.

(iii) <u>Binding Obligation</u>. This Agreement constitutes a legal, valid and binding obligation of the Issuing Entity enforceable against the Issuing Entity in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(iv) <u>No Violation</u>. The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Issuing Entity's Formation Documents or any Contractual Obligation of the Issuing Entity, (ii) result in the creation or imposition of any Lien upon any of the Issuing Entity's properties, other than Liens permitted or created pursuant to the Transaction Documents, or (iii) violate any Applicable Law, in each case, except where such failure to comply could not reasonably be expected to have a Material Adverse Effect with respect to the Issuing Entity.

(v) <u>No Proceedings</u>. There are no proceedings or investigations pending or, to the knowledge of the Issuing Entity, threatened against the Issuing Entity, before any Governmental Authority (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to the Issuing Entity.

(vi) <u>No Consents</u>. All approvals, authorizations, consents, orders or other actions of any Person or of any Governmental Authority (if any) required for the due execution, delivery and performance by the Issuing Entity of this Agreement have been obtained.

(b) Upon discovery by the Depositor or by the Issuing Entity of a breach of any of the representations and warranties set forth in <u>Section 3.2(a)</u>, the party discovering such breach shall give prompt written notice to the other party.

Section 3.3 <u>Covenants of the Depositor.</u> The Depositor hereby covenants as to the Receivables the Depositor has sold to the Issuing Entity hereby that:

(a) <u>Delivery of Payments</u>. The Depositor shall within two (2) Business Days after the Closing Date, transfer all Collections received by it on or after the Cutoff Date with respect to any Receivable or related Second Step Transferred Property to, or at the direction of, the Issuing Entity (or the Grantor Trust).

(b) <u>Keeping of Records and Books of Account</u>. The Depositor will maintain and implement administrative and operating procedures and keep and maintain all documents, books, records and other information, reasonably necessary or advisable for the collection of all Receivables and other Second Step Transferred Property.

(c) <u>Security Interests</u>. The Depositor will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any Lien (other than Permitted Liens) on any portion of the Receivables or other Second Step Transferred Property, whether now existing or hereafter transferred hereunder, or any interest therein, and the Depositor will not sell, pledge, assign or suffer to exist any Lien on its interest, if any, hereunder. The Depositor will promptly notify the Issuing Entity of the existence of any Lien (other than Permitted Liens) on any portion of the Receivables or other Second Step Transferred Property and the Depositor shall defend the right, title and interest of the Issuing Entity (and the permitted assignees) in, to and under such Receivables and other Second Step Transferred Property, against all claims of third parties; provided, however, that nothing in this subsection shall prevent or be deemed to prohibit the Depositor from suffering to exist Permitted Liens upon any portion of the Second Step Transferred Property.

ARTICLE IV
MISCELLANEOUS PROVISIONS

Section 4.1 <u>Amendment.</u>

(a) This Agreement may be amended, waived, supplemented or modified only with 10 Business Days' prior written notice to the Rating Agencies of the substance of such proposed amendment and by a written amendment duly executed and delivered by the Depositor and the Issuing Entity, without the consent of the Indenture Trustee, the Owner Trustee, the Grantor Trust Trustee, any of the Noteholders, any of the Certificateholders or any other Person to (i) cure any ambiguity, (ii) correct or supplement any provision in this Agreement that may be defective or inconsistent with any other provision in this Agreement or any other Transaction Document or with any description thereof in the Offering Memorandum, (iii) add to the covenants, restrictions or obligations of the Seller, (iv) add, change or eliminate any other provision of this Agreement in any manner that shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of the Noteholders or Unaffiliated Certificateholders, or (v) to add or supplement any credit enhancement for the benefit of the Noteholders of any class or the Certificateholders (provided that if any such addition shall affect any class of Noteholders differently from any other class of Noteholders, then such addition shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any class of Noteholders), <u>provided</u> that in the case of this <u>clause (v)</u>, the consent of the Certificateholders shall be required. Notwithstanding anything to the contrary herein, an Opinion of Counsel shall be delivered to the Depositor, the Grantor Trust Trustee and the

Owner Trustee to the effect that such amendment would not cause the Issuing Entity or the Grantor Trust to fail to qualify as a grantor trust for United States federal income tax purposes.

(b) This Agreement may be amended, waived, supplemented or modified only with 10 Business Days' prior written notice to the Rating Agencies of the substance of such proposed amendment and by a written amendment duly executed and delivered by the Depositor, the Issuing Entity, and the Indenture Trustee with the consent of Noteholders whose Notes evidence not less than a majority of the Outstanding Amount of the Controlling Class as of the close of business on the preceding Distribution Date, or if no Notes (other than the Class XS Notes) are Outstanding, Certificateholders holding a majority of the Voting Interests of the Certificates (which consent, whether given pursuant to this Section 4.1 or pursuant to any other provision of this Agreement, shall be conclusive and binding on such Person and on all future holders of such Notes or Certificates and of any Notes or Certificates issued upon the transfer thereof or in exchange thereof or in lieu thereof whether or not notation of such consent is made upon any Notes or Certificates) for the purpose of adding any provisions to, or changing in any manner, or eliminating any of the provisions of this Agreement, or of modifying in any manner the rights of the Noteholders or the Certificateholders; provided, however, that no such amendment shall (a) adversely affect the then-current credit rating assigned to any Class of Notes by any of the Rating Agencies without the consent of the holders of two-thirds of the Outstanding Amount of each affected Class of Notes as of the close of the preceding Distribution Date or (b) reduce the aforesaid percentage of Noteholders or Certificateholders required to consent to any such amendment, without the consent of the holders of all Notes or Certificates then outstanding, as the case may be. Notwithstanding anything to the contrary herein, an Opinion of Counsel shall be delivered to the Depositor, the Grantor Trust Trustee and the Owner Trustee to the effect that such amendment would not cause the Grantor Trust or the Issuing Entity to fail to qualify as a grantor trust for United States federal income tax purposes.

