# Exhibit 21

As filed with the Securities and Exchange Commission on April 20, 2022

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM S-3
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Carvana Co.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

**1930 W. Rio Salado Parkway**
**Tempe, Arizona 85281**
**(480) 719-8809**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Ernest Garcia, III**
**Chief Executive Officer**
**1930 W. Rio Salado Parkway**
**Tempe, Arizona 85281**
**(480) 719-8809**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies of all communications, including communications sent to agent for service, should be sent to:*
**Robert M. Hayward, P.C.**
**Robert E. Goedert, P.C.**
**Michael P. Keeley**
**Kirkland & Ellis LLP**
**300 North LaSalle**
**Chicago, IL 60654**
**(312) 862-2000**

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box. ☒

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of Securities Act. ☐

Table of Contents

**PROSPECTUS**



# Carvana Co.

## Class A Common Stock

---

We may offer and sell shares of Class A common stock, par value $0.001 per share, from time to time in amounts, at prices and on terms that will be determined at the time of the offering.

Our Class A common stock is traded on the New York Stock Exchange (the "NYSE") under the symbol "CVNA."

We have two classes of common stock: Class A common stock and Class B common stock. Holders of the Class A common stock are entitled to one vote per share. Ernest Garcia, II, Ernest Garcia, III, and entities controlled by one or both of them (collectively, the "Garcia Parties") are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A common units ("Class A Units") and Class B common units ("Class B Units" and together with the Class A Units ("LLC Units")) of Carvana Group, LLC ("Carvana Group") were exchanged for Class A common stock). All other holders of Class B common stock are each entitled to one vote per share. All holders of Class A and Class B common stock vote together as a single class except as otherwise required by applicable law. Holders of the Class B common stock do not have any right to receive dividends or distributions upon the liquidation or winding up of Carvana Co.

We may sell these securities on a continuous or delayed basis, directly, through agents, dealers or underwriters as designated from time to time, or through a combination of these methods. If any agents, dealers or underwriters are involved in the sale of any securities, the applicable prospectus supplement will set forth their names and any applicable commissions or discounts. The shares of Class A common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale, or at negotiated prices. See "Plan of Distribution."

We urge you to read carefully this prospectus, any accompanying prospectus supplement and any documents we incorporate by reference into this prospectus and any accompanying prospectus supplement before you make your investment decision.

---

**Investing in our Class A common stock involves a high degree of risk. You should review carefully the risks and uncertainties described under the heading "Risk Factors" in the applicable prospectus supplement and under similar headings in other documents incorporated by reference in this prospectus and such prospectus supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**The date of this prospectus is April 20, 2022.**

Table of Contents

**Table of Contents**

|  | Page |
|---|---|
| COMPANY OVERVIEW | 2 |
| RISK FACTORS | 3 |
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS | 4 |
| USE OF PROCEEDS | 5 |
| ORGANIZATIONAL STRUCTURE | 6 |
| DESCRIPTION OF CAPITAL STOCK | 11 |
| PLAN OF DISTRIBUTION | 19 |
| LEGAL MATTERS | 21 |
| EXPERTS | 21 |
| WHERE YOU CAN FIND MORE INFORMATION | 21 |
| INCORPORATION OF DOCUMENTS BY REFERENCE | 22 |

Table of Contents

Table of Contents

**ABOUT THIS PROSPECTUS**

This prospectus is part of an automatic shelf registration statement on Form S-3 that we filed with the Securities and Exchange Commission (the "SEC") as a "well-known seasoned issuer" as defined in Rule 405 under the Securities Act of 1933, as amended (the "Securities Act"). Under this shelf registration statement, we may sell, at any time and from time to time, in one or more offerings, the shares of Class A common stock described in this prospectus. As allowed by the SEC's rules, this prospectus provides a general description of our Class A common stock. Each time we sell Class A common stock, we will provide a prospectus supplement containing specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus, and accordingly, to the extent inconsistent, information in this prospectus is superseded by the information in the prospectus supplement. You should read both this prospectus and any prospectus supplement together with additional information described under the heading "Where You Can Find More Information."

**We have not authorized any dealer, salesperson or other person to give any information or to make any representation other than those contained or incorporated by reference in this prospectus and the accompanying supplement to this prospectus or any associated "free writing prospectus." We take no responsibility for, and can provide no assurance as to the reliability of, any other information others may give you. In this prospectus, any reference to an applicable prospectus supplement may refer to a "free writing prospectus," unless the context otherwise requires. This prospectus and the accompanying prospectus supplement do not constitute an offer to sell or the solicitation of an offer to buy any securities other than the registered securities to which they relate, nor do this prospectus and the accompanying prospectus supplement constitute an offer to sell or the solicitation of an offer to buy securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. You should not assume that the information contained in this prospectus and any accompanying prospectus supplement is accurate on any date subsequent to the date set forth on the front of the document.**

We urge you to read carefully this prospectus and any accompanying prospectus supplement, together with the information incorporated herein and therein by reference as described under the heading "Incorporation of Documents By Reference," before deciding whether to invest in the Class A common stock being offered.

Unless we state otherwise or the context otherwise requires, the terms "we," "us," "our," "our business" "Carvana" and "our company" refer to and similar references refer to Carvana Co. and its consolidated subsidiaries, including Carvana Group, LLC and its subsidiaries ("Carvana Group").

1

Table of Contents

**COMPANY OVERVIEW**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want—a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

We provide refreshingly different and convenient experiences for used car buying and selling that can save customers time and money. On our platform, consumers can research and identify a vehicle, inspect it using our patented 360-degree vehicle imaging technology, obtain financing and warranty coverage, purchase the vehicle, and schedule delivery or pick-up, all from their desktop or mobile devices. Alternatively, a customer can obtain a firm offer online for their vehicle by answering a few questions without needing to provide photos or service records. Our transaction technologies and online platform transform a traditionally time consuming process by allowing customers to secure financing, complete a purchase or sale, and schedule delivery or pick-up online in as little as 10 minutes.

We were incorporated in Delaware on November 29, 2016. Our Class A common stock is listed on the NYSE under the symbol "CVNA." Our principal executive office is located at 1930 W. Rio Salado Parkway, Tempe, Arizona 85281, and our telephone number is (480) 719-8809. Our website address is *www.carvana.com*. This website address is not intended to be an active link, and information on, or accessible through, our website should not be construed to be part of this prospectus.

Additional information about us is included in documents incorporated by reference in this prospectus. See "Where You Can Find More Information" and "Incorporation of Documents by Reference."

2

Table of Contents

**RISK FACTORS**

An investment in our Class A common stock involves a high degree of risk. Before deciding whether to invest in our Class A common stock, you should carefully consider the risks, uncertainties and assumptions discussed under Item 1A, "Risk Factors," in our most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, as updated from time to time by our subsequent filings with the SEC, which are incorporated herein by reference, together with the information in this prospectus and any other information incorporated by reference into this prospectus and the accompanying prospectus supplement. See the sections of this prospectus entitled "Where You Can Find More Information" and "Incorporation of Documents by Reference." Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect our business, financial condition or results of operations. The occurrence of any of these known or unknown risks might cause you to lose all or part of your investment in our Class A common stock.

Table of Contents

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus, along with the documents incorporated by reference in this prospectus, contain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Such forward-looking statements include, but are not limited to, statements regarding our or our management's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to other characterizations of future events or circumstances, such as statements about our future financial performance, including any underlying assumptions, are forward-looking statements. The words "anticipate," "estimate," "expect," "project," "plan," "intend," "believe," "may," "will," "should," "can have," "likely" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking.

The forward-looking statements contained or incorporated by reference in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. You should not place undue reliance on these forward-looking statements in deciding whether to invest in our securities. We cannot assure you that future developments affecting us will be those that we have anticipated. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under the sections entitled "Risk Factors" in this prospectus and the applicable prospectus supplement and "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our most recent Annual Report on Form 10-K, which is incorporated by reference herein, and any subsequent periodic reports we file with the SEC. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date the statements were made, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should read this prospectus, along with the documents incorporated by reference herein, with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

Forward-looking statements speak only as of the date they were made. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

4

Table of Contents

**USE OF PROCEEDS**

Unless indicated otherwise in any applicable prospectus supplement, we intend to contribute the net proceeds from the sale of shares of Class A common Stock offered by us under this prospectus and any related prospectus supplement to our wholly owned subsidiary, Carvana Co. Sub LLC ("Carvana Sub"), that will in turn use such net proceeds to acquire newly-issued Class A Units in Carvana Group at a purchase price per Class A Unit based on the applicable public offering price, less any applicable underwriting discounts and commissions. In turn, Carvana Group intends to use the net proceeds for general corporate purposes, which may include, but are not limited to, funding working capital, capital expenditures, operating expenses, repayment of existing indebtedness and the selective pursuit of business development opportunities, including to expand our current business through acquisitions of, or investments in, other businesses, products or technologies. Additional information on the use of net proceeds from the sale of shares of Class A common stock that we may offer from time to time by this prospectus may be set forth in the applicable prospectus supplement relating to a particular offering.

Table of Contents

**Table of Contents**

**ORGANIZATIONAL STRUCTURE**

**Overview**

Carvana Co. is a Delaware corporation formed to serve as a holding company that holds an indirect interest in Carvana Group through its wholly owned subsidiary, Carvana Sub. Carvana Sub is a Delaware limited liability company that has elected to be treated as a corporation for U.S. federal income tax purposes. Neither Carvana Co. nor Carvana Sub engaged in any business or other activities other than in connection with their formation prior to Carvana Co.'s initial public offering (the "IPO"). Carvana Co.'s. sole asset is the capital stock of its wholly owned subsidiary, Carvana Sub, whose only assets are a membership interest in Carvana Group and a 0.1% ownership interest in Carvana, LLC, and operates and controls all of the business and affairs and consolidates the financial results of Carvana Group. The operating agreement of Carvana Group provides for two classes of common ownership interests in Carvana Group (one held by certain employees and consultants subject to vesting and a participation threshold, and one held by the other Carvana Group owners, including the Garcia Parties and Carvana Sub). We, Carvana Sub and holders of the LLC Units (the "LLC Unitholders") are also parties to an exchange agreement (the "Exchange Agreement") under which each LLC Unitholder (and certain permitted transferees thereof) may (subject to the terms of the Exchange Agreement) exchange their LLC Units for shares of our Class A common stock. To the extent such owners also hold Class B common stock, they will be required to deliver to Carvana Sub a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be cancelled. As a holder exchanges its LLC Units, our indirect interest in Carvana Group will be correspondingly increased.

The following diagram depicts our organizational structure. This diagram is provided for illustrative purposes only and does not purport to represent all legal entities owned or controlled by us, or owning a beneficial interest in us.



6

**Table of Contents**

(1)     Shares of Class A common stock and Class B common stock vote as a single class. Each outstanding share of Class A common stock is entitled to one vote on all matters to be voted on by stockholders generally. The shares of Class B common stock have no economic rights. Each share of our Class B common stock held by the Garcia Parties entitles its holder to ten votes on all matters to be voted on by stockholders generally for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock). All other shares of our Class B common stock entitle their holder to one vote per share on all matters to be voted on by stockholders generally. In accordance with the Exchange Agreement, LLC Unitholders are entitled to exchange LLC Units, together with shares of Class B common stock in the case of certain Class A Units, for shares of Class A common stock determined in accordance with the Exchange Agreement or, at our election, for cash.

## Incorporation of Carvana Co.

Carvana Co. was incorporated in Delaware on November 29, 2016. Our amended and restated certificate of incorporation authorizes two classes of common stock: Class A common stock and Class B common stock. In addition, our amended and restated certificate authorizes shares of undesignated preferred stock (including our Class A Convertible Preferred Stock), the rights, preferences and privileges of which may be designated from time to time by our Board. Our Class A common stock, Class B common stock and Class A Convertible Preferred Stock have the terms described in "Description of Capital Stock."

## Amended and Restated Operating Agreement of Carvana Group

The operations of Carvana Group, and the rights and obligations of the LLC Unitholders, are set forth in the Fourth Amended and Restated Limited Liability Company Agreement of Carvana Group, LLC, which we refer to as the "LLC Operating Agreement."

*Manager*. Our wholly owned subsidiary, Carvana Sub, is a member and the sole manager of Carvana Group. As the sole manager, we are able to control all of the day-to-day business affairs and decision-making of Carvana Group without the approval of any other member, unless otherwise stated in the LLC Operating Agreement. As such, through our officers and directors, we are responsible for all operational and administrative decisions of Carvana Group and the day-to-day management of Carvana Group's business. Pursuant to the LLC Operating Agreement, Carvana Sub cannot be removed, under any circumstances, as the sole manager of Carvana Group except by our election.

*Compensation*. Carvana Sub is not entitled to compensation for our services as manager. We and Carvana Sub are entitled to reimbursement by Carvana Group for fees and expenses incurred on behalf of Carvana Group, including all expenses associated with this offering and maintaining our corporate existence.

*Recapitalization*. The LLC Operating Agreement provides for the Class A Units and Class B Units, which we refer to collectively as the "LLC Units." The LLC Operating Agreement also reflects unlimited authorized LLC Units. Each LLC Unit entitles the holder to a pro rata share of the net profits and net losses and distributions of Carvana Group. Holders of LLC Units have no voting rights, except as expressly provided in the LLC Operating Agreement.

*Distributions*. The LLC Operating Agreement requires that tax distributions be made by Carvana Group to its members. Tax distributions generally will be made quarterly (i) to each member of Carvana Group holding non-convertible preferred units (currently only Carvana Sub), on a pro rata basis, based on the net taxable income of Carvana Group allocable to the holder of such convertible preferred units, (ii) to each member of Carvana Group holding Class A Units, including us, on a pro rata basis, based on the net taxable income of Carvana Group, and (iii) to each member of Carvana Group holding Class B Units, based on such member's allocable

7

Table of Contents

share of the net taxable income of Carvana Group, in each case calculated at an assumed tax rate. Tax distributions made in respect of the convertible preferred units will be calculated at the assumed tax rate that is determined to be sufficient for Carvana Sub to pay its actual, current income tax obligations with respect to the net taxable income allocated by Carvana Group to Carvana Sub in respect of such convertible preferred units, and thus are expected to be calculated at a lower effective tax rate than tax distributions made in respect of the Class A Units and Class B Units. Additionally, the tax rates used to determine tax distributions will apply regardless of the actual final tax liability of any such member. We expect Carvana Group may make distributions out of distributable cash periodically to the extent permitted by our agreements governing our indebtedness and necessary to enable us to cover our operating expenses and other obligations, including our tax liability and obligations under the Tax Receivable Agreement, as well as to make dividend payments, if any, to the holders of our Class A common stock and Class A Convertible Preferred Stock.

*Exchange Rights*. The LLC Operating Agreement provides that the LLC Unitholders other than Carvana Sub (and certain permitted transferees thereof) may, pursuant to the terms of the Exchange Agreement, exchange their LLC Units for shares of our Class A common stock or cash. To the extent such owners also hold Class B common stock, they will be required to deliver to us a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. As a holder exchanges its LLC Units, our interest in Carvana Group will be correspondingly increased. See "—Exchange Agreement."

*Issuance of LLC Units Upon Exercise of Options or Issuance of Other Equity Compensation*. Upon the exercise of options issued by us, or the issuance of other types of equity compensation by us (such as the issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock), our wholly owned subsidiary, Carvana Sub, will be required to acquire from Carvana Group a number of LLC Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation subject to adjustment as set forth in the Exchange Agreement. When we issue shares of Class A common stock in settlement of stock options granted to persons that are not officers or employees of Carvana Group or its subsidiaries, we will cause Carvana Sub to make, or be deemed to make, a capital contribution to Carvana Group equal to the aggregate value of such shares of Class A common stock, and Carvana Group will issue to Carvana Sub a number of LLC Units equal to 1.25 times the number of shares of Class A common stock we issued subject to adjustment as set forth in the Exchange Agreement. When we issue shares of Class A common stock in settlement of stock options granted to persons that are officers or employees of Carvana Group or its subsidiaries, we will be deemed to have sold directly to the person exercising such award a portion of the value of each share of Class A common stock equal to the exercise price per share, and Carvana Sub will be deemed to have sold directly to Carvana Group (or the applicable subsidiary of Carvana Group) the difference between the exercise price and market price per share for each such share of Class A common stock. In cases where we grant other types of equity compensation to employees of Carvana Group or its subsidiaries, on each applicable vesting date Carvana Sub will be deemed to have sold to Carvana Group (or such subsidiary) the number of vested shares at a price equal to the market price per share, Carvana Group (or such subsidiary) will deliver the shares to the applicable person, and Carvana Sub will be deemed to have made a capital contribution in Carvana Group equal to the purchase price for such shares in exchange for a number of LLC Units corresponding to the ratio of shares of Class A common stock to LLC Units.

*Maintenance of Four-to-Five Ratio of Shares of Class A Common Stock and LLC Units Owned by Carvana Co*. The LLC Operating Agreement requires that (1) we at all times maintain a ratio of 1.25 LLC Units owned by Carvana Sub for each share of Class A common stock issued by us (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the Exchange Agreement, and taking into account Carvana Sub's 0.1% ownership interest in Carvana, LLC), and (2) Carvana Group at all times maintain a four-to-five ratio between the number of shares of Class A common stock issued by us and the number of LLC Units owned by Carvana Sub.

8

Table of Contents

***Transfer Restrictions***. The LLC Operating Agreement generally does not permit transfers of LLC Units by members, subject to limited exceptions. Any transferee of LLC Units that is admitted as a member of Carvana Group must assume all of the obligations of a transferring member with respect to the transferred units.

***Dissolution***. The LLC Operating Agreement provides that Carvana Group may be dissolved voluntarily only at the election of the manager. In addition to a voluntary dissolution, Carvana Group will be dissolved upon the entry of a decree of judicial dissolution or other circumstances in accordance with Delaware law. Upon a dissolution event, the proceeds of a liquidation will be distributed in the following order: (1) first, to pay the expenses of winding up Carvana Group; (2) second, to pay debts and liabilities owed to creditors of Carvana Group, other than members; (3) third, to pay debts and liabilities owed to members; and (4) fourth, to the members pro-rata in accordance with their respective percentage ownership interests in Carvana Group (after accounting for the participation thresholds of outstanding Class B Units and as determined based on the number of vested LLC Units held by a member relative to the aggregate number of all outstanding vested LLC Units).

***Confidentiality***. Each member agrees to maintain the confidentiality of Carvana Group's confidential information. This obligation excludes information independently obtained or developed by the members, information that is in the public domain or otherwise disclosed to a member, in either such case not in violation of a confidentiality obligation or disclosures required by law or judicial process or approved by our chief executive officer.

***Indemnification and Exculpation***. The LLC Operating Agreement provides for indemnification of the manager, members and officers of Carvana Group and their respective subsidiaries or affiliates. To the extent permitted by applicable law, Carvana Group will indemnify us, Carvana Sub as its manager, its authorized officers, its other employees and agents from and against any losses, liabilities, damages, costs, expenses, fees or penalties incurred by any acts or omissions of these persons, provided that the acts or omissions of these indemnified persons are not the result of fraud, intentional misconduct or a violation of the implied contractual duty of good faith and fair dealing, or any lesser standard of conduct permitted under applicable law.

We, Carvana Sub, as the manager, and the authorized officers and other employees and agents of Carvana Group will not be liable to Carvana Group, its members or their affiliates for damages incurred by any acts or omissions of these persons, provided that the acts or omissions of these exculpated persons are not the result of fraud or intentional misconduct.

***Amendments.*** The LLC Operating Agreement may be amended with the consent of the holders of a majority in voting power of the outstanding LLC Units. Notwithstanding the foregoing, no amendment to any of the provisions that expressly require the approval or action of certain members may be made without the consent of such members and no amendment to the provisions governing the authority and actions of the manager or the dissolution of Carvana Group may be amended without the consent of the manager.

**Exchange Agreement**

Pursuant to the Exchange Agreement, each LLC Unitholder other than Carvana Sub (and certain permitted transferees thereof) may (subject to the terms of the exchange agreement) exchange their LLC Units for shares of our Class A common stock or, at our election, for cash. To the extent such owners also hold Class B common stock, they will be required to deliver to us a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered will be cancelled. As a holder exchanges its LLC Units, our indirect interest in Carvana Group will be correspondingly increased. LLC Unitholders may exchange LLC Units for shares of our Class A common stock (or, at our election, for cash) at any time upon their election.

When an LLC Unitholder exchanges Class A Units and, if applicable, shares of Class B common stock, they will receive four shares of Class A common stock for every five Class A Units or, at our option, cash equal to the

9

Table of Contents

value of a share of Class A common stock (the "Class A Common Stock Value") multiplied by 0.8 times the number of Class A Units being exchanged. The Class A Common Stock Value will equal the average of the volume weighted average prices for a share of Class A common stock for each of the three consecutive full trading days ending on and including the last full trading day immediately prior to the related date of exchange.

Class B Units are subject to vesting and a participation threshold, and as a result, LLC Unitholders exchanging Class B Units will receive a number of shares of Class A Common Stock equal to the Class A Common Stock Value less the applicable participation threshold multiplied by 0.8 times the number of Class B Units being exchanged, divided by the Class A Common Stock Value, subject to adjustment as set forth in the Exchange Agreement.

10

Table of Contents

**DESCRIPTION OF CAPITAL STOCK**

*The following is a description of the material terms of our amended and restated certificate of incorporation and amended and restated bylaws. The following description may not contain all of the information that is important to you. To understand the material terms of our Class A common stock, you should read our amended and restated certificate of incorporation and amended and restated bylaws, copies of which have been filed with the SEC.*

**General**

Our amended and restated certificate of incorporation (our "certificate") authorizes capital stock consisting of:

- 500,000,000 shares of Class A common stock, par value $0.001 per share;
- 125,000,000 shares of Class B common stock, par value $0.001 per share; and
- 50,000,000 shares of undesignated preferred stock, with a par value per share that may be established by the Board in the applicable certificate of designations.

As of April 19, 2022 we had 90,098,441 and 82,900,276 shares of our Class A common stock and Class B common stock issued and outstanding, respectively.

The following summary describes the material provisions of our capital stock. We urge you to read our amended and restated certificate of incorporation and our amended and restated bylaws, which have been filed with the SEC.

Certain provisions of our certificate and our amended and restated bylaws (our "bylaws") summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of Class A common stock.

**Class A Common Stock**

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. The holders of our Class A common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class A common stock will vote together with holders of our Class B common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate of incorporation described below or as otherwise required by applicable law or the certificate.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our Board out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation or the sale of all or substantially all of our assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock will be entitled to receive pro rata our remaining assets available for distribution.

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class A common stock.

11

Table of Contents

**Class B Common Stock**

Each holder of Class B common stock is entitled to one vote for each share of Class B common stock held of record by such holder; provided that each holder that, together with its affiliates (which, in the case of the Garcia Parties, includes each other Garcia Party), (1) beneficially owned 50% or more of the LLC Units immediately following the completion of the IPO and (2) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least 25% of the outstanding shares of Class A common stock (determined assuming that each LLC Unit held by holders other than Carvana Sub were exchanged for Class A common stock), is entitled to ten votes for each share of Class B common stock held of record by such holder. As a result, because only the Garcia Parties met the 50% ownership threshold at the completion of the IPO, only the Garcia Parties are entitled to ten votes per share of Class B common stock they beneficially own, for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock). Each other share of our Class B common stock entitles its holder to one vote on all matters to be voted on by stockholders generally. The Garcia Parties holding shares of our Class B common stock will be entitled to one vote for each share held of record on all matters submitted to a vote of stockholders when the Garcia Parties' direct or indirect beneficial ownership of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is less than 25%. The holders of our Class B common stock do not have cumulative voting rights in the election of directors.

Holders of shares of our Class B common stock vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our certificate of incorporation described below or as otherwise required by applicable law or the certificate.

Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation or the sale of all or substantially all of our assets. Additionally, holders of shares of our Class B common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class B common stock. Any amendment of our certificate of incorporation that gives holders of our Class B common stock (1) any rights to receive dividends or any other kind of distribution, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Holders of Class A Units own 100% of our outstanding Class B common stock.

**Preferred Stock**

Under the terms of our certificate, our Board is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our Board has the discretion to determine the rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our Board to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

Table of Contents

**Forum Selection**

Our certificate provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the United States District Court for the District of Delaware) will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action asserting a claim against the company or any director or officer of the company arising pursuant to any provision of the DGCL, our certificate or our bylaws or (4) any other action asserting a claim against the company or any director or officer of the company that is governed by the internal affairs doctrine. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Anti-Takeover Provisions**

Our certificate, bylaws and the DGCL contain provisions, which are summarized in the following paragraphs, that are intended to enhance the likelihood of continuity and stability in the composition of our Board. These provisions are intended to avoid costly takeover battles, reduce our vulnerability to a hostile change of control and enhance the ability of our Board to maximize stockholder value in connection with any unsolicited offer to acquire us. However, these provisions may have an anti-takeover effect and may delay, deter or prevent a merger or acquisition of us by means of a tender offer, a proxy contest or other takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the prevailing market price for the shares of Class A common stock held by stockholders. These provisions include:

*Dual Class of Common Stock*. As described above in "—Class A Common Stock " and "—Class B Common Stock," our certificate provides for a dual class common stock structure pursuant to which the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote for so long as the Garcia Parties maintain, in the aggregate, direct or indirect beneficial ownership of at least 25% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock), thereby giving the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.

*Classified Board.* Our certificate provides that our Board will be divided into three classes of directors, with the classes as nearly equal in number as possible, and with the directors serving three-year terms. As a result, approximately one-third of our Board will be elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our Board. Our certificate provides that, subject to any rights of holders of preferred stock to elect additional directors under specified circumstances, the number of directors will be fixed exclusively pursuant to a resolution adopted by our Board. Our Board currently has six members.

*Stockholder Action by Written Consent.* Our certificate precludes stockholder action by written consent at any time the Garcia Parties are no longer entitled to ten votes for each share of Class B common stock held of record on all matters submitted to a vote.

*Special Meetings of Stockholders.* Except as required by law, special meetings of our stockholders shall be called at any time only by or at the direction of our Board or the chairman of our Board; provided, however, (1) at any time when the Garcia Parties beneficially own any of our Class B common stock, special meetings of our stockholders shall also be called by our Board or the chairman of our Board at the request of the Garcia Parties and (2) at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes

13

Table of Contents

for each share held of record on all matters submitted to a vote, special meetings of our stockholders shall also be called by holders of a majority in voting power of the outstanding shares of our capital stock entitled to vote on all matters to be voted on by stockholders generally, voting together as a single class. Our bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of us.

*Advance Notice Procedures.* Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our Board; provided, however, such advance notice procedure does not apply to the Garcia Parties. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our Board or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the bylaws will not give our Board the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of us.

*Removal of Directors; Vacancies.* Directors may be removed with or without cause upon the affirmative vote of a majority in voting power of all outstanding shares of stock entitled to vote thereon, voting together as a single class; provided, however, at any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, directors may only be removed for cause, and only by the affirmative vote of holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class. In addition, our certificate provides that, subject to the rights granted to one or more series of preferred stock then outstanding, any newly created directorship on our Board that results from an increase in the number of directors and any vacancies on our Board will be filled at any time when the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, either (1) upon the affirmative vote of a majority in voting power of all outstanding shares of capital stock entitled to vote thereon, voting together as a single class or (2) if no such appointment has been made by the tenth day following the occurrence of the vacancy, or if such shareholders holding a majority in voting power of all outstanding shares of capital stock notify our Board that no appointment shall be made, by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director. At any time the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any newly created directorship on our Board that results from an increase in the number of directors and any vacancy occurring on our Board will be filled by the affirmative vote of a majority of the remaining directors, even if less than a quorum, or by the sole remaining director.

*Supermajority Approval Requirements.* Our Board is expressly authorized to make, alter, amend, change, add to, rescind or repeal, in whole or in part, our bylaws without a stockholder vote in any matter not inconsistent with the laws of the State of Delaware and our certificate. For as long as the Garcia Parties holding our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of a majority in voting power of the outstanding shares of our stock entitled to vote on such amendment, alteration, change, addition, rescission or repeal. When the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, any amendment, alteration, rescission or repeal of our bylaws by our stockholders will require the affirmative vote of the holders of at least 66 2/3% in voting power of all the then-outstanding shares of stock of the company entitled to vote thereon, voting together as a single class. The DGCL provides generally that the affirmative vote of a majority of the

14

Table of Contents

outstanding shares entitled to vote thereon, voting together as a single class, is required to amend a corporation's certificate of incorporation, unless the certificate requires a greater percentage.

At any time when the Garcia Parties holding our Class B common stock are no longer entitled to ten votes for each share held of record on all matters submitted to a vote, the following provisions in our amended and restated certificate of incorporation may be amended, altered, repealed or rescinded only by the affirmative vote of the holders of at least 66 2/3% (as opposed to a majority threshold that would apply when holders of our Class B common stock are entitled to ten votes for each share held of record on all matters submitted to a vote) in voting power of all the then-outstanding shares of stock entitled to vote thereon, voting together as a single class:

- the provision requiring a 66 2/3% supermajority vote for stockholders to amend our bylaws;

- the provisions providing for a classified Board (the election and term of our directors);

- the provisions regarding resignation and removal of directors;

- the provisions regarding entering into business combinations with interested stockholders;

- the provisions regarding stockholder action by written consent;

- the provisions regarding calling special meetings of stockholders;

- the provisions regarding filling vacancies on our Board and newly created directorships;

- the provisions eliminating monetary damages for breaches of fiduciary duty by a director; and

- the amendment provision requiring that the above provisions be amended only with a 66 2/3% supermajority vote.

The combination of the classification of our Board, the lack of cumulative voting and the supermajority voting requirements will make it more difficult for our existing stockholders to replace our Board as well as for another party to obtain control of us by replacing our Board. Because our Board has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management.

*Authorized but Unissued Shares*. Our authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval, subject to stock exchange rules. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. One of the effects of the existence of authorized but unissued common stock or preferred stock may be to enable our Board to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive our stockholders of opportunities to sell their shares of common stock at prices higher than prevailing market prices.

*Business Combinations*. We are not subject to the provisions of Section 203 of the DGCL. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the time that the person becomes an interested stockholder, unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns, or did own within three years prior to the determination of interested stockholder status, 15% or more of the corporation's voting stock.

Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions: (1) before the stockholder became an interested stockholder,

15

Table of Contents

the Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder; (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans, in some instances; or (3) at or after the time the stockholder became an interested stockholder, the business combination was approved by the Board and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares.

We have opted out of Section 203; however, our certificate of incorporation contains similar provisions providing that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the stockholder became an interested stockholder, unless:

- prior to such time, our Board approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, excluding certain shares; or

- at or subsequent to that time, the business combination is approved by our Board and by the affirmative vote of holders of at least 66 2/3% of our outstanding voting stock that is not owned by the interested stockholder.

Under certain circumstances, this provision will make it more difficult for a person who would be an "interested stockholder" to effect various business combinations with the company for a three-year period. This provision may encourage companies interested in acquiring the company to negotiate in advance with our Board because the stockholder approval requirement would be avoided if our Board approves either the business combination or the transaction which results in the stockholder becoming an interested stockholder. These provisions also may have the effect of preventing changes in our Board and may make it more difficult to accomplish transactions which stockholders may otherwise deem to be in their best interests.

Our certificate of incorporation provides that the Garcia Parties, and any of their direct or indirect transferees and any group as to which such persons are a party, do not constitute "interested stockholders" for purposes of this provision.

**Limitations on Liability and Indemnification of Officers and Directors**

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties, subject to certain exceptions. Our certificate of incorporation includes a provision that eliminates the personal liability of directors for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL. The effect of these provisions is to eliminate the rights of us and our stockholders, through stockholders' derivative suits on our behalf, to recover monetary damages from a director for breach of fiduciary duty as a director, including breaches resulting from grossly negligent behavior. However, exculpation will not apply to any director if the director has acted in bad faith, knowingly or intentionally violated the law, authorized illegal dividends or redemptions or derived an improper benefit from his or her actions as a director.

16

Table of Contents

Our bylaws provide that we must indemnify and advance expenses to our directors and officers to the fullest extent authorized by the DGCL. We also are expressly authorized to carry directors' and officers' liability insurance providing indemnification for our directors, officers and certain employees for some liabilities. We believe that these indemnification and advancement provisions and insurance will be useful to attract and retain qualified directors and officers.

The limitation of liability, indemnification and advancement provisions that will be included in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breaches of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

## Corporate Opportunity Doctrine

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our certificate of incorporation, to the maximum extent permitted from time to time by Delaware law, renounces any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to certain of our officers, directors or stockholders or their respective affiliates, other than those officers, directors, stockholders or affiliates acting in their capacity as our employee or director. Our certificate provides that, to the fullest extent permitted by law, any director or stockholder who is not employed by us or our affiliates will not have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (2) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, in the event that any director or stockholder, other than directors or stockholders acting in their capacity as our director or as a stockholder, acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity. Our certificate will not renounce our interest in any business opportunity that is expressly offered to an employee director or employee in his or her capacity as a director or employee of Carvana Co. To the fullest extent permitted by law, no business opportunity will be deemed to be a potential corporate opportunity for us unless we would be permitted to undertake the opportunity under our certificate, we have sufficient financial resources to undertake the opportunity and the opportunity would be in line with our business.

## Dissenters' Rights of Appraisal and Payment

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of Carvana Co. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

## Stockholders' Derivative Actions

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

17

**Table of Contents**

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is American Stock Transfer & Trust Company, LLC. Its address is 6201 15th Avenue, Brooklyn, NY 11219.

**Listing**

Our Class A common stock is listed on the NYSE under the trading symbol "CVNA."

18

**Table of Contents**

**Table of Contents**

**PLAN OF DISTRIBUTION**

We may sell our Class A common stock from time to time pursuant to underwritten public offerings, "at-the-market" offerings, negotiated transactions, block trades or a combination of these methods. We may sell our Class A common stock to or through one or more underwriters or dealers (acting as principal or agent), through agents, or directly to one or more purchasers. We may distribute our Class A common stock from time to time in one or more transactions:

- at a fixed price or prices, which may be changed;

- at market prices prevailing at the time of sale;

- at prices related to such prevailing market prices; or

- at negotiated prices.

A prospectus supplement or supplements (and any related free writing prospectus that we may authorize to be provided to you) will describe the terms of the offering of our Class A common stock, including, to the extent applicable:

- the name or names of the underwriters, dealers or agents, if any;

- the purchase price of shares of our Class A common stock or other consideration therefor and the proceeds, we will receive from the sale;

- any over-allotment or other options under which underwriters may purchase additional shares of Class A common stock from us;

- any agency fees or underwriting discounts and other items constituting agents' or underwriters' compensation;

- any public offering price;

- any discounts or concessions allowed or reallowed or paid to dealers; and

- any securities exchange or market on which our Class A common stock may be listed.

Only underwriters named in a prospectus supplement will be underwriters of our Class A common stock offered by that prospectus supplement. Dealers and agents participating in the distribution of our Class A common stock may be deemed to be underwriters and compensation received by them on resale of our Class A common stock may be deemed to be underwriting discounts. If such dealers or agents were deemed to be underwriters, they may be subject to statutory liabilities under the Securities Act.

If underwriters are used in the sale, they will acquire the shares of our Class A common stock for their own account and may resell the shares of our Class A common stock from time to time in one or more transactions at a fixed public offering price or at varying prices determined at the time of sale. The obligations of the underwriters to purchase the shares of our Class A common stock will be subject to the conditions set forth in the applicable underwriting agreement. We may offer the shares of our Class A common stock to the public through underwriting syndicates represented by managing underwriters or by underwriters without a syndicate. Subject to certain conditions, the underwriters will be obligated to purchase all of the shares of our Class A common stock offered by the prospectus supplement, other than the shares of our Class A common stock covered by any option to purchase additional shares of Class A common stock. If a dealer is used in the sale of the shares of our Class A common stock, we or an underwriter will sell the shares of our Class A common stock to the dealer, as principal. The dealer may then resell the shares of our Class A common stock to the public at varying prices to be determined by the dealer at the time of resale. To the extent required, we will set forth in the prospectus supplement the name of the dealer and the terms of the transaction. Any public offering price and any discounts or concessions allowed or reallowed or paid to dealers may change from time to time.

We may use underwriters, dealers or agents with whom we have a material relationship. We will describe in the prospectus supplement, naming the underwriter, dealer or agent, the nature of any such relationship.

Table of Contents

We may sell Class A common stock directly or through agents we designate from time to time. We will name any agent involved in the offering and sale of our Class A common stock and we will describe any commissions payable to the agent in the prospectus supplement. Unless the prospectus supplement states otherwise, the agent will act on a best-efforts basis for the period of its appointment.

We may provide agents, underwriters and dealers with indemnification against civil liabilities, including liabilities under the Securities Act, or contribution with respect to payments that the agents, underwriters or dealers may make with respect to these liabilities. Agents, underwriters and dealers, or their affiliates, may engage in transactions with, or perform services for, us in the ordinary course of business.

Any underwriter may engage in over-allotment, stabilizing transactions, short-covering transactions and penalty bids in accordance with Regulation M under the Exchange Act. Over-allotment involves sales in excess of the offering size, which create a short position. Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum price. Syndicate-covering or other short-covering transactions involve purchases of the securities, either through exercise of the over-allotment option or in the open market after the distribution is completed, to cover short positions. Penalty bids permit the underwriters to reclaim a selling concession from a dealer when the securities originally sold by the dealer are purchased in a stabilizing or covering transaction to cover short positions. Those activities may cause the price of the securities to be higher than it would otherwise be. If commenced, the underwriters may discontinue any of the activities at any time.

Any underwriters that are qualified market makers on the NYSE may engage in passive market making transactions in our Class A common stock on the NYSE in accordance with Regulation M under the Exchange Act, during the business day prior to the pricing of the offering, before the commencement of offers or sales of our Class A common stock. Passive market makers must comply with applicable volume and price limitations and must be identified as passive market makers. In general, a passive market maker must display its bid at a price not in excess of the highest independent bid for such security; if all independent bids are lowered below the passive market maker's bid, however, the passive market maker's bid must then be lowered when certain purchase limits are exceeded. Passive market making may stabilize the market price of the securities at a level above that which might otherwise prevail in the open market and, if commenced, may be discontinued at any time.

In compliance with guidelines of the Financial Industry Regulatory Authority, Inc. ("FINRA"), the maximum consideration or discount to be received by any FINRA member or independent broker dealer may not exceed 8% of the aggregate amount of our Class A common stock offered pursuant to this prospectus and the applicable prospectus supplement.

20

Table of Contents

## LEGAL MATTERS

The validity of the Class A common stock offered hereby will be passed upon for us by Kirkland & Ellis LLP, Chicago, Illinois. Some of the partners of Kirkland & Ellis LLP are investors in, or are partners in partnerships that are investors in, the issuer of Class A common stock. Any underwriters or agents will be advised about other issues relating to any offering by counsel named in the applicable prospective supplement.

## EXPERTS

The financial statements and management's assessment of the effectiveness of internal control over financial reporting incorporated by reference in this prospectus and elsewhere in the registration statement have been so incorporated by reference in reliance upon the reports of Grant Thornton LLP, independent registered public accountants, upon the authority of said firm as experts in accounting and auditing.

The combined financial statements of ADESA US AUCTION as of and for the year ended December 31, 2021, have been incorporated by reference in this prospectus and elsewhere in the registration statement in reliance upon the report of KPMG LLP, independent auditors, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the SEC. We have filed with the SEC a registration statement on Form S-3 under the Securities Act with respect to the Class A common stock offered by this prospectus. This prospectus does not contain all of the information set forth in the registration statement and the exhibits to the registration statement. For further information with respect to us and the Class A common stock offered by this prospectus, we refer you to the registration statement and the exhibits filed as part of the registration statement. The SEC maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is *www.sec.gov*.

21

Table of Contents

## INCORPORATION OF DOCUMENTS BY REFERENCE

The SEC allows us to incorporate by reference the information we file with the SEC. This allows us to disclose important information to you by referencing those filed documents. We have previously filed the following documents with the SEC and incorporate them by reference into this prospectus:

- our Annual Report on Form 10-K for the year ended December 31, 2021 filed on February 24, 2022 (including the portions of our Definitive Proxy Statement on Schedule 14A, filed with the SEC on March 23, 2022, (as supplemented by the Proxy Statement Supplement filed on March 24, 2022) that we incorporate by reference in such Annual Report);

- our Current Reports on Form 8-K filed on February 3, 2022, February 24, 2022 (with respect to Items 1.01 and 9.01 only) as amended by the Current Report on Form 8-K/A filed on February 25, 2022 (with respect to Items 1.01 and 9.01 only) and as further amended by the Current Report on Form 8-K/A filed on April 20, 2022, and March 22, 2022; and

- the description of our Class A common stock set forth in Exhibit 4.9 of our Annual Report on Form 10-K for the year ended December 31, 2021.

We also incorporate by reference any future filings made by us with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act (excluding any information furnished to, rather than filed with, the SEC), including prior to the termination of the offering of the Class A common stock made by this prospectus. Information in such future filings updates and supplements the information provided in this prospectus. Any statements in any such future filings will automatically be deemed to modify and supersede any information in any document we previously filed with the SEC that is incorporated or deemed to be incorporated herein by reference to the extent that statements in the later filed document modify or replace such earlier statements.

You may request a copy of these filings, at no cost, by writing or telephoning us at the following address or telephone number:

Carvana Co.
1930 W. Rio Salado Parkway
Tempe, Arizona 85281
Attn: Investor Relations Department
Phone: (480) 719-8809

Those copies will not include exhibits, unless the exhibits have specifically been incorporated by reference in this document or you specifically request them.

22

Table of Contents

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 14.        Other Expenses of Issuance and Distribution**

The following table sets forth the estimated fees and expenses payable by Carvana Co. in connection with the issuance and distribution of the securities being registered hereby, other than underwriting discounts and commissions:

|  | Amount to be paid |
| --- | --- |
| Securities and Exchange Commission registration fee | $        (1) |
| Printing expenses | (2) |
| Accounting fees and expenses | (2) |
| Legal fees and expenses | (2) |
| Transfer Agent fees and expenses (including counsel's fees) | (2) |
| Miscellaneous expenses | (2) |
| Total | $        (2) |

(1)    In accordance with Rules 456(b) and 457(r), we are deferring payment of the registration fee. The registration fee will be paid at the time of any particular offering of securities under the registration statement and is therefore not currently determinable.

(2)    These expenses are calculated in part based on the number of issuances and the amount of securities offered and accordingly cannot be estimated at this time.

**Item 15.        Indemnification of Directors and Officers**

Section 102(b)(7) of the General Corporation Law of the State of Delaware (the "DGCL") allows a corporation to provide in its certificate of incorporation that a director of the corporation will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except where the director breached the duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of Delaware corporate law or obtained an improper personal benefit. Our certificate of incorporation provides for this limitation of liability.

Section 145 of the DGCL ("Section 145") provides that a Delaware corporation may indemnify any person who was, is or is threatened to be made, party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of such corporation), by reason of the fact that such person is or was an officer, director, employee or agent of such corporation or is or was serving at the request of such corporation as a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the corporation's best interests and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his conduct was illegal. A Delaware corporation may indemnify any persons who are, were or are a party to any threatened, pending or completed action or suit by or in the right of the corporation by reason of the fact that such person is or was a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the

II-1

Table of Contents

corporation's best interests, provided that no indemnification is permitted without judicial approval if the officer, director, employee or agent is adjudged to be liable to the corporation. Where an officer or director is successful on the merits or otherwise in the defense of any action referred to above, the corporation must indemnify him against the expenses which such officer or director has actually and reasonably incurred.

Section 145 further authorizes a corporation to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would otherwise have the power to indemnify him under Section 145.

Our bylaws provide that we will indemnify our directors and officers to the fullest extent authorized by the DGCL and must also pay expenses incurred in defending any such proceeding in advance of its final disposition upon delivery of an undertaking, by or on behalf of an indemnified person, to repay all amounts so advanced if it should be determined ultimately that such person is not entitled to be indemnified under this section or otherwise.

We are party to indemnification agreements with each of our executive officers and directors. The indemnification agreements provide the executive officers and directors with contractual rights to indemnification, expense advancement and reimbursement, to the fullest extent permitted under the DGCL.

The indemnification rights set forth above shall not be exclusive of any other right which an indemnified person may have or hereafter acquire under any statute, provision of our certificate of incorporation or bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

These indemnification provisions may be sufficiently broad to permit indemnification of our officers and directors for liabilities arising under the Securities Act.

We maintain standard policies of insurance that provide coverage (1) to our directors and officers against loss arising from claims made by reason of breach of duty or other wrongful act and (2) to us with respect to indemnification payments that we may make to such directors and officers.

II-2

**Table of Contents**

**Item 16.**      **Exhibits**

| Exhibit No. | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement. |
| 5.1 | Opinion of Kirkland & Ellis LLP. |
| 23.1 | Consent of Grant Thornton LLP. |
| 23.2 | Consent of Kirkland & Ellis LLP (included in Exhibit 5.1) |
| 23.3 | Consent of KPMG LLP. |
| 24.1 | Power of Attorney (included on signature page to this registration statement). |
| 107 | Calculation of Filing Fee Table. |

\*  To be filed by amendment to this registration statement or as an exhibit to a Current Report on Form 8-K and incorporated herein by reference.

**Item 17.**      **Undertakings**

(a)    The undersigned registrant hereby undertakes:

(1)    To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)    To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii)    To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)    To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*Provided, however*, that paragraphs (a)(1)(i), (a)(1)(ii) and (a)(1)(iii) do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2)    That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3)    To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

II-3

Table of Contents

(4)    That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities:

   (i)    Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

   (ii)    Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

   (iii)    The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

   (iv)    Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(5)    That, for the purpose of determining liability under the Securities Act of 1933 to any purchaser:

   (i)    Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

   (ii)    Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5) or (b)(7) as part of a registration statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(1)(i), (vii) or (x) for the purpose of providing the information required by Section 10(a) of the Securities Act shall be deemed to be part of and included in the registration statement as of the earlier of the date such form of prospectus is first used after effectiveness or the date of the first contract of sale of securities in the offering described in the prospectus. As provided in Rule 430B, for liability purposes of the issuer and any person that is at that date an underwriter, such date shall be deemed to be a new effective date of the registration statement relating to the securities in the registration statement to which that prospectus relates, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof. *Provided, however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date.

(6)    That, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(7)    Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by

II-4

Table of Contents

controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

II-5

Table of Contents

Table of Contents

*Signatures*

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Tempe, State of Arizona, on April 20, 2022.

**Carvana Co.**

By: /s/ Ernest C. Garcia, III
_____
Name: Ernest C. Garcia, III
Title: President, Chief Executive Officer, and Chairman

\*\*\*

**Power of Attorney**

The undersigned directors and officers of Carvana Co. hereby appoint each of Paul Breaux and Stephen Palmer, as attorney-in-fact for the undersigned, with full power of substitution and resubstitution, for and in the name, place and stead of the undersigned, to sign and file with the Securities and Exchange Commission under the Securities Act of 1933 any and all amendments (including post-effective amendments) and exhibits to this registration statement on Form S-3 and any and all applications and other documents to be filed with the Securities and Exchange Commission pertaining to the registration of the securities covered hereby, with full power and authority to do and perform any and all acts and things whatsoever requisite and necessary or desirable, hereby ratifying and confirming all that said attorney-in-fact, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities indicated on April 20, 2022.

| Signature | Title |
|---|---|
| /s/ Ernest C. Garcia, III<br>Ernest C. Garcia, III | President, Chief Executive Officer, and Chairman<br>(Principal Executive Officer) |
| /s/ Mark Jenkins<br>Mark Jenkins | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Stephen Palmer<br>Stephen Palmer | Vice President of Accounting and Finance<br>(Principal Accounting Officer) |
| /s/ Dan Quayle<br>Dan Quayle | Director |
| /s/ Michael Maroone<br>Michael Maroone | Director |
| /s/ Neha Parikh<br>Neha Parikh | Director |

II-6

**Table of Contents**

| Signature | Title |
|---|---|
| /s/ Ira Platt<br>Ira Platt | Director |
| /s/ Greg Sullivan<br>Greg Sullivan | Director |

II-7

**Table of Contents**

**Exhibit 5.1**

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

April 20, 2022

Carvana Co.
1930 W. Rio Salado Parkway
Tempe, Arizona 85281

Ladies and Gentlemen:

We are acting as special counsel to Carvana Co., a Delaware corporation (the "Company"), in connection with the preparation of the Registration Statement on Form S-3ASR filed with the Securities and Exchange Commission (the "Commission") on or about the date hereof under the Securities Act of 1933, as amended (the "Act") (such Registration Statement, as amended or supplemented, is hereinafter referred to as the "Registration Statement"). The Registration Statement relates to the issuance and sale by the Company from time to time, pursuant to Rule 415 of the General Rules and Regulations promulgated under the Securities Act, of an unspecified amount of Class A common stock, par value $0.001 per share (the "Shares") in one or more offerings from time to time on a delayed or continuous basis (the "Offerings").

In that connection, we have examined originals, or copies certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary for the purposes of this opinion, including (i) the corporate and organizational documents of the Company, including the Amended and Restated Certificate of Incorporation of the Company filed with the Secretary of State of the State of Delaware on April 27, 2017, (ii) minutes and records of the proceedings of the Company and (iii) the Registration Statement.

For purposes of this opinion, we have assumed the authenticity of all documents submitted to us as originals, the conformity to the originals of all documents submitted to us as copies and the authenticity of the originals of all documents submitted to us as copies. We have also assumed the legal capacity of all natural persons, the genuineness of the signatures of persons signing all documents in connection with which this opinion is rendered, the authority of such persons signing on behalf of the parties thereto other than the Company and the due authorization, execution and delivery of all documents by the parties thereto other than the Company. We relied upon statements and representations of officers and other representatives of the Company and others as to factual matters.

We have also assumed that:

(i) the Registration Statement and any amendments thereto (including post-effective amendments) will be effective and will comply with all applicable laws at the time the Shares are offered or issued as contemplated by the Registration Statement;

(ii) a prospectus supplement or term sheet ("Prospectus Supplement") will have been prepared and filed with the Commission describing the Shares offered thereby and will comply with all applicable laws;

(iii) all Shares will be issued and sold in compliance with applicable federal and state securities laws and in the manner stated in the Registration Statement and the appropriate Prospectus Supplement;

(iv) the Shares will be issued and sold in the form and containing the terms set forth in the Registration Statement, the appropriate Prospectus Supplement;

(v) the Shares offered do not violate any law applicable to the Company, or result in a default under or breach of any agreement or instrument binding upon the Company;

(vi) the Company will have obtained any legally required consents, approvals, authorizations and other orders of the Commission and any other regulatory authorities necessary to issue and sell the Shares being offered;

(vii) the Shares offered comply with all requirements and restrictions, if any, applicable to the Company, whether imposed by any court or governmental or regulatory body having jurisdiction over the Company; and

(viii) a definitive purchase, underwriting or similar agreement with respect to any Shares offered or issued will have been duly authorized and validly executed and delivered by the Company and the other parties thereto (an "Agreement").

Based upon and subject to the foregoing qualifications, assumptions and limitations and the further limitations set forth below, we are of the opinion that the Shares will be validly issued, fully paid and non-assessable when, as and if (i) the Registration Statement shall have become effective pursuant to the provisions of the Act, (ii) appropriate corporate action shall have been taken to authorize the issuance and sale of such Shares, (iii) a Prospectus Supplement or Prospectus Supplements with respect to the Shares shall have been filed (or transmitted for filing) with the Commission pursuant to Rule 424(b) of the Act and any exhibits necessary under the rules and regulations of the Commission shall have been filed with the Commission in an amendment to the Registration Statement or incorporated by reference into the Registration Statement pursuant to a Current Report on Form 8-K of the Company filed with the Commission, (iv) any legally required consents, approvals, authorizations and other orders of the Commission and any other regulatory authorities shall have been obtained and (v) if applicable, appropriate certificates representing the Shares are duly executed, countersigned by the Company's transfer agent/registrar, registered and delivered against payment of the agreed consideration therefor in accordance with the applicable Agreement.

Our opinion expressed above is subject to the qualifications that we express no opinion as to the applicability of, compliance with, or effect of any laws except the General Corporation Law of the State of Delaware (including the statutory provisions, all applicable provisions of the Delaware constitution and reported judicial decisions interpreting the foregoing).

We hereby consent to the filing of this opinion with the Commission as Exhibit 5.1 to the Registration Statement. We also consent to the reference to our firm under the heading "Legal Matters" in the Prospectus Supplement constituting part of the Registration Statement. In giving this consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission.

We do not find it necessary for the purposes of this opinion, and accordingly we do not purport to cover herein, the application of the securities or "Blue Sky" laws of the various states to the issuance and sale of the Shares.

This opinion is limited to the specific issues addressed herein, and no opinion may be inferred or implied beyond that expressly stated herein. The Shares may be issued from time to time on a delayed or continuous basis, and this opinion is limited to the laws, including the rules and regulations, as in effect on the date hereof, which laws are subject to change with possible retroactive effect. We assume no obligation to revise or supplement this opinion after the date of effectiveness should the General Corporation Law of the State of Delaware be changed by legislative action, judicial decision or otherwise after the date hereof.

Sincerely,

/s/ Kirkland & Ellis LLP

Kirkland & Ellis LLP

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We have issued our reports dated February 24, 2022 with respect to the consolidated financial statements and internal control over financial reporting of Carvana Co. included in the Annual Report on Form 10-K for the year ended December 31, 2021, which are incorporated by reference in this Registration Statement. We consent to the incorporation by reference of the aforementioned reports in this Registration Statement, and to the use of our name as it appears under the caption "Experts."

/s/ GRANT THORNTON LLP

Southfield, Michigan
April 20, 2022

**Exhibit 23.3**

**Consent of Independent Auditors**

We consent to the use of our report dated April 18, 2022, with respect to the combined financial statements of ADESA US AUCTION, incorporated herein by reference and to the reference to our firm under the heading "Experts" in the prospectus.

/s/ KPMG LLP

Indianapolis, Indiana
April 20, 2022

**Calculation of Filing Fee Tables**
**Form S-3**
(Form Type)
**CARVANA CO.**
(Exact Name of Registrant as Specified in its Charter)

**Table 1—Newly Registered and Carry Forward Securities**

| | Security Type | Security Class Title | Fee Calculation or Carry Forward Rule | Amount Registered | Proposed Maximum Offering Price Per Unit | Maximum Aggregate Offering Price | Fee Rate | Amount of Registration Fee | Carry Forward Form Type | Carry Forward File Number | Carry Forward Initial effective date | Filing Fee Previously Paid In Connection with Unsold Securities to be Carried Forward |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Newly Registered Securities** | | | | | | | | |
| **Fees to Be Paid** | Equity | Class A Common Stock, par value $0.001 per share(1) | Rule 456 (b) and Rule 457(r) | (1) | (1) | (1) | (2) | (2) | | | | |
| **Fees Previously Paid** | — | — | — | — | — | — | — | — | | | | |
| | | | | **Carry Forward Securities** | | | | | | | | |
| **Carry Forward Securities** | — | — | — | — | — | — | — | — | — | — | — | — |
| | | **Total Offering Amounts** | | | | — | | — | | | | |
| | | **Total Fees Previously Paid** | | | | | | — | | | | |
| | | **Total Fee Offsets** | | | | | | — | | | | |
| | | **Net Fee Due** | | | | | | — | | | | |

(1) An indeterminate amount of Class A Common Stock is being registered as may from time to time be offered at indeterminate prices. The proposed maximum offering price per security and aggregate offering price will be determined from time to time in connection with issuances of securities registered under this registration statement.

(2) Omitted pursuant to General Instructions II.E of Form S-3. In accordance with Rules 456(b) and 457(r), the registrant is deferring payment of all registration fees. Any registration fee will be paid subsequently on a pay-as-you-go basis in accordance with Rule 457(r).

# Exhibit 22

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended March 31, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1930 W. Rio Salado**
**Parkway        Tempe        Arizona**          **85281**
(Address of principal executive offices)          (Zip Code)

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of May 6, 2022, the registrant had 105,743,879 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding.

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
| | Unaudited Condensed Consolidated Balance Sheets as of March 31, 2022 and December 31, 2021 | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2022 and 2021 | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2022 and 2021 | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2022 and 2021 | 5 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 50 |
| Item 4. | Controls and Procedures | 50 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 51 |
| Item 1A. | Risk Factors | 51 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 51 |
| Item 3. | Defaults Upon Senior Securities | 51 |
| Item 4. | Mine Safety Disclosures | 52 |
| Item 5. | Other Information | 52 |
| Item 6. | Exhibits | 53 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 247 | $ | 403 |
| Restricted cash | | 295 | | 233 |
| Accounts receivable, net | | 208 | | 206 |
| Finance receivables held for sale, net | | 393 | | 356 |
| Vehicle inventory | | 3,304 | | 3,149 |
| Beneficial interests in securitizations | | 416 | | 382 |
| Other current assets, including $8 and $12, respectively, due from related parties | | 207 | | 163 |
| Total current assets | | 5,070 | | 4,892 |
| Property and equipment, net | | 1,856 | | 1,560 |
| Operating lease right-of-use assets, including $16 and $17, respectively, from leases with related parties | | 475 | | 369 |
| Intangible assets, net | | 4 | | 4 |
| Goodwill | | 9 | | 9 |
| Other assets, including $4 and $7, respectively, due from related parties | | 171 | | 181 |
| Total assets | $ | 7,585 | $ | 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities, including $28 and $27, respectively, due to related parties | $ | 748 | $ | 656 |
| Short-term revolving facilities | | 2,786 | | 2,053 |
| Current portion of long-term debt | | 178 | | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | | 29 | | 29 |
| Total current liabilities | | 3,741 | | 2,890 |
| Long-term debt, excluding current portion | | 3,286 | | 3,208 |
| Operating lease liabilities, excluding current portion, including $12 and $13, respectively, from leases with related parties | | 474 | | 361 |
| Other liabilities | | 32 | | 31 |
| Total liabilities | | 7,533 | | 6,490 |
| Commitments and contingencies (Note 17) | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of March 31, 2022 and December 31, 2021 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 90,062 and 89,930 shares issued and outstanding as of March 31, 2022 and December 31, 2021, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of March 31, 2022 and December 31, 2021 | | — | | — |
| Additional paid-in capital | | 829 | | 795 |
| Accumulated deficit | | (749) | | (489) |
| Total stockholders' equity attributable to Carvana Co. | | 80 | | 306 |
| Non-controlling interests | | (28) | | 219 |
| Total stockholders' equity | | 52 | | 525 |
| Total liabilities & stockholders' equity | $ | 7,585 | $ | 7,015 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Sales and operating revenues:** | | |
| Used vehicle sales, net | $ 2,732 | $ 1,800 |
| Wholesale vehicle sales, including $14 and $6 respectively, from related parties | 575 | 240 |
| Other sales and revenues, including $48 and $42, respectively, from related parties | 190 | 205 |
| **Net sales and operating revenues** | 3,497 | 2,245 |
| Cost of sales, including $9 and $1, respectively, to related parties | 3,199 | 1,907 |
| **Gross profit** | 298 | 338 |
| Selling, general and administrative expenses, including $6 for both periods, to related parties | 727 | 397 |
| Interest expense | 64 | 30 |
| Other expense (income), net | 13 | (7) |
| **Net loss before income taxes** | (506) | (82) |
| Income tax provision | — | — |
| **Net loss** | (506) | (82) |
| Net loss attributable to non-controlling interests | (246) | (46) |
| **Net loss attributable to Carvana Co.** | $ (260) | $ (36) |
| Net loss per share of Class A common stock, basic and diluted | $ (2.89) | $ (0.46) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 90,095 | 78,103 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2020** | 76,512 | $ — | 95,592 | $ — | $ 742 | $ (354) | $ 414 | $ 802 |
| Net loss | — | — | — | — | — | (36) | (46) | (82) |
| Exchanges of LLC Units | 3,247 | — | (3,073) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 225 | — | — | 225 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (225) | — | — | (225) |
| Issuance of Class A common stock to settle vested restricted stock units | 62 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (9) | — | — | (9) |
| Options exercised | 15 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 10 | — | — | 10 |
| **Balance, March 31, 2021** | 79,834 | $ — | 92,519 | $ — | $ 755 | $ (390) | $ 356 | $ 721 |

3

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 89,930 | $ — | 82,900 | $ — | $ 795 | $ (489) | $ 219 | $ 525 |
| Net loss | — | — | — | — | — | (260) | (246) | (506) |
| Exchanges of LLC Units | 27 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1 | — | — | 1 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1) | — | — | (1) |
| Contribution of Class A common stock from related party | (97) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 139 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (12) | — | — | (12) |
| Options exercised | 63 | — | — | — | 2 | — | — | 2 |
| Equity-based compensation | — | — | — | — | 43 | — | — | 43 |
| **Balance, March 31, 2022** | 90,062 | $ — | 82,900 | $ — | $ 829 | $ (749) | $ (28) | $ 52 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (506) | $ (82) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 37 | 22 |
| Equity-based compensation expense | 28 | 8 |
| Loss on disposal of property and equipment | 1 | — |
| Provision for bad debt and valuation allowance | 5 | 1 |
| Amortization and write-off of debt issuance costs and bond premium | 6 | 2 |
| Unrealized loss on warrants to acquire Root Class A common stock | 5 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 10 | (2) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (1,985) | (1,427) |
| Proceeds from sale of finance receivables, net | 1,906 | 1,368 |
| Gain on loan sales | (105) | (138) |
| Principal payments received on finance receivables held for sale | 61 | 32 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | (133) | (397) |
| Accounts receivable | (5) | (41) |
| Other assets | (43) | (29) |
| Accounts payable and accrued liabilities | 117 | 151 |
| Operating lease right-of-use assets | (106) | — |
| Operating lease liabilities | 113 | — |
| Other liabilities | 1 | — |
| Net cash used in operating activities | (593) | (532) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (220) | (82) |
| Principal payments received on and proceeds from sale of beneficial interests | 12 | 7 |
| Net cash used in investing activities | (208) | (75) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 5,231 | 2,064 |
| Payments on short-term revolving facilities | (4,498) | (1,981) |
| Proceeds from issuance of long-term debt | 20 | 640 |
| Payments on long-term debt | (36) | (14) |
| Payments of debt issuance costs | — | (7) |
| Proceeds from equity-based compensation plans | 2 | — |
| Tax withholdings related to restricted stock units and awards | (12) | (9) |
| Net cash provided by financing activities | 707 | 693 |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (94) | 86 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 542 | $ 415 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of March 31, 2022, Carvana Co. owned approximately 51.5% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity) owned the remaining 48.5%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K filed on February 24, 2022.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of March 31, 2022, results of operations and changes in stockholder's equity for the three months ended March 31, 2022 and 2021, and cash flows for the three months ended March 31, 2022 and 2021. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Liquidity**

Since inception, the Company has incurred losses, and expects to incur additional losses in the future as it continues to build inspection and reconditioning centers ("IRCs") and vending machines, serve more of the U.S. population, and enhance technology and software. Since March 31, 2022, the Company has completed an equity offering of 15.6 million shares of Class A Common Stock for net proceeds of $1.2 billion and issued a total of $3.275 billion in aggregate principal amount of 10.25% senior unsecured notes due 2030 (the "2030 Notes"). The Company intends to use the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA, Inc. ("ADESA") and other ancillary transactions to occur in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes. In March 2022, the Company's forward flow partner committed to purchase a total of $5.0 billion of the Company's finance receivables through March 2023, and such facility had approximately $4.5 billion of unused capacity as of March 31, 2022. In addition, the Company has a $3.0 billion floor plan facility effective through September 22, 2022 and $2.0 billion thereafter through March 31, 2023. Management believes that current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**New Accounting Standards not Adopted Yet**

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. ASU 2021-08 requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606 instead of being recorded at fair value. The ASU is effective for fiscal years beginning after December 15, 2022, with early adoption permitted. The Company plans to early adopt this ASU during the quarter ended June 30, 2022 and is currently evaluating the expected impact of the adoption of this guidance on the consolidated financial statements.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Business**

On February 24, 2022, the Company entered into a definitive agreement to acquire the U.S physical auction business of ADESA from KAR Auction Services, Inc. ("KAR"), for approximately $2.2 billion. On May 9, 2022, the Company completed its previously announced acquisition of the U.S. physical auction business of ADESA from KAR for approximately $2.2 billion. The initial accounting for this acquisition is expected to be completed by the time the Quarterly Report on Form 10-Q for the period ended June 30, 2022 is filed with the SEC. Refer to Note 20 — Subsequent Events for additional information.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 4 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net as of March 31, 2022 and December 31, 2021:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Land and site improvements | $ 365 | $ 303 |
| Buildings and improvements | 754 | 643 |
| Transportation fleet | 501 | 347 |
| Software | 190 | 169 |
| Furniture, fixtures and equipment | 111 | 97 |
| Total property and equipment excluding construction in progress | 1,921 | 1,559 |
| Less: accumulated depreciation and amortization on property and equipment | (338) | (294) |
| Property and equipment excluding construction in progress, net | 1,583 | 1,265 |
| Construction in progress | 273 | 295 |
| Property and equipment, net | $ 1,856 | $ 1,560 |

Depreciation and amortization expense on property and equipment was approximately $36 million and $22 million for the three months ended March 31, 2022 and 2021, respectively. These amounts primarily relate to selling, general and administrative activities and are included as a component of selling, general and administrative expenses in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 5 — GOODWILL AND INTANGIBLE ASSETS, NET**

The following table summarizes goodwill and intangible assets, net as of March 31, 2022 and December 31, 2021:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Intangible assets: | | |
| Developed technology | $ 9 | $ 9 |
| Non-compete agreements | 1 | 1 |
| Intangible assets, acquired cost | 10 | 10 |
| Less: accumulated amortization | (6) | (6) |
| Intangible assets, net | $ 4 | $ 4 |
| | | |
| Goodwill | $ 9 | $ 9 |

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Amortization expense was less than $1 million during each of the three months ended March 31, 2022 and 2021. As of March 31, 2022, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 2.9 years. The anticipated annual amortization expense to be recognized in future years as of March 31, 2022, is as follows:

|  | Expected Future Amortization |
| --- | --- |
|  | (in millions) |
| Remainder of 2022 | $ 1 |
| 2023 | 1 |
| 2024 | 1 |
| 2025 | 1 |
| 2026 | — |
| Thereafter | — |
| Total | $ 4 |

### NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of March 31, 2022 and December 31, 2021:

|  | March 31, 2022 | December 31, 2021 |
| --- | --- | --- |
|  | (in millions) | |
| Accounts payable, including $28 and $27, respectively, due to related parties | $ 154 | $ 141 |
| Sales taxes and vehicle licenses and fees | 104 | 102 |
| Accrued compensation and benefits | 85 | 45 |
| Accrued interest expense | 57 | 42 |
| Accrued property and equipment | 57 | 85 |
| Reserve for returns and cancellations | 54 | 44 |
| Accrued advertising costs | 38 | 40 |
| Customer deposits | 37 | 34 |
| Other accrued liabilities | 162 | 123 |
| Total accounts payable and accrued liabilities | $ 748 | $ 656 |

### NOTE 7 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all interest in DriveTime, entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2024. The Company has the right to exercise up to two consecutive one-year renewal options

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2023 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations, the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco IRCs. At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a sublease agreement from DriveTime of a fully operational IRC near Cleveland, Ohio. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. In July 2021, the Company exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime effective October 1, 2021.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were approximately $1 million during each of the three months ended March 31, 2022 and 2021, allocated between inventory and selling, general and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. While the Company solely occupies the IRC, DriveTime is not fully released from the lease obligations by the landlord. The lease expires in October 2023, subject to the ability to exercise three renewal options of five years each.

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was less than $1 million during each of the three months ended March 31, 2022 and 2021.

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In December 2019, Verde Investments, Inc. ("Verde"), a related party of the Company due to the Garcia Parties controlling and owning substantially all interest in Verde, purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was less than $1 million during each of the three months ended March 31, 2022 and 2021.

**Wholesale Revenue**

In 2020, DriveTime began purchasing wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party. As a result, the Company recognized approximately $14 million and $6 million of wholesale revenue from DriveTime during the three months ended March 31, 2022 and 2021, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of March 31, 2022, approximately $16 million related to vehicles and reconditioning services were included in vehicle inventory in the accompanying unaudited condensed consolidated balance sheets. The Company also recognized approximately $9 million of cost of goods sold during the three months ended March 31, 2022, related to vehicles acquired from and reconditioning services performed by DriveTime.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended March 31, 2022 and 2021, the Company recognized approximately $47 million and $38 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. The Company recognized approximately $1 million and $4 million during the three months ended March 31, 2022 and 2021, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated party. The Company incurred approximately $4 million and $3 million during the three months ended March 31, 2022 and 2021, respectively, related to the administration of limited warranty and GAP waiver coverage.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of approximately $2 million during each of the three months ended March 31, 2022 and 2021, related to these services.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million under this agreement during each of the three months ended March 31, 2022 and 2021.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the three months ended March 31, 2022 and 2021.

**Accounts Payable Due to Related Party**

As of March 31, 2022 and December 31, 2021, approximately $28 million and $27 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contributions of Class A Common Shares From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in Q4 2021, the Company's CEO, Ernie Garcia III ("Mr. Garcia"), committed to giving current employees 23 shares of Class A common stock from his personal shareholdings once they reach their two-year employment anniversary ("CEO Milestone Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia will contribute to the Company, at the end of each fiscal quarter, the number of shares of our Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund restricted stock unit awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the three months ended March 31, 2022, 97,336 RSUs vested and were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has indemnified Mr. Garcia from any such obligations that may arise.

**NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2021 and 2022, the Company and the Ally Parties have

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. On each of March 17, 2022 and March 22, 2022, the Ally Parties amended the MPSA to, in aggregate, extend the scheduled commitment termination date to March 21, 2023 and increase the Ally Parties' commitment to purchase finance receivables to $5.0 billion, an increase of $1.0 billion from the previous commitment.

During the three months ended March 31, 2022 and 2021, the Company sold approximately $500 million and $491 million, respectively, in principal balances of finance receivables under the MPSA and had approximately $4.5 billion of unused capacity as of March 31, 2022.

**Securitization Transactions**

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the three months ended March 31, 2022 and 2021, the Company sold approximately $1.4 billion and $813 million, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was approximately $105 million and $138 million during the three months ended March 31, 2022 and 2021, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of March 31, 2022, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets, which as of March 31, 2022 and December 31, 2021 were

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

approximately $416 million and $382 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of March 31, 2022 and December 31, 2021.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at March 31, 2022 and December 31, 2021. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | March 31, 2022 | | December 31, 2021 | |
| | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| | (in millions) | | | |
| Rated notes | $ 316 | $ 316 | $ 282 | $ 282 |
| Certificates and other assets | 100 | 100 | 100 | 100 |
| Total unconsolidated VIEs | $ 416 | $ 416 | $ 382 | $ 382 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of March 31, 2022 and December 31, 2021 were as follows:

| | March 31, 2022 | | December 31, 2021 | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | (in millions) | | | |
| Rated notes | $ 323 | $ 316 | $ 282 | $ 282 |
| Certificates and other assets | 100 | 100 | 93 | 100 |
| Total securities available for sale | $ 423 | $ 416 | $ 375 | $ 382 |

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

### NOTE 10 — DEBT INSTRUMENTS

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of March 31, 2022 and December 31, 2021 consisted of the following:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Asset-based financing: | | |
| Floor plan facility | 2,572 | 1,877 |
| Finance receivable facilities | 214 | 176 |
| Financing of beneficial interest in securitizations | 270 | 282 |
| Notes payable | 8 | 10 |
| Real estate financing | 447 | 447 |
| Total asset-based financing | 3,511 | 2,792 |
| Senior notes | 2,450 | 2,450 |
| Total debt | 5,961 | 5,242 |
| Less: current portion | (2,886) | (2,154) |
| Less: unamortized debt issuance costs [1] | (33) | (34) |
| Total long-term debt, net | $ 3,042 | $ 3,054 |

(1) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying condensed consolidated balance sheets and not included here.

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by the Company's vehicles, general intangibles, accounts receivable, and finance receivables. Under the Floor Plan Facility, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts. The Floor Plan Facility also requires monthly interest payments and that at least 7.5% of the total principal amount owed to the lender is held as restricted cash.

Effective October 1, 2020, the Company amended the Floor Plan Facility to increase the line of credit to $1.25 billion, reduce the interest rate to one-month LIBOR plus 3.15% and extend the maturity date to March 31, 2023. Effective March 1, 2021, the interest rate was reduced to one-month LIBOR plus 2.65%. Effective July 1, 2021, the line of credit was increased to $1.75 billion, and the LIBOR-based interest rate was amended to a substantially similar rate tied to a prime rate minus 0.50%, in advance of the cessation of LIBOR. Effective December 1, 2021, the line of credit was increased to $2.25 billion. Effective February 1, 2022, the Company amended its Floor Plan Facility to increase the line of credit to $3.0 billion through September 22, 2022. The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter.

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

As of March 31, 2022 and December 31, 2021, the Company had $2.6 billion and $1.9 billion, respectively, outstanding under this facility, unused capacity of approximately $428 million and $373 million, respectively, and held approximately $193 million and $141 million, respectively, in restricted cash related to this facility. During the three months ended March 31, 2022, the Company's effective interest rate on this facility was approximately 2.62%. For the year ended December 31, 2021, the Company's effective interest rate on this facility was approximately 2.55%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility, which was subsequently increased to $500 million, to fund certain automotive finance receivables originated by the Company. In June 2021, the Company amended its agreement to, among other things, extend the maturity date to January 24, 2023.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million, and extend the maturity date to December 8, 2023.

On April 30, 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until October 30, 2022. In December 2021, the Company amended its agreement to, among other things, increase this line of credit to $600 million.

On October 15, 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until April 15, 2023.

On March 18, 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until September 18, 2023.

The facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. The facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of March 31, 2022 and December 31, 2021, the Company had $214 million and $176 million, respectively, outstanding under these facilities, unused capacity of approximately $2.3 billion and $1.9 billion, respectively, and held approximately $69 million and $67 million, respectively, in restricted cash related to these facilities. During the three months ended March 31, 2022, the Company's effective interest rate on these facilities was approximately 1.67%. For the year ended December 31, 2021, the Company's effective interest rate on these facilities was approximately 1.64%.

**Long-Term Debt**

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (collectively, the "Senior Notes") each under a separate indenture (collectively, the "Indentures"), as further described below.

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes components of our senior unsecured notes:

| | March 31, 2022 | | December 31, 2021 | Interest Rate |
|---|---|---|---|---|
| | | (in millions, except percentages) | | |
| 2025 Senior Unsecured Notes due October 1, 2025 | $ 500 | $ | 500 | 5.625 % |
| 2027 Senior Unsecured Notes due April 15, 2027 | 600 | | 600 | 5.500 % |
| 2028 Senior Unsecured Notes due October 1, 2028 | 600 | | 600 | 5.875 % |
| 2029 Senior Unsecured Notes due September 1, 2029 | 750 | | 750 | 4.875 % |
| Total principal amount | 2,450 | | 2,450 | |
| Less: unamortized debt issuance cost | (27) | | (28) | |
| Total debt | 2,423 | | 2,422 | |

Each issuance of Senior Notes was entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The interest on each of the Senior Notes is payable semi-annually, beginning on March 1, 2022 for the 2029 Notes, October 15, 2021 for the 2027 Notes, and April 1, 2021 for the 2025 Notes and 2028 Notes. The Senior Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, or immaterial subsidiaries).

The Company may redeem some or all of each issuance of Senior Notes at redemption prices set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to those redemption dates, the Company may redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to its redemption date, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if any of the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of March 31, 2022 and December 31, 2021, the outstanding principal of these notes had a weighted-average interest rate of 6.5% and 6.4%, respectively, and totaled approximately $8 million and $10 million, respectively, net of unamortized debt issuance costs, of which approximately $7 million as of both March 31, 2022 and December 31, 2021, was due within the next

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of March 31, 2022, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of both March 31, 2022 and December 31, 2021, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was approximately $444 million, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of March 31, 2022 and December 31, 2021, the Company has pledged approximately $270 million and $282 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from July 2024 to September 2028. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was approximately $267 million and $279 million as of March 31, 2022 and December 31, 2021, respectively, of which approximately $92 million and $93 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

As of March 31, 2022, the Company was in compliance with all debt covenants.

## NOTE 11 — STOCKHOLDERS' EQUITY

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock, determined on an as-exchanged basis, assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub, LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of March 31, 2022 and December 31, 2021, there were approximately 216 million Class A Units, for both periods presented, and 2 million and 3 million Class B Units, respectively, (as adjusted for the participation thresholds and closing price of Class A common stock on March 31, 2022 and December 31, 2021), issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended March 31, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 4 million LLC Units and 0 million and 3 million shares of Class B common stock for less than 1 million and 3 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received less than 1 million and 4 million LLC Units during the three months ended March 31, 2022 and 2021, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes. On August 16, 2021, Carvana Group LLC issued approximately 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes. Carvana Co. used its net proceeds from the 2023 Notes, the 2025 and 2028 Notes, the 2027 Notes, and the 2029 Notes, to purchase 0.6 million, 1.1 million, 0.6 million, and 0.8 million, respectively, of Class A Non-Convertible Preferred Units.

When Carvana Co. makes payments on the Senior Notes, Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 12 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the three months ended March 31, 2022 and 2021, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of approximately $1 million and $12 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of March 31, 2022, Carvana Co. owned approximately 51.5% of Carvana Group with the LLC Unitholders owning the remaining 48.5%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

**NOTE 13 — EQUITY-BASED COMPENSATION**

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the three months ended March 31, 2022 and 2021 is as follows:

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2022** | | **2021** |
| | (in millions) | | |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | $ 9 | $ | 7 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | 31 | | — |
| Options | 3 | | 3 |
| Total equity-based compensation | 43 | | 10 |
| Equity-based compensation capitalized to property and equipment | (2) | | (2) |
| Equity-based compensation capitalized to inventory | (13) | | — |
| Equity-based compensation, net of capitalized amounts | $ 28 | $ | 8 |

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

As of March 31, 2022, the total unrecognized compensation related to outstanding equity awards was approximately $186 million, which the Company expects to recognize over a weighted-average period of approximately 2.5 years. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other stock-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company, other than equity granted in relation to the CEO Milestone Gift, vests over four year periods based on continued employment with the Company. As of March 31, 2022, approximately 9 million shares remain available for future equity-based award grants under this plan.

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to a maximum of $10,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP. During the three months ending March 31, 2022, the Company has not issued any shares of Class A common stock, in regards to its second six month offering period, and recognized less than $1 million of equity-based compensation expense related to the ESPP for the three months ended March 31, 2022.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three months ended March 31, 2022 or 2021. As of March 31, 2022, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 14 — NET LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented. Net loss for all periods presented is attributable only to Class A common stockholders, due to no activity related to convertible preferred stock during those periods.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net loss per share during the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | **(in millions, except number of shares, which are reflected in thousands, and per share amounts)** | |
| **Numerator:** | | |
| Net loss | $ (506) | $ (82) |
| Net loss attributable to non-controlling interests | (246) | (46) |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (260) | $ (36) |
| **Denominator:** | | |
| Weighted-average shares of Class A common stock outstanding | 90,095 | 78,149 |
| Nonvested weighted-average restricted stock awards | — | (46) |
| Weighted-average shares of Class A common stock outstanding, basic and diluted | 90,095 | 78,103 |
| Net loss per share of Class A common stock, basic and diluted | $ (2.89) | $ (0.46) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented.

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net loss per share of Class A common stock for the three months ended March 31, 2022 and 2021.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | **(in thousands)** | |
| Options [1] | 1,268 | 1,153 |
| Restricted Stock Units and Awards [1] | 320 | 654 |
| Class A Units [2] | 82,963 | 94,189 |
| Class B Units [2] | 1,989 | 2,380 |

_____

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.
(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state, and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 11 — Stockholders' Equity, the Company acquired less than 1 million and 4 million LLC Units during the three months ended March 31, 2022 and 2021, respectively, in connection with exchanges with LLC Unitholders.

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

During the three months ended March 31, 2022 and 2021, the Company recorded a gross deferred tax asset of approximately $1 million and $225 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 5 — Goodwill and Intangible Assets, Net, the Company acquired various intangible assets in connection with the acquisition of Car360 in 2018. As a result, the Company recognized a deferred tax liability of approximately $2 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheets. The deferred tax liability will be amortized over five to seven years and less than $1 million was amortized during each of the three months ended March 31, 2022 and 2021.

During the three months ended March 31, 2022, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of March 31, 2022 and December 31, 2021, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the three months ended March 31, 2022 and 2021 was an expense of 0.1% and a benefit of 0.1%, respectively, related to its wholly-owned subsidiaries.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of March 31, 2022, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of March 31, 2022, the total unrecorded TRA liability is approximately $1.6 billion. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

**NOTE 16 — LEASES**

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of March 31, 2022, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2022 and 2034. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three months ended March 31, 2022 and 2021 were as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in millions) | |
| **Lease costs:** | | |
| Finance leases: | | |
| Amortization of finance lease assets | $ 17 | $ 7 |
| Interest obligations under finance leases | 3 | 2 |
| Total finance lease costs | $ 20 | $ 9 |
| | | |
| Operating leases: | | |
| Fixed lease costs to non-related parties | $ 25 | $ 10 |
| Fixed lease costs to related parties | 1 | 1 |
| Total operating lease costs | $ 26 | $ 11 |
| | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | |
| Operating lease liabilities to non-related parties | $ 12 | $ 7 |
| Operating lease liabilities to related parties | $ 2 | $ 1 |
| Interest payments on finance lease liabilities | $ 3 | $ 2 |
| | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | |
| Principal payments on finance lease liabilities | $ 34 | $ 11 |

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of March 31, 2022:

| | Finance Leases | Operating Leases [1] Related Party [2] | Operating Leases [1] Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Remainder of 2022 | $ 72 | $ 3 | $ 44 | $ 47 | $ 119 |
| 2023 | 87 | 5 | 62 | 67 | 154 |
| 2024 | 77 | 3 | 69 | 72 | 149 |
| 2025 | 64 | 2 | 74 | 76 | 140 |
| 2026 | 46 | 2 | 73 | 75 | 121 |
| Thereafter | 13 | 4 | 371 | 375 | 388 |
| Total minimum lease payments | 359 | 19 | 693 | 712 | 1,071 |
| Less: amount representing interest | (37) | (3) | (205) | (208) | (245) |
| Total lease liabilities | $ 322 | $ 16 | $ 488 | $ 504 | $ 826 |

_____

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of March 31, 2022 and December 31, 2021, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of March 31, 2022 and 2021 were as follows, excluding short-term operating leases:

| | As of March 31, | |
|---|---|---|
| | 2022 | 2021 |
| **Weighted-average remaining lease terms (years)** | | |
| Operating leases | 9.2 | 9.5 |
| Finance leases | 4.5 | 4.4 |
| **Weighted-average discount rate** | | |
| Operating leases | 7.0 % | 8.2 % |
| Finance leases | 5.3 % | 5.3 % |

**NOTE 17 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was approximately $22 million and $16

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

million as of March 31, 2022 and December 31, 2021, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, the Company does not believe that the ultimate resolution of these actions will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies in our most recent Annual Report on Form 10-K.

The following tables are a summary of fair value measurements and hierarchy level at March 31, 2022 and December 31, 2021:

| | March 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $ 27 | $ 27 | $ — | $ — |
| Beneficial interests in securitizations | 416 | — | — | 416 |
| | December 31, 2021 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [(1)] | $ 154 | $ 154 | $ — | $ — |
| Beneficial interests in securitizations | 382 | — | — | 382 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of March 31, 2022 and December 31, 2021, the Company has purchase price adjustment receivables of approximately $37 million and $34 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. During the three months ended March 31, 2022 and 2021, the adjustments to the fair

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

value of the purchase price adjustment receivables were a gain of approximately $3 million and $4 million, respectively, and are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of March 31, 2022 and December 31, 2021, the discount rates were 3.1% to 10.0% and 1.1% to 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers into or out of Level 3 during the three months ended March 31, 2022 or 2021.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that meet the criteria for sale set forth in the Risk Retention Rules. For the three months ended March 31, 2022, the Company sold beneficial interests in securitizations for a purchase price totaling approximately $1 million.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2022 | | 2021 |
| | (in millions) | | |
| **Opening Balance** | $ | 382 | $ | 131 |
| Received in securitization transactions | | 87 | | 57 |
| Cash receipts | | (42) | | (13) |
| Change in fair value | | (10) | | 2 |
| Sales of beneficial interests | | (1) | | — |
| **Ending Balance** | $ | 416 | $ | 177 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended March 31, 2022 and December 31,

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

2021. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of March 31, 2022 and December 31, 2021 was as follows:

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Carrying value, net of unamortized debt issuance costs | $ 2,423 | $ 2,422 |
| Fair value | 2,136 | 2,411 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of March 31, 2022 and December 31, 2021 were as follows:

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Carrying value | $ 393 | $ 356 |
| Fair value | 416 | 392 |

**Investment in Equity Securities**

During October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to the accounting standards and recorded the investment at its cost of approximately $126 million which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of our investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of our investment in Root, as there have not been changes in the observable price of our equity interest through March 31, 2022.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products will be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "warrants"). One tranche consisting of 42 million warrants vests either upon the earlier of product integration or 18 months, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Company's e-commerce platform, which are expected to begin during 2022. The Company used a Monte Carlo simulation to estimate the fair value of these warrants, which are classified as Level 3. At contract inception the Company recognized an asset of approximately $30 million for the warrants and deferred revenue, classified in other assets and other liabilities, respectively in the accompanying consolidated balance sheets.

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents changes in our Level 3 warrants measured at fair value:

| | 2022 |
|---|---:|
| | (in millions) |
| Balance at December 31, 2021 | $ 6 |
| Total unrealized loss [1] | (5) |
| Balance at March 31, 2022 | $ 1 |

(1) We recognized the decrease in fair value in relation to the warrants to acquire Class A common stock through other expense (income), net in the accompanying consolidated statements of operations.

**Derivative Instruments**

As of March 31, 2022 and December 31, 2021, the Company had no other outstanding derivative instruments.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | |
|---|---:|---:|
| | 2022 | 2021 |
| | (in millions) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 48 | $ 14 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 73 | $ 25 |
| Property and equipment acquired under finance leases | $ 149 | $ 26 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 118 | $ 6 |
| Equity-based compensation expense capitalized to property and equipment | $ 2 | $ 2 |
| Fair value of beneficial interests received in securitization transactions | $ 87 | $ 57 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 31 | $ 6 |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

| | March 31, 2022 | December 31, 2021 | March 31, 2021 |
|---|---:|---:|---:|
| | (in millions) | | |
| Cash and cash equivalents | $ 247 | $ 403 | $ 370 |
| Restricted cash [1] | 295 | 233 | 45 |
| Total cash, cash equivalents and restricted cash | $ 542 | $ 636 | $ 415 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities. Refer to Note 10 — Debt Instruments for additional information. Remaining restricted cash represents certain cash held for corporate insurance purposes.

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 20 — SUBSEQUENT EVENTS**

On April 26, 2022, the Company completed its previously announced public offering of 15,625,000 shares of its Class A common stock for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5,400,000 shares of the Class A common stock offered at the public offering price. The Company intends to use the net proceeds from this offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with this offering.

On May 6, 2022, the Company issued $3.275 billion aggregate principal amount of the 2030 Notes. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA and other ancillary transactions to occur in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes. Interest on the 2030 Notes is payable semi-annually, beginning on November 1, 2022. The 2030 Notes mature on May 1, 2030 unless earlier repurchased or redeemed by the Company. The 2030 Notes contain a number of customary covenants similar to the existing senior unsecured notes as described in Note 10 — Debt Instruments.

On May 9, 2022, using proceeds from the issuance of the 2030 Notes described above, the Company completed its acquisition of the U.S. physical auction business of ADESA from KAR, for approximately $2.2 billion. The initial accounting for this acquisition is expected to be completed by the time the Quarterly Report on Form 10-Q for the period ended June 30, 2022 is filed with the SEC.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Part I, Item 1 of this Form 10-Q.*

**Overview**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- *Purchase a used vehicle.* As of March 31, 2022, we listed approximately 89,000 total units on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- *Finance their purchase.* Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we generally earn a premium upon sale.

- *Protect their purchase.* Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- *Sell us their car.* We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- *Vehicle acquisition.* We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to

32

determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- *Inspection and reconditioning.* Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to an inspection and reconditioning center ("IRC"), at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- *Photography and merchandising.* To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

- *Transportation and fulfillment.* Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

### COVID-19 Update

We have experienced and may continue to experience ongoing effects from the novel coronavirus ("COVID-19") pandemic, including the Omicron variant, such as production or other operational constraints that may negatively impact our operations and costs. However, we believe we have been relatively successful in navigating the impact of COVID-19 on our business to date and believe our business model positions us well to scale up and down to meet expected customer demand during and after the COVID-19 pandemic. We continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the three months ended March 31, 2022, the number of vehicles we sold to retail customers

33

grew by 13.8% to 105,185 compared to 92,457 in the three months ended March 31, 2021. We expect our used vehicle sales to grow in future periods with increased penetration in our current markets and expansion into new markets.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings, resulting in serving more of the U.S. population, in each of the past eight years. Our market openings increased the total percentage of the U.S. population served to 81.0% in 313 markets as of March 31, 2022 from 74.5% in 272 markets as of March 31, 2021. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. We continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, wholesale sales of vehicles we acquire from customers, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $2.7 billion and $1.8 billion during the three months ended March 31, 2022 and 2021, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

34

Wholesale sales, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $575 million and $240 million during the three months ended March 31, 2022 and 2021, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $190 million and $205 million during the three months ended March 31, 2022 and 2021, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During our growth phase, our highest priority outside of safety will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

- *Reduce average days to sale.* Our goal is generally to increase both our number of markets and our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our 17 existing IRCs, which collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization**.**

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs after acquisition from customers or wholesale auctions.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

### Seasonality

Used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but

we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19, which may not fully reflect the underlying performance of our business.

### Investment in Growth

We have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. We anticipate that our operating expenses will increase substantially as we continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

### Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 7 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

### Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S. population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Retail units sold | 105,185 | 92,457 |
| Population coverage | 81.0 % | 74.5 % |
| Average monthly unique visitors (in thousands) | 24,729 | 13,235 |
| Number of IRCs | 17 | 12 |
| Total website units | 89,011 | 32,854 |
| Total gross profit per unit [1] | $ 2,833 | $ 3,656 |

(1) Includes $76 and $0, respectively, related to the CEO Milestone Gift.

*Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

*Population Coverage*

We previously reported number of markets as a key operating metric. As we have continued to grow, the population covered by these markets is increasingly a more important driver of our growth than the number of markets we serve. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers, which is typically conducted by a Carvana employee in a branded delivery truck. We define population coverage as the metropolitan statistical area population in the markets we serve at the end of the period divided by the total population in the U.S., based on 2015 data from the U.S. Census Bureau. We view the growth in population we serve as a key driver of our growth. As we increase our population coverage, the number of consumers who have access to our fully integrated customer experience increases, which in turn helps increase the number of vehicles we sell.

36

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Number of IRCs*

As we continue to grow, our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale over the past three years. We define the number of IRCs as the number of owned or leased IRCs in which Carvana employees perform our 150-point inspection and recondition vehicles to "Carvana Certified" standards before sale to customers. As we scale, we intend to more fully utilize the capacity in our existing 17 IRCs, which, as of March 31, 2022, collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization. As we increase our number of IRCs, we increase this capacity to inspect and recondition vehicles, which in turn increases the number of vehicles we can sell.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

## Components of Results of Operations

*Used Vehicle Sales*

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 and related stimulus payments and labor impacts on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling

37

prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Vehicle Sales*

Wholesale vehicle sales is equal to the aggregate proceeds we receive on vehicles sold to wholesalers. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale vehicle sales include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by COVID-19. Beginning in 2020, wholesale vehicle sales includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

*Cost of Sales*

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value.

*Used Vehicle Gross Profit*

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

38

*Wholesale Vehicle Gross Profit*

Wholesale vehicle gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, and the average acquisition price associated with these vehicles.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes, our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other Expense (Income)*

Other expense (income), net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our warrants to acquire Root Class A common stock as discussed in Note 18 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

*Income Tax Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. As of March 31, 2022, the Company's income tax expense is related to certain subsidiaries.

39

**Results of Operations**

| | Three Months Ended March 31, | | | Change |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| | (in millions, except unit and per unit amounts) | | | |
| **Net sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 2,732 | $ | 1,800 | 51.8 % |
| Wholesale vehicle sales [1] | 575 | | 240 | 139.6 % |
| Other sales and revenues [2] | 190 | | 205 | (7.3)% |
| Total net sales and operating revenues | $ 3,497 | $ | 2,245 | 55.8 % |
| **Gross profit:** | | | | |
| Used vehicle gross profit [3] | $ 85 | $ | 112 | (24.1)% |
| Wholesale vehicle gross profit [1] | 23 | | 21 | 9.5 % |
| Other gross profit [2] | 190 | | 205 | (7.3)% |
| Total gross profit | $ 298 | $ | 338 | (11.8)% |
| **Unit sales information:** | | | | |
| Used vehicle unit sales | 105,185 | | 92,457 | 13.8 % |
| Wholesale vehicle unit sales | 50,280 | | 26,040 | 93.1 % |
| **Per unit selling prices:** | | | | |
| Used vehicles | $ 25,973 | $ | 19,469 | 33.4 % |
| Wholesale vehicles | $ 11,436 | $ | 9,217 | 24.1 % |
| **Per retail unit gross profit:** | | | | |
| Used vehicle gross profit [4] | $ 808 | $ | 1,211 | (33.3)% |
| Wholesale vehicle gross profit | $ 219 | $ | 227 | (3.7)% |
| Other gross profit | $ 1,806 | $ | 2,218 | (18.6)% |
| Total gross profit | $ 2,833 | $ | 3,656 | (22.5)% |
| **Per wholesale unit gross profit:** | | | | |
| Wholesale vehicle gross profit | $ 457 | $ | 806 | (43.2)% |

(1) Includes $14 and $6, respectively, of wholesale revenue from related parties.
(2) Includes $48 and $42, respectively, of other sales and revenues from related parties.
(3) For the three months ended March 31, 2022, used vehicle gross profit includes $8 of share-based compensation expense related to the CEO Milestone Gift.
(4) For the three months ended March 31, 2022, used vehicle per unit gross profit includes $76 of share-based compensation expense related to the CEO Milestone Gift.

*Used Vehicle Sales*

*Three months ended March 31, 2022 Versus 2021.* Used vehicle sales increased by $932 million to $2.7 billion during the three months ended March 31, 2022, compared to $1.8 billion during the three months ended March 31, 2021. The increase in revenue was primarily due to an increase in the average selling price of our retail units sold to $25,973 from $19,469 due primarily to the overall appreciation in the used vehicle market compared to the three months ended March 31, 2021. The number of used vehicles sold also increased to 105,185 from 92,457 during the three months ended March 31, 2022 and 2021, respectively. The increase in unit sales was driven by growth in existing markets due to continued marketing efforts, expanded inventory selection and increased brand awareness. The increase in unit sales was also driven by growth to 81.0% market population coverage as of March 31, 2022 from 74.5% as of March 31, 2021.

40

*Wholesale Vehicle Sales*

*Three months ended March 31, 2022 Versus 2021.* Wholesale vehicle sales increased by $335 million to $575 million during the three months ended March 31, 2022, compared to $240 million during the three months ended March 31, 2021. The increase in revenue was primarily driven by an increase in wholesale units sold to 50,280 from 26,040 during the three months ended March 31, 2022 and 2021, respectively. In addition, the average selling price of our wholesale units sold increased to $11,436 during the three months ended March 31, 2022 from $9,217 during the three months ended March 31, 2021. The increase in wholesale units sold was due to acquiring more vehicles from customers, and the higher average selling price was due primarily to the overall appreciation in the used vehicle market compared to the three months ended March 31, 2021.

*Other Sales and Revenues*

*Three months ended March 31, 2022 Versus 2021.* Other sales and revenues decreased by $15 million to $190 million during the three months ended March 31, 2022, compared to $205 million during the three months ended March 31, 2021. This decrease was primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates, partially offset by the impact of the increase in retail units sold and the impact of higher industry-wide vehicle prices on average loan size during the three months ended March 31, 2022. Additionally, the decrease was further offset by an increase in VSC sales and GAP waiver coverage sales driven by the increase in retail units sold during the three months ended March 31, 2022.

*Used Vehicle Gross Profit*

*Three months ended March 31, 2022 Versus 2021.* Used vehicle gross profit decreased by $27 million to $85 million during the three months ended March 31, 2022, compared to $112 million during the three months ended March 31, 2021. Increased retail units sold was offset by a decrease in used vehicle gross profit per unit to $808 for the three months ended March 31, 2022 compared to $1,211 for the three months ended March 31, 2021. The per unit decrease was primarily driven by higher reconditioning costs resulting in part from the impact of the COVID-19 Omicron variant and severe weather events on production throughput and higher wholesale acquisition prices, partially offset by a higher ratio of customer-sourced vehicles sold during the three months ended March 31, 2022.

*Wholesale Vehicle Gross Profit*

*Three months ended March 31, 2022 Versus 2021.* Wholesale vehicle gross profit increased by $2 million to $23 million during the three months ended March 31, 2022, compared to $21 million during the three months ended March 31, 2021. This was primarily due to an increase in wholesale units sold to 50,280 during the three months ended March 31, 2022 from 26,040 during the three months ended March 31, 2021, partially offset by a decrease in wholesale vehicle gross profit per wholesale unit to $457 in the three months ended March 31, 2022 compared to $806 in the three months ended March 31, 2021. The increase in wholesale units sold was primarily driven by acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was primarily driven by the difference between our wholesale acquisition price and sales price compared to the three months ended March 31, 2021.

*Other Gross Profit*

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

41

*Components of SG&A*

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2022 | | 2021 |
| | (in millions) | | |
| Compensation and benefits [1] | $ | 236 | $ | 126 |
| CEO Milestone Gift [2] | | 20 | | — |
| Advertising | | 155 | | 100 |
| Market occupancy [3] | | 23 | | 13 |
| Logistics [4] | | 56 | | 30 |
| Other [5] | | 237 | | 128 |
| Total | $ | 727 | $ | 397 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $330 million to $727 million during the three months ended March 31, 2022, compared to $397 million during the three months ended March 31, 2021. The increase was partially due to an increase in compensation and benefits by $110 million during the three months ended March 31, 2022, which was primarily driven by expansion of our teams to support our growth.

In addition, during the three months ended March 31, 2022, the first tranche of the CEO Milestone Gift related to Mr. Garcia's contribution occurred resulting in $20 million of compensation expense within selling, general and administrative expense, which is presented separately above, compared to none in the three months ended March 31, 2021.

The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $55 million during the three months ended March 31, 2022, primarily due to an increase in advertising to drive growth in units sold and vehicles acquired from customers. Market occupancy, logistics, and other expenses also increased during the three months ended March 31, 2022 compared to the respective prior year period primarily due to increases in the number of units sold and in population coverage, and in preparation for future growth. The increase is also due in part to efforts to decrease and balance discretionary spend as a result of the uncertain economic environment surrounding COVID-19 during the three months ended March 31, 2021.

*Interest Expense*

Interest expense increased by $34 million to $64 million during the three months ended March 31, 2022, compared to $30 million during the three months ended March 31, 2021. The increase is primarily due to increased interest incurred on additional senior unsecured notes issued by the Company in October 2020, March 2021, and August 2021, along with increased interest expense incurred on sale leaseback financing since March 31, 2021.

*Other Expense (Income), Net*

Other expense (income), net changed by $20 million to expense of $13 million during the three months ended March 31, 2022 compared to income of $7 million during the three months ended March 31, 2021. The change is primarily due to fair value adjustments on our retained beneficial interests in securitizations and purchase price adjustment receivables when the

capital markets were more uncertain, primarily due to COVID-19, and the fair value adjustments on our warrants to acquire Root Class A common stock.

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: EBITDA, EBITDA margin, Adjusted EBITDA and Adjusted EBITDA Margin. We believe the presentation of both U.S. GAAP and non-GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable U.S. GAAP financial measures.

*EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA Margin*

EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA Margin are supplemental measures of operating performance that do not represent and should not be considered an alternative to net loss or cash flow from operations, as determined by U.S. GAAP. EBITDA is defined as net loss before interest expense, income tax expense, and depreciation and amortization expense. Adjusted EBITDA is defined as EBITDA plus other expense (income), net and other unusual items, as provided in the following table. EBITDA Margin is EBITDA as a percentage of total revenues. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. We use EBITDA and Adjusted EBITDA to measure the operating performance of our business and EBITDA Margin and Adjusted EBITDA Margin to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. EBITDA, EBITDA Margin, Adjusted EBITDA and Adjusted EBITDA margin may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of EBITDA and Adjusted EBITDA to net loss, which is the most directly comparable U.S. GAAP measure, and calculation of EBITDA Margin and Adjusted EBITDA Margin is as follows:

|  | Three Months Ended March 31, | | | |
|  | 2022 | | 2021 | |
|  | (dollars in millions) | | | |
| Net loss | $ | (506) | $ | (82) |
| Depreciation and amortization expense | | 37 | | 22 |
| Interest expense | | 64 | | 30 |
| EBITDA[1] | $ | (405) | $ | (30) |
|  | | | | |
| Total revenues | $ | 3,497 | $ | 2,245 |
| EBITDA Margin | | (11.6)% | | (1.3)% |
|  | | | | |
| EBITDA[1] | $ | (405) | $ | (30) |
| Other expense (income), net | | 13 | | (7) |
| CEO Milestone Gift in cost of sales | | 8 | | — |
| CEO Milestone Gift in SG&A | | 20 | | — |
| Adjusted EBITDA | $ | (364) | (364) $ | (37) |
|  | | | | |
| Total revenues | $ | 3,497 | $ | 2,245 |
| Adjusted EBITDA Margin | | (10.4)% | | (1.6)% |

_____
(1) We incurred less than $1 million of income tax provision for each of the three months ended March 31, 2022 and 2021.

43

**Liquidity and Capital Resources**

*General*

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, and increased population coverage.

We had the following liquidity resources available as of March 31, 2022 and December 31, 2021:

| | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|
| | (in millions) | | |
| Cash and cash equivalents | $ 247 | $ | 403 |
| Availability under short-term revolving facilities [1] | 483 | | 438 |
| Availability under sale-leaseback agreements | — | | — |
| Committed liquidity resources available | $ 730 | $ | 841 |
| Unpledged vehicle inventory not included above | 1 | | 665 |
| Unpledged real estate not included above | 824 | | 677 |
| Unpledged beneficial interests in securitizations | 152 | | 100 |
| Total liquidity resources | $ 1,707 | $ | 2,283 |

[1] Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.

Our total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities, on our balance sheet that can be financed using traditional asset-based financing sources.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

As of March 31, 2022 and December 31, 2021, the short-term revolving facilities had a total commitment of approximately $5.6 billion and $4.3 billion, an outstanding balance of $2.8 billion and $2.1 billion, and unused capacity of approximately $2.8 billion and $2.2 billion, respectively.

Availability under real estate agreements is the available amount we can borrow under our existing real estate financing agreements based on the value of existing real estate on our balance sheet. From time to time, we may enter into committed real estate financing agreements that allow for future pledging of real estate assets on a flexible timeline. We began using committed real estate financing agreements in 2017 and may do so in the future.

44

Unpledged vehicle inventory and finance receivables is the value of vehicle inventory and finance receivables on our balance sheet on the period end date beyond that covered by committed financing agreements.

Unpledged real estate assets include IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include EBITDA net of share-based compensation, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition, as a growing automotive retailer, we also invest in and generate several types of automotive retail assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of March 31, 2022 and December 31, 2021, our outstanding principal amount of indebtedness, including finance leases, was approximately $6.3 billion and $5.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments

45

and Note 16 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| **Asset-Based Financing:** | | |
| Inventory | $ 2,572 | $ 1,877 |
| Finance receivables and beneficial interests | 484 | 458 |
| Transportation fleet[1] | 327 | 212 |
| Real estate[2] | 450 | 450 |
| Total asset-based financing | 3,833 | 2,997 |
| Senior Notes | 2,450 | 2,450 |
| Total debt | 6,283 | 5,447 |
| Less: unamortized debt issuance costs[3] | (33) | (34) |
| Total debt, net | $ 6,250 | $ 5,413 |

_____

(1) Amount includes notes payable and finance leases.

(2) Amount includes real estate financing and notes payable.

(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our consolidated balance sheets and not included here.

On April 26, 2022, the Company completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion. Also, on May 6, 2022, the Company issued $3.275 billion in senior unsecured notes due 2030. The Company intends to use the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA and other ancillary transactions to occur in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the three months ended March 31, 2022 and 2021:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2022 | 2021 |
|  | (in millions) | |
| Net cash used in operating activities | $ (593) | $ (532) |
| Net cash used in investing activities | (208) | (75) |
| Net cash provided by financing activities | 707 | 693 |
| Net increase in cash, cash equivalents and restricted cash | (94) | 86 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 542 | $ 415 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. Cash used in operating activities was approximately $593 million and $532 million during the three months ended March 31, 2022 and 2021, respectively, an increase of $61 million, primarily due to

46

increased net loss as a result of increased selling, general and administrative expenses and reconditioning costs, partially offset by decreases in cash used to acquire vehicle inventory.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $208 million and $75 million during the three months ended March 31, 2022 and 2021, respectively, an increase of $133 million, primarily driven by an increase in purchases of property and equipment partially offset by increases in principal payments received on, and proceeds from the sale of, beneficial interests in securitizations.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was approximately $707 million and $693 million during the three months ended March 31, 2022 and 2021, respectively, an increase of approximately $14 million. The change primarily relates to increased net proceeds from short-term revolving facilities during the three months ended March 31, 2022, partially offset by decreased proceeds from long-term debt.

### Contractual Obligations and Commitments

As of March 31, 2022, there have been no material changes to the contractual obligations or commitments previously disclosed in our most recent Annual Report on Form 10-K, filed February 24, 2022. See Note 20 — Subsequent Events, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our 2030 Notes.

### Fair Value Measurements

We report money market securities, certain receivables, warrants to acquire Root Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

### Critical Accounting Estimates

There have been no material changes to our critical accounting estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

47

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- our acquisition of ADESA from KAR Auction Services, Inc., including business uncertainties while the acquisition is pending, the assumption of unknown liabilities, and the ability to successfully integrate the operations of the acquired businesses;

- our history of losses and ability to maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19 and other future epidemics and public health crises;

- our relationship with DriveTime and its affiliates;

- our minority equity investment in Root, Inc.;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

48

- our ability to sell our inventory expeditiously;

- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the Internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

49

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indentures governing our Senior Notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

There were no changes to our internal controls over financial reporting that occurred during the three months ended March 31, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II. OTHER INFORMATION

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 24, 2022, except as follows:

***Our business is subject to risks related to the larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues.***

Decreases in consumer demand could adversely affect the market for used vehicles and, as a result, reduce the number of consumers using our website and mobile application. Consumer purchases of new and used vehicles generally decline during recessionary periods and other periods in which disposable income is adversely affected. For example, the number of used vehicle sales in the United States decreased from approximately 41.4 million in 2007 to approximately 35.5 million in 2009, according to CNW Research Retail Automotive Summary. Inflationary cost increases for labor, materials, and services may cause costs to increase, as well as scarcity of certain products, which may also adversely affect the market for used vehicles. Purchases of new and used vehicles are typically discretionary for consumers and have been, and may continue to be, affected by negative trends in the economy and other factors, including the COVID-19 pandemic, inflation, rising interest rates, rising vehicle prices, the cost of energy and gasoline, the availability and cost of credit, reductions in business and consumer confidence, stock market volatility, increased regulation, increased unemployment, and market volatility related to the conflict in Ukraine. The conflict in Ukraine has and may continue to result in increased volatility in global oil and gas prices. It may also lead to changes in the availability of certain resources, such as nickel and neon, which may affect the supply of new vehicles, thereby affecting the supply chain and market for used vehicles. This volatility may change consumer car purchasing behaviors, which could materially and adversely affect our business and results of operations. To the extent the conflict in Ukraine adversely affects our business, it may also have the effect of heightening many other risks disclosed in our Form 10-K, any of which could materially and adversely affect our business and results of operations. Increased environmental regulation has also made, and may in the future make, used vehicles more expensive and less desirable for consumers. Our business may also be negatively affected by challenges to the larger automotive ecosystem, including urbanization, global supply chain challenges, military conflicts, and other macroeconomic issues. For example, rideshare services, such as Uber and Lyft, are becoming increasingly popular as a means of transportation and may decrease consumer demand for the used vehicles we sell, particularly if urbanization increases. New technologies such as autonomous driving software also have the potential to change the dynamics of vehicle ownership in the future. Any of the foregoing could have a material adverse effect on our business, results of operations and financial condition.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

**Recent Sales of Unregistered Securities**

There were no unregistered sales of equity during the three months ended March 31, 2022, except as otherwise previously reported.

During the three months ended March 31, 2022, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged less than 0.1 million LLC Units for less than 0.1 million newly-issued shares of Class A common stock. These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

51

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

52

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 2.1 | Securities and Asset Purchase Agreement, dated February 24, 2022, by and among KAR Auction Services, Inc., Carvana Group, LLC and Carvana Co. solely for purposes of Section 10.15 thereof as guarantor (incorporated by reference to Exhibit 2.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on February 25, 2022). |
| 10.1 | Fourth Amendment to Second Amended and Restated Inventory Financing and Security Agreement, dated February 1, 2022, among Ally Bank, Ally Financial Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on February 3, 2022). |
| 10.2 | Nineteenth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated March 17, 2022, 2022, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K, filed with the SEC on March 22, 2022). |
| 10.3 | Twentieth Amendment to the Amended and Restated Master Purchase and Sale Agreement, dated March 22 , 2022, 2022, among Carvana Auto Receivables 2016-1 LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Current Report on Form 8-K, filed with the SEC on March 22, 2022). |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:       May 10, 2022

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins
      Mark Jenkins
      Chief Financial Officer
      (On behalf of the Registrant and as Principal Financial Officer)

54

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    May 10, 2022                                              /s/ Ernest C. Garcia, III

                                                                Ernest C. Garcia, III
                                                                *Chairman and Chief Executive Officer*

<u>Exhibit 31.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:     May 10, 2022                                                    /s/ Mark Jenkins
                                                                         Mark Jenkins
                                                                         *Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:      May 10, 2022                                                        /s/ Ernest C. Garcia, III
                                                                              Ernest C. Garcia, III
                                                                              *Chairman and Chief Executive Officer*

Exhibit 32.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended March 31, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        May 10, 2022                                              /s/ Mark Jenkins
                                                                              Mark Jenkins
                                                                              *Chief Financial Officer*

# Exhibit 23

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 10, 2022**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **001-38073** | **81-4549921** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.RS. Employer Identification No.) |

**1930 W. Rio Salado Parkway**
**Tempe, Arizona 85281**
**(Address of principal executive offices, including zip code)**

**(480) 719-8809**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Class A Common Stock, Par Value $0.001 Per Share** | **CVNA** | **New York Stock Exchange** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01**        **Other Events.**

On May 10, 2022, Carvana Co. ("Carvana") announced a workforce reduction of approximately 2,500 employees primarily in operational groups in connection with its previously announced plans to better align staffing and expense levels with sales volumes.

All impacted team members will have the opportunity to receive four weeks of pay plus an additional week for every year they have been with Carvana. Impacted team members will also have the opportunity to receive extended healthcare coverage, pay equal to early vesting of certain previously granted equity awards, recruiting and résumé support, and continuing participation in certain other company programs. The executive team is foregoing their salaries for the remainder of the year to help contribute to the severance pay for departing team members.

In connection with these right-sizing initiatives, over the next several weeks Carvana will be transitioning operations away from its Euclid, OH IRC and a few logistics hubs.

We believe these decisions, while extremely difficult, will result in Carvana restoring a better balance between its sales volumes and staffing levels and facilitate Carvana returning to efficient growth on its mission to change the way people buy and sell cars.

Additional materials on Carvana's operating plan in the current industry and macroeconomic environment will be made available on the Investor Relations website later this week.

### *Forward-Looking Statements*

This Current Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements reflect the Company's current expectations and projections with respect to, among other things, the workforce reduction. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning. Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in the Company's Annual Report on Form 10-K for 2021.

**Item 9.01**        **Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 101 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: May 10, 2022

CARVANA CO.

By:    /s/ Paul Breaux

Name:  Paul Breaux

Title:   Vice President, General Counsel and Secretary

# Exhibit 24

# Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

Dow Jones Institutional News

June 24, 2022 Friday 11:41 PM GMT

Copyright 2022 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2022, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 3599 words

**Byline:** By Jacob Adelman

## Body

Terri Burton wanted to do something special to mark her son's high school graduation, so she bought him the car of his youthful dreams: a Volkswagen Golf GTI.

But the purchase was the start of a nightmare. Within months of getting the car, her son, who has autism, was stopped twice by police in their South Texas town because Carvana (ticker: CVNA), the company that sold the car to Burton, hadn't registered the vehicle in her name, she says.

It wasn't until almost six months later that Burton learned the reason for the registration delay: Carvana couldn't transfer the car's ownership to her because the company -- officially, at least -- hadn't owned the car.

Problems with the paperwork from Carvana's earlier purchase of the car for resale were keeping it from getting official ownership, or title, to the vehicle, a Carvana customer-service agent explained in a tense phone call late last year that Burton, of Corpus Christi, recorded.

"It was horrible," says Burton, whose son had panicked each time he was pulled over by officers suspicious of the temporary out-of-state license plates that Carvana had been issuing for the 2017 hatchback in lieu of providing permanent Texas ones. "This was my gift to my son, and they messed it up so bad."

The Burtons were among thousands of families that purchased cars from Tempe, Ariz.--based Carvana during the pandemic, when the company thrived by taking on traditional dealers with a web-enabled, highly scalable approach to vehicle sales. Carvana's used cars often arrive at customers' homes with the same convenience as Amazon-delivered paper towels. Customers can also pick up cars from Carvana's multistory glass towers, which are designed to dispatch vehicles like cans of soda from a vending machine and include ceremonial coin slots.

But as the economy has reopened, Carvana's efforts to resume its torrid pandemic-era sales pace have been complicated by an inconvenient side effect of the growth: In its haste to seize market share from competitors, Carvana was selling cars faster than it could get them registered to their new owners.

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

Disgruntled Carvana customers have long shared their gripes about registration delays and other issues -- including late deliveries, undisclosed vehicle damage, and missing accessories -- on online message groups and to the media.

Barron's interviews with Carvana customers and former employees shed light on why registrations were delayed and how state regulators have tried to address the issue. The reporting reveals a company scrambling to address the problem, at one point forming an ad hoc unit known as the "undriveable-car task force."

Carvana says many of the delays involved internal paperwork problems, including errors on title documents, missing documents from buyers, and slow work by third-party registration services and state motor vehicle agencies.

In other instances, though, including Burton's, Carvana sold cars before it had title to the vehicles, an action that is illegal in many states where the company does business.

Carvana said in a response to questions for this article that very few of its customers experienced registration delays, and that only a small number of these delays were the result of the company selling cars before it had title.

The company says its record should be viewed in light of the many purchases and sales it makes, and the challenges of operating during the pandemic. Carvana sold more than 425,000 cars to retail customers in 2021, up 74% from a year earlier.

"Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says. "In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states."

Interviews with state officials and former Carvana employees show the issue is wider-reaching than the company suggests.

Burton and other customers, meanwhile, are lining up to challenge Carvana in a lawsuit filed in U.S. District Court in Pennsylvania that alleges some of the company's customers went years without being able to legally drive vehicles they paid for. The suit, for which class-action status is being sought, identifies about two dozen potential plaintiffs.

And state regulators across the U.S. have been subjecting the company to suspensions or increased oversight over registration delays and its practice of issuing multiple temporary license plates from states where it has dealer's licenses, instead of promptly providing permanent ones.

Carvana insists the lawsuit has "no substantive merit." Its attorneys have sought the suit's dismissal, arguing the claims should be handled through arbitration under plaintiffs' original sales contracts with the company. A judge in Easton, Pa., is deliberating on whether to let the case proceed.

Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021. "We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward," it says.

The scrutiny comes at a difficult time for Carvana, which has seen flagging sales, steep losses, and a stock that's down more than 90% from an August 2021 peak.

Carvana CEO Ernie Garcia III has vowed to slash some $125 million in spending, including laying off around 2,500 employees, or about 12% of the company's staff, in May. At the same time, Carvana is rushing to turn its recent acquisition of Adesa U.S., the country's second-biggest car-auction business, into a new leg of growth.

The $2.2 billion purchase, financed with high-interest debt, gives Carvana a national network of parking lots and garages that it says will be used to recondition hundreds of thousands more vehicles each year for resale.

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

Carvana was founded in 2012 as an online-focused subsidiary of DriveTime, a used-car business owned by Garcia's father, Ernie Garcia II.

The elder Garcia grew DriveTime out of an earlier used-car company, Ugly Ducking, which he purchased in 1991, the year after he pleaded guilty to a felony bank-fraud charge related to the implosion of Charles Keating's Lincoln Savings & Loan Association.

Prosecutors accused Garcia II of posing as a borrower on a fraudulent mortgage from Lincoln that generated bogus profits for the bank in return for getting a loan for his own real estate business. He was sentenced to three years' probation. Garcia and his real estate business later filed for bankruptcy.

Garcia III, the son, spun Carvana off into its own business with himself at the helm in 2014. He and his father remain the company's largest individual shareholders. The younger Garcia soon began erecting the company's trademark "vending machine" towers in cities throughout the country.

Carvana went public on the New York Stock Exchange in 2017. The initial public offering valued the company at roughly $2 billion.

From its earliest days, Carvana emulated West Coast tech companies that aimed to disrupt established industries with new, online business models.

CEO Garcia openly compared the company's approach with that of Amazon.com (AMZN), and its motto for employees -- "Your next customer may be your mom" -- echoes the e-commerce giant's customer-centric business ethos.

There were also quirky, Silicon Valley--style workplace perks. For their one-year work anniversaries, some employees were given Allbirds -- the woven wool sneakers favored by West Coast tech entrepreneurs -- marked with the car dealer's logo, a halo hovering over a sedan.

Meanwhile, Carvana's custom-built headquarters in a Tempe business park includes a room known as "the library" with leather chairs, a wood-paneled ceiling, and book-lined shelves that slide away to reveal a cocktail bar in a secret nook. It was largely stocked with bottles from Costco's in-house Kirkland brand, one employee says.

But Carvana's biggest similarity with the tech start-ups may be its willingness to burn through cash in a race to displace old-line incumbents and outpace potential competitors. In its quarterly earnings reports, Carvana repeatedly posted net losses, even as Garcia assured investors that the company was forging ahead on a path toward profitability.

"We wanted to build a paradigm-shifting company," he told analysts in May 2018, about a year after the company's initial listing.

A couple of years later, as the coronavirus pandemic began rewiring the economy, Garcia was delivering on that promise. Car buyers across the country found themselves flush with stimulus cash they could put toward down payments on vehicles. Carvana's online model was a perfect fit for quarantines and concerns about in-person contact.

During the three months ended June 30, 2021, as the country muddled through a second spring in the pandemic's grasp, Carvana posted its first, and only, net quarterly profit. By that August, Carvana's stock traded at $377, giving the company a market value of more than $60 billion, larger than older publicly traded peers CarMax (KMX) and AutoNation (AN) combined.

In January of this year, Carvana announced the sale of its one-millionth car, casting the event as a key milestone in its quest to become the country's largest auto retailer. CarMax, the current No. 1 auto dealer, sold more than 924,000 cars to retail customers in its latest fiscal year.

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

"Carvana's mission is to change the way people buy and sell used cars by creating a transparent, simple, and enjoyable customer experience," the company said at the time. "The auto industry is fragmented -- and that means there's ample room to grow."

24 Jun 2022 19:41 ET  Carvana Sought to Disrupt Auto Sales. It -2-

Shortly after Carvana opened its 28th vending machine tower in early 2021 near the Las Vegas Strip -- there now are 33 -- JD Decker, the Nevada Department of Motor Vehicles' chief lawman, was patrolling the desert metropolis when he stopped a car for driving with an expired temporary license plate from North Carolina.

The driver told Decker he'd been getting one temporary license plate after another from Carvana, and was waiting for the next one. He showed Decker a stack of expired temporary plates from around the country he'd burned through.

"He probably had about 10 different states represented," Decker says. "He had the car for about a year and there was a problem with the title, so they just kept sending him temp tags from all over."

Former Carvana employees say this was standard procedure by then: The company had started encountering delays in getting vehicles registered to its buyers, so it would use its dealer licenses across the country to issue temporary plates from multiple states to customers.

"You might end up with a Tennessee temporary plate for 45 days, then an Ohio temporary plate for another 30 to 45 days," says a former senior member of the department at Carvana's Tempe headquarters that responds to the most serious customer complaints, known as the executive resolution team.

"Customers would end up getting sometimes four to six different temporary plates from multiple states," says the former staffer, who was laid off by the company after almost two years in April following a dispute over workplace accommodations for a disability. He asked not to be identified, citing ongoing litigation with the company over his dismissal.

Some of the sanctions levied by states in recent months cite the improper furnishing of temporary out-of-state plates. Carvana says it has "had a number of productive and helpful conversations with regulators across the country" on the topic of out-of-state plates and is "very confident in our processes going forward."

By early 2021, Carvana was staffing up to deal with title issues. That's when Thomas Hollingsworth joined what he was told was a newly formed titles department at the Tempe headquarters tasked with solving issues that were keeping cars from getting registered to their new owners.

Until he left the department for another role at Carvana that August, Hollingsworth -- who has also since left the company -- spent his days on the phone with banks, state motor vehicle departments, and former owners working to fix paperwork snags.

"I would come in at 7 a.m. and I would leave around 2:30 p.m., and the whole day was basically running through these titles," he says.

During a period of heavy hiring that fall, Carvana established a new category of staffers called "paperwork specialists" to better manage the documents that flowed in and out of the company with the cars it bought and sold, says a former member of the auto dealer's recruiting team.

The paperwork specialists were entry-level workers making $15 an hour who were sent out in the field after two weeks of rudimentary instruction, says the former recruiter, whose job was among those lost in the May layoffs and who asked not to be identified for fear of reprisal.

Carvana says it strongly disagrees with the recruiter's characterizations on pay and training. "As a growing business with a novel model, we constantly create new roles and adjust existing ones," the company says. "We've been fortunate to hire a number of great people in all roles."

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

But Carvana's sense of urgency surrounding the title-transfer issues may be most apparent in its formation of the undriveable-car task force in May.

Samantha Berger, another former member of the executive resolution team, says three of her colleagues were pulled aside for specialized vehicle-registration training early that month and given a "giant spreadsheet" of cars.

The cars were ones that Carvana had been keeping on the road with temporary plates that were now expiring, leaving them to languish, undriveable and parked outside new owners' homes, says Berger, who wound up leaving the company days later, shortly before the layoffs.

Asked about the undriveable-car task force, Carvana says that its "internal teams have done an incredible job solving unprecedented business process challenges associated with a global pandemic in real-time."

From his perch in Carvana's titles department, Hollingsworth says he was able to see where the company's process went wrong: Sometimes cars got sold off its lots around the country before document handlers in Tempe had time to finish getting the cars' titles transferred to Carvana.

No states are known to have sanctioned Carvana over the practice of selling vehicles without holding title, but in multiple states where Carvana does business -- including Texas, Pennsylvania, Michigan, and Illinois -- regulators say it's illegal in most cases to do so.

While some traditional used-car dealers concede it isn't unheard of to sell vehicles before holding title, most do so only sparingly, and only if they're sure they'll obtain title quickly enough not to cause registration delays for their buyers, according to Jonathan Chariff, CEO of the South Motors auto group in Miami. Florida requires dealers to possess a vehicle's title, or some other evidence of ownership, before making a sale, a state motor vehicle department spokesman says.

Carvana says that "for a limited time period, Carvana offered a small percentage of cars for sale prior to receiving the paper certificate of title," but that "when viewed in totality, the cars for which the paper certificate of title hadn't arrived at time of sale were a very small percentage of Carvana's sales."

Furthermore, Carvana says it only sold cars without a title "in the states where such practice is permissible." However, customers in states where it is illegal tell Barron's that they learned from Carvana that it sold them cars without holding the titles.

Those customers include Burton, the Texas woman who bought the Volkswagen hatchback for her son.

Another Carvana customer, Melody Postoy of Glendale, Ariz., another state where the practice is barred, traded in her Lexus for a later model in late December. About 2 1/2 months later, the last of the temporary plates Carvana provided her expired, leaving her unable to drive the car, she says.

She spent hours on the phone with customer-service agents who offered constantly shifting excuses for why Carvana had been unable to get her registered as the vehicle's owner.

One agent attributed the problem to difficulties with title transfers across state lines. Postoy says this surprised her, since a vehicle history report she reviewed showed that the car had always been registered in Arizona.

In April, when Carvana agreed to reclaim the vehicle for a refund, the agent Postoy spoke with to arrange pickup offered a different excuse. "They told me they were having issues getting ahold of the title," Postoy says.

When asked about such anecdotes in states where vehicles may not be sold without holding title, Carvana said it didn't want to discuss specifics of its legal analysis.

Even in states where selling vehicles without title isn't prohibited, registration delays have caused problems for Carvana's customers.

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

One potential plaintiff in the proposed class-action suit, a hospital lab assistant in North Carolina named William Stalls, bought a 2012 Hyundai Sonata from Carvana in January 2021. Over the next 12 months, Stalls was issued temporary plates from Georgia, Tennessee, Arkansas, and Arizona, the lawsuit alleges.

While driving with one of those plates, police pulled him over for speeding and found in a database that the car was still registered to a prior owner, according to the complaint.

"Despite Stalls showing the officer his sale paperwork and explaining he was waiting for permanent tags from Carvana, Stalls was arrested and confined to jail for eight hours before posting bond," according to the suit.

An attempt to reach Stalls was unsuccessful. Attorney Robert Cocco, who filed the lawsuit, declined to comment on the case. Asked about the Stalls case, Carvana reiterated that the lawsuit had no merit.

In February, a month after celebrating the sale of its first one million cars, Carvana disappointed investors with an earnings report that showed sales flattening in the fourth quarter of 2021 after their pandemic-era boom.

"It is an understatement to say a lot has changed about our environment, " Garcia said three months later in his employee letter announcing layoffs.

Inflation was squeezing consumer savings, car prices had soared, and the company was dealing with mounting debt as a result of its Adesa acquisition.

Carvana was also facing scrutiny from state motor vehicle agencies over the company's failure to meet vehicle registration deadlines and the use of out-of-state permits by its customers.

Early this year, Pennsylvania officials suspended the company's license to issue temporary permits at its two vending-machine towers in that state, in Philadelphia and near Pittsburgh, citing late document submittals, "improper issuance and verification of temporary Pennsylvania plates in other states," and other violations, Pennsylvania Department of Transportation spokesman Diego Sandino said in an email.

The suspension at the Philadelphia location is active until August, Sandino says. The location near Pittsburgh is suspended for three months after it comes into compliance, which as of late May it hadn't yet done.

The Pennsylvania actions came in response to "temporary technical operational challenges that have since been corrected," Carvana says. "This does not impact our ability to sell cars in Pennsylvania." The company is still able to issue temporary license plates in the state through a third-party licenser, it says.

24 Jun 2022 19:41 ET  Carvana Sought to Disrupt Auto Sales. It -3-

Issues related to late title transfers and the use of out-of-state plates have also resulted in increased oversight in Illinois, where the company was forced to cease business entirely for about two weeks in May. A suspension in a North Carolina county ended in January, though the company remains on probation in another North Carolina county. Carvana's license is also on probation in Michigan over registration issues.

"Carvana is confident in and proud of our current title and registration operations," the company says. "We have productive conversations with regulators in every state where we operate and are very confident that our current operations are designed to meet state standards."

Even Carvana's home state of Arizona has clamped down on the company's operations after officials there received more than 80 complaints about the company over a four-year period, says Arizona Department of Transportation, or ADOT, spokesman Bill Lamoreaux.

The complaints revolved around "such issues as missing, delayed, and altered title and registration documents, contract discrepancies, significant odometer discrepancies, and incomplete emissions at the time of sale," Lamoreaux says.

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

Carvana often used temporary license plates from Arizona, according to customers and former employees. The state allowed car dealers to issue temporary plates even for sales that occurred in other states, according to Lamoreaux. Last month, Arizona canceled that program after discussions with Carvana, he says.

Lamoreaux declined to provide further details, citing open investigations into Carvana's registration practices.

"ADOT tries to accommodate businesses like Carvana with their unique online business model as best we can," Lamoreaux says. "But for consumer protection, we need to make sure that all car dealers operating in Arizona are following state laws."

Write to Jacob Adelman at jacob.adelman@barrons.com

(END) Dow Jones Newswires

June 24, 2022 19:41 ET (23:41 GMT)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Newswire

**Journal Code:** DJDN

**Subject:** AUTOMOTIVE SALES (90%); DELAYS & POSTPONEMENTS (89%); POLICE FORCES (76%); EDUCATIONAL INSTITUTION GRADUATION (73%); NEWS BRIEFS (73%); SECONDARY SCHOOLS (73%); CUSTOMER SERVICE (67%); AUTISM (57%); LICENSES & PERMITS (51%); ccat Corporate/Industrial News (%); c1513 Sales Figures (%); c12 Corporate Crime/Legal Action (%); neqac Equities Asset Class News (%); nfiac Fixed Income Asset Class News (%); c15 Financial Performance (%); c151 Earnings (%); gcat Political/General News (%); gcrim Crime/Legal Action (%); ncat Content Types (%); nfact Factiva Filters (%); nfcpex C&E Executive News Filter (%); nfcpin C&E Industry News Filter (%); PROVIDER TERMS: N/BKG, N/CMDI, N/CMR, N/DJEN, N/DJG, N/DJG7, N/DJGP, N/DJGS, N/DJGV, N/DJI, N/DJIB, N/DJIV, N/DJN, N/DJPT, N/DJQA, N/DJRT, N/DN, N/EWR, N/FNVW, N/FXW, N/MADN, N/WED, N/WER, N/BRNO, N/CNW, N/DJPN, N/DJWI, N/FCTV, N/FRT, N/HIY, N/PAG, N/PRO, N/SLS, N/TSY, N/WEI, N/NTAKE (%)

**Company:**  CARVANA CO (92%)

**Ticker:** CVNA (NYSE) (92%)

**Company-Number:** DJ Ticker: N/BKG, N/CMDI, N/CMR, N/DJEN, N/DJG, N/DJG7, N/DJGP, N/DJGS, N/DJGV, N/DJI, N/DJIB, N/DJIV, N/DJN, N/DJPT, N/DJQA, N/DJRT, N/DN, N/EWR, N/FNVW, N/FXW, N/MADN, N/WED, N/WER, N/BRNO, N/CNW, N/DJPN, N/DJWI, N/FCTV, N/FRT, N/HIY, N/PAG, N/PRO, N/SLS, N/TSY, N/WEI,

Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars. -- Barrons.com

N/NTAKE; ISIN: N/BKG, N/CMDI, N/CMR, N/DJEN, N/DJG, N/DJG7, N/DJGP, N/DJGS, N/DJGV, N/DJI, N/DJIB, N/DJIV, N/DJN, N/DJPT, N/DJQA, N/DJRT, N/DN, N/EWR, N/FNVW, N/FXW, N/MADN, N/WED, N/WER, N/BRNO, N/CNW, N/DJPN, N/DJWI, N/FCTV, N/FRT, N/HIY, N/PAG, N/PRO, N/SLS, N/TSY, N/WEI, N/NTAKE

**Industry:** NAICS441120 USED CAR DEALERS (92%); SIC5521 MOTOR VEHICLE DEALERS (USED ONLY) (92%); AUTOMOTIVE SALES (90%); SECONDARY SCHOOLS (73%); INTERNET & WWW (68%); MARKET SHARE (60%); i645 Clothing Stores (%); i656 Mixed Retailing (%); i64 Retail/Wholesale (%); i654 Specialty Retailing (%); iretail Retail (%); PROVIDER TERMS: N/BKG, N/CMDI, N/CMR, N/DJEN, N/DJG, N/DJG7, N/DJGP, N/DJGS, N/DJGV, N/DJI, N/DJIB, N/DJIV, N/DJN, N/DJPT, N/DJQA, N/DJRT, N/DN, N/EWR, N/FNVW, N/FXW, N/MADN, N/WED, N/WER, N/BRNO, N/CNW, N/DJPN, N/DJWI, N/FCTV, N/FRT, N/HIY, N/PAG, N/PRO, N/SLS, N/TSY, N/WEI, N/NTAKE (%)

**Geographic:** CORPUS CHRISTI, TX, USA (79%); TEXAS, USA (93%); ARIZONA, USA (92%); UNITED STATES (92%); NORTH AMERICA (79%); usaz Arizona; usfl Florida; ustx Texas; usa United States; namz North America; uss Southern U.S.; usw Western U.S.

**Load-Date:** June 24, 2022

**End of Document**

# Exhibit 25





# LETTER TO **SHAREHOLDERS**

# Q2 | 2022





# CAR**VANA**

AUGUST 4, 2022







Dear Shareholders,

The second quarter was a quarter of adjustment and progress for Carvana. As a result of changes in the economy, the market, and the industry, we shifted our priorities to focus on driving profitability through operating efficiency and reducing expenses.

The people inside Carvana are responding. We have implemented new internal processes to accelerate our progress, and we are now operating more effectively across the business than at any other time in our history.

Our team's efforts are producing many positive trends in our key operating metrics. In the second quarter, we drove meaningful sequential improvement in retail units sold, revenue and total GPU, while simultaneously reducing total SG&A dollars. This resulted in material reductions to SG&A per retail unit sold and a significant improvement in EBITDA margin.

Looking through a medium-term lens, we also made tremendous progress this quarter by acquiring ADESA U.S. ("ADESA"), the second largest used vehicle physical auction business in the U.S., significantly increasing the scope of our logistics network and reconditioning capacity. In the few months since the acquisition, we have already made meaningful progress integrating our two businesses, giving us visibility to significant gains in both the short and long term.

The used vehicle industry continues to face high used vehicle prices, rising interest rates, and other macroeconomic pressures. We believe the factors currently impacting used vehicle industry sales are transitory, and at some point, the headwinds we have seen this year will turn into tailwinds. We are adapting to the current environment quickly and using it as an opportunity to become more efficient. As a result, we will be well positioned for the turnaround when it arrives.

In tougher times, focus generally turns to the short term, but it is useful to maintain awareness of the long term as well. It looks better than ever.

Despite all the headwinds we have faced in the economy, in the industry, and from shifting our priorities, we have continued to deliver incredible customer experiences and to rapidly gain market share.

The strength of our customer offering, our market penetration in our more mature markets, and our dramatically improved infrastructure resulting from the acquisition of ADESA bode very well for our future scale.

We believe we have a clear roadmap to return to $4,500 GPU[1] and beyond. We still have a long way to go to hit our mid-term SG&A target of $3,000 per unit[1], but the path has never been as clearly outlined with concrete internal goals across teams against which we are making rapid, meaningful progress.

We remain firmly on the path to changing the way people buy and sell cars and to becoming the largest and most profitable automotive retailer.

## Summary of Q2 2022 Results

Q2 2022 Financial Results: All financial comparisons stated below are versus Q2 2021, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 117,564 an increase of 9%
- Revenue totaled $3.884 billion, an increase of 16%
- Total gross profit was $396 million, a decrease of 28%
- Total gross profit per unit was $3,368, a decrease of $1,752
  - Total gross profit per unit includes a $51 impact from the CEO's gift[2] and a $34 impact from expenses related to our May reduction in force
  - Total gross profit per unit, excluding these items was $3,453
- Net Income (loss) was $(439) million, a decrease from $45 million

---

[1]  Excluding ADESA. For additional details on our midterm SG&A goal including ADESA please see our updating operating plan presentation posted on our investor relations website.

[2]  For additional information, please see the 1 Million Milestone Gift materials posted on our investor relations website.

- Adjusted EBITDA margin[3] was (6.2%), a decrease from 3.4%
  - Adjusted EBITDA margin includes a (0.2%) impact from non-Gift share-based compensation and a (0.4%) impact from our May reduction in force
  - Adjusted EBITDA margin excluding these items was (5.6%)
- Basic and diluted net loss, per Class A share was $2.35 based on 101.5 million shares of Class A common stock outstanding

Other Results and Recent Events:

- On April 26, 2022, we issued 15.625 million shares of Carvana Co. Class A common stock, generating total proceeds of $1.2 billion after fees and expenses.
- On May 9, 2022, we closed our acquisition of the ADESA U.S. Physical Auction business from KAR Global for $2.2 billion. The purchase price of the acquisition and funding for future improvements was funded through the issuance of $3.275 billion of new senior notes due 2030.
- In June 2022, we completed a $30 million sale leaseback on the second phase of our Indianapolis inspection and reconditioning center (IRC).
- Following quarter-end, we opened 1 new greenfield IRC near Richmond, VA.
- In July 2022, we launched Carvana Insurance built with Root to enable Coverage in 3 Clicks™.

## Outlook

We made strong progress on our operating plan in Q2 2022, achieving our outlook for meaningful sequential improvement in retail units sold, revenue, total GPU, SG&A per retail unit sold, and EBITDA margin, while also laying the groundwork for additional progress in future quarters.

As discussed in our recent operating plan presentation, given the current industry, economy, and market environment, we have shifted our priorities to lowering expenses and driving positive free cash flow. On the path toward these goals:

- We continue to expect sequential improvements in SG&A per retail unit sold in Q3 vs. Q2 and again in Q4 vs. Q3 on a consolidated basis, inclusive of ADESA SG&A expenses.

- We are maintaining our Q4 stretch goal of $4,000 SG&A per retail unit sold, excluding D&A, SBC, and ADESA. Including the consolidation of ADESA SG&A expenses, this stretch goal maps into a range of $4,350 to $4,450 SG&A per retail unit sold, excluding D&A and SBC. Our ability to achieve our stretch goal will depend primarily on retail unit volume and the total SG&A expense savings that we are able to achieve by Q4.

- Finally, we continue to expect a return to >$4,000 total GPU and significant positive EBITDA in FY 2023, both including and excluding ADESA gross profit and SG&A expenses.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

---

[3] Adjusted EBITDA margin excludes the impacts of the CEO's Gift and Other Income and Expense

## Integrating ADESA

We closed our acquisition of ADESA on May 9, 2022, and since then our teams have been working closely together on integrating Carvana operations into ADESA locations. As of August 4, we have already:

1) Embedded market hubs at 18 ADESA locations.

2) Began landing over half of the cars we buy from customers that we plan to sell wholesale at ADESA sites.

3) Ramped up our overall inspection and reconditioning volume to over 500 units per week at ADESA sites that complement our existing IRC footprint, mostly in coastal locations.

Looking forward, we plan to continue rapidly adding Carvana functions to ADESA locations while preserving and over time improving upon the operations that successfully made ADESA the second largest used vehicle physical auction business in the U.S. For additional details on ADESA's Q2 financial results, please see Appendix 1.

We are extremely happy with our integration progress so far which has only been possible because of the enthusiasm from the teams on both sides to work together.

This progress and the visibility into additional progress has us more excited than ever about the long-term strategic benefits of the Carvana and ADESA combination.

## Expansion

In Q2 2022, we completed our acquisition of ADESA and closed one IRC in Euclid, OH, the smaller of two IRCs in the Cleveland, OH metropolitan area. ADESA's 56 locations currently have the physical capacity to produce more than 200k units per year when fully staffed with limited real estate improvements. This brought our total annual capacity at full utilization to ~1.2 million units at quarter-end, an increase from ~1 million units at the end of Q1.

We opened 1 new IRC near Richmond, VA in July 2022 and remain on track to open 2 more IRCs in 2022, bringing our total annual capacity at full utilization to ~1.4 million units by the end of 2022.

Looking beyond 2022, we expect to focus our expansion efforts on developing ADESA sites for additional production, as well as improving our logistics network and reducing delivery times and costs.



**ANNUAL PRODUCTION CAPACITY AT FULL UTILIZATION (in millions)**

# CARVANA MARKETS, VENDING MACHINES, IRCs, AND ADESA SITES



*As of August 4, 2022

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: https://investors.carvana.com/investor-resources/investor-materials

## Management Objectives

Historically, our three primary financial objectives have been: (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage. We believe continued focus on these goals will lead to a strong long-term financial model.

As discussed in our recent operating plan presentation, given the current industry, economy, and market environment, we have shifted our priorities to lowering expenses and driving positive free cash flow. However, this letter maintains our historical format to discuss our key results.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | Q2 2022 | Long Term Target |
|---|---|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 42% | 129% | 16% | – |
| Gross Margin | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15.1% | 10.2% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 3.7% | 3.4% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 11.3% | 13.9% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 1.0% | 2.0% | 0.5 – 1.0% |
| SG&A Total as % of Revenue | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 15.9% | 18.6% | 6 – 8% |
| Net Income (loss) Margin | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% | (11.3)% | – |
| Adjusted EBITDA Margin* | (23.2%) | (16.8%) | (9.9%) | (5.7%) | (4.6%) | 0.2% | (6.2)% | 8 – 13.5% |
| EBITDA Margin | | | | | | | | 8 – 13.5% |

*Adjusted EBITDA Margin excludes the impacts of the CEO's Gift and Other Income and Expense which we expect to be immaterial in the long-term

## Objective #1: Grow Retail Units and Revenue

Retail units sold in Q2 increased to 117,564, up 9% from 107,815 in Q2 2021. Q2 revenue grew to $3.884 billion, up 16% from $3.336 billion. Revenue grew faster than retail units due to higher used vehicle prices and the acquisition of ADESA.

Our growth in the quarter reflected significant market share gains versus the used vehicle industry as a whole, which was down ~15% year-over-year according to industry data sources. These market share gains reflect the desirability of our customer offering and came despite several headwinds related to our changing priorities.

These headwinds included the disruption of our reduction in force that we completed in May and the adjustment to our priorities to elevate expense reduction as our number one financial objective. For example, we reduced our marketing budget by 15% sequentially and reduced the size of our immediately available inventory versus peak levels, which both created sequential volume headwinds with an eye toward future profitability.

We also made progress strengthening our logistics network in Q2, though we do not believe logistics network changes were a material driver of sequential sales volume.

For additional details on our logistics network please see Appendix 2.

### QUARTERLY RETAIL UNIT SALES



## Objective #2: Increase Total Gross Profit Per Unit

We achieved significant sequential improvement in total GPU in Q2 2022, despite the continued impacts of elevated retail and wholesale costs.

- Total
  - Total GPU was $3,368 vs. $5,120 in Q2 2021 and $2,833 in Q1 2022
    - Total GPU includes a -$51 impact from Ernie's 1MM unit milestone gift and a -$34 one-time impact from our May reduction in force.
    - Excluding these impacts, total GPU was $3,453 vs. $2,909 in Q1 2022, a sequential improvement of $544.

- Retail
  - Retail GPU was $1,131 vs. $2,022 in Q2 2021 and $808 in Q1 2022
    - Retail GPU includes a -$51 impact from Ernie's 1MM unit milestone gift and a -$34 one-time impact from our May reduction in force.
    - Excluding these impacts, retail GPU was $1,216 vs. $884 in Q1 2022, a sequential improvement of $332.
  - Year-over-year changes in retail GPU were primarily driven by ~$600 per unit higher reconditioning and inbound transport costs compared to Q2 2021, the aforementioned Gift and reduction in force impacts, and higher retail depreciation rates compared to Q2 2021, partially offset by buying more cars from customers.
  - Sequential changes in retail GPU were primarily driven by higher spreads between retail sales prices and acquisition prices. Retail reconditioning and inbound transport costs were similar in Q2 and Q1, as we primarily sold vehicles in Q2 that were reconditioned prior to our cost efficiency initiatives.

- Wholesale
  - Wholesale GPU was $383 vs. $547 in Q2 2021 and $219 in Q1 2022[4]
  - Year-over-year changes in wholesale GPU were driven by a $43 impact from the acquisition of ADESA, as well as wholesale volume growth (units +18% YoY to 55,299), offset by a decrease in gross profit per wholesale unit sold to $814 from $1,254 in Q2 2022 due to higher wholesale market depreciation and higher inbound transport costs on wholesale units sold.
  - Sequential changes in wholesale GPU were primarily driven by ADESA and increased spreads between sales and acquisition prices.

- Other
  - Other GPU was $1,854 vs. $2,551 in Q2 2021 and $1,806 in Q1 2022
  - Year-over-year changes in Other GPU were driven by several factors, including higher benchmark interest rates at time of loan sale relative to origination interest rates, wider credit spreads, and a change in loan sales channel mix, partially offset by the impact of higher industry-wide vehicle prices on average loan size.
  - Sequential changes in Other GPU were primarily driven by higher origination rates relative to benchmark interest rates, partially offset by wider credit spreads and a change in loan sales channel mix.
  - Looking toward Q3, we expect to sell loans in the whole loan sales format but will maintain flexibility to optimize our channel mix as the quarter progresses.

For additional details on drivers of Total GPU please see Appendix 3.

---

[4] Beginning in Q2 2022, wholesale gross profit and wholesale GPU includes gross profit from the sale of wholesale marketplace vehicles at our acquired ADESA locations. For additional details on the impact of ADESA on wholesale GPU, please see the Q2 2022 Financial Supplement Tables posted on our investor relations website.



## Objective #3: Demonstrate Operating Leverage

We made significant sequential improvement in net loss margin and Adjusted EBITDA margin in Q2, levering by 3.2% and 5.0%, respectively, driven by improvements in both GPU gains and SG&A leverage. On a year-over-year basis net loss margin increased by 12.7% and Adjusted EBITDA margin loss increased by 9.9%, each driven by the industry, economic, and internal factors described throughout this letter.

For Q2 2022, as a percentage of revenue:

- Total SG&A levered by 2.2% sequentially, reflecting gains across most components. Compensation and benefits levered by 0.8%, advertising levered by 1.1%, logistics and market occupancy increased by 0.2%, and other SG&A levered by 0.5%. Leverage across these components was driven by adjustments made to better align expense levels with sales volume.

- Total SG&A increased by 4.5% year-over-year, compensation and benefits increased 2.1%, advertising levered by 0.2%, logistics and market occupancy increased by 1.0%, and other SG&A increased by 1.6%.

For additional details on SG&A leverage please see Appendix 4.



8

## Summary

Andy Grove has a famous quote about companies going through difficult periods:

*"Bad companies are destroyed by crisis, good companies survive them, great companies are improved by them."*

Quotes that get repeated over time are usually repeated because they are supported by history and ring true. This quote is no different. Plans are full of straight lines, but history tends to zig and zag.

On the way to achieving our mission, we will probably be tested many times. As we have in the past, we will Zag Forward and seek to improve with every test.

The march continues.


Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO


## Summary

Andy Grove has a famous quote about companies going through difficult periods:

## Appendix #1: Additional Details on Integrating ADESA

One of our priorities at ADESA is to continue providing great customer service to ADESA's auction buyers and sellers and to benefit from ADESA's existing high-quality business through EBITDA contribution today with the potential to increase very significantly as the auction industry rebounds over the next several years.

The current wholesale auction industry environment is a unique and challenging one, with constraints on new car production leading to much lower than historical supply from large commercial sellers, such as new car manufacturers, rental car companies, and finance companies.

Marketplace unit volume was the primary driver of ADESA's results in Q2, with units declining ~10% sequentially vs. Q1. Approximately half of this change was due to the attrition of certain customers following the acquisition. Since the closing, we have already had some buyers and sellers that initially pulled away from ADESA come back, and we have also recently had multiple other large commercial sellers increase the volume they are sending to ADESA. The team at ADESA has done an excellent job managing the turbulence of the acquisition and is back to business as usual.

For the partial quarter following the close of our acquisition on May 9, 2022, the ADESA wholesale marketplace transacted 111,883 units, generating $108 million in revenue, $20 million of gross profit excluding depreciation and amortization, and -$2 million of Adjusted EBITDA. For additional details on ADESA financial results, please see the Q2 2022 Financial Supplement Tables posted on our investor relations website.

This partial quarter Adjusted EBITDA included $3 million of one-time expenses and the reallocation of $2 million of gross profit generated from Carvana business that was internalized following the acquisition.  In addition, these results were impacted by a temporary pause on making operating adjustments while our two companies merged. Following quarter end, we began implementing changes that we expect to positively impact EBITDA contribution by approximately $7 million per quarter by later this year.

As a result of the way the teams have come together, all we have continued to learn about the business, the rapid progress we are making in integration, and the long-term opportunity that exists between the two companies, we are more excited than ever about our acquisition of ADESA.

## Appendix #2: Additional Details on Strengthening the Logistics Network

Logistics continues to be an important area where there is significant room for additional improvement in reliability, costs, and delivery speed. It is also an area where we have made a lot of fundamental progress recently.

Starting with speed metrics, delivery times across the network have largely been flat over the last several months. These metrics have remained approximately flat as a result of the fundamental progress that we are making being offset by three temporary headwinds.

- The first headwind has been adding delivery time buffers in many states to provide cushion for our title and registration teams to work with the various states to complete necessary registration paperwork. As it relates to title and registration, it is important to note that we are (a) at the best execution levels we have ever been in our history, (b) based on data we have access to, in many cases likely better than the majority of traditional dealerships, and (c) committed to making additional progress which is what has caused us to add buffers in certain states. We expect to remove these buffers over time as we continue to improve our processes and obtain licenses at additional locations, which simplifies paperwork processing.

- Second, reduced affordability and the tougher economic environment have led to an increase in the rate of customer order cancellation, which leads to additional strain per sale on our network. While we expect this effect to also be transitory and to alleviate over time naturally when affordability and the economy improve, we are also actively working on several product improvements to reduce this unnecessary strain.

- Third, as part of our work to balance the business with sales volume, we have reduced the size of our inventory which, all else constant, causes customers to select cars that are further away from them on average.

Moving to reliability, two important metrics we use internally measure the percentage of scheduled multi-car hauler trips and of individual car loading events that are executed as expected. Both metrics have improved materially over the last couple months and are now at levels that are similar to or better than prior to the Omicron wave. This progress has been the result of product and process enhancements as well as more internal benchmarking leading to operational focus at our sites with the most opportunity for improvement.

Finally, on cost, an important driver for our network is our utilization percentage which measures what percentage of vehicle slots are utilized on a mile weighted basis across our logistics network. Over the last 6 months, we have reduced unutilized slots by approximately one third. This has been accomplished with fundamental product enhancements and by balancing inventory positioning which got out of balance in the first quarter. We added route utilization awareness into our vehicle bidding systems, into our schedulers, and into our customer facing merchandising to nudge transportation demand toward routes where the logistics network is better suited to fulfill it reliably and efficiently.

Historically these systems had awareness of shipping distance, but were unaware of utilization on required routes. In order to improve inventory positioning without building in recurring costs, we spent more on third party transportation in the second quarter to move inventory from our most out of balance locations. Over time, we will explore the appropriate balance of utilization and speed in our logistics network as these are performance criteria that can be traded off with one another.

Overall, we feel that our logistics network is stronger than it has been in recent history. That said, we have significantly more progress to make and we have better visibility than ever into how to make that progress. This will continue to be an area of the business that receives increased attention.

## Appendix #3: Additional Details on Drivers of Total GPU

We achieved $3,410 total GPU ex Gift, RIF, ADESA in Q2, while experiencing several notable impacts on the business.

- First, retail reconditioning and inbound transport costs were up ~$600 per unit YoY. We made progress in Q2 on reducing costs on produced units that were pushed to the website, but this progress will take time to appear in retail cost of sales as the newly produced units are sold and units produced in past periods with higher cost structures become a smaller share of sales.

- Second, the current used vehicle affordability and interest rate environment is having an impact on the share and mix of customers who finance a vehicle with us. As used vehicle prices normalize we expect favorable finance attachment rate and mix effects relative to Q2. We estimate attach rate and mix effects vs. a normalized environment at ~$250 of Other GPU.

- Third, we saw industry-wide cost of funds for large, mature issuers increase relative to benchmark rates in Q2 relative to Q1 2022 and FY 2021. We have not yet passed on these cost of fund increases, which we estimate at less than 1 point of rate, but we are starting to see other lenders increase rates and believe the industry will continue to pass through increased costs. We estimate the impact of passing through cost of funds increases at ~$250 of Other GPU.

- Finally, we experienced an impact from a higher cost of funds on our Q2 securitization relative to large, mature issuers. We estimate this impact at ~$100 of Other GPU, which we view as transitory based on the specific timing of our Q2 securitization.

Beyond these notable impacts, we also see several additional opportunities.

- With our recent acquisition of ADESA, we also see an opportunity to utilize ADESA locations to expand our wholesale volume and GPU.

- In July, we launched our fully embedded insurance offering with Root, providing an opportunity for expanded insurance-related GPU.

- We continue to see multiple opportunities to expand Other GPU by adding new products to our checkout flow when priorities permit and further enhancements to our finance platform.

Putting it all together, we continue to have strong conviction about our vertically integrated business model's ability to generate significant GPU, largely through normalizing large temporary impacts and operating our standard playbook on other opportunities.

## Appendix #4: Additional Details on SG&A per Retail Unit Sold

Our path to our midterm goal on SG&A per retail unit sold has two phases.

Phase 1: Return to previous levels of SG&A per retail unit sold ex D&A and SBC

- The first phase is a return to $4,000 SG&A per retail unit sold excluding D&A, SBC, and ADESA (or equivalently, our consolidated goal of $4,350-4,450 ex D&A and SBC including ADESA). We have achieved this goal in several quarters in the past.

- The most important step in this phase is managing SG&A expenses down in absolute dollar terms to match volume. Our business has several levers to adjust expense levels. The largest of these are staffing levels, scheduling optimization, in-sourcing third-party services, and reducing other discretionary expenses.

Phase 2: Proceed to Midterm Goal

- Our teams are focused on our primary objective of driving efficiency and reducing SG&A per retail unit sold. Across the business, we have numerous initiatives in place to drive toward our midterm goal.

- In logistics, we have several key initiatives underway to lower costs, improve speed, and enhance reliability. These include reducing third-party logistics spend, increasing utilization through better load balancing across the network, improving trip and staging execution, and reducing vehicle miles traveled.

- In our last-mile delivery network, we have several key initiatives underway for improving cost per retail unit sold, while maintaining strong availability for our customers, including (i) internal benchmarking and performance management, (ii) staffing and scheduling optimization, (iii) in-sourcing third-party vehicle pick-ups, (iv) pairing retail and buying cars from customer activities, and (v) increasing vending machine utilization.

- In customer care, we have several key initiatives underway for improving cost per retail unit sold, while maintaining a strong customer experience, including (i) internal benchmarking and performance management, (ii) automation of manual tasks, (iii) simplified advocate workflows, (iv) enhanced customer communication, and (v) reduction of duplicated and low value tasks.

- In advertising, our two primary areas of focus are (i) optimizing spend by mixing toward higher efficiency channels, campaigns, and markets, and (ii) increasing customer conversion to sale. We have several key initiatives underway to improve conversion to sale, including a new co-signer product offering, more affordable inventory, and improvements to the logistics network, as discussed above.

- Finally, in corporate and technology, we continue to see opportunities to reduce inefficient and discretionary spend, which combined with growth in volume, will lower per unit expenses.

We are already seeing gains across these areas and are excited to progress to our near-term, midterm, and long-term SG&A goals.

## Appendix

*Conference Call Details*

Carvana will host a conference call today, August 4, 2022, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until August 11, 2022, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 6706049#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2021 and Quarterly Report on Form 10-Q for the quarter ending March 31, 2022.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,047 | $ | 403 |
| Restricted cash | | 150 | | 233 |
| Accounts receivable, net | | 428 | | 206 |
| Finance receivables held for sale, net | | 393 | | 356 |
| Vehicle inventory | | 2,865 | | 3,149 |
| Beneficial interests in securitizations | | 401 | | 382 |
| Other current assets, including $8 and $12, respectively, due from related parties | | 207 | | 163 |
| Total current assets | | 5,491 | | 4,892 |
| Property and equipment, net | | 3,261 | | 1,560 |
| Operating lease right-of-use assets, including $15 and $17, respectively, from leases with related parties | | 659 | | 369 |
| Intangible assets, net | | 82 | | 4 |
| Goodwill | | 847 | | 9 |
| Other assets, including $3 and $7, respectively, due from related parties | | 162 | | 181 |
| Total assets | $ | 10,502 | $ | 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities, including $24 and $27, respectively, due to related parties | $ | 981 | $ | 656 |
| Short-term revolving facilities | | 1,118 | | 2,053 |
| Current portion of long-term debt | | 212 | | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | | 57 | | 29 |
| Total current liabilities | | 2,368 | | 2,890 |
| Long-term debt, excluding current portion | | 6,605 | | 3,208 |
| Operating lease liabilities, excluding current portion, including $11 and $13, respectively, from leases with related parties | | 640 | | 361 |
| Other liabilities | | 25 | | 31 |
| Total liabilities | | 9,638 | | 6,490 |
| Commitments and contingencies | | | | |
| Stockholders' equity: | | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,789 and 89,930 shares issued and outstanding as of June 30, 2022 and December 31, 2021, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Additional paid-in capital | | 1,526 | | 795 |
| Accumulated deficit | | (987) | | (489) |
| Total stockholders' equity attributable to Carvana Co. | | 539 | | 306 |
| Non-controlling interests | | 325 | | 219 |
| Total stockholders' equity | | 864 | | 525 |
| Total liabilities & stockholders' equity | $ | 10,502 | $ | 7,015 |

15

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | $ 5,694 | $ 4,304 |
| Wholesale sales and revenues, including $7, $16, $21 and $22, respectively, from related parties | 704 | 557 | 1,279 | 797 |
| Other sales and revenues, including $50, $49, $98 and $91, respectively, from related parties | 218 | 275 | 408 | 480 |
| **Net sales and operating revenues** | 3,884 | 3,336 | 7,381 | 5,581 |
| Cost of sales, including $9, $3, $18 and $4, respectively, to related parties | 3,488 | 2,784 | 6,687 | 4,691 |
| **Gross profit** | 396 | 552 | 694 | 890 |
| Selling, general and administrative expenses, including $7, $6, $13 and $12, respectively, to related parties | 721 | 470 | 1,448 | 867 |
| Interest expense | 116 | 43 | 180 | 73 |
| Other (income) expense, net | (3) | (6) | 10 | (13) |
| **Net (loss) income before income taxes** | (438) | 45 | (944) | (37) |
| Income tax provision | 1 | — | 1 | — |
| **Net (loss) income** | (439) | 45 | (945) | (37) |
| Net (loss) income attributable to non-controlling interests | (201) | 23 | (447) | (23) |
| **Net (loss) income attributable to Carvana Co.** | $ (238) | $ 22 | $ (498) | $ (14) |
| | | | | |
| Net (loss) earnings per share of Class A common stock - basic | $ (2.35) | $ 0.27 | $ (5.20) | $ (0.18) |
| Net (loss) earnings per share of Class A common stock - diluted | $ (2.35) | $ 0.26 | $ (5.20) | $ (0.18) |
| | | | | |
| Weighted-average shares of Class A common stock - basic [1] | 101,450 | 81,398 | 95,773 | 79,751 |
| Weighted-average shares of Class A common stock - diluted | 101,450 | 176,015 | 95,773 | 79,751 |

(1) Weighted-average shares of Class A common stock - basic - outstanding have been adjusted for unvested restricted stock awards.

16

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (945) | $ (37) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 101 | 46 |
| Equity-based compensation expense | 42 | 18 |
| Loss on disposal of property and equipment | 2 | 1 |
| Provision for bad debt and valuation allowance | 8 | 6 |
| Amortization and write-off of debt issuance costs | 12 | 5 |
| Unrealized loss on warrants to acquire Root Class A common stock | 5 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 10 | (4) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (3,960) | (3,289) |
| Proceeds from sale of finance receivables, net | 3,921 | 3,254 |
| Gain on loan sales | (235) | (338) |
| Principal payments received on finance receivables held for sale | 113 | 78 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 333 | (926) |
| Accounts receivable | (29) | (111) |
| Other assets | (19) | (60) |
| Accounts payable and accrued liabilities | 122 | 216 |
| Operating lease right-of-use assets | (102) | (4) |
| Operating lease liabilities | 140 | 6 |
| Other liabilities | (6) | — |
| Net cash used in operating activities | (487) | (1,139) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (361) | (194) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of  beneficial interests | 25 | 20 |
| Net cash used in investing activities | (2,525) | (174) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 8,159 | 4,664 |
| Payments on short-term revolving facilities | (9,094) | (4,024) |
| Proceeds from issuance of long-term debt | 3,416 | 710 |
| Payments on long-term debt | (66) | (29) |
| Payments of debt issuance costs | (65) | (11) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 3 | 1 |
| Tax withholdings related to restricted stock units and awards | (7) | (17) |
| Net cash provided by financing activities | 3,573 | 1,294 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 561 | (19) |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,197 | $ 310 |

17

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| | **(in thousands)** | | | |
| Weighted-average shares of Class A common stock outstanding | 101,450 | 81,398 | 95,773 | 79,751 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock [1] | 84,798 | — | 84,798 | 91,731 |
| | 186,248 | 81,398 | 180,571 | 171,482 |

(1) For the three months ended June 30, 2021, the weighted-average as-exchanged LLC Units for shares of Class A common stock were considered dilutive and included in the weighted-average shares of Class A common stock - diluted amount of 176,015.

18

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

*Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation*

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically only been a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations.

A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net (loss) income, which is the most directly comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| (dollars in millions) | | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 | Jun 30, 2022 |
| Net (loss) income | $ | 45 | $ (68) | $ (182) | $ (506) | $ (439) |
| Income tax provision | | — | — | 1 | — | 1 |
| Interest expense | | 43 | 48 | 55 | 64 | 116 |
| Other (income) expense, net | | (6) | (3) | 22 | 13 | (3) |
| Depreciation and amortization expense | | 30 | 32 | 40 | 45 | 76 |
| CEO Milestone Gift in cost of sales | | — | — | — | 8 | 6 |
| CEO Milestone Gift in SG&A | | — | — | — | 20 | 4 |
| Adjusted EBITDA [1] | $ | 112 | $ 9 | $ (64) | $ (356) | $ (239) |
| Share-based compensation, excluding Gift | | 9 | 11 | 11 | 10 | 9 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [1] | $ | 121 | $ 20 | $ (53) | $ (346) | $ (230) |
| | | | | | | |
| Total revenues | $ | 3,336 | $ 3,480 | $ 3,753 | $ 3,497 | $ 3,884 |
| Adjusted EBITDA Margin [2] | | 3.4 % | 0.3 % | (1.7)% | (10.2)% | (6.2)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation [2] | | 3.6 % | 0.6 % | (1.4)% | (9.9)% | (5.9)% |

(1) For the three months ended June 30, 2022, includes $14 of expenses associated with the previously announced workforce reduction.
(2) For the three months ended June 30, 2022, includes 0.4% of expenses associated with the previously announced workforce reduction.

| (dollars in millions) | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Net loss | $(37) | $(93) | $(164) | $(255) | $(365) | $(462) | $(287) |
| Income tax provision | — | — | — | — | — | — | 1 |
| Interest expense | 1 | 3 | 7 | 25 | 81 | 131 | 176 |
| Other (income) expense, net | — | — | 1 | 1 | 4 | (1) | 6 |
| Depreciation and amortization expense | 3 | 5 | 12 | 24 | 41 | 74 | 129 |
| CEO Milestone Gift in cost of sales | — | — | — | 4 | 5 | 1 | — |
| CEO Milestone Gift in SG&A | — | — | — | 8 | 8 | — | — |
| Adjusted EBITDA | $(33) | $(85) | $(144) | $(193) | $(226) | $(257) | $25 |
| Share-based compensation, excluding Gift | — | — | 6 | 14 | 23 | 25 | 39 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(33) | $(85) | $(138) | $(179) | $(203) | $(232) | $64 |
| | | | | | | | |
| Total revenues | $130 | $365 | $859 | $1,955 | $3,940 | $5,587 | $12,814 |
| Adjusted EBITDA Margin | (25.0)% | (23.2)% | (16.8)% | (9.9)% | (5.7)% | (4.6)% | 0.2% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (25.0)% | (23.2)% | (16.1)% | (9.2)% | (5.2)% | (4.2)% | 0.5% |

| (dollars in millions) | Three Months Ended, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q2 14 | Q2 15 | Q2 16 | Q2 17 | Q2 18 | Q2 19 | Q2 20 | Q2 21 | Q2 22 |
| Net (loss) income | $(3) | $(8) | $(18) | $(39) | $(51) | $(64) | $(106) | $ 45 | $ (439) |
| Income tax provision | — | — | — | — | — | — | — | — | 1 |
| Interest expense | — | — | 1 | 3 | 4 | 19 | 20 | 43 | 116 |
| Other (income) expense, net | — | — | — | — | — | 1 | (3) | (6) | (3) |
| Depreciation and amortization | — | 1 | 1 | 3 | 5 | 9 | 18 | 30 | 76 |
| CEO Milestone Gift in cost of sales | — | — | — | — | — | 2 | — | — | 6 |
| CEO Milestone Gift in SG&A | — | — | — | — | — | 1 | — | — | 4 |
| Adjusted EBITDA | $(3) | $(7) | $(16) | $(33) | $(42) | $(32) | $(71) | $112 | $(239) |
| Share-based compensation, excluding Gift | — | — | — | 2 | 3 | 6 | 6 | 9 | 9 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(3) | $(7) | $(16) | $(31) | $(39) | $(26) | $(65) | $121 | $(230) |
| | | | | | | | | | |
| Total revenues | $9 | $29 | $87 | $209 | $475 | $986 | $1,118 | $3,336 | $3,884 |
| Adjusted EBITDA Margin | (25.6)% | (23.0)% | (18.9)% | (15.8)% | (8.8)% | (3.2)% | (6.4)% | 3.4% | (6.2)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (25.6)% | (23.0)% | (18.9)% | (14.8)% | (8.2)% | (2.6)% | (5.8)% | 3.6% | (5.9)% |

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2022** | **2021** | **Change** | **2022** | **2021** | **Change** |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | 18.3 % | $ 5,694 | $ 4,304 | 32.3 % |
| Wholesale sales and revenues [1] | 704 | 557 | 26.4 % | 1,279 | 797 | 60.5 % |
| Other sales and revenues [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total net sales and operating revenues | $ 3,884 | $ 3,336 | 16.4 % | $ 7,381 | $ 5,581 | 32.3 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 133 | $ 218 | (39.0)% | $ 218 | $ 330 | (33.9)% |
| Wholesale gross profit [1] | 45 | 59 | (23.7)% | 68 | 80 | (15.0)% |
| Other gross profit [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total gross profit | $ 396 | $ 552 | (28.3)% | $ 694 | $ 890 | (22.0)% |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 117,564 | 107,815 | 9.0 % | 222,749 | 200,272 | 11.2 % |
| Wholesale vehicle unit sales | 55,299 | 47,052 | 17.5 % | 105,579 | 73,092 | 44.4 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | 25,195 | 23,225 | 8.5 % | 25,562 | 21,491 | 18.9 % |
| Wholesale vehicles | 12,731 | 11,838 | 7.5 % | 12,114 | 10,904 | 11.1 % |
| **Per retail unit gross profit:** | | | | | | |
| Used vehicle gross profit [4] | $ 1,131 | $ 2,022 | (44.1)% | $ 979 | $ 1,648 | (40.6)% |
| Wholesale gross profit | 383 | 547 | (30.0)% | 305 | 399 | (23.6)% |
| Other gross profit | 1,854 | 2,551 | (27.3)% | 1,832 | 2,397 | (23.6)% |
| Total gross profit | $ 3,368 | $ 5,120 | (34.2)% | $ 3,116 | $ 4,444 | (29.9)% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit | $ 814 | $ 1,254 | (35.1)% | $ 644 | $ 1,095 | (41.2)% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 111,883 | $ — | NM | 111,883 | $ — | NM |
| Wholesale marketplace revenues [5] | $ 108 | $ — | NM | $ 108 | $ — | NM |
| Wholesale marketplace gross profit [5][6] | $ 5 | $ — | NM | $ 5 | $ — | NM |

(1) Includes $7, $16, $21 and $22, respectively, of wholesale revenue from related parties.
(2) Includes $50, $49, $98 and $91, respectively, of other sales and revenues from related parties.
(3) For the three and six months ended June 30, 2022, used vehicle gross profit includes $6 and $14, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) For the three and six months ended June 30, 2022, used vehicle per unit gross profit includes $51 and $63, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(5) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.
(6) Wholesale marketplace gross profit includes $15 of depreciation and amortization expense.
NM = Not meaningful

21

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 | Jun 30, 2022 |
| | (in millions) | | | | |
| Compensation and benefits (1) | $ 148 | $ 181 | $ 212 | $ 236 | $ 248 |
| CEO Milestone Gift (2) | — | — | — | 20 | 4 |
| Advertising | 119 | 126 | 134 | 155 | 131 |
| Market occupancy [3] | 15 | 18 | 24 | 23 | 24 |
| Logistics [4] | 34 | 40 | 44 | 56 | 71 |
| Other [5] | 154 | 181 | 206 | 237 | 243 |
| Total | $ 470 | $ 546 | $ 620 | $ 727 | $ 721 |
| Depreciation and amortization | 24 | 26 | 33 | 37 | 49 |
| Share-based compensation, excluding Gift | 9 | $ 11 | $ 11 | $ 10 | 9 |
| Total, excluding depreciation and amortization and share-based compensation | $ 437 | $ 509 | $ 576 | $ 660 | $ 659 |

---

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the CEO's gift of personal stock to employees upon the company's one millionth vehicle sold, except those costs related to preparing vehicles for sale, which are included in cost of sales.

(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

We had the following liquidity resources available as of June 30, 2022 and 2021:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Cash and cash equivalents | $    1,047 | $    403 |
| Availability under short-term revolving facilities [1] | 1,603 | 438 |
| **Committed liquidity resources available** | **$    2,650** | **$    841** |
| Unpledged vehicle inventory not included above[2] | — | 665 |
| Unpledged real estate not included above[3] | 1,972 | 677 |
| Unpledged beneficial interests in securitizations[4] | 124 | 100 |
| **Total liquidity resources[5]** | **$    4,746** | **$    2,283** |

_____

1.  Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date, excluding the impact to restricted cash requirements. This is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

2.  Unpledged vehicle inventory is the value of vehicle inventory on our balance sheet on the period end date beyond that covered by committed financing agreements. On February 1, 2022, we upsized our vehicle inventory floor plan commitment to $3.0 billion.

3.  Unpledged real estate assets include IRC, ADESA locations and vending machine real estate assets that have not been previously pledged or sold. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

4.  Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

5.  Total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities on our balance sheet that can be financed using traditional asset-based financing sources. To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.









CARVANA
CULTURE

Q2 | 2022







# Exhibit 26

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Quarterly Period Ended June 30, 2022

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission File Number: 001-38073

# CARVANA CO.
(Exact name of registrant as specified in its charter)

| **Delaware** | **81-4549921** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **1930 W. Rio Salado Parkway     Tempe     Arizona** | **85281** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(480) 719-8809**
(Registrant's telephone number, including area code)
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of August 1, 2022, the registrant had 105,802,327 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding.

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

|  |  | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
|  | Unaudited Condensed Consolidated Balance Sheets as of June 30, 2022 and December 31, 2021 | 1 |
|  | Unaudited Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2022 and 2021 | 2 |
|  | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three and Six Months Ended June 30, 2022 and 2021 | 3 |
|  | Unaudited Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2022 and 2021 | 5 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 56 |
| Item 4. | Controls and Procedures | 56 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 57 |
| Item 1A. | Risk Factors | 57 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 57 |
| Item 3. | Defaults Upon Senior Securities | 57 |
| Item 4. | Mine Safety Disclosures | 57 |
| Item 5. | Other Information | 57 |
| Item 6. | Exhibits | 58 |

PART I. FINANCIAL INFORMATION

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

|  | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 1,047 | $ | 403 |
| Restricted cash | | 150 | | 233 |
| Accounts receivable, net | | 428 | | 206 |
| Finance receivables held for sale, net | | 393 | | 356 |
| Vehicle inventory | | 2,865 | | 3,149 |
| Beneficial interests in securitizations | | 401 | | 382 |
| Other current assets, including $8 and $12, respectively, due from related parties | | 207 | | 163 |
| Total current assets | | 5,491 | | 4,892 |
| Property and equipment, net | | 3,261 | | 1,560 |
| Operating lease right-of-use assets, including $15 and $17, respectively, from leases with related parties | | 659 | | 369 |
| Intangible assets, net | | 82 | | 4 |
| Goodwill | | 847 | | 9 |
| Other assets, including $3 and $7, respectively, due from related parties | | 162 | | 181 |
| Total assets | $ | 10,502 | $ | 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable and accrued liabilities, including $24 and $27, respectively, due to related parties | $ | 981 | $ | 656 |
| Short-term revolving facilities | | 1,118 | | 2,053 |
| Current portion of long-term debt | | 212 | | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | | 57 | | 29 |
| Total current liabilities | | 2,368 | | 2,890 |
| Long-term debt, excluding current portion | | 6,605 | | 3,208 |
| Operating lease liabilities, excluding current portion, including $11 and $13, respectively, from leases with related parties | | 640 | | 361 |
| Other liabilities | | 25 | | 31 |
| Total liabilities | | 9,638 | | 6,490 |
| Commitments and contingencies (Note 17) | | | |
| Stockholders' equity: | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,789 and 89,930 shares issued and outstanding as of June 30, 2022 and December 31, 2021, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of June 30, 2022 and December 31, 2021 | | — | | — |
| Additional paid-in capital | | 1,526 | | 795 |
| Accumulated deficit | | (987) | | (489) |
| Total stockholders' equity attributable to Carvana Co. | | 539 | | 306 |
| Non-controlling interests | | 325 | | 219 |
| Total stockholders' equity | | 864 | | 525 |
| Total liabilities & stockholders' equity | $ | 10,502 | $ | 7,015 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Sales and operating revenues:** | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | $ 5,694 | $ 4,304 |
| Wholesale sales and revenues, including $7, $16, $21 and $22, respectively, from related parties | 704 | 557 | 1,279 | 797 |
| Other sales and revenues, including $50, $49, $98 and $91, respectively, from related parties | 218 | 275 | 408 | 480 |
| **Net sales and operating revenues** | 3,884 | 3,336 | 7,381 | 5,581 |
| Cost of sales, including $9, $3, $18 and $4, respectively, to related parties | 3,488 | 2,784 | 6,687 | 4,691 |
| **Gross profit** | 396 | 552 | 694 | 890 |
| Selling, general and administrative expenses, including $7, $6, $13 and $12, respectively, to related parties | 721 | 470 | 1,448 | 867 |
| Interest expense | 116 | 43 | 180 | 73 |
| Other (income) expense, net | (3) | (6) | 10 | (13) |
| **Net (loss) income before income taxes** | (438) | 45 | (944) | (37) |
| Income tax provision | 1 | — | 1 | — |
| **Net (loss) income** | (439) | 45 | (945) | (37) |
| Net (loss) income attributable to non-controlling interests | (201) | 23 | (447) | (23) |
| **Net (loss) income attributable to Carvana Co.** | $ (238) | $ 22 | $ (498) | $ (14) |
| | | | | |
| Net (loss) earnings per share of Class A common stock - basic | $ (2.35) | $ 0.27 | $ (5.20) | $ (0.18) |
| Net (loss) earnings per share of Class A common stock - diluted | $ (2.35) | $ 0.26 | $ (5.20) | $ (0.18) |
| | | | | |
| Weighted-average shares of Class A common stock - basic [1] | 101,450 | 81,398 | 95,773 | 79,751 |
| Weighted-average shares of Class A common stock - diluted | 101,450 | 176,015 | 95,773 | 79,751 |

(1) Weighted-average shares of Class A common stock - basic - outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2020** | 76,512 | $ — | 95,592 | $ — | $ 742 | $ (354) | $ 414 | $ 802 |
| Net loss | — | — | — | — | — | (36) | (46) | (82) |
| Exchanges of LLC Units | 3,247 | — | (3,073) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 225 | — | — | 225 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (225) | — | — | (225) |
| Issuance of Class A common stock to settle vested restricted stock units | 62 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (9) | — | — | (9) |
| Options exercised | 15 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 10 | — | — | 10 |
| **Balance, March 31, 2021** | 79,834 | $ — | 92,519 | $ — | $ 755 | $ (390) | $ 356 | $ 721 |
| Net income | — | — | — | — | — | 22 | 23 | 45 |
| Exchanges of LLC Units | 3,189 | — | (3,118) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 217 | — | — | 217 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (217) | — | — | (217) |
| Issuance of Class A common stock to settle vested restricted stock units | 59 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (8) | — | — | (8) |
| Options exercised | 26 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 11 | — | — | 11 |
| **Balance, June 30, 2021** | 83,106 | $ — | 89,401 | $ — | $ 771 | $ (368) | $ 367 | $ 770 |

3

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 89,930 | $  — | 82,900 | $  — | $  795 | $  (489) | $  219 | $  525 |
| Net loss | — | — | — | — | — | (260) | (246) | (506) |
| Exchanges of LLC Units | 27 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1 | — | — | 1 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1) | — | — | (1) |
| Contribution of Class A common stock from related party | (97) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 139 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (12) | — | — | (12) |
| Options exercised | 63 | — | — | — | 2 | — | — | 2 |
| Equity-based compensation | — | — | — | — | 43 | — | — | 43 |
| **Balance, March 31, 2022** | 90,062 | $  — | 82,900 | $  — | $  829 | $  (749) | $  (28) | $  52 |
| Net loss | — | — | — | — | — | (238) | (201) | (439) |
| Issuances of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 15,625 | — | — | — | 1,227 | — | — | 1,227 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (554) | — | 554 | — |
| Exchanges of LLC Units | 19 | — | — | — | — | — | — | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21 | — | — | 21 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21) | — | — | (21) |
| Contribution of Class A common stock from related party | (2) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 48 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 27 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | 5 | — | — | 5 |
| Options exercised | 10 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, June 30, 2022** | 105,789 | $  — | 82,900 | $  — | $  1,526 | $  (987) | $  325 | $  864 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (945) | $ (37) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 101 | 46 |
| Equity-based compensation expense | 42 | 18 |
| Loss on disposal of property and equipment | 2 | 1 |
| Provision for bad debt and valuation allowance | 8 | 6 |
| Amortization and write-off of debt issuance costs | 12 | 5 |
| Unrealized loss on warrants to acquire Root Class A common stock | 5 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 10 | (4) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (3,960) | (3,289) |
| Proceeds from sale of finance receivables, net | 3,921 | 3,254 |
| Gain on loan sales | (235) | (338) |
| Principal payments received on finance receivables held for sale | 113 | 78 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 333 | (926) |
| Accounts receivable | (29) | (111) |
| Other assets | (19) | (60) |
| Accounts payable and accrued liabilities | 122 | 216 |
| Operating lease right-of-use assets | (102) | (4) |
| Operating lease liabilities | 140 | 6 |
| Other liabilities | (6) | — |
| Net cash used in operating activities | (487) | (1,139) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (361) | (194) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 25 | 20 |
| Net cash used in investing activities | (2,525) | (174) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 8,159 | 4,664 |
| Payments on short-term revolving facilities | (9,094) | (4,024) |
| Proceeds from issuance of long-term debt | 3,416 | 710 |
| Payments on long-term debt | (66) | (29) |
| Payments of debt issuance costs | (65) | (11) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 3 | 1 |
| Tax withholdings related to restricted stock units and awards | (7) | (17) |
| Net cash provided by financing activities | 3,573 | 1,294 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 561 | (19) |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,197 | $ 310 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC") and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of June 30, 2022, Carvana Co. owned approximately 55.6% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity) owned the remaining 44.4%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K filed on February 24, 2022.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of June 30, 2022, results of operations and changes in stockholder's equity for the three and six months ended June 30, 2022 and 2021, and cash flows for the six months ended June 30, 2022 and 2021. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

6

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Liquidity**

Since inception, the Company has incurred losses, and expects to incur additional losses in the future as it continues to build inspection and reconditioning centers ("IRCs") and vending machines, serve more of the U.S. population, and enhance technology and software. Since March 31, 2022, the Company has completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion and issued a total of $3.275 billion in aggregate principal amount of 10.25% senior unsecured notes due 2030 (the "2030 Notes"). The Company used a portion of the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA, Inc. ("ADESA") and other ancillary transactions to occur in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes. In March 2022, the Company's forward flow partner committed to purchase a total of $5.0 billion of the Company's finance receivables through March 2023, and such facility had $3.2 billion of unused capacity as of June 30, 2022. In addition, the Company has a $3.0 billion floor plan facility effective through September 22, 2022 and $2.0 billion thereafter through March 31, 2023. Management believes that current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. ASU 2021-08 requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606 instead of being recorded at fair value. The Company early adopted ASU 2021-08 during the three months ended June 30, 2022, and it did not have a material effect on its condensed consolidated financial statements as there were no business combinations affected by the retrospective application to January 1, 2022.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Business**

On May 9, 2022, the Company completed its previously announced acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA from KAR Auction Services, Inc. ("KAR") for approximately $2.2 billion in cash. Proceeds from the issuance and sale of the 2030 Notes were used to fund the acquisition. The acquisition included 56 sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding the Company's infrastructure and enhancing its customer offering by facilitating a broader selection of vehicles and faster delivery times.

The following table summarizes the preliminary allocation of the purchase price consideration to identifiable assets acquired and liabilities assumed as of June 30, 2022:

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

| Assets Acquired | Preliminary Purchase Price Allocation (in millions) | |
|---|---|---|
| Current assets | $ | 208 |
| Property and equipment | | 1,281 |
| Operating lease right-of-use assets | | 188 |
| Intangible assets | | 79 |
| Other assets | | 1 |
| Total Assets Acquired | | 1,757 |
| | | |
| **Liabilities Assumed** | | |
| Current liabilities | | 233 |
| Operating lease liabilities | | 167 |
| Total Liabilities Assumed | | 400 |
| | | |
| **Net Assets Acquired** | | 1,357 |
| Purchase price consideration | | 2,195 |
| **Goodwill** | $ | 838 |

Identifiable intangible assets acquired consist of the following:

| | Fair Value | | Useful Life |
|---|---|---|---|
| Customer relationships | $ | 50 | 10 years |
| Developed technology | $ | 29 | 3 years |

Preliminary measurements of fair value are subject to change during the measurement period based on the Company's continuing review of matters related to the acquisition and could be material. The Company expects to complete the purchase price allocation as soon as practicable, but no later than one year from the acquisition date.

Customer relationships were valued using the multi-period excess earnings method of the income approach. Developed technology was valued using the replacement cost method of the cost approach. Significant assumptions used in the valuations were revenues and attrition rate and are classified as Level 3 due to the lack of observable market data. No residual values were assigned to the customer relationships and developed technology intangible assets and they are amortized on an economic useful life basis commensurate with future anticipated cash flows and straight line, respectively. The remaining weighted-average amortization period for the intangible assets acquired was approximately 7.1 years.

Real property was valued using market comparable transactions of the market approach, for which the key assumption is the similarity of the acquired property to market comparable transactions. Personal property was valued using the replacement cost method of the cost approach, for which the key assumptions are the costs of similar personal property in new condition and economic obsolescence rates.

The acquisition resulted in the recognition of $838 million of goodwill, which is deductible for tax purposes and represents the future economic benefits expected to arise from anticipated synergies and intangible assets that do not qualify for separate recognition, including an assembled workforce, non-contractual relationships and other agreements.

For the three months ended June 30, 2022, the Company recognized $108 million of wholesale sales and revenues, $103 million of cost of sales, and a net loss of $21 million from ADESA operations, which includes $20 million of depreciation and amortization, including acquired intangible assets amortization expense of $4 million.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following unaudited pro forma combined results of operations information for the three and six months ended June 30, 2022 and 2021 have been prepared as if the ADESA acquisition occurred on January 1, 2021:

| | | Unaudited | | | |
| | | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|
| | | (in millions) | | | |
| Revenues | $ | 3,968 $ | 3,560 $ | 7,680 $ | 6,036 |
| Net loss | | (485) | (11) | (1,075) | (167) |
| Net loss attributable to non-controlling interests | | (216) | (5) | (478) | (83) |
| Net loss attributable to Carvana Co. | $ | (269) $ | (6) $ | (597) $ | (84) |
| Net loss per share of Class A common stock - basic and diluted | $ | (2.54) $ | (0.06) $ | (5.65) $ | (0.88) |
| Weighted-average shares of Class A common stock - basic and diluted | | 105,743 | 97,064 | 105,731 | 95,428 |

The unaudited pro forma combined results of operations information reflect the following pro forma adjustments:

| | | Unaudited | | | |
| | | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|
| | | Increase/(Decrease) (in millions) | | | |
| Interest expense | $ | 36 $ | 86 $ | 123 $ | 173 |
| Lease expense | | 1 | (6) | 5 | (11) |
| Depreciation and amortization expense | | 7 | (1) | 13 | (4) |
| Intercompany revenues and cost of sales | $ | (2) $ | (5) $ | (7) $ | (10) |

The unaudited pro forma combined results of operations information is provided for informational purposes only and is not necessarily intended to represent the results that would have been achieved had the ADESA acquisition been consummated on January 1, 2021 or indicative of the results that may be achieved in the future.

## NOTE 4 — PROPERTY AND EQUIPMENT, NET

The following table summarizes property and equipment, net as of June 30, 2022 and December 31, 2021:

| | | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| | | (in millions) | | |
| Land and site improvements | $ | 1,297 | $ | 303 |
| Buildings and improvements | | 1,080 | | 643 |
| Transportation fleet | | 589 | | 347 |
| Software | | 204 | | 169 |
| Furniture, fixtures and equipment | | 166 | | 97 |
| Total property and equipment excluding construction in progress | | 3,336 | | 1,559 |
| Less: accumulated depreciation and amortization on property and equipment | | (410) | | (294) |
| Property and equipment excluding construction in progress, net | | 2,926 | | 1,265 |
| Construction in progress | | 335 | | 295 |
| Property and equipment, net | $ | 3,261 | $ | 1,560 |

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Depreciation and amortization expense on property and equipment was $85 million and $30 million for the three months ended June 30, 2022 and 2021, respectively, of which $45 million and $23 million were recorded to selling, general and administrative expense, respectively, $12 million and $7 million were capitalized to vehicle inventory, respectively, and $28 million and $5 million were recorded to cost of sales, respectively, including $11 million and $5 million previously capitalized to vehicle inventory.

Depreciation and amortization expense on property and equipment was $138 million and $57 million for the six months ended June 30, 2022 and 2021, respectively, of which $81 million and $45 million were recorded to selling, general and administrative expense, respectively, $21 million and $12 million were capitalized to vehicle inventory, respectively, and $36 million and $9 million were recorded to cost of sales, respectively, including $18 million and $9 million previously capitalized to vehicle inventory, respectively.

## NOTE 5 — GOODWILL AND INTANGIBLE ASSETS, NET

The following table summarizes goodwill and intangible assets, net as of June 30, 2022 and December 31, 2021:

| | June 30, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | (in millions) | | | |
| Intangible assets: | | | | |
| Customer relationships | $ | 50 | $ | — |
| Developed technology | | 41 | | 9 |
| Non-compete agreements | | 1 | | 1 |
| Intangible assets, acquired cost | | 92 | | 10 |
| Less: accumulated amortization | | (10) | | (6) |
| Intangible assets, net | $ | 82 | $ | 4 |
| | | | | |
| Goodwill | $ | 847 | $ | 9 |

Amortization expense was $4 million and less than $1 million during the three months ended June 30, 2022 and 2021 and $4 million and $1 million during the six months ended June 30, 2022 and 2021, respectively. As of June 30, 2022, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 6.5 years. The anticipated annual amortization expense to be recognized in future years as of June 30, 2022, is as follows:

| | Expected Future Amortization | |
|---|---|---|
| | (in millions) | |
| Remainder of 2022 | $ | 13 |
| 2023 | | 17 |
| 2024 | | 18 |
| 2025 | | 14 |
| 2026 | | 7 |
| Thereafter | | 13 |
| Total | $ | 82 |

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES**

The following table summarizes accounts payable and other accrued liabilities as of June 30, 2022 and December 31, 2021:

|  | June 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Accounts payable, including $24 and $27, respectively, due to related parties | $ 294 | $ 141 |
| Accrued compensation and benefits | 100 | 45 |
| Sales taxes and vehicle licenses and fees | 100 | 102 |
| Accrued interest expense | 90 | 42 |
| Reserve for returns and cancellations | 57 | 44 |
| Accrued property and equipment | 46 | 85 |
| Customer deposits | 37 | 34 |
| Accrued advertising costs | 36 | 40 |
| Other accrued liabilities | 221 | 123 |
| Total accounts payable and accrued liabilities | $ 981 | $ 656 |

**NOTE 7 — RELATED PARTY TRANSACTIONS**

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all of the interests in DriveTime, entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2024. The Company has the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2023 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations, the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco IRCs. At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia, where the Company previously maintained partial occupancy. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a sublease agreement from DriveTime of a fully operational IRC near Cleveland, Ohio. The lease has an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. In July 2021, the Company exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime effective October 1, 2021.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were $1 million during each of the three months ended June 30, 2022 and 2021, and $2 million and $3 million during the six months ended June 30, 2022 and 2021, respectively, allocated between inventory and selling, general and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. While the Company solely occupies the IRC, DriveTime is not fully released from the lease obligations by the landlord. The lease expires in October 2023, subject to the ability to exercise three renewal options of five years each.

**Corporate Office Leases**

In September 2016, the Company entered into a lease for the second floor of its corporate headquarters in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of the first floor of the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was less than $1 million during each of the three and six months ended June 30, 2022 and 2021.

In December 2019, Verde Investments, Inc. ("Verde"), a related party of the Company due to the Garcia Parties controlling and owning substantially all of the interests in Verde, purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was less than $1 million during each of the three and six months ended June 30, 2022 and 2021.

**Wholesale Revenue**

DriveTime purchases wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. The Company recognized $7 million and $16 million of wholesale sales and revenues from DriveTime during the three months ended June 30, 2022 and 2021, respectively, and $21 million and $22 million during the six months ended June 30, 2022 and 2021, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of June 30, 2022, $3 million related to vehicles and reconditioning services were included in vehicle inventory in the accompanying unaudited condensed consolidated balance sheets. The Company also recognized $9 million and $2 million of

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

cost of goods sold during the three months ended June 30, 2022 and 2021, respectively, and $18 million and $2 million during the six months ended June 30, 2022 and 2021, respectively.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended June 30, 2022 and 2021, the Company recognized $49 million and $45 million, respectively, and during the six months ended June 30, 2022 and 2021, the Company recognized approximately $96 million and $83 million, respectively of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. The Company recognized $1 million and $4 million during the three months ended June 30, 2022 and 2021, respectively, and approximately $2 million and $8 million during the six months ended June 30, 2022 and 2021, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated party. The Company incurred $5 million and $3 million during the three months ended June 30, 2022 and 2021, respectively, and approximately $9 million and $6 million during the six months ended June 30, 2022 and 2021, respectively, related to the administration of limited warranty and GAP waiver coverage.

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of $2 million and $1 million during the three months ended June 30, 2022 and 2021, respectively, and approximately $4 million and $3 million during the six months ended June 30, 2022 and 2021, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million under this agreement during each of the three and six months ended June 30, 2022 and 2021.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the three and six months ended June 30, 2022 and 2021.

**Accounts Payable Due to Related Party**

As of June 30, 2022 and December 31, 2021, $24 million and $27 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contributions of Class A Common Shares From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in Q4 2021, the Company's CEO, Ernie Garcia III ("Mr. Garcia"), committed to giving current employees 23 shares of Class A common stock from his personal shareholdings once they reach their two-year employment anniversary ("CEO Milestone Gift" or "Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia will contribute to the Company, at the end of each fiscal quarter, the number of shares of its Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund restricted stock unit awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the three and six months ended June 30, 2022, 1,771 and 99,107 RSUs, respectively, vested and were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has indemnified Mr. Garcia from any such obligations that may arise.

**NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2021 and 2022, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. On each of March 17, 2022 and March 22, 2022, the Ally Parties amended the MPSA to, in aggregate, extend the scheduled commitment termination date to March 21, 2023 and increase the Ally Parties' commitment to purchase finance receivables to $5.0 billion, an increase of $1.0 billion from the previous commitment.

During the three months ended June 30, 2022 and 2021, the Company sold $1.3 billion and $597 million, respectively, in principal balances of finance receivables under the MPSA. During the six months ended June 30, 2022 and 2021, the Company sold $1.8 billion and $1.1 billion, respectively, in principal balances of finance receivables under the MPSA and had $3.2 billion of unused capacity as of June 30, 2022.

**Securitization Transactions**

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain

14

or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Risk Retention Rules, as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the three months ended June 30, 2022 and 2021, the Company sold $605 million and $1.2 billion, respectively, in principal balances of finance receivables through securitization transactions. During each of the six months ended June 30, 2022 and 2021, the Company sold approximately $2.0 billion in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was $130 million and $200 million during the three months ended June 30, 2022 and 2021, respectively, and $235 million and $338 million during the six months ended June 30, 2022 and 2021, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of June 30, 2022, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets, which as of June 30, 2022 and December 31, 2021 were $401 million and $382 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of June 30, 2022 and December 31, 2021.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at June 30, 2022 and December 31, 2021. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

| | June 30, 2022 | | December 31, 2021 | |
| | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| Rated notes | $ 300 | $ 300 | $ 282 | $ 282 |
| Certificates and other assets | 101 | 101 | 100 | 100 |
| Total unconsolidated VIEs | $ 401 | $ 401 | $ 382 | $ 382 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of June 30, 2022 and December 31, 2021 were as follows:

| | June 30, 2022 | | December 31, 2021 | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| Rated notes | $ 314 | $ 300 | $ 282 | $ 282 |
| Certificates and other assets | 97 | 101 | 93 | 100 |
| Total securities available for sale | $ 411 | $ 401 | $ 375 | $ 382 |

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 10 — DEBT INSTRUMENTS

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of June 30, 2022 and December 31, 2021 consisted of the following:

|  | June 30, 2022 | | December 31, 2021 |
|---|---|---|---|
|  | (in millions) | | |
| Asset-based financing: | | | |
| Floor plan facility | $ | 1,118 | $ | 1,877 |
| Finance receivable facilities | | — | | 176 |
| Financing of beneficial interest in securitizations | | 314 | | 282 |
| Notes payable | | 7 | | 10 |
| Real estate financing | | 486 | | 447 |
| Total asset-based financing | | 1,925 | | 2,792 |
| Senior notes | | 5,725 | | 2,450 |
| Total debt | | 7,650 | | 5,242 |
| Less: current portion | | (1,236) | | (2,154) |
| Less: unamortized debt issuance costs [1] | | (88) | | (34) |
| Total included in long-term debt, net | $ | 6,326 | $ | 3,054 |

(1) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying condensed consolidated balance sheets and not included here.

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company has a floor plan facility with a lender to finance its used vehicle inventory (the "Floor Plan Facility"), which is secured by the Company's vehicles, general intangibles, accounts receivable, and finance receivables. Under the Floor Plan Facility, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 180 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facility and subsequently reborrow such amounts. The Floor Plan Facility also requires monthly interest payments and that at least 7.5% of the total principal amount owed to the lender is held as restricted cash.

Effective October 1, 2020, the Company amended the Floor Plan Facility to increase the line of credit to $1.25 billion, reduce the interest rate to one-month LIBOR plus 3.15% and extend the maturity date to March 31, 2023. Effective March 1, 2021, the interest rate was reduced to one-month LIBOR plus 2.65%. Effective July 1, 2021, the line of credit was increased to $1.75 billion, and the LIBOR-based interest rate was amended to a substantially similar rate tied to a prime rate minus 0.50%, in advance of the cessation of LIBOR. Effective December 1, 2021, the line of credit was increased to $2.25 billion. Effective February 1, 2022, the Company amended its Floor Plan Facility to increase the line of credit to $3.0 billion through September 22, 2022. The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter.

As of June 30, 2022 and December 31, 2021, the Company had $1.1 billion and $1.9 billion, respectively, outstanding under this facility, unused capacity of $1.9 billion and $373 million, respectively, and held $84 million and $141 million,

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

respectively, in restricted cash related to this facility. During the three months ended June 30, 2022, the Company's effective interest rate on this facility was approximately 3.31%. For the year ended December 31, 2021, the Company's effective interest rate on this facility was approximately 2.55%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility, which was subsequently increased to $500 million, to fund certain automotive finance receivables originated by the Company. In June 2021, the Company amended its agreement to, among other things, extend the maturity date to January 24, 2023.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million, and extend the maturity date to December 8, 2023.

On April 30, 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until October 30, 2022. In December 2021, the Company amended its agreement to, among other things, increase this line of credit to $600 million.

On October 15, 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until April 15, 2023.

On March 18, 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until September 18, 2023.

The facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The facilities require monthly payments of interest and fees based on usage and unused facility amounts. The facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of June 30, 2022 and December 31, 2021, the Company had zero and $176 million, respectively, outstanding under these facilities, unused capacity of $2.6 billion and $1.9 billion, respectively, and held $33 million and $67 million, respectively, in restricted cash related to these facilities. During the three months ended June 30, 2022, the Company's effective interest rate on these facilities was approximately 2.58%. For the year ended December 31, 2021, the Company's effective interest rate on these facilities was approximately 1.64%.

**Long-Term Debt**

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (collectively, the "Senior Notes") each under a separate indenture (collectively, the "Indentures"), as further described below.

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes components of the Company's senior unsecured notes:

| | June 30, 2022 | | December 31, 2021 | Interest Rate |
|---|---|---|---|---|
| | | (in millions, except percentages) | | |
| 2025 Senior Unsecured Notes due October 1, 2025 ("2025 Notes") | $ 500 | $ | 500 | 5.625 % |
| 2027 Senior Unsecured Notes due April 15, 2027 ("2027 Notes") | 600 | | 600 | 5.500 % |
| 2028 Senior Unsecured Notes due October 1, 2028 ("2028 Notes") | 600 | | 600 | 5.875 % |
| 2029 Senior Unsecured Notes due September 1, 2029 ("2029 Notes") | 750 | | 750 | 4.875 % |
| 2030 Senior Unsecured Notes due May 1, 2030 ("2030 Notes") | 3,275 | | — | 10.250 % |
| Total principal amount | 5,725 | | 2,450 | |
| Less: unamortized debt issuance cost | (82) | | (28) | |
| Total debt | $ 5,643 | $ | 2,422 | |

Each of the 2025 Notes, the 2027 Notes, the 2028 Notes and the 2029 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The 2030 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee. The interest on each of the Senior Notes is payable semi-annually, beginning on March 1, 2022 for the 2029 Notes, October 15, 2021 for the 2027 Notes, April 1, 2021 for the 2025 Notes and 2028 Notes, and November 1, 2022 for the 2030 Notes. The Senior Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, or immaterial subsidiaries).

The Company may redeem some or all of each issuance of Senior Notes at redemption prices set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to those redemption dates, the Company may redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. With respect to the 2030 Notes, the Company may, at its option, redeem in the aggregate of up to 10% of the original aggregate principal amount of the 2030 Notes during the period from, and including, May 1, 2025 to, but excluding May 1, 2027, at a redemption price equal to 105.125% of the 2030 Notes to be redeemed, plus accrued and unpaid interest thereon to the relevant redemption rate. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to its redemption date, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if any of the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of June 30, 2022 and December 31, 2021, the outstanding principal of these notes had a weighted-average interest rate of 6.7% and 6.4%, respectively, and totaled $7 million and $10 million, respectively, net of unamortized debt issuance costs, of which $6 million and $7 million as of June 30, 2022 and December 31, 2021, respectively, was due within the next twelve

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of June 30, 2022, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of June 30, 2022 and December 31, 2021, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was $483 million and $444 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of June 30, 2022 and December 31, 2021, the Company has pledged $314 million and $282 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from July 2024 to September 2028. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was $311 million and $279 million as of June 30, 2022 and December 31, 2021, respectively, of which $112 million and $93 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

As of June 30, 2022, the Company was in compliance with all debt covenants.

**NOTE 11 — STOCKHOLDERS' EQUITY**

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock, determined on an as-exchanged basis, assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub, LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of June 30, 2022 and December 31, 2021, there were 236 million and 216 million Class A Units, and 2 million and 3 million Class B Units, respectively, (as adjusted for the participation thresholds and closing price of Class A common stock on June 30, 2022 and December 31, 2021), issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 26, 2022, the Company completed a public offering of 15.625 million shares of its Class A common stock for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5.4 million shares of the Class A common stock offered at the public offering price. The Company used the net proceeds to purchase 19.5 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended June 30, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 4 million LLC Units and zero and 3 million shares of Class B common stock for less than 1 million and 3 million newly-issued shares of Class A common stock, respectively. During the six months ended June 30, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 8 million LLC Units and zero and 6 million shares of Class B common stock for less than 1 million and 6 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received less than 1 million and 4 million LLC Units during the three months ended June 30, 2022 and 2021, respectively, and less than 1 million and 8 million LLC Units during the six months ended June 30, 2022 and 2021, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes. On August 16, 2021, Carvana Group LLC issued 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes. On May 6, 2022, Carvana Group LLC issued 3.3 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2030 Notes. Carvana Co. used its net proceeds from the 2023 Notes, the 2025 and 2028 Notes, the 2027 Notes, the 2029 Notes and the 2030 Notes, to purchase 0.6 million, 1.1 million, 0.6 million, 0.8 million, and 3.3 million, respectively, of Class A Non-Convertible Preferred Units.

When Carvana Co. makes payments on the Senior Notes, Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired.

**NOTE 12 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the six months ended June 30, 2022 and 2021, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of $1 million and $24 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity. During the six months ended June 30, 2022, Carvana Co. utilized its net proceeds from its equity offering to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by $554 million, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of June 30, 2022, Carvana Co. owned approximately 55.6% of Carvana Group with the LLC Unitholders owning the remaining 44.4%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in millions) | |
| Transfers from (to) non-controlling interests: | | |
| Decrease as a result of issuances of Class A common stock | $ (554) | $ — |
| Increase as a result of exchanges of LLC Units | 1 | 24 |
| Total transfers from (to) non-controlling interests | $ (553) | $ 24 |

**NOTE 13 — EQUITY-BASED COMPENSATION**

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the three and six months ended June 30, 2022 and 2021 is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions) | | | |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | $ 8 | $ 8 | $ 17 | $ 15 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | 6 | — | 37 | — |
| Options | 4 | 2 | 7 | 5 |
| Class A Units | — | 1 | — | 1 |
| Total equity-based compensation | 18 | 11 | 61 | 21 |
| Equity-based compensation capitalized to property and equipment | (2) | (1) | (4) | (3) |
| Equity-based compensation capitalized to inventory | (2) | — | (15) | — |
| Equity-based compensation, net of capitalized amounts | $ 14 | $ 10 | $ 42 | $ 18 |

As of June 30, 2022, the total unrecognized compensation related to outstanding equity awards was $210 million, which the Company expects to recognize over a weighted-average period of approximately 3.4 years. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14 million shares of Class A common stock are available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other stock-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company, other than equity granted in relation to the CEO Milestone Gift, vests over four year periods based on continued employment with the Company. As of June 30, 2022, approximately 8 million shares remain available for future equity-based award grants under this plan.

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to maximums that may vary between

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

$10,000 and $25,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP.

As of June 30, 2022, the Company issued 27,462 shares of Class A common stock and 470,044 shares remained available for future issuance. The per share price of shares purchased on June 30, 2022 was $20.32 and the per share discount from market value for shares purchased was $2.26. During the three and six months ended June 30, 2022, the Company incurred less than $1 million of equity-based compensation expense related to the ESPP.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and six months ended June 30, 2022 or 2021. As of June 30, 2022, outstanding Class B Units had participation thresholds between $0.00 to $12.00. During the three and six months ended June 30, 2022 and 2021, the Company incurred less than $1 million of equity-based compensation expense related to the Class B Units.

**NOTE 14 — NET (LOSS) EARNINGS PER SHARE**

Basic and diluted net (loss) earnings per share is computed by dividing the net (loss) earnings attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net (loss) earnings per share is computed by giving effect to all potentially dilutive shares. For the three and six months ended June 30, 2022 and the six months ended June 30, 2021, potentially dilutive shares are excluded from diluted net (loss) earnings per share because they have an anti-dilutive impact. Net (loss) earnings for all periods presented is attributable only to Class A
common stockholders, due to no activity related to convertible preferred stock during those periods.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net (loss) earnings per share during the three and six months ended June 30, 2022 and 2021:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions, except number of shares, which are reflected in thousands, and per share amounts) | | | |
| **Numerator:** | | | | |
| Net (loss) income attributable to Carvana Co. - basic | $ (238) | $ 22 | $ (498) | $ (14) |
| Income impact of assumed conversions from LLC Units | — | 23 | — | — |
| Net (loss) income attributable to Carvana Co. - diluted | $ (238) | $ 45 | $ (498) | $ (14) |
| | | | | |
| **Denominator:** | | | | |
| Weighted-average shares of Class A common stock outstanding | 101,450 | 81,439 | 95,773 | 79,795 |
| Nonvested weighted-average restricted stock awards | — | (41) | — | (44) |
| Weighted-average shares of Class A common stock - basic | 101,450 | 81,398 | 95,773 | 79,751 |
| Dilutive potential Class A common shares: | | | | |
| Options [1] | — | 835 | — | — |
| Restricted Stock Units and Awards [1] | — | 420 | — | — |
| Class A Units [2] | — | 91,078 | — | — |
| Class B Units [2] | — | 2,284 | — | — |
| Weighted-average shares of Class A common stock outstanding - diluted | 101,450 | 176,015 | 95,773 | 79,751 |
| | | | | |
| Net (loss) earnings per share of Class A common stock - basic | $ (2.35) | $ 0.27 | $ (5.20) | $ (0.18) |
| Net (loss) earnings per share of Class A common stock - diluted | $ (2.35) | $ 0.26 | $ (5.20) | $ (0.18) |

(1) Calculated using the treasury stock method, if dilutive
(2) Calculated using the if-converted method, if dilutive

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net (loss) earnings per share of Class B common stock under the two-class method has not been presented.

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net (loss) earnings per share of Class A common stock for the three and six months ended June 30, 2022 and 2021.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in thousands) | | | |
| Options [1] | 1,281 | 97 | 1,281 | 1,124 |
| Restricted Stock Units and Awards [1] | 74 | 27 | 74 | 654 |
| Class A Units [2] | 82,963 | — | 82,963 | 89,483 |
| Class B Units [2] | 1,835 | — | 1,835 | 2,248 |

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.
(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state, and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 11 — Stockholders' Equity, the Company acquired less than 1 million and 4 million LLC Units during the three months ended June 30, 2022 and 2021, respectively, and 1 million and 8 million LLC Units during the six months ended June 30, 2022 and 2021, respectively, in connection with exchanges with LLC Unitholders. During the three months ended June 30, 2022 and 2021, the Company recorded a gross deferred tax asset of $1 million and $217 million, respectively, and during the six months ended June 30, 2022 and 2021, the Company recorded a gross deferred tax asset of $1 million and $442 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 11 — Stockholders' Equity, the Company issued 15.625 million shares of its Class A common stock and received net proceeds from the offering of $1.2 billion. The Company utilized the proceeds to purchase 19.5 million newly issued Class A units in Carvana Group. The Company recognized a gross deferred tax asset of $20 million from the offering, associated with a portion of the basis difference resulting from this purchase of Carvana Group units, which is reflected as an increase to addition paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 5 — Goodwill and Intangible Assets, Net, the Company acquired various intangible assets in connection with the acquisition of Car360 in 2018. As a result, the Company recognized a deferred tax liability of $2 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheets. The deferred tax liability will be amortized over five to seven years and less than $1 million was amortized during each of the six months ended June 30, 2022 and 2021.

During the six months ended June 30, 2022, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient negative evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of June 30, 2022 and December 31, 2021, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the three months ended June 30, 2022 and 2021 was an expense of 0.1% and an expense of 0.3%, respectively, and for the six months ended June 30, 2022 and 2021 was an expense of 0.2% and an expense of 0.1%, respectively, related to its wholly-owned subsidiaries.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of June 30, 2022, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of June 30, 2022, the total unrecorded TRA liability is $1.6 billion. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 16 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

### Operating Leases

As of June 30, 2022, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2022 and 2038. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

### Finance Leases

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and six months ended June 30, 2022 and 2021 were as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | | 2022 | | 2021 | |
| | (in millions) | | | | | | | |
| **Lease costs:** | | | | | | | | |
| Finance leases: | | | | | | | | |
| Amortization of finance lease assets | $ | 24 | $ | 8 | $ | 41 | $ | 15 |
| Interest obligations under finance leases | | 5 | | 1 | | 8 | | 3 |
| Total finance lease costs | $ | 29 | $ | 9 | $ | 49 | $ | 18 |
| | | | | | | | | |
| Operating leases: | | | | | | | | |
| Fixed lease costs to non-related parties | $ | 27 | $ | 11 | $ | 52 | $ | 21 |
| Fixed lease costs to related parties | | 1 | | 2 | | 2 | | 3 |
| Total operating lease costs | $ | 28 | $ | 13 | $ | 54 | $ | 24 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | | | | | |
| Operating lease liabilities to non-related parties | | | | | $ | 32 | $ | 15 |
| Operating lease liabilities to related parties | | | | | $ | 1 | $ | 2 |
| Interest payments on finance lease liabilities | | | | | $ | 8 | $ | 3 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | | | | | |
| Principal payments on finance lease liabilities | | | | | $ | 65 | $ | 22 |

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of June 30, 2022:

| | Finance Leases | Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| | | | | (in millions) | |
| Remainder of 2022 | $ 58 | $ 2 | $ 45 | $ 47 | $ 105 |
| 2023 | 104 | 5 | 95 | 100 | 204 |
| 2024 | 93 | 3 | 103 | 106 | 199 |
| 2025 | 79 | 2 | 107 | 109 | 188 |
| 2026 | 60 | 2 | 105 | 107 | 167 |
| Thereafter | 23 | 4 | 483 | 487 | 510 |
| Total minimum lease payments | 417 | 18 | 938 | 956 | 1,373 |
| Less: amount representing interest | (44) | (3) | (260) | (263) | (307) |
| Total lease liabilities | $ 373 | $ 15 | $ 678 | $ 693 | $ 1,066 |

(Operating Leases [1] spans Related Party [2], Non-Related Party, and Total Operating columns)

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of June 30, 2022 and December 31, 2021, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of June 30, 2022 and 2021 were as follows, excluding short-term operating leases:

| | As of June 30, | |
|---|---|---|
| | 2022 | 2021 |
| **Weighted-average remaining lease terms (years)** | | |
| Operating leases | 8.9 | 9.2 |
| Finance leases | 4.5 | 4.4 |
| **Weighted-average discount rate** | | |
| Operating leases | 7.0 % | 8.2 % |
| Finance leases | 5.5 % | 5.3 % |

**NOTE 17 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each used vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was $27 million and $16 million as of June 30, 2022 and December 31, 2021, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Purchase Obligations**

The Company has purchase obligations for certain customary services related to operating a wholesale auction business of $181 million in aggregate over the next seven years, as of June 30, 2022. These purchase obligations are recorded as liabilities when the services are rendered.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, the Company does not believe that the ultimate resolution of these actions will have a material adverse effect on its financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies in its most recent Annual Report on Form 10-K.

The following tables are a summary of fair value measurements and hierarchy level at June 30, 2022 and December 31, 2021:

| | June 30, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 1,009 | $ 1,009 | $ — | $ — |
| Beneficial interests in securitizations | 401 | — | — | 401 |
| | December 31, 2021 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 154 | $ 154 | $ — | $ — |
| Beneficial interests in securitizations | 382 | — | — | 382 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of June 30, 2022 and December 31, 2021, the Company has purchase price adjustment receivables of $36 million and $34 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company

31

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of $3 million and $6 million during the three months ended June 30, 2022 and 2021, respectively, and a gain of approximately $6 million and $14 million during the six months ended June 30, 2022 and 2021, respectively, and are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of June 30, 2022 and December 31, 2021, the discount rates were 4.5% to 10.0% and 1.1% to 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers into or out of Level 3 during the three and six months ended June 30, 2022 or 2021.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that meet the criteria for sale set forth in the Risk Retention Rules. For the three and six months ended June 30, 2022, the Company sold beneficial interests in securitizations for a purchase price totaling $2 million and $3 million, respectively.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and six months ended June 30, 2022 and 2021:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| | | (in millions) | | |
| **Opening Balance** | $ 416 | $ 177 | $ 382 | $ 131 |
| Received in securitization transactions | 37 | 80 | 124 | 137 |
| Cash receipts | (50) | (20) | (92) | (33) |
| Change in fair value | — | 2 | (10) | 4 |
| Sales of beneficial interests | (2) | — | (3) | — |
| **Ending Balance** | $ 401 | $ 239 | $ 401 | $ 239 |

32

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended June 30, 2022 and December 31, 2021. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of June 30, 2022 and December 31, 2021 was as follows:

| | June 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Carrying value, net of unamortized debt issuance costs | $ 5,643 | $ 2,422 |
| Fair value | 4,207 | 2,411 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of June 30, 2022 and December 31, 2021 were as follows:

| | June 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Carrying value | $ 393 | $ 356 |
| Fair value | 419 | 392 |

**Investment in Equity Securities**

During October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to the accounting standards and recorded the investment at its cost of $126 million which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of its investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of its investment in Root, as there have not been changes in the observable price of its equity interest through June 30, 2022.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products will be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "warrants"). One tranche consisting of 42 million warrants vests either upon the earlier of product integration or 18 months, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Company's e-commerce platform, which are expected to begin during the second half of 2022. The Company used a Monte Carlo simulation to estimate the fair value of these warrants, which are classified as Level 3. At contract inception the Company recognized an asset of $30 million for the warrants and deferred revenue, classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets.

33

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents changes in the Company's Level 3 warrants measured at fair value:

|  | 2022 |
| --- | --- |
|  | (in millions) |
| Balance at December 31, 2021 | $ 6 |
| Total unrealized loss [1] | (5) |
| Balance at June 30, 2022 | $ 1 |

(1) The Company recognized the decrease in fair value in relation to the warrants to acquire Class A common stock through other expense (income), net in the accompanying consolidated statements of operations.

**Derivative Instruments**

As of June 30, 2022 and December 31, 2021, the Company had no other outstanding derivative instruments.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the six months ended June 30, 2022 and 2021:

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2022 | 2021 |
|  | (in millions) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 129 | $ 61 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 49 | $ 37 |
| Property and equipment acquired under finance leases | $ 232 | $ 53 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 321 | $ 16 |
| Equity-based compensation expense capitalized to property and equipment | $ 4 | $ 3 |
| Fair value of beneficial interests received in securitization transactions | $ 124 | $ 137 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 70 | $ 13 |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

|  | June 30, 2022 | December 31, 2021 | June 30, 2021 |
| --- | --- | --- | --- |
|  | (in millions) | | |
| Cash and cash equivalents | $ 1,047 | $ 403 | $ 201 |
| Restricted cash [1] | 150 | 233 | 109 |
| Total cash, cash equivalents and restricted cash | $ 1,197 | $ 636 | $ 310 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities. Refer to Note 10 — Debt Instruments for additional information. Remaining restricted cash represents certain cash held for corporate insurance purposes.

34

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Part I, Item 1 of this Form 10-Q.*

**Overview**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a used vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- *Purchase a used vehicle.*   As of June 30, 2022, we listed approximately 78,900 total units on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling used vehicles to retail customers is the primary driver of our business. Selling used vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, and trade-ins.

- *Finance their purchase.*   Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we generally earn a premium upon sale.

- *Protect their purchase.*   Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate.

- *Sell us their car.*   We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- *Vehicle acquisition.*   We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to

35

determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- *Inspection and reconditioning.*    Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to an inspection and reconditioning center ("IRC"), at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- *Photography and merchandising.*    To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs to better ensure a consistent customer experience.

- *Transportation and fulfillment.*    Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles nationwide. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs, and when a vehicle is sold, it is delivered directly to the customer or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

### COVID-19 Update

We have experienced and may continue to experience ongoing effects from the novel coronavirus ("COVID-19") pandemic, including the Omicron variant, such as production or other operational constraints that may negatively impact our operations and costs. However, we believe we have been relatively successful in navigating the impact of COVID-19 on our business to date and believe our business model positions us well to scale up and down to meet expected customer demand during and after the COVID-19 pandemic. We continue to evaluate the nature and extent of the impact to our business and our results of operations and financial condition as conditions evolve as a result of the COVID-19 pandemic.

### Used Vehicle Unit Sales

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the six months ended June 30, 2022, the number of vehicles we sold to retail customers

36

grew by 11.2% to 222,749 compared to 200,272 in the six months ended June 30, 2021. We expect our used vehicle sales to grow in future periods with increased penetration in our current markets and expansion into new markets.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, the sale of GAP waiver coverage, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer free home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings, resulting in serving more of the U.S. population, in each of the past nine years. Our market openings increased the total percentage of the U.S. population served to 81.1% in 315 markets as of June 30, 2022 from 79.4% in 299 markets as of June 30, 2021. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. We continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, wholesale sales of vehicles we acquire from customers, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $3.0 billion and $2.5 billion during the three months ended June 30, 2022 and 2021, respectively, and $5.7 billion and $4.3 billion during the six months ended June 30, 2022 and 2021, respectively. As we increase penetration in existing markets and expand to new ones, we expect used vehicle sales to increase

37

along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales and revenues, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $704 million and $557 million during the three months ended June 30, 2022 and 2021, respectively, and $1.3 billion and $797 million during the six months ended June 30, 2022 and 2021, respectively. We expect wholesale sales to increase with retail units sold through trade-ins and as we expand our program of acquiring vehicles from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

On May 9, 2022, we completed our acquisition of the U.S. physical auction business of ADESA from KAR. We have included revenue earned from the sale of wholesale marketplace units by non-Carvana sellers through our wholesale marketplace platform, including auction fees and related services revenue, in wholesale sales and revenues from the date of acquisition. We generate a gross profit on wholesale marketplace units from the difference between the revenue earned from the sale of wholesale marketplace units through our wholesale marketplace platform less our cost of sales associated with operating the wholesale marketplace platform.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commission on VSCs and sales of GAP waiver coverage totaled $218 million and $275 million during the three months ended June 30, 2022 and 2021, respectively, and $408 million and $480 million during the six months ended June 30, 2022 and 2021, respectively. We expect other sales and revenues to increase with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During our growth phase, our highest priority outside of safety will continue to be providing exceptional customer experiences, increasing our brand awareness and efficiently building an infrastructure to support growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* We plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

- *Reduce average days to sale.* Our goal is generally to increase our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our 17 existing IRCs, which collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization. We also intend to use capacity in the facilities acquired as part of the ADESA acquisition.

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs or other sites after acquisition from customers or wholesale auctions.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

38

- ***Increase monetization of our finance receivables.*** We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- ***Optimize purchasing and pricing.*** We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

### Seasonality

Used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns to date have not reflected the general seasonality of the used vehicle industry, but we expect this to change once our business and markets mature. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19, which may not fully reflect the underlying performance of our business.

### Investment in Growth

We have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. We anticipate that our operating expenses will increase substantially as we continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

### Relationship with Related Parties

For discussion about our relationship with related parties, refer to Note 7 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

### Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S.

population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2022** | **2021** | **2022** | **2021** |
| Retail units sold | 117,564 | 107,815 | 222,749 | 200,272 |
| Population coverage | 81.1 % | 79.4 % | 81.1 % | 79.4 % |
| Average monthly unique visitors (in thousands) | 23,547 | 16,590 | 24,138 | 14,912 |
| Number of IRCs [1] | 17 | 13 | 17 | 13 |
| Total website units | 78,910 | 45,822 | 78,910 | 45,822 |
| Total gross profit per unit [2] | $ 3,368 | $ 5,120 | $ 3,116 | $ 4,444 |

(1) Excludes IRCs acquired through the acquisition of ADESA.
(2) Includes $51, $0, $63, and $0, respectively, related to the CEO Milestone Gift.

### *Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

### *Population Coverage*

We previously reported number of markets as a key operating metric. As we have continued to grow, the population covered by these markets is increasingly a more important driver of our growth than the number of markets we serve. We define a market as a metropolitan area in which we have commenced local advertising and generally offer free home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. We view the growth in population we serve as a key driver of our growth. As we increase our population coverage, the number of consumers who have access to our fully integrated customer experience increases, which in turn helps increase the number of vehicles we sell.

### *Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

### *Number of IRCs*

As we continue to grow, our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale over the past three years. We define the number of IRCs as the number of owned or leased IRCs in which Carvana employees perform our 150-point inspection and recondition vehicles to "Carvana Certified" standards before sale to customers. As we scale, we intend to more fully utilize the capacity in our existing 17 IRCs, which, as of June 30, 2022, collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization. As we increase our number of IRCs, we increase this capacity to inspect and recondition vehicles, which in turn increases the number of vehicles we can sell. With the acquisition of ADESA, we have added 56 locations that currently have the physical capacity to produce an additional 0.2 million units per year when fully staffed with

40

limited real estate improvements. Number of IRCs excludes any IRCs or potential IRCs acquired through the acquisition of ADESA.

### Total Website Units

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

### Total Gross Profit per Unit

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of the used vehicle, gains on the sales of loans originated to finance the vehicle, commissions on sales of VSCs, revenue from GAP waiver coverage, and gross profit generated from wholesale sales of vehicles.

### Components of Results of Operations

### Used Vehicle Sales

Used vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from used vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting used vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of used vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. Absent the impact of COVID-19, on a quarterly basis, the number of used vehicles we sell is also affected by seasonality, with demand for used vehicles reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of used vehicle sales expected to occur in the fourth calendar quarter. The impact of COVID-19 and related stimulus payments and labor impacts on seasonality is uncertain.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

### Wholesale Sales and Revenues

Wholesale sales and revenues includes the aggregate proceeds we receive on vehicles we acquire and sell to wholesalers, and beginning in 2022, wholesale marketplace revenues. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale sales and revenues include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by COVID-19. Beginning in 2020, wholesale sales and revenues includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by

41

an unrelated third party. Wholesale marketplace revenues include revenue earned from the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including auction fees and related services revenue.

### Other Sales and Revenues

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs and sales of GAP waiver coverage. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of used vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

### Cost of Sales

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale, and beginning in 2022, wholesale marketplace cost of sales. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC or other site. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value. Wholesale marketplace cost of sales include costs related to the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including labor, rent, depreciation and amortization.

### Used Vehicle Gross Profit

Used vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Used vehicle gross profit per unit is our aggregate used vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

### Wholesale Gross Profit

Wholesale gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers, and beginning in 2022, wholesale marketplace revenues less wholesale marketplace cost of sales. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, the average acquisition price associated with these vehicles, and the number of wholesale marketplace units sold.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines, hubs, and physical auctions, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. We anticipate that these expenses will increase as we grow. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

*Interest Expense*

Interest expense includes interest incurred on our Senior Notes, our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

*Other Expense (Income)*

Other expense (income), net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our warrants to acquire Root Class A common stock as discussed in Note 18 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

*Income Tax Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. During both the three and six months ended June 30, 2022, the Company generated income tax expense of $1 million, compared to less than $1 million during both the three and six months ended June 30, 2021.

43

**Results of Operations**

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 | 2021 | Change | 2022 | 2021 | Change |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Used vehicle sales, net | $ 2,962 | $ 2,504 | 18.3 % | $ 5,694 | $ 4,304 | 32.3 % |
| Wholesale sales and revenues [1] | 704 | 557 | 26.4 % | 1,279 | 797 | 60.5 % |
| Other sales and revenues [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total net sales and operating revenues | $ 3,884 | $ 3,336 | 16.4 % | $ 7,381 | $ 5,581 | 32.3 % |
| **Gross profit:** | | | | | | |
| Used vehicle gross profit [3] | $ 133 | $ 218 | (39.0)% | $ 218 | $ 330 | (33.9)% |
| Wholesale gross profit [1] | 45 | 59 | (23.7)% | 68 | 80 | (15.0)% |
| Other gross profit [2] | 218 | 275 | (20.7)% | 408 | 480 | (15.0)% |
| Total gross profit | $ 396 | $ 552 | (28.3)% | $ 694 | $ 890 | (22.0)% |
| **Unit sales information:** | | | | | | |
| Used vehicle unit sales | 117,564 | 107,815 | 9.0 % | 222,749 | 200,272 | 11.2 % |
| Wholesale vehicle unit sales | 55,299 | 47,052 | 17.5 % | 105,579 | 73,092 | 44.4 % |
| **Per unit selling prices:** | | | | | | |
| Used vehicles | $ 25,195 | $ 23,225 | 8.5 % | $ 25,562 | $ 21,491 | 18.9 % |
| Wholesale vehicles | $ 12,731 | $ 11,838 | 7.5 % | $ 12,114 | $ 10,904 | 11.1 % |
| **Per retail unit gross profit:** | | | | | | |
| Used vehicle gross profit [4] | $ 1,131 | $ 2,022 | (44.1)% | $ 979 | $ 1,648 | (40.6)% |
| Wholesale gross profit | 383 | 547 | (30.0)% | 305 | 399 | (23.6)% |
| Other gross profit | 1,854 | 2,551 | (27.3)% | 1,832 | 2,397 | (23.6)% |
| Total gross profit | $ 3,368 | $ 5,120 | (34.2)% | $ 3,116 | $ 4,444 | (29.9)% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit | $ 814 | $ 1,254 | (35.1)% | $ 644 | $ 1,095 | (41.2)% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 111,883 | $ — | NM | 111,883 | $ — | NM |
| Wholesale marketplace revenues [5] | $ 108 | $ — | NM | $ 108 | $ — | NM |
| Wholesale marketplace gross profit [5] [6] | $ 5 | $ — | NM | $ 5 | $ — | NM |

(1) Includes $7, $16, $21 and $22, respectively, of wholesale revenue from related parties.
(2) Includes $50, $49, $98 and $91, respectively, of other sales and revenues from related parties.
(3) For the three and six months ended June 30, 2022, used vehicle gross profit includes $6 and $14, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) For the three and six months ended June 30, 2022, used vehicle per unit gross profit includes $51 and $63, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(5) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.
(6) Wholesale marketplace gross profit includes $15 of depreciation and amortization expense.
NM = Not meaningful

44

*Used Vehicle Sales*

*Three months ended June 30, 2022 Versus 2021.* Used vehicle sales increased by $458 million to $3.0 billion during the three months ended June 30, 2022, compared to $2.5 billion during the three months ended June 30, 2021. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 117,564 from 107,815 during the three months ended June 30, 2022 and 2021, respectively, which was driven by enhanced marketing efforts, expanded inventory selection, and increased brand awareness. The increase in unit sales was also driven by growth to 81.1% market population coverage as of June 30, 2022 from 79.4% as of June 30, 2021. The average selling price of our retail units sold also increased to $25,195 from $23,225 during the three months ended June 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the three months ended June 30, 2021.

*Six months ended June 30, 2022 Versus 2021.* Used vehicle sales increased by $1.4 billion to $5.7 billion during the six months ended June 30, 2022 compared to $4.3 billion during the six months ended June 30, 2021. The increase in revenue was primarily due to an increase in the number of used vehicles sold to 222,749 from 200,272 during the six months ended June 30, 2022 and 2021, respectively, which was driven by enhanced marketing efforts, expanded inventory selection, and increased brand awareness. The increase in unit sales was also driven by growth to 81.1% market population coverage as of June 30, 2022 from 79.4% as of June 30, 2021. The average selling price of our retail units sold also increased to $25,562 from $21,491 during the six months ended June 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the six months ended June 30, 2021.

*Wholesale Sales and Revenues*

*Three months ended June 30, 2022 Versus 2021.* Wholesale sales and revenues increased by $147 million to $704 million during the three months ended June 30, 2022, compared to $557 million during the three months ended June 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 111,883 wholesale marketplace units sold and $108 million in wholesale revenue. Additionally, wholesale units sold increased to 55,299 from 47,052 during the three months ended June 30, 2022 and 2021, respectively, and the average selling price of our wholesale units sold increased to $12,731 during the three months ended June 30, 2022 from $11,838 during the three months ended June 30, 2021. The increase in wholesale units sold was due to acquiring more vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the three months ended June 30, 2021.

*Six months ended June 30, 2022 Versus 2021.* Wholesale vehicle sales increased by $0.5 billion to $1.3 billion during the six months ended June 30, 2022, compared to $0.8 billion during the six months ended June 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 111,883 wholesale marketplace units sold, for a total of $108 million in wholesale revenue. Additionally, wholesale units sold increased to 105,579 from 73,092 during the six months ended June 30, 2022 and 2021, respectively, and the average selling price of our wholesale units sold increased to $12,114 during the six months ended June 30, 2022 from $10,904 during the six months ended June 30, 2021. The increase in wholesale units sold was due to acquiring more vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the six months ended June 30, 2021.

*Other Sales and Revenues*

*Three months ended June 30, 2022 Versus 2021.* Other sales and revenues decreased by $57 million to $218 million during the three months ended June 30, 2022, compared to $275 million during the three months ended June 30, 2021. This decrease was primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates, partially offset by the impact of the increase in retail units sold and the impact of higher industry-wide vehicle prices on average loan size during the three months ended June 30, 2022.

*Six months ended June 30, 2022 Versus 2021.* Other sales and revenues decreased by $72 million to $408 million during the six months ended June 30, 2022, compared to $480 million during the six months ended June 30, 2021. The decrease is primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates, partially offset by the impact of the increase in retail units sold, and the impact of higher industry-wide vehicle prices on average loan size during the six months ended June 30, 2022.

*Used Vehicle Gross Profit*

*Three months ended June 30, 2022 Versus 2021.* Used vehicle gross profit decreased by $85 million to $133 million during the three months ended June 30, 2022, compared to $218 million during the three months ended June 30, 2021. Increased retail units sold was offset by a decrease in used vehicle gross profit per unit to $1,131 for the three months ended June 30, 2022

45

compared to $2,022 for the three months ended June 30, 2021. The per unit decrease was primarily driven by higher reconditioning and inbound transport costs and higher retail depreciation rates, partially offset by a higher ratio of customer-sourced vehicles sold during the three months ended June 30, 2022.

*Six months ended June 30, 2022 Versus 2021.* Used vehicle gross profit decreased by $112 million to $218 million during the six months ended June 30, 2022, compared to $330 million during the six months ended June 30, 2021. This decrease was driven primarily by a decrease in used vehicle gross profit per unit to $979 for the six months ended June 30, 2022 compared to $1,648 for the six months ended June 30, 2021, partially offset by an increase in retail units sold. The per unit decrease was primarily driven by higher acquisition and reconditioning costs and higher retail depreciation rates, partially offset by a higher ratio of customer-sourced vehicles sold compared to the six months ended June 30, 2021.

### Wholesale Gross Profit

*Three months ended June 30, 2022 Versus 2021.* Wholesale gross profit decreased by $14 million to $45 million during the three months ended June 30, 2022, compared to $59 million during the three months ended June 30, 2021. This was primarily due to a decrease in wholesale gross profit per wholesale unit to $814 in the three months ended June 30, 2022 compared to $1,254 in the three months ended June 30, 2021, partially offset by an increase in wholesale units sold to 55,299 during the three months ended June 30, 2022 from 47,052 during the three months ended June 30, 2021, as well as $5 million from the acquisition of ADESA. The increase in wholesale units sold was primarily driven by acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was primarily driven by the difference between our wholesale acquisition price and sales price compared to the three months ended June 30, 2021.

*Six months ended June 30, 2022 Versus 2021.* Wholesale gross profit decreased by $12 million to $68 million during the six months ended June 30, 2022, compared to $80 million during the six months ended June 30, 2021. This decrease was driven primarily by a decrease in wholesale vehicle gross profit per wholesale unit to $644 from $1,095 in the six months ended June 30, 2022, and 2021, respectively, partially offset by an increase in wholesale units sold to 105,579 from 73,092, respectively, as well as $5 million from the acquisition of ADESA. The increase in the number of wholesale units sold was primarily due to acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was driven by the difference between our wholesale acquisition price and sales price compared to the six months ended June 30, 2021.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

46

*Components of SG&A*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions) | | | |
| Compensation and benefits [1] | $ 248 | $ 148 | $ 484 | $ 274 |
| CEO Milestone Gift [2] | 4 | — | 24 | — |
| Advertising | 131 | 119 | 286 | 219 |
| Market occupancy [3] | 24 | 15 | 47 | 28 |
| Logistics [4] | 71 | 34 | 127 | 64 |
| Other [5] | 243 | 154 | 480 | 282 |
| Total | $ 721 | $ 470 | $ 1,448 | $ 867 |
| Depreciation and amortization | $ 49 | $ 24 | $ 86 | $ 46 |
| Share-based compensation, excluding Gift | 9 | 9 | 19 | 17 |
| Total, excluding depreciation and amortization and share-based compensation | $ 659 | $ 437 | $ 1,319 | $ 804 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $251 million to $721 million during the three months ended June 30, 2022, compared to $470 million during the three months ended June 30, 2021, and by $581 million to $1,448 million during the six months ended June 30, 2022, compared to $867 million during the six months ended June 30, 2021. The increase was partially due to an increase in compensation and benefits by $100 million and $210 million during the three and six months ended June 30, 2022, respectively, which was primarily driven by expansion of our teams to support our growth, as well as the acquisition of ADESA.

In addition, during the three and six months ended June 30, 2022, we incurred $4 million and $24 million, respectively, of compensation expense related to the CEO Milestone Gift within selling, general and administrative expense, which is presented separately above, compared to none in the three and six months ended June 30, 2021.

The increase in selling, general and administrative expenses was also due to an increase in advertising expense of $12 million and $67 million during the three and six months ended June 30, 2022, respectively, primarily due to an increase in advertising to drive growth in units sold and vehicles acquired from customers. Market occupancy, logistics, and other expenses also increased during the three and six months ended June 30, 2022 compared to the respective prior year period primarily due to building capacity for increases in the number of units sold and in population coverage, and in preparation for future growth.

*Interest Expense*

Interest expense increased by $73 million to $116 million during the three months ended June 30, 2022, compared to $43 million during the three months ended June 30, 2021, and increased by $107 million to $180 million during the six months ended June 30, 2022, compared to $73 million during the six months ended June 30, 2021. The increase is primarily due to

increased interest incurred on additional senior unsecured notes issued by the Company in March 2021, August 2021, and May 2022, along with increased interest expense incurred on sale leaseback financing since June 30, 2021.

### Other Expense (Income), Net

Other expense (income), net changed by $3 million to income of $3 million during the three months ended June 30, 2022 compared to income of $6 million during the three months ended June 30, 2021. Other income, net changed by $23 million to expense of $10 million during the six months ended June 30, 2022 compared to income of $13 million during the six months ended June 30, 2021. The change is primarily due to fair value adjustments on our retained beneficial interests in securitizations and purchase price adjustment receivables and the fair value adjustments on our warrants to acquire Root Class A common stock.

### Non-GAAP Financial Measures

To supplement the consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation. We historically presented EBITDA and EBITDA Margin, however we believe the presentation of Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation in conjunction with U.S. GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable U.S. GAAP financial measures.

### Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically been only a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net (loss) income, which is the most directly

48

comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| Net (loss) income | $ (439) | $ 45 | $ (945) | $ (37) |
| Income tax provision | 1 | — | 1 | — |
| Interest expense | 116 | 43 | 180 | 73 |
| Other (income) expense, net | (3) | (6) | 10 | (13) |
| Depreciation and amortization expense in cost of sales | 27 | 6 | 35 | 11 |
| Depreciation and amortization expense in SG&A | 49 | 24 | 86 | 46 |
| CEO Milestone Gift in cost of sales | 6 | — | 14 | — |
| CEO Milestone Gift in SG&A | 4 | — | 24 | — |
| Adjusted EBITDA [1] | $ (239) | $ 112 | $ (595) | $ 80 |
| Share-based compensation, excluding Gift | 9 | 9 | 19 | 17 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [1] | $ (230) | $ 121 | $ (576) | $ 97 |
| | | | | |
| Total revenues | $ 3,884 | $ 3,336 | $ 7,381 | $ 5,581 |
| Adjusted EBITDA Margin [2] | (6.2)% | 3.4 % | (8.1)% | 1.4 % |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation [2] | (5.9)% | 3.6 % | (7.8)% | 1.7 % |

(1) For each of the three and six months ended June 30, 2022, includes $14 of expenses associated with the previously announced workforce reduction.
(2) For the three and six months ended June 30, 2022, includes 0.4% and 0.2%, respectively, of expenses associated with the previously announced workforce reduction.

**Liquidity and Capital Resources**

*General*

We generate cash from the sale of used retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of used vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, and increased population coverage.

49

We had the following liquidity resources available as of June 30, 2022 and December 31, 2021:

| | June 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1,047 | $ 403 |
| Availability under short-term revolving facilities [1] | 1,603 | 438 |
| Committed liquidity resources available | $ 2,650 | $ 841 |
| Unpledged vehicle inventory not included above | — | 665 |
| Unpledged real estate not included above [2] | 1,972 | 677 |
| Unpledged beneficial interests in securitizations | 124 | 100 |
| Total liquidity resources | $ 4,746 | $ 2,283 |

_____

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in the Floor Plan Facility and Finance Receivable Facilities, excluding the impact to restricted cash requirements.
(2) Total unpledged gross real estate assets minus committed sale leasebacks. Includes $1.1 billion of ADESA unpledged real estate assets based on preliminary valuations.

Our total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities, on our balance sheet that can be financed using traditional asset-based financing sources.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

As of June 30, 2022 and December 31, 2021, the short-term revolving facilities had a total commitment of $5.6 billion and $4.3 billion, an outstanding balance of $1.1 billion and $2.1 billion, and unused capacity of $4.5 billion and $2.2 billion, respectively.

Availability under real estate agreements is the available amount we can borrow under our existing real estate financing agreements based on the value of existing real estate on our balance sheet. From time to time, we may enter into committed real estate financing agreements that allow for future pledging of real estate assets on a flexible timeline. We began using committed real estate financing agreements in 2017 and may do so in the future.

Unpledged vehicle inventory and finance receivables is the value of vehicle inventory and finance receivables on our balance sheet on the period end date beyond that covered by committed financing agreements.

Unpledged real estate assets include real estate acquired as part of the acquisition of ADESA's U.S. physical auction business, IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained

beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include Adjusted EBITDA, excluding non-Gift share-based compensation, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition, as a growing automotive retailer, we also invest in and generate several types of automotive retail assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of June 30, 2022 and December 31, 2021, our outstanding principal amount of indebtedness, including finance leases, was $8.0 billion and $5.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments and Note 16 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

| | June 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| **Asset-Based Financing:** | | |
| Inventory | $ 1,118 | $ 1,877 |
| Finance receivables and beneficial interests | 314 | 458 |
| Transportation fleet[1] | 376 | 212 |
| Real estate[2] | 490 | 450 |
| Total asset-based financing | 2,298 | 2,997 |
| Senior Notes | 5,725 | 2,450 |
| Total debt | 8,023 | 5,447 |
| Less: unamortized debt issuance costs[3] | (88) | (34) |
| Total debt, net | $ 7,935 | $ 5,413 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our consolidated balance sheets and not included here.

On April 26, 2022, we completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion. Also, on May 6, 2022, we issued $3.275 billion in senior unsecured notes due 2030. We intend to use the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by us in connection with the offering. We used the net proceeds from the issuance and sale of the 2030 Notes (a) to

finance the $2.2 billion ADESA acquisition and other ancillary transactions to occur in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes.

***Cash Flows***

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the six months ended June 30, 2022 and 2021:

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | (in millions) | |
| Net cash used in operating activities | $ (487) | $ (1,139) |
| Net cash used in investing activities | (2,525) | (174) |
| Net cash provided by financing activities | 3,573 | 1,294 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 561 | (19) |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 1,197 | $ 310 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of used retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, cash used to acquire customers, and personnel-related expenses. Cash used in operating activities was $487 million and $1.1 billion during the six months ended June 30, 2022 and 2021, respectively, a decrease of $652 million, primarily due to decreases in cash used to acquire vehicle inventory, partially offset by increased net loss as a result of increased selling, general and administrative expenses and reconditioning costs.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $2.5 billion and $174 million during the six months ended June 30, 2022 and 2021, respectively, an increase of $2.4 billion, primarily driven by our acquisition of the U.S. physical auction business of ADESA for approximately $2.2 billion, together with an increase in purchases of property and equipment partially offset by increases in principal payments received on, and proceeds from the sale of, beneficial interests in securitizations.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $3.6 billion and $1.3 billion during the six months ended June 30, 2022 and 2021, respectively, an increase of $2.3 billion. The change primarily relates to increased net proceeds from long-term debt primarily from the issuance of our $3.275 billion Senior Notes in May 2022 along with proceeds from the issuance of Class A common stock during the six months ended June 30, 2022, partially offset by decreased net proceeds from short-term revolving facilities.

**Contractual Obligations and Commitments**

As of June 30, 2022, there have been no material changes to the contractual obligations or commitments previously disclosed in our most recent Annual Report on Form 10-K, filed February 24, 2022 other than the issuance of $3.275 billion in Senior Notes in May 2022 and the purchase obligations for services of $181 million over the next seven years.

52

**Fair Value Measurements**

We report money market securities, certain receivables, warrants to acquire Root Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Critical Accounting Estimates**

Except for the following, there have been no material changes to our critical accounting estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

*Business Combination Purchase Price Allocation*

The purchase price of an acquisition is allocated to the identifiable assets acquired and liabilities assumed based on their fair values at the date of acquisition, with the excess purchase price being recorded as goodwill. The purchase price allocation for ADESA is preliminary and will continue to be assessed during the measurement period, which may be up to one year from the acquisition date, with any adjustments being recorded against goodwill. See Note 3 — Business Combinations, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for a description of the preliminary status of the accounting for the ADESA acquisition.

The allocation of purchase price to the tangible and identifiable intangible assets acquired is specifically complex because of the significant estimates and assumptions involved in determining their fair values. Due to this higher degree of complexity, we obtained the assistance of outside valuation experts in the allocation of purchase price to the tangible and identifiable intangible assets acquired. While outside valuation experts were used, management has the ultimate responsibility for the valuation methods, models and inputs used and the resulting purchase price allocation. Critical estimates used in valuing tangible assets associated with the ADESA acquisition include, but are not limited to, the similarity of the acquired real property to market comparable transactions, costs of similar personal property in new condition, and economic obsolescence rates. Critical estimates used in valuing identifiable intangible assets associated with the ADESA acquisition include, but are not limited to, revenues and attrition rate.

53

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- our acquisition of ADESA from KAR Auction Services, Inc., including the ability to successfully integrate the operations of the acquired businesses;

- our history of losses and ability to achieve or maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19 and other future epidemics and public health crises;

- our relationship with DriveTime and its affiliates;

- our minority equity investment in Root, Inc.;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

54

- our ability to sell our inventory expeditiously;

- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indentures governing our Senior Notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Control Over Financial Reporting

Except for the ADESA acquisition, whose controls have been integrated with ours, there were no changes to our internal controls over financial reporting that occurred during the three months ended June 30, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 24, 2022 and in our Quarterly Report on Form 10-Q filed May 10, 2022.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

**Recent Sales of Unregistered Securities**

There were no unregistered sales of equity during the six months ended June 30, 2022, except as otherwise previously reported.

During the six months ended June 30, 2022, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged less than 0.1 million LLC Units for less than 0.1 million newly-issued shares of Class A common stock. These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Indenture, dated as of May 6, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.2 | Form of 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.3 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 10.2500% Senior Notes due 2030 (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.4 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 4.875% Senior Notes due 2029 (incorporated by reference to Exhibit 4.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.5 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.875% Senior Notes due 2028 (incorporated by reference to Exhibit 4.5 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.6 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.500% Senior Notes due 2027 (incorporated by reference to Exhibit 4.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 4.7 | Supplemental Indenture, dated as of May 9, 2022, among Carvana Co., each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee, related to the 5.625% Senior Notes due 2025 (incorporated by reference to Exhibit 4.7 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 10, 2022). |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:     August 4, 2022

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins

Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

59

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        August 4, 2022                                                        /s/ Ernest C. Garcia, III
                                                                                              Ernest C. Garcia, III
                                                                                              *Chairman and Chief Executive Officer*

Exhibit 31.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        August 4, 2022                                              /s/ Mark Jenkins
                                                                         Mark Jenkins
                                                                         *Chief Financial Officer*

<u>Exhibit 32.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended June 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:      August 4, 2022                                           /s/ Ernest C. Garcia, III
                                                                    Ernest C. Garcia, III
                                                                    *Chairman and Chief Executive Officer*

Exhibit 32.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended June 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:     August 4, 2022                                            /s/ Mark Jenkins
                                                                    Mark Jenkins
                                                                    *Chief Financial Officer*

**Exhibit 27**



**SOS**

# Department of State suspends Novi dealership

October 07, 2022

> ## Angela Benander
>
> 517-242-9192

NOVI - The Michigan Department of State (MDOS) today suspended the license of an Oakland County vehicle dealer for imminent harm to the public.

Carvana LLC, owned by Paul W. Breaux and located at 26890 Adell Center Drive in Novi, has been summarily suspended for several alleged violations of the Michigan Vehicle Code, which were discovered during an investigation by MDOS regulatory staff of multiple no-title complaints from consumers. The violations include:

- failing to make application for title and registration within 15 days of delivery for 112 customers since agreeing to an earlier probation extension

- committing fraudulent acts in connection with selling or otherwise dealing in vehicles where Carvana employees admitted to destroying title applications and all applicable documents pertaining to the sale of three vehicles that were sold to customers and Carvana took the vehicles back

- failing to maintain odometer records

- improperly issuing temporary registrations

- failing to have records available for inspection during reasonable or established business hours

- possessing improper odometer disclosure records on which the odometer disclosure had been signed on behalf of the purchaser

- violating terms of a probation agreement 127 times

These continued violations create an ongoing imminent threat to the public health, safety or welfare of the public, requiring emergency action.

The dealership's issues began in February 2021, when MDOS regulatory staff conducted a general compliance inspection and assessed multiple notices of non-compliance. MDOS and Carvana representatives had a preliminary conference March 23, 2021 to

address the violations and on May 7, 2021, Carvana entered an 18-month probation agreement with a $2,500 administrative fine and admission of several violations of the Code. One of the stipulations was that all dealership employees that handled paperwork would attend the department's dealer training program.

After the dealership violated the probation agreement, MDOS held a second preliminary conference with multiple Carvana representatives on January 11, 2022. The department continued to work with Carvana on compliance and on February 7, 2022, Carvana representatives signed a six-month probation extension with a $5,000 administrative fine and admission of several more violations of the Code.

Following the signing of the probation extension, MDOS received several no-title complaints from consumers and conducted the investigation that led to the current violations and suspension. The department will seek revocation of the dealer's license at an administrative hearing.

Consumers who have a complaint against Carvana, or who have purchased a vehicle from that dealer and have had problems obtaining the title, are encouraged to call the Office of Investigative Services automotive complaint line at 517-335-1410.

# # #

Secretary of State        News Article        Business Licensing

Secretary of State        MI Newswire

# Related News

**Secretary Benson announces work to ban guns at polling places,**

## create Michigan Voting Rights Act

At this week's annual Judge Damon Keith Memorial Soul Food Luncheon, Secretary of State Jocelyn Benson announced she is working with state lawmakers to ban firearms at polling places and enact a Voting Rights Act for the state of Michigan.

## NewDEAL Forum lays out 'Playbook' to strengthen democracy, protect voting rights, and transform election administration across the nation

Calling for a dramatic increase in protections for election workers as well as a stronger commitment to transparency in how elections are run, the NewDEAL Forum has released a new publication with concrete recommendations for state and local leaders across a range of elected offices to preserve and strengthen our democracy.

## Secretary of State office in Jackson to close for remodeling until Feb. 13

The Secretary of State office in Jackson will be closed next week for a remodeling project, but most residents can go online to Michigan.gov/SOS instead for their transactions.

## Benson launches tour of Secretary of State offices

The Secretary of State office in Jackson will be closed next week for a remodeling project, but most residents can go online to Michigan.gov/SOS instead for their transactions.

## Benson visits Michigan International Auto Show in Grand Rapids

Michigan Secretary of State Jocelyn Benson participated in the ribbon cutting and grand opening of the Michigan International Auto Show in Grand Rapids on Wednesday, where she saw everything from an original Model T to state-of-the art electric vehicles.

## Benson and Nessel update legislators on work to protect elections and restore driver's licenses

Secretary of State Jocelyn Benson and Attorney General Dana Nessel today updated lawmakers on the state Senate Elections and Ethics Committee on the strength of Michigan elections and identified legislation that would build on their success

Michigan elections and identified legislation that would build on their success.

## Board of State Canvassers to meet Feb. 1

The Board of State Canvassers will meet at 7710 West Saginaw Highway, Delta Township Office in Lansing.

## Secretary Benson continues transparent voter registration list maintenance

Secretary of State Jocelyn Benson today launched the next phase of transparent, ongoing voter registration list maintenance, announcing that the Bureau of Elections will make available in advance the list of voter registrations to be cancelled in accordance with federal law.

## Redford Township Secretary of State to close for remodeling Jan. 30

The Secretary of State office in Redford Township will be closed for two weeks for a remodeling project, but most residents can go online to Michigan.gov/SOS instead for their transactions.

## Benson and state lawmakers announce plans to protect the people who protect democracy

Secretary of State Jocelyn Benson, the chairs of both the Senate and House elections committees, and numerous other lawmakers today announced legislative plans to protect the people who protect democracy



**Department of State suspends Novi dealership**

Copyright State of Michigan

**Exhibit 28**

**STATE OF MICHIGAN**

**COURT OF CLAIMS**

CARVANA LLC, an Arizona limited liability
company,

        Plaintiff,

v                                                                          Case No.  22-000172-MZ

JOCELYN BENSON, in her official capacity as                 Hon. Thomas C. Cameron
the MICHIGAN SECRETARY OF STATE,

        Defendant.

_____/

**<u>ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER</u>**

Pending before this Court is plaintiff's motion for a temporary restraining order (TRO).
Defendant has filed its response and plaintiff has moved for leave to file a reply brief in support
of its motion for a TRO.  Plaintiffs motion for leave to file a reply brief is GRANTED.  For the
reasons discussed, Plaintiff's motion for a TRO is DENIED.

Plaintiff is an automobile dealer that buys and sells used vehicles nationwide.  It operates
several "hubs" throughout Michigan, as well as a car "vending machine" in Novi.  According to
plaintiff, the hubs "temporarily store previously purchased vehicles" and "are used as last-mile
delivery facilities to coordinate deliveries of vehicles."  The "vending machine," meanwhile, is a
"large, glass, automated tower[] that display[s] previously purchased vehicles that are ready to be
picked up."  After a customer purchases a vehicle online, they may choose to have the vehicle
delivered, or they may pick up the vehicle directly from the vending machine.

-1-

Because its business involves the purchasing and selling of vehicles, plaintiff maintains a vehicle dealer's license under MCL 257.250 of the Michigan Vehicle Code (MVC), MCL 257.1 *et seq.* On October 7, 2022, defendant sent plaintiff an "Order of Summary Suspension" suspending plaintiff's dealer license. According to defendant, plaintiff violated numerous provisions of the MVC and these violations presented an "imminent threat to public health, safety or welfare." Defendant's order noted plaintiff's earlier violations of the MVC which twice resulted in plaintiff being placed on probationary status. Defendant's order stated plaintiff "shall be given an opportunity to show compliance at a preliminary conference and an administrative hearing shall be promptly commenced to determine if the vehicle dealer license . . . should be revoked." A preliminary conference is scheduled for October 20, 2022, and an administrative hearing is scheduled for November 22, 2022. The suspension caused plaintiff to cease operations at its brick-and-mortar "vending machine" in Novi, but it did not affect plaintiff's online sales.

Plaintiff argues the suspension of its license without a hearing is a violation of statutory law and of its due process rights under the Michigan and United States Constitutions. It asks this Court to enter a TRO that enjoins defendant from suspending the license pending the outcome of an administrative hearing.

## I. INJUNCTIVE RELIEF

A preliminary injunction "is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008). It is incumbent on the moving party to show they are entitled to a preliminary injunction. MCR 3.310(A)(4). The purpose of a preliminary injunction is to "maintain the status quo pending a final hearing regarding the parties' rights." *Mich AFSCME Council 25 v*

*Woodhaven-Brownstown Sch Dist*, 293 Mich App 143, 145; 809 NW2d 444 (2011) (quotation marks and citation omitted).  And, the grant of a preliminary injunction "is generally considered equitable relief."  *Id*.  Whether a preliminary injunction is proper involves a four-part test:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued.  [*Id*. at 148 (citation omitted).]

It is "indispensable" that a request for a preliminary injunction demonstrate "a particularized showing of irreparable harm."  *Mich Coalition of State Employee Unions v Mich Civil Serv Comm*, 465 Mich 212, 225; 634 NW2d 692 (2001).

> In order to establish irreparable injury, the moving party must demonstrate a noncompensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty.  The injury must be both certain and great, and it must be actual rather than theoretical. [*Thermatool Corp v Borzym*, 227 Mich App 366, 377; 575 NW2d 334 (1998).]

 "[A]n injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural."  *Mich AFSCME Council 25*, 293 Mich App at 149 (quotation marks and citations omitted).  Courts should evaluate the potential for irreparable injury "in light of the totality of the circumstances affecting, and the alternatives available to, the party seeking injunctive relief."  *Id*.  "Equally important is that a preliminary injunction should not issue where an adequate legal remedy is available."  *Pontiac Fire Fighters Union Local 376*, 482 Mich at 9.

Plaintiff argues "its business operations and goodwill will be immeasurably damaged with each passing day that injunctive relief does not issue."  It states that the suspension has already impaired its "reputation and goodwill with Michigan consumers."  In some cases, loss of goodwill can be a basis to find a party suffered irreparable injury "because the damages flowing from such

losses are difficult to compute." *Slis v State*, 332 Mich App 312, 362-363; 956 NW2d 569 (2020) (quotation marks and citation omitted). "Whether the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Id*. at 362 (quotation marks and citation omitted). While plaintiff summarily argues the suspension caused irreparable injury to its goodwill, plaintiff offers no corresponding argument explaining how this loss affects its "overall economic well-being." Plaintiff states it "is the second-largest used car retailer in the United States and has sold over 1 million vehicles." Thus, plaintiff's assertion that it suffered loss of goodwill due to the suspension is insufficient to show irreparable harm, in particular because plaintiff's Michigan-based sales are a subset of its overall operations. Moreover, the suspension affects plaintiff's sales only at its vending machine in Novi, but not its overall online sales.

Plaintiff also contends its business operations will suffer if the TRO is not granted. In support of this argument, plaintiff contends it will be unable to deliver 71 vehicles customers have already purchased and that its competitors will be able to gain the upper hand in the market. As an initial matter, we reject plaintiff's argument that it will be unable to deliver the purchased vehicles, presumably exposing it to lawsuits. As noted, a preliminary injunction is only appropriate if the potential damages are too speculative in nature. *Thermatool Corp*, 227 Mich App at 377. Plaintiff's damages, if any, in regard to the purchased vehicles are not speculative in nature given the vehicles were each purchased for a particular price, and presumably, under a contract with the purchaser.

As to the second part of the argument, plaintiff avers that its competitors will "exploit the Suspension Order and/or gain an unfair advantage to grow market share." Plaintiff offers no further explanation for this unsupported assertion. Moreover, plaintiff's Novi brick-and-mortar

-4-

operation provides car buyers a unique purchasing experience—one that would be difficult to replicate by competitors in the short-time frame of a TRO. And, while one aspect of plaintiff's Michigan operations have been suspended, its other operations have not, lessening the risk that other vehicle dealers will be able to gain a foothold in the market. Indeed, "[a] relative deterioration of competitive position does not in itself suffice to establish irreparable injury." *Thermatool Corp*, 227 Mich App at 377.

Because plaintiff has failed to establish sufficient danger of irreparable harm, this Court need not consider the remaining elements of the preliminary injunction. *Pontiac Fire Fighters Union Local 376*, 482 Mich at 13 n 21.

## II.  DUE PROCESS VIOLATIONS

We turn next to the question of whether defendant violated plaintiff's due process rights by suspending its license without first holding a hearing on the matter. Defendant cited various statutory provisions when it suspended plaintiff's license, including MCL 257.250 of the MVC, which states, in relevant part:

> (a) Before denying, revoking, suspending, or refusing to renew a dealer's license the secretary of state shall:
>
> 1. Cause an investigation of the licensee after a complaint in writing of any person has been filed in his office.
>
> 2. Set a date for hearing and give said licensee notice thereof at least 10 days in advance in the manner herein provided.
>
> 3. Cause a record to be taken of the hearing proceedings.
>
> 4. Enter a final order together with his findings.

Defendant also cited the Administrative Procedures Act, MCL 24.201, *et seq.*, which provides, in part:

(1) Before beginning proceedings for the suspension, revocation, annulment, withdrawal, recall, cancellation or amendment of a license, an agency shall give notice, personally or by mail, to the licensee of facts or conduct that warrants the intended action. The licensee shall be given an opportunity to show compliance with all lawful requirements for retention of the license except as otherwise provided in any of the following:

(a) The support and parenting time enforcement act, 1982 PA 295, MCL 552.601 to 552.650.

(b) The regulated occupation support enforcement act, 1996 PA 236, MCL 338.3431 to 338.3436.

(c) Section 41309 of the natural resources and environmental protection act, 1994 PA 451, MCL 324.41309.

(2) If the agency finds that the public health, safety or welfare requires emergency action and incorporates this finding in its order, summary suspension of a license may be ordered effective on the date specified in the order or on service of a certified copy of the order on the licensee, whichever is later, and effective during the proceedings. The proceedings shall be promptly commenced and determined. [MCL 24.292.]

Plaintiff argues defendant violated MCL 257.250 because defendant failed to conduct a hearing before suspending plaintiff's license. Plaintiff also contends defendant violated MCL 24.292 because plaintiff's alleged violations did not place "public health, safety or welfare" at risk.

This Court is mindful that "as a general rule, deference is given to an administrative agency's decisions, provided that the agency's construction is consistent with the purpose and policies of the statute itself." *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 416; 565 NW2d 844 (1997). Defendant's order of suspension listed with specificity a number of plaintiff's purported violations of the MVC which defendant believed were a risk to public health, safety, or welfare under MCL 24.292. On this basis, defendant concluded it was entitled to suspend plaintiff's license without first holding a hearing. Defendant's interpretation of MCL 24.292 is consistent with the statute's purpose. That is, the purpose of MCL 24.292 is to allow administrative agencies to take preemptive action when there is a risk to public health, safety, or

-6-

welfare.  As such, this Court concludes that defendant's decision to suspend plaintiff's license without a hearing is statutorily permitted and therefore declines to find a violation of plaintiff's due process rights.[1]  *Empire Iron Mining Partnership*, 455 Mich at 416.

For these reasons, plaintiff's motion for a TRO is DENIED.

DATE:  October 19, 2022

Thomas C. Cameron
Judge, Court of Claims

---

[1] Though unclear, it seems from the language of the parties' two earlier penalty agreements, in May 2021 and January 2022, that plaintiff expressly waived its right to hearing arising from any agency action made during the probationary period.  Given the uncertainty of this language however, this Court declines to hold that plaintiff waived its right to a hearing in regard to the order of suspension.

# Exhibit 29





# LETTER TO SHAREHOLDERS

## Q3 | 2022





# CARVANA

NOVEMBER 3, 2022







Dear Shareholders,

In the third quarter we achieved strong operational progress against a difficult industry and macroeconomic backdrop.

The difficult backdrop is visible in our sequential decrease in retail units and the resulting limited progress in SG&A per retail unit sold. The strong operational progress appears through our sequential reduction of Carvana-related SG&A expense by approximately $90 million and sequential improvement in Adjusted EBITDA.

Since the end of the third quarter, we have seen additional industry and economic headwinds that further pressure sales volume, and which are likely to put additional pressure on GPU. To manage the business through this period, we are seeking to rapidly decrease expenses while optimizing for volume flexibility to be able to adjust the business to changes in unit sales as quickly as possible.

While the current environment has drawn our focus to the near-term, the long-term remains extremely exciting. All the things that defined our opportunity a year ago are unchanged. We were always going to have to traverse difficult periods and cycles on our way to fulfilling our mission. Like other companies we admire in history, our goal is to be made better by the challenges we face. On the other side of this period, we plan to be a better company as a result of having gone through it.

While progress is rarely linear, we remain firmly on the path to changing the way people buy and sell cars and to becoming the largest and most profitable automotive retailer.

## Summary of Q3 2022 Results

Q3 2022 Financial Results: All financial comparisons stated below are versus Q3 2021, unless otherwise noted. Complete financial tables appear at the end of this letter.

- Retail units sold totaled 102,570 a decrease of 8%
- Revenue totaled $3.386 billion, a decrease of 3%
- Total gross profit was $359 million, a decrease of 31%
- Total gross profit per unit was $3,500, a decrease of $1,172
    - Total gross profit per unit, excluding depreciation, amortization, and share-based compensation, was $3,870
- Net loss margin was (15.0%), a decrease from (2.0%)
    - Net loss margin included a (2.1%) non-cash impact from a change of the fair value of Root warrants
- Adjusted EBITDA margin[1] was (5.9%), a decrease from 0.3%
    - Adjusted EBITDA margin, excluding non-Gift share-based compensation, was (5.5%)
- Basic and diluted net loss per Class A share was $2.67 based on 105.9 million shares of Class A common stock outstanding


Other Results and Recent Events:

- On September 22, 2022, we amended and restated our floorplan facility with Ally to secure $2.2 billion of capacity through September 22, 2023, and $2.0 billion of capacity thereafter through March 22, 2024.
- We opened our second vending machine near Phoenix, AZ.
- We opened a new Carvana IRC near Richmond, VA.
- Following quarter-end, we opened a new Carvana IRC near Sacramento, CA.

---

[1] Adjusted EBITDA margin excludes the impacts of the CEO's Gift and Other Income and Expense

## Outlook

We made strong progress reducing SG&A expenses in Q3 2022. In May 2022, we outlined a stretch goal of $4,000 SG&A expense per retail unit sold, excluding depreciation, amortization, share-based compensation, and ADESA expenses in Q4 2022. This equated to a stretch goal of $4,350 to $4,450 including ADESA expenses. We are making strong progress reducing SG&A expenses on an absolute dollar basis, but due to the current volume environment, we do not expect to reach this stretch goal on a per unit basis in Q4.

In Q4, we expect a sequential reduction in retail units sold and total GPU as the impacts of reduced used vehicle industry demand, increasing benchmark interest rates, higher used vehicle depreciation rates, and our profitability initiatives flow through. We also expect to continue our progress reducing SG&A expenses through our efficiency and cost initiatives.

Our goal is to manage the business to achieve >$4,000 total GPU and significant Adjusted EBITDA profitability at current volume levels, while also building in flexibility to achieve profitability at higher or lower volume levels.

Looking toward 2023, we are not providing a quantitative outlook at this time. In light of current industry and macroeconomic conditions, we believe forecasting the environment over the coming months and quarters is difficult, and we plan instead to provide more real time color on how certain key dynamics are likely to impact our results.

For more information regarding the non-GAAP financial measures discussed in this letter, please see the reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements included at the end of this letter.

## The Current Environment

We are currently operating in a challenging industry and macroeconomic environment, while simultaneously adapting our business to drive profitability. This environment raises two key questions about our progress: (1) what are the drivers of our current retail units sold volume? and (2) what is our path to profitability and positive free cash flow?

Part 1: Units

Industry-wide used vehicle prices are up 7% YoY and up 43% since 2019 as of September 2022, based on industry data. At the same time, benchmark interest rates have increased on an absolute basis by 3.9% YoY and 2.6% since 2019, and credit spreads have increased 1% YoY and 0.8% since 2019. Putting these together, the monthly payment for a customer buying a typical car in 2022 has increased by 22% and 57% since 2021 and 2019, respectively. This increase in the cost of buying a used vehicle has significantly outpaced the increase in the cost of buying goods and services in the economy as a whole over the same periods.

As a result of these and other affordability headwinds, based on industry data sources industry-wide used vehicle sales declined by 10-15% YoY in Q3 2022. We gained market share against this industry backdrop despite taking numerous actions that are focused on driving profitability but reduce sales, other things being equal.

Our focus on profitability impacts retail unit volume in several ways. Historically, when we were primarily focused on growth, we incorporated the value of future sales, including from repeat customers and word of mouth, into our marketing budget and pricing decisions. As a result, we more frequently acquired sales that were less profitable in the immediate period but were expected to generate higher net present value over time. Currently, as we are primarily focused on profitability, we are intentionally acquiring fewer of these sales.

Additionally, the rapidly rising interest rate environment is creating a headwind to conversion and total GPU. Lower conversion and total GPU reduce the number of profitable sales, other things being equal, leading us to further reduce sales volume.

One example of this occurs in markets with lower profitability due to long distance from inventory (e.g., the Pacific Northwest). We have historically had strong success growing these types of markets over time, but in a profitability-focused or lower GPU environment it makes more sense to reduce advertising or take other actions to improve profitability, such as increasing long-distance shipping fees, in these markets.

As a result of our actions, markets in the central part of the country, excluding Illinois, which are closer to large inventory pools and experienced fewer adjustments, grew by 4% YoY in Q3 2022, significantly outpacing the industry. By comparison, markets in the eastern part of the country performed approximately in-line with the company as a whole, and markets in the western part of the country significantly underperformed the company as a whole.

In Q3, we estimate that the four largest drivers of our retail unit sold volume, outside of the significant decline in industry sales, were rising benchmark interest rates, reduced advertising, reduced inventory, and other actions we are taking to reduce and improve less profitable transactions. These drivers are described in more detail below.

1. First, we continued to see significant increases in benchmark interest rates in Q3 vs. Q2. On average through the quarter, the 2-year Treasury increased by 0.7% to 3.4% in Q3 from 2.7% in Q2. The price Carvana earns on loans sold through both our forward flow and securitization channels is strongly related to the spread between origination rates and the 2-year Treasury rate. Thus, we generally adjust origination rates in conjunction with movements in the 2-year Treasury rate. Meanwhile, we see evidence today that many lenders are increasing rates at a pace that appears to be more closely in line with increases in the Fed Funds rate, which has lagged increases in the 2-year Treasury rate so far this year. We believe different approaches to setting rates have resulted in a temporary sales headwind for Carvana. For example, sales to our cash customers, who aren't directly impacted by interest rates, grew over 20% year over year. Over time, we believe different approaches to setting rates will converge as interest rates settle, leading to normalization of this headwind.

3

2. Second, we reduced advertising spend by -11% sequentially in Q3. As discussed above, a key driver of this reduction has been less advertising in distant markets with less profitable sales. More advertising positively impacts retail unit sales volume, other things being equal, by driving more users to our website.

3. Third, we reduced our website inventory by -10% sequentially in Q3. We are continuing to normalize our inventory size and expect to further reduce inventory in Q4. Larger inventory positively impacts conversion, other things being equal, since with larger inventory customers have a higher likelihood of finding a car that matches their preferences.

4. Fourth, we are testing or have rolled out several initiatives that increase sales profitability but have some offsetting sales impact, including requiring payment at the time a customer places their order instead of at delivery, incentivizing pickups and drop-offs at vending machines, and continuing inventory visibility metering on long-distance inventory.

The drivers described above had an impact on growth in Q3 but lay the groundwork for a more efficient and profitable business moving forward.

Part 2: Profitability

We reduced quarterly SG&A expenses by approximately $90 million in Q3 vs. Q2, excluding the impacts of consolidating a full quarter of ADESA expenses. We also levered SG&A per retail unit sold slightly excluding these impacts, despite lower retail units sold.

Our SG&A expense reductions in Q3 vs. Q2 were broad-based, including in payroll, advertising, logistics, and other SG&A expense. These expense reductions were primarily driven by our cost savings initiatives across all areas of the business, including increasing operational efficiency, standardizing processes across our nationwide network of locations, and focusing advertising on profitable transactions.

**Q3 2022 Sequential Changes in SG&A Expense, Excluding ADESA**

| *Dollars in millions* | | |
|---|---|---|
| Q2 2022 SG&A, GAAP | $ | 694 |
| Q2 2022 SG&A ex D&A ex SBC | $ | 637 |
| Sequential changes: | | |
| RIF one-time expenses | | (10) |
| RIF recurring savings | | (14) |
| Other payroll savings | | (20) |
| Advertising | | (14) |
| Logistics | | (14) |
| Market occupancy | | (1) |
| Other SG&A | | (19) |
| D&A | | (4) |
| Total ex D&A ex SBC | $ | (96) |
| Q3 2022 SG&A ex D&A ex SBC | $ | 541 |

4

These expense reductions were driven by meaningful progress across our operating efficiency initiatives. More details are provided in the table below.

| Business Area | Key Initiatives | Recent Results |
|---|---|---|
| Retail cost of sales | • Reduce third-party production volume<br>• Reduce third-party vendor services share<br>• Reduce third-party inbound transport share<br>• Internal benchmarking / performance mgmt | • Units produced in Sep'22 were ~$200 lower non-vehicle costs than Q1<br>• Top IRCs with ~25% of units produced in Sep'22 were ~$250 better than the average IRC |
| Wholesale cost of sales | • Utilize ADESA locations to reduce inbound transport cost and cycle time | • Average inbound transport costs down 13% QoQ |
| Customer care | • Automation of manual tasks<br>• Simplified advocate workflows<br>• Enhanced customer communication<br>• Reduction of duplicated or low value tasks<br>• Internal benchmarking / performance mgmt | • Customer verifications handled per hour +25% QoQ<br>• Customer care calls per sale down 20% QoQ |
| Last-mile delivery | • Staffing and scheduling optimization<br>• In-sourcing third-party pickups<br>• Pairing retail and buying cars activities<br>• Increasing vending machine utilization<br>• Internal benchmarking / performance mgmt | • VM utilization up +24% QoQ<br>• Share of retail deliveries paired with buying car pickups more than doubled QoQ<br>• Last mile deliveries per advocate hour up +7% QoQ |
| Logistics expense | • Staffing and scheduling optimization<br>• Reduce average outbound miles<br>• Reduce third-party shipping<br>• Improve network load balancing<br>• Improve trip and staging execution | • Network utilization +8% QoQ<br>• Average shipping miles down 10% QoQ (add'l 10% down since QE)<br>• Logistics hubs with new management structure are ~10% more efficient than avg<br>• Third-party spend per unit down >25% QoQ |
| Advertising | • Optimizing spend by mixing toward higher efficiency channels<br>• Conversion drivers (co-signer offering, faster delivery times, lower rescheduling rates) | • Decreases in conversion due to higher rates etc. offset by efficiency gains<br>• Actively testing to further optimize<br>• Oldest cohort $600 per retail unit below company average |
| Market occupancy | • Consolidate Carvana and ADESA locations in overlapping markets | • Mkt occupancy expense down 4% QoQ |
| Other SG&A | • Standardize limited warranty processes across locations<br>• Consolidate corporate and customer care offices into smaller number of locations<br>• Reduce discretionary spend | • Limited warranty cost per unit down 24% QoQ |

## Integrating ADESA

We closed our acquisition of the ADESA U.S. physical auction business ("ADESA") on May 9, 2022, and since then our teams have been closely working together on integrating Carvana operations into ADESA locations.   We continued to make progress in Q3 and as of November 3, we have:

1)   Embedded market hubs at 38 ADESA locations, up from 18 in August.

2)   Begun landing directly at ADESA sites over 70% of the cars we buy from customers that we plan to sell wholesale, up from over 50% in August.

3)   Continued to inspect and recondition over 500 units per week at ADESA sites that complement our existing IRC footprint, mostly in coastal locations.

Looking forward, we plan to continue adding Carvana operations to ADESA locations to improve our capabilities and provide better, faster, more cost-efficient customer experiences that require relatively low levels of capital investment.

In addition, we plan to preserve, and over time improve upon, the operations that successfully made ADESA the second largest used vehicle physical auction business in the U.S. by delivering the same great service their customers have come to expect from ADESA while also leveraging Carvana capabilities to further benefit their customers.

We are extremely happy with our integration progress so far which has only been possible because of the enthusiasm from the teams on both sides to work together. This progress and the visibility into more has us more excited than ever about the long-term strategic benefits of the Carvana and ADESA combination.

## Expansion

In Q3 2022, we continued completing our in-progress IRC and vending machine construction projects and integrating our newly acquired ADESA U.S. locations.

In Q3, we launched one new Carvana IRC near Richmond, VA and one new vending machine in Phoenix, AZ.

In Q4, we launched a second Carvana IRC near Sacramento, CA, and we expect to complete construction on one additional Carvana IRC near Chicago, IL, which we plan to launch as a logistics and vehicle storage hub in Q4 and as a production location in the future as production needs require.

We expect the completion of the Chicago IRC to bring our total annual capacity at full utilization to ~1.4 million units by the end of 2022, giving us significant capacity for future growth.

In our May 2022 operating plan presentation, we provided a FY 2023 capital expenditure budget in the range of $100 to $200 million. We currently expect to be in the lower half of this range, with our primary focus on leveraging ADESA sites to enhance our logistics network and operating efficiency. We're already starting to see benefits from the Carvana and ADESA combination and are even more excited about what that means for our business in the long-term.

## CARVANA MARKETS, VENDING MACHINES, IRCs, AND ADESA SITES



*As of November 3, 2022

For a complete list of our market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on our IRCs, please see: https://investors.carvana.com/investor-resources/investor-materials

## Management Objectives

As discussed in our recent operating plan presentation, given the current industry, economy, and market environment, we have shifted our priorities to lowering expenses and driving positive free cash flow. However, this letter maintains our historical format built around the three objectives (1) Grow Retail Units and Revenue; (2) Increase Total Gross Profit Per Unit; and (3) Demonstrate Operating Leverage, to discuss our key results.

## LONG TERM FINANCIAL GOALS

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | Q3 2022 | Long Term Target |
|---|---|---|---|---|---|---|---|---|
| YoY Revenue Growth | 180% | 135% | 128% | 101% | 42% | 129% | (2.7)% | – |
| Gross Margin | 5.3% | 7.9% | 10.1% | 12.9% | 14.2% | 15.1% | 10.6% | 15 – 19% |
| Advertising | 7.4% | 6.5% | 5.7% | 5.2% | 5.1% | 3.7% | 3.5% | 1.0 – 1.5% |
| SG&A ex. Advertising and D&A | 21.1% | 18.2% | 14.9% | 13.7% | 13.7% | 11.3% | 14.2% | 4.5 – 5.5% |
| D&A | 1.3% | 1.3% | 1.2% | 1.0% | 1.3% | 1.0% | 1.7% | 0.5 – 1.0% |
| SG&A Total as % of Revenue | 29.8% | 26.0% | 21.7% | 20.0% | 20.2% | 15.9% | 19.4% | 6 – 8% |
| Net Loss Margin | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% | (15.0)% | – |
| Adjusted EBITDA Margin* | (23.2%) | (16.8%) | (9.9%) | (5.7%) | (4.6%) | 0.2% | (5.9)% | 8 – 13.5% |
| EBITDA Margin | | | | | | | | 8 – 13.5% |

*Adjusted EBITDA Margin excludes the impacts of the CEO's Gift and Other Income & Expense which we expect to be immaterial in the long-term

**Numbers may not foot due to rounding

## Objective #1: Grow Retail Units and Revenue

Retail units sold in Q3 were 102,570, a reduction of 8% from 111,949 in Q3 2021. Q3 revenue was $3.386 billion, a reduction of 3% from $3.480 billion in Q3 2021.

As discussed earlier in this letter, retail unit volume in Q3 was impacted by a variety of internal and external factors, including industry-wide used vehicle prices, interest rates, other macroeconomic forces, and our own actions to drive profitability, including passing benchmark interests through to origination rates, reducing advertising, and lowering inventory size. For additional details, please see The Current Environment section of the letter.



**QUARTERLY RETAIL UNIT SALES**

## Objective #2: Increase Total Gross Profit Per Unit

We sequentially improved total GPU in Q3 2022. This improvement was primarily driven by consolidating a full quarter of ADESA results and was achieved despite the headwinds from industry wide increases in used vehicle depreciation rates and benchmark interest rates.

- Total
  - Total GPU was $3,500 vs. $4,672 in Q3 2021 and $3,368 in Q2 2022
    - Total GPU includes $351 of depreciation and amortization and $19 of Gift share-based compensation expense. Total GPU excluding these expenses was $3,870 vs. $3,649 in Q2 2022, a sequential improvement of $221.[2]

- Retail
  - Retail GPU was $1,131 vs. $1,769 in Q3 2021 and $1,131 in Q2 2022[3]
  - Year-over-year changes in retail GPU were primarily driven by higher reconditioning and inbound transport costs and higher retail depreciation rates compared to Q3 2021, partially offset by buying more cars from customers.
  - Sequential changes in retail GPU were primarily driven by higher spreads between retail prices and acquisition prices and lower retail costs of sales, offset by higher retail depreciation rates compared to Q2 2022.

- Wholesale
  - Wholesale GPU was $448 vs. $420 in Q3 2021 and $383 in Q2 2022[4]
  - Year-over-year changes in wholesale GPU were driven by a $127 impact from the acquisition of ADESA offset by higher wholesale market depreciation rates and higher inbound transport costs on wholesale units sold compared to Q3 2021.
  - Sequential changes in wholesale GPU were primarily driven by a full quarter of ADESA operations and lower inbound transport costs on wholesale units sold, partially offset by higher wholesale market depreciation rates compared to Q2 2022.

- Other
  - Other GPU was $1,921 vs. $2,483 in Q3 2021 and $1,854 in Q2 2022
  - Year-over-year changes in Other GPU were primarily driven by higher benchmark interest rates at time of loan sale relative to origination interest rates, wider credit spreads, and a change in loan sales channel mix toward forward flow vs. securitization sales, partially offset by the impact of higher industry-wide vehicle prices on average loan size.
  - Sequential changes in Other GPU were primarily driven by higher origination rates relative to benchmark interest rates and improved securitization credit spreads relative to Q2, partially offset by lower ancillary product attachment rates. Looking toward Q4, we expect to maintain flexibility to optimize our channel mix as the quarter progresses.

---

[2] We are providing Total GPU, Retail GPU, and Wholesale GPU with and excluding D&A and Gift share-based compensation expense. Historically, we have reported GPU including D&A expense, which has had the effect of reducing our GPU numbers, while ADESA historically has reported gross profit figures excluding D&A expense. For purposes of clarity, we are providing both.

[3] Retail GPU included $117 of depreciation and amortization and $19 of Gift share-based compensation. Retail GPU excluding these expenses was $1,267, approximately flat vs. $1,276 in Q2 2022.

[4] Wholesale GPU included $235 of depreciation and amortization. Wholesale GPU excluding this expense was $683 vs. $519 in Q2 2022, a sequential improvement of $164. Beginning in Q2 2022, wholesale gross profit and wholesale GPU includes gross profit from the sale of wholesale marketplace vehicles at our acquired ADESA locations. For additional details on the impact of ADESA on wholesale GPU, please see the Q3 2022 Financial Supplement Tables posted on our investor relations website.



**THIRD QUARTER TOTAL GROSS PROFIT PER UNIT**

## Objective #3: Demonstrate Operating Leverage

On a sequential basis net loss margin increased by 3.7% and Adjusted EBITDA margin levered by 0.3%. On a year-over-year basis net loss margin increased by 13.0% and Adjusted EBITDA margin loss increased by 6.2%, each driven by the industry, economic, and internal factors described throughout this letter.

For Q3 2022, as a percentage of revenue:

- Total SG&A increased by 0.8% sequentially, compensation and benefits increased by 0.1%, advertising increased by 0.1%, logistics and market occupancy levered by 0.1%, and other SG&A increased by 0.7%.
- Total SG&A increased by 3.7% year-over-year, compensation and benefits increased 1.4%, advertising levered by 0.2%, logistics and market occupancy increased by 0.7%, and other SG&A increased by 1.8%.

For additional details on SG&A leverage please see our discussion earlier in this letter.



THIRD QUARTER NET INCOME (LOSS) MARGIN

THIRD QUARTER ADJUSTED EBITDA MARGIN

11

## Summary

In the third quarter, we made some of the most significant operational progress we have ever made as a company. Unfortunately, the increasingly challenging environment presented headwinds that inhibited that progress, allowing only a portion to show in our financial results.

The environment has continued to get increasingly difficult since the end of the quarter and it is probable things will continue to get more difficult before they get easier. As we did this quarter, we will keep our heads down and sprint as quickly as we can to improve operationally against this backdrop.

Difficult periods feel endless when we are in them. They aren't fun. They aren't easy. But they do end. And when this one does, our goal is to look back over the progress we made and the way we improved the business with pride.

The march continues.

Sincerely,

Ernie Garcia, III, Chairman and CEO

Mark Jenkins, CFO

## Appendix

*Conference Call Details*

Carvana will host a conference call today, November 3, 2022, at 5:30 p.m. EST (2:30 p.m. PST) to discuss financial results. To participate in the live call, analysts and investors should dial (833) 255-2830 or (412) 902-6715, and ask for "Carvana Earnings." A live audio webcast of the conference call along with supplemental financial information will also be accessible on the company's website at investors.carvana.com. Following the webcast, an archived version will also be available on the Investor Relations section of the company's website. A telephonic replay of the conference call will be available until November 10, 2022, by dialing (877) 344-7529 or (412) 317-0088 and entering passcode 8157634#.

*Forward Looking Statements*

This letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements reflect Carvana's current expectations and projections with respect to, among other things, its financial condition, results of operations, plans, objectives, future performance, and business. These statements may be preceded by, followed by or include the words "aim," "anticipate," "believe," "estimate," "expect," "forecast," "intend," "likely," "outlook," "plan," "potential," "project," "projection," "seek," "can," "could," "may," "should," "would," "will," the negatives thereof and other words and terms of similar meaning.

Forward-looking statements include all statements that are not historical facts. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. Among these factors are risks related to the "Risk Factors" identified in our Annual Report on Form 10-K for 2021 and our Quarterly Report on Form 10-Q for the first quarter of 2022.

There is no assurance that any forward-looking statements will materialize. You are cautioned not to place undue reliance on forward-looking statements, which reflect expectations only as of this date. Carvana does not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments, or otherwise.

*Use of Non-GAAP Financial Measures*

As appropriate, we supplement our results of operations determined in accordance with U.S. generally accepted accounting principles ("GAAP") with certain non-GAAP financial measurements that are used by management, and which we believe are useful to investors, as supplemental operational measurements to evaluate our financial performance. These measurements should not be considered in isolation or as a substitute for reported GAAP results because they may include or exclude certain items as compared to similar GAAP-based measurements, and such measurements may not be comparable to similarly-titled measurements reported by other companies. Rather, these measurements should be considered as an additional way of viewing aspects of our operations that provide a more complete understanding of our business. We strongly encourage investors to review our consolidated financial statements included in publicly filed reports in their entirety and not rely solely on any one, single financial measurement or communication.

Reconciliations of our non-GAAP measurements to their most directly comparable GAAP-based financial measurements are included at the end of this letter.

Investor Relations Contact Information: Mike Levin, investors@carvana.com

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | September 30, 2022 | December 31, 2021 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 316 | $ 403 |
| Restricted cash | 161 | 233 |
| Accounts receivable, net | 359 | 206 |
| Finance receivables held for sale, net | 485 | 356 |
| Vehicle inventory | 2,577 | 3,149 |
| Beneficial interests in securitizations | 350 | 382 |
| Other current assets, including $5 and $12, respectively, due from related parties | 221 | 163 |
| Total current assets | 4,469 | 4,892 |
| Property and equipment, net | 3,326 | 1,560 |
| Operating lease right-of-use assets, including $14 and $17, respectively, from leases with related parties | 689 | 369 |
| Intangible assets, net | 76 | 4 |
| Goodwill | 847 | 9 |
| Other assets, including $1 and $7, respectively, due from related parties | 214 | 181 |
| Total assets | $ 9,621 | $ 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $19 and $27, respectively, due to related parties | $ 1,009 | $ 656 |
| Short-term revolving facilities | 575 | 2,053 |
| Current portion of long-term debt | 213 | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | 81 | 29 |
| Total current liabilities | 1,878 | 2,890 |
| Long-term debt, excluding current portion | 6,616 | 3,208 |
| Operating lease liabilities, excluding current portion, including $10 and $13, respectively, from leases with related parties | 669 | 361 |
| Other liabilities | 84 | 31 |
| Total liabilities | 9,247 | 6,490 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2022 and December 31, 2021 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,932 and 89,930 shares issued and outstanding as of September 30, 2022 and December 31, 2021, respectively | — | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of September 30, 2022 and December 31, 2021 | — | — |
| Additional paid-in capital | 1,544 | 795 |
| Accumulated deficit | (1,270) | (489) |
| Total stockholders' equity attributable to Carvana Co. | 274 | 306 |
| Non-controlling interests | 100 | 219 |
| Total stockholders' equity | 374 | 525 |
| Total liabilities & stockholders' equity | $ 9,621 | $ 7,015 |

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Sales and operating revenues:** | | | | |
| Retail vehicle sales, net | $ 2,492 | $ 2,650 | $ 8,186 | $ 6,954 |
| Wholesale sales and revenues, including $6, $15, $27 and $37, respectively, from related parties | 697 | 552 | 1,976 | 1,349 |
| Other sales and revenues, including $39, $52, $137 and $143, respectively, from related parties | 197 | 278 | 605 | 758 |
| **Net sales and operating revenues** | 3,386 | 3,480 | 10,767 | 9,061 |
| Cost of sales, including $2, $17, $20 and $21, respectively, to related parties | 3,027 | 2,957 | 9,714 | 7,648 |
| **Gross profit** | 359 | 523 | 1,053 | 1,413 |
| Selling, general and administrative expenses, including $7, $7, $20 and $19, respectively, to related parties | 656 | 546 | 2,104 | 1,413 |
| Interest expense | 153 | 48 | 333 | 121 |
| Other (income) expense, net | 58 | (3) | 68 | (16) |
| **Net loss before income taxes** | (508) | (68) | (1,452) | (105) |
| Income tax provision | — | — | 1 | — |
| **Net loss** | (508) | (68) | (1,453) | (105) |
| Net loss attributable to non-controlling interests | (225) | (36) | (672) | (59) |
| **Net loss attributable to Carvana Co.** | $ (283) | $ (32) | $ (781) | $ (46) |
| Net loss per share of Class A common stock, basic and diluted | $ (2.67) | $ (0.38) | $ (7.88) | $ (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 105,857 | 84,779 | 99,134 | 81,427 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

15

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (1,453) | $ (105) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 179 | 72 |
| Equity-based compensation expense | 57 | 28 |
| Loss on disposal of property and equipment | 3 | 1 |
| Provision for bad debt and valuation allowance | 11 | 16 |
| Amortization and write-off of debt issuance costs | 20 | 8 |
| Unrealized loss on warrants to acquire Root's Class A common stock | 77 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 1 | (6) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (5,690) | (5,315) |
| Proceeds from sale of finance receivables, net | 5,628 | 5,375 |
| Gain on loan sales | (361) | (528) |
| Principal payments received on finance receivables held for sale | 146 | 136 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 638 | (1,230) |
| Accounts receivable | 40 | (111) |
| Other assets | (75) | (86) |
| Accounts payable and accrued liabilities | 155 | 319 |
| Operating lease right-of-use assets | (132) | (117) |
| Operating lease liabilities | 178 | 121 |
| Other liabilities | (7) | — |
| Net cash used in operating activities | (585) | (1,422) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (451) | (390) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 72 | 38 |
| Net cash used in investing activities | (2,568) | (352) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 10,596 | 8,733 |
| Payments on short-term revolving facilities | (12,074) | (8,318) |
| Proceeds from issuance of long-term debt | 3,435 | 1,525 |
| Payments on long-term debt | (111) | (46) |
| Payments of debt issuance costs | (75) | (21) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 4 | 1 |
| Tax withholdings related to restricted stock units and awards | (8) | (25) |
| Net cash provided by financing activities | 2,994 | 1,849 |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (159) | 75 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 477 | $ 404 |

**CARVANA CO. AND SUBSIDIARIES**
**OUTSTANDING SHARES AND LLC UNITS**
**(Unaudited)**

LLC Units (adjusted for the exchange ratio and participation thresholds) are considered potentially dilutive shares of Class A common stock because they are exchangeable into shares of Class A common stock, if the Company elects not to settle exchanges in cash. Weighted-average shares of Class A common stock and as-exchanged LLC Units, which were evaluated for potentially dilutive effects and were determined to be anti-dilutive, are as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | **2022** | **2021** | **2022** | **2021** |
|  | (in thousands) | | | |
| Weighted-average shares of Class A common stock outstanding | 105,857 | 84,779 | 99,134 | 81,427 |
| Weighted-average as-exchanged LLC Units for shares of Class A common stock | 84,543 | 90,062 | 84,764 | 93,331 |
|  | 190,400 | 174,841 | 183,898 | 174,758 |

17

**CARVANA CO. AND SUBSIDIARIES**
**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES (continued)**
**(Unaudited)**

*Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation*

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically been only a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations.

A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net loss, which is the most directly comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| (dollars in millions) | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 | Jun 30, 2022 | Sep 30, 2022 |
| Net loss | $ (68) | $ (182) | $ (506) | $ (439) | $ (508) |
| Income tax provision | — | 1 | — | 1 | — |
| Interest expense | 48 | 55 | 64 | 116 | 153 |
| Other (income) expense, net | (3) | 22 | 13 | (3) | 58 |
| Depreciation and amortization expense in cost of sales | 6 | 7 | 8 | 27 | 36 |
| Depreciation and amortization expense in SG&A | 26 | 33 | 37 | 49 | 57 |
| CEO Milestone Gift in cost of sales | — | — | 8 | 6 | 2 |
| CEO Milestone Gift in SG&A | — | — | 20 | 4 | 2 |
| Adjusted EBITDA [1] | $ 9 | $ (64) | $ (356) | $ (239) | $ (200) |
| Share-based compensation, excluding Gift | 11 | 11 | 10 | 9 | 14 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [1] | $ 20 | $ (53) | $ (346) | $ (230) | $ (186) |
| | | | | | |
| Total revenues | $ 3,480 | $ 3,753 | $ 3,497 | $ 3,884 | $ 3,386 |
| Net loss margin | (2.0)% | (4.8)% | (14.5)% | (11.3)% | (15.0)% |
| Adjusted EBITDA Margin [2] | 0.3 % | (1.7)% | (10.2)% | (6.2)% | (5.9)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation [2] | 0.6 % | (1.4)% | (9.9)% | (5.9)% | (5.5)% |

(1) For the three months ended June 30, 2022, includes $14 of expenses associated with the previously announced workforce reduction.
(2) For the three months ended June 30, 2022, includes 0.4% of expenses associated with the previously announced workforce reduction.

18

| (dollars in millions) | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Net loss | $(37) | $(93) | $(164) | $(255) | $(365) | $(462) | $(287) |
| Income tax provision | — | — | — | — | — | — | 1 |
| Interest expense | 1 | 3 | 7 | 25 | 81 | 131 | 176 |
| Other (income) expense, net | — | — | 1 | 1 | 4 | (1) | 6 |
| Depreciation and amortization expense in cost of sales | — | — | — | — | — | — | 24 |
| Depreciation and amortization expense in SG&A | 3 | 5 | 12 | 24 | 41 | 74 | 105 |
| CEO Milestone Gift in cost of sales | — | — | — | 4 | 5 | 1 | — |
| CEO Milestone Gift in SG&A | — | — | — | 8 | 8 | — | — |
| Adjusted EBITDA | $(33) | $(85) | $(144) | $(193) | $(226) | $(257) | $25 |
| Share-based compensation, excluding Gift | — | — | 6 | 14 | 23 | 25 | 39 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(33) | $(85) | $(138) | $(179) | $(203) | $(232) | $64 |
| | | | | | | | |
| Total revenues | $130 | $365 | $859 | $1,955 | $3,940 | $5,587 | $12,814 |
| Net loss margin | (28.5)% | (25.5)% | (19.1)% | (13.0)% | (9.3)% | (8.3)% | (2.2)% |
| Adjusted EBITDA Margin | (25.0)% | (23.2)% | (16.8)% | (9.9)% | (5.7)% | (4.6)% | 0.2% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (25.0)% | (23.2)% | (16.1)% | (9.2)% | (5.2)% | (4.2)% | 0.5% |

| (dollars in millions) | Three Months Ended, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Q3 14** | **Q3 15** | **Q3 16** | **Q3 17** | **Q3 18** | **Q3 19** | **Q3 20** | **Q3 21** | **Q3 22** |
| Net loss | $(4) | $(8) | $(23) | $(41) | $(64) | $(93) | $(18) | $(68) | $(508) |
| Income tax provision | — | — | — | — | — | — | — | — | — |
| Interest expense | — | — | 1 | 1 | 6 | 21 | 20 | 48 | 153 |
| Other (income) expense, net | — | — | — | 1 | — | 1 | (9) | (3) | 58 |
| Depreciation and amortization expense in cost of sales | — | — | — | — | — | — | — | 6 | 36 |
| Depreciation and amortization expense in SG&A | — | 1 | 1 | 3 | 6 | 11 | 19 | 26 | 57 |
| CEO Milestone Gift in cost of sales | — | — | — | — | 1 | 1 | — | — | 2 |
| CEO Milestone Gift in SG&A | — | — | — | — | 7 | 3 | — | — | 2 |
| Adjusted EBITDA | $(4) | $(7) | $(21) | $(36) | $(44) | $(56) | $12 | $9 | $(200) |
| Share-based compensation, excluding Gift | — | — | — | 2 | 3 | 6 | 6 | 11 | 14 |
| Adjusted EBITDA, excluding non-Gift share-based compensation | $(4) | $(7) | $(21) | $(34) | $(41) | $(50) | $18 | $20 | $(186) |
| | | | | | | | | | |
| Total revenues | $12 | $36 | $99 | $225 | $535 | $1,095 | $1,544 | $3,480 | $3,386 |
| Net loss margin | (36.1)% | (26.0)% | (22.2)% | (17.6)% | (12.0)% | (8.4)% | (1.2)% | (2.0)% | (15.0)% |
| Adjusted EBITDA Margin | (32.7)% | (23.1)% | (20.3)% | (15.6)% | (8.3)% | (5.1)% | 0.8% | 0.3% | (5.9)% |
| Adjusted EBITDA Margin, excluding non-Gift share-based compensation | (32.7)% | (23.1)% | (20.3)% | (15.1)% | (7.7)% | (4.6)% | 1.2% | 0.6% | (5.5)% |

19

**CARVANA CO. AND SUBSIDIARIES**
**RESULTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | Change | 2022 | 2021 | Change |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Retail vehicle sales, net | $ 2,492 | $ 2,650 | (6.0)% | $ 8,186 | $ 6,954 | 17.7 % |
| Wholesale sales and revenues [1] | 697 | 552 | 26.3 % | 1,976 | 1,349 | 46.5 % |
| Other sales and revenues [2] | 197 | 278 | (29.1)% | 605 | 758 | (20.2)% |
| Total net sales and operating revenues | $ 3,386 | $ 3,480 | (2.7)% | $ 10,767 | $ 9,061 | 18.8 % |
| **Gross profit:** | | | | | | |
| Retail vehicle gross profit [3] | $ 116 | $ 198 | (41.4)% | $ 334 | $ 528 | (36.7)% |
| Wholesale gross profit [1] | 46 | 47 | (2.1)% | 114 | 127 | (10.2)% |
| Other gross profit [2] | 197 | 278 | (29.1)% | 605 | 758 | (20.2)% |
| Total gross profit | $ 359 | $ 523 | (31.4)% | $ 1,053 | $ 1,413 | (25.5)% |
| **Unit sales information:** | | | | | | |
| Retail vehicle unit sales | 102,570 | 111,949 | (8.4)% | 325,319 | 312,221 | 4.2 % |
| Wholesale vehicle unit sales | 47,763 | 50,204 | (4.9)% | 153,342 | 123,296 | 24.4 % |
| **Per unit selling prices:** | | | | | | |
| Retail vehicles | 24,296 | 23,671 | 2.6 % | 25,163 | 22,273 | 13.0 % |
| Wholesale vehicles | 14,593 | 10,995 | 32.7 % | 12,886 | 10,941 | 17.8 % |
| **Per retail unit gross profit:** | | | | | | |
| Retail vehicle gross profit [4] | $ 1,131 | $ 1,769 | (36.1)% | $ 1,027 | $ 1,691 | (39.3)% |
| Wholesale gross profit | 448 | 420 | 6.7 % | 350 | 407 | (14.0)% |
| Other gross profit | 1,921 | 2,483 | (22.6)% | 1,860 | 2,428 | (23.4)% |
| Total gross profit | $ 3,500 | $ 4,672 | (25.1)% | $ 3,237 | $ 4,526 | (28.5)% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit [5] | $ 691 | $ 936 | (26.2)% | $ 626 | $ 1,030 | (39.2)% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 193,061 | $ — | NM | 304,944 | $ — | NM |
| Wholesale marketplace revenues [6] | $ 193 | $ — | NM | $ 301 | $ — | NM |
| Wholesale marketplace gross profit [6] [7] | $ 13 | $ — | NM | $ 18 | $ — | NM |

_____

(1) Includes $6, $15, $27 and $37, respectively, of wholesale revenue from related parties.

(2) Includes $39, $52, $137 and $143, respectively, of other sales and revenues from related parties.

(3) For the three and nine months ended September 30, 2022, used vehicle gross profit includes $2 and $16, respectively, of share-based compensation expense related to the CEO Milestone Gift.

(4) For the three and nine months ended September 30, 2022, used vehicle per unit gross profit includes $19 and $49, respectively, of share-based compensation expense related to the CEO Milestone Gift.

(5) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.

(6) For the three and nine months ended September 30, 2022, wholesale marketplace gross profit includes $22 and $37, respectively, of depreciation and amortization expense.

NM = Not meaningful

**CARVANA CO. AND SUBSIDIARIES**
**COMPONENTS OF SG&A**
**(Unaudited)**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | Sep 30, 2021 | Dec 31, 2021 | Mar 31, 2022 | Jun 30, 2022 | Sep 30, 2022 |
| | (in millions) | | | | |
| Compensation and benefits [1] | $ 181 | $ 212 | $ 236 | $ 248 | $ 221 |
| CEO Milestone Gift [2] | — | — | 20 | 4 | 2 |
| Advertising | 126 | 134 | 155 | 131 | 117 |
| Market occupancy [3] | 18 | 24 | 23 | 24 | 23 |
| Logistics [4] | 40 | 44 | 56 | 71 | 57 |
| Other [5] | 181 | 206 | 237 | 243 | 236 |
| Total | $ 546 | $ 620 | $ 727 | $ 721 | $ 656 |
| Depreciation and amortization | 26 | 33 | 37 | 49 | 57 |
| Share-based compensation, excluding Gift | $ 11 | $ 11 | $ 10 | 9 | 14 |
| Total, excluding depreciation and amortization and share-based compensation | $ 509 | $ 576 | $ 660 | $ 659 | $ 583 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the CEO's gift of personal stock to employees upon the company's one millionth vehicle sold, except those costs related to preparing vehicles for sale, which are included in cost of sales.

(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.

(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.

(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

**CARVANA CO. AND SUBSIDIARIES**
**LIQUIDITY RESOURCES**
**(Unaudited)**

We had the following liquidity resources available as of September 30, 2022 and December 31, 2021:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 316 | $ 403 |
| Availability under short-term revolving facilities [1] | 1,956 | 438 |
| **Committed liquidity resources available** | **$ 2,272** | **$ 841** |
| Unpledged vehicle inventory not included above[2] | 52 | 665 |
| Unpledged real estate not included above[3] | 1,995 | 677 |
| Unpledged beneficial interests in securitizations[4] | 67 | 100 |
| **Total liquidity resources[5]** | **$ 4,386** | **$ 2,283** |

_____

1.  Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date, excluding the impact to restricted cash requirements. This is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

2.  Unpledged vehicle inventory is the value of vehicle inventory on our balance sheet on the period end date beyond that covered by committed financing agreements.

3.  Unpledged real estate assets include IRC, ADESA locations and vending machine real estate assets that have not been previously pledged or sold. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

4.  Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

5.  Total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities on our balance sheet that can be financed using traditional asset-based financing sources. To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.













# CARVANA
## CULTURE

# Q3 | 2022



# Exhibit 30

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the Quarterly Period Ended September 30, 2022

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission File Number: 001-38073

# CARVANA CO.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**300 E. Rio Salado Parkway**     **Tempe**     **Arizona**     **85281**
(Address of principal executive offices)          (Zip Code)

**(480) 719-8809**
(Registrant's telephone number, including area code)

**1930 W. Rio Salado Parkway**     **Tempe**     **Arizona**     **85281**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒  Yes ☐  No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒  Yes ☐  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of October 31, 2022, the registrant had 105,947,745 shares of Class A common stock outstanding and 82,900,276 shares of Class B common stock outstanding.

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
| | Unaudited Condensed Consolidated Balance Sheets as of September 30, 2022 and December 31, 2021 | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2022 and 2021 | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity for the Three and Nine Months Ended September 30, 2022 and 2021 | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2022 and 2021 | 7 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 58 |
| Item 4. | Controls and Procedures | 58 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 60 |
| Item 1A. | Risk Factors | 60 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 60 |
| Item 3. | Defaults Upon Senior Securities | 60 |
| Item 4. | Mine Safety Disclosures | 60 |
| Item 5. | Other Information | 60 |
| Item 6. | Exhibits | 61 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 316 | $ 403 |
| Restricted cash | 161 | 233 |
| Accounts receivable, net | 359 | 206 |
| Finance receivables held for sale, net | 485 | 356 |
| Vehicle inventory | 2,577 | 3,149 |
| Beneficial interests in securitizations | 350 | 382 |
| Other current assets, including $5 and $12, respectively, due from related parties | 221 | 163 |
| Total current assets | 4,469 | 4,892 |
| Property and equipment, net | 3,326 | 1,560 |
| Operating lease right-of-use assets, including $14 and $17, respectively, from leases with related parties | 689 | 369 |
| Intangible assets, net | 76 | 4 |
| Goodwill | 847 | 9 |
| Other assets, including $1 and $7, respectively, due from related parties | 214 | 181 |
| Total assets | $ 9,621 | $ 7,015 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities, including $19 and $27, respectively, due to related parties | $ 1,009 | $ 656 |
| Short-term revolving facilities | 575 | 2,053 |
| Current portion of long-term debt | 213 | 152 |
| Other current liabilities, including $4 and $3, respectively, from leases with related parties | 81 | 29 |
| Total current liabilities | 1,878 | 2,890 |
| Long-term debt, excluding current portion | 6,616 | 3,208 |
| Operating lease liabilities, excluding current portion, including $10 and $13, respectively, from leases with related parties | 669 | 361 |
| Other liabilities | 84 | 31 |
| Total liabilities | 9,247 | 6,490 |
| Commitments and contingencies (Note 17) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2022 and December 31, 2021 | — | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 105,932 and 89,930 shares issued and outstanding as of September 30, 2022 and December 31, 2021, respectively | — | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 82,900 shares issued and outstanding as of September 30, 2022 and December 31, 2021 | — | — |
| Additional paid-in capital | 1,544 | 795 |
| Accumulated deficit | (1,270) | (489) |
| Total stockholders' equity attributable to Carvana Co. | 274 | 306 |
| Non-controlling interests | 100 | 219 |
| Total stockholders' equity | 374 | 525 |
| Total liabilities & stockholders' equity | $ 9,621 | $ 7,015 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| **Sales and operating revenues:** | | | | |
| Retail vehicle sales, net | $ 2,492 | $ 2,650 | $ 8,186 | $ 6,954 |
| Wholesale sales and revenues, including $6, $15, $27 and $37, respectively, from related parties | 697 | 552 | 1,976 | 1,349 |
| Other sales and revenues, including $39, $52, $137 and $143, respectively, from related parties | 197 | 278 | 605 | 758 |
| **Net sales and operating revenues** | 3,386 | 3,480 | 10,767 | 9,061 |
| Cost of sales, including $2, $17, $20 and $21, respectively, to related parties | 3,027 | 2,957 | 9,714 | 7,648 |
| **Gross profit** | 359 | 523 | 1,053 | 1,413 |
| Selling, general and administrative expenses, including $7, $7, $20 and $19, respectively, to related parties | 656 | 546 | 2,104 | 1,413 |
| Interest expense | 153 | 48 | 333 | 121 |
| Other (income) expense, net | 58 | (3) | 68 | (16) |
| **Net loss before income taxes** | (508) | (68) | (1,452) | (105) |
| Income tax provision | — | — | 1 | — |
| **Net loss** | (508) | (68) | (1,453) | (105) |
| Net loss attributable to non-controlling interests | (225) | (36) | (672) | (59) |
| **Net loss attributable to Carvana Co.** | $ (283) | $ (32) | $ (781) | $ (46) |
| Net loss per share of Class A common stock, basic and diluted | $ (2.67) | $ (0.38) | $ (7.88) | $ (0.56) |
| Weighted-average shares of Class A common stock, basic and diluted [1] | 105,857 | 84,779 | 99,134 | 81,427 |

(1) Weighted-average shares of Class A common stock outstanding have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2020** | 76,512 | $ — | 95,592 | $ — | $ 742 | $ (354) | $ 414 | $ 802 |
| Net loss | — | — | — | — | — | (36) | (46) | (82) |
| Exchanges of LLC Units | 3,247 | — | (3,073) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 225 | — | — | 225 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (225) | — | — | (225) |
| Issuance of Class A common stock to settle vested restricted stock units | 62 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (9) | — | — | (9) |
| Options exercised | 15 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 10 | — | — | 10 |
| **Balance, March 31, 2021** | 79,834 | $ — | 92,519 | $ — | $ 755 | $ (390) | $ 356 | $ 721 |
| Net income | — | — | — | — | — | 22 | 23 | 45 |
| Exchanges of LLC Units | 3,189 | — | (3,118) | — | 12 | — | (12) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 217 | — | — | 217 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (217) | — | — | (217) |
| Issuance of Class A common stock to settle vested restricted stock units | 59 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (2) | — | — | — | (8) | — | — | (8) |
| Options exercised | 26 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 11 | — | — | 11 |
| **Balance, June 30, 2021** | 83,106 | $ — | 89,401 | $ — | $ 771 | $ (368) | $ 367 | $ 770 |

3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net loss | — | — | — | — | — | (32) | (36) | (68) |
| Exchanges of LLC Units | 2,400 | — | (2,201) | — | 8 | — | (8) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 199 | — | — | 199 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (199) | — | — | (199) |
| Issuance of Class A common stock to settle vested restricted stock units | 42 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (1) | — | — | — | (8) | — | — | (8) |
| Options exercised | 22 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 14 | — | — | 14 |
| **Balance, September 30, 2021** | 85,569 | $ — | 87,200 | $ — | $ 785 | $ (400) | $ 323 | $ 708 |

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY - (Continued)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 89,930 | $ — | 82,900 | $ — | $ 795 | $ (489) | $ 219 | $ 525 |
| Net loss | — | — | — | — | — | (260) | (246) | (506) |
| Exchanges of LLC Units | 27 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1 | — | — | 1 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1) | — | — | (1) |
| Contribution of Class A common stock from related party | (97) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 139 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (12) | — | — | (12) |
| Options exercised | 63 | — | — | — | 2 | — | — | 2 |
| Equity-based compensation | — | — | — | — | 43 | — | — | 43 |
| **Balance, March 31, 2022** | 90,062 | $ — | 82,900 | $ — | $ 829 | $ (749) | $ (28) | $ 52 |
| Net loss | — | — | — | — | — | (238) | (201) | (439) |
| Issuances of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 15,625 | — | — | — | 1,227 | — | — | 1,227 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (554) | — | 554 | — |
| Exchanges of LLC Units | 19 | — | — | — | — | — | — | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21 | — | — | 21 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21) | — | — | (21) |
| Contribution of Class A common stock from related party | (2) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 48 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 27 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | 5 | — | — | 5 |
| Options exercised | 10 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, June 30, 2022** | 105,789 | $ — | 82,900 | $ — | $ 1,526 | $ (987) | $ 325 | $ 864 |
| Net loss | — | — | — | — | — | (283) | (225) | (508) |

5

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contribution of Class A common stock from related party | (14) | | — | | — | | — | | — | | — | | — | | — |
| Issuance of Class A common stock as restricted stock awards and to settle vested restricted stock units | 142 | | — | | — | | — | | — | | — | | — | | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | | — | | — | | — | | (1) | | — | | — | | (1) |
| Options exercised | 15 | | — | | — | | — | | 1 | | — | | — | | 1 |
| Equity-based compensation | — | | — | | — | | — | | 18 | | — | | — | | 18 |
| **Balance, September 30, 2022** | 105,932 | $ | — | 82,900 | $ | — | $ | 1,544 | $ | (1,270) | $ | 100 | $ | 374 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**
**(In millions)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2022 | 2021 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (1,453) | $ (105) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 179 | 72 |
| Equity-based compensation expense | 57 | 28 |
| Loss on disposal of property and equipment | 3 | 1 |
| Provision for bad debt and valuation allowance | 11 | 16 |
| Amortization and write-off of debt issuance costs | 20 | 8 |
| Unrealized loss on warrants to acquire Root's Class A common stock | 77 | — |
| Unrealized loss (gain) on beneficial interests in securitization | 1 | (6) |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (5,690) | (5,315) |
| Proceeds from sale of finance receivables, net | 5,628 | 5,375 |
| Gain on loan sales | (361) | (528) |
| Principal payments received on finance receivables held for sale | 146 | 136 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 638 | (1,230) |
| Accounts receivable | 40 | (111) |
| Other assets | (75) | (86) |
| Accounts payable and accrued liabilities | 155 | 319 |
| Operating lease right-of-use assets | (132) | (117) |
| Operating lease liabilities | 178 | 121 |
| Other liabilities | (7) | — |
| Net cash used in operating activities | (585) | (1,422) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (451) | (390) |
| Payments for acquisitions, net of cash acquired | (2,189) | — |
| Principal payments received on and proceeds from sale of beneficial interests | 72 | 38 |
| Net cash used in investing activities | (2,568) | (352) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 10,596 | 8,733 |
| Payments on short-term revolving facilities | (12,074) | (8,318) |
| Proceeds from issuance of long-term debt | 3,435 | 1,525 |
| Payments on long-term debt | (111) | (46) |
| Payments of debt issuance costs | (75) | (21) |
| Net proceeds from issuance of Class A common stock | 1,227 | — |
| Proceeds from equity-based compensation plans | 4 | 1 |
| Tax withholdings related to restricted stock units and awards | (8) | (25) |
| Net cash provided by financing activities | 2,994 | 1,849 |
| **Net (decrease) increase in cash, cash equivalents and restricted cash** | (159) | 75 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 477 | $ 404 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co."), together with its consolidated subsidiaries (the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want — a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle purchase transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC"), auto insurance, and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016 for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Notes (as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and guaranteed by its and Carvana Group's existing domestic restricted subsidiaries.

In accordance with Carvana Group LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity, the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of September 30, 2022, Carvana Co. owned approximately 55.7% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity) owned the remaining 44.3%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K filed on February 24, 2022.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of September 30, 2022, results of operations and changes in stockholder's equity for the three and nine months ended September 30, 2022 and 2021, and cash flows for the nine months ended September 30, 2022 and 2021. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

8

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Liquidity**

Since inception, the Company has incurred losses, and expects to incur additional losses in the future as it continues to build inspection and reconditioning centers ("IRCs") and vending machines, serve more of the U.S. population, and enhance technology and software. In the second quarter of 2022, the Company completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion and issued a total of $3.275 billion in aggregate principal amount of 10.25% senior unsecured notes due 2030 (the "2030 Notes"). The Company used a portion of the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the offering. The Company used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the $2.2 billion acquisition of the U.S. physical auction business of ADESA, Inc. ("ADESA") and other ancillary transactions in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes. In March 2022, the Company's forward flow partner committed to purchase a total of $5.0 billion of the Company's finance receivables through March 2023, and such facility had $1.9 billion of unused capacity as of September 30, 2022. In addition, the Company has a $2.2 billion floor plan facility effective through September 22, 2023, and $2.0 billion thereafter through March 22, 2024. Management believes that current working capital, results of operations, and existing financing arrangements are sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Adoption of New Accounting Standards**

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. ASU 2021-08 requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606 instead of being recorded at fair value. The Company early adopted ASU 2021-08 in the second quarter of 2022 and it did not have a material effect on its condensed consolidated financial statements as there were no business combinations affected by the retrospective application to January 1, 2022.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Business**

On May 9, 2022, the Company completed its previously announced acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA from KAR Auction Services, Inc. for approximately $2.2 billion in cash. Proceeds from the issuance and sale of the 2030 Notes were used to fund the acquisition. The acquisition included 56 auction sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding the Company's infrastructure and enhancing its customer offering by facilitating a broader selection of vehicles and faster delivery times.

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes the preliminary allocation of the purchase price consideration to identifiable assets acquired and liabilities assumed as of September 30, 2022:

|  | Preliminary Purchase Price Allocation |
|---|---|
|  | (in millions) |
| **Assets Acquired** |  |
| Current assets | $ 208 |
| Property and equipment | 1,281 |
| Operating lease right-of-use assets | 188 |
| Intangible assets | 79 |
| Other assets | 1 |
| Total Assets Acquired | 1,757 |
|  |  |
| **Liabilities Assumed** |  |
| Current liabilities | 233 |
| Operating lease liabilities | 167 |
| Total Liabilities Assumed | 400 |
|  |  |
| **Net Assets Acquired** | 1,357 |
| Purchase price consideration | 2,195 |
| **Goodwill** | $ 838 |

Identifiable intangible assets acquired consist of the following:

|  | Fair Value | Useful Life |
|---|---|---|
| Customer relationships | $ 50 | 10 years |
| Developed technology | $ 29 | 3 years |

Preliminary measurements of fair value are subject to change during the measurement period based on the Company's continuing review of matters related to the acquisition and could be material. The Company expects to complete the purchase price allocation as soon as practicable, but no later than one year from the acquisition date.

Customer relationships were valued using the multi-period excess earnings method of the income approach. Developed technology was valued using the replacement cost method of the cost approach. Significant assumptions used in the valuations were revenues and attrition rate and are classified as Level 3 due to the lack of observable market data. No residual values were assigned to the customer relationships and developed technology intangible assets and they are amortized on an economic useful life basis commensurate with future anticipated cash flows and straight line, respectively. As of September 30, 2022, the remaining weighted-average amortization period for the intangible assets acquired was approximately 6.8 years.

Real property was valued using market comparable transactions of the market approach, for which the key assumption is the similarity of the acquired property to market comparable transactions. Personal property was valued using the replacement cost method of the cost approach, for which the key assumptions are the costs of similar personal property in new condition and economic obsolescence rates.

The acquisition resulted in the recognition of $838 million of goodwill, which is deductible for tax purposes and represents the future economic benefits expected to arise from anticipated synergies and intangible assets that do not qualify for separate recognition, including an assembled workforce, non-contractual relationships and other agreements.

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

For the three and nine months ended September 30, 2022, the Company recognized $193 million and $301 million, respectively, of wholesale sales and revenues, $180 million and $283 million, respectively, of cost of sales, and a net loss of $36 million and $57 million, respectively, from ADESA operations, which includes $31 million and $51 million, respectively, of depreciation and amortization, including acquired intangible assets amortization expense of $6 million and $10 million, respectively.

The following unaudited pro forma combined results of operations information for the three and nine months ended September 30, 2022 and 2021 have been prepared as if the ADESA acquisition occurred on January 1, 2021:

| | *Unaudited* | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (in millions) | | | |
| Revenues | $ 3,386 | $ 3,685 | $ 11,066 | $ 9,721 |
| Net loss | (508) | (144) | (1,583) | (312) |
| Net loss attributable to non-controlling interests | (225) | (68) | (703) | (153) |
| Net loss attributable to Carvana Co. | $ (283) | $ (76) | $ (880) | $ (159) |
| Net loss per share of Class A common stock - basic and diluted | $ (2.67) | $ (0.76) | $ (8.32) | $ (1.64) |
| Weighted-average shares of Class A common stock - basic and diluted | 105,857 | 100,404 | 105,774 | 97,076 |

The unaudited pro forma combined results of operations information reflect the following pro forma adjustments:

| | *Unaudited* | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | Increase/(Decrease) (in millions) | | | |
| Interest expense | $ — | $ 86 | $ 123 | $ 259 |
| Lease expense | — | (3) | 5 | (13) |
| Depreciation and amortization expense | — | — | 13 | (4) |
| Intercompany revenues and cost of sales | — | $ (5) | $ (7) | $ (15) |

The unaudited pro forma combined results of operations information is provided for informational purposes only and is not necessarily intended to represent the results that would have been achieved had the ADESA acquisition been consummated on January 1, 2021 or indicative of the results that may be achieved in the future.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 4 — PROPERTY AND EQUIPMENT, NET**

The following table summarizes property and equipment, net as of September 30, 2022 and December 31, 2021:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Land and site improvements | $ 1,357 | $ 303 |
| Buildings and improvements | 1,231 | 643 |
| Transportation fleet | 658 | 347 |
| Software | 229 | 169 |
| Furniture, fixtures and equipment | 172 | 97 |
| Total property and equipment excluding construction in progress | 3,647 | 1,559 |
| Less: accumulated depreciation and amortization on property and equipment | (488) | (294) |
| Property and equipment excluding construction in progress, net | 3,159 | 1,265 |
| Construction in progress | 167 | 295 |
| Property and equipment, net | $ 3,326 | $ 1,560 |

Depreciation and amortization expense on property and equipment was $100 million and $33 million for the three months ended September 30, 2022 and 2021, respectively, of which $51 million and $27 million were recorded to selling, general and administrative expense, respectively, $13 million and $6 million were capitalized to vehicle inventory, respectively, and $36 million and $6 million were recorded to cost of sales, respectively, including $13 million and $6 million previously capitalized to vehicle inventory.

Depreciation and amortization expense on property and equipment was $238 million and $91 million for the nine months ended September 30, 2022 and 2021, respectively, of which $132 million and $72 million were recorded to selling, general and administrative expense, respectively, $34 million and $19 million were capitalized to vehicle inventory, respectively, and $72 million and $17 million were recorded to cost of sales, respectively, including $31 million and $17 million previously capitalized to vehicle inventory, respectively.

**NOTE 5 — GOODWILL AND INTANGIBLE ASSETS, NET**

The following table summarizes goodwill and intangible assets, net as of September 30, 2022 and December 31, 2021:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Intangible assets: | | |
| Customer relationships | $ 50 | $ — |
| Developed technology | 41 | 9 |
| Non-compete agreements | 1 | 1 |
| Intangible assets, acquired cost | 92 | 10 |
| Less: accumulated amortization | (16) | (6) |
| Intangible assets, net | $ 76 | $ 4 |
| | | |
| Goodwill | $ 847 | $ 9 |

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Amortization expense was $6 million and less than $1 million during the three months ended September 30, 2022 and 2021, respectively, and $10 million and $1 million during the nine months ended September 30, 2022 and 2021, respectively. As of September 30, 2022, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 6.3 years. The anticipated annual amortization expense to be recognized in future years as of September 30, 2022, is as follows:

|  | Expected Future Amortization |
|---|---|
|  | (in millions) |
| Remainder of 2022 | $ 6 |
| 2023 | 18 |
| 2024 | 18 |
| 2025 | 14 |
| 2026 | 7 |
| Thereafter | 13 |
| Total | $ 76 |

### NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of September 30, 2022 and December 31, 2021:

|  | September 30, 2022 | December 31, 2021 |
|---|---|---|
|  | (in millions) | |
| Accounts payable, including $19 and $27, respectively, due to related parties | $ 292 | $ 141 |
| Accrued compensation and benefits | 78 | 45 |
| Sales taxes and vehicle licenses and fees | 85 | 102 |
| Accrued interest expense | 191 | 42 |
| Reserve for returns and cancellations | 58 | 44 |
| Accrued property and equipment | 32 | 85 |
| Customer deposits | 33 | 34 |
| Accrued advertising costs | 18 | 40 |
| Other accrued liabilities | 222 | 123 |
| Total accounts payable and accrued liabilities | $ 1,009 | $ 656 |

### NOTE 7 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all of the interests in DriveTime, entered into a lease agreement that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities (the "DriveTime Lease Agreement"). The DriveTime Lease Agreement was most recently amended in December 2018. Lease duration varies by location, with the hub locations having cancellable terms, provided 60 days' prior written notice is given, expiring between 2023 and 2026. The Company has the right to exercise up to two

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

consecutive one-year renewal options at up to ten of these hub locations, less the number of locations renewed under the DriveTime Hub Lease Agreement described below.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. Lease expiration varies by location with most having cancellable terms, provided 60 days' prior written notice is given, expiring between 2022 and 2023 and the Company having the right to exercise up to two consecutive one-year renewal options at up to ten of these locations, less the number of locations renewed under the DriveTime Lease Agreement described above.

The DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both have non-cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and extension options as described above. At non-reconditioning locations, it is not reasonably certain that the Company will exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year and therefore the Company accounts for them as short-term leases. For these locations, the Company makes variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management has determined that the costs allocated to the Company are based on a reasonable methodology. The DriveTime Lease Agreement includes the Blue Mound and Delanco IRCs. At both of these locations, the Company expects to extend the lease terms beyond twelve months, therefore those locations are not considered short-term leases. The Company occupies all of the space at these IRCs and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these IRC locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational IRC in Winder, Georgia. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

In November 2018, the Company entered into a sublease agreement from DriveTime of a fully operational IRC near Cleveland, Ohio. The lease had an initial term of three years, subject to the Company's ability to exercise three renewal options of five years each. In July 2021, the Company exercised the first renewal option to extend through October 2026 and agreed to assume the lease from DriveTime effective October 1, 2021.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were $1 million during each of the three months ended September 30, 2022 and 2021, and $3 million and $4 million during the nine months ended September 30, 2022 and 2021, respectively, allocated between inventory and selling, general and administrative expenses.

In February 2019, the Company entered into an agreement to assume a lease of an IRC near Nashville, Tennessee that DriveTime leased from an unrelated landlord. While the Company solely occupies the IRC, DriveTime is not fully released from the lease obligations by the landlord. The lease expires in October 2023, subject to the ability to exercise three renewal options of five years each.

**Office Leases**

In September 2016, the Company entered into a lease for office space in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of another floor in the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company will pay the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was less than $1 million during each of the three months ended September 30, 2022 and 2021, and $1 million during each of the nine months ended September 30, 2022 and 2021.

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In December 2019, Verde Investments, Inc. ("Verde"), a related party of the Company due to the Garcia Parties controlling and owning substantially all of the interests in Verde, purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was less than $1 million during each of the three months ended September 30, 2022 and 2021, and $1 million during each of the nine months ended September 30, 2022 and 2021.

**Wholesale Sales and Revenues**

DriveTime purchases wholesale vehicles from the Company through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. The Company recognized $6 million and $15 million of wholesale sales and revenues from DriveTime during the three months ended September 30, 2022 and 2021, respectively, and $27 million and $37 million during the nine months ended September 30, 2022 and 2021, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of September 30, 2022, $2 million related to vehicles and reconditioning services were included in vehicle inventory in the accompanying unaudited condensed consolidated balance sheets. The Company also recognized $1 million and $17 million of cost of goods sold during the three months ended September 30, 2022 and 2021, respectively, and $19 million during each of the nine months ended September 30, 2022 and 2021.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers, and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. During the three months ended September 30, 2022 and 2021, the Company recognized $42 million and $47 million, respectively, and during the nine months ended September 30, 2022 and 2021, the Company recognized $138 million and $130 million, respectively of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations. The commission earned on the sale of these VSCs is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. The Company recognized expense of $3 million and income of $5 million during the three months ended September 30, 2022 and 2021, respectively, and expense of $1 million and income of $13 million during the nine months ended September 30, 2022 and 2021, respectively, related to payments for excess reserves to which it expects to be entitled, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated party. The Company incurred $5 million during each of the three months ended September 30, 2022 and 2021, and approximately $14 million and $11 million during the nine months ended September 30, 2022 and 2021, respectively, related to the administration of limited warranty and GAP waiver coverage.

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of $3 million and $2 million during the three months ended September 30, 2022 and 2021, respectively, and approximately $7 million and $5 million during the nine months ended September 30, 2022 and 2021, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million and $1 million during the three and nine months ended and September 30, 2022, respectively, and less than $1 million during each of the three and nine months ended September 30, 2021 under this agreement.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the three and nine months ended September 30, 2022 and 2021.

**Accounts Payable Due to Related Party**

As of September 30, 2022 and December 31, 2021, $19 million and $27 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contributions of Class A Common Shares From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in Q4 2021, the Company's CEO, Ernest Garcia III ("Mr. Garcia"), committed to giving then-current employees 23 shares of Class A common stock from his personal shareholdings once employees reach their two-year employment anniversary ("CEO Milestone Gift" or "Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia will contribute to the Company, at the end of each fiscal quarter, the number of shares of Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund RSU awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the three and nine months ended September 30, 2022, 14,099 and 113,206 RSUs, respectively, vested and were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has agreed to indemnify Mr. Garcia from any such obligations that may arise.

**NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS**

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements, including a

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

master purchase and sale agreement and master transfer agreements, and fixed pool loan sales, including securitization transactions.

**Master Purchase and Sale Agreement**

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial Inc. (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. Throughout 2021 and 2022, the Company and the Ally Parties have amended the MPSA to, among other things and subject to the terms of the agreement, broaden the set of finance receivables covered by the MPSA and provide additional flexibility in the timing of sales of finance receivables. In March 2021, the Ally Parties committed to purchase up to a maximum of $4.0 billion of principal balances of finance receivables through March 2022. On each of March 17, 2022 and March 22, 2022, the Ally Parties amended the MPSA to, in aggregate, extend the scheduled commitment termination date to March 21, 2023 and increase the Ally Parties' commitment to purchase finance receivables to $5.0 billion, an increase of $1.0 billion from the previous commitment. Finally, on November 1, 2022, the Company amended and restated the MPSA to, among other things, consolidate and reflect the several previously executed amendments to the MPSA facility and streamline the funding mechanics associated with the sale of finance receivables to the Ally Parties.

During the three months ended September 30, 2022 and 2021, the Company sold $1.3 billion and $594 million, respectively, in principal balances of finance receivables under the MPSA. During the nine months ended September 30, 2022 and 2021, the Company sold $3.1 billion and $1.7 billion, respectively, in principal balances of finance receivables under the MPSA and had $1.9 billion of unused capacity as of September 30, 2022.

**Securitization Transactions**

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with the Risk Retention Rules, as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the three months ended September 30, 2022 and 2021, the Company sold $364 million and $1.5 billion, respectively, in principal balances of finance receivables through securitization transactions. During the nine months ended September 30, 2022 and 2021, the Company sold approximately $2.4 billion and $3.4 billion, respectively, in principal balances of finance receivables through securitization transactions.

**Gain on Loan Sales**

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was $126 million and $191 million during the three months ended September 30, 2022 and 2021, respectively, and $361 million and $529 million during the nine months ended September 30, 2022 and 2021, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

**NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES**

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs and performing ministerial duties as the trust administrator. As of September 30, 2022, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets, which as of September 30, 2022 and December 31, 2021 were $350 million and $382 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of September 30, 2022 and December 31, 2021.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at September 30, 2022 and December 31, 2021. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

|  | September 30, 2022 | | December 31, 2021 | |
|  | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
|---|---|---|---|---|
|  | (in millions) | | | |
| Rated notes | $ 283 | $ 283 | $ 282 | $ 282 |
| Certificates and other assets | 67 | 67 | 100 | 100 |
| Total unconsolidated VIEs | $ 350 | $ 350 | $ 382 | $ 382 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual maturities. The amortized cost and fair value of securities available for sale as of September 30, 2022 and December 31, 2021 were as follows:

|  | September 30, 2022 | | December 31, 2021 | |
|  | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|---|---|---|---|---|
|  | (in millions) | | | |
| Rated notes | $ 298 | $ 283 | $ 282 | $ 282 |
| Certificates and other assets | 45 | 67 | 93 | 100 |
| Total securities available for sale | $ 343 | $ 350 | $ 375 | $ 382 |

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 10 — DEBT INSTRUMENTS**

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of September 30, 2022 and December 31, 2021 consisted of the following:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Asset-based financing: | | |
| Floor plan facilities | $ 575 | $ 1,877 |
| Finance receivable facilities | — | 176 |
| Financing of beneficial interest in securitizations | 298 | 282 |
| Notes payable | 4 | 10 |
| Real estate financing | 486 | 447 |
| Total asset-based financing | 1,363 | 2,792 |
| Senior notes | 5,725 | 2,450 |
| Total debt | 7,088 | 5,242 |
| Less: current portion | (687) | (2,154) |
| Less: unamortized debt issuance costs [1] | (85) | (34) |
| Total included in long-term debt, net | $ 6,316 | $ 3,054 |

(1) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying condensed consolidated balance sheets and not included here.

**Short-Term Revolving Facilities**

*Floor Plan Facilities*

The Company previously entered into a floor plan facility with a lender to finance its vehicle inventory (the "Original Floor Plan Facility"), which was secured by Carvana LLC's vehicle inventory, general intangibles, accounts receivable, and finance receivables. The Original Floor Plan Facility was amended at various times and effective September 22, 2022, the Company amended and restated the facility (the "12-Month Floor Plan Facility") to extend the maturity date to September 22, 2023 with a line of credit of $2.2 billion and tie the interest rate to a prime rate plus 1.00%.

On September 22, 2022, the Company also entered into a separate floor plan facility (the "18-Month Floor Plan Facility", and together with the 12-Month Floor Plan Facility, the "Floor Plan Facilities") with a lender. The line of credit under the 18-Month Floor Plan Facility is $2.0 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and its maturity date is March 22, 2024. The interest rate under the 18-Month Floor Plan Facility is tied to a prime rate plus 1.00%.

Under the Floor Plan Facilities, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 150 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the Floor Plan Facilities and subsequently reborrow such

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

amounts. The Floor Plan Facilities also require monthly interest payments and that at least 12.5% of the total principal amount owed to the lender is held as restricted cash.

The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter under the Floor Plan Facilities.

As of September 30, 2022, the Company had $575 million outstanding under the 12-Month Floor Plan Facility, unused capacity of $1.6 billion, and held $72 million in restricted cash related to this facility. As of September 30, 2022, the Company had no amount outstanding under the 18-Month Floor Plan Facility, unused capacity of $2 billion, which becomes available following the maturity and repayment of the 12-Month Floor Plan Facility, and held no amount in restricted cash related to this facility. During the three months ended September 30, 2022, the Company's effective interest rate on the 12-Month Floor Plan Facility was approximately 4.53%.

As of December 31, 2021, the Company had $1.9 billion outstanding under the Original Floor Plan Facility, unused capacity of $373 million, and held $141 million in restricted cash related to this facility. For the year ended December 31, 2021, the Company's effective interest rate on the Original Floor Plan Facility was approximately 2.55%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain automotive finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility, which was subsequently increased to $500 million, to fund certain automotive finance receivables originated by the Company. In June 2021, the Company amended its agreement to, among other things, extend the maturity date to January 24, 2023.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million, and extend the maturity date to December 8, 2023.

On April 30, 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase this line of credit to $600 million. In September 2022, the Company amended its agreement to extend the maturity date to March 30, 2024.

On October 15, 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until April 15, 2023.

On March 18, 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain automotive finance receivables originated by the Company. The Company can draw upon this facility until September 18, 2023.

The Finance Receivable Facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The Finance Receivable Facilities require monthly payments of interest and fees based on usage and unused facility amounts. The Finance Receivable Facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these Finance Receivable Facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of September 30, 2022 and December 31, 2021, the Company had zero and $176 million, respectively, outstanding under these Finance Receivable Facilities, unused capacity of $2.6 billion and $1.9 billion, respectively, and held $41 million and $67 million, respectively, in restricted cash related to these Finance Receivable Facilities. During the three months ended September 30, 2022, the Company's effective interest rate on these

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Finance Receivable Facilities was approximately 4.33%. For the year ended December 31, 2021, the Company's effective interest rate on these Finance Receivable Facilities was approximately 1.64%.

**Long-Term Debt**

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (collectively, the "Senior Notes") each under a separate indenture (collectively, the "Indentures"), as further described below.

The following table summarizes components of the Company's senior unsecured notes:

| | September 30, 2022 | | December 31, 2021 | Interest Rate |
|---|---|---|---|---|
| | **(in millions, except percentages)** | | | |
| 2025 Senior Unsecured Notes due October 1, 2025 ("2025 Notes") | $ 500 | $ | 500 | 5.625 % |
| 2027 Senior Unsecured Notes due April 15, 2027 ("2027 Notes") | 600 | | 600 | 5.500 % |
| 2028 Senior Unsecured Notes due October 1, 2028 ("2028 Notes") | 600 | | 600 | 5.875 % |
| 2029 Senior Unsecured Notes due September 1, 2029 ("2029 Notes") | 750 | | 750 | 4.875 % |
| 2030 Senior Unsecured Notes due May 1, 2030 ("2030 Notes") | 3,275 | | — | 10.250 % |
| Total principal amount | 5,725 | | 2,450 | |
| Less: unamortized debt issuance cost | (79) | | (28) | |
| Total debt | $ 5,646 | $ | 2,422 | |

Each of the 2025 Notes, the 2027 Notes, the 2028 Notes and the 2029 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The 2030 Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee. The interest on each of the Senior Notes is payable semi-annually, beginning on April 1, 2021 for the 2025 Notes and 2028 Notes, October 15, 2021 for the 2027 Notes, March 1, 2022 for the 2029 Notes, and November 1, 2022 for the 2030 Notes. The Senior Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, or immaterial subsidiaries).

The Company may redeem some or all of each issuance of Senior Notes at redemption prices set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to those redemption dates, the Company may redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. With respect to the 2030 Notes, the Company may, at its option, redeem in the aggregate of up to 10% of the original aggregate principal amount of the 2030 Notes during the period from, and including, May 1, 2025 to, but excluding May 1, 2027, at a redemption price equal to 105.125% of the 2030 Notes to be redeemed, plus accrued and unpaid interest thereon to the relevant redemption rate. In addition, the Company may, at its option, redeem some or all of the Senior Notes prior to its redemption date, by paying a make-whole premium plus any accrued and unpaid interest to, but not including, the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Indentures contain restrictive covenants that limit the ability of the Company and certain of its subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, make intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations. Certain of these covenants will be suspended if any of the Senior Notes are assigned an investment grade rating from any two of Moody's Investors Service, Inc., Standard & Poor's Rating Services, and Fitch Ratings, Inc., and there is no continuing default.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. Each note has a fixed annual interest rate, a two- to five-year term and requires monthly payments. As of September 30, 2022 and December 31, 2021, the outstanding principal of these notes had a weighted-average interest rate of 7.0% and 6.4%, respectively, and totaled $4 million and $10 million, respectively, net of unamortized debt issuance costs, of which $2 million and $7 million as of September 30, 2022 and December 31, 2021, respectively, was due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of September 30, 2022, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of September 30, 2022 and December 31, 2021, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was $483 million and $444 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of September 30, 2022 and December 31, 2021, the Company has pledged $298 million and $282 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from July 2024 to September 2029. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The outstanding balance of these facilities, net of unamortized debt issuance costs, was $295 million and $279 million as of September 30, 2022 and December 31, 2021, respectively, of which $109 million and $93 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2022, the Company was in compliance with all debt covenants.

**NOTE 11 — STOCKHOLDERS' EQUITY**

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the

22

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock, determined on an as-exchanged basis, assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub, LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of September 30, 2022 and December 31, 2021, there were 236 million and 216 million Class A Units, and 2 million and 3 million Class B Units, respectively, (as adjusted for the participation thresholds and closing price of Class A common stock on September 30, 2022 and December 31, 2021), issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 26, 2022, the Company completed a public offering of 15.625 million shares of its Class A common stock for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5.4 million shares of the Class A common stock offered at the public offering price. The Company used the net proceeds to purchase 19.5 million newly-issued LLC Units in Carvana Group.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During the three months ended September 30, 2022 and 2021, certain LLC Unitholders exchanged zero and 3 million LLC Units and zero and 2 million shares of Class B common stock for zero and 3 million newly-issued shares of Class A common stock, respectively. During the nine months ended September 30, 2022 and 2021, certain LLC Unitholders exchanged less than 1 million and 11 million LLC Units and zero and 8 million shares of Class B common stock for less than 1 million and 9 million newly-issued shares of Class A common stock, respectively. Simultaneously, and in connection with these exchanges, Carvana Co. received zero and 3 million LLC Units during the three months ended September 30, 2022 and 2021, respectively, and less than 1 million and 11 million LLC Units during the nine months ended September 30, 2022 and 2021, respectively, increasing its total ownership interest in Carvana Group, and canceled the exchanged shares of Class B common stock.

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of senior unsecured notes issuances. On March 29, 2021, Carvana Group, LLC issued 0.6 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2027 Notes. On August 16, 2021, Carvana Group LLC issued 0.8 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2029 Notes. On May 6, 2022, Carvana Group LLC issued 3.3 million Class A Non-Convertible Preferred Units in connection with the issuance of its 2030 Notes. Carvana Co. used its net proceeds from the 2023 Notes (which have since been repurchased), the 2025 and 2028 Notes, the 2027 Notes, the 2029 Notes and the 2030 Notes, to purchase 0.6 million, 1.1 million, 0.6 million, 0.8 million, and 3.3 million, respectively, of Class A Non-Convertible Preferred Units.

When Carvana Co. makes payments on the Senior Notes, Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired.

**NOTE 12 — NON-CONTROLLING INTERESTS**

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the nine months ended September 30, 2022 and 2021, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of $1 million and $32 million, respectively, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity. During the nine months ended September 30, 2022, Carvana Co. utilized its net proceeds from its equity offering to purchase LLC Units, which resulted in adjustments to increase non-controlling interests and to decrease additional paid-in capital by $554 million, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As of September 30, 2022, Carvana Co. owned approximately 55.7% of Carvana Group with the LLC Unitholders owning the remaining 44.3%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net loss attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

|  | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
|  | 2022 | | 2021 | |
|  | (in millions) | | | |
| Transfers from (to) non-controlling interests: | | | | |
| Decrease as a result of issuances of Class A common stock | $ | (554) | $ | — |
| Increase as a result of exchanges of LLC Units | | 1 | | 32 |
| Total transfers from (to) non-controlling interests | $ | (553) | $ | 32 |

**NOTE 13 — EQUITY-BASED COMPENSATION**

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the three and nine months ended September 30, 2022 and 2021 is as follows:

|  | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2022 | | 2021 | | 2022 | | 2021 | |
|  | (in millions) | | | | | | | |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | $ | 12 | $ | 11 | $ | 29 | $ | 26 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | | 3 | | — | | 40 | | — |
| Options | | 3 | | 3 | | 10 | | 8 |
| Class A Units | | — | | — | | — | | 1 |
| Total equity-based compensation | | 18 | | 14 | | 79 | | 35 |
| Equity-based compensation capitalized to property and equipment | | (3) | | (3) | | (7) | | (6) |
| Equity-based compensation capitalized to inventory | | (1) | | (1) | | (16) | | (1) |
| Equity-based compensation, net of capitalized amounts | $ | 14 | $ | 10 | $ | 56 | $ | 28 |

As of September 30, 2022, the total unrecognized compensation related to outstanding equity awards was $167 million, which the Company expects to recognize over a weighted-average period of approximately 3.0 years. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). Under the 2017 Incentive Plan, 14 million shares of Class A common stock were initially available for issuance, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other stock-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company, other than equity granted in relation to the CEO Milestone Gift, vests over four year periods based on continued employment with the Company. As of September 30, 2022, approximately 7 million shares remain available for future equity-based award grants under this plan.

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to maximums that may vary between

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

$10,000 and $25,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP.

As of September 30, 2022, the Company issued 27,462 shares of Class A common stock and 470,044 shares remained available for future issuance. During the three and nine months ended September 30, 2022, the Company incurred less than $1 million of equity-based compensation expense related to the ESPP.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four- to five-years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for their Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and nine months ended September 30, 2022 or 2021. As of September 30, 2022, outstanding Class B Units had participation thresholds between $0.00 to $12.00. During the three and nine months ended September 30, 2022 and 2021, the Company incurred less than $1 million of equity-based compensation expense related to the Class B Units.

**NOTE 14 — NET LOSS PER SHARE**

Basic and diluted net loss per share is computed by dividing the net loss attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net loss per share is computed by giving effect to all potentially dilutive shares. For all periods presented, potentially dilutive shares are excluded from diluted net loss per share because they have an anti-dilutive impact. Therefore, basic and diluted net loss per share attributable to Class A common stockholders are the same for all periods presented. Net loss for all periods presented is attributable only to Class A common stockholders, due to no activity related to convertible preferred stock during those periods.

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net loss per share during the three and nine months ended September 30, 2022 and 2021:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions, except number of shares, which are reflected in thousands, and per share amounts) | | | |
| **Numerator:** | | | | |
| Net loss | $ (508) | $ (68) | $ (1,453) | $ (105) |
| Net loss attributable to non-controlling interests | (225) | (36) | (672) | (59) |
| Net loss attributable to Carvana Co. Class A common stockholders, basic and diluted | $ (283) | $ (32) | $ (781) | $ (46) |
| **Denominator:** | | | | |
| Weighted-average shares of Class A common stock outstanding | 105,878 | 84,815 | 99,141 | 81,468 |
| Nonvested weighted-average restricted stock awards | (21) | (36) | (7) | (41) |
| Weighted-average shares of Class A common stock, basic and diluted | 105,857 | 84,779 | 99,134 | 81,427 |
| Net loss per share of Class A common stock, basic and diluted | $ (2.67) | $ (0.38) | $ (7.88) | $ (0.56) |

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net loss per share of Class B common stock under the two-class method has not been presented.

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net loss per share of Class A common stock for the three and nine months ended September 30, 2022 and 2021.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in thousands) | | | |
| Options [1] | 1,265 | 1,101 | 1,265 | 1,101 |
| Restricted Stock Units and Awards [1] | 826 | 688 | 826 | 710 |
| Class A Units [2] | 82,963 | 87,912 | 82,963 | 91,060 |
| Class B Units [2] | 1,580 | 2,150 | 1,580 | 2,271 |

_____

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.

(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity, as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

corporation and is subject to U.S. federal, state, and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 11 — Stockholders' Equity, the Company did not acquire any LLC units during the three months ended September 30, 2022. The Company acquired 3 million LLC Units during the three months ended September 30, 2021. The Company acquired less than 1 million and 11 million LLC Units during the nine months ended September 30, 2022 and 2021, respectively, in connection with exchanges with LLC Unitholders. During the three months ended September 30, 2022, the Company did not record a gross deferred tax asset. During the three months ended September 30, 2021, the Company recorded a gross deferred tax asset of $199 million. During the nine months ended September 30, 2022, and 2021, the Company recorded a gross deferred tax asset of $1 million and $641 million, respectively, associated with the basis difference in its investment in Carvana Group related to the acquisition of these LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 11 — Stockholders' Equity, during the nine months ended September 30, 2022, the Company issued 15.625 million shares of its Class A common stock and received net proceeds from the offering of $1.2 billion. The Company utilized the proceeds to purchase 19.5 million newly issued Class A units in Carvana Group. The Company recognized a gross deferred tax asset of $20 million from the offering, associated with a portion of the basis difference resulting from this purchase of Carvana Group units, which is reflected as an increase to addition paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity.

As described in Note 5 — Goodwill and Intangible Assets, Net, the Company acquired various intangible assets in connection with the acquisition of Car360 in 2018. As a result, the Company recognized a deferred tax liability of $2 million which is reflected within other liabilities in the accompanying unaudited condensed consolidated balance sheets. The deferred tax liability will be amortized over five to seven years and less than $1 million was amortized during each of the nine months ended September 30, 2022 and 2021.

During the nine months ended September 30, 2022, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of September 30, 2022 and December 31, 2021, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the three months ended September 30, 2022 and 2021 was an expense of 0.1% and 0.3%, respectively, and for the nine months ended September 30, 2022 and 2021 was an expense of 0.1% and 0.2%, respectively, related to its wholly-owned subsidiaries.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity, each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement ("TRA"). Under the TRA, the Company generally will be required to pay to the Original LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of September 30, 2022, the Company has concluded based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded a liability related to the tax savings it may realize from utilization of such deferred tax assets. As of September 30, 2022, the total unrecorded TRA liability is $1.6 billion. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

## NOTE 16 — LEASES

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of September 30, 2022, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, IRCs, storage, parking and corporate offices. The initial terms expire at various dates between 2022 and 2038. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and nine months ended September 30, 2022 and 2021 were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2022** | **2021** | **2022** | **2021** |
| | (in millions) | | | |
| **Lease costs:** | | | | |
| Finance leases: | | | | |
| Amortization of finance lease assets | $ 27 | $ 11 | $ 68 | $ 26 |
| Interest obligations under finance leases | 5 | 2 | 13 | 5 |
| Total finance lease costs | $ 32 | $ 13 | $ 81 | $ 31 |
| | | | | |
| Operating leases: | | | | |
| Fixed lease costs to non-related parties | $ 26 | $ 14 | $ 78 | $ 35 |
| Fixed lease costs to related parties | 1 | 1 | 3 | 4 |
| Variable short-term lease costs to related parties | — | 1 | — | 1 |
| Total operating lease costs | $ 27 | $ 16 | $ 81 | $ 40 |
| | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | |
| Operating lease liabilities to non-related parties | | | $ 56 | $ 23 |
| Operating lease liabilities to related parties | | | $ 4 | $ 4 |
| Interest payments on finance lease liabilities | | | $ 13 | $ 5 |
| | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | |
| Principal payments on finance lease liabilities | | | $ 106 | $ 35 |

30

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of September 30, 2022:

| | Finance Leases | Operating Leases [1] | | | Total |
| | | Related Party [2] | Non-Related Party | Total Operating | |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Remainder of 2022 | $ 32 | $ 1 | $ 25 | $ 26 | $ 58 |
| 2023 | 117 | 5 | 106 | 111 | 228 |
| 2024 | 105 | 3 | 114 | 117 | 222 |
| 2025 | 91 | 2 | 115 | 117 | 208 |
| 2026 | 71 | 2 | 112 | 114 | 185 |
| Thereafter | 32 | 4 | 510 | 514 | 546 |
| Total minimum lease payments | 448 | 17 | 982 | 999 | 1,447 |
| Less: amount representing interest | (47) | (3) | (266) | (269) | (316) |
| Total lease liabilities | $ 401 | $ 14 | $ 716 | $ 730 | $ 1,131 |

_____

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of September 30, 2022 and December 31, 2021, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of September 30, 2022 and 2021 were as follows, excluding short-term operating leases:

| | As of September 30, | |
|---|---|---|
| | 2022 | 2021 |
| **Weighted-average remaining lease terms (years)** | | |
| Operating leases | 8.6 | 9.2 |
| Finance leases | 4.3 | 4.4 |
| **Weighted-average discount rate** | | |
| Operating leases | 7.1 % | 7.5 % |
| Finance leases | 5.6 % | 5.4 % |

**NOTE 17 — COMMITMENTS AND CONTINGENCIES**

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each retail vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was $21 million and $16 million as of September 30, 2022 and December 31, 2021, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

31

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Purchase Obligations**

The Company has purchase obligations for certain customary services related to operating a wholesale auction business of $174 million in aggregate over the next seven years, as of September 30, 2022. These purchase obligations are recorded as liabilities when the services are rendered.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business. The Company is currently involved in matters related to, among other topics, its title and registration process, including requests for information from government agencies, class actions and shareholder derivative lawsuits. The Company believes the claims in these matters are not material or are without merit and intends to defend the matters vigorously. The Company also continues to work closely with government agencies to respond to their requests for information. It is not possible to determine the probability of loss or estimate damages, if any, for any of the above matters, and therefore, the Company has not established reserves for any of these proceedings. If the Company determines that a loss is both probable and reasonably estimable, the Company will record a liability, and, if the liability is material, disclose the amount of the liability reserved. If an unfavorable ruling or development were to occur, there exists the possibility of a material adverse impact on the Company's business, results of operations, financial condition or cash flows.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies in its most recent Annual Report on Form 10-K.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following tables are a summary of fair value measurements and hierarchy level at September 30, 2022 and December 31, 2021:

| | September 30, 2022 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 139 | $ 139 | $ — | $ — |
| Beneficial interests in securitizations | 350 | — | — | 350 |

| | December 31, 2021 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 154 | $ 154 | $ — | $ — |
| Beneficial interests in securitizations | 382 | — | — | 382 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2022 and December 31, 2021, the Company has purchase price adjustment receivables of $41 million and $34 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a gain of $5 million and $3 million during the three months ended September 30, 2022 and 2021, respectively, and a gain of $11 million and $17 million during the nine months ended September 30, 2022 and 2021, respectively, and are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its rated notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of September 30, 2022 and December 31, 2021, the discount rates were 4.7% to 10.0% and 1.1% to 10.0%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it to

33

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other expense (income), net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers into or out of Level 3 during the three and nine months ended September 30, 2022 or 2021.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that meet the criteria for sale set forth in the Risk Retention Rules. For the three and nine months ended September 30, 2022, the Company sold beneficial interests in securitizations for a purchase price totaling $40 million and $43 million, respectively.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and nine months ended September 30, 2022 and 2021:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (in millions) | | | |
| **Opening Balance** | $ 401 | $ 239 | $ 382 | $ 131 |
| Received in securitization transactions | 24 | 33 | 148 | 170 |
| Cash receipts | (44) | (27) | (136) | (60) |
| Change in fair value | 9 | 2 | (1) | 6 |
| Sales of beneficial interests | (40) | — | (43) | — |
| **Ending Balance** | $ 350 | $ 247 | $ 350 | $ 247 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended September 30, 2022 and December 31, 2021. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of September 30, 2022 and December 31, 2021 was as follows:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Carrying value, net of unamortized debt issuance costs | $ 5,646 | $ 2,422 |
| Fair value | 3,465 | 2,411 |

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the

34

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of September 30, 2022 and December 31, 2021 were as follows:

|  | September 30, 2022 | | December 31, 2021 |
|---|---|---|---|
|  | (in millions) | | |
| Carrying value | $ | 485 | $ | 356 |
| Fair value | | 520 | | 392 |

**Investment in Equity Securities**

During October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to the accounting standards and recorded the investment at its cost of $126 million which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of its investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of its investment in Root, as there have not been changes in the observable price of its equity interest through September 30, 2022. On August 12, 2022, Root effected a reverse stock split of its Class A common stock and Class B common stock at a ratio of 18:1, whereby each 18 shares of Root's Class A common stock and Class B common stock were automatically combined into one share of Class A common stock or Class B common stock, respectively (the "Reverse Stock Split"). The shares of Root's Class A common stock issuable to the Company on the conversion of the Series A convertible preferred shares were adjusted proportionally.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products were to be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "Warrants"). On September 1, 2022, the integrated auto insurance solution, which embedded into the Company's e-commerce platform (the "Integrated Platform"), was completed. One tranche of the Warrants, consisting of 2.4 million shares, as adjusted pursuant to the Reverse Stock Split, became exercisable upon completion of the Integrated Platform, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Integrated Platform and are considered a derivative instrument. The Company used a Monte Carlo simulation to estimate the fair value of these Warrants, which are classified as Level 3. At contract inception, the Company recognized an asset of $30 million for the Warrants and deferred revenue, classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets. During the three months ended September 30, 2022, the Company determined it was probable that the volume of insurance products required to earn the Warrants would be achieved and recorded an additional $75 million of Warrants and deferred revenue based on the contract inception date fair value as determined by the Monte Carlo simulation. The Warrants and deferred revenue are classified in other assets and other liabilities, respectively, in the accompanying consolidated balance sheets.

The following table presents changes in the Company's Level 3 Warrants measured at fair value:

|  | 2022 |
|---|---|
|  | (in millions) |
| Balance at December 31, 2021 | $ | 6 |
| Warrants to acquire Root's Class A common stock | | 75 |
| Total unrealized loss [1] | | (77) |
| Balance at September 30, 2022 | $ | 4 |

(1) The Company recognized the decrease in fair value in relation to the Warrants to acquire Root's Class A common stock through other expense (income), net in the accompanying consolidated statements of operations. The Company recognized a

35

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

decrease in fair value of $72 million and $77 million during the three and nine months ended September 30, 2022, respectively. No amounts were recorded during the three and nine months ended September 30, 2021.

**Derivative Instruments**

As of September 30, 2022 and December 31, 2021, the Company had no other outstanding derivative instruments.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the nine months ended September 30, 2022 and 2021:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2022 | 2021 |
|  | (in millions) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 178 | $ 82 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 43 | $ 74 |
| Property and equipment acquired under finance leases | $ 300 | $ 81 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 371 | $ 139 |
| Warrants to acquire Root's Class A common stock | $ 75 | $ — |
| Equity-based compensation expense capitalized to property and equipment | $ 6 | $ 6 |
| Fair value of beneficial interests received in securitization transactions | $ 148 | $ 235 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 105 | $ 22 |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

|  | September 30, 2022 | December 31, 2021 | September 30, 2021 |
|---|---|---|---|
|  | (in millions) | | |
| Cash and cash equivalents | $ 316 | $ 403 | $ 297 |
| Restricted cash [1] | 161 | 233 | 107 |
| Total cash, cash equivalents and restricted cash | $ 477 | $ 636 | $ 404 |

(1) Amounts included in restricted cash primarily represent the deposits required under the Company's short-term revolving facilities. Refer to Note 10 — Debt Instruments for additional information. Remaining restricted cash represents certain cash held for corporate insurance purposes.

36

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our consolidated financial statements and the accompanying notes included in Part I, Item 1 of this Form 10-Q.*

**Overview**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a retail vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a retail vehicle.***   As of September 30, 2022, we listed approximately 71,300 total retail units on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling vehicles to retail customers is the primary driver of our business. Selling retail vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including vehicle service contracts ("VSCs"), GAP waiver coverage, other ancillary products, and trade-ins.

- ***Finance their purchase.***   Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we generally earn a premium upon sale.

- ***Protect their purchase.***   Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with insurance against certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of DriveTime, who is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate. We have also partnered with Root, Inc. ("Root") to offer an integrated auto insurance solution, through which customers in most states may conveniently access auto insurance directly from the Carvana e-commerce platform.

- ***Sell us their car.***   We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a firm offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can schedule a time to have the vehicle picked up at their home or elsewhere within one of our markets and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- ***Vehicle acquisition.***   We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used-car auction market. Acquiring directly from

37

customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

• *Inspection and reconditioning.*   Once we acquire a vehicle, we leverage our in-house logistics or a vendor to transport the vehicle to a greenfield inspection and reconditioning center or auction location with reconditioning capacity ("IRC"), at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for the vehicle to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

• *Photography and merchandising.*   To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs and certain auction sites to better ensure a consistent customer experience.

• *Transportation and fulfillment.*   Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles to customers in our markets. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs and other sites, and when a vehicle is sold, it is delivered directly to customers in our markets or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

**Retail Vehicle Unit Sales**

Since launching to customers in Atlanta, Georgia in January 2013, we have experienced rapid growth in sales through our website www.carvana.com. During the nine months ended September 30, 2022, the number of vehicles we sold to retail customers grew by 4.2% to 325,319 compared to 312,221 in the nine months ended September 30, 2021. Over time, we expect our retail vehicle sales to grow in future periods with increased penetration in our current markets and expansion into new markets.

We view the number of vehicles we sell to retail customers as the most important measure of our growth, and we expect to continue to focus on building a scalable platform to increase our retail units sold. This focus on retail units sold is motivated by several factors:

• Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of automotive finance receivables originated to finance the vehicle, the sale of VSCs, GAP waiver coverage, other ancillary products, and the sale of vehicles acquired from customers.

38

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

We plan to invest in technology and infrastructure to support growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our historical growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations.

Our expansion model has enabled us to increase our rate of market openings, resulting in serving more of the U.S. population, in each of the past nine years. Our market openings increased the total percentage of the U.S. population served to 81.1% in 315 markets as of September 30, 2022 from 80.6% in 308 markets as of September 30, 2021. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our growth plan. We continually evaluate consumer demand and our operational capacity to determine our market opening and vending machine launch strategy.

When we open a market, we commence advertising using a blend of brand and direct advertising channels. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings. This historically has led to increased market penetration over time following the market opening. We also advertise on national television to increase brand awareness.

### Revenue and Gross Profit

Our increased penetration in existing markets and expansion into new markets has generally led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, wholesale sales of vehicles we acquire from customers, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, retail vehicle sales, totaled $2.5 billion and $2.7 billion during the three months ended September 30, 2022 and 2021, respectively, and $8.2 billion and $7.0 billion during the nine months ended September 30, 2022 and 2021, respectively. As we increase penetration in existing markets and expand to new ones, we generally expect retail vehicle sales to increase along with retail units sold, absent any material adverse macroeconomic conditions. We generate gross profit on retail vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales and revenues, which includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory, totaled $697 million and $552 million during the three months ended September 30, 2022 and 2021, respectively, and $2.0 billion and $1.3 billion during the nine months ended September 30, 2022 and 2021, respectively. We generally expect wholesale sales to trend proportionately with retail units sold through trade-ins and from customers who wish to sell us a car independent of a retail sale. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

On May 9, 2022, we completed our acquisition of the U.S. physical auction business of ADESA from KAR Auction Services, Inc. We have included revenue earned from the sale of wholesale marketplace units by non-Carvana sellers through our wholesale marketplace platform, including auction fees and related services revenue, in wholesale sales and revenues from the date of acquisition. We generate a gross profit on wholesale marketplace units from the difference between the revenue earned from the sale of wholesale marketplace units through our wholesale marketplace platform less our cost of sales associated with operating the wholesale marketplace platform.

Other sales and revenues, which primarily includes gains on the sales of automotive finance receivables we originate, sales commissions on ancillary products such as VSCs, GAP waiver coverage, and auto insurance, totaled $197 million and $278 million during the three months ended September 30, 2022 and 2021, respectively, and $605 million and $758 million during the nine months ended September 30, 2022 and 2021, respectively. We generally expect other sales and revenues to trend proportionately with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies, absent any material adverse macroeconomic conditions. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During current macroeconomic uncertainty, our highest priority will continue to be providing exceptional customer experiences while improving efficiency, increasing our brand awareness and maximizing our infrastructure to support efficient growth in retail units sold. Secondarily, we plan to pursue several strategies designed to increase our total gross profit per unit. These strategies include the following:

- *Increase the purchase of vehicles from customers.* Over time, we plan to grow the number of vehicles that we purchase from our customers either as trade-ins or independent of a retail sale. This in turn will grow our wholesale business, provide additional vehicles for our retail business, which on average are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection.

- *Reduce average days to sale.* Our goal is generally to increase our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing IRC infrastructure.* As we scale, we intend to more fully utilize the capacity in our 17 existing IRCs, which collectively have capacity to inspect and recondition approximately 1 million vehicles per year at full utilization**.** We also intend to use existing capacity in the facilities acquired as part of the ADESA acquisition.

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs or other sites after acquisition from customers or wholesale auctions.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

40

**Seasonality**

Used vehicle sales (retail and wholesale) generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our rapid growth, our overall sales patterns in the past have not always reflected the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of macroeconomic conditions, which may not fully reflect the underlying performance of our business.

**Investment in Growth**

We have aggressively invested in the growth of our business and we expect this investment to continue during normal conditions. While we intend to become increasingly efficient over time, we also anticipate that our operating expenses will increase substantially over time as we continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

**Relationship with Related Parties**

For discussion about our relationship with related parties, refer to Note 7 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

**Key Operating Metrics**

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S. population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Retail units sold | 102,570 | 111,949 | 325,319 | 312,221 |
| Population coverage | 81.1 % | 80.6 % | 81.1 % | 80.6 % |
| Average monthly unique visitors (in thousands) | 21,333 | 20,071 | 23,203 | 16,632 |
| Total website units | 71,365 | 56,054 | 71,365 | 56,054 |
| Total gross profit per unit [1] | $ 3,500 | $ 4,672 | $ 3,237 | $ 4,526 |

(1) Includes $19, $0, $49, and $0, respectively, related to the CEO Milestone Gift.

*Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

41

*Population Coverage*

We previously reported number of markets as a key operating metric. As we have continued to grow, the population covered by these markets is increasingly a more important driver of our growth than the number of markets we serve. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of U.S. population that lives within those markets. We view the growth in population we serve as a key driver of our growth. As we increase our population coverage, the number of consumers who have access to our fully integrated customer experience increases, which in turn helps increase the number of vehicles we sell.

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell over time. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of retail vehicles, gains on the sales of loans originated to finance the vehicles, commissions on sales of VSCs, GAP waiver coverage and other ancillary products, and gross profit generated from wholesale sales of vehicles. We operate an integrated business with the objective of increasing the number of retail units sold and total gross profit per unit. Gross profits generated from the sale of retail and wholesale units are interrelated. For example, our nationwide reconditioning and inspection centers are designed to produce vehicles for both retail and wholesale sales, our vehicle storage locations have shared parking for both retail and wholesale vehicles, and our integrated multi-vehicle logistics and last mile delivery network is operated in service of both retail and wholesale sales. Such interrelationships require us to share finite operational capacity and optimize joint decisions between retail and wholesale sales, in order to position us to achieve our objective of increasing total gross profit per unit. As a result, the inclusion of gross profit generated from wholesale sales of vehicles in total gross profit per unit reflects our integrated business model and the interrelationship between wholesale and retail vehicle sales. We believe the total gross profit per unit metric provides investors with the greatest opportunity to view our performance through the same lens that our management does, and therefore assists investors to best evaluate our business and measure our progress.

*Number of IRCs*

We previously reported our number of IRCs as a key operating metric. With the acquisition of ADESA's physical auction business, we have added an additional 56 locations and are performing reconditioning work at several of these locations as of September 30, 2022, in addition to the 17 historical Carvana-specific locations. Given the expanded reconditioning capacity associated with the acquisition of ADESA's physical auction business, we no longer consider the number of IRCs a key operating metric. During October 2022, we launched one additional IRC in California, bringing the total Carvana-specific locations to 18.

**Components of Results of Operations**

*Retail Vehicle Sales*

Retail vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from retail vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting retail vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of retail vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customer's purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. On a quarterly basis, the number of retail vehicles we sell is also affected by seasonality, with demand for retail vehicles generally reaching a seasonal high point late in the first quarter of each year, commensurate with the timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of retail vehicle sales generally expected to occur in the fourth calendar quarter. However, in 2022, heightened inflation and rising interest rates have resulted in lower demand for used vehicles.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

*Wholesale Sales and Revenues*

Wholesale sales and revenues includes the aggregate proceeds we receive on vehicles we acquire and sell to wholesalers, and beginning in 2022, wholesale marketplace revenues. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale sales and revenues include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market, both of which have been impacted by the novel coronavirus ("COVID-19") in 2020, 2021, and to a lesser extent in 2022. Wholesale sales and revenues includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. Wholesale marketplace revenues include revenue earned from the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including auction fees and related services revenue.

*Other Sales and Revenues*

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs, sales of GAP waiver coverage, and commissions and warrants we receive on sales of auto insurance. In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

In September 2022, we partnered with Root to offer an integrated auto insurance solution, through which customers may conveniently access auto insurance directly from the Carvana e-commerce platform. We receive commissions and Warrants to purchase shares of Root's Class A common stock based on the Root insurance policies sold through the Integrated Platform. The commission revenue we recognize depends on the number of retail units we sell, the conversion rate of auto policies on these sales, commission rates we receive, and forecasted attrition. The revenue we recognize from warrants as non-cash

43

consideration depends on the probability of achieving certain auto policy sales thresholds within a specific timeline as well as our performance under the agreement.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, and the price at which we are able to sell them in securitization transactions or to financing partners.

The number of loans we originate is driven by the number of retail vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

***Cost of Sales***

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale, and beginning in 2022, wholesale marketplace cost of sales. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC or other site. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value. Wholesale marketplace cost of sales include costs related to the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including labor, rent, depreciation and amortization.

***Retail Vehicle Gross Profit***

Retail vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Retail vehicle gross profit per unit is our aggregate retail vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

***Wholesale Gross Profit***

Wholesale gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers, and beginning in 2022, wholesale marketplace revenues less wholesale marketplace cost of sales. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, the average acquisition price associated with these vehicles, and the number of wholesale marketplace units sold.

***Other Gross Profit***

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

***Selling, General and Administrative Expenses***

Selling, general and administrative ("SG&A") expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines, hubs, and physical auctions, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

44

***Interest Expense***

Interest expense includes interest incurred on our Senior Notes, our Floor Plan Facilities, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

***Other Expense (Income)***

Other expense (income), net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our Warrants to acquire Root's Class A common stock as discussed in Note 18 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q, along with other general expenses such as gains or losses from disposals of long-lived assets.

***Income Tax Provision***

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC ("Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co. During the three and nine months ended September 30, 2022, the Company generated income tax expense of less than $1 million and $1 million, respectively, compared to less than $1 million during both the three and nine months ended September 30, 2021.

45

**Results of Operations**

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | Change | 2022 | 2021 | Change |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Retail vehicle sales, net | $ 2,492 | $ 2,650 | (6.0)% | $ 8,186 | $ 6,954 | 17.7 % |
| Wholesale sales and revenues [1] | 697 | 552 | 26.3 % | 1,976 | 1,349 | 46.5 % |
| Other sales and revenues [2] | 197 | 278 | (29.1)% | 605 | 758 | (20.2)% |
| Total net sales and operating revenues | $ 3,386 | $ 3,480 | (2.7)% | $ 10,767 | $ 9,061 | 18.8 % |
| **Gross profit:** | | | | | | |
| Retail vehicle gross profit [3] | $ 116 | $ 198 | (41.4)% | $ 334 | $ 528 | (36.7)% |
| Wholesale gross profit [1] | 46 | 47 | (2.1)% | 114 | 127 | (10.2)% |
| Other gross profit [2] | 197 | 278 | (29.1)% | 605 | 758 | (20.2)% |
| Total gross profit | $ 359 | $ 523 | (31.4)% | $ 1,053 | $ 1,413 | (25.5)% |
| **Unit sales information:** | | | | | | |
| Retail vehicle unit sales | 102,570 | 111,949 | (8.4)% | 325,319 | 312,221 | 4.2 % |
| Wholesale vehicle unit sales | 47,763 | 50,204 | (4.9)% | 153,342 | 123,296 | 24.4 % |
| **Per unit selling prices:** | | | | | | |
| Retail vehicles | $ 24,296 | $ 23,671 | 2.6 % | $ 25,163 | $ 22,273 | 13.0 % |
| Wholesale vehicles | $ 14,593 | $ 10,995 | 32.7 % | $ 12,886 | $ 10,941 | 17.8 % |
| **Per retail unit gross profit:** | | | | | | |
| Retail vehicle gross profit [4] | $ 1,131 | $ 1,769 | (36.1)% | $ 1,027 | $ 1,691 | (39.3)% |
| Wholesale gross profit | 448 | 420 | 6.7 % | 350 | 407 | (14.0)% |
| Other gross profit | 1,921 | 2,483 | (22.6)% | 1,860 | 2,428 | (23.4)% |
| Total gross profit | $ 3,500 | $ 4,672 | (25.1)% | $ 3,237 | $ 4,526 | (28.5)% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit [5] | $ 691 | $ 936 | (26.2)% | $ 626 | $ 1,030 | (39.2)% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 193,061 | $ — | NM | 304,944 | $ — | NM |
| Wholesale marketplace revenues [6] | $ 193 | $ — | NM | $ 301 | $ — | NM |
| Wholesale marketplace gross profit [6] [7] | $ 13 | $ — | NM | $ 18 | $ — | NM |

(1) Includes $6, $15, $27 and $37, respectively, of wholesale revenue from related parties.
(2) Includes $39, $52, $137 and $143, respectively, of other sales and revenues from related parties.
(3) For the three and nine months ended September 30, 2022, retail vehicle gross profit includes $2 and $16, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) For the three and nine months ended September 30, 2022, retail vehicle per unit gross profit includes $19 and $49, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(5) Wholesale vehicle gross profit per wholesale unit excludes wholesale marketplace units sold and wholesale marketplace gross profit.
(6) Wholesale marketplace revenues and wholesale marketplace gross profit are included in wholesale sales and revenues and wholesale gross profit, respectively.
(7) For the three and nine months ended September 30, 2022, wholesale marketplace gross profit includes $22 and $37, respectively, of depreciation and amortization expense.
NM = Not meaningful

46

*Retail Vehicle Sales*

*Three months ended September 30, 2022 Versus 2021.* Retail vehicle sales decreased by $158 million to $2.5 billion during the three months ended September 30, 2022, compared to $2.7 billion during the three months ended September 30, 2021. The decrease in revenue was primarily due to a decrease in the number of retail vehicles sold to 102,570 from 111,949 during the three months ended September 30, 2022 and 2021, respectively, which was driven by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability. The average selling price of our retail units sold increased to $24,296 from $23,671 during the three months ended September 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Retail vehicle sales increased by $1.2 billion to $8.2 billion during the nine months ended September 30, 2022 compared to $7.0 billion during the nine months ended September 30, 2021. The increase in revenue was primarily due to an increase in the number of retail vehicles sold to 325,319 from 312,221 during the nine months ended September 30, 2022 and 2021, respectively, which was driven by enhanced marketing efforts, expanded inventory selection, and increased brand awareness, partially offset by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability. The average selling price of our retail units sold also increased to $25,163 from $22,273 during the nine months ended September 30, 2022 and 2021, respectively, due primarily to the overall appreciation in the used vehicle market compared to the nine months ended September 30, 2021.

*Wholesale Sales and Revenues*

*Three months ended September 30, 2022 Versus 2021.* Wholesale sales and revenues increased by $145 million to $697 million during the three months ended September 30, 2022, compared to $552 million during the three months ended September 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 193,061 wholesale marketplace units sold and $193 million in wholesale revenue. Wholesale units sold decreased to 47,763 from 50,204 during the three months ended September 30, 2022 and 2021, respectively, while the average selling price of our wholesale units sold increased to $14,593 during the three months ended September 30, 2022 from $10,995 during the three months ended September 30, 2021. The decrease in wholesale units sold was due to acquiring fewer vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Wholesale vehicle sales increased by $0.6 billion to $2.0 billion during the nine months ended September 30, 2022, compared to $1.3 billion during the nine months ended September 30, 2021. The increase in revenue was primarily driven by the acquisition of ADESA, resulting in 304,944 wholesale marketplace units sold, for a total of $301 million in wholesale revenue. Additionally, wholesale units sold increased to 153,342 from 123,296 during the nine months ended September 30, 2022 and 2021, respectively, and the average selling price of our wholesale units sold increased to $12,886 during the nine months ended September 30, 2022 from $10,941 during the nine months ended September 30, 2021. The increase in wholesale units sold was due to acquiring more vehicles from customers, and the higher average selling price was due primarily to overall appreciation in the used vehicle market compared to the nine months ended September 30, 2021.

*Other Sales and Revenues*

*Three months ended September 30, 2022 Versus 2021.* Other sales and revenues decreased by $81 million to $197 million during the three months ended September 30, 2022, compared to $278 million during the three months ended September 30, 2021. This decrease was primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates and decrease in retail units sold, partially offset by the impact of higher industry-wide vehicle prices on average loan size during the three months ended September 30, 2022.

*Nine months ended September 30, 2022 Versus 2021.* Other sales and revenues decreased by $153 million to $605 million during the nine months ended September 30, 2022, compared to $758 million during the nine months ended September 30, 2021. The decrease is primarily due to the decrease in gain on loan sales driven by rapidly increasing benchmark interest rates,

47

partially offset by the impact of the increase in retail units sold, and the impact of higher industry-wide vehicle prices on average loan size during the nine months ended September 30, 2022.

### Retail Vehicle Gross Profit

*Three months ended September 30, 2022 Versus 2021.* Retail vehicle gross profit decreased by $82 million to $116 million during the three months ended September 30, 2022, compared to $198 million during the three months ended September 30, 2021. Retail vehicle gross profit per unit decreased to $1,131 for the three months ended September 30, 2022, compared to $1,769 for the three months ended September 30, 2021. The per unit decrease was primarily driven by higher acquisition, reconditioning and inbound transport costs, partially offset by a higher ratio of customer-sourced vehicles sold during the three months ended September 30, 2022.

*Nine months ended September 30, 2022 Versus 2021.* Retail vehicle gross profit decreased by $194 million to $334 million during the nine months ended September 30, 2022, compared to $528 million during the nine months ended September 30, 2021. This decrease was driven primarily by a decrease in retail vehicle gross profit per unit to $1,027 for the nine months ended September 30, 2022 compared to $1,691 for the nine months ended September 30, 2021, partially offset by an increase in retail units sold. The per unit decrease was primarily driven by higher acquisition, reconditioning and inbound transport costs, partially offset by a higher ratio of customer-sourced vehicles sold during the nine months ended September 30, 2022.

### Wholesale Gross Profit

*Three months ended September 30, 2022 Versus 2021.* Wholesale gross profit decreased by $1 million to $46 million during the three months ended September 30, 2022, compared to $47 million during the three months ended September 30, 2021. This was primarily due to a decrease in wholesale units sold to 47,763 during the three months ended September 30, 2022 from 50,204 during the three months ended September 30, 2021 and a decrease in wholesale gross profit per wholesale unit to $691 in the three months ended September 30, 2022 compared to $936 in the three months ended September 30, 2021, partially offset by $13 million from the acquisition of ADESA. The decrease in wholesale gross profit per wholesale unit was primarily driven by the difference between our wholesale acquisition price and sales price and the decrease in wholesale units sold was primarily driven by acquiring less vehicles from customers compared to the three months ended September 30, 2021.

*Nine months ended September 30, 2022 Versus 2021.* Wholesale gross profit decreased by $13 million to $114 million during the nine months ended September 30, 2022, compared to $127 million during the nine months ended September 30, 2021. This decrease was driven primarily by a decrease in wholesale vehicle gross profit per wholesale unit to $626 from $1,030 in the nine months ended September 30, 2022, and 2021, respectively, partially offset by an increase in wholesale units sold to 153,342 from 123,296, respectively, as well as $18 million from the acquisition of ADESA. The increase in the number of wholesale units sold was primarily due to acquiring more vehicles from customers, while the decrease in gross profit per wholesale unit was driven by the difference between our wholesale acquisition price and sales price compared to the nine months ended September 30, 2021.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

48

*Components of SG&A*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| | (in millions) | | | |
| Compensation and benefits [1] | $ 221 | $ 181 | $ 705 | $ 455 |
| CEO Milestone Gift [2] | 2 | — | 26 | — |
| Advertising | 117 | 126 | 403 | 345 |
| Market occupancy [3] | 23 | 18 | 70 | 46 |
| Logistics [4] | 57 | 40 | 184 | 104 |
| Other [5] | 236 | 181 | 716 | 463 |
| Total | $ 656 | $ 546 | $ 2,104 | $ 1,413 |
| Depreciation and amortization | 57 | 26 | 143 | 72 |
| Share-based compensation, excluding Gift | 14 | 11 | 33 | 28 |
| Total, excluding depreciation and amortization and share-based compensation | $ 583 | $ 509 | $ 1,902 | $ 1,313 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses increased by $110 million to $656 million during the three months ended September 30, 2022, compared to $546 million during the three months ended September 30, 2021. The increase was partially due to an increase in compensation and benefits of $40 million which was primarily driven by expansion of our teams to support growth, as well as compensation related to the team acquired in the acquisition of ADESA. Market occupancy, logistics, and other expenses also increased during the three and nine months ended September 30, 2022 compared to the respective prior year period primarily due to building capacity for increases in the number of units sold and in population coverage, and in preparation for future growth. These increases were offset by a $9 million decrease in advertising expenses during the three months ended September 30, 2022.

Selling, general and administrative expenses increased by $691 million to $2,104 million during the nine months ended September 30, 2022, compared to $1,413 million during the nine months ended September 30, 2021. The increase was partially due to an increase in compensation and benefits by $250 million which was primarily driven by expansion of our teams to support our growth, as well as the acquisition of ADESA.

In addition, during the nine months ended September 30, 2022, we incurred $26 million of compensation expense related to the CEO Milestone Gift within selling, general and administrative expense, which is presented separately above, compared to none in the nine months ended September 30, 2021.

The increase in selling, general and administrative expenses during the nine months ended September 30, 2022 was also driven by increased advertising expense of $58 million due to an increase in advertising to drive growth in units sold and vehicles acquired from customers. Market occupancy, logistics, and other expenses also increased during the nine months ended September 30, 2022 compared to the respective prior year period primarily due to building capacity for increases in the number of units sold and in population coverage, and in preparation for future growth.

*Interest Expense*

Interest expense increased by $105 million to $153 million during the three months ended September 30, 2022, compared to $48 million during the three months ended September 30, 2021, and increased by $212 million to $333 million during the nine months ended September 30, 2022, compared to $121 million during the nine months ended September 30, 2021. The increase is primarily due to increased interest incurred on additional senior unsecured notes issued by the Company in March 2021, August 2021, and May 2022, along with increased interest expense incurred on sale leaseback financing since September 30, 2021.

*Other Expense (Income), Net*

Other expense (income), net changed by $61 million to expense of $58 million during the three months ended September 30, 2022 compared to income of $3 million during the three months ended September 30, 2021. Other expense (income), net changed by $84 million to expense of $68 million during the nine months ended September 30, 2022 compared to income of $16 million during the nine months ended September 30, 2021. The change is primarily due to fair value adjustments on our Warrants to acquire Root's Class A common stock and fair value adjustments on our retained beneficial interests in securitizations and purchase price adjustment receivables.

**Non-GAAP Financial Measures**

To supplement the consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation. We historically presented EBITDA and EBITDA Margin, however we believe the presentation of Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation in conjunction with U.S. GAAP financial measures provides investors with increased transparency into financial measures used by our management team, and it also improves investors' understanding of our underlying operating performance and their ability to analyze our ongoing operating trends. All historic non-GAAP financial measures have been reconciled with the most directly comparable U.S. GAAP financial measures.

***Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation***

Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation are supplemental measures of operating performance that do not represent and should not be considered an alternative to net (loss) income or cash flow from operations, as determined by U.S. GAAP. Adjusted EBITDA is defined as net (loss) income plus income tax expense, interest expense, other (income) expense, net, depreciation and amortization, and share-based compensation related to the CEO Milestone Gift, Following our acquisition of ADESA, we are also excluding depreciation and amortization expense which is expensed as part of cost of sales which has historically been only a small component of cost of sales. Adjusted EBITDA, excluding non-Gift share-based compensation is defined as Adjusted EBITDA plus share-based compensation unrelated to the CEO Milestone Gift. Adjusted EBITDA Margin is Adjusted EBITDA as a percentage of total revenues. Adjusted EBITDA Margin, excluding non-Gift share-based compensation is Adjusted EBITDA, excluding non-Gift share-based compensation as a percentage of total revenues. We use Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to measure the operating performance of our business and Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation to measure our operating performance relative to our total revenues. We believe these metrics are useful measures to us and to our investors because they exclude certain financial and capital structure items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA, Adjusted EBITDA, excluding non-Gift share-based compensation, Adjusted EBITDA Margin, and Adjusted EBITDA Margin, excluding non-Gift share-based compensation may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations. A reconciliation of Adjusted EBITDA and Adjusted EBITDA, excluding non-Gift share-based compensation to net loss, which is the most directly

50

comparable U.S. GAAP measure, and calculation of Adjusted EBITDA Margin and Adjusted EBITDA Margin, excluding non-Gift share-based compensation is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| Net loss | $ (508) | $ (68) | $ (1,453) | $ (105) |
| Income tax provision | $ — | $ — | $ 1 | $ — |
| Interest expense | 153 | 48 | 333 | 121 |
| Other (income) expense, net | 58 | (3) | 68 | (16) |
| Depreciation and amortization expense in cost of sales | 36 | 6 | 71 | 17 |
| Depreciation and amortization expense in SG&A | 57 | 26 | 143 | 72 |
| CEO Milestone Gift in cost of sales | 2 | — | 16 | — |
| CEO Milestone Gift in SG&A | 2 | — | 26 | — |
| Adjusted EBITDA [1] | $ (200) | $ 9 | $ (795) | $ 89 |
| Share-based compensation, excluding Gift | 14 | 11 | 33 | 28 |
| Adjusted EBITDA, excluding non-Gift share-based compensation [1] | (186) | 20 | (762) | 117 |
| | | | | |
| Total revenues | 3,386 | 3,480 | 10,767 | 9,061 |
| Net loss margin | (15.0)% | (2.0)% | (13.5)% | (1.2)% |
| Adjusted EBITDA margin [2] | (5.9)% | 0.3 % | (7.4)% | 1.0 % |
| Adjusted EBITDA margin, excluding non-Gift share-based compensation [2] | (5.5)% | 0.6 % | (7.1)% | 1.3 % |

(1) For the three and nine months ended September 30, 2022, includes $0 and $14, respectively, of expenses associated with the previously announced workforce reduction.
(2) For the three and nine months ended September 30, 2022, includes 0.0% and 0.1%, respectively, of expenses associated with the previously announced workforce reduction.

## Liquidity and Capital Resources

### General

We generate cash from the sale of retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of retail vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities, real estate and equipment financing, the issuance of long-term notes, and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, and increased population coverage.

51

We had the following liquidity resources available as of September 30, 2022 and December 31, 2021:

| | September 30, 2022 | December 31, 2021 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 316 | $ 403 |
| Availability under short-term revolving facilities [1] | 1,956 | 438 |
| Committed liquidity resources available | $ 2,272 | $ 841 |
| Unpledged vehicle inventory not included above | 52 | 665 |
| Unpledged real estate not included above [2] | 1,995 | 677 |
| Unpledged beneficial interests in securitizations | 67 | 100 |
| Total liquidity resources | $ 4,386 | $ 2,283 |

(1) Based on pledging all eligible vehicles and finance receivables under the available capacity in our floor plan and finance receivable facilities, excluding the impact to restricted cash requirements.
(2) Total unpledged gross real estate assets minus committed sale leasebacks. Includes $1.1 billion of ADESA unpledged real estate assets based on preliminary valuations.

Our total liquidity resources is composed of cash and equivalents, availability under existing credit facilities, and additional unpledged assets, including vehicle inventory, finance receivables, real estate, and securities, on our balance sheet that can be financed using traditional asset-based financing sources.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets.

As of September 30, 2022 and December 31, 2021, the short-term revolving facilities had a total commitment of $4.8 billion and $4.3 billion, an outstanding balance of $575 million and $2.1 billion, and unused capacity of $4.2 billion and $2.2 billion, respectively.

Availability under real estate agreements is the available amount we can borrow under our existing real estate financing agreements based on the value of existing real estate on our balance sheet. From time to time, we may enter into committed real estate financing agreements that allow for future pledging of real estate assets on a flexible timeline. We began using committed real estate financing agreements in 2017 and may do so in the future.

Unpledged vehicle inventory and finance receivables is the value of vehicle inventory and finance receivables on our balance sheet on the period end date beyond that covered by committed financing agreements.

Unpledged real estate assets include real estate acquired as part of the acquisition of ADESA's U.S. physical auction business, IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and expect to continue to use various forms of real estate financing in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback or pledge real estate and retained

beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include Adjusted EBITDA, excluding non-Gift share-based compensation, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition, as a growing automotive retailer, we also invest in and generate several types of automotive retail assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of September 30, 2022 and December 31, 2021, our outstanding principal amount of indebtedness, including finance leases, was $7.5 billion and $5.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments and Note 16 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

| | September 30, 2022 | | December 31, 2021 |
| --- | --- | --- | --- |
| | (in millions) | | |
| **Asset-Based Financing:** | | | |
| Inventory | $ | 575 | $ | 1,877 |
| Finance receivables and beneficial interests | | 298 | | 458 |
| Transportation fleet[1] | | 402 | | 212 |
| Real estate[2] | | 489 | | 450 |
| Total asset-based financing | | 1,764 | | 2,997 |
| Senior Notes | | 5,725 | | 2,450 |
| Total debt | | 7,489 | | 5,447 |
| Less: unamortized debt issuance costs[3] | | (85) | | (34) |
| Total debt, net | $ | 7,404 | $ | 5,413 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our consolidated balance sheets and not included here.

On April 26, 2022, we completed an equity offering of 15.6 million shares of Class A common stock for net proceeds of $1.2 billion. Also, on May 6, 2022, we issued $3.275 billion in senior unsecured notes due 2030. We are using the net proceeds from the Class A common stock offering for general corporate purposes and to pay any costs, fees and expenses incurred by us in connection with the offering. We used the net proceeds from the issuance and sale of the 2030 Notes (a) to finance the

$2.2 billion ADESA acquisition and other ancillary transactions in connection therewith, and to pay related fees and expenses in connection therewith and (b) for working capital, capital expenditures and other general corporate purposes.

***Cash Flows***

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the nine months ended September 30, 2022 and 2021:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in millions) | |
| Net cash used in operating activities | $ (585) | $ (1,422) |
| Net cash used in investing activities | (2,568) | (352) |
| Net cash provided by financing activities | 2,994 | 1,849 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (159) | 75 |
| Cash, cash equivalents and restricted cash at beginning of period | 636 | 329 |
| Cash, cash equivalents and restricted cash at end of period | $ 477 | $ 404 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, personnel-related expenses, and cash used to acquire customers. Cash used in operating activities was $585 million and $1.4 billion during the nine months ended September 30, 2022 and 2021, respectively, a decrease of $837 million, primarily due to decreases in cash used to acquire vehicle inventory, partially offset by increased net loss as a result of increased selling, general and administrative expenses and reconditioning costs.

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash used in investing activities was $2.6 billion and $352 million during the nine months ended September 30, 2022 and 2021, respectively, an increase of $2.2 billion, primarily driven by our acquisition of the U.S. physical auction business of ADESA for approximately $2.2 billion.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity and proceeds from equity issuances which have been used to provide working capital, finance the $2.2 billion acquisition of ADESA, and for general corporate purposes, including paying down our short-term revolving facilities. Cash provided by financing activities was $3.0 billion and $1.8 billion during the nine months ended September 30, 2022 and 2021, respectively, an increase of $1.1 billion. The change primarily relates to increased net proceeds from long-term debt primarily from the issuance of our $3.275 billion Senior Notes in May 2022 along with proceeds from the issuance of Class A common stock during the nine months ended September 30, 2022, partially offset by decreased net proceeds from short-term revolving facilities.

**Contractual Obligations and Commitments**

As of September 30, 2022, there have been no material changes to the contractual obligations or commitments previously disclosed in our most recent Annual Report on Form 10-K, filed February 24, 2022 other than the issuance of $3.275 billion in Senior Notes in May 2022 and the purchase obligations for services of $174 million over the next seven years.

**Fair Value Measurements**

We report money market securities, certain receivables, Warrants to acquire Root's Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

54

**Critical Accounting Estimates**

Except for the following, there have been no material changes to our critical accounting estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022.

*Business Combination Purchase Price Allocation*

The purchase price of an acquisition is allocated to the identifiable assets acquired and liabilities assumed based on their fair values at the date of acquisition, with the excess purchase price being recorded as goodwill. The purchase price allocation for ADESA is preliminary and will continue to be assessed during the measurement period, which may be up to one year from the acquisition date, with any adjustments being recorded against goodwill. See Note 3 — Business Combinations, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q for a description of the preliminary status of the accounting for the ADESA acquisition.

The allocation of purchase price to the tangible and identifiable intangible assets acquired is specifically complex because of the significant estimates and assumptions involved in determining their fair values. Due to this higher degree of complexity, we obtained the assistance of outside valuation experts in the allocation of purchase price to the tangible and identifiable intangible assets acquired. While outside valuation experts were used, management has the ultimate responsibility for the valuation methods, models and inputs used and the resulting purchase price allocation. Critical estimates used in valuing tangible assets associated with the ADESA acquisition include, but are not limited to, the similarity of the acquired real property to market comparable transactions, costs of similar personal property in new condition, and economic obsolescence rates. Critical estimates used in valuing identifiable intangible assets associated with the ADESA acquisition include, but are not limited to, revenues and attrition rate.

55

## FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the impact on our business from macroeconomic conditions, including heightened inflation and rising interest rates;

- our acquisition of ADESA from KAR Auction Services, Inc., including the ability to successfully integrate the operations of the acquired businesses;

- our history of losses and ability to achieve or maintain profitability in the future;

- our ability to effectively manage our rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- our limited operating history;

- the seasonal and other fluctuations in our quarterly operating results, including as a result of COVID-19 and other future epidemics and public health crises;

- our relationship with DriveTime and its affiliates;

- our minority equity investment in Root, Inc.;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

56

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the internet and e-commerce;

- our ability to grow complementary product and service offerings;

- our ability to address the shift to mobile device technology by our customers;

- risks related to the larger automotive ecosystem;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to raise additional capital;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- the risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

57

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- the resources required to comply with public company obligations;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indentures governing our Senior Notes;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 24, 2022, other than those disclosed below.

### Inflation and Interest Rate Risk

We are affected by inflationary factors such as decreased vehicle affordability, including as a result of rising interest rates, and increases in supply chain and logistics costs, materials costs, and labor costs. We do not believe that inflation has historically had a material effect on our business, financial condition, or results of operations. However, given the current macroeconomic environment and its effect on our results of operations in the third quarter of 2022, which were primarily fewer units sold, we will continue to look for ways to manage any changes in consumer purchasing behavior and increased costs, both of which may continue to adversely affect our business, financial condition, and results of operations.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to

management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

There were no changes to our internal controls over financial reporting that occurred during the three months ended September 30, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors. For more information, see "Legal Matters" in Note 17 — Commitments and Contingencies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q.

**ITEM 1A. RISK FACTORS**

There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 24, 2022 and in our Quarterly Report on Form 10-Q filed May 10, 2022.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 10.1* | Third Amended and Restated Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.2* | Inventory Financing and Security Agreement, dated as of September 22, 2022, among Carvana, LLC, Ally Bank, and Ally Financial Inc. (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 22, 2022). |
| 10.3* | Second Amended and Restated Master Purchase and Sale Agreement, dated November 1, 2022, among Ally Bank, Ally Financial Inc. and Carvana Auto Receivables 2016-1 LLC, filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

*Certain portions of this exhibit have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K. The registrant agrees to furnish supplementally an unredacted copy of this exhibit to the Securities and Exchange Commission upon its request.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:        November 3, 2022

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins
Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

62

**Exhibit 10.3**

**SECOND AMENDED AND RESTATED**

**MASTER PURCHASE AND SALE AGREEMENT**

**among**

**Carvana Auto Receivables 2016-1 LLC**

**as Transferor**

**and**

**ALLY BANK and ALLY FINANCIAL INC.**

**each a Purchaser**

**DATED AS OF NOVEMBER 1, 2022**

Certain information has been excluded because it is both (i) not material and (ii) the type that the registrant treats as private or confidential.

TABLE OF CONTENTS

| | | | PAGE |
|---|---|---|---|
| ARTICLE I DEFINITIONS AND USAGE | | | 1 |
| | Section 1.1 | Definitions | 1 |
| ARTICLE II COMMITMENT TO SELL RECEIVABLES POOLS | | | 2 |
| | Section 2.1 | Commitments to Sell and Purchase Receivables Pools | 2 |
| | Section 2.2 | Payment of Second Step Receivables Purchase Price | 4 |
| | Section 2.3 | Pricing Model | 4 |
| | Section 2.4 | Termination Options. | 5 |
| | Section 2.5 | Taxes. | 8 |
| | Section 2.6 | Loss and Liquidation Data. | 9 |
| | Section 2.7 | Re-Liening Trigger Events | 9 |
| ARTICLE III PURCHASE AND SALE OF RECEIVABLES | | | 10 |
| | Section 3.1 | Sale of Receivables | 10 |
| | Section 3.2 | The Closing | 13 |
| ARTICLE IV | | | 13 |
| CLOSINGS | | | 13 |
| | Section 4.1 | Effecting Purchases | 13 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | | | 14 |
| | Section 5.1 | Representations and Warranties of the Purchasers. | 14 |
| | Section 5.2 | Representations and Warranties of the Transferor | 15 |
| ARTICLE VI CONDITIONS | | | 23 |
| | Section 6.1 | Conditions to Effectiveness | 23 |
| | Section 6.2 | Conditions to Obligation of the Purchasers | 24 |
| | Section 6.3 | Conditions to Obligation of the Transferor | 27 |
| ARTICLE VII COVENANTS OF THE TRANSFEROR | | | 27 |
| | Section 7.1 | Protection of Right, Title and Interest | 27 |
| | Section 7.2 | Other Liens or Interests | 29 |
| | Section 7.3 | Perfection Costs and Expenses | 29 |
| | Section 7.4 | Separateness | 29 |
| | Section 7.5 | Notice of Servicer Termination; Etc. | 29 |
| | Section 7.6 | Conduct of Business; Ownership | 29 |
| | Section 7.7 | Collections | 30 |
| | Section 7.8 | Consolidations, Mergers and Sales of Assets. | 30 |
| | Section 7.9 | Master Sale Agreement | 30 |
| | Section 7.10 | Operation of the Transferor | 30 |
| | Section 7.11 | Selection Standards; Quarterly Meetings. | 30 |
| | Section 7.12 | Furnishing of Information and Inspection of Records | 31 |

| Section 7.13 | Compliance with Laws, Etc. | 31 |
|---|---|---|
| Section 7.14 | Indemnity. | 31 |
| Section 7.15 | Publicity | 32 |
| Section 7.16 | No Solicitation | 33 |
| Section 7.17 | Remediation | 33 |
| Section 7.18 | Quarterly Statements as to Compliance | 33 |
| Section 7.19 | Additional Covenants | 33 |
| Section 7.20 | Negative Covenants | 36 |
| Section 7.21 | Accountant's Letter | 38 |

ARTICLE VIII MISCELLANEOUS PROVISIONS — 39

| Section 8.1 | Obligations of the Transferor | 39 |
|---|---|---|
| Section 8.2 | Repurchase of Receivables Upon Breach by the Transferor | 39 |
| Section 8.3 | Assignment of Warranty Receivables | 39 |
| Section 8.4 | Amendment | 39 |
| Section 8.5 | Waivers | 39 |
| Section 8.6 | Notices | 40 |
| Section 8.7 | Costs and Expenses | 40 |
| Section 8.8 | Survival | 41 |
| Section 8.9 | Headings and Cross-References | 41 |
| Section 8.10 | Governing Law, Submission to Jurisdiction, Etc | 41 |
| Section 8.11 | Counterparts; Facsimile and Electronic Signatures | 41 |
| Section 8.12 | Further Assurances | 42 |
| Section 8.13 | No Reliance | 42 |
| Section 8.14 | Severability of Provisions | 42 |
| Section 8.15 | Assignment | 42 |
| Section 8.16 | No Third Party Beneficiaries | 42 |
| Section 8.17 | No Petition Covenant | 42 |
| Section 8.18 | Special Acknowledgement of Purchasers | 43 |
| Section 8.19 | Effect of Amendment and Restatement | 43 |
| Section 8.20 | Recourse Limited to Collateral; Subordination | 43 |

EXHIBITS

EXHIBIT A FORM OF SECOND STEP POOL SUPPLEMENT
EXHIBIT B [RESERVED]
EXHIBIT C FORM OF NOTICE OF CLOSING DATE
EXHIBIT D PURCHASE-BID FILE TAPE DATA LAYOUT
EXHIBIT E CREDIT POLICY
EXHIBIT F SYSTEM DESCRIPTION
EXHIBIT G SYSTEM DESCRIPTION
EXHIBIT H COLLECTION ACCOUNT WIRING INFORMATION

APPENDIX

APPENDIX A Definitions

**SECOND AMENDED AND RESTATED MASTER PURCHASE AND SALE
AGREEMENT**

THIS SECOND AMENDED AND RESTATED MASTER PURCHASE AND SALE AGREEMENT (as from time to time amended, supplemented or otherwise modified and in effect, this "Agreement") is made as of November 1, 2022, among Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company (the "Transferor"), Ally Bank., a Utah chartered bank, and Ally Financial Inc., a Delaware corporation (each a "Purchaser" and collectively, the "Purchasers").

RECITALS:

In the regular course of its business, Carvana, LLC (the "Seller") sells used automobiles and light trucks and originates automobile and light truck retail installment sale contracts secured by such automobiles and light trucks.

1. On the Original Execution Date, the Seller and the Transferor have entered into the Master Sale Agreement (Flow) (the "Master Sale Agreement") pursuant to which the Seller has agreed to sell, from time to time, Receivables and related property to the Transferor pursuant to the terms and conditions set forth therein.

2. The Transferor wishes to sell, and the Purchasers wish to purchase, from time to time, Receivables and related property (including the security interests in the related Financed Vehicles) pursuant to the terms of this Agreement.

3. Bridgecrest has agreed to service the Receivables Pools and related Purchased Property for the benefit of the Purchasers pursuant to the Master Servicing Agreement.

4. The Transferor and the Purchasers wish to provide in this Agreement, among other things, the terms on which the Receivables Pools and related property are to be sold by the Transferor to the Purchasers.

In consideration of the foregoing, other good and valuable consideration, and the mutual terms and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND USAGE

Section 1.1 Definitions. Certain capitalized terms used in the above recitals and in this Agreement are defined in and shall have the respective meanings assigned to them in (or by reference in) Appendix A to this Agreement. All references herein to "the Agreement" or "this Agreement" are to this Master Purchase and Sale Agreement as it may be amended, supplemented or modified from time to time, the exhibits and attachments hereto and the capitalized terms used herein which are defined in such Appendix A, and all references herein to Articles, Sections and subsections are to Articles, Sections or subsections of this Agreement unless otherwise specified. The rules of construction and usage set forth in such Appendix A shall be applicable to this Agreement.

ARTICLE II

COMMITMENT TO SELL RECEIVABLES POOLS

Section 2.1 Commitments to Sell and Purchase Receivables Pools

(a) Transferor Obligation. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements set forth herein, the Transferor commits to sell to the Purchasers one Receivables Pool each calendar quarter during the Commitment Period, with a total Cutoff Date Aggregate Outstanding Principal Balance for all such Receivables Pools sold during the Commitment Period, taken together, equal to the Commitment Amount and each Receivables Pool sold to the Purchaser shall have a Cutoff Date Aggregate Outstanding Principal Balance

equal to at least $300,000,000, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Selection Procedures, including the Freestyle Selection, by the Purchase Percentage, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%), of the aggregate principal balance of quarterly pools of receivables originated by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during the second calendar week preceding the calendar week in which the related Closing Date shall occur related to such Receivables Pool during the Commitment Period; provided, that the Transferor shall not be obligated to sell any Receivables Pool if the related Second Step Receivables Purchase Price for such Receivables Pool is less than or equal to the Cutoff Date Aggregate Outstanding Principal Balance (collectively, the "Transferor Obligation"); provided, further, notwithstanding the maximum FICO score described in clause (xxxiv) in the definition of "Eligible Receivable," if the Seller elects to consummate a Limited Sale Option under the Master Sale Agreement, then the Transferor shall include in any related Receivables Pool that has a related Cutoff Date on and including February 24, 2019 through and including March 24, 2019, all Receivables (without regard to the Purchase Percentage or application of the Freestyle Selection Criteria) where the related Obligors have a FICO score of more than the Upper Bound FICO Score and that otherwise meet the definition of "Eligible Receivable" (other than the Upper Bound FICO Score described in clause (xxxiv) thereof) originated during the related Origination Period; provided further that, in connection with a Limited Sale Option, if the Transferor sells such Receivables with FICO scores of more than the Upper Bound FICO Score, the Transferor shall also be required to include in such Receivables Pool all Eligible Receivables originated during the related Origination Period with FICO scores of not less than [***] and not more than the Upper Bound FICO Score that otherwise meet the definition of "Eligible Receivable" with randomization codes of the related contract numbers that are greater than the Purchase Percentage; provided, further, that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables sold during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(a), any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

(b) Purchaser Obligation. Upon the terms and subject to the conditions set forth in this Agreement, including Section 2.1(c) below, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Purchasers commit to purchase one Receivables Pool each calendar quarter during the Commitment Period on each Closing Date designated by the Transferor pursuant to Section 4.1(a); provided that the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Receivables Pools purchased during the Commitment Period shall not exceed the Commitment Amount and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***], or such other later dates or higher amount with respect to Flex Receivables as agreed to by the Purchasers in their sole discretion (collectively, the "Purchaser Obligation"). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this Section 2.1(b), any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

(c) Basic Documents; Second Step Pool Supplement. The Transferor's right, title and interest in the Receivables and related Purchased Property purchased, from time to time, by the Purchaser pursuant to Section 3.1 shall be transferred and assigned by the execution and delivery of a Second Step Pool Supplement, in form and content substantially similar to Exhibit A attached hereto, and the satisfaction of the terms and conditions and the performance of the transactions contained in this Agreement and such Second Step Pool Supplement, as applicable. The Transferor shall deliver the Second Step Pool Supplement to the Purchaser for any Receivables Pool in accordance with the time periods specified in Section 6.2(i)(i).

[***] Redacted for confidentiality purposes.

(d) <u>Selection of Receivables Pools</u>. The Receivables to be sold in each Receivables Pool shall be selected by the Seller and the Transferor in accordance with the Selection Procedures, as selected by the Seller in accordance with the Selection Procedures and such other documented administrative criteria as the Purchasers may agree to from time to time, and sold to the Transferor pursuant to the Master Sale Agreement, after the Transferor has determined that both before and after giving effect to such Selection Procedures, (i) each such Receivable meets the Eligible Receivable criteria and (ii) (a) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria and (b) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, such Receivables Pool together with all Receivable Pools previously purchased, meet the applicable Eligible Receivables Pool criteria. If any of the Purchaser, the Seller or the Transferor determines that such Receivables Pool does not satisfy the applicable criteria for an Eligible Receivables Pool, then the Seller and the Transferor shall, without any selection believed to be adverse to the Purchaser, randomly select Eligible Receivables for removal from such Receivables Pool that will positively impact the out of compliance criteria. If the Purchasers reasonably determine that such Receivables Pool does not appear to have been selected on a random basis after applying such documented administrative criteria as the Purchasers may agree to from time to time (based on information reasonably requested by the Purchasers and provided by the Seller and the Transferor comparing the Receivables to be sold to the Purchasers on the related Closing Date as compared against receivables originated during the related Origination Period that meet the definition of an Eligible Receivable and are not sold to the Purchasers), then the Purchasers, the Seller and the Transferor will determine an approach to adjust the mix of Eligible Receivables in such pool (including adding or removing Receivables meeting the definition of Eligible Receivables) to ensure that such Receivables Pool was randomly selected by the Seller and the Transferor. In such circumstance, the Seller, the Transferor and the Purchasers will revisit this <u>Section 2.1(d)</u> and the related definitions to determine if changes thereto are needed to ensure future Receivables Pools are representative of receivables originated by the Seller during the related Origination Period that are eligible to be sold hereunder and that there was no adverse selection pursuant to the Freestyle Selection.

Section 2.2 <u>Payment of Second Step Receivables Purchase Price</u>. Upon the terms and subject to the conditions set forth in this Agreement, and in reliance on the covenants, representations, warranties and agreements herein set forth, the Second Step Receivables Purchase Price due on each Closing Date shall be paid by the Purchasers to the Transferor on such Closing Date by wire transfer of immediately available funds to an account or accounts designated by the Transferor. The Second Step Receivables Purchase Price will be set forth in the Second Step Pool Supplement for each Receivables Pool, in the form set forth in <u>Exhibit A</u>.

Section 2.3 <u>Pricing Model</u>. On the initial Closing Date, the Pricing Model shall be as agreed upon by the Parties and may thereafter be amended in accordance with this Section 2.3. The "Pricing Model" shall be delivered by the Purchaser to the Transferor in a Microsoft excel file format by electronic mail. The Parties shall not modify the Pricing Model other than in accordance with this Section 2.3, or by the Purchasers as necessary to cure any ambiguity, correct any error, or to make it consistent with this Agreement; provided, that, for the avoidance of doubt, the inputs and variables used by the Pricing Model (including, for example, any Specified Variables) shall be freely changeable by the Purchasers based on attributes of the Receivables Pool in order to determine the Purchase Price without regard to this Section 2.3. Otherwise, the Pricing Model may only be changed as follows:

(a) At any time, but no more frequently than weekly, the Purchasers will have the right to send a written notice to the Transferor (a "<u>Pricing Model Change Notice</u>") proposing changes to the Pricing Model, including any assumptions within the Pricing Model (the "<u>Pricing Model Amendments</u>"), applicable to all Receivable Pools to be purchased on or after the effective date of such Pricing Model Amendment (which effective date shall be at least 30 days, but no longer than ninety (90) days, after delivery of a Pricing Model Change Notice as described below, or such earlier date as otherwise agreed to by the Transferor and the Purchasers). A Pricing Model Change Notice shall be provided by the Purchasers to the Transferor at least ninety (90) days prior to the effectiveness of the related Pricing Model Amendment; <u>provided</u> that, such notice need only be provided thirty (30) days prior to effectiveness of the related Pricing Model Amendment if the changes based upon (A) 15% deviation in quarterly vintage loss or liquidation experience for any Receivables as compared against prior assumptions, including experience reflected in Vintage Data reports provided to the Purchasers from the Servicer, (B) changes in any of the Credit Policy or the definitions of Eligible Receivable or Eligible Receivables Pool, (C) changes impacting the

Purchasers or their Affiliates due to or arising out of any Banking Regulatory Change or change in Requirements of Law, (D) changes in the cost of funds (including any internal allocation of costs or cost of funds) to the auto finance division of the Purchasers, (E) at any time during the existence and continuance of any Catalyst Event, (F) changes to the methodology (including underlying loss assumptions for comparably-designated dealers) for calculating the NAALR, or (G) a failure by the Transferor and the Purchasers to agree upon mutually acceptable changes to the defined term Eligible Receivables Pool prior by January 24, 2018.

(b) If the Purchasers and the Transferor reach mutual written agreement regarding such Pricing Model Amendments, then the Pricing Model shall be amended to include such Pricing Model Amendments for Pools purchased subsequent to the date of such mutual agreement. If the Purchasers and the Transferor are not able to reach mutual agreement regarding such Pricing Model Amendments within thirty (30) days after receipt of the related Pricing Model Change Notice, then, the Purchasers may elect, in their sole discretion, to (A) remove or amend and resubmit such Pricing Model Change Notice upon written notice to the Transferor (and the Transferor shall have the longer of (i) the remainder of such thirty (30) day period and (ii) ten (10) days to consider such amended notice) or (B) terminate their obligation to make any further purchases hereunder effective immediately, upon written notice to the Transferor (the "Pricing Termination Notice"). If there is no agreement to amend the Pricing Model and this Agreement is not so terminated, the Pricing Model will remain in effect without the proposed change.

(c) If a change to the Pricing Model was previously made based on a Pricing Model Change Notice delivered in connection with the occurrence of a Catalyst Event under Section 2.3(a)(E), within thirty (30) days after the end of such Catalyst Event, the Purchasers shall send a subsequent Pricing Model Change Notice to the Transferor proposing changes to the Pricing Model that reasonably reflect the change of circumstances that caused the cessation of such Catalyst Event. Notwithstanding the forgoing, if (i) the Pricing Model Amendment has not yet taken effect and (ii) the Catalyst Event is not continuing, Purchasers shall immediately withdraw the Pricing Model Change Notice upon the termination of the Catalyst Event.

Section 2.4 Termination Options.

(a) Transferor Termination Options. The Transferor may terminate the Transferor Obligation and the Purchaser Obligation by providing the Purchaser written notice thereof at any time after the occurrence of any of the following (the "Transferor Termination Option"):

(i) the commencement of a voluntary case by either Purchaser under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by either Purchaser to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of either Purchaser;

(ii) If the Purchasers and the Transferor are not able to reach mutual agreement regarding a Pricing Model Amendment; provided, that such termination shall not take effect until the last day of the applicable 90 day or 30 day notice period described in Section 2.3(a), as applicable);

(iii) the breach of any representation, warranty or covenant in this Agreement or the Master Sale Agreement in any material respect by a Purchaser and, if such breach is capable of being cured and such Purchaser is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such failure is received from the Transferor or after discovery of such failure by the related Purchaser; or

(iv) for any reason with ninety (90) days' prior written notice to the Purchaser.

(b) Purchaser Termination Options. The Purchasers may terminate the Transferor Obligation and the Purchaser Obligation by providing the Transferor written notice thereof at any time after the occurrence of any of the following (the "Purchaser Termination Option"):

(i)    the commencement of a voluntary case by the Transferor, the Seller, the Performance Guarantor, or the Servicer under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Transferor, the Seller, the Performance Guarantor, or the Servicer to the entry of an order for relief in an involuntary case under any such law, or the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Transferor, the Seller, the Performance Guarantor, or the Servicer;

(ii)    the Seller or the Performance Guarantor (x) consolidates or merges with or into another Person and is not the surviving entity, or (y) is a party to a merger, conversion or consolidation and is not the surviving entity, or (z) has a Person succeed to its business and, in each case, in the case of the Performance Guarantor, the Guaranty ceases to be legally enforceable against the successor entity;

(iii)    a Servicer Termination Event shall be continuing pursuant to the terms of the Servicing Agreement;

(iv)    if for any reason, a modification to the servicing of the Purchased Property in respect of any Banking Regulatory Change is not made pursuant to Section 3.17 of the Servicing Agreement;

(v)    if the System of Record, including the components thereof, is updated or otherwise modified, or replaced by a successor computer system utilized by the Seller to select receivables, such that the updated, modified or replaced System of Record, including the components thereof, cannot apply the Selection Procedures, as determined by the Purchasers after consultation with the Seller during the Quarterly Selection Standards Meeting following the update, modification or replacement of the System of Record, including the components thereof;

(vi)    (y) the occurrence of a "Termination Event" or "Commitment Termination Event" under any Other Facility Transaction Document or a termination event, event of default, or servicer default under any other credit or purchase facility by the Purchasers or any of their Affiliates to the Seller or the Transferor or any of their consolidated Affiliates that enables or permits the holder or holders of such indebtedness or any trustee or agent on its or their behalf to cause such indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (z) any indebtedness of the Seller or the Transferor or any of their consolidated Affiliates which exceeds $[***] in aggregate principal or face amount becoming due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(vii)    a Material Adverse Effect occurs with respect to the Seller or the Transferor;

(viii)    failure of the Seller or the Transferor to pay any amount owed to the Purchasers or any other transaction party under any Basic Document for at least five (5) Business Days;

(ix)    the failure of the Seller or the Transferor to deliver a report or data file under in any Basic Document for at least five (5) Business Days after written notice of such failure is received from either Purchaser or after discovery of such failure by the Seller or the Transferor;

(x)    the breach of any representation, warranty or covenant in any Basic Document in any material respect by the Seller or Transferor and, if such breach is capable of being cured and the Seller or the Transferor is attempting in good faith to remedy such breach, such breach shall continue uncured for more than thirty (30) days after written notice of such breach is received from either Purchaser or after discovery of such breach by the Seller or the Transferor;

(xi)    the Transferor is required to register as an "investment company" under the Investment Company Act of 1940;

(xii)    the entry of (y) one or more judgments against the Transferor of $25,000 or more or (z) a judgment against the Seller of $2,500,000 or more or one or more judgments, in the aggregate, of $5,000,000 or more;

[***] Redacted for confidentiality purposes.

(xiii)    the Purchasers shall cease to have a valid and perfected first-priority security interest in any Purchased Property related to 5.0% or more of the Aggregate Outstanding Principal Balance of any Purchased Receivables, and, upon and following the Seller's breach of its purchase obligations pursuant to Section 7.2 of the Master Sale Agreement or the Transferor's breach of its repurchase obligations pursuant to Section 8.2 of this Agreement, any of the Purchased Property;

(xiv)    a Pension Benefit Guaranty Corporation or tax lien is filed against the Seller or Transferor;

(xv) a Change in Control;

(xvi)    for any reason with ninety (90) days' prior written notice to the Transferor; or

(xvii)    upon delivery of a Pricing Termination Notice pursuant to Section 2.3(b)

Section 2.5 Taxes.

(a)    All payments made by the Transferor, the Servicer, the Seller, the Performance Guarantor or the Purchasers under this Agreement and the other Basic Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes or any other tax based upon net income (including any income or capital gain earned by such Party or subsequent transferee or assignee thereof in respect of any Receivable) imposed on any Party as a result of a present or former connection between such Party and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Party having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to any Party hereunder, the amounts so payable to such Party shall be increased to the extent necessary to yield to such Party (after payment of all Non-Excluded Taxes) the amounts payable hereunder in the amounts specified in or pursuant to this Agreement or the other Basic Documents. Whenever any Non-Excluded Taxes are payable by any Party, as promptly as possible thereafter the Party subject to such Non-Excluded Taxes shall send to the paying Party a certified copy of an original official receipt received by the Party subject to such Non-Excluded Taxes showing payment thereof. If any Party fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or other required documentary evidence, such Party shall indemnify the Party subject to such Non-Excluded Taxes for any incremental taxes, interest or penalties that may become payable by such Party as a result of any such failure. The agreements in this Section 2.5(a) shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

(b)    Notice of Increased Costs; Relocation of Purchasing Office; Mandatory Assignment.

(i)    In the event that a Purchaser becomes aware that any amounts are or will be owed to it pursuant to Section 2.5(a), then it shall promptly notify the Transferor thereof and, as soon as possible thereafter, such Purchaser shall submit to the Transferor a certificate indicating the amount of such Purchaser's increased costs, Non-Excluded Taxes and the calculation thereof. Such certificate shall only be prima facie evidence of such increased costs or Non-Excluded Taxes.

(ii)    If such Purchaser claims any additional amounts payable pursuant to Section 2.5(a), it shall use its reasonable efforts (consistent with legal and regulatory restrictions) to avoid the need for changing the methodology for calculating the Second Step Receivables Purchase Price Purchase Price, including changing the jurisdiction of its applicable purchasing office, provided that the taking of any such action would not, in the reasonable judgment of such Purchaser, be disadvantageous to such Purchaser.

(c)    No Assignee Rights to Increased Costs. The terms and conditions of Section 2.5 hereof are personal to the Purchaser and shall not accrue to the benefit of any other Person, including any assignee or transferee of any direct or indirect interest in the Receivables.

Section 2.6 <u>Loss and Liquidation Data</u>. No later than 60 days after the end of each calendar quarter during the period beginning on the date hereof and ending on the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables), the Transferor shall, or shall cause the Seller, Bridgecrest or any other Affiliate holding or aggregating such information to, deliver to the Purchasers a cumulative net loss ratio as of the end of the related calendar quarter (and a narrative description of the methodology for making such calculation), which may be included in the Monthly Servicer Report delivered within 60 days after the end of each calendar quarter to the extent the information is available at that time, for the Seller's entire originated portfolio of retail installment sales contracts as of the end of the related calendar quarter.

Section 2.7 <u>Re-Liening Trigger Events</u>. Upon the occurrence of a Re-Liening Trigger Event, at the direction of the Purchasers, the Transferor shall, and the Transferor shall direct and cause any Affiliate that is a Title Lien Nominee to and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles (or if such Re-Liening Trigger Event relates to (i) one or more States, the related Financed Vehicles titled in such States or (ii) a Title Lien Nominee, the related Financed Vehicles liened in the name of such Title Lien Nominee) to be revised to name the Purchasers or their designee as lienholder; any Re-Liening Expenses shall be paid by the Servicer, and to the extent such costs are not paid by the Servicer but are paid by the Purchasers, such costs shall be recovered by adjusting the Second Step Receivables Purchase Price for an upcoming Receivables Pool as described in <u>Section 2.2</u> and the related Second Step Pool Supplement. In addition, at the sole expense of the Purchasers, upon the request of the Purchasers, the Transferor shall, and the Transferor shall direct and cause the any Affiliate that is a Title Lien Nominee and shall cooperate with the Servicer to, take all steps necessary to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicles identified, individually or by characteristic, by the Purchasers to be revised to name the Purchasers or their designee as lienholder. The Purchasers shall not direct the Servicer or the Transferor to take any steps to cause the Certificate of Title or other evidence of ownership of the related Financed Vehicle to be revised to name any other Person. The Transferor shall cause any Affiliate that is a Title Lien Nominee to irrevocably appoint or cause each relevant subservicer to irrevocably appoint, the Purchasers as its attorney-in-fact, such appointment being coupled with an interest, to take any and all steps required to be performed pursuant to this Section 2.7, including execution of Certificates of Title or any other documents in the name of the Transferor or such Title Lien Nominee and, in connection with the appointment of any successor Servicer, to execute a power of attorney with respect to such successor Servicer promptly after its appointment as such, naming such successor Servicer as its attorney-in-fact for the same purposes.

ARTICLE III

PURCHASE AND SALE OF RECEIVABLES

Section 3.1 <u>Sale of Receivables</u>.

(a) On each Closing Date during the Commitment Period, subject to the terms and conditions of this Agreement, the Transferor agrees to sell to the Purchasers, and the Purchasers agree to purchase from the Transferor, a Receivables Pool and the following other property relating thereto (collectively, the "<u>Purchased Property</u>"):

(i) all right, title and interest of the Transferor in, to and under each Receivable included in the applicable Receivables Pool listed on a Schedule of Receivables (the form of which is attached as <u>Schedule 2</u> to the Second Step Pool Supplement) delivered to the Purchaser on such Closing Date and all monies received thereon after the related Cutoff Date, exclusive of any amounts allocable to the premium for physical damage collateral protection insurance required by the Seller or the Servicer, as applicable, covering any related Financed Vehicle;

(ii) the interest of the Transferor in the security interests in the related Financed Vehicles granted by Obligors pursuant to the Receivables in the applicable Receivables Pool and, to the extent permitted by law, any accessions thereto;

(iii) the interest of the Transferor in any proceeds from claims on any physical damage, credit life, credit disability, warranties, debt cancellation agreements or other insurance policies covering the related Financed Vehicles or Obligors, including any rebates or credits of any premium or other payment with respect to any of the foregoing;

(iv) all of the Transferor's right, title and interest in, to and under the related Receivable Files;

(v) all right, title and interest of the Transferor in, to and under the Master Sale Agreement and the applicable First Step Pool Supplement and First Step Receivables Assignment, including the right of the Transferor to cause the Seller to repurchase Receivables under certain circumstances and the right of the Transferor to be indemnified under the circumstances specified in the Master Sale Agreement; and

(vi) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing described in clauses (i) through (v) above and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all the foregoing, including all proceeds of the conversion of any or all of the foregoing, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, investment property, payment intangibles, general intangibles, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

(b) <u>Second Step Receivables Purchase Price</u>. On each Closing Date, in consideration for the related Purchased Property, the Purchasers shall pay to the Transferor an amount (the "<u>Second Step Receivables Purchase Price</u>") equal to the Purchase Price for such Purchased Property.

The Cutoff Date Aggregate Outstanding Principal Balance, the purchase price designated by the Pricing Model, the Pre-closing Interest Carry Amount, the re-liening expenses described in <u>Section 2.7</u> and the Second Step Receivables Purchase Price for each Receivables Pool shall be set forth on the related Second Step Pool Supplement.

(c) <u>Wire Transfer</u>. The Purchasers shall pay each Second Step Receivables Purchase Price by federal wire transfer (same day) funds to the Transferor (or its designee) to the account set forth below:

Account Name: Carvana LLC
Account Number: 4124114661
Bank: Wells Fargo Bank, N.A.
ABA: 121000248

Within two (2) Business Days after each Closing Date, the Transferor shall pay to or as directed by the Purchasers in (same day) funds an amount equal to the aggregate amount of all Collections received by the Transferor after the related Cutoff Date, including from the Seller or the Servicer, with respect to the Receivables Pool sold to the Purchasers on such Closing Date through (but excluding) the applicable Closing Date.

(d) <u>Purchase Price Adjustment Payments</u>. Purchase price adjustment payments may be due to the Transferor by the Purchasers as agreed upon by the Parties, as applicable.

(e) <u>Purchase Cadence and Second Step Pool Supplement</u>. Not later than the third (3rd) Business Day following an Origination Period, the Transferor shall provide the Purchasers with the Purchase Percentage and supply the Purchasers with an initial data tape in form and substance acceptable to the Purchasers containing the information as called for in <u>Exhibit D</u> and indicating which Receivables listed in such initial data tape are Flex Receivables with respect to all Receivables originated or acquired by the Seller in the preceding Origination Period (and any Previously Originated Receivables to be included in the Related Receivables Pool) that the Seller and the Transferor intend in good faith to sell to the Purchasers under this Agreement meeting the selection criteria for sale to the Transferor and those Receivables meeting the eligibility criteria for sale by the Transferor to the Purchasers, a Receivables Pool. Not later than the first (1st) Business Day of the second week following an Origination Period (but at least two (2) Business Days prior to the related

Closing Date), the Transferor shall supply the Purchasers with a final data tape in form and substance acceptable to the Purchasers containing the final information as called for in <u>Exhibit D</u> and indicating which Receivables listed in such initial data tape are Flex Receivables with respect to all Receivables in the related Receivables Pool and identifying any receivable in the initial data tape that was determined not to be an Eligible Receivable, including any receivable with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable. Not less than one (1) Business Day prior to each proposed Closing Date, the Transferor will deliver to the Purchasers the related Second Step Pool Supplement substantially in the form of <u>Exhibit A</u> hereto and in form and substance reasonably acceptable to the Purchasers. Exhibit A will set forth amounts due by the Transferor with respect to the applicable Receivables Pool and will contain at least the following settlement information: calculation of the related Cutoff Date Aggregate Outstanding Principal Balance, the Pre-closing Interest Carry Amount, the purchase price designated by the Pricing Model, the re-liening expenses described in <u>Section 2.7</u> and the Second Step Receivables Purchase Price.

(f) <u>No Recourse</u>. It is understood that each sale of Purchased Property by the Transferor to the Purchaser pursuant to this Agreement, a Second Step Pool Supplement and the related Second Step Receivables Assignment shall be without recourse (except as set forth herein and in the other Basic Documents) and the Transferor does not guarantee collection of any Receivable. However, each such sale shall be made pursuant to and in reliance by the Purchaser on the representations, warranties and covenants of the Transferor as set forth in <u>Section 5.2</u>, the indemnities set forth in <u>Section 7.14</u> and the repurchase obligation set forth in <u>Section 8.2</u>.

(g) <u>Intent of the Parties</u>. This Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment is intended to effect a sale of each Receivables Pool by the Transferor to the Purchasers, and the parties intend to treat each such transaction as an independent sale for federal income tax and financial reporting purposes. It is the intention of the Transferor that each sale, transfer, assignment and other conveyance of each Receivables Pool contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment constitutes an independent sale of the related Purchased Property from the Transferor to the Purchasers and that the beneficial interest in and title to each such Receivables Pool shall not be part of the Transferor's estate in the event of the filing of a bankruptcy petition by or against the Transferor under any bankruptcy law. Each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment does not constitute and is not intended to result in any assumption by the Purchasers (or any of its assigns) of any obligation of the Seller or the Transferor to the Obligors, Affiliates of the Seller, insurers or any other Person in connection with any Receivables, any insurance policies or any agreement or instrument relating to any of them, in each case related to such transfer and assignment. Although the parties intend that each sale, transfer, assignment and other conveyance contemplated by this Agreement, the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment to be an independent sale, in the event any such transfer and assignment is deemed to be other than a sale, the parties intend and agree (i) that all filings described in this Agreement shall give the Purchasers a first priority perfected security interest in, to and under the Receivables Pool and the related Purchased Property and all proceeds of any of the foregoing, in each case with respect to such transfer and assignment; (ii) this Agreement, together with the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment, shall be deemed to be the grant of, and the Transferor hereby grants to the Purchasers, a security interest from the Transferor to the Purchasers in such Receivables and the related Purchased Property in order to secure its obligations hereunder with respect to such transfer and assignment; (iii) this Agreement, together with the applicable Second Step Pool Supplement and the related Second Step Receivables Assignment, shall be a security agreement under applicable law for the purpose of each such transfer and assignment; and (iv) the Purchasers shall have all of the rights, powers and privileges of a secured party under the UCC with respect to each such transfer and assignment and the Purchased Property related thereto.

Section 3.2 <u>The Closing</u>. The initial closing during the Commitment Period shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

ARTICLE IV

CLOSINGS

Section 4.1 <u>Effecting Purchases</u>.

(a)  <u>General Procedures</u>. During the Commitment Period, the purchase and sale of a Receivables Pool pursuant to the Transferor Obligation will occur on the Closing Date for the calendar quarter that follows receipt of notification from the Transferor of its intent to complete such a sale at such time (which Closing Date, for the avoidance of doubt, will fall in the last calendar week of the related Origination Period). For the avoidance of doubt, subject to the terms and conditions of this Agreement, the Transferor is obligated to sell a Receivables Pool to the Purchasers hereunder during each calendar quarter during the Commitment Period.

(i)    Notification of each sale must be provided by the Transferor to the Purchasers no later the third (3rd) Business Day following an Origination Period (which date falls in the week prior to the week in which the proposed Closing Date for such sale falls), substantially in the form of <u>Exhibit C</u> attached hereto. Such notification must specify for each such proposed Receivables Pool (i) the approximate Cutoff Date Aggregate Outstanding Principal Balance, (ii) the applicable proposed Closing Date, and (iii) the proposed Cutoff Date.

(ii)   Not later than the third (3rd) Business Day after receipt of the initial data tape received in <u>Section 3.1(e)</u> above (but at least three (3) Business Days prior to the related Closing Date), the Purchasers shall notify the Seller of the Purchase Price for each Eligible Receivable on the initial data tape by the Purchasers and the allocation of purchases between Ally Bank and Ally Financial.

(iii)  Not later than the second (2nd) Business Day of the second week following an Origination Period (but at least one (1) Business Day prior to the related Closing Date), the Purchasers shall notify the Seller of the final Purchase Price (including any Flex Amount) for the Receivables Pool and the final allocation of purchase between Ally Bank and Ally Financial.

(iv)   Not less than two (2) Business Days prior to the proposed Closing Date, the Transferor shall deliver to the Purchaser a receivables pool schedule in the form of Schedule 2 to Exhibit A (the "<u>Receivables Pool Schedule</u>"), which shall identify as of the Cutoff Date the pool of Receivables (the "<u>Receivables Pool</u>") to be sold. The Transferor shall promptly provide to the Purchaser all data related to the Receivables Pool that are necessary to determine the Purchase Price for such Receivables Pool or that are reasonably requested by the Purchaser.

(v)    On the Pricing Date, the Purchase Price shall be calculated in accordance with <u>Section 2.3</u>.

(b)  Upon the satisfaction or written waiver of the conditions specified in <u>Section 6.3</u>, on each Closing Date, the Seller will sell the related Purchased Property to the Transferor and the Transferor will sell the Purchased Property in such Receivables Pool to the Purchaser in accordance with the applicable Basic Documents.

(c)  <u>Due Diligence</u>. With respect to each proposed purchase of a Receivables Pool the Seller and the Transferor agree to cooperate with the Purchasers, with respect to all reasonable requests for documents or other information and due diligence procedures.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.1 <u>Representations and Warranties of the Purchasers</u>. The Purchasers represent and warrant to the Transferor as of the date hereof and as of each Closing Date:

(a)   <u>Organization and Good Standing</u>. Ally Bank has been duly organized and is validly existing as a Utah chartered bank in good standing, with power and authority to own its properties and to conduct its business

as such properties are presently owned and such business is presently conducted; and as of the date hereof, Ally Bank's deposits are insured by the Federal Deposit Insurance Corporation and Ally Bank is subject to the Federal Deposit Insurance Act. Ally Financial has been duly organized and validly exists as an entity in good standing under the laws of the State of Delaware, with power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted, including to acquire and own the Receivables.

(b) <u>Due Qualification</u>. Ally Bank is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America. Ally Financial is duly qualified to do business as a foreign entity in good standing, and has authority to hold loans in all jurisdictions of the United States of America.

(c) <u>Power and Authority</u>. The Purchasers have full power and authority to execute and deliver this Agreement and the Master Servicing Agreement and to perform the terms and provisions hereof and thereof and the execution, delivery and performance of this Agreement and the Master Servicing Agreement have been duly authorized by the Purchasers by all necessary action.

(d) <u>Due Authorization; Enforceability; No Violation</u>. This Agreement and the Master Servicing Agreement have been duly authorized, executed and delivered by the Purchasers, and each is the legal, valid and binding obligation of the Purchasers, enforceable against the Purchasers in accordance with its terms, except as such enforceability may be limited by applicable insolvency, bankruptcy, reorganization, conservatorship, receivership, liquidation or other laws and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law. The consummation of the transactions contemplated by this Agreement and the Master Servicing Agreement and the fulfillment of the terms of this Agreement and the Master Servicing Agreement shall not conflict with, result in any breach of any of the terms and provisions of or constitute (with or without notice or lapse of time) a default under, the articles of incorporation or bylaws of the Purchasers, or, in any material respect, any indenture, agreement, mortgage, deed of trust or other instrument to which the Purchasers is a party or by which it is bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument, or violate, in any material respect, any law or, to the best of the Purchaser's knowledge, any order, rule or regulation applicable to the Purchasers of any Governmental Authority having jurisdiction over the Purchasers or any of its properties, in each case, that would materially and adversely affect the performance by the Purchasers of its obligations under, or the validity and enforceability of, this Agreement.

(e) <u>No Proceedings</u>. There are no proceedings or investigations pending, or, to the best of the Purchasers' knowledge, threatened, before any Governmental Authority having jurisdiction over either Purchaser or any of their properties (i) asserting the invalidity of this Agreement and the Master Servicing Agreement, or (ii) seeking any determination or ruling that might materially and adversely affect the performance by either Purchaser of its obligations under, or the validity or enforceability of, this Agreement and the Master Servicing Agreement against the Purchasers.

Section 5.2 <u>Representations and Warranties of the Transferor</u>. The Transferor represents and warrants to the Purchasers as of the date hereof and as of each Closing Date (except as provided herein otherwise):

(a) <u>Organization and Good Standing</u>. It has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its formation, with all requisite power and authority to own or lease its properties and conduct its business as such business is presently conducted, and had at all relevant times, and now has all necessary power, authority and legal right to own or lease its properties and conduct its business as such business is presently conducted, including to acquire, own and sell the Receivables and the other Purchased Property except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) <u>Due Qualification</u>. It is duly qualified to do business and is in good standing and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business requires such qualifications, licenses or approvals (including, as applicable, the origination,

purchase, sale and servicing of the Receivables) except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c) <u>Power and Authority; Due Authorization</u>. It (i) has all necessary power, authority and legal right to (A) execute and deliver the Basic Documents to which it is a party, (B) carry out the terms of the Basic Documents to which it is a party and (C) to assign or grant the security interest in the assets transferred by it on the terms and conditions in this Agreement and (ii) has taken all necessary action to authorize the execution, delivery and performance of the Basic Documents to which it is a party and to assign or grant a security interest in the assets transferred by it on the terms and conditions in this Agreement.

(d) <u>Binding Obligation</u>. The Basic Documents to which it is a party have been duly executed and delivered by it and constitute legal, valid and binding obligations of it enforceable against it in accordance with their terms.

(e) <u>No Violation</u>. The consummation of the transactions contemplated by the Basic Documents to which it is a party and the fulfillment of the terms thereof will not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, its formation documents or any agreement to which it is bound, (ii) result in the creation or imposition of any Lien upon any of its properties, other than pursuant to the Master Sale Agreement and this Agreement, or (iii) violate any Requirements of Law, except, in each case, for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f) <u>No Proceedings</u>. There is no litigation, proceeding or investigation pending or, to the best of its knowledge, threatened against it, before any governmental authority (i) asserting the invalidity of any Basic Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Basic Documents, (iii) challenging the enforceability of a material portion of the Receivables or (iv) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect.

(g) <u>All Consents Required</u>. All approvals, authorizations, consents, orders, licenses or other actions of any person or of any governmental authority required for the due execution, delivery and performance by it of the Basic Documents to which it is a party have been obtained except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h) <u>Compliance.</u> It is not in violation in any material respect of any Basic Document to which it is a party or any laws, ordinances, Governmental Rules or regulations to which it is subject except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(i) <u>Bulk Sales</u>. The execution, delivery and performance of the Basic Documents to which it is a party is in the ordinary course of business and does not require compliance with any bulk sales act or similar law.

(j) <u>Solvency</u>. As of each Closing Date, (i) the Transferor is not and shall not become insolvent as a result of the transfer of the related Purchased Property on such date, (ii) the Transferor did not intend to or believe that it would incur debts that would be beyond its ability to pay as such debts matured, (iii) the Transferor did not transfer the related Purchased Property with the actual intent to hinder, delay or defraud any Person and (iv) the assets of the Transferor did not constitute unreasonably small capital to carry out its business as conducted.

(k) <u>Selection Procedures</u>. No procedures believed by it to be materially adverse to the interests of the Purchasers were utilized by it in identifying or selecting Receivables to be transferred by it. In addition, each Receivable assigned pursuant to this Agreement has been underwritten in accordance with and satisfies the standards of the Credit Policy in all material respects.

(l) <u>Taxes</u>. It has filed, caused to be filed, or received an extension of time for filing that has not yet expired, all federal and material state, local or foreign tax returns that are required to be filed by it. It has paid or made adequate provisions for the payment of all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of

which is currently being contested in good faith by appropriate proceedings and with respect to which reserves have been provided on the books of it), and no tax lien has been filed and, to the its knowledge, no claim is being asserted, with respect to any such tax, fee or other charge.

(m) <u>Exchange Act Compliance; Regulations T, U and X</u>. None of the transactions contemplated in the Basic Documents to which it is a party (including the use of the proceeds from the advances) will violate or result in a violation of Section 7 of the Exchange Act, or any regulations issued pursuant thereto, including Regulations T, U and X of the Federal Reserve Board, 12 C.F.R., Chapter II. It does not own or intend to carry or purchase, and no proceeds from the sale of the Purchased Property will be used to carry or purchase, any "margin stock" within the meaning of Regulation U or to extend "purchase credit" within the meaning of Regulation U.

(n) <u>Quality of Title</u>. Each Receivable, together with the Contract related thereto, transferred by it were, prior to the transfer thereof, owned by it free and clear of any Lien except for Permitted Liens, and the Purchasers upon the providing of value described herein shall acquire a valid ownership interest and a perfected first priority security interest in each Receivable and the related Purchased Property then-existing or thereafter arising, free and clear of any Lien, other than Permitted Liens. No effective financing statement or other instrument similar in effect covering any portion of the Purchased Property shall, after the relevant Cutoff Date, be on file in any recording office except such as may be filed in favor of the Transferor or the Purchasers in accordance with the Master Sale Agreement and this Agreement.

(o) <u>Security Interest</u>. It has granted a security interest (as defined in the UCC) to the Purchasers in the Purchased Property, which is enforceable in accordance with applicable law upon execution and delivery of the Basic Documents. Upon the filing of UCC-1 financing statements naming the Purchasers as secured party, or upon the Collateral Custodian obtaining possession, in the case of that portion of the Purchased Property which constitutes tangible chattel paper, or upon the E-Vault Provider granting control to the Purchasers, in the case of that portion of the Purchased Property which constitutes electronic chattel paper, the Purchasers shall have a first priority (except for any Permitted Liens) perfected security interest in the Purchased Property.

(p) <u>Reports Accurate</u>. All Monthly Reports, information, exhibits, financial statements, documents, books, records or reports (including the data file indicating characteristics of the Receivables and including electronic writings) furnished or to be furnished by the Seller or the Transferor directly or indirectly to the Purchasers, the Servicer, the Collateral Custodian or the bank holding the Collection Account under or in connection with the Basic Documents to which it is a party (including the Second Step Pool Supplement delivered in connection with each sale are true, correct and complete in all material respects as of the date specified therein or the date so furnished (as applicable).

(q) <u>Location of Offices.</u> The principal place of business and chief executive office of it and the office where it keeps all the Records related to the tangible Contracts are located at the address set forth in <u>Section 8.6</u>; <u>provided</u>, that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281 (or at such other locations as to which the notice and other specified requirements shall have been satisfied).

(r) <u>Tradenames and Place of Business</u>. (i) Except as specified in this Agreement, it has no trade names, fictitious names, assumed names or "doing business as" names or other names under which it has done or is doing business and (ii) its principal place of business and chief executive office is located at the address set forth in <u>Section 8.6</u> and has been so for the last four (4) months; <u>provided</u>, that on or about April 1, 2017, the Transferor's principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281.

(s) <u>Transfer Agreements</u>. The Master Sale Agreement and this Agreement are the only agreements pursuant to which it purchases or sells the Receivables and the related Contracts.

(t) <u>Value Given</u>. The Purchasers shall have given reasonably equivalent value to the Transferor in consideration for the transfer by the Transferor to the Purchasers of the Receivables and the related Purchased Property under this Agreement, no such transfer shall have been made for or on account of an

antecedent debt owed by the Transferor to the Purchasers and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code. The Transferor shall have given reasonably equivalent value to the Seller in consideration for the transfer by the Seller to the Transferor of the Receivables and the related 2016-1 Purchased Property under the Master Sale Agreement, no such transfer shall have been made for or on account of an antecedent debt owed by the Seller to the Transferor and no such transfer is or may be voidable or subject to avoidance under any section of the Bankruptcy Code.

(u) <u>Accounting</u>. The Transferor accounts for the transfers to the Purchasers of Receivables and related Purchased Property under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents. The Seller accounts for the transfers to the Transferor of Receivables and related Purchased Property and by the Transferor to the Purchasers under the Basic Documents as sales of such Receivables and related Purchased Property in its books, records and financial statements, in each case consistent with the requirements set forth in the Basic Documents, other than for income tax and consolidated accounting purposes.

(v) <u>Investment Company Act</u>. The Transferor is not (i) an "investment company" and is not controlled by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and (ii) a "covered fund" as defined in the final regulations issued December 10, 2013, implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. In making that determination, the Transferor is entitled to rely upon the exemption provided in Section 3(c)(5)(A) or (B) of the Investment Company Act, although there may be additional exemptions or exclusions available to the Transferor.

(w) <u>ERISA</u>. (i) No prohibited transactions or Reportable Events have occurred with respect to any Pension Plan (if any), (ii) no notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA has been filed, nor has any Pension Plan been terminated under Section 4041(c) of ERISA, nor has the Pension Benefit Guaranty Corporation instituted proceedings to terminate, or appointed a trustee to administer a Pension Plan and no event has occurred or condition exists that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, and (iii) no liability under Title IV (other than accrued premiums to the Pension Benefit Guaranty Corporation) has been incurred (whether or not assessed), which individually or in the aggregate with respect to all or any of (i), (ii) and (iii) above, would reasonably be expected to have a Material Adverse Effect on the Seller or Transferor (including its rights and interests in, to or under any Contracts or related Receivables), with respect to the Seller or Transferor.

(x) <u>Accuracy of Representations and Warranties</u>. Each representation or warranty by the Transferor contained in the Basic Documents to which it is a party or in any certificate or other document furnished by the Seller or Transferor pursuant thereto or in connection therewith is true and correct in all material respects as of the date made.

(y) <u>OFAC</u>. Neither the Transferor nor any Affiliate is a Sanctioned Person. The proceeds of any funding will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

(z) <u>Master Sale Agreement</u>. As of each Closing Date, the Transferor has not taken any action that would cause the representations and warranties of the Seller under the Master Sale Agreement or the applicable First Step Pool Supplement, or Bridgecrest under the Master Servicing Agreement, or the Collateral Custodian under the Collateral Custodian Agreement, to be false.

(aa) <u>Use of Proceeds</u>. No proceeds of a purchase hereunder shall be used by the Transferor for a purpose that violates or would be inconsistent with Regulations T, U or X promulgated by the Board of Governors of the Federal Reserve System from time to time.

(ab) <u>Remediation</u>. In the event that the Seller, the Transferor or the Servicer or any of their Affiliates has been required under any Requirements of Law, or has agreed or made arrangements with any Governmental

Authority, to make any Remediation, such Person shall have taken such action as so agreed or arranged or in compliance with all Requirements of Law, as applicable.

(ac) <u>Receivables</u>. The Transferor makes the following representations and warranties as of each Closing Date (except to the extent otherwise provided) with respect to the Receivables the Transferor sold to the Purchasers on such Closing Date, on which the Purchasers relies in accepting such Receivables. Such representations and warranties speak as of the applicable Closing Date (except as provided herein otherwise), and shall survive the sale, transfer and assignment of such Receivables to the Purchasers and any subsequent sale, assignment or transfer of any such Receivables:

   (i) <u>Characteristics of Receivables.</u> As of each Cutoff Date (except to the extent otherwise provided in the definition of "Eligible Receivable") with respect to the related Receivables to be purchased, (A) each Receivable is an Eligible Receivable, (B) (i) with respect to Receivables with a Cut-Off Date on or prior to March 19, 2020, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (ii) with respect to Receivables with a Cut-Off Date after March 19, 2020, to the best of the Transferor's knowledge, all of the Receivables to be purchased on the applicable Closing Date together with all Receivables previously purchased, constitute an Eligible Receivables Pool (as determined as of each relevant Cutoff Date for each such Receivable) and (C) the Receivables Pool was selected as described in <u>Section 2.1(d)</u>.

   (ii) <u>Creation, Perfection and Priority of Security Interests</u>. The following representations and warranties regarding creation, perfection and priority of security interests in the related Purchased Property are true and correct:

      (A) While it is the intention of the Transferor and the Purchasers that the transfer and assignment contemplated by this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment shall constitute sales of the related Purchased Property from the Transferor to the Purchaser, this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment shall create a valid and continuing security interest (as defined in the applicable UCC) in the related Purchased Property in favor of the Purchaser, which security interest is prior to all other Liens, and is enforceable as such against creditors of and purchasers from the Transferor.

      (B) Prior to the sale of such Purchased Property to the Purchaser under this Agreement, the Receivables constituted "tangible chattel paper" or "electronic chattel paper" within the meaning of the applicable UCC.

      (C) All filings (including such UCC filings) as are necessary in any jurisdiction to perfect the security interest of the Purchasers in the Purchased Property have been (or prior to the applicable Closing Date will be) made.

      (D) Other than the sale and backup security interest granted to the Purchasers pursuant to this Agreement, the Transferor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of such Purchased Property. The Transferor has not authorized the filing of, and is not aware of, any financing statements against the Transferor that include a description of collateral covering such Purchased Property other than the financing statements relating to the security interests granted to the Purchasers under this Agreement or any financing statement that has been effectively terminated. The Transferor is not aware of any judgment or tax lien filings against it or such Purchased Property.

      (E) Wells Fargo, as Collateral Custodian, or a permitted subcontractor, has in its possession all original copies of the related Original Contract Documents and other documents that constitute or evidence such Receivables and the related Purchased Property that are tangible chattel paper. The E-Vault Provider has in its "control" (as such term is used in Section 9-105 of the UCC), for the benefit of the Purchasers as the "secured party" (as such term is used in Section 9-105 of the UCC), all electronic records constituting or forming a part of the Receivables that are electronic

chattel paper, such that the Purchasers have had and will at all times have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivables. Such Receivable Files and other documents that constitute or evidence such Purchased Property do not have any marks or notations indicating that any ownership or security interest therein has been pledged, assigned or otherwise conveyed to any Person other than the Purchasers.

(F) None of the Seller, the Transferor, the Servicer or a custodian or vaulting agent thereof holding any Receivable that is electronic chattel paper has communicated an Authoritative Copy of any loan agreement that constitutes or evidences such Receivable to any Person other than the Purchasers and the Collateral Custodian.

(iii) <u>Schedule of Receivables</u>. The information set forth in the related Schedule of Receivables and in any computer tape regarding the Receivables is true, accurate and complete, and, other than as may be a result of the application of the criteria included in the definitions of Eligible Receivables Pool set forth in <u>Exhibit A</u>, no selection procedures believed to be adverse to the Purchasers were utilized in selecting such Receivables, with respect to the related Receivables Pool, from those receivables of the Seller or the Transferor that otherwise meet such criteria as well as the definition of Eligible Receivables.

(iv) <u>Compliance With Law</u>. All Requirements of Law in respect of any aspect of such Receivables and the related Purchased Property (including the origination thereof), in each case, have been complied with in all material respects and each Receivable and the sale of the related Financed Vehicle evidenced thereby complied at the time it was originated or made and now complies in all material respects with all applicable Requirements of Law.

(v) <u>Binding Obligation</u>. Each such Receivable with respect to the related Receivables Pool represents the genuine, legal, valid and binding payment obligation in writing of the Obligor thereon, enforceable by the holder thereof in accordance with its terms, except as enforceability may be limited by bankruptcy, receivership, conservatorship, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights in general and by equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(vi) <u>Security Interest in Financed Vehicle</u>. Immediately prior to the sale, transfer and assignment thereof pursuant hereto and the related Second Step Receivables Assignment, each such Receivable with respect to the related Receivables Pool was secured by a valid security interest in the Financed Vehicle in favor of the Transferor as secured party, or all necessary and appropriate actions shall have been commenced that would result in the valid perfection of a first priority security interest in the Financed Vehicle favor of the Transferor as secured party.

(vii)<u>Receivables In Force</u>. As of the applicable Cutoff Date, no such Receivable has been satisfied, subordinated or rescinded, and the Financed Vehicle securing each such Receivable has not been released from the lien of the related Receivable in whole or in part.

(viii)    <u>No Waiver</u>. Since the applicable Cutoff Date, no provision of a Receivable has been, or shall be, waived, altered or modified in any respect other than with respect to alterations and modifications so that such Receivable is an Eligible Receivable (other than <u>clause (ix)</u> thereof, which must have been satisfied at the time of origination) and such Receivable is enforceable after giving effect thereto.

(ix) <u>No Defenses</u>. No right of rescission, setoff, counterclaim or defense has been asserted or threatened with respect to any such Receivable.

(x) <u>No Liens</u>. To the best of the Transferor's knowledge: (1) there are no Lien or claims that have been filed for work, labor or materials affecting any Financed Vehicle securing any such Receivable that are or may be Lien prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by such Receivable; (2) no contribution failure has occurred with respect to any Benefit Plan which is sufficient to give rise to a Lien under Section 303(k) of ERISA with respect to any such Receivable; and (3) no tax lien has been filed and no claim related thereto is being asserted with respect to any such Receivable.

(xi) <u>Insurance</u>. Each Obligor under such Receivables is required to maintain a physical damage insurance policy of the type that the Seller requires in accordance with the Credit Policy.

(xii) <u>Good Title</u>. No such Receivable or the related Purchased Property has been sold, transferred, assigned or pledged by the Transferor to any Person other than the Purchasers; immediately prior to the conveyance of such Receivables and the related Purchased Property pursuant to this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment, the Transferor had good and marketable title thereto, free of any Lien other than Permitted Liens; and, upon execution and delivery of the Second Step Pool Supplement and the related Second Step Receivables Assignment by the Transferor, the Purchasers shall acquire a valid and enforceable perfected ownership interest in each such Receivable and Purchased Property, the unpaid indebtedness evidenced thereby and the collateral security therefor, free of any Lien other than Permitted Liens.

(xiii) <u>Lawful Assignment</u>. No such Receivable or the related Purchased Property was originated in, or is subject to Requirements of Law of, any jurisdiction the Requirements of Law of which would make unlawful, void or voidable the sale, transfer and assignment of such Receivable and the other related Purchased Property under this Agreement and the related Second Step Receivables Assignment. None of the Seller, the Transferor or the Servicer has entered into any agreement with any Obligor that prohibits, restricts or conditions the assignment of such Receivable or any other Purchased Property.

(xiv) <u>All Filings Made</u>. All filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected ownership interest in the Receivables and the related Purchased Property shall have been made.

(xv) <u>One Original</u>. There is only one original executed copy of each tangible record constituting or forming a part of such Receivable that is tangible chattel paper or a single Authoritative Copy of each electronic record constituting or forming a part of each Purchased Receivable that is electronic chattel paper.

(xvi) <u>No Documents or Instruments</u>. No such Receivable, or constituent part thereof, constitutes a "negotiable instrument" or "negotiable document of title" (as such terms are used in the UCC).

ARTICLE VI

CONDITIONS

Section 6.1 <u>Conditions to Effectiveness</u>. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent as of the date hereof:

(a) <u>Basic Documents</u>. Each of the Purchasers, the Transferor, the Seller, Bridgecrest, the Collateral Custodian and the Performance Guarantor, as the case may be, shall have executed and delivered each of the Basic Documents to which it is a party, and shall have executed and/or delivered each other document and instrument required to be executed and/or delivered by such party on or about the Original Execution Date or the date hereof, as applicable, prior to the effectiveness hereof or thereof, hereunder or thereunder.

(b) <u>Documents to be Delivered by the Transferor</u>.

(i) <u>Good Standing Certificates</u>. The Purchasers shall have received a certificate from the Secretary of State of the States of Arizona and Delaware as to the formation and good standing of the Seller and the Transferor, respectively.

(ii) <u>Corporate Documents</u>. The Purchasers shall have received duly certified copies of the Seller and the Transferor's certificate of formation and limited liability company agreement, resolutions of its directors approving the execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party and the transactions contemplated hereby and thereby, and such other evidence of the authority and incumbency of officers and other appropriate personnel of the Seller and the Transferor, respectively.

(iii) <u>Opinions</u>. External counsel (which shall be satisfactory to the Purchasers in its reasonable judgment) for the Transferor, the Seller, Bridgecrest, the Collateral Custodian (which may be internal counsel) and the Performance Guarantor shall have furnished to the Purchasers written opinions dated as of the Original Execution Date in the form satisfactory to the Purchasers in its reasonable judgment.

(iv) <u>Evidence of UCC Filing</u>. On or prior to Effective Date of this Agreement, the Transferor shall record and file, at its own expense, a UCC-1 financing statement in each jurisdiction in which it is required by applicable law, authorized by and naming the Transferor as seller or debtor, naming the Purchasers as purchaser or secured party, naming the Receivables and the other Purchased Property as collateral, meeting the requirements of the laws of each such jurisdiction and in such manner as is necessary to perfect each sale, transfer, assignment and conveyance of Receivables to the Purchasers hereunder. Such UCC-1 financing statement shall be provided to the Purchasers on or prior to such Effective Date.

(v) <u>Other Documents</u>. The Transferor, the Servicer, the Collateral Custodian and the Performance Guarantor shall have provided such other documents as the Purchaser may reasonably request.

(c) <u>Representations and Warranties</u>. Each of the representations and warranties of each of the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects as of the date hereof (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, the Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to the date hereof.

(d) <u>UCC Search Reports</u>. (A) The Transferor shall deliver to the Purchasers (i) certified copies of requests for information or copies (Form UCC-11) (or a similar search report certified by parties acceptable to the Purchasers) dated a date reasonably near the Original Execution Date listing all effective financing statements which name the Seller and the Transferor (under each of its present names and any previous names) as debtor or seller and which are filed in Arizona and Delaware, respectively, and such other jurisdictions where the Purchasers may reasonably request, together with copies of such financing statements, none of which shall cover any Receivables or other Purchased Property, (ii) search reports, each dated a date reasonably near the Original Execution Date with respect to federal, state and local tax liens, judgment liens and liens of the PBGC, respectively, filed against the Seller and the Transferor from the Secretaries of State of the States of Arizona and Delaware and from Maricopa County, Arizona and New Castle County, Delaware, respectively, or such other jurisdictions as the Purchasers shall reasonably request, in each case, showing no such Lien on any of the Receivables or other Purchased Property.

Section 6.2 <u>Conditions to Obligation of the Purchasers</u>. The obligation of the Purchasers to purchase Receivables and the related Purchased Property with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Aggregate Purchase Commitment</u>. After giving effect to such purchase and sale, the sum of the Cutoff Date Aggregate Outstanding Principal Balance for such Receivables Pool and the aggregate amount of the Cutoff Date Aggregate Outstanding Principal Balance for all previous Receivables Pools within the Commitment Period shall not exceed the amount of Purchaser's Obligation as of such Closing Date and the sum of the Cutoff Date Aggregate Outstanding Principal Balance for all Flex Receivables purchased during the period beginning April 30, 2020 through and including July 2, 2020, taken together, shall not exceed $[***] (or such other later dates or higher amount as agreed to by the Purchasers in their sole discretion). Notwithstanding the foregoing or anything to the contrary herein, solely for the purposes of this <u>Section 6.2(a)</u>, any Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020 shall not be deemed to be a Flex Receivable.

---

[***] Redacted for confidentiality purposes.

(b)  Minimum Sales Amount. The Aggregate Outstanding Principal Balance as of the related Cutoff Date shall not be less than $[***] other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, (adjusted downward for a nonmaterial amount resulting from application of the Freestyle Selection by the Purchase Percentage, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%,) of the aggregate principal balance of quarterly pools of receivables meeting the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time originated by the Seller during the second calendar week preceding the related Closing Date unless otherwise agreed by the Purchasers.

(c)  Commitment Termination Event. No Commitment Termination Event shall have occurred and the Sale shall occur during the Commitment Period.

(d)  Scheduled Commitment Termination Date. The Scheduled Commitment Termination Date shall not have occurred.

(e)  Representations and Warranties. Each of the representations and warranties of each of the Transferor, the Servicer the Seller, the Collateral Custodian and the Performance Guarantor, under each of the Basic Documents shall be true and correct in all material respects at the time of each Closing Date (or, if another date for such representation or warranty is specified herein or therein, then such other date), and the Transferor, Servicer, the Seller, the Collateral Custodian and the Performance Guarantor shall have performed in all material respects all covenants and agreements required to be performed by it hereunder and thereunder on or prior to each Closing Date.

(f)  Master Sale Agreement. Each of the conditions to the obligations of the Seller under the Master Sale Agreement shall have been satisfied without any waiver thereof.

(g)  Security Interests. The security interest granted by the Transferor in favor of the Purchasers in each Receivables Pool previously sold to the Purchasers is a valid and continuing security interest prior to all other Liens, and is enforceable as against such other creditors of and purchasers from the Transferor.

(h)  Computer Files Marked. Each of the Seller and the Servicer shall have, on or prior to each Closing Date, indicated in its Receivables System, that such Purchased Property has been sold to the Purchasers pursuant to this Agreement and the related Second Step Receivables Assignment.

(i)  Documents to be Delivered By the Transferor. On or before such Closing Date, the Transferor shall have delivered to the Purchasers the following documents:

(i)  The Second Step Pool Supplement. The Transferor will execute and deliver the related Second Step Pool Supplement and each of the other documents, certificates and instruments required to be attached thereto as set forth in Exhibit A (a final completed draft of which shall be delivered to the Purchasers at least one (1) Business Day prior to the Closing Date).

(ii)  Master Sale Agreement Documents. The Transferor shall deliver to the Purchasers a set of all documents and other writings delivered in connection with the Master Sale Agreement.

[***] Redacted for confidentiality purposes.

(iii) <u>Opinions</u>. On the initial Closing Date, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of the initial Closing Date, with respect to true sale characterization of the sales from the Seller to the Transferor pursuant to the Master Sale Agreement, nonconsolidation of the Transferor with the Seller and security interest matters (including creation, perfection and filing priority and control of electronic chattel paper) along with bring-downs of the opinions referred to in <u>Section 6.1(b)(iii)</u>. For any subsequent Closing Date, such counsel shall deliver such bring-downs of the foregoing opinions or new opinions with respect to such matters or such other matters, in each case, due to material changes in circumstances or Requirements of Law (since previously delivered), in each case that the Purchaser shall reasonably request. For the first Closing Date for which there is, or will be, a concentration with respect to any State of outstanding Receivables in all Eligible Receivables Pools purchased by the Purchasers that exceeds 10% of the aggregate Outstanding Principal Balance of all Receivables in all purchased Eligible Receivables Pools after giving effect to such sale, counsel for the Seller and the Transferor shall have furnished to the Purchasers one or more opinions of external counsel in the form satisfactory to the Purchasers in its reasonable judgment, dated as of such Closing Date, with respect to state titling statute opinions with respect to the Lien on the related Financed Vehicles.

(iv)  <u>Other Documents</u>. On each Closing Date, the Transferor, the Servicer and the Performance Guarantor shall provide such other documents as the Purchasers may reasonably request.

(j) <u>Collateral Custodian Certificate</u>. With respect to all Receivables included in the related Receivables Pool, the Transferor shall, or shall have caused the Seller to, have Delivered each related Original Contract Document to the Collateral Custodian, and the Purchasers shall have received the related executed Document Receipt in accordance with the requirements of the Collateral Custodian Agreement, and the Seller, the Transferor and the Servicer shall have marked their computer files with respect to such Receivables to indicate the interest of the Purchasers.

(k) <u>Other Transactions</u>. The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder.

Section 6.3 <u>Conditions to Obligation of the Transferor</u>. The obligation of the Transferor to sell the Receivables with respect to each Receivables Pool and the related Purchased Property under this Agreement, the related Second Step Pool Supplement and the related Second Step Receivables Assignment is subject to the satisfaction of the following conditions on or before the related Closing Date:

(a) <u>Second Step Receivables Purchase Price</u>. On such Closing Date, the Purchasers shall deliver to the Transferor the Second Step Receivables Purchase Price for such Receivables Pool, in accordance with <u>Section 3.1(b)</u> of this Agreement.

(b) <u>Representations and Warranties True</u>. The representations and warranties of the Purchasers under this Agreement and each of the other Basic Documents to which it is a party shall be true and correct in all material respects as of such Closing Date, and the Purchasers shall have performed in all material respects all covenants and agreements, if any, required to be performed by it hereunder and thereunder on or prior to such Closing Date.

(c) <u>Documents to be Delivered By the Purchaser</u>. On or before such Closing Date, the Purchasers shall have delivered to the Transferor the related Second Step Pool Supplement.

(d) <u>Other Transactions</u>. The transactions contemplated by the Master Sale Agreement and the Master Servicing Agreement shall be consummated to the extent that such transactions are intended to be substantially contemporaneous with the transactions hereunder in connection with such sale and such Closing Date.

(e) <u>Other Documents</u>. On such Closing Date, the Purchasers shall provide such other documents as the Transferor may reasonably request.

ARTICLE VII

COVENANTS OF THE TRANSFEROR

Section 7.1 <u>Protection of Right, Title and Interest</u>. The Transferor covenants and agrees with the Purchasers as follows:

(a) <u>Protection of Title; Filings</u>. The Transferor shall authorize and file such financing statements and amendments to financing statements and cause to be authorized, as applicable, and filed such continuation and other statements, all in such manner and in such places as may be required by law fully to preserve, maintain and protect the interest of the Purchasers under this Agreement, each Second Step Pool Supplement and each Second Step Receivables Assignment in the Receivables and the other Purchased Property and in the proceeds thereof. The Transferor shall deliver (or cause to be delivered) to the Purchasers file-stamped copies of, or filing receipts for, any document filed as provided above, as soon as available following such filing.

(b) <u>Name Change</u>. The Transferor shall not change its State of organization or its name, identity or corporate structure in any manner that would, could or might make any financing statement or continuation statement filed by the Transferor in accordance with <u>Section 7.1(a)</u> seriously misleading within the meaning of the UCC, unless it shall have given the Purchasers (i) at least 30 days prior written notice thereof if such change would create a new debtor under the UCC (which for purposes of this <u>Section 7.1(b)</u>, shall not include a name change) or change the jurisdiction that would govern the perfection or effect of perfection against the Transferor and after delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents, or (ii) otherwise, notice thereof within 30 calendar days after effectiveness of such change, together with delivery to the Purchasers of the applicable financing statements necessary to perfect or continue the perfection of the Purchaser's security and ownership interests hereunder and under the other Basic Documents.

(c) <u>Executive Office; Maintenance of Offices</u>. The Transferor shall (i) give the Purchasers at least 30 days prior written notice of any relocation of its principal executive office if, as a result of such relocation, the applicable provisions of the UCC would require the filing of any amendment of any previously filed financing or continuation statement or of any new financing statement Records; <u>provided</u>, that on or about April 1, 2017, the its principal place of business and chief executive office will be located at 1930 W. Rio Salado Pkwy, Tempe, AZ 85281 and (ii) deliver to the Purchasers acknowledgment copies of the applicable financing statements necessary to perfect or continue the perfection of their respective security or ownership interests hereunder and under the other Basic Documents (it being understood that amendments to all relevant financing statements will be filed in connection with the change in chief executive office described above). The Transferor shall at all times maintain offices from which it primarily services Receivables and its principal executive office within the United States of America.

(d) <u>New Debtor</u>. In the event that the Transferor shall change the jurisdiction in which it is formed or otherwise enter into any transaction which would result in a "new debtor" (as defined in the UCC) succeeding to the obligations of the Transferor hereunder, the Transferor shall comply fully with the obligations of <u>Section 7.1(a)</u>.

(e) <u>Receivables Systems</u>. If the Transferor maintains computer systems, the Transferor shall maintain, or cause to be maintained, its computer systems so that, from and after the time of sale of the Receivables under this Agreement, if the computer systems and records (including any backup archives) shall refer to any such Receivable, they shall indicate clearly the interest of the Purchasers in such Receivable and that such Receivable is owned by the Purchasers. Indication of the Purchaser's ownership of a Receivable shall be deleted from or modified on the computer systems and records of the Transferor, if any, when, and only when, the related Receivable shall have been paid in full or repurchased. The Transferor shall cause the Collateral Custodian or the E-Vault Provider on its behalf at all times to maintain "control" (as such term is used in Section 9-105 of the UCC) of all electronic records constituting or forming a part of a Receivable constituting electronic chattel paper on behalf of the Purchasers, as "secured party" (as such term is used in

Section 9-105 of the UCC) such that the Purchasers have had and at all times will have a first priority perfected security interest against the Seller and the Transferor and their creditors in such Receivable.

(f) Certificates of Title. If the Seller has not received a Certificate of Title related to a Purchased Receivable naming a Title Lien Nominee the first lien holder on such Certificate of Title for the related Financed Vehicle or the title application or other documentation necessary to obtain a Certificate of Title thereto noting such lien holder has not been submitted, then, promptly, but no later than 30 days following the related date of origination, the Transferor shall, or shall cause the Seller, to take all steps necessary to perfect the security interest against each Obligor in the related Financed Vehicle.

Section 7.2 Other Liens or Interests. Except for the sale contemplated by this Agreement and the Second Step Receivables Assignment, the Transferor shall not sell, pledge, assign or transfer any Receivable or the related Purchased Property (or any portion thereof) to any other Person, or grant, create, incur, assume or suffer to exist any Lien thereon or on any interest therein, and the Transferor shall defend the right, title and interest of the Purchasers in, to and under such Receivables and the related Purchased Property against all claims of third parties claiming through or under the Transferor. The Transferor shall not do anything to impair the right, title, ownership or security interest of the Purchasers in the Purchased Property.

Section 7.3 Perfection Costs and Expenses. The Transferor agrees to pay all reasonable costs and disbursements in connection with the perfection, as against all third parties, of the Purchaser's right, title and interest in and to the Purchased Property with respect to each Receivables Pool.

Section 7.4 Separateness. Each of the Seller and the Transferor has taken, and shall continue to take, steps to make it unlikely that a voluntary or involuntary application for relief by the Seller under the Bankruptcy Code or similar applicable Requirements of Law in any state jurisdiction, would result in consolidation of the assets and liabilities of the Transferor with those of the Seller. These steps include the maintenance of the Transferor as a separate, limited-purpose subsidiary pursuant to the limitations in the Transferor's limited liability company agreement and compliance with any assumptions or statements of fact in the non-consolidation opinion delivered to the Purchasers in connection with this Agreement. These limitations include restrictions on the nature of the Transferor's business and a restriction on the Transferor's ability to commence a voluntary case or proceeding under the United States Bankruptcy Code or similar applicable state Requirements of Law without the unanimous affirmative vote of all of the Transferor's directors. Under the circumstances set forth in the Transferor's limited liability company agreement, the Transferor is required to have at least one (1) director who qualifies thereunder as an independent director.

Section 7.5 Notice of Servicer Termination; Etc. The Transferor shall notify the Purchasers (A) as soon as possible and in any event within five (5) Business Days after it obtains knowledge of the occurrence of an Event of Servicing Termination; and (B) promptly after the Transferor obtains knowledge thereof, notice of any litigation, investigation or proceeding that may exist at any time between the Transferor and any Person or any litigation or proceeding relating to this Agreement, any other Basic Document or the Purchased Property.

Section 7.6 Conduct of Business; Ownership. The Transferor shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted and do all things necessary to remain duly organized, validly existing and in good standing as a domestic limited liability company in its jurisdictions of formation and maintain all requisite authority, licenses and permits to conduct its business in each jurisdiction in which its business is conducted, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents. The Transferor shall at all times be a wholly-owned subsidiary of the Seller.

Section 7.7 Collections. In the event the Transferor receives any Collections after the related Cutoff Date with respect to the Purchased Property, it shall turn over any Collections received by it with respect to any Purchased Property to the Servicer within two (2) Business Days after its identification of such Collections.

Section 7.8 <u>Consolidations, Mergers and Sales of Assets</u>.

(a) The Transferor shall not consolidate or merge with or into any other Person or sell, lease or otherwise transfer all or substantially all of its assets to any other Person.

(b) The Transferor hereby agrees that, until the last Business Day of the twelfth (12th) month following the latest maturing Receivable, it shall not (i) take any action prohibited by (or inconsistent with) its limited liability company agreement, or (ii) without the prior written consent of the Purchasers, amend its limited liability company agreement.

Section 7.9 <u>Master Sale Agreement</u>. The Transferor, on its own behalf and on behalf of the Purchasers and the other Seller Indemnified Parties, shall promptly enforce all covenants, indemnities and other obligations of the Seller contained in the Master Sale Agreement (including <u>Sections 6.11</u> and <u>7.2</u> thereof). The Transferor shall deliver consents, approvals, directions, notices, waivers and take other actions under the Master Sale Agreement as may be directed by the Purchasers.

Section 7.10 <u>Operation of the Transferor</u>. Without limiting the generality of <u>Sections 7.4</u> and <u>7.8(b)</u>, the Transferor shall be operated and managed in accordance with rating agency requirements for multi-use special purpose entities.

Section 7.11 <u>Selection Standards; Quarterly Meetings</u>.

(a) Until the Commitment Termination Date, in addition to the Quarterly Operations Review (as defined in the Master Servicing Agreement), the Transferor shall participate in quarterly meetings with the Purchasers ("<u>Quarterly Selection Standards Meeting</u>") on the 60th day (or such other day as soon thereafter as the Transferor and the Purchasers shall mutually agree) of each quarter and if such day is not a Business Day, then on the next Business Day (or as Parties may mutually agree) by telephone or, if agreed to by the parties, in person, to discuss and review, among other things, loss and delinquency performance of the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, any material changes to the Seller's Credit Policy and other origination or underwriting guidelines, processes or policies, including special origination programs, that could influence, modify or impact the Purchased Property or the mix or characteristics of future Receivables Pools, as well as any proposed amendments or modifications to the definitions of Eligible Receivable or Eligible Receivables Pool since the preceding Quarterly Selection Standards Meeting.

(b) During, or following, any Quarterly Selection Standards Meeting, the Purchasers may propose a change by delivering a written request to the Transferor containing such proposed changes ("<u>Selection Standards Change Notice</u>") to the definitions of Eligible Receivable or Eligible Receivables Pool. If Purchasers and the Transferor reach mutual written agreement regarding such changes ("<u>Selection Standards Modification</u>"), then the definitions of Eligible Receivable or Eligible Receivables Pool shall be amended to include such Selection Standards Modification for any Receivables Pools purchased on or after the date of such mutual agreement, or if Purchasers and the Transferor are not able to reach mutual agreement regarding such Selection Standards Modification within 30 days after receipt of the related Selection Standards Change Notice, then no change will occur to the definitions of Eligible Receivable or Eligible Receivables Pool.

Section 7.12 <u>Furnishing of Information and Inspection of Records</u>. If at any time the Transferor maintains any information regarding the Purchased Property, the Transferor shall furnish to the Purchasers from time to time such information with respect to the Purchased Property as the Purchasers may reasonably request. If the Transferor maintains such information, the Transferor shall, at any time and from time to time during regular business hours, as requested by the Purchasers, permit the requesting party, or its agents, representatives or regulators, (i) to examine and make copies of and take abstracts from all books, records and documents (including computer tapes and disks) relating to the Receivables or other Purchased Property, and (ii) to visit the offices and properties of the Transferor for the purpose of examining such materials described in clause (i), and to discuss matters relating to the Purchased Property or the Transferor's performance hereunder and under the other Basic Documents to which such Person is a party with any of the officers, directors, employees or independent public accountants of the Transferor having knowledge of such matters.

Section 7.13 <u>Compliance with Laws, Etc</u>. The Transferor shall comply with all Requirements of Law applicable to it, except for any such noncompliance that would not reasonably be expected to have a Material Adverse Effect on the Purchasers or any of the Purchased Property or any of the transactions contemplated by the Basic Documents.

Section 7.14 <u>Indemnity</u>.

(a)  The Transferor shall indemnify, defend and hold harmless the Purchasers and its officers, directors, employees, Affiliates and agents (the "<u>Indemnified Parties</u>") from and against any and all costs, expenses, losses, damages, claims and liabilities arising out of or resulting from the use, ownership or operation by the Transferor or any of its Affiliates of any Financed Vehicle.

(b)  The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all reasonable and documented costs, expenses, losses, claims, damages and liabilities solely to the extent that such cost, expense, loss, claim, damage or liability arose out of or resulted from the action or inaction (including any failure to comply with any applicable Requirements of Law) of any third party to whom the Transferor subcontracted or delegated the performance of its duties under this Agreement or the other Basic Documents and only to the extent such cost, expense, loss, claim, damage or liability is not related to any credit loss.

(c)  The Transferor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all costs, expenses, losses, claims, damages and liabilities, including reasonable external legal fees and expenses (i) to the extent that such cost, expense, loss, claim, damage, or liability arose out of, resulted from or was imposed upon any such Indemnified Party through the negligence (except for reasonable errors in judgment), willful misfeasance or bad faith of the Transferor or agent in the performance of its duties under this Agreement or the other Basic Documents to which it is a party or by reason of a breach of its obligations or duties under this Agreement or the other Basic Documents to which it is a party, (ii) arising out of, or resulting from, any breach of any representation, warranty, covenant or obligation of the Transferor in this Agreement, the other Basic Documents to which it is a party or in any Schedule, Exhibit, written statement or certificate furnished by the Transferor pursuant to this Agreement or the other Basic Documents to which it is a party (in each case, as each such representation or warranty would read if all qualifications as to knowledge or materiality, including each reference to the defined term "Material Adverse Effect," were deleted therefrom), (iii) arising out of, or resulting from, any untrue statement of a material fact in any written information provided or delivered by the Transferor, or any Affiliate of the Transferor on its behalf, to the Purchasers pursuant to, for the purposes of, or in connection with, this Agreement or the other Basic Documents to which it is a party, (iv) arising out of, or resulting from, any action, suit, proceeding or claim or other litigation to the extent resulting from the actions or omissions of the Seller, the Transferor or any of their consolidated Affiliates or any of their respective agents, directors, officers, servants or employees, excluding, however, any costs, expenses, losses, claims, damages or liabilities resulting from the gross negligence, bad faith or willful misconduct on the part of any such Indemnified Party, and (v) resulting from the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle, including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable. Indemnification under this <u>Section 7.14</u> shall include reasonable fees and expenses of one external counsel and reasonable costs and expenses of litigation; <u>provided</u>, <u>however</u>, that the Transferor pursuant to this <u>Section 7.14</u>, the Seller pursuant to <u>Section 5.4</u> of the Master Sale Agreement and the Servicer pursuant to <u>Section 5.2</u> of the Master Servicing Agreement shall only be responsible collectively for reasonable fees and expenses of one external counsel. If the Transferor has made any indemnity payments pursuant to this <u>Section 7.14</u> and the recipient thereafter collects any of such amounts from others with respect to such claim, the recipient shall promptly repay such amounts collected to the Servicer, without interest.

(d)  This <u>Section 7.14</u> shall survive any termination of this Agreement.

Section 7.15 <u>Publicity</u>. All media releases, public announcements and public disclosures by any Party or its respective employees or agents, relating to this Agreement or the other Basic Documents or the transactions contemplated hereby or thereby or the name of the Purchasers or the Transferor, including promotional or marketing material, shall be coordinated with and consented to by the other Party in writing prior to the release thereof, which

consent shall not be unreasonably withheld or delayed; provided, however, that any announcement intended solely for internal distribution by the disclosing Party to its directors, employees, officers and agents or any disclosure required by Requirements of Law or by accounting requirements, shall not require such coordination or consent.

Section 7.16 No Solicitation. The Transferor agrees that it will not, directly or indirectly, specifically solicit, and will not permit any of its Affiliates to, directly or indirectly, specifically solicit, any Obligor (in writing or otherwise) to refinance any Purchased Receivable (including solicitations for the purchase of a new vehicle); provided, however, that each of Transferor and its Affiliates may, directly or indirectly, engage in a general solicitation directed generally at the obligors of receivables originated or serviced by the Seller or the Servicer at large, so long as the Obligors under the Purchased Receivables are not the predominant targets of such general solicitation for refinancing.

Section 7.17 Remediation. The Transferor shall (i) provide the Purchasers with written notice, to the extent not prohibited by any applicable Requirements of Law, of any Remediation if such Remediation could reasonably be expected, individually or in the aggregate with any other Remediation, to have a Material Adverse Effect on the Purchasers or any of the Purchased Property and (ii) implement any Remediation in accordance with all terms thereof and all applicable Requirements of Law.

Section 7.18 Quarterly Statements as to Compliance. The Transferor shall deliver to the Purchasers, on or before the forty-fifth (45th) day following each calendar quarter, beginning February 14, 2017 (or, if such day is not a Business Day, the next succeeding Business Day), an Officer's Certificate of the Transferor, dated as of the last Business Day of the immediately preceding calendar quarter, in each instance stating that (i) a review of the activities of the Transferor during the preceding calendar quarter (or, with respect to the first such certificate, such period as shall have elapsed from the Effective Date to the date of such certificate) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Transferor has fulfilled all its obligations under this Agreement in all material respects throughout such period, or, if there has been a default in the fulfillment of any such obligation, in any material respect specifying each such default known to such officer and the nature and status thereof.

Section 7.19 Additional Covenants. From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will:

(a) Preservation of Existence; License. It will preserve and maintain its existence, rights, franchises and privileges in its State of formation, and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualification has had, or would reasonably be expected to have, a Material Adverse Effect and (without suspension or limitation) will not terminate or let lapse any licenses, consents or approval currently held by it necessary to ensure its performance of any duty contemplated by this Agreement and the other Basic Document to which it is a party.

(b) Performance and Compliance with Contracts. It will, at its expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Contracts and in and all other agreements related to such Contracts. It shall enforce its rights under this Agreement and the other Basic Documents.

(c) Keeping of Records and Books of Account. It will (or will cooperate with the Servicer to) maintain and implement administrative and operating procedures (including an ability to re-create records evidencing Receivables in the event of the destruction of the originals thereof, in the case of tangible Contracts, or loss of access to the vault system of the Contracts maintained therein, in the case of electronic Contracts), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables.

(d) Transferred Assets. With respect to each Receivable transferred or acquired by it, it will: (i) transfer or acquire such Receivable pursuant to and in accordance with the terms of the Master Sale Agreement and this Agreement, (ii) take all action necessary to perfect, protect and more fully evidence the assignee's interest in such Receivable, including (A) filing and maintaining, effective financing statements (Form UCC-1) in all necessary or appropriate filing offices, and filing continuation statements, amendments or

assignments with respect thereto in such filing offices and (B) executing or causing to be executed such other instruments or notices as may be necessary or appropriate and (iii) taking all additional action that the Purchasers may reasonably request, including the filing of financing statements to perfect, protect and more fully evidence the respective interests of the parties to the Master Sale Agreement and this Agreement in the Purchased Property.

(e) <u>Collection Policy</u>. It will (or will cooperate with the Servicer to), to the extent applicable, comply with the Collection Policy with respect to each Receivable.

(f) <u>Taxes</u>. It will file or cause to be filed all federal and material state, local or foreign tax returns that are required to be filed by it. It will shall pay all federal or material amounts of state, local or foreign taxes and all material assessments made against it or any of its property (other than any amount of tax the validity of which it plans to contest in good faith by appropriate proceedings and with respect to which it retains reserves on its books).

(g) <u>Use of Proceeds</u>. The Transferor will use the proceeds only to acquire Receivables from the Seller.

(h) <u>Liens</u>. It will not create, or participate in the creation of, or permit to exist, any Lien with respect to the Collection Account or any account into which collections on the Receivables are deposited, except as set forth in the Basic Documents.

(i) <u>Reporting</u>. It will distribute, or cause to be distributed, to the Purchasers:

(i) <u>Monthly Reports</u>. Not later than the Reporting Date preceding each Payment Date, a Monthly Servicer Report.

(ii) <u>Additional Data</u>. Additionally, and solely to the extent such data is available, the Transferor shall provide, or reasonably cooperate with the Servicer to provide the Purchasers the Monthly Servicer Report or Monthly Data File, as applicable, in a format reasonably acceptable to the Purchasers, with data regarding the characteristics of the Receivables, in form and substance reasonably acceptable to the Purchasers, including (A) delinquencies (including a list of Delinquent Receivables), and (B) annualized losses or loss information by vintage origination year on the Seller's originated portfolio of motor vehicle installment sales contracts and installment loans, presented on a quarterly basis, in each case of <u>clause (A)</u> and <u>(B)</u>, until the third annual anniversary of the Commitment Termination Date of this Agreement (or, if the Seller provides such information to another finance counterparty or the Seller makes such information publicly available, until the final payment or liquidation of all of the Purchased Receivables).

(iii) <u>Income Tax Liability</u>. Within ten (10) Business Days after the receipt of revenue agent reports or other written proposals, determinations or assessments of the Internal Revenue Service or any other taxing authority which propose, determine or otherwise set forth positive adjustments to the tax liability of any "Affiliated Group" (within the meaning of Section 1504(a)(l) of the Code) which equal or exceed one million dollars ($1,000,000) with respect to the Seller or twenty-five thousand dollars ($25,000) with respect to the Transferor, telephonic or emailed notice (confirmed in writing within five (5) Business Days) specifying the nature of the items giving rise to such adjustments and the amounts thereof.

(iv) <u>Tax Returns</u>. Upon demand by the Purchasers, copies of all federal, State and local tax returns and reports filed by the Seller or the Transferor (excluding sales, use and like taxes), to the extent the Seller or the Transferor is required to file such tax returns.

(v) <u>Auditors' Management Letters</u>. Promptly after any auditors' management letters are received by the Seller or the Transferor or by its accountants, which refer in whole or in part to any inadequacy, defect, problem, qualification or other lack of fully satisfactory accounting controls utilized by the Seller or the Transferor.

(vi) <u>ERISA</u>. Promptly after receiving written notice of any "Reportable Event" (as defined in Title IV of ERISA) with respect to the Seller or the Transferor (or any ERISA Affiliate thereof), a copy of such written notice.

(vii) <u>Notice of Material Events</u>. Promptly after obtaining knowledge of an event or circumstance that is likely to result in a Commitment Termination Event, Event of Servicing Termination or have a Material Adverse Effect on the Seller or the Transferor, the Purchased Property, or the Purchasers, notice of such event or circumstance. Promptly upon the entry of a judgment against the Seller of $1,000,000 or more.

(j) <u>Accounting Policy</u>. It will promptly notify the Purchasers of any material change in its accounting policies.

(k) <u>Other</u>. It will furnish to the Purchasers promptly, from time to time, such other information, documents, records or reports respecting the Purchased Property or the condition or operations, financial or otherwise, of it as the Purchasers may from time to time reasonably request in order to protect the interests of the Purchasers under or as contemplated by the Basic Documents.

(l) <u>Compliance with System Description</u>. It will, and will cause the Collateral Custodian, E-Vault Provider and, to the extent applicable to the then-applicable E-Vault System, E-Sign Provider to, at all times comply in all material respects with the System Description with respect to matters related to the perfection in the Receivables and the Purchased Receivables by "control" (as such term is used in Section 9-105 of the UCC).

(m) <u>Financial Statements</u>. To the extent not filed with the Commission and publicly available on EDGAR, within 120 days after the end of each fiscal year and 60 days after each fiscal quarter (or if the Seller is a reporting company under the Securities and Exchange Act of 1934, such period as required thereunder for the filing thereof), the Transferor will cause the Seller to provide to the Purchasers copies of its audited financial statements for the prior fiscal year or unaudited financial statements with respect to each of the first three fiscal quarters.

(n) <u>Access to Systems</u>. During the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, or cause the Seller to, give the Purchasers and their duly authorized representatives, attorneys and auditors, upon reasonable request of Purchaser, on-site access to the Transferor and the Seller's loan originations systems and document repository, which access shall facilitate quality assurance and quality control reviews, to enable the Purchasers to back-up Receivables Files to the Purchasers' systems, enable the Purchasers to review Receivables originations processes, procedures, approvals and boarding and permit the Purchasers with reasonable access to the Seller's quality reporting and backup documentation (e.g., workpapers, sampled transactions and account-level results). Promptly following the end of each calendar month during the period beginning on the initial Closing Date and ending thirty (30) days after the Commitment Period, the Transferor shall, and shall cause the Seller to, at the reasonable request of Purchasers, provide the Purchasers with screenshots that would enable the Purchasers to complete the foregoing review on a sample of Receivables determined by the Purchasers (limited to one hundred (100) Receivables in any calendar week).

(o) <u>Annual Opinion of Counsel</u>. Counsel for the Transferor shall deliver on or before March 15 of each year (or, if such date is not a Business Day, the next succeeding Business Day), beginning March 15, 2018, an Opinion or Opinions of Counsel addressed to the Purchasers stating that, in the opinion of such counsel, such action has been taken with respect to the authorization, execution and filing of any financing statements and continuation statements as is necessary to maintain the liens and security interests created under this Agreement and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain the liens and security interests created under this Agreement.

(p) <u>Delivery of Servicer Files</u>. To the extent that any portion of the Servicer Files related to any Purchased Receivable is not in the possession of the Servicer immediately prior to any related Closing Date, the Transferor shall, and shall cause the Seller to, deliver such portion of the Servicer Files for each Receivable listed on the Schedule of Receivables delivered to the Purchasers on each Closing Date.

Section 7.20 <u>Negative Covenants</u>. From the date hereof until the later of the Commitment Termination Date and the date on which the Receivables have been paid in full, the Transferor will not:

(a) <u>Other Business</u>. It will not (i) engage in any business other than the transactions contemplated by the Basic Documents, (ii) incur any indebtedness, obligation, liability or contingent obligation of any kind other than pursuant to or as contemplated by the Basic Documents (excluding any incidental expenses incurred in connection with the performance of its obligations under the Basic Documents) or (iii) form any subsidiary or make any investments in any other person.

(b) <u>Receivables Not to be Evidenced by Instruments</u>. It will take no action to cause any Receivable that is not, as of the Closing Date or the related Settlement Date, as the case may be, evidenced by an "instrument" (as defined in Article 9 of the UCC), other than an instrument that constitutes part of chattel paper, to be so evidenced except in connection with the enforcement or collection of such Receivable.

(c) <u>True Sale</u>. It will not account for or treat (whether in its financial statements or otherwise) the transfers by the Seller to the Transferor or the Transferor to the Purchasers in any manner other than as the sale, or absolute assignment, of the Receivables and related assets.

(d) <u>ERISA Matters</u>. It will not, to the extent it could reasonably result in material liability to or impairment of any assets of or interests of the Purchaser in assets of the Transferor, (i) engage or permit any ERISA affiliate to engage in any prohibited transaction for which an exemption is not available or has not previously been obtained from the United States Department of Labor, (ii) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Code with respect to any Pension Plan, (iii) fail to make any payments to a Multiemployer Plan that it or any ERISA Affiliate is required to make under the agreement relating to such Multiemployer Plan or any law pertaining thereto, (iv) permit the filing of any notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, (v) permit the termination of any Pension Plan under Section 4041(c) of ERISA or the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate or appoint a trustee to administer a Pension Plan, or (vi) permit any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, except for non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e) <u>Formation Documents; Transfer Agreement</u>. Without the prior consent of the Purchasers, the Transferor will not amend, modify, waive or terminate any provision of its formation documents, and the Seller and the Transferor will not amend, modify, waive or terminate any provision of the Basic Documents.

(f) <u>Changes in Payment Instructions to Obligors</u>. It will not add or make any change, or permit the Servicer to make any change, in its instructions to Obligors regarding payments to be made with respect to the Receivables, unless the Purchasers shall have consented to such change and has received duly executed copies of all documentation related thereto, which documentation shall be satisfactory in form and substance to the Purchasers.

(g) <u>Extension or Amendment of Receivables</u>. It will not, except as otherwise permitted in pursuant to this Agreement or the other Basic Documents, extend, amend or otherwise modify, or permit the Servicer to extend, amend or otherwise modify, the terms of any Receivables.

(h) <u>Credit Policy</u>. During the Commitment Period, the Transferor will not, and it will not permit the Seller to, amend, modify, restate or replace, in whole or in part, its identity, income, and payment verification practices, including, but not limited to, any change to <u>Exhibit E</u> attached hereto, without written notification to the Purchasers; <u>provided</u> that the prior written consent of the Purchasers shall be required if such amendment, modification, restatement or replacement would impair the collectability of any Receivable or otherwise materially and adversely affect the interests or the remedies of the Purchasers under this Agreement or any other Basic Document. The Transferor will provide, or shall cause to be provided, to the Purchasers on a [***] basis a current version of the Seller's policies concerning generation of financing terms as well as (i) a comparison showing all changes to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous calendar month or (ii) an affirmation that no changes were made to the Seller's policies concerning generation of financing terms as provided to the Purchasers during the previous [***], noting that the Purchasers may also request a current version of the Seller's policies concerning generation of financing terms at any point in time. For the avoidance of doubt, changes to the Receivable Structure Constraints shall be considered material changes to policies concerning generation of financing terms. The Transferor will provide, or shall cause to be provided, to the Purchasers on a monthly basis a current version of the Seller's Credit Policy as well as (i) a comparison showing all changes to the Seller's Credit Policy as provided to the Purchasers during the previous [***] or (ii) an affirmation that no changes were made to the Seller's Credit Policy as provided to the Purchasers during the previous [***], noting that the Purchasers may also request a current version of the Seller's Credit Policy at any point in time.

(i) <u>Collection Policy</u>. The Transferor will not amend, modify, restate or replace, in whole or in part, the Collection Policy, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement, and as modified by the Servicing Exceptions, if any, or with respect to any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with <u>Section 3.1(c)</u> of the Master Servicing Agreement.

(j) <u>No Assignments</u>. It will not assign or delegate, grant any interest in or permit any Lien (other than Permitted Liens) to exist upon any of its rights, obligations or duties under this Agreement or any other Basic Document without the prior written consent of the Purchasers.

Section 7.21 <u>Accountant's Letter</u>. Not later than thirty (30) days after the end of each calendar quarter, upon the request of the Purchasers, the Transferor shall cause a firm of independent certified public accountants, to furnish to the Purchasers a letter in form and substance acceptable to the Purchasers, stating as of the Cutoff Date that they have performed specified procedures with respect to each Receivables Pool sold to the Purchasers during the preceding calendar quarter. The Transferor shall be responsible for all expenses associated with obtaining such agreed upon procedures letters up to $[***] annually; <u>provided</u> that in the event an agreed upon procedures letter reveals deviations material in nature or amount, then the Transferor shall be obligated to reimburse up to an additional $[***] of agreed upon procedure letters costs incurred in the following 12-month period.

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.1 <u>Obligations of the Transferor</u>. The obligations of the Transferor under this Agreement shall not be affected by reason of any invalidity, illegality or irregularity of any Receivable with respect to any Receivables Pool.

[***] Redacted for confidentiality purposes.

Section 8.2 <u>Repurchase of Receivables Upon Breach by the Transferor</u>. Upon (i) the discovery of any breach of any representation or warranty as set forth in <u>Section 5.2(cc)</u> of this Agreement (and with respect to <u>paragraphs (i)(B)(ii) and (x)</u> therein, without giving effect to any knowledge requirements) or (ii) the Purchasers incurring any cost, expense, loss, claim, damage or liability resulting from the failure of either Purchaser to have a perfected and enforceable security interest against a related Obligor in the related Financed Vehicle (including any failure to obtain a first priority perfected security interest in the related Financed Vehicle in connection with the origination of the Receivable), the Party discovering such breach shall give prompt written notice of the breach to the other Parties. Such notice shall specify the reason for such ineligibility or breach and shall identify all Receivables that the party preparing such notice knows is so ineligible or in breach as of such date. Unless the breach described in <u>clause (i)</u> above has been cured in all material respects by the last day of the Collection Period immediately following the Collection Period during which such breach is discovered or notice of such breach is given and, with respect to the failure described in <u>clause (ii)</u> above, in each such circumstance, the Transferor shall repurchase, as of the last day of such Collection Period, any Receivable for which such representation or warranty was breached for the Warranty Payment. In consideration of the repurchase of a Warranty Receivable, the Transferor shall remit, or cause to be remitted the Warranty Payment to the applicable Collection Account for distribution pursuant to <u>Section 4.2</u> of the Master Servicing Agreement. The obligation of the Transferor to repurchase any Receivable as to which a breach has occurred and is continuing, shall, if such obligation is fulfilled, constitute the sole remedy (except as provided in <u>Section 7.14</u> of this Agreement) against the Transferor for such breach available to the Purchasers.

Section 8.3 <u>Assignment of Warranty Receivables</u>. With respect to all Receivables repurchased pursuant to this Agreement, the Purchasers shall assign to the Transferor, without recourse, representation or warranty to the Transferor, all the Purchaser's right, title and interest in and to such Receivables, and all security and documents relating thereto.

Section 8.4 <u>Amendment</u>. This Agreement may be amended from time to time by a written amendment duly executed and delivered by the Transferor and the Purchasers.

Section 8.5 <u>Waivers</u>. No failure or delay on the part of the Purchasers in exercising any power, right or remedy under this Agreement, any Second Step Pool Supplement or any Second Step Receivables Assignment shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other or further exercise thereof or the exercise of any other power, right or remedy.

Section 8.6 <u>Notices</u>. All communications and notices pursuant hereto to either Party must be in writing personally delivered, sent by facsimile or email and shall be deemed to have been duly given at the address, fax number or email for each Party set forth below.

To Transferor:   Carvana Auto Receivables 2016-1 LLC
                c/o Carvana, LLC, its sole member
                1930 W. Rio Salado Pkwy
                Tempe, AZ 85281
                Attention: General Counsel
                Email: DL-CarvanaLegal@carvana.com

<u>With a copy to</u>:   Snell & Wilmer L.L.P.
                400 East Van Buren
                Phoenix, Arizona 85004-2202
                Attention: Brian Burke
                602.382.6379
                bburke@swlaw.com

To Purchasers:   Ally Bank
                500 Woodward Avenue
                Detroit, MI 48226
                Attn: Scott Brobecker
                Email: Scott.Brobecker@ally.com

and:    Ally Financial
        Ally Detroit Center
        500 Woodward Avenue
        MC: MI-01-10-LEGAL
        Detroit, MI 48226
        Attn: Richard V. Kent
        Fax No.: (313) 334-3276

Section 8.7 Costs and Expenses. Except as otherwise provided in this Agreement or the other Basic Documents, the Transferor agrees to pay to the Purchasers all reasonable costs and expenses in connection with the preparation, execution and delivery of this Agreement and the other Basic Documents and the other documents to be delivered hereunder or in connection herewith and any requested amendments, waivers or consents hereof including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Purchasers (which shall not exceed $[***] under the Basic Documents), with respect thereto and all costs and expenses, if any, in connection with the enforcement of this Agreement and the other documents delivered hereunder or in connection herewith.

Section 8.8 Survival. The respective agreements, representations, warranties and other statements by the Transferor and the Purchasers set forth in or made pursuant to this Agreement shall remain in full force and effect and shall survive the closing under Section 3.2 and any sale, transfer or other assignment of the Receivables or other Purchased Property by the Purchasers.

Section 8.9 Headings and Cross-References. The various headings in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 8.10 Governing Law, Submission to Jurisdiction, Etc.

(a)  THIS AGREEMENT AND THE SECOND STEP RECEIVABLES ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS..

(b)  THE TRANSFEROR AND THE PURCHASERS HEREBY MUTUALLY AGREE TO SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH OF THE TRANSFEROR AND THE PURCHASERS HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)  THE TRANSFEROR AND PURCHASERS EACH HEREBY WAIVES (TO THE EXTENT THAT IT MAY LAWFULLY DO SO) ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER BASIC DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. INSTEAD, ANY DISPUTE RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

[***] Redacted for confidentiality purposes.

Section 8.11 <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which will be an original, but which together will constitute one and the same instrument. This Agreement may be executed and delivered electronically or by facsimile. Any electronic or facsimile signatures will have the same legal effect as manual signatures. The words "execution", "signed", "signature", and words of like import in this Agreement or in any such amendment, waiver, certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the UCC.

Section 8.12 <u>Further Assurances</u>. The Transferor and Purchasers shall each, at the request of the other, execute and deliver to the other all other instruments that either may reasonably request in order to more fully effect the sale of the Purchased Property to the Purchasers.

Section 8.13 <u>No Reliance</u>. The Purchasers acknowledges and agrees that it is purchasing the Receivables without recourse to the Transferor (other than as otherwise provided in this Agreement).

Section 8.14 <u>Severability of Provisions</u>. If any provision of this Agreement is invalid or unenforceable, then, to the extent such invalidity or unenforceability shall not deprive either Party of any material benefit intended to be provided by this Agreement, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

Section 8.15 <u>Assignment</u>. Subject to the terms of the Confidentiality and Reconstitution Agreement, neither the Transferor nor the Purchasers may assign or otherwise transfer its rights and obligations under this Agreement without the prior written consent of the other Party.

Section 8.16 <u>No Third Party Beneficiaries</u>. This Agreement does not create, and shall not be deemed to create, a relationship between the Parties or any of them and any third party in the nature of a third party beneficiary or fiduciary relationship; provided, however, that the existence of this Section 8.15 shall not relieve the Transferor of its indemnity obligations set forth in Section 7.14 of this Agreement and the Purchasers may enforce such indemnification claims for the Indemnified Parties set forth in Section 7.14.

Section 8.17 <u>No Petition Covenant</u>. Notwithstanding any prior termination of this Agreement, no party to this Agreement shall, prior to the date which is one year and one day after the later of (i) the final payment or liquidation of all Receivables purchased by Ally Bank and Ally Financial Inc. under the Master Purchase Agreement (Flow) and (ii) the repayment in full of all obligations of each Bankruptcy Remote Party in respect of all amounts owing by any Bankruptcy Remote Party to the Administrative Agent and the Lenders pursuant to the Loan and Security Agreement or any other similar financing arrangement to which Ally Bank or any of its Affiliates is a party other than inchoate obligations for which no claim has been made, acquiesce, petition or otherwise invoke or cause any Bankruptcy Remote Party to invoke the process of any Governmental Authority for the purpose of commencing or sustaining a case against such Bankruptcy Remote Party under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of such Bankruptcy Remote Party or any substantial part of its property, or ordering the winding up or liquidation of the affairs of any Bankruptcy Remote Party under any federal or state bankruptcy or Insolvency Proceeding.

Section 8.18 <u>Special Acknowledgement of Purchasers</u>. Each Purchaser hereby acknowledges that it is a sophisticated purchaser capable of analyzing the risk of purchasing the Receivables and that subsequent to the consummation of the transaction contemplated hereby, the Purchasers shall bear all of the risks of ownership of the Receivables, including the risks of defaults and credit losses with respect thereto, except as otherwise set forth in any of the Basic Documents.

Section 8.19 <u>Effect of Amendment and Restatement</u>. It is the intent of the parties hereto that this Second Amended and Restated Master Purchase and Sale Agreement shall, as of the date hereof, amend and restate and replace in its entirety the Amended and Restated Master Purchase and Sale Agreement (Flow), dated March 6, 2017 (the "<u>Original Amended Master Purchase and Sale Agreement</u>"), among the Transferor and the Purchasers, which amended and restated and replaced in its entirety the Master Purchase and Sale Agreement (the "<u>Original Master Purchase and Sale Agreement</u>"), dated December 22, 2016, among the Transferor and the Purchasers; <u>provided</u> that, with respect to the period of time from December 22, 2016 through Mach 6, 2017, the rights, obligations, representations and warranties of the parties shall be governed by the Original Master Purchase and Sale Agreement and, with respect to the period of time from March 6, 2017, through the date hereof, the rights, obligations, representations and warranties of the parties shall be governed by the Original Amended Master Purchase and Sale Agreement; <u>provided</u> further, that the amendment and restatement of the Original Amended Master Purchase and Sale Agreement shall not affect any of the grants, transfers or conveyances contemplated by the Original Amended Master Purchase and Sale Agreement to have occurred prior to the date hereof. Each of the parties hereto, in each of its respective capacities hereunder and under each of the other Basic Documents, as applicable, hereby consents to the amendment and restatement of the Original Amended Master Purchase and Sale Agreement and each of the other Basic Documents on the date hereof, and does hereby acknowledge receipt of notice of such amendments and restatements and waives any further notice requirement with respect thereto, if and to the extent any such consent or notice was required hereunder or thereunder.

Section 8.20 <u>Recourse Limited to Collateral; Subordination</u>.

(a) The obligations of the Transferor under this Agreement and the other Transaction Documents are obligations solely of the Transferor and shall not constitute a claim against the Transferor to the extent that the Transferor does not have funds sufficient to make payment of such obligations. In furtherance of and not in derogation of the foregoing, to the extent the Transferor enters into secured transactions, the parties hereto acknowledge and agree that they shall have no right, title or interest in or to Other Assets. To the extent that, notwithstanding the agreements and provisions contained in the preceding sentences of this subsection, any of the parties hereto either (i) asserts an interest or claim to, or benefit from, Other Assets, or (ii) is deemed to have any such interest, claim to, or benefit in or from Other Assets, whether by operation of law, legal process, pursuant to applicable provisions of insolvency laws or otherwise (including by virtue of Section 1111(b) of the Bankruptcy Code or any successor provision having similar effect under the Bankruptcy Code), then the parties hereto further acknowledge and agree that any such interest, claim or benefit in or from Other Assets is and shall be expressly subordinated to the indefeasible payment in full of all obligations and liabilities of the Transferor which, under the terms of the relevant documents relating to such Other Assets, are entitled to be paid from, entitled to the benefits of, or otherwise secured by such Other Assets (whether or not any such entitlement or security interest is legally perfected or otherwise entitled to a priority of distribution or application under applicable law, including insolvency laws, and whether asserted against the Transferor), including the payment of post-petition interest on such other obligations and liabilities. This subordination agreement shall be deemed a subordination agreement within the meaning of Section 510(a) of the Bankruptcy Code. The parties hereto further acknowledge and agree that no adequate remedy at law exists for a breach of this Section 8.20 and the terms of this Section 8.20 may be enforced by an action for specific performance.

(b) The provisions of this Section 8.20 shall be for the third party benefit of those entitled to rely thereon and shall survive the termination of this Agreement.

(c) The Transferor covenants and agrees that if it enters into secured transactions with respect to Other Assets, it shall cause the appropriate documentation with respect thereto to include provisions substantially similar to those contained in (i) this Section 8.20 pursuant to which the Person(s) to which Other Assets are conveyed disclaims (and subordinates) any interest it may have in the assets of the Transferor other than the specific Other Assets related to such secured transaction and (ii) Section 8.17.

* * *

The Parties have caused this Second Amended and Restated Master Purchase and Sale Agreement to be executed by their respective duly authorized officers as of the date and year first above written.

CARVANA AUTO RECEIVABLES 2016-1 LLC,
as Transferor

By:      /s/ Paul Breaux
         Name: Paul Breaux
         Title: Vice President

ALLY BANK,
as Purchaser

By:      /s/ Scott M. Brobecker
         Name: Scott Brobecker
         Title: Authorized Representative

ALLY FINANCIAL INC.,
as Purchaser

By:      /s/ Thomas E. Elkins
         Name: Tom Elkins
         Title: Authorized Representative

**Agreed to and accepted by:**

CARVANA, LLC,
 as Seller

By:      /s/ Paul Breaux
         Name: Paul Breaux
         Title: Vice President

**APPENDIX A**

**DEFINITIONS AND USAGE**

(a) <u>Construction and Usage</u>. Unless otherwise provided in the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement or any other Basic Documents, the following rules of construction and usage are applicable to this Appendix and the Master Sale Agreement, the Master Purchase and Sale Agreement, the Master Servicing Agreement and any other Basic Documents.

 (i) As used in this Appendix or in any Basic Document and in any certificate or other document made or delivered pursuant thereto, accounting terms not defined herein, or in any such Basic Document, or in any such certificate or other document, and accounting terms partly defined herein or in any such certificate or other document, to the extent not defined herein, have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms herein, in any such Basic Document or in any such certificate or other document are inconsistent with the meanings of such terms under such generally accepted accounting principles, the definitions contained herein, in such Basic Document or in any such certificate or other document control.

 (ii) The words "hereof," "herein," "hereunder" and words of similar import when used in any Basic Document refer to such Basic Document as a whole and not to any particular provision or subdivision thereof. References in any Basic Document to "Article," "Section" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section or subdivision of or an attachment to such Basic Document. The term "including" means "including without limitation." The word "or" is not exclusive.

 (iii) The definitions contained in any Basic Document are equally applicable to both the singular and plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

 (iv) Any agreement, instrument, statute or regulation defined or referred to below means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

 (v) Any interest calculated over a period under any Basic Document shall be based on the actual number of days in such period and 365-day years.

(b) <u>Definitions</u>

 All terms defined in this Appendix shall have the defined meanings when used in any Basic Document, unless otherwise specified or defined therein.

 "<u>2-year Prime ABS Spread</u>" means, as of any day, the "2-year Prime ABS Spread" for the most recent week set forth in the Morgan Markets Auto ABS Index; <u>provided,</u> that, if the Morgan Markets Auto ABS Index ceases or fails to publish the 2-year Prime ABS Spread, the 2-year Prime ABS Spread shall be the 2-year Prime ABS Spread as determined by the Purchasers from time to time in the ordinary course of their business and provided to the Transferor; and <u>provided, further</u>, that if the Purchasers no longer periodically determine the 2-year Prime ABS Spread in the ordinary course of their business, then the Purchasers and the Transferor will otherwise establish a methodology for determining the 2-year Prime ABS Spread in a manner mutually acceptable to the Purchasers and the Transferor.

 "<u>Action Plan</u>", with respect to a Receivables Pool, has the meaning set forth in <u>Section 3.16(d)</u> of the Master Servicing Agreement.

 "<u>Action Plan Meeting</u>", with respect to a Receivables Pool, has the meaning set forth in <u>Section 3.16(c)</u> of the Master Servicing Agreement.

"Action Plan Meeting Regarding Certificates of Title", with respect to all of the Receivables in all Receivables Pools, has the meaning set forth in Section 3.16(g) of the Master Servicing Agreement.

"Action Plan Regarding Certificates of Title", with respect to all of the Receivables in all Receivables Pools, has the meaning set forth in Section 3.16(h) of the Master Servicing Agreement.

"Administrative Purchase Payment" means, with respect to an Administrative Receivable within a Receivables Pool to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Administrative Receivable as of such date and (b) the Receivables Purchase Rate and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) 30/360.

"Administrative Receivable" means a Receivable which the Servicer has repurchased pursuant to Section 3.8 of the Master Servicing Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Outstanding Principal Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of any date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool, as applicable.

"Ally Bank" means Ally Bank, a Utah chartered bank, and its permitted successors and assigns.

"Ally Bank Controls Effectiveness Review" means the Ally Bank process that assesses a suppliers' risk management controls in compliance with FDIC/FFIEC Third Party Vendor Management guidelines.

"Ally Financial" means Ally Financial Inc., a Delaware corporation, and its permitted successors and assigns.

"Anti-Corruption Laws" has the meaning set forth in Section 3.30 of the Master Servicing Agreement.

"Annual Percentage Rate" or "APR" of a Receivable means the annual rate of finance charges stated in the Receivable.

"Applicable Servicing Modification," with respect to a Banking Regulatory Change, shall be the modification to the Servicer's servicing standards and practices (i) approved by the Banking Regulator, if the Banking Regulator has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, (ii) if clause (i) is inapplicable, then as approved by the Purchaser, if the Purchaser has approved a different modification than that proposed by the Purchaser in the related Notice of Banking Regulatory Change, or (iii) otherwise, the modification proposed by the Purchaser in the related Notice of Banking Regulatory Change.

"Approved Financed Ancillary Products" means, the products mutually agreed to by the Purchasers and the Transferor with respect to vehicle service contracts, global positioning systems, gap insurance or waiver, prepaid maintenance, tire & wheel protection, paintless dent repair, and such other products as may be agreed to in writing by the Purchasers and Transferor from time to time.

"Authoritative Copy" means with respect to any Electronic Contract, a copy of such Contract that is unique, identifiable and, except as otherwise provided in Section 9-105 of the UCC, unalterable, and is marked "original" or has no watermark or other marking that would indicate that it is a "copy" or "duplicate" or not an original or not an "authoritative" copy.

"Available Collections" means, with respect to a Receivables Pool for any date or period of determination, the sum of the following amounts with respect to such date or period:

(i)    all monies collected from whatever source on such date or during such period with respect to the Receivables within such Receivables Pool;

(ii)   all Liquidation Proceeds received with respect to a Receivable within such Receivables Pool during such period; and

(iii)  the Administrative Purchase Payments or Warranty Payments received with respect to each Receivable within such Receivables Pool that became an Administrative Receivable or Warranty Receivable on such date or during such period pursuant to Section 8.2 of the Master Purchase and Sale Agreement or pursuant to Section 3.8 of the Master Servicing Agreement;

provided, however, that in calculating the Available Collections the following will be excluded:

(i)    all payments and proceeds of any Receivables the Warranty Payment or Administrative Purchase Payment of which has previously been included in Available Collections for such Receivables Pool;

"Banking Regulator" means a United States federal or State regulatory agency or instrumentality having authority over U.S. national banks or state chartered banks, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Financial Institutional Examination Council and the Utah Department of Financial Institutions, or any successor federal or state agency or instrumentality.

"Banking Regulatory Change" will occur if (i) a Banking Regulator adopts or modifies regulations or policies which alter the obligations of U.S. national or state chartered banks in general, or Ally Bank in particular, with respect to the servicing of retail automotive loans and retail automotive installment sales contracts, (ii) such regulations apply to retail automotive installment sale contracts owned or serviced by Ally Bank, (iii) compliance by third parties servicing receivables (as servicer for Ally Bank) owned by Ally Bank is required by law and (iv) such regulations require the Servicer (as servicer for Ally Bank) to implement new servicing standards or practices, or otherwise modify the existing standards or practices, other than those set forth in the Basic Documents.

"Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended from time to time.

"Bankruptcy Remote Party" means each of CAR 2016-1, the Borrower or any trust, limited liability company or corporation wholly-owned by CAR 2016-1.

"Basic Documents" means the Master Sale Agreement (including the First Step Receivables Assignment), the Master Purchase and Sale Agreement (including the Second Step Receivables Assignment), the Master Servicing Agreement, , the First Step Pool Supplements, the Second Step Pool Supplements, the Master Confidentiality and Reconstitution Agreement, the Collateral Custodian Agreement, the Letter Agreement and any other document, certificate, opinion, agreement or writing the execution of which is necessary or incidental to carrying out the transactions contemplated by this Agreement or any of the other foregoing documents.

"Benefit Plan" means any of (i) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (ii) a plan subject to Section 4975 of the Code or (iii) any entity whose underlying assets include plan assets by reason of investment by an employee benefit plan or plan in such entity.

"Bridgecrest" means Bridgecrest Credit Company, LLC, an Arizona limited liability company, and its permitted successors and assigns.

"Business Continuity Plan" means the document in which the Servicer plans to protect its employees, and continue its most critical business functions in situations where the facilities, people or information technology resources are interrupted for an extended period.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which banking institutions or trust companies in New York, New York, Minneapolis, Minnesota or Detroit, Michigan may, or are required to, remain closed.

"CAR 2016-1" means the Transferor.

"CAR 2016-1 Purchased Property" has the meaning set forth in Section 3.1(a) of the Master Sale Agreement.

"Carvana" means Carvana, LLC, an Arizona limited liability company, and its permitted successors and assigns.

"Catalyst Event" means a period of time commencing on the date when the 2-year Prime ABS Spread exceeds 0.75% and continuing until the earliest time as of which the 2-year Prime ABS Spread is equal to or less than 0.75%.

"CER" has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

"Certificate of Title" means with respect to a Financed Vehicle, (i) the original certificate of title relating thereto, or copies of correspondence to the applicable Registrar of Titles, and all enclosures thereto, for issuance of the original Certificate of Title or (ii) if the applicable Registrar of Titles issues a letter or other form of evidence of lien in lieu of a Certificate of Title (including electronic titling), either notification of an electronic recordation, by either a Title Intermediary or the applicable Registrar of Titles, or the original lien entry letter or form or copies of correspondence to such applicable Registrar of Titles, and all enclosures thereto, for issuance of the original lien entry letter or form, which, in either case, shall name the related Obligor as the owner of such Financed Vehicle and a Title Lien Nominee as secured party.

"Change in Control" means the (i) failure of Carvana to maintain, directly or indirectly, (A) control of the board of directors (or similar governing body) and (B) a beneficial ownership of 100% percent of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of the Transferor or (ii) failure of Persons that, as of the Closing Date, directly or indirectly maintain, (X) control of the board of directors (or similar governing body) and (Y) a beneficial ownership of more than fifty percent (50%) of the equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana to maintain such control or more than 50% ownership, other than as a result of (1) a registered public offering of securities of Carvana or (2) transfers of equity interests to Affiliates of such Persons or to other Persons that, individually or collectively, as of the Closing Date, owned equity interests (having ordinary voting power on an as-converted, fully-diluted basis) of Carvana representing not less than ten percent (10%) of such equity interests or Affiliates thereof.

"Change Order" has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

"Change Request" has the meaning set forth in Section 7.1(b) of the Master Servicing Agreement.

"Closing" means the initial closing that shall take place at or about 11:00 a.m., Chicago time, at the offices of Kirkland & Ellis LLP, in Chicago, Illinois on or about December 30, 2016, or at such other time, date and place as the parties shall agree upon.

"Closing Date" means, with respect to a First Tier Receivables Pool and subject to Section 3.1(e) of the Master Sale Agreement or a Receivables Pool and subject to Section 4.1(a) of the Master Purchase and Sale Agreement, the date on which the related First Step Pool Supplement or Second Step Pool Supplement is executed and delivered and the Purchase Price is paid, which generally will be the third (3rd) Business Day of the last calendar week of each calendar quarter.

"CNL" means, with respect to any Receivables Pool and any Distribution Date, the Cumulative Net Losses for such Receivables Pool through the last day of the related Collection Period.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

"Collateral Custodian" means Wells Fargo Bank, National Association.

"Collateral Custodian Agreement" means the Amended and Restated Collateral Custodian Agreement, dated as of November 1, 2022, among the Purchasers, the Collateral Custodian, the Servicer, the Transferor and the Seller, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Collateral Custodian Fee: The fees set forth in the Collateral Custodian Agreement as the Collateral Custodian Fees.

"Collection Account" has the meaning set forth in Section 4.1 of the Master Servicing Agreement.

"Collection Period" means each calendar month during the term of the Master Servicing Agreement or, in the case of the initial Collection Period, the period from and including the Cutoff Date of the related Receivables to and including the last day of the month preceding the month in which the first related Distribution Date occurs. Any amount stated "as of the close of business of the last day of a Collection Period" gives effect to all applications of Collections and all remittances or distributions as of the end of the day on such last day.

"Collection Policy" means, with respect to (i) the initial Servicer, the customary servicing and collection guidelines, policies and procedures of the Servicer, including those as attached as Exhibit D to the Master Servicing Agreement, in effect on the Original Execution Date, as such guidelines, policies and procedures as may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement, and as modified by the Servicing Exceptions and the Process Remediations attached to the Master Servicing Agreement as Exhibit F, if any, or (ii) any successor Servicer, the customary servicing and collection guidelines, policies and procedures of such successor Servicer with such changes as shall be required by the Purchasers and agreed to in writing by such successor Servicer and the Purchasers, as such agreed upon guidelines, policies and procedures may be changed from time to time in accordance with Section 3.1(c) of the Master Servicing Agreement.

"Collections" means, with respect to a First Tier Receivables Pool or a Receivables Pool, all amounts collected by the Servicer or its agents (from whatever source) or otherwise turned over to the Collection Account on or with respect to the related Receivables or the other CAR 2016-1 Purchased Property or Purchased Property, as applicable.

"Commission" means the Securities and Exchange Commission.

"Commitment Amount" means the sum of (i) $5,000,000,000 plus (ii) the Outstanding Principal Balance of a Receivable that had been previously included in a Receivables Pool and was repurchased, remediated and resold to the Purchasers in a subsequent Receivables Pool.

"Commitment Period" means the period from the Fifth Extension Amendment Effective Date to the earliest of (i) the Scheduled Commitment Termination Date, (ii) the occurrence of a Commitment Termination Event and (iii) the purchase by the Purchasers of Receivables Pools with a total Cutoff Date Aggregate Outstanding Principal Balance in an amount equal to the Commitment Amount.

"Commitment Termination Event" means the occurrence of a termination pursuant to Section 2.4(a) or 2.4(b) of the Master Purchase and Sale Agreement.

"Confidential Information" means all information and material of any type, scope or subject matter whatsoever relating to the Purchasers, the Transferor, the Seller, the Servicer or any of their subsidiaries, whether oral or written, and howsoever evidenced or embodied, which each Party, each Party's representatives or agents (including any officers of any Party or any of their subsidiaries) may furnish to the other, or to which either Party is afforded access by the other Party, either directly or indirectly for purposes of such Party's participation in the transactions contemplated by the Master Purchase and Sale Agreement. However, "Confidential Information" shall not include information or material of a Party which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its agents and other representatives, (ii) was available to the receiving Party on a non-confidential basis prior to its disclosure by the disclosing Party, (iii) becomes available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or the disclosing Party's

representatives or agents, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from transmitting the information to the Purchaser, the Seller, the Servicer or the Transferor by a contractual, legal or fiduciary obligation or (iv) consists of the documents evidencing the consummation of the transactions contemplated by the Basic Documents so long as all references to the other Party and all information specific to the assets sold or price paid pursuant to the transactions are removed.

"Confidentiality Agreement" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Contract" means, a fully-executed retail installment sale contract, direct purchase money loan or conditional sale contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract under which an extension of credit is made in the ordinary course of business of the Seller to such Obligor and which is secured by the related Financed Vehicle.

"Credit Policy" means the credit underwriting guidelines, policies and procedures that Carvana or its Subsidiaries utilize in originating or acquiring retail installment sales contracts, including the credit policies as attached as Exhibit E to the Master Purchase and Sale Agreement, as such guidelines, policies and procedures may be amended, modified, restated, replaced or otherwise supplemented from time to time in accordance with Section 7.20(h) of the Master Purchase and Sale Agreement and Section 6.22(f) of the Master Sale Agreement.

"Cumulative Net Losses" means, with respect to a Receivables Pool as of any Distribution Date, the sum of (i) the aggregate Net Losses experienced on all Liquidating Receivables with such Receivables Pool from the first day of the related Origination Period through the end of the related Collection Period and (ii) the Outstanding Principal Balance as of the Pool Termination Date of any Receivables within such Receivables Pool outstanding on the related Pool Termination Date.

"Customer Information" has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

"Cutoff Date" means with respect to each First Tier Receivables Pool and Receivables Pool, the last day of the related Origination Period; provided that for the purpose of this definition, Sunday shall be deemed to be the last day of the calendar week; provided, further, that, with respect to any First Tier Receivables Pool and Receivables Pool sold (i) from and including March 7, 2019 to and including April 4, 2019, respectively, (ii) on March 20, 2020, and (iii) on any other date consented to by the Purchasers in their sole discretion, the "Cutoff Date" shall be the date consented to by the Purchasers.

"Cutoff Date Aggregate Outstanding Principal Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool and as of the applicable Cutoff Date, the aggregate of the Outstanding Principal Balance of each Receivable in such First Tier Receivables Pool or Receivables Pool as of the applicable Cutoff Date, as applicable.

"Defaulted Receivable" means any Receivable upon the first occurrence of any of the following: (i) all, or any part in excess of 10% of any scheduled payment (the "Default Threshold") is one hundred and twenty (120) (or such shorter period as shall be specified in the Collection Policy, it being understood that such period in the Collection Policy shall not be lengthened without the prior written consent of the Purchasers) or more days delinquent on the last day of a calendar month (taking into account the application by the Servicer of payments received in any Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy), (ii) only for Receivables charged off on or before December 31, 2022, for which the Financed Vehicle has been surrendered or repossessed and the redemption period granted the Obligor or required by applicable law has expired, or is to be repossessed but is unable to be located or is otherwise subject to being repossessed, (iii) which has been settled for less than the Outstanding Principal Balance, (iv) which has been liquidated by the Servicer through the sale of the related Financed Vehicle, (v) for which proceeds have been received which in the Servicer's judgment, constitute the final amounts recoverable in respect of such Receivable, or (vi) which has been charged-off (or should have been charged-off) in accordance with the Collection Policy.

"Delinquent Receivable" means any Receivable (other than a Defaulted Receivable) for which all or any part of a scheduled payment (the "Delinquency Threshold") is thirty-one (31) or more days past due, taking into

account the application by the Servicer of payments received in any Collection Period to previously unpaid scheduled payments or portions thereof in accordance with the Collection Policy. For purposes of determining delinquency, in accordance with the Collection Policy, the Servicer applies payments from Obligors in order of delinquency of outstanding scheduled payments, with payments first applied to the longest overdue and outstanding scheduled payment or portion thereof.

"Deliver" means, (x) With respect to a Tangible Contract or other document in a Receivable File other than an Electronic Contract or an electronic Certificate of Title, to deliver physical possession of such Tangible Contract or other document via reputable overnight delivery service, (y) with respect to an Electronic Contract, to direct Wells Fargo Bank, National Association, to transfer such Electronic Contract to the Forward Flow Vault Partition and (z) with respect to electronic Certificates of Title, to cause the applicable Title Intermediary to provide the Collateral Custodian with full electronic access to view such electronic Certificates of Title on the records of the Title Intermediary. The terms "Delivery" and "Delivered" shall have corollary meanings.

"Disclosure Information" has the meaning set forth in Section 3(a)(iv) of the Master Confidentiality and Reconstitution Agreement.

"Distribution Date" means, with respect to each First Tier Receivables Pool or Receivables Pool, the 15th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day, beginning on the date specified in the applicable First Step Pool Supplement or Second Step Pool Supplement, as applicable.

"Document Receipt" means the Document Receipt substantially in the form attached as an exhibit to the Collateral Custodian Agreement executed by the Collateral Custodian and delivered to the Purchasers and the Servicer.

"DriveTime" means DriveTime Automotive Group, Inc., a Delaware corporation, and its permitted successors and assigns.

"Effective Date" means, the date upon which all of the conditions described in Section 6.1 to the Master Purchase and Sale Agreement are met.

"Electronic Contract" means a Contract that constitutes "electronic chattel paper" under and as defined in Section 9-102(31) of the UCC.

"Eligible Receivable" means, with respect to each Receivable in a First Tier Receivables Pool or a Receivables Pool, as applicable that such Receivable:

(i) Such Receivable was underwritten by the Seller in its ordinary course of business and in accordance with the Credit Policies of the Seller as approved by the Purchasers;

(ii) Such Receivable was purchased by the Transferor from the Seller in the ordinary course of business and as soon as is practicable after the file with respect to such Receivable is complete;

(iii) Each such sale and assignment of such Receivable was made without any fraud or misrepresentation;

(iv) With respect to each such sale and assignment of such Receivable, the Seller and the Transferor have taken all steps reasonably necessary to ensure that such sale and assignment has been perfected under the relevant UCC;

(v) With respect to such Receivable, the Seller shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Transferor a first priority perfected security interest in the CAR 2016-1 Purchased Property shall have been made and the Transferor shall have taken all steps necessary to ensure that all filings (including UCC filings) necessary in any jurisdiction to give the Purchasers a first priority perfected security interest in the Purchased Property shall have been made;

(vi)  The terms of such Receivable (a) create a valid enforceable security interest in favor of the holder thereof, and (b) contain customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for realization against the Financed Vehicle;

(vii) With respect to such Receivable, the related Original Contract Documents are in the possession of the Custodian and the Custodian has issued a collateral receipt to the Purchasers as required under the Collateral Custodian Agreement and the related Servicer Files are in the possession of the Servicer;

(viii)   (a) a Title Lien Nominee is named as the first lien holder on the Certificate of Title for the related Financed Vehicle, or if a new or replacement Certificate of Title is being or will be applied for with respect to such Financed Vehicle, documentation has been or will be submitted to obtain title thereto noting such Person as lien holder and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns and if the Certificate of Title has not been received, the Collateral Custodian will have received a copy of the title application within 45 days of inclusion as part of the Purchased Property or (b) in those states that permit electronic recordation of Liens, such Person is named as the first lien holder on the Certificate of Title for the related Financed Vehicle on the electronic Lien and title system of the applicable state, or the Servicer or the Originator has submitted for electronic recordation, by either a third-party service provider or the relevant state registrar of titles, for such Person to be named as the lien holder on the Certificate of Title on the electronic Lien and title system of the applicable state and if a confirmation has not been received, the Collateral Custodian will have received a copy of the electronic submission within 45 days of inclusion as part of the Purchased Property and such title is free and clear of all Liens and adverse claims that are equal or superior to the Lien of such Person and its assigns;

(ix)  Such Receivable (including the related Contract) is currently and was at and all times since origination in compliance with all Requirements of Law;

(x)  At the time of origination by the Seller, the related Financed Vehicle was covered by an insurance policy that covers physical loss or damage in at least the minimum amount required by the state in which the related Obligor resides, the related Obligor is required under the terms of the related Contract to maintain such insurance policy, and there are no forced-placed insurance premiums added to the Original Amount Financed;

(xi)  Such Receivable arises under a Contract which, together with such Receivable (a) has been executed and delivered (or electronically authenticated) by the related Obligor, (b) is in full force and effect and constitutes the legal, valid and binding obligation of the related Obligor, (c) is evidenced by only one executed original copy (or with respect to electronic chattel paper, one Authoritative Copy) (in each case within the meaning of the UCC), (d) contains customary and enforceable provisions such that the rights and remedies of the holder thereof shall be adequate for the realization against the Purchased Property of the benefits of the security provided thereby, including all the rights of a secured party under the relevant UCC, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, (e) does not require the Obligor under such Contract to consent to the transfer of the rights and duties of the Seller under such Contract, and (f) does not contain a confidentiality provision that purports to restrict the ability of the Purchasers, to exercise their rights under the Basic Documents, including its right to review the Contract. With respect to a Contract that is electronic chattel paper, the record or records composing the electronic chattel paper are created, stored and assigned in such a manner that (A) a single Authoritative Copy of the record or records exists which is unique, identifiable and unalterable (other than a revision that is readily identifiable as an authorized or unauthorized revision) other than with the participation of the Collateral Custodian in the case of an addition or amendment of a permitted and identifiable assignee and), (B) each copy of the Authoritative Copy and any copy of a copy is readily identifiable as a copy that is not the Authoritative Copy, and (C) the Authoritative Copy has been communicated to and is maintained by the Collateral Custodian;

(xii) The maturity date of such Receivable has not been deferred or extended, except in accordance with the Credit Policy and the Collection Policy and no other provision of the related Contract has been waived,

amended or rewritten or amounts due and owing thereunder deferred or waived (except waivers, amendments, rewrites, deferrals or waivers in all material respects in accordance with the Credit Policy and the Collection Policy and alterations and modifications so that such Receivable is an Eligible Receivable (other than clause (ix) hereof, which must have been satisfied at the time of origination)) and such Receivable is enforceable after giving effect thereto;

(xiii)    Such Receivable (a) is not subject to any dispute, offset, counterclaim or defense whatsoever (except the discharge in bankruptcy of such Obligor), and (b) with respect thereto (i) there is no material breach, default, violation or event of acceleration existing under the related Contract, and there is no event which, with the passage of time, or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration and (ii) to the best of the its knowledge, no right of rescission, setoff, counterclaim or defense shall have been asserted or threatened;

(xiv)    Such Receivable is assignable without notice to or the consent of the related Obligor;

(xv) The Obligor of such Receivable is not a government or government agency, and such Obligor is not an individual that was included on OFAC's List of Specially Designated Nationals at the time of origination;

(xvi)    Such Receivable is denominated and payable only in Dollars by an Obligor with a billing address in any State or territory of the United States or United States military installation;

(xvii)    Such Receivable is not, (a) as of the Cutoff Date for the related Receivables Pool, a Delinquent Receivable, or (b) as of the Closing Date for the related Receivables Pool, a Defaulted Receivable or a Liquidating Receivable;

(xviii)    Each Receivable constitutes any of "chattel paper," "an account," an "instrument" or a "general intangible" as defined in the UCC;

(xix)    The Transferor has good and marketable title to such Receivable free and clear of all liens (other than Permitted Liens) and such Receivable, together with the Contract related thereto, has not been satisfied, subordinated or rescinded, nor shall any Financed Vehicle or other related security have been released from the security interest granted under the related Contract in whole or in part;

(xx) The Transferor has acquired a valid and perfected first priority security interest in such Receivable and, upon the sale by the Transferor to the Purchasers pursuant to the Master Purchase and Sale Agreement, the Purchasers have acquired a valid and perfected first priority security interest in such Receivable;

(xxi)    The Contract related to such Receivable is a Simple Interest Receivable, and scheduled payments under each Receivable have been applied in accordance with the method for allocating principal and interest set forth in such Receivable;

(xxii)    (A) For a Receivable that is not a Flex Receivable, the first scheduled payment in respect of such Receivable is no more than forty-five (45) days from the related contract date or (B) is a Flex Receivable;

(xxiii)    If such Receivable is a Receivable newly originated by the Seller, at the time of sale of such Receivable, the first scheduled payment was not past due; provided, that no funds have been advanced by the Transferor or the Seller, or anyone acting on behalf of any of them in order to cause such Receivable to comply with this clause (xxiii);

(xxiv)    The Financed Vehicle related to such Receivable (a) was purchased with the proceeds of such Receivable, (b) has all accessories and optional equipment described in the Contract, (c) is not at the time of origination designated for racing or modified for use as a public livery vehicle or any other commercial use, (d) has a history verified by Carvana through an Autocheck report (which may be an

aggregate report in a data tape format) reflecting no disclosed accidents, no title issues or odometer discrepancies with respect to each Financed Vehicle;

(xxv)    Such Receivable shall have been originated in the United States of America to an Obligor domiciled in the United States for the retail sale of a Financed Vehicle by the Seller who, at the time of origination, had all material licenses, permits and consents necessary to originate Receivables in the jurisdiction in which such Contract was originated;

(xxvi)   Such Receivable shall not have been originated in, or be subject to the laws of, any jurisdiction under which the transfer of such Receivable under the transaction documents shall be unlawful, void or voidable;

(xxvii)  With respect to such Receivable, none of the Seller or the Transferor is required to perform any additional service for, or perform or incur any additional obligation to, the related Obligor in order to enforce the related Contract;

(xxviii) With respect to such Receivable there exists a Receivable File that contains, without limitation, each of the items described in the definition of "Receivable File", including the applicable Original Contract Documents, and the Servicer File and Original Contract Documents are in the possession of the Servicer and the Custodian, respectively, and, with respect to each document contained therein, each form has been correctly prepared in all material respects;

(xxix)   The information relating to the Receivables set forth in the related Schedule of Receivables is true and correct;

(xxx)    The Financed Vehicle related to such Receivable is not of a model year older than 10 years as of the date of origination;

(xxxi)   The Financed Vehicle related to such Receivable does not, as of the date of origination of the related Contract, have mileage in excess of [***] miles;

(xxxii)  The original term of such Receivable is not more than seventy-five (75) months;

(xxxiii)  (A) for Receivables with a related Cutoff Date on or after February 24, 2019 and on or prior to March 19, 2020, the LTV at origination did not exceed [***]% and (B) for Receivables with a related Cutoff Date after March 19, 2020, where the Obligor has a FICO score (a) greater than or equal to [***], then the LTV at origination is less than or equal to [***]%; (b) greater than or equal to [***] and less than [***], then the LTV at origination is less than or equal to [***]%, (c) greater than or equal to [***] and less than [***], then the LTV at origination is less than or equal to [***]%; and (d) less than [***], then the LTV at origination is less than or equal to [***]%;

(xxxiv)  The Obligor has a FICO score of not less than [***] and, not more than the Upper Bound FICO Score, which, except for a Receivable included in the initial Receivables Pool on the initial Closing Date, shall have been obtained by Carvana within the [***] days prior to the origination of the related Receivable, unless otherwise consented to by the Purchasers; provided that, if the Seller exercises a Limited Sale Option on any Closing Date occurring on or after March 7, 2019 through and including April 4, 2019, the maximum FICO score limit described in this clause (xxxiv) shall not apply; provided further that, with respect to any Receivable in the First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, the maximum and minimum FICO score limits described in this clause (xxxiv) shall not apply;

(xxxv)   Contract provides for level payments, except for the last payment, which is less than or equal to the amount of the preceding level payments, that fully amortized the financed amount and requires that any prepayment must fully pay the Original Amount Financed plus accrued interest to date;

[***] Redacted for confidentiality purposes.

(xxxvi)  Obligor is a natural person, is not an Affiliate of Carvana, is the end user of the Financed Vehicle and the Financed Vehicle is intended for personal, family or household use;

(xxxvii) The Contract does not permit the Obligor to reduce or delay payment or return the Financed Vehicle in lieu or cancellation of payment or to substitute, exchange or add a vehicle as CAR 2016-1 Purchased Property or Purchased Property, respectively;

(xxxviii) Has a governing law provision approved by the Purchasers for use in the jurisdiction where the Obligor (but not any of the Obligor's agents) took delivery of the vehicle;

(xxxix)  No Receivable with a related Cutoff Date on or after the Second Extension Amendment Effective Date and secured by a Financed Vehicle includes Approved Financed Ancillary Products with parameters in excess of the ancillary product Purchasing Guidelines & Parameters;

(xl)  For Receivables with a related Cutoff Date on or after the Second Extension Amendment Effective Date, the Obligor has an ID Analytics Credit Optics 5.1 Auto score of not less than 450; and

(xli) No Receivable arises under a Contract that has been executed and delivered (or electronically authenticated) by, and constitutes the legal, valid and binding obligation of, more than one Obligor.

"Eligible Receivables Pool" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"ERISA" means The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"E-Sign Provider" shall mean DocuSign, Inc.

"E Sign Transition Period" shall mean the period beginning on November 29, 2017 and ending on December 4, 2017 or such other day as the Transferor shall specify in writing to the Purchasers.

"E-Vault Provider" means eOriginal, Inc.

"E-Vault System" shall have the meaning set forth in the Custodial Agreement.

"Event of Servicing Termination" means an event specified in Section 6.1 of the Master Servicing Agreement.

"Exchange Act" means The Securities Exchange Act of 1934.

"Extension Amendment Effective Date" means November 3, 2017.

"FDIC/FFIEC Third Party Vendor Management" means the guidance to address the management by a regulated entity of third and fourth party suppliers issued by the Federal Deposit Insurance Corporation, the Federal Financial Institutions Examination Council or any other regulatory entity that covers a business in which Ally Bank or an Ally Bank Affiliate currently operates or may look to operate in the future.

"FICO Score" means, as of any date of determination, the credit score for the applicable Obligor using the Fair, Isaac & Co. FICO Auto Version 3.0 methodology, as provided to Carvana or the Servicer by Experian or such other version as approved by the Purchasers, which, except for Receivables included in the initial Receivables Pool on the initial Closing Date, shall not, without the consent of the Purchasers, be obtained more than thirty (30) days prior to the applicable origination date.

"Fifth Extension Amendment Effective Date" means March 19, 2021.

"Financed Vehicle" means a used automobile or light truck, together with all accessories thereto, securing an Obligor's indebtedness under a Receivable.

"First Step Pool Supplement" means the First Step Pool Supplement, in the form of Exhibit A to the Master Sale Agreement, executed by CAR 2016-1 and the Seller on each Closing Date.

"First Step Receivables Assignment" means the document of assignment attached as Schedule 1 to the First Step Pool Supplement.

"First Step Receivables Purchase Price" means, with respect to a First Tier Receivables Pool, an amount equal to the related Second Step Receivables Purchase Price.

"First Tier Receivables Pool" has the meaning set forth in the recitals to the Master Sale Agreement.

"Flex Amount" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Flex Receivable" means either (x) a Receivable that meets the criteria of an "Eligible Receivable" (other than clause (xxii)(A) thereto) and (i) pursuant to which, at the time of origination of the related Contract, the related Obligor has elected in writing to defer the first scheduled payment in respect of such Receivable, (a) if the APR of the related Receivable is less than 10% per annum, 90 days from the related contract date, or (b) if the APR of the related Receivable is greater than or equal to 10% and less than or equal to 20%, 60 days from the related contract date, (ii) for which interest accrues at the related APR from the date of origination of such related Contract during such deferral period, (iii) for which the related credit application was completed and has a date on or after April 6, 2020 through and including May 31, 2020 (or such other date as agreed to by the Purchasers in their sole discretion), and (iv) as the time of submission of the related credit application, the related Obligor has submitted and signed an employment and income attestation in accordance with the Credit Policies of the Seller, noting that for the avoidance of doubt, a Receivable with an APR greater than 20% shall not be a Flex Receivable, or (y) a Receivable sold on June 30, 2020, September 29, 2020, or December 30, 2020.

"Forward Flow Vault Partition" means the segregated vault partition of the E-Vault System established in the name of the Purchasers.

"Freestyle Selection" means the random order that the Receivables are to be selected in the System of Record, after consideration of the Purchase Percentage, Eligible Receivable criteria and Eligible Receivables Pool criteria. The Receivables to be sold to the Transferor will be based on the contract number of the Receivables. The Seller shall sell to the Transferor all Receivables where the ninth and tenth digits of the contract number (such number, the "randomization code") are a number from 01 through the number equal to the Purchase Percentage (it being understood that a Purchase Percentage of 100 would have a randomization code of 00) or, with respect to any Previously Originated Receivable that later becomes an Eligible Receivable, such Previously Originated Receivable shall be included in such Eligible Receivables Pool if its randomization code falls within the Purchase Percentage for its related Origination Period. For example, if the Purchase Percentage for an Origination Period is 85%, the Seller would sell Receivables with contract numbers ending in 01 through 85, and retain Receivables with contract numbers ending in 86 through 00. The Seller shall ensure that contract numbers are assigned randomly as they are entered into the System of Record and in no way adverse to the Purchasers.

"GAP Letter" has the meaning set forth in Section 3.13 of the Master Servicing Agreement.

"GLBA" means the Gramm-Leach-Bliley Act and its implementing regulations.

"GLBA Privacy Requirements" has the meaning set forth in Section 2(b) of the Master Confidentiality and Reconstitution Agreement.

"General Change" has the meaning set forth in Section 3.18(d) of the Master Servicing Agreement.

"<u>Governmental Authority</u>" means any government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the applicable Person.

"<u>Governmental Rules</u>" means any and all laws, statutes, codes, rules, regulations, ordinances, orders, writs, decrees and injunctions, of any Governmental Authority and any and all legally binding conditions, standards, prohibitions, requirements and judgments of any Governmental Authority.

"<u>Indemnified Parties</u>" has the meaning set forth in <u>Section 7.14</u> of the Master Purchase and Sale Agreement.

"<u>Individual Pre-closing Interest Carry Amount</u>" means, with respect to a Receivable in a Receivables Pool therein and as of the related Closing Date, an amount equal to (i) the Outstanding Principal Balance of such Receivable as of the Cutoff Date, <u>multiplied by</u> (ii) the Pricing Model all-in cost of funds of the Purchasers, for the related FICO band related to such Receivable, <u>multiplied by</u> (iii) (A) with respect to a Receivable for which the last scheduled payment for such Receivable was on or prior to the Cutoff Date, the number of days from the day following such last scheduled payment date through (and including) the related Closing Date for such Receivable and (B) with respect to a Receivable for which the first scheduled payment date for such Receivable does not occur on or prior to the Cutoff Date, the number of days from the day following the date of origination of such Receivable through (and including) the related Closing Date for such Receivable, <u>divided by</u> (iv) 365.

"<u>Information Security Program</u>" has the meaning set forth in <u>Section 3.17(b)</u> of the Master Servicing Agreement.

"<u>Information Recipient</u>" has the meaning set forth in <u>Section 3.28</u> of the Master Servicing Agreement.

"<u>Insolvency Event</u>" means with respect to a specified Person, such Person shall (A) file a petition or commence a proceeding (1) to take advantage of any Insolvency Law or (2) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, (B) consent or fail to object to any such petition filed or proceeding commenced against or with respect to it or all or substantially all of its property, or any such involuntary petition or proceeding shall not have been dismissed or stayed within sixty (60) days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or proceeding, (C) admit in writing its inability to pay its debts generally as they become due, (D) make an assignment for the benefit of its creditors, (E) voluntarily suspend payment of its obligations or (F) take any action in furtherance of any of the foregoing

"<u>Insolvency Laws</u>" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"<u>Insolvency Proceeding</u>" means with respect to any Person, any bankruptcy, insolvency, arrangement, rearrangement, conservatorship, moratorium, suspension of payments, readjustment of debt, reorganization, receivership, liquidation, marshaling of assets and liabilities or similar proceeding of or relating to such Person under any Insolvency Laws.

"<u>Inspection Standard</u>" has the meaning set forth in <u>Section 3.18(a)</u> of the Master Servicing Agreement.

"<u>Letter Agreement</u>" means the eighteenth amended and restated letter agreement, dated as of March 22, 2022, among the Purchasers, the Seller, the Transferor and the Servicer, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Lien</u>" means any security interest, lien, charge, pledge, equity, or encumbrance of any kind.

"Liquidating Receivable" means a Receivable as to which the Servicer (i) has reasonably determined, in accordance with its customary servicing procedures, that eventual payment of amounts owing on such Receivable is unlikely, or (ii) has repossessed and disposed of the Financed Vehicle.

"Liquidation Expenses" means, with respect to a Liquidating Receivable, the actual reasonable out-of-pocket costs of liquidation not to exceed $675 (or such greater amount as the Servicer determines is reasonably necessary in accordance with its customary procedures to refurbish and dispose of a liquidated Financed Vehicle).

"Liquidation Proceeds" means, with respect to a Liquidating Receivable, all amounts realized with respect to such Receivable net of Liquidation Expenses and any amounts that are required to be refunded to the Obligor on such Receivable, but in any event not less than zero.

"Loan-to-Value Ratio" or "LTV" means, with respect to any Receivable, the ratio (expressed as a percentage) of (x) the Original Amount Financed of such Receivable on the date such Receivable was originated by the Seller, to (y) the sum of (a)(i) the KBB Weekly "Good Wholesale" (or "Lending") value of the Financed Vehicle as determined by Kelly Blue Book as of the date of origination of the related Receivable or (ii) if such value is not available, the clean trade-in value as determined by National Appraisal Guides, Inc. in the most recent NADA guide or such other source as shall be approved in writing by the Purchasers, plus (b) an amount determined by the Purchasers in their sole discretion to account for Seller's reconditioning process and other factors that enhance vehicle value.

"Master Confidentiality and Reconstitution Agreement" means the Amended and Restated Master Confidentiality and Reconstitution Agreement, dated as of November 1, 2022, by and among Carvana, Bridgecrest, the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Purchase and Sale Agreement" means the Second Amended and Restated Master Purchase and Sale Agreement, dated as of November 1, 2022, by and among the Transferor and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Sale Agreement" means the Second Amended and Restated Master Sale Agreement (Flow), dated as of November 1, 2022, by and among the Seller and CAR 2016-1, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Master Servicing Agreement" means the Amended and Restated Master Servicing Agreement (Flow), dated as of November 1, 2022, by and among Carvana, Bridgecrest and the Purchasers, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means, with respect to any Person and to any event or circumstance, a material adverse effect on (i) the business, financial condition, operations, performance or properties of such Person, (ii) the validity or enforceability of the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document or the validity, enforceability or collectability of (a) a material portion of the Receivables purchased by the Purchasers, or (b) a material portion of the collections of such Receivables or the security interests in the Financed Vehicles, (iii) the rights and remedies of either Purchaser, (iv) the ability of such Person to perform its obligations under the Master Sale Agreement, Master Purchase and Sale Agreement or any other Basic Document to which it is a party or (v) the status, existence, perfection, priority or enforceability of either Purchaser interest in any Purchased Property.

"Monthly Data File" has the meaning set forth in Section 4.3 of the Master Servicing Agreement.

"Monthly Servicer Report" has the meaning set forth in Section 4.3 of the Master Servicing Agreement.

"NAALR" means the net average annualized loss rate for the related FICO band or Eligible Receivables Pool, as applicable, as determined by the Purchasers in accordance with their customary policies and procedures, without specific deviation for the Seller or Transferor other than deviation with respect to performance of the Receivables resulting from the application of such customary policies and procedures applied consistently.

"Net Loss" means, with respect to a Receivables Pool, (i) as of any Distribution Date, for each Liquidating Receivable in such Receivables Pool, the Outstanding Principal Balance of such Liquidating Receivable when it became a Liquidating Receivable minus all Liquidation Proceeds received with respect to such Liquidating Receivable on or before the last day of the related Collection Period and (ii) as of the related Pool Termination Date, and with respect to each Receivable then outstanding within such Receivables Pool, the Outstanding Principal Balance of such Receivable as of the last day of the related Collection Period.

"Nonconforming Receivables Pool" means a Receivables Pool that the Purchasers have agreed to purchase on a Closing Date after waiving (i) one or more of the characteristics contained in the definition of "Eligible Receivables Pool" or (ii) one or more of the characteristics contained in the definition of "Eligible Receivable".

"Non-Excluded Taxes" has the meaning set forth in Section 2.5(c) of the Master Purchase and Sale Agreement.

"Notice of Banking Regulatory Change" has the meaning set forth in Section 3.18(a) of the Master Servicing Agreement.

"Notified Total Costs" has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

"NPPI" means "non-public personal information" as defined in 16 C.F.R. § 314.2(b) (2003) as well as any information that identifies a customer or consumer (as such terms are defined by the Gramm-Leach-Bliley Act of 1999 (15 U.S.C. § 6801 et seq.), as amended from time to time) and information from which a customer's or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. NPPI also includes any information Ally Financial or Ally Bank (including any of their Affiliates) may directly or indirectly disclose to the Servicer or any Servicer agent or which the Servicer or any Servicer agent may collect or otherwise have access to due to the Servicer or the Servicer agents' relationship with Ally Financial, Ally Bank or any of their Affiliates that relates to an individual. This includes, but is not limited to, financial information; medical or health related information; credit history; income; financial benefits; application, loan or claim information; names or lists of individuals derived from nonpublic personally identifiable information or otherwise derived from Ally Financial, Ally Bank or any of their Affiliates; and the identification of an individual as an Ally Financial or Ally Bank customer or as an individual Ally Financial or Ally Bank claimant.

"Obligor" means the purchaser or co-purchasers of the Financed Vehicle or any other Person who owes payments under a Receivable.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Officer's Certificate" means with respect to any Person, a certificate signed by a Responsible Officer of such Person.

"OFSS" has the meaning set forth in Section 3.23 of the Master Servicing Agreement.

"Operations Diligence" has the meaning set forth in Section 3.15(b) of the Master Servicing Agreement.

"Opinion of Counsel" means a written opinion of counsel, which counsel may be internal or external counsel to a Party, reasonably acceptable to the Party receiving such opinion.

"Original Amount Financed" means, with respect to a Receivable and as of the date on which such Receivable was originated, the aggregate amount advanced under the Receivable toward the purchase price of the Financed Vehicle, including accessories, vehicle delivery fees, insurance premiums, service and warranty contracts and other items customarily financed as part of automobile and light truck retail installment sale contracts or direct purchase money loans and related costs.

"Original Contract Documents" means, with respect to each Receivable, (i) the original Contract and (ii) the Certificate of Title or evidence that such Certificate of Title has been applied for. For the avoidance of doubt, an Authoritative Copy of an electronic document shall constitute an original.

"Original Execution Date" means December 22, 2016.

"Origination Period" means, each quarter during the period beginning with the first quarter of 2021 and ending with the quarter containing the last day of the Commitment Period; provided, that, with respect to (i) the initial First Tier Receivables Pool and Receivables Pool, (ii) any First Tier Receivables Pool and Receivables Pool sold from and including March 7, 2019 to and including April 4, 2019, respectively, (iii) any First Tier Receivables Pool and Receivables Pool sold on March 20, 2020, and (iv) any other date consented to by the Purchasers in their sole discretion, the "Origination Period" shall be the period consented to by the Purchasers.

"Other Assets" means any assets (or interests therein) (other than the Purchased Property) conveyed or purported to be conveyed by CAR 2016-1 to another Person or Persons other than the Purchased Property conveyed to the Purchasers under the Master Purchase and Sale Agreement, whether by way of a sale, capital contribution or by virtue of the granting of a lien.

"Other Facility Transaction Documents" means collectively, the "Transaction Documents" or similar term as such term is defined in any purchase agreement or loan and security agreement among Carvana, a bankruptcy remote, special purpose purchaser or borrower formed by Carvana or its Affiliates, the Transferor and Ally Bank.

"Other Information" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Outstanding Principal Balance" means, with respect to a Receivable and as of any date, the Original Amount Financed, less:

(i)   payments received from or on behalf of the related Obligor prior to such date allocable to principal;

(ii)  any refunded portion of extended warranty protection plan costs, physical damage, credit life or disability, warranties, debt cancellation and other insurance premiums included in the Original Amount Financed and allocable to principal;

(iii) any Administrative Purchase Payment or Warranty Payment to the extent allocable to principal; and

(iv)  any Liquidation Proceeds previously received on or prior to the last day of the related Collection Period allocable to principal with respect to such Receivable.

"Outward Facing Supplier Standards" means Ally Bank's "Outward Facing Supplier Standards" as provided by Ally Bank to the Servicer.

"Party" means, with respect to each Basic Document, each Person that is a party to such Basic Document, and its permitted successors and assigns.

"Patriot Act" has the meaning set forth in Section 2(f) of the Master Confidentiality and Reconstitution Agreement.

"Performance Guarantor" means, DriveTime and its successors and permitted assigns under the Master Servicing Agreement.

"Permitted Disclosures" has the meaning set forth in Section 2(c) of the Master Confidentiality and Reconstitution Agreement.

"Permitted Liens" any of (a) Liens created pursuant to any Basic Document or (b) with respect to any Financed Vehicle, the Lien noted on the Certificate of Title related to the Financed Vehicle in favor of a Title Lien Nominee.

"Person" means any legal person, including any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Pool Balance" means, with respect to a First Tier Receivables Pool or a Receivables Pool, as applicable, as of the close of business of the last day of a Collection Period, the Aggregate Outstanding Principal Balance of the Receivables in such First Tier Receivables Pool or Receivables Pool (excluding Administrative Receivables and Warranty Receivables and Liquidating Receivables as of such date).

"Pool Termination Date" means, with respect to each Receivables Pool, the date that occurs on the last day of the sixth (6th) month after the maturity date of the Receivable within such Receivables Pool with the longest original term to maturity as of the Cutoff Date for such Receivables Pool.

"Pre-closing Interest Carry Amount" means, with respect to a Receivables Pool and as of the related Closing Date, an amount equal to the sum of the Individual Pre-closing Interest Carry Amounts for each of the Receivables in such Receivables Pool.

"Previously Originated Receivable" means, for any Closing Date and the related Eligible Receivables Pool, an Eligible Receivable originated in a prior Origination Period that met the eligibility criteria to be included in an Eligible Receivables Pool that could have been sold to the Purchasers pursuant to the Master Purchase and Sale Agreement on a prior Closing Date but for (i) the Seller not having completed ministerial administrative procedures for such Receivable (such as validating receipt of the down payment) or (ii) the failure to satisfy the representations and warranties regarding the information provided for such Receivable on the related Schedule of Receivables in Section 5.2(cc)(iii) of the Master Purchase and Sale Agreement and clause (xxiv) of the definition of "Eligible Receivable" and such Receivables was removed or repurchased from a prior First Tier Receivables Pool or Receivables Pool, as applicable, solely as a result of such failure (and not for any other reason).

"Pricing Date" shall mean, with respect to any Receivables Pool, the date on which the Purchase Price is agreed, which date shall be no more than two (2) Business Days prior to such Closing Date.

"Pricing Model" has the meaning set forth in Section 2.3 of the Master Purchase and Sale Agreement.

"Pricing Model Amendments" has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

"Pricing Model Change Notice" has the meaning set forth in Section 2.3(a) of the Master Purchase and Sale Agreement.

"Pricing Termination Notice" has the meaning set forth in Section 2.3(b) of the Master Purchase and Sale Agreement

"Program" has the meaning set forth in Section 3.27 of the Master Servicing Agreement.

"Protective Measures" means the steps specified in Section 2(d) of the Master Confidentiality and Reconstitution Agreement.

"Public Securitization" means a public offering registered with the Commission or a private offering under Rule 144A of the Securities Act of asset backed securities backed by United States automotive retail installment sale contracts originated or acquired by Carvana or its Affiliates and sponsored by Carvana or any U.S. special purpose subsidiary thereof engaged in such offerings.

"Purchase Percentage" for an Origination Period, means, the percentage equal or greater than to (i) the aggregate Outstanding Principal Balance of all Receivables originated or acquired by the Seller to be sold to the Transferor on the related Closing Date pursuant to the Master Sale Agreement divided by (ii) the aggregate principal balance of all receivables originated or acquired by the Seller that meet the criteria described in the definition of "Eligible Receivable" and such other documented administrative criteria as the Purchasers may agree to from time to time during such Origination Period (which, for purposes of clause (ii) shall be reduced by the aggregate principal

balance of receivables with respect to which the applicable obligor has exercised its right to return the related financed vehicle and terminate the related receivable). In no event shall the Purchase Percentage be less than the value, expressed as a percentage, equal to the minimum sales amount of $300,000,000 for each Closing Date divided by the amount determined in clause (ii) of the preceding sentence, other than during the period from October 1, 2020 through March 22, 2021 when the Purchase Percentage will be 0%, and, in the event the Seller or the Transferor shall fail to notify the Purchasers of the Purchase Percentage for any Origination Period, the Purchase Percentage from the prior Origination Period shall apply.

"Purchase Price" means the price applicable to the Purchased Receivables purchased in any Receivables Pool, which shall be equal to (x) the sum of (i) the price for such Receivables Pool designated by the Pricing Model (for the avoidance of doubt, the Pricing Model will, for each Purchased Receivable in such Receivables Pool, (A) increase the related purchase price for any interest scheduled to accrue (ignoring any non-scheduled payment that may be received by the Seller) for the period from the date of origination (or, if such Purchased Receivable has at least one scheduled monthly payment occurring prior to the related Cutoff Date, from such most recent scheduled monthly payment date) through the related Closing Date and (B) decrease the related purchase price for the portion of any non-scheduled payment received by the Seller prior to the related Cutoff Date allocated to accrued interest) plus (ii) the Pre-closing Interest Carry Amount for such Receivables Pool as of the Closing Date, minus (y) the Flex Amount (if any) for such Receivables Pool.

"Purchased Property" has the meaning set forth in Section 3.1(a) of the Master Purchase and Sale Agreement.

"Purchased Receivables" means, as applicable, all Receivables purchased by CAR 2016-1 in any First Tier Receivables Pool pursuant to the Master Sale Agreement and all Receivables purchased by the Purchaser in any Receivables Pool pursuant to the Master Purchase and Sale Agreement.

"Purchasers" means either Ally Bank or Ally Financial, and its permitted successors and assigns, if the reference to "Purchaser" relates to Receivables purchased by a specified Purchaser, or both Ally Bank and Ally Financial, and their permitted successors and assigns, if the reference to "Purchaser" or "Purchasers" relates to the Receivables or the Receivables Pools as a whole, as the context may require.

"Purchaser Inspection Parties" has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

"Purchaser Obligation" has the meaning set forth in Section 2.1(b) of the Master Purchase and Sale Agreement.

"Purchaser Termination Option" has the meaning set forth in Section 2.4(b) of the Master Purchase and Sale Agreement.

"Purchasing Guidelines & Parameters" are as agreed upon by the Parties to the Master Purchase and Sale Agreement.

"Quarterly Operations Review" has the meaning set forth in Section 3.15(a) of the Master Servicing Agreement.

"Quarterly Review Event" has the meaning set forth in Section 3.15(c) of the Master Servicing Agreement.

"Quarterly Selection Standards Meeting" has the meaning set forth in Section 7.11(a) of the Master Purchase and Sale Agreement.

"Receivable" means a Contract for a Financed Vehicle and any amendments, modifications or supplements to such retail installment sale contract that is included in the Schedule of Receivables attached as Schedule 2 to each Second Step Pool Supplement. The term "Receivable" does not include any Repurchased Receivable.

"Receivable Files" means, with respect to each Receivable and the related Contract, collectively, the Original Contract Documents and the Servicer Files.

"Receivable Structure Constraints" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Receivables Pool" shall have the meaning given to such term in Section 4.1 of the Master Purchase and Sale Agreement.

"Receivables Pool CNL Ratio" means, for any Distribution Date, the ratio of (i) net losses with respect to the Receivables included in a Receivables Pool during the related Collection Period to (ii) the difference between the beginning balance of the Outstanding Principal Balance for such Collection Period and the ending balance of the Outstanding Principal Balance for such Collection Period, in each case with respect to the Receivables included in such Receivables Pool.

"Receivables Pool CNL Ratio Comparison" means, with respect to a Receivables Pool on any Distribution Date, (x) the Receivables Pool CNL Ratio for such Receivables Pool reported on any Distribution Date for the related Collection Period, divided by (y) the Carvana entire portfolio cumulative net loss ratio for the same Collection Period.

"Receivables Pool Schedule" has the meaning set forth in Section 4.1(a) of the Master Purchase and Sale Agreement.

"Receivables Purchase Rate" means, with respect to Receivables, the percentage equivalent of a fraction, the numerator of which is the Purchase Price for such Receivable, and the denominator of which is the Cutoff Date Aggregate Outstanding Principal Balance of such Receivables.

"Receivables System" means the principal computer system of the Servicer used in the servicing of retail installment sales contracts and direct purchase money loans, including back-up archives.

"Reconstitution" means a direct or indirect encumbrance, risk transfer or disposition of the Purchased Property, or any part thereof, by the Purchaser in the form of a whole loan sale transaction, a securitization transaction funded by securities sold to the public and/or private capital markets or by an asset backed commercial paper conduit, a synthetic transaction where all or a portion of the risk of loss on a reference pool of Receivables is transferred to an investor or counterparty, or any combination of the foregoing; provided, however, that the Purchaser shall not engage in more than three Reconstitutions with respect to the Receivables included in a Receivables Pool sold to the Purchaser under the Master Purchase and Sale Agreement on any Closing Date.

"Reconstitution Assets" has the meaning set forth in Section 3(a)(iii) of the Master Confidentiality and Reconstitution Agreement.

"Reconstitution Assets Servicing Agreement" has the meaning set forth in Section 3(c) of the Master Confidentiality and Reconstitution Agreement.

"Registrar of Titles" means with respect to any State, the governmental agency or body responsible for the registration of, and the issuance of certificates of title relating to, motor vehicles and liens thereon.

"Regulation AB" Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)), in the adopting release (Asset-Backed Securities Disclosure and Registration, Securities Act Release 33-9638, 79 Fed. Reg. 57,184 (September 24, 2014)) and in any adopting release in respect of any amendment with respect to any of the foregoing or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Regulator Inspection Parties" has the meaning set forth in Section 3.19(a) of the Master Servicing Agreement.

"Re-Liening Expenses" means, any costs associated with the revision of the Certificates of Title pursuant to Section 2.7 of the Master Sale and Purchase Agreement.

"Re-Liening Trigger Event" has the meaning agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"Relationship Manager" has the meaning set forth in Section 3.26 of the Master Servicing Agreement.

"Remediation" has the meaning set forth in Section 5.1(r) of the Master Servicing Agreement.

"Report of Assessment of Compliance with Servicing Criteria" has the meaning set forth in Section 3.12 of the Master Servicing Agreement.

"Reporting Date" means the 10th day of each calendar month or, if such day is not a Business Day, the next succeeding Business Day.

"Repurchased Receivable" means any repurchased Administrative Receivable or repurchased Warranty Receivable.

"Requirements of Law" means all (a) requirements of applicable federal, state and local laws, and regulations thereunder and (b) orders, decrees, directives, rules and binding guidelines of, or agreements, with any Governmental Authority that are directed to or binding on such Person or such Person's business, operations, services (including, with respect to the Servicer, the Servicer's obligation to service the Purchased Property on behalf of the Purchasers pursuant to the Master Servicing Agreement) or assets, including, in each case, usury laws, Utah banking laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Consumer Financial Protection Bureau's Regulations "B" and "Z," the Servicemembers Civil Relief Act of 2003, the Texas Consumer Credit Code, the United States Foreign Corrupt Practices Act of 1977, the Patriot Act and state adaptations of the National Consumer Act and the Uniform Consumer Credit Code and other consumer credit laws and equal credit opportunity and disclosure laws; provided, that, in each case with respect to clauses (a) and (b) above, with respect to the Servicer's obligations described in the Master Servicing Agreement, "Requirements of Law" shall not include any items described in clauses (a) or (b) above that are directed to or binding on Ally Financial or Ally Bank solely as a result of such Peron's status as a bank holding company or Utah charted bank, respectively, unless otherwise specified on Exhibit E to the Master Servicing Agreement. Following the Original Execution Date during the term of the Master Servicing Agreement, should the Servicer offer or enter into any subsequent agreement with another Person to service assets on behalf of such Person in compliance with, or provide indemnity for breach of, Requirements of Law applicable to Ally Financial or Ally Bank that are excluded from this definition as a result of the preceding proviso, then this definition shall be deemed to be modified to include such broader provision without any further action of the Parties.

"Responsible Officer" means, when used with respect to any Person, any officer of such Person, including any president, vice president, assistant vice president, secretary, assistant secretary or any other officer thereof customarily performing functions similar to those performed by the individuals who at the time shall be such officers, respectively, or to whom any matter is referred because of such officer's knowledge of or familiarity with the particular subject.

"Rule 193 Receivables" has the meaning set forth in Section 3(a)(iv) of the Master Confidentiality and Reconstitution Agreement.

"Schedule of Receivables" means, the list identifying the Receivables attached as Schedule 2 to each Second Step Pool Supplement (which list may be in the form of electronic file, microfiche, disk or other means acceptable to the Purchaser, or pursuant to the Master Sale Agreement).

"Scheduled Commitment Termination Date" means March 21, 2023.

"SEC Reporting Date" has the meaning set forth in Section 3.18(b) of the Master Servicing Agreement.

"Second Extension Amendment Effective Date" means November 2, 2018.

"Second Step Pool Supplement" means the Second Step Pool Supplement, in the form of Exhibit A to the Master Purchase and Sale Agreement executed by the Seller and the Purchaser on each Closing Date.

"Second Step Receivables Assignment" means the document of assignment attached as Schedule 2 to each Second Step Pool Supplement.

"Second Step Receivables Purchase Price" has the meaning set forth in Section 3.1(b) of the Master Purchase and Sale Agreement.

"Securities Act" means the Securities Act of 1933.

"Selection Procedures" means, the process for selecting Eligible Receivables for inclusion in any First Tier Receivables Pool and Receivables Pool pursuant to Section 3.1(d) of the Master Sale Agreement and Section 2.1(d) of the Master Purchase and Sale Agreement, respectively, whereby such First Tier Receivables Pool and Receivables Pool is selected by the Seller and Transferor utilizing the System of Record under a Freestyle Selection. Such selection shall be made subject to the Eligible Receivable criteria and Eligible Receivables Pool criteria and the sequential contract number assignment described in Section 2.1(d) of the Master Sale Agreement and Section 3.1(d) of the Master Purchase and Sale Agreement.

"Seller" means Carvana, as the seller of the CAR 2016-1 Purchased Property under the Master Sale Agreement, and its permitted successors and assigns.

"Seller Certificate of Title Review Trigger Event" has the meaning set forth in Section 3.16(g) of the Master Servicing Agreement."

"Seller Indemnified Parties" has the meaning set forth in Section 6.11(a) of the Master Sale Agreement.

"Servicer" means Bridgecrest as the servicer of the Receivables, or any permitted successor or assignee thereto under the Master Servicing Agreement.

"Servicer Coverage" has the meaning set forth in Section 3.22 of the Master Servicing Agreement.

"Servicer Files" means the documents specified in Section 2.1 of the Master Servicing Agreement.

"Servicer Indemnified Parties" has the meaning set forth in Section 5.2(a) of the Master Servicing Agreement.

"Servicer Review Trigger Event" has the meaning set forth in Section 3.15 of the Master Servicing Agreement.

"Servicer Termination Threshold Event" means, with respect to the sold Receivables Pools, on any Distribution Date, the aggregate CNL for such Receivables Pools shall be equal to 150% or greater of the aggregate Purchaser Estimated Cumulative Net Losses for such Receivables Pools on such Distribution Date.

"Servicing Criteria" means "Servicing Criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

"Servicing Exception" means any exceptions or supplements to the Collections Policy specified on Exhibit E to the Servicing Agreement (including any requirement of federal, state or local law, or any regulation or any order, decree, directive, rule and binding guideline of, or agreement, with any Governmental Authority applicable to either Purchaser solely as a result of such Purchaser's status as a bank holding company or Utah charted bank, as applicable, that the Purchasers determine requires revisions to the existing Collections Policy), as may be amended or supplemented from time to time by the Purchasers.

"Servicing Fee" means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Servicer for services rendered during the related Collection Period, which will be equal to one-twelfth of the

Servicing Fee Rate multiplied by the Pool Balance of such Receivables Pool as of the first day of such Collection Period; <u>provided</u> that in connection with any initial Collection Period that includes days falling in more than one calendar month, the Servicing Fee shall be calculated for such initial Collection Period giving effect to the reduction of the Pool Balance of such Receivables Pool as of the first day of each such calendar month following the related Cutoff Date during such initial Collection Period.

"<u>Servicing Fee Rate</u>" is as agreed upon by the Parties to the Master Servicing Agreement.

"<u>Settlement Date</u>" means with respect to each Origination Period, the third (3rd) Business Day of the last calendar week of such Origination Period; provided that on any date consented to by the Purchasers in their sole discretion, the "Settlement Date" will be the date consented to by the Purchasers.

"<u>Settlement Report</u>" has the meaning set forth in <u>Section 3.1(e)</u> of the Master Purchase and Sale Agreement.

"<u>Simple Interest Method</u>" means the method of allocating each monthly payment (including multiple monthly payments) on a Simple Interest Receivable to principal and interest, pursuant to which the portion of such payment that is allocated to interest is equal to the Outstanding Principal Balance thereon <u>multiplied</u> by the fixed rate of interest applicable to such Receivable <u>multiplied</u> by the period of time elapsed (expressed as a fraction of a calendar year) since the preceding payment of interest with respect to such Outstanding Principal Balance was made.

"<u>Simple Interest Receivable</u>" means any Receivable under which the portion of each payment allocable to earned interest and the portion allocable to the principal is determined in accordance with the Simple Interest Method. For purposes hereof, all payments with respect to a Simple Interest Receivable shall be allocated to principal and interest in accordance with the Simple Interest Method.

"<u>SOC 1</u>" has the meaning set forth in <u>Section 3.13</u> of the Master Servicing Agreement.

"<u>Specified Variables</u>" is as agreed upon by the Parties to the Master Sale Agreement and Master Purchase and Sale Agreement.

"<u>State</u>" means any of the 50 states of the United States of America, or the District of Columbia.

"<u>Supplemental Fees</u>" means, with respect to a Receivables Pool as of any Distribution Date, the fee payable to the Purchaser during the related Collection Period, determined pursuant to and defined in <u>Section 3.10(b)</u> of the Master Servicing Agreement.

"<u>Supplemental Servicing Fees</u>" means, with respect to a Receivables Pool as of any Distribution Date, all late fees, prepayment charges and other administrative fees and expenses or similar charges allowed by applicable law with respect to related Receivables, collected (from whatever source) on the Receivables serviced by the Servicer during the related Collection Period.

"<u>System Description</u>" means (a) prior to the E Sign Transition Period, the written description of the eOriginal e-contract system attached to the Master Sale Agreement as <u>Exhibit C</u> and the Master Purchase and Sale Agreement as <u>Exhibit F</u>, (b) during the E-Sign Transition Period, either (i) the written description of the eOriginal e-contract system attached to the Master Sale Agreement as <u>Exhibit C</u> and the Master Purchase and Sale Agreement as <u>Exhibit F</u> or (ii) the written descriptions of the eOriginal, Inc. Authoritative Copy System Description and the DocuSign System Description Authoritative Copy attached to the Master Sale Agreement as <u>Exhibit D</u> and the Master Purchase and Sale Agreement as <u>Exhibit G</u> , and (c) after the E Sign Transition Period, the written descriptions of the eOriginal, Inc. Authoritative Copy System Description and the DocuSign System Description Authoritative Copy attached to the Master Sale Agreement as <u>Exhibit D</u> and the Master Purchase and Sale Agreement as <u>Exhibit G</u>.

"<u>System of Record</u>" means the computer system and programs in place on the date that the Master Sale Agreement and Master Purchase and Sale Agreement become effective (as such system may be updated or otherwise modified) utilized by the Seller to select Receivables for each First Tier Receivables Pool and Receivables Pool

under the Master Sale Agreement and by the Transferor to select Receivables for each Receivables Pool under the Master Purchase and Sale Agreement, respectively.

"TPSM" means Ally Bank's Third Party Supplier Management team.

"Title Intermediary" means, VINTek or another title administration service provider approved in writing by the Seller and Purchasers.

"Title Lien Nominee" means Carvana or GFC Lending LLC (or any other name approved in writing by the Purchasers).

"Three-Month Average Receivables Pool CNL Ratio Comparison" means, on any Distribution Date, the average of the Receivables Pool CNL Ratio Comparison with respect to a Receivable Pool for such Distribution Date and the two Distribution Dates preceding such Distribution Date.

"Transferor" means Carvana Auto Receivables 2016-1 LLC, a Delaware limited liability company, and its permitted successors and assigns.

"Transferor Obligation" has the meaning set forth in Section 2.1(a) of the Master Purchase and Sale Agreement.

"Transferor Termination Option" has the meaning set forth in Section 2.4(a) of the Master Purchase and Sale Agreement.

"Treasury Regulations" means the regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"UCC" means the Uniform Commercial Code as in effect in any relevant jurisdiction, from time to time.

"Upper Bound FICO Score" has the meaning agreed upon by the Parties to the Master Sale Agreement and the Master Purchase and Sale Agreement.

"Vehicle Age" with respect to a Financed Vehicle, means the year of origination of the Contract for such Financed Vehicle minus the model year of such Financed Vehicle.

"Warranty Payment" means, with respect to a Warranty Receivable within a First Tier Receivables Pool or a Receivables Pool, as applicable, to be repurchased as of the last day of a Collection Period, a payment equal to the sum of (i) the product of (a) the Outstanding Principal Balance with respect to such Warranty Receivable as of such date and (b) the Receivables Purchase Rate, or solely with respect to any Receivable being repurchased pursuant to Section 7.2(ii) of the Master Sale Agreement or Section 8.2(ii) of the Master Purchase and Sale Agreement, and (ii) the product of (x) the amount set forth in clause (i) above, (y) the APR of such Administrative Receivable and (z) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) (1) for a Flex Receivable prior to receipt of the first scheduled payment, the actual number of days from the related Cutoff Date through the repurchase date, divided by 360 or (2) in all other cases, 30/360.

"Warranty Receivable" means a Receivable which the Transferor has repurchased pursuant to Section 8.2 of the Master Purchase and Sale Agreement or Seller has repurchased pursuant to Section 7.2 of the Master Sale Agreement.

\* \* \* \* \*

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia III, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:     November 3, 2022                                      /s/ Ernest C. Garcia, III
                                                                Ernest C. Garcia, III
                                                                *Chairman and Chief Executive Officer*

Exhibit 31.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    November 3, 2022                                    /s/ Mark Jenkins
                                                             Mark Jenkins
                                                             *Chief Financial Officer*

Exhibit 32.1

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        November 3, 2022                                     /s/ Ernest C. Garcia, III

                                                                 Ernest C. Garcia, III
                                                                 *Chairman and Chief Executive Officer*

Exhibit 32.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2022, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:       November 3, 2022                                            /s/ Mark Jenkins
                                                                       Mark Jenkins
                                                                       *Chief Financial Officer*

# Exhibit 31

# No titles, no registration: Car owners in Ohio file complaints against Carvana

 **myfox28columbus.com**/news/problem-solvers/no-titles-no-registration-car-owners-in-ohio-file-complaints-against-carvana-vehicles-bureau-of-motor-vehicles-bmv-attorney-general-david-yost

by Lisa Rantala

Tue, November 22nd 2022 at 3:05 PM
Updated Wed, November 23rd 2022 at 11:28 PM





1/5



5

VIEW ALL PHOTOS



Andrew Turner purchased this red 2017 Honda Accord from a Carvana dealer in Kentucky more than a year ago. Since then, the company has sent him three temporary tags, but no title to register the car in Ohio. November 22, 2022 (WSYX)

COLUMBUS, Ohio (WSYX) — Many Ohio drivers say they were promised a stress-free car purchase from big-named vendor Carvana. Now, they say they're facing the most stressful time of their lives.

Nearly 200 complaints have come into the state from drivers saying they're forced to drive their cars illegally. Consumers are also calling ABC6 On Your Side Problem Solvers for help.

"Carvana is such a big name. It was so easy and convenient," Andrew Turner told Problem Solvers last month. "I just thought there's no way that they would be legally able to do that, that quickly and not have their ducks in a row."

Turner purchased his 2017 Honda Accord more than a year ago from a Carvana dealer in Kentucky. However, a dashcam video obtained by Problem Solvers shows the same car stopped this summer by Washington Court House Police. Officers indicated they pulled the car over since they did not see a tag. Once stopped, the temporary tag Turner's wife provided did not come back to Ohio or Kentucky. She told police Carvana has issued them three temporary tags but no title so they can register their car.

> "I don't think it's stolen or nothing, but you need to get ahold of Carvana," the lead officer of the traffic stop told Turner's wife. "That's on Carvana, not on you. You need to tell them, 'I need the title to this car. I've had it for over a year. You're giving me continuous 45-day plates which is illegal.' They can't do that."

In Ohio, drivers are required to register their cars 30 days after purchase. To do that, the Bureau of Motor Vehicles needs a title. However, complaints filed with Ohio Attorney General David Yost on Carvana state the vendor has not fulfilled the requirements to provide the title months and even a year after purchase.

A New Albany woman reported Carvana offered her $500 for Uber and Lyft since she could not drive her car without a title.

An active military man in Stark County claimed his lender was going to increase his interest rate to 18% due to no title.

In Guernsey County, a deputy sheriff wrote, "I'm paying monthly for a vehicle that cannot be operated. I need my car registered so I can get to work."

Heather Stacy in Kent, Ohio told Problem Solvers she was about to acquire her sixth temporary tag from the BMV since she also doesn't have a title. Since she's obtained so many, the Ohio AG's office must approve future tags.

> "Someone really needs to step in and help the consumers like me," said Stacy.

3/5

Other states like Illinois and North Carolina have suspended Carvana from selling cars due to their own investigations into undelivered titles and registration failures. Florida has issued two administrative complaints against the company. Consumer attorneys in Pennsylvania filed a class-action lawsuit against Carvana in federal court.

"There's something rotten at its core here and the disturbing thing is that it's not being fixed," said Pennsylvania attorney Robert Cocco who filed the lawsuit. He's looking to recoup the fees collected for titles and registrations that never happened along with other damages the lack of both has caused.

"People have been put in jail, literally, and have had to post a bond to get out," Cocco told Problem Solvers.

In Ohio, the Secretary of State's website shows none of Carvana's licenses have been canceled. Despite repeated complaints, five of the vendor's six titles in Ohio remain active.

Problem Solvers requested an interview with Ohio Attorney General David Yost about his response to the Carvana complaints. Within a week of his re-election, Yost's communications team sent Problem Solvers this email,

> "At this time we'll pass on an interview; however, Ohioans who suspect unfair business practices should contact the Ohio Attorney General's Office at OhioProtects.org or 800-282-0515. We can neither confirm nor deny the existence of or potential for any investigation."

Problem Solvers reached out to the Ohio Department of Public Safety to ask what action the agency might have taken. They provided us with the following statement:

*"Ohio law requires that vehicles must be titled in Ohio to receive an Ohio temporary tag. In December of 2020, the Ohio BMV became aware of an inordinately high number of recent temporary tag issuances by Carvana. After investigating the matter, it was determined that the issuances did not comply with Ohio law. The Ohio BMV subsequently suspended temporary tag issuance privileges for all applicable Carvana locations in Ohio.*

*After a number of meetings with Carvana representatives and written assurance that prior practices have been halted, temporary tag issuance permission was reinstated in the Ohio dealer licensed Carvana locations that offer motor vehicles for sale. The Ohio BMV continues to monitor Carvana to ensure compliance with Ohio law.*

*Customers in Ohio who have not received a title within the statutorily mandated timeline for a vehicle they purchased should contact the Ohio Attorney General's Office to seek assistance."*

Problem Solvers also reached out to Carvana and is waiting for a comment.

Last week, national reports indicated Carvana plans to lay off about 8% of its workforce, which is about 1,500 employees. Chief executives reportedly stated the eliminations come as the company is facing economic headwinds and an uncertain future.

5/5