(c) No amendment, waiver or other modification which adversely affects the rights, duties, indemnities or immunities of the Owner Trustee or the Grantor Trust Trustee under this Agreement shall be effective without such entity's prior written consent.

Section 4.2 Protection of Right, Title and Interest in and to Receivables.

(a) The Depositor, at its expense, shall cause all financing statements and continuation statements, amendments, assignments and any other necessary documents and notices, covering or evidencing the Issuing Entity's right, title and interest in and to the Receivables and other Second Step Transferred Property to be promptly recorded, registered and filed, and at all times to be kept recorded, registered and filed, and take such other action, all in such manner and in such places as may be required by law, fully to preserve and protect the right, title and

interest of the Issuing Entity hereunder in and to all of the Receivables and such other Second Step Transferred Property. The Depositor shall deliver to the Issuing Entity file-stamped copies of, or filing receipts for, any document recorded, registered or filed as provided above, as soon as available following such recording, registration or filing. The Issuing Entity shall cooperate fully with the Depositor in connection with the obligations set forth above and will execute any and all documents reasonably required to fulfill the intent of this subsection.

(b) <u>Name Change</u>. The Depositor shall not change its State of organization or its name, identity or entity structure in any manner that would, could or might make any financing statement or continuation statement filed by the Depositor or the Issuing Entity or the Issuing Entity's assigns seriously misleading within the meaning of the UCC, unless it shall give the Issuing Entity written notice thereof at least five (5) Business Days prior to such change.

(c) <u>Executive Office; Maintenance of Offices</u>. The Depositor shall give the Issuing Entity written notice at least ten (10) Business Days prior to any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement. The Depositor shall at all times maintain its principal executive office within the United States of America.

(d) <u>New Debtor</u>. In the event that the Depositor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Depositor hereunder, the Depositor shall comply fully with the obligations of <u>Section 4.2(a)</u>.

(e) The Depositor shall maintain its computer systems relating to contract record keeping so that, from and after the time of sale of any Receivable under this Agreement, the Depositor's master computer records (including any backup archives) that refer to a Receivable shall indicate clearly the interest of the Issuing Entity (or assignees).

Section 4.3 <u>Governing Law; Consent to Jurisdiction; Waiver of Objection to Venue.</u>
THIS AGREEMENT AND THE SECOND STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS (OTHER THAN §§5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW)). EACH OF THE PARTIES HERETO HEREBY AGREES TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, LOCATED IN THE BOROUGH OF MANHATTAN AND THE FEDERAL COURTS LOCATED WITHIN THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER OR UNDER THE SECOND STEP RECEIVABLES ASSIGNMENT IN ANY OF THE

AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

Section 4.4 <u>Waiver of Jury Trial.</u> TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE BETWEEN THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. INSTEAD, ANY SUCH DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

Section 4.5 <u>Notices.</u> All demands, notices and communications upon or to the Depositor or the Issuing Entity under this Agreement shall be delivered as specified in Part III of Appendix A to the Indenture.

Section 4.6 <u>Severability of Provisions.</u> If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions and terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement.

Section 4.7 <u>Closing; Assignment; Conveyance of Receivables and Second Step Transferred Property to the Issuing Entity.</u> The transfer of the Receivables contemplated by this Agreement shall take place at 1930 W. Rio Salado Parkway, Tempe, Arizona 85281, on the date hereof. This Agreement may not be assigned by the Issuing Entity or the Depositor except as contemplated by this Section 4.7. The Depositor acknowledges that the Issuing Entity (or any permitted assign) may make further assignments, conveyances and pledges of the Receivables and the other Second Step Transferred Property, together with its rights under this Agreement to other Persons pursuant to the Indenture and the Receivables Contribution Agreement and that the Grantor Trust may make further assignments, conveyances and pledges pursuant to the Receivables Contribution Agreement and the Indenture. The Depositor acknowledges and consents to such assignments and pledges and waives any further notice thereof.

Section 4.8 <u>No Waiver; Cumulative Remedies.</u> No failure to exercise and no delay in exercising, on the part of the Depositor or the Issuing Entity, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 4.9 <u>Counterparts.</u> This Agreement may be executed in two (2) or more counterparts (and by different parties on separate counterparts), each of which shall be an

original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by email or facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 4.10 Third-Party Beneficiaries. This Agreement will inure to the benefit of and be binding upon the parties hereto, the Grantor Trust and the Indenture Trustee and, to the extent expressly referenced herein, shall inure to the benefit of the Noteholders and the Certificateholders, who shall be considered to be a third party beneficiary hereof. Except as otherwise provided in this Agreement, no other Person will have any right or obligation hereunder.

Section 4.11 Merger and Integration. Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

Section 4.12 Headings. The headings herein are for purposes of references only and shall not otherwise affect the meaning or interpretation of any provision hereof.

Section 4.13 Indemnification. The Depositor shall indemnify and hold harmless the Issuing Entity and its assignees (each, an "Indemnified Person") from and against any loss, liability, expense (including reasonable and documented out of pocket external attorneys' fees and costs) or damage suffered or sustained by reason of third party claims which may be asserted against or incurred by the Issuing Entity or any of the permitted assignees (collectively, "Losses") as a result of the breach of the Depositor's representations and warranties contained herein and any failure by the Depositor to comply with its obligations under Section 4.2 or Section 3.3(c); provided that the Depositor's repurchase obligation for a breach of representations and warranties set forth in Section 3.1(b) hereof is the sole remedy therefor. Notwithstanding the foregoing, such indemnity shall not be available to an Indemnified Person to the extent that such Losses (A) have resulted from the gross negligence, bad faith, fraud or willful misconduct of such Indemnified Person or (B) arise primarily due to the deterioration in the credit quality or market value of the Receivables, Financed Vehicles or other Second Step Transferred Property (or the underlying Obligors thereunder) or otherwise constituting credit recourse for the failure of an Obligor to pay any amount owing with respect to any Second Step Transferred Property.

Section 4.14 Survival.

All representations, warranties, covenants, indemnities and other provisions made by the Depositor herein or in connection herewith shall be considered to have been relied upon by the Issuing Entity, and shall survive the execution and delivery of this Agreement. The terms of Section 4.13 shall survive the termination of this Agreement.

Section 4.15 No Petition Covenant.

Notwithstanding any prior termination of this Agreement, the Depositor shall not, prior to the date which is one year and one day after the final distribution with respect to the Notes (other than the Class XS Notes) to the Note Distribution Account or, with respect to the Certificates, to the Certificateholders or the Certificate Distribution Account, acquiesce, petition or otherwise invoke or cause the Issuing Entity or the Grantor Trust to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuing Entity or the Grantor Trust under any federal or State bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuing Entity or the Grantor Trust or any substantial part of the property of either of them, or ordering the winding up or liquidation of the affairs of the Issuing Entity or the Grantor Trust under any federal or State bankruptcy or insolvency proceeding.

Section 4.16 <u>Limitation on Liability.</u>

It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust, National Association ("<u>WTNA</u>"), not individually or personally but solely as Owner Trustee of the Issuing Entity in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Issuing Entity is made and intended not as personal representations, undertakings and agreements by WTNA but is made and intended for the purpose of binding only Issuing Entity, (c) nothing herein contained shall be construed as creating any liability on WTNA, individually or personally, to perform any covenant either expressed or implied contained herein of the Issuing Entity, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto, (d) WTNA has made no investigation as to the accuracy or completeness of any representations and warranties made by Issuing Entity in this Agreement and (e) under no circumstances shall WTNA be personally liable for the payment of any indebtedness or expenses of Issuing Entity or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Issuing Entity or Grantor Trust, as applicable, under this Agreement.

**[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

CARVANA RECEIVABLES DEPOSITOR LLC

By:      /s/ Paul Breaux

Name:    Paul Breaux

Title:     Vice President


CARVANA AUTO RECEIVABLES TRUST 2020-NP1

By:      WILMINGTON TRUST,
         NATIONAL ASSOCIATION,
         not in its individual capacity but solely as
         Owner Trustee

By:      /s/ Nancy Hagner

Name:    Nancy Hagner

Title:     Vice President

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e1)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 6, 2020

/s/ Ernest C. Garcia, III
Ernest C. Garcia, III
*Chairman and Chief Executive Officer*

Exhibit 31.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 6, 2020

/s/ Mark Jenkins

Mark Jenkins
*Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:     May 6, 2020                                                              /s/ Ernest C. Garcia, III

                                                                                   Ernest C. Garcia, III
                                                                                   *Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2020, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:       May 6, 2020                                                          /s/ Mark Jenkins
                                                                                  _____
                                                                                  Mark Jenkins
                                                                                  *Chief Financial Officer*

# Exhibit 6







# LETTER TO SHAREHOLDERS

## Q3 | 2020





# CARVANA

### OCTOBER 29, 2020





Dear Shareholders,

The third quarter was an exceptional quarter for Carvana. We hit several significant operational and financial milestones including buying more cars from our customers than we sold, crossing $4,000 in GPU, and achieving our first EBITDA positive quarter.

These are important milestones, and they carry important meaning.

Buying more cars from our customers than we sold to them just 2 years after focusing on the opportunity demonstrates the appeal of our customer experience, the scrappiness of our team, the quality of our brand, and the scalability of our infrastructure. It also feeds back into our retail offering by supplying us with a highly scalable channel of extremely diverse and desirable inventory.

Crossing $4,000 GPU and achieving our first EBITDA positive quarter demonstrate the power of our financial model as we march toward our long-term goals.

Customer preference shifts and our team's continued execution in 2020 bode very well for our long-term opportunity. Looking forward, our focus will remain exactly where it has been: on our customers, on our team, and on our execution. We are firmly on the path to changing the way people buy cars, to delivering 2 million+ cars per year, and to becoming the largest and most profitable automotive retailer.

## Summary of Q3 2020 Results

All financial comparisons stated below are versus Q3 2019, unless otherwise noted. Complete financial tables appear at the end of this letter.

Q3 2020 Financial Results:

- Retail units sold totaled 64,414, an increase of 39%
- Revenue totaled $1.544 billion, an increase of 41%
- Total gross profit was $261 million, an increase of 90%
- Total gross profit per unit (GPU) was $4,056, an increase of $1,093 [1]
- Net loss was $18 million, an improvement from $92 million
- EBITDA margin was 1.4%, an improvement from (5.5%) [2]
- Basic and diluted net loss, per Class A share was $0.10 based on 70.0 million shares of Class A common stock outstanding

Q3 2020 Other Results:

- Opened our 9th inspection and reconditioning center (IRC) near Columbus, Ohio
- Opened one vending machine in Louisville, Kentucky, bringing our end-of-quarter total to 25
- Increased our March 2020 forward flow agreement with Ally to a total purchase commitment of $3 billion

## Recent Events

We would also like highlight the following recent accomplishments:

- Opened our 10th IRC near Orlando, Florida
- Opened our 26th vending machine near Detroit, Michigan
- Increased our floor plan facility with Ally to $1.25 billion from $950 million and extended its maturity through March 2023
- Closed a $1.1 billion senior notes offering ($500 million 5.625% Senior Notes due 2025 and $600 million 5.875% Senior Notes due 2028) and redeemed $600 million 8.875% Senior Notes due 2023

---

[1]  Includes a $0 and $33 impact for the current and prior year period, respectively from the 100k Milestone Gift.

[2]  Includes a 0.0% and 0.4% impact for the current and prior year period, respectively from the 100k Milestone Gift.

## Outlook

In light of the uncertainty surrounding COVID-19 and its economic repercussions we are not providing guidance at this time. Instead, we are providing directional color.

Following our significant progress on production capacity, GPU, and EBITDA margin this quarter, we are positioning the business for strong growth in 2021.

In the fourth quarter, we expect seasonal patterns across major line items to be similar to past years, with a few adjustments noted below.

First, we have elected not to run our usual Cyber Monday promotion this year as we continue to focus on building inventory. As a result, we expect retail unit growth to face a headwind around the time of Cyber Monday and a tailwind as we continue building selection on the website. Over the course of the third quarter we significantly grew the number of vehicles available for immediate purchase, but ended the quarter at just half the level we had prior to the pandemic. During the fourth quarter we expect to make significant additional progress in growing our inventory.

Second, we expect the market to transition to a more normalized depreciation environment in Q4 accentuating normal seasonal trends in wholesale GPU.

Lastly, we expect Retail GPU to have a seasonal change that more closely resembles 2018, as Q4 2019 was impacted by early iterations in our customer-sourced bidding and pricing that offset a normal seasonal shape.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

2

## Clear Progress Toward Our Long-Term Goals

Our management team has always focused on delivering an exceptional and unparalleled customer experience while simultaneously growing the business rapidly and achieving our financial objectives. To realize our long-term vision, our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and, (3) Demonstrate Operating Leverage.

At our Analyst Day in November 2018, we laid out our long-term goals of selling 2 million+ units per year and achieving 15% to 19% gross margin, 6% to 8% SG&A as a percent of revenue, and 8% to 13.5% EBITDA margin.

In only two years, we have made tremendous progress toward these goals.

That progress starts with growth, which is rooted in our industry leading customer experiences. Since Q3 2018, we have increased the number of cars we sold to customers 2.5x and increased the number of cars we bought from customers an incredible 8x.

Growth has been and will continue to be our first financial objective due to the enormous size of our opportunity and the significant positive feedback in our model. As we grow—by expanding geographically, building accumulated awareness, improving our customer experience, and broadening our customer offering—our business becomes stronger. Growth in customers allows us to hold more inventory, increasing selection and conversion. Growth allows us to add more IRCs, increasing the density of our logistics network and lowering average delivery times, which further increases conversion. Growth also enables economies of scale, creating value to further invest in the customer experience. All these dynamics create a flywheel that drives even more growth.



3

We have paired our rapid growth over the past several years with significant increases in gross margin, reaching the middle of our long-term target range in Q3. Our gains in gross margin have been broad-based, including buying more cars from customers, lowering average days to sale, and enhancing monetization of our finance platform and ancillary products. Despite all this progress, we still see significant opportunities for further gains, giving us the flexibility to either drive additional margin expansion or further enhance our customer offering.



# GROSS MARGIN

*2018, 2019, and Q3 2020 include a 0.2%, 0.1%, and 0.0% impact from the 100k Milestone Gift, respectively.

4

We have also paired our rapid growth with meaningful SG&A leverage. Our progress on SG&A has come while making significant investments to support our continued growth, building an industry-leading supply chain, and continually improving the customer experience.

In 2019, for example, we made the decision to invest meaningfully in building our offering of buying cars from customers, and those investments are paying significant dividends today. In Q3, we sourced 56% of the cars we retailed from customers which exceeded the top end of our long-term target range of sourcing 38% to 52%.

We expect to make similar investments in the future when we believe they serve our long-term goals, while demonstrating SG&A leverage as we continue to scale.





*2018, 2019, and Q3 2020 include a 0.4%, 0.2%, and 0.0% impact from the 100k Milestone Gift, respectively.

Our progress on our three key financial objectives led to our first EBITDA positive quarter in Q3, a significant milestone on the path toward building the largest and most profitable auto retailer. We are excited about this achievement, what it means for our trajectory, and what it says about the quality of our business model and team.



*2018, 2019, and Q3 2020 include a 0.6%, 0.4%, and 0.0% impact from the 100k Milestone Gift, respectively.

Our cohorts also demonstrate our progress toward profitability. In Q3, our five oldest cohorts were solidly EBITDA positive, with our two oldest cohorts approaching our long-term target EBITDA margin range. While our cohorts generally have similar gross margins, older cohorts have much lower SG&A as a percent of revenue due to lower advertising expenses as a percent of revenue, lower logistics expenses as a percent of revenue due to closer geographic proximity to existing IRCs, and greater scale.

Our progress over the past two years leaves us more excited than ever about our opportunity to change the way people buy cars.

We believe that our focus on growth should reflect the size of the opportunity in front of us as well as our operational and financial capacity to make the investments necessary to achieve that growth. Over the last nine months, customer preference migration, our team's successful execution, and our financial strength bolster the argument for growth as our top priority. Looking forward, we expect to continue investing in growth while maintaining strong gross margins and demonstrating SG&A leverage.

## Buying Cars from Customers

In Q3, for the first time in our history we bought more cars from our customers than we sold to them.

We acquired 73.4k vehicles from our customers, an increase of 128% year-over-year, which resulted in buying 114% as many cars as we sold, up from 69% a year ago. Two primary drivers powered this exceptional growth. The first was the unprecedented demand we saw after resuming purchasing vehicles from our customers in May. The second was our operating teams' incredible response to this increase in demand. For perspective on the scale of the operational challenges our team overcame, we more than tripled the number of cars we bought from our customers quarter-over-quarter, reaching a level nearly double our previous high all while delivering to customers the best experience available when selling a car.

Our rapid acceleration in buying cars from customers fueled our inventory growth lifting our customer sourced retail units. In Q3, we sourced 56% of our retail units sold from customers, up from 31% a year ago. This number eclipsed the top end of the long-term target range of 38%-52% that we outlined at our analyst day just two years ago.





## Expansion

The unprecedented demand that we've seen for buying and selling cars online has underscored the importance of our expansion strategy. We believe, now more than ever, in our approach of developing infrastructure well ahead of demand, and we remain committed to building out our IRC pipeline and logistics network capacity to meet future demand.

In Q3, we further demonstrated progress in this regard, opening our 9th inspection and reconditioning center (IRC) near Columbus, Ohio. Since quarter-end, we've opened our 10th IRC, also a four-line facility, near Orlando, Florida. Additionally, we expect to open our 11th IRC by year-end, increasing our annual production capacity to approximately 600k vehicles at full utilization.

We now operate 26 vending machines and serve 261 markets covering 73.2% of the population.  We will continue to open smaller markets to fill out our footprint in the immediate term. From there, our path to 95% population coverage will primarily involve balancing the benefits of serving a broader population with our goal to alleviate constraints in our supply chain.



**CARVANA MARKETS AND POPULATION COVERAGE**



*Represents facilities and markets as of October 29, 2020

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: investors.carvana.com/resources/investor-materials.

## Management Objectives

Our three primary financial objectives are: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and, (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

Below we present our long-term financial model that we introduced at our Analyst Day on November 29, 2018. We believe this is the appropriate frame through which to evaluate our results and progress towards each of our financial objectives.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | Q3 2020 | Long Term Target |
|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 41% | – |
| Gross Margin [1] | 5.3% | 7.9% | 10.1% | 12.9% | 16.9% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 4.2% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A [2] | 21.1% | 18.2% | 14.9% | 13.7% | 11.9% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.2% | 0.5 – 1.0% |
| SG&A Total as % of Revenue [2] | 29.8% | 26.0% | 21.7% | 20.0% | 17.4% | 6 – 8% |
| Net Loss Margin [3] | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (1.1)% | – |
| EBITDA Margin [3] | (23.2%) | (16.9%) | (10.5%) | (6.2%) | 1.4% | 8 – 13.5% |

[1] Gift impact of 0.2%, 0.1%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
[2] Gift impact of 0.4%, 0.2%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
[3] Gift impact of 0.6%, 0.4%, and 0.0% in 2018, 2019, and Q3 2020, respectively.
Note: Numbers may not foot due to rounding.

## Objective #1: Grow Retail Units and Revenue

Q3 2020 marked another quarter of strong year-over-year growth across retail units sold and revenue.  For the quarter, retail units sold increased to 64,414, up 39% from 46,413 in Q3 2019. Q3 revenue grew to $1.544 billion, up 41% from $1.095 billion.

As in Q2, inventory constraints impacted growth in retail units sold, and we are continuing to focus on growing inventory to meet demand. We ended the quarter with 26,897 website units and 11,900 available for immediate purchase, up from 5,914 at the end of Q2 but still only half as many as pre-pandemic levels.



**QUARTERLY RETAIL UNIT SALES**

## Objective #2: Increase Total Gross Profit Per Unit

Total GPU reached a record in Q3 at over $4,000, driving our gross margin to the midpoint of our long-term model. The year-over-year and sequential GPU growth was driven primarily by strength in Retail and Finance GPU.

For Q3 2020:

- Total
  - Total GPU was $4,056 vs. $2,963 in Q3 2019 and $2,726 in Q2 2020 [3]
- Retail
  - Retail GPU was $1,857 vs. $1,305 in Q3 2019 and $1,190 in Q2 2020 [3]
  - Year-over-year changes in retail vehicle GPU were primarily driven by more customer-sourced vehicles, which generally have higher margins. Sequential changes were primarily driven by more customer-sourced vehicles, a reduction in average days to sale to 58 from 89, and lower reconditioning costs per unit as production utilization normalized.
- Wholesale
  - Wholesale GPU was $266 vs. $120 in Q3 2019 and $137 in Q2 2020 [3]
  - Year-over-year changes in wholesale GPU were driven by record wholesale volume (units +31% YoY to 15,375) and record gross profit per wholesale unit sold of $1,113, an increase from $476 in Q3 2019. Increased wholesale volume came from the growth in vehicles purchased from customers, while gross profit per wholesale unit benefited from the strength in wholesale market values.
- Other
  - Other GPU was $1,934 vs. $1,539 in Q3 2019 and $1,399 in Q2 2020
  - Year-over-year changes in Other GPU were driven by higher finance GPU and increased attachment of VSC. Finance GPU was $1,415 in Q3 compared to $1,078 in Q3 2019 and $865 in Q2 2020. The YoY increase was primarily due to tightened credit standards and lower benchmark interest rates, while the sequential gain was also due to improved market conditions.



### TOTAL GROSS PROFIT PER UNIT

*2018, 2019, Q1 2020, Q2 2020, and Q3 2020 include a $43, $31, $10, $0, and $0 impact from the 100k Milestone Gift, respectively.

---

[3] Total GPU includes a $0, $33, and $0 impact in Q3 2020, Q3 2019, and Q2 2020, respectively, from the 100k Milestone Gift. This includes a $0, $30, and $0 impact, respectively, in retail GPU, and a $0, $3, and $0 impact, respectively, in wholesale GPU.

## Objective #3: Demonstrate Operating Leverage

We achieved positive EBITDA for the first time in Q3 driven by strong GPU performance along with continued SG&A leverage while resuming incremental investments required to prepare for another year of significant growth. Net loss margin levered by 7.3% to (1.1%) versus the prior year and EBITDA margin levered by 6.9% in Q3 to reach positive 1.4%.

For Q3 2020, as a percentage of revenue:

- Total SG&A levered by 1.6%, primarily reflecting benefits from scale and sustained cost efficiencies through the pandemic, moderated by investments to support the growth in the business into 2021. [4]
- Compensation and benefits levered by 0.6%, Advertising levered by 0.8%, Logistics and market occupancy were approximately flat, and Other SG&A levered by 0.2%



*2018, 2019, Q1 2020, Q2 2020, and Q3 2020 include a 0.6%, 0.4%, 0.0%, 0.0% and 0.0% impact from the 100k Milestone Gift, respectively.

---

[4] Prior year period includes a 0.3% impact from the 100k Milestone Gift, contained within Compensation and Benefits.

## Summary

In the third quarter we hit several significant milestones on the path to fulfilling our mission of changing the way people buy cars.

We achieved these milestones because of the quality of the team we get to work with every day, because of their obsession with our customer experience, and because of the foundation we have laid over the last 7 years as a result of our long-term focus.

We are in the best position we have ever been as a company.

Our offering has never been more appealing to car buyers and sellers. The path to our long-term financial model has never been more clearly visible. Our financial position has never been stronger. Our team has never been closer or more battle tested. And our ambition and focus on our customers have never wavered.

The march continues.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

14

# Appendix

*Conference Call Details*

Carvana will host a conference call today, October 29, 2020, at 5:30 p.m. EDT (2:30 p.m. PDT) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until November 5, 2020, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 10148378#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2019 and our Quarterly Report on Form 10-Q for Q1 2020, Q2 2020, and Q3 2020.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In thousands)**

| | September 30, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Restricted cash | 22,619 | 42,443 |
| Accounts receivable, net | 82,932 | 39,864 |
| Finance receivables held for sale, net | 316,972 | 286,969 |
| Vehicle inventory | 967,547 | 762,696 |
| Beneficial interests in securitizations | 112,134 | 98,780 |
| Other current assets, including $5,437 and $0, respectively, due from related parties | 71,196 | 52,654 |
| Total current assets | 1,747,104 | 1,359,422 |
| Property and equipment, net | 800,181 | 543,471 |
| Operating lease right-of-use assets, including $22,483 and $44,583, respectively, from leases with related parties | 141,657 | 123,420 |
| Intangible assets, net | 5,990 | 7,232 |
| Goodwill | 9,353 | 9,353 |
| Other assets, including $4,908 and $6,138, respectively, due from related parties | 28,513 | 14,850 |
| Total assets | $ 2,732,798 | $ 2,057,748 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $12,845 and $9,549, respectively, due to related parties | $ 355,876 | $ 234,443 |
| Short-term revolving facilities | 126,981 | 568,840 |
| Current portion of long-term debt | 54,313 | 48,731 |
| Other current liabilities, including $3,442 and $4,518, respectively, from leases with related parties | 11,616 | 12,856 |
| Total current liabilities | 548,786 | 864,870 |
| Long-term debt, excluding current portion, including $15,000 held by a related party | 1,080,929 | 883,060 |
| Operating lease liabilities, excluding current portion, including $19,482 and $41,829, respectively, from leases with related parties | 140,010 | 116,071 |
| Other liabilities | 1,497 | 1,808 |
| Total liabilities | 1,771,222 | 1,865,809 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2020 and December 31, 2019 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 70,538 and 50,507 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 71 | 51 |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 101,200 and 101,219 shares issued and outstanding as of September 30, 2020 and December 31, 2019, respectively | 101 | 101 |
| Additional paid-in capital | 721,174 | 280,994 |
| Accumulated deficit | (290,836) | (183,034) |
| Total stockholders' equity attributable to Carvana Co. | 430,510 | 98,112 |
| Non-controlling interests | 531,066 | 93,827 |
| Total stockholders' equity | 961,576 | 191,939 |
| Total liabilities & stockholders' equity | $ 2,732,798 | $ 2,057,748 |

16

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | $ 3,245,209 | $ 2,470,630 |
| Wholesale vehicle sales, including $1,323, $0, $1,365, and $0, respectively, from related parties | 129,925 | 92,430 | 258,965 | 188,474 |
| Other sales and revenues, including $26,141, $15,824, $69,423, and $40,386, respectively, from related parties | 124,556 | 71,408 | 255,985 | 177,205 |
| **Net sales and operating revenues** | 1,543,609 | 1,094,854 | 3,760,159 | 2,836,309 |
| Cost of sales, including $931, $997, $2,664, and $3,487, respectively, to related parties | 1,282,336 | 957,311 | 3,210,258 | 2,472,441 |
| **Gross profit** | 261,273 | 137,543 | 549,901 | 363,868 |
| Selling, general and administrative expenses, including $4,712, $4,264, $13,630, and $9,884, respectively, to related parties | 267,842 | 207,970 | 783,487 | 545,054 |
| Interest expense, including $332, $332, $998, and $998 to related parties | 20,276 | 20,990 | 69,053 | 55,953 |
| Other (income) expense, net | (9,201) | 827 | 5,126 | 1,760 |
| **Net loss before income taxes** | (17,644) | (92,244) | (307,765) | (238,899) |
| Income tax provision | 76 | — | (162) | — |
| **Net loss** | (17,720) | (92,244) | (307,603) | (238,899) |
| Net loss attributable to non-controlling interests | (10,635) | (62,156) | (199,801) | (165,373) |
| **Net loss attributable to Carvana Co.** | $ (7,085) | $ (30,088) | $ (107,802) | $ (73,526) |
| Net loss per share of Class A common stock, basic and diluted | $ (0.10) | $ (0.60) | $ (1.73) | $ (1.61) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 70,005 | 49,787 | 62,244 | 45,726 |

(1)   Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

17

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In thousands)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (307,603) | $ (238,899) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 52,076 | 27,505 |
| Loss on disposal of property and equipment | 5,708 | 1,046 |
| Provision for bad debt and valuation allowance | 10,752 | 7,030 |
| Gain on loan sales | (129,041) | (99,408) |
| Equity-based compensation expense | 18,011 | 25,366 |
| Amortization and write-off of debt issuance costs and bond premium | 5,745 | 3,569 |
| Originations of finance receivables | (2,492,741) | (1,877,336) |
| Proceeds from sale of finance receivables, net | 2,478,931 | 2,027,689 |
| Purchase of finance receivables | — | (161,781) |
| Principal payments received on finance receivables held for sale | 60,113 | 54,623 |
| Unrealized (gain) loss on beneficial interests in securitization | (4,021) | 219 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (45,575) | (27,907) |
| Vehicle inventory | (197,962) | (213,762) |
| Other assets | (17,743) | (25,755) |
| Accounts payable and accrued liabilities | 112,495 | 65,452 |
| Operating lease right-of-use assets | (18,237) | (18,896) |
| Operating lease liabilities | 22,699 | 16,952 |
| Other liabilities | (311) | (382) |
| Net cash used in operating activities | (446,704) | (434,675) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment, including $21,657 and $6,282, respectively, from related parties | (270,486) | (151,380) |
| Principal payments received on beneficial interests in securitizations | 8,782 | 2,577 |
| Net cash used in investing activities | (261,704) | (148,803) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 3,425,755 | 3,093,039 |
| Payments on short-term revolving facilities | (3,867,614) | (3,133,186) |
| Proceeds from issuance of long-term debt | 203,047 | 367,349 |
| Payments on long-term debt | (18,414) | (11,087) |
| Payments of debt issuance costs | (11,730) | (8,423) |
| Net proceeds from issuance of Class A common stock | 1,058,940 | 297,611 |
| Proceeds from exercise of stock options | 4,907 | 1,492 |
| Tax withholdings related to restricted stock awards | (8,619) | (3,552) |
| Net cash provided by financing activities | 786,272 | 603,243 |
| **Net increase in cash, cash equivalents and restricted cash** | 77,864 | 19,765 |
| Cash, cash equivalents and restricted cash at beginning of period | 118,459 | 88,709 |
| Cash, cash equivalents and restricted cash at end of period | $ 196,323 | $ 108,474 |

18

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | **2020** | **2019** | **2020** | **2019** |
|  | (in thousands) | | | |
| Weighted-average shares of Class A common stock outstanding | 70,005 | 49,787 | 62,244 | 45,726 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 104,406 | 105,733 | 104,907 | 107,016 |
|  | 174,411 | 155,520 | 167,151 | 152,742 |

19

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(Unaudited)**

In prior periods we calculated non-GAAP measures including Gross Profit ex-Gift, Gross Profit per Unit ex-Gift, EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss and Adjusted Net Loss per Share, to exclude the impact of the 100k Milestone Gift program. As this program has concluded it is not material to current or future years and the adjustment is no longer included within similar calculations. For the three and nine months ended September 30, 2020, there was approximately $0.0 million and $0.5 million, respectively, of stock based compensation related to the 100k Milestone Gift program within cost of sales, which would impact all measures. For the three and nine months ended September 30, 2019, there was approximately $4.4 million and $10.7 million, respectively, of stock based compensation related to the 100k Milestone Gift program impacting the calculation of EBITDA ex-Gift, EBITDA Margin ex-Gift, Adjusted Net Loss, and Adjusted Net Loss per Share, including approximately $1.5 million and $4.2 million, respectively, within cost of sales impacting the calculation of Gross Profit ex-Gift and Gross Profit per Unit ex-Gift.

### *EBITDA and EBITDA Margin*

EBITDA and EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. EBITDA Margin is EBITDA as a percentage of total revenues. We use EBITDA to measure the operating performance of our business and EBITDA Margin to measure our operating performance relative to our total revenues. We believe that EBITDA and EBITDA Margin are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA and EBITDA Margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA to net loss is the most directly comparable GAAP measure, and calculation of EBITDA Margin is as follows:

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 |
| | (dollars in thousands) | | | | |
| Net loss [1] | $ (92,244) | $ (125,740) | $ (183,557) | $ (106,326) | $ (17,720) |
| Depreciation and amortization expense | 10,675 | 13,760 | 15,811 | 17,629 | 18,636 |
| Interest expense | 20,990 | 24,653 | 28,862 | 19,915 | 20,276 |
| Income tax provision | — | — | — | (238) | 76 |
| EBITDA | $ (60,579) | $ (87,327) | $ (138,884) | $ (69,020) | $ 21,268 |
| | | | | | |
| Total revenues | $1,094,854 | $1,103,587 | $ 1,098,216 | $ 1,118,334 | $ 1,543,609 |
| Net loss margin | (8.4)% | (11.4)% | (16.7)% | (9.5)% | (1.1)% |
| EBITDA Margin [2] | (5.5)% | (7.9)% | (12.6)% | (6.2)% | 1.4 % |

(1) Includes $4.4 million, $2.5 million, $0.5 million, $0.0 million, and $0.0 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.4%, 0.2%, 0.0%, 0.0%, and 0.0%, respectively, related to the 100k Milestone Gift.

| | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| | (dollars in thousands) | | | | | |
| Net loss [1] | $ (15,238) | $ (36,780) | $ (93,112) | $ (164,316) | $ (254,745) | $ (364,639) |
| Depreciation and amortization expense | 1,705 | 2,800 | 4,658 | 11,568 | 23,539 | 41,265 |
| Interest expense | 108 | 1,412 | 3,587 | 7,659 | 25,018 | 80,606 |
| EBITDA | $ (13,425) | $ (32,568) | $ (84,867) | $ (145,089) | $ (206,188) | $ (242,768) |
| | | | | | | |
| Total revenues | $ 41,679 | $ 130,392 | $ 365,148 | $ 858,870 | $1,955,467 | $3,939,896 |
| Net loss margin | (36.6)% | (28.2)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% |
| EBITDA Margin [2] | (32.2)% | (25.0)% | (23.2)% | (16.9)% | (10.5)% | (6.2)% |

(1) Includes $0.0 million, $0.0 million, $0.0 million, $0.0 million, $11.8 million, and $13.2 million, respectively, related to the 100k Milestone Gift.
(2) Includes 0.0%, 0.0%, 0.0%, 0.0%, 0.6%, and 0.4%, respectively, related to the 100k Milestone Gift.

20

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | Change | 2020 | 2019 | Change |
| | (dollars in thousands, except per unit amounts) | | | (dollars in thousands, except per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 1,289,128 | $ 931,016 | 38.5 % | $ 3,245,209 | $ 2,470,630 | 31.4 % |
| Wholesale vehicle sales [1] | 129,925 | 92,430 | 40.6 % | 258,965 | 188,474 | 37.4 % |
| Other sales and revenues [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total net sales and operating revenues | $ 1,543,609 | $ 1,094,854 | 41.0 % | $ 3,760,159 | $ 2,836,309 | 32.6 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 119,607 | $ 60,563 | 97.5 % | $ 268,035 | $ 171,063 | 56.7 % |
| Wholesale vehicle gross profit [1][4] | 17,110 | 5,572 | 207.1 % | 25,881 | 15,600 | 65.9 % |
| Other gross profit [2] | 124,556 | 71,408 | 74.4 % | 255,985 | 177,205 | 44.5 % |
| Total gross profit | $ 261,273 | $ 137,543 | 90.0 % | $ 549,901 | $ 363,868 | 51.1 % |
| **Market information:** | | | | | | |
| Markets, beginning of period | 261 | 137 | 90.5 % | 146 | 85 | 71.8 % |
| Market launches | — | 9 | (100.0)% | 115 | 61 | 88.5 % |
| Markets, end of period | 261 | 146 | 78.8 % | 261 | 146 | 78.8 % |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 64,414 | 46,413 | 38.8 % | 171,939 | 127,179 | 35.2 % |
| Wholesale vehicle unit sales | 15,375 | 11,698 | 31.4 % | 33,406 | 29,155 | 14.6 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 20,013 | $ 20,059 | (0.2)% | $ 18,874 | $ 19,426 | (2.8)% |
| Wholesale vehicles | $ 8,450 | $ 7,901 | 6.9 % | $ 7,752 | $ 6,465 | 19.9 % |
| **Per unit gross profit: [5]** | | | | | | |
| Used vehicle gross profit [3] | $ 1,857 | $ 1,305 | 42.3 % | $ 1,559 | $ 1,345 | 15.9 % |
| Wholesale vehicle gross profit [4] | $ 1,113 | $ 476 | 133.8 % | $ 775 | $ 535 | 44.9 % |
| Other gross profit | $ 1,934 | $ 1,539 | 25.7 % | $ 1,489 | $ 1,393 | 6.9 % |
| Total gross profit | $ 4,056 | $ 2,963 | 36.9 % | $ 3,198 | $ 2,861 | 11.8 % |

(1)  Includes $1,323 and $0 for the three months ended September 30, 2020 and 2019, respectively, and $1,365 and $0 for the nine months ended September 30, 2020 and 2019, respectively, of wholesale revenue from related parties.
(2)  Includes $26,141 and $15,824 for the three months ended September 30, 2020 and 2019, respectively, and $69,423 and $40,386 for the nine months ended September 30, 2020 and 2019, respectively, of other sales and revenues from related parties.
(3)  Includes $0, $1,381, $510, and $3,953, or $0, $30, $3, and $31 per unit, related to the 100k Milestone Gift.
(4)  Includes $0, $142, $17, and $267, or $0, $12, $0, and $9 per wholesale unit, related to the 100k Milestone Gift.
(5)  All gross profit per unit amounts are per used vehicle sold, except wholesale vehicle gross profit, which is per wholesale vehicle sold.

21

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Sep 30, 2019 | Dec 31, 2019 | Mar 31, 2020 | Jun 30, 2020 | Sep 30, 2020 |
| | (in thousands) | | | | |
| Compensation and benefits [1] | $ 60,655 | $ 72,939 | $ 84,250 | $ 74,202 | $ 80,248 |
| 100k Milestone Gift | 2,903 | 1,263 | — | — | — |
| Advertising | 55,264 | 58,867 | 74,788 | 62,330 | 65,148 |
| Market occupancy [2] | 5,517 | 6,644 | 8,103 | 8,019 | 9,733 |
| Logistics [3] | 14,068 | 18,090 | 18,914 | 16,699 | 18,073 |
| Other [4] | 69,563 | 83,860 | 89,656 | 78,684 | 94,640 |
| Total | $ 207,970 | $ 241,663 | $ 275,711 | $ 239,934 | $ 267,842 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets, and those related to the 100k Milestone Gift.

(2) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(3) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(4) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

22

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

|  | September 30, 2020 | December 31, 2019 |
|---|---|---|
|  | (in thousands) | |
| Cash and cash equivalents | $ 173,704 | $ 76,016 |
| Availability under short-term revolving facilities [1] | 975,264 | 279,080 |
| Availability under sale-leaseback agreements [2][3] | 101,233 | 104,680 |
| **Committed liquidity resources available** | **$ 1,250,201** | **$ 459,776** |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.

(2)  We have $75.0 million available for sale and leaseback transactions under the Master Sale-Leaseback Agreement with VMRE, and an additional $26.2 million and $29.7 million as of September 30, 2020 and December 31, 2019, respectively, available under sale-leaseback agreements with other parties.

(3) We have $197.7 million and $158.7 million of total unfunded gross real estate assets as of September 30, 2020 and December 31, 2019, respectively.

As of September 30, 2020 and December 31, 2019, the short-term revolving facilities had total capacity of $1.9 billion and $1.6 billion, an outstanding balance of $127.0 million and $568.8 million, and unused capacity of $1.7 billion and $1.0 billion, respectively.

We also had $19.9 million and $137.7 million of committed funds for future construction costs of IRCs with unfinished construction as of September 30, 2020 and December 31, 2019, respectively.

In addition, we had $36.6 million and $13.5 million of total unpledged beneficial interests in securitizations as of September 30, 2020 and December 31, 2019, respectively.

On October 2, 2020, we issued $500.0 million principal amount of 5.625% Senior Notes due 2025 and $600.0 million principal amount of 5.875% Senior Notes due 2028 and used approximately $626.8 million of the proceeds to redeem in full the outstanding $600.0 million principal amount of our 8.875% Senior Notes due 2023 resulting in net proceeds of approximately $455.9 million.






# CARVANA
## CULTURE

# Q3 | 2020